IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | NO. 1:10CR485 (LMB) |
| JEFFREY ALEXANDER STERLING, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## <u>MOTION FOR PRETRIAL DETENTION</u>

Comes now the United States of America, by and through its Attorneys, Neil H. MacBride,

United States Attorney for the Eastern District of Virginia; William M. Welch II, Senior

Litigation Counsel, Criminal Division; Timothy J. Kelly, Trial Attorney, Public Integrity

Section, Criminal Division; and James L. Trump, Senior Litigation Counsel, United States

Attorney's Office, and moves the Court to order the defendant detained pending trial.

As grounds, the Government states that the defendant poses a danger to certain individuals

and the community at large, and there is no combination of conditions that can reasonably assure

the safety of the community.[1]  Put simply, the Indictment alleges that when the Cental

Intelligence Agency (hereinafter "CIA") took legal positions perceived by the defendant as

adverse to his interests in various administrative and civil actions filed by the defendant, the

---

[1]  The Pre-Trial Services Report prepared in the Eastern District of Missouri identified at least one other significant fact that is directly relevant to the issue of danger to certain individuals and danger to the community at large.  Given the confidentiality of the Report and the related issue, the Government will not address that fact in this publicly filed motion.  Instead, that fact can be addressed under seal or at sidebar at the detention hearing.  The Government's position, however, is that the issue needs to be resolved prior to the defendant's release.

defendant retaliated against the CIA by leaking highly classified information. The defendant facilitated those illegal disclosures of classified information through the telephone, e-mail, and face-to-face meetings.

The threat of continued criminal activity by this defendant requires his detention. By virtue of his former employment as a CIA case officer, the defendant participated in highly classified programs, worked with human assets and current and former CIA employees whose roles and identities remain classified, and possesses other highly classified information. Also by virtue of his former employment at the CIA, the defendant has been trained in clandestine tradecraft, including the use of communication techniques that avoid detection. Given the defendant's pattern and propensity of illegally disclosing classified information when the Government takes adverse action against him, and his training and experience that may facilitate his doing so in response to the present Indictment, this matter warrants detention to protect the lives of various individuals and to protect the community against further illegal disclosures of classified information.

## I.     Background

On December 22, 2010, the defendant was indicted in this district. On January 6, 2011, the defendant was arrested in St. Louis, Missouri, in the Eastern District of Missouri, and made his initial appearance before United States Magistrate Judge Terry I. Adelman, who ordered the defendant detained pending a detention hearing. On January 10, 2011, the defendant waived his right to a detention hearing in the Eastern District of Missouri and requested a detention hearing in the Eastern District of Virginia.

The defendant worked at the CIA from 1993 to 2002.  *Indictment*, ¶5. After serving as a career trainee for eighteen months, the defendant worked as an operations officer for various divisions within the CIA for approximately the next five years.  *Id*.  From November 1998 through May 2000, he served as the case officer assigned to a highly classified clandestine operational program designed to impede the weapons capabilities of certain countries, including Country A (hereinafter "Classified Program No. 1").  *Id*. at ¶ 16.  During that same time frame, the defendant was also the case officer assigned to handle the human asset associated with that program (hereinafter "Human Asset No. 1").  *Id*. at ¶¶ 14, 16.

In connection with his employment, the defendant signed five separate security and non-disclosure agreements in which he agreed never to disclose classified information to unauthorized persons.  *Id*. at ¶¶ 8-10.  In each one of these agreements, the defendant also acknowledged that the unauthorized disclosure of classified information could constitute a criminal offense.  *Id*. at ¶¶ 8-10.  Finally, in each one of these agreements, the defendant agreed that he would surrender any classified information in his possession at the conclusion of his employment.  *Id*. at ¶ 11.

Beginning in August 2000, the defendant began to pursue various administrative and civil actions against the CIA concerning alleged employment-related racial discrimination and decisions made by the CIA's Publications Review Board regarding the defendant's desire to publish his memoirs.  *Id*. at ¶¶ 18, 20.  The defendant's anger and resentment grew over the CIA's decisions in these matters to such an extent that, for example, on January 7, 2003, he told a Publications Review Board member that he would come at the CIA "with everything at his

disposal." *Id*. at ¶¶ 18, 31.  On February 12, 2003, the CIA rejected Sterling's third offer to

settle his discrimination lawsuit.  *Id*. at ¶ 33.

In retaliation for these decisions by the CIA, beginning on February 27, 2003, and

continuing through March 29, 2003, the defendant made various telephone calls from his

residence in Herndon, Virginia, within the Eastern District of Virginia, to Author A's residence

and emailed Author A a newspaper article about the weapons capabilities of Country A.  *Id*. at ¶¶

34, 37, 38.  Shortly thereafter, in April 2003, the Author A had several conversations with the

CIA's Office of Public Affairs, seeking comment about a newspaper article that the author

intended to write concerning Classified Program No. 1, the program for which the defendant had

been the case officer.  *Id*. at ¶¶ 39-42.  These conversations revealed that unauthorized

disclosures of classified information about Classified Program No. 1 to Author A had occurred.

However, after a meeting in which senior government officials explained the classified nature of

the program, the national security implications of disclosing the program, and the imminent

danger the human asset associated with the program could face by its disclosure, Author A's

employer, a national newspaper, agreed not to publish the article.  *Id*. at ¶¶ 42, 43.

From December 2003 through November 2005, despite the national newspaper's decision

not to publish the story, the defendant and Author A remained in touch via telephone and email.

*Id*. at ¶¶ 44-54.  During this time frame, the defendant provided more classified information,

including information that enabled Author A to travel and gather more information for a

forthcoming book.  *Id*. at ¶ 53.  Ultimately, in January 2006, Author A published a book that

contained information about Classified Program No. 1 and Human Asset No. 1.  *Id*. at ¶ 55.  The

defendant's illegal disclosures of classified information for the unsuccessful publication of the

newspaper article in March and April 2003 and later for the successful publication of Author A's

book in January 2006 form the basis of the charges in the present Indictment.

## II.   The Defendant Should Be Detained Because the Defendant Is a Danger to Certain Persons and the Community At Large.

A defendant may be detained only if a judicial officer "'finds that no condition or

combination of conditions will reasonably assure the appearance of the person as required and

the safety of any other person and the community.'" *United States v. Clark,* 865 F.2d 1433,

1435-36 (4th Cir. 1989)(quoting 18 U.S.C. § 3142(e)).  *See also United States v. Salerno,* 481

U.S. 739 (1987).  A judicial officer's finding of dangerousness must be "'supported by clear and

convincing evidence.'" *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010)(quoting 18

U.S.C. § 3142(f)(2)(b)).  Although the default position under the law is release, the fact remains

that detention may be warranted where no combination of conditions will reasonably assure the

safety of any other person and the community, even in instances where no rebuttable

presumption of detention applies.  *Stone*, 608 F.3d at 945-46, 948 fn.7 (noting two Sixth Circuit

cases upholding pre-trial detention based upon danger of further illegal activity even though the

court did not address the respective defendants' propensity for violence in either case).

A.  Danger to Certain Persons

The defendant's release poses two immediate forms of danger:  danger to the lives of

particular individuals and danger to the community at large.  As alleged in the Indictment, "[i]n

retaliation for the CIA's refusal to settle on terms favorable to defendant STERLING, as well as

other decisions made by the CIA, defendant STERLING caused and attempted to cause the

publication of classified information about Classified Program No. 1 and Human Asset No. 1

that defendant STERLING characterized in a false and misleading manner." *See Indictment*, ¶18.

The consistent pattern of the defendant's illegal disclosure of classified information when faced with adverse action by the Government is striking and undeniable. More specifically, when the CIA rejected a settlement offer on October 30, 2001, the defendant illegally disclosed classified information by November 3, 2001. *Id*. at ¶¶ 22, 23. When the CIA rejected another settlement offer on February 12, 2003, the defendant illegally disclosed more and different classified information within weeks. *Id*. at ¶¶ 33, 34. As the CIA successfully obtained dismissal of the defendant's underlying civil complaint and defended the district court's decision on appeal, *see Sterling v. Tenet*, 416 F.3d 338, 341-42 (4th Cir. 2005), the defendant illegally disclosed or caused the disclosure of classified information. *Indictment* at ¶¶ 44-54.

In making these illegal disclosures, the defendant put the life of at least one individual in great danger. This individual, identified as Human Asset No. 1 in the Indictment, *see Indictment*, ¶ 14, played a role in Classified Program No. 1. The defendant's illegal disclosures revealed certain identifying information about Human Asset No. 1 that placed Human Asset No. 1 in great danger. *Id*. at ¶ 42. The threat to Human Asset No. 1 was so great that certain United States government officials cited the danger to Human Asset No. 1 as one reason why Author A's employer should not publish a newspaper article about Classified Program No. 1 in late April 2003. *Id*. at ¶ 42. The perceived danger to Human Asset No. 1 as well as other reasons were apparently significant enough to cause Author A's employer not to publish the newspaper article. *Id*. at ¶ 43. By continuing to illegally disclose or cause the disclosure of classified

information, the defendant remained unabated in his desire to retaliate against the Government, no matter the cost of any human's life.  *See Indictment* at ¶¶ 44-54.

Human Asset No. 1, however, would not be the only person placed in danger by the defendant's release, again given the defendant's pattern and propensity of illegally disclosing classified information when confronted with adverse Government action.  The defendant knows the true names and identities of all of the current and former CIA employees involved with Classified Program No. 1, some of whom remain within covert status at the CIA.  The defendant, a trained lawyer, presumably knows that these individuals must be potential witnesses.  The mere revelation of their true identities could endanger their lives and certainly would ruin their careers.  Given the blatant disregard with which the defendant held Human Asset No. 1's life over an issue so unremarkable as money, the defendant's efforts at retaliation would likely extend to those who the defendant believed may have played some part in the current charges when the defendant's liberty is at stake.  Detention would guarantee a level of confidence and security in knowing that the defendant would not be able to harm them or jeopardize their careers through the unauthorized disclosure of classified information.

B.  Danger to The Community at Large

The second danger posed by the defendant is the danger to the community posed by the defendant's likelihood of continuing to make illegal disclosures of classified information.  The "safety of the community" concern expressed in 18 U.S.C. § 3142 encompasses more than merely danger of harm involving physical violence.[2]  Courts have recognized that a threat to the

---

[2]  The legislative history of §3142 supports this interpretation.  *See* S.Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3195 ("The reference to safety of any other person is intended to cover the situation in which the safety of a particular

safety of the community may include, for example, a continuing generalized threat of criminal

activity.  *See Stone*, 608 F.3d at 948 fn.7 (noting two Sixth Circuit cases upholding pre-trial

detention based on continuing criminal activity); *United States v. Millan,* 4 F.3d 1038, 1048 (2d

Cir. 1993)(holding that "[t]he Bail Reform Act's concept of dangerousness covers the effect of a

defendant's release on the safety of identifiable individuals, such as a victim or witness, as well

as 'the danger that the defendant might engage in criminal activity to the detriment of the

community.'" (quotation omitted)); *United States v. Reynolds,* 956 F.2d 192 (9th Cir. 1992)

(holding that "danger may, at least in some cases, encompass pecuniary or economic harm.");

*United States v. Provenzano,* 605 F.2d 85, 95 (3rd Cir. 1979)(holding that danger not limited to

physical harm, but may include the opportunity to exercise a substantial and corrupting influence

within a labor union).

There can be no doubt that protecting the nation's security secrets is vital and important.

As the Supreme Court has noted,  "[i]t is 'obvious and unarguable' that *no governmental interest

is more compelling* than the security of the Nation."  *Haig v. Agee*, 453 U.S. 280, 307 (1981)

(emphasis added).  More particularly, "'[t]he Government has a substantial interest in protecting

sensitive sources and methods of gathering information,'" *United States v. Abu Ali*, 528 F.3d

210, 247 (4th Cir. 2008) (quoting *United States v. Smith*, 780 F.2d 1102, 11085 (4th Cir. 1985)),

and "'in protecting both the secrecy of information to our national security and the appearance of

confidentiality so essential to the effective operation of our foreign intelligence service.'" *Abu*

---

identifiable individual, perhaps a victim or witness, is of concern, while the language referring to
the safety of the community refers to the danger that the defendant might engage in criminal
activity to the detriment of the community.  The committee intends that the concern about safety
be given a broader construction than merely danger of harm involving physical violence.").

*Ali*, 528 F.3d at 247 (quoting *C.I.A. v. Sims*, 471 U.S. 159, 175 (1985)).  Any continuing criminal threat to national security interests logically must fall within the purview of the Bail Reform Act.

The threat of continued illegal disclosures of classified information posed by the defendant's release is great.  The defendant's *modus operandi* is to disclose classified information when he perceives that he has been wronged by the Government.  His decisions and actions were deliberate, methodical, and unrelenting.  The defendant spent almost three years disclosing and causing the disclose of classified information to retaliate against the CIA.  By virtue of his former employment, the defendant has knowledge of other classified programs, the identities of other human assets and other current and former CIA employees, and other classified information.  That the defendant left the employment of the CIA in January, 2002 does not lessen the significance of the classified information presently possessed by the defendant.

When faced with this criminal Indictment, it is very likely, based upon his past behavior, that the defendant will retaliate in the same deliberate, methodical, vindictive manner.  The defendant's unauthorized disclosures of classified information may not occur immediately, but his pattern and practice should inform the Court that they will likely happen.  The only practical and effective of way of preventing those disclosures from occurring is by detention.

C.  Inability of Non-Detention Methods to Protect the Safety of Persons or the Community

The defendant was a CIA case officer by training.  He received at least one assumed identity for employment purposes.  The defendant knows how to engage in clandestine tradecraft.  Among other things, he knows how to use the telephone to avoid detection, to arrange face-to-face meetings to reduce the likelihood of being spotted, and to expose counter-surveillance efforts.  As alleged in the Indictment, the defendant used the telephone and email to

facilitate his disclosures of classified information, and did so in a way to avoid detection.  *See Indictment* at ¶¶ 19, 34, 37, 38, 44-51, 54.

Home detention and electronic monitoring are insufficient because the only way to protect certain persons and the community at large from the harm caused by the defendant's additional illegal disclosures of classified information is to deny the defendant access to the telephone and the Internet and regulate who may visit the defendant at home.  Simply placing the defendant in pre-trial home detention and under electronic monitoring "does not minimize the very real possibility that further similar criminal conduct could be carried out from home."  *See United States v. Bergrin,* 2009 WL 1560039 at 9 (D.N.J. 2009).  Since the defendant used the telephone, the Internet and face-to-face meetings to illegally disclose classified information in this case, it would be impossible to prevent his continued criminal activity without more stringent conditions.

The addition of more stringent conditions, however, would not solve the problem.[3] Prohibiting or severely restricting the defendant's use or access to a computer or telephone "is a difficult condition of release to enforce."  *See Bergrin,* 2009 WL 1560039 at 9 (D.N.J. 2009). *See also United States v. Voelker,* 489 F.3d 139, 145 (3d Cir. 2007)(stating that "[t]he ubiquitous presence of the internet and the all-encompassing nature of the information it contains are too

---

[3]  The Government would consider a bail package that included, among other things, restrictions on the defendant's access to and use of the telephone and the Internet as well as personal contacts outside of immediate family members and his legal representatives.  However, the Government's position in this regard assumes that a set of restrictions could be crafted that are practicable and enforceable, and sufficiently stringent to provide some level of confidence that any more disclosures of classified information would not and could not happen again. While the Government has reservations about the feasability of such a set of conditions, the Government remains open to considering such a bail package if presented

obvious to require extensive citation or discussion.").  In the end, prohibiting or severely restricting the defendant's use or access to a computer or telephone and regulating his visitors would do no more than "'elaborately replicate a detention facility without the confidence of security such a facility instills.'"  *Bergrin,* 2009 WL 1560039 at 9 (quoting *United States v. Gotti*, 776 F.Supp. 666, 672 (E.D.N.Y.1991)).  *See also United States v. Orena,* 986 F.2d 628,632-33 (2d Cir. 1993)(finding $4 million bail package for both defendants secured by family homes and property, home confinement. restricted visitation and phone calls and consent to government searches insufficient to address dangerousness).  The cost to national security and the danger posed to the careers and lives of certain individuals is simply too high not to require the defendant's detention in this matter.

In the end, any conditions that this Court may consider imposing would require the Court to trust and rely upon the defendant's agreement not to violate his conditions of release and, more specifically, not to illegally disclose any classified information.  Yet the defendant's history of honoring similar types of agreements is abysmal.  Despite agreeing on five separate occasions that he would never disclose classified information, *see Indictment* at ¶¶ 8-10, the defendant did so repeatedly over the course of a three year period.   This Court simply cannot trust the defendant to adhere to a similar promise when he so readily violated such a promise in the past.

## III.   All of the Section 3142(g) Factors Weigh in Favor of Detention

### A.   The Nature and Circumstances of the Offenses Charged

The charges contained in the present indictment are serious.  The charges involve the unauthorized disclosure of highly classified information related to Classified Program No. 1, a

program designed to impede the progress of the weapons capabilities of certain countries.  These

charges, when coupled with the defendant's underlying selfish and vindictive motivations and

apparent lack of concern for the safety of Human Asset No. 1, "indicate a strong threat to

society."  *Stone*, 608 F.3d at 947.

The defendant's unauthorized disclosures, however, may be viewed as more pernicious

than the typical espionage case where a spy sells classified information for money.  Unlike the

typical espionage case where a single foreign country or intelligence agency may be the

beneficiary of the unauthorized disclosure of classified information, this defendant elected to

disclose the classified information publicly through the mass media.  Thus, every foreign

adversary stood to benefit from the defendant's unauthorized disclosure of classified

information, thus posing an even greater threat to society.

B.  The Weight of the Evidence Against the Defendant

"This factor goes to the weight of the evidence of dangerousness, not the weight of the

evidence of the defendant's guilt."  *Id*. at 948.  The Government previously addressed this factor

in Section II.

C.  The History and Characteristics of the Defendant

"Courts have never required a prior criminal record before ordering detention."  *Id*. at 950.

"'Although a prior record of violence eases the government's burden of showing dangerousness,

it is not essential.'"  *Id*. (quoting *United States v. Rodriguez*, 950 F.2d 85, 88 (2nd Cir. 1991).  A

single threat to a police officer may be sufficient to show a danger to the community. *Stone*, 608

F.3d at 950 (citing *United States v. Gomez-Fernandez*, 1999 WL 992985 at *2 (10th Cir. 1999)).

The history and characteristics of the defendant seemingly would support release.  The defendant does not have a criminal record.  He has no known substance abuse problem.  He has been employed for the past six years.  He is married, and owns his own home in Missouri, where he has resided since 2003.  He has not been employed by the CIA since 2002.

However, looking beyond these otherwise innocuous facts, the truly relevant history and characteristics of the defendant support detention.  With the return of the Indictment, there is every reason to believe that the defendant's desire to exact revenge upon the Government has increased exponentially, rather than abated.  Despite the fact that he is no longer an employee of the CIA, the defendant retains his training in clandestine tradecraft that he could use to facilitate the disclosure of classified information.  He retains the knowledge of certain classified programs, and the identities of many current and former employees of the CIA.  He retains the knowledge of how to develop relationships with members of the media to make those disclosures as damaging as possible.  And in any event, his conduct that facilitated the illegal disclosure of classified information continued long *after* he left the CIA, settled in Missouri, and found gainful employment there.[4]

Indeed, from December 2003 through November 2005, the defendant and Author A communicated via telephone and email. *Indictment*, ¶¶ 44-54.  During this time frame, the defendant received a Federal Express package from Author A that related to the defendant's unauthorized disclosures of classified information to Author A. *Id*. at ¶ 50.  In November 2004, the defendant enabled Author A's travel to a foreign country to gather more information for the

---

[4] Finally, as mentioned in footnote 1, there remains the outstanding issue that needs to be resolved prior to his release.

forthcoming book by having provided certain classified information regarding the operational details of Classified Program No. 1 and Human Asset No. 1. *Id*. at ¶ 53. Finally, in approximately March 2005, while the defendant's now-wife was away for the weekend, Author A traveled to Missouri and met with the defendant.

Thus, while at first blush the defendant's history and characteristics would support release, they in fact do not. The defendant's personal history and characteristics in fact are no bar to his continued criminal activity. His former employment as a CIA case officer and knowledge and practice of clandestine tradecraft would only serve to facilitate continued criminal activity.

D. The Nature and Seriousness of the Danger to Any Person or the Community

The Government previously addressed this factor in Section II.

**IV.   Conclusion**

Based upon the foregoing, no conditions of release will reasonably assure the safety of any

person or the community.  Accordingly, the Government requests the Court order the defendant

detained prior to trial.

Respectfully submitted,

Neil H. MacBride
United States Attorney

William M. Welch II
Senior Litigation Counsel
Criminal Division
United States Department of Justice

Timothy J. Kelly
Trial Attorney
Public Integrity Section
United States Department of Justice

James L. Trump
Senior Litigation Counsel
United States Attorney's Office
Eastern District of Virginia

By: _____/s/_____
James L. Trump
Attorney for the United States of America
United States Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone:  703-299-3726
Fax: 703-299-3981
Email Address: jim.trump@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused an electronic copy of the *Motion for Pretrial Detention*

to be served via ECF upon Edward B. MacMahon, Jr., counsel for defendant Sterling.


By:          /s/
          James L. Trump
          Attorney for the United States of America
          United States Attorney's Office
          Justin W. Williams U.S. Attorney's Building
          2100 Jamieson Avenue
          Alexandria, Virginia 22314
          Phone:  703-299-3726
          Fax: 703-299-3981
          Email Address: jim.trump@usdoj.gov