UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

UNITED STATES

v.

JEFFREY ALEXANDER STERLING,

Defendant.

No. 1:10cr485 (LMB)

## AFFIDAVIT OF JAMES RISEN

DISTRICT OF COLUMBIA  ) ss.:

JAMES RISEN, being first duly sworn, deposes and says:

1.     I am a reporter for *The New York Times* ("*The Times*") and the author of *State of War: The Secret History of the CIA and the Bush Administration* ("*State of War*"). I submit this affidavit in opposition to a motion in limine by the Government to admit my testimony and in support of a motion to quash a trial subpoena directed at me in connection with the criminal trial of Jeffrey Sterling. The subpoena, which calls for information about the identity of confidential source(s) that I used in reporting certain information in Chapter 9 of *State of War*, is attached hereto as Exhibit 1. A copy of *State of War* is submitted with this affidavit as Exhibit 2.

2.     I am fully familiar with the facts set forth herein. The exhibits attached to this affidavit are true and accurate copies of the documents cited herein.

3.     This is the third time a subpoena has been directed at me calling for testimony about my confidential source(s) for Chapter 9. The first subpoena directed at me was a grand jury subpoena issued on January 24, 2008. ████████████████████████ ████████████████████████████ A second grand

jury subpoena directed at me was issued on April 26, 2010.



4.

5.      Since my graduation from Brown University in 1977 and receiving a Masters Degree from the Medill School of Journalism at Northwestern University in 1978, I have been a reporter. In 1978 through 1979, I worked as a reporter at the *Fort Wayne (Indiana) Journal Gazette*. In 1980 and 1981, I worked as a business reporter at the *Miami Herald*. From 1981 to 1984, I was a reporter at the *Detroit Free Press*, covering the auto industry. From 1984 until 1990, I was the Detroit Bureau Chief of the *Los Angeles Times*, covering news in Detroit and throughout the Midwest. In 1990, I transferred to the Washington Bureau of the *Los Angeles Times,* and covered economic policy for five years. In 1995, I began to cover intelligence and national security for the *Los Angeles Times* in Washington. In 1998, I joined *The New York Times* in the Washington Bureau, where I have worked ever since as an investigative reporter, largely focusing on intelligence, national security and terrorism.

6.      I have won a number of awards in connection with my newspaper reporting. In 2002, I was a member of *The New York Times* reporting team that won the Pulitzer Prize for Explanatory Reporting for coverage of the Sept. 11 attacks and terrorism. In 2006, I won the Pulitzer Prize for National Reporting, for reporting that revealed the existence of President Bush's legally questionable domestic wiretapping program. In awarding the prize, the Pulitzer board cited my "carefully sourced stories on secret domestic eavesdropping that

stirred a national debate on the boundary line between fighting terrorism and protecting civil liberty."

   7. In 2006, I was awarded the Goldsmith Prize for Investigative Reporting, for reporting on President Bush's illegal domestic wiretapping program.  The Goldsmith Prize is given annually by the Joan Shorenstein Center on the Press, Politics and Public Policy at the John F. Kennedy School of Government at Harvard University to "honor journalism that promotes more effective and ethical conduct of government by disclosing excessive government secrecy, impropriety, and mismanagement."  To the best of my ability, I try to write stories that I believe fit the mission of the Goldsmith Prize.

   8. In 2007, I was elected to the American Academy of Arts and Sciences. That same year, after winning a Publisher's Award from *The New York Times*, I received a personal letter from Arthur O. Sulzberger, Jr., the publisher of the newspaper. "Your investigative reporting has been an extraordinary asset to the paper since the day you joined us," Mr. Sulzberger wrote to me. "But it has now become a central reason that our Washington report is admired by our readers — not to mention leaders around the nation and the world."

   9. It was my reporting, both in *The New York Times* and my book *State of War*, that revealed that the Bush Administration had, in all likelihood, violated the law and the United States Constitution by secretly conducting warrantless domestic wiretapping on American citizens.  My reporting helped to spark a national debate that continues today about the legality and propriety of that wiretapping program.  My stories led to judicial examination of that program for the first time.  In August 2006, for example, partly as a result of my reporting on the subject, a federal judge in Detroit declared that the Bush Administration's domestic wiretapping program was unconstitutional.  Likewise, my disclosure of the previously secret domestic wiretapping program helped lead to Congressional efforts to overhaul the Foreign Intelligence Surveillance Act of 1978.  More recently, views on domestic wiretapping were the subject of Congressional questioning of then-Judge (and now Supreme Court Justice) Sotomayor.

For example, on July 16, 2009, then-Senator Arlen Specter asked then-Judge Sotomayor questions about the wiretapping debate, including whether or not she would have granted *certiorari* on the facts of the wiretapping case, *American Civil Liberties Union* v. *National Sec. Agency*, 493 F.3d 644 (6th Cir. 2007). An excerpt of the Congressional transcript is attached as Exhibit 3. By bringing this issue out into the open for the first time, I believe that my reporting provided a public service to the nation, enabling Congress, the courts, and the American people to openly debate the proper balance between civil liberties and national security for domestic surveillance and to publicly consider a Supreme Court nominee's stance on this important issue concerning the appropriate limits of executive power.

10.     In addition to my newspaper reporting, I have also written three books, all of which have been the product of my work as an investigative journalist. Writing books allows me to give more extensive treatment to newsworthy topics of my choice than my newspaper reporting does alone. My first book, *Wrath of Angels: The American Abortion War* (Basic Books, 1998), which I co-authored with Judy L. Thomas, provided the first comprehensive history of the anti-abortion movement ever written. *The New York Times Book Review* hailed it as "far and away the most thorough and knowledgeable history of anti-abortion activism after *Roe*." My second book, *The Main Enemy: The Inside Story of the CIA's Final Showdown with the KGB* (Random House, 2003), co-authored with Milt Bearden, was a colorful and dramatic history of the espionage wars between the United States and the Soviet Union in the closing days of the Cold War. *The New York Times Book Review* wrote that "revelations twinkle in *The Main Enemy* like stars at sunset." *The Main Enemy* was awarded the Cornelius Ryan Award from the Overseas Press Club for the best book on foreign affairs in 2003.

11.     My third book, *State of War: the Secret History of the CIA and the Bush Administration* (Free Press, 2006), was a *New York Times* bestseller. *State of War* included explosive revelations about a series of illegal or potentially illegal actions taken by President Bush, including the domestic wiretapping program. It also disclosed how President Bush se-

cretly pressured the CIA to use torture on detainees in secret prisons around the world; how the White House and CIA leadership ignored information before the 2003 invasion of Iraq that showed that Iraq did not have weapons of mass destruction; documented how, in the aftermath of the invasion, the Bush Administration punished CIA professionals who warned that the war in Iraq was going badly; showed how the Bush Administration turned a blind eye to Saudi involvement in terrorism; and revealed that the CIA's intelligence operations on weapons of mass destruction in Iraq, Iran and other countries were completely dysfunctional, and even reckless. In his review in *The New York Times Book Review*, Walter Isaacson hailed *State of War* and said that "James Risen may have become the new Woodward and Bernstein." *The Dallas Morning News*, in its review of *State of War*, said "Domestic spying, demands for political loyalty in the name of national security, investigating a newspaper's sources: With *State of War*, the Nixonian déjà vu can give a reader whiplash."

12.    While the disclosures contained in *State of War* were no doubt embarrassing to the government, I strongly believe that they were important and newsworthy. *State of War* sparked national debate about a number of topics, and that debate continued long after the book was published.

13.    The response to *State of War* from the reading public was startling and gratifying to me. Many people actually stopped me on the street, came up to me in restaurants, or wrote to me to thank me for writing it and for uncovering the truth. I believe that the publication of *State of War* contributed to a significant turning point in the American public's understanding of American policies in the post-9/11 era.

14.    My investigative reporting, both in my books and in my newspaper articles, has often been critical of the United States government, regardless of the administration in power. Throughout my twenty years of reporting in Washington, I have written stories that angered officials in the first Bush Administration, the Clinton Administration, the second Bush Administration, and the Obama Administration. In 1996, my stories in the *Los Angeles Times*

revealing that President Clinton had given a green light to Iranian arms smuggling into the Balkans prompted the Republican-controlled House of Representatives to take the remarkable step of voting to create a special House Select Subcommittee designed solely to investigate what I had uncovered about the Clinton Administration. A few years later, many of those same Congressional Republicans were calling for me to be thrown in jail for what I had uncovered during the second Bush Administration.

15.    My reporting on intelligence and national security has often included major revelations of great public interest:

- I was the first to reveal that the CIA was waterboarding terrorism suspects. *See* James Risen, David Johnston, and Neil A. Lewis, "Harsh C.I.A. Methods Cited In Top Qaeda Interrogations," *New York Times*, May 13, 2004, at A1, attached as Exhibit 4.

- I revealed that, before the invasion of Iraq, the CIA had received information from about 30 relatives of Iraqi scientists that Iraq had abandoned its programs to develop weapons of mass destruction, but failed to share that information with President Bush, even as he was publicly warning of the threat posed by Iraq's quest for such weapons. *See* James Risen, "C.I.A. Held Back Iraqi Arms Data, U.S. Officials Say," *New York Times*, July 6, 2004, at A1; attached as Exhibit 5; *see also* Exhibit 2 (*State of War*) at 85-107.

- I revealed that, contrary to law and with little oversight, the NSA was monitoring and eavesdropping on large volumes of phone calls, emails, and other Internet communications inside the United States to search for evidence of potential terrorist activity, without first securing search warrants or congressional approval. A number of government officials questioned the legality of the program, but the administration insisted on keeping it secret. *See* James Risen and Eric Lichtblau, "Bush Lets U.S. Spy on Callers Without Courts," *New York Times*, December 16, 2005, at A1, attached as Exhibit 6; Eric Lichtblau and James Risen, "Spy Agency Mined Vast Data Trove, Officials Report," *New York Times*, December 24, 2005, at A1, attached as Exhibit 7; *see also* Exhibit 2 (*State of War*) at 39-60.

- I revealed that the Bush Administration was engaged in a secret program that was initiated weeks after the September 11, 2001 attacks and provided counterterrorism officials with access to financial records from the international SWIFT database — including records of banking transactions involving thousands of Americans and others in the United States — in order help detect terrorist financiers. Eric Lichtblau and James Risen, "Bank Data Sifted In Secret By U.S. To Block Terror," *New York Times*, June 23, 2006, at A1, attached as Exhibit 8.

16.    In Chapter 9 of *State of War,* I reported on Operation Merlin, an intelligence operation in 2000 during the Clinton Administration that was intended to stall — but

which may have actually helped —— Iran in its efforts to develop a nuclear weapons program. The plan behind Merlin, as reported in Chapter 9, was to have a former Russian scientist provide Iranian officials with faulty nuclear blueprints. The CIA hoped that based on those flawed plans, Iran would build an inoperable nuclear weapon. The operation, in theory, would have undermined Iran's efforts to build a nuclear program.

17.    As reported in Chapter 9, Merlin was deeply flawed and mismanaged from the start. First, the flaws in the nuclear blueprints were so obvious that the Russian scientist noticed them within minutes of seeing the plans. When the scientist explained this to his CIA handlers, they inexplicably refused to call off the operation and simply told him that he should go ahead and deliver the plans to the Iranians. Thus, notwithstanding their knowledge that the flaws in the plans could be easily spotted, the CIA pushed ahead.

18.    I take very seriously my obligations as a journalist when reporting about matters that may be classified or may implicate national security concerns. I do not always publish all information that I have, even if it is newsworthy and true. If I believe that the publication of the information would cause real harm to our national security, I will not publish a piece. I have found, however, that all too frequently, the government claims that publication of certain information will harm national security, when in reality, the government's real concern is about covering up its own wrongdoing or avoiding embarrassment. As a result, I think long and hard before publishing such pieces.

19.    I gave this type of serious consideration to my publication of the information contained in Chapter 9 of *State of War*. I actually learned the information about Operation Merlin that was ultimately published in Chapter 9 of *State of War* in 2003, but I held the story for three years before publishing it. I made the decision to publish the information about Operation Merlin only after: (1) it became clear that the main rationale for fighting the Iraq War was based on flawed intelligence about Iraq's non-existent weapons of mass destruction, including its supposed nuclear program; (2) the press, particularly *The New York Times*, had

-7-

been harshly criticized for not doing more independent investigative reporting before the Iraq War about the quality of our intelligence concerning Iraq's weapons of mass destruction; (3) the March 31, 2005 Report to the President by the Commission on the Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction described American intelligence on Iran as inadequate to allow firm judgments about Iran's weapons programs, making it clear that the CIA's intelligence on weapons of mass destruction in Iran was just as badly flawed as it had been on Iraq; and (4) there was increasing speculation that the United States might be planning for a possible conflict with Iran, once again based on supposed intelligence concerning weapons of mass destruction, just as in Iraq.  After all of this, I realized that U.S. intelligence on Iran's supposed weapons of mass destruction was so flawed, and that the information I had was so important, that this was a story that the public had to know about before yet another war was launched.

20.     I was particularly struck by an exclusive interview I had in January 2004 with David Kay, the chief of the CIA's hunt for WMD in Iraq.  In his first major interview after returning from Iraq, he told me that the fundamental errors in the CIA's pre-war intelligence assessments were so grave that he would recommend that the CIA and other intelligence agencies completely overhaul their intelligence collection and analytical efforts on weapons of mass destruction.  In the interview, he plaintively told me that CIA analysts working for him had come to him, "almost in tears, saying they felt so badly that we weren't finding what they had thought we were going to find — 'I have had analysts apologizing for reaching the conclusions that they did.'"  It became clear to me that the Bush Administration had lost its credibility on the issue of intelligence concerning weapons of mass destruction.

21.     The information in Chapter 9 about Operation Merlin was about an intelligence effort that was approximately six years old at the time of publication and dated back to the Clinton Administration.  The story was so old that it could not harm national security, and in fact I believe I performed a vitally important public service by exposing the reckless and

badly mismanaged nature of intelligence on Iran's efforts to obtain weapons of mass destruction, so that the nation would not go to war once again based on flawed intelligence, as it had in Iraq.

22.     Chapter 9 also discloses another failure of our intelligence efforts in Iran. In 2004, a CIA officer mistakenly sent an email to an American CIA agent in Iran that may have contained information sufficient to reveal the identities of the entire network of spies in that country.  It turned out that the recipient of the e-mail was actually a double-agent who eventually turned the information over to his Iranian handlers.  This mistake, at a minimum, put the entire CIA spy network in Iran at risk.

23.     The subjects covered in Chapter 9 were particularly relevant in light of current events at the time the book was published.  The press, including my own newspaper, was soundly criticized for failing to scrutinize U.S. intelligence related to Iraq's WMD capabilities in the period immediately preceding the Iraq War.  Then, around the time *State of War* was published, there was considerable public speculation about a possible future conflict with Iran.  As a result, reporting about our intelligence in evaluating Iran's nuclear program was essential.

24.     In my view, information about this type of intelligence failure is particularly newsworthy, particularly when dealing with areas of foreign policy in which our political fears about the policies of a foreign regime might cloud our assessment of their military goals and capabilities.  That was certainly the case with our assessment of Iraq's WMD capabilities before the Iraq War.  And it seems to be the case with Iran even today.

25.     I believe my decision to report about the matters discussed in Chapter 9 of *State of War* has been vindicated, particularly given subsequent reports about the unreliability of our intelligence about Iran's nuclear capabilities and about our government's tendency to overstate the threat in a way that is not entirely consistent with the intelligence actually gathered.  For example, in December 2007, the United States intelligence community published a

National Intelligence Estimate ("2007 NIE") on Iran, in which the U.S. government acknowl-
edged that virtually everything it had been saying about Iran's nuclear program for the last four
years had been wrong.  The 2007 NIE stated that Iran had abandoned its nuclear weapons pro-
gram in 2003, a complete reversal from previous intelligence assessments that had concluded
that Iran was actively seeking a nuclear weapon.  It revealed that almost all of the public state-
ments by the Bush Administration about Iran and its weapons program had been wrong, and
had been based on bad information.  The 2007 NIE (attached hereto as Exhibit 9) must be seen
as a public disavowal of the CIA's earlier intelligence efforts on Iran's supposed nuclear pro-
gram.

   26.  Since then, U.S. intelligence assessments of Iran's nuclear program have
swung back and forth.  Ever since the 2007 NIE was published, U.S. intelligence analysts have
been under pressure to disavow it and issue a new one that concludes that Iran is racing to build
a nuclear weapon.  But while there is substantial evidence of Iran's ongoing uranium enrich-
ment program, the intelligence about the status of Iran's efforts to actually build a nuclear
bomb has been far less conclusive.  In an article that was quickly attacked by the Obama Ad-
ministration, Seymour M. Hersh, wrote recently in *The New Yorker* that a new 2011 NIE from
the United States intelligence community reaffirms that there is no conclusive evidence that
Iran has made any effort to build a nuclear bomb since 2003.  *See* "Iran and the Bomb," by
Seymour M. Hersh, published on June 6, 2011 in *The New Yorker* at pp. 30-35 (attached as Ex-
hibit 10).  "There's a large body of evidence," wrote Mr. Hersh, "including some of America's
most highly classified intelligence assessments, suggesting that the U.S. could be in danger of
repeating a mistake similar to the one made with Saddam Hussein's Iraq eight years ago — al-
lowing anxieties about the policies of tyrannical regime to distort our estimates of the state's
military capacities and intentions."  *Id.* at 30.

   27.  Whether one agrees with Mr. Hersh's article or not, it is clear that, five
years after I wrote *State of War*, there is still a serious national debate about Iran's nuclear am-

bitions and about whether the current administration has incentives to exaggerate intelligence related to this topic.

28.     The point of Chapter 9 of *State of War* was that the CIA was just as blind and just as reckless in the way it dealt with intelligence on Iran's weapons of mass destruction as it had been on Iraq.  That was clearly the message of the 2007 NIE, and perhaps it is the message of the 2011 NIE as well.  Given the CIA's own disavowal of its past work on Iran's nuclear program, it is that much more important to understand *why* our intelligence efforts in evaluating Iran's nuclear threat have failed in the past.  Chapter 9 of *State of War* is one of the few sources of information covering this important subject.

29.     The Bush Administration was embarrassed by the disclosures I made in the course of my reporting for *State of War* as well as in *The New York Times*, and eventually singled me out as a target for political harassment.  That administration speculated publicly about prosecuting me under the Espionage Act for publication of my reporting about their domestic eavesdropping program and about my reporting in *State of War*, leaked to the press a story about engaging in secret surveillance of journalists' phone calls, and attempted to create an atmosphere of intimidation for reporters, like me, who uncovered wrongdoing and incompetence in the administration.  Moreover, the Bush Administration was selective in its attacks.  When other journalists reported on the same subjects at the same time that I did, the Bush Administration said and did nothing about potentially prosecuting or even investigating the identity of the source(s) of those journalists, but instead threatened only to "go after" me and *The New York Times*.

30.     I believe that the investigation that led to this prosecution started because of my reporting on the National Security Agency's warrantless wiretapping program.  The Bush White House was furious over that story.  I believe that this investigation started as part of an effort by the Bush Administration to punish me and silence me, following the publication of the NSA wiretapping story.  I was told by a reliable source that Vice President Dick Cheney

pressured the Justice Department to personally target me because he was unhappy with my reporting and wanted to see me in jail.  After he left office in 2009, Cheney publicly admitted that the fact that I won a Pulitzer Prize for the NSA story "always aggravated me."

31.   In fact, the first subpoena issued to me was the culmination of a prolonged campaign against me by the Bush Administration and its supporters.  President Bush called the disclosures about the likely-illegal wiretapping program a "shameful act," *see* Dan Eggen, *Fearing More Leaks, White House Targets Officials, Journalists*, Seattle Times, Mar. 6, 2006, at A1, attached hereto as Exhibit 11, and the administration and its supporters thereafter publicly speculated about potential prosecutions of me for espionage.  Shortly after that, an organized campaign of hate mail from right wing groups with close ties to the White House was launched, inundating me with personal threats.  Meanwhile, protesters supporting the Bush Administration picketed my office, calling for me to be prosecuted.  Right wing pundits and bloggers supporting the Bush Administration took to television and the Internet to call for the White House and the Justice Department to prosecute me for espionage.  Failing that, they called for the Justice Department to subpoena me in a leak investigation, which right wing pundits said would have the same effect as prosecution, since it could force me to go to jail if I refused to testify about the identity of my confidential source(s).

32.   Immediately after *State of War* was released, the Department of Justice announced that investigations were underway concerning disclosures in the book as well as other leaks.  On January 13, 2006, the week after my book hit shelves, then-Attorney General Alberto Gonzales held a press conference at which he publicly announced that the Department of Justice was actively considering the prosecution of journalists under the Espionage Act for publishing truthful, classified information.  When he was asked about the investigation and the potential imprisonment of reporters, Gonzales said:

> That's a matter that's being handled by career prosecutors and folks within our Criminal Division.  And I think it's too early to make decisions regarding whether or not reporters should go to jail.  We have an obligation to ensure that our laws are enforced.

-12-

*See* January 13, 2006 FDCH Capital Transcripts, attached hereto as Exhibit 12.

33.     In mid-March, after Attorney General Gonzales raised publicly the pos-
sibility of prosecuting journalists, the Director of the CIA, Porter Goss, suggested that it was
his "hope" and "aim" that the leak investigations would lead to subpoenas requiring me to tes-
tify about the identity of my confidential source(s).   Only two months into the investigation,
Goss explained:   "It is my aim and it is my hope that we will witness a grand jury investigation
with reporters present being asked to reveal who is leaking this information."   *See* David West-
phal, *Bush's Secrecy Push is Excessive, Critics Say*, The Sacramento Bee, Mar. 12, 2006, at
A1, attached hereto as Exhibit 13.

34.     Then, on May 21, 2006, Attorney General Gonzales was asked by
George Stephanopoulos on ABC's "This Week" if "he believed that journalists could be prose-
cuted for publishing classified information."   He replied that "there are some statutes on the
book[s] which, if you read them carefully, would seem to indicate that that is a possibility . . . .
We have an obligation to enforce those laws.   We have an obligation to ensure that our national
security is protected."   *See* Transcript of ABC's "This Week with George Stephanopoulos,"
2006 WLNR 9116668 (May 21, 2006), attached hereto as Exhibit 14.

35.     When asked several weeks later by the Senate Judiciary Committee for a
clarification of Attorney General Gonzales' remarks on ABC's "This Week," Matthew W. Frie-
drich, Chief of Staff and Principal Deputy Assistant Attorney General Criminal Division, sub-
mitted written testimony that adopted the Attorney General's remarks as Department of Justice
Policy.   Even though, as Mr. Friedrich acknowledged in his responses to the Judiciary Commit-
tee's questions, the Justice Department "has never in its history prosecuted a member of the
press under [the Espionage Act] or any other statute relating to the protection of classified in-
formation," the Department's current position is that "such a prosecution is possible under the
law."   *See* Friedrich Responses to Questions for the Record, attached hereto as Exhibit 15.

-13-

36.     By publicly speculating about the possibility of prosecuting journalists, such as myself, under the Espionage Act for publishing truthful stories containing classified information, I believe that the Government was trying to intimidate journalists, like me, who publish stories that expose excessive government secrecy, illegality, or malfeasance.

37.     Around the same time that the Government was making public statements about potentially prosecuting journalists, Brian Ross and Richard Esposito of ABC News reported on May 15, 2006, that senior federal law enforcement officials had informed them that the government was tracking the phone numbers of journalists without the journalists' knowledge as part of an effort to root out the journalists' confidential sources. According to the article, the journalists' phones were not being "tapped," but the government was tracking the incoming and outgoing numbers called and received on the journalists' phones. The story stated that the government was examining the phone calls and contacts of journalists from ABC News, *The New York Times*, and the *Washington Post* a part of a "widespread CIA leak investigation." I was mentioned by name as one of the reporters whose work the government was looking into. A copy of the story, entitled "Federal Source to ABC News: We Know Who You're Calling," is attached hereto as Exhibit 16.

38.     Even if I was not one of the journalists subject to the surveillance outlined in the story by Messrs. Ross and Esposito, the story indicates that senior federal law enforcement officials provided Messrs. Ross and Esposito with information about the surveillance. By leaking the story in the manner that it did, the Government further contributed to creating an atmosphere of fear for journalists who publish stories about national security and intelligence issues.

39.     The surveillance described in the story by Messrs. Ross and Esposito is disturbing to me as a journalist. If the Government was, in fact, tracking who I was speaking to on the phone, then it can attempt to learn the identity of potential confidential sources on other stories, including those that I am working on and have yet to publish.

-14-

40.     I have reason to believe that the story by Brian Ross and Richard Esposito *is* true. Since that story was published, I have learned from an individual who testified before a grand jury in this District that was examining my reporting about the domestic wiretapping program that the Government had shown this individual copies of telephone records relating to calls made to and from me.

41.     As noted above, on June 23, 2006, Eric Lichtblau and I wrote another story in *The Times* that disclosed the existence of another government program of questionable legality that was initiated weeks after the September 11, 2001 attacks and provided counterterrorism officials with access to money transfer records in the SWIFT database as part of an effort to detect terrorist financiers.

42.     The same day that the article about the SWIFT program by Eric Lichtblau and me appeared in *The Times*, *The Wall Street Journal* and the *Los Angeles Times* also published articles about the SWIFT program. Those articles are attached hereto as Exhibits 17 and 18.

43.     The Bush Administration was outraged by the disclosures about the SWIFT program. Vice President Cheney called the disclosure of the program "a disgrace," while President Bush called it "disgraceful." *See* Transcript of CNN: Paula Zahn Now, *New York Times Guilty of Treason?; Old Glory Becomes Burning Issue in Congress; Israeli Troops Move Into Gaza to Rescue Captured*, 2006 WLNR 11144252 (June 27, 2006), which is attached hereto as Exhibit 19. Members of Congress close to the administration, such as Rep. Peter King of New York, "call[ed] for the attorney general to begin an investigation and prosecution of *The New York Times*, including its reporters who worked on the case."

44.     Significantly, however, all of the administration's expressions of outrage concerning the disclosure of the SWIFT program were directed only at Mr. Lichtblau and me. As CNN reported on June 27, 2006, even though "[t]he story was [also] reported by the *Los Angeles Times* and *Wall Street Journal*, . . . the attacks have focused on *The New York Times*,

including its reporters who worked on the case." As far as I am aware, nobody in the administration complained publicly about the other articles written about the SWIFT program the same day as mine. All of the calls for journalists to be investigated or prosecuted were directed solely at Mr. Lichtblau and me. I cannot help but think that the fact that I had written earlier, both in *The Times* and *State of War*, about the administration's legally questionable domestic eavesdropping program, had something to do with the selective attention that was being focused on *The Times* and me.

45.  Public threats from the administration of putting me in jail continued. On August 30, 2006, Republican Congressman Peter Hoekstra publicly predicted that "those reporters," meaning Eric Lichtblau and me, "will be sitting in jail by the end of the year until they reveal their sources." *See* Myron Kukla, *Hoekstra Predicts Jailing of Reporters (NYT Traitors To Be Jailed By Year End)*, Grand Rapids Press, Aug. 31, 2006 at B1, attached hereto as Exhibit 20.

46.  That was the atmosphere in which I was first subpoenaed to testify concerning my confidential source(s) for Chapter 9 of *State of War*, on January 24, 2008. ████████

47.  I believe that the efforts to target me have continued under the Obama Administration, which has been aggressively investigating whistleblowers and reporters in a way that will have a chilling effect on the freedom of the press in the United States.

48.  The second subpoena directed at me was issued on April 26, 2010. ████████

49. 

I believe that this is further evidence of the Government's intent to harass me in connection with this matter.

50.     The subpoena that I am fighting now seeks the identity of and other information relating to my confidential source(s) for Chapter 9 of *State of War*. I cannot agree to provide the testimony that the Government seeks.

51.     I could not have written Chapter 9 of *State of War* (and many, if not all of the above-referenced articles and books) without the use of confidential source(s). My source(s) for Chapter 9 provided me with information with the understanding that I would not reveal their identity/ies. In circumstances in which I promise confidentiality to a source, I cannot break that promise.

52.     Any testimony I were to provide to the Government would compromise to a significant degree my ability to continue reporting as well as the ability of other journalists to do so. This is particularly true in my current line of work covering stories relating to national security, intelligence, and terrorism. If I aided the Government in its effort to prosecute

my confidential source(s) for providing information to me under terms of confidentiality, I would inevitably be compromising my own ability to gather news in the future. I also believe that I would be impeding all other reporters' ability to gather and report the news in the future.

53.     Compelling journalists to testify about their conversations with confidential sources will inevitably hinder future attempts to obtain cooperation from those or other confidential sources. It creates the inevitable appearance that journalists either are or can be readily converted into an investigative arm of the government. This would seriously compromise journalists' integrity and independence, qualities that are essential to our ability to gain the trust of potential news sources and to effectively investigate and report on newsworthy events. Persons who would otherwise be willing to speak to me would surely refuse to do so if they perceived me to be not a journalist who keeps his word when he promises confidentiality but one who would break it in the interest of government prosecutors.

54.     I understand that, if the Government cannot get testimony from me about the identity of my confidential source(s), the Government may seek testimony from me about the details of my conversations with my confidential source(s) (without actually asking me the name(s) of my source(s)). I cannot provide this testimony to the Government either. The agreement I have reached with my confidential source(s) for Chapter 9 of my book, *State of War*, does not merely cover the name of the source(s). Rather, I understand my agreement(s) to require me not to reveal any information that would enable someone to identify my confidential source(s).

55.     I have never heard of any confidentiality agreement made by a journalist that merely requires the journalist not to name his or her source. Such an agreement would be of little value to a source or potential source. If a journalist were to withhold a source's name but provide enough information to authorities to identify the source, the promise of confidentiality would provide little meaningful protection to a source or potential source.

56.     The scope of my confidentiality agreement(s) with my source(s) for Chapter 9 are typical of such agreements as they are used for investigative reporting generally. Such confidentiality agreements do not necessarily preclude a journalist from disclosing anything whatsoever about the source.  In fact, when reporting using confidential sources, it is quite common to report some generic information that assists in demonstrating the credibility of the source.  For example, one might identify the employer of the source by noting that the source is "an employee of Microsoft" or "management at McDonalds."  Additionally, or alternatively, a reporter might identify the location of a source by, for example, noting that they work at Microsoft in Seattle, Washington.

57.     The common thread in revealing any identifying information about a confidential source is that such disclosures remain general enough that they do not tend to reveal the identity of the source.  The above example might be acceptable because there are a sufficient number of employees of Microsoft in Seattle that those characteristics do not materially threaten to reveal the particular source's identity.  However, it might violate the same agreement to disclose that a source was an employee of Microsoft located in a very small town that only had a few such employees.

58.     In short, confidentiality agreement(s) are not so formulaic as to define specific categories of information for protection, such as occupation, location, or time.  Rather, they are common-sense agreements not to disclose whatever information might, alone or in combination, reveal the identity of the source in light of the particular circumstances.

59.     Based on my review of the Government's papers and the particular nature of the testimony the Government claims to be seeking, I have concluded that I cannot answer the questions the Government wants to ask me consistent with my obligation to maintain the confidentiality of my source(s).  First, the subpoena contains no limitations on the scope of testimony.  In its motion papers, the Government has demanded that I identify Sterling as the individual who, as charged in Counts One through Seven of the Indictment, retained and then

-19-

transmitted national security information to me.  The Government's other requests for testimony are also specifically designed to confirm or rule out Mr. Sterling as a source.  The Government seeks "(1) testimony about the specific information that the defendant conveyed to [me], much of which was publicly disclosed by [me] in [my] book; (2) [my] recollection of where and when the specific information was transmitted to [me] (3) testimony authenticating [my] book and laying the foundation for admitting the defendant's statements contained in it; and (4) [my] recollection of [my] preexisting *non*-confidential source relationship with Sterling, including [my] authorship of a newspaper article about Sterling's civil lawsuit in 2002."  With the possible exception of #3, it is readily apparent that I cannot testify on these topics without confirming or refuting that Mr. Sterling was a confidential source for Chapter 9 of *State of War*, nor without providing information that would tend to reveal the identity/ies of my confidential source(s).

60.    I am willing to testify — as I have told the Government all along — that (1) I wrote a particular newspaper article or chapter of a book; (2) a particular newspaper article or chapter of a book that I wrote was accurate; (3) statements referred to in my newspaper article or book chapter as being made by an unnamed source were in fact made to me by an unnamed source; and (4) statements referred to in my newspaper article or book chapter as being made by an identified source were in fact made to me by that identified source.  But I cannot testify as to the Government's other questions.

61.    To answer the Government's other questions would violate my agreement to maintain in confidence not just the name(s) of my source(s), but information that would tend to reveal the identity/ies of my source(s).  If I provide the testimony that has been requested of me, including the "what," "how," "when," and "where" of acquiring each piece of confidential information, doing so will reveal my confidential source(s), regardless of whether I directly provide any name(s).  Accordingly, I cannot comply with the subpoena.

62.     I did have a non-confidential reporting relationship with Mr. Sterling in connection with my March 2002 article entitled "Fired by C.I.A., He Says Agency Practiced Bias." To the extent the Government's seeks to verify the information in that article, I stand by it; the article accurately portrays the information provided to me. However, I cannot testify as to whether I had any other discussion(s) with Mr. Sterling outside the context of that article for one simple reason: the questioning appears to be an attempt to elicit information about my communications with Mr. Sterling so as to confirm or deny that he was a confidential source for Chapter 9. To the extent the Government is asking these questions because the Government believes that they might reveal something about my confidential source(s) for the information in Chapter 9, then this appears to be just another indirect route to the same source-identifying information that the Government is seeking through its more direct questions about Chapter 9.

63.     I cannot answer questions about information provided to me confiden- tially by any particular individual in connection with Chapter 9, or even answer whether any particular individual did or did not provide me with information, because to do so would reveal my source(s) by process of elimination. For example, if there were only a handful of people that had access to a particular piece of information in *State of War*, asking whether I had any conversations with each of them, one by one, would quickly reveal my source(s). No matter how creative the Government's approach is, in order to protect my source(s)' confidentiality, I must decline to answer any of these questions designed to either confirm or rule out particular people.

64.     If I am forced to testify, it will immediately and substantially harm my ability to gather newsworthy information. Recently, it has become more clear than ever to me how important promises of confidentiality are to my sources. In my ongoing reporting and newsgathering, numerous sources of confidential information have told me that they are com- fortable speaking to me in confidence specifically because I have shown that I will honor my word and maintain their confidence even in the face of Government efforts to force me to re-

veal their identities or information.  The fact that I have not previously revealed my sources has allowed me to gain access to newsworthy information that I could not otherwise get.  Based on these experiences, I have no doubt that if I am forced to reveal my confidential source(s) for Chapter 9 of *State of War*, it will immediately harm my ability to secure the trust of sources in the future.

        65.     I respectfully urge the Court to deny the Government motion in limine quash the subpoena.

JAMES RISEN

Sworn to before me this

21st th day of June, 2011.

Barbara Brincefield
Notary Public

BARBARA BRINCEFIELD
Notary Public of District of Columbia
My Commission Expires October 14, 2015

-22-