# EXHIBIT 1

AO 89 (Rev. 01/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Virginia

United States of America       )
v.       )
Jeffrey Alexander Sterling       )    Case No.    1:10cr485
      )
_____ )
Defendant       )

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:    **James Risen
17905 Hollingsworth Drive
Derwood, MD 20855**

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | United States District Court 401 Courthouse Square Alexandria, VA 22314 | Courtroom No.: | 600 |
|---|---|---|---|
| | | Date and Time: | September 12, 2011 10 a.m. |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

Date:   05/17/2011                          CLERK OF COURT

                                              *Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*    United States of America
_____ , who requests this subpoena, are:

James L. Trump, AUSA
U. S. Attorney's Office, Alexandria, VA
Jim.Trump@usdoj.gov
(703) 299-3700

AO 89 (Rev. 01/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case (Page 2)

Case No.

## PROOF OF SERVICE

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☐ I personally served the subpoena on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the subpoena at the individual's residence or usual place of abode with *(name)* _____

_____, a person of suitable age and discretion who resides there,

on *(date)* _____, and mailed a copy to the individual's last known address; or

☐ I served the subpoena on *(name of individual)* _____, who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because _____ ; or

☐ Other *(specify):*


Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .


I declare under penalty of perjury that this information is true.


Date: _____        _____

                                              *Server's signature*

                                   _____

                                              *Printed name and title*


                                   _____

                                              *Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT 2

This Exhibit has been filed by hand with the Court.

# EXHIBIT 3

7/16/09 CQ Cap. Transcripts (Pg. Unavail. Online)
2009 WLNR 13571492

CQ Capital Transcripts
Copyright 2009 Voxant

July 16, 2009

Sen. Patrick J. Leahy Holds A Hearing On The Nomination Of Judge Sonia Sotomayor To Be An Associate
Justice Of The U.S. Supreme Court

Sen. Patrick J. Leahy Holds A Hearing On The Nomination Of Judge Sonia Sotomayor To Be An Associate
Justice Of The U.S. Supreme Court

xfdtr SENATE-HRG-SOTOMAYOR 26thadd

XXX issues arising from the Constitution are important.SPECTER: Well, I know that, but that's a pretty easy
question to answer. I'm not asking you to agree with Justice Roberts that the court ought to take more cases,
which seemed to me to be pretty easy, or a question about Justice Scalia saying that there's turmoil when the cir-
cuit split.

And you don't have the Supreme Court taking cert, but isn't that of the highest magnitude? Our discussions here
have involved a great many issues, but I would suggest to you that, on separation of powers and when you un-
dertake the role of the Congress contrasting with the role of the president, Congress is Article I. It was placed
with primacy, because we're closest to the people.

And when you have a question which you wouldn't comment on yesterday, like the terrorist surveillance pro-
gram, which flatly contradicts the congressional enactment on Foreign Intelligence Surveillance Act, that the
only way you'd get a wiretap is with court approval, and the case is declared unconstitutional in the Detroit dis-
trict court, and the Sixth Circuit dodges the case on standing with very questionable grounds, and the Supreme
Court won't even hear it, and you have a case involving September 11th and a very blatant conflict between
Congress powers expressed under Article I with the sovereign immunities act, and the president is stepping in
under foreign powers, isn't -- isn't that a category of the highest magnitude?

SOTOMAYOR: It is so difficult to answer that question in the abstract. For the reason I've just explained, the is-
sue is much, much more complicated than an absolute that says, if a case presents this question, I'm always go-
ing to take it.

That's not how a judge looks at the issue of granting or not granting certiorari, I assume, because the fact is
weighing so many different factors at the time that decision is made. I...

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

SPECTER: Judge, I don't want to interrupt you, but I've got a minute-and-a-half left and a couple of comments I want to make in conclusion.

I would ask you to rethink that. And I would also ask you to rethink the issues you didn't want to answer yesterday about conflict between the Congress and the court.

Even though the Constitution made Congress Article I and the president Article II, the Supreme Court has really reversed the order. The judiciary is now really in Article I, if the powers were to be redefined.

And I'd ask you to take a look -- you have said repeatedly that the job of the court is to apply the law, not to make the law. And take a look again at the standard of proportional and congruent and see if you don't agree with Justice Scalia that that's another way for the court to make law.

And take a look, too, at what Justice Roberts said here in the confirmation hearings, that there would be deference and respect for congressional fact-finding, how that is not done in the Garrett case and in the voting rights case.

MORE

---- INDEX REFERENCES ---

NEWS SUBJECT: (Legal (1LE33); Government (1GO80); Legislation (1LE97); Judicial (1JU36))

Language: EN

OTHER INDEXING: (CONGRESS; CONSTITUTION; GARRETT; JUSTICE ROBERTS; JUSTICE SCALIA; SIXTH CIRCUIT; SOTOMAYOR; SUPREME COURT; US SUPREME COURT; XXX) (Article; Patrick J. Leahy; Sen; Sonia Sotomayor)

KEYWORDS: (BC-SENATE-HRG-SOTOMAYOR, 26th Add, f1416,0514); (w)

Word Count: 612
7/16/09 FDCHCAPTRPTS (No Page)
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT 4

Westlaw.

The New York Times

5/13/04 NYT A1

5/13/O4 N.Y. Times A1
2004 WLNR 5538566

New York Times (NY)
Copyright (c) 2004 The New York Times. All rights reserved.

May 13, 2004

Section: A

THE STRUGGLE FOR IRAQ: DETAINEES; Harsh C.I.A. Methods Cited In Top Qaeda
Interrogations

This article was reported and written by James Risen, David Johnston and Neil A.
Lewis.

Central Intelligence Agency's use of coercive interrogation methods against some
high-level leaders and operatives of Al Qaeda produces concern inside agency about
abuse; at least one agency employee reportedly has been disciplined for threatening
detainee with gun during questioning; Khalid Shaikh Mohammed, thought to have
helped plan 9/11 terror attacks, was strapped down, forcibly pushed under water and
made to believe he might drown; that and other techniques were authorized by set of
secret rules for interrogation of high-level Qaeda prisoners that were endorsed by
Justice Dept and CIA; rules are among first adopted by Bush administration after
9/11 for handling detainees and may have helped establish new understanding
throughout government that officials would have greater freedom to deal harshly
with detainees; methods used by CIA are so severe that senior officials of Federal
Bureau of Investigation directed its agents to stay out of interviews for fear of
being compromised in future criminal cases; defenders of operation say methods do
not violate American anti-torture statutes, and are necessary to fight war against
nebulous enemy whose intentions could only be gleaned by extracting information
from uncooperative detainees; photo (M)

WASHINGTON, May 12 The Central Intelligence Agency has used coercive interrogation
methods against a select group of high-level leaders and operatives of Al Qaeda
that have produced growing concerns inside the agency about abuses, according to
current and former counterterrorism officials.

At least one agency employee has been disciplined for threatening a detainee with a
gun during questioning, they said.

In the case of Khalid Shaikh Mohammed, a high-level detainee who is believed to
have helped plan the attacks of Sept. 11, 2001, C.I.A. interrogators used graduated
levels of force, including a technique known as "water boarding," in which a
prisoner is strapped down, forcibly pushed under water and made to believe he might
drown.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

These techniques were authorized by a set of secret rules for the interrogation of high-level Qaeda prisoners, none known to be housed in Iraq, that were endorsed by the Justice Department and the C.I.A. The rules were among the first adopted by the Bush administration after the Sept. 11 attacks for handling detainees and may have helped establish a new understanding throughout the government that officials would have greater freedom to deal harshly with detainees.

Defenders of the operation said the methods stopped short of torture, did not violate American anti-torture statutes, and were necessary to fight a war against a nebulous enemy whose strength and intentions could only be gleaned by extracting information from often uncooperative detainees. Interrogators were trying to find out whether there might be another attack planned against the United States.

The methods employed by the C.I.A. are so severe that senior officials of the Federal Bureau of Investigation have directed its agents to stay out of many of the interviews of the high-level detainees, counterterrorism officials said. The F.B.I. officials have advised the bureau's director, Robert S. Mueller III, that the interrogation techniques, which would be prohibited in criminal cases, could compromise their agents in future criminal cases, the counterterrorism officials said.

After the attacks of Sept. 11, President Bush signed a series of directives authorizing the C.I.A. to conduct a covert war against Osama bin Laden's Qaeda network. The directives empowered the C.I.A. to kill or capture Qaeda leaders, but it is not clear whether the White House approved the specific rules for the interrogations.

The White House and the C.I.A. declined to comment on the matter.

The C.I.A. detention program for Qaeda leaders is the most secretive component of an extensive regime of detention and interrogation put into place by the United States government after the Sept. 11 attacks and the war in Afghanistan that includes the detention facilities run by the military in Iraq and Guantanamo Bay, Cuba.

There is now concern at the agency that the Congressional and criminal inquiries into abuses at Pentagon-run prisons and other detention centers in Iraq and Afghanistan may lead to examinations of the C.I.A's handling of the Qaeda detainees. That, in turn, could expose agency officers and operations to the same kind of public exposure as the military now faces because of the Iraq prison abuses.

So far, the agency has refused to grant any independent observer or human rights group access to the high-level detainees, who have been held in strict secrecy. Their whereabouts are such closely guarded secrets that one official said he had been told that Mr. Bush had informed the C.I.A. that he did not want to know where they were.

The authorized tactics are primarily those methods used in the training of American Special Operations soldiers to prepare them for the possibility of being captured

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

and taken prisoners of war. The tactics simulate torture, but officials say they are supposed to stop short of serious injury.

Counterrorism officials say detainees have also been sent to third countries, where they are convinced that they might be executed, or tricked into believing they were being sent to such places. Some have been hooded, roughed up, soaked with water and deprived of food, light and medications.

Many authorities contend that torture and coercive treatment is as likely to provide information that is unreliable as information that is helpful.

Concerns are mounting among C.I.A. officers about the potential consequences of their actions. "Some people involved in this have been concerned for quite a while that eventually there would be a new president, or the mood in the country would change, and they would be held accountable," one intelligence source said. "Now that's happening faster than anybody expected."

The C.I.A.'s inspector general has begun an investigation into the deaths of three lower-level detainees held by the C.I.A in Iraq and Afghanistan. The Justice Department is also examining the deaths.

The secret detention system houses a group of 12 to 20 prisoners, government officials said, some under direct American control, others ostensibly under the supervision of foreign governments.

The C.I.A. high-level interrogation program seemed to show early results with the capture of Abu Zubaida in April 2002. Mr. Zubaida was a close associate of Mr. bin Laden's and had run Al Qaeda's recruiting, in which young men were brought from other countries to training camps in Afghanistan.

Under such intensive questioning, Mr. Zubaida provided useful information identifying Jose Padilla, a low-level Qaeda convert who was arrested in May 2002 in connection with an effort to build a dirty bomb. Mr. Zubaida also helped identify Mr. Mohammed as a crucial figure in the 9/11 plot, counterterrorism officials said.

A few other detainees have been identified by the Bush administration, like Ramzi bin al-Shibh, another 9/11 plotter and Walid Ba'Attash, who helped plan the East Africa embassy bombings in 1998 and the attack on the Navy destroyer Cole in October 2000.

Some of the prisoners have never been identified by the government. Some may have only peripheral ties to Al Qaeda. One Middle Eastern man, who had been identified by intelligence officials as a money launderer for Mr. bin Laden, was captured in the United Arab Emirates. He traveled there when some of the emirates' banks froze his accounts. When the U.A.E. government alerted the the C.I.A. that he was in the country, the man was arrested and subsequently disappeared into the secret detention program.

In the interrogation of Mr. Mohammed, C.I.A. officials became convinced that he was not being fully cooperative about his knowledge of the whereabouts of Mr. bin

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Laden. Mr. Mohammed was carrying a letter written by Mr. bin Laden to a family member when he was captured in Pakistan early in 2003. The C.I.A. officials then authorized even harsher techniques, according to officials familiar with the interrogation.

The C.I.A. has been operating its Qaeda detention system under a series of secret legal opinions by the agency's and Justice Department lawyers. Those rules have provided a legal basis for the use of harsh interrogation techniques, including the water-boarding tactic used against Mr. Mohammed.

One set of legal memorandums, the officials said, advises government officials that if they are contemplating procedures that may put them in violation of American statutes that prohibit torture, degrading treatment or the Geneva Conventions, they will not be responsible if it can be argued that the detainees are formally in the custody of another country.

The Geneva Conventions prohibit "violence to life and person, in particular . . . cruel treatment and torture" and "outrages upon personal dignity, in particular, humiliating and degrading treatment."

Regarding American anti-torture laws, one administration figure involved in discussions about the memorandums said: "The criminal statutes only apply to American officials. The question is how involved are the American officials."

The official said the legal opinions say restrictions on procedures would not apply if the detainee could be deemed to be in the custody of a different country, even though American officials were getting the benefit of the interrogation. "It would be the responsibility of the other country," the official said. "It depends on the level of involvement.".

Like the more numerous detainees at Guantanamo Bay, the high-level Qaeda prisoners have also been defined as unlawful combatants, not as prisoners of war. Those prisoners have no standing in American civilian or military courts.

The Bush administration began the program when intelligence agencies realized that a few detainees captured in Afghanistan had such a high intelligence value that they should be separated from the lower-level figures who had been sent to a military installation at Guantanamo Bay, which officials felt was not suitable.

There was little long-term planning. The agency initially had few interrogators and no facilities to house the top detainees. After the Sept. 11 attacks, the agency began to search for remote sites in friendly countries around the world where Qaeda operatives could be kept quietly and securely.

"There was a debate after 9/11 about how to make people disappear," a former intelligence official said.

The result was a series of secret agreements allowing the C.I.A. to use sites overseas without outside scrutiny.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

So far, the Bush administration has not said what it intends to do over the long term with any of the high-level detainees, leaving them subject to being imprisoned indefinitely without any access to lawyers, courts or any form of due process.

Some officials have suggested that some of the high-level detainees may be tried in military tribunals or officially turned over to other countries, but counterterrorism officials have complained about the Bush administration's failure to have an "endgame" for these detainees. One official said they could also be imprisoned indefinitely at a new long-term prison being built at Guantanamo.

Photo: Khalid Shaikh Mohammed in image on F.B.I. Web site last year. (Photo by F.B.I.)(pg. A13)

---- INDEX REFERENCES ----

COMPANY: JUSTICE DEPARTMENT; CENTRAL INTELLIGENCE AGENCY

NEWS SUBJECT: (Legal (1LE33); Judicial (1JU36); International Terrorism (1IN37); Government (1GO80); Economics & Trade (1EC26); Sept 11th Aftermath (1SE05))

INDUSTRY: (Aerospace & Defense (1AE96); Defense (1DE43); Security (1SE29); Defense Intelligence (1DE90); Aerospace & Defense Regulatory (1AE25))

REGION: (North America (1NO39); Western Europe (1WE41); Latin America (1LA15); Cuba (1CU43); Europe (1EU83); Gulf States (1GU47); Central Europe (1CE50); Iraq (1IR87); Arab States (1AR46); Western Asia (1WE54); Afghanistan (1AF45); Americas (1AM92); Asia (1AS61); Middle East (1MI23); USA (1US73); Switzerland (1SW77); Caribbean (1CA06))

Language: EN

OTHER INDEXING: (Risen, James; Johnston, David; Lewis, Neil A; Mohammed, Khalid Shaikh; Bush, George W (Pres)) (ABU ZUBAIDA; AMERICAN SPECIAL OPERATIONS; CENTRAL INTELLIGENCE AGENCY; CIA; COUNTERRORISM; DETAINEES; FEDERAL BUREAU OF INVESTIGATION; GENEVA CONVENTIONS; JUSTICE DEPARTMENT; JUSTICE DEPT; LADEN; MR ZUBAIDA; NAVY; OSAMA; STRUGGLE; WHITE HOUSE; ZUBAIDA) (Al Qaeda; Bush; Cole; Harsh C.I.A. Methods; Jose Padilla; Khalid; Khalid Shaikh Mohammed; Mohammed; Photo by; Qaeda; Robert S. Mueller; Shaikh Mohammed; Shibh; Zubaida) (Terrorism; Torture; Airlines and Airplanes; Hijacking; Terrorism; World Trade Center (NYC); Terrorism) (New York City; Washington (DC))

COMPANY TERMS: CENTRAL INTELLIGENCE AGENCY; FEDERAL BUREAU OF INVESTIGATION

EDITION: Late Edition - Final

Word Count: 2010
5/13/04 NYT A1
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 5

7/6/04 N.Y. Times A1
2004 WLNR 5578123

New York Times (NY)
Copyright (c) 2004 The New York Times. All rights reserved.

July 6, 2004

Section: A

THE REACH OF WAR: INTELLIGENCE; C.I.A. HELD BACK IRAQI ARMS DATA, U.S. OFFICIALS
SAY

JAMES RISEN

Report from Senate Select Committee on Intelligence is expected to contain scathing
indictment of CIA and its leaders for failing to recognize that evidence they
collected before war in Iraq did not justify their assesssment that Saddam Hussein
had illicit weapons; report says CIA was told by relatives of Iraqi scientists that
Baghdad's programs to develop unconventional weapons had been abandoned, but that
agency failed to give that information to Pres Bush, even as he publicly warned of
threat posed by Hussein's illicit weapons; existence of secret prewar CIA operation
to debrief relatives of Iraqi scientists--and agency's failure to give their
statements to president and other policymakers--was uncovered by Senate
intelligence panel; CIA officials play down significance of information collected
in secret debriefing operation, saying they assumed such talk was part of Iraqi
denial and deception program; Senate report is said to conclude that entire
intelligence community did poor job of collecting information about status of
Iraq's weapons programs, and that intelligence analysts did even worse job of
writing reports that accurately relected information they had; Senate panel finds
no evidence that CIA changed reports as result of political pressure from White
House; detailed examination of Senate panel's investigation; photo (L)

WASHINGTON, July 5 The Central Intelligence Agency was told by relatives of Iraqi
scientists before the war that Baghdad's programs to develop unconventional weapons
had been abandoned, but the C.I.A. failed to give that information to President
Bush, even as he publicly warned of the threat posed by Saddam Hussein's illicit
weapons, according to government officials.

The existence of a secret prewar C.I.A. operation to debrief relatives of Iraqi
scientists -- and the agency's failure to give their statements to the president
and other policymakers -- has been uncovered by the Senate Select Committee on
Intelligence. The panel has been investigating the government's handling of prewar
intelligence on Iraq's unconventional weapons and plans to release a wide-ranging
report this week on the first phase of its inquiry. The report is expected to
contain a scathing indictment of the C.I.A. and its leaders for failing to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

recognize that the evidence they had collected did not justify their assessment that Mr. Hussein had illicit weapons.

C.I.A. officials, saying that only a handful of relatives made claims that the weapons programs were dead, play down the significance of the information collected in the secret debriefing operation. That operation is one of a number of significant disclosures by the Senate investigation. The Senate report, intelligence officials say, concludes that the agency and the rest of the intelligence community did a poor job of collecting information about the status of Iraq's weapons programs, and that analysts at the C.I.A. and other intelligence agencies did an even worse job of writing reports that accurately reflected the information they had.

Among the many problems that contributed to the committee's harsh assessment of the C.I.A.'s prewar performance were instances in which analysts may have misrepresented information, writing reports that distorted evidence in order to bolster their case that Iraq did have chemical, biological and nuclear programs, according to government officials. The Senate found, for example, that an Iraqi defector who supposedly provided evidence of the existence of a biological weapons program had actually said he did not know of any such program.

In another case concerning whether a shipment of aluminum tubes seized on its way to Iraq was evidence that Baghdad was trying to build a nuclear bomb, the Senate panel raised questions about whether the C.I.A. had become an advocate, rather than an objective observer, and selectively sought to prove that the tubes were for a nuclear weapons program.

While the Senate panel has concluded that C.I.A. analysts and other intelligence officials overstated the case that Iraq had illicit weapons, the committee has not found any evidence that the analysts changed their reports as a result of political pressure from the White House, according to officials familiar with the report.

The Senate report is expected to criticize both the director of central intelligence, George J. Tenet, and his deputy, John McLaughlin, and other senior C.I.A. officials, for the way they managed the agency before the war. Mr. Tenet has announced his resignation, effective July 11, and Mr. McLaughlin will serve as acting director until a permanent director is appointed. The C.I.A. has scheduled a farewell ceremony for Mr. Tenet on Thursday, just as the reverberations from the Senate report are likely to be hitting the agency.

The possibility that Mr. Tenet personally overstated the evidence has been investigated by the Senate panel, officials said. He was interviewed privately by the panel recently, and was asked whether he told President Bush that the case for the existence of Iraq's unconventional weapons was a "slam dunk."

In his book about the Bush administration's planning for the war in Iraq, "Plan of Attack," Bob Woodward reported that Mr. Tenet reassured Mr. Bush about the evidence of the existence of Iraq's illicit weapons after Mr. Bush had made clear he was unimpressed by the evidence presented to him in a December 2002 briefing by Mr. McLaughlin. "It's a slam-dunk case!" Mr. Tenet is quoted as telling the president.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

In his private interview with the Senate panel, Mr. Tenet refused to say whether he had used the "slam-dunk" phrase, arguing that his conversations with the president were privileged, officials said.

In hindsight, the Senate panel and many other intelligence officials now agree that there was little effort within the American intelligence community before the war to question the basic assumption that Mr. Hussein was still seeking to produce illicit weapons. Evidence that fit that assumption was embraced; evidence to the contrary was ignored or seen as part of a clever Iraqi disinformation campaign.

Yet there were some people inside the intelligence community who recognized the need for better evidence, according to intelligence officials. In 1998, the United Nations withdrew its weapons inspectors from Iraq, severely hampering the C.I.A.'s ability to monitor Iraqi weapons efforts. In response, Charlie Allen, the agency's assistant director for collection, began searching for new sources of information, the intelligence officials said.

He pushed for several new collection programs, including one that called for approaching members of the families of Iraqi scientists believed to be involved in secret weapons programs, the officials said. At the time, the C.I.A. had no direct access to important Iraqi scientists, and using family members as intermediaries seemed like the next best thing.

Beginning in 2000, the C.I.A. contacted the relatives and asked them what they knew or could learn about the work being conducted by the scientists. Officials would not say how or where the relatives were contacted.

The relatives told the agency that the scientists had said that they were no longer working on illicit weapons, and that those programs were dead. Yet the statements from the relatives were never included in C.I.A. intelligence reports on Iraq that were distributed throughout the government. C.I.A. analysts monitoring Iraq apparently ignored the statements from the family members and continued to issue assessments that Mr. Hussein was still developing unconventional weapons, Senate investigators have found.

At the time, C.I.A. analysts were deeply cynical about statements from Iraqis suggesting that Mr. Hussein had no illicit weapons, and assumed that such talk was simply part of an Iraqi denial and deception program, several intelligence officials said.

In response, a C.I.A. spokesman said, the families' statements were "not at all convincing."

"There was nothing definitive about it," the spokesman said. "No useful information was collected from the family members, and that's why it wouldn't have been disseminated."

The agency's handling of intelligence on biological weapons has also drawn Congressional criticism. In fact, the C.I.A. relied heavily on four Iraqi defectors to reach its conclusion that Iraq had developed mobile biological weapons laboratories.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

But one defector, an Iraqi scientist, said he had been working on a technical
program known as a "protein slurry," and that his work was unrelated to biological
weapons. He said he did not know of any other biological weapons activity under way
in Iraq. Senate investigators did not discover that his statements contradicted the
view that Iraq had an active biological program until they read the original
reports of his debriefings from before the war, officials said. A C.I.A. official
said the agency still had good reasons to use the defector's information, and has
been trying to explain that to the Senate committee. The official would not
elaborate.

There were problems with the handling of the other defectors used to buttress the
biological weapons case. Information from one was used even though the Defense
Intelligence Agency had warned in the spring of 2002 that he had fabricated
information. The C.I.A. took statements that another defector had given to German
intelligence without knowing his identity or learning that he had ties to the Iraqi
National Congress, the Iraqi exile group led by Ahmad Chalabi. Mr. Chalabi, until
recently a close ally of the Pentagon, fell into disfavor with the Bush
administration after it became clear that his organization had provided
disinformation to the United States and had exaggerated the threat posed by Mr.
Hussein.

One of the most sensitive elements of the Senate investigation relates to the
C.I.A.'s handling of intelligence about the shipment of aluminum tubes seized by
the United States in 2001 on its way into Iraq.

Senior C.I.A. analysts became convinced that the shipment was strong evidence that
Mr. Hussein was reconstituting his nuclear weapons program. The agency concluded
that the aluminum tubes were to be used as spinning rotors in a centrifuge that
could enrich uranium for bombs.

But other government experts, particularly at the national laboratories and in the
State Department, were skeptical. They argued that the tubes seemed designed for
use in conventional military rockets.

The technical debate reached a peak in 2002, just as the intelligence community was
preparing a comprehensive National Intelligence Estimate, an interagency assessment
of the status of Iraq's unconventional weapons.

Seeking to prove its case, the C.I.A. hired outside experts to conduct technical
tests, spinning the tubes at high speeds to determine whether they could withstand
the stress of a centrifuge.

But the Senate panel investigated the way in which the C.I.A. selectively sought to
prove its case with the outside experts in the face of the skepticism from analysts
at other agencies. For example, in the National Intelligence Estimate, the C.I.A.
disclosed the initial -- and successful -- test results to support its assertion
that the tubes could be used to help produce nuclear weapons. Only later did the
C.I.A. report results that showed that the tubes ultimately failed in testing.

C.I.A. officials said in response that only the initial test results were reported

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

in the intelligence assessment because those were the only results available at the
time. When later results were available in January 2003, they were reported to the
rest of the intelligence community, the officials said. The C.I.A. officials added
that nearly all of the subsequent test failures were a result of failures of
testing equipment, and that the few failures of tubes were at speeds that exceeded
those required for centrifuges. The agency had asked the outside experts to push
the tubes to their limits in the stress tests, and so their failure did not mean
that the tubes could not be used in a centrifuge, the C.I.A. officials say.

The C.I.A.'s views on the tubes ultimately prevailed inside the Bush
administration. Although the State Department's own analysts issued a dissent in
the National Intelligence Estimate, Secretary of State Colin L. Powell went with
the C.I.A. In his presentation to the United Nations in February 2003 laying out
the administration's case against Iraq, he relied on the aluminum tubes to show
that Mr. Hussein was rebuilding his nuclear weapons program.

Photo: At the Security Council on Feb. 5, 2003, Secretary of State Colin L. Powell
said Iraq had obtained aluminum tubes, shown on the screen at right, for uranium
enrichment. (Photo by James Estrin/The New York Times)(pg. A10)

                    ---- INDEX REFERENCES ----

COMPANY: PENTAGON LTD; CENTRAL INTELLIGENCE AGENCY; STATE DEPARTMENT; UNITED
NATIONS

NEWS SUBJECT:  (World Organizations (1IN77); Nuclear, Biological, & Chemical
Warfare (1NU88); United Nations (1UN54); Government (1GO80); Bioterrorism (1BI12))

INDUSTRY:  (Science & Engineering (1SC33); Aerospace & Defense (1AE96); Physical
Science (1PH15); Defense (1DE43); Security (1SE29); Defense Intelligence (1DE90);
Science (1SC89))

REGION:  (Middle East (1MI23); Gulf States (1GU47); Iraq (1IR87); Arab States
(1AR46))

Language:  EN

OTHER INDEXING:  (Risen, James; Hussein, Saddam (Pres); Bush, George W (Pres))
(AHMAD CHALABI; CENTRAL INTELLIGENCE AGENCY; CIA; DEFENSE INTELLIGENCE AGENCY;
IRAQI NATIONAL CONGRESS; NATIONAL INTELLIGENCE ESTIMATE; PENTAGON; SECURITY
COUNCIL; SENATE; SENATE COMMITTEE; SENATE SELECT COMMITTEE; SENIOR C; STATE
DEPARTMENT; UNITED NATIONS; WHITE HOUSE)  (Bush, C.; Chalabi; Charlie Allen; Colin
L. Powell; George J. Tenet; Hussein; James Estrin; John McLaughlin; McLaughlin;
Pres Bush; Saddam Hussein; Tenet)  (United States International Relations; United
States Armament and Defense; Atomic Weapons; Biological and Chemical Warfare;
Intelligence Services; Terrorism)  (Iraq; Iraq; Iraq)

COMPANY TERMS: CENTRAL INTELLIGENCE AGENCY

EDITION: Late Edition - Final

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

7/6/04 NYT A1

Word Count: 2282
7/6/04 NYT A1
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 6

Westlaw.

The New York Times

12/16/05 NYT A1

Page 1

12/16/05 N.Y. Times A1
2005 WLNR 20281359

New York Times (NY)
Copyright (c) 2005 The New York Times. All rights reserved.

December 16, 2005

Section: A

## Bush Lets U.S. Spy on Callers Without Courts

JAMES RISEN and ERIC LICHTBLAU; Barclay Walsh contributed research for this
article.

National Security Agency officials privately voice concern about legality of
eavesdropping on Americans and others inside United States without court-approved
warrants, as secretly authorized by Pres Bush in wake of 9/11 attacks; at issue is
NSA's monitoring of international telephone calls and e-mail messages inside US in
search of evidence of terrorist activity under presidential order signed in 2002;
dozen current and former agency officials question whether this surveillance has
stretched, if not crossed, constitutional limits on legal searches; Bush
administration views operation as necessary so agency can move quickly on threats
to US; defenders of program say it has been critical tool in helping disrupt
terrorist plots and prevent attacks inside US; critics say most people targeted for
NSA monitoring have never been charged with crime; it is not clear how much members
of Congress were told about presidential order and eavesdropping program; photo;
timeline of NSA's half-century of surveillance (L)

WASHINGTON, Dec. 15 Months after the Sept. 11 attacks, President Bush secretly
authorized the National Security Agency to eavesdrop on Americans and others inside
the United States to search for evidence of terrorist activity without the court-
approved warrants ordinarily required for domestic spying, according to government
officials.

Under a presidential order signed in 2002, the intelligence agency has monitored
the international telephone calls and international e-mail messages of hundreds,
perhaps thousands, of people inside the United States without warrants over the
past three years in an effort to track possible "dirty numbers" linked to Al Qaeda,
the officials said. The agency, they said, still seeks warrants to monitor entirely
domestic communications.

The previously undisclosed decision to permit some eavesdropping inside the country
without court approval was a major shift in American intelligence-gathering
practices, particularly for the National Security Agency, whose mission is to spy
on communications abroad. As a result, some officials familiar with the continuing

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

operation have questioned whether the surveillance has stretched, if not crossed, constitutional limits on legal searches.

"This is really a sea change," said a former senior official who specializes in national security law. "It's almost a mainstay of this country that the N.S.A. only does foreign searches."

Nearly a dozen current and former officials, who were granted anonymity because of the classified nature of the program, discussed it with reporters for The New York Times because of their concerns about the operation's legality and oversight.

According to those officials and others, reservations about aspects of the program have also been expressed by Senator John D. Rockefeller IV, the West Virginia Democrat who is the vice chairman of the Senate Intelligence Committee, and a judge presiding over a secret court that oversees intelligence matters. Some of the questions about the agency's new powers led the administration to temporarily suspend the operation last year and impose more restrictions, the officials said.

The Bush administration views the operation as necessary so that the agency can move quickly to monitor communications that may disclose threats to the United States, the officials said. Defenders of the program say it has been a critical tool in helping disrupt terrorist plots and prevent attacks inside the United States.

Administration officials are confident that existing safeguards are sufficient to protect the privacy and civil liberties of Americans, the officials say. In some cases, they said, the Justice Department eventually seeks warrants if it wants to expand the eavesdropping to include communications confined within the United States. The officials said the administration had briefed Congressional leaders about the program and notified the judge in charge of the Foreign Intelligence Surveillance Court, the secret Washington court that deals with national security issues.

The White House asked The New York Times not to publish this article, arguing that it could jeopardize continuing investigations and alert would-be terrorists that they might be under scrutiny. After meeting with senior administration officials to hear their concerns, the newspaper delayed publication for a year to conduct additional reporting. Some information that administration officials argued could be useful to terrorists has been omitted.

Dealing With a New Threat

While many details about the program remain secret, officials familiar with it say the N.S.A. eavesdrops without warrants on up to 500 people in the United States at any given time. The list changes as some names are added and others dropped, so the number monitored in this country may have reached into the thousands since the program began, several officials said. Overseas, about 5,000 to 7,000 people suspected of terrorist ties are monitored at one time, according to those officials.

Several officials said the eavesdropping program had helped uncover a plot by Iyman

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Faris, an Ohio trucker and naturalized citizen who pleaded guilty in 2003 to
supporting Al Qaeda by planning to bring down the Brooklyn Bridge with blowtorches.
What appeared to be another Qaeda plot, involving fertilizer bomb attacks on
British pubs and train stations, was exposed last year in part through the program,
the officials said. But they said most people targeted for N.S.A. monitoring have
never been charged with a crime, including an Iranian-American doctor in the South
who came under suspicion because of what one official described as dubious ties to
Osama bin Laden.

The eavesdropping program grew out of concerns after the Sept. 11 attacks that the
nation's intelligence agencies were not poised to deal effectively with the new
threat of Al Qaeda and that they were handcuffed by legal and bureaucratic
restrictions better suited to peacetime than war, according to officials. In
response, President Bush significantly eased limits on American intelligence and
law enforcement agencies and the military.

But some of the administration's antiterrorism initiatives have provoked an outcry
from members of Congress, watchdog groups, immigrants and others who argue that the
measures erode protections for civil liberties and intrude on Americans' privacy.

Opponents have challenged provisions of the USA Patriot Act, the focus of
contentious debate on Capitol Hill this week, that expand domestic surveillance by
giving the Federal Bureau of Investigation more power to collect information like
library lending lists or Internet use. Military and F.B.I. officials have drawn
criticism for monitoring what were largely peaceful antiwar protests. The Pentagon
and the Department of Homeland Security were forced to retreat on plans to use
public and private databases to hunt for possible terrorists. And last year, the
Supreme Court rejected the administration's claim that those labeled "enemy
combatants" were not entitled to judicial review of their open-ended detention.

Mr. Bush's executive order allowing some warrantless eavesdropping on those inside
the United States -- including American citizens, permanent legal residents,
tourists and other foreigners -- is based on classified legal opinions that assert
that the president has broad powers to order such searches, derived in part from
the September 2001 Congressional resolution authorizing him to wage war on Al Qaeda
and other terrorist groups, according to the officials familiar with the N.S.A.
operation.

The National Security Agency, which is based at Fort Meade, Md., is the nation's
largest and most secretive intelligence agency, so intent on remaining out of
public view that it has long been nicknamed "No Such Agency." It breaks codes and
maintains listening posts around the world to eavesdrop on foreign governments,
diplomats and trade negotiators as well as drug lords and terrorists. But the
agency ordinarily operates under tight restrictions on any spying on Americans,
even if they are overseas, or disseminating information about them.

What the agency calls a "special collection program" began soon after the Sept. 11
attacks, as it looked for new tools to attack terrorism. The program accelerated in
early 2002 after the Central Intelligence Agency started capturing top Qaeda
operatives overseas, including Abu Zubaydah, who was arrested in Pakistan in March
2002. The C.I.A. seized the terrorists' computers, cellphones and personal phone

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

directories, said the officials familiar with the program. The N.S.A. surveillance
was intended to exploit those numbers and addresses as quickly as possible, they
said.

In addition to eavesdropping on those numbers and reading e-mail messages to and
from the Qaeda figures, the N.S.A. began monitoring others linked to them, creating
an expanding chain. While most of the numbers and addresses were overseas, hundreds
were in the United States, the officials said.

Under the agency's longstanding rules, the N.S.A. can target for interception phone
calls or e-mail messages on foreign soil, even if the recipients of those
communications are in the United States. Usually, though, the government can only
target phones and e-mail messages in the United States by first obtaining a court
order from the Foreign Intelligence Surveillance Court, which holds its closed
sessions at the Justice Department.

Traditionally, the F.B.I., not the N.S.A., seeks such warrants and conducts most
domestic eavesdropping. Until the new program began, the N.S.A. typically limited
its domestic surveillance to foreign embassies and missions in Washington, New York
and other cities, and obtained court orders to do so.

Since 2002, the agency has been conducting some warrantless eavesdropping on people
in the United States who are linked, even if indirectly, to suspected terrorists
through the chain of phone numbers and e-mail addresses, according to several
officials who know of the operation. Under the special program, the agency monitors
their international communications, the officials said. The agency, for example,
can target phone calls from someone in New York to someone in Afghanistan.

Warrants are still required for eavesdropping on entirely domestic-to-domestic
communications, those officials say, meaning that calls from that New Yorker to
someone in California could not be monitored without first going to the Federal
Intelligence Surveillance Court.

A White House Briefing

After the special program started, Congressional leaders from both political
parties were brought to Vice President Dick Cheney's office in the White House. The
leaders, who included the chairmen and ranking members of the Senate and House
intelligence committees, learned of the N.S.A. operation from Mr. Cheney, Lt. Gen.
Michael V. Hayden of the Air Force, who was then the agency's director and is now a
full general and the principal deputy director of national intelligence, and George
J. Tenet, then the director of the C.I.A., officials said.

It is not clear how much the members of Congress were told about the presidential
order and the eavesdropping program. Some of them declined to comment about the
matter, while others did not return phone calls.

Later briefings were held for members of Congress as they assumed leadership roles
on the intelligence committees, officials familiar with the program said. After a
2003 briefing, Senator Rockefeller, the West Virginia Democrat who became vice
chairman of the Senate Intelligence Committee that year, wrote a letter to Mr.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Cheney expressing concerns about the program, officials knowledgeable about the letter said. It could not be determined if he received a reply. Mr. Rockefeller declined to comment. Aside from the Congressional leaders, only a small group of people, including several cabinet members and officials at the N.S.A., the C.I.A. and the Justice Department, know of the program.

Some officials familiar with it say they consider warrantless eavesdropping inside the United States to be unlawful and possibly unconstitutional, amounting to an improper search. One government official involved in the operation said he privately complained to a Congressional official about his doubts about the program's legality. But nothing came of his inquiry. "People just looked the other way because they didn't want to know what was going on," he said.

A senior government official recalled that he was taken aback when he first learned of the operation. "My first reaction was, 'We're doing what?' " he said. While he said he eventually felt that adequate safeguards were put in place, he added that questions about the program's legitimacy were understandable.

Some of those who object to the operation argue that is unnecessary. By getting warrants through the foreign intelligence court, the N.S.A. and F.B.I. could eavesdrop on people inside the United States who might be tied to terrorist groups without skirting longstanding rules, they say.

The standard of proof required to obtain a warrant from the Foreign Intelligence Surveillance Court is generally considered lower than that required for a criminal warrant -- intelligence officials only have to show probable cause that someone may be "an agent of a foreign power," which includes international terrorist groups -- and the secret court has turned down only a small number of requests over the years. In 2004, according to the Justice Department, 1,754 warrants were approved. And the Foreign Intelligence Surveillance Court can grant emergency approval for wiretaps within hours, officials say.

Administration officials counter that they sometimes need to move more urgently, the officials said. Those involved in the program also said that the N.S.A.'s eavesdroppers might need to start monitoring large batches of numbers all at once, and that it would be impractical to seek permission from the Foreign Intelligence Surveillance Court first, according to the officials.

The N.S.A. domestic spying operation has stirred such controversy among some national security officials in part because of the agency's cautious culture and longstanding rules.

Widespread abuses -- including eavesdropping on Vietnam War protesters and civil rights activists -- by American intelligence agencies became public in the 1970's and led to passage of the Foreign Intelligence Surveillance Act, which imposed strict limits on intelligence gathering on American soil. Among other things, the law required search warrants, approved by the secret F.I.S.A. court, for wiretaps in national security cases. The agency, deeply scarred by the scandals, adopted additional rules that all but ended domestic spying on its part.

After the Sept. 11 attacks, though, the United States intelligence community was

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

criticized for being too risk-averse. The National Security Agency was even cited by the independent 9/11 Commission for adhering to self-imposed rules that were stricter than those set by federal law.

Concerns and Revisions

Several senior government officials say that when the special operation began, there were few controls on it and little formal oversight outside the N.S.A. The agency can choose its eavesdropping targets and does not have to seek approval from Justice Department or other Bush administration officials. Some agency officials wanted nothing to do with the program, apparently fearful of participating in an illegal operation, a former senior Bush administration official said. Before the 2004 election, the official said, some N.S.A. personnel worried that the program might come under scrutiny by Congressional or criminal investigators if Senator John Kerry, the Democratic nominee, was elected president.

In mid-2004, concerns about the program expressed by national security officials, government lawyers and a judge prompted the Bush administration to suspend elements of the program and revamp it.

For the first time, the Justice Department audited the N.S.A. program, several officials said. And to provide more guidance, the Justice Department and the agency expanded and refined a checklist to follow in deciding whether probable cause existed to start monitoring someone's communications, several officials said.

A complaint from Judge Colleen Kollar-Kotelly, the federal judge who oversees the Federal Intelligence Surveillance Court, helped spur the suspension, officials said. The judge questioned whether information obtained under the N.S.A. program was being improperly used as the basis for F.I.S.A. wiretap warrant requests from the Justice Department, according to senior government officials. While not knowing all the details of the exchange, several government lawyers said there appeared to be concerns that the Justice Department, by trying to shield the existence of the N.S.A. program, was in danger of misleading the court about the origins of the information cited to justify the warrants.

One official familiar with the episode said the judge insisted to Justice Department lawyers at one point that any material gathered under the special N.S.A. program not be used in seeking wiretap warrants from her court. Judge Kollar-Kotelly did not return calls for comment.

A related issue arose in a case in which the F.B.I. was monitoring the communications of a terrorist suspect under a F.I.S.A.-approved warrant, even though the National Security Agency was already conducting warrantless eavesdropping.

According to officials, F.B.I. surveillance of Mr. Faris, the Brooklyn Bridge plotter, was dropped for a short time because of technical problems. At the time, senior Justice Department officials worried what would happen if the N.S.A. picked up information that needed to be presented in court. The government would then either have to disclose the N.S.A. program or mislead a criminal court about how it had gotten the information.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Several national security officials say the powers granted the N.S.A. by President
Bush go far beyond the expanded counterterrorism powers granted by Congress under
the USA Patriot Act, which is up for renewal. The House on Wednesday approved a
plan to reauthorize crucial parts of the law. But final passage has been delayed
under the threat of a Senate filibuster because of concerns from both parties over
possible intrusions on Americans' civil liberties and privacy.

Under the act, law enforcement and intelligence officials are still required to
seek a F.I.S.A. warrant every time they want to eavesdrop within the United States.
A recent agreement reached by Republican leaders and the Bush administration would
modify the standard for F.B.I. wiretap warrants, requiring, for instance, a
description of a specific target. Critics say the bar would remain too low to
prevent abuses.

Bush administration officials argue that the civil liberties concerns are
unfounded, and they say pointedly that the Patriot Act has not freed the N.S.A. to
target Americans. "Nothing could be further from the truth," wrote John Yoo, a
former official in the Justice Department's Office of Legal Counsel, and his co-
author in a Wall Street Journal opinion article in December 2003. Mr. Yoo worked on
a classified legal opinion on the N.S.A.'s domestic eavesdropping program.

At an April hearing on the Patriot Act renewal, Senator Barbara A. Mikulski,
Democrat of Maryland, asked Attorney General Alberto R. Gonzales and Robert S.
Mueller III, the director of the F.B.I., "Can the National Security Agency, the
great electronic snooper, spy on the American people?"

"Generally," Mr. Mueller said, "I would say generally, they are not allowed to spy
or to gather information on American citizens."

President Bush did not ask Congress to include provisions for the N.S.A. domestic
surveillance program as part of the Patriot Act and has not sought any other laws
to authorize the operation. Bush administration lawyers argued that such new laws
were unnecessary, because they believed that the Congressional resolution on the
campaign against terrorism provided ample authorization, officials said.

The Legal Line Shifts

Seeking Congressional approval was also viewed as politically risky because the
proposal would be certain to face intense opposition on civil liberties grounds.
The administration also feared that by publicly disclosing the existence of the
operation, its usefulness in tracking terrorists would end, officials said.

The legal opinions that support the N.S.A. operation remain classified, but they
appear to have followed private discussions among senior administration lawyers and
other officials about the need to pursue aggressive strategies that once may have
been seen as crossing a legal line, according to senior officials who participated
in the discussions.

For example, just days after the Sept. 11, 2001, attacks on New York and the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Pentagon, Mr. Yoo, the Justice Department lawyer, wrote an internal memorandum that argued that the government might use "electronic surveillance techniques and equipment that are more powerful and sophisticated than those available to law enforcement agencies in order to intercept telephonic communications and observe the movement of persons but without obtaining warrants for such uses."

Mr. Yoo noted that while such actions could raise constitutional issues, in the face of devastating terrorist attacks "the government may be justified in taking measures which in less troubled conditions could be seen as infringements of individual liberties."

The next year, Justice Department lawyers disclosed their thinking on the issue of warrantless wiretaps in national security cases in a little-noticed brief in an unrelated court case. In that 2002 brief, the government said that "the Constitution vests in the President inherent authority to conduct warrantless intelligence surveillance (electronic or otherwise) of foreign powers or their agents, and Congress cannot by statute extinguish that constitutional authority."

Administration officials were also encouraged by a November 2002 appeals court decision in an unrelated matter. The decision by the Foreign Intelligence Surveillance Court of Review, which sided with the administration in dismantling a bureaucratic "wall" limiting cooperation between prosecutors and intelligence officers, cited "the president's inherent constitutional authority to conduct warrantless foreign intelligence surveillance."

But the same court suggested that national security interests should not be grounds "to jettison the Fourth Amendment requirements" protecting the rights of Americans against undue searches. The dividing line, the court acknowledged, "is a very difficult one to administer."

Photo: In 2002, President Bush toured the National Security Agency at Fort Meade, Md., with Lt. Gen. Michael V. Hayden, who was then the agency's director and is now a full general and the principal deputy director of national intelligence. (Photo by Doug Mills/Associated Press)(pg. A16)

Chart: "A Half-Century of Surveillance"

HISTORY -- Created in 1952, the National Security Agency is the biggest American intelligence agency, with more than 30,000 employees at Fort Meade, Md., and listening posts around the world. Part of the Defense Department, it is the successor to the State Department's "Black Chamber" and American military eavesdropping and code-breaking operations that date to the early days of telegraph and telephone communications.

MISSION -- The N.S.A. runs the eavesdropping hardware of the American intelligence system, operating a huge network of satellites and listening devices around the world. Traditionally, its mission has been to gather intelligence overseas on foreign enemies by breaking codes and tapping into telephone and computer communications.

SUCCESSES -- Most of the agency's successes remain secret, but a few have been

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

revealed. The agency listened to Soviet pilots and ground controllers during the shooting down of a civilian South Korean airliner in 1983; traced a disco bombing in Berlin in 1986 to Libya through diplomatic messages; and, more recently, used the identifying chips in cellphones to track terrorist suspects after the 2001 attacks.

DOMESTIC ACTIVITY -- The disclosure in the 1970's of widespread surveillance on political dissenters and other civil rights abuses led to restrictions at the N.S.A. and elsewhere on the use of domestic wiretaps. The N.S.A. monitors United Nations delegations and some foreign embassy lines on American soil, but is generally prohibited from listening in on the conversations of anyone inside the country without a special court order.

OFFICIAL RULES -- Since the reforms of the late 1970's, the N.S.A. has generally been permitted to target the communications of people on American soil only if they are believed to be "agents of a foreign power" -- a foreign nation or international terrorist group -- and a warrant is obtained from the Foreign Intelligence Surveillance Court.

EXPANDED ROLE -- Months after the terror attacks of Sept. 11, 2001, President Bush signed a secret executive order that relaxed restrictions on domestic spying by the N.S.A., according to officials with knowledge of the order. The order allows the agency to monitor without warrants the international phone calls and e-mail messages of some Americans and others inside the United States.

(pg. A16)

December 28, 2005, Wednesday - Because of an editing error, a front-page article on Dec. 16 about a decision by President Bush to authorize the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without warrants ordinarily required for domestic spying misstated the name of the court that would normally issue those warrants. It is the Foreign -- not Federal --Intelligence Surveillance Court.

---- INDEX REFERENCES ----

COMPANY: JUSTICE DEPARTMENT; PENTAGON LTD; STATE DEPARTMENT; CENTRAL INTELLIGENCE AGENCY; DEFENSE DEPARTMENT; UNITED NATIONS

NEWS SUBJECT: (Legal (1LE33); Social Issues (1SO05); Judicial (1JU36); International Terrorism (1IN37); Legislation (1LE97); United Nations (1UN54); Government (1GO80); Crime (1CR87); Civil Rights Law (1CI34); World Organizations (1IN77); Criminal Law (1CR79); Economics & Trade (1EC26); Political Parties (1PO73); Sept 11th Aftermath (1SE05); Public Affairs (1PU31))

INDUSTRY: (Smuggling & Illegal Trade (1SM35); Aerospace & Defense (1AE96); Defense (1DE43); Security (1SE29); Defense Intelligence (1DE90); Homeland Security (1HO11); Aerospace & Defense Regulatory (1AE25))

REGION: (North America (1NO39); Americas (1AM92); USA (1US73))

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Language:  EN

OTHER INDEXING:  (Risen, James; Lichtblau, Eric; Bush, George W (Pres))  (AIR
FORCE; BROOKLYN BRIDGE; CENTRAL INTELLIGENCE AGENCY; CONGRESS; CONSTITUTION;
DEFENSE DEPARTMENT; DEMOCRATIC; DEPARTMENT OF HOMELAND; FEDERAL INTELLIGENCE
SURVEILLANCE COURT; FEDERAL BUREAU OF INVESTIGATION; FOREIGN INTELLIGENCE
SURVEILLANCE ACT; FOREIGN INTELLIGENCE SURVEILLANCE COURT; FOREIGN INTELLIGENCE
SURVEILLANCE COURT OF REVIEW; HOUSE; HOUSE ON; JUSTICE DEPARTMENT; LEGAL LINE
SHIFTS; NATIONAL SECURITY AGENCY; NSA; OSAMA; PATRIOT ACT; PENTAGON; SENATE; SENATE
INTELLIGENCE COMMITTEE; STATE DEPARTMENT; SUPREME COURT; US SPY; UNITED NATIONS;
USA; USA PATRIOT ACT; WHITE HOUSE)  (Abu Zubaydah; Al Qaeda; Alberto R. Gonzales;
Barbara A. Mikulski; Bush; Cheney; Colleen Kollar-Kotelly; Dick Cheney; Doug Mills;
Faris; Generally; George J. Tenet; Iyman Faris; John D. Rockefeller; John Kerry;
John Yoo; Judge Kollar; Kotelly; Michael V. Hayden; Months; Mueller; Pres Bush;
Qaeda; Revisions; Robert S. Mueller; Rockefeller; Traditionally; Yoo)  (Terrorism;
Surveillance of Citizens by Government; Wiretapping and Other Eavesdropping Devices
and Methods; Electronic Mail; Freedom and Human Rights; Terrorism; Terrorism)

EDITION: Late Edition - Final

Word Count: 4957
12/16/05 NYT A1
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT 7

Westlaw.

*The New York Times*

12/24/05 NYT A1

Page 1

12/24/05 N.Y. Times A1
2005 WLNR 20892633

New York Times (NY)
Copyright (c) 2005 The New York Times. All rights reserved.

December 24, 2005

Section: A

DOMESTIC SURVEILLANCE: THE PROGRAM; SPY AGENCY MINED VAST DATA TROVE, OFFICIALS
REPORT

ERIC LICHTBLAU and JAMES RISEN

National Security Agency has traced and analyzed large volumes of telephone and
Internet communications flowing into and out of US as part of eavesdropping program
that Pres Bush approved after Sept 11, 2001, attacks to hunt for evidence of
terrorist activity; government officials say volume of information from
telecommunications data and voice networks, without court-approved warrants, is
much larger than White House has acknowledged; say it was collected by tapping
directly into some of American telecommunication system's main arteries (M)

WASHINGTON, Dec. 23 The National Security Agency has traced and analyzed large
volumes of telephone and Internet communications flowing into and out of the United
States as part of the eavesdropping program that President Bush approved after the
Sept. 11, 2001, attacks to hunt for evidence of terrorist activity, according to
current and former government officials.

The volume of information harvested from telecommunication data and voice networks,
without court-approved warrants, is much larger than the White House has
acknowledged, the officials said. It was collected by tapping directly into some of
the American telecommunication system's main arteries, they said.

As part of the program approved by President Bush for domestic surveillance without
warrants, the N.S.A. has gained the cooperation of American telecommunications
companies to obtain backdoor access to streams of domestic and international
communications, the officials said.

The government's collection and analysis of phone and Internet traffic have raised
questions among some law enforcement and judicial officials familiar with the
program. One issue of concern to the Foreign Intelligence Surveillance Court, which
has reviewed some separate warrant applications growing out of the N.S.A.'s
surveillance program, is whether the court has legal authority over calls outside
the United States that happen to pass through American-based telephonic "switches,"
according to officials familiar with the matter.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

"There was a lot of discussion about the switches" in conversations with the court, a Justice Department official said, referring to the gateways through which much of the communications traffic flows. "You're talking about access to such a vast amount of communications, and the question was, How do you minimize something that's on a switch that's carrying such large volumes of traffic? The court was very, very concerned about that."

Since the disclosure last week of the N.S.A.'s domestic surveillance program, President Bush and his senior aides have stressed that his executive order allowing eavesdropping without warrants was limited to the monitoring of international phone and e-mail communications involving people with known links to Al Qaeda.

What has not been publicly acknowledged is that N.S.A. technicians, besides actually eavesdropping on specific conversations, have combed through large volumes of phone and Internet traffic in search of patterns that might point to terrorism suspects. Some officials describe the program as a large data-mining operation.

The current and former government officials who discussed the program were granted anonymity because it remains classified.

Bush administration officials declined to comment on Friday on the technical aspects of the operation and the N.S.A.'s use of broad searches to look for clues on terrorists. Because the program is highly classified, many details of how the N.S.A. is conducting it remain unknown, and members of Congress who have pressed for a full Congressional inquiry say they are eager to learn more about the program's operational details, as well as its legality.

Officials in the government and the telecommunications industry who have knowledge of parts of the program say the N.S.A. has sought to analyze communications patterns to glean clues from details like who is calling whom, how long a phone call lasts and what time of day it is made, and the origins and destinations of phone calls and e-mail messages. Calls to and from Afghanistan, for instance, are known to have been of particular interest to the N.S.A. since the Sept. 11 attacks, the officials said.

This so-called "pattern analysis" on calls within the United States would, in many circumstances, require a court warrant if the government wanted to trace who calls whom.

The use of similar data-mining operations by the Bush administration in other contexts has raised strong objections, most notably in connection with the Total Information Awareness system, developed by the Pentagon for tracking terror suspects, and the Department of Homeland Security's Capps program for screening airline passengers. Both programs were ultimately scrapped after public outcries over possible threats to privacy and civil liberties.

But the Bush administration regards the N.S.A.'s ability to trace and analyze large volumes of data as critical to its expanded mission to detect terrorist plots before they can be carried out, officials familiar with the program say. Administration officials maintain that the system set up by Congress in 1978 under

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

the Foreign Intelligence Surveillance Act does not give them the speed and
flexibility to respond fully to terrorist threats at home.

A former technology manager at a major telecommunications company said that since
the Sept. 11 attacks, the leading companies in the industry have been storing
information on calling patterns and giving it to the federal government to aid in
tracking possible terrorists.

"All that data is mined with the cooperation of the government and shared with
them, and since 9/11, there's been much more active involvement in that area," said
the former manager, a telecommunications expert who did not want his name or that
of his former company used because of concern about revealing trade secrets.

Such information often proves just as valuable to the government as eavesdropping
on the calls themselves, the former manager said.

"If they get content, that's useful to them too, but the real plum is going to be
the transaction data and the traffic analysis," he said. "Massive amounts of
traffic analysis information -- who is calling whom, who is in Osama Bin Laden's
circle of family and friends -- is used to identify lines of communication that are
then given closer scrutiny."

Several officials said that after President Bush's order authorizing the N.S.A.
program, senior government officials arranged with officials of some of the
nation's largest telecommunications companies to gain access to switches that act
as gateways at the borders between the United States' communications networks and
international networks. The identities of the corporations involved could not be
determined.

The switches are some of the main arteries for moving voice and some Internet
traffic into and out of the United States, and, with the globalization of the
telecommunications industry in recent years, many international-to-international
calls are also routed through such American switches.

One outside expert on communications privacy who previously worked at the N.S.A.
said that to exploit its technological capabilities, the American government had in
the last few years been quietly encouraging the telecommunications industry to
increase the amount of international traffic that is routed through American-based
switches.

The growth of that transit traffic had become a major issue for the intelligence
community, officials say, because it had not been fully addressed by 1970's-era
laws and regulations governing the N.S.A. Now that foreign calls were being routed
through switches on American soil, some judges and law enforcement officials
regarded eavesdropping on those calls as a possible violation of those decades-old
restrictions, including the Foreign Intelligence Surveillance Act, which requires
court-approved warrants for domestic surveillance.

Historically, the American intelligence community has had close relationships with
many communications and computer firms and related technical industries. But the
N.S.A.'s backdoor access to major telecommunications switches on American soil with

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

the cooperation of major corporations represents a significant expansion of the agency's operational capability, according to current and former government officials.

Phil Karn, a computer engineer and technology expert at a major West Coast telecommunications company, said access to such switches would be significant. "If the government is gaining access to the switches like this, what you're really talking about is the capability of an enormous vacuum operation to sweep up data," he said.

---- INDEX REFERENCES ----

COMPANY: DEPARTMENT OF HOMELAND SECURITY; JUSTICE DEPARTMENT; PENTAGON LTD

NEWS SUBJECT: (Legal (1LE33); Judicial (1JU36); International Terrorism (1IN37); Government (1GO80); Economics & Trade (1EC26); Sept 11th Aftermath (1SE05))

INDUSTRY: (Software (1SO30); Data Mining (1DA69); Electronic Information Censorship (1EL52); I.T. in Government (1IT22); Internet Technology (1IN39); I.T. Regulatory (1IT67); Internet Regulatory (1IN49); I.T. (1IT96); Internet Usage Statistics (1IN79); Software Technology (1SO75); Electronic Information Ethics (1EL74); Security (1SE29); Internet (1IN27); Homeland Security (1HO11); Software Regulatory (1SO49); Software Agents (1SO53); Internet Software (1IN50))

REGION: (North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

OTHER INDEXING: (Lichtblau, Eric; Risen, James; Bush, George W (Pres)) (CONGRESS; DEPARTMENT OF HOMELAND SECURITY; FOREIGN INTELLIGENCE SURVEILLANCE; FOREIGN INTELLIGENCE SURVEILLANCE ACT; FOREIGN INTELLIGENCE SURVEILLANCE COURT; JUSTICE DEPARTMENT; NATIONAL SECURITY AGENCY; OSAMA BIN LADEN; PENTAGON; WHITE HOUSE) (Al Qaeda; Bush; DOMESTIC; Historically; Phil Karn) (Terrorism; Telephones and Telecommunications; Computers and the Internet; Electronic Mail; Wiretapping and Other Eavesdropping Devices and Methods; Privacy; Terrorism)

COMPANY TERMS: NATIONAL SECURITY AGENCY

EDITION: Late Edition - Final

Word Count: 1620
12/24/05 NYT A1
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 8

Westlaw.

𝕿𝖍𝖊 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕿𝖎𝖒𝖊𝖘

6/23/06 NYT A1                                                              Page 1

6/23/06 N.Y. Times A1
2006 WLNR 10871009

New York Times (NY)

Copyright (c) 2006 The New York Times. All rights reserved.

June 23, 2006

Section: A

BANK DATA SIFTED IN SECRET BY U.S. TO BLOCK TERROR

ERIC LICHTBLAU and JAMES RISEN; Barclay Walsh contributed reporting for this
article.

Counterterrorism officials have used secret program, initiated weeks after Sept 11
attacks, to sift through financial records from vast international database and
examine banking transactions of thousands of people in US; officials say program is
limited to tracing transactions to Al Qaeda by reviewing records from nerve center
of global banking, Belgian cooperative called Swift that routes about $6 trillion a
day between financial institutions; records involve movements of money overseas and
into and out of US, not routine domestic transactions; program, run out of CIA and
overseen by Treasury Department, reportedly helped capture most wanted Qaeda
figures in Southeast Asia; photos; chart; Under Sec Stuart Levey explains it as
unique, powerful and legal window into terrorist networks, interview; cites
president's emergency economic powers and multiple safeguards against unwarranted
searches of Americans' records; officials have not sought individual court-approved
warrants, relying on broad administrative subpoenas for millions of records from
Swift; officials inside administration have expressed concern about legal and
privacy issues; program is separate from NSA's warrantless eavesdropping but arises
from same Bush administration effort to use technological tools and break down
longstanding barriers to accessing private information; nearly 20 current and
former officials and industry executives discuss Swift operation; authorities are
keenly interested in money transfers by individuals, businesses and organizations
inside US; Swift executives tried to end cooperation in 2003 and continued only
after intervention by top officials including Fed's then-chairman Alan Greenspan,
although with new controls, including outside auditing; debate within Treasury and
Justice departments on legality discussed; The New York Times turned down
administration request not to publish article; executive editor Bill Keller
explains (L)

WASHINGTON, June 22 Under a secret Bush administration program initiated weeks
after the Sept. 11 attacks, counterterrorism officials have gained access to
financial records from a vast international database and examined banking
transactions involving thousands of Americans and others in the United States,
according to government and industry officials.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

The program is limited, government officials say, to tracing transactions of people suspected of having ties to Al Qaeda by reviewing records from the nerve center of the global banking industry, a Belgian cooperative that routes about $6 trillion daily between banks, brokerages, stock exchanges and other institutions. The records mostly involve wire transfers and other methods of moving money overseas and into and out of the United States. Most routine financial transactions confined to this country are not in the database.

Viewed by the Bush administration as a vital tool, the program has played a hidden role in domestic and foreign terrorism investigations since 2001 and helped in the capture of the most wanted Qaeda figure in Southeast Asia, the officials said.

The program, run out of the Central Intelligence Agency and overseen by the Treasury Department, "has provided us with a unique and powerful window into the operations of terrorist networks and is, without doubt, a legal and proper use of our authorities," Stuart Levey, an under secretary at the Treasury Department, said in an interview on Thursday.

The program is grounded in part on the president's emergency economic powers, Mr. Levey said, and multiple safeguards have been imposed to protect against any unwarranted searches of Americans' records.

The program, however, is a significant departure from typical practice in how the government acquires Americans' financial records. Treasury officials did not seek individual court-approved warrants or subpoenas to examine specific transactions, instead relying on broad administrative subpoenas for millions of records from the cooperative, known as Swift.

That access to large amounts of confidential data was highly unusual, several officials said, and stirred concerns inside the administration about legal and privacy issues.

"The capability here is awesome or, depending on where you're sitting, troubling," said one former senior counterterrorism official who considers the program valuable. While tight controls are in place, the official added, "the potential for abuse is enormous."

The program is separate from the National Security Agency's efforts to eavesdrop without warrants and collect domestic phone records, operations that have provoked fierce public debate and spurred lawsuits against the government and telecommunications companies.

But all the programs grew out of the Bush administration's desire to exploit technological tools to prevent another terrorist strike, and all reflect attempts to break down longstanding legal or institutional barriers to the government's access to private information about Americans and others inside the United States.

Officials described the Swift program as the biggest and most far-reaching of several secret efforts to trace terrorist financing. Much more limited agreements

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

with other companies have provided access to A.T.M. transactions, credit card
purchases and Western Union wire payments, the officials said.

Nearly 20 current and former government officials and industry executives discussed
aspects of the Swift operation with The New York Times on condition of anonymity
because the program remains classified. Some of those officials expressed
reservations about the program, saying that what they viewed as an urgent,
temporary measure had become permanent nearly five years later without specific
Congressional approval or formal authorization.

Data from the Brussels-based banking consortium, formally known as the Society for
Worldwide Interbank Financial Telecommunication, has allowed officials from the
C.I.A., the Federal Bureau of Investigation and other agencies to examine "tens of
thousands" of financial transactions, Mr. Levey said.

While many of those transactions have occurred entirely on foreign soil, officials
have also been keenly interested in international transfers of money by
individuals, businesses, charities and other groups under suspicion inside the
United States, officials said. A small fraction of Swift's records involve
transactions entirely within this country, but Treasury officials said they were
uncertain whether any had been examined.

Swift executives have been uneasy at times about their secret role, the government
and industry officials said. By 2003, the executives told American officials they
were considering pulling out of the arrangement, which began as an emergency
response to the Sept. 11 attacks, the officials said. Worried about potential legal
liability, the Swift executives agreed to continue providing the data only after
top officials, including Alan Greenspan, then chairman of the Federal Reserve,
intervened. At that time, new controls were introduced.

Among the safeguards, government officials said, is an outside auditing firm that
verifies that the data searches are based on intelligence leads about suspected
terrorists. "We are not on a fishing expedition," Mr. Levey said. "We're not just
turning on a vacuum cleaner and sucking in all the information that we can."

Swift and Treasury officials said they were aware of no abuses. But Mr. Levey, the
Treasury official, said one person had been removed from the operation for
conducting a search considered inappropriate.

Treasury officials said Swift was exempt from American laws restricting government
access to private financial records because the cooperative was considered a
messaging service, not a bank or financial institution.

But at the outset of the operation, Treasury and Justice Department lawyers debated
whether the program had to comply with such laws before concluding that it did not,
people with knowledge of the debate said. Several outside banking experts, however,
say that financial privacy laws are murky and sometimes contradictory and that the
program raises difficult legal and public policy questions.

The Bush administration has made no secret of its campaign to disrupt terrorist
financing, and President Bush, Treasury officials and others have spoken publicly

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

about those efforts. Administration officials, however, asked The New York Times not to publish this article, saying that disclosure of the Swift program could jeopardize its effectiveness. They also enlisted several current and former officials, both Democrat and Republican, to vouch for its value.

Bill Keller, the newspaper's executive editor, said: "We have listened closely to the administration's arguments for withholding this information, and given them the most serious and respectful consideration. We remain convinced that the administration's extraordinary access to this vast repository of international financial data, however carefully targeted use of it may be, is a matter of public interest."

Mr. Levey agreed to discuss the classified operation after the Times editors told him of the newspaper's decision.

On Thursday evening, Dana Perino, deputy White House press secretary, said: "Since immediately following 9/11, the American government has taken every legal measure to prevent another attack on our country. One of the most important tools in the fight against terror is our ability to choke off funds for the terrorists."

She added: "We know the terrorists pay attention to our strategy to fight them, and now have another piece of the puzzle of how we are fighting them. We also know they adapt their methods, which increases the challenge to our intelligence and law enforcement officials."

Referring to the disclosure by The New York Times last December of the National Security Agency's eavesdropping program, she said, "The president is concerned that once again The New York Times has chosen to expose a classified program that is working to protect our citizens."

Swift declined to discuss details of the program but defended its role in written responses to questions. "Swift has fully complied with all applicable laws," the consortium said. The organization said it insisted that the data be used only for terrorism investigations and had narrowed the scope of the information provided to American officials over time.

A Crucial Gatekeeper

Swift's database provides a rich hunting ground for government investigators. Swift is a crucial gatekeeper, providing electronic instructions on how to transfer money among 7,800 financial institutions worldwide. The cooperative is owned by more than 2,200 organizations, and virtually every major commercial bank, as well as brokerage houses, fund managers and stock exchanges, uses its services. Swift routes more than 11 million transactions each day, most of them across borders.

The cooperative's message traffic allows investigators, for example, to track money from the Saudi bank account of a suspected terrorist to a mosque in New York. Starting with tips from intelligence reports about specific targets, agents search the database in what one official described as a "24-7" operation. Customers' names, bank account numbers and other identifying information can be retrieved, the officials said.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

The data does not allow the government to track routine financial activity, like
A.T.M. withdrawals, confined to this country, or to see bank balances, Treasury
officials said. And the information is not provided in real time -- Swift generally
turns it over several weeks later. Because of privacy concerns and the potential
for abuse, the government sought the data only for terrorism investigations and
prohibited its use for tax fraud, drug trafficking or other inquiries, the
officials said.

The Treasury Department was charged by President Bush, in a September 2001
executive order, with taking the lead role in efforts to disrupt terrorist
financing. Mr. Bush has been briefed on the program and Vice President Dick Cheney
has attended C.I.A. demonstrations, the officials said. The National Security
Agency has provided some technical assistance.

While the banking program is a closely held secret, administration officials have
held classified briefings for some members of Congress and the Sept. 11 commission,
the officials said. More lawmakers were briefed in recent weeks, after the
administration learned The Times was making inquiries for this article.

Swift's 25-member board of directors, made up of representatives from financial
institutions around the world, was previously told of the program. The Group of
10's central banks, in major industrialized countries, which oversee Swift, were
also informed. It is not clear if other network participants know that American
intelligence officials can examine their message traffic.

Because Swift is based overseas and has offices in the United States, it is
governed by European and American laws. Several international regulations and
policies impose privacy restrictions on companies that are generally regarded as
more stringent than those in this country. United States law establishes some
protections for the privacy of Americans' financial data, but they are not
ironclad. A 1978 measure, the Right to Financial Privacy Act, has a limited scope
and a number of exceptions, and its role in national security cases remains largely
untested.

Several people familiar with the Swift program said they believed that they were
exploiting a "gray area" in the law and that a case could be made for restricting
the government's access to the records on Fourth Amendment and statutory grounds.
They also worried about the impact on Swift if the program were disclosed.

"There was always concern about this program," a former official said.

One person involved in the Swift program estimated that analysts had reviewed
international transfers involving "many thousands" of people or groups in the
United States. Two other officials placed the figure in the thousands. Mr. Levey
said he could not estimate the number.

The Swift data has provided clues to money trails and ties between possible
terrorists and groups financing them, the officials said. In some instances, they
said, the program has pointed them to new suspects, while in others it has
buttressed cases already under investigation.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:10-cr-00485-LMB   Document 115-3   Filed 06/21/11   Page 44 of 80 PageID# 679

Among the successes was the capture of a Qaeda operative, Riduan Isamuddin, better known as Hambali, believed to be the mastermind of the 2002 bombing of a Bali resort, several officials said. The Swift data identified a previously unknown figure in Southeast Asia who had financial dealings with a person suspected of being a member of Al Qaeda; that link helped locate Hambali in Thailand in 2003, they said.

In the United States, the program has provided financial data in investigations into possible domestic terrorist cells as well as inquiries of Islamic charities with suspected of having links to extremists, the officials said.

The data also helped identify a Brooklyn man who was convicted on terrorism-related charges last year, the officials said. The man, Uzair Paracha, who worked at a New York import business, aided a Qaeda operative in Pakistan by agreeing to launder $200,000 through a Karachi bank, prosecutors said.

In terrorism prosecutions, intelligence officials have been careful to "sanitize," or hide the origins of evidence collected through the program to keep it secret, officials said.

The Bush administration has pursued steps that may provide some enhanced legal standing for the Swift program. In late 2004, Congress authorized the Treasury Department to develop regulations requiring American banks to turn over records of international wire transfers. Officials say a preliminary version of those rules may be ready soon. One official described the regulations as an attempt to "formalize" access to the kind of information secretly provided by Swift, though other officials said the initiative was unrelated to the program.

The Scramble for New Tools

Like other counterterrorism measures carried out by the Bush administration, the Swift program began in the hectic days after the Sept. 11 attacks, as officials scrambled to identify new tools to head off further strikes.

One priority was to cut off the flow of money to Al Qaeda. The 9/11 hijackers had helped finance their plot by moving money through banks. Nine of the hijackers, for instance, funneled money from Europe and the Middle East to SunTrust bank accounts in Florida. Some of the $130,000 they received was wired by people overseas with known links to Al Qaeda.

Financial company executives, many of whom had lost friends at the World Trade Center, were eager to help federal officials trace terrorist money. "They saw 9/11 not just as an attack on the United States, but on the financial industry as a whole," said one former government official.

Quietly, counterterrorism officials sought to expand the information they were getting from financial institutions. Treasury officials, for instance, spoke with credit card companies about devising an alert if someone tried to buy fertilizer and timing devices that could be used for a bomb, but they were told the idea was

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

not logistically possible, a lawyer in the discussions said.

The F.B.I. began acquiring financial records from Western Union and its parent company, the First Data Corporation. The programs were alluded to in Congressional testimony by the F.B.I. in 2003 and described in more detail in a book released this week, "The One Percent Doctrine," by Ron Suskind. Using what officials described as individual, narrowly framed subpoenas and warrants, the F.B.I. has obtained records from First Data, which processes credit and debit card transactions, to track financial activity and try to locate suspects.

Similar subpoenas for the Western Union data allowed the F.B.I. to trace wire transfers, mainly outside the United States, and to help Israel disrupt about a half-dozen possible terrorist plots there by unraveling the financing, an official said.

The idea for the Swift program, several officials recalled, grew out of a suggestion by a Wall Street executive, who told a senior Bush administration official about Swift's database. Few government officials knew much about the consortium, which is led by a Brooklyn native, Leonard H. Schrank, but they quickly discovered it offered unparalleled access to international transactions. Swift, a former government official said, was "the mother lode, the Rosetta stone" for financial data.

Intelligence officials were so eager to use the Swift data that they discussed having the C.I.A. covertly gain access to the system, several officials involved in the talks said. But Treasury officials resisted, the officials said, and favored going to Swift directly.

At the same time, lawyers in the Treasury Department and the Justice Department were considering possible legal obstacles to the arrangement, the officials said.

In 1976, the Supreme Court ruled that Americans had no constitutional right to privacy for their records held by banks or other financial institutions. In response, Congress passed the Right to Financial Privacy Act two years later, restricting government access to Americans' banking records. In considering the Swift program, some government lawyers were particularly concerned about whether the law prohibited officials from gaining access to records without a warrant or subpoena based on some level of suspicion about each target.

For many years, law enforcement officials have relied on grand-jury subpoenas or court-approved warrants for such financial data. Since 9/11, the F.B.I. has turned more frequently to an administrative subpoena, known as a national security letter, to demand such records.

After an initial debate, Treasury Department lawyers, consulting with the Justice Department, concluded that the privacy laws applied to banks, not to a banking cooperative like Swift. They also said the law protected individual customers and small companies, not the major institutions that route money through Swift on behalf of their customers.

Other state, federal and international regulations place different and sometimes

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

conflicting restrictions on the government's access to financial records. Some put greater burdens on the company disclosing the information than on the government officials demanding it.

Among their considerations, American officials saw Swift as a willing partner in the operation. But Swift said its participation was never voluntary. "Swift has made clear that it could provide data only in response to a valid subpoena," according to its written statement.

Indeed, the cooperative's executives voiced early concerns about legal and corporate liability, officials said, and the Treasury Department's Office of Foreign Asset Control began issuing broad subpoenas for the cooperative's records related to terrorism. One official said the subpoenas were intended to give Swift some legal protection.

Underlying the government's legal analysis was the International Emergency Economic Powers Act, which Mr. Bush invoked after the 9/11 attacks. The law gives the president what legal experts say is broad authority to "investigate, regulate or prohibit" foreign transactions in responding to "an unusual and extraordinary threat."

But L. Richard Fischer, a Washington lawyer who wrote a book on banking privacy and is regarded as a leading expert in the field, said he was troubled that the Treasury Department would use broad subpoenas to demand large volumes of financial records for analysis. Such a program, he said, appears to do an end run around bank-privacy laws that generally require the government to show that the records of a particular person or group are relevant to an investigation.

"There has to be some due process," Mr. Fischer said. "At an absolute minimum, it strikes me as inappropriate."

Several former officials said they had lingering concerns about the legal underpinnings of the Swift operation. The program "arguably complies with the letter of the law, if not the spirit," one official said.

Another official said: "This was creative stuff. Nothing was clear cut, because we had never gone after information this way before."

Treasury officials said they considered the government's authority to subpoena the Swift records to be clear. "People do not have a privacy interest in their international wire transactions," Mr. Levey, the Treasury under secretary, said.

Tighter Controls Sought

Within weeks of 9/11, Swift began turning over records that allowed American analysts to look for evidence of terrorist financing. Initially, there appear to have been few formal limits on the searches.

"At first, they got everything -- the entire Swift database," one person close to the operation said.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Intelligence officials paid particular attention to transfers to or from Saudi Arabia and the United Arab Emirates because most of the 9/11 hijackers were from those countries.

The volume of data, particularly at the outset, was often overwhelming, officials said. "We were turning on every spigot we could find and seeing what water would come out," one former administration official said. "Sometimes there were hits, but a lot of times there weren't."

Officials realized the potential for abuse, and narrowed the program's targets and put in more safeguards. Among them were the auditing firm, an electronic record of every search and a requirement that analysts involved in the operation document the intelligence that justified each data search. Mr. Levey said the program was used only to examine records of individuals or entities, not for broader data searches.

Despite the controls, Swift executives became increasingly worried about their secret involvement with the American government, the officials said. By 2003, the cooperative's officials were discussing pulling out because of their concerns about legal and financial risks if the program were revealed, one government official said.

"How long can this go on?" a Swift executive asked, according to the official.

Even some American officials began to question the open-ended arrangement. "I thought there was a limited shelf life and that this was going to go away," the former senior official said.

In 2003, administration officials asked Swift executives and some board members to come to Washington. They met with Mr. Greenspan, Robert S. Mueller III, the F.B.I. director, and Treasury officials, among others, in what one official described as "a full-court press." Aides to Mr. Greenspan and Mr. Mueller declined to comment on the meetings.

The executives agreed to continue supplying records after the Americans pledged to impose tighter controls. Swift representatives would be stationed alongside intelligence officials and could block any searches considered inappropriate, several officials said.

The procedural change provoked some opposition at the C.I.A. because "the agency was chomping at the bit to have unfettered access to the information," a senior counterterrorism official said. But the Treasury Department saw it as a necessary compromise, the official said, to "save the program."

Photos: Financial data from the Swift program led to the capture of Hambali, a Qaeda operative, in 2003. (Photo by Associated Press); The Swift data helped convict Uzair Paracha on terrorism-related charges last year in New York. (pg. A10)

Chart: "A Money Transfer"
The Brussels-based Society for Worldwide Interbank Financial Telecommunication,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

also known as Swift, provides electronic messaging services that direct financial
transactions worth about $6 trillion a day among some 7,800 institutions worldwide.
A look at a typical transaction:

SENDER instructs a bank, or other financial institution, to send money to a desired
recipient, often in another country.

SENDER'S BANK sends detailed payment instructions to receiver's bank through Swift.

SWIFT processes the message that includes names and numbers of accounts involved
and a description of the asset being transferred. It does not actually move money
with the message.

IN THE UNITED STATES
107 institutions are members of Swift.
588 institutions use the system.

When the transaction is settled, the sender's bank transfers the money to the
recipient's bank.

RECIPIENT'S BANK credits the amount to the recipient's account according to the
message.

RECIPIENT collects the amount.

(pg. A10)

---- INDEX REFERENCES ----

COMPANY: JUSTICE DEPARTMENT; CENTRAL INTELLIGENCE AGENCY; SUNTRUST BANKS INC; FIRST
DATA CORP

NEWS SUBJECT: (Consumer Protection (1CO43); Legal (1LE33); Benelux (1BE50);
Consumer Privacy (1CO05); Business Lawsuits & Settlements (1BU19); Business
Litigation (1BU04); Judicial (1JU36); International Terrorism (1IN37); Technology
Law (1TE30); Government (1GO80); Government Litigation (1GO18); Economic Policy &
Policymakers (1EC69); World Organizations (1IN77); Economics & Trade (1EC26); Sept
11th Aftermath (1SE05))

INDUSTRY: (E-Commerce Technology (1EC54); Financial Services Products (1FI16);
Major Central Banks (1MA01); I.T. in Government (1IT22); Financial Services
(1FI37); I.T. in Financial Services (1IT24); I.T. Regulatory (1IT67); Financial
Services Regulatory (1FI03); I.T. (1IT96); Security (1SE29); Retail Regulatory
(1RE54); Financial Services Convergence (1FI45); Electronic Transaction Technology
(1EL86); Federal Reserve (1FE99))

REGION: (North America (1NO39); Western Europe (1WE41); Europe (1EU83); New York
(1NE72); Americas (1AM92); Middle East (1MI23); USA (1US73); Belgium (1BE51))

Language: EN

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

OTHER INDEXING:  (Bush, George W (Pres); Lichtblau, Eric; Risen, James; Keller,
Bill; Levey, Stuart (Under Sec); Greenspan, Alan; Hambali (Terrorist); Paracha,
Uzair)  (CENTRAL INTELLIGENCE AGENCY; CIA; CONGRESS; DANA PERINO; FEDERAL BUREAU OF
INVESTIGATION; FEDERAL RESERVE; FIRST DATA; INTERNATIONAL EMERGENCY ECONOMIC
POWERS; JUSTICE DEPARTMENT; NATIONAL SECURITY AGENCY; NSA; QAEDA; ROSETTA; SEC
STUART LEVEY; SECRET; SOCIETY; SOCIETY FOR WORLDWIDE INTERBANK; STUART LEVEY;
SUNTRUST; SUPREME COURT; TIMES; TREASURY; TREASURY DEPARTMENT; WHITE HOUSE;
WORLDWIDE INTERBANK)  (Al; Al Qaeda; Alan Greenspan; BANK; Bill Keller; Bush; DATA
SIFTED; Democrat; Dick Cheney; Fed; Fischer; Greenspan; Leonard H. Schrank; Levey;
Mueller; Photo; Qaeda; Quietly; Republican; Richard Fischer; Riduan Isamuddin;
Robert S. Mueller; Ron Suskind; Tighter Controls Sought; Uzair Paracha)
(Terrorism; Banks and Banking; Privacy; Computers and the Internet; Terrorism;
Surveillance of Citizens by Government; Terrorism; Wiretapping and Other
Eavesdropping Devices and Methods; Terrorism; Terrorism)  (Far East, South and
Southeast Asia and Pacific Areas)

COMPANY TERMS: AL QAEDA (TERRORIST GROUP); SWIFT (SOCIETY FOR WORLD INTERBANK
FINANCIAL TELECOMMUNICATION); NEW YORK TIMES; CENTRAL INTELLIGENCE AGENCY; TREASURY
DEPARTMENT; JUSTICE DEPARTMENT; NATIONAL SECURITY AGENCY; NATIONAL SECURITY AGENCY

EDITION: Late Edition - Final

Word Count: 4891
6/23/06 NYT A1
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT 9



## National Intelligence Estimate

# Iran: Nuclear Intentions and Capabilities



*November 2007*

## OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE

The Director of National Intelligence serves as the head of the Intelligence Community (IC), overseeing and directing the implementation of the National Intelligence Program and acting as the principal advisor to the President, the National Security Council, and the Homeland Security Council for intelligence matters.

The Office of the Director of National Intelligence is charged with:

- Integrating the domestic and foreign dimensions of US intelligence so that there are no gaps in our understanding of threats to our national security;
- Bringing more depth and accuracy to intelligence analysis; and
- Ensuring that US intelligence resources generate future capabilities as well as present results.

## NATIONAL INTELLIGENCE COUNCIL

Since its formation in 1973, the National Intelligence Council (NIC) has served as a bridge between the intelligence and policy communities, a source of deep substantive expertise on critical national security issues, and as a focal point for Intelligence Community collaboration. The NIC's key goal is to provide policymakers with the best, unvarnished, and unbiased information—regardless of whether analytic judgments conform to US policy. Its primary functions are to:

- Support the DNI in his role as Principal Intelligence Advisor to the President and other senior policymakers.
- Lead the Intelligence Community's effort to produce National Intelligence Estimates (NIEs) and other NIC products that address key national security concerns.
- Provide a focal point for policymakers, warfighters, and Congressional leaders to task the Intelligence Community for answers to important questions.
- Reach out to nongovernment experts in academia and the private sector—and use alternative analyses and new analytic tools—to broaden and deepen the Intelligence Community's perspective.

## NATIONAL INTELLIGENCE ESTIMATES AND THE NIE PROCESS

National Intelligence Estimates (NIEs) are the Intelligence Community's (IC) most authoritative written judgments on national security issues and designed to help US civilian and military leaders develop policies to protect US national security interests. NIEs usually provide information on the current state of play but are primarily "estimative"—that is, they make judgments about the likely course of future events and identify the implications for US policy.

The NIEs are typically requested by senior civilian and military policymakers, Congressional leaders and at times are initiated by the National Intelligence Council (NIC). Before a NIE is drafted, the relevant NIO is responsible for producing a concept paper or terms of reference (TOR) and circulates it throughout the Intelligence Community for comment. The TOR defines the key estimative questions, determines drafting responsibilities, and sets the drafting and publication schedule. One or more IC analysts are usually assigned to produce the initial text. The NIC then meets to critique the draft before it is circulated to the broader IC. Representatives from the relevant IC agencies meet to hone and coordinate line-by-line the full text of the NIE. Working with their Agencies, reps also assign the level of confidence they have in each key judgment. IC reps discuss the quality of sources with collectors, and the National Clandestine Service vets the sources used to ensure the draft does not include any that have been recalled or otherwise seriously questioned.

All NIEs are reviewed by National Intelligence Board, which is chaired by the DNI and is composed of the heads of relevant IC agencies. Once approved by the NIB, NIEs are briefed to the President and senior policymakers. The whole process of producing NIEs normally takes at least several months.

The NIC has undertaken a number of steps to improve the NIE process under the DNI. These steps are in accordance with the goals and recommendations set out in the SSCI and WMD Commission reports and the 2004 Intelligence Reform and Prevention of Terrorism Act. Most notably, over the last year and a half, the IC has:

- *Created new procedures to integrate formal reviews of source reporting and technical judgments.* The Directors of the National Clandestine Service, NSA, NGA, and DIA and the Assistant Secretary/INR are now required to submit formal assessments that highlight the strengths, weaknesses, and overall credibility of their sources used in developing the critical judgments of the NIE.

- *Applied more rigorous standards.* A textbox is incorporated into all NIEs that explains what we mean by such terms as "we judge" and that clarifies the difference between judgments of likelihood and confidence levels. We have made a concerted effort to not only highlight differences among agencies but to explain the reasons for such differences and to prominently display them in the Key Judgments.

# Scope Note

This National Intelligence Estimate (NIE) assesses the status of Iran's nuclear program, and the program's outlook over the next 10 years. This time frame is more appropriate for estimating capabilities than intentions and foreign reactions, which are more difficult to estimate over a decade. In presenting the Intelligence Community's assessment of Iranian nuclear intentions and capabilities, the NIE thoroughly reviews all available information on these questions, examines the range of reasonable scenarios consistent with this information, and describes the key factors we judge would drive or impede nuclear progress in Iran. This NIE is an extensive reexamination of the issues in the May 2005 assessment.

This Estimate focuses on the following key questions:

- What are Iran's intentions toward developing nuclear weapons?

- What domestic factors affect Iran's decisionmaking on whether to develop nuclear weapons?

- What external factors affect Iran's decisionmaking on whether to develop nuclear weapons?

- What is the range of potential Iranian actions concerning the development of nuclear weapons, and the decisive factors that would lead Iran to choose one course of action over another?

- What is Iran's current and projected capability to develop nuclear weapons? What are our key assumptions, and Iran's key chokepoints/vulnerabilities?

**This NIE does *not* assume that Iran intends to acquire nuclear weapons. Rather, it examines the intelligence to assess Iran's capability and intent (or lack thereof) to acquire nuclear weapons, taking full account of Iran's dual-use uranium fuel cycle and those nuclear activities that are at least partly civil in nature.**

This Estimate does assume that the strategic goals and basic structure of Iran's senior leadership and government will remain similar to those that have endured since the death of Ayatollah Khomeini in 1989. We acknowledge the potential for these to change during the time frame of the Estimate, but are unable to confidently predict such changes or their implications. This Estimate does not assess how Iran may conduct future negotiations with the West on the nuclear issue.

**This Estimate incorporates intelligence reporting available as of 31 October 2007.**

## What We Mean When We Say: An Explanation of Estimative Language

We use phrases such as *we judge, we assess,* and *we estimate*—and probabilistic terms such as *probably* and *likely*—to convey analytical assessments and judgments. Such statements are not facts, proof, or knowledge. These assessments and judgments generally are based on collected information, which often is incomplete or fragmentary. Some assessments are built on previous judgments. In all cases, assessments and judgments are not intended to imply that we have "proof" that shows something to be a fact or that definitively links two items or issues.

In addition to conveying judgments rather than certainty, our estimative language also often conveys 1) our assessed likelihood or probability of an event and 2) the level of confidence we ascribe to the judgment.

*Estimates of Likelihood.* Because analytical judgments are not certain, we use probabilistic language to reflect the Community's estimates of the likelihood of developments or events. Terms such as *probably, likely, very likely,* or *almost certainly* indicate a greater than even chance. The terms *unlikely* and *remote* indicate a less then even chance that an event will occur; they do not imply that an event will not occur. Terms such as *might* or *may* reflect situations in which we are unable to assess the likelihood, generally because relevant information is unavailable, sketchy, or fragmented. Terms such as *we cannot dismiss, we cannot rule out,* or *we cannot discount* reflect an unlikely, improbable, or remote event whose consequences are such that it warrants mentioning. The chart provides a rough idea of the relationship of some of these terms to each other.

| Remote | Very unlikely | Unlikely | Even chance | Probably/ Likely | Very likely | Almost certainly |
|---|---|---|---|---|---|---|

*Confidence in Assessments.* Our assessments and estimates are supported by information that varies in scope, quality and sourcing. Consequently, we ascribe *high, moderate,* or *low* levels of confidence to our assessments, as follows:

- *High confidence* generally indicates that our judgments are based on high-quality information, and/or that the nature of the issue makes it possible to render a solid judgment. A "high confidence" judgment is not a fact or a certainty, however, and such judgments still carry a risk of being wrong.

- *Moderate confidence* generally means that the information is credibly sourced and plausible but not of sufficient quality or corroborated sufficiently to warrant a higher level of confidence.

- *Low confidence* generally means that the information's credibility and/or plausibility is questionable, or that the information is too fragmented or poorly corroborated to make solid analytic inferences, or that we have significant concerns or problems with the sources.

# Key Judgments

A. We judge with high confidence that in fall 2003, Tehran halted its nuclear weapons program[1]; we also assess with moderate-to-high confidence that Tehran at a minimum is keeping open the option to develop nuclear weapons. We judge with high confidence that the halt, and Tehran's announcement of its decision to suspend its declared uranium enrichment program and sign an Additional Protocol to its Nuclear Non-Proliferation Treaty Safeguards Agreement, was directed primarily in response to increasing international scrutiny and pressure resulting from exposure of Iran's previously undeclared nuclear work.

- We assess with high confidence that until fall 2003, Iranian military entities were working under government direction to develop nuclear weapons.

- We judge with high confidence that the halt lasted at least several years. (Because of intelligence gaps discussed elsewhere in this Estimate, however, DOE and the NIC assess with only moderate confidence that the halt to those activities represents a halt to Iran's entire nuclear weapons program.)

- We assess with moderate confidence Tehran had not restarted its nuclear weapons program as of mid-2007, but we do not know whether it currently intends to develop nuclear weapons.

- We continue to assess with moderate-to-high confidence that Iran does not currently have a nuclear weapon.

- Tehran's decision to halt its nuclear weapons program suggests it is less determined to develop nuclear weapons than we have been judging since 2005. Our assessment that the program probably was halted primarily in response to international pressure suggests Iran may be more vulnerable to influence on the issue than we judged previously.

B. We continue to assess with low confidence that Iran probably has imported at least some weapons-usable fissile material, but still judge with moderate-to-high confidence it has not obtained enough for a nuclear weapon. We cannot rule out that Iran has acquired from abroad—or will acquire in the future—a nuclear weapon or enough fissile material for a weapon. Barring such acquisitions, if Iran wants to have nuclear weapons it would need to produce sufficient amounts of fissile material indigenously—which we judge with high confidence it has not yet done.

C. We assess centrifuge enrichment is how Iran probably could first produce enough fissile material for a weapon, if it decides to do so. Iran resumed its declared centrifuge

---

[1] For the purposes of this Estimate, by "nuclear weapons program" we mean Iran's nuclear weapon design and weaponization work and covert uranium conversion-related and uranium enrichment-related work; we do not mean Iran's declared civil work related to uranium conversion and enrichment.

enrichment activities in January 2006, despite the continued halt in the nuclear weapons program. Iran made significant progress in 2007 installing centrifuges at Natanz, but we judge with moderate confidence it still faces significant technical problems operating them.

- We judge with moderate confidence that the earliest possible date Iran would be technically capable of producing enough HEU for a weapon is late 2009, but that this is very unlikely.

- We judge with moderate confidence Iran probably would be technically capable of producing enough HEU for a weapon sometime during the 2010-2015 time frame. (INR judges Iran is unlikely to achieve this capability before 2013 because of foreseeable technical and programmatic problems.) All agencies recognize the possibility that this capability may not be attained until *after* 2015.

D. Iranian entities are continuing to develop a range of technical capabilities that could be applied to producing nuclear weapons, if a decision is made to do so. For example, Iran's civilian uranium enrichment program is continuing. We also assess with high confidence that since fall 2003, Iran has been conducting research and development projects with commercial and conventional military applications—some of which would also be of limited use for nuclear weapons.

E. We do not have sufficient intelligence to judge confidently whether Tehran is willing to maintain the halt of its nuclear weapons program indefinitely while it weighs its options, or whether it will or already has set specific deadlines or criteria that will prompt it to restart the program.

- Our assessment that Iran halted the program in 2003 primarily in response to international pressure indicates Tehran's decisions are guided by a cost-benefit approach rather than a rush to a weapon irrespective of the political, economic, and military costs. This, in turn, suggests that some combination of threats of intensified international scrutiny and pressures, along with opportunities for Iran to achieve its security, prestige, and goals for regional influence in other ways, might—if perceived by Iran's leaders as credible—prompt Tehran to extend the current halt to its nuclear weapons program. It is difficult to specify what such a combination might be.

- We assess with moderate confidence that convincing the Iranian leadership to forgo the eventual development of nuclear weapons will be difficult given the linkage many within the leadership probably see between nuclear weapons development and Iran's key national security and foreign policy objectives, and given Iran's considerable effort from at least the late 1980s to 2003 to develop such weapons. In our judgment, only an Iranian political decision to abandon a nuclear weapons objective would plausibly keep Iran from eventually producing nuclear weapons—and such a decision is inherently reversible.

F.  We assess with moderate confidence that Iran probably would use covert facilities—rather than its declared nuclear sites—for the production of highly enriched uranium for a weapon.  A growing amount of intelligence indicates Iran was engaged in covert uranium conversion and uranium enrichment activity, but we judge that these efforts probably were halted in response to the fall 2003 halt, and that these efforts probably had not been restarted through at least mid-2007.

G.  We judge with high confidence that Iran will not be technically capable of producing and reprocessing enough plutonium for a weapon before about 2015.

H.  We assess with high confidence that Iran has the scientific, technical and industrial capacity eventually to produce nuclear weapons if it decides to do so.

**Key Differences Between the Key Judgments of This Estimate on Iran's Nuclear Program and the May 2005 Assessment**

| 2005 IC Estimate | 2007 National Intelligence Estimate |
|---|---|
| Assess with high confidence that Iran currently is determined to develop nuclear weapons despite its international obligations and international pressure, but we do not assess that Iran is immovable. | Judge with high confidence that in fall 2003, Tehran halted its nuclear weapons program. Judge with high confidence that the halt lasted at least several years. (DOE and the NIC have moderate confidence that the halt to those activities represents a halt to Iran's entire nuclear weapons program.) Assess with moderate confidence Tehran had not restarted its nuclear weapons program as of mid-2007, but we do not know whether it currently intends to develop nuclear weapons. Judge with high confidence that the halt was directed primarily in response to increasing international scrutiny and pressure resulting from exposure of Iran's previously undeclared nuclear work. Assess with moderate-to-high confidence that Tehran at a minimum is keeping open the option to develop nuclear weapons. |
| We have moderate confidence in projecting when Iran is likely to make a nuclear weapon; we assess that it is unlikely before early-to-mid next decade. | We judge with moderate confidence that the earliest possible date Iran would be technically capable of producing enough highly enriched uranium (HEU) for a weapon is late 2009, but that this is very unlikely. We judge with moderate confidence Iran probably would be technically capable of producing enough HEU for a weapon sometime during the 2010-2015 time frame. (INR judges that Iran is unlikely to achieve this capability before 2013 because of foreseeable technical and programmatic problems.) |
| Iran could produce enough fissile material for a weapon by the end of this decade if it were to make more rapid and successful progress than we have seen to date. | We judge with moderate confidence that the earliest possible date Iran would be technically capable of producing enough highly enriched uranium (HEU) for a weapon is late 2009, but that this is very unlikely. |

# EXHIBIT 10

ANNALS OF NATIONAL SECURITY

# IRAN AND THE BOMB

*How real is the nuclear threat?*

### BY SEYMOUR M. HERSH

Is Iran actively trying to develop nuclear weapons? Members of the Obama Administration often talk as if this were a foregone conclusion, as did their predecessors under George W. Bush. There is a large body of evidence, however, including some of America's most highly classified intelligence assessments, suggesting that the United States could be in danger of repeating a mistake similar to the one made with Saddam Hussein's Iraq eight years ago—allowing anxieties about the policies of a tyrannical regime to distort our estimations of the state's military capacities and intentions. The two most recent National Intelligence Estimates (N.I.E.s) on Iranian nuclear progress, representing the best judgment of the senior officers from all the major American intelligence agencies, have stated that there is no conclusive evidence that Iran has made any effort to build the bomb since 2003.

Despite years of covert operations inside Iran, extensive satellite imagery, and the recruitment of many Iranian intelligence assets, the United States and its allies, including Israel, have been unable to find irrefutable evidence of an ongoing hidden nuclear-weapons program in Iran, according to intelligence and diplomatic officials here and abroad. One American defense consultant told me that as yet there is "no smoking calutron," although, like many Western government officials, he is convinced that Iran is intent on becoming a nuclear state sometime in the future.

The general anxiety about the Iranian regime is firmly grounded. President Mahmoud Ahmadinejad has repeatedly questioned the Holocaust and expressed a desire to see the state of Israel eliminated, and he has defied the 2006 United Nations resolution calling on Iran to suspend its nuclear-enrichment program. Tehran is also active in arming Hezbol-

lah in Lebanon and Hamas in Gaza. Iran is heavily invested in nuclear technology, and has a power plant ready to go on line in the port city of Bushehr, with a second in the planning stage. In the past four years, it has tripled the number of centrifuges in operation at its main enrichment facility at Natanz, which is buried deep underground. On the other hand, the Iranian enrichment program is being monitored by the International Atomic Energy Agency, and Natanz and all Iran's major declared nuclear installations are under extensive video surveillance. I.A.E.A. inspectors have expressed frustration with Iran's level of coöperation and cited an increase in production of uranium, but they have been unable to find any evidence that enriched uranium has been diverted to an illicit weapons program.

National Intelligence Estimates, whose preparation is the responsibility of the Director of National Intelligence, Lieutenant General James Clapper, of the Air Force, are especially sensitive, because the analysts who prepare them have access to top-secret communications intercepts as well as the testimony of foreign scientists and intelligence officials, among others, who have been enlisted by the C.I.A. and its military counterpart, the Defense Intelligence Agency. In mid-February, Clapper's office provided the House and Senate intelligence committees with an update to the N.I.E. on the Iranian nuclear-weapons program. The previous assessment, issued in 2007, created consternation and anger inside the Bush Administration and in Congress by concluding, "with high confidence," that Iran had halted a nascent nuclear-weapons program in 2003. That estimate added, "We do not know whether it currently intends to develop nuclear weapons." The Bush White House had insisted that a summary of the 2007 N.I.E. be made public—an unprecedented

move—but then President Bush and Vice-President Dick Cheney quickly questioned its conclusions. Peter Hoekstra, a Republican from Michigan who had been chairman of the House Intelligence Committee, characterized the N.I.E. as "a piece of trash."

The public dispute over the 2007 N.I.E. led to bitter infighting within the Obama Administration and the intelligence community over this year's N.I.E. update—a discrepancy between the available intelligence and what many in the White House and Congress believed to be true. Much of the debate, which delayed the issuing of the N.I.E. for more than four months, centered on the Defense Intelligence Agency's astonishing assessment that Iran's earlier nuclear-weapons research had been targeted at its old regional enemy, Iraq, and not at Israel, the United States, or Western Europe. One retired senior intelligence official told me that the D.I.A. analysts had determined that Iran "does not have an ongoing weapons program, and all of the available intelligence shows that the program, when it did exist, was aimed at Iraq. The Iranians thought Iraq was developing a bomb." The Iranian nuclear-weapons program evidently came to an end following the American-led invasion of Iraq, in early 2003, and the futile hunt for the Iraqi W.M.D. arsenal. Israeli Prime Minister Benjamin Netanyahu insists that Iran, like Libya, halted its nuclear program in 2003 because it feared military action. "The more Iran believes that all options are on the table, the less the chance of confrontation," Netanyahu told a joint session of Congress last week.

The D.I.A. analysts understood that the 2011 assessment would be politically explosive. "If Iran is not a nuclear threat, then the Israelis have no reason to threaten imminent military action," the retired senior intelligence official said. "The guys working on this are good analysts, and their bosses are backing them up."

The internal debate over the Iran assessment was alluded to last fall by W. Patrick Lang, a retired Army intelligence officer who served for years as the ranking D.I.A. analyst on the Middle East and contributed to many N.I.E.s. "Do you all know what an N.I.E. is?" Lang said to an

audience at the University of Virginia. "The National Intelligence Estimate is the ground truth of the American government hammered out on the anvil of the Lord. . . . Then, once things are approved, people stand up at meetings and wave them and point to them and say, 'See here, it says here that Saleh'"—Ali Abdullah Saleh, the President of Yemen—"'is a fink.' And then everybody has to agree that Saleh is a fink."

Lang told his audience that there was "enormous pressure" on intelligence analysts in 2002 to produce an N.I.E. that buttressed the Bush Administration's claims about the threat posed by Iraq's suspected nuclear arsenal before the invasion of Iraq. After the disaster of Iraq, the atmosphere shifted. "Analysts in the intelligence community are just refusing to sign up this time for a lot of baloney," Lang said. "I regard that as a highly encouraging sign." The D.I.A. analysts insisted that the updated N.I.E. deal primarily with the facts about Iran's nuclear program, Lang told me later, and Lieutenant General Ronald L. Burgess, Jr., the director of the D.I.A., supported this approach. "These guys are not drinking the Kool-Aid," Lang said. "They stopped the N.I.E. cold."

Burgess, whose long career in Army intelligence includes two years with the Joint Special Operations Command, has repeatedly stressed his belief that Iran would be capable of building a bomb at some point in the future. But Burgess also told the Voice of America in January, 2010, that "the bottom-line assessments of the [2007] N.I.E. still hold true. We have not seen indication that the government has made the decision to move ahead with the program. But the fact still remains that we don't know what we don't know." (A spokesman for General Burgess told me that "because of the classification of the information in the N.I.E., it would be inappropriate for us to engage in a discussion with you.") A government consultant who has read the highly classified 2011 N.I.E. update depicted the report as reinforcing the essential conclusion of the 2007 paper: Iran halted weaponization in 2003. "There's more evidence to support that assessment," the consultant told me.

The D.I.A.'s conclusion that Iran's ultimate target would have been Iraq, and not Israel or a Western power, was



*There is no conclusive evidence that Iran has tried to build a bomb since 2003.*

not included in the final version of the 2011 report, as presented to the United States government, in February. "It was in, and then got taken out, because, as they"—the analysts in General Clapper's office—"told the D.I.A., 'There's no hard proof, and we can't know because of the uncertainty of the information we're getting,'" the retired senior intelligence official said, "But the implications of Iran's getting nuclear weapons are so dire and the benefits to them are so great that it will compel them to continue pursuit of a nuclear capability. And you"—meaning the D.I.A. analysts—"cannot disprove there is a weapons program?

"It's the same old shit: the N.I.E. does not say absolutely or unequivocally

that Iran has a nuclear program that is going to be deployed," the retired official continued. "The important thing is that nothing substantially new has been learned in the last four years, and none of our efforts—informants, penetrations, planting of sensors—leads to a bomb."

The N.I.E. makes it clear that U.S. intelligence has been unable to find decisive evidence that Iran has been moving enriched uranium to an underground weapon-making center. In the past six years, soldiers from the Joint Special Operations Force, working with Iranian intelligence assets, put in place cutting-edge surveillance techniques, according to two former intelligence officers: Street

signs were surreptitiously removed in heavily populated areas of Tehran—say, near a university suspected of conducting nuclear enrichment—and replaced with similar-looking signs implanted with radiation sensors. American operatives, working undercover, also removed bricks from a building or two in central Tehran that they thought housed nuclear-enrichment activities and replaced them with bricks embedded with radiation-monitoring devices.

High-powered sensors disguised as stones were spread randomly along roadways in a mountainous area where a suspected underground weapon site was under construction. The stones were capable of transmitting electronic data on the weight of the vehicles going in and out of the site; a truck going in light and coming out heavy could be hauling dirt—crucial evidence of excavation work. There is also constant satellite coverage of major suspect areas in Iran, and some American analysts were assigned the difficult task of examining footage in the hope of finding air vents—signs, perhaps, of an underground facility in lightly populated areas.

This year, when intelligence officials presented the N.I.E. on Iranian nuclear capacity to the Senate and House intelligence committees, they did not issue a summary for public consumption. The briefings were closed, but, as always, a few legislators and officials provided background accounts to the press. The accounts were incomplete, and did not relay the essential finding of the estimate: that nothing significantly new had been learned to suggest that Iran is pursuing a nuclear weapon.

The few official statements at the time made it clear that U.S. intelligence officials simply did not know whether Iran would become a nuclear state. General Clapper told the Senate Intelligence Committee on February 16th, in his annual Worldwide Threat Assessment, that Iran was "keeping open the option to develop nuclear weapons, in part by developing various nuclear capabilities that better position it to produce such weapons, should it choose to do so. We do not know, however, if Iran will eventually decide to build nuclear weapons." He added that Iran was technically capable of producing enough enriched uranium for a nuclear weapon in the next few years, "if it chooses to do so."

A month later, in public testimony before the Senate Armed Services Committee, Carl Levin, Democrat of Michigan, the committee's chairman, asked Clapper about his conclusion that Iran had not decided to re-start its nuclear-weapons work: "Is that correct?" Clapper said yes, but added that he would prefer to speak more fully in a classified hearing. Levin persisted: "O.K., but what is the level of confidence that you have? . . . Is that a high level?" Clapper responded, "Yes, it is."

Joseph Lieberman, an Independent who is conservative on security and foreign-policy issues and one of Israel's strongest supporters in the Senate, chose to speak publicly about Iran after the hearing. "I can't say much in detail," Lieberman said, according to Agence France-Presse, "but it's pretty clear that they're continuing to work seriously on a nuclear-weapons program."

Lieberman's statement reflected the view of many in Congress and in the Obama Administration. As Presidential candidates in 2008, both Barack Obama and Hillary Clinton had warned of an Iranian nuclear arsenal, and occasionally spoke as if it were an established fact that Iran had decided to get the bomb. In Obama's first prime-time news conference as President, in early February, 2009, he declared that Iran's "financing of terrorist organizations like Hezbollah and Hamas, the bellicose language that they've used towards Israel, their development of a nuclear weapon, or their pursuit of a nuclear weapon—that all of those things create the possibility of destabilizing the region and are not only contrary to our interests but I think are contrary to the interests of international peace."

Thomas E. Donilon, Obama's national-security adviser, returned to that theme a few weeks ago. In a speech on May 12th to the Washington Institution for Near East Policy, he said that the United States would continue its aggressive sanctions policy until Iran proves that its enrichment intentions are peaceful and meets all its obligations under the nonproliferation treaty, to which Iran is a signatory. "Like all N.P.T. parties, Iran has the right to peaceful nuclear energy," Donilon said. "But it also has a responsibility to fulfill its obligations. There is no alternative to doing so." He did not mention the current intelligence stating that there is no conclusive evidence that Iran is making any efforts to weaponize; nor could he say that the current sanctions regime is aimed at forcing Iran to stop a nuclear-weapons program that does not exist. Later in his speech, however, Donilon said that Iran's nuclear program "is part of a larger pattern of destabilizing activities throughout the region. . . . We have no illusions about the Iranian regime's regional ambitions. We know that they will try to exploit this period of tumult and will remain vigilant. . . . The



THE STRANGE CASE OF DR. JEKYLL AND MISTER SOFTEE

door to diplomacy remains open to Iran. But that diplomacy must be meaningful and not a tactical attempt to ward off sanctions."

America's sanctions policy thus is increasingly aimed, as Donilon indicated, at changing Iran's political behavior, and the spectre of nuclear-weapons development has become a tool for accomplishing that goal.

President Obama has been prudent in his public warnings about the consequences of an Iranian bomb, but he and others in his Administration have often overstated the available intelligence about Iranian intentions. Last October, Dennis Ross, a leading Administration adviser on the region, told a meeting of the American Israel Public Affairs Committee that "the challenge of Iran" was "a foremost national-security priority of the United States." He said that Iran had "significantly expanded its nuclear program," and accused it of pursuing the program "in violation of its international obligations." He also repeated the President's declaration that his Administration was "determined to prevent Iran from acquiring nuclear weapons."

"The point here is that the pressure on Iran only continues to grow," Ross told the AIPAC convention. "Ultimately, we hope that the severe pressure Iran faces today will compel a change in behavior. . . . Its leaders should listen carefully to President Obama, who has said many times, 'We are determined to prevent Iran from acquiring nuclear weapons.'" The Obama Administration has played a leading role in winning more sanctions against Iran in the United Nations, the European Union, and Congress. The sanctions bar a wide array of weapons and missile sales to Iran, and make it more difficult for banks and other financial institutions to do business there.

In early March, Robert Einhorn, the special adviser to Secretary of State Hillary Clinton for nonproliferation and arms control, gave a talk about the Iranian nuclear posture to the Arms Control Association, in which he went beyond the findings of the most recent N.I.E. "They are clearly acquiring all the necessary elements of a nuclear-weapons capability," Einhorn said. Leonard Spector, the deputy director of nonpro-

liferation studies at the Monterey Institute, and a fellow arms-control expert, pointedly asked whether the Obama Administration now believed that Iran has re-started weaponization activities. Einhorn said, "The N.I.E. addresses this issue, but, as I mentioned before, it remains classified." Einhorn also referred Spector to the most recent I.A.E.A. report on Iran, which, like previous reports, included a complaint that Tehran was refusing to help resolve a number of issues that were preventing the agency from establishing that all nuclear activities in Iran were peaceful. Iran maintains that the issues in dispute were based solely on fabricated documents. (Einhorn said in an e-mail that he would prefer not to discuss Iranian weaponization with me, as did a spokesman for Gary Samore, President Obama's special assistant for arms control.)

Officials in Western Europe and Israel told me what their governments had concluded about Iranian nuclear weapons. Although none knew of any specific evidence of an Iranian weapons program, all said that they believed that Iran was intent on getting the bomb—and quickly. One senior European diplomat complained about America's N.I.E. process. "The American intelligence community was trying desperately not to be blamed anew for an intelligence assessment, as it was in Iraq," he said. "I think Iraq paralyzed the community, and its first N.I.E. on Iran was disastrous, in my view, because it conflated weaponization with the process of developing a nuclear weapon. Weaponization is only a part of the process, but there are other parts as well, including enrichment and the development of delivery systems. Yet to the layman the N.I.E. meant that Iran hadn't been weaponizing. Yes, it may very well be the case that there is no evidence of developing a nuclear weapon. To me, that is not the whole basis of making a judgment. The more important questions are: Is Iran behaving in a way that would be rational if they were not developing a nuclear weapon? And the answer on that is very clear—their behavior only makes sense if their goal is to have the bomb. And are they doing the other elements of developing a bomb? And they definitely are. There may or may not be weaponization in

Iran today, but I don't think it is an interesting question. It says nothing about their intention." The diplomat cited as evidence of Iran's weapons intent its decision to enrich some uranium to a purity level of twenty per cent for medical purposes.

Israel views Iran, which provides material and military support to Hezbollah, Hamas, and other such groups, as an existential threat. Many of its generals and political leaders have insisted for decades that once the Iranian leadership acquired a bomb—an inevitability, in their view—they would use it against Tel Aviv or Jerusalem, despite the certainty of massive retaliation. Nevertheless, most Israeli military experts agree that Iran does not now have a nuclear weapon and fear regional proliferation more than they do attack. In January, Meir Dagan, the Mossad chief between 2002 and 2010, marked his retirement by declaring that he did not believe Iran would become a nuclear power before 2015. The statement contradicted many previous Israeli estimates. But, as a former senior adviser to a Labor Prime Minister of Israel told me, the extended timeline revolves, in part, around domestic politics. Dagan believed that Iran should be handled with covert action, not with a major bombing assault. (Israeli fighter pilots have been training for years at the Hatzerim airbase, in the Negev, and at a foreign site, for a potential raid on known and suspected nuclear-weapons facilities in Iran.) "Meir is doing two things," the former official told me. "He's basically saying, 'I've overcome the Iranian threat with covert action,' and he's trying to screw up Bibi's options for going forward with an attack on Iran. And he's also keeping Bibi from taking credit for keeping Iran from going nuclear."

The political infighting in Israel over the Iranian threat continued in early May, when Ehud Barak, the Israeli Defense Minister, told the daily paper *Haaretz* that he did not believe that Iran would drop a nuclear bomb on Israel or any other country in the region. He added, in a clear swipe at Netanyahu, that Israel should not spread public fear about the Iranian nuclear program. "I don't think in terms of panic," Barak said. "I don't think [the Iranian leadership] will do anything so long as they

are in complete control of their senses, but to say that somebody really knows and understands what will happen with such a leadership sitting in a bunker in Tehran and thinking that it's going to fall in a few days . . . I don't know what it would do."

Early in the Obama Administration, Secretary of State Clinton provoked a brief diplomatic furor by raising the concept of an American nuclear deterrent to protect our allies in the Middle East. At a news conference in Bangkok, in July of 2009, Clinton noted the fears of Iran's neighbors "who come to see me and convey their deep apprehension about what might happen" if Iran gets the bomb. She then began discussing the possibility of an American nuclear umbrella in the area, which would give the Iranians pause, "because they won't be able to intimidate and dominate, as they apparently believe they can, once they have a nuclear weapon." The obvious inference was that Iran recognized the limits of nuclear power and the possibility of mutual assured destruction, (MAD), the deterrent that may have kept the United States and the Soviet Union from waging nuclear warfare at the height of the Cold War.

Clinton's remarks prompted Dan Meridor, Israel's minister of intelligence and atomic energy, to say, "I was not thrilled to hear the American statement from yesterday that they will protect their allies with a nuclear umbrella, as if they had already come to terms with a nuclear Iran." Clinton quickly clarified her comments, saying that the Obama Administration was not backing away from its commitment to prevent Iran from developing the bomb. In a subsequent Sunday-morning television interview, Clinton warned Iran, "You do not have a right to obtain a nuclear weapon. You do not have the right to have the full enrichment and reprocessing cycle under your control."

Around of negotiations five months ago between Iran and the West, first in Geneva and then in Istanbul, yielded little progress. Iran continued to insist on the same two preconditions that prevented progress in earlier meetings: that the United States and its allies lift all sanctions and acknowledge Iran's right to enrich uranium. The American

response to Iran's demand, as Einhorn told the Arms Control Association in his speech a few weeks later, would be more sanctions. "We have determined that in the wake of Istanbul we have no choice but to increase the cost to Iran of refusing to engage seriously." He revealed that, because of sanctions, in recent years Iran may have lost as much as sixty billion dollars in much needed energy investments. He described other setbacks—to the shipping, banking, and transportation industries—all aimed at forcing Iran to return to negotiations. But Einhorn also acknowledged the limitation of sanctions: "While Iran's leaders are feeling the pressure, the sanctions have not yet produced a change in Iran's strategic thinking about its nuclear program."

During the Cold War, Cuba was similarly confronted by American economic sanctions. Those sanctions took effect in 1962, after Fidel Castro's nationalization of American companies doing business there. Fifty years later, the boycott is still largely in place, and so is the regime.

Meanwhile, the Iranian economy has been bolstered by booming trade with its neighbors and closer ties with Turkey and Syria. The economic and political ties with Turkey are especially significant, because Turkey has been vocal about its opposition to an Iranian bomb. "We tell the Iranians all the time that we would not like to see a nuclear bomb in Iran," a senior Turkish diplomat told me. "They know the price of not telling the truth." Billions of dollars annually in food, oil, and other goods are crossing Iran's borders, and this has strengthened Iran's political ties with its neighbors and established the country as a regional power base and as a counterweight to the Israeli and American influence.

The political stress between Washington and Tehran has promoted some unconventional thinking. A group of English diplomats and public officials have suggested thinking in terms of



containing an Iranian bomb, and not in terms of getting rid of it. "We just don't think the Iranians will deal with us," a former senior adviser to the British Foreign Office told me. "We want to talk about nuclear bombs, and they talk about regional issues." The officials at 10 Downing Street were amused by the initial optimism of the Obama Administration. "The President thought an initiative to talk about the bomb with Iran would work, and then he found it would not. And the U.S. had no Plan B."

One of the worries is that Netanyahu "might take a pot shot" at Iran, as the former adviser put it. "Everything in London is now about containment and the notion that if the Iranians get a bomb we'll have to live with it. I believe that the Iranians do understand the logic of nuclear deterrence, but the Israelis do not. London believes we cannot allow containment to be seen as a policy of failure"—in terms of a fallback policy for dealing with Iran. "And so we're trying to shift the public perception of deterrence so it is seen as a good. The Brits are really concerned about the Israelis, and what they might do unilaterally."

A third approach, championed by the American diplomat Thomas Pickering and others, is to accept Iran's nuclear-power program, but to try to internationalize it and offer Iran various incentives. Pickering is a retired ambassador who, having served in Russia, India, Israel, Jordan, and elsewhere, ended his public career by serving for three and a half years as the Under-Secretary of State for Political Affairs in the Clinton Administration. He has been active in many public organizations, including the American Iranian Council, which is devoted to the normalization of relations with Iran, and most recently he has been involved in secret, back-channel talks with Palestinian leaders, with Afghanis, and with some of the key advisers close to Ahmadinejad in Iran. His communications with Iran, known informally as Track II talks, have been shared since early 2005 with Secretaries of State Condoleezza Rice and Hillary Clinton. In a recent interview, Pickering would not discuss the details of his contacts with Iran, but he did express cautious support for the findings of the 2011 N.I.E. When asked for his views about an Iranian

34     THE NEW YORKER, JUNE 6, 2011

bomb, Pickering said, "I've seen nothing to indicate there is a there there, but there are indications of intent. And there may be programs we don't know about. Even if the Iranians can be mechanical klutzes, we believe they can enrich uranium to ninety per cent."

Pickering and his associates in the Track II talks—they include former Ambassadors William Miller, a Farsi speaker who served in the American Embassy in Tehran, and William Luers, a former president of the Metropolitan Museum of Art, in New York, who spent thirty-one years in the Foreign Service—are convinced that the solution to the nuclear impasse is to turn Iran's nuclear-enrichment programs into a multinational effort. In 2008, Pickering, Luers, and Jim Walsh, of M.I.T., published an essay in *The New York Review of Books* which called for Iran to permit two or more additional governments, such as those of France and Germany, to participate in the operation of their enrichment activities. A critical element would be prohibiting the production of weapons-grade enriched uranium or reprocessed plutonium.

The essay did not get into specifics in terms of Iranian demands, but one official involved said that the Iranians have repeatedly insisted in the Track II talks that "Washington had to give a sign that it was no longer pursuing regime change." It is widely believed in Tehran that either Israel or America was responsible for the assassinations of two Iranian nuclear scientists last year, and that the West and Israel are determined not only to quash a nuclear program but also to force the mullahs from power. Washington, the official involved said, would need to halt covert activities against the religious leadership in Tehran and provide evidence to indicate an official end to the operations.

Pickering, Luers, and Walsh depicted what they said would be the many benefits of reëngagement between the U.S. and Iran:

Surprisingly, for all their differences—over Israel, Hamas and Hezbollah, and Iran's nuclear program—the two nations have insufficiently appreciated common interests.... No two countries have more common interest in the futures of Afghanistan and Iraq.... The U.S. and Iran are the strongest regional supporters of the current government in Baghdad; they both stress the importance of Iraq's territorial integrity and the need to maintain a central government. The U.S. and Iran also have a common interest in supporting Afghanistan, reducing opium trafficking, and defeating Sunni extremist movements like the Taliban and Al Qaeda. Moreover, Pakistan seems to have descended into a long period of turmoil and domestic strife, with threatening implications for both Tehran and Washington.

Pickering and his colleagues have long sought a meeting with President Obama. If it were to take place, one of those involved in the Track II talks said, the message to Obama would be clear: "Get off your no-enrichment policy, which is getting you nowhere. Stop your covert activities. Give the Iranians a sign that you're not pursuing regime change. Instead, the Iranians see continued threats, sanctions, and covert operations."

Mohamed ElBaradei, a Nobel Peace Prize recipient who is now a candidate for the Presidency of Egypt, spent twelve years as the director-general of the International Atomic Energy Agency retiring two years ago. For the past decade, he has been a central player in the dispute among America, Iran, and Israel over the bomb. In "The Age of Deception," his recent memoir, he writes, "My best reading is that the Iranian nuclear program, including enrichment, has been for Iran the means to an end. Tehran is determined to be recognized as a regional power. The recognition, in their view, is intricately linked to the achievement of a grand bargain with the West. Even if the intent is not to develop nuclear weapons, the successful acquisition of the full nuclear-fuel cycle, including enrichment, sends a signal of power to Iran's neighbors and to the world, providing a sort of insurance against attack."

"During my time at the agency," ElBaradei told me in an earlier interview, "we haven't seen a shred of evidence that Iran has been weaponizing, in terms of building nuclear-weapons facilities and using enriched materials." There is evidence that Iranian scientists have studied the issues involved in building and delivering a bomb, he added, "but the American N.I.E. reported that it stopped even those studies in 2003."

ElBaradei said, "I am not God—nobody is—and I don't know the future intentions of Iran, but I don't believe Iran is a clear and present danger. All I see is the hype about the threat posed by Iran." He added, "The core issue is mutual lack of trust. I believe there will be no solution until the day that the United States and Iran sit down together to discuss the issues and put pressure on each other to find a solution." ♦



*"Speaking of creativity, I'd like everyone to take a minute and note how Richard is using his tongue to make it look like he has three lips."*

Kanin

EXHIBIT 11

3/6/06 Seattle Times A1
2006 WLNR 3787947

Seattle Times (WA)
Copyright (c) 2006 Seattle Times Company, All Rights Reserved.

March 6, 2006

Section: ROP News

Fearing more leaks, White House targets officials, journalists Wide crackdown
Federal employees questioned, warned

Dan Eggen; The Washington Post

WASHINGTON - The Bush administration, seeking to limit leaks of classified information, has launched initiatives targeting journalists and their possible government sources. The efforts include several FBI probes, a polygraph investigation inside the CIA and a warning from the Justice Department that reporters could be prosecuted under espionage laws.

Dozens of employees at the CIA, the National Security Agency (NSA) and other intelligence agencies have been interviewed in recent weeks by agents from the FBI's Washington field office, who are investigating possible leaks that led to reports about secret CIA prisons and the NSA's warrantless domestic-surveillance program, according to law-enforcement and intelligence officials.

Taken together, some media watchers, lawyers and editors say, the incidents represent the most extensive and overt campaign against leaks in a generation and have worsened the already-tense relationship between mainstream news organizations and the White House.

Numerous employees at the CIA, FBI, Justice Department and other agencies also have received letters from Justice prohibiting them from discussing even unclassified issues related to the NSA program, according to sources familiar with the notices. Some GOP lawmakers also are considering whether to approve tougher penalties for leaking.

In a little-noticed case in California, FBI agents from Los Angeles already have contacted Sacramento Bee reporters about stories published in July that were based on sealed court documents related to a terrorism case in Lodi, Calif., according to the newspaper.

"There's a tone of gleeful relish in the way they talk about dragging reporters before grand juries, their appetite for withholding information, and the hints that reporters who look too hard into the public's business risk being branded

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

traitors," New York Times Executive Editor Bill Keller said in a statement. "I don't know how far action will follow rhetoric, but some days it sounds like the administration is declaring war at home on the values it professes to be promoting abroad."

President Bush has called the NSA leak "a shameful act" that was "helping the enemy," and said in December that he hoped the Justice Department would conduct a full investigation into the disclosure.

"We need to protect the right to free speech and the First Amendment, and the president is doing that," White House spokesman Trent Duffy said. "But at the same time, we do need to protect classified information which helps fight the war on terror."

Disclosing classified information without authorization has long been against the law, yet such leaks are one of the realities of life in Washington, accounting for much of the back-channel conversation that goes on daily among journalists, policy intellectuals, and current and former government officials.

Presidents also have long complained about leaks. Richard Nixon's infamous "plumbers" originally were set up to plug them, and he tried, but failed, to prevent publication of a classified history of the Vietnam War called the Pentagon Papers. Ronald Reagan exclaimed at one point that he was "up to my keister" in leaks.

Bush administration officials, who complain that reports about detainee abuse, clandestine surveillance and other topics have endangered the nation during a time of war, have taken a more aggressive approach than other recent administrations, including a clear willingness to take on journalists more directly, if necessary.

"Almost every administration has ... come in saying they want an open administration, and then getting bad press and fuming about leaks," said David Greenberg, a Rutgers University journalism professor and author of "Nixon's Shadow." "But it's a pretty fair statement to say you haven't seen this kind of crackdown on leaks since the Nixon administration."

But David Rivkin, who was a senior lawyer in the Reagan and George H.W. Bush administrations, said the leaking is "out of control," especially given the threat posed by terrorist groups.

"We're at the end of this paradigm where we had this sort of gentlemen's agreement where you had leaks and journalists were allowed to protect the leakers," Rivkin said. "Everyone is playing Russian roulette now."

At Langley, the CIA's security office has been conducting numerous interviews and polygraph examinations of employees in an effort to discover whether any of them have had unauthorized contact with journalists.

CIA Director Porter Goss has spoken about the issue at an "all hands" meeting of employees and sent a cable to the field aimed at discouraging media contacts and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

reminding employees of the penalties for disclosing classified information, according to intelligence sources and people in touch with agency officials.

"It is my aim, and it is my hope, that we will witness a grand-jury investigation with reporters present being asked to reveal who is leaking this information," Goss told a Senate committee.

The Justice Department also argued in a court filing last month that reporters can be prosecuted under the 1917 Espionage Act for receiving and publishing classified information. The brief was filed in support of a case against two pro-Israel lobbyists, the first nongovernment officials to be prosecuted for receiving and distributing classified information.

Sen. Pat Roberts, R-Kan., chairman of the Senate Intelligence Committee, said last month that he is considering legislation that would criminalize the leaking of a wider range of classified information than what is now covered by law. The measure would be similar to earlier legislation that was vetoed by President Clinton in 2000 and opposed in 2002 by then-Attorney General John Ashcroft.

But the vice chairman of the committee, Sen. Jay Rockefeller, D-W.Va., complained in a letter to the national intelligence director last month that "damaging revelations of intelligence sources and methods are generated primarily by Executive Branch officials pushing a particular policy, and not by the rank-and-file employees of the intelligence agencies."

As evidence, Rockefeller noted the case of Valerie Plame, a CIA officer whose identity was leaked to reporters. A grand-jury investigation by Special Counsel Patrick Fitzgerald resulted last year in the jailing of Judith Miller, then a reporter at The New York Times, for refusing to testify, and in criminal charges against I. Lewis "Scooter" Libby, who resigned as Vice President Dick Cheney's chief of staff. In court papers, Libby has said his "superiors" authorized him to disclose a classified government report.

The New York Times, which first disclosed the NSA program in December, and The Washington Post, which reported on secret CIA prisons in November, said investigators have not contacted reporters or editors about those articles.

Leonard Downie Jr., executive editor of The Post, said that there has long been a "natural and healthy tension between government and the media" on national-security issues, but that he is "concerned" about comments by Goss and others that appear to reflect a more aggressive stance by the government.

In Sacramento, the Bee newspaper reported last month that FBI agents had contacted two of its reporters and, along with a federal prosecutor, had "questioned" a third reporter about articles last July detailing the contents of sealed court documents about five terrorism suspects. A Bee article on the contacts did not address whether the reporters supplied the agents with any information or whether they were subject to subpoenas.

Executive Editor Rick Rodriguez said last week he could not comment, based on the advice of newspaper attorneys. Representatives of the FBI and the U.S.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

attorney's office in Los Angeles, which is conducting the inquiry, also declined to comment.

    In prosecuting a former Defense Department analyst and two pro-Israel lobbyists for allegedly spreading sensitive national-security information about U.S. policy in the Middle East, the Bush administration is making use of a statute whose origins lie in the first anxious days of World War I.

    The Espionage Act makes it a crime for a government official with access to "national defense information" to communicate it intentionally to any unauthorized person. A 1950 amendment aimed at Soviet spying broadened the law, forbidding an unauthorized recipient of the information to pass it on, or even to keep it himself.

    The Justice Department said "there plainly is no exemption" for the media, but added: A "prosecution under the espionage laws of an actual member of the press for publishing classified information leaked to it by a government source would raise legitimate and serious issues and would not be undertaken lightly; indeed, the fact that there has never been such a prosecution speaks for itself."

                    ---- INDEX REFERENCES ----

COMPANY: JUSTICE DEPARTMENT; PENTAGON LTD; DEFENSE DEPARTMENT; BEE LINE GSM; RUTGERS UNIVERSITY

NEWS SUBJECT:  (Legal (1LE33); Judicial (1JU36); Government (1GO80); Police (1PO98); Government Litigation (1GO18); Economics & Trade (1EC26))

INDUSTRY:  (Security (1SE29))

REGION:  (Middle East (1MI23); USA (1US73); Americas (1AM92); North America (1NO39); California (1CA98))

Language:  EN

OTHER INDEXING:  (BEE; BUSH; CIA; DEFENSE DEPARTMENT; FBI; GOP; JUDITH MILLER; JUSTICE; JUSTICE DEPARTMENT; NATIONAL SECURITY AGENCY; NSA; PENTAGON; RUTGERS UNIVERSITY; SENATE; SENATE INTELLIGENCE COMMITTEE; WHITE HOUSE)  (Bill Keller; Bush; Clinton; David Greenberg; David Rivkin; Dick Cheney; Executive Branch; Fearing; George H.W. Bush; Goss; Jay Rockefeller; John Ashcroft; Leonard Downie Jr.; Libby; Nixon; Pat Roberts; Patrick Fitzgerald; Porter Goss; Reagan; Richard Nixon; Rick Rodriguez; Rivkin; Rockefeller; Ronald Reagan; Trent Duffy; Valerie Plame)

EDITION: Fourth

Word Count: 1774
3/6/06 STLTI A1
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT 12

1/13/06 FDCH CAP. TRANSCRIPTS (Pg. Unavail. Online)
2006 WLNR 741791

FDCH Capital Transcripts
Copyright 2006 Voxant

January 13, 2006

Alberto Gonzales Holds A News Conference On The Nomination Of Judge Samuel Alito To The Supreme Court

Alberto Gonzales Holds A News Conference On The Nomination Of Judge Samuel Alito To The Supreme Court

xfdtr JUSTICE-GONZALES-ALITO 1stadd

XXX with this program.QUESTION: Did you yourself promulgate any of those legal authorities? Did you write about them or (inaudible)?

GONZALES: There have been a number of lawyers throughout the administration that have been involved in carefully evaluating the legal authorities in relation to this program.

And so over a period of many months, many years, a number of lawyers have been involved in providing legal advice as to the legal authorities in relation to this program.

QUESTION: (OFF-MIKE)

GONZALES: We're engaged in a discussion with the Congress about that.

I presume that's one of the reasons why the senator would like me to come before the Senate Judiciary Committee and more fully explain our discussions, our reasoning regarding the legal authorities that exist for this program.

I respectfully disagree with the chairman.

We believe the legal authorities are there and that the president acted consistent with his legal authorities and in a manner that he felt was necessary and appropriate to protect this country against this new kind of threat.

QUESTION: Are you prepared to see reporters go to jail for (inaudible)?

GONZALES: Cooperating in connection with what?

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

QUESTION:  (OFF-MIKE)

GONZALES:  That's a matter that's being handled by career prosecutors and folks
within our Criminal Division.  And I think it's too early to make decisions
regarding whether or not reporters should go to jail.

We have an obligation to ensure that our laws are enforced.  There's been a serious
disclosure of classified information that's occurred in connection with this case
and obviously we're going to look at it very, very seriously.

QUESTION:  The Democrats say they are probably going to hold the vote a week and
you had mentioned that he should be confirmed expeditiously.  I was just wondering
what you thought of that.

GONZALES:  We continue to hope that the Senate remains on the schedule that was
previously outlined and that he would receive a floor vote by January 20th.

There's no mystery here about Judge Alito.  His record has been out there for a
long time.  People have known that this is the nominee.

We've now gone through an extensive hearing process.  He will be providing
additional information through his written answers to written questions.

But we believe the information is out there regarding his qualifications.  And
certainly a sufficient amount of information is out there for the Senate to make an
informed judgment as to whether or not this individual should serve on the Supreme
Court of the United States.

Thank you very much.

END

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Judicial (1JU36); Legal (1LE33); Government (1GO80))

Language:  EN

OTHER INDEXING:  (ALITO; CONGRESS; END; GONZALES; QUESTION; SENATE; SENATE
JUDICIARY COMMITTEE; SUPREME COURT; XXX)  (Alberto; Alberto Gonzales Holds; Alito;
Holds; Samuel Alito)

KEYWORDS:  (BC-JUSTICE-GONZALES-ALITO, 1st Add, f6831,0422);  (w)

Word Count: 533
1/13/06 FDCHCAPTRPTS (No Page)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT 13

3/12/O6 Sacramento Bee A1
2006 WLNR 4158622

Sacramento Bee, The (CA)
Copyright 2006 The Sacramento Bee

March 12, 2006

Section: MAIN NEWS

Bush's secrecy push is excessive, critics say

David Westphal
Bee Washington Bureau Chief

WASHINGTON Working at the National Archives in the late 1990s, historian William Burr stumbled onto a 1962 telegram written by fabled diplomat George Kennan about China's nuclear program. The telegram, essentially a translation of a Yugoslav newspaper article, was mostly innocuous, but Burr decided to make a copy of it.

It proved to be prescient. Today the original document has been removed from the archive, replaced by a notice that declares it to be a government secret.

The document is one of 9,500 that have been removed from the archives in a project that has become the new poster child for open-government advocates, many of whom contend the Bush administration is taking secrecy to new heights. What makes the latest venture especially eye-catching is that many of the reclassified documents already have been published in government books or still appear on federal Web sites.

"It just seems like a complete overreaction," said Burr, a senior analyst for the National Security Archive. Burr said it was understandable that the government would clamp down a bit after the 2001 terrorist attacks, but he added, "Some of this makes little sense because the documents are already in the public domain. It's too late."

Open—government advocates say the massive reclassification project carried out by the CIA and other agencies is more evidence for their assertion that this is one of the most secretive administrations in modern history.

"Open government is under dramatic assault," said Paul McMasters, a First Amendment expert at the Freedom Forum. The Bush administration, he said, seems to view the federal government as being involved in "profligate information sharing" that needs to be curbed.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Bush has said he favors open government and, in a meeting with newspaper editors a year ago, put his views in the context of urging democratic freedoms around the world. "I talk to the people in Iraq about a free press and transparency and openness," he said, "and I'm mindful we can't talk one way and do another."

But he also added: "We're still at war. And that's important for people to realize."

Throughout American history, anti-secrecy crusaders nearly always have been at odds with presidents over government openness. But many of these advocates say the Bush presidency has been particularly active in limiting the public's access to government information.

"What has happened is that there has been a pendulum swing far in the direction of increased secrecy," said Steven Aftergood, a senior research analyst at the Federation of American Scientists. "It's not just a matter of a few frustrated reporters. It's also Congress, which has had extraordinary difficulty getting the information it needs to do oversight."

Others say that in an age of terror threats, the greater worry is that critical security information will leak into the public domain, at risk to American lives.

"I think times have changed," Sen. Pat Roberts, R-Kan., chairman of the Senate Intelligence Committee, told Fox News after expressing support for legislation that would broaden the scope of criminal charges for leaking classified information.

For some anti-secrecy advocates, the recently discovered program to classify thousands of once-open documents takes the cake. Earlier this year another historian, Matthew Aid, reported that the CIA and other federal agencies had secretly reclassified more than 55,000 pages of records, including many that have appeared in widely disseminated publications.

According to Aid, some of the now-sealed documents seemed noteworthy only because they proved embarrassing to the United States. One was a complaint from the CIA about the bad publicity it was receiving over its inability to forecast anti-American riots in Colombia in 1948. Another documented the CIA's failure to predict China's intervention in the Korean War.

Aid notes Bush's own executive order declares that information cannot be classified simply to "prevent embarrassment to a person, organization or agency."

It is not unusual for federal agencies such as the CIA to conduct reviews of public documents at the National Archives to determine if they should be reclassified. But the volume and nature of this particular project drew a rebuke from the National Archives and Records Administration, which earlier this month declared a moratorium on further reclassifications.

Allen Weinstein, the nation's chief archivist, asked the agencies involved in the reclassification to "restore to the public shelves as quickly as possible the maximum amount of information consistent with the obligation to protect truly

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

sensitive national security information."

A CIA spokeswoman said the agency's reclassification effort should be seen as part of a huge amount of information - 26 million pages - that the CIA has released to the archives since 1998.

"The CIA has worked hand in glove with the National Archives over the years on reclassification," said CIA spokeswoman Michele Ness, who added that the agency welcomed Weinstein's call for discussions on how the reclassification project should proceed.

Aftergood, who writes a secrecy newsletter for the Federation of American Scientists, said some of the administration's confidentiality initiatives are a legitimate result of the Sept. 11 terror attacks. But he said the White House's anti-openness bent goes well beyond that, and started when Bush and Vice President Dick Cheney came to office.

"The administration philosophically believes in a strong executive," he said, "and part of that is the belief that strength comes from secrecy."

Last year, Cheney acknowledged in a meeting with reporters that the White House has sought to strengthen the executive powers of the president.

"I think that the world we live in demands it," he said.

For some journalists, the administration showed its intentions early, when then Attorney General John Ashcroft issued revised guidelines for releasing documents under the Freedom of Information Act. The new rules seemed to send a message to federal agencies by declaring that the Justice Department would support any denial of a FOIA request if there was a "sound legal basis" to do so.

In a meeting with news media executives, Justice Department officials initially indicated the revisions would have little practical effect. But a Coalition of Journalists for Open Government study found that agency use of exemptions to limit disclosure grew by 22 percent from 2000 to 2004.

Also striking has been the increase in the number of documents ordered classified.

Between 1999 and 2004, the number of documents ordered sealed annually nearly doubled, to 15.6 million, according to the Information Security Oversight Office. Meanwhile, declassifying documents has slowed dramatically - from 127 million pages in 1999, to 28 million pages in 2004.

Perhaps more disconcerting to journalists is the administration's apparent eagerness to confront reporters who acquire and publish classified national security information. Two investigations are under way, involving reporters from the Washington Post and the New York Times, aimed at uncovering who leaked information about terrorist prison sites abroad and the National Security Agency's domestic eavesdropping program.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Although ostensibly aimed at the leakers, CIA chief Porter Goss recently told
Congress he hopes reporters are implicated as well.

"It is my aim and it is my hope that we will witness a grand jury investigation
with reporters present being asked to reveal who is leaking this information," said
Goss.

A grand jury subpoena could put the reporters at risk of jail because they likely
would refuse to testify, having promised their sources not to reveal identities.

A similar clash sent former New York Times reporter Judith Miller to jail for 85
days last year for refusing to testify before a grand jury investigating the
leaking of a CIA employee's identity. Miller ultimately received a waiver from her
source and appeared before the grand jury.

In recent weeks the administration has signaled a willingness to play even rougher
with the news media, suggesting that reporters probably could be charged with a
felony simply by coming into contact with classified information, even if they did
nothing with it.

The White House does not buy the argument that it is depriving the public of
crucial information, insisting that some uptick in secrecy is necessary because of
the war on terror.

OPEN - AND CLOSED

Here's a year-by-year look since 1995 of federal documents that have been
classified and declassified, in millions:

Year / New classified documents / Pages declassified

1995 / 3.6 / 69.0

1996 / 5.8 / 196.0

1997 / 6.5 / 204.1

1998 / 7.3 / 193.1

1999 / 8.0 / 126.8

2000 / 11.2 / 75.0

2001 / 8.7 / 100.1

2002 / 11.3 / 44.4

2003 / 14.2 / 43.1

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

2004 / 15.6 / 28.4

Source: Information Security Oversight Office; compiled by OpenTheGovernment.org
and National Security Archive

The Bee's David Westphal can be reached at (202) 383-0002 or
dwestphal@mcclatchydc.com.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Judicial (1JU36); Legal (1LE33); Government (1GO80))

INDUSTRY:  (Security (1SE29))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39))

Language:  EN

OTHER INDEXING:  (AMERICAN SCIENTISTS; BEE; CIA; FOIA; FOX NEWS; FREEDOM FORUM;
FREEDOM OF INFORMATION; INFORMATION SECURITY OVERSIGHT OFFICE; JUSTICE DEPARTMENT;
NATIONAL ARCHIVES; NATIONAL ARCHIVES AND RECORDS ADMINISTRATION; NATIONAL SECURITY
AGENCY; NATIONAL SECURITY ARCHIVE; OPEN; SENATE INTELLIGENCE COMMITTEE; WHITE
HOUSE; YUGOSLAV)  (Aftergood; Aid; Allen Weinstein; Burr; Bush; Cheney; David
Westphal; Dick Cheney; George Kennan; Goss; John Ashcroft; Judith Miller; Matthew
Aid; Michele Ness; Miller; Pat Roberts; Paul McMasters; Porter Goss; Source; Steven
Aftergood; Weinstein; William Burr)

EDITION: METRO FINAL

Word Count: 1794
3/12/06 SACRAMENTOBEE A1
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.