# EXHIBIT 14

**WestLaw.**

5/21/06 ABCSTEPHANPLS (No Page)

5/21/06 ABC GEO. STEPHANOPOULOS (Pg. Unavail. Online)
2006 WLNR 9116668

ABC GEORGE STEPHANOPOULOS
Copyright 2006 inewsnetwork Inc. 2006

May 21, 2006

GeorgeStephanopoulos 2006-05-21 09:30:00

NATIONAL

ABC

ABC

GeorgeStephanopoulos

2006-05-21

09:30:00

This week, President Bush raises the Stakes on Immigration.

The only way to solve this problem is to make sure we have a Rational Debate and have a Comprehensive plan.

But the Senate Debate gets Nasty.

I really believe this Amendment is Racist.

This Merely Declares English to be our National Language.

Where does the President stand, and will Congress pass Reform he can Sign? We'll ask our Headliner, Attorney General Alberto Gonzales.

Then on the Trail with Presidential hopeful John Edwards. You've also said the President is the worst President of our lifetime.

Yes.

Worse than Richard Nixon?

Absolutely.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

George will, Cokie Roberts and Fareed Zakaria Debate the week's politics on our roundtable. Plus, the Star of "America's most wanted" Lobbies Congress.

And this may be the most meaningful Piece of Child protection Legislation ever.

And as always, "The Sunday funnies."

The Senate yesterday voted to make English the National Language of the United States and also our National Muffin, the English Muffin.

Good morning, everyone. We begin today with a little News. Earlier today President Bush called Reporters into the White House to Praise the first full-time Government in Iraq since the Fall of Saddam Hussein.

The Formation of a Unity Government in Iraq is a New day for the Millions of Iraqis who want to Live in Freedom, and the Formation of the Unity Government in Iraq is -- Begins a New Chapter in our Relationship with Iraq.

We'll have more on that New Iraqi Government and how much difference it will make on the roundtable but now we turn to the Fallout from the President's big Speech of the week, Immigration Reform with the man responsible for Enforcing our Immigration Laws, Attorney General Alberto Gonzales. Welcome back to "This week," Sir.

Hey, George. How are you?

I'm Good. Thank you. Let's start with that Debate over whether or not to make English the National Language. The Senate passed an Amendment on Thursday. On Friday, you were in Houston and you said the President was against the idea. You said - While you were saying that, Tony Snow was in the White House Signaling support for the Amendment so can you clear that up for us? Where does the President stand?

Sure, this is really a question of Semantics, George. Of course, English is the common Unifying Language of our Great Country. English Represents a Path to opportunity. I have Consistently said that English Represents Freedom in our Country, in order to be successful and take Advantage of the wonderful opportunities in America, you need to be able to Communicate in English, and we have never been supportive -- The President has never been supportive of English only or English as the Official Language but certainly we support the Fact that English is the National Language of the United States of America.

Let's Tease out the implications of that. Currently the Voting Rights Act Permits Bilingual Ballots. Would you seek to prohibit that?

Of course not, and I don't believe that any of the proposed Amendments that are currently being discussed now would Alter in any way the Rights that are afforded to Citizens, both at the State or at the Federal Level based upon Language, and so we do support the Reauthorization of Section 203 of the Voting Rights Act which does provide a balance in different Languages depending on the Community, and those

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

would not be affected based on my reading of the Amendments. Those Rights would not be affected. Of course, we're in the Legislative process now. Ultimately we have to see what passes in the Senate and what comes out of the Conference and what is ultimately presented to the President of the United States.

Part of that is whether or not we should have a Wall across the Mexican Border. You opposed that back in April. The AP reported that you were speaking to Hispanic Publishers and you said -- Yet the Senate this week passed an Amendment which called for a 370-Mile Fence or Wall, whatever you want to call it, across the Border, so do you believe that 370-Mile Fence would be Contrary to our Traditions?

Actually I don't, George. I don't think it would be Feasible or make much sense to have a Wall that stretches 2,000 Miles along our Southern Border. The objective here is to have a Smart Border Strategy, and part of that should include in my Judgment Fencing along certain -- A Wall along certain Portions of the Border. We currently have it in place. It makes sense in certain areas. In other areas we have for example parts of the Border where we have Steep Cliffs and you don't need a Border so depending on the Geography, depends on the use of Technology and Border Patrol Agents you don't need a Border in my Judgment all along our Southern Border but in certain places it does make sense. We do have Infrastructure where we have it along certain Portions of our Border and I think it does make sense that we have additional Fencing.

A third Key Debate is whether Illegal Immigrants who have paid into the Social Security System using Fraudulent Social Security numbers should be able to collect benefits. A Provision to allow that Narrowly passed the Senate but here's what Senator Sessions said about that.

The person comes into our Country Illegally, Submits a False Social Security number, has no Legal right to expect to ever collect on that amount. They would say, well, they paid into it, they're entitled to it. Not so in my opinion.

Where do you stand, Mr. Attorney General?

Well, George, this is a question of Policy. It's something that's being Debated in the Congress today, and I would Prefer to simply wait to see what comes out of the Congress.

So you don't have a Position on whether or not Illegal Immigrants who have paid into the System should get their benefits or should be denied it because they got them Fraudulently?

Well, I am very much concerned about the Fact that People are taking Advantage of a Reliance upon Forged Documents, and that's something, of course, that we will be looking at trying to Address in the future. People should not benefit from that kind of Illegal activity, but with respect to whether or not they should be able to collect on Social Security, that is a Policy Debate that we continue to wait to see how that Unfolds in the Congress.

Finally, on the Broader issue, the President has come out against this Notion that giving Illegal Immigrants the Path to Citizenship if they pay Fines, if they

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

5/21/06 ABCSTEPHANPLS (No Page)                                    Page 4

pay Taxes is Amnesty, yet, as you know, a number of Republicans in the House, a Majority of Republicans in the House believe it is including their lead negotiator the Chairman of the Judiciary Committee James sensenbrenner, he said after the President's Speech, listen, it is Amnesty. There is no question about that and I know you disagree, but what I'm trying to get at is what's the bottom line for the President here? Can he Sign a Comprehensive Immigration Bill that does not include a Path to Citizenship for Immigrants who are now in the Country Illegally?

Well, I mean the President outlined to the American People five Broad Principles that he wants to see and expects to see in Comprehensive Immigration Reform, and we believe that all of those Components are very, very important to the overall Goal that we all share of Ensuring that our Border is Secure, and I think each of the Components, Principles the President talked about Reinforced the overall Strategy. We believe it will be very, very important in Enhancing our Law Enforcement efforts a temporary worker Program will Enhance our Law Enforcement efforts and make America ultimately more Secure.

Let me turn to another issue. ABC News reported this week that the Government is reviewing Phone Records of Journalists without their knowledge. How Extensive is that Tracking of the Phone Records of Journalists, and are you concerned that it might have a Chilling effect on the first Amendment?

I think there's misunderstanding about these activities, George. We -- To the Extent that we engage in Electronic Surveillance or Surveillance of Content, as the President says, we don't engage in Domestic-To-Domestic Surveillance without a Court order and obviously if, in Fact, there is a basis under the Constitution to go to the Federal Judge and satisfy the Constitutional standards of Probable cause and we get a Court order, that will be Pursued. I will say that I understand very much the Role that the Press plays in our Society, the protection under the first Amendment we want to promote and respect the right of the Press but it can't be the Case that that right Trumps over the right that Americans would like to see, the ability of the Federal Government to go after Criminal activity, and so those two Principles have to be Accommodated. In my Judgment they can be Accommodated. They have been Accommodated, and we will continue to Accommodate both of those Principles going forward.

So you believe Journalists can be Prosecuted for publishing Classified Information?

Well, again, George, it depends on the circumstances. There are some Statutes on the book which if you read the Language carefully would seem to indicate that that is a possibility. That's a Policy Judgment by the Congress in passing that kind of Legislation. We have an Obligation to Enforce those Laws. We have an Obligation to Ensure that our National Security is protected. Obviously we want to work with the Press in getting the Information that we can to Pursue Criminal wrongdoing, but we want to do so in a way, of course, that's respectful of the Role that the Press plays in our Society.

Well, let me try to get specific on it then. Are you open to the possibility that "The New York Times" should be Prosecuted for publishing their Initial story on what the President Calls his Terrorist Surveillance Program?

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

5/21/06 ABCSTEPHANPLS (No Page)

George, we're engaged now in an Investigation about what would be the appropriate course of action. In that particular Case I'm not going to talk about it specifically but as we do in every Case, it's a Case-By-Case Evaluation about what the evidence shows us, our Interpretation of the Law. We have an Obligation to Enforce the Law and to Prosecute those who engage in Criminal activity.

Including possibly the Journalists themselves?

I'm not going to talk about, again, specific Cases, but if the Law provides that conduct is, in Fact, Criminal and the evidence is there to support it, we have an Obligation, of course, to look at that very seriously.

Finally, Sir, just earlier this month the Office of Professional responsibility in the Justice Department announced they were closing their Investigation into the development of this Domestic Surveillance Program, what the President Calls the Terrorist Surveillance Program. They said they couldn't get the necessary clearances. Here's a Letter that H. Marshall Jarrot, the Counsel in the Office of responsibility Wrote. He said -- Who denied them Security clearances and did you agree with that decision or do you think this Investigation should go forward?

George, it would be Inappropriate for me to get into the Internal decision-making within the Executive Branch, but let me just say this, the question is whether or not the Lawyers did their job. Did they meet the Professional responsibilities, Ethical standards as Lawyers in providing Legal advice in connection with the Program the President approved last December to the American People. We have laid out a 42-Page Paper that details the work of the Lawyers in connection with this Program. I've gone -- I've testified three times before the Congress with respect to the Legal Analysis. We've provided Numerous additional Briefings and Information to the Congress. We continue to provide additional Briefings to the Congress, and so the work of the Lawyers, what was done in connection with Legal Analysis of this Program is already out there, and so we believe that there is Accountability and continues to be Accountability with respect to the work of the Lawyers.

But, Sir, excuse me. You're the Chief Law Enforcement Officer of the Government. They couldn't Deny the clearances without your okay, could they?

Well, that's not necessarily True, George. Every particular Case is different. Various Officials within the Federal Government have the Authority to Grant clearances with respect to certain Programs, so that would not be something that would necessarily Fall within my area of responsibility. But the Main point is is that the American People need to be Reassured that the Lawyers at the Department of Justice have satisfied their Ethical responsibilities in my Judgment, and that is evidenced by all of the work that we have produced with respect to our Analysis of what the President confirmed last December.

Okay, Mr. Attorney General, thank you very much.

Thanks, George.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

We're on the Trail with John Edwards next.

And later, John Walsh Tracking Predators.

There are according to the Justice Department 550,000 convicted Sex Offenders in this Country. 150,000 have disappeared, Fallen through the Cracks.

We were on the Trail this week with John Edwards.

Hey, how are you?

No Democrat Angling for the White House has spent more time in early Primary states like New Hampshire and Iowa where John Kerry's running Mate in 2004 is turning up the Heat on President Bush.

George W. Bush, the worst President in my lifetime.

We talked about that tough Rhetoric. His recent Tussles with Mary Cheney and what Edwards thinks about Hillary Clinton when I met with him on Friday in his Home State of North Carolina. There the Former Senator was delivering $300,000 in College Scholarships to Seniors at Green Central high School.

We're very proud to be able to do that, proud to be able to help you to go to College.

Good to see you.

The Scholarships will help Double the number of Green Central high School Students going to College and the money comes from an Anti-Poverty Initiative that Edwards hopes will be the heart of a run for the White House.

First of all, I think you have to Convince the Country that it's the Moral and just thing to do. Second, you have to Convince the Country that the way you want to deal with Poverty Embraces the Values that most Americans believe.

Is the Country not there yet?

I don't think they're completely there. I think the -- I think in their Conscience inside they're there but they haven't had any leadership. No one has made them think about it. And you can sort of see it in the reaction to Katrina.

The big Debate in Washington right now is over Immigration and there's a lot of People who are concerned that by having guest worker Programs you're actually going to make it harder for low-income Americans to work their way out of Poverty. Do you agree with that?

I think actually the Jury is very much out on the impact on the Wages of lower Income Americans of Immigrants working in this Country. The Studies that I have seen are basically evenly divided. I mean there are some -- I know there is a

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Princeton Economist who has determined that it's not having much effect. Much Negative effect.

A Harvard Economist that Taste it is.

We got one on each side so I Honestly don't know the Answer. I think it's still an open question right now.

But you support the compromise in the Senate right now then? You'd bring in guest workers?

The way I think about this is not all that complicated. We basically have three choices. One is we can Pretend the problem is not there, put our head against the Wall, the second we can try to Deport 10 or 11 million People who Live here now which is Absurd, never going to happen or, third, we can find a way to incorporate them into our Country and into our Culture.

Senate passing an Amendment last night that would make English the National Language.

I saw that

Doesn't look like you support it.

No, I wouldn't say that. I think that People need -- I think if we want to Assimilate Folks from all kind of Cultures into America which I think we absolutely do, I mean English is the Language of Commerce in the United States, and I think it is very important for People to Learn to speak English. Now these Amendments -- If I remember right there were two of them, but it sounded like so much Washington Stuff to me, but I do think it's important for Folks who have come here from another Country to Learn to speak English.

So you really have no problem with it being the National Language then?

I think it is the National Language whether I have a problem with it or not which I don't.

Back in the News in the last Couple of weeks because Mary Cheney is out on a book Tour and keeps bringing up the moment which she called in the Vice Presidential Debate bringing Sleazy politics to a whole New Level when you talked about her in the Vice Presidential Debate.

Let me say first that I think the Vice President and his Wife Love their Daughter. I think they Love her very much, and you can't have anything but respect for the Fact that they're willing to talk about the Fact that they have a Gay Daughter, the Fact that they Embrace her, it's a wonderful thing.

I Mouthed a phrase towards Senator Edwards that is not appropriate for Prime time Television.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

What is your reaction to that?

I think that what I said then was appropriate, and I do believe that it was in a very partisan political Environment. We were in the Middle of a very Hot Campaign, very close Campaign. He said thank you and then --

She said he was Acting?

Well, he didn't Act -- It didn't seem like he was Acting although you never know with the Vice President. I think what's more important than all of that is watching what her Father, the Vice President of the United States, has done to this Country. It is not an accident that he's Unbelievably Poorly thought of. I can't even remember what his last poll numbers are, but they're like in the Teens, around 20%. There's a reason for that. I mean, he is one of if not the Principal Architect of this Disaster in Iraq. He put us on an Energy Path that the American People are paying an enormous Price for right now. He paid little or no attention to making sure the Government was prepared to respond to the kind of Disaster that hit our Gulf Coast. I mean, we've got a Health Care Crisis going on. He's had no proposal of any kind that I know of, and People don't Trust him anymore which is understandable. I wouldn't Trust him.

You've also said that his Boss, the President, is the worst President of our lifetime.

Yes.

Who is the President? Who is the President that broke the Law and the Constitution and started Spying on the American People? Listen -- [ Applause ] -- The Answer to that question, as we've already heard, is George W. Bush, the worst President in my lifetime.

Worse than Richard Nixon?

Absolutely, absolutely.

What has President Bush done which is worse than the Crimes and cover-ups of Watergate?

Well, he's done a Variety of thing, things that will take us Forever to recover from. I think we can recover from them but the damage he's done to the way America is viewed in the World, the Lack of respect for America in the World, what the ongoing conflict in Iraq is doing to America's Image, his response to this Hurricane on the Gulf Coast, which I think is part of a pattern of Incompetence.

But if he's worse than Richard Nixon, should President Bush be Impeached?

I think the way we need to deal with it is a Democratic President in the next Election. I think the damage that this President has done -- I didn't get through the whole List, for example, leading an effort, Illegal effort, I think it's absolutely clear it's Illegal effort to Spy on Americans, completely ignoring the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Law and the Constitution. I mean, the President knew and his Advisers knew --

He says he has the Authority under the Constitution, Article 2 of the Constitution.

He is wrong. He is wrong. It is the reason we have a separation of Powers in this Country, and the Congress had Enacted a Law that told the President exactly what he was supposed to do, and he just ignored it, Intentionally ignored it. If there was any question about this, the very least they should have done is go to the Congress and try to get the Law changed. Should we be monitoring Al Qaeda? Absolutely. It's necessary to keep this Country safe. But we're to do it under the Law and the President is not above the Law.

If it's so clearly Illegal why not move to Impeach, just for political reasons?

I think all these things you and I have already talked about today ranging from People dying in Iraq to Gasoline Prices to this Disaster on the Gulf Coast, this Country is faced with so many problems and having watched up close, because I was in it, the effort to Impeach President Clinton on Grounds that were much, much less than what this President has done, I saw the damage it did, not only to the Country but how it cut the whole Congress -- Tied up in Knots in trying to deal with any other kind of issues so I don't think that's where we ought to --

You're for Censure but not Impeachment?

If I were in the Senate, I'd Vote for Censure. If I had an up-or-down Vote I'd Vote for it.

Would you Vote to confirm General Hayden as Director of the CIA?

No.

Why not?

Because he Oversaw this Domestic Spying Program. There's so many issues that I've already discussed with you about the Illegality and the Unconstitutionality of that Spying Program. I think he is not the person we should put in charge of the CIA.

It sure seems like he'll get through. Do you think Democrats are laying down on this?

I think they ought to be against him. I mean, I can only speak for me and they have to speak for themselves

ABC poll this week came out and showed President Bush Lowest approval Ratings of any President in 25 years, same for the Republican Congress but there was also some troubling News for Democrats. The approval Rating for Democrats in Congress wasn't much higher, and a Majority of Americans don't believe that Democrats are setting a clear direction for the Country. Why do you think that is?

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

I think that's -- All of those poll results are Anti-Washington. I think People are Sick of what they see going on there. They're Sick of the fighting. They're Sick of the Corruption. They don't feel like -- They feel like we have too many politicians, not enough leaders.

So you're to blame your leaders in Washington?

I just think that if you don't Live in Washington, which I don't anymore, thank Goodness, I Live here in North Carolina, I think it just gives you a completely -- I can tell you for me it gives me a completely different Perspective. People are out in the Real World worried about things like the War in Iraq, the -- What's happening with the Health Care costs, Gasoline Prices, those are the things they want Solutions to and they want leaders to deal with those issues.

How about the Message about the Republican Congress? I was talking to a Democratic Consultant this morning, and he said Democrats have to Choose. They have to decide is this a do nothing Congress or a do the wrong thing Congress? What's your opinion?

Well, that's a Good question. I think some of both actually. There's some where the Congressional Republican leadership has gotten their way where they've done damage so I think it's some of both but the heart of this question, I think what I hear you asking, is do the Democrats Lay on the side and let the Republicans Implode which they're doing a very Good job of for a lot of reasons, Gas Prices, the War in Iraq, Et Cetera, or do we go out with a Strong Defining Message as an Alternative? I feel very strongly we ought to do the Latter.

But you're not seeing it yet.

I think it will happen between now and November I'm optimistic it will happen.

It's pretty clear you're looking at the 2008 Presidential Race although you haven't made any decisions yet. What could stop you from running?

Elizabeth having her Health problems come back.

How is she doing now?

She's doing Great. She's -- All the tests are Good, and they're very encouraging, you know, but we have Young Children, Emma, Claire and Jack and the Health of Elizabeth and how my Family is doing has to be at the front of anything.

Is that pretty much it though?

No, I think we have to see where we are in this work on Poverty. How I can best advance that and also just where the Country is and what I think the Country needs, but, listen, I'll be the first to tell you I'm thinking about it, and I'm very seriously considering it. Just haven't made a final decision.

As you know, there is a big Debate going on in the Democratic party about one of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

your potential Opponents if you Choose in 2008, Senator Clinton. It Breaks under two Premises. A lot of Democrats believe she can't be denied the nomination, and she can't Win the General Election. Are they right?

I have no idea about either one. I think that if Senator Clinton Chooses to run for President, and that'll be a serious question for her and her Family, she'll be a very Formidable Candidate, and I think it's an Unknowable. Having lived through these Campaigns and all these predictions that were made before 2004 about the nomination and the General Election, what would happen, I mean, I was in the Trenches in both. I mean I was out there fighting for the nomination. John Kerry Won the nomination. He Earned it, then I was on the Ticket with John Kerry in the General Election, I just think anybody who suggests particularly now but even at the time that you can predict what's going to happen is just living in never-never Land.

Neither her nor Kerry's decision will affect yours?

It will not.

You will make your decision by?

Don't have a time Frame but can't wait too long.

We'll be back. Senator Edwards, thanks very much.

Thanks, George.

The roundtable is next with George will, Cokie Roberts and Fareed Zakaria.

And later, "The Sunday funnies."

The Bush Administration is tightening Immigration now. In order to Cross the United States, you have to have Legal Documentation, you want to get into the United States you have to have Legal Documentation or a 95 Mile-An-Hour Fastball and other than that --

The roundtable, John Walsh and "The Sunday funnies" after this from our ABC Stations.

Announcer: Once again, George

And we are back now with the roundtable. I am joined as always by George will, Fareed Zakaria, Cokie Roberts, welcome to all of you and we saw the President come out early this morning after Church designed I think to affect our programming just a little bit talking about a New day and a New Chapter in Iraq. Fareed Zakaria, Tlfz a Government announced yesterday but it didn't include the National Security Secretary, the head of Defense or the head of Interior.

Other than that, other than that, Mrs. Lincoln, how do you like the play? You know, they've kicked the can down the Road one more time. The Core issue for the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

5/21/06 ABCSTEPHANPLS (No Page)                                                    Page 12

Iraqi Government is the Core issue for any Government, favorite Maxim you need a
Monopoly over the use of Force. They Cannot decide who will have that Monopoly.
Will it be Militia? Will it be Various Shia parties or will it be some kind of a
National Army? And until they can Reconcile, Figure that out, until they can really
Reconcile with the Sunnis, I think you're going to continue to see this. Let's hope
-- Obviously it might work out. I have to say I met the New Prime Minister a year
ago when I was in Iraq. He didn't Strike me as particularly Soft or Conciliatory on
the Sunnis. In Fact, he struck me as more hard line than Jaafari, the old Prime
Minister. Perhaps he'll change.

If a President after an Election came out and said, I've got a New Cabinet, Good
News, I don't have an Attorney General, Secretary of State or Secretary of Defense,
you would say why are you taking our time with this? Beyond that, however, there is
a question, the Basic question about Contemporary Iraq, what is the Relevance of
what goes on in the Green Zone where these People met to announce this Government,
what is the Relevance of that to events five Miles away in Sadr City? Or somewhere
like that.

Not only Sadr City but also up in the North in Ramadi. One of the things we saw
this week was an increase in U.S. Troops at the end of the week, a thousand more
Troops to Quell the disturbance.

And Rumsfeld saying the Drawdown which was promised now is no longer promised. I
thought, the President came out, I noticed the first lady was by his side. Maybe
that will be Permanent from here on out because her approval Ratings are so much
higher than his but he's got to do this. Any little Teeny bit of Good News out of
Iraq is something that he's got to promote because, of course, it is Iraq that is
causing him all of the problems and his problems are now so affecting the political
Landscape, that for him to just get any bit of Good News out of Iraq is something
that he has to Ballyhoo.

You know, he said this Marks the beginning of a New Relationship between the
United States and Iraq. I hope so in the sense that if we will finally begin
explaining to the Iraqi Government what precisely are the terms under which we will
stay, that is to say, we want to see some kind of political Bargain Brokered
between the Shia, Sunnis and Kurds --

We've been pushing it.

Although we haven't been using a lot of Influence.

In some Ways they're getting criticized for having too much Influence.

Well, I think it's better to have too much because we're the ones to the Extent
that Iraq is Secure, we're the ones Securing it. We're the ones funding all these
Governments and it's important for us to make clear we will not continue -- We will
not Baby-Sit a Civil War. I mean, if they can't come to a deal, why are we there?

Is there any way to know, George, whether or not this Government will allow the
United States to withdraw what they had hoped for, 40,000 to 60,000 Troops by the
end of the year?

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

I don't think it's up to them to allow. We will withdraw --

Will the conditions allow it?

Probably not. Because we're in a Civil War. I mean it's not a question of if. We're in the Middle of a Civil War. 90 years ago this month, may 1916, the Psychs-Pico agreement invented Iraq and they've been trying to make a Nation out of it ever since, a Nation that will hold together other than under Tyranny. So far so Bad.

And what we've seen in recent Experience is that Nations that were Cobbled together either as a result of that World War I Truce or as a result of the Soviet Union have Fallen apart when the Tyrants have gone.

Most recently in the Balkans?

That's right, so it's a very Iffy proposition to put it Mildly.

If you say that every Nation that was Drawn by British Cartographers is Illegitimate and should Fall apart that's half of the World.

Nobody is saying Illegitimate. I'm just saying that's just the Experience.

The Truth of the Matter Indonesia exists because of Dutch Imperialism. All of Africa exists --

The question is whether they'll continue to exist and there's lots of fights going on there.

Turn to a fight here. Immigration Debate this week. We saw the Attorney General on this issue of whether or not English should be the National Language. At one Level, George will, it seems like common sense. English is the National Language as Senator Edwards said but this Amendment could have implications.

It could. When you asked the Attorney General if we should have Bilingual Ballots he said, of course. It seems to me the Attorney General needs a Refresher course in American Law. In 1906, high Tide of American Immigration, it was Stipulated as Law that to be eligible for Citizenship you had to demonstrate a Competence in Oral English. 1950, more than half a Century ago, it was Strengthened to say written, Spoken, reading English. You have to have this Competence. Now, Therefore, it follows as night to day that anyone who says I require a Bilingual Ballot has become a Citizen Ineligible to Vote only by the Nonenforcement of the Law and this is what is driving Americans Crazy.

The Voting Rights Act does specifically call for Bilingual Ballots.

Exactly, and the Voting Rights Act is Therefore in Stark contradiction of American Immigration Law.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Two conflicting Laws and maybe somebody bring them to the Supreme Court but at the moment what you've got is a political Debate over this question of English and it is to me a very Silly Debate because on the one hand we know that most People speak English. It is True that --

Most want to speak English.

Exactly and Learning English is a Pathway to success. It is also True, however, that you Dial 411 and you get Press one for English, Press two for Spanish, and that's not going to change. As long as American Business sees it's in its best Interest to have Bilingual everything we're going to have Bilingual everything.

You know, about 150 years ago, there was -- German was the second most Spoken Language in Bismarck speculated on whether the United States would be a German speaking Country or English speak Country. It's nonsense. It's an English speaking Country. The Commercial Incentives are all to speak English. Anyone trying to get ahead in this Country knows that. There is a transitional Phase for those who come in here and because we take in lots of People that means the transitional Phase Involves lots of People who companies want to Cater to. What is the Great problem in the United States that we don't speak -- That we speak too many Foreign Languages, there are too many signs -- Americans are too Multilingual. We have forgotten what Language we speak?

I grew up in a City where the Stores all said -- [ Speaking French and Spanish ]

If you went to Yorktown in New York until 30 years ago it was essentially a German speaking part --

The first Congress of the United States Contemplated Printing Laws in German as well as in English.

Lost by one Vote.

And they didn't do it and it's a very Good thing. You say it's Silly. You say it's nonsense to worry about this. Let me tell you why it's not. The Law has an Expressive function and by saying there are some expectations that we can have for Immigrants coming to the Country, we set not a high Bar but a Bar which is that we are not a Nation Defined by Ethnicity, we are Defined as Lincoln said by a proposition, we're a Creedle Nation.

Liberty is Spoken in English? George, my point is what is the problem we are trying to solve?

We are trying to solve --

That Americans aren't speaking English?

That there should be some -- No, we're trying to get People who come here to understand that if you Cannot read the Laws, read the founding Documents and follow

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

the political arguments of the Country, you are not going to be part of the Country.

But I think that People do understand that.

Believe me, they understand that, George, because they can't cash a check without --

Then why is it -- If you say it is obviously True, why is it Silly or nonsense to Stipulate something obviously True in the Law of the United States?

Because it is a political Football that has nothing to do with the Real problem. It is simply one more way to try to Assert a certain kind of Nativist Populism.

It is like Mr. Reid saying it is Racist --

There is a lot of name calling going on in this Debate.

It won't make much difference. I'll step in. It is not going anywhere. Please anybody disagree with me in a moment but no Matter what happens in the Senate, no Matter how many Debates they have over the English Language, this Bill is going to Die of its own Weight, and there's no way it can get through the House.

I think at the moment that seems to be the Case unless somehow I mean they all keep saying, the President has to Weigh in. The President has Weighed in and all it's done is make the Conservatives Angry and the Hispanics, by the way.

It was designed to Placate them. Was it a mistake for the President to give that Speech in Prime time Monday night?

No, I think not. This is actually something he believes and has been Consistent on this, probably the strongest Thread running through his entire Career.

Right.

It was leadership. It didn't work.

And I think his proposal is a very sensible, Intelligent Solution to a Real problem. His proposal, the three parts Greater Enforcement, Legalization of existing Undocumented workers and guest worker Program is the Solution.

This gets back to what I was saying earlier about Iraq just Casting a Pall over everything. If the President were at decent approval Ratings, the Fact that he came out and led would make a difference.

Would make a much bigger difference.

The Fact he is at the Ratings he is because of Iraq, they just ignore him.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

I think that's right. Elections this week including a big Election last night in New Orleans. Mayor Ray Nagin came back and is going to be Mayor again. Watch this.

This is a Great day for the City of New Orleans. This Election is over, and it's time for this Community to start the Healing process.

Cokie, you're our Resident New Orleans Expert. I got to say I was surprised by this coming off of the runoff, the Primary, it seemed like Mitch Landrieu would Suck up all the Votes. Didn't happen.

Everybody assumed this was much more about Race than it was and the Opponents of Nagin for the most part were White. I mean, the second -- The person who came in third was White, and People thought those White voters would go automatically to Landrieu and Nagin would Lose. The Truth is, I'll be interested in seeing the exit Polls if there are any, but in my Anecdotal Conversations throughout New Orleans, those White voters went with Nagin.

Of course, Nagin got the White Vote the first time around.

But these are also People who would do basically anything other than Vote for a Democrat like Mitch Landrieu and they would Prefer to Vote for Ray Nagin who they think they have some control over Rather than Vote for Mitch Landrieu.

And, George, Ray Nagin Bucked what may be a Tide this year, an Incumbent who stayed in despite voter Anger.

The Incumbent always Wins, also a Fact in those Races.

We saw in Pennsylvania this week a Real scare shot through the Republican Ranks in their Primary.

A lot of Incumbents lost and they lost second point, they lost because Conservatives got Mad at them. It was over a pay raise and other local Matters but still Conservatives, these Turbulent Conservatives Defected. Third, the Conservatives were Outspent eight to one and Won. Now, one of the things the Republicans are Counting on this Fall is their Superior fund-raising ability. They may find out as The New York Yankees have not having Won the World Series since 2000 that there's a declining Marginal Utility of the last Dollar.

Nagin was also Greatly Outspent.

Was Greatly Outspent. And he lost. Thank you all very much. Sorry we couldn't get you in on that, Fareed. The roundtable will keep talking in the Green Room. You can find out later by going to ABC and Clicking on "This week."

Now "In Memoriam." One Singular Sensation every little step she takes one Thrilling combination every move that she makes

I can Scarcely wait Till tomorrow when a New life begins for me as it does each day, as it does each day

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

5/21/06 ABCSTEPHANPLS (No Page)                                                Page 17

When you take the events that Unfolded in the months before the Tet Offensive and add them up, to me it constitutes a Conspiracy to Deceive.

This week, the Pentagon released the names of 26 Soldiers and Marines killed in Iraq.

We'll be back with John Walsh.

Our Voice this week, John Walsh.

The names of 100 --

America's most Famous Crime fighter is now taking on a New cause, pushing Congress to pass the Toughest Sexual Predators Law ever. But with Congress Tied up in Knots this Election year, Walsh fears that Bill may be a Victim.

I have Hunted every kind of dangerous Fugitive on "America's most wanted." You know who the Toughest to catch are, the Child Killers and the Pedophiles. Their Cunning, they're Smart. They know the Laws. They know how to Beat it. I've been going to Capitol Hill every year for 25 years and this may be the most meaningful Piece of Child protection Legislation ever. It would set up a National Sex Offender Registry. It would Mandate that every Single State keep a Uniform Registry designed by the Justice Department and for the first time in the History of this Country, convicted Sexual Predators, Rapists and Child Molesters who are in Violation of their Parole, Probation or Refuse to Register even though Mandated to would be held Accountable. You're looking at a guy who is the Father of a murdered 6-Year-Old Child. Wake up. It can be the Soccer Coach. It can be the Rabbi. It can be the School Bus driver. For years they've been out there and they've known all the Rules and they've known how to Lure our Kids and hurt our Kids. When I was a little boy, you walked down the Street and your Mom or Dad would say there's a Bad Dog there. Don't go in that Yard. Don't Pet that Dog. It could bite you. Same thing with a Sexual Predator. I want to have the ability to say to my 11-Year-Old Son, do not ever go in that Garage, do not ever be lured in that House. Don't go in and look at that Puppy. Don't go in there and play those Video games because that's a House and that's a man that you shouldn't be talking to. I think that Congress will get the Message, you will be held Accountable this time. You will -- Someone, me, other Parents, the Media, somebody will hold you Accountable for not getting this done.

The Bill is sitting on the Congressional Calendar right now. If you want it passed, call your Representative or Senator.

And for more from John Walsh check out Voices plus. Go to ABCNews.Com and Click on "This week," And now "The Sunday funnies."

And the President made it clear that the issue should be discussed in a Civil Fashion.

America needs to conduct this Debate on Immigration in a reasoned and respectful Tone. We Cannot build a Unified Country by Inciting People to Anger or playing on

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

anyone's fears.

That's what -- That's what Terrorism and Gay People are for.

And according to a Washington poll, Washington/Abc News poll actually, People, Americans say they Trust Democrats more than Republicans to deal with Iraq, the Economy, Iraq and other issues, in Fact, if the Election were held today John Kerry would still Lose. Yeah.

Things are very Bad for the President. Even now his own Staff is -- You remember Tony Sopranos in "The Sopranos" started to Lose it and Beat someone up. Look what happened at the Airport.

After a visit to Orlando to promote his Prescription Drug plan, the President was surprised when Air Force one pulled away without him and suffered only Minor bruises.

That is Unacceptable.

As you probably heard, "USA today" reported the Agency is collecting Data on billions of Domestic Calls.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (HR & Labor Management (1HR87); Legal (1LE33); Race Relations (1RA49); Social Issues (1SO05); Business Management (1BU42); World Elections (1WO93); Global Politics (1GL73); World Conflicts (1WO07); Social Welfare (1SO83); Judicial (1JU36); Civil Unrest (1CI11); Sex Crimes (1SE01); Labor Unions (1LA31); Legislation (1LE97); Government (1GO80); Minority & Ethnic Groups (1MI43); Crime (1CR87); Criminal Law (1CR79); Economics & Trade (1EC26); Political Parties (1PO73); Public Affairs (1PU31))

INDUSTRY:  (Gen Y Entertainment (1GE14); Smuggling & Illegal Trade (1SM35); Gen Y TV (1GE33); Online & Electronic Publishing (1ON84); Publishing (1PU26); Internet Regulatory (1IN49); Entertainment (1EN08); Internet (1IN27))

REGION:  (North America (1NO39); Gulf States (1GU47); Louisiana (1LO72); Iraq (1IR87); New York (1NE72); Arab States (1AR46); North Carolina (1NO26); Americas (1AM92); Middle East (1MI23); USA (1US73))

Language:  EN

OTHER INDEXING:  (ABC; ABC NEWS; ABC STATIONS; ACT PERMITS BILINGUAL; AIR FORCE; AMERICAN BUSINESS; AMERICAN IMMIGRATION; AMERICAN LAW; AMERICAN PEOPLE; AP; BILINGUAL; BILINGUAL BALLOT; BILINGUAL BALLOTS; BILL; BORDER; BORDER PATROL AGENTS; BRITISH CARTOGRAPHERS; CHILD; CHILD KILLERS; CIA; CITIZEN INELIGIBLE; CIVIL FASHION; COLLEGE; COLLEGE SCHOLARSHIPS; COMPREHENSIVE IMMIGRATION BILL; CONGRESS; CONGRESSIONAL REPUBLICAN; CONSERVATIVES; CONSERVATIVES ANGRY; CONSTITUTION; CORRUPTION; CREEDLE NATION; DEBATE; DEFINED; DEMOCRAT ANGLING; DEMOCRATIC; DEMOCRATIC CONSULTANT; DEPARTMENT OF JUSTICE; DRAWDOWN; EXTENSIVE; FALSE SOCIAL

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

SECURITY; FAREED; FAREED ZAKARIA; FAREED ZAKARIA DEBATE; FEDERAL JUDGE; FORMATION;
GEORGE WILL FAREED ZAKARIA; GOOD NEWS; HARVARD ECONOMIST; HISPANICS; HOME STATE;
HOUSE; IFFY; ILLEGAL; ILLEGAL IMMIGRANTS; IMMIGRANTS; IMMIGRATION; IMMIGRATION
DEBATE; JUDICIARY COMMITTEE; JUSTICE DEPARTMENT; LANGUAGE; LANGUAGE OF COMMERCE;
LAW; LAWYERS; LOBBIES CONGRESS; MATE; MATTER INDONESIA; MESSAGE; MEXICAN BORDER;
NATIONAL; NATIONAL ARMY; NATIONAL LANGUAGE; NATIONAL MUFFIN; NATIONAL SECURITY;
NATIONAL SEX OFFENDER REGISTRY; OFFICE OF PROFESSIONAL; PEDOPHILES; PENTAGON;
PEOPLE; POLICY; POLICY DEBATE; PRESIDENTIAL DEBATE; PRESIDENTIAL RACE; PRIMARY;
PRINCETON ECONOMIST; PSYCHS PICO; RACE; RAPISTS; RATIONAL DEBATE; REFRESHER;
REPUBLICAN CONGRESS; REPUBLICANS; REPUBLICANS IMPLODE; SADDAM HUSSEIN;
SCHOLARSHIPS; SCHOOL BUS; SENATE; SENATE DEBATE; SEXUAL; SEXUAL PREDATOR; SHIA;
SILLY; SILLY DEBATE; SINGLE STATE; SMART; SMART BORDER STRATEGY; SOCIAL SECURITY;
STAKES; STARK; STIPULATED; STRATEGY; STRONG DEFINING MESSAGE; SUNNIS; SUPREME
COURT; TASTE; TLFZ; TOUGHEST; TOUGHEST SEXUAL PREDATORS LAW; TURBULENT
CONSERVATIVES DEFECTED; UNCONSTITUTIONALITY; UNIFORM REGISTRY; UNIFYING LANGUAGE;
VOTE; VOTING; WHITE HOUSE; WHITE VOTE)   (Acting; Al Qaeda; Alberto Gonzales;
Alberto Gonzales.; Assimilate Folks; Attorney; Bargain Brokered; Beat; Bush; Bush
Lowest; Calls; Classified Information; Clinton; Clinton Chooses; Cokie; Cokie
Roberts; Consistently; Criminal; Declares English; Documents; Edwards; Election;
Elections; Elizabeth; English; English Represents; Ethical; Folks; Forged
Documents; George; George W. Bush; George will; GeorgeStephanopoulos; Good; Greatly
Outspent; H. Marshall Jarrot; Hayden; Health; Hey; Hispanic Publishers; Impeached;
Impeachment; Intelligent Solution; Intentionally; Iowa; Jack; John; John Edwards;
John Kerry; John Kerry Won; John Walsh; Kerry; Kurds; Landrieu; Learning English;
Liberty; Lincoln; Marginal Utility; Mary Cheney; Mitch; Mitch Landrieu; Nagin;
Nagin Bucked; Permanent; Phase; Phase Involves; Poverty; Ray; Ray Nagin; Reid;
Represents Freedom; Richard Nixon; Roberts; Rumsfeld; Sessions; Singular Sensation;
Spoken; Strengthened; Tony Sopranos; Voices; Wake; Walsh; Walsh Tracking Predators;
Washington)

Word Count: 8572
5/21/06 ABCSTEPHANPLS (No Page)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT 15

49



U.S. Department of Justice

Office of Legislative Affairs

---

Office of the Assistant Attorney General                    Washington, D.C. 20530

March 1, 2007

The Honorable Patrick J. Leahy
Chairman
Committee on the Judiciary
United States Senate
Washington, D.C. 20510

Dear Mr. Chairman:

Enclosed please find responses to questions posed to Criminal Division Chief of Staff and Principal Deputy Assistant Attorney General Matthew W. Friedrich, following Mr. Friedrich's appearance before the Committee on June 6, 2006. The subject of the Committee's hearing was the unauthorized disclosure of classified information by the press. We apologize for the length of time our response has required.

You also requested the Department's views on S. 2831, the "Free Flow of Information Act of 2006." On June 20, 2006, the Department provided the Committee with a letter setting forth its views in opposition to this legislation. For your convenience, we have enclosed a copy of the letter for the hearing record.

Senator Leahy also requested the Department's views on data retention by Internet service providers. The Attorney General has commissioned a panel of experts within the Department to examine this issue and provide him with recommendations. That panel's work is ongoing. Therefore, I respectfully request that you allow the Department additional time to finalize its own inquiry before we respond to the Committee's request.

We hope that this information is helpful to you. If we may be of additional assistance in connection with this or any other matter, we trust that you will not hesitate to call upon us. The

50

The Honorable Patrick J. Leahy
Page 2

Office of Management and Budget has advised us that from the perspective of the Administration's program, there is no objection to submission of this letter.

Sincerely,

*Richard A. Hertling*

Richard A. Hertling
Acting Assistant Attorney General

Enclosures

cc:   The Honorable Arlen Specter
      Ranking Minority Member

51

Responses to Questions for the Record
Matthew W. Friedrich
Chief of Staff and Principal Deputy Assistant Attorney General
Criminal Division

"Examining DOJ's Investigation of Journalists Who Publish Classified Information:
Lessons from the Jack Anderson Case"

Committee on the Judiciary
United States Senate
June 6, 2006

Senator Specter:

1.   *Last Month Attorney General Gonzales made a series of statements on ABC's This Week
     program to suggest that DOJ would consider prosecuting a journalist or news
     organization for publishing classified information.*

     - *To which statutes was he referring when he said, "There are some statutes on the
       book, which if you read the language carefully, would seem to indicate that
       [prosecution of journalists] is a possibility."?*
     - *Does the Department of Justice share the views of Benno Schmidt and Harold
       Edgar, who wrote in 1973 that the Espionage Act does not apply to journalists, or
       the views of Justices White and Stewart, who wrote in the 1971 Pentagon Papers
       case that the Act does apply to journalists?*
     - *Title 18, United States Code, Section 798, which bars the willful publication of
       communications intelligence, appears to apply to journalists. Was this the statute
       Attorney General Gonzales was discussing?*

Answer:  The statutes to which the Attorney General was referring were 18 U.S.C. §§ 793 and
798. These two provisions, on their face, do not provide an exemption for any particular
profession or class of persons, including journalists. Many judges (including Justices of the
United States Supreme Court) and commentators have examined these statutes and reached the
same conclusion. In his concurring opinion in the Pentagon Papers case, for example, Justice
White wrote, "from the face of [the statute] and from the context of the Act of which it was a
part, it seems undeniable that a newspaper, as well as others unconnected with the Government,
are vulnerable to prosecution under § 793(e) if they communicate or withhold the materials
covered by that section." *New York Times v. United States*, 403 U.S. 713, 740 (1971). We agree
with Senator Specter, who stated on May 2, 2006, in a hearing with FBI Director Mueller, "the
White-Stewart opinions" from the Pentagon Papers case "are pretty flat out that there is authority
under those statutes to prosecute a newspaper, [and] inferentially [to] prosecute reporters."

     In *United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988), *cert. denied*, 488 U.S. 908
(1988), the United States Court of Appeals for the Fourth Circuit explicitly rejected a
defendant's assertion that the First Amendment barred his prosecution under § 793 for

52

unauthorized disclosures of classified information. The Fourth Circuit did so over the objections of numerous news organizations that had filed amicus briefs in the case to press the First Amendment defense against prosecution. Further, several legal commentators have concluded, with respect to §§ 793 and 798, that journalists are not exempt from the reach of these statutes if their elements are otherwise met.

It bears emphasis that the Attorney General has made clear that the Justice Department's primary focus has been and will continue to be investigating and prosecuting leakers, not members of the press. The Department strongly believes that the best approach is to work cooperatively with journalists to persuade them not to publish classified information that can damage national security.

2.    *How do you square the Attorney General's public comments on the prosecution of journalists with Department of Justice regulations (28 C.F.R. § 50.10) that say that "the prosecutorial power of the government should not be used in such a way that it impairs a reporter's responsibility to cover as broadly as possible controversial public issues"?*

Answer: In his "This Week" appearance, the Attorney General was addressing the potential reach of 18 U.S.C. §§ 793 and 798 on their face. The Attorney General's comments are consistent with the Department of Justice's policy, as expressed in 28 C.F.R. § 50.10. Strictly speaking, the provisions of 28 C.F.R. § 50.10 are not "regulations," but a statement of policy that does not "create or recognize any legally enforceable right in any person." *See id.* at 50.10(n); *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046-47 (D.C. Cir. 1987). As set forth in 28 C.F.R. § 50.10, the policy seeks to "balanc[e] the concern that the Department of Justice has for the work of the news media and the Department's obligation to the fair administration of justice." The Department recognizes the vital role that a free press plays in our society. Accordingly, the Department's voluntarily adopted internal policy requires a rigorous internal review – culminating with the Attorney General himself – of not only decisions to prosecute members of the press but also subpoenas aimed at the press, even in cases where the press itself is not the target of the investigation. The policy demonstrates the Department's ongoing commitment to striking a balance between the public's interest in the free dissemination of ideas and its interest in effective law enforcement and the fair administration of justice.

3.    *The Department of Justice argued at this Committee's October 2005 reporters' privilege hearing that reporters' privilege legislation is not necessary because Department of Justice regulations, namely 28 C.F.R. § 50.10, set forth safeguards and a framework for evaluating requests for journalists' testimony and documents.*

      •    *Do these regulations apply to requests for records of deceased journalists, like Jack Anderson?*
      •    *Does the Department of Justice believe that there should be the same level of First Amendment protection of the notes and confidential sources of deceased journalists?*

2

53

> *Don't some of the national security concerns about the publication of national secrets diminish when a journalist dies? Dead journalists don't publish anymore, after all. Accordingly, doesn't the government's interest in and concern about such materials diminish?*

Answer: At the time of my testimony, the Department was reviewing the applicability of 28 C.F.R. § 50.10 to circumstances involving deceased journalists. Subsequent to my testimony, the Department revised the United States Attorneys' Manual to make it clear that "[t]he Department considers the requirements of 28 C.F.R. § 50.10 applicable to the issuance of subpoenas for the journalistic materials and telephone toll records of deceased journalists." United States Attorneys' Manual § 9-13.400.

Separate and apart from the applicability of the Department's policy to deceased journalists, it is the Department's view that, as a legal matter, the treatment of notes and sources of deceased journalists should be the same as that of living journalists. The courts, including the United States Supreme Court in *Branzburg v. Hayes*, 408 U.S. 665 (1972), have held that journalists have no First Amendment privilege against disclosing their sources in response to a grand jury subpoena.

With respect to the Department's views on the effect a journalist's death may have on any national security concerns regarding the journalist's sources or records, such a determination is highly fact-specific and would need to be evaluated on a case-by-case basis.

4.    *Courts, including the Supreme Court in Swidler & Berlin v. United States, 524 U.S. 399 (1998), have said that testimonial and production privileges, like the attorney-client privilege, apply after the death of the privilege holder.*

> *If courts are willing to extend privileges beyond the grave when policy supports it, wouldn't a reporter's privilege better safeguard the First Amendment interests of deceased reporters and their sources?*

> *If the attorney-client privilege, marital privilege, psychiatric privilege, and even executive privilege can survive the death of one of the privilege holders, why shouldn't the same thing apply to reporters? What is the policy difference? For instance, is the First Amendment protection of the press any less than the Sixth Amendment right to counsel?*

Answer: As noted above, the Department has revised the United States Attorneys' Manual to make it clear that "[t]he Department considers the requirements of 28 C.F.R. § 50.10 applicable to the issuance of subpoenas for the journalistic materials and telephone toll records of deceased journalists." United States Attorneys' Manual § 9-13.400.

As a broader matter, the same courts, including the Supreme Court, that have consistently held that the marital, psychiatric, and attorney-client privileges extend beyond the grave also

3

54

have consistently held that journalists possess no First Amendment privilege to avoid testifying in response to a valid grand jury subpoena. As the Supreme Court stated in *Branzburg*, "the Constitution does not, as it never has, exempt the newsman from performing the citizen's normal duty of appearing and furnishing information relevant to the grand jury's task." *Branzburg*, 408 U.S. at 691.

The Department remains committed – as it always has been – to striking an appropriate balance between the public interest in the free dissemination of ideas and the public's interest in effective law enforcement and national security. Accordingly, the Department believes that, as a legal matter and as a policy matter, legislation in this area is both unnecessary and unwise.

5.    *The Department of Justice has procedures and regulations in place to address subpoenas to journalists.*

•    *What similar procedures are in place to ensure that a decision to prosecute a journalist is carefully considered and the First Amendment interests properly weighed. Shouldn't this be a higher standard than the one that applies to subpoenas?*

**Answer:** The Department of Justice takes seriously any investigative or prosecutorial decision that implicates – directly or indirectly – members of the news media, whether it be the issuance of a subpoena or the filing of an indictment. The seriousness with which the Department approaches these decisions is reflected in the Department's governing policy, 28 C.F.R. § 50.10, which is reiterated in the United States Attorneys' Manual.

As is noted in the Department's policy, "the prosecutorial power of the government should not be used in such a way that it impairs a reporter's responsibility to cover as broadly as possible controversial public issues." The Department has never in its history prosecuted a member of the press under section 793, section 798, or any other statute relating to the protection of classified information, even though, as a legal matter, such a prosecution is possible under the law.

The Department's policy requires the express authorization of the Attorney General for any decision to prosecute a member of the news media for an offense committed during the course of, or arising out of, the news gathering or reporting process. In authorizing any such decision, the Attorney General would necessarily seek to "balanc[e] the concern that the Department of Justice has for the work of the news media and the Department's obligation to the fair administration of justice." 28 C.F.R. § 50.10.

6.    *Section 798 of the Criminal Code was enacted in 1950 in response to a June 7, 1942 Chicago Daily Tribune article that disclosed during wartime that the United States had obtained advanced intelligence of the Japanese navy's attack plans at Midway. This information was later revealed to have come from communications intelligence, specifically intercepted wires and a cracked Japanese code. Section 798 is now being*

4

55

*discussed as a potential tool for prosecuting journalists who willfully publish communications intelligence.*

- *What level of national security threat does the Department of Justice believe is needed for prosecution under section 798? Does the threat need to be imminent? Do we need to be at war?*

**Answer:** As to the requirements of the law, section 798 does not, by its terms, require a showing either that the disclosure of classified communications information resulted in an imminent threat to the United States or that the nation was at war when the disclosure was made. No court has interpreted section 798 as requiring a showing that the disclosure resulted in an imminent threat or occurred in a time of war, nor does the Department believe that such an interpretation would be warranted in light of the clear wording of the statute.

5

56

Senator Leahy:

1.  You testified that the Department of Justice has never prosecuted a member of the press under 18 U.S.C. § 793 for the publication of national defense information, but believes that such a prosecution could be possible.

    (a)  Could section 793 be used to prosecute a journalist for publishing national defense information for the purpose of promoting public debate or selling newspapers?

    (b)  What about conduct that is incidental to a journalist publishing a story, such as retaining classified documents that may be used later in a story, or communicating such information to a publisher or other reporters in the course of writing a story? Does the Department believe that section 793 also reaches this type of conduct?

Answer: As the Attorney General has indicated, while there are statutes on the books (including, most notably, 18 U.S.C. §§ 793 and 798) that do not appear to exempt any profession or class of persons from their scope, the Department's "primary focus" is on the leakers of classified information and not the media recipients of that information. Having said that, a leading case in this area, *United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988), *cert. denied*, 488 U.S. 908 (1988), holds that section 793 makes no distinction between the motivations of those who illegally disclose national defense information to someone not authorized to receive it.

In *Morison*, the defendant claimed that, because he leaked classified national defense information to the news media and not to a foreign power, his actions did not constitute "classic spying" and therefore did not run afoul of section 793. The Fourth Circuit rejected this contention, noting that the language of the statute "includes no limitation to spies or to 'an agent of a foreign government,' either as to the transmitter or the transmittee of the information, and they declare no exemption in favor of one who leaks to the press. It covers 'anyone.' It is difficult to conceive of any language more definite and clear." *Morison*, 844 F.2d at 1063.

To be clear, the defendant in *Morison* was not a member of the news media, although he did work part time for a defense publication, and no court has had occasion to consider the application of section 793 to a member of the news media.

With regard to conduct that is incidental to a journalist publishing a story, whether such conduct falls within section 793 will depend on the particular facts and circumstances. Therefore, it would be inappropriate to offer an advisory opinion about the legality of such conduct.

2.  Section 798 of title 18 prohibits unauthorized disclosure of classified information pertaining to communications intelligence. Like section 793, section 798 has never been used to prosecute a journalist.

6

· 57

(a)     Without getting into the details of any ongoing investigations, has the Department
        ever considered prosecuting a journalist for publishing classified information
        under this provision?

(b)     Do you believe there is a legally significant difference between the act of
        publishing a story that reveals only the existence of a classified program
        involving communications intelligence, and the act of publishing a story that
        discloses specific details about the program?

Answer: Respectfully, it would be inappropriate to comment upon whether the Department is
now considering the prosecution of journalists for publishing classified information. As to
whether such prosecutions have ever been considered, my understanding is that there are
historical examples where such prosecutions were considered by the Department. *See* Gabriel
Schoenfeld, *Has the* New York Times *Violated the Espionage Act?*, Commentary (Mar. 2006), at
http://www.commentarymagazine.com/Production/files/schoenfeld0306advance.html.

With regard to whether there is a legally significant difference between publishing the
existence of a classified program and the details of such program, the answer would likely
depend on the particular facts and circumstances, including the extent to which the existence of
the program is classified information.

3. .    You testified that you think improper classification might be a proper defense to certain
        statutes involving the dissemination of classified information. Specifically, do you
        believe that improper classification could be a defense to a case brought under section
        798? What about a prosecution under section 793?

Answer: As I stated in my testimony before the Committee on June 6, 2006, improper
classification "might be a defense to certain statutes," but it is "not certain" that this defense is
available for sections 793 and 798. Some commentators have argued that improper classification
could be a defense to prosecution under the Espionage Act. Professors Edgar and Schmidt, for
example, in their 1973 article argued that the language of the Espionage Act "suggests that the
appropriateness of the classification is a question for the jury." However, in *United States v.
Boyce*, 594 F.2d 1246 (9th Cir. 1979), the Ninth Circuit considered and rejected a defendant's
challenge to his conviction under sections 793, 794, and 798 for disclosing communications
intelligence to the Soviets. The Ninth Circuit specifically held that "[u]nder section 798, the
propriety of the classification is irrelevant. The fact of classification of a document or
documents is enough to satisfy the classification element of the offense."

Beyond this Ninth Circuit case, the Department is unaware of any case law that addresses
the issue of improper classification as a defense, and we are aware of no case that affirmatively
holds that such a defense is available to defendants in Espionage Act cases.

7

58

4.    *Besides sections 793 and 798, are there any other legal authorities that the Justice Department believes could be used to prosecute journalists for publishing classified information?*

Answer: Sections 793 and 798 are the two statutes that are most relevant to the vast majority of crime reports the Department receives from Intelligence Community members relating to the unauthorized disclosure of classified information. Depending on the facts and circumstances of any particular case, there may be other statutes of potential applicability.

5.    *What is the Department's position on whether Congress should enact a new law to criminally punish leaks?*

Answer: The Department is prepared to work with the Congress both on crafting new legislation and improving the existing statutory tools at the Department's disposal to combat illegal leaks of classified information.

6.    *Other than the Jack Anderson case, has the Department made any attempts over the past 5 years to search the files of journalists, either living or deceased?*

Answer: I am informed that over the past five years, the Department has approved search warrants for materials related to the news gathering process pursuant to the Privacy Protection Act, 42 U.S.C. § 2000aa *et seq.*, in four cases. The Department also issues subpoenas to reporters pursuant to the policy embodied in 28 C.F.R. § 50.10.

7.    *You testified that the Department is reviewing its policy for seeking information from the estates of deceased journalists. Is that review complete and, if so, what is the new policy?*

Answer: As noted above, this review is complete and the Department has changed its policy. The Department has revised the United States Attorneys' Manual to make it clear that "[t]he Department considers the requirements of 28 C.F.R. § 50.10 applicable to the issuance of subpoenas for the journalistic materials and telephone toll records of deceased journalists." United States Attorneys' Manual § 9-13.400.

8

59



U.S. Department of Justice

Office of Legislative Affairs

---

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

June 20, 2006

The Honorable Arlen Specter
Chairman
Committee on the Judiciary
United States Senate
Washington, D.C. 20510

Dear Mr. Chairman:

 This letter presents the views of the Department of Justice on S. 2831, the "Free Flow of Information Act of 2006." S. 2831 would create a "journalist's privilege" to be asserted in a number of circumstances by a covered journalist or "communication service provider" against the compelled disclosure of either a source who provided information under a promise or agreement of confidentiality, or of information obtained while acting in a professional capacity. The Department opposes this legislation because it would subordinate the constitutional and law enforcement responsibilities of the Executive branch — as well as the constitutional rights of criminal defendants — to a privilege favoring selected segments of the media that is not constitutionally required.

### Constitutional Concerns

 The leading authority on the constitutional status of a journalist's privilege is *Branzburg v. Hayes*, 408 U.S. 665 (1972), which rejected arguments asserting the privilege on First Amendment grounds in the grand jury context. A recent Federal court of appeals decision on the issue, *In re Grand Jury, Judith Miller*, 438 F.3d 1141 (D.C. Cir. 2006), dismissed arguments questioning the force of *Branzburg*'s holding and applied *Branzburg* to reject the assertion of a First Amendment journalist's privilege. While some Federal courts have recognized a First Amendment-based journalist's privilege in civil cases — where the Government's law enforcement responsibilities are not directly affected, *see Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981) — the privilege proposed in the bill would extend to criminal proceedings, including grand jury investigations, and to the national security context.

 In addition, the bill's definitions of privileged "journalist[s]" and "communication service provider[s]" do not exclude the agents and media outlets of hostile foreign entities, and therefore extend protection to these agents against the law enforcement efforts of the United States. For example, the definitions appear to encompass entities such as *Al-Manar* and its

60

The Honorable Arlen Specter
Page 2

reporters and cameramen. *Al-Manar* is the media outlet and television station of the terrorist organization Hezbollah. *Al-Manar* was placed on the Terrorist Exclusion List by the State Department in 2005 and more recently was designated a specially designated global terrorist by the Treasury Department pursuant to Executive Order 13224.

Because the broad privilege established by the bill is not grounded on a constitutional right, we object to any provision that subordinates to the privilege recognized constitutional imperatives, such as Presidential responsibilities under Article II and a defendant's rights under the Sixth Amendment.

President's Authority to Control Classified Information

Section 7 of the bill would permit disclosure where the information or record in question was obtained by the journalist as a result of his eyewitness observation of criminal conduct or the committing of criminal or tortious conduct by the journalist himself. There is an "exception to the exception," providing: "This section does not apply if the alleged criminal or tortious conduct is the act of communicating the documents or information at issue." As we understand it, this latter provision appears to apply to eyewitness or perpetrator information concerning a criminal disclosure of classified national security information, including, for example, the provision of such information to a journalist for an entity such as *Al-Manar*. Therefore, its effect would be to extend the protection of the privilege to this criminal disclosure of classified national security information. This provision could interfere with the President's constitutional authority to control classified national security information. *See generally Department of Navy v. Egan*, 484 U.S. 518, 527 (1988) (acknowledging the compelling nature of the President's constitutional authority to classify and control access to information bearing on the national security).

National Security and Law Enforcement Responsibilities of the Executive Branch

Section 9(a)(1) of the bill would permit the Executive branch to obtain a journalist's testimony and information involving source identification only if the Government could demonstrate to a court, by "clear and convincing evidence," that the disclosure is "necessary to prevent an act of terrorism or to prevent significant and actual harm to the national security" *and only if* "the value of the information that would be disclosed clearly outweighs the harm to the public interest and the free flow of information that would be caused by compelling the disclosure." Similarly exacting standards are required to bypass the privilege under section 9(a)(2) in criminal prosecutions or investigations of unauthorized disclosure of classified information by a Federal employee. The conditions this provision requires the Government to satisfy in order to obtain information critical to national security place impermissible burdens on .

61

The Honorable Arlen Specter
Page 3

the constitutional responsibilities of the President and the Executive branch.[1] *See generally Haig v. Agee*, 453 U.S. 280, 307 (1981) (stressing that "It 'is obvious and unarguable' that no governmental interest is more compelling than the security of the Nation" in rejecting former CIA agent's claim that passport revocation violated First Amendment rights).

Sixth Amendment

Under subsection 5(b) of the bill, defendants could obtain a journalist's testimony or evidence only if they proved to a court by clear and convincing evidence that, *inter alia*, the information sought was (1) "directly relevant" to guilt or innocence or to a "critical" sentencing fact; (2) "essential"; and (3) non-"peripheral"; and that failure to provide the information sought "would be contrary to the public interest." Thus, a defendant who established that the information or testimony sought was essential information that was directly relevant to innocence still could not obtain it if he could not also persuade a court, by clear and convincing evidence, that nondisclosure of the information would be "contrary to the public interest." This provision is inconsistent with the requirements of the Sixth Amendment.

The Sixth Amendment provides in relevant part: "In all criminal proceedings, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . [and] to have compulsory process for obtaining witnesses in his favor." As the Supreme Court has recognized, "This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). Although this right is not absolute, the government bears a heavy burden when it seeks to limit it by statute. As the Second Circuit has explained: "While a defendant's right to call witnesses on his behalf is not absolute, a state's interest in restricting who may be called will be scrutinized closely. In this regard, maximum 'truth gathering,' rather than arbitrary limitation, is the favored goal." *Ronson v. Commissioner of Correction*, 604 F.2d

---

[1] In *Branzburg*, the Supreme Court described the relative weight to be accorded to law enforcement and national security interests in conflict with an asserted journalist's privilege:

Fair and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government, and the grand jury plays an important, constitutionally mandated role in this process. On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial.

408 U.S. at 690.

62

The Honorable Arlen Specter
Page 4

176, 178 (2d Cir. 1979) (State court's refusal to call psychiatrist to testify in support of prisoner's insanity defense violated Sixth Amendment right to compulsory process).

The conditions of subsection 5(b) exceed the standards imposed by courts that have given considerable deference to a reporter's privilege, based upon their view that the privilege is constitutionally required. *See, e.g., In re Shain*, 978 F.2d 850 (4th Cir. 1992) (reporter's privilege against compelled testimony in a criminal case rejected in the absence of government harassment or bad faith); *United States v. Criden*, 633 F.2d 346, 358-59 (3d Cir. 1980) (constitutional reporter's privilege can be overcome if the movant "demonstrates" and "persuades the court" that the information could not be obtained from other sources and such information is "crucial to the claim"; privilege claim rejected and testimony compelled). A district court recently described the balance to be struck between a constitutionally based journalist's privilege and a defendant's Sixth Amendment rights: A defendant's "Sixth Amendment right to prepare and present a full defense to the charges against him is of such paramount importance that it may be outweighed by a First Amendment journalist privilege *only* where the journalist's testimony is cumulative or otherwise not material." *United States v. Lindh*, 210 F.Supp.2d 780, 782 (E.D. Va. 2002) (emphasis added). Last month, the United States District Court for the District of Columbia held that a defendant's Sixth Amendment right to obtain relevant and admissible evidence for his criminal trial could not be subordinated to an asserted reporter's privilege. *See United States v. Libby*, 2006 WL 1453084 (D.D.C., May 26, 2006).

Based upon the continuing validity of *Branzburg* and ensuing opinions such as *Miller*, we conclude that the reporter's privilege described in the bill is not required by the First Amendment. Moreover, on the contrary assumption that the asserted privilege has some constitutional underpinning, the bill's current subordination of criminal defendants' Sixth Amendment rights to the privilege is unsustainable.

### Other Concerns

#### Section 3

The bill's critical definition of "journalist" may be challenged legitimately as both overinclusive and underinclusive. It is overinclusive because, as indicated above, it includes hostile foreign entities as well as a wide-ranging category of entities whose ability to invoke the privilege would present obstacles to efficient law enforcement. However, from the standpoint of free speech principles, the definition could also be considered underinclusive because its discrimination between those who write and disseminate news for financial gain and pursuant to an employment or contractual relationship, on the one hand (the protected segment); and those who do so on an uncompensated or unaffiliated basis, on the other (the unprotected segment), is not rationally related to the purpose of the bill. We question whether a definition that effectively reconciles these conflicting considerations is possible as a practical matter.

63

The Honorable Arlen Specter
Page 5

We also recommend that section 3 define a "promise or agreement of confidentiality" to mean an assurance of confidentiality granted only upon a journalist's reasonable belief that the assurance is essential to gather news that is of significant public interest and for which reasonable alternative sources do not exist. This definition should exclude an assurance given to a source where the journalist has reasonable cause to believe (1) that the disclosure of the information is itself a crime; or (2) that the information being disclosed will place individuals in significant risk of serious bodily injury or will pose a significant risk to national security if not provided to law enforcement or other proper authorities without further delay.

Section 4

Section 4 of the bill ("Compelled Disclosure at the Request of Attorneys for the United States in Criminal Proceedings") would require the Department of Justice to demonstrate to a court "clear and convincing evidence" of a number of factors before it could compel disclosure in Federal criminal proceedings. Initially, we note that there is no evidence that the Department of Justice has abused its subpoena power to obtain source information. Indeed, since 1991, only 4.9% of the media subpoena requests that the Department's Criminal Division has processed were for source information, and only 12 such subpoenas have been issued in the last 14 years.

Additionally, the "clear and convincing" standard is a challenging one to meet, more rigorous than a "preponderance of the evidence," though less rigorous than "beyond a reasonable doubt." *See, e.g., Addington v. Texas,* 441 U.S. 418, 431-32 (noting that the clear and convincing evidence standard is a "middle level of burden of proof"). The bill would make source information more difficult to obtain than, for example, evidence of governmental misconduct sought to be protected by the deliberative process privilege. *See United States v. Lake County Bd. of Com'rs,* 233 F.R.D. 523, 526 (N.D. Ind. 2005) (explaining that the deliberative process privilege can be overcome by a "sufficient showing of a particularized need to outweigh the reasons for confidentiality").

This standard might severely restrict our ability to gain access to the information. It would require the Department to establish that there were reasonable grounds, based upon information from an alternative, independent source, to believe that a crime had occurred. If knowledge of the crime came from only a single source, we might not be able to compel disclosure.

Section 4 also severely conflicts with statutory, court-imposed, and operationally essential protections for sensitive grand jury and other criminal investigative information, by replacing confidential internal Department of Justice reviews of investigative background information (*i.e.,* the Attorney General's guidelines for the use of compulsory process against the news media) with public adversarial judicial proceedings.

64

The Honorable Arlen Specter
Page 6

Section 4 explicitly should permit compelled disclosure where the source waives the privilege.

We also note that paragraph 4(b)(2) of the bill would require that the Government demonstrate to a court, by clear and convincing evidence "to the extent possible, that the subpoena avoids requiring production of a large volume of unpublished material and is limited to the verification of published information and surrounding circumstances relating to the accuracy of the published information." Depending on how courts applied this provision, it could induce individuals to use journalists to shield documents from production.

Further, paragraph 4(b)(3) would require the Government to give reasonable and timely notice of its demand for documents. While this generally may not be problematic, the provision makes no allowance for exigent circumstances making such notice unworkable.

Finally, we note that subsection 4(a) of the bill states that it applies to "a journalist, any person who employs or has an independent contract with a journalist, or a communication service provider." However the exception provided in section 4(b) omits "communication service provider." This may be a drafting oversight.

### Section 5

The provision in section 5 of the bill governing disclosure at the request of a criminal defendant is notably more lenient in favor of disclosure than that in section 4 governing disclosure at the request of attorneys for the United States in criminal proceedings. Specifically, section 5 omits two criteria applicable to requests by Government attorneys. If the intent is to balance the interests of the criminal justice system against the public interest in a privilege against disclosure, we believe that whatever standard is to apply should apply both to defendants and to the attorneys for the Government.

### Section 6

Section 6 would create a privilege in civil litigation for journalists to refuse to divulge confidential sources, except upon a showing by a "clear and convincing evidence" standard of certain factors listed in subsection 6(b) of the bill. The statutory criteria for the civil privilege in section 6 of the bill ("Civil Litigation") appear to have been modeled in large part on the criteria contained in the Attorney General's guidelines for the use of compulsory process against the news media. Cf. 28 C.F.R. § 50.10(f)(2)-(4) and (6) with D.R. 850, § 6(b)(1)-(2) and (4)-(6). However, there are several potentially important differences, all of which are troubling.

First, the administration of the Attorney General's guidelines is not subject to judicial review, leaving the application of these criteria to the considered judgment and expertise of the Attorney General himself. By contrast, under section 6, the criteria would be applied by the

65

The Honorable Arlen Specter
Page 7

courts, and the Attorney General's judgment about, for example, the need for the information would receive no deference. We see no reason to displace the Attorney General's judgment with that of the judiciary in this fashion.

Second, section 6 would require the district court to find that all of the designated criteria were established by "clear and convincing evidence." That evidentiary standard compounds our first concern by placing an unduly heavy burden of justification on the Government.

Third, even after all of the criteria that derive from the Attorney General's guidelines were met, section 6 would require an additional showing — again, under the "clear and convincing evidence" standard — that "nondisclosure of the information would be contrary to the public interest, taking into account both the public interest in compelling disclosure and the public interest in newsgathering." See §6(b)(3). This public-interest criterion is not found in the Attorney General's guidelines because the existing criteria are designed to limit the use of compulsory process to cases where the public interest so demands. Adding an additional public-interest hurdle is at best superfluous and at worst harmful, since it could lead a court to deny disclosure even when the information was essential to the successful completion of the case and the information could not be obtained from other sources. Indeed, the breadth of the criterion might authorize courts to act upon undisclosed and potentially irrelevant factors (as opposed to the more specific considerations set forth in the Attorney General's guidelines).

Fourth, it is unclear whether the exception for cases in which the journalist is an eyewitness or a participant in criminal or tortious conduct, see § 7, actually would limit the scope of the privilege in section 6. The section 6 privilege is confined to the identity of confidential sources and the contents of confidential information, and it is hard to imagine how that kind of information would be at issue when a journalist was being asked to testify about what he himself saw or did.

Fifth, the exception for prevention of death or substantial bodily harm (see § 8) would require a showing that death or harm was otherwise "reasonably certain" to result. "Reasonable certainty" seems an extraordinarily and unduly demanding standard for the prospective loss of life or prospective serious injury.

The foregoing discussion relates to the application of section 6 to civil litigation involving the Federal government. The statutory privilege also would apply to civil suits between private parties. We note that most Federal courts have recognized a qualified common law reporter's privilege in civil cases, see, e.g., Zerilli v. Smith, 656 F.2d 705 (D.C. Cir. 1981), and it is not obvious that the common law privilege has proven inadequate to protect legitimate newsgathering interests.

66

The Honorable Arlen Specter
Page 8

Section 7

Section 7 of the bill ("Exception for Journalist's Eyewitness Observations or Participation in Criminal or Tortious Conduct") would create an exception from the shield for crimes witnessed by the journalist. According to this section, the exception "does not apply if the alleged criminal or tortious conduct is the act of communicating the documents or information at issue." Therefore, if the crime at issue was the disclosure of the information to the journalist, then the shield would attach and the journalist would not have to disclose the source unless the Government satisfied the requirements of section 4 ("Compelled Disclosure at the Request of Attorneys for the United States in Criminal Proceedings").

This provision would virtually immunize a journalist from performing the civic duty that every other citizen is required to perform: serving as a witness to crime. Further, by excepting "disclosure" crimes, the provision would permit the journalist to participate intentionally in a violation of the criminal laws of the United States — indeed, as the recipient of the disclosure, to cause the crime to occur — with impunity. Even the more highly recognized and protected attorney-client privilege does not apply where the attorney participates in crime. We note specifically that this provision would hinder investigations of leaks of classified information.

Section 8

Section 8 of the bill ("Exception to Prevent Death or Substantial Bodily Injury") provides that a journalist has no privilege against disclosure to the extent the information is "reasonably necessary to stop or prevent reasonably certain (i) death or (ii) substantial bodily harm". We believe that the standard of "reasonably certain" death or substantial bodily harm is unreasonably difficult to meet.[2] We also believe that the exception should apply not only to information necessary to prevent death or bodily harm, but to prevent property damage as well.

Thank you for the opportunity to present our views. Please do not hesitate to call upon us if we may be of additional assistance. The Office of Management and Budget has advised us

---

[2] We recognize that this is the standard used in Rule 1.6 of the ABA Model Rules of Professional Conduct.

67

The Honorable Arlen Specter
Page 9

that from the perspective of the Administration's program, there is no objection to submission of this letter and enactment of this legislation would not be in accord with the President's program.

Sincerely,

William E. Moschella
Assistant Attorney General

cc:   The Honorable Patrick J. Leahy
      Ranking Minority Member

# EXHIBIT 16

# ABC News: The Blotter

## Federal Source to ABC News: We Know Who You're Calling

May 15, 2006 10:33 AM

**Brian Ross and Richard Esposito Report:**

A senior federal law enforcement official tells ABC News the government is tracking the phone numbers we (Brian Ross and Richard Esposito) call in an effort to root out confidential sources.

"It's time for you to get some new cell phones, quick," the source told us in an in-person conversation.

ABC News does not know how the government determined who we are calling, or whether our phone records were provided to the government as part of the recently-disclosed NSA collection of domestic phone calls.

Other sources have told us that phone calls and contacts by reporters for ABC News, along with the New York Times and the Washington Post, are being examined as part of a widespread CIA leak investigation.

One former official was asked to sign a document stating he was not a confidential source for New York Times reporter James Risen.

Our reports on the CIA's secret prisons in Romania and Poland were known to have upset CIA officials. The CIA asked for an FBI investigation of leaks of classified information following those reports.

People questioned by the FBI about leaks of intelligence information say the CIA was also disturbed by ABC News reports that revealed the use of CIA predator missiles inside Pakistan.

Under Bush Administration guidelines, it is not considered illegal for the government to keep track of numbers dialed by phone customers.

The official who warned ABC News said there was no indication our phones were being tapped so the content of the conversation could be recorded.

A pattern of phone calls from a reporter, however, could provide valuable clues for leak investigators.

.

# EXHIBIT 17

Copyright 2006 Factiva, a Dow Jones and Reuters Company
All Rights Reserved



**factiva.**

(Copyright (c) 2006, Dow Jones & Company, Inc.)

## THE WALL STREET JOURNAL.

The Wall Street Journal

June 23, 2006 Friday

SECTION: Pg. A1

LENGTH: 1212 words

HEADLINE: Treasury Tracks Financial Data In Secret Program --- Since 9/11, U.S. Has Used Subpoenas to Access Records From Fund-Transfer System

BYLINE: By Glenn R. Simpson

BODY:

Since shortly after the Sept. 11, 2001 terrorist attacks, the U.S. Treasury Department has been secretly tracking suspected terrorist financing through a far-reaching program that gives it access to records from the network that handles nearly all international financial transfers.

The information comes from a Belgian firm known by its acronym, Swift, which manages much of the world's financial-message traffic. Under the program, U.S. counter-terrorism analysts query Swift's vast database of billions of financial transactions for information on activity by suspected terrorists. The program operates under a series of broad U.S. subpoenas.

U.S. officials say the Terrorist Finance Tracking Program has been highly successful both in leading to the apprehension of terrorism suspects and in thwarting terrorist operations. People familiar with the program said, for example, that it yielded useful information on the bombings last July 7 in London. The program "has helped to disrupt terrorist cells and operations and has helped save lives," Treasury said in a statement to The Wall Street Journal.

Still, disclosure of its existence may be controversial in Europe and other parts of the world and within the global banking industry, which has long worried about the privacy of transactions. U.S. officials said few American citizens would have financial data that fall under the program, because they are unlikely to engage in international money transfers.

Stuart Levey, Treasury's top counter-terrorism official, said the program was initiated after department lawyers determined they had the legal authority to subpoena Swift, which keeps its data in the U.S. To his knowledge, Mr. Levey said, such broad subpoenas of Swift data had not been attempted previously.

He said the subpoenas are based on a longstanding U.S. law dealing with economic sanctions, known as the International Emergency Economic Powers Act. Passed in 1977, it allows the president to impose economic sanctions when dealing with a national-security threat. The law has been used, among other things, to impose sanctions on rogue states.

The program is known to officials of the world's leading central banks, as well as key U.S. allies in the war on terror, with which the U.S. has shared data. Its existence also is known to Swift's board, which consists of representatives of the organization's member banks.

While U.S. officials had never discussed the tracking program publicly until yesterday, they have repeatedly discussed in broad terms their efforts to engage in surveillance of cross-border financial activity around the world and have widely publicized the fruits of such surveillance in efforts to blacklist corrupt financial institutions.

In a statement, Swift said, "In the aftermath of the September 11th attacks, Swift responded to compulsory subpoenas for limited sets of data. Our fundamental principle has been to preserve the confidentiality of our users' data while complying with the lawful obligations in countries where we operate ....Through this process, Swift received significant protections and assurances as to the purpose, confidentiality, oversight and control of the limited sets of data produced under the subpoenas."

The government has a similar program through which it accesses data from Western Union, The Wall Street Journal reported last year.

Formed in 1973 by international banks, Swift is an industry cooperative that acts as an electronic gatekeeper for most of the world's major banks, brokerages, and investment managers to transmit funds across borders. Swift doesn't handle any funds, but processes some 11 million sets of transfer instructions and confirmations daily -- more than 2.5 billion a year.

Through Swift, banks and brokerages relay information to each other about financial transfers through a series of standardized forms that contain large amounts of information, including the identities of sender and recipients, the amount being transferred, the account numbers used and intermediate banks. These forms are transmitted through a secure computer network. The actual funds or securities are transferred later by banks or clearing and settlement companies.

Swift's board of directors is chosen by member banks; its legal regulator is the National Bank of Belgium. Since 1998, it also has been supervised by the world's major central banks, including the Federal Reserve, the Bank of England, the European Central Bank and the Bank of Japan. Formally called the Society for Worldwide Interbank Financial Telecommunications, Swift handles the vast bulk of world-wide cross-border wire traffic.

Swift's headquarters is a tightly guarded campus with long, well-manicured lawns in La Hulpe, a suburb of Brussels, the Belgian capital and headquarters of the European Union. The company is run by an American, Leonard Schrank, whose office is adorned with photos from a management seminar Swift held at the National Aeronautics and Space Administration.

Last night, in a statement, Treasury Secretary John W. Snow called the program an "essential tool" for fighting terror and said it had effective oversight and safeguards. "It is not `data mining,' or trolling through the private financial records of Americans," he said. "It is not a `fishing expedition,' but rather a sharp harpoon aimed at the heart of terrorist activity."

Mr. Levey said safeguards include regular outside audits. Intelligence analysts are allowed to search data only for specific individuals or groups suspected of terrorist involvement, he said, and the data isn't subjected to controversial data-mining techniques such as pattern-seeking algorithms. In addition to the probe of the London bombings, the data helped lead investigators to "a key facilitator of terrorism in Iraq," Mr. Levey said.

U.S. officials agreed to discuss the program after concluding that knowledge of its existence was emerging and public disclosure was inevitable. Aspects of it have recently been declassified. Mr. Snow called the disclosure "regrettable." Mr. Levey said he fears that "sophisticated terrorists will now stop using the system in ways we have access to, or will take extensive precautions to hide their identities, and that is really a loss."

For their part, American banks are more accustomed to providing information to government agencies than are some of their foreign counterparts. Under a series of U.S. laws, domestic banks are required to turn over large amounts of data to the government to fight money laundering and terrorism.

---

```
          A Look at Swift

  -- What it is: A financial-industry owned co-operative messaging system for
financial information. Its name is an acronym for Society for Worldwide
Interbank Financial Telecommunication.

  -- Clients: Nearly 8,000 financial institutions in 205 countries, including
banks, broker/dealers and investment managers, along with their market
infrastructures in payments, securities, treasury and trade. About two-thirds
of its traffic comes from Europe.
```

-- Headquarters: Brussels

-- Founded: 1973

-- Total number of messages, year to date: 904,826,708

-- Average daily number of transactions, year to date: 11,034,472

Source: the company

NOTES:
PUBLISHER: Dow Jones & Company, Inc.

LOAD-DATE: June 23, 2006

EXHIBIT 18

WestLaw.                                                            NewsRoom

6/23/06 LAT-BUS (No Page)                                          Page 1

6/23/06 L.A. Times (Bus. Sec.) (Pg. Unavail. Online)
2006 WLNR 10850261

Los Angeles Times
Copyright 2006 Los Angeles Times

June 23, 2006

Treasury Secretly Works at Tracking Terrorist Financing

By Josh Meyer and Greg Miller

WASHINGTON -- The U.S. government, without the knowledge of many banks and their customers, has engaged for years in a secret effort to track terrorist financing by reviewing confidential information on transfers of money between banks worldwide.

The program, run by the Treasury Department, is considered a potent weapon in the war on terrorism because of its ability to clandestinely monitor financial transactions and map terrorist webs.

Current and former officials at multiple U.S. agencies acknowledged the program's existence but spoke on condition of anonymity, citing its sensitive nature. ``We're very, very protective of it,'' said a senior U.S. official familiar with the program. ``It is extremely valuable.''

The program is part of an arsenal of aggressive measures the government has adopted since the Sept. 11 terrorist attacks that yield new intelligence, but also circumvent traditional safeguards against abuse and raise concerns about intrusions on privacy.

The program extracts information about bank transfers from the world's largest financial communication network, which is run by a consortium of financial institutions called the Society for Worldwide Interbank Financial Telecommunication, or SWIFT.

The SWIFT network carries up to 12.7 million messages a day containing instructions on many of the international transfers of money between banks. The messages typically include the names and account numbers of bank customers -- from U.S. citizens to major corporations -- who are sending or receiving funds.

The program gives U.S. intelligence analysts extraordinary access into what is essentially the central nervous system of international banking.

The Treasury Department uses a little-known power -- administrative subpoenas -- to routinely seek data from the SWIFT network, which has operations in the U.S.,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

including a main computer hub in Manassas, Va. The subpoenas are secret and not reviewed by judges or grand juries, as are most criminal subpoenas.

SWIFT acknowledged Thursday in response to questions from the Los Angeles Times that it has provided data under subpoena since shortly after Sept. 11, a striking leap in cooperation from international bankers who long resisted such law enforcement intrusions into the confidentiality of their communications. But SWIFT said in a statement that it has worked with U.S. officials to restrict the use of the data to terrorism investigations.

The program is part of the Bush administration's dramatic expansion of intelligence-gathering capabilities, which includes warrantless eavesdropping on the international phone calls of some U.S. citizens. Critics complain that these efforts are not subject to independent governmental reviews designed to prevent abuse and charge that they collide with privacy and consumer protection laws in the United States.

Steven Aftergood, director of the Project on Government Secrecy at the Federation of American Scientists, said the SWIFT program raises similar issues. ``It boils down to a question of oversight, both internal and external. And in the current circumstances, it is hard to have confidence in the efficacy of their oversight,'' he said. ``Their policy is, `Trust us,' and that may not be good enough anymore.''

A former senior Treasury official expressed concern that the SWIFT program allows access to vast quantities of sensitive data that could be abused without safeguards. The official, who said he did not have independent knowledge of the program, questioned what becomes of the data, some of it presumably on innocent banking customers.

``How do you separate the wheat from the chaff?'' the former official said. ``And what do you do with the chaff?''

The effort also runs counter to the expectations of privacy and security that are sacrosanct in the worldwide banking community. SWIFT promotes its services largely by touting the network's security, and most of its customers are likely unaware that the U.S. government is regularly using subpoenas to review the private financial information.

U.S. officials, some of whom expressed surprise the program had not previously been revealed by critics, acknowledged it would be controversial in the financial community. ``It is certainly not going to sit well in the world marketplace,'' said the former counterterrorism official. ``It could very likely undermine the integrity of SWIFT.''

Bush administration officials asked the Los Angeles Times not to publish information about the program, contending that disclosure could damage its effectiveness and that sufficient safeguards are in place to protect the public.

Dean Baquet, the editor of the Times, said, ``We weighed the government's arguments carefully, but in the end we determined that it was in the public interest to publish information about the extraordinary reach of this program. It is part of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

6/23/06 LAT-BUS (No Page)                                                                    Page 3

the continuing national debate over the aggressive measures employed by the
government.''

Officials familiar with the program offer conflicting descriptions of whether it
allows access only to financial data relating to individual terrorist suspects, or
to a much broader range of data that would sweep up innocent people as well.

The senior U.S. official said U.S. authorities subpoena SWIFT data only when they
have specific intelligence that connects an individual or company to suspected
terrorist activity. ``This program is legal, it is properly run, it's got
oversight,'' he said. ``It's exactly what you want your government to be doing.''

But a former U.S. official, who is also familiar with the program, characterized it
as more comprehensive than individual searches. ``I think it's more than targeted.
I don't know that it's the whole network, but it's very broad.''

The program was initially a closely guarded secret, but over the years it has
become known to a steadily wider circle of government officials, former officials,
banking executives and outside experts.

Current and former U.S. officials say the effort has only been marginally
successful against al-Qaida, which long ago began transferring money through other
means, including the highly informal banking system common in Islamic countries.

The value of the program, they said, has been in tracking lower- and mid-level
terrorist operatives and financiers who believe they have not been detected, and
militant groups, such as Hezbollah and Hamas, that also operate political and
social welfare organizations.

It's no secret that the Treasury Department tries to track terrorist financing, or
that those efforts ramped up significantly after the Sept. 11 terrorist attacks.
But the SWIFT program goes far beyond what has been publicly disclosed about that
effort in terms of the amount of financial data that U.S. intelligence agencies can
access.

The program also represents a major tactical shift. U.S. investigators have long
been able to subpoena records on specific accounts or transactions when they could
show cause -- a painstaking process designed mainly for gathering evidence. But
access to SWIFT enables them to follow suspicious financial trails around the
globe, identifying new suspects without having to seek assistance from foreign
banks.

SWIFT is a consortium founded in 1973 to replace telex messages. It has almost
7,900 participating institutions in 205 countries, including Bank of America, JP
Morgan Chase Bank, Citibank and Credit Suisse. The network handled 2.5 billion
financial messages in 2005, including many originating in countries such as Saudi
Arabia, Pakistan and the United Arab Emirates that the United States scrutinizes
closely for terrorist activity.

The system does not execute the actual transfer of funds between banks -- that is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

carried out by the Federal Reserve and its international counterparts. Rather, banks use the network to transmit instructions about such transfers. For that reason, SWIFT's data is extremely valuable to intelligence services seeking to uncover terrorist webs.

CIA operatives trying to track Osama bin Laden's money in the late 1990s, figured out clandestine ways to access the SWIFT network. But a former CIA official said Treasury officials blocked the effort because they did not want to anger the banking community.

Historically, ``there was always a line of contention'' inside the government, said Paul Pillar, former deputy director of the CIA's counterterrorism center. ``The Treasury position was placing a high priority on the integrity of the banking system. There was considerable concern from that side about anything that could be seen as compromising the integrity of international banking.''

Before Sept. 11, a former senior SWIFT executive said, providing access to its sensitive data would have been anathema to the Belgium-based consortium. But the attacks on the World Trade Center and the Pentagon led to a new mind-set in many industries, including telecommunications.

SWIFT said that the Office of Foreign Assets Control in the Department of the Treasury sent the first subpoena shortly after Sept. 11, seeking ``limited sets of data'' to learn about how al-Qaida financed the attacks.

Unlike telephone lines and e-mail communications, the SWIFT network cannot be easily tapped. It uses secure log-ins and state-of-the-art encryption technology to prevent intercepted messages from being deciphered. ``It is arguably the most secure network on the planet,'' said the former SWIFT executive who spoke on condition of anonymity. ``This thing is locked down like Fort Knox.''

SWIFT said that it was responding to compulsory subpoenas and negotiated with U.S. officials to narrow them and to establish protections for the privacy of its customers. SWIFT also said it has never given U.S. authorities direct access to its network.

``Our fundamental principle has been to preserve the confidentiality of or users' data while complying with the lawful obligations in countries where we operate,'' SWIFT said in its statement.

Current and former U.S. officials familiar with the SWIFT program describe it as one of the most valuable weapons in the financial war on terrorism, but declined to provide even anecdotal evidence of its successes.

A former high-ranking CIA officer said it has been a success and another official said it has allowed U.S. counterterrorism officials to follow a tremendous number of leads. CIA officials pursue leads overseas and the FBI and other agencies pursue leads in the United States, where the CIA is prohibited from operating.

Officials said the program was relied upon especially heavily when intelligence

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

chatter from phone and e-mail intercepts suggested an imminent attack, conveying real-time intelligence for ongoing counterterrorism operations.

The former SWIFT executive said much can be learned from network messages, which require an actual name and address of both sender and recipient, unlike phone calls and e-mails, in which terrorist operatives can easily disguise their identities.

``There is a good deal of detail in there,'' he said.

As the global war on terrorism has succeeded in taking out some senior terrorists and their financiers, particularly within al-Qaida, the organization and its many affiliates have sought to move to hidden locations and to transfer their money through proxies, such as charities, aid organizations and corporate fronts.

The officials said the SWIFT information can be used in ``link analysis.'' That technique allows analysts to identify any person with whom a suspected terrorist had financial dealings -- even those with no connection to terrorism. That information is then mapped and analyzed to detect patterns, shifts in strategy, specific ``hotspot'' accounts, and geographic locations that have become new havens for terrorist activity.

No outside governmental oversight body, such as the Foreign Intelligence Surveillance Court or a grand jury, monitors the subpoenas served on SWIFT.

Current and former U.S. officials said subpoenas must be approved by a senior Treasury administrator and, the senior U.S. official said, are limited to a ``targeted search on a known name where there is an intelligence nexus.''

But the official said it's used frequently.

``Treasury has gone painstakingly, in my view, to ensure the legality,'' said a former U.S. counterterrorism official. ``They have been pretty conservative there.''

SWIFT said it ``has insisted on protecting the data, narrowing the scope, and limiting access and use to terrorism investigations,'' and said that ``independent audit controls provide additional assurance that these protections are fully complied with.''

A SWIFT representative said Booz Allen Hamilton is the auditor, but provided no further details on how the oversight process works.

Although the searches focus on suspected terrorist activity overseas, U.S. officials acknowledged that they do delve into the financial activities of Americans, noting that privacy laws don't protect individuals believed to be acting as a ``foreign terrorist agent.''

Aftergood, the Federation of American Scientists official, said that the SWIFT program is probably very effective, ``but it also needs to be done within the boundaries of the law and with proper respect for constitutional protections.''

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

John Pike, the director of the national security information web site, GlobalSecurity.org, said that the subpoena-driven SWIFT effort did not concern him as much as the NSA eavesdropping. ``There are civil liberties concerns,'' he said, but added, ``I would have to say that by prevailing community standards that this was not at the top of my list.''

A senior U.S. official and others familiar with the program said they could not discuss how many searches have been conducted or how successful they have been. SWIFT also declined to provide information on subpoenas, but said, ``Our understanding is that it has been very valuable.''

Current and former U.S. officials said a second program, run by the FBI, is similar in that it seeks to access the financial records of a vast number of individuals, including Americans, who do not know that the information is being accessed.

Officials said the administration has briefed congressional intelligence committees on the SWIFT program, in contrast to the way the information on the NSA wiretapping was withheld. One senior congressional aide said the committees have ``a good handle on what the executive branch is doing to track terrorist financing'' and are generally supportive of those efforts.

But the operation seems to have been kept secret from key segments of the banking industry, including senior banking executives in the United States and overseas.

John McKessy, the chairman of the SWIFT user group in the United States, said he was unaware of any such program. McKessy represents companies and institutions that are not members of the SWIFT co-operative, but use its messaging system.

SWIFT noted that its published policies clearly indicate that it cooperates with law enforcement authorities and that the subpoenas were ``discussed carefully within the board,'' made up of members from 25 major banks. SWIFT said it has also kept informed an oversight committee drawn from the central banks of the major industrial countries.

The SWIFT program plugs a gap in global efforts to track terrorism financing.

In the United States, law enforcement authorities can access bank records if they get permission through the legal process. The FBI also has various legal ways to get almost instantaneous access to financial records. And U.S. banking laws require financial institutions to file Suspicious Activity Reports, but authorities believe al-Qaida and other terrorist groups know how to evade the activities that trigger such red flags.

U.S. officials, however, have long complained that they cannot get access to financial records overseas and that some requests for cooperation from foreign governments and financial institutions took months, while others were rebuffed.

``The sort of 18th century notions on this stuff drive me nuts,'' said one senior U.S. counterterrorism official. ``Somebody can move money with the click of a

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

mouse, but it takes me six months to find it. If that is the world in which we
live, you have to understand the costs involved with that.''

The Sept. 11 commission urged the government in its July 2004 report to put more
emphasis on tracking the flow of funds, rather than seeking to disrupt them, to
learn how terrorist networks are organized.

Lee Hamilton, a former congressman and co-chairman of the commission who said he
has been briefed on the SWIFT program, said U.S. intelligence agencies have made
significant progress in recent years, but are still falling short. ``I still cannot
point to specific successes of our efforts here on terrorist financing,'' he said.

----- INDEX REFERENCES -----

COMPANY: SWIFT AND CO; CHASE MANHATTAN BANK; BOOZ ALLEN AND HAMILTON INC; SWIFT AND
CO NEW

NEWS SUBJECT:  (Legal (1LE33); International Terrorism (1IN37); Technology Law
(1TE30); Government (1GO80); Sept 11th Aftermath (1SE05))

INDUSTRY:  (I.T. (1IT96); Banking & Financial Services Software (1BA49); I.T. in
Government (1IT22); Software (1SO30); Software Products (1SO56); Application
Software (1AP32); Security (1SE29))

REGION:  (USA (1US73); Americas (1AM92); North America (1NO39))

Language:  EN

OTHER INDEXING:  (AMERICAN SCIENTISTS; BOOZ ALLEN HAMILTON; CHASE BANK; CIA;
DEPARTMENT OF; FBI; FEDERAL RESERVE; FOREIGN INTELLIGENCE SURVEILLANCE COURT;
HEZBOLLAH; NSA; OFFICE OF FOREIGN; PENTAGON; SWIFT; SWIFT CO; TREASURY; TREASURY
DEPARTMENT)  (Aftergood; Americans; Bush; Credit Suisse; Dean Baquet; Historically;
John McKessy; John Pike; Laden; Lee Hamilton; McKessy; Paul Pillar; Qaida; Steven
Aftergood; Suspicious Activity Reports; Treasury; Treasury Secretly Works)

Word Count: 3347
6/23/06 LAT-BUS (No Page)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT 19

WestLaw.                                                                    NewsRoom

6/27/06 PZNOW (No Page)                                                     Page 1

6/27/06 CNN: Paula Zahn Now (Pg. Unavail. Online)
2006 WLNR 11144252

CNN: Paula Zahn Now
Copyright 2006 Voxant

June 27, 2006

'New York Times' Guilty of Treason?; Old Glory Becomes Burning Issue in Congress;
Israeli Troops Move Into Gaza to Rescue Captured

xfdcn PAULA-ZAHN-NOW-01

<Show: PAULA ZAHN NOW>

<Date: June 27, 2006>

<Time: 20:00>

<Tran: 062701CN.V99>

<Type: SHOW>

<Head: 'New York Times' Guilty of Treason?; Old Glory Becomes Burning

Issue in Congress; Israeli Troops Move Into Gaza to Rescue Captured

Soldier - Part 1)

(Sect: News; International)

(Time: 20:00)

PAULA ZAHN, CNN ANCHOR:  And good evening.  Thanks so much for joining us
tonight.We're staying with this hour's breaking news story.  Just a short time ago,
Israeli troops and tanks crossed the border into southern Gaza.  They are trying to
rescue an Israeli soldier who was kidnapped by Palestinian militants on Sunday.

We are trying to make contact with John Vause, who we are hoping to have join us on
the telephone from Gaza.

But we should explain what we know so far, the Israeli troops entered southern
Gaza.  Planes attacked two bridges and a power station.  We're told that it has
knocked out electricity in most of the coastal strip this early Wednesday morning,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

their time, and, of course, stepping up the pressure on Palestinian militants holding captive that 19-year-old soldier that they have gone in to rescue.

We now have made contact with John Vause.

John, what else do we know?

JOHN VAUSE, CNN CORRESPONDENT: Well, Paula, we know that this all began within the last few minutes. Israeli troops have been moving across the border, concentrated in the southern part of the Gaza Strip, around the town of Rafah, near the border with Egypt.

Thousands of Israeli soldiers have been stationed along the border with Gaza, on standby, awaiting orders from the Israeli prime minister to move in. We know that they're taking up positions around the town of Rafah. Israeli intelligence believes that the 19-year-old corporal, Gilad Shalit, is being held in the southern part of Gaza, quite possibly in a town called Khan Yunus, not far from Rafah.

We know that a number of bridges have been hit by airstrikes. Also, that power station, as you mentioned, Paula, has been hit in an airstrike as well, knocking out a lot of power. But, still, there is power to the -- to Gaza City, which is coming actually from Israel, Paula.

ZAHN: Give us a sense of the back-story here, because we know that there have been intense negotiations going on between the U.N. and Arab leaders -- Condoleezza Rice, the secretary of state here, urging Israel to give diplomacy a chance. And -- and, yet, we see these strikes.

VAUSE: Well, the Israelis have made it perfectly clear that time was running out.

And they have demanded the return of the Israeli corporal ever since he was taken in that morning -- Sunday morning raid from his Israeli military outpost by Palestinian militants. And they said they would not wait forever. That is why the Israeli troops are now moving in. They were not -- Israel was not part of any negotiations.

They would not negotiate with the hostage-takers. What we have seen is a team of mediators, led mostly by the Egyptians, who have been on the ground here, dealing with the various Palestinian factions, trying to secure the release of this Israeli corporal.

It seems that the main sticking point in trying to secure his release has not been from the Palestinian militants within Gaza, but, rather, from the Hamas leadership, which is based outside of Gaza in Damascus, in Syria. Khaled Meshaal, in particular, apparently took a very hard-line stance against releasing this Israeli soldier, apparently highlighting a split within Hamas itself -- Paula.

ZAHN: John Vause, appreciate the update.

And, once again, just to remind the audience of why Israel says it is striking

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

those bridges, apparently, that's where they feel that this kidnapped soldier would be being sent from one part of the bridge to the other.  And they hope that knocking down that bridge would sort of cut the -- Gaza into two and make it a little bit easier for them to retrieve the soldier.

As more details become available, we will bring them to you.

John Vause, again, thanks for that late report.

We turn now to the  Security Watch  here tonight.  Is one of the country's leading newspapers guilty of treason?  The controversy is growing over the revelation in The New York Times  that the government has been secretly combing through millions of bank records to catch terrorists.

Republicans are feasting on this, throwing words like disgraceful, offensive and treasonous at  The Times  for tearing the lid off this secret anti-terrorist program.  The Bush administration says it is essential to fighting the war on terror.

We now get the very latest tonight from White House correspondent Ed Henry, part of the best political team on TV.

(BEGIN VIDEOTAPE)

ED HENRY, CNN WHITE HOUSE CORRESPONDENT (voice over): Republicans stepped up their barrage on  The New York Times  for publishing details of a once-secret program tracking the banking transactions of terrorists.

SEN. PAT ROBERTS (R-KS), SENATE INTELLIGENCE COMMITTEE CHAIRMAN: If another attack occurs because of this information going out and giving the terrorists at least a leg up in regards to what they know and not know and changing their method of operations, if that attack comes the people who have written these stories and the people who have made their decisions should look in the mirror.

HENRY (voice over):  From the president on down, Republicans have been reading from the same script.

GEORGE W. BUSH, PRESIDENT OF THE UNITED STATES:  The disclosure of this program is disgraceful.

RICHARD CHENEY, VICE PRESIDENT OF THE UNITED STATES:  I think that is a disgrace.

REP. PETER KING (R-NY), HOMELAND SECURITY COMMITTEE CHAIRMAN: Disgraceful and illegal.

HENRY:  They're teeing off on news stories that reported questions about the legality of a Bush administration program that uses an international database to review the banking transactions of thousands of Americans.

The story was also reported by  The Los Angeles Times  and  Wall Street Journal,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

but the attacks have focused on  The New York Times.

The chance to beat up on a newspaper with a liberal reputation is too good to resist for an administration struggling to keep its conservative base happy.

CHENEY:  The New York Times  has now made it more difficult for us to prevent attacks in the future.  Publishing this highly classified information about our sources and methods for collecting intelligence will enable the terrorists to look for ways to defeat our efforts.

HENRY:  But White House Press Secretary Tony Snow was less certain than the vice president when pressed Tuesday on what evidence there is the leak has compromised terror probes.

TONY SNOW, WHITE HOUSE PRESS SECRETARY:  None of those things have had time to proceed.  So, we really don't have any basis right now for knowing exactly how it has influenced things.

HENRY:  Snow did charge,  The New York Times  endangered lives by bucking a tradition of media organizations agreeing to keep government secrets at a time of war.

But  Times  executive editor Bill Keller defended the decision to publish, writing, I think it would be arrogant for us to preempt the work of Congress and the courts by deciding these programs are perfectly legal and abuse-proof, based entirely on the word of the government.

(on camera):  But, unlike the NSA domestic surveillance program, very few Democrats have raised questions about the banking program. Republicans are confident they're on solid legal ground, which is why they're firing away at  The Times.  And if they score political points with conservatives along the way, so much the better.

Ed Henry, CNN, the White House.

(END VIDEOTAPE)

ZAHN:  And now I'm going turn to a member of Congress who says  The Times  ought to face criminal charges for revealing this secret program, Representative Peter King, a New York Republican who is chairman of the Homeland Security Committee.

Thanks so much for joining us tonight.

KING:  Thank you, Paula.

I wanted to start off by reading a short sentence from the Espionage Act of 1917. And it basically says, it makes it a crime for a person to convey information with intent to interfere with the operation or success of the armed forces of the United States or to promote the success of its enemies.

We just heard what Tony Snow had to say.  He said it is not clear what the impact

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

of printing this story was.  Are you saying that  The New York Times  intended to compromise the security of our nation by printing this story?

KING:  Paula, what I'm saying is, they had to know that this would compromise the security of the United States.

The administration laid out the case why it would do that, and they went ahead.  To me, this was a reckless disregard of the security of the United States.  And I believe that fits within the Espionage Act of 1917.  And that's why I'm calling on the attorney general to begin an investigation and prosecution of  The New York Times,  including its reporters who worked on the case, the editors who worked on the case, and Sulzberger, the publisher.

ZAHN:  Why not the sources?

KING:  Oh, the sources as well.  Obviously, we should go after the sources.  What they have done here is absolutely reprehensible. And, in going after the sources, one way to get them is to put the reporters in before the grand jury from  The New York Times,  and, if they don't reveal those sources, to cite them for contempt.

I think there's a lot of things we can do here.  For instance, I don't know why any American who cares about the security of the country would continue to advertise in  The New York Times  or why anyone would want to hold stock in  The New York Times.   I mean, what they have done here is absolutely disgraceful.

ZAHN:  But, Representative King, you heard Tony Snow.  And -- and he said that, right now, there is no way to measure what the impact of this story has been and whether it, in his -- fact, has compromised the the -- investigation.

KING:  Well, it is too soon to know the exact extent.

But you have to know, when you reveal secrets in time of war, that it is going to have a significant effect.  Now, it will take time to know exactly how significant it is going to be.  Are we going to lose tens of lives, or hundreds of lives, or thousands of lives?

But it has definitely compromised America.  Just as you -- if you give secrets to an enemy, you don't exactly know how long it's going to take, but common sense shows that, when you compromise such an important program, which has been so successful in tracking down terrorists, then, it has to work against the United States.  If nothing else, we have alerted the enemy.  We have let them know exactly what we're doing, and they can adjust their methods.

ZAHN:  You say we have alerted the enemy.  Are you telling me tonight that leaders of these terrorist organizations had no idea that their financial transactions were being monitored?

KING:  Oh, they knew we were trying to do it.  And they knew we were somewhat successful.  And they certainly knew we do a very good job in the United States.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

6/27/06 PZNOW (No Page)                                             Page 6

But they did not -- my understanding, they did not have any real knowledge of the full extent of what we were capable of doing. They guessed we might be able to do it, but they didn't know the full extent of it. They didn't know that we had this agreement with SWIFT, which literally involves millions and millions of transactions.

And they were guessing they were -- and they thought we might, but now that we have laid it out for them. They know exactly what we have. I would much rather have kept them guessing.

ZAHN:   Representative King, just a real brief answer to this.

Out of all of the classified information that has ever been passed along to reporters, there has never been one single prosecution under this Espionage Act that we were both talking about. Very quickly, in closing, are you really confident you're going successfully prosecute someone here?

KING:   I'm confident the attorney general should do it. Whether he does or not is up to him. But I think the time has come to put an end to this.

The New York Times, they're serial offenders.. They're recidivists. They have done it before. They're doing it again. We have a war ahead of us which is going to go for many years. We can't afford the risk of American lives because of the arrogance and the left-wing agenda of The New York Times.

ZAHN:   Representative Peter King, thank you so much for your time.

KING:   Thank you, Paula.

ZAHN:   A characterization that I'm sure some of our guests to come will dispute.

So, we are going to dig deeper now into the legal and ethical questions in this story.

Joining me now, senior legal analyst Jeffrey Toobin and Howard Kurtz, who covers the media for The Washington Post and also hosts CNN's RELIABLE SOURCES.

Good to see the two of you.

You have just heard what Representative King had to say. He would like to see the attorney general forcefully prosecute this case. Is there any evidence that The New York Times broke any law here, Jeffrey?

JEFFREY TOOBIN, CNN SENIOR LEGAL ANALYST:   I think there is no way you could or you should prosecute The New York Times for espionage.

ZAHN:   Why not?

TOOBIN:   Because espionage, as the -- as the statute you read said, requires an

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

intent to help our enemies.  There is no intent to help our enemies here.  There is an intent to inform the public.

And, in this country, it is the private sector, not the government, that decides what gets published.  Now, the question about whether  The New York Times  should have done this is a hard question. But whether it was a crime is an easy question. It wasn't.

ZAHN:   So, Howie Kurtz, take a stab at that.  Should  The New York Times  have gone ahead with this story, when the administration repeatedly asked them not to print it?

HOWARD KURTZ, CNN CONTRIBUTOR:   This is a much closer call, Paula, than the other Times  scoop last December about the domestic surveillance program, which -- and I think a lot of the pent-up frustration and anger that we just heard from Congressman King, which we hear from conservative commentators and people in the White House, is because of that story.

And, so, now, because that story was harder to defend, because, arguably, the domestic eavesdropping story -- program was -- was not entirely legal, they hadn't gotten court warrants, I think this story, which most people was, why should it be revealed about the -- the banking capabilities and -- and scrutiny that the government has, this has given the critic of  The Times   -- and there are many -- an opening to go after that paper.

TOOBIN:   One problem that the -- the government has here is, they haven't really explained very well what the harm is.

They say, well, the banks won't cooperate.  Well, the banks have to cooperate. They -- they're under legal obligation to cooperate. And -- and they're saying, well, we're advising the terrorists of what our plans are.

You know, our government officials have held press conferences talking about how we're monitoring the transactions of -- of terrorists, the financial transactions. So, the fact that  The New York Times  says we're doing this hardly seems to add much to what the terrorists already know.

ZAHN:   So, how much of this, Howard, potentially is payback time for  The New York Times  for going with the NSA story that you just referenced a minute ago?

KURTZ:   And not just that.  It has a liberal editorial page that was against the war, and a lot -- and there is a lot of political payback here.  It is not an entire coincidence that, with the midterm elections coming up, Republicans see some benefit in beating up on the most visible national liberal newspaper.  That plays very well with their base.

But, on the legal question, I -- an Espionage Act prosecution may be unlikely.  But what is not entirely unlikely is another Judith Miller situation, where there's a leak investigation.  Reporters are asked to testify.  They refuse to disclose their confidential sources. And then they face the very difficult choice for any

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

journalist of having to go to jail in order to protect those sources.

ZAHN:   I need a 10-second thought from you.  If you had been the lawyers advising· The New York Times,  would you have told them not to go with this story?

TOOBIN:  Boy, that's hard in 10 seconds.

But I -- I probably would have said publish the story.  But I think Howie is right. I think we are going to see more reporters in the grand jury.  And what we have learned is that, in federal court, reporters have no privilege to avoid testifying. So, we may see more reporters in jail.

ZAHN:   Jeffrey and Howard Kurtz, thank you both.

(CROSSTALK)

ZAHN:   Jeffrey does have a last name.  That would be Toobin.

(LAUGHTER)

ZAHN:   Appreciate both of your perspectives tonight.

We move now on to our countdown of the top 10 stories on CNN.com, about 17 million of you logging on to our Web site today.

At number 10 -- supermodel Naomi Campbell -- you remember her -- she makes an appearance again in a New York courtroom.  Her lawyers are trying to work out a plea deal in her cell phone assault case. Prosecutors have yet to present that case to a grand jury.

Boy, wouldn't Jeffrey Toobin love to be in the middle of that one, right?

TOOBIN:  No.  Nothing better than a good cell phone assault case, I will tell you.

(LAUGHTER)

ZAHN:   Number nine -- rival Palestinian factions Hamas and Fatah have agreed to an agreement to establish a Palestinian state alongside Israel.  Both sides say the accord will be signed a little bit later on this summer.

Numbers eight and seven when we come back, plus, patriotism vs. free speech, an issue that has been simmering since Vietnam, suddenly, it boils over once again.

(BEGIN VIDEOTAPE)

ZAHN (voice-over):  Old Glory becomes a burning issue. And senators choose sides for a controversial election-year vote.  Is it really time to change the Constitution?

· © 2008 Thomson/West. No Claim to Orig. US Gov. Works.

And the  Eye Opener  -- the confession.  For the first time, a former priest and convicted pedophile speaks out in an explosive new film about the families he victimized and the church he betrayed.  So, why is he a free man tonight?

All that and much more when we come back.

(END VIDEOTAPE)

(COMMERCIAL BREAK)

ZAHN:  Welcome back.

Here is what's happening at this moment.

We are going to recap a story now that is breaking in the Middle East right now. Israeli tanks and troops are crossing the border into southern Gaza in a campaign to bring back an Israeli soldier kidnapped by Palestinian militants on Sunday.  The Israelis had warned the Palestinian Authority of an extended military campaign if the soldier wasn't released.

Attorneys for indicted former White House aide Lewis Libby are asking a judge for more time to request highly sensitive presidential briefing notes for Libby's defense.  Libby is charged with lying to investigators looking into the leak of CIA operative Valerie Plame's name to the news media.

And the U.S. is urging Libya to finish compensating families for the 1988 bombing of Pan Am 103 over Lockerbie, Scotland.  Libya is about to be removed from the USS -- U.S. terrorist list, but had hinted that it no longer had a legal responsibility to the families, who were to be paid $10 million each.

Now, a week from tonight, all of us will be getting ready for Fourth of July fireworks.  But, tonight, all of the fireworks were in the U.S. Senate.  Less than two hours ago, a constitutional amendment to protect the U.S. flag failed by a single vote.

Congressional correspondent Dana Bash joins me now with more on that very passionate debate -- Dana.

DANA BASH, CNN WHITE HOUSE CORRESPONDENT:  Hi, Paula.

Well, you know, it was a cliffhanger until the very end.  As you said, the Senate came very, very close, in fact, closer than they ever have before, to actually amending the Constitution, 66 votes in favor. But that was just one vote short of the two-thirds majority needed for that amendment.  And it capped two days of debate about the stars and stripes, freedom of speech, and politics.

(BEGIN VIDEOTAPE)

BASH (voice-over):  Senators pushing the flag desecration amendment used the pre-Fourth of July, election-year debate to argue changing the Constitution was

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

necessary and, in this case, the ultimate sign of patriotism.

SEN. JOHN CORNYN (R), TEXAS:  The American flag is a monument, a symbol, of our freedom, our country and our way of life.  Why in the world would we refuse to protect it against desecration?

BASH:  Opponents pledged their allegiance to the flag, too, but said changing the Constitution goes too far.

SEN. ROBERT BYRD (D), WEST VIRGINIA:  I believe that amending the Constitution to prohibit the flag desecration flies in the face, the very face of First Amendment right, like freedom of speech.

BASH:  But supporters have been pushing to amend the Constitution since 1989, to overcome Supreme Court rulings that laws banning flag desecration violate the First Amendment.

SEN. ORRIN HATCH (R), UTAH:  It just says we're going to return this issue back to the Congress, where it should have been to begin with.  And it says these exact words:  The Congress shall have power to prohibit the physical desecration of the flag of the United States. Does that mean the Congress has to?  No.  Will the Congress?  I hope so.

BASH:  Democrats asked, where do you draw the line?

SEN. FRANK LAUTENBERG (D), NEW JERSEY:  There he is, Kid Rock, with his head through the flag.  Is that a desecration?  It was such a desecration that he was invited to address the Republican Convention. And they partied with him, and they loved him.  What constitutes desecration?

(END VIDEOTAPE)

BASH:  Now, Democrats, even those who voted for this amendment, say that Republicans bringing it up now, four months before Election Day, are doing it just because of crass political reasons.

They also say that Republicans, this is another example of the fact that their priorities are perhaps misguided.  But, Paula, supporters of this amendment, especially Republicans, the Republican leader in the Senate, insists that this is all about values, and that is why it deserved a place on the Senate floor for debate -- Paula.

ZAHN:  Something else that is being widely debated.

Dana Bash, thank you so much.  Appreciate the update.

And, in just a minute, an incredible view of abuse, through the eyes of an abuser himself -- in his own words, a former Catholic priest tells how he preyed on children in California for two decades.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

And, then, a little bit later on: the medical facts behind today's stern new warning from the U.S. surgeon general: Are we doing enough to protect ourselves from other people's smoke? You might be pretty darn shocked by the results of this latest study.

First, though, number eight on our CNN.com countdown -- the seven-member crew of shuttle Discovery arrived at Kennedy Space Center this morning to get ready for this weekend's launch. Discovery is scheduled to lift off on Saturday.

Number seven -- in Clinton, Missouri, crews are cleaning up after a three-story building housing an Elks Lodge collapsed. It happened last night. The lodge's president was killed. Nine other people were trapped and had to be rescued. Right now, the cause of the collapse is unknown -- numbers six and five straight ahead.

Please stay with us.

(COMMERCIAL BREAK)

ZAHN: Keep on sticking around with us tonight. We have more breaking news -- this story out of Las Vegas.

Police say two officers have been involved in a shooting at a checkpoint inside the city's airport.

Our own Dan Simon happened to be at McCarran Airport. He joins me now on the phone from Las Vegas with the very latest.

Do we have any idea exactly what happened here?

DAN SIMON, CNN CORRESPONDENT: Well, Paula, these -- the reports I'm getting now are unconfirmed.

What we're hearing is that a man may have gotten a knife through security and then took a woman and a child hostage. At some point, police got involved and actually shot this man. We know that one man has been shot by a police officer. That has been confirmed.

What has not been confirmed is exactly what happened. Did somebody get a knife through security and take somebody hostage at a -- at a store? That's where we're hearing this occurred.

Police are about to give us a news conference in the next few minutes. At this point, it doesn't look like travel has really been disrupted to any degree. There is a portion that has been cordoned off here at the airport. But I'm looking at passengers going through security right now. And planes are taking off on time. But this does -- at least -- at least a few minutes ago, this may have been a pretty tense situation, as we're hearing that a police officer actually fired on a suspect, and that suspect was shot and is down -- Paula.

ZAHN: Well, we know there are a lot of details to nail down here, Dan. As soon as

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

you get them, we will come back to you live.

Once again, our own Dan Simon at McCarran Airport in Las Vegas, where it has been confirmed that two officers have shot someone who apparently was involved in some kind of incident beyond a checkpoint at the airport. Initial reports suggested that he might have been carrying a knife -- that is something we certainly haven't been able to confirm -- also, a report that he had taken, perhaps, a woman and child hostage -- all of this very much in the very beginning stages of reporting.

And we will try to confirm all this information for you throughout this hour.

We are going to take a short break. We will be right back.

(COMMERCIAL BREAK)

ZAHN: Now we move on to a very chilling story. He was an abusive priest who preyed on children in California for two decades. His story, as told in his own words, is a subject of a documentary making its debut this week at the Los Angeles Film Festival. The movie is a disturbing view of abuse through the eyes of the abuser himself, former priest Oliver O'Grady.

Here is investigative correspondent Drew Griffin with tonight's Eye Opener.

(BEGIN VIDEOTAPE)

DREW GRIFFIN, CNN INVESTIGATIVE REPORTER (voice-over): The film is not just a horrific story, but also the confession of former priest Oliver O'Grady.

OLIVER O'GRADY, FORMER PRIEST: I want to promise myself that this is going to be the most honest confession of my life and in doing that, I need to make the long journey backwards to understand what I did, to acknowledge that, in some way to make reparation for it.

GRIFFIN: In Deliver Us From Evil, filmmaker and former CNN freelance producer Amy Berg travels to Ireland and is granted unlimited access to this convicted child molester, who for nearly two decades was shuttled from parish to parish in northern California's Catholic Church. And during those two decades, O'Grady claims in this film the church knew about the abuse and did little to stop it.

---- INDEX REFERENCES ----

NEWS SUBJECT: (Government (1GO80))

REGION: (Middle East (1MI23); USA (1US73); Americas (1AM92); Palestine (1PA37); North America (1NO39); Arab States (1AR46))

Language: EN

OTHER INDEXING: (BASH; BASH: OPPONENTS; CATHOLIC; CATHOLIC CHURCH; CIA; CNN; CNN

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

WHITE HOUSE; CONGRESS; CONSTITUTION; DANA; DANA BASH; ELKS LODGE; EYE OPENER;
FRANK; GLORY; GRIFFIN; HENRY; HOMELAND SECURITY COMMITTEE; INTELLIGENCE; KENNEDY
SPACE CENTER; KHAN YUNUS; LIBBY; NSA; OLIVER; ORRIN; PALESTINIAN; PALESTINIAN
AUTHORITY; PAN AM; PAT; PETER; PRIEST; REPUBLICAN CONVENTION; REPUBLICANS; ROBERT;
SECURITY; SENATE; SUPREME COURT; SWIFT; TOOBIN; UN; UTAH; WHITE HOUSE; ZAHN)    (Amy
Berg; Bill Keller; Boy; Bush; Condoleezza Rice; Congressional; Dan; Dan Simon;
Democrats; Discovery; Ed Henry; Egyptians; GEORGE W. BUSH; Gilad Shalit; Howard;
Howard Kurtz; Howie Kurtz; Initial; Jeffrey; Jeffrey Toobin; John; John Vause;
Khaled Meshaal; KING; Lewis Libby; Libby; Naomi Campbell; O'Grady; Oliver; Oliver
O'Grady; Paula; Peter King; Representative; Representative King; Snow; Tony Snow;
Toobin; Valerie Plame; VAUSE)

KEYWORDS:   (PAULA-ZAHN-NOW-01);   (w)

Word Count: 5266
6/27/06 PZNOW (No Page)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT 20

WestLaw.                                                        NewsRoom

8/31/06 GRPR B1                                                      Page 1

8/31/06 Grand Rapids Press B1
2006 WLNR 15372063

Grand Rapids Press, The
Copyright 2006 The Grand Rapids Press

August 31, 2006

Section: City & Region

Hoekstra predicts jailing of reporters
Congressman decries revelation of secret wiretapping program

Myron Kukla / The Grand Rapids Press

HOLLAND -- New York Times reporters who broke the story of a three-year program of warrantless wiretapping of U.S. citizens will be in jail by yearend if they don't reveal their government sources, U.S. Rep. Peter Hoekstra predicted Wednesday.

The revelation last December has been a devastating blow to intelligence gathering, said Hoekstra, chairman of the House Intelligence Committee.

"If people understood the threat out there (from terrorist organizations), Americans would be absolutely furious that the tools we have to track the terrorists have been lost," said Hoekstra, R-Holland, in an address to the Holland A.M. Rotary Club.

"The Justice Department is going after those who violated their oath of office by giving classified information to reporters. Those reporters will be sitting in jail by the end of the year until they reveal their sources."

Times reporters James Risen and Eric Lichtblau in a Dec. 16, 2005, story reported President Bush secretly authorized the National Security Agency in 2002 to eavesdrop on phone and e-mail communications of thousands of Americans, seeking information about terrorist planning.

The story said nearly one dozen current and former government officials provided details, but did not identify them.

Hoekstra said the Justice Department investigation likely will lead to a grand jury questioning individuals and reporters under oath.

Since the story broke, terrorists have used more pre-paid cell phones and tossed them away, making it hard to track them, Hoekstra said.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

A federal judge in Detroit has described the warrantless eavesdropping as an attack on the Constitution and U.S. Bill of Rights.

U.S. District Judge Anna Diggs Taylor this month ruled President Bush exceeded his authority, citing it as a violation of the First and Fourth amendments.

"I couldn't disagree with the ruling more. It could disarm America in a time of war," Hoekstra said, noting the Justice Department is appealing the ruling and has negotiated a deal to continue the program while the appeal is pending.

"This will likely go all the way to the Supreme Court," he said.

---- INDEX REFERENCES ----

NEWS SUBJECT: (Judicial (1JU36); Legal (1LE33); International Terrorism (1IN37); Government (1GO80))

INDUSTRY: (Security (1SE29))

Language: EN

OTHER INDEXING: (CONSTITUTION; HOEKSTRA; HOUSE INTELLIGENCE COMMITTEE; JUSTICE DEPARTMENT; NATIONAL SECURITY AGENCY; PETER HOEKSTRA; SUPREME COURT; US BILL) (Anna Diggs Taylor; Bush; Eric Lichtblau; James Risen)

KEYWORDS: Government; Media

EDITION: All Editions

Word Count: 428
8/31/06 GRPR B1
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.