# EXHIBIT 1

# This exhibit has been filed under seal.

# EXHIBIT 2

# This exhibit has been filed under seal.

# EXHIBIT 3

# This exhibit has been filed under seal.

# EXHIBIT 4

# This exhibit has been filed under seal.

EXHIBIT 5

# This exhibit has been filed under seal.

# EXHIBIT 6

# This exhibit has been filed under seal.

# EXHIBIT 7

# This exhibit has been filed under seal.

# EXHIBIT 8

# This exhibit has been filed under seal.

# EXHIBIT 9

# This exhibit has been filed under seal.

EXHIBIT 10

# This exhibit has been filed under seal.

EXHIBIT 11

# This exhibit has been filed under seal.

# EXHIBIT 12

# This exhibit has been filed under seal.

# EXHIBIT 13

# This exhibit has been filed under seal.

# EXHIBIT 14

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

---

IN RE: GRAND JURY SUBPOENA, JAMES RISEN

Case No.: 1:08dm61 — LMB

UNDER SEAL

---

## DECLARATION OF SCOTT ARMSTRONG

(Russell) Scott Armstrong, declares under penalty of perjury as follows:

1.     I have been a professional journalist for 31 years. I am the executive director of the Information Trust, a Washington, D.C.-based, not-for-profit organization devoted to improving the quality of journalism. I worked for *The Washington Post* as a reporter covering national security matters from 1976 through 1985. I have worked for many national newspapers, television and radio networks in the course of my career. Along with Bob Woodward, I wrote *The Brethren,* a narrative account of the Supreme Court from 1969 through 1976 describing the Court's inner workings. I assisted Bob Woodward and Carl Bernstein in the research and writing of *The Final Days.* I taught journalism as a visiting scholar at the American University School of Communication and have lectured on journalism and/or investigative techniques at various other institutions including: Brown University, Columbia University Graduate School of Journalism, Harvard University, George Mason University, George Washington University, Georgetown University, Pennsylvania State University, Princeton University, University of Scranton, Syracuse University, the Universities of California (Berkeley, Davis, UCLA, USC), University of Illinois, Indiana University, University of Maryland, University of Pennsylvania, University of Texas, University of Virginia, as well as law schools at Columbia, Duke, Georgetown, Harvard, Washington School of Law, University of Virginia, and Yale.

2.    I make this declaration at the request of attorneys representing James Risen in connection with a filing concerning whether he should be compelled to disclose the identity of one or more confidential sources with whom he spoke while engaged in newsgathering.

3.    In addition to my extensive reporting on national security matters, I have been the co-convener of the ongoing "Dialogue between the Media and the Intelligence Community on Unauthorized Disclosures." ("Dialogue"). In the Dialogue, representatives of the media and senior government officials have met periodically to discuss issues surrounding the media's relationship with confidential sources employed by the government.

4.    In 1985, I founded the National Security Archive, a private, non-profit research institute, which makes available to journalists, historians, scholars, congressional staffs, present and former public officials, other public interest organizations, and the general public comprehensive government documentation pertaining to important issues of foreign and national security policy.

5.    In addition, I have been invited to address issues relating to government secrecy and unauthorized disclosures (leaks) by such official organizations as The First Judicial Circuit Court Conference, the National Security Agency's Senior Seminar, the Defense Investigative Service, the Defense Security Service, the National Defense University, the National War College, the Naval War College, the Foreign Service Institute, the National Industrial Security Program, the National Archive and Record Administration, the U.S. Security Policy Board, the General Accounting Office, the Congressional Research Service, and the Commission on Protecting and Reducing Government Secrecy. I have testified or consulted with committee staff on related issues for such congressional committees as the Senate Select Committee on Intelligence, the Senate Judiciary Committee, the House Permanent Select Committee on Intelligence, the House Armed Services Committee, the House Appropriations Committee, and such unofficial organizations as the American Bar Association's Committee on National Security, American Society for Industrial Security, and the American Society of Access Professionals. I have also lectured on

-2-

myriad occasions to groups of professional journalists on matters relating to leaks and national security information including: the American Society of Newspaper Editors, the Society of Professional Journalists, the Investigative Reporters and Editors, the Radio and Television News Directors Association, the Associated Press Managing Editors, the National Newspaper Association, the Newspaper Association of America, the Freedom of Information coalitions in Illinois, Indiana, New York, Oklahoma, as well as the full gamut of library associations including national and regional groups affiliated with the American Library Association, the Association of Research Libraries, the American Association of Law Librarians, and the Society of Archivists. I have also been a board member and consultant to the Government Accountability Project, a whistleblower protection organization, which often assists government employees who have become confidential sources to other branches of government or the media on matters involving fraud, waste, abuse, and government improprieties.

6.      I have been qualified as an expert witness in the use of secret or classified documents in daily journalism by federal District Judge Joseph Young in the case of *United States. v. Morison*, 655 (D. Md. 1985). I was qualified as an expert witness in media coverage, use of confidential sources and libel by Federal District Court Judge Ewing Werlein, Jr. in *MMAR Group, Inc. v. Dow Jones & Co., Inc.*, 987 F. Supp. 535 (S.D. Texas, Houston Division, 1997), by Judge Geoffrey Alprin in *Prentice v. McPhilemy*, 27 Med. L. Rptr. 2377 (D.C. Sup. Ct. 1999) and by Texas District Court Judge Joseph H Hart in *Jack Taylor, et al. v. Barry Switzer, et al.*, (No. 4-91-001; 126th District Travis County) and in numerous other federal and state cases involving issues of confidential sources. I was qualified as an expert witness in the analysis of media coverage and editorial decision-making in regard to venue issues by Chief Judge Richard P. Matsch in *United States v. Timothy James McVeigh and Terry Lynn Nichols*, and have prepared and submitted testimony for introduction in other federal court cases on media coverage and editorial decision making as they relate to venue issues.

-3-

7.    I have been the plaintiff in a number of federal cases designed to preserve and to increase access to classified and sensitive government information and to contest the failure to declassify government information. My involvement has included the selection of special masters with high level government clearances and the preparation of expert testimony.

8.    In the course of my experience as a reporter, I have maintained confidential source relationships with thousands of present and former U.S. government and private sector employees. The purpose of these relationships is to get and verify accurate information. In order to promote a free and candid relationship with confidential sources, I have frequently found it necessary to guarantee them anonymity in regard to information provided about classified or otherwise confidential and sensitive information. Much of the verification process could not be done without the guarantee of anonymity. Over the course of three decades, such guarantees of confidentiality. when used to confirm information with multiple confidential sources, have proven to my satisfaction that this process yields more candid and accurate information than to rely solely or predominantly on public or official comments or documentation. In order to secure and sustain cooperation of a series of sources on an issue or topic, the sources must be confident that the full extent of their cooperation and role will remain anonymous and that they will not be subjected to professional recriminations, chastisement, or in very rare cases, even prosecution.

9.    Many sources require such guarantees of confidentiality before any extensive exchange of information is permitted. In my experience, even in public and private institutions that are known for their transparency and openness, officials and staff often require such guarantees of confidentiality before discussing sensitive matters such as major policy debates, personnel matters, investigations of improprieties, and financial and budget matters.

-4-

10.     Many types of reporting require the use of confidential sources. Prominent among these uses are three types of investigative or "enterprise" journalism: (a) original investigative reporting, which involves reporters developing factual accounts and documentation unknown to the public; (b) interpretive investigative reporting, which takes a mix of known facts and new information and produces an interpretation previously unavailable to the public; and (c) reporting on investigations, which publicizes information developed in government investigations that has not been known to the public and might well be suppressed.[1] These different types of investigative reporting are often mixed in the reporting of a single story. They share one key feature: to verify information, the journalist applies enterprise and initiative to examine information from as many knowledgeable and often confidential sources as can be developed.

11.     Some information communicated under confidentiality arrangements will include significant "details" or "secrets." At other times, the information communicated simply amounts to candid, relevant background information, context and detailed leads, which in turn allow other information to be sought from yet other sources. Each confidential relationship with a source may provide one or more individual details that eventually are distilled and woven into a comprehensive news story. It would be rare for there not to be multiple sources — including confidential sources — for news stories on highly sensitive topics. The important "enterprise" stories tend to be built on information elicited from and verified with multiple confidential sources.

---

[1]     For a coherent description of these types of reporting see pp. 116-129, *The Elements of Journalism: What Newspeople Should and the Public Should Expect* by Bill Kovach and Tom Rosenticl. Three Rivers Press, 2001.

12.    Daily reporting most often does not enjoy the same amount of reporting time and flexibility as the investigative enterprise methods outlined above. Journalists on daily deadlines therefore often make use of confidential sources to report on daily developments in government and other institutions. These confidential relationships are necessary for reporters because even official government pronouncements must be verified before they are published. Official news conferences, daily news briefings, and government reports and studies require further checking by reporters. Traditionally, journalists will talk with other knowledgeable officials who are not authorized to speak to the subject but are individuals with whom they have developed a track record of candor and confidence. In some instances, this additional briefing goes beyond corroboration to add perspective that can be helpful to the reporter in writing a story but which the individual (or even the government) will not permit to be attributed by name or even position or sometimes even quoted directly in any way. Publicly available or acknowledged information may in turn prompt more detailed or relevant information from a confidential source, which may in turn lead back to additional on-the-record acknowledgments, which increase the pool of accurate and verifiable public information and/or may lead to yet more information from other confidential sources. Thus, in daily journalism, as in investigative enterprise journalism, information essential to the verification of facts within a story may come from confidential sources in the form of unique and relevant, contextual comments, which become part of the process of expanding, correcting, confirming or contradicting what other public and confidential sources have said. Thus, a relationship with the confidential source permits, among other things, the authentication of the public information. The maintenance of confidential sources is therefore essential to daily journalism.

13.    The broad use of secrecy in government and in the corporate and institutional world creates a need for journalists to rely on confidential sources. In the national security community, the compulsory addition of security clearances, information classification, safeguards, nondisclosure disclosure agreements, security monitoring, polygraphs, special-access programs and compartments all inhibit the disclosure of information — even non-sensitive details — through routine means. Because so much in-

formation is routinely classified, the verification of something as mundane as a press briefing may involve talking to scores of sources who are not authorized to add further detail and could be subject to sanctions for doing so. In journalism, stories about major national security or diplomatic policy or military activities warrant confirmation, contextual perspective, and detailed elaboration. In order to provide readers with information as accurate and verified as possible, reporters often find it only available from confidential sources. In my opinion, the vast majority of high level government officials become confidential sources at one time or another. In my experience, they understand that the efficient operation of government and minimal standards of accountability to the public require that they provide confidential briefings to journalists covering daily stories. Moreover, I have observed that frequently important events about government that are embarrassing to senior officials, to important government agencies and/or a presidential administration are cloaked in multiple layers of secrecy, more often than not for political rather than national security reasons.

14.    National security is often the rationale used by government officials to deny the public information about illegal or unauthorized intelligence activities, about failed operations and bankrupt policy, about fraud, waste and abuse within national security budgets and about activities that are diplomatically or politically inconvenient to disclose publicly. On a daily basis, the overly broad application of official secrecy occludes accurate descriptions of policy and practice not only for the public, but also for other agencies and even whole branches of government. The highest ranking government officials may prefer to be confidential sources to the news media in order to communicate candidly their differences of opinion or fact with others in the same department or administration to an oversight committee. Such confidential source relationships are often the only manner through which the mixture of sensitive and non-sensitive national security information can be integrated and conveyed to the public.

-7-

15.    In cases involving classified or officially-restricted federal government information, journalists customarily seek to develop confidential sources in multiple executive branch agencies among senior officials and their staffs and in multiple congressional offices of members of Congress, their personal staff, and their committee staff. Stories often develop as a result of the alternative flow of information to the reporter from congressional and executive branch offices. Congressional oversight responsibilities enable congressional officials and their staffs to request information and entitle them to receive briefings on most details. Since congressional investigators often conduct their own field research, the intellectual process that develops information often includes a symbiotic relationship between journalists and congressional investigators. I have observed that similar interaction occurs between reporters and executive branch officials. The symbiotic interaction between journalists and congressional and executive officials has become the norm in terms of interactions between the press and the government. In recent years, this pollination process has often been the most important catalyst for constitutionally critical exchanges among the branches of federal government and the American public.

16.    Executive agencies of the federal government regularly require journalists reporting on national security matters to conduct much of their work through interviews of officials and former officials that are given on background (without direct attribution) or deep background (with guarantees of anonymity). In my experience, these agencies include the Departments of Defense, State, Energy, Justice, Homeland Security, Commerce, and Treasury, the Central Intelligence Agency, the military services, the National Security Council, the Homeland Security Council, and the White House. Officials from these organizations typically say far more on background, deep-background, or off-the-record (a category which had traditionally meant the information could not be pursued for a news story, but which has come to mean the equivalent of deep background) than is ever said on the record. These are "authorized" disclosures, which agencies insist be conducted on background or deep background precisely to avoid specific accountability for any government official. Professional journalists typically find it necessary to obtain verification, perspective, correction, and commentary on these official leaks by interviewing others,

-8-

who are not authorized to comment on the officially authorized disclosure. This system is largely of the government's making, but requires the media to comply with the requests for anonymity or be excluded from essential information.

17.    Elected legislators and congressional staff with access to controlled information regularly discuss such information with journalists in order to provide background information to the public and — on occasion — to surface the gravamen of serious concerns about executive branch policy. In my experience, journalists use this access to various officials in different branches of government to provide what is often the only information the public will receive on national security topics for months, years, or even decades.

18.    In many instances, national security reporting also involves developing non-U.S. official sources including knowledgeable American experts as well as foreign officials and experts. Former officials of the U.S. and other governments are often able to provide important factual information and policy insights that are identical to classified details but not controlled by confidentiality agreements with the U.S. government. For many of the same reasons, these individuals also require a guarantee of confidential source status as a condition of their cooperation.

19.    In my experience, journalists usually prefer to ascribe every statement and assertion in news articles to a specific source either by naming the individual or by providing an explicit indication of the individual's position, affiliations, and an indication of the source's knowledge or perspective about the events or policy reported upon. National security stories, however, commonly require that the identity and the identifying characteristics of the source be protected. This occurs even to the point where a confidential source may be quoted publicly and officially by name and position in a story at one point without disclosing the same source provided additional material anonymously. In such a case, reporters will normally attempt to guide the reader as candidly as possible to a conclusion about the degree of confi-

-9-

dence that is warranted in the source for any specific statement. The attribution may be generic in form and may credit the confirming sources' authority rather than the original source's profile.

20.    In the process of evaluating information for publication, national security journalists or their editors normally consult with knowledgeable official sources about the sensitivity of the information and the consequences of disclosure. As a final draft is prepared, they customarily consult with one or more executive agencies in order both to seek official comment and to provide a last opportunity for official expressions of concern — nearly always made "off-the-record" — regarding the sensitive information to be disclosed. Such consultations may result in no changes, the exclusion of certain details or may lead to ongoing discussions which may take months or even years.

21.    Once a decision has been made to protect the identity of a confidential source, it is extremely unusual for journalists to reveal their own confidential sources. I can count on one hand the number of instances where journalists or editors have cooperated with a leak investigation and revealed the identity of their sources. In instances where their sources' careers — and indeed their liberty — hang in the balance, journalists customarily take precautions to prevent intentional or inadvertent disclosures by their colleagues or their editors. Most national security journalists operate on the assumption that they will not reveal sources even where their refusal to comply with a court order may yield a contempt citation and even incarceration or fines. This commitment has proven essential to secure the cooperation and candor of sources responsible for virtually all national security stories.

22.    In 1975, in the wake of the *Branzburg v. Hayes* decision three years earlier, the Justice Department issued regulations which, in their present form, specify that "[t]he use of subpoenas to members of the news media should, **except under exigent circumstances**, be <u>limited to the verification of published information and to such surrounding circumstances as relate to the accuracy of the published information.</u>" 28 C.F.R. §§ 50.10(b), 50.10(f)(3). (emphasis added). The Guidelines seek to limit attempts to use grand jury subpoenas to learn "unpublished information" such as the identities of confi-

dential sources per se. Thus the guidelines stress that the following principles apply when requesting authorization to subpoena a member of the press: the government must have reasonable grounds to believe, "based on information obtained from **non-media** sources, that a crime has occurred, and that the information sought is essential to a successful investigation – particularly with reference to directly establishing guilt or innocence," *see id.* § 50.10(f)(1) (emphasis added); "all reasonable efforts should be made to obtain the desired information from alternative sources," *id.* at §§ 50.10(b); the government should have "unsuccessfully attempted to obtain the information from alternative nonmedia sources," *id.* §50.10(f)(3); the government should treat "[e]ven . . . requests for publicly disclosed information . . . should be treated with care to avoid claims of harassment," id. § 50.10(f)(5); and, "wherever possible," the government should seek material information on a limited subject matter and for a limited time period, and "avoid requiring the production of large quantities of unpublished material." *Id.* § 50.10(f)(6). In particular, "[t]he subpoena should not be used to obtain peripheral, nonessential, or speculative information." Id. § 50.10(f)(1). It is my understanding that these guidelines continue to embody the policy of the United States government.

23. I am generally familiar with the national security reporting of James Risen that has appeared in *The New York Times* and that is contained in his book *State of War: The Secret History of the CIA and the Bush Administration* ("*State of War*"). At the request of Mr. Risen's attorneys, I have again reviewed Chapter Nine (which is entitled, "A Rogue Operation") of *State of War*. The chapter includes an eclectic narrative of newsworthy information and assertions presented regarding U.S. intelligence about Iran, several covert operations conducted by the CIA and other agencies against Iranian targets and broader policy implications of intelligence analysis and operational failures. Certain significant assertions appear to be unique to the book. Other details such as internal government debates, which have been published elsewhere, are woven into Mr. Risen's narrative in a singular manner.

24.     *State of War's* publication and the wide serialization of excerpts — including Chapter Nine — created a wave of news coverage in the U.S. and abroad about the information contained in Chapter Nine as well as other information elaborating on previously published information from *The New York Times.* Ensuing commentary about the U.S. intelligence community's perceptions and analysis of the Iranian nuclear program have made regular reference to certain details first revealed in the book. Regardless of whether one agrees with all the Chapter's assertions and analysis, it is by simple definition, "newsworthy."

25.     In my professional opinion, the government's issuance of a grand jury subpoena to Mr. Risen is in conflict with the intention and thirty-year practice under the Department of Justice guidelines for issuing subpoenas to news media. A judicial order requiring a national security reporter at a major news media organization, such as James Risen, to disclose confidential sources for the publication of newsworthy information would damage the quality of information available to the public on national security issues. Were Mr. Risen to comply, in my opinion, the damage would significantly undermine the confidence of a wide variety of confidential sources across many U.S. government agencies and institutions as well as many knowledgeable individual sources not associated with the U.S. government. The consequences to the public would be a degradation of the newsgathering capabilities of not only Mr. Risen and his colleagues at *The New York Times* but also of most other journalists providing in-depth coverage of national security matters and the important intricacies of national government affairs. Such an order would further unsettle an untidy but well-established accommodation between government institutions and the media that allows critically important information to surface publicly in an era when secrecy, classification and other governmental controls technically cover almost every detail of the most newsworthy national security topics. Without the protection of confidential sources, public policy discussion and debate would be devoid of the most important national security information, that which is essential to sustaining an informed democracy.

-12-

26.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on: February 16 2008

Russell Scott Armstrong

# EXHIBIT 15

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

IN RE: GRAND JURY SUBPOENA, JAMES RISEN

Case No.: 1:08dm61 – LMB

UNDER SEAL

## DECLARATION OF CARL BERNSTEIN

Carl Bernstein hereby deposes and says:

1. I have been a journalist for 47 years. I have worked as an investigative reporter for *The Washington Post*, a senior correspondent and Washington Bureau Chief for ABC News, and have taught journalism at New York University. I have contributed to *Time, Rolling Stone, The New Republic, The New York Times*, and *The Los Angeles Times*, among other publications. With Bob Woodward I co-authored the books *All the President's Men* and *The Final Days* and I contributed to Mr. Woodward's book *The Secret Man*. I am also the co-author of *His Holiness*, a biography of Pope John Paul II, and *A Woman in Charge: The Life of Hillary Rodham Clinton*.

2. I am fully familiar with the facts set forth herein and make this declaration based on my personal knowledge unless otherwise stated.

3. More than thirty years ago, while an investigative reporter for *The Washington Post*, my colleague Bob Woodward and I reported the facts and circumstances arising out of the break-in of the Democratic National Committee's offices in the Watergate. Those facts and circumstances were among those that ultimately led to the resignation of President Richard M.

Nixon. Our work was cited in the Pulitzer Prize award to *The Washington Post* for Public Service in 1973.

4.    Throughout our investigation, we relied on confidential sources, among them an individual who became known to the public as "Deep Throat," and whose identity remained secret until 2005, more than thirty years after our investigation. In 2005, W. Mark Felt and his family announced, and Mr. Woodward and I confirmed, that Mr. Felt was our confidential source, Deep Throat. At the time of our reporting, Mr. Felt was the number-two official at the Federal Bureau of Investigation.

5.    Mr. Felt, like all our confidential sources, would not have agreed to be a source for our Watergate reporting had Mr. Woodward and I not been able to assure him total and absolute confidentiality. Stated differently, almost all of the articles I co-authored with Mr. Woodward on Watergate could not have been reported or published without the assistance of our confidential sources and without the ability to grant them anonymity, including the individual known as Deep Throat. In fact, we identified no major sources of information by name in any of more than 150 articles we wrote in the first ten months after the Watergate break-in. In virtually all of them, anonymous sources were the basis for the significant information we developed.

6.    Throughout my career — in my own reporting and the reporting of staff that I have directed — I have been involved in numerous situations where sources with information on matters of great public interest and concern insist on confidentiality for fear of retaliation or retribution if their identities became known. Without the ability to grant confidentiality to the sources involved, those stories would not have been published or broadcast.

-2-

7. · I am greatly concerned about the federal government's drive in recent years to subpoena reporters to testify about their confidential sources. Not only do I believe it is an assault on the First Amendment and the press freedoms we are guarantee, but on an individual level, compelling the disclosure of confidential information by any reporter is certain to obstruct his future newsgathering and make it nearly impossible to do his job effectively. In my experience, confidential sources will speak only to a journalist they trust and one whom they believe is sufficiently independent of government influence and authority. If an investigative reporter is compelled by the government to testify as to confidential information, his trustworthiness, integrity and independence will likely be forever tainted and any potential sources who might have previously approached him with important information may very well be deterred.

8. I also believe, based on my professional experience, that compelled disclosure of confidential information will cause irrevocable damage to the quality of information the public receives. Many times, in my experience, people who have valuable information about corporate or governmental wrongdoing will only come forward if granted confidentiality. Without such individuals (in some circumstances called "whistleblowers") and the ability to protect them, the press will not be able to sufficiently develop important stories — as in the case of Watergate — or even learn of the existence of potential important stories, and the uninformed public will suffer as a result.

9. I understand that *New York Times* investigative reporter and author James Risen has been served with a subpoena seeking, among other things, the identity of the source, or sources, for information contained in Chapter Nine of his book, *State of War: The Secret History of the CIA and the Bush Administration* ("*State of War*").

-3-

10. In my professional opinion, for all of the reasons set forth in this Affidavit, were an order to compel Mr. Risen to disclose information about his confidential sources issued and were it to be obeyed, it would do irreparable harm to investigative reporting across the nation.

11. Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 12, 2008

Carl Bernstein

-4-

# EXHIBIT 16

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

---

IN RE: GRAND JURY SUBPOENA, JAMES RISEN

Case No.: 1:08dm61 -- LMB

UNDER SEAL

---

## AFFIDAVIT OF ANNA KASTEN NELSON

DISTRICT OF COLUMBIA   ) ss.:

1.      I am Anna Kasten Nelson, the Distinguished Historian in Residence at the American University in Washington, D.C., where I teach courses related to the history of U.S. Foreign Policy.  I have also taught history at George Washington University and Tulane University and was a Distinguished Visiting Professor in history at Arizona State University in 1992.

2.      I have also been a member of the staff of the Public Documents Commission, which was formed after President Nixon's efforts to destroy his tapes and the U.S. State Department Historical Advisory Committee.  I was one of five presidential appointees to the John F. Kennedy Assassination Records Review Board.  Each of these was formed to release historical records to the public.

3.     I am writing in support of investigative journalist James Risen, who I understand has refused to reveal to the Government the names of confidential source(s) used for Chapter Nine of his book, *State of War: The Secret History of the CIA and the Bush Administration* ("*State of War*"). The work of journalists such as Mr. Risen is essential to historians such as myself. Compelling him and other journalists like him to testify about the identity of their confidential source(s) would, in my view, have a direct impact on the work of many historians.

4.     Historians no longer limit themselves to writing about past centuries. Every year, we see countless historical treatises and articles in scholarly and public interest journals about the rise of the United States as a world power in the last half century. Traditionally, historians have looked to official government records as their primary sources. These materials, however, are often not open to researchers for 25 to 30 years and, even then, are frequently censored for purported national security information or privacy reasons. Thus, researchers seeking to understand the immediate past now frequently look to investigative journalism to provide the first cut of history.

5.     In January 2004, for example, I published an article about a woman chosen by Secretary of Defense George Marshall to be an Assistant Secretary in the Defense Department in 1950. She was attacked by supporters of Sen. Joseph McCarthy. Among my most important sources were three articles published at that time in the *Washington Post*. Those articles — which were based on information received from anonymous sources — helped me determine that masked by false accusations of communist

2

party membership was a deep anti-Semitism among the woman's opponents. Thus, the journalist who had informed his readers also was in a unique position to inform a future historian.

6.      Investigative journalism is a particularly indispensable source when it comes to historical research and writing into matters of foreign policy and intelligence. Indeed, most of what we know about the recent use of intelligence in the making of foreign policy — which began in earnest with the beginning of the Cold War and passage of the National Security Act of 1947 — originally emerged in articles and books by investigative journalists. Without these journalists, historians would simply be unaware of key elements of their narratives.

7.      That journalists write the first draft of history is much more than a cliché when it comes to national security policy. Newspapers like *The New York Times* and books like *State of War* have been important research tools for those of us examining the use of intelligence by America at home and abroad. Since we have only official government documents and statements, we rely upon journalists to tell us what they saw and heard, which is indispensable to our understanding and analysis of events we could not possibly witness.

8. If Mr. Risen and other investigative journalists are unable to report effectively on matters of intelligence, the historical record will be incomplete, if not erroneous. After World War II, for example, many scholarly books and articles were published explaining the course of the war and the crucial role of intelligence. Many of these accounts were wrong or misleading, however, because they were written before the release of information about the Ultra code breaking machine.

9. In this case, future historians would be hard-pressed to present accurate and informative portrayals of our current foreign policy without the benefit of reporting by journalists like Mr. Risen on the use of human and signal intelligence. Indeed, Mr. Risen's reporting in Chapter 9 of *State of War* deals with an issue that almost certainly will be the subject of countless historical analyses: the incompetence and mismanagement of certain intelligence efforts in Iran. This will be a critically important subject to historians in light of, among other things, recent changes to the National Intelligence Estimate regarding Iran's supposed nuclear capabilities.

10. Consider, as well, the extent to which historians will rely on the work of investigative journalists to explain and evaluate our intelligence agencies' failures to evaluate Iraq's WMD capabilities and the ensuing consequences of those failures. Without the work of investigative reporters, and the information provided by their confidential sources, historians would be left to write the history of the Iraq War buildup based in large part on the official, often self-serving, statements of government and military officials.

4

11.    Although our own books and articles are stuffed with footnotes, we historians understand that investigative journalists, as observers of the present, must protect their sources. If they do not, the American people will never learn about corruption, incompetence, excessive government secrecy, flaws in homeland security, or disastrous decisions made by policy makers who are advised by their intelligence chiefs. We must depend upon journalists and journalists must be permitted to depend upon confidential sources. If not, the historic record will ultimately suffer.

_____

Anna Nelson

Date: February 13, 2008

Witnessed by me this 13 day of February, 2008,

_____
(Notary Public)

My commission expires on: ___Oct. 14, 2011___

5

# EXHIBIT 17

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

IN RE: GRAND JURY SUBPOENA, JAMES RISEN

Case No.: 1:08dm61 -- LMB

UNDER SEAL

## AFFIDAVIT OF JACK NELSON

Jack Nelson, being duly sworn, deposes and says:

1. Prior to my retirement at the end of 2001, I spent 36 years as a journalist with the *Los Angeles Times*, including 22 years as the *Times'* Washington Bureau Chief. Before I began working for the *Los Angeles Times*, I worked as a reporter for *The Atlanta Journal-Constitution* and *The Biloxi Daily Herald*.

2. In 1960, I was awarded a Pulitzer Prize for reporting that exposed widespread financial corruption and medical malpractice at the Milledgeville (Ga.) State Hospital, then the world's largest mental institution. Much of my career has been spent either doing investigative reporting or overseeing investigative reporting. During my career as a reporter, I used confidential sources at all levels of government to report on financial corruption, vote fraud, medical malpractice, and other wrongdoing. I am, through these experiences, personally familiar with news reporting in general, and with the importance of confidential sources in newsgathering, in particular.

3. I make this affidavit in support of a fellow investigative reporter, James Risen, who, I understand, has been served with a grand jury subpoena seeking to obtain, among other things, the identity of the source, or sources, of information provided to him and published in Chapter 9 of his book, *State of War: The Secret History of the CIA and the Bush Administration* ("State of War"). I am fully familiar with the facts set forth herein and make this affidavit based on my personal knowledge unless otherwise stated.

4. I have utilized and protected confidential sources throughout a career of more than 50 years as a journalist. During that time, I have found it essential to use confidential sources to adequately report and keep the public informed of government at the local, state and national level. In order to fully report stories on many subjects, especially in order to learn of government activities that otherwise would have been shielded from the public, I often found it necessary to rely on confidential sources.

5. I have covered the activities of six different presidential administrations -- four Republican and two Democratic -- and have directed the Washington bureau's coverage of five of them. And in all of the administrations we had to rely on confidential sources in reporting on government developments that were of great public interest but that government officials tried to keep concealed.

6. In Washington, my own reporting and the reporting of staffers I've directed routinely disclosed governmental abuses of one kind or another based on solid sources who insisted on confidentiality for fear of reprisal if their identities became known. Without those sources the *Los Angeles Times* would have been unable to report numerous such stories involving corruption or governmental abuses in at least six administrations. Examples include: aspects of the Watergate scandal and abuses of power of the FBI and other federal agencies in the Nixon Administration; questions surrounding President Ford's pardon of President Nixon; scandals in the Carter Administration involving OMB Director Bert Lance and President Carter's brother Billy Carter's

2

representation of Libya; illegal and inappropriate payments and cover-up attempts in the Iran/Contras scandal in the Ronald Reagan Administration; President George H. W. Bush's role in the Iran/Contras scandal and other wronging in his Administration; and lies told by President Clinton in the Monica Lewinsky scandal. All of these stories contributed in a positive way to important national debates in this country and none of them would have been possible without information obtained from confidential sources.

7. Similarly, the information reported in Chapter 9 of *State of War* provided considerable benefit to the public. The chapter relates to a critically important subject: flaws and mismanagement of U.S. intelligence efforts concerning Iran's nuclear capabilities. Mr. Risen's reporting in Chapter 9 is all the more important given our apparent failures to gather accurate intelligence regarding Iraq's WMD capabilities (and the catastrophic consequences of that failure), and in light of recent changes to the National Intelligence Estimate concerning our intelligence agencies' views regarding the existence of an active nuclear program in that country.

8. Based on my experience, a reporter who obeys a court order to disclose a source to whom he has promised confidentiality would seriously damage his ability to cover government in the future. In my opinion, other government sources who insist on confidentiality and hear news about a reporter disclosing the identity of a confidential source obviously would consider that reporter, and perhaps other reporters, to be untrustworthy and refuse to deal with them in the future. And it undoubtedly would have a ripple effect, silencing whistleblowers and other government employees who might otherwise cooperate with the press in exposing government wrongdoing.

3

9. In fact, high government officials from presidents on down routinely have leaked classified information when it has promoted their agenda or otherwise suited their purposes. Any reporter who has covered Washington for any length of time knows that officials routinely leak classified information. Some government public information officials have publicly acknowledged that they routinely use classified information in briefing reporters. Congress passed a bill cracking down on leaks in 2000, but President Clinton vetoed it after Kenneth Bacon, the Assistant Secretary of Defense for Public Affairs, and Strobe Talbot, the Deputy Secretary of State, reportedly told the President they routinely used classified information in briefing reporters and could not adequately do their jobs if the bill became law. Bacon told the *Washington Post* the measure was "disastrous for journalists . . . disastrous for any official who deals with the press in national security, whether at State, the NSC or the Pentagon." And Talbot told me, for a paper on government secrecy that I wrote while at Harvard University as a Shorenstein Fellow in 2001, that the bill was "unbelievably pernicious for all kinds of reasons." The paper was a chapter in a 2003 book, "Terrorism, War, and the Press," published by the Joan Shorenstein Center on the Press, Politics and Public Policy and the John F. Kennedy School of Government.

4

10. I believe a federal court order that holds reporters or their news organizations in contempt for refusing to divulge confidential sources would be closely watched by all government sources and potential sources who might be inclined to help the public know how its government is operating. And if a contempt order were to compel a reporter to reveal his source, it would have a chilling effect on sources and not only damage the reporter's ability to do his job, but the ability of all reporters covering government to do their jobs.

_____
Jack Nelson

Date: 2/15/08

Witnessed by me this 15 th day of Feb. , 2008,

_____
(Notary Public)

My commission expires on 05/01/2010

5

EXHIBIT 18

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

TO BE FILED UNDER SEAL

----------------------------------------------------------------   x Case No. 1:08dm61 - LMB

IN RE GRAND JURY SUBPOENA, JAMES RISEN

----------------------------------------------------------------   x

## DECLARATION OF DANA PRIEST

I, Dana Priest, hereby declare under the penalty of perjury as follows:

1.      I am a staff writer for *The Washington Post.*

2.      I was the *Post's* Pentagon correspondent for seven years and subsequently covered the intelligence beat for three years. I also covered the invasion of Panama, reported from Iraq, and covered the Kosovo air war. I have traveled widely with Army Special Forces in Asia, Africa and South America, with Army infantry units on peacekeeping duty in Bosnia, Kosovo and Afghanistan, and with the regional four-star military commanders. In 2003 I authored a book about the military's expanding responsibility and influence, *"THE MISSION: Waging War and Keeping Peace With America's Military,"* which won the New York Public Library Bernstein Book Award and was a finalist for the 2003 Pulitzer Prize for non-fiction. I worked for three years as an analyst and contributor for NBC News and am currently a contributor to CBS News as well as a fellow at New York University's Center on Law and Security.

3.      My work has been recognized by my profession with a number of awards including The Pulitzer Prize, The George Polk Award, the Overseas Press Club Award, the American Academy of Diplomacy's Award for Distinguished Reporting and Analysis on Foreign Affairs, the Gerald R. Ford Prize for Distinguished Reporting on the National Defense, and Harvard University's David Nyhan Award for Political Journalism "for many years of distinguished investigative reporting."

4.      Beginning in 1996 and continuing to this day, I have authored hundreds of news articles on matters of national security. Some of those articles have revealed government waste, corruption and wrongdoing. Some have disclosed controversial, secret policy decisions and the real-life effects of those decisions on the lives of Americans and people living outside the United States. A number have revealed the tactics, operations and strategy of the U.S. government's war on terror in a way that allows the public to judge whether government's actions in this realm are achieving the stated goal of these policies, namely the destruction of Al Qaeda-influenced terrorism around the world.

5.      Because the U.S. government has made secret nearly every aspect of its counterterrorism program, it would have been impossible to report even on the basic contours of these decisions, operations and programs without the help of confidential sources. The same is true for most military operations, particularly those involving special operations forces and counterintelligence assets. In my experience, the individuals who provide information about these matters on the condition of anonymity do so because they believe that the information should be made public, but they are not officially authorized to disclose the information or do not wish the information to be attributed to a named official.

6.      The subjects that I have been able to cover, based on information provided by confidential sources, include the existence and conditions of hundreds of prisoners, some later to be found innocent, held at the military prison at Guantanamo Bay, Cuba; the capture, treatment and interrogation of prisoners in Afghanistan and Iraq; the workings of the joint CIA-Special Forces teams in Afghanistan responsible for toppling the Taliban and Al Qaeda; the use of the predator unmanned aerial vehicle to target suspected terrorist leaders; the wasteful spending of tens of billions of dollars in taxpayer funds on an outdated and redundant satellite system; the legal opinions supporting the "enhanced interrogation techniques" of prisoners captured in the war on terror; the specifics of those techniques, including waterboarding; the rendition of multiple suspected terrorists by the CIA in cooperation with foreign intelligence services to third countries; the lack of success in capturing Osama bin Laden; the absence of human sources in Iraq, Iran and Pakistan by the CIA despite the high priority put on those countries by the U.S. intelligence services; the abuse of prisoners at the Abu Ghraib prison in Iraq; the accidental death of an innocent Afghan prisoner at the hands of an inexperienced CIA officer; the imprisonment of innocent

Afghans sold for bounties to the U.S. military by Pakistan police and others; the mistaken capture, rendition, abuse and detention of Khalid al-Masri, an innocent naturalized German citizen of Lebanese extraction by the CIA and its allies; the mistaken rendition of Maher Arar, a Canadian citizen, into Syrian hands and his subsequent torture there; and the existence and evolution of the CIA's secret prisons in the countries of Eastern Europe. (These prisons were illegal in those countries, the very countries that the United States had worked so long to liberate from their Soviet-dominated and allied intelligence agencies and to welcome into the world of nations governed by the rule of law.) All of the revelations in my stories on these subjects were at one point secret from the American public. None of them could have been reported without the help of confidential sources.

7. Many of the above stories, which are attached, have resulted in significant, thoughtful and on-going public debate, including within the governments of our closest allies in Europe and in the U.S. Congress, where some of these practices, once revealed by myself and other reporters, have been prohibited or substantially modified. The legality of these programs has been questioned and defended by the public, interest groups, elected members of Congress, the president and his national security team, and even presidential and Congressional candidates seeking office in 2008. This is, it seems to me, the essence of a democracy.

8. If reporters believe, as I do, that it is their responsibility to describe the broad contours of the war on terror, in order to help the public judge whether the tactics of the war on terror are effective in achieving our goals, then they, together with their editors and publishers, must necessarily delve into the realm of secret information. It can not be avoided.

9. As a reporter covering matters of national security, I am aware that there is no broad prohibition against the publication of secret or classified information per se. Why is that? Justice Potter Stewart, writing in the Pentagon Papers cases, described it this way: "So far as the Constitution goes, the autonomous press may publish what it knows, and it may seek to learn what it can. But this autonomy cuts both ways. The press is free to do battle against secrecy...in government. But the press cannot expect from the Constitution any guarantee that it will succeed....The Constitution, in other words, establishes the *contest*, not its resolution. Congress may provide a resolution through carefully drawn legislation. For the

rest, we must rely, as so often in our system we must, on the tug and pull of the political forces in American society."

10.     The media's responsibility, as I see it, is to play its role in that contest—for, as Justice Stewart reminded us, "it is the contest itself that serves the public interest." If the press fails at this, we fail to meet our responsibility. In times of war and conflict, the stakes can be especially high. Consider what happened when the news media did not work hard enough before the Iraq war to determine whether the Bush administration's assertions of weapons of mass destruction in Iraq were accurate. For the press to have done a better job reporting about Iraq's nuclear capabilities in the run-up to the war, of course, it would have had to have access to secret or classified information, and it would almost certainly have had to have the assistance of confidential sources.

11.     Mr. Risen's reporting in Chapter 9 of his book *State of War: The Secret History of the CIA and the Bush Administration* deals with potential incompetence and mismanagement of certain intelligence efforts concerning Iran's WMD capabilities. This is the kind of important and newsworthy subject that, in my experience, cannot be covered without the assistance of confidential sources.

12.     In 2007, I co-authored a series of articles in the *Post* that revealed the systematic lack of adequate care for soldiers and Marines returning from wars in Iraq, Afghanistan and elsewhere at the Walter Reed Army Medical Center. The abuses revealed in those articles could not have been uncovered without the help of people who agreed to speak only in return for promises to keep their identities confidential. These articles, which I have attached, resulted in significant reform to the Veteran's Administration services to Iraq and Afghanistan veterans, and to the Army and wider Defense Department's system of care for the physically and mentally wounded. Defense Secretary Robert Gates cited these articles in his May 2007 commencement speech at the U.S. Naval Academy: "As officers, you will have a responsibility to communicate to those below you that the American military must be non-political and recognize the obligation we owe the Congress to be honest and true in our reporting to them. Especially when it involves admitting mistakes or problems. The same is true with the press, in my view a critically important guarantor of our freedom. When it identifies a problem, as at Walter Reed, the response of senior leaders should be to find out if the allegations are true—as they were at Walter

Reed—and if so, say so, and then act to remedy the problem. If untrue, then be able to document that fact. The press is not the enemy, and to treat it as such is self-defeating."

13.    The press would be severely hobbled in its efforts to reveal problems if it were not able to rely upon and protect confidential sources.  If reporters are compelled to identify their confidential sources in cases such as this one, my ability and the ability of other reporters to obtain newsworthy information in the future on the kinds of subjects described in this Declaration would be severely impaired. Sources who would otherwise feel a responsibility to reveal potential abuses would be reluctant to do so, and the public would be left without the information necessary ultimately to ensure that government is responsive to its will.

I declare under the penalty of perjury that the foregoing is true to the best of my knowledge, information and belief.

_Dana L. Priest_

Dana Priest

# washingtonpost.com

## The Hotel Aftermath
Inside Mologne House, the Survivors of War Wrestle With Military Bureaucracy and Personal Demons

By Anne Hull and Dana Priest
Washington Post Staff Writers
Monday, February 19, 2007; A01



**Equifax Credit Watch™ Gold**

Don't let identity thieves ruin your credit!

**EQUIFAX**   LEARN MORE

Advertisement



NETFLIX

The guests of Mologne House have been blown up, shot, crushed and shaken, and now their convalescence takes place among the chandeliers and wingback chairs of the 200-room hotel on the grounds of Walter Reed Army Medical Center.

Oil paintings hang in the lobby of this strange outpost in the war on terrorism, where combat's urgency has been replaced by a trickling fountain in the garden courtyard. The maimed and the newly legless sit in wheelchairs next to a pond, watching goldfish turn lazily through the water.

But the wounded of Mologne House are still soldiers -- Hooah! -- so their lives are ruled by platoon sergeants. Each morning they must rise at dawn for formation, though many are half-snowed on pain meds and sleeping pills.

In Room 323 the alarm goes off at 5 a.m., but Cpl. Dell McLeod slumbers on. His wife, Annette, gets up and fixes him a bowl of instant oatmeal before going over to the massive figure curled in the bed. An Army counselor taught her that a soldier back from war can wake up swinging, so she approaches from behind.

"Dell," Annette says, tapping her husband. "Dell, get in the shower."

"Dell!" she shouts.

Finally, the yawning hulk sits up in bed. "Okay, baby," he says. An American flag T-shirt is stretched over his chest. He reaches for his dog tags, still the devoted soldier of 19 years, though his life as a warrior has become a paradox. One day he's led on stage at a Toby Keith concert with dozens of other wounded Operation Iraqi Freedom troops from Mologne House, and the next he's sitting in a cluttered cubbyhole at Walter Reed, fighting the Army for every penny of his disability.

McLeod, 41, has lived at Mologne House for a year while the Army figures out what to do with him. He worked in textile and steel mills in rural South Carolina before deploying. Now he takes 23 pills a day, prescribed by various doctors at Walter Reed. Crowds frighten him. He is too anxious to drive. When panic strikes, a soldier friend named Oscar takes him to Baskin-Robbins for vanilla ice cream.

Case 1:10-cr-00485-LMB    Document 115-6    Filed 06/21/11    Page 66 of 124 PageID# 859

"They find ways to soothe each other," Annette says.

Mostly what the soldiers do together is wait: for appointments, evaluations, signatures and lost paperwork to be found. It's like another wife told Annette McLeod: "If Iraq don't kill you, Walter Reed will."

## After Iraq, a New Struggle

The conflict in Iraq has hatched a virtual town of desperation and dysfunction, clinging to the pilings of Walter Reed. The wounded are socked away for months and years in random buildings and barracks in and around this military post.

The luckiest stay at Mologne House, a four-story hotel on a grassy slope behind the hospital. Mologne House opened 10 years ago as a short-term lodging facility for military personnel, retirees and their family members. Then came Sept. 11 and five years of sustained warfare. Now, the silver walkers of retired generals convalescing from hip surgery have been replaced by prosthetics propped against Xbox games and Jessica Simpson posters smiling down on brain-rattled grunts.

Two Washington Post reporters spent hundreds of hours in Mologne House documenting the intimate struggles of the wounded who live there. The reporting was done without the knowledge or permission of Walter Reed officials, but all those directly quoted in this article agreed to be interviewed.

The hotel is built in the Georgian revival style, and inside it offers the usual amenities: daily maid service, front-desk clerks in formal vests and a bar off the lobby that opens every afternoon.

But at this bar, the soldier who orders a vodka tonic one night says to the bartender, "If I had two hands, I'd order two." The customers sitting around the tables are missing limbs, their ears are melted off, and their faces are tattooed purple by shrapnel patterns.

Most everyone has a story about the day they blew up: the sucking silence before immolation, how the mouth filled with tar, the lungs with gas.

"First thing I said was, '[Expletive], that was my *good* eye,' " a soldier with an eye patch tells an amputee in the bar.

The amputee peels his beer label. "I was awake through the whole thing," he says. "It was my first patrol. The second [expletive] day in Iraq and I get blown up."

When a smooth-cheeked soldier with no legs orders a fried chicken dinner and two bottles of grape soda to go, a kitchen worker comes out to his wheelchair and gently places the Styrofoam container on his lap.

A scrawny young soldier sits alone in his wheelchair at a nearby table, his eyes closed and his chin dropped to his chest, an empty Corona bottle in front of him.

Those who aren't old enough to buy a drink at the bar huddle outside near a magnolia tree and smoke cigarettes. Wearing hoodies and furry bedroom slippers, they look like kids at summer camp who've crept out of their rooms, except some have empty pants legs or limbs pinned by medieval-looking hardware. Medication is a favorite topic.

"Dude, [expletive] Paxil saved my life."

"I been on methadone for a year, I'm tryin' to get off it."

"I didn't take my Seroquel last night and I had nightmares of charred bodies, burned crispy like campfire marshmallows."

Mologne House is afloat on a river of painkillers and antipsychotic drugs. One night, a strapping young infantryman loses it with a woman who is high on her son's painkillers. "Quit taking all the soldier medicine!" he screams.

Pill bottles clutter the nightstands: pills for depression or insomnia, to stop nightmares and pain, to calm the nerves.

Here at Hotel Aftermath, a crash of dishes in the cafeteria can induce seizures in the combat-addled. If a taxi arrives and the driver looks Middle Eastern, soldiers refuse to get in. Even among the gazebos and tranquility of the Walter Reed campus in upper Northwest Washington, manhole covers are sidestepped for fear of bombs and rooftops are scanned for snipers.

Bomb blasts are the most common cause of injury in Iraq, and nearly 60 percent of the blast victims also suffer from traumatic brain injury, according to Walter Reed's studies, which explains why some at Mologne House wander the hallways trying to remember their room numbers.

Some soldiers and Marines have been here for 18 months or longer. Doctor's appointments and evaluations are routinely dragged out and difficult to get. A board of physicians must review hundreds of pages of medical records to determine whether a soldier is fit to return to duty. If not, the Physical Evaluation Board must decide whether to assign a rating for disability compensation. For many, this is the start of a new and bitter battle.

Months roll by and life becomes a blue-and-gold hotel room where the bathroom mirror shows the naked disfigurement of war's ravages. There are toys in the lobby of Mologne House because children live here. Domestic disputes occur because wives or girlfriends have moved here. Financial tensions are palpable. After her husband's traumatic injury insurance policy came in, one wife cleared out with the money. Older National Guard members worry about the jobs they can no longer perform back home.

While Mologne House has a full bar, there is not one counselor or psychologist assigned there to assist soldiers and families in crisis — an idea proposed by Walter Reed social workers but rejected by the military command that runs the post.

After a while, the bizarre becomes routine. On Friday nights, antiwar protesters stand outside the gates of Walter Reed holding signs that say "Love Troops, Hate War, Bring them Home Now." Inside the gates, doctors in white coats wait at the hospital entrance for the incoming bus full of newly wounded soldiers who've just landed at Andrews Air Force Base.

And set back from the gate, up on a hill, Mologne House, with a bowl of red apples on the front desk.

**Into the Twilight Zone**

Dell McLeod's injury was utterly banal. He was in his 10th month of deployment with the 178th Field Artillery Regiment of the South Carolina National Guard near the Iraqi border when he was smashed in

the head by a steel cargo door of an 18-wheeler. The hinges of the door had been tied together with a plastic hamburger-bun bag. Dell was knocked out cold and cracked several vertebrae.

When Annette learned that he was being shipped to Walter Reed, she took a leave from her job on the assembly line at Stanley Tools and packed the car. The Army would pay her $64 a day to help care for her husband and would let her live with him at Mologne House until he recovered.

A year later, they are still camped out in the twilight zone. Dogs are periodically brought in by the Army to search the rooms for contraband or weapons. When the fire alarm goes off, the amputees who live on the upper floors are scooped up and carried down the stairwell, while a brigade of mothers passes down the wheelchairs. One morning Annette opens her door and is told to stay in the room because a soldier down the hall has overdosed.

In between, there are picnics at the home of the chairman of the Joint Chiefs of Staff and a charity-funded dinner cruise on the Potomac for "Today's troops, tomorrow's veterans, always heroes."

Dell and Annette's weekdays are spent making the rounds of medical appointments, physical therapy sessions and evaluations for Dell's discharge from the Army. After 19 years, he is no longer fit for service. He uses a cane to walk. He is unable to count out change in the hospital cafeteria. He takes four Percocets a day for pain and has gained 40 pounds from medication and inactivity. Lumbering and blue-eyed, Dell is a big ox baby.

Annette puts on makeup every morning and does her hair, some semblance of normalcy, but her new job in life is watching Dell.

"I'm worried about how he's gonna fit into society," she says one night, as Dell wanders down the hall to the laundry room.

The more immediate worry concerns his disability rating. Army doctors are disputing that Dell's head injury was the cause of his mental impairment. One report says that he was slow in high school and that his cognitive problems could be linked to his native intelligence rather than to his injury.

"They said, 'Well, he was in Title I math,' like he was retarded," Annette says. "Well, y'all took him, didn't you?"

The same fight is being waged by their friends, who aren't the young warriors in Army posters but middle-age men who left factory jobs to deploy to Iraq with their Guard units. They were fit enough for war, but now they are facing teams of Army doctors scrutinizing their injuries for signs of preexisting conditions, lessening their chance for disability benefits.

Dell and Annette's closest friend at Mologne House is a 47-year-old Guard member who was driving an Army vehicle through the Iraqi night when a flash of light blinded him and he crashed into a ditch with an eight-foot drop. Among his many injuries was a broken foot that didn't heal properly. Army doctors decided that "late life atrophy" was responsible for the foot, not the truck wreck in Iraq.

When Dell sees his medical records, he explodes. "Special ed is for the mentally retarded, and I'm not mentally retarded, right, babe?" he asks Annette. "I graduated from high school. I did some college. I worked in a steel mill."

It's after 9 one night and Dell and Annette are both exhausted, but Dell still needs to practice using

Case 1:10-cr-00485-LMB   Document 115-6   Filed 06/21/11   Page 69 of 124 PageID# 862

voice-recognition software. Reluctantly, he mutes "The Ultimate Fighting Challenge" on TV and sits next to Annette in bed with a laptop.

"My name is Wendell," he says. "Wendell Woodward McLeod Jr."

Annette tells him to sit up. "Spell 'dog,' " she says, softly.

"Spell 'dog,' " he repeats.

"Listen to me," she says.

"Listen to me." He slumps on the pillow. His eyes drift toward the wrestlers on TV.

"You are not working hard enough, Dell," Annette says, pleading. "Wake up."

"Wake up," he says.

"Dell, come on now!"

**For Some, a Grim Kind of Fame**

No one questions Sgt. Bryan Anderson's sacrifice. One floor above Dell and Annette's room at Mologne House, he holds the gruesome honor of being one of the war's five triple amputees. Bryan, 25, lost both legs and his left arm when a roadside bomb exploded next to the Humvee he was driving with the 411th Military Police Company. Modern medicine saved him and now he's the pride of the prosthetics team at Walter Reed. Tenacious and wisecracking, he wrote "[Expletive] Iraq" on his left leg socket.

Amputees are the first to receive celebrity visitors, job offers and extravagant trips, but Bryan is in a league of his own. Johnny Depp's people want to hook up in London or Paris. The actor Gary Sinise, who played an angry Vietnam amputee in "Forrest Gump," sends his regards. And Esquire magazine is setting up a photo shoot.

Bryan's room at Mologne House is stuffed with gifts from corporate America and private citizens: $350 Bose noise-canceling headphones, nearly a thousand DVDs sent by well-wishers and quilts made by church grannies. The door prizes of war. Two flesh-colored legs are stacked on the floor. A computerized hand sprouting blond hair is on the table.

One Saturday afternoon, Bryan is on his bed downloading music. Without his prosthetics, he weighs less than 100 pounds. "Mom, what time is our plane?" he asks his mother, Janet Waswo, who lives in the room with him. A movie company is flying them to Boston for the premiere of a documentary about amputee hand-cyclers in which Bryan appears.

Representing the indomitable spirit of the American warrior sometimes becomes too much, and Bryan turns off his phone.

Perks and stardom do not come to every amputee. Sgt. David Thomas, a gunner with the Tennessee National Guard, spent his first three months at Walter Reed with no decent clothes; medics in Samarra had cut off his uniform. Heavily drugged, missing one leg and suffering from traumatic brain injury, David, 42, was finally told by a physical therapist to go to the Red Cross office, where he was given a T-shirt and sweat pants. He was awarded a Purple Heart but had no underwear.

The Hotel Aftermath - washingtonpost.com
Case 1:10-cr-00485-LMB    Document 115-6    Filed 06/21/11    Page 70 of 124 PageID#
863
Page 8 of 10

David tangled with Walter Reed's image machine when he wanted to attend a ceremony for a fellow amputee, a Mexican national who was being granted U.S. citizenship by President Bush. A case worker quizzed him about what he would wear. It was summer, so David said shorts. The case manager said the media would be there and shorts were not advisable because the amputees would be seated in the front row.

" 'Are you telling me that I can't go to the ceremony 'cause I'm an amputee?' " David recalled asking. "She said, 'No, I'm saying you need to wear pants.' "

David told the case worker, "I'm not ashamed of what I did, and y'all shouldn't be neither." When the guest list came out for the ceremony, his name was not on it.

Still, for all its careful choreography of the amputees, Walter Reed offers protection from a staring world. On warm nights at the picnic tables behind Mologne House, someone fires up the barbecue grill and someone else makes a beer run to Georgia Avenue.

Bryan Anderson is out here one Friday. "Hey, Bry, what time should we leave in the morning?" asks his best friend, a female soldier also injured in Iraq. The next day is Veterans Day, and Bryan wants to go to Arlington National Cemetery. His pal Gary Sinise will be there, and Bryan wants to give him a signed photo.

Thousands of spectators are already at Arlington the next morning when Bryan and his friend join the surge toward the ceremony at the Tomb of the Unknowns. The sunshine dazzles. Bryan is in his wheelchair. If loss and sacrifice are theoretical to some on this day, here is living proof -- three stumps and a crooked boyish smile. Even the acres of tombstones can't compete. Spectators cut their eyes toward him and look away.

Suddenly, the thunder of cannons shakes the sky. The last time Bryan heard this sound, his legs were severed and he was nearly bleeding to death in a fiery Humvee.

Boom. Boom. Boom. Bryan pushes his wheelchair harder, trying to get away from the noise. "Damn it," he says, "when are they gonna stop?"

Bryan's friend walks off by herself and holds her head. The cannon thunder has unglued her, too, and she is crying.

### Friends From Ward 54

An old friend comes to visit Dell and Annette. Sgt. Oscar Fernandez spent 14 months at Walter Reed after having a heart attack in Afghanistan. Oscar also had post-traumatic stress disorder, PTSD, a condition that worsened at Walter Reed and landed the 45-year-old soldier in the hospital's psychiatric unit, Ward 54.

Oscar belonged to a tight-knit group of soldiers who were dealing with combat stress and other psychological issues. They would hang out in each other's rooms at night, venting their fury at the Army's Cuckoo's Nest. On weekends they escaped Walter Reed to a Chinese buffet or went shopping for bootleg Spanish DVDs in nearby Takoma Park. They once made a road trip to a casino near the New Jersey border.

They abided each other's frailties. Sgt. Steve Justi would get the slightest cut on his skin and drop to his

knees, his face full of anguish, apologizing over and over. For what, Oscar did not know. Steve was the college boy who went to Iraq, and Oscar figured something terrible had happened over there.

Sgt. Mike Smith was the insomniac. He'd stay up till 2 or 3 in the morning, smoking on the back porch by himself. Doctors had put steel rods in his neck after a truck accident in Iraq. To turn his head, the 41-year-old Guard member from Iowa had to rotate his entire body. He was fighting with the Army over his disability rating, too, and in frustration had recently called a congressional investigator for help.

"They try in all their power to have you get well, but it reverses itself," Oscar liked to say.

Dell was not a psych patient, but he and Oscar bonded. They were an unlikely pair -- the dark-haired Cuban American with a penchant for polo shirts and salsa, and the molasses earnestness of Dell.

Oscar would say things like "I'm trying to better myself through my own recognizance," and Dell would nod in appreciation.

To celebrate Oscar's return visit to Walter Reed, they decide to have dinner in Silver Spring.

Annette tells Oscar that a soldier was arrested at Walter Reed for waving a gun around.

"A soldier, coming from war?" Oscar asks.

Annette doesn't know. She mentions that another soldier was kicked out of Mologne House for selling his painkillers.

The talk turns to their friend Steve Justi. A few days earlier, Steve was discharged from the Army and given a zero percent disability rating for his mental condition.

Oscar is visibly angry. "They gave him nothing," he says. "They said his bipolar was preexisting."

Annette is quiet. "Poor Steve," she says.

After dinner, they return through the gates of Walter Reed in Annette's car, a John 3:16 decal on the bumper and the Dixie Chicks in the CD player. Annette sees a flier in the lobby of Mologne House announcing a free trip to see Toby Keith in concert.

A week later, it is a wonderful night at the Nissan Pavilion. About 70 wounded soldiers from Walter Reed attend the show. Toby invites them up on stage and brings the house down when he sings his monster wartime hit "American Soldier." Dell stands on stage in his uniform while Annette snaps pictures.

"Give a hand clap for the soldiers," Annette hears Toby tell the audience, "then give a hand for the U.S.A."

### A Soldier Snaps

Deep into deer-hunting country and fields of withered corn, past the Pennsylvania Turnpike in the rural town of Ellwood City, Steve Justi sits in his parents' living room, fighting off the afternoon's lethargy.

A photo on a shelf shows a chiseled soldier, but the one in the chair is 35 pounds heavier. Antipsychotic

drugs give him tremors and cloud his mind. Still, he is deliberate and thoughtful as he explains his path from soldier to psychiatric patient in the war on terrorism.

After receiving a history degree from Mercyhurst College, Steve was motivated by the attacks of Sept. 11, 2001, to join the National Guard. He landed in Iraq in 2003 with the First Battalion, 107th Field Artillery, helping the Marines in Fallujah.

"It was just the normal stuff," Steve says, describing the violence he witnessed in Iraq. His voice is oddly flat as he recalls the day his friend died in a Humvee accident. The friend was driving with another soldier when they flipped off the road into a swamp. They were trapped upside down and submerged. Steve helped pull them out and gave CPR, but it was too late. The swamp water kept pushing back into his own mouth. He rode in the helicopter with the wet bodies.

After he finished his tour, everything was fine back home in Pennsylvania for about 10 months, and then a strange bout of insomnia started. After four days without sleep, he burst into full-out mania and was hospitalized in restraints.

Did anything trigger the insomnia? "Not really," Steve says calmly, sitting in his chair.

His mother overhears this from the kitchen and comes into the living room. "His sergeant had called saying that the unit was looking for volunteers to go back to Iraq," Cindy Justi says. "This is what triggered his snap."

Steve woke up in the psychiatric unit at Walter Reed and spent the next six months going back and forth between there and a room at Mologne House. He was diagnosed with bipolar disorder. He denied to doctors that he was suffering from PTSD, yet he called home once from Ward 54 and shouted into the phone, "Mom, can't you hear all the shooting in the background?"

He was on the ward for the sixth time when he was notified that he was being discharged from the Army, with only a few days to clear out and a disability rating of zero percent.

On some level, Steve expected the zero rating. During his senior year of college, he suffered a nervous breakdown and for several months was treated with antidepressants. He disclosed this to the National Guard recruiter, who said it was a nonissue. It became an issue when he told doctors at Walter Reed. The Army decided that his condition was not aggravated by his time in Iraq. The only help he would get would come from Veterans Affairs.

"We have no idea if what he endured over there had a worsening effect on him," says his mother.

His father gets home from the office. Ron Justi sits on the couch across from his son. "He was okay to sacrifice his body, but now that it's time he needs some help, they are not here," Ron says.

**Outside the Gates**

The Army gives Dell McLeod a discharge date. His days at Mologne House are numbered. The cramped hotel room has become home, and now he is afraid to leave it. His anxiety worsens. "Shut up!" he screams at Annette one night, his face red with rage, when she tells him to stop fiddling with his wedding ring.

Later, Annette says: "I am exhausted. He doesn't understand that I've been fighting the Army."

The Hotel Aftermath - washingtonpost.com
Case 1:10-cr-00485-LMB    Document 115-6    Filed 06/21/11    Page 73 of 124 PageID#
866
Page 9 of 10

Doctors have concluded that Dell was slow as a child and that his head injury on the Iraqi border did not cause brain damage. "It is possible that pre-morbid emotional difficulties and/or pre-morbid intellectual functioning may be contributing factors to his reported symptoms," a doctor wrote, withholding a diagnosis of traumatic brain injury.

Annette pushes for more brain testing and gets nowhere until someone gives her the name of a staffer for the House Committee on Oversight and Government Reform. A few days later, Annette is called to a meeting with the command at Walter Reed. Dell is given a higher disability rating than expected -- 50 percent, which means he will receive half of his base pay until he is evaluated again in 18 months. He signs the papers.

Dell wears his uniform for the last time, somber and careful as he dresses for formation. Annette packs up the room and loads their Chevy Cavalier to the brim. Finally the gates of Walter Reed are behind them. They are southbound on I-95 just past the Virginia line when Dell begins to cry, Annette would later recall. She pulls over and they both weep.

Not long after, Bryan Anderson also leaves Mologne House. When the triple amputee gets off the plane in Chicago, American Airlines greets him on the tarmac with hoses spraying arches of water, and cheering citizens line the roads that lead to his home town, Rolling Meadows.

Bryan makes the January cover of Esquire. He is wearing his beat-up cargo shorts and an Army T-shirt, legless and holding his Purple Heart in his robot hand. The headline says "The Meaning of Life."

A month after Bryan leaves, Mike Smith, the insomniac soldier, is found dead in his room. Mike had just received the good news that the Army was raising his disability rating after a congressional staff member intervened on his behalf. It was the week before Christmas, and he was set to leave Walter Reed to go home to his wife and kids in Iowa when his body was found. The Army told his wife that he died of an apparent heart attack, according to her father.

Distraught, Oscar Fernandez calls Dell and Annette in South Carolina with the news. "It's the constant assault of the Army," he says.

Life with Dell is worsening. He can't be left alone. The closest VA hospital is two hours away. Doctors say he has liver problems because of all the medications. He is also being examined for PTSD. "I don't even know this man anymore," Annette says.

At Mologne House, the rooms empty and fill, empty and fill. The lobby chandelier glows and the bowl of red apples waits on the front desk. An announcement goes up for Texas Hold 'Em poker in the bar.

One cold night an exhausted mother with two suitcases tied together with rope shows up at the front desk and says, "I am here for my son." And so it begins.

*Staff researcher Julie Tate contributed to this report.*

© 2007 The Washington Post Company

Ads by Google

Ark-La-Tex Waste Removal
Were Available 24 Hrs A Day. Call Us For Asbestos And Mold Removal.
www.JonesEnvironmentalInc.com

Eat Red. Choose Cherries.

# washingtonpost.com

# Hospital Investigates Former Aid Chief

## Walter Reed Official Had Own Charity

By Dana Priest and Anne Hull
Washington Post Staff Writers
Tuesday, February 20, 2007; A01

For the past three years, Michael J. Wagner directed the Army's largest effort to help the most vulnerable soldiers at Walter Reed Army Medical Center. His office in Room 3E01 of the world-renowned hospital was supposed to match big-hearted donors with thousands of wounded soldiers who could not afford to feed their children, pay mortgages, buy plane tickets or put up visiting families in nearby hotels.



Advertisement

A SHOWCASE

KETTLER condos.com

But while he was being paid to provide this vital service to patients, outpatients and their relations, Wagner was also seeking funders and soliciting donations for his own new charity, based in Texas, according to documents and interviews with current and former staff members. Some families also said Wagner treated them callously and made it hard for them to receive assistance.

Last week, Walter Reed launched a criminal investigation of Wagner after The Washington Post sought a response to his activities while he ran the Army's Medical Family Assistance Center, a position he left several weeks ago. Maj. Gen. George W. Weightman, the commander at Walter Reed, said the probe by the Criminal Investigation Command (CID) "reflects the seriousness with which we take these allegations."

Weightman's legal adviser, Col. Samuel Smith, said that "it would clearly be a conflict of interest" prohibited by federal law, Army regulations and Defense Department ethics rules if Wagner used his position to solicit funds for his own organization.

The saga of the Medical Family Assistance Center is just one example of the problems at Walter Reed, where nearly 700 soldiers and Marines from the wars in Iraq and Afghanistan live as outpatients while recuperating. Some families are happy with the help they received from Wagner and his office, and many soldiers and their families applauded the dedication of workers there. Others said that they had problems with Wagner and that the center seemed chaotic and disorganized.

"We had many family members who came to me because they couldn't get a respectful and compassionate response from Dr. Wagner," said Peggy Baker, director of a charity that helps wounded soldiers, Operation First Response.

Wagner, who has a doctorate in education, resigned his position last month to work full time on his Military, Veteran and Family Assistance Foundation, based in Dallas. The foundation includes the Phoenix Project, which runs marriage retreats for soldiers returning from combat. According to its Web site, the foundation is supported by several corporations, other foundations and individuals.

In a phone interview, Wagner denied he had solicited funds or made contact with donors during office

hours. "It's just not true," he said. "I intentionally stayed out of that. I couldn't do that. I couldn't do both." He said he is not paid by the foundation. The documents that would verify that have not yet been filed with the Internal Revenue Service.

Wagner said his superiors "knew of my involvement right from the beginning." Weightman said the command had been unaware of Wagner's Texas charity until recently.

Wagner defended his work at the center. "My only purpose and my priority 12 to 19 hours a day was to assist the families of the wounded," he said. "I saw 6,000 people coming back from Iraq and Afghanistan. I did my best, but I'm not God. What I did there was a job that was superhuman."

Wagner said that the charity was founded by his brother and that he did not officially become its executive director until he left Walter Reed. But fundraising documents from early January, before he resigned, list him as the director, and the organization's Web site called him its executive director months before he resigned.

In a fundraising letter he signed shortly before he quit the Medical Family Assistance Center, Wagner referred to his work at Walter Reed. As head of the center, he wrote, "I have had over a thousand citizens in this great country asking what they might be able to do at Walter Reed for our wounded troops and their families. I found myself telling them that Walter Reed was blessed with the outpouring of the goodness and generosity of the American public and that if they were really interested in assisting, they should look within their own communities."

But, his letter continued, "I realized they were not working with their local communities so . . . I decided to found the Military, Veteran and Family Assistance Foundation to do just this, to do what I am able to help our soldiers reenter their home and local community."

Wagner included an ambitious business plan to take the charity from a $237,000 pilot project in the first year, which ended in August 2006 -- while he was working at Walter Reed -- to a $145 million foundation by 2011. He signed the letter "Executive Director and Founder."

Leita Sosin, an 11-year Army veteran who worked in Wagner's office for two years, said she complained to him and to co-workers about his involvement with the charity. "It really broke me to see what he was doing," said Sosin, 29, a former Army operating-room technician. "Instead of working with the families at Walter Reed and with us, he spent all his time putting together the Phoenix Project."

Moscow Spencer, a case manager fired by Wagner in October, also complained to her co-workers. "All day long he'd work on his program," she said. "If someone came in to donate money, he would talk to them about his project."

Sosin said the office was overwhelmed by the number of families who needed assistance and who were confused by the complex bureaucracy. "Everyone needed help, but you couldn't get them the help as fast as they needed it," she said. "Someone like me could scream all day about how it was broken, but no one wanted to take the time to fix it."

She also said Wagner was arrogant toward some staff members and families. "People got hurt in the process, whether it be financially or because he promised a lot of things he never followed up on," she said.

In April, Sosin said, she laid out her concerns in a three-page letter to her superiors. She received no

response and resigned. Wagner said that Sosin never complained to him and that he had no idea why she quit.

Poverty among soldiers returning from war is not uncommon. While they continue to live on the Army payroll until they return to active duty or are discharged, some experience a substantial decrease in pay when combat pay or hazard pay disappears.

Some Army families breach the poverty line when a spouse quits a job to help the soldier recuperate; mortgage payments don't stop, and they still need to feed their children. Many turn to the generosity of Americans eager to prove they have not forgotten the troops' sacrifices. While staff members and soldiers acknowledge that some families take advantage of the plentiful freebies at Walter Reed, many others ask for help only as a last resort.

The assistance center is supposed to be the connection between a soldier's family and private donors. Until recently, it did not accept cash contributions but instead matched families' needs -- for bus or plane tickets, clothing, emergency food vouchers, grants for mortgages or living expenses -- with organizations set up to help.

According to Walter Reed, 14 families on average seek assistance from the center each day. Although it is difficult to quantify the value of donations, the center received $4,500 worth of phone cards in 2006 and handled $1.9 million worth of donated plane tickets. Weightman said the center's staff was recently increased from five to nine employees, with two people assigned to keeping track of the donations, and training has been improved.

The system for receiving donations is often confusing, even for the staff, Weightman said. "There's too much for any one person to know, but depending on the question, they may know [the answer] or direct you to the person who does know it."

Some soldiers go directly to the many volunteer organizations set up to help the wounded. Last year, Wagner began an effort to funnel all requests and donations through the family assistance center. It was a good idea, said Sosin and others, but because Wagner seemed preoccupied, a bottleneck of requests resulted.

"It was really all at the expense of the service member," said Sandra Butterfield, who worked at Walter Reed as an ombudsman for a Defense Department-funded relief organization. "He decreed that everything had to go through him," and it didn't seem to matter if that slowed the process. Officials, she said, "don't understand what it meant to have no money. Family members changed the sheets, empty the bedpan. But they are leaving their homes across the country. . . . Every day I came home angry."

Some families were also angered by the way Wagner treated them.

"The patient care was absolutely wonderful, but the administration was horrible, especially Dr. Wagner," said Maria Mendez, whose 25-year-old nephew, Spec. Roberto Reyes Jr., suffered severe brain and limb damage when a mine exploded near him outside Baghdad. "It was like running around in circles. He was never around."

"They were unprofessional, discourteous and uncompassionate all in one," Mendez said. "I was very surprised. You figure any family who's gone through such devastation, then faces this, to be treated with such unprofessionalism . . . it's like you're putting salt on the wounds."

Frustrated, Mendez set up an account for her sister, Aida Rivera, Reyes's mother, to pay for her stay at Walter Reed. Rivera eventually got financial assistance from the Army and outside organizations, but she also received a $3,519 bill from Mologne House, a hotel at Walter Reed, for her stay as her son's nonmedical attendant.

Staff members from other offices also complained to the command about Wagner, according to memos obtained by The Post. In one, an employee, who asked not to be named, questioned why a soldier's mother "who had subsisted on dried soups . . . due to her lack of funds" could not get help. Four months after approaching the center, the memo said, the mother had not received the per diem owed her as her child's nonmedical attendant "and has no cash for essentials nor emergencies."

A wife who accompanied her wounded husband, who was based in Germany, said Wagner asked her repeatedly why she did not return to Germany so she could continue working. The woman "reported she felt harassed and bullied but that she held her ground," the employee's memo states.

Wagner said families were often angry at his office, not because it failed them but because they were distraught over their situation. "Their true need is an emotional one. They're going to be angry at somebody. . . . I did my best; no, more than my best."

*Staff researcher Julie Tate contributed to this report.*

© 2007 The Washington Post Company

Ads by Google

24/7 Injured Support
Military Severely Injured Center Call Anytime 1-888-774-1361
www.militaryonesource.com

Army Medical Malpractice
Helping U.S. Army Families w/ Army Medical Malpractice Claims
www.MilitaryMedicalClaims.com

Sending Soldiers Packages
Cookies, flashlights, fudge. Put a smile on a soldier's face!
www.TreatsForTroops.com

Case 1:10-cr-00485-LMB    Document 115-6    Filed 06/21/11    Page 78 of 124 PageID# 871

# washingtonpost.com

## The War Inside

Troops Are Returning From the Battlefield With
Psychological Wounds, But the Mental-Health System
That Serves Them Makes Healing Difficult

By Dana Priest and Anne Hull
Washington Post Staff Writers
Sunday, June 17, 2007; A01



Army Spec. Jeans Cruz helped capture Saddam
Hussein. When he came home to the Bronx, important
people called him a war hero and promised to help
him start a new life. The mayor of New York, officials
of his parents' home town in Puerto Rico, the borough
president and other local dignitaries honored him with
plaques and silk parade sashes. They handed him their
business cards and urged him to phone.

But a "black shadow" had followed Cruz home from Iraq, he confided to an Army counselor. He was
hounded by recurring images of how war really was for him: not the triumphant scene of Hussein in
handcuffs, but visions of dead Iraqi children.

In public, the former Army scout stood tall for the cameras and marched in the parades. In private, he
slashed his forearms to provoke the pain and adrenaline of combat. He heard voices and smelled stale
blood. Soon the offers of help evaporated and he found himself estranged and alone, struggling with
financial collapse and a darkening depression.

At a low point, he went to the local Department of Veterans Affairs medical center for help. One VA
psychologist diagnosed Cruz with post-traumatic stress disorder. His condition was labeled "severe and
chronic." In a letter supporting his request for PTSD-related disability pay, the psychologist wrote that
Cruz was "in need of major help" and that he had provided "more than enough evidence" to back up his
PTSD claim. His combat experiences, the letter said, "have been well documented."

None of that seemed to matter when his case reached VA disability evaluators. They turned him down
flat, ruling that he deserved no compensation because his psychological problems existed before he
joined the Army. They also said that Cruz had not proved he was ever in combat. "The available
evidence is insufficient to confirm that you actually engaged in combat," his rejection letter stated.

Yet abundant evidence of his year in combat with the 4th Infantry Division covers his family's living-
room wall. The Army Commendation Medal With Valor for "meritorious actions . . . during strategic
combat operations" to capture Hussein hangs not far from the combat spurs awarded for his work with
the 10th Cavalry "Eye Deep" scouts, attached to an elite unit that caught the Iraqi leader on Dec. 13,
2003, at Ad Dawr.

Veterans Affairs will spend $2.8 billion this year on mental health. But the best it could offer Cruz was
group therapy at the Bronx VA medical center. Not a single session is held on the weekends or late
enough at night for him to attend. At age 25, Cruz is barely keeping his life together. He supports his
disabled parents and 4-year-old son and cannot afford to take time off from his job repairing boilers. The

Case 1:10-cr-00485-LMB    Document 115-6    Filed 06/21/11    Page 79 of 124 PageID#
872
The War Inside - washingtonpost.com                                                    Page 2 of 7

rough, dirty work, with its heat and loud noises, gives him panic attacks and flesh burns but puts $96 in his pocket each day.

Once celebrated by his government, Cruz feels defeated by its bureaucracy. He no longer has the stamina to appeal the VA decision, or to make the Army correct the sloppy errors in his medical records or amend his personnel file so it actually lists his combat awards.

"I'm pushing the mental limits as it is," Cruz said, standing outside the bullet-pocked steel door of the New York City housing project on Webster Avenue where he grew up and still lives with his family. "My experience so far is, you ask for something and they deny, deny, deny. After a while you just give up."

## An Old and Growing Problem

Jeans Cruz and his contemporaries in the military were never supposed to suffer in the shadows the way veterans of the last long, controversial war did. One of the bitter legacies of Vietnam was the inadequate treatment of troops when they came back. Tens of thousands endured psychological disorders in silence, and too many ended up homeless, alcoholic, drug-addicted, imprisoned or dead before the government acknowledged their conditions and in 1980 officially recognized PTSD as a medical diagnosis.

Yet nearly three decades later, the government still has not mastered the basics: how best to detect the disorder, the most effective ways to treat it, and the fairest means of compensating young men and women who served their country and returned unable to lead normal lives.

Cruz's case illustrates these broader problems at a time when the number of suffering veterans is the largest and fastest-growing in decades, and when many of them are back at home with no monitoring or care. Between 1999 and 2004, VA disability pay for PTSD among veterans jumped 150 percent, to $4.2 billion.

By this spring, the number of vets from Afghanistan and Iraq who had sought help for post-traumatic stress would fill four Army divisions, some 45,000 in all.

They occupy every rank, uniform and corner of the country. People such as Army Lt. Sylvia Blackwood, who was admitted to a locked-down psychiatric ward in Washington after trying to hide her distress for a year and a half [story, A13]; and Army Pfc. Joshua Calloway, who spent eight months at Walter Reed Army Medical Center and left barely changed from when he arrived from Iraq in handcuffs; and retired Marine Lance Cpl. Jim Roberts, who struggles to keep his sanity in suburban New York with the help of once-a-week therapy and a medicine cabinet full of prescription drugs; and the scores of Marines in California who were denied treatment for PTSD because the head psychiatrist on their base thought the diagnosis was overused.

They represent the first wave in what experts say is a coming deluge.

As many as one-quarter of all soldiers and Marines returning from Iraq are psychologically wounded, according to a recent American Psychological Association report. Twenty percent of the soldiers in Iraq screened positive for anxiety, depression and acute stress, an Army study found.

But numbers are only part of the problem. The Institute of Medicine reported last month that Veterans Affairs' methods for deciding compensation for PTSD and other emotional disorders had little basis in science and that the evaluation process varied greatly. And as they try to work their way through a

Case 1:10-cr-00485-LMB    Document 115-6    Filed 06/21/11    Page 80 of 124 PageID# 873

confounding disability process, already-troubled vets enter a VA system that chronically loses records and sags with a backlog of 400,000 claims of all kinds.

The disability process has come to symbolize the bureaucratic confusion over PTSD. To qualify for compensation, troops and veterans are required to prove that they witnessed at least one traumatic event, such as the death of a fellow soldier or an attack from a roadside bomb, or IED. That standard has been used to deny thousands of claims. But many experts now say that debilitating stress can result from accumulated trauma as well as from one significant event.

In an interview, even VA's chief of mental health questioned whether the single-event standard is a valid way to measure PTSD. "One of the things I puzzle about is, what if someone hasn't been exposed to an IED but lives in dread of exposure to one for a month?" said Ira R. Katz, a psychiatrist. "According to the formal definition, they don't qualify."

The military is also battling a crisis in mental-health care. Licensed psychologists are leaving at a far faster rate than they are being replaced. Their ranks have dwindled from 450 to 350 in recent years. Many said they left because they could not handle the stress of facing such pained soldiers. Inexperienced counselors muddle through, using therapies better suited for alcoholics or marriage counseling.

A new report by the Defense Department's Mental Health Task Force says the problems are even deeper. Providers of mental-health care are "not sufficiently accessible" to service members and are inadequately trained, it says, and evidence-based treatments are not used. The task force recommends an overhaul of the military's mental-health system, according to a draft of the report.

Another report, commissioned by Defense Secretary Robert M. Gates in the wake of the Walter Reed outpatient scandal, found similar problems: "There is not a coordinated effort to provide the training required to identify and treat these non-visible injuries, nor adequate research in order to develop the required training and refine the treatment plans."

But the Army is unlikely to do more significant research anytime soon. "We are at war, and to do good research takes writing up grants, it takes placebo control trials, it takes control groups," said Col. Elspeth Ritchie, the Army's top psychiatrist. "I don't think that that's our primary mission."

In attempting to deal with increasing mental-health needs, the military regularly launches Web sites and promotes self-help guides for soldiers. Maj. Gen. Gale S. Pollock, the Army's acting surgeon general, believes that doubling the number of mental-health professionals and boosting the pay of psychiatrists would help.

But there is another obstacle that those steps could not overcome. "One of my great concerns is the stigma" of mental illness, Pollock said. "That, to me, is an even bigger challenge. I think that in the Army, and in the nation, we have a long way to go." The task force found that stigma in the military remains "pervasive" and is a "significant barrier to care."

Surveys underline the problem. Only 40 percent of the troops who screened positive for serious emotional problems sought help, a recent Army survey found. Nearly 60 percent of soldiers said they would not seek help for mental-health problems because they felt their unit leaders would treat them differently; 55 percent thought they would be seen as weak, and the same percentage believed that soldiers in their units would have less confidence in them.

Lt. Gen. John Vines, who led the 18th Airborne Corps in Iraq and Afghanistan, said countless officers keep quiet out of fear of being mislabeled. "All of us who were in command of soldiers killed or wounded in combat have emotional scars from it," said Vines, who recently retired. "No one I know has sought out care from mental-health specialists, and part of that is a lack of confidence that the system would recognize it as 'normal' in a time of war. This is a systemic problem."

Officers and senior enlisted troops, Vines added, were concerned that they would have trouble getting security clearances if they sought psychological help. They did not trust, he said, that "a faceless, nameless agency or process, that doesn't know them personally, won't penalize them for a perceived lack of mental or emotional toughness."

**Overdiagnosed or Overlooked?**

For the past 2 1/2 years, the counseling center at the Marine Corps Air Ground Combat Center in Twentynine Palms, Calif., was a difficult place for Marines seeking help for post-traumatic stress. Navy Cmdr. Louis Valbracht, head of mental health at the center's outpatient hospital, often refused to accept counselors' views that some Marines who were drinking heavily or using drugs had PTSD, according to three counselors and another staff member who worked with him.

"Valbracht didn't believe in it. He'd say there's no such thing as PTSD," said David Roman, who was a substance abuse counselor at Twentynine Palms until he quit six months ago.

"We were all appalled," said Mary Jo Thornton, another counselor who left last year.

A third counselor estimated that perhaps half of the 3,000 Marines he has counseled in the past five years showed symptoms of post-traumatic stress. "They would change the diagnosis right in front of you, put a line through it," said the counselor, who spoke on the condition of anonymity because he still works there.

"I want to see my Marines being taken care of," said Roman, who is now a substance-abuse counselor at the Marine Corps Air Station in Cherry Point, N.C.

In an interview, Valbracht denied he ever told counselors that PTSD does not exist. But he did say "it is overused" as a diagnosis these days, just as "everyone on the East Coast now has a bipolar disorder." He said this "devalues the severity of someone who actually has PTSD," adding: "Nowadays it's like you have a hangnail. Someone comes in and says 'I have PTSD,' " and counselors want to give them that diagnosis without specific symptoms.

Valbracht, an aerospace medicine specialist, reviewed and signed off on cases at the counseling center. He said some counselors diagnosed Marines with PTSD before determining whether the symptoms persisted for 30 days, the military recommendation. Valbracht often talked to the counselors about his father, a Marine on Iwo Jima who overcame the stress of that battle and wrote an article called "They Even Laughed on Iwo." Counselors found it outdated and offensive. Valbracht said it showed the resilience of the mind.

Valbracht retired recently because, he said, he "was burned out" after working seven days a week as the only psychiatrist available to about 10,000 Marines in his 180-mile territory. "We could have used two or three more psychiatrists," he said, to ease the caseload and ensure that people were not being overlooked.

Former Lance Cpl. Jim Roberts's underlying mental condition was overlooked by the Marine Corps and successive health-care professionals for more than 30 years, as his temper and alcohol use plunged him into deeper trouble. Only in May 2005 did VA begin treating the Vietnam vet for PTSD. Three out of 10 of his compatriots from Vietnam have received diagnoses of PTSD. Half of those have been arrested at least once. Veterans groups say thousands have killed themselves.

To control his emotions now, Roberts attends group therapy once a week and swallows a handful of pills from his VA doctors: Zoloft, Neurontin, Lisinopril, Seroquel, Ambien, hydroxyzine, "enough medicine to kill a mule," he said.

Roberts desperately wants to persuade Iraq veterans not to take the route he traveled. "The Iraq guys, it's going to take them five to 10 years to become one of us," he said, seated at his kitchen table in Yonkers with his vet friends Nicky, Lenny, Frenchie, Ray and John nodding in agreement. "It's all about the forgotten vets, then and now. The guys from Iraq and Afghanistan, we need to get these guys in here with us."

"In here" can mean different things. It can mean a 1960s-style vet center such as the one where Roberts hangs out, with faded photographs of Huey helicopters and paintings of soldiers skulking through shoulder-high elephant grass. It can mean group therapy at a VA outpatient clinic during work hours, or more comprehensive treatment at a residential clinic. In a crisis, it can mean the locked-down psych ward at the local VA hospital.

"Out there," with no care at all, is a lonesome hell.

**Losing a Bureaucratic Battle**

Not long after Jeans Cruz returned from Iraq to Fort Hood, Tex., in 2004, his counselor, a low-ranking specialist, suggested that someone should "explore symptoms of PTSD." But there is no indication in Cruz's medical files, which he gave to The Washington Post, that anyone ever responded to that early suggestion.

When he met with counselors while he was on active duty, Cruz recalled, they would take notes about his troubled past, including that he had been treated for depression before he entered the Army. But they did not seem interested in his battlefield experiences. "I've shot kids. I've had to kill kids. Sometimes I look at my son and like, I've killed a kid his age," Cruz said. "At times we had to drop a shell into somebody's house. When you go clean up the mess, you had three, four, five, six different kids in there. You had to move their bodies."

When he tried to talk about the war, he said, his counselors "would just sit back and say, 'Uh-huh, uh-huh.' When I told them about the unit I was with and Saddam Hussein, they'd just say, 'Oh, yeah, right.' "

He occasionally saw a psychiatrist, who described him as depressed and anxious. He talked about burning himself with cigarettes and exhibited "anger from Iraq, nightmares, flashbacks," one counselor wrote in his file. "Watched friend die in Iraq. Cuts, bruises himself to relieve anger and frustration." They prescribed Zoloft and trazodone to control his depression and ease his nightmares. They gave him Ambien for sleep, which he declined for a while for fear of missing morning formation.

Counselors at Fort Hood grew concerned enough about Cruz to have him sign what is known as a Life Maintenance Agreement. It stated: "I, Jeans Cruz, agree not to harm myself or anyone else. I will first contact either a member of my direct Chain of Command . . . or immediately go to the emergency

Case 1:10-cr-00485-LMB    Document 115-6    Filed 06/21/11    Page 83 of 124 PageID# 876

room." That was in October 2004. The next month he signed another one.

Two weeks later, Cruz reenlisted. He says the Army gave him a $10,000 bonus.

His problems worsened. Three months after he reenlisted, a counselor wrote in his medical file: "MAJOR depression." After that: "He sees himself in his dreams killing or strangling people. . . . He is worried about controlling his stress level. Stated that he is starting to drink earlier in the day." A division psychologist, noting Cruz's depression, said that he "did improve when taking medication but has degenerated since stopping medication due to long work hours."

Seven months after his reenlistment ceremony, the Army gave him an honorable discharge, asserting that he had a "personality disorder" that made him unfit for military service. This determination implied that all his psychological problems existed before his first enlistment. It also disqualified him from receiving combat-related disability pay.

There was little attempt to tie his condition to his experience in Iraq. Nor did the Army see an obvious contradiction in its handling of him: He was encouraged to reenlist even though his psychological problems had already been documented.

Cruz's records are riddled with obvious errors, including a psychological rating of "normal" on the same physical exam the Army used to discharge him for a psychological disorder. His record omits his combat spurs award and his Army Commendation Medal With Valor. These omissions contributed to the VA decision that he had not proved he had been in combat. To straighten out those errors, Cruz would have had to deal with a chaotic and contradictory paper trail and bureaucracy -- a daunting task for an expert lawyer, let alone a stressed-out young veteran.

In the Aug. 16, 2006, VA letter denying Cruz disability pay because he had not provided evidence of combat, evaluators directed him to the U.S. Armed Services Center for Research of Unit Records. But such a place no longer exists. It changed its name to the U.S. Army and Joint Services Records Research Center and moved from one Virginia suburb, Springfield, to another, Alexandria, three years ago. It has a 10-month waiting list for processing requests.

To speed things up, staff members often advise troops to write to the National Archives and Records Administration in Maryland. But that agency has no records from the Iraq war, a spokeswoman said. That would send Cruz back to Fort Hood, whose soldiers have deployed to Iraq twice, leaving few staff members to hunt down records.

But Cruz has given up on the records. Life at the Daniel Webster Houses is tough enough.

After he left the Army and came home to the Bronx, he rode a bus and the subway 45 minutes after work to attend group sessions at the local VA facility. He always arrived late and left frustrated. Listening to the traumas of other veterans only made him feel worse, he said: "It made me more aggravated. I had to get up and leave." Experts say people such as Cruz need individual and occupational therapy.

Medications were easy to come by, but some made him sick. "They made me so slow I didn't want to do nothing with my son or manage my family," he said. After a few months, he stopped taking them, a dangerous step for someone so severely depressed. His drinking became heavier.

To calm himself now, he goes outside and hits a handball against the wall of the housing project. "My

son's out of control. There are family problems," he said, shaking his head. "I start seeing these faces. It goes back to flashbacks, anxiety. Sometimes I've got to leave my house because I'm afraid I'm going to hit my son or somebody else."

Because of his family responsibilities, he does not want to be hospitalized. He doesn't think a residential program would work, either, for the same reason.

His needs are more basic. "Why can't I have a counselor with a phone number? I'd like someone to call."

Or some help from all those people who stuck their business cards in his palm during the glory days of his return from Iraq. "I have plaques on my wall -- but nothing more than that."

*Staff researcher Julie Tate contributed to this report.*

View all comments that have been posted about this article.

### Post a Comment

View all comments that have been posted about this article.

You must be logged in to leave a comment. Login | Register

Submit

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

© 2007 The Washington Post Company

**Ads by Google**

Ptsd Treatment
Individualized PTSD Treatment. Excellent Cure Rate, Private Rooms.
CasaPalmera.com/TraumaTreatment

PTSD help
Free Supplement Update Newsletter Written by Dr. Ray Sahelian, M.D.
www.RaySahelian.com

Legal Help for Veterans
Denied benefits from VA? Legal assistance for VA appeals.
www.legalhelpforveterans.com

# washingtonpost.com

## Little Relief on Ward 53

At Walter Reed, Care for Soldiers Struggling With
War's Mental Trauma Is Undermined by Doctor
Shortages and Unfocused Methods

By Anne Hull and Dana Priest
Washington Post Staff Writers
Monday, June 18, 2007; A01



Advertisement

University of Phoenix™

Earn your
degree in one
of the most
convenient and
efficient ways
possible.

University of  next level, here I come

On the military plane that crossed the ocean at night,
the wounded lay in stretchers stacked three high. The
drone of engines was broken by the occasional sound
of moaning. Sedated and sleeping, Pfc. Joshua
Calloway was at the top of one stack last September.
Unlike the others around him, Calloway was
handcuffed to his stretcher.

When the 20-year-old infantry soldier woke up, he was on the locked-down psychiatric ward at Walter
Reed Army Medical Center. A nurse handed him pajamas and a robe, but they reminded him of the
flowing clothes worn by Iraqi men. He told the nurse, "I don't want to look like a freakin' Haj." He
wanted his uniform. Request denied. Shoelaces and belts were prohibited.

Calloway felt naked without his M-4, his constant companion during his tour south of Baghdad with the
101st Airborne Division. The year-long deployment claimed the lives of 50 soldiers in his brigade. Two
committed suicide. Calloway, blue-eyed and lantern-jawed, lasted nine months -- until the afternoon he
watched his sergeant step on a pressure-plate bomb in the road. The young soldier's knees buckled and
he vomited in the reeds before he was ordered to help collect body parts. A few days later he was sent to
the combat-stress trailers, where he was given antidepressants and rest, but after a week he was still
twitching and sleepless. The Army decided that his war was over.

Every month, 20 to 40 soldiers are evacuated from Iraq because of mental problems, according to the
Army. Most are sent to Walter Reed along with other war-wounded. For amputees, the nation's top
Army hospital offers state-of-the-art prosthetics and physical rehab programs, and soon, a new $10
million amputee center with a rappelling wall and virtual reality center.

Nothing so gleaming exists for soldiers with diagnoses of post-traumatic stress disorder, who in the
Army alone outnumber all of the war's amputees by 43 to 1. The Army has no PTSD center at Walter
Reed, and its psychiatric treatment is weak compared with the best PTSD programs the government
offers. Instead of receiving focused attention, soldiers with combat-stress disorders are mixed in with
psych patients who have issues ranging from schizophrenia to marital strife.

Even though Walter Reed maintains the largest psychiatric department in the Army, it lacks enough
psychiatrists and clinicians to properly treat the growing number of soldiers returning with combat
stress. Earlier this year, the head of psychiatry sent out an "SOS" memo desperately seeking more
clinical help.

Individual therapy with a trained clinician, a key element in recovery from PTSD, is infrequent, and
targeted group therapy is offered only twice a week.

Young Pfc. Calloway was put in robes that first night. His dreams were infected by corpses. He tasted blood in his mouth. He was paranoid and jumpy. He couldn't stop the movie inside his head of Sgt. Matthew Vosbein stepping on the bomb. His memory was shot. His insides burned.

Calloway's mother came to Walter Reed from Ohio and told the psychiatrist everything she knew about her son. Sitting in the office for the interview, Calloway jiggled his leg and put his head in his hands as he described his tour in Iraq. His mental history was probed and more notes were taken. The trivia of his life -- a beagle named Zoe, a job during high school at a Meijer superstore, a love of World War II history -- competed with what he had become.

"I can't remember who I was before I went into the Army," he said later. "Put me in a war for a year, my brain becomes a certain way. My brain is a big, black ball of crap with this brick wall in front of it."

After a week in the lockdown unit, Calloway was stabilized. They gave him back his shoelaces and belt. On the 10th day, he was released and turned over to outpatient psychiatry for treatment. And Calloway, a casualty without a scratch, began the longest season of his young life.

**Inside Walter Reed**

The Washington Post began following Calloway after he was brought to Walter Reed last fall with an initial diagnosis of acute stress disorder. He had all the signs of PTSD, but it would be the hospital's job to treat him and then decide whether he met the Army's strict guidelines for a PTSD diagnosis -- which required a certain level of chronic impairment -- and whether he could ever return to duty.

Calloway's physical metamorphosis was rapid. The burnished soldier turned soft and fat, gaining 20 pounds the first month from tranquilizers and microwaved Chef Boyardee. He lived at Mologne House, a hotel on the grounds of Walter Reed that was overtaken by wounded troops. His roommate was another soldier from Iraq with psych problems who kept the curtains drawn and played Saints Row video games all day until one day he vanished -- poof, AWOL, leaving nothing behind but empty bottles of lithium and Seroquel.

For the first time in almost a year, Calloway had a plush bed and a hot shower, but he was too angry to appreciate the simple comforts. On an early venture outside Walter Reed, he went to downtown Silver Spring and became enraged by young people laughing at Starbucks. "Don't they know there is a war going on?" he said.

Wearing a rock band T-shirt, Calloway looked like any other 20-year-old on the sidewalk, but an unspeakable compulsion tore through him. He said he wanted to hatchet someone in the back of the neck.

"I want to see people that I hate die," he said. "I want to blow their heads off. I wish I didn't, but I do." He made similar statements to his psychiatry team at Walter Reed.

Violence seeped into his life in a thousand ways. When he cut himself shaving, the iron smell of blood on his fingertips gave a slight euphoria. But it was the distinct horror of his sergeant's death that was encoded in his brain. The memory made him physically sick. He would sweat and shake as if having a seizure, and sometimes he felt as if he were back in the heat and sand of Iraq.

The recognized treatment for PTSD is cognitive behavioral therapy, in which patients are encouraged to face their feared memories or situations and to change their negative perceptions. A key technique is

Case 1:10-cr-00485-LMB    Document 115-6    Filed 06/21/11    Page 87 of 124 PageID#
880

known as prolonged exposure therapy. It involves revisiting a traumatic memory in order to process it. The idea is not to erase the memory but to prevent it from being disabling. Highly structured, one-on-one sessions over a limited time period have proved most effective, according to Edna B. Foa, a professor of psychology in psychiatry at the University of Pennsylvania, who has been contracted by the Department of Veterans Affairs to train 250 therapists who treat PTSD.

But Calloway and a dozen other soldiers from Iraq and Afghanistan interviewed by The Post described a vague regimen at Walter Reed's outpatient psychiatric unit, Ward 53. They get a heavy dose of group sessions such as "Reflecting with Music," "Decisions," "Feelings Exploration" and "Art Expressions." Calloway reported to his "Reel Reflections" class one morning for a screening of "The Devil Wears Prada." Only two hours a week are devoted to a post-traumatic recovery group, according to a copy of their schedule.

These soldiers said they are over-medicated and treated with none of the urgency given the physically wounded. One desperate patient, a combat medic who broke down after her third tour in Iraq, said she begged her psychiatrist: "We are handicapped patients, too. Cut off both my legs, but give me my sanity. You can't get a prosthesis for that."

In an interview this month, Col. John C. Bradley, head of psychiatry at Walter Reed, said soldiers with combat-stress disorders receive the accepted psychotherapeutic treatment there. He said they are placed in a specially designed "trauma track" and are given at least an hour of individual therapy a week and a full range of classes to help them cope with their symptoms. Exposure therapy is as effective in group settings as in individual sessions, he maintained -- a belief that runs counter to the latest clinical research.

Bradley acknowledged staff shortages and said vacancies in his department go unfilled for as long as a year because of the Army pay scale and the high cost of living in the Washington area. He recently asked to increase his staff by 20 percent, and last month he brought on a reservist to help doctors with the time-consuming duties of preparing reports for the soldiers' medical evaluation board process. "We are constantly looking for innovative ways to provide service and outreach and support to soldiers," said Bradley, who deployed to Iraq last year with a combat-stress unit.

One of the country's best PTSD programs is located at Walter Reed, but because of a bureaucratic divide it is not accessible to most patients. The Deployment Health Clinical Center, run by the Department of Defense and separate from the Army's services, offers a three-week program of customized treatment. Individual exposure therapy and fewer medications are favored. Deployment Health can see only about 65 patients a year but is the envy of many in the Army. "They need to clone that program," said Col. Charles W. Hoge, chief of psychiatry and behavior services at the Walter Reed Army Institute of Research.

Instead, Deployment Health was forced to give up its newly renovated quarters in March and was placed in temporary space one-third the size to make room for a soldier and family assistance center. The move came after a series of articles in The Post detailed the neglect of wounded outpatients at Walter Reed. Therapy sessions are now being held in Building T-2, a rundown former computer center, until new space becomes available.

Joshua Calloway reported to Ward 53 five mornings a week in his uniform. He was a tough patient from the start, angering easily and impatient with anyone who had not experienced combat. He was irritated that he had to attend groups with soldiers who had bombed out of boot camp or never deployed. He participated in processing exercises using work sheets to help him manage his fears. ("For example,

original thought: 'I'm in a crowd, they're looking at me, they're all going to jump me, the enemy looked at me in Iraq and shot me, I leave.' Feelings: Anxious. Behavior: Leave situation.")

With the exception of the post-traumatic stress group run by Joshua Friedlander, a clinical psychologist and former Army captain who had served in Iraq, most of the classes felt like B.S. sessions to Calloway. "Civilians reading from a booklet," he said.

Ultimately, his treatment was in the hands of a civilian psychiatrist. Before taking a contract job at Walter Reed in 2005, the doctor had worked at Washington's St. Elizabeths Hospital and specialized in addictions and pedophilia. On Ward 53, he was responsible for about 30 soldiers, many back from Iraq. Calloway felt little validation from the psychiatrist. Sometimes the doctor typed on his computer while Calloway talked.

There was another, more delicate, problem. The psychiatrist was Indian. Calloway had a gut reaction to anyone he thought looked Iraqi, a paranoia shared by many of Walter Reed's wounded.

"You are seeing a [expletive] Pakistani?" asked Spec. Isaac Serna, a fellow war-wounded soldier in the 101st Airborne. "I'd freak, dude."

Calloway confessed his bias to the doctor. "I want to kill Arabs," he said.

"Does that include me?" the Hindu doctor asked, according to Calloway. "You can say it."

Antidepressants are most commonly used to treat PTSD, and Calloway was on a total of seven medications by Christmas, including lithium, used to treat bipolar disorder. He had now gained 30 pounds and was too lethargic to exercise. Bored one night, he took out the sweat-stained spiral notebook he had carried in Iraq. Grains of sand were still between the pages scribbled with Arabic commands. He repeated the phrases that loosely translated to "don't speak" and "shut up."

"Balla hashee!" he said. "In chep!"

He spent the holidays reading "The PTSD Workbook" and eating Starbursts in a room piled high with goody boxes from his church back home.

"You are in our prayers, Josh," one card read. "We are so proud of your service to your country."

## Unabating Anger

In Iraq he was infected with MRSA, a microbe that makes the skin boil, and at Walter Reed he suffered a painful outbreak that landed him in the hospital. Festering sores brought a respite from Ward 53. In the hospital, he got Percocet and "The Daily Show," and late at night he read a memoir by a soldier who served in Iraq called "The Last True Story I'll Ever Tell." A friend in the 101st lent it to him with underlined passages, and Calloway read aloud the one on Page 172 about trying to fit back in after war.

*I spent most of my time watching the rooftops and side roads, looking into my rearview mirror to make sure no one was creeping up on my car from behind. . . . Every time I saw someone sitting contently inside a coffee shop or restaurant, I wanted to yell at them, wake them up.*

A social worker with a clipboard came to his room the next afternoon. "The surgeon general is concerned about all the soldiers coming home with smoking habits," he said.

Case 1:10-cr-00485-LMB    Document 115-6    Filed 06/21/11    Page 89 of 124 PageID#
882
Little Relief on Ward 53 - washingtonpost.com                                                     Page 5 of 9

Calloway said he never smoked before Iraq but smoked three packs a day in theater.

"Have you ever considered a patch?" the man asked.

By his fourth month as an outpatient on Ward 53, Calloway had learned breathing techniques to ease his panic. He had been asked to recite statements of self-love in group therapy. He had learned to cook in occupational therapy. But his core anger was as high as ever, made worse by the relationship with his psychiatrist. They met once or twice a week, mostly to discuss meds and argue. "Why don't you ever come in here and smile?" the doctor asked, according to Calloway. "Why don't you ever come in here and think today will be a good day?"

Walter Reed officials refused to discuss individual patients for this story, citing privacy concerns.

Calloway wanted to scream. Disillusioned, he stopped faithfully attending the combat-stress group he first found helpful. In the cold of winter he went down to Capitol Tattoo on Georgia Avenue, where the milky skin of his arms became a canvas of colors and death poetry. In honor of Vosbein, he had a silhouette of a soldier drawn on, with the words: "Lay down your armor. And have no fear. I'll be home soon."

Even with his nihilistic markings, Calloway still saw himself as a soldier. On Sunday mornings he attended a VFW brunch in Arlington, feeling at home with the snowy-haired veterans who sipped coffee under an American flag. As an Iraq vet, he was treated as part of the newest generation of warriors. One Sunday, he was accompanied by a girl from Ohio who'd come to visit him at Walter Reed. She wore his dog tags, and his eyes were full of light. "Thank you, ma'am," he told the waitress who brought his biscuits and gravy.

But the girl went back to Ohio and Calloway came to the next brunch alone, secretly terrified that in 30 years he'd be sitting in a support group like the Vietnam guys. With his nightmares and balled-up fists, what woman would want him?

"I'm not getting any better," he told his mother on the phone.

His step-grandfather in Ohio spent a morning making calls, trying unsuccessfully to reach anyone at Walter Reed. "He's meeting with people 15 minutes a day, he's been written off," said Greg Albright. "Josh has not been cooperative, he's been insulting to the doctor. But that's a function of the place he's been." Albright met with an aide from the district office of Rep. John A. Boehner (R) in Ohio. He wanted help bringing Josh home for treatment, and the family was willing to pay for it. But Calloway was still in the Army.

One night in his room, Calloway put in a DVD and watched the opening scene of "Saving Private Ryan," the American G.I.s coming onto Omaha Beach, retching in fear as they unloaded from the boats and faced a rain of German bullets. Limbs severed, necks punctured, foreheads blown open, but the grunts kept charging.

"See why I picked infantry?" Calloway said, his leg furiously twitching. "There's no other place in the world where you can have a job like that. It's a brotherhood that's deeper than your own family."

His romanticized ideals clashed with reality. His anti-nightmare medication made him a zombie in the morning, and he slept through his alarm. After missing morning formation, he was ordered by his platoon sergeant to pick up trash, but in the middle of his work duty he had an anxiety attack; shaking

and unable to focus his eyes, he was taken to the ER, where he overheard his sergeant tell the doctor that it seemed to be a big coincidence that Calloway had an attack while doing work.

**'I Can't Handle Another Day'**

He often wondered why he snapped. Several factors make PTSD more likely -- youth, a history of depression or trauma, multiple deployments, and relentless exposure to violence. Calloway hit most of the criteria. He had been depressed in high school, and four months out of basic training he was in one of the most dangerous sectors of Baghdad.

Alpha Company, 2nd Battalion, 502nd Infantry Regiment got to Baghdad in the fall of 2005. The roads around Yusufiyah, where they patrolled, were littered with bombs. A first sergeant was lost right away, and the casualties never stopped. Living in abandoned Iraqi houses, Calloway went weeks without bathing and days without sleep. He went on raids at night, kicking in doors and searching houses to the sound of gunfire and screams.

Calloway had never felt such excitement or sense of belonging. His best friend was Spec. Denver Rearick, a grizzled 23-year-old on his second tour. In his Kentucky cowboy wisdom, Rearick warned Calloway: "Your entire body is a puzzle before you go to war. You go to war and every little piece of that puzzle gets twisted and turned. And then you are supposed to come back home again."

The pressure and dread and exhaustion began to smother Calloway. He survived several bomb blasts. Some soldiers were sucking on aerosol cans of Dust-Off to get high, and one accidentally died. Sleep deprivation mixed with the random violence scrambled Calloway. He wore it on his face. One of the sergeants asked him, "Are you gonna kill yourself, Calloway?"

Music was his escape. On rare nights on base, Calloway, Rearick and Vosbein would strip off their armor and climb up to the roof to play guitars and harmonica. Vosbein loved Johnny Cash. He was from Louisiana, free and easy with his affections, and at 30 he treated Calloway like a kid brother.

The day Vosbein died was sunny and hot. A convoy patrol in three Humvees pulled over to check a crater in the road. As Calloway was opening his door, Vosbein was already moving toward the crater. The force of the explosion rattled Calloway's teeth and knocked two other soldiers to the ground. Vosbein -- whistling, happy Vos -- was eviscerated. Parts of him were everywhere.

Calloway buckled and puked. Then rage. He wanted to shoot the first Iraqi he saw, but his legs weren't working. He was useless to help clean up the scene. Later that night as the chaplain gathered the platoon to talk, Calloway stood off to the side with two sergeants, crying. They confiscated his weapon. Rearick sat up with him in his room until he fell asleep. His commanders watched him closely. "We want to do what's best for you," the company commander told him with compassion. "You need to tell me what you need."

"I can't handle another day of this place," Calloway answered. He was sent to the combat-stress control trailers, where the decision was made to ship him to Walter Reed.

In his room at Mologne House, Calloway kept photos from Iraq on his computer: Vosbein grilling steaks at their patrol base. Calloway's gang piled on a tank with their guitars. Driving through a blinding orange sandstorm. Rearick, wiry and invincible, smiling in a dirty cowboy hat.

"He was able to handle it," Calloway said.

But Rearick was in bad shape. While Calloway was at Walter Reed, Rearick was home in Waco, Ky., sleeping with a .45 and the furniture pushed in front of the window. He was so anxious in crowds that he no longer went to bars or restaurants, ordering his meals at the drive-through window. To rouse him in the morning, his father tossed a boot from the doorway because he startled so violently when touched.

Rearick had sought help after coming home from his first tour in Iraq. While asleep one night, he knocked his girlfriend to the floor. "I damn near broke her nose," he said. Without telling his commanders at Fort Campbell, he went to the VA hospital in Lexington, where he was prescribed antidepressants. He didn't like the pills, so he drank himself to sleep, while gearing up for his second tour.

"All the banners said 'Welcome Home Heroes,' " Rearick said. "But the moment we start falling apart it's like, 'Never mind.' For us, it was the beginning of the dark ages. It was the dreams. It was going to the store and buying bottles of Tylenol PM and bottles of Jack."

Rearick retired from the Army earlier this year. In the bucolic green of Kentucky, he threw himself into the physical work of breaking horses and moving cattle. The only places he feels safe are the pastures and his barricaded room.

"At least Calloway doesn't try to sugarcoat it," he said. "He's like, 'I'm [expletive] up and I'm pissed off.' "

Rearick knows his outlaw paradise of guitars, guns and Willie Nelson is just a cover.

"Everyone thinks you are a badass," he said. "But you are scared of the dark."

**Going Home, Far From Cured**

Calloway put a Johnny Cash song on his cellphone to describe his sixth month on Ward 53.

*I'm stuck at Folsom Prison*

*And time keeps dragging on*

One night he mixed Monster energy drink and Crown Royal and got so drunk he was taken to the ER at Walter Reed, which landed him in the Army's alcohol counseling program. He had to submit to a breathalyzer test at 7 each morning. "I am losing my mind more and more while I'm here," he said.

His psychiatrist had referred him to the Deployment Health Clinical Center, but Calloway blew his chance at getting into the coveted program when he missed appointments. He blamed his meds and memory problems. He had been exposed to multiple bomb blasts in Iraq, but after seven months at Walter Reed he had not been tested for traumatic brain injury, which affects memory. Instead he was given a Dell PDA to help him remember appointments.

The relationship with his psychiatrist was barely tolerable. The frustration seemed mutual. "He complained about his problems but did not seem eager to listen to any suggestions I provided him," the doctor noted in Calloway's records. He added that Calloway showed up to Ward 53 not in uniform but in cutoff shorts with his tattoos showing.

Even on high doses of sedating drugs, Calloway's rage crackled, and one night he started breaking things

outside Mologne House. He was again taken to the ER, where he screamed that he wanted to kill his psychiatrist.

Finally, Calloway got what he wanted -- a new doctor. Lt. Col. Robert Forsten had served in Iraq and had published studies on combat stress. Right away, Calloway noticed Forsten's combat badge and his listening skills. Forsten agreed that the violence of Iraq was transforming and harrowing but said it should not define the rest of Calloway's life. The doctor also tried to reframe the experience. "You're a soldier," he said, according to Calloway. "You went to Iraq. You did your job.' "

Something clicked for Calloway. But it was so late in the game. His physical evaluation board process was nearly complete, and he would be going home soon. His worries turned to what diagnosis the Army would give him and how he would be rated for disability pay. His case worker had told him that she could not locate anyone at Fort Campbell to provide written proof that he had witnessed a traumatic event in combat. Forsten picked up the phone and within days had an official statement:

"During a routine route clearance in August 2006, PFC Calloway's team leader (SGT Vosbein) was clearing a suspected IED crater while PFC Calloway was inside his M1114. SGT Vosbein stepped on a crush wire that detonated 2X155 mm artillery shells. The detonation killed SGT Vosbein and knocked the remaining soldiers to the ground. PFC Calloway came to the site and saw his team leader blown apart into several pieces."

Forsten would soon get another assignment and leave Walter Reed.

The evaluation board diagnosed depression and chronic PTSD in Calloway, and ruled that his conditions had a "definite impact" on his work and social capabilities. He was given a temporary disability rating of 30 percent, which meant he would get $815 a month. He would be reevaluated in 2008. He would report to the VA hospital in Cincinnati for treatment when he got home.

After eight months at Walter Reed, Calloway showed "some improvement of his symptoms," according to his medical records. But his step-grandfather, Greg Albright, who came from Ohio to help him pack, was astounded at his volatility. "He's a grenade with the pin half-out," Albright said.

Even on his last night, Calloway avoided the open grassy spaces in front of Mologne House. He chain-smoked under the awning. He wondered what home would be like.

At dawn the next morning, he set out for Ohio, a combat infantry sticker on the bumper of his car.

*Staff researcher Julie Tate contributed to this article.*

View all comments that have been posted about this article.

Post a Comment

View all comments that have been posted about this article.

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

Case 1:10-cr-00485-LMB   Document 115-6   Filed 06/21/11   Page 93 of 124 PageID# 886



# washingtonpost.com

Hello priestd
Change Preferences | Sign Out

The Washington Post
Print Edition | Subscribe



| NEWS | POLITICS | OPINIONS | LOCAL | SPORTS | ARTS & LIVING | CITY GUIDE | | JOBS |

SHC

SEARCH: [_____] (go) ⦿ washingtonpost.com ○ Web: results by Google™ | Search Ar

washingtonpost.com > Nation

Advert

» THIS STORY:   READ +  |  WATCH +  |  TALK +  | ⊙ Comments

Articles, slideshows and videos »

## 'A Soldier's Officer'

*By Dana Priest and Anne Hull*
Washington Post Staff Writers
Sunday, December 2, 2007; Page A01

In a nondescript conference room at Walter Reed Army Medical Center, 1st Lt. Elizabeth Whiteside listened last week as an Army prosecutor outlined the criminal case against her in a preliminary hearing. The charges: attempting suicide and endangering the life of another soldier while serving in Iraq.

Her hands trembled as Maj. Stefan Wolfe, the prosecutor, argued that Whiteside, now a psychiatric outpatient at Walter Reed, should be court-martialed. After seven years of exemplary service, the 25-year-old Army reservist faces the possibility of life in prison if she is tried and convicted.

Military psychiatrists at Walter Reed who examined Whiteside after she recovered from her self-inflicted gunshot wound diagnosed her with a severe mental disorder, possibly triggered by the stresses of a war zone. But Whiteside's superiors considered her mental illness "an excuse" for criminal conduct, according to documents obtained by The Washington Post.

At the hearing, Wolfe, who had already warned Whiteside's lawyer of the risk of using a "psychobabble"

defense, pressed a senior psychiatrist at Walter Reed to justify his diagnosis.

"I'm not here to play legal games," Col. George Brandt responded angrily, according to a recording of the hearing. "I am here out of the genuine concern for a human being that's breaking and that is broken. She has a severe and significant illness. Let's treat her as a human being, for Christ's sake!"

In recent months, prodded by outrage over poor conditions at Walter Reed, the Army has made a highly publicized effort to improve treatment of Iraq veterans and change a culture that stigmatizes mental illness. The Pentagon has allocated hundreds of millions of dollars to new research and to care for soldiers with post-traumatic stress disorder, and on Friday it announced that it had opened a new center for psychological health in Rosslyn.

But outside the Pentagon, the military still largely deals with mental health issues in an ad hoc way, often relying on the judgment of combat-hardened commanders whose understanding of mental illness is vague or misinformed. The stigma around psychological wounds can still be seen in the smallest of Army policies. While family members of soldiers recovering at Walter Reed from physical injuries are provided free lodging and a per diem to care for their loved ones, families of psychiatric outpatients usually have to pay their own way.

**Walter Reed and Beyond**

- Timeline: How Did She Get Here?
- Audio Gallery: Lt. Whiteside's Story
- Full Series: Walter Reed and Beyond
- Blog: Washington Post Investigations

**TOOLBOX**

Resize Text    Save/Share +
Print This    E-mail This

COMMENT

Comments are closed for this item.

Discussion Policy

WHO'S BLOGGING    sphere

» Links to this article

"It's a disgrace," said Tom Whiteside, a former Marine and retired federal law enforcement officer who lost his free housing after his daughter's physical wounds had healed enough that she could be moved to the psychiatric ward. A charity organization, the Yellow Ribbon Fund, provides him with an apartment near Walter Reed so he can be near his daughter.

Under military law, soldiers who attempt suicide can be prosecuted under the theory that it affects the order and discipline of a unit and brings discredit to the armed forces. In reality, criminal charges are extremely rare unless there is evidence that the attempt was an effort to avoid service or that it endangered others.

At one point, Elizabeth Whiteside almost accepted the Army's offer to resign in lieu of court-martial. But it meant she would have to explain for the rest of her life why she was not given an honorable discharge. Her attorney also believed that she would have been left without the medical care and benefits she needed.

No decision has yet been made on whether Whiteside's case will proceed to court-martial. The commander of the U.S. Army Military District of Washington, Maj. Gen. Richard J. Rowe Jr., who has jurisdiction over the case, "must determine whether there is sufficient

evidence to support the charges against Lieutenant Whiteside and recommend how to dispose of the charges," said his spokesman.

### 'A Soldier's Officer'

A valedictorian at James Madison High School in Vienna, a wrestler and varsity soccer player, Whiteside followed in her father's footsteps by joining the military. She enlisted in the Army Reserve in 2001 and later joined ROTC while studying economics at the University of Virginia. During her time in college, Whiteside said, she experienced periods of depression, but she graduated and was commissioned an officer in the Army Reserve.

CONTINUED    **1  2  3  4  5    Next >**

» THIS STORY:  READ +  |  WATCH +  |  TALK +  |    Comments

---

**Related**
**Full Coverage: Beyond Walter Reed**

**More on washingtonpost.com**
Soldier Charged in Sgt.'s Death in Iraq
More Recruits, U.S. Arms Planned for Afghan Force
US Military Deaths in Iraq at 3,883
Armored Vehicle Cut Threatens Industry

» Related Topics & Web Content

**People who read this also read ...**
Obama Defeats Clinton in Maine Caucuses
Clinton Looks to Trusted Adviser To Re-Energize Flagging Campaign
Bombing Kills Top Figure in Hezbollah
A President Who Tortured



**Most Viewed Nation Articles**
Gunman Targets Students at Northern Illinois University
Navy Will Attempt to Down Spy Satellite
Ohio Ex-Cop Convicted in Lover's Death
SEIU Endorses Obama

» Top 35 Most Viewed

© 2007 The Washington Post Company

**Ads by Google**

**Lookup Military Records**
Search military service records now Online military record resources.
Military-Records.Govt-Files.com

**Army Medical Malpractice**
Helping U.S. Army Families w/ Army Medical Malpractice Claims
www.MilitaryMedicalClaims.com

**Military Base Closures**
Search for Security Jobs in the WA Register Online - ClearanceJobs.com
www.ClearanceJobs.com

NEWS | POLITICS | OPINIONS | LOCAL | SPORTS | ARTS & LIVING | CITY GUIDE                          JC

SEARCH:            GO   ⊙ washingtonpost.com  ○ Web: Results by Google™

# The Washington Post

## washingtonpost.com

### The Washington Post

January 6, 2005 Thursday
Final Edition

# Terror Suspect Alleges Torture;
# Detainee Says U.S. Sent Him to Egypt Before Guantanamo

**BYLINE: Dana Priest** and Dan Eggen, Washington Post Staff Writers

**SECTION:** A Section; A01

**LENGTH:** 1385 words

U.S. authorities in late 2001 forcibly transferred an Australian citizen to Egypt, where, he alleges, he was tortured for six months before being flown to the U.S. military prison at **Guantanamo Bay,** Cuba, according to court papers made public yesterday in a petition seeking to halt U.S. plans to return him to Egypt.

Egyptian-born Mamdouh Habib, who was detained in Pakistan in October 2001 as a suspected al Qaeda trainer, alleges that while under Egyptian detention he was hung by his arms from hooks, repeatedly shocked, nearly drowned and brutally beaten, and he contends that U.S. and international law prohibits sending him back.

Habib's case is only the second to describe a secret practice called "rendition," under which the CIA has sent suspected terrorists to be interrogated in countries where torture has been well documented. It is unclear which U.S. agency transferred Habib to Egypt.

Habib's is the first case to challenge the legality of the practice and could have implications for U.S. plans to send large numbers of **Guantanamo Bay** detainees to Egypt, Yemen, Saudi Arabia and other countries with poor human rights records.

The CIA has acknowledged that it conducts renditions, but the agency and Bush administration officials who have publicly addressed the matter say they never intend for the captives to be tortured and, in fact, seek pledges from foreign governments that they will treat the captives humanely.

A Justice Department spokesman declined to comment on Habib's allegations, which were filed in November but made public only yesterday after a judge ruled that his petition contained no classified information. The department has not addressed the allegation that he was sent to Egypt.

An Egyptian official reached last night said he could not comment on Habib's allegations but added: "Accusations that we are torturing people tend to be mythology."

The authority under which renditions and other forcible transfers may be legally performed is reportedly summarized in a March 13, 2002, memo titled "The President's Power as Commander in Chief to Transfer Captive Terrorists to the Control and Custody of Foreign Nations." Knowledgeable U.S. officials said White House counsel Alberto R. Gonzales participated in its production.

The administration has refused a congressional request to make it public. But it is referred to in an August 2002 Justice Department opinion -- which Gonzales asked for and helped draft -- defining torture in a narrow way and concluding that the president could legally permit torture in fighting terrorism.

When the August memo became public, Bush repudiated it, and last week the Justice Department replaced it with a broader interpretation of the U.N. Convention Against Torture, which prohibits the practice under all circumstances. The August memo is expected to figure prominently in today's confirmation hearing for Gonzales, Bush's nominee to run the Justice Department as attorney general.

In a statement he planned to read at his hearing, made public yesterday, Gonzales said he would combat terrorism "in a manner consistent with our nation's values and applicable law, including our treaty obligations."

Also yesterday, the American Civil Liberties Union released new documents showing that 26 FBI agents reported witnessing mistreatment of **Guantanamo Bay** detainees, indicating a far broader pattern of alleged abuse there than reported previously.

The records, obtained in an ongoing ACLU lawsuit, also show that the FBI's senior lawyer determined that 17 of the incidents were "DOD-approved interrogation techniques" and did not require further investigation. The FBI did not participate in any of the interviews directly, according to the documents.

The new ACLU documents detail abuses seen by FBI personnel serving in Afghanistan, Iraq and **Guantanamo Bay,** including incidents in which military interrogators grabbed prisoners' genitals, bent back their fingers and, in one case, placed duct tape over a prisoner's mouth for reciting the Koran.

In late 2002, an FBI agent recounted that one detainee at **Guantanamo Bay** had been subjected to "intense isolation" for more than three months and that his cell was constantly flooded with light. The agent reported that "the detainee was evidencing behavior consistent with extreme psychological trauma," including hearing voices, crouching in a corner for hours and talking to imaginary people.

According to the e-mails, military interrogators at **Guantanamo Bay** tried to hide some of their activities from FBI agents, including having a female interrogator rub lotion on a prisoner during Ramadan -- a highly offensive tactic to an observant Muslim man.

Habib was taken to the **Guantanamo Bay** prison in May 2002.

Three Britons released from the prison -- Rhuhel Ahmed, Asif Iqbal and Shafiq Rasul -- have said Habib was in "catastrophic shape" when he arrived. Most of his fingernails were missing, and while sleeping he regularly bled from his nose, mouth and ears but U.S. officials denied him treatment, they said.

Habib's attorney, Joseph Margulies, said Habib had moved to Australia in the 1980s but eventually decided to move his family to Pakistan. He was there in late 2001 looking for a house and school for his children, Margulies said. U.S. officials accuse Habib of training and raising money for al Qaeda, and say he had advance knowledge of the Sept. 11, 2001, attacks. Australian media have reported that authorities in that country cleared him of having terrorist connections in 2001 and have quoted his Australian attorney as saying he was tortured in Egypt.

On Oct. 5, 2001, Pakistani authorities seized Habib, and over three weeks, he asserts in a memorandum filed in U.S. District Court in the District of Columbia, three Americans interrogated him.

The petition says he was taken to an airfield where, during a struggle, he was beaten by several people who spoke American-accented English. The men cut off his clothes, one placed a foot on his neck "and posed while another took pictures," the document says.

He was then flown to Egypt, it alleges, and spent six months in custody in a barren, 6-foot-by-8-foot cell, where he slept on the concrete floor with one blanket. During interrogations, Habib was "sometimes suspended from hooks on the wall" and repeatedly kicked, punched, beaten with a stick, rammed with an electric cattle prod and doused with cold water when he fell asleep, the petition says.

He was suspended from hooks, with his is feet resting on the side of a large cylindrical drum attached to wires and a battery, the document says. "When Mr. Habib did not give the answers his interrogators wanted, they threw a switch and a jolt of electricity" went through the drum, it says. "The action of Mr. Habib 'dancing' on the drum forced it to rotate, and his feet constantly slipped, leaving him suspended by only the hooks on the wall . . . This ingenious cruelty lasted until Mr. Habib finally fainted."

At other times, the petition alleges, he was placed in ankle-deep water that his interrogators told him "was wired to an electric current, and that unless Mr. Habib confessed, they would throw the switch and electrocute him."

Habib says he gave false confessions to stop the abuse.

The State Department's annual human rights report has consistently criticized Egypt for practices that include torturing prisoners.

After six months in Egypt, the petition says, Habib was flown to Bagram Air Base in Afghanistan.

U.S. intelligence officials have said renditions -- and the threat of renditions -- are a potent device to induce suspected terrorists to divulge information. Habib's petition says the threat that detainees at Bagram would be sent to Egypt prompted many of them to offer confessions.

His petition argues that his "removal to Egypt would be unquestionably unlawful" in part because he "faces almost certain torture."

The U.N. Convention Against Torture says no party to the treaty "shall expel, return or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."

"The fact that the United States would contemplate sending him to Egypt again is astonishing to me," said Margulies, the attorney.

Researcher Julie Tate contributed to this report.

### Find Documents with Similar Topics

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

| Subject | Geography |
|---|---|
| ⌐ PRISONS | ⌐ EGYPT |
| ⌐ TERRORISM | ⌐ UNITED STATES |
| ⌐ TORTURE | ⌐ CUBA |
| ⌐ US FEDERAL GOVERNMENT | |



**washingtonpost.com**  Hello priestd  Change Preferences | Sign Out    The Washington Post  Print Edition | Subscribe

| NEWS | POLITICS | OPINIONS | LOCAL | SPORTS | ARTS & LIVING | CITY GUIDE | | JOBS |
|------|----------|----------|-------|--------|---------------|------------|--|------|
| | | | | | | | | SHO |

SEARCH: [          ]    ⊙ washingtonpost.com  ○ Web: Results by Google    | Search Ar

**washingtonpost.com > Politics**

2008 Politics » Candidates | Issues | Calendar | Dispatches | Schedules | Polls | RSS      Advert

# CIA Avoids Scrutiny of Detainee Treatment
Afghan's Death Took Two Years to Come to Light; Agency Says Abuse Claims Are Probed Fully

*By Dana Priest*
Washington Post Staff Writer
Thursday, March 3, 2005; Page A01

In November 2002, a newly minted CIA case officer in charge of a secret prison just north of Kabul allegedly ordered guards to strip naked an uncooperative young Afghan detainee, chain him to the concrete floor and leave him there overnight without blankets, according to four U.S. government officials aware of the case.

The Afghan guards--paid by the CIA and working under CIA supervision in an abandoned warehouse code-named the Salt Pit--dragged their captive around on the concrete floor, bruising and scraping his skin, before putting him in his cell, two of the officials said.

As night fell, so, predictably, did the temperature.

By morning, the Afghan man had frozen to death.

After a quick autopsy by a CIA medic--"hypothermia" was listed as the cause of death--the guards buried the Afghan, who was in his twenties, in an unmarked, unacknowledged cemetery used by Afghan forces, officials said. The captive's family has never been notified; his remains have never been returned for burial. He is on no one's registry of captives, not even as a "ghost detainee," the term for CIA captives held in military prisons but not registered on the books, they said.

**TOOLBOX**

▭ Resize Text    ◻ Save/Share +
🖶 Print This    E-mail This

COMMENT

⊕ Discussion Policy

WHO'S BLOGGING    powered by **sphere**
» Links to this article

"He just disappeared from the face of the earth," said one U.S. government official with knowledge of the case.

The CIA case officer, meanwhile, has been promoted, two of the officials said, who like others interviewed for this article spoke on the condition of anonymity because they are not authorized to talk about the matter. The case is under investigation by the CIA inspector general.

The fact that the Salt Pit case has remained secret for more than two years reflects how little is known about the CIA's treatment of detainees and its handling of allegations of abuse. The public airing of abuse at Abu Ghraib prompted the Pentagon to undertake and release scathing reports about conduct by military personnel, to revise rules for handling prisoners, and to prosecute soldiers accused of wrongdoing. There has been no comparable public scrutiny of the CIA, whose operations and briefings to Congress are kept classified by the administration.

Thirty-three military workers have been court-martialed and an additional 55 received reprimands for their mishandling of detainees, according to the Defense Department. One CIA contractor has been charged with a crime related to allegations of detainee abuse. David A. Passaro is on trial in federal court in North Carolina, facing four assault charges in connection with the death of Abdul Wali, a prisoner who died while at a U.S. military firebase in Afghanistan in June 2003.

The CIA's inspector general is investigating at least half a dozen allegations of serious abuse in Iraq and Afghanistan, including two previously reported deaths in Iraq, one in Afghanistan and the death at the Salt Pit, U.S. officials said.

A CIA spokesman said yesterday that the agency actively pursues allegations of misconduct. Other U.S. officials said CIA cases can take longer to resolve because, unlike the military, the agency must rely on the Justice Department to conduct its own review and to prosecute when warranted.

"The agency has an aggressive, robust office of the inspector general with the authority to look into any CIA program or operation anywhere," said a CIA representative who spoke on the condition of anonymity. "The inspector general has done so and will continue to do so. We investigate allegations of abuse fully." The spokesman declined to comment on any case.

CONTINUED    1    2    3    Next >

**People who read this also read ...**

Oldest Girl Was Target of Mother's Wrath, Detective Testifies

As Crunchtime Arrives, All-Out Appeal in Region

Eliot Spitzer - Predatory Lenders' Partner in Crime

Carolyn Hax Live: Valentine's Day Special

pregate edge

Discovery by

**Most Viewed Politics Articles**

TOP .

Prop

Clinton Camp May Regret Largely
Turning Its Back on Caucus States

Clinton, Obama Offer Similar
Economic Visions

House Defies Bush on Wiretaps

Romney Releases His Delegates,
Backs McCain

Direc

Envir

Real l

ESTA

Senic

» Top 35 Most Viewed

# More in the Politics Section

FEAT

FDA I

T-Shi

Cool

Roth

Earn

Discc

Looki

Get ti

HSBC



## 2008 Fundraising

See who is giving to the '08 presidential
candidates.

- **Research Donations ... By Name,**
  Occupation, Employer or Zip Code
- ...By State

## Latest Politics Blog Updates

- **Capitol Briefing:** Player of the Week: John Conyers (updated 16
  minutes ago)
- **White House Watch:** The House Strikes Back (updated 55 minutes
  ago)
- **The Trail:** Obama's Texas Test (updated 1 hour ago)
- **The Fix:** Friday House Line: Republican Retirements Galore (updated 1
  hour ago)
- Index of Politics Columns and Blogs | Opinions Section

© 2007 The Washington Post Company



washingtonpost.com > Politics

2008 Politics » Candidates | Issues | Calendar | Dispatches | Schedules | Polls | RSS

# CIA's Assurances On Transferred Suspects Doubted
## Prisoners Say Countries Break No-Torture Pledges

*By Dana Priest*
Washington Post Staff Writer
Thursday, March 17, 2005; Page A01

The system the CIA relies on to ensure that the suspected terrorists it transfers to other countries will not be tortured has been ineffective and virtually impossible to monitor, according to current and former intelligence officers and lawyers, as well as counterterrorism officials who have participated in or reviewed the practice.

To comply with anti-torture laws that bar sending people to countries where they are likely to be tortured, the CIA's office of general counsel requires a verbal assurance from each nation that detainees will be treated humanely, according to several recently retired CIA officials familiar with such transfers, known as renditions.

But the effectiveness of the assurances and the legality of the rendition practice are increasingly being questioned by rights groups and others, as freed detainees have alleged that they were mistreated by interrogators after the CIA secretly delivered them to countries with well-documented records of abuse.

President Bush weighed in on the matter for the first time yesterday, defending renditions as vital to the nation's defense.

In "the post-9/11 world, the United States must make sure we protect our people and our friends from attack," he said at a news conference. "And one way to do so is to arrest people and send them back to their country of

At a news briefing, President Bush defended the practice of transferring suspected terrorists to countries of origin. (Bill O'leary/twp - Twp)

**TOOLBOX**

Resize Text   Save/Share +

Print This   E-mail This

COMMENT

origin with the promise that they won't be tortured. That's the promise we receive. This country does not believe in torture. We do believe in protecting ourselves." One CIA officer involved with renditions, however, called the assurances from other countries "a farce."

Discc

Looki

:*: Discussion Policy

Get ti

WHO'S BLOGGING    ⠄⠄⠄⠄⠄ sphere    HSBC

» Links to this article

Another U.S. government official who visited several foreign prisons where suspects were rendered by the CIA after the attacks of Sept. 11, 2001, said: "It's beyond that. It's widely understood that interrogation practices that would be illegal in the U.S. are being used."

The CIA inspector general recently launched a review of the rendition system, and some members of Congress are demanding a thorough probe. Canada, Sweden, Germany and Italy have started investigations into the participation of their security services in CIA renditions.

The House voted 420 to 2 yesterday to prohibit the use of supplemental appropriations to support actions that contravene anti-torture statutes. The measure's co-author, Rep. Edward J. Markey (D-Mass.), singled out renditions, saying "diplomatic assurances not to torture are not credible, and the administration knows it."

Rendition, a form of covert action that is supposed to be shrouded in the deepest secrecy, was first authorized by President Ronald Reagan in 1986 and was used by the Clinton administration to transfer drug lords and terrorists to the United States or other countries for military or criminal trials.

After the 2001 attacks, Bush broadened the CIA's authority and, as a result, the agency has rendered more than 100 people from one country to another without legal proceedings and without providing access to the International Committee of the Red Cross, a right afforded all prisoners held by the U.S. military.

The CIA general counsel's office requires the station chief in a given country to obtain a verbal assurance from that country's security service. The assurance must be cabled back to CIA headquarters before a rendition takes place.

CIA Director Porter J. Goss told Congress a month ago that the CIA has "an accountability program" to monitor rendered prisoners. But he acknowledged that "of course, once they're out of our control, there's only so much we can do."

CONTINUED    1    2    Next >

**More on washingtonpost.com**

• More Politics News

» washingtonpost.com

People who read this also read ...

Dan Froomkin - Return of the 9/11 President

Pairs With Spares

Howard Kurtz - Hillary Sinks in Potomac

Sugar Substitutes May Contribute to Weight Gain


gregate
nowledge

**washingtonpost.com**    Hello priestd    Change Preferences | Sign Out    The Washington Post    Print Edition | Subscribe

exclusive online offer
99¢ camera phone

picture messag capability
*Price after new 2-yr serv

NEWS | POLITICS | OPINIONS | LOCAL | SPORTS | ARTS & LIVING | CITY GUIDE | JOBS

SHC

SEARCH: ☉ ⊙ washingtonpost.com ○ Web: Results by Google | Search Ar

washingtonpost.com > Nation > National Security

# Italy Knew About Plan To Grab Suspect
## CIA Officials Cite Briefing in 2003

Adver

*By Dana Priest*
Washington Post Staff Writer
Thursday, June 30, 2005; Page A01

Before a CIA paramilitary team was deployed to snatch a radical Islamic cleric off the streets of Milan in February 2003, the CIA station chief in Rome briefed and sought approval from his counterpart in Italy, according to three CIA veterans with knowledge of the operation and a fourth who reviewed the matter after it took place.

The previously undisclosed Italian involvement undercuts the accusation, which has fueled public resentment in Italy toward the United States, that the CIA brashly slipped into the country unannounced and uninvited to kidnap an Italian resident off the street.

In fact, former and current CIA officials said, both the CIA and the Italian service agreed beforehand that if the unusual operation was to become public, as it has, neither side would confirm its involvement, a standard agreement the CIA makes with foreign intelligence services over covert operations.

Last Thursday, an Italian magistrate issued arrest warrants for 13 U.S. intelligence operatives. The warrants charged that they kidnapped a suspected terrorist, Hassan Mustafa Osama Nasr -- also known as Abu Omar -- held him hostage at two U.S. military bases and then flew him to Cairo, where he alleged to his wife in a phone call that he was tortured under interrogation.

The CIA "told a tiny number of people" about the action, said one intelligence veteran in the management chain of the operation when it took place. "Certainly not the magistrate, not the Milan police."

TOOLBOX
Resize Text    Save/Share +
Print This    E-mail This

COMMENT

Comments are closed for this item.
Discussion Policy

WHO'S BLOGGING    powered by sphere
» Links to this article

It is unclear how high in the Italian intelligence service the information was shared or whether the office of Prime Minister Silvio Berlusconi was aware. It was not shared with the magistrate issuing the warrants, who works independently from the national government.

The Italian court case offers an accidental glimpse into how U.S. and foreign intelligence agencies coordinate and communicate on sensitive counterterrorism matters in ways that are expressly kept secret, even from other parts of their governments. This bifurcation between stated policies and secret practices has become more common since the Sept. 11, 2001, attacks, as the CIA has sought cooperation from other governments to covertly apprehend and transport suspected terrorists to undisclosed locations without legal hearings.

The CIA has conducted more than 100 of these apprehensions, known as extraordinary rendition, since Sept. 11, according to knowledgeable intelligence officials.

In Italy, the justice department and public have been demanding answers from the United States and their own government since Nasr disappeared as he was walking to a mosque on Feb. 17, 2003. And justice departments and government investigators in other countries have begun to unearth information about their governments' roles in apprehensions once thought to be the work of the CIA alone.

In Sweden, an inquiry discovered that Swedish ministers had agreed to apprehend and expel two Egyptian terrorism suspects in 2002 but called the CIA for help in flying them out of the country when they could not charter a flight quickly to take the suspects to Egypt.

A former CIA official said the covert operation was exposed after the CIA paramilitaries drew attention to it by arriving commando-style, in semi-opaque masks, and "went through the standard drill as if they were arresting Khalid Sheik Mohammed," the architect of the Sept. 11 attacks.

In Canada, a government inquiry has revealed a greater role by Canadian intelligence in the Justice Department's secret 2002 "expedited removal" of a Syrian-born Canadian citizen to Syria after he was detained as he changed flights at a New York airport.

CONTINUED    1    2    Next >

**More on washingtonpost.com**

• More Nation News

» washingtonpost.com

**People who read this also read ...**

Georgian Tycoon Had Severe Heart Disease

About 20,000 rally in Georgia against president

Dan Froomkin - Return of the 9/11 President

Shifting Loyalties



**Most Viewed Nation Articles**

Gunman Targets Students at Northern Illinois University

Navy Will Attempt to Down Spy Satellite

Ohio Ex-Cop Convicted in Lover's Death

2 Planets Found In Solar System That Is Similar To

TOP.

Para1

washingtonpost.com

# Help From France Key In Covert Operations

Paris's 'Alliance Base' Targets Terrorists

By Dana Priest
Washington Post Staff Writer
Sunday, July 3, 2005; A01



.W RETREAT & SPA, MALDIVES
35,000 STARPOINTS®

Advertisement



NETFLIX

Rent The Notebook today!   ⊙ click here

PARIS -- When Christian Ganczarski, a German convert to Islam, boarded an Air France flight from Riyadh on June 3, 2003, he knew only that the Saudi government had put him under house arrest for an expired pilgrim visa and had given his family one-way tickets back to Germany, with a change of planes in Paris.

He had no idea that he was being secretly escorted by an undercover officer sitting behind him, or that a senior CIA officer was waiting at the end of the jetway as French authorities gently separated him from his family and swept Ganczarski into French custody, where he remains today on suspicion of associating with terrorists.

Ganczarski is among the most important European al Qaeda figures alive, according to U.S. and French law enforcement and intelligence officials. The operation that ensnared him was put together at a top secret center in Paris, code-named Alliance Base, that was set up by the CIA and French intelligence services in 2002, according to U.S. and European intelligence sources. Its existence has not been previously disclosed.

Funded largely by the CIA's Counterterrorist Center, Alliance Base analyzes the transnational movement of terrorist suspects and develops operations to catch or spy on them.

Alliance Base demonstrates how most counterterrorism operations actually take place: through secretive alliances between the CIA and other countries' intelligence services. This is not the work of large army formations, or even small special forces teams, but of handfuls of U.S. intelligence case officers working with handfuls of foreign operatives, often in tentative arrangements.

Such joint intelligence work has been responsible for identifying, tracking and capturing or killing the vast majority of committed jihadists who have been targeted outside Iraq and Afghanistan since the Sept. 11, 2001, attacks, according to terrorism experts.

The CIA declined to comment on Alliance Base, as did a spokesman for the French Embassy in Washington.

Most French officials and other intelligence veterans would talk about the partnership only if their names were withheld because the specifics are classified and the politics are sensitive. John E.

McLaughlin, the former acting CIA director who retired recently after a 32-year career, described the relationship between the CIA and its French counterparts as "one of the best in the world. What they are willing to contribute is extraordinarily valuable."

The rarely discussed Langley-Paris connection also belies the public portrayal of acrimony between the two countries that erupted over the invasion of Iraq. Within the Bush administration, the discord was amplified by Defense Secretary Donald H. Rumsfeld, who has claimed the lead role in the administration's "global war on terrorism" and has sought to give the military more of a part in it.

But even as Rumsfeld was criticizing France in early 2003 for not doing its share in fighting terrorism, his U.S. Special Operations Command was finalizing a secret arrangement to put 200 French special forces under U.S. command in Afghanistan. Beginning in July 2003, its commanders have worked side by side there with U.S. commanders and CIA and National Security Agency representatives.

### Organizing Alliance Base

Alliance Base, headed by a French general assigned to France's equivalent of the CIA -- the General Directorate for External Security (DGSE) -- was described by six U.S. and foreign intelligence specialists with involvement in its activities. The base is unique in the world because it is multinational and actually plans operations instead of sharing information among countries, they said. It has case officers from Britain, France, Germany, Canada, Australia and the United States.

The Ganczarski operation was one of at least 12 major cases the base worked on during its first years, according to one person familiar with its operations.

"It's really an effort to come up with innovative ideas and deal with some of the cooperation issues," said one CIA officer familiar with the base. "I don't know of anything like it."

Factions within the intelligence services of several countries opposed a multinational approach, according to current and former U.S. and European government officials who described its inception. The CIA's Counterterrorist Center did not want to lose control over all counterterrorism operations; the British service did not want to dilute its unique ties to Washington; Germany was not keen to become involved in more operations.

And no country wanted to be perceived as taking direction from the CIA, whose practice of extraordinary renditions -- secretly apprehending suspected terrorists and transferring them to other countries without any judicial review -- has become highly controversial in Europe. In Italy, 13 alleged CIA operatives are accused of kidnapping a radical Egyptian cleric off the streets of Milan in 2003.

To play down the U.S. role, the center's working language is French, sources said. The base selects its cases carefully, chooses a lead country for each operation, and that country's service runs the operation.

The base also provides a way for German case officers to read information from their own country's law enforcement authorities, sources said. German law bars criminal authorities from sharing certain information directly with their intelligence agencies.

French law, by contrast, encourages intelligence sharing among its police and security services. In fact, since the Napoleonic Code was adopted in 1804, French magistrates have had broad powers over civil society. Today, magistrates in the French Justice Department's anti-terrorism unit have authority to detain people suspected of "conspiracy in relation to terrorism" while evidence is gathered against them.

The top anti-terrorism magistrate, Judge Jean-Louis Bruguiere, has said that in the past decade, he has ordered the arrests of more than 500 suspects, some with the help of U.S. authorities. "I have good connections with the CIA and FBI," Bruguiere said in a recent interview.

In France, which has a Muslim population reaching 8 percent -- the largest in Europe -- U.S. and French terrorism experts are desperate to take terrorist-group recruiters and new recruits off the streets, and have been willing to put their own anti-terrorism laws into the service of allies to lure suspects such as Ganczarski from abroad.

"Yes, without a doubt there are some cases where we participate that way," one senior French intelligence official said.

France sent its interrogators to Guantanamo Bay to gather evidence that could be used in French court against the French detainees the United States was holding there. France is the only one of six European nations that continues to imprison detainees returned to it from the U.S. military facility at Guantanamo Bay, Cuba.

Bruguiere and other French intelligence officials like to note dryly that France first realized it had become a target of al Qaeda-style jihadists when a group of Algerian radicals hijacked an airliner with the intent of crashing it into the Eiffel Tower in 1994. They viewed the attacks on the World Trade Center and the Pentagon as another, if much larger, part of the jihadist campaign against Western civilization.

So it did not surprise many intelligence officers when, in the days after the attacks, President Jacques Chirac issued an edict to French intelligence services to share information about terrorism with the U.S. intelligence agencies "as if they were your own service," according to two officials who read it.

The steady, daily flow of encrypted messages increased. "We saw a quantitative and qualitative difference in the degree of detail in the information," said Alejandro Wolff, the second-in-charge at the U.S. Embassy here, whose portfolio includes fighting terrorism.

One CIA veteran with knowledge of the U.S.-French intelligence work estimates that the French have detained about 60 suspects since the end of 2001, some with the help of the CIA. "They do as much for us as the British and in some ways more -- if you ask them," said a recently retired senior intelligence official who worked closely with France and other European countries.

France was also an early and willing collaborator in other parts of the world, allowing the CIA to fly its top-secret, armed Predator drone, still controversial inside the Pentagon, from France's air base in the former French colony of Djibouti. Its mission was to kill al Qaeda figures on a classified CIA list of "high-value targets." On Nov. 3, 2002, CIA officers operating remote controls from the air base took their first shot, killing Abu Ali al-Harithi, the mastermind of the October 2000 attack on the destroyer USS Cole, and six others, including Ahmed Hijazi, a naturalized U.S. citizen, in a Yemeni desert.

The broader cooperation between the United States and France plays to the strengths of each side, according to current and former French and U.S. officials. The CIA brings money from its classified and ever-growing "foreign liaison" account -- it has paid to transport some of France's suspects from abroad into Paris for legal imprisonment -- and its global eavesdropping capabilities and worldwide intelligence service ties. France brings its harsh laws, surveillance of radical Muslim groups and their networks in Arab states, and its intelligence links to its former colonies.

"There's an easy exchange of information," said Pierre de Bousquet de Florian, director of France's domestic CIA, the Directorate of Territorial Surveillance, who declined to comment on specifics of the relationship. "The cooperation between my service and the American service is candid, loyal and certainly effective."

France's willingness to share its dossiers on terrorists has helped the United States make some of its most significant convictions, including those of Ahmed Ressam, who was stopped at the Canadian border on his way to attempt to blow up Los Angeles International Airport in 1999, and Zacarias Moussaoui, a Moroccan who once lived in France and is the only person in the United States to have pleaded guilty in the Sept. 11 hijacking plot.

## Tension Over Iraq

In the run-up to the Iraq war, the White House drew the battle lines between countries that were tough on terrorists -- the administration included Iraq in the mix -- and those that were not. France's government believed U.N. inspections had successfully contained Saddam Hussein's development of weapons programs, and Bruguiere saw no connection between Iraq and al Qaeda. At the Defense Department, on Capitol Hill and elsewhere, many cast France's opposition to war as evidence it was a slacker when it came to fighting terrorism.

French fries became "freedom fries" on Air Force One and in congressional cafeterias. Rumsfeld prohibited general officers from telephoning their French counterparts, grounded U.S. planes at the Paris Air Show and disinvited the French from Red Flag, a major U.S. military exercise in which they had participated for decades.

Three months into the dispute, the State Department and the CIA made a case for France, citing its intelligence cooperation. Bush eventually told Rumsfeld to desist, according to two former State Department officials. Then-Secretary of State Colin L. Powell wrote a memo saying that punishing the French was not U.S. policy. A. Elizabeth Jones, the assistant secretary of state for European and Eurasian affairs, kept it on top of her desk. "I frequently needed to be able to pull it out and quote it to my Pentagon colleagues," Jones said.

But Rumsfeld persisted a year later, excluding the French Air Force from the Red Flag exercise in 2004.

Rumsfeld's symbolic jabs baffled some officials inside the Bush administration. "Most things the secretary of defense did I could understand, even if I disagreed with him," said Lawrence B. Wilkerson, former chief of staff to Powell. "On this one, it was totally irrational, even dumb."

The intelligence services tried to insulate themselves from the public fray.

"The French were very keen on demonstrating there was no drop-off at all," said Wolff, the U.S. diplomat here. "There was never any sense of this spilling over. There was an effort on both sides to compartmentalize" the differences.

The same was true for the CIA and other U.S. intelligence agencies, which report a steady, daily flow of encrypted messages on terrorism between the CIA and its French counterpart.

"The relations between intelligence services in the United States and France has been good, even during the transatlantic dispute over Iraq, for practical reasons," Bruguiere said. "If you want to have a better grasp of a difficult situation, you have to share intelligence real time."

## The Ganczarski Operation

Ganczarski, a metallurgist from the industrial Ruhr district in Germany, had been radicalized by a Saudi cleric touring European mosques in the early 1990s, studied Islam on a religious scholarship in the kingdom, traveled to Afghanistan four times, trained in al Qaeda camps, met Osama bin Laden, and returned to Germany from his last trip nine days before Sept. 11, 2001.

Intelligence officials say he was part of a patient, post-9/11 al Qaeda plan to activate European converts, including failed British "shoe-bomber" Richard Reid. Ganczarski's cell phone was the last number that a suicide bomber who killed 21 people on the island of Djerba called in April 2002. Some of the casualties were French, which gave Bruguiere legal grounds to arrest Ganczarski.

On May 20, 2003, an urgent bit of intelligence was fed into Alliance Base: Ahmed Mehdi, an associate of Ganczarski, had just booked a 14-day vacation to the French island of Reunion in the Indian Ocean.

Mehdi, then a 34-year-old Moroccan who had lived near Ganczarski in Germany, was under surveillance and showing a worrisome interest in remote-control detonators. German authorities, who did not have enough evidence to arrest him or Ganczarski, believed Mehdi was planning an attack on Reunion.

Mid-level case officers working at Alliance Base met to devise a plan: They would entice first Mehdi, then Ganczarski, to France. Bruguiere would lock them up on suspicion of associating with terrorists.

The CIA arranged for an asset to suggest that Mehdi stop in Paris on his way to Reunion to surveil targets. Mehdi, Alliance Base learned from wiretaps, worried that France would not give him a visa, which he needed because he is Moroccan. On cue, the French services arranged for a visa. The Germans monitored calls and contacts there for a change of plans.

On June 1, French authorities apprehended Mehdi at Charles de Gaulle International Airport in Paris. He was sent to Fresnes Prison outside Paris. Two days later, on June 3, 2003, Ganczarski was there, too.

Unbeknownst to the two men, they were held in cells just yards from each other. Authorities used the information gained from one to question the other. Within days, Mehdi told Bruguiere's investigators about the plot, the network and Ganczarski. Investigators now believe that Mehdi has links to al Qaeda's Hamburg cell that plotted the Sept. 11 attacks and that Ganczarski associated directly with Sept. 11 architect Khalid Sheikh Mohammed.

Alliance Base's role in the operation was noted obliquely on June 11, 2003, by Interior Minister Nicholas Sarkozy. Speaking before Parliament, he said, "This arrest took place thanks to the perfect collaboration between the services of the great democracies."

*Staff researcher Julie Tate contributed to this report.*

© 2005 The Washington Post Company

**Ads by Google**

**Washington DC Babysitters**
Search DC Sitter/Nanny Listings Register today for a perfect match!
www.Sittercity.com

**Reviews, Drinks, Recipes**
The top restaurant picks, recipes and drink mixes in Washington, D.C.
www.johnaknowsgoodfood.com

http://www.washingtonpost.com/wp-dyn/content/article/2005/07/02/AR2005070201361_p...    2/15/2008



**washingtonpost.com**   Hello priestd   Change Preferences | Sign Out   The Washington Post   Print Edition | Subscribe

One Week Only!
At the Warner Theatre ·

| NEWS | POLITICS | OPINIONS | LOCAL | SPORTS | ARTS & LIVING | CITY GUIDE | | JOB! |

SH(

SEARCH: [          ]  ⊙ washingtonpost.com  ○ Web: Results by Google   | Search Ar

washingtonpost.com > Nation > National Security

# CIA Holds Terror Suspects in Secret Prisons
## Debate Is Growing Within Agency About Legality and Morality of Overseas System Set Up After 9/11

*By Dana Priest*
Washington Post Staff Writer
Wednesday, November 2, 2005; Page A01

The CIA has been hiding and interrogating some of its most important al Qaeda captives at a Soviet-era compound in Eastern Europe, according to U.S. and foreign officials familiar with the arrangement.

The secret facility is part of a covert prison system set up by the CIA nearly four years ago that at various times has included sites in eight countries, including Thailand, Afghanistan and several democracies in Eastern Europe, as well as a small center at the Guantanamo Bay prison in Cuba, according to current and former intelligence officials and diplomats from three continents.

The hidden global internment network is a central element in the CIA's unconventional war on terrorism. It depends on the cooperation of foreign intelligence services, and on keeping even basic information about the system secret from the public, foreign officials and nearly all members of Congress charged with overseeing the CIA's covert actions.

The existence and locations of the facilities -- referred to as "black sites" in classified White House, CIA, Justice Department and congressional documents -- are known to only a handful of officials in the United States and, usually, only to the president and a few top intelligence officers in each host country.

The CIA and the White House, citing national security concerns and the value of the



In Afghanistan, the largest CIA covert prison was code-named the Salt Pit, at center left above. (Space Imaging Middle East)

**TOOLBOX**

▭ Resize Text   ⬚ Save/Share +
Print This           E-mail This

COMMENT ◌

⊕ Discussion Policy
WHO'S BLOGGING    sphere
» Links to this article

Advert

TOP ·
Paral
Prop!
Prec!
Real
ESTA
Direc
SCH(

FEAT
FDA !
T-Shi
Cool
Roth
Earn

Case 1:10-cr-00485-LMB    Document 115-6    Filed 06/21/11    Page 112 of 124 PageID# 905

program, have dissuaded Congress from demanding that the agency answer questions in open testimony about the conditions under which captives are held. Virtually nothing is known about who is kept in the facilities, what interrogation methods are employed with them, or how decisions are made about whether they should be detained or for how long.

While the Defense Department has produced volumes of public reports and testimony about its detention practices and rules after the abuse scandals at Iraq's Abu Ghraib prison and at Guantanamo Bay, the CIA has not even acknowledged the existence of its black sites. To do so, say officials familiar with the program, could open the U.S. government to legal challenges, particularly in foreign courts, and increase the risk of political condemnation at home and abroad.

But the revelations of widespread prisoner abuse in Afghanistan and Iraq by the U.S. military -- which operates under published rules and transparent oversight of Congress -- have increased concern among lawmakers, foreign governments and human rights groups about the opaque CIA system. Those concerns escalated last month, when Vice President Cheney and CIA Director Porter J. Goss asked Congress to exempt CIA employees from legislation already endorsed by 90 senators that would bar cruel and degrading treatment of any prisoner in U.S. custody.

Although the CIA will not acknowledge details of its system, intelligence officials defend the agency's approach, arguing that the successful defense of the country requires that the agency be empowered to hold and interrogate suspected terrorists for as long as necessary and without restrictions imposed by the U.S. legal system or even by the military tribunals established for prisoners held at Guantanamo Bay.

The Washington Post is not publishing the names of the Eastern European countries involved in the covert program, at the request of senior U.S. officials. They argued that the disclosure might disrupt counterterrorism efforts in those countries and elsewhere and could make them targets of possible terrorist retaliation.

The secret detention system was conceived in the chaotic and anxious first months after the Sept. 11, 2001, attacks, when the working assumption was that a second strike was imminent.

Since then, the arrangement has been increasingly debated within the CIA, where considerable concern lingers about the legality, morality and practicality of holding even unrepentant terrorists in such isolation and secrecy, perhaps for the duration of their lives. Mid-level and senior CIA officers began arguing two years ago that the system was unsustainable and diverted the agency from its unique espionage mission.

"We never sat down, as far as I know, and came up with a grand strategy," said one former senior intelligence officer who is familiar with the program but not the location of the prisons. "Everything was very reactive. That's how you get to a situation where you pick people up, send them into a netherworld and don't say, 'What are we going to do with them afterwards?' "

CONTINUED    1  2  3  4   Next >

http://www.washingtonpost.com/wp-dyn/content/article/2005/11/01/AR2005110101644.ht...    2/15/2008



washingtonpost.com    Hello priestd
Change Preferences | Sign Out

The Washington Post
Print Edition | Subscribe

*Shirley Hopkinson*

| NEWS | POLITICS | OPINIONS | LOCAL | SPORTS | ARTS & LIVING | CITY GUIDE | | JOBS |

SHC

SEARCH: [          ]  (go)  ⦿ washingtonpost.com  ○ Web: Results by Google  | Search Ar

washingtonpost.com > Nation > National Security

# Foreign Network at Front of CIA's Terror Fight
## Joint Facilities in Two Dozen Countries Account for Bulk of Agency's Post-9/11 Successes

*By Dana Priest*
Washington Post Staff Writer
Friday, November 18, 2005; Page A01

The CIA has established joint operation centers in more than two dozen countries where U.S. and foreign intelligence officers work side by side to track and capture suspected terrorists and to destroy or penetrate their networks, according to current and former American and foreign intelligence officials.

The secret Counterterrorist Intelligence Centers are financed mostly by the agency and employ some of the best espionage technology the CIA has to offer, including secure communications gear, computers linked to the CIA's central databases, and access to highly classified intercepts once shared only with the nation's closest Western allies.

The Americans and their counterparts at the centers, known as CTICs, make daily decisions on when and how to apprehend suspects, whether to whisk them off to other countries for interrogation and detention, and how to disrupt al Qaeda's logistical and financial support.

The network of centers reflects what has become the CIA's central and most successful strategy in combating terrorism abroad: persuading and empowering foreign security services to help. Virtually every capture or killing of a suspected terrorist outside Iraq since the Sept. 11, 2001, attacks -- more than 3,000 in all -- was a result of foreign intelligence services' work alongside the agency, the CIA deputy director of operations told a congressional committee in a closed-door session earlier this year.



⊞ Enlarge This Photo

CIA Director Porter J. Goss appears to have eased off the earlier drive to sign up local services in the fight against terrorism -- he said his goal is to improve "unilateral" intelligence collection and operations. (Photos By Ron Edmonds -- Associated Press)

TOOLBOX

⬜⬜⬜ Resize Text   ⬜ Save/Share +

Case 1:10-cr-00485-LMB  Document 115-6  Filed 06/21/11  Page 114 of 124 PageID# 907

The initial tip about where an al Qaeda figure is hiding may come from the CIA, but the actual operation to pick him up is usually organized by one of the joint centers and conducted by a local security service, with the CIA nowhere in sight. "The vast majority of successes involved our CTICs," one former counterterrorism official said. "The boot that went through the door was foreign."

The centers are also part of a fundamental, continuing shift in the CIA's mission that began shortly after the 2001 attacks. No longer is the agency's primary goal to recruit military attaches, diplomats and intelligence operatives to steal secrets from their own countries. Today's CIA is desperately seeking ways to join forces with other governments it once reproached or ignored to undo a common enemy.

George J. Tenet orchestrated the shift during his tenure as CIA director, working with the agency's station chiefs abroad and officers in the Counterterrorist Center at headquarters to bring about an exponential deepening of intelligence ties worldwide after Sept. 11.

Beneath the surface of visible diplomacy, the cooperative efforts, known as liaison relationships, are recasting U.S. dealings abroad.

The White House has stepped up its criticism of Uzbek President Islam Karimov in the past year for his authoritarian rule and repression of dissidents. But joint counterterrorism efforts with Tashkent continued until recently. In Indonesia, as the State Department doled out tiny amounts of assistance to the military when it made progress on corruption and human rights, the CIA was pouring money into Jakarta and developing intelligence ties there after years of tension. In Paris, as U.S.-French acrimony peaked over the Iraq invasion in 2003, the CIA and French intelligence services were creating the agency's only multinational operations center and executing worldwide sting operations.

The CIA has operated the joint intelligence centers in Europe, the Middle East and Asia, according to current and former intelligence officials. In addition, the multinational center in Paris, codenamed Alliance Base, includes representatives from Britain, France, Germany, Canada and Australia.

"CTICs were a step forward in codifying, organizing liaison relationships that elsewhere would be more ad hoc," a former CIA counterterrorism official said. "It's one tool in the liaison tool kit."

The CIA declined to comment for this article. The Washington Post interviewed more than two dozen current and former intelligence officials and more than a dozen senior foreign intelligence officials as well as diplomatic and congressional sources. Most of them spoke on the condition that they not be named because they are not authorized to speak publicly or because of the sensitive nature of the subject.

CONTINUED   1   2   3   4   Next >

Print This

E-mail This

COMMENT

No comments have been posted about this item

Comments are closed for this item.

Discussion Policy

WHO'S BLOGGING   ...by sphere

» Links to this article

TOP.

Envir

1 of 67 DOCUMENTS

# The Washington Post

# washingtonpost.com

The Washington Post

September 10, 2006 Sunday
Correction Appended
Final Edition

## Bin Laden Trail 'Stone Cold'; U.S. Steps Up Efforts, But Good Intelligence On Ground is Lacking

**BYLINE:** Dana Priest and Ann Scott Tyson, Washington Post Staff Writers

**SECTION:** A Section; A01

**LENGTH:** 3201 words

The clandestine U.S. commandos whose job is to capture or kill Osama bin Laden have not received a credible lead in more than two years. Nothing from the vast U.S. intelligence world -- no tips from informants, no snippets from electronic intercepts, no points on any satellite image -- has led them anywhere near the al-Qaeda leader, according to U.S. and Pakistani officials.

"The handful of assets we have have given us nothing close to real-time intelligence" that could have led to his capture, said one counterterrorism official, who said the trail, despite the most extensive manhunt in U.S. history, has gone "stone cold."

But in the last three months, following a request from President Bush to "flood the zone," the CIA has sharply increased the number of intelligence officers and assets devoted to the pursuit of bin Laden. The intelligence officers will team with the military's secretive Joint Special Operations Command (JSOC) and with more resources from the National Security Agency and other intelligence agencies.

The problem, former and current counterterrorism officials say, is that no one is certain where the "zone" is.

"Here you've got a guy who's gone off the net and is hiding in some of the most formidable terrain in one of the most remote parts of the world surrounded by people he trusts implicitly," said T. McCreary, spokesman for the National Counterterrorism Center. "And he stays off the net and is probably not mobile. That's an extremely difficult problem."

Intelligence officials think that bin Laden is hiding in the northern reaches of the autonomous tribal region along the Afghanistan-Pakistan border. This calculation is based largely on a lack of activity elsewhere and on other intelligence, including a videotape, obtained exclusively by the CIA and not previously reported, that shows bin Laden walking on a trail toward Pakistan at the

end of the battle of Tora Bora in December 2001, when U.S. forces came close but failed to capture him.

Many factors have combined in the five years since the Sept. 11, 2001, attacks to make the pursuit more difficult. They include the lack of CIA access to people close to al-Qaeda's inner circle; Pakistan's unwillingness to pursue him; the reemergence of the Taliban and al-Qaeda in Afghanistan; the strength of the Iraqi insurgency, which has depleted U.S. military and intelligence resources; and the U.S. government's own disorganization.

But the underlying reality is that finding one person in hiding is difficult under any circumstances. Eric Rudolph, the confessed Olympics and abortion clinic bomber, evaded authorities for five years, only to be captured miles from where he was last seen in North Carolina.

It has been so long since there has been anything like a real close call that some operatives have given bin Laden a nickname: "Elvis," for all the wishful-thinking sightings that have substituted for anything real.

After playing down bin Laden's importance and barely mentioning him for several years, Bush last week repeatedly invoked his name and quoted from his writings and speeches to underscore what Bush said is the continuing threat of terrorism.

Many terrorism experts, however, say the importance of finding bin Laden has diminished since Bush first pledged to capture him "dead or alive" in the aftermath of the Sept. 11 attacks. Terrorists worldwide have repeatedly shown they no longer need him to organize or carry out attacks, the experts say. Attacks in Europe, Asia and the Middle East were perpetrated by homegrown terrorists unaffiliated with al-Qaeda.

"Will his capture stop terrorism? No," Rep. Jane Harman (D-Calif.), vice chairman of the House Intelligence Committee, said in a recent interview. "But in terms of a message to the world, it's a huge message."

Despite a lack of progress, at CIA headquarters bin Laden and his deputy, Ayman al-Zawahiri, are still the most wanted of the High Value Targets, referred to as "HVT 1 and 2." The CIA station in Kabul still offers a briefing to VIP visitors that declares: "We are here for the hunt!" -- a reminder that finding bin Laden is a top priority.

Gary Berntsen, the former CIA officer who led the first and last hunt for bin Laden at Tora Bora, in December 2001, says, "This could all end tomorrow." One unsolicited walk-in. One tribesman seeking to collect the $25 million reward. One courier who would rather his kids grow up in the United States. One dealmaker, "and this could all change," Berntsen said.

On the videotape obtained by the CIA, bin Laden is seen confidently instructing his party how to dig holes in the ground to lie in undetected at night. A bomb dropped by a U.S. aircraft can be seen exploding in the distance. "We were there last night," bin Laden says without much concern in his voice. He was in or headed toward Pakistan, counterterrorism officials think.

That was December 2001. Only two months later, Bush decided to pull out most of the special operations troops and their CIA counterparts in the paramilitary division that were leading the hunt for bin Laden in Afghanistan to prepare for war in Iraq, said Flynt L. Leverett, then an expert on the Middle East at the National Security Council.

"I was appalled when I learned about it," said Leverett, who has become an

outspoken critic of the administration's counterterrorism policy. "I don't know of anyone who thought it was a good idea. It's very likely that bin Laden would be dead or in American custody if we hadn't done that."

Several officers confirmed that the number of special operations troops was reduced in March 2001.

White House spokeswoman Michele Davis said she would not comment on the specific allegation. "Military and intelligence units move routinely in and out," she said. "The intelligence and military community's hunt for bin Laden has been aggressive and constant since the attacks."

The Pakistani intelligence service, notoriously difficult to trust but also the service with the best access to al-Qaeda circles, is convinced bin Laden is alive because no one has ever intercepted or heard a message mourning his death. "Al-Qaeda will mourn his death and will retaliate in a big way. We are pretty sure Osama is alive," Pakistan's interior minister, Aftab Khan Sherpao, said in a recent interview with The Washington Post.

Pakistani intelligence officials also say they think bin Laden remains actively involved in al-Qaeda activities. They cite the interrogations of Ahmed Khalfan Ghailani, a key planner of the bombings of two U.S. embassies in East Africa in 1998, and Abu-Faraj al-Libbi, who served as a communications conduit between bin Laden and senior al-Qaeda operatives until his capture last year.

Libbi and Ghailani, who was arrested in Pakistan in July 2004, were the last two people taken into custody to have met with and taken orders from Zawahiri and to hear directly from bin Laden. "Both Ghailani and Libbi were informed that Osama was well and alive and in the picture by none other than Zawahiri himself," one Pakistani intelligence official said.

Two Pakistani intelligence officials recently interviewed in Karachi said that the last time they received firsthand information on bin Laden was in April 2003, when an arrested al-Qaeda leader, Tawfiq bin Attash, disclosed having met him in the Khost province of Afghanistan three months earlier.

Attash, who helped plan the 2000 USS Cole bombing, told interrogators that the meeting took place in the Afghan mountains about two hours from the town of Khost.

By then, Pakistan was the United States' best bet for information after an infusion of funds from the U.S. intelligence community, particularly in the area of expensive NSA eavesdropping equipment.

"For technical intelligence ISI (Inter-Services Intelligence) works hand in hand with the NSA," a senior Pakistani intelligence official said. "The U.S. assistance in building Pakistan's capabilities for technical intelligence since 9/11 is superb."

Since early 2002, the United States has stationed a small number of personnel from the NSA and the CIA near where bin Laden may be hiding. They are embedded with counterterrorism units of the Pakistan army's elite Special Services Group, according to senior Pakistani intelligence officials.

The NSA and other specialists collect imagery and electronic intercepts that their CIA counterparts then share with the Pakistani units in the tribal areas and with the province of Baluchistan to the south.

But even with sophisticated technology, the local geography presents formidable obstacles. In a land of dead-end valleys, high peaks and winding ridge lines, it is

easy to hide within the miles of caves and deep ravines, or to live unnoticed in mud-walled compounds barely distinguishable from the surrounding terrain.

The Afghan-Pakistan border is about 1,500 miles. Pakistan deploys 70,000 troops there. Its army had never entered the area until October 2001, more than a half century after Pakistan's founding.

A Muslim country where many consider bin Laden a hero, Pakistan has grown increasingly reluctant to help the U.S. search. The army lost its best source of intelligence in 2004, after it began raids inside the tribal areas. Scouts with blood ties to the tribes ceased sharing information for fear of retaliation.

They had good reason. At least 23 senior anti-Taliban tribesmen have been assassinated in South and North Waziristan since May 2005. "Al-Qaeda footprints were found everywhere," Interior Minister Sherpao said in a recent interview. "They kidnapped and chopped off heads of at least seven of these pro-government tribesmen."

Pakistani and U.S. counterterrorism and military officials admit that Pakistan has now all but stopped looking for bin Laden. "The dirty little secret is, they have nothing, no operations, without the Paks," one former counterterrorism officer said.

Last week, Pakistan announced a truce with the Taliban that calls on the insurgent Afghan group to end armed attacks inside Pakistan and to stop crossing into Afghanistan to fight the government and international troops. The agreement also requires foreign militants to leave the tribal area of North Waziristan or take up a peaceable life there.

In Afghanistan, the hunt for bin Laden has been upstaged by the reemergence of the Taliban and al-Qaeda, and by Afghan infighting for control of territory and opium poppy cropland.

Lt. Gen. John R. Vines, who commanded U.S. troops in Afghanistan in 2003, said he thinks bin Laden kept close to the border, not wandering far into either country. That belief is still current among military and intelligence analysts.

"We believe that he held to a pretty narrow range of within 15 kilometers of the border," said Vines, who now commands the XVIII Airborne Corps, "so that if the Pakistanis, for whatever reason, chose to do something to him, he could cross into Afghanistan and vice versa."

He said he thinks bin Laden's protection force "had a series of outposts with radios that could alert each other" if helicopters were coming or other troop movements were evident.

Pakistani military officials in Wana, the capital of South Waziristan, described bin Laden as having three rings of security, each ring unaware of the movements and identities of the other. Sometimes they communicated with specially marked flashlights. Sometimes they dressed as women to avoid detection by U.S. spy planes.

Pakistan will permit only small numbers of U.S. forces to operate with its troops at times and, because their role is so sensitive politically, it officially denies any U.S. presence. A frequent complaint from U.S. troops is that they have too little to do. The same complaint is also heard from U.S. forces in Afghanistan, where there were few targets to go after.

Although the hunt for bin Laden has depended to a large extent on technology, until recently unmanned aerial vehicles (UAVs) were in short supply, especially

when the war in Iraq became a priority in 2003.

In July 2003, Vines said that U.S. forces under his command thought they were close to striking bin Laden, but had only one drone to send over three possible routes he might take. "A UAV was positioned on the route that was most likely, but he didn't go that way," Vines said. "We believed that we were within a half-hour of possibly getting him, but nothing materialized."

Faced with the most sophisticated technology in the world, bin Laden has gone decidedly low-tech. His 23 video or audiotapes in the last five years are thought to have been hand-carried to news outlets or nearby mail drops by a series of couriers who know nothing about the contents of their deliveries or the real identity of the sender, a simple method used by spies and drug traffickers for centuries.

"They are really good at operational security," said Ben Venzke, chief executive officer of IntelCenter, a private company that analyzes terrorist information and has obtained, analyzed and published all bin Laden's communiques. "They are very good at having enough cut-outs" to move videos into circulation without detection. "It's some of the simplest things to do."

Bureaucratic battles slowed down the hunt for bin Laden for the first two or three years, according to officials in several agencies, with both the Pentagon and the CIA accusing each other of withholding information. Defense Secretary Donald H. Rumsfeld's sense of territoriality has become legendary, according to these officials.

In early November 2002, for example, a CIA drone armed with a Hellfire missile killed a top al-Qaeda leader traveling through the Yemeni desert. About a week later, Rumsfeld expressed anger that it was the CIA, not the Defense Department, that had carried out the successful strike.

"How did they get the intel?" he demanded of the intelligence and other military personnel in a high-level meeting, recalled one person knowledgeable about the meeting.

Gen. Michael V. Hayden, then director of the National Security Agency and technically part of the Defense Department, said he had given it to them.

"Why aren't you giving it to us?" Rumsfeld wanted to know.

Hayden, according to this source, told Rumsfeld that the information-sharing mechanism with the CIA was working well. Rumsfeld said it would have to stop.

A CIA spokesman said Hayden, now the CIA director, does not recall this conversation. Pentagon spokesman Bryan Whitman said, "The notion that the department would do anything that would jeopardize the success of an operation to kill or capture bin Laden is ridiculous." The NSA continues to share intelligence with the CIA and the Defense Department.

At that time, Rumsfeld was putting in place his own aggressive plan, led by the U.S. Special Operations Command (SOCOM), to dominate the hunt for bin Laden and other terrorists. The overall special operations budget has grown by 60 percent since 2003 to $8 billion in fiscal year 2007.

Rows and rows of temporary buildings sprang up on SOCOM's parking lots in Tampa as Rumsfeld refocused the mission of a small group of counterterrorism experts from long-term planning for the war on terrorism to manhunting. The group "went from 20 years to 24-hour crisis-mode operations," one former special operations officer

said. "It went from planning to manhunting."

In 2004, Rumsfeld finally won the president's approval to put SOCOM in charge of the "Global War on Terrorism."

Today, however, no one person is in charge of the overall hunt for bin Laden with the authority to direct covert CIA operations to collect intelligence and to dispatch JSOC units. Some counterterrorism officials find this absurd. "There's nobody in the United States government whose job it is to find Osama bin Laden!" one frustrated counterterrorism official shouted. "Nobody!"

"We work by consensus," explained Brig. Gen. Robert L. Caslen Jr., who recently stepped down as deputy director of counterterrorism under the Joint Chiefs of Staff. "In order to find Osama bin Laden, certain departments will come together. . . . It's not that effective, or we'd find the guy, but in terms of advancing United States power for that mission, I think that process is effective."

But Lt. Gen. Stanley A. McChrystal, the JSOC commander since 2003, has become the de facto leader of the hunt for bin Laden and developed a good working relationship with the CIA to the extent that he recently was able to persuade the former station chief in Kabul to become his special assistant. He asks for targets from the CIA, and it tries to comply. "We serve the military," one intelligence officer said.

McChrystal's troops have shuttled between Afghanistan and Iraq, where they succeeded in killing al-Qaeda leader Abu Musab al-Zarqawi and killed or captured dozens of his followers.

Under McChrystal, JSOC has improved its ability to quickly turn captured documents, computers and cellphones into leads and then to act upon them, while waiting for more analysis from CIA or SOCOM.

Industry experts and military officers say they are being aided by computer forensic field kits that let technicians retrieve information from surviving hard drives, cellphones and other electronic devices, as was the case in the Zarqawi strike.

McChrystal, who has commanded JSOC since 2003, now has the authority to go after bin Laden inside Pakistan without having to seek permission first, two U.S. officials said.

"The authority," one knowledgeable person said, "follows the target," meaning that if the target is bin Laden, the stakes are high enough for McChrystal to decide any action on his own. The understanding is that U.S. units will not enter Pakistan, except under extreme circumstances, and that Pakistan will deny giving them permission.

Such was the case in early January, when JSOC troops clandestinely entered the village of Saidgai, two officials familiar with the operation said, and Pakistan protested.

A week later, acting on what Pakistani intelligence officials said was information developed out of Libbi's interrogation, the CIA ordered a missile strike against a house in the village of Damadola, about 120 miles northwest of Islamabad, where Pakistani and American officials thought Zawahiri to be hiding.

The missile killed 13 civilians and several suspected terrorists. But Zawahiri was not among them. The strike "could have changed the destiny of the war on terror. Zawahiri was 100 percent sure to visit Damadola . . . but he disappeared at

the last moment," one Pakistani intelligence official said.

Tens of thousands of Pakistanis staged an angry anti-American protest near Damadola, shouting, "Death to America!"

"Once again, we have lost track of Ayman al-Zawahiri," the Pakistani intelligence official said in a recent interview. "He keeps popping on television screens. It's miserable, but we don't know where he or his boss are hiding."

Contributing to this report were staff writers Bradley Graham, Thomas E. Ricks, Josh White, Griff Witte and Allan Lengel in Washington, Kamran Khan in Islamabad and John Lancaster in Wana, Pakistan, and staff researchers Julie Tate and Robert E. Thomason.

LOAD-DATE: September 10, 2006

LANGUAGE: ENGLISH

CORRECTION-DATE: September 11, 2006


CORRECTION:  A Sept. 10 article incorrectly reported when U.S. special operations troops were reduced in the effort to find Osama bin Laden. The date was March 2002.

PUBLICATION-TYPE: Newspaper


Copyright 2006 The Washington Post

# The Washington Post

## washingtonpost.com

The **Washington Post**

December 11, 2004 Saturday
Final Edition

# New Spy **Satellite** Debated On Hill;
# Some Question Price and Need

**BYLINE: Dana Priest,** Washington Post Staff Writer

**SECTION:** A Section; A01

**LENGTH:** 1295 words

The United States is building a new generation of spy **satellites** designed to orbit undetected, in a highly classified program that has provoked opposition in closed congressional sessions where lawmakers have questioned its necessity and rapidly escalating price, according to U.S. officials.

The previously undisclosed effort has almost doubled in projected cost -- from $5 billion to nearly $9.5 billion, officials said. The National Reconnaissance Office, which manages spy **satellite** programs, has already spent hundreds of millions of dollars on the program, officials said.

The stealth **satellite,** which would probably become the largest single-item expenditure in the $40 billion intelligence budget, is to be launched in the next five years and is meant to replace an existing stealth **satellite,** according to officials. Non-stealth **satellites** can be tracked and their orbits can be predicted, allowing countries to attempt to hide weapons or troop movements on the ground when they are overhead.

Opponents of the new program, however, argue that the **satellite** is no longer a good match against today's adversaries: terrorists seeking small quantities of illicit weapons, or countries such as North Korea and Iran, which are believed to have placed their nuclear weapons programs underground and inside buildings specifically to avoid detection from spy **satellites** and aircraft.

The National Reconnaissance Office and the CIA declined to comment. Lockheed Martin Corp., which sources said is the lead contractor on the project, issued a statement saying, "As a matter of policy we do not discuss what we may or may not be doing in regards to classified programs."

The **satellite** in question would be the third and final version in a series of spacecraft funded under a classified program once known as Misty, officials said.

Concerned about the latest **satellite's** relevancy and escalating costs, the Senate Select Committee on Intelligence has twice tried to kill it, according to knowledgeable officials. The program has been strongly supported, however, by Senate and House appropriations committees; by the House intelligence committee, which was chaired by Rep. Porter J. Goss (R-Fla.) until he recently became CIA director; and by his predecessor, George J. Tenet.

"With the amount of money we're talking about here, you could build a whole new CIA," said one official, who, like others, talked about the program and the debate on the condition of anonymity because of the project's sensitivity.

The debate over the secret program has been carried out in closed session on Capitol Hill, and no legislator has publicly acknowledged the existence of the program. Echoes of the heated discussion, however, have begun to emerge in public.

Earlier this week, four Democratic senators refused to sign the "conference sheets" used by the House-Senate conference committee working on the 2005 intelligence authorization bill. Sources said that was meant to protest inclusion once again of the **satellite** program.

A statement by conference managers said only that four Democratic senators -- John D. Rockefeller IV (W.Va.), vice chairman of the intelligence committee; Carl M. Levin (Mich.); Richard J. Durbin (Ill.); and Ron Wyden (Ore.) -- objected to a classified item in the bill "that they believe is unnecessary and the cost of which they believe is unjustified." It continued: "They believe that the funds for this item should be expended on other intelligence programs that will make a surer and greater contribution to national security." Some Republican lawmakers have concerns about the program as well, as do some senators on the Armed Services Committee, sources said.

In an attempt to verbalize frustration while abiding by classification constraints, Rockefeller made an unusual reference to his protest on the Senate floor.

"My decision to take this somewhat unprecedented action is based solely on my strenuous objection -- shared by many in our committee -- to a particular major funding acquisition program that I believe is totally unjustified and very wasteful and dangerous to national security," Rockefeller said. "Because of the highly classified nature of the programs contained in the national intelligence budget, I cannot talk about them on the floor."

Rockefeller added that the committee has voted "to terminate the program" for the past two years, "only to be overruled" by the appropriations committees.

A small firestorm followed, with at least one radio talk show host and callers to Rockefeller's office charging that he had divulged classified information. On Thursday, spokeswoman Wendi Morigi issued what she called a clarification. "Any assertion about classified intelligence programs based on Senator Rockefeller's statement is wholly speculative," the statement said. It said Rockefeller's floor statement had been "fully vetted and approved by security officials."

That statement illustrates the constraints faced by members of Congress as they work to adjust or terminate even multibillion-dollar programs that are hidden from public scrutiny and debate. There have been other hints of problems in **satellite** programs in the last year.

Several months ago, Sen. Dianne Feinstein (D-Calif.), a member of the intelligence committee, made a cryptic reference to the value of expensive **satellite** programs during testimony on her intelligence reform proposal.

"I can't go into this, but when we look at **satellites,** one or the other of us has questions," she told her colleagues. "I'm concerned these are tens-of-billions-of-dollar items and we sure as heck better know what we're doing."

Stealth technology has been used to cloak military aircraft such as the F-117A fighter and the B-2 bomber.

When radar searches for a stealth craft, it records a signature that is much smaller than its size should indicate. Thus a stealth plane or **satellite** could appear to radar analysts as airborne debris.

Advanced nations routinely patrol the skies with radar and other equipment to detect spy planes, **satellites** and other sensors.

About 95 percent of spycraft are detected by other nations, experts say. But "even France and Russia would have a hard time figuring out what they were tracking" if they were to pick up the image of a stealth **satellite**, said John Pike of GlobalSecurity.org, an expert on space imagery.

The idea behind a stealth **satellite** is "so the evildoers wouldn't know we are looking at them," Pike said. "It's just a fundamental principle of operational security that you know when the other guy's **satellites** are going to be overhead and you plan accordingly."

But, Pike said, "the cover and deception going on today is more systematic and continual. It's not the 'duck and cover' of the Soviet era."

The existence of the maiden stealth **satellite** launched under the Misty program was first reported by Jeffrey T. Richelson in his 2001 book "The Wizards of Langley: Inside the CIA's Directorate of Science and Technology." Richelson said that first craft was launched from the space shuttle Atlantis on March 1, 1990.

Amateur space trackers in England and Canada were able to detect it at points after that, Richelson reported.

A second Misty **satellite** was launched nearly a decade later and is in operation, sources said.

Circumstantial evidence of that **satellite's** existence was outlined in the April issue of a Russian space magazine, Novosti Kosmonavtiki. According to a translation for The Washington Post, the article suggested that a **satellite** launched from Vandenberg Air Force Base in California in 1999 may be the second-generation Misty craft and noted that the **satellite** was put into orbit along with "a large number of debris," a likely deception method.

Researcher Julie Tate contributed to this report.

## Find Documents with Similar Topics

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

| Industry | Subject | Geography |
|---|---|---|
| ☐ SATELLITE TECHNOLOGY | ☐ DEFENSE CONTRACTING | ☐ UNITED STATES |
| ☐ DEFENSE CONTRACTING | ☐ ESPIONAGE | |
| ☐ SURVEILLANCE TECHNOLOGY | ☐ CONFERENCES & CONVENTIONS | |
| ☐ SATELLITE INDUSTRY | ☐ INTELLIGENCE SERVICES | |
| | ☐ LEGISLATIVE BODIES | |

[_____] **OR** [_____]

Show Major and Minor Index Terms | Show Relevancy Scores                 Clear Selections

**SUBJECT: SATELLITE** TECHNOLOGY (93%); LEGISLATORS (91%); SURVEILLANCE TECHNOLOGY (90%); DEFENSE CONTRACTING (90%); ESPIONAGE (90%); CONFERENCES & CONVENTIONS (89%); **SATELLITE** INDUSTRY (89%); LEGISLATIVE BODIES (89%); INTELLIGENCE SERVICES (89%); APPROPRIATIONS (78%); US DEMOCRATIC PARTY (78%); SPACECRAFT (78%); US REPUBLICAN PARTY (78%); CONCEALED WEAPONS (77%); SPACE EXPLORATION (73%); NUCLEAR WEAPONS (70%); MILITARY WEAPONS (68%); ILLEGAL WEAPONS (68%); TERRORISM (67%); WAR & CONFLICT (54%)

**COMPANY:** LOCKHEED MARTIN CORP (67%)