# The Washington Post

# washingtonpost.com

### The Washington Post

November 8, 2002 Friday
Final Edition

# CIA Killed U.S. Citizen In Yemen Missile Strike; Action's Legality, Effectiveness Questioned

**BYLINE: Dana Priest,** Washington Post Staff Writer

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 955 words

A U.S. citizen was among the people killed in the pilotless missile strike on suspected al Qaeda terrorists in Yemen Sunday, administration officials confirmed yesterday, adding a new element to an attack that reflects the evolving nature of the U.S. war on terrorism around the world.

Ahmed Hijazi and five other suspected al Qaeda operatives were killed by a five-foot long Hellfire missile launched from a remote controlled CIA Predator aircraft as they rode in a vehicle 100 miles east of the Yemeni capital, Sanaa.

Hijazi held U.S. citizenship and was also a citizen of an unidentified Middle Eastern country, a senior administration official confirmed. He was not born in the United States, but resided here for an unknown period of time, the official said.

With him in the vehicle, said Yemeni and U.S. government officials, was a senior al Qaeda leader, Abu Ali al-Harithi, who is suspected of masterminding the October 2000 attack on the destroyer USS Cole.

Hijazi's citizenship highlights the different approaches pursued simultaneously by the administration as it wages its war on terror. In some cases since Sept. 11, American citizens have been arrested and afforded traditional legal rights in the criminal justice system. In others, they have been captured and held indefinitely in military brigs as "enemy combatants." Now, at least in Hijazi's case, a citizen has been killed in a covert military action.

What's more, Hijazi was killed in a country considered at peace with the United States, although U.S. officials say the strike was carried out with the approval and cooperation of Yemen's government.

It was unclear whether the CIA operatives who fired the missile knew that an American citizen was among their targets. It also was unclear whether that would have made any difference.

Even in war, the U.S. government affords greater legal protections to U.S. citizens than foreigners and, in peacetime, the CIA is restricted in the kinds of surveillance and operations it can conduct against U.S. citizens at home and abroad.

The administration, working with the authority of a presidential finding that permits covert actions against Osama bin Laden's al Qaeda terrorist network, considered al-Harithi and his traveling party a military target -- "combatants" under international law.

Officials further contend that Sunday's missile strike was an act of self-defense, which is also permitted under the international laws of war, because al-Harithi already had allegedly attacked the United States in October 2000 when he helped blow up the USS Cole, killing 17 sailors.

Administration officials, intelligence operatives and military analysts, frustrated with the slow, torturous pace of locating and capturing individual terrorists in lawless areas of countries such as Yemen, praised the CIA strikes as an innovative way to get the job done.

"This is an extraordinary change of threshold," said one former intelligence operative who praised the tactic as particularly effective.

The CIA strikes are also a reflection, they say, of how slow the U.S. military, even its Special Operations forces, have been to adapt to the ad hoc, ever-changing tactics of smaller and smaller cadres of terrorists now operating without much of a command structure. The CIA, in fact, has become a much more central tactical military tool in the terrorism war than in any previous conflict, largely because it has a much less cumbersome bureaucracy.

The CIA's separate targeting process, which was used in Sunday's Predator strike, is quicker, more fluid and involves fewer decision-makers in its "trigger-pulling" chain of command than even the nimblest military operation, intelligence experts said.

But while the lethality of the CIA Predator attack was considered successful, it also raises a host of new questions about the legality, effectiveness and ethics of using a tactic outwardly akin to assassination. Assassination is banned by a presidential executive order.

"This ought to be a last resort for the United States," said Jeffrey H. Smith, former general counsel at the CIA. The preferable route, he said, would be to capture and try terrorists, and share the evidence of guilt with the world.

"To the extent you do more and more of this, it begins to look like it is policy," Smith said. "It is not clear that that is an effective tool." Israel, for example, has asserted it has targeted individual Palestinians whom it considers combatants. But the tactic has not stopped suicide attacks and other violence; some analysts suggest it has only outraged the Palestinian community and fueled the violence.

After a while, Smith said, such pinpoint targeting of individuals might "suggest that it's acceptable behavior to assassinate people. . . . Assassination as a norm of international conduct exposes American leaders and Americans overseas."

State Department spokesman Richard Boucher said yesterday that the government did not yet have enough information to verify Hijazi's U.S. citizenship but may learn more from Yemeni authorities. Yemeni officials said yesterday that personal documents, weapons and **satellite** telephones had been found in the burned-out car.

Yemen is bin Laden's ancestral home, and U.S. intelligence officials describe the country as one of the key refuges for al Qaeda operatives pushed out of Afghanistan by the war there. U.S. Special Forces trainers were sent to Yemen after Sept. 11, 2001.

The U.S. military has been preparing more intensive operations in Yemen. But military operations have proven highly risky. In December, an attempt to force militant Islamic tribal forces on the Saudi border to turn over suspected al Qaeda members ended with the deaths of 13 Yemeni soldiers.

**Find Documents with Similar Topics**

# The Washington Post

## washingtonpost.com

### The Washington Post

April 3, 2002 Wednesday
Final Edition

## 'Team 555' Shaped a New Way of War; Special Forces and Smart Bombs Turned Tide and Routed Taliban

**BYLINE: Dana Priest,** Washington Post Staff Writer

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 3976 words

Two darkened helicopters rocked through a nighttime storm that had smothered the Panjshir Valley in clouds. The MH-53J Pave Lows -- the largest choppers in the Air Force inventory -- suddenly felt like tin to the soldiers riding in back. One helicopter was flying blind, its electronic sensors having failed.

"Pull up! Pull up!" someone shouted from the cockpit as a mountainside appeared out of the black.

As the chopper surged upward, Chief Warrant Officer David Diaz hung on in back and worried. He and the 11 other soldiers split between the two helicopters constituted Team 555 of the U.S. Army Special Forces. Rough weather had already foiled their mission twice -- and it was a once-in-a-lifetime mission.

Team 555 had been chosen to be the first A-team infiltrated into Afghanistan during the war, the vanguard of a small, nearly invisible U.S. ground presence that helped topple the Taliban with stunning speed and tested a new template for warfare.

Shortly after midnight on Oct. 19, Diaz's helicopter thudded to the ground. But like many war scenarios, this one began off-script: Both choppers had landed in the wrong place. On a moonless night, the two halves of 555 were separated by several miles and one small mountain. With each man responsible for 300 pounds of gear and with huge, uneven rocks underfoot, exploration was out of the question.

Up ahead, Diaz saw little lights dancing toward him. "This is bad," he thought. They were flashlights, and their illumination rendered his night vision goggles useless, suggesting this wasn't the reception party he was expecting.

"I'm going to try to talk to these guys," Diaz told his men. "If I hit the ground, I expect you guys to start shooting." He began walking, a machine gun in his hands and a Beretta strapped to his thigh.

Before long, a huge silhouette loomed into view -- "a monster of a man," in Diaz's reckoning -- and stretched out his hand.

"Hi! I'm Hal!" the monster roared in thoroughly American English. "Damn glad to meet you!"

Thus did the Central Intelligence Agency welcome the U.S. Special Forces into Afghanistan, setting in motion a war plan that would blend intelligence and ordnance in novel ways.

The Special Forces have been quietly carrying the military's banner for unconventional warfare for five decades. At the height of their involvement in Vietnam, 3,750 Special Forces soldiers -- known then as Green Berets -- trained paramilitary and South Vietnamese strike forces, conducted raids and led a hearts-and-minds campaign. In the 1980s, they advised Central American militaries fighting leftist guerrillas. In the 1991 Persian Gulf War, they hunted Iraqi Scud launchers, conducted long-range reconnaissance and accompanied Kuwaiti resistance fighters back into Kuwait City.

But not until last fall's drive to oust the Taliban from power in Afghanistan did the Special Forces play the central role in a conflict. And they did it with just over 300 soldiers.

The Special Forces teams executed three missions: synchronizing the unorganized forces of ethnic Uzbek and Tajik Afghan opposition groups in the north; building small armies out of Pashtun tribesmen in the south; and providing the targeting information that enabled Navy and Air Force pilots to fire guided bombs at al Qaeda and Taliban fighters and equipment, most of the time with devastating precision.

These missions depended on a new relationship between U.S. military and intelligence personnel, and a highly improvisational partnership between U.S. soldiers on the ground and their Afghan counterparts. But under the pressures of war, these relationships were forged quickly.

Before the war began, on Oct. 7, top-ranking U.S. military officials cautioned that it would take until summer to break the Taliban's five-year hold on power.

It took 49 days, from the 555's debut on Oct. 19 until the Taliban fell to the Northern Alliance in the southern city of Kandahar on Dec. 6.

Moreover, it took just 316 Special Forces soldiers: 18 A-teams, four company-level units and three battalion-level commands, all reporting to a Joint Special Operations Task Force at the Khanabad Air Base in Karshi, Uzbekistan, 100 miles north of the Afghan border. Nearly every team also included one or two CIA operatives and an Air Force Special Operations combat controller, expert at guiding high-flying aircraft to targets.

As the fighting in Afghanistan continues, much of what the Special Forces and their partners did in Afghanistan remains obscured by the unit's culture of secrecy and Defense Department decisions not to publicize their actions.

But Team 555's experience in the effort that led to the taking of the Afghan capital of Kabul highlights the emerging relationships between the Pentagon and the CIA, and between the Special Forces and the Afghan armies they assisted. This article is drawn from interviews with more than 30 Special Forces officers and soldiers, most of them from the 5th Special Forces Group based at Fort Campbell, Ky. Some team members asked to be identified only by rank and first name.

Team 555 (the Triple Nickel) won the right to be the first one in through a competitive vetting process. Diaz, 38, had spent seven months on the Afghan-Pakistan border on a CIA-led mission training members of the Afghan resistance to the Soviets in 1987; some members of his team had seen combat in Iraq and Somalia, and others had trained Arab armies in the Persian Gulf.

Hal and his partner, Phil -- names the members of 555 assumed were pseudonyms -- were among the CIA operatives that had been inserted into Afghanistan beginning Sept. 27 to designate landing zones, secure safe houses, vet anti-Taliban commanders and supply their troops with weapons, communications gear, medical supplies and clothing.

For weeks, Hal and Phil had been promising Northern Alliance commanders working around Bagram air base that U.S. air power was coming to defeat the Taliban.

Once Team 555 arrived, the CIA operatives had something more concrete to offer.

After 555's helicopters hit the ground, Hal, a former Navy SEAL and part of the CIA's growing paramilitary unit within its Special Activities Division, reunited the separated halves of the team at a safe house in the village of Astana in the lush north-central Panjshir Valley. The area had been home to opposition leader Ahmed Shah Massoud, who had retained control even during the Soviet occupation during the 1980s, up through his assassination, by operatives linked to al Qaeda, on Sept. 9.

At the safe house, the team met Phil, from the CIA's analytical branch. Fluent in Russian, he wore a beige jacket and seemed to have long-term relationships with the Afghan commanders the team would be paired with.

Phil gave a briefing on the mission: The next day, the team would join up with commanders allied with Massoud's successor, Gen. Mohammed Fahim, the Northern Alliance's defense minister. (He is now defense minister in the interim government.) They would work mainly with Gen. Bismullah Khan and two other subcommanders, including Gen. Babajan, who had commanded troops in a three-year standoff with the Taliban at Bagram.

First, they were to help U.S. warplanes destroy the Taliban front line around that airfield. Then, they were to search for and destroy Taliban and al Qaeda targets in the 35-mile stretch south to Kabul. Finally, they were to help the alliance seize Kabul, a triumph they hoped would demoralize Taliban troops in the south.

The team's movements were tracked by Special Forces soldiers 1,500 miles away in a Combined Air Operations Center at the Prince Sultan Air Base outside Riyadh, the capital of Saudi Arabia. That group also analyzed pictures and other intelligence on the A-teams' targets.

When Phil introduced Diaz and the others to Bismullah Khan at their next safe house, in the village of Taqhma, he said, "Here's the Special Forces team I've been promising you."

"Okay," said Khan, friendly but reserved. "Show us what you can do."

"All you have to do is show me where to start," Diaz replied.

At 7 the next morning, a four-man survey team snuck as close to the Taliban front lines as they could to fix their position and look for targets.

The view was startling. The Taliban had added 2,000 troops to its force of 5,000 in the days since Massoud's assassination. With the naked eye, they could see Taliban tanks, artillery, troops, command posts, vehicles and ammunition bunkers. Targets. More than 50 of them.

The scouting team called back to Diaz, who had gone to the Bagram airfield control tower, which overlooked the carcasses of several rusted Soviet MiG fighters and offered the best view of the front line, 1,000 meters away. Diaz radioed Sgt. 1st Class J.T. at the safe house in Taqhma. "Bring the CAS equipment, fast!" he said, meaning the binoculars, laser designator and Global Positioning System used to identify and plot target coordinates. He asked Tech Sgt. Calvin, an Air Force Special Operations combat controller, to see if he could redirect aircraft already in the air to bomb immediately.

J.T. lugged the 90-pound equipment backpack up to the control tower just about the time the aircraft started showing up. Gen. Babajan, a stout, jovial man, had arrived by then, too, along with an entourage that filled the 20-by-20-foot tower.

"Look over there," Diaz told Babajan, handing him the binoculars. "That's the target." He pointed toward the Taliban front line, at a buried antiaircraft artillery gun sticking up from what looked like a mound of mud and at a command-and-control shack identified by a protruding antenna.

The first aircraft, an F/A-18 Hornet off the USS Theodore Roosevelt, demolished it with a blast that flung dry dirt and fiery shards of metal three stories into the air.

The fireworks were immediately upstaged by cheers and laughter from the commanders. Babajan shook the team members' hands and hugged Diaz. From the base of the tower, his security force erupted in cheers and applause.

Babajan scribbled in his notebook, listing targets struck and targets he wanted struck.

After an hour, the Taliban hit back -- artillery shells whizzed by, exploding in front of and behind the tower. Calvin crouched, Phil hit the floor. Two Special Forces soldiers scrambled down the rickety staircase.

It was clear, Diaz would say later, that the team's predeployment chest-beating had given way to fear. "Everybody stop where you're at and get back up here!" he yelled. "Here's the deal. We will not be effective if we leave. Don't even bother to duck. The Taliban are bad shots."

The team stayed seven hours, until dusk, directing a continuous flow of warplanes onto the Taliban front lines until there were no more aircraft available.

The tremendous roar of invisible warplanes flying at 15,000 feet overhead forced the Taliban forces to scatter into trenches and walled compounds as giant blasts of fire leapt up around them.

That night, back at the safe house, the Afghans honored the Americans with a huge feast and a long list of targets for the next day.

For nearly a week, 555 was one of only two Special Forces teams inside Afghanistan, so it had the entire range of Air Force and Navy planes at its call; F-18, F-14 and F-15 fighters, B-52 and B-1 bombers, AC-130 gunships. The Taliban troops made themselves easy targets too by returning to Bagram from Kabul in truck convoys most nights to snuggle close to the Northern Alliance front line.

Team 555's work with Fahim north of Kabul set a pattern for three more A-teams that infiltrated beginning in the second half of October: 553 in the central Bamian province, 585 around Kunduz and 595 in Dara-e Suf, a remote mountain village and headquarters for their new partner, Gen. Abdurrashid Dostum, the ethnic Uzbek warlord renowed for his ruthlessness and Machiavellian alliance shifts.

For 18 days those four teams, plus two 15-person battalion-level units -- only 78 soldiers in all -- accounted for the entire Special Forces presence in Afghanistan, according to the U.S. Army Special Forces Command. Yet they set the stage for the fall of the northern two-thirds of the country.

With such small numbers, most of the A-teams split into four detachments of three men each to cover more territory.

Some subteams went for weeks without seeing other Americans, maintaining contact via **satellite** radio. One was ferried into place in a beat-up, Soviet-made MI-8 HIP helicopter that "barely cleared some of the highest peaks" of the Hindu Kush mountains, according to the team's report. One three-man detachment of Team 595 worked in a dug-in observation post on a hilltop, an 18-hour horseback ride from the closest U.S. soldier.

Horses, in fact, were briefly an unfortunate fact of life for the Americans. Only two of 595's men

had ever ridden before their first hours in Afghanistan; suddenly, the burly soldiers found themselves atop wiry mountain ponies, in stiff wooden saddles with stirrups so short their knees were jammed into their armpits.

The grizzled Northern Alliance commanders, for their part, had to come to terms with the Americans' relative inexperience and fresh faces. Dostum was one of many Afghan commanders who insisted at first that the Americans remain at headquarters, out of harm's way, which was too far from the action to direct airstrikes. Dostum, said Mark, the Special Forces captain assigned to him, worried that the death of one U.S. soldier might weaken the U.S. commitment to the war.

The soldiers convinced him otherwise, even though they were unsure themselves. "The problem we have as soldiers is, we don't make policy," said the team sergeant, Paul. "We can say, 'We're committed,' and the next day Congress can say, 'No, we're not.' We end up being very vague on those statements."

Air Force and Navy pilots made crucial adjustments, too.

Air power experts had disdained "tank-plinking," or hitting small numbers of troops or a few tanks and artillery pieces -- until this war. The pilots and their commanders, sitting at the operations center in Saudi Arabia, had been trained in the efficacy of destroying large sites with high "strategic" value, such as top military command centers and government ministries. But these targets were missing in Afghanistan. Only after spirited, daily debates over the radios with the Special Forces teams did they learn to hit mud huts, jeeps and villages, targets that often looked civilian in nature but that troops said had been taken over by the Taliban.

Special Forces teams kept and filed reports on the number of casualties the U.S. airstrikes inflicted, but the Defense Department has refused to release the number of civilians believed killed, and has acted defensive about admitting mistakes. Finally, air planners cut their traditional 72-hour targeting cycle to as little as 12 hours. For still greater flexibility, they divided the country into 30 "kill boxes," in which pilots could loiter, waiting to be given targets.

In early November, 1st Sgt. J.T. was hunting for targets with an Afghan commander in the turret of a building southeast of Bagram when the sandbags in front of them began popping with the impact of machine gun rounds. The laser target designator was knocked to the ground.

J.T. radioed for help. "Is there anything out there?" he asked. "Please, anything." He got no response. They began to climb down a ladder propped against the building. The Afghan commander was handing the radio down to J.T. when it squawked. After they scurried back up, a familiar, if frantic, dialogue ensued during which J.T. talked the pilot onto targets.

Over the next hour, 45 bombs rained on a 300-by-100-meter area around them.

"Shack on target!" J.T. yelled to indicate a direct hit. "Shack on target!"

"It was beautiful," he recalled. "The whole area was laden with machine guns and mortars. We completely smoked everything."

They also were now within days of Kabul.

On Nov. 3, Lt. Col. Max Bowers, a 5th Group battalion commander, and seven others arrived at Dara-e Suf, joining Team 595. His job was to coordinate the battles of three major Northern Alliance commanders, including Dostum. Their goal was Mazar-e Sharif, the northwestern city that Dostum had controlled between 1992 and 1997 and that held strategic value because it could open a supply pipeline to allied forces elsewhere in the north.

By then Dostum had allied himself with his former enemies Attah Mohammed and Mohammed Mohaqiq to take the city. They were eager for Bowers's communications capability, which could

link up and keep track of each.

Bowers carried a 4-by-6-foot laminated map that they marked with X's and O's and arrows as they designed the offensive. Dostum would take the plans to his war council, where Bowers would sit silently with him. Dostum and Bowers's plan was to encircle Mazar-e Sharif. There was great concern that Taliban forces would resist and turn the battle into a house-by-house fight, "absolutely the worst kind of fight you can be in," Bowers said.

As they approached Mazar-e Sharif, Bowers's toughest job was to figure out how to get the forces of all three commanders into the city without fratricide. When they started squabbling, he would pull out from his chest pocket a piece of the World Trade Center he had been given and would say, "This is why we're here." Their squabbles, he said, were brief.

Each commander was given an Inmarsat **satellite** phone to speak to the others and to Bowers. Bowers also had his own line of communication with the A-teams attached to each commander. The night before the battle, with Dostum and the other commanders' troops arrayed on the ridges overlooking Mazar-e Sharif, they watched convoys of Taliban troops flee. Bowers's men called in fierce airstrikes. Troops on the hilltops, he said, "were simply ecstatic."

"We saturated the battlefield with small close-air-support cells and we hit the Taliban if they were engaging us, if they were trying to maneuver in a favorable position," he said. "We engaged them while they were moving and if they tried to retreat. They simply could not move."

The Taliban front line collapsed nearly immediately on the night of Nov. 9. Taliban soldiers ran away, abandoning trenches, leaping from tanks and scrambling into trucks and jeeps for a getaway. Hundreds fled to Samangan and Kunduz provinces. U.S. forces used aircraft to attack some of the fleeing fighters but did not ask the Afghans to intercept them on the ground, Bowers said.

Dostum immediately set his sights on Kabul and Kunduz. But so did Fahim and the other commanders. For weeks Washington had been urging the Northern Alliance leadership not to move on the capital, trying to buy time to negotiate a power-sharing agreement among Afghanistan's ethnic blocs. But the fighting was about to overtake the diplomacy.

The competition for Kabul did not rest solely with the commanders. Leading Team 555, Diaz did not want to have another A-team's general beat his general into Kabul. Fahim had led Massoud's triumphant forces into the capital in 1992, on the heels of the Soviet retreat, and Massoud had held the city for four years, before the Taliban swept into power.

"I tried to play him against Dostum by saying, 'Hey, we don't want to be last. Why aren't we starting?' " said Diaz, who was still near Bagram, trying to push Fahim's troops to begin their march south to Kabul.

Fahim agreed to ready his troops if Diaz would request strikes on a final list of targets whose destruction would make their offensive easier. Beginning Nov. 10, Team 555 called in 25 strikes that, by the team's official estimates, killed 2,200 enemy soldiers and destroyed 29 tanks and six command posts over two days. Reporters in the area soon after saw no evidence of such destruction.

Fahim's troops put on brand new Chinese-made uniforms, readied their weapons for the offensive, and stayed in garrison. Fahim had agreed to give Diaz 24 hours' notice before his troops began their move south. Diaz estimated that it would take Fahim's foot soldiers 10 days to reach the capital.

But on Nov. 12, Diaz's team sergeant, Greg, radioed with news: "They're moving out in two hours."

"We tried to stay ahead of them with the bombings," said Greg, "but at some point we did have to stop, because they were moving faster than we could calculate where they were at. We knew their objective was Kabul, and they weren't going to be slowed down by our bombing."

Fahim, said Diaz, resorted to a time-honored practice to get several subcommanders to slow down so he could take the city. "He paid them off to stop," he said.

As they moved south, the Northern Alliance allowed thousands of Afghan Taliban members to switch sides. Several suicide bombers among the instant defectors blew themselves up in an effort to kill those who were switching.

"There was a lot of handshaking involved, especially between Afghani and Afghani," said Greg. But the opposite was true for the non-Afghan fighters, the Arabs, Pakistanis, Chechens and others in Afghanistan to fight alongside the Taliban and al Qaeda. "The Pakis and other foreigners, they couldn't care less about; they were going to kill them," Greg said.

And they did. In one case, after hand-to-hand combat in Estelef, a village on the way to Kabul that Fahim's subcommanders would not allow the Americans to bomb, the Taliban surrendered on Nov. 11. The Afghans within the Taliban forces there began killing the Arabs and Pakistanis in their own ranks. "In a lot of cases, the native Afghanis in the Taliban unit were killing them themselves," said Diaz.

"We absorbed the native Afghanis; the Arabs and Pakistanis were all killed trying to escape, supposedly," added Greg.

During the last day of the offensive, the team came under heavy fire, said J.T. One Afghan guard, afraid the Americans might get hurt, laid his body across two of them as they crouched behind a barrier and continued to call in aircraft.

"They saw us as an asset, but they also saw that if one of us got hurt, [Washington] might pull us out. We didn't have to get in the trenches and fight with them. They didn't want us there," J.T. said.

By dawn the next day, Taliban forces were fleeing south from Kabul. Fahim, with Team 555 not far behind, was surrounded by a crush of cheering Afghans as he approached the capital.

The team made its way to the U.S. Embassy, which had been closed since 1989. Marines, who guard U.S. embassies around the world, would open the doors and raise the flag in front of the international media corps, but first, it fell to 555 to check the building for booby traps. They found the embassy frozen in time, the ambassador's desk still brimming with papers.

As they looked around the compound, opening drawers and peering in closets and the refrigerator, they found four soda cans wrapped in brown paper and labeled "bomb." A map of Kabul clung to the wall. Open drink bottles sat behind the Marine Corps bar, a standard recreation room in many embassy compounds.

In Kabul, the members of Team 555 moved into another safe house and befriended a couple of young shoeshine boys, whom the team outfitted in clothes and soccer equipment. They also opened the Kabul airfield, which immediately became the hub of international relief efforts.

Diaz's team was twice visited by the Afghan commanders they had worked with. They came bearing coordinates and asked Diaz to call in his bombers and fighters to an area just south of Kabul. Enemy territory, they insisted.

Calvin, the Air Force combat controller, sent the request into the base at Karshi, which passed it to the operations center in Saudi Arabia. The response, Calvin recalled, came back quickly: The target request was not Taliban, but a rival alliance faction. "It is a problem between them," the

# The Washington Post

## washingtonpost.com

### The Washington Post

February 20, 2002 Wednesday
Final Edition

## In War, Mud Huts And Hard Calls;
## As U.S. Teams Guided Pilots' Attacks, Civilian Presence Made Task Tougher

**BYLINE: Dana Priest,** Washington Post Staff Writer

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 1640 words

When the soldiers of U.S. Army Special Forces Team 555 went to work in Afghanistan, they found no shortage of targets for U.S. warplanes to strike: mud huts where Taliban soldiers slept, rusted jeeps they drove, shacks with suspicious antennas pointing toward the sky.

But to Navy and Air Force pilots flying thousands of feet above, they didn't look like military targets, and in the initial days of the war, the fliers were reluctant to attack. So "we started to play this terminology game," said Chief Warrant Officer Dave Diaz, who led Team 555.

He told the nine soldiers and one Air Force Special Operations combat controller with him: "Yes, it is a civilian village, mud hut, like everything else in this country. But don't say that. Say it's a military compound. It's a built-up area, barracks, command and control. Just like with the convoys -- if it really was a convoy with civilian vehicles they were using for transport, we would just say, hey, military convoy, troop transport."

The pilots quickly came to trust Team 555's judgment -- in their 25 days of round-the-clock target-spotting, the team directed 175 aircraft sorties -- but the early episode recounted by Diaz highlights the complexity of identifying targets in the Afghan war.

The U.S. military's targeting practices have come under question as Afghan villagers have reported civilian casualties from U.S. airstrikes. Pentagon officials have disputed the reports and insisted that the vast majority of airstrikes hit Taliban and al Qaeda targets. Other military leaders have noted that in a war like the one in Afghanistan, enemy forces may intermingle freely with noncombatants.

Team 555 infiltrated into Afghanistan on Oct. 19 and remained until Jan. 4; identifying targets was its primary mission. The team's experience, recounted in extensive interviews with several members, illuminates how they chose and checked targets, and how, in certain circumstances, civilians could find themselves in harm's way.

From the night they infiltrated, Team 555 members began working with the CIA and with Northern Alliance commanders to select targets for airstrikes. First, they were to destroy the Taliban front line around the Bagram airfield, where the alliance and the Taliban had faced off for three years. After that, the team was to send planes to destroy Taliban and al Qaeda strongholds in the 30-mile swath of barren land stretching south to the capital, Kabul. Finally, they were to

help the alliance seize Kabul.

For nearly a week in late October, 555 was one of only two Special Forces teams inside Afghanistan, so it had the entire range of Air Force and Navy planes at its call: F-18, F-14 and F-15 fighters, B-52 and B-1 bombers, AC-130 gunships. To service all the targets, the team split into two groups and used one of three observation posts within two miles of one another.

From those and other positions, they could see through high-powered binoculars a plethora of targets: small columns of men walking ridge lines, cooking fires burning near trench lines, artillery and mortar pieces and tanks glistening in the afternoon sun, mortars embedded in courtyards. Sometimes they saw black-shrouded figures, which they took to be al Qaeda members.

To verify targets, pilots and targeteers working in a command center in Saudi Arabia had an unprecedented array of information: CIA intelligence from the ground, pictures from **satellites,** P-3 spy planes and, in some cases, live feeds of video shot by unmanned Predator surveillance aircraft hovering over the battlefield.

In the early going, when a pilot expressed reluctance to hit a certain target, members of Team 555 sometimes stopped their terminology game to plead their case explicitly.

"Yes, it's a mud hut," went the argument of one sergeant, who asked to be identified only as J.T. "We live in mud huts. They live in mud huts. We fight out of mud huts. They fight out of mud huts. There are no good guys there anymore."

A number of Taliban troops would spend their days in Kabul but return to Bagram for the night, believing it was safer there. Northern Alliance intelligence in Kabul kept track of nearly everyone who left on these evening treks. Sometimes the convoys included civilians.

"We knew the only people who were going to travel from here to Kabul were combatants, and in some cases, their family members," said Diaz. Although Team 555 members worked hard with the Air Force to avoid striking civilians, there were occasions when they saw a few women and children mixed in with Taliban forces they needed to strike at that moment. Then, Diaz said, "the guidance I gave my team, and the guidance from higher [headquarters], is that they are combatants."

Rear Adm. Craig R. Quigley, a Pentagon spokesman, said that war planners developed rules of engagement for Special Forces soldiers and pilots that took into account "the very unsettled and unconventional conditions that our forces would find themselves in in Afghanistan" to include times when the Taliban and al Qaeda kept families near them. As is standard, he would not describe the rules of engagement but said they "allowed clarity for forces on the ground." To date, Quigley added, "we have not taken any action against any of our forces for noncompliance with the rules of engagement."

International law requires that military forces take "all feasible precautions" to avoid civilian casualties, attack only military objects and weigh the value of military targets when some civilian casualties are likely to occur if they are struck. That is what Diaz and the other members of Team 555 believe they did.

By law, unarmed civilians can never be considered combatants, said Kenneth Roth, director of Human Rights Watch, which is sending investigators to Afghanistan to assess civilian casualties. "But we don't criticize things that are close calls," he added.

In unconventional warfare, he said, commanders have an obligation to weigh the value of hitting targets that will likely result in civilian deaths. "They need to make the argument, is that a trade-off that can be justified?"

Sgt. 1st Class Tom Rosenbarger, a 14-year Special Forces veteran, vetted the requests for strikes that Team 555 called in. He sat 1,500 miles away in the space-age Combined Air Operations Center (known as the CAOC, or "KAY-ok") at Prince Sultan Air Base outside Riyadh. From there, he tracked the movement of every Special Forces team in Afghanistan, monitored the teams' radios and helped analyze all kinds of data on the targets that the teams requested be struck.

Rosenbarger was also the mediator between high-tech, high-precision aviation and seat-of-the-pants, in-the-dirt unconventional warfare. At the start of the war, many CAOC staffers had no idea what the Special Forces teams' capabilities were.

"Understand, this is UW," he recalled telling one skeptical Air Force officer, using the abbreviation for "unconventional warfare," which is what Special Forces are expressly trained to wage.

"What's UW?" the Air Force officer asked.

"Unconventional war, it was something we have practiced, but we had not seen in a long time," said one high-ranking Air Force official with experience in the CAOC. "The trust we had in the military people on the ground" built as the days passed.

Team 555's Air Force representative, a Special Operations combat controller from the 720th Special Tactics Group, taught the team how to call in close air support using binoculars, a laser target designator, Global Positioning System devices and other equipment. But with a 15,000-foot minimum altitude imposed on pilots for their safety, it was sometimes impossible for pilots in the cockpits to see what the team saw from the ground. Some would fly near the target, use their own binoculars to peer down, and talk about what they saw with the Special Forces team members.

"The general lay of the land, it's brown and dusty mud," said J.T. "So a lot of the lower fighting positions, they really couldn't see. It's really hard to pick up the contrast, or the lack of it. They'd say, 'I see a city. I see a town.' I would say, well no, you see a cluster of five buildings. In one of these buildings you'll see a cluster of vehicles. While they may look like Toyota Land Cruisers, they are used to move troops and ammunition. This area here is all bad guys."

Some pilots refused to drop munitions if they weren't convinced. But, Rosenbarger said, his Air Force colleagues adapted quickly, especially after he sneaked them copies of initial bomb damage assessment reports showing ample amounts of military equipment destroyed in "villages" occupied by Taliban forces.

Sometimes, the nature of the war made targeting easier. Many Afghan Taliban and Northern Alliance soldiers were friends who had found themselves drafted into opposing armies. They would communicate over rudimentary radios, sometimes taunting each other in the heat of battle.

"Your bomb missed us," one would say, recalled members of Team 555.

"Where did it land?" a Northern Alliance officer would respond with some coaching from the Americans.

Five hundred meters to the north, would come the answer. Or 1,000 meters to the south. The combat controller would immediately recalculate the coordinates and pass them to the nearest aircraft, which could restrike the target within minutes. Team 555 members said that in a week, they killed many Taliban commanders this way and destroyed much of their communications network.

Military planners at the U.S. Central Command in Tampa had calculated that it would take five months before conditions would be ripe to begin an offensive against Kabul. After the airstrikes directed by Team 555, Northern Alliance forces began their march on the capital in 20 days, and

Nexis® Document

# The Washington Post

## washingtonpost.com

### The Washington Post

December 26, 2002 Thursday
Final Edition

## U.S. Decries Abuse but Defends Interrogations; 'Stress and Duress' Tactics Used on Terrorism Suspects Held in Secret Overseas Facilities

**BYLINE: Dana Priest** and Barton Gellman, Washington Post Staff Writers

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 2838 words

Deep inside the forbidden zone at the U.S.-occupied Bagram air base in Afghanistan, around the corner from the detention center and beyond the segregated clandestine military units, sits a cluster of metal shipping containers protected by a triple layer of concertina wire. The containers hold the most valuable prizes in the war on terrorism -- captured al Qaeda operatives and Taliban commanders.

Those who refuse to cooperate inside this secret CIA interrogation center are sometimes kept standing or kneeling for hours, in black hoods or spray-painted goggles, according to intelligence specialists familiar with CIA interrogation methods. At times they are held in awkward, painful positions and deprived of sleep with a 24-hour bombardment of lights -- subject to what are known as **"stress and duress"** techniques.

Those who cooperate are rewarded with creature comforts, interrogators whose methods include feigned friendship, respect, cultural sensitivity and, in some cases, money. Some who do not cooperate are turned over -- "rendered," in official parlance -- to foreign intelligence services whose practice of torture has been documented by the U.S. government and human rights organizations.

In the multifaceted global war on terrorism waged by the Bush administration, one of the most opaque -- yet vital -- fronts is the detention and interrogation of terrorism suspects. U.S. officials have said little publicly about the captives' names, numbers or whereabouts, and virtually nothing about interrogation methods. But interviews with several former intelligence officials and 10 current U.S. national security officials -- including several people who witnessed the handling of prisoners -- provide insight into how the U.S. government is prosecuting this part of the war.

The picture that emerges is of a brass-knuckled quest for information, often in concert with allies of dubious human rights reputation, in which the traditional lines between right and wrong, legal and inhumane, are evolving and blurred.

While the U.S. government publicly denounces the use of torture, each of the current national security officials interviewed for this article defended the use of violence against captives as just and necessary. They expressed confidence that the American public would back their view. The CIA, which has primary responsibility for interrogations, declined to comment.

"If you don't violate someone's human rights some of the time, you probably aren't doing your job," said one official who has supervised the capture and transfer of accused terrorists. "I don't think we want to be promoting a view of zero tolerance on this. That was the whole problem for a long time with the CIA."

The off-limits patch of ground at Bagram is one of a number of secret detention centers overseas where U.S. due process does not apply, according to several U.S. and European national security officials, where the CIA undertakes or manages the interrogation of suspected terrorists. Another is Diego Garcia, a somewhat horseshoe-shaped island in the Indian Ocean that the United States leases from Britain.

U.S. officials oversee most of the interrogations, especially those of the most senior captives. In some cases, highly trained CIA officers question captives through interpreters. In others, the intelligence agency undertakes a "false flag" operation using fake decor and disguises meant to deceive a captive into thinking he is imprisoned in a country with a reputation for brutality, when, in reality, he is still in CIA hands. Sometimes, female officers conduct interrogations, a psychologically jarring experience for men reared in a conservative Muslim culture where women are never in control.

In other cases, usually involving lower-level captives, the CIA hands them to foreign intelligence services -- notably those of Jordan, Egypt and Morocco -- with a list of questions the agency wants answered. These "extraordinary renditions" are done without resort to legal process and usually involve countries with security services known for using brutal means.

According to U.S. officials, nearly 3,000 suspected al Qaeda members and their supporters have been detained worldwide since Sept. 11, 2001. About 625 are at the U.S. military's confinement facility at Guantanamo Bay, Cuba. Some officials estimated that fewer than 100 captives have been rendered to third countries. Thousands have been arrested and held with U.S. assistance in countries known for brutal treatment of prisoners, the officials said.

At a Sept. 26 joint hearing of the House and Senate intelligence committees, Cofer Black, then head of the CIA Counterterrorist Center, spoke cryptically about the agency's new forms of "operational flexibility" in dealing with suspected terrorists. "This is a very highly classified area, but I have to say that all you need to know: There was a before 9/11, and there was an after 9/11," Black said. "After 9/11 the gloves come off."

According to one official who has been directly involved in rendering captives into foreign hands, the understanding is, "We don't kick the [expletive] out of them. We send them to other countries so they can kick the [expletive] out of them." Some countries are known to use mind-altering drugs such as sodium pentathol, said other officials involved in the process.

Abu Zubaida, who is believed to be the most important al Qaeda member in detention, was shot in the groin during his apprehension in Pakistan in March. National security officials suggested that Zubaida's painkillers were used selectively in the beginning of his captivity. He is now said to be cooperating, and his information has led to the apprehension of other al Qaeda members.

U.S. National Security Council spokesman Sean McCormack declined to comment earlier this week on CIA or intelligence-related matters. But, he said: "The United States is treating enemy combatants in U.S. government control, wherever held, humanely and in a manner consistent with the principles of the Third Geneva Convention of 1949."

The convention outlined the standards for treatment of prisoners of war. Suspected terrorists in CIA hands have not been accorded POW status.

Other U.S. government officials, speaking on condition of anonymity, acknowledged that interrogators deprive some captives of sleep, a practice with ambiguous status in international

law.

The U.N. High Commissioner for Human Rights, the authoritative interpreter of the international Convention Against Torture, has ruled that lengthy interrogation may incidentally and legitimately cost a prisoner sleep. But when employed for the purpose of breaking a prisoner's will, sleep deprivation "may in some cases constitute torture."

The State Department's annual human rights report routinely denounces sleep deprivation as an interrogation method. In its 2001 report on Turkey, Israel and Jordan, all U.S. allies, the department listed sleep deprivation among often-used alleged torture techniques.

U.S. officials who defend the renditions say the prisoners are sent to these third countries not because of their coercive questioning techniques, but because of their cultural affinity with the captives. Besides being illegal, they said, torture produces unreliable information from people who are desperate to stop the pain. They look to foreign allies more because their intelligence services can develop a culture of intimacy that Americans cannot. They may use interrogators who speak the captive's Arabic dialect and often use the prospects of shame and the reputation of the captive's family to goad the captive into talking.

In a speech on Dec. 11, CIA director George J. Tenet said that interrogations overseas have yielded significant returns recently. He calculated that worldwide efforts to capture or kill terrorists had eliminated about one-third of the al Qaeda leadership. "Almost half of our successes against senior al Qaeda members has come in recent months," he said.

Many of these successes have come as a result of information gained during interrogations. The capture of al Qaeda leaders Ramzi Binalshibh in Pakistan, Omar al-Faruq in Indonesia, Abd al-Rahim al-Nashiri in Kuwait and Muhammad al Darbi in Yemen were all partly the result of information gained during interrogations, according to U.S. intelligence and national security officials. All four remain under CIA control.

Time, rather than technique, has produced the most helpful information, several national security and intelligence officials said. Using its global computer database, the CIA is able to quickly check leads from captives in one country with information divulged by captives in another.

"We know so much more about them now than we did a year ago -- the personalities, how the networks are established, what they think are important targets, how they think we will react," said retired Army general Wayne Downing, the Bush administration's deputy national security adviser for combating terrorism until he resigned in June.

"The interrogations of Abu Zubaida drove me nuts at times," Downing said. "He and some of the others are very clever guys. At times I felt we were in a classic counter-interrogation class: They were telling us what they think we already knew. Then, what they thought we wanted to know. As they did that, they fabricated and weaved in threads that went nowhere. But, even with these ploys, we still get valuable information and they are off the street, unable to plot and coordinate future attacks."

In contrast to the detention center at Guantanamo Bay, where military lawyers, news reporters and the Red Cross received occasional access to monitor prisoner conditions and treatment, the CIA's overseas interrogation facilities are off-limits to outsiders, and often even to other government agencies. In addition to Bagram and Diego Garcia, the CIA has other secret detention centers overseas, and often uses the facilities of foreign intelligence services.

Free from the scrutiny of military lawyers steeped in the international laws of war, the CIA and its intelligence service allies have the leeway to exert physically and psychologically aggressive techniques, said national security officials and U.S. and European intelligence officers.

Although no direct evidence of mistreatment of prisoners in U.S. custody has come to light, the

prisoners are denied access to lawyers or organizations, such as the Red Cross, that could independently assess their treatment. Even their names are secret.

This month, the U.S. military announced that it had begun a criminal investigation into the handling of two prisoners who died in U.S. custody at the Bagram base. A base spokesman said autopsies found one of the detainees died of a pulmonary embolism, the other of a heart attack.

Al Qaeda suspects are seldom taken without force, and some suspects have been wounded during their capture. After apprehending suspects, U.S. take-down teams -- a mix of military special forces, FBI agents, CIA case officers and local allies -- aim to disorient and intimidate them on the way to detention facilities.

According to Americans with direct knowledge and others who have witnessed the treatment, captives are often "softened up" by MPs and U.S. Army Special Forces troops who beat them up and confine them in tiny rooms. The alleged terrorists are commonly blindfolded and thrown into walls, bound in painful positions, subjected to loud noises and deprived of sleep. The tone of intimidation and fear is the beginning, they said, of a process of piercing a prisoner's resistance.

The take-down teams often "package" prisoners for transport, fitting them with hoods and gags, and binding them to stretchers with duct tape.

Bush administration appointees and career national security officials acknowledged that, as one of them put it, "our guys may kick them around a little bit in the adrenaline of the immediate aftermath." Another said U.S. personnel are scrupulous in providing medical care to captives, adding in a deadpan voice, that "pain control [in wounded patients] is a very subjective thing."

The CIA's participation in the interrogation of rendered terrorist suspects varies from country to country.

"In some cases [involving interrogations in Saudi Arabia], we're able to observe through one-way mirrors the live investigations," said a senior U.S. official involved in Middle East security issues. "In others, we usually get summaries. We will feed questions to their investigators. They're still very much in control."

The official added: "We're not aware of any torture or even physical abuse."

Tenet acknowledged the Saudis' role in his Dec. 11 speech. "The Saudis are proving increasingly important support to our counterterrorism efforts -- from making arrests to sharing debriefing results," he said.

But Saudi Arabia is also said to withhold information that might lead the U.S. government to conclusions or policies that the Saudi royal family fears. U.S. teams, for that reason, have sometimes sent Saudi nationals to Egypt instead.

Jordan is a favored country for renditions, several U.S. officials said. The Jordanians are considered "highly professional" interrogators, which some officials said meant that they do not use torture. But the State Department's 2001 human rights report criticized Jordan and its General Intelligence Directorate for arbitrary and unlawful detentions and abuse.

"The most frequently alleged methods of torture include sleep deprivation, beatings on the soles of the feet, prolonged suspension with ropes in contorted positions and extended solitary confinement," the 2001 report noted. Jordan also is known to use prisoners' family members to induce suspects to talk.

Another significant destination for rendered suspects is Morocco, whose general intelligence service has sharply stepped up cooperation with the United States. Morocco has a documented history of torture, as well as longstanding ties to the CIA..

The State Department's human rights report says Moroccan law "prohibits torture, and the government claims that the use of torture has been discontinued; however, some members of the security forces still tortured or otherwise abused detainees."

In at least one case, U.S. operatives led the capture and transfer of an al Qaeda suspect to Syria, which for years has been near the top of U.S. lists of human rights violators and sponsors of terrorism. The German government strongly protested the move. The suspect, Mohammed Haydar Zammar, holds joint German and Syrian citizenship. It could not be learned how much of Zammar's interrogation record Syria has provided the CIA.

The Bush administration maintains a legal distance from any mistreatment that occurs overseas, officials said, by denying that torture is the intended result of its rendition policy. American teams, officials said, do no more than assist in the transfer of suspects who are wanted on criminal charges by friendly countries. But five officials acknowledged, as one of them put it, "that sometimes a friendly country can be invited to 'want' someone we grab." Then, other officials said, the foreign government will charge him with a crime of some sort.

One official who has had direct involvement in renditions said he knew they were likely to be tortured. "I . . . do it with my eyes open," he said.

According to present and former officials with firsthand knowledge, the CIA's authoritative Directorate of Operations instructions, drafted in cooperation with the general counsel, tells case officers in the field that they may not engage in, provide advice about or encourage the use of torture by cooperating intelligence services from other countries.

"Based largely on the Central American human rights experience," said Fred Hitz, former CIA inspector general, "we don't do torture, and we can't countenance torture in terms of we can't know of it." But if a country offers information gleaned from interrogations, "we can use the fruits of it."

Bush administration officials said the CIA, in practice, is using a narrow definition of what counts as "knowing" that a suspect has been tortured. "If we're not there in the room, who is to say?" said one official conversant with recent reports of renditions.

The Clinton administration pioneered the use of extraordinary rendition after the bombings of U.S. embassies in Kenya and Tanzania in 1998. But it also pressed allied intelligence services to respect lawful boundaries in interrogations.

After years of fruitless talks in Egypt, President Bill Clinton cut off funding and cooperation with the directorate of Egypt's general intelligence service, whose torture of suspects has been a perennial theme in State Department human rights reports.

"You can be sure," one Bush administration official said, "that we are not spending a lot of time on that now."

Staff writers Bob Woodward, Susan Schmidt and Douglas Farah, and correspondent Peter Finn in Berlin, contributed to this report.

### Find Documents with Similar Topics

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

**Subject**

TERRORISM

Case 1:10-cr-00485-LMB   Document 115-7   Filed 06/21/11   Page 18 of 78 PageID# 935

Page 1 of 4

# The Washington Post

## washingtonpost.com

### The Washington Post

September 30, 2004 Thursday
Final Edition

# Plan Would Let U.S. Deport Suspects To Nations That Might Torture Them

**BYLINE:** Dana Priest and Charles Babington, Washington Post Staff Writers

**SECTION:** A Section; A01

**LENGTH:** 1098 words

The Bush administration is supporting a provision in the House leadership's intelligence reform bill that would allow U.S. authorities to deport certain foreigners to countries where they are likely to be tortured or abused, an action prohibited by the international laws against torture the United States signed 20 years ago.

The provision, part of the massive bill introduced Friday by House Speaker J. Dennis Hastert (R-Ill.), would apply to non-U.S. citizens who are suspected of having links to terrorist organizations but have not been tried on or convicted of any charges. Democrats tried to strike the provision in a daylong House Judiciary Committee meeting, but it survived on a party-line vote.

The provision, human rights advocates said, contradicts pledges President Bush made after the Abu Ghraib prisoner-abuse scandal erupted this spring that the United States would stand behind the U.N. Convention Against Torture. Hastert spokesman John Feehery said the Justice Department "really wants and supports" the provision.

Justice Department spokesman Mark Corallo said, "We can't comment on any specific provision, but we support those provisions that will better secure our borders and protect the American people from terrorists."

The provision is one of several items in the bill that Democrats say are unrelated to intelligence reform but Republicans say are important tools for fighting terrorists. The Senate is debating its own intelligence reform bill that does not include the provision, and the House bill is being marked up in several committees.

Human rights groups and members of Congress opposed to the provision say it could result in the torture of hundreds of people now held in the United States who could be sent to such countries as Egypt, Saudi Arabia, Yemen, Jordan and Pakistan, all of which have dubious human rights records.

Supporters say the measure would provide a much-needed change to U.S. laws.

"Our laws are not up to date with the war we're fighting," Feehery said. In many cases, he said, the Justice Department "can't keep [terror suspects] in detention, they can't convict them, they don't want to try them. . . . If you can't detain them indefinitely, you sure don't want them in America."

The international anti-torture law prohibited the deportation of individuals to countries where there is a reasonable expectation that they will be tortured, abused or persecuted. U.S. immigration law permits non-U.S. citizens to seek political asylum to avoid such persecution and prohibits deportation or removal to countries likely to commit torture or abuse unless the government seeks assurance the country will not do so.

In 2002, the Justice Department, in a case that has earned international condemnation, approved the expedited removal of a Syrian-born Canadian citizen, **Maher Arar**, to Syria, a country whose long record of torture has been criticized publicly by Bush.

Arar, who U.S. authorities have said they suspect of links to a terrorist group, alleges that his Syrian captors tortured him during his 375 days in prison. He disputes U.S. claims. Freed last year by Syria, he lives in Canada with his family and has never been arrested or charged with a crime by Canada or the United States.

"Is it an inconvenience if we can't send people back to torturers? Sure," said Tom Malinowski of Human Rights Watch. "But since Abu Ghraib, everyone from the president to the Defense Department to Congress has said the United States does not have a policy of torture. If this passes, we will have a policy of tolerating torture."

Under the Hastert bill, U.S. authorities could send an immigrant to any country, regardless of the likelihood of torture or abuse. The measure would shift to the deportee the burden of proving "by clear and convincing evidence that he or she would be tortured" -- a burden that human rights activists say is impossible to satisfy. It would bar a U.S. court from reviewing the regulations, which would fall under the secretary of homeland security.

The provision would apply retroactively, to people now in detention and those who may have already been secretly deported under classified procedures to countries with well-documented histories of torture and human rights violations.

It also would allow U.S. authorities to deport foreigners convicted of any felony or suspected of having links to terrorist groups to any country -- even somewhere that is not a person's home country or place of birth, contrary to current practice. The CIA already has such authority, under a secret presidential finding first signed by President Bill Clinton and expanded by Bush after Sept. 11, 2001. The CIA has taken an unknown number of suspected terrorists apprehended abroad to third countries for interrogation.

Also in the Judiciary Committee meeting, GOP members defeated other Democratic-sponsored attempts to strike provisions that would make it easier to deport or track terrorist suspects.

GOP leaders scrambled to appease disgruntled Republicans who said the chamber was moving too quickly -- and ignoring rank-and-file members -- in pushing the 335-page bill.

As several House committees addressed various portions of the bill, Republicans generally defeated Democratic efforts to sidetrack it. But in some cases, GOP members were the sharpest critics.

In the intelligence committee, three senior Republicans opened a daylong markup by attacking the bill. "It is a cobbled-together bill," said Rep. Ray LaHood (R-Ill.). "It is a rush to judgment."

Rep. Randy "Duke" Cunningham (R-Calif.) said, "We're fools to rush forward and pass something that has been worked on for only so short a time." Rep. Jim Gibbons (R-Nev.) said, "This Congress appears to be rushing to implement reform on an election-year timetable."

With House Majority Whip Roy Blunt (R-Mo.) taking the unusual step of temporarily filling a committee vacancy for the day, members soothed tempers, in part by accepting a handful of amendments. One, offered by Gibbons and backed by the panel's Democrats, would authorize a

newly appointed national intelligence director to shift unlimited amounts of money from one purpose to another within agencies under the director's purview.

Hours later, Gibbons voted to send the amended bill to the House floor. Cunningham did, too, saying he had learned that the House Appropriations Committee was content with the bill's spending provisions. Most Democrats also endorsed the bill. Only two members of the intelligence committee -- LaHood and Rep. Rush D. Holt (D-N.J.) -- voted against the measure.

## Find Documents with Similar Topics

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

**Subject**

☐ JUSTICE DEPARTMENTS

☐ LAW ENFORCEMENT

☐ TORTURE

☐ US DEMOCRATIC PARTY

☐ US REPUBLICAN PARTY

☐ DEPORTATION

☐ HUMAN RIGHTS

☐ LEGISLATIVE BODIES

☐ TERRORISM

☐ US FEDERAL GOVERNMENT

**Geography**

☐ UNITED STATES

☐ SYRIA

☐☐☐☐☐☐☐☐☐☐☐☐  **OR**  ☐☐☐☐☐☐☐☐☐☐☐☐

Show Major and Minor Index Terms | Show Relevancy Scores                    Clear Selections

**SUBJECT:** LAW ENFORCEMENT (90%); US DEMOCRATIC PARTY (90%); JUSTICE DEPARTMENTS (90%); US REPUBLICAN PARTY (90%); TORTURE (90%); TERRORISM (89%); HUMAN RIGHTS (89%); US FEDERAL GOVERNMENT (89%); LEGISLATIVE BODIES (89%); LEGISLATORS (89%); DEPORTATION (89%); POLITICAL ASYLUM (78%); LEGISLATION (78%); IMMIGRATION LAW (78%); IMMIGRATION (78%); HUMAN RIGHTS VIOLATIONS (77%); INTERNATIONAL LAW (77%); HUMAN RIGHTS ORGANIZATIONS (77%); US POLITICAL PARTIES (76%); POLITICS (76%); APPROVALS (73%); TALKS & MEETINGS (73%); TERRORIST ORGANIZATIONS (70%); US PRESIDENTS (69%)

**ORGANIZATION:** US DEPARTMENT OF JUSTICE (83%); UNITED NATIONS (56%)

**PERSON:** GEORGE W BUSH (56%)

**GEOGRAPHIC:** UNITED STATES (94%); SYRIA (91%); SAUDI ARABIA (79%); EGYPT (79%); JORDAN (68%)

**LOAD-DATE:** September 30, 2004

**LANGUAGE:** ENGLISH

# The Washington Post

## washingtonpost.com

### The Washington Post

May 11, 2004 Tuesday
Final Edition

## Secret World of U.S. Interrogation; Long History of Tactics in Overseas Prisons Is Coming to Light

**BYLINE: Dana Priest** and Joe Stephens, Washington Post Staff Writers

**SECTION:** A Section; A01

**LENGTH:** 3005 words

Last of three articles

In Afghanistan, the CIA's secret U.S. interrogation center in Kabul is known as "The Pit," named for its despairing conditions. In Iraq, the most important prisoners are kept in a huge hangar near the runway at Baghdad International Airport, say U.S. government officials, counterterrorism experts and others. In Qatar, U.S. forces have been ferrying some Iraqi prisoners to a remote jail on the gigantic U.S. air base in the desert.

The Abu Ghraib prison in Iraq, where a unit of U.S. soldiers abused prisoners, is just the largest and suddenly most notorious in a worldwide constellation of detention centers -- many of them secret and all off-limits to public scrutiny -- that the U.S. military and CIA have operated in the name of counterterrorism or counterinsurgency operations since the Sept. 11, 2001, attacks.

These prisons and jails are sometimes as small as shipping containers and as large as the sprawling Guantanamo Bay complex in Cuba. They are part of an elaborate CIA and military infrastructure whose purpose is to hold suspected terrorists or insurgents for interrogation and safekeeping while avoiding U.S. or international court systems, where proceedings and evidence against the accused would be aired in public. Some are even held by foreign governments at the informal request of the United States.

"The number of people who have been detained in the Arab world for the sake of America is much more than in Guantanamo Bay. Really, thousands," said Najeeb Nuaimi, a former justice minister of Qatar who is representing the families of dozens of prisoners.

The largely hidden array includes three systems that only rarely overlap: the Pentagon-run network of prisons, jails and holding facilities in Iraq, Afghanistan, Guantanamo and elsewhere; small and secret CIA-run facilities where top al Qaeda and other figures are kept; and interrogation rooms of foreign intelligence services -- some with documented records of torture -- to which the U.S. government delivers or "renders" mid- or low-level terrorism suspects for questioning.

All told, more than 9,000 people are held by U.S. authorities overseas, according to Pentagon figures and estimates by intelligence experts, the vast majority under military control. The detainees have no conventional legal rights: no access to a lawyer; no chance for an impartial

hearing; and, at least in the case of prisoners held in cellblock 1A at Abu Ghraib, no apparent guarantee of humane treatment accorded prisoners of war under the Geneva Conventions or civilians in U.S. jails.

Although some of those held by the military in Iraq, Afghanistan and Guantanamo have had visits by the International Committee of the Red Cross, some of the CIA's detainees have, in effect, disappeared, according to interviews with former and current national security officials and to the Army's report of abuses at Abu Ghraib.

The CIA's "ghost detainees," as they were called by members of the 800th MP Brigade, were routinely held by the soldier-guards at Abu Ghraib "without accounting for them, knowing their identities, or even the reason for their detention," the report says. These phantom captives were "moved around within the facility to hide them" from Red Cross teams, a tactic that was "deceptive, contrary to Army doctrine, and in violation of international law."

CIA employees are under investigation by the Justice Department and the CIA inspector general's office in connection with the death of three captives in the past six months, two who died while under interrogation in Iraq, and a third who was being questioned by a CIA contract interrogator in Afghanistan. A CIA spokesman said the hiding of detainees was inappropriate. He declined to comment further.

None of the arrangements that permit U.S. personnel to kidnap, transport, interrogate and hold foreigners are ad hoc or unauthorized, including the so-called renditions. "People tend to regard it as an extra-judicial kidnapping; it's not," former CIA officer Peter Probst said. "There is a long history of this. It has been done for decades. It's absolutely legal."

In fact, every aspect of this new universe -- including maintenance of covert airlines to fly prisoners from place to place, interrogation rules and the legal justification for holding foreigners without due process afforded most U.S. citizens -- has been developed by military or CIA lawyers, vetted by Justice Department's office of legal counsel and, depending on the particular issue, approved by White House general counsel's office or the president himself.

In some cases, such as determining whether a U.S. citizen should be designated an enemy combatant who can be held without charges, the president makes the final decision, said Alberto R. Gonzales, counsel to the president, in a Feb. 24 speech to the American Bar Association's Standing Committee on Law and National Security.

Critics of this kind of detention and treatment, Gonzales said, "assumed that there was little or no analysis -- legal or otherwise -- behind the decision to detain a particular person as enemy combatant."

On the contrary, the administration has applied the law of war, he said. "Under these rules, captured enemy combatants, whether soldiers or saboteurs, may be detained for the duration of hostilities."

Because most of the directives and guidelines on these issues are classified, former and current military and intelligence officials who described them to The Washington Post would do so only on the condition that they not be identified.

Along with other CIA and military efforts to disrupt terrorist plots and break up al Qaeda's financial networks, administration officials argue that the interrogations are a key component of their global counterterrorism strategy and counterinsurgency operations in Iraq. As the CIA's deputy director, John McLaughlin, recently told the commission investigating the Sept. 11 attacks: "The country, with all its capabilities, is now much more orchestrated into an offensive mix that is relentless."

Abu Ghraib -- where photographs were taken that have enraged the Arab world and rocked U.S.

political and military leadership -- held 6,000 to 7,000 detainees at the time of the documented abuse. Today, it and other sites in Iraq hold more than 8,000 prisoners, U.S. and coalition officials said. They range from those believed to have played key roles in the insurgency to some who are held on suspicion of petty crimes.

Until the current scandal cast some hazy light, little has been publicly known about the Iraq detention sites, their locations and who was being held there. That has been a source of continuing frustration for international monitoring groups such as New York-based Human Rights Watch, which has repeatedly sought to visit the facilities. Even the military's investigative report on abuses at Abu Ghraib remains classified, despite having become public through leaks.

Far better known has been the Defense Department's facility at Guantanamo Bay. The open-air camps there house about 600 detainees, flown in from around the world over the past two years. Secrecy there remains tight, with detainees and most of the facilities off-limits to visitors.

The U.S. Supreme Court is deciding whether detainees held there, whom the Pentagon has declared "enemy combatants" in the war against terrorism, should have access to U.S. courts.

Last week, the U.S. military acknowledged that two Guantanamo Bay guards had been disciplined in connection with use of excessive force against detainees. And U.S. defense officials confirmed the existence of a list of approved interrogation techniques, dating to April 2003, that included reversing sleep patterns, exposing prisoners to hot and cold, and "sensory assault," including use of bright lights and loud music.

The treatment of prisoners in Afghanistan has received less public attention.

The U.S. military holds 300 or so people at Bagram, north of the capital of Kabul, and in Kandahar, Jalalabad and Asadabad. Human Rights Watch estimates that at least 700 people had been released from those sites, most of them held a few weeks or less. Special Forces units also have holding centers at their firebases, including at Gardez and Khost.

In December 2002, two Afghans died in U.S. custody in Afghanistan. The U.S. military classified both as homicides. Another Afghan died in June 2003 at a detention site near Asadabad.

"Afghans detained at Bagram airbase in 2002 have described being held in detention for weeks, continuously shackled, intentionally kept awake for extended periods of time, and forced to kneel or stand in painful positions for extended periods," said a report in March by Human Rights Watch. "Some say they were kicked and beaten when arrested, or later as part of efforts to keep them awake. Some say they were doused with freezing water in the winter."

Before the U.S. military was imprisoning and interrogating people in Afghanistan and Iraq, the CIA was scooping up suspected al Qaeda leaders in such far-off places as Pakistan, Yemen and Sudan. Today, the CIA probably holds two to three dozen captives around the world, according to knowledgeable current and former officials. Among them are al Qaeda leaders Khalid Sheik Mohammed and Ramzi Binalshibh in Pakistan and Abu Zubaida. The CIA is also in charge of interrogating Saddam Hussein, who is believed to be in Baghdad.

The location of CIA interrogation centers is so sensitive that even the four leaders of the House and Senate intelligence committees, who are briefed on all covert operations, do not know them, congressional sources said. These members are given periodic reports about the captives, but several members said they do not receive information about conditions under which prisoners are held, and members have not insisted on this information. The CIA has told Congress that it does not engage in torture as a tactic of interrogation.

"There's a black hole on certain information such as location, condition under which they are held," said one congressional official who asked not to be identified. "They are told it's too sensitive."

In Afghanistan, the CIA used to conduct some interrogations in a cluster of metal shipping containers at Bagram air base protected by three layers of concertina wire. It is unclear whether that center is still open, but the CIA's main interrogation center now appears to be in Kabul, at a location nicknamed "The Pit" by agency and Special Forces operators.

"Prisoner abuse is nothing new," said one military officer who has been working closely with CIA interrogators in Afghanistan. A dozen former and current national security officials interviewed by The Washington Post in 2002, including several who had witnessed interrogations, defended the use of stressful interrogation tactics and the use of violence against detainees as just and necessary.

The CIA general counsel's office developed a new set of interrogation rules of engagement after the Sept. 11 attacks. It was vetted by the Justice Department and approved by the National Security Council's general counsel, according to U.S. intelligence officials and other U.S. officials familiar with the process. "There are very specific guidelines that are thoroughly vetted," said one U.S. official who helps oversee the process. "Everyone is on board. It's legal."

The rules call for field operators to seek approval from Washington to use "enhanced measures" -- methods that could cause temporary physical or mental pain.

U.S. intelligence officials say the CIA, contrary to the glamorized view from movies and novels, had no real interrogation specialists on hand to deal with the number of valuable suspects it captured after Sept. 11. The agency relied on analysts, psychologists and profilers. "Two and a half years later," one CIA veteran said, "we have put together a very professional, controlled, deliberate and legally rationalized approach to dealing with the Abu Zubaidas of the world."

U.S. intelligence officials say their strongest suit is not harsh interrogation techniques, but time and patience.

Much larger than the group of prisoners held by the CIA are those who have been captured and transported around the world by the CIA and other agencies of the U.S. government for interrogation by foreign intelligence services. This transnational transfer of people is a key tactic in U.S. counterterrorism operations on five continents, one that often raises the ire of foreign publics when individual cases come to light.

For example, on Jan. 17, 2002, a few hours before Bosnia's Human Rights Chamber was to order the release of five Algerians and a Yemeni for lack of evidence, Bosnian police handed them over to U.S. authorities, who flew them to Guantanamo Bay.

The Bosnian government, faced with public outcry, said it would compensate the families of the men, who were suspected of making threats to the U.S. and British embassies in Bosnia.

The same month, in Indonesia, Muhammad Saad Iqbal Madni, suspected of helping Richard C. Reid, the Briton charged with trying to detonate explosives in his shoe on an American Airlines flight, was detained by Indonesian intelligence agents based on information the CIA provided them. On Jan. 11, without a court hearing or a lawyer, he was hustled aboard an unmarked U.S.-registered Gulfstream V jet parked at a military airport in Jakarta and flown to Egypt.

It was no coincidence Madni ended up in Egypt. Egypt, Morocco, Jordan and Saudi Arabia are well-known destinations for suspected terrorists.

"A lot of people they [the U.S.] are taking to Jordan, third-country nationals," a senior Saudi official said. "They can do anything they want with them, and the U.S. can say, 'We don't have them.' "

In the past year, an unusual country joined that list of destinations: Syria.

Last year U.S. immigration authorities, with the approval of then-acting Attorney General Larry Thompson, authorized the expedited removal of **Maher Arar** to Syria, a country the U.S. government has long condemned as a chronic human rights abuser. Maher, a Syrian-born Canadian citizen, was detained at JFK International Airport in New York as he was transferring to the final leg of his flight home to Canada.

U.S. authorities say Arar has links to al Qaeda. Not wanting to return him to Canada for fear he would not be adequately followed, immigration officials took him, in chains and shackles, to a New Jersey airfield, where he was "placed on a small private jet, and flown to Washington D.C.," according to a lawsuit filed recently against the U.S. government. He was flown to Jordan, interrogated and beaten by Jordanian authorities who then turned him over to Syria, according to the lawsuit.

Arar said that for the 10 months he was in prison, he was beaten, tortured and kept in a shallow grave. After much pressure from the Canadian government and human rights activists, he was freed and has returned to Canada.

CIA Director George J. Tenet, testifying earlier this year before the commission investigating the Sept. 11 attacks, said the agency participated in more than 70 renditions in the years before the attacks. In 1999 and 2000 alone, congressional testimony shows, the CIA and FBI participated in two dozen renditions.

Christopher Kojm, a former State Department intelligence official and a staff member of the commission, explained the rendition procedure at a recent hearing: "If a terrorist suspect is outside of the United States, the CIA helps to catch and send him to the United States or a third country," he testified. "Though the FBI is often part of the process, the CIA is usually the main player, building and defining the relationships with the foreign government intelligence agencies and internal security services."

The Saudis currently are detaining and interrogating about 800 terrorism suspects, said a senior Saudi official. Their fate is largely controlled by Saudi-based joint intelligence task forces, whose members include officers from the CIA, FBI and other U.S. law enforcement agencies.

The Saudi official said his country does not participate in renditions and today holds no more than one or two people at the request of the United States. Yet much can hinge on terminology.

In some interrogations, for example, specialists from the United States and Saudi Arabia develop questions and an interrogation strategy before questioning begins, according to one person knowledgeable about the process. During interrogation, U.S. task force members watch through a two-way mirror, he said.

"Technically, the questioning is done by a Saudi citizen. But, for all practical purposes, it is done live," he said. The United States and Saudis "are not 'cooperating' anymore; we're doing it together."

He said the CIA sometimes prefers Saudi interrogation sites and other places in the Arab world because their interrogators speak a detainee's language and can exploit his religion and customs.

"As hard as it is to believe, you can't physically abuse prisoners in Saudi Arabia," the Saudi official said. "You can't beat them; you can't electrocute them."

Instead, he said, the Saudis bring radical imams to the sessions to build a rapport with detainees, who are later passed on to more moderate imams. Working in tandem with relatives of the detainees, the clerics try to convince the subjects over days or weeks that terrorism violates tenets of the Koran and could bar them from heaven.

"According to our guys, almost all of them turn," the Saudi official said. "It's like deprogramming

them. There is absolutely no need to put them through stress. It's more of a therapy."

The Saudis don't want or need to be directed by American intelligence specialists, who have difficulty understanding Arab culture and tribal relations, he said. "We know where they grew up," he said of the detainees. "We know their families. We know the furniture in their home."

Research editor Margot Williams contributed to this report.


### Find Documents with Similar Topics

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

| Subject | Geography |
|---|---|
| ☐ COUNTERTERRORISM | ☐ IRAQ |
| ☐ PRISONS | ☐ UNITED STATES |
| ☐ REBELLIONS & INSURGENCIES | ☐ AFGHANISTAN |
| ☐ TERRORISM | ☐ QATAR |
| ☐ ESPIONAGE | ☐ KABUL, AFGHANISTAN |
| ☐ INTELLIGENCE SERVICES | ☐ BAGHDAD, IRAQ |
| ☐ INTERROGATION OF SUSPECTS | ☐ CUBA |
| ☐ US FEDERAL GOVERNMENT | |

[                    ]   OR   [                    ]

Show Major and Minor Index Terms | Show Relevancy Scores                    Clear Selections

**SUBJECT:** TERRORISM (90%); PRISONS (90%); COUNTERTERRORISM (90%); REBELLIONS & INSURGENCIES (90%); INTERROGATION OF SUSPECTS (89%); US FEDERAL GOVERNMENT (89%); ESPIONAGE (89%); INTELLIGENCE SERVICES (89%); ARMIES (77%); SEPTEMBER 11 ATTACK (77%); INTERNATIONAL LAW (77%); INTERNATIONAL COURTS & TRIBUNALS (77%); TORTURE (77%); TERRORIST ORGANIZATIONS (76%); ARMED FORCES (75%); NATIONAL SECURITY (73%); AIRPORTS (72%); JUSTICE DEPARTMENTS (72%); LAWYERS (67%); RIGHT TO COUNSEL (65%); TREATIES & AGREEMENTS (50%); RELIEF ORGANIZATIONS (50%)

**GEOGRAPHIC:** KABUL, AFGHANISTAN (92%); BAGHDAD, IRAQ (90%) IRAQ (98%); UNITED STATES (97%); AFGHANISTAN (94%); QATAR (93%); CUBA (87%)

**LOAD-DATE:** May 11, 2004

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper


Copyright 2004 The **Washington Post**


Search Terms:   [(publication (washington post) and byline (dana priest) and maher arar)](6)
        Source:   ▦ [The Washington Post]
         View:   Full with Indexing
         Sort:   Publication Date

# The Washington Post

## washingtonpost.com

### The Washington Post

November 20, 2003 Thursday
Final Edition

# Man Was Deported After Syrian Assurances

**BYLINE: Dana Priest,** Washington Post Staff Writer

**SECTION:** A Section; A24

**LENGTH:** 404 words

U.S. officials said yesterday that they decided to send a Syrian-born Canadian citizen to Syria last year only after the CIA received assurances from Syria that it would not torture the man.

**Maher Arar,** recently freed from prison, said he pleaded with U.S. authorities not to send him to Syria precisely because he believed he would be tortured. Arar has said he was tortured with cables and electrical cords during his 10-month imprisonment.

U.S. law strictly prohibits sending people -- even on national security grounds -- to a country where it is likely they will be tortured. Yesterday, a Justice Department spokesman confirmed that the Syrian assurances allowed them to legally send Arar to Syria.

Syrian has said it did not torture Arar. "We welcome statements by the Syrian Embassy, as it is fully consistent with the assurances the U.S. government received prior to his removal" from the United States, the Justice Department spokesman said.

In a Nov. 7 speech, President Bush said Syria has left its people "a legacy of torture, oppression, misery and ruin." Spokesmen at the Justice Department and the CIA declined to comment on why they believed the Syrian assurances to be credible.

Arar, who holds Canadian and Syrian citizenship, was en route to Canada, where he lives, from Tunisia when he was detained on Sept. 26, 2002, at John F. Kennedy International Airport in New York because he was on a terrorism watch list. That Oct. 7, Larry D. Thompson, then acting attorney general, ordered his deportation to Syria on national security grounds.

Canadian Solicitor General Wayne Easter said publicly for the first time yesterday that Canada contributed information that led to Arar's arrest. Easter discussed the case yesterday in a meeting in Washington with Attorney General John D. Ashcroft. After the meeting, Easter told reporters: "This information didn't just come from Canada alone. The information comes from sources globally."

Arar's arrest and deportation have been heavily criticized in Canada, where government opposition leaders have demanded an investigation. Some Canadians have said the case has raised fears and outrage that a Canadian traveling through the United States could be deported to a country known for torture.

Canadian officials said last month that they did not take part in the decision to send Arar to Syria.

Correspondent Deneen L. Brown in Toronto contributed to this report.

# The Washington Post

## washingtonpost.com

### The Washington Post

November 19, 2003 Wednesday
Final Edition

# Top Justice Aide Approved Sending Suspect to Syria

**BYLINE: Dana Priest,** Washington Post Staff Writer

**SECTION:** A Section; A28

**LENGTH:** 539 words

A senior Justice Department official personally approved sending a Syrian-born Canadian citizen suspected of terrorist links to Syria last year after consulting with CIA officials, according to U.S. officials.

Then-Deputy Attorney General Larry D. Thompson, in his capacity as acting attorney general, signed the highly unusual order, citing national security and declaring that to send the man, **Maher Arar,** home to Canada would be "prejudicial to the interests of the United States," according to the officials, who spoke on the condition of anonymity.

Arar, who holds dual Canadian and Syrian citizenship, was en route to Canada, where he lives, from a trip to Tunisia when he was detained on Sept. 26, 2002 by immigration officials at John F. Kennedy International Airport in New York. Arar, who was questioned at the airport because his name appeared on a government watch list, was kept in a New York jail for more than 10 days and then sent to Syria via Jordan.

One U.S. official said yesterday that when apprehended at the airport, Arar had the names of "a large number of known al Qaeda operatives, affiliates or associates" in his wallet or pockets.

While in custody in New York, Arar said, he repeatedly pleaded with U.S. officials not to send him to Syria, a country with a record of torturing prisoners that has been well documented by the State Department, because he believed he would face such treatment.

Arar, who was released last month after an aggressive campaign by Canadian officials to free him, is back in Canada. He has described in graphic detail how he was tortured with cables and electrical cords and kept in a small cell he described as a "grave" during his 10 months in prison.

The U.S. immigration law used to carry out the "expedited removal" of Arar strictly prohibits sending anyone, even on national security grounds, to a country where "it is more likely than not that they will be tortured," said a U.S. official familiar with the law applied in the Arar case.

Justice Department officials would not comment on why Thompson would have signed the order if Arar said he would be tortured in Syria and if U.S. authorities had identified him to the Syrians as an al Qaeda member.

In response to questions, a Justice Department spokesman said "the removal of Mr. Arar was accomplished after interagency consultation and in full compliance with the law and with all relevant international treaties and conventions."

Attorney General John D. Ashcroft is scheduled to meet today with his Canadian counterpart, Solicitor General Wayne Easter. The case has become a political issue in Canada, where opposition parties have accused the government of buckling to U.S. pressure. Prime Minister Jean Chretien last week officially protested Arar's treatment, and Canadian Foreign Minister Bill Graham has asked Secretary of State Colin L. Powell for an explanation.

Imad Moustafa, the charge d'affaires at the Syrian Embassy in Washington, has denied Arar was tortured. But he said Syria had no reason to imprison Arar. He said U.S. intelligence officials told their Syrian counterparts that Arar was an al Qaeda member. Syria agreed to take him as a favor and to win goodwill of the United States, he said.

**Find Documents with Similar Topics**

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

| Industry | Subject | Geography |
|---|---|---|
| ⌐ AIRPORTS | ⌐ ATTORNEYS GENERAL | ⌐ SYRIA |
| | ⌐ JUSTICE DEPARTMENTS | ⌐ CANADA |
| | ⌐ LAW ENFORCEMENT | ⌐ UNITED STATES |
| | ⌐ TERRORISM | ⌐ NEW YORK, USA |
| | ⌐ STATE DEPARTMENTS & FOREIGN SERVICES | |
| | ⌐ IMMIGRATION | |

[_____]  **OR**  [_____]

Show Major and Minor Index Terms ¦ Show Relevancy Scores                Clear Selections

**SUBJECT:** ATTORNEYS GENERAL (91%); JUSTICE DEPARTMENTS (91%); LAW ENFORCEMENT (90%); TERRORISM (90%); AIRPORTS (90%); STATE DEPARTMENTS & FOREIGN SERVICES (89%); IMMIGRATION (88%); LAWYERS (78%); NATIONAL SECURITY (78%); INTERNATIONAL LAW (78%); TERRORIST ORGANIZATIONS (78%); PRISONS (76%); IMMIGRATION LAW (74%); HEADS OF STATE & GOVERNMENT (71%); INTERNATIONAL RELATIONS (70%); PLATFORMS & ISSUES (69%); POLITICS (62%); TREATIES & AGREEMENTS (60%)

**ORGANIZATION:** AL-QAEDA (55%)

**PERSON:** JEAN CHRETIEN (50%); JOHN F KENNEDY (56%)

**GEOGRAPHIC:** NEW YORK, USA (93%) SYRIA (98%); CANADA (96%); UNITED STATES (95%); JORDAN (78%)

**LOAD-DATE:** November 19, 2003

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2003 The **Washington Post**

Search Terms: [(publication (washington post) and byline (dana priest) and maher arar)](6)

Nexis® Document

# The Washington Post

## washingtonpost.com

### The Washington Post

November 5, 2003 Wednesday
Correction Appended
Final Edition

## Deported Terror Suspect Details Torture in Syria; Canadian's Case Called Typical of CIA

**BYLINE:** DeNeen L. Brown and **Dana Priest**, Washington Post Staff Writers

**SECTION:** A Section; A01

**LENGTH:** 1068 words

**DATELINE:** TORONTO Nov. 4

A Canadian citizen who was detained last year at John F. Kennedy ▽ International Airport in New York as a suspected terrorist said Tuesday he was secretly deported to Syria and endured 10 months of torture in a Syrian prison.

**Maher Arar,** 33, who was released last month, said at a news conference in Ottawa that he pleaded with U.S. authorities to let him continue on to Canada, where he has lived for 15 years and has a family. But instead, he was flown under U.S. guard to Jordan and handed over to Syria, where he was born. Arar denied any connection to terrorism and said he would fight to clear his name.

U.S. officials said Tuesday that Arar was deported because he had been put on a terrorist watch list after information from "multiple international intelligence agencies" linked him to terrorist groups.

Officials, speaking on condition of anonymity, said that the Arar case fits the profile of a covert CIA "extraordinary rendition" -- the practice of turning over low-level, suspected terrorists to foreign intelligence services, some of which are known to torture prisoners.

Arar's case has brought repeated apologies from the Canadian government, which says it is investigating what information the Royal Canadian Mounted Police gave to U.S. authorities. Canada's foreign minister, Bill Graham, also said he would question the Syrian ambassador about Arar's statements about torture. In an interview on CBC Radio, Imad Moustafa, the Syrian chargé d'affaires in Washington, denied that Arar had been tortured.

Arar said U.S. officials apparently based the terrorism accusation on his connection to Abdullah Almalki, another Syrian-born Canadian. Almalki is being detained by Syrian authorities, although no charges against him have been reported. Arar said he knew Almalki only casually before his detention but encountered him at the Syrian prison where both were tortured.

Arar, whose case has become a cause celebre in Canada, demanded a public inquiry. "I am not a terrorist," he said. "I am not a member of al Qaeda. I have never been to Afghanistan."

He said he was flying home to Montreal via New York on Sept. 26, 2002, from a family visit to

Tunisia.

"This is when my nightmare began," he said. "I was pulled aside by immigration and taken [away]. The police came and searched my bags. I asked to make a phone call and they would not let me." He said an FBI agent and a New York City police officer questioned him. "I was so scared," he said. "They told me I had no right to a lawyer because I was not an American citizen."

Arar said he was shackled, placed on a small jet and flown to Washington, where "a new team of people got on the plane" and took him to Amman, the capital of Jordan. Arar said U.S. officials handed him over to Jordanian authorities, who "blindfolded and chained me and put me in a van. . . . They made me bend my head down in the back seat. Then these men started beating me. Every time I tried to talk, they beat me."

Hours later, he said, he was taken to Syria and there he was forced to write that he had been to a training camp in Afghanistan. "They kept beating me, and I had to falsely confess," he said. "I was willing to confess to anything to stop the torture."

Arar said his prison cell "was like a grave, exactly like a grave. It had no light, it was three feet wide, it was six feet deep, it was seven feet high. . . . It had a metal door. There was a small opening in the ceiling. There were cats and rats up there, and from time to time, the cats peed through the opening into the cell."

Steven Watt, a human rights fellow at the Center for Constitutional Rights in Washington, said Arar's case raised questions about U.S. counterterrorism measures. "Here we have the United States involved in the removal of somebody to a country where it knows persons in custody of security agents are tortured," Watt said. "The U.S. was possibly benefiting from the fruits of that torture. I ask the question: Why wasn't he removed to Canada?"

A senior U.S. intelligence official discussed the case in terms of the secret rendition policy. There have been "a lot of rendition activities" since the Sept. 11, 2001, terrorist attacks in the United States, the official said. "We are doing a number of them, and they have been very productive."

Renditions are a legitimate option for dealing with suspected terrorists, intelligence officials argue. The U.S. government officially rejects the assertion that it knowingly sends suspects abroad to be tortured, but officials admit they sometimes do that. "The temptation is to have these folks in other hands because they have different standards," one official said. "Someone might be able to get information we can't from detainees," said another.

Syria, where use of torture during imprisonment has been documented by the State Department, maintains a secret but growing intelligence relationship with the CIA, according to intelligence experts.

"The Syrian government has provided some very useful assistance on al Qaeda in the past," said Cofer Black, former director of counterterrorism at the CIA who is now the counterterrorism coordinator at the State Department.

One senior intelligence official said Tuesday that Arar is still believed to have connections to al Qaeda. The Justice Department did not have enough evidence to detain him when he landed in the United States, the official said, and "the CIA doesn't keep people in this country."

With those limitations, and with a secret presidential "finding" authorizing the CIA to place suspects in foreign hands without due process, Arar may have been one of the people whisked overseas by the CIA.

In the early 1990s, renditions were exclusively law enforcement operations in which suspects were snatched by covert CIA or FBI teams and brought to the United States for trial or questioning. But CIA teams, working with foreign intelligence services, now capture suspected

terrorists in one country and render them to another, often after U.S. interrogators have tried to gain information from them.

Renditions are considered a covert action. Congress, which oversees the CIA, knows of only the broad authority to carry out renditions but is not informed about individual cases, according to intelligence officials.Priest reported from Washington. Staff writers John Mintz and Glenn Kessler in Washington contributed to this report.

## Find Documents with Similar Topics

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

| Subject | Geography |
| --- | --- |
| ⌐ TERRORISM | ⌐ SYRIA |
| ⌐ DEPORTATION | ⌐ CANADA |
| ⌐ INTELLIGENCE SERVICES | ⌐ UNITED STATES |
| ⌐ LAW ENFORCEMENT | ⌐ NEW YORK, USA |
| ⌐ POLICE FORCES | ⌐ AMMAN, JORDAN |
| ⌐ SPECIAL INVESTIGATIVE FORCES | ⌐ JORDAN |
| ⌐ ESPIONAGE | |
| ⌐ INVESTIGATIONS | |

[_____] OR [_____]

Show Major and Minor Index Terms | Show Relevancy Scores                    Clear Selections

**SUBJECT:** TERRORISM (93%); DEPORTATION (92%); INTELLIGENCE SERVICES (90%); LAW ENFORCEMENT (89%); POLICE FORCES (89%); SPECIAL INVESTIGATIVE FORCES (89%); ESPIONAGE (88%); INVESTIGATIONS (87%); STATE DEPARTMENTS & FOREIGN SERVICES (78%); AIRPORTS (78%); IMMIGRATION (78%); TERRORIST ORGANIZATIONS (78%); INTERNATIONAL RELATIONS (73%); PRESS CONFERENCES (72%); INTERVIEWS (70%); RIGHT TO COUNSEL (60%)

**PERSON:** JOHN F KENNEDY (74%)

**GEOGRAPHIC:** AMMAN, JORDAN (92%); NEW YORK, NY, USA (79%); TORONTO, ON, CANADA (58%); MONTREAL, PQ, CANADA (58%) NEW YORK, USA (94%); ONTARIO, CANADA (58%); QUEBEC, CANADA (58%) SYRIA (99%); CANADA (97%); UNITED STATES (95%); JORDAN (92%); AFGHANISTAN (79%)

**LOAD-DATE:** November 5, 2003

**LANGUAGE:** ENGLISH

**CORRECTION-DATE:** November 6, 2003

**CORRECTION:** A Nov. 5 article about the deportation of a Canadian citizen to Syria misstated the location of the Center for Constitutional Rights. It is based in New York.

**PUBLICATION-TYPE:** Newspaper

# The Washington Post

## washingtonpost.com

### The Washington Post

November 3, 2005 Thursday
Final Edition

## Policies on Terrorism Suspects Come Under Fire; Democrats Say CIA's Covert Prisons Hurt U.S. Image; U.N. Official on Torture to Conduct Inquiry

**BYLINE: Dana Priest** and Josh White, Washington Post Staff Writers

**SECTION:** A Section; A02

**LENGTH:** 1003 words

The Bush administration's policies for holding and detaining suspected terrorists came under sharp scrutiny and criticism yesterday after disclosure that the CIA had set up covert prisons in several Eastern European democracies and other countries.

The U.N. special rapporteur on torture said he would seek more information about the covert prisons, referred to in classified documents as "black sites." Congressional Democrats and human rights groups warned that the secret system would damage the U.S. image overseas.

House Democrats said they plan to introduce a motion as early as today to endorse language in the defense spending package written by Sen. John McCain ⚡ (R-Ariz.), which would bar cruel and inhuman treatment of prisoners in U.S. custody, including those in CIA hands. The motion would instruct House conferees to accept McCain's precise measure.

Rep. John P. Murtha (Pa.), ranking Democrat on the Appropriations defense subcommittee, urged the United States to adopt a doctrine of "no torture, no excuses," and said Congress needs to speak on the issue. "The United States of America and the values we reflect abhor human rights violators and uphold human rights," Murtha said in a statement.

McCain's amendment was endorsed last month by the Senate, 90 to 9, over the objections of the White House, which said it would restrict the president's ability to protect the country. The House Democrats said they already have 15 GOP supporters for their motion, and Republicans have told the White House they expect it to pass, an Appropriations Committee spokesman said.

The CIA and the White House are seeking language that would exempt prisoners held by the agency, which would include the 30 or so al Qaeda figures that sources said are being held in the black sites. Neither the White House nor the CIA will officially comment on the secret prison system, but intelligence officials have said in interviews that the arrangement is essential to gaining information about possible terrorist activities.

The Washington Post reported Wednesday that the CIA's covert detention system has at times established facilities in eight countries, including, among others, Thailand, Afghanistan and **Guantanamo Bay,** Cuba. Those facilities are now closed. The Post did not publish the names of Eastern European countries involved in the program, at the request of senior U.S. officials. They argued that doing so could damage counterterrorism efforts in those countries and elsewhere,

and could lead to retaliation by terrorists.

The governments of Russia and Bulgaria issued statements saying no such facility existed in their countries, Reuters reported. Thailand also denied hosting such a facility.

Yesterday, administration officials were buffeted by questions about the black sites.

"The fact that they are secret, assuming there are such sites, does not mean" torture would be tolerated there, national security adviser Stephen J. Hadley told reporters.

"Some people say that the test of your principles [is] what you do when no one's looking," he said. "And the president has insisted that whether it is in the public or it is in the private, the same principles will apply and the same principles will be respected. And to the extent people do not meet up, measure up to those principles, there will be accountability and responsibility."

State Department spokesman Sean McCormack also declined to talk specifically about the sites, saying, "These are difficult issues. And we have ongoing discussions on a variety of different fronts with countries around the world about these issues, because the threat from terrorism . . . is a common threat to democracies and peace-loving nations."

Human rights groups said the al Qaeda prisoners should be brought to trial, rather than held indefinitely in covert prisons in which they have no recognized legal rights. "We think these people should be prosecuted and punished fully for the murders of thousands of people," said Tom Malinowski of Human Rights Watch. "What is really clear is that this is a dead-end policy and they are close to the dead end."

John D. Rockefeller IV (D-W.Va.), vice chairman of the Senate Select Committee on Intelligence, has been pushing for more than a year to conduct a review of the CIA's interrogation and detention practices. Yesterday, he lashed out at the administration for not being more forthcoming.

"They have made it clear that anyone who suggests that oversight is needed should be labeled as unpatriotic," he said.

Manfred Nowak, the U.N. special rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, said he had heard allegations of secret detention facilities sponsored by the United States, but had not heard of any in Eastern Europe before yesterday.

"Every secret place of detention is usually a higher risk for ill treatment, that's the danger of secrecy," Nowak said in a telephone interview from Austria, adding that he wants to pursue access to all U.S. detention facilities outside its territory.

Nowak and his predecessor have been trying to gain access to the U.S. military detention facility at **Guantanamo Bay** since it opened in early 2002.

Last week, the Bush administration invited U.N. experts to Guantanamo but offered a one-day visit with no ability to talk to detainees. Nowak said he would not accept because a "guided tour" would not allow him to probe allegations of abuse.

"I have many allegations that detainees have been abused while in Guantanamo," he said. "If I didn't have plenty of allegations, I wouldn't bother the United States government with trying to visit."

A senior U.S. official, speaking anonymously yesterday, said the administration is unlikely to budge: "The offer they have is the final offer. We are not prepared to open Guantanamo up to just anyone who wants to come in and talk to detainees."

Staff writers R. Jeffrey Smith and Jonathan Weisman and researcher Julie Tate contributed to this

# The Washington Post

## washingtonpost.com

### The Washington Post

February 10, 2005 Thursday
Final Edition

# Detainees Accuse Female Interrogators; Pentagon Inquiry Is Said to Confirm Muslims' Accounts of Sexual Tactics at Guantanamo

**BYLINE:** Carol D. Leonnig and **Dana Priest,** Washington Post Staff Writers

**SECTION:** A Section; A01

**LENGTH:** 1348 words

Female interrogators repeatedly used sexually suggestive tactics to try to humiliate and pry information from devout Muslim men held at the U.S. military prison at **Guantanamo Bay,** Cuba, according to a military investigation not yet public and newly declassified accounts from detainees.

The prisoners have told their lawyers, who compiled the accounts, that female interrogators regularly violated Muslim taboos about sex and contact with women. The women rubbed their bodies against the men, wore skimpy clothes in front of them, made sexually explicit remarks and touched them provocatively, at least eight detainees said in documents or through their attorneys.

A wide-ranging Pentagon investigation, which has not yet been released, generally confirms the detainees' allegations, according to a senior Defense Department official familiar with the report. While isolated accounts of such tactics have emerged in recent weeks, the new allegations and the findings of the Pentagon investigation indicate that sexually oriented tactics may have been part of the fabric of Guantanamo interrogations, especially in 2003.

The inquiry uncovered numerous instances in which female interrogators, using dye, pretended to spread menstrual blood on Muslim men, the official said. Separately, in court papers and public statements, three detainees say that women smeared them with blood.

The military investigation of U.S. detention and interrogation practices worldwide, led by Vice Adm. Albert T. Church III, confirmed one case in which an Army interrogator took off her uniform top and paraded around in a tight T-shirt to make a Guantanamo detainee uncomfortable, and other cases in which interrogators touched the detainees suggestively, the senior Pentagon official said.

The official, who spoke on the condition of anonymity because the report has not yet been made public, said the fake blood was used on Muslim men before they intended to pray, because some Muslims believe that "if a woman touches him prior to prayer, then he's dirty and can't pray." Muslim men also believe that contact with women other than their wives diminishes religious purity.

Defense Department officials said they have reprimanded two female interrogators for such

tactics. It is unclear whether military personnel, employees of other agencies or private contractors were involved.

The attorney interviews of detainees are the result of a Supreme Court decision last summer that gave the captives access to lawyers and the opportunity to challenge their incarceration in U.S. courts.

In previous documents, detainees have complained of physical abuse, including routine beatings, painful shackling, and exposure to extremes of hot and cold. Defense Secretary Donald H. Rumsfeld insisted then that detainees were treated "humanely," and Pentagon officials said terrorists were trained to fabricate torture allegations.

Some of the accounts resemble the sexual aspects of the humiliation of Iraqi prisoners at the U.S. prison at Abu Ghraib. Photographs that became public last year showed a servicewoman there holding naked prisoners on a leash and posing next to a pile of naked prisoners.

Pentagon officials said yesterday that wearing skimpy clothing or engaging in provocative touching and banter would be inappropriate interrogation techniques.

"I don't see that as being authorized by secretary of defense's approved interrogation techniques for Guantanamo," said Col. David McWilliams, a spokesman for the U.S. Southern Command in Miami, which oversees operations at **Guantanamo Bay.**

McWilliams said it is premature to comment on whether the detainee allegations are credible until a second military investigation that focuses on **Guantanamo Bay** abuse allegations is complete. The inquiry, which began in early January after the release of documents in which FBI agents said they witnessed abuse, is scheduled to be completed this month.

"That's exactly why we're doing an investigation," McWilliams said. "We're going to establish the facts and the truth."

Church's report found that interrogators used sexually oriented tactics and harassment to shock or offend Muslim prisoners, the senior Pentagon official said. The official said that the military would not condone "sexual activity" during interrogation, but that good interrogators "take initiative and are a little creative."

"They are trying to find the key that will get someone to talk to them. Using things that are culturally repulsive is okay as long as it doesn't extend to something prohibited by the Geneva Conventions."

Attorneys for detainees scoffed at the Pentagon's insistence that the military can fairly investigate its own personnel. They noted that the Defense Department last fall initially dismissed torture allegations, insisting that detainees were trained at terrorist camps to lodge false claims.

Even detainee lawyers doubted that interrogators would spread menstrual blood on prisoners when a recently released British detainee first made the allegation in early 2004. A month ago, a Pentagon spokesman confirmed it had verbally reprimanded one female interrogator who, in early 2003, had smeared red dye from a marker on a detainee's shirt and told him it was blood.

In a yet-to-be-published book, former Army translator Erik Saar said he saw a female interrogator smear red dye on a Saudi man's face, telling him it was blood. Saar's account was first reported by the Associated Press last month. And Mamdouh Habib, an Australian man released from **Guantanamo Bay** last month, said he was strapped down while a woman told him she was "menstruating" on his face.

One lawyer, Marc Falkoff, said in an interview that when a Yemeni client told him a few weeks ago about an incident involving menstrual blood, "I almost didn't even write it down." He said: "It seemed crazy, like something out of a horror movie or a John Waters film. Now it doesn't seem

ludicrous at all."

Some of the newly declassified accounts of detainees evoke scenes from a rock music video. German detainee Murat Kurnaz told his lawyer that three women in lacy bras and panties strutted into the interrogation room where he was sitting in chains. They cooed about how attractive he was and suggested "they could have some fun," he said.

When Kurnaz averted his eyes, he said, one woman sat on his lap, another rubbed her breasts against his back and massaged his chest and a third squatted near his crotch. He head-butted the woman behind him, he said, knocking her off him. All three ran out and a team of soldiers stormed in and beat him, he said.

Detainee lawyers likened the tactics to Nazis shaving the beards of orthodox Jews or artists dunking a crucifix in urine to shock Christians. "They're exploiting religious beliefs to break them down, to destroy them," said Michael Ratner of the Center for Constitutional Rights, which represents several dozen detainees. "What they're doing, it reminds me of a pornographic Web site -- it's like the fantasy of all these S&M clubs."

Falkoff said some of his clients have also been threatened with rape by male interrogators.

One soldier told another detainee, Muktar Warafi, that he had to start telling the truth or he would be raped, according to Falkoff's notes of the interview. When he left the room, another person immediately came into the room and told Warafi: "That interrogator is new and doesn't know the rules. We apologize on his behalf. Now let's talk."

Yasein Esmail, a Yemeni detainee, said he had been interrogated more than 100 times since being "kidnapped" in a marketplace in Kabul, Afghanistan, and brought to **Guantanamo Bay**. He recounted to his lawyer that when he refused to talk in one interview, a female soldier entered wearing a tight T-shirt.

"Why aren't you married?" she reportedly asked Esmail. "You are a young man and have needs. What do you like?"

Esmail said "she bent down with her breasts on the table and her legs almost touching" him. "Are you going to talk," she asked, "or are we going to do this for six hours?"

Researcher Julie Tate contributed to this report.

### Find Documents with Similar Topics

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

**Industry**

☐ LAWYERS

**Subject**

☐ INVESTIGATIONS
☐ PRISONS
☐ RELIGION
☐ ARMED FORCES
☐ DEFENSE DEPARTMENTS
☐ LAWYERS
☐ MUSLIMS & ISLAM

**Geography**

☐ UNITED STATES
☐ CUBA

☐ **OR** ☐

# The Washington Post

## washingtonpost.com

The **Washington Post**

December 17, 2004 Friday
Final Edition

# At Guantanamo, a Prison Within a Prison;
# CIA Has Run a Secret Facility for Some Al Qaeda Detainees, Officials Say

**BYLINE: Dana Priest** and Scott Higham, Washington Post Staff Writers

**SECTION:** A Section; A01

**LENGTH:** 1190 words

Within the heavily guarded perimeters of the Defense Department's much-discussed **Guantanamo Bay** prison in Cuba, the CIA has maintained a detention facility for valuable al Qaeda captives that has never been mentioned in public, according to military officials and several current and former intelligence officers.

The buildings used by the CIA are shrouded by high fences covered with thick green mesh plastic and ringed with floodlights, officials said. They sit within the larger Camp Echo complex, which was erected to house the Defense Department's high-value detainees and those awaiting military trials on terrorism charges.

The facility has housed detainees from Pakistan, West Africa, Yemen and other countries under the strictest secrecy, the sources said. "People are constantly leaving and coming," said one U.S. official who visited the base in recent months. It is unclear whether the facility is still in operation today. The CIA and the Defense Department declined to comment.

Most international terrorism suspects in U.S. custody are held not by the CIA but by the Defense Department at the **Guantanamo Bay** prison. They are guaranteed access to the International Committee of the Red Cross (ICRC) and, as a result of a U.S. Supreme Court ruling this year, have the right to challenge their imprisonment in federal courts.

CIA detainees, by contrast, are held under separate rules and far greater secrecy. Under a presidential directive and authorities approved by administration lawyers, the CIA is allowed to capture and hold certain classes of suspects without accounting for them in any public way and without revealing the rules for their treatment. The roster of CIA prisoners is not public, but current and former U.S. intelligence officials say the agency holds the most valuable al Qaeda leaders and many mid-level members with knowledge of the group's logistics, financing and regional operations.

The CIA facility at the **Guantanamo Bay** prison was constructed over the past year as the agency confronted one of its toughest emerging problems: where to hold terrorists for interrogations that could last for years.

During the 1990s, the CIA typically had custody of half a dozen terrorists at any time and usually kept them in foreign prisons, mostly in Egypt and Jordan. But just two months after the attacks of

Sept. 11, 2001, CIA paramilitary teams working with foreign intelligence services had arrested dozens of people thought to have knowledge of upcoming attacks on the United States.

The CIA is believed to be holding about three dozen al Qaeda leaders in undisclosed locations, U.S. national security officials say. Among them are pivotal Sept. 11 plotters Khalid Sheik Mohammed, Ramzi Binalshibh and Abu Zubaida and the leader of Southeast Asia's Islamic terrorist movement, Nurjaman Riduan Isamuddin, who is also known as Hambali.

CIA detention facilities have been located on an off-limits corner of the Bagram air base in Afghanistan, on ships at sea and on Britain's Diego Garcia island in the Indian Ocean.

Maintaining facilities in foreign countries is difficult, however, said current and former CIA officials. Binalshibh and Abu Zubaida were believed to have been taken to Thailand immediately after capture. The Thai government eventually insisted that they be transferred elsewhere.

"People are willing to help but not to hold," said one CIA veteran of counterterrorism operations.

The U.S. base at **Guantanamo Bay** thus provided the CIA with an isolated venue devoid of the sensitive international politics. But it came with strings attached.

The U.S. military, which controls the base, required the agency to register all detainees, abide by military detention standards and permit the ICRC some level of access.

"If you're going to be in my back yard, you're going to have to abide by my rules" is how one defense official explained it.

Army officials investigating the Abu Ghraib prison scandal concluded that the CIA had held "ghost detainees" at the prison, inmates who were not registered or officially acknowledged, a violation of military rules.

Asked about the arrangement with the CIA at **Guantanamo Bay,** Pentagon spokesman Bryan Whitman said he could not comment on operations of other agencies. "As we have stated since the beginning of detention operations at Guantanamo, the ICRC has access to detainees at Guantanamo and is permitted to meet with them, consistent with military necessity," Whitman said in a statement. Pentagon policy "is that all [Defense] detainees, including those at Guantanamo, are treated humanely, and in accordance with applicable law," the statement continued.

One U.S. official knowledgeable about the arrangement with the ICRC considered it a positive step forward. "There is no one in Gitmo who is not identified," he said, using **Guantanamo Bay's** nickname.

Red Cross officials declined to say where they had been permitted to visit, or whom. "We have been granted broad access to the camp," the ICRC said in a prepared statement. "We are confident we have visited all of the people detained at Guantanamo, in all of the places they are being detained."

The CIA has worked at **Guantanamo Bay** since the early days of the prison camps, which opened in January 2002 when the first men captured in the Afghan war were transferred to a collection of chain-link cages called Camp X-Ray. The CIA has kept an office at the Navy base and takes part in interrogation sessions of Defense Department detainees alongside FBI agents, military intelligence officers and others in what are called Tiger Teams.

Many of the interrogations have been conducted inside trailers set up within the perimeter of Camp Delta, a more permanent compound of steel cages that took the place of Camp X-Ray by the end of 2003.

The facility used by the CIA is in Camp Echo, which also houses high-value military detainees.

The camp consists of more than a dozen single-story concrete-block huts built away from the main prison complex. Each hut is divided in half. Inside is a steel cage, a restroom, and a table for interviews and interrogations, according to sources familiar with the facility.

The CIA's facility has been "off-limits to nearly everyone on the base," said one military official familiar with operations at **Guantanamo Bay.**

One of the huts at Camp Echo has been occupied by a detainee named Mohamedou Oulad Slahi, according to one source familiar with the new compound. Slahi, a Mauritanian businessman, acted as the liaison between a group of Islamic radicals living in Hamburg and al Qaeda leader Osama bin Laden, according to the Sept. 11 commission.

According to statements given by the key plotter, Binalshibh, Slahi persuaded the men to go to Afghanistan, rather than Chechnya, to fight.

He arranged their travel and for them to meet al Qaeda operatives in Pakistan, who in turn arranged a meeting between Binalshibh and bin Laden.

Slahi was arrested by secret police in Mauritania during the night on Sept. 27, 2001, members of his family told local media at the time. By December, he was in U.S. custody.

Researcher Julie Tate contributed to this report.

### Find Documents with Similar Topics

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

**Subject**

☐ DEFENSE DEPARTMENTS

☐ PRISONS

☐ TERRORISM

☐ TERRORIST ORGANIZATIONS

☐ ESPIONAGE

☐ INTELLIGENCE SERVICES

**Geography**

☐ UNITED STATES

☐ CUBA

| | **OR** | |
| --- | --- | --- |

Show Major and Minor Index Terms | Show Relevancy Scores                    Clear Selections

**SUBJECT:** TERRORISM (90%); PRISONS (90%); DEFENSE DEPARTMENTS (90%); TERRORIST ORGANIZATIONS (90%); ESPIONAGE (89%); INTELLIGENCE SERVICES (89%); US FEDERAL GOVERNMENT (78%); MILITARY & VETERANS LAW (77%); SEPTEMBER 11 ATTACK (77%); MILITARY BASES (77%); PARAMILITARY & MILITIA (75%); NATIONAL SECURITY (73%); APPROVALS (72%); SETTLEMENTS & DECISIONS (70%); MUSLIMS & ISLAM (69%); DECISIONS & RULINGS (67%); RELIEF ORGANIZATIONS (66%); LAW COURTS & TRIBUNALS (66%); RELIGION (50%)

**ORGANIZATION:** AL-QAEDA (94%); INTERNATIONAL RED CROSS & RED CRESCENT MOVEMENT (82%); INTERNATIONAL COMMITTEE OF THE RED CROSS (82%); SUPREME COURT OF THE UNITED STATES (55%)

# The Washington Post

## washingtonpost.com

### The Washington Post

December 17, 2004 Friday
Final Edition

## At Guantanamo, a Prison Within a Prison; CIA Has Run a Secret Facility for Some Al Qaeda Detainees, Officials Say

**BYLINE: Dana Priest** and Scott Higham, Washington Post Staff Writers

**SECTION:** A Section; A01

**LENGTH:** 1190 words

Within the heavily guarded perimeters of the Defense Department's much-discussed **Guantanamo Bay** prison in Cuba, the CIA has maintained a detention facility for valuable al Qaeda captives that has never been mentioned in public, according to military officials and several current and former intelligence officers.

The buildings used by the CIA are shrouded by high fences covered with thick green mesh plastic and ringed with floodlights, officials said. They sit within the larger Camp Echo complex, which was erected to house the Defense Department's high-value detainees and those awaiting military trials on terrorism charges.

The facility has housed detainees from Pakistan, West Africa, Yemen and other countries under the strictest secrecy, the sources said. "People are constantly leaving and coming," said one U.S. official who visited the base in recent months. It is unclear whether the facility is still in operation today. The CIA and the Defense Department declined to comment.

Most international terrorism suspects in U.S. custody are held not by the CIA but by the Defense Department at the **Guantanamo Bay** prison. They are guaranteed access to the International Committee of the Red Cross (ICRC) and, as a result of a U.S. Supreme Court ruling this year, have the right to challenge their imprisonment in federal courts.

CIA detainees, by contrast, are held under separate rules and far greater secrecy. Under a presidential directive and authorities approved by administration lawyers, the CIA is allowed to capture and hold certain classes of suspects without accounting for them in any public way and without revealing the rules for their treatment. The roster of CIA prisoners is not public, but current and former U.S. intelligence officials say the agency holds the most valuable al Qaeda leaders and many mid-level members with knowledge of the group's logistics, financing and regional operations.

The CIA facility at the **Guantanamo Bay** prison was constructed over the past year as the agency confronted one of its toughest emerging problems: where to hold terrorists for interrogations that could last for years.

During the 1990s, the CIA typically had custody of half a dozen terrorists at any time and usually kept them in foreign prisons, mostly in Egypt and Jordan. But just two months after the attacks of

Sept. 11, 2001, CIA paramilitary teams working with foreign intelligence services had arrested dozens of people thought to have knowledge of upcoming attacks on the United States.

The CIA is believed to be holding about three dozen al Qaeda leaders in undisclosed locations, U.S. national security officials say. Among them are pivotal Sept. 11 plotters Khalid Sheik Mohammed, Ramzi Binalshibh and Abu Zubaida and the leader of Southeast Asia's Islamic terrorist movement, Nurjaman Riduan Isamuddin, who is also known as Hambali.

CIA detention facilities have been located on an off-limits corner of the Bagram air base in Afghanistan, on ships at sea and on Britain's Diego Garcia island in the Indian Ocean.

Maintaining facilities in foreign countries is difficult, however, said current and former CIA officials. Binalshibh and Abu Zubaida were believed to have been taken to Thailand immediately after capture. The Thai government eventually insisted that they be transferred elsewhere.

"People are willing to help but not to hold," said one CIA veteran of counterterrorism operations.

The U.S. base at **Guantanamo Bay** thus provided the CIA with an isolated venue devoid of the sensitive international politics. But it came with strings attached.

The U.S. military, which controls the base, required the agency to register all detainees, abide by military detention standards and permit the ICRC some level of access.

"If you're going to be in my back yard, you're going to have to abide by my rules" is how one defense official explained it.

Army officials investigating the Abu Ghraib prison scandal concluded that the CIA had held "ghost detainees" at the prison, inmates who were not registered or officially acknowledged, a violation of military rules.

Asked about the arrangement with the CIA at **Guantanamo Bay,** Pentagon spokesman Bryan Whitman said he could not comment on operations of other agencies. "As we have stated since the beginning of detention operations at Guantanamo, the ICRC has access to detainees at Guantanamo and is permitted to meet with them, consistent with military necessity," Whitman said in a statement. Pentagon policy "is that all [Defense] detainees, including those at Guantanamo, are treated humanely, and in accordance with applicable law," the statement continued.

One U.S. official knowledgeable about the arrangement with the ICRC considered it a positive step forward. "There is no one in Gitmo who is not identified," he said, using **Guantanamo Bay's** nickname.

Red Cross officials declined to say where they had been permitted to visit, or whom. "We have been granted broad access to the camp," the ICRC said in a prepared statement. "We are confident we have visited all of the people detained at Guantanamo, in all of the places they are being detained."

The CIA has worked at **Guantanamo Bay** since the early days of the prison camps, which opened in January 2002 when the first men captured in the Afghan war were transferred to a collection of chain-link cages called Camp X-Ray. The CIA has kept an office at the Navy base and takes part in interrogation sessions of Defense Department detainees alongside FBI agents, military intelligence officers and others in what are called Tiger Teams.

Many of the interrogations have been conducted inside trailers set up within the perimeter of Camp Delta, a more permanent compound of steel cages that took the place of Camp X-Ray by the end of 2003.

The facility used by the CIA is in Camp Echo, which also houses high-value military detainees.

The camp consists of more than a dozen single-story concrete-block huts built away from the main prison complex. Each hut is divided in half. Inside is a steel cage, a restroom, and a table for interviews and interrogations, according to sources familiar with the facility.

The CIA's facility has been "off-limits to nearly everyone on the base," said one military official familiar with operations at **Guantanamo Bay.**

One of the huts at Camp Echo has been occupied by a detainee named Mohamedou Oulad Slahi, according to one source familiar with the new compound. Slahi, a Mauritanian businessman, acted as the liaison between a group of Islamic radicals living in Hamburg and al Qaeda leader Osama bin Laden, according to the Sept. 11 commission.

According to statements given by the key plotter, Binalshibh, Slahi persuaded the men to go to Afghanistan, rather than Chechnya, to fight.

He arranged their travel and for them to meet al Qaeda operatives in Pakistan, who in turn arranged a meeting between Binalshibh and bin Laden.

Slahi was arrested by secret police in Mauritania during the night on Sept. 27, 2001, members of his family told local media at the time. By December, he was in U.S. custody.

Researcher Julie Tate contributed to this report.


### Find Documents with Similar Topics

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

**Subject**

☐ DEFENSE DEPARTMENTS

☐ PRISONS

☐ TERRORISM

☐ TERRORIST ORGANIZATIONS

☐ ESPIONAGE

☐ INTELLIGENCE SERVICES

**Geography**

☐ UNITED STATES

☐ CUBA

[ ] **OR** [ ]

Show Major and Minor Index Terms | Show Relevancy Scores                    Clear Selections

**SUBJECT:** TERRORISM (90%); PRISONS (90%); DEFENSE DEPARTMENTS (90%); TERRORIST ORGANIZATIONS (90%); ESPIONAGE (89%); INTELLIGENCE SERVICES (89%); US FEDERAL GOVERNMENT (78%); MILITARY & VETERANS LAW (77%); SEPTEMBER 11 ATTACK (77%); MILITARY BASES (77%); PARAMILITARY & MILITIA (75%); NATIONAL SECURITY (73%); APPROVALS (72%); SETTLEMENTS & DECISIONS (70%); MUSLIMS & ISLAM (69%); DECISIONS & RULINGS (67%); RELIEF ORGANIZATIONS (66%); LAW COURTS & TRIBUNALS (66%); RELIGION (50%)

**ORGANIZATION:** AL-QAEDA (94%); INTERNATIONAL RED CROSS & RED CRESCENT MOVEMENT (82%); INTERNATIONAL COMMITTEE OF THE RED CROSS (82%); SUPREME COURT OF THE UNITED STATES (55%)

Nexis®: Document

# The Washington Post

## washingtonpost.com

### The Washington Post

October 24, 2004 Sunday
Final Edition

## Memo Lets CIA Take Detainees Out of Iraq; Practice Is Called Serious Breach of Geneva Conventions

**BYLINE: Dana Priest,** Washington Post Staff Writer

**SECTION:** A Section; A01

**LENGTH:** 1700 words

At the request of the CIA, the Justice Department drafted a confidential memo that authorizes the agency to transfer detainees out of Iraq for interrogation -- a practice that international legal specialists say contravenes the Geneva Conventions.

One intelligence official familiar with the operation said the CIA has used the March draft memo as legal support for secretly transporting as many as a dozen detainees out of Iraq in the last six months. The agency has concealed the detainees from the International Committee of the Red Cross and other authorities, the official said.

The draft opinion, written by the Justice Department's Office of Legal Counsel and dated March 19, 2004, refers to both Iraqi citizens and foreigners in Iraq, who the memo says are protected by the treaty. It permits the CIA to take Iraqis out of the country to be interrogated for a "brief but not indefinite period." It also says the CIA can permanently remove persons deemed to be "illegal aliens" under "local immigration law."

Some specialists in international law say the opinion amounts to a reinterpretation of one of the most basic rights of Article 49 of the Fourth Geneva Convention, which protects civilians during wartime and occupation, including insurgents who were not part of Iraq's military.

The treaty prohibits the "[I]ndividual or mass forcible transfers, as well as deportations of protected persons from occupied territory . . . regardless of their motive."

The 1949 treaty notes that a violation of this particular provision constitutes a "grave breach" of the accord, and thus a "war crime" under U.S. federal law, according to a footnote in the Justice Department draft. "For these reasons," the footnote reads, "we recommend that any contemplated relocations of 'protected persons' from Iraq to facilitate interrogation be carefully evaluated for compliance with Article 49 on a case by case basis." It says that even persons removed from Iraq retain the treaty's protections, which would include humane treatment and access to international monitors.

During the war in Afghanistan, the administration ruled that al Qaeda fighters were not considered "protected persons" under the convention. Many of them were transferred out of the country to the naval base in **Guantanamo Bay,** Cuba, and elsewhere for interrogations. By contrast, the U.S. government deems former members of Saddam Hussein's Baath Party and military, as well as insurgents and other civilians in Iraq, to be protected by the Geneva Conventions.

International law experts contacted for this article described the legal reasoning contained in the Justice Department memo as unconventional and disturbing.

"The overall thrust of the Convention is to keep from moving people out of the country and out of the protection of the Convention," said former senior military attorney Scott Silliman, executive director of Duke University's Center on Law, Ethics and National Security. "The memorandum seeks to create a legal regime justifying conduct that the international community clearly considers in violation of international law and the Convention." Silliman reviewed the document at The Post's request.

The CIA, Justice Department and the author of the draft opinion, Jack L. Goldsmith, former director of the Office of Legal Counsel, declined to comment for this article.

CIA officials have not disclosed the identities or locations of its Iraq detainees to congressional oversight committees, the Defense Department or CIA investigators who are reviewing detention policy, according to two informed U.S. government officials and a confidential e-mail on the subject shown to The Washington Post.

White House officials disputed the notion that Goldsmith's interpretation of the treaty was unusual, although they did not explain why. "The Geneva Conventions are applicable to the conflict in Iraq, and our policy is to comply with the Geneva Conventions," White House spokesman Sean McCormick said.

The Office of Legal Counsel also wrote the Aug. 1, 2002, memo on torture that advised the CIA and White House that torturing al Qaeda terrorists in captivity abroad "may be justified," and that international laws against torture "may be unconstitutional if applied to interrogations" conducted in the war on terrorism. President Bush's aides repudiated that memo once it became public this June.

The Office of Legal Counsel writes legal opinions considered binding on federal agencies and departments. The March 19 document obtained by The Post is stamped "draft" and was not finalized, said one U.S. official involved in the legal deliberations. However, the memo was sent to the general counsels at the National Security Council, the CIA and the departments of State and Defense.

"The memo was a green light," an intelligence official said. "The CIA used the memo to remove other people from Iraq."

Since the Sept. 11, 2001, attacks, the CIA has used broad authority granted in a series of legal opinions and guidance from the Office of Legal Counsel and its own general counsel's office to transfer, interrogate and detain individuals suspected of terrorist activities at a series of undisclosed locations around the world.

According to current and former agency officials, the CIA has a rendition policy that has permitted the agency to transfer an unknown number of suspected terrorists captured in one country into the hands of security services in other countries whose record of human rights abuse is well documented. These individuals, as well as those at CIA detention facilities, have no access to any recognized legal process or rights.

The scandal at Abu Ghraib, and the investigations and congressional hearings that followed, forced the disclosure of the Pentagon's behind-closed-doors debate and classified rules for detentions and interrogations at **Guantanamo Bay** and in Afghanistan and Iraq. Senior defense leaders have repeatedly been called to explain and defend their policies before Congress. But the CIA's policies and practices remain shrouded in secrecy.

The only public account of CIA detainee treatment comes from soldier testimony and Defense

Department investigations of military conduct. For instance, Army Maj. Gen. Antonio M. Taguba's report on Abu Ghraib criticized the CIA practice of maintaining "ghost detainees" -- prisoners who were not officially registered and were moved around inside the prison to hide them from Red Cross teams. Taguba called the practice "deceptive, contrary to Army doctrine and in violation of international law."

Gen. Paul J. Kern, who oversaw another Army inquiry, told Congress that the number of CIA ghost detainees "is in the dozens, to perhaps up to 100."

The March 19, 2004, Justice Department memo by Goldsmith deals with a previously unknown class of people -- those removed from Iraq.

It is not clear why the CIA would feel the need to remove detainees from Iraq for interrogation. A U.S. government official who has been briefed on the CIA's detention practices said some detainees are probably taken to other countries because "that's where the agency has the people, expertise and interrogation facilities, where their people and programs are in place."

The origin of the Justice Department memo is directly related to the only publicly acknowledged ghost detainee, Hiwa Abdul Rahman Rashul, nicknamed "Triple X" by CIA and military officials.

Rashul, a suspected member of the Iraqi Al-Ansar terrorist group, was captured by Kurdish soldiers in June or July of 2003 and turned over to the CIA, which whisked him to Afghanistan for interrogation.

In October, White House counsel Alberto R. Gonzales asked the Office of Legal Counsel to write an opinion on "protected persons" in Iraq and rule on the status of Rashul, according to another U.S. government official involved in the deliberations.

Goldsmith, then head of the office, ruled that Rashul was a "protected person" under the Fourth Geneva Convention and therefore had to be brought back to Iraq, several intelligence and defense officials said.

The CIA was not happy with the decision, according to two intelligence officials. It promptly brought Rashul back and suspended any other transfers out of the country.

At the same time, when transferring Rashul back to Iraq, then-CIA Director George J. Tenet asked Defense Secretary Donald H. Rumsfeld not to give Rashul a prisoner number and to hide him from International Red Cross officials, according to an account provided by Rumsfeld during a June 17 Pentagon news conference. Rumsfeld complied.

As a "ghost detainee," Rashul became lost in the prison system for seven months.

Rumsfeld did not fully explain the reason he had complied with Tenet's request or under what legal authority he could have kept Rashul hidden for so long. "We know from our knowledge that [Tenet] has the authority to do this," he said.

Rashul, defense and intelligence officials noted, had not once been interrogated since he was returned to Iraq. His current status is unknown.

In the one-page October 2003 interim ruling that directed Rashul's return, Goldsmith also created a new category of persons in Iraq whom he said did not qualify for protection under the Geneva Conventions. They are non-Iraqis who are not members of the former Baath Party and who went to Iraq after the invasion.

After Goldsmith's ruling, the CIA and Gonzales asked the Office of Legal Counsel for a more complete legal opinion on "protected persons" in Iraq and on the legality of transferring people out of Iraq for interrogation. "That case started the CIA yammering to Justice to get a better memo," said one intelligence officer familiar with the interagency discussion.

Michael Byers, a professor and international law expert at the University of British Columbia, said that creating a legal justification for removing protected persons from Iraq "is extraordinarily disturbing."

"What they are doing is interpreting an exception into an all-encompassing right, in one of the most fundamental treaties in history," Byers said. The Geneva Convention "is as close as you get to protecting human rights in times of chaos. There's no ambiguity here."

## Find Documents with Similar Topics

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

| Subject | Geography |
| --- | --- |
| ☐ TREATIES & AGREEMENTS | ☐ IRAQ |
| ☐ INTERNATIONAL LAW | ☐ UNITED STATES |
| ☐ JUSTICE DEPARTMENTS | |
| ☐ LAW ENFORCEMENT | |
| ☐ US FEDERAL GOVERNMENT | |
| ☐ REBELLIONS & INSURGENCIES | |

[_____]  OR  [_____]

Show Major and Minor Index Terms | Show Relevancy Scores                Clear Selections

**SUBJECT:** TREATIES & AGREEMENTS (92%); LAW ENFORCEMENT (90%); INTERNATIONAL LAW (90%); JUSTICE DEPARTMENTS (90%); US FEDERAL GOVERNMENT (89%); REBELLIONS & INSURGENCIES (88%); HUMAN RIGHTS (78%); LAWYERS (78%); WAR CRIMES (78%); DEPORTATION (78%); INTELLIGENCE SERVICES (78%); ETHICS (78%); IMMIGRATION (77%); IMMIGRATION LAW (74%); NATIONAL SECURITY (73%); ILLEGAL IMMIGRANTS (67%); TERRORIST ORGANIZATIONS (66%); NAVIES (65%); RELIEF ORGANIZATIONS (56%)

**ORGANIZATION:** INTERNATIONAL RED CROSS & RED CRESCENT MOVEMENT (57%); INTERNATIONAL COMMITTEE OF THE RED CROSS (57%)

**PERSON:** SADDAM HUSSEIN (51%)

**GEOGRAPHIC:** IRAQ (94%); UNITED STATES (93%); AFGHANISTAN (79%); CUBA (66%)

**LOAD-DATE:** October 24, 2004

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newspaper

Copyright 2004 The **Washington Post**

Search Terms: [(publication (washington post) and byline (dana priest) and guantanamo bay)](33)
     Source: ▦ [The Washington Post]
      View: Full with Indexing

Nexis® Document

# The Washington Post

## washingtonpost.com

### The Washington Post

June 27, 2004 Sunday
Final Edition

## CIA Puts Harsh Tactics On Hold;
## Memo on Methods Of Interrogation Had Wide Review

**BYLINE: Dana Priest,** Washington Post Staff Writer

**SECTION:** A Section; A01

**LENGTH:** 1581 words

The CIA has suspended the use of extraordinary interrogation techniques approved by the White House pending a review by Justice Department and other administration lawyers, intelligence officials said.

The "enhanced interrogation techniques," as the CIA calls them, include feigned drowning and refusal of pain medication for injuries. The tactics have been used to elicit intelligence from al Qaeda leaders such as Abu Zubaida and Khalid Sheik Mohammed.

Current and former CIA officers aware of the recent decision said the suspension reflects the CIA's fears of being accused of unsanctioned and illegal activities, as it was in the 1970s. The decision applies to CIA detention facilities, such as those around the world where the agency is interrogating al Qaeda leaders and their supporters, but not military prisons at **Guantanamo Bay,** Cuba, and elsewhere.

"Everything's on hold," said a former senior CIA official aware of the agency's decision. "The whole thing has been stopped until we sort out whether we are sure we're on legal ground." A CIA spokesman declined to comment on the issue.

CIA interrogations will continue but without the suspended techniques, which include feigning suffocation, "stress positions," light and noise bombardment, sleep deprivation, and making captives think they are being interrogated by another government.

The suspension is the latest fallout from the abuse scandal at Abu Ghraib prison in Iraq, and is related to the White House decision, announced Tuesday, to review and rewrite sections of an Aug. 1, 2002, Justice Department opinion on interrogations that said torture might be justified in some cases.

Although the White House repudiated the memo Tuesday as the work of a small group of lawyers at the Justice Department, administration officials now confirm it was vetted by a larger number of officials, including lawyers at the National Security Council, the White House counsel's office and Vice President Cheney's office.

The memorandum was drafted by the Justice Department's Office of Legal Counsel to help the CIA determine how aggressive its interrogators could be during sessions with suspected al Qaeda members. The legal opinion was signed by Jay S. Bybee, then head of the office and now a federal judge. The office consists mainly of political appointees and is considered the executive

branch agencies' legal adviser. Memos signed by the head of the office are given the weight of a binding legal opinion.

A Justice Department official said Tuesday at a briefing that the office went "beyond what was asked for," but other lawyers and administration officials said the memo was approved by the department's criminal division and by the office of Attorney General John D. Ashcroft.

In addition, Timothy E. Flanigan -- then deputy White House counsel -- discussed a draft of the document with lawyers at the Office of Legal Counsel before it was finalized, the officials said. David S. Addington, Cheney's counsel, also weighed in with remarks during at least one meeting he held with Justice lawyers involved with writing the opinion. He was particularly concerned, sources said, that the opinion include a clear-cut section on the president's authority.

That section of the memo has become among the most controversial within the legal community that has analyzed the opinion since it was made public by The Washington Post. During Tuesday's briefing, White House counsel Alberto R. Gonzales called the commander in chief section "unnecessary."

The Justice Department, he said, "will make a decision as to whether or not that is something that should continue to remain in the opinion." Justice Department officials said it would be scrapped.

The commander in chief section of the opinion said laws prohibiting torture do "not apply to the President's detention and interrogation of enemy combatants" in his role as commander in chief. Congress, which has signed international laws prohibiting torture, "may no more regulate the President's ability to detain and interrogate enemy combatants than it may regulate his ability to direct troop movements on the battlefield," according to the August memorandum.

Another element of the opinion criticized by outside lawyers is that it defines torture as pain "equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death." That standard would allow a variety of tactics that would be considered cruel and inhumane under international law, legal experts have said.

At a briefing Tuesday, Gonzales declined to answer repeated questions about how the legal opinion, or the upcoming review of it, affected the CIA. But, he added, "As far as I'm told, every interrogation technique that has been authorized throughout the government is lawful and does not constitute torture."

Asked yesterday about the memo's circulation to a wider group of officials than previously known, White House spokeswoman Erin Healy replied in an e-mail: "It would not be uncommon for the Department of Justice to discuss issues with lawyers throughout the administration. Regardless, the President's policy is very clear. He expects detainees to be treated in a manner consistent with our laws, treaties and values. The President has spoken out against torture, he has never authorized it, nor will he. As we have said, portions of the memo are overbroad and the Department of Justice is reviewing it."

The legal debate over CIA interrogation techniques had its origins in the battlefields of Afghanistan, secret counterterrorism operations in Pakistan and in President Bush's decision to use unconventional tools in going after al Qaeda.

The interrogation methods were approved by Justice Department and National Security Council lawyers in 2002, briefed to key congressional leaders and required the authorization of CIA Director George J. Tenet for use, according to intelligence officials and other government officials with knowledge of the secret decision-making process.

When the CIA and the military "started capturing al Qaeda in Afghanistan, they had no interrogators, no special rules and no place to put them," said a senior Marine officer involved in

detainee procedures. The FBI, which had the only full cadre of professional interrogators from its work with criminal networks in the United States, took the lead in questioning detainees.

But on Nov. 11, 2001, a senior al Qaeda operative who ran the Khaldan paramilitary camp in Afghanistan was captured by Pakistani forces and turned over to U.S. military forces in January 2002. The capture of Ibn al-Shaykh al-Libi, a Libyan, sparked the first real debate over interrogations. The CIA wanted to use a range of methods, including threatening his life and family.

But the FBI had never authorized such methods. The bureau wanted to preserve the purity of interrogations so they could be used as evidence in court cases.

Al-Libi provided the CIA with intelligence about an alleged plot to blow up the U.S. Embassy in Yemen with a truck bomb and pointed officials in the direction of Abu Zubaida, a top al Qaeda leader known to have been involved with the Sept. 11 plot.

In March 2002, Abu Zubaida was captured, and the interrogation debate between the CIA and FBI began anew. This time, when FBI Director Robert S. Mueller III decided to withhold FBI involvement, it was a signal that the tug of war was over. "Once the CIA was given the green light . . . they had the lead role," said a senior FBI counterterrorism official.

Abu Zubaida was shot in the groin during his apprehension in Pakistan. U.S. national security officials have suggested that painkillers were used selectively in the beginning of his captivity until he agreed to cooperate more fully. His information led to the apprehension of other al Qaeda members, including Ramzi Binalshibh, also in Pakistan. The capture of Binalshibh and other al Qaeda leaders -- Omar al-Faruq in Indonesia, Rahim al-Nashiri in Kuwait and Muhammad al Darbi in Yemen -- were all partly the result of information gained during interrogations, according to U.S. intelligence and national security officials. All four remain under CIA control.

A former senior Justice Department official said interrogation techniques for "high-value targets" were reviewed and approved on a case-by-case basis, based partly on what strategies would work best on specific detainees. Justice lawyers suggested some limitations that were adopted, the former official said.

The former official, who spoke on the condition of anonymity because of the sensitivity of the issue, said the administration concluded that techniques did not amount to torture if they did not produce significant physical harm or injury. However, interrogators were allowed to trick the detainees into thinking they might be harmed or instructed to endure unpleasant physical tasks, such as being forced to stand or squat in stress positions.

"Clearly, that is not considered torture," the former Justice official argued. "It might be unpleasant and it might offend our sensibilities in most situations, but in these situations they were necessary and productive."

At the same time, the former official said, "we never had a situation where we said, 'You can do anything you want to.' We never, ever did that. We were aggressive, but our people were very scholarly and lawyerlike."

Staff writers John Mintz and Dan Eggen contributed to this report.


**Find Documents with Similar Topics**

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

**Industry**                    **Subject**

Nexis® Document

# The Washington Post

# washingtonpost.com

### The Washington Post

June 24, 2004 Thursday
Final Edition

# U.S. Struggled Over How Far to Push Tactics; Documents Show Back-and-Forth on Interrogation Policy

**BYLINE: Dana Priest** and Bradley Graham, Washington Post Staff Writers

**SECTION:** A Section; A01

**LENGTH:** 1881 words

Newly released documents and interviews portray the civilian leadership at the Pentagon as urgently concerned that al Qaeda and Taliban detainees might have information that could prevent terrorist attacks and as searching intently for effective and "exceptional" interrogation techniques that would pass legal muster.

Defense Secretary Donald H. Rumsfeld and his senior aides emerge as central players in the government's struggle over nearly three years to decide how far it could go to extract information from those captured in Afghanistan and Iraq and others imprisoned at **Guantanamo Bay,** Cuba.

The result, seen in the documents and in the officials' statements, is a trail of fitful ad hoc policymaking in which interrogation tactics were authorized for a time, then rescinded or modified after the Pentagon's lawyers or others raised legal, ethical or practical objections. Some practices authorized in the field were pulled back at the Pentagon level, and decisions on how to treat detainees were sometimes made case by case.

Rumsfeld, for example, approved in December 2002 a range of severe methods including the stripping of prisoners at Guantanamo, and using dogs to frighten them. He later rescinded those tactics and signed off on a shorter list of "exceptional techniques" suggested by a Pentagon working group in 2003, even though the panel pointed out that, historically, the U.S. military had rejected the use of force in interrogations. "Army interrogation experts view the use of force as an inferior technique that yields information of questionable quality," and distorts the behavior of those being questioned, the group report noted.

Although the White House this week repudiated a Justice Department opinion that torture might be legally defensible, Pentagon general counsel William J. Haynes II in 2003 forced the Pentagon working group to use it as its legal guidepost. He did so over objections from the top lawyers of every military service, who found the legal judgments to be extreme and wrong-headed, according to several military lawyers and memos outlining the debate that were summarized for The Washington Post.

In Iraq, where White House and Pentagon lawyers say all prisoners are protected by the Geneva Conventions, Rumsfeld agreed to hide an Iraqi captive from the International Committee of the Red Cross because, he said, CIA Director George J. Tenet asked him to. Legal experts call it a clear violation of the conventions. "A request was made to do that, and we did," Rumsfeld said last week, even as his deputy general counsel, Daniel J. Dell'Orto, acknowledged from the same podium that "we should have registered him much sooner than we did."

Rumsfeld played a direct role in setting policies for detainee treatment in Afghanistan and Guantanamo, according to a list of Defense Department memos related to **Guantanamo Bay** obtained by The Post. He signed seven orders from January 2002 to January 2003 establishing the interrogation center, placing the Army in charge, allowing access by the Red Cross and foreign intelligence officials, and even deciding how detainee mail would be handled.

Unlike the CIA, which vetted and won approval from the Justice Department and National Security Council for its aggressive interrogation tactics after Sept. 11, 2001, the Pentagon has worked largely on its own in promulgating new questioning methods.

The White House and Justice Department were "completely uninvolved with" reviewing the interrogation rules in Afghanistan and Iraq, said a senior administration official involved in the process.

The Pentagon's chief spokesman, Lawrence T. DiRita, portrayed Rumsfeld as largely responding to requests from commanders and interrogators in the field rather than pushing a certain interrogation policy. "These things tended to come up through legal channels," he said in an interview.

Part of the Pentagon leadership's drive for more leeway in interrogations can be traced to a historic change during Rumsfeld's tenure: the military's dramatically enhanced role in collecting and analyzing intelligence that can be used to thwart terrorist networks worldwide. To accomplish this, Rumsfeld has begun an unprecedented drive to build a Pentagon-based human intelligence apparatus that could one day rival the CIA's clandestine case officer program.

This intelligence-gathering mission trumps most other priorities, including the desire to bring alleged wrongdoers to trial for their role in terrorist plots.

As Rumsfeld explained it in February to the Greater Miami Chamber of Commerce: "What we think about is keeping them off the battlefield so they can't go out and kill more people, immediately interrogating them so we can find out what they know that can prevent future acts of terror against our country . . . and only last is the issue of a crime and some sort of a process that would make a judgment about that crime."

The debate over tactics at Guantanamo appears to have begun in December 2002 when two Navy interrogators heard young military intelligence personnel talking about using techniques that they described to their superiors as "repulsive and potentially illegal."

Navy general counsel Alberto J. Mora brought the issue to the attention of Haynes. Mora's appeals were ignored, however, until he threatened to put his concerns in writing for Haynes, several senior Pentagon officials said. Mora's questions led to the discovery that among the list of "counter-resistance strategies" at Guantanamo were such tactics as using scenarios "designed to convince the detainee that death or severely painful consequences are imminent for him and/or his family," according to an October 2002 memo, and wrapping detainees in wet towels or dripping water on them to make them believe they would suffocate.

Lt. Col. Diane E. Beaver, the legal counsel at Guantanamo then, ruled that those and other techniques -- including 20-hour interrogations, light and sound assaults, stress positions, exposure to cold weather and water -- were legal. She said they could be used with proper oversight and training of interrogators, as long as "there is an important governmental objective, and it is not done for the purpose of causing harm or with the intent to cause prolonged mental suffering."

Interrogators at the detention facilities were particularly interested in using the techniques against two prisoners -- one of them Mohamed al Qahtani, a Saudi detainee who some officials believed may have been the planned 20th hijacker on Sept. 11. Both detainees were considered

to have important information about potential future terrorist operations, defense officials have said.

Maj. Gen. Michael Dunlavey, the commander of Guantanamo, agreed, and sent the list of tactics to Gen. James T. Hill, head of the U.S. Southern Command, for approval.

Hill was not as convinced, and wondered in a memo about the legality of some of the techniques. He asked Gen. Richard B. Myers, chairman of the Joint Chiefs of Staff, for guidance. In December, Rumsfeld approved the use of dogs and stripping, but threw out other controversial items.

Rumsfeld also set up a working group of military lawyers and others to deliberate over the range of techniques that might be useful and appropriate. The group came up with 35 techniques. Among the most severe were 20-hour interrogations, face slapping, stripping detainees to create "a feeling of helplessness and dependence," and using dogs to increase anxiety.

The president's directive in February 2002 that ordered U.S. forces to treat al Qaeda and Taliban detainees humanely and consistent with the Geneva Conventions does contain a loophole phrase: "to the extent appropriate and consistent with military necessity."

The working group's report discussed when the "military necessity" exception might be invoked, citing two factors. One was when government officials felt certain that a particular detainee had information needed to prevent an attack. The other factor was a likelihood that a terrorist attack was about to occur and the attack's potential scale.

But the report also noted that "military courts have treated the necessity defense with disfavor and in fact, some have refused to accept necessity as a permissible defense." The rejections have come from judges who objected to the notion of weighing one evil against another, or who feared that acceptance of the necessity argument would open the door to "private moral codes" substituting for the rule of law, the report said.

Other cautionary flags were raised as well. The report warned that use of exceptional techniques could have "adverse effects" on the "culture and self-image" of the armed forces, recalling the damage done in the past by "perceived law of war violations."

It argued that use of such tactics in some cases but not others could create uncertainty among interrogators about the appropriate limits for interrogators. It also noted that, if the tactics became public, the disclosure could undermine confidence in the war on terrorism and in the military tribunal process that was developed for putting detainees on trial.

Rumsfeld eventually pared the list of 35 methods to 24. Most were part of standard military doctrine. Seven, however, went beyond that, including: removing a detainee from the standard interrogation setting and putting him in a less comfortable room; replacing hot rations with cold food or military Meals Ready to Eat; adjusting the temperature to uncomfortable levels or introducing an unpleasant smell; reversing sleep cycles from night to day; deceiving detainees into thinking they were being questioned by people from a country other than the United States.

"The secretary has placed great stock in the legal reviews that have taken place at every level, and has been persuaded each time that he has had to make decisions, that there were sufficient legal reviews along the way," DiRita said.

A suspected Iraqi member of the terrorist group Al Ansar did not receive such a thorough legal review, defense officials said. The man -- identified by U.S. News & World Report as Hiwa AbdulRahman Rashul -- was picked up by Kurdish soldiers in June or July of 2003 and taken outside Iraq by the CIA for interrogation. In October, the CIA's general counsel told the CIA's directorate of operations that it had to bring the man back to Iraq, since all Iraqi detainees were to be accorded treatment under the Geneva Conventions.

Tenet asked Rumsfeld not to give the prisoner a number and to hide him from international Red Cross officials. He became lost in the system for seven months and was not interrogated by CIA or military officials during that time.

In his investigation into the abuse of detainees at Iraq's Abu Ghraib prison, Army Maj. Gen. Antonio M. Taguba had criticized the CIA practice of maintaining such "ghost detainees" and called the practice "deceptive, contrary to Army doctrine and in violation of international law."

Rumsfeld was asked at a news conference last week, "How is this case different from what Taguba was talking about, the ghost detainees?"

"It is just different, that's all," Rumsfeld replied.

"But can you explain how and why?"

"I can't."

Staff writers Mike Allen and R. Jeffrey Smith contributed to this report.

## Find Documents with Similar Topics

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

| Industry | Subject | Geography |
|---|---|---|
| ☐ LAWYERS | ☐ INTERROGATION OF SUSPECTS | ☐ UNITED STATES |
| | ☐ TERRORISM | ☐ AFGHANISTAN |
| | ☐ TERRORIST ORGANIZATIONS | ☐ IRAQ |
| | ☐ ARMIES | ☐ CUBA |
| | ☐ DEFENSE DEPARTMENTS | |
| | ☐ LAWYERS | |

[_____]  OR  [_____]

Show Major and Minor Index Terms | Show Relevancy Scores                    Clear Selections

**SUBJECT:** TERRORISM (90%); INTERROGATION OF SUSPECTS (90%); TERRORIST ORGANIZATIONS (90%); ARMIES (89%); LAWYERS (89%); DEFENSE DEPARTMENTS (89%); INTERVIEWS (78%); ETHICS (77%); PUBLIC POLICY (76%); LAW ENFORCEMENT (73%); JUSTICE DEPARTMENTS (72%); TREATIES & AGREEMENTS (60%); RELIEF ORGANIZATIONS (50%)

**COMPANY:** WASHINGTON POST CO (52%)

**ORGANIZATION:** AL-QAEDA (84%)

**TICKER:** WPO (NYSE) (52%)

**INDUSTRY:** NAICS517510 CABLE AND OTHER PROGRAM DISTRIBUTION (52%); NAICS515120 TELEVISION BROADCASTING (52%); NAICS511120 PERIODICAL PUBLISHERS (52%); NAICS511110 NEWSPAPER PUBLISHERS (52%); SIC4841 CABLE & OTHER PAY TELEVISION SERVICES (52%); SIC4833 TELEVISION BROADCASTING STATIONS (52%); SIC2711 NEWSPAPERS: PUBLISHING, OR PUBLISHING & PRINTING (52%)

# The Washington Post

## washingtonpost.com

The Washington Post

June 10, 2004 Thursday
Final Edition

# Guantanamo List Details Approved Interrogation Methods

**BYLINE: Dana Priest** and Bradley Graham, Washington Post Staff Writers

**SECTION:** A Section; A13

**LENGTH:** 909 words

A still-classified list of 24 interrogation methods approved for use on **Guantanamo Bay** detainees includes placing prisoners in uncomfortable interrogation cells and deceiving them into thinking they are in the hands of Middle East interrogators who knew all about their culture, a U.S. government official said.

The list, approved April 16, 2003, after debate between Pentagon lawyers and political appointees, also allows interrogators to give uncooperative prisoners food that is cold or less palatable and to isolate them from their peers, the official said.

The existence of the Guantanamo list was previously known, and a few of its methods have been cited in The Washington Post, including allowing interrogators to subject detainees to irritatingly hot or cold temperatures and to reverse their normal sleep patterns. But the Pentagon has refused to release the list, citing its classified status, and most of the methods have been unknown until now.

The Guantanamo techniques -- including seven that go beyond standard U.S. military doctrine -- appeared on an unofficial list drawn up by an Army captain and posted on a wall of the Abu Ghraib prison outside Baghdad for use by interrogators there.

But the Guantanamo list does not include some of the more severe methods available to interrogators in Iraq if they got proper approval, including forcing detainees to sit or stand in stressful positions, using sleep or sensory deprivation, and using military dogs to intimidate. Nor do the Guantanamo methods approach the definitions of torture contained in recently revealed Justice Department and Pentagon legal reviews that argued such measures might be justified in certain circumstances.

Unlike in Iraq, where prisoners were accorded unambiguous prisoner-of-war status, prisoners in Guantanamo were given a newly designated "unlawful enemy combatants." They were suspected al Qaeda and Taliban fighters, captured on the Afghanistan battlefield. President Bush said they did not deserve prisoner of war status, but he ordered the military to treat them in accordance with the Geneva Conventions.

Pentagon spokesman Bryan Whitman declined to comment on specific interrogation techniques. Given that the detainees were believed to have intelligence about ongoing threats to the United States, Whitman said, "It was appropriate to ask the question: Should there be something else we should be doing to learn about potential attacks in the making?"

In fact, on Dec. 2, 2002, Defense Secretary Donald H. Rumsfeld approved a set of more

aggressive interrogation methods to be used on Mohamed al Qahtani, a Saudi detainee who some officials believed may have been the planned 20th hijacker in the Sept. 11, 2001, attacks. A naval psychologist at the base protested the use of some techniques meant to humiliate prisoners and sought help from the Navy's top civilian lawyer, Alberto J. Mora, to stop them, according to three defense officials knowledgeable about the debate.

Mora is the Navy's general counsel. Although previous reports have highlighted the concerns of senior military lawyers about employing more severe interrogation measures, the disclosure of Mora's role reveals that the worries extended to some high-ranking civilians in the Defense Department as well. Mora declined a request to be interviewed.

"The Navy's general counsel was the real hero," said one senior military lawyer who participated in the discussions.

The techniques approved by Rumsfeld were suspended Jan. 15, 2003, "out of concern for their effectiveness or appropriateness," Whitman said.

Rumsfeld then asked a working group of lawyers, intelligence officials and representatives of the Office of Special Operations and Low-Intensity Conflict to come up with permanent interrogation guidelines for Guantanamo. They looked at 35 techniques, including covering a suspect with wet towels to simulate drowning, and stripping detainees. Only 24 techniques survived, the result of a rancorous debate.

Seven of those approved techniques are not included in U.S. military doctrine, and are listed as: "change of scenery up; change of scenery down; dietary manipulation; environmental manipulation; sleep adjustment (reversal) ; isolation for 30 days"; and a technique known as "false flag," or deceiving a detainee into believing he is being interrogated by someone from another country.

The other 17 techniques are approved in standard military doctrine and carry these names: direct questioning; incentive/removal of incentive; emotional love/hate; fear up/harsh; fear up/mild; reduced fear; pride and ego up and down; futility; "we know all"; establish your identity; repetition; file and dossier; good cop/bad cop; rapid fire; and silence.

Four of the tactics required interrogators to notify commanders in advance of their use. They are: isolating a detainee from peers; pride and ego up or down, which means attacking someone's personal worth and sense of pride; and "fear up/harsh," in which interrogators could yell at prisoners, throw things around the interrogation room and convince a detainee that he has something to fear.

Rumsfeld's working group also considered a legal analysis by Pentagon and other government lawyers that said torture of detainees may be legally justifiable in some circumstances. But the 24 techniques approved by Rumsfeld were far less aggressive and severe than the types of methods contemplated in the legal review.

### Find Documents with Similar Topics

Below are concepts discussed in this document. Select terms of interest and either modify your search or narrow the current results set

| Industry | Subject | Geography |
|---|---|---|
| ☐ LAWYERS | ☐ INTERROGATION OF SUSPECTS | ☐ UNITED STATES |
| | ☐ APPROVALS | ☐ IRAQ |
| | ☐ LAWYERS | ☐ MIDDLE EAST |

# The Washington Post

## washingtonpost.com

### The Washington Post

June 8, 2004 Tuesday
Final Edition

## Memo Offered Justification for Use of Torture; Justice Dept. Gave Advice in 2002

**BYLINE: Dana Priest** and R. Jeffrey Smith, Washington Post Staff Writers

**SECTION:** A Section; A01

**LENGTH:** 1699 words

In August 2002, the Justice Department advised the White House that torturing al Qaeda terrorists in captivity abroad "may be justified," and that international laws against torture "may be unconstitutional if applied to interrogations" conducted in President Bush 's war on terrorism, according to a newly obtained memo.

If a government employee were to torture a suspect in captivity, "he would be doing so in order to prevent further attacks on the United States by the Al Qaeda terrorist network," said the memo, from the Justice Department's office of legal counsel, written in response to a CIA request for legal guidance. It added that arguments centering on "necessity and self-defense could provide justifications that would eliminate any criminal liability" later.

The memo seems to counter the pre-Sept. 11, 2001, assumption that U.S. government personnel would never be permitted to torture captives. It was offered after the CIA began detaining and interrogating suspected al Qaeda leaders in Afghanistan and elsewhere in the wake of the attacks, according to government officials familiar with the document.

The legal reasoning in the 2002 memo, which covered treatment of al Qaeda detainees in CIA custody, was later used in a March 2003 report by Pentagon lawyers assessing interrogation rules governing the Defense Department's detention center at **Guantanamo Bay,** Cuba. At that time, Defense Secretary Donald H. Rumsfeld had asked the lawyers to examine the logistical, policy and legal issues associated with interrogation techniques.

Bush administration officials say flatly that, despite the discussion of legal issues in the two memos, it has abided by international conventions barring torture, and that detainees at Guantanamo and elsewhere have been treated humanely, except in the cases of abuse at Abu Ghraib prison in Iraq for which seven military police soldiers have been charged.

Still, the 2002 and 2003 memos reflect the Bush administration's desire to explore the limits on how far it could legally go in aggressively interrogating foreigners suspected of terrorism or of having information that could thwart future attacks.

In the 2002 memo, written for the CIA and addressed to White House Counsel Alberto R. Gonzales, the Justice Department defined torture in a much narrower way, for example, than does the U.S. Army, which has historically carried out most wartime interrogations.

In the Justice Department's view -- contained in a 50-page document signed by Assistant

Attorney General Jay S. Bybee and obtained by The Washington Post -- inflicting moderate or fleeting pain does not necessarily constitute torture. Torture, the memo says, "must be equivalent in intensity to the pain accompanying serious physical injury, such as organ failure, impairment of bodily function, or even death."

By contrast, the Army's Field Manual 34-52, titled "Intelligence Interrogations," sets more restrictive rules. For example, the Army prohibits pain induced by chemicals or bondage; forcing an individual to stand, sit or kneel in abnormal positions for prolonged periods of time; and food deprivation. Under mental torture, the Army prohibits mock executions, sleep deprivation and chemically induced psychosis.

Human rights groups expressed dismay at the Justice Department's legal reasoning yesterday.

"It is by leaps and bounds the worst thing I've seen since this whole Abu Ghraib scandal broke," said Tom Malinowski of Human Rights Watch. "It appears that what they were contemplating was the commission of war crimes and looking for ways to avoid legal accountability. The effect is to throw out years of military doctrine and standards on interrogations."

But a spokesman for the White House counsel's office said, "The president directed the military to treat al Qaeda and Taliban humanely and consistent with the Geneva Conventions."

Mark Corallo, the Justice Department's chief spokesman, said "the department does not comment on specific legal advice it has provided confidentially within the executive branch." But he added: "It is the policy of the United States to comply with all U.S. laws in the treatment of detainees -- including the Constitution, federal statutes and treaties." The CIA declined to comment.

The Justice Department's interpretation for the CIA sought to provide guidance on what sorts of aggressive treatments might not fall within the legal definition of torture.

The 2002 memo, for example, included the interpretation that "it is difficult to take a specific act out of context and conclude that the act in isolation would constitute torture." The memo named seven techniques that courts have considered torture, including severe beatings with truncheons and clubs, threats of imminent death, burning with cigarettes, electric shocks to genitalia, rape or sexual assault, and forcing a prisoner to watch the torture of another person.

"While we cannot say with certainty that acts falling short of these seven would not constitute torture," the memo advised, ". . . we believe that interrogation techniques would have to be similar to these in their extreme nature and in the type of harm caused to violate law."

"For purely mental pain or suffering to amount to torture," the memo said, "it must result in significant psychological harm of significant duration, e.g., lasting for months or even years." Examples include the development of mental disorders, drug-induced dementia, "post traumatic stress disorder which can last months or even years, or even chronic depression."

Of mental torture, however, an interrogator could show he acted in good faith by "taking such steps as surveying professional literature, consulting with experts or reviewing evidence gained in past experience" to show he or she did not intend to cause severe mental pain and that the conduct, therefore, "would not amount to the acts prohibited by the statute."

In 2003, the Defense Department conducted its own review of the limits that govern torture, in consultation with experts at the Justice Department and other agencies. The aim of the March 6, 2003, review, conducted by a working group that included representatives of the military services, the Joint Chiefs of Staff and the intelligence community, was to provide a legal basis for what the group's report called "exceptional interrogations."

Much of the reasoning in the group's report and in the Justice Department's 2002 memo overlap. The documents, which address treatment of al Qaeda and Taliban detainees, were not written to

apply to detainees held in Iraq.

In a draft of the working group's report, for example, Pentagon lawyers approvingly cited the Justice Department's 2002 position that domestic and international laws prohibiting torture could be trumped by the president's wartime authority and any directives he issued.

At the time, the Justice Department's legal analysis, however, shocked some of the military lawyers who were involved in crafting the new guidelines, said senior defense officials and military lawyers.

"Every flag JAG lodged complaints," said one senior Pentagon official involved in the process, referring to the judge advocate generals who are military lawyers of each service.

"It's really unprecedented. For almost 30 years we've taught the Geneva Convention one way," said a senior military attorney. "Once you start telling people it's okay to break the law, there's no telling where they might stop."

A U.S. law enacted in 1994 bars torture by U.S. military personnel anywhere in the world. But the Pentagon group's report, prepared under the supervision of General Counsel William J. Haynes II, said that "in order to respect the President's inherent constitutional authority to manage a military campaign . . . [the prohibition against torture] must be construed as inapplicable to interrogations undertaken pursuant to his Commander-in-Chief authority."

The Pentagon group's report, divulged yesterday by the Wall Street Journal and obtained by The Post, said further that the 1994 law barring torture "does not apply to the conduct of U.S. personnel" at **Guantanamo Bay.**

It also said the anti-torture law did apply to U.S. military interrogations that occurred outside U.S. "maritime and territorial jurisdiction," such as in Iraq or Afghanistan. But it said both Congress and the Justice Department would have difficulty enforcing the law if U.S. military personnel could be shown to be acting as a result of presidential orders.

The report then parsed at length the definition of torture under domestic and international law, with an eye toward guiding military personnel about legal defenses.

The Pentagon report uses language very similar to that in the 2002 Justice Department memo written in response to the CIA's request: "If a government defendant were to harm an enemy combatant during an interrogation in a manner that might arguably violate criminal prohibition, he would be doing so in order to prevent further attacks on the United States by the al Qaeda terrorist network," the draft states. "In that case, DOJ [Department of Justice] believes that he could argue that the executive branch's constitutional authority to protect the nation from attack justified his actions."

The draft goes on to assert that a soldier's claim that he was following "superior orders" would be available for those engaged in "exceptional interrogations except where the conduct goes so far as to be patently unlawful." It asserts, as does the Justice view expressed for the CIA, that the mere infliction of pain and suffering is not unlawful; the pain or suffering must be severe.

A Defense Department spokesman said last night that the March 2003 memo represented "a scholarly effort to define the perimeters of the law" but added: "What is legal and what is put into practice is a different story." Pentagon officials said the group examined at least 35 interrogation techniques, and Rumsfeld later approved using 24 of them in a classified directive on April 16, 2003, that governed all activities at **Guantanamo Bay.** The Pentagon has refused to make public the 24 interrogation procedures.

Staff writer Josh White contributed to this report.





# Soldiers Face Neglect, Frustration At Army's Top Medical Facility

By Dana Priest and Anne Hull
Washington Post Staff Writers
Sunday, February 18, 2007; A01

Behind the door of Army Spec. Jeremy Duncan's room, part of the wall is torn and hangs in the air, weighted down with black mold. When the wounded combat engineer stands in his shower and looks up, he can see the bathtub on the floor above through a rotted hole. The entire building, constructed between the world wars, often smells like greasy carry-out. Signs of neglect are everywhere: mouse droppings, belly-up cockroaches, stained carpets, cheap mattresses.

This is the world of Building 18, not the kind of place where Duncan expected to recover when he was evacuated to Walter Reed Army Medical Center from Iraq last February with a broken neck and a shredded left ear, nearly dead from blood loss. But the old lodge, just outside the gates of the hospital and five miles up the road from the White House, has housed hundreds of maimed soldiers recuperating from injuries suffered in the wars in Iraq and Afghanistan.

The common perception of Walter Reed is of a surgical hospital that shines as the crown jewel of military medicine. But 5 1/2 years of sustained combat have transformed the venerable 113-acre institution into something else entirely -- a holding ground for physically and psychologically damaged outpatients. Almost 700 of them -- the majority soldiers, with some Marines -- have been released from hospital beds but still need treatment or are awaiting bureaucratic decisions before being discharged or returned to active duty.

They suffer from brain injuries, severed arms and legs, organ and back damage, and various degrees of post-traumatic stress. Their legions have grown so exponentially -- they outnumber hospital patients at

Walter Reed 17 to 1 -- that they take up every available bed on post and spill into dozens of nearby hotels and apartments leased by the Army. The average stay is 10 months, but some have been stuck there for as long as two years.

Not all of the quarters are as bleak as Duncan's, but the despair of Building 18 symbolizes a larger problem in Walter Reed's treatment of the wounded, according to dozens of soldiers, family members, veterans aid groups, and current and former Walter Reed staff members interviewed by two Washington Post reporters, who spent more than four months visiting the outpatient world without the knowledge or permission of Walter Reed officials. Many agreed to be quoted by name; others said they feared Army retribution if they complained publicly.

While the hospital is a place of scrubbed-down order and daily miracles, with medical advances saving more soldiers than ever, the outpatients in the Other Walter Reed encounter a messy bureaucratic battlefield nearly as chaotic as the real battlefields they faced overseas.

On the worst days, soldiers say they feel like they are living a chapter of "Catch-22." The wounded manage other wounded. Soldiers dealing with psychological disorders of their own have been put in charge of others at risk of suicide.

Disengaged clerks, unqualified platoon sergeants and overworked case managers fumble with simple needs: feeding soldiers' families who are close to poverty, replacing a uniform ripped off by medics in the desert sand or helping a brain-damaged soldier remember his next appointment.

"We've done our duty. We fought the war. We came home wounded. Fine. But whoever the people are back here who are supposed to give us the easy transition should be doing it," said Marine Sgt. Ryan Groves, 26, an amputee who lived at Walter Reed for 16 months. "We don't know what to do. The people who are supposed to know don't have the answers. It's a nonstop process of stalling."

Soldiers, family members, volunteers and caregivers who have tried to fix the system say each mishap seems trivial by itself, but the cumulative effect wears down the spirits of the wounded and can stall their recovery.

"It creates resentment and disenfranchisement," said Joe Wilson, a clinical social worker at Walter Reed. "These soldiers will withdraw and stay in their rooms. They will actively avoid the very treatment and services that are meant to be helpful."

Danny Soto, a national service officer for Disabled American Veterans who helps dozens of wounded service members each week at Walter Reed, said soldiers "get awesome medical care and their lives are being saved," but, "Then they get into the administrative part of it and they are like, 'You saved me for what?' The soldiers feel like they are not getting proper respect. This leads to anger."

This world is invisible to outsiders. Walter Reed occasionally showcases the heroism of these wounded soldiers and emphasizes that all is well under the circumstances. President Bush, former defense secretary Donald H. Rumsfeld and members of Congress have promised the best care during their regular visits to the hospital's spit-polished amputee unit, Ward 57.

"We owe them all we can give them," Bush said during his last visit, a few days before Christmas. "Not only for when they're in harm's way, but when they come home to help them adjust if they have wounds, or help them adjust after their time in service."

Along with the government promises, the American public, determined not to repeat the divisive Vietnam experience, has embraced the soldiers even as the war grows more controversial at home. Walter Reed is awash in the generosity of volunteers, businesses and celebrities who donate money, plane tickets, telephone cards and steak dinners.

Yet at a deeper level, the soldiers say they feel alone and frustrated. Seventy-five percent of the troops polled by Walter Reed last March said their experience was "stressful." Suicide attempts and unintentional overdoses from prescription drugs and alcohol, which is sold on post, are part of the narrative here.

Vera Heron spent 15 frustrating months living on post to help care for her son. "It just absolutely took forever to get anything done," Heron said. "They do the paperwork, they lose the paperwork. Then they have to redo the paperwork. You are talking about guys and girls whose lives are disrupted for the rest of their lives, and they don't put any priority on it."

Family members who speak only Spanish have had to rely on Salvadoran housekeepers, a Cuban bus driver, the Panamanian bartender and a Mexican floor cleaner for help. Walter Reed maintains a list of bilingual staffers, but they are rarely called on, according to soldiers and families and Walter Reed staff members.

Evis Morales's severely wounded son was transferred to the National Naval Medical Center in Bethesda for surgery shortly after she arrived at Walter Reed. She had checked into her government-paid room on post, but she slept in the lobby of the Bethesda hospital for two weeks because no one told her there is a free shuttle between the two facilities. "They just let me off the bus and said 'Bye-bye,' " recalled Morales, a Puerto Rico resident.

Morales found help after she ran out of money, when she called a hotline number and a Spanish-speaking operator happened to answer.

"If they can have Spanish-speaking recruits to convince my son to go into the Army, why can't they have Spanish-speaking translators when he's injured?" Morales asked. "It's so confusing, so disorienting."

Soldiers, wives, mothers, social workers and the heads of volunteer organizations have complained repeatedly to the military command about what one called "The Handbook No One Gets" that would explain life as an outpatient. Most soldiers polled in the March survey said they got their information from friends. Only 12 percent said any Army literature had been helpful.

"They've been behind from Day One," said Rep. Thomas M. Davis III (R-Va.), who headed the House Government Reform Committee, which investigated problems at Walter Reed and other Army facilities. "Even the stuff they've fixed has only been patched."

Among the public, Davis said, "there's vast appreciation for soldiers, but there's a lack of focus on what happens to them" when they return. "It's awful."

Maj. Gen. George W. Weightman, commander at Walter Reed, said in an interview last week that a major reason outpatients stay so long, a change from the days when injured soldiers were discharged as quickly as possible, is that the Army wants to be able to hang on to as many soldiers as it can, "because this is the first time this country has fought a war for so long with an all-volunteer force since the Revolution."

Acknowledging the problems with outpatient care, Weightman said Walter Reed has taken steps over the past year to improve conditions for the outpatient army, which at its peak in summer 2005 numbered nearly 900, not to mention the hundreds of family members who come to care for them. One platoon sergeant used to be in charge of 125 patients; now each one manages 30. Platoon sergeants with psychological problems are more carefully screened. And officials have increased the numbers of case managers and patient advocates to help with the complex disability benefit process, which Weightman called "one of the biggest sources of delay."

And to help steer the wounded and their families through the complicated bureaucracy, Weightman said, Walter Reed has recently begun holding twice-weekly informational meetings. "We felt we were pushing information out before, but the reality is, it was overwhelming," he said. "Is it fail-proof? No. But we've put more resources on it."

He said a 21,500-troop increase in Iraq has Walter Reed bracing for "potentially a lot more" casualties.

**Bureaucratic Battles**

The best known of the Army's medical centers, Walter Reed opened in 1909 with 10 patients. It has treated the wounded from every war since, and nearly one of every four service members injured in Iraq and Afghanistan.

The outpatients are assigned to one of five buildings attached to the post, including Building 18, just across from the front gates on Georgia Avenue. To accommodate the overflow, some are sent to nearby hotels and apartments. Living conditions range from the disrepair of Building 18 to the relative elegance of Mologne House, a hotel that opened on the post in 1998, when the typical guest was a visiting family member or a retiree on vacation.

The Pentagon has announced plans to close Walter Reed by 2011, but that hasn't stopped the flow of casualties. Three times a week, school buses painted white and fitted with stretchers and blackened windows stream down Georgia Avenue. Sirens blaring, they deliver soldiers groggy from a pain-relief cocktail at the end of their long trip from Iraq via Landstuhl Regional Medical Center in Germany and Andrews Air Force Base.

Staff Sgt. John Daniel Shannon, 43, came in on one of those buses in November 2004 and spent several weeks on the fifth floor of Walter Reed's hospital. His eye and skull were shattered by an AK-47 round. His odyssey in the Other Walter Reed has lasted more than two years, but it began when someone handed him a map of the grounds and told him to find his room across post.

A reconnaissance and land-navigation expert, Shannon was so disoriented that he couldn't even find north. Holding the map, he stumbled around outside the hospital, sliding against walls and trying to keep himself upright, he said. He asked anyone he found for directions.

Shannon had led the 2nd Infantry Division's Ghost Recon Platoon until he was felled in a gun battle in Ramadi. He liked the solitary work of a sniper; "Lone Wolf" was his call name. But he did not expect to be left alone by the Army after such serious surgery and a diagnosis of post-traumatic stress disorder. He had appointments during his first two weeks as an outpatient, then nothing.

"I thought, 'Shouldn't they contact me?' " he said. "I didn't understand the paperwork. I'd start calling phone numbers, asking if I had appointments. I finally ran across someone who said: 'I'm your case manager. Where have you been?'

"Well, I've been here! Jeez Louise, people, I'm your hospital patient!"

Like Shannon, many soldiers with impaired memory from brain injuries sat for weeks with no appointments and no help from the staff to arrange them. Many disappeared even longer. Some simply left for home.

One outpatient, a 57-year-old staff sergeant who had a heart attack in Afghanistan, was given 200 rooms to supervise at the end of 2005. He quickly discovered that some outpatients had left the post months earlier and would check in by phone. "We called them 'call-in patients,' " said Staff Sgt. Mike McCauley, whose dormant PTSD from Vietnam was triggered by what he saw on the job: so many young and wounded, and three bodies being carried from the hospital.

Life beyond the hospital bed is a frustrating mountain of paperwork. The typical soldier is required to file 22 documents with eight different commands -- most of them off-post -- to enter and exit the medical processing world, according to government investigators. Sixteen different information systems are used to process the forms, but few of them can communicate with one another. The Army's three personnel databases cannot read each other's files and can't interact with the separate pay system or the medical recordkeeping databases.

The disappearance of necessary forms and records is the most common reason soldiers languish at Walter Reed longer than they should, according to soldiers, family members and staffers. Sometimes the Army has no record that a soldier even served in Iraq. A combat medic who did three tours had to bring in letters and photos of herself in Iraq to show she that had been there, after a clerk couldn't find a record of her service.

Shannon, who wears an eye patch and a visible skull implant, said he had to prove he had served in Iraq when he tried to get a free uniform to replace the bloody one left behind on a medic's stretcher. When he finally tracked down the supply clerk, he discovered the problem: His name was mistakenly left off the "GWOT list" -- the list of "Global War on Terrorism" patients with priority funding from the Defense Department.

He brought his Purple Heart to the clerk to prove he was in Iraq.

Lost paperwork for new uniforms has forced some soldiers to attend their own Purple Heart ceremonies and the official birthday party for the Army in gym clothes, only to be chewed out by superiors.

The Army has tried to re-create the organization of a typical military unit at Walter Reed. Soldiers are assigned to one of two companies while they are outpatients -- the Medical Holding Company (Medhold) for active-duty soldiers and the Medical Holdover Company for Reserve and National Guard soldiers. The companies are broken into platoons that are led by platoon sergeants, the Army equivalent of a parent.

Under normal circumstances, good sergeants know everything about the soldiers under their charge: vices and talents, moods and bad habits, even family stresses.

At Walter Reed, however, outpatients have been drafted to serve as platoon sergeants and have struggled with their responsibilities. Sgt. David Thomas, a 42-year-old amputee with the Tennessee National Guard, said his platoon sergeant couldn't remember his name. "We wondered if he had mental problems," Thomas said. "Sometimes I'd wear my leg, other times I'd take my wheelchair. He would think I was a different person. We thought, 'My God, has this man lost it?' "

Civilian care coordinators and case managers are supposed to track injured soldiers and help them with appointments, but government investigators and soldiers complain that they are poorly trained and often do not understand the system.

One amputee, a senior enlisted man who asked not to be identified because he is back on active duty, said he received orders to report to a base in Germany as he sat drooling in his wheelchair in a haze of medication. "I went to Medhold many times in my wheelchair to fix it, but no one there could help me," he said.

Finally, his wife met an aide to then-Deputy Defense Secretary Paul D. Wolfowitz, who got the erroneous paperwork corrected with one phone call. When the aide called with the news, he told the soldier, "They don't even know you exist."

"They didn't know who I was or where I was," the soldier said. "And I was in contact with my platoon sergeant every day."

The lack of accountability weighed on Shannon. He hated the isolation of the younger troops. The Army's failure to account for them each day wore on him. When a 19-year-old soldier down the hall died, Shannon knew he had to take action.

The soldier, Cpl. Jeremy Harper, returned from Iraq with PTSD after seeing three buddies die. He kept his room dark, refused his combat medals and always seemed heavily medicated, said people who knew him. According to his mother, Harper was drunkenly wandering the lobby of the Mologne House on New Year's Eve 2004, looking for a ride home to West Virginia. The next morning he was found dead in his room. An autopsy showed alcohol poisoning, she said.

"I can't understand how they could have let kids under the age of 21 have liquor," said Victoria Harper, crying. "He was supposed to be right there at Walter Reed hospital. . . . I feel that they didn't take care of him or watch him as close as they should have."

The Army posthumously awarded Harper a Bronze Star for his actions in Iraq.

Shannon viewed Harper's death as symptomatic of a larger tragedy -- the Army had broken its covenant with its troops. "Somebody didn't take care of him," he would later say. "It makes me want to cry. "

Shannon and another soldier decided to keep tabs on the brain injury ward. "I'm a staff sergeant in the U.S. Army, and I take care of people," he said. The two soldiers walked the ward every day with a list of names. If a name dropped off the large white board at the nurses' station, Shannon would hound the nurses to check their files and figure out where the soldier had gone.

Sometimes the patients had been transferred to another hospital. If they had been released to one of the residences on post, Shannon and his buddy would pester the front desk managers to make sure the new charges were indeed there. "But two out of 10, when I asked where they were, they'd just say, 'They're gone,' " Shannon said.

Even after Weightman and his commanders instituted new measures to keep better track of soldiers, two young men left post one night in November and died in a high-speed car crash in Virginia. The driver was supposed to be restricted to Walter Reed because he had tested positive for illegal drugs, Weightman said.

Part of the tension at Walter Reed comes from a setting that is both military and medical. Marine Sgt. Ryan Groves, the squad leader who lost one leg and the use of his other in a grenade attack, said his recovery was made more difficult by a Marine liaison officer who had never seen combat but dogged him about having his mother in his room on post. The rules allowed her to be there, but the officer said she was taking up valuable bed space.

"When you join the Marine Corps, they tell you, you can forget about your mama. 'You have no mama. We are your mama,' " Groves said. "That training works in combat. It doesn't work when you are wounded."

**Frustration at Every Turn**

The frustrations of an outpatient's day begin before dawn. On a dark, rain-soaked morning this winter, Sgt. Archie Benware, 53, hobbled over to his National Guard platoon office at Walter Reed. Benware had done two tours in Iraq. His head had been crushed between two 2,100-pound concrete barriers in Ramadi, and now it was dented like a tin can. His legs were stiff from knee surgery. But here he was, trying to take care of business.

At the platoon office, he scanned the white board on the wall. Six soldiers were listed as AWOL. The platoon sergeant was nowhere to be found, leaving several soldiers stranded with their requests.

Benware walked around the corner to arrange a dental appointment -- his teeth were knocked out in the accident. He was told by a case manager that another case worker, not his doctor, would have to approve the procedure.

"Goddamn it, that's unbelievable!" snapped his wife, Barb, who accompanied him because he can no longer remember all of his appointments.

Not as unbelievable as the time he received a manila envelope containing the gynecological report of a young female soldier.

Next came 7 a.m. formation, one way Walter Reed tries to keep track of hundreds of wounded. Formation is also held to maintain some discipline. Soldiers limp to the old Red Cross building in rain, ice and snow. Army regulations say they can't use umbrellas, even here. A triple amputee has mastered the art of putting on his uniform by himself and rolling in just in time. Others are so gorked out on pills that they seem on the verge of nodding off.

"Fall in!" a platoon sergeant shouted at Friday formation. The noisy room of soldiers turned silent.

An Army chaplain opened with a verse from the Bible. "Why are we here?" she asked. She talked about heroes and service to country. "We were injured in many ways."

Someone announced free tickets to hockey games, a Ravens game, a movie screening, a dinner at McCormick and Schmick's, all compliments of local businesses.

Every formation includes a safety briefing. Usually it is a warning about mixing alcohol with meds, or driving too fast, or domestic abuse. "Do not beat your spouse or children. Do not let your spouse or children beat you," a sergeant said, to laughter. This morning's briefing included a warning about black ice, a particular menace to the amputees.

Dress warm, the sergeant said. "I see some guys rolling around in their wheelchairs in 30 degrees in T-shirts."

Soldiers hate formation for its petty condescension. They gutted out a year in the desert, and now they are being treated like children.

"I'm trying to think outside the box here, maybe moving formation to Wagner Gym," the commander said, addressing concerns that formation was too far from soldiers' quarters in the cold weather. "But guess what? Those are nice wood floors. They have to be covered by a tarp. There's a tarp that's got to be rolled out over the wooden floors. Then it has to be cleaned, with 400 soldiers stepping all over it. Then it's got to be rolled up."

"Now, who thinks Wagner Gym is a good idea?"

Explaining this strange world to family members is not easy. At an orientation for new arrivals, a staff sergeant walked them through the idiosyncrasies of Army financing. He said one relative could receive a 15-day advance on the $64 per diem either in cash or as an electronic transfer: "I highly recommend that you take the cash," he said. "There's no guarantee the transfer will get to your bank." The audience yawned.

Actually, he went on, relatives can collect only 80 percent of this advance, which comes to $51.20 a day. "The cashier has no change, so we drop to $50. We give you the rest" -- the $1.20 a day -- "when you leave."

The crowd was anxious, exhausted. A child crawled on the floor. The sergeant plowed on. "You need to figure out how long your loved one is going to be an inpatient," he said, something even the doctors can't accurately predict from day to day. "Because if you sign up for the lodging advance," which is $150 a day, "and they get out the next day, you owe the government the advance back of $150 a day."

A case manager took the floor to remind everyone that soldiers are required to be in uniform most of the time, though some of the wounded are amputees or their legs are pinned together by bulky braces. "We have break-away clothing with Velcro!" she announced with a smile. "Welcome to Walter Reed!"

## A Bleak Life in Building 18

"Building 18! There is a rodent infestation issue!" bellowed the commander to his troops one morning at formation. "It doesn't help when you live like a rodent! I can't believe people live like that! I was appalled by some of your rooms!"

Life in Building 18 is the bleakest homecoming for men and women whose government promised them good care in return for their sacrifices.

One case manager was so disgusted, she bought roach bombs for the rooms. Mouse traps are handed out. It doesn't help that soldiers there subsist on carry-out food because the hospital cafeteria is such a hike on cold nights. They make do with microwaves and hot plates.

Army officials say they "started an aggressive campaign to deal with the mice infestation" last October and that the problem is now at a "manageable level." They also say they will "review all outstanding work orders" in the next 30 days.

Soldiers discharged from the psychiatric ward are often assigned to Building 18. Buses and ambulances blare all night. While injured soldiers pull guard duty in the foyer, a broken garage door allows unmonitored entry from the rear. Struggling with schizophrenia, PTSD, paranoid delusional disorder and traumatic brain injury, soldiers feel especially vulnerable in that setting, just outside the post gates, on a street where drug dealers work the corner at night.

"I've been close to mortars. I've held my own pretty good," said Spec. George Romero, 25, who came back from Iraq with a psychological disorder. "But here . . . I think it has affected my ability to get over it . . . dealing with potential threats every day."

After Spec. Jeremy Duncan, 30, got out of the hospital and was assigned to Building 18, he had to navigate across the traffic of Georgia Avenue for appointments. Even after knee surgery, he had to limp back and forth on crutches and in pain. Over time, black mold invaded his room.

But Duncan would rather suffer with the mold than move to another room and share his convalescence in tight quarters with a wounded stranger. "I have mold on the walls, a hole in the shower ceiling, but . . . I don't want someone waking me up coming in."

Wilson, the clinical social worker at Walter Reed, was part of a staff team that recognized Building 18's toll on the wounded. He mapped out a plan and, in September, was given a $30,000 grant from the Commander's Initiative Account for improvements. He ordered some equipment, including a pool table and air hockey table, which have not yet arrived. A Psychiatry Department functionary held up the rest of the money because she feared that buying a lot of recreational equipment close to Christmas would trigger an audit, Wilson said.

In January, Wilson was told that the funds were no longer available and that he would have to submit a new request. "It's absurd," he said. "Seven months of work down the drain. I have nothing to show for this project. It's a great example of what we're up against."

A pool table and two flat-screen TVs were eventually donated from elsewhere.

But Wilson had had enough. Three weeks ago he turned in his resignation. "It's too difficult to get anything done with this broken-down bureaucracy," he said.

At town hall meetings, the soldiers of Building 18 keep pushing commanders to improve conditions. But some things have gotten worse. In December, a contracting dispute held up building repairs.

"I hate it," said Romero, who stays in his room all day. "There are cockroaches. The elevator doesn't work. The garage door doesn't work. Sometimes there's no heat, no water. . . . I told my platoon sergeant I want to leave. I told the town hall meeting. I talked to the doctors and medical staff. They just said you kind of got to get used to the outside world. . . . My platoon sergeant said, 'Suck it up!' "

*Staff researcher Julie Tate contributed to this report.*

© 2007 The Washington Post Company

Ads by Google

Comcast Package
Cable, Phone, Internet All 3 For $33 Each
www.comcast.com/tripleplay

Download IE7

Faster & more secure browsing. Get the new IE7 customized by Google.
www.google.com/toolbar/ie7/

RCN Broadband Service
Enjoy fast and reliable internet with speeds up to 20 mbps.
www.RCN.com

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

AUG 2 9 2002

In the Matter of the           )
New York Times Company and     )
Eric Schmitt to Quash the      )
Subpoena Issued by Brian       )
Regan for use in:              )
                               )
UNITED STATES                  )
                               )
v.                             )          Criminal No.  01-405-A
                               )
BRIAN PATRICK REGAN,           )
                               )
         Defendant.            )

## MEMORANDUM ORDER

THIS MATTER is before the Court on the New York Times
Company and Eric Schmitt's Motion to Quash the Subpoena issued by
the Defendant Brian Patrick Regan, and/or for protective order.
Defendant seeks to compel the testimony of Mr. Schmitt, a
reporter for the New York Times who wrote a July 5, 2002, story
entitled "U.S. Plans for Iraq is Said to Include Attack on Three
Sides." ("Article").  The Defendant has subpoenaed Mr. Schmitt to
question him about information concerning his confidential
source(s) for the Article.  Specifically, Defendant seeks
information from Mr. Schmitt concerning whether the source(s) is
a government official, under what circumstance the source(s)
transmitted the information, whether the source(s) provided Mr.
Schmitt documentation to support the war plans information, and
the Government's investigation of the alleged "leak" of

information.

For the reasons stated in open court on August 8, 2002, and supplemented below, the Motion to Quash is GRANTED. First, the information regarding Mr. Schmitt's confidential source(s) sought by the subpoena is irrelevant and immaterial under Rule 17(a) of the Federal Rules of Criminal Procedure because it has no bearing on the Defendant's innocence/guilt or punishment in this case. Second, the information is protected under the First Amendment because the balance of factors weigh in favor of Mr. Schmitt's and the public's interests in maintaining the confidentiality of Mr. Schmitt's source(s).

## I.

Defendant's subpoena is barred under Rule 17(a) of the Federal Rules of Criminal Procedure. Under Rule 17(a), to withstand a motion to quash, the party serving the subpoena must show that the testimony sought is both relevant and material to his defense. *See Stern v. United States District Court for the District of Massachusetts*, 214 F.3d 4, 17 (1st Cir. 2000), *cert. denied*, 531 U.S. 114 (2001)(citing *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982); *United States v. Campbell*, 874 F.2d 838 (1st Cir 1989)).

In this case, the Defendant has failed to show how Mr. Schmitt's testimony regarding his confidential source(s) is relevant or material to his innocence/guilt or his punishment.

2

This criminal matter deals with allegations that the Defendant attempted to disclose, among other things, sensitive information to the Iraqi government. Whether Government officials leaked information in the summer of 2002 concerning Iraqi war plans to the press has no bearing on the Defendant's alleged attempt to surreptitiously transmit equally sensitive but different information to Iraq for pecuniary gain over a year ago.

Nor does the information bear on the Defendant's punishment. The defense suspects, without any factual basis, that Government officials intentionally leaked war plans to the New York Times, or failed to vigorously investigate such a leak. The defense maintains that such information would assist the jury in assessing whether the Defendant should be sentenced to death. However, the Supreme Court has emphasized time and time again "what is important at the selection stage is an *individualized determination* on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa v. California*, 512 U.S. 967, 973 (1994) (citations omitted). There is no evidence before the Court that the United States released sensitive information to the press concerning Iraq, or failed to adequately investigate such a leak. Even if there was such evidence, it does not speak to the character of the Defendant, nor the harm he allegedly caused. The evidence has no bearing on whether the Defendant, accused of attempting to sell top secret information

3

to various foreign powers, should face the ultimate penalty. Evidence that Government officials deliberately leaked war plans to the press does not mitigate the offense before the Court.

Further, Defendant relies heavily on what he *might* discover by issuing a subpoena for Mr. Schmitt. Courts frequently quash Rule 17(c) subpoenas seeking document production based on the "mere hope" that a subpoena may result in the discovery of exculpatory material. *See, e.g., United States v. Gika,* 112 F.R.D. 198, 201 (D. Mass. 1986)(citing *United States v. Cuthbertson,* 630 F.2d 139 (3d Cir. 1980), *cert. denied,* 449 U.S. 1126 (1981)). These principles are equally applicable to subpoenas seeking information under Rule 17(a) like the instant one. The Defendant has no evidence that the information in the Article was deliberately "leaked" by the Government or by a rogue official. Defendant's suspicions are based on conjecture and speculation, he simply thinks that Mr. Schmitt's testimony will provide such information. In other words, the Defendant wishes to embark on a fishing expedition in the hope that something may turn up to support his claims. Rule 17(a) is not a discovery tool for such inquiries. *See Cuthbertson,* 630 F.2d at 144.

## II.

The motion to quash the subpoena is also granted because information concerning the reporter's confidential source(s) is protected from compelled disclosure in this case under the First

4

Amendment.    Several circuit courts of appeals, including the Fourth Circuit, have held that a reporter holds a qualified First Amendment privilege against disclosing information acquired during news gathering activities through confidential sources. *See Larouche v. Nat'l Broadcasting Co.*, 780 F.2d 1134, 1139 (4th Cir.), *cert. denied*, 479 U.S. 818 (1986)).    *See also Schoen v. Schoen*, 5 F.3d 1289, 1292 n. 5 (9th Cir. 1993) (citing cases).

In determining whether a reporter can shield his sources under the First Amendment, the court must engage in a balancing test to determine whether the reporter's constitutional protection is outweighed by society's need for the information. In doing so, a court must focus on three factors.    First, "whether the information is relevant, [second] whether the information can be obtained by alternative means, and [third] whether there is a compelling interest in the information." *Larouche*, 780 F.2d at 1139 (citations omitted).

The Court emphasizes as a threshold matter that this case involves the disclosure of information concerning a confidential source(s).    Defendant may not seek the identity of Mr. Schmitt's confidential source(s), but he does seek sensitive information concerning the source(s)' status as a government official and the circumstances of the disclosure of the information.    These questions sufficiently trespass the confidential relationship between Mr. Schmitt and his source(s) to trigger the

5

constitutional protections necessary to preserving a free press. *See Ashcraft v. Conoco Inc.*, 218 F.3d 282, 287 (4th Cir. 2000) (recognizing that "if reporters were routinely required to divulge identities of their sources, the free flow of newsworthy information would be restrained and the public's understanding of important issues would be hampered in ways inconsistent with a healthy republic."). In balancing the interests at stake, the fact that Mr. Schmitt claims privilege with respect to a confidential source(s) places the thumb on the scale of protecting First Amendment interests at the onset. *See In Re Shain*, 978 F.2d 850, 852-84 (4th Cir. 1992) (emphasizing absence of confidentiality in affirming district court's finding that reporters had no qualified privilege under the First Amendment).

Further, the Court also emphasizes that Mr. Schmitt is not being subpoenaed to testify as an eyewitness to criminal activity that he has observed that might be relevant to the case at bar. Members of the press share the obligation of all citizens to give relevant testimony with respect to criminal conduct. *See In Re Shain*, 978 F.2d at 853. In numerous cases, courts have declined to quash subpoenas where the reporter is asked to testify about the observations of criminal activity. *See, e.g., id.* at 853 (holding that reporters did not have First Amendment privilege to refuse to testify to matters concerning the defendant learned during news gathering). Therefore, it would be a wholly

6

different matter if the Defendant sought Mr. Schmitt's testimony concerning the Defendant's own conduct.  But he does not.

Turning to the balancing of interests in this case, the Court finds that the relevant factors weigh in favor of quashing the subpoena.  As discussed above, the information sought from the reporter by the Defendant on its face is not relevant to this case.  At best, there is the off-chance that the subpoena may arguably disclose some relevant evidence.  But that is insufficient. "[T]here must be a showing of actual relevance; a showing of potential relevance will not suffice."  Shoen, 48 F.3d at 416.  In light of the Defendant's failure to demonstrate the relevance of the sought after information, the subpoena must be quashed.  Defendant has failed to show any compelling need for compromising Mr. Schmitt's confidential source(s), much less a need that overrides Mr. Schmitt's and the public's interest in maintaining the confidentiality of his sources.  The fact that the Government has not heretofore provided the Defendant with the information concerning the "leak" indicates that the Defendant may not be able to acquire the information from other avenues.  However, this factor alone does not outweigh the fact that the information sought is ultimately irrelevant, having no bearing on either guilt or punishment.

### III.

In sum, for the foregoing reasons, it is hereby

7

ORDERED that the New York Times and Mr. Schmitt's Motion to Quash Defendant's Subpoena is GRANTED.

The Clerk is directed to forward a copy of this Order to counsel for the Defendant, the Government and the New York Times and Mr. Schmitt.

Entered this 20 day of August, 2002.

Gerald Bruce Lee
United States District Judge

Alexandria, Virginia
08/20/02

8