


IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re: ) 1:08dm61 (LMB)
)
Grand Jury Subpoena to ) UNDER SEAL
James Risen )

MEMORANDUM OPINION

A federal grand jury has been investigating how highly classified information about a Central Intelligence Agency ("CIA") operation [REDACTED] [REDACTED] was leaked to journalist James Risen. Before the Court is Risen's Motion to Quash a grand jury subpoena that seeks his testimony about his reporting. For the reasons discussed below, Risen's Motion to Quash the subpoena has been granted.

I. Background

A. Chapter 9 of State of War

In January 2006, Risen published a book about the CIA, State of War: The Secret History of the CIA and the Bush Administrati: ("State of War"). Chapter 9 of State of War describes a covert CIA operative's attempts to provide Iran with flawed nuclear weapon plans under a highly classified CIA program.

As reported in Chapter 9, the CIA recruited a former Russian scientist, identified by the codename "MERLIN," to provide Iranian officials with faulty nuclear blueprints, as part of a CIA plan to undermine Iran's nuclear programs. According to Risen, the flaws in the blueprints were immediately spotted by



the former scientist. Nevertheless, the CIA instructed him to continue with the operation and drop the blueprints off at the Iranian embassy in Vienna. Chapter 9 concludes that the operation was deeply flawed and mismanaged, because the latent defects in the blueprints were easily identifiable, and the operation actually resulted in the transfer of potentially helpful nuclear technology to the Iranians. Much of Chapter 9 is told from the perspective of a CIA case officer, described as the Russian scientist's "personal handler," who was assigned to persuade the scientist to go along with the operation.



Decl. of Eric B. Bruce, dated March 7, 2008, ("Bruce Decl.") at ¶ 7, Ex. B to Government's Ex Parte Submission in Supp. of Opp. to James Risen's Mot. to Quash Grand Jury Subpoena, dated June 18, 2010.[1]

B. Risen's contacts with Jeffrey Sterling

The government's target in the leak investigation is Jeffrey Sterling, who was hired as a CIA case officer in 1993. Bruce

---

1 Bruce Decl. at ¶ 7. Chapter 9 also reports that an Iranian intelligence officer provided the CIA with evidence that Iran was behind a bombing and that CIA officials suppressed that information. Id. at ¶ 116-118.





TOP SECRET

Decl. at ¶ 13. From late 1998 or early 1999 through April or May 2000, Sterling was assigned as [redacted] Id. at ¶¶ 16, 26. Sterling frequently met with [redacted] and had principal responsibility for drafting classified reports about his progress. Id. at ¶ 27 After being told that he failed to meet performance targets, Sterling, who is African American, filed a discrimination complaint with the CIA on August 22, 2000. Id. at ¶¶ 17-18. Sterling then filed a lawsuit against the CIA that was dismissed based on the State Secrets privilege. Sterling's employment with the CIA ended on or about January 31, 2002. Id. at ¶¶ 19-20.

The government has established that Sterling first began communicating with Risen during the final stages of his employment with the CIA. On November 4, 2001, Risen published an article in the New York Times, revealing that a CIA undercover station was located in the 7 World Trade Center building. [redacted] Risen quoted an anonymous "former agency official" as his source. Id. at ¶ 47-48, 52. Former CIA case officer [redacted] testified to the grand jury that Sterling told her [redacted]





TOP SECRET

[redacted] Id. at ¶ 49.

On March 2, 2002, the New York Times published an article by Risen about Sterling's discrimination lawsuit against the CIA. Id. at ¶ 53. The article quotes Sterling extensively. Risen wrote that Sterling "was assigned to try to recruit Iranians as spies," [redacted] Id. at ¶ 54.

The government alleges that after he was fired by the CIA, Sterling attempted to draw attention to the [redacted] project. The evidence supporting that allegation is that on March 5, 2003, Sterling met with two Senate Select Committee on Intelligence staffers, [redacted] and [redacted], to discuss the [redacted] program and his discrimination lawsuit. Id. at ¶ 61-62. [redacted] [redacted] later told the government in an interview that during the meeting "Sterling also threatened to go to the press, though he could not recall if Sterling's threat related to the [redacted] Operation or his lawsuit." Id. at ¶ 63.

Risen avers in his affidavit that he learned about the CIA programs in 2003. Affidavit of James Risen, dated February 16, 2008 ("2008 Risen Aff.") at ¶ 17. Risen states that he promised confidentiality to the source(s) who provided the information about MERLIN, and that the agreement "does not merely cover the name of the source(s). Rather, I understand my agreement(s) to

TOP SECRET





TOP SECRET

require me not to reveal any information that would enable someone to identify my confidential source(s)." Reply Affidavit of James Risen, dated July 6, 2010 ("2010 Risen Reply Aff."), at ¶ 5.

Between February 27, 2003 and March 29, 2003, there were seven phone calls from Sterling's home telephone in the Eastern District of Virginia to Risen's home telephone in the District of Maryland. Bruce Decl. at ¶ 65; Government's Opp. to James Risen's Mot. to Quash Grand Jury Subpoena ("Opp.") at 9. On March 10, 2003, Sterling sent an email message to Risen with a reference to a CNN.com article entitled: "Report: Iran has 'extremely advanced' nuclear program." In the message, Sterling wrote, "I'm sure you've already seen this, but quite interesting, don't you think? All the more reason to wonder..." Id. at ¶ 66.

On April 3, 2003 - four days after the last of the seven phone calls from Sterling's home to Risen's home - Risen called the CIA Office of Public Affairs, asking about an operation known as [REDACTED] that involved [REDACTED] Id. at ¶ 68. Also on April 3, 2003, Risen called the National Security Council's Office of Public Affairs for comment about the operation. Id. at ¶ 69.

On April 30, 2003, former National Security Advisor Condoleezza Rice, former CIA director George Tenet, and three other CIA and NSC staff members met with Risen and New York Times





TOP SECRET

Washington Bureau Chief Jill Abramson in an effort to convince them to not publish an article [redacted] because it would compromise national security. Id. at ¶¶ 72-76. During the meeting, Risen stated [redacted] Id. at ¶ 74. On or about May 6, 2003, Abramson told the government that the newspaper had decided not to publish the story. Id. at ¶ 77.

Risen continued to pursue the [redacted] story as part of a book that he was writing about the CIA, and the evidence before the grand jury shows that he kept in touch with Sterling. In approximately August 2003, Sterling moved from Virginia to his home state of Missouri, where he stayed with friends, [redacted] and [redacted]. Id. at ¶ 78. Phone records for the [redacted] phone document 19 calls between the New York Times office in Washington D.C. and their home. Id. at ¶ 79. [redacted] and [redacted] have testified before the grand jury that they did not receive calls from anyone at the New York Times. Id. The government also found records of phone calls between the New York Times and Sterling's cell phone and work phone extension at Blue Cross/Blue Shield in Missouri, where he began working in August 2004. Sterling had access to the [redacted] computer, and an FBI search





TOP SECRET

of the computer revealed 27 emails between Sterling and Risen, including a May 8, 2004 message from Risen to Sterling, stating "I want to call today. I'm trying to write the story". Id. at ¶¶ 81-85. A forensic examination of the [redacted] computer revealed a string of characters that indicate a file called [redacted] was once viewed or saved on that computer. Id. at ¶ 86.

Moreover, during a search of Sterling's personal computer, federal agents found a letter to "Jim" that was created on March 19, 2004. See Tab C to Opp. Brief. The letter describes Sterling's discrimination complaint and meeting with Senate staffers. The letter states that "[f]or obvious reasons, I cannot tell you every detail." Id. at 2.

[redacted], [redacted] testified before the grand jury that some time between October 2004 and January 2006, Sterling told her about his plans to meet with "Jim," who had written an article about Sterling's discrimination case and was then working on a book about the CIA. Bruce Decl. at ¶ 90. [redacted] testified that she understood "Jim" to be James Risen. Id. at ¶ 91. According to [redacted], when the couple saw State of War in a bookstore, Sterling - without looking at the book first - told [redacted] that Chapter 9 was about work he had done at the CIA. Id. at ¶ 92. Additionally, [redacted] a former government intelligence official with whom Risen consulted on his stories, told the grand jury that Risen told him that Sterling







was his source for information about the ██████ operation. Id. at ¶¶ 93-109.

In a book proposal sent to Simon & Schuster in September 2004, Risen described ████████████████████████████████████████

Id. at ¶ 106. Risen and the publishing company reached a publishing agreement and in November 2005, Risen sent a final or near-final version of the manuscript to Simon & Schuster. Id. at ¶ 106.

In a classified filing dated March 7, 2008, the government admitted that the above-described evidence amounts to probable cause to indict Sterling:

> The evidence gathered to date clearly establishes that there is at least probable cause to believe that Jeffrey Sterling is responsible for the unauthorized disclosure of classified information regarding the ██████████ Operation to James Risen, and three federal judges have also made a similar finding by authorizing the search warrants described above. The Government believes that there is also probable cause to suggest that Jeffrey Sterling is further responsible for the ████████████████ disclosures described above. However, the Government further believes that this matter warrants additional investigation to insure a proper charging decision before an indictment is presented to the Grand Jury.

Id. ¶ 142.[3]

[3]The Court strongly disagrees with the government's decision to redact Paragraph 142 of the Bruce declaration from the







C. Subpoenas to Risen

A grand jury sitting in the Eastern District of Virginia began investigating the disclosures about the [redacted] operation in or about March 2006. Id. at ¶ 9. On January 28, 2008, the government issued its first grand jury subpoena to Risen ("2008 subpoena"), seeking testimony and documents about the identity of the source(s) for Chapter 9 and Risen's communications with the source(s). Risen moved to quash the subpoena, arguing that the reporter's privilege under the First Amendment and federal common law protects him from being compelled to disclose the information.

Risen's motion to quash was granted in part and denied in part, after the Court found that the government already had strong evidence against Sterling and that Risen's testimony would simply amount to "the icing on the cake." However, because Risen had disclosed Sterling's name and some information about his reporting to [redacted], the Court found a waiver as to that

---

material provided to Risen's counsel. Like much of the redacted information in the declaration, this paragraph contains absolutely no information that would compromise national security. The government's admission that probable cause exists is significant, and it likely would have caused Risen's counsel to present different arguments to the Court. Classification of the entire paragraph is improper because the paragraph does not appear to divulge national security information. Rather, the paragraph confirms a conclusion of law. If the government's concern is that codenames for the programs are revealed, it could have redacted those names but left the remainder of the paragraph unclassified.







information.

Both Risen and the government sought reconsideration. Risen filed affidavits from himself and [redacted] that Risen claims establish that their discussions were part of Risen's reporting and therefore that no waiver occurred. While those motions were pending, the government ordered Risen to appear before the grand jury with less than 48 hours notice. The Court granted Risen's motion to stay, and nothing more occurred until July 21, 2009, when the Court asked both parties for a status update because the term of the grand jury which had issued the 2008 subpoena had expired. The government responded that its investigation was continuing and that it had convened another grand jury during the week of July 27, 2009. On August 5, 2009, the Court issued an order staying argument of the motions for reconsideration, to allow the new Attorney General an opportunity to evaluate the wisdom of reauthorizing the subpoena, given its significant First Amendment implications.

On January 19, 2010, the Attorney General authorized the issuance of a second grand jury subpoena ("2010 subpoena"). The subpoena issued on April 26, 2010. Unlike the 2008 subpoena, the 2010 subpoena does not ask for the identity of confidential sources; instead, the subpoena demands Risen's appearance before the grand jury and requires production of a broad list of documents and information. Among the requested documents are all







Rolodex and contact information for Sterling, all notes related to Risen's reporting on Chapter 9, all emails or other correspondence relating to Chapter 9, and drafts of book proposals. Risen has denied possessing any of these documents other than the Rolodex contact information.

After oral argument on October 12, 2010, the Court quashed the subpoena as to the document requests, accepting Risen's representation that the only responsive document possibly in his possession was the contact information and finding that the compelled disclosure of that information would divulge the names of confidential sources. The unresolved issue, which is addressed in this Opinion, is the request for Risen's testimony.[3]

In a declaration attached to the government's Opposition brief, Special Assistant United States Attorney William M. Welch II clarifies exactly what the government would ask Risen:

- First, the government wants Risen to confirm the accuracy of the March 2, 2002 article about Sterling's discrimination complaint and the CIA's decision to fire him. Specifically, the government wants to ask Risen where Sterling disclosed the information, what other information Sterling provided, how Sterling provided the information, and when Sterling

---

[3]In the October 12, 2010 Order, the Court asked the parties to provide an update on the status of negotiations on the remaining portion of the subpoena. On October 19, 2010, the parties informed the Court that they have been unable to reach a compromise.







provided the information, as well as whether Risen and Sterling discussed the discrimination lawsuit after the article was published and whether Risen intends to write future stories about Sterling's discrimination lawsuit.

- Next, the government wants to ask Risen about "the where, the what, the how, and the when" regarding disclosure of classified information published in Chapter 9. The government will allow Risen to discuss sources using agreed-upon pseudonyms, such as "Source A," rather than their real names.
- Last, the government wants to ask Risen about "the where, the what, the how, and the when" regarding the 2004 letter that Sterling sent to Risen.

II. Discussion

On June 3, 2010, Risen filed a Motion to Quash the 2010 subpoena under Federal Rule of Criminal Procedure 17(c)(2), which provides that the Court may quash or modify a subpoena if compliance would be unreasonable or oppressive. Risen argues that the Court should quash the subpoena because it is protected by the reporter's privilege under both the First Amendment and the common law, and that the 2010 subpoena, like the 2008 subpoena, seeks confidential source information. Risen also argues that the benefit of the leaks to the public outweighs any harm they caused, and that the government issued the subpoena to







harass and intimidate him.

A. Federal Rule of Criminal Procedure 17(c)(2)

Although the government and Risen disagree about whether a reporter's privilege applies to this case, it is well accepted that grand juries' subpoena powers have some limits. Federal Rule of Criminal Procedure 17(c)(2) allows a court to quash a grand jury subpoena "if compliance would be unreasonable or oppressive."

The Fourth Circuit has not hesitated to find that Rule 17(c)(2) imposes limits on grand jury subpoenas.

> [T]he grand jury is not unfettered in the exercise of its investigatory powers. The law forbids it from undertaking those practices that do not aid the grand jury in its quest for information bearing on the decision to indict. This prohibition bars, inter alia, grand jury requests that amount to civil or criminal discovery as well as arbitrary, malicious, or harassing inquires.

United States v. Under Seal (In re Grand Jury Proceedings No. 92-4 Doe No. A93-155), 42 F.3d 876, 878 (4th Cir. 1994) (internal quotation marks and citations omitted). Parties may use Rule 17(c)(2) to challenge a grand jury subpoena for seeking privileged material, and "[i]n the absence of such a privilege, a subpoena may still be unreasonable or oppressive under Rule 17(c) if it is irrelevant, abusive or harassing, overly vague, or excessively broad." United States v. Under Seal (In re Grand Jury Doe No. G.J. 2005-2), 478 F.3d 581, 585 (4th Cir. 2007) (internal quotation marks and citations omitted).





TOP SECRET

B. First Amendment Privilege in the Fourth Circuit

In addition to the Rule 17(c)(2) protections, Risen argues that the First Amendment's guarantee of a free press as well as federal common law establish a qualified reporter's privilege that prevents compelled disclosure of the type at issue.[4] The government counters that there is no reporter's privilege in a criminal case, relying heavily on Branzburg v. Hayes, 408 U.S. 665 (1972), which addressed three consolidated cases in which journalists sought to quash grand jury subpoenas. In the *first* case, a Kentucky grand jury sought testimony from a newspaper reporter who wrote articles about marijuana production and use. The reporter had agreed not to name the subjects of the stories, and the grand jury sought the subjects' identities. Id. at 667-68. In the *second case*, a Massachusetts grand jury subpoenaed a television reporter who had been permitted to enter the Black Panther Party's headquarters on the condition that he not disclose what he saw or heard inside. The grand jury sought information about what took place in the headquarters. Id. at

[4]Risen also argues that the Court should apply a federal common law reporter's privilege; however, the Fourth Circuit has only mentioned a common law privilege in passing in United States v. Steelhammer, 539 F.2d 373 (4th Cir. 1976), a civil contempt proceeding. In Steelhammer, the court's analysis focused mostly on the First Amendment privilege. Although other circuits have recognized a strong reporter's privilege under the federal common law, the Fourth Circuit has not done so. Therefore, the Court will limit its analysis to the reporter's privilege under the First Amendment.







672-75. In the third case, a federal grand jury in California subpoenaed the notes and interview recordings of a newspaper reporter who covered the Black Panther Party. Id. at 675-79.

The majority in Branzburg declined to recognize a reporter's privilege in those cases, finding that

> [n]othing in the record indicates that these grand juries were probing at will and without relation to existing need . . . Nor did the grand juries attempt to invade protected First Amendment rights by forcing wholesale disclosure of names and organizational affiliations for a purpose that was not germane to the determination of whether a crime has been committed.

Id. at 700 (internal quotation marks and citations omitted).

Although Justice Powell joined in the majority, he wrote a concurring opinion to emphasize the "limited nature" of the majority's opinion:

> If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by striking a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct.

Id. at 709-10 (Powell, J., concurring).

With Branzburg as the Supreme Court's only pronouncement on the First Amendment reporter's privilege, circuit courts have







varied widely on the protections that they provide journalists. The Fourth Circuit has repeatedly followed Justice Powell's concurrence by recognizing that under the right facts there is qualified protection for journalists. In United States v. Steelhammer, 539 F.2d 373 (4th Cir. 1976), the district court ordered several journalists to testify at a civil contempt trial about statements made in their presence at a rally. Id. at 374. Although the Fourth Circuit affirmed the order, it applied Justice Powell's balancing jurisprudence:

> [I]t is conceded that the reporters did not acquire the information sought to be elicited from them on a confidential basis . . . . [T]he record fails to turn up even a scintilla of evidence that the reporters were subpoenaed to harass them or to embarrass their newsgathering abilities . . . . [I]n the balance of interests suggested by Mr. Justice Powell in his concurring opinion in Branzburg[], the absence of any claim of confidentiality and the lack of evidence of vindictiveness tip the scale to the conclusion that the district court was correct in requiring the reporters to testify.

Id. at 376 (Winter, J., dissenting), adopted by the court en banc, 561 F.2d 539, 540 (4th Cir. 1977).

The Fourth Circuit has since adopted a three-part balancing test for evaluating whether to enforce subpoenas issued to journalists. In a civil defamation case, LaRouche v. National Broadcasting Co., 780 F.2d 1134 (4th Cir. 1986), the plaintiff filed a motion to compel defendant NBC to reveal the confidential sources behind the allegedly defamatory statements. Id. at 1137. In affirming the







district court's denial of the motion to compel, the Fourth Circuit adopted the following test to determine whether the reporter had to disclose confidential sources: "(1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information." Id. at 1139. Because the plaintiff had not exhausted reasonable alternative means of obtaining the same information, he had not demonstrated that his interests in fact-finding outweighed NBC's interest in maintaining the confidentiality of its sources. Id.

In In re Shain, 978 F.2d 850 (4th Cir. 1992), the Fourth Circuit held that the First Amendment reporter's privilege applies to criminal cases only where the government seeks a reporter's confidential information or issues the subpoena to harass the journalist. As part of their coverage of a bribery scandal in the South Carolina legislature, four reporters each interviewed a state senator about his relationship with a registered lobbyist, and later published portions of those interviews in their news stories. Id. at 851. After the senator's indictment, the United States Attorney subpoenaed the reporters to testify at the criminal trial, and the reporters moved to quash the subpoenas. Id. at 851-52. The Fourth Circuit affirmed the







district court's denial of the motions to quash, holding that "the absence of confidentiality or vindictiveness in the facts of this case fatally undermines the reporters' claim to a First Amendment privilege." Id. at 853; cf., United States v. Regan, Criminal No. 01-405-A (E.D. Va. Aug. 20, 2002) (quashing subpoena to a newspaper reporter in a criminal case because it did not satisfy the LaRouche balancing test).

The Fourth Circuit has even extended the reporter's privilege to apply to non-confidential information in civil cases. In Church of Scientology International v. Daniels, 992 F.2d 1329 (4th Cir. 1993), the Church of Scientology sued a drug company executive over his comments to USA Today's editorial board. Although the executive's comments had not been made under a confidentiality agreement, the Fourth Circuit affirmed the magistrate judge's denial of the church's request to compel the newspaper to produce all materials related to the editorial board meeting, including notes, tapes, and draft articles. Applying the LaRouche test, the Court agreed with the magistrate judge's conclusion that the church "had made no effort to pursue alternative sources of information concerning the meeting." Id. at 1335.

In Ashcraft v. Conoco, Inc., 218 F.3d 282 (4th Cir.







2000), the Fourth Circuit reversed a contempt order against a journalist for refusing to identify the source of his information about a confidential tort claim settlement, holding that if courts routinely required journalists to disclose their sources, "the free flow of newsworthy information would be restrained and the public's understanding of important issues and events would be hampered in ways inconsistent with a healthy republic." Id. at 287.

These cases articulate a clear legal rule. If a reporter presents some evidence that he obtained information under a confidentiality agreement or that a goal of the subpoena is to harass or intimidate the reporter, he may invoke a qualified privilege against having to testify in a criminal proceeding. The district court must then determine whether that qualified privilege is overcome using the three LaRouche factors.

> [A] First Amendment journalist privilege is properly asserted in this circuit where the journalist produces some evidence of confidentiality or governmental harassment. Only where such evidence exists may district courts then proceed to strike a balance between the competing interests involved, namely freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct.

United States v. Lindh, 210 F. Supp. 2d 780, 783 (E.D. Va. 2002) (emphasis added; internal quotations and citation







omitted).[5]

C. Confidentiality

The Court has accepted Risen's explanation of his confidentiality agreement with his source and that his discussion of the source with [redacted] was also made in confidence as part of his news gathering.

The government argues that the 2010 subpoena does not seek confidential information because it does not require Risen to disclose the identity of his confidential source(s). Risen responds that the agreement with his confidential source(s) for Chapter 9 "does not merely cover the name of the source(s). Rather, I understand my agreement(s) to require me not to reveal any information that would enable someone to identify my confidential source(s)." 2010 Risen Reply Aff. at ¶ 5. The government

[5]The district court in United States v. King, 194 F.R.D. 569 (E.D. Va. 2000), reached a different result, holding that evidence of confidentiality and harassment is necessary before Justice Powell's balancing test is triggered. Id. at 584. However, that opinion did not discuss Ashcraft, which had been issued five days earlier. Ashcraft did not require any prerequisite showing of harassment or bad faith. Rather, because the journalist acquired his information from a confidential source, the panel applied the LaRouche factors. Moreover, the circumstances in King are vastly different from the present matter. In King, the identity of the journalist's confidential source - a cooperating government witness - had been independently discovered and revealed as a matter of public record. Id. at 584. Accordingly, when he attempted to invoke the qualified privilege, any interest the journalist had in maintaining the confidentiality of the source or her statements had evaporated.







counters that the promise of confidentiality "only could have extended to their names, not their information, because Mr. Risen published their information in Chapter 9." Opp. at 25.

The government's narrow view of the scope of "confidentiality" has been rejected by many courts, which have found that the reporter's privilege is not narrowly limited to the names of confidential sources but, at minimum, includes information that could lead to the discovery of a confidential source's identity. See, e.g., Miller v. Mecklenburg Cnty., 602 F. Supp. 675, 679 (W.D.N.C. 1985) (recognizing "a qualified privilege under the First Amendment for the reporter both against revealing the identity of confidential sources and against revealing material that is supplied to the reporter by such confidential source"); Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League, 89 F.R.D. 489, 496 (C.D. Cal. 1981) (quashing subpoena to reporters for "any and all notes, file memoranda, tape recordings or other materials reflecting" conversations with listed individuals); Loadholtz v. Fields, 389 F. Supp. 1299, 1303 (M.D. Fla. 1975) ("The compelled production of a reporter's resource materials is equally invidious as the compelled disclosure of his confidential informants.").







As Risen explains, confidentiality pledges that are limited to the name of the source "would be of little value to a source or potential source. If a journalist were to withhold a source's name but provide enough information to authorities to identify the source, the promise of confidentiality would provide little meaningful protection to a source or potential source." 2010 Risen Reply Aff., at ¶ 6.

The Court finds that Risen did have a confidentiality agreement with his source and that the agreement extended beyond merely revealing the source's name but to protect any information that might lead to the source's identity. Therefore, the Court must conduct the three-part LaRouche balancing test to determine whether the reporter's privilege protects Risen from being compelled to disclose the information sought by the government.[6]

---

[6]Risen also argues that the government issued the subpoenas to harass him.

Risen bases his harassment claim on his record of writing stories that criticized and exposed the government's national security and intelligence practices during a time of war. Risen won the 2006 Pulitzer Prize for National Reporting for his articles that revealed the government's domestic warrantless wiretapping program. 2008 Risen Aff. at ¶ 4. Many officials - including former President Bush - criticized Risen's reporting and some threatened investigations and potential prosecution. 2008 Risen Aff. at ¶¶ 25-41.

The issuance of the 2010 subpoena under a new Attorney General does not remove the specter of harassment, because we do not know how many of the attorneys and government officials who sought Risen's testimony in 2008 are still in their jobs and to







D. Balancing the equities

In its Opposition Brief, the government has refined the general categories of information that it seeks to obtain from Risen about Chapter 9: 1) testimony about where the disclosures occurred to establish venue; 2) testimony about what information each source disclosed and when the disclosure occurred to ensure that the grand jury charges the right individual; 3) testimony about how Risen received classified information because oral disclosure of classified information requires greater intent; and 4) testimony to authenticate Chapter 9.

1. Need to establish venue

The government has a compelling interest in establishing venue. "The Supreme Court has cautioned that the question of venue in a criminal case is more than a matter 'of formal legal procedure'; rather, it raises 'deep issues of public policy in the light of which legislation must be construed.'" United States v. Ebersole, 411 F.3d 517, 524 (4th Cir. 2005) (quoting United States v. Johnson,

---

what extent, if any, they advised the new Attorney General about approving the subpoena. Moreover, the sweeping scope of the 2010 subpoena provides some support to Risen's harassment argument. For example, Risen's book proposals could hardly help the government establish probable cause to charge Sterling or any other suspects. However, because confidentiality is sufficient to trigger the LaRouche balancing test, it is not necessary to decide whether the subpoena was issued, at least in part, to harass or intimidate Risen.







323 U.S. 273, 276 (1944)).

As the government correctly points out, there are four possible districts where venue could be established: the Eastern District of Virginia, where Sterling lived until August 2003; the Eastern District of Missouri, where Sterling moved in August 2003; the District of Maryland, where Risen lived; and the District of Columbia, where Risen worked. Opp. at 8. For prosecutions involving disclosure of classified information, venue is proper both where the information is sent and where it is received. Under Fed. R. Crim. P. 18, venue may be in multiple districts as long as part of the criminal act took place in that district. See United States v. Bankole, 39 Fed. Appx. 839, 841 (4th Cir. 2002).

Although the government's pursuit of Risen's testimony to establish venue satisfies the relevance and compelling interest prongs of the LaRouche test, it fails to meet the second prong because the government has not demonstrated that the information is unavailable from other sources. The government merely states that it "cannot establish venue for the substantive disclosures of classified information by any of Mr. Risen's source(s) to him without Mr. Risen's eyewitness testimony concerning the crimes he witnessed." Opp. at 8-9.







The government briefly admits it need only establish venue by a preponderance of the evidence. See Ebersole, 411 F.3d at 524 ("The prosecution bears the burden of proving venue by a preponderance of the evidence and, when a defendant is charged with multiple crimes, venue must be proper on each count. For some offenses, there may be more than one appropriate venue, or even a venue in which the defendant has never set foot.") (internal citations and quotation marks omitted). As discussed above, the government has e-mail and telephone records indicating communications between Risen and Sterling in the few weeks before Risen's April 3, 2003 inquiries about [redacted] to the NSC and CIA. All seven phone calls were between Risen's home in the District of Maryland and Sterling's home in the Eastern District of Virginia. Although Sterling may have provided additional information about [redacted] to Risen after Sterling moved to Missouri, he had already given Risen enough information about the program before April 3, 2003 for the CIA Director and National Security Advisor to personally intervene with the plans of the New York Times to publish the article. Risen's specific questions about [redacted] on April 3, 2003 indicated that he already knew many details about the classified program. As the government acknowledges, it may "rely upon inferences drawn







from telephone records and other evidence to establish venue." Opp. at 9. The government clearly has sufficient circumstantial evidence to meet the preponderance of the evidence standard for establishing venue in the Eastern District of Virginia. Although the government has a compelling interest in establishing venue and information about venue is relevant, the government has failed to satisfy the second prong of LaRouche, because the information can be acquired through alternate means.

2. Need to charge the right individual

The government next argues that it must ask Risen about what specific classified information each source disclosed to him and when it was disclosed so the grand jury will be able to charge the right individual(s).

Although the government has an obligation to avoid erroneously charging innocent parties with criminal conduct, there is no danger of that happening in this case. The government's classified filings demonstrate that there is no need to exculpate parties other than Sterling because the government does not have any other suspect or target to investigate. As the evidence clearly shows, very few people had access to the information in Chapter 9, and Sterling was the only one of those people who could have been Risen's source. Bruce Decl. at ¶¶ 110-30. Chapter 9 reports two







key meetings: a 1998 meeting in San Francisco with CIA employees and MERLIN, and a 2003 meeting between a former CIA employee and Senate staffers. [redacted] The government has not presented the Court with any evidence that CIA employees knew that Sterling met with SSCI staffers until after the leak. [redacted] As to [redacted] and [redacted], the Senate staffers, the government investigated [redacted] as a possible source, and the investigation "has not revealed any evidence that [redacted] ever had any direct contact with James Risen, and certainly no contact related to the [redacted] Operation." Id. at ¶ 113, n. 30. And when the government interviewed [redacted] in November 2005, he could



not remember [redacted] Id. at ¶ 115.[7]

[redacted] Id. at ¶ 113.

The government has not presented even a remote possibility that anyone other than Sterling could be charged with disclosing this information. Therefore, the government fails to satisfy the second and third prongs of the LaRouche test.

3. Need to establish mens rea

The government next argues that it must ask Risen how he received the classified information because the government needs to ensure that it establishes the proper mens rea under 18 U.S.C. § 793(d), which provides that:

> Whoever, lawfully having possession of, access to, control over, or being entrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the

[7]Risen's counsel cannot fully argue this point because the information about [redacted] testimony is in a classified filing to which Risen's counsel does not have access.







> advantage of any foreign nation, willfully communicates, delivers, transmits . . . the same to any person not entitled to receive it . . . [s]hall be fined under this title or imprisoned not more than ten years, or both.

Specifically, the government argues that if Risen's source(s) disclosed the classified information orally, the government would have to establish that the disclosure was willful and that the defendant had reason to believe that the disclosure could harm the United States; if the disclosure to Risen involved providing classified documents, the government would only have to prove willfulness. See New York Times Co. v. United States, 403 U.S. 713, 738 n.9 (1971) (White, J., concurring) (concluding that prosecution for disclosure of classified documents does not require a demonstration of intent to harm the government). The government contends that without Risen's testimony about the form of the disclosure, it will not know which mens rea requirement applies. In his Reply Brief, Risen does not challenge the government's statutory interpretation.

The government's argument fails because it can satisfy the heightened requirement for oral disclosure, making Risen's testimony about the form of disclosure unnecessary. The government already has more than enough evidence to establish probable cause that Sterling had reason to believe that disclosure could harm the United States. Specifically,







the government recovered from Sterling's computer a letter, dated March 19, 2004, addressed to "Jim." In that letter, the author expressed great animosity towards the CIA, even implying that the CIA was involved with the death of a federal judge. The government actually claims that the letter demonstrates Sterling's "deep-seated hatred and anger towards the CIA." Opp. at 35. Because the government already has evidence that Sterling wanted to harm the CIA, it has sufficient evidence to establish probable cause that Sterling knew disclosure could injure the United States.

It also is inconceivable that Risen's source did not know that disclosure could harm United States interests. Throughout its Opposition Brief and the classified Bruce Declaration, the government adamantly alleges that the disclosure of this information harmed United States security interests. Nowhere in its filings does the government suggest that it even considered the possibility that Risen obtained the information from a source(s) who did not know that the disclosure could harm the nation. Because the government does not have a compelling interest in the information, the government has failed to satisfy the third prong of the LaRouche test.

4. Need to authenticate Chapter 9

Lastly, the government argues that Risen's testimony is







necessary to authenticate and admit the contents of Chapter 9 and the March 2, 2002 New York Times article. However, this request also fails the second and third prongs of the LaRouche test.

Risen has already authenticated the contents of Chapter 9 in a signed 2008 declaration, in which he discusses, in depth, his reporting of Chapter 9 and his decision to publish the information. See, e.g., 2008 Risen Aff. at ¶ 17 ("I actually learned the information about Operation Merlin that was ultimately published in Chapter 9 of State of War in 2003, but I held the story for three years before publishing it.").

Risen has also authenticated the accuracy of his March 2, 2002 New York Times article. In a signed affidavit, Risen wrote:

> As a preliminary matter, I understand that the Government also now intends to ask whether I stand by the content of an article I published in March 2002, titled 'Fired by C.I.A., He Says Agency Practiced Bias.' I do. The facts in that article are true, to the best of my knowledge, and I stand by what I wrote.

Affidavit of James Risen, dated June 3, 2010, at ¶ 10.

Moreover, the authentication, hearsay, and best evidence rules of the Federal Rules of Evidence do not apply to grand jury proceedings. See, e.g., United States v. Calandra, 414 U.S. 338, 344-45 (1974) ("The grand jury's







sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence[.]"); In re Grand Jury Subpoena (T-112), 597 F.3d 189, 196 (4th Cir. 2010) ("[C]ourts for generations have recognized that a grand jury indictment need not be based on evidence conforming to the formal requirements of a trial."). Although the government might have a plausible argument that such authentication may be necessary at trial, it cannot argue that the government has a compelling interest in authenticating Chapter 9 during grand jury proceedings. Because authentication would not aid the grand jury's probable cause evaluation, this justification fails the second and third prongs of the LaRouche test, both because there is not a compelling interest to authenticate and because the information sought is already available in Risen's affidavits.

III. Conclusion

The grand jury's investigation involves a sensitive national security issue, which both sides argue should be taken into consideration in applying the LaRouche balancing test. The government correctly stresses that few interests







are as compelling as the government's interests in protecting national security. "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." Haig v. Agee, 453 U.S. 280, 307 (1981). The government is investigating the alleged disclosure of highly classified information about

Risen also relies on the significance of the national security element to emphasize the value of the leaked information which, if true, points to a mishandled project by the CIA about which the public needs to be aware. Reporting about national security often serves a significant public interest, and investigative reporting about national security often requires confidentiality agreements. See Affidavit of Scott Armstrong, dated February 16, 2008, at ¶ 14 ("The highest ranking government officials may prefer to be confidential sources to the news media in order to communicate candidly their differences of opinion or fact with others in the same department or administration to an oversight committee. Such confidential source relationships are often the only manner through which the mixture of sensitive and non-sensitive national security information can be integrated and conveyed to the public.")





TOP SECRET

Both parties present compelling arguments, yet they are unable to cite to any Fourth Circuit precedent that carves out a national security exception to the LaRouche balancing test. Moreover, the subpoena at issue is a grand jury subpoena, not a trial subpoena. As such, the government's compelling interest at this stage is merely to establish probable cause that Sterling or any other suspect disclosed classified information. "A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an ex parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." United States v. Calandra, 414 U.S. 338, 343-44 (1974).

As discussed above, the circumstantial evidence already before the grand jury - including the testimony of [redacted] who confirmed Sterling as Risen's source, the telephone and e-mail records, and Sterling's discussion with the Senate staffers - is more than enough evidence to establish probable cause to indict Sterling and the government has essentially admitted that fact. To require a reporter to violate his confidentiality agreement with his source under these facts would essentially destroy the reporter's privilege. Were Sterling to be indicted and a trial







subpoena to be issued to Risen, the analysis might well change, because at trial the government would have the much higher burden of proving Sterling's guilt beyond a reasonable doubt. In that context, the government might well satisfy the LaRouche balancing test. It has not satisfied that balancing test in the grand jury context.

For these reasons, James Risen's Motion to Quash the grand jury subpoena has been granted by an Order issued on November 24, 2010.

The Clerk is directed to forward a copy of this Memorandum Opinion to the Court Security Officer, who will provide a copy to the government, arrange for classification review, and provide a redacted copy to movant's counsel.

Entered this 30th day of November, 2010

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge



