# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:10cr485 (LMB) |
| | ) | |
| JEFFREY ALEXANDER STERLING | ) | Hearing: July 7, 2011 |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO JAMES RISEN'S MOTION TO QUASH SUBPOENA AND/OR FOR A PROTECTIVE ORDER

The United States, by and through its attorneys, hereby opposes James Risen's Motion To Quash Subpoena And/Or For A Protective Order (Docket No. 115; hereinafter "Mot.").[1]  Quite simply, this Court should deny Risen's motion to quash and require him to testify at trial and identify his source for the classified information that is at issue in this case.  As previously set forth in our motion in limine, a reporter's privilege does not apply in this criminal matter. *Branzburg v. Hayes*, 408 U.S. 665 (1972), controls and is the law.[2]  Risen fails to establish that the law provides for a privilege here, where there is no evidence that Sterling's prosecution is

---

[1] Risen has also styled his pleading as an opposition to the Government's motion in limine to admit his testimony (Docket No. 105; hereinafter "Gov't. Mot."), and this pleading is both a responsive and rebuttal brief to Risen's pleading.  *See* Local Criminal Rule 47(F)(1).  The government incorporates by reference the arguments advanced in our initial motion in limine in opposing Risen's motion to quash.

[2] "Unquestionably the Supreme Court decided in *Branzburg* that there is no First Amendment privilege protecting journalists . . . regardless of any confidence promised by the reporter to any source.  The Highest Court has spoken and never revisited the question.  Without doubt, that is the end of the matter."  *In re:  Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1147 (D.C. Cir. 2006).

being conducted in bad faith or to harass or intimidate Risen,[3] and his predictions of dire consequences should he be required to testify are no more persuasive today as they were then. S*ee, e.g. Bullcoming v. New Mexico*, 564 U.S. __ , __ (2011(slip. op. at 16)("[T]he predictions of dire consequences, we again observe, are dubious.").

But even if this Court were to find that a qualified privilege exists and apply the Fourth Circuit's balancing test in *LaRouche v. National Broadcasting Co.,* 780 F.2d 1134 (4th Cir. 1986), the Court should resist Risen's attempt to import additional factors into the test for which there is no support in the case law.  The *LaRouche* test does not require that the allegedly privileged information sought be "necessary or critical" such that Sterling's prosecution could not proceed without it and does not require that the Court weigh any alleged "newsworthiness"of the information reported by Risen against the harm caused by his reporting, an analysis for which courts are ill-suited and one which, in any case, does not favor him here.  In fact, the *LaRouche* test's three prongs – that the information sought is relevant, that no other sources exist for the information and that disclosure of the information serves a compelling interest – each weigh overwhelmingly in favor of enforcing Risen's trial subpoena.  Finally, as explained below, Risen's motion makes clear that this Court should, at a minimum, order him to testify not only about the matters of authentication, for which he concedes he must, but also about a host of relevant facts known to him that are neither confidential nor privileged.  To narrow and focus the

---

[3] *See In re Shain*, 978 F.2d 850, 852 (holding that "absent evidence of governmental harassment or bad faith, the reporters have no privilege different from that of any other citizen not to testify about knowledge relevant to a criminal prosecution"), and our discussion at pages 6 through 14 of the motion in limine.

legal and factual issues for argument on July 7, 2011, the Government will address those issues

first because, as explained below, they are not subject to any privilege.

## ARGUMENT

**I.    Even Assuming *Arguendo* The Existence Of A Qualified Reporter's Privilege, It Does Not Protect The Dissemination Of Information That Is *Neither* Confidential Nor Privileged Or That Is False.**

As a preliminary matter, this Court is not bound by its opinion of November 30, 2010

concerning the existence or the scope of a qualified reporter's privilege here.  *See* Redacted

Memorandum Opinion (Docket No. 118) (hereinafter "Mem. Op.").  The return of the Indictment

by the grand jury requires this Court to decide these issues on a clean slate.  Prior to the return of

the Indictment, this Court grounded its ruling that a qualified reporter's privilege existed in the

First Amendment.  *See* Mem. Op. pp. 14-19.  The Court limited its ruling to "the grand jury

context."  *Id*. at 35.  And this Court relied upon the use of hearsay evidence that was admissible

in that grand jury context.  *See, e.g., id*. at 31-32 (stating that "the best evidence rules of the

Federal Rules of Evidence do not apply to grand jury proceedings").

Since this Court issued that opinion, the grand jury returned an indictment that charges

defendant Sterling with unlawfully disclosing and retaining national defense information.  The

grand jury specifically found that the very communications at issue here were themselves a

*crime*, thus significantly tilting any balancing analysis in favor of testimony.  And the grand jury

specifically found that the defendant provided information to Risen in a false and misleading

manner *specifically* as a means of inducing Risen to write about it, thus severely undercutting any

First Amendment protection to be afforded that information.  *See* Indictment (hereinafter "Ind.")

¶¶ 18, 19(d), 36, 39-42.  As a result of the return of the Indictment, the Government will be

required to prove at trial its case by the higher standard of "beyond a reasonable doubt." This

Court must now decide whether a qualified reporter's privilege exists in this context (which, we

believe, it does not), and if necessary, whether to apply any such privilege to these facts, legal

issues the Court did not and could not have considered on November 30, 2010. Thus, the law of

the case doctrine does not apply because this Court must consider issues of law not previously

decided. *United States v. Lentz*, 524 F.3d 501, 528 (4th Cir. 2008); *United States v. Aramony*,

166 F.3d 655, 661 (4th Cir. 1999).

   However, even if the law of the case doctrine applies, the doctrine is "not a straitjacket but

can be avoided – at the direction of the court that made the invoked ruling – on several different

bases." *Conley v. United States*, 323 F.3d 7, 13 (1st Cir. 2003)(citing *Ellis v. United States*, 313

F.3d 636, 647 (1st Cir. 2002). *See also Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir.

1988) (noting that the law of the case doctrine is "not an 'inexorable command' but rather a

prudent judicial response to the public policy favoring an end to litigation."). "[R]econsideration

is proper if the initial ruling was made on an inadequate record or was designed to be preliminary

or tentative." *Ellis*, 313 F.3d at 647. *See also Peterson v. Lindner*, 765 F.2d 898, 704 (7th Cir.

1985)("law of the case" doctrine must yield to "rational decision making."). Similarly, a court

should reconsider an initial ruling where new evidence or new circumstances warrant such a

review. *Conley*, 323 F.3d at 13 (new circumstances warranting review); *Ellis*, 313 F.3d at 647-

48 (new evidence justifying review); *United States v. Robinson*, 690 F.2d 869, 872-73 (11th Cir.

1982)(magistrate judge's clarifying and expanding upon prior ruling warranted reconsideration).

   Any one of those exceptions apply in this case. First, this Court explicitly reserved final

judgment in the trial context "because at trial the government would have the much higher

burden of proving Sterling's guilt beyond a reasonable doubt. In that context, the government might well satisfy the *LaRouche* balancing test." Mem. Op. p. 35. Second, there has been a change in circumstances – the indictment of the defendant – that transforms the legal and factual landscape of the Court's previous ruling, now requiring the Court to consider the existence and application of any reporter's privilege in light of the Government's higher "beyond a reasonable doubt" standard, rather the probable cause standard that governs grand jury proceedings. Third, the grand jury specifically found that the very communications at issue here were themselves a *crime* and that the defendant used Risen to disseminate false information, further altering the legal and factual foundation of the Court's previous ruling. Finally, the applicable evidence rules are now different. The Federal Rules of Evidence will obviously apply at trial, and evidence admissible before the grand jury and considered by this Court in its Opinion may no longer be admissible at trial. *See, e.g.,* Mem. Op. pp. 7-8 (hearsay statements of grand jury witnesses); Mot. p. 45 (inadmissibility of prior affidavit).

> **A.  Assuming *Arguendo* The Existence Of A Qualified Reporter's Privilege, Risen Must Answer All Relevant Questions About The Information In Chapter Nine Because He Has Conceded That He Must Testify About Authentication.**

Risen now concedes that he must testify about authentication. *See* Mot. pp. 45-46; Risen Affidavit ¶ 60. He admits that the mere fact that his prior affidavit would be inadmissible under the hearsay rules now requires his testimony at a criminal trial. *See* Mot. p. 45. However, rather than acknowledging that he must answer questions about all non-confidential, non-privileged information appearing in Chapter Nine, he imposes new, novel restrictions on the scope of his testimony. Risen agrees only to answer four discrete questions about authentication, and only then under the terms of a protective order that forbids either party from straying beyond what he

has deemed permissible.[4]  *Id*. at 45-46.  This Court should not endorse such a unilateral, witness-imposed set of restrictions on the truth-seeking process.  *See Nixon*, 418 U.S. at 710 (stating that "[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.")*.  See also Rakas v. Illinois*, 439 U.S. 128, 137 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174-75 (1969))(recognizing the "'public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth'").

There should be no restrictions on the Government's ability to ask questions about the information appearing within Chapter Nine – as opposed to Risen's source(s) for that information – because all of that information is non-confidential and non-privileged.  Indeed, Risen again concedes as much, acknowledging that some "confidentiality agreements do not necessarily preclude a journalist from disclosing anything whatsoever about the source."  Risen Affidavit ¶56.  Put simply, even under his own terms, testimony about the information in Chapter Nine is appropriate because Risen put it in the book, thus confirming Risen's belief that the manner in which he disclosed this information, whether sentence by sentence or the chapter taken as a whole, would not reveal the identity of his source(s).

The Government, therefore, is entitled to ask Risen not only if he wrote Chapter Nine and whether the information contained therein is accurate (*i.e.*, whether Risen accurately reported what was told to him), but also to ask him specific questions about *each* statement in Chapter

---

[4]  The use of such a restrictive protective order is reversible error because such an order may infringe upon the defendant's Confrontation Clause rights.  *See United States v. Treacy*, 623 F.3d 32, 43-45 (2nd Cir. 2011).  Instead, Risen should be subject to the rules of evidence like any other witness. *Id*. at 44.

Nine.  *See Treacy*, 623 F.3d at 39, 42-44 (affirming district court's order requiring journalist to answer questions about each and every statement in newspaper article).  The answers to those questions about specific statements appearing in Chapter Nine help to prove the Government's case and rebut Sterling's theories of the case.  For example, Risen uses quotation marks to set aside certain factual assertions throughout Chapter Nine.  *See, e.g.,* Dkt. 115, Exhibit 2  to the Kurtzberg Affidavit, *State of War*, pp. 197, 203, 206.  The Government is entitled to ask Risen questions regarding the meaning and significance of those quotation marks so that the jury understands what, if any, meaning to attach to the quoted information and why that information is reported in that manner.  The Government similarly must be able to ask Risen questions about the meaning and significance of the indented and italicized information appearing in *State of War* so that the jury understands the importance, if any, of that information and the manner in which it is reported.  *See, e.g., id.* at pp. 204-05.  The Government should be able to clarify through Risen that certain references to the word "he" means "the CIA case officer," and that "the senior CIA officer" is a different person than "the CIA case officer." *See*, *e.g.*, *id.* at pp. 197, 203, 206. Finally, the Government is entitled to know if Risen fact-checked Chapter Nine with his source(s) or had a general practice of fact-checking with his source(s) to prove the essential elements of the charges and to rebut known defenses.  There is evidence of a continued series of communications between Risen and Sterling after 2003 but before publication of the book.  The jury is entitled to draw an inference that these communications were part of Risen's fact-checking process.  Sterling disputes whether there is any such proof.  *See* Dkt. 60, Memorandum in Support of Defendant Jeffrey Sterling's Alternative Motion to Dismiss Count Eight, p. 1 (stating that "[t]he Indictment fails to allege that Mr. Sterling was cognizant of Author A's intent

to publish a book, and accordingly, it necessarily fails to allege that Mr. Sterling could reasonably

foresee the use of the mail to ship Author A's published book."). In other words, testimony by

Risen as to his how he fact-checked Chapter Nine would not reveal the identity of his source but

would be relevant information for the jury to consider in conjunction with other evidence

presented by the government.

The Government is also entitled to ask Risen specific questions about *each* statement in the

relevant newspaper articles that he wrote and the Simon & Schuster book proposal he submitted,

and the jury is entitled to his answers.[5] For example, the Government should be permitted to ask

Risen questions about the document that he received from the defendant in connection with

risen's March 2002 *New York Times* article. *See* Gov't. Mot., Exhibit B. Risen admits that he

had a non-confidential source relationship with the defendant for this article. Risen Affidavit ¶

62. Risen published the fact that he received a document from the defendant and quoted from

that document. Thus, nothing should preclude the Government from asking Risen questions

about the document received from the defendant and quoted by Risen in the article – yet, under

Risen's view, the Government may only ask authentication-type questions. There is no legal or

factual basis for such a limitation.

All of the additional information derived from these questions proves essential elements of

the charged crimes and rebuts defense theories of the case. For example, the Government must

prove beyond a reasonable doubt that Sterling was the person who disclosed the classified

information relating to Human Asset No. 1 and Classified Program No. 1, a fact that the

---

[5] The relevant newspaper articles are the *New York Times* articles published on November 4, 2001, and March 2, 2002. *See* Ind. ¶¶ 23, 27. *See* Exhibit 4 (November 4, 2001 article).

defendant contests.  Additional information elicited from Risen about various newspaper articles, the Simon & Schuster book proposal and Chapter Nine do precisely that.[6]  Similarly, the Government must prove beyond a reasonable doubt as an essential element of the charges that Sterling disclosed information that was national defense information.  Therefore, the Government must be able to ask Risen questions about specific statements appearing in Chapter Nine to identify the information that he learned from his confidential source(s), as opposed to public sources.  Moreover, as the Court knows, the defense wants the Government to specify not only what particular portions of Chapter Nine are national defense information, but also the form in which Risen received the national defense information.  Only Risen can tell the jury the form in which he received the national defense information.

That Risen does not wish to answer certain questions is no reason to foreclose the Government from eliciting additional non-confidential, non-privileged information in order to prove its case beyond a reasonable doubt and rebut defense theories.  Even assuming *arguendo* the existence of a reporter's privilege, there is no reason to treat Risen differently than any other privilege holder called to testify about non-confidential, non-privileged information.  Indeed, there is no reason to treat Risen any differently than other award-winning journalists who have answered under oath similar sorts of questions.  *See*, *e.g.*, Exhibit 1 (Deposition of Michael Isikoff, pp. 63-65, 77-92, 106-111, 116-124, 128-133)(testifying about each and every statement appearing in certain newspaper articles through the use of pseudonyms Source A, Source B, and Source C, including identifying Source A as his primary source); Exhibit 2 (Deposition of Daniel

---

[6]  The Simon & Schuster book proposal contains very specific classified information – information which Sterling and very few others knew, thus tending to prove Sterling's identity as the source of that information.

Klaidman, pp. 43-45, 52-53,59, 61-62, 66-72)(testifying about each and every statement appearing in certain newspaper articles through the use of pseudonym DOJ-4, including identifying DOJ-4 as his primary source); Exhibit 3 (Deposition of Toni Locy, pp. 97-98, 115-118)(testifying about each and every statement appearing in certain magazine article through the use of pseudonyms, including acknowledging the use of the telephone for her sources).  This Court should not countenance anything less, particularly in a criminal matter.

**B.    Risen Must Answer Questions About *When* He Received The Classified Information Appearing In Chapter Nine Because He Has Waived Any Privilege As To That Issue.**

*When* Risen received the classified information appearing in Chapter Nine cannot possibly reveal the identity of Risen's confidential source(s), because Risen confirmed to the Government three years ago that he received most, if not all, of the information in 2003.  *See* Mem. Op. p. 31 (stating "'I actually learned the information about Operation Merlin that was ultimately published in Chapter Nine of State of War in 2003, but I held the story for three years before publishing it.'")(quoting 2008 Risen Affidavit ¶ 17).  Any lingering doubt about the confidentiality of *when* Risen received the classified information appearing in Chapter Nine evaporated when Risen waived any protection attaching to that fact by publicly confirming it in his motion to quash.  *See* Mot. p. 44 (stating "Risen knew about Operation Merlin as early as 2003 but held the story for three years . . ."); Risen Affidavit ¶ 19 (stating "I actually learned the information about Operation Merlin that was ultimately published in Chapter Nine of *State of War* in 2003, but I held the story for three years before publishing it").  Inexplicably, having now confirmed to the public that he learned of the Chapter Nine information in 2003, Risen asserts that he cannot tell a jury of twelve that very same information.  *See* Risen Affidavit ¶ 61 (stating "[i]f I provide the testimony that

has been requested of me, including the . . . "when," . . . of acquiring each piece of confidential information, doing so will reveal my confidential source(s), regardless of whether I directly provide any name(s)").

The flaw in Risen's reasoning is readily apparent.  Having unqualifiedly confirmed that he "actually learned the information about Operation Merlin that was ultimately published in Chapter Nine of *State of War* in 2003," Risen has also confirmed that he received *each* piece of confidential information about Classified Program No. 1 in 2003, and by virtue of his public confirmation of this fact, no information remains on this issue for which he may credibly assert a claim of privilege or confidentiality.  Nonetheless, seeking not to testify about this issue, Risen now attempts to use his claim of privilege as both a sword and a shield, a practice that courts have routinely discouraged.  *See*, *e.g.*, *In re Chevron Corp,.*, 2011 WL 2023257 at *8 (3rd Cir. May 25, 2011)(stating that use of attorney-client privilege and work product doctrine "as both sword and shield" is "an abuse that courts have discouraged"); *In re Grand Jury Proceedings*, 616 F.3d 1172, 1185 n.24 (10th Cir. 2010)("[A] litigant cannot use the work product doctrine as both a sword and shield.")(citation and internal quotations omitted).

*When* Risen received the classified information appearing in Chapter Nine is highly relevant and material because the timing of those disclosures eliminates potential suspects and helps prove the defendant's identity as the source.  As noted, the Government must prove beyond a reasonable doubt that he was the person who disclosed the classified information relating to Human Asset No. 1 and Classified Program No. 1.  Sterling contests this.  Since Risen concedes that he learned the details of Classified Program No. 1 in 2003, this fact will enable the jury to eliminate as potential suspects those individuals who only became aware of that information

*after* 2003.  It will also protect them against unfair accusations that they broke the law.  Thus, the Government has a right to prove, and the jury has a right to know, when Risen received the particular pieces of classified information appearing in Chapter Nine of his book.

### C.  Risen Must Answer Questions About The 2004 Letter Because The Letter Is Not Confidential Or Privileged.

In October 2006, federal agents seized from Sterling's computer a letter that Sterling had written.  The letter was drafted in 2004, well after the defendant was aware of the F.B.I.'s investigation into the disclosure of national security information to Risen.  In the letter, the defendant explained away his contemporaneous contacts with Risen as being related to a story about his pending discrimination lawsuit against the CIA, rather than about the disclosure of classified information.  In the letter, the defendant flatly denied disclosing national security information to Risen and instead suggested that unidentified staffers with the Senate Select Committee on Intelligence may have done so.  *See* Mem. Op. pp. 27-28, 30.

There is nothing confidential or privileged about the letter.  Sterling created the letter, not Risen, and the Government recovered the letter from Sterling's computer.  The letter is a product of nothing that Risen authored.  At trial, the Government must prove beyond a reasonable doubt that Sterling, and not any other person, committed the crimes alleged in the Indictment.  In this case, identity is all the more important because the defendant expressly denies in this 2004 letter purportedly written to Risen that he was Risen's source.  Sterling to this day continues to deny, through counsel, that he communicated any national defense information to Risen.

The Government believes the 2004 letter is evidence of Sterling's "consciousness of guilt" because the letter is an attempt to falsely exculpate himself.  As evidence of "consciousness of guilt," the letter proves, in part, Sterling's identity as the source for the national defense

information appearing in Chapter Nine.  The letter also proves, in part, the defendant's intent to obstruct the investigation as charged in Count Ten, the Obstruction of Justice charge and helps prove that Sterling "knowingly and corruptly" destroyed documents as alleged in that count.

The Government has a right to ask, and the jury is entitled to know, if Risen had knowledge of or ever received the 2004 letter.  If not, the inference the jury can draw is that it was nothing more than a self-serving ruse designed to throw suspicion in the direction of others and probative of the defendant's intent. There is nothing about the scope of that testimony that is protected or confidential.  Indeed, both the Fourth Circuit and the Second Circuit have upheld the admission of a journalist's testimony to prove "consciousness of guilt," and only Risen can establish if he received the letter or not.  *See In re Shain*, 978 F.2d 850, 853 (4th Cir. 1992)(demonstrating defendant's "knowledge of his guilt through his attempts to minimize what occurred before he became aware that he had been taped" was relevant and material); *Treacy*, 623 F.3d at 39, 42-44 (finding that district court rightly decided issue of admission of reporter's testimony to prove consciousness of guilt).

**D.    Risen Must Answer Questions About Non-Sources For Chapter Nine Because Who Was Not A Source Is Not Confidential Or Privileged.**

Who was not a confidential source for Chapter Nine is not confidential or privileged.  No qualified reporter's privilege could possibly attach to questions posed to Risen about who was not a source for Chapter Nine.  Risen's only basis to contest such questions is his assertion that to answer such questions would indirectly identify the real confidential source(s), yet that assertion is based solely on conjecture and speculation.

Risen's argument begs the question of how narrowly-tailored the government's questions may be.  "The strength of the [reporter's] privilege is further diminished if the questions asked of

13

the reporter are narrowly tailored." *United States v. Treacy*, 603 F.Supp.2d 670, 672 (S.D.N.Y. 2009)(citing *United States v. Markiewicz*, 732 F.Supp. 316, 319 (N.D.N.Y. 1990)), *aff'd*, *Treacy*, 623 F.3d at 39, 42-44. Questions about the source status of one individual, for example, do not identify who the true confidential source(s) may be.

Moreover, Risen is in no position to decide if any particular question or questions do or do not identify his confidential source(s) because he has no idea how closely held any particular fact may have been. Thus, he would be invoking a privilege to protect non-confidential information based upon conjecture, elevating his speculative suppositions over the Supreme Court's time-honored precept that "the public . . . has a right to every man's evidence." *Trammel v. United States,* 445 U.S. 40, 50 (1980)(citations omitted). Speculation and conjecture simply cannot trump the Supreme Court's strong pronouncements that "[t]he need for information in the criminal context is much weightier because 'our historic[al] commitment to the rule of law . . . is nowhere more profoundly manifest than in our view that 'the twofold aim [of criminal justice] is that guilt shall not escape or innocence suffer.''" *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367, 384 (2004)(quotations omitted).

### E.    Risen Must Answer Questions About Where He Received The Classified Information In Chapter Nine Because That Fact Is Not Confidential Or Privileged.

Another area about which Risen must answer questions, assuming *arguendo* the existence of a privilege, is where he and his source(s) were located when he received the classified information at issue. Venue for the crime of disclosure of classified information at issue rests in the district "where the proscribed act, the act of transmission, took place." *United States v. Truong Dinh Hung*, 629 F.2d 908, 919 (4th Cir. 1980). Risen asserts that for him to testify about

14

such matters would reveal the identity of his source(s), *see* Risen Affidavit ¶ 61, but this assertion is based solely on conjecture and speculation.  There is no reason why Risen's testimony that either he or his source were located generally in the Eastern District of Virginia when certain disclosures were made would identify Risen's source to the exclusion of others, particularly given Risen's acknowledgment those disclosures were made to him in or prior to 2003.[7]

Moreover, while this Court concluded that the Government's evidence of venue before the grand jury was sufficient in that context, Risen's testimony is now sought at an adversarial proceeding with a heightened burden of proof.  Consequently, inferences that may have supported probable cause for venue in the grand jury context must be viewed through a different lens in the adversarial setting of a trial.  While the Indictment alleges that Risen and Sterling exchanged phone calls and emails, very few of them occurred in 2003, when these disclosures occurred.  *See* Ind. ¶¶ 34-54.  While the Court held that a handful of these calls in 2003 supported probable cause for venue in the grand jury, *see* Mem. Op. p. 25-26, the jury should not have to rely on guesswork or inferences at trial.  This is especially so given that the longest duration of these calls is 1 minutes, 31 seconds.  Given that the Government's questions to Risen about venue will not reveal the identity of his source, there is no reason that Risen should not be compelled to provide this testimony.

---

[7]  The timing of these disclosures places them well before the defendant moved to Missouri, so testimony concerning Missouri – which could reveal Sterling's identity – would not be at issue.  *See* Ind. ¶ 6, 47.

## II.    None Of Risen's Testimony Is Barred By A "Reporter's Privilege" Under The First Amendment Or Federal Common Law.

The Government acknowledges that this Court previously held, in the grand jury context and on the facts before it at that time, that a reporter's privilege existed that shielded Risen from testifying before the grand jury.  *See* Mem. Op. p. 19-35.  As explained above, however, this Court is not bound by that opinion in deciding the issues before it today.  As for the information at issue that is even conceivably subject to Risen's confidentiality agreement with his source, the Government respectfully maintains that there is no reporter's privilege under the First Amendment or federal common law that operates to protect him from testifying at trial about that information here, as explained in the Government's motion in limine to admit Risen's testimony. *See* Gov't Mot. pp. 6-16.

Risen suggests that *Branzburg v. Hayes*, 408 U.S. 665 (1972), supports the existence of such a privilege under the First Amendment.  But as many courts have recognized, this interpretation turns the very holding of *Branzburg* – that such a privilege does not exist in a criminal proceeding – on its head.  *See In Re Grand Jury Proceedings (Storer Communications, Inc.)*, 810 F.2d 580, 583 (6th Cir. 1987)(rejecting the notion of a "reporter's privilege" grounded in the First Amendment, because it would require a court of appeals to "restructure the holding of the Supreme Court in *Branzburg v. Hayes*, since the majority opinion in that case rejected the existence of such a first amendment testimonial privilege")(citations omitted).[8]

---

[8]  That federal common law does not provide a reporter's privilege is even clearer than in the First Amendment context.  Indeed, Risen does not cite any case for the proposition that this Circuit or any other has recognized such a common law privilege in criminal cases, for there are none.  *See* Mot. pp. 25-32.

Risen also attempts to marshal Fourth Circuit precedent in support of the existence of such a First Amendment privilege in a criminal case brought in good faith. But there is none. As we discussed in our motion in limine, the Fourth Circuit has recognized a qualified reporter's privilege in civil cases that can require a balancing of the relevant interests at stake, *see, e.g.*, *Ashcraft v. Conoco, Inc.*, 218 F.3d 282 (4th Cir. 2000); *LaRouche*, 780 F.2d at 1139, but it has never recognized a qualified privilege in a good faith criminal proceeding. Moreover, in some of those same civil cases, the Circuit has specifically rejected the existence of such a privilege in the criminal setting. *See Ashcraft*, 218 F.3d at 287 (holding that the trial court abused its discretion in requiring a reporter to testify about his confidential sources in a civil matter, but recognizing *Branzburg's* holding that a "reporter, like [an] ordinary citizen, must respond to grand jury subpoenas and answer questions related to criminal conduct he personally observed . . . regardless of any promises of confidentiality he gave to subjects of stories").

Indeed, in *In re Shain* – the only case cited by Risen in which the Fourth Circuit considered such a privilege in a criminal matter, the Circuit held that, under *Branzburg*, "absent evidence of governmental harassment or bad faith, the reporters have no privilege different from that of any other citizen not to testify about knowledge relevant to a criminal prosecution." *In re Shain,* 978 F.2d at 852. As explained in more detail below, because there is no evidence that Sterling's prosecution has been brought in bad faith, there is no basis to recognize a reporter's privilege or engage in a balancing analysis here.[9]

---

[9] Risen also cites two trial court opinions – one of which is unpublished – in support of his argument that the Fourth Circuit has recognized such a privilege when either bad faith *or* confidential sources are present. Obviously, neither opinion is binding on this Court. In any event, a close reading of *United States v. Lindh*, 210 F. Supp. 2d 780 (E.D.Va. 2002), reveals that neither bad faith nor confidential sources were at issue in that case, and the language quoted by

Risen argues that Sterling's prosecution has been brought in bad faith to harass or intimidate him, and the Court should consider this claim in its analysis.  Mot. pp. 46-47. However, there is no evidence to support such an accusation.  The Fourth Circuit has held in another context that bad faith "implies the conscious doing of a wrong because of dishonest purpose of moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will."  *In Re: 1997 Grand Jury*, 215 F.3d 430, 437 (4th Cir. 2000), *quoting United States* v. *Gilbert*, 198 F.3d 1293, 1298-99 (11th Cir. 1999), *in turn quoting* Black's Law Dictionary 139 (6th ed. 1990).  Risen makes no such showing here.  Indeed, this Court's ruling that its analysis under the *LaRouche* balancing test might well be different in the trial context, *see* Mem. Op. p. 35, and Risen's concession that he must testify about authentication reflects that the Government has acted in good faith.

Moreover, the Indictment in this matter was returned by a grand jury that found probable cause that serious crimes were committed by Sterling, and that Risen was a witness to those crimes.  As such, any alleged harassment prior to that time – which the Government denies – is of no moment.  Risen does not even attempt to address this central fact, or challenge in any way the detailed allegations against Sterling in the Indictment for which he is an eyewitness.  Indeed, to the Government's knowledge, no court has ever quashed a subpoena issued to a reporter on the grounds that a grand jury investigation was being conducted in bad faith, let alone an investigation that resulted in the return of an indictment.

---

Risen, and Risen's reliance on the district court's use of the disjunctive "or" rather than the conjunctive "and"  is dicta, particularly in light of the quoted reference to *Shain*, which, in turn, relies *Branzburg*.  *See Lindh*, 210 F. Supp. 2d at 783 ("Pelton concedes that he cannot invoke any First Amendment privilege on the basis of confidentiality of sources or government harassment; those factors are simply not present here.").

18

The scant evidence Risen can marshal to support his claim of bad faith amounts to the fact that "Bush Administration officials" and Members of Congress criticized decisions by *The New York Times* to print various articles concerning alleged classified Bush-era programs related to national security in 2006.  *See* Mot. p. 47.  However, the grand jury returned its indictment of Sterling in December 2010, and the Government served Risen with a trial subpoena in May 2011. Both of those events occurred well after "the Bush Administration officials" identified by Risen left government service.  Moreover, the Indictment alleges the unauthorized disclosure of a classified program totally unrelated to the alleged classified programs at issue in the articles cited by Risen.  Indeed, according to the Indictment, Classified Program No. 1 was authorized "in the late 1990s," which was during the Clinton Administration.  Ind. ¶ 15.  Risen simply cannot bridge the chasm that exists between the apparent displeasure by "Bush Administration officials" in 2006 concerning *Times* articles unrelated to Classified Program No. 1, and the grand jury's return of the Indictment in December 2010 charging Sterling with disclosing the classified program at issue here.  Finally, both counsel for Risen and Risen himself neglect to include in their affidavits that since the undersigned counsel assumed responsibility for this case, we have made clear that Risen is a witness, not a subject or target, and have re-affirmed his status as a witness as recently as two weeks ago.

Risen also alleges that the Government's representations concerning probable cause to the Court and to him during the grand jury litigation are additional evidence of bad faith.  *See* Mot. p. 47.  They are nothing of the sort.  The Government's position in 2010 was clear, even as it sought grand jury testimony from Risen, that we believed the evidence before the grand jury was sufficient to establish probable cause that Sterling disclosed classified information to Risen.  The

existence of probable cause to believe Sterling to be "the leaker" and probable cause to establish specific violations of Section 793(d) are two distinct concepts, and the Government never sought the identity of Risen's confidential source(s) during the 2010 grand jury litigation.  *See* Mem. Op. pg. 10.  The grand jury, however, needed to know the "what," "when," "how" and "where" regarding the disclosure of specific pieces of national defense information appearing in Chapter Nine to make discrete charging decisions whether probable cause existed to charge Sterling, especially given Risen's assertion to his publisher that he had multiple CIA sources for the information in Chapter Nine.  The Government's representations to the Court and to Risen were and are not inconsistent, and they certainly are not evidence of bad faith.[10]

**III.  Assuming *Arguendo* That This Court Applies The *LaRouche* Test, It Should Not Add The Additional Factors To The Test That Risen Suggests.**

    **A.  The Test Does Not Require That Risen's Testimony Be "Necessary Or Critical" Such That Sterling's Trial Could Not Proceed Without It.**

As the Government demonstrated in its motion in limine, the *LaRouche* factors weigh overwhelmingly in favor of requiring Risen to testify concerning matters subject to his confidentiality agreement with his source.  That testimony (1) is relevant; (2) cannot be obtained by alternative means; and (3) the Government has a compelling interest in presenting the testimony to the jury at Sterling's trial.  Gov't. Mot. pp. 18-27.  *See LaRouche*, 780 F.2d at 1139.

---

[10]  In support of this argument, Risen also cites the Department of Justice's policy on the issuance of subpoenas to members of the media.  *See* 28 C.F.R. 50.10 (f)(1).  However, there were reasonable grounds to believe that the information sought was "essential to a successful investigation," and the Department has repeatedly so found.  *See id.*  Nonetheless, this policy does not "create or recognize any legally enforceable right in any person." 28 C.F.R. 50.10 (n). *See In re Shain*, 978 F.2d at 853 (holding that reporters do not have the right to seek enforcement of DOJ subpoena policies before being compelled to testify).  *See also In re Grand Jury Subpoena*, 2011 WL 234922 at *9 (Fourth Circuit rejecting the same argument in attorney subpoena context).

Perhaps not surprisingly, then, Risen has attempted to graft additional requirements onto the *LaRouche* test. The first is that the information must be "necessary" or "critical" to the Government's case. *See* Mot. pp. 36-41. In short, Risen effectively asserts that unless Sterling's prosecution could not proceed without the testimony about his confidential source, the Government is not entitled to it. This is not the law, and it is obvious from the paucity of cases he cites that it is not.

In support of this newfound "necessary or critical" prong of the *LaRouche* test, Risen relies solely on civil, not criminal, cases where "the demand for every man's evidence" is paramount. *United States v. Nixon*, 418 U.S. 683, 710 (1974). The first civil case Risen cites is *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, *modified*, 628 F.2d 932 (5th Cir. 1980). In that case, the Fifth Circuit required a plaintiff show that a reporter's confidential source information was "necessary to proper preparation and presentation of the case" before being entitled to it. 628 F.2d at 932. *Miller* obviously is not binding on this Court, and it does not impose a requirement that Risen's testimony about his confidential source be "necessary" in the sense that Sterling's trial cannot proceed without it. In fact, the language in *Miller* echos the manner in which the Government has described Risen's testimony here. *See* Gov't Mot. p. 5 (describing Risen's "eyewitness" testimony as "powerful evidence" of the factual issues before the jury that will "simplify the trial" and "allow for an efficient presentation of the Government's case."). Because Risen is an eyewitness to the charged crimes committed by Sterling, his testimony is undeniably information that the Government considers part of the "proper presentation of the case" against Sterling. In that sense, the Government has no quarrel with the language Risen cites from *Miller*.

The other civil case relied upon by Risen is *Church of Scientology v. Daniels*, 992 F.2d 1329, 1335 (4th Cir. 1993), which Risen argues supports the "critical" portion of his newfound "necessary or critical" element of the *LaRouche* test.  In that case, the Fourth Circuit affirmed the trial court's denial of discovery directed to a newspaper concerning its non-confidential source for an allegedly libelous statement that appeared in a newspaper article.  *Id*.  In doing so, the court relied in part on the fact that the non-confidential source was willing to stipulate to the accuracy of the statement in the newspaper, just as LaRouche already possessed the names of the sources that he sought to compel in that case.  *Id*.  In dicta, the *Daniels* Court also noted that law requires that the requested information be "critical to the case."  *Id.*  The use of that phrase aside, however, the court was making the point that – as in *LaRouche* – the requested information could be obtained by alternative means.  Indeed, that was the holding of *LaRouche* on the point for which the *Daniels* Court cited it.  *See LaRouche*, 780 F.2d at 1139 (affirming denial of motion to compel discovery where reasonable alternative means had not been exhausted and the party possessed the confidential source information it sought to compel).  The facts here are inapposite, where Risen is the only source for the information requested, neither Risen nor Sterling has agreed to stipulate to that information, and the Government has exhausted its attempts to obtain the information from Risen.[11]

---

[11]  Risen claims that the "Government has also made no effort to demonstrate that it has exhausted alternative sources" for the testimony that it seeks from him.  Mot. p. 40.  However, it is self-evident that, in a leak case such as this one, Risen is the only source for the information that the Government seeks.  *See The New York Times Co. v. Gonzales*, 459 F.3d 160, 170 (2d Cir. 2006)("[A]s the recipients of the disclosures, [reporters] are the only witnesses – other than the source(s) – available to identify the conversations in question and to describe the circumstances of the leaks. . . . There is simply no substitute for the evidence they have.").  Risen's own affidavit, in which he describes the closeness with which he holds this information and his refusal to provide it, only underscores this obvious point.  Moreover, the Court is well

It is obvious that Risen's purported "necessary or critical" element does not represent an additional prong of the *LaRouche* test, given that, although there are almost 150 cases that cite *LaRouche*, Risen fails to identify even a single additional case that references these terms. Indeed, Risen's argument that these are elements that should be part of the "compelling interest" prong of the test is utterly without support in the case law. Mot. p. 39. In short, there is simply no requirement under the *LaRouche* test that the information sought from Risen must be "necessary or critical" to the Government's case, such that Sterling's trial could not continue without it.

Finally, Risen's reliance on this Court's previous balancing under *LaRouche* in the grand jury setting is misplaced for several reasons. First, the grand jury returned an indictment charging the very communications at issue here as *crimes*. In this setting, any qualified reporter's privilege deserves decidedly less weight in any balancing analysis because "[t]he need for information in the criminal context  is much weightier." *Cheney*, 542 U.S. at 384. Indeed, other confidentiality-based privileges, such as the attorney-client privilege and the spousal privileges, yield where the protected communications further a crime or fraud. *See United States v. Under Seal*, 102 F.3d 748, 750-51 (4th Cir. 1996)(citing *In re Grand Jury Subpoena*, 884 F.2d 124, 127 (4th Cir. 1989)("when a client gives information to an attorney for the purpose of committing or furthering a crime or fraud," the privilege is lost."); *United States v. Parker*, 834 F.2d 408, 411 (4th Cir. 1987) (recognizing the crime-fraud exception for spousal privileges). Yet nowhere does

---

aware of the Government's exhaustive efforts, again set forth in Risen's own affidavit, to secure his testimony in this matter.

Risen address how or why a qualified reporter's privilege should retain the same level of protection in these circumstances.

Second, given the grand jury's specific findings that Sterling used Risen to disseminate information in a false and misleading way, any balancing analysis must reflect the significantly reduced First Amendment protections over the communications at issue here. It is well-settled that false statements of fact have little constitutional value, and they are not entitled to the same degree of protection as truthful statements. *See, e.g., United States v. Stevens*, 130 S.Ct. 1577, 1584 (2010)(recognizing "fraud" as one of the "historic and traditional categories" of speech excepted from the First Amendment); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988) (stating "[f]alse statements of fact are particularly valueless"); *Herbert v. Lando*, 441 U.S. 153, 171 (1979)("[s]preading false information in and of itself carries no First Amendment credentials"); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) ("[e]rroneous statement[s] of fact [are] not worthy of constitutional protection" for their own sake). Risen's silence on this point is deafening as he once again does not explain how or why, in the face of such well-settled Supreme Court precedent, any qualified reporter's privilege rooted in the First Amendment can retain any degree of protection on the facts of this case.

Yet disseminating false and misleading information about Human Asset No. 1 and Classified Program No. 1 is precisely what the grand jury found Sterling did in this case. The grand jury concluded that the defendant "caused and attempted to cause the publication of classified information about Classified Program No. 1 and Human Asset No. 1 that defendant STERLING characterized in a false and misleading manner." Ind. ¶ 18. The grand jury further determined that the defendant, in disclosing classified information to Risen, "characteriz[ed] the

24

classified information in a false and misleading manner as a means of inducing Author A to write and publish a story premised on that false and misleading information." *Id*. at ¶ 19(d). Those findings of the grand jury must be accorded a presumption of regularity, *United States v. Mechanik*, 475 U.S. 66, 75 (1986); *In re Grand Jury Subpoena*, 2011 WL 234922 at *4, and should be accepted as true. *See United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994)(citing *United States v. Sampson*, 371 U.S. 75, 78-79 (1962); *United States v. Welch*, 327 F.3d 1081, 1090 (10th Cir. 2003). Risen's beliefs that his confidential source(s) provided him truthful information, no matter how sincerely held, do not alter the indisputable fact that the grand jury found otherwise.

Because the First Amendment does not protect the dissemination of false information, *see Herbert*, 441 U.S. at 175, public policy dictates that a qualified reporter's privilege rooted in the First Amendment and invoked to protect the dissemination of false information must lose its force. Any contrary ruling runs afoul of the Supreme Court's strong disfavor towards construing evidentiary privileges broadly, "even those rooted in the Constitution." *Id*. The Supreme Court has often stated regarding evidentiary privileges that "[w]hatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Nixon*, 418 U.S. at 710 (1974)(rejecting an absolute privilege for the President). This Court should not extend any qualified reporter's privilege to cover the dissemination of false information, as alleged in the Indictment.

Other considerations also weigh heavily against Risen's reliance on this Court's prior balancing analysis in the grand jury context. First, the standard of proof is markedly different at trial as this Court presciently noted in November 2010. *See* Mem. Op. p. 35. Second, evidence

admissible before the grand jury and considered by this Court in its Memorandum Opinion may

no longer be admissible at trial. *Id*. at 31 (stating "the authentication, hearsay, and best evidence

rules of the Federal Rules of Evidence do not apply to grand jury proceedings"). Separate and

apart from Risen's concession regarding the admissibility of his grand jury affidavit at trial, s*ee*

Mot. p. 45, other evidence relied upon by the Court in its Memorandum Opinion similarly would

be inadmissible at trial. For example, the grand jury testimony of the witness cited by the Court

at page 7 of its Memorandum Opinion would be inadmissible under Rules 801(c), 802 and 803 of

the Federal Rules of Evidence and *United States v. Acker*, 52 F.3d 509, 514-515 (4th Cir.

1995)(availability of spousal privileges to testifying and non-testifying spouses). The grand jury

testimony of the witness cited by the Court at pages 7, 9, 10, 20, and 34 of its Memorandum

Opinion - testimony that this Court deemed one of the key facts in its conclusion - is

inadmissible hearsay on its face absent some exception; yet Risen treats the admissibility of the

testimony of both witnesses as a foregone conclusion. *See* Mot. pp. 39-40. Finally, Risen

completely ignores that, unlike the grand jury context, the adversarial process is now in play.

Inferences sufficient for probable cause in the grand jury context are no longer sufficient in the

adversarial setting of a trial.

    **B.**    **The Test Does Not Require The Balancing Of Any Alleged "Newsworthiness" Of Risen's Reporting Of The National Defense Information Disclosed To Him Against The Harm His Reporting Caused.**

Risen also asserts that this Court should import an additional factor into the *LaRouche* test

and weigh "the public interest in compelling disclosure, measured by the harm the leak caused,

against the public interest in newsgathering, measured by the leaked information's value." Mot.

pp. 33, 41-45. Not only is this not the law in this or in any Circuit, it is an impractical

undertaking for which courts are uniquely ill-suited. The Court should not add these factors into its *LaRouche* analysis, should it undertake one.

As a threshold matter, attempting to evaluate the "newsworthiness" of a leak would inevitably be highly subjective. Risen suggests no objective standard, test or factors that could be applied by the courts to structure such an analysis. Similarly, weighing the "newsworthiness" of the leak against the harm it caused is not a helpful analytic framework because the "news value" of a leak is often directly related to – rather than in tension with – the harm it may cause. In other words, often the more harm a leak causes, the more newsworthy it is. Most problematic, however, would be an attempt by a court to assess the harm a leak of national defense information caused. The Fourth Circuit has cautioned against courts attempting to engage in similar such analyses because of the inherent limits of the judicial branch's capability to do so.

For example, Judge Wilkinson explained that "requiring the judiciary to draw conclusions about the potential effects of [the] disclosure [of classified information] . . . would require access to the most sensitive technical information, and background knowledge of the range of intelligence operations that cannot easily be presented in the single 'case or controversy' to which courts are confined. Even with sufficient information, courts obviously lack the expertise needed for [this] evaluation." *United States v. Morison*, 844 F.2d 1057, 1082-83 (4th Cir. 1988)(Wilkinson, J., concurring). More recently, in *El-Masri* v. *United States*, 479 F.3d 296, 305 (4th Cir. 2007), the Fourth Circuit reiterated how ill-equipped the courts were in evaluating the consequences of disclosure of national security information, while conversely recognizing the executive branch's expertise in appreciating how seemingly trivial information may have great significance "to one who has a broad view of the scene and may put the questioned item of

information in its proper context."

Moreover, the practical effect of a court's engaging in such an analysis, by explicitly recognizing "good leaks" of classified information, would effectively destroy the system through which the country protects that information. It would encourage government employees who are provided access to classified information to betray their commitment to safeguard it by suggesting that they, too, should undertake their own independent analysis of the effect of their disclosure of that information should they desire to do so. It would also provide a ready-made defense for every disgruntled intelligence community employee or contractor who discloses such information to the press because he harbors a grudge against the institution for which he works.

There are sound reasons, then, why these factors are not the law in this Circuit or in any other. In support of his argument, Risen cites only Judge Tatel's concurrence in *In Re Grand Jury Subpoena (Judith Miller)*, 438 F.3d 1141, 1175 (D.C. Cir. 2006), and Judge Sack's dissent in *Gonzales*, 459 F.3d at 186. For many of these reasons, courts have rightly rejected weighing these factors in considering claims of privilege asserted by reporters. *See, e.g.*, *Judith Miller*, 438 F.3d at 1162-63 (Henderson, J., concurring). This Court should do so as well.

In fact, even if this Court were to attempt to evaluate the newsworthiness of the information contained in Risen's book, that evaluation would not be (and could not be based on the record here) favorable to Risen. According to the Indictment, Sterling caused Risen to write information about Classified Program No. 1 and Human Asset No. 1 that was false and misleading. *See* Ind. ¶¶ 18, 19(d), 36, 39-42. Quite obviously, there is no value to the public in reporting false and misleading information. To the contrary, the public is harmed by the dissemination of false information on important matters of public policy. Risen relied upon

28

information and documents his sources provided to him to write Chapter Nine; he has never

admitted personal knowledge of the truth of the matters about which he reported. Risen cannot

dispute based on any personal knowledge that his reporting in Chapter Nine was false and

misleading, that it may have harmed the public, and that it was not newsworthy.[12]  In this respect,

the Indictment is the only competent evidence this Court should use in deciding Risen's motion

to quash his subpoena.  On this point, his declaration that "the newsworthiness of the information

contained in Chapter Nine of State of War outweighs any alleged harm that was caused by its

publication" is as breathtakingly hollow as it is sweeping.  Mot. p. 42.  And, finally, it is

noteworthy that *The New York Times* decided not to print Risen's article in 2003.  *See* Ind. ¶¶ 17,

42-43.

Risen's attempt to argue why his reporting in Chapter Nine was newsworthy is a complete

non-sequitur.  Nothing in Chapter Nine relates to the reliability of the CIA's intelligence

regarding Iran's nuclear weapons program, Risen's ostensible rationale for publishing the

information appearing in that chapter. *See* Mot. pp. 42-45.  What Chapter Nine does include,

however, in addition to information about Classified Program No. 1, is classified information

concerning Human Asset No. 1.  *See* Ind. ¶ 55.  That is precisely the kind of information for

which, even in Judge Tatel's estimation, any reporter's privilege must yield.  *See Judith Miller*,

438 F.3d 1141 at 1173 (Tatel, J., concurring)(leaks concerning the exposure of a covert agent as

well as other leaks "could be even more damaging, causing harm far in excess of their news

value.  In such cases, the reporter privilege must give way").

---

[12]  Similarly, none of other prominent journalists who submitted affidavits on Risen's
behalf, each of whom avers that the information in Chapter Nine is newsworthy, have any
personal knowledge about the allegations in the Indictment.

## CONCLUSION

WHEREFORE, for the foregoing reasons, and for the reasons stated in our motion in limine, we respectfully request that the Court deny Risen's motion to quash the subpoena.

Respectfully submitted,

Neil H. MacBride
United States Attorney
Eastern District of Virginia

Lanny A. Breuer
Assistant Attorney General
Criminal Division
U.S. Department of Justice

William M. Welch II
Senior Litigation Counsel
Criminal Division
U.S. Department of Justice

Timothy J. Kelly
Trial Attorney
Criminal Division
U.S. Department of Justice

By:    _____/s/_____
James L. Trump
Senior Litigation Counsel
United States Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2011, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the

following:

Peter K. Stackhouse, Esq.
219 Lloyds Lane
Alexandria, Virginia 22302
(703) 684-7184

David N. Kelley, Esq.
Joel Kurtzberg, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

Edward B. MacMahon
107 East Washington Street
Middleburg, VA 20118
(703) 589-1124

Barry J. Pollack
Miller & Chevalier
655 Fifteenth Street, NW
Suite 900
Washington, DC 20005-5701
(202) 626-5830
(202) 626-5801 (fax)


_____/s/_____
James L. Trump
Senior Litigation Counsel