JUL 2 9 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,          )
                                   )
                                   )
          v.                       )          1:10cr485 (LMB)
                                   )
                                   )
JEFFREY ALEXANDER STERLING,        )
                                   )
                                   )
          Defendant.               )

## MEMORANDUM OPINION

The government has issued a subpoena that would require journalist James Risen ("Risen") to testify at the criminal trial of Jeffrey Sterling ("Sterling"), a former Central Intelligence Agency officer charged with disclosing classified information to Risen. Before the Court is the Government's Motion in Limine to Admit the Testimony of James Risen [Dkt. No. 105] and the Motion of James Risen to Quash Subpoena and/or for Protective Order [Dkt. No. 115]. For the reasons stated below, the motions will be denied in part and granted in part, and the subpoena will be quashed for Risen's testimony about his reporting and source(s) except to the extent that Risen will be required to provide testimony that authenticates the accuracy of his journalism, subject to a protective order.

## I.  Background

### A.  Risen's reporting

In January 2006, Risen published State of War: The Secret History of the CIA and the Bush Administration ("State of War"),

a book about the CIA.  Chapter 9 of <u>State of War</u> describes

"Operation Merlin," an allegedly failed attempt by the CIA to

have a former Russian scientist provide flawed nuclear weapon

blueprints to Iran.  Ex. 2 to Risen's Mot. to Quash at 193-218.

Chapter 9 includes an account of how, despite the former

scientist immediately spotting the flaws in the plan, the CIA

instructed him to deliver the blueprints to the Iranian embassy

in Vienna.  Chapter 9 concludes that because the defects in the

blueprints were easily identifiable, Operation Merlin was deeply

flawed.  Much of Chapter 9 is told from the perspective of a CIA

case officer who was assigned to persuade the scientist to go

along with the operation.

## B.  Grand jury proceedings

A grand jury sitting in the Eastern District of Virginia

began investigating the unauthorized disclosures about Operation

Merlin sometime in March 2006.[1]  Grand Jury Op. at 9.  On January

28, 2008, the government issued its first grand jury subpoena to

Risen, seeking testimony and documents about the identity of the

source(s) for Chapter 9 and Risen's communications with the

---

[1]On November 30, 2010, the Court issued a Memorandum Opinion
regarding Risen's motion to quash the grand jury subpoena,
1:08dm61 ("Grand Jury Opinion").  The Court adopts the facts as
stated in the Grand Jury Opinion, which summarized the
government's evidence, much of which came from a classified
government declaration.  The government has since redacted
classified information from the Grand Jury Opinion, and on June
28, 2011, the Court unsealed the redacted version of the Grand
Jury Opinion.  This Memorandum Opinion quotes only from the
redacted version of the Grand Jury Opinion.

source(s).   Invoking the reporter's privilege, Risen moved to quash the subpoena.   Id.

Risen's motion to quash was granted in part and denied in part, after the Court found that the government already had sufficient evidence to establish probable cause and that Risen's testimony would simply amount to "the icing on the cake." However, because Risen had disclosed Sterling's name and some information about his reporting to another source, the Court found a waiver as to that information.   Id. at 9-10.   Both Risen and the government sought reconsideration, but the grand jury expired before the Court could rule on the motions.   Id. at 10.

On January 19, 2010, Attorney General Holder authorized prosecutors to seek a second grand jury subpoena for Risen.   That subpoena, which issued on April 26, 2010, did not explicitly request the identity of confidential sources; instead, the subpoena sought information about "the where, the what, the how, and the when" regarding disclosure of the classified information published in Chapter 9.   Specifically, the government identified four general categories of information that it sought to obtain from Risen about Chapter 9: 1) testimony about where the disclosures occurred; 2) testimony about what information each source disclosed and when the disclosure occurred; 3) testimony about how Risen received classified information; and 4) testimony to authenticate Chapter 9. Grand Jury Opinion at 23.

3

Risen moved to quash the subpoena, arguing that information
about his confidential sources was protected by the qualified
reporter's privilege both under the First Amendment and the
common law.  Risen justified invoking the reporter's privilege on
the basis of his confidentiality agreement with his sources and
on his belief that the government issued the subpoena to harass
him.  Id. at 14.  He also argued that the government had not
overcome the qualified reporter's privilege because it had not
demonstrated that it had a compelling interest in the
information, that the information was relevant, and that the
information was unavailable from alternative sources.

The government responded that the Fourth Circuit does not
recognize a reporter's privilege under those facts; however, even
if such a qualified privilege were recognized, it would not apply
to this case because Risen did not have a confidentiality
agreement with his source, nor did the government issue the
subpoena to harass him.  Finally, the government argued that the
privilege did not apply because the government had a compelling
interest to establish probable cause and the information sought
from Risen was not available from alternative sources.

In a classified affidavit filed in March 2008 in connection
with the first grand jury subpoena, the government summarized the
evidence it had developed indicating that Sterling had disclosed

4

classified information to Risen.[2]

That evidence showed that Sterling was hired as a CIA case officer in 1993. Grand Jury Opinion at 2-3. After being told that he failed to meet performance targets, Sterling, who is African American, filed a discrimination complaint with the CIA on August 22, 2000, followed by a lawsuit that was dismissed after the CIA invoked the State Secrets privilege. His employment with the CIA ended on or about January 31, 2002. Id.

On March 2, 2002, Risen published a New York Times article about Sterling's discrimination lawsuit against the CIA. The article identifies Sterling by name, quotes him extensively, and reports that Sterling "was assigned to try to recruit Iranians as spies." Id. at 4. This article supported the government's conclusion that Sterling began communicating with Risen during the last stages of his employment with the CIA.

The government also described evidence that after Sterling was fired by the CIA, he attempted to draw attention to the Iranian nuclear weapons project. On March 5, 2003, Sterling met with two staffers for the Senate Select Committee on Intelligence to discuss the nuclear weapons project, as well as his unsuccessful discrimination lawsuit. One of the staffers later told the government in an interview that during the meeting

---

[2]Because the government has not filed a similar affidavit in connection with the trial subpoena, this section summarizes the information in the 2008 affidavit that the government has since unclassified.

5

"Sterling also threatened to go to the press, though he could not recall if Sterling's threat related to the [nuclear weapons plan project] or his lawsuit." Id.

Through telephone and other communication records, the government has evidence that between February 27, 2003 and March 29, 2003, there were seven phone calls from Sterling's home telephone in the Eastern District of Virginia to Risen's home telephone in the District of Columbia. Id. at 5. Email evidence includes a March 10, 2003 email message from Sterling to Risen referencing a CNN.com article entitled: "Report: Iran has 'extremely advanced' nuclear program." Sterling wrote, "I'm sure you've already seen this, but quite interesting, don't you think? All the more reason to wonder . . ." Id.

On April 3, 2003, four days after the last of the seven phone calls from Sterling's home to Risen's home, Risen called the CIA Office of Public Affairs and the National Security Council's Office of Public Affairs for comment about the Iranian nuclear operation. On April 30, 2003, former National Security Advisor Condoleezza Rice, former CIA director George Tenet, and three other CIA and NSC staff members met with Risen and New York Times Washington Bureau Chief Jill Abramson in an effort to convince them not to publish an article about the Iranian nuclear project because it would compromise national security. Id. at 5-6. On or about May 6, 2003, Abramson told the government that

6

the newspaper had decided not to publish the story.

In approximately August 2003, Sterling moved from Virginia to Missouri, where he stayed with friends. Phone records for the telephone in his friends' home document 19 calls between the <u>New York Times</u> office in Washington D.C. and the friends' home. <u>Id.</u> at 6. The friends testified before the grand jury that they did not receive calls from anyone at the <u>New York Times</u>. The government also has records of phone calls between the <u>New York Times</u> and Sterling's cell phone and work phone extension at Blue Cross/Blue Shield in Missouri, where he began working in August 2004. Sterling had access to his friends' computer; an FBI search of the computer revealed 27 emails between Sterling and Risen. <u>Id.</u> at 6-7. In addition, a search of Sterling's personal computer revealed a letter to "Jim" that was created on March 19, 2004, describing Sterling's discrimination complaint and his meeting with Senate staffers. The letter states that "[f]or obvious reasons, I cannot tell you every detail." <u>Id.</u> at 7. Of particular significance was the testimony of a former government intelligence official with whom Risen consulted on his stories. He told the grand jury that Risen had told him that Sterling was his source for information about the Iranian nuclear weapons operation. <u>Id.</u> at 7-8. Another witness testified before the grand jury that Sterling told her about his plans to meet with "Jim," who had written an article about Sterling's discrimination

7

case and was then working on a book about the CIA, and that when she and Sterling saw <u>State of War</u> in a bookstore, Sterling, without first looking at the book, told her that Chapter 9 was about work he had done at the CIA. <u>Id.</u> at 7.

Chapter 9 describes, in detail, two key classified meetings about Operation Merlin. Few people attended the meetings, and the government determined that Sterling was the only person who was present at both, leading to the conclusion that Sterling was the source for that part of Chapter 9.

In its papers, the government conceded that the above-described evidence would establish probable cause to indict Sterling:

> The evidence gathered to date clearly establishes that there is at least probable cause to believe that Jeffrey Sterling is responsible for the unauthorized disclosure of classified information regarding the [] Operation to James Risen, and three federal judges have also made a similar finding by authorizing the search warrants described above. The Government believes that there is also probable cause to suggest that Jeffrey Sterling is further responsible for the [] disclosures described above. However, the Government further believes that this matter warrants additional investigation to insure a proper charging decision before an indictment is presented to the Grand Jury.

<u>Id.</u> at 8.

In a Memorandum Opinion issued on November 30, 2010, the Court explained its reasons for quashing the subpoena. In essence, the Court found that "[i]f a reporter presents some evidence that he obtained information under a confidentiality

8

agreement or that a goal of the subpoena is to harass or intimidate the reporter, he may invoke a qualified privilege against having to testify in a criminal proceeding." Grand Jury Op. at 19. Concluding that Risen's confidentiality agreement with his source(s) established that he could invoke a qualified privilege, the Court applied the Fourth Circuit's three-part balancing test, which requires the Court to consider (1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information. Id. at 17, citing LaRouche v. National Broadcasting Co., 780 F.2d 1134 (4th Cir. 1986).

Applying the LaRouche balancing test to the four categories of information sought, the Court determined that the government had not overcome the qualified reporter's privilege, given the strong circumstantial evidence already before the grand jury, concluding that there "is more than enough evidence to establish probable cause to indict Sterling and the government has essentially admitted that fact." Id. at 34. The Court indicated that it might be less likely to quash a trial subpoena, because at that stage the government must prove guilt beyond a reasonable doubt. Id. at 35.

C.  Sterling's indictment and the trial subpoena

On December 22, 2010, a grand jury indicted Sterling,

9

charging him with ten counts: Unauthorized Disclosure of National
Defense Information, in violation of 18 U.S.C. § 793(d) (Counts
One, Four, and Six); Unauthorized Disclosure of National Defense
Information, in violation of 18 U.S.C. § 793(e) (Counts Two,
Five, and Seven); Unlawful Retention of Classified Information,
in violation of 18 U.S.C. § 793(e) (Count Three); Mail Fraud, in
violation of 18 U.S.C. § 1341 (Count Eight); Unauthorized
Conveyance of Government Property, in violation of 18 U.S.C. §
641 (Count Nine); and Obstruction of Justice, in violation of 18
U.S.C. § 1512(c)(1) (Count Ten).

On May 23, 2011, the government served a subpoena on Risen,
seeking his trial testimony.  The subpoena does not specify the
scope of testimony sought from Risen; however, in a Motion in
Limine filed the same day, the government clarified the scope,
explaining that it planned to ask Risen to identify Sterling as
his source for Chapter 9, and to provide other information about
Risen's relationship with Sterling, such as the time and place of
the disclosures, as well as to authenticate <u>State of War</u>.  On
June 21, 2011, Risen moved to quash the subpoena.  Sterling filed
an opposition to the government's Motion in Limine, in which he
simply argues that the Court should defer ruling on the motion.

## II.    Discussion

## A. <u>Scope of the First Amendment reporter's privilege</u>

As it did during the grand jury proceeding, the government

10

argues that no reporter's privilege exists under these facts, repeatedly placing the term "Reporter's Privilege" in quotation marks, suggesting that the Fourth Circuit has never recognized the privilege.  Mot. in Limine at 6, Opp. to Mot. to Quash at 16.

The government relies upon <u>Branzburg v. Hayes</u>, 408 U.S. 665 (1972) to support its argument that there is no reporter's privilege here.   <u>Branzburg</u> consolidated three cases in which journalists sought to quash grand jury subpoenas for their notes and testimony about their reporting.   The majority held that there was no reporter's privilege in these cases, finding:

> Nothing in the record indicates that these grand juries were "prob[ing] at will and without relation to existing need." <u>DeGregory v. Attorney General of New Hampshire</u>, 383 U.S. 825, 829 (1966). Nor did the grand juries attempt to invade protected First Amendment rights by forcing wholesale disclosure of names and organizational affiliations for a purpose that was not germane to the determination of whether crime has been committed, <u>cf.</u> <u>NAACP v. Alabama</u>, 357 U.S. 449 (1958); <u>NAACP v. Button</u>, 371 U.S. 415 (1963); <u>Bates v. Little Rock</u>, 361 U.S. 516 (1960), and the characteristic secrecy of grand jury proceedings is a further protection against the undue invasion of such rights. <u>See</u> Fed. Rule Crim. Proc. 6 (e). The investigative power of the grand jury is necessarily broad if its public responsibility is to be adequately discharged. <u>Costello v. United States</u>, 350 U.S., at 364.

<u>Id.</u> at 700.

As this Court explained in the Grand Jury Opinion, the Fourth Circuit recognizes a qualified First Amendment reporter's privilege that may be invoked when a subpoena either seeks

11

information about confidential sources or is issued to harass or
intimidate the journalist.[3]

Justice Powell, one of the five justices in the Branzburg
majority, wrote a concurring opinion to emphasize the "limited
nature" of the majority's ruling:

> If a newsman believes that the grand jury investigation
> is not being conducted in good faith he is not without
> remedy. Indeed, if the newsman is called upon to give
> information bearing only a remote and tenuous
> relationship to the subject of the investigation, or if
> he has some other reason to believe that his testimony
> implicates confidential source relationships without a
> legitimate need of law enforcement, he will have access
> to the court on a motion to quash and an appropriate
> protective order may be entered. The asserted claim to
> privilege should be judged on its facts by the striking
> of a proper balance between freedom of the press and
> the obligation of all citizens to give relevant
> testimony with respect to criminal conduct. The balance
> of these vital constitutional and societal interests on
> a case-by-case basis accords with the tried and
> traditional way of adjudicating such questions.  In
> short, the courts will be available to newsmen under
> circumstances where legitimate First Amendment
> interests require protection.

Id. at 709-10 (Powell, J., concurring).

The Fourth Circuit first applied Justice Powell's
concurrence to recognize a qualified First Amendment reporter's

---

[3]Risen also argues that the Court should apply a federal
common law reporter's privilege.  Mot. to Quash at 25.  The
Fourth Circuit has only mentioned a common law privilege in
United States v. Steelhammer, 539 F.2d 373 (4th Cir. 1976), a
civil contempt proceeding, and has never applied the common law
privilege in a criminal case.  Although other circuits have
recognized a strong reporter's privilege under the federal common
law, because the Fourth Circuit has not done so, the Court will
limit its analysis to the reporter's privilege under the First
Amendment.

privilege in <u>United States v. Steelhammer</u>, 539 F.2d 373 (4th Cir. 1976), in which a divided Fourth Circuit panel vacated a district court's contempt order issued to several journalists who refused to testify at a civil contempt trial.  Sitting <u>en banc</u>, the Fourth Circuit reversed the panel's decision, adopting Judge Winter's dissent from the panel decision, in which he outlined the contours of the reporter's privilege:

> In the instant case it is conceded that the reporters
> did not acquire the information sought to be elicited
> from them on a confidential basis; one of them
> (Steelhammer) so testified in the district court.  My
> study of the record fails to turn up even a scintilla
> of evidence that the reporters were subpoenaed to
> harass them or to embarrass their newsgathering
> abilities at any future public meetings that the miners
> might hold. It therefore seems to me that, in the
> balancing of interests suggested by Mr. Justice Powell
> in his concurring opinion in <u>Branzburg v. Hayes</u>, 408
> U.S. 665, 709 . . . (1972), the absence of a claim of
> confidentiality and the lack of evidence of
> vindictiveness tip the scale to the conclusion that the
> district court was correct in requiring the reporters
> to testify. These absences convert the majority's
> conclusion into a broad holding that journalists called
> as witnesses in civil cases have a privilege to refuse
> to testify about all events they have observed in their
> professional capacity if other witnesses to the same
> events are available, despite the avowal that the
> holding is limited to the facts of the case.

<u>Id.</u> at 376 (Winter, J., dissenting), <u>adopted by the court en banc</u> 561 F.2d 539, 540 (4th Cir. 1977).

In <u>LaRouche v. National Broadcasting Co.</u>, 780 F.2d 1134 (4th Cir. 1986), the Fourth Circuit reaffirmed its recognition of a qualified reporter's privilege and established the balancing test for deciding whether that privilege can be enforced.  That

13

test, adopted from <u>Miller v. Transamerican Press, Inc.</u>, 621 F.2d 721, <u>modified</u>, 628 F.2d 932 (5th Cir. 1980), <u>cert. denied</u> 450 U.S. 1041 (1981), provides that the Court must consider "(1) whether the information is relevant, (2) whether the information can be obtained by alternative means, and (3) whether there is a compelling interest in the information." <u>LaRouche</u>, 780 F.2d at 1139.

The Fourth Circuit reaffirmed the qualified reporter's privilege in <u>Ashcraft v. Conoco</u>, 218 F.3d 282 (4th Cir. 2000), which involved a contempt order against a journalist who refused to identify the sources of his information about a confidential settlement. Finding that the sources' identities were confidential, the Fourth Circuit applied the <u>LaRouche</u> balancing test and reversed the district court, holding that disclosure was not justified by a compelling interest. "If reporters were routinely required to divulge the identities of their sources, the free flow of newsworthy information would be restrained and the public's understanding of important issues and events would be hampered in ways inconsistent with a healthy republic." <u>Id.</u> at 287.

The Fourth Circuit has addressed the reporter's privilege in only one criminal case, <u>In Re Shain</u>, 978 F.2d 850 (4th Cir. 1992), which involved four reporters, each of whom had interviewed a state senator about his relationship with a

14

registered lobbyist, and later published portions of those
interviews in their news stories. After the senator was indicted
in a bribery scandal, the government subpoenaed the reporters to
testify at the criminal trial, and the reporters moved to quash
the subpoenas. The district court denied the motions, and the
Fourth Circuit affirmed, finding that

> the incidental burden on the freedom of the press in
> the circumstances of this case does not require the
> invalidation of the subpoenas issued to the reporters,
> and absent evidence of governmental harassment or bad
> faith, the reporters have no privilege different from
> that of any other citizen not to testify about
> knowledge relevant to a criminal prosecution.

Id. at 852. Relying on this passage, the government argues that
the LaRouche test applies to subpoenas in criminal cases only if
the journalist has demonstrated that the subpoena was issued in
bad faith. Mot. in Limine at 12. The government's
interpretation of In re Shain is incorrect. As the Fourth
Circuit made clear, the holding was limited to "the circumstances
of this case," which did not involve any confidentiality
agreement between the reporters and their source(s). Under these
facts, the Fourth Circuit recognized that "the absence of
confidentiality or vindictiveness in the facts of this case
fatally undermines the reporters' claim to a First Amendment
privilege." Id. at 853 (emphasis added). The government also
tries to rely on In re Shain for the proposition that the
qualified reporter's privilege is applied differently in criminal

15

cases, but the Fourth Circuit has not drawn any distinction between civil actions and criminal cases.  Accordingly, the only proper reading of <u>In re Shain</u> is that in criminal cases, as in civil actions, the <u>LaRouche</u> test is triggered by either an agreement to keep sources confidential or evidence of harassment.  <u>See, e.g.</u>, <u>United States v. Regan</u>, Criminal No. 01-405-A (E.D. Va. Aug. 20, 2002) (quashing subpoena of journalist in criminal case); <u>United States v. Lindh</u>, 210 F. Supp. 2d 780, 783 (E.D. Va. 2002) (recognizing that a First Amendment reporter's privilege applies in a criminal case "where the journalist produces some evidence of confidentiality <u>or</u> governmental harassment") (emphasis added).

Both the government and Risen incorrectly urge the Court to consider subjective factors that the Fourth Circuit has not recognized as part of the reporter's privilege analysis.  The government argues that the reporter's privilege does not apply in this case because Risen's reporting was premised on "false and misleading" information that Sterling provided to him.  Response to Mot. to Quash at 24.  Citing to several First Amendment cases, none of which dealt with the reporter's privilege,[4] the

---

[4]<u>United States v. Stevens</u>, 130 S.Ct. 1577 (2010) involved a First Amendment challenge to a prohibition on depictions of animal cruelty; <u>Hustler Magazine v. Falwell</u>, 485 U.S. 46 (1988) held that a public figure in a defamation action is required to demonstrate actual malice; <u>Herbert v. Lando</u>, 441 U.S. 153 (1979) involved a plaintiff's efforts to inquire into the editorial process in a libel lawsuit; and <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323 (1974) held that a private figure plaintiff in a

government maintains that "well-settled Supreme Court precedent" bars the application of the qualified reporter's privilege to dissemination of false information. Id. Risen, meanwhile, urges the Court to consider the "newsworthiness" of the leaks and the public interest in reporting on the progress of Iran's nuclear program. Mot. to Quash at 41. This line of argument would have the Court serve as editor-in-chief, unilaterally determining whether reporting is sufficiently accurate or newsworthy as to be deserving of First Amendment protection. Neither the Fourth Circuit nor any other court has ever recognized such factors as pertinent to the reporter's privilege, and this Court declines to be the first to do so.

In sum, the Fourth Circuit's qualified First Amendment reporter's privilege caselaw has two steps. First the Court must determine whether the subpoena seeks confidential reporting information or was issued to harass the reporter. Upon a finding of either, the Court applies the three-part LaRouche test.

B.  <u>Whether the qualified reporter's privilege applies to Risen</u>

The qualified reporter's privilege applies to this subpoena because it seeks confidential source information.[5] The

_____

defamation action is not required to plead actual malice.

[5]As he did in the grand jury proceedings, Risen argues that the government issued the subpoenas to harass him. Risen bases his harassment claim on his record of writing stories that exposed the government's national security and intelligence practices, including articles that revealed the government's domestic warrantless wiretapping program, and the criticism that

government does not dispute that Risen had a confidentiality agreement with the source(s) of information for Chapter 9. See Grand Jury Opinion at 20. In an affidavit filed with his Motion to Quash the trial subpoena, Risen avers that he received the information from confidential source(s):

> I could not have written Chapter 9 of State of War (and many, if not all of the above-referenced articles and books) without the use of confidential source(s). My source(s) for Chapter 9 provided me with information with the understanding that I would not reveal their identity/ies. In circumstances in which I promise confidentiality to a source, I cannot break that promise. . . .
>
> Any testimony I were to provide to the Government would compromise to a significant degree my ability to continue reporting as well as the ability of other journalists to do so. This is particularly true in my current line of work covering stories relating to national security, intelligence, and terrorism. If I aided the Government in its effort to prosecute my confidential source(s) for providing information to me under terms of confidentiality, I would inevitably be compromising my own ability to gather news in the future. I also believe that I would be impeding all other reporters' ability to gather and report the news in the future.

Risen Aff. ¶¶ 51-52.

The government argues that even if Risen had a confidentiality agreement with his source(s), it would not cover much of the testimony sought by the subpoena, including the time

---

he received from members of the Bush administration. The government argues that the trial subpoena was not issued by the Bush administration and therefore there is no evidence of harassment. It is unnecessary to decide whether the subpoena was issued, at least in part, to harass or intimidate Risen given the clear evidence of confidentiality, which is all that is needed to trigger the privilege.

and place of the alleged disclosure and testimony about Risen's
2002 newspaper article concerning Sterling's civil lawsuit
against the CIA. Mot. in Limine at 17. Risen responds that his
confidentiality agreement(s) extend beyond the name of the
source:

> I understand that, if the Government cannot get
> testimony from me about the identity of my confidential
> source(s), the Government may seek testimony from me
> about the details of my conversations with my
> confidential source(s) (without actually asking me the
> name(s) of my source(s)). I cannot provide this
> testimony to the Government either. The agreement I
> have reached with my confidential source(s) for Chapter
> 9 of my book, State of War, does not merely cover the
> name of the source(s). Rather, I understand my
> agreement(s) to require me not to reveal any
> information that would enable someone to identify my
> confidential source(s). . . .

> I have never heard of any confidentiality agreement
> made by a journalist that merely requires the
> journalist not to name his or her source. Such an
> agreement would be of little value to a source or
> potential source. If a journalist were to withhold a
> source's name but provide enough information to
> authorities to identify the source, the promise of
> confidentiality would provide little meaningful
> protection to a source or potential source.

Risen Aff. ¶¶ 54-55.

The government's narrow view of the scope of Risen's
confidentiality agreement is incorrect. Courts have long held
that the reporter's privilege is not narrowly limited to
protecting the reporter from disclosing the names of confidential
sources, but also extends to information that could lead to the
discovery of a source's identity. See, e.g., Miller v.

Mecklenburg Cnty., 602 F. Supp. 675, 679 (W.D.N.C. 1985)
(recognizing "a qualified privilege under the First Amendment for
the reporter both against revealing the identity of confidential
sources and against revealing material that is supplied to the
reporter by such confidential source.") (emphasis in original);
Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League, 89
F.R.D. 489, 491 (C.D. Cal. 1981) (quashing subpoena to reporters
for "any and all notes, file memoranda, tape recordings or other
materials reflecting" conversations with listed individuals);
Loadholtz v. Fields, 389 F. Supp. 1299, 1303 (M.D. Fla. 1975)
("The compelled production of a reporter's resource materials is
equally as invidious as the compelled disclosure of his
confidential informants.").  Risen's testimony about his
reporting, including the time and location of his contacts with
his confidential source(s), is protected by the qualified
reporter's privilege because that testimony could help the
government establish the identity of Risen's source(s) by adding
or eliminating suspects.

Having found that the qualified reporter's privilege
applies, the Court must conduct the three-part LaRouche balancing
test to determine whether Risen can be compelled to testify about
his source(s) for Chapter 9.

C.    Authentication of Risen's reporting

     The government seeks "to elicit testimony from Risen that

the book offered into evidence is in fact the book that he

authored."  Mot. in Limine at 23 (emphasis in original).  Risen

concedes that he is willing to provide authentication testimony,

subject to a protective order limiting the testimony to

confirmation:

     (1) that he wrote a particular newspaper article or
     chapter of a book; (2) that a particular newspaper
     article or book chapter that he wrote is accurate; (3)
     that statements referred to in his newspaper article or
     book chapter as being made by an unnamed source were in
     fact made to him by an unnamed source; and (4) that
     statements referred to in his newspaper article or book
     chapter as being made by an identified source were in
     fact made by that identified source.

Mot. to Quash at 45-46.  Risen's agreement to authenticate his

newspaper articles and book provides significant evidence to the

government.  Most importantly, Risen will testify that statements

referred to in the March 2, 2002 newspaper article as being made

by Sterling were in fact made by Sterling.  Risen, therefore,

will testify before the jury that he interviewed Sterling for

that newspaper article.  Although this is not a direct admission

that Sterling was a source for Chapter 9, it provides direct

evidence of Risen's contacts with Sterling.

D.    Application of the LaRouche balancing test to the subpoena
for Risen's testimony about his reporting and confidential
source(s)

     The remainder of the subpoena seeks Risen's testimony about:

1) who disclosed national security information to him, 2) where
and when the national security information was disclosed to him,
and 3) information about Risen's relationship with Sterling
before 2003. Mot. in Limine at 18-23.

### 1. Relevance

It is undisputed that testimony about the source of the
classified information is relevant in a criminal case that
charges Sterling with unauthorized disclosure of that
information.  Moreover, Risen does not dispute that testimony
about the venue and timing of the disclosure is relevant to the
government's case.  Therefore, the first LaRouche factor weighs
in favor of enforcing the trial subpoena.

### 2.  Availability of information by alternative means

The second prong of the LaRouche test requires the Court to
consider "whether the information can be obtained by alternative
means."  The government argues that the information is
unavailable by alternative means because "[n]o other person can
provide eyewitness testimony that directly, as opposed to
circumstantially, identifies Sterling as the individual who
disclosed the national defense information concerning Classified
Program No. 1 and Human Asset No. 1 to Risen."  Mot. in Limine at
24-25.  This argument fails because nowhere in LaRouche or any
other reporter's privilege opinion cited by either party is the
analysis of "alternative means" restricted to comparing direct to

22

circumstantial evidence.  As the standard jury instructions and case law establish, "circumstantial evidence is no less probative than direct evidence."  <u>Stamper v. Muncie</u>, 944 F.2d 170, 174 (4th Cir. 1991).  The government has not stated whether it has nontestimonial direct evidence, such as email messages or recordings of telephone calls in which Sterling discloses classified information to Risen; nor has it proffered in this proceeding the circumstantial evidence it has developed.

The government also argues that it "has exhausted its attempts to obtain the information from Risen" and that "it is self-evident that, in a leak case such as this one, Risen is the only source for the information that the Government seeks."  Gov. Response at 22 and 22, n. 11.  This argument clearly misstates the evidence in the record, which as described in Section I-C, <u>infra</u>, includes numerous telephone records, email messages, computer files, and testimony that strongly indicates that Sterling was Risen's source.  Indeed, in its Motion in Limine, the government acknowledges that if Risen does not testify, the government "will rely on the numerous telephone calls between Risen and Sterling's home in Herndon, Virginia in February and March 2003 – immediately before Mr. Risen made it known to the CIA that he possessed information about Classified Program No. 1 – in order to prove venue[.]" Mot. in Limine at 25, n. 14.

In addition to the documentary evidence, the government has the testimony of the former intelligence official with whom Risen consulted on his stories.  The former intelligence official testified before the grand jury that Risen told him that Sterling was his source for information about the classified operation. Such testimony at trial would provide exactly what the government seeks to obtain from its subpoena: an admission that Sterling was Risen's source for the classified information in Chapter 9.

The government briefly argues that the former government intelligence official's testimony would be inadmissible because it is hearsay, although the government does not elaborate on its reasons for this conclusion.  Response to Mot. to Quash at 26. Contrary to the government's view of inadmissibility, any statements by Risen to a third party that Sterling was his source would be admissible hearsay under Fed. R. Evid. 804(b)(3) as a statement against interest.  "A statement is admissible under this exception if: (1) the speaker is unavailable; (2) the statement is actually adverse to the speaker's penal interest; and (3) corroborating circumstances clearly indicate the trustworthiness of the statement."  <u>United States v. Smith</u>, 383 Fed. Appx. 355, 356 (4th Cir. 2010)(internal quotation marks omitted).  Risen would be unavailable if the Court finds that the reporter's privilege prevents the government from eliciting his testimony, or he refuses to testify even if the privilege were

denied and he was ordered to testify.  Risen's statements are
adverse to his penal interest because receiving classified
information without proper authorization is a federal felony
under 18 U.S.C. 793(e); <u>see</u> U.S. Sentencing Guidelines Manual §
2M3.3 (providing a base offense level 29 for convictions for the
"Unauthorized Receipt of Classified Information.").[6]  The
corroborating circumstances, including the emails and phone
records discussed above, indicate the trustworthiness of Risen's
statement to that official that Sterling was his source.
Therefore, the former government official's testimony about
Risen's comments would not be excluded as hearsay.

Nor would such testimony violate the Sixth Amendment's
Confrontation Clause under <u>Crawford v. Washington</u>, 541 U.S. 36,
59 (2004), which has limited the use of hearsay in criminal
trials.  Whether hearsay is admissible depends on whether it is
characterized as "testimonial."  The Court left "for another day
any effort to spell out a comprehensive definition of
'testimonial,'" <u>id.</u> at 68, but it held that at minimum, the term
covers police interrogations and prior testimony at a preliminary
hearing, before a grand jury, or at a former trial.  The Court
described the "core class of 'testimonial statements'":

> [1] ex parte in-court testimony or its functional
> equivalent--that is, material such as affidavits,

_____

[6]The government clearly recognizes Risen's potential
exposure to criminal liability and has offered to obtain an order
of immunity for him.

custodial examinations, prior testimony that the
defendant was unable to cross-examine, or similar
pretrial statements that declarants would reasonably
expect to be used prosecutorially, [2] extrajudicial
statements . . . contained in formalized testimonial
materials, such as affidavits, depositions, prior
testimony, or confessions, [and] [3] statements that
were made under circumstances which would lead an
objective witness reasonably to believe that the
statement would be available for use at a later trial.

Id. at 51-52 (citations and quotations omitted).

Risen's statements to this official do not fit any of the

categories that would qualify them as "testimonial."  The Fourth

Circuit has held that the test for determining whether statements

fall into the third general category of testimonial statements is

"whether the declarant would have expected or intended to 'bear

witness' against another in a later proceeding."  United States

v. Udeozor, 515 F.3d 260, 268 (4th Cir. 2008) (holding that

recorded telephone conversations in which defendant's unavailable

co-conspirator admitted to bringing a victim to the United States

illegally was not testimonial because the co-conspirator "did not

expect that his statements would be used prosecutorially"); see

also United States v. Jordan, 509 F.3d 191, 201 (4th Cir. 2007)

("To our knowledge, no court has extended Crawford to statements

made by a declarant to friends or associates."); United States v.

Blackwell, 2011 U.S. App. LEXIS 13512 (4th Cir. June 29, 2011)

("A statement unwittingly made to a confidential informant and

recorded by the government is not 'testimonial' for Confrontation

Clause purposes.") (quoting United States v. Watson, 525 F.3d

26

583, 589 (7th Cir. 2008)). Whether a statement is "testimonial" for Confrontation Clause purposes, therefore, turns on the purpose of the statement. In this case, Risen made the comments in the course of his reporting. Given Risen's rigorous invocation of the reporter's privilege, it strains credulity to find that a journalist would ever reasonably expect that his efforts to verify the veracity of a confidential source would be used in court against that source in a criminal trial. Under these facts, Risen's statements to the former government official cannot be deemed testimonial, and therefore the Confrontation Clause does not bar admission of the former official's testimony at trial.[7]

The government also claims that hearsay rules and the spousal privilege would prevent the admission of testimony from the witness who testified before the grand jury that Sterling told her about his plans to meet with "Jim," who had written an article about Sterling's discrimination case and that Sterling commented about Chapter 9 when they saw State of War in the bookstore, Resp. to Mot. to Quash at 26. Of course, these statements by the defendant are a party admission under Fed. R.

---

[7]Neither Risen, the government, nor Sterling has argued that the former government official can claim a privilege, and the former official has already testified before the grand jury without invoking a privilege. Although the reporter's privilege protects a journalist from testifying about his sources, no court has ever held that the privilege protects a source from testifying about the journalist.

Evidence 801(d) and are not hearsay.  Although the government
argues that the spousal privilege would prevent this witness from
testifying, nothing in the record indicates that Sterling and the
witness are married now or were married during the time of
Sterling's alleged statements.  If this witness is currently
married to Sterling, and if she were to assert the spousal
testimonial privilege, then her testimony will be unavailable to
the government.  See Trammel v. United States, 445 U.S. 40, 53
(1980) (only the witness-spouse can assert the spousal
privilege).

Had the government provided the Court with a summary of its
trial evidence, and that summary contained holes that could only
be filled with Risen's testimony, the Court would have had a
basis upon which to enforce the subpoena.  The government has not
provided such a summary, relying instead on the mere allegation
that Risen provides the only direct testimony about the source of
the classified information in Chapter 9.  That allegation is
insufficient to establish that compelling evidence of the source
for Chapter 9 is unavailable from means other than Risen's
testimony.  The information provided to the Court during the
grand jury proceeding, particularly the testimony of the former
government intelligence official, provides the exact same
information that the government is seeking in the subpoena:
Risen's statement about the identity of his source for Chapter 9.

Therefore, the second LaRouche factor weighs heavily in favor of quashing the subpoena.

### 3.   Compelling interest

Under the third LaRouche factor, the Court must consider whether there is a compelling interest in obtaining the information.   See Church of Scientology Int'l v. Daniels, 992 F.2d 1329, 1335 (4th Cir. 1993) (affirming the denial of a request to compel a reporter to produce his notes, tapes, and draft articles because the information sought by the plaintiff was "questionable, rather than critical to the case, as the law requires");   In re Petroleum Products Antitrust Litig., 680 F.2d 5, 7 (2d Cir. 1982) (stating that compelled disclosure of confidential sources is required only upon a "clear and specific" showing that the information is "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources."); Miller v. Transamerican Press, Inc., 621 F.2d 721, modified, 628 F.2d 932 (5th Cir. 1980) (finding that "knowledge of the identity of the informant is necessary to proper preparation and presentation of the case").

The government attempts to avoid the reasoning in these cases by arguing that such analysis applies only to civil actions, not criminal cases.   Resp. to Mot. to Quash at 21-22. This argument fails because the case law does not distinguish

29

between civil actions and criminal cases. Accordingly, for a compelling interest to exist, the information must be necessary or, at the very least, critical to the litigation at issue.

The government argues that the government's burden of establishing Sterling's guilt beyond a reasonable doubt creates a compelling interest in obtaining Risen's testimony. Mot. in Limine at 26. To be sure, in the Grand Jury Opinion, this Court stated that the government's interest in the enforcement of a trial subpoena might be more compelling than in the grand jury context, where the burden of proof is probable cause, a much lower evidentiary standard. Grand Jury Opinion at 34-35. The government, however, in specifying the compelling interest, has not pleaded that Risen's testimony is necessary or critical to proving Sterling's guilt beyond a reasonable doubt; instead, it has argued that Risen's testimony will "simplify the trial and clarify matters for the jury" and "allow for an efficient presentation of the Government's case." Mot. in Limine at 5. An efficient and simpler trial is neither necessary nor critical to demonstrating Sterling's guilt beyond a reasonable doubt. If making the trial more efficient or simpler were sufficient to satisfy the LaRouche compelling interest factor, there would hardly be a qualified reporter's privilege. Having failed to establish a compelling interest in Risen's testimony, the

government does not prevail on the third element of the LaRouche test.

Balancing the three LaRouche factors, those aspects of the subpoena addressing the identity of Risen's source(s) will be quashed because the government has failed to demonstrate that the equivalent information is unavailable from other sources and that there is a compelling interest in Risen's testimony.

### III.    Conclusion

The Fourth Circuit recognizes a qualified reporter's privilege, which is not limited only to civil actions.  When a reporter invokes the privilege, the Court must balance the reporter's need to protect his or her sources against the legitimate need of prosecutors or civil litigants for the journalist's testimony to establish their case.

Rather than explaining why the government's need for Risen's testimony outweighs the qualified reporter's privilege, the government devotes most of its energy to arguing that the reporter's privilege does not exist in criminal proceedings that are brought in good faith.  Fourth Circuit precedent does not support that position.  Moreover, the government has not summarized the extensive evidence that it already has collected through alternative means.  Nor has the government established that Risen's testimony is necessary or critical to proving Sterling's guilt beyond a reasonable doubt.  A criminal trial

31

subpoena is not a free pass for the government to rifle through a reporter's notebook. The government must establish that there is a compelling interest for the journalist's testimony, and that there are no other means for obtaining the equivalent of that testimony. Under the specific facts of this case, as discussed above, the government has evidence equivalent to Risen's testimony. Accordingly, the Government's Motion in Limine to Admit the Testimony of James Risen [Dkt. No. 105] and the Motion of James Risen to Quash Subpoena and/or for Protective Order [Dkt. No. 115] will be granted in part and denied in part, and Risen will be required to provide testimony limited to confirming the following topics: (1) that Risen wrote a particular newspaper article or chapter of a book; (2) that a particular newspaper article or book chapter that Risen wrote is accurate; (3) that statements referred to in Risen's newspaper article or book chapter as being made by an unnamed source were in fact made to Risen by an unnamed source; and (4) that statements referred to in Risen's newspaper article or book chapter as being made by an identified source were in fact made by that identified source.

    Entered this 29th day of July, 2011.

Alexandria, Virginia

/s/ _____

**Leonie M. Brinkema**
**United States District Judge**

32