# UNCLASSIFIED // REDACTED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

Filed with Classified
Information Security Officer

CISO _____

Date _____
8/29/11

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| vs. | ) |
| | ) |
| **JEFFREY ALEXANDER STERLING,** | ) |
| | ) |
| **Defendant.** | ) |

Case No. 1:10-cr-00485-LMB

## NOTICE BY JEFFREY A. STERLING OF INTENT TO USE EXPERT TESTIMONY AND TO DISCLOSE CLASSIFIED INFORMATION

**COMES NOW** Jeffrey A. Sterling, by counsel, and pursuant to Rule 16(b)(C) of the Federal Rules of Criminal Procedure, hereby gives Notice of the defendant's intent to use expert testimony. The defense will present opinion evidence at trial concerning the subjects set forth in the enclosed reports which set forth the witness' opinions, the bases and reasons for those opinions, and the witness' qualification.

    1.    David Manners
        Address, Qualifications and Contact Information known to the
        United States.

    A summary of Mr. Manners' opinion is attached hereto.

    2.    W. Patrick Lang
        14 West Rosemont Avenue
        Alexandria, Virginia 22301

        Report and CV attached as a classified exhibit. The defense
        hereby gives notice of its intent to disclose all of the classified
        information set forth in Mr. Lang's report pursuant to CIPA § 5(a)
        and demands reciprocal discovery as required by CIPA § 6(f).

The defendant reserves the right to supplement, amend, or alter these disclosures.

# UNCLASSIFIED // REDACTED

JEFFREY A. STERLING
By Counsel

_____
Edward B. MacMahon, Jr.
VSB No. 25432
Law Office of Edward B. MacMahon, Jr.
P.O. Box 25
107 East Washington Street
Middleburg, VA   20118
(540) 687-3902
(540) 687-6366
ebmjr@verizon.net

_____
Barry J. Pollack (admitted *pro hac vice*)
Miller & Chevalier Chartered
655 Fifteenth St. N.W. Suite 900
Washington, DC 20005
(202) 626-5830
(202) 626-5801 (facsimile)
bpollack@milchev.com

*Counsel for Defendant Jeffrey A. Sterling*

## CERTIFICATE OF SERVICE

I hereby certify that on August the 29th, 2011, I delivered an original of the

following Notice by Jeffrey Sterling of Intent to Use Expert Testimony with attachments

in support to the CISO as directed by the Classified Information Protective Order issued

in this case.

By: _____

Edward B. MacMahon, Jr. (VSB #25432)

*Counsel for Jeffrey A. Sterling*

TOP SECRET/

# Declaration of Colonel Walter Patrick Lang

I, Walter Patrick Lang, have been retained by defense counsel in the case of *United States v. Jeffrey A. Sterling*, 1:10-CR-485, to provide my opinion based on my experience and training as a Defense Department (Defense Intelligence Agency) intelligence expert as to whether there is any National Defense Information set forth in Chapter 9 of State of War, a book written by James Risen and published in 2006. It is my understanding that Mr. Sterling stands accused of providing national defense information to Mr. Risen. To reach my opinion, I have read Chapter 9 of State of War and numerous materials provided to me in the SCIF in the Alexandria, Virginia Courthouse. My opinion is set forth below and is summarized as follows:

1.    SUMMARY OF OPINION

Having read James Risen's book State of War specifically, Chapter 9, titled "A Rogue Operation", and having reviewed all the materials listed below and having the intelligence experience and qualifications described below, it is my opinion that United States national security was not damaged by the information revealed in Chapter 9 of State of War and that the CIA itself was responsible for many compromises of national security in the supposed covert operation described in Chapter 9 of State of War. It is my opinion that the only potential damage suffered in the U.S. Government as a result of the publication of Chapter 9 of State of War is to the reputation of the CIA as intelligence organization. It is my opinion that no foreign government, specifically Iran, gained any benefit whatsoever arising from the publication of Chapter 9 of State of War. The bases for these opinions as well as my qualification to offer this opinion are set forth below.

TOP SECRET

**TOP SECRET/** [                    ]

## 2.   QUALIFICATIONS AS A DEFENSE INTELLIGENCE EXPERT

I am a retired colonel of the United States Army and am also retired from the Senior Executive Service (SES) of the Defense Intelligence Agency (DIA). During my service as a Senior Executive I was awarded the "Presidential Rank of Distinguished Executive." In the U.S. Army I served in the infantry, Special Forces (Green Berets), and military intelligence.

I am fluent in the Arabic and French languages and was the first professor of the Arabic language at the United States Military Academy at West Point, New York. I hold a Master of Arts degree from the University of Utah in Middle East studies. My major field for that degree was Arabic language literature.

In DIA, I was the "Defense Intelligence Officer for the Middle East, South Asia and Counterterrorism" (DIO) for eight years. As such, I was the chief substantive officer in the agency for all intelligence work in the field and in Washington for my area of responsibility. Before my retirement from the Army I was "Defense and Army Attaché" in Yemen and later in Saudi Arabia.

In the last several years of my government service (34 years in all), I was head of all Department of Defense HUMINT operations world-wide. In that capacity I commanded all overt and clandestine HUMINT forces in the Department of Defense. I am an experienced and qualified clandestine operations case officer, and I have been decorated twice [                                        ] for the recruitment of foreign agents [                    ]. I also recruited many foreign agents for the Department of Defense during the period of my service. In government service I traveled extensively and lived in or visited every country in the Middle East.

## 3.   MATERIALS REVIEWED TO FORM AN EXPERT OPINION

In preparing for my opinion testimony I reviewed the following documents:

FBI 302s
-   Rice, Condoleezza (F00271-275)

**TOP SECRET/** [                    ]                                      2

**TOP SECRET/**

- W☐☐☐ (F00228-234)
- Y___, ☐☐☐ (F00236-239)
- N___, ☐☐ (F00156-161)
- N☐☐ (F00098-103)
- Perez, Anna (F00309-311)
- R___☐ (F00166-171)
- S___, ☐ (F00216-218)
- W___☐ (F00325-326)
- Anton, Michael (F00261)
- B___,☐ (F00002-5)
- C☐ (F00007-8)
- D___,☐ (F00020-22)
- E___,☐ (F00024-25);(F00291-292)
- F___,☐ (F00042-45);(F00033-40)
- G___,☐ (F00055-59)
- G___, ☐ (F00051-53)
- H☐ (F00296-301);(F00067-69);(F00241-44)
- I☐ (F00083-85)
- M___, ☐ (F00105-108)
- S☐ (F00194-211);(F00315-320);(F00184-185);(F00213-14);(F00187-192)
- ☐ (F00136-144);(F00124-131);(F00120-122);(F00133-134)

Misc

- Declaration/Affidavit of Elizabeth Ann Culver
- S00076-77 (SSCI memo by Don Stone memorializing Sterling meeting)
- Q02343-48 (Sterling file review)
- ☐ National Labs docs (Q02352-2361)
- Prelim talking points for ☐ pitching ☐ operation (Q02362-68)

Exhibits Identified by the Government[1]

- Proposed Exhibit Number:
  - Exhibits #1-48
  - #50-69
  - #76-78
  - #80
  - #83-84
  - #87
  - #101
  - #103-107
  - 112
  - 121
  - 128-132
  - 134-35

CIA Cables

---

[1] The defense seeks to disclose the unredacted copies of all of these exhibits.

**TOP SECRET/**

- C02217-02870
- C02095-96
- C02146-48
- C02150-51
- C02153-54
- C02199-00
- C02202-03
- C02205-07
- C02212-13
- C02872-2877

4.       THE INTELLIGENCE PROCESS

The process of producing "finished intelligence" for government use is often described in the press as "intelligence gathering." This implies a simple search for many pieces of individual information which, when obtained, are given more or less equal weight in government decision making. In fact, the "intelligence process" consists of a more or less perpetual cycle of: Collection, Collation, Analysis, Dissemination, Evaluation and Re-tasking for further collection. I have written a book on intelligence that touches on this subject. (Intelligence: The Human Factor, Chelsea Books (2005)).

In order to form and express an opinion about the matters discussed herein, it is necessary to understand and explain the intelligence process so that a proper evaluation of any harm to the United States or benefit to our enemies can be evaluated.

Collection: Based on decision maker generated requirements, tasking is sent to appropriate activities asking them to search for information pertinent to government priority information goals. The collection activities may be as diverse as the CIA (for HUMINT collection), NSA (for SIGINT searches on enemy communications), military intelligence (for collection from prisoners or the reports of combat units in action), the Department of State (from embassies or consulates), etc. Once information is found, it is sent to the requesting agency as well as to many other analytic or decision making organizations that may have an interest in the subject.

**TOP SECRET**                                                                                 4

**TOP SECRET/** [_____]

Collation: After the "raw" (unevaluated) information arrives at the analytic group concerned, it is grouped into collections of "like" data concerning the same requests so that the various "raw" (unevaluated) items can be effectively compared.

Analysis: The information is then subjected to "testing" by skilled and experienced scholars (referred to in the intelligence community as "analysts"). After comparing all the available "raw" information, and on the basis of a preponderance of probabilities, the analysts reach a decision as to what the truth of the matter is likely to be with regard to the question originally asked by the tasking authority. In making that decision the analyst employs not only the newly collected information, but also all the other information available on the subject in the files of the various agencies of the intelligence community (CIA, DIA, State INR, Army, etc). These files are normally available electronically to the community of analysts that work on particular problems (Terrorism, Nonproliferation, HIV/AIDS, etc.). A by-product of this research is a judgment as to the value of the various sources that have contributed to the process. This is an important matter for consideration in making further judgments in the future. Clearly the level of skill and experience of the particular analysts plays a major role in this process.

Dissemination: The analyzed information is then sent (disseminated or "published") to the consumer (decision maker), not as raw (unevaluated) information from the field, but rather as the considered, evaluated judgment (finished intelligence) of the particular intelligence agency on the subject under consideration.

Evaluation: At the consuming office, department or headquarters, the original requester decides if the disseminated product satisfies the need that caused the original tasking.

Re-tasking: If the requirement is not satisfied, then further tasking is sent to collection activities. This cycle is endless.

5.   [_____]

**TOP SECRET/** [_____]

**TOP SECRET/**

6.   **LEGAL STANDARD FOR NATIONAL SECURITY INFORMATION**

In order for the Government to sustain its burden on each of these Counts, it must prove beyond a

reasonable doubt that the information that Mr. Sterling allegedly either disclosed or retained, was closely held

by the government and that the disclosure of the information would be damaging to national security.  The

Government must also prove beyond a reasonable doubt that the person who allegedly received the National

Defense Information was not authorized to receive it and that the defendant had reason to believe that the

information disclosed could be used to the injury of the United States or to the aid of a foreign nation and that

such injuries or aid was intended.  United States v. Rosen, 520 F. Supp. 2d 786, 792 (E.D. Va. 2007); see also

United States v. Morison, 844 F.2d 1057, 1071-1072 (4th Cir. 1988).   Information that is merely embarrassing

to government officials who approved or participated in such programs is not national security information.

Morison, 844 F.2d at 1085 (Phillips, J. concurring). For the purpose of this opinion, I assume that the

information at issue was closely held and that Mr. Risen was not authorized to receive the information.  It is my

**TOP SECRET/**                                                                                                     6

TOP SECRET

opinion that the information disclosed caused no injury to the United States and did not aide any foreign nation

or enemy of the United States.

7.   THE "MATTER" OF THE IRANIAN NUCLEAR WEAPONS PROGRAM AS DESCRIBED IN STATE OF
     WAR AND IN DISCOVERY

The [                    ] operation was conducted for the purpose of [

] (Bates

No. Q02367.)

. (Bates

No. Q02368.)

(Bates No. Q02368.)

TOP SECRET/‖[                    ]

[                                                        ]

[                              ] (Bates No. Q02116)

My conclusion is that the Iranians either: 1) had no weapons program in 2000; 2) quickly detected the

[        ] flaws; or 3) were so deeply suspicious of the manner of its delivery that they decided to ignore it. [        ]

[                                                    ]

[                    ] It follows logically from this failure of accomplishment that the [        ] project and

document were early on dismissed by the Iranians as inconsequential or malicious. Therefore, the revelation in

State of War of the U.S. government origin of this ineffective project would not have been an advantage to the

Iranian government or damaging to the interests of the U.S. (Bates No. Q02116.)

I have not been given access to DIA or CIA analysis of the Iranian nuclear program which is necessary

for a complete opinion. I do know that in November, 2007, the United States National Intelligence Council

(NIC) published a "National Intelligence Estimate" (NIE) on Iran. Such a document constitutes the official

U.S. Government truth with regard to a given subject, in this case, Iran. Such a document is the collective

opinion of the entire United States Intelligence Community published to all key decision makers. Unclassified

"Key Judgments" were released to the general public. Among them:

· "We judge with high confidence that in fall, 2003, Tehran halted its nuclear weapons program; we also

assess with moderate-to high confidence that Tehran at a minimum is keeping open the option to

develop nuclear weapons..."

· "We judge with confidence that the halt lasted at least several years."

· "We assess with high confidence that Tehran had not restarted its nuclear weapons program as of mid-

2007."

These key judgments have never been rescinded, superseded or cancelled. In 2010 and 2011, the NIC

developed and published to a very select and small distribution list an update to the 2007 Iran NIE. This

TOP SECRET/‖[                    ]                                  8

**TOP SECRET//**

document has not been released in any form to the public, but on 10 March, 2011, James Clapper, the Director

of National Intelligence (DNI) of the United States appeared before the U.S. Senate Armed Services

Committee. As DNI he is the superior and chief of the NIC the organization that produces NIEs.

From his testimony on 10 March, 2011:

"We continue to assess Iran is keeping open the option to develop nuclear weapons in part by developing

various nuclear capabilities that better position it to produce such weapons, should it choose to do so. We do

not know, however, if Iran will eventually decide to build nuclear weapons"

In my opinion this statement clearly implies that it is the official opinion of the U.S. Intelligence

community that Iran does not have nuclear weapons or an ongoing nuclear weapons program.


Chairman Levin responded,

"Now, relative to Iran, Director Clapper, you mentioned in your statement that you do not, we do not know,

talking about the Intelligence Community, if Iran will eventually decide to build nuclear weapons. I read into

that that Iran has not made a decision as of this point to restart its nuclear weapons program. Is that correct?"


Clapper responded to Levin,

"Yes, sir…"


Even without access to the 2011 revision to the 2007 Iran NIE, it is clear from Clapper's testimony that

it is the official position of the United States Government that there has been no Iranian nuclear weapons

program since fall of 2003. Without all of the information that has been requested by counsel at my direction,

this opinion cannot be stated with reasonable certainty at this time.

This, coupled with all that is known, or rather, not known of any effect of Operation[⁣⁣⁣⁣⁣⁣] and the

[⁣⁣⁣⁣⁣⁣] indicates that the disclosures supposedly made in Chapter 9 of State of War, had no

**TOP SECRET**

9

TOP SECRET/ [REDACTED]

damaging effect on the interests of the U.S. since [REDACTED]

(Bates No. Q02116) and the Iranian weapons program was halted in late 2003 for reason described by the 2007

NIE as indicating that "Tehran's decisions are guided by a cost-benefit approach…"

8.   DISCLOSURE OF [REDACTED]

Risen's Chapter 9 does not disclose the [REDACTED] of the CIA asset who delivered the [REDACTED]

materials in [REDACTED]

[REDACTED] Nevertheless, it

may be claimed that as a result of the publication of State of War, the [REDACTED] may have been

revealed.

In fact, the CIA [REDACTED]

[REDACTED]

(Bates No. C02929) [REDACTED]

[REDACTED]

[REDACTED] (Bates No. C03000)

[REDACTED]

[REDACTED] (Bates

No. Q02277)

9.   DESTRUCTION OF THE USEFULNESS OF THE "DELIVERY" ASSET.

TOP SECRET [REDACTED]                                                  10

TOP SECRET/

It is a likely claim by the government that disclosures in Chapter 9 of <u>State of War</u> destroyed the

usefulness of the asset to the CIA

It is demonstrable that the CIA did not think that was true.  In C02776, a CIA

reporting cable

Any country's intelligence operations are the most difficult of targets to penetrate or interact with

because these operations are conducted by trained and experienced operatives who are the people the most

likely to detect something "amiss."  In the words of a CIA cable's author,

not the material in Chapter 9 of <u>State of War</u>.   Furthermore on 7 July,

2006, in C02779,

The book, <u>State of War</u>, was published and

released in January, 2006 and these two cables were written based on meetings with the asset that took place in

TOP SECRET/

11

TOP SECRET/ [                    ]

**10.    EXPOSURE OF "UNIQUE"** [                    ]

Bates Nos. Q02365-67 are CIA papers done in preparation for briefing meetings with staff at the

[                                                                            ]

**11.    LACK OF PROFESSIONALISM IN** [            ] **TRADECRAFT**

Bates No. F00190, dated 26 June 2003, (an FBI 302 report) as well as other government exhibits that are

CIA operational reports, makes it clear that the level of professionalism of the tradecraft employed against the

[                    ] was quite low:  Chapter 9 of State of War tells a sad and disappointing story of the way the

[                    ] operation was planned and conducted and government exhibits, such as. Bates No. F00190 fill out

blank "spots" in the picture to make the story of how CIA conducted operation [            ] embarrassingly

clear.

1.   In the beginning of the [            ] operation when the planning was not clearly formulated, [            ]

[                                                                        ]

[                                        ] (Bates Nos. Q02277 & C02147.) [                    ]

[                                                    ] (Bates Nos. Q02152,

Q02162.) [                                                    ]

[                                                                ]

TOP SECRET [                                        ]          12

**TOP SECRET/**

in Bates No. C03000.

This poor practice on CIA's part makes a mockery of any contention that the

by Chapter 9 of State of War.  In fact the CIA had

deliberately.

2.  Bates No. F00190

3.

TOP SECRET/ [redacted]

[redacted] was an easily

avoidable risk and the exposure of this and other operational errors in Chapter 9 of <u>State of War</u> is and

should be an embarrassment for the CIA.

4. In my opinion, a sound operational approach to the [redacted]

[redacted]

could have been timed for maximum chance of success.  Apparently, that was not done.  This is yet

another instance in which Chapter 9 of <u>State of War</u> exposes the CIA to ridicule as having made a poor

plan and then having poorly executed it.


SUMMARY

It is clear from my review of Chapter 9 of <u>State of War</u> that publication of this chapter did not "damage

national security" for the following reasons:

1. [redacted] was judged by the U.S. Government to be useless to [redacted]

[redacted] (Bates Nos. Q02365, Q02367, Q02368.)

2. There is no evidence that indicates that the [redacted]

[redacted] (Bates No. Q02116.)  Indeed, it is the opinion of the

U.S. Government that after fall, 2003 the Iranians did not have a nuclear weapons program. (NIE on

Iran, 2007.)

3. [redacted]

[redacted] (Bates No. Q02367) in other words, nothing very "exotic" or unusual. [redacted]

[redacted]

[redacted] that in my opinion, it is inconceivable that CIA would have abandoned that [redacted] because of

the mere mention of something similar in Chapter 9 of <u>State of War</u>.

TOP SECRET// [redacted]                                                      14

TOP SECRET//

4. It has been suggested that the mention of the use of "foreign agents" and the existence of liaison relationships in Chapter 9 of State of War might have had a "chilling" effect on the ability of the CIA to recruit agents for their work or one the willingness of foreign governments and agencies to cooperate with the U.S. in intelligence matters. Neither of these things is true. In my opinion and experience, recruitment of foreign agents is an intensely personal and individual activity in which the rapport between the recruiting operative and the prospective agent are the key ingredients, not the prospective agent's impression of news stories involving disclosures of intelligence activity.

5. Similarly, foreign governments enter into liaison relations with the United States because the U.S.A. is the most powerful and influential country in the world and it possesses resources in the intelligence business that are possessed by no other country. The United States can provide kinds and quality in information available from no other country. Foreign intelligence agencies all need that assistance and are eager to get it. They are unlikely to be deterred from future liaison information by anything in Chapter 9 of State of War.

CONCLUSION

It is my conclusion that national security was not damaged by the material in Chapter 9 of State of War, and that the only substantial damage done was to the reputation of the CIA as a professional and adroit intelligence service. The definition of leaks of information that are damaging to national security does not include disclosures or leaks that are merely revealing of administrative ineptitude or that are embarrassing to government organizations. In my opinion the Chapter 9 "leaks" are merely embarrassing to the CIA.

TOP SECRET

15

Revised CV and event List

W. Patrick Lang

Objective
To inform of personal background involving expertise in; the Middle East, South Asia, and Islam; unconventional warfare, counterinsurgency and counter guerilla operations, Special Forces., clandestine and overt HUMINT intelligence collection operations and executive management of same, expert instructor and college level professor.

Employment

·INDEPENDENT CONSULTANT
September, 2001 ·
Expert resource available to Industrial, news, security, and international business, and brokerage firms in threat analysis, risk analysis, strategic planning, negotiations with governments and non-governmental entities in Muslim countries. Expert trainer of U.S. and other personnel in requirements of operations in Muslim countries. Strategic military and political intelligence analyst, media consultant for many TV, radio and print productions.

FMS, INCORPORATED.
President, August 1994-2001.
Responsible for the North America centered activities of a privately held European and Middle Eastern based industrial and financial group. Concentrates activities in Business Development, Government, Philanthropic and Political activities and relations of the FM Holdings Group. Also served as President and registered US agent of the Future Millennium Foundation, a non-profit charitable foundation specializing in micro-credit lending for women and vocational training in the building trades as well as computer literacy as well in support to the Peace Process activities of the Council on Foreign Relations in New York City. The foundation concentrated its operations in Lebanon.

DEFENSE INTELLIGENCE AGENCY, U.S. GOVERNMENT
Director, Human intelligence Collection (HUMINT), June 1992-July 1994
In charge of world wide U.S. military collection of information necessary to American strategic and tactical activities. Included world-wide command of all military, naval and air force attaches serving with U.S. diplomatic missions as well as many other collection activities. These collection activities included all the espionage assets of the Department of Defense

DEFENSE INTELLIGENCE AGENCY, U. S. GOVERNMENT
The Defense Intelligence Officer for the Middle East, South Asia and Terrorism, 1985-1992
The chief substantive official (boss) in the Department of Defense for the analysis and dissemination of information regarding the subjects named in position title. Wrote and supervised the writing of all Department of Defense intelligence documents touching on area of expertise. A principal adviser to Secretary of Defense, Chairman of Joint Staff and President of the United States for Middle Eastern Affairs. This period spanned the Iran-Iraq War, the USS Stark incident, intermittent difficulties with Libya and the 1990-1991 Gulf War. The vice-chairman of the Joint Chiefs of Staff Board which investigated the Stark incident. A principal figure in Bob Woodward's book "The Commanders." Briefer for President George H.W. Bush during Operation Desert Storm. Expert briefer.

DEPARTMENT OF DEFENSE, U.S. GOVERNMENT
Defense and Army Attaché, 1979-1985
First in North Yemen and then in Saudi Arabia served as the senior U.S. military officer in the embassy. Position equivalent in rank to Counselor of Embassy.

U. S. ARMY
Professor, United States Military Academy, West Point, New York , 1976-1979
Created all instructional programs in the Arabic Language and Middle East Studies. Taught the resulting courses for three years. Founder of Cadet Arabic Language Club. Initiated program of cadet exchanges with Arab Military Academies. Twice selected as best classroom teacher of the year in the U.S.M.A. faculty. Elected member of Faculty Senate for Department of Foreign Languages.

U.S. ARMY
Service As Commissioned Officer 1962-1988
Originally commissioned in the infantry, served several tours of duty in Special Forces . Served two years in Viet Nam in Special Forces and Military Intelligence. Many decorations for Valor, Distinguished Service and Accomplishments. Qualified and experience military intelligence analyst at the tactical and strategic levels. Clandestine case officer with experience in both counterinsurgency and national strategic arenas.


U.S. ARMY
Born at Fort Devens Massachusetts, 31 May 1940


Education
VIRGINIA MILITARY INSTITUTE
BA, English, 1962
Collegiate Who's Who. Graduated Distinguished in General Merit.

THE UNIVERSITY OF UTAH
MA, Middle East Studies, 1974
International Honors Society of Phi Kappa Phi.

ARMED FORCES STAFF COLLEGE
Joint Staff Officer Course 1974

U.S. ARMY COMMAND AND GENERAL STAFF COLLEGE (non-resident)
General Staff Officer Course 1973

U.S. ARMY WAR COLLEGE, CARLISLE BARRACKS, PENNSYLVANIA (resident)
Senior Officer Course, 1984


Skills & Honors
Speaks, reads and writes Arabic and French.


Retired Regular Army officer (Colonel.)


Retired member of Senior Executive Service of U.S. Civil Service Retired in Grade of SES-4. This is the equivalent of a Lieutenant General.


Holds award of Presidential Rank of Distinguished Executive in the Senior Executive Service. This is the equivalent of a knighthood in the British civil service.


Very widely traveled in the Middle East and North Africa.


Knight Commander of the Equestrian Order of the Holy Sepulcher of Jerusalem. (Papal Honor)


Silver Palm of Jerusalem (Papal Honor)


Member of the Board of Directors of the Harry F. Guggenheim Foundation


Life Member of the Special Forces and Special Operations Association.


Member, Board of Advisors, Department of International Relations and Political Science, Virginia Military Institute, Lexington, Virginia, 2009-


Member, Board of Directors, International Council for Middle East Studies (ICMES), Washington, D.C. 2011

Member, Board of Directors, Middle East Policy Council (MEPC), Washington, D.C. 2011

End Resume.

List of Books, Articles, Symposia, Lectures and Media Events for W. Patrick Lang:

Books:

"Intelligence: The Human Factor," Chelsea House Publishers, Philadelphia, PA, 2004

"The Tribes of the Al-Anbar Governorate," (contributor), DIA, Washington, DC, June 2006.

"The Butcher's Cleaver," Volume I of "Strike the Tent." iUniverse, Lincoln, Nebraska. November, 2007

"Death Piled Hard," Volume 2 of "Strike the Tent." iUniverse, Bloomington, Indiana, April, 2009

Articles:

"Drinking the Koolaid," "Middle East Policy," Middle East Policy Council, Washington, DC 2004

"Wahhabism and Jihad," "America," New York, New York, March 10, 2003

"Speaking Truth to Power," "America," New York, New York, August 4th, 2003

"Jackson's Valley Campaign and the Operational Level of War." "Parameters" Carlisle Barracks PA, Army War College Winter 1985.

"The Best Defense Is..." "Military Review" Command and General Staff College, Ft. Leavenworth, KS August, 1976

"Contemplating the Ifs......" (With Larry C. Johnson) "The National Interest" The Nixon Center, Washington, D.C. Number 83, Spring 2006

"Dear Hearts Across the Seas.." "America," New York, New York, May 29th, 2006

"Al-Qaeda and the Jihadis," "America," New York, New York, September 20th, 2006.

"A Concert of the Greater Middle East," The National Interest Online. Washington, D.C. 28 December, 2006.

"Islam: Monotheistic but not Monolithic." "One." New York, New York, January, 2007.

"What Iraq Tells Us About Ourselves." "Foreign Policy" .com, Washington, D.C. Posted February, 2007.

"Show Russia More Respect." "The Christian Science Monitor" Boston, Massachusetts, 11 June, 2007.

Debate:

Resolved - "The US can never win in Afghanistan," The IQ2 Debate Series, New York University, New York, New York. 6 October, 2009.

Symposia:

"With the Process Dead, What are the Prospects for Peace?" Middle East Policy Council, Washington, DC, March 8th, 2001

"Imperial Dreams," Middle East Policy Council, Washington, DC, October 3rd, 2003

"A Conversation between a Military Strategist and a US Ambassador on Postwar Developments in Iraq." The Miller Center, University of Virginia, Charlottesville, VA, October 31st, 2003

"Al-Qaeda 2.0: Transnational Terrorism After 9/11." New America Foundation, Washington, DC, December 2nd, 2004

"Iraq, Afghanistan and the War on 'Terror,'" Middle East Policy Council, Washington, DC, January 11th, 2005

"The Ethics of Withdrawal From Iraq." Notre Dame University and Fordham University, New York City, 21 March, 2005

"Terrorism and South Asia." Smithsonian Institution and Meridian House, Washington, DC, 24 May, 2005

"Occupied Iraq, One War, Many Insurgencies." Middle East Policy Council, Washington, D.C., June 17th, 2005.

"Iraq, Israel, Iran and the decline of American Influence." Middle East Policy Council, Washington, D.C., January 19th, 2007

"Iraq, Iran and Beyond." The New York University Institute of Law and Security, New York, New York, 24 January, 2007

"Government Secrecy and National Security." The New York University Institute of Law Security, New York, New York, 12 April, 2007

"Annual Symposium on the Middle East." Featured speaker on Saudi Arabia. US Army War College. Carlisle Barracks, Pennsylvania. March 3, 2008.

"America and the Emerging Iraqi Reality, New Goals, No Illusions," a panel on this paper written by Ellen Laipson. The Century Foundation, Washington, DC, 9 June, 2008.

"Torture and American Culture, an Inquiry and Reflection." Panel at the Fordham Center on Religion and Culture. Fordham University, New York, New York. 21 October, 2008

"Torture, Conscience, and the Catholic Moral Tradition," Panel at the Columbus Law School, The Catholic University of America. Washington, D.C. 19 March, 2009

"Today's Military: Its Challenges, Missions, and Future." Panel at "The Center on Law and Security," New York University. New York, New York, 24 April 2009.

"Counterinsurgency: America's Strategic Burden?" Conference panel at "The Center on Law and Security," New York University, New York, New York, 20 November, 2009.

"The Future of Warfare." Conference Panel. "Washington Ideas Forum." Washington, DC 30 September, 2010.

""Cutting the Fuse: Moving Beyond the War on Terror." Panel on Strategy in the Middle East. New America Foundation. Washington, D.C. 13 October, 2010.

Consulting:

Technical Expert on Issues of National Security, Federal Public Defender Office, Portland, Oregon. Federal Public Defender Office for the District of Columbia, the Dechert, and Pitney Day law firms,  August,  2008 to the present.

Subject Matter Expert Consultant, CENTCOM Appraisal Team, USCENTCOM, Ft. McNair, Washington, DC. January-February, 2009

Workshop on "Terrorism - 2025." Johns Hopkins University Applied Physics Laboratory for the National Counterterrorism Center.  Laurel, Maryland, 27-28 January, 2010.

War Games:

"Path to the Future" war game on the future of the Middle East.  Played for SAIC/DNI/NIC, Chantilly, Virginia, 29-31 October 2007.

War Game on Middle East.  (Title Classified) Played for SAIC/NDI/NIC, Tyson's Corner, Virginia, 14-15 December, 2009.

"Israel and US Interests."  Institute for National Strategic Studies, NDU. Washington, DC.  10 January, 2008.

"Iraq Futures."  War game on the future of Iraq.  Played for SAIC/DNI/NIC, Tyson's Corner, Virginia, 29-30 June, 2010.

"The Evolving Nature of Warfare," SAIC/NIC/NDI, Chantilly, Virginia, 7-8 June, 2011.


Hearings:

"National Security Implications of the Disclosure of the Identity of a Covert Intelligence Officer." Joint Committee of the House and Senate. 22 July, 2005, Washington, D.C.

Lectures:

"Area Orientation for Operations in the Islamic World," (keynote speaker on two occasions in 2004) Joint Special Operations University, Hurlbut Air force Base, Florida, 2004.

"Cultural Roots of Jihadism." St. Mary's University at San Antonio and Ft. Hood, Texas, 28 and 30 April, 2005.

"Intelligence in Counterinsurgency," Joint Military Intelligence College. Bolling Air Force Base, Washington, D.C. 13 December, 2005

"Counterinsurgency in Iraq," Joint Military Intelligence College, Bolling Air Force Base, Washington, D.C. 15 December, 2005

"Lebanon, Syria and Palestine,"  A Forum at The Miller Center of Public Affairs, University of Virginia, Charlottesville, Virginia, 11 September, 2006

"Iraqi Politics," and "Islam."  St. Mary's University, San Antonio, Texas, 5 and 6 February, 2007

"Iran's Actions in Iraq."  Center for Naval Analyses (CNA), Alexandria, Virginia, 26 March, 2007

"Insurgency and Counterinsurgency Theory," Human Terrain Team training, Ft. Leavenworth, Kansas, July, 2007.

"The Petraeus/Crocker Report," a forum at the Miller Center of Public Affairs, University of Virginia, Charlottesville, Virginia, 3 October, 2007.

"Foreign Policy Seminar in Islamic Religion." Washington Semester Program, American University, Washington, D.C. 25 February, 2008.

"Islamic Religion and Arab Culture." Master's Degree program in "Homeland Security Management," Joint Program of the Department of Homeland Security and the US Navy Postgraduate School, Monterey, California, March, 2008.

"A Concert of the Middle East." In the Polymath Lecture Series at the University of Oklahoma, Norman Oklahoma, 17 November, 2008.

"A *Tour d'Horizon* of the Middle East," A Forum at The Miller Center of Public Affairs, University of Virginia, Charlottesville, Virginia, 1 November, 2010.

"Practical Realities in Service in the Middle East," Stanford University in Washington, Washington, DC, 17 May, 2011.


Courses Taught:

Senior Crisis Management Seminars, Department of State, Washington, D.C. Continuous seminars beginning in 2006.

"Combating Terrorism," American University, Washington, D.C., Fall, 2006

"Red Team Training for Deployment to Iraq." 18th Airborne Corps, Ft. Bragg, NC. January, 2008.

"Understanding Islam," and "Making Soldiers out of Tribesmen," Human Terrain Team training, Ft. Leavenworth, Kansas, November, 2007, February, April, and May 2008.

Significant Television:

Many appearances on CBS, ABC "Nightline," CNN, Fox News, MSNBC, Australian National Television, German National Television, BBC, CBC, and the "Newshour," among others.

IQ2 Debate on Afghanistan Policy, Rosenkrantz Foundation, New York, New York, 6 October 2009.

Many Radio interviews on a variety of US and overseas networks.

"Torture at Gitmo." " CBS 60 "Minutes," 1 May 2005.


...................................................

For those who are interested in such things, I registered under the "Foreign agent Registration Act" for several years as the Washington representative of a Lebanese industrialist, politician and philanthropist. I did this on advice of counsel because I was this man's employee and he and I both served on the board of advisors of the US Middle East project of the Council on Foreign Relations in New York City. The project sponsored papers which made policy recommendations to the US Government and thus its activities were covered by the FRA law.

In addition I was the Director of the family charitable foundation of the same person. The foundation was involved in microcredit lending and vocational training in Lebanon and support to the Peace Process generally.

I de-registered myself several years ago and if my name appears on the DOJ website it is due entirely to the DOJ's inability to manage their own website. pl

### Declaration of David Manners

Mr. Sterling anticipates that he may elicit expert testimony from David Manners on the subjects of national defense information, CIA tradecraft and CIA sources and methods. Mr. Manners' qualifications to provide this testimony is summarized as follows. Mr. Manners is a graduate of the U.S. Naval Academy in 1976. He was medically discharged in 1977. Mr. Manners was employed by the Defense Intelligence Agency from 1978 to 1980. Mr. Manners was employed with the CIA from 1980 through 1998. Since leaving the CIA, Mr. Manners has been the principal of his own consulting business, which provides support to companies seeking to business in the Middle East and Africa.

Based on Mr. Manners' education, training, work history, skills and experience, as well as his reading of Chapter 9 of the book by James Risen, State of War, Mr. Sterling anticipates that Mr. Manners will offer the opinion that the portion of Chapter 9 relating to "Classified Program No. 1" did not disclose any national defense information that would compromise CIA tradecraft, sources or methods, or its ability to work with foreign intelligence agencies; nor did the publication of this information aid enemies of the United States. In reaching these conclusions, Mr. Manners assumes that everything in Chapter 9 about "Classified Program No. 1" is true. To the extent that some of the information is false, that would only strengthen his opinion that the disclosures did not harm national security.

First, the disclosures in Chapter 9 will not hinder the CIA in recruiting human sources or agents in the future. Chapter 9 did not identify "Human Asset No. 1." However, even if "Human Asset No. 1" had been identified, it would not have hindered the CIA in recruiting future agents. "Human Asset No. 1" was not a CIA employee. He was simply an individual recruited to assist the Agency. Any such agent or potential agent always knows that there is some risk that their identity will be disclosed. Cases such as Aldrich Ames and Robert Hanssen offer a much better illustration of that risk than does a leak about a single operation to a single reporter, although agents and potential agents realize these occur as well and the CIA continued after Ames and Hanssen successfully to recruit

agents. Agents are motivated by financial or other considerations that outweigh the risk of detection. In Mr. Manners' opinion, there is nothing about the publication of Chapter 9 that will change that calculus.

Second, Chapter 9 does not disclose any unique CIA method or tradecraft in a manner that would aid an enemy of the United States or would preclude the CIA from using such methods in the future. The operation described in Chapter 9, "Classified Program No. 1," involved providing an unfriendly nation false information, in particular false nuclear plans. Such efforts at providing an enemy false military or other plans have been undertaken at least since the times of the Ancient Greeks. It is no surprise to other countries that the United States uses such methods. Indeed, it does so routinely. Nor will the publication of Chapter 9 stop the United States from using such methods in the future. Any country receiving nuclear or other sensitive plans from an unknown source will always suspect that the plans may be part of an intelligence disinformation operation. The publication of Chapter 9 did not change this fact. Before and after the publication of Chapter 9, the success or failure of such operations depends on the perceived credibility of the source or sources and the apparent validity of information provided.

Finally, the publication of Chapter 9 would not hinder the ability of the CIA to work with intelligence agencies of other countries. All countries suffer leaks from time to time. Other countries have always known that the United States is no exception. Further, as a practical matter, other countries have no choice but to work with United States intelligence agencies. No other country in the world possesses the wealth of intelligence information as does the United States. No previous compromise of United States intelligence information, including compromises that unlike the publication of Chapter 9 were significant, has diminished the interest of other countries in working with United States intelligence. It is Mr. Manners' opinion that the publication of Chapter 9 will not have any impact on the willingness of the intelligence agencies of other countries to work with the United States.