IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:10cr485 (LMB) |
| | ) | |
| JEFFREY ALEXANDER STERLING | ) | |

**REPLY OF THE UNITED STATES TO DEFENDANT'S
RESPONSE REGARDING POTENTIAL GIGLIO INFORMATION**

The United States of America, through undersigned counsel, hereby replies to the defendant's response (Docket 338) to the government's *Motion to Exclude Cross-Examination of Certain Government Witnesses Concerning Certain Instances of Prior Conduct* (Docket 336).

**I.      The Relevance Arguments**

In its motion, the government submits that the defendant should not be permitted to cross-examination certain witnesses about their having taken home secret documents. Their conduct, self-reported and, in all but one instance, accidental, is not probative of their character for truthfulness or untruthfulness as required by the Federal Rules of Evidence and, specifically, Rule 608(b). Moreover, most of this conduct is old and, if cross-examination were allowed, would be unfairly prejudicial to the government and confusing for the jury.

The defendant, of course, disagrees and argues that there are four "primary" reasons the "mishandling" of classified information by these witnesses is relevant. This relevance argument is based on the goose/gander principle of admissibility, that is, the conduct of these witnesses is so similar to the conduct of the defendant that the jury should be allowed to take this fact into account when accessing the probative value of the government's evidence, the "thoroughness" of its

investigation, and the credibility of its witnesses. This argument is factually and legally flawed.

As with most evidentiary matters, it helps to start with the facts. First, the defendant repeatedly but incorrectly states that "nearly every one," "many," "numerous," or "all" of the government witnesses have mishandled classified information. And it is this "fact" that drives his relevance arguments – *i.e.*, the probative value of the impeaching evidence is enhanced because this misconduct happened so frequently and involved so many of the government witnesses. In truth, the government expects to call about 40 witnesses in its case-in-chief. We have disclosed that six of these witnesses have acknowledged taking home secret documents, returning them to the agency, and self-reporting their conduct. Only four of the six witnesses had access to information relating to Classified Program No. 1, and just three of those four had access to information about the program during the relevant time frame as described in Chapter 9 of *State of War*. Five of the witnesses admitted inadvertently taking home a single document and then returning it. Only one of these incidents occurred within the past few years. The others took place in 2003, 1998, 1997, and 1991 and before 1979. In other words, the "mishandling" of classified documents disclosed by the government is hardly as widespread and pervasive as the defendant would have the Court believe. Indeed, the relatively few instances of this type of conduct demonstrates just how serious these employees take their responsibilities to protect classified information, especially when one considers the hundreds of years of combined agency service represented by the government's witnesses.

Second, in Counts 3, 5, and 7 of the indictment, the defendant is charged with retaining and thereafter communicating to James Risen and the public a classified letter relating to Classified Program No. 1. This letter is included in Chapter 9 of *State of War* (at pages 204-05 of the paperback edition) and described as having been hastily written by "the Russian" in Vienna and

included in the package of materials to be delivered to the Iranians, with a copy later given to the CIA. The government will show at trial that this letter was actually drafted by the defendant, with input by the Russian asset and Mr. S., the supervisor of the program, over a period of about five months in 1999 and 2000, and the text of the letter is found in CIA cables leading up to the Vienna operation. The defendant worked in New York at the time.

The New York office was destroyed on September 11, 2001, meaning that the defendant must have taken a copy of the letter from the office when he left in 2000. He disclosed the letter to James Risen sometime prior to April 2003 when Risen first contacted the CIA about his article on Classified Program No. 1. Risen told the Director of Public Affairs that he had seen a document, and Risen's description of that document was consistent with the document drafted by the defendant in 2000 and eventually found in Risen's book. In early 2003, the defendant lived in Herndon, Virginia, and it would be reasonable for the jury to infer that the defendant, having been fired from the CIA, retained that document at his home in Herndon.

To support this inference, *i.e.*, that the defendant took the document from the agency and stored it at his home, the government will prove that, in 2006, the defendant similarly stored a number of other agency documents – including classified documents – at his home in Missouri. In other words, the 2006 evidence helps show that in 2003 the defendant had a practice of storing CIA documents in his home, and that he did so knowingly and intentionally and not by mistake or accident.

Thus, the defendant's conduct – purposely taking classified materials from the CIA, storing them at his home without any intent on returning them (let alone admitting to having taken them), and then giving a reporter at least one classified document, is a far cry from the witnesses' conduct at issue here. None of these witnesses had any intent on keeping the classified material

and did, in fact, return it; five of the six indicated that their conduct was inadvertent; all six self-reported their violations; and there is no indication that any of them disclosed the classified information to a reporter. All of them passed their background checks, maintained their top secret clearances, and continued on in their careers as public servants. There is simply no parallel between the conduct of the defendant and these witnesses.

The first three of the defendant's four relevance arguments, however, depend on this invented congruence between the defendant's conduct and the conduct of the government's witnesses. For example, he claims that the probative value of his 2006 conduct is substantially diminished because the government's witnesses did essentially the same thing. But they did not. And even if they did, the probative value of the 2006 conduct does not depend on the conduct of anyone but the defendant. It is relevant primarily to the question of whether the defendant stored the letter disclosed to Risen at his home—that is, it is relevant if it tends to make the existence of that fact more probable than it would be without the evidence – and it does. *See* Rule 401 of the Federal Rules of Evidence. That some other person, a government witness or some other agency employee, did something similar at some other time and place, does not change that equation.

Similarly, the defendant says that the jury is entitled to know that four witnesses with access to Classified Program No. 1 "mishandled" classified material because this fact, standing alone, should make them suspects as potential sources for Risen. If any of these witnesses had a prior relationship with Risen, was shown to have communicated with Risen at the time of the leak, had worked as a case officer on Classified Program No. 1 at time portrayed in the book, had helped prepare the document disclosed by Risen in his book, had participated in the San Francisco meeting described in the book, and had been fired from the CIA and thereafter had threatened to retaliate against the CIA for having been fired, they too most likely would have been suspected of

4

having disclosed classified information to Risen regardless of whether they "mishandled" classified information on some another occasion. They did not, of course, share these traits with the defendant, and, accordingly, they did not face the same sort of scrutiny as did the defendant. More importantly, though, the probative value of the defendant's 2006 conduct is buttressed by all of the other evidence that points directly to the defendant as the only person who provided classified information about Classified Program No. 1 to Risen, and that is why the jury is entitled to hear it.

Finally, the defendant states that the "mishandling" of classified documents goes to veracity, but fails to explain how. As we note in our motion, that these witnesses self-reported their conduct (and there is no indication that they did not) supports an inference that they are honest employees, not the opposite. Conduct probative of character for untruthfulness or dishonesty is fraud, perjury, and the like. That is certainly not the case here.

## II. Access to CIA Files

The defendant repeatedly states that he is entitled to more than the "summaries" provided by the government. In all but a few instances, the government has provided the defendant with the verbatim text of the information contained in the CIA files. But he wants more. Based only on his speculation that there is something more than what he has been provided, he claims he is entitled to rummage through the witnesses' highly confidential and classified records. The government has satisfied its constitutional duties of providing the defendant with potential *Giglio* information. He is not entitled to search for more simply because he suspects there is more. "Defense counsel has no constitutional right to conduct his own search of the government's files to argue relevance." *Kasi v. Angelone*, 300 F.3d 487, 505 (4th Cir. 2002), *quoting Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987). Accordingly, "[m]ere speculation about the

existence of potentially exculpatory or impeaching evidence is insufficient to give the defense access to materials under *Brady* and *Giglio*." *United States v. Jones*, 378 Fed.Appx. 359, 360 (4th Cir. 2010). *See also United States v. Paulino*, 103 F.3d 122 (4th Cir. 1996) (per curiam) ( "Mere speculation that *Brady* material exists does not justify fishing expeditions in government files.") (unpublished) (citing *United States v. Crowell*, 586 F.2d 1020, 1029 (4th Cir.1978)); *Miles v. Conway*, 739 F.Supp.2d 324 (W.D. N.Y. 2010) ("As a matter of law, mere speculation by a defendant that the government has not fulfilled its obligations under *Brady* . . . is not enough to establish that the government has, in fact, failed to honor its discovery obligations"); *Franza v. Stinson*, 58 F.Supp.2d 124 (S.D.N.Y.1999) ("Franza's claim of withheld *Brady* material is speculative, conclusory and unsupported, and thus must be rejected"); *United States v. Caro*, 597 F. 3d 608 (4th Cir. 2010)("Because Caro can only speculate as to what the requested information might reveal, he cannot satisfy *Brady*'s requirement of showing that the requested evidence would be "favorable to [the] accused."); *United States v. Upton*, 856 F.Supp. 727, 746 (E.D.N.Y. 1994) (assuming the veracity of the government's representation regarding *Brady*); *United States v. Safavian*, 233 F.R.D. 12, 18 (D.D.C. 2005) ("[T]he [defendant's] request for disciplinary actions relating to other government employees does not seem to be material and in fact strikes the Court as nothing more than a fishing expedition unlikely to lead to admissible evidence.").

The defendant wants to engage in this type of classic "fishing expedition" in the hope of obtaining something favorable. The law does not sanction this.

### III.   The Aggregate Theory

The defendant argues that the Court should view the government's disclosures in the aggregate when evaluating relevancy, citing *Kyles v. Whitley*, 514 U.S. 419 (1995). In *Kyles*, a death penalty case on habeas review, favorable evidence was withheld from the defense at trial.

6

The Supreme Court found that the "net" or "cumulative" effect of the evidence withheld by the government (the prior statements of key government witnesses) raised a reasonable probability that its disclosure would have produced a different result.

This is a pre-trial proceeding. There have been no *Brady* violations. There is no cumulative effect to measure here.

## IV. Conclusion

For the foregoing reasons, the Court should grant the government's motion to preclude cross-examination of various CIA witnesses concerning specific instances of conduct disclosed to him by the government, and likewise reject the defendant's requests for production of the underlying classified documents from the witnesses' employee files.

Respectfully submitted,

| | |
|---|---|
| Jack Smith | Dana J. Boente |
| Chief | United States Attorney |
| | |
| Eric G. Olshan | James L. Trump |
| Deputy Chief | Senior Litigation Counsel |
| Public Integrity Section | |
| U.S. Department of Justice | Dennis Fitzpatrick |
| | Assistant United States Attorney |
| | Eastern District of Virginia |

By         /s/
James L. Trump
Attorney for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3726
jim.trump@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2014, I filed a copy of the foregoing under seal with the Court and the Court Information Security Officer for service on Edward B. MacMahon, Jr., and Barry J. Pollack, counsel for the defendant.

By         /s/
James L. Trump
Attorney for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3726
jim.trump@ usdoj.gov