1

              UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
                 ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .      Criminal No. 1:10cr485
                              .
     vs.                      .      Alexandria, Virginia
                              .      January 5, 2015
JEFFREY ALEXANDER STERLING,   .      10:45 a.m.
                              .
             Defendant.       .
                              .
.  .  .  .  .  .  .  .  .  .  .

                  TRANSCRIPT OF HEARING
        BEFORE THE HONORABLE LEONIE M. BRINKEMA
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:            JAMES L. TRUMP, AUSA
                              DENNIS M. FITZPATRICK, AUSA
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                                and
                              ERIC G. OLSHAN, Deputy Chief
                              Public Integrity Section of the
                              Criminal Division
                              United States Department of
                              Justice
                              1400 New York Avenue, N.W.
                              Suite 12100
                              Washington, D.C. 20005

FOR THE DEFENDANT:            EDWARD B. MAC MAHON, JR., ESQ.
                              Law Office of Edward B.
                              MacMahon, Jr.
                              107 East Washington Street
                              P.O. Box 25
                              Middleburg, VA 20118
                                and
                              BARRY J. POLLACK, ESQ.
                              Miller & Chevalier Chartered
                              655 - 15th Street, N.W.
                              Suite
                              Washington, D.C. 20005-5701


        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1   ALSO PRESENT:                    DAVID N. KELLEY, ESQ.
                                      JOEL KURTZBERG, ESQ.
 2
     OFFICIAL COURT REPORTER:         ANNELIESE J. THOMSON, RDR, CRR
 3                                    U.S. District Court, Fifth Floor
                                      401 Courthouse Square
 4                                    Alexandria, VA 22314
                                      (703)299-8595
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

|                                      | DIRECT | CROSS | REDIRECT | RECROSS |
|--------------------------------------|--------|-------|----------|---------|
| WITNESS ON BEHALF OF THE GOVERNMENT: |        |       |          |         |
| James Risen                          | 9      | 24    | 34       | 36      |

EXHIBITS

|               | MARKED | RECEIVED |
|---------------|--------|----------|
| DEFENDANT'S:  |        |          |
| No. 151       | 26     |          |
| No. 152       | 29     |          |

4

1                          P R O C E E D I N G S

2              THE CLERK:  Criminal Case 10-485, United States of

3    America v. Jeffrey Alexander Sterling.  Would counsel please

4    note their appearances for the record.

5              THE COURT:  Mr. MacMahon -- I saw defense counsel.

6    Where is the government?

7              All right, Mr. Pollack, you get the prize.  You're

8    the first one up here.

9              MR. POLLACK:  I was hoping for a prize, Your Honor.

10             THE COURT:  Here we go.

11                         (Defendant present.)

12             MR. MAC MAHON:  Good morning, Your Honor.

13             THE COURT:  Good morning, Mr. MacMahon.

14             MR. MAC MAHON:  Sorry, we were out in the conference

15   room.

16             THE COURT:  I know, we were off schedule this

17   morning.

18             All right, counsel, please put your appearances on

19   the record.

20             MR. TRUMP:  Good morning.  Jim Trump on behalf of the

21   United States.

22             MR. OLSHAN:  Eric Olshan on behalf of the United

23   States.  Good morning, Your Honor.

24             THE COURT:  Good morning.

25             MR. FITZPATRICK:  Good morning, Your Honor.  Dennis

1    Fitzpatrick on behalf of the United States.

2             THE COURT:  Good morning.

3             All right, Mr. MacMahon and Mr. Pollack, you're here,

4    and the defendant, Mr. Sterling, is here.

5             MR. MAC MAHON:  Yes, Your Honor.

6             THE COURT:  All right.

7             MR. POLLACK:  That's correct, Your Honor.  Thank you.

8             THE COURT:  Now, how we're going to proceed this

9    morning is this will be an open hearing.  Then we're going to

10   have a recess.  I think we'll have some CIPA matters we also

11   need to address, so that obviously will have to be a sealed,

12   closed hearing, but the first order of business this morning is

13   the taking of some testimony from Mr. Risen, unless something

14   has changed in that respect.

15            And before we get to that, you may recall several

16   years ago, Mr. Risen filed an affidavit in connection with this

17   case, and that affidavit was filed in a redacted form on the

18   public docket, and then there was a sealed version of the

19   affidavit.  Mr. MacMahon, I believe it was, a few weeks ago

20   requested the opportunity to see the unsealed affidavit, and it

21   turns out for some reason, we didn't have a copy of it in

22   court.

23            So we've contacted Mr. Stackhouse on behalf of

24   Mr. Risen.  He has submitted to us now the unredacted

25   affidavit, which has, as I understand it, been filed under

6

1    seal.  I've looked at the redactions and, quite frankly, don't

2    think there's any reason why this should remain under seal.  It

3    just mentioned a few grand jury-related matters which were

4    purely procedural.

5          What's the government's position on that?

6          MR. TRUMP:  Are we talking about the 2011 affidavit,

7    Your Honor?

8          THE COURT:  I believe so.  Let me look at the date on

9    this thing.

10         MR. TRUMP:  Document 115?

11         THE COURT:  I don't have a document -- 371 is the

12   docket number.  Well, I'm sorry, that may be the new docket

13   number now.

14         MR. TRUMP:  That's the new.

15         THE COURT:  Yeah, hold on a second.

16         MR. TRUMP:  The one that was filed June 21, 2011?

17         THE COURT:  I'm looking for the date.  Hold on.

18         Yes, June 21, 2011.

19         MR. TRUMP:  I haven't looked at what the redactions

20   are.  We can take a look at it and get back to the Court fairly

21   quickly as to whether there's anything that is still

22   classified.

23         THE COURT:  It wasn't classified.  I don't believe

24   there was anything classified.  It was a matter of it was grand

25   jury-related, 6(e) kind of issues, and I just --

7

1          MR. TRUMP:  I would just like an opportunity to take

2     a quick look.

3          THE COURT:  All right.

4          MR. TRUMP:  But if that's the case, then, of course,

5     we would have no problem.

6          THE COURT:  And, Mr. MacMahon, I'll be glad to give

7     you a copy of this after the hearing today.  Really what was

8     redacted is absolutely pro forma.

9          MR. MAC MAHON:  Thank you, Your Honor.  I just -- it

10    just was I couldn't get a -- I was just trying to get a

11    complete record before we had the hearing, Your Honor.

12         THE COURT:  That's fine.  It won't add anything of

13    substance.  It is purely grand jury procedural issues, all

14    right?

15         MR. MAC MAHON:  Thank you.

16         THE COURT:  All right.  So now do we have anything

17    preliminary before we hear testimony from Mr. Risen?

18         Do we have counsel here for Mr. Risen?

19         MR. KELLEY:  Yes.  David Kelley, Cahill, Gordon &

20    Reindel.

21         MR. KURTZBERG:  Joel Kurtzberg, Cahill, Gordon &

22    Reindel.

23         THE COURT:  All right.  And who's going to be the

24    main spokesperson for Mr. Risen?

25         MR. KELLEY:  Mr. Kurtzberg will be.

1    THE COURT:  All right, Mr. Kurtzberg, come up to the

2    lectern for just a second.  I'm assuming you've had some -- I

3    hope you have -- some discussion with counsel before today so

4    you sort of know -- everybody has worked out the parameters of

5    today's hearing?

6    MR. KURTZBERG:  We have had some discussion, Your

7    Honor, yes.  I can't tell you that I do know all of the

8    parameters, but we have, we have had discussions.

9    THE COURT:  All right.  Well, then Mr. Risen is here.

10   We'll put him on the stand.  I assume -- who's calling him

11   actually?

12   MR. TRUMP:  I guess we'll begin, Your Honor.

13   THE COURT:  So we'll let the government do the direct

14   examination; and obviously, at any point if you need to object,

15   I'm sure you will, and then we'll have to address that issue at

16   that point.

17   MR. KURTZBERG:  Yes, Your Honor.

18   THE COURT:  All right.

19   MR. KELLEY:  Your Honor, before we proceed, may we

20   just have one moment with government counsel?

21   THE COURT:  Go ahead.

22   (Discussion among counsel off the record.)

23   MR. KELLEY:  Thank you, Your Honor.

24   MR. TRUMP:  We're ready to proceed, Your Honor.

25   THE COURT:  All right, Mr. Risen, if you'd go up to

Risen - Direct                                                              9

1    the witness stand?

2              JAMES RISEN, GOVERNMENT'S WITNESS, AFFIRMED

3                        DIRECT EXAMINATION

4    BY MR. TRUMP:

5    Q.    Good morning, sir.  Would you please state your name for

6    the court reporter?

7    A.    James Risen.

8    Q.    Would you spell your last name, please?

9    A.    R-i-s-e-n.

10   Q.    Mr. Risen, how are you employed?

11   A.    I write books, and I am a reporter for *The New York Times*.

12   Q.    And how long have you been a reporter for *The New York*

13   *Times*?

14   A.    Sixteen years.

15   Q.    Have you previously submitted affidavits in this

16   proceeding and in the prior grand jury proceeding?

17   A.    Yes.

18   Q.    Do you recall how many affidavits roughly?

19   A.    Two or three.  I'm not sure.

20   Q.    Can you recall -- in 2011, there was a proceeding with

21   respect to a trial subpoena, and you submitted an affidavit

22   with respect to that proceeding?

23   A.    Yes.

24   Q.    Was that your last affidavit?

25   A.    I believe so.

Risen - Direct                                                          10

1   Q.   Now, Mr. Risen, I'd like to show you a couple of

2   documents.

3              THE COURT:  Yes, sir?

4              Do you have one for counsel?

5              MR. KURTZBERG:  May I have a copy, Your Honor?

6   BY MR. TRUMP:

7   Q.   Do you have in front of you what's been marked as

8   Government Exhibit 75, Government Exhibit 83, and Government

9   Exhibit 132?

10  A.   Yeah.

11  Q.   Beg your pardon?

12  A.   Yes.

13  Q.   And do you recognize what's been marked as Government

14  Exhibit 75?

15  A.   Yes.

16  Q.   And what, what is that?

17  A.   It's a story I wrote for *The New York Times*.

18  Q.   And it's entitled "A Nation Challenged:  The Intelligence

19  Agency; Secret CIA Site in New York was Destroyed on September

20  11"?

21  A.   Yes.

22  Q.   And that's your article?

23  A.   Yes.

24  Q.   It was published on or about November 4, 2001?

25  A.   Yeah.  That's the date here, yeah.

1   Q.   Approximately then?

2   A.   Yeah.

3   Q.   Government Exhibit 83, do you recognize that?

4   A.   Yes.

5   Q.   And what is that?

6   A.   Another story I wrote for *The New York Times*.

7   Q.   And that's entitled "Fired by CIA, He Says Agency

8   Practiced Bias"?

9   A.   Yes.

10   Q.   And was that published on or about March 2, 2002?

11   A.   I don't, I don't see the date here.

12   Q.   I believe it's on the second page.

13   A.   Oh, yeah.  Yeah.

14   Q.   And finally, do you recognize what's been marked as

15   Government Exhibit 132?

16   A.   Yes.

17   Q.   And is that chapter 9 of your book *State of War*?

18   A.   That's the title of it, yeah.  I haven't read it.

19   Q.   Chapter 9 is entitled "A Rogue Operation"?

20   A.   Yes.

21   Q.   And was *State of War* published in early 2006?

22   A.   Yes.

23   Q.   Mr. Risen, did you have a confidentiality agreement with

24   your source or sources for chapter 9 of your book *State of War*?

25   A.   As I said in my 2011 affidavit, I had -- in my reporting,

1   I have used both unnamed and identified sources, and where my

2   reporting and where my articles or book describe information

3   gathered from unnamed sources, I had unnamed sources.  Where I

4   had -- where my articles or book says I had identified sources,

5   I had identified sources.

6   Q.   To the extent that you had unidentified sources for

7   information contained in chapter 9, did you have

8   confidentiality agreements with those unidentified sources?

9   A.   As I said, I had -- in those places in which my stories or

10  my book say that I have unidentified sources, I had

11  unidentified sources.  Where I said that I had identified

12  sources, I had identified sources.

13  Q.   And my question is for those unidentified sources for

14  information that appears in chapter 9 of *State of War*, did you

15  have confidentiality agreements with those sources?

16  A.   As I said in my affidavit in 2011, where I had

17  unidentified sources -- where I say that I had unidentified

18  sources in my articles or in my books, I had unidentified

19  sources.  Where I say I did not have -- where I had identified

20  sources, I had identified sources.

21  Q.   Do you understand the question I'm asking you, sir?

22  A.   I do.

23  Q.   Did you have confidentiality agreements with your

24  unidentified sources for chapter 9?

25  A.   As I said in my affidavit in 2011, when I had unidentified

Risen - Direct                                                          13

1   sources, I had unidentified sources.  When I said I had

2   identified sources, I had identified sources.

3           THE COURT:  Mr. Risen, that is not responding to the

4   question.  Now, you're a craftsman of language; you understand

5   the question.  If you have a problem with the question, your

6   counsel can note an objection, but he hasn't objected.  It's a

7   simple question.  Either you have an agreement, a

8   confidentiality agreement or you don't, or you believe that you

9   do, but you do need to respond to the question.

10          THE WITNESS:  I believe that's not the question he's

11  really asking.

12          THE COURT:  Mr. Trump, do you want to ask it again?

13  BY MR. TRUMP:

14  Q.   Did you have unidentified sources for information

15  contained in chapter 9?

16  A.   I had information from unidentified sources in chapter 9,

17  yes.

18  Q.   And for those sources, did you have confidentiality

19  agreements?

20  A.   As I said, I had unidentified sources for chapter 9.

21  Q.   Did you have confidentiality agreements with those

22  sources?

23  A.   As I said, I had unidentified sources for chapter 9.

24          MR. TRUMP:  One moment, Your Honor.

25  Q.   With respect to the article "Fired by CIA, He Says Agency

Risen - Direct                                                          14

1   Practiced Bias," the November 4, 2001 article, did you have a

2   nonconfidential reporter-source relationship with Jeffrey

3   Sterling?

4   A.   I decline to answer that question.

5   Q.   And why is that, sir?

6   A.   I don't want to provide information that I believe the

7   government wants to use as a building block for a larger mosaic

8   or in this case.

9   Q.   In your 2011 affidavit, you made that assertion; is that

10  correct?

11  A.   That's correct.

12  Q.   And you stated in your affidavit --

13          THE COURT:  What paragraph are you looking at?

14          MR. TRUMP:  This is document 115-2, filed June 21,

15  2011, in paragraph 62.  And I quote:  "I did have a

16  nonconfidential reporting relationship with Mr. Sterling in

17  connection with my March 2002 article entitled 'Fired by CIA,

18  He Says Agency Practiced Bias.'"

19  Q.   Was that the statement in your affidavit?

20  A.   Yes.

21  Q.   Is that an accurate statement?

22  A.   As I said, I don't want to answer that question because I

23  am not willing to provide information in any way that will

24  prove or disprove a mosaic that the government seems to be

25  trying to make.

1    Q.   The information reported in chapter 9 of your book, is

2    that information -- does the information in chapter 9

3    accurately reflect information provided to you by your source

4    or sources?

5    A.   Yes.  My chapter 9 accurately reflects information I

6    obtained from a wide range of unnamed and other -- unnamed

7    sources and other information gathered through my reporting.

8    Q.   I'm referring to information in chapter 9, and you used a

9    phrase, "other information."  What other information are you

10   referring to?

11   A.   Information I gathered from unidentified sources or other

12   information from other forms of reporting.

13   Q.   So there's information from unidentified sources as well

14   as other information from other sources -- of other sources of

15   reporting?

16   A.   Yes.

17   Q.   And what would those other sources be?

18   A.   I am not going to get into details about that.  I can say

19   that I had information from unidentified sources and other

20   forms of information gathered through reporting.

21   Q.   Is there public record information within chapter 9?

22   A.   I'm just going to say, repeat what I just said:  I

23   obtained information from unidentified sources and from other

24   forms of information I gathered through my reporting.

25   Q.   And a category of that other information, is it public

1   record information?

2   A.   As I said, I'll repeat what I just said:  There will be --

3   there is information from unidentified sources, and there is

4   other forms of information gathered through my reporting.

5   Q.   Is there a reason why you cannot say whether there is

6   information in chapter 9 from public record sources?

7   A.   As I said, I am not going to provide -- as I said in a

8   separate context, I'm not going to provide the government with

9   information that they seem to want to use to create a mosaic to

10  prove or disprove certain facts.

11  Q.   You have, in fact, answered that question in a prior

12  affidavit, though, haven't you, sir?

13  A.   Which question?

14  Q.   The question about public record information.

15  A.   I don't remember that.

16  Q.   One moment.

17       In your June 2010 affidavit, at page 6, paragraph

18  14 --

19  A.   Which, which affidavit?

20  Q.   June 3, 2010.  And I can show it to you if you like, but

21  in paragraph 14, it says, ". . . and the sections it does not

22  intend to ask about"  -- "it" being the government -- "are

23  generally those that do not implicate confidential information

24  at all, such as the passages at page 199 to 200 outlining

25  publicly available information about Congressional legislation,

Risen - Direct                                                        17

1  the passage on page 201 chronicling the United States' public

2  criticism of Iran, and the pages (sic) on page 206 discussing

3  appearances before Congress."

4         Do you recall making those statements?

5  A.   I don't recall that.  If you could show it to me?  I don't

6  recall that at all.

7  Q.   Is that your affidavit?

8  A.   I don't recall it, frankly, but --

9  Q.   Did you look at the last page of that?

10 A.   Page 6?

11 Q.   The last page has your signature, does it not?

12 A.   Yeah, I'm not arguing -- I probably did do this.  I just

13 don't remember.

14 Q.   Is that an accurate statement, paragraph 14 on page 6?

15 A.   Frankly, I don't remember.

16 Q.   That's not the question, sir.  Is it an accurate

17 statement?

18 A.   Accurate statement about what?

19 Q.   Is the passage I read from paragraph 14 on page 6 of your

20 affidavit an accurate statement, yes or no?

21 A.   Can I talk to my lawyer, please?

22         THE COURT:  Counsel, you'd better consult, because

23 that was submitted to the Court, and I assume it's under the

24 penalty of perjury.  So yes, go ahead and talk.

25

Risen - Direct                                                          18

1              (Discussion between the witness and his attorneys off

2     the record.)

3              THE COURT:  All right, we'll take a five-minute

4     recess.

5              (Recess from 11:08 a.m., until 11:17 a.m.)

6                     (Defendant present.)

7              THE COURT:  Mr. Trump?

8     BY MR. TRUMP:

9     Q.   Mr. Risen, when we took a break, we were on page 6 of your

10    affidavit dated June 3, 2010, paragraph 14.  Is paragraph 14 an

11    accurate statement?

12    A.   Yes.

13    Q.   So there, there is public source information within

14    chapter 9, *State of War*, correct?

15    A.   Yes.

16    Q.   Is there also information that you obtained independently

17    based upon your own research?

18    A.   Yes, yeah.

19    Q.   For example, you went to Vienna, correct?

20    A.   Yes.

21    Q.   You made observations which you include in your writing of

22    chapter 9, correct?

23    A.   Yes.

24    Q.   Now, getting back to a question that I previously asked

25    about confidential sources, way back in 2008, you submitted an

1    affidavit with respect to the grand jury process; is that

2    correct?

3    A.    Separate from this one?

4    Q.    Yes.

5    A.    Yeah.  Okay.

6    Q.    And in that affidavit, at paragraph 43, you stated, "I

7    could not have written chapter 9 of *State of War* and many if

8    not all of the referenced articles and books without the use of

9    confidential source or sources.  My source or sources for

10   chapter 9 provided me with information with the understanding

11   that I would not reveal their identities.  In circumstances of

12   which I promise confidentiality to a source, I cannot break

13   that promise."

14          Was that an accurate statement in 2008?

15   A.    Yes.

16   Q.    Is it an accurate statement today?

17   A.    Yes.

18   Q.    And you repeated that statement almost verbatim in your

19   2011 affidavit to this Court; is that correct?

20   A.    I believe so, yeah.

21   Q.    So is it true that you had confidential sources who

22   provided -- source or sources who provided information that

23   appears in chapter 9?

24   A.    Yes.

25   Q.    Is it your position that you would not breach that

Risen - Direct                                                          20

1  agreement?

2  A.    Those agreements, yes.

3  Q.    Has your position changed since 2008?

4  A.    No.

5  Q.    Has it changed as a result of the litigation in this case?

6  A.    No.

7  Q.    Has it changed as a result of the Fourth Circuit opinion a

8  year and a half ago?

9  A.    No.

10  Q.   Is it your testimony today that regardless of any threat

11  of sanctions, that you would not under any circumstance testify

12  as to the identity of a confidential source or sources who

13  provided information for chapter 9?

14  A.    Yes.

15  Q.   With respect to chapter 9 and the different categories of

16  information -- information provided by confidential sources,

17  information that may be in the public record, information based

18  upon independent research -- have you accurately reflected the

19  information obtained from confidential sources in chapter 9?

20  A.    Chapter 9 accurately reflects all of my reporting.

21  Q.    And in other words, if information came from a

22  confidential source, that information is accurately reflected

23  in chapter 9?

24  A.    Yes.

25  Q.    If I understand what your counsel told us previously,

Risen - Direct                                                        21

1   however, you are unwilling to parse out paragraph by paragraph

2   or category by category which information came from which

3   category of source.  Is that a fair statement?

4   A.    Yes.

5   Q.    So if I were to ask you, for example, at page 210,

6   paragraph in numeral sequence of the --

7   A.    Are you reading from the chapter, from the chapter?

8   Q.    From the chapter, page 210.

9   A.    Yeah.

10  Q.    You write, "The CIA had obtained genuine Russian nuclear

11  weapons blueprints from a Russian scientist and had forwarded

12  them to one of the national laboratories . . .."  my question

13  to you --

14  A.    I'm sorry, where were you?

15  Q.    Page 210.

16  A.    Um-hum.  What did you read?

17  Q.    The paragraph that begins, "The CIA had obtained genuine

18  Russian nuclear weapons blueprints from a Russian scientist and

19  had forwarded them to one of the national laboratories . . .."

20  A.    Um-hum.

21  Q.    Is it my understanding that you're unwilling to testify

22  today as to whether that information came from a confidential

23  source?

24  A.    Yes.

25  Q.    So you're unwilling to verify whether you have accurately

Risen - Direct                                                          22

1   reported that information from a confidential source?

2   A.    Yes.

3   Q.    And that's true no matter what question and which

4   paragraph I would choose from chapter 9?

5   A.    Yes.

6   Q.    In your reporting and your characterization of identified

7   sources, to the extent that you have quoted from an identified

8   source, are those quotations accurate?

9   A.    I'm sorry, could you repeat that?

10  Q.    To the extent in the three writings that you have there in

11  front of you, the two articles and the book, to the extent that

12  you quote from an identified source, are the quotations

13  accurate?

14  A.    Yes.

15  Q.    So in the article "Fired by CIA," to the extent you quote

16  from Jeffrey Sterling, those quotations are accurate?

17  A.    I accurately quoted from the identified sources identified

18  in the story.

19  Q.    And one of those identified sources is Mr. Sterling?

20  A.    Yes.

21  Q.    In the story?

22  A.    Yes.

23          MR. TRUMP:  The Court's indulgence?

24          THE COURT:  Yes, sir.

25  BY MR. TRUMP:

Risen - Direct                                                          23

1    Q.   If you were ordered to appear at trial, which begins

2    January 12, would your testimony at trial be identical to your

3    testimony today?

4    A.   Yes, I believe so.

5    Q.   And again, with respect to whether you would reveal

6    directly or indirectly a confidential source or sources, your

7    testimony is you would not under any circumstances, under any

8    threat of sanctions reveal a source or sources for chapter 9?

9    A.   Correct, yes.

10   Q.   And that position has not changed since 2008?

11   A.   Yes.

12             MR. TRUMP:  One second.

13             That's all we have.

14             THE COURT:  All right.  Mr. MacMahon?

15             MR. MAC MAHON:  Your Honor, as an initial matter, if

16   this was, we're trying to find out what the trial testimony is

17   going to be, we would be moving to dismiss given the many

18   admissions in the government's case that without asking

19   Mr. Risen who his source was or sources were or where any of

20   these events occurred, they can't even make their case, and now

21   three years later, here we are, and the questions aren't even

22   asked.

23             I'm not expecting the Court to rule on that now, we

24   can brief that later, but if we were in court, that motion

25   would be made, and not knowing the parameters, I wanted to make

Risen - Cross                                                          24

1    it now, but there are many especially as to venue unequivocal

2    statements that the government can't even prove where any of

3    these disclosures took place without asking Mr. Risen, and now

4    we just heard that they're not even going to ask him, and so we

5    would move to dismiss on those grounds.

6            Other than that, Your Honor, I just have a few

7    questions for Mr. Risen.

8                          CROSS-EXAMINATION

9    BY MR. MAC MAHON:

10   Q.   Mr. Risen, my name is Edward MacMahon.  I'm one of the

11   attorneys for Mr. Sterling.  You and I have never met before,

12   have we?

13   A.   No.

14   Q.   We've never spoken before, have we?

15   A.   No.

16   Q.   And you're aware that the government took the case trying

17   to compel you to answer questions in this case all the way to

18   the United States Supreme Court, correct?

19   A.   Yes.

20   Q.   And you're aware in many of those pleadings, they accused

21   you, sir, of being inextricably involved in the crimes that

22   Mr. Sterling is charged with, correct?

23   A.   Yeah.  I can't remember all of what they said.  They said

24   a lot of things.

25   Q.   And now you know that publicly the attorney general at

Risen - Cross                                                          25

1   least has said that you are not to be jailed if you refuse to

2   answer the questions that his Justice Department went all the

3   way to the Supreme Court in order to try to compel you to

4   answer, correct?

5   A.   I'm not sure if he ever said that publicly.  I just heard,

6   I've seen news reports about that.

7           THE COURT:  Mr. MacMahon, I don't think the

8   government went to the Supreme Court.

9           Did you-all go to the Supreme Court?

10          MR. TRUMP:  No, Your Honor.

11          THE COURT:  No.

12          MR. TRUMP:  Mr. Risen took the case to the Supreme

13  Court.

14          THE COURT:  Yeah.

15          MR. MAC MAHON:  I didn't ask the question well, Your

16  Honor.

17  Q.   But in papers filed with the Supreme Court, the government

18  took that position, correct?

19  A.   Counsel, could you repeat the question?

20  Q.   I'll move along, Your Honor.

21  A.   Yeah.

22  Q.   Now, can I -- Your Honor, we don't have our exhibits

23  numbered, so I'm just going to have to hand these up to be

24  numbered, not knowing what to do, but I'd like to show

25  Mr. Risen an exhibit.

1          THE COURT:  All right, what -- is there just one

2    exhibit you're showing him?

3          MR. MAC MAHON:  I've got just a couple to show him,

4    Your Honor.

5          THE COURT:  Let's do it one at a time since they're

6    not pre-numbered.

7          MR. MAC MAHON:  And I didn't bring enough copies, so

8    I'll show Mr. Kurtzberg.

9          THE COURT:  All right.

10         MR. TRUMP:  If counsel will just identify it by the

11   Bates number, I think we can --

12         THE COURT:  That's fine.  We'll do this as Defense

13   Exhibit 151.

14         (Defendant's Exhibit No. 151 was marked for

15   identification.)

16         MR. MAC MAHON:  I'm sorry, Your Honor, what's the

17   number?

18         THE COURT:  Defense Exhibit 151.  That's the Bates

19   stamp number.

20         MR. MAC MAHON:  Okay.  Thank you.

21   Q.   Mr. Risen, have you seen this document before?

22   A.   Hold on.  I'm not sure.  What is it?

23   Q.   It says on the, on the first page "Untitled CIA Book by

24   James Risen."

25   A.   Okay.

Risen - Cross                                                    27

1   Q.   Does that, does that refresh your recollection as to what

2   I might have shown you?

3   A.   I'm not sure what this document is.  Is it a draft of my

4   chapter?

5   Q.   If I proffered to you that it was part of a book proposal,

6   would that refresh your recollection?

7   A.   It's not a book proposal.

8           THE COURT:  It's not a book proposal?

9           THE WITNESS:  No.

10          THE COURT:  No.

11  BY MR. MAC MAHON:

12  Q.   Okay.  Can you turn to the page that's X00155, please?

13  A.   Yeah.

14  Q.   And do you see the --

15  A.   Oh, I know what this is, yeah.

16  Q.   What is it, sir?

17  A.   The government got this from Simon & Schuster, correct?

18  Q.   You know, I --

19          THE COURT:  It doesn't work that way.  You can't ask

20  him questions.

21                          (Laughter.)

22          THE WITNESS:  He asked me what it is.

23          THE COURT:  That's the reporter in you, but you can't

24  do it as a witness.

25  BY MR. MAC MAHON:

1   Q.   Mr. Risen, I would tell you, but the judge won't let me.

2   A.   Okay.

3   Q.   No, I -- do you recognize this document, sir?

4   A.   Now I do, yeah.  Okay.

5   Q.   Okay.  And what is this document?

6   A.   Do you want me to answer?

7   Q.   If you can.

8   A.   I think -- I'm not positive, but I think it's something

9   that the government got from my publisher, Simon & Schuster.

10  Q.   And is this a document that you wrote?

11  A.   You know, I'm not even sure.  It's -- to be honest, I

12  think it was a marketing memo for the Frankfurt book show that

13  Simon & Schuster had.

14  Q.   Okay.  And this document said that CIA officers involved

15  in the operation -- officers plural -- have come to the author

16  to discuss the case, and they now feel enormous guilt for a

17  program that they believe has aided Iran's nuclear program.

18           Do you see that?

19  A.   Where were you reading?

20  Q.   On page marked X00155.

21  A.   Which paragraph?

22  Q.   The, the paragraph down at the bottom that starts, "CIA

23  officers."

24  A.   Oh, okay.  Yeah.

25  Q.   Did I read that correctly?

Risen - Cross                                                      29

1   A.    "CIA officers," yeah.

2   Q.    Is that something you wrote?

3   A.    Yeah, I believe it was -- as I said, I think it was a

4   marketing memo for the Frankfurt book show many years ago when

5   Simon & Schuster was marketing the book.

6   Q.    Okay.  And Simon & Schuster published *State of War*,

7   correct?

8   A.    Yes.

9   Q.    Are you aware that Mr. Sterling is being charged with mail

10  fraud arising from the sale of the book *State of War* in the

11  Eastern District of Virginia?

12  A.    Mail fraud?  No, I wasn't.

13          MR. MAC MAHON:  Can I show another document, Your

14  Honor?  This one is a newspaper article.  Again, I'm an article

15  short.  This doesn't have Bates numbers on it, Your Honor.

16          THE COURT:  Well, for purposes of this hearing, we'll

17  make it Defense 152, and hopefully that won't overly confuse

18  matters, all right?

19          (Defendant's Exhibit No. 152 was marked for

20  identification.)

21          MR. MAC MAHON:  Yes, Your Honor, I'm sorry.

22  Q.    Have you seen this document before, sir?

23  A.    Yes.

24  Q.    Is this an article that you and Mr. Lichtblau wrote?

25  A.    "Lichtblau."

Risen - Cross                                                            30

1    Q.   How do you say that?

2    A.   Eric "Lichtblau."

3    Q.   "Lichtblau."  On May 2 of 2003?

4    A.   Yes.

5    Q.   And Mr. Trump asked you a bunch of questions about

6    disclosing sources.  Would the same answers apply if I asked

7    you who the sources were for the information in -- this article

8    is entitled "Broad Domestic Role Asked for CIA and the

9    Pentagon"?

10   A.   Yes.

11            MR. KURTZBERG:  I object.  He's not clear what

12   question he's referring to.

13            MR. MAC MAHON:  That's fair enough, Your Honor.  I'll

14   rephrase the question.

15            THE COURT:  Sustained.

16   BY MR. MAC MAHON:

17   Q.   Mr. Trump asked you questions about whether you would

18   disclose sources for any articles that you'd written.  Do you

19   remember those series of questions?

20   A.   Yes.

21   Q.   And if I asked you if you would disclose -- if you were

22   willing to disclose any of the sources for the information in

23   this article, "Broad Domestic Role Asked for CIA and the

24   Pentagon," would your answer be the same?

25   A.   Yes.

Risen - Cross                                                          31

1   Q.   Now, Mr. Risen, you were asked to look at some of the

2   affidavits that you filed in this case.  Do you remember filing

3   an affidavit in June of 2011 in this case?

4   A.   Yes.

5   Q.   And do you remember giving reasons why you decided -- you

6   decided to publish the information in chapter 9 of *State of*

7   *War*, correct?

8   A.   Yes.

9   Q.   And you wrote in paragraph 21 of that affidavit that the

10  information in chapter 9 about Operation MERLIN was about an

11  intelligence effort that was approximately six years old at the

12  time of publication and dated back to the Clinton

13  administration.  That's what you wrote, right?

14  A.   Yes.

15  Q.   And you wrote that the story was so old that it could not

16  harm national security, excuse me, and, in fact, I believed I

17  performed a vitally important public service by exposing the

18  reckless and badly mismanaged nature of intelligence on Iran's

19  efforts to obtain weapons of mass destruction so that the

20  nation again would not go to war once again based on flawed

21  intelligence, as it had in Iraq.

22          Those are your words, right?

23  A.   Yes.

24  Q.   Do you stand by those today?

25  A.   Yes.

1   Q.    And you also said in paragraph 19 that you gave serious

2   consideration to my publication of the information contained in

3   chapter 9 of *State of War*.   Those are your words, right?

4   A.    Yes.

5   Q.    And that you made the -- you made the decision to publish

6   the information after it was clear that the main rationale for

7   fighting the Iraq war was based on flawed intelligence about

8   Iraq's nonexistent weapons of mass destruction, including its

9   supposed nuclear program, correct?

10  A.    Yes.

11  Q.    Those are your words, right?

12  A.    Yes.

13  Q.    And you said to the press one of your decisions -- reasons

14  you made the decision to publish was because the press had been

15  harshly criticized for not doing more independent investigative

16  reporting before the Iraq war, correct?

17  A.    Yes.

18  Q.    In your affidavit, you made reference as well to a report

19  of national intelligence estimate that concluded that there was

20  no nuclear weapons program in Iran, correct?

21  A.    Yes.

22  Q.    And you wrote that you were concerned about speculation

23  that the United States might be planning for a possible war

24  with Iran again based on supposed intelligence concerns of

25  weapons of mass destruction just as in Iraq, correct?

1   A.   Yes.

2   Q.   Those are your words, Mr. Risen, as to why you published,

3   correct?

4   A.   Yes.

5   Q.   And you concluded that after all of this, I realized that

6   U.S. intelligence on Iran's supposed weapons of mass

7   destruction was so flawed and that the information I had was so

8   important that this was a story that the public had to know

9   about before yet another war was launched.

10          Those are your words, correct?

11  A.   Yes.

12  Q.   Do you stand by them today?

13  A.   Yes.

14          MR. MAC MAHON:  May I confer for a second, Your

15  Honor?

16          THE COURT:  Go ahead.

17          MR. MAC MAHON:  Nothing further, Your Honor, thank

18  you.

19          THE COURT:  Mr. Risen, I just had a couple of

20  questions.  You use several different literary devices in

21  chapter 9.  I'm just curious as to what as an author you mean

22  by that; that is, sometimes you have things in quotation marks,

23  sometimes you have them in italics, and sometimes just in plain

24  print.  Are there reasons why you as an author make those

25  differences when you're writing?

Risen - Redirect                                                      34

1            THE WITNESS:  That's a good question.  There's no

2  hard-and-fast rule.  It's just sometimes it's done for emphasis

3  or to set it off from the rest of the book or the chapter.

4  Sometimes it's just for, like I said, for emphasis or to

5  highlight something.

6            THE COURT:  But when you're quoting something, I

7  mean, when I quote, I put it in quotation marks.

8            THE WITNESS:  Right, yeah.  In books, at least I

9  think generally in nonfiction current events books are written

10  differently than newspaper stories, so you have different,

11  different ways of writing.  It's not, it's not written -- you

12  know, books aren't written like a newspaper story.  So you, you

13  have more of a voice, I guess you'd say.

14            THE COURT:  You the author?

15            THE WITNESS:  Yes.

16            THE COURT:  All right.  Is there any redirect,

17  Mr. Trump?

18            MR. TRUMP:  A few questions, if I may have a moment.

19            THE COURT:  Go ahead.

20                     REDIRECT EXAMINATION

21  BY MR. TRUMP:

22  Q.    Mr. Risen, I'm not sure we got a direct answer to the

23  question relating to the Simon & Schuster document.

24  A.    Um-hum.

25  Q.    Can you testify today whether you wrote that document?

1    A.    You know, I don't remember.  I think it was a -- as I

2    said, it was -- I believe, and you should ask -- I think you

3    guys got it from Simon & Schuster, correct?  I think it was --

4    as I said, in your filings over the years, you have called it a

5    book proposal.  It's not a book proposal.  I think it was a

6    marketing memo for the Frankfurt book show, and that was

7    probably ten years ago.

8    Q.    My question is did you write it, or did someone from Simon

9    & Schuster write it?

10   A.    I probably wrote some of it, and it probably got rewritten

11   by Simon & Schuster.  I can't remember specifically how much

12   input I had into it.  I think I wrote most of it, but --

13   Q.    Going back to your position with respect to revealing

14   confidential source identity directly or indirectly, if I

15   didn't ask this specifically, it was your position that you

16   would not testify directly with respect to the identity of a

17   source or sources, correct?

18   A.    Yes.

19   Q.    It was also your position that you would not testify to

20   certain facts that you believed would allow the government to

21   identify those sources indirectly; is that correct?

22   A.    Say that again?  I'm sorry.

23   Q.    It was your position dating back to 2008 that you would

24   refuse to answer questions as to certain facts if you believed

25   those facts would allow an indirect identification of your

Risen - Redirect                                                    36

1   source or sources; is that fair?

2   A.   Yes.

3   Q.   And those facts would include where you met a source,

4   correct?

5   A.   Yes.

6   Q.   When you met a source?

7   A.   Yes.

8   Q.   And it would also include testimony as to who was not a

9   source, correct?

10  A.   Correct.

11  Q.   Was that your position back in 2008?

12  A.   Yes.

13  Q.   Was it your position in 2011?

14  A.   Yes.

15  Q.   Is it your position today?

16  A.   Yes.

17  Q.   So if I were to ask you where you met a source, you would

18  refuse to answer?

19  A.   Yes.

20            MR. TRUMP:  That's all I have, Your Honor.

21            THE COURT:  Mr. MacMahon?

22            MR. MAC MAHON:  Very briefly, Your Honor.

23                      RECROSS EXAMINATION

24  BY MR. MAC MAHON:

25  Q.   Mr. Risen, from 2006 up to and including today, the

Risen - Redirect                                                          37

1   government has never asked you who any of your sources were for

2   this book, have they?

3   A.    Well, they subpoenaed me a lot.

4   Q.    But you've never been asked the question at all, correct?

5   A.    This is the first time I've testified, today.

6   Q.    And no one's ever -- no one from the government has asked

7   you when any disclosure or any information you learned that's

8   in chapter 9 was transferred to you, correct?

9   A.    I'm sorry, what?

10  Q.    No one's asked you when you learned any of information

11  that's at issue in chapter 9 of *State of War*, right?  You've

12  never been asked the question, right?

13  A.    No, I don't think so.

14  Q.    You've never been asked who wasn't your sources.  In fact,

15  they've never asked you any of these questions that Mr. Trump

16  just listed that you would refuse to answer, correct?

17  A.    Yeah.  I mean, this is the first time I testified, so

18  right.

19              MR. MAC MAHON:  That's all, Your Honor.

20              THE COURT:  All right, thank you for your testimony,

21  Mr. Risen.  You may step down.

22              THE WITNESS:  Is that it?

23              THE COURT:  For now, yes.

24                          (Witness excused.)

25              THE COURT:  All right, that concludes this hearing,

1  which was aimed at developing the parameters of Mr. Risen's

2  testimony.  I suppose from here on, the next step is for

3  you-all to decide whether to call Mr. Risen at the trial, and

4  that's obviously an issue that I'll leave for counsel to

5  determine.

6          Is there anything else we need to discuss as to this

7  case that can be done in an open hearing?  Mr. Trump, is there

8  anything further?

9          MR. TRUMP:  I think that's fair, Your Honor.  Nothing

10 further.

11         THE COURT:  Mr. MacMahon?

12         MR. MAC MAHON:  Nothing from defense either, Your

13 Honor.

14         THE COURT:  All right.  So we'll need a, what,

15 ten-minute break to get the courtroom set up?

16         MR. TRUMP:  We have to go back to the SCIF and get

17 the documents.

18         THE COURT:  There were some late filings on Friday.

19 I want to make sure any odds and ends from those filings are

20 addressed today.  I assume, Mr. MacMahon, you and Mr. Pollack

21 had a chance to look at them?

22         MR. MAC MAHON:  We, we got to look at them this

23 morning, Your Honor.

24         THE COURT:  All right.

25         MR. MAC MAHON:  Well, I did.  He was here a couple

1    days.  We can address those today, but it will have to be a,

2    obviously have to be a closed hearing.

3            THE COURT:  Correct.  So I'll give you, is ten

4    minutes enough time to go to the SCIF?

5            MR. TRUMP:  Sure.

6            THE COURT:  All right, that's fine.  So we'll

7    reconvene at 5 of.  Thank you.

8                        (Which were all the proceedings

9                         had at this time.)

10

11            CERTIFICATE OF THE REPORTER

12        I certify that the foregoing is a correct transcript of

13    the record of proceedings in the above-entitled matter.

14

15

16    _____
                        /s/
17                Anneliese J. Thomson

18

19

20

21

22

23

24

25