SECRET

**DECLASSIFIED**

/ /                                SECRET                    FRP: , , , , , , , ,

```
------------------------------------------------------------------------
--
00 8503320    ASO              PAGE 001          IN 8503320
                          TOR: 122000Z JAN 00 CIA OFFICE #2 7607
------------------------------------------------------------------------
--
```

S E C R E T 122000Z JAN 00
         CIA OFFICE #2
CITE            7607

TO: IMMEDIATE    LANGLEY

FOR:

                    CLASSIFIED PROGRAM NO. 1 (CP 1)

SUBJECT:  MERLIN (M)  - 10 JAN MEETING

REF: NONE

TEXT:

   1. ACTION REQUIRED: PLS SEE BELOW.

   2. SUMMARY: ON 10 JAN 00, C/O JEFFREY STERLING HELD A MEETING WITH    M       AT A MID-TOWN MANHATTAN HOTEL. DURING THE MEETING, THE FINAL TOUCHES WERE PLACED IN PREPARATION TO LAUNCH THE   CP 1   OPERATION. DESPITE THE PROGRESS MADE AND  M 'S APPARENT READINESS, ISSUES RELATED TO  M 'S SALARY              HAVE PLACED DOUBT AS TO WHETHER   M  IS WILLING TO CONTINUE WITH THE PROJECT.   M 'S DISSATISFACTION WITH THE STATUS OF HIS            SALARY DISCREPANCIES CULMINATED IN HIS EXPRESSED UNWILLINGNESS TO CONTINUE WITH THE PROJECT UNLESS THESE ISSUES ARE RESOLVED TO HIS SATISFACTION BEFORE PROCEEDING WITH THE OPERATION.

   3. INITIALLY, C/O DISCUSSED THE TENTATIVE TIME LINE FOR  M  IN VIENNA. C/O EXPLAINED THAT  M  WOULD SPEND ANYWHERE BETWEEN THREE AND FIVE DAYS IN VIENNA; TWO OR THREE DAYS TO ORIENT HIMSELF WITH AND TAKE IN THE CITY, ONE DAY TO FIND THE IRANIAN MISSION TO THE IAEA AND DELIVER THE PACKAGE, AND THEN DEPART ON THE NEXT DAY. C/O EXPLAINED THAT THE BEST WAY WILL BE FOR  M  TO SIMPLY DROP THE PACKAGE OFF AND THEN DEPART THE MISSION WITHOUT ANY LENGTHY DISCUSSION WITH IRANIAN OFFICIALS.   M  AGREED THAT THE SIMPLEST WAY WOULD BE THE MOST APPROPRIATE. DURING THE DISCUSSION,  M  QUERIED AS TO THE EXACT DATE OF TRAVEL AS HE HAD TO NOTIFY HIS EMPLOYER WHEN HE WOULD NEED TIME OFF FROM WORK.  M  SAID HE WILL HAVE NO DIFFICULTY GETTING TIME, HE JUST NEEDED TO KNOW SPECIFIC DATES. C/O SAID THAT AT PRESENT, THE BEST TIME TO GO WILL BE SOMETIME WITHIN THE LAST WEEK OF JAN AND THE FIRST WEEK OF FEB.   M  WAS ALSO HOPEFUL THAT HIS WIFE WOULD RECEIVE HER  COUNTRY A  PASSPORT BY 15 JANUARY. HE HAS RECEIVED INFORMATION ON THE NECESSARY DOCUMENTATION FOR AUSTRIAN VISAS AND WILL UNDERTAKE

SECRET
**DECLASSIFIED**

GOVERNMENT
EXHIBIT
35
1:10CR485

C02978

**DECLASSIFIED**

SECRET

THAT PROCESS AS SOON AS HE RECEIVES HIS WIFE'S PASSPORT. M WAS TOLD THAT IT WILL TAKE APPROXIMATELY ONE WEEK TO RECEIVE THE VISAS.

4. C/O ALSO SAID THAT IT WILL BE WORKED OUT THAT SOMEONE MEETS M IN VIENNA TO PASS HIM THE PACKAGE. M SAID THAT THE SITUATION HAS CHANGED AND THAT HE CAN NOW TAKE THE PACKAGE. M EXPLAINED TO HIS WIFE THAT HE HAS TO DELIVER SOME MATERIALS WHILE THEY ARE IN VIENNA. HE DID NOT GIVE HER ANY FURTHER EXPLANATION. M SAID THE REASON HE DECIDED TO TELL HIS WIFE WAS THAT HE THOUGHT IT MIGHT BE TOO RISKY TO HAVE SOMEONE MEET HIM IN VIENNA, SO HE FELT IT MORE SECURE TO HANDLE THE PACKAGE HIMSELF. M SAID THAT HE HAS NO APPREHENSIONS ABOUT BEING IN VIENNA ALONE, BUT THAT HE WOULD LIKE TO HAVE AN EMERGENCY CONTACT NUMBER JUST IN CASE.

5. M THEN PROVIDED THE FOLLOWING TEXT FOR THE LETTER TO BE INCLUDED IN THE PACKAGE OF MATERIAL:

"TO UNIVERSITY:

FIRST, LET ME INTRODUCE MYSELF. I AM A PERSON, WHO WORKED FOR MANY YEARS IN ATOMIC INDUSTRY. PLEASE CHECK OUT NEXT PAGE FOR MY PERSONAL INFO PLEASE.
I WOULD LIKE TO INFORM YOU I HAVE VERY VALUABLE INFORMATION ABOUT DESIGN AND PRODUCTION OF ATOMIC WEAPON. AT THIS TIME, I POSSESS A DESCRIPTION OF ONE OF KEY ELEMENTS OF MODERN SYSTEM, TBA 480, HIGH VOLTAGE AUTOMATIC BLOCK. DESCRIBED DEVICE IS KNOWN AS A FIRE SWITCH WHICH LETS TO INITIATE SIMULTANEOUSLY ALL DETONATORS AT A WEAPON CORE (SPHERICAL CHARGE). I AM SURE OTHER DEVICES CAN BE AVAILABLE FOR YOUR REVIEW IN THE FUTURE. I DID NOT CONTACT RIGHT PEOPLE IN YOUR COUNTRY DIRECTLY BECAUSE UNFORTUNATELY, I COULD NOT FIND THEM. OF COURSE I TRIED MANY OTHER WAYS TO ATTRACT ATTENTION TO THIS INFO BY TELLING LITTLE BIT ABOUT WHAT I HAVE BUT IT DOES NOT WORK. WHOLE MISUNDERSTANDING, AND, ACCORDINGLY, WASTING TIME AND DISAPPOINTING. SO I DECIDED TO OFFER THIS ABSOLUTELY REAL AND VALUABLE BASIC INFORMATION FOR    IRANIAN SUBJECT 2 (I.S.2)   , ABOUT THIS POSSIBLE EVENT. PLEASE LET HIM KNOW YOU HAVE THIS PACKAGE. WHAT IS A PURPOSE OF MY OFFER?
IF YOU TRY TO CREATE A SIMILAR DEVICE YOU WILL NEED TO ASK SOME PRACTICAL QUESTIONS. NO PROBLEM.
YOU WILL GET ANSWERS BUT I EXPECT TO BE PAID FOR THAT.
LET'S TALK ABOUT DETAILS LATER WHEN I SEE REAL INTEREST IN IT.
NOW JUST TAKE YOUR TIME FOR PROFESSIONAL STUDY OF ENCLOSED DOCUMENTATION.
MY CONTACT INFO ON NEXT PAGE."

ON THE NEXT PAGE, M NOTED THE FOLLOWING:

" M    , FORMER ENGINEER/RESEARCHER,

ARZAMAS 16, RUSSIA

E-MAIL: M EMAIL ADDRESS"

6. SUGGEST THIS LETTER CAN BE PARED DOWN A BIT TO REMOVE THE PUFFERY LANGUAGE INCLUDED BY M. DEFER TO HQS ON FINAL VERSION OF THE LETTER. ALSO, M AND C/O DISCUSSED THE POSSIBILITY OF TWO LETTERS BEING INCLUDED WITH THE PACKAGE. THOUGH THE LETTERS WOULD ESSENTIALLY SAY THE SAME THING, QUERY HQS' THOUGHT'S ON HAVING ONE LETTER ADDRESSED TO    IRANIAN SUBJECT 2    WITHIN THE PACKAGE ITSELF AND ANOTHER LETTER ADDRESSED TO IRANIAN SUBJECT 1 (I.S.1) IN A SEPARATE ENVELOPE. THE SECOND LETTER WOULD SERVE TO PROVIDE AN INTRODUCTION TO I.S.1 AND ESTABLISH THE IMPORTANCE OF THE PACKAGE AND THAT IT IS

SECRET
**DECLASSIFIED**

SECRET **DECLASSIFIED**

INTENDED FOR I.S.2. FEEL THIS WILL ENSURE THAT I.S.1 ALSO TAKES NOTICE OF THE PACKAGE AS OPPOSED TO MERELY FORWARDING THE PACKAGE TO I.S.2 WITHOUT INTEREST.

7. FOLLOWING DISCUSSIONS ON THE VIENNA TRIP, C/O EXPLAINED THE CURRENT STATUS OF M 'S FINANCIAL ISSUES. C/O TOOK PAINS TO EXPLAIN TO M IN A REASONABLE FASHION THAT THE CURRENT PAYMENT SCHEME WAS CAUSING PROBLEMS AND THAT A NEW STRUCTURE HAD TO BE INTRODUCED. C/O ALSO EXPLAINED THAT M WOULD BE RECEIVING A ADDITIONAL INFORMATION REGARDING HIS 1998 SALARY.

M HAD NO DIFFICULTY WITH THE FACT THAT HIS FUTURE SALARY WOULD BE PAID TO HIM AS EARNED.

C/O THEN TOLD M THAT AS A RESULT OF THE MEASURES BEING TAKEN TO CORRECT HIS SALARY SITUATION, REVIEW OF HIS SALARY HISTORY INDICATED THAT HE HAD BEEN OVERPAID BY USD 5,000.00 IN FEB '98. AND, AS A RESULT, HIS '99 SALARY WOULD HAVE TO BE REDUCED BY 5,000.00. C/O HAD 60,000.00 FOR M REPRESENTING FEB - NOV '99 (6,000.00 PER MONTH). THOUGH M EARNED 66,000.00 FOR DEC '99, THIS AMOUNT WAS REDUCED BY 5,000.00 PER HQS INFORMATION THAT M WAS OVERPAID BY 5,000.00 IN FEB '98. C/O CHOSE NOT TO BRING THE REMAINING 1,000.00 IN ANTICIPATION THAT M WOULD NOT UNDERSTAND THE REDUCTION IN HIS SALARY AMOUNT. DURING THE CONVERSATION, C/O TRIED TO EXPLAIN THAT THE REMAINING AMOUNT (EITHER USD 1,000.00 OR 6,000.00) WOULD BE PAID AT THE NEXT MEETING ONCE IT IS CLEARLY DETERMINED THAT M HAD IN FACT BEEN OVERPAID BY 5,000.00.

8. M BECAME INCENSED AND SAID THAT C/O'S INFORMATION WAS NOT CORRECT. M SAID THAT THE MONEY HE RECEIVED IN FEB '98 WAS FOR A DEC '97 PAYMENT THAT HE HAD NOT RECEIVED AND THEREFORE HAD NOT BEEN OVERPAID IN 1998 AS CIA CONTENDS. M SAID THAT HE HAS WAITED TOO LONG FOR HIS FINANCES TO BE CORRECTED AND THAT HE DID NOT WISH TO PROCEED WITH PROJECT ANY LONGER. M THEN PROCEEDED TO BLAME C/O FOR THE SALARY PROBLEMS, HOWEVER, C/O QUICKLY REMINDED M THAT THE DIFFICULTIES EXPERIENCED WITH HIS FINANCES WERE A RESULT OF ACTIVITIES PRIOR TO '99, I.E. BEFORE C/O WAS INVOLVED. M REFUSED TO TAKE THE '99 SALARY C/O HAD FOR HIM AND SAID THAT HE DID NOT NEED THE MONEY AND THAT HE WOULD ONLY ACCEPT IT IF IT WAS THE CORRECT AMOUNT, 66,000.00. AFTER SOME BACK AND FORTH CONVERSATION AND C/O ASSURANCES THAT HE WOULD REVISIT THE ISSUE WITH HQS, M LEFT THE MEETING.

9. C/O CALLED M THE FOLLOWING DAY. EVIDENTLY IN A CALMER MOOD, M SAID THAT HE WILL NOT PROCEED WITH THE PROJECT UNLESS AND UNTIL HE RECEIVES ADDITIONAL INFORMATION ABOUT HIS SALARY AND USD 66,000.00 THAT HE BELIEVES HE IS DUE, OR A PROMISE FROM US THAT THESE ITEMS ARE COMING TO HIM. M SAID HE IS WILLING TO CONTINUE ON THE PROJECT'S PRESENT SCHEDULE, BUT NOT UNTIL HE AT LEAST RECEIVES A PROMISE FROM CIA THAT HE WILL RECEIVE THE MONEY HE BELIEVES IS OWED TO HIM, I.E. USD 66,000. SUGGEST THAT CP OFFICER MR. S. TRAVEL TO NEW YORK TO MEET WITH M TO DELIVER HQS POSITION DIRECTLY ON THE FINANCES WHICH WE BELIEVE WILL GO LONG WAY TO EASING M 'S CONCERNS AND SECURING HIS CONTINUED PARTICIPATION IN THE OPERATION. LOOK FORWARD TO THOUGHTS/COMMENTS FROM HQS.

10. FILE:    CP 1    DECL ON: X1, CL REASON: 1.5(C), CL BY:
ID #  DRV

END OF MESSAGE

SECRET
**DECLASSIFIED**

SECRET

~~SECRET~~
**DECLASSIFIED**

/ /        ~~SECRET~~        FRP: , , , , , , ,

---

00 8529944    ASR              PAGE 001
                    TOT: 141320Z JAN 00      LANGLEY  713315

---

~~SECRET~~              141320Z   LANGLEY   713315
TO: CIA OFFICE #2

FROM:

                CLASSIFIED PROGRAM NO. 1 (CP 1)

SUBJECT: MERLIN (M) - 10 JAN MEETING

REF:         07607.| 00 8503320 |
    CIA OFFICE #2
TEXT:

    1.  ACTION REQUIRED: PLEASE ADVISE RE DESIRED DATES FOR C/O
VISIT.

    2.  HQS REGRETS THAT STERLING WAS A VICTIM OF THE MURDERED
MESSENGER SYNDROME AFTER BRINGING (NOT VERY) BAD NEWS TO      M
 .  ANY CONFUSION ABOUT M'S SALARY IS LARGELY HIS OWN FAULT
BECAUSE HE WANTED TO BE PAID DIFFERENT PARTS OF HIS SALARY IN
DIFFERENT    YEARS.  THAT SAID, HE MAY BE RIGHT ABOUT THE EARLY 1998
PAYMENTS, AND HE IS EVIDENTLY QUITE EMOTIONAL BENEATH THE STOLID
SURFACE AND NOT CAPABLE OF SORTING IT ALL OUT RATIONALLY.  HE HAS HAD
A LUCRATIVE RELATIONSHIP WITH US SINCE 1994 AND IS ACTING IN AN
IMMATURE FASHION.  NEVERTHELESS, WE NEED HIS SERVICES NOW AND
MR. S.  WILL SEEK TO PLACATE HIM.  WE PROPOSE PAYING HIM THE
DISPUTED SALARY.  WE WILL CAREFULLY CONSIDER AN APPROPRIATE
OPERATIONAL BONUS UPON THE SUCCESSFUL COMPLETION OF HIS VIENNA
MISSION.  MR. S.  WILL ALSO TELL HIM TO STOP BLAMING STERLING FOR
THINGS WHICH OCCURRED BEFORE HIS WATCH, AND TO AVOID THE TEMPTATION
TO TRY TO PLAY ONE    CIA    OFFICER OFF AGAINST ANOTHER, SINCE THIS
WILL ONLY HARM HIS OWN CREDIBILITY WITH THE ORGANIZATION.  PLEASE
ADVISE WHEN CIA OFF.#2 WANTS   MR. S.  TO MEET  M .  WE SUGGEST IT BE
AFTER HE HAS OBTAINED ALL THE NECESSARY TRAVEL DOCUMENTS AND MADE HIS
RESERVATIONS FOR VIENNA, SO WE CAN COMBINE THE   DISCUSSION   WITH
SPECIFIC OPS PREPARATIONS.

    3.  THAT UNPLEASANTNESS ASIDE, HIS PROPOSED LETTER, NOW IN ITS
FIFTH ITERATION, SHOWS REAL PROGRESS.  WE AGREEE WITH STERLING'S
COMMENTS THAT THE VERBIAGE NEEDS TO BE TIGHTENED UP STILL FURTHER TO
MAKE SURE THE IRANIANS UNDERSTAND WHAT HE HAS AND ON WHAT TERMS.  HE
SHOULD SAY EXPLICITLY THAT HE IS OFFERING THE SCHEMATIC AND
ASSOCIATED PARTS LIST FREE TO PROVE THAT HE CAN PROVIDE FURTHER
INFORMATION, AND ACKNOWLEDGE THAT WHAT HE IS PROVIDING INITIALLY IS

~~SECRET~~
**DECLASSIFIED**

**GOVERNMENT EXHIBIT 36 1:10CR485**

C02982


SECRET **DECLASSIFIED**

INCOMPLETE. THERE SHOULD BE A VERY CLEAR MESSAGE THAT HE EXPECTS TO BE PAID FOR THE REST OF THE DETAILS THEY WILL NEED IF THEY WANT TO BUILD THE DEVICE. WE BELIEVE THE PACKAGE SHOULD BE ADDRESSED TO IRANIAN SUBJECT 2 AT IRANIAN INST. 1 , AND THAT BOTH AN E-MAIL AND A LETTER BE SENT TO HIM SAYING THAT M WILL DROP OFF A PACKAGE OF INFORMATION FOR HIM AT THE VIENNA MISSION. A SECOND LETTER ADDRESSED TO IRANIAN SUBJECT 1 BY TITLE ONLY CAN ACCOMPANY THE PACKAGE, WITH AN EXPLANATION THAT M HAS BEEN IN E-MAIL CORRESPONDENCE WITH IRAN SUB 2 (COPIES INCLUDED) AND HAS PROMISED TO SEND HIM SOME IMPORTANT INFORMATION, FOLLOWED BY A REQUEST THAT IRAN SUB 1 MAKE CERTAIN THE INFORMATION REACHES IRAN SUB 2 OR ANY OTHER INTERESTED PARTY. EACH ITERATION OF HIS DRAFT LETTER IS BETTER THAN THE PREVIOUS ONE, SO C/O'S PATIENCE SEEMS TO BE PAYING OFF. IT IS WORTH OUR WHILE TO TAKE THE EXTRA TIME TO MAKE SURE HE FINALLY GETS IT JUST RIGHT, SINCE THE LETTERS WILL HAVE TO DO MUCH OF THE WORK FOR US WITH THE TARGET.

4. WE ARE GLAD THAT M HAS COME BACK TO OUR POSITION THAT IT WOULD BE BEST FOR HIM TO TRAVEL TO VIENNA WITH HIS PACKAGE RATHER THAN BE MET THERE. WE WILL NEED TO REHEARSE WITH HIM HOW TO TRAVEL WITH THE DOCUMENTS WITHOUT DISPLAYING ANY NERVOUSNESS . GIVEN HIS IMPULSIVENESS, M IS NOT A NATURAL CLANDESTINE AGENT, AND WE FACE AN OPERATIONAL TRADEOFF BETWEEN THE RISKS OF MEETING HIM IN VIENNA AND THOSE OF LETTING HIM TRAVEL WITH THE PACKAGE. ON BALANCE IT WILL PROBABLY BE SAFER TO SEND HIM WITH IT, CAREFULLY PREPPED.

5. PLEASE ADVISE WHEN OFFICE #2 WOULD LIKE MR. S. TO VISIT FOR THE MEETING.

6. FILE: CP 1

CL BY: ID # , CL REASON: 1.5 (C); DECL ON: X1; DRV FROM:

CABLETYPE:
>
RELNO:       0000000034
ORIG: CP/ (       MR. S.       ); AUTH:   CIA OFFICER 17 ; REL:
CIA OFFICER 16; CL BY    ID # .

END OF MESSAGE                SECRET

**DECLASSIFIED**

SECRET

~~SECRET~~
**DECLASSIFIED**

/ /  ~~SECRET~~  FRP: , , , , , , , ,

---

00 8987417   ASO              PAGE 001
                              TOT: 172337Z FEB 00     LANGLEY 755554

---

~~SECRET~~
                172338Z     LANGLEY   755554
TO: IMMEDIATE                INFO
      CIA OFFICE #2, CIA OFFICE #5      CIA OFFICE #7, CIA OFFICE #8
FROM:

                    CLASSIFIED PROGRAM NO. 1 (CP 1)

SUBJECT: LATEST TWISTS IN    CP 1    PLANNING

REF: NONE.

TEXT:

   1.

   2. CIA OFFICE #2 OFFICER STERLING AND HQS   CP 1   PROGRAM MANAGER
MR. S.  MET   MERLIN (M)   THE EVENING OF 14 FEBRUARY '00 IN A NEW
YORK HOTEL ROOM.   M CONTINUED TO OBJECT TO MINOR PROPOSED CHANGES
IN HIS AGMT AND EVENTUALLY WALKED OUT. HE CALLED MR. S.  THE NEXT
MORNING TO SAY IT WAS ALL A MISUNDERSTANDING AND THAT HE HAD ALL THE
TRAVEL DOCUMENTS READY AND HAD MADE PLANS FOR HIMSELF AND HIS WIFE TO
TRAVEL TO VIENNA FOR THE   CP 1   APPROACH ON # FEBRUARY.
   MR. S.  SET UP A MEETING WITH HIM FOR 21 FEBRUARY TO ASSESS HIS
STATE OF PREPAREDNESS FOR THE OPERATION. IF THINGS LOOK GOOD WE WILL
LAUNCH HIM AS DISCUSSED                                       . IF
NOT  MR. S.  WILL DIRECT HIM TO POSTPONE THE TRIP AND WILL NOT
PROVIDE HIM THE PACKET OF MATERIALS.

   3.   M 'S HISTRIONICS MAY HAVE BEEN AN EXCUSE TO DELAY THE
ACTUAL APPROACH OUT OF FEAR (MORE OF TRAVEL THAN OF THE IRANIANS WE
SURMISE) OR A DESIRE TO KEEP THE PAY COMING AS LONG AS POSSIBLE.
C/O'S CHALLENGED HIM ON THIS AND HE DID NOT DISAGREE, BUT HE TOLD
 MR. S.  THE NEXT MORNING THAT HE HAD THOUGHT ABOUT IT AND WAS NOT
AFRAID TO PROCEED. HIS WIFE, ALWAYS A STEADYING INFLUENCE, MAY HAVE
GOT TO HIM OVERNIGHT.

   4.  NONE OF  M 'S DESIRES CONCERNING HIS AGMT ARE SHOW STOPPERS
(CASH PAYMENT,            A SMALL DISPUTED SUM) AND  MR. S.
PLANS TO BRING THE ONE HE AGREED TO LAST YEAR AND TELL HIM HE WILL
GET THE SAME DEAL AGAIN, THOUGH POINTING OUT THAT HIS DESIRE FOR
LATER PAYMENT MAY NOT WORK                     . MR. S.  WILL
HAVE THE MONEY TO PAY HIS 1999 SALARY IN FULL. HE WILL THEN REVIEW
IN DETAIL  M 'S TRAVEL, LODGING, AND VIENNA TOURISM PLANS TO MAKE

~~SECRET~~
**DECLASSIFIED**

GOVERNMENT
EXHIBIT
37
1:10CR485

C02985

SE̸CRET **DECLASSIFIED**

SURE HE IS AWARE OF WHAT HE NEEDS TO DO TO KEEP OUT OF TROUBLE. HE IS WORRIED ENOUGH ABOUT HERR HAIDER TO BEHAVE. WE WILL THEN GO OVER THE APPROACH TO THE IRANIAN MISSION WITH THE DOCUMENT PACKET, WHICH WILL CONTAIN A COVER LETTER TO    IRANIAN SUBJECT 1    ASKING HIM TO PASS THE FIRESET PLANS TO    IRANIAN SUBJECT 2
WHO HAS BEEN IN E-MAIL CORRESPONDENCE WITH M. C/O WILL DIRECT M TO E-MAIL IRANIAN SUBJECT 2 BEFORE HIS TRIP, TELLING HIM HE WILL BE IN VIENNA AND WILL DROP OFF AN IMPORTANT PACKET OF INFORMATION AT THE IRANIAN MISSION THERE. WE WILL REVIEW AGAIN THE LOCATION OF THE MISSION AND GO OVER WHAT HE SHOULD SAY TO IRANIAN SUBJECT 1 IF HE HAS THE OPPORTUNITY TO TALK TO HIM (NOT MUCH, SINCE WE DON'T WANT TO RAISE THE DEFENSES ANY MORE THAN NECESSARY). GIVEN HIS GENERAL NERVOUSNESS M SHOULD BE QUITE CONVINCING AS A MAN WHO WANTS TO DROP OFF HIS PACKAGE AND LEAVE BEFORE ANY ONE KNOWS HE WAS THERE. C/O WILL STRESS THAT WE NEED A FULL AND DETAILED REPORT OF HIS VISIT AND RECEPTION, AND WILL IMPLY THAT WE WILL BE WATCHING HIM "TO PROVIDE PROTECTION."

5. IF IN C/O ASSESSMENT M IS READY TO ACCOMPLISH THE MISSION HE WILL PROVIDE THE DOCUMENTS (A SCHEMATIC,    DRAWINGS AND A PARTS LIST, ALL LABELED IN RUSSIAN) AND A TRAVEL ADVANCE, AND GO OVER HOW TO TRANSPORT THEM SAFELY AND WHAT TO SAY IF QUESTIONED (COMPUTER STORAGE DEVICE DESIGNED BY M FOR POSSIBLE SALE    ).

6. IN THE EVENT MR. S. ASSESSES THAT M IS NOT UP TO IT, HE WILL DIRECT HIM TO POSTPONE THE TRIP AND WILL MAKE ARRANGEMENTS FOR FURTHER TRAINING SESSIONS. THE MOST PROBABLE OUTCOME IS THAT M WILL BE READY.

7.

8. FILE:    CP 1

CL BY:    ID #, CL REASON: 1.4 (C); DECL ON: X1; DRV FROM:

CABLETYPE:
>
RELNO:    000000537
ORIG: CP    (    MR. S.    ); AUTH:    CIA OFFICER 18 ; REL: DAVID SHEDD ; CL BY    ID # .

END OF MESSAGE    SE̸CRET

**DECLASSIFIED**

SE̸CRET

~~SECRET~~
**DECLASSIFIED**

/ /    ~~SECRET~~    FRP: , , , , , , ,

```
---------------------------------------------------------------------
--
00 9036409    ASR              PAGE 001           IN 9036409
                         TOR: 221655Z FEB 00  CIA OFFICE #2 7682
---------------------------------------------------------------------
--
```

~~S E C R E T~~ 221638Z FEB 00

CITE CIA OFFICE #2 7682

TO:    LANGLEY  ,  CIA OFFICE #5

FOR:

                            CLASSIFIED PROGRAM NO. 1 (CP 1)

SUBJECT:  FINAL PRE-APPROACH MEETING WITH  MERLIN (M)

REF:     LANGLEY   755554| 00 8987417 |

TEXT:

    1. ACTION REQUIRED: FOR THE RECORD.

    2. HQS  MR. S.   MET    M   IN HIS NEW YORK CITY HOTEL ROOM THE EVENING OF 21 FEBRUARY AND MADE FINAL PREPARATIONS FOR HIS DELIVERY OF   THE CP 1   DISINFORMATION PACKAGE TO THE IRANIAN MISSION IN VIENNA THE WEEK OF 28 FEBRUARY.  M WAS IN GOOD SPIRITS AND APOLOGIZED FOR HIS "RUDENESS" THE PREVIOUS WEEK WHEN HE HAD WALKED OUT BRIEFLY OVER A MINOR AGMT ISSUE. C/O ADVISED HIM THAT WE COULD MEET HIM HALFWAY ON WHEN AND HOW HE IS PAID.

                                                 C/O PAID HIM $66,000 FOR HIS 1999 EARNINGS AND PROVIDED $5000 AS A TRAVEL ADVANCE.

    3. ONCE THE FINANCIAL PART OF THE MEETING WAS OVER,  M AND C/O WENT OVER HIS TRAVEL PLANS, COMPORTMENT IN VIENNA AND APPROACH TO THE IRANIAN IAEA MISSION IN GREAT DETAIL. HE WILL DEPART NYC ON THE EVENING OF # FEBRUARY ON A NON-STOP    FLIGHT TO VIENNA. ONCE THERE, HE WILL STAY AT THE INTERCONTINENTAL HOTEL ON THE STADTPARK. HE WILL DEPART AND RETURN DIRECTLY TO NYC ON # MARCH. C/O OUTLINED THE SORT OF THING WHICH COULD BRING HIM TO THE ATTENTION OF  OTHERS   , PRINCIPALLY ANY ASSOCIATION WITH SUSPECT RUSSIANS.  M GOT THE POINT IMMEDIATELY AND AGREED TO AVOID HIS FORMER COUNTRYMEN. WE WORKED OUT A COVER STORY FOR THE SCHEMATICS AND PLANS IN THE DISINFORMATION PACKAGE (A DESIGN FOR A COMPUTER DATE STORAGE DEVICE). HE WILL CARRY ONLY A SANITIZED VERSION OF THE COVER LETTER AND WILL

~~SECRET~~
**DECLASSIFIED**

GOVERNMENT EXHIBIT
38
1:10CR485

C02988

**DECLASSIFIED**

SECRET

PREPARE A FINAL VERSION                IN VIENNA.
                                       C/O DIRECTED M TO
PLAY UP HIS AMERICAN RESIDENCE AND PRA STATUS IN THE EVENT OF ANY
TROUBLE, AND PROVIDED HIM THE LOCATION OF THE U.S. CONSULATE. HE
WILL LOOK LIKE A TOURIST AND BEHAVE ACCORDINGLY, AIDED BY HIS WIFE
WHO IS FAR MORE INTERESTED IN SUCH MATTERS THAN HE IS.

    4. C/O AGAIN PROVIDED DETAILS OF THE LOCATION AND DIRECTIONS TO
THE IRANIAN IAEA MISSION, AND WENT OVER M 'S ROLE IN DROPPING OFF
THE PACKET. HE WILL INCLUDE A COVER LETTER TO    IRANIAN SUBJECT 1
           EXPLAINING HIS OFFER AND ASKING FOR HELP IN GETTING THE
INFORMATION TO               IRANIAN SUBJECT 2                , WITH
WHOM HE HAS BEEN CORRESPONDING. PERHAPS CHARACTERISTICALLY M HAD
MISPLACED THE E-MAIL ADDRESS OF IRANIAN SUBJECT 2 AND C/O PROVIDED IT
AGAIN ALONG WITH INSTRUCTIONS TO SEND OFF A BRIEF NOTICE TELLING IRANIAN
SUBJECT 2 OF HIS PLANS TO DELIVER AN IMPORTANT PACKET TO THE MISSION IN
VIENNA. C/O EXPLAINED THAT THE LESS TALKING M DOES AT THIS STAGE
WITH WHATEVER IRANIAN HE ENCOUNTERS THE BETTER, SINCE HE DOES NOT
WANT TO PROVOKE EITHER EXTREME REACTION: A. WE DON'T HAVE A WEAPONS
PROGRAM AND AREN'T INTERESTED IN YOUR INFORMATION OR B. THIS IS
GREAT, WHY DON'T YOU COME TO TEHRAN WITH US TOMORROW.  M SAW THE
POINT CLEARLY AND AGREED SIMPLY TO DROP OFF THE PACKET AND PLAY UP
HIS NERVOUSNESS ABOUT GETTING OUT OF THERE UNOBSERVED.

    5. M WILL FAMILIARIZE HIMSELF FIRST WITH THE CITY AND THEN
WITH THE AREA OF THE MISSION BEFORE MAKING HIS APPROACH ON THE 1ST OR
2ND OF MARCH. C/O ADVISED HIM THAT "WE WILL BE KEEPING AN EYE ON
YOU" FROM A DISCREET DISTANCE IN ORDER TO PROVIDE PROTECTION. THE
POINT WAS BOTH TO PROVIDE REASSURANCE AND TO HINT THAT WE ARE
MONITORING HIS PERFORMANCE.  M EXPRESSED HIS SATISFACTION THAT WE
WERE BACKING HIM UP, AND THEN ASKED FOR AN EMERGENCY CONTACT NUMBER.
C/O PROVIDED HIS CELL PHONE NUMBER AS AN EMERGENCY RPT EMERGENCY ONLY
CONTACT AND WARNED M OF ALL THE    PITFALLS HE COULD STEP INTO IF
HE MISUSED IT
                                   . IT IS UNLIKELY THAT
M WILL MAKE USE OF THIS LIFELINE IN ANYTHING SHORT OF A
LIFE-THREATENING SITUATION.

    6. OVERALL, C/O WAS SATISFIED WITH M 'S DEGREE OF PREPARATION
AND COMMITMENT TO THE MISSION, AND RELEASED THE DOCUMENTS AND TRAVEL
FUNDS TO HIM, SETTING UP A DEBRIEFING MEETING THE EVENING OF 9 MARCH
IN NYC. HE AND THE INFORMATION HE IS CARRYING HAVE BEEN EXHAUSTIVELY
PREPARED, AND NOW IT IS UP TO LUCK AND THE IRANIAN REACTION.

    7. FILE:    CP 1      DECL ON: X1, CL REASON: 1.5(C), CL BY:
 ID # DRV

END OF MESSAGE                    SECRET

SECRET
**DECLASSIFIED**

C02989