UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | Criminal No. 1:10cr485 |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | January 13, 2015 |
| JEFFREY ALEXANDER STERLING, | . | 2:00 p.m. |
| | . | |
| Defendant. | . | EXCERPT OF P.M. SESSION |
| | . | |
| . . . . . . . . . . | . | |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:            JAMES L. TRUMP, AUSA
                               DENNIS M. FITZPATRICK, AUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314
                                 and
                               ERIC G. OLSHAN, Deputy Chief
                               Public Integrity Section of the
                               Criminal Division
                               United States Department of
                               Justice
                               1400 New York Avenue, N.W.
                               Suite 12100
                               Washington, D.C. 20005


FOR THE DEFENDANT:             EDWARD B. MAC MAHON, JR., ESQ.
                               Law Office of Edward B.
                               MacMahon, Jr.
                               107 East Washington Street
                               P.O. Box 25
                               Middleburg, VA 20118
                                 and
                               BARRY J. POLLACK, ESQ.
                               MIA P. HAESSLY, ESQ.
                               Miller & Chevalier Chartered
                               655 - 15th Street, N.W.
                               Suite
                               Washington, D.C. 20005-5701


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1   APPEARANCES:  (Cont'd.)

2   CLASSIFIED INFORMATION          CHRISTINE E. GUNNING
    SECURITY OFFICERS:              MAURA PETERSON
3

4   ALSO PRESENT:                   GERARD FRANCISCO
                                    SA ASHLEY HUNT
5                                   JENNIFER MULLIN, ESQ.

6
    OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
7                                   U.S. District Court, Fifth Floor
                                    401 Courthouse Square
8                                   Alexandria, VA 22314
                                    (703)299-8595
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

Opening Statement by Mr. Trump:                    Page 4

Opening Statement by Mr. MacMahon:                 Page 21

4

1                    A F T E R N O O N   S E S S I O N

2                           (Defendant and Jury present.)

3              THE COURT:  All right, Mr. Trump, are you making the

4    opening statement?

5              MR. TRUMP:  Yes, Your Honor.

6              THE COURT:  All right.

7                         OPENING STATEMENT

8                         BY MR. TRUMP:

9              May it please the Court, defense counsel.

10             Again, my name is Jim Trump.  It's my pleasure with

11   Eric Olshan and Dennis Fitzpatrick to represent the United

12   States in this case.

13             The defendant, Jeffrey Sterling, once worked for the

14   Central Intelligence Agency, the CIA.  He was a case officer, a

15   spy if you will.  He had access to classified information, Top

16   Secret, Secret files, and as you will learn, between 1998 and

17   2000, the defendant was assigned to a very closely held and

18   highly classified operation involving Iran and its nuclear

19   weapons program.

20             He was responsible for the safety and security of a

21   very valuable human asset working with the CIA on that

22   operation, a Russian nuclear weapons engineer whose role in the

23   operation and whose association with the CIA was a closely

24   guarded secret.

25             When the defendant went to work with the CIA, he

1    promised never, ever to disclose its secrets.  He promised in

2    writing to guard and protect forever the classified information

3    with which he was entrusted, and he broke that promise.  The

4    defendant betrayed his country; he betrayed his colleagues; he

5    betrayed the CIA and compromised its mission; and most

6    importantly, he betrayed the Russian asset, a man who literally

7    placed his trust and his life into the defendant's hands.

8            And why?  Anger, bitterness, selfishness.  The

9    defendant struck back at the CIA because he thought he had been

10   treated unfairly.  He had sued the agency for discrimination

11   and demanded that they pay him $200,000 to settle his claim.

12   When the agency refused, he struck back with the only weapon he

13   had:  secrets, the agency's secrets.

14           The defendant is charged in a ten-count indictment.

15   At its core, the indictment charges the defendant with having

16   disclosed what is called national defense information.  He

17   disclosed it to a reporter, James Risen in *The New York Times,*

18   first in March and April of 2003 and then again between 2004

19   and 2005.  The national defense information at issue in this

20   case was then passed on to the public with the publication of

21   Mr. Risen's book, *State of War*, in early 2006.

22           The case will, excuse me, the case will unfold

23   essentially in two somewhat overlapping parts.  First, to

24   understand the case and to prove to you that the information

25   disclosed by the defendant to Risen and eventually revealed

6

1    publicly in chapter 9 of his book is under the law of national

2    defense information, you will need to know what this operation

3    entailed, the significance of the human asset used in the

4    operation, and what the defendant knew and didn't know about

5    it.

6          You will hear testimony from a number of CIA case

7    officers about the operation, which we will call Classified

8    Program No. 1, as well as recorded testimony from the human

9    asset himself, whom will be called Human Asset No. 1, or

10   Merlin.

11         Second, you will need to know how the CIA became

12   aware in 2003 that the classified program, Program No. 1, was

13   compromised.  William Harlow, the former director of CIA's

14   Office of Public Affairs, will testify about telephone

15   conversations with Risen in April 2003 and a subsequent White

16   House meeting between the national security advisor,

17   Condoleezza Rice, and *The New York Times*.

18         You will also learn that the defendant had a source

19   relationship with James Risen in 2002; and the defendant's

20   relationship with Risen continued through 2004 and 2005 with

21   e-mails and telephone calls back and forth until the book's

22   publication in January of 2006; and at that point, the

23   relationship ended.

24         Finally, you must know why, why this is important,

25   why the compromise of the operation and the compromise of

1   Merlin potentially damaged national security.

2          The defendant worked for the CIA from 1993 through

3   January 31, 2002.  As I mentioned, he was trained and deployed

4   as a case officer; and as such, he understood the importance of

5   protecting a human asset's relationship with the CIA and the

6   importance of maintaining the secrecy of a CIA operation such

7   as Classified Program No. 1.  He had spent some time overseas,

8   and he also developed a specialty in Iranian affairs.  In 1998,

9   the defendant was assigned to the agency's Counterproliferation

10   Division at its Langley headquarters.

11          In October 1998, the defendant was asked to take over

12   as the case officer for Classified Program No. 1, which meant

13   moving to New York, which he did in early 1999.  From that

14   time, early 1999 until May of 2000, he served as the case

15   officer for the operation, and he personally was responsible

16   for the Russian engineer Merlin.

17          In October 1998, Classified Program No. 1 was already

18   two years old.  It was designed to gather intelligence about

19   Iran's nuclear weapons program, an intelligence priority for

20   the CIA.  In a nutshell, the CIA thought it could exploit

21   Iran's interest in acquiring nuclear technology.

22          With the help of a second Russian engineer, the

23   agency and the National Laboratory developed a set of very

24   sophisticated plans, plans for a Russian-designed fireset, a

25   key component to a detonation system of a nuclear weapon.  The

1    National Laboratory embedded secret flaws into the plans so

2    that the fireset would never work.  In other words, the plans

3    would appear genuine; but if Iran took the bait, it could spend

4    huge amounts of time and money trying to develop a fireset that

5    could not work and, in the process, hopefully convey important

6    information to the CIA about the status of its nuclear weapons

7    program.

8           But the CIA needed a salesman, someone who could pose

9    as a greedy Russian engineer seeking money for the fireset

10   plans, and Merlin fit that role exactly.  He had, in fact,

11   worked for the former Soviet Union and Russia as a nuclear

12   weapons expert in its nuclear weapons facility; and he was an

13   expert in the assembly of nuclear warheads.  He had immigrated

14   with his family to the United States several years earlier and

15   subsequently began working with the CIA.

16          When the defendant first became involved in the

17   operation, another case officer, Zach W., was responsible for

18   Merlin.  Zach W., however, was taking a new assignment; so a

19   meeting was planned to introduce Merlin to his new case

20   officer, the defendant.  The CIA decided to use this meeting as

21   an opportunity to show Merlin for the first time the fireset

22   schematics, the bait for the Iranians, and explain to him in

23   more detail how the operation would work.

24          They met in San Francisco at a hotel in January 1999:

25   Robert S., known to many in the operation as Bob, the manager

```
 1   of the program from the Counterproliferation Division; Merlin;

 2   the defendant; Zach W.; and Len, another CIA officer.  They

 3   showed Merlin the documents that Merlin would offer the

 4   Iranians, the fireset schematics and a parts list.

 5        Merlin studied the plans and quickly noticed that the

 6   schematics were missing several key components, and that was

 7   intentional.  The plan was for Merlin to hold back some

 8   information so that the Iranians would come pay him for the

 9   complete plans.  Merlin never, never spotted the deeply

10   embedded hidden flaws in the plans.  Indeed, that would have

11   been impossible.

12        The second Russian engineer, the one who designed the

13   plans, had been unable to spot them; and a team of scientists

14   from the National Lab spent hundreds and hundreds of man-hours

15   pouring over the plans before detecting even some of the flaws.

16        Following the San Francisco meeting, the defendant

17   and Robert S. worked with Merlin when trying to find inroads

18   into the Iranian scientific community.  Under Zach W.'s

19   direction, Merlin had already been out there on the Internet,

20   so to speak, trying to reach out to Iranian scientists or

21   academics who might seem interested in what he was offering.

22        The defendant continued that effort with Merlin.  You

23   will see numerous CIA cables in which the defendant reported on

24   the progress being made by Merlin along with copies of e-mails

25   and suggestions for ways for Merlin to improve and hone his
```

1    approach.  They also worked on a letter that would accompany

2    the fireset schematics, exchanging several drafts and having

3    Merlin work on ways to improve the sales pitch to the Iranians.

4          Now, this letter is important because a copy of it

5    appears in chapter 9 of Risen's book.  The letter is completely

6    mischaracterized in that book as something Merlin hastily did

7    on his own ostensibly to warn the Iranians about the hidden

8    flaws in the schematics, when, in fact, it was a letter that

9    the defendant and Merlin worked on for months.

10          The letter simply reconfirms Merlin's offer.  He has

11   a fireset.  The plans -- he has fireset plans, but they are

12   incomplete.  If the Iranians want the complete package, they

13   will have to pay him.

14          In late 1999, Merlin's sales pitch on the Internet

15   paid off; and an Iranian official expressed interest in what he

16   was selling.  A delivery was planned for Vienna, Austria, in

17   early 2000.  Merlin and the defendant worked on the finishing

18   touches of the letter in January.

19          Merlin flew to Vienna, Austria, at the end of

20   February 2000.  He went with his wife, playing the role of a

21   tourist.  He carried the fireset plans with him.  The letter he

22   stored electronically on a disk so he could print it out once

23   he got to Vienna, to his Vienna hotel.  Once in Vienna,

24   everything went pretty much as planned, and Merlin delivered

25   the package to the Iranian mission of the IAEA, the

1  International Atomic Energy Association, together with his

2  letter, and he returned to the United States.

3          Back in New York, the defendant and Robert S. briefed

4  Merlin on his trip.  At that time, the CIA had intelligence

5  that the plans had been taken from Vienna to Iran; but Merlin

6  had not yet been contacted by anyone about his delivery.

7          In May 2000, however, the defendant was being

8  replaced in New York by another agent, another case agent --

9  excuse me, case officer, Steven Y.  The defendant's role in the

10  operation was over, and he no longer had access to its files,

11  to its cables, any documents or information about Merlin, and

12  the future of the operation.

13          Now, at this point, no one had raised any concerns

14  about the operation, particularly concerns that we were giving

15  away nuclear technology.  In fact, the lab had certified to the

16  CIA that that could not happen.  No concerns within the

17  Counterproliferation Division; no concerns among senior

18  management, case officers, Merlin, the National Laboratory; and

19  significantly, no concerns expressed by the defendant.

20          The defendant expressed no such concerns to his

21  management in New York, to the inspector general.  Nothing came

22  up in his personnel evaluations.  Even during his litigation

23  with the agency, he never expressed any concerns that this was

24  a bad operation, a flawed operation, in any respect.  Indeed,

25  when he took an employment grievance to the House Select

1   Committee on Intelligence, not a word, not a word was said

2   about Classified Program No. 1, nothing.

3          That all changed on March 5, 2003. Just after the

4   CIA had rejected his settlement offer of $200,000, the

5   defendant met with two Senate staffers, Don Stone and Vicki

6   Divoll, both who will testify later during this trial. The

7   defendant described generally Classified Program No. 1; but for

8   the first time, for the first time, he says the program was

9   mismanaged. He claims that the Russian had been able to find

10  the flaws in the plans. Iran might be able to spot these flaws

11  as well, fix them. He was worried that the CIA may have given

12  Iran nuclear weapons technology. That's when everything

13  changed.

14         On April 3, 2003, William Harlow, the CIA's director

15  of Public Affairs, was called by James Risen. They talked by

16  phone. Risen told Harlow he was working on a story, and he

17  wanted comment. The story involved a Russian engineer trying

18  to sell flawed fireset plans to the Iranians. He had a real

19  CIA cryptonym, a code name, for the human asset, the one that

20  we will be calling Merlin.

21         Harlow knew that that was very, very rare for someone

22  outside the agency to have that type of information. Risen

23  said the plans were delivered to the Iranians at the IAEA

24  mission in Vienna in 2000, but Risen was not sure if the

25  operation was still ongoing.

1          Risen made a number of follow-up calls to Harlow.  He

2    said the story was in near final form.  He had documents, he

3    said; and he said the program had not been handled properly.

4    Iran had been told that the designs were flawed, and the

5    Iranians might be able to fix the flaws.  He also was aware

6    that the case officer had been to see the Senate committee.

7          Sound familiar?  With the very same pitch, the same

8    spin that the defendant had put on the operation with SSCI, the

9    Senate Select Committee on Intelligence, Risen was now telling

10   the CIA, William Harlow, its director of Public Affairs.

11         Harlow did some research.  He alerted his superiors.

12   He had learned that there was such a program like the one Risen

13   described, but it was hardly flawed.  More importantly, unknown

14   to Risen, it was ongoing.

15         The next thing that happens, Harlow is headed to the

16   White House for a meeting with *The New York Times*.  There with

17   George Tenet, the director of the CIA; and Condoleezza Rice,

18   the national security advisor for the President; *The New York*

19   *Times* editor, Jill Abramson; and Mr. Risen, Dr. Rice set out a

20   set of talking points prepared by Harlow and which she went

21   over with Ms. Abramson and Mr. Risen.  She asked them not to

22   publish.  She said lives were at stake.  She said it would harm

23   the U.S. efforts to stop the spread of nuclear weapons.

24         At the meeting, Risen reiterated they had documents,

25   a letter, a letter written by the Russian asset to the Iranians

1   warning them of the flaws in the plans.

2          Director Tenet corrected Risen.  Russians told the

3   Iranians -- excuse me, the Russian told the Iranians that the

4   plans were incomplete, not that they were flawed.

5          *The New York Times* said they would get back in a week

6   or so.  A week later, *The New York Times* informed the White

7   House and the CIA that it would not publish the story.

8          It was sort of a case of winning the battle but

9   losing the war because Risen ended up publishing the story but

10  not through *The New York Times*.  He put his article into a

11  book, *State of War*, in January 2006; and what appears in

12  chapter 9 of *State of War* closely tracks what Risen told Harlow

13  in April of 2003.

14         The chapter had pretty much the same spin.  While it

15  reports the basic outline of the classified program accurately,

16  Risen claims that Merlin found the flaws in the plans at the

17  San Francisco meeting; and according to the book, Merlin was so

18  concerned that he was handing over nuclear secrets to the

19  Iranians that he tried to warn them of the flaws in the plans

20  by hastily drafting a letter to that effect while in Vienna.

21         The book quotes nearly verbatim from the draft of the

22  letter that the defendant copied into a CIA cable months before

23  the trip to Vienna.  That book also claims that the case

24  officer of the defendant was also concerned about the way the

25  program was handled and concerned that the operation may have

1    given away valuable nuclear secrets.

2           Now, the evidence that the defendant was Risen's

3    source will unfold in several ways.  There is motive:  his

4    litigation with the CIA.  It began in 2000, just after he left

5    Classified Program No. 1.  It continued through April 2003,

6    just when Risen is talking to Harlow about his story.

7           The basis of the defendant's claims is -- was that he

8    was discriminated against because of his race.  He was bitter.

9    He was angry.  He was seeking revenge.

10          For example, on January 7, 2003, he told a CIA

11   employee that he was disgusted with the CIA, and as a result,

12   he would come after them with everything at his disposal.

13          January 27, 2003, and then again on February 12 of

14   2003, offers to settle the litigation were rejected.  The CIA

15   just said no.  Fifteen days later, the defendant called James

16   Risen at his residence.

17          Shortly after that was the Senate meeting that I just

18   discussed, and key to that was that the only person to have

19   ever said that the Russian spotted the flaws in the plans, an

20   impossibility as explained before, the only person who ever

21   said that we were giving plans to the Iranians that may have

22   aided their nuclear weapons program was the defendant and James

23   Risen.

24          The defendant was also a source for Risen.  On

25   October 30, 2001, during litigation, the CIA rejected a

1   previous offer by the defendant, $200,000.  Four days later,

2   *November 4, 2001, The New York Times* publishes an article by

3   Risen discussing the destruction of the CIA's New York office

4   in the 9/11 attacks.  The existence of that office, the office

5   in which the defendant worked, was a classified fact.  A short

6   time later, the defendant tells a colleague at the CIA that he

7   had confirmed the existence of the CIA's New York office to a

8   newspaper or magazine; she wasn't sure which.

9          March 2, 2002, Risen publishes a story in *The New*

10  *York Times* about the defendant's discrimination lawsuit.  Risen

11  publicly confirmed that the defendant was his source, and he

12  quoted from the defendant extensively.

13         I lost a note, Your Honor.  If I may?

14         In addition to the litigation, the facts of the book,

15  the facts of chapter 9 will also reveal to you that the

16  defendant was a source for James Risen.  First, the book is

17  written from the perspective of a case officer.  The case

18  officer who was the case officer between January of 1999

19  through the Vienna trip up until May of 2000, that case officer

20  was the defendant.  The perspective of the book, the case

21  officer, only knows the information from that period.  Risen

22  only knows the information from that period.

23         The book discusses the case officer's involvement in

24  the operation, quotes the conversation between the case officer

25  and a senior, a senior case officer, Robert S.  The only

1    persons to have communicated together at the San Francisco

2    meeting were Robert S. and the, and the defendant.

3          The book quotes -- excuse me, the book describes

4    extensively the San Francisco meeting.  It describes Merlin,

5    the other case officers, what happened at the meeting; but it

6    also has facts that aren't otherwise recorded in CIA documents

7    and cables.

8          For example, the book explains that Merlin and the

9    case officer went on a wine trip in Sonoma County, California.

10   The only persons to know about that fact were Robert S., the

11   case officer, Merlin, and Mrs. Merlin.

12         As you go through the book, as you will, you will see

13   that each of the facts that are reiterated in the book by

14   Mr. Risen were facts known to Mr. Sterling.  They were facts

15   known only to the case officers who were working on the

16   operation at that time and then found their way to Mr. Risen.

17         But they're also facts discussing the operation that

18   are not otherwise known to case officers or to Mr. Robert S.

19   For example, the book quotes from the defendant's PAR, his

20   performance appraisal report.  That is not a document from the

21   operation.  That is a document that is reviewed with the

22   defendant by his New York management.  People like Robert S.

23   and the other case officers have no access to that document.

24         But what's further instructive is that document does

25   not on its face link the operation to the human asset at issue.

1   Yet in the book, Mr. Risen quotes from that document and links

2   it to operation, Classified Program No. 1.

3          In addition to facts in the book that were known to

4   Mr. Sterling, the defendant, there are also facts not in the

5   book that were not known to the defendant, in other words,

6   facts that were known to other case officers, other people

7   working on the operation, the people within management that

8   they knew about the operation.

9          For example, the book speculates about whether the

10  operation continued beyond 2000.  You will hear testimony that

11  it did.  You will hear testimony that there were similar

12  operations that followed the Vienna operation, operations which

13  the defendant knew nothing about and, hence, Mr. Risen knew

14  nothing about.

15         You will also learn, for example, that Merlin never

16  did, in fact, hear back from the Iranians.  Again, that's

17  something that Risen speculates about because the defendant

18  knew nothing about that.

19         In addition to the facts of the book, you will also

20  see a pattern between Risen and the defendant extending from

21  2004 -- excuse me, extending from 2003 up through and including

22  the end of 2005, when the book is published.  This pattern

23  shows a number of telephone calls, e-mails interspersed with

24  telephone calls in which they discuss the fact that Risen is

25  working on his book.  For example, in early January, Risen

1    reached out to defendant via e-mail and says, "Can we get

2    together in early January?  Jim."

3           Thereafter, in 2004, you will see a steady stream of

4    e-mails and contacts between James Risen and the defendant.  On

5    February 9, 2004, again on April 24, 2004, he calls the

6    defendant, James Risen calls the defendant 14 times and then

7    sends an e-mail from his personal account to the defendant's

8    personal e-mail account.

9           This pattern of e-mail contact continues through May,

10   interstate telephone calls from Risen again to the defendant

11   and e-mails from Risen on his personal e-mail account to the

12   defendant's personal e-mail account.  One such e-mail says,

13   "I'm sorry if I've failed you so far, but I really enjoy

14   talking to you and would like to continue."

15          Again, this evidence will show that there's a

16   pattern, a pattern of communication between the defendant and

17   Risen extending from 2004 up through the publication of the

18   book in early January 2006, and that that pattern ends.

19          Finally, the government must also show you as part of

20   its burden that the disclosures made by the defendant to James

21   Risen, disclosures that ultimately made their way to the

22   public, were potentially damaging to national security.  There

23   will be witnesses, CIA officers with experience who will

24   testify that these, these disclosures were potentially damaging

25   in a number of ways.

1          First, the asset.  The disclosures put his life in

2     jeopardy, his life and the life of his family.  They

3     compromised the CIA's ability to use him in the future.  He was

4     a very unique asset:  a real Russian nuclear weapons expert.

5     They don't come by those very often, but the disclosures in

6     *State of War* in 2006 caused the CIA to bring his use to a halt.

7          They also compromised the methods used in the

8     operation.  They compromised the fact that now that, now that

9     this was in the book, the way the operation was conducted, the

10    use of the labs, the science behind the schematics, all those

11    methods were now compromised.  Again, the arena of nuclear

12    technology and those countries wishing to exploit nuclear

13    technology is not that big.  This loss of intelligence was a

14    serious compromise for the agency.

15         And finally, the CIA's ability to recruit assets, to

16    keep people cooperating once they begin cooperating with the

17    CIA, was damaged.  When assets, when foreign intelligence

18    services, when people working with the CIA pick up a book and

19    they read about the compromises in this case, it's a loss of

20    intelligence.  It makes them pause.  It makes them wonder if we

21    can ever keep our secrets.

22         My time is coming to an end.  It's a fairly complex

23    case.  The evidence will come in piece by piece.  You will hear

24    a number of case officers who only have a certain share of the

25    information, and that is part of the way the CIA

1    compartmentalizes its operations.  This was a limited access

2    operation.  Only those who participated in the operation were

3    allowed to have access to its documents.  Once they were out,

4    they were out for good.

5            So we have to put on case officer after case officer

6    after case officer to explain what they knew and what the time

7    frame was for their knowledge, and you will see at the end that

8    the only case officer, the only person who knew what is

9    published in that book in chapter 9 and who knew the details

10   that were in the book and what was not in the book, what was in

11   the cables, what was not in the cables, is Jeffrey Sterling.

12           Thank you very much.

13           THE COURT:  All right, Mr. MacMahon?

14                        OPENING STATEMENT

15                        BY MR. MAC MAHON:

16           May it please the Court.  Thank you, Your Honor.

17   Ladies and gentlemen of the jury, counsel.

18           My name, ladies and gentlemen, is Edward MacMahon;

19   and I'm one of the attorneys here representing Jeffrey Sterling

20   in this case.  As the judge told you, Mr. Sterling has entered

21   a plea of not guilty to these charges.

22           With me is Barry Pollack, who will do a lot of the

23   talking as well, and Mia Haessly.  So you'll hear from all of

24   us.  There's no rhyme or reason as to who's going to get up and

25   speak.

1          What I -- I want you to remember, you've actually

2    been picked to do an interesting case.  Lots of time as trial

3    lawyers, we have to look at jurors and argue about breach of

4    contracts; and other cases are car wrecks, some of the ones we

5    heard about in voir dire; but this is a very interesting case;

6    and one of the reasons is because the subject matter we're

7    dealing with is very important; but the person this is the most

8    important to is Jeffrey Sterling and his wife, who is in the

9    courtroom with him.

10          Mr. Sterling is an extraordinary man.  He's not a

11   traitor.  He's not even -- he's a wonderful man who has never

12   betrayed his country or done anything of the sort, and you will

13   hear no evidence of that at all.

14          Who he is?  He's the first person in his family to

15   graduate from college is who he is.  He's a man who in 1993

16   went to work for the CIA because he was a patriot, because

17   that's what he wanted to do; and he's a man who then went to

18   law school after he worked there -- while he was at the CIA and

19   thereafter; and at the time he was arrested, which was in 2010

20   on these charges, he was working as a health care fraud

21   investigator, working with United States attorneys

22   investigating health care fraud; and since that time, he's been

23   unemployed and unemployable.

24          And what we need is for you folks to listen very

25   closely to this case and listen for evidence.  I didn't really

1  hear any evidence in that opening, a promise of any actual

2  evidence in this case other than a lot of suspicion; but we're

3  going to ask you to find him not guilty and let Mr. Sterling

4  get on with his life with him and his wife in Missouri, where

5  they live.

6          And, ladies and gentlemen, I won't ask you to do that

7  out of sympathy for Mr. Sterling.  That's no reason at all to

8  acquit somebody in a criminal case.

9          What I want you to do is to listen very closely for

10  any direct evidence that the government has at all that

11  Mr. Sterling leaked any information, any classified information

12  about Merlin or Classified Program No. 1, whatever it is.  You

13  didn't see an e-mail that came up.  You're not going to see or

14  hear a phone call.  You're not going to hear anything, and

15  that's because it doesn't exist.

16          Mr. Trump is a fine lawyer.  If he had an e-mail with

17  details of these programs or a phone call, you would have heard

18  it; and you're not going to hear it in this case.  So what we

19  really have is a cloud that needs to be lifted off of

20  Mr. Sterling.

21          This process has been going on for 13 years.  This is

22  how long this has been going on.  As I say, Mr. Sterling was

23  gone -- has been gone from the CIA for almost 15 years.  We

24  could have had jurors in this case -- you're going to hear

25  evidence come in from cables that were written by the CIA when

1    we could have had jurors who weren't even born.  Some of this

2    stuff happened during the early Clinton administration.

3            And the reason I want to emphasize this fact for you

4    is that as jurors, you get to decide who's telling the truth

5    and who really remembers what happened in a conversation in

6    2000 or 1999; and think for yourself the detail with which you

7    could remember incidents that took place 15 and 20 years ago.

8            And there's one other thing I want you to keep in

9    mind as you hear this case.  You can hear in Mr. Trump's voice

10   a disdain for Mr. Risen's book.  It's not, it's not hard to

11   miss, okay?  The CIA is angry, and you're going to hear people

12   say:  That's false.  That's a lie.  That never happened.

13           And this is not a -- a criminal case is not a place

14   where the CIA goes to get its reputation back, okay?  This is a

15   case to decide whether Mr. Sterling disclosed information to

16   Mr. Risen.  You'll keep hearing witness after witness say that

17   when they accused the CIA of a botched operation, that was a

18   terrible thing to say.

19           And in that regard, what I want you to also remember,

20   because this is important as to how this book ends up being

21   written, is that a lot of these events take place in the, in

22   the build-up to the, to the Iraq war; and we all know that was

23   a time when the same CIA at this exact same time was telling us

24   all that there were weapons of mass destruction in Iraq; and we

25   all know, sadly, how true that claim was.

1          And so in the middle of this literal food fight

2    between Mr. Risen and the CIA sits Jeffrey Sterling; and he

3    needs you to perform a jury service, which is to decide his

4    case and form a check against the government that's been making

5    these claims against him for years.

6          And I will tell you now, and you can hold me to this,

7    that the evidence will be that Mr. Sterling never spoke about

8    his experiences in this program or about Merlin to a single

9    person who wasn't entitled to know it, not a single person.  I

10   didn't hear -- Mr., Mr. Trump told you that he spoke to Risen.

11   Did you hear where, when, or anything about what happened?  No.

12   That's because there isn't any such evidence of it whatsoever.

13         The government will produce no direct evidence

14   whatsoever of a single communication.

15         It won't produce any evidence that anything happened

16   here in the Eastern District of Virginia.  The judge is going

17   to tell you at the end of the case that you have to find that

18   something, the disclosure was made here in the Eastern District

19   of Virginia.

20         Nothing happened here.  Even in the opening

21   statement, we didn't hear that that happened.

22         And so let's back up a little bit.  So Mr. Trump

23   tells you that Mr. Sterling is angry and mad at the CIA, and he

24   files a discrimination case.

25         Well, he did.  You're going to see a lot of the

1    pleadings, these stacks of documents.  A lot of them are

2    documents from this case.  And what is that?  That's

3    Mr. Sterling exercising his right to file a lawsuit, and he did

4    it.  He followed the law in every way until the case was

5    dismissed, yes, by the CIA, claiming national security, that

6    Mr. Sterling's discrimination case could not be heard because

7    it would infringe upon national security.

8         And I say that -- we're going to get a screen here;

9    and we're going to hear people's names and everything; and I

10   beseech you -- the judge has asked you if you won't consider

11   this as evidence of all the importance and the security.

12   Nobody wants a witness to be disclosed, but you need to -- just

13   because we can't call these witnesses by their names and you're

14   looking at redacted documents, it's just part of this process.

15   It's going to prove nothing to you.

16        But when you see it, it's going to look strange, and

17   again, I ask you to remember this is the process that we're in.

18   It's not -- it doesn't mean anything else than that as to what

19   we're looking at.

20        Mr. Trump is right, Mr. Sterling went to the House of

21   Representatives and complained.  He has the absolute right to

22   do that.  He went to the House of Representatives legally,

23   legally, and he complained.

24        What happened next?  He went -- reporters got

25   interested in his case.  It wasn't just Mr. Risen who wrote a

1   story about a black CIA officer feeling discriminated against.

2   Mr. Sterling's story was in *People* magazine.  He was on

3   television.  He wasn't hiding the fact that he was in a lawsuit

4   with the CIA.

5            And no, they didn't pay him.  The case got dismissed.

6            What happened next, Mr. Sterling tries to write a

7   book, and how do you do that when you work at the CIA?  You

8   have to have your book cleared by a lawful -- a legal process.

9            He submitted his book; it didn't get cleared; and he

10  ended up in litigation again with the CIA, in trial litigation,

11  legal litigation.

12           So you're seeing the pattern that Mr. Trump is

13  talking about is one also of legal actions taken by Jeffrey

14  Sterling.

15           And there's also no question that Mr. Sterling in

16  2003 went to the Senate Select Intelligence Committee and

17  voiced his concerns about this program.  He was legally

18  authorized to do that.  There's no question about that.  That's

19  not being a traitor, to go tell the Congress that you think

20  something is wrong with a program at the CIA.

21           But all these actions do leave him as an outcast at

22  the CIA.  There isn't any question about that.  Sterling is out

23  of the club at this point.  He's, he's a whistleblower.  He's

24  whatever -- he's a pain in their side.  He's whatever you want

25  to call him, he's that; and everybody, almost everybody who

1   testifies against him in this case is going to be someone who's

2   still inside of this tight club.

3         So there's no disputing that Mr. Risen, we don't

4   dispute that after Mr. Sterling went to the Senate Select

5   Intelligence Committee, Mr. Risen learned of the lawful

6   disclosures that Mr. Sterling had made at the SSCI.

7         Do you know how long the phone call was that

8   Mr. Sterling made that Mr. Trump told you about in the opening

9   statement?  Three seconds.  It's a three-second call.  That's

10   all you'll see.  You'll see a bunch of phone records here.

11   So -- and a lot of them you won't see, and I'll get to that in

12   a second.

13         But so the key issue for you to decide in one respect

14   is what happened?  How did this information get out of the

15   SSCI, the Senate Select Intelligence Committee, and to

16   Mr. Risen?  Was it Mr. Sterling or someone else?  That's the

17   question you get to decide; and I'll suggest to you here later

18   on, I'll tell you exactly how, a scenario where it could have

19   happened.

20         But what do you not see?  You don't see a written

21   communication to Mr. Risen from Mr. Sterling about the program

22   at all, no evidence they even met in person.  Did you hear

23   that?  Did you hear in 2003 that they met in person and he gave

24   him documents or anything?  No, no evidence of that.

25         Do you have any evidence that Mr. Sterling FedExed or

1    mailed something to Mr. Risen?  No.  They have a few traces of

2    e-mails.  Risen is still interested.  Mr. Sterling certainly is

3    interested in his discrimination case which goes on, so they're

4    still talking about something that they've written a public

5    story about, and there's nothing.  There's nothing else at all,

6    no recorded calls.

7           And so what you have is a suspicion, a suspicion that

8    it was Mr. Sterling backed up by anger and the fact that the

9    CIA despises Mr. Sterling now to go on for 13 years and do

10   this.

11          But the evidence, which the government didn't tell

12   you about again, is that Mr. Sterling -- excuse me, Mr. Risen

13   will tell you by transcript that he had a wide range of unnamed

14   sources for his reporting.  That's what Mr. Risen is going to

15   tell you.  He had a wide range of sources.  That was a question

16   asked by the government.

17          Folks, that's as good as it gets from Mr. Risen's

18   mouth.

19          And we didn't hear any, any testimony proffered at

20   all by the government from Mr. Risen, the evil person who

21   printed this book, not a thing.  And the government can't fill

22   this void, okay?  There's no way they can fill this; but all

23   they want you to do is speculate about what Mr. Risen heard or

24   what he did, without ever putting on any evidence of that at

25   all.

1              And they know from Mr. Risen's other exhibits,

2    there's a book proposal that Mr. Risen wrote in which he says

3    that he talked to multiple CIA officers about this program.

4              We don't need to put this up, Mr. Francisco.

5              I'll read this to you.  You'll get this at the end of

6    the case.  It's Government Exhibit 128, and in it, it says that

7    Mr. Risen writes:  "CIA officers involved in the operation have

8    come to the author to discuss the case because they now feel

9    enormous guilt for a program that they believe may have aided

10   Iran's nuclear weapons program."

11             You catch all the plurals, ladies and gentlemen?  But

12   who do they -- it must have all -- everybody is lying because

13   it's Sterling giving everything to Risen, and Risen writes

14   these things before there's ever even a criminal investigation

15   at all.  He writes in the, in the preface of his book that

16   you'll get that the book wouldn't be possible without the

17   cooperation of many current and former officials in the

18   intelligence community and other parts of the government.  Many

19   of them were willing to discuss sensitive matters only on a

20   condition of anonymity.  That's Mr. Risen's words.

21             So what do we have to rebut that?  Circumstantial

22   evidence.  Sterling, it must have been Sterling; but it's just

23   an invitation to speculate; and that's not the burden that the

24   government carries here.

25             So again, I say to you, listen closely for direct

1    evidence of Mr. Sterling's supposed acts.  They don't exist.

2    No such evidence exists.

3          And when you get the book, the speculation won't

4    even -- isn't even played out by reading the book.  The

5    beginning of chapter 9 details an event which took place in

6    2004 which led to the death of Iranian agents.

7          Folks, Sterling wasn't at the CIA, okay?  He wasn't

8    there.  They can't pin this one on him.  That's the first thing

9    that's in it.  It's not him.

10          And then later in the book, on page 207 -- again,

11   you're going to -- we're going to go through this.  It's going

12   to get mind-numbing, I'm sure, to you soon enough, but when

13   we're actually looking at the book, on page 207, there's

14   writing about an NSA program, of the NSA supposedly being

15   involved in tracking an Iranian official to see that the plans

16   are delivered.  I'm not doing a good job of telling you what it

17   says, but the CIA's people are going to tell you that's

18   completely false.  That never happened.  Nobody ever tracked an

19   Iranian official picking up the plans in Iran and bringing --

20   picking them up in Vienna and bringing them to Iran.  It's

21   completely false.

22          So what is Mr. Risen?  Is he a fableist?  Is

23   Mr. Sterling the source for his fables?  What is, what is going

24   on?  There's no way that Sterling could have told him that.

25   Apparently, it's completely untrue.

1          You'll look more into the book.  Mr. Merlin, who

2     you'll hear testify by videotape, he, he's quoted -- his

3     language attributed to this Russian is in quotes in this book,

4     okay?  That's on page 207.  And I asked him at the deposition

5     to read it out loud, and you'll hear him speak in his Russian

6     accent exactly the words that are in this book.

7          And then the next question is, "Can you tell me how

8     it is that Mr. Risen has you quoted in this book?"

9          And he says, "No, I can't explain that at all.  No

10    possible explanation for that."

11          "Are those words that you used?"

12          "Yes, those are words that I used.  It's a correct

13    quote, but I never talked to him, and I don't know anybody who

14    did."

15          There's another one of those quotes as well.  The --

16          Merlin tells in Risen's book in quotes, he talks

17    about delivering the weapons -- the plans for a nuclear weapon

18    and wrapping them in a newspaper and putting them on top of a

19    mailbox in Austria.  There's the high-quality operation we're

20    talking about.

21          But what's more important than that?  There's no

22    report that says he wrapped them in a newspaper.  He doesn't

23    remember telling Mr. Sterling that he wrapped the plans for a

24    nuclear weapon in a newspaper, but what Mr. Risen has in the

25    book is accurate, so where did it come from?

1          It's not my job to prove to you where it came from,

2   but it didn't come from Jeffrey Sterling.

3          And there's all kinds of information in this book

4   that you'll see came from sources other than Mr. Sterling.  It

5   couldn't have come from Mr. Sterling, and it will take apart

6   the mosaic, it will take the pieces out of the jigsaw puzzle

7   that Mr. Trump wants you to put together for them.

8          Mr. S. -- Bob, I guess we call him -- is a very

9   interesting witness in this case.  He knew everything that was

10  in this book, okay, everything that's in chapter 9.  He was

11  there the whole time.  There isn't any debate about that, and

12  so when Mr. Trump tells you that, that this didn't happen,

13  nobody else -- Bob knew everything, okay?  Bob knew everything,

14  and the CIA just takes his word that he didn't ever speak to

15  Mr. Risen.

16         We're going to get phone records in this case out the

17  gazoo, and Mr. Sterling gets the Friends and Family Plan from

18  the government.  Everybody he talked to in the last ten years,

19  if he called somebody, they went and got his phone records.  If

20  he stayed at somebody's house, they got his.  But for Bob, they

21  don't even bother.  They don't even bother.  They don't have

22  Mr. Risen's phone records.

23         So how do you prove that Bob -- you're going to come

24  in in a circumstantial case and say:  I'm going to prove to you

25  that Bob S. and Jim Risen never talked to each other, but I

1    never got either one of their phone records, but it must have

2    been Sterling.  There's the pattern of what we have here.

3          There are some e-mails, very short traces of e-mails

4    between Sterling and Risen, but they don't add up to anything

5    at all.  There's no evidence at all of Mr. S.'s e-mail traffic

6    at all, none, not a single thing.

7          And guess what?  The CIA can't tell you what

8    Mr. Sterling was doing.  You would think the CIA would be able

9    to track the e-mails or the printing or the comings and goings

10   of a case officer; and they say:  No, sorry, we can't.  We

11   can't do that for you, right?  It's not there.  We don't know.

12         And this is important because when you read this

13   book, you will see that Mr. Risen obviously had access to a lot

14   of documents, but when did Sterling get them?  Sterling was out

15   of the program in 2000, in May of 2000, and there's no sense or

16   even suggestion of a leak between that time and 2003.

17         So what did he do, go home with a backpack full of

18   documents from the CIA that he printed up, and nobody can tell

19   you when it happened, where it happened?  Did you hear a

20   witness who's going to say Jeffrey Sterling printed up a

21   letter?

22         Bob, by the way, the letter Mr. Trump told you, Bob

23   was working on that letter with Merlin as well.  It wasn't just

24   Mr. Sterling.  And it was Merlin, by the way, who will tell you

25   he was the last person with a copy of the letter, the

1   approximate letter that ends up in the book.

2          So there are other things about firing sets and, for

3   example, Merlin only refers to the plans as blueprints.

4   Mr. Risen refers to them as blueprints.  In not a single cable

5   that Mr. Sterling drafted do you see those words.

6          But again, Mr. S., Merlin, they'll all deny being the

7   source.  They've all seen what's happened to Mr. Sterling, and

8   nobody is going to admit to having anything to do with this.

9          So there's lots of possibilities to how this

10  happened, and I'm going to leave you with one other one at this

11  time.  Before I do that, though, the phone records, these phone

12  calls Mr. Trump just told you about, the April -- oh, excuse

13  me, the February 2003 call was 50 seconds, I'm sorry.  The next

14  calls, there were six apparent calls in 2003 that add up to

15  three minutes, three-and-a-half minutes over a three-week time

16  period.  I guess the government wants you to think that all the

17  information in Risen's book came in over those as well.

18         So there is another scenario, I'll suggest to you;

19  and again, the defendant has no burden of proof in this case;

20  but listen, listen to something else that may have happened

21  that the evidence in this case will support.

22         Mr. Sterling goes up to the Senate Select

23  Intelligence Committee and tells, tells his story, as he was

24  legally entitled to do.  No one's going to tell you otherwise.

25  And one of the people that he tells it to is someone named

1    Vicki Divoll, and my distinguished colleague here already gave

2    you her name.  What do we know about Vicki Divoll?  She's a

3    very partisan Democrat who works, been working up on the Hill

4    for a while, very experienced.

5            And what happens within about a month after, after

6    this happens?  Ms. Divoll is fired from her job at the Senate

7    Select Intelligence Committee, and what do you think she was

8    fired for?  She was fired because of a story about something

9    dealing with the CIA that happened in front of that committee

10   was published by Mr. Risen.  That's exactly what happened.

11           I'll show you the story.  It's called "Broad Domestic

12   Role Asked for CIA and the Pentagon."  It details an effort by

13   the CIA in 2003 to get permission to obtain records in the

14   United States without a subpoena.

15           The leak is plainly attributed to Mrs. Divoll.

16   You'll get to hear her testify and hear her answer how it is

17   that the story got out, because what she did was tell somebody

18   else -- her story is:  I told somebody else, who told somebody

19   else, and eventually, somehow Mr. Risen got ahold of it.  Okay?

20   Does that sound like something that happened?  It did happen.

21           And now we'll see what she has to say about it.

22   She's going to deny ever talking to Mr. Risen, either; but

23   there's no question because -- that she got fired for a story

24   that makes it to Jim Risen.  And what could have happened after

25   that?  Risen finds out about the story, and what story does he

1    find out about?  The one that Sterling told her, right?  That's

2    the consistent story.  Who else told the Senate Select

3    Intelligence Committee?  He did.

4           And then if you read Risen's -- what we have here is

5    evidence, Mr. Risen says he reached out to many officials and

6    other intelligence officers and other people and reached for

7    more information.  Why is it that it's only Mr. Sterling that

8    the government can think of to tell you that he may have

9    called?  As I say, they don't even ask for Bob's phone records

10   to see whether it was him or anybody else.

11          And, of course, in this time now was the time the

12   book is being written, there's reasons for these officials to

13   be worried.  The CIA is getting all kinds of bad press for not

14   finding any weapons of mass destruction in Iraq; and what do

15   they need, another story about a Russian scientist dropping off

16   plans for a nuclear weapon wrapped in a newspaper?  No, they

17   don't need that.

18          So it's equally plausible, ladies and gentlemen, that

19   Mr. Risen then went and talked to other people.  I don't know

20   who.  I don't have to prove it.  I don't know where else it

21   came from, but if you look at the documents, you'll see he got

22   a lot of documents from a lot of people, including documents

23   that they admit Mr. Sterling never had in the first place.  And

24   whoever tried to help him may not be the last person ever

25   burned by a reporter, but they didn't get the story that they

1    wanted.  So you'll consider that evidence as you hear the rest

2    of these witnesses testify.

3           Mr. Sterling is also charged with mail fraud somehow

4    for selling Mr. Risen's book here in Virginia, stealing

5    property and putting it in a book.  It's a silly charge for

6    which there's no basis.  In fact, the, the sale of the book in

7    Virginia is probably the only thing that, the evidence you'll

8    ever hear of anything that happened; and you can consider that

9    as to why that was raised.

10          He's charged with obstruction of justice apparently

11   because an e-mail was deleted on his computer at some point in

12   time, and you'll see the government has no evidence that that

13   was done in any way to hinder or delay or any kind of an

14   investigation.

15          And again, I want to thank you-all for your service,

16   valuable service as jurors in this case.  It's going to be a

17   slog looking through all these details; but I hope I gave you a

18   good outline of the defendant's case; and again, we will ask

19   you to give Mr. Sterling his life back at the end of this case.

20   Thank you very much.

21          THE COURT:  All right, ladies and gentlemen, we're

22   going to take about a five- -- only a five-minute break, so

23   I'll ask you to stay in the jury room.  We have to set up the

24   courtroom for the special witnesses who are going to be

25   beginning.  Five-minute recess.

1          (Recess from 2:56 p.m., until 3:08 p.m.)

2          *          *          *          *          *

3

4                    CERTIFICATE OF THE REPORTER

5      I certify that the foregoing is a correct excerpt of the

6   record of proceedings in the above-entitled matter.

7

8

9                                        /s/
                                  Anneliese J. Thomson
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25