S⌐ .E T 14 /SEP 99 STAFF

CITE

TO: Langley

FOR:

REF: NONE

TEXT:

    1. THE FOLLOWING IS PAR FOR SAMUEL CRAWFORD , AIN

        A. GENERAL INFORMATION:

           1) GRADE: 12/1

           2) OCCUPATIONAL TITLE: OPERATIONS OFFICER

           3) REPORTING PERIOD: 10 JAN 99 - 31 JULY 99

           4) TYPE OF REPORT: ANNUAL

           5) DATE REPORT DUE IN OP: 30 AUG 99

        B. OVERALL PERFORMANCE RATING:................()

SECRET

GOVERNMENT EXHIBIT 59 1:10CR485

F S

X00037

S╌╌╌╌╌╌T

C. KEY JOB ELEMENTS AND RATING:

D. NARRATIVE COMMENTS:

1) BY SUPERVISOR **Mr. H.** [ ] AIN [ ]
CHIEF- ⎤ BRANCH.

NARRATIVE:
I CERTIFY SUBJECT HAS NOT YET MASTERED THE SKILLS OF A FULL PERFORMANCE OPERATIONS OFFICER.

SUBJECT IS A GS-12 OPERATIONS OFFICER SERVING IN AN OPERATIONS OFFICER POSITION IN [ ] **office** ONE OF THE DIRECTORATE'S [ ] **offices** AND IS ONE OF [ ] GS-12 C/OS IN A [ ] C/O BRANCH.

IMPACT:

AS **office** 'S [ ] MANAGER, SUBJECT QUICKLY DEMONSTRATED HIS EXPERTISE ON THIS HIGH PRIORITY TARGET THROUGH HIS SECURE AND PRODUCTIVE HANDLING OF AN [ ] ASSET. SUBJECT HAS INCREASED THIS ASSET'S INTELLIGENCE PRODUCTION AND OBTAINED TIMELY REPORTING FROM THE ASSET IN RESPONSE TO A HIGH PRIORITY POLICYMAKER REQUIREMENT ON RECENT [ ]. SUBJECT HANDLES THIS ASSET I [ ]. HIS EXTENSIVE KNOWLEDGE OF THE [ ] TARGET AND SOUND OPERATIONAL JUDGMENT HAVE ENABLED HIM TO MANAGE HIS OWN OPERATIONS WHILE PROVIDING INSIGHTFUL GUIDANCE TO OTHER **office** OFFICERS WORKING THE [ ]. IN ADDITION TO THE VALUABLE INTELLIGENCE DESCRIBED ABOVE, SUBJECT PRODUCED [ ] (INCLUDING ONE [ ] REPORT) INTELLIGENCE REPORTS ON [ ] DURING THE REPORTING PERIOD.

COMPETENCIES:

: SUBJECT HAS NOT YET MET EXPECTATIONS IN HIS COMPETENCY.
SUBJECT ARRIVED AT **office** IN DECEMBER 1998 (MID WAY THROUGH THE GS-12 PAR PERIOD) AND HAS MANAGED TO [ ] AND BEGIN [ ] AND [ ] OF TWO [ ]. SUBJECT HAS NURTURED A PRODUCTIVE WORKING RELATIONSHIP WITH THE **USG Agency** ⎤ WITH WHOM **office** HAS HAD MIXED RESULTS IN THE PAST. AS A RESULT OF THIS COOPERATIVE RELATIONSHIP SUBJECT HAS **identified** TWO POTENTIAL RECRUITMENT TARGETS AMONG THE [ ] AND IS WORKING CLOSELY WITH [ ] TO DEVELOP APPROACHES TO THESE TARGETS. BASED ON SUBJECT'S SOUND OPERATIONAL JUDGMENT AND EXTENSIVE AREA EXPERTISE, **office** IS CONFIDENT THAT SUBJECT WILL SUCCEED IN ADVANCING SOME OF HIS CURRENT [ ] THROUGH THE [ ] CYCLE AND INITIATE OTHER PROMISING RELATIONSHIPS DURING THE NEXT RATING PERIOD.

: SUBJECT FULLY AND COMPLETELY MET EXPECTATIONS. SUBJECT DEMONSTRATED GOOD TRADECRAFT IN THE HANDLING OF HIS ASSIGNED CASES AND DEMONSTRATED STRICT ADHERENCE TO THE [ ]
IN PREPARING TO MOVE AN [ ] FROM [ ], SUBJECT HAS INTRODUCED GREATER LEVELS OF [ ] INTO THE [ ] AND MEETINGS ARRANGEMENTS FOR THIS OPERATION.
WHILE [ ] TWO FOREIGN OFFICIALS WHILE IN [ ] GUISE, SUBJECT HAS DEMONSTRATED HIS ABILITY TO OPERATE SECURELY IN [ ]

ADDITIONALLY, SUBJECT HAS DEMONSTRATED HIGH STANDARDS OF

S╌╌╌╌RET

S⎻   ⎴T

TRADECRAFT IN HIS EXEMPLARY HANDLING OF A SENSITIVE CASE.

: SUBJECT FULLY AND COMPLETELY MET EXPECTATIONS.
SUBJECT MAINTAINED A STRONG CI/SECURITY POSTURE IN ALL THAT HE DID DURING THE REPORTING PERIOD, PARTICULARLY A HIGH INTEREST SENSITIVE CASE. SUBJECT MAINTAINED A STRICT ADHERENCE TO THE            AND IS CONSTANTLY SEEKING TO IMPROVE THE SECURITY OF HIS CASES. SUBJECT CONTINUED TO **vet** HIS ASSETS THROUGH WELL PLANNED **evaluations** WITH     AND     OBTAINED FROM     INFO AND CLOSE COOPERATION WITH THE     AND     .
SUBJECT'S CONTACT REPORTS ARE THOROUGH, CONCISE AND TIMELY. SUBJECT'S     ARE CREATIVE AND WELL PLANNED.

: SUBJECT SIGNIFICANTLY EXCEEDED EXPECTATIONS. IN ADDITION TO SERVING AS A SUBSTANTIVE EXPERT ON [     ] FOR THE **office**, SUBJECT PRODUCED [ ] INTELLIGENCE REPORTS (INCLUDING AN     REPORT) DURING THE REPORTING PERIOD. MANY OF THE REPORTS SUBJECT PRODUCED WERE THE RESULT OF LONG HOURS OF TEDIOUS, TECHNICAL TRANSLATION WORK PERFORMED BY SUBJECT.
IN ADDITION TO REPORTING ON [     ] ISSUES, SUBJECT HAS REPORTED ON [     ] PREPAREDNESS FOR     AND [     ] [     ] ISSUES.
SUBJECT HAS ALSO PRODUCED VALUABLE     REPORTING ON THE LOCAL [     ] PRESENCE.

**INITIATIVE/LEADERSHIP**: SUBJECT FULLY AND COMPLETELY MET EXPECTATIONS.
AS **office** 'S ISSUE COORDINATOR     , SUBJECT HAS ENCOURAGED HIS COLLEAGUES TO ENGAGE THIS HARD TARGET. IN DOING SO, SUBJECT PROVIDED DETAILED, AND NUANCED GUIDANCE THAT MAXIMIZED THE EFFECTIVENESS OF OPERATIONAL EFFORTS.
SUBJECT HAS WORKED HARD TO FURTHER DEVELOP A TEAM CONCEPT WITH THE LOCAL     [     ] WHICH HAS LED TO IMPROVED COORDINATION AND NEW OPERATIONAL INITIATIVES.
SUBJECT HAS ALSO DEVELOPED EFFECTIVE WORKING RELATIONSHIPS WITH OTHER     OFFICES IN **office** 'S [     ].

**LEARNING**: SUBJECT FULLY AND COMPLETELY MET EXPECTATIONS.
DURING THE PERIOD COVERED BY THIS PAR, HE SUCCESSFULLY COMPLETED THE     COURSE AS WELL AS [     ] LANGUAGE IMMERSION WITH OTHER NE/[     ] OFFICERS. SUBJECT HAS EXPLOITED THE KNOWLEDGE HE ACQUIRED DURING THE     COURSE IN HIS DAY TO DAY OPERATIONAL ACTIVITIES AT **office**.

2) BY REVIEWING OFFICIAL **Mr. S. 2** [ ], AIN [     ],

I FULLY CONCUR WITH THE RATING OFFICER'S ASSESSMENT OF SUBJECT'S PERFORMANCE. DURING THIS PAR PERIOD, SUBJECT HAS DEMONSTRATED SOUND JUDGMENT, SOLID TRADECRAFT AND EFFECTIVE WRITING SKILLS. IN SUMMARY, SUBJECT HAS HANDLED ALL THE ACTIVITIES AND RESPONSIBILITIES GIVEN TO HIM UPON ARRIVAL WITH SKILL AND CONFIDENCE AND HAS DEMONSTRATED THE POTENTIAL TO FULFILL ALL THE REQUIREMENTS FOR PROMOTION TO THE FULL PERFORMANCE LEVEL DURING HIS TOUR IN [     ] [     ], IN ADDITION TO THE PROFESSIONAL SKILLS AND POTENTIAL DEMONSTRATED BY SUBJECT, SUBJECT HAS EXHIBITED A COLLEGIAL AND CONSTRUCTIVE APPROACH TO HIS WORK THAT IS LAUDABLE. I AM CONFIDENT THAT SUBJECT WILL BE ABLE TO EXPLOIT THE SOUND OPERATIONAL BASE HE ESTABLISHED DURING HIS FIRST SEVEN MONTHS IN **office** TO BRING SOME OF HIS PROMISING     TO CLOSURE AND FULFILL THE EXPECTATIONS OF THE     COMPETENCY FOR PROMOTION TO GS-13.

S⎻   ⎴T

Samuel L. Crawford
SSN:
GS-12/3 00
DO/NE (DO/NR)

00-1440564

FRP: . . . . . . . . .
STAFF

PAGE 001
TOR: 23 AUG 00

S      T 23   AUG 00 STAFF

CITE

TO: DIRECTOR.

FOR: NO DISSEM C/NR/       INFO C/NE/      . C/NR/

SUBJECT: EYES ONLY - PAR FOR Samuel L. Crawford

REF: NONE

TEXT:

   1. THE FOLLOWING IS PAR FOR Samuel L. Crawford.

      A. GENERAL INFORMATION:

         1) GRADE: GS-12

         2) OCCUPATIONAL TITLE: OPERATIONS OFFICER

         3) REPORTING PERIOD: 1 AUGUST 1999 - 31 JULY 2000

         4) TYPE OF REPORT: ANNUAL

         5) DATE REPORT DUE IN OP: 31 AUGUST 2000

      B. OVERALL PERFORMANCE RATING:...............()

GOVERNMENT
EXHIBIT
60
1:10CR485

E-1
ATT. 2

X00040

C. KEY JOB ELEMENTS AND RATING:

D. NARRATIVE COMMENTS:

1) BY SUPERVISOR ( Mr. L        EMPLOYEE NO. [    ] CHIEF/[    ] BRANCH)

I CERTIFY THAT SUBJECT HAS FAILED TO MASTER ALL THE COMPETENCIES REQUIRED OF AN OPERATIONS OFFICER TO ADVANCE TO GS-13.

SUBJECT IS A GS-12 OPERATIONS OFFICER ASSIGNED AS AN OPERATIONS OFFICER IN THE [    ] WHICH IS COMPRISED OF [    ], [    ]. SUBJECT'S PRIMARY JOB RESPONSIBILITY WAS TO interface with FOREIGN TARGETS, HANDLE ONGOING CASES AND SERVE AS office 'S [    ] TARGETING REFERENT. ON 18 JULY 2000, I REQUESTED THAT SUBJECT PROVIDE INFORMATION FOR THIS PAR, I.E. PAR NOTES, BY COB 04 AUGUST. I MADE A SECOND REQUEST ON 07 AUGUST AND EXTENDED THE DEADLINE TO COB 09 AUGUST BUT DID NOT RECEIVE ANY PAR NOTES FROM SUBJECT.

HIGHLIGHTS:

SUBJECT EFFECTIVELY HANDLED A FOREIGN SOURCE UNDER [    ] WHO PRODUCED [    ] REPORTS ON THE [    ] TARGET. ONE REPORT PROVIDED THE FIRST DETAILS OF A NEW [    ] [    ]. SUBJECT CONVINCED THE SOURCE TO ACCEPT [    ] WHICH REPRESENTED A KEY OPERATIONAL DEVELOPMENT IN THE PROGRESS OF THIS CASE.

SUBJECT HANDLED A SENSITIVE ASSET WHO SUCCESSFULLY COMPLETED THE FIRST STAGE OF A COMPLEX [    ] [    ] TARGET WHICH WON PRAISE FROM DCI.

SUBJECT'S SECURE AND PRODUCTIVE HANDLING OF ANOTHER [    ] RESULTED IN WELL-RECEIVED REPORTING ON [    ] [    ]

[    ]: SUBJECT DID NOT FULLY MEET EXPECTATIONS DUE TO A LACK OF [    ] WORK. SUBJECT HAD NO SUSTAINED OPERATIONS DURING THIS REVIEWING PERIOD WHICH PRECLUDED HIM FROM HAVING ANY REAL OPPORTUNITY TO WORK TOWARD THE RECRUITMENT OF NEW SOURCES. SUBJECT WAS COUNSELED ON HIS PERFORMANCE IN THIS AREA BUT WITH NO APPRECIABLE IMPROVEMENT. SUBJECT MET WITH AN [    ] OFFICIAL BUT AFTER A COUPLE OF MEETINGS SUBJECT DROPPED THE CONTACT DUE TO TARGET'S LACK OF ACCESS. TO HIS CREDIT, SUBJECT USED HIS [    ] EFFECTIVELY TO MEET A HIGH PRIORITY [    ] SUBJECT ATTEMPTED SEVERAL TIMES TO GET A SECOND MEETING WITH THE [    ] BUT THE TARGET BACKED OUT OF ONE INVITATION AND PROVED DIFFICULT TO RECONTACT. SUBJECT ATTENDED A FEW FUNCTIONS FOR [    ] PURPOSES BUT DID NOT MEET ANY VALID [    ] LEADS.

[    ]: SUBJECT FULLY MET EXPECTATIONS. SUBJECT DEMONSTRATED HIS AMPLE TRADECRAFT SKILLS IN HIS HANDLING OF ONGOING CASES. SUBJECT SECURELY AND PRODUCTIVELY HANDLED A SENSITIVE ASSET WHO WAS A KNOWN HANDLING PROBLEM DUE TO HIS DEMANDING AND

E-1

X00041

OVERBEARING NATURE. SUBJECT PERSEVERED WITH THIS ASSET AND APPLIED HIS TRADECRAFT SKILLS TO WORK AROUND THESE PROBLEMS AND GUIDE THE ASSET THROUGH THE SUCCESSFUL FIRST STAGE OF A HIGH PRIORITY **classified** OPERATION. SUBJECT EFFECTIVELY USED IN HIS HANDLING[ ] AND SUBJECT'S ABILITY TO MOVE THIS CASE INTO FULL MODE WAS HIGHLY COMMENDABLE.

: SUBJECT FULLY MET EXPECTATIONS. SUBJECT EXHIBITED GOOD AND SECURITY AWARENESS IN HIS HANDLING CASES. [ ]

[ . , THE ASSET CONDUCTED THE OPERATION SUCCESSFULLY THANKS IN LARGE PART TO SUBJECT'S GUIDANCE.

: SUBJECT FULLY MET EXPECTATIONS. SUBJECT PRODUCED[ ] INTELLIGENCE REPORTS DURING THIS PERIOD. IN ADDITION TO THE WELL-RECEIVED[ ] REPORTING MENTIONED IN THE HIGHLIGHTS, SUBJECT WAS EFFECTIVE IN DIRECTING AN [ ] AGENT TO REPORT ON MATTERS WHICH RESULTED IN WELL-RECEIVED REPORTING ON [ ] [ ] THE 1999 [ ] SUBJECT ALSO PRODUCED A TIMELY SERIES OF USEFUL REPORTS FROM ASSETS ON THE STATUS OF FOREIGN COUNTRIES.

INITIATIVE AND LEADERSHIP: SUBJECT DID NOT FULLY MEET EXPECTATIONS DUE PRIMARILY TO A LACK OF INITIATIVE IN GENERATING NEW OPERATIONS. IN HIS ROLE AS **office** 'S [ ] COORDINATOR SUBJECT SUPPORTED **office** OFFICERS IN [ ] OFFICIALS IN [ ]. SUBJECT MADE SOLID PROGRESS ON **office** 'S BEHALF IN DEVELOPING A PRODUCTIVE WORKING RELATIONSHIP WITH COUNTERPARTS AT THE [ ] OFFICE RESPONSIBLE [ ] WHICH HAS BEEN STRAINED IN THE PAST.

LEARNING: SUBJECT FULLY MET EXPECTATIONS. SUBJECT CONTINUED TO EXPAND HIS [ ] EXPERTISE THROUGH HIS ACTIVE PARTICIPATION IN TWO [ ] RELATED OPS CONFERENCES. SUBJECT ALSO WORKED ON IMPROVING HIS [ ] LANGUAGE CAPABILITIES BY USING [ ] TRANSLATING [ ] LANGUAGE DOCUMENTS RECEIVED FROM

2) BY REVIEWING OFFICIAL ( [ ] ) (AIN: [

THERE IS NO APPROPRIATE REVIEWING OFFICIAL. PLEASE SEE SEPARATE CABLE TRAFFIC FROM [ ] REGARDING SUBJECT'S REFUSAL TO READ, SIGN, OR ACKNOWLEDGE THIS PAR. AS PART OF THE STANDARD PREPROGRAMMED PAR CABLE FORMAT, PARAGRAPH SEVEN BELOW CANNOT BE DELETED OR MODIFIED BY **office**. THEREFORE, IN PARAGRAPH SEVEN BELOW, THE LINE "AND HAS BEEN ACKNOWLEDGED BY THE EMPLOYEE" IS NOT ACCURATE AND SHOULD BE DELETED.

3) TOTAL MONTHS IN POSITION: (18)

4) TOTAL MONTHS UNDER SUPERVISION: (12)

5) INTERIM DISCUSSIONS WERE HELD: 14 OCTOBER 1999; 05 JANUARY 2000; 06 APRIL 2000

SF

E-1
Att. 2

X00042

6) EMPLOYEE COMMENTS:

7) CERTIFICATION: I CERTIFY THAT THE ABOVE PERFORMANCE APPRAISAL WAS PREPARED BY Mr. L[       ] EMPLOYEE NO.[       ]
[ ]                BRANCH, REVIEWED BY
        (AIN: [2.      ], AND HAS BEEN ACKNOWLEDGED BY THE EMPLOYEE.

### Head of the office

DATE: 8/23/00

2. FILE: NONE. CL BY:[    ] CL REASON: 1.5(C), DECL ON: X1, DRV FROM:

CABLETYPE: CICO FPAR 2.6.
END OF MESSAGE

E-1
ATT. 2

**The New York Times**

GOVERNMENT EXHIBIT 75 1:10CR485

MARTHA

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers, please click here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now. »

November 4, 2001
A NATION CHALLENGED: THE INTELLIGENCE AGENCY

# A NATION CHALLENGED: THE INTELLIGENCE AGENCY; Secret C.I.A. Site in New York Was Destroyed on Sept. 11

By JAMES RISEN

**WASHINGTON, Nov. 3—** The Central Intelligence Agency's clandestine New York station was destroyed in the Sept. 11 attack on the World Trade Center, seriously disrupting United States intelligence operations while bringing the war on terrorism dangerously close to home for America's spy agency, government officials say.

The C.I.A.'s undercover New York station was in the 47-story building at 7 World Trade Center, one of the smaller office towers destroyed in the aftermath of the collapse of the twin towers that morning. All of the agency's employees at the site were safely evacuated soon after the hijacked planes hit the twin towers, the officials said.

The intelligence agency's employees were able to watch from their office windows while the twin towers burned just before they evacuated their own building.

Immediately after the attack, the C.I.A. dispatched a special team to scour the rubble in search of secret documents and intelligence reports that had been stored in the New York station, either on paper or in computers, officials said. It could not be learned whether the agency was successful in retrieving its classified records from the wreckage.

A C.I.A. spokesman declined to comment.

The agency's New York station was behind the false front of another federal organization, which intelligence officials requested that The Times not identify. The station was, among other things, a base of operations to spy on and recruit foreign diplomats stationed at the United Nations, while debriefing selected American business executives and others willing to talk to the C.I.A. after returning from overseas.

The agency's officers in New York often work undercover, posing as diplomats and business executives, among other things, depending on the nature of their intelligence operations.

The recovery of secret documents and other records from the New York station should follow well-rehearsed procedures laid out by the agency after the Iranian takeover of the United States

Embassy in Tehran in 1979. The revolutionaries took over the embassy so rapidly that the C.I.A. station was not able to effectively destroy all of its documents, and the Iranians were later able to piece together shredded agency reports. Since that disaster, the agency has emphasized rigorous training and drills among its employees on how to quickly and effectively destroy and dispose of important documents in emergencies.

As a result, a C.I.A. station today should be able to protect most of its secrets even in the middle of a catastrophic disaster like the Sept. 11 attacks, said one former agency official. "If it was well run, there shouldn't be too much paper around," the former official said.

The agency's New York officers have been deeply involved in counterterrorism efforts in the New York area, working jointly with the Federal Bureau of Investigation and other agencies. Many of the most important counterterrorism cases of the last few years, including the bureau's criminal investigations of the August 1998 bombings of two United States Embassies in East Africa and the October 2000 bombing of the U.S.S. Cole in Yemen have been handled out of New York.

The United States has accused Osama bin Laden and his Al Qaeda terrorist network of conducting both of those attacks.

But United States intelligence officials emphasize that there is no evidence that the hijackers knew that the undercover station was in the World Trade Center complex.

With their undercover station in ruins, C.I.A. officers in New York have been forced to share space at the United States Mission to the United Nations, as well as borrow other federal government offices in the city, officials said. The C.I.A.'s plans for finding a new permanent station in New York could not be determined.

The agency is prohibited from conducting domestic espionage operations against Americans, but the agency maintains stations in a number of major United States cities, where C.I.A. case officers try to meet and recruit students and other foreigners to return to their countries and spy for the United States. The New York station, which has been led by its first female station chief for the last year, is believed to have been the largest and most important C.I.A. domestic station outside the Washington area.

The station has for years played an important role in espionage operations against Russian intelligence officers, many of whom work undercover as diplomats at the United Nations. Agency officers in New York often work with the F.B.I. to recruit and then help manage foreign agents spying for the United States. The bureau's New York office, at 26 Federal Plaza, was unaffected by the terrorist attack.

The destruction of the C.I.A.'s New York station has added to the intense emotions shared by many of its employees about the agency's role in the battle against terrorism. For some, the

A Nation Challenged: Intelligence Agency; Secret C.I.A. Site...

Case 1:10-cv-00485-EMBTH Document 406-1 Filed 01/16/15 Page 10 of 12 PageID #: 3115

station's destruction served to underscore the failure of United States intelligence to predict the attacks.

In the immediate aftermath of the attacks, morale suffered badly within the C.I.A., some officials said, as the agency began to confront what critics have called an intelligence failure on the scale of Pearl Harbor.

But the terrorist attacks have also brought an urgent new sense of mission to the agency, which has been flooded with job applications as well as inquiries from former officers eager to return to work. Congress is pouring money into the agency's counterterrorism operations, and the C.I.A. seems poised to begin focusing its resources on terrorism in much the same way it once focused on the Soviet Union in the cold war.

The attacks were not the first in which the C.I.A. was directly touched by terrorists. In 1983, seven agency officers died in the suicide car bombing of the United States Embassy in Beirut. Among the others killed was the agency's station chief in Lebanon, William Buckley, who died in captivity after being kidnapped by terrorists in 1984, and Richard Welch, the agency's Athens station chief, who was shot to death by Greek terrorists in 1975.

Copyright 2011 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Back to Top

# Fired by C.I.A., He Says Agency Practiced Bias

## First Discrimination Suit by a Black Officer

By JAMES RISEN

WASHINGTON, March 1 — As a young case officer at the Central Intelligence Agency, Jeffrey Sterling says, he was eager to begin his first overseas posting, in Bonn, and he relished his secret assignment to recruit Iranians as spies.

After long hours spent on the Iranian desk at C.I.A. headquarters and nearly a year in language school learning Farsi, he felt that he was ready to put his training to use.

But after waiting two months for orders that never arrived, he said, he returned to the agency headquarters in Virginia in the fall of 1997 to ask his bosses why he had not been given any new cases.

The answer stunned him, he said.

According to Mr. Sterling, a supervisor on the Iran Task Force of the agency blurted out why he had not been given new assignments. As a "big black man speaking Farsi," Mr. Sterling "stuck out" and would draw too much attention to the agency's secret Iranian agents. The supervisor, who is white, suggested that a black man, especially a tall athletically built black man like Mr. Sterling, could not meet secretly with Iranians without putting the agency's most sensitive Iranian cases at risk, Mr. Sterling said.

"He said, 'You kind of stick out as a big black guy,'" Mr. Sterling recalled. "I said, 'When did you realize I was black?'"

Mr. Sterling said he was a victim of racial discrimination throughout his career at the agency. He has been fired and has sued the agency, which vigorously denies the accusations.

Agency officials said they were prevented from responding to Mr. Sterling's specific statements by his refusal to waive his privacy rights. They said his dismissal stemmed from his refusal to accept a new assignment.

Mr. Sterling, 34 and unemployed, said that he was embittered by his experiences and that he believed he had never been given a fair chance to prove himself inside the agency's clubby atmosphere.

Agency officials and outside lawyers who handle cases against the agency said Mr. Sterling was the first black case officer to file a racial discrimination suit against the agency. Mr. Sterling said other black case officers shared his feelings but were afraid to speak up.

"I think they bring minorities in the door to maintain appearances, and so they can say they are diverse," he said of the agency. "But that's just a facade."

Although the agency has expressed a determination to become more diverse, white men have long dominated its top management. Since the agency started in 1947, every director, deputy director and chief of espionage operations has been a white man.

In the mid-1990's, the white male control over espionage faced its first major legal challenge from a class-action suit by a group of women who were case officers and who charged sexual discrimination. The women won a $990,000 settlement in federal court in 1995.

Mr. Sterling also said he believed that his experience showed how difficult it had been for the agency to adapt to a changing world.

The failure to develop more case officers from diverse backgrounds, he said, helped explain why the agency was unable to penetrate Al Qaeda's terrorist network before Sept. 11, while an American teenager, John Walker Lindh, was able to join the group.

"If a skinny white kid from the Bay Area can go up and knock on the door of the Taliban and Al Qaeda and be welcomed in, imagine what a nontraditional C.I.A. officer would have been able to do," Mr. Sterling said.

John Brennan, the deputy executive director of the agency, who met Mr. Sterling several times about his case, said there was no evidence that racial discrimination had caused his problems.

"It was an unfortunate situation," Mr. Brennan said, "because Jeffrey was a talented officer and had a lot of the skills we are looking for, and we wanted him to succeed.

"We were quite pleased with Jeffrey's performance in a number of areas. Unfortunately, there were some areas of his work and development that needed some improvement."

In his suit, filed in August in Federal District Court in Manhattan, Mr. Sterling contends that he faced a pattern of discrimination throughout his career.

The challenge of Mr. Sterling's fitting in was complicated by the secretive nature of the agency, where even mundane personnel matters are classified.

Mr. Sterling contends that the managers retaliated against him after he had filed a complaint in 2000 with the antidiscrimination office at the agency over his treatment on his last field assignment, in the New York station. The agency, he said, ordered him to undergo a complete security reinvestigation two years ahead of schedule.

In August 2000, Mr. Sterling was



GOVERNMENT EXHIBIT 83 1:07CR25

Jeffrey Sterling says other black case

forced to leave the New York station. In March 2001, he was placed on administrative leave. He said he was subsequently discharged for refusing an assignment to return to the Iran Task Force, although agency officials said he refused other possible assignments, as well. He was let go in October.

Mr. Sterling and others familiar with his case said they believed that

*An ex-employee says he asked the Iran unit, 'When did you realize I was black?'*

he and other young black case officers lacked mentors to help them navigate the byzantine world of espionage early in their careers.

Agency officials said they were working to improve recruiting and developing employees from minorities. About 12 percent of the professional staff members of the Directorate of Operations, the espionage arm where Mr. Sterling worked, are members of minorities, agency officials said.

"The agency has been very serious about diversity, and we have a very intense recruitment effort," said



Susana Raab for The New York Times

: officers at the Central Intelligence Agency shared his feelings about discrimination but were afraid to speak up.

Don Cryer, a special assistant to the director of the agency, George J. Tenet, for diversity plans and programs. "Our numbers are rising in all the key areas."

Mr. Cryer said he had also met Mr. Sterling before his dismissal.

"The agency really did try to find a way to help Jeffrey be successful," Mr. Cryer said, "because we truly did see him as an employee with potential."

In fact, Mr. Sterling was just the sort of person whom the agency has said it wants to recruit.

Raised in Cape Girardeau, Mo., the youngest of six children, Mr. Sterling was the sole member of his family to go to college. After graduating from Millikin University in Decatur, Ill., he earned a law degree from Washington University in St. Louis. After that, he responded to a newspaper advertisement from the Central Intelligence Agency and was hired in 1993.

In December 1994, he completed training to become a case officer and joined the Iran Task Force in January 1995. He was the sole black officer there out of 20 to 30 professional staff members, he said. In that unit, Mr. Sterling traveled to Africa and Europe to work with Iranian agents.

After his training in Farsi, followed by another period at headquarters while he went through a divorce, Mr. Sterling was sent to Bonn in September 1997, assigned to recruiting Iranians as agents.

But, he said, his efforts to meet Iranian diplomats were hampered because his "cover," the position he had to pretend to hold while operating for the C.I.A., was as an Army logistics officer. He said his superiors denied his request to switch him to a State Department cover, so he could pose as an American diplomat and move more freely among foreign officials.

While he handled one or two existing cases in Germany, he said, he was not given new cases to develop.

After meeting his supervisors in November 1997, when Mr. Sterling said he was told that he had not been given new cases because his appearance was a hindrance, he demanded that he be allowed to leave Germany, and he returned to headquarters.

After nearly a year in the counterproliferation division, Mr. Sterling transferred to New York in January 1999, where, he said, he was the lone black case officer.

Again, he was assigned to try to recruit Iranians as spies, and soon received a positive evaluation. Mr. Sterling "demonstrated good tradecraft in the handling of his assigned cases," according to an evaluation in September 1999 by a supervisor and provided by Mr. Sterling.

But soon after that, managers in New York began to tell Mr. Sterling that they were disappointed by his failure to recruit Iranian spies. Mr. Sterling again complained that he had been given a cover as an Army officer and he again requested a State Department cover. Again, he said, that request was denied.

In April 2000, Mr. Sterling met his New York supervisors and was told that he had two months to start recruiting three new spies, and hold three meetings with each, or he would be forced to leave the station.

Mr. Sterling said he saw that as an unrealistic and unfair deadline and rejected the terms. He now says white case officers were routinely given more time to meet less demanding standards. He filed a complaint with the equal employment opportunity office at the agency and said he was soon notified that he would be subjected to a security investigation.

Robert Baer, a former case officer and the writer of a new book on his career at the agency, agreed that the demands put on Mr. Sterling for developing new agents were unreasonable.

"It's incomprehensible to me why any manager would give anyone a two-month limit," Mr. Baer said. "That's an outrageous requirement. It often occurs that people go a whole tour of two or three years who don't recruit a single agent."

Mr. Sterling said that perhaps the most depressing part of his experience occurred on Sept. 11, when the terrorist attacks occurred just as the agency was dismissing him.

"I was trained by the organization to counter enemies like that," he said. "I had the language and area familiarization, but I was still not considered good enough."