UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | Criminal No. 1:10cr485 |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | January 15, 2015 |
| JEFFREY ALEXANDER STERLING, | . | 1:45 p.m. |
| | . | |
| Defendant. | . | EXCERPT OF P.M. SESSION |
| | . | |

. . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:                JAMES L. TRUMP, AUSA
                                   DENNIS M. FITZPATRICK, AUSA
                                   United States Attorney's Office
                                   2100 Jamieson Avenue
                                   Alexandria, VA 22314
                                      and
                                   ERIC G. OLSHAN, Deputy Chief
                                   Public Integrity Section of the
                                   Criminal Division
                                   United States Department of
                                   Justice
                                   1400 New York Avenue, N.W.
                                   Suite 12100
                                   Washington, D.C. 20005


FOR THE DEFENDANT:                 EDWARD B. MAC MAHON, JR., ESQ.
                                   Law Office of Edward B.
                                   MacMahon, Jr.
                                   107 East Washington Street
                                   P.O. Box 25
                                   Middleburg, VA 20118
                                      and
                                   BARRY J. POLLACK, ESQ.
                                   MIA P. HAESSLY, ESQ.
                                   Miller & Chevalier Chartered
                                   655 - 15th Street, N.W.
                                   Suite
                                   Washington, D.C. 20005-5701


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1   APPEARANCES:  (Cont'd.)

 2   CLASSIFIED INFORMATION        CHRISTINE E. GUNNING
     SECURITY OFFICERS:            MAURA PETERSON
 3

 4   ALSO PRESENT:                 GERARD FRANCISCO
                                   SA ASHLEY HUNT
 5                                 JENNIFER MULLIN, ESQ.

 6
     OFFICIAL COURT REPORTER:      ANNELIESE J. THOMSON, RDR, CRR
 7                                 U.S. District Court, Fifth Floor
                                   401 Courthouse Square
 8                                 Alexandria, VA 22314
                                   (703)299-8595
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

|                              | DIRECT | CROSS | REDIRECT | RECROSS |
|------------------------------|--------|-------|----------|---------|

WITNESSES ON BEHALF OF
THE GOVERNMENT:

| William Harlow            |  4 | 29 |
| Condoleezza Rice, Ph.D.   | 42 | 62 |


EXHIBITS

|                | MARKED | RECEIVED |
|----------------|--------|----------|

GOVERNMENT'S:

| No. 105 |  | 8  |
| 106     |  | 10 |
| 107     |  | 15 |
| 108     |  | 17 |
| 111     |  | 21 |
| 112     |  | 21 |
| 113     |  | 26 |
| 114     |  | 25 |
| 115     |  | 29 |


DEFENDANT'S:

| No. 4 |  | 38 |

1                    A F T E R N O O N   S E S S I O N

2                              (Defendant and Jury present.)

3            THE COURT:  Mr. Trump, call your next witness.

4            MR. TRUMP:  Mr. Harlow.

5            THE COURT:  Mr. Harlow.  He's outside, correct?

6            MR. TRUMP:  Yes.

7            THE COURT:  All right.  No, he's outside.

8       WILLIAM HARLOW, GOVERNMENT'S WITNESS, AFFIRMED

9            MR. TRUMP:  Mr. Wood, he'll need the binder with

10    exhibits in the hundred series.

11                           DIRECT EXAMINATION

12    BY MR. TRUMP:

13    Q.    Would you please state your name?

14    A.    William Harlow.

15    Q.    Would you spell your last name?

16    A.    H-a-r-l-o-w.

17    Q.    Were you formerly employed at the CIA?

18    A.    Yes, I was.

19    Q.    What was your title?

20    A.    I was the Director of Public Affairs.

21    Q.    And what, what was your term there?  What --

22    A.    I was there from 1997 until 2004.

23    Q.    Did you serve in the military?

24    A.    Yes, I did.

25    Q.    When did you begin your military service?

1    A.    I was commissioned in 1972 and served on active duty in

2    the Navy until I retired to take the job at the CIA in 1997.

3    Q.    Prior to working at the CIA, what position did you hold in

4    the military?

5    A.    I was a public affairs specialist for most of my time in

6    the Navy, so I served in jobs dealing with the news media,

7    public communication, information.  I had assignments overseas

8    in London and Japan, a lot of time in the Pentagon.  I served

9    four years while on active duty as the Assistant Press

10   Secretary for National Security Affairs at the White House.

11   That was 1988 to '92.

12   Q.    Have you held a Top Secret clearance?

13   A.    I'm sorry?

14   Q.    Have you held a Top Secret clearance?

15   A.    Yes, I have.

16   Q.    Since when?

17   A.    I believe I got my first Top Secret clearance in 1981.

18   Q.    And obviously, as a result of your -- as part of your

19   duties at the CIA, you had to be cleared?

20   A.    Absolutely, yes.

21   Q.    What, what does the Office of Public Affairs do?

22   A.    Well, among the things it does is deal with the news

23   media, respond to public inquiries from, from the media, try to

24   answer questions as we could from, from the media, and other

25   functions involving internal communication with agency

Harlow - Direct                                                          6

1    employees and other public communications, but the principal

2    part of my job was dealing with the news media.

3    Q.    And what was your position specifically, Director?  What

4    were your responsibilities?

5    A.    Well, my responsibility was to run the entire operation of

6    the, of the Press Office, or the Public Affairs Office, but

7    specifically with the news media, I would receive calls from

8    the media, respond to those calls.  They'd have questions.  I'd

9    try to answer if I could from my personal knowledge; if not,

10   research the question to try to find out what the answer was

11   and respond appropriately.

12   Q.    And were you authorized to speak to the media, obviously?

13   A.    Yeah.  I was the official spokesman for the agency.  I

14   was, was authorized and expected to be the person who would

15   respond to the, to the press on whatever matters they were,

16   they were concerned with.

17   Q.    And did you have what's called original classification

18   authority?

19   A.    I had that authority, yes.

20   Q.    Which means what in layman's terms?

21   A.    It means I could determine the information that I was

22   creating which I thought needed to be maintained at a certain

23   level of classification within the agency, or within

24   government.

25   Q.    In terms of executing your duties, however, did you always

Harlow - Direct                                                          7

1    seek authorization from those involved in whatever the activity

2    was for your discussions with the press?

3    A.   Well, there were many occasions where I had the

4    information already, I knew the information.  I had the

5    background that I could respond to the press.  On other

6    occasions, on very sensitive matters or things that I just

7    wasn't personally involved with or aware of, then I would seek

8    out other officials within the agency hierarchy to find out

9    what the facts were in order to be able to respond.

10   Q.   Do you know someone by the name of James Risen?

11   A.   Yes, I do.

12   Q.   And did you have dealings with him over time?

13   A.   Yes.  He was an intelligence correspondent who dealt with

14   the agency, first with the -- he worked for *The Los Angeles*

15   *Times* and then later became a correspondent for *The New York*

16   *Times* and was a regular caller to our office.

17   Q.   And what was the nature of your communication?  Was it

18   phone? direct? e-mail?

19   A.   Almost always telephonic.  Occasionally, we'd get e-mails

20   from him and other reporters, but generally, it was telephonic.

21   Q.   Let me direct your attention to April of 2003.  Do you

22   recall getting a telephone call from Mr. Risen?

23   A.   Yes, I do.

24   Q.   Do you recall exactly what date?

25   A.   I believe it was April 3.

Harlow - Direct                                                    8

1    Q.    Now, do you, do you and your staff keep a phone log?

2    A.    Yes, they do.

3    Q.    And how is that phone log kept?

4    A.    My administrative assistant would field incoming calls and

5    would write down the time of the call and the caller, and it

6    kept it in a running log.  They would also note the time that I

7    returned the call.  Sometimes I'd answer immediately, and that

8    time would be noted in the log.  Other times, I'd call back 15

9    minutes, an hour, two hours later.  They'd, they'd write down

10   the time of the return phone call.

11   Q.    Are these logs kept accurately?

12   A.    Yes.  To the best of my knowledge, they were.

13   Q.    And what purpose does it serve for you to have this log?

14   A.    Well, it, it ensured that I returned all of the phone

15   calls, which was a very important thing to do, to make sure

16   that I got that, and it would keep a record of who was calling

17   when so that if I needed to go back at a later date and find

18   out, you know, who I spoke to a week before, two weeks before,

19   whenever it was, I'd be able to determine what transpired.

20   Q.    Would you look at what's in the binder as Exhibit 105?

21              THE COURT:  Is there any exhibit -- any objection to

22   105?

23              MR. MAC MAHON:  No objection, Your Honor.

24              THE COURT:  All right, it's in evidence then.

25              (Government's Exhibit No. 105 was received in

1    evidence.)

2              MR. TRUMP:  Could we have that on the screen?

3              THE COURT:  You may.  It's in evidence.

4    BY MR. TRUMP:

5    Q.   All right.  And what is 105?

6    A.   This is the phone log from April 3 of 2003.

7    Q.   And your name is in the upper right-hand corner?

8    A.   That's correct.

9    Q.   And do you see an entry for 4:03?

10   A.   Yes.

11   Q.   And what does that entry indicate?

12   A.   It says, "Jim Risen, NYT."

13   Q.   And that's *New York Times*?

14   A.   Yes.

15   Q.   And the area that's blacked out, those were just the other

16   names of the people who called?

17   A.   Right.  The other, presumably the other reporters who

18   called during the course of that day.

19   Q.   When you receive a call from a reporter, do you take

20   notes?

21   A.   Yes, that was my practice.

22   Q.   And then if necessary, do you memorialize your notes in a

23   communication to other officials?

24   A.   Right.  I mean, very frequently it wasn't necessary, but

25   just you would never know, so I'd keep notes on a spiral steno

Harlow - Direct                                                    10

1    pad as I was talking to a reporter, and then if I needed to go

2    back and repeat anything to somebody either telephonically or

3    in an e-mail internally, I'd, I'd have the material available

4    to me to, to construct that, that communication.

5    Q.   And internally, do you call that a Lotus Note?

6    A.   That's correct.

7    Q.   And did you prepare a Lotus Note of your telephone

8    conversation with Mr. Harlow on April 3?

9              THE COURT:  Mr. Risen.

10   BY MR. TRUMP:

11   Q.   Excuse me, Mr. Risen on April 3?

12   A.   Yes, I did.

13   Q.   And you then communicated -- you communicate via Lotus

14   Note with those people who need to know what that conversation

15   was about?

16   A.   That's correct.

17   Q.   And would you look at Exhibit 106?

18             THE COURT:  Any objection to 106?

19             MR. MAC MAHON:  No objection, Your Honor.

20             THE COURT:  All right, it's in.

21             (Government's Exhibit No. 106 was received in

22   evidence.)

23   BY MR. TRUMP:

24   Q.   Was that the Lotus Note that you prepared of your

25   telephone conversation with Mr. Risen on April 3?

Harlow - Direct                                                          11

1    A.    Yes, it is.

2    Q.    And was that prepared from your notes?

3    A.    Yes.

4    Q.    Fairly contemporaneous with the conversation as your

5    duties would allow?

6    A.    Right.  It looks like the timing of this was 6:43 p.m., so

7    a couple hours later, I had time to, to create this note, but

8    it was based on my handwritten notes that were made

9    simultaneous to the incoming phone call.

10   Q.    And what, what did Mr. Risen call about?

11   A.    He called and told me that he was working on a story, and

12   he stressed that it wasn't a tomorrow story.  Usually if you

13   get a call late in the afternoon from a reporter, it may be

14   that they're on deadline.

15         He said it, you know, wasn't a tomorrow story but

16   implied that it was reasonably soon, and he said that he was

17   writing about a classified CIA program which he said involved

18   the Iranian nuclear program, weapons program, and he told me

19   that this program was, was known by a code name, he used the

20   word "Merlin," and he told me that there was a Russian

21   scientist who had defected to the U.S. who the CIA had arranged

22   to sell some nuclear weapons designs to the Iranians, and he

23   said that these designs had been modified by the National Labs,

24   which is a U.S. organization that is involved with nuclear

25   weapons design, production, and whatever, and they were

1  modified, he told me, so that they wouldn't work or there was

2  some problem with them, and he said that the Russian had given

3  the plans to, to the Iranians in Europe.

4  Q.    Let me, let me stop you there.  At this time, 2003, was

5  this subject matter something that you heard about a lot?

6  A.    This particular operation?

7  Q.    Let me -- I should rephrase it a better way.  Were most of

8  your calls about other subject matters?

9  A.    Yes.  This was a few weeks after the launch of the

10 invasion of Iraq.  This was 18 months or so into the post-9/11

11 period, so most of the activity I was getting was about

12 terrorism or about the Iraq war, although weapons proliferation

13 is always an important issue, but it wasn't one that I was

14 getting calls on on a daily basis, so this was a little bit out

15 of the blue to me.

16 Q.    And you mentioned that he had used a specific code word.

17 That code word specifically wasn't "Merlin."  It was a more

18 precise term?

19 A.    That's correct.

20 Q.    And you recognized it as a CIA type of code?

21 A.    It was a CIA type of code.  I didn't recognize it

22 specifically, but just the way it was formulated struck me as

23 the way we would encode things at the agency.

24 Q.    Was that also rare that you would receive that type of

25 information?

1   A.    Yes.  It's very rare that those code words leak or are

2   known to the public, and so if somebody purports to have one of

3   some operation which is current, not historical, that was quite

4   rare and alerting to me.

5   Q.    Okay.  Let's go on.  What did he say -- after he said the

6   Russian gave the Iranians the plans, did he tell you what the

7   plans involved?

8   A.    Yes.  He went on to explain, he said the plans involved

9   what he called a fire set, which he said controlled the

10  implosion of the nuclear weapons detonation, and, and he also

11  told me he wasn't sure whether this program was still going on

12  or not but that it, it had started in, in the year 2000 in the

13  previous administration.

14  Q.    Have you just summarized the substance of the factual

15  information provided by Mr. Risen?

16  A.    I'm sorry?

17  Q.    That summary were all the facts that Mr. Risen provided to

18  you?

19  A.    Yes, yes, right.

20  Q.    When you typed this note and you quoted the word "fire

21  set," was that a specific term that Mr. Risen had used?

22  A.    Yes.  It was a term specifically that he used; and I

23  wanted to put it in quotes to make clear that, that that was

24  the terminology he was using; it wasn't my own interpretation

25  of nuclear weapons design.

1    Q.    What did you tell Mr. Risen at this point?

2    A.    Well, I, I told him I would check to see if there was

3    anything I could tell him about, about his question, but I also

4    told him that, you know, that if there was such a program, I

5    didn't think a respectable newspaper should be writing about

6    it.  That is the kind of thing that was highly sensitive, and I

7    didn't think it was, would do any good for that kind of

8    information to be bandied about in the press.

9    Q.    How did you leave it with Mr. Risen?

10   A.    Only that I would look into it and, and get back to him.

11   Q.    Now, did you get a call from another intelligence public

12   affairs officer?

13   A.    Yes.  Later that afternoon, I did.

14   Q.    And what was that about?

15   A.    Another public affairs officer elsewhere in government

16   said he had gotten a similar call from Risen with the same kind

17   of questions.  He told me that Risen told him that he knew that

18   President Clinton --

19        MR. MAC MAHON:  Your Honor, this is hearsay on top of

20   hearsay.

21        THE COURT:  Well, it's not being offered for the

22   truth of its contents.  It's just being offered to explain what

23   that man had been told or heard.  I'm overruling the objection.

24   Go ahead.

25        THE WITNESS:  He told me that, that Risen had told

1   him that he heard that the program had been approved by

2   President Clinton, and he was trying to find out whether it had

3   been reapproved or continued to be approved under the current

4   administration, and he, too, had no immediate comment to Risen,

5   but he was just sharing with me a heads up that he had gotten a

6   similar call.

7   BY MR. TRUMP:

8   Q.   Did you get another call the following day?

9   A.   Yes, I did.

10  Q.   And that was April 4, 2003?

11  A.   Yes.

12          MR. TRUMP:  And if we could look at 107?

13          THE COURT:  Any objection to 107?

14          MR. MAC MAHON:  No, Your Honor.

15          THE COURT:  All right, it's in.

16          (Government's Exhibit No. 107 was received in

17  evidence.)

18  BY MR. TRUMP:

19  Q.   Is that your phone log for the following day?

20  A.   Yes, it is.

21  Q.   April 4?

22          And did you receive two telephone calls from

23  Mr. Risen?

24  A.   Yes.

25  Q.   Or -- on the first page of, excuse me, 107, there are two

1    calls listed?

2    A.    Yes.

3    Q.    And the second page, one?

4    A.    One more, right.

5    Q.    Sometimes calls are recorded that you don't return right

6    away?

7    A.    Yeah, sometimes.

8    Q.    But you had one conversation with Mr. Risen on April 4?

9    You only had one conversation on April 4?

10   A.    No, no, I don't think so.  I think the call at 10:43 looks

11   like I returned it at 11:00; the call at 4:33, I'm not sure

12   what that says; and then there was another call at 6:20.  It

13   doesn't have a call completed time.  That probably just meant

14   that my staff went home before I did, but I think the first

15   call, I may be wrong, but my vague recollection is the first

16   call was unrelated to his call the day before.

17            The second calls were -- I may be wrong on this, but

18   I think it was -- he may have been talking about multiple

19   things, and the later calls certainly were about this issue.

20   Q.    And again, did you prepare notes and then a Lotus Note of

21   the telephone conversations?

22   A.    Yes, I did.

23   Q.    And is that memorialized in Exhibit 108?

24   A.    Yes.

25            MR. MAC MAHON:  No objection, Your Honor.

1          THE COURT:  All right, it's in.

2          (Government's Exhibit No. 108 was received in

3    evidence.)

4          THE WITNESS:  And I see from this I'm wrong because

5    the timing of this is, would have been after the first phone

6    call, so the others may have been follow-ups to it but --

7    BY MR. TRUMP:

8    Q.   The bottom of that exhibit is simply the e-mail chain from

9    the previous day?

10   A.   That's right.  The way it worked is you'd see the whole

11   chain.

12   Q.   Now, in this telephone call, did Mr. Risen provide any

13   more details of, of what he discussed the previous day?

14   A.   Yes.  Initially, he was asking did I have an answer for

15   him, and I told him I didn't yet but that I was working on it.

16   Do you want to go --

17   Q.   And what did you, what did you respond?

18   A.   I'm sorry?

19   Q.   What was your response?

20   A.   Well, I, I told him that, that, more about I was

21   questioning why he should want to write about a story like this

22   and told him that, you know, if the facts were correct as he

23   laid them out, which I wasn't confirming, that I told him I

24   thought such a story would jeopardize U.S. security and didn't

25   think it was in anyone's benefit to do so.

Harlow - Direct                                                    18

1        And he -- as I say in the note, he responded to me,

2   amazingly enough, that he hadn't really thought through the

3   security implications of the, of that particular article that

4   he was working on.

5   Q.   Let me, let me stop you there.  In terms of the factual

6   information or the information that Risen had for his story,

7   did you get anything more on April 4 that you didn't have on

8   April 3?

9   A.   I don't think so.  I think this is mostly him trying to

10  drag out of me:  Are you going to answer the question?  What's

11  the answer?

12  Q.   And how did you -- when you and Mr. Risen hung up, how was

13  it left with him?

14  A.   Well, just that I was going to continue to, to try to get

15  the answer.  He was telling me that he thought -- he would

16  think about how he might adjust the story so that it wouldn't

17  have an impact on national security.

18        And I'd also had a conversation with him as part of

19  this reminding him of an earlier incident where he had

20  objected, when senior officials at the White House had called

21  his publisher to try to prevent the publication of a very

22  sensitive bit of information, and he -- and his editor had

23  objected to that.  So I told him, you know, "We should work

24  together.  If you don't want that to happen, you should come

25  back to me and think this through," although I didn't think

1   that there was a way to dumb this story down to make it so that

2   it would be appropriate to put in the paper given the nature of

3   this particular, this particular story.

4   Q.   What did you do now?  Two phone calls, and what was your

5   responsibility at this point?

6   A.   When I would get calls like this and what I did in this

7   case would be to reach out to appropriate officials within the

8   agency and ask them:  What do you know about this?  Do you know

9   anything about this particular code word that he gave us --

10  gave me?  Is there such an operation?

11          And I'd try to gather information about it so that I

12  could advise senior leadership about if and how to respond.

13  Q.   Were you able to gather some information?

14  A.   I did.

15  Q.   Were you able to determine whether there was, in fact, a

16  program like this?

17  A.   Yes.  I learned that there was a program similar to what

18  he was describing and that it was highly sensitive and was not

19  the kind of information which we would ever have wanted to

20  reach the media.

21  Q.   In doing that research, did the name of the defendant,

22  Jeffrey Sterling, come up?

23  A.   Yes.  At one point, someone within that group, and I don't

24  know at this point who, mentioned to me this was the program

25  that Jeffrey Sterling had been working on or had been involved

1    in or something like that.

2    Q.    Did you know Jeffrey Sterling?

3    A.    I knew the name.  I never met Mr. Sterling, but I knew his

4    name.

5    Q.    And why was his name familiar to you?

6    A.    The previous year, I believe, he filed a lawsuit alleging

7    discrimination against the agency for his treatment while he

8    was a case officer.  That, that story got a lot of publicity,

9    was in the media quite a bit, and there was a, particularly a

10   story about him and his case written in *The New York Times*, I

11   believe, by Jim Risen.

12   Q.    After gathering the information, did you call Risen back,

13   or did he call you?

14   A.    We were still -- the way I left it with him is that he was

15   going to think about if there was a way to deal with the story,

16   and so as I recall, there was a period of time when he didn't

17   press the issue and I didn't have a good answer for him other

18   than don't do it.  So I think there was a gap in time before

19   there was another exchange on the specifics of this story.

20   Q.    And did that occur on April 25?

21   A.    Yes.

22   Q.    Of 2003?

23         And could we look at Government 111?

24   A.    Okay.

25   Q.    And again, was this the phone log of your calls?

1    A.    Yes.

2    Q.    And there were calls reflected from Mr. Risen?

3    A.    Yes.

4    Q.    And did you talk to him on April 25?

5    A.    Yes, I did.

6    Q.    Did you prepare notes and then subsequently a Lotus Note

7    of that conversation?

8    A.    Yes, I did.

9    Q.    And is that Exhibit 112?

10          THE COURT:  I assume there's no objection to 111 or

11   112?

12          MR. MAC MAHON:  No, Your Honor.

13          THE COURT:  All right.

14          (Government's Exhibit Nos. 111 and 112 were received

15   in evidence.)

16          THE WITNESS:  Yes, that's the note.

17   BY MR. TRUMP:

18   Q.    And about what time did you talk to Mr. Risen on April 25?

19   A.    It was about 3:30 in the afternoon.

20   Q.    And what did you discuss with him?

21   A.    He said he had been considering my previous communication

22   with him urging him to think about it, but he was still working

23   on the story, and then he started to read to me the lead of his

24   story.  So it was clear to me at this point that the story was,

25   was fairly well along, because usually by the time a reporter

1    has written out the lead and structure of their story, it's

2    getting closer to publication.

3              So he started reading to me the, what he planned to,

4    to write.

5    Q.   And it was the same story about the Iranian nuclear

6    weapons?

7    A.   Same story but, but it was more fully laid out, and he,

8    you know, told me how the story would probably appear in the

9    paper, you know, saying that the U.S. had an ongoing classified

10   program to derail the Iranian nuclear program and by selling

11   them intentionally flawed diagrams, and then he said something

12   about according to government documents and knowledgeable

13   people.

14   Q.   And what did that mean to you?

15   A.   You know, that triggered in my mind an alarm bell.  So I

16   stopped and asked him, you know, "Are you telling me that you

17   have documents about some of this stuff?"

18             And he said, "Yes."

19             Then he went on to further, you know, read from his

20   draft story, and he said the program was code name Merlin and

21   that it involved a Russian defector pretending to be a

22   scientist willing to sell the firing sets, and he said the deal

23   was eventually made and it was part of a larger program to

24   inject design flaws into the Iranian program.

25   Q.   Now, stopping you there, again, without revealing the true

1   code name, he had used the true code name for the -- he had

2   used a true cryptonym rather than --

3   A.   He used, he used a, more than "Merlin," which he said was

4   the description of the entire operation.  I believe I, you

5   know, by the time, I had learned that perhaps the code name

6   that he was using was referring to the individual as opposed to

7   the overall program, but he was still using very specific,

8   agency-like code words in his communication with me.

9   Q.   And in your Lotus Note, you used the term "firing set,"

10  i-n-g, rather than "fire sets."  Is this what Risen is telling

11  you, as best as you can recall?

12  A.   As best as I can recall, that's what he was saying, yes.

13  Q.   What did you ask him in response?

14  A.   Well, I, I asked him again whether he had considered the

15  wisdom of doing this story, and he told me he had, and he said

16  to me that he had talked to some people who believed that the

17  operation was not handled properly and that, that the Iranians

18  were already aware of the flaw.  Therefore, his revealing it

19  wouldn't be, wouldn't be a problem, and that the Iranians had

20  already been able to fix the flaws that were in the diagrams

21  that were sent to him.

22        And this was the first time that he ever mentioned to

23  me any notion that the program was not well run, successful,

24  appropriate, and that's the first time I had heard that

25  allegation either from him or anywhere else, so that was

Harlow - Direct                                                        24

1   concerning to me.

2   Q.   And what did you ask him to do?

3   A.   I asked him how widely this had been discussed at his

4   newspaper, because by this point, I was certain this was a

5   highly sensitive program, and I didn't want too many people

6   bandying about the story because the more people who know about

7   it in the newsroom, the greater the possibility that it might

8   leak.  Even if it didn't end up in *The New York Times*, it could

9   leak somewhere else.

10          So I asked him to control that, and I did tell him at

11  that point that I thought that there was enough concern about

12  this that very high officials in the U.S. government would want

13  to make strong representations to his leadership about the lack

14  of wisdom of running such an article, and so I urged him to not

15  go ahead until we had an opportunity to do that and to keep

16  tight the number of people who would see his draft or know

17  about this article that he was preparing.

18  Q.   Now, at the bottom of that note, it indicates you had to

19  move quickly?

20  A.   Yes.  Again, because he already had a draft of the

21  article, I thought this is something which could appear in the

22  paper in the next few days, so we didn't have a lot of time to

23  think about this.  If we wanted to prevent it from appearing in

24  a paper, we needed to act quickly to make a representation to

25  his leadership about not doing so.

1    Q.    So what did you do?

2    A.    Well, I sent this note to agency senior leadership.  They

3    agreed, and in conversations with the White House, there was a

4    decision that the National Security Advisor, Dr. Rice, would,

5    in fact, hold a meeting with *New York Times* officials to talk

6    about this, and then I was asked to craft some talking points

7    that she could have for her use or consideration in that

8    meeting to, to make the case to *The New York Times* that this

9    was not an article which ought to appear in their paper.

10   Q.    And did you, in fact, draft some talking points?

11   A.    Yes, I did.

12   Q.    Was that based upon the research that you had done over

13   the last two weeks or so?

14   A.    Yes.

15   Q.    And looking at Government 114 --

16          THE COURT:  114?  Any objection?

17          MR. MAC MAHON:  No objection, Your Honor.

18          THE COURT:  All right, it's in.

19          (Government's Exhibit No. 114 was received in

20   evidence.)

21   BY MR. TRUMP:

22   Q.    Are those the talking points you drafted?

23   A.    Yes, they are.

24   Q.    Now, when was the White House meeting?  Let me back up.

25   Did you prepare a memorandum memorializing the White House

Harlow - Direct                                                      26

1    meeting?

2    A.    Yes.  After the meeting took place, I prepared a --

3    because I was present at the meeting, I took notes and then

4    created a memo to circulate at the agency beyond this.

5    Q.    And did, did that memo reflect the date of the meeting?

6    A.    Yes.

7    Q.    And is that memo Exhibit 113, Exhibit 113?

8             THE COURT:  Any objection to 113?

9             MR. MAC MAHON:  No objection, Your Honor.

10            THE COURT:  All right, it's in.

11            (Government's Exhibit No. 113 was received in

12   evidence.)

13            THE WITNESS:  Yes.  That's, that's my note.

14   BY MR. TRUMP:

15   Q.    And when was the White House meeting?

16   A.    April 30.

17   Q.    And who was there on behalf of the CIA?

18   A.    The Director, George Tenet, was there; Steve Kappes, who

19   was the No. 2 in the clandestine service, the Deputy Director

20   of Operations; and myself.

21   Q.    And obviously, Dr. Rice was the chair of the meeting?

22   A.    Yes.

23   Q.    And who was there on behalf of The New York Times?

24   A.    Jill Abramson, who was then the Washington bureau chief,

25   and Jim Risen.

1   Q.   And there was also someone from NSC staff?

2   A.   Anna Perez, who is Dr. Rice's spokesperson, was also

3   present.

4   Q.   Did you give Dr. Rice the talking points, or had someone

5   given them to her?

6   A.   Someone had given them to her in advance, so she had them

7   before we arrived.

8   Q.   And tell us what happened at the meeting.

9   A.   It lasted about 15 minutes.  I noted that she followed the

10  talking points very closely, and when she got done, there was

11  some conversation.  Jill Abramson asked for more information

12  about one of the talking points, one of the assertions in the

13  talking points, which is that leak of this information could

14  result in people dying.

15          At that point, Director Tenet spoke up and said that,

16  reminding people that this was off the record because we didn't

17  want this to end up in their story if they ended up ignoring

18  us, but the Russian involved had used his true name when

19  dealing with the Iranians, and so if they learned that they had

20  been misled, they might go after him, and so that was a concern

21  particularly for, you know, for that one individual.

22  Q.   Did Mr. Risen ask any questions?

23  A.   Yes.  He, he asked about the question about we had

24  asserted -- or the notion of whether the Iranians were witting

25  of the program, whether they were aware this operation had been

Harlow - Direct                                                    28

1    conducted, and he said that he -- or he implied that he had

2    seen a letter to the Iranians from the Russian which had told

3    them that the program was flawed, and so he took from that that

4    it meant, you know, they already know, so, you know, our story

5    won't make it any worse for this guy.

6            And Director Tenet answered up and said no, the

7    purpose for the letter was for the individual to suggest to the

8    Iranians that they continue to need him, they needed his

9    services, so he wasn't telling them, "What I just gave you was

10   no good."  He was telling them, "You need me to continue to

11   help you on this program."

12   Q.   So what happened -- how did the meeting wrap up?

13   A.   Well, Jill Abramson, the Washington bureau's chief, said

14   that they had a fully realized draft, which to me meant the

15   story was done, it was ready to go, but they hadn't yet decided

16   to publish it, and they would go back and think about it and

17   would let us know.  And she said that the decision was above

18   her pay grade, that it would be made by her bosses in New York.

19           And there was a discussion about we were urging them

20   to keep the information very tightly held and don't have it

21   easily available on your computer systems, don't have it laying

22   around, don't have too many people editing it, because we

23   didn't want the information to leak.  Even if it didn't appear

24   in *The New York Times*, we didn't want it to appear anywhere

25   else.  We asked them to keep it closely held.

Harlow - Cross                                                            29

1   Q.   And how did it wrap up?

2   A.   Abramson said that she would let us know her decision --

3   or the paper's decision after she talked to her bosses in New

4   York, and that was the end of the meeting.

5   Q.   And did you later find out that *The New York Times* decided

6   not to post the story?

7   A.   Yes.  I believe it was a week, ten days later or so I got

8   a call from Anna Perez, the spokesperson for Dr. Rice, who said

9   that they had gotten a call from *The New York Times* saying not

10  to worry, we're not going with it, and that appeared to be the

11  end of the story.

12  Q.   And is that reflected in Government Exhibit 115?

13  A.   Yes.

14          MR. MAC MAHON:  No objection, Your Honor.

15          THE COURT:  All right, 115 is in evidence.

16          (Government's Exhibit No. 115 was received in

17  evidence.)

18          MR. TRUMP:  The Court's indulgence?

19          THE COURT:  Yes, sir.

20          MR. TRUMP:  That's all I have.

21          THE COURT:  All right.  Mr. MacMahon,

22  cross-examination?

23          MR. MAC MAHON:  Thank you, Your Honor.

24                          CROSS-EXAMINATION

25  BY MR. MAC MAHON:

1  Q.   Good afternoon, Mr. Harlow.  My name is Edward MacMahon.

2  I'm one of the attorneys representing Mr. Sterling.

3            Sir, you say, I think, on direct -- first of all,

4  these events took place how many years ago?

5  A.   Not quite 12 years ago.

6  Q.   All right.  And you've been reading off of the documents

7  in front of you as you testified today, haven't you?

8  A.   Yes.

9  Q.   Because you don't have really an independent recollection

10  of many of these events, do you?

11  A.   Well, this was a very memorable event, so of my time at

12  the agency, this was one of the more startling phone calls I

13  got, so I have a recollection of it.  I couldn't have given you

14  the date of the phone call or the exact order or the sequence

15  of events, but the events, you know, I remember that.

16  Q.   All right.  But you're reading off the paper in front of

17  you, aren't you?

18  A.   I was because it makes it easier and so I didn't get it

19  wrong, but I guarantee you I remember that phone call.

20  Q.   Okay.  And you said you told Mr. Risen that you didn't

21  think a respectable journalist would publish this story?

22  A.   Yes, sir.

23  Q.   That's not exactly what you told him, is it?  Didn't you

24  tell him Al Jazeera was the only outlet that would publish

25  that?

1  A.    If you'd like me to read all of these back to you, I'll

2  read the entire document, but yeah.

3  Q.    You did tell him that it would be Al Jazeera that would

4  publish this story?

5  A.    Yeah, I did because I thought that it might shock him into

6  thinking that a publication that maybe didn't have our best

7  interests, U.S. best interests, you know, we're talking weeks

8  after the invasion of Iraq, 18 months after 9/11, I wanted to

9  give him the impression that a reputable news organization

10 would not be putting this kind of information out, and so I

11 wanted to get his attention.

12          Whether I did or not, I don't know.

13 Q.    And Al Jazeera is what, an Arab-owned news network?

14          MR. TRUMP:  Objection, Your Honor.  This is going far

15 afield.

16          THE COURT:  It is.  However, it's mentioned in the

17 notes, and I'm going to allow just a bit of this.  I doubt

18 we're going very far.

19          MR. MAC MAHON:  I'm almost done, Your Honor, I

20 promise.

21          THE COURT:  Go ahead.  Overruled.

22 BY MR. MAC MAHON:

23 Q.    What is Al Jazeera, Mr. Harlow?

24 A.    It's an Arab-owned news network which at the time was not

25 particularly held in high regard.  It's gotten better over the

1    years from my observing from afar, but at the time, it wasn't

2    particularly held in high regard, and I was trying to get his

3    attention.

4    Q.   Did you get a reaction from Mr. Risen when you suggested

5    his journalism might appear on Al Jazeera?

6    A.   No.

7    Q.   Now, when you -- if you look at Exhibit 106, which I think

8    you told us was your notes of the first time that you talked to

9    Mr. Risen, correct?  About this subject.  I know that you

10   talked to him a lot.

11   A.   Right.  Yes.

12   Q.   Okay.  And in your notes -- if we could put that up,

13   Mr. Francisco? -- he told you that there were -- excuse me, he

14   was unaware, and this is in the middle, whether the program was

15   still in operation, correct?

16           THE COURT:  Third paragraph down.

17   BY MR. MAC MAHON:

18   Q.   Third paragraph down.  It starts with, "He went on to say

19   that the plans involved"?

20   A.   Yes, correct.

21   Q.   Right?  That's what you wrote down in your notes, that

22   Mr. Risen on April 3, 2003, was unsure that the program was in

23   operation but that it started in 2000.

24   A.   Right.

25   Q.   Now, that -- he obtained more information in the next

1    three weeks, didn't he?  He appeared to, didn't he?

2    A.    Yes.

3    Q.    Okay.  So if we'd look at Government Exhibit 112, and it's

4    the -- if Mr. Francisco could highlight the fifth line down?

5    It starts, "The United States," please.

6           Now, he says, "The United States has an ongoing

7    classified program"?

8           MR. TRUMP:  Objection.  That's not what it says, Your

9    Honor.

10   BY MR. MAC MAHON:

11   Q.    ". . . [H]as had an ongoing classified program to derail

12   the Iranian nuclear weapons," correct?

13   A.    Right.

14   Q.    "Ongoing" is your word here, right?

15   A.    Right.

16   Q.    Is that what Mr. Risen told you, that he now knew the

17   program was ongoing?

18   A.    Assuming that he was telling me the truth in his first

19   call, that he didn't know whether it was ongoing, and he now is

20   saying it is ongoing, then I accept your point that he learned

21   something in that period.  Whether or not he did, I don't know.

22          Part of Risen's MO is that he would do all this

23   aw-shucks kind of stuff and would often not tell you much of

24   what he knew, and so whether he was, he was telling me

25   everything he knew, I'm certain he wasn't telling me everything

1   he knew on April 3, he was telling me more since he had drafted

2   his story on April 25.

3   Q.   Sir, you don't disagree that he told you something

4   different and knew that he -- on April 25 than he had told you

5   on April 3, correct?

6   A.   He definitely told me something different, yes.

7   Q.   Okay.  And in that same call, you said he had "according

8   to government documents and knowledgeable people," correct?

9   A.   Right.

10  Q.   He didn't attribute that to one person, did he?

11  A.   I wrote down what he told me.

12  Q.   Right.  Let's go to Exhibit 113 as well, if we could,

13  please.  And these are notes from the meeting at the White

14  House on April 30?

15  A.   Right.

16  Q.   And if we could focus in on the paragraph that starts with

17  "Risen said" -- "Risen asked," excuse me?  Mr. Risen said at

18  that meeting, and you were present, that he had seen a letter

19  to the Iranians from the Russian which told them that their

20  program was flawed.

21          That's what he said at the meeting, isn't it?

22  A.   It says he implied he had seen a letter to the Iranians.

23  Q.   Well, what did he exactly say, do you remember?

24  A.   I don't remember that.  You know, as he pointed out, it

25  was a dozen years ago.

1    Q.    Right.   This was your -- this is your best recollection of

2    what happened is that he implied that he had seen a letter to

3    the Iranians from the Russian telling them that their program

4    was flawed.   Right?

5    A.    Right.

6    Q.    Did you ever see that letter?

7    A.    No, sir.

8    Q.    Now, you were interviewed by the FBI several times about

9    this matter, correct?

10   A.    Yes, sir.

11   Q.    And did you tell the FBI that Mr. Risen has lots of

12   sources for the stories that he calls you with?

13   A.    Sure.   Most reporters, national news stories, they can

14   have lots of sources.

15   Q.    Right.   You told him that Mr. Risen had access to senior

16   CIA officials, correct?

17   A.    I think I told him former senior CIA officials.

18   Q.    Right.   He'd written a book recently with a former CIA

19   official named Milt Bearden, correct?

20   A.    Right.   Who had been retired for about ten years.

21   Q.    But that's something you told the FBI?

22   A.    I told them Milt Bearden, who had been retired for about

23   ten years, yes.

24   Q.    And you told -- you didn't -- Mr. Bearden wasn't the only

25   former CIA -- that was the only CIA official that you named

Harlow - Cross                                                      36

1   when you talked to the --

2   A.   Yeah.

3   Q.   Because you didn't know if there was anybody else,

4   correct?

5   A.   No.

6   Q.   All right.  And you also told the FBI in 2003 that you

7   didn't even know whether Mr. Risen had documents about the

8   program.

9   A.   I -- he said he did in response to me.  I don't know

10  whether he was telling me the truth again, but that's what he

11  told me.

12  Q.   Okay.  And you also told them that someone they should

13  talk to about something like this would be Bill Duhnke, a

14  person named Bill Duhnke, correct, up at the -- that worked at

15  the U.S. Senate?

16       MR. TRUMP:  Objection, Your Honor.  That gets into

17  another topic that we would need to discuss at the bench.

18       THE COURT:  Approach the bench.  Mira.

19       (Sealed Bench Conference B not transcribed in this

20        volume.)

21  BY MR. MAC MAHON:

22  Q.   Now, Mr. Harlow, in 2003, you told the FBI that you

23  thought that Mr. Risen might reach out to the Staff Director of

24  the Senate Select Intelligence Committee on Intelligence for

25  confirmation, that Mr. Risen would, correct?

Harlow - Cross                                                    37

1    A.    I'm sorry?

2    Q.    Do you remember telling the FBI that Mr. Risen didn't

3    indicate or tell you in any way where he'd gotten this story

4    from?

5    A.    That's correct; he didn't.

6    Q.    And you told him that he didn't tell you whether it was a

7    Hill staffer or not?

8    A.    He didn't tell me at all where he got it.

9    Q.    And you suggested to the -- you told the FBI that he might

10   have contact with someone affiliated with one of the

11   intelligence committees, and that's the permanent United States

12   Select Intelligence Committee on Intelligence, correct?

13   A.    My recollection is what the FBI asked me is who are the

14   kind of people that Risen might talk to on a story like this,

15   and I told them that he had regular contact with the

16   Congressional Oversight Committees, including the Senate

17   Intelligence Committee, and so the kind of places he might go

18   to ask about the story would be the Senate Oversight

19   committees.

20          That's my recollection of it.  You know, it's a dozen

21   years ago but --

22   Q.    And one of the names you gave them was Bill Duhnke, right?

23   A.    Right.

24   Q.    Now, do you -- you testified earlier that you were aware

25   from your duties in the Press Office, is it, that Mr. Sterling

Harlow - Cross                                                          38

1   had filed a discrimination case against the CIA?

2   A.   Yes.

3   Q.   Okay.  In fact, you had, you had written an e-mail in 2002

4   about Mr. Sterling's discrimination case.  Do you remember

5   that?

6   A.   No.

7   Q.   Do you remember an e-mail titled "Bill Harlow's Tirade"?

8   A.   No.

9   Q.   Do you know whether that e-mail has to do with

10  Mr. Sterling's discrimination case?

11  A.   I have no idea.

12           MR. MAC MAHON:  Your Honor, I have a document that's

13  marked as Defendant's Exhibit 4.  If I could hand it to the

14  witness?  I have copies for the Court.

15           MR. TRUMP:  I fail to see any relevance in this.  It

16  doesn't relate --

17           THE COURT:  Well, I don't have it, so let me take a

18  look at it.

19           I'm going to permit this.  Overruled.

20           MR. MAC MAHON:  Move Exhibit No. 4, Your Honor.

21           THE COURT:  All right, it's in.

22           (Defendant's Exhibit No. 4 was received in evidence.)

23  BY MR. MAC MAHON:

24  Q.   Are you done reading that, Mr. Harlow?

25  A.   Yes.

1   Q.   Does this e-mail -- if we can publish this for the jury,

2   please?  The subject line of this e-mail is "Bill Harlow's

3   Tirade"?

4   A.   Yes.

5   Q.   Does this refresh your recollection as to what the tirade

6   was about?

7   A.   Haven't a clue.

8   Q.   Does reading of the body of the e-mail suggest to you that

9   in any way this had to do with Mr. Sterling's pending case in

10  the Southern District of New York?

11  A.   It has something to do with it.  Exactly what it has to do

12  with it, I don't know.  I'm not even sure who it's from since

13  it's been blacked out, but --

14  Q.   But Mr. Sterling did have a case in the Southern District

15  of New York in 2002, correct?

16  A.   I believe that's where it was.  I know he had a case,

17  yeah.

18  Q.   All right.  And you knew that there were articles in the

19  paper and otherwise in that time frame?

20  A.   Yes.

21  Q.   And you were being asked to comment about his case,

22  weren't you?

23  A.   Sure.

24  Q.   And that resulted in your tirade, correct?

25  A.   I don't know if that's what resulted in it or not.  I'm

1    sure the "tirade" is a joke, but in any case, this is somebody

2    responding to it, saying while we can't talk about

3    Mr. Sterling's case, we can talk about our efforts to, to have

4    an effective hiring program, equal opportunity at the agency,

5    and somebody who wanted to talk about that, and we did to some

6    extent talk about that without talking about the specifics of

7    his case.

8            We were able to talk about how many people we had

9    hired in the last class of clandestine officers, 20-some

10   percent had been of minority.  So we were addressing the

11   overall charge that we were an organization which discriminated

12   against, without getting into specifics of his case because we

13   weren't allowed to due to privacy.

14   Q.   All right.  And lastly, Mr. Trump asked you about in April

15   of 2003, you were fielding a lot of calls, weren't you?

16   A.   Sure.

17   Q.   All right.  And you were fielding a lot of calls about

18   whether weapons of mass destruction had been found in Iraq,

19   correct?

20   A.   Sure.

21           MR. TRUMP:  Objection.

22           THE COURT:  Well, it's already been answered.  You

23   have to be faster on your feet, Mr. Trump.

24   BY MR. MAC MAHON:

25   Q.   That was a, that was a topic of great interest, correct?

1              MR. TRUMP:  Objection.

2              MR. MAC MAHON:  He opened the door.

3              THE COURT:  Well, he opened the door.  Your witness

4    did testify that he had a lot of activity.  We're not going to

5    go very far into that, but that's not inappropriate.

6    Overruled.

7    BY MR. MAC MAHON:

8    Q.   And that was the subject of most of your calls, was

9    whether the U.S. government was actually going to find weapons

10   of mass destruction in Iraq after you went to war, correct?

11   A.   No, I wouldn't say most of my calls.  Certainly not in

12   April, because the invasion had only happened a few weeks

13   before, and we were telling people, you know, that it was going

14   to take a lot longer than that, and it wasn't until months and

15   months later that we determined that we probably weren't going

16   to find weapons of mass destruction, so at this point, no.

17             We were getting questions at this point about how was

18   the war going?  Have you found Saddam yet?  And also, how is

19   the war against Al Qaeda going?  You know, have you found Bin

20   Laden yet?

21             So in April of 2003, that wasn't the principal

22   question.

23   Q.   But you were fielding calls at that time --

24   A.   Sure.

25   Q.   -- about whether the CIA --

```
Rice - Direct                                                    42
```

1    A.    We were getting some.  Some, yeah.

2              THE COURT:  That's been asked and answered.

3              MR. MAC MAHON:  Nothing further, Your Honor.

4              THE COURT:  All right, is there any redirect?

5              MR. TRUMP:  No, Your Honor.

6              THE COURT:  All right.  Mr. Harlow is not going to be

7    called as a witness again, correct?

8              MR. TRUMP:  Correct.

9              THE COURT:  Mr. Harlow, you're free to stay in court

10   and watch the proceedings if you want to, or you may leave.

11   Thank you for your testimony.

12             THE WITNESS:  Thank you very much.

13                         (Witness excused.)

14             THE COURT:  All right, call your next witness.

15             MR. OLSHAN:  Your Honor, the government calls

16   Condoleezza Rice.

17             THE COURT:  All right.  Mr. Wood, the next witness is

18   outside as well.

19       CONDOLEEZZA RICE, PH.D., GOVERNMENT'S WITNESS, AFFIRMED

20             MR. OLSHAN:  May I proceed?

21             THE COURT:  Yes, sir.

22                         DIRECT EXAMINATION

23   BY MR. OLSHAN:

24   Q.    Good afternoon, ma'am.

25   A.    Good afternoon.

Rice - Direct                                                          43

1   Q.   If you could, please state and spell your name for the

2   record.

3   A.   My name is Condoleezza Rice, C-o-n-d-o-l-e-e-z-z-a, Rice,

4   R-i-c-e.

5   Q.   Secretary Rice, were you formerly the Secretary of State

6   for the United States?

7   A.   I was.

8   Q.   Can you tell the jury what years you were Secretary of

9   State?

10  A.   I was Secretary of State from January 2005 until 2009.

11  Q.   That's a cabinet-level position within the U.S.

12  government?

13  A.   It is.

14  Q.   Can you tell the jury a little bit about your educational

15  background?

16  A.   Yes.  I was a graduate -- I was an undergraduate student

17  at the University of Denver, where I studied first music and

18  then political science.  I received my B.A. in 1974 and then

19  did my master's degree at Notre Dame, finishing in 1975.  I

20  received my Ph.D. in International Studies from the University

21  of Denver in 1981 and then went to Stanford University.

22  Q.   And are you currently employed, Secretary Rice?

23  A.   I am.  I'm on the faculty of Stanford University in the

24  Graduate School of Business, and I'm a senior fellow at the

25  Hoover Institution on Public Policy.

Rice - Direct                                                          44

1    Q.    Do you teach courses?

2    A.    I do.  I teach undergraduate courses in American foreign

3    policy.  I teach courses for the business school in, concerning

4    political risk and also on global politics.

5    Q.    Other than your position as Secretary of State, have you

6    held other positions within the United States government?

7    A.    I have.  From 1989 until 1991, I was Special Assistant to

8    the President for National Security Affairs and Senior Director

9    for Soviet and East European Affairs in the administration of

10   President George H. W. Bush; and then from 2001, January of

11   2001 until my becoming Secretary of State in 2005, I was

12   Assistant to the President for National Security Affairs, more

13   commonly known as National Security Advisor.

14   Q.    Let's focus on that time, time frame.  In approximately

15   April of 2003, were you National Security Advisor?

16   A.    I was.

17   Q.    Can you briefly describe for the jury what the National

18   Security Advisor is and what she does?

19   A.    The National Security Advisor is the principal aide or

20   assistant to the President for National Security Affairs.  It's

21   the responsibility of the National Security Advisor to make

22   sure that the President is properly briefed on matters of

23   national security.

24          The National Security Advisor also coordinates the

25   government's policies through the National Security Council,

1   which consists of the Secretary of State, the Secretary of

2   Defense, and some other key national security officials; and

3   the National Security Advisor undertakes various tasks at the

4   direction of the President on behalf of American national

5   security policy.

6   Q.   Is it fair to say with that description that it's a fairly

7   high-ranking government position?

8   A.   Yes, I think that's fair.

9   Q.   As of April 2003, approximately how long had you been

10  National Security Advisor?

11  A.   I became National Security Advisor after the inauguration

12  of President George W. Bush.  The National Security Advisor

13  does not require confirmation, so upon his inauguration, I was

14  National Security Advisor.  That would have been in January of

15  2001, so roughly two years and a few months.

16  Q.   As the National Security Advisor, did you hold a security

17  clearance?

18  A.   I did hold several security clearances, yes.

19  Q.   And at other times prior to that, perhaps during the first

20  Bush administration, did you also hold security clearances?

21  A.   I had held security clearances a number of times during my

22  government service.

23  Q.   What about when you were later Secretary of State?

24  A.   As Secretary of State, I also held security clearances.

25  Q.   In connection with your government positions, did you

Rice - Direct                                                        46

1    receive training on how to properly handle classified

2    information?

3    A.   Yes.  We received training on how to properly handle

4    national security information to make certain that it would not

5    be disclosed, how to handle documents, how to secure documents,

6    and after that training, we were certified and, in fact,

7    certified by signature that we had been properly trained and

8    agreed to handle the materials properly.

9    Q.   You did this periodically through your career?

10   A.   Yes.

11   Q.   How important would you say the proper handling of

12   classified information was during your tenure?

13   A.   The proper handling of national security information is

14   extraordinarily important because it very often involves some

15   of the most sensitive programs that the United States is

16   carrying out to try to secure the country.  It can contain

17   intelligence information that is important to securing the

18   country.  So the handling of sensitive national security

19   information is extraordinarily important.

20   Q.   Do you recall attending a meeting on April 30, 2003, at

21   the White House with representatives from *The New York Times*?

22   A.   I do.

23   Q.   And that was in your office at the White House?

24   A.   The meeting was held in my office, yes.

25   Q.   Can you describe for the jury how that meeting came about?

Rice - Direct                                                        47

1    A.    Prior to that meeting, I received information from the

2    National Security Council press staff that *The New York Times*

3    had called to say that they were about to publish an article

4    related to a sensitive national security program.  I informed

5    the President that there was likely to be a *New York Times*

6    article about this program concerning the Iranian nuclear

7    program and efforts to disrupt it.

8              At that time, the President and I talked about and I

9    decided that I should ask *The New York Times* leadership to come

10   to the White House for a meeting to discuss why that story

11   should not be published.  In fact, Jill Abramson, the

12   Washington bureau chief of *The New York Times*, agreed to come.

13   I explained that I could not talk about this on an open line

14   and so it was very important that a meeting take place, and I

15   held that meeting in my office.

16   Q.    So let's back up a little bit.  First, you just mentioned

17   that you told Ms. Abramson that you couldn't talk about it on

18   an open line.  Can you tell the jury a little bit about why you

19   couldn't do that?

20   A.    Well, on an open line, one had to assume given that the

21   call would be between the White House and *The New York Times*

22   that those lines could have been monitored.  We have secure

23   lines but obviously would not have had a secure line to *The New*

24   *York Times*.  We would have had a secure line between the White

25   House and the Defense Department, for instance, but not with

1   *The New York Times*.

2            And on an open line, there was a chance of compromise

3   of the information, compromise to a foreign government, and so

4   I was concerned about talking, even talking about this program

5   in that way on an open line.

6   Q.    So you mentioned that your understanding as to the nature

7   of this proposed *New York Times* story was it had something to

8   do with disrupting the Iranian nuclear program; is that

9   correct?

10  A.    That's correct.

11  Q.    And do you remember any more general specifics about this

12  program as it was going to be reported in *The Times*?

13  A.    Yes.  It is my recollection that the thrust of the story

14  was that the effort to disrupt the Iranian nuclear program by

15  supplying to the Iranians flawed parts for their program had

16  been botched or had been mismanaged and that the program was

17  therefore not working.

18  Q.    At the time that you learned about this anticipated *New*

19  *York Times* story, were you familiar with a classified program

20  similar to the description of that article?

21  A.    I was familiar with the program that fit that description.

22  Q.    You'd been briefed on this program previously?

23  A.    I had been briefed on the program previously.

24  Q.    Secretary Rice, to your knowledge, did everyone -- you

25  mentioned the National Security Council.  To your knowledge,

Rice - Direct                                                      49

1    did everyone on the National Security Council know about this

2    specific classified program?

3    A.   No, quite to the --

4              MR. POLLACK:  I would object, Your Honor.  This may

5    be an issue that we need to take up at the bench, but I think

6    it is beyond the protective order's bounds.

7              MR. OLSHAN:  Your Honor, it's not.

8              THE COURT:  I think the government is very sensitive

9    to the protective order, and I doubt that they would go beyond

10   it so --

11             MR. OLSHAN:  I'll rephrase the question.

12             MR. POLLACK:  This is an area that if they go into

13   it, we can't be prevented from going into.

14             MR. OLSHAN:  I'll rephrase the question.

15             THE COURT:  Let me hear what the new question is.

16   BY MR. OLSHAN:

17   Q.   You testified, Secretary Rice, that you were familiar with

18   this program, correct?

19   A.   Yes.

20   Q.   How closely held would you describe this program?

21   A.   This program was very closely held.  It was one of the

22   most closely held programs during my tenure as National

23   Security Advisor.

24   Q.   When you learned that *The New York Times* was prepared to

25   write an article about this program, what was your initial

Rice - Direct                                                        50

1    reaction to that?

2    A.   Well, my initial reaction upon learning this was first of

3    all to be stunned because to my knowledge, very few people knew

4    about this program.  I knew that very, very few people knew

5    within the White House about the program, and so I was stunned

6    that *The Times* had the information.

7              Secondly, I was deeply concerned because this was not

8    just a sensitive program, but it was one of the only levers

9    that we believed we had, that the President had to try to

10   disrupt the Iranian nuclear program.

11   Q.   You said "one of the only levers."  Is that the same as

12   saying only a few options were in play as far as how to disrupt

13   a foreign nuclear program?

14   A.   The Iranian nuclear program was -- disruption of or even

15   preferably destruction of the Iranian nuclear program was one

16   of the highest priorities of the Bush administration.  It had

17   been a high priority before in the Clinton administration.  It

18   remains a high priority today for the Obama administration.

19             And so yes, it was an important option, an important

20   way that we might be able to disrupt the program, and that's

21   why I was concerned about its possible compromise.

22   Q.   You testified that you convened a meeting at the White

23   House, correct?

24   A.   Yes.

25   Q.   Do you recall who was in attendance at that meeting?

Rice - Direct                                                          51

1  A.   Well, I recall that Jill Abramson, the bureau chief,

2  Washington bureau chief with *The New York Times*, was there.

3  James Risen, the reporter who was going to write the story, was

4  there.  I remember also George Tenet, the Director of Central

5  Intelligence and the Director of the Central Intelligence

6  Agency.  The positions were combined at the time, and so George

7  held both the positions of Director of Central Intelligence and

8  the Director of the Central Intelligence Agency, the CIA.

9         And I can't remember specifically, but I believe that

10 there was also a member of my staff there from the Press

11 Office.

12 Q.   You mention that you were notified by an individual in the

13 Press Office; is that correct?

14 A.   That's correct.  In the NSC Press Office.

15 Q.   Did you share with that person from the Press Office any

16 of the details that you knew about this classified program?

17 A.   I did not share the details of this program.  I was in a

18 receiving mode to know what the press person had been told, but

19 because the press person would not have been briefed on the

20 program, would not have been, as we say, read into the program,

21 I did not discuss the details of the program with that person.

22 Q.   Was it important not to discuss the details with that

23 person?

24 A.   It was important not to discuss the details with anyone

25 who was not, not properly on a need-to-know basis for that

Rice - Direct                                                    52

1    program.

2    Q.   You testified that George Tenet was in attendance, and you

3    described his positions at the time.  Was he the

4    highest-ranking intelligence official in the United States

5    government at the time?

6    A.   At the time, the Director of Central Intelligence was the

7    highest-ranking intelligence official in the government.  There

8    have since been subsequent reforms that have created another

9    position, but at that time, the Director of Central

10   Intelligence, George Tenet, was the highest-ranking

11   intelligence official.

12   Q.   And the purpose of this meeting was to convince *The Times*

13   not to run the story?

14   A.   The purpose was to convince *The Times* not to run the

15   story.

16   Q.   Did you speak at the meeting?

17   A.   I did speak at the meeting.

18             MR. OLSHAN:  Your Honor, if we could bring up

19   Government's Exhibit 114, which is already in evidence?

20             THE COURT:  Yes.

21             If you'll look at the screen, that's probably the

22   easiest way of seeing it.

23             THE WITNESS:  Thank you.

24   BY MR. OLSHAN:

25   Q.   Secretary Rice, you've got two options there, one on the

Rice - Direct                                                               53

1   screen and a hard copy in front of you as well.

2   A.   Yes, thank you.

3   Q.   Do you recognize that document?

4   A.   I do recognize the document.

5   Q.   And what is that document?

6   A.   The document is a set of talking points that were provided

7   to me by the Central Intelligence Agency for use in the meeting

8   with *The New York Times*.

9   Q.   Was it common when you attended meetings as National

10  Security Advisor for someone to prepare talking points for you

11  to use?

12  A.   When I conducted or attended sensitive or important,

13  significant meetings, I was provided talking points so that I

14  would remember the key points that had to be, that had to be

15  made in said meeting.

16  Q.   How important were talking points such as these when you

17  were going to be dealing with not only a sensitive topic but a

18  classified topic?

19  A.   Well, in a case like this, I was concerned that I would

20  properly deliver to *The New York Times* a statement that, about

21  the importance of a program, about the sensitivity of the

22  program, about the dangers of its compromise; but I wanted to

23  do so in a way that would not further compromise the program by

24  inadvertently giving information that I didn't need to provide;

25  and so these points were to make certain that I stayed within

1    the boundaries of what the CIA thought was appropriate to, to

2    convey to *The New York Times*.

3              So the talking points were extremely important in

4    this case.

5    Q.   And would you have reviewed these prior to delivering

6    them?

7    A.   I would have reviewed them, I would have checked them for

8    whether they accorded with my own understanding of what the

9    program was and what had happened, and I would have reviewed

10   them several times.

11   Q.   In sensitive meetings where you're dealing with topics

12   such as a very significant classified program or story about

13   it, would you tend to hew closely to those talking points, or

14   would you sort of freelance a little?

15   A.   I would not freelance in a circumstance like this because

16   my concern was to in this meeting deliver only what I needed to

17   deliver to *The New York Times* to convince them not to publish

18   the story and to avoid straying into further information that

19   might have confirmed, directly confirmed the program, that

20   might give further information about the program, and so the

21   safety valve, if you will, was to adhere very closely to the

22   talking points.

23             I can't say that I delivered them word for word, but

24   I would have adhered to them very closely.

25   Q.   If we could highlight or if you could take a look at the

Rice - Direct                                                         55

1    second talking point, that starts with "We've never called"?

2    A.   Yes.

3    Q.   Can you read that, please?

4    A.   Yes.  "We've never called a meeting like this before in

5    this administration.  The fact that we have done so may tell

6    you how seriously we view this matter."

7    Q.   And do you recall as you sit here today conveying that

8    sentiment about never having convened a meeting like this at

9    the meeting?

10   A.   I did.

11   Q.   If you could take a look at the fourth, fifth, and sixth

12   bullet points?  It's the ones that start with "Jim" --

13   A.   Yes.

14   Q.   -- and go down to the bullet point that starts with "I say

15   incorrectly."

16   A.   Yes.

17   Q.   Do you see that?

18   A.   I do.

19   Q.   Do you remember making any comments at this meeting with

20   Mr. Risen and Ms. Abramson about whether the information they

21   had purportedly obtained was inappropriately provided to them?

22   A.   I told them that it had been inappropriately provided to

23   them and also that some of the information that they had

24   received was inaccurate.

25   Q.   And when you say "inappropriately," what do you mean by

1    that?

2    A.   Inappropriately because intelligence programs are not to

3    be disclosed to those who are not authorized to know about

4    them, and *The New York Times* would not have been authorized to

5    know about them.

6    Q.   And again, can you recall word for word what you said?

7    A.   Some 12 years later, I can't recall word for word, but I

8    recognize these points, and I did say that they had been

9    inappropriately provided the information and that some of it

10   was inaccurate.

11   Q.   And to the extent the information as you understood it was

12   inaccurate, what were you thinking about?  What did you convey?

13   A.   I had been told that *The Times* was going to publish in the

14   story that the program had been botched, that it wasn't

15   working, and that the Iranians knew this, and it had been my

16   understanding, in fact, I had been told just the opposite, that

17   the program was indeed working, was underway and was working,

18   and I had no reason to believe that the Iranians knew anything

19   about it.

20   Q.   You testified that you, you had heard that the story was

21   that this program had been botched in some way; is that

22   correct?

23   A.   Yes.

24   Q.   Now, was the purpose of your convening this meeting out of

25   any sort of embarrassment that it would get out that there had

1    been a botched operation?

2    A.    My concern in convening this meeting was that we had a

3    very sensitive, extremely important program for the security of

4    the country that was about to be compromised, and given that we

5    did not have very many options for disrupting and possibly

6    undermining the Iranian nuclear program, I was very concerned

7    that any compromise of this program was going to take a good

8    option out of the hands of the President.  That was my concern.

9    Q.    So was the disclosure of the existence of the program the

10   driving force behind convening the meeting?

11   A.    The driving force was the disclosure of a very sensitive

12   program which if disclosed and compromised, was going to at the

13   very least alert the Iranians that this, this program was

14   underway and the dangers associated with that, and that was my

15   concern was the disclosure and compromise of a highly sensitive

16   and closely held program.

17   Q.    Secretary Rice, you testified that this is the first time

18   in two-plus years that you had convened a meeting like this,

19   correct?

20   A.    Yes.

21   Q.    Did you, did you understand the significance of asking a

22   news-gathering organization not to print a story?

23   A.    I certainly understood the significance of the White House

24   asking *The New York Times* not to publish a story.  It's why I

25   talked first to the President about whether we should even do

1   so.

2           I understand and fully respect the role of the press.

3   I understand and fully respect the importance of a free press

4   to our democracy and our democratic values, but I needed in

5   this case to make certain that *The New York Times* understood

6   the import of what they were about to do, and so with the

7   President's consent, I went to them to ask that they not

8   publish the story.

9   Q.   If you could take a look at the last bullet point on the

10  first page of the bullet points, it starts, "Asking

11  journalists"?

12  A.   Yes.

13  Q.   Do you see the second -- excuse me, the third sentence

14  that begins, "I am going to"?

15  A.   Yes.

16  Q.   Can you read that?

17  A.   "I am going to ask in the strongest possible terms that

18  you not discuss this matter with colleagues and that you not

19  conduct further inquiries around town about it."

20  Q.   Why, if at all, was it important to convey to the

21  participants of this meeting not to go talking about this?

22  A.   Well, there were very few people who had been briefed on

23  the program, read into the program, but I knew that it was

24  often the practice of journalists that they would get a nugget

25  about a program and then they would make calls around town to

Rice - Direct                                                      59

1   different agencies to try to get confirmation, to get some

2   further information, and my concern was that in doing so, they

3   would actually spread the news about the program to people who

4   did not yet know.

5   Q.   Did you have any concern about further inquiries even

6   within the government ranks?

7   A.   Well, yes, within the government ranks especially, because

8   there were people who would likely be called by the press who

9   didn't know about the program, and to start asking questions

10  about it would further compromise the program itself.

11  Q.   Do you remember whether you expressed anything

12  specifically to the group about the gravity of this disclosure

13  and what it could mean for people's lives?

14  A.   I did say to *The New York Times*, to Ms. Abramson and to

15  Mr. Risen, that the disclosure of this program, the compromise

16  of this program would likely or could result in actual danger

17  to lives of people.  Obviously, it would endanger the program

18  itself and take away from us a tool for dealing with the

19  Iranian nuclear program.

20       I adhered closely to what was said in the talking

21  points because the problem is to say enough about what is being

22  proposed without confirming too many details of the program to

23  the press, and so the language that I used is actually, I

24  recognize this language that is in the talking points.

25  Q.   And specifically, which language are you referring to?

Rice - Direct                                                          60

1    A.    Let me see.

2    Q.    If I could direct your attention --

3    A.    Yes, it's --

4    Q.    Go ahead.

5    A.    I'm trying to.  "Preventing working nuclear weapons from

6    falling into the hands of rogue states is one of the most

7    important missions that this or any other administration can

8    have."

9    Q.    Thank you.

10          What was your understanding at the time of how close

11   The Times was to publishing this story?

12   A.    The NSC press spokesman, press people had told me that

13   they believed that the publication of the story was imminent,

14   probably within the next couple of days.

15   Q.    During the meeting, do you recall after you delivered the

16   talking points whether you answered any questions?

17   A.    I don't recall answering any questions, and it was my

18   practice in these circumstances to deliver the points, not to

19   get into a conversation so that I wouldn't inadvertently

20   disclose more information, and then to refer questions to the

21   agency, in this case to George Tenet.

22   Q.    Do you recall during the meeting whether you asked,

23   whether you asked The New York Times, either Ms. Abramson or

24   Mr. Risen, to do anything with any materials that they had?

25   A.    I, I do recall that I asked that if they had any

Rice - Direct                                                          61

1    materials, that they would destroy them.  I remember saying

2    that I, I knew that they wouldn't give them back to us

3    because -- and I wouldn't ask that, but that if they had any

4    materials, to please destroy them.

5    Q.   Following the meeting, did you learn at some point that

6    *The New York Times* had decided not to run the story?

7    A.   I remember that the bureau chief, Ms. Abramson, told me

8    that she had to discuss this with her higher-ups, the editor,

9    Howell Raines, and she would get back to me.  I don't remember

10   precisely who she got back to, whether it was to me or to the

11   press shop.  I think it may have been to people in the press

12   area.  I don't remember having a further conversation with her

13   myself.

14   Q.   *The New York Times* did not run the story; is that right?

15   A.   That's correct.

16   Q.   And do you recall what your reaction was when you

17   ultimately did learn that the story wasn't running?

18   A.   I was relieved when I learned that the story was not

19   running and grateful to *The Times* for not doing so.

20   Q.   Other than sitting in that room with Mr. Risen, did you

21   ever have any other conversations with him about this

22   classified program?

23   A.   I had no conversations with Mr. Risen about this program.

24   Q.   And have you ever discussed this classified program with

25   anybody whom -- who was not authorized to know about it?

Rice - Cross                                                        62

1   A.   I did not at the time and I have not since discussed the

2   program with anyone who was not authorized to know about it.

3              MR. OLSHAN:  One moment, Your Honor?

4              THE COURT:  Yes, sir.

5              MR. OLSHAN:  That's all I have for now, Your Honor.

6              THE COURT:  All right.  Mr. Pollack?

7              MR. POLLACK:  Thank you, Your Honor.

8                          CROSS-EXAMINATION

9   BY MR. POLLACK:

10  Q.   Good afternoon, Dr. Rice.  My name is Barry Pollack, and

11  I'm one of the lawyers that represents Mr. Sterling.

12              Dr. Rice, you had indicated to Mr. Olshan that this

13  was the first meeting of this kind that you participated in as

14  the National Security Advisor, correct?

15  A.   That's correct.

16  Q.   But while this was the first such meeting, this was not

17  the only meeting that you participated in where there had been

18  a disclosure of such sensitive information, correct?

19  A.   That is correct.

20  Q.   And this also was not the first occasion on which you had

21  asked editors for *The New York Times* not to run a story,

22  correct?

23  A.   I don't recall having asked editors of *The New York Times*

24  prior to this not to run a story, but subsequent to this, I

25  did.

1   Q.   Okay.  If we could pull up Exhibit 108, which is already

2   in evidence?

3            Dr. Rice, this is a Lotus Note from Bill Harlow at

4   the CIA.  Do you know who Mr. Harlow is?

5   A.   I do.

6   Q.   He was the press person for the CIA?

7   A.   That's correct.

8   Q.   And this is Mr. Harlow indicating toward the middle of the

9   page, the paragraph that begins, "I reminded"?

10  A.   Yes.

11  Q.   This is less than 24 hours after Mr. Harlow received a

12  phone call from Mr. Risen about the story that Mr. Risen was

13  working on about Classified Program No. 1?

14           MR. OLSHAN:  Objection.  Can the defense lay a

15  foundation that this witness has any knowledge of that?

16           THE COURT:  All right.  Lay a foundation first,

17  Mr. Pollack.

18  BY MR. POLLACK:

19  Q.   Well, specifically, Dr. Rice, what I want to ask you about

20  is Mr. Harlow says that he reminded Mr. Risen of a recent

21  occasion on which they had Condi Rice call his publisher to

22  kill a story.

23  A.   I don't know to what Mr. Harlow is referring.

24  Q.   And you did learn -- you learned about Mr. Risen's story

25  from the press person at the National Security Council,

Rice - Cross                                                          64

1   correct?

2   A.   That's my recollection.

3   Q.   But you did become aware that a similar call had been made

4   by Mr. Risen to Mr. Harlow, the press person at the CIA?

5   A.   I was told by our press people that Bill Harlow said that

6   he had been called by Mr. Risen, yes.

7   Q.   Okay.  And you were aware that the CIA did not want this

8   story published, correct?

9   A.   That's correct.

10  Q.   And as you indicated in your talking points, Exhibit 114,

11  the -- in the middle of the page -- well, it's toward the

12  bottom of the screen now, preventing working nuclear weapons

13  from falling into the hands of rogue states is one of the most

14  important missions of your, the administration you worked for

15  certainly --

16  A.   Yes.

17  Q.   -- and any other administration, correct?

18  A.   That's correct.

19  Q.   And certainly counterproliferation was of great interest

20  at this particular time, correct?

21  A.   That's correct.

22  Q.   The United States had invaded Iraq the earlier month?

23         MR. OLSHAN:  Objection.

24         THE COURT:  Well, we've heard that before.  Let's

25  just move this along, Mr. Pollack.  Sustained.

Rice - Cross                                                        65

1    BY MR. POLLACK:

2    Q.   Well, specifically, it was of great interest --

3    counterproliferation was of great interest in the Intelligence

4    Community, correct?

5    A.   It was of great interest throughout the administration

6    and, of course, in the Intelligence Community.

7    Q.   And the Intelligence Community particularly at this point

8    in time did not want a story published about a

9    counterproliferation program that they were working against

10   Iran, correct?

11   A.   I cannot speak to the, what the Intelligence Community was

12   thinking.  I can only speak to what I was thinking about this

13   matter.

14   Q.   Okay.  But you were aware that the Intelligence Community

15   wanted you to meet with *The New York Times*, correct?

16   A.   I was aware that the Intelligence Community was concerned

17   about it and that they wanted the -- that no one wanted *The New*

18   *York Times* to publish this story, and it was actually with the

19   President that I talked about meeting with *The New York Times*.

20   Q.   Okay.  What I'm asking is about the CIA.  You weren't

21   meeting with *The New York Times* over the CIA's objection,

22   right?

23   A.   No, of course not.

24   Q.   Of course not.  The CIA very much wanted you to meet with

25   *The New York Times* because they believed that you might be

Rice - Cross                                                        66

1  effective in convincing *The New York Times* not to publish the

2  story, correct?

3  A.    I wanted to meet with *The New York Times* because I

4  believed that I might be effective in convincing *The Times* not

5  to publish the story.

6  Q.    I understand that, but what I'm asking you is wasn't it

7  communicated to you that the CIA wanted the same thing?

8  A.    Of course.

9  Q.    It was -- you knew it was important to the CIA?

10  A.    It was important to the administration and to the CIA.

11  Q.    Yeah.  And, in fact, it was the CIA that drafted the

12  talking points that you used for that meeting, correct?

13  A.    That is correct.

14  Q.    The talking points that you adhered to very closely?

15  A.    That is correct.

16  Q.    And the meeting was attended by three officials from the

17  CIA?

18  A.    I remember George Tenet's attendance.  I don't remember

19  who else was there.

20  Q.    Do you remember the Assistant Deputy Director of

21  Operations was there?

22  A.    I don't remember.

23  Q.    Do you remember that Mr. Harlow was there?

24  A.    I don't remember.

25  Q.    And you were aware by the time of the meeting that

Rice - Cross                                                      67

1    Mr. Risen had made an inquiry of the NSC press person, correct?

2    A.    Yes.

3    Q.    And an inquiry of the CIA press person?

4    A.    Yes.

5    Q.    Were you aware of others?

6    A.    I was not aware of others.

7    Q.    You don't know how many people Mr. Risen had spoken to at

8    that point?

9    A.    I do not.

10   Q.    And, Dr. Rice, from your experience at that point, you

11   knew that when the administration wanted to convince someone

12   not to publish a story, there were two tactics that they could

13   employ.  They could either indirectly confirm the story, or

14   they could say that the story was not entirely correct.

15            Would you agree with that?

16   A.    Well, there are several tactics that one can employ.  I

17   would imagine that those are among them.

18   Q.    Do you remember being interviewed by the FBI in April of

19   2006?

20   A.    Yes.

21   Q.    Do you remember telling the FBI that when scheduling a

22   meeting with a publication for the purpose of requesting it not

23   to publish a story, one of two tactics is usually taken:  The

24   administration either stated that the publication did not have

25   the story entirely correct, or the administration indirectly

Rice - Cross                                                                68

1   confirmed the story?

2   A.   Those are two of the tactics that you could use, yes.

3   Q.   And in this case, the administration chose to employ the

4   former tactic, correct?

5   A.   Would you repeat what the former tactic is?

6   Q.   Sure.  You told the FBI that the former tactic would be to

7   tell the publication that they did not have the story entirely

8   correct.

9   A.   That was a part of what I told *The New York Times*.

10  Q.   And that's what you told the FBI was the tactic that you

11  employed?

12  A.   I told *The New York Times* that part of the story, part of

13  what they had told -- had been told was not correct.

14  Q.   Because you believed that if you convinced *The New York*

15  *Times* that they did not have the story correct, that might

16  convince them not to publish it, correct?

17  A.   That was one part of what I told *The New York Times*.  The

18  other part was that it was a program of significance to

19  national security and that indeed, not only was part of it not

20  correct, but it was inappropriate that they had access to it at

21  all.  So I said both of those, not just one.

22  Q.   Hoping that both -- either or both would be effective?

23  A.   I certainly hoped, I certainly hoped they would not

24  publish.

25  Q.   But you understood that the danger of employing the tactic

Rice - Cross                                                          69

1   of trying to convince the publisher that the story is not

2   correct is that you might allow the reporter in doing so to

3   collect additional information about the story?

4   A.   My goal was to state for *The New York Times* that some of

5   what they had was not correct and that they had been

6   inappropriately provided this information, and then to do so

7   within points that did not provide further information to the

8   reporter.

9            It's also why I asked that they not continue to call

10  around to try to confirm the story.

11  Q.   Do you recall telling the FBI that the danger in answering

12  the questions of the reporter or in this case his superior is

13  that by doing so, the meeting becomes an interview during which

14  the reporter collects additional information for the story?

15  A.   That is why I adhered closely to talking points, not to

16  get into a conversation about the story, correct.

17  Q.   And in this particular meeting, it wasn't just the editor

18  of the publisher or the bureau chief of the publisher that was

19  there, but the reporter was there, correct?

20  A.   That's correct.

21  Q.   And in fact, *The Times* insisted on having Mr. Risen at

22  this meeting, correct?

23  A.   I believe that's right.

24  Q.   And in your experience, these meetings are often just with

25  the publisher, not with the reporter, correct?

1    A.   Well, I can't speak in a general way about this.  These

2    meetings are set up with the appropriate people in the room,

3    and if *The New York Times* wanted to bring the reporter, that

4    was fine with me.

5    Q.   Do you remember telling the FBI that often such a meeting

6    would be held with the editor rather than the reporter and that

7    on occasions when a publication presses the government to meet

8    directly with the reporter, you believe it's because the

9    reporter wants to be present to develop additional information

10   for the story?

11   A.   I don't remember that specific statement, but clearly in

12   this case, *The New York Times* wanted to bring the reporter, and

13   I didn't object.

14   Q.   And as you indicated, it's -- because you don't want to

15   provide additional information, that's why you rarely -- well,

16   it's why you don't want to stray from the talking points,

17   correct?

18   A.   That's correct.

19   Q.   And at meetings like this, you personally rarely answer

20   questions, correct?

21   A.   In meetings of extraordinary sensitivity, particularly

22   ones that involve intelligence information, it was my practice

23   and habit not to stray from the talking points and to defer

24   questions really to the intelligence personnel.

25   Q.   And that's what you did here.  You decided it would be up

Rice - Cross                                                      71

1    to the CIA to determine how much or how little to say, correct?

2    A.   That's correct.

3    Q.   And you referred to Director Tenet and the others from the

4    CIA to answer questions or to respond to comments from the

5    reporter, correct?

6    A.   I believe that that is the case.  I can't say that I

7    didn't answer any questions.  It's a very long time ago, but in

8    general, it was preferable to have the agency answer questions,

9    not me.

10   Q.   You do recall that Director Tenet answered at least one

11   question, a question that was posed by Mr. Risen where he said

12   that he had seen a letter and that suggested that the program

13   was flawed in some way, and Director Tenet told Mr. Risen that,

14   in fact, the letter was intended to suggest that the Iranians

15   needed the services that were being offered?

16   A.   I --

17             MR. OLSHAN:  Your Honor, I'm going to object.  If

18   Mr. Pollack is going to read from a document, he should show

19   the document to the witness.

20             THE COURT:  I think that's appropriate.  Do you have

21   a copy?  And I need to see one, too.  Is it a defense exhibit?

22             MR. POLLACK:  No.  Let's go to Government Exhibit

23   113, which is already in evidence.

24             THE COURT:  All right.  This is one of Mr. Harlow's

25   Lotus Notes.

Rice - Cross                                                      72

1          MR. POLLACK:  In fact, this is Mr. Harlow's notes of

2    the meeting in which Dr. Rice participated.

3    Q.   And if you can go to the fifth paragraph?

4    A.   Yes.

5    Q.   It says, "Risen asked about the issue of whether the

6    Iranians were witting of the program.  He implied that he had

7    seen a letter to the Iranians from the Russian which told them

8    that their program was flawed.  The DCI" -- now, DCI is the

9    Director of Central Intelligence?

10   A.   Yes.

11   Q.   That would be Mr. Tenet?

12   A.   That's correct.

13   Q.   ". . . DCI said that the individual was suggesting to the

14   Iranians that they needed his services, not telling them that

15   the designs they got from him were flawed."

16          Does that match your recollection of what happened?

17   A.   These are Mr. Harlow's notes apparently, and I don't

18   recall myself what Director Tenet said in response to the

19   question.

20   Q.   You don't recall whether in responding to the questions,

21   Director Tenet --

22          THE COURT:  She's answered the question.  She doesn't

23   recall.

24   BY MR. POLLACK:

25   Q.   Okay.  Do you recall whether Director Tenet gave any

Rice - Cross                                                    73

1    additional information to Mr. Risen that he didn't have prior

2    to the meeting?

3    A.    I don't.

4    Q.    Now, this was the only meeting that you were involved in

5    with *The New York Times* on this issue, correct?

6    A.    I believe that's the case.

7    Q.    Okay.  You don't know what efforts the CIA made to

8    dissuade Mr. Risen from publishing this story?

9    A.    I do not.

10          MR. POLLACK:  I don't have anything further.  Thank

11   you, Dr. Rice.

12          THE WITNESS:  Thank you very much.

13          THE COURT:  Mr. Olshan, is there any redirect

14   examination for Secretary Rice?

15          MR. OLSHAN:  No redirect.

16          THE COURT:  All right.  Then thank you, ma'am, for

17   your testimony.  You're free to go.

18          THE WITNESS:  Thank you, Your Honor.

19                    (Witness excused.)

20          *         *         *         *         *

21               CERTIFICATE OF THE REPORTER

22       I certify that the foregoing is a correct excerpt of the

23   record of proceedings in the above-entitled matter.

24

25                              _____/s/_____
                                Anneliese J. Thomson