1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | Criminal No. 1:10cr485 |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | January 21, 2015 |
| JEFFREY ALEXANDER STERLING, | . | 1:55 p.m. |
| | . | |
| Defendant. | . | <u>EXCERPT OF P.M. SESSION</u> |

. . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:    JAMES L. TRUMP, AUSA
                       DENNIS M. FITZPATRICK, AUSA
                       United States Attorney's Office
                       2100 Jamieson Avenue
                       Alexandria, VA 22314
                         and
                       ERIC G. OLSHAN, Deputy Chief
                       Public Integrity Section of the
                       Criminal Division
                       United States Department of
                       Justice
                       1400 New York Avenue, N.W.
                       Suite 12100
                       Washington, D.C. 20005

FOR THE DEFENDANT:     EDWARD B. MAC MAHON, JR., ESQ.
                       Law Office of Edward B.
                       MacMahon, Jr.
                       107 East Washington Street
                       P.O. Box 25
                       Middleburg, VA 20118
                         and
                       BARRY J. POLLACK, ESQ.
                       MIA P. HAESSLY, ESQ.
                       Miller & Chevalier Chartered
                       655 - 15th Street, N.W.
                       Suite
                       Washington, D.C. 20005-5701

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1   APPEARANCES:  (Cont'd.)

 2   CLASSIFIED INFORMATION          CHRISTINE E. GUNNING
     SECURITY OFFICERS:              MAURA PETERSON
 3

 4   ALSO PRESENT:                   GERARD FRANCISCO
                                     SA ASHLEY HUNT
 5                                   JENNIFER MULLIN, ESQ.

 6
     OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
 7                                   U.S. District Court, Fifth Floor
                                     401 Courthouse Square
 8                                   Alexandria, VA 22314
                                     (703)299-8595
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **WITNESS ON BEHALF OF THE GOVERNMENT:** | | | | |
| SA Ashley K. Hunt | 4 | | | |

1                 A F T E R N O O N   S E S S I O N

2                      (Defendant and Jury present.)

3               *         *         *         *         *

4        SPECIAL AGENT ASHLEY K. HUNT, GOVERNMENT'S WITNESS,

5                     PREVIOUSLY AFFIRMED, RESUMED

6               *         *         *         *         *

7            THE COURT: All right. Redirect, Mr. Olshan?

8            MR. OLSHAN: Yes, Your Honor.

9                          REDIRECT EXAMINATION

10   BY MR. OLSHAN:

11   Q.   Special Agent Hunt, Mr. MacMahon asked you some questions

12   about phone records. Do you recall those?

13   A.   Yes.

14   Q.   Did you obtain phone records for Vicki Divoll?

15   A.   I did.

16   Q.   And did those reflect any communications between

17   Ms. Divoll and Mr. Risen?

18   A.   They did not.

19   Q.   And what about phone records for Merlin? Did you obtain

20   any of those phone records?

21   A.   I did.

22   Q.   What did they reflect about communications with Mr. Risen?

23   A.   They reflected no contact between Merlin and James Risen.

24   Q.   Mr. MacMahon asked you about Mr. S. and his

25   characterization in the book. Do you recall those questions?

1  A.     Yes.
2  Q.     And in the book, is he referred to as the senior case
3  officer or the senior CIA officer?
4  A.     Or perhaps official, something like that.
5  Q.     But he is referenced in the book?
6  A.     Yes.
7  Q.     Do any of Mr. S.'s -- does language from any of Mr. S.'s
8  PARs show up in chapter 9?
9  A.     No.
10 Q.     How many articles did James Risen write about Mr. S.,
11 newspaper articles?
12 A.     One.
13 Q.     What was that?  About Mr. S.
14 A.     I'm sorry, about --
15            MR. MAC MAHON:  They're confusing Mr. S.'s, Your
16 Honor.
17            THE WITNESS:  Yes.  I'm sorry.  No, I'm sorry.
18 BY MR. OLSHAN:
19 Q.     How many newspaper articles?
20 A.     Are we talking about Bob S.?
21 Q.     Yes.
22 A.     He wrote no articles about Bob S.
23 Q.     Thank you.
24        You testified that you had written that SSCI as an
25 organization was not cooperative at first.  Is that correct?

Hunt - Redirect 6

1 A. That's correct.
2 Q. Was Vicki Divoll cooperative during the course of your
3 investigation?
4 A. Yes.
5 Q. What about Don Stone?
6 A. Yes.
7 Q. Special Agent Hunt, when you investigate a case, do you
8 consider motive?
9 A. I do.
10 Q. How important is motive evidence in your investigation?
11     MR. MAC MAHON: Your Honor, objection to testimony as
12 to her theory of motive.
13     MR. OLSHAN: Your Honor, the defense put the
14 thoroughness of this investigation at issue. The witness
15 should be able to describe why it is that she focused her
16 direction a particular way.
17     THE COURT: I'll permit it. I believe the door was
18 opened. Overruled.
19 BY MR. OLSHAN:
20 Q. My question, Special Agent Hunt, was how important is
21 motive evidence when you conduct a criminal investigation?
22 A. It is very important.
23 Q. Did you obtain evidence that you believed provided --
24 presented a motive for somebody to disclose information to
25 Mr. Risen during the course of this investigation?

Hunt - Redirect 7

1  A.  Yes.
2  Q.  And who did that evidence involve?
3  A.  Jeffrey Sterling.
4  Q.  Has Robert S. ever sued the CIA?
5  A.  No.
6  Q.  Merlin ever sued the CIA?
7  A.  No.
8  Q.  When you initiated the investigation, I believe you
9  testified it was in April of 2003?
10 A.  That's correct.
11 Q.  At the time when you initiated your investigation
12 concerning unauthorized disclosure of classified information to
13 James Risen, did you learn any information regarding Mark Zaid
14 and Mr. Krieger that, that directed your investigation?
15 A.  I did.
16      MR. MAC MAHON:  Your Honor, objection.  That door was
17 not opened as to Mr. Sterling's prior lawyers.
18      MR. OLSHAN:  Your Honor, this is about why --
19      THE COURT:  Again, the scope of the investigation,
20 what was done and not done, was clearly part of the cross.  I'm
21 going to allow it, excuse me, on redirect; and if there needs
22 to be recross on that, you'll be allowed to.  Go ahead.
23      MR. MAC MAHON:  Thank you, Your Honor.
24 BY MR. OLSHAN:
25 Q.  What did you learn at the outset of your investigation

1  about information from Mr. Krieger and Zaid that helped you
2  direct your investigation and focus it?
3  A.   When I opened my investigation on April 8, 2003, my
4  investigation was based on a report I received from the CIA
5  dated April 7, 2003.  In that report, the CIA provided
6  information about the fact --
7             MR. MAC MAHON:  Your Honor, that's hearsay.
8             THE COURT:  Wait.
9             MR. OLSHAN:  Your Honor, this is not for the truth.
10 It's why she took the actions.
11            THE COURT:  It explains why she is acting, takes the
12 investigative tacks that she does, so I'm going to overrule the
13 objection.  It's not hearsay.
14 BY MR. OLSHAN:
15 Q.   You may continue, Special Agent Hunt.
16 A.   The CIA advised that on February 24, 2003, it was
17 contacted by Mark Zaid and Roy Krieger.  They told the CIA on
18 February 24 that a client of theirs had contacted them on
19 February 21, 2003, and that that client, that unnamed client at
20 the time voiced his concerns about an operation that was
21 nuclear in nature, and he threatened to go to the media.
22 Q.   Did you later learn who that client was from Mr. Zaid and
23 Mr. Krieger in the course of your investigation?
24 A.   I did.
25 Q.   Did those facts help you focus the direction of your

Hunt - Redirect 9

1 investigation?
2 A. They did.
3 Q. And who did you learn was the client of Mr. Krieger and
4 Mr. Zaid?
5 A. Jeffrey Sterling.
6 Q. You testified that you have read the chapter a number of
7 times; is that correct?
8 A. Yes.
9 Q. Which person in your opinion, which person received the
10 most favorable treatment as written in chapter 9?
11 　　　　MR. MAC MAHON: Your Honor, that's --
12 　　　　THE COURT: All right, now I think that's going
13 beyond the scope of proper cross -- proper redirect.
14 　　　　MR. OLSHAN: If it's relevant to the investigation,
15 Your Honor.
16 　　　　THE COURT: Well, then ask the question in a
17 different way.
18 BY MR. OLSHAN:
19 Q. Was the characterization of certain individuals in chapter
20 9 relevant to your investigation and how you conducted it after
21 the book was published in 2006?
22 A. Yes, it was.
23 Q. And which character in the book is referenced most
24 favorably?
25 A. The case officer who was handling the Merlin asset.

Hunt - Redirect                                                    10

1  Q.  And who was that in reality?
2  A.  Jeffrey Sterling.
3  Q.  Chapter 9 also references two specific events: the trip
4  to Vienna and the San Francisco meeting.  Do you recall those?
5  A.  I do.
6  Q.  Relative to Mr. Sterling's time as the case officer, did
7  those events -- strike that.
8       Where do those events fall relative to Mr. Sterling's
9  time as the case officer for Merlin?
10 A.  The San Francisco meeting occurred at the beginning of
11 Jeffrey Sterling's time as the case officer for this asset and
12 operation, and the operation carried out in Vienna in
13 February-March of 2000 falls toward the end of his time as the
14 case officer.
15 Q.  The fact about the Sonoma trip, in the course of your
16 investigation, did you determine whether that was known to
17 Mr. Sterling?
18 A.  It was.
19 Q.  And the fact about the postman in Vienna, was that known
20 to Mr. Sterling?
21 A.  It was.
22 Q.  Did those facts and the additional details about the San
23 Francisco meeting and the Vienna trip influence the direction
24 of your investigation?
25 A.  Yes.

Hunt - Redirect                                                    11

1          MR. OLSHAN:  May I have a moment, Your Honor?
2          THE COURT:  Yes, sir.
3   BY MR. OLSHAN:
4   Q.   You testified that you obtained phone records from
5   Mr. Stone; is that correct?
6   A.   Yes.
7   Q.   Were those phone records for his personal phone numbers or
8   his Senate phone numbers or both?
9   A.   I tried to obtain records for all of the numbers, both
10  his, his residence and his number at the Senate.  I'm not sure
11  that -- well, I collected some of those records in 2003 and
12  some of them later.
13  Q.   When you testified that SSCI was not cooperative as an
14  organization, did that include the lawyers for the Senate not
15  being cooperative?
16  A.   Yes.
17         MR. OLSHAN:  That's all.
18              *       *       *       *       *
19
20                   CERTIFICATE OF THE REPORTER
21     I certify that the foregoing is a correct excerpt of the
22  record of proceedings in the above-entitled matter.
23
24
25                                       _____/s/_____
                                         Anneliese J. Thomson