```
                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
                       ALEXANDRIA DIVISION

UNITED STATES OF AMERICA       .        Criminal No. 1:10cr485
                               .
     vs.                       .        Alexandria, Virginia
                               .        January 21, 2015
JEFFREY ALEXANDER STERLING,    .        9:40 a.m.
                               .
               Defendant.      .        EXCERPT
                               .
.  .  .  .  .  .  .  .  .  .  .
```

                    TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE LEONIE M. BRINKEMA
                UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:              JAMES L. TRUMP, AUSA
                                 DENNIS M. FITZPATRICK, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314
                                   and
                                 ERIC G. OLSHAN, Deputy Chief
                                 Public Integrity Section of the
                                 Criminal Division
                                 United States Department of
                                 Justice
                                 1400 New York Avenue, N.W.
                                 Suite 12100
                                 Washington, D.C. 20005


FOR THE DEFENDANT:               EDWARD B. MAC MAHON, JR., ESQ.
                                 Law Office of Edward B.
                                 MacMahon, Jr.
                                 107 East Washington Street
                                 P.O. Box 25
                                 Middleburg, VA 20118
                                   and
                                 BARRY J. POLLACK, ESQ.
                                 MIA P. HAESSLY, ESQ.
                                 Miller & Chevalier Chartered
                                 655 - 15th Street, N.W.
                                 Suite 900
                                 Washington, D.C. 20005-5701


          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
1    APPEARANCES:  (Cont'd.)

2    CLASSIFIED INFORMATION          CHRISTINE E. GUNNING
     SECURITY OFFICERS:              MAURA PETERSON
3

4    ALSO PRESENT:                   GERARD FRANCISCO
                                     SA ASHLEY HUNT
5                                    JENNIFER MULLIN, ESQ.

6
     OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
7                                    U.S. District Court, Fifth Floor
                                     401 Courthouse Square
8                                    Alexandria, VA 22314
                                     (703)299-8595
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          I N D E X

2                   DIRECT   CROSS   REDIRECT   RECROSS

3  WITNESS ON BEHALF OF
   THE GOVERNMENT:

4
   SA Ashley K. Hunt        4       79      107       115

5

6

7                        EXHIBITS

8                          MARKED        RECEIVED

9  GOVERNMENT'S:

10  Nos. 48 thru 51                       44
          54 thru 58                       44
11        61 thru 63                       44
          65 thru 66                       45
12        73 thru 74                       45

13        77                               45
          94 thru 96                       45
14        98                               42
          102                              12
15        118                              46

16        125                              33
          128                              63
17        129                              33
          130                              46
18        131                              67

19        132A                            176
          137                              6
20        139                              15
          140                              6
21        141                              10

22        161                              32
          163                              40
23        166                             177
          168                              72
24        175                              77

25        176                             178

1                        P R O C E E D I N G S

2            *         *         *         *         *

3                      (Defendant and Jury present.)

4            THE COURT:  Your next witness?

5            MR. OLSHAN:  The United States calls Special Agent

6   Ashley Hunt.

7            THE COURT:  All right.

8         SA ASHLEY K. HUNT, GOVERNMENT'S WITNESS, AFFIRMED

9                      DIRECT EXAMINATION

10   BY MR. OLSHAN:

11   Q.   Good morning.

12   A.   Good morning.

13   Q.   Would you please state and spell your name for the record?

14   A.   Ashley, middle initial K, Hunt, H-u-n-t.

15   Q.   How are you employed, ma'am?

16   A.   I'm employed by the Federal Bureau of Investigation.

17   Q.   And what's your job there?

18   A.   I'm a special agent.

19   Q.   When did you become a special agent with the FBI?

20   A.   In 2000.

21   Q.   So you've been a special agent for approximately how long?

22   A.   Almost 15 years.

23   Q.   Prior to becoming a special agent, did you have any other

24   jobs with the FBI?

25   A.   Yes, I did.  I was an analyst in a Russian

Hunt - Direct                                                        5

1   counterintelligence unit for three years before I became an

2   agent.

3   Q.   What's your educational background?

4   A.   I have a Bachelor's of Science Degree in Psychology from

5   the University of Alabama.

6   Q.   Other than your employment with the FBI, have you had any

7   other career?

8   A.   No.

9   Q.   Special Agent Hunt, are you the case agent assigned to the

10  investigation involving unauthorized disclosures related to

11  Classified Program No. 1 and Merlin?

12  A.   Yes.

13  Q.   And how long have you been assigned to that investigation?

14  A.   Almost 12 years.

15  Q.   Approximately when did you begin working on it?

16  A.   I opened the investigation on April 8, 2003.

17  Q.   Is this the only case that you've worked during those, the

18  last 12 years?

19  A.   No.

20  Q.   What kind of cases do you currently work on?

21  A.   For the past three years, I've been working on white

22  collar crime and public corruption matters.

23  Q.   And prior to that, what type of cases did you work?

24  A.   Espionage cases.

25  Q.   Special Agent Hunt, during the course of your

1  investigation, did you obtain a search warrant for the

2  defendant's e-mail accounts?

3  A.   Yes.

4  Q.   Let's talk through that process.  Who was the provider for

5  the defendant's e-mail accounts?

6  A.   MSN Hotmail.

7  Q.   And approximately when did you execute a search warrant?

8  A.   I believe the warrant was actually executed by my partner

9  in my absence in October of 2006.

10  Q.   Did you do anything to preserve the content of the

11  defendant's e-mail accounts prior to execution of the warrant?

12  A.   Yes.

13  Q.   Can you tell the jury what you did?

14  A.   Yes.  In April of 2006, I prepared what is called a

15  preservation letter, and I sent the preservation letter to MSN

16  Hotmail.

17  Q.   I'll stop you right there.  If we could with the

18  assistance of the court security officer take a look at the

19  second binder?  I'm going to ask Special Agent Hunt to look at

20  Exhibits 137 and 140.

21        THE COURT:  Any objection to those exhibits?

22        MR. MAC MAHON:  Not to 137 or 140, Your Honor.

23        THE COURT:  All right, they're both in.

24        (Government's Exhibit Nos. 137 and 140 were received

25  in evidence.)

Hunt - Direct                                                            7

1   BY MR. OLSHAN:

2   Q.   Do you see those documents, Special Agent Hunt?

3   A.   Yes.

4   Q.   Okay.  Let's look at 137 first.  In your own words, what

5   does that reflect?

6   A.   It is the response I received from MSN Hotmail to the

7   preservation letter I sent them.

8   Q.   Okay.  And this document is dated at the bottom May 12,

9   2006, correct?

10  A.   Yes.

11  Q.   When did you actually send the preservation letter?

12  A.   I sent it in April.

13  Q.   And the date in the middle of that page is 4/19/06.

14  A.   Correct.

15  Q.   Do you see that?

16       Is that around the time that you submitted the

17  preservation request?

18  A.   Yes.  I believe I submitted it a day or two before I

19  received this response.

20       THE COURT:  Go ahead.

21  BY MR. OLSHAN:

22  Q.   Special Agent Hunt, can you tell the jury what the purpose

23  of a preservation request is?

24  A.   Yes.  So when you send a preservation letter to a provider

25  of this kind, they take a snapshot of the entire contents of

1    the particular e-mail account that you've named in the

2    preservation letter.  You can also name more than one e-mail

3    account, but essentially, they preserve all the data in that

4    e-mail account on that day and on no other day moving forward.

5    Q.    So it's literally frozen in time in a sense?

6    A.    That's correct.

7    Q.    Did your preservation request to MSN Hotmail include

8    preservation of jeffreys@hotmail.com and jsthe7th@hotmail.com?

9    A.    Yes.

10   Q.    At some point, did you serve -- was another snapshot taken

11   by MSN?

12   A.    Yes.

13   Q.    Was that in July?

14   A.    Yes, July of 2006.

15   Q.    And what was the purpose of doing that?

16   A.    Well, my initial request was for MSN Hotmail to extend the

17   preservation of the April snapshot for an additional 90-day

18   period, so when you send a preservation letter and a snapshot

19   is taken, the provider agrees to freeze that data and keep it

20   for 90 days, so in July, I wanted them to keep the April data

21   for an additional 90-day period.

22         They misunderstood my request.  They took another

23   snapshot of the same e-mail account or accounts in July, and

24   then after I made a second request, they agreed to further

25   preserve the data that had been collected in April for an

1    additional 90-day period.

2    Q.   So in July of 2006, there were at that point two

3    snapshots?

4    A.   Correct.

5    Q.   And if you could look at Exhibit 140?  What does that

6    document reflect?

7    A.   It is a response I received from MSN Hotmail in July of

8    2006.

9    Q.   Confirming the snapshot process you just discussed?

10   A.   Yes.

11   Q.   You testified at some point, you actually executed a

12   search warrant for these e-mail accounts; is that correct?

13   A.   I believe my partner did.

14   Q.   I'm sorry.

15   A.   Yes.

16   Q.   The FBI did.

17   A.   Yes, the FBI did.

18   Q.   If you could look at Exhibit 141, which is not in evidence

19   yet?

20           THE COURT:  Any objection to 141?

21           MR. MAC MAHON:  Well, Your Honor, you usually don't

22   put the affidavits and search warrants in evidence in the case.

23           MR. OLSHAN:  There's no affidavit, Your Honor.

24           MR. MAC MAHON:  There is a search warrant, Your

25   Honor.

Hunt - Direct                                                      10

1            THE COURT:  It's just the -- I just see the warrant

2     here.  My exhibit only has two pages.

3            MR. MAC MAHON:  No objection, Your Honor.

4            THE COURT:  All right.

5            MR. MAC MAHON:  I was flipping to the back.

6            THE COURT:  141 is in.

7            (Government's Exhibit No. 141 was received in

8     evidence.)

9     BY MR. OLSHAN:

10    Q.    Do you see that document?

11    A.    I do.

12    Q.    Is this the search warrant that the FBI executed for those

13    e-mail accounts?

14    A.    Yes.

15    Q.    After the search warrant was executed, did you receive the

16    proceeds of that search warrant?

17    A.    Yes.

18    Q.    Can you describe for the jury what you got?

19    A.    Yes.  MSN Hotmail sent a disc to the FBI in the mail, and

20    the disc had the data captured in April, the data captured in

21    July, and the data captured in October.  I'm not sure exactly

22    how this was done, but the disc and the data was given to a

23    filter agent who then printed all the data from the disc, and

24    the filter agent reviewed all of the data, removing any

25    communications he deemed to possibly be privileged.

1    Q.    So, for example, any communication that might reflect

2    conversation or communication between the defendant or anyone

3    else and a lawyer?

4    A.    Correct.

5    Q.    You were not involved in that process?

6    A.    That's correct.

7    Q.    What happened after that process ended?

8    A.    So after that process was complete, I was given a Bankers

9    Box or two full of the hard copy printouts from the e-mail

10   accounts divided into the April set, the July set, and the

11   October set.

12   Q.    And then did you review that material?

13   A.    Yes.

14   Q.    By hand?

15   A.    Yes.

16   Q.    If we could bring 141 back up just for the record?

17         The date of this search warrant at the bottom was

18   when?

19   A.    October 12, 2006.

20   Q.    Thank you.

21         If you could take a look at Exhibit 102, which should

22   be in the same binder but earlier?  If you could just focus on

23   the first six pages, do you recognize that?

24   A.    I do.

25   Q.    What is that?

1  A.   This is an e-mail dated March 10, 2003, and the e-mail is

2  from the account jeffreys@hotmail.com.

3  Q.   Before, before we get into that, where did you locate this

4  e-mail?

5  A.   This e-mail was located in the April set of data that was

6  received from MSN Hotmail.

7  Q.   And did you check whether this e-mail was maintained or

8  contained in the other batches from July or October?

9  A.   Yes.  I reviewed those batches of data, and this e-mail

10  did not appear in either one.

11          MR. OLSHAN:  Your Honor, we'd move in 102.

12          MR. MAC MAHON:  No objection, Your Honor.

13          THE COURT:  All right, it's in.

14          (Government's Exhibit No. 102 was received in

15  evidence.)

16          MR. OLSHAN:  If we could publish the first page,

17  Mr. Francisco, and zoom in on the portion where it starts

18  with "Date"?  And then you can just include the -- that's fine.

19  Q.   Is this the e-mail you're referring to?

20  A.   Yes.

21  Q.   What's the date?

22  A.   March 10, 2003.

23  Q.   And who's the sender?

24  A.   Jeffreys@hotmail.com.

25  Q.   And who's the recipients -- who are the recipients listed

Hunt - Direct                                                      13

1    in the "To" line?

2    A.   Jeffreys@hotmail.com and jrisen@nytimes.com.

3    Q.   Is there a subject below the "To" line?

4    A.   Yes.

5    Q.   Can you read the subject?

6    A.   It reads, "CNN.com - Report:  Iran has 'extremely

7    advanced' nuclear program - Mar. 10, 2003."

8    Q.   And then below that, is there text in the body of that

9    e-mail?

10   A.   Yes.

11   Q.   What does it say?

12   A.   It says, "I'm sure you've already seen this, but quite

13   interesting, don't you think?  All the more reason to

14   wonder . . . J."

15   Q.   And then is there a link attached to this e-mail?

16   A.   Yes.

17   Q.   Did you click on that link, or did you go to that link?

18   A.   Yes.

19   Q.   And if you could look at the last two pages of the

20   exhibit, is that the same story?

21   A.   Yes, it is.

22   Q.   Without reading it, what is the story about?

23   A.   The story is about the then current state of the Iranian

24   nuclear weapons program.

25   Q.   And it was -- this link was attached to an e-mail between

1   an e-mail account that the defendant used and an e-mail account

2   associated with Jim Risen?

3   A.    That's correct.

4   Q.    And again, what was the date?

5   A.    March 10, 2003.

6   Q.    In the course of your investigation, did you learn whether

7   Mr. Sterling went to the Senate at any point?

8   A.    Yes, I did.

9   Q.    What was the date on which Mr. Sterling went to the

10  Senate?

11  A.    March 5, 2003.

12  Q.    How many days later was this e-mail sent?

13  A.    Five.

14  Q.    You testified that this e-mail was not in the subsequent

15  snapshots from July and October, correct?

16  A.    That's correct.

17  Q.    Between April, that first snapshot, and the next July

18  snapshot, did you have any interaction with the defendant?

19  A.    Yes, I did.

20  Q.    Did you serve him a subpoena?

21  A.    Yes.

22  Q.    If you could take a look at Exhibit 139, which should be

23  in the same binder?

24          THE COURT:  Any objection?

25          MR. MAC MAHON:  No objection, Your Honor.

Hunt - Direct                                                      15

1              THE COURT:  All right, 139 is in.

2              (Government's Exhibit No. 139 was received in

3      evidence.)

4      BY MR. OLSHAN:

5      Q.    Is that two-page document the subpoena that, that you

6      served on Mr. Sterling?

7      A.    Yes, it is.

8      Q.    And where did that occur?

9      A.    That occurred in O'Fallon, Missouri.

10     Q.    That's where the defendant lived at the time?

11     A.    Yes.

12     Q.    Is that where he still resides to the best of your

13     knowledge?

14     A.    Yes.

15     Q.    And what's the date on this subpoena?

16     A.    The date on the subpoena is June 15, 2006.

17     Q.    Do you recall whether you actually served it on June 15?

18     A.    I served it on June 16.

19     Q.    If you could take a look at the second page?  Generally

20     speaking, what does this rider call for the production of?

21     A.    This subpoena was both for testimony and documents, and

22     the rider listed descriptions of categories of documents.

23     Q.    And would that rider have covered documents related to the

24     defendant's work?

25              MR. MAC MAHON:  Excuse me, Your Honor, the document

1   does speak for itself.

2            THE COURT:  I recognize that, but it's a complex

3   case.  I am letting documents be published.  So overruled.

4   BY MR. OLSHAN:

5   Q.   I'm not going to have you go through all of these.  Does

6   this cover documents related to the defendant's work?

7   A.   Yes.

8   Q.   Did the defendant work on Iranian matters?

9   A.   Yes.

10  Q.   Did he work on a specific program related to the Iranian

11  nuclear program?

12  A.   Yes.

13  Q.   That's what we've been referring to as Classified Program

14  No. 1?

15  A.   Yes.

16  Q.   You served this subpoena on the defendant, put him on

17  notice of your investigation on June 16, 2006?

18  A.   Yes, because in addition to the subpoena, we served him a

19  target letter at the same time.

20  Q.   And, Agent Hunt, this was between those two snapshots in

21  April and July; is that correct?

22  A.   Of 2006, yes.

23  Q.   Thank you, 2006.

24            Now, the e-mail that was found in the April one and

25  not in the subsequent July and August was from approximately

1   how long -- or how many months or years prior to when you

2   actually executed the search warrant?

3   A.    Three and a half.

4   Q.    So from October 2006 back to March of 2003?

5   A.    Yes.

6   Q.    When you were reviewing those three batches, did you

7   observe any -- how would you characterize the difference in

8   volume between batch 1 from April, batch 2 from July, and batch

9   3 from October?

10  A.    I don't recall there being a considerable difference.

11  Q.    Special Agent Hunt, were you involved in the analysis of a

12  computer obtained from John and Lora Dawson?

13  A.    Yes.

14  Q.    And when was that computer obtained from the Dawsons?

15  A.    In August of 2006.

16          MR. OLSHAN:  May I have a moment to confer with

17  counsel?

18          THE COURT:  Yes, sir.

19          MR. OLSHAN:  Your Honor, at this time, I'd like to

20  read one of the stipulations.

21          THE COURT:  Stipulation?

22          MR. OLSHAN:  Yes.

23          THE COURT:  Go ahead.

24          MR. OLSHAN:  It's not been marked yet.  I believe it

25  will be Government's Exhibit 174.

Hunt - Direct                                                              18

1              THE COURT:  All right.  Hold on one second, because

2       we have a 174 in the binder, but I don't think there's anything

3       behind it.  It's blank.

4              All right, so 174 is stipulation number what?

5              MR. OLSHAN:  I knew you would ask me that.  I think

6       this will be Stipulation No. 11.

7              THE COURT:  Okay.

8              MR. OLSHAN:  May I?

9              THE COURT:  Yes.

10             MR. OLSHAN:  "The United States of America, through

11      its attorney, and the defendant, Jeffrey Alexander Sterling,

12      and the defendant's attorneys, hereby stipulate and agree that

13      if called to testify, John and Lora Dawson would testify

14      consistent with the following:

15             "From approximately August 2003 to approximately July

16      2004, the defendant lived in the home of John and Lora Dawson

17      at 6817 Crest Avenue, University City, St. Louis, Missouri.  No

18      one other than John and Lora Dawson, their infant child, and

19      the defendant lived at that address during that time.  The

20      defendant did not own a cell phone or personal computer during

21      that time.

22             "John and Lora Dawson permitted the defendant to use

23      the telephone at their residence, which during that entire time

24      was assigned the number 314-862-8850.  The defendant used that

25      telephone to make and receive long distance telephone calls

Hunt - Direct                                                        19

1    while he lived with the Dawsons.

2            "From February 9, 2004, until June 11, 2004, 19

3    telephone calls were placed from 202-862-0300, the telephone

4    number for the Washington, D.C., office of *The New York Times*,

5    to 314-862-8850, the Dawsons' home telephone number, which is

6    reflected in Government Exhibit 98, page 3, call 8, through

7    page 8, call 25.

8            "During this time, neither of the Dawsons knew anyone

9    who lived or worked in Washington, D.C., and the Dawsons had no

10   reason to receive calls from anyone at the Washington, D.C.,

11   office or any other office of *The New York Times*.

12           "During the time the defendant resided with the

13   Dawsons, the Dawsons permitted the defendant to use a computer,

14   to wit:  a Packard Bell L100 bearing serial No. P493907180,

15   containing Seagate hard drive ST33210A, bearing serial number

16   5AB11AEB, located in their spare bedroom, to send and receive

17   e-mails, and the defendant did, in fact, use the Dawsons'

18   computer to do so.  During this time, no one other than the

19   Dawsons and the defendant had access to the computer.  At no

20   time did the Dawsons use the computer to send e-mails to or

21   receive e-mails from James Risen or anyone affiliated with *The*

22   *New York Times*."

23           Thank you.

24   Q.   Special Agent Hunt, were you involved in the analysis of

25   the computer that was just referenced in that stipulation?

Hunt - Direct                                                          20

1   A.    Yes, I was.

2   Q.    Can you describe for the jury what your involvement in

3   that analysis process was?

4   A.    Yes.  So my partner and I made a request of the computer

5   analysis personnel within our office, and that request was

6   assigned to Reju Kurian, who testified yesterday, and we

7   basically provided a list of keywords, and we asked him to

8   process the computer and search the entire computer for any

9   reference to any of the keywords on the list we provided to

10  him.

11  Q.    What happened after -- did Mr. Kurian execute the request

12  to do a keyword search?

13  A.    Yes.

14  Q.    And then what happened?

15  A.    Initially, he used a tool called Forensic Toolkit.  I

16  believe he also used a tool called dtSearch, and that resulted

17  in the location of the string that you saw in one of the

18  exhibits yesterday that said Q:\MERLIN\MERLIN.DOC.

19  Q.    If we could just briefly publish Government Exhibit 146,

20  which is that data?

21         The document at 146, this first page, that was a

22  result from that first part of Mr. Kurian's search?

23  A.    That's correct.  And I believe that this was actually

24  located on September 26, 2006.

25  Q.    That's when you identified it?

1   A.   I believe that's when Mr. Kurian completed his search and

2   located this data.

3   Q.   Now, to be clear, Special Agent Hunt, this says,

4   "Q:\MERLIN," etc.  Do you know whether there was any actual

5   document related to this string of data?

6   A.   No.

7   Q.   This was produced because it contained a particular

8   keyword?

9          MR. MAC MAHON:  Your Honor, objection to leading.

10  BY MR. OLSHAN:

11  Q.   Was there a --

12         THE COURT:  Sustained.

13  BY MR. OLSHAN:

14  Q.   Was there a particular keyword that resulted in this hit?

15  A.   Yes.  When the keyword "Merlin" was searched, it resulted

16  in the location of this data.

17  Q.   So if you could continue, after that search result, what

18  happened next?

19  A.   Mr. Kurian said that he was going to use a different tool

20  called EnCase to further analyze the data, and I believe he did

21  so on September 28, 2006, just two days after this.

22  Q.   You say EnCase.  Is that spelled E-n-C-a-s-e?

23  A.   Yes.

24  Q.   And did that -- did you give him search terms for that

25  analysis?

1   A.    Yes.  I believe he used the same list.

2   Q.    Did that search turn up any hits?

3   A.    Yes.

4   Q.    Did we talk about those yesterday?

5   A.    Yes.  It turned up the exhibits that were reviewed

6   yesterday as well as some others that were not reviewed.  They

7   were all responsive to the keyword "Risen."

8   Q.    So, for example, "Risen" is the same as "risen"?

9   A.    That's correct.

10  Q.    Were there hits that were not responsive to or not related

11  to your investigation?

12  A.    Yes.  The word "risen" appeared in other parts of the

13  computer, and so we as the case agents had to go through and

14  review all of the data responsive to the search.  We had to

15  eliminate what was not relevant, and we had to highlight for

16  Mr. Kurian the hits that were relevant to our investigation.

17  Q.    And did any of those hits come from unallocated space on

18  the computer?

19          MR. MAC MAHON:  Your Honor, I object.  We had an

20  expert testify to this yesterday.

21          THE COURT:  I think that's correct, so I'm going to

22  sustain that objection.

23          MR. OLSHAN:  Your Honor, I'm just laying a very

24  simple background foundation.  I'm not --

25          THE COURT:  Well, I think you should get to the

Hunt - Direct                                                          23

1    questions, and then if there's lack of foundation, you can go

2    back over it.

3              MR. OLSHAN:  Fair enough.

4    Q.   If you could take a look at Exhibit 117?  Does 117, the

5    first two pages, reflect the proceeds of the search, or part of

6    the proceeds of Mr. Kurian's search?

7    A.   Yes.

8    Q.   And what was the keyword that resulted in this hit?

9    A.   "Risen."

10   Q.   Is that reflected at the top?  If we could zoom in on the

11   top four lines?

12   A.   Yes.

13   Q.   What did you do when you got this hit with "Risen"

14   appearing?  How did you analyze this?

15   A.   Well, I believe with this and the other hits, we

16   bookmarked them or flagged them in some way for Mr. Kurian so

17   that he later could copy this data separately onto a separate

18   disc for us.

19   Q.   And did he do that?

20   A.   He did.

21   Q.   And then what did you do with the data when it was copied

22   to a disc?

23   A.   We reviewed it again, and we printed out what appears as

24   the exhibit.

25   Q.   And how did you go about reviewing this data?

Hunt - Direct                                                          24

1    A.    I read it line by line.

2    Q.    What were you looking for?

3    A.    Well, when I initially saw the appearance of an e-mail

4    address that appeared to be one for James Risen, because the

5    e-mail address is Jrisen@aol.com, I scrolled down further

6    looking for text that might be part of a message.

7    Q.    Did you find any?

8    A.    I did.

9    Q.    So if you could scroll to the bottom third of that page,

10   do you see a date?  Were you able to to extract a date?

11   A.    Yes.  "Tuesday, December 23, 2003."

12   Q.    And the time?

13   A.    "2:29 p.m."

14   Q.    Right below that, is there the word "To"?

15   A.    Yes.

16   Q.    And is there another e-mail address?

17   A.    Yes, jsthe7th@hotmail.com.

18   Q.    Reviewing this cluster data, did you find any content

19   that -- as you were analyzing?

20   A.    Yes.

21   Q.    Can you go to the next page?  Do you see any particular

22   content?

23   A.    I do.  I see text that says, "can we get together in early

24   january?  jim."

25   Q.    And Jrisen was the e-mail address on the first page,

Hunt - Direct                                                                25

1  correct?

2  A.    That's correct.

3  Q.    Do you know his first name?

4  A.    James, Jim.

5  Q.    And does he go by "Jim"?

6  A.    Yes.

7  Q.    What did you do after you were able to extract these

8  fragments of the message?

9  A.    I prepared a summary, a summary document that only

10 contained the "From," "To," the sent date, and what appeared to

11 be the text of the message.

12 Q.    Okay.  If we could go to Exhibit 119?  What is that?

13 A.    It appears to be another fragment.

14 Q.    And did you analyze this one?

15 A.    I did.

16 Q.    And what did you locate in this fragment?

17 A.    I see "From" and the e-mail address "Jrisen@aol.com."

18 Q.    And just to be clear, that starts on the second line?

19 A.    Yes, and it wraps around to the third.

20 Q.    Keep going.

21 A.    And then on the fourth line, I see a date, "Monday,

22 March 22, 2004."

23 Q.    On that line, do you see the word "Sent"?

24 A.    Yes.

25 Q.    And the date again?

Hunt - Direct                                                        26

1    A.    "Monday, March 22, 2004."

2    Q.    The time?

3    A.    On the following line, it says "12:52 p.m."

4    Q.    And then below that, do you see "To" for a recipient?

5    A.    Yes, "To jsthe7th@hotmail.com."

6    Q.    Were you able to locate any content related to this data?

7    A.    No.

8    Q.    Go to 120.  Did you also examine this fragment?

9    A.    I did.

10   Q.    Again, do you see a "From"?

11   A.    I do.

12   Q.    Who is that from?

13   A.    "From Jrisen@aol.com."

14   Q.    Two lines later, "Sent"?

15   A.    "Sent Thursday, May 6, 2004, 12:34 a.m."

16   Q.    And "To"?

17   A.    "To jsthe7th@hotmail.com."

18   Q.    And if you could go ahead two pages in that exhibit, do

19   you see another fragment that's part of Exhibit 120?

20         Flip ahead two pages in the same exhibit.  Do you see

21   another fragment?

22   A.    I do.

23         THE COURT:  Wait, in Exhibit 120?

24         MR. OLSHAN:  Yes.  So this is page 3 of Exhibit 120.

25         THE COURT:  All right.

1    BY MR. OLSHAN:

2    Q.    Did you follow the same process, Agent Hunt?

3    A.    I did.

4    Q.    Just to step back, did you do this process for all of the

5    data that was produced to you by Mr. Kurian?

6    A.    I did it for the data that was responsive to the keyword

7    searches.

8    Q.    And what would -- how would you describe the volume of

9    information that you reviewed line by line?

10   A.    Well --

11   Q.    You don't need to be specific.

12   A.    Sure.

13   Q.    Just characterize it.

14   A.    Sure.  These, these extracts that appear as exhibits were

15   actually part of much larger files, and after these hits were

16   initially located, these responses to the keyword searches, I

17   actually scrolled through some of this unallocated cluster

18   data, and I scrolled for possibly up to a hundred pages in

19   connection with what was -- in connection with the part of the

20   computer where just one of these hits was located.

21        I wanted to see if I could find any other relevant

22   data, and I could not, and at a, at a certain point, searching

23   any further in this sort of nonsensical script seemed to be

24   counterproductive.

25   Q.    If you could locate that page, page 3 of Exhibit 120?

Hunt - Direct                                                      28

1   A.    Yes.

2   Q.    Did you employ that same process on this fragment?

3   A.    Yes.

4   Q.    And again, do you see on the first line "From"?

5   A.    Yes.

6   Q.    And what e-mail address follows that?

7   A.    "From Jrisen@aol.com."

8   Q.    And then two lines later, what else do you see?

9   A.    "Sent Friday, May 7, 2004, 3:47 p.m."

10  Q.    Two lines later, is there a recipient?

11  A.    Yes, "To jsthe7th@hotmail.com."

12  Q.    And again, were you able to locate when you continued to

13  review this any content that might be related to these -- to

14  this e-mail?

15  A.    No.

16  Q.    Keep going to Exhibit 121.  Did you examine this fragment?

17  A.    Yes.

18  Q.    Do you see a "From" at the top of that?

19  A.    I do.

20  Q.    Again, what's the e-mail address?

21  A.    "From Jrisen@aol.com."

22  Q.    Scrolling down, do you see a, a date?

23  A.    "Sent Saturday, May 8, 2004, 5:15 p.m."

24  Q.    If we could zoom to the bottom half of that page?

25        I'm sorry, that was what?  What was the date again?

Hunt - Direct                                                                 29

1    A.    "Sent Saturday, May 8, 2004, 5:15 p.m."

2    Q.    And do you see a "To"?

3    A.    I do.

4    Q.    To whom was this addressed?

5    A.    "To jsthe7th@hotmail.com."

6    Q.    Were you able to locate any content for this?

7    A.    Yes.

8    Q.    On the second page of Exhibit 121?

9    A.    Yes.

10   Q.    What's written next to the word "SCRIPT," which is in

11   brackets about two-thirds of the way down?

12   A.    "I want to call today.  I'm trying to write the story.

13   jim."

14   Q.    If you could look at Exhibit 122?  Did you follow that

15   same process again for this fragment?

16   A.    Yes.

17   Q.    And does this reflect an e-mail from Mr. Risen?

18   A.    Yes.

19   Q.    Do you see "From"?

20   A.    "From Jrisen@aol.com."

21   Q.    What else do you see?

22   A.    "Sent Sunday, May 16, 2004, 8:52 p.m., To

23   jsthe7th@hotmail.com."

24   Q.    And about two-thirds of the way down the page, did you

25   locate any content?

1   A.   Yes.

2   Q.   Can you read that?

3   A.   Yes.  "I am sorry if I have failed you so far.  But I

4   really enjoy talking with you, and I would like to continue.

5   jim."

6   Q.   Take a look at Government Exhibit 123.  Did you follow the

7   same process for this fragment?

8   A.   I did.

9   Q.   What was the term you found at the top of this one?

10  A.   "From Jrisen@aol.com."

11  Q.   And were you able to locate when this was sent at the

12  bottom?

13  A.   Yes.

14  Q.   Do you see where it says "Sent"?

15  A.   I do.

16  Q.   Six lines up from the bottom?

17  A.   Yes.

18  Q.   What does it say after that?

19  A.   "Sent Monday, May 17, 2004, 1:11 p.m."

20  Q.   To?

21  A.   "To jsthe7th@hotmail.com."

22  Q.   Were you able to locate any content related to this

23  e-mail?

24  A.   I was not.

25  Q.   Let's go to 124.  Again, did you follow the same process

1   that you had used in reviewing the other data for this

2   fragment?

3   A.    Yes.

4   Q.    And was the hit again "Jrisen," or "Risen"?

5   A.    Yes.

6   Q.    And at the top, do you see a "From" line?

7   A.    Yes.  "From Jrisen@aol.com."

8   Q.    And then as you scroll down toward the middle of the page,

9   do you see a "Sent"?

10  A.    Yes.  "Sent Thursday, June 10, 2004, 4:12 p.m."

11  Q.    Is there a reference to the "To" line?

12  A.    Yes.  "To jsthe7th@hotmail.com."

13  Q.    Just to be clear, each of these that we've gone through

14  has "From," "Sent," and "To," correct?

15  A.    Correct.

16  Q.    And, I'm sorry, the "To" on this one was who -- was what?

17  What e-mail address was this to?  It's on the first page of

18  124.

19  A.    "To jsthe7th@hotmail.com."

20  Q.    And as you reviewed this cluster, were you able to locate

21  any content?

22  A.    Yes.

23  Q.    Appear on the next page of the exhibit, about a quarter of

24  the way down on the second page of that exhibit?

25  A.    Yes.

Hunt - Direct                                                        32

1   Q.   What was that content?

2   A.   "I can get it to you.  where can I send it?"

3   Q.   Now, if we could just go back to the first page, what was

4   the date on this fragment that you found?

5   A.   The date was June 10, 2004.

6   Q.   June 10, 2004.

7            Let's pause with the e-mails for a second.  In the

8   course of your investigation, did you obtain bank records or

9   credit card records for Mr. Risen?

10  A.   Yes.

11           MR. OLSHAN:  Your Honor, at this point, I'd like to

12  read a brief stip, stipulation.

13           THE COURT:  All right.  And the number?

14           MR. OLSHAN:  This is Stipulation No. 1, Government's

15  Exhibit 161, which should be in the Court's binder in an

16  unexecuted form.

17           THE COURT:  All right.  So 161 is going into

18  evidence, correct, counsel?

19           MR. OLSHAN:  Yes.

20           THE COURT:  Yes?  All right.

21           (Government's Exhibit No. 161 was received in

22  evidence.)

23           MR. OLSHAN:  May I read it, Your Honor?

24           THE COURT:  Yes.

25           MR. OLSHAN:  "Stipulation No. 1.  The United States

1    of America, through its attorneys, and the defendant, Jeffrey

2    Alexander Sterling, and the defendant's attorneys, hereby

3    stipulate and agree as follows:

4            "The following documents are records of regularly

5    conducted activity within the meaning of Rule 803 of the

6    Federal Rules of Evidence and admissible at trial without

7    further authentication or identification:"

8            And then it lists Government's Exhibits 125 and 129.

9            THE COURT:  All right.  So Exhibits 125 and 129 are

10   being moved in at this point.  Any objection?

11           MR. MAC MAHON:  No, Your Honor.

12           THE COURT:  All right, they're in.

13           (Government's Exhibit Nos. 125 and 129 were received

14   in evidence.)

15           MR. OLSHAN:  If we could publish 125?

16   Q.   Do you recognize that document, Special Agent Hunt?

17   A.   I do.

18   Q.   And what is that document?

19   A.   This is a Bank One statement for James Risen.

20   Q.   And does it list a series of charges on that Bank One

21   account?

22   A.   It does.

23   Q.   And have all but one been redacted?

24   A.   Yes.

25   Q.   What is the remaining charge?  If we could zoom in on

 1  that?

 2          THE COURT:  Now, let me just tell the jury because

 3  we've had redactions in this case, this is not a national

 4  security issue.  This is just a privacy issue, all right?  So I

 5  want them to know the difference.

 6          MR. OLSHAN:  That's exactly right.  Thank you, Your

 7  Honor.

 8  Q.   That one line item --

 9  A.   Yes.

10  Q.   -- what does it say as the description of it?

11  A.   I believe the date of the charge is June 28.  However, the

12  information indicates that the charge is for a FedEx shipment

13  on June 11, 2004, in the amount of $40.49.

14  Q.   And just to be clear, the last exhibit I had shown you,

15  124, with that fragment, was dated June 10, one day before?

16  A.   That's correct.

17  Q.   And that's the fragment that had, "I can get it to you.

18  where can I send it?"

19  A.   That's correct.

20          MR. MAC MAHON:  Your Honor, excuse me, I think this

21  says June 28, not June 10.

22          MR. OLSHAN:  The agent read the whole --

23          THE COURT:  If you read the whole "FEDEX SHP

24  6/11/04," that's what she's talking about.

25          MR. MAC MAHON:  Okay.  Thank you, Your Honor.

Hunt - Direct                                                           35

 1            THE COURT:  All right.

 2   BY MR. OLSHAN:

 3   Q.   Is that correct, Agent Hunt?

 4   A.   That's correct.  It appears to be a charge on June 28 for

 5   a shipment on June 11, 2004.

 6   Q.   You're basing that on reviewing this record?

 7   A.   Yes.

 8            MR. OLSHAN:  We can take that down.  Thank you,

 9   Mr. Francisco.

10   Q.   Go to 126.  Again, Special Agent Hunt, did you use the

11   same process in analyzing this fragment?

12   A.   I did.

13   Q.   And what do you see in this fragment?

14   A.   "From Jrisen@aol.com; Sent June 11, 2004, 11:59 a.m.; To

15   jsthe7th@hotmail.com."

16   Q.   And were you able to locate any content related to that

17   e-mail fragment?

18   A.   No.

19   Q.   If you could flip ahead two pages in the same exhibit, so

20   it's page 3 now, Exhibit 126?

21            Again, did you analyze that fragment?

22   A.   Yes.

23            MR. OLSHAN:  One moment, Your Honor?

24            THE COURT:  Yes, sir.

25   BY MR. OLSHAN:

1   Q.   Did you analyze this fragment?

2   A.   I did.

3   Q.   And what did you find in this fragment?

4   A.   "From Jrisen@aol.com; Sent June 11, 2004, 2:05 p.m.; To

5   jsthe7th@hotmail.com."

6   Q.   Again, were you able to locate any content related to that

7   e-mail fragment?

8   A.   No.

9   Q.   If you could skip ahead two more pages, same exhibit, so

10  it will be page 5 now of Exhibit 126?  There should be a

11  fragment with the number "158."  Do you see that?

12  A.   I do.

13  Q.   Did you use the same analysis?

14  A.   Yes.

15  Q.   If you could look at the bottom third or so of that

16  fragment, do you see -- what do you see there?  What did you,

17  what did you find?

18  A.   I see, "From Jrisen@aol.com; Sent Friday, June 11, 2004,

19  2:23 p.m.; To jsthe7th@hotmail.com."

20  Q.   Again, did you find any content for that e-mail fragment

21  on June 11?

22  A.   No.

23  Q.   Two more pages, same exhibit, 126.  Do you see a fragment

24  with "155" at the top?

25  A.   I do.

1    Q.   And again, if you could review the bottom third of that

2    fragment, do you see -- what do you see there when you analyzed

3    it?

4    A.   "From Jrisen@aol.com; Sent Friday, June 11, 2004, 3:36

5    p.m., To jsthe7th@hotmail.com."

6    Q.   Any content located for that fragment?

7    A.   No.

8    Q.   Last one in this batch, two more pages forward, please, in

9    Exhibit 126, do you see a fragment with the number "154"?

10   A.   I do.

11   Q.   And did you analyze that the same way you'd analyzed all

12   the other ones we've talked about?

13   A.   Yes.

14   Q.   And what did you find in that fragment?

15   A.   "From Jrisen@aol.com; Sent Sunday, June 13, 2004, 12:33

16   p.m.; To jsthe7th@hotmail.com."

17   Q.   Any other -- any content found when you did that?

18   A.   No.

19           MR. OLSHAN:  Your Honor, I actually think I'm done

20   with that topic for now.  If this would be an appropriate time

21   to break?

22           THE COURT:  All right, it seems to be the magic hour,

23   11:05.  That's where we were yesterday, too.  I'll give the

24   jury 20 minutes, so we'll start back up again at 25 after.

25           And, Agent Hunt, you need to be back then.

1              (Recess from 11:05 a.m., until 11:28 a.m.)

2                        (Defendant and Jury present.)

3         THE COURT:  All right, Mr. Olshan?

4         MR. OLSHAN:  Thank you.

5    Q.    Special Agent Hunt, I believe when we left off, we talked

6    about e-mails that you were able to recover, correct?

7    A.    Yes.

8    Q.    During the course of your investigation, did you obtain

9    phone records for the defendant, Jeffrey Sterling?

10   A.    I did.

11   Q.    Did those include phone records from when he resided at

12   13455 Farm Crest Court, in Herndon, Virginia?

13   A.    Yes.

14   Q.    When did he live there?

15   A.    He lived there from sometime in the year 2000, when he

16   returned from New York, until August of 2003.

17   Q.    How do you know that he no longer resided there after

18   August of 2003?

19   A.    Because the Dawsons told the FBI that he came to live with

20   them --

21         MR. MAC MAHON:  Your Honor, I object.  That's hearsay

22   and beyond the scope of the stipulation.

23         THE COURT:  Sustained.

24         MR. OLSHAN:  Your Honor, that's fine.  The

25   stipulation makes it clear.  I'll move on.

1        THE COURT:  Sustained.

2   BY MR. OLSHAN:

3   Q.   After August of 2003, did the defendant live with the

4   Dawsons for a period of time?

5   A.   Yes.

6        THE COURT:  And that was in Missouri?

7        THE WITNESS:  Yes.

8   BY MR. OLSHAN:

9   Q.   That was approximately August 2003 to approximately July

10  2004?

11  A.   Yes.

12  Q.   After July 2004, when the defendant left the Dawsons' home

13  in Missouri, where did he go?

14  A.   He went to live with his then girlfriend/now wife in

15  O'Fallon, Missouri.

16  Q.   You testified that you obtained phone records for the

17  defendant?

18  A.   Yes.

19  Q.   Does that include phone records related to each of those

20  locations where he lived?

21  A.   Not exactly.

22  Q.   Explain.  What phone records did you get?

23  A.   I --

24  Q.   I'm sorry, I'll start over.  For what phone numbers -- did

25  you get phone records for his landline phone in Virginia?

Hunt - Direct                                                      40

1   A.   Yes.

2   Q.   Were you aware of whether he had a cell phone at the time?

3   A.   I did not know of any cell phone he used when he was in

4   Virginia.

5   Q.   And did you obtain phone records for his time in Missouri?

6   A.   Yes.

7   Q.   Did that include both home and business phone records?

8   A.   Those records included records for the landline at the

9   Dawsons' residence, his work number at Blue Cross-Blue Shield,

10  and a cellular telephone number he used at that time.

11  Q.   In Missouri?

12  A.   In Missouri.

13           MR. OLSHAN:  Your Honor, at this time, I'd like to

14  read Stipulation No. 3, which is Exhibit 163.

15           THE COURT:  All right, 163 is in evidence.

16           (Government's Exhibit No. 163 was received in

17  evidence.)

18           MR. OLSHAN:  "The United States, through its

19  attorneys, and the defendant, Jeffrey Alexander Sterling, and

20  the defendant's attorneys, stipulate and agree that telephone

21  records reflect that the following 47 telephone calls occurred

22  between the listed phone numbers at the specified dates and

23  times and for the listed duration:"

24           Your Honor, I'm not going to read the list of 47

25  phone calls that are contained in the stipulation.

Hunt - Direct                                                    41

1          THE COURT:  But they're listed in Exhibit 163?

2          MR. OLSHAN:  They are.  And they're also referenced

3    in the next exhibit that I'm going to show the witness.

4          THE COURT:  All right.

5    BY MR. OLSHAN:

6    Q.   Special Agent Hunt, if you could take a look at Exhibit

7    98?

8          With the assistance of the court security officer?

9    Thank you, sir.

10         Agent Hunt, you testified that you obtained phone

11   records for the defendant, correct?

12   A.   Yes.

13   Q.   Did you also obtain subscriber information to -- for

14   Mr. Risen and phone numbers associated with him?

15   A.   Yes.

16   Q.   Government's Exhibit 98, did you have a hand in creating

17   that?

18   A.   I created it.

19   Q.   And generally, what is, what is this?

20   A.   This exhibit is a chart I created summarizing the

21   telephone calls between Jeffrey Sterling and James Risen, and

22   it also includes summary information related to the e-mails

23   that we discussed that are other exhibits.

24   Q.   Does it also make reference not just to the phone calls

25   but also who the relevant subscribers were?

1    A.    Yes.

2    Q.    And the phone records that you reviewed in creating this

3    document, were they voluminous?

4    A.    Yes.

5            MR. OLSHAN:   Your Honor, at this time, we would offer

6    Government's Exhibit 98.

7            MR. MAC MAHON:   Your Honor, we object.   This isn't a

8    summary under 1001.   We stipulated to the calls both as to the

9    Dawsons and to the place in Virginia, and then this just

10   intersperses, it's more argument than it is a summary.

11           THE COURT:   Well, it's not uncommon in a complex case

12   with voluminous records for either party to introduce charts or

13   summaries that help the jury work their way through the

14   evidence, but ultimately, the value of any chart or summary

15   must be evaluated in terms of the underlying data.   If the

16   chart or summary is not accurately reflecting the data, you

17   should disregard the chart.

18           No, I'm going to permit it in as a reasonable aid for

19   the jury.

20           MR. OLSHAN:   Thank you.

21           THE COURT:   So over the objection of defense, 98 is

22   in.

23           (Government's Exhibit No. 98 was received in

24   evidence.)

25           MR. OLSHAN:   If we could publish the first page of

1    Exhibit 98?

2    Q.    Special Agent Hunt, you testified that this summary chart

3    includes phone records, subscriber information, and e-mail

4    content, correct?

5    A.    Yes.

6    Q.    Is it arranged chronologically?

7    A.    Yes.

8    Q.    What is the first entry?

9    A.    The first entry indicates a telephone call from the number

10   affiliated with Jeffrey Sterling's residence to a number

11   affiliated with James Risen's residence on February 27, 2003,

12   at 8:03 p.m., with a duration of 50 seconds.

13   Q.    Was that the first telephone contact you were able to find

14   between numbers associated with Mr. Sterling and numbers

15   associated with Mr. Risen?

16   A.    Yes.

17           MR. OLSHAN:  Your Honor, we'd like to move in a

18   series of exhibits.  It's not by stipulation; there's just no

19   objection from defense.

20           THE COURT:  And what are they?

21           MR. OLSHAN:  At this time, I think we'd like to move

22   in -- or we would like to move in Government's Exhibits 48

23   through 51.

24           THE COURT:  All right, hold on a second so I can get

25   the book.

1              MR. OLSHAN:  Sure.

2              THE COURT:  Wait a minute.

3              And there's no objection to these?

4              MR. MAC MAHON:  No, Your Honor.

5              THE COURT:  All right, 48 through 51, they're in.  Go

6      ahead.

7              (Government's Exhibit Nos. 48 thru 51 were received

8      in evidence.)

9              MR. OLSHAN:  54 through 58, I believe they're not in

10     yet.

11             THE COURT:  Any objection?

12             MR. MAC MAHON:  I'm looking through them, Your Honor.

13             THE COURT:  All right.

14             MR. MAC MAHON:  Court's indulgence?

15             No objection, Your Honor.

16             THE COURT:  All right, 54 through and including 58

17     are in.

18             (Government's Exhibit Nos. 54 thru 58 were received

19     in evidence.)

20             MR. OLSHAN:  61 through 63.

21             MR. MAC MAHON:  No objection, Your Honor.

22             THE COURT:  All right, they're in.

23             (Government's Exhibit Nos. 61 thru 63 were received

24     in evidence.)

25             MR. OLSHAN:  73 and 74.

1            MR. MAC MAHON:  No objection.

2            THE COURT:  All right, they're in.

3            (Government's Exhibit Nos. 73 and 74 were received in

4       evidence.)

5            MR. OLSHAN:  A couple more.

6            THE COURT:  Go ahead.

7            MR. OLSHAN:  65, 66.

8            MR. MAC MAHON:  No objection, Your Honor.

9            THE COURT:  All right, they're in.

10            (Government's Exhibit Nos. 65 and 66 were received in

11       evidence.)

12            MR. OLSHAN:  77.

13            MR. MAC MAHON:  Just a second, Your Honor.

14            THE COURT:  It's the other book.  That's a summons.

15            MR. MAC MAHON:  No objection to 77, Your Honor.

16            THE COURT:  All right.

17            (Government's Exhibit No. 77 was received in

18       evidence.)

19            MR. OLSHAN:  94 to 96.

20            THE COURT:  I'm sorry, 94 to 96?

21            MR. OLSHAN:  Yes.

22            MR. MAC MAHON:  No objection, Your Honor.

23            THE COURT:  All right, they're in.

24            (Government's Exhibit Nos. 94 thru 96 were received

25       in evidence.)

Hunt - Direct                                                            46

1           MR. OLSHAN:  And then the last two are 118 and 130.

2           MR. MAC MAHON:  No objection to either of those

3    either, Your Honor.

4           THE COURT:  All right, they're in.

5           (Government's Exhibit Nos. 118 and 130 were received

6    in evidence.)

7           MR. OLSHAN:  Thank you.

8    Q.   Special Agent Hunt, you testified that the first phone

9    call you found and that's reflected in Exhibit 98 was on

10   March -- excuse me, February 27, 2003.

11   A.   Yes.

12   Q.   In the course of your investigation, did you become

13   familiar with the defendant's litigation involving the CIA?

14   A.   I did.

15   Q.   And during the course of that litigation, were there a

16   series of settlement offers extended by either Mr. Sterling or

17   his lawyers?

18   A.   Yes.

19   Q.   If you can take a look at Exhibit 96, which should be in

20   the same binder?  Actually, I apologize, 95.

21          Does that document reflect a settlement offer from

22   lawyers representing Mr. Sterling?

23   A.   Yes.

24   Q.   And if we could zoom in on the bottom paragraph of that?

25   Actually, quickly, it says what date at the top?

1   A.   January 27, 2002.

2   Q.   Do you believe that's a typo, or is that correct as far as

3   the year?

4   A.   I believe the year is 2003, because on the second page,

5   there's a reference to 7 February 2003.

6   Q.   And is there a fax header at the top of this exhibit?

7   A.   Yes.  It says "January 27, '03."

8   Q.   Do you have any reason to believe this was not transmitted

9   on January 7, 2003?

10  A.   No.

11  Q.   And if we could zoom in on the second paragraph, does it

12  state -- does this letter state a settlement offer?

13  A.   It does.

14  Q.   Can you read that paragraph?

15  A.   The second paragraph?

16  Q.   Yes, please.

17  A.   "Mr. Sterling is willing to voluntarily dismiss his

18  lawsuit in exchange for payment of $200,000 plus attorneys'

19  fees and costs; a favorable employment recommendation and/or

20  statement, the language of which is to be negotiated in good

21  faith; and the government's consent to unseal Judge Schwartz's

22  decision (following its declassification, of course)."

23  Q.   That's fine.  This was January 27, 2003, correct?

24  A.   Correct.

25  Q.   If you could look at 96?  Does that appear to be another

1   letter from Mr. Sterling's lawyers?

2   A.   Yes, yes.

3   Q.   What's the date of that?

4   A.   12 February 2003.

5   Q.   And if you could read the first two paragraphs?

6        Actually, I apologize, could you just read the first

7   paragraph?

8   A.   "I write in reference to my client's settlement offer

9   conveyed to you by my letter dated 27 January 2003.  The

10  settlement offer expired Friday, 7 February 2003."

11  Q.   This letter is dated February 12, correct?

12  A.   Yes, 2003.

13  Q.   And approximately how many days from this letter about the

14  lapse of the settlement offer until that first phone call to

15  Mr. Sterling -- excuse me, between Mr. Sterling's phone and

16  Mr. Risen's phone?

17  A.   Roughly two weeks.

18  Q.   You testified that in, sometime in 2000 through August

19  2003, the defendant resided in Herndon.  Is that correct?

20  A.   Yes.

21  Q.   Do you know if he was employed during that time?

22  A.   Well, he was employed by the CIA until January 31, 2002.

23  Q.   Thank you.

24       After that, was he employed?

25  A.   He was not as far as I know.

1    Q.    If we could go to the first page of Exhibit 98, please?

2          Do you see the second entry?

3    A.    I do.

4    Q.    Is that the e-mail, does that reference the e-mail that

5    was obtained pursuant to the search warrant in October of 2006?

6    A.    Yes.  It's a reference to the March 10, 2003 e-mail.

7    Q.    If you could, the bottom of that first page, the second

8    call, what's the date?

9    A.    March 10, 2003.

10   Q.    This is a very short call?

11   A.    Yes, six seconds.

12   Q.    And who are the parties to that call?

13   A.    The call was made from the landline at Jeffrey Sterling's

14   residence to the landline at James Risen's residence.

15   Q.    If you could flip the page and look at calls or -- calls 3

16   through 7?  On the left column, does that designate call

17   numbers if there's a number listed there?

18   A.    That's correct.

19   Q.    So calls 3 through 7, what month did those take place?

20   A.    They took place in March of 2003.

21   Q.    And, for example, the third call, that's March 10, 2003?

22   A.    Yes.

23   Q.    How many days after the defendant's meeting with the

24   Senate was that call?

25   A.    Five.

Hunt - Direct                                                    50

1   Q.   I apologize if I already asked you this:  The remainder of

2   the calls on that page occurred when the defendant lived in

3   Virginia?

4   A.   Yes.

5   Q.   They're all from his landline or involve his landline?

6   A.   They're all from his landline in Herndon, Virginia.

7   Q.   And who's originating those calls?

8   A.   Jeffrey Sterling.

9   Q.   To James Risen's phone numbers?

10  A.   To James Risen's phone numbers.

11  Q.   If you could flip to page 3 of the chart?

12       Does the first line refer to the e-mail you were able

13  to extract from that data we discussed before?

14  A.   Yes.  The first line refers to the e-mail dated December

15  23, 2003, that said, "can we get together in early january?

16  jim."

17  Q.   Now, if you could, I'm going to take you through these a

18  little bit quicker, Special Agent Hunt.  Calls 8 through 21,

19  flip through and take a look at those.

20       Do those all involve the same originating phone

21  number?

22  A.   They do.

23  Q.   And what originating phone number is that?

24  A.   It is the telephone number for the office of *The New York*

25  *Times* in Washington, D.C.

1    Q.   And what's the terminating phone number?

2    A.   The terminating phone number, or the number where the call

3    was received, is the number for the residence of Lora and John

4    Dawson in St. Louis, Missouri.

5    Q.   And what's the span of dates for the ones that we focused

6    on, 8 through 21?

7    A.   February 9, 2004, to April 22, 2004.

8    Q.   So a series of calls over approximately two-and-a-half

9    months in 2004?

10   A.   Yes.

11   Q.   And again, are some of those short?

12   A.   Yes.

13   Q.   Let me direct your attention to page 5 of this exhibit.

14   Call 18, do you see that call?

15   A.   I do.

16   Q.   What's the duration of that call?

17   A.   24 minutes and 58 seconds.

18   Q.   And again, that's from *The New York Times* to the Dawsons'

19   residence?

20   A.   That's correct.

21   Q.   And if you flip the page to page 6, do you see call 21?

22   A.   I do.

23   Q.   The duration of that call?

24   A.   4 minutes and 42 seconds.

25   Q.   Following that, do you see a series of the e-mail

Hunt - Direct                                                    52

1    extracts?

2    A.   Yes.

3    Q.   Is it fair to say that during the course of this phone

4    communication, there's interspersed e-mail traffic based on

5    your analysis?

6    A.   Yes, that was my conclusion.

7    Q.   E-mail F on page 6?

8    A.   Yes.

9    Q.   From May 8, 2004, what does that one say?

10   A.   "I want to call today.  I'm trying to write the story

11   jim."  And it also included text that said, "I need your phone

12   number again."

13   Q.   If you could flip to the next page?  Do you see a series

14   of e-mails and phone calls in May of 2004?

15   A.   Yes.

16   Q.   Again, did that -- do they involve contact -- the phone

17   calls, do they involve contact between *The New York Times* and

18   the Dawsons' residence?

19   A.   Yes.

20   Q.   How long is call No. 23 and call No. 24?

21   A.   Call No. 23 on May 12, 2004, was 10 minutes and 9 seconds.

22   Q.   Call 24?

23   A.   Call 24, which occurred on May 25, 2004, was 7 minutes and

24   52 seconds.

25   Q.   And on May 16, about nine days before that

1    7-minute-52-second call, did you find an e-mail for that date?

2    A.    Yes.

3    Q.    What did it say?

4    A.    It said, "I am sorry if I have failed you so far.  But I

5    really enjoy talking with you, and I would like to continue.

6    jim."

7    Q.    If you could flip to the next page, page 8?  Does the

8    series of phone calls and e-mail contact continue?

9    A.    Yes.

10   Q.    And this is late May through mid-June 2004?

11   A.    Yes.

12   Q.    If you could flip to page 9?  At a certain point, did you

13   find phone traffic between phone numbers associated with

14   Mr. Risen and/or *The New York Times* and Mr. Sterling's work

15   numbers at Blue Cross in Missouri?

16   A.    Yes.

17   Q.    Is that reflected in calls 27, 28, and 29, on page 9?

18   A.    Yes.

19   Q.    Flipping to page 10, calls 30 and 31, did they also

20   involve contact with the defendant's work phone?

21   A.    Yes, from *The New York Times* and from James Risen's

22   residential number.

23   Q.    What's call 31?  What's the duration of that?

24   A.    The duration is 3 minutes and 2 seconds.  It's a call that

25   occurred on July 8, 2004.

1   Q.    And it was from Mr. Risen's personal residence?

2   A.    Correct.

3   Q.    What does call 32 reflect?

4   A.    Call 32 on November 6, 2004, reflects a one-minute

5   telephone call from a cellular telephone used by Jeffrey

6   Sterling to a residential number for James Risen.

7   Q.    Over the course of this period, there are multiple calls

8   between multiple phone numbers for both men?

9   A.    Correct.

10  Q.    If you could flip to page 11 and look at call 33, is that

11  from February 14, 2005?

12  A.    It is.

13  Q.    What's the duration of that call?

14  A.    35 minutes and 57 seconds.

15  Q.    And who are the parties to that?

16  A.    The call was made from the number for *The New York Times*'

17  office in Washington, D.C., to Jeffrey Sterling's number at

18  Blue Cross-Blue Shield in Missouri.

19  Q.    If you could flip from page 11 through to page 14?  Agent

20  Hunt, how long did the communication or the phone traffic last

21  according to this chart between phone numbers associated with

22  Mr. Sterling and phone numbers associated with Mr. Risen?

23  A.    The last relevant call I found was a call on November 20,

24  2005, from a cellular telephone number used by James Risen to a

25  cellular telephone number used by Jeffrey Sterling.

Hunt - Direct                                                    55

1   Q.   11/20/2005.  Are you aware when *State of War* was

2   published?

3   A.   Yes.

4   Q.   And when was it published?

5   A.   January of 2006.

6   Q.   The book started shipping in December of '05?

7   A.   I believe so.

8   Q.   What does that last entry in the chart reflect?

9   A.   The last entry provides a date range of November 21, 2005,

10  to May 8, 2007, and indicates that during phone records

11  collected for that time period, no calls were found between

12  James Risen and Jeffrey Sterling.

13  Q.   So from the period of about a month before the book came

14  out to sometime in mid-2007, no phone calls?

15          MR. MAC MAHON:  Your Honor, objection.  He asked what

16  the dates were.

17          MR. OLSHAN:  I'm clarifying this for the jury, Your

18  Honor.

19          THE COURT:  I'm, I'm going to permit that.

20  Overruled.

21  BY MR. OLSHAN:

22  Q.   So the question was from approximately one month before

23  *State of War* was published through the middle of 2007, how many

24  calls did you find between Mr. Sterling and Mr. Risen?

25  A.   None.

Hunt - Direct                                                        56

1   Q.   If you could go to the first binder and look at Exhibit

2   59, which is already in evidence?  Do you recognize this

3   document?

4   A.   I do.

5   Q.   Is this a performance assessment report, or PAR, for

6   Mr. Sterling?

7   A.   Yes.

8   Q.   And is this a version that was provided to Mr.,

9   Mr. Sterling in the course of his EEO litigation?

10  A.   Yes.

11  Q.   And this document was unclassified when provided to

12  Mr. Sterling?

13  A.   Yes.

14        MR. OLSHAN:  May I confer with counsel?

15        THE COURT:  Go ahead.

16  BY MR. OLSHAN:

17  Q.   Just to clarify, Agent Hunt, the version that appears as a

18  trial version, does this contain substitutions?

19  A.   Yes, it does.

20  Q.   Otherwise, is this document the same version that

21  Mr. Sterling received in unclassified form during the EEO

22  litigation?

23  A.   Yes.

24  Q.   I hate to do this to you.  If you could -- actually,

25  Mr. Francisco, if we could just pull up on the screen Exhibit

1  83, which is already in evidence?

2           Special Agent Hunt, do you recognize this newspaper

3  article?

4  A.   I do.

5  Q.   And does language from Exhibit 59 appear in Exhibit 83?

6  A.   Yes.

7           MR. OLSHAN:  May I have one moment, Your Honor?

8           THE COURT:  Yes, sir.

9  BY MR. OLSHAN:

10 Q.   And in Exhibit 83, was that language from Exhibit 59

11 quoted in the newspaper article?

12 A.   Yes.

13 Q.   Have you read chapter 9 of *State of War*?

14 A.   Yes.

15 Q.   If you could take a look at Exhibit 60?  Do you have 60 in

16 front of you?

17 A.   I do.

18 Q.   One thing to just clarify very quickly:  59 and 60, the

19 name that appears on the first page says "Samuel L. Crawford."

20 Is that correct?

21 A.   That's correct.

22 Q.   What's your understanding of who that person is?

23 A.   My understanding is that that was a pseudonym used for

24 Jeffrey Sterling.

25 Q.   For purposes of the EEO process?

1    A.   Yes.

2            THE COURT:  But not necessarily the name that he was

3    using at the CIA, is that right?

4            THE WITNESS:  That's my understanding.

5            THE COURT:  So this was a name that was substituted

6    the way we've substituted Merlin?

7            MR. OLSHAN:  No, this is specifically, if the witness

8    knows, was this name specifically substituted for purposes of

9    giving him a name in the EEO process?

10           THE WITNESS:  Yes.

11   BY MR. OLSHAN:

12   Q.   Not for trial purposes?

13   A.   That's correct.

14   Q.   So the version that Mr. Sterling received of these

15   exhibits said "Samuel L. Crawford"?

16   A.   Yes, it did.

17   Q.   You testified that you have read *State of War*?

18   A.   Yes.

19   Q.   Chapter 9?

20   A.   Yes.

21           THE COURT:  I'm sure she's read it several times, all

22   right?  Let's move this along.

23                           (Laughter.)

24           MR. OLSHAN:  I know that's the fact, Your Honor.

25   Q.   Is there language that appears in Exhibit 60 that is also

1    quoted in chapter 9?

2    A.    Yes.

3    Q.    Right.  And just, just to be clear, Exhibit 60 contains,

4    contains substitutions for trial purposes, correct?  Some

5    substitutions for trial purposes?

6    A.    That's correct.

7    Q.    But the original version of Exhibit 60 that was provided

8    to the defendant was unclassified?

9    A.    That's correct.

10   Q.    You've reviewed the performance assessment, the PAR that

11   appears at Exhibit 60, correct?

12   A.    Yes.

13   Q.    Have you reviewed the original version of that?

14   A.    Yes.

15   Q.    The original version that was provided to Mr. Sterling

16   during the course of his employment?

17   A.    Yes.

18   Q.    And the one that was provided to him in the course of the

19   EEO process?

20   A.    Yes.

21   Q.    Do any of those documents, either version, make any

22   reference to this specific classified program or to Merlin?

23   A.    Yes.

24   Q.    Is the language that appears in the original version

25   specifically connected to an asset or a program?

1          MR. MAC MAHON:  Your Honor, I object.  If they're not

2    going to put the document in evidence, there's no way to

3    cross-examine.

4          THE COURT:  I think this is too vague.  I'm going to

5    sustain the objection.

6          MR. OLSHAN:  That's fine.  I'll leave that.

7          Your Honor, at this time, I've got two more

8    stipulations.

9          THE COURT:  All right.

10         MR. OLSHAN:  This is Stipulation No. 7, and it's

11   Exhibit 167:  "The United States, through its attorneys, and

12   the defendant, Jeffrey Alexander Sterling, and the defendant's

13   attorneys, hereby stipulate and agree that the following

14   exhibits may be admitted at trial without further

15   authentication or identification:

16         "Exhibit 128, Exhibit 132, and Exhibit -- Defense

17   Exhibit 1."

18         Your Honor, for the record, both 132 and Defense

19   Exhibit 1 are already in.

20         THE COURT:  All right.

21         MR. OLSHAN:  "The parties further agree that a

22   representative from Simon & Schuster would testify as follows:

23         "The document contained in Government's Exhibit 128

24   was submitted to Simon & Schuster by James Risen in or about

25   September 2004.  *State of War:  The Secret History of the CIA*

1   *and the Bush Administration*, by James Risen, was published in

2   or about December 2005."

3            This is Stipulation No. 10.  It would be Government's

4   Exhibit 173:  "The United States, through its attorneys, and

5   the defendant, Jeffrey Alexander Sterling, and the defendant's

6   attorneys, hereby stipulate and agree that if called as a

7   witness at trial, James Risen would testify as follows:

8            "Mr. Risen is the author of the book *State of War*,

9   which was published by Simon & Schuster in 2006.  Mr. Risen had

10  unidentified or unnamed sources for the information contained

11  in chapter 9 of *State of War*.  Chapter 9 of *State of War*

12  accurately reflects information Mr. Risen obtained from a wide

13  range of sources, including information from unnamed sources,

14  information from public sources, and information from his own

15  research.

16           "If asked by either the United States or the defense,

17  Mr. Risen would refuse to identify who was or was not an

18  unnamed source for any information set forth in chapter 9 of

19  *State of War*.

20           "If asked by either the United States or the defense,

21  Mr. Risen would refuse to identify who was or was not an

22  unnamed source for any of his other writings, including

23  newspaper articles."

24           If we could publish Exhibit 129?

25  Q.   Special Agent Hunt, you testified that you reviewed

1    Mr. Risen's bank records; is that correct?

2    A.   Yes.

3    Q.   Did you locate any specific charges related to a trip to

4    Vienna?

5    A.   I did.

6    Q.   And does Exhibit 9 -- 129 also reflect, similar to 125, a

7    Bank One credit card statement?

8    A.   Yes.

9    Q.   And what are the charges that have not been redacted from

10   this document?

11   A.   There is a charge dated 11/17, November 17.  It's a charge

12   at the Inter-Continental Vienna.

13   Q.   And that's 11/17 of what year?  Up at the top, do you

14   see --

15   A.   2004.

16   Q.   And do you see another charge?

17   A.   Yes.  A second charge on November 21, 2004, also at

18   Inter-Continental Vienna.

19   Q.   And do you know where it was that Merlin stayed in Vienna

20   during the operation in February 2000?

21   A.   Yes.  He stayed at the Inter-Continental Vienna.

22   Q.   If you could take a look at Exhibit 128?

23            THE COURT:  Now, I will tell you that the Exhibit 129

24   in the Court's book did not have redactions on it to the same

25   extent of what was shown on the screen, so I want to make sure

Hunt - Direct                                                          63

1    that the physical exhibits that are going to go to the jury are

2    absolutely consistent with what they're being shown in court.

3              MR. OLSHAN:  They will be, Your Honor.  We may have

4    passed it up.  If we didn't, I apologize, but what the jury

5    will get and what's being shown are the versions that are --

6              THE COURT:  Agent Hunt, as you look through that

7    book, because that's the book that's going to go to the jury,

8    does 129 look exactly like the screen did?

9              THE WITNESS:  Yes.  It's redacted.

10             THE COURT:  Completely other than those two lines?

11             THE WITNESS:  Yes.

12             THE COURT:  All right, okay.

13             I'm sorry, now, 128?

14             MR. OLSHAN:  128.  Based on the stipulation, we'd

15   move -- we would move 128 in.

16             THE COURT:  I assume there's no objection?

17             MR. MAC MAHON:  No objection, Your Honor.

18             THE COURT:  All right, it's in.

19             (Government's Exhibit No. 128 was received in

20   evidence.)

21   BY MR. OLSHAN:

22   Q.   Special Agent Hunt, what is Exhibit 128?

23   A.   Exhibit 128 is a book proposal we received from Simon &

24   Schuster.

25   Q.   And if you flip through, is most of this document

1   redacted?

2   A.    Yes.

3   Q.    And, for example, on that first page, where it says, it

4   looks like a stamp, "Redacted"?

5   A.    Yes.

6   Q.    Wherever that appeared throughout the document, to your

7   knowledge, who applied those redactions?

8   A.    Simon & Schuster.

9   Q.    Is there a portion of this document related to or that

10  describes Classified Program No. 1 and Merlin?

11  A.    Yes, beginning on the fourth page.

12  Q.    If we could move to that, that page?  Can you read the

13  first sentence which runs onto the second page?

14  A.    "Under Merlin, True First Name, a Russian nuclear

15  scientist who had earlier defected to the United States, posed

16  as an unemployed and greedy scientist willing to sell nuclear

17  designs to the highest bidder."

18  Q.    If you could go back to that first page, the

19  words "Merlin" -- the word "Merlin" and the phrase "True First

20  Name," were those substitutions for use at trial?

21  A.    Yes.

22  Q.    Have you reviewed the original document that was produced

23  by Simon & Schuster?

24  A.    I have.

25  Q.    And what is the word that appears beneath, without saying

Hunt - Direct                                                                65

1   it, how would you describe the word that is beneath "True First

2   Name"?

3   A.   The word --

4   Q.   I'll ask a different way.

5   A.   The word in the original was the true first name of the

6   asset we're referring to as Merlin.

7   Q.   In the course of your investigation, you learned what the

8   true first name was?

9   A.   I did.

10  Q.   Can you continue reading on page 2, where it starts

11  with "Under CIA orders"?

12  A.   "Under CIA orders, True First Name approached Iranian

13  officials in Vienna and turned over the nuclear blueprints.

14  Within days, the National Security Agency, which secretly

15  eavesdrops on all international airline reservations systems,

16  watched as an Iranian official in Vienna abruptly left Austria

17  and returned home to Iran.  The CIA later learned from another

18  source that the blueprints were being kept in a highly secure

19  place in the Iranian facility where scientists are working on a

20  nuclear weapon.

21       "CIA officers involved in the operation have come to

22  the author to discuss the case because they now feel enormous

23  guilt for a program that they believe has aided Iran's nuclear

24  program.  This book will provide the full details of Merlin and

25  will explain how and why the CIA mounted such a dangerous

Hunt - Direct                                                        66

1    operation."

2    Q.   Other than those couple paragraphs, is there anything else

3    in this, this document that would -- is there anything else in

4    this document?

5    A.   No.  The remainder of the document was redacted by Simon &

6    Schuster.

7    Q.   And just for the record, based on the stipulation, this

8    was a document that was submitted to Simon & Schuster in

9    September 2004?

10   A.   That's my understanding.

11   Q.   During the course of your investigation, did you review

12   records from Barnes & Noble?

13   A.   Yes.

14           MR. OLSHAN:  One moment, Your Honor.

15           THE COURT:  Yes, sir.

16   BY MR. OLSHAN:

17   Q.   Can you take a look at Exhibit 131?

18           THE COURT:  Is there a question?

19   BY MR. OLSHAN:

20   Q.   Do you have that in front of you?

21   A.   Yes.

22   Q.   Do those appear to be Barnes & Noble records?

23   A.   Yes.

24           MR. OLSHAN:  We would offer those.

25           THE COURT:  Any objection?

1          MR. MAC MAHON:  No objection, Your Honor.

2          THE COURT:  All right, 131 is in.

3          (Government's Exhibit No. 131 was received in

4    evidence.)

5    BY MR. OLSHAN:

6    Q.   If we could zoom in on the first portion, down to where it

7    says "Total Sales, Maximum On Hand & On Order," Special Agent

8    Hunt, generally speaking, what do these records reflect?

9    A.   These records reflect the number of copies of the book

10   *State of War* that were located in various Barnes & Noble stores

11   in the Eastern District of Virginia.

12   Q.   So for example, the first set is for a location on Wilson

13   Boulevard in Arlington, correct?

14   A.   That's correct.

15   Q.   And then the next set is Clarendon Boulevard in Arlington?

16   A.   Correct.

17   Q.   And the third is Tysons Corner in McLean?

18   A.   Yes.

19          MR. OLSHAN:  If you could zoom in on the first batch?

20   Thank you.

21   Q.   Do you see in the column towards the right where it says

22   "Sales Units"?

23   A.   Yes.

24   Q.   Does that reflect books being sold?

25   A.   I believe so.

1   Q.   And in particular, this is for the Wilson Boulevard

2   location?

3   A.   Yes.

4   Q.   What does the column read for the week ending January 7,

5   '06, sales units?

6   A.   I'm sorry, which week?

7   Q.   The week ending January 7, '06.

8   A.   On hand units, 45.

9   Q.   What does it say for sales units?

10  A.   Five.

11  Q.   And if you can go down to the summary there, total sales,

12  maximum on hand and on order, what does it say for sales units?

13  A.   Nineteen.

14  Q.   And then going to the next store, Clarendon Boulevard,

15  during the relevant period of time, how many sales units were

16  there total for that store?

17  A.   Seventy.

18  Q.   The next one, Tysons Corner, on page 2, what's the total

19  for sales units?

20  A.   Seventy-two.

21  Q.   Fountain Drive, the next one?

22  A.   Ninety-two.

23  Q.   Does this Exhibit 131 contain similar data for other

24  locations in the Eastern District of Virginia?

25  A.   Yes.

1    Q.    Are you familiar with Government's Exhibits 142, 143, 144,

2    which were shown to the jury but not published?

3    A.    Yes.

4    Q.    And Exhibit 145 as well?  You can look at 145 in your

5    binder.

6    A.    Yes.

7    Q.    Were those documents obtained from a search of the

8    defendant's home?

9    A.    Yes, in October of 2006.

10   Q.    And where was that home located?

11   A.    O'Fallon, Missouri.

12   Q.    By the time of that search in October of 2006, how much

13   time had passed since the defendant had access to the CIA, or

14   CIA facility?

15   A.    More than four-and-a-half years.

16   Q.    And between his last stint at the CIA and where these

17   documents were recovered when they were recovered, had he lived

18   in one place or multiple places?

19   A.    Multiple places.

20   Q.    These were found in his residence in O'Fallon?

21   A.    Yes.

22            MR. MAC MAHON:  Your Honor, that's asked and

23   answered.

24            MR. OLSHAN:  That's all I had on that topic, Your

25   Honor.

1          THE COURT:  All right, overruled.

2   BY MR. OLSHAN:

3   Q.   If you could look at Exhibit 73?

4          THE COURT:  That's in the first binder.

5          MR. OLSHAN:  In the first binder.

6          This is already in evidence, Your Honor.

7          THE COURT:  I'm sorry?

8          MR. OLSHAN:  It's already in evidence.

9          THE COURT:  All right.

10  BY MR. OLSHAN:

11  Q.   Do you have the document?

12  A.   I do.

13  Q.   And what is 73?

14         If you can publish that?  Thank you.

15  A.   It's entitled in the subject line:  "Second Appeal of the

16  Recommendation of the Personnel Evaluation Board/Employee

17  Review Panel."

18  Q.   And what is the purpose of this?

19  A.   The purpose of this document was to inform Jeffrey

20  Sterling of the fact that his appeal had been denied and that

21  his employment with the CIA was being terminated.

22  Q.   This is dated October 31, 2001?

23  A.   That's correct.

24  Q.   If you could take a look at Government Exhibit 75?  Do you

25  see the newspaper article in 75?

Hunt - Direct                                                              71

1   A.   Yes.

2   Q.   Does that newspaper -- is that written by Mr. Risen?

3   A.   Yes.

4   Q.   And does that newspaper article reference unnamed sources

5   for the fact that a CIA office was destroyed on 9/11?

6   A.   Yes.

7   Q.   How many days after Mr. Sterling was notified that he was

8   being terminated did this story run?

9   A.   Four.

10  Q.   And just to be clear, Agent Hunt, after the defendant

11  received that notification on October 31, 2001, did he continue

12  on a term basis with the CIA for a period of time?

13  A.   That's my understanding.

14  Q.   And that was through end of January 2002?

15  A.   Yes.

16          MR. OLSHAN:  May have a moment, Your Honor?

17          THE COURT:  Yes, sir.

18          MR. OLSHAN:  One more minute, Your Honor.  I

19  apologize.

20          One more stip, Your Honor?

21          THE COURT:  Yes, sir.

22          MR. OLSHAN:  This is Stipulation No. 8, Government

23  Exhibit 168.

24          THE COURT:  All right.  I assume it's in then.  It's

25  a stipulation.

1           (Government's Exhibit No. 168 was received in

2    evidence.)

3           MR. OLSHAN:  "The United States, through its

4    attorneys, and the defendant, Jeffrey Alexander Sterling, and

5    the defendant's attorneys, hereby stipulate and agree as

6    follows:

7           "The following documents are records of regularly

8    conducted activity within the meaning of Rule 803 of the

9    Federal Rules of Evidence and admissible at trial without

10   further authentication or identification:

11          "Exhibit 131.

12          "A representative from Barnes & Noble would testify

13   that on or about December 24, 2005, Barnes & Noble shipped

14   copies of *State of War:  The Secret History of the CIA and the*

15   *Bush Administration*, by James Risen, from New Jersey via

16   commercial carrier to the Eastern District of Virginia, where

17   they were made available for sale at Barnes & Noble retail

18   locations."

19   Q.   Special Agent Hunt, you might not have it up there, but

20   have you had a chance to review what's been marked as

21   Government's Exhibit 132B?

22   A.   Yes.

23   Q.   Do you have a copy with you?

24   A.   I do.

25          THE COURT:  Now, that's not up here, or if it is,

Hunt - Direct                                                          73

1    it's not in the book.

2              MR. OLSHAN:  May I pass it up, Your Honor?

3              THE COURT:  Go ahead.

4    BY MR. OLSHAN:

5    Q.   You're familiar with this exhibit?

6    A.   I am.

7    Q.   And what is 132B?

8    A.   132B is a photocopy of chapter 9 from *State of War*, but

9    anything in the chapter that's not related to Classified

10   Program 1 has been removed.

11   Q.   So, for example --

12             MR. MAC MAHON:  Your Honor, if I may, we object to

13   this exhibit coming in.

14             THE COURT:  And the basis for the objection?

15             MR. MAC MAHON:  It's not a summary.  It's not a

16   substitute.  It's nothing that's admissible.  It's just taking

17   the same chapter and deleting the information that the agent

18   has decided to do, but we heard testimony from Bob that he's

19   the one that did this in the first place, and it's misleading

20   to the jury.  They can get the whole chapter.  It's already in

21   evidence.

22             THE COURT:  I think the best evidence is the entire

23   chapter.  I mean, again, the jury instruction you even

24   submitted suggested that, you know, you were submitting the

25   entire chapter so the jury would have a complete picture.  So

1   I'm going to sustain that objection.

2            MR. OLSHAN:  Your Honor --

3            THE COURT:  You can argue how the jury should look at

4   the exhibit.  That's perfectly proper for both sides, but I'm

5   not going to have it go in like this.

6            MR. OLSHAN:  Your Honor, I wasn't even going to ask

7   to have it admitted.  I was going to ask to use it as a

8   demonstrative with this witness.

9            THE COURT:  Just during her testimony?

10           MR. OLSHAN:  Correct.

11           THE COURT:  That's all right.  It's not going to go

12  back to the jury.  So 132B will not go into evidence.

13  BY MR. OLSHAN:

14  Q.   You've had a chance to review this?

15  A.   Yes.

16  Q.   And any paragraph that does not relate to Mr. -- to Merlin

17  or Classified Program No. 1 has been removed from this

18  demonstrative exhibit?

19  A.   That's correct.

20  Q.   And if you could just very briefly tell the jury which

21  paragraphs have been removed?

22  A.   Paragraphs 1 through 6, paragraph 29.

23  Q.   1 through 6, 29.

24  A.   Paragraph 29 -- paragraphs 29 through 34.

25  Q.   29 through 34.

1  A.   Most of paragraph 40, paragraph 73, paragraph 75,

2  paragraphs 77 and 78, paragraphs 80 through 82, paragraphs 89

3  through 91, and paragraphs 95 through 117.

4  Q.   Now, paragraphs 95 through 117, that's page 212 through

5  the end of the chapter?

6  A.   Yes.

7          MR. OLSHAN:   One moment, Your Honor.

8  Q.   Going back briefly to Exhibit 60, it's that performance

9  assessment, PAR --

10 A.   Yes.

11 Q.   -- that contains language that is quoted in the chapter?

12 A.   Yes.

13 Q.   The PAR itself, does it have the word "Merlin" anywhere in

14 it?

15 A.   No.

16 Q.   Does it identify the classified program that we've been

17 dealing with?

18         MR. MAC MAHON:   Your Honor, this is asked and

19 answered several times, going through the same documents.

20         MR. OLSHAN:   I just have two more questions.

21         THE COURT:   I'll allow two more questions but no

22 more.

23 BY MR. OLSHAN:

24 Q.   The question was does the PAR in any version make

25 reference to Classified Program 1 or Merlin?

1            MR. MAC MAHON:  The same objection.  In a version the

2    jury can't even see, Your Honor.

3            THE COURT:  Overruled.  Let's continue this.  Go

4    ahead.

5            THE WITNESS:  No.  There's no reference to Merlin or

6    Classified Program No. 1 in this PAR by name.  By name.

7    BY MR. OLSHAN:

8    Q.   The only connection to this is in the book?

9    A.   That's correct.

10            MR. MAC MAHON:  Your Honor, objection.

11            THE COURT:  Wait, wait, wait, wait.  That was

12    leading.  Sustained.

13    BY MR. OLSHAN:

14    Q.   Does the book connect the language in the PAR to the

15    operation and Merlin?

16            MR. MAC MAHON:  Your Honor, that's asked and answered

17    now two or three times.

18            THE COURT:  I'm going to sustain the objection.

19            MR. OLSHAN:  One moment?

20            That's all I have.

21            THE COURT:  All right.  Cross-examination,

22    Mr. MacMahon?

23            MR. TRUMP:  Wait, sorry.

24            THE COURT:  Wait, was there anything else?

25            MR. OLSHAN:  I apologize, there is one other

1    stipulation.

2            MR. MAC MAHON:  May I remain standing, Your Honor?

3    I'm sorry.

4            THE COURT:  Yes, you may.

5            MR. MAC MAHON:  Thank you.

6    BY MR. OLSHAN:

7    Q.   Special Agent Hunt, during your review of the defendant's

8    phone records, did you identify records of calls between

9    Mr. Sterling and other members of the media or news outlets?

10   A.   I did.

11   Q.   And in particular, was there a specific member of the

12   media, a person?

13   A.   Yes.

14   Q.   Who was that?

15   A.   Ronald Kessler.

16   Q.   And the -- and anything else?  Anyone else or any entity?

17   A.   The *LA Times*.

18           MR. OLSHAN:  Found it.  I believe this is Stipulation

19   No. 12, and it will be Government's Exhibit 174 -- 5, 175.

20           THE COURT:  All right, it's in.

21           (Government's Exhibit No. 175 was received in

22   evidence.)

23           MR. OLSHAN:  "The United States, through its

24   attorneys, and the defendant, Jeffrey Alexander Sterling, and

25   the defendant's attorneys, hereby stipulate and agree that

Hunt - Direct                                                                78

1    business records reflect the following:

2              "During 2003, Ronald Kessler of Potomac, Maryland,

3    was the subscriber for Telephone No. 301-279-5818.  During

4    2003, the telephone number for the Washington, D.C., office of

5    the *Los Angeles Times* was 202-293-4650.  The toll free number

6    for the office was 800-528-4637.

7              "The parties further stipulate and agree that

8    telephone records reflect that the following ten telephone

9    calls occurred between the listed phone numbers at the

10   specified dates and times and for the listed duration."

11             I want to read this, Your Honor.

12             THE COURT:  Go ahead.

13             MR. OLSHAN:  "Call 1, April 9, 2003, Wednesday; time,

14   2:21 p.m.; duration, 23 seconds; originating number,

15   703-793-9388; terminating number, 301-279-5818.

16             "Call 2, also April 9, 3 p.m., 36-second duration;

17   originating number, 703-793-9388; terminating number,

18   301-279-5818.

19             "Also April 9, 4:14 p.m., 13-second call; originating

20   number, 703-793-9388; terminating number 301-279-5818."

21             That's the first three calls, Your Honor.  Those

22   involve the number for Mr. Kessler.  The remaining seven calls

23   involve numbers for the *LA Times*.  I'll just go ahead and

24   proffer, the jury will have this document, the originating

25   number for the remaining calls and all of the calls is the

1  defendant's landline, 703-793-9388; and the terminating number

2  for calls 4 through 10 is either the, is either the 800 number

3  for the *LA Times* or their office in D.C.

4          Your Honor, I notice there's an issue with this

5  document.  I haven't had a chance to discuss it with counsel.

6          THE COURT:  All right.

7          MR. OLSHAN:  So we may need to resubmit a different

8  version of this.  I'll confer with counsel.

9          THE COURT:  All right.  Is there anything further for

10 Agent Hunt?

11         MR. OLSHAN:  No, Your Honor.

12         THE COURT:  All right.

13         MR. MAC MAHON:  Excuse me, Your Honor.

14         THE COURT:  That's all right.  So sort that issue out

15 over the lunch break, all right?

16         MR. OLSHAN:  Very well.

17                         CROSS-EXAMINATION

18 BY MR. MAC MAHON:

19 Q.   Special Agent Hunt, how are you?

20 A.   Good.  How are you?

21 Q.   Good afternoon.

22         The calls to Mr. Kessler that are set forth in the

23 stipulation, four calls:  23 seconds, 36 seconds, 13 seconds,

24 and 46 seconds, correct?

25 A.   I don't know.  I don't have it in front of me.

1    Q.    Did you ever ask Mr. Kessler if he ever spoke to

2    Mr. Sterling?

3    A.    I did not.

4    Q.    You didn't bother to ask him?

5    A.    No.

6    Q.    So you can't tell the jury because you never even asked

7    what it is that Mr. Sterling may have talked about with

8    Mr. Kessler, correct?

9    A.    I cannot.

10   Q.    Right.  And the same would be that whatever these other

11   calls are to the *LA Times*, you don't know who they were to,

12   what was discussed, or anything else, right?

13   A.    That's correct.

14   Q.    Right.  And you know that in this -- from the beginning of

15   his discrimination case, that Mr. Sterling was very interested

16   in his discrimination case, correct?

17   A.    Can you repeat the question?

18   Q.    Well, Mr. Sterling had a discrimination case against the

19   CIA, correct?

20   A.    Yes.

21   Q.    And that went on for a long time, didn't it?

22   A.    Yes.

23   Q.    Okay.  And you know that Mr. Sterling was interested

24   because he spoke to Mr. Risen in a public story about his

25   discrimination case, correct?

1  A.    I could speculate that that's the case.

2  Q.    He was interested in getting publicity about his

3  discrimination case, correct?

4  A.    I don't know.  You'd have to ask him.

5  Q.    Well, you never asked Mr. Risen, did you?

6  A.    No.

7  Q.    And when was Mr. Sterling's discrimination case finally

8  dismissed?

9  A.    I think it may have been -- well, I'm not sure.  I think

10 that the Supreme Court denied cert in early 2006.

11 Q.    2006.  It was ongoing all the way up through 2006,

12 correct?

13 A.    I think so.

14 Q.    Right.  And do you remember why the case was dismissed?

15         MR. OLSHAN:  Objection.  Irrelevant.

16         MR. MAC MAHON:  He brought up the issue of the case,

17 Your Honor.

18         THE COURT:  I'm going to overrule the objection.  You

19 brought the case up.

20         THE WITNESS:  I did not study that.

21 BY MR. MAC MAHON:

22 Q.    Did you read the Fourth Circuit opinion that said that --

23         MR. OLSHAN:  Objection, Your Honor.  The legal

24 reasoning for a court upholding a decision or rejecting a

25 decision is not relevant to this case.

1           MR. MAC MAHON:  Let me ask a question a different

2    way, Your Honor.

3           THE COURT:  Well, let me hear the question without --

4    now, if it's a leading question, you're going to be, you know,

5    making a statement, and I don't want the jury to hear an

6    improper statement.

7           MR. MAC MAHON:  I will do my best, Your Honor.

8    Q.   The CIA invoked the national security privilege --

9           MR. OLSHAN:  Objection, Your Honor.

10   BY MR. MAC MAHON:

11   Q.   -- to have Mr. --

12          THE COURT:  Wait, wait, wait, wait, wait, wait, wait,

13   wait, wait, wait.  Look, the jury has been told multiple times,

14   and this is a very attentive jury, that when lawyers make

15   statements, that's not any evidence, all right?  That's the

16   first thing.  Number two, it needs to be relevant to this case.

17          I don't think the details of the lawsuit or certainly

18   not the legal rulings in the lawsuit are appropriate or

19   relevant.  It's wasting the jury's time.  So I'm going to

20   sustain the objection, all right?

21          MR. MAC MAHON:  Your Honor, with respect --

22          THE COURT:  Wait.  It's relevant that the case was

23   going on for a period of time.  That's not inappropriate, but

24   to get into the details of why one court in a totally separate

25   case made certain types of rulings or what positions the

Hunt - Cross                                                      83

1    parties took is not relevant to this case.

2              MR. MAC MAHON:  Thank you, Your Honor.

3              THE COURT:  All right.

4    BY MR. MAC MAHON:

5    Q.   Agent Hunt, you, you were here in court when people

6    testified that PARs were all classified, correct?  Did you hear

7    that testimony?

8    A.   I did.

9    Q.   All right.  You heard multiple witnesses tell this jury

10   that PARs were classified documents, correct?

11   A.   Yes.

12   Q.   And the two exhibits, I think they're 59 and 60, were

13   completely declassified when they were given to Mr. Sterling,

14   correct?

15   A.   Yes.

16   Q.   There was no prohibition on him just giving those

17   documents to anybody if he felt it would help his

18   discrimination case, was there?

19   A.   I don't know.  I believe that the CIA gave him some sort

20   of instruction, and without it in front of me, I couldn't tell

21   you what it was.

22   Q.   But you don't disagree that they were completely

23   declassified and given to his uncleared lawyer, correct?

24   A.   I don't know if his lawyer had a clearance at the time or

25   not.

1   Q.   Well, they were given to his civil lawyer in New York,

2   weren't they?

3   A.   I'm not sure.

4   Q.   And they were filed correctly?  The two PARs were filed in

5   an unclassified version, correct?

6   A.   Without documentation in front of me, I can't really

7   answer these questions.

8   Q.   All right.  You, you testified that you made edits to

9   chapter 132 to show the jury the documents.

10              If we could put up 132, page 93, please?  The first

11  page, please, Mr. Francisco.

12              And the next page, please?

13              This is a, this is a page that you redacted from your

14  analysis of the case?

15  A.   I did not do the analysis, but yes, it is one of the, one

16  of the pages, paragraphs that have been redacted.

17  Q.   Right.  And this, and this -- if we could focus on, hook

18  in on -- excuse me, zoom in on paragraph 1, please.

19              This part of *State of War* deals with something that

20  happened in 2004, correct?

21  A.   That's what the book says.

22  Q.   And Mr. Sterling wasn't there at that time, was he?

23  A.   At the CIA?

24  Q.   No.

25  A.   No.

1    Q.    He wasn't, was he?

2          And if we could go to page 207, please?  And

3    paragraphs 73 and 74?

4    A.    Yes.

5    Q.    Did you redact those two paragraphs as well?

6          MR. OLSHAN:  Your Honor, if Mr. MacMahon is going to

7    have the witness go back and forth between the demonstrative

8    and what's in evidence, we'd ask to move the demonstrative in.

9          THE COURT:  No.

10         MR. MAC MAHON:  Your Honor, she's testified as to

11   what paragraphs she took out.

12         THE COURT:  No, we're not, we're not going to move

13   the demonstrative in.

14         THE WITNESS:  I did not make the redactions, but 73

15   has been redacted; 74 has not.

16   BY MR. MAC MAHON:

17   Q.    Okay.  And you know that the part in 73 is information

18   from sitting through this trial that was never given to

19   Mr. Sterling at all, correct?

20         MR. OLSHAN:  Objection, Your Honor.  I think we're

21   getting a little bit close here.

22         THE COURT:  I think, Mr. MacMahon, this is not

23   appropriate.  I mean, this whole issue about redacting or

24   editing the chapter, I think, is improper, and I don't think

25   the government should have gotten into it.  So you opened a can

1    of worms, so I'm going to close it and just tell the jury to

2    disregard this whole line of testimony.  It's not relevant to

3    the case.

4           The issue in this case is whether any of the

5    information that's been discussed, that is, concerning

6    Operation No. 1 or Merlin, is in the book, all right?

7           All right, go ahead.

8           MR. MAC MAHON:  I will, Your Honor, but -- I'll move

9    along.  The Court's ruled.

10   Q.  Let's look at Exhibit 139, if you would, please, which is

11   the subpoena to testify in front of a grand jury that you

12   served on Mr. Sterling?

13   A.  Yes.

14   Q.  All right.  And when Mr. Olshan was showing you a

15   document, he was also showing you an e-mail that Mr. Sterling

16   sent to Mr. Risen in 2003, correct?

17   A.  Yes, on March 10.

18   Q.  All right.  And it was a CNN article, correct?

19   A.  There was a link to a CNN article in the e-mail.

20   Q.  Right.  And that article wasn't classified, was it?

21   A.  No.

22   Q.  And that article didn't talk at all about anything that

23   Mr. Sterling ever did at the CIA, did it?

24   A.  No.

25   Q.  And who drafted the rider?  Let's look at page 2 of the

1    subpoena.  Did you draft this?

2    A.    No.

3    Q.    Now, you -- there's nothing in this rider that asks

4    Mr. Sterling to preserve any correspondence with James Risen,

5    is there?

6    A.    No.

7    Q.    Well, that was the focus of your investigation, wasn't it?

8    A.    The focus of the investigation was the unauthorized

9    disclosure of national defense information.

10   Q.    To Mr. Risen, correct?

11   A.    Yes.

12   Q.    In the attachment to the subpoena to Mr. Sterling, nobody

13   thought to put, "Preserve any communications you may have with

14   James Risen," correct?

15           MR. OLSHAN:  Objection.  The witness has already

16   testified she didn't draft the document.

17           THE COURT:  Well, she's been asked to testify about

18   it.  I mean, but frankly, the jury can read it as well.  It's

19   not there.  Let's move this along.

20   BY MR. MAC MAHON:

21   Q.    Did you -- when you executed this search warrant on

22   Mr. Sterling's house, you didn't find any classified documents

23   whatsoever dealing with Merlin at all, did you?

24   A.    No.

25   Q.    And you didn't find any documents dealing with Classified

Hunt - Cross                                                              88

1    Program No. 1 at all, correct?

2    A.    That's correct.

3    Q.    Did you, did you tell the grand jury -- or, excuse me, the

4    jury that there was a -- you found a FedEx receipt of

5    Mr. Risen's?  It's one of, one of his credit card records that

6    showed a FedEx receipt?

7    A.    A FedEx charge, yes.

8    Q.    A FedEx charge.

9          You wouldn't want to mislead the jury as to what that

10   was, would you, ma'am?

11   A.    I wouldn't want to mislead them about anything.

12   Q.    Right.  And you, you had actually served subpoenas for the

13   FedEx records of Mr. Risen, hadn't you?

14   A.    Yes.

15   Q.    Right.  And you served -- and you received FedEx records

16   dealing with Mr. Risen and his wife, correct?

17   A.    I don't recall exactly what was in the records.  I would

18   have to review them.

19   Q.    You asked for FedEx records just for Mr. Risen, correct?

20   A.    I would have to look at the records.

21   Q.    Well, you did get FedEx receipts from Mr. -- showing

22   communication between Mr. Risen and his lawyers, right?

23              MR. OLSHAN:  Objection, Your Honor.

24              THE COURT:  What's the basis for the objection?

25              MR. OLSHAN:  It's not relevant.

1            MR. MAC MAHON:  Let me -- I'll ask it a different

2    way.

3            THE COURT:  All right.

4    BY MR. MAC MAHON:

5    Q.   You did a thorough request of FedEx for all FedEx receipts

6    you could find, whether they were Mr. Sterling, Mr. Risen, or

7    Mr. Risen's wife, right?

8    A.   I would have to look back at my original request to FedEx.

9            THE COURT:  You have it -- you've got papers in your

10   hand, Mr. MacMahon.

11   BY MR. MAC MAHON:

12   Q.   I don't want to put all these in evidence.  The point,

13   ma'am, you do not have the FedEx receipt or charge you showed

14   the jury on that credit card, you don't have any evidence that

15   that was a FedEx that was sent from Mr. Risen to Mr. Sterling,

16   do you?

17   A.   I do not.

18   Q.   And you don't even know if it has anything to do with this

19   case, do you?

20   A.   I do not.

21   Q.   And again, you got all Mr. Sterling's FedEx records,

22   right?

23            MR. OLSHAN:  Objection.  Asked, asked and answered.

24            THE COURT:  I think you've made your point.

25   BY MR. MAC MAHON:

Hunt - Cross                                                          90

1   A.   And you didn't find any communication --

2            THE COURT:  Mr. MacMahon, there was an objection.

3            MR. MAC MAHON:  I'm sorry, Your Honor.

4            THE COURT:  I'm sustaining the objection because

5   you've made your point on that.

6            MR. MAC MAHON:  Well, I just wanted to take it a

7   little further, Your Honor, with respect to what was received,

8   which is that you received all -- you didn't find any FedEx

9   transactions whatsoever between Mr. Sterling and Mr. Risen,

10  correct?

11           THE WITNESS:  I did not, but FedEx no longer had the

12  underlying records for the FedEx shipment that was made on

13  June 11, 2004.  They could not provide me with that data in

14  response to my request.

15  BY MR. MAC MAHON:

16  Q.   So you don't know what it was?

17  A.   I don't.

18  Q.   Did you receive any FedEx receipts back into 2004 from

19  FedEx?

20  A.   I would have to look back at the date of my request.

21  Q.   When did you request the records?

22  A.   Without the record in front of me, I cannot recall.  What

23  I do recall is that FedEx only maintained records for a certain

24  time period, and going back, they -- the records for the

25  shipment on June 11, 2004, did not fall within the time period

1   of what they had still maintained in their records at the point

2   of my request.

3   Q.   And the credit card records don't show who it was a FedEx

4   to or from, either, right?

5   A.   That's correct.

6   Q.   And you found no communication written of any form between

7   Mr. Sterling and Mr. Risen that relates to any classified

8   information at all, do you?

9   A.   The communications I did find, I'm not sure to what

10  they're referring.

11  Q.   But there's no classified information in any communication

12  that you found and pasted back together between Mr. Risen and

13  Mr. Sterling, correct?

14  A.   That's correct.

15  Q.   And Exhibit 124, which you, which you put up for the jury,

16  that's Mr. Risen offering to send something to Mr. Sterling,

17  correct?

18  A.   Yes.

19  Q.   And you don't know -- have any idea what that is, right?

20  A.   I don't.

21  Q.   You don't even know if he ever sent him anything, do you?

22  A.   I don't.

23  Q.   I mean, you don't know, you can't testify today that

24  Mr. Sterling ever gave any classified documents to Mr. Risen

25  whatsoever, correct?

1   A.    That's correct.

2   Q.    And you can't say where, if at all, Mr. Risen or

3   Mr. Sterling ever talked about classified matters, correct?

4   A.    I'm not certain.  I can only make deductions from phone

5   records.

6   Q.    The phone records don't tell you what people are talking

7   about, do they, ma'am?

8   A.    They don't.

9   Q.    And speaking of phone records, you never got Bob's phone

10  records at all, did you?

11  A.    I did not.

12  Q.    You originally said that you had, and then you looked back

13  and found that you didn't, right?

14  A.    I thought that I had.  I left for another assignment three

15  years ago, and I don't know where all the documents related to

16  this case are located in this office.

17  Q.    But, ma'am, you knew that Bob was somebody who's quoted in

18  Mr. Risen's article in one way or another, isn't he?

19  A.    I don't know that he's quoted.

20  Q.    Well, he's certainly attributed in the book, isn't he?

21  Information that's attributed to him is set forth in *State of*

22  *War*?

23  A.    One could say that he is described in the chapter.

24  Q.    And one way to tell the jury that Bob and Mr. Risen ever

25  talked would have been to get Bob's phone records, right?

1           MR. OLSHAN:  Objection, Your Honor.  This is

2    argument.

3           THE COURT:  No, I don't think so.  I'm going to

4    permit it.  Overruled.

5           THE WITNESS:  Yes.

6    BY MR. MAC MAHON:

7    Q.   And do you remember telling Merlin that if he could think

8    of anything to talk about about the Classified Program No. 1

9    and the leak, to go -- have him tell Bob?

10   A.   I do not recall that.

11   Q.   Did you ever, did you ever ask Bob for any of his e-mails?

12   A.   What e-mails?

13   Q.   Any e-mails.  Did you ask to look at any of his e-mail

14   accounts at all?

15   A.   No.

16   Q.   You never got any of Mr. Risen's e-mails, right?

17   A.   Only the ones that we have described as having been

18   recovered from the computer from the Dawsons.

19   Q.   No other e-mails at all, right?

20   A.   No.

21   Q.   And you never analyzed any of the hard drives of

22   Mr. Risen's, correct?

23   A.   I didn't have the permission to do that.

24   Q.   And you didn't analyze any of the hard drive or e-mails of

25   Ms. Divoll or anyone else at the Senate, right?

Hunt - Cross                                                            94

1   A.    I did not.

2   Q.    And Mr. Duhnke didn't ever talk to you, did he?

3   A.    Briefly.

4   Q.    He didn't talk to you in any detail about what happened

5   after Mr. Sterling was up at the Senate, correct?

6   A.    That's correct.

7   Q.    "He didn't cooperate" was your exact words, correct?

8   A.    I don't know if those were my exact words.

9   Q.    You don't have any information that shows if Mr. Sterling

10  or Mr. Risen ever met in person, correct?

11  A.    I have information suggesting they did, but I do not know

12  that they did.

13  Q.    Right.  And you don't know if they did, where they met at

14  all, correct?

15  A.    I do not.

16  Q.    And Mr. Risen lives in Maryland, right?

17  A.    Yes.

18  Q.    And his office is in D.C.?

19  A.    Yes.

20  Q.    You have no witness that says that Mr. Sterling ever left

21  the CIA with a soft file, correct?

22  A.    Correct.

23  Q.    There's no witness that says Mr. Sterling printed up

24  cables about Classified Program No. 1 and took them home,

25  correct?

1              MR. OLSHAN:  Objection, Your Honor.

2              MR. MAC MAHON:  She's the case agent, Your Honor.

3              THE COURT:  The, the scope of the investigation is

4    fair game.  I'm permitting it.  Overruled.

5              MR. OLSHAN:  Fair enough.

6              THE WITNESS:  Could you repeat the question?

7    BY MR. MAC MAHON:

8    Q.   You have no witness that saw Mr. Sterling leave the CIA

9    with any classified documents, correct?

10   A.   Correct.

11   Q.   You have no witness that said that Mr. Sterling ever

12   printed a classified document or took it home, correct?

13   A.   Correct.

14   Q.   And the, the letter that's in the book, you don't have a

15   copy even of that letter, do you?

16   A.   Not in, not in its exact form.

17   Q.   All right.  And you have no copy of that letter that was

18   in Mr. Sterling's possession at any time, do you?

19   A.   No.

20   Q.   You have no information as to why Merlin is accurately

21   quoted in the book, correct?

22   A.   I don't know that he's accurately quoted, but I do not

23   know the origin of the quotes.

24   Q.   Right.  And Merlin told you when you interviewed him that

25   he couldn't account for how he came to be quoted in the book,

1    correct?

2    A.    I believe that's correct.

3    Q.    You have no information how it is that the information

4    about Merlin using a newspaper appears in Mr. Sterling's -- in

5    Mr. Risen's book, correct?

6    A.    I do not.

7    Q.    Because it's not in any CIA report that, for example,

8    Mr. Sterling may have printed, correct?

9    A.    That's correct.

10   Q.    The same with the postman, correct?

11   A.    That's correct.

12   Q.    And the same with Sonoma, correct?

13   A.    That's correct.

14   Q.    And you heard Mr. Harlow testify that Mr. Risen had

15   additional information that he didn't have on his first call

16   when he called the CIA the second time, correct?

17          MR. OLSHAN:  Objection.  That wasn't the testimony,

18   Your Honor.

19          THE COURT:  Sustained.

20   BY MR. MAC MAHON:

21   Q.    Did you hear Mr. Harlow say that he had additional

22   information, that Mr. Risen indicated there was different

23   information on the second call than he had on the first call?

24          MR. OLSHAN:  Objection.

25          THE COURT:  Wait, wait, wait, wait.  I'm going to

1   sustain that objection again.

2          MR. OLSHAN:  That wasn't the testimony, Your Honor.

3          THE COURT:  I know.  Sustained.

4   BY MR. MAC MAHON:

5   Q.   Do you remember writing in 2003 that you thought it was a

6   SSCI staffer that was responsible for the leak?

7   A.   I probably did.

8   Q.   And you wrote and said that what you needed to figure out

9   who was responsible for the leak was a copy of the actual

10  letter provided by the Russian to the Iranian, correct?

11  A.   I don't know.  I would need my memory refreshed.

12  Q.   You never got a copy of that letter, right?

13  A.   No, not as it appears in the book.

14  Q.   Do you remember writing in January of 2006 that SSCI was

15  unified in its opposition at every level to your investigation?

16  A.   I'd have to have my memory refreshed.

17         THE COURT:  All right, do you have her report?

18         MR. MAC MAHON:  I do, Your Honor.

19         The Court's indulgence, Your Honor?

20         THE COURT:  Yes, sir.

21         MR. MAC MAHON:  It's not jumping right up, Your

22  Honor.

23         THE COURT:  Well, should we take the lunch break at

24  this point?

25         MR. MAC MAHON:  Yeah, that would help me find it,

Hunt - Cross                                                              98

1    Your Honor.

2              THE COURT:  All right, we'll go ahead and do that,

3    folks.  We'll reconvene at 5 of two.

4              (Recess from 12:53 p.m., until 1:55 p.m.)

1                   A F T E R N O O N   S E S S I O N

2                           (Defendant and Jury present.)

3            THE COURT:  All right, Mr. MacMahon?

4            MR. MAC MAHON:  May it please the Court, Your Honor?

5            THE COURT:  Yes, sir.

6            MR. MAC MAHON:  Thank you.

7                      CROSS-EXAMINATION (Cont'd.)

8    BY MR. MAC MAHON:

9    Q.   Agent Hunt, when we broke, I was asking you about some

10   statements in a document, and now I've got a copy for you and

11   the Court, if the Court wants a copy as well.

12           THE COURT:  Yes, please.

13   BY MR. MAC MAHON:

14   Q.   Ma'am, I've handed you a document that's dated January 17,

15   2006.  It's results of investigation.  I won't say the top

16   word.  Have you seen that document before?

17   A.   Yes.

18   Q.   You wrote this, right?

19   A.   Yes.

20   Q.   And if you'd turn to page 8, the first full paragraph,

21   read that first full paragraph and see if that refreshes your

22   recollection as to whether you wrote that there was unified

23   opposition exhibited by SSCI at every level of your

24   investigation.

25   A.   Yes.

1  Q.   That is what you wrote, isn't it?

2  A.   Yes.

3  Q.   And do you also remember writing in 2006 that the FBI

4  director contacted the SSCI Chairman and Senator Pat Roberts,

5  right?

6  A.   Yes.

7  Q.   And that Senator Roberts told Director Mueller that he

8  wasn't going to cooperate with the FBI at all in this

9  investigation, correct?

10 A.   Yes.

11 Q.   And that never changed, did it?

12 A.   It did change.

13 Q.   You then got some cooperation from SSCI, correct?

14 A.   I did.

15 Q.   You never got an interview with Mr. Duhnke, right?

16 A.   I did not interview Mr. Duhnke.

17 Q.   And you never received any phone record that showed

18 Mr. Risen calling Mr. Stone, as he testified yesterday,

19 correct?

20 A.   I collected records from Mr. Stone.  I did not find a call

21 in any of those records.

22 Q.   So even though Mr. Stone admits talking to Mr. Risen, by

23 pulling out phone records, you were unable to prove that that

24 was true, correct?

25 A.   That's correct.

1    Q.   Do you remember doing a -- do you remember writing a, or

2    seeing a report dated September 6, 2007?

3    A.   I would have to see a copy of it.

4    Q.   About whether the information at the New York station --

5    excuse me, excuse me, the New York office in New York -- strike

6    that question.

7            Do you remember seeing a CIA document that indicates

8    that before the Risen story that you showed the jury as an

9    exhibit was published about the World Trade Center, that there

10   was a prior news story on *ABC News*?

11   A.   I would need to have my memory refreshed.

12           MR. MAC MAHON:  May I show this to the witness, Your

13   Honor?

14           THE COURT:  Yes.  And I'll return this to you because

15   this is not going into evidence.

16           MR. MAC MAHON:  No, Your Honor, it's not.

17           THE COURT:  All right.

18           MR. MAC MAHON:  And this is a document dated

19   September 6, 2007.

20           THE WITNESS:  What's the question?

21   BY MR. MAC MAHON:

22   Q.   Have you ever seen that document before?

23   A.   Yes.

24   Q.   And that document indicates that there was a story about

25   the fact that a CIA office in New York was destroyed on

1  September 11 was public before Mr. Risen's story that you

2  showed the jury, right?

3  A.    It says October 2001, yes.

4  Q.    And you don't have any phone records that show

5  Mr. Sterling talking to Mr. Risen in 2001, correct?

6  A.    Correct.

7  Q.    And you know that the -- from your investigation that the

8  CIA is unable to say in any way what Mr. Sterling ever did on

9  his computer when he worked at the CIA, correct?

10  A.    No, that's not my understanding.

11  Q.    Does the CIA have some information on, on cables that

12  Mr. Sterling accessed at any point in time?

13  A.    No, but they provided log-in and log-out information for

14  him.

15  Q.    And when was the last time that Mr. Sterling logged into

16  his computer at the CIA when he was cleared to know anything

17  about Classified Program No. 1?

18  A.    I'm not sure because I don't have the records in front of

19  me.

20  Q.    But they don't have any -- the CIA's computer systems

21  weren't such that they could tell you when it was that he

22  printed anything from that file, if he did so, right?

23  A.    That's correct.

24  Q.    Or if he e-mailed himself or -- with documents, correct?

25  They couldn't tell you that?

1    A.    I have no knowledge of those things.

2    Q.    And you don't have any e-mails, any copies of any e-mails

3    that Mr. Sterling sent to himself while he was at the CIA, if

4    it even happened, right?

5    A.    I don't fully understand your question.

6    Q.    In your investigation, you saw no e-mails at all from

7    Mr. Sterling's account at the CIA, right?

8    A.    I don't know.  I saw a lot of e-mails during the course of

9    the investigation.  I don't know if I saw any with his name on

10   them or not.

11   Q.    And you didn't see any e-mails in Mr. Sterling's account

12   that contained classified information regarding Merlin or

13   Classified Program No. 1, correct?

14   A.    You're talking about within CIA's systems?

15   Q.    Yes.

16   A.    I don't recall.

17   Q.    And you've already said you didn't find any on any of the

18   computers of his that you searched, either, correct?

19   A.    I didn't find what?

20   Q.    Any classified information on any computer of

21   Mr. Sterling's.

22   A.    That's correct.

23   Q.    Did you search Mr. Sterling's computer that was seized in

24   2006 for any log files?

25   A.    What I can tell you is that the computer was processed.

1   When we make a request, I don't know that we would have

2   specifically requested log files.  We would have requested for

3   them to look for evidence of certain things in the entirety of

4   the computer.

5   Q.   And that would have been a keyword search like the one

6   that the gentleman testified to yesterday?

7   A.   Yes.

8   Q.   And nothing came up, no positive hits on that at all,

9   correct?

10  A.   I believe we found one letter that you're aware of.

11  Q.   A draft letter.

12  A.   I don't know what it was.

13  Q.   Anything other than that, you didn't find anything,

14  correct?

15  A.   Correct.

16          MR. MAC MAHON:  Just a second, Your Honor.

17          THE COURT:  Okay.

18  BY MR. MAC MAHON:

19  Q.   Ma'am, did you subpoena Mr. Risen's Western Union

20  receipts?

21  A.   I believe I did.

22  Q.   Did you -- you were given back a receipt of a transfer of

23  money from Mr. Risen to his son by Western Union?

24          MR. OLSHAN:  Objection.  Why is that relevant, Your

25  Honor?

1           THE COURT:  Yeah.

2           MR. MAC MAHON:  Scope of the investigation, Your

3     Honor.

4           THE COURT:  I'm sorry?

5           MR. MAC MAHON:  The scope of the investigation.

6           MR. OLSHAN:  Every piece of paper that was obtained

7     is not necessarily -- is not relevant, Your Honor.

8           THE COURT:  No, I understand that.  I think it's for

9     a different purpose.  I'll overrule the objection.  I

10    understand, Mr. MacMahon.

11          THE WITNESS:  I don't recall what was in the Western

12    Union records I received.  I would need to review the records

13    to make any sort of definitive comment.

14    BY MR. MAC MAHON:

15    Q.   All right.  But you never found any -- though you were

16    looking, you never found any transfer, any evidence of any

17    transfer of money from Mr. Sterling to Mr. Risen or vice versa,

18    correct?

19    A.   I did not.

20    Q.   That's what you were looking for, wasn't it?

21    A.   I would have to go back and look at the records.  There

22    was something in some other record that suggested to me that

23    information regarding a Western Union transaction might be

24    related to my investigation, and so I then sought Western Union

25    records.

1   Q.   And found nothing relevant to your investigation, correct?

2   A.   That's correct.

3   Q.   And you -- how many times did you pull credit reports on

4   Mr. Risen?

5   A.   Without the records in front of me, I couldn't tell you.

6   Q.   What were Mr. Risen's credit reports going to tell you

7   about whether Mr. Sterling had disclosed classified information

8   to Mr. Risen?

9            MR. OLSHAN:  Objection, Your Honor.  How is this

10  relevant?

11           THE COURT:  The scope of the investigation is

12  relevant to this particular case.  Overruled.

13           THE WITNESS:  I obtained Mr. Risen's credit report or

14  reports in order to identify the credit cards he used because I

15  then obtained records for his credit cards.  The e-mails that

16  have already been discussed suggested that James Risen was

17  meeting with Jeffrey Sterling, and we also had a witness tell

18  us that they, in fact, did meet.

19           MR. MAC MAHON:  Your Honor, object to her repeating

20  these questions -- her testifying --

21           THE COURT:  And that would be hearsay, so I'm going

22  to go ahead and have that stricken.  Go ahead.

23           MR. OLSHAN:  Your Honor, respectfully, the witness

24  was answering the question.

25           THE COURT:  Well, I think it was more of a narrative.

1           But go ahead, Mr. MacMahon.

2    BY MR. MAC MAHON:

3    Q.   You testified already that you have no information on

4    whether Mr. Sterling and Mr. Risen ever, ever met in person,

5    correct?

6    A.   I have no definitive evidence but I --

7    Q.   You've got a strong suspicion, right, ma'am?

8    A.   I was told that they did.

9           THE COURT:  Well, you opened the door to that one.

10          MR. MAC MAHON:  That's fine.

11   Q.   And do you have any proof that they ever met together

12   other than some witness who said that to you?

13   A.   No.

14   Q.   You weren't able to verify that statement, correct?

15   A.   I was not.

16   Q.   And sitting here today, you can't tell this jury anything

17   about where or when Mr. Risen or Mr. Sterling met or what they

18   ever discussed, correct?

19   A.   Correct.

20          MR. MAC MAHON:  That's all I have, Your Honor.

21          THE COURT:  All right.  Redirect, Mr. Olshan?

22          MR. OLSHAN:  Yes, Your Honor.

23                     REDIRECT EXAMINATION

24   BY MR. OLSHAN:

25   Q.   Special Agent Hunt, Mr. MacMahon asked you some questions

1   about phone records.  Do you recall those?

2   A.   Yes.

3   Q.   Did you obtain phone records for Vicki Divoll?

4   A.   I did.

5   Q.   And did those reflect any communications between

6   Ms. Divoll and Mr. Risen?

7   A.   They did not.

8   Q.   And what about phone records for Merlin?  Did you obtain

9   any of those phone records?

10  A.   I did.

11  Q.   What did they reflect about communications with Mr. Risen?

12  A.   They reflected no contact between Merlin and James Risen.

13  Q.   Mr. MacMahon asked you about Mr. S. and his

14  characterization in the book.  Do you recall those questions?

15  A.   Yes.

16  Q.   And in the book, is he referred to as the senior case

17  officer or the senior CIA officer?

18  A.   Or perhaps official, something like that.

19  Q.   But he is referenced in the book?

20  A.   Yes.

21  Q.   Do any of Mr. S.'s -- does language from any of Mr. S.'s

22  PARs show up in chapter 9?

23  A.   No.

24  Q.   How many articles did James Risen write about Mr. S.,

25  newspaper articles?

 1    A.    One.

 2    Q.    What was that?  About Mr. S.

 3    A.    I'm sorry, about --

 4              MR. MAC MAHON:  They're confusing Mr. S.'s, Your

 5    Honor.

 6              THE WITNESS:  Yes.  I'm sorry.  No, I'm sorry.

 7    BY MR. OLSHAN:

 8    Q.    How many newspaper articles?

 9    A.    Are we talking about Bob S.?

10    Q.    Yes.

11    A.    He wrote no articles about Bob S.

12    Q.    Thank you.

13              You testified that you had written that SSCI as an

14    organization was not cooperative at first.  Is that correct?

15    A.    That's correct.

16    Q.    Was Vicki Divoll cooperative during the course of your

17    investigation?

18    A.    Yes.

19    Q.    What about Don Stone?

20    A.    Yes.

21    Q.    Special Agent Hunt, when you investigate a case, do you

22    consider motive?

23    A.    I do.

24    Q.    How important is motive evidence in your investigation?

25              MR. MAC MAHON:  Your Honor, objection to testimony as

 1  to her theory of motive.

 2          MR. OLSHAN:  Your Honor, the defense put the

 3  thoroughness of this investigation at issue.  The witness

 4  should be able to describe why it is that she focused her

 5  direction a particular way.

 6          THE COURT:  I'll permit it.  I believe the door was

 7  opened.  Overruled.

 8  BY MR. OLSHAN:

 9  Q.   My question, Special Agent Hunt, was how important is

10  motive evidence when you conduct a criminal investigation?

11  A.   It is very important.

12  Q.   Did you obtain evidence that you believed provided --

13  presented a motive for somebody to disclose information to

14  Mr. Risen during the course of this investigation?

15  A.   Yes.

16  Q.   And who did that evidence involve?

17  A.   Jeffrey Sterling.

18  Q.   Has Robert S. ever sued the CIA?

19  A.   No.

20  Q.   Merlin ever sued the CIA?

21  A.   No.

22  Q.   When you initiated the investigation, I believe you

23  testified it was in April of 2003?

24  A.   That's correct.

25  Q.   At the time when you initiated your investigation

1    concerning unauthorized disclosure of classified information to

2    James Risen, did you learn any information regarding Mark Zaid

3    and Mr. Krieger that, that directed your investigation?

4    A.   I did.

5              MR. MAC MAHON:  Your Honor, objection.  That door was

6    not opened as to Mr. Sterling's prior lawyers.

7              MR. OLSHAN:  Your Honor, this is about why --

8              THE COURT:  Again, the scope of the investigation,

9    what was done and not done, was clearly part of the cross.  I'm

10   going to allow it, excuse me, on redirect; and if there needs

11   to be recross on that, you'll be allowed to.  Go ahead.

12             MR. MAC MAHON:  Thank you, Your Honor.

13   BY MR. OLSHAN:

14   Q.   What did you learn at the outset of your investigation

15   about information from Mr. Krieger and Zaid that helped you

16   direct your investigation and focus it?

17   A.   When I opened my investigation on April 8, 2003, my

18   investigation was based on a report I received from the CIA

19   dated April 7, 2003.  In that report, the CIA provided

20   information about the fact --

21             MR. MAC MAHON:  Your Honor, that's hearsay.

22             THE COURT:  Wait.

23             MR. OLSHAN:  Your Honor, this is not for the truth.

24   It's why she took the actions.

25             THE COURT:  It explains why she is acting, takes the

1  investigative tacks that she does, so I'm going to overrule the

2  objection.  It's not hearsay.

3  BY MR. OLSHAN:

4  Q.   You may continue, Special Agent Hunt.

5  A.   The CIA advised that on February 24, 2003, it was

6  contacted by Mark Zaid and Roy Krieger.  They told the CIA on

7  February 24 that a client of theirs had contacted them on

8  February 21, 2003, and that that client, that unnamed client at

9  the time voiced his concerns about an operation that was

10 nuclear in nature, and he threatened to go to the media.

11 Q.   Did you later learn who that client was from Mr. Zaid and

12 Mr. Krieger in the course of your investigation?

13 A.   I did.

14 Q.   Did those facts help you focus the direction of your

15 investigation?

16 A.   They did.

17 Q.   And who did you learn was the client of Mr. Krieger and

18 Mr. Zaid?

19 A.   Jeffrey Sterling.

20 Q.   You testified that you have read the chapter a number of

21 times; is that correct?

22 A.   Yes.

23 Q.   Which person in your opinion, which person received the

24 most favorable treatment as written in chapter 9?

25          MR. MAC MAHON:  Your Honor, that's --

1        THE COURT:  All right, now I think that's going

2   beyond the scope of proper cross -- proper redirect.

3        MR. OLSHAN:  If it's relevant to the investigation,

4   Your Honor.

5        THE COURT:  Well, then ask the question in a

6   different way.

7   BY MR. OLSHAN:

8   Q.   Was the characterization of certain individuals in chapter

9   9 relevant to your investigation and how you conducted it after

10  the book was published in 2006?

11  A.   Yes, it was.

12  Q.   And which character in the book is referenced most

13  favorably?

14  A.   The case officer who was handling the Merlin asset.

15  Q.   And who was that in reality?

16  A.   Jeffrey Sterling.

17  Q.   Chapter 9 also references two specific events:  the trip

18  to Vienna and the San Francisco meeting.  Do you recall those?

19  A.   I do.

20  Q.   Relative to Mr. Sterling's time as the case officer, did

21  those events -- strike that.

22        Where do those events fall relative to Mr. Sterling's

23  time as the case officer for Merlin?

24  A.   The San Francisco meeting occurred at the beginning of

25  Jeffrey Sterling's time as the case officer for this asset and

1    operation, and the operation carried out in Vienna in

2    February-March of 2000 falls toward the end of his time as the

3    case officer.

4    Q.   The fact about the Sonoma trip, in the course of your

5    investigation, did you determine whether that was known to

6    Mr. Sterling?

7    A.   It was.

8    Q.   And the fact about the postman in Vienna, was that known

9    to Mr. Sterling?

10   A.   It was.

11   Q.   Did those facts and the additional details about the San

12   Francisco meeting and the Vienna trip influence the direction

13   of your investigation?

14   A.   Yes.

15           MR. OLSHAN:  May I have a moment, Your Honor?

16           THE COURT:  Yes, sir.

17   BY MR. OLSHAN:

18   Q.   You testified that you obtained phone records from

19   Mr. Stone; is that correct?

20   A.   Yes.

21   Q.   Were those phone records for his personal phone numbers or

22   his Senate phone numbers or both?

23   A.   I tried to obtain records for all of the numbers, both

24   his, his residence and his number at the Senate.  I'm not sure

25   that -- well, I collected some of those records in 2003 and

1    some of them later.

2    Q.   When you testified that SSCI was not cooperative as an

3    organization, did that include the lawyers for the Senate not

4    being cooperative?

5    A.   Yes.

6               MR. OLSHAN:  That's all.

7               THE COURT:  All right, recross?

8               MR. MAC MAHON:  Briefly, Your Honor.

9                         RECROSS EXAMINATION

10   BY MR. MAC MAHON:

11   Q.   Ma'am, whatever records you got from Mr. Stone, you were

12   never able to document the call that he said he got from

13   Mr. Risen right at the same time when the, after Mr. Sterling

14   had met there, correct?

15   A.   That's correct.

16   Q.   So you're not able to tell the jury how long that phone

17   call was?

18   A.   No.

19   Q.   You can't, you can't tell them what the originating number

20   was or the terminating number, correct?

21   A.   I have no records that reflect that call.

22   Q.   And that's a fact that you learned in early 2003 from

23   Mr. Stone, correct?

24   A.   No.

25   Q.   Well, how long did it take for Mr. Stone to tell you that

1  he'd spoken to James Risen?

2  A.   I did not see the memorandum that documented the call

3  until March of 2005.

4  Q.   And in March of 2005, you were still investigating this

5  case completely, right?

6  A.   Yes.

7  Q.   Okay.  And you had written about Mr. Sterling in 2003,

8  hadn't you, the same time you're telling in answer to

9  Mr. Olshan's questions that you were hearing some hearsay about

10  Mr. Sterling's lawyers?

11  A.   I'm sorry, what's the question?

12  Q.   You said you had heard some hearsay that Mr. Sterling's

13  lawyers were talking about him at the CIA, correct?

14  A.   What I said is that his attorneys went to the CIA on

15  February 24.  At that time, they did not name Jeffrey Sterling.

16  Q.   All right.  But on April 12 of 2003, you wrote a memo

17  about Mr. Sterling, and you said that it was unlikely that it

18  was Mr. Sterling who was the leak, correct?

19  A.   If I wrote that at that time, then that was based on the

20  information I had at that time.

21  Q.   Right.  You said that it's unlikely that someone who has

22  already attempted to settle an EEO lawsuit for a few hundred

23  thousand dollars would choose to attack and enrage the

24  organization from which he seeks but has not yet received a

25  settlement.

1            That's your writing, isn't it?

2   A.    I don't know.  You haven't shown me the document.

3   Q.    And you also in the same document dismiss your concerns

4   about Mr. Zaid and Krieger, correct?  You don't remember that?

5   A.    I don't know.  It was 12 years ago.

6   Q.    And in the last 12 years, you still haven't come up with

7   any proof that Mr. Sterling ever talked to Mr. Risen about

8   Classified Program No. 1 or Merlin, right?

9   A.    Correct.

10           MR. MAC MAHON:  That's all, Your Honor.  Thank you.

11           THE COURT:  All right, thank you, Agent.  You may

12  step down.

13                        (Witness excused.)

14           *         *         *         *         *

15

16

17

18

19

20

21

22

23

24

25

1              *         *         *         *         *

2                      (Defendant present, Jury out.)

3          THE COURT:  Let's go to the charge itself.  So I'm

4  going to take out, obviously, those instructions that relate to

5  the mail fraud.

6          And let's start with the government's proposed

7  verdict form.  Is there any objection to the verdict form?

8  Obviously, we'll amend it so that Count 8 comes out.

9  Anything -- I hope you-all looked at it carefully.

10         MR. MAC MAHON:  Your Honor --

11         THE COURT:  I'm going to -- I'm sorry, I'm going to

12  take off of the verdict form the listing of the counts under

13  criminal number.  We don't need that on the verdict form.

14         MR. TRUMP:  We will remove that from the verdict

15  form, Your Honor.

16         THE COURT:  All right.  And Count 8 needs to come

17  out.

18         Was there anything -- I think the rest of it is

19  clear.  Now, you know, the verdict form itself doesn't

20  differentiate the specifics of each count, but because the jury

21  instructions are going to go into the jury room and in the

22  explanation of the charges, because I double-checked this, the

23  government does have the date and the specifics as to each

24  count, so the jury, if they take those instructions with the

25  verdict form, should be able to sort out what we're talking

1      about, all right?

2            But, Mr. MacMahon, did you-all get a chance to really

3      look at this carefully?

4            MR. MAC MAHON:  Yes, Your Honor.  I don't think that

5      the list of the charges needs to go at the top.

6            THE COURT:  Right.  We're going to take that out.

7            MR. MAC MAHON:  This part's going to come out.  Then

8      we don't object to the verdict form, Your Honor.

9            THE COURT:  All right.

10           MR. TRUMP:  I just want to note that in reviewing the

11     instructions last night and taking out the headers and the

12     footnotes, we gave you a packet as they existed before, but I

13     also handed to your clerk a suggestion for the definition of

14     "NDI" in terms of the national defense information defined.

15           THE COURT:  Go ahead.  And?

16           MR. TRUMP:  And in the first paragraph, which reads,

17     "For Counts 1, 2, and 4 through 7, the term 'information

18     relating to the national defense,'" included the

19     phrase "including matters relating to the nation's intelligence

20     capabilities."  That's out of *Gorin*, *Boyce*, *Truong*, *Rosen*.

21           All of those cases discuss the fact that national

22     defense information is not limited to military matters, but I

23     think -- I don't want to misquote Judge Ellis, but I think his,

24     his quote from his written decision was that it includes all

25     matters relating to foreign policy and, and intelligence.

1          So I think just adding that phrase, "may reasonably

2   be connected with the national defense of the United States

3   against any of its enemies, including matters related to the

4   nation's intelligence capability," is consistent with the law.

5          THE COURT:  All right.  Does defense want to address

6   that, Mr. MacMahon?

7          MR. MAC MAHON:  Yes, Your Honor.  The form

8   instruction is sufficient.  A lot of these instructions are

9   leading, are kind of leading the jury to a certain position.

10  The term "national defense information" describes itself.  I

11  don't think it's necessary for you to add to the instruction

12  things that expert witnesses have said here or otherwise

13  because --

14         THE COURT:  Well, we're not.  It's what other

15  colleagues have said, and it's been not reversed by the Fourth

16  Circuit, but I think because the word "defense" is in that

17  heading, it could mislead the jury, and they do need to

18  understand that it doesn't just affect the military.  It also

19  does relates to intelligence sources.

20         So, I mean, you know, I don't think it's a

21  misstatement of the law, and I think it helps clarify things

22  for the jury.  If it's wrong on the law, you need to make sure

23  you've told me.

24         MR. MAC MAHON:  No, it's wrong on the law in the

25  sense that we're describing what the statute, what the statute

1    reads, and then we're adding words to it in the sense that

2    tailors itself to what the government thinks it's put on in its

3    case.  That's what I --

4              THE COURT:  All right.

5              MR. MAC MAHON:  It's not a misstatement of law.  I

6    just don't think that it's necessary, and it's unduly

7    prejudicial as it indicates.

8              THE COURT:  Mr. Trump?

9              MR. TRUMP:  I could just -- I have the quote from the

10   *Morison* case and the *Rosen* case, and Judge Ellis summarizes

11   *Morison* and *Truong* and says, "The phrase 'information related

12   to national defense' has consistently been construed broadly to

13   include information dealing with military matters and more

14   generally with matters relating to the United States foreign

15   policy and intelligence capabilities."

16             THE COURT:  Yeah, I'm going to let it -- I'm going to

17   keep that in.  That's not an improper statement of law.

18             All right, there was an objection to the government's

19   definition of "possession," and again, is "possession" a term

20   of art in these statutes any different from any other criminal

21   statute?

22             MR. MAC MAHON:  Can we go back, Your Honor?

23             THE COURT:  I'm sorry.

24             MR. MAC MAHON:  I'm sorry, but in the definition of

25   "national defense information," and I think you were looking at

1   the government's exhibit, the last sentence says, "Finally, a

2   person 'not entitled to receive' NDI can include the press or a

3   member of the press."  I haven't --

4        THE COURT:  I can leave that out.  That's not part of

5   the definition.

6        MR. MAC MAHON:  Okay.  Thank you, Your Honor.

7        THE COURT:  I mean, all right, we'll strike that from

8   it, okay?

9        All right, now, there was an objection by the defense

10   to the government's proposed possession instruction, and my

11   question is why are we not just using the standard instruction

12   for possession?

13        MR. MAC MAHON:  Your Honor, I'm sorry, what

14   instruction is that?

15        THE COURT:  The number?  You objected to it, so --

16        MR. MAC MAHON:  I know.  I can't tell.

17        MR. OLSHAN:  It's 8.  8, Your Honor.

18        THE COURT:  No. 8?  I took your numbers off.  My

19   problem is I pulled it out of my set because I didn't like it,

20   either.

21        MR. MAC MAHON:  Yes, Your Honor.  Our objection is

22   that the standard instruction would be fine.  This goes into

23   too much theory of the government's case as to what constitutes

24   possession.

25        THE COURT:  Now, the only thing is that we're

1    really -- at no point are we talking joint possession in this

2    case.  We're talking actual or -- actually, we're just talking

3    actual construction, aren't we?

4              MR. MAC MAHON:  That's all I understand, Your Honor.

5              THE COURT:  Who's addressing possession?  Mr. Olshan?

6              MR. OLSHAN:  Your Honor, I think the definition of

7    "lawful possession" and "unauthorized possession" are important

8    to keep in here.  They are terms that appear in the statute as

9    to whether the defendant lawfully possessed information versus

10   unlawfully possessed a document or tangible item, so it is

11   necessary to instruct the jury as to the distinction between

12   "lawful possession" and "unauthorized possession," and in order

13   to discuss either of those, you have to get into who is

14   permitted to have possession of this type of information, and

15   that's individuals with a need to know.  That's what the 793

16   offenses get at.

17             MR. MAC MAHON:  Just briefly, the evidence in this

18   case, Your Honor, is that after maybe it's May 1 of 2000,

19   Mr. Sterling was not authorized to have any of this

20   information.  So the government has to prove that he actually

21   possessed this information at some point in time after he

22   was -- so to get into all these -- the actual facts of the case

23   are actual possession that had to have continued past the time

24   he was allowed to have it, there is no argument that he had a

25   need to know after that date.

1          THE COURT:  Well, actual possession basically is the

2    person who knowingly has direct physical control over a thing

3    at a given time.  That's actual possession.  So we -- that does

4    need to be in that definition.  That's the core of the

5    possession instruction.

6          MR. OLSHAN:  May I have a moment to confer with my

7    colleagues?

8          THE COURT:  Yeah.

9          MR. OLSHAN:  Your Honor, as we read it, lawful

10   possession does need to be changed.  Half of the counts that

11   are 793 counts deal with the defendant's unauthorized

12   disclosure of information.

13         Obviously, when you leave the employment of the CIA,

14   you cannot purge your brain of information that you know.  It's

15   retained there, and you are in lawful possession of it so long

16   as you don't disclose it in some unauthorized fashion.

17         So the definition as it currently reads does need to

18   be changed because "lawful possession" does not mean possession

19   of classified information by a person who holds an appropriate

20   security clearance and has a need to know.  That's not the case

21   when somebody leaves their employment with the CIA or anywhere

22   else.  They are still in lawful possession of it regardless of

23   whether they had the sufficient clearance.

24         So that the definition should be something more akin

25   to "lawful possession" means possession of classified

1   information that a person obtained while they held the

2   appropriate security clearance and had the need to know.

3          THE COURT:  We're going to get into a degree of

4   complexity here because we're talking both information in the

5   head and physical documents, two different types of

6   information.  So I want both sides to sit down and think about

7   this, but the possession instruction needs to be redrafted.

8   I'll take a crack at it as well, all right?  Okay.

9          MR. MAC MAHON:  Thank you, Your Honor.

10          MR. TRUMP:  I assume, Judge, there's no debate that

11   information can be possessed.

12          THE COURT:  Of course.

13          MR. TRUMP:  That's not the issue.

14          THE COURT:  No, that's not the issue.

15          MR. TRUMP:  That's been well settled in terms of the

16   case law for decades, that you can possess classified

17   information.  It doesn't have to be a tangible possession.

18          THE COURT:  Correct.

19          MR. MAC MAHON:  The difference here, Judge, is there

20   are charges dealing with tangible evidence.

21          THE COURT:  It's both.  It's both.

22          MR. MAC MAHON:  Yes.

23          THE COURT:  That's the problem.  There's a tangible

24   evidence charge, and then there's just information.

25          MR. OLSHAN:  Right.  So that's why the distinction

1    does make a difference, and just giving a possession charge

2    might not provide the jury with the appropriate instruction as

3    to the fact that there is a distinction between lawful

4    possession and unlawful possession.  Lawful possession deals

5    with information.  Unlawful possession deals with tangible

6    items such as a letter that the defendant retained when he

7    left.

8            THE COURT:  Well, again, we're here to try to help

9    the jury reach an appropriate decision in light of the correct

10   law and facts, and so it doesn't help if you give me a

11   muddled-up instruction.

12           MR. OLSHAN:  Well, we agree.

13           THE COURT:  So we need to get that one clarified.

14           While you're on your feet, Mr. Olshan, what about

15   this aiding and abetting issue?  Because again, you've got

16   Section 2, I think, in every one of these counts.

17           MR. OLSHAN:  Your Honor, we're not asking for a

18   specific aiding and abetting instruction.  The only utility to

19   Section 2 in this case would be 2(b), which is the causation

20   prong, when you willfully cause an innocent intermediary to

21   effectively complete the crime.  Because 793, as I mentioned

22   before, already has in its statutory language causes, there's

23   no need to provide a separate instruction on Section 2(b).

24           THE COURT:  All right, does the defense agree with

25   that?

1          MR. MAC MAHON:  Well, Your Honor, I don't know how

2    Mr. Risen has gone as far as he is now to he's completely

3    innocent of involvement in this.  The charge of mailing the

4    book, I mean, I know that's out of it now, but the receipt of

5    all this information, the jury will hear, was, was a crime in

6    and of itself if Mr. Sterling wasn't authorized to release it,

7    but if the government is totally giving up on that Mr. Sterling

8    aided and abetted any crime and then can't use the acts that

9    Mr. Risen undertook, that would be the -- it would be

10   abandoning Mr. Risen as a player in determining the guilt in

11   this or innocence on any one of these charges, because I don't

12   understand why it was in there in the first place if Mr. Risen

13   isn't considered to have been, the term was inextricably

14   involved in these crimes.

15          So I'm not sure I understand the answer.  Is the

16   government abandoning any possibility that Mr. Sterling

17   assisted Mr. Risen in committing a crime?

18          THE COURT:  That's not -- no one has argued the case

19   this way.  I mean, that wasn't in either side's opening

20   statement, that Risen himself committed any crime.

21          MR. MAC MAHON:  That would be -- but if he aided and

22   abetted, he'd have to aid and abet somebody who did commit a

23   crime.

24          THE COURT:  Correct.  Look, the government didn't

25   actually use the language "aid and abet."  I just noted,

1    however, you've cited to that section in all these counts in

2    the indictment, and I wanted to make sure, I mean, you have the

3    right as the agency bringing the case to dismiss or to reduce

4    the charges.  If you were telling me you're dismissing the "and

5    to" portion of the charges, that's fine.  It's dismissed, and

6    we don't need to get into aiding and abetting.

7            MR. MAC MAHON:  That's fine, Your Honor.

8            THE COURT:  All right?

9            MR. OLSHAN:  Your Honor, just to be clear --

10           THE COURT:  If the statute says "causes," if within

11   793 it says "and causes something to be the case," then you've

12   got it within the statutory language of the principal offense,

13   and you don't need a separate aiding and abetting instruction,

14   nor did you need to even cite to that section when you indicted

15   the case.

16           MR. OLSHAN:  That's correct.  As the Court is aware,

17   even if there were a true aiding and abetting theory in the

18   sense that Mr. Risen would have been participating in the

19   crime, you still don't even have to cite Section 2 for it to be

20   instructed.

21           Here any Section 2 theory was causation, which is

22   2(b), not 2(a).  So the Court is correct.  Nobody has argued

23   that Mr. Risen was a participant in the crime; rather,

24   Mr. Sterling caused Mr. Risen to communicate this information,

25   and that is contained in Section 793, and the causation

1    instruction that we submitted accounts for that.

2           THE COURT:  And therefore, I don't need a 2(b)

3    instruction.

4           MR. OLSHAN:  That's exactly right, Your Honor.

5           THE COURT:  Excellent, all right.

6           MR. OLSHAN:  I think they're quite similar, but there

7    does not need to be a separate one.

8           THE COURT:  All right.  And I don't believe the

9    causation one was a problem for the defense, correct?

10          MR. MAC MAHON:  I did these objections a couple

11   nights ago, Your Honor; I'm sorry.

12          THE COURT:  That's all right.

13          MR. MAC MAHON:  I think we did object to the

14   instruction as it was written.  I don't have my objections

15   here.

16          THE COURT:  All right, you don't have a set?

17          MR. MAC MAHON:  Not of the objections.

18          THE COURT:  Well, all right, we'll print one out for

19   you so you've got it, but let me -- I want to go through your

20   objections now so that we don't have an issue down the road,

21   and I want to, I want to focus primarily on the specific

22   instructions.  This would be on page 3 of your objections.

23          I told you yesterday I was not going to grant your

24   request to not instruct on the nature of the charges, and you

25   raised that with, with all of them.  That's -- the standard

1   practice in this court is to give some kind of instruction as

2   to nature of the charges, and I told you the alternative to

3   that was sending in the indictment, which I know you don't want

4   the Court to do, correct?

5          MR. MAC MAHON:  That's correct.

6          THE COURT:  All right.  So we're going to go ahead,

7   and I think the government's brief summary of each count was

8   sufficient.  That's what they submitted, and I intend to go

9   with what they submitted.  So those objections are overruled.

10          Then you had an objection to 8.  I think we've just

11   addressed that one, but let me just make sure.  That's

12   possession.  So we're working on possession.  So that objection

13   is, it's fine.  We're going to work on that.

14          You objected to No. 9, which was the national defense

15   information.  We've been through that one as well.  I'm

16   striking the reference in the last sentence to the press, and

17   we are adding the intelligence information that was submitted.

18   So 9 has been taken care of.

19          With 10, reason to believe, your only objection to

20   that is you think it misstates the law and it's unduly

21   suggestive of guilt.  I think "reason to believe" is part of

22   the language in the, in the charging document.  That does have

23   to be explained to the jury.

24          So why is it a misstatement of the law?  What law do

25   you have that suggests that that's a misstatement?

1    MR. MAC MAHON:  Your Honor, I think the objection is

2 just to the last paragraph.  The reason to believe is a common

3 term that I've seen before, but the government does not have to

4 prove, that could be used both to, that kind of language, we've

5 got at lot of this in these instructions where they're telling

6 the jury what they don't have to find, which is what, what I've

7 objected to as we go along.

8    The jury should be instructed what they do have to

9 find and not led away in other directions.  It's obviously

10 adapted from the model jury instruction.  The model would be

11 fine.

12    THE COURT:  Let me take a look.  The problem is that

13 I pulled them out of order because I -- I don't know why the --

14 I mean, the explanation of disjunctive versus conjunctive, I

15 think, is proper, but there's no issue in this case about a

16 non-enemy country being involved.  I mean, the whole question

17 has been Iran and Russia, right?  And so I don't know why we

18 need that last sentence starting with "Further."

19    You have no objection to the first paragraph.

20    MR. MAC MAHON:  No, Your Honor.

21    THE COURT:  All right.

22    MR. MAC MAHON:  I think that's the form.  I think

23 that's from the model.

24    THE COURT:  What's the defense response --

25 government's response to that?

1          MR. OLSHAN:  I'm sorry, Your Honor, the defense's

2    objection was just to the second sentence?

3          THE COURT:  It's -- well, they have a problem in

4    particular with, I think, the last sentence of the second

5    paragraph, "Further."

6          MR. MAC MAHON:  The last two sentences, Your Honor, I

7    think is what I said.

8          THE COURT:  The law two sentences.  The first two

9    sentences in the second paragraph are correct.  "The statute

10   reads in the alternative, so proof of either will suffice," and

11   then the first sentence, you know, explains what the two

12   alternatives are.

13         MR. OLSHAN:  Right.  That's fine, Your Honor.  The

14   statute does say "foreign nations," so it's enough to leave it

15   at that without breaking into --

16         THE COURT:  Fine.  So I'm getting rid of the -- that

17   instruction is going to go as is, with the last two sentences

18   starting with the word "Further" to the end is stricken.

19         All right, Mr. Pollack?

20         MR. POLLACK:  I'm in agreement with that.  I have a

21   slightly separate point to make.  If the jury is going to be

22   instructed they can find either or, then they should also be

23   instructed that they have to be unanimous on which one they

24   find.

25         MR. OLSHAN:  No.  Your Honor, many statutes are

1    charged in the disjunctive, and there's not a standard

2    instruction that they must agree as to the specific means

3    establishing -- excuse me, many -- yes, that's right.

4              THE COURT:  Well, we can make a special verdict form

5    and see what they find.  I mean, that's the other option on

6    that one, although I don't think -- unless you've got case law

7    that they have to be unanimous as to which one they find, I

8    think I'm going to leave it as is, because as a normal course

9    of business, you don't have to tell the jury.  You do for overt

10   acts in a conspiracy, they have to be unanimous on the, on

11   the -- or do they?  They don't have to be unanimous on the

12   overt act, do they, in a conspiracy charge?

13             MR. TRUMP:  They just have to have unanimously

14   decided there's at least one overt act.

15             THE COURT:  That an overt act, yeah.  That would be

16   consistent with finding either alternative.

17             MR. TRUMP:  There's no case law that suggests as to

18   this type of element, that a special verdict is necessary.

19             THE COURT:  Yeah.  No, we're going to leave it as is.

20   All right, okay.

21             Then the next objection was to 10, which I think is

22   willful, right?  I lost your numbers when I started redoing

23   these, yeah.

24             MR. OLSHAN:  I think we may have just finished 10.

25   10 was reason to believe.

1          THE COURT:  Okay.

2          MR. POLLACK:  11 is willful.

3          THE COURT:  Okay.  And they've objected to 11 as

4  well.

5          MR. MAC MAHON:  "Willfully" is a term you use all the

6  time in instructing jurors, Your Honor.  This additional

7  language -- I'm sorry, Your Honor, can I sit down?

8          THE COURT:  Yes, whatever makes you comfortable.  I

9  can hear you.

10          MR. MAC MAHON:  I'm sorry.  But the in deciding

11  willfully, you may consider all the evidence introduced at

12  trial, including any evidence concerning the classification

13  status of information.

14          THE COURT:  Yeah, you're right; that shouldn't be in

15  there.  That's coming out, all right.

16          And again, 12 was the nature of offenses, so that's

17  not going in.  13, 14, 15, there was no objection.

18          16.  All right, now, we've already defined "national

19  defense information," so I don't think that's a problem, right?

20          MR. OLSHAN:  I'm sorry, which instruction, Your

21  Honor?

22          THE COURT:  Well, I think I have the right number.

23  Again, as I said, I got rid of these numbers.  Instruction

24  No. 16, what's your 16?

25          MR. POLLACK:  Willful retention, the definition of

1    "willful retention," Your Honor.

2             THE COURT:  The next one, all right.  Willful

3    retention, all right.  And what is the problem with that?

4             MR. POLLACK:  Okay.  The first sentence in this,

5    well, I guess it's the entirety of the second paragraph, it's

6    the same issue we just dealt with.  It's about classification.

7    There's already a separate instruction on classification.

8             THE COURT:  All right, so that whole paragraph should

9    come out.

10            MR. POLLACK:  Agreed, Your Honor.

11            THE COURT:  Second paragraph.

12            MR. POLLACK:  And then in the third paragraph, the --

13   nothing -- no objection to the first sentence, which is

14   repeating what's already been instructed, but I do object to

15   the last portion, the "Unlike."  Again, highlighting what the

16   government does not have to prove as opposed to simply

17   instructing what they do have to prove for this count, there's

18   no need to do a compare and contrast of the different counts.

19   The jury will have the instruction for each count.

20            So I, I would ask Your Honor to just strike

21   everything from "Unlike the intent element" forward.

22            THE COURT:  I think this is necessary to distinguish

23   this count from the other ones because there are differences,

24   and without this, it doesn't distinguish it.

25            MR. POLLACK:  If the -- understanding the Court's

1    ruling in that regard, then I would suggest where you say,

2    "Unlike . . . for Counts 1, 2, and 4 through 7, the government

3    does not have to prove," I would insert "for purposes of Count

4    3, that the defendant," etc., so that it's clear that this

5    instruction only pertains to Count 3.

6              THE COURT:  All right, I assume the government

7    doesn't object to that?

8              MR. OLSHAN:  No, Your Honor.

9              THE COURT:  All right, that will be added to that

10   one.  All right.

11             All right, the ones about mail fraud come out.  So

12   we're moving on to the objection to property, instruction

13   No. 19?  I don't have my index here.  Hold on a second.

14             MR. POLLACK:  That still relates to the mail fraud,

15   Your Honor.

16             THE COURT:  That's right; that's out.  Then false

17   pretenses, that's out, too, right?

18             MR. POLLACK:  Correct.

19             THE COURT:  Okay.  And material is out.  "Willfully"

20   has been defined.  "Knowingly" has been defined.  Mailing is

21   out.

22             MR. POLLACK:  27, I think, Your Honor, is the next

23   one that we need to deal with.

24             THE COURT:  27?  What, the nature of the offense

25   charged?  No, I've already ruled that I'm going to allow that

1    unless you're maintaining the government's mischaracterized the

2    offense, and I don't think they have.

3              All right, thing of value was, I think, you're

4    objecting to thing of value, is that right, your objection on

5    31?

6              MR. POLLACK:  Yes, Your Honor.  It seems like this

7    instruction almost directs a verdict on this element when you

8    say, "Classified information is a thing of value to the United

9    States."

10              THE COURT:  I think that sentence should come out.  A

11   thing of value can be anything, including oral information or

12   intangible property, that has value.

13              MR. POLLACK:  Okay.  I understand.  Thank you, Your

14   Honor.

15              THE COURT:  All right?  Unless I hear a strong yelp

16   from the government, it's coming out.

17                          (No response.)

18              THE COURT:  All right.  All right, 33.

19              MR. OLSHAN:  Your Honor, 33 relates back to 25, which

20   was originally in the wire fraud set of charges.

21              THE COURT:  You mean mail fraud?

22              MR. OLSHAN:  Excuse me, mail fraud.

23              THE COURT:  All right, hold on.

24              MR. OLSHAN:  So our position would be that the full

25   knowingly instruction would need to be moved back to this

1    count.

2           THE COURT:  I'm just going to give the standard

3    instruction for knowingly, all right?  So that one shouldn't be

4    a problem.

5           Okay.  33, 34, 35.

6           Okay.  36, the essential elements of the offense for

7    obstruction of justice, the defense says that this is

8    incomplete.

9           MR. POLLACK:  Your Honor, before we get to that?

10          THE COURT:  Yeah.

11          MR. POLLACK:  34, I understand the Court's ruling

12   that it is going to give a nature of the offense instruction,

13   but in 34, the sentence in the middle that begins with, "The

14   defendant deleted this e-mail," I think should read, "The

15   defendant is alleged to have deleted this e-mail."

16          THE COURT:  Yes.

17          MR. OLSHAN:  Your Honor, it should also say "that had

18   a CNN article," not "*Newsweek*."

19          THE COURT:  I'm sorry, not *Newsweek*.  Yes, it should

20   be CNN.  And it attached as --

21          MR. POLLACK:  Had a link to a CNN article.

22          THE COURT:  That linked to --

23          MR. OLSHAN:  Thank you.

24          THE COURT:  -- a CNN article about the Iranian, okay.

25          All right, with those two corrections then, there is

1  no objection, correct, to the form of the instruction; is that

2  right?

3       MR. POLLACK:  Other than the objection we've already

4  made to giving a nature of the offense instruction.

5       THE COURT:  Correct.  Okay.  All right.  So that took

6  care of 34.  There was no objection to 35.

7       36, all right, you're objecting to the elements.  All

8  right, and what is the, what is the objection here?  It does

9  say "four essential elements," and you list three, so there's a

10 mistake in the instruction.

11      MR. MAC MAHON:  That was the basis for the objection,

12 Your Honor.

13      THE COURT:  So it should be three essential elements.

14      MR. MAC MAHON:  There's a form instruction that has

15 this charge, I know for sure.

16      THE COURT:  The government took this, did you not,

17 directly from a form instruction?

18      MR. MAC MAHON:  It doesn't appear to be, Your Honor.

19 It may have but --

20      MR. POLLACK:  The citation is to case law, not to any

21 form book.

22      THE COURT:  Well, I'll check the form book.  If it's,

23 if it's there, that's what I'm going to use.  All right, we'll

24 take a look at that one.

25      There was no objection to 37.  38 --

1          MR. POLLACK:  Actually, Your Honor, with respect to

2    37, again, the government gives no citation whatsoever for

3    where this is coming from.  I would have to assume there's a

4    form instruction for an official proceeding that would go along

5    with the form instruction for obstruction.  Boy, that's tough.

6          THE COURT:  Well, if not, I could almost take

7    judicial notice a grand jury investigation is an official

8    proceeding.  So do you want me to just take official notice and

9    tell the jury that?

10         MR. POLLACK:  No, Your Honor.  I don't think the

11   Court can direct a verdict of guilt on an element of the

12   offense.  I think there is a standard instruction, and that's

13   what ought to be given.

14         THE COURT:  Well, but even if there isn't a standard

15   instruction, I'm not uncomfortable telling the jury that a

16   grand jury proceeding would be an official proceeding.  I will

17   look to see if there is an instruction just to put your minds

18   at ease.

19         MR. POLLACK:  If the Court is inclined to do that,

20   then I will ask the Court to say that the jury may find that a

21   grand jury -- the Court cannot instruct the jury --

22         THE COURT:  I will look and see.  Some of these

23   instructions say, you know, official proceedings include such

24   matters as blah, blah, blah, blah, all right?  I'll take a look

25   at that one.

1           MR. POLLACK:  Thank you, Your Honor.

2           THE COURT:  All right.  And 38 you also objected to,

3    and again, you just want a form instruction.  Of course, you

4    didn't give me the form instruction, so these are not really

5    appropriate --

6           MR. POLLACK:  Well, this one, Your Honor, again,

7    there's a sentence at the end about what the government does

8    not have to prove that I don't believe is part of the form

9    instruction.  I haven't been able to look, but they cite a form

10   instruction, and they cite a number of cases, but again, the

11   first part of the instruction properly instructs the jury what

12   it does have to find.  The latter sentence says what they don't

13   have to find.

14          THE COURT:  Well, you know, some standard

15   instructions do have they don't have to prove certain things.

16   If you look at the conspiracy statute, there are a whole lot of

17   things that say the government doesn't have to prove that the

18   conspiracy was successful or that the defendant knew about it

19   at the beginning.  So it doesn't necessarily mean that this is

20   improper.

21          Mr. Olshan?

22          MR. OLSHAN:  That's exactly the point I was going to

23   make, Your Honor.  Many form instructions say exactly that, and

24   that proposition is not controversial that the act of

25   obstruction is not needed to actually obstruct.

```
 1              THE COURT:  I'm sure that's a correct statement of
 2    the law.  I'll just look at the form book.  If it's slightly
 3    worded differently, I'll change it.  Otherwise, it may go in
 4    just the way it is, all right?
 5              All right, you didn't like the causation instruction,
 6    which is 39, and what specifically don't you like about the
 7    causation instruction?  And this is your Section 2(b)
 8    instruction.
 9              MR. MAC MAHON:  Your Honor, again, I think there's a
10    form on causation here, and I just think when you get to the
11    end of this, again, more than half of the instruction is on
12    what they don't need to prove.
13              THE COURT:  All right, I will --
14              MR. MAC MAHON:  And that's a term that we use to
15    instruct juries all the time:  does not need to perform the
16    crime of unauthorized disclosure.
17              THE COURT:  All right, I'll look at it.
18              MR. MAC MAHON:  I mean, I don't know why you would
19    tell the jury that.  The whole government's case is that that's
20    what he did, that he was present, that he was aware.  I mean,
21    these are things that are reducing really the thought of what,
22    the willfulness also that needs to be proven.
23              THE COURT:  Well, this reads like a model
24    instruction.  Again, I didn't compare these to the form book,
25    but you've got here, ". . . a general suspicion that an
```

1   unlawful act may occur or that something criminal is happening

2   is not enough.  Mere knowledge that the unauthorized disclosure

3   of national defense information is being committed without more

4   is also not sufficient to establish causing an act to be done

5   through another."

6           So I think this reads pretty close to what that would

7   properly be.  I'll take another look at it.

8           MR. MAC MAHON:  And again, we would also ask that you

9   drop the Section 2.  Acts of another really aren't appropriate

10  in terms of what's being argued to the jury.

11          THE COURT:  Well, no, because they're saying that

12  within 793, there is cause to -- one causes it to happen.

13  Well, you cause something to happen usually because somebody

14  else or another actor has done it.  If you did it yourself, you

15  do it yourself.  If you cause it to happen, then there's

16  usually another player.

17          I'll take, I'll take a look at the instruction.

18          MR. MAC MAHON:  Just for the record, I think that

19  means if you go get somebody else, find somebody to hand the

20  information, you take it and get it out of the -- however it

21  would be done.  It doesn't -- it's not meant to be used in the

22  fashion here where we have a newspaper reporter or a book.

23  It's having a coconspirator inside the circle is the way I read

24  the statute.

25          THE COURT:  Well, if Mr. Risen were not protected by

1    the newsman's privilege, I suspect he'd have been named as a

2    coconspirator.  I mean, he is the, he is the vehicle by which

3    the information went out to the general public.

4            MR. MAC MAHON:  And there is no privilege, Your

5    Honor.  That's been established.  I'd cite to this case as well

6    for that.

7            THE COURT:  Well, you're talking to the wrong

8    authority for that.  I'm on record for a different reason, all

9    right.  Anyway --

10           MR. OLSHAN:  Your Honor, just to be clear, the theory

11   is that Mr. Sterling caused Mr. Risen to communicate this

12   information to the world.  That's the causation, not somebody

13   caused a document to be taken out of --

14           THE COURT:  No, I understand that.  I understand

15   that's your theory of the case.  And as I said, I think, I

16   think that instruction is probably correct, but I will

17   double-check it.

18           All right, Instruction 40 was also objected to, and

19   that was the definition of "classified information."  What's

20   the objection?

21           MR. MAC MAHON:  Well, first of all, the jury has

22   heard about two days' worth of the definition of "classified

23   information," but there isn't an element in any, any of the

24   charges in this case at all dealing with classified

25   information.  We've asked for an instruction, lesser included,

1    Your Honor, but instructing the jury on classified information

2    would confuse them as they look to see what's national defense

3    information because, of course, one could be national defense

4    information, not be classified, and then be classified and not

5    be the adverse, and the opposite would be true either way.

6           So I think it bolsters the government's case to

7    highlight to the jury any more than they already have what is

8    or isn't classified.

9           THE COURT:  Well, I think where this ought to be used

10   is along with the elements for those offenses, not here at the

11   very end, and it seems to me that the jury should know that

12   classified information is not equivalent to national defense

13   information, although I'm not sure actually that's a correct

14   statement of the law, either.

15          MR. MAC MAHON:  I think it is, Your Honor.

16          MR. OLSHAN:  It's correct that just by virtue of

17   being classified, it does not necessarily satisfy the NDI

18   standard, but it's certainly something the jury can consider in

19   determining whether the NDI standard has been met.

20          THE COURT:  Well, the NDI standard is what degree of

21   harm, because even at the Confidential level, the definition

22   that's in the record in this case is that it could cause harm,

23   correct?

24          MR. OLSHAN:  Correct.

25          THE COURT:  All right.

1          MR. OLSHAN:  I believe that the language for the

2    definition of NDI is just injury to the United States.  I don't

3    think it uses the same phrases that appear in the definitions

4    of the classification levels.

5          THE COURT:  But is harm any different from injury?

6          MR. OLSHAN:  In my mind, no.

7          THE COURT:  In the law, is there a distinction

8    between harm and injury?

9          MR. MAC MAHON:  There is potential anyway, Your

10   Honor.

11         MR. TRUMP:  Your Honor?

12         THE COURT:  Yeah.

13         MR. TRUMP:  In the case law, it's primarily been

14   discussed in the context of closely held and --

15         THE COURT:  Well, closely held may be different than

16   classified.

17         MR. TRUMP:  No, what I mean, Judge, is courts have

18   said that juries can consider the fact that a document or

19   information is classified in deciding whether the government

20   has met its burden to show that it's NDI, and it's primarily to

21   the point of closely held that that is a factor the jury can

22   consider as to whether information has been closely held is the

23   fact that it has been classified, it was under strict controls,

24   etc., etc.  That's why we put on all the evidence as to the

25   level of classification, the compartmentalized nature of the

1    information.

2              But the jury can be -- can consider the fact that

3    it's classified in determining whether the government has met

4    its burden to prove that it's NDI.

5              THE COURT:  All right.  Well, there's a typo in here

6    anyway, but I think again, there's nothing inaccurate about how

7    this instruction is written.  It's not giving a false statement

8    of the law, and I don't think that it's misleading the jury, so

9    I'm going to overrule that objection.  You have "fat" rather

10   than "fact," so I need to change that.  Okay.

11             Now, Instruction 41, you've objected to the

12   instruction about the chapter 9.

13             MR. OLSHAN:  Your Honor, this has been an issue

14   throughout the trial.  We do believe an appropriate instruction

15   on this topic is necessary.

16             THE COURT:  Well, let me hear from you, Mr. MacMahon

17   or Mr. Pollack, on that one.

18             MR. MAC MAHON:  Your Honor, I think this instruction

19   is improper.  They've put this whole chapter in evidence and

20   suggested that Classified Program No. 1 and Human Asset No. 1

21   are the national defense information that we're dealing with,

22   but what they're not -- that has to be true, the jury has to

23   find that that's actually proved to be national defense

24   information.

25             You know, we've heard a lot of stuff from many

1  witnesses about how inaccurate the book is in and of itself,

2  but for them to tell the jury that Mr. Risen writes about other

3  purported intelligence -- they haven't heard anything about

4  those other operations other than the two that we were allowed

5  to talk about, which was the one from 2004 and that the NSA

6  part is wrong.  They heard -- they didn't hear about anything

7  else.

8         But for the government to come in and say that

9  nothing in this book is true, that -- the government hasn't

10 confirmed the existence of these operations nor the truth of

11 what Mr. Risen says about this other operation, nor are they

12 required to do so, that puts a patina again of national defense

13 over this case, where really the confirmation of this book came

14 from the trial as what has really happened, but the jury

15 shouldn't be told anything else about these other parts of it

16 because it's just going to make it --

17        THE COURT:  Well, what --

18        MR. MAC MAHON:  -- look like there's more.

19        THE COURT:  All right, what about -- the first

20 sentence you have no problem with, telling them they can read

21 the whole chapter if they want.

22        MR. MAC MAHON:  No.  In fact, I'd expect that's the

23 first thing they're going to do.

24        THE COURT:  All right.

25        MR. MAC MAHON:  I don't think the rest of it's even

1    necessary.  It's, again, unduly suggestive.  They can have

2    their first -- I'm not sure why they need to be told they can

3    read the book.  They can read any exhibit they want.

4          THE COURT:  I think you're right.  I don't think

5    there's any need for this instruction at all.  It's just going

6    to the jury.  They've got the book.  They can do what they want

7    with it.

8          MR. TRUMP:  But --

9          THE COURT:  Wait.  That also means, though, that I

10   don't expect there to be argument about chapter 9 in that -- in

11   this respect.  In other words, if, if you start arguing

12   about -- especially I think this is more likely to come from

13   the defense than from the government:  If you start arguing

14   about other portions of chapter 9, then you open the door for

15   the Court instructing the jury as to how they have to approach

16   chapter 9.

17         MR. MAC MAHON:  Other than the two instances I just

18   discussed, Your Honor, which is the 2004, which we cleared with

19   you ahead of time, and then the NSA language on page 212, I

20   believe, those are -- they've asked witnesses about that as the

21   case has gone on.

22         THE COURT:  Mr. Trump?

23         MR. MAC MAHON:  Other than that, Mr. Pollack is doing

24   the closing, so I should defer to him on this, Your Honor.

25         THE COURT:  Mr. Trump?

1          MR. TRUMP:  Your Honor, it goes back to the way the

2     case has been charged.  The case has been charged with respect

3     to Classified Program No. 1 and Merlin, Human Asset No. 1.

4     That is the only burden the government has with respect to

5     chapter 9.

6          The jury's going to immediately see that there is

7     roughly 40-50 percent of that chapter that has nothing to do

8     with Classified Program 1 and Human Asset No. 1, and they're

9     going to be confused because there was no testimony about it,

10    there was no evidence about it.  Yet it's there, and they may

11    assume, incorrectly, that the way the case has been charged is

12    that everything in chapter 9 has come from this defendant to

13    Risen to the book, and that would be an incorrect assumption

14    for them to make.

15         They should be told that consistent with the first

16    sentence, "The government has alleged that chapter 9 contains

17    national defense information," that is a correct statement.

18    It's also correct that Mr. Risen writes about other matters --

19    I don't, I don't really care what phrase is used -- but writes

20    about other United States intelligence operations against Iran

21    in chapter 9.

22         That is a true statement, but those matters are not

23    at issue in this case, and the jury should be told as much,

24    because if they sit back there and read chapter 9, they're

25    going to wonder, What do we do with all this other stuff, and

1    why haven't we heard any evidence about it?

2              THE COURT:  All right.

3              MR. TRUMP:  If you -- if the Court wishes to stop at

4    the end of "you should not consider them in any way during your

5    deliberations," that's fine, but --

6              THE COURT:  I think maybe what we should say in the

7    second sentence is, "This case focuses solely on the -- this

8    case focuses solely on those parts of chapter 9 that deal with

9    Classified Program No. 1 and Human Asset No. 1."

10             MR. MAC MAHON:  But, Your Honor, if I may, we still

11   have these other two issues.

12             THE COURT:  But I said "focuses."  Now, if you raise

13   these other issues as two side issues, that's --

14             MR. MAC MAHON:  They go to source, Your Honor.

15             THE COURT:  I'm sorry?

16             MR. MAC MAHON:  I'll defer -- Mr. Pollack is doing

17   the closing so --

18             THE COURT:  The law is it doesn't make any difference

19   if Risen had ten sources.  If one of those sources was

20   Mr. Sterling and the information that he revealed was

21   classified, then he's guilty, all right?

22             So the fact that there are other sources of other

23   information in the book is really irrelevant.  That's a red

24   herring.  The question is are there other reasonable sources

25   for the information that's at issue in this case, and the fact

1  that there might have been a source about X project or Y

2  project is irrelevant to this case.

3              MR. POLLACK:  Your Honor, I think -- I don't think --

4              THE COURT:  Mr. Pollack, let me stop you for a

5  second --

6              MR. POLLACK:  Yes.

7              THE COURT:  -- because you've got clear evidence in

8  this case that Risen has said he had multiple sources.

9              You've got that in the preface, and you've had it in

10  other pieces of evidence here.

11             MR. POLLACK:  I understand, Your Honor.  I don't

12  think there, I don't think there really is as much of an issue

13  here as the Court may be concerned.  With respect to the NSA

14  information that's, that's -- that Risen writes about,

15  irrespective of whether or not it's accurate, that relates to

16  Classified Program No. 1, so that's not even an issue.

17             The only thing that doesn't relate to Classified

18  Program No. 1 that I plan to mention in argument is what has

19  already been said in the trial, which is that there is a

20  discussion of something that supposedly happened in 2004, and

21  to the extent that Mr. Risen had sources for that information,

22  certainly it wasn't Mr. Sterling, and the jury can infer from

23  that that it is less likely therefore that Sterling was a

24  source for the Classified Program No. 1 information.  In other

25  words, if Risen had a source that could tell him about both, he

1    could have gotten it from, from that source, and therefore,

2    it's less likely that he got the Classified Program No. 1 stuff

3    from Sterling.

4         So I fully understand that the fact that there are

5    multiple sources is not in and of itself a defense, and the

6    fact that other people might have committed crimes is never a

7    defense, but it goes to whether, the likelihood that

8    Mr. Sterling committed the charged offense, the fact that Risen

9    has sources that are not Sterling.

10        But it's just with respect to those first two cases

11   that have already been discussed with a couple witnesses now,

12   and I wouldn't do it in an argument any differently or any more

13   expansively than what's already been done.

14        THE COURT:  All right, I'm not going to give an

15   instruction on the book.  That whole exhibit is in.  You can

16   argue it.  It's perfectly proper for both sides to argue, focus

17   the jury's attention on what they have to pay attention to and

18   shouldn't, but I'm not going to do this.  So that one's out.

19   Okay.  Instruction -- that was 41, I think, yeah.

20        42 is multiple sources.

21        MR. POLLACK:  And on this, Your Honor, this goes back

22   to the point that we were just discussing.  There is a standard

23   instruction or at least a common instruction that is given that

24   evidence that somebody else might have committed a crime isn't

25   a defense and that you have to decide whether or not the

1    defendant committed the crime charged.

2            We have no objection to that kind of instruction

3    here, but this, this instruction as written, I think, is far

4    beyond what needs to be said on that topic and really is

5    suggestive that if you find that Mr. Sterling provided

6    anything, you have to find him guilty, and the jury does have

7    to find that there is national defense information, that they

8    can find beyond a reasonable doubt that that particular

9    national defense information came from Mr. Sterling, and I

10   think this instruction just goes too far in suggesting

11   otherwise.

12           So I would suggest replacing this with the

13   instruction -- an instruction that says that the fact that

14   other people might have provided him national defense

15   information is not relevant to your consideration.  That's not

16   a defense.  What you need to decide is did Mr. Sterling provide

17   him national defense information and has the government proven

18   that beyond a reasonable doubt or not.

19           THE COURT:  Well, what if we take this portion out?

20   This portion does seem to be a correct statement of the law

21   without any problems:  "For each of . . . Counts 1, 2, and 4

22   through 7, the government must prove beyond a reasonable doubt

23   each and every element of these offenses as I have explained

24   them to you.  The government, however, does not have to prove

25   that the defendant was the only person who communicated the

1    national defense information alleged in the indictment to James

2    Risen."

3            And then jump down to, "Your duty as jurors is

4    limited to determining whether the government has proved beyond

5    a reasonable doubt that the defendant committed the offenses

6    charged, irrespective of whether other persons may have

7    communicated the same or similar information to James Risen."

8            That's, I think, a fair statement of the law.

9            MR. OLSHAN:  That's fine for us, Your Honor.  My only

10   suggestion would be in that portion the Court read, that second

11   sentence that starts, "The government, however" --

12           THE COURT:  Yeah?

13           MR. OLSHAN:  --  it should probably end

14   with "indictment."

15           So it's "the only person who communicated the

16   national defense information alleged in the indictment," but

17   it's not just to James Risen in some of the counts.  Other

18   counts are to the public at large.

19           So rather than just focusing in on Risen, just leave

20   it as "the national defense information alleged in the

21   indictment," period.

22           THE COURT:  That's really getting subtle because, I

23   mean, every single disclosure was through the vehicle of

24   Risen's writing.

25           MR. OLSHAN:  That is correct, but the way the case is

```
 1    charged, the communication that matters for Counts 1 and 2 and
 2    6 and 7 is communication or attempted communication to the
 3    public.  So we would ask that the instruction, just leave it
 4    at, "The government, however, does not have to prove that the
 5    defendant was the only person who communicated the national
 6    defense information alleged in the indictment."
 7              THE COURT:  All right.  All right, Mr. Pollack, with
 8    those edits, are you comfortable then with the multiple
 9    sources?
10              MR. POLLACK:  I think we're getting close, Your
11    Honor.  I would --
12              THE COURT:  So we're not going to use the first
13    paragraph at all, I don't think.  Let's see.
14              Yeah, because the first paragraph repeats what we've
15    already said in the description of the offenses.
16              MR. OLSHAN:  That's fine.
17              THE COURT:  All right, so that's coming out entirely,
18    and so we would start again, the first sentence and the second
19    sentence, with the words "to James Risen" omitted, right?  The
20    first two sentences of paragraph 2.
21              MR. POLLACK:  Stop there, Your Honor.  The only
22    change I would say there is to change the word "communicated"
23    to "disclosed."
24              MR. OLSHAN:  I believe the statute has both words.
25              THE COURT:  Does it use both?
```

1          MR. OLSHAN:  "Willfully communicates, delivers,

2    transmits, or causes to communicate, be communicated,

3    delivered, or transmitted."  So it's not disclosed; it's

4    communicated.

5          THE COURT:  I'm going to leave "communicated" then if

6    that's what the language is.

7          All right, so we'll leave that in.  We're going to

8    get rid of the example and then go to the last sentence:  Your

9    duty as jurors is to determine whether the government.

10          MR. POLLACK:  And that last sentence, Your Honor, I

11    would end with "the offenses charge."

12          THE COURT:  "Whether the government has proved beyond

13    a reasonable doubt that the defendant committed the offenses

14    charged."  No, that has to be there.  "Irrespective of whether

15    other persons may have communicated the same or similar

16    information."

17          MR. POLLACK:  Well, you've already said, you've

18    already said, Your Honor, the government does not have to prove

19    that the defendant was the only person who disclosed the

20    national defense information alleged in the indictment, so I

21    don't think you need to repeat that again in that latter

22    clause.

23          THE COURT:  Well, I think it, I think it clarifies

24    it, so I'm going to go ahead and do it that way, all right?

25    Okay.  So that takes care of multiple sources.  We're almost

1    done.

2         43, well, motive was a significant issue in this

3    case, and it's not an element, but I think it's been discussed

4    enough that unless it's a mis-definition of motive -- let me

5    take a look here.

6         I mean, there's been the, been the nuance here of

7    whistleblowing.  I mean, that's certainly also floated in the

8    case from the defense standpoint, and the government has

9    discussed motive extensively.  Unless this is -- and I don't

10   think this is an incorrect definition of "motive."  I don't see

11   what the objection is.

12        Mr. Pollack?

13        MR. POLLACK:  May I have a moment, Your Honor?

14        THE COURT:  Yes, sir.

15        MR. POLLACK:  Your Honor, in the second paragraph,

16   certainly if the Court's inclined to give the instruction, in

17   the last sentence, where it says "may aid you in determining

18   that defendant's intent," I would add "or lack of intent," and

19   the last paragraph, which, I guess, is all one sentence, I

20   would strike the first part and just say the latter part, which

21   is that the presence or absence of motive is a circumstance you

22   may consider as bearing on the intent or lack of intent of a

23   defendant.

24        And it seems, I mean, it seems repetitive.  You could

25   probably just strike the last sentence of that second paragraph

1    in its entirety and just give that latter clause of the third

2    paragraph.

3            THE COURT:  All right, what's the government's view

4    of that?

5            MR. OLSHAN:  Your Honor, we believe that this is

6    appropriate as written.  Mr. Pollack's suggestion as for that

7    last sentence in paragraph 2, "The motive of a defendant is

8    irrelevant except insofar as motive may aid you in determining

9    that defendant's intent or lack of intent," suggests to the

10   jury that if you find he had some kind of good motive, then

11   that negates intent, but that's not what this instruction is.

12           MR. POLLACK:  I don't think it suggests that at all.

13   In fact, you're going to say explicitly to the contrary if you

14   give this instruction.  My, my point is the government can't

15   have it both ways.  If they want the jury to know that if they

16   buy the government's motive evidence, that they can consider

17   that in forming the view that the defendant did have the

18   intent, then equally if they don't buy the government's motive

19   evidence, they can consider that in finding that the government

20   hasn't proved intent.

21           THE COURT:  All right, I'm going to -- I know that

22   motive is a standard instruction.  I'm just going to look at

23   the books and see what they have, all right?  And I'm going to

24   use what they have in the book.

25           Okay.  Those were the specific instructions that you

1    had objections to.  As to 44, witness protective measures and

2    substitutions, redactions, you said they were already given,

3    they probably -- they do need to be given again, so let me tell

4    you, I have looked at those, and I'm going to give them --

5    again, I'm going to get you a set, you probably won't get them

6    for another hour or so, of the proposed charge, so you'll have

7    the whole thing, but just so you know, I am going to tell the

8    jury that the number of witnesses and the amount of evidence

9    submitted is not, you know, a deciding factor, so that's a

10   pretty standard instruction.

11           Here's what I wrote on witness protection measures.

12   "During this trial, you heard testimony from witnesses who are

13   currently employed by the CIA.  You also heard testimony from

14   former employees of the CIA, some of whom continue to work for

15   the CIA as contractors, and you have heard the testimony of

16   Human Asset No. 1 by video deposition and that of his wife.

17   These witnesses testified either by using only initials or

18   using a made-up name such as Merlin, and you were not told

19   their true names.  These witnesses also testified with a screen

20   preventing the general public from seeing them.

21           The disclosure of the witness's names and their

22   physical identity could potentially compromise either their

23   continued work for the CIA or expose them to safety issues.

24           As I explained to you, one of your roles as jurors

25   will be to assess the credibility of each witness who has

1    testified during the trial.  You should not make any judgments

2    about the credibility of those witnesses simply because they do

3    not -- you do not know their full names or because they

4    testified with the screen.  Moreover, you should not consider

5    the manner in which such witnesses testify as an expression of

6    my opinion as to any of the facts of this case.  It is your job

7    and yours alone to decide the facts of this case."

8              So I think that takes care of the protective measures

9    issue, and I'm assuming there's no objection to that.

10                        (No response.)

11             THE COURT:  Okay.  No objection was heard.

12             I'm going to give the standard instruction on the

13   effect of the defendant's failure to testify, and I think that

14   heading is probably -- that's the standard heading, but I think

15   I just will say "not testifying" rather than "failure to

16   testify," unless you don't care.

17             MR. MAC MAHON:  What's that, Your Honor?  I'm sorry.

18             THE COURT:  Yeah, the heading for this instruction,

19   which is right out of the book, is "failure to testify," and I

20   think I'll just say "effect of the defendant not testifying" --

21             MR. MAC MAHON:  That's fine, thank you.

22             THE COURT:  -- is probably more benign.

23             Every time I do these instructions, I find something

24   else I don't like about them.  Okay.

25             There were two proposed defendant's jury

1    instructions, and I'm not sure what you mean, what you intended

2    by this, so what -- the first one is -- you don't have numbers

3    on them.  There were two instructions that you asked the Court

4    to give.

5              "Your verdict must be based on the facts as you find

6    them and on the law contained in all of these instructions."

7    I'm certainly giving that.

8              And then you have two questions -- or two statements.

9    What was the point of these instructions?

10             MR. MAC MAHON:  Your Honor, I'm not exactly sure what

11   you're looking at.

12             THE COURT:  All right.

13             MR. MAC MAHON:  We did propose an instruction on the

14   lesser-included offense, if that's what you're looking at.

15             THE COURT:  Well, where did -- how did you do that?

16   I don't remember ever seeing that.

17             MR. MAC MAHON:  They were filed by ECF a couple days

18   ago.

19             THE COURT:  Well, what I have is, "Whether an

20   employee of the United States, who by virtue of his employment

21   or position came to possess documents," I mean, blah, blah,

22   blah, this made no context.

23             MR. MAC MAHON:  We'll withdraw that, Your Honor,

24   because I don't even know what you're looking at.

25             THE COURT:  Here, I'll show it.

1          Show them this.

2          MR. MAC MAHON:  Yes, Your Honor.  These are the --

3    these were the jury instructions that were -- they weren't

4    submitted.

5          THE COURT:  They were not submitted?

6          MR. MAC MAHON:  They were submitted, Your Honor, but

7    not in the exact form that I understood, and what these were

8    were the potential jury instructions on a lesser-included

9    offense that we would ask the Court to consider.

10         THE COURT:  Oh, oh, oh.  All right, hand that back up

11   here.

12         All right, so this is the only proposed substantive

13   instruction then from the defense.  Well, you have No. 2.

14         MR. MAC MAHON:  Well, we have the instruction on

15   venue that the Court has already rejected.

16         THE COURT:  All right.  What is the government's view

17   about a lesser included?

18         MR. TRUMP:  I really am at a loss.

19         THE COURT:  Well, it's not a lesser included.  I

20   mean, a lesser included would be still another offense within

21   it.

22         MR. TRUMP:  A lesser-included offense has to marry up

23   in terms of the elements of the larger offense.  There's no

24   lesser included, as far as I know, to any of the offenses that

25   we have charged.

1          THE COURT:  No, this can't be a lesser-included

2    offense.  This is an acquittal.  This is saying if the

3    information is not national defense information, simply because

4    it's embarrassing to one or another public official, you have

5    to acquit.  I mean, you're taking this from --

6          MR. MAC MAHON:  That's a different instruction, Your

7    Honor; I'm sorry.  The other instruction we gave was the

8    statute that deals with possession or disclosure of classified

9    information.

10          THE COURT:  Well --

11          MR. MAC MAHON:  The jury could find that there was

12   classified information that was disclosed or possessed, and

13   that's a separate charge altogether.

14          THE COURT:  Well, I'm confused.  I thought we had --

15   I had my staff, I thought, download everything you submitted.

16   I must have missed one, so somebody needs to give me what

17   you've got.

18          Does the government have it?

19          MR. TRUMP:  I don't think we have it.

20          THE COURT:  I don't think we got a lesser included.

21   Are you sure you filed one?

22          MR. MAC MAHON:  I thought we had, Your Honor.

23   Mr. Holt was supposed to file it.  I'm not trying to throw him

24   under the bus.

25          THE COURT:  Oh, okay.

1          MR. MAC MAHON:  The lesser included would have been

2    the possession of classified information.  It doesn't marry up

3    except for the national defense charges.  The Court, I'm sure,

4    has had these cases here where just the simple possession of

5    the classified information.  The jury has heard a lot of

6    information about why things are classified and what

7    Mr. Sterling possessed, and we just think that that should be a

8    charge that they can consider if they decided to do so.

9          THE COURT:  But there's absolutely no dispute, I

10   mean, there's no evidence in this case to suggest that this is

11   not -- there really isn't -- any national defense information.

12   I mean, every witness who's testified for the government has

13   said that it is.

14          You haven't had any evidence, there's no evidence in

15   this case to my knowledge that undermines that part of this

16   case.

17          MR. MAC MAHON:  Well, the jury still doesn't have to

18   find it, Your Honor.

19          THE COURT:  No, the jury, the jury might not find it,

20   but you still don't give the jury an instruction when there's

21   no evidence.  There still has to be evidence to suggest the

22   basis for a lesser-included offense.

23          Mr. Olshan?  You have to be at the lectern.

24   Mr. MacMahon gets a bye because of his back.

25          MR. OLSHAN:  Even if there were some evidence that it

1    was not NDI, legally, the instruction they want is a completely

2    separate offense.  I'm not aware of any case law that says it's

3    properly considered to somehow be a lesser-included offense.

4          So on both bases, we don't think any other

5    instruction would be appropriate.  There's no other offense.

6    The offenses that are charged are the 793 offenses, period.

7          THE COURT:  All right.  Well, obviously, if the

8    defense feels strongly about this and they have a basis for it,

9    that's something you need to submit to us this evening, not

10   tomorrow morning at 9:30, but get it to us tonight so we can

11   take a careful look at it and see if it should be there, but

12   I've not seen the proposed lesser-included instruction.

13         MR. TRUMP:  Judge, I've researched this in the

14   context of a completely different case, but it only pertains to

15   tangible information.  It would not pertain to intangible

16   classified information, I believe, so it can't be a

17   lesser-included offense with respect to the majority of the 793

18   counts.

19         THE COURT:  All right.  Well, I don't even have it in

20   front of me, and I don't know what the basis --

21         MR. TRUMP:  The statute relates to the removal of

22   classified material.

23         THE COURT:  And is that the misdemeanor?

24         MR. MAC MAHON:  Yes, Your Honor.

25         THE COURT:  Yeah.  That was used in the *Drake* case?

1          MR. TRUMP:  I have no idea, Your Honor.

2          THE COURT:  It might have been.  That case was

3    resolved with a misdemeanor.

4          MR. MAC MAHON:  It's 1924, Your Honor.

5          THE COURT:  All right.  But does not appear to be in

6    this case because that's -- this is different.

7          MR. TRUMP:  Much different.

8          THE COURT:  Yeah, yeah.  All right.

9          Well, anyway, at this point, I'm not giving it.  So

10   are there any other instructions that either side wants the

11   Court to be considering?

12         MR. POLLACK:  Do you have something?

13         MR. OLSHAN:  I do have something.

14         MR. POLLACK:  Go ahead.

15         MR. OLSHAN:  Your Honor, something that we hit on a

16   few minutes ago got me thinking about the sort of omnibus issue

17   for the instructions, which is that although the charges are

18   captioned in the indictment as unauthorized disclosure, the

19   actual charging language and statute is not disclosure; it's

20   communication; and so anywhere that the instructions reference

21   the means of dissemination, it should be the statutory

22   language, which is communication, not --

23         THE COURT:  I'm letting you make those changes.

24   That's -- I mean, I'm not going to go through -- you have them

25   on your computer as well, right?

1          MR. OLSHAN:  We do.  So, for example, just making

2     sure that the capsule summary for the charges tracks the

3     statutory language and not the captioned language.  We can do

4     that.

5          Related to that, Your Honor, if we could go back to

6     instruction 39, which is the causation instruction?

7          THE COURT:  Well, wait a minute.  I'm looking real

8     fast.  I think you are okay.  I'm looking at your Instruction

9     No. 2.  You've got it there, "caused national defense

10    information to be communicated, delivered, and transmitted."

11         MR. OLSHAN:  Correct.

12         THE COURT:  That's the correct language.

13         MR. OLSHAN:  We just want to make sure it's

14    consistent.

15         THE COURT:  Okay.  All right, go ahead.

16         MR. OLSHAN:  Instruction 39, which is the causation

17    instruction?

18         THE COURT:  Yeah.

19         MR. OLSHAN:  The way that it's written, it

20    says, "First, that another person committed the crime."

21         That's, that's not what it is.  That should be

22    changed.  It's "that another person performed the acts

23    constituting the crime," because the next sentence or two

24    sentences later says that intermediary does not have the

25    necessary intent.

1          So you cannot say that somebody else committed the

2    crime unless they also had the intent, and so my recommendation

3    for this, and we can submit this to the Court overnight, is

4    that where it says "First," this should be, "First, that

5    another person performed the acts constituting the crime of the

6    unauthorized communication of national defense information."

7          And then below, where it says, "The government need

8    not prove," it should be, "The government need not prove that

9    the person who performed the acts constituting the crime of the

10   unauthorized communication of national defense information did

11   so with criminal intent.  That person may be an innocent

12   intermediary or pawn."

13         Similarly, the next sentence, "The defendant need not

14   perform the crime," well, obviously, the defendant has to

15   commit a crime in order to be convicted, and I would imagine

16   the defense doesn't like this language for that reason, and so

17   it can similarly be clarified to, "The defendant need not

18   perform the acts constituting -- the acts that constitute the

19   crime of the unauthorized disclosure of national defense

20   information."

21         THE COURT:  You're getting -- you need to -- we all

22   need to sit down and think about that one carefully.  I don't

23   want these instructions so complicated that this jury can't

24   figure out what they're doing, all right?  That's getting

25   really complicated, and there's got to be a simpler way of

1    doing that.  So rather than trying to do this ad-libbed, think

2    about it carefully.

3            And again, now what's going to -- you need to get

4    these distributed as quickly as possible so I can get a

5    reasonable response from the defense if they have an objection

6    to it.  And again, this has been a great jury.  I don't want to

7    hold them up, and so I -- and I, again, I have a hearing at

8    nine o'clock, so we have basically a half-an-hour window to get

9    any last-minute things ironed out tomorrow morning, all right?

10           MR. OLSHAN:  And just so the parties are clear, we

11   should get together on, I believe, the possession instruction;

12   is that correct?

13           THE COURT:  See if you can work out a joint

14   instruction that you're happy with for possession.  I'm going

15   to look at it as well, yeah.

16           MR. OLSHAN:  And we'll also submit something on

17   causation.

18           THE COURT:  On causation.

19           MR. OLSHAN:  And I believe the Court suggested the

20   Court would circulate another --

21           THE COURT:  I'm going to give you my proposed charge

22   before I go home tonight, so you'll, you know, look -- check in

23   your e-mail, all right?

24           MR. OLSHAN:  Thank you.

25           THE COURT:  We're going to e-mail it to you rather

1    than putting -- I'm not putting it on ECF because it's a work

2    in progress.  Therefore, make sure we have good e-mail, leave

3    them with my law clerk before you go, good e-mail addresses for

4    you, all right?

5              All right, is there anything else?

6                      (No response.)

7              THE COURT:  Now, the last thing is it's only five

8    o'clock.  You've got to make sure before you leave the

9    courtroom that you've worked with Ms. Guyton and Ms. Gunning on

10   making sure that the physical exhibits that are going to go to

11   the jury are the ones you thought you had entered -- in fact,

12   we should do that right now.  Just I'll have the list read to

13   you, but I want you physically to have looked at them so

14   there's no question about the integrity of what's going to go

15   to the jury, all right?

16             We're not giving them the transcript for Merlin; we

17   already agreed on that.  And the cable books, we may get a --

18   oh, juries always ask for an index.  I've had this happen

19   before, so that's another job the government's got if you don't

20   already have it is an index of the exhibits that have been

21   entered into evidence, and we need one for the defense as well.

22   No editorial comments.  Enough to explain what it is, and it

23   may be very similar to the exhibit list you filed already.

24   Just make sure you don't list anything there that was not

25   entered into evidence.

1           That in a case like this will be one of the first

2    questions the jury asks.  So both sides need to make sure

3    you've done that, okay, so we have that ready for them tomorrow

4    morning.

5           MR. MAC MAHON:  Your Honor, they may also ask for

6    multiple copies of the chapter as well.  I don't know how the

7    Court wants to deal with that.

8           THE COURT:  I have no problem -- all right, we'll

9    make sure that there are 12 --

10          MR. TRUMP:  We can have multiple copies.

11          With respect to that exhibit, 132 was the exhibit

12    without paragraph markings.

13          THE COURT:  I think we should put the paragraph

14    numbers in.

15          MR. TRUMP:  And 132A is the one with the numbers.

16          THE COURT:  All right.

17          MR. TRUMP:  If you want to have them both, they can

18    have both.  The numbers are very easy in terms of argument if

19    someone --

20          THE COURT:  I think it's easier for you-all if you're

21    going to argue the case to do it to numbers, all right?

22          MR. POLLACK:  As long as we're talking about the

23    chapter in its entirety, I have no problem with there being a

24    version of numbered paragraphs.

25          THE COURT:  All right.  And I'm almost positive I've

1   mentioned it to the jury that the numbers would be added.

2           MR. TRUMP:  It's 132A.

3           THE COURT:  Yeah.

4           MR. TRUMP:  It doesn't matter to me whether 132 and

5   132A go in, but 132A is the one with the paragraphs.

6           THE COURT:  Let's make the 12 copies -- your job is

7   to make 12 copies of 12A (sic) if we don't already have that.

8           Now, what about the cable books?

9           MR. TRUMP:  Well, they're all in the exhibit book.

10  All the cables are in the exhibit books.  They don't need their

11  cable books unless --

12          THE COURT:  I don't think we should.  I think the

13  practice has always been to have one set of exhibits, with the

14  exception being chapter 9 because that will take them, you

15  know, half an hour or so to read if they all want to sit down

16  and read it.  Okay?

17          All right, so unless there's anything else, I'm going

18  to have Ms. Guyton read --

19          MR. POLLACK:  Yes, Your Honor.  I think it's clear

20  for the record, but just out of an abundance of caution, I want

21  to make sure that it is:  With respect to our back-and-forth on

22  the charge, we're reserving our objections, and to the extent

23  that they lead to modifications, those are understanding the

24  Court's initial rulings --

25          THE COURT:  You've filed your objections.  We've

1   denied some of them and granted some of them, and that's the

2   law of the case, and you can certainly, you know, appeal any

3   objections.

4           MR. POLLACK:  I understand, Your Honor.  Thank you.

5           THE COURT:  All right.  So are you ready to

6   double-check your list?  All right, Ms. Guyton will now read it

7   to you.

8           I think the easiest way of doing this in looking at

9   Ms. Guyton's notes is to tell you what's not in evidence, all

10  right?  Because the vast majority of these exhibits went in.

11  So I'm going to have her just read the numbers of the

12  government's exhibits that did not go into evidence.  I think

13  that's much faster and easier to do it that way, okay?

14          THE CLERK:  Okay.

15          THE COURT:  Yeah, Mr. Olshan?

16          MR. OLSHAN:  One brief thing.  Your Honor, the issue

17  of the summary e-mails that were behind each of those exhibits?

18          THE COURT:  Ah.

19          MR. OLSHAN:  So I didn't reference those when we were

20  dealing with those exhibits with Agent Hunt, and so we're fine

21  just to pull those out.  Frankly, they're now redundant because

22  they are part of Exhibit 98, which is the fulsome summary that

23  she did of the calls and e-mails.  So we can pull those out

24  from the official exhibits that are going to go back.

25          THE COURT:  I think they're extremely helpful for the

1    jury, and I don't think they're unfair.  They're not

2    inaccurate.  I think we should leave them with them, all right?

3    Because the jury has to look at that summary chart and decide

4    whether it's accurate, and those are the supporting materials

5    for it.

6            MR. OLSHAN:  Certainly our position was they were

7    generated by Agent Hunt, and the parties can argue about the

8    sanctity of those summaries all we want, and so it's fine by,

9    it's fine by our standard -- or we're fine with leaving them

10   in.  We just wanted the Court to know we were still thinking

11   about it.

12           THE COURT:  All right.

13           MR. POLLACK:  Your Honor, I would just like to note

14   an objection to that.  The, the government agreed that they had

15   not moved them in through the computer expert.  They were not

16   in evidence, and then they did not attempt to move them in

17   through Agent Hunt.  They're not in evidence.

18           THE COURT:  All right, to avoid any problems since

19   you do have it in the other document, they're out, all right?

20   So you need to make sure, though, physically when you go

21   through these books to make sure that what's going to the jury

22   is correct, that you have those removed, all right?

23           MR. OLSHAN:  Very well.

24           THE COURT:  Because there's that one exhibit where I

25   think there are three or four different strings discussed --

1          MR. OLSHAN:  Correct.

2          THE COURT:  -- and there are three or four separate

3     summaries like that.

4          MR. OLSHAN:  That's right.  There were four, four or

5     so that had no content.

6          THE COURT:  Yeah, right.  Okay.

7          All right, so here are the exhibits that were not

8     entered into evidence.

9          THE CLERK:  Government Exhibit Nos. 64, 67, 68, 69,

10    70, 71, 72, 76, 80, 82, 85, 88, 97, 104, 109.

11         132A, is that going to be admitted?

12         THE COURT:  132A is in.

13         (Government's Exhibit No. 132A was received in

14    evidence.)

15         THE CLERK:  132B was offered but not admitted.  136,

16    not admitted -- was not offered, I'm sorry; and 138 not

17    admitted.  147, 149, 150, 151 --

18         MR. TRUMP:  Wait up, please.

19         THE CLERK:  I'm sorry.

20         MR. TRUMP:  Can we go back to 147?

21         THE CLERK:  Okay.  147, 149, 150, 151, 152, 153, 154,

22    155, 156, 165, 166.

23         THE COURT:  And there were so few defense exhibits,

24    let's read the ones that are in evidence.

25         MR. OLSHAN:  166, I did move that one, Stipulation

1  No. 6, about the $1.5 million.

2          THE COURT:  That, that was your stipulation?

3          MR. OLSHAN:  It was.

4          THE COURT:  I think that's right.

5          MR. OLSHAN:  Stipulation No. 5, which is Exhibit 165,

6  we did not read in, but 166 we did.

7          THE COURT:  Hold on a second.

8          MR. MAC MAHON:  132C, was that on the list?  I'm

9  sorry.

10          THE COURT:  No, 132C is not in.

11          MR. MAC MAHON:  That's out.

12          THE COURT:  132C is not in.  166 then is in.

13          (Government's Exhibit No. 166 was received in

14  evidence.)

15          THE COURT:  All right, are you satisfied then?

16          MR. TRUMP:  We had 170, 171, and 172 -- 171 and -72

17  are in the record, but they don't go to the jury, correct?

18          THE COURT:  Are those --

19          MR. TRUMP:  Merlin.

20          THE COURT:  The video deposition is not going in as

21  an exhibit.

22          MR. TRUMP:  It's marked just for appellate purposes.

23          THE COURT:  Correct.

24          MR. TRUMP:  And our list goes through 175, but there

25  is a 176, which is Stipulation No. --

1           THE CLERK:  13.

2           MR. TRUMP:  -- 13.

3           THE COURT:  Right, that's in.  All right?

4           (Government's Exhibit No. 176 was received in

5    evidence.)

6           THE COURT:  All right, the government's satisfied?

7    And again, the last job will be to check physically on the

8    exhibits, all right?

9           But we'll now read the defense exhibits that were

10   entered into evidence.

11          THE CLERK:  Defense Exhibit No. 1, No. 2, No. 3,

12   No. 4, 5, 6, and 7.  8 was not admitted.

13          THE COURT:  Is that consistent with your records?

14          MR. MAC MAHON:  Yes, Your Honor.

15          THE COURT:  Yes, all right.

16          Yes, Mr. Olshan?

17          MR. OLSHAN:  I seem to recall 5 and 6 were the same

18   document.  Did they both actually go in?  Not that it matters,

19   but just to make sure.

20          MR. POLLACK:  Well, there was an underlying e-mail

21   chain, and then there was a second document that showed that

22   that e-mail chain was forwarded to Mr. Koch.

23          THE COURT:  Right.

24          MR. POLLACK:  So they're not identical documents.

25          MR. OLSHAN:  But they're both in?

1           THE COURT:  Yes.  All right?

2           All right, so unless there's anything else, so the

3      government is going to redo the verdict form, taking out Count

4      8, all right?  And I will just tell the jury, I have to tell

5      them something about Count 8 not being there on the verdict

6      form.  I'll just say Count 8 is being omitted or something like

7      that, all right?  Because otherwise, they're going to read the

8      verdict form, and they'll see the different count numbers, and

9      the jury is not stupid; they'll figure out something is

10     missing.

11          MR. FITZPATRICK:  Your Honor, I was going to letter

12     them.  A will be Count 1, B will be Count 2, is that what

13     you're talking about?

14          THE COURT:  Look, I mean, the jury instructions are

15     written by count number.

16          MR. FITZPATRICK:  Oh.

17          MR. OLSHAN:  The Court could renumber them.

18          THE COURT:  Oh, we're not going to renumber all the

19     counts.  I mean, the jury will know that you're talking

20     about -- they'll see instructions for Counts 1, 2, 3, 4, 5, 6,

21     7, 8 -- I'm sorry, 9, and 10, and we'll have a juror who will

22     say, "Where's Count 8?"

23          So I need to tell them that I've taken care of

24     Count 8 one way or the other, not to worry about it, all right?

25     That doesn't tell them whether I've convicted or acquitted on

1    Count 8.  It's no longer for them to worry about.

2          There's so much information in this case, I don't

3    even think Mr. Trump mentioned mail fraud.  I may have said it

4    in the opening, but, I mean, this jury is not going to be

5    looking for a mail fraud claim in this case, so that's not

6    going to be a problem, all right?

7          But you're going to prepare the new verdict form.

8          MR. OLSHAN:  Yes.

9          THE COURT:  All right.  And you're going to give me

10   whatever additional instructions, and again, if there's

11   something else that comes to mind, yeah.

12         MR. TRUMP:  We will prepare an exhibit list

13   consistent with the omissions.

14         THE COURT:  Correct, a new index.

15         MR. TRUMP:  Correct.

16         THE COURT:  And defense is short, but yours as well,

17   okay?

18         All right, anything else?

19                    (No response.)

20         THE COURT:  No?  All right, then make sure you go

21   through these exhibits with Ms. Gunning and Ms. Guyton.

22     (Recess from 5:18 p.m., until 9:53 a.m., January 22, 2015.)

23

24

25

181

1                CERTIFICATE OF THE REPORTER

2        I certify that the foregoing is a correct excerpt of the

3   record of proceedings in the above-entitled matter.

4

5

6                                    _____/s/_____
                                        Anneliese J. Thomson
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25