1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .      Criminal No. 1:10cr485
                              .
      vs.                     .      Alexandria, Virginia
                              .      January 16, 2015
JEFFREY ALEXANDER STERLING,   .      2:00 p.m.
                              .
            Defendant.        .      EXCERPT OF P.M. SESSION
                              .
. . . . . . . . . .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:          JAMES L. TRUMP, AUSA
                             DENNIS M. FITZPATRICK, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314
                               and
                             ERIC G. OLSHAN, Deputy Chief
                             Public Integrity Section of the
                             Criminal Division
                             United States Department of
                             Justice
                             1400 New York Avenue, N.W.
                             Suite 12100
                             Washington, D.C. 20005


FOR THE DEFENDANT:           EDWARD B. MAC MAHON, JR., ESQ.
                             Law Office of Edward B.
                             MacMahon, Jr.
                             107 East Washington Street
                             P.O. Box 25
                             Middleburg, VA 20118
                               and
                             BARRY J. POLLACK, ESQ.
                             MIA P. HAESSLY, ESQ.
                             Miller & Chevalier Chartered
                             655 - 15th Street, N.W.
                             Suite 900
                             Washington, D.C. 20005-5701


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
1   APPEARANCES:  (Cont'd.)

2   CLASSIFIED INFORMATION         CHRISTINE E. GUNNING
    SECURITY OFFICERS:             MAURA PETERSON
3

4   ALSO PRESENT:                  GERARD FRANCISCO
                                   SA ASHLEY HUNT
5                                  JENNIFER MULLIN, ESQ.

6
    OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
7                                  U.S. District Court, Fifth Floor
                                   401 Courthouse Square
8                                  Alexandria, VA 22314
                                   (703)299-8595
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WITNESS ON BEHALF OF THE GOVERNMENT: | | | | |
| David Cohen | 4 | 13 | | |

Cohen - Direct                                                        4

1                      A F T E R N O O N   S E S S I O N

2               *         *         *         *         *

3                      (Defendant and Jury present.)

4               THE COURT:  All right, the next witness is Mr. Cohen,

5     I believe?

6               MR. OLSHAN:  Yes, Your Honor.

7               THE COURT:  All right.

8               MR. OLSHAN:  The government calls David Cohen.

9               DAVID COHEN, GOVERNMENT'S WITNESS, AFFIRMED

10              MR. OLSHAN:  May I proceed?

11              THE COURT:  Yes, sir.

12                          DIRECT EXAMINATION

13    BY MR. OLSHAN:

14    Q.    Good afternoon, sir.  If you could please state and spell

15    your name for the record?

16    A.    David Cohen.  It's D-a-v-i-d C-o-h-e-n.

17    Q.    Mr. Cohen, are you currently employed?

18    A.    Yes.

19    Q.    And in what field are you employed?

20    A.    I'm self-employed in the national security consulting

21    arena.

22    Q.    Is that in the private sector?

23    A.    Yes.

24    Q.    Prior to your current work in the private sector, did you

25    hold government jobs?

Cohen - Direct                                                        5

1   A.    Yes.

2   Q.    What was your most recent government position?

3   A.    I was the Deputy Commissioner for Intelligence for the New

4   York City Police Department.

5   Q.    How long did you hold that position?

6   A.    I held it from 4 January -- February 2002 until 1 January

7   2013.

8   Q.    Prior to that, did you have a career in the Central

9   Intelligence Agency?

10  A.    Yes.

11  Q.    And what years did you work for the CIA?

12  A.    From early 1966 until November 2000.

13  Q.    Approximately 34 years?

14  A.    34-35 years.

15  Q.    Can you briefly describe for the jury, Mr. Cohen, what

16  positions you held within the CIA during your tenure?

17  A.    I served initially as a, as an analyst, became an Office

18  Director in the analytical arm of the agency.  I served as a

19  Division Chief in the Directorate of Operations.  I served as

20  the Associate Deputy Director for Intelligence, the second most

21  senior job in the analytical arm of the agency.  I served as

22  the Deputy Director of Operations, the head of the clandestine

23  services, and I oversaw a field office.

24  Q.    Was that field office in New York?

25  A.    Yes.

Cohen - Direct                                                          6

1   Q.   Approximately when were you overseeing the field office in

2   New York?

3   A.   October 1997 through early November 2000.

4   Q.   Mr. Cohen, during the time that you worked for the CIA,

5   did you hold security clearances?

6   A.   Did I what?

7   Q.   Did you hold security clearances?

8   A.   Yes.

9   Q.   For the whole time you worked at the CIA?

10  A.   Yes.

11  Q.   Were you trained in the proper handling of classified

12  information in connection with that -- those jobs?

13  A.   Yes.

14  Q.   How would you describe the importance of handling

15  classified information?

16  A.   Extremely important.  People's lives depend on it.

17  Q.   You testified that you worked in the New York office from

18  1997 to 2000 approximately.  Is that correct?

19  A.   From October 1997 through early November 2000.

20  Q.   Excuse me, I apologize.

21       During that time, was -- did you work in a secure CIA

22  facility in New York?

23  A.   Yes.

24  Q.   Were there specific access controls to gain entry to that

25  CIA space?

Cohen - Direct                                                              7

1   A.   I believe there was a safe-like entrance.  You needed to

2   know the, the access code to it.

3   Q.   Inside the secure CIA space, did individual employees --

4   case officers, for example -- have personally assigned secure

5   safes?

6   A.   Each, each individual would have their own safe and safe

7   combination.

8   Q.   And did one case officer have access -- excuse me, would

9   one case officer have access to another case officer's safe?

10  A.   No.  And it would be a breach of security to leave it open

11  overnight.

12  Q.   If a case officer or any employee in that secure space

13  were to leave the space with classified documents or any kind

14  of document, would anyone have necessarily known that at the

15  time?

16          MR. MAC MAHON:  Your Honor, I object to this

17  speculation in the form of --

18          THE COURT:  Well, more than that, I think this is now

19  cumulative, so we don't need to hear it from two or three

20  different witnesses.

21          MR. OLSHAN:  Your Honor, this witness had not

22  testified about it, but I will move on if the Court would

23  prefer.

24          THE COURT:  Move on.

25  BY MR. OLSHAN:

1   Q.   Do you know an individual named Jeffrey Sterling,

2   Mr. Cohen?

3   A.   Yes.

4   Q.   Do you see him in the courtroom?

5   A.   Yes.

6           MR. OLSHAN:  Is that sufficient, Your Honor?

7           THE COURT:  Yes, that's sufficient in this case.

8   BY MR. OLSHAN:

9   Q.   How did you come to know Mr. Sterling, Mr. Cohen?

10  A.   Mr. Sterling was assigned to the New York office.

11  Q.   So was he a subordinate of yours?

12  A.   He was, he was a subordinate of mine, yes.

13  Q.   And you were the top-ranking CIA officer in that office;

14  is that correct?

15  A.   Yes.

16  Q.   Did he report directly to you, or did he report to others?

17  A.   He reported to others.

18  Q.   During the time that you overlapped with Mr. Sterling in

19  New York, did you interact with him at all?

20  A.   Yes.  I would see him in the, in the office, corridors.

21  We would pass.

22  Q.   Did you socialize with him?

23  A.   No.

24  Q.   How would you characterize your, your working relationship

25  to the extent that you saw Mr. Sterling?

1    A.    Rather good.

2    Q.    Mr. Cohen, are you aware of a specific classified program

3    involving an effort to undermine the nuclear weapons

4    capabilities of Iran?

5    A.    Yes, I am.

6    Q.    And was that program ongoing during the time that you were

7    in New York?

8    A.    Yes, it was.

9    Q.    And are you aware of whether Mr. Sterling was assigned in

10   some respect to work on that program?

11   A.    Yes, he was.

12   Q.    Can you describe for the jury what your day-to-day

13   involvement would have been in this particular program at the

14   time?

15   A.    My, my involvement in the program would have been

16   essentially twofold:  first, to understand the strategic

17   dimensions of it, what its broad objective was, and to

18   understand it first and foremost; and secondly, if there were

19   any problems that developed in the course of that office's

20   involvement or participation in the program, those problems

21   would have been brought to my attention for me to understand it

22   and see what next steps would be.

23   Q.    As the head of that particular office, would you have had

24   any day-to-day responsibilities for this particular program?

25   A.    No, not especially.  That would be the responsibility of

Cohen - Direct                                                          10

1    those that reported to me.

2    Q.    Can you recall whether this was the defendant's only

3    assignment or whether he had other assignments as well?

4    A.    He had multiple assignments.  That was certainly one.  He

5    had other responsibilities as well.

6    Q.    During your time in New York, how would you characterize

7    the significance of this particular classified program?

8    A.    The significance of this program?

9    Q.    Correct.

10   A.    I would consider it vitally important to the national

11   security of the country.

12   Q.    Relative to other programs that you were dealing with

13   during that time, how would you, how would you compare it?

14   A.    The single most important.

15   Q.    During your career with the CIA, did you become familiar

16   with the handling of human assets?

17   A.    Yes, I did.

18   Q.    And can you tell the jury in your view and in your

19   experience how closely held the true name of a human asset is?

20   A.    The, the holding -- the knowledge of the true name of a

21   human asset is the single most important piece of information

22   held by the Central Intelligence Agency because the

23   individual's life depended on it.

24   Q.    At some point, did the defendant leave the New York

25   office?

1  A.    Say that again?

2  Q.    At some point, did the defendant leave the New York

3  office?

4  A.    Yes.

5  Q.    And are you familiar with the circumstances under which he

6  left the office?

7  A.    Yes.

8  Q.    Did you have a role in his departure from the office?

9  A.    It was my decision that he leave the office.

10 Q.    And why was that?

11 A.    Because he was not performing consistent with the

12 expectations of a person with his background and grade.

13 Q.    Did you take any steps to assist the defendant in working

14 to achieve what he should be doing at the time?

15 A.    Yeah.  His performance was, was extremely subpar.  He had

16 been talked to about it and given guidance on what should be

17 done to sort of bring him up to the level of expectations for

18 an individual, a case officer with his, at again his grade

19 level.

20        At, at some point, when the situation got more

21 complicated, he was given an -- would have been given, I

22 believe he was, an advance work plan which maps out the steps

23 one would take to, to achieve the level that was expected.  In

24 Mr. Sterling's situation, you know, all of us worked very, very

25 hard to make sure that, you know, he had the maximum

Cohen - Direct                                                          12

1   opportunity to succeed.

2   Q.   Let me ask you, did you work with Mr. Sterling to -- so

3   that he would succeed?

4   A.   Well, I personally didn't, but I set the guidelines that

5   we wanted this gentleman to succeed in the New York area

6   because we had great expectations for him and thought it was an

7   arena where he should be able to do well.

8   Q.   Ultimately, did he meet those expectations?

9   A.   He did not meet those expectations with respect to the --

10  and they were quite minimal, I might add.

11  Q.   Mr. Cohen, do you know an individual named James Risen?

12  A.   I know the name.

13  Q.   And can you recall whether you've ever spoken to

14  Mr. Risen?

15  A.   I think in that period between 9/11, the attacks on the

16  World Trade Center, when I was still with -- in the private

17  sector with American International Group at that time, and

18  sometime between that and before February 2000, when I took my

19  responsibilities with the New York City Police Department,

20  Mr. Risen called me to talk -- to ask my, my views about some

21  of the very vague, because it was such a long time ago,

22  regarding the 9/11 events, but I chose not to talk to him.

23  Q.   Did you defer him to the CIA -- or refer him to the CIA?

24  A.   I would have said, "Go talk to someone else," and it might

25  have been CIA.  Anybody but me.

Cohen - Cross                                                          13

1    Q.   Have you ever spoken to Mr. Risen again that you can

2    recall?

3    A.   No.

4    Q.   And have you ever spoken to him about the specific

5    classified program that we've been discussing today?

6    A.   No.

7    Q.   Have you ever discussed this classified program with

8    anybody whom you believed was not authorized to know about it?

9    A.   No.

10            MR. OLSHAN:  One moment, Your Honor?

11            THE COURT:  Yes, sir.

12            MR. OLSHAN:  That's all I have, Your Honor.

13            THE COURT:  All right.  Mr. MacMahon?

14            MR. MAC MAHON:  Thank you, Your Honor.

15                          CROSS-EXAMINATION

16   BY MR. MAC MAHON:

17   Q.   Mr. Cohen, my name is Edward MacMahon.  I'm one of the

18   lawyers here for Mr. Sterling.  Good afternoon.

19            Was it your testimony that you were in the same

20   office as Mr. Sterling in New York?

21   A.   The same office suite.

22   Q.   The same office suite.  Well, how far away were you --

23   well, you had a suite.  You were -- did you have a bigger

24   office than Mr. Sterling?

25   A.   Yes.

Cohen - Cross                                                        14

1    Q.    Did you ever see Mr. Sterling's work space?

2    A.    It was virtually identical to everyone else's, I believe.

3    Q.    And how long -- were you able to walk by his work space

4    and see what he was doing?

5    A.    I don't ever recall peering in.

6    Q.    All right, let me ask the question a different way.  The

7    work space -- none of us have been to the office, CIA office in

8    New York, okay?  Did Mr. Sterling's work space have a door on

9    it?

10   A.    Yes.

11   Q.    And was it -- did you ever go by and see Mr. Sterling's

12   door closed?  Do you remember either way?

13   A.    I'm sure over time, I would have walked by, and sometimes

14   it would be open, and other times it would be closed.

15   Q.    And did every case officer have their own printer in their

16   office?

17   A.    I don't recall.

18   Q.    There wasn't a, a big printer somewhere that did print

19   jobs in the office?

20   A.    I don't recall.

21   Q.    Did the CIA when you were running that office have the

22   ability to track what case officers were printing off of their

23   computers?

24   A.    I don't recall.

25   Q.    Did they have any way to track what agents were doing on

1   the agency computers, meaning see who they were e-mailing, see

2   what Web sites they were looking at, anything like that?

3           MR. OLSHAN:  Your Honor, I'm going to object to

4   foundation.  Mr. Cohen hasn't established that he had any

5   position where he would have known about --

6           MR. MAC MAHON:  He says he ran the office, Your

7   Honor.

8           THE COURT:  Well, I'm the chief judge of this

9   building, and I couldn't tell you how the IT systems work.

10          MR. MAC MAHON:  Can I ask the question a different

11  way, Your Honor?

12          THE COURT:  Go ahead.

13  BY MR. MAC MAHON:

14  Q.   Were you, were you aware in 2000 in the New York office

15  whether the CIA was able to see what a, what a particular CIA

16  officer was doing on their computer?

17  A.   You know, CIA over the years has implemented a number of

18  what I would call counterintelligence techniques, but I

19  couldn't detail them.

20  Q.   Why were there counterintelligence techniques that the CIA

21  had to employ?

22          MR. OLSHAN:  Objection, Your Honor.

23          THE COURT:  Do we need to approach?

24          MR. MAC MAHON:  Excuse me?

25          MR. OLSHAN:  No, my objection is relevance.

Cohen - Cross                                                          16

1              THE COURT:  Mr. MacMahon?

2              MR. MAC MAHON:  Your Honor, I'm asking him

3    questions -- the evidence in the case will be that there was

4    no, the CIA can't track Mr. Sterling's computer use whatsoever

5    at this time, and I'm trying to see if that's correct, if he

6    has any personal knowledge of that.

7              THE COURT:  If this witness would know.  So the right

8    question, I think, is how familiar were you with the IT

9    systems?

10             THE WITNESS:  I can barely do an e-mail.

11             THE COURT:  That's the answer, all right.

12             MR. MAC MAHON:  Thank you.

13                        (Laughter.)

14             MR. MAC MAHON:  Thanks for saving me time.

15             THE COURT:  All right.  You're not the only one.

16             THE WITNESS:  Thank you.

17   BY MR. MAC MAHON:

18   Q.   Sir, did you, did you tell this jury that the operation

19   Merlin, as we call it here, was the most important operation

20   that the CIA had ongoing in 1999 and 2000?

21             THE COURT:  That's not what he said.

22             THE WITNESS:  I don't remember hearing that word,

23   "Merlin," until just now.

24   BY MR. MAC MAHON:

25   Q.   Well, the program that we're talking about today, and I

1   may have -- if I'm being corrected by the judge, I probably did

2   misunderstand your testimony.  What, what was your answer to

3   the question as to how important the operation that we're

4   talking about was?

5   A.   I think it was one of the most important operations CIA in

6   that era was running, and I say that on the basis of several

7   factors:  my, my senior positions held at the agency and my, my

8   position in that, in that field office and my 50-year

9   understanding of national security matters.

10  Q.   Right.  And that's the same time that you determined that

11  Mr. Sterling was a subpar employee, right?

12  A.   He certainly was on, on a lot of matters.

13  Q.   All right.  And that was your decision to put him on one

14  of the most important programs even though you, Mr. Cohen,

15  thought he was a subpar employee?

16  A.   I think he came to the, the office with that program

17  attached to him.  I didn't make that decision to the best of my

18  recollection.

19  Q.   But you made the assessment that he was a subpar employee,

20  correct?

21  A.   Absolutely.

22  Q.   All right.  And did you ask to have him taken off the

23  program?

24  A.   I didn't ask for that.  I asked that he be returned to

25  Washington, where they could assess the totality of his

1    responsibilities.

2    Q.    And no one had reported to you that Mr. Sterling had ever

3    taken any classified documents out of the building, right?

4    A.    You'd have to say that again.

5    Q.    Had anyone ever told you in 2000, when you were

6    Mr. Sterling's supervisor, that Mr. Sterling took classified

7    information out of the building?

8    A.    I don't know if anybody would have known it.

9    Q.    Sir, the question was nobody told you that, did they?

10   A.    Nobody told me, but it didn't -- doesn't mean it didn't

11   happen.

12   Q.    All right.  It was never brought to anybody's attention,

13   correct?

14   A.    No.

15   Q.    All right.  And you don't have any, any proof whatsoever

16   that Mr. Sterling violated any security protocol ever when he

17   worked for you at the CIA, correct?

18   A.    While he worked for me, I didn't have any firsthand

19   knowledge of that.

20          MR. MAC MAHON:  That's all I have, Your Honor.  Thank

21   you.

22          THE COURT:  All right, any redirect?

23          MR. OLSHAN:  No.

24          THE COURT:  All right, Mr. Cohen, thank you for your

25   testimony.  You're excused as a witness.

1                           (Witness excused.)

2              *          *          *          *          *

3

4                    CERTIFICATE OF THE REPORTER

5        I certify that the foregoing is a correct excerpt of the

6    record of proceedings in the above-entitled matter.

7

8

9                                    _____
                                              /s/
10                                   Anneliese J. Thomson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25