UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
                       ALEXANDRIA DIVISION

UNITED STATES OF AMERICA       .        Criminal No. 1:10cr485
                               .
     vs.                       .        Alexandria, Virginia
                               .        January 20, 2015
JEFFREY ALEXANDER STERLING,    .        9:30 a.m.
                               .
             Defendant.        .        <u>EXCERPT OF A.M. SESSION</u>
                               .
.   .   .   .   .   .   .   .   .   .

                    TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE LEONIE M. BRINKEMA
                 UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:            JAMES L. TRUMP, AUSA
                               DENNIS M. FITZPATRICK, AUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314
                                 and
                               ERIC G. OLSHAN, Deputy Chief
                               Public Integrity Section of the
                               Criminal Division
                               United States Department of
                               Justice
                               1400 New York Avenue, N.W.
                               Suite 12100
                               Washington, D.C. 20005


FOR THE DEFENDANT:             EDWARD B. MAC MAHON, JR., ESQ.
                               Law Office of Edward B.
                               MacMahon, Jr.
                               107 East Washington Street
                               P.O. Box 25
                               Middleburg, VA 20118
                                 and
                               BARRY J. POLLACK, ESQ.
                               MIA P. HAESSLY, ESQ.
                               Miller & Chevalier Chartered
                               655 - 15th Street, N.W.
                               Suite 900
                               Washington, D.C. 20005-5701


        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

1    APPEARANCES:  (Cont'd.)

2    CLASSIFIED INFORMATION          CHRISTINE E. GUNNING
     SECURITY OFFICERS:              MAURA PETERSON
3

4    ALSO PRESENT:                   GERARD FRANCISCO
                                     SA ASHLEY HUNT
5                                    JENNIFER MULLIN, ESQ.

6
     OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
7                                    U.S. District Court, Fifth Floor
                                     401 Courthouse Square
8                                    Alexandria, VA 22314
                                     (703)299-8595
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2
                              DIRECT   CROSS   REDIRECT   RECROSS
3
      WITNESS ON BEHALF OF
4     THE GOVERNMENT:

5     David Raymond Shedd                    4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      P R O C E E D I N G S

2           *         *         *         *         *

3                   (Defendant and Jury present.)

4      DAVID RAYMOND SHEDD, GOVERNMENT'S WITNESS, AFFIRMED

5           *         *         *         *         *

6                      CROSS-EXAMINATION

7   BY MR. MAC MAHON:

8   Q.   Good morning, Mr. Shedd.

9   A.   Good morning.

10  Q.   I'm sorry, I hurt my back.  That wasn't a look for you; I

11  apologize.

12          I'm one of the -- my name is Edward MacMahon.  I'm

13  one of Mr. Sterling's lawyers.  How are you today?

14  A.   Doing well, thank you.

15  Q.   How many times did you meet with Mr. Trump to go over the

16  testimony that you gave today?

17  A.   I believe three times.

18  Q.   And, and your testimony was that Mr. Risen's story

19  confirms facts about Classified Program No. 1?  Is that what

20  you said?

21  A.   It is.

22  Q.   Isn't it your testimony that actually confirms what's in

23  Mr. Risen's book as being true?

24          MR. TRUMP:  Objection, Your Honor.

25          THE COURT:  Sustained.

1    BY MR. MAC MAHON:

2    Q.   You testified, I think you said that there were assets

3    that won't work with the CIA because of Mr. Risen's book.  Did

4    you say that?

5    A.   I believe what I said, to be more accurate, are reticent

6    to cooperate with CIA when there is public revelations.

7    Q.   Right.  And you, you can't tell us today of any single

8    asset or anyone who hasn't cooperated with the CIA because of

9    this book, correct?

10   A.   I cannot.

11   Q.   Right.  And most of those people cooperate with the CIA

12   because of money, right?

13   A.   No.

14   Q.   CIA pays a lot of money to sources, doesn't it?

15   A.   On occasion.

16   Q.   Excuse me?

17   A.   On occasion.

18   Q.   How many times were you interviewed by the FBI when you

19   were asked whether Mr., Mr. Sterling at the House of

20   Representatives made disclosures about Classified Program

21   No. 1?

22   A.   To the best of my recollection, two times.

23   Q.   Right.  And they kept asking you the same question:  Did

24   Sterling say anything at the House of Representatives about

25   Classified Program No. 1, correct?

1    A.    No.

2    Q.    That was the question the government kept asking you,

3    wasn't it?

4    A.    No.  The question was in my presence with Mr. Sheehy and

5    Ms. Wyndee Parker, whether the discussion was held about

6    classified programs.

7    Q.    Correct.

8    A.    And that's all I would be competent to answer.

9    Q.    Right.  And you told them no once, and they asked you

10   again, right?

11   A.    A second interview, yes.

12   Q.    The same question:  He must have done something wrong at

13   the interview at the House, right?

14         MR. TRUMP:  Objection, Your Honor.  He was not

15   present at the interview.

16         THE COURT:  Sustained.  Rephrase your question.

17   BY MR. MAC MAHON:

18   Q.    You -- it is perfectly legal for Mr. Sterling to go to the

19   House of Representatives and complain about what he considered

20   as discrimination at the House, correct?

21         MR. TRUMP:  Objection, Your Honor.  Mr. Shedd is not

22   an attorney.

23         THE COURT:  Well, Mr. Shedd, if you know.  And if you

24   don't know, don't guess.

25         THE WITNESS:  Could you repeat the question?

Shedd - Cross                                                            7

1    BY MR. MAC MAHON:

2    Q.   It was completely legal for Mr. Sterling to go to the

3    House of Representatives and complain about what he considered

4    was unfair treatment at the CIA, correct?

5    A.   I believe so from a legal standpoint.

6    Q.   And you, you were never told of any information that

7    Mr. Sterling disclosed to the House of Representatives that he

8    wasn't entitled to disclose, correct?

9    A.   That's correct.

10   Q.   You told the FBI that Mr. Risen is on your blacklist?  Is

11   that a term you used?

12   A.   I believe so.

13   Q.   And Mr. Risen is on a blacklist because he writes stories

14   that are critical of the CIA, correct?

15   A.   No.  He is on my blacklist because I had no interest in

16   speaking to him, and I had his efforts to contact me blocked.

17   Q.   Okay.  And when did that happen?

18   A.   During my period at the National Security Council.

19   Q.   And how many other journalists did you have blocked from

20   access to you when you worked with the NSC?

21           MR. TRUMP:  Objection, Your Honor.  Objection.  Not

22   relevant.

23           THE COURT:  I'm going to overrule that objection.

24   You can answer.  Go ahead.

25           THE WITNESS:  I do not recall, but the principle of

1    the matter was I was not interested in speaking to journalists

2    as an intelligence professional.

3    BY MR. MAC MAHON:

4    Q.   Right, but you listed Mr. Risen specifically as the

5    recipient of the blacklist for you, correct?

6    A.   I did.

7    Q.   Okay.  And you testified that the disclosures in the book

8    would tell Iran that we were trying to interfere with their

9    nuclear weapons program?  Is that a fair statement of what you

10   said?

11   A.   Disrupt would be the accurate word, yes.

12   Q.   And your testimony to the jury is that the Iranians don't

13   know that the United States government is trying to interfere

14   with their nuclear weapons program?

15   A.   Having it confirmed to them is very different than

16   suspecting that, in fact, we're doing it.

17   Q.   Do you believe the Iranians didn't know before 2006 that

18   the Americans were trying to interfere with their nuclear

19   weapons program?

20   A.   I do not believe before 2006 that they knew the modalities

21   in which we were trying to interfere or believed to interfere

22   with their nuclear program.  That would be a correct statement.

23   Q.   Were you ever given any details as to how the delivery of

24   the, I think your term, fire set plan was accomplished by

25   Merlin to the Iranians in Vienna?

1  A.    Yes.

2  Q.    You knew it was delivered wrapped in a newspaper?

3  A.    I don't recall how it was delivered.

4  Q.    Did you understand that it was actually delivered in

5  person to someone at the Iranian office?

6          MR. TRUMP:  Objection.  He just testified he does not

7  know how.

8          THE COURT:  Sustained.

9  BY MR. MAC MAHON:

10  Q.   So you don't know any details about how it occurred,

11  correct?

12  A.   That's a loaded word when you say "any details."

13  Q.   Do you know any details at all -- you said you were

14  briefed on this program in depth, correct?

15  A.   Correct.

16  Q.   Okay.  Do you remember any details at all about how it was

17  that Merlin delivered the plans for a nuclear weapon to the

18  Iranian office in Vienna?

19  A.   He had established contact through a letter, and he then

20  had a meeting at a certain location in Vienna.

21  Q.   A meeting with someone from Iran?

22  A.   From Iran, correct.

23  Q.   Now, Mr. Trump asked you if you did an evaluation of the

24  compromise caused by the publication of *State of War*.  Do you

25  remember that?

1    A.   In terms of chapter 9?  Is that what you're referring to?

2    Q.   Well, no, of the whole book, *State of War*.  That's what he

3    asked you, didn't he?

4    A.   I think the reference was to chapter 9.

5    Q.   Well, Mr. Tenet asked you to do an analysis of the whole

6    book, correct?

7             MR. TRUMP:  Objection, Your Honor.  Beyond the scope.

8             THE COURT:  And chapter 9 is the only -- chapter 9 is

9    the only issue in this case, so I'm going to -- you can confine

10   that question to chapter 9, please.

11            THE WITNESS:  Let the record show it wasn't

12   Mr. Tenet.

13   BY MR. MAC MAHON:

14   Q.   Who was it, sir?

15   A.   Ambassador Negroponte.

16   Q.   Okay.  I apologize.  But you did do an analysis of chapter

17   9, didn't you?

18   A.   I would not call it an analysis.

19   Q.   Well, what would you call it?

20   A.   I would call it a summary statement of what I believed to

21   be the compromises of chapter 9 in an approximately two-page

22   memo.

23   Q.   And you were also asked to do an analysis of who you

24   thought the likely sources were, weren't you?

25            MR. TRUMP:  Objection.  Beyond the scope.

1           MR. MAC MAHON:  It's the same analysis.

2           THE COURT:  I'm going to, I'm going to permit that.

3    Overruled.  So that is a question, sir.

4    BY MR. MAC MAHON:

5    Q.   Mr. Shedd --

6    A.   Repeat the question.

7    Q.   -- you were also asked, weren't you, to do an analysis of

8    who the likely source was for the disclosure of information in

9    *State of War*, chapter 9, correct?

10   A.   I was asked what potential individuals would have had

11   access to it; that's correct.

12   Q.   Right.  And your answer was --

13           THE COURT:  Well, be careful.  No improper revelation

14   of names.

15           MR. MAC MAHON:  I won't, Your Honor.

16           THE COURT:  All right, that's fine.

17   BY MR. MAC MAHON:

18   Q.   Your answer was that the likely source was agency --

19           MR. TRUMP:  Your Honor?

20           THE COURT:  Wait.

21           MR. TRUMP:  I'm going to object at this point.  He's

22   asking for an opinion of this person as to possible sources.

23           THE COURT:  The jury will be told that they can't

24   decide this case on conjecture but on the evidence, but I think

25   this evidence is sufficiently relevant to the defense.  I'm

1    overruling the objection.

2    BY MR. MAC MAHON:

3    Q.   Mr. Shedd, do you remember writing this report on

4    chapter -- one paragraph starts "Chapter 9, A Rogue Operation"?

5    No, it's not an exhibit, Mr. Shedd.  Do you remember writing

6    it?

7    A.   Could you give me a --

8            MR. TRUMP:  If there's a report that --

9            THE COURT:  Yes, I agree.  If you've got a document

10   authored by this witness, it's only fair to show it to him.

11           MR. MAC MAHON:  I will, Your Honor.

12           THE COURT:  All right.  What -- is there an exhibit

13   number?  Mr. MacMahon, is that --

14           MR. MAC MAHON:  It's not an exhibit, Your Honor.  I

15   can show it to him to refresh his recollection.

16           Can I show this to Mr. Wood, Your Honor -- give this

17   to Mr. Wood?

18           THE COURT:  Yes, go ahead.

19           Mr. Trump, do you have a copy of that someplace?

20           MR. TRUMP:  Someplace, Your Honor, but not --

21           THE COURT:  All right.

22   BY MR. MAC MAHON:

23   Q.   Just the page, just the page that was opened to,

24   Mr. Shedd.

25   A.   I need context.

Shedd - Cross                                                          13

1   Q.   And you can go back -- just look at the page that's opened

2   to you, where it says "Analysis of the Compromise."  Do you see

3   that?  Do you see "Rogue Operation"?

4   A.   I'm sorry, I see a blackened page with one sentence.

5             THE COURT:  All right, let's approach the bench.

6             (Bench conference on the record.)

7             THE COURT:  Mr. MacMahon, you've got to give him more

8   context than this.

9             MR. MAC MAHON:  It's all blacked out, Judge.  I'm

10  sorry, Your Honor.

11            THE COURT:  Well, where did it come from?

12            MR. MAC MAHON:  This came from discovery in this

13  case, and if you go back, he did an analysis of the entire

14  book, and it's --

15            THE COURT:  Is there a heading?  Is this a Lotus

16  note?  What is this?

17            MR. MAC MAHON:  I think you've got to go back a

18  couple more pages.  He's tasked to evaluate the whole book and

19  say who the likely sources are, and his answer is agency

20  officials for chapter 9, and that's the point.

21            THE COURT:  All right, but is this the start of it?

22            MR. MAC MAHON:  I think so.

23            THE COURT:  I'm looking at the Bates stamp numbers.

24  Even they are cut off.

25            Well, show him this first page.

Shedd - Cross                                                          14

1          MR. TRUMP:  I don't think this is Mr. Shedd, Your

2    Honor, but it may -- this, this part is, but not up here, I

3    believe.

4          THE COURT:  Do you have a better copy with the Bates

5    stamp number?

6          MR. MAC MAHON:  This is, this is as good as it gets

7    from what we have in the SCIF.

8          THE COURT:  Well, show this to him.

9          MR. MAC MAHON:  Can I just approach the witness just

10   briefly, Your Honor?

11         THE COURT:  Well, no, Mr. Wood can do that.

12         MR. MAC MAHON:  Okay.

13         THE COURT:  Give it to him like this, ask him if he

14   recognizes that, and see what happens from there.

15         MR. MAC MAHON:  Okay.  Thank you.

16         (End of bench conference.)

17   BY MR. MAC MAHON:

18   Q.   Mr. Shedd, directing your attention to the first page of

19   that document -- oh, I'm sorry.  Excuse me, Your Honor.

20         Mr. Shedd, directing your attention to the first page

21   of that document, do you see what, what we're looking at here?

22   What you're looking at, excuse me.

23   A.   There's a lot on the page.  What, what aspect of it?

24   Q.   Does that refresh your recollection that you wrote a

25   report in which you were asked to, to give information as to

1    who you believed the likely source was for the information in

2    chapter 9?

3    A.    That's correct.

4    Q.    Right.  And your answer when we looked at the next page

5    was that in your view, the likely source were agency officials,

6    correct?  That's the page with the red tab on it, Mr. Shedd.

7    A.    Correct.

8             THE COURT:  All right, you can return that.

9             Mr. Wood, if you would, return the document to

10   Mr. MacMahon.

11            MR. MAC MAHON:  I don't have any further questions,

12   Your Honor.  Thank you.

13        *         *         *         *         *

14

15                 CERTIFICATE OF THE REPORTER

16       I certify that the foregoing is a correct excerpt of the

17   record of proceedings in the above-entitled matter.

18

19

20   _____
                        /s/
21                  Anneliese J. Thomson

22

23

24

25