IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:10cr485 (LMB) |
| | ) | |
| JEFFREY ALEXANDER STERLING | ) | |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

> *I was deeply concerned because this was not just a sensitive program, but it was one of the only levers that we believed we had, that the President had, to try to disrupt the Iranian nuclear program.*
>
> > *Former National Security Advisor Condoleezza Rice,*
> > *Testimony Regarding a Meeting at the White House on April 30, 2003*
>
> *These are matters of war and peace, and they should be evaluated based on the facts and what is ultimately best for the American people and for our national security.*
>
> > *President Barack Obama, April 2, 2015*

On April 2, 2015, President Obama took the podium in the Rose Garden of the White House to announce that the United States had arrived at a tentative agreement with Iran over its nuclear program. In his remarks, the President emphasized that he has "no greater responsibility than the security of the American people," and he insisted that he will do whatever is "necessary to prevent Iran from acquiring a nuclear weapon." *Statement by the President on the Framework to Prevent Iran from Obtaining a Nuclear Weapon*, Apr. 2, 2015, *available at* www.whitehouse.gov/the-press-office/2015/04/02/statement-president-framework-prevent-iran-obtaining-nuclear-weapon (last accessed Apr. 15, 2015). Iran, he said, has been advancing its nuclear program for decades and our country's options for preventing Iran from developing nuclear weapons are few.

But, the President stated, we must do everything we can to prevent Iran from doing so, to "make our country, our allies, and our world safer."  *Id.*  The issues at stake, he said "are bigger than politics."  *Id.*

The President's recent statements about the Iranian nuclear weapons program echo the trial testimony of Dr. Condoleezza Rice, who, as the National Security Advisor to President George W. Bush, met with representatives of *The New York Times* at the White House on April 30, 2003, for the express purpose of requesting that the newspaper stand down from running an article James Risen had written concerning Classified Program No. 1., a CIA operation targeting the Iranian nuclear weapons program.   Dr. Rice explained at trial that

> disruption of or even preferably destruction of the Iranian nuclear program was one of the highest priorities of the Bush administration.  It had been a high priority before in the Clinton administration.  It remains a high priority today for the Obama administration.

DE 418 at 50.   During the meeting, she told the newspaper's representatives that "preventing working nuclear weapons from falling into the hands of rogue states is one of the most important missions that this or any other administration can have."  *Id.* at 60.   Dr. Rice knew to be true in 2003 what President Obama would reiterate twelve years later – the United States had and has very few options for disrupting and undermining the Iranian nuclear weapons program.   And so, at the April 30, 2003 White House meeting, Dr. Rice conveyed her deep concerns to representatives from the *Times*, including Mr. Risen, that any article about Classified Program No. 1 would endanger lives and national security by compromising one of the most important, closely held, and sensitive intelligence operations of her entire tenure as National Security Advisor.

The trial in this case proved beyond a reasonable doubt that the defendant, Jeffrey Sterling, motivated by pure vindictiveness, is the reason Mr. Risen wrote an article about Classified

Program No. 1 – and, in turn, the reason why Dr. Rice took the then-unprecedented step of convening a meeting at the White House to request that a national newspaper not run a story.   Of course, the trial also established that the defendant and Mr. Risen were not deterred by the *Times*' decision in 2003 to heed Dr. Rice's warnings concerning the compromise of Classified Program No. 1; the two men continued to communicate for the better part of two-and-a-half years until the publication of Mr. Risen's book *State of War* in December 2005, which contained the same account of the program he sought to publish in 2003.

After a two-week trial, the defendant now stands convicted of *all* of the charges submitted to the jury, including seven counts of unlawful disclosure and retention of national defense information under 18 U.S.C. § 793(d) and (e) (Counts One – Seven), one count of unauthorized conveyance of government property under 18 U.S.C. § 641 (Count Nine), and one count of obstruction of justice under 18 U.S.C. § 1512(c)(1) (Count Ten).   The evidence at trial established conclusively that Classified Program No. 1 was no ordinary intelligence program.   Nor was it a "rogue" operation, as characterized by the defendant and Mr. Risen.   On the contrary, the program was meticulously conceived and developed over a period of many years by the CIA, in consultation with this country's foremost nuclear experts, including a team – led by Walt C. – at a national laboratory.   It was reviewed, vetted, and approved by high-level officials in the United States government, and used not only against Iran but other countries as well.

Evidence at trial established that at all times, the program, which depended on the assistance of not one, but two, sensitive Russian assets, was one of the government's most closely held operations.   Moreover, during his time as a case officer assigned to the program, the

defendant was tasked with the most important responsibility of any intelligence officer: the handling of a human asset, Merlin.

The defendant has now had his day in court, the truth about Classified Program No. 1 and Merlin has been laid bare in a public forum, and a jury of the defendant's peers has rendered a resounding and considered verdict, finding beyond a reasonable doubt that the defendant made a calculated, deliberate, and willful decision to sabotage a critical counterproliferation program out of sheer spite, in violation of his sworn duty as a former CIA case officer – and in violation of this country's criminal law.   The defendant's actions resulted in substantial damage to national security and placed in harm's way two human assets, their families, and those who worked with them.   When he disclosed facts about Classified Program No. 1 – and distorted them to maximize the damage to the CIA, an entity he had grown to despise – he did so out of selfishness, not love of his country.   Those facts could not be clearer from the evidence presented at trial.   As such, the defendant deserves to be sentenced to a significant and lengthy term of imprisonment.

I.      **The Applicable Guidelines Range Is Correctly Calculated at 235 to 293 Months.**

As this Court is aware, after *United States v. Booker*, 543 U.S. 220 (2005), the district court must engage in a multi-step process in sentencing a defendant.   First, the district court must correctly determine, after making appropriate findings of fact, the applicable guideline range. *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006); *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).   In doing so, the Court must make factual findings, supported by a preponderance of the evidence, to substantiate any pertinent guidelines enhancements.   *See United States v. Harvey*, 532 F.3d 326, 337 (4th Cir. 2008); *United States v. Quinn*, 359 F.3d 666, 680 (4th Cir. 2004).   "Next, the court must 'determine whether a sentence within that range serves

the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does

serve those factors.'"  *Moreland*, 437 F.3d at 432 (quoting *United States v. Green*, 436 F.3d 449,

455 (4th Cir. 2006)).

That the Sentencing Guidelines are non-binding does not render them irrelevant to the

imposition of an appropriate sentence.  On the contrary, "[a]s a matter of administration and to

secure nationwide consistency, the Sentencing Guidelines should be the starting point and the

initial benchmark" for determining a defendant's sentence.  *Gall v. United States*, 552 U.S. 38, 49

(2007); *United States v. Abu Ali*, 528 F.3d 210, 260 (4th Cir. 2008).  Indeed, given the Sentencing

Commission's important institutional role and expertise, the recommended guidelines range

typically will "reflect a rough approximation of sentences that might achieve § 3553(a)'s

objectives."  *United States v. Kimbrough*, 552 U.S. 85, 89 (2007) (quoting *Rita v. United States*,

551 U.S. 338, 350 (2007)); *Unites States v. Lymas*, – F.3d – , 2015 WL 1219553, at *4 (4th Cir.

Mar. 18, 2015).  The district court must therefore "consider the guideline range applicable to the

defendant and pertinent policy statements of the Sentencing Commission."  *United States v.

Perez-Pena*, 453 F.3d 236, 241 (4th Cir. 2006); *see also Hughes*, 401 F.3d at 548 ("In the wake of

*Booker* . . . a sentencing court is still required to 'consult [the] Guidelines and take them into

account when sentencing.'" (quoting *Booker*, 543 U.S. at 264)).  And, if the district court imposes

a sentence outside the guideline range, the court must explain its reasons for the variance as

required by 18 U.S.C. § 3553(c)(2).  *Id.*; *see also United States v. Carter*, 564 F.3d 325, 328 (4th

Cir. 2009); *Abu Ali*, 528 F.3d at 260 ("If the sentencing court believes 'an outside-Guidelines

sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification

is sufficiently compelling to support the degree of the variance.'" (quoting *Kimbrough*, 552 U.S. at

5

597)); *Moreland*, 437 F.3d at 434 ("The farther the court diverges from the advisory guideline range, the more compelling the reasons for the divergence must be.").

The United States has reviewed the initial Presentence Investigation Report (PSR) and submitted its proposed corrections to the probation officer on April 6, 2015.   DE 455.   All of those corrections are reflected in the revised report dated April 16, 2015.   DE 462.   The United States has no additions, corrections, or objections to the revised report.   The PSR properly calculates a combined base offense level of 35 for grouped Counts One through Seven and Nine, pursuant to U.S.S.G. § 2M3.2.   *Id.* ¶ 44.   Likewise, because the obstruction of justice count, Count Ten, does not group with the other counts of conviction, the Guidelines impose an additional one-level upward adjustment to the recommended offense level.   *Id.* ¶¶ 50-58.   Finally, the PSR includes an appropriate two-level adjustment for the defendant's abuse of a position of trust under § 3B1.3, *id.* ¶ 47, resulting in a total offense level of 38 and a recommended Guidelines sentence of 235 to 293 months.   *Id.* ¶¶ 62, 91.

For his part, the defendant does not challenge the base offense level of 35 or the additional one-level adjustment for the obstruction of justice count.   Rather, his only substantive objection relates to the abuse-of-trust enhancement.   *Id.* at 22.   The Court should reject his objection and apply the enhancement.

## II.      The Enhancement for Abuse of a Position of Trust Is Appropriate.

The PSR properly assesses a two-level enhancement to account for the defendant's abuse of a position of trust, pursuant to U.S.S.G. § 3B1.3.   Section 3B1.3 provides, in pertinent part:

> If the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by

2 levels.   This adjustment may not be employed if an abuse of trust . . . is included in the base offense level or specific offense characteristic.

The Fourth Circuit has identified several factors that a district court should consider in determining whether a defendant abused a position of trust:

> First, courts ask whether the defendant had special duties or "special access to information not available to other employees."   Second, the defendant's level of supervision or "degree of managerial discretion" is relevant.   Bank tellers who embezzle from their employers provide an example of a situation where there is little trust to abuse because the employees are closely supervised, and it is expected that wrongs they commit will be readily detected.   Third, the analysis also entails an examination of "the acts committed to determine whether this defendant is 'more culpable' than others who hold similar positions and who may commit crimes."

*United States v. Gordon*, 61 F.3d 263, 269 (4th Cir. 1995).   "It is certainly also important to inquire into the level of harm occasioned by the breach of trust."   *United States v. Pitts*, 176 F.3d 239, 246 (4th Cir. 1999).

In light of these factors, and under the clear wording of the enhancement, the defendant should be subject to a two-level upward adjustment.   As someone occupying the highly coveted position of an operations officer, or case officer, with the CIA, the defendant plainly occupied a position of trust.   On his first day with the CIA, the defendant signed a secrecy agreement, acknowledging his obligation to protect classified information and agreeing that "by being granted access to such information or material [he would be] placed in a position of *special confidence* and *trust* and become obligated to protect the information and/or material from unauthorized disclosure."   GX 1 at 1 ¶ 2 (emphasis added).   Throughout the defendant's nearly nine-year career, he was repeatedly re-advised concerning the handling of sensitive and classified information.   And given the nature of the highly sensitive assignments undertaken by the defendant, there is no doubt that he understood the sensitivity of the information available to him

7

and the trust placed in him by the United States government to maintain the security of that classified information.

It was the defendant's unique assignment as a handler for Merlin that gave him access to one of the United States' most sensitive counterproliferation operations.   Very few people – throughout the entire federal government – were privy to the details of Classified Program No. 1, and even fewer knew the true identity of Merlin.   The defendant was one of these select few. Unlike a bank teller, who is subject to constant supervision, the defendant enjoyed significant autonomy in his role as a case officer, and after he left the CIA he was subject to no oversight concerning his continued adherence to his lifelong secrecy obligation.   In other words, once the defendant was no longer employed by the CIA, he was entrusted to police his own conduct with respect to the classified information he'd learned.   By committing his crimes, the defendant willfully abused that solemn trust, and, as described below, the amount of harm he wrought was tremendous.   As such, the defendant's position of trust "significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.

In his objection to the initial PSR, the defendant claimed that § 3B1.3 was somehow inapplicable because access to "information not available to other employees" and the presence of "special duties" were inherent in his position with the CIA – and likewise inherent in his crimes. He is wrong.   The fact that, by its nature, his job as a case officer vested him with access to closely held, classified material and afforded him special responsibilities in no way undermines application of the enhancement.   Indeed, in analogous circumstances, other courts have upheld the application of this abuse-of-trust provision notwithstanding that the underlying offense

actually required proof of the defendant's status as an employee.   For example, in an

embezzlement case the Seventh Circuit reasoned:

> This court has explained that, although *breach* of trust is a necessary element of
> embezzlement under 18 U.S.C. § 656 – a statute parallel to § 1005 prohibiting
> "misappropriation" of bank funds with the intent to deceive – *abuse* of trust is not,
> and constitutes more egregious conduct warranting an upward adjustment under
> § 3B1.3.   *See United States v. Dion*, 32 F.3d 1147, 1149-50 (7th Cir. 1994)
> (joining Second, Third, Fifth and Ninth Circuits in holding that abuse of position of
> trust is not an element of embezzlement under § 656).

*United States v. Sonsalla*, 241 F.3d 904, 909 (7th Cir. 2001) (emphasis in original).   The court in

*Sonsalla* went on to hold that a defendant convicted of violating 18 U.S.C. §§ 656 or 1005 – both

of which require proof that the defendant was an "officer, director, agent or employee" of the

victim bank – could be held to account for an abuse of a position of trust through the two-level

enhancement in § 3B1.3.   *See also United States v. Brown*, 66 F.3d 124, 129 (6th Cir. 1995) ("Nor

is abuse of trust a necessary element of the crime of embezzlement; the government had to show

that Brown was a municipal agent, *see* 18 U.S.C. § 666(a)(1), but did not have to prove the degree

of independence and discretion that the enhancement provision requires . . . .").

As such, even where a statute, by its express terms, requires proof that the defendant

occupied a position of trust, courts have held that § 3B1.3 is still applicable so long as the

defendant *abused* that trust.   Here, of course, § 793 does not require proof that the defendant was

a government employee, but even if it did, a two-level abuse-of-trust enhancement would be

appropriate in light of the defendant's egregious abuse of the trust placed in him by the CIA.

Indeed, addressing analogous abuse-of-trust circumstances in a case involving the National

Security Agency (NSA), the Fourth Circuit had little trouble upholding application of the

enhancement.   In *United States v. Ford*, 288 F. App'x 54 (4th Cir. 2008) (unpublished), the court,

after reciting the factors articulated in *Gordon*, concluded that an NSA employee who revealed

Top Secret information was subject to the two-level increase:

> Ford held a top secret security clearance as an employee of the National Security
> Agency and he was able to remove classified documents from his office without
> detection by his supervisors. Ford's actions exposed classified information to
> discovery by a person without a security clearance and created a potential for
> serious harm to our nation's security.
>
> The district court also did not err in finding that Ford's advisory Guidelines
> sentence should be enhanced because his abuse of his position of public trust
> contributed significantly to his commission of the offense.   Ford simply would not
> have been able to commit the offense of retaining classified documents without
> permission if he had not held a top secret security clearance as an employee of
> NSA.

*Id.* at 61.   The court's reasoning in *Ford* – a case the defendant did not address in his objection –

applies with equal force here: Sterling "simply would not have been able to commit [his crimes] if

he had not held a top secret security clearance as an employee of the [CIA]."   As such, the PSR

appropriately increased the defendant's offense level by two levels pursuant to § 3B1.3, and the

Court should reject the defendant's objection.

## III.   The 18 U.S.C. § 3553(a) Sentencing Factors Support a Severe Sentence.

Under 18 U.S.C. § 3551, a defendant must be sentenced in a manner "so as to achieve the

purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they

are applicable in light of all the circumstances of the case."   This mandate is repeated in the first

sentence of § 3553(a), which provides: "The court shall impose a sentence sufficient, but not

greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."

This section then states that in determining a particular sentence, a sentencing court must consider

certain enumerated factors.   Thus, § 3553(a) serves two functions:

First, it prescribes that every sentence comply with the four announced *purposes* for sentencing. Second, it lists seven *factors* that a court must consider in determining a particular sentence, and included as one of the factors is the list of announced purposes for sentencing in § 3553(a)(2).

*   *   *   *

The proper application of § 3553(a) therefore requires a sentencing court to focus on the four *purposes* of sentencing, as applicable in a particular case, and to consider, in determining a sentence that achieves those purposes, the seven *factors* listed in § 3553(a)(1)-(7).

*United States v. Shortt*, 485 F.3d 243, 247-48 (4th Cir. 2007) (emphasis in original).   These factors can overlap in their application.   *United States v. Johnson*, 445 F.3d 339, 345 (4th Cir. 2006) (comparing, for example, promoting respect for the law under § 3553(a)(2)(A) and affording adequate deterrence under § 3553(a)(2)(B)).

In this case, the applicable § 3553(a) factors are consistent with a severe sentence.   Of particular significance are (1) the nature and circumstance of the offense and the need for the sentence imposed to reflect the seriousness of the offense, (2) the history and characteristics of the defendant, and (3) the need for the sentence imposed to promote respect for the law and afford adequate deterrence.

### A.   The Nature and Circumstances of the Offense and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense

The nature and circumstances of the offenses for which the defendant has been convicted – especially the seven counts of conviction under 18 U.S.C. § 793 – as well as the need for the sentence to reflect the seriousness of his crimes, warrant a significant and lengthy sentence for a number of reasons.   18 U.S.C. § 3553(a)(1) & (a)(2)(A).

1.   The defendant was convicted of having unlawfully disclosed national defense information about Classified Program No. 1 and Human Asset No. 1 (i.e., Merlin).   In rendering

11

its verdict, the jury determined beyond a reasonable doubt that the disclosure of this information was potentially damaging to the United States and also that the defendant had reason to believe this information could be used to the injury of the United States or to the advantage of any foreign nation.

Testimony at trial made clear that Classified Program No. 1 was designed to gather intelligence about, as well as undermine, Iran's nuclear weapons program and similar programs of other rogue states.   It is beyond dispute that preventing the proliferation of nuclear weapons has been a national security priority for decades, and Classified Program No. 1 represented a unique – and rare – opportunity to counter the threats that stem from the development, spread, and possession of nuclear weapons by Iran and other foreign adversaries.   Any intelligence gathered by and through this program could have assisted senior level officials in making vital decisions that impact this country's foreign policies, diplomatic relationships, and military preparedness.

That the defendant, as a trained CIA case officer, knew all of this makes his conduct particularly egregious.   While a case officer, he specialized in Iranian matters and served in the agency's Counter Proliferation Division.   By virtue of his employment at the CIA, the defendant was aware of the threat posed by Iran should it develop or acquire nuclear weapons, he was knowledgeable about Iran's support for and sponsorship of terrorism, and he was cognizant of the lethal and frightening combination – nuclear weapons and terrorism – those threats present.

More specifically, during the defendant's time as a case officer assigned to Classified Program No. 1, which spanned approximately a year and a half, he was privy to the prodigious effort the United States had undertaken to conceive, develop, and vet the program.   Indeed, he was instrumental in the program's deployment against Iran.   Notwithstanding that he was

12

reassigned from Classified Program No. 1 in 2000 before it was used against other countries, he was aware those operations were contemplated, GX 45, and most likely underway when he chose to reveal this program to James Risen in 2003.

2.      In addition, the defendant was entrusted with – and later willfully violated – one of the most sacrosanct responsibilities of a case officer: the handling and protection of a sensitive, human asset.   That asset, Merlin, testified that he was a nuclear weapons expert who had worked at Arzamas 16, one of the Soviet Union's nuclear weapons assembly facilities.   After moving with his family to the United States in the mid-1990s, Merlin was approached by the CIA and ultimately agreed to work with the agency.   Merlin's first case officers, Laurie D. and Steven B., both testified that the intelligence obtained as a result of Merlin's numerous initial debriefings was considered extremely valuable.

Because the former Soviet Union remains an adversary and poses a nuclear threat, intelligence about its nuclear capabilities is critical.   That the United States had obtained this knowledge and information from Merlin was a closely held secret and an important intelligence advantage.   As David Shedd, one of this country's highest-ranking intelligence officials, explained at trial:

> I believe it is a safe assumption that our nuclear posture inside the United States and security of the United States relies heavily on understanding what our adversaries know or, as importantly, do not know what we know about their programs . . . .

DE 459 at 21.

The defendant was well aware of Merlin's background and the significance of the intelligence he provided the United States, and he therefore knew that disclosing the fact that the United States was in possession of this intelligence could undermine its utility to the government.

13

3.      Likewise, the defendant also compromised closely held intelligence sources and methods.   The jury heard testimony from five case officers – Steven B., Laurie D., Zach W., Stephen Y., and Denis M. – and the program's primary architect, Robert S., also an experienced case officer, all of whom worked directly with Merlin.   The jury also heard testimony from Charles Seidel and Mark L., former case officers and supervisors of the defendant.   These witnesses uniformly testified that the most critical task undertaken by a case officer is the protection of the agency's human assets.   The relationship between case officer and asset relies heavily on trust, with the asset depending on the case officer to protect his or her identity and security at all costs.   Any compromise of that trust, and the agency would be unable to carry out its mission.   Perhaps the most egregious aspect of the defendant's conduct, then, is that he chose to violate this fundamental principle.   Merlin put his faith and trust, indeed his life, and the lives of his family, into the defendant's hands.   The defendant selfishly and callously violated that trust and put them at risk.

Both Merlin and his wife testified that they continue to live in constant fear as a result of the disclosure of Merlin's involvement with the CIA in *State of War*.   DE 435 at 45; DE 460 at 12. Indeed, the government's last witness, Jill Eulitz, testified as an expert on Russia's intelligence service and highlighted the fact that the service has a long memory and is willing to wait years or decades to exact retribution against those who have betrayed the country.   Critically, numerous witnesses also testified that the public disclosure of a human asset severely undermines the United States' ability to recruit other foreign assets, who may fear a fate similar to Merlin's if they choose to place their trust in our government.   *See, e.g.*, DE 459 at 21-22 (testimony of David Shedd). The defendant's deliberate and reckless decision to reveal to Mr. Risen Merlin's identity and,

critically, his affiliation with the CIA is an aggravating factor militating in favor of a severe sentence.

In addition, the defendant also compromised closely held intelligence methods.   The CIA devoted significant time and money to develop the plans used during Classified Program No. 1. As a result of the defendant's disclosures, however, the United States' adversaries now know that this country's intelligence community is capable of extremely sophisticated nuclear counterproliferation operations, and, in response, they may take countermeasures to protect against any perceived vulnerabilities in their security systems and methods.   Likewise, as a result of the defendant's conduct, our adversaries also know the CIA was able to recruit and utilize two Russian nuclear engineers (Merlin and Human Asset No. 2) as part of Classified Program No. 1. Again, these foreign powers may take countermeasures to make it more difficult for other assets working with and for the United States to gather useful intelligence, and to prevent our intelligence agencies from recruiting other valuable assets in the future.

4.       In addition, the potential damage caused by the defendant's dissemination of highly sensitive, classified national defense information to James Risen and the public at large through the publication of his book, *State of War*, could not be controlled.   As a result of the defendant's conduct, every intelligence service in the world knew what we did and how we did it.   And that is precisely what the defendant intended.   His purpose was not to assist a specific foreign government; rather, his purpose was to maximize damage to the CIA as an institution – motivated by pure vindictiveness on his part.   To achieve his goal, the defendant not only outed the existence of Classified Program No. 1, he did so in a way that made the agency appear hapless, even reckless, in its handling of the program.   This version of events, parroted by Mr. Risen in Chapter

15

9, runs contrary to the facts elicited at trial, which established that those involved in the program

acted in a deliberate and thorough manner to ensure at all times that, in the words of Walt C., the

program would "do no harm."   DE 460 at 26.

The defendant knew all of this, and yet he carefully invented details and imaginary

concerns that would draw the attention of the media.   Testimony at trial confirmed that while

serving as a case officer working on Classified Program No. 1, and even subsequently while

litigating his various employment claims against the CIA, the defendant never once expressed any

concerns about the plan, design, management, or execution of Classified Program No. 1 – not to

his fellow case officers, not to Merlin, not to Robert S. or David Shedd, not to any of his

supervisors in New York or at CIA Headquarters, not to the CIA Inspector General, and not to the

House Permanent Select Committee on Intelligence.   To the contrary, cable traffic reflected the

defendant's consistent approval of and enthusiasm for the program.   Only once it was clear that

his litigation efforts were not going to succeed did the defendant come up with the idea that the

program was ill-conceived and poorly run, a story he concocted almost *five* years after he first met

Merlin in 1998 (and three years after the Vienna trip), all so he could have a vehicle through which

to inflict as much damage as possible on the agency he believed had treated him unfairly.

He succeeded, and his success came at the expense of national security.   Indeed, although

the government was required only to prove potential harm, the evidence at trial, in fact, proved

actual harm: actual harm to Merlin and his family and actual harm to the classified operations in

which he had participated, and which were the product of approximately ten years' worth of

development and deployment.   To that end, the evidence at trial laid to rest any doubt about

whether the defendant's actions, which he still denies, were motivated by a desire to expose

government malfeasance.   Nothing could be further from the truth.   The trial in this case

established conclusively that the defendant was no whistleblower.   He had nothing to blow the

whistle on, so he invented a rogue operation and cast himself as the hero.   This conduct –

disclosing the details of Classified Program No. 1 and then distorting them to serve his own

vindictive means – underscores the serious and aggravated nature of the defendant's criminal

conduct.

5.      As noted, in the PSR the defendant's offense level is increased by two levels for

abuse of a position of trust.   That enhancement is appropriate and illustrates the egregious nature

of the defendant's conduct and need for a severe sentence to reflect the gravity of his crimes.

When the defendant joined the CIA in May 1993, he took an oath to protect forever the secrets

with which he was entrusted.   GX 1.   He received training on the importance of protecting

classified information and the handling of human assets.   When he left the CIA in January 2002,

he was debriefed on his obligation to continue to protect classified information, which included the

identity of the assets with whom he had worked.   He said he understood those obligations.   When

Gayle Scherlis asked him during his final debriefing if he had kept any classified materials, he said

no.   That was a lie, of course, as the evidence at trial proved that he had taken a classified

document (the letter from Merlin to the Iranians that appears in Mr. Risen's book) when he left

New York.

The defendant was given a tremendous opportunity to serve his country when he joined the

CIA.   Ultimately, he was unable to meet that challenge, and he was fired.   His obligation to

protect national security continued, however, and his deliberate choice to ignore that obligation is

another factor supporting imposition of a lengthy sentence.

17

6.      Finally, when the defendant learned that the FBI was investigating the

unauthorized disclosure of classified information in 2006, rather than come clean and admit he had

communicated with Risen about the Iranian nuclear weapons program, he chose to obstruct justice.

No doubt acting in the hope that no one would ever uncover the nature of his discussions with Mr.

Risen, the defendant elected to destroy email evidence – specifically, an email he had sent Mr.

Risen over three years earlier.   This is not the act of an innocent man, a fact the jury understood

when it convicted him of Count Ten.   This independent and egregious conduct underscores the

seriousness of the defendant's conduct.

**B.      The History and Characteristics of the Defendant**

The history and characteristics of the defendant further support the need for a severe

sentence in this case.   18 U.S.C. § 3553(a)(1).   The defendant's criminal conduct was not borne

of ignorance, naiveté or mistake.   Rather, the conduct engaged in here was undertaken by an

intelligent and careful man.   The defendant is well-educated, having earned his BA in 1989 and a

law degree in 1992.   He was admitted to practice law in New York in 2000.   His employment

with the CIA lasted almost a decade, and even after he was terminated he was able to find another

job with Anthem Blue Cross Blue Shield in Missouri, where he remained employed for several

years until his arrest in 2011.   In short, when the defendant left the CIA, he was an educated and

employable professional, possessing many more options than the average criminal defendant.

Despite these opportunities, however, the defendant chose a different a path.   He chose to

break the law.   As discussed above, the defendant's convictions in this case under 18 U.S.C. § 793

rest, in part, on the jury's findings that the defendant had "reason to believe" that his actions were

potentially damaging to the United States and that they might aid foreign powers.   In other words,

rather than simply walking away from his CIA experience, the defendant deliberately abused the opportunities provided to him by the agency to the detriment of this country's national security. The facts in this case established that the defendant was not a victim of circumstance, who had been forced into making a bad decision by events beyond his control.   On the contrary, he proved himself an opportunist, who knew he possessed valuable information and elected to use that information for individual leverage.   That an intelligent, well-educated member of the professional class made a calculated and deliberate choice to ignore his binding secrecy obligations as a means to settle a personal score further illustrates the seriousness of his conduct.

### C.   The Need for the Sentence Imposed to Promote Respect for the Law and Afford Adequate Deterrence

In addition, imposing a substantial prison sentence in this case is necessary to promote respect for the law and afford adequate deterrence to criminal conduct.   18 U.S.C. § 3553(a)(2)(A) & (a)(2)(B).   The importance of these factors cannot be overstated.   A substantial sentence in this case would send an appropriate and much needed message to all persons entrusted with the handling of classified information, i.e., that intentional breaches of the laws governing the safeguarding of national defense information will be pursued aggressively, and those who violate the law in this manner will be tried, convicted, and punished accordingly.

On his first day at the CIA in 1993, the defendant signed a secrecy agreement.   All CIA employees do the same.   Without the promise of secrecy, the CIA, and other members of the intelligence community, simply cannot function properly.   The disclosures at issue in this case provide a clear and stark example of exactly what can happen when an individual employee disregards his secrecy obligations and appoints himself the arbiter of what information should be made public.   The potential damage is uncontrollable and potentially limitless.

19

This case also demonstrates exactly why no individual should be entitled to grant himself such power.   People act in response to all manner of motivation, some more commendable than others.   Here, the evidence established that the defendant communicated national defense information for purely selfish and vindictive purposes.   It is exactly because this enormous decision-making responsibility cannot be left to the whims of the individual employee that the same secrecy agreement the defendant signed in 1993 made clear that, if he had concerns regarding classified information, he had appropriate, independent outlets through which to address such concerns, including the House and Senate intelligence committees and the CIA's Inspector General.   GX 1 at 1 ¶ 9.   A severe sentence in this case, therefore, will deter other similarly situated individuals from delegating to themselves the decision of what should be made public, and instead will counsel in favor of pursuing grievances related to the United States' national defense, justified or otherwise, through appropriate and lawful channels.

## D.      Other § 3553(a) Factors

The United States submits that the remaining 18 U.S.C. § 3553(a) factors – including, protecting the public from further crimes of the defendant, *id.* § 3553(a)(2)(C); providing the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, *id.* § 3553(a)(2)(D); and the need to provide restitution to any victim of the offense, *id.* § 3553(a)(7) – are either irrelevant to the imposition of the defendant's sentence or are simply outweighed by the factors discussed above.

Likewise, the factor addressing the need to avoid unwarranted sentence disparities among defendants with similar records, who have been found guilty of similar conduct, *id.* § 3553(a)(6), is inapplicable to the defendant's conviction.   Simply put, this case is unique.   As noted, the trial in

this matter established that the defendant, acting out of vindictiveness, deliberately sabotaged an ongoing, high-priority, closely held counterproliferation operation, putting Merlin and Human Asset No. 2 at risk, compromising valuable intelligence methods, and irreparably damaging national security in the process.   No other case charged in federal court even remotely resembles these facts.

Moreover, the degree of harm at issue here further separates the defendant's conduct from other individuals who communicated national defense information to the public through the media.   *Cf. Abu Ali*, 528 F.3d at 263 (finding that the harm contemplated by Ali was much broader in scope and more devastating in terms of its potential impact than the harm contemplated by John Walker Lindh, whose sentence the district court had used for comparison purposes).   Here, the potential harm caused by the defendant is far greater in scope than the harm contemplated or caused by a defendant in any recent § 793 prosecutions.

Most importantly for sentencing-disparity purposes, the defendant exercised his right to a jury trial.   The jury's guilty verdict on each of the nine counts it considered reflects the community's rejection of the defendant's conduct and its conclusion that there existed no reasonable doubt as to his criminal responsibility.   The jury verdict sets the defendant apart from other defendants who have admitted their unauthorized disclosures, cooperated with the government, and demonstrated remorse and acceptance of responsibility through guilty pleas. Indeed, the distinction between defendants who proceed to trial and those who accept responsibility and plead guilty is critical.   For purposes of this § 3553(a) factor, the Fourth Circuit has held that "'[d]efendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government

and proceeds to trial.'"  *United States v. Jeffery*, 631 F.3d 669, 679 (4th Cir. 2011) (quoting

*United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009)).   In *Abu Ali*, the Fourth Circuit

further opined:

> By comparison, Abu Ali refused to cooperate with the government, expressed no responsibility or remorse for any of his offenses, and stands convicted of a crime that carries a mandatory minimum (not maximum) of twenty years imprisonment.   Although Abu Ali had every right to go to trial and claim innocence until proven guilty, he has now been proven guilty and thus cannot avail himself of the benefits typically afforded those who reach plea agreements with the government and accept responsibility for their illegal conduct before going to trial. A comparison resting on Lindh's sentence fails to account for this stark contrast.

> Prior to the Supreme Court's recent decisions in *Gall*, *Kimbrough*, and *Rita*, this circuit had held that a downward deviation based primarily on the comparison of a defendant who went to trial with those who entered plea agreements is a misapplication of § 3553(a)(6) that required the sentence to be vacated.   *See United States v. Khan*, 461 F.3d 477, 500-01 (4th Cir. 2006); *United States v. Perez-Pena*, 453 F.3d 236, 242–43 (4th Cir. 2006).   This was because we viewed the comparison of such defendants, even if co-defendants, to be like "comparing apples and oranges." *Perez-Pena*, 453 F.3d at 243; *see also* Khan, 461 F.3d at 485, 499-501 (finding there is a material difference between those who "accept[] responsibility and provide[] valuable assistance to the government" and those who "never accept[] responsibility and obstruct[] justice both before and during his trial").

528 F.3d at 263-64.

Like Abu Ali, the defendant went to trial.   He cannot now point to other defendants and

avail himself of the benefits they obtained by pleading guilty and accepting responsibility for their

conduct.   There is, quite simply, no useful comparison, either factually or legally, to any other

case.

## IV.    Conclusion.

The trial in this case laid to rest any speculation about the defendant's conduct, his

motivation, and the nature and importance of Classified Program No. 1.   A jury of his peers has

found him guilty of every charge it was asked to consider, finding that he communicated national

defense information to James Risen and, ultimately, the public, all the while acting with reason to

believe that such disclosures could do harm to the United States or benefit a foreign nation.   The

defendant breached his solemn oath to the United States, and, in doing so, hobbled one of this

country's few options to undermine the Iranian nuclear weapons program.   The recommended

Guidelines range of 235 to 293 months has been correctly calculated.   The government

respectfully submits that the Court should impose a severe sentence in this case, reflecting the

severity of the conduct.

Respectfully submitted,

Raymond N. Hulser                                    Dana J. Boente
Acting Chief                                         United States Attorney

Eric G. Olshan                                       James L. Trump
Deputy Chief                                         Senior Litigation Counsel
Public Integrity Section
U.S. Department of Justice                           Dennis Fitzpatrick
                                                     Assistant United States Attorney
                                                     Eastern District of Virginia

By      _____/s/_____
        Eric G. Olshan
        Attorney for the United States of America
        United States Attorney's Office
        2100 Jamieson Avenue
        Alexandria, Virginia 22314
        (202) 514-7621
        (202) 514-3003 (fax)
        eric.olshan@usdoj.gov

23

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2015, I caused an electronic copy of the foregoing

pleading to be filed and served via ECF on Edward B. MacMahon, Jr., and Barry J. Pollack,

counsel for the defendant.


By     _____/s/_____
          Eric G. Olshan
          Attorney for the United States of America
          United States Attorney's Office
          2100 Jamieson Avenue
          Alexandria, Virginia 22314
          (202) 514-7621
          (202) 514-3003 (fax)