**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| vs. | ) |
| | ) |
| JEFFREY ALEXANDER STERLING, | ) |
| | ) |
| Defendant. | ) |

Case No. 1:10-cr-00485-LMB

**JEFFREY ALEXANDER STERLING'S
MEMORANDUM IN AID OF SENTENCING**

## I.     INTRODUCTION

On May 11, 2015, Mr. Jeffrey Sterling will appear before this Court to be sentenced.   This sentencing is set to occur almost four and a half years since this case was initially indicted and, in some respects, ten to fifteen years since the events at issue transpired.   It has been over fifteen years since Mr. Sterling left employment at the CIA and over ten years since Mr. Risen's book State of War was published.   This Court will need to keep all of this in mind as it determines what sentence is "sufficient, but not greater than necessary" to comply with the purposes of federal sentencing.   18 U.S.C. § 3553(a).   *See United States v. Frappier,* 377 F. Supp. 2d 220, 226 (D. Me. 2005) (court found that the eight-year period without incident between purchase of firearm and arrest supported downward departure under the Guidelines).   The defense respectfully submits that the proper answer is that Mr. Sterling should be treated no more harshly than any other person who has been charged and convicted of "leaking" to the press.   In this memorandum, we will provide the Court with specific sentences meted out to other convicted "leakers" so that the Court can decide what is both fair for Mr. Sterling and consistent with the Government's prior

stances in similar cases.   *See* 18 U.S.C. § 3553(a)(6) (the sentencing court shall consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

This case started on December 10, 2010, when a grand jury convening in the United States District Court for the Eastern District of Virginia, Alexandria Division, returned a ten count Indictment against Mr. Sterling.   Counts 1, 4 and 6 charged the defendant with Unauthorized Disclosure of National Defense Information, in violation of Title 18 U.S.C. § 793(d); Counts 2, 5, and 7 charged Unauthorized Disclosure of National Defense Information, in violation of Title 18 U.S.C. § 793(e); Count 3 charged Unlawful Retention of National Defense Information, in violation of Title 18 U.S.C. § 793(e); Count 8 charged Mail Fraud, in violation of Title 18 U.S.C. § 1341; Count 9 charged Unauthorized Conveyance of Government Property, in violation of Title 18 U.S.C. § 641; and Count 10 charged Obstruction of Justice, in violation of Title 18 U.S.C. § 1512(c)(1).   An arrest warrant was also issued for the defendant.

On January 13, 2015, the defendant appeared in Court for commencement of a Jury Trial. On January 21, 2015, the Court issued a Judgment of Acquittal as to Count 8 of the Indictment, Mail Fraud.   On January 26, 2015, the Jury returned a verdict of Guilty as to the remaining nine counts of the Indictment: Unauthorized Disclosure of National Defense Information (Counts 1, 4, and 6), Unauthorized Disclosure of National Defense Information (Counts 2, 5, and 7), Unlawful Retention of National Defense Information (Count 3), Unauthorized Conveyance of Government Property (Count 9), and Obstruction of Justice (Count 10).   This Court continued the case for sentencing to April 24, 2015, pending completion of a presentence investigation and report.

The Probation Office has calculated that Mr. Sterling's Sentencing Guideline's Total Offense Level is 38.   If the Court accepts that calculation, and the defense has interposed an

2

objection to that calculation, the sentencing range called for under the Sentencing Guidelines is 235 to 293 months.[1]   Such a sentence is plainly excessive and shows – most clearly – that charging an alleged "leaker" under the Espionage Act (18 U.S.C. § 793) can lead to extreme sentencing calculations if a defendant elects to exercise his constitutional right to a trial.   The Espionage Act's base guideline is level 30 or 35.   And while it is clear that the conduct the jury found supported these convictions was not classic espionage, the Guidelines were drafted with espionage in mind.   This fact alone justifies a significant downward departure.   In this regard, the Court should be mindful that while the Government has successfully charged "leakers" under the Espionage Act, its legislative history would not support such charges.   When the Espionage Act, then called the Internal Security Act, was amended in 1950, the focus was on the threat of global communism:

> There exists a world Communist movement which, in its origins, its development and its present practice, is a world-wide revolutionary movement whose purpose is by treachery, deceit…espionage, sabotage, terrorism and any other means necessary, to establish a Communist

---

[1] Mr. Sterling contends that the Probation Office erred in enhancing his sentence for abuse of a position of trust.   The enhancement is appropriate in cases where the defendant performed special duties or had special access to information not available to other employees; possessed a great deal of discretion; and acted in a manner more culpable than others in similar positions who engaged in criminal acts.   *United States v. Akinkoye*, 185 F.3d 192, 203 (4th Cir. 1999).   Its applicability must also be assessed from the point of view of the victim.   *Id*.   Applying these factors to Mr. Sterling's case, it is clear that the enhancement is unwarranted.   Mr. Sterling did not have any special duties or access to information not available to other similarly-situated CIA case officers.   Moreover, having "special access to information" is inherent in the offense charged.   The Government, in its sentencing memorandum, argued that the enhancement is appropriate because other Circuits have held that it is applicable even "where a statute, by its express terms, requires proof that the defendant occupied a position of trust . . . so long as the defendant *abused* that trust." DE 464 at 9.   This is a much more general proposition than what Mr. Sterling argued.   The Fourth Circuit has explicitly stated that a determination of whether an abuse of trust occurred includes assessing whether the defendant performed special duties or had special access to information not available to other employees.   This requirement is more than merely holding a position of trust, and it is inherent in the Espionage Act charges.   Nor did Mr. Sterling possess any particular degree of discretion in exercising his duties or act in a manner indicating greater culpability than other convicted "leakers."   Finally, none of the ostensible "victims" in this case shared a heightened "trust" relationship with Mr. Sterling.   The Government failed entirely to acknowledge this last point.   Without this enhancement, Mr. Sterling is at an adjusted offense level of 36, which results in a sentencing range of 188-235 months.

3

> totalitarian dictatorship in the countries throughout the world through the medium of a world-wide communist organization.

Internal Security Act, Ch. 1024, 64 Stat. 987, P.L. 831 (§2 (1)).

As previously noted to the Court, the ten-year statute of limitations applicable to Espionage Act cases can also be attributed to fears of a Communist movement.   The "agents of communism have devised clever and ruthless espionage and sabotage tactics which are carried out in many instances in form and manner successfully evasive of existing law."   *Id*. at § 2 (11).   The point here is not to cast doubt upon the wisdom of the Espionage Act.   What is critical, however, is for the Court to see Mr. Sterling not as a spy or a communist who committed espionage in the sense that the Guidelines were established to punish.   Mr. Sterling was convicted, under the Espionage Act, for "leaking" information to a reporter.   He should be treated similarly to others convicted for the same crimes and not singled out for a long prison sentence because he elected to exercise his right to a trial.

## II.     MR. STERLING'S PERSONAL HISTORY AND CHARACTERISTICS

The probation officer has presented a detailed portrayal of Mr. Sterling.   As the Court knows from that account, Mr. Sterling was the first person in his family to graduate from college. He is one of six children and grew up in Cape Girardeau, Missouri.   Both of his parents are deceased, and one of his brothers died just days before the trial started.   Mr. Sterling graduated from high school in 1985 and then graduated from Milliken University in 1989.   In May of 1992, Mr. Sterling graduated from Washington University in Saint Louis, Missouri, earning his Juris Doctor.   Mr. Sterling was admitted to the New York Bar in 2000.   The Court has letters from some of his friends, family, and professional colleagues describing the other Jeffrey Sterling that

1569209.1

they know (attached hereto as Exhibit 1).   Mr. Sterling is a self-made man who has never been in any trouble with the law before or after these charges were made.

Many people who have known Mr. Sterling for years, in some cases decades, have taken the time to write the Court and provide some insight into the history and characteristics of the defendant.   These people know Mr. Sterling better than anyone.   They uniformly see him as a man of honesty, integrity, and compassion.   A United States Navy (Reserve) Commander writes of how Mr. Sterling helped him through a low period.   As the Commander puts it, "I honestly feel that Jeff saved my life Judge Brinkema."   A former CIA officer still under official cover calls Mr. Sterling "a lover of all things American" who is "a beautiful person who deserves the most consideration [the Court] can offer."   A former co-worker from Mr. Sterling's career following the CIA notes that Mr. Sterling helped her in a time of confusion and need.   She says, "without a doubt, you are dealing with a person of very good moral character."   Another former co-worker characterizes Mr. Sterling as a "gentleman of integrity and honesty."   A third former colleague calls Mr. Sterling "a kind and gentle soul."   Another former co-worker sees Mr. Sterling as "an ethical man who loves his country, family, and fellow man."   Yet another says simply, "I would trust Jeff with my life."

A college student who Mr. Sterling has mentored speaks of Mr. Sterling's "selflessness and compassion."   She says, "Encountering an adult who does not have children but shows that they care about a teenager's problems and wants to relate to them is very rare, but that is simply the kind of person Jeffrey is."   Another person Jeffrey has mentored, who has known him for twenty years since she was ten years old, writes, "Jeff has continued to be a consistent, respected role model" in her life.   A younger cousin echoes this sentiment, stating Mr. Sterling "is truly a role model."

A close family friend says she has "always known Jeffrey to be a person of integrity whose loyal, honest, caring, dependable, and trustworthy attributes have remained consistent since I've known him. . . .   Jeffrey is an intelligent, compassionate man who still has so much to offer the community."   A friend since the late 1990's sees Mr. Sterling as a "Gentle Giant, who is a kind, thoughtful, good man" with a "deep sense of morality."   Another close friend of the family says that Mr. Sterling "is one of the most caring, considerate, funny and loyal people I know."   Another friend characterizes Mr. Sterling as "a man who I find to be intelligent, honorable, caring, and committed."   According to another friend, Mr. Sterling is "a kind, gentle, honest person with a strong sense of self, integrity and altruism."   A friend from college writes about "the lifetime of service, loyalty and compassion that make up the person I know as Jeffrey Sterling, a man that I am proud to call my friend and brother."   Yet another friend wrote to the Court to describe the Jeffrey Sterling she knows: "an honorable, big hearted man."

The Court should take into account the consequences that Mr. Sterling, this "honorable, big hearted man," has already suffered as a result of the lengthy investigation of him, his indictment, the extraordinarily long litigation process caused by the Government's interlocutory appeal, and his ultimate conviction.   Mr. Sterling, a man who came from humble beginnings to attend college and obtain a law degree, has for years been unemployed, unemployable, and destitute.   A journalism professor at his alma mater, Millikin University, describes for the Court Mr. Sterling's life under indictment, even before conviction: "Mr. Sterling had already paid a great price to society.   His struggles under indictment for violation of the Espionage Act had already cost this man much, in terms of living any sort of productive life.   For years, Mr. Sterling was not in prison, but he certainly was not free."

1569209.1

Mr. Sterling began working at the CIA in 1993 and left the CIA, officially, on January 31, 2002.   All of the CIA witnesses, save one, who testified at the trial, stated that Mr. Sterling was very good at his job as an operations officer.   Mr. Sterling handled many classified duties, including those that became central to the trial of this case.   There is no doubt that Mr. Sterling became disenchanted with the CIA due to what he perceived to be racial discrimination in New York.   That disenchantment led to a series of lawsuits, one of which was dismissed on state secrets grounds.

Mr. Sterling, who has been unemployed since these charges were made, was essentially unemployed after leaving the CIA.   Beginning in 2004, Mr. Sterling was employed as a fraud investigator with Anthem Blue Cross Blue Shield.   His employment ended with his arrest.   As Mr. Sterling told the probation office, while at Anthem he uncovered a national health care fraud scheme that prevented a $30 million fraud and led to the arrest and conviction of several individuals.   As a result of his work on that case, Mr. Sterling was personally thanked by The Honorable Patricia A. Seitz, the Presiding Judge for presenting victim testimony.   In further recognition of his work on that case, Mr. Sterling received an award for Criminal Investigator of the Year by Blue Cross Blue Shield of Georgia and received an Honorable Mention from the National Health Care Anti-Fraud Association, both in 2010.   Those certificates are attached hereto as Exhibit 2.

As has been noted, since he was arrested in 2011, Mr. Sterling has been unemployed. Though he has tried repeatedly to gain employment, no employer wanted to hire anyone charged with espionage.   The last five years have been extremely difficult for Mr. Sterling.   He has lived in a legal limbo caused by Government appeals, which took three years to resolve.   He has been

1569209.1

threatened with foreclosure and has been unable to support his loving wife.  Mr. Sterling has suffered terribly and now must face the loss of his law license as well.

Mr. Sterling exercised his constitutional right to remain silent, go to trial, and put the Government to the burden of its proof, as he had every right to do.  He stands convicted of a serious crime, and for that he must be punished.  However, there is nothing in Mr. Sterling's background that requires anything other than the Court to exercise its discretion and treat him fairly, justly, and comparably to others who have recently been convicted of similar offenses. And, in doing so, the Court must consider the fact that this case has taken a long time, that Mr. Sterling did not cause the delay, and that five years of his life have already been lived under the shadow of these charges.

## III.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Pursuant to 18 U.S.C. § 3553(a)(1), in determining an appropriate sentence, the Court must consider the "nature and circumstances of the offense."  Here, the Government posited in its sentencing memorandum that great harm was done as a result of the disclosures that Mr. Risen made in State of War, though it certainly did not prove any such harm in the trial.   The reality is that the United States is now in the midst of negotiations with the Iranians about the issue of the Iranian nuclear weapons program.   No evidence was presented that the disclosures alleged in this case aided the Iranians in any way.

A twenty-year CIA veteran, who was the senior officer directing operations in Prague, Czechoslovakia and in Amman, Jordan and was at one time responsible for sensitive human intelligence and technical collection operations aimed at the Soviet nuclear weapons program, including their facilities at Arzamas 16, the facility at which Merlin worked, was designated by

the Government as a witness in this case.   The Government never called him.[2]   Having read the Government's sentencing memorandum, he has written to inform the Court that in describing the harm that was supposedly caused by the leak in this case, the Government's sentencing memorandum engages in "overwrought hyperbole," rather than an analysis of the facts.   His letter, which is attached as Exhibit 3, should be extremely helpful to the Court in assessing the nature and circumstances of the offense, placed in proper context.

He notes that it is a matter of public record that in 1992, after the fall of the Soviet Union, the "Los Alamos National Laboratories and Arzamas 16 [began] to collaborate closely" and that both sides recognized that this meant that the United States would obtain previously undisclosed information about Arzamas 16.   Thus, while he does not "doubt that Merlin provided useful information to the United States, it seems unlikely that this information was as singularly vital as the government suggests in its sentencing memorandum."   Further, he finds the suggestion that the Merlins' lives were somehow placed at risk lacking in any factual basis: "The Russians are not going to harm an émigré scientist, one of many such scientists who relocated to the U.S., who worked at a facility that has been open to us since the 1992."

Finally, the CIA veteran says that it is "not credible to suggest [as the government does] that the public disclosure of a human asset 'severely undermines' our ability to recruit other foreign assets."   He notes that even the highly damaging disclosures of Aldrich Ames and his exposure did not preclude the United States from recruiting assets, including Merlin himself.   Indeed, while disclosures of classified information "are never helpful, they happen all the time (and sometimes the United States quietly endorses the disclosure - read some of Bob Woodward's books, or look

---

[2] After speaking with this witness, the defense gave the Government notice that should the Government call him, the defense may wish to elicit expert opinion testimony from him.   Apparently, at some point thereafter, the Government decided it would not call him as a witness.

1569209.1

at Agency collaboration on the film about the Bin Laden raid)." Yet, the United States (and other countries) continue to recruit agents and continue to engage in deception, as nations have since the time of the Trojan War. This experienced former CIA officer is not condoning the leaks in this case, nor suggesting they caused no harm. The offense is a serious one, but the actual harm caused pales in comparison to the Government's portrayal of that harm

While recognizing the seriousness of the charges, the Court should again be aware that the Government's theory of the case was that Mr. Sterling, in leaking information, was blinded by anger and revenge based on his sincerely held belief that he had been mistreated by the Agency. He was not, in the Government's view, a mercenary or spy who sold information to a foreign intelligence service – such as Robert Hansen, Aldrich Ames, Jonathan Pollard and others – or a politically motivated agent seeking to disclose details of the CIA torture program – such as John Kiriakou. Mr. Sterling did not profit, financially or politically, from the acts for which he has been convicted nor could he have done so. For these reasons, this case, though very serious, bears little resemblance to the panoply of Espionage Act cases that have preceded it. It is therefore distinguishable in a manner that militates in favor of a substantially more lenient sentence in this case.

## IV. THE SENTENCING RATIONALES SET FORTH IN 18 U.S.C. § 3553

The sentencing factors set forth in 18 U.S.C. § 3553(a)(2) also do not compel the prison sentence suggested by the Guidelines. In fact, no sentence approaching that suggested by the Guidelines is warranted. In addition to the personal characteristics of the defendant and the nature and circumstances of the offense, Section 3553(a)(2) directs the Court to consider the

> need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from

further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).   These factors are addressed in turn below.

A.    *Respect for the Law and Just Punishment*

There is no reason to impose a lengthy prison sentence in this case in order to reflect the seriousness of the offenses, to promote justice, or to provide just punishment.   Mr. Sterling has paid a very steep price in this matter.   He has lost his job, and all of his savings have been spent trying to keep his house.   He has been unemployed for five years and faces the loss of his law license.   He has been unable to support his wife who has stood by him at every turn.   Three years of the time between indictment and trial was spent on appeals filed by either the Government or Mr. Risen.   Those three years are lost to Mr. Sterling, as well, both in his ability to lead a productive life and as time he could have spent serving any sentence this Court may impose.

In sentencing other defendants convicted of leaking to the press, the Government has already established the sentences it believes are necessary and appropriate.   In meting out justice, the Court cannot turn a blind eye to the positions the Government has taken in similar cases.   For example, in this Court, John Kiriakou was convicted – on his own plea – for disclosing the identity of a covert agent to the press, in violation of Title 50 U.S.C. § 421(a).   Mr. Kiriakou was indicted for four violations of the Espionage Act and for violations of 18 U.S.C. § 1001.   All of those charges were dismissed pursuant to the terms of his plea.   The Plea Agreement and Statement of Facts in Support of the Plea are attached as Exhibit 4 and Exhibit 5.   In that case, Mr. Kiriakou intentionally disclosed to a reporter the name of a covert officer and interrogation techniques.   He then lied to the FBI about it.   On his plea, and by agreement with the Government, Mr. Kiriakou was sentenced to thirty months in prison and three years of supervised release.   In this case, the

Government has never alleged or proven that Mr. Sterling leaked Merlin's full real name or the name of anyone else acting in a covert capacity.

In the case of *United States v. Stephen Jin-Woo Kim*, No. 10-225 (CKK), in the United States District Court for the District of Columbia, Mr. Kim was convicted of violating the Espionage Act, 18 U.S.C § 793(d) for disclosing information about the North Korean nuclear weapons program to a reporter.   Copies of the Plea Agreement and Statement of Offense filed in that case are attached hereto as Exhibit 6 and Exhibit 7.   According to the Statement of Offense, Mr. Kim also lied to the FBI when questioned about his contacts with the reporter.   Ex. 7 ¶ 11. For his crimes, Mr. Kim was sentenced, by agreement, to 13 months of incarceration and one year of supervised release.   Mr. Sterling exercised his right to remain silent.   He made no false statements to government investigators nor did he testify falsely before this Court.

Finally, there is the case of General David Petraeus, styled *United States v. David Howell Petraeus*, Case No. 3:15CR- 47.   Copies of the Plea Agreement and Statement of Offense filed in that case are attached hereto as Exhibit 8 and Exhibit 9.   General Petreaus, the former head of the CIA, was allowed to plead guilty to a misdemeanor violation of 18 U.S.C. § 1924.   For that violation, the Government agreed to ask for no prison time and fined the former General/CIA Head turned investment banker a total of $40,000.00.[3]   In the Statement of Offense, General Petraeus admitted that he provided substantial amounts of classified information to his mistress who was writing a book about him.   That classified information included: "the identities of covert officers, war strategy, intelligence capabilities and mechanisms, diplomatic discussions, quotes and deliberative discussions form high level National Security Council meetings, and DEFENDANT DAVID HOWELL PETRAEUS's discussions with the President of the United States."   Ex. 9 ¶

---

[3] General Petraeus was subsequently sentenced to serve two years of probation and pay a $100,000 fine.

1569209.1

17.   He also admitted that he lied to the FBI about what he had done (*id.* ¶¶ 31-32), yet he faced no perjury or obstruction charges.   Again, Mr. Sterling revealed the names of no covert personnel and never lied about his actions to the FBI.   General Petraeus was sentenced to probation.   Mr. Sterling should not receive a different form of justice than General Petraeus.

B.   *Deterrence*

For many of the same reasons, a lengthy prison sentence is not required to "afford adequate deterrence to criminal conduct."   18 U.S.C. § 3553(a)(2)(B).   Those with security clearances in the Government are well aware of this prosecution and the impact it has had on Mr. Sterling's life. This, on top of a sentence consistent with that meted out to others convicted of similar crimes, is more than sufficient.   The publication of classified information has continued unabated since the arrest and trial in this case.   There is no reason to believe that a substantial prison sentence given to a man who last worked at the CIA in 2002 will deter the leakers who supply information to the press on an almost daily basis to serve their own political and personal purposes.   Nor is specific deterrence necessary.   Mr. Sterling is a law-abiding citizen who has no criminal history prior to the offense conduct in this case and has not been alleged to have committed any sort of offense in the many years since the offense conduct in this case.   Mr. Sterling will never again be given access to classified information.   The Court is unlikely ever to have before it a defendant with a lower likelihood of recidivism.

## V.     CONCLUSION

There is no dispute that Mr. Sterling stands before the Court convicted of serious offenses.

However, a sentence no more severe than what the Government itself believed was "sufficient, but

not greater than necessary" to punish the three "leakers" identified above (Messrs. Kiriakou, Kim,

and Petraeus) is warranted in Mr. Sterling's case.   Taken together, the history and characteristics

of Mr. Sterling, the nature and circumstances of the offense, and the other sentencing factors

compel the conclusion that such a sentence would be sufficient punishment in this case.


JEFFREY A. STERLING
By Counsel

By:      _____/s/_____
Edward B. MacMahon, Jr.
VSB No.   25432
Edward B. MacMahon, Jr., PLC
P.O.   Box 25
107 East Washington Street
Middleburg, VA     20118
(540) 687-3902
(540) 687-6366
ebmjr@macmahon-law.com


_____/s/_____
Barry J. Pollack (admitted *pro hac vice*)
Mia P. Haessly (admitted *pro hac vice*)
Miller & Chevalier Chartered
655 Fifteenth St. N.W. Suite 900
Washington, DC 20005
(202) 626-5830
(202) 626-5801 (facsimile)
bpollack@milchev.com
mhaessly@milchev.com

*Counsel for Jeffrey A. Sterling*

14

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By:     /s/_____

Edward B. MacMahon, Jr. (VSB # 25432)
Edward B. MacMahon, Jr., PLC
107 East Washington Street
P.O. Box 25
Middleburg, VA 20118
(540) 687-3902
(540) 687-6366 (facsimile)
ebmjr@macmahon-law.com

*Counsel for Jeffrey A. Sterling*