IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No. 1:10cr485 (LMB) |
| | ) |
| JEFFREY ALEXANDER STERLING | ) |

**REVISED RESPONSE OF THE UNITED STATES
TO DEFENDANT'S SENTENCING MEMORANDUM**

In his Sentencing Memorandum, DE 466, the defendant advocates for a sentence "no more severe" than the sentences handed down in three other cases, *Kiriakou*, *Kim*, and *Petraeu*s, all three of which were resolved through plea agreements and guilty pleas prior to trial.[1]   In other words, the defendant, who was convicted at trial on all nine counts submitted to the jury, believes that a sentence falling somewhere between probation (*Petraeus*) and 30 months' imprisonment (*Kiriakou*) is reasonable and appropriate for willfully compromising a then-ongoing, extremely sensitive, closely held operation designed to infiltrate and disrupt the nuclear weapons program of Iran and other rogue states, putting CIA assets at risk and exposing classified methods to our adversaries, in violation of his sworn duty and the law.   The defendant takes this position based primarily on his belief that he is similarly situated to these other defendants, he should not be punished for exercising his right to a trial, the government has overstated the seriousness of his conduct, and the 18 U.S.C. § 3553(a) factors support leniency in this case.   We disagree.

---

[1]   *United States v. Kiriakou*, No. 1:12cr127 (E.D. Va.); *United States v. Kim*, No. 10cr225 (D.D.C.); *United States v. Petraeus*, No. 3:15cr47 (W.D.N.C.).

## I.      The Espionage Act and the Sentencing Guidelines

The defendant agrees that the base offense level for the grouped counts (Counts 1-7 and 9) is a level 35 and that a one-level increase is warranted for the remaining count (Count 10), resulting in an offense level total of 36 and a sentencing range of 188-235 months.   The defendant contends, however, that a two-level adjustment for abuse of a position of public trust should not apply, an argument we addressed in our initial sentencing memorandum.   DE 464 at 6-10. Notwithstanding his agreement that the Sentencing Guidelines call for a bottom-end sentence of more than fifteen years, the defendant argues that this lower range should not apply because the Sentencing Guidelines "were not drafted with espionage in mind."   DE 466 at 3.   He is mistaken.

There is no support for the defendant's assertion in the language of the statute, the Guidelines, or case law.   Although prosecutions of government employees under the Espionage Act have been few, no court has held that the law does not apply to a person who discloses classified national defense information to the media or the public rather than to a foreign government.   *See*, *e.g.*, *United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988); *United States v. Rosen*, 557 F.3d 192 (4th Cir. 2009); *United States v. Rosen*, 445 F. Supp. 2d 602 (E.D. Va. 2006); *United States v. Drake*, 818 F. Supp. 2d 909 (D. Md. 2011); *United States v. Kiriakou*, 2012 WL 3263854 (E.D. Va. 2012).   Indeed, although the Espionage Act, first enacted in 1917, has been amended on a number of occasions, most recently in 1996, Congress – certainly aware of the breadth of §§ 793 and 794 of the statute – has not substantively changed those provisions since 1950.

Nevertheless, in attempting to minimize and distinguish the seriousness of his conduct, the defendant confuses the Espionage Act with the Internal Security Act, a lengthy and controversial effort by Congress to deal with a number of national security issues, including the threat of

2

domestic communism. The revisions to the Espionage Act, specifically to subsections 793(d) and (e), were the product of an executive study group, the Interdepartmental Intelligence Committee, consisting of representatives of the Justice Department, Army Intelligence, and the CIA. The Espionage Act amendments were proposed by the Attorney General, and they were passed by Congress along with amendments to a number of other statutes and a completely new law entitled "The Internal Security Act of 1950." The Espionage Act amendments, however, had nothing to do with that new statute.[2]

The defendant ignores this distinction, conflating the noncontroversial Espionage Act amendments with the controversial new Internal Security Act. Indeed, the quotations in the defendant's Sentencing Memorandum concerning communism, DE 466 at 3-4, are from Section 2 of that new law, not the separate provisions of the legislation amending the Espionage Act.

Likewise, the defendant's argument that a significant departure from the Guidelines is warranted because he was not convicted of "classic espionage" is similarly mistaken. Courts have applied the Guidelines provisions at issue here for violations of § 793 since 1987, and the Sentencing Commission has not seen fit to carve out any exception or departure for disclosing national defense information to the media or the public.

Moreover, the defendant's argument that § 2M3.2 is somehow a bad fit for his crimes because they did not involve "true" espionage is belied by the fact that such conduct – i.e., "classic" spying – is punishable under an entirely different statute, 18 U.S.C. § 794, and pursuant to an entirely different Guideline. U.S.S.G. § 2M3.1. The defendant was not charged pursuant

---

[2] *See* Senate Report No. 427 to accompany S. 595, 80th Congress, May 27, 1949 and House of Representatives Report No. 647 to accompany H.R. 47081, 81st Congress, May 20, 1949; *The Espionage Statutes and Publication of Defense Information*, Edgar and Schmidt, Columbia Law Review, May 1973, 1021-22.

to § 794, and therefore he is not subject to § 2M3.1's heightened Guidelines calculation, which would increase his base offense level to 40.   Because he was convicted pursuant to § 793, and his conduct falls squarely within the purview of § 2M3.2, his vague attempt to undermine the Guidelines calculation fails.

## II.     The *Kiriakou*, *Kim*, and *Petraeus* Sentences

The oft-repeated theme of the defendant's sentencing memorandum is that he should not be punished any more severely than the defendants who pled guilty in *Kiriakou*, *Kim*, and *Petraeus*, and that doing so would unfairly punish him for exercising his right to a trial.   This argument is plainly inconsistent with sentencing law and policy, as guilty pleas almost always carry some benefit to the defendant.   The Guidelines, of course, account for guilty pleas through adjustments for acceptance of responsibility, U.S.S.G. § 3E1.1, and a sentencing court can certainly consider an agreement to plead guilty when applying the § 3553(a) factors.   More importantly, as we noted in our sentencing memorandum, DE 464 at 21-22, the Fourth Circuit has held repeatedly that a defendant who enters into a plea agreement and cooperates with the government is not similarly situated to a defendant who proceeds to trial for purposes of the sentencing-disparity analysis under § 3553(a).   Simply put, a variance or departure from the Guidelines based primarily on a comparison of this defendant with defendants who entered into plea agreements, accepted responsibility for their conduct, and pled guilty would run counter to binding precedent.

But even if this Court were to compare this case with *Kiriakou*, *Kim*, and *Petraeus*, the defendant's argument would fail.   The trial in this case proved that the defendant disclosed an ongoing, classified operation involving two high-value Russian assets cooperating with the United States.   The operation was deployed not just against Iran, but, at the time of the unlawful disclosures, against other countries as well.   Had Risen published his article in 2003, the

4

defendant's disclosures would have put those involved in grave danger.   As it was, the

compromise of the program forced the CIA to curtail its plans with regard to Merlin and Iran, and,

with the publication of *State of War* in 2006, to shut down the use of Merlin entirely.   The trial

made clear that the defendant's conduct was borne not of patriotism but of pure spite – to punish

the CIA for firing him and refusing to settle his discrimination claims.

   We have reviewed the documents the defendant submitted related to these other cases, and

in none of them did any of the defendants admit as part of their guilty pleas that they compromised

ongoing, classified intelligence operations.   Kiriakou admitted disclosing the identity of a covert

CIA officer – a very serious offense to be sure.[3]   Likewise, according to Kim's plea documents,

Kim admitted disclosing classified information from an intelligence report to the media about the

military capabilities of North Korea, and that information was included in an article published on

the internet.   And the *Petraeus* case did not involve the disclosure of any classified information to

the public.   Petraeus had given his biographer – who possessed a security clearance – access to

classified information and improperly stored classified information at his residence.   None of this

classified information was included in his biography, made public in any other way, or disclosed

by his biographer to any third parties.[4]   Indeed, none of the cases to which the defendant cites in

support of his call for leniency involved a defendant who admitted pursuant to his guilty plea that

---

[3]   Mr. Kiriakou did not disclose the CIA's interrogation program as suggested by the defendant's sentencing memorandum, DE 466 at 10, 11; on the contrary, the interrogation program had already become public by 2008 when Kiriakou first disclosed the identity of a covert CIA officer.

[4]   The defendant attempts to downplay the seriousness of his conduct by stating that he never lied to the FBI, unlike Mr. Kiriakou and General Petraeus.   This is false, as the defendant is well aware, and the government is obliged to correct this misrepresentation.   To that end, when the defendant was interviewed by the FBI in June 2003, with counsel present, he lied, among other things, about his relationship with James Risen, including denying that he had communicated with Risen after March 5, 2003.   In fact, as the evidence proved at trial, the defendant had emailed Risen a CNN article about Iran's nuclear weapons program just five days later on March 10, 2003.

he compromised the identity of a foreign human asset.

The lack of similarity in the harm caused by the disclosures is not the only distinguishing

factor separating this case from the three cited by the defendant.   Each national security case is

unique.   Each comes with its own intelligence equities and problems, which, unless one is

intimately involved in the prosecution of the case, will never be understood completely.   As this

Court noted in sentencing Mr. Kiriakou:

> . . . I recognize the difficulty the government has in prosecuting these types of
> cases.   They have to balance the potential danger of disclosure of very sensitive
> information when deciding how to proceed, and in balancing those concerns, they
> came up with this plea.

*Kiriakou*, Sentencing Transcript at 20-21 (January 25, 2003).   Indeed, this Court indicated it

would have sentenced Kiriakou within the Guidelines had the case not been a binding plea.   *Id*.[5]

We can only speculate about the difficulties faced by the prosecutors and intelligence counterparts

in these other cases.   The prosecution in *Petraeus*, for example, undoubtedly considered the

difficulty of proving intent and willfulness on the part of the defendant, elements of a § 793

offense, as well as the likelihood that very sensitive classified information would necessarily be

disclosed at trial, when it decided to resolve the case through a plea agreement.

## III.    Pre-Trial Delay

This case was indicted on December 22, 2010, and the defendant was arraigned on January

14, 2011.   Trial was scheduled to begin on October 17, 2011, but was delayed as a result of the

government's interlocutory appeal to resolve three pre-trial rulings.   The defendant claims that

the government's appeal should be a factor in determining his sentence, as he "did not cause the

delay" and he has had to live "under the shadow of these charges" for the past four years.   DE 466

---

[5]  Mr. Kiriakou's Guidelines range was 97 to 121 months, taking into account his acceptance of
responsibility.

at 8. The defendant suggests the appeal was essentially a fight between the government and Risen during which he played no role. To the contrary, the defendant played a critical part in the events leading to the government's decision to seek an interlocutory appeal.

On October 14, 2011, this Court raised the *Giglio* matter that became one of the three issues on appeal, finding that the government had missed the deadline for *Giglio* production set by the Court's discovery order. Defense counsel initially responded to the Court's comments by indicating that a continuance would be appropriate "to give us the opportunity to do the investigation we should have been able to do." DE 281.[6] Notwithstanding the defendant's willingness to continue the trial, the Court indicated that it could also sanction the government by striking two witnesses. When the government indicated that it would be forced to appeal that sanction, given the significance of the witnesses' testimony, the Court gave defense counsel the option of a brief continuance instead. Not surprisingly, and despite having earlier proposed a continuance, counsel declined, stating that he no longer wanted a continuance and that "we should just have the appeal." *Id.*

The defendant's refusal to entertain a brief continuance to address the potential *Giglio* material occurred three days before trial was set to begin. At that point, the Court had issued its ruling on the government's motion to reconsider the Risen matter, and the government was prepared to proceed to trial, notwithstanding its disagreement. Barring some other unforeseen event, then, this case would have proceeded to trial in 2011 had the defendant not resisted a brief continuance. And now, in 2015, it is disingenuous to suggest that he had nothing to do with the

---

[6] DE 281 is the underseal transcript of the October 14, 2011 CIPA hearing. The portions of the hearing referenced here were made public on appeal and quoted in the government's initial brief. *See United States v. Sterling*, Appeal No. 11-5028, Document 24, Brief for the United States (Public Version), filed January 13, 2012.

appeal and that he should get some sort of credit for the intervening years he's remained free.[7]

The simple fact remains: national security cases are often complicated, and this case was no exception.   Even relatively simple matters, such as discovery, are made more difficult by classification issues.   In 2011, the defendant saw a strategic advantage in forcing the government to seek an interlocutory appeal rather than agreeing to a brief continuance.   That was his right, but it was also a critical factor in causing the delay of which he now complains.   Indeed, that is another advantage to reaching a plea agreement in these types of cases – the avoidance of lengthy, protracted litigation.   The defendant certainly had a right to a jury trial, but the exercise of that right had consequences, including, in this case, lengthy pre-trial proceedings.

## IV.     The Seriousness of the Offense

Finally, in his sentencing memorandum, the defendant attempts to undermine the evidence introduced at trial as to the seriousness of his crimes through the submission of a letter from David Manners, a defense expert witness and former CIA employee who has not worked at the agency in approximately seventeen years.   There is good reason to question Manners's credibility and the weight the defendant places on his unsworn opinion that the defendant's disclosure of classified national defense information caused little or no harm to the United States.

In his Sentencing Memorandum, the defendant notes that Mr. Manners was identified as a government witness, but not called, and Mr. Manners alludes to this as well.   Mr. Manners suggests that he was not called as a witness by the government because he "could not confirm to

---

[7]  In hindsight, the defendant's characterization of the importance of the potential *Giglio* material produced by the government proved to be "overwrought hyperbole," and the Court's suggested continuance of two weeks would certainly have resolved the disputed *Giglio* matters.   Following the remand from the Fourth Circuit, this Court reviewed the information produced by the government and heard from three witnesses before ruling that the majority of the information was not admissible.   Moreover, as to the few areas of inquiry that the Court did permit, the defendant ultimately elected to pursue none of them with the relevant witnesses.

the government that Risen had identified Sterling as the source of the information that appeared in

his book." What Mr. Manners fails to say is that, on two occasions, he appeared before a federal

grand jury and testified, under oath, that Risen did, in fact, identify the defendant as the source of

the information that subsequently appeared in Chapter 9 of State of War, and that Mr. Manners

recanted his grand jury testimony only after his testimony became the subject of pre-trial litigation

in 2011. The government put Mr. Manners on its witness list as a precaution, just in case Risen

were to testify at trial and his conversations with Mr. Manners became an issue – certainly not

because we found Mr. Manners credible. The opposite is true.

By way of background, on December 14, 2007, Mr. Manners was interviewed by the FBI

about his relationship with James Risen and Manners's knowledge that the defendant was Risen's

source of information for the classified program at issue in this case. Manners appeared before a

federal grand jury on February 7, 2008, and testified under oath about these facts. During his

testimony, Manners stated that he and Risen had known each other since shortly after Manners

retired from the CIA in 1998. Risen, whom Manners considered a friend, often used Manners as a

sounding board, so to speak, about intelligence matters. According to Manners, he would only

discuss historical matters with Risen, i.e., events that had already occurred and where, in

Manners's view, no harm would come from discussing them with Risen.

Manners testified that Risen had called him in 2004 or 2005 about the defendant,

identifying him by name. Risen told Manners that he had met the defendant, and the defendant

told Risen that he had worked briefly with Manners when the defendant was assigned to the CIA's

Iran Task Force. According to Manners's testimony, Risen told him about the defendant's

difficult experience with the agency. Critically, Risen further told Manners that the defendant

had worked on a very important operation while in New York involving the Iranian nuclear

weapons program and played a key role in the recruitment of a source crucial to that operation.

During this conversation, which was by telephone, Risen asked Manners a number of questions

about the operation the defendant had previously discussed with Risen and tried to elicit from

Manners his opinion as to whether the CIA would conduct an operation as described.   Manners

testified that it was clear to him at that time that the defendant was the source of Risen's

information about the Iranian operation Risen described generically to Manners and that the

defendant wanted to get his story out through Risen because the defendant wanted to get back at

the CIA.

      In December 2010, just prior to indictment, Manners was again interviewed by the FBI and

put before a federal grand jury.   Manners testified that his prior interview in 2007 and grand jury

testimony in 2008 were "fully accurate."[8]   He also acknowledged that Risen most likely used

Manners as an unidentified source of information in Chapter 9 of State of War.[9]

      The Court is familiar with Manners's grand jury testimony, having referred to that

testimony in its November 30, 2010 Memorandum Opinion regarding the Risen grand jury

subpoena, DE 118 at 9 and 20, and in its subsequent July 29, 2011 Memorandum Opinion

regarding the Risen trial subpoena, DE 148 at 24-27.[10]   The government moved for

reconsideration of that opinion, and in that motion discussed Manners's grand jury testimony.

---

[8]   Copies of Manners's grand jury transcripts and interview reports were provided to the
defendant prior to trial.
[9]   On page 211 of *State of War*, Risen states that "[s]everal former CIA officials" opined on the
theory behind MERLIN, and Manners stated that he believed that Risen most likely was referring
to him in that paragraph.
[10]   Manners's grand jury testimony was relevant for two different reasons.   The government
initially advocated during the grand jury process that Risen had waived any confidential source
privilege by telling Manners that Sterling was his source.   The Court, however, subsequently
considered Manners's grand jury testimony in its application of the *LaRouche* balancing test to the
government's request for a trial subpoena.

DE 162 at 13.   The Court addressed the Manners issue very briefly during the October 12, 2011

hearing on that and other motions.   DE 269 at 4.

Just prior to trial, on August 25, 2011, the government met again with Mr. Manners.   This

time he told a different story.   In contrast to his prior sworn and unsworn statements, Manners

stated for the first time that the telephone conversation he had with Risen about the defendant was

not one, but two conversations.   The first conversation was about the defendant and his troubles

with the agency in New York.   The second conversation was about the operation discussed in

Chapter 9.   During the second conversation, however, there was no discussion of the defendant or

his role in that operation.   Manners's last-minute recantation severely undermined his credibility

as a witness.

In light of Manners's credibility issues, the Court should view the merits of his opinions –

and the propriety of submitting unsworn testimony in the form of a letter supporting the defendant

– with healthy skepticism.   The time for this type of "evidence" was trial.   The government

established at trial through several witnesses, who were placed under oath and subjected to

cross-examination, that the United States suffered both actual and potential damage as a result of

the defendant's conduct.   We summarized that testimony in detail in our sentencing

memorandum.   DE 464 at 11-14.   It is the only evidence before the Court on harm, potential or

otherwise.   For his part, the defendant had provided notice that he would call two experts to rebut

the government's evidence on the potential harm occasioned by these disclosures, including

Manners.   DE 244.[11]   He called neither, and that was his choice.   But he cannot subvert the trial record through the last-ditch submission of a letter from someone who has not worked at the CIA in nearly two decades, who did not testify at trial, who is friends with the person to whom the defendant communicated national defense information, and whose eve-of-trial recantation calls into question his veracity.   The Court should disregard his letter for sentencing purposes.

---

[11]   Manners's letter, DE 466-3, opines on matters that go well beyond the scope of his expert notice, DE 244 at 26-27, specifically the discussion of Arzamas 16, the value of the information provided by Merlin regarding Russian nuclear weapons capabilities, and the possibility that Russia would retaliate against Merlin and his family as a result of Merlin's work for the CIA.

**V. Conclusion**

The defendant's sentencing memorandum is a transparent attempt to deflect blame from his own conduct and minimize the severity of his crimes. The time for equivocation and minimization is over. The defendant was found guilty of significant offenses that strike at the core of the United States' national security interests. For these reasons, and those articulated in the government's sentencing memorandum, the Court should impose a sentence reflecting the severity and egregiousness of the defendant's conduct.

Respectfully submitted,

Raymond N. Hulser            Dana J. Boente
Chief                        United States Attorney

Eric G. Olshan             James L. Trump
Deputy Chief             Senior Litigation Counsel
Public Integrity Section
U.S. Department of Justice      Dennis Fitzpatrick
                                Assistant United States Attorney
                                Eastern District of Virginia

By                    /s/
                     James L. Trump
                     Attorney for the United States of America
                     United States Attorney's Office
                     2100 Jamieson Avenue
                     Alexandria, Virginia 22314
                     (703) 299-3726
                     (703) 837-8242 (fax)
                     jim.trump@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2015, I caused an electronic copy of the foregoing

pleading to be filed and served via ECF on Edward B. MacMahon, Jr., and Barry J. Pollack,

counsel for the defendant.

By                   /s/

James L. Trump
Attorney for the United States of America
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3726
(703) 837-8242 (fax)