UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .       Criminal No. 1:10cr485
                              .
     vs.                      .       Alexandria, Virginia
                              .       May 11, 2015
JEFFREY ALEXANDER STERLING,   .       1:55 p.m.
                              .
              Defendant.      .
                              .
.  .  .  .  .  .  .  .  .  .   .

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:           JAMES L. TRUMP, AUSA
                              DENNIS M. FITZPATRICK, AUSA
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                                and
                              ERIC G. OLSHAN, Deputy Chief
                              Public Integrity Section of the
                              Criminal Division
                              United States Department of
                              Justice
                              1400 New York Avenue, N.W.
                              Suite 12100
                              Washington, D.C. 20005


FOR THE DEFENDANT:            EDWARD B. MAC MAHON, JR., ESQ.
                              Law Office of Edward B.
                              MacMahon, Jr.
                              107 East Washington Street
                              P.O. Box 25
                              Middleburg, VA 20118
                                and
                              BARRY J. POLLACK, ESQ.
                              Miller & Chevalier Chartered
                              655 - 15th Street, N.W.
                              Suite 900
                              Washington, D.C. 20005-5701

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1    APPEARANCES:  (Cont'd.)

2    CLASSIFIED INFORMATION          MAURA I. PETERSON
       OFFICER:

3

4    OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Fifth Floor
5                                    401 Courthouse Square
                                     Alexandria, VA 22314
6                                    (703)299-8595

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                     (Defendant present.)

 3           THE CLERK:  Criminal Case 10-485, United States of

 4   America v. Jeffrey Alexander Sterling.  Will counsel please

 5   note their appearances for the record.

 6           MR. TRUMP:  Good afternoon, Your Honor.  Jim Trump on

 7   behalf of the United States.

 8           MR. OLSHAN:  Eric Olshan for the United States.  Good

 9   afternoon, Your Honor.

10           MR. FITZPATRICK:  And Dennis Fitzpatrick for the

11   United States.  Good afternoon.

12           THE COURT:  Good afternoon.

13           MR. MAC MAHON:  Good afternoon, Your Honor.  Edward

14   MacMahon for Mr. Sterling.

15           MR. POLLACK:  Good afternoon, Your Honor.  Barry

16   Pollack for Mr. Sterling.

17           THE COURT:  All right.  And the defendant is in

18   court.

19           All right, this matter is before the Court on

20   posttrial motions that are not yet resolved as well as the

21   sentencing of the defendant if those motions are not granted.

22   Mr. MacMahon, I'm addressing you, but obviously, if Mr. Pollack

23   is the attorney to respond, then he'll just stand up and

24   respond.  There are three motions by my understanding that are

25   under consideration:  your motion for reconsideration based on
```

4

1   the theory of selective position, correct?

2           MR. MAC MAHON:  Yes, Your Honor.

3           THE COURT:  As well as a motion for acquittal on

4   Count 9, that's a stand-alone motion; and there's a separate

5   motion for acquittal on all counts, correct?

6           MR. MAC MAHON:  Yes, Your Honor, that's correct.

7           THE COURT:  All right.  Now, you've written an

8   extensive brief.  The government has responded to it.  You've

9   done a reply brief.  I will tell you, frankly, I think the

10  government's response was thorough and accurate, and I

11  understand your argument about venue, but again, the *Ebersole*

12  case, I feel, fully supports the instruction which the Court

13  gave, but are there any additional issues you want to raise or

14  any particular issue in the government's response that you want

15  to take issue with?

16          MR. MAC MAHON:  No, Your Honor.  We'll rest on the

17  pleadings.  I know the Court reads them carefully.

18          THE COURT:  I have.  And as I said, you know, I

19  certainly agree with you, this case was almost entirely based

20  on circumstantial evidence, but this wasn't mere circumstantial

21  evidence.  I think the circumstantial evidence in this case

22  was, in fact, overwhelming and compelling.

23          I mean, I'll just mention now orally one or two

24  points.  Obviously, there'll be a written opinion coming out

25  hopefully within a few days, but the, one of the critical

1  issues in this case, frankly, was there were only four people

2  at that San Francisco meeting:  Mr. and Mrs. Merlin, the

3  defendant, and one other agent, just four, and information

4  about that meeting and the visit to the Sonoma Valley appears

5  in the book, so the only logical inference that any trier of

6  fact could make from that is that one of those four people was

7  the source of that particular piece of information in the book.

8       And at trial, the jury heard from Mr. and Mrs. Merlin

9  as well as from that agent.  They denied being the source.

10 There was also absolutely no evidence that any of them had any

11 motive.

12      The logical inference from all that evidence was that

13 Mr. Sterling, who was the other person there and who did have a

14 motive, was the source, and that's just one example of the very

15 powerful circumstantial evidence which the government had in

16 this case.

17      So I recognize your argument, and obviously, in a

18 perfect world, you'd only have direct evidence, but many times

19 that's not the case in a criminal case.  And the jury was made

20 up of 12 carefully selected people.  They were a good jury.

21 They were attentive.  You may recall I don't think we ever had

22 a morning when they came late, and that was their unanimous

23 decision.

24      So I'm satisfied that both the motion under Rule 29

25 and Rule 33 should not be granted, and I'm going to deny your

1    motion.

2          In the issue of selective prosecution, that's always

3    a troubling one, and you raise some interesting comparators,

4    but the government has come back and has been able to

5    articulate the various reasons why, for example, in the

6    *Petraeus* case, he was offered the opportunity to plead to a

7    misdemeanor.  In the -- in other cases, there have been

8    misdemeanors.  There was a misdemeanor in the NSA case over in

9    Maryland, the *Drake* case.

10         These cases are very difficult for both the defense

11   but also for the government.  They have to weigh each case on

12   its own individual merits, among which can be the nature of the

13   information involved, how much has to be disclosed if the case

14   goes to trial, and those other factors, and I do not find in

15   this case that the defendant's race played any part in the

16   government's decision to prosecute him nor that he was unfairly

17   selected, so I'm denying the motion for -- to dismiss this case

18   based on selective prosecution.

19         That being the case then, unless there's any other

20   pretrial matter we need to address, I'm going to go ahead with

21   the sentencing.  Is there anything else?

22         MR. TRUMP:  No, Your Honor.

23         THE COURT:  All right.  Now, Mr. MacMahon and

24   Mr. Pollack, have you had enough time to -- and to put you at

25   ease, the guidelines are too high, all right?  So I don't need

1    to hear a whole lot of argument about how the guidelines are

2    calculated.  We'll leave them as they are, but the Probation

3    Office has recommended a significant variance, even the

4    government has not asked for a guideline sentencing in this

5    case, and the Court is certainly not going to give a 235-month

6    sentence in this case.

7            But the guidelines as calculated here come out to an

8    offense level of 38.  The defense has a criminal history of I.

9    The advisory guideline range is 235 to 293 months.  There's a

10   one- to three-year period of supervised release.  The fine

11   range is 25,000 to 250,000 dollars, and since there are nine

12   counts of conviction, there would be $900 in special

13   assessments, all right?

14           Then, Mr. Trump, who's arguing this for the

15   government?

16           MR. TRUMP:  I am, Your Honor.

17           THE COURT:  All right.

18           MR. TRUMP:  I wasn't aware that the Probation Office

19   was advocating for a variance.

20           THE COURT:  You normally don't know it, but I'm

21   saying it at this time.

22           MR. TRUMP:  I don't know what that, that variance is,

23   so be that as it may.

24           Your Honor, our pleadings tried to provide context,

25   context for how the guidelines and 3553 factors relate to what

1    was proved at trial, because now we have a trial record.  We

2    don't have to speculate.  We don't have to guess.  We don't

3    have to debate the merits of what the defendant did.  The jury

4    has spoken and spoken quite loudly in fact.

5            In terms of the seriousness of the offense and how it

6    relates to the 3553 factors and the harm caused by the

7    defendant, Judge, the jury was required to find unanimously

8    that the information disclosed was, in fact, national defense

9    information and the disclosure was potentially damaging to the

10   United States, and that the jury got right because the evidence

11   at trial clearly established that this was no ordinary

12   intelligence program.

13           This was not a rogue operation.  This was not

14   something for which there was any, any government abuse,

15   government fraud.  There was nothing there of any, any type of

16   whistleblower effect.

17           It was meticulously planned.  It involved the

18   cooperative efforts of the CIA and the National Laboratories.

19   It involved a team of the country's foremost nuclear experts.

20   It took years to develop, millions of dollars were spent, and

21   it wasn't launched until it was reviewed and vetted at the

22   highest level of the government, and its focus, its focus was

23   the proliferation of nuclear weapons, and that, Your Honor, was

24   and is a big deal.

25           Again, what was proved at trial was that one of the

1    greatest threats to the security of our country is posed by the

2    proliferation of nuclear weapons, weapons of mass destruction,

3    and one of the CIA's most important missions, critical missions

4    is the gathering of intelligence about and, if possible, the

5    thwarting, the thwarting of the development of such weapons.

6            For a long time, the Intelligence Community resources

7    in this regard were directed at a very few number of countries,

8    for example, the Soviet Union and China.  By comparison, today

9    there are dozens of countries together with transnational

10   organizations, terrorist organizations, and proliferation

11   networks who aspire to acquire and develop and possibly use

12   nuclear weapons.

13           Iran remains a nuclear threat.  Historically, Iran

14   has been openly hostile to the United States and its allies.

15   It's been a supporter of terrorism and terrorist organizations.

16   The need for any additional information about Iran's nuclear

17   weapons program and its intentions has been and remains

18   extremely important to the United States.  That was true back

19   in the late 1990s, when this program was developed; it was true

20   in 1999 and 2000, when the defendant was part of this operation

21   and worked on this program; and it was true in 2003, when the

22   disclosures were made to James Risen; and it was true during

23   the period 2003-2006, when the defendant continued to

24   communicate with Risen over the publication of *State of War*;

25   and it's true today.

1          And the defendant, of course, knew all of this.  He

2  was trained as a CIA case officer.  He was an Iranian expert.

3  He served on the Iran task force.  He worked at the

4  Counterproliferation Division.  He obviously was familiar with

5  the operation.  He was familiar with the history of the

6  operation, how it was developed, the resources and the time and

7  the effort that was spent on the operation.  Indeed, part of

8  his employment complaints about his management in New York is

9  that he wasn't given enough credit for his role in this

10 operation.

11         Simply put, we cannot overstate the significance of

12 Classified Program No. 1 as it was described at trial.  It was

13 that important.  As Dr. Rice explained, there are only a finite

14 number of ways to penetrate and gain intelligence information

15 from our adversaries in an effort to stop the proliferation of

16 nuclear weapons and weapons technology.

17         Having to abandon this operation, having to abandon

18 Merlin, that hurt.  It was a substantial and costly blow to our

19 intelligence efforts involving Iran and other rogue states.

20 That was true then and it remains true today.

21         Of course, we will never know what would have

22 happened had Merlin reestablished contact with the Iranians

23 back in 2003.  As Robert S. testified, that was in the works

24 when Bill Harlow got his call from James Risen about the story

25 that he wanted to publish in March and April of 2003, and we

 1    won't know what else Merlin could have done for the CIA.

 2    Again, Robert S. testified that the publication of *State of War*

 3    in early 2006 caused the CIA to cease all operational use of

 4    Merlin.

 5          He was a unique asset.  His skill set was very, very

 6    valuable, and most significantly, he could be trusted, but the

 7    agency determined at that time that it could not go forward

 8    with any of their plans because the risk to his safety was far

 9    too great following publication of Risen's book.

10          And let me talk about Merlin for a minute, Your

11    Honor.  We refer to him as a human asset.  He's a real person.

12    He has a wife.  He has children, grandchildren.  He was someone

13    who was recruited by the CIA to do something that no one else

14    could.  He was told by his case officers:  Your identity is

15    safe with us.  Your association with the CIA is safe as well.

16    No one will ever know what you did for the CIA.

17          In fact, in a run-up to the Vienna operation, at one

18    of the defendant's meetings with Merlin in New York, Merlin

19    asked:  Will my identity and association with the CIA ever

20    become public?

21          And this defendant sat face to face with Merlin and

22    assured him:  No, it will never, ever become public.

23          Based on those assurances, he went to Vienna.  He

24    knew he could be arrested, he could be kidnapped, he could be

25    interrogated by the Iranians, but he did what he was told to

1   do.  He performed the mission as directed.  He delivered the

2   fire set plans as he was instructed to do.

3        Gathering intelligence, the CIA depends on

4   information collected with the assistance of people like

5   Merlin.  It is critical to their mission, and the relationship

6   between, between the CIA and its assets such as Merlin depends

7   on absolute certain secrecy.

8        The asset works closely with a case officer, and the

9   most important -- and again, this came out at trial through a

10   number of witnesses -- the most important function of any case

11   officer is maintaining the secrecy of the identity of his or

12   her human sources and their relationship with the CIA.

13        The defendant broke that promise.  He violated the

14   most basic, most fundamental, most important duty of a case

15   officer.  That the KGB or the Iranians or anyone else has not

16   yet retaliated against Merlin doesn't serve to mitigate the

17   defendant's conduct.  What he did was unconscionable.  He put

18   Merlin in danger, his family in danger, and for what?  Because

19   the CIA would not settle his claims against the agency.

20        Merlin, of course, was quite upset with the

21   publication of the books in 2006, and after the trial, he

22   wanted to provide the probation officer or the Court with a

23   statement as to how this case had affected him and his family,

24   but when he read about the case and he saw how he was

25   characterized in the trial as a greedy, perhaps racist,

1  bumbling Russian scientist, he just had enough.  He wanted

2  nothing more to do with this process.

3         Merlin came to the United States with his family not

4  as a defector, not as someone wanting to help the CIA, but to

5  provide his family with a better life.  He and his wife both

6  became United States citizens on their own, without help from

7  the CIA.  They were proud of their new country, proud of what

8  they were able to do, and proud that they were able to do

9  something noble for the United States.

10         The defendant, of course, wants the Court to consider

11  the time he has spent on bond preparing for trial, that he was

12  living under a cloud for four years, unable to support his

13  family.  Merlin has been living under a cloud for almost a

14  decade, living in fear for himself, for his family.  He lost

15  his job working for the CIA.

16         Merlin deserves our thanks.  He did not deserve what

17  happened to him as a result of the defendant's crimes, and he,

18  not the defendant, is the only victim here.

19         The context of when, how, and why these disclosures

20  were made also demonstrates the egregiousness of the

21  defendant's conduct.  When.  When the defendant spoke with

22  Risen is significant.  In 2003, the defendant had already left

23  the CIA.  He spoke with Risen about his knowledge of a program

24  that he worked on back in 2000, but the defendant was aware

25  when he turned Merlin over to the next case officer,

1    Stephen Y., he was aware that the operation was continuing,

2    that it was being planned against other countries as well.

3            In other words, when he sat down with James Risen, at

4    the same time that was occurring, Merlin was engaging with

5    other countries in similar operations.  The recklessness of

6    what the defendant did is astounding.  He put Merlin at risk.

7    He put case officers at risk.  He put the program at risk.  It

8    was happening at the time he was sitting down with a reporter.

9            And how?  Well, as the trial record again proved,

10   there was nothing amiss about this program.  There were no

11   faulty plans.  There was no inadvertent transfer of technology

12   to Iran.  There was no threat that we were giving away nuclear

13   secrets, but what does the defendant tell Risen?

14           Here is an intelligent, astute, well-trained case

15   officer, who knows the truth about the program, he knows the

16   facts, yet he makes a very deliberate, calculated decision to

17   change some of those facts, and why?  The only way he could get

18   the story published, the only way he could create something

19   newsworthy was by characterizing the program in the light that

20   he did.

21           Why?  Spite.  Vindictiveness.  Nothing to do --

22   nothing noble.  Nothing doing his duty, going to SSCI.  Nothing

23   in the nature of any sort of legitimate complaint.  He was

24   angry.  He ran out of options.  His litigation was running --

25   his litigation settlement claims had been, had been dismissed

1    by the agency, and this was what was left, and he struck back.

2            Your Honor, this was not a fun case.  Asking the

3    Court to punish a former public servant, someone who at one

4    time volunteered to serve his country, is not something that

5    makes anyone feel good.  Yet there were rewarding aspects of

6    the case.  There were moments where it was a pleasure to work

7    on this case, getting to meet and to know some of the case

8    officers, some of the men and women who work at the CIA.  It

9    was a fascinating experience, getting to know a little about

10   their lives and how they conduct themselves on a day-to-day

11   basis.

12           We have gone through lots of CIPA hearings.  We have

13   dealt with lots of classified material, classified documents.

14   We have filed things under seal ad nauseam.  We've had

15   protective orders.  We've debated the redactions to particular

16   documents, the substitutions that have to be made, which way is

17   the document better suited for trial, which way should this

18   appear, and at times it's all very technical, very legal, very

19   sterile.

20           But in sitting down with the witnesses in this case,

21   the case officers:  Stephen Y., Stephen B., Laurie D., Zach W.,

22   Max, Denis M., Bob S., even the supervisors:  Charles Seidel,

23   people like David Shedd and others, dealing with classified

24   information is not a technicality.  It's not something they do

25   because they're legally obligated to do it.  It's not something

1    that they have to study a CIPA guide to figure out.

2            It is real.  It's how they live their lives.  It's

3    how they deal with their colleagues, with their friends, with

4    their family.  It is engrained in them, it is part of their

5    soul that they do not, they do not question why material was

6    classified or why they are obligated to keep those secrets

7    dear.

8            They have sworn that they will do so.  They have

9    sworn that they will protect these secrets with their life

10   because they are life-and-death matters.

11           It is a difficult job.  It is a job that few

12   undertake, but it is a job that they do knowing what the

13   consequences are, knowing that they can't talk about these

14   things, they can't talk about them with their friends, with

15   their families, and even when they leave the agency, they are

16   sworn to secrecy.  They know that.

17           It's engrained in them, and the idea that one of

18   theirs, one of theirs, the defendant, Jeffrey Sterling, would

19   violate that trust is just unconscionable, and that is why in

20   the end, Judge, he should be sentenced severely because what he

21   did was deliberate, it was calculated, it was designed to

22   thwart an operation that at its core put people at risk, put

23   assets at risk, and for that he should be punished and he

24   should be punished severely.

25           THE COURT:  All right.  Mr. MacMahon?

1          MR. MAC MAHON:  May it please the Court.  Your Honor,

2    I don't want to relitigate the case that we already tried,

3    obviously.  Mr. Sterling pled not guilty and is not going to

4    allocute to you today that he did these things, and we'll have

5    to deal with that on appeal, I understand.

6          So the prosecutors did a great job trying their case.

7    They won their case.  They deserved to call the facts out as

8    they want to, and that's not really what we're doing here

9    today.  What we're trying to do today is to figure out what

10   would be a fair sentence for Mr. Sterling given all the facts

11   and circumstances as we deal with them here.

12         And again, I know you read the pleadings that we file

13   very closely, so I'm not going to repeat everything that's in

14   my sentencing memorandum.  First of all, I just wanted to say

15   that with respect to the claim that, in the reply that somehow

16   defense counsel was responsible for five years, four-and-a-half

17   years of delay in this case by not agreeing to a continuance at

18   the time that the first trial went sideways, Judge, that was a

19   very serious issue.  It was very serious to you at the time.  I

20   had a conflict of -- a scheduling conflict.  I couldn't give

21   you a continuance.  And there were multiple appellate issues

22   that came up anyway.

23         So it is a fact that Mr. Sterling since he was

24   arrested in 2001 has lived under a cloud.  He hasn't had a job.

25   He hasn't been able to work, and that's just a fact.  And

1   whether it's because Mr. Risen appealed to the Supreme Court or

2   the government appealed the issue about who would know what the

3   jury is may be important to the lawyers involved, but

4   Mr. Sterling is the one whose, whose life has been passing as

5   it goes by.

6          With respect to the issue of harm, no one that tried

7   this case from the very beginning and to the end, and that

8   includes all the lawyers in this room, we all know this is a

9   very serious case.  We all appreciate your time on these CIPA

10  issues.  Anytime we have CIPA issues in a case, it's very

11  important.

12         So nothing, nothing we've said or written at all in

13  any way is meant to take away from what's obviously a very

14  serious case and a very serious issue, but the record does

15  show, Your Honor, there is peace negotiations, whatever you

16  want to call them, with the Iranians right now.  They're going

17  to open an embassy in Washington.

18         And there was a 2007, I believe, intelligence

19  estimate that said they don't even have a nuclear weapons

20  program.  So whatever it was that occurred in 2003 or 2005 is

21  water under the bridge at this point in time from a factual

22  standpoint, and again not taking away or anything that would

23  happen, the government never even tried, didn't assume a burden

24  of proving that there was any actual damage done to the United

25  States, and that's why I think it was important for you to read

1    Mr. Manners' letter, which since it was a sentencing issue, in

2    their sentencing memorandum, they said this was the worst leak

3    essentially that had ever occurred or one of them.

4            And again, I'm not, I'm not belittling this.  I'm

5    just saying so Mr. Manners reads this, and what does he do?  He

6    comes forward with his own description.

7            Aldrich Ames turned in a whole bunch of agents who

8    got killed, and that was before Mr. Sterling supposedly

9    disclosed the name of Merlin.  The book --

10           THE COURT:  Yeah, but Aldrich Ames also got a life

11   sentence.

12           MR. MAC MAHON:  He did, Your Honor.  So I'm saying in

13   terms of the claim that everything was going to be -- I'm not

14   comparing -- I'm just saying the claim they can't recruit

15   agents because of this is something that Mr. Manners deals with

16   in his letter.

17           And what did Mr. Manners get out of it?  He gets

18   called, someone who retracted his testimony and otherwise, he's

19   obviously saying something that the agency didn't want, but the

20   issue, you can, you can read his letter and determine for

21   yourself the level of damage, and again, it wasn't even an

22   element in the case.

23           I do just very quietly, I mean, quietly is not the

24   right word, but remind you that we had, you know, in dealing

25   with CIA people telling you things of a certain fact and that

1  they're established and that all these terrible things had

2  happened, we had another case where the whole world was

3  watching and they couldn't tell you the truth, and there were

4  no consequences for what happened in that situation, and I only

5  ask you to keep that in mind when you hear what Mr. Manners

6  called the hyperbolic claims of damages that arise from this

7  case as to what they say.

8         Mr. Manners certainly -- I'm sorry, Merlin feels like

9  he was mistreated in this case.  We only asked questions that

10  were brought out in the discovery, but Mr. Manners certainly

11  didn't deserve this at all.

12         So it gets me to the end here, Judge, which is where

13  I want to try to tell you about Jeffrey Sterling, and I don't

14  think I can do any better than the letters that you read from

15  all the people that described him as a loving and a caring

16  person and a wonderful person.  He's been called a lot of names

17  in this courtroom:  a traitor; selfish, I think, five or six

18  times; somebody who turned over -- he's been called a lot of

19  names, but who he is is a person.  He's the first person in his

20  family to graduate high school and go to law school, and he

21  did, as Mr. Trump says, volunteer and go and work at the CIA.

22         And this is a very odd sentencing.  At least maybe

23  the Court with all your experience has dealt with this before,

24  but if Mr. Sterling was a selfish person in 2003 or an angry

25  person in 2004, that's not who's here today.  He's a

1  47-year-old man, and, and it's not somebody that you need to

2  wait and see what's going to happen if you give him a fair

3  sentence in line with what other people convicted of what he

4  has done.

5         I don't know if you've had a defendant come before

6  you who has letters of support from people he worked with at

7  health care fraud investigations, and we've given you

8  commendations he got where he saved our government millions of

9  dollars in health care fraud.  He was someone who a judge in --

10  a federal judge called to the, the podium or at least called

11  out in a sentencing to thank him for all the work that he's

12  done.

13         So whoever he was in 2003, he's not that person

14  anymore.  He's someone who went to law school, got a job, and

15  started ferreting out health care abuse.  He's someone who

16  loves his, his wife.  He's someone who has a family and people

17  that love him and support him, and that's who you, that's who

18  you're going to sentence today.

19         And I think you do need to look at the other

20  sentences that other people got.  Mr. Trump talked about an

21  agent, a CIA agent turning over the name of somebody.  Well,

22  that's what Mr. Kiriakou did.  He stood at this very podium,

23  and he got sentenced.  Mr. Kim was convicted of discussing with

24  a reporter issues of the Korean nuclear weapons program.

25         Every case is different; I understand that.  That's

1    why we haven't -- I don't stand here telling you -- you have

2    the job of figuring out what the sentence is here.  None of us

3    can do that job for you, but all we ask is that you be fair,

4    and I know you will be, and sentence Jeffrey Sterling for the

5    man that he is today, and just please be fair to him, Your

6    Honor.  That's all.

7         THE COURT:  All right, Mr. Sterling, come up to the

8    lectern.

9         First of all, just for the record, are there any

10   victims who want to be heard?

11                    (No response.)

12        THE COURT:  All right, Mr. Sterling, this is your

13   opportunity to say anything you'd like the Court to consider.

14   I have read all the letters that were submitted on your behalf

15   by counsel, but you may very well want to say something as

16   well.

17        THE DEFENDANT:  Very briefly, Your Honor.  I would

18   like to thank the Court for the respect -- the Court and the

19   staff for the respect that you have shown me and the courtesies

20   that you've shown me through the years.  I would especially

21   like to thank Mr. Wood, who has been very gracious and very

22   courteous to me and my loving wife, Holly.

23        And I would also finally like to thank Your Honor for

24   delaying the start of the trial so I was able to attend my

25   brother's funeral.  He was a Marine and proudly served his

1    country, and it meant a lot to me to be able to say goodbye to

2    him.

3         And that's all.  Thank you very much.

4         THE COURT:  All right.  Well, Mr. Trump, to

5    paraphrase something you said about being a CIA agent is a

6    difficult job, being a federal judge is also a very difficult

7    job, and there's nothing more difficult than having to sentence

8    in a case like this because clearly, Mr. Sterling, you should

9    get a lot of credit in terms of your total life, and 3553(a) of

10   Title 18 of the United States Code gives the Court the

11   authority, in fact, the obligation to make sure that in any

12   sentencing, we consider the multiple factors, not just the

13   crime that was committed, although that is clearly a factor and

14   an important one.

15        But the Court has to look at the entire person who

16   stands before the Court when we go to sentence someone, and you

17   do get a lot of credit in the Court's eyes for coming from the

18   background you came from, working your way through school,

19   getting a law degree, and volunteering to work at the CIA.  All

20   that was highly commendable.

21        And what's happened since you left the CIA, I do also

22   feel that your work for Blue Cross was outstanding and showed

23   that you have a lot of talent and the ability to live a

24   law-abiding life.

25        But these years at the CIA, especially the ones at

1   issue in this case, are obviously a terrible part of your life.

2   It's a part that you're going to have to deal with.  This Court

3   takes very seriously the obligations of people who have trust

4   of the kind that you had, especially when you're working with

5   human assets.

6           Since you've mentioned the *Kiriakou* case,

7   Mr. MacMahon, you may recall that I accepted that plea under a

8   binding plea agreement, but I also said during that sentencing

9   that I was troubled by the fact that the identity of an agent

10  was disclosed, and had I not agreed -- and I did agree for the

11  various reasons that we often have in these types of cases

12  where you're balancing the disclosure problems that the

13  government has against being able to have the case go

14  forward -- I would have probably sentenced him higher, because

15  there is in my view no more critical secret than the secret of

16  those people who are working on behalf of the United States

17  government in covert capacities, even more than the program

18  itself.

19          Regardless of the merits of that program, there's no

20  question that Merlin was a human asset and that the information

21  in that book put him in a highly compromised position, and that

22  is to me the most serious element of this entire case, and that

23  is, of course, another reason why the Court has to impose a

24  sentence that addresses not just your conduct, because I don't

25  think there's any danger, Mr. Sterling, that you're going to

1  recidivate, that you're going to do this type of thing again,

2  but there has to be a clear message sent to other people at the

3  agency or in any other kind of clandestine or sensitive or

4  secret operation of the government that when you take an oath

5  in which you promise that you will not reveal secrets, that if

6  you do knowingly reveal those secrets, there's going to be a

7  price to be paid.

8          Now, the government talked about how essential it is

9  to the national security that we have people willing to serve

10 as human assets and that we have secrets preserved, and that's

11 true, but it's equally if not more essential to the security of

12 the nation that we have a justice system that's fair so that it

13 will have the respect of the people, and that means that the

14 courts have to always balance these various issues.

15         I've looked very carefully at this case.  I am

16 satisfied that a sentence higher than that given to

17 Mr. Kiriakou is appropriate in this case and in part because,

18 as the government did correctly point out, this is different in

19 that Kiriakou did come forward and admit his guilt.  That has

20 not happened in this case.

21         Now, that doesn't mean a person is punished severely

22 because he uses his right to go to trial, but from a sentencing

23 standpoint, it does suggest that you have two different

24 defendants, one who has come to grips with the fact that he did

25 wrong, recognizes it, and is ready to move on with his life,

1 and the second person, who for whatever reason does not believe

2 he committed any crime, and that means, in my view, that there

3 is a difference between these two cases.  I think, however,

4 that not that great a difference is appropriate.

5        The final sentence of the Court, considering the

6 3553(a) factors, is the defendant be committed to the custody

7 of the Bureau of Prisons for a period of 42 months on each of

8 Counts 1, 2, 3, 4, 5, 6, 7, 9, and 10, all concurrent with each

9 other, followed by two years of supervised release, and the

10 terms and conditions of supervision, Mr. Sterling, are first of

11 all your uniform good behavior, which means you're not to

12 violate any federal, state, or local laws.

13        Do you understand that?

14        THE DEFENDANT:  Yes, I do.

15        THE COURT:  Secondly, you are not to -- I'm sorry,

16 you are required to follow all the conditions of supervision as

17 explained to you by the Probation Office, and they'll also be

18 included on the judgment order.  Do you understand that?

19        THE DEFENDANT:  Yes, I do.

20        THE COURT:  The only special condition I'm imposing

21 in this case is you are required to get a complete mental

22 health evaluation.  You are required to take any medications

23 prescribed by your mental health practitioner and fully

24 participate in such in- or outpatient mental health treatment

25 as directed by the Probation Office.

1          Do you understand that?

2          THE DEFENDANT:  Yes, I do.

3          THE COURT:  You will have to waive any privacy rights

4  you have to the mental health treatment so that Probation can

5  monitor your progress.  Do you understand that?

6          THE DEFENDANT:  Yes, I do.

7          THE COURT:  I'm going to waive the costs of that

8  program.  I am also waiving the costs of supervision, any other

9  costs of supervision, the costs of incarceration, and any of

10  the statutory fines.  I don't think you have the financial

11  resources to cover those at this point.

12          There is no history of drug abuse, so the mandatory

13  drug testing is not imposed.  However, the Probation Office can

14  demand a drug test from you at any time, and you must comply.

15  Do you understand that?

16          THE DEFENDANT:  Yes, I do.

17          THE COURT:  Lastly, because there are nine counts of

18  conviction, there's a total of $900 in special assessments.

19          Now, there was a forfeiture provision in the

20  indictment, and I can't recall what we finally did with the

21  forfeiture.  Is there any forfeiture in this case?

22          MR. TRUMP:  We have not pursued the forfeiture issue.

23          THE COURT:  All right, I just wanted to make sure for

24  the record.

25          And I'm assuming that the government has no objection

1    to the defendant being allowed to self-surrender?  There have

2    been no problems at all on bond, and this is a nonviolent

3    offense.

4              MR. TRUMP:  We would not object to self-surrender

5    once space became available at whatever institution the

6    defendant recommends or the Bureau of Prisons decides.

7              THE COURT:  All right.  Now, Mr. MacMahon, I don't

8    think in your papers -- and if you had it, I must have missed

9    it -- did you make a recommendation to a facility?  I'm

10   assuming you want it near Missouri?

11             MR. MAC MAHON:  Yes, Your Honor, near where his wife

12   lives, St. Louis, Missouri.

13             THE COURT:  All right, we'll make that

14   recommendation.

15             MR. MAC MAHON:  If I may, Your Honor?

16             THE COURT:  Yes, sir.

17             MR. MAC MAHON:  There is some -- in the pre-sentence

18   report, which is obviously filed with you under seal, there's

19   some specific medication, and I just would ask that the Court,

20   if you're willing to put in the order that they consider,

21   however that can be -- I know you don't want to tell BOP what

22   to do in the prison in terms of medication, but the doctors

23   have suggested those specific medicines for him.

24             THE COURT:  That's something that you and Ms. Riffle

25   should talk about, the Probation Office.  You're going to have

```
1    time, at least a few weeks, before the defendant has to

2    self-surrender in which you should be able to make those

3    arrangements.  I think those two medications are standard.  If

4    they're formulary or they're funny, sometimes the Bureau of

5    Prisons has trouble with some of those, but if you find in

6    talking with Ms. Riffle and the BOP that there are going to be

7    issues about that, you can approach the Court with a motion,

8    and we'll see if we can help you out on that.

9            MR. MAC MAHON:  Thank you, Your Honor.

10           THE COURT:  All right?  So I'm not going to put it in

11   the judgment order per se.

12           We will recommend a designation to a facility as

13   close to St. Louis, Missouri, as possible.

14           Mr. Sterling, I want to advise you you have a right

15   to appeal both the convictions and this sentence.  If you wish

16   to file an appeal, you have to file the notice of appeal within

17   14 days of today's date.  I will -- you have a right to be

18   represented by counsel through that appeal.  If you are unable

19   to afford to hire counsel yourself, we will appoint counsel for

20   you.

21           Do you understand that?

22           THE DEFENDANT:  Yes, I do, Your Honor.

23           THE COURT:  All right, is there anything further?

24           MR. MAC MAHON:  Not for the defense, Your Honor.

25           THE COURT:  All right.  Then the last thing,
```

1    Mr. Sterling, is I am going to continue you on your current

2    bond.  The terms and conditions are all the same, with the

3    additional condition that when you are notified by the Marshals

4    Service as to where and when to report to start serving your

5    sentence, you must get yourself there.

6              Do you understand that?

7              THE DEFENDANT:  Yes, I do.

8              THE COURT:  All right.  Mr. Trump, was there anything

9    else?

10             MR. TRUMP:  Yes, Judge.  With respect to any issues

11   that may arise on appeal, if the Court is inclined, we would

12   ask the Court to make the record as to whether the sentence

13   would be the same regardless of the number of counts; in other

14   words, would the Court have imposed the same sentence

15   regardless of nine counts versus three?

16             THE COURT:  I've imposed the sentence on each count

17   concurrent because I believe that that is the appropriate

18   sentence as to each count.

19             MR. TRUMP:  I guess our question is would the Court

20   find that, that that would be the sentence regardless of the

21   number of counts?

22             THE COURT:  If there had been one or nine, it

23   would --

24             MR. TRUMP:  Yes.

25             THE COURT:  The only -- yes.  They're all the same.

1   I mean, the only count that really is a little bit different is

2   the obstruction count because that's sort of after the fact,

3   but, of course, ironically, that had the highest exposure.

4   That had a twenty-year exposure.  I think all the others had a

5   ten-year exposure.

6          All the other counts have the same core problem, that

7   is, that Merlin's identity was exposed and there was a clear

8   breach of the obligation to keep things secret.

9          In terms of the obstruction count, that's an

10  obstruction of justice.  That's in some respects, you know, has

11  its own problems.  So I'm comfortable in putting on the record

12  that the sentence would have been the same were it a conviction

13  of one count or of all of those counts.

14         MR. TRUMP:  The second thing is an administrative

15  matter, and I'm not trying to signal to the Court any intention

16  on the part of the government, but because of the different

17  multiple layers of review in this case, we have to object to

18  the sentence or else any appellate issue related to sentence

19  could be waived, so we just want to put on the record that,

20  note our objection.

21         THE COURT:  That's your job, Mr. Trump.

22         MR. TRUMP:  Thank you.

23         THE COURT:  I understand that.

24         MR. MAC MAHON:  I'll jump in and object to the

25  advisory opinion on the first question about the consecutive --

1    the sentence on all charges.

2            THE COURT:  Well, look, as long as we're doing this,

3    to save us another hearing on this, if the defendant -- if

4    there is an appeal, is there going to be any motion to stay

5    execution of sentence?

6            MR. MAC MAHON:  Well, Your Honor, I'm not, I'm not

7    sure as of today if there's going to be, but it wouldn't affect

8    the motion for bail pending appeal, I wouldn't think.  I

9    haven't had a chance to consult with my client about that.

10           THE COURT:  All right, that's fine.

11           MR. MAC MAHON:  So I can't answer that.

12           THE COURT:  Well, maybe you and the government can

13   talk as well and see what you can work out.

14           MR. MAC MAHON:  We will, Your Honor.

15           THE COURT:  All right, very good.

16           When you leave court today, Ms. Riffle is in the

17   courtroom.  You should make sure you've checked in with

18   Probation and Pretrial so that also the folks in Missouri know

19   that the pretrial bond will stay in place until the defendant

20   self-surrenders if there's no stay of the execution.

21           MR. MAC MAHON:  We'll do that, Your Honor.

22           THE COURT:  All right, if there's nothing further

23   then, we'll recess court for the day.

24           MR. TRUMP:  Thank you, Your Honor.

25           MR. POLLACK:  Thank you, Your Honor.

1                    (Which were all the proceedings

2                      had at this time.)

3

4              CERTIFICATE OF THE REPORTER

5       I certify that the foregoing is a correct transcript of

6   the record of proceedings in the above-entitled matter.

7

8

9                           _____
                                        /s/
10                              Anneliese J. Thomson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25