1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | Criminal No. 1:10cr485 |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | January 12, 2015 |
| JEFFREY ALEXANDER STERLING, | . | 3:13 p.m. |
| | . | |
| Defendant. | . | |
| | . | |
| . . . . . . . . . . | . | |

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:              JAMES L. TRUMP, AUSA
                                 DENNIS M. FITZPATRICK, AUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314
                                   and
                                 ERIC G. OLSHAN, Deputy Chief
                                 Public Integrity Section of the
                                 Criminal Division
                                 United States Department of
                                 Justice
                                 1400 New York Avenue, N.W.
                                 Suite 12100
                                 Washington, D.C. 20005


FOR THE DEFENDANT:               EDWARD B. MAC MAHON, JR., ESQ.
                                 Law Office of Edward B.
                                 MacMahon, Jr.
                                 107 East Washington Street
                                 P.O. Box 25
                                 Middleburg, VA 20118


(APPEARANCES CONT'D. ON FOLLOWING PAGE)


(Pages 1 - 37)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1    APPEARANCES:  (Cont'd.)

 2    FOR THE DEFENDANT:           BARRY J. POLLACK, ESQ.
                                   MIA P. HAESSLY
 3                                 Miller & Chevalier Chartered
                                   655 - 15th Street, N.W.
 4                                 Suite 900
                                   Washington, D.C. 20005-5701
 5

 6    ALSO PRESENT:                SA ASHLEY HUNT
                                   JENNIFER MULLIN, ESQ.
 7

 8    OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                                   U.S. District Court, Fifth Floor
 9                                 401 Courthouse Square
                                   Alexandria, VA 22314
10                                 (703)299-8595

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2              (Defendant not present.)

3          THE COURT:  All right, we're now in the open portion

4  of the hearing.  This is just a matter, a few logistical

5  matters that I want to make sure have been taken care of.

6  First of all, we have a government motion to amend expert

7  notice, that a witness who they planned to call will not be

8  called to testify.

9          Is there any objection to that motion being granted?

10         MR. MAC MAHON:  No objection, Your Honor.

11         THE COURT:  All right, the motion is granted.  All

12 right?

13         There's a motion in limine to exclude Mr. Risen from

14 appearing at the trial to testify, and I -- that was just

15 filed, so I have not heard from the defense its position on

16 that.  Mr. MacMahon?

17         MR. MAC MAHON:  If you would, Your Honor, we, we just

18 got this an hour or two ago, but obviously, we object to not

19 being able to call Mr. Risen as a witness on various grounds.

20 Obviously, I haven't been able to do all the legal research,

21 but Mr. Risen's testimony was taken here in court, and we all

22 heard it.  It's key, I think, for this jury to hear his

23 testimony that he had multiple sources, a wide range of

24 sources, whatever it was that he said, and to limit us from

25 putting on that testimony really because the government didn't

1    like the answer that they got and didn't even ask him any

2    questions, I think, is infringing upon Mr. Sterling's right to

3    a fair trial.

4         We have the right to call Mr. Risen as a witness if

5    we want.

6         THE COURT:  Do you have any objection to the

7    government's proposed instruction should he testify?

8         MR. MAC MAHON:  Yes, Your Honor, I do.  The

9    instruction that says they shouldn't draw any inferences

10   against Mr. Sterling for his refusal to testify, the

11   instruction that's on page 4?

12        THE COURT:  Right.

13        MR. MAC MAHON:  Mr. Risen hasn't actually refused to

14   testify about his sources.  He's not unavailable in a legal

15   sense, which requires under, I think it's 803 or 804 that a

16   court order be entered.  He's just -- the government didn't

17   even ask him a question.  I mean, it's politically unavailable

18   is what he is.

19        They never asked him the question.  They never asked

20   him any questions before this hearing.  They never subpoenaed

21   any of his e-mails.  They never went after his phone records.

22   They did all kinds of things that we would want to be able to

23   put on in front of a jury to show that the -- I could bring you

24   dozens of pleadings where they say how necessary this testimony

25   is, that it's their only direct evidence, that they can't prove

1   venue without him, all of these things, and now all of a

2   sudden, he's a witness who can't be called at all.

3           I think that that instruction the way it's written

4   actually infringes upon Mr. Sterling's right to remain silent.

5   If the government doesn't bother to call Mr. Risen, that is

6   something that the defense can talk about, something we can

7   argue about, something we can bring up in opening, something we

8   can bring up in closing.  It's their burden of proof.  We don't

9   have to do a thing.

10          And to tell the jury when -- I mean, and I don't

11  really know of any questions Mr. Risen didn't answer because

12  apparently the questions were, "If I asked you this, you

13  wouldn't answer, would you?"

14          The answer was, "Yes."

15          You were never asked to make him answer a single

16  question.

17          And, you know, we've got Mr. Risen coming -- they

18  want to put all kinds of things in about Mr. Risen in this

19  case, but to tell us that we can't really deal with it at all,

20  we can't put in -- so I don't understand even, even the

21  argument that somehow -- you've got witnesses here who won't

22  testify because they're serving life sentences.  You know, it's

23  not a missing witness.  It's somebody they won't even call.

24  That's, that's a different thing whatsoever.

25          And, you know, if, if under -- in the case of *Kyles*

1    *v. Whitley*, the lack of an investigation by the government, why

2    didn't they subpoena Mr. Risen's e-mails?  Why didn't they

3    subpoena his phone records and find out who else he was talking

4    to instead of doing it -- we've got about seven minute of phone

5    calls over two years between Mr. Sterling just in phone

6    records, and we don't know if he talked to any of these other

7    people we've talked about and the jury is going to talk all

8    about, which is why I was asking about the other phone records

9    as well.

10          And so I just think it's a completely unfair, really

11   an unconstitutional thing to suggest to this jury that no

12   inference should be drawn because the government doesn't call

13   the key witness, the one witness that it has said all along

14   holds the key testimony in this case, and if the attorney

15   general made a decision that that was what was going to happen,

16   that's what happened, but that doesn't mean it should fall on

17   Mr. Sterling to then act as if nothing ever happened in the

18   case with Mr. Risen other than what the government thinks is

19   incriminatory.

20          They've made motions to you that certain things he

21   said were statements against penal interest.  You remember

22   those motions, that his statements to Mr. Harlow were

23   statements against penal interest.

24          He has no penal interest whatsoever it turns out with

25   respect to testifying in this court when the President and the

1    attorney general say that nothing's supposed to happen to him,

2    and so I think we get to talk about that, and I think that it's

3    just like any other witness that they don't call, that that's

4    something that they just have to live with and live with the

5    consequences.  They're the ones that are making the decision.

6         And if he's declared unavailable by the government,

7    we can put in the transcript of what happened in court.  We're

8    happy just to have that, the transcript of the -- with my

9    motion taken out and other things, but then his prior sworn

10   testimony comes in.

11        THE COURT:  Well, which do you want?  Do you want his

12   live testimony in court, or do you want the transcript?

13        MR. MAC MAHON:  We would take the transcript right

14   now over his live testimony, Your Honor, given the parameters

15   of your order that we had to ask the questions.  We would be,

16   we would be satisfied with that transcript, and I think we'd be

17   entitled to it once the government declares him unavailable

18   anyway under --

19        THE COURT:  Well, I don't think the government

20   declares somebody unavailable, I mean, but in any case, you

21   want to introduce his transcript, and we can fight about the

22   jury instruction down the road.

23        MR. MAC MAHON:  Yes --

24        THE COURT:  All right.

25        MR. MAC MAHON:  -- but also, I think that what

1  they're also saying in here, we talked about this last night,

2  counsel did, so this didn't come out of the blue completely,

3  Your Honor, but, you know, as to what arguments could be made

4  about whether the government could have gotten this

5  information, whether it even tried, what kind of an

6  investigation is it where the key witness in the case is

7  declared off bounds completely by the government and that I

8  can't tell the jury that, that they've decided the key witness

9  in their case is somebody that they're just not going to bother

10  with at all, that they can't, they're just going to see if they

11  can do this some other way, that -- and I just think that's

12  completely fair and would happen in every other case that we

13  had.

14        THE COURT:  Mr. Olshan?

15        MR. OLSHAN:  Your Honor, Mr. MacMahon's statements

16  underscore why this motion is ripe at this point.  The one

17  thing that last week's hearing accomplished is dispelling any

18  speculation about the limits to which Mr. Risen would go to not

19  answer questions about his sources, either directly or

20  indirectly.  He stated that repeatedly on the record.

21        The hearing last week made that crystal clear, and

22  legally what that means is that as to the core non-collateral

23  issues in this case, he is unavailable either to the government

24  or to the defense.  If we were to call him, they wouldn't be

25  able to cross-examine him on any of these issues related to

1  sourcing.  If the defense were to call him, we would not be

2  able to cross-examine him effectively because he has said he

3  would refuse to answer any questions, regardless of the

4  potential sanction, about who his sources were for this chapter

5  in *State of War* or any article that he wrote or anything.

6          And so the, the law is, is pretty squarely on point

7  that when a witness is equally unavailable or available to both

8  sides, you don't get to comment on the government's failure to

9  call that witness.  There's no Sixth Amendment issue hereby

10  because a defendant can't call a witness to take the stand and

11  answer some questions on direct, knowing that that witness is

12  not going to answer relevant questions on cross-examination.

13          THE COURT:  This is a little bit different, I think.

14  This is not a person who's taking a Fifth Amendment, pulling in

15  the full Fifth Amendment.  I mean, part of the issue here is,

16  you know, a policy decision that was made by the executive

17  branch as to how to handle this situation, because frankly, you

18  won in the Fourth Circuit, and the Supreme Court didn't grant

19  cert, so, you know, the law in terms of what the law of the

20  case was was that Mr. Risen was not going to have a right to

21  refuse to testify.

22          He would not have a Fifth Amendment right, and, you

23  know, he never got pushed to the ultimate, so we don't know

24  what the final outcome would be, but he did say some things

25  during his testimony that are certainly not irrelevant to this

1    case.  I believe he did confirm that there were multiple

2    sources.  That in and of itself is an important fact, I think,

3    for the defense, and unless, you know, you want to do some

4    stipulations, I think those portions of his testimony where he

5    did provide information, I think, are sufficiently relevant to

6    this case that allowing a properly redacted transcript is not

7    inappropriate.  I mean, there's some stuff in there that I

8    don't think the whole transcript would be needed in this case,

9    and I would expect you-all to work it out.

10          What kind of instruction I give -- but I also don't

11   think it's fair to allow the defense to be able to argue that

12   the jury should draw an inference against the government

13   because of the way the, the Risen testimony -- I mean, it is

14   what it is.

15          So I think the real fight on this may be the jury

16   instructions and possibly, you know, limitation to some degree

17   on how the case is argued.  What I don't want to do is have to

18   open this thing up and then all of a sudden have someone coming

19   over from DOJ to have to explain what the attorney general's

20   position is.  That's a trial within a trial and not necessary

21   for this case, all right?

22          So I hope that ruling is clear enough.  I'm going to

23   deny the government's motion in limine, allow the defense to

24   move in the portions of the transcript they want, and frankly,

25   you can move in whatever portions of the transcript you-all

```
 1   want, and that will be part of the evidence for this jury, and
 2   then how it's argued may get affected down the road when I
 3   decide how I want to handle the jury instruction.
 4           MR. OLSHAN:  A couple points if I may, Your Honor?
 5           THE COURT:  Yeah.
 6           MR. OLSHAN:  Mr. MacMahon just stated that they'd
 7   like to argue about this in opening, that they'd like to
 8   somehow --
 9           THE COURT:  We're not arguing the case in opening
10   statements.  In fact, we can, we can jump to that right now.
11   How much time is the government requesting for its opening
12   argument -- opening statement, not argument?
13           MR. TRUMP:  I don't want the Court to, to laugh or
14   gag when I, when I ask, but I've been trying to get it down
15   under 40 minutes, and the reason I say that, there's, there's
16   two burdens on the government here that are really, they're
17   overlapping evidence but essentially two cases.
18           One, we have to prove that the information that was
19   disclosed is national defense information, and because of the
20   way that the, the book is written, we have to go through the,
21   the classified program in some detail and explain to the jury
22   what the real program was all about and, and the fact that it
23   wasn't flawed and that sort of thing.
24           Then the second part is linking the defendant to the
25   book.  So there's, there's really two areas that have to be
```

1    explained.  I'm trying to get it down less than 40, but I would

2    hope the Court would give us a little bit of leeway just

3    because it is a circumstantial case, and linking up the

4    circumstantial evidence to the program and everything does

5    take, take a little time.

6            I'm not a long-winded person, Judge.

7            THE COURT:  I know.

8            MR. TRUMP:  I can tell when a jury falls asleep, and

9    I'm certainly going to try to keep it as short as possible.

10           THE COURT:  I have to tell you, Mr. Trump, I don't

11   think in all the years I've been on the bench I've ever seen an

12   opening statement that runs more than about 30 minutes that's

13   effective.

14           MR. TRUMP:  I'm trying to get it down to that --

15           THE COURT:  Okay.

16           MR. TRUMP:  -- but I hope the Court won't cut me off

17   at 31 minutes and say, "You're done."

18           THE COURT:  All right.

19           MR. TRUMP:  Because there is a lot of information

20   there that, frankly, is going to be very confusing without some

21   explanation.

22           THE COURT:  All right.  Mr. MacMahon, who's opening

23   for defense?

24           MR. MAC MAHON:  I am, Your Honor.

25           THE COURT:  Is 40 minutes about what you were looking

1   for?

2           MR. MAC MAHON:  I wasn't -- you've never given me

3   that long before, Your Honor, and I wasn't expecting it, but

4   I'll -- it's your court, so whatever you say.

5           THE COURT:  Forty minutes is the outside limit for

6   each side, all right?  But it's not to be argument.  If it

7   starts getting argumentative, I'm going to cut it, all right?

8   That's for both sides.  So a simple, straightforward

9   explanation of what the jury can sort of be expecting and what

10  the problems in the case might be, that's legitimate, all

11  right?

12          But offhand, so you can save me some research time,

13  what's the burden of proof for establishing venue in a criminal

14  case?

15          MR. OLSHAN:  Preponderance.

16          THE COURT:  Is that the defense understanding as

17  well, preponderance?

18          MR. MAC MAHON:  Yes, Your Honor.

19          THE COURT:  All right.

20          MR. MAC MAHON:  We submitted a proposed instruction

21  to you that sets forth the standards.

22          THE COURT:  I haven't -- all right.  I haven't looked

23  at the instructions yet, so it's too far down the road so far.

24  Okay.

25          MR. OLSHAN:  A couple more points on the Risen issue,

1    Your Honor?

2          THE COURT:  Yeah.

3          MR. OLSHAN:  With respect to understanding the

4    Court's ruling denying the motion to exclude, we would, we

5    would still argue that the Court should give an appropriate

6    instruction that based on the witness's availability or

7    unavailability to both sides, the defense cannot argue that the

8    jury should infer --

9          THE COURT:  All right, that's at the end of the case,

10   when we'll have our jury instruction charging conference.  Go

11   ahead.

12         MR. OLSHAN:  One other point on, on the transcript.

13   I think preliminarily, and we'll have to discuss this, we would

14   oppose entering the transcript, even portions of it, into the

15   record, as opposed to potentially doing a read-back of his

16   testimony, so that the jury is not in the back with a

17   transcript.

18         THE COURT:  Oh, that's how it's done.  In this court,

19   my law clerk sits in the witness box, reads the answers, and

20   the side that proposed the question will read it.  That more or

21   less covers how it's done.  So it won't be that they're going

22   to get the transcript, yeah, yeah.

23         MR. OLSHAN:  And then one final point:  We certainly

24   would have some objections to questions that were asked by, by

25   Mr. MacMahon during the hearing.  For example, Mr. Risen was

1   prompted to go through his prior affidavit as to why he wrote

2   the chapter, which suggests that he is somehow an expert in

3   national security matters, where we certainly haven't conceded

4   that he is in a position to opine on what would be harmful to

5   the United States' security interests and what would not.

6         THE COURT:  Well, I'm not sure I'm going to entertain

7   that, but the bottom line is I don't know yet what the

8   transcript is, so what needs to be done is the defense needs to

9   indicate what portions of the transcript -- if you want the

10   whole thing, then so be it.  Then I'll see what objections the

11   government's got.  But if you want it shortened or whatever --

12   now, that's coming in in the defense case because the

13   government is not planning to use it, is that correct, in your

14   case-in-chief?

15         MR. OLSHAN:  That's correct.

16         THE COURT:  All right.  So there are quite a few days

17   before we have to actually get to this issue, but I do expect

18   the defense to decide what portions of the transcript you want

19   to use, if not the whole thing.  Get that immediately, as soon

20   as possible to the government.  The government should then

21   indicate what objections you've got, and I'll have to rule on

22   it, rule on it at some point before we get to that point in the

23   case, all right?

24         MR. OLSHAN:  Very well.

25         THE COURT:  Okay.

1      MR. MAC MAHON:  Your Honor, if I may, we need to get

2   a copy of the transcript.  I'm sure we can arrange that, but --

3      THE COURT:  That hadn't been ordered yet?

4      MR. OLSHAN:  I believe it's been docketed for the

5   parties.

6      THE COURT:  Oh, then --

7      MR. OLSHAN:  Because it was a public hearing.

8      MR. MAC MAHON:  We'll, we'll get a copy, Your Honor.

9   I just wanted to say on this, some of these questions deal also

10  with this mail fraud count, where Mr. Sterling is being charged

11  with conspiring essentially with Mr. Risen to publish the book.

12  So we'll deal with that at the right time.

13     THE COURT:  All right.  I want to make --

14     MR. TRUMP:  Your Honor, there's no allegation that

15  Mr. Risen conspired with anyone.

16     THE COURT:  There's no conspiracy charge in this

17  case.

18     MR. MAC MAHON:  It's a scheme or artifice to defraud

19  the United States out of its property by the publication of the

20  book.  I didn't use the right word.

21     THE COURT:  All right.

22     MR. MAC MAHON:  "Scheme or artifice" would be the

23  exact words.

24     THE COURT:  All right.  I just, since this is an open

25  hearing and I'm not sure the public has been kept apprised of

1    this, we are going to seat a jury of 14 individuals.  The

2    defense will have a total number of 11 peremptory strikes; the

3    government will have 7.  I have subpoenaed approximately 100

4    jurors.

5              That does mean that the well of the court -- the

6    courtroom is going to be packed with jurors on tomorrow, and

7    there may not be much room, if any, for reporters or the

8    public.  We'll try to have one or two seats at the very back of

9    the courtroom for, you know, the first two reporters who get

10   here, but other -- the two who are in court probably will be

11   the two, but quite seriously, there won't be enough room for

12   everybody, and that's just the physical problems we have with

13   the courtroom.  If we can get a couple extra chairs in back,

14   I'll have the CSO see if we can do that.

15             Once the jury has been selected, then we will go

16   right into opening statements.  Whether that happens before

17   lunch or after lunch, I don't know.  It will depend how long it

18   takes to get the jury in place, all right?

19             MR. TRUMP:  One of the --

20             THE COURT:  And also for the purposes of the public,

21   we are going to continue this trial on Friday.  We will start

22   at 10:00 on Friday.  That's not, not our normal practice, but

23   we were able to move the motions docket to 9:00, so this, this

24   trial will go forward on Friday.

25             And then we'll see next week.  We don't have court on

1    Monday because it's Martin Luther King holiday.  We'll see

2    whether or not we also have Friday.  When I voir dire the

3    jurors, I am going to tell them to be prepared to be here on

4    the Fridays.

5              And I do need from you, Mr. Trump, an estimate, I

6    think we've been through this before, but when do you think the

7    government will close its case-in-chief, assuming no, assuming

8    no snow days?

9              MR. TRUMP:  We certainly hope by the end of the

10   second week.

11             THE COURT:  All right, so that would be by the 23rd

12   of, of January.

13             MR. TRUMP:  That Friday, yeah.

14             THE COURT:  That Friday, all right.

15             MR. TRUMP:  We hope.

16             THE COURT:  All right.  And how long, Mr. MacMahon,

17   do you think the defense case -- I know a lot of your case will

18   go on through the cross-examination of government witnesses,

19   but --

20             MR. MAC MAHON:  I would, I would guess after

21   consulting with Mr. Pollack a day at the most is what we have.

22             THE COURT:  All right.  Out of an abundance of

23   caution, I think I should tell the prospective jurors that they

24   could be here through the end of January.  I mean, given time

25   to deliberate, the potential that we might lose a day or so for

1   snow days, all right?  I don't want to spook jurors, either,

2   but I think -- that's, that's the outside limit for this case,

3   right?

4           So if I have a juror who says they're going to be out

5   of town February 3, that's not going to be a problem, right?

6   That's what we're all heading for.

7           MR. TRUMP:  (Nodding head.)

8           THE COURT:  All right, very good.

9           I think the last thing I need to address unless

10  there's any other housekeeping matters are, is the proposed

11  voir dire because there were some objections, and I want to run

12  by you-all what I think -- what I'm planning to tell the jury.

13  As you know, we start voir dire with the Court giving a brief

14  summary of the case.  I think this is enough, it's not too

15  much, but let me just tell you what I plan to tell the jury:

16          The United States has charged the defendant, Jeffrey

17  Alexander Sterling, with six offenses, including several counts

18  of unauthorized disclosure of national defense information and

19  one count each of unlawful retention of national defense

20  information, mail fraud, unauthorized conveyance of government

21  property, and obstruction of justice.

22          These charges arise out of the publication in 2006 of

23  a book entitled *State of War* by James Risen, a Pulitzer

24  Prize-winning *New York Times* journalist.  Specifically, chapter

25  9 of that book describes a CIA effort to undermine the progress

1  of Iran's nuclear weapons program by having a person posing as

2  a former Soviet Union nuclear scientist offer to sell nuclear

3  weapon plans to Iranians.  The plans were to appear accurate

4  but would contain flaws that would mislead the Iranians.

5          Chapter 9 included classified information about the

6  project and the human asset, who will be referred to as Merlin

7  throughout this trial.

8          The defendant, Mr. Sterling, was first employed by

9  the Central Intelligence Agency in 1993.  He had a Top Secret

10 security clearance, and during the time period of 2000 to

11 2002 -- or January 31 of 2002, he was involved as one of the

12 handlers of Mr. Merlin and was aware of the project at issue in

13 chapter 9.

14         The government alleges that it was the defendant who

15 was the source of the classified information in chapter 9 to

16 Risen and that as a result of the publication of the book, the

17 national defense was damaged.  The government also alleges that

18 when subpoenaed to testify before a grand jury about the leak,

19 the defendant destroyed documents.

20         Then I'm going to ask the jury if they have

21 heard/read/seen anything about this case and then go into the

22 general inquiry.

23         MR. MAC MAHON:  If I may, Your Honor?

24         THE COURT:  Yeah.

25         MR. MAC MAHON:  This came up before.  Mr. Sterling

1   has access to the specific program that we're talking about in

2   terms of the -- was actually in, there's even some debate about

3   that, but in early May of 2000.  He did not have any access to

4   Classified Program No. 1 through 2002.  There isn't any -- I

5   won't be corrected by the government on that, either.

6          So when, when you instruct the jury that he had

7   access through 2002, that expands the time period of what we're

8   going to be arguing about in the case.  It's just not accurate.

9   He was an employee --

10          THE COURT:  What is -- he was an employee of the

11   Central Intelligence Agency until January 31 of 2002.

12          MR. MAC MAHON:  No, I don't --

13          MR. TRUMP:  Yes.

14          THE COURT:  Yes.  That's what the indictment says.

15          MR. MAC MAHON:  He was on --

16          THE COURT:  Administrative leave?

17          MR. MAC MAHON:  He was -- Mr. Pollack may know that.

18          MR. POLLACK:  I'm sorry, Your Honor.  Your Honor, if

19   I understood the instruction, it said that he was the handler

20   of the human asset through that date.  He was only the handler

21   of the human asset through May of 2000 even though he was

22   employed by the CIA until January of 2002.

23          MR. TRUMP:  That's correct.

24          THE COURT:  All right.  So when did he -- his time

25   period of being a handler of the asset was for what time

1    period?

2              MR. POLLACK:  From December of 1998 through May of

3    2000.

4              THE COURT:  All right, but he left -- and continued

5    to be employed by the CIA until January 31 of 2002.

6              MR. TRUMP:  Right.

7              THE COURT:  All right.

8              MR. TRUMP:  Our preference would be not to include

9    Pulitzer-winning --

10             THE COURT:  I'm sorry?

11             MR. TRUMP:  Pulitzer Prize-winning journalist for

12   Mr. Risen.  It -- I know it, it will come from the Court, but

13   as I think you heard from the deposition, there are a lot of

14   inaccuracies in this chapter, so we are not going to be

15   applauding Mr. Risen's research.

16             But in terms of the statement, "The disclosures that

17   are charged occurred in 2003 and 2006," the way it's charged,

18   it's not just the book.  It was the disclosures to Risen in

19   2003 even though the article was not published, and the harm

20   occurred, the potential damage was both 2003, then again in

21   2006.

22             THE COURT:  All right.  Well, again, my job is just

23   to give a fairly accurate, simple overview of the case.  I am

24   going to -- I think because there's been so much coverage

25   recently about this case, I think I should add in the question

1    about pretrial publicity that -- because that's why Risen has

2    to be mentioned because Mr. Risen has been on, I believe, *60*

3    *Minutes*.  There have been major articles.  *The Post* had one

4    last week after he testified.

5          So I think I need to just alert the jury and say, you

6    know, have any of you seen Mr. Risen talk about this case or

7    his involvement?

8          MR. TRUMP:  Certainly, Your Honor.

9          THE COURT:  Yeah.

10         MR. TRUMP:  I think the labeling of the time frame

11   2003 and 2006 is important and the labeling of the damage as

12   potential damage because that's the legal standard.

13         THE COURT:  All right, so that's the ballpark idea of

14   what I'm going to say to the jury in terms of describing the

15   case.

16         And then in terms of the voir dire, because I did --

17   I don't normally do this, but I think to make things simpler,

18   the government's proposed voir dire, 1 and 2 were not objected

19   to, so those are in.  3 had been withdrawn by the government,

20   and I will not be giving that.

21         Defense objected to No. 4, where the government

22   was -- wanted me to ask have any members of the jury ever

23   provided an anonymous tip, served as an anonymous source, or

24   provided information anonymously or otherwise to any

25   journalist, reporter, or news media?

1           I think that's a very fair and appropriate question,

2    and I'm also going to add, though, have any ever worked as a

3    journalist, because I think that's also appropriate, and

4    possibly maybe even whether they've ever attended journalism

5    school, because the whole issue about newsman's privilege comes

6    up in those programs, and newsman's privilege is an issue sort

7    of lurking in the background of this case.

8           There were no objections to No. 5, and what I'm going

9    to do with No. 5, though, is expand it, not just worked for

10   but, I think, employed by or had any business dealings with,

11   because we have so many independent contractors now who work

12   for intelligence agencies, that we would want to include them.

13          And it's not just going to be the CIA.  It will be,

14   the government has requested any other intelligence agency of

15   the United States government, and then I'm going to

16   add "including any congressional committees dealing with

17   intelligence issues," which incorporates the issue you wanted

18   about the Senate but without, you know, particularly

19   pinpointing it.

20          And I'm going to add in that question whether the

21   work had been in any capacity because I think you, you had a

22   specific question about acting as a case officer, and we don't

23   want to get into that level of detail.

24          And I obviously will have to tell the jurors if any

25   of them do have an answer to that question, they'll have to

1    approach the bench because that one would have to be held with

2    our special equipment most likely, all right?

3          No. 6 would, would repeat that; that is, have they,

4    any members of the panel had any disputes with or legal claims

5    against the CIA or any other agency of the United States

6    government?  So that would expand that a little bit.  I mean,

7    the government wanted that one.

8          7, I think there was no objection to 7.

9          There was an objection to 8, which asks jurors for

10   their opinions about the work or mission of the Central

11   Intelligence Agency.  That's problematic.  I think because I

12   give those early instructions that you both know I do about

13   what the juror's role is, and generally, if they have any views

14   about the issues in this case that they think would interfere

15   with their ability to judge it fairly, I think that question is

16   sufficiently broad to cover this type of a specific concern.

17   So I'm not probably going to give 8.

18         And then 9 addresses the issue about security issues,

19   the use of the names.  It also, I'm going to add the screen

20   issue there so that we are thoroughly discussing with the

21   potential jurors whether there would be an impact on them from

22   seeing a screen in the courtroom or from the fact that the full

23   names are not being used for some of the witnesses.  So I am

24   going to give 9 that way.

25         10 is out.

1           The government wanted 11 withdrawn, and I'm curious,

2    probably if they've ever worked for an intelligence agency,

3    that probably would cover 11, but I thought 11 was actually a

4    fairly relevant question.  That asks whether any of the jurors

5    have received any training regarding classified information or

6    possessed a security clearance.  I think that will be captured

7    in the other question, but the government wanted it withdrawn,

8    and I wasn't sure whether that's really the case.

9           MR. OLSHAN:  We don't have a strong opinion about

10   that one.  We agree that it's probably covered by prior

11   questioning, maybe the next question as well, but if the Court

12   would prefer to give it, that's fine.

13          THE COURT:  All right.  The next question, 12, asks

14   if anyone's ever been investigated or charged with improper

15   possession of classified documents.  I think that's certainly a

16   relevant question.  I also think we should add to that has

17   anybody ever been involved in investigating that kind of a leak

18   or been called as a witness in an investigation involving the

19   misuse of classified documents.  I think that is important to

20   have that.

21          13 will be, will be asked.  14 has been withdrawn.

22          And then 15 through 18, there were no objections from

23   the, from the defense, so I will ask all of those questions.

24          In terms of the defense instructions, some of

25   these --

27

1          MR. OLSHAN:  Your Honor?

2          THE COURT:  Yeah.

3          MR. OLSHAN:  Briefly, in our reply to the defense's

4    objections to the government's proposed voir dire --

5          THE COURT:  Right.

6          MR. OLSHAN:  -- as to No. 2, we had suggested an

7    additional or alternative related to Mr. Risen.

8          This is document 383.

9          THE COURT:  Um-hum.

10          MR. OLSHAN:  And I think the Court may have addressed

11    this somewhat already, but just inquiring whether any of the

12    prospective jurors have an opinion one way or the other about a

13    journalist's appearance in a criminal trial or refusal to

14    provide information about sources or -- source or sources.

15          THE COURT:  I think 2 has -- some version of 2 does

16    have to be added.  I'm also -- the defense had asked at one

17    point about their views about *The New York Times*, Risen, or

18    Simon & Schuster, so I'll make sure that that's all, I think,

19    packed into that particular instruction.

20          Why do we have separate instructions about Patrick

21    Lang and the second person on your list?

22          MR. MAC MAHON:  No particular reason other than --

23          THE COURT:  Anybody who's -- anyone who's going to be

24    a witness, the jurors will have gotten any witness's name and

25    be able to tell us if they know these people.  That should be

1   sufficient.

2          MR. MAC MAHON:  This was done in one, 11, I can't

3   really remember, Your Honor.

4          THE COURT:  Okay.

5          MR. MAC MAHON:  But those were withdrawn as included

6   somewhere else.

7          THE COURT:  All right.  And so 3, 4, and 5 are

8   essentially going to be given one way or the other.

9          And again, 6 is too vague a question.  I, I think 6

10  will be adequately covered in the general questions that I give

11  them.

12         I've added what you wanted in 7 to what I call the

13  government's question No. 5, and No. 8 is just asking for an

14  opinion about whether certain types of people keep information

15  confidential.  I'm not asking for people's opinions about

16  things.

17         Now, why is service in the U.S. military relevant to

18  this case?  I don't think we have any military issues at all.

19  It's on your list.  I'm just, I'm just going with your list.

20  Do you want that out?

21         MR. MAC MAHON:  We'll withdraw that one.

22         THE COURT:  All right, that's out.

23         The same way with nuclear weaponry, I don't know why

24  that's relevant to this case.  Concerns about an Iranian

25  nuclear program, that's a sufficient issue in this case that I

1  think that's a proper question, but not if people are generally

2  involved with the design or --

3          MR. MAC MAHON:  We'll withdraw that one.

4          THE COURT:  All right, so 10 is also going to be out.

5          I'll do a version of 11.

6          I don't see how 12 is of any value to this case

7  because again, I'm asking if anybody has been a journalist or

8  has been to journalism school, and I think that's sufficient,

9  so I'm not going to ask 12.

10          13 and 14 are already going to be covered.

11          15, "Have you ever worked as an intelligence

12  analyst?" I've covered that in the more general question, "Have

13  you worked in any capacity for any intelligence agency?"

14          16, "Do you have an opinion as to whether Iran should

15  be allowed nuclear weapons?"  Again, that's going to be asked

16  in the more general question about the fact that the Iranian

17  nuclear program is, you know, an issue in this case, is that

18  going to affect your impartiality?

19          I think 17 is, that's the one about ever filed an

20  employment suit against your former employer.  I think because

21  Mr. Sterling did and the article about that is in one of the

22  Risen things, that that's a fair question, so I will give 17.

23          And again, these "Do you believe" various questions I

24  don't think are appropriate, so I'm not going to give the last

25  ones.  I think to some degree, they're subsumed anyway in some

1   of the other ones that I'm giving.

2          "Do you have strong opinions about Condoleezza Rice?"

3   Again, her name will appear on the witness list, and I think

4   that's all we need to do with that, so I don't see any --

5   unless the government wants me to ask that question.

6          MR. OLSHAN:  We don't think there's a need, Your

7   Honor.

8          THE COURT:  All right.

9          MR. MAC MAHON:  I guess the only --

10         THE COURT:  Yeah.

11         MR. MAC MAHON:  Do you want us to stand up, Your

12  Honor?

13         THE COURT:  Go ahead.

14         MR. MAC MAHON:  The only reason this one does ring a

15  bell is because of the next question really, the very

16  high-ranking government official who's going to come, and I

17  know your preliminary instructions tell the jury to consider

18  the testimony of all witnesses in equal weight --

19         THE COURT:  Yeah.

20         MR. MAC MAHON:  -- but just because of her status,

21  that was the reason that that was there.

22         THE COURT:  All right.  All right, I will give that.

23  I'll give 24 and 25 in a combined question.

24         And I've already addressed 26, and I've addressed 27.

25         And then, of course, I will add whether any of the

1   witnesses have ever been jurors before, whether they have any

2   legal training.  I don't think either side included that, but I

3   think that's always appropriate in a criminal case.  Whether

4   they've ever been a witness in general, and then any scheduling

5   problem.

6           So that gives you an overview of what the voir dire

7   is going to look like tomorrow, all right?  So it's going to

8   take some time with that many jurors here.

9           We've already had, I think, five excused.  I hope

10  you've got the list now, and it's a frustrating list because

11  there are a fair number who don't tell us anything about their

12  employment status.  So I don't know if they're retired or

13  unemployed or what, but if for any reason the government has

14  any additional information, I mean, if you have filled in those

15  blanks, I think it would only be fair to share that with the

16  defense counsel.

17          All right, I think that may have covered everything

18  that was on my list.

19          MR. TRUMP:  Judge, I know from an administrative

20  standpoint, you like to have an order authorizing the use of

21  the equipment.

22          THE COURT:  Oh, did you do one already?

23          MR. TRUMP:  We have an order.

24          THE COURT:  Excellent.

25          MR. TRUMP:  And just out of curiosity, how does the

 1   Court propose handling the responses by the jurors to these

 2   questions?  Individually?  At the podium?

 3              THE COURT:  No, my practice is in open court.  I

 4   think it helps other jurors to, you know, jog their memory.  I

 5   will add at the very end a question I don't always ask but I

 6   will say:  Is there anything you've heard during the voir dire

 7   process either from the Court, counsel, or other jurors that

 8   makes you think you could not sit as an impartial juror in this

 9   case?

10              MR. TRUMP:  And I --

11              THE COURT:  By the way, I don't know whether we

12   should get into any of what's happened in France.  I mean, you

13   know, national security right now is a hot issue, and I had

14   thought about whether any current events might in any respect

15   affect their ability to judge this case.  I'll let you think

16   about that, and you can let me know tomorrow morning if you

17   think we have to add anything.

18              MR. TRUMP:  I think Your Honor is attuned to this,

19   but I would ask that even though some jurors will obviously be

20   excused because of their responses to the questions, that we

21   just allow them to sit down and go on to the next question

22   rather than giving the next juror a reason to say:  Oh, I can

23   get out of this by answering a particular way.

24              THE COURT:  I never do it.  They're going to be stuck

25   in the courtroom until it's all over, yeah.

1          MR. TRUMP:  We had one thought about the screened

2    witnesses and the use of their names that may be helpful.  For

3    example, when a witness such as Lori D. is testifying, that

4    we -- to avoid counsel using her last name, that we actually

5    put "Lori D." in front of the witness stand so that we are

6    constantly reminded not to use a last name.

7          Now, with her, it's probably not much of an issue

8    because she's not going to be on the stand very long, but with

9    respect to another witness that we are all familiar with and we

10   talk about frequently, using his last name, it might be helpful

11   that we have it up there as a constant reminder that we can

12   only refer to these witnesses first name, last initial.

13         I throw that out there because I personally am afraid

14   that I might slip and use a last name.

15         THE COURT:  I have no problem with that.  I assume

16   defense counsel don't.

17         MR. MAC MAHON:  No, Your Honor, that's no problem.

18         THE COURT:  Just make sure that it's --

19         MR. TRUMP:  Just the screened witnesses.

20         THE COURT:  Just make sure it's clear.

21         MR. MAC MAHON:  Just as long as we do it with all of

22   them.  As long as we do it with all of the screened witnesses.

23         THE COURT:  Yes, all screened witnesses will be --

24   and I'll, again, I'll explain that to the jury, all right?

25         Are there any other housekeeping matters either side

1  can think of that we might need to address before we get

2  started tomorrow morning?

3          MR. MAC MAHON:  Not for the defense, Your Honor.

4          THE COURT:  All right.

5          MR. OLSHAN:  Your Honor, I just wanted to raise one

6  issue to make sure it's not going to be an issue for opening,

7  which is to make clear at least our position that this case is

8  about the unauthorized disclosures at issue in this case, not

9  about any other unauthorized disclosures, not about any other

10 leaks that have occurred out in the world.

11         There's been a lot of press about that, and we want

12 to make clear -- or we wanted to make it clear with the defense

13 that our position is certainly none of that has any place in

14 this trial.  So we wanted to sort of flag that for the Court,

15 that if that issue were to come up as to sort of a selective

16 prosecution argument about why is this person being prosecuted

17 versus other people who may have done this, that we're prepared

18 to litigate that.

19         THE COURT:  I don't think that's appropriate for the

20 jury.  It may be appropriate for the Court if and when it

21 becomes relevant, you know, at the end of this case.  I mean,

22 there's still an open motion on that issue, but if that's not a

23 question for the jury, I don't expect that to be a problem.

24         MR. MAC MAHON:  I have no intention of arguing that

25 because General Petraeus hasn't been charged, that Mr. Sterling

1    should walk --

2              THE COURT:  But that --

3              MR. MAC MAHON:  -- or the other people that we've

4    talked about who, higher government officials who aren't

5    prosecuted.

6              I have feelings about that, but I'm not going to

7    argue that, Your Honor.

8              THE COURT:  That does raise an issue, though, because

9    the Petraeus article was, I think, the lead article in *The Post*

10   this weekend.  I mean, both sides should think carefully about

11   whether or not the jury should be asked something about that,

12   not necessarily Petraeus but just this whole issue of, you

13   know, government leaks.  I mean, we also are not mentioning

14   Snowden.

15             MR. MAC MAHON:  Snowden.

16             THE COURT:  Snowden.  But, you know, there are an

17   awful lot of people who have strong feelings that he's a

18   patriot and not a, not a criminal.  So I think that, that

19   question of some sort needs to be asked, and whether it should

20   be done specifically or in a general form, I'll let both sides

21   think about that.  I'm going to think about it, too, because I

22   want a fair jury.  I want a jury of 14 people who are going to

23   come in here, you know, unbiased, and there are some very tough

24   issues in this case in that respect.

25             MR. OLSHAN:  We understand, Your Honor.  I think our

1   position would be that the generalized questioning in the

2   proposed voir dire would probably ferret out from people things

3   that are related to these specific cases, as opposed to

4   flagging for them specific names, specific, specific incidents,

5   but we'll discuss and we'll get with the defense and --

6           THE COURT:  All right.  If for any reason, and I'm

7   not inviting this, but if there are for any reason last-minute

8   issues, because what I don't want to do is get all these

9   civilians in here and then start having to sit around waiting

10  for us to resolve stuff, you need to let us know so that we

11  can, you know, do it at 9:30 tomorrow morning, but at this

12  point, there shouldn't be any last-minute things, and we should

13  be able to get this case started tomorrow.

14          MR. MAC MAHON:  9:30 or 10:00?

15          THE COURT:  Yeah.

16          MR. OLSHAN:  I was going to ask the same question.

17  The Court raised a good point.  What time should we --

18          THE COURT:  Be up here?

19          MR. OLSHAN:  Yes.

20          THE COURT:  If there are no problems, being here 9:45

21  is fine.  I mean, we're going to start bringing the jurors in a

22  little before ten, so once, you know, they start coming in the

23  courtroom, obviously, be sensitive to that.

24          And don't be surprised, I'm having the screen brought

25  up, but it's going to be out in the hall in the corner so that

1    we don't have a long break in getting it in here, but I'm not

2    planning to bring it in -- once the jury is in and we take -- I

3    ideally would like to bring the screen in during the luncheon

4    recess, and we'll keep it as far over here and closed so that

5    during opening statements, you know, it's not out there, and

6    then as soon as the first witness is ready to go, we'll close

7    the screen up.  So we may have to take a break when we do that.

8            But that's the plan for tomorrow, all right?

9            MR. OLSHAN:  Very well.

10           THE COURT:  All right, anything else?

11           MR. MAC MAHON:  No, Your Honor.

12           THE COURT:  If not, we'll recess court for the day.

13           MR. MAC MAHON:  Thank you.

14                      (Which were all the proceedings had

15                       at this time.)

16

17              CERTIFICATE OF THE REPORTER

18     I certify that the foregoing is a correct transcript of

19   the record of proceedings in the above-entitled matter.

20

21

22                          _____
                                        /s/
23                             Anneliese J. Thomson

24

25