UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .      Criminal No. 1:10cr485
                              .
     vs.                      .      Alexandria, Virginia
                              .      January 13, 2015
JEFFREY ALEXANDER STERLING,   .      10:00 a.m.
                              .
              Defendant.      .
                              .
.  .  .  .  .  .  .  .  .  .  .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>VOLUME I</u>

<u>APPEARANCES:</u>

FOR THE GOVERNMENT:            JAMES L. TRUMP, AUSA
                               DENNIS M. FITZPATRICK, AUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314
                                 and
                               ERIC G. OLSHAN, Deputy Chief
                               Public Integrity Section of the
                               Criminal Division
                               United States Department of
                               Justice
                               1400 New York Avenue, N.W.
                               Suite 12100
                               Washington, D.C. 20005


FOR THE DEFENDANT:             EDWARD B. MAC MAHON, JR., ESQ.
                               Law Office of Edward B.
                               MacMahon, Jr.
                               107 East Washington Street
                               P.O. Box 25
                               Middleburg, VA 20118

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 1 - 281)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

 1   APPEARANCES:  (Cont'd.)

 2   FOR THE DEFENDANT:            BARRY J. POLLACK, ESQ.
                                  MIA P. HAESSLY, ESQ.
 3                                Miller & Chevalier Chartered
                                  655 - 15th Street, N.W.
 4                                Suite 900
                                  Washington, D.C. 20005-5701
 5

 6   CLASSIFIED INFORMATION       CHRISTINE E. GUNNING
     SECURITY OFFICERS:           MAURA PETERSON
 7

 8   ALSO PRESENT:                GERARD FRANCISCO
                                  SA ASHLEY HUNT
 9                                JENNIFER MULLIN, ESQ.

10
     OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
11                                U.S. District Court, Fifth Floor
                                  401 Courthouse Square
12                                Alexandria, VA 22314
                                  (703)299-8595
13

14

15

16

17

18

19

20

21

22

23

24

25

3

I N D E X

Opening Statement by Mr. Trump:                    Page 140

Opening Statement by Mr. MacMahon:                 Page 157


                          DIRECT   CROSS   REDIRECT   RECROSS

WITNESSES ON BEHALF OF
THE GOVERNMENT:

Stephen B.                  175     192

Laurie D.                   198     210      219

Zach W.                     220     259      274

                          EXHIBITS

                                  MARKED           RECEIVED

GOVERNMENT'S:

No.  5                                              217
      6                                             212
      7                                             267
      8                                             243
     10                                             243

     13                                             243
     14                                             243
     15                                             243
    132                                             262

4

1                    P R O C E E D I N G S

2                         (Defendant and Prospective Jurors present.)

3              THE CLERK:  Criminal Case 10-485, United States of

4    America v. Jeffrey Alexander Sterling.  This case comes on for

5    trial by jury.  Would counsel please note their appearances for

6    the record.

7              MR. TRUMP:  Good morning, Your Honor.  Jim Trump on

8    behalf of the United States.

9              MR. OLSHAN:  Good morning, Your Honor.  Eric Olshan

10   on behalf of the United States.

11             MR. FITZPATRICK:  Good morning, Your Honor.  Dennis

12   Fitzpatrick on behalf of the United States.

13             THE COURT:  Good morning.

14             MR. MAC MAHON:  Good morning, Your Honor.  Edward

15   MacMahon for Mr. Sterling.

16             MR. POLLACK:  Good morning, Your Honor.  Barry

17   Pollack for Mr. Sterling.

18             MS. HAESSLY:  Good morning, Your Honor.  Mia Haessly

19   for Mr. Sterling.

20             THE COURT:  Good morning.

21             All right, ladies and gentlemen, you've been

22   summonsed to court today to be considered for service on a jury

23   that is going to hear a criminal case, and our first order of

24   business is to call attendance.  So when you hear your name

25   called, would you please stand and just say "here" or

1    "present"?  Then you may sit.

2              THE CLERK:  No. 1, Maridel Anderson.

3              THE PROSPECTIVE JUROR:  Here.

4              THE CLERK:  Juror No. 2, David Anderson.

5              THE PROSPECTIVE JUROR:  Here.

6              THE CLERK:  Juror No. 3, Matthew Balser.

7              THE PROSPECTIVE JUROR:  Here.

8              THE CLERK:  Juror No. 4, Ross Banfield.

9              THE PROSPECTIVE JUROR:  Present.

10             THE CLERK:  Juror No. 5, Donna Beitzel.

11             THE PROSPECTIVE JUROR:  Present.

12             THE CLERK:  Juror No. 6, Laura Billings.

13             THE PROSPECTIVE JUROR:  Here.

14             THE CLERK:  Juror No. 7, Kathy Boykin.

15                       (No response.)

16             THE CLERK:  Kathy Boykin.

17                       (No response.)

18             THE CLERK:  Juror No. 8, Kelsey Brosnahan.

19             THE PROSPECTIVE JUROR:  Here.

20             THE CLERK:  Juror No. 9, Norman Brown.

21             THE PROSPECTIVE JUROR:  Here.

22             THE CLERK:  Juror No. 10, Amelie Cagle.

23             THE PROSPECTIVE JUROR:  Here.

24             THE CLERK:  Juror No. 11, James Carnes.

25             THE PROSPECTIVE JUROR:  Here.

1           THE CLERK:  Juror No. 12, Anne Cassidy.

2           THE PROSPECTIVE JUROR:  Here.

3           THE CLERK:  Juror No. 13, Arthur Catterall.

4           THE PROSPECTIVE JUROR:  Here.

5           THE CLERK:  Juror No. 14, Chanhmaly Chaleunrath.

6                    (No response.)

7           THE CLERK:  Chanhmaly Chaleunrath.

8                    (No response.)

9           THE CLERK:  Juror No. 15, Harish Cherukuri.

10           THE PROSPECTIVE JUROR:  Here.

11           THE CLERK:  Juror No. 16, Gabriel Chu.

12           THE PROSPECTIVE JUROR:  Here.

13           THE CLERK:  Juror No. 17, Janice Connally.

14                    (No response.)

15           THE CLERK:  Janice Connally.

16                    (No response.)

17           THE CLERK:  Juror No. 18, Jan Cunningham.

18                    (No response.)

19           THE CLERK:  Jan Cunningham.

20                    (No response.)

21           THE CLERK:  Juror No. 19, Donna Curtin.

22           THE PROSPECTIVE JUROR:  Here.

23           THE CLERK:  Juror No. 20, Michelle Dade.

24                    (No response.)

25           THE CLERK:  Michelle Dade.

1                        (No response.)

2          THE CLERK:   Juror No. 21, Chiraphan Davis.

3                        (No response.)

4          THE CLERK:   Chiraphan Davis.

5                        (No response.)

6          THE CLERK:   Juror No. 22, Charles Davis.

7          THE PROSPECTIVE JUROR:   Here.

8          THE CLERK:   Juror No. 23, Steven Dike.

9                        (No response.)

10         THE CLERK:   Steven Dike.

11                       (No response.)

12         THE CLERK:   Juror No. 24, Noureddine Elabassi.

13         THE PROSPECTIVE JUROR:   Here.

14         THE CLERK:   Juror No. 25, Bernard Engel.

15         THE PROSPECTIVE JUROR:   Here.

16         THE CLERK:   Juror No. 26, Gregory Fabian.

17         THE PROSPECTIVE JUROR:   Here.

18         THE CLERK:   Juror No. 27, Timothy Fitzgibbon.

19                       (No response.)

20         THE CLERK:   Timothy Fitzgibbon.

21                       (No response.)

22         THE CLERK:   Juror No. 28, Jovelita Fonseca.

23         THE PROSPECTIVE JUROR:   Here.

24         THE CLERK:   Juror No. 29, Matthew Friel.

25         THE PROSPECTIVE JUROR:   Here.

1              THE CLERK:  Juror No. 30, Steven Frith.

2          THE PROSPECTIVE JUROR:  Here.

3              THE CLERK:  Juror No. 31, Matthew Garofalo.

4          THE PROSPECTIVE JUROR:  Here.

5              THE CLERK:  Juror No. 32, Diane Gilliam.

6          THE PROSPECTIVE JUROR:  Here.

7              THE CLERK:  Juror No. 33, Kristi Gilmore.

8          THE PROSPECTIVE JUROR:  Here.

9              THE CLERK:  Juror No. 34, Kristine Gilson.

10         THE PROSPECTIVE JUROR:  Here.

11             THE CLERK:  Juror No. 35, Paul Glen.

12         THE PROSPECTIVE JUROR:  Here.

13             THE CLERK:  Juror No. 36, Nancy Gofus.

14         THE PROSPECTIVE JUROR:  Here.

15             THE CLERK:  Juror No. 37, Amanda Granlund.

16         THE PROSPECTIVE JUROR:  Here.

17             THE CLERK:  Juror No. 38, Maxine Greenstein.

18                     (No response.)

19         THE CLERK:  Maxine Greenstein.

20                     (No response.)

21         THE CLERK:  Juror No. 39, Cathleen Gregorson.

22         THE PROSPECTIVE JUROR:  Here.

23         THE CLERK:  Juror No. 40, Kathleen Halasz.

24         THE PROSPECTIVE JUROR:  Here.

25         THE CLERK:  Juror No. 41, Jennie Hamm.

1           THE PROSPECTIVE JUROR:  Here.

2           THE CLERK:  Juror No. 42, David Harrison.

3           THE PROSPECTIVE JUROR:  Here.

4           THE CLERK:  Juror No. 43, Alan Herman.

5                     (No response.)

6           THE CLERK:  Alan Herman.

7           THE PROSPECTIVE JUROR:  Here.

8           THE CLERK:  Juror No. 44, Ivan Hernandez.

9           THE PROSPECTIVE JUROR:  Here.

10          THE CLERK:  Juror No. 45, Alberta Hickey.

11          THE PROSPECTIVE JUROR:  Here.

12          THE CLERK:  Juror No. 46, Dion Hinchcliffe.

13                    (No response.)

14          THE CLERK:  Dion Hinchcliffe.

15                    (No response.)

16          THE CLERK:  Juror No. 47, Charles Hoffman.

17          THE PROSPECTIVE JUROR:  Here.

18          THE CLERK:  Juror No. 48, Keric Hopkins.

19          THE PROSPECTIVE JUROR:  Here.

20          THE CLERK:  Juror No. 49, Aaron Hunt.

21          THE PROSPECTIVE JUROR:  Here.

22          THE CLERK:  Juror No. 50, Dega Hussen.

23                    (No response.)

24          THE CLERK:  Dega Hussen.

25                    (No response.)

```
 1              THE CLERK:  Juror No. 51, Andrew Ihle.

 2              THE PROSPECTIVE JUROR:  Here.

 3              THE CLERK:  Juror No. 52, Nancy Ingalsbe.

 4              THE PROSPECTIVE JUROR:  Here.

 5              THE CLERK:  Juror No. 53, Nika Jani.

 6                         (No response.)

 7              THE CLERK:  Nika Jani.

 8                         (No response.)

 9              THE CLERK:  Juror No. 54, Leslie Jenson.

10                         (No response.)

11              THE CLERK:  Leslie Jenson.

12                         (No response.)

13              THE CLERK:  Juror No. 55, Angela Keaton.

14              THE PROSPECTIVE JUROR:  Here.

15              THE CLERK:  Juror No. 56, Sozina Khan.

16              THE PROSPECTIVE JUROR:  Here.

17              THE CLERK:  Juror No. 57, Sandra Khouri.

18              THE PROSPECTIVE JUROR:  Here.

19              THE CLERK:  Juror No. 58, David Knox.

20              THE PROSPECTIVE JUROR:  Here.

21              THE CLERK:  Juror No. 59, Steve Lee.

22              THE PROSPECTIVE JUROR:  Here.

23              THE CLERK:  Juror No. 60, Caitlin Lhommedieu.

24              THE PROSPECTIVE JUROR:  Here.

25              THE CLERK:  Juror No. 61, Melody Long.
```

```
 1                         (No response.)

 2           THE CLERK:  Melody Long.

 3                            (No response.)

 4           THE CLERK:  62, Matthew Lowman.

 5           THE PROSPECTIVE JUROR:  Here.

 6           THE CLERK:  Juror No. 63, James Lyke.

 7           THE PROSPECTIVE JUROR:  Here.

 8           THE CLERK:  Juror No. 64, Peter Lynn, Jr.

 9           THE PROSPECTIVE JUROR:  Here.

10           THE CLERK:  Juror No. 65, George McCool, II.

11           THE PROSPECTIVE JUROR:  Here.

12           THE CLERK:  Juror No. 66, Peggy McCoy.

13           THE PROSPECTIVE JUROR:  Here.

14           THE CLERK:  Juror No. 67, Tracy McGull.

15                            (No response.)

16           THE CLERK:  Tracy McGull.

17                            (No response.)

18           THE CLERK:  Juror No. 68, Vernon Michelsen, Jr.

19           THE PROSPECTIVE JUROR:  Here.

20           THE CLERK:  Juror No. 69, Neil Mickelson.

21           THE PROSPECTIVE JUROR:  Here.

22           THE CLERK:  Juror No. 70, Rebecca Miller.

23           THE PROSPECTIVE JUROR:  Here.

24           THE CLERK:  Juror No. 71, Amanda Morris.

25           THE PROSPECTIVE JUROR:  Here.
```

1          THE CLERK:  Juror No. 72, Sean Mountcastle.

2                      (No response.)

3          THE CLERK:  Sean Mountcastle.

4                      (No response.)

5          THE CLERK:  Juror No. 73, Thuong Nguyen.

6          THE PROSPECTIVE JUROR:  Here.

7          THE CLERK:  Juror No. 74, Scott Oden.

8          THE PROSPECTIVE JUROR:  Here.

9          THE CLERK:  Juror No. 75, Stephen Pace, Jr.

10                     (No response.)

11         THE CLERK:  Stephen Pace, Jr.

12                     (No response.)

13         THE CLERK:  Juror No. 76, Mahesh Panwar.

14         THE PROSPECTIVE JUROR:  Here.

15         THE CLERK:  Juror No. 77, Nicolas Pedrozo.

16         THE PROSPECTIVE JUROR:  Here.

17         THE CLERK:  Juror No. 78, Nancy Perry.

18         THE PROSPECTIVE JUROR:  Here.

19         THE CLERK:  Juror No. 79, Maria Pierce.

20         THE PROSPECTIVE JUROR:  Here.

21         THE CLERK:  Juror No. 80, Manavi Puri.

22         THE PROSPECTIVE JUROR:  Here.

23         THE CLERK:  Juror No. 81, Margaret Rowe.

24         THE PROSPECTIVE JUROR:  Here.

25         THE CLERK:  Juror No. 82, Gloria Roy.

```
 1                   THE PROSPECTIVE JUROR:  Here.

 2                   THE CLERK:  Juror No. 83, Gregory Scites.

 3                   THE PROSPECTIVE JUROR:  Here.

 4                   THE CLERK:  Juror No. 84, Sidney Shaw.

 5                   THE PROSPECTIVE JUROR:  Here.

 6                   THE CLERK:  Juror No. 85, William Shepard.

 7                            (No response.)

 8                   THE CLERK:  William Shepard.

 9                            (No response.)

10                   THE CLERK:  Juror No. 86, Harriet Shriver.

11                   THE PROSPECTIVE JUROR:  Here.

12                   THE CLERK:  Juror No. 87, Teresa Simpson.

13                   THE PROSPECTIVE JUROR:  Here.

14                   THE CLERK:  Juror No. 88, Christopher Stanley.

15                   THE PROSPECTIVE JUROR:  Here.

16                   THE CLERK:  Juror No. 89, Kim Stenberg.

17                   THE PROSPECTIVE JUROR:  Here.

18                   THE CLERK:  Juror No. 90, Yvonne Stephens.

19                   THE PROSPECTIVE JUROR:  Here.

20                   THE CLERK:  Juror No. 91, Arthur Stewart.

21                            (No response.)

22                   THE CLERK:  Arthur Stewart.

23                            (No response.)

24                   THE CLERK:  Juror No. 92, George Tobin.

25                   THE PROSPECTIVE JUROR:  Here.
```

```
 1          THE CLERK:  Juror No. 93, Sheena Tosta.

 2          THE PROSPECTIVE JUROR:  Here.

 3          THE CLERK:  Juror No. 94, Lien Ngoc Tran.

 4          THE PROSPECTIVE JUROR:  Here.

 5          THE CLERK:  Juror No. 95, Phan Vu.

 6          THE PROSPECTIVE JUROR:  Here.

 7          THE CLERK:  Juror No. 96, Edward Waters.

 8                    (No response.)

 9          THE CLERK:  Edward Waters.

10                    (No response.)

11          THE CLERK:  Juror No. 97, Deborah Weigel.

12                    (No response.)

13          THE CLERK:  Deborah Weigel.

14                    (No response.)

15          THE CLERK:  Juror No. 98, Debra Williams.

16          THE PROSPECTIVE JUROR:  Here.

17          THE CLERK:  Juror No. 99, Kristin Witters.

18          THE PROSPECTIVE JUROR:  Here.

19          THE CLERK:  Juror No. 100, Jessica Wood.

20          THE PROSPECTIVE JUROR:  Here.

21          THE CLERK:  Juror No. 101, Suzanne Yerks.

22          THE PROSPECTIVE JUROR:  Here.

23          THE CLERK:  Is there anyone here who's here for jury

24  duty whose name I have not called?

25                    (No response.)
```

1          THE CLERK:  Ladies and gentlemen of the jury, would

2   you please stand and raise your right hand.

3                      (Prospective Jurors affirmed.)

4          THE COURT:  All right, ladies and gentlemen, as I

5   said earlier, you've been summonsed to court today to be

6   considered for service on a jury which is going to consider a

7   criminal case brought by the United States of America against

8   the defendant, Jeffrey Alexander Sterling.

9          Now, if you are chosen to be a juror, you should

10  think about yourself throughout the trial as if you were a

11  judge just like me.  I can't give you each a black robe to wear

12  like the one I'm wearing, but I hope you will think of yourself

13  throughout your time as a juror as wearing a black robe.

14         Now, we have an expectation of what we find -- what

15  we think a judge should be when he or she comes into the

16  courtroom.  First and foremost, we want a person who comes into

17  the courtroom with an absolutely open mind, with no

18  predispositions, no preconceptions about the issues that he or

19  she has to decide.

20         Obviously, then we need a judge who wouldn't be

21  connected to any of the parties in the case, and so during

22  what's called the voir dire process, which is basically jury

23  selection, I as the presiding judge will be asking all of you a

24  series of questions, and the purpose of these questions is to

25  try to determine which of you would be best suited to sit as a

1    judge in this case.

2              Now, under our American system of law, it is very

3    important for jurors and for judges to keep certain points in

4    mind.  First of all, your job as a juror in this case is to

5    judge the issues in this case based solely upon what you see

6    and hear here in the courtroom.  That means it's extremely

7    important not to let any outside information affect your

8    thinking process.

9              And because of that concern and because this

10   particular case has had a fair amount of media publicity about

11   it, I'm going to be asking you a series of questions, and as

12   you listen to these questions, I want you to think very

13   carefully about whether or not because of any exposure you may

14   have had to any of the issues surrounding this case, you

15   believe you might have trouble in judging this particular case.

16             Now, when I ask you questions, I'm going to use the

17   word "you," but every question applies not to just you

18   individually but also to any of your immediate family members

19   or extremely close personal friends.  So if you believe that

20   you have an answer to any of my questions, the way we proceed

21   is for you to raise your hand.

22             Now, as you can see, we've got a packed courtroom

23   today, and I'm going to have to start by pointing to some of

24   you.  I normally start on my left in the first row, and I'll go

25   across the courtroom, and after about the second or third row,

1    I can't tell in the back where you're seated, so I'll just have

2    to point to you.  You have to stand up when I do point to you,

3    state your name again, and provide the answer to the question.

4              Now, there may be certain questions that generate a

5    response that you feel is a private or personal response or a

6    response that can't be discussed in the open courtroom.  If

7    that is the case, ask to approach the bench.  I will then put

8    on (demonstrating) that funny white noise machine, and the

9    purpose of that machine is to block the overall hearing in the

10   courtroom of what we're talking about here at the bench.

11             Now, it's extremely important that whenever we have a

12   bench conference, and that's not just voir dire but during the

13   trial itself, I don't mind if you stand up and stretch, but if

14   you start to talk or rustle papers or whatever, it becomes

15   harder for us to hear at the bench, and so I ask you please to

16   not talk at any -- during any of those bench conferences.

17             Now, let me just tell you very briefly -- and this is

18   a very, very brief overview of what is at issue in this case

19   today.  As I said, the United States has charged the defendant,

20   Jeffrey Alexander Sterling, with certain offenses against the

21   United States.  These offenses include the unauthorized

22   disclosure of national defense information as well as the

23   retention of -- unlawful retention of national defense

24   information, mail fraud, unauthorized conveyance of government

25   property, and obstruction of justice.

1           These charges arise out of the publication in 2006 of

2      a book entitled *State of War*, written by James Risen, who is a

3      Pulitzer Prize-winning journalist employed by *The New York*

4      *Times*.  Specifically, chapter 9 of that book, and it is chapter

5      9 of that book that's at issue in this case, describes a

6      Central Intelligence Agency effort to undermine the progress of

7      Iran's nuclear weapons program by having a person posing as a

8      former Soviet Union nuclear scientist offer to sell nuclear

9      weapon plans to the Iranians.  The plans were to appear

10     accurate but would, in fact, contain flaws that would mislead

11     the Iranians.

12          Chapter 9 included classified information about the

13     project and the human asset, that is, the physicist, who will

14     be referred to throughout this trial as Merlin.

15          The defendant, Jeffrey Alexander Sterling, was hired

16     by the Central Intelligence Agency, that is, the CIA, in 1993,

17     and he had a Top Secret clearance as an employee of that

18     agency.  From December of 1998 through approximately May of

19     2000, he was one of Merlin's handlers, and he was involved in

20     the Iranian project.  His employment with the Central

21     Intelligence Agency ended in or about January 31 of 2002.

22          Now, the government alleges that, that Mr. Sterling

23     provided information to Risen about Merlin and the Iranian

24     project and that that information was classified and he was not

25     authorized to disclose that information.  That information was

1  ultimately published in 2006, when the *State of War* book came

2  out.  It was published by the publisher Simon & Schuster.

3       The government further alleges that when the leak of

4  the information became apparent, they began a criminal

5  investigation into the leak, and at one point, Mr. Sterling

6  received a grand jury subpoena to appear concerning that

7  investigation and to bring documents with him, and in the

8  obstruction of justice charge, the government alleges that

9  Mr. Sterling destroyed one of the e-mails that would have been

10 relevant to that investigation.

11      Now, Mr. Sterling has entered not guilty pleas to all

12 of the charges in this case, and that means that he begins this

13 case with a presumption of innocence, and the burden will be on

14 the government throughout this trial to prove Mr. Sterling

15 guilty.  The burden which the government bears in a criminal

16 case is a burden of proof beyond a reasonable doubt.

17      Those of you who are chosen to be the jurors in this

18 case will have to decide the issues that have been raised by

19 the charges brought by the government and by the denial of

20 those charges by the defendant.  You can see that this is a

21 very serious case, and we therefore need very serious and

22 dedicated persons to be the jurors in this case, so I hope you

23 will listen carefully to the voir dire, and if you have any

24 answers or you want to raise any additional issues with the

25 Court that might address your suitability as a juror, that you

1    will let me know.

2           Now, having told you just very briefly what is

3    involved in this case, do any of you believe that you may have

4    seen, heard, read, or in any respect that you might know

5    something about this case?  Please raise your hands.  Is there

6    anybody in the first row?

7           Yes, ma'am, your name, please?  If you'd stand up,

8    tell me your name?  Yes.

9           THE PROSPECTIVE JUROR:  Harriet Shriver, but just

10   what I read in the newspaper.

11          THE COURT:  Wait just one second, ma'am.  I've got to

12   get your -- the list of names here.

13          What is your last name?

14          THE PROSPECTIVE JUROR:  Shriver.

15          THE COURT:  And you spell that with an "F"?

16          THE PROSPECTIVE JUROR:  "S" as in Sam.

17          THE COURT:  Sorry.  Spell your whole last name.

18          THE PROSPECTIVE JUROR:  S-h-r-i-v -- as in Victor --

19          THE COURT:  Fine, Ms. Shriver.  I've got you, all

20   right.

21          And you've, you've seen something about this case in

22   the paper?

23          THE PROSPECTIVE JUROR:  Yes.

24          THE COURT:  All right.  Was that one of the recent

25   articles?

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Do you feel that there is anything in

3    what you read that could affect your ability to judge this case

4    impartially?

5          THE PROSPECTIVE JUROR:  I don't know.  I really don't

6    know at this point.

7          THE COURT:  You think that there might have been

8    something in the article you read -- was the article about

9    Mr. Risen, the reporter?

10         THE PROSPECTIVE JUROR:  Yes, yes.

11         THE COURT:  And was it in the --

12         THE PROSPECTIVE JUROR:  I don't remember the whole

13   article, to be perfectly honest, and I didn't skim it, but

14   that's my only association with this.

15         THE COURT:  Having had that kind of a brief contact

16   with this, some of the subject matter, again, do you think that

17   that could affect how you would judge this case?

18         THE PROSPECTIVE JUROR:  I guess not, no.

19         THE COURT:  All right, thank you, Ms. Shriver.

20         Anybody else in Ms. Shriver's row?

21                    (No response.)

22         THE COURT:  Now, in the center section.  And I have

23   to point to you.

24         Yes, sir, your name, please?

25         THE PROSPECTIVE JUROR:  Jim Carnes, C-a-r-n-e-s.

1          THE COURT:  Yes, sir.

2          THE PROSPECTIVE JUROR:  I read the same article about

3    the testimony of the --

4          THE COURT:  The reporter?

5          THE PROSPECTIVE JUROR:  The reporter.

6          THE COURT:  And that's all.  You did not read

7    anything over the years?

8          THE PROSPECTIVE JUROR:  No.

9          THE COURT:  Mr. Carnes, is there anything about what

10   you read in that article that you feel might affect your

11   ability to judge this case impartially?

12         THE PROSPECTIVE JUROR:  Probably not.

13         THE COURT:  All right, thank you, sir.

14         Anyone else in the first row?  How about on the side?

15         THE PROSPECTIVE JUROR:  Ross --

16         THE COURT:  All right, you're the second row, but

17   that's all right.  What's your name, sir?

18         THE PROSPECTIVE JUROR:  Ross Banfield.

19         THE COURT:  How do you spell the last name?

20         THE PROSPECTIVE JUROR:  B -- as in boy --

21   a-n-f-i-e-l-d.

22         THE COURT:  Yes, Mr. Banfield.

23         THE PROSPECTIVE JUROR:  Same article.

24         THE COURT:  All right.  And again, do you feel in any

25   respect that may have affected how you go about judging this

1   case?

2           THE PROSPECTIVE JUROR:  I don't believe so.

3           THE COURT:  All right, thank you, sir.

4           In the middle section now, yes, sir, your name,

5   please?

6           THE PROSPECTIVE JUROR:  Neil Mickelson, M -- as in

7   Mary -- i-c-k-e-l-s-o-n.

8           THE COURT:  I've got it.

9           THE PROSPECTIVE JUROR:  Ma'am, I hold a TS/SCI

10  clearance and work for a federal contract in the intelligence

11  community.

12          THE COURT:  Have you heard anything about this case

13  through that?

14          THE PROSPECTIVE JUROR:  I have, ma'am.

15          THE COURT:  Would that affect your ability to judge

16  it impartially, do you feel?

17          THE PROSPECTIVE JUROR:  I'm not really sure, ma'am.

18  I will also add that I worked for Booz Allen Hamilton, and one

19  of our former employees was recently subject to a similar

20  disclosure.

21          THE COURT:  All right.  Now, again, usually when

22  people have known people in this type of a situation, it can

23  affect their impartiality.  Do you feel you'd have some

24  difficulties in being impartial in this case?

25          THE PROSPECTIVE JUROR:  I don't believe so, ma'am.  I

1    don't know any of the personalities in question nor the people

2    in question in either of those cases.

3              THE COURT:  All right, thank you, sir.

4              Yes, your name, please?

5              THE PROSPECTIVE JUROR:  Juror No. 2, David Anderson.

6              THE COURT:  Yes, sir.

7              THE PROSPECTIVE JUROR:  I've worked on classified

8    programs since 1990 for mostly three-letter agencies, including

9    the CIA.  I am familiar with the -- I read the article and am

10   familiar with the circumstance and discussed it with some

11   colleagues.

12             THE COURT:  Do you feel then that you've already made

13   up your mind about issues or that it would be difficult to be

14   impartial in judging this case?

15             THE PROSPECTIVE JUROR:  I would work hard to be

16   impartial and just listen to the facts in the case, so I think

17   I can be impartial.

18             THE COURT:  All right, thank you, Mr. Anderson.

19             Yes, sir, your name, please?

20             THE PROSPECTIVE JUROR:  Bernard Engel.  I've read the

21   most recent article, and I believe there were previous articles

22   about the reporter being let off.

23             THE COURT:  All right.  Now, Mr. Engel, is there

24   anything about what you've read that you feel could affect your

25   impartiality in judging this case?

1        THE PROSPECTIVE JUROR:  Well, it raises a few

2   questions about why the government chose to forego the

3   testimony -- or push harder for the testimony from Mr. Risen.

4        THE COURT:  All right.  And do you feel that that

5   might affect how you'd go about judging this case?

6        THE PROSPECTIVE JUROR:  Hard to say.  I'd have to

7   hear more.

8        THE COURT:  All right, thank you, sir.

9        Anybody on the left side in the second or third rows?

10                    (No response.)

11        THE COURT:  All right, let me just take the whole

12   left side at this point.  Is there anybody on the left side

13   who's had exposure to any of the issues in this case?  Anyone

14   in the back?

15                    (No response.)

16        THE COURT:  All right.  In the center, are there any

17   more people?  Yes, your name, please?

18        THE PROSPECTIVE JUROR:  Cagle, C-a-g-l-e, C -- as in

19   Charlie -- a-g-l-e.

20        THE COURT:  Yes, Ms. Cagle.

21        THE PROSPECTIVE JUROR:  Similar to the others.  Read

22   the article mostly about the reporter, not about the case so

23   much.

24        THE COURT:  And do you feel there's anything about

25   what you read in that article that might affect how you'd judge

1     this case?

2             THE PROSPECTIVE JUROR:  I don't think so.

3             THE COURT:  All right, thank you, Ms. Cagle.

4             Anybody else in the center section?

5                     (No response.)

6             THE COURT:  How about on the far right?  Anybody

7     else?

8                     (No response.)

9             THE COURT:  All right.  Now, have any members of the

10    panel -- to your knowledge, have any of you ever read this book

11    that we've -- the *State of War*?

12                    (No response.)

13            THE COURT:  Nobody.

14            Have any of you to your knowledge other than the

15    newspaper article you recently read, to your knowledge, have

16    you read other articles by James Risen?

17                    (No response.)

18            THE COURT:  All right.  Have any of you ever been

19    employed by or ever invested in *The New York Times* or Simon &

20    Schuster, the publishing house?

21                    (No response.)

22            THE COURT:  So none of you have worked for in any

23    capacity *The New York Times* or Simon & Schuster, correct?

24                    (No response.)

25            THE COURT:  And none of you to your knowledge owns

27

1   stock in either of those entities?

2                              (No response.)

3          THE COURT:  All right, I'll have counsel at this

4   point stand up --

5          THE PROSPECTIVE JUROR:  Your Honor?

6          THE COURT:  I'm sorry.  Yes, sir, your name, please?

7          THE PROSPECTIVE JUROR:  I own a few shares.

8          THE COURT:  No, I need your name first.

9          THE PROSPECTIVE JUROR:  Alan Herman, H-e-r-m-a-n.

10          THE COURT:  Yes, Mr. Herman.  Yes, sir.

11          THE PROSPECTIVE JUROR:  I own a few shares of *The New*

12   *York Times*.

13          THE COURT:  In any, in any respect, do you feel that

14   might affect how you would judge this case?

15          THE PROSPECTIVE JUROR:  Not at all.

16          THE COURT:  All right, thank you, sir.

17          Is there anybody else?

18                              (No response.)

19          THE COURT:  All right, I'll have counsel stand and

20   identify themselves at this time.  I'll start with you,

21   Mr. Trump.

22          MR. TRUMP:  Good morning.  Jim Trump on behalf of the

23   United States.

24          MR. OLSHAN:  Good morning.  Eric Olshan on behalf of

25   the United States.

1          MR. FITZPATRICK:  And Dennis Fitzpatrick on behalf of

2     the United States.

3          THE COURT:  And do you want to identify your case

4     agents?

5          MR. OLSHAN:  With us today is Special Agent Ashley

6     Hunt from the FBI.

7          THE COURT:  Anybody else?

8          MR. OLSHAN:  Should we identify other personnel as

9     well?

10         THE COURT:  I think all personnel working with the

11    government should be identified.

12         MR. OLSHAN:  Jennifer Mullin, who's with the Office

13    of General Counsel at the CIA.

14         THE COURT:  All right.  And are you going to have a

15    technical person working with you, Mr. Gerard?

16         MR. FITZPATRICK:  Yes.  Your Honor, we'll also have

17    Gerard Francisco, and perhaps a woman by the name of Pam Benson

18    will be in the courtroom.

19         THE COURT:  All right.  Ladies and gentlemen, do any

20    of you think you might know in any personal or business

21    capacity any of government's attorneys or the case agents?

22    Anybody?

23                         (No response.)

24         THE COURT:  You-all may have a seat.

25         Have any members of the panel had any business

1    dealings with the United States Attorney's Office for this

2    district?  Yes, sir, your name, please?

3              THE PROSPECTIVE JUROR:  Only in the grand jury,

4    serving on the grand jury.

5              THE COURT:  All right, your name, sir?

6              THE PROSPECTIVE JUROR:  James Carnes, C-a-r-n-e-s.

7              THE COURT:  And, Mr. Carnes, when did you serve on

8    the grand jury?

9              THE PROSPECTIVE JUROR:  In the late '80s or early

10   '90s.

11             THE COURT:  All right, is there anything about that

12   grand jury experience or your working with prosecutors from the

13   U.S. Attorney's Office that might affect your impartiality in

14   judging this case?

15             THE PROSPECTIVE JUROR:  No, I don't believe so.

16             THE COURT:  All right, thank you, sir.

17             Anybody else?  Yes, your name, please?

18             THE PROSPECTIVE JUROR:  Suzanne Yerks, Y-e-r-k-s.

19             THE COURT:  Yes, Ms. Yerks.

20             THE PROSPECTIVE JUROR:  I work for a company named

21   VeriSign, and I've actually seen your name a lot come through

22   on court orders that I handle directly for domain name

23   transcripts and things like that.

24             THE COURT:  Ms. Yerks, in any respect, do you feel

25   that that familiarity with the Court or the U.S. Attorney's

1    Office might affect your impartiality?

2            THE PROSPECTIVE JUROR:  No.

3            THE COURT:  All right, thank you, ma'am.

4            Anybody else?

5                    (No response.)

6            THE COURT:  All right.  Now, have defense -- yes,

7    ma'am, your name, please?

8            THE PROSPECTIVE JUROR:  Kris Gilson.

9            THE COURT:  How do you spell the last name?

10           THE PROPECTIVE JUROR:  G-i-l-s-o-n.

11           THE COURT:  Yes, ma'am.

12           THE PROSPECTIVE JUROR:  I work for the federal

13   government and have been involved on the fringe of several

14   court cases with the attorneys, no one that is here in the room

15   or --

16           THE COURT:  Which, which agency do you work with?

17           THE PROSPECTIVE JUROR:  I work for the Maritime

18   Administration.  We're part of DOT.

19           THE COURT:  All right.  Is there anything about your

20   work with possibly U.S. attorneys that might affect your

21   impartiality?

22           THE PROSPECTIVE JUROR:  No, I don't believe so,

23   ma'am.

24           THE COURT:  Thank you, Ms. Gilson.

25           THE PROSPECTIVE JUROR:  Your Honor, can I also bring

1   up one other thing?

2              THE COURT:  Yes, ma'am.

3              THE PROSPECTIVE JUROR:  I'm supposed to be heading

4   out of the country for work next week, and I was excused for

5   next week, but I don't want to impact my service here, but I

6   just wanted to bring that up.  I don't know how relevant it is.

7              THE COURT:  Is that trip -- can that be changed, or

8   is it very difficult to change it?

9              THE PROSPECTIVE JUROR:  No, it's with the

10  International Maritime Organization.  It's been planned for,

11  you know, a year in advance, and my role is fairly critical as

12  a working group chair.

13             THE COURT:  All right, thank you, Ms. Gilson.

14             THE PROSPECTIVE JUROR:  Okay.

15             THE PROSPECTIVE JUROR:  Your Honor?

16             THE COURT:  Yes, ma'am, your name, please?

17             THE PROSPECTIVE JUROR:  Nancy Perry.

18             THE COURT:  Yes, Ms. Perry.

19             THE PROSPECTIVE JUROR:  For full disclosure, I work

20  with general counsel at Northrup Grumman, and we work with the

21  U.S. Attorney's Office.  I don't have any close contact, but I

22  just wanted to make sure that you knew.

23             THE COURT:  All right.  But again, Ms. Perry, do you

24  feel in any respect the work you do with them could affect your

25  impartiality?

1           THE PROSPECTIVE JUROR:  No, no.

2           THE COURT:  All right, thank you, ma'am.

3           Anybody else?

4                         (No response.)

5           THE COURT:  All right.  Now, I'll have counsel for

6    the defendant as well as Mr. Sterling introduce themselves.

7           MR. MAC MAHON:  I am Edward MacMahon.  I'm an

8    attorney for Jeffrey Sterling.

9           MR. POLLACK:  Good morning.  My name is Barry

10   Pollack.  I'm also an attorney for Mr. Sterling.

11          THE COURT:  Counsel, could you identify the firms and

12   where they're located?  I want to know if anybody knows your

13   law firm.

14          MR. MAC MAHON:  My office is in Middleburg, Virginia,

15   and Washington, D.C.  I'm a sole practitioner.

16          MR. POLLACK:  I work in Washington, D.C., for a group

17   called Miller & Chevalier.

18          THE COURT:  All right.

19          MS. HAESSLY:  Good morning.  My name is Mia Haessly,

20   and I also work at Miller & Chevalier in Washington, D.C.

21          THE COURT:  And, Mr. Sterling, just introduce

22   yourself.

23          THE DEFENDANT:  Jeffrey Sterling, in Missouri.

24          THE COURT:  And you work now in Missouri?

25          THE PROSPECTIVE JUROR:  I work outside of Los

1    Angeles.

2              THE COURT:  All right, you-all may have a seat.

3              Ladies and gentlemen, do any of you think you might

4    know either defense counsel or the defendant in any personal or

5    business capacity?  Yes?

6              THE PROSPECTIVE JUROR:  My name is Caitlin

7    Lhommedieu, and I'm familiar with Mr. MacMahon, his firm,

8    having worked in the courthouse, but I don't know him

9    personally.

10             THE COURT:  All right, what about any of the

11   prosecutors?  Do you know any of them?

12             THE PROSPECTIVE JUROR:  I'm not familiar with any of

13   them.

14             THE COURT:  Is there anything about your familiarity

15   with Mr. MacMahon that you feel might affect your impartiality

16   as a judge in this case?

17             THE PROSPECTIVE JUROR:  Not at all.

18             THE COURT:  All right, thank you, ma'am.

19             Do any members of the panel believe you may have had

20   any business dealings with either of the two law firms

21   represented by defense counsel or ever have litigated against

22   them or with them?

23             Yes, sir, your name, please?

24             THE PROSPECTIVE JUROR:  Arthur Catterall, C.

25             THE COURT:  Yes, Mr. Catterall.

1          THE PROSPECTIVE JUROR:  I'm an attorney with the

2   Justice Department Tax Division and currently have a case where

3   Miller & Chevalier is on the other side.

4          THE COURT:  All right.  Now, Mr. Catterall, do you

5   feel in any respect that might make it difficult for you to sit

6   as a juror in this case?

7          THE PROSPECTIVE JUROR:  I don't think so.

8          THE COURT:  Now, you are an employee of the

9   Department of Justice.  Do you feel because the U.S. Attorney's

10  Office is part of that agency, that you might have some

11  orientation to favor that side of the case?

12         THE PROSPECTIVE JUROR:  I don't think so.

13         THE COURT:  In terms of the Tax Division, that -- is

14  it the Civil or the Criminal Division?

15         THE PROSPECTIVE JUROR:  Civil.

16         THE COURT:  Civil.  Have you had any experience with

17  criminal law?

18         THE PROSPECTIVE JUROR:  No, no.

19         THE COURT:  Have you always practiced on the civil

20  side of things?

21         THE PROSPECTIVE JUROR:  Yes, yes.

22         THE COURT:  All right.  Do you understand that if you

23  were chosen to be a juror, at the end of the case -- and this

24  applies, frankly, to all the jurors -- I give the law that has

25  to be applied as the jury makes its fact-finding?  If I were to

1    state the law a certain way that you might disagree with or

2    think that it's wrong because of what you learned in law school

3    or whatever, can you put aside your personal view of the law

4    and follow that as given by the Court?

5            THE PROSPECTIVE JUROR:  Yes, ma'am.

6            THE COURT:  All right, thank you, sir.

7            Is there anybody else?

8                    (No response.)

9            THE COURT:  All right.  Now, as I said earlier, this

10   case involves allegations involving among other things the

11   Iranian nuclear weapons program.  Also, as several of you have

12   mentioned, there's been a great deal of coverage about

13   Mr. Risen, who is a reporter, and the fact that he has

14   throughout this case asserted what's called a newsman's

15   privilege not to reveal any sources of information for any of

16   his articles.  There's also been a great deal of publicity

17   about the Central Intelligence Agency lately.

18           So there's been a lot of news stories circulating

19   about some of the issues or some of the entities or

20   participants in this case.  What I want to know is from what

21   any of you may have seen, read, or heard about any of these

22   issues, do you feel that they could somehow contaminate your

23   ability to judge this case impartially based on the information

24   received just inside this courtroom?

25           So is there anybody who feels that because of the

```
 1    nature of some of these issues, that you might have problems

 2    being impartial in judging this case?

 3                        (No response.)

 4            THE COURT:  No?  All right.

 5            Do any of you -- I know we already had one or two

 6    people who've answered this question, but do any of you have

 7    any training in the law, that is, you've attended law school,

 8    you work as a paralegal, you are an attorney?  I want to know

 9    now about any legal training or background that any of you

10    have.

11            So let me start in the first row.  Again, anybody on

12    the left side?  Anybody on the left side at all?

13                        (No response.)

14            THE COURT:  So no lawyers or law training there?

15    Okay.

16            How about the center section?  Let's see, the first

17    row, yes, sir, your name again, please?

18            THE PROSPECTIVE JUROR:  Catterall.

19            THE COURT:  Yes, Mr. Catterall.  And you're the Tax

20    Division Justice Department attorney.

21            THE PROSPECTIVE JUROR:  Yes.

22            THE COURT:  All right, thank you, sir.  I think

23    you've already answered my questions.

24            The lady next to you, yes, your name, please?

25            THE PROSPECTIVE JUROR:  Peggy McCoy.
```

1          THE COURT:  Yes, Ms. McCoy.  Are you an attorney?

2          THE PROSPECTIVE JUROR:  I'm an inactive attorney, and

3     right now I'm the director of the Alexandria Bar Association.

4          THE COURT:  All right.  Now, Ms. McCoy, were you ever

5     in active practice?

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  What kind of practice did you have?

8          THE PROSPECTIVE JUROR:  I did civil litigation

9     primarily, professional liability defense, with more of a focus

10    on medical malpractice.

11         THE COURT:  All right.  And now you're the executive

12    director of the Alexandria Bar.  Is there anything first of all

13    about your previous work as an attorney or your current work as

14    the executive director of the Bar that you feel could affect

15    your impartiality in judging this case?

16         THE PROSPECTIVE JUROR:  No.

17         THE COURT:  You didn't practice any criminal law?

18         THE PROSPECTIVE JUROR:  No.

19         THE COURT:  All right.  Again, can you follow the

20    Court's instructions even if you disagree with the Court's

21    proposition of a particular point of law?

22         THE PROSPECTIVE JUROR:  Yes.

23         THE COURT:  All right, thank you, Ms. McCoy.

24         Anybody else in the center section?  Let me start on

25    the aisle.  Your name, sir?  Yes, yes, sir.

1          THE PROSPECTIVE JUROR:  Bernard Engel.

2          THE COURT:  Yes, Mr. Engel.

3          THE PROSPECTIVE JUROR:  I'm not sure if it counts,

4   but after retirement from the federal government, I worked for

5   several years as a court reporter.

6          THE COURT:  Oh, as a court reporter.

7          THE PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Did you ever cover anything in this

9   courthouse?

10          THE PROSPECTIVE JUROR:  No, no.  Strictly, you know,

11   county, Fairfax.

12          THE COURT:  Did you cover both civil and criminal

13   matters?

14          THE PROSPECTIVE JUROR:  Primarily civil.

15          THE COURT:  All right.  Is there anything about your

16   work as a court reporter that you feel might affect your

17   impartiality?

18          THE PROSPECTIVE JUROR:  I've seen good attorneys and

19   bad attorneys.

20                         (Laughter.)

21          THE COURT:  Very good.  There are only good attorneys

22   in this courtroom; let me assure you.

23                         (Laughter.)

24          THE COURT:  And, I'm sorry, can you just spell your

25   last name for me?

```
 1              THE PROSPECTIVE JUROR:  E-n-g-e-l.

 2              THE COURT:  All right, thank you, Mr. Engel.

 3              There were more people in Mr. Engel's row.  Yes, your

 4    name, please?  Yes, sir.

 5              THE PROSPECTIVE JUROR:  I'm Gabriel Chu.

 6              THE COURT:  Yes, Mr. Chu.

 7              THE PROSPECTIVE JUROR:  I work as a patent examiner.

 8    I trained in patent law.

 9              THE COURT:  So you're right next door?

10              THE PROSPECTIVE JUROR:  Exactly.

11              THE COURT:  All right.  Now, Mr. Chu, obviously, you

12    did take criminal law when you were in law school.

13              THE PROSPECTIVE JUROR:  Oh, no, I'm not an attorney.

14              THE COURT:  You're a patent examiner.  All right,

15    that's fine.

16              Is there anything about your work in that field that

17    you feel might affect your impartiality?

18              THE PROSPECTIVE JUROR:  No.

19              THE COURT:  All right, thank you, sir.

20              Yes, your name?

21              MS. LHOMMEDIEU:  Caitlin Lhommedieu, and I am a civil

22    litigator from Roeder & Cochran in Tysons.  I've had no

23    criminal experience.

24              THE COURT:  You were a law clerk, however, in this

25    courthouse.
```

```
 1              THE PROSPECTIVE JUROR:  I was a law clerk in this

 2   courthouse.

 3              THE COURT:  All right.  So you were exposed to some

 4   criminal law in that respect.

 5              THE PROSPECTIVE JUROR:  I don't even remember any,

 6   but I primarily focused my attention on the civil matters, and

 7   if I had time, I might sometimes go see a criminal matter just

 8   to learn about it, but I know nothing about criminal law.

 9              THE COURT:  All right.  Ms. Lhommedieu, do you

10   believe in any respect that your experience as an attorney and

11   your experience with this Court as a law clerk for one of the

12   magistrate judges in any respect could affect your

13   impartiality?

14              THE PROSPECTIVE JUROR:  Not at all.

15              THE COURT:  Thank you, ma'am.

16              Any more folks in the center section with legal

17   training background or work in the legal field?

18                       (No response.)

19              THE COURT:  How about on the side?  Anybody?

20              Yes, ma'am, your name, please?

21              THE PROSPECTIVE JUROR:  Kris Gilson.

22              THE COURT:  All right, Ms. Gilson, I think I don't

23   need to hear further from you, but thank you.

24              THE PROSPECTIVE JUROR:  Okay.

25              THE COURT:  Anybody else?  Way in the back.  Yes,
```

1    your name, please?

2              THE PROSPECTIVE JUROR:  Alan Herman.

3              THE COURT:  Yes, Mr. Herman.

4              THE PROSPECTIVE JUROR:  I'm retired from the U.S. Air

5    Force.  1980, I was a judge advocate in the Air Force.  After

6    that, I was a clerk at the D.C. Court of Appeals for six years,

7    not federal court but local court, and I have -- I just retired

8    from essentially a legal services job with Legal Counsel for

9    the Elderly in D.C.

10             THE COURT:  With -- I assume you've had some exposure

11   to criminal cases then.

12             THE PROSPECTIVE JUROR:  Back when I was in the Air

13   Force, very early on, I prosecuted and defended cases, and I

14   was a military appellate judge for five years, from '75 to

15   1980.

16             THE COURT:  So you've been on both sides of the

17   criminal justice system, so to speak.

18             THE PROSPECTIVE JUROR:  Yes, I have.

19             THE COURT:  All right, very good.  Is there anything

20   about those experiences that you feel might affect your ability

21   to be impartial in judging this case?

22             THE PROSPECTIVE JUROR:  No, ma'am.

23             THE COURT:  Thank you, Mr. Herman.

24             Anybody else?

25                        (No response.)

1    THE COURT:  Have any members of the pool ever worked

2  as or trained to be a journalist or a reporter for any form of

3  media, whether we're talking print media, electronic media?

4  Anybody?

5                      (No response.)

6          THE COURT:  So nobody here has any reporting

7  experience?  I'm not talking about your high school newspaper,

8  but, I mean, seriously as a profession.

9          Yes, your name, please?

10         THE PROSPECTIVE JUROR:  Brown, B-r-o-w-n.

11         THE COURT:  Yes, sir.

12         THE PROSPECTIVE JUROR:  Way back in the day, I did

13 sports reporting.  I haven't done anything for 20 --

14         THE COURT:  I'm sorry, you did some reporting --

15         THE PROSPECTIVE JUROR:  Sports reporting for a local

16 newspaper.

17         THE COURT:  All right.  Mr. Brown, is there anything

18 about that experience that you feel could affect your

19 impartiality in this case?

20         THE PROSPECTIVE JUROR:  Not at all.

21         THE COURT:  All right, thank you, sir.

22         And over here, yes, your name, please?

23         THE PROSPECTIVE JUROR:  Matt Garofalo.

24         THE COURT:  Can you spell the last name?

25         THE PROSPECTIVE JUROR:  G-a-r-o-f-a-l-o.

1          THE COURT:  Yes, sir.

2          THE PROSPECTIVE JUROR:  I had an internship my senior

3    year in college with *The Richmond Times* as a dispatch reporter.

4          THE COURT:  All right.  And as part of that

5    internship, did you do any kind of investigative work?

6          THE PROSPECTIVE JUROR:  I wouldn't consider it

7    investigative.  More a research.

8          THE COURT:  All right.  Did you have any training in

9    the ethics of journalism and how one goes about doing

10   investigative reporting, anything like that?

11         THE PROSPECTIVE JUROR:  No.

12         THE COURT:  Is there anything about your experience

13   in that internship that you think could affect your

14   impartiality in judging this case?

15         THE PROSPECTIVE JUROR:  No.

16         THE COURT:  All right, thank you, sir.

17         Anybody else?  Yes, your name, please?

18         THE PROSPECTIVE JUROR:  Nancy Gofus.

19         THE COURT:  All right.

20         THE PROSPECTIVE JUROR:  I spent two summers as an

21   intern with *The Virginia Pilot* in Norfolk, Virginia.

22         THE COURT:  And again, did you do any kind of

23   investigative reporting?

24         THE PROSPECTIVE JUROR:  No, not at all.  I just

25   worked in the library.

44

1          THE COURT:  Is there anything about your experience

2   with that paper that you feel might affect your impartiality in

3   judging this case?

4          THE PROSPECTIVE JUROR:  Not at all.

5          THE COURT:  All right, thank you, ma'am.

6          Anybody else?

7                    (No response.)

8          THE COURT:  Have any members of the panel ever had

9   any business dealings with or worked for the Central

10  Intelligence Agency, any other federal intelligence agency or

11  department?  And that would include any Congressional

12  intelligence-related committees.  So I want to know now if any

13  of you have had that kind of experience.  And if for any reason

14  you can't discuss it openly, then approach the bench.

15          All right, starting in the first row, your name, sir?

16  Yeah.

17          THE PROSPECTIVE JUROR:  I'm sorry, Paul Glen.  I was

18  Juror No. 35.

19          THE COURT:  Yes, Mr. Glen.

20          THE PROSPECTIVE JUROR:  Okay.  I'm a retired

21  counterintelligence officer and also a former chief of

22  intelligence for -- counterintelligence for Central Admin.

23  Currently work with DIA.

24          THE COURT:  All right.  So it's military background

25  in intelligence.

45

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  All right.  Now, Mr. Glen, given the

3   issues in this case, do you feel that you would have any

4   difficulty in being impartial in judging this case?

5          THE PROSPECTIVE JUROR:  None.

6          THE COURT:  In your work, did you ever have to work

7   on any issues involving leaks of classified information?

8          THE PROSPECTIVE JUROR:  Yes, ma'am.

9          THE COURT:  And you acted as what, an investigator in

10  those matters?

11         THE PROSPECTIVE JUROR:  I acted as an investigator.

12         THE COURT:  Do you feel in any respect because you've

13  been involved in this type of an investigation, that that could

14  affect how you would judge this case?

15         THE PROSPECTIVE JUROR:  No, ma'am.

16         THE COURT:  All right, thank you, sir.

17         Yes, your name?

18         THE PROSPECTIVE JUROR:  James Carnes.  I was a

19  federal civil servant in the Department of Defense, Office of

20  the Secretary of Defense.  I was the consumer of CIA

21  information.

22         THE COURT:  So you're familiar with classification

23  issues and that sort of things.

24         THE PROSPECTIVE JUROR:  Yes, ma'am.

25         THE COURT:  Now, Mr. Carnes, is there anything about

1    that experience that you feel could make it difficult for you

2    to be impartial in judging this case?

3            THE PROSPECTIVE JUROR:  No.

4            THE COURT:  In that position, did you ever -- were

5    you ever involved in any kind of leak investigation?

6            THE PROSPECTIVE JUROR:  No.

7            THE COURT:  Either as an investigator, a witness, or

8    anything like that?

9            THE PROSPECTIVE JUROR:  No, ma'am.

10           THE COURT:  All right.  And again, you don't feel

11    that that former work would in any respect affect your

12    impartiality?

13           THE PROSPECTIVE JUROR:  No.

14           THE COURT:  All right, thank you, Mr. Carnes.

15           All right, is there anybody else in the first row?

16    Yes, ma'am, your name, please?

17           THE PROSPECTIVE JUROR:  Peggy McCoy, and my father

18    worked for the Defense Intelligence Agency for 25 years.

19           THE COURT:  All right.  And I assume he didn't tell

20    you a whole lot about his work.

21           THE PROSPECTIVE JUROR:  No.

22           THE COURT:  Is there anything, though, about him

23    having had that kind of a job that you feel could affect your

24    impartiality?

25           THE PROSPECTIVE JUROR:  No.

1           THE COURT:  To your knowledge, was he ever involved

2   in any kind of leak investigation as an investigator or as a

3   witness or anything like that?

4           THE PROSPECTIVE JUROR:  As far as leaks, I wouldn't

5   know, but classified information, I'm sure that he dealt with

6   that.

7           THE COURT:  All right, thank you, Ms. McCoy.

8           Yes, your name, please?

9           THE PROSPECTIVE JUROR:  David Knox, K-n-o-x.

10          THE COURT:  Yes, sir.

11          THE PROSPECTIVE JUROR:  I currently hold a TS/SCI

12   clearance supporting the intelligence community for a federal

13   contractor.

14          THE COURT:  All right, sir.  Do you feel in any

15   respect that that work, that position could affect your ability

16   to be impartial in judging this case?

17          THE PROSPECTIVE JUROR:  It would not.

18          THE COURT:  It would not?  Have you ever been

19   involved in any kind of a leak investigation either as a

20   witness, as an investigator, as a subject?

21          THE PROSPECTIVE JUROR:  No, ma'am.

22          THE COURT:  No?  All right, thank you, Mr. Knox.

23          All right, is that everybody in the first row?

24                   (No response.)

25          THE COURT:  All right, now in the second row.  Yes --

1    I should start to know some of your names.  I'm sorry I don't.

2    Yes, sir, on the aisle.  Yeah.

3              THE PROSPECTIVE JUROR:  Bernard Engel.  I was a court

4    service officer for the Department of State and worked with

5    agency personnel, agency fraud at various agencies involved.

6              THE COURT:  Were you ever involved in any leak

7    investigations?

8              THE PROSPECTIVE JUROR:  No.

9              THE COURT:  Have you ever been a witness or ever had

10   to be involved in anything close to this kind of a case?

11             THE PROSPECTIVE JUROR:  No.

12             THE COURT:  And again, Mr. Engel, is there anything

13   about your experience with the State Department that you feel

14   might affect your impartiality in judging this case?

15             THE PROSPECTIVE JUROR:  I don't believe so.

16             THE COURT:  All right, thank you, Mr. Engel.

17             Yes, your name, please?

18             THE PROSPECTIVE JUROR:  David Anderson.

19             THE COURT:  Yes, Mr. Anderson.

20             THE PROSPECTIVE JUROR:  As I stated earlier, I've

21   worked on classified programs and new business proposals for

22   the CIA since about 1990.

23             THE COURT:  And you're a contractor?

24             THE PROSPECTIVE JUROR:  I am, yes, a contractor;

25   that's correct.

1           THE COURT:  All right.  Again, is there anything

2   about that work on classified materials that you think could

3   affect your impartiality in judging this case?

4           THE PROSPECTIVE JUROR:  I don't believe so.

5           THE COURT:  Have you ever been involved in any kind

6   of a leak investigation either because you had to be a witness,

7   you had to investigate it, or you were the subject of one?

8           THE PROSPECTIVE JUROR:  No.

9           THE COURT:  All right, thank you, Mr. Anderson.

10          Yes, your name, please?

11          THE PROSPECTIVE JUROR:  Neil Mickelson, ma'am.

12          THE COURT:  Yes, sir.

13          THE PROSPECTIVE JUROR:  Ma'am, I currently hold a

14  TS/SCI clearance as a federal government contractor --

15          THE COURT:  Wait, slow just one second.

16          All right, yes, Mr. Mickelson.

17          THE PROSPECTIVE JUROR:  Okay.  I hold a TS/SCI

18  clearance currently as a federal contractor with the National

19  Reconnaissance Office.  I also served in active duty with the

20  Air Force and hold an SCI clearance with the NRO.

21          THE COURT:  All right.  And again, do you feel in any

22  respect that those positions or having that kind of a clearance

23  would affect your impartiality in judging this case?

24          THE PROSPECTIVE JUROR:  No.

25          THE COURT:  Have you ever been involved in any kind

```
 1    of a leak investigation either as an investigator, as a

 2    witness, or even a possible subject?

 3              THE PROSPECTIVE JUROR:  No, ma'am.

 4              THE COURT:  All right, thank you, Mr. Mickelson.

 5              Yes, your name, please?

 6              THE PROSPECTIVE JUROR:  Nancy Gofus.  And my daughter

 7    works at the CIA.

 8              THE COURT:  All right.  Is there -- I doubt she tells

 9    you much about her work --

10              THE PROSPECTIVE JUROR:  Not at all.

11              THE COURT:  -- but is there anything about her

12    employment with that agency, I mean, the fact that you have a

13    family member working for that agency, that you'd feel could

14    affect your impartiality in judging this case?

15              THE PROSPECTIVE JUROR:  No.

16              THE COURT:  Thank you, Ms. Gofus.

17              All right, over -- yes, next to you, yes, your name,

18    please?

19              THE PROSPECTIVE JUROR:  Alberta Hickey.

20              THE COURT:  All right, one second, Ms. Hickey.

21              Yes, ma'am.

22              THE PROSPECTIVE JUROR:  I currently have TS/SCI

23    clearances, and I have worked in the past on CIA contracts for

24    a government contractor.

25              THE COURT:  All right.  Now, Ms. Hickey, do you feel
```

 1    in any respect because you have those clearances or you do that

 2    kind of work, that you might have difficulty in being impartial

 3    in judging this case?

 4                    THE PROSPECTIVE JUROR:  No.

 5                    THE COURT:  Have you ever been involved in any kind

 6    of a leak investigation either as an investigator, as a

 7    witness, or as a possible suspect?

 8                    THE PROSPECTIVE JUROR:  No.

 9                    THE COURT:  All right, thank you, Ms. Hickey.

10                    How about on the side?  Yes, sir, your name, please?

11                    THE PROSPECTIVE JUROR:  Hi, good morning.  David

12    Harrison.

13                    THE COURT:  Yes, Mr. Harrison.

14                    THE PROSPECTIVE JUROR:  I work for a government

15    contractor and hold an active clearance that works closely with

16    the CIA.  I do not personally, but the contract does.

17                    THE COURT:  I'm sorry, did you say that you have a

18    clearance?

19                    THE PROSPECTIVE JUROR:  I do have a clearance, yes,

20    ma'am, Top Secret.

21                    THE COURT:  All right.  Now, have you ever been

22    involved in any kind of a leak investigation?

23                    THE PROSPECTIVE JUROR:  No, ma'am.

24                    THE COURT:  Ever been a witness or anything like

25    that?

52

1              THE PROSPECTIVE JUROR:  No, ma'am.

2              THE COURT:  And is there anything about your having a

3    clearance or working with intelligence agencies that you feel

4    could affect your impartiality in this case?

5              THE PROSPECTIVE JUROR:  No, ma'am.

6              THE COURT:  All right, thank you, Mr. Harrison.

7    Since I'm look at the right side, anybody else on the right

8    side?

9              Yes, sir, on the aisle.  Your name, please?

10             THE PROSPECTIVE JUROR:  I'm Steve Frith.  I'm a

11   retired Army military intelligence officer, and I am currently

12   a contractor supporting the intelligence community.

13             THE COURT:  Is that the military intelligence

14   community or civilian?

15             THE PROSPECTIVE JUROR:  It's three-letter agencies.

16             THE COURT:  All right.  Mr. Frith, is there anything

17   about your having that kind of a clearance or the kind of work

18   you do that you feel could affect your impartiality in judging

19   this case?

20             THE PROSPECTIVE JUROR:  No, ma'am.

21             THE COURT:  Have you ever been part of a leak

22   investigation either as an investigator, as a witness, or as a

23   subject?

24             THE PROSPECTIVE JUROR:  No, ma'am.

25             THE COURT:  All right, thank you, Mr. Frith.

53

1            Anybody else on the right side?  Way in the back,

2   anyone?

3                      (No response.)

4            THE COURT:  Back to the center section, anybody else?

5   Yes, your name, please?  Way in the back.

6            THE PROSPECTIVE JUROR:  Steve Lee.  I currently work

7   for a federal contractor and currently hold an active security

8   clearance.

9            THE COURT:  All right.  And, Mr. Lee, is there

10  anything about your having that kind of a clearance or that

11  kind of work that you feel could affect your impartiality in

12  judging this?

13           THE PROSPECTIVE JUROR:  No, ma'am.

14           THE COURT:  All right.  Have you ever been involved

15  in a leak investigation as an investigator, as a possible

16  witness, or suspect?

17           THE PROSPECTIVE JUROR:  I have not, ma'am.

18           THE COURT:  All right, thank you, Mr. Lee.

19           Yes, your name, please?

20           THE PROSPECTIVE JUROR:  Peter Lynn, L-y-n-n.

21           THE COURT:  Yes, sir.

22           THE PROSPECTIVE JUROR:  I worked for the Department

23  of Navy from '86 to 2001 in the intelligence community.

24           THE COURT:  Are you currently doing any work in the

25  intelligence community?

1           THE PROSPECTIVE JUROR:  I am not.

2           THE COURT:  Mr. Lynn, was there anything about that

3    work that you feel could affect your impartiality as a judge in

4    this case?

5           THE PROSPECTIVE JUROR:  No.

6           THE COURT:  Were you ever part of any kind of a leak

7    investigation as an investigator, a witness, or even possibly a

8    subject?

9           THE PROSPECTIVE JUROR:  I was not.

10          THE COURT:  All right, thank you, Mr. Lynn.

11          Anybody else?  Way on the side, yes.

12          THE PROSPECTIVE JUROR:  My name is Debra Williams.

13   I'm an intelligence research specialist with the Department of

14   Homeland Security, but I do sit at CIA headquarters.

15          THE COURT:  All right.  And, Ms. Williams, is there

16   anything about your work both in the intelligence world and

17   with the CIA that you feel could affect your impartiality in

18   this case?

19          THE PROSPECTIVE JUROR:  No, ma'am.

20          THE COURT:  Have you ever been involved in any kind

21   of a leak investigation as an investigator, a witness, or

22   possibly a suspect?

23          THE PROSPECTIVE JUROR:  I have not.

24          THE COURT:  All right, thank you, Ms. Williams.

25          I think we had another hand.  Yes, ma'am, your name

1    again, please?

2              THE PROSPECTIVE JUROR:  Harriet Shriver.

3              THE COURT:  Yes, Ms. Shriver.

4              THE PROSPECTIVE JUROR:  Just that I interviewed and

5    was offered a job with the CIA years ago, never worked for

6    them.

7              THE COURT:  Is there anything about that situation

8    that you feel could affect your impartiality?

9              THE PROSPECTIVE JUROR:  I don't think so.

10             THE COURT:  All right, thank you, Ms. Shriver.

11             Anybody else?

12                        (No response.)

13             THE COURT:  Have any members of the panel -- and

14   remember, this applies as well to your immediate family members

15   or close personal friends -- ever filed either a formal or

16   informal employment discrimination claim or felt that you had

17   been the victim of discrimination by your employer, whether the

18   employer was a private entity or the federal government?

19             Yes, ma'am, your name, please?

20             THE PROSPECTIVE JUROR:  My name is Donna Curtin,

21   Juror No. 19.

22             THE COURT:  Yes, ma'am.

23             THE PROSPECTIVE JUROR:  It was my father.  It was a

24   long time ago, and he did file suit for age discrimination.

25             THE COURT:  And against, was it a private entity?

1            THE PROSPECTIVE JUROR:  It was a private firm.

2            THE COURT:  And how was that matter resolved, if you

3   know?

4            THE PROSPECTIVE JUROR:  I believe it was resolved out

5   of court, and I think he was, he was given damages.

6            THE COURT:  All right.  Is there anything about that

7   case that you feel might affect your impartiality?  And the

8   reason I mention that is there may be evidence in this case

9   that at one point, Mr. Sterling raised a discrimination claim

10  against the Central Intelligence Agency.  So we want to make

11  sure that any jurors who might have had experience with that

12  sort of an issue have thought about it and whether that could

13  affect their impartiality.

14           Do you feel in any respect your father's experience

15  might affect how you would judge this case?

16           THE PROSPECTIVE JUROR:  I don't think so.

17           THE COURT:  All right, thank you, ma'am.

18           THE PROSPECTIVE JUROR:  You're welcome.

19           THE COURT:  Is there anybody else?  Nope?

20           Way in the back, yes, your name, please?

21           THE PROSPECTIVE JUROR:  George-Ann Tobin.

22           THE COURT:  Yes, Ms. Tobin.

23           THE PROSPECTIVE JUROR:  I've worked for the National

24  Gallery of Art, and one of the things that I do, I'm the senior

25  official on all sorts of employment litigation, things with the

1   gallery, and some of those have been about employment

2   discrimination, so I have testified before the Merit Service

3   Review Board.

4           THE COURT:  All right.  So you've had some experience

5   with those types of matters although you haven't actually filed

6   one.

7           THE PROSPECTIVE JUROR:  Correct.

8           THE COURT:  Well, let me just ask you, is there

9   anything about your work in employment discrimination matters

10   that you feel could affect your impartiality in judging this

11   case?

12           THE PROSPECTIVE JUROR:  No.

13           THE COURT:  All right, thank you, ma'am.

14           Anybody else?

15                   (No response.)

16           THE COURT:  Let me just follow up on that question.

17   Have any of you worked in the area of human resources such that

18   you've handled employment discrimination claims?  Anybody?

19           On the aisle, yes, sir, your name, please?

20           THE PROSPECTIVE JUROR:  Ross Banfield.

21           THE COURT:  I need you to stand up, sir, because it's

22   hard to hear you.  All right, Mr. Banfield, what kind of work

23   have you done in that area?

24           THE PROSPECTIVE JUROR:  I was sued for

25   discrimination.  I'm an employer.

58

1        THE COURT:  All right.  And how did that work out?

2        THE PROSPECTIVE JUROR:  It was dismissed.

3        THE COURT:  It was dismissed.  Is there anything

4    about your experience in that respect that you feel could

5    affect your impartiality in judging this case?

6        THE PROSPECTIVE JUROR:  No.

7        THE COURT:  All right, thank you, Mr. Banfield.

8        Yes, your name, sir?

9        THE PROSPECTIVE JUROR:  David Anderson.

10        THE COURT:  Yes, sir.

11        THE PROSPECTIVE JUROR:  I worked as a business

12    conduit officer within the corporation, which looked at a lot

13    of discrimination type of issues brought forward through the

14    open line.

15        THE COURT:  Is there anything about that work that

16    you feel might affect your impartiality in judging this case?

17        THE PROSPECTIVE JUROR:  No.

18        THE COURT:  All right, thank you, sir.

19        Anybody else?  Yes, your name, please?

20        THE PROSPECTIVE JUROR:  Cagle, C-a-g-l-e.

21        THE COURT:  Yes, Ms. Cagle.

22        THE PROSPECTIVE JUROR:  My husband was a human

23    resources executive, but we're second time around.  We weren't

24    married during that time.

25        THE COURT:  All right.  Is there anything about

1    things he may have told you about that work that could affect

2    your impartiality?

3              THE PROSPECTIVE JUROR:  No.

4              THE COURT:  Thank you, ma'am.

5              Anybody else?

6                        (No response.)

7              THE COURT:  Now, some of the witnesses who are going

8    to testify in this case are either current or former employees

9    of the Central Intelligence Agency, and because of sensitivity

10   of their type of work, they may be testifying only using their

11   initials, and there may be -- and there will be some protective

12   measures taken so that these people's identity is not known to

13   the general public.  In fact, during the trial, we will have a

14   fairly large screen across the well of the court so that the

15   jurors will be able to see the witness but not the general

16   public.

17             We are also going to have pieces of evidence, that

18   is, documentary evidence which at some point may have been

19   classified, and for various reasons, portions of that evidence

20   may have what are called redactions.  That means portions may

21   be blacked out for sensitivity and security reasons.

22             Do any of you feel that those types of protective

23   measures might somehow make it difficult for you to be

24   impartial in judging this case?  Is there anyone?

25                        (No response.)

1          THE COURT:  Do you feel you would have trouble in

2    evaluating the credibility of a witness who when he or she

3    testified was not giving you their full name?  Is there anybody

4    who would be troubled by that?

5                          (No response.)

6          THE COURT:  All right.  One of the witnesses in this

7    case may be former Secretary of State Condaleezza Rice.  She

8    was part of the Cabinet of the last President Bush, that is,

9    President George W. Bush.  Do any of you first of all know

10   Secretary Rice?  Anybody?

11         THE PROSPECTIVE JUROR:  Just as a secretary.

12         THE COURT:  No, I mean, have a personal --

13         THE PROSPECTIVE JUROR:  No.

14         THE COURT:  Ever known her personally.

15         THE PROSPECTIVE JUROR:  No.

16         THE COURT:  All right.  Were any of you members of

17   the President Bush Administration?  I mean, not that you were a

18   government employee while he was president but actually a

19   member of his cabinet or of the immediate administration?  Is

20   there anybody?

21                         (No response.)

22         THE COURT:  Do any of you have any feelings about the

23   Bush Administration or Secretary Rice's performance that you

24   feel in any respect might make it difficult for you to evaluate

25   her testimony fairly?

1                        (No response.)

2            THE COURT:  Do any of you feel that because she is a

3    former Secretary of State and had other high-level government

4    positions, her testimony would somehow be worthy of more

5    credibility than that of just an ordinary citizen who's coming

6    in to testify?  Anybody?

7                        (No response.)

8            THE COURT:  All right.  I've asked some of you this

9    question but I'm just going to expand it to all of you now, so

10   if you've already answered this question, you don't need to

11   raise your hand, but to your knowledge, have any of you or any

12   of your close relatives ever been investigated for or charged

13   with possession -- unlawful possession of classified government

14   documents?

15                        (No response.)

16           THE COURT:  Other than what some of you have already

17   told me, have any of you ever been involved in investigating

18   such an issue?

19                        (No response.)

20           THE COURT:  To your knowledge, have any of you ever

21   been called as a witness to have to testify or give information

22   about a possible leak of classified information?

23                        (No response.)

24           THE COURT:  No?  All right.

25           Have any of you ever been a witness in any kind of

1    trial proceeding?  I'm sure some of you have.  I usually get

2    answers to that question.

3            The gentleman in the white shirt, your name, sir?

4            THE PROSPECTIVE JUROR:  Name is James Lyke, L-y-k-e.

5    Background, in 1979, I was a witness in a criminal case.

6            THE COURT:  What kind of a criminal case?

7            THE PROSPECTIVE JUROR:  A high school friend of mine

8    was charged with drunk driving and possession of marijuana.

9            THE COURT:  And so I assume you were called by the

10   defense?

11           THE PROSPECTIVE JUROR:  Correct.

12           THE COURT:  All right.  Was there anything about that

13   experience that you feel could affect your ability to be

14   impartial in judging this case?

15           THE PROSPECTIVE JUROR:  No, ma'am.

16           THE COURT:  All right, thank you, Mr. Lyke.

17           Anybody else on the far side?  Yes, in the back, your

18   name, please?

19           THE PROSPECTIVE JUROR:  Margaret Rowe.  I don't know

20   exactly how long ago, but I was called as a witness in a

21   litigation against a salesman for a yearbook company who

22   overstepped his territory bounds, and I was found by the

23   attorneys pending against him because I had dealings with him

24   when I was in college.

25           THE COURT:  All right.  Ms. Rowe, was there anything

1     about your experience on the witness stand that you feel could

2     affect your impartiality in judging this case?

3               THE PROSPECTIVE JUROR:  No, ma'am.

4               THE COURT:  Thank you, ma'am.

5               All right, anybody else on the left side?

6                         (No response.)

7               THE COURT:  Now, in the center, anybody who's been a

8     witness?  Yes, ma'am -- let me start in the first row just to

9     keep my normal practice.

10              THE PROSPECTIVE JUROR:  Jim Carnes, C-a-r-n-e-s.

11              THE COURT:  Yes.

12              THE PROSPECTIVE JUROR:  I was a witness in a case in

13    this courthouse where an individual was -- federal --

14    Department of Defense employee was protesting a job dismissal.

15    He was --

16              THE COURT:  And you were called by which side?

17              THE PROSPECTIVE JUROR:  The defense.

18              THE COURT:  All right.  Was there anything --

19              THE PROSPECTIVE JUROR:  I was in the office with him.

20    I was employed in the office in which he served.

21              THE COURT:  Was there anything about your experience

22    as a witness in that case that you feel might make it difficult

23    to be impartial in judging this case?

24              THE PROSPECTIVE JUROR:  No.

25              THE COURT:  All right, thank you, sir.

```
 1              All right, now in the second row?  Yes, ma'am, your
 2   name, please?  Yeah.
 3              THE PROSPECTIVE JUROR:  Nancy Gofus.  I was a witness
 4   in a case in the Richmond courts where my corporation was suing
 5   an employee for intellectual property theft.
 6              THE COURT:  And was there anything about your
 7   experience as a witness that you feel might affect your
 8   impartiality?
 9              THE PROSPECTIVE JUROR:  No.
10              THE COURT:  Thank you, Ms. Gofus.
11              All right, anybody else?  Yes, your name, please?
12              THE PROSPECTIVE JUROR:  I'm Rebecca Miller.
13              THE COURT:  Yes, Ms. Miller.
14              THE PROSPECTIVE JUROR:  And I've been a witness in
15   four court cases just over my lifetime.  One was when I was a
16   child a long time ago over a horse thing.  I was ten.  And then
17   once I was a witness in an automobile accident in Herndon, and
18   then once also as a witness in a drunk driving accident, and
19   then most recently I was called as a witness in a real estate,
20   husband-wife issue over real estate.
21              THE COURT:  Now, Ms. Miller, having been on the stand
22   a few times, in any respect, do you feel those experiences
23   could affect your impartiality in judging this case?
24              THE PROSPECTIVE JUROR:  No.
25              THE COURT:  Thank you, ma'am.
```

1          Yes, your name, please?

2          THE PROSPECTIVE JUROR:  Ms. Lhommedieu.

3          THE COURT:  Yes, ma'am.

4          THE PROSPECTIVE JUROR:  I was a witness in a domestic

5    matter against my ex-husband.

6          THE COURT:  All right.  Was there anything about that

7    experience that you feel could affect your impartiality?

8          THE PROSPECTIVE JUROR:  Not at all.

9          THE COURT:  All right, thank you.

10         Anybody else in the center section?  Yes, your name,

11   please?

12         THE PROSPECTIVE JUROR:  Gabriel Chu.  I'm not sure

13   if --

14         THE COURT:  I'm sorry, you're Mr.?

15         THE PROSPECTIVE JUROR:  Gabriel Chu.

16         THE COURT:  Yes, sir.

17         THE PROSPECTIVE JUROR:  I'm not sure if this

18   qualifies, but I was in a car accident, and I had to testify.

19         THE COURT:  That does count.  Is there anything about

20   your experience on the witness stand that you feel could affect

21   your impartiality?

22         THE PROSPECTIVE JUROR:  No.

23         THE COURT:  And, ladies and gentlemen, the reason I

24   ask this question and the next question is going to be about

25   prior jury service is sometimes something happens when you're

1    in another court, and it upsets you enough or it shocks you

2    enough that it can actually affect your attitude towards the

3    legal system, and that's why we just want to make sure that any

4    prior experience you've had in proceedings like this might not

5    affect how you judge this case.

6            And, Mr. Chu, you said there was no problem?

7            THE PROSPECTIVE JUROR:  No.

8            THE COURT:  Okay.  Great.

9            Anybody else in the center section?  Yes, in the

10   back, your name, please?

11           THE PROSPECTIVE JUROR:  Peter Lynn, L-y-n-n.

12           THE COURT:  Yes, sir.

13           THE PROSPECTIVE JUROR:  A witness as an employer in

14   an unemployment claim.

15           THE COURT:  Anything about that experience that you

16   feel might affect your impartiality in judging this case?

17           THE PROSPECTIVE JUROR:  No.

18           THE COURT:  All right, thank you, sir.

19           How about on the right side?  Anybody with witness

20   experience?  Let me start in the front.  Your name, please?

21           THE PROSPECTIVE JUROR:  Donna Beitzel.

22           THE COURT:  Can you spell the last name?

23           THE PROSPECTIVE JUROR:  B-e-i-t-z-e-l.

24           THE COURT:  Yes, ma'am.

25           THE PROSPECTIVE JUROR:  May I approach the bench,

1    please?

2              THE COURT:  Yes.

3              (Bench conference on the record.)

4              THE PROSPECTIVE JUROR:  It's a domestic --

5              THE COURT:  Wait.

6              THE PROSPECTIVE JUROR:  Okay.

7              THE COURT:  And you're Ms. Beitzel?

8              THE PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Yes, Ms. Beitzel.

10             THE PROSPECTIVE JUROR:  I had a domestic dispute with

11   my current husband.

12             THE COURT:  A domestic dispute with your husband?

13             THE PROSPECTIVE JUROR:  With my husband, yes.  I was

14   called for the prosecution.

15             THE COURT:  And you had to testify?

16             THE PROSPECTIVE JUROR:  Um-hum.

17             THE COURT:  Is there anything about your experience

18   on the witness stand that you think would make it difficult for

19   you to be impartial in judging this case?

20             THE PROSPECTIVE JUROR:  No.  I just don't want to

21   discuss it publicly.

22             THE COURT:  That's fine.  Thank you very much.

23             THE PROSPECTIVE JUROR:  Thank you.

24             (End of bench conference.)

25             THE COURT:  All right, we were asking about whether

```
 1   anybody had any experience as a witness, and I think there are

 2   still a few hands over on the side.

 3            Yes, sir, your name?

 4            THE PROSPECTIVE JUROR:  George McCool.

 5            THE COURT:  How do you spell the last name?

 6            THE PROSPECTIVE JUROR:  M-c-C-o-o-l.

 7            THE COURT:  Yes, sir.

 8            THE PROSPECTIVE JUROR:  I was called in a child abuse

 9   case several years ago by my employer.

10            THE COURT:  All right.  Is there anything about your

11   experience as a witness that you think could affect your

12   ability to be impartial in judging this case?

13            THE PROSPECTIVE JUROR:  No, ma'am.

14            THE COURT:  Thank you, Mr. McCool.

15            And there's another hand over there.  Yes, way in the

16   back.  Yes.

17            THE PROSPECTIVE JUROR:  Gregory Fabian.  I was a

18   witness in traffic court about ten years ago.

19            THE COURT:  Was there anything about that experience

20   that you feel could affect your impartiality in judging this

21   case?

22            THE PROSPECTIVE JUROR:  No.

23            THE COURT:  Thank you, Mr. Fabian.

24            And one more hand over there?  Yes, ma'am.

25            THE PROSPECTIVE JUROR:  Cathleen Gregorson.
```

1            THE COURT:  Yes, ma'am.

2            THE PROSPECTIVE JUROR:  I was a witness in a TPR

3    trial last March.

4            THE COURT:  And is there anything about that

5    experience that you feel could affect your impartiality in

6    judging this case?

7            THE PROSPECTIVE JUROR:  Honestly, it's still very

8    fresh.  I will try very hard to remain impartial.

9            THE COURT:  Did you have a tough time on the witness

10   stand?

11           THE PROSPECTIVE JUROR:  Yes.

12           THE COURT:  And you were, I would assume,

13   aggressively cross-examined?

14           THE PROSPECTIVE JUROR:  Yes.

15           THE COURT:  And did that leave a bad feeling?

16           THE PROSPECTIVE JUROR:  Yes.

17           THE COURT:  All right, thank you, Ms. Gregorson.

18           Anybody else?

19                   (No response.)

20           THE COURT:  Now, the next question has to do with

21   jury service.  I'd like to know if any of you have ever served

22   on either a trial or a grand jury.  This would include criminal

23   and/or civil cases either in federal or state court.  So we're

24   looking for your experience as a juror.  Anybody?

25           I'm just going to start on the left side.  Anybody on

1     the left side?

2               Yes, ma'am, your name, please?

3               THE PROSPECTIVE JUROR:  Debra Williams.  I've

4     actually served twice.  Once was for a domestic abuse, and the

5     second case was for breaking and entering.

6               THE COURT:  All right.  Now, in terms of those two

7     cases, what happened?  What did the jury do in those cases?

8               THE PROSPECTIVE JUROR:  In the domestic abuse, he was

9     found not guilty, and for breaking and entering, it was a

10    guilty plea.  It was California, third strike.

11              THE COURT:  All right.  Now, Ms. Williams, is there

12    anything about your experience in either of those two trials

13    that you feel could affect your impartiality as a juror in this

14    case?

15              THE PROSPECTIVE JUROR:  Not at all.

16              THE COURT:  Thank you, ma'am.

17              Yes, your name again, please?

18              THE PROSPECTIVE JUROR:  Nancy Perry.

19              THE COURT:  Yes, Ms. Perry.

20              THE PROSPECTIVE JUROR:  I served in a jury for a DWI.

21              THE COURT:  And what did the jury do in that case?

22              THE PROSPECTIVE JUROR:  He was found guilty.

23              THE COURT:  All right.  And, Ms. Perry, is there

24    anything about that experience that you feel could affect your

25    impartiality in judging this case?

1        THE PROSPECTIVE JUROR:  No, ma'am.

2        THE COURT:  All right, thank you.

3        Yes, your name, please?

4        THE PROSPECTIVE JUROR:  Kristin Witters.

5        THE COURT:  Yes, Ms. Witters.

6        THE PROSPECTIVE JUROR:  It's W-i.

7        THE COURT:  Thank you.

8        THE PROSPECTIVE JUROR:  I served on two juries in the

9   past six years for Fairfax County, both civil.  One was a

10  theft, and one was domestic violence.

11       THE COURT:  All right, what did the jury do in those

12  cases?

13       THE PROSPECTIVE JUROR:  Both were dismissed.

14       THE COURT:  Both were -- so the jury found --

15       THE PROSPECTIVE JUROR:  Not guilty.

16       THE COURT:  Not guilty, all right.

17       Is there anything about those experiences that you

18  feel could affect your impartiality as a juror in this case?

19       THE PROSPECTIVE JUROR:  No, ma'am.

20       THE COURT:  Thank you.

21       Anyone else on the left side?  Yes, your name,

22  please?

23       THE PROSPECTIVE JUROR:  Suzanne Yerks, Y-e-r-k-s.

24       THE COURT:  Yes, ma'am.

25       THE PROSPECTIVE JUROR:  I served on a jury for a

1  robbery in circuit court.

2        THE COURT:  And what did the jury do in that case?

3        THE PROSPECTIVE JUROR:  Found the defendant guilty.

4        THE COURT:  Is there anything about your experience

5  as a juror in that case that you feel could affect your

6  impartiality in this case?

7        THE PROSPECTIVE JUROR:  No, ma'am.

8        THE COURT:  Thank you, Ms. Yerks.

9        Yes, sir, your name, please?

10        THE PROSPECTIVE JUROR:  Sidney Shaw.

11        THE COURT:  Yes, Mr. Shaw.

12        THE PROSPECTIVE JUROR:  I served on an Arlington

13  County jury.  It was a speeding violation, and the defendant

14  was found guilty.

15        THE COURT:  Was found guilty?

16        THE PROSPECTIVE JUROR:  Yes.

17        THE COURT:  Anything about that experience that you

18  feel could affect your impartiality as a --

19        THE PROSPECTIVE JUROR:  No, ma'am.

20        THE COURT:  All right, thank you, sir.

21        Anyone else on the left side?

22                (No response.)

23        THE COURT:  All right, how about in the center now?

24  We'll start in the first row.  Yes, ma'am, in the red shirt.

25        THE PROSPECTIVE JUROR:  Anne Marie Cassidy,

1   C-a-s-s-i-d-y.

2           THE COURT:  Thank you, ma'am.

3           THE PROSPECTIVE JUROR:  It was Loudoun County, and it

4   was an assault on a police officer, and the person was found

5   guilty.

6           THE COURT:  All right.  Was there anything about your

7   experience on that jury that you feel could affect your

8   impartiality in this case?

9           THE PROSPECTIVE JUROR:  No, ma'am.

10          THE COURT:  Thank you, Ms. Cassidy.

11          Yes, sir, your name again?

12          THE PROSPECTIVE JUROR:  Paul Glen.

13          THE COURT:  Yes.

14          THE PROSPECTIVE JUROR:  It was just a Fairfax County

15  civil where a car hit a man on a bicycle.

16          THE COURT:  All right.  And, Mr. Glen, what did the

17  jury do in that case?

18          THE PROSPECTIVE JUROR:  There was an award made to

19  the individual on the bicycle.

20          THE COURT:  All right, was there anything about that

21  experience that you feel could affect your impartiality in this

22  case?

23          THE PROSPECTIVE JUROR:  No, ma'am.

24          THE COURT:  All right, thank you, Mr. Glen.

25          Yes, your name?

74

1            THE PROSPECTIVE JUROR:  Jim Carnes again.

2            THE COURT:  Yes, Mr. Carnes.

3            THE PROSPECTIVE JUROR:  Federal grand jury, one year,

4    served here in the building.

5            THE COURT:  All right.  Now, Mr. Carnes, you know

6    that the standard in the grand jury is just probable cause.

7            THE PROSPECTIVE JUROR:  Yes, ma'am.

8            THE COURT:  It's not proof beyond a reasonable doubt.

9    You can appreciate that difference?

10           THE PROSPECTIVE JUROR:  Yes, ma'am.

11           THE COURT:  Is there anything about your experience

12   in a grand jury that you feel could affect your ability to

13   judge this case fairly and impartially?

14           THE PROSPECTIVE JUROR:  No.

15           THE COURT:  All right, thank you, sir.

16           Yes, your name, please?

17           THE PROSPECTIVE JUROR:  Catterall, with a "C."

18           THE COURT:  Yes, sir.

19           THE PROSPECTIVE JUROR:  I served on a jury 20-25

20   years ago.

21           THE COURT:  And what kind of a case was it,

22   Mr. Catterall?

23           THE PROSPECTIVE JUROR:  Some kind of destruction of

24   property, I believe.

25           THE COURT:  Do you remember what the jury did?

```
 1              THE PROSPECTIVE JUROR:  Found him guilty.

 2              THE COURT:  All right.  Was there anything about that

 3   experience that you feel could affect your impartiality as a

 4   judge in this case?

 5              THE PROSPECTIVE JUROR:  No.

 6              THE COURT:  Thank you, sir.

 7              All right, how about in the second row?  Yes, on the

 8   aisle again?

 9              THE PROSPECTIVE JUROR:  Bernard Engel.  I served on a

10   jury in Montgomery County.  It was a criminal case, robbery.

11   We found the defendant not guilty.

12              THE COURT:  You found him not guilty?

13              THE PROSPECTIVE JUROR:  Not guilty.

14              THE COURT:  All right.  And, Mr. Engel, is there

15   anything about that experience that you feel could affect your

16   impartiality in this case?

17              THE PROSPECTIVE JUROR:  No, ma'am.

18              THE COURT:  Thank you, sir.

19              Your name, please?

20              THE PROSPECTIVE JUROR:  I'm David Anderson.  I served

21   on three juries in southern California, two civil, one

22   criminal.  The two civil found for the plaintiff.  The criminal

23   was hung.

24              THE COURT:  Was hung.

25              THE PROSPECTIVE JUROR:  Yes.
```

1          THE COURT:  Now, was there anything about that

2    experience, especially being on a hung jury, that means the

3    jurors could not agree, that you feel could affect your

4    impartiality in judging this case?

5          THE PROSPECTIVE JUROR:  No.

6          THE COURT:  In terms of the hung jury experience, do

7    you know whether you were one of the hangers?

8          THE PROSPECTIVE JUROR:  I was the foreman.  It was

9    eleven to one.  I was not one of the hangers.

10          THE COURT:  All right, did you have any -- as a

11    result of that experience on that jury, do you have any

12    attitudes or feelings about the jury process that you think

13    could affect your ability to judge this case?

14          THE PROSPECTIVE JUROR:  At the time, I was very

15    frustrated, but that was many years ago, so no.

16          THE COURT:  All right.  And you, and you understand

17    and, I assume, appreciate that each juror has a right to his

18    own evaluation of the evidence, and all the other jurors are

19    supposed to listen to that evaluation and consider it

20    carefully?

21          THE PROSPECTIVE JUROR:  Correct.

22          THE COURT:  All right, thank you, Mr. Anderson.

23          Anybody else in Mr. Anderson's row?  Yes, ma'am, your

24    name, please?

25          THE PROSPECTIVE JUROR:  Yes.  Alberta Hickey.

```
 1              THE COURT:  Yes, Ms. Hickey.

 2              THE PROSPECTIVE JUROR:  I served on a Fairfax County

 3    jury.  The woman was found not guilty.  It was a civil case.

 4              THE COURT:  Is there anything about that experience

 5    that you feel could affect your impartiality in this case?

 6              THE PROSPECTIVE JUROR:  No.

 7              THE COURT:  All right, thank you, Ms. Hickey.

 8              Yes, your name, please?

 9              THE PROSPECTIVE JUROR:  Diane Gilliam.

10              THE COURT:  Yes, Ms. Gilliam.

11              THE PROSPECTIVE JUROR:  It was a criminal case, a

12    murder case actually.

13              THE COURT:  A murder case?

14              THE PROSPECTIVE JUROR:  Yeah.

15              THE COURT:  In what jurisdiction?

16              THE PROSPECTIVE JUROR:  Prince William County.

17              THE COURT:  I'm sorry?

18              THE PROSPECTIVE JUROR:  Prince William County.  He

19    was found guilty.  It was about 20 years ago.

20              THE COURT:  All right.  And, Ms. Gilliam, was there

21    anything about your experience on that jury that you feel could

22    affect your impartiality in judging this case?

23              THE PROSPECTIVE JUROR:  Since it's been so long ago,

24    no.

25              THE COURT:  All right, thank you, ma'am.
```

1        All right, anybody else now in the center section?

2   How about the back rows?  Any people with jury experience in

3   the back?  No?

4                    (No response.)

5        THE COURT:  How about on the right side?  Yes, your

6   name, sir?

7        THE PROSPECTIVE JUROR:  Yes, David Knox, K-n-o-x.

8        THE COURT:  Yes, Mr. Knox.

9        THE PROSPECTIVE JUROR:  I served as an alternate

10  juror for a criminal proceeding in P. G. County for attempted

11  murder.  I do not know the outcome.  I was an alternate, and I

12  was let go prior to that decision.

13       THE COURT:  All right, was there anything about that

14  experience in that trial that you feel could affect your

15  impartiality in judging this case?

16       THE PROSPECTIVE JUROR:  No.

17       THE COURT:  Thank you, sir.

18       All right.  Yes, your name, please?

19       THE PROSPECTIVE JUROR:  Noureddine Elabassi.  It was

20  a --

21       THE COURT:  I'm sorry, slow down just one second.

22  How do you spell your last name?

23       THE PROSPECTIVE JUROR:  Elabassi.

24       THE COURT:  Yes, Mr. Elabassi.

25       THE PROSPECTIVE JUROR:  It was a case in Fairfax

1  County about whether to award damages for injury caused during

2  an accident and also determine the dollar amount for the

3  person.

4          THE COURT:  And what did the jury do in that case?

5          THE PROSPECTIVE JUROR:  The person was awarded

6  damages, and the jury, we decided on the amount that we had to

7  choose to give to the injuries.

8          THE COURT:  All right.  And was there anything about

9  your experience with that jury that you feel could affect your

10 impartiality in judging this case?

11         THE PROSPECTIVE JUROR:  Absolutely not.

12         THE COURT:  All right, thank you, sir.

13         All right, in the -- behind, yes, ma'am, your name,

14 please?

15         THE PROSPECTIVE JUROR:  Sandra Khouri.  That's

16 K-h-o-u-r-i.

17         THE COURT:  Yes, Ms. Khouri.

18         THE PROSPECTIVE JUROR:  This was in Kentucky.  It was

19 a civil case, and it was thrown out.  The defendant -- the

20 plaintiff's lawyer caught her in a lie and threw the case out.

21         THE COURT:  So the jury never had to do a decision.

22         THE PROSPECTIVE JUROR:  Right.

23         THE COURT:  Was there anything, though, about that

24 experience while you were in court that you think could affect

25 your impartiality in judging this case?

```
 1              THE PROSPECTIVE JUROR:  No.

 2              THE COURT:  No?  All right, thank you, ma'am.

 3              Yes, sir, your name, please?

 4              THE PROSPECTIVE JUROR:  Brown, Scott Brown.

 5              THE COURT:  Yes, sir.

 6              THE PROSPECTIVE JUROR:  I served on a jury just for a

 7   day.  It was a trial, a robbery experience with the employee of

 8   the employer.  I was dismissed after one day.

 9              THE COURT:  Was there anything about your experience,

10   though, for that one day that might affect your impartiality in

11   judging this case?

12              THE PROSPECTIVE JUROR:  Not at all.

13              THE COURT:  All right, thank you, sir.

14              Way in the back, yes.

15              THE PROSPECTIVE JUROR:  Gregory Fabian.

16              THE COURT:  Yes, sir.

17              THE PROSPECTIVE JUROR:  I served on a criminal jury

18   in Fairfax County.

19              THE COURT:  And what kind of a case was it?

20              THE PROSPECTIVE JUROR:  It was a soliciting a minor

21   case.

22              THE COURT:  All right, what did the jury do in that

23   case?

24              THE PROSPECTIVE JUROR:  The case was dismissed, so we

25   didn't render a verdict.
```

1          THE COURT:  You never had to do a verdict?

2          THE PROSPECTIVE JUROR:  No.

3          THE COURT:  Was there anything, though, about your

4    experience in that trial that you feel could affect your

5    impartiality in judging this case?

6          THE PROSPECTIVE JUROR:  No.

7          THE COURT:  All right, thank you, sir.

8          Anybody else?  Yes, ma'am.

9          THE PROSPECTIVE JUROR:  Peggy McCoy, and back related

10   to the employment discrimination, I just wanted to put out

11   there that I have handled employment discrimination cases as a

12   defense attorney, but I don't feel as though that would affect

13   my ability to be impartial.

14         THE COURT:  All right, thank you, Ms. McCoy.

15         Now, as I mentioned before, I as the presiding judge

16   at the end of the trial will give you, the jury, the specific

17   definitions of certain legal terms and the law, and you have to

18   use the law that the Court gives you, that's called the

19   instructions, in deciding the case.

20         Do any of you feel that if the Court were to give you

21   a principle of law that you thought was stupid or foolish or

22   just you didn't think was correct, would you be able to put

23   aside your own personal view of the law and apply that as given

24   to you by the Court?  Is there anybody who would have trouble

25   with that?

```
 1                    Yes, sir, your name, please?

 2                    THE PROSPECTIVE JUROR:  Gabriel Chu.

 3                    THE COURT:  Yes, Mr. Chu.  Do you have a problem with

 4       that?

 5                    THE PROSPECTIVE JUROR:  Hypothetically.

 6                    THE COURT:  All right.  Well, it's important to

 7       recognize that, you know, it's not a juror's job to change the

 8       law.  It's to take the law that exists and apply it to the

 9       facts.  So you'd have a problem with that, Mr. Chu?

10                    THE PROSPECTIVE JUROR:  Possibly, yes.

11                    THE COURT:  All right, thank you, sir.

12                    Is there anybody else?  Yes, your name, please?

13                    THE PROSPECTIVE JUROR:  Matthew Lowman.

14                    THE COURT:  Yes, Mr. Lowman.  And you'd also have an

15       issue with that?

16                    THE PROSPECTIVE JUROR:  I might.

17                    THE COURT:  It's Lowman, right, L-o-w-m-a-n?

18                    THE PROSPECTIVE JUROR:  L-o-w.

19                    THE COURT:  All right, is there anybody else?  Yes,

20       ma'am, your name, please?

21                    THE PROSPECTIVE JUROR:  Donna Curtin.

22                    THE COURT:  Yes, Ms. Curtin.  And you also have a

23       problem with that?

24                    THE PROSPECTIVE JUROR:  I could.

25                    THE COURT:  All right, thank you, Ms. Curtin.
```

```
 1                  THE PROSPECTIVE JUROR:  You're welcome.

 2                  THE COURT:  Is there anybody else?  Way on the side,

 3    yes.

 4                  THE PROSPECTIVE JUROR:  I'm Gloria Roy.  My brother

 5    is currently serving prison time, and he was wrongly accused.

 6                  THE COURT:  All right, how do you spell your last

 7    name?

 8                  THE PROSPECTIVE JUROR:  R-o-y, Roy.

 9                  THE COURT:  Yes, Ms. Roy.  You feel therefore you

10    might have difficulty in being --

11                  THE PROSPECTIVE JUROR:  He was wrongly accused.

12                  THE COURT:  All right, thank you, ma'am.

13                  Anybody else?

14                              (No response.)

15                  THE COURT:  Do any members of the panel have any

16    difficulty with the English language?  Has anyone had trouble

17    understanding what I've said or any of the questions?

18                  Yes, your name, please?

19                  THE PROSPECTIVE JUROR:  Ivan Hernandez.

20                  THE COURT:  All right, Mr. Hernandez, how long have

21    you been in the United States?

22                  THE PROSPECTIVE JUROR:  Fifteen years ago.

23                  THE COURT:  And your English sounds fine to me.  Did

24    you have trouble understanding anything I've said?

25                  THE PROSPECTIVE JUROR:  Yes, sometimes.  Especially
```

1    listening in this case, I'd like to be very clear what

2    everybody says.

3            THE COURT:  All right, thank you, sir.

4            Is there anybody else?

5                    (No response.)

6            THE COURT:  Now, obviously, there are quite a few

7    issues that are going to have to be raised and addressed in

8    this case, and this trial is going to take some period of time.

9    I will assure you that we're -- the nickname for this Court is

10   the Rocket Docket, in case you haven't heard that, because we

11   are actually the fastest federal court in the country, and we

12   try to make sure that we do not waste jurors' time.

13           We appreciate how valuable your time is and what a

14   sacrifice jurors do pay in sitting in a case that is long.

15   However, I do need to have, whoever's going to be a juror has

16   to be able to give their full time and attention to the case

17   for its duration, and therefore, let me give you an approximate

18   view of the schedule.  We'll be in session today until

19   approximately 6:00, and I give jurors a one-hour lunch break

20   around 1:00.  It sort of depends where we are, but in that time

21   frame, and usually a 15- to 20-minute mid-morning and

22   mid-afternoon break.

23           We can accommodate some medical concerns.  If folks

24   have back issues, you can stand up and move around a little

25   bit.  If you have to take medication, we will certainly be able

1   to make breaks to accommodate those types of situations.

2           We will run this trial this week.  Today, obviously,

3   we started already at 10:00.  Wednesday and Thursday, we're

4   going to start a little earlier, at 9:30, and you will be out

5   no later than 5:30.  On Friday, we will be starting at 10:00,

6   and we will be out by 5:00.

7           Next Monday is the Martin Luther King federal

8   holiday, so we will not be in session, and then next week,

9   Tuesday, Wednesday, and Thursday, we would have those 9:30

10  start times.  I'm not yet sure what time we would start on

11  Friday.

12          The trial will most likely go into the last week of

13  January.  How far, I don't know.  And I am assured by everybody

14  that this case will be fully completed by the end of January,

15  which would be January 30.  So those of you who have February

16  plans or commitments will not have a problem, but I do need all

17  of you to be able to sit throughout January, and it might be

18  sooner than the end of the month.  I can't tell you for

19  certain, but that would be the outside limit.

20          So we need jurors who are able to give their full

21  time and attention to this trial with that time frame in mind.

22  So if any of you have any medical issues, any business issues

23  that cannot be changed or accommodated, or any other family

24  situations that would interfere with your ability to serve on

25  this jury, I need to know that now.

1          So let me start in the first row, whether that
2    schedule would create an insurmountable problem for any of you.
3    Yes, sir, your name, please?
4          THE PROSPECTIVE JUROR:  Last name is Stanley.
5          THE COURT:  All right, hold on one second.
6          THE PROSPECTIVE JUROR:  S-t-a-n-l-e-y.
7          THE COURT:  Yes, Mr. Stanley.
8          THE PROSPECTIVE JUROR:  I'm director of finance for a
9    small nonprofit.  I handle all the tax and financial
10   requirements, and January is tax financial --
11         THE COURT:  I'm sorry, January is what?
12         THE PROSPECTIVE JUROR:  Tax financial issues, and
13   it's 1099s, and I do it all for my small nonprofit.
14         THE COURT:  Well, how many 1099s do you have to
15   generate?
16         THE PROSPECTIVE JUROR:  Three- four hundred.  And I
17   handle all the financial.
18         THE COURT:  And there's nobody else who can do that
19   for you?
20         THE PROSPECTIVE JUROR:  My bookkeeper handles the
21   payment of bills, but I handle everything else.
22         THE COURT:  All right, thank you, Mr. Stanley.
23         All right, yes, ma'am, your name again?
24         THE PROSPECTIVE JUROR:  Harriet Shriver.
25         THE COURT:  Ms. Shriver, yes.

1          THE PROSPECTIVE JUROR:  I have reservations on an

2    auto train for Florida and a lease in Florida starting the

3    23rd.

4          THE COURT:  Of January?

5          THE PROSPECTIVE JUROR:  Whatever Saturday is.  The

6    24th, I guess, the 25th.

7          THE COURT:  So that's a prepaid lease?

8          THE PROSPECTIVE JUROR:  Yeah.

9          THE COURT:  All right, thank you, Ms. Shriver.

10         Yes, ma'am, your name, please?

11         THE PROSPECTIVE JUROR:  Donna Curtin.

12         THE COURT:  Yes, Ms. Curtin.

13         THE PROSPECTIVE JUROR:  I do have a medical test

14   scheduled for the last week in January.  It could be changed,

15   but it shouldn't be changed.

16         THE COURT:  All right, thank you, ma'am.

17         How about anybody else in the first row?  Yes, you're

18   Ms. McCool?

19         THE PROSPECTIVE JUROR:  Peggy McCoy.

20         THE COURT:  McCoy, yes.

21         THE PROSPECTIVE JUROR:  Well, I feel terrible saying

22   this, but I have a three-year-old at home, and so I would have

23   to rely on an 80-year-old grandparent to take care of her

24   pretty much every day unless my husband took off from work.

25         THE COURT:  Well, I mean, legitimate child care

1    issues are something we certainly will consider.  So it's not

2    possible for you to sit then for that length of time?

3              THE PROSPECTIVE JUROR:  Really it's not.  And the Bar

4    Association also has a pretty significant event in the middle

5    of February.  Again, that's a social event, that's not life or

6    death, but the situation with the three-year-old is a problem.

7              THE COURT:  All right, thank you.

8              All right.  And over here, yes, sir, your name,

9    please?

10             THE PROSPECTIVE JUROR:  Yeah, David Knox, K-n-o-x.

11             THE COURT:  Yeah.

12             THE PROSPECTIVE JUROR:  I have a personal trip with

13   tickets planned and paid for starting the evening of the 28th.

14             THE COURT:  So that's Wednesday evening.

15             THE PROSPECTIVE JUROR:  Yes, ma'am.

16             THE COURT:  All right, thank you, sir.

17             All right, in the second row?  And I'm just going to

18   now take the whole left side.  Is there anybody on the left

19   side for whom -- yes, ma'am?

20             THE PROSPECTIVE JUROR:  Manavi Puri.

21             THE COURT:  What's the last name?

22             THE PROSPECTIVE JUROR:  P-u-r-i.

23             THE COURT:  Yes, Ms. Puri.

24             THE PROSPECTIVE JUROR:  I don't know if this is

25   important, either, but I just changed jobs, and I'm on a

1   three-month probation period which ends February 3.  So I'm a

2   little concerned if I'm out of the office for the next three

3   weeks.

4           THE COURT:  Well, you have protection from employment

5   actions --

6           THE PROSPECTIVE JUROR:  Okay.

7           THE COURT:  -- as a, as a juror.

8           Is it a government agency or a private company?

9           THE PROSPECTIVE JUROR:  No, nonprofit organization.

10          THE COURT:  It's a nonprofit?  You shouldn't have a

11  problem.

12          THE PROSPECTIVE JUROR:  Okay.

13          THE COURT:  All right?  But otherwise, you can sit;

14  is that correct?

15          THE PROSPECTIVE JUROR:  Yes.

16          THE COURT:  All right, thank you.

17          Anybody else?  Yes, your name, sir?

18          THE PROSPECTIVE JUROR:  Sidney Shaw.  My wife is

19  scheduled for surgery on the 21st of January.  It should be

20  minor, but it's certainly a concern.

21          THE COURT:  Okay.  That's Wednesday.  I assume you

22  were planning to be with her for that?

23          THE PROSPECTIVE JUROR:  Yes.  But I would like to

24  confer with her and see how she feels about it before I commit.

25          THE COURT:  All right, thank you, Mr. Shaw.

1          Yes, ma'am, your name?

2          THE PROSPECTIVE JUROR:  Maria Pierce.

3          THE COURT:  Yes, Ms. Pierce.

4          THE PROSPECTIVE JUROR:  Yes, I'm the sole coordinator

5    and office manager for a small dental practice, and it's really

6    just the doctor and myself.  So for today, I bumped the morning

7    patients to the afternoon, but I can't do that for two weeks.

8          THE COURT:  All right, Ms. Pierce, thank you.

9          Way in the back, yes.

10          THE PROSPECTIVE JUROR:  Sheena Tosta.

11          THE COURT:  Hold on one second, ma'am.  How do you

12    pronounce your -- spell your last name?

13          THE PROSPECTIVE JUROR:  "T" like Tom.

14          THE COURT:  Yes, ma'am.

15          THE PROSPECTIVE JUROR:  I am an HMR manager for a

16    small company, and we have a deadline for next Friday for

17    benefits, and I have no one else to do that.

18          THE COURT:  How many employees do you have to do

19    paperwork for?

20          THE PROSPECTIVE JUROR:  125.

21          THE COURT:  125?

22          THE PROSPECTIVE JUROR:  Yes.

23          THE COURT:  All right, Ms. Tosta, thank you.

24          Yes, ma'am.

25          THE PROSPECTIVE JUROR:  I have --

```
 1              THE COURT:  I'm sorry, your last name?

 2              THE PROSPECTIVE JUROR:  Roy, R-o-y.

 3              THE COURT:  Yes, Ms. Roy.

 4              THE PROSPECTIVE JUROR:  I have panic attacks, and

 5    it's very hard for me to sit, even sit in this room, and I need

 6    to get some air at this moment, but I'm trying to control

 7    myself.

 8              THE COURT:  All right, Ms. Roy, thank you.

 9              Anybody else?  Yes, your name, please?

10              THE PROSPECTIVE JUROR:  George-Ann Tobin.

11              THE COURT:  Yes, Ms. Tobin.

12              THE PROSPECTIVE JUROR:  I'm the chief investment

13    officer for the National Gallery of Art, and we have a board

14    meeting the morning of January 29.

15              THE COURT:  How long would that meeting last?

16              THE PROSPECTIVE JUROR:  An hour and a half.

17              THE COURT:  And is that the only conflict you've got

18    during that time period?

19              THE PROSPECTIVE JUROR:  Yes.

20              THE COURT:  All right.  We might be able to work

21    around that if you're chosen, all right, but that would be the

22    only thing -- I'm sorry, what time would that meeting be?

23              THE PROSPECTIVE JUROR:  It's at 11:00, so I'd have to

24    be there kind of from 10:30 to, yeah.

25              THE COURT:  But you'd be able to be back here by two?
```

1          THE PROSPECTIVE JUROR:  Yes.

2          THE COURT:  All right, thank you.

3          Yes, your name, please?

4          THE PROSPECTIVE JUROR:  I'm Margaret Rowe.  I am the

5     director of pharmacy at Fauquier Hospital.  We're a small

6     hospital in Warrenton.  We just experienced a huge flu epidemic

7     that was very difficult to manage.

8          I'm also having an attorney leave my department, and

9     so I have staffing responsibilities, so it's difficult for me.

10    A few days would be fine, but a three-week commitment would

11    probably not work.

12         THE COURT:  All right, thank you, Ms. Rowe.

13         How about in the -- is that everybody on the left?

14              (No response.)

15         THE COURT:  All right, in the center section.  Yes,

16    we'll start on the aisle again.  Yes, sir.

17         THE PROSPECTIVE JUROR:  May I approach?

18         THE COURT:  Yes.

19         (Bench conference on the record.)

20         THE COURT:  Yes.  Remind me of your name again.

21         THE PROSPECTIVE JUROR:  I'm Bernard Engel.

22         THE COURT:  Yes, Mr. Engel.

23         THE PROSPECTIVE JUROR:  When I got to the building

24    this morning, I got a phone call that my sister-in-law had died

25    this morning.

1           THE COURT:  I'm sorry.

2           THE PROSPECTIVE JUROR:  They think the funeral is

3   going to be on Thursday, but obviously, they're not sure yet,

4   and so I, you know --

5           THE COURT:  Will that be out of town?

6           THE PROSPECTIVE JUROR:  No, no, it will be here.

7           THE COURT:  So that will be Thursday?

8           THE PROSPECTIVE JUROR:  Likely.  I'll know, you know,

9   later on today, I would assume I would find out the exact day.

10          THE COURT:  I appreciate your telling me that.  I'm

11  so sorry for your loss.

12          THE PROSPECTIVE JUROR:  Thank you.  I appreciate

13  that.

14          (End of bench conference.)

15          THE COURT:  Yes, sir.

16          THE PROSPECTIVE JUROR:  I would also like to

17  approach, Your Honor.

18          THE COURT:  All right.

19          (Bench conference on the record.)

20          THE COURT:  You're Mr. Anderson?

21          THE PROSPECTIVE JUROR:  Mr. Anderson, Juror No. 2.  I

22  have just taken a leave of absence from work.  My, my son has a

23  rare disease, and it's progressed, and I need to spend time

24  with him and care for him in the last months of his life.

25          THE COURT:  I'm very sorry to hear that.

1        THE PROSPECTIVE JUROR:  Thank you.

2        THE COURT:  Very sorry.

3        (End of bench conference.)

4        THE COURT:  Before I send my folks back, is there

5   anybody else who needs to approach the bench?  All right, those

6   of you who need to approach the bench, just start lining up in

7   the well.

8        All right, the first juror can come forward.

9        (Bench conference on the record.)

10        THE PROSPECTIVE JUROR:  Good morning.

11        THE COURT:  Yes, sir, your name, please?

12        THE PROSPECTIVE JUROR:  My name is Phan Vu.

13        THE COURT:  I'm sorry?

14        THE PROSPECTIVE JUROR:  My name is Phan Vu, P-h-a-n

15   and my last name is V-u.

16        THE COURT:  The last name is?

17        THE PROSPECTIVE JUROR:  V-u.

18        THE COURT:  V as in Victor?  Okay.  Just one second.

19        Yes, Mr. Vu.

20        THE PROSPECTIVE JUROR:  Yes.  Actually, over ten

21   year, I have seven surgery, and that cause my health, it's not

22   really good health --

23        THE COURT:  Okay.

24        THE PROSPECTIVE JUROR:  -- because I have memory and

25   memory not really good; and my, my hearing, sometime I can

1  hear; sometimes, you know, I not really hear very well.

2          THE COURT:  All right.

3          THE PROSPECTIVE JUROR:  And so also, my age, I'm 66

4  years old, and I retired last year.  I'm not able to perform my

5  duty at work, and so that's why I retired last year, and so I

6  cannot continue to work.

7          THE COURT:  All right, Mr. Vu, I think you've said

8  enough.  I understand your situation.  Thank you.

9          THE PROSPECTIVE JUROR:  Yeah.

10          THE COURT:  Thank you.  You may go back to your seat.

11          THE PROSPECTIVE JUROR:  Okay.  Thank you.

12          THE COURT:  Be careful on the step.

13          THE PROSPECTIVE JUROR:  Okay.  Thank you very much.

14          THE COURT:  Yes, ma'am, just come up here, please.

15  Your name?

16          THE PROSPECTIVE JUROR:  Ingalsbe, Nancy Ingalsbe,

17  with an "I."

18          THE COURT:  Yes, ma'am.

19          THE PROSPECTIVE JUROR:  I, I just want to say that I

20  feel totally overwhelmed.  I was an instructional assistant in

21  an elementary school, a basic teacher's aide for 26 years, and

22  even judging children was so hard for me.  I think some

23  people's personalities are more built to be a judge than

24  others, and quite honestly, I truly was never good at it.

25          If there 's some other thing that -- I don't want to

```
 1    be a terrible American, but this is the third time that I've

 2    actually been over here, and I am --

 3              THE COURT:  Your were called for jury duty?

 4              THE PROSPECTIVE JUROR:  Yeah.

 5              THE COURT:  All right.  And you were never selected

 6    as a juror?

 7              THE PROSPECTIVE JUROR:  No, I wasn't.

 8              THE COURT:  All right.

 9              THE PROSPECTIVE JUROR:  And --

10              THE COURT:  All right, thank you, Ms. Ingalsbe.

11    Thank you.

12              THE PROSPECTIVE JUROR:  I just feel like it's

13    important to be honest --

14              THE COURT:  All right.

15              THE PROSPECTIVE JUROR:  -- about what's inside of a

16    person's personality, and I've sat here trying to speak out and

17    not being able to, but I find this all very, very intimidating.

18              THE COURT:  Would you feel it difficult to express

19    yourself in front of the other jurors if you were a juror and

20    there are other 11 other people in the room?  Would you --

21              THE PROSPECTIVE JUROR:  I definitely feel that way.

22              THE COURT:  All right.

23              THE PROSPECTIVE JUROR:  I don't really feel like it's

24    a part of what I could actually do.

25              THE COURT:  All right, thank you, ma'am.  You're free
```

1    to go.

2              Good morning.

3              THE PROSPECTIVE JUROR:  Good morning.  The name is

4    Angela Keaton.

5              THE COURT:  Keaton.  Yes, Ms. Keaton.

6              THE PROSPECTIVE JUROR:  I home school my sixth grade

7    son, and he also has some educational learning disabilities, so

8    I'm also the go-between between the therapist, and that's also

9    done on a weekly basis.

10             THE COURT:  Is there anybody else who's involved in

11   the home schooling, like your husband --

12             THE PROSPECTIVE JUROR:  My husband, but he works, so

13   he could probably only do, like, one day a week.

14             THE COURT:  All right.  And what grade level?

15             THE PROSPECTIVE JUROR:  Sixth grade.

16             THE COURT:  Sixth grade?

17             THE PROSPECTIVE JUROR:  Um-hum.

18             THE COURT:  All right, thank you, ma'am.

19             THE PROSPECTIVE JUROR:  Um-hum.

20             THE COURT:  Yes, sir, your name, please?

21             THE PROSPECTIVE JUROR:  McCool, M-c-C-o-o-l.

22             THE COURT:  Yes, Mr. McCool.

23             THE PROSPECTIVE JUROR:  I have three possible

24   conflicts.  First of all, I'm a teacher with special needs at a

25   private day school.  I have issues with my children's

```
 1    programming and educational issues --

 2              THE COURT:  Wait, do they have substitute teachers

 3    who cover when you're not there?

 4              THE PROSPECTIVE JUROR:  Really we're a small school.

 5    We have one person there to cover.  They might do anything, but

 6    there would be testing, too, which I need to be present for.

 7              Additionally, I have a pending civil court matter in

 8    Fairfax on the 26th.  I need to go to court.

 9              THE COURT:  Are you a party in that case?

10              THE PROSPECTIVE JUROR:  I am.  I am actually the

11    defendant.

12              THE COURT:  And what kind of a case is it?

13              THE PROSPECTIVE JUROR:  Small claims, civil.

14              THE COURT:  All right.  That's January 26?

15              THE PROSPECTIVE JUROR:  Yes, ma'am, 9:30 a.m.

16              THE COURT:  All right, thank you, Mr. McCool.

17              THE PROSPECTIVE JUROR:  Yes, ma'am.

18              THE COURT:  Yes, ma'am, your name, please?

19              THE PROSPECTIVE JUROR:  My name is Sozina Khan.  The

20    last name is K-h-a-n.

21              THE COURT:  Yes, Ms. Khan.

22              THE PROSPECTIVE JUROR:  Yes.  I have a medical

23    problem.  I am 65 years old, and I'm diabetic and high blood

24    pressure, and I cannot control my bladder.  I have a bladder

25    control problem, and I have to run to the bathroom back and
```

1    forth.

2              THE COURT:  If we took breaks, I mean, would you be

3    comfortable raising your hand and saying, "I need a break," and

4    we'd just give you a five-minute break?

5              THE PROSPECTIVE JUROR:  I've been sitting here with

6    very great difficulty today.  I have to rush back and forth to

7    the bathroom.

8              THE COURT:  And it makes it hard for you to

9    concentrate?

10             THE PROSPECTIVE JUROR:  It makes it very hard, and it

11   gives me pain.

12             THE COURT:  All right, Ms. Khan.

13             THE PROSPECTIVE JUROR:  And then I have another

14   reason.  I'm running two programs for mentally challenged

15   people, and I am a decision-maker person, so if I have to be

16   here for this long period of time, it's going to be difficult.

17             THE COURT:  All right, thank you, Ms. Khan.

18             THE PROSPECTIVE JUROR:  Thank you.

19             THE COURT:  All right, the next person?

20             Yes, your name, please?

21             THE PROSPECTIVE JUROR:  Ross Banfield.

22             THE COURT:  Yes, Mr. Banfield.

23             THE PROSPECTIVE JUROR:  I am a proprietor of a small

24   construction company, I have 197 employees, and we are

25   struggling to make payroll.  Additionally, I am manning a

1    21-day discovery period in the middle of findings for a divorce

2    case, which is on the docket in Warrenton February 14, so I, I

3    would -- my mind would not be here.

4            THE COURT:  Well, I mean, how much discovery are you

5    involved with?  Do you go to all the depositions?

6            THE PROSPECTIVE JUROR:  No.  I have to put all the

7    financial documentation together about the company's finances

8    and my finances.

9            THE COURT:  Oh, oh, because of distribution issues.

10           THE PROSPECTIVE JUROR:  Yes, that's correct.

11           THE COURT:  And where are you in that process at this

12   point?

13           THE PROSPECTIVE JUROR:  I just received notice

14   yesterday.

15           THE COURT:  Okay.  Thank you.

16           Yes, sir.

17           THE PROSPECTIVE JUROR:  Good morning, Your Honor.  My

18   name is Keric Hopkins.  I'm Juror No. 48.

19           THE COURT:  Yes, sir.

20           THE PROSPECTIVE JUROR:  My company only provides two

21   weeks of paid jury leave, and I do not have enough personal

22   leave to cover myself financially for the amount of time that

23   you say this trial is going to take, and that would be -- I'll

24   put this in extreme financial hardship on me to have to serve

25   on this jury past about two, two-and-a-half weeks.  I just

1   don't have the money to cover my bills.

2           The other issue is I'm a Type 1-1/2 diabetic, and my

3   blood sugar is rather unpredictable, and when it starts

4   crashing, I need to eat, and that would probably interfere -- I

5   understand you're going to give us breaks and stuff --

6           THE COURT:  Yeah.

7           THE PROSPECTIVE JUROR:  -- but I can't tell when this

8   is going to happen to me, so --

9           THE COURT:  All right, thank you, Mr. Hopkins.

10          THE PROSPECTIVE JUROR:  Thank you, Your Honor.

11          (End of bench conference.)

12          THE COURT:  Folks, you don't have to come to the

13  bench unless you really want to, so if it's not a personal

14  matter, we'll get you on the record, but you can stay in your

15  seat.  So I'm just letting you know that.

16          (Bench conference on the record.)

17          THE COURT:  Yes, sir.  Your name again?

18          THE PROSPECTIVE JUROR:  Scott Brown, B-r-o-w-n.  It's

19  under Norman.

20          My wife has a medical procedure this week, a

21  colonoscopy.  I'm the only one home, so I need to be with her,

22  I believe.  Next week, she's traveling visiting her ailing

23  father in St. Louis.  I'm the only one home for that.

24          Later next week, I have business travel, and then the

25  topper is the following week, we have expensive ticket

1    reservations for Utah to an event.

2            THE COURT:  All right.  So the last week of January,

3    you've got prepaid tickets?

4            THE PROSPECTIVE JUROR:  Yeah, yeah.

5            THE COURT:  All right, thank you, sir.

6            THE PROSPECTIVE JUROR:  Okay.

7            THE COURT:  All right, the next witness -- the next

8    juror?  Yes, sir, your name, please?

9            THE PROSPECTIVE JUROR:  Matthew Balser, B-a-l-s-e-r.

10           THE COURT:  Yes, Mr. Balser.

11           THE PROSPECTIVE JUROR:  As of yesterday, I was

12   accepted and enrolled into a mandatory one-month training

13   academy for employment at the NRL in Chantilly, and it would

14   start Monday the 19th.

15           THE COURT:  How are you employed right now?

16           THE PROSPECTIVE JUROR:  Not by the NRL.  A different

17   job.

18           THE COURT:  All right, so it's a new job.

19           THE PROSPECTIVE JUROR:  But in order to get it, I

20   must attend this academy 8 a.m. to 5 p.m.

21           THE COURT:  Okay.  Thank you, sir.

22           THE PROSPECTIVE JUROR:  Thank you.

23           THE COURT:  Yes, sir, your name, please?

24           THE PROSPECTIVE JUROR:  Matthew Friel.

25           THE COURT:  Yes, Mr. Friel.

1              THE PROSPECTIVE JUROR:  I'm a full-time college

2    student.

3              THE COURT:  Yeah, I thought you must be, looking at

4    your age.  George Mason?

5              THE PROSPECTIVE JUROR:  No.  I'm actually going to

6    Northern Virginia Community College, but this is my final

7    semester before I transfer to George Mason actually.

8              THE COURT:  Okay.

9              THE PROSPECTIVE JUROR:  I'm just going to have a lot

10   of school-related obligations.

11             THE COURT:  Are you on semester break right now or

12   are you actually back in classes?

13             THE PROSPECTIVE JUROR:  My classes actually began

14   yesterday.

15             THE COURT:  All right.  They're five days a week?

16             THE PROSPECTIVE JUROR:  Three days a week:  Monday,

17   Tuesday, and Thursday.

18             THE COURT:  And what time do they meet?

19             THE PROSPECTIVE JUROR:  On Monday, it is from about

20   eight to twelve, Tuesday is about 12:30 to three, and about

21   12:30 to three on Thursday as well.

22             THE COURT:  F-r-i-e-l is the last name?

23             THE PROSPECTIVE JUROR:  Yes, ma'am.

24             THE COURT:  Thank you, Mr. Friel.

25             THE PROSPECTIVE JUROR:  Thank you.

1          THE COURT:  Yes, ma'am, your name, please?

2          THE PROSPECTIVE JUROR:  Maridel Anderson.

3          THE COURT:  How do you spell the last name?

4          THE PROSPECTIVE JUROR:  A-n-d-e-r-s-o-n, Anderson.

5          THE COURT:  Maridel.

6          THE PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Yes, ma'am.

8          THE PROSPECTIVE JUROR:  I have a diabetic -- I'm a

9    diabetic, and sometimes I shake.

10         THE COURT:  Okay.

11         THE PROSPECTIVE JUROR:  And I'm doing home day care

12   in the house, and I babysit also my grandbaby because my

13   daughter, she go to school.

14         THE COURT:  All right, thank you, ma'am.

15         THE PROSPECTIVE JUROR:  Thanks.

16         THE COURT:  Yes, ma'am.

17         THE PROSPECTIVE JUROR:  Good morning, Your Honor.  My

18   name is Jovelita Fonseca, Your Honor.

19         THE COURT:  Can you spell your last name?

20         THE PROSPECTIVE JUROR:  F-o-n-s-e-c-a.

21         THE COURT:  Fonseca?

22         THE PROSPECTIVE JUROR:  Yes.  I've been sick with

23   bronchitis for --

24         THE COURT:  I'm sorry?

25         THE PROSPECTIVE JUROR:  I've been sick with

1    bronchitis for almost a month now.

2            THE COURT:  So you're feeling sick today?

3            THE PROSPECTIVE JUROR:  I'm not being --

4            THE COURT:  All right.  Are you having trouble

5    understanding my English?

6            THE PROSPECTIVE JUROR:  No, Your Honor.

7            THE COURT:  All right.  But you're just not feeling

8    well?

9            THE PROSPECTIVE JUROR:  Yes.

10            THE COURT:  All right, thank you, Ms. Fonseca.

11            THE PROSPECTIVE JUROR:  Thank you, Your Honor.

12            THE COURT:  Yes, ma'am, your name, please?

13            THE PROSPECTIVE JUROR:  Yvonne Stephens.

14            THE COURT:  What's the last name?

15            THE PROSPECTIVE JUROR:  Stephens.

16            THE COURT:  Yes, Ms. Stephens.  Yes, ma'am.

17            THE PROSPECTIVE JUROR:  For two reasons:  One, I have

18    two elderly parents that are really sick, and at any time, I

19    would have probably the need to go out of town to go check on

20    them because they have been in and out of the hospital, as well

21    as I work at a university, I'm the director of one of the labs,

22    and they have nobody to keep that lab open while I'm here,

23    because like today, it's shut, so the students and no one can

24    use the labs.

25            THE COURT:  Which school do you work for?

1              THE PROSPECTIVE JUROR:  University of Mary

2    Washington.

3              THE COURT:  And they don't have another lab director?

4              THE PROSPECTIVE JUROR:  No, I'm the only one.

5              THE COURT:  So how many students are dislocated

6    today?

7              THE PROSPECTIVE JUROR:  Quite a few.

8              THE COURT:  What kind of a lab is it?

9              THE PROSPECTIVE JUROR:  It's a language lab.

10             THE COURT:  Language lab.

11             THE PROSPECTIVE JUROR:  And the students come in to

12   do listening lessons on the computers, and sometimes they have

13   films they've got to watch, and classes are sometimes held in

14   there as well.

15             THE COURT:  And so they can't use that lab if you're

16   not there?

17             THE PROSPECTIVE JUROR:  Exactly.

18             THE COURT:  All right, thank you, Ms. Stephens.

19             THE PROSPECTIVE JUROR:  Good morning, Judge.  My name

20   is Lien Tran.  T-r-a-n the last name.

21             THE COURT:  I'm sorry, how do you spell the last

22   name?

23             THE PROSPECTIVE JUROR:  T-r-a-n.

24             THE COURT:  It's Tran.

25             THE PROSPECTIVE JUROR:  Yes.  I have appointment on

1    today I already cancel and have appointment next one for my

2    eye, I have some problem with my eye, on January 30.

3              THE COURT:  On January 30.

4              THE PROSPECTIVE JUROR:  Yes, 9:30.

5              THE COURT:  Where would that appointment be?  What

6    jurisdiction?

7              THE PROSPECTIVE JUROR:  The appointment for my eye

8    because I have diabetes, so seven months already, after that

9    they have to check up on my eyes.

10             THE COURT:  Where is the appointment?

11             THE PROSPECTIVE JUROR:  The appointment is Leesburg

12   Pike.

13             THE COURT:  Falls Church?

14             THE PROSPECTIVE JUROR:  Yes.

15             THE COURT:  What time is that?

16             THE PROSPECTIVE JUROR:  9:30.

17             THE COURT:  After that, could you be back here by

18   lunchtime?

19             THE PROSPECTIVE JUROR:  Lunchtime?  What time?

20             THE COURT:  I don't know, 11:00-noon?

21             THE PROSPECTIVE JUROR:  (Nodding head.)

22             THE COURT:  So the 30th is the only problem you have?

23             THE PROSPECTIVE JUROR:  Yes, only 1-30.

24             THE COURT:  Other than that, you don't have any

25   problem?

1          THE PROSPECTIVE JUROR:  I don't know yet, but 30 is

2    the one important.

3          THE COURT:  All right, very good.  Thank you.

4          THE PROSPECTIVE JUROR:  All right, thank you.

5          THE COURT:  Yes, ma'am, your name, please?

6          THE PROSPECTIVE JUROR:  Gilmore, Kristi Gilmore.  And

7    I just wanted to mention that my husband is legally blind.  I

8    mean, he's completely blind except in his left eye, which he

9    has light and dark perception, and he is employed, and it

10   shouldn't be a problem for me to serve unless there's a

11   emergency for me.  For instance, two weeks ago, there was a

12   small fire at OPM, and I had to go pick him up, you know.

13         So I just wanted to bring that --

14         THE COURT:  That's fine.  But otherwise, you could

15   serve as a juror?

16         THE PROSPECTIVE JUROR:  Yes, yes.

17         THE COURT:  All right, thank you, Ms. Gilmore.

18         THE PROSPECTIVE JUROR:  Okay.  Thank you.

19         THE COURT:  Yes, sir.

20         THE PROSPECTIVE JUROR:  Hernandez.

21         THE COURT:  Mr. Hernandez.

22         THE PROSPECTIVE JUROR:  Yes.  And the reason I wanted

23   to come up here is because I know this is a special case, and I

24   believe I have some time that they use another car, I don't

25   understand, and I would like to be cleared from being part of

```
 1   this jury.

 2           THE COURT:  All right, thank you, Mr. Hernandez.

 3           THE PROSPECTIVE JUROR:  That's fine.

 4           THE COURT:  You can go back.

 5           (End of bench conference.)

 6           THE COURT:  All right, ladies and gentlemen, I've

 7   asked you a broad range of questions, and you-all, I think, now

 8   understand the reason why I am asking you these questions, but

 9   if there's any other thing in your life experience that you've

10   had or thing on your schedule that you haven't already told me

11   about that you feel could interfere with your ability to be a

12   fully attentive and impartial juror for the duration of the

13   trial, this is the time to let me know.  Is there anybody?

14           All right, some of you I've already heard from.

15   Ma'am, tell me your name again, please.

16           THE PROSPECTIVE JUROR:  Donna Curtin.

17           THE COURT:  All right, Ms. Curtin, I don't need to

18   hear from you again.

19           THE PROSPECTIVE JUROR:  Okay.

20           THE COURT:  Just one second.

21           All right, the next person who had a hand up?  Yes,

22   ma'am, your name, please?

23           THE PROSPECTIVE JUROR:  Nancy Gofus.

24           THE COURT:  Yes, Ms. Gofus.

25           THE PROSPECTIVE JUROR:  And I am supposed to be
```

1    attending a conference for training incoming board chairs

2    beginning January 25.  I'm the incoming board chair on the

3    College of William and Mary Foundation Board.

4              THE COURT:  If you were unable to attend that, would

5    that be a serious problem for you or your school?

6              THE PROSPECTIVE JUROR:  You know, the college has

7    invested money for me to be an attendee of this, and I think

8    that would be lost.  That is the issue.

9              THE COURT:  And would that be all that day or just --

10             THE PROSPECTIVE JUROR:  No, it's in Naples, Florida.

11   It's a Sunday-through-Tuesday conference.

12             THE COURT:  All right, thank you, ma'am.

13             Who else?  Yes, your name, please?

14             THE PROSPECTIVE JUROR:  Gabriel Chu.

15             THE COURT:  I don't need to hear from you, Mr. Chu.

16   Thank you.

17             THE PROSPECTIVE JUROR:  You do not?

18             THE COURT:  No, that's all right.

19             Yes, ma'am, your name, please?

20             THE PROSPECTIVE JUROR:  I just think that I --

21             THE COURT:  I need your name.

22             THE PROSPECTIVE JUROR:  Oh, I'm sorry, Rebecca

23   Miller.

24             THE COURT:  Yes, Ms. Miller.

25             THE PROSPECTIVE JUROR:  I think I may know just

```
 1    professionally the sister of one of the attorneys on this side,

 2    of Mr. MacMahon.  I'm not 100 percent sure, but Middleburg is a

 3    small town, and so if he has a relative that's in the same

 4    business that I am, we may have worked together before.  So I

 5    need to disclose that.

 6              THE COURT:  In any respect, do you feel -- first of

 7    all, Mr. MacMahon, do you have a sister who works in

 8    Middleburg?

 9              MR. MAC MAHON:  Two sisters, Your Honor.

10              THE PROSPECTIVE JUROR:  I only know one.

11                          (Laughter.)

12              THE COURT:  All right.  And, I mean, would you

13    consider yourself a close friend?

14              THE PROSPECTIVE JUROR:  No, not at all.  It's

15    strictly professional, and I don't think it would influence my

16    decision in any way, shape, or form, but I felt like I needed

17    to disclose that.

18              THE COURT:  Thank you, Ms. Miller.  That's fine.

19              All right, and was there somebody else?  Yes, in the

20    back there, your name, please?

21              THE PROSPECTIVE JUROR:  Steve Lee.

22              THE COURT:  Mr. Lee?  Yes.

23              THE PROSPECTIVE JUROR:  I've got personal foreign

24    travel scheduled from the 22nd through the 25th.

25              THE COURT:  And is that prepaid?
```

1           THE PROSPECTIVE JUROR:  Yes.

2           THE COURT:  All right, thank you, sir.

3           Anybody else?  Nobody else in the center.  Nobody on

4     the left?

5                        (No response.)

6           THE COURT:  All right, just on the right then.  Yes,

7     your name, sir?

8           THE PROSPECTIVE JUROR:  Noureddine Elabassi.  I don't

9     know how you determine this, but I'm the sole owner, Your

10    Honor, of three businesses that employs about 70 people, and I

11    run the day-to-day operation for all the three businesses.

12          THE COURT:  Would it be possible for there to be

13    somebody else to do that for you while you're here?

14          THE PROSPECTIVE JUROR:  I have assistants.

15          THE COURT:  You have assistants.

16          THE PROSPECTIVE JUROR:  But there are certain jobs

17    that they do with their other jobs that I'm the sole person.

18          THE COURT:  Well, if you were chosen to be a juror,

19    would you feel in any respect pressure from your personal

20    business commitments such that they might be a distraction?

21          THE PROSPECTIVE JUROR:  Yes, ma'am.

22          THE COURT:  All right, thank you, sir.

23          Anybody else?  Yes, your name, please?

24          THE PROSPECTIVE JUROR:  My name is Thuong Nguyen.

25          THE COURT:  Yes, Mr. Nguyen.

1          THE PROSPECTIVE JUROR:   Juror No. 73.

2          THE COURT:   Yes, sir.

3          THE PROSPECTIVE JUROR:   I was a refugee coming from a

4    totalitarian regime, so I, from time to time, I have strong

5    opposition to those oppressive regime.   I don't know how that

6    is going to affect my, this case.

7          THE COURT:   Well, I mentioned that the Iranian

8    nuclear weapons program will be an issue in this case.   Do you

9    think because Iran is going to be a little bit involved in this

10   case, that that might be a problem for you?

11         THE PROSPECTIVE JUROR:   I don't think so.   I will try

12   to be as impartial as possible.

13         THE COURT:   All right, thank you, Mr. Nguyen.

14         Anybody else?

15                        (No response.)

16         THE COURT:   All right.   Counsel, approach the bench.

17         (Bench conference on the record.)

18         THE COURT:   Okay.   All right, first of all, is there

19   any objection to the Court's voir dire?

20         MR. OLSHAN:   I don't believe so.

21         MR. FITZPATRICK:   No.

22         THE COURT:   Any additional questions the government

23   wants the Court to ask the pool?

24         MR. FITZPATRICK:   No.

25         MR. OLSHAN:   No.

1          THE COURT:  No?  All right.

2          Any objection to the voir dire?

3          MR. MAC MAHON:  No, Your Honor.

4          THE COURT:  Are there any additional questions you

5     want asked of the pool?

6          MR. MAC MAHON:  No, Your Honor.

7          THE COURT:  All right.  Here are the ones who I think

8     we need to strike.  You-all let me know if there's an

9     objection:  No. 1, Maridel Anderson; No. 2, David Anderson; No.

10    3, Matthew Balser; No. 4, Ross Banfield; 9, Norman Brown; 16,

11    Gabriel Chu; 19, Donna Curtin; 24, Noureddine Elabassi; 25,

12    Bernard Engel; 28, Jovelita Fonseca; 29, Matthew Friel; 34,

13    Kristine Gilson; 35, Paul Glen; 36, Nancy Gofus; 39, Kathleen

14    Gregorson; 44, Ivan Hernandez; 48, Keric Hopkins; 52, Nancy

15    Ingalsbe; 55, Angela Keaton; 56, Sozina Khan; 58, David Knox;

16    59, Steve Lee; 62, Matthew Lowman; 65, George McCool; 66, Peggy

17    McCoy.

18          MR. TRUMP:  What was the last one, Your Honor?

19          THE COURT:  McCoy.  66, McCoy.

20          79, Maria Pierce; 81, Margaret Rowe; 82, Gloria Ann

21    Roy; 86, Harriet Shriver; 88, Christopher Stanley; 90, Yvonne

22    Watson Stephens; 93, Sheena Tosta; and 95, Phan Vu.

23          All right, is there any objection to those?  Those

24    jurors either said they had conflicts that would result in

25    there being a hardship or they had medical issues or they have

```
 1    biases or prejudices that gave the Court concern based upon

 2    what they said during their answers.

 3              MR. OLSHAN:  One moment.

 4              THE COURT:  Yeah.

 5              MR. OLSHAN:  Your Honor, I believe you said Juror 35,

 6    Paul Glen.

 7              THE COURT:  Yes.

 8              MR. OLSHAN:  I believe Mr. Paul stated that --

 9              MR. POLLACK:  We can't hear you.

10              MR. OLSHAN:  I believe Mr. Paul stated that --

11              THE COURT:  Mr. Glen.

12              MR. OLSHAN:  Excuse me, thank you.  Mr. Glen stated

13    that despite his employment, he could render a fair verdict in

14    this case.

15              THE COURT:  I was concerned about him just being too

16    close to the issues in this case.  I'm not -- I don't think

17    everybody who has a clearance necessarily should be stricken,

18    but his answer concerned me.

19              What's your view on 35?  Do you want him struck or

20    not?

21              MR. MAC MAHON:  Yes, Your Honor.

22              THE COURT:  Yeah, I'm going to continue with that.

23              MR. OLSHAN:  For cause.

24              THE COURT:  For cause, yeah.

25              MR. MAC MAHON:  I have him circled for that reason.
```

1            THE COURT:  Yeah.  I've already -- did you-all have

2     any objections to the ones I've stricken for cause?

3            MR. MAC MAHON:  I don't believe so, Your Honor.

4            MR. TRUMP:  I take it, Your Honor, that you feel we

5     could work around 92?

6            THE COURT:  Let me see.

7            MR. MAC MAHON:  Jim, can you speak up?  I can't hear

8     you, I'm sorry.

9            THE COURT:  Yes.  Mr. Trump asked if we could work

10    around -- I just, by our count, we have enough extra jurors.

11    The critical mass that we need for you to use all of your

12    strikes and we still get 14 jurors is 32, and we still have

13    some extra jurors that I can work with, and so I think I would

14    strike 92 because again, I'm concerned about any jurors who

15    can't be here for the full time.  He had a conflict on January

16    29.

17            That's what you're asking me?

18            MR. TRUMP:  Yes.  I just didn't know whether it was

19    an oversight or you had already determined that.

20            THE COURT:  No, I was concerned to make sure we had

21    enough jurors left in the pool, but 92 will also be out.

22            And that gives me also concern about 73, Mr. Nguyen,

23    who feels so strongly about totalitarian regimes that he might

24    have a problem in this case.  Anybody want him stricken for

25    cause?

1        If nobody's asking for it, I'll leave him in the

2   pool, but that gives me a little bit of a concern because Iran

3   is involved in this case.   Nobody cares?

4        MR. MAC MAHON:   No, not for the defense.

5        THE COURT:   All right, we'll leave him in.

6        Is there anybody else?

7        We have Mr. -- 84 is Sidney Shaw.   He's got a wife

8   with surgery on January 21.   He wasn't sure, but, you know,

9   again, I don't want all of a sudden on the 20th to hear that a

10  juror is not going to be here.   So do you want me to strike him

11  now?

12       You don't care?

13       MR. MAC MAHON:   I don't take a position on that, Your

14  Honor.

15       MR. OLSHAN:   We don't have a position, either.   If

16  the Court -- if there are enough left --

17       THE COURT:   There are enough jurors in the pool, let

18  me strike 84 as well, all right?

19       So were there any other people who the government

20  wants the Court to strike for cause?

21       While they're doing it, are there any others you-all

22  want stricken for cause?

23       MR. MAC MAHON:   Your Honor, if it's okay, we are both

24  keeping different lists, but I had David Anderson as a CIA

25  employee.

1           THE COURT:  He's out.

2           MR. MAC MAHON:  He's already out.  And then a man

3   named Frith, he's a military officer.

4           MR. TRUMP:  What number?

5           MR. MAC MAHON:  He's 30.  He wasn't as close as the

6   other one you struck, but I thought he was also a little too

7   close for comfort.

8           THE COURT:  No, I didn't see anything.  I watch them

9   pretty carefully when they answer.  I think he can be a

10  straight shooter.  I'll overrule that request.

11          MR. MAC MAHON:  And the gentleman -- oh, we already

12  got him, I think -- who talked about the hung jury, I think

13  that's Mr. Anderson again.

14          MR. OLSHAN:  He's out.

15          THE COURT:  Yes, he's out.

16          MR. MAC MAHON:  He's out.

17          Mr. Pollack may have something that -- we haven't had

18  a chance to coordinate.

19          MR. POLLACK:  Your Honor, I have in my notes No. 98,

20  Debra Williams --

21          THE COURT:  Right.

22          MR. POLLACK:  -- works for the Department of Homeland

23  Security but actually sits at the CIA and has had conversations

24  with members of the CIA.

25          I felt that she may be too steeped in --

1        THE COURT:  Well, you know, she sat on two juries,

2   and one was a not guilty verdict, so, I mean, she clearly knows

3   how to be an impartial judge.

4        MR. POLLACK:  I understand, but there's a difference

5   between a domestic abuse case and a case involving national

6   security issues, and that's her area of expertise.

7        THE COURT:  Well, I don't think that necessarily

8   disqualifies a person.  I don't think again that there was

9   enough, any of what she said to give me concern.  So I

10  understand your concern, but I'm going to overrule it.

11       MR. POLLACK:  Thank you, Your Honor.

12       MR. OLSHAN:  I was just curious if the Court has done

13  a rough count of about how many we've got left after all these.

14       THE COURT:  There's enough.

15       MR. OLSHAN:  Okay.

16       THE COURT:  You've got all your strikes.  Don't worry

17  about it.

18       MR. OLSHAN:  The only issue is when we hand the

19  jurors a list of witnesses, we could lose a couple more.

20       THE COURT:  You might lose one or two, but we're all

21  right.

22       MR. OLSHAN:  Okay.

23       THE COURT:  Anything further?

24                    (No response.)

25       THE COURT:  I think given the hour, since you're up

1   here, what we're going to do is once we get the jury seated and

2   I've given them preliminary instructions, we'll take the lunch

3   break.  So the two opening statements will be back to back

4   without a break because there's not going to be enough time for

5   you to do an opening statement before 1:00, all right?

6          And it does mean we will be calling witnesses today,

7   so your first couple of witnesses need to be in the building by

8   2:00 or so.

9          MR. OLSHAN:  We will be prepared.

10          THE COURT:  Anything further?  Because we need to get

11   this moving.  No?

12          MR. POLLACK:  (Shaking head.)

13          THE COURT:  All right, then I find the remainder of

14   the pool to be without objection, and we'll go ahead and we'll

15   start selecting them.  Once we have the 14 in the box, I'll

16   explain to them that you'll show them the list of witnesses,

17   give them a minute to see if they recognize any of the names.

18   If they don't, they'll return the list to Mr. Wood, and then

19   we'll go ahead and do the strikes, okay?

20          MR. OLSHAN:  Your Honor, if they do recognize a name,

21   we'll all come up here?

22          THE COURT:  Yes.  I'm going to ask them to approach

23   the bench, and we'll do that up here at the bench, all right?

24   Very good.

25          MR. MAC MAHON:  Thank you, Your Honor.

```
 1                (End of bench conference.)

 2                THE CLERK:  If I call your name, please come forward

 3     and have a seat in the jury box:  Juror No. 8, Kelsey

 4     Brosnahan; Juror No. 68, Vernon Michelsen; Juror No. 89, Kim

 5     Stenberg; Juror No. 57, Sandra Khouri; Juror No. 94, Lien Tran;

 6     Juror No. 43, Alan Herman; Juror No. 101, Suzanne Yerks.

 7                THE COURT:  Mr. Herman, you need to go in first.  We

 8     have to keep you in order here.

 9                THE CLERK:  Juror No. 70, Rebecca Miller; Juror No.

10     5, Donna Beitzel; Juror No. 30, Steven Frith; Juror No. 78,

11     Nancy Perry; Juror No. 37, Amanda Granlund; Juror No. 42, David

12     Harrison; Juror No. 26, Gregory Fabian.

13                THE COURT:  Now, ladies and gentlemen, before we,

14     before we get started, Mr. Wood is going to give each of you a

15     slip of paper that has a list of potential witness names on it.

16     Actually, my law clerk is going to do this for you.  I want you

17     each to look at the list of names, and let us know if you

18     believe you recognize any of the names on this list.

19                We need one more for the first row.

20                All right, do each of you have a list?  We need one

21     more for the -- yeah.

22                Do any of you recognize any of the names on that

23     list?  I'm sorry, if you do, you need to raise your hand.

24                All right, let me start in the front row.  Yes,

25     you're Mr. Mickelson?
```

1        MR. OLSHAN:  Your Honor, can we approach?

2        THE COURT:  Yeah.  I'm sorry.

3        THE PROSPECTIVE JUROR:  The name Condaleezza Rice,

4   everybody knows who that is.

5        THE COURT:  All right, putting aside Condaleezza

6   Rice, thank you.  Other than that, is there any other name?

7        THE PROSPECTIVE JUROR:  No, ma'am.

8        THE COURT:  Thank you for bringing that to our

9   attention.

10        Ladies and gentlemen, other than Condaleezza Rice,

11   are there any other names on that list that anybody recognizes?

12                    (No response.)

13        THE COURT:  No?  You can return those lists to

14   Mr. Wood, please.

15        THE CLERK:  If I call your name, please -- you may

16   exit the courtroom.  Please check in with the Clerk's Office

17   before exiting the building.

18        Juror No. 94, Lien Tran; Juror No. 70, Rebecca

19   Miller; Juror No. 89, Kim Stenberg; Juror No. 5, Donna Beitzel;

20   Juror No. 30, Steven Frith; Juror No. 68, Vernon Michelsen;

21   Juror No. 78, Nancy Perry.

22        If I call your name, please come forward and have a

23   seat in the jury box.

24        THE COURT:  And, Mr. Wood, as you put the new juror

25   in the box, give them the list, yeah.

1          Juror No. 49, Aaron Hunt; Juror No. 41, Jennie Hamm;

2    Juror No. 11, James Carnes; Juror No. 40, Kathleen Halasz;

3    Juror No. 6, Laura Billings; Juror No. 73, Thuong Nguyen; Juror

4    No. 12, Anne Cassidy.

5          THE COURT:  The newly called persons, again, other

6    than Condaleezza Rice, do any of you recognize any of the

7    witnesses on that list that's been given to you?

8          Anybody?  No?

9                          (Jurors shaking heads.)

10         THE COURT:  All right, then the seven jurors who just

11   got the -- get the list from them first.

12         If you'll just hand those up to us, please?

13         THE CLERK:  If I call your name, you may exit the

14   courtroom.  Please check in with the Clerk's Office before

15   exiting the building.  Juror No. 40, Kathleen Halasz; Juror No.

16   11, James Carnes.

17         If I call your name, please come forward and have a

18   seat in the jury box:  Juror No. 51, Andrew Ihle; Juror No. 47,

19   Charles Hoffman.

20         THE COURT:  And again, Mr. Hoffman and Mr. Ihle, I'll

21   ask you to look at that list and see other than Condaleezza

22   Rice, whether you recognize any of the names on that list.  No?

23                          (Jurors shaking heads.)

24         THE COURT:  No?  All right, very good.  Hand the list

25   back to Mr. Wood.

1        MR. MAC MAHON:  Your Honor, we were blocked.  We

2   couldn't see which one was Mr. Ihle when he came in.

3        THE COURT:  Mr. Ihle, would you mind standing up?

4                    (Prospective Juror Ihle stood.)

5        MR. MAC MAHON:  Thank you, sir.

6        THE CLERK:  If I call your name, you may exit the

7   courtroom.  Please check in with the Clerk's Office before

8   exiting the building.  Juror No. 47, Charles Hoffman.

9        If I call your name, please come forward and have a

10  seat in the jury box.  Juror No. 83, Gregory Scites.

11       THE COURT:  Do you recognize any names, Mr. Scites?

12                    (Prospective Juror shaking head.)

13       THE COURT:  No?  Thank you.

14       THE CLERK:  Juror No. 83, Gregory Scites, you may

15  exit the courtroom.  Please check in with the Clerk's Office

16  before exiting the building.

17       If I call your name, please come forward and have a

18  seat in the jury box.  Juror No. 60, Caitlin Lhommedieu.

19       THE COURT:  Ms. Lhommedieu, do you see any names on

20  that list?

21                    (Prospective Juror shaking head.)

22       THE COURT:  No?  All right, thank you.

23       THE CLERK:  Juror No. 60, Caitlin Lhommedieu, you may

24  exit the courtroom.  Please check in with the Clerk's Office

25  before exiting the building.

1          Juror No. 71, Amanda Morris, please come forward and

2     have a seat in the jury box.

3          THE COURT:  Ms. Morris, do you recognize any names?

4     No?

5          THE PROSPECTIVE JUROR:  No.

6          THE COURT:  All right, thank you.

7          THE CLERK:  Juror No. 71, Amanda Morris, you may exit

8     the courtroom.  Please check in with the Clerk's Office before

9     exiting the building.

10          Juror No. 74, Scott Oden, please come forward and

11     have a seat in the, in the jury box.

12          THE COURT:  Mr. Oden, you don't recognize any names?

13          THE PROSPECTIVE JUROR:  No.

14          THE COURT:  All right, thank you, sir.

15          THE CLERK:  Juror No. 74, Scott Oden, you may exit

16     the courtroom.  Please check in with the Clerk's Office before

17     exiting the building.

18          Juror No. 80, Manavi Puri, please come forward and

19     have a seat in the jury box.

20          THE COURT:  No, Ms. Puri?  No names?

21          THE PROSPECTIVE JUROR:  No.

22          THE COURT:  All right, thank you.

23          THE CLERK:  Juror No. 80, Manavi Puri, you may exit

24     the courtroom.  Please check in with the Clerk's Office before

25     exiting the building.

126

```
 1              Juror No. 76, Mahesh Panwar, please come forward and
 2   have a seat in the jury box.
 3              THE COURT:  Mr. Panwar, do you recognize any names on
 4   that list?
 5              THE PROSPECTIVE JUROR:  Not on the list.
 6              THE COURT:  All right, thank you.
 7              THE CLERK:  Ladies and gentlemen of the jury, would
 8   you please stand and raise your right hand.
 9                         (Jurors affirmed.)
10              THE COURT:  All right, we have now selected the 14
11   people who will be our jury.  I want to thank the remainder of
12   the pool for being here this morning.  You are all free to
13   leave at this time.  Please leave quietly.  Check out through
14   the Clerk's Office.  We do appreciate your attendance this
15   morning.
16              I know it's been a long morning, folks, and in about
17   five minutes, I'm going to give you your morning lunch break,
18   all right?  But I do want to take just a few minutes to give
19   you some very important instructions.
20              Mr. Panwar and Ms. Brosnahan, if you look to your
21   right, you'll see a series of pads and paper.  Since it's going
22   to be a long trial, I'm giving each of you, so if you could
23   just, you know, take and pass them down, a pen and notepad if
24   you want to take notes during the trial.
25              Now, I just need to give you a caution because there
```

1    actually are a lot of judges who don't let jurors take notes.

2    There's a fear that you'll be so involved in writing things

3    down, you won't be watching the witnesses or really paying

4    attention, and we don't want your note taking to be a

5    distraction, but there are people who find that taking notes

6    helps them keep their attention focused, and it makes them more

7    comfortable when they have to decide something, so we're giving

8    you notebooks.

9         You should understand that your notes are by no means

10   a full record of what the proceedings are.  None of you is a

11   trained court stenographer, I don't believe we have any

12   stenographers here, and in any case, you should make sure that

13   you understand your notes are simply an individual memory aid.

14   Your notes are not evidence.  They're not to be shared with the

15   other jurors.  They're just there to help you.

16        Anytime we have a recess, your notes will be

17   collected by the clerk, and so you should probably put your

18   name so we get the right notebook back to you, and we'll get

19   them back to you at the beginning of each session of the

20   proceedings.

21        Now, I want to give you a little overview as to how a

22   trial is structured so you know what to expect.  When we get

23   back from the one-hour lunch break, we will begin with the

24   opening statements.  The opening statements are just basically

25   a preview of what each side believes the case will show.

1        You might think about an opening statement like the

2   cover of the box of a jigsaw puzzle.  If any of you do those

3   puzzles, you know that the box cover has the completed picture.

4   You put all the pieces together, and this is what you get.

5        But with opening statements, you often get two

6   different box covers, and at the end of the day, it will be

7   your job to decide whether any of those pictures have been met

8   by the evidence in the case.

9        Now, because the government has the burden of proof

10   in a criminal case, the rules allow the government to go first

11   at each stage of the trial, and that means that one of the

12   prosecutors will make the first opening statement, and then

13   defense counsel will have an opportunity to make an opening

14   statement on behalf of the defendant, in other words, to give

15   you a different box cover.

16        After we complete the opening statements, then we are

17   going to begin the evidence portion of the trial, and the

18   evidence in the trial consists of three categories of

19   information.  First would be stipulations.  When both parties

20   to a lawsuit agree that certain facts are the case and they're

21   not going to put any evidence on to establish that fact, they

22   can stipulate to the fact, and then it's up to you, the jury,

23   whether to accept the fact or not, but there won't be any

24   evidence presented to support that fact because the parties are

25   agreeing that it is the case.

1        The other type of evidence is the testimony of

2   witnesses.  Now, with one exception, all the witnesses in this

3   case are going to be -- actually, there are more than one

4   exception.  Most of the witnesses in this case will be

5   testifying live in the courtroom from this witness box.

6        As I indicated to you earlier, the first couple of

7   days, we're going to have witnesses who are -- whose identity

8   needs to be somewhat cloaked.  Those witnesses you will only

9   hear referred to by their first name and a last initial, like,

10  you know, Suzie S.  We will have a large screen across the

11  courtroom.  I alerted you earlier that we would be doing that,

12  and you've all told me that wouldn't be a problem for you in

13  evaluating that witness's testimony.

14       When a witness is called, the side that calls that

15  witness first conducts what we call the direct examination.

16  Now, since the government goes first, it's going to call all of

17  its witnesses and put all its evidence on first.  So the

18  government will call their first witness, ask all the questions

19  they have of the witness.  Then defense counsel will have the

20  opportunity to ask questions of that witness.  That's called

21  cross-examination.

22       When the defense attorney has finished with that line

23  of questioning, if the government believes that they need to

24  address some of the issues that came up during the cross, they

25  get a chance to ask another round of questions.  That's called

1    the redirect.  And defense counsel can actually ask one last

2    round of questions.  That's called the recross.

3            Then we're done with that witness.  He or she steps

4    down, the next witness comes on, and we will go that way until

5    the government has called all of its witnesses.

6            We are also going to have a witness who will testify

7    via video deposition.  In that case, that particular witness

8    has a very serious medical condition and would not be able to

9    safely travel to the courthouse, and so what happened is last

10   week, he was deposed, and that means actually he was in a room,

11   he was under an oath to tell the truth.

12           Lawyers for both sides were present.  A video camera

13   was present.  A court stenographer was present.  I was actually

14   present at a distant location.  The defendant, Mr. Sterling was

15   in the room.  And that man was asked questions by both the

16   prosecutor and the defense in exactly the same order:  direct

17   exam, cross, redirect, recross.

18           So you will have that testimony, and I believe there

19   may be another witness coming in via a transcript.  Again, all

20   that testimony that you have was done with the witness being

21   under oath.  You are at a disadvantage in not having in some

22   cases the witness physically in the courtroom, but you're to

23   give that testimony such credibility as you are able to.

24           In any case, once the government has put on all of

25   its witnesses, the other thing the government will do during

1   its case-in-chief is move various exhibits -- physical

2   exhibits, documents, copies of cables, that sort of thing --

3   into evidence.  I believe chapter 9 of the book will be going

4   into evidence.

5        When the government has put all of its evidence in,

6   you will hear the prosecutors say that they rest.  That means

7   they believe they've put on all of their evidence.

8        Then we turn to the defense.  Now, in a criminal

9   case, because the defendant begins the trial with a presumption

10  of innocence, there is absolutely no obligation on a defendant

11  to put on any evidence whatsoever because it's the government's

12  burden to prove a defendant guilty.  It is not -- there is no

13  burden on a defendant to prove his innocence.  That's not our

14  legal system.  So the defense may put on evidence, or it may

15  choose not to.

16       If the defense does call witnesses, then we just

17  reverse the order; in other words, either Mr. Pollack or

18  Mr. MacMahon will ask the first line of questioning, that's the

19  direct examination; then the prosecutors can cross that

20  witness; and then if the defense counsel feel that something

21  came up during cross that they need to further address, they

22  have the redirect; and then the government can do a recross if

23  they feel it's necessary; and we go that way until the defense

24  has produced whatever evidence the defense wants to.

25       Lastly, the government does get a chance to rebut

1    that evidence if they want to put on a rebuttal case, in which

2    case we will then shift back with the government calling its

3    witness and doing the direct exam, and we'll go that way until

4    all the evidence is in.

5         Now, during the course of the trial, a lawyer may

6    object to a question that's being asked or to an answer that's

7    being given, and it's a lawyer's job to object when the lawyer

8    believes that something is happening in the trial that violates

9    some rule of law or some ruling that the Court has made, or in

10   this case, because we have potentially some classified

11   information, if there's a classification issue that has to be

12   addressed, and it's going to be my job as the judge to rule on

13   the objection.

14        Now, if I think that the objection has a good basis,

15   I will either say that I'm granting the objection or the

16   objection is sustained, and those words mean the same thing.

17   On the other hand, if I don't think that there's any problem, I

18   will either say "Objection overruled" or "denied," and those

19   words mean the same thing.

20        You must be careful not to draw any inference against

21   a party who may have made an objection or try to draw any

22   inference from my ruling.  The fact that a court grants or

23   denies an objection doesn't mean the court thinks that that

24   side should win or lose the case.  It's much like a referee or

25   an umpire during a sporting event that simply calls a play the

1    way that person thinks it should be called and doesn't do it to

2    help one side or to hurt the other.

3            Now, once all the evidence is in, the next phase of

4    the trial is what we call closing argument.  That's the time

5    when the lawyers are trying to argue from the evidence

6    presented during the trial to the ultimate conclusions they

7    want you to reach.  Again, the government goes first because it

8    has the burden of proof; then the defense makes its closing

9    argument; and because of the burden of proof being so high on

10   the government, they are allowed to make the final argument,

11   which is called a rebuttal.

12           Then it becomes my job as the judge to give you the

13   legal instructions that you must use in deciding the case.  I

14   will give those to you orally in court, but you will also have

15   written copies of those instructions that you will be able to

16   take into the jury room when you go to consider this case.

17           Now, it's extremely important that jurors follow

18   certain rules of conduct.  The first rule of conduct is, No. 1,

19   you should not start deciding any issue in this case until you

20   have heard all the evidence, all the arguments of counsel, and

21   gotten the instructions from the Court, and that means that

22   when you're on a break or a recess, you can get to know each

23   other, you can talk about the weather, about football season,

24   whatever you want to talk about.  Do not talk about the trial

25   because we don't want you to start making up your mind about

134

1   issues.  You know, if you start to make up your mind and then

2   more evidence comes in down the road, you may not be able to

3   fully evaluate that evidence or change your mind about it, so

4   it's important to keep an open mind.

5           It's also extraordinarily important to make sure that

6   your thought process is not contaminated by anything outside of

7   this courtroom, so since you're going to be here for many days

8   and there are lots of people in the courthouse, you may be

9   standing in line in the cafeteria downstairs and hear two

10  people talking about the case, or you may bump into one of the

11  prosecutors or defense counsel or somebody who's previously

12  testified.

13          You should stay away from any of those contacts.  If

14  you think you've overheard something, you need to get away from

15  it and bring it immediately to my attention.

16          If you bump into one of the lawyers in an elevator

17  and the lawyer is sort of rude, tries to avoid eye contact or

18  the normal human reaction of smiling when you see somebody you

19  recognize, do not take that as an insult.  The attorneys are

20  trying to avoid any appearance of an out-of-court contact with

21  a juror which could be a problem, so please understand that.

22          It's also extremely important in this age of the

23  Internet and electronic communications that you understand you

24  are not permitted to tweet, e-mail, or in any respect

25  correspond with anybody, including any other jurors, about this

1    case.  When you go home tonight, you can tell your family or

2    colleagues, you know, "I'm on jury duty.  I'm going to be stuck

3    in Alexandria for the next two or three weeks."

4              If they say, "What are you hearing?"

5              "I can't talk about it.  The judge told me I can't

6    discuss the case."

7              Because if you start to talk about the case, I

8    guarantee you, because Americans love trials, and criminal

9    trials especially seem to fascinate us, they're going to ask

10   you questions or give you their two cents' worth about the

11   case, and that's going to start contaminating your thought

12   process, so you must avoid that.

13             You may be curious about things that come up during

14   this case, but you cannot conduct any investigation.  That

15   means you can't go on the Internet and look up Mr. Risen or

16   other articles he may have written.  You can't look up this

17   book.  You can't look up anything about this case.

18             And there will most likely be some media coverage of

19   this case.  I'm not prohibiting you from reading *The Washington*

20   *Post* or *The Times* or whatever you read, or going on the

21   Internet and looking at news articles, but they cannot involve

22   this case or any issues that might be related to this case.

23             So any case -- any information about leaks, anything

24   about the Iranian nuclear program, even CIA, stay away from for

25   the next two or three weeks.  It shouldn't kill anybody to

1    avoid that kind of news.  But you could read the sports page,

2    you could read the theater page, you could read, you know,

3    about the mess on the subway, but just stay away from anything

4    that could possibly contaminate your thought process.

5          We're going to take the break at this point.  Again,

6    leave your notebooks with your names on them on your chairs.

7    We'll get them back to you.

8          You're not frozen to your seat.  You're welcome to

9    sit anyplace in the jury box.  When we come back from the lunch

10   break -- and I'm going to give you until 2:00 today, and when

11   we come back, as I say, we will start with the opening

12   statements.  All right?

13         So I'm going to let the jury go.  I want to keep

14   counsel here for one minute for some housekeeping matters, but

15   you can go with Mr. Wood.  He'll take you into the jury room.

16                         (Jury out.)

17         THE COURT:  All right, any objection to the Court's

18   preliminary instructions to the jury?

19         MR. TRUMP:  No, Your Honor.

20         THE COURT:  Anything from the defense?

21         MR. MAC MAHON:  No, Your Honor.

22         THE COURT:  All right, you-all have a seat for just

23   one second.

24         It's come to my attention, and you're going to need

25   to take a minute or two with Ms. Gunning about the exhibits,

1   all right?  Defense counsel raised an issue earlier that

2   apparently the exhibit books are marked with a big "Secret" on

3   top.

4          MR. MAC MAHON:  I did, Your Honor.  I just -- and

5   there's dozens of them, and I think this is unduly suggestive.

6   There must be some other way to do this other than a bright red

7   flag.

8          THE COURT:  I want counsel to get with Ms. Gunning

9   during the break and figure out how you're marking these

10  exhibits, but also, I want to make sure that anything that's

11  being entered into evidence is in its proper format.  That's

12  all I think I need to say to you at this point, all right?

13         I assume the parties want a rule on the witnesses?

14         MR. MAC MAHON:  Yes, Your Honor.

15         THE COURT:  All right.  That means that other than

16  the case agent from the FBI and, of course, the defendant, no

17  other witness who's going to testify in this case may be in

18  court while testimony is being taken.  People who are in court

19  cannot be discussing with people outside of the courtroom who

20  are going to be witnesses the testimony that's been going on.

21         Everybody clear about that?  All right.

22         MR. MAC MAHON:  Other than as to Mr. Lang, Your

23  Honor, who is an expert witness, and Mr. Manners, who is in a

24  sense an expert, but no expert witness can watch the other

25  expert witnesses testify.

1           THE COURT:  I thought we went through that before in

2    this case, but do both sides want their experts able to sit in

3    the courtroom and hear testimony?

4           MR. TRUMP:  Your Honor, we would ask -- we have a

5    rebuttal expert, Mr. Duelpher, who has no other role in the

6    case other than to hear what Mr. Lang has to say and rebut it.

7    I would object to having Mr. Manners hear testimony.  He's been

8    in the grand jury.  He may have factual evidence as it relates

9    to the whole Risen issue.  There are a lot of things going on

10   with Mr. Manners, I don't think he should sit here and listen

11   to testimony.

12          MR. MAC MAHON:  We'll withdraw as to Mr. Manners,

13   Your Honor.

14          THE COURT:  All right, so just Lang and your

15   rebuttal?

16          MR. TRUMP:  Mr. Duelpher.

17          THE COURT:  Mr. Duelpher and Mr. Lang can stay in the

18   courtroom.

19          MR. TRUMP:  And Mr. Duelpher would only be here for

20   Mr. Lang.

21          THE COURT:  All right, that's fine.  All right,

22   shouldn't be a problem with that.

23          All right, anything else before we get started?

24   Forty minutes more or less for the opening statements.

25          Any other issue?

1          MR. MAC MAHON:  No, Your Honor.

2          THE COURT:  No?

3          MR. MAC MAHON:  Not from defense.

4          MR. TRUMP:  What time are we coming back?

5          THE COURT:  2:00.

6          MR. TRUMP:  2:00.

7          THE COURT:  All right.  Very good, we'll recess court

8    until then.

9          (Recess from 1:00 p.m., until 2:00 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    A F T E R N O O N   S E S S I O N

2                         (Defendant and Jury present.)

3             THE COURT:  All right, Mr. Trump, are you making the

4    opening?

5             MR. TRUMP:  Yes, Your Honor.

6             THE COURT:  All right.

7                         OPENING STATEMENT

8                         BY MR. TRUMP:

9             May it please the Court, defense counsel.

10            Again, my name is Jim Trump.  It's my pleasure with

11   Eric Olshan and Dennis Fitzpatrick to represent the United

12   States in this case.

13            The defendant, Jeffrey Sterling, once worked for the

14   Central Intelligence Agency, the CIA.  He was a case officer, a

15   spy if you will.  He had access to classified information, Top

16   Secret, Secret files, and as you will learn, between 1998 and

17   2000, the defendant was assigned to a very closely held and

18   highly classified operation involving Iran and its nuclear

19   weapons program.

20            He was responsible for the safety and security of a

21   very valuable human asset working with the CIA on that

22   operation, a Russian nuclear weapons engineer whose role in the

23   operation and whose association with the CIA was a closely

24   guarded secret.

25            When the defendant went to work with the CIA, he

1    promised never, ever to disclose its secrets.  He promised in

2    writing to guard and protect forever the classified information

3    with which he was entrusted, and he broke that promise.  The

4    defendant betrayed his country; he betrayed his colleagues; he

5    betrayed the CIA and compromised its mission; and most

6    importantly, he betrayed the Russian asset, a man who literally

7    placed his trust and his life into the defendant's hands.

8          And why?  Anger, bitterness, selfishness.  The

9    defendant struck back at the CIA because he thought he had been

10   treated unfairly.  He had sued the agency for discrimination

11   and demanded that they pay him $200,000 to settle his claim.

12   When the agency refused, he struck back with the only weapon he

13   had:  secrets, the agency's secrets.

14         The defendant is charged in a ten-count indictment.

15   At its core, the indictment charges the defendant with having

16   disclosed what is called national defense information.  He

17   disclosed it to a reporter, James Risen in *The New York Times,*

18   first in March and April of 2003 and then again between 2004

19   and 2005.  The national defense information at issue in this

20   case was then passed on to the public with the publication of

21   Mr. Risen's book, *State of War*, in early 2006.

22         The case will, excuse me, the case will unfold

23   essentially in two somewhat overlapping parts.  First, to

24   understand the case and to prove to you that the information

25   disclosed by the defendant to Risen and eventually revealed

1    publicly in chapter 9 of his book is under the law of national

2    defense information, you will need to know what this operation

3    entailed, the significance of the human asset used in the

4    operation, and what the defendant knew and didn't know about

5    it.

6              You will hear testimony from a number of CIA case

7    officers about the operation, which we will call Classified

8    Program No. 1, as well as recorded testimony from the human

9    asset himself, whom will be called Human Asset No. 1, or

10   Merlin.

11             Second, you will need to know how the CIA became

12   aware in 2003 that the classified program, Program No. 1, was

13   compromised.  William Harlow, the former director of CIA's

14   Office of Public Affairs, will testify about telephone

15   conversations with Risen in April 2003 and a subsequent White

16   House meeting between the national security advisor,

17   Condoleezza Rice, and *The New York Times*.

18             You will also learn that the defendant had a source

19   relationship with James Risen in 2002; and the defendant's

20   relationship with Risen continued through 2004 and 2005 with

21   e-mails and telephone calls back and forth until the book's

22   publication in January of 2006; and at that point, the

23   relationship ended.

24             Finally, you must know why, why this is important,

25   why the compromise of the operation and the compromise of

1    Merlin potentially damaged national security.

2            The defendant worked for the CIA from 1993 through

3    January 31, 2002.  As I mentioned, he was trained and deployed

4    as a case officer; and as such, he understood the importance of

5    protecting a human asset's relationship with the CIA and the

6    importance of maintaining the secrecy of a CIA operation such

7    as Classified Program No. 1.  He had spent some time overseas,

8    and he also developed a specialty in Iranian affairs.  In 1998,

9    the defendant was assigned to the agency's Counterproliferation

10   Division at its Langley headquarters.

11           In October 1998, the defendant was asked to take over

12   as the case officer for Classified Program No. 1, which meant

13   moving to New York, which he did in early 1999.  From that

14   time, early 1999 until May of 2000, he served as the case

15   officer for the operation, and he personally was responsible

16   for the Russian engineer Merlin.

17           In October 1998, Classified Program No. 1 was already

18   two years old.  It was designed to gather intelligence about

19   Iran's nuclear weapons program, an intelligence priority for

20   the CIA.  In a nutshell, the CIA thought it could exploit

21   Iran's interest in acquiring nuclear technology.

22           With the help of a second Russian engineer, the

23   agency and the National Laboratory developed a set of very

24   sophisticated plans, plans for a Russian-designed fire set, a

25   key component to a detonation system of a nuclear weapon.  The

1    National Laboratory embedded secret flaws into the plans so

2    that the fire set would never work.  In other words, the plans

3    would appear genuine; but if Iran took the bait, it could spend

4    huge amounts of time and money trying to develop a fire set

5    that could not work and, in the process, hopefully convey

6    important information to the CIA about the status of its

7    nuclear weapons program.

8          But the CIA needed a salesman, someone who could pose

9    as a greedy Russian engineer seeking money for the fire set

10   plans, and Merlin fit that role exactly.  He had, in fact,

11   worked for the former Soviet Union and Russia as a nuclear

12   weapons expert in its nuclear weapons facility; and he was an

13   expert in the assembly of nuclear warheads.  He had emigrated

14   with his family to the United States several years earlier and

15   subsequently began working with the CIA.

16         When the defendant first became involved in the

17   operation, another case officer, Zach W., was responsible for

18   Merlin.  Zach W., however, was taking a new assignment; so a

19   meeting was planned to introduce Merlin to his new case

20   officer, the defendant.  The CIA decided to use this meeting as

21   an opportunity to show Merlin for the first time the fire set

22   schematics, the bait for the Iranians, and explain to him in

23   more detail how the operation would work.

24         They met in San Francisco at a hotel in January 1999:

25   Robert S., known to many in the operation as Bob, the manager

1    of the program from the Counterproliferation Division; Merlin;

2    the defendant; Zach W.; and Len, another CIA officer.  They

3    showed Merlin the documents that Merlin would offer the

4    Iranians, the fire set schematics and a parts list.

5        Merlin studied the plans and quickly noticed that the

6    schematics were missing several key components, and that was

7    intentional.  The plan was for Merlin to hold back some

8    information so that the Iranians would come pay him for the

9    complete plans.  Merlin never, never spotted the deeply

10   embedded hidden flaws in the plans.  Indeed, that would have

11   been impossible.

12       The second Russian engineer, the one who designed the

13   plans, had been unable to spot them; and a team of scientists

14   from the National Lab spent hundreds and hundreds of man-hours

15   pouring over the plans before detecting even some of the flaws.

16       Following the San Francisco meeting, the defendant

17   and Robert S. worked with Merlin when trying to find inroads

18   into the Iranian scientific community.  Under Zach W.'s

19   direction, Merlin had already been out there on the Internet,

20   so to speak, trying to reach out to Iranian scientists or

21   academics who might seem interested in what he was offering.

22       The defendant continued that effort with Merlin.  You

23   will see numerous CIA cables in which the defendant reported on

24   the progress being made by Merlin along with copies of e-mails

25   and suggestions for ways for Merlin to improve and hone his

1    approach.  They also worked on a letter that would accompany

2    the fire set schematics, exchanging several drafts and having

3    Merlin work on ways to improve the sales pitch to the Iranians.

4           Now, this letter is important because a copy of it

5    appears in chapter 9 of Risen's book.  The letter is completely

6    mischaracterized in that book as something Merlin hastily did

7    on his own ostensibly to warn the Iranians about the hidden

8    flaws in the schematics, when, in fact, it was a letter that

9    the defendant and Merlin worked on for months.

10          The letter simply reconfirms Merlin's offer.  He has

11   a fire set.  The plans -- he has fire set plans, but they are

12   incomplete.  If the Iranians want the complete package, they

13   will have to pay him.

14          In late 1999, Merlin's sales pitch on the Internet

15   paid off; and an Iranian official expressed interest in what he

16   was selling.  A delivery was planned for Vienna, Austria, in

17   early 2000.  Merlin and the defendant worked on the finishing

18   touches of the letter in January.

19          Merlin flew to Vienna, Austria, at the end of

20   February 2000.  He went with his wife, playing the role of a

21   tourist.  He carried the fire set plans with him.  The letter

22   he stored electronically on a disk so he could print it out

23   once he got to Vienna, to his Vienna hotel.  Once in Vienna,

24   everything went pretty much as planned, and Merlin delivered

25   the package to the Iranian mission of the IAEA, the

1  International Atomic Energy Association, together with his

2  letter, and he returned to the United States.

3         Back in New York, the defendant and Robert S. briefed

4  Merlin on his trip.  At that time, the CIA had intelligence

5  that the plans had been taken from Vienna to Iran; but Merlin

6  had not yet been contacted by anyone about his delivery.

7         In May 2000, however, the defendant was being

8  replaced in New York by another agent, another case agent --

9  excuse me, case officer, Stephen Y.  The defendant's role in

10  the operation was over, and he no longer had access to its

11  files, to its cables, any documents or information about

12  Merlin, and the future of the operation.

13         Now, at this point, no one had raised any concerns

14  about the operation, particularly concerns that we were giving

15  away nuclear technology.  In fact, the lab had certified to the

16  CIA that that could not happen.  No concerns within the

17  Counterproliferation Division; no concerns among senior

18  management, case officers, Merlin, the National Laboratory; and

19  significantly, no concerns expressed by the defendant.

20         The defendant expressed no such concerns to his

21  management in New York, to the inspector general.  Nothing came

22  up in his personnel evaluations.  Even during his litigation

23  with the agency, he never expressed any concerns that this was

24  a bad operation, a flawed operation, in any respect.  Indeed,

25  when he took an employment grievance to the House Select

1  Committee on Intelligence, not a word, not a word was said

2  about Classified Program No. 1, nothing.

3          That all changed on March 5, 2003.  Just after the

4  CIA had rejected his settlement offer of $200,000, the

5  defendant met with two Senate staffers, Don Stone and Vicki

6  Divoll, both who will testify later during this trial.  The

7  defendant described generally Classified Program No. 1; but for

8  the first time, for the first time, he says the program was

9  mismanaged.  He claims that the Russian had been able to find

10  the flaws in the plans.  Iran might be able to spot these flaws

11  as well, fix them.  He was worried that the CIA may have given

12  Iran nuclear weapons technology.  That's when everything

13  changed.

14          On April 3, 2003, William Harlow, the CIA's director

15  of Public Affairs, was called by James Risen.  They talked by

16  phone.  Risen told Harlow he was working on a story, and he

17  wanted comment.  The story involved a Russian engineer trying

18  to sell flawed fire set plans to the Iranians.  He had a real

19  CIA cryptonym, a code name, for the human asset, the one that

20  we will be calling Merlin.

21          Harlow knew that that was very, very rare for someone

22  outside the agency to have that type of information.  Risen

23  said the plans were delivered to the Iranians at the IAEA

24  mission in Vienna in 2000, but Risen was not sure if the

25  operation was still ongoing.

1          Risen made a number of follow-up calls to Harlow.  He

2    said the story was in near final form.  He had documents, he

3    said; and he said the program had not been handled properly.

4    Iran had been told that the designs were flawed, and the

5    Iranians might be able to fix the flaws.  He also was aware

6    that the case officer had been to see the Senate committee.

7          Sound familiar?  With the very same pitch, the same

8    spin that the defendant had put on the operation with SSCI, the

9    Senate Select Committee on Intelligence, Risen was now telling

10   the CIA, William Harlow, its director of Public Affairs.

11         Harlow did some research.  He alerted his superiors.

12   He had learned that there was such a program like the one Risen

13   described, but it was hardly flawed.  More importantly, unknown

14   to Risen, it was ongoing.

15         The next thing that happens, Harlow is headed to the

16   White House for a meeting with *The New York Times*.  There with

17   George Tenet, the director of the CIA; and Condoleezza Rice,

18   the national security advisor for the President; *The New York*

19   *Times* editor, Jill Abramson; and Mr. Risen, Dr. Rice set out a

20   set of talking points prepared by Harlow and which she went

21   over with Ms. Abramson and Mr. Risen.  She asked them not to

22   publish.  She said lives were at stake.  She said it would harm

23   the U.S. efforts to stop the spread of nuclear weapons.

24         At the meeting, Risen reiterated they had documents,

25   a letter, a letter written by the Russian asset to the Iranians

1    warning them of the flaws in the plans.

2          Director Tenet corrected Risen.  Russians told the

3    Iranians -- excuse me, the Russian told the Iranians that the

4    plans were incomplete, not that they were flawed.

5          *The New York Times* said they would get back in a week

6    or so.  A week later, *The New York Times* informed the White

7    House and the CIA that it would not publish the story.

8          It was sort of a case of winning the battle but

9    losing the war because Risen ended up publishing the story but

10   not through *The New York Times*.  He put his article into a

11   book, *State of War*, in January 2006; and what appears in

12   chapter 9 of *State of War* closely tracks what Risen told Harlow

13   in April of 2003.

14         The chapter had pretty much the same spin.  While it

15   reports the basic outline of the classified program accurately,

16   Risen claims that Merlin found the flaws in the plans at the

17   San Francisco meeting; and according to the book, Merlin was so

18   concerned that he was handing over nuclear secrets to the

19   Iranians that he tried to warn them of the flaws in the plans

20   by hastily drafting a letter to that effect while in Vienna.

21         The book quotes nearly verbatim from the draft of the

22   letter that the defendant copied into a CIA cable months before

23   the trip to Vienna.  That book also claims that the case

24   officer of the defendant was also concerned about the way the

25   program was handled and concerned that the operation may have

1  given away valuable nuclear secrets.

2         Now, the evidence that the defendant was Risen's

3  source will unfold in several ways.  There is motive:  his

4  litigation with the CIA.  It began in 2000, just after he left

5  Classified Program No. 1.  It continued through April 2003,

6  just when Risen is talking to Harlow about his story.

7         The basis of the defendant's claims is -- was that he

8  was discriminated against because of his race.  He was bitter.

9  He was angry.  He was seeking revenge.

10        For example, on January 7, 2003, he told a CIA

11  employee that he was disgusted with the CIA, and as a result,

12  he would come after them with everything at his disposal.

13        January 27, 2003, and then again on February 12 of

14  2003, offers to settle the litigation were rejected.  The CIA

15  just said no.  Fifteen days later, the defendant called James

16  Risen at his residence.

17        Shortly after that was the Senate meeting that I just

18  discussed, and key to that was that the only person to have

19  ever said that the Russian spotted the flaws in the plans, an

20  impossibility as explained before, the only person who ever

21  said that we were giving plans to the Iranians that may have

22  aided their nuclear weapons program was the defendant and James

23  Risen.

24        The defendant was also a source for Risen.  On

25  October 30, 2001, during litigation, the CIA rejected a

1  previous offer by the defendant, $200,000.  Four days later,

2  *November 4, 2001, The New York Times* publishes an article by

3  Risen discussing the destruction of the CIA's New York office

4  in the 9/11 attacks.  The existence of that office, the office

5  in which the defendant worked, was a classified fact.  A short

6  time later, the defendant tells a colleague at the CIA that he

7  had confirmed the existence of the CIA's New York office to a

8  newspaper or magazine; she wasn't sure which.

9          March 2, 2002, Risen publishes a story in *The New*

10 *York Times* about the defendant's discrimination lawsuit.  Risen

11 publicly confirmed that the defendant was his source, and he

12 quoted from the defendant extensively.

13         I lost a note, Your Honor.  If I may?

14         In addition to the litigation, the facts of the book,

15 the facts of chapter 9 will also reveal to you that the

16 defendant was a source for James Risen.  First, the book is

17 written from the perspective of a case officer.  The case

18 officer who was the case officer between January of 1999

19 through the Vienna trip up until May of 2000, that case officer

20 was the defendant.  The perspective of the book, the case

21 officer, only knows the information from that period.  Risen

22 only knows the information from that period.

23         The book discusses the case officer's involvement in

24 the operation, quotes the conversation between the case officer

25 and a senior, a senior case officer, Robert S.  The only

1    persons to have communicated together at the San Francisco

2    meeting were Robert S. and the, and the defendant.

3          The book quotes -- excuse me, the book describes

4    extensively the San Francisco meeting.  It describes Merlin,

5    the other case officers, what happened at the meeting; but it

6    also has facts that aren't otherwise recorded in CIA documents

7    and cables.

8          For example, the book explains that Merlin and the

9    case officer went on a wine trip in Sonoma County, California.

10   The only persons to know about that fact were Robert S., the

11   case officer, Merlin, and Mrs. Merlin.

12         As you go through the book, as you will, you will see

13   that each of the facts that are reiterated in the book by

14   Mr. Risen were facts known to Mr. Sterling.  They were facts

15   known only to the case officers who were working on the

16   operation at that time and then found their way to Mr. Risen.

17         But they're also facts discussing the operation that

18   are not otherwise known to case officers or to Mr. Robert S.

19   For example, the book quotes from the defendant's PAR, his

20   performance appraisal report.  That is not a document from the

21   operation.  That is a document that is reviewed with the

22   defendant by his New York management.  People like Robert S.

23   and the other case officers have no access to that document.

24         But what's further instructive is that document does

25   not on its face link the operation to the human asset at issue.

 1    Yet in the book, Mr. Risen quotes from that document and links

 2    it to operation, Classified Program No. 1.

 3           In addition to facts in the book that were known to

 4    Mr. Sterling, the defendant, there are also facts not in the

 5    book that were not known to the defendant, in other words,

 6    facts that were known to other case officers, other people

 7    working on the operation, the people within management that

 8    they knew about the operation.

 9           For example, the book speculates about whether the

10    operation continued beyond 2000.  You will hear testimony that

11    it did.  You will hear testimony that there were similar

12    operations that followed the Vienna operation, operations which

13    the defendant knew nothing about and, hence, Mr. Risen knew

14    nothing about.

15           You will also learn, for example, that Merlin never

16    did, in fact, hear back from the Iranians.  Again, that's

17    something that Risen speculates about because the defendant

18    knew nothing about that.

19           In addition to the facts of the book, you will also

20    see a pattern between Risen and the defendant extending from

21    2004 -- excuse me, extending from 2003 up through and including

22    the end of 2005, when the book is published.  This pattern

23    shows a number of telephone calls, e-mails interspersed with

24    telephone calls in which they discuss the fact that Risen is

25    working on his book.  For example, in early January, Risen

1   reached out to defendant via e-mail and says, "Can we get

2   together in early January?  Jim."

3            Thereafter, in 2004, you will see a steady stream of

4   e-mails and contacts between James Risen and the defendant.  On

5   February 9, 2004, again on April 24, 2004, he calls the

6   defendant, James Risen calls the defendant 14 times and then

7   sends an e-mail from his personal account to the defendant's

8   personal e-mail account.

9            This pattern of e-mail contact continues through May,

10  interstate telephone calls from Risen again to the defendant

11  and e-mails from Risen on his personal e-mail account to the

12  defendant's personal e-mail account.  One such e-mail says,

13  "I'm sorry if I've failed you so far, but I really enjoy

14  talking to you and would like to continue."

15           Again, this evidence will show that there's a

16  pattern, a pattern of communication between the defendant and

17  Risen extending from 2004 up through the publication of the

18  book in early January 2006, and that that pattern ends.

19           Finally, the government must also show you as part of

20  its burden that the disclosures made by the defendant to James

21  Risen, disclosures that ultimately made their way to the

22  public, were potentially damaging to national security.  There

23  will be witnesses, CIA officers with experience who will

24  testify that these, these disclosures were potentially damaging

25  in a number of ways.

1          First, the asset.  The disclosures put his life in

2     jeopardy, his life and the life of his family.  They

3     compromised the CIA's ability to use him in the future.  He was

4     a very unique asset:  a real Russian nuclear weapons expert.

5     They don't come by those very often, but the disclosures in

6     *State of War* in 2006 caused the CIA to bring his use to a halt.

7          They also compromised the methods used in the

8     operation.  They compromised the fact that now that, now that

9     this was in the book, the way the operation was conducted, the

10    use of the labs, the science behind the schematics, all those

11    methods were now compromised.  Again, the arena of nuclear

12    technology and those countries wishing to exploit nuclear

13    technology is not that big.  This loss of intelligence was a

14    serious compromise for the agency.

15         And finally, the CIA's ability to recruit assets, to

16    keep people cooperating once they begin cooperating with the

17    CIA, was damaged.  When assets, when foreign intelligence

18    services, when people working with the CIA pick up a book and

19    they read about the compromises in this case, it's a loss of

20    intelligence.  It makes them pause.  It makes them wonder if we

21    can ever keep our secrets.

22         My time is coming to an end.  It's a fairly complex

23    case.  The evidence will come in piece by piece.  You will hear

24    a number of case officers who only have a certain share of the

25    information, and that is part of the way the CIA

1      compartmentalizes its operations.  This was a limited access

2      operation.  Only those who participated in the operation were

3      allowed to have access to its documents.  Once they were out,

4      they were out for good.

5              So we have to put on case officer after case officer

6      after case officer to explain what they knew and what the time

7      frame was for their knowledge, and you will see at the end that

8      the only case officer, the only person who knew what is

9      published in that book in chapter 9 and who knew the details

10     that were in the book and what was not in the book, what was in

11     the cables, what was not in the cables, is Jeffrey Sterling.

12              Thank you very much.

13              THE COURT:  All right, Mr. MacMahon?

14                      OPENING STATEMENT

15                    BY MR. MAC MAHON:

16              May it please the Court.  Thank you, Your Honor.

17     Ladies and gentlemen of the jury, counsel.

18              My name, ladies and gentlemen, is Edward MacMahon;

19     and I'm one of the attorneys here representing Jeffrey Sterling

20     in this case.  As the judge told you, Mr. Sterling has entered

21     a plea of not guilty to these charges.

22              With me is Barry Pollack, who will do a lot of the

23     talking as well, and Mia Haessly.  So you'll hear from all of

24     us.  There's no rhyme or reason as to who's going to get up and

25     speak.

1          What I -- I want you to remember, you've actually

2     been picked to do an interesting case.  Lots of time as trial

3     lawyers, we have to look at jurors and argue about breach of

4     contracts; and other cases are car wrecks, some of the ones we

5     heard about in voir dire; but this is a very interesting case;

6     and one of the reasons is because the subject matter we're

7     dealing with is very important; but the person this is the most

8     important to is Jeffrey Sterling and his wife, who is in the

9     courtroom with him.

10          Mr. Sterling is an extraordinary man.  He's not a

11     traitor.  He's not even -- he's a wonderful man who has never

12     betrayed his country or done anything of the sort, and you will

13     hear no evidence of that at all.

14          Who he is?  He's the first person in his family to

15     graduate from college is who he is.  He's a man who in 1993

16     went to work for the CIA because he was a patriot, because

17     that's what he wanted to do; and he's a man who then went to

18     law school after he worked there -- while he was at the CIA and

19     thereafter; and at the time he was arrested, which was in 2010

20     on these charges, he was working as a health care fraud

21     investigator, working with United States attorneys

22     investigating health care fraud; and since that time, he's been

23     unemployed and unemployable.

24          And what we need is for you folks to listen very

25     closely to this case and listen for evidence.  I didn't really

1   hear any evidence in that opening, a promise of any actual

2   evidence in this case other than a lot of suspicion; but we're

3   going to ask you to find him not guilty and let Mr. Sterling

4   get on with his life with him and his wife in Missouri, where

5   they live.

6           And, ladies and gentlemen, I won't ask you to do that

7   out of sympathy for Mr. Sterling.  That's no reason at all to

8   acquit somebody in a criminal case.

9           What I want you to do is to listen very closely for

10   any direct evidence that the government has at all that

11   Mr. Sterling leaked any information, any classified information

12   about Merlin or Classified Program No. 1, whatever it is.  You

13   didn't see an e-mail that came up.  You're not going to see or

14   hear a phone call.  You're not going to hear anything, and

15   that's because it doesn't exist.

16           Mr. Trump is a fine lawyer.  If he had an e-mail with

17   details of these programs or a phone call, you would have heard

18   it; and you're not going to hear it in this case.  So what we

19   really have is a cloud that needs to be lifted off of

20   Mr. Sterling.

21           This process has been going on for 13 years.  This is

22   how long this has been going on.  As I say, Mr. Sterling was

23   gone -- has been gone from the CIA for almost 15 years.  We

24   could have had jurors in this case -- you're going to hear

25   evidence come in from cables that were written by the CIA when

1   we could have had jurors who weren't even born.  Some of this

2   stuff happened during the early Clinton administration.

3           And the reason I want to emphasize this fact for you

4   is that as jurors, you get to decide who's telling the truth

5   and who really remembers what happened in a conversation in

6   2000 or 1999; and think for yourself the detail with which you

7   could remember incidents that took place 15 and 20 years ago.

8           And there's one other thing I want you to keep in

9   mind as you hear this case.  You can hear in Mr. Trump's voice

10  a disdain for Mr. Risen's book.  It's not, it's not hard to

11  miss, okay?  The CIA is angry, and you're going to hear people

12  say:  That's false.  That's a lie.  That never happened.

13          And this is not a -- a criminal case is not a place

14  where the CIA goes to get its reputation back, okay?  This is a

15  case to decide whether Mr. Sterling disclosed information to

16  Mr. Risen.  You'll keep hearing witness after witness say that

17  when they accused the CIA of a botched operation, that was a

18  terrible thing to say.

19          And in that regard, what I want you to also remember,

20  because this is important as to how this book ends up being

21  written, is that a lot of these events take place in the, in

22  the build-up to the, to the Iraq war; and we all know that was

23  a time when the same CIA at this exact same time was telling us

24  all that there were weapons of mass destruction in Iraq; and we

25  all know, sadly, how true that claim was.

1           And so in the middle of this literal food fight

2    between Mr. Risen and the CIA sits Jeffrey Sterling; and he

3    needs you to perform a jury service, which is to decide his

4    case and form a check against the government that's been making

5    these claims against him for years.

6           And I will tell you now, and you can hold me to this,

7    that the evidence will be that Mr. Sterling never spoke about

8    his experiences in this program or about Merlin to a single

9    person who wasn't entitled to know it, not a single person.  I

10   didn't hear -- Mr., Mr. Trump told you that he spoke to Risen.

11   Did you hear where, when, or anything about what happened?  No.

12   That's because there isn't any such evidence of it whatsoever.

13          The government will produce no direct evidence

14   whatsoever of a single communication.

15          It won't produce any evidence that anything happened

16   here in the Eastern District of Virginia.  The judge is going

17   to tell you at the end of the case that you have to find that

18   something, the disclosure was made here in the Eastern District

19   of Virginia.

20          Nothing happened here.  Even in the opening

21   statement, we didn't hear that that happened.

22          And so let's back up a little bit.  So Mr. Trump

23   tells you that Mr. Sterling is angry and mad at the CIA, and he

24   files a discrimination case.

25          Well, he did.  You're going to see a lot of the

1    pleadings, these stacks of documents.  A lot of them are

2    documents from this case.  And what is that?  That's

3    Mr. Sterling exercising his right to file a lawsuit, and he did

4    it.  He followed the law in every way until the case was

5    dismissed, yes, by the CIA, claiming national security, that

6    Mr. Sterling's discrimination case could not be heard because

7    it would infringe upon national security.

8            And I say that -- we're going to get a screen here;

9    and we're going to hear people's names and everything; and I

10   beseech you -- the judge has asked you if you won't consider

11   this as evidence of all the importance and the security.

12   Nobody wants a witness to be disclosed, but you need to -- just

13   because we can't call these witnesses by their names and you're

14   looking at redacted documents, it's just part of this process.

15   It's going to prove nothing to you.

16           But when you see it, it's going to look strange, and

17   again, I ask you to remember this is the process that we're in.

18   It's not -- it doesn't mean anything else than that as to what

19   we're looking at.

20           Mr. Trump is right, Mr. Sterling went to the House of

21   Representatives and complained.  He has the absolute right to

22   do that.  He went to the House of Representatives legally,

23   legally, and he complained.

24           What happened next?  He went -- reporters got

25   interested in his case.  It wasn't just Mr. Risen who wrote a

1   story about a black CIA officer feeling discriminated against.

2   Mr. Sterling's story was in *People* magazine.  He was on

3   television.  He wasn't hiding the fact that he was in a lawsuit

4   with the CIA.

5           And no, they didn't pay him.  The case got dismissed.

6           What happened next, Mr. Sterling tries to write a

7   book, and how do you do that when you work at the CIA?  You

8   have to have your book cleared by a lawful -- a legal process.

9           He submitted his book; it didn't get cleared; and he

10  ended up in litigation again with the CIA, in trial litigation,

11  legal litigation.

12          So you're seeing the pattern that Mr. Trump is

13  talking about is one also of legal actions taken by Jeffrey

14  Sterling.

15          And there's also no question that Mr. Sterling in

16  2003 went to the Senate Select Intelligence Committee and

17  voiced his concerns about this program.  He was legally

18  authorized to do that.  There's no question about that.  That's

19  not being a traitor, to go tell the Congress that you think

20  something is wrong with a program at the CIA.

21          But all these actions do leave him as an outcast at

22  the CIA.  There isn't any question about that.  Sterling is out

23  of the club at this point.  He's, he's a whistleblower.  He's

24  whatever -- he's a pain in their side.  He's whatever you want

25  to call him, he's that; and everybody, almost everybody who

1  testifies against him in this case is going to be someone who's

2  still inside of this tight club.

3       So there's no disputing that Mr. Risen, we don't

4  dispute that after Mr. Sterling went to the Senate Select

5  Intelligence Committee, Mr. Risen learned of the lawful

6  disclosures that Mr. Sterling had made at the SSCI.

7       Do you know how long the phone call was that

8  Mr. Sterling made that Mr. Trump told you about in the opening

9  statement? Three seconds. It's a three-second call. That's

10 all you'll see. You'll see a bunch of phone records here.

11 So -- and a lot of them you won't see, and I'll get to that in

12 a second.

13      But so the key issue for you to decide in one respect

14 is what happened? How did this information get out of the

15 SSCI, the Senate Select Intelligence Committee, and to

16 Mr. Risen? Was it Mr. Sterling or someone else? That's the

17 question you get to decide; and I'll suggest to you here later

18 on, I'll tell you exactly how, a scenario where it could have

19 happened.

20      But what do you not see? You don't see a written

21 communication to Mr. Risen from Mr. Sterling about the program

22 at all, no evidence they even met in person. Did you hear

23 that? Did you hear in 2003 that they met in person and he gave

24 him documents or anything? No, no evidence of that.

25      Do you have any evidence that Mr. Sterling FedExed or

1    mailed something to Mr. Risen?  No.  They have a few traces of

2    e-mails.  Risen is still interested.  Mr. Sterling certainly is

3    interested in his discrimination case which goes on, so they're

4    still talking about something that they've written a public

5    story about, and there's nothing.  There's nothing else at all,

6    no recorded calls.

7           And so what you have is a suspicion, a suspicion that

8    it was Mr. Sterling backed up by anger and the fact that the

9    CIA despises Mr. Sterling now to go on for 13 years and do

10   this.

11          But the evidence, which the government didn't tell

12   you about again, is that Mr. Sterling -- excuse me, Mr. Risen

13   will tell you by transcript that he had a wide range of unnamed

14   sources for his reporting.  That's what Mr. Risen is going to

15   tell you.  He had a wide range of sources.  That was a question

16   asked by the government.

17          Folks, that's as good as it gets from Mr. Risen's

18   mouth.

19          And we didn't hear any, any testimony proffered at

20   all by the government from Mr. Risen, the evil person who

21   printed this book, not a thing.  And the government can't fill

22   this void, okay?  There's no way they can fill this; but all

23   they want you to do is speculate about what Mr. Risen heard or

24   what he did, without ever putting on any evidence of that at

25   all.

1              And they know from Mr. Risen's other exhibits,

2    there's a book proposal that Mr. Risen wrote in which he says

3    that he talked to multiple CIA officers about this program.

4              We don't need to put this up, Mr. Francisco.

5              I'll read this to you.  You'll get this at the end of

6    the case.  It's Government Exhibit 128, and in it, it says that

7    Mr. Risen writes:  "CIA officers involved in the operation have

8    come to the author to discuss the case because they now feel

9    enormous guilt for a program that they believe may have aided

10   Iran's nuclear weapons program."

11             You catch all the plurals, ladies and gentlemen?  But

12   who do they -- it must have all -- everybody is lying because

13   it's Sterling giving everything to Risen, and Risen writes

14   these things before there's ever even a criminal investigation

15   at all.  He writes in the, in the preface of his book that

16   you'll get that the book wouldn't be possible without the

17   cooperation of many current and former officials in the

18   Intelligence Community and other parts of the government.  Many

19   of them were willing to discuss sensitive matters only on a

20   condition of anonymity.  That's Mr. Risen's words.

21             So what do we have to rebut that?  Circumstantial

22   evidence.  Sterling, it must have been Sterling; but it's just

23   an invitation to speculate; and that's not the burden that the

24   government carries here.

25             So again, I say to you, listen closely for direct

1   evidence of Mr. Sterling's supposed acts.  They don't exist.

2   No such evidence exists.

3           And when you get the book, the speculation won't

4   even -- isn't even played out by reading the book.  The

5   beginning of chapter 9 details an event which took place in

6   2004 which led to the death of Iranian agents.

7           Folks, Sterling wasn't at the CIA, okay?  He wasn't

8   there.  They can't pin this one on him.  That's the first thing

9   that's in it.  It's not him.

10          And then later in the book, on page 207 -- again,

11  you're going to -- we're going to go through this.  It's going

12  to get mind-numbing, I'm sure, to you soon enough, but when

13  we're actually looking at the book, on page 207, there's

14  writing about an NSA program, of the NSA supposedly being

15  involved in tracking an Iranian official to see that the plans

16  are delivered.  I'm not doing a good job of telling you what it

17  says, but the CIA's people are going to tell you that's

18  completely false.  That never happened.  Nobody ever tracked an

19  Iranian official picking up the plans in Iran and bringing --

20  picking them up in Vienna and bringing them to Iran.  It's

21  completely false.

22          So what is Mr. Risen?  Is he a fableist?  Is

23  Mr. Sterling the source for his fables?  What is, what is going

24  on?  There's no way that Sterling could have told him that.

25  Apparently, it's completely untrue.

1           You'll look more into the book.  Mr. Merlin, who

2   you'll hear testify by videotape, he, he's quoted -- his

3   language attributed to this Russian is in quotes in this book,

4   okay?  That's on page 207.  And I asked him at the deposition

5   to read it out loud, and you'll hear him speak in his Russian

6   accent exactly the words that are in this book.

7           And then the next question is, "Can you tell me how

8   it is that Mr. Risen has you quoted in this book?"

9           And he says, "No, I can't explain that at all.  No

10  possible explanation for that."

11          "Are those words that you used?"

12          "Yes, those are words that I used.  It's a correct

13  quote, but I never talked to him, and I don't know anybody who

14  did."

15          There's another one of those quotes as well.  The --

16          Merlin tells in Risen's book in quotes, he talks

17  about delivering the weapons -- the plans for a nuclear weapon

18  and wrapping them in a newspaper and putting them on top of a

19  mailbox in Austria.  There's the high-quality operation we're

20  talking about.

21          But what's more important than that?  There's no

22  report that says he wrapped them in a newspaper.  He doesn't

23  remember telling Mr. Sterling that he wrapped the plans for a

24  nuclear weapon in a newspaper, but what Mr. Risen has in the

25  book is accurate, so where did it come from?

1            It's not my job to prove to you where it came from,

2    but it didn't come from Jeffrey Sterling.

3            And there's all kinds of information in this book

4    that you'll see came from sources other than Mr. Sterling.  It

5    couldn't have come from Mr. Sterling, and it will take apart

6    the mosaic, it will take the pieces out of the jigsaw puzzle

7    that Mr. Trump wants you to put together for them.

8            Mr. S. -- Bob, I guess we call him -- is a very

9    interesting witness in this case.  He knew everything that was

10   in this book, okay, everything that's in chapter 9.  He was

11   there the whole time.  There isn't any debate about that, and

12   so when Mr. Trump tells you that, that this didn't happen,

13   nobody else -- Bob knew everything, okay?  Bob knew everything,

14   and the CIA just takes his word that he didn't ever speak to

15   Mr. Risen.

16           We're going to get phone records in this case out the

17   gazoo, and Mr. Sterling gets the Friends and Family Plan from

18   the government.  Everybody he talked to in the last ten years,

19   if he called somebody, they went and got his phone records.  If

20   he stayed at somebody's house, they got his.  But for Bob, they

21   don't even bother.  They don't even bother.  They don't have

22   Mr. Risen's phone records.

23           So how do you prove that Bob -- you're going to come

24   in in a circumstantial case and say:  I'm going to prove to you

25   that Bob S. and Jim Risen never talked to each other, but I

1    never got either one of their phone records, but it must have

2    been Sterling.  There's the pattern of what we have here.

3           There are some e-mails, very short traces of e-mails

4    between Sterling and Risen, but they don't add up to anything

5    at all.  There's no evidence at all of Mr. S.'s e-mail traffic

6    at all, none, not a single thing.

7           And guess what?  The CIA can't tell you what

8    Mr. Sterling was doing.  You would think the CIA would be able

9    to track the e-mails or the printing or the comings and goings

10   of a case officer; and they say:  No, sorry, we can't.  We

11   can't do that for you, right?  It's not there.  We don't know.

12          And this is important because when you read this

13   book, you will see that Mr. Risen obviously had access to a lot

14   of documents, but when did Sterling get them?  Sterling was out

15   of the program in 2000, in May of 2000, and there's no sense or

16   even suggestion of a leak between that time and 2003.

17          So what did he do, go home with a backpack full of

18   documents from the CIA that he printed up, and nobody can tell

19   you when it happened, where it happened?  Did you hear a

20   witness who's going to say Jeffrey Sterling printed up a

21   letter?

22          Bob, by the way, the letter Mr. Trump told you, Bob

23   was working on that letter with Merlin as well.  It wasn't just

24   Mr. Sterling.  And it was Merlin, by the way, who will tell you

25   he was the last person with a copy of the letter, the

1    approximate letter that ends up in the book.

2            So there are other things about firing sets and, for

3    example, Merlin only refers to the plans as blueprints.

4    Mr. Risen refers to them as blueprints.  In not a single cable

5    that Mr. Sterling drafted do you see those words.

6            But again, Mr. S., Merlin, they'll all deny being the

7    source.  They've all seen what's happened to Mr. Sterling, and

8    nobody is going to admit to having anything to do with this.

9            So there's lots of possibilities to how this

10   happened, and I'm going to leave you with one other one at this

11   time.  Before I do that, though, the phone records, these phone

12   calls Mr. Trump just told you about, the April -- oh, excuse

13   me, the February 2003 call was 50 seconds, I'm sorry.  The next

14   calls, there were six apparent calls in 2003 that add up to

15   three minutes, three-and-a-half minutes over a three-week time

16   period.  I guess the government wants you to think that all the

17   information in Risen's book came in over those as well.

18           So there is another scenario, I'll suggest to you;

19   and again, the defendant has no burden of proof in this case;

20   but listen, listen to something else that may have happened

21   that the evidence in this case will support.

22           Mr. Sterling goes up to the Senate Select

23   Intelligence Committee and tells, tells his story, as he was

24   legally entitled to do.  No one's going to tell you otherwise.

25   And one of the people that he tells it to is someone named

1   Vicki Divoll, and my distinguished colleague here already gave

2   you her name.  What do we know about Vicki Divoll?  She's a

3   very partisan Democrat who works, been working up on the Hill

4   for a while, very experienced.

5           And what happens within about a month after, after

6   this happens?  Ms. Divoll is fired from her job at the Senate

7   Select Intelligence Committee, and what do you think she was

8   fired for?  She was fired because of a story about something

9   dealing with the CIA that happened in front of that committee

10  was published by Mr. Risen.  That's exactly what happened.

11          I'll show you the story.  It's called "Broad Domestic

12  Role Asked for CIA and the Pentagon."  It details an effort by

13  the CIA in 2003 to get permission to obtain records in the

14  United States without a subpoena.

15          The leak is plainly attributed to Mrs. Divoll.

16  You'll get to hear her testify and hear her answer how it is

17  that the story got out, because what she did was tell somebody

18  else -- her story is:  I told somebody else, who told somebody

19  else, and eventually, somehow Mr. Risen got ahold of it.  Okay?

20  Does that sound like something that happened?  It did happen.

21          And now we'll see what she has to say about it.

22  She's going to deny ever talking to Mr. Risen, either; but

23  there's no question because -- that she got fired for a story

24  that makes it to Jim Risen.  And what could have happened after

25  that?  Risen finds out about the story, and what story does he

1    find out about?  The one that Sterling told her, right?  That's

2    the consistent story.  Who else told the Senate Select

3    Intelligence Committee?  He did.

4           And then if you read Risen's -- what we have here is

5    evidence, Mr. Risen says he reached out to many officials and

6    other intelligence officers and other people and reached for

7    more information.  Why is it that it's only Mr. Sterling that

8    the government can think of to tell you that he may have

9    called?  As I say, they don't even ask for Bob's phone records

10   to see whether it was him or anybody else.

11          And, of course, in this time now was the time the

12   book is being written, there's reasons for these officials to

13   be worried.  The CIA is getting all kinds of bad press for not

14   finding any weapons of mass destruction in Iraq; and what do

15   they need, another story about a Russian scientist dropping off

16   plans for a nuclear weapon wrapped in a newspaper?  No, they

17   don't need that.

18          So it's equally plausible, ladies and gentlemen, that

19   Mr. Risen then went and talked to other people.  I don't know

20   who.  I don't have to prove it.  I don't know where else it

21   came from, but if you look at the documents, you'll see he got

22   a lot of documents from a lot of people, including documents

23   that they admit Mr. Sterling never had in the first place.  And

24   whoever tried to help him may not be the last person ever

25   burned by a reporter, but they didn't get the story that they

1    wanted.  So you'll consider that evidence as you hear the rest

2    of these witnesses testify.

3           Mr. Sterling is also charged with mail fraud somehow

4    for selling Mr. Risen's book here in Virginia, stealing

5    property and putting it in a book.  It's a silly charge for

6    which there's no basis.  In fact, the, the sale of the book in

7    Virginia is probably the only thing that, the evidence you'll

8    ever hear of anything that happened; and you can consider that

9    as to why that was raised.

10           He's charged with obstruction of justice apparently

11   because an e-mail was deleted on his computer at some point in

12   time, and you'll see the government has no evidence that that

13   was done in any way to hinder or delay or any kind of an

14   investigation.

15           And again, I want to thank you-all for your service,

16   valuable service as jurors in this case.  It's going to be a

17   slog looking through all these details; but I hope I gave you a

18   good outline of the defendant's case; and again, we will ask

19   you to give Mr. Sterling his life back at the end of this case.

20   Thank you very much.

21           THE COURT:  All right, ladies and gentlemen, we're

22   going to take about a five- -- only a five-minute break, so

23   I'll ask you to stay in the jury room.  We have to set up the

24   courtroom for the special witnesses who are going to be

25   beginning.  Five-minute recess.

1              (Recess from 2:56 p.m., until 3:08 p.m.)

2                        (Defendant and Jury present.)

3         THE COURT:  All right, call your first witness.

4         MR. OLSHAN:  Thank you, Your Honor.  The government

5   calls Stephen B.

6         THE COURT:  All right, Mr. B.

7         STEPHEN B., GOVERNMENT'S WITNESS, AFFIRMED

8         MR. OLSHAN:  May I proceed, Your Honor?

9         THE COURT:  Yes, sir.

10                       DIRECT EXAMINATION

11  BY MR. OLSHAN:

12  Q.   Good afternoon, sir.

13  A.   Good afternoon.

14  Q.   If you could, please state your first name, spell your

15  first name, and state your last initial.

16  A.   Stephen B., S-t-e-p-h-e-n.

17  Q.   Mr. B., have you ever been employed by the Central

18  Intelligence Agency, or the CIA?

19  A.   Yes.

20  Q.   Is the CIA part of the United States government?

21  A.   Yes.

22  Q.   If you could explain in your own words very briefly, what

23  does, what does the CIA do?

24  A.   The CIA collects foreign intelligence and foreign

25  counterintelligence information and provides that information

1    to U.S. policymakers.

2    Q.   Were you employed by the CIA during the 1990s?

3    A.   Yes.

4    Q.   Let me focus your attention on the years 1994 and 1995.

5    Were you employed by the CIA during that time?

6    A.   Yes, I was.

7    Q.   What was your position with the CIA during that period?

8    A.   I was a case officer.

9    Q.   Can you explain to the jury what a, what a case officer

10   does?

11   A.   Sure.  A case officer, or an operations officer, as it's

12   also known, is someone who spots, assesses, recruits, and

13   handles foreign human assets.

14   Q.   And when you say "spots," is that the same thing as

15   recruiting?

16   A.   Well, recruiting is different than spotting.  Spotting is,

17   is sorting through people, leads, to find the right people with

18   access to information that we're looking for.

19   Q.   When you find the right people to access the information

20   you're looking for, would you have a role recruiting those

21   individuals as a case officer?

22   A.   Yes.

23   Q.   While you were a case officer, did you hold a security

24   clearance?

25   A.   I did.

1   Q.   And at what level?

2   A.   Top Secret/SCI.

3   Q.   And do you know what "SCI" stands for?

4   A.   Special Compartmented Information.

5   Q.   Is there a level below Top Secret?

6   A.   Yes, Secret.

7   Q.   Mr. B., does everyone -- during your time at the CIA, does

8   everyone have or did everybody have, who had a TS or a Top

9   Secret security clearance, have access to all of the Top Secret

10  information at the CIA?

11  A.   No.

12  Q.   Was it broken down as to who could access specific types

13  of Top Secret information?

14  A.   Yes.  It's compartmented, so not everyone can see

15  everything that everyone else is working on.

16  Q.   Are you familiar with the concept of a need to know?

17  A.   Yes, I am.

18  Q.   And is that something that's a principle used or employed

19  in the CIA?

20  A.   Absolutely.

21  Q.   Can you tell the jury what the need-to-know principle is?

22  A.   So you have a clearance, a Secret, Top Secret, and then

23  you also have need to know based on the work that you're doing.

24  So just because you have a Top Secret clearance doesn't mean

25  that you're going to be able to see details of other cases or

1   other operations going on.  Only if you have the need to know

2   also and the clearance can you -- will you might be allowed to

3   have access to that information.

4   Q.   During your time as a CIA employee, did you receive

5   training concerning the handling of classified information?

6   A.   Yes.

7   Q.   Was it important at the CIA to properly handle classified

8   information?

9   A.   Very much so.

10  Q.   You mentioned the term "human asset" when you were

11  describing what a case officer does.  Do you recall that?

12  A.   Yes.

13  Q.   Can you tell the jury what a human asset is in the CIA

14  lingo?

15  A.   It's a source, a person who has access to information of

16  interest to the agency, to the CIA.  That would be a human

17  asset.  And then a person who we recruit, who agrees to work

18  for the agency and share that information with us.

19  Q.   Are you familiar with a human asset whom I will refer to

20  as Merlin?

21  A.   Yes.

22  Q.   Was Merlin this person's true name, or was it something

23  different?

24  A.   It was something different.

25  Q.   Approximately when did you meet Merlin?

Stephen B. - Direct                                                      179

1   A.    In approximately 1994.

2   Q.    And do you recall what nationality Merlin was?

3   A.    Yes.  He was Russian.

4   Q.    Did he come from a specific professional background?

5   A.    Yes.  He was an engineer that worked for a facility called

6   Arzamas-16.

7   Q.    Is that a facility in Russia?

8   A.    It is.

9   Q.    What was the purpose of that facility?

10  A.    My understanding was it's, part of the responsibilities of

11  that facility was to assemble and disassemble tactical and

12  nuclear weapons.

13  Q.    Did Merlin have a role in the assembly, for example, of

14  weapons?

15  A.    He worked in a facility that had that responsibility, yes.

16  Q.    Assembly?

17  A.    Correct.

18  Q.    And at some point, did Mr. Merlin immigrate to the United

19  States?

20  A.    He did.

21  Q.    With his family?

22  A.    Yes.

23  Q.    Was Mr. Merlin a defector to the United States?

24  A.    No, not a defector.

25  Q.    Did you have any involvement in recruiting Merlin to work

1  for the CIA?

2  A.    I did.

3  Q.    Were you the first person to approach and attempt to

4  recruit Mr. Merlin on behalf of the CIA?

5  A.    Yes.

6  Q.    Was he interested when you first approached him?

7  A.    No, he was not.  He expressed concern through his wife

8  that he didn't want to speak with anyone from the Intelligence

9  Community, we felt -- my assessment was because in Russia, any

10  dealings with the KGB would have been much different than the

11  way we would treat assets here in the U.S. and as part of the

12  Central Intelligence Agency.

13  Q.    And just for the jury's benefit, what is the KGB briefly?

14  A.    Russian security service, intel service at the time.

15  Q.    You say intel.  That's intelligence service?

16  A.    Intelligence service, yes.

17  Q.    You testified that at first, Mr. Merlin was not interested

18  in working with the CIA; is that correct?

19  A.    Yes.

20  Q.    At some point, did he become interested?

21  A.    Yes.

22  Q.    And how were you able to persuade him to work with the

23  CIA?

24  A.    Initially, we met with his wife, who was also an émigré

25  and identified as a lead by CIA headquarters to our office, and

Stephen B. - Direct                                                    181

1    we went out and interviewed her a few times.  She was the one

2    who actually said, "The person that you should talk to is my

3    husband, because he, he did more interesting things at Arzamas

4    than I did."

5    Q.   And so was she instrumental in persuading him to work with

6    you in the CIA?

7    A.   Yes, I believe so.

8    Q.   Did you provide any other incentive to Mr. Merlin to work

9    with the CIA at the time?

10   A.   Yes.  We offered him payment for his time.

11   Q.   Is it -- was that standard practice when recruiting human

12   assets?

13   A.   Absolutely.

14   Q.   After Mr. Merlin agreed to work with the CIA, what

15   happened next?  What did you, what did you do once he agreed

16   to, to work with you?

17   A.   We set up a series of debriefings with members of the

18   Department of Energy and CIA analysts who helped in the

19   technical debriefings of Mr. Merlin.

20   Q.   So you mentioned the word "debriefings."  What's the

21   purpose of those debriefings?

22   A.   To collect intelligence, to collect details on what was

23   happening within Arzamas-16.

24   Q.   So it was to gather historical information or intelligence

25   that Mr. Merlin possessed; is that accurate?

1    A.    Yes.

2    Q.    Did you attend these debriefings?

3    A.    I did.

4    Q.    Did Mr. Merlin speak good English?

5    A.    No.  We, we had to use a, a translator, an agency

6    translator to help with those debriefings.

7    Q.    Do you recall what name, first name the agency translator

8    went by when dealing with Mr. Merlin?

9    A.    I believe it was Ivan.

10   Q.    You testified your first name is Stephen.  Did Mr. Merlin

11   know you by the name Stephen or something else?

12   A.    No, he knew me by another name, which was my agency alias.

13   Q.    What was the first name of that agency alias?

14   A.    Scott.

15   Q.    When you would meet with Mr. Merlin for these debriefings,

16   would you meet at a CIA facility or somewhere else?

17   A.    Somewhere else.

18   Q.    Why not meet at a CIA facility with Mr. Merlin?

19   A.    Because we always incorporate pieces of operational

20   security.  We're always concerned about counterintelligence,

21   what other people might be trying to find out about our

22   operations.  So if we were to bring him to a known agency

23   location, that might not be -- it just doesn't work well with

24   the operational security, what we try to build into our, our

25   cases.

Stephen B. - Direct                                                    183

1   Q.   Was there a risk involved if you were to bring Mr. Merlin

2   to a specific CIA, known CIA location?

3   A.   There could be a risk because someone who we don't want

4   might be watching a known CIA facility, the Russians, for

5   example.

6   Q.   Did you tell the Russians that you were debriefing

7   Mr. Merlin?

8   A.   No, sir.

9   Q.   Was it important or unimportant for the Russians to know

10  whether Mr. Merlin was working with the CIA?

11  A.   Well, my presumption would be that they would prefer that

12  he was not talking to the CIA.

13  Q.   How important was it from your perspective, from the CIA's

14  perspective, to ensure that the Russians not know that he was

15  working --

16            MR. POLLACK:   Objection.

17            THE WITNESS:   A very high priority.

18            THE COURT:   Wait, there's an objection.

19            MR. POLLACK:   I'm going to object.   Mr. B. has to

20  speak for himself.   He can't speak for the agency.

21            THE COURT:   I'll sustain the objection.

22            MR. OLSHAN:   That's fine.

23  Q.   From your personal perspective, how important was it for

24  the Russians not to know that Mr. Merlin was meeting with the

25  CIA?

1   A.    I would judge it as very important.

2   Q.    Does it pose any risk from an intelligence standpoint if,

3   if the Russians were to find out that you had been debriefing

4   Mr. Merlin?

5   A.    My assessment would be that yes, that would not be

6   something we would want in our operation.

7   Q.    Could it affect the intelligence value of his debriefings?

8   A.    It certainly could.

9   Q.    You testified that there were other people present during

10  these debriefings in addition to you and the translator, Ivan.

11  Is that correct?

12  A.    Yes.

13  Q.    Do you have a technical background, Mr. B.?

14  A.    I do not.

15  Q.    Were there individuals involved in the debriefings who,

16  who did?

17  A.    Yes.

18  Q.    And were any of those individuals from National

19  Laboratories in the United States?

20  A.    They were.

21  Q.    And those individuals, did they have specific technical

22  backgrounds?

23  A.    Yes.

24  Q.    Was the information obtained from Mr. Merlin during these

25  technical debriefings, was it evaluated by the CIA?

Stephen B. - Direct                                                      185

1    A.   It was.

2    Q.   And were you ever made aware of the assessment of the

3    value of the information provided by Mr. Merlin?

4    A.   Yes, I was.

5    Q.   What was reported to you about the value of his

6    intelligence?

7              MR. POLLACK:   I'm going to object.   Hearsay and

8    relevance.

9              THE COURT:   Well, is it being offered for the truth

10   of its contents, or what is the purpose for asking this

11   question?

12             MR. OLSHAN:   It's not being offered for the truth.

13   It's what was reported to this individual, but it also goes to

14   the closely held nature of this particular asset, his

15   importance to the CIA.

16             THE COURT:   I'll sustain -- I'll overrule the

17   objection then.

18   BY MR. OLSHAN:

19   Q.   My question, Mr. B., was were you ever made aware of the

20   evaluation of the intelligence that Mr. Merlin provided to the

21   U.S. government?

22   A.   Yes.

23   Q.   And what was the evaluation of that information?

24   A.   Some of the reporting was rated as outstanding.

25   Q.   And was that on a scale?

Stephen B. - Direct                                                186

1   A.   It is on a scale of which outstanding, an outstanding

2   rating is the highest rating that can be given to a piece of

3   intelligence.

4   Q.   During the time that you worked with Merlin -- strike

5   that.

6            Approximately how long did you work with Merlin?

7   A.   Approximately one year.

8   Q.   So that would be from sometime in 1994 to sometime in

9   1995?

10  A.   Yes.

11  Q.   During the time that you worked with Mr. Merlin, would you

12  characterize him as an easy asset to handle or a hard asset to

13  handle?

14  A.   Fairly easy.

15  Q.   Is that fairly or very?

16  A.   I said fairly, but he was not a problem to handle.

17  Q.   Can you describe briefly the information that was gathered

18  related to this human asset Merlin?  Was it subject to any

19  access restrictions as far as who could review it?

20  A.   Yes.  So the information was compartmented.  It was held

21  in, in close channels, and so yes, to answer your question.

22  Q.   Could individuals at the CIA who were not read into this

23  specific program or file for Merlin access any documents

24  related to Mr. Merlin?

25  A.   No.

1   Q.   Did you maintain a file in your particular office?

2   A.   We had, we had what we call a soft file in the office,

3   yes.

4   Q.   How was that soft file maintained?

5   A.   In the safe in our, in our office.

6   Q.   Was there also an electronic file?

7   A.   There is.

8   Q.   And were there restrictions as to who could access that --

9   A.   Yes.

10  Q.   -- electronic file?

11  A.   Yes.

12  Q.   And similarly, was that restricted to people who had been

13  granted access to information related to Mr. Merlin?

14  A.   Yes, people who had the need to know about this case.

15  Q.   You testified that in approximately 1995, you stopped

16  being the case officer for Mr. Merlin.  Is that right?

17  A.   Yes.

18  Q.   Did you transfer Mr. Merlin to a different case officer?

19  A.   I did.

20  Q.   And what was the first name and last initial of that case

21  officer?

22  A.   That case officer was Laurie D.

23  Q.   Was it routine for one case officer to hand -- to transfer

24  an asset to another one at some period of time?

25  A.   Yes.  Typically, when you are leaving that office to go to

Stephen B. - Direct                                              188

1    a new office, you will hand over assets to another officer.

2    Q.   Is that what happened with you?

3    A.   Yes.

4    Q.   You went to a different office?

5    A.   Yes.

6    Q.   Now, Ms. D., Ms. Laurie D., was she in your chain of

7    command when you transferred Merlin to her as the new case

8    officer?

9    A.   She was.

10   Q.   Where was she in your chain of command?

11   A.   She was my immediate supervisor.

12   Q.   After you stopped being Merlin's case officer, did you

13   retain any access to either that soft file you mentioned or the

14   electronic file related to Merlin?

15   A.   No, sir.

16   Q.   Could you have accessed that if you wanted to?

17   A.   No.

18   Q.   During your time as Merlin's case officer, was he ever

19   used for anything other than historical debriefings?

20   A.   No.

21   Q.   Was he used operationally?

22   A.   No.

23   Q.   Do you have any personal knowledge as to whether he was

24   ever used in any CIA operations?

25   A.   I do not.

Stephen B. - Direct                                                    189

1   Q.   Did you ever hear anything else about Mr. Merlin from

2   Laurie D., for example?

3   A.   Just in casual conversation on, you know, how things were

4   going between, you know -- she would say, she said -- go ahead.

5            MR. POLLACK:  Objection.

6            THE COURT:  Wait, wait.

7            MR. POLLACK:  Objection, Your Honor.  This is hearsay

8   and at times I understand that Mr. B. is not even involved

9   anymore.

10           THE COURT:  Well, I think the question is relevant to

11  this case because it addresses the degree to which there is

12  ongoing contact about a human asset after a person leaves the

13  program.  To that extent, I'm permitting it, but in terms of

14  the truth of the contents or what actually was said, that's not

15  terribly important.

16           MR. OLSHAN:  Okay.

17           MR. POLLACK:  My understanding is he's about to relay

18  a conversation he had with Laurie D., not a conversation he had

19  with Merlin.

20           THE COURT:  No, no, I understand that.

21           MR. POLLACK:  Okay.

22           MR. OLSHAN:  I'll rephrase the question.

23           THE COURT:  Rephrase the question.

24  BY MR. OLSHAN:

25  Q.   Mr. B., did you have any discussions with Laurie D. about

1  any classified aspects of Mr. Merlin --

2  A.   No.

3  Q.   -- by the CIA?

4  A.   No.

5  Q.   So any remarks were casual, generic?  How would you

6  describe it?

7  A.   Yes.  It was just casual conversation after I had left the

8  office, just saying, you know, "How are things going?"

9       "Doing well."

10      Those sorts of things, but nothing, nothing on a

11  classified level, no.

12  Q.   Let me ask you a question:  Relative to your entire CIA

13  career, Mr. B., how would you in your personal experience rank

14  the intelligence value of Mr. Merlin compared to other assets

15  that you dealt with?

16      THE COURT:  He can testify to that.  Objection

17  overruled.

18      THE WITNESS:  Based on my career, the intelligence

19  that was produced by Merlin, my judgment was that it was one of

20  the most prolific in terms of intelligence that I had handled.

21  BY MR. OLSHAN:

22  Q.   Do you know the defendant in this case, Mr. B., Jeffrey

23  Sterling?

24  A.   I do not.

25  Q.   Have you ever seen this man before?

Stephen B. - Direct                                                191

 1    A.    Not to my knowledge, no.

 2    Q.    Do you know an individual named James Risen?

 3    A.    I do not.

 4    Q.    Have you ever read the book *State of War* by James Risen?

 5    A.    I did read the book.

 6    Q.    Did you -- and when, when did that happen?

 7    A.    After Special Agent Hunt interviewed me on this case and

 8    asked me if I had read the book, I said no.  She showed me the

 9    book, some of the pages under one of the chapters was

10    highlighted, asked me to read it.

11          After that interview, I went out and purchased the

12    book out of curiosity and read the book.

13    Q.    Approximately when was that?

14    A.    It had to be in 2006.

15    Q.    Subsequent to purchasing the book, did you ever meet

16    Mr. Risen?

17    A.    No.

18    Q.    Have you ever spoken to him about your dealings with

19    Merlin?

20    A.    No.

21    Q.    Did you ever discuss Merlin or his role with the CIA with

22    anyone whom you believed did not have access or the need to

23    know about Merlin?

24    A.    No.

25          MR. OLSHAN:  One moment, Your Honor?

Stephen B. - Cross                                                    192

1                THE COURT:  Yes, sir.

2                MR. OLSHAN:  I'll pass the witness at this time, Your

3    Honor.

4                THE COURT:  All right.  Mr. Pollack?

5                MR. POLLACK:  Thank you, Your Honor.

6                          CROSS-EXAMINATION

7    BY MR. POLLACK:

8    Q.   Good afternoon, Mr. B.  My name is Barry Pollack, and I'm

9    one of the attorneys that represents Mr. Sterling.

10               As I understand it, Mr. B., your role with respect to

11   Merlin was first in recruiting him, correct?

12   A.   Yes.

13   Q.   And then secondly in debriefing him because he had

14   information about the Russian nuclear program that might be of

15   value to the United States, correct?

16   A.   Yes.

17   Q.   And at that time during your involvement from '94 to '95,

18   Merlin was not an operational asset, correct?

19   A.   That is correct.

20   Q.   You were merely debriefing him to get information from him

21   from his prior career, correct?

22   A.   That is correct.

23   Q.   And so when you said that he was a very easy asset to

24   handle, that was in the context of he was a very easy person to

25   debrief, correct?

1   A.    Yes.

2   Q.    And, in fact, you got voluminous information from him,

3   correct?

4   A.    That is correct.

5   Q.    And just to be clear, the time that you were interacting

6   with Merlin, Mr. Sterling was not part of that relationship at

7   all, correct?

8   A.    That's correct.

9   Q.    And when you first wanted to -- well, you first heard

10  about Merlin and his potential value from Merlin's wife,

11  correct?

12  A.    Well, the first was a lead from CIA headquarters that

13  identified both Merlin and his wife as new émigrés to the

14  United States, both of interest, potential interest to the

15  Intelligence Community.  So that was the first I had heard

16  about it, but I also heard from Mrs. Merlin that her husband

17  would be someone that we should talk to.

18  Q.    And so that made you more interested in Mr. Merlin, right?

19  A.    Yes.

20  Q.    And you said that the CIA recruits assets or treats assets

21  a little bit differently than the KGB did in, in Soviet Union?

22  A.    Yes.

23  Q.    In fact, the way that you went about trying to recruit

24  Merlin is you asked the wife, Mrs. Merlin, to stress for

25  Mr. Merlin just how much money he could make working for the

Stephen B. - Cross                                                        194

1    CIA, correct?

2    A.   That was part of the recruitment pitch, yes.

3    Q.   And, in fact, when you met Mr. Merlin after he had

4    initially refused to talk to government officials, you actually

5    showed Mr. Merlin a suitcase full of $50,000 worth of cash to

6    try to entice him; is that correct?

7    A.   I did.

8    Q.   And ultimately, the money was enticing to Mr. Merlin, was

9    it not?

10   A.   I would think so, yes.

11   Q.   And, in fact, ultimately, he agreed to cooperate with the

12   United States government and work for them, correct?

13   A.   He did.

14   Q.   But before doing that, before accepting the deal, he

15   actually tried to negotiate more money, did he not?

16   A.   No, he tried to negotiate less money for less time.  We

17   had asked him to work for us for at least two years in exchange

18   for a set amount of money.  He came back to me and said, "I'd

19   like to work for one year," and so I told him that that was not

20   the deal that was on the table.

21   Q.   Okay.  So he wanted to work for one year for $150,000, and

22   you wanted him to work for two years for $300,000, correct?

23   A.   It was -- I don't recall the exact numbers, but that was

24   basically the deal.

25              MR. POLLACK:  Your Honor, may I hand the witness a

Stephen B. - Cross                                                     195

1    document to see if it refreshes his recollection?

2               THE COURT:  You hand it to Mr. Wood.

3               MR. POLLACK:  Thank you.

4               THE COURT:  That's all right.  Let's just move this

5    along.  It's all right.

6    BY MR. POLLACK:

7    Q.   The question, Mr. B., is does that refresh your

8    recollection as to whether the amount that you were going to

9    pay to Mr. Merlin for his two years of debriefing was $300,000?

10   A.   It doesn't refresh my recollection because it was 20 years

11   ago, but I presume if that's what I said back then, those

12   numbers are correct.

13   Q.   And after about a year or so --

14              MR. OLSHAN:  Your Honor?

15              THE COURT:  Is there an objection?

16              MR. OLSHAN:  I apologize, I may have missed it.  Has

17   it been noted for the record what it is that the witness is

18   looking at?

19              THE COURT:  No, it was not.

20              MR. POLLACK:  Your Honor, for the record, I was

21   showing the witness an FBI 302 form from an interview of Mr. B.

22   that was conducted by the FBI.  It's dated April 7, 2006.

23              THE COURT:  All right, that's what it is.

24              And you'll hear the terminology "302."  That's just

25   what the FBI calls its reports of investigation, and I think

1   you'll hear a lot of references to FBI 302s.

2           We can return that document to counsel.

3           Go ahead, Mr. Pollack.

4           MR. POLLACK:  Thank you, Your Honor.

5   Q.   And then after approximately a year, you ended your

6   relationship with Merlin, correct?

7   A.   Yes.

8   Q.   And you turned that relationship over to another case

9   officer by the name of Laurie D.?

10  A.   Yes.

11  Q.   And before you, you did so, you turned over your paper

12  file pertaining to Merlin to Laurie D., correct?

13  A.   Yes.

14  Q.   And at that point, your access to the FBI's relationship

15  with Merlin was cut off?  Let me rephrase it:  Specifically at

16  that point, you no longer had the ability to access documents

17  pertaining to the CIA's relationship with Merlin?

18  A.   CIA, correct.

19  Q.   And that, that is typical that once you're no longer

20  involved, you no longer have a need to know, and so therefore,

21  you can't access even electronically the documentation

22  pertaining to a particular project, correct?

23  A.   Yes.

24          MR. POLLACK:  Thank you.  I don't have anything

25  further.

1              THE WITNESS:  Thank you.

2              THE COURT:  All right, any questions?  Any redirect?

3              MR. OLSHAN:  No redirect.

4              THE COURT:  All right, there should be another

5    witness in there ready for us.

6              Thank you, Mr. B.  You go with Mr. Wood.

7              THE WITNESS:  Thank you.

8              THE COURT:  He'll escort you out.

9              MR. OLSHAN:  Your Honor, is the witness fully

10   released at this point?

11             THE COURT:  Wait one second.  Is anybody planning to

12   call this witness again in the course of the trial?

13             MR. OLSHAN:  The government is not.

14             MR. POLLACK:  No, Your Honor.

15             THE COURT:  All right, then you are released, and

16   that means you may now leave the courthouse.

17             THE WITNESS:  Thank you.

18             THE COURT:  Thank you for your testimony.

19             THE WITNESS:  Thank you.

20                       (Witness excused.)

21             THE COURT:  And just so we can keep the case moving

22   efficiently, are the next two or three witnesses about the same

23   length?

24             MR. OLSHAN:  The next one is, and then the third one

25   will get a little longer, and after that, it will get

1   potentially significantly longer.

2          THE COURT:  All right, but I want to make sure we

3   have enough witnesses here today that we can keep this going.

4          All right, we'll have the affirmation administered.

5           LAURIE D., GOVERNMENT'S WITNESS, AFFIRMED

6          THE COURT:  Tomorrow please have those on sturdier

7   paper.

8          MR. OLSHAN:  We will for tomorrow, Your Honor.

9          THE COURT:  Okay.

10                      DIRECT EXAMINATION

11  BY MR. OLSHAN:

12  Q.   Good afternoon, ma'am.

13  A.   Good afternoon.

14  Q.   If you could just lean in a little bit?

15  A.   Sure.

16  Q.   Ma'am, if you would state and spell your first name and

17  your last initial?

18  A.   Okay.  My first name is L-a-u-r-i-e.  My last initial is

19  D.

20          THE COURT:  Ms. D., you're going to have to keep your

21  voice up.

22          THE WITNESS:  Okay.  I'll talk louder.  I can

23  project.

24          THE COURT:  That's perfect.

25  BY MR. OLSHAN:

Laurie D. - Direct                                                      199

1  Q.   Ma'am, let me direct your attention to the 1990s.  Were

2  you employed by the Central Intelligence Agency during that

3  time?

4  A.   Yes.

5  Q.   And at some point during your employment with the CIA, did

6  you meet an individual whom I will call Merlin?

7  A.   Yes.

8  Q.   Was that in the course of your work at the CIA?

9  A.   Yes.

10  Q.   And can you recall approximately when did you meet Merlin?

11  A.   In the 1995-1996 time frame.

12  Q.   Ma'am, are you familiar with the term "case officer"?

13  A.   Yes, I am.

14  Q.   Were you Merlin's case officer?

15  A.   For a part of the time, yes.

16  Q.   Was there a period of time when you knew Merlin where you

17  were not his case officer?

18  A.   Yes.

19  Q.   Can you describe for the jury what your role was with

20  respect to Merlin before you became his case officer?

21  A.   I was the manager of an office, and so Steve B., whom you

22  just met, used to work for me, so I saw the information that he

23  collected from Merlin and helped edit and release the

24  information that, share it back to Washington.

25  Q.   Were you Mr. B.'s supervisor?

Laurie D. - Direct                                                    200

1    A.    Yes, I was.

2    Q.    In that role, were you permitted access to classified

3    information related to Mr. Merlin?

4    A.    Yes.

5    Q.    During the time that you were at the CIA, were you trained

6    in the handling or the proper handling of classified

7    information?

8    A.    Yes.

9    Q.    Was that an important aspect of your job at the CIA?

10   A.    Yes.

11   Q.    Did you have a security clearance at the time?

12   A.    Yes, I did.

13   Q.    And what was that security clearance?

14   A.    Top Secret/HCS -- or SCI.

15   Q.    Approximately how long were you supervising Mr. B., his

16   handling of Merlin, before you became Merlin's case officer?

17   A.    Approximately 18 months to two years.

18   Q.    Is that the total amount of time that you dealt with

19   Merlin, or that's the amount of time that --

20   A.    That I supervised Steve B.  I don't remember the exact

21   dates, but --

22   Q.    You testified a minute ago that one of your roles as a

23   supervisor to Mr. B. was to edit correspondence or

24   communications; is that correct?

25   A.    Yes.

Laurie D. - Direct                                                    201

1    Q.   What types of communications, if you could describe those?

2    A.   Normally reporting information that he might have gotten

3    from Mr. Merlin into intelligence reports.

4    Q.   Where would those reports go?

5    A.   To Washington.

6    Q.   When you say Washington, where --

7    A.   CIA headquarters.

8    Q.   Was it standard practice for the supervisor to have a role

9    in editing the work product, so to speak, before it went back

10   to Washington?

11   A.   Yes.

12   Q.   At some point, you testified you became the case officer

13   for Merlin?

14   A.   Yes, I did.

15   Q.   And if you could estimate, approximately how long were you

16   in that role?

17   A.   Probably about 18 months or so.

18   Q.   Were you involved in any of the debriefings of Merlin?

19   A.   Yes, I was.

20   Q.   Were you physically present for those, or did you just

21   edit the reports after the debriefings?

22   A.   When I was the case officer, I was at the briefings --

23   debriefings.

24   Q.   Ms. D., the reports that were provided back to

25   headquarters, did you ever receive a response as to the, the

Laurie D. - Direct                                                    202

1  intelligence value of what Mr. Merlin was providing to the CIA?

2  A.   Yes.  Traditionally, the CIA, if someone writes a report,

3  you would get feedback on what it is that you provided that

4  would help you either tell you whether or not it's worth your

5  while to continue pursuing a certain line of, you know,

6  debriefing or what impact that might have had or then follow-up

7  questions.

8  Q.   So how important is it to have an accurate idea of the

9  usefulness of somebody's intelligence?

10 A.   It's very important.

11 Q.   And why is that?

12 A.   One, it helps you as the case officer to be able to know,

13 to how you, how you should be debriefing someone and the

14 direction of the case, where you need to go next in terms of

15 collecting information.

16 Q.   And to the extent you recall, what was the, the quality of

17 the reviews that came back for Mr. Merlin's intelligence?

18 A.   It had, it had very high impact.  It had very well

19 received by the policymakers, U.S. policymakers and the

20 analysts in headquarters, in CIA headquarters.

21 Q.   Ms. D., did you ever receive any award in connection with

22 the debriefings of Mr. Merlin?

23 A.   Yes, I did.

24 Q.   During the time when you were Mr. Merlin's case officer,

25 did you take any specific precautions to ensure that his role

1  working with the CIA remained hidden?

2  A.   Yes.

3  Q.   And just generally, what types of precautions would you

4  take?

5  A.   Do you mean in terms of writing things up, or do you mean

6  in terms of, like, doing, making sure that I varied my route, I

7  mean, that type -- I'm not quite sure what you mean.

8  Q.   I'll rephrase that.  So rather than the way that you wrote

9  things up, in dealing with Merlin, for example, would you meet

10  him at a known CIA facility?

11  A.   No, no.  We would, we would get hotels and would meet in

12  hotels.

13  Q.   Why would you do it at a hotel as opposed to a secure CIA

14  facility?

15  A.   Basically, because the, Mr. Merlin should have never gone

16  into a secure facility like that.  It's just too risky that in

17  the event it's a -- it's not -- for his security, it's not good

18  to go into one of those facilities in the event that somebody

19  ever finds out where it is.

20  Q.   So --

21  A.   So we went to hotels instead.

22  Q.   And that was so that people who might be paying attention

23  wouldn't know he was working with the CIA?

24  A.   Exactly.  Yeah, it's for his own security.

25  Q.   Do you recall what country Mr. Merlin was from?

1    A.    Yes.  He was -- yes.

2    Q.    Was that Russia?

3    A.    Yeah, Russia.

4    Q.    Do you recall whether you had any specific concerns about

5    the Russians finding out that Mr. Merlin was working with the

6    CIA?

7    A.    Other than his family members?

8    Q.    I'll rephrase the question.

9    A.    Okay.

10   Q.    Did you have any concerns about the Russian government

11   finding out about Merlin working with the CIA?

12   A.    Yes.

13   Q.    Describe those concerns.

14   A.    As in any of these cases when you're dealing with someone

15   from another country, you don't want their country to find out

16   that they're cooperating with the U.S. government because it

17   would jeopardize their safety and security and potentially

18   their family's as well back in their home country or even in

19   the U.S.

20   Q.    You testified that for some portion of the time when you

21   were the case officer for Merlin, debriefings were still going

22   on; is that correct?

23   A.    Yes.

24   Q.    At some point during your time as his case officer, was

25   there any discussion of using Merlin in a more operational

Laurie D. - Direct                                                    205

1    sense?

2    A.    Yes.

3    Q.    And were you involved in preliminary discussions about

4    that?

5    A.    Yes, I was.

6    Q.    What type of operation -- not what type of operation.

7    What were the basic contours of this planned operation?

8    A.    We were going to -- I'm trying not to use lingo here.  We

9    were going to ask Mr. Merlin if he'd be willing to get in

10   contact with another country.

11   Q.    Was that Iran?

12   A.    Iran, yes.

13   Q.    For what purpose?

14   A.    To learn more about their nuclear program.

15   Q.    Do you remember whether there was any discussion while you

16   were the case officer for Merlin as to what Mr. Merlin would

17   offer or communicate to the Iranians about?

18   A.    Yeah.  He would pose as a disgruntled Russian nuclear

19   scientist who basically wanted to offer his services to the

20   Iranian government and help them with their program.

21   Q.    Help them with their nuclear program?

22   A.    Um-hum.

23   Q.    And in connection with this planned operation, was there

24   an idea as to what he would offer, what type of intelligence?

25   A.    He would offer his expertise and also some documents.

Laurie D. - Direct                                                      206

1   Q.   Were those plans or schematics?

2   A.   Yeah -- yes.

3   Q.   Can you recall what the plans or schematics were for?

4   A.   Not specifically, no.

5   Q.   Do you recall whether it had to do with a specific nuclear

6   component?

7   A.   No, I don't remember.

8   Q.   Do you recall whether there was any discussion while you

9   were Mr. Merlin's case officer about whether these schematics

10  or plans would have any flaws in them?

11  A.   Yes.

12  Q.   And what type of flaws?

13  A.   I don't remember the exact details, and I'm not a

14  technical person, but there was something in those plans that

15  would not enable the Iranians actually to be able to make

16  whatever that piece was work.

17  Q.   Were these flaws apparent, or were they to be hidden?

18  A.   To be hidden.

19  Q.   Now, was Merlin involved in the plan to use, in the idea

20  to embed flaws --

21  A.   No.

22  Q.   -- or was he kept out of that?

23  A.   He was kept out of that.

24  Q.   And can you describe for the jury why Merlin was kept in

25  the dark about whether there would be flaws in these plans?

Laurie D. - Direct                                                207

1    A.    It was for his own security.  The less that he would know

2    about that, he could have plausible deniability.  If he were

3    ever asked, he wouldn't have to lie because he really didn't

4    know.  So it was for his, for his own security so that he --

5    there was no -- there would be no chance of him mistakenly

6    providing information that he shouldn't have because he

7    wouldn't, he wouldn't know.

8              And for the operation itself, the security of the

9    operation itself.

10   Q.    For the security of the operation, it was important that

11   he not know --

12   A.    Yes.

13   Q.    -- some of the details?

14   A.    Um-hum.

15   Q.    Why is that?

16   A.    Same thing.  Just to minimize the amount of information

17   that mistakenly could be given to the Iranians and to help keep

18   it secure and keep Merlin secure.

19   Q.    Was it standard operating procedure for human assets not

20   to be told all the details of the operations that they would be

21   used in?

22   A.    Generally speaking, yes.

23   Q.    You testified that this idea was in the planning stage

24   when you were the case officer for Mr. Merlin?

25   A.    Yes.

Laurie D. - Direct                                                    208

1    Q.   All right.  At some point, did you transition out of that

2    role and hand off Merlin to another case officer?

3    A.   Yes, I did.

4    Q.   And do you recall the first name and last initial of the

5    next case officer?

6    A.   Zach W.

7    Q.   Did Merlin know you by the name Laurie D. or by something

8    else?

9    A.   He knew my first name.

10   Q.   Laurie?

11   A.   Um-hum.

12   Q.   Ms. D., after your involvement with Merlin ended, did you

13   have any further access to the classified case associated with

14   Mr. Merlin?

15   A.   No.

16   Q.   If you'd wanted to, could you have gone and pulled out any

17   documents related to Mr. Merlin?

18   A.   No.

19   Q.   Is that -- when I say that, I'm asking is that true of

20   physical documents?

21   A.   It's true physical or, or things on the computer.  I

22   didn't have access to it.

23   Q.   So after you were no longer the case officer, you had no

24   access to either electronic or physical?

25   A.   No, I did not.

Laurie D. - Direct                                                    209

1    Q.    Relative to your entire CIA career, Ms. D., how would you

2    rank the intelligence value of Merlin compared to other assets

3    you dealt with?

4    A.    In my entire career, this is probably the most important

5    one that I've ever worked on, and I've worked on a lot of

6    interesting things, but this is the most important.

7    Q.    Ms. D., do you know Jeffrey Sterling?

8    A.    No, I don't.

9    Q.    The defendant in this case?

10   A.    No, I don't.

11   Q.    Before entering the courtroom today, have you ever seen

12   him before?

13   A.    No, I have not.

14   Q.    Do you know a reporter named James Risen?

15   A.    No, I don't.

16   Q.    Have you ever discussed your dealings with Merlin with

17   James Risen?

18   A.    No, I did not.

19   Q.    Have you ever read a book called *State of War*?

20   A.    I only saw the one piece of a chapter related to Merlin

21   when I was interviewed with the FBI.  Otherwise, I have not

22   read the book.

23   Q.    So did you ever discuss with Mr. Risen, the author of that

24   book and that chapter, anything to do --

25   A.    No.

Laurie D. - Cross                                                    210

1   Q.   -- with your time dealing with Merlin?

2   A.   No.

3   Q.   Have you ever had discussions with anyone about Merlin

4   where that person was not authorized to know about Merlin?

5   A.   No.

6           MR. OLSHAN:  One moment, Your Honor?

7           THE COURT:  Yes, sir.

8   BY MR. OLSHAN:

9   Q.   Ms. D., are you still employed by the CIA?

10  A.   Yes, I am.

11  Q.   And do you still work on intelligence matters?

12  A.   Yes, I do.

13          MR. OLSHAN:  That's all, Your Honor.

14          THE COURT:  All right.  Mr. Pollack?

15          MR. POLLACK:  Thank you, Your Honor.

16                     CROSS-EXAMINATION

17  BY MR. POLLACK:

18  Q.   Ms. D., if I understand it correctly, originally at the

19  beginning of your tenure as the case officer for Merlin, the

20  relationship with Merlin was still one of simply debriefing

21  him?  He was not yet an operational asset?

22  A.   Yes.

23  Q.   And then at some point during your tenure, there was an

24  operation that it was decided Merlin would be well suited to

25  participate in, correct?

1   A.   Yes.

2   Q.   And there was an individual by the name of Robert or Bob

3   whose last name begins with "S" who was the person at

4   headquarters overseeing that operation, correct?

5   A.   Yes.

6   Q.   And, and for purposes of our conversation, we're going to

7   call that operation Classified Program No. 1, okay?

8   A.   Okay.

9            MR. POLLACK:  And if I can have Exhibit, Government

10  Exhibit No. 6 put up on the screen for the witness?

11           THE COURT:  Now, do we have any issues with this

12  exhibit?

13           MR. OLSHAN:  This is just for the witness, Your

14  Honor, at this point?

15           THE COURT:  No, it's going to go up on the screen

16  and --

17           MR. POLLACK:  Well, I was going to lay the foundation

18  to admit it, but if you have no objection to its admission, we

19  could just show it.

20           THE COURT:  Hold on a second.  Just wait a second.

21           All right, I assume there's no objection to this

22  exhibit.  It's a government exhibit, so I assume there's no

23  objection.

24           MR. OLSHAN:  There's no objection, Your Honor.  There

25  was just the issue that came up this morning about it.

1          THE COURT:  I understand that.  We'll take care of

2    that.

3          MR. OLSHAN:  All right.

4          THE COURT:  All right, it may be shown to the jury.

5    We have the room set up appropriately.

6          And, ladies and gentlemen, if that light is a glare

7    and it makes it difficult for you to see what's on your

8    screens, let us know, and we'll close the blinds.  Anyone need

9    the blinds closed at this point?  No?

10                    (Jurors shaking heads.)

11         THE COURT:  All right, go ahead, Mr. Pollack.  And

12   Government Exhibit 6 is in, all right?

13         MR. POLLACK:  Thank you, Your Honor.

14         (Government's Exhibit No. 6 was received in

15   evidence.)

16   BY MR. POLLACK:

17   Q.   And, Ms. D., you have a paper copy of it in front of you?

18   A.   Yes.

19   Q.   Of Government Exhibit 6?

20   A.   Yes, I do.

21   Q.   Go ahead and take a moment to review it.  Can you just

22   describe for me generally, what is this that we are looking at?

23   A.   This is an operational cable which is saying about Mr. S.

24   coming up to where we were meeting with Mr. Merlin.

25         THE COURT:  I'm sorry, you're going to need to talk

Laurie D. - Cross                                                      213

1    to --

2              THE WITNESS:  I'm sorry, okay.  My apologies.  This

3    is an operational cable that's indicating that Mr. S. is coming

4    up to travel to meet with me and with Mr. Merlin to talk about

5    the possibility of working on this operational idea,

6    Classified --

7    BY MR. POLLACK:

8    Q.   Classified Program No. 1?

9    A.   Classified Program 1.

10   Q.   Okay.  And so this is an official CIA document?

11   A.   Yes.

12   Q.   And this was a, colloquially, it's called a cable?

13   A.   Yes.

14   Q.   And it was fairly routine, was it not, that cables would

15   be created to document what happened in the course of an

16   operation, correct?

17   A.   Yes.  We document everything.

18   Q.   If something happens, it gets put into a cable, correct?

19   A.   Yes, yes.

20   Q.   And then the cables then become the official record of the

21   operation, correct?

22   A.   Yes.

23   Q.   And someone who is, quote, read into the program or into

24   the cabinet has the ability to access these cables, correct?

25   A.   Yes.

Laurie D. - Cross                                                    214

1   Q.   Okay.  And this particular cable, if you'd look to the

2   second page, who's the author of this cable?

3   A.   I think it's -- it looks like it's Mr. S., the originator.

4   Q.   Okay.  So Mr. S. wrote this cable to document his trip to

5   meet with you and to meet with Merlin, correct?

6   A.   I guess so, yes.  That's what it says here.

7   Q.   And it describes the, the general terms of what the

8   operation is going to be, what Classified Program No. 1 is,

9   correct?

10  A.   Yes.

11  Q.   Similar to, as you described on the stand, that it would

12  be an effort to get flawed designs to a foreign country,

13  correct?

14  A.   Yes.

15  Q.   And if you'd look at the second page, about the middle of

16  that paragraph, I don't know if we can zoom in on it at all, it

17  says, "Note that the whole operational concept here is

18  deception," correct?

19  A.   I'm looking for it.  Hold on a second.  Where do you see

20  this on the second page?

21          THE COURT:  Ms. D., if you'd turn around and look at

22  the screen?

23          THE WITNESS:  Oh, right here.

24          THE COURT:  Yeah.

25          THE WITNESS:  Okay.

Laurie D. - Cross                                                    215

1          THE COURT:  That will make it easier for you.

2          THE WITNESS:  Yeah, okay.  Yes.

3  BY MR. POLLACK:

4  Q.   And that's -- those are Mr. S.'s words, correct?

5  A.   I'm -- yes, but I'm assuming he didn't do this by himself.

6  I'm sure there were people back in Washington he was working

7  with on this.

8  Q.   But he was the one overseeing this program?

9  A.   As far as I could tell from the field, from where I was.

10  Q.   In fact, this program was largely his concept, correct?

11  A.   I don't know if it was his concept.  It was CIA

12  headquarters' concept.

13  Q.   And it's his description of the concept that it's one of

14  deception, correct?

15  A.   Well, according to this cable.

16  Q.   And, in fact, it was Mr. S., was it not, who had the idea

17  to use Merlin in this operation, correct?

18  A.   I, I honestly -- I guess I don't understand what you're

19  asking.

20  Q.   Sure.  There, there was a concept for this operation, this

21  Classified Program No. 1, that we would try to get flawed

22  nuclear designs to a foreign power, correct?

23  A.   Yes.

24  Q.   And then the CIA needed somebody to actually pull that

25  off, to play the role of somebody who could get these plans to

1    the foreign power, correct?

2    A.    Yes.

3    Q.    And you were the case officer for the particular asset

4    Merlin?

5    A.    Yes.

6    Q.    And Mr. S. believed that Merlin would be a good vehicle to

7    use in Operation Classified Program No. 1?

8    A.    He was probably one of several people who probably thought

9    Mr. Merlin was that.  I don't -- wouldn't necessarily say that

10   Mr. S. is the only person who ever thought of it.  I mean, I

11   guess, you know, there's a lot of people back in headquarters.

12   It's not usually something done by one person.

13   Q.    And the idea was for someone, in this case Merlin, to be

14   dangled before the foreign power, the Iranians, correct?

15   A.    Yes.

16   Q.    And what does it mean to dangle somebody?

17   A.    I'm trying not to go into lingo.

18   Q.    In general terms.

19   A.    Basically, you would be putting someone in front of

20   someone who was unwitting that they had another agenda.  In

21   this instance with Mr. Merlin, we wanted to place him,

22   highlight him or have himself highlight himself to the Iranian

23   government ostensibly to help them, but in reality, he was

24   helping the U.S. government.

25   Q.    And this was a different role for Merlin than the role he

1    had had up until that point, where he was simply being

2    debriefed, correct?

3    A.   Yes.

4    Q.   But Mr. Merlin agreed to play this role, correct?

5    A.   Yes, he did.

6            MR. POLLACK:  If we can go ahead and put up

7    Government Exhibit 5?

8            THE COURT:  I assume there's no objection from the

9    United States?

10           MR. OLSHAN:  No objection.

11           THE COURT:  All right, 5 is in.

12           (Government's Exhibit No. 5 was received in

13   evidence.)

14   BY MR. POLLACK:

15   Q.   And Government Exhibit 5 again is another CIA operational

16   cable; is that correct?

17   A.   Yes, it is.

18   Q.   And can you tell who -- and this one -- I probably should

19   have noted this -- Government Exhibit 6 was dated May of '97.

20   A.   Yes.

21   Q.   This one is dated January of '97, correct?

22   A.   Yes.

23   Q.   And can you tell, Government Exhibit 5, the cable from

24   January of '97, who the author of that cable is?

25   A.   It does not say here.  The ID number is not there.

Laurie D. - Cross                                                    218

1    Q.    But it's a cable to which you would have had access?

2    A.    More than likely, yeah.

3    Q.    And it's a cable to which Mr. S. would have had access?

4    A.    His office that he worked in would have been the one to

5    probably see this cable.

6    Q.    And if you look at the fourth line on page 2, it says "M,"

7    and that's Merlin?

8    A.    Um-hum.

9    Q.    "M's operational motivation for this activity is almost

10   purely financial, and his desire to continue earning income

11   from the CIA is something that Merlin was very frank and honest

12   about during his meetings with C/O and CPD officers."

13           Now, "C/O" stands for case officer?

14   A.    Yes, it does.

15   Q.    And, and just to be complete, "CPD" stands for

16   Counterproliferation Division?

17   A.    Yes.

18   Q.    And was Merlin very frank and honest in his discussions

19   with you that his motivation to participate in this operation

20   was almost purely financial?

21   A.    Based on this cable.  I don't remember every specific

22   detail of that conversation, but presuming that I'm the one who

23   wrote this, I don't know that -- I would assume I'm probably

24   the person who wrote this, but, but yeah.

25   Q.    And with respect to the actual operational planning,

Laurie D. - Redirect                                                       219

1   the -- with respect to the actual operational planning, it's

2   true, is it not, that Mr. S. did nearly everything and that you

3   had little involvement in that planning?

4   A.    What do you mean?

5   Q.    With respect to the details of how this operation was

6   going to play itself out, is it fair to say that Mr. S. had a

7   much larger role in coming up with that plan than you did?

8   A.    I would think so because he was back in headquarters and I

9   was not.  I was handling the asset.

10  Q.    And then your tenure in handling the asset ended in July

11  of 1997?

12  A.    Yes.

13          MR. POLLACK:  I don't have anything further, Ms. D.

14  Thank you.

15          THE WITNESS:  Okay.  Thank you.

16          THE COURT:  All right, any redirect?

17          MR. OLSHAN:  One second, Your Honor.  Thank you.

18                    REDIRECT EXAMINATION

19  BY MR. OLSHAN:

20  Q.    Ms. D., one of the cables that Mr. Pollack showed you

21  reflected that Mr. Merlin was candid and honest about his

22  desire for financial payment; is that correct?

23  A.    Yes.

24  Q.    And in your dealings with him, did he tend to fulfill his

25  side of the bargain in return for the payment that the CIA

1   provided?

2   A.   Very much so, yes.

3              MR. OLSHAN:  No further questions.

4              THE COURT:  Any recross?

5              MR. POLLACK:  No, Your Honor, thank you.

6              THE COURT:  Is anybody going to call this witness

7   again?

8              MR. OLSHAN:  No, Your Honor.

9              MR. POLLACK:  No, thank you.

10             THE COURT:  All right.  Ms. D., thank you for your

11  testimony.  You're free to leave.  If you'd go with Mr. Wood?

12             THE WITNESS:  Thank you.

13                          (Witness excused.)

14             THE COURT:  We'll bring the next witness in.

15             MR. TRUMP:  Mr. Zach W.

16             Your Honor, this is the first witness that we would

17  probably use these notebooks for to go through about four or

18  five cables.

19             THE COURT:  Approach the bench for one second.

20  Everybody come up for a second.

21             (Sealed Bench Conference A not transcribed in this

22  volume.)

23            ZACH W., GOVERNMENT'S WITNESS, AFFIRMED

24                        DIRECT EXAMINATION

25  BY MR. TRUMP:

1  Q.    Would you please state your full name and your last

2  initial.

3  A.    Zach W.

4  Q.    And we're spelling Zach Z-a-c-h?

5  A.    Z-a-c-h.

6  Q.    Mr. W., have you previously been employed by the Central

7  Intelligence Agency?

8  A.    Yes, I have.

9  Q.    And when did you begin working for the CIA?

10 A.    I began work for the CIA in May of 1983.

11 Q.    And when did you end your official employment with the

12 CIA?

13 A.    I retired in October of 2012.

14 Q.    Do you maintain a relationship with the agency as a

15 contractor?

16 A.    I do.  I -- since retirement, I work as a contractor in a

17 part-time capacity for a couple of different offices in the

18 CIA.

19 Q.    Now, back in 1983, what were you doing when you were --

20 what was your first position with the --

21 A.    My first position with the Central Intelligence Agency was

22 in a position, I think the title of it at the time was called

23 information control clerk.  I stapled material that came in

24 from all around the world on the midnight shift in an office

25 that was like a mailroom.

1   Q.   So essentially, you were doing clerical --

2   A.   It was a clerical position, yes.

3   Q.   Did you make a change in your career status at some point?

4   A.   I did.  In, in the summer of 1985, I joined what was then

5   known as the Directorate of Operations, now the Clandestine

6   Service, the National Clandestine Service.  So I moved into the

7   professional ranks that summer.

8   Q.   At some point, did you become an operations officer or

9   case officer?

10  A.   I did at the completion of training.

11  Q.   Have you spent time in the, as a case officer overseas?

12  A.   I have, yes.

13  Q.   As well as domestically?

14  A.   Domestically working out of Washington, yeah.

15  Q.   Let me direct your -- well, let me back up a second.  As

16  you were going through your training to become an operations

17  officer or case officer, were you trained in the proper

18  handling of classified information?

19  A.   I was.  Actually, I probably got some training in that

20  beginning in 1983.  I handled a great deal of classified

21  information, and so yes, you're trained on maintaining its

22  security and keeping things, keeping things secure.

23  Q.   But back in 1983, you didn't deal with any human assets,

24  did you?

25  A.   I did not, no.

Zach W. - Direct                                                      223

1   Q.   In training to become an operations officer, was that part

2   of your training?

3   A.   Of course, yes.  To maintain the security of assets, human

4   assets is, is probably one of the, of the highest order in the

5   training.

6   Q.   Is that principle, the maintaining the security of your

7   human assets, is that something that's reemphasized throughout

8   your career?

9   A.   It's reemphasized throughout your career -- the answer to

10  your question is yes.  The National Clandestine Service mission

11  is to recruit human assets, and so keeping them secure and safe

12  is, is critical and essential to the mission.  So, of course,

13  it is reinforced in training how to do it but then reinforced

14  throughout the, throughout the process that that's part of your

15  work.

16  Q.   And were you a case officer back in 1997?

17  A.   I was serving as an operations officer, as a case officer

18  in 1997, yes.

19  Q.   And at that time, did you become familiar with what we are

20  calling Classified Program No. 1?

21  A.   I did, yes.

22  Q.   Do you recall about when?

23  A.   I, I believe in the summer, maybe the late spring of 1997.

24  Q.   And how was it that you became familiar with this program?

25  A.   Well, I don't remember the details precisely, but what

1    would have happened, because it is a, was a highly sensitive

2    program, I didn't know anything about it.  I didn't know

3    anything about the source.  I didn't know anything about the

4    program until management came to me, probably my immediate

5    supervisor at the time, and probably with the decision of their

6    management along the chain, had decided to give me the

7    responsibility for the case as the case officer that had been

8    handling those responsibilities was moving on.

9    Q.   As part -- one of those responsibilities was dealing,

10   handling a human asset they were calling Merlin?

11   A.   Yes.

12   Q.   Who was the case officer that preceded you in the handling

13   of Merlin?

14   A.   Laurie D.

15   Q.   What was the status of Classified Program No. 1 and Merlin

16   when you took over in mid-1997?

17   A.   My recollection is that the case up to that point had been

18   primarily one where intelligence was obtained directly from

19   that source.  The plan moving forward was to expand that,

20   change the direction somewhat into a more operationally driven

21   program or operation, as we say.  It wasn't about intelligence

22   anymore.  It was about using Merlin's background and skills to

23   make operational achievements.

24   Q.   Now, when you -- you said you didn't know anything about

25   the program prior to your involvement in it.  Did you have to

Zach W. - Direct                                                          225

1   be read into the program?

2   A.    Well, yes.  I would have met with Laurie D.  She would

3   have given me a sense of what the case was to that point.  I

4   would have also read what we refer to as cable traffic, that

5   is, a history, a documented history of virtually everything

6   that goes on with, relating to a case.  I probably wouldn't

7   have read everything about it; that would be unnecessary; but I

8   would have had enough information when the time came to meet

9   and take over these responsibilities that I'd have a good sense

10  of who this person was and what, what our operational goals

11  were.

12  Q.    And the documents, the cables, the materials that you

13  review were marked according to the special access of this, the

14  limited access of this program?

15  A.    Correct.  It was, it was very clear.  In fact, you know,

16  when you are brought in and you're assigned a case like this,

17  it immediately becomes evident to the person who has those

18  responsibilities how sensitive it is because of the markings on

19  the, on the cables, the written products.

20  Q.    At some point, did you meet Merlin?

21  A.    I did.

22  Q.    And what name did you use for yourself for when you, when

23  you dealt with Merlin?

24  A.    I think at the time, I used the name Max.

25  Q.    And without saying the name, how did you refer to Merlin?

Zach W. - Direct                                                      226

1    A.    I would have, I would have -- how would I have referred to

2    him?

3    Q.    Yes.

4    A.    In his, in his true name.   In his name.

5    Q.    Not Merlin, but his true name?

6    A.    True name, whatever that was.

7    Q.    What was your job, what was your duty with respect to

8    Merlin and the status of the operation?   What were you

9    instructed to do?

10   A.    As a handling case officer for a human asset, you have

11   multiple responsibilities.   First and foremost is to establish,

12   maintain a good relationship.   You represent, you are the face

13   of the agency.   Even though I was using the name Max, it was

14   very clear to him that I was from the CIA.   There was no, there

15   was no misunderstanding on that score.

16        So I represent the National Clandestine Service to

17   him.   It's to maintain that relationship, maintain it as a

18   positive relationship.   It was also to explain to him the goals

19   and work with him to achieve those goals that we'd agreed on.

20   Q.    Were you working with someone from headquarters as well?

21   A.    I, I was, I was taking guidance.   I was providing

22   assessment.   I was providing feedback with an office at

23   headquarters, the Counter- -- in the Counterproliferation

24   Division.

25   Q.    And did you have a specific point of contact within the

Zach W. - Direct                                                         227

1    Counterproliferation Division?

2    A.    Yes.

3    Q.    Who was that?

4    A.    That person was Robert S.

5    Q.    And you also called him Bob?

6    A.    Bob, Bob S.

7    Q.    When you met with Merlin, was Bob S./Robert S. sometimes

8    present?

9    A.    Sometimes present, usually not.  Usually the meetings were

10   held -- if there was a need for, for Bob to come to the

11   meetings, of course he could, but for the most part, I met

12   Merlin one on one.  That's kind of standard procedure.

13   Q.    And just tell us what you were doing with Merlin.

14   A.    Well, the, the operation at the time, the direction that

15   was, we were going after was to use Merlin's background as a,

16   as an engineer involved in nuclear-related materials Russian

17   and use that and leverage that profile and that experience to

18   attract attention from Iranian officials involved in their

19   nuclear weapons program.

20   Q.    And did you help him, coach him on how to accomplish this

21   goal?

22   A.    Yeah, I'd like to think I did.  I -- we worked very

23   closely coming up with potential people for him to engage.  You

24   know, it's very interesting, you -- today's world is not the

25   world of, of the mid-late '90s when it comes to, you know,

1   being able to Google things in and immediately quick responses.

2   The Internet was quite in its, in its earliest phases.

3   Everything was www\, etc.  I mean, you had to get it right, and

4   it took a lot of effort simply even to find potential

5   individuals or organizations or institutions online to reach

6   out to, to potentially float him and then do it, do it

7   consistently and do it in such a way that would, would come

8   across to those targets as being genuine.

9           So there was a lot of back-and-forth.  There was a

10  lot of engagement in a very practical way in that regard.

11  Q.   And was most of the, most of the attempt to attract

12  Iranian officials done through the Internet?

13  A.   It wasn't entirely done through the Internet.  Some of it

14  was done in genuine old-fashioned put a stamp on the letter and

15  send it and see what response we get.  Yeah, the whole goal

16  was -- that wasn't just done to accomplish that because we

17  thought, Okay, that's how they'll respond.  The goal was to

18  promote a profile that really gave Merlin credibility in his

19  efforts to engage those targets.

20  Q.   And did you task him with providing you with the results

21  of his Internet work and --

22  A.   Absolutely.  I would, I would, for instance, see what he

23  could get on his own.  I would sometimes ask Washington for

24  ideas from them.  I would pass that information to him.  He

25  would pass information to me.

Zach W. - Direct                                                          229

1              We'd talk very carefully about the wording of his

2    efforts to make those, those contacts, very carefully about how

3    to word it.  He, he wasn't -- everything was very carefully

4    orchestrated.  There was not any sort of effort alone to make

5    those decisions.  There was constant contact between

6    Washington, myself, and, and Merlin and then back-and-forth.

7    So it was a continuous continuation effort.

8    Q.    Did he bring you evidence of the results of his work?

9    A.    Absolutely.  Sometimes it was voluminous.  Sometimes on,

10   you know, printer paper that we'd all laugh at today.  I mean,

11   it was, it was volumes of stuff.

12             When I reflect back, I can't help but convey just how

13   different the time was with regards to technology.  Today it's,

14   it's Google, print, you got a list of whatever.  That wasn't

15   the case then.  It took a lot of work, a lot of effort.  And

16   computers themselves were, were not as reliable as they are

17   today.

18   Q.    Was he doing the computer work primarily from his home?

19   A.    He was.  He had a computer designated for this.  He did

20   other things on it, but yes, there was a -- he did.  I think

21   from time to time, he may have checked to see whether he got

22   any bites from his computer at work, but he didn't do anything

23   operationally with, with that computer.

24   Q.    Have you been at his home?

25   A.    I was at his home, yes.

Zach W. - Direct                                                    230

1    Q.    And I believe you've mentioned that the target was, at

2    this point was, was Iran?

3    A.    Iran.  And I think, I think it -- that might have had

4    something to do with why I was chosen to take responsibility

5    for the case.  I'd done work on Iranian-related issues in the

6    past.

7    Q.    Were you aware of any other targets at that point?

8    A.    No.

9    Q.    And what else was going on in the operation from, from CP

10   standpoint?  What, what other aspects of the operation had to

11   sort of fall in place in order to move forward?

12   A.    Sure.  Well, it did no good if you were trying to engage

13   these targets if you didn't have something to provide them or

14   something to sort of bait them if contact was made, and so

15   quite separate but parallel was an effort by individuals in CP

16   Division to create a material that ideally Merlin could then

17   use to attract these targets.

18   Q.    Were you heavily involved in that process?

19   A.    I wasn't heavily involved in it.  I was aware of it.  I'm

20   not, I'm not a technically minded person particularly, but I --

21   it wasn't that sophisticated that I didn't understand it, but I

22   was not directly involved in anything related to that, that

23   material itself.

24   Q.    How was it that you would be communicating with those who

25   were aware of it?  Was that --

1    A.    Most of it was, most of it was really informing me and my

2    office of the status of that effort.  It wasn't really, it

3    wasn't -- there would be a message sent about a topic, and in

4    it would also say something like, you know, and that's, in

5    parallel we're working with the next phase or so forth.

6              So it was often I was informed of it, but it wasn't

7    something that I was directly aware of, you know, on a

8    day-to-day basis by any means.

9    Q.    And when you refer to your office, your office at this

10   time was in New York?

11   A.    In New York City.

12   Q.    At some point, were you going to move on to a new

13   assignment?

14   A.    Yes.  In the, in the fall of 1998, an opportunity came for

15   me to, to move on to another office.

16   Q.    So what is it that you did with Classified Program No. 1

17   and, and Merlin?

18   A.    The office identified an incoming officer who would take

19   on not only responsibilities for this case but other, some

20   other responsibilities of mine and I think some other

21   responsibilities of other, other people as well, but it was

22   time to transfer responsibility from, from the -- of this case

23   to another officer.

24   Q.    And who was the officer that was going to get Classified

25   Program No. 1 and Merlin?

1    A.    Mr. Sterling.

2    Q.    And do you see him in the courtroom?

3    A.    I do.

4    Q.    Would you point him out, please?

5    A.    Right there (indicating).

6          THE COURT:  Any issue about the identification?

7          MR. POLLACK:  No, Your Honor.  There's no question

8    this is Mr. Sterling.

9          THE COURT:  All right, the identification is

10   established.

11         THE WITNESS:  This would have been in the same

12   regards that, when responsibility was transferred to me a

13   year-and-a-half earlier, similar circumstances.

14   BY MR. TRUMP:

15   Q.    Where was Mr. Sterling, the defendant, working at the time

16   the, the change was going to take place?

17   A.    I, I don't know for sure.  I know headquarters.  I know

18   Washington.  I know the Washington area.  I believe

19   Counterproliferation Division, but I --

20   Q.    But he wasn't in New York yet?

21   A.    He was not in New York yet.  And I could be wrong on, on

22   that.

23   Q.    Where was the -- was there a meeting planned at which

24   point you would introduce Mr. Sterling to Merlin?

25   A.    There was a meeting planned.  It was not for that sole

Zach W. - Direct                                                    233

1    purpose only, but that was going to be, it was a sort of

2    phased-in effort because the plan was to introduce Mr. Sterling

3    even before he moved to New York City.

4    Q.   Where was that meeting going to take place?

5    A.   San Francisco, California.

6    Q.   And did it, in fact, take place in San Francisco?

7    A.   It did take place in San Francisco.

8    Q.   Approximately when was that?

9    A.   In, in I want to say mid-November of 1998.

10   Q.   And who were the people who went to San Francisco for that

11   meeting?

12   A.   Merlin and Merlin's spouse, myself, Mr. Sterling, Bob S.,

13   and a, a contractor who was primarily technically, technically

14   focused by the name of Len.

15   Q.   And what was planned for, for San Francisco?

16   A.   Well, what was planned, there were a couple of important

17   things that were to take place there.  One is for Merlin to

18   meet Mr. Sterling, and that was important because that

19   relationship was important to get off to a good start.  It was

20   also time for all those efforts that had gone into the crafting

21   of the, the product, that ideally if all things came to be, we,

22   we would have Merlin attract the Iranian targets.

23           So there was a time to show that product at least in

24   its initial approved draft form to Merlin and talk about with

25   him the story he would tell to any Iranians that might show

1    interest.

2    Q.   Let's get back to the purpose in terms of meeting

3    Mr. Sterling.  Had you met Mr. Sterling before?

4    A.   I had met Mr. Sterling before.

5    Q.   And how was that?  How was it that you came in contact

6    with him?

7    A.   Well, we were both officers who had worked on

8    Iranian-related issues in the past, and although I had never

9    worked with Mr. Sterling up to that point in any, in any

10   great -- that I remember in any specific cases, we would run

11   into each other at different forums related to Iran or working

12   that, that issue and so on, and so I knew him in that context.

13   Q.   So in San Francisco, was Merlin introduced to

14   Mr. Sterling?

15   A.   He was.

16   Q.   How did it go?

17   A.   I think it went very well.  It went very well.  He was

18   introduced, I think the first time was at, was at breakfast.

19   It was sort of a public setting, so it's a little bit, a little

20   formality to that, but it was all very, it was -- I think it

21   went very well.  I think the relationship seemed to go very

22   well.

23   Q.   And did Mr. Sterling also meet Mrs. Merlin?

24   A.   He did.  You know, the, the meetings in San Francisco took

25   place in a, in a way that there would be some social time and

1    then there would be some work, focus on work, and then there

2    would be some social time, some down time for that relationship

3    to take off both with Merlin and, and Mrs. Merlin, and so over

4    the course of a couple days, there was a combination of sort of

5    social interaction, maybe some meals, some local -- some work

6    behind closed doors where we're talking about the specifics of

7    the case and how we're moving it forward, etc., etc., and then

8    followed by some more social time.

9    Q.   Let's talk about the work behind closed doors.  At some

10   point, you had meetings to talk about the operation; is that

11   right?

12   A.   We did.

13   Q.   Where did they take place?

14   A.   They took place in a, in a hotel suite.

15   Q.   And who was present while the operational meeting was

16   taking place?

17   A.   Myself; Mr. Sterling; Bob S.; Len, this technical officer;

18   and Merlin.

19   Q.   And Mrs. Merlin was not participating in those meetings?

20   A.   No.

21   Q.   Who was the most senior person in terms of the operation

22   present at the meeting?

23   A.   Bob S.

24   Q.   Were the -- was the product shown to Mr., Mr. Merlin?

25   A.   Yes.   The product was, it was sort of a diagram, and I, I

1   also recall sort of a complimentary list of, of parts included

2   in the diagram of this piece of technology to which he could

3   realistically claim to have knowledge of enough to attract the

4   Iranian targets.

5   Q.   Do you recall today what, what type of technology we're

6   talking about?

7   A.   It was a, I believe, a firing set from a -- for a nuclear,

8   a nuclear missile.

9   Q.   We're dealing with nuclear weapons here, right?

10  A.   Nuclear weapons.

11  Q.   What happened when Merlin was given the diagram and the

12  list?

13  A.   Well, I, you know, he, he is an engineer, and he looked at

14  it, and he said, well, you know, it should be this and it

15  should be this, but it was, it was a good discussion actually.

16  It was a quite good discussion.

17          His reaction was, gee, maybe you should have some of

18  this on, more on this list, or this doesn't match.  There was a

19  good dialogue that went back and forth about, about the

20  product.

21          It was very important, I think, for all of us at the

22  time to incorporate and to listen to Merlin's ideas on it, but

23  there was a good give-and-take, and he had some questions that

24  Len, the technical person, had to go back to the people who

25  helped him craft this diagram and this list of parts and so

1   forth and clarify.

2   Q.   And do you recall some of the specific concerns that he

3   raised?

4   A.    He, he thought that there were parts -- there was a

5   diagram, and then there's a list of parts, and I -- my

6   recollection is that there were things included in the diagram

7   that were absent from the parts, and he thought there should

8   have been, there should have been, everything here should have

9   been here, but as we explained to him, the legend that we were

10  prompting him to use and coaching him to use with the Iranians,

11  we explained to him why that, that it had been crafted that

12  way.

13  Q.   These, these questions that he asked, what, were they

14  taken seriously?

15  A.    Oh, they were taken quite seriously, quite seriously.  You

16  know, this is, this is serious business, and it's, it was

17  critical for those of us working to achieve those goals to have

18  Merlin committed 100 percent to the process.  He's the one out

19  there engaging these targets, serious people, and so the key

20  was to craft a story and make sure he was comfortable with it

21  so when he raised issues -- and I say "issues."  That was

22  not -- for the most part, it was accepting, okay, I think this

23  can work.

24  Q.   Did you or Robert S. or Len or anybody else answer all of

25  his questions at those meetings?

1  A.   No, we couldn't.  We couldn't because some of the

2  questions were even beyond the technical expertise of Len, who

3  was there.  It was important for, for us to get back to him,

4  and he accepted that.  He accepted that.

5  Q.   And was it planned to get back to him?

6  A.   Yeah, I got back to him.  I got back to him a couple weeks

7  later specifically.

8  Q.   Did you have any private, one-on-one conversations with

9  Merlin during, during these meetings or during the social

10 activity?

11 A.   I did.  I had one, one short -- we'd started the day with

12 breakfast, and then we'd gone into meetings, and then I think

13 there was a lunch break, and then we spent the afternoon in

14 more meetings, and at the end, pretty much everyone left.  I

15 had been meeting Merlin at that point for a year and a half or

16 however long it was, and so I probably had the best

17 relationship, and I stayed behind and spoke to him and got his

18 temperature, took his sort of temperature on what he thought of

19 the new officer who would be taking over, and he was very

20 positive about it.

21      This -- I had mentioned the fact of an introduction.

22 It didn't come as a surprise to him in San Francisco.  He knew

23 he'd be meeting someone new, and he'd now had that experience a

24 couple of times in his relatively short association with the

25 agency, so it, it was not, it was not a new thing to him.

1   Q.   Did you have any private conversations or conversations

2   solely with Mr. Sterling while you were in San Francisco?

3   A.   I'm sure I did.  I'm sure I did because it's just the way

4   I work, but I don't, I don't honestly remember anything

5   substantive.  We would have been talking very much about, about

6   the case.  So it's quite possible that it would have been

7   looking over the diagram and we would have walked to another,

8   to another part of the suite and had a conversation about this

9   or that, but I don't, I don't remember it as being any

10  substantive issue.

11  Q.   Did Mr. Sterling raise any concerns with you or address

12  you on any issues that had come up during the meetings?

13  A.   No, no, no.  I, you know, I thought it was a -- I thought

14  it was a great case, and I thought it had great potential, and

15  I think that seemed the view of everyone.  I felt, I felt a

16  little saddened that it had not gotten further along during my,

17  during my tenure; that's all.

18  Q.   Did Merlin and Mrs. Merlin socialize with Mr. Sterling and

19  Robert S. without you present?

20  A.   They did.  I went -- I returned back to New York the

21  following day, and -- or at least a day later than everyone

22  else.  I went back early.  It was time for that relationship

23  to, to be the most important one, and so they did.  They spent

24  some time.  They, they took a morning or an afternoon and went

25  off to do some Wine Country touring and so forth to build that

Zach W. - Direct                                                    240

1    relationship.

2    Q.    You were not present with them?

3    A.    I was not.

4    Q.    Did you know where they went?

5    A.    I know they went to Wine Country.  I don't know whether it

6    was Sonoma or Napa or -- I don't know.

7    Q.    So how was it left with, with Merlin at the conclusion of

8    these meetings?

9    A.    Well, we'd -- at the conclusion of the meetings, we'd gone

10   over a couple --

11   Q.    In terms of the operation.

12   A.    Yeah, right.  We'd gone over a couple of times the

13   specifics and how, how he was supposed to engage the potential

14   targets that would come his way.  We repeated that, went over

15   it a couple of times.  He asked some questions.  We, we

16   explained that it wasn't just a matter of he would be out there

17   alone.  He'd be potentially representing others unknown,

18   unnamed, went over that as a legend, as a story.  We went over

19   it repeatedly so that he was secure with it.

20          And as far as his questions went on the material on

21   the diagram, we said we'd get back to him, and we, and we did a

22   couple weeks later.

23   Q.    You returned to New York?

24   A.    I returned to New York.

25   Q.    And you're still the case officer --

1   A.    I'm still the case officer.

2   Q.    -- with respect to this program.

3         So what happened when you got back to New York in

4   terms of your follow-up?

5   A.    I had a meeting scheduled with him not too much longer.

6   It might have, it might have been the end -- maybe ten days

7   later, something like that, and I would have collected the

8   receipts.  I would have been responsible for all of the

9   administrative things to the, to the case, all of his, all of

10  his expenses out in San Francisco, so there would have been

11  that, and then I would have, I would have also relayed to him

12  information that had already come.

13        I think at that point, we hadn't quite gotten clarity

14  yet on, on where -- on his issues.  I don't think that was done

15  at my personal meeting with him.  I don't think that was

16  conveyed until a subsequent meeting just a few days later after

17  Mr. Sterling had arrived in New York.

18  Q.    So at this first meeting that you had, Mr. Sterling was

19  not present?

20  A.    No.  It was, it was -- I think it was more on research.

21  It was also more on things he was doing to gain access to

22  targets.  It was administrative for the most part.  I could be

23  wrong; it's been a long time; but, but where we really

24  explained to him, you know, addressed his questions that he had

25  about the material was done at the final meeting I had with

1   Merlin, where Mr. Sterling was, was present.

2   Q.   The things that we've been talking about, how are they

3   documented as part of the CIA's recordkeeping?

4   A.   We communicate in written form, in what we call official

5   cables.  It, it -- the parlance in our organization is that

6   it's never happened until it's written down, so when there's a

7   meeting when there's something like this that happens, we

8   record it, we make the official U.S. government record of it on

9   whatever end of the spectrum, whether it's in the Washington

10  end, whether it's the field end, and that's how we communicate.

11          There might be a phone call in between to report on

12  something urgent, but for the most part, everything on which

13  action is taken requires something written down, a cable.

14          MR. TRUMP:  At this time, I'd like to ask that the

15  jurors can get their notebooks.

16          THE COURT:  All right.  Now, ladies and gentlemen,

17  what has been done is many of these cables, because I noticed

18  you were squinting before when you were trying to look at the

19  screens, are now in a notebook.  It's very important that you

20  not go rummaging through the book.  Just only turn to the

21  particular tab that's being addressed.

22          And, Mr. Wood, do you have those?

23          MR. TRUMP:  Before they open their notebooks, I'd

24  like to take the witness through a series of foundation

25  questions with respect to them, unless there's no objection to

1    their admission.

2              THE COURT:  What are -- list the exhibit numbers that

3    you're going to be discussing.

4              Don't open the books yet, folks.

5              MR. TRUMP:  8, 10, 13, 14, and 15.

6              THE COURT:  All right.  Are there any objections to

7    those exhibits?

8              MR. POLLACK:  No, Your Honor.

9              THE COURT:  All right.  So 8, 10, 13, 14, and 15.  8,

10   10, 13, 14, and 15 are in evidence.

11             (Government's Exhibit Nos. 8, 10, and 13 through 15

12   were received in evidence.)

13             MR. TRUMP:  Your Honor, I guess if there's no

14   objection to any of the cables, we could move them all in

15   but --

16             THE COURT:  Well, let's keep it organized.  Right

17   now, again, the jury should not open the books until we address

18   a particular exhibit.

19   BY MR. TRUMP:

20   Q.   And do you have the notebook in front of you, sir?

21   A.   I don't.

22             MR. TRUMP:  Could he have an exhibit book, please?

23             THE COURT SECURITY OFFICER:  An exhibit book?

24             THE COURT:  An exhibit book for the witness, please.

25             THE COURT SECURITY OFFICER:   What page?

1          THE COURT:  8.  I assume 8 is the first one you're

2    going to discuss?  Wait, do you have the separate one?

3          MR. TRUMP:  If you just hand him the binder, he can

4    follow along.

5          THE COURT:  All right, which exhibit number,

6    Mr. Trump?

7          MR. TRUMP:  Exhibit 8.

8          THE COURT:  8.  So, folks, you may now open your

9    books to Exhibit 8, please.

10   BY MR. TRUMP:

11   Q.   Do you see Exhibit 8 in front of you?

12   A.   I do.  I have it.

13   Q.   And is that one of the official cables you just --

14   A.   Yes.  That would be an example of a cable that would have

15   been -- we would have written on this case.

16   Q.   And are there cables sent from the field as distinguished

17   from cables sent from headquarters?

18   A.   Correct, there are.  And that, that site is generally

19   designated up here, where it says at the very top under the

20   first "Secret," "To CIA Office No. 2."  That would have

21   designated the location it was being sent to, would have been

22   coming out of Langley, which would have indicated Washington.

23   Q.   So in this case, New York is CIA Office No. 2, correct?

24   A.   Correct.

25   Q.   And so this, this is a cable that was sent to you?

1   A.   Yes.

2   Q.   And do you recall who sent it to you?

3   A.   I, I don't recall specifically.  I'm assuming that the

4   person who wrote it either was Robert S. or worked for him or,

5   or something.  It says down here "Originator, Mr. S.," so I'm

6   looking at the very bottom.

7   Q.   And "CP" is counterproliferation?

8   A.   Counterproliferation.

9        I would also say from a, from a content point of

10  view, this is an exact example of the kind of go, the

11  back-and-forth that went on.  In other words, I would have

12  worked with Merlin to craft language of a letter that he might

13  send to the potential targets.  He wouldn't just send it.  I

14  didn't have the authority to say, "Send it."  I would have to

15  work with him.  We might massage it to --

16             MR. POLLACK:  Your Honor --

17             THE COURT:  Yeah, I think the answer is going --

18             MR. POLLACK:  -- there's no pending questions.

19             THE COURT:  Right.  It's better to just wait for

20  the --

21             THE WITNESS:  Oh, I'm sorry.  I'm sorry.

22  BY MR. TRUMP:

23  Q.   Let's just --

24  A.   Sure.

25  Q.   -- talk a little bit about understanding the cables so

1    that --

2    A.    Gotcha.

3    Q.    Since you received this cable, generally, it is something

4    that you are either being informed of or being tasked to do by

5    Mr. S. or someone within CP?

6    A.    Correct, correct.

7    Q.    Referring to paragraph 2 --

8    A.    Um-hum.

9    Q.    -- is that an example of the exchange that you had

10   described previously in which --

11   A.    Exactly.

12   Q.    -- you and Merlin would discuss his Internet searches and

13   things like that?

14   A.    Yep.

15   Q.    And then you got back to CP on certain suggestions?

16   A.    Correct.

17   Q.    The rest of paragraph 2 reflects CP keeping you up to date

18   on what's going on?

19   A.    Correct.  Also, as I sort of described in parallel, yeah.

20   Q.    And this type of cable was one that went back and forth --

21   A.    All the time.

22   Q.    -- all the time on this operation?

23   A.    When there was something to be said, yeah.

24   Q.    And let's go to Exhibit 10.

25            THE COURT:  All right, you folks may turn to 10 now.

Zach W. - Direct                                                    247

BY MR. TRUMP:

Q.   Now, is that a cable you sent?

A.   Yes.

Q.   And you sent it to whom?

A.   To, to Langley, to headquarters.

Q.   And who was getting these cables from you at headquarters?

A.   A very select group of people in Counterproliferation

Division who were read into the case.

Q.   And that would include Robert S.?

A.   And that would have included Robert S.

Q.   And you are Mr. W.?

A.   And I am Mr. W.

Q.   And what does this cable reflect?

A.   The status of the case, the planning for the eventual trip

to San Francisco.  This is the first time I tell Merlin that

I'll be leaving the post for another job and that someone new

will be coming in.  He provided some additional things related,

I think, to his computer.

Q.   And the date of this cable is at the top, correct?

A.   Correct.  Right under the page No. 1, that's the date it

would have been, the 29th of October, 1998.

Q.   So on the 29th of October, you're informing people back at

headquarters that you had a meeting with Merlin?

A.   Just two days before, on the 27th of October.

Q.   And paragraph 2 is the paragraph that relates to

Zach W. - Direct                                                     248

1    discussion that was had at that meeting?

2    A.    Correct.

3    Q.    Including problems with Merlin's computer, right?

4    A.    Yep.

5    Q.    Paragraph 3 anticipates your meeting in San Francisco,

6    right?

7    A.    Correct.  It's almost purely administrative.

8    Q.    And then paragraph 4 is the discussion of the change from

9    you to a new case officer?

10   A.    Correct.

11   Q.    And let's jump ahead then to No. 13.

12            THE COURT:  All right, Exhibit 13.

13   BY MR. TRUMP:

14   Q.    Do you see cable 13?

15   A.    I do.  I have it in front of me.

16   Q.    What's the date of that cable?

17   A.    The 17th of November.

18   Q.    And did this cable originate out of New York or out of

19   headquarters?

20   A.    Out of New York to headquarters.

21   Q.    And were you the author of this cable?

22   A.    I was the author of this cable.

23   Q.    What are you describing generally in this cable?

24   A.    Basically, everything that happened in San Francisco in a,

25   in a nutshell.  Not every he said/she said, but everything from

1    how the meetings were, were broken down to basically how the

2    schedule went, to how people spent their time, to questions

3    that Merlin had, how it all seemed to, to go.

4    Q.    And in paragraph 2, for example, that's where the cable

5    reflects Mr. Sterling's introduction to, to Merlin?

6    A.    Correct.

7    Q.    And the fact that the plans were shown to, to Merlin?

8    A.    The fire set plans.  And we began to work on his, his

9    story that he was going to use with the potential targets.

10   Q.    Let me refer you to the fourth paragraph.

11   A.    Um-hum.

12   Q.    Does that paragraph discuss -- do you discuss in that

13   paragraph the after lunch meeting with Merlin?

14   A.    I do.

15   Q.    And in that paragraph, what do you discuss with respect to

16   the legend, the cover arrangement with, with Merlin in terms of

17   how he was going to describe these plans?

18   A.    Well, the basis of his story was going to be that he was

19   fronting for others, other unnamed associates of his who had --

20   who he would have known and with whom he would have engaged

21   from his previous experience in Russia.

22   Q.    Let's, let's deal specifically with paragraph 4.  In that

23   paragraph, do you describe M as the middleman?

24   A.    Yeah.

25   Q.    And right after that, how do you describe the plans?

1    A.    The fire set plans were not of his design but came from

2    other Russians whom he had met and who wanted to market them

3    for financial gain.

4    Q.    And keep going.

5    A.    Merlin was serving as the middleman.  The plans were

6    incomplete but would be found to be true and accurate upon

7    Iran's careful review.  Basically, if the Iranians wanted the

8    information that would make the plans complete, they would have

9    to pay Merlin and his unnamed colleagues.

10            This, this was the core of the story.

11   Q.    Was that, in fact, discussed at the meeting?

12   A.    That was, in fact, discussed at the meeting.

13   Q.    Did Merlin recognize at some point that the plans were

14   incomplete?

15   A.    Yes, he did.  I don't know that he said they were

16   incomplete, but I think he -- yeah, I think he recognized that,

17   yeah.  The goal was never, ever to provide complete plans to

18   Iran on how to build a nuclear weapon.

19   Q.    And Mr. Sterling was at this meeting?

20   A.    Mr. Sterling was at that meeting.

21   Q.    Now, let's jump ahead to 14.

22            THE COURT:  Exhibit 14.

23   BY MR. TRUMP:

24   Q.    Was this a cable you received in the context of your work

25   with Merlin?

1   A.    No, this was a cable that I probably wrote in part with

2   Mr. Sterling after --

3   Q.    Exhibit 14?

4   A.    Excuse me?

5   Q.    No. 14.

6   A.    No. 14, I'm so sorry.  I thought I had 14.  I'm so sorry.

7   I'm sorry.

8            This was a cable I would have received from

9   Washington.

10  Q.    And what's the date on this cable?

11  A.    25 November 1998.

12  Q.    And what is the context of receiving this cable in the

13  context of your San Francisco meeting?

14  A.    To help those of us who were going to meet Merlin to

15  explain to him and give him answers to the questions he raised

16  about the, the material in San Francisco.

17  Q.    And in -- was this the way that you got the information

18  from headquarters through the lab that you would then later

19  take to, to Merlin?

20  A.    Yes, this was how.

21  Q.    And in paragraph 2, it discusses the question that Merlin

22  had at the meeting, the request to verify the accuracy of the

23  schematic and the parts list presented to Merlin during the

24  training session?  That's referring to the San Francisco

25  meeting?

1    A.    Correct.

2    Q.    What does it say following that, "As we had expected"?

3    A.    "As we had expected, the inclusion of certain assemblies

4    on the parts list but not on the schematic was indeed

5    intentional, with the goal of suggesting that the anonymous

6    fire set designer knew that these two assemblies, these

7    specific parts, were essential but did not know how to make the

8    spec or spec them in any detail.  That would be his story to

9    the Iranians if they were to raise this issue."

10   Q.    So this is what you're to take back to Merlin to respond

11   to the questions that he had at the meeting?

12   A.    Correct.

13   Q.    And paragraph 3 is further advice as to how you should

14   explain this to Merlin?

15   A.    Exactly, yes.  The plan to -- yes.

16   Q.    And then finally, 15.

17          THE COURT:  Exhibit 15.

18   BY MR. TRUMP:

19   Q.    What is the date of that cable?

20   A.    11 December 1998.

21   Q.    And were you the author of this cable?

22   A.    I was.  And I, I think I coordinated it with, with

23   Mr. Sterling.

24   Q.    Was this your last cable as case officer on this, on this

25   program?

1   A.   Case?  Yes.

2   Q.   And just generally, what was -- this cable reflects what?

3           15.

4           MR. MAC MAHON:  Thank you.

5           MR. TRUMP:  Exhibit 15.

6           THE WITNESS:  Um-hum.

7   BY MR. TRUMP:

8   Q.   Was this the follow-up to the meeting at which you were

9   going to explain to Merlin --

10  A.   Correct.  This was our, this was our opportunity to

11  address his, the questions he'd raised.

12  Q.   When did the meeting take place?

13  A.   December 10, in the evening.

14  Q.   That was in New York?

15  A.   In New York City.

16  Q.   And who was present at the meeting?

17  A.   Myself, Merlin, and Mr. Sterling.

18  Q.   And does paragraph 3 accurately reflect the information

19  that you provided to Merlin that you got from the lab?

20  A.   Yes, it does.

21  Q.   And would you just briefly summarize that?  Paragraph 3.

22  A.   Can I, can I read a section from it?

23  Q.   Sure.

24  A.   "It was explained to Merlin that it made sense for the

25  designer of the fire set to know that certain parts, mainly

1    these two, are included within the fire set design but that he

2    would not necessarily know how to configure such elements; in

3    other words, the designer knows what they are and where they go

4    in a schematic, but he would not know how to design such parts

5    himself, therefore negating them from the parts list."

6    Q.   And right before that sentence, the lab reiterated that

7    the discrepancy between the schematic and the parts list that

8    Merlin saw was, in fact, intended?

9    A.   Was intended.  And that we told him that.

10   Q.   What was Merlin's response when you provided this

11   explanation?

12   A.   Merlin was always trying to make the, you know, in this,

13   in this period, as I recollect, was always trying to make the

14   product better, more complete, more understanding, and so he

15   accepted it.  He had some additional follow-up questions, maybe

16   suggesting that some, some of the parts be identified in

17   Russian, maybe we look at it in a different way or so forth and

18   so on, but there was -- this was not an issue of conflict at

19   all.

20          There was, there was no -- this was a genuine

21   conversation on how to, how to move this forward.

22   Q.   Now, during that meeting, did, did Merlin express any

23   concern that perhaps you were asking him to hand over

24   technology to the Iranians that would allow them to build this

25   device?

Zach W. - Direct                                                      255

1   A.    No, never.  Not at this meeting or at any other meeting

2   that I participated.

3   Q.    How about Mr. Sterling?  Did he express any concerns that

4   somehow this was a mismanaged, bungled operation?

5   A.    No, not when I was there.

6   Q.    And that, and that somehow we would be -- we, the

7   government, would be handing over technology that would allow

8   the Iranians to advance their nuclear weapons program?

9   A.    No.  That was, that was, that was never discussed.  The

10  goal was always very clear to Merlin, to provide quite the

11  opposite.

12  Q.    You sum up this cable in paragraph 7?

13  A.    I do.

14  Q.    And as you sum it up, when you left that meeting, what was

15  your impression of where you stood in the operation?

16  A.    Well, I was out of the operation.  I thought that it was

17  teed up and, and moving along.  I mean, all parts seemed to be

18  coming in sync.

19          Where we were lacking at that point was that we

20  didn't have a legitimate target.  You know, paragraph 4 is

21  interesting in that regard, too, on this.

22  Q.    And did you have any concern at all with the changeover

23  from Mr. Sterling -- from you to Mr. Sterling as related to, to

24  Merlin?

25  A.    I had no concerns whatsoever.

1    Q.   Was this the last time you saw Merlin?

2    A.   It was.

3    Q.   What type of electronic access did you have at your New

4    York office with respect to this type of cable traffic?

5    A.   While I was responsible for it --

6    Q.   While you were responsible for it.

7    A.   While I was responsible for it, I would have access on my

8    computer to a certain file, that's the best way to describe it,

9    that would give me access to all the messages, all the cables

10   related to the case that came to New York.

11   Q.   But if, if Robert S. sent out a cable to some other office

12   somewhere and didn't copy New York, you didn't get it?

13   A.   I would not see it.  I wouldn't have anything to do with

14   it.

15   Q.   Did you maintain any -- did you -- sorry, poor phrasing.

16        When, when Merlin gave you stuff, documents, e-mails

17   and things, how did you handle that information?

18   A.   Some of this I kept in a, in what could best be described

19   as sort of a soft file.  Maybe the most recent cable traffic

20   printed up.  Maybe some of the material that he'd given me he

21   retained copies, I retained copies, material he'd pulled down

22   off the Internet that we might be actively pursuing, there

23   might be a folder like that, and I would have maintained it in

24   my, in my safe.

25   Q.   Was it maintained in the same manner as documents that

Zach W. - Direct                                                        257

1   were actually marked by the agency?  In other words, Merlin

2   didn't have any stamps to put on the documents:  Secret, Top

3   Secret, whatever?

4   A.   Well, he didn't have any of that -- he would have had

5   access that he pulled down off the Internet, none of which is

6   classified.

7   Q.   Once it came to you --

8   A.   Yes.

9   Q.   -- how did you handle it?

10  A.   I would have handled it -- I would have put the whole

11  package together, and it would have been handled, even though

12  it wasn't classified, it would have been connected to this

13  case, and I would have maintained it securely.  There's

14  nothing, there's nothing classified about it, but once you put

15  piece 1 with piece 2, it becomes sensitive, and you maintain it

16  accordingly.

17  Q.   And the reason for that is it provides a connection

18  between you and Merlin and this operation?

19  A.   Well, and also you have to understand there's certain

20  things if he pulled it off of his computer, if he printed it

21  off his computer, there might have been elements about his

22  computer that were on there.  The material he pulled wasn't

23  necessarily classified, but now elements related to his

24  computer were.  You maintain his secrecy, his safety, and

25  securely.  That's why you treat it as sensitive.

1          MR. TRUMP:  The Court's indulgence?

2          THE COURT:  Yes, sir.

3          MR. TRUMP:  The Court's indulgence?

4   Q.   Now --

5          THE COURT:  Are you using the notebooks any further?

6          MR. TRUMP:  I don't think so, Your Honor.

7          THE COURT:  All right, folks, you can close them up

8   then, all right?  Thank you.

9   BY MR. TRUMP:

10  Q.   Do you know someone by the name of James Risen?

11  A.   I, I know who he is.  I don't know him.

12  Q.   Have you ever met him?

13  A.   No.

14  Q.   Have you ever talked to him?

15  A.   No.

16  Q.   Did you provide any information to him about anything you

17  worked on at the CIA?

18  A.   Never.

19  Q.   Have you ever discussed Classified Program No. 1, Human

20  Asset No. 1, Merlin, with anyone that you knew who was not

21  cleared to receive that information?

22  A.   No.

23  Q.   After you left New York and you went on to other things,

24  did you ever -- were you ever read back into the program?

25  A.   No.

1  Q.   As a result, were you able to follow what happened with

2  Merlin and what happened with the operation?

3  A.   No.  It wouldn't have been anything that would have been

4  appropriate for me to follow up on.  That's not to say there

5  might not have been a casual conversation in a cafeteria

6  sometime saying, you know, "How are things going?"

7          "Great."

8          But that would have been truly the extent of the

9  details.

10         MR. TRUMP:  The Court's indulgence?

11         Nothing further, Your Honor.

12         THE COURT:  All right, Mr. Pollack?

13         MR. POLLACK:  Thank you, Your Honor.

14                         CROSS-EXAMINATION

15 BY MR. POLLACK:

16 Q.   Good afternoon, Mr. W.

17 A.   Thank you.  Good afternoon.

18 Q.   As I understand it, you were the case officer for Merlin

19 from approximately July of 1997 to approximately November of

20 1998; is that correct?

21 A.   Yeah, I think December '98.

22 Q.   Okay.  And it wasn't until the very end of your tenure as

23 Merlin's case officer that you even had these plans or

24 schematics available, correct?

25 A.   That's correct.

Zach W. - Cross                                                           260

1    Q.    So during the bulk of your tenure, the year-plus leading

2    up to that point --

3    A.    Right.

4    Q.    -- what you were doing with Merlin is you were dangling

5    him in front of the Iranians, correct?

6    A.    Um-hum.  We were, we were building his legend.

7    Q.    Building his legend is his story, correct?

8    A.    Yeah, yeah.  His story.

9    Q.    And specifically doing things that might call to the

10   attention of the Iranians his existence, correct?

11   A.    That was the goal.

12   Q.    That was the goal.

13          And so you were helping him, for example, in sending

14   e-mail messages or letters by e-mail to Iranian scientists,

15   correct?

16   A.    Correct.

17   Q.    Or Iranian scholars?

18   A.    Or institutions.

19   Q.    Or Iranian institutions, scholars in the nuclear field,

20   correct?

21   A.    Yes.

22   Q.    And in those e-mails, Merlin would explain somewhat

23   cryptically, but explain that he had some information that he

24   thought might be of interest to the people that he was sending

25   these e-mails or letters to, correct?

1    A.    Yes.

2    Q.    And that he would be interested in meeting with somebody

3    to, to talk about the information that he had, correct?

4    A.    Correct.

5    Q.    And you also assisted him in, in identifying academic

6    conferences that he could go to where there might be scientists

7    or people in the nuclear field, correct?

8    A.    I, I think so.  I don't recall sending him on any.

9    That's, that's certainly a viable idea and sounds right.  I

10   don't, I don't remember anything.

11   Q.    You just don't specifically recall one way or the other?

12   A.    Well, I -- that sounds right, but I, I'm reluctant to say

13   that entirely because without the actual material in hand yet,

14   we might have been a little, been a little premature.  That's

15   all.  I'm not suggesting not, but that's all.

16   Q.    So in terms of actually sending him out to conferences?

17   A.    Yeah.  I don't remember doing that.

18   Q.    Okay.  But certainly during your tenure, you were

19   assisting him in sending out communications to Iranian

20   scientists and scholars?

21   A.    For him to do it, yes.

22   Q.    Yes, okay.

23         I'd like to introduce Government Exhibit 132, which

24   is chapter 9.  Does anyone have an objection to that?

25              MR. TRUMP:  No.

Zach W. - Cross                                                                    262

1   BY MR. POLLACK:

2   Q.   And if I could -- if we could go ahead and call that up on

3   the screen?

4           THE COURT:   Well, it's a large exhibit.   You'll have

5   to give a page number to make it make any sense.

6           MR. POLLACK:   Specifically, I'm going to be referring

7   to page 200.   Thank you, Your Honor.

8           THE COURT:   All right, 132.   No objection, obviously,

9   from the government.   That's in.

10           (Government's Exhibit No. 132 was received in

11   evidence.)

12   BY MR. POLLACK:

13   Q.   Now, Mr. W., you indicated that you did at some point

14   actually read chapter 9 of *State of War*, correct?

15   A.   I don't -- yeah.   I did when I was approached by a special

16   agent and asked if I'd read it.   I said no, and they said,

17   "Well could you?"

18           And I, I did, I guess, yeah.

19   Q.   Okay.   And to be clear, when you say "special agent," that

20   would be the FBI special agent, Special Agent Hunt, correct?

21   A.   Right.

22   Q.   Who was investigating the leak to Mr. Risen, correct?

23   A.   Correct.

24   Q.   She talked to you and in the course of her investigation

25   told you about this chapter and encouraged you to actually read

Zach W. - Cross                                                    263

1    it, correct?

2    A.   Of her official duties, yes, encouraged me to read it.

3    Q.   Okay.  And what I'd like to do is refer you to the bottom

4    full paragraph on page 200.

5             THE COURT:  And, ladies and gentlemen, the numbers

6    you see in the left-hand column do not exist in the actual

7    book.  They've been put in there for ease of reference, so that

8    is one change from the book.  All right.

9    BY MR. POLLACK:

10   Q.   And this paragraph says that at the case officer's urging,

11   the Russian started sending messages to Iranian scientists,

12   scholars, and even Iranian diplomats stationed at the IAEA in

13   Vienna, and "IAEA" stands for the International Atomic Energy

14   Association; is that correct?

15   A.   Um-hum.

16            THE COURT:  I'm sorry, you have to say yes or no.

17            THE WITNESS:  Yes.

18   BY MR. POLLACK:

19   Q.   Which was headquartered in Vienna?

20   A.   Which was headquartered in Vienna.

21   Q.   "In his e-mails, he would explain that he had information

22   of great interest to Iran and that he was seeking a meeting

23   with someone who could hear him out.  The messages were

24   designed to be playfully intriguing but not quite revealing.

25   Just enough to prompt a response."

1    A.    Yes.

2    Q.    And you are the case officer that is being referenced in

3    that paragraph, are you not?

4              MR. TRUMP:  Objection, Your Honor.

5              THE COURT:  I don't -- well --

6              MR. TRUMP:  How does --

7              THE COURT:  How would he know?

8              THE WITNESS:  I don't know.

9    BY MR. POLLACK:

10   Q.    Is that -- let me rephrase the question.

11             THE COURT:  Sustained.

12   BY MR. POLLACK:

13   Q.    Does that sound like a general description of what you

14   were working on with Merlin as his case officer?

15   A.    To some degree, it does, but it seems a little bit more

16   detailed.

17   Q.    Okay.

18   A.    This seems a little bit more precise in its targeting than

19   we were at the phase when I was in the case, just saying.

20   Q.    Okay.  Now, at some -- well, let me strike that.

21             THE COURT:  Do you want that on the screen?  No, all

22   right.

23   BY MR. POLLACK:

24   Q.    Well, if we can keep the chapter up, I'd like to go

25   back -- let me ask you a question first.

1           Thank you, Your Honor.

2           On your direct, Mr. Trump asked you about the plans

3    that were first available, the product that was first available

4    and given to Merlin at the meeting in San Francisco.

5    A.   Yeah.

6    Q.   And you referred to those plans in your testimony as plans

7    for a "firing set."  Do you remember that?

8    A.   I think so, yeah.

9    Q.   The phrase "firing set," was that a phrase that you used

10   to describe the piece of equipment that we're talking about?

11   A.   I believe so.

12   Q.   And was that also a phrase that you heard Merlin use in

13   describing the plans after he saw them?

14   A.   You know, I suppose so.  I don't think we ever -- I don't,

15   I don't recall specifically.  There is a really very short time

16   between the period on the 14th of November, when he sees the

17   device for the first time.  We have one administrative meeting

18   together.  We still don't have the answers yet on his

19   questions, and we have one more meeting.

20           So I'm reluctant to answer your question fully.  It's

21   not because I don't want to say yes.  I just don't -- it wasn't

22   how we responded to it.

23           Remember, when we spoke about things even together,

24   we didn't speak about things in a lot of specifics.  We tried

25   to keep things fairly generic.

1          In the meeting that I had with, with Mr. Sterling

2   and, and Merlin, we were at a restaurant, so we're not going to

3   be talking about firing sets.

4   Q.    Okay.  Let me see if I understand that.  You -- as your

5   tenure drew to a close, you had the meeting in San Francisco,

6   correct?

7   A.    Yeah.

8   Q.    Then you had a follow-up meeting just with Merlin,

9   correct?

10  A.    Just with Merlin.

11  Q.    And then you had a meeting with Merlin and Mr. Sterling?

12  A.    Correct.

13  Q.    And then you were done?

14  A.    And then I was done.

15  Q.    Okay.  And given that relatively brief level of

16  interaction that you had with Merlin after the plans became

17  available, you can't recall precisely how Merlin referred to

18  them?

19  A.    I can't.

20  Q.    But "firing set" is a phrase that you would have used?

21  A.    That's what we were talking about from the schematic, as I

22  recall.

23  Q.    And now if we can go ahead and put 132 back up, and I'd

24  like to go to page 195, and if we can go to the last full

25  paragraph?  It talks about the technical designs for a TB 480

1  high-voltage block, otherwise known as a "firing set."

2  And "firing set" is in quotation marks, correct?

3  A.    Um-hum.

4          THE COURT:  You have to say yes or no.

5          THE WITNESS:  Yes.  I'm so sorry.

6  BY MR. POLLACK:

7  Q.    And immediately above that in the partial paragraph, it

8  talks about the blueprints, calls these the blueprints for a

9  nuclear bomb.  Do you see that?

10  A.    I do see that.

11  Q.    And the book, this chapter variously refers to them as the

12  blueprints for a nuclear bomb, nuclear blueprints, or just

13  blueprints.  Is that --

14  A.    Okay.  Yes.

15  Q.    Do you recall yourself, did you ever refer to them as

16  blueprints?

17  A.    I don't remember ever saying they were blueprints.

18  Q.    Do you recall Merlin referring to them as blueprints?

19  A.    No, I don't think so.  I don't recall one way or another.

20  Q.    Now, at some point before -- if we can call up, if the

21  government has no objection, Government Exhibit 7, which I do

22  not believe is presently in, but I move its admission.

23          THE COURT:  Any objection?  Again, it's a government

24  exhibit.  It can't be, so it's in.  All right.

25          (Government's Exhibit No. 7 was received in

Zach W. - Cross                                                        268

1    evidence.)

2              MR. POLLACK:   Okay.   Thank you, Your Honor.

3    Q.   This is a cable, Mr. W., that's written in February of

4    1998, correct?

5    A.   Yes, it is.

6    Q.   And that's during your tenure as the case officer for

7    Merlin, correct?

8    A.   Yes, it is.

9    Q.   That is before Mr. Sterling has a relationship with

10   Merlin, correct?

11   A.   Correct.

12   Q.   Okay.   And if you'd look at the paragraph that is numbered

13   paragraph 2, the fourth line refers to firing set, correct?

14   A.   Correct.

15   Q.   The second-to-the-last line in paragraph 2 refers

16   to firing set, correct?

17   A.   Okay.   Yes, yes.

18   Q.   And in paragraph 3, the third line refers to the firing

19   set experts, correct?

20   A.   Correct.

21   Q.   And two lines later, "make a workable firing set,"

22   correct?

23   A.   Correct.

24   Q.   And the second-to-last line from the bottom of the page

25   talks about a viable firing set, correct?

1    A.    Correct.

2    Q.    Paragraph 4 in the fourth line refers to a firing set,

3    correct?

4    A.    Correct.

5            MR. POLLACK:  And now if we could go to Exhibit 13?

6            THE COURT:  All right, that's also in.

7    BY MR. POLLACK:

8    Q.    Exhibit 13 is the cable that Mr. Trump discussed with you

9    that is the cable that talks about the meeting in San

10   Francisco, correct?

11   A.    Correct.

12   Q.    And you had indicated that you were the author of that

13   cable, correct?

14   A.    Correct.

15   Q.    And in this cable -- well, would Mr. Sterling have had

16   access to this cable?

17   A.    Yes, he would have.

18   Q.    This is really the first meeting during his tenure as the

19   case officer, right?

20   A.    Correct.

21   Q.    Okay.  And in this cable, which is authored by you, in

22   paragraph 5 on the second page -- if we can go down a little

23   further in that paragraph?

24           Do you see where it says in the third line in the

25   paragraph that starts "Overall," you use the phrase "firing

1   set," correct?

2   A.   Right.

3   Q.   Okay.  But if we go to the beginning of the cable,

4   paragraph 2, you talk about -- this is not -- yeah.

5           MR. MAC MAHON:  One second.

6   BY MR. POLLACK:

7   Q.   So in the first -- I'm sorry, in paragraph 2, on the third

8   line, it talks about "fire set plans," correct?

9   A.   Right.

10  Q.   Not "firing."  "Fire," right?

11  A.   Right.

12  Q.   And in the next paragraph, paragraph 3, lines 3 and 4, the

13  group showed M the fire, fire set plans, not firing, correct?

14  A.   Yes.

15  Q.   And four lines later, again it says "fire set plans,"

16  correct?

17  A.   Correct.

18  Q.   Continuing on the next page, same paragraph, second

19  line, "fire set plans," right?

20  A.   Um-hum.

21          THE COURT:  Yes?

22          THE WITNESS:  Yes.  I'm so sorry.  Yes.

23  BY MR. POLLACK:

24  Q.   And finally, paragraph 5, fifth line from the bottom, it

25  says "fire set plans," correct?

1   A.   Okay.  Yes.

2   Q.   So while you use the phrase "firing set" and you use it

3   once in this cable, repeatedly in this cable, the first cable

4   that deals with Mr. Sterling's involvement, the phrase that's

5   typically use is "fire set," correct?

6   A.   Um-hum, yes.  Yes.

7   Q.   And -- by the way, in paragraph 6 --

8   A.   Um --

9        THE COURT:  There's no question pending.

10  BY MR. POLLACK:

11  Q.   In paragraph 6 --

12       MR. TRUMP:  Paragraph 6 of what?

13       MR. POLLACK:  We're still on Exhibit 13.

14  Q.   This talks about the, the social outing, the car trip to

15  Wine Country, correct?

16  A.   Um-hum, yes.

17  Q.   The fact that there was an outing to Wine Country, that

18  was something that would have been known not just to the people

19  who were at the meeting in San Francisco but also to people

20  back at headquarters that received this cable?

21  A.   That would have been known to them after they received

22  this cable.

23  Q.   Sure.

24  A.   Yes.  After they read the cable, yes.

25  Q.   Sure.  And anybody at any point who had access to this

1   cable after they read this would be aware of that fact, right?

2   A.   Yes.

3   Q.   Now, prior to that meeting in San Francisco, you were told

4   that Mr. Sterling was going to be taking over for you, correct,

5   that a decision had been made that he would be the next case

6   officer?

7   A.   Yes.

8   Q.   And it was conveyed to you, was it not, that there were

9   some concerns that Mr. Sterling's race might complicate his

10  handling of Merlin?

11  A.   Well, the thought was we had no idea how Merlin would,

12  would respond.  The agency didn't have an issue with it, but

13  the asset, we didn't, we didn't know.  It turned out not to be

14  the case.

15  Q.   Now, if we can go to Exhibit 14?

16        And this is the cable that was from headquarters that

17  was following up on some of the questions that Merlin raised in

18  San Francisco, correct?

19  A.   Correct, yes.

20  Q.   And again, Mr. Sterling is involved now in the program.

21  He would have been a recipient of this communication?

22  A.   I'm not sure he would have been a recipient of it, but he

23  would have been aware of it, yeah, yeah.

24  Q.   And in paragraph 2 of Exhibit 14, in the middle of the

25  paragraph, it talks about anonymous fire set designer, right?

Zach W. - Cross                                                   273

1    A.    Fire set.

2    Q.    Not firing set, correct?

3    A.    Correct.

4    Q.    And the last line of that paragraph again talks about fire

5    set, correct?

6    A.    I don't see it.

7          Yes.

8    Q.    Okay.  And paragraph 4, if we can go down, again same

9    exhibit, 14, talks about the fire set team, correct?

10   A.    Correct.

11   Q.    And then Government Exhibit 15 is the cable that you wrote

12   documenting the follow-up meeting, not the one that was just

13   you and Merlin but the one that was you, Merlin, and

14   Mr. Sterling, correct?

15   A.    Correct.

16   Q.    And if we can go to paragraph 3 of Exhibit 15, starting in

17   the second line, it talks about the fire set schematic,

18   correct?

19   A.    Yes.

20   Q.    Fourth line, fire set, correct?

21   A.    Correct.

22   Q.    Sixth line, fire set, correct?

23   A.    Correct.

24   Q.    If we can go to the next page of Exhibit 15, the

25   third-to-last line in that first partial paragraph, fire set,

1  right?

2  A.    Yes.

3  Q.    And finally, paragraph 7 of the same cable about the

4  meeting with you, Merlin, and Mr. Sterling, middle of that

5  paragraph, again, fire set, correct?

6  A.    Correct.

7           MR. POLLACK:  Mr. W., I don't have any other

8  questions.  Thank you.

9           THE COURT:  Is there any redirect?

10                      REDIRECT EXAMINATION

11  BY MR. TRUMP:

12  Q.    Do you recall questions about Exhibit 6?

13           THE COURT:  What question are you directing him to?

14  BY MR. TRUMP:

15  Q.    Exhibit 6, do you have that in front of you?

16  A.    I do.

17  Q.    That was a cable to the New York office, correct?

18  A.    Yes.  Yes.

19  Q.    And 7 was also a cable to the New York office?

20  A.    Exhibit 7?

21  Q.    Yes.

22  A.    Yes.

23  Q.    Same with Exhibit 8?

24  A.    Yes.

25  Q.    So when Mr. Sterling, the defendant, took over from you as

1   the case officer, he has access to all these cables, correct?

2   A.   Oh, yes.

3   Q.   And he may have also had access to them at

4   Counterproliferation, correct?

5   A.   Yes.  We call it reading in, so you'd be, you'd be --

6   you'd do the background.  You'd do the sort of your due

7   diligence.

8           MR. POLLACK:  Your Honor, I'm going to move to strike

9   that unless there's a foundation as to whether he has actual

10  knowledge of that, as opposed to whether he's guessing.

11          THE COURT:  Lay a foundation.  How do you know that?

12          THE WITNESS:  How do I know?

13          THE COURT:  How do you know that he would have had

14  access to these cables from the Counterproliferation desk?

15          THE WITNESS:  Well, when he was identified as the

16  officer, it is standard operating procedure for the officer who

17  is taking over to read the background of the case, just as I

18  had done when Laurie D. had done the case.

19          Now, I didn't read all the way back to the history of

20  the beginning of the case, but I certainly read sufficient

21  background.  Where that was, I don't know, but the person would

22  have been given access to it for the very purpose of making

23  them capable of handling those responsibilities.

24          THE COURT:  That's a sufficient foundation.  There's

25  no objection there.

1   BY MR. TRUMP:

2   Q.   Either through his position at headquarters or when he

3   arrived at the New York office, these are cables that are part

4   of this limited access program in the cabinet and available to

5   the defendant?

6   A.   Yes.  They are the history of the case.

7   Q.   Even the ones that predated his official tenure as case

8   officer?

9   A.   Yes.

10  Q.   And let's go to Exhibit 13.  And just to illustrate this,

11  in the second paragraph, you used the term "fire set," right?

12  A.   Yes.

13  Q.   This is a cable you wrote, correct?

14  A.   Yes.

15  Q.   And you were shown some other cables you wrote in which

16  you used the term "firing set," right?

17  A.   Yes.

18  Q.   Were these terms interchangeable as far as you were

19  concerned?

20  A.   As far as I was concerned, they were.

21  Q.   And do you know of any technical distinction between the

22  terminology "firing set" or "fire set"?

23  A.   I don't know of any.

24          MR. TRUMP:  The Court's indulgence?

25          THE COURT:  Yes, sir.

Zach W. - Redirect                                                       277

1              MR. TRUMP:  I'll just check my notes for one second,

2     Your Honor.

3     Q.   You were asked some questions about directing Merlin to do

4     things that brought him to the attention of the Iranians,

5     correct?

6     A.   Yes, that was the goal.

7     Q.   And that was -- the goal was to get the Iranians

8     interested in this guy who was a real-life Russian nuclear

9     engineer, correct?

10    A.   Correct.

11    Q.   But there was no attempt to make it known to the Iranians

12    that he was connected to the CIA?

13    A.   No, there was no attempt to do that.

14             MR. TRUMP:  That's all I have.

15             THE COURT:  Any recross?

16             MR. POLLACK:  No, Your Honor.

17             THE COURT:  All right, I assume no one's going to

18    call Mr. W. again in the trial; is that correct?

19             MR. TRUMP:  I certainly hope not.

20             THE COURT:  All right.  Then, sir, you're excused as

21    a witness.  Thank you for your testimony.

22             THE WITNESS:  Thank you very much.

23             THE COURT:  You may leave.

24                         (Witness excused.)

25             THE COURT:  And, ladies and gentlemen, you've been

1    very patient as a jury.  I normally give my jurors more breaks

2    than you had.  We ran a little bit out of sync in part because

3    of the logistics, but I'm going to let you get 15 minutes

4    early, out a little bit earlier.

5          We need to start tomorrow morning at 9:30, and we

6    can't start until all 14 of you are here.  I don't think we

7    have any weather issues tomorrow morning, and fortunately,

8    almost all of you live pretty near the courthouse, I don't have

9    people way out in the boonies this time, but if there is any

10   weather, please plan accordingly so that you're here on time.

11         And remember my cautions about do not do any

12   investigation about this case.  You are going to get a copy of

13   chapter 9 as an exhibit to, so that you can read it for

14   yourselves when you're deliberating, but don't go out and try

15   to buy the book or download it or anything like that.

16         Just go home, get a good night's sleep, a little

17   exercise if you want, get your minds off the case so you come

18   back fresh tomorrow morning.  I do recommend you may want to

19   bring sweaters or jackets with you.  The temperature in the

20   courtroom varies dramatically, and I'd rather have it cool than

21   hot because you'll fall asleep if it's too hot, but I don't

22   want anybody getting sick.  So anyway, thank you for your

23   attendance today.

24         We're going to stay in session.  I have a few matters

25   to take up with counsel.  Just leave your notebooks there.

1    We'll have everything back for you tomorrow morning.  So 9:30

2    start tomorrow morning.  Thank you.

3                       (Jury out.)

4              THE COURT:  Now, obviously, unlike most cases, you

5    can't leave all your exhibits in the courtroom.  Anything

6    that's classified needs to be taken care of by Ms. Gunning and

7    her folks.  We'll need to get it up here tomorrow morning, you

8    know, by, say, 9:20 at the latest so that we don't start late.

9              Mr. Pollack had one issue he wanted to raise after

10   the government's opening statement.  Why don't you go put it on

11   the record right now.

12             MR. POLLACK:  Yes, Your Honor.  As I'd indicated

13   earlier, I wanted to preserve the issue that the government in

14   its opening statement did not establish -- even if everything

15   that they said in their opening statement they're able to

16   prove, did not establish venue for the charges, and that is a

17   basis, I believe, for a motion for a judgment of acquittal

18   prior to putting on any, any evidence.  I don't expect the

19   Court to rule on that now, but I want to preserve the issue for

20   the record.

21             THE COURT:  All right.  You've made the point, but

22   again, I never rule on a motion like that.  We're going to have

23   this case, you know, have the evidence presented, and you can

24   file your motions down the road.

25             But you've made the motion for the record, and that

1   is what it is.  It puts the government on notice.  At some

2   point, do some legal research on that issue, all right?

3          MR. POLLACK:  Thank you, Your Honor.

4          THE COURT:  Anything else that we need to address

5   tonight?  For tomorrow morning, I understand that you will have

6   that first witness on, the short witness, you had indicated

7   earlier, right?  Yes.

8          MR. OLSHAN:  That's correct.

9          SPECIAL AGENT HUNT:  Yes.

10          THE COURT:  All right, that's fine.  And I think the

11   system is working reasonably well with the witnesses.  Again, I

12   want to make sure we have everybody here who we need, so if we

13   run -- if we move the pace a bit tomorrow and we get ahead of

14   your schedule, don't leave us without witnesses, all right?  So

15   the burden is on the government to make sure you've got your

16   people lined up.

17          Anything else we need to address?

18          MR. OLSHAN:  I just had a logistical question, Your

19   Honor.

20          THE COURT:  Yes.

21          MR. OLSHAN:  It is a bit tight back here in front of

22   the screen, so would it be possible maybe for us to put some of

23   the extra binders on the floor against the table so we can get

24   some of the clutter out of way, mainly for Mr. Francisco's

25   benefit?

1              THE COURT:  I'm sorry about that.  No, I think we're

2    going to leave things just as they are, but again, anything

3    that's classified can't stay in here overnight because the

4    courtroom is open to janitors and other folks who don't have

5    clearance, all right?

6              MR. OLSHAN:  Just thought I'd ask.  Thank you.

7              THE COURT:  All right.  All right, we'll recess court

8    for the evening.

9      (Recess from 5:49 p.m., until 9:30 a.m., January 14, 2015.)

10

11                   CERTIFICATE OF THE REPORTER

12      I certify that the foregoing is a correct transcript of

13   the record of proceedings in the above-entitled matter.

14

15

16                        _____
                                    /s/
17                            Anneliese J. Thomson

18

19

20

21

22

23

24

25