282

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .      Criminal No. 1:10cr485
                              .
     vs.                      .      Alexandria, Virginia
                              .      January 14, 2015
JEFFREY ALEXANDER STERLING,   .      9:35 a.m.
                              .
            Defendant.        .
                              .
. . . . . . . . . . .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>VOLUME II</u>

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:           JAMES L. TRUMP, AUSA
                              DENNIS M. FITZPATRICK, AUSA
                              United States Attorney's Office
                              2100 Jamieson Avenue
                              Alexandria, VA 22314
                                and
                              ERIC G. OLSHAN, Deputy Chief
                              Public Integrity Section of the
                              Criminal Division
                              United States Department of
                              Justice
                              1400 New York Avenue, N.W.
                              Suite 12100
                              Washington, D.C. 20005


FOR THE DEFENDANT:            EDWARD B. MAC MAHON, JR., ESQ.
                              Law Office of Edward B.
                              MacMahon, Jr.
                              107 East Washington Street
                              P.O. Box 25
                              Middleburg, VA 20118

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 282 - 535)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1    <u>APPEARANCES</u>:  (Cont'd.)

2    FOR THE DEFENDANT:              BARRY J. POLLACK, ESQ.
                                    MIA P. HAESSLY, ESQ.
3                                   Miller & Chevalier Chartered
                                    655 - 15th Street, N.W.
4                                   Suite 900
                                    Washington, D.C. 20005-5701
5

6    CLASSIFIED INFORMATION         CHRISTINE E. GUNNING
     SECURITY OFFICERS:             MAURA PETERSON
7

8    ALSO PRESENT:                  GERARD FRANCISCO
                                    SA ASHLEY HUNT
9                                   JENNIFER MULLIN, ESQ.

10
     OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
11                                  U.S. District Court, Fifth Floor
                                    401 Courthouse Square
12                                  Alexandria, VA 22314
                                    (703)299-8595
13

14

15

16

17

18

19

20

21

22

23

24

25

284

<pre>
1                            I N D E X

2                       DIRECT   CROSS   REDIRECT   RECROSS

3   WITNESSES ON BEHALF OF
    THE GOVERNMENT:
4
    Mrs. Merlin              286     295
5
    Walter C.                299     328      335       336
6
    Robert S.                340     511
7


8
                           EXHIBITS
9
                                    MARKED        RECEIVED
10
    GOVERNMENT'S:
11
    Nos. 5 thru 25                                357
12
         26                                       324
13
         27                                       357
14
         28                                       324
15
         29 thru 33, 35 thru 38                   357
16
         39 thru 43                               462
17
         44 thru 47                               357
18
         103                                      473
19

20  DEFENDANT'S:

21  No. 1                                         517

22       2                                        523

23


24


25
</pre>

285

```
 1                    P R O C E E D I N G S

 2                    (Defendant and Jury present.)

 3              THE CLERK:  Criminal Case 10-485, United States of

 4    America v. Jeffrey Alexander Sterling.  Would counsel please

 5    note their appearances for the record.

 6              MR. TRUMP:  Good morning, Your Honor.  Jim Trump on

 7    behalf of the United States.

 8              MR. OLSHAN:  Eric Olshan for the United States.  Good

 9    morning, Your Honor.

10              THE COURT:  Good morning.

11              MR. FITZPATRICK:  Dennis Fitzpatrick for the United

12    States.  Good morning.

13              THE COURT:  Good morning.

14              MR. POLLACK:  Good morning, Your Honor.  Barry

15    Pollack on behalf of Mr. Sterling.

16              MR. MAC MAHON:  Edward MacMahon for Mr. Sterling,

17    Your Honor.

18              MS. HAESSLY:  Mia Haessly for Mr. Sterling.

19              THE COURT:  Good morning.

20              And good morning, ladies and gentlemen.  Thank you

21    for being a superb jury.  You're essentially on time -- we had

22    to start a few minutes late -- even with the weather.  Those of

23    you who live in Fairfax County, schools were closed again

24    today.  So I really appreciate your being here on time.

25              I just want to make sure, did any of you have any
```

1   difficulties last night in complying with my instructions?

2   Because there were articles in *The Post* about the case, just

3   short ones.

4                      (Jurors shaking heads.)

5          THE COURT:  Great.  Well, just continue to, again,

6   avoid any of that kind of contact, and let me know if for some

7   reason you inadvertently bump into anything.

8          We're going to start with another witness.  The

9   government is ready to proceed?

10         MR. TRUMP:  Yes, Your Honor.

11         THE COURT:  And I understand that there are various

12  logistics and other reasons why counsel occasionally have to

13  leave the courtroom while the case is in progress.  Just do so

14  down that hall, and it's no problem because I recognize there's

15  a lot of going back and forth, all right?

16         Mr. Trump, your next witness?

17         MRS. MERLIN, GOVERNMENT'S WITNESS, AFFIRMED

18                     DIRECT EXAMINATION

19  BY MR. TRUMP:

20  Q.   Good morning.  May I ask you to speak as loudly and

21  clearly as you can into that microphone so everyone can hear

22  you?  Okay?

23  A.   Okay.

24  Q.   I'm going to refer to you as Mrs. Merlin.  Are you

25  familiar with a book called *State of War*, written by James

1   Risen?

2   A.   Yes, I know.

3            THE COURT:  Mrs. Merlin, you're going to have to

4   speak up much louder than that.

5            THE WITNESS:  Okay.

6   BY MR. TRUMP:

7   Q.   Is the answer yes?

8   A.   Yes.

9   Q.   Is your husband the Russian engineer who had worked at

10  Arzamas 16, as depicted in that book?

11  A.   Yes.

12  Q.   I'm going to refer to him as your husband, okay?

13  A.   Okay.

14  Q.   Please don't refer to him by name.

15  A.   Okay.  I will try.

16  Q.   Do you, do you now live in the United States?

17  A.   Yes.  I live in the United States.

18  Q.   About when, just about when did you come to the United

19  States?

20  A.   I came to the country beginning of the '90s.

21  Q.   The 1990s?

22  A.   Yeah.

23  Q.   And you came from the former Soviet Union?

24  A.   Yes.

25  Q.   Were either you or your husband defectors?

Mrs. Merlin - Direct                                              288

1   A.   No, we are not.  We was refugees.

2              THE COURT:  I'm sorry, you were what?

3              THE WITNESS:  We was refugees.

4              THE COURT:  Refugees.

5   BY MR. TRUMP:

6   Q.   At some point after you arrived in the United States, were

7   you approached by the CIA?

8   A.   Yes.  We was approached by CIA but not just in the first

9   months.  Little bit later, yes.

10  Q.   And what were you -- excuse me.

11             Did you have a professional career back in the Soviet

12  Union?

13  A.   Yes.  We both have a professional career.

14  Q.   What were you doing when -- what were you doing in the

15  United States when you were approached by the CIA?  What were

16  you doing for a living?

17  A.   In the beginning, when we -- we do very, like, easy jobs,

18  just cleaning, working in cleaning houses, very primitive jobs.

19  Q.   And did you move to the United States with, with your

20  children?

21  A.   Yes, with the children and parents.

22  Q.   Eventually, did you agree to work with the CIA?

23  A.   Not in the beginning.  Just a little while after few

24  meetings, we agreed to work with CIA.

25  Q.   And the same with your husband eventually?

1    A.    Yes.

2    Q.    Did you meet a number of CIA case officers?

3    A.    Yes.  We meet some, yeah.

4    Q.    Do you recall any of their names?

5    A.    I remember the most, you know, pleasant people always is

6    like Max, Ed, Bob.

7    Q.    You knew these people by their first names?

8    A.    Yeah, not by their last names.

9    Q.    Now, when your husband was working with the CIA, did he

10   provide you with the details of what he was doing?

11   A.    No, never.  He never did it in Russia because he had such

12   job, he don't supposed to provide me with information, and I

13   got used to.  Then he's involved with such kind of activity

14   that it is not mandatory me to be involved in know the details.

15   Q.    So just to be clear, you knew he was meeting and working

16   with CIA officers?

17   A.    Yes, of course.

18   Q.    But you did not know the details of what he was doing?

19   A.    Never know details.

20   Q.    Do you recall a trip to San Francisco?

21   A.    Yes, I remember.

22   Q.    Do you know when approximately?

23   A.    Approximately it was in, I think, 2001.  I am not exactly

24   sure about the date.  It was long time ago.  I did not keep in

25   the memory.

1   Q.   Did you go with your husband?

2   A.   Yes, I did.

3   Q.   Had you ever been to San Francisco before?

4   A.   No.

5   Q.   Did you understand the purpose of the trip was for your

6   husband to meet with CIA in San Francisco?

7   A.   Yes.

8   Q.   Again, did you know why?

9   A.   Yes.  He explained to me then he needs some translation

10  technical.  He had very good technical background, and he needs

11  some translation in some, given some information to say about

12  people he have to meet.  I didn't know details, just, you know.

13  Q.   You thought he was translating some technical matters for

14  the CIA?

15  A.   Yeah, um-hum.

16  Q.   Is that yes?

17  A.   Yes.

18  Q.   When you got to San Francisco, did you meet with people

19  from the CIA?

20  A.   Yes.

21  Q.   Do you recall who you met?

22  A.   It was Jeff; it was Max; it was Bob.

23  Q.   And the person you know as Jeff, is he in the courtroom

24  today?

25  A.   Yes.

Mrs. Merlin - Direct                                              291

1              THE COURT:  All right, is there any issue about

2    identification?

3              MR. MAC MAHON:  No, Your Honor.

4              THE COURT:  All right.

5    BY MR. TRUMP:

6    Q.   Was that the first time you ever met Jeff?

7    A.   Yes, this is the first time.

8    Q.   Is that also the only time?

9    A.   This is the only time.

10   Q.   While in San Francisco, did you socialize briefly with,

11   with Jeff?

12   A.   Yeah.  We went some, you know, in some places to show us

13   around San Francisco, and it was, yeah, have socialize.

14   Q.   Did you attend the meetings with the CIA with your

15   husband?

16   A.   No.

17   Q.   Did he ever tell you what those meetings were about?

18   A.   No.

19   Q.   Do you recall a trip to Vienna, Austria?

20   A.   Yes, I do.

21   Q.   Was that after San Francisco?

22   A.   It was after San Francisco.

23   Q.   Again, roughly, do you recall when?

24   A.   Roughly, it was in maybe a few months after San Francisco.

25   Q.   And again, did this trip have something to do with your

1  husband's work for the CIA?

2  A.    Yes.

3  Q.    Did you know what again?

4  A.    Again, the same thing.  Even we did not discuss after I

5  visited San Francisco what he have to do in Vienna, because I

6  thought it is the same thing, it continue the same, you know,

7  work.

8  Q.    About how long was your trip to Vienna?

9  A.    I don't recall exactly the days, but it was a short one.

10 It was, like, maybe for a week, but I don't recall exactly how

11 many days.

12 Q.    Did you enjoy your trip?

13 A.    Yeah, we enjoyed the trip.

14 Q.    Did your husband appear to enjoy the trip?

15 A.    He enjoyed a lot.

16 Q.    At any time during the trip, did he appear concerned or

17 upset or worried about anything?

18 A.    No, not at all.

19 Q.    Did he express anything like that to you?

20 A.    No, never.

21 Q.    After the trip, did he tell you anything about what he had

22 done?

23 A.    No.  We never discuss his job what he does.  We have,

24 like, family discussions but nothing about his work.

25 Q.    Now, did you read the book *State of War* when it was

Mrs. Merlin - Direct                                                        293

1   published in 2006?

2   A.    Yes.  After they told me it's published, I read it,

3   um-hum.

4   Q.    And what was your reaction when you read the book?

5   A.    I can say that I was shocked.

6   Q.    Were you also concerned?

7   A.    Yes.  My concern was very high-level concern.

8   Q.    And what was your concern?

9   A.    My concern was then somebody not what, who I want to can

10  read the book and find out about me and my family and my

11  husband, if we can be approached by KGB, and my family can be

12  in danger, my kids can be in danger, and my husband can be in

13  danger because the information which is in the book can be very

14  useful for KGB.

15  Q.    Now, did you or your husband ever tell your children about

16  the work you had done for the CIA?

17  A.    No.

18  Q.    Did they learn about that through the book?

19  A.    After the book was published, yeah, my older child was

20  find out from the book, yeah.  And if you read the book, you

21  can say then it's not too many people left this city in Russia

22  we were from, and it's not too many people in the United States

23  who is from Arzamas 16, and they can find out who we are, and

24  there was very concern.

25            I was just shocked when I read how my husband was

1    represented in this book.

2    Q.    And do you know anyone by the name of James Risen?

3    A.    I start to know about Jim Risen after reading the book.

4    Q.    Do you know personally?

5    A.    In person, I never saw him in person.

6    Q.    So you never talked to him?

7    A.    No.

8    Q.    Have you ever talked to anyone other than the CIA or the

9    FBI about your relationship with the CIA?

10   A.    No, never.

11   Q.    To your knowledge, has your husband ever spoken with James

12   Risen?

13          MS. HAESSLY:  I'm going to object, Your Honor, to the

14   lack of foundation.

15          THE COURT:  About whether her husband has ever spoken

16   to Risen?

17          MS. HAESSLY:  Yes.

18          MR. TRUMP:  I said to her knowledge.

19          THE COURT:  Yes, overruled.

20   BY MR. TRUMP:

21   Q.    To your knowledge, has your husband ever spoken with James

22   Risen?

23   A.    Never.  He doesn't know -- did not know James Risen

24   before, no.

25   Q.    To your knowledge, has he ever spoken to any reporters?

Mrs. Merlin - Cross                                                    295

1   A.   No.

2   Q.   And again, to your knowledge, has he ever spoken to anyone

3   other than the CIA or the FBI about his work with the CIA?

4   A.   No, never happened.

5            MR. TRUMP:  The Court's indulgence?

6            THE COURT:  Yes, sir.

7            MR. TRUMP:  That's all I have, Your Honor.

8            THE COURT:  All right, cross-examination?

9                      CROSS-EXAMINATION

10  BY MS. HAESSLY:

11  Q.   Good morning, Mrs. Merlin.  My name is Mia Haessly, and

12  I'm one of the attorneys for Mr. Sterling.

13           THE COURT:  Counsel, you need to speak up, too.  All

14  right.

15  BY MS. HAESSLY:

16  Q.   Have you ever been interviewed by the FBI?

17  A.   By FBI interviewed?  I don't know what you mean under

18  "interview."

19  Q.   Have they ever met with you and asked you questions about

20  this case?

21  A.   No.

22  Q.   And you, you testified that you made a trip to San

23  Francisco.

24  A.   Yes.

25  Q.   And during this trip, you participated in some social

1    outings with your husband?

2    A.   Can you repeat the question?

3    Q.   When you were in San Francisco, you participated in some

4    social events with your husband; is that correct?

5    A.   Yes.

6    Q.   Do you recall a trip that you took to Wine Country?

7    A.   Yes, I remember.

8    Q.   And who was present during that trip?

9    A.   Jeff was, was present; Bob was present; and other people I

10   don't remember.  I remember these two people.

11   Q.   So you recall that Jeff and Bob were present?

12   A.   Yeah.

13   Q.   Your husband was also present?

14   A.   Yeah, of course.

15   Q.   And you believe that other people may have been present?

16   A.   No, I don't recall it.  No.

17   Q.   Do you recall where in Wine Country you went to?  Was it

18   Sonoma County?

19   A.   Yes.  It was, I think, Sonoma, yeah.

20   Q.   Mrs. Merlin, you testified that you've read the book *State

21   of War*.

22   A.   Um-hum.

23            THE COURT:  Ma'am, you have to say yes or no.

24            THE WITNESS:  Yes, I read the book.

25            MS. HAESSLY:  Can we --

Mrs. Merlin - Cross                                                    297

1              MR. TRUMP:  Your Honor, I'm going to object to

2     showing this witness this, this note.

3              THE COURT:  I don't know how this witness can testify

4     to this.

5              MR. TRUMP:  She doesn't know about anything

6     Mr. Risen --

7              THE COURT:  Yeah, I'm going to sustain.

8              MS. HAESSLY:  Your Honor, she testified she read the

9     book, and this is in the book.

10             THE COURT:  That's all right, we'll do it a different

11    way.  I'm sustaining the objection.  Let's move this along.

12    BY MS. HAESSLY:

13    Q.   You also testified that you accompanied your husband to

14    Vienna; is that correct?

15    A.   Yes.

16    Q.   While you were in Vienna, do you recall going to the

17    opera?

18    A.   I don't recall it.

19             MS. HAESSLY:  Mr. Francisco, could we pull up Exhibit

20    132, please?

21             MR. FRANCISCO:  What page?

22             MS. HAESSLY:  Page 203, paragraph 50.

23    Q.   Mrs. Merlin, can you see on your screen beside you

24    paragraph 50?

25             THE COURT:  What is the question?

Mrs. Merlin - Cross                                                    298

1   BY MS. HAESSLY:

2   Q.   This is paragraph 50 from the book.

3   A.   Okay.

4   Q.   Have you -- in this paragraph, there's a quote from the

5   Russian, referring to your husband, "I spent a lot of time to

6   ask people as I could, and they told me that no streets with

7   this name are around."

8            Do you see that?

9   A.   Yes, I can see that.

10  Q.   Do you know how your husband came to be quoted in

11  Mr. Risen's book?

12  A.   Can you repeat?

13  Q.   Do you know how your husband is quoted, how he came to be

14  quoted in Mr. Risen's book?

15  A.   Can you rephrase?  I cannot get the meaning of your

16  sentence.

17  Q.   Do you have any knowledge of how your husband's quotation

18  came to be in this book?

19  A.   I don't have a clue.  I don't know.

20  Q.   And after this book was published, did anybody not

21  connected with the program described in the book connect you or

22  your husband with the book?

23  A.   No.

24  Q.   Did you, your husband, or anybody in your family ever

25  receive any threats?

1    A.    No.

2    Q.    Were you or your husband ever approached by the KGB?

3    A.    No, not yet.

4             MS. HAESSLY:  One moment, Your Honor?

5             No further questions.  Thank you.

6             THE COURT:  All right, any redirect?

7             MR. TRUMP:  One moment.

8             No, Your Honor.

9             THE COURT:  All right.  Mrs. Merlin, thank you for

10   your testimony.  You're finished with the Court.  You may go

11   home.

12            THE WITNESS:  Thank you.

13                       (Witness excused.)

14            THE COURT:  Call the next witness.

15            MR. OLSHAN:  Your Honor, the government's next

16   witness is Walter C.

17            THE COURT:  Hold on a second.

18          WALTER C., GOVERNMENT'S WITNESS, AFFIRMED

19                     DIRECT EXAMINATION

20   BY MR. OLSHAN:

21   Q.    Good morning, sir.

22   A.    Good morning.

23   Q.    If you would, could you please state and spell your first

24   name and just your last initial?

25   A.    Walter C., W-a-l-t-e-r C.

1  Q.   Mr. C., are you currently employed?

2  A.   No, I'm retired.

3  Q.   And can you briefly describe for the jury your educational

4  background?

5  A.   I have an undergraduate degree in physics and a Master's

6  Degree in Engineering Physics.

7  Q.   Where did you obtain those degrees?

8  A.   Florida State University for the bachelor's and the Air

9  Force Institute of Technology for the master's degree.

10 Q.   You mentioned the Air Force.  Were you ever enlisted or

11 did you ever work for the Air Force in connection with your

12 education or afterwards?

13 A.   Yes.  I served an an officer in the United States Air

14 Force for 20 years.

15 Q.   Was that both before and after you received your master's

16 or just after?

17 A.   I received my master's at about the three-year point in my

18 Air Force career.

19 Q.   After you received your master's degree from the Air

20 Force, did you work as a scientist with the Air Force?

21 A.   I worked as a scientist and also a project manager.

22 Q.   You testified that you worked -- or you were affiliated

23 with the Air Force for 20 years, correct?

24 A.   Correct.

25 Q.   After your affiliation with the Air Force, did you go work

1  somewhere else?

2  A.   Yes.  When I retired from the Air Force, I went to work

3  for one of the National Laboratories.

4  Q.   And how long did you work for one of the National

5  Laboratories?

6  A.   Twenty-three years.

7  Q.   So between the Air Force and the National Laboratory,

8  that's 43 years?

9  A.   Correct.

10 Q.   Approximately what years did you work at the National

11 Laboratory?

12 A.   From 1989 to 2011.

13 Q.   I'm probably going to refer to it as the lab.  Is that

14 okay?

15 A.   The lab is fine.

16 Q.   And, I'm sorry, you said what years did you work at the

17 lab?

18 A.   1989 to 2011.

19 Q.   And that's when you retired?

20 A.   Correct.

21 Q.   In 2011?

22      During your time working at the lab, did your work

23 ever involve nuclear engineering or weaponry?

24 A.   Yes.

25 Q.   Approximately how much of your time there was spent in

Walter C. - Direct                                                        302

1   that field?

2   A.    Approximately 50 percent.

3   Q.    During your time at the lab, did you become familiar with

4   a particular classified program that I will refer to as

5   Classified Program No. 1?

6   A.    Yes, I did.

7   Q.    And was the lab contracted to work on this program?

8   A.    Yes, it was.

9   Q.    By a different government agency?

10  A.    Yes.

11  Q.    What agency was that?

12  A.    That was the CIA.

13  Q.    Can you briefly describe why was the lab contracted to

14  do -- to work on this program, as opposed to the CIA just doing

15  it on its own?

16  A.    Because the lab has specific and long-lasting technical

17  experience in the area of interest.

18  Q.    And in your experience at the lab, was this routine that

19  government entities would contract with the lab to do specific

20  technical sorts of programs?

21  A.    Yes, that happened very often.

22  Q.    Was your work with this particular program classified?

23  A.    Yes.

24  Q.    And did you hold a security clearance?

25  A.    Yes, I did.

Walter C. - Direct                                                    303

1  Q.   Without saying it, at the lab, did the program have a

2  specific code name?

3  A.   It did.

4  Q.   And do you know if the CIA used the same or a different

5  code name for the same program?

6  A.   They had their own code name for this project.

7  Q.   Did you know what that code name was?

8  A.   I did not.

9  Q.   But you knew it was different?

10 A.   Yes.

11 Q.   You testified that this was a classified program.  Did

12 other people at the lab hold security clearances?

13 A.   Yes.  Virtually everyone at the lab has one kind of

14 security clearance or another.

15 Q.   And does that mean that virtually everyone at the lab knew

16 about this particular program?

17 A.   No, absolutely not.  This was a very close-hold program,

18 and very few individuals at the lab were briefed in at the

19 security level needed to work on this project.

20 Q.   And relative to your whole 23-year career at the lab, how

21 would you characterize the -- how closely held this program was

22 compared to others you worked on?

23 A.   This was more closely held than any other project that I

24 worked on either at the lab or during my tenure in the Air

25 Force.

Walter C. - Direct                                                      304

1    Q.    I mentioned Classified Program No. 1.  Can you briefly

2    describe for the jury what the purpose was for this program

3    when the lab got involved?

4    A.    The purpose of the program was to develop a design of a

5    Russian nuclear fire set that would have embedded in that

6    design a significant number of flaws to render it impossible to

7    operate and to provide that to our customer, the CIA, who would

8    then deliver it by some means to Iran.

9    Q.    To Iran?

10   A.    To Iran, yes.

11   Q.    And what was your understanding of the purpose of

12   providing these -- this design with embedded flaws to the

13   Iranians?  Why do that?

14   A.    The whole idea was to have a, a credible red herring to

15   give to Iran that would distract them from their own fire set

16   development and cause them to expend resources and time trying

17   to make this faulty design work that might have been applied to

18   their original work, thereby causing them a lot of delays and

19   frustration in their, their nuclear program.

20   Q.    So was it meant to undermine the development of Iran's

21   nuclear capability?

22   A.    Yes, undermine and delay the program.

23   Q.    Are you familiar with the term "counterproliferation"?

24   A.    Yes.

25   Q.    Can you describe in your own words just what that concept

1  is?

2  A.   Well, proliferation, of course, is the proliferation in

3  this case of nuclear design information.   Counterproliferation

4  would be any action taken to try to stop that proliferation or

5  at least slow it down.

6  Q.   You testified that the target was Iran.   When the lab got

7  involved in this program, was it the lab's job to help develop

8  the designs that would be delivered to Iran?

9  A.   Yes.   We had -- or rather, the CIA had access to a Russian

10 nuclear fire set designer, and they provided this individual,

11 made him available to us, a very small number of my team on the

12 technical side, to study the information that he had and

13 develop a design that we could be -- that could then be used to

14 be corrupted and then given to the Iranians.

15 Q.   So let me take you back a little bit.   When you first

16 started, when the lab first started its work on Classified

17 Program No. 1, did you base the work or the project on any

18 assumptions about the state of Iran's nuclear capabilities at

19 the time?

20 A.   Yes.   We believed them to be a nascent proliferant, if

21 that's a good way to put it, and they were early in their

22 technical development of a nuclear program.

23 Q.   So when you say early, relative to the United States, much

24 earlier?

25 A.   Much earlier.

Walter C. - Direct                                                      306

1   Q.   If you could, tell the jury approximately when did the lab

2   become involved in this program?

3   A.   Approximately the summer of 1996.

4   Q.   You testified that the product at issue involved a fire

5   set, a Russian fire set; is that correct?

6   A.   Correct.

7   Q.   Can you briefly describe for the jury's benefit, what is a

8   fire set?  What does that do?

9   A.   A fire set, a nuclear fire set in particular is one of

10  many, many components that go into a nuclear weapon, and if you

11  think of the distributor in an automobile as a very simplistic

12  way of looking at this, the distributor sends electrical pulses

13  to the spark plug to then combust the gasoline in the

14  cylinders.

15       Much the same concept only on a much higher and much

16  more demanding technical level, the fire set does the same

17  thing for the, the nuclear device.  And when I say nuclear

18  device as distinct from the fire set, I'm talking about what

19  everybody calls the bomb, the plutonium or whatever the bomb is

20  made of, and the explosive that goes around that device, the

21  fire set, enables the initiation of that device.

22  Q.   So you testified that the fire set is one of the

23  components that would be part of a nuclear device; is that

24  correct?

25  A.   Right.

1   Q.   And that's one of a few or many?

2   A.   Many.  Sometimes many hundreds of components go together

3   to make up a nuclear weapon.

4   Q.   So did this program involve offering to the Iranians a

5   complete mockup of a nuclear device?

6   A.   No.  This, this was specifically focused on a nuclear fire

7   set.

8   Q.   Just one of those many components?

9   A.   Correct.

10   Q.   Now, from the outset of the lab's involvement in this

11   program, were there any guiding principles as far as your

12   involvement or the, the lab's involvement in this project?

13   A.   Yes.  Similar to other programs we've done especially for

14   the CIA, there was a single overriding imperative.

15   Q.   What was that imperative?

16   A.   That was, to coin a phrase, do no harm.  In other words,

17   we didn't want to deliver a product that was ultimately going

18   to end up in the Iranians' hands that would result in giving

19   them a significant or any level of improvement toward their

20   nuclear program or anything that might ultimately come to harm

21   the United States or its allies.

22   Q.   And did this principle guide the lab's work throughout its

23   entire involvement in the program?

24   A.   Absolutely.  At every meeting that I held, and I was the

25   senior project manager for the program at the lab, we always

1   focused on that imperative.

2   Q.   You mentioned you were the project manager.  Is that the

3   same thing as sort of the team leader for the folks at the lab?

4   A.   Yes.

5   Q.   You testified that the, the customer, so to speak, was the

6   CIA.

7   A.   Correct.

8   Q.   Did you have particular points of contact at the CIA?

9   A.   Yes.

10  Q.   And were those individuals whom I'll refer to as Bob S.

11  and William, or Bill F.?

12  A.   Correct.  Those were the principal interfaces we had with

13  the agency.

14  Q.   And you would have meetings with them?

15  A.   Yes, we had program reviews on a regular basis.

16  Q.   You testified that the idea was to deliver to the Iranians

17  a flawed fire set design.  How did you go about developing that

18  at the beginning?

19  A.   Well, as I stated earlier, because the CIA had access to

20  this Russian nuclear fire set designer and they essentially

21  provided him to us, we were able to take information that he

22  had and construct initially a working, fully functional nuclear

23  fire set design based on the information that he provided.

24  Q.   Let me back you up.  You mentioned a Russian asset,

25  correct?

1  A.    Correct.

2  Q.    I'm going to refer to an individual named Merlin.  Are you

3  familiar with who that person is?

4  A.    I am.

5  Q.    Is the Russian asset you just mentioned who had fire set

6  design experience the same as Merlin or someone else?

7  A.    No, it was someone else.  To my knowledge, Merlin did not

8  possess nuclear fire set knowledge to any great degree.

9  Q.    As between the fire set engineer that you debriefed and

10  Mr. Merlin, which one had greater technical knowledge as to the

11  design of fire sets?

12  A.    Oh, the other asset.

13  Q.    The first one that you --

14  A.    The first one.

15  Q.    Did you ever meet with the other one, whom I'm referring

16  to as Merlin?

17  A.    No, I did not.

18  Q.    Now, you testified that you were involved in debriefing

19  this first Russian scientist about his knowledge as to Russian

20  fire sets, correct?

21  A.    Correct.

22  Q.    Did he have a complete understanding of a Russian fire

23  set?

24  A.    He did not have a complete understanding.  The way the

25  Russians work, they compartmentalize their design labs.

Walter C. - Direct                                                      310

1    Q.    What does that mean?

2    A.    That means that no single individual at least at the

3    working level has a complete knowledge of any particular fire

4    set design or any weapon component design, and it's basically

5    because they don't trust their own people.

6    Q.    And can you explain that?  Why would it matter if one

7    person knew how to design an entire fire set?

8    A.    If one person had a complete knowledge of a fire set

9    design and that person decided to provide that information to a

10   third party, that could be extremely damaging to the Russian

11   program.

12   Q.    Now, this concept of compartmentalization, how one

13   scientist wouldn't necessarily know everything in Russia, was

14   that concept built into the, the idea for this particular

15   program as far as the product that would be delivered?

16   A.    Well, it certainly had an impact on our approach because

17   the individual that we debriefed knew a lot about this nuclear

18   fire set, which is designated the TBA 480, but he didn't have a

19   complete knowledge.  However, because of the lab's extensive

20   experience designing U.S. nuclear fire sets, we were able to

21   fill in the blanks and construct a complete functional design

22   that looked very much like a Russian nuclear fire set.

23   Q.    Let me make sure I have this straight.  So you debriefed

24   this individual to obtain all the information he possessed

25   about fire sets, or this TBA 480, right?

Walter C. - Direct                                                     311

1    A.    Right.

2    Q.    And then was that sufficient to construct a working fire

3    set based on just his knowledge?

4    A.    No, because he had, he had gaps in design that he could

5    not fill in for us.

6    Q.    And who filled those in?

7    A.    Our technical design team.

8    Q.    So in combination between the information provided by this

9    first Russian and the technical team, was the lab able to

10   develop a workable fire set based on the combined information?

11   A.    Yes.

12   Q.    Can you recall approximately how long from mid-1996,

13   beginning of 1996, did it take to develop the, the functioning

14   fire set design?

15   A.    It took approximately nine months.  So we had a

16   functioning design that we tested in a laboratory approximately

17   April of the following year.

18   Q.    '97?

19   A.    '97, yes.

20   Q.    After you had this working fire set, what did you do with

21   it?

22   A.    At that point, our next -- the next phase of the project

23   was to develop flaws that could be incorporated into that

24   design that would ensure that it would not function.

25   Q.    Was it just one embedded flaw or multiple flaws?

1   A.    No, they were, they were multiple flaws.

2   Q.    Approximately how long did it take -- did the process take

3   to embed these flaws into the fire set design?

4   A.    We spent about eight months developing the flaws and

5   testing the flaws.  Now, when I say testing, we didn't build a

6   completely broken fire set and test it, but we did test each of

7   the individual flaws both by laboratory testing and also using

8   sophisticated models that the lab has developed over the years.

9   Q.    During this time that the lab was embedding the flaws, do

10  you recall attending a meeting with Bill F. and Bob S. and

11  others about someone that I will refer to as Merlin?

12  A.    Yes.

13  Q.    Is that the first time that you can recall learning about

14  Merlin or his use in this program?

15  A.    Yes.

16  Q.    Was that in approximately October 1997?

17  A.    That sounds right, yes.

18  Q.    You testified that Mr. Merlin was going to be delivering

19  this product, that flawed design, correct?

20  A.    Yes.

21  Q.    Can you just describe for the jury, when we say "design,"

22  was it one, one piece of paper that he was going to hand them?

23  What was he going to give them?

24  A.    The deliverables that we were under contract to the CIA to

25  provide them included three pieces.  One was an electrical

1   schematic, second was a parts list that referred to that

2   electrical schematic, and the third was a three-dimensional

3   drawing that showed how all the components would have to be put

4   together in a fairly compact package.

5   Q.   You described this third part of the product as a 3-D

6   design of how it would have to be put together, correct?

7   A.   Yes.

8   Q.   In your experience, is that a difficult part of

9   construction of a fire set, sort of packaging?

10  A.   Yes.  It's one of the very most difficult parts of, of

11  developing an operational nuclear fire set.

12  Q.   Were the embedded flaws embedded in such a way that it

13  would make it easier or harder to take the fire set and reduce

14  it to the 3-D design that would be provided?

15  A.   The electrical flaws were so many and so complex that in

16  the first place, it would have been impossible to, to find all

17  the flaws even if you knew what you were looking for.  The

18  taking the electrical package and putting it into a, you know,

19  small space, small configuration that could be used in an

20  aircraft-delivered weapon or in a missile-delivered weapon

21  creates a whole host of additional problems beyond just the

22  electrical problems.

23  Q.   Thank you.

24        So once the team had taken the workable fire set and

25  created the embedded, the flawed version of it, what did the

1   lab do with the flawed version?

2   A.   We wanted to know how easy or how hard it would be for

3   Iran to perhaps determine what was, what was wrong with this

4   fire set, so the lab, you know, over decades, we were able to

5   call on the experience of fire set designers.  We put together

6   a team that we called the Red Team, which was given the

7   electrical design, and they were asked to evaluate that design.

8   They were not told anything about where it came from or that

9   it, that it had problems or it had flaws in it, but they were

10  asked to evaluate that design.

11           And the team was comprised of individuals that could

12  bring to bear all the technical expertise that would be

13  required to develop a fire set, and combined, they had

14  approximately 200 years of experience in developing fire sets

15  for the U.S.

16  Q.   200 years focused -- combined 200 years focused on just

17  fire sets?

18  A.   Correct.

19  Q.   And to be clear, none of individuals or the scientists

20  that were on the Red Team were part of developing the flawed

21  design?

22  A.   That's correct.

23  Q.   Did any of the members of the Red Team have prior

24  experience trying to identify flaws in weapons designs or other

25  designs?

1   A.    Yes, some of them did.

2   Q.    And was it useful to you in evaluating the flawed designs

3   to have people on the Red Team who had previously spotted or

4   tried to spot flaws in other designs?

5   A.    One of the things we were interested in is whether or not

6   any of the team members would discover that this design had

7   been intentionally modified or corrupted.

8   Q.    Now, given the experience of the Red Team, did you expect

9   that they would be able to identify some of the problems with

10  the fire set design?

11  A.    Yes.  We were certain that they were going to identify

12  some of the flaws that we had designed into the faulty fire

13  set.

14  Q.    And did they?

15  A.    Yes, they did.

16  Q.    Approximately what percentage of the embedded flaws did

17  they identify?

18  A.    Over a period of five months that they worked with the

19  design, they identified approximately 25 percent of the flaws

20  that we had built into the design.

21  Q.    Now, did you have any expectation based on the experience

22  of the Red Team that they might identify that some of these

23  flaws were deliberately placed in the design?

24  A.    We actually, we actually assumed that they would based on

25  the experience of some of the team members.  It turned out that

Walter C. - Direct                                                        316

1    to our surprise, that none of Red Team members tumbled to the

2    fact that this was an intentionally corrupted fire set design.

3    Q.   So no one figured it out?

4    A.   No one figured it out on the Red Team.

5    Q.   Now, given the experience of the team, did you have any

6    expectation that they would be able to cobble together a fire

7    set based on these flawed designs?

8    A.   None.  We were certain that they could do it given the

9    time and especially given their experience level.

10   Q.   You said you were certain they could cobble something

11   together; is that correct?

12   A.   Yes.

13   Q.   And was that a final, complete, usable fire set, or just

14   something that would work in the laboratory?

15   A.   No.  They divided their time between modeling the

16   electrical schematic that was provided to them, testing

17   individual parts of that, and then after they had identified

18   ten problem areas and fixed those, we -- they built a

19   laboratory version of that fire set and got it to function in

20   the laboratory.

21   Q.   Now, you said function in the laboratory.  Is that

22   different than getting a fire set to work in a weapon?

23   A.   Yes.  The laboratory, as you can imagine, is a very benign

24   environment, you know, like your desktop at work.  When you

25   take a laboratory test version and you package it again into a,

1  you know, a small container that might fly in a missile or in

2  an aircraft bomb, you run into a host of problems that could

3  broadly be categorized as ruggedization issues.

4  Q.    I'll just stop you there.  So there would be additional

5  problems in trying to use a fire set outside of a laboratory

6  setting in a weapons setting?

7  A.    Yes, many.

8  Q.    And you testified that the Red Team was able to identify

9  approximately 25 percent of the embedded flaws?

10  A.    Correct.

11  Q.    Would any of the remaining 75 percent of the flaws come

12  into place once you tried to take this device out of a

13  laboratory setting?

14  A.    Certainly.

15  Q.    And would those have proven -- strike that.

16          You testified that the Red Team worked on the flawed

17  designs or examined them for approximately five months; is that

18  right?

19  A.    Yes, yes.

20  Q.    And at the completion of the Red Team's work, did you

21  consider the design a success?

22  A.    Yes, we did.

23  Q.    Why was that?

24  A.    Well, first of all, because of the Red Team's experience,

25  we knew that they were going to solve enough of the problems,

Walter C. - Direct                                                  318

1    and they solved approximately 25 percent, and be able to make a

2    laboratory version function, and they could have even taken

3    that and they could have packaged it because, you know, the lab

4    has the experience to do that.  So we were not at all

5    surprised.

6            The fact that it took them five months was actually a

7    good sign because we considered that the Iranian program, which

8    would be much less mature than the U.S. program, their nuclear

9    scientists would take way, way longer to solve the same

10   problems.

11   Q.   And going back to that guiding principle about do no harm,

12   was that conclusion about the Red Team relevant in your

13   assessing the risk of this program?

14   A.   Absolutely.  And that's why we put together a Red Team, to

15   evaluate.

16   Q.   After the Red Team completed its work, did you show the

17   design with the embedded flaws to the first Russian scientist?

18   A.   Yes, we did.

19   Q.   Was he able to identify upon examining the product any of

20   the embedded flaws?

21   A.   No.

22   Q.   What was his reaction upon reviewing --

23            MR. MAC MAHON:  Your Honor, objection.  Lack of

24   foundation.  It's just hearsay.

25            THE COURT:  Well, lay a foundation.

Walter C. - Direct                                                          319

1   BY MR. OLSHAN:

2   Q.   Did you meet with this individual, the first Russian

3   scientist?

4   A.   Yes.  We had four meetings with him.

5   Q.   And were you present when he reviewed the completed flawed

6   fire set design?

7   A.   Yes, I was.

8   Q.   And as to his response, did he indicate any concerns about

9   the fire set design?

10              MR. MAC MAHON:  Your Honor, objection to hearsay as

11  well.

12              THE COURT:  It's only being offered -- I can tell

13  from the question it's not being offered for the truth of its

14  contents but rather to explain the understanding that this

15  witness and the lab would have had, and that's different, so

16  it's not hearsay.  Overruled.

17              MR. OLSHAN:  That's my purpose.  Thank you, Your

18  Honor.

19  Q.   So did he have any concerns -- did he express any concerns

20  to you?

21  A.   He had no concerns.

22  Q.   And was that relevant in this risk assessment?

23  A.   It was another data point that said we have done a good

24  job in our design, and the original Russian nuclear fire set

25  designer that we worked with was satisfied that it looked

Walter C. - Direct                                                    320

1   credible to him.

2   Q.   You testified that the Red Team took approximately five

3   months.  When did that end?  Approximately when did their work

4   end?

5   A.   That ended approximately May of '98.

6   Q.   So between the lab's first involvement in mid, excuse me,

7   mid-1996 through the end of the Red Team process was

8   approximately two years of work?

9   A.   Correct.

10  Q.   You testified a couple times about risk assessment.  At

11  the end of the work that the lab did, did the lab provide or

12  produce an overall assessment of the risk of this design being

13  provided to the Iranians?

14  A.   Yes.  The CIA asked for that risk assessment, and we

15  provided that to them.

16  Q.   So it was important that the CIA had that risk assessment

17  in your understanding?

18  A.   Yes.

19  Q.   And was it also important for the lab to have made that

20  assessment?

21  A.   Yes, indeed.

22  Q.   And what was the bottom line of that assessment?

23  A.   The bottom line was there was no risk that the Iranian

24  nuclear scientists would determine that this look-alike Russian

25  nuclear fire set had been intentionally corrupted.

Walter C. - Direct                                                    321

1  Q.   And did you reach any assessments about whether this

2  flawed fire set design would materially advance their program?

3  A.   We did.  That was part of the, the risk assessment.

4  Q.   And would it?

5  A.   And we determined that the answer to that was no.

6  Q.   Did that assessment take into account the possibility that

7  the Iranians might already be working with a Russian scientist

8  who could help them with this Russian design?

9  A.   What, what -- one of the stipulations of our risk

10 assessment and that conclusion was that you would have to

11 have -- that the Iranians would have to have a team of nuclear

12 fire set designers because of the compartmentalization issue.

13 If they had one nuclear fire set designer from Russia, he

14 wouldn't have been able to help them at the, at the level it

15 would require to use the design.

16 Q.   So they would have needed a whole team of people?

17 A.   Correct.

18 Q.   And if they had a whole team of people, would this be of

19 interest to them in the first place?

20 A.   If they --

21      MR. MAC MAHON:  Your Honor, objection to speculation

22 at this point.

23      MR. OLSHAN:  This is based on --

24      THE COURT:  No, I think this witness has sufficient

25 knowledge.  Overruled.

Walter C. - Direct                                                     322

1              MR. OLSHAN:    Thank you.

2    Q.    So my question, Mr. C., is if they had had a team of

3    Russian scientists, would this product, these flawed designs,

4    be of any use to them in your experience?

5    A.    In my estimation, if they were already working with a team

6    of nuclear fire set designers from Russia, and that would --

7    that would mean the Russians were willing to give them

8    essentially the crown jewels of their program.  They wouldn't

9    have any need for the design that we had provided to the CIA.

10   Q.    After the lab completed its work, later in 1998, do you

11   recall whether you received any questions that were conveyed by

12   Merlin about the product, the design?  Do you remember being

13   contacted by anyone that he had --

14   A.    Yes.  One of, one of the CIA officers called me and said

15   that Merlin had some concerns about the package that we had

16   provided.

17   Q.    And did those concerns involve identifying the embedded

18   flaws?

19   A.    No.

20   Q.    Did it have anything to do with the completeness of what

21   was handed to him?

22   A.    Yes.

23             THE COURT:  Do you remember any more detail than just

24   completeness?  Was there a particular aspect of incompleteness

25   that was earmarked for you?

1            THE WITNESS:  Yes, Your Honor.  Because the nuclear

2    fire set designer that we debriefed did not have a complete

3    knowledge of that design, we had some gaps in the parts list

4    that we were unable to provide specific Russian part numbers

5    for.

6    BY MR. OLSHAN:

7    Q.   Going back to this concept of compartmentalization, did

8    that fit the story that the person offering these plans to

9    Russia, who was a disaffected Russian scientist, would not know

10   everything that would need to go into the design?

11   A.   Yes, exactly.

12   Q.   So in your estimation, would it have raised potentially

13   red flags with the Iranians if what had been provided to them

14   had been the complete parts list, with all the right parts and

15   everything slotted in the right place?

16   A.   That would have been surprising having come from a single

17   individual.  That would have been impossible.

18   Q.   You testified that you heard about these concerns.  Based

19   on the concerns, were any changes made to the product?

20   A.   We made no changes to the product after that.

21            MR. OLSHAN:  I'd like to show the witness two

22   exhibits.  They're going to be Exhibits 26 and 28 in the first

23   binder.

24            THE COURT:  Does defense have any objection to 26

25   and/or 28?

Walter C. - Direct                                                    324

1          MR. MAC MAHON:  26 and 28?

2          No objection to either exhibit, Your Honor.

3          THE COURT:  All right, they're both in.

4          (Government's Exhibit Nos. 26 and 28 were received in

5    evidence.)

6    BY MR. OLSHAN:

7    Q.   Do you have those in front of you, sir?

8    A.   I do.

9          MR. OLSHAN:  Your Honor, at this time, may we publish

10   26?

11         THE COURT:  Yes.  They're both admitted, so you may

12   publish them.

13   BY MR. OLSHAN:

14   Q.   Mr. C., do you recognize this document?

15   A.   Yes, I do.

16   Q.   And does this appear to be a redacted version of a letter?

17   A.   Yes.

18   Q.   What's the purpose of this letter?

19   A.   Because we were providing materials to a foreign entity,

20   in this case Iran, we had to ensure that nothing in the

21   deliverables would violate any of the U.S. export control laws.

22   Q.   In addition, in addition to the sort of operational

23   aspects of this program, were there also legal requirements

24   involved in the lab's work?

25   A.   Yes.

Walter C. - Direct                                                    325

1    Q.   Does this letter indicate that -- what does this letter

2    indicate about whether the conduct would violate any export

3    control or other laws?

4    A.   Well, it merely says that nothing that we are providing to

5    the CIA that would ultimately end up with the Iranians would

6    violate a number of different export control laws.

7    Q.   And the last sentence, if you could just read that?  Can

8    you read it out loud?

9    A.   Yes.  "However, in the very remote possibility that the

10   end user can also acquire the critical specifications

11   intentionally omitted from the design and if the user can also

12   acquire the necessary fabrication technologies to successfully

13   fabricate a fully functional device, the end product would then

14   be subject to the above controls."

15   Q.   So does that mean if they were able to take what you were

16   giving them and get other additional information, then it

17   possibly could violate export control law?

18   A.   Yes.

19   Q.   All right.  But as designed, it did not?

20   A.   Correct.

21   Q.   Was this a required letter for purposes of the lab's

22   sign-off on the program?

23   A.   Yes, it was.

24   Q.   And who is it addressed to?

25   A.   It is addressed to our contacts at the CIA.

Walter C. - Direct                                                    326

1   Q.   Mr. F. and Mr. S.?

2   A.   Mr. F. and Mr. S.

3   Q.   That's Bill F. and Bob S.?

4   A.   Correct.

5   Q.   What's the date on this letter?

6   A.   It's June 9, 1999.

7   Q.   So this letter was approximately one year after the Red

8   Team had completed its work?

9   A.   Yes.

10  Q.   If you could flip to 28 in that binder?

11  A.   Okay.

12  Q.   Do you see another letter?

13  A.   I have it, yes.

14  Q.   Is that another letter from the lab to the CIA?

15  A.   That is a letter from our National Laboratory to the CIA.

16  Q.   What's the date of that letter?

17  A.   July 28, 1999.

18  Q.   So about a month and a half after the letter we looked at

19  in Exhibit 26?

20  A.   Yes.

21  Q.   What's the purpose of this letter?

22  A.   This is a, essentially a summary of the imperative that we

23  had operated with since Day One, that we were not to provide

24  enabling technology to the Iranians, and it succinctly states

25  that what we are providing to the CIA and thus ultimately to

1   the Iranians would not significantly enable them their nuclear

2   fire set program to advance.

3   Q.   And this assessment was based on an assumption that the

4   Iranians already had some basic understanding as to a nuclear

5   weapons design?

6   A.   Correct.

7   Q.   You testified that you did not know what the CIA called

8   this program.  Did you have access to any of the material at

9   the CIA related to this program?

10  A.   No.

11  Q.   Could you have gone on your computer and looked at

12  anything in the CIA's files about this program?

13  A.   No.

14  Q.   Do you know an individual named James Risen?

15  A.   I do not know James Risen.

16  Q.   Have you ever heard of him?

17  A.   I have heard of him.

18  Q.   And are you aware of a book he wrote called *State of War*?

19  A.   I am.

20  Q.   Have you read it?

21  A.   I have read one of the chapters.

22  Q.   Is that chapter 9?

23  A.   "A Rogue Operation."

24  Q.   A chapter about the program we've been describing?

25  A.   Yes.

Walter C. - Cross                                                          328

1    Q.   Have you ever talked to Mr. Risen about this program or

2    your work or the lab's work on the program?

3    A.   No.

4    Q.   Have you ever talked to anyone whom you knew did not have

5    proper clearances to know about this program?

6    A.   No.

7              MR. OLSHAN:  One moment, Your Honor?

8              THE COURT:  Yes, sir.

9              MR. OLSHAN:  One moment, Your Honor.

10             If we could go back briefly to Exhibit 28?

11             THE COURT:  28?  All right.

12   BY MR. OLSHAN:

13   Q.   And if you could just read, Mr. C., the second paragraph?

14   A.   "The significant design details that might materially aid

15   the user have been intentionally omitted from this design.

16   This includes such critical information necessary for use in a

17   delivery system."

18   Q.   And does this letter encapsulate that prime directive, so

19   to speak, that the lab worked on the entire time?

20   A.   Yes, it did.

21             MR. OLSHAN:  That's all I have for now, Your Honor.

22             THE COURT:  All right, cross-examination?

23             MR. MAC MAHON:  Thank you, Your Honor.

24                         CROSS-EXAMINATION

25   BY MR. MAC MAHON:

1    Q.   Good morning, Mr. C.  My name is Edward MacMahon.  I'm one

2    of the lawyers for Mr. Sterling.

3    A.   Good morning.

4    Q.   Did you read chapter 9 of *State of War*?  Is that what your

5    testimony was?

6    A.   I did.

7    Q.   And were you offended by the suggestion that Mr. Risen

8    wrote that something that you worked on may have aided the

9    Iranians in developing a nuclear weapons program?

10   A.   I, I was entertained by the chapter, and then as an

11   afterthought, I was offended because it violated -- or the

12   concept of a rogue operation violated our prime directive to do

13   no harm.

14   Q.   All right.  So it did offend you?

15   A.   Yes.

16   Q.   And it offended you because it was never -- your, your

17   testimony is that the operation was vetted in a way that

18   nothing of any value could be given to the Iranians, correct?

19   A.   Yes, on our part, on the lab's part.

20   Q.   Okay.  Now, in -- you testified -- I think you testified

21   that you briefed -- and that may be the wrong word -- but you

22   talked to Bob S. about the work that was done at the lab?

23   A.   Yes.  They -- Bill F. and Bob S. would come to the labs to

24   review the program frequently, so I, I met him on a number of

25   occasions.

Walter C. - Cross                                                          330

1    Q.    Okay.  And without naming anybody, you also briefed other

2    people that worked at the CIA about the operation, correct?

3    A.    Correct.

4    Q.    And how many people other than Bob S. did you brief about

5    this operation?

6    A.    I, I would recall two-three-four, a small number of

7    individuals.

8    Q.    And do you remember when this happened that you gave

9    details to these people?

10   A.    It would have been during the lifetime of the project, so

11   '96 through '98, and then occasionally afterwards, as they had

12   follow-up questions.

13   Q.    Right.  And what you gave to those people were crucial

14   details about the deception plans, correct?

15   A.    Well, the deception plans, if you're referring to the

16   design flaws that the lab built in, yes.

17   Q.    Was there -- was -- deception was the whole idea, correct?

18   A.    Correct.

19   Q.    Now, I think your other term was you wanted to make a

20   credible red herring.  Is that what you said?

21   A.    Yes.  That was the reason that this TBA 480 was selected,

22   because it was based on a real Russian nuclear fire set and it

23   would be -- the design would be credible.

24   Q.    Right.  And one of the ways that you made a credible

25   design of a Russian nuclear weapon was to add a parts list of

1   English parts; is that correct?

2   A.   It had -- yes, it was a parts list that referenced the

3   electrical schematic.

4   Q.   And it referenced the parts list for a Russian nuclear

5   weapon in English, correct?

6   A.   I don't remember fully, but I believe that it did.  I'd

7   have to see the parts list to refresh my memory.

8   Q.   Had you ever seen a design for a Russian nuclear weapon

9   with English parts list before?

10  A.   I'd never seen a design for a Russian nuclear fire set

11  before.

12  Q.   You'd never seen -- you'd never seen one at all, much less

13  one with an English parts list, right?

14  A.   That's right.

15  Q.   And you testified that there were people -- and if I've

16  got this wrong, please correct me -- but that you said that you

17  had people who were experienced in identifying flaws in fire

18  set plans?

19  A.   Yes.  Fire set plans and, and other nuclear weapons

20  components.

21  Q.   And this is because there's a, market may not be the right

22  word, but there are counterfeit fire set plans?

23            MR. OLSHAN:  Objection.

24            THE COURT:  Sustained.

25  BY MR. MAC MAHON:

Walter C. - Cross                                                   332

1   Q.   Okay.  You said that -- why do you have people with

2   experience -- I'm trying to think of a way to ask the question,

3   Your Honor.  Your testimony was there were people at the lab

4   with experience in detecting flaws in fire set plans, correct?

5   A.   Yes.

6   Q.   Okay.

7   A.   Well, fire set and other nuclear components.

8   Q.   Right.

9   A.   But as a subset of that, yes.

10  Q.   And is that all for purposes of the deception plans that

11  we're talking of here?

12          MR. OLSHAN:  Objection.

13          THE COURT:  Sustained.

14          MR. MAC MAHON:  He opened the door, Your Honor.  I'm

15  trying to understand --

16          THE COURT:  Sustained.

17          MR. MAC MAHON:  Thank you, Your Honor.

18  Q.   You -- we looked at -- I think your testimony was that you

19  didn't have any idea what the Iranian scientists had in 1998 in

20  terms of fire set plans; is that correct?

21  A.   That we did not have any idea?

22  Q.   You didn't have any information as to whether there was a,

23  they had a working set of fire set plans from a Russian

24  scientist, correct?

25  A.   We had access to intelligence assessment from the

Walter C. - Cross                                                    333

1    Intelligence Community that made an assessment as to what the

2    maturity of their program was.

3    Q.  Okay.  And you're aware that there came a time when the

4    U.S. government issued an intelligence finding publicly that

5    the Iranians --

6              MR. OLSHAN:  Objection.  This is beyond the scope of

7    direct.

8              MR. MAC MAHON:  Your Honor, he testified as to

9    what --

10             THE COURT:  I think right now, as long as we're

11   talking about publicly released documents, there's no basis for

12   the objection.  The issue about what the Iranians -- the level

13   of knowledge that the Iranians may have had about fire sets is

14   within the scope of the direct.  It certainly is included in

15   the assumptions that are listed in Exhibits 26 or 28.

16             So you've opened the door, but it has to be within

17   the parameters of this case.

18             MR. MAC MAHON:  I understand, Your Honor.

19             MR. OLSHAN:  Your Honor, my objection is to anything

20   that Mr. -- anything that happened after this.  If Mr. MacMahon

21   wants to limit it to an assessment at the time that the lab was

22   involved in this program, that's fine, but anything that

23   happened subsequent is not relevant to this witness's

24   testimony.

25             THE COURT:  Well, it depends.  Let me hear the

Walter C. - Cross                                                      334

1    question again.

2    BY MR. MAC MAHON:

3    Q.    My question is are you aware that the United States

4    government issued a national intelligence assessment later that

5    said the Iranians don't even have a nuclear weapons program?

6    A.    Only vaguely.  I couldn't confirm that 100 percent.

7    Q.    And when we looked at Exhibit -- excuse me, Exhibit 28, if

8    Mr. Francisco would put Exhibit 28 up again for me, please?

9              I'm sorry, it's 26, please, Mr. Francisco.  I'm

10   sorry.

11             I beg the Court's indulgence.

12             Okay.  Do you remember the paragraph that Mr. Olshan

13   had you read that starts, "However, in the very remote

14   possibility" --

15   A.    Yes.

16   Q.    "-- that the end user can also acquire the critical

17   specifications intentionally?"

18             Do you see that?

19   A.    Yes.

20   Q.    So in June -- on June 9, 1999, you were aware that there

21   was a remote possibility that the end user could acquire the

22   critical specs and thus get some benefit from getting these

23   plans, correct?

24   A.    A very remote possibility.

25   Q.    Right.  "Very remote" is the word here, but there was a

1    possibility, wasn't there?

2    A.   I think I would have to speculate on that.

3    Q.   And the weapons plans that you worked on, they weren't

4    designed to be delivered wrapped in a newspaper, were they?

5    A.   I have no idea about that end of that operational plan.

6            MR. MAC MAHON:  No further questions, Your Honor.

7            THE COURT:  All right, is there any redirect?

8            MR. OLSHAN:  Briefly, Your Honor.

9            THE COURT:  All right.

10                        REDIRECT EXAMINATION

11   BY MR. OLSHAN:

12   Q.   Mr. C., Mr. MacMahon just asked you a question about an

13   English parts list.  Do you recall that?

14   A.   Yes.

15   Q.   And I believe it was your testimony you couldn't recall

16   exactly, but you recall that there was some English as part of

17   the parts list?

18   A.   Yes.

19   Q.   Did this concept of compartmentalization and what one

20   Russian might know factor into whether it made sense to have

21   some English in the design, in the product?

22   A.   Yes, that was certainly part of it.

23   Q.   Can you elaborate on that just a little bit?

24   A.   I can.  The, the operational concept that CIA shared with

25   us, and I'm sure it was, sure it was limited, suggested that

Walter C. - Redirect                                           336

1    because this Russian nuclear fire set designer was now residing

2    in the U.S., that he would not have or never -- and never

3    really did have access to all the Russian part numbers that

4    would have gone into the TBA 480 Russian nuclear fire set

5    design.

6    Q.   So if this Russian were in the United States and was

7    trying to tell the Iranians about fire set components, would he

8    have access to Russian parts in the United States?

9    A.   He would not have.  He would have -- logically, he would

10   have, and I think this was part of the operational concept,

11   logically he would have access to U.S. part numbers.

12   Q.   And would those be in English?

13   A.   Yes.

14        MR. OLSHAN:  No further questions.

15        THE COURT:  All right, any recross?

16        MR. MAC MAHON:  Just briefly, Your Honor.

17                      RECROSS EXAMINATION

18   BY MR. MAC MAHON:

19   Q.   So as you understood it, the plan was to have the Russian

20   engineer that posed and presented these plans to be someone

21   living in the United States?

22   A.   Is this Merlin that we're talking --

23   Q.   Anyone.  When you were talking about the plan and the

24   proposition that they might have an American parts list for

25   things necessary for a nuclear weapon, the person that you were

Walter C. - Redirect                                                337

1    told about hypothetically would be someone that lived in the

2    United States; is that correct?

3    A.   The person that -- I'm struggling with your question; I

4    apologize.

5    Q.   Let me try again.  It must not have been a good question.

6    A.   The person that we interacted with, the Russian nuclear

7    fire set designer, resided in the U.S.

8    Q.   Right.  But it had to be something credible that was going

9    to be delivered, correct?

10   A.   The design, the package that we put together?

11   Q.   Yes.

12   A.   Yes, it had to be credible.

13   Q.   And was the -- what you were told the plan was, that the

14   person who designed the -- it was to appear that the person who

15   designed the plan was living in the United States and that's

16   why they only had an English parts list?

17   A.   That, that sounds like one of the logics that was provided

18   as to the reason that we did not have a complete Russian parts

19   list.

20           MR. MAC MAHON:  That's all, Your Honor.  Thank you.

21           THE COURT:  All right, is anybody going to call this

22   witness again?

23           MR. OLSHAN:  No, Your Honor.

24           THE COURT:  All right, thank you for your testimony,

25   sir.  You're free to go at this time, all right?

1         THE WITNESS:  Thank you, Your Honor.

2                   (Witness excused.)

3         THE COURT:  All right, we'll call the next witness.

4    We'll go for about 20 minutes unless anybody needs a break

5    before then.  Then we'll take our morning break, all right?

6         Mr. Trump?

7         MR. TRUMP:  Your Honor, there was one point that came

8    up that we can take up at the next break or we can take up at

9    the bench.

10        THE COURT:  Well, we have a witness on deck.  Let's

11   get the witness started.

12        MR. TRUMP:  Well, it may come up again, and so I

13   wanted to note an objection about something that was said that

14   may come up again.

15        THE COURT:  Come up, come up to the bench.

16        Mr. Trump, is this a regular bench conference?

17        MR. TRUMP:  Yes.

18        THE COURT:  All right.

19        (Bench conference on the record.)

20        THE COURT:  Yes, Mr. Trump?

21        MR. TRUMP:  I believe Mr. MacMahon was referring to

22   what has been discussed in discovery and elsewhere as a public

23   document, NIE, a national intelligence estimate.  He's

24   referring to it incorrectly, and I think if we refer to

25   documents like that, we should actually use the language in the

1    document and not some characterization of the language.

2            The document doesn't say that Iran never had a

3    nuclear weapons program, but that's the characterization that

4    Mr. MacMahon has put on it, so if we're going to refer to it,

5    I'm going to ask the Court that we actually refer to it

6    correctly in terms of the actual language of the document.

7            THE COURT:  Well, raise that -- if it comes up in

8    another question improperly, make the objection then, all

9    right?

10           MR. MAC MAHON:  And for the record, I think I

11   characterized it exactly correctly.

12           THE COURT:  All right.

13           MR. MAC MAHON:  It says they don't have a nuclear

14   weapons program as of the time of that.  I didn't suggest --

15           MR. TRUMP:  I believe it said it halted the nuclear

16   weapons program.

17           THE COURT:  I don't want to take up the jury's time

18   right now.

19           MR. MAC MAHON:  Can I ask one other question?  Your

20   Honor, and I know this is just as good a time as any to ask,

21   but some kind of sequence of witnesses would be helpful to the

22   defense so that we can get the files out.

23           THE COURT:  Standard practice is to give the --

24           MR. TRUMP:  We've provided them all the --

25           MR. MAC MAHON:  But we don't know who the witness is

Robert S. - Direct                                          340

1    after Mr. S., and I didn't want to ask in front of the jury.

2           MR. TRUMP:  They're the other screened witnesses.  It

3    would be --

4           THE COURT:  Well, we should have the order.  Let's

5    not do this now.  Mr. S. is the next witness.  How long is he

6    going to take?

7           MR. TRUMP:  Several hours.

8           THE COURT:  He'll be a good chunk of the day.  I

9    don't want to keep the jury waiting.

10          MR. MAC MAHON:  Thank you.

11          THE COURT:  At our lunch break, we'll take care of

12   it.

13          MR. MAC MAHON:  Thank you.

14          (End of bench conference.)

15          ROBERT S., GOVERNMENT'S WITNESS, AFFIRMED

16                    DIRECT EXAMINATION

17   BY MR. TRUMP:

18   Q.   Good morning, sir.  Would you state your first name and

19   last initial.

20   A.   Robert S.

21   Q.   Are you sometimes known to your colleagues as Bob?

22   A.   Yes.

23   Q.   Do you have a college degree?

24   A.   Yes, I do.

25   Q.   What is your degree?

1   A.   It's a history degree.

2   Q.   Where did you get that degree?

3   A.   Harvard College.

4   Q.   And did you also obtain a master's degree?

5   A.   Yes.

6   Q.   In what?

7   A.   In history.

8   Q.   Also from Harvard?

9   A.   They gave me a scholarship, yes, sir.

10  Q.   And you also have a Ph.D. from Harvard?

11  A.   Yes.

12  Q.   At some point, did you begin working for the CIA?

13  A.   Yes.

14  Q.   Approximately when?

15  A.   On the 2nd of July, 1979.

16  Q.   And when did you officially retire from the, the CIA?

17  A.   On the 31st of October, 2000.

18  Q.   And what did you do at that point?

19  A.   I worked as a consultant.

20  Q.   Until when?

21  A.   Until shortly after the September 11 attack in 2001.

22  Q.   At that point, what happened?

23  A.   I was asked by the CIA to return as a contractor.

24  Q.   And for how long were you a contractor with the CIA?

25  A.   I still am.

Robert S. - Direct                                                      342

1    Q.    Do you know someone by the name of James Risen?

2    A.    I don't know him.

3    Q.    Have you ever met him?

4    A.    No.

5    Q.    Have you ever talked to him?

6    A.    No.

7    Q.    Have you ever provided him with any information?

8    A.    No.

9    Q.    When you started with the CIA in 1979, were you trained to

10   become an operations officer or case officer?

11   A.    Yes.

12   Q.    Did you receive operational training?

13   A.    Yes.

14   Q.    Did you receive training in the importance of handling

15   classified information?

16   A.    Yes.

17   Q.    Including documents?

18   A.    Yes.

19   Q.    Did you receive refresher training on those documents?

20   A.    Yes, as recently as December 2014.

21   Q.    And do all case officers receive such training?

22   A.    Yes.

23   Q.    Did you, did you also receive training in the importance

24   of protecting the confidentiality of human assets?

25   A.    Yes.

Robert S. - Direct                                                      343

1   Q.    And what is a human asset?

2   A.    It is an individual who volunteers to assist the CIA in

3   carrying out its mission of gathering foreign intelligence.

4   This would be a person who has access to that intelligence and

5   is willing to share it with the United States government.

6   Q.    And why is it important to protect the relationship of a

7   confiden- -- excuse me, of a human asset with the CIA?

8   A.    Because the government or terrorist group or lab or

9   company or whatever that the foreign individual belongs to

10  would take reprisals against him or her if they learned that

11  they were cooperating with the United States government and

12  sharing secrets.

13  Q.    Now, were your first assignments overseas?

14  A.    Yes.

15  Q.    And your first assignment overseas lasted about how long?

16  A.    Four years.

17  Q.    Was that work as a case officer?

18  A.    Yes, it was.

19  Q.    As a case officer, was part of your work to identify and

20  recruit human assets?

21  A.    Yes.

22  Q.    And did you do that?

23  A.    I did.

24  Q.    And then once they're recruited, did you handle them?

25  A.    I met them securely so that their cooperation with us

1   would not become known and talked to them and guided them and

2   collected information from them.

3   Q.   So in other words, you had experience in the recruitment

4   and handling of human assets?

5   A.   Yes.

6   Q.   Your second overseas assignment, how long was that?

7   A.   Two years.

8   Q.   Approximately when to when?

9   A.   From 1985 to 1987.

10  Q.   Again, were you a case officer?

11  A.   I was.

12  Q.   At some point during that period, did you, did you have an

13  emphasis in any particular area?

14  A.   Yes.  That was an emphasis on counterproliferation,

15  particularly of nuclear weapons.

16  Q.   And is that -- was that at that time an intelligence

17  priority of the CIA?

18  A.   Yes.  It was an intelligence priority of the government,

19  which was tasked to the CIA and other intelligence agencies.

20  Q.   And has that priority continued until present day?

21  A.   Yes, it has.

22  Q.   In 1987, did you have a third overseas assignment?

23  A.   I did.

24  Q.   And what was that?

25  A.   I was the deputy chief of a CIA office overseas.

1  Q.    For how long?

2  A.    For three years.

3  Q.    Another overseas assignment after that?

4  A.    Yes.

5  Q.    And what was that?

6  A.    That was as the chief of a CIA office beginning in 1990

7  and continuing to 1993.

8  Q.    During that period, did you again focus on nuclear

9  nonproliferation?

10  A.    Yes.

11  Q.    And was there any particular country that you were focused

12  on at that time?

13  A.    Iran.

14  Q.    After 1993, did you return to the United States for a

15  period?

16  A.    I did.

17  Q.    What did you do beginning in 1993?

18  A.    I was assigned as the CIA's representative on the faculty

19  of one of the senior military schools.

20  Q.    Approximately what period of time was that?

21  A.    '93 to '95.

22  Q.    And what subjects were you teaching?

23  A.    Because of the history Ph.D., they drafted me to teach

24  military history, but I also taught what I primarily came there

25  to teach, which is intelligence and its support for the war

Robert S. - Direct                                                    346

1   fighter.

2   Q.   Are you familiar with the Counterproliferation Division of

3   the CIA?

4   A.   Yes.  I was one of its founders.

5   Q.   And when was that?

6   A.   1995.

7   Q.   Did you go to work for the Counterproliferation Division

8   in 1995?

9   A.   Yes.

10  Q.   As, as what?

11  A.   As a senior operations officer assigned to come up with

12  new ways to collect intelligence.

13  Q.   Just generally, what was the mission of the

14  Counterproliferation Division?

15  A.   To monitor the progress of countries potentially hostile

16  to the United States on developing programs of weapons of mass

17  destruction and to slow their efforts where possible.

18  Q.   And weapons of mass destruction would include nuclear

19  weapons?

20  A.   Those are the most frightening weapons of mass

21  destruction, yes.

22  Q.   And what does a, a senior operations officer do within,

23  I'll call it CPD, Counterproliferation Division?

24  A.   It was my responsibility to provide guidance to field

25  offices to spot opportunities and to coordinate the

Robert S. - Direct                                                    347

1    operational, the technical, and the legal aspects of being able

2    to do one of those operations in headquarters and with the

3    field offices.

4    Q.   And as such, did you again have experience with dealing

5    with human assets?

6    A.   Yes.  I met many of them myself, although at that point, I

7    was not the direct case officer assigned to them.  Those were

8    the officers in the various field offices.

9    Q.   Now, I'd like to, I'd like to talk to someone that we've

10   been referring to as Merlin.  Are you familiar with that

11   person?

12   A.   Yes, I am.

13   Q.   When did you first learn about Merlin?

14   A.   In the autumn of 1996.

15   Q.   From whom?

16   A.   The person who wrote the message was Laurie D.  It came

17   basically from her boss, who was a contact of mine.  He

18   suggested that she write that message.

19   Q.   Were you aware that she was a case officer?

20   A.   Yes.

21   Q.   And did you respond to that message?

22   A.   I did.

23   Q.   And what was the purpose of this exchange between you and

24   Laurie D.?

25   A.   To set up a meeting where I could evaluate Merlin's

Robert S. - Direct                                                      348

1   suitability for the kind of operation that I had in mind.

2   Q.   Now, was "Merlin" his true name?

3   A.   No.

4   Q.   Without revealing what it was, but do human assets go by a

5   code name of some sort within the agency?

6   A.   Yes.  We never refer to them in official traffic by their

7   true names.

8   Q.   And why is that?

9   A.   Or in our conversations among ourselves.

10  Q.   Why is that?

11  A.   Because it's an extra layer of source protection if, you

12  know, some inadvertent leak of one document is not going to

13  reveal the name of the human asset.

14  Q.   And conversely, do you ever tell the human asset what

15  their code name is?

16  A.   No, you do not.

17  Q.   Did you know Merlin's true name?

18  A.   Yes.

19  Q.   And so back in 1996, did you meet him?

20  A.   Yes.

21  Q.   And what was the purpose in meeting with Merlin?

22  A.   To assess his willingness and suitability to assist us in

23  a complex new operation that we were trying to put together.

24  Q.   And what was your understanding of his background?

25  A.   I understood that he was a nuclear engineer, with

Robert S. - Direct                                                    349

1    experience in the Soviet, the former Soviet nuclear weapons

2    program.

3    Q.   And specifically, what type of engineering was he familiar

4    with?

5    A.   He's an electrical engineer, and he was very familiar with

6    the more hands on and practical aspects of the program rather

7    than the theoretical.

8    Q.   In layman's terms, was he an assembler?

9    A.   He was an assembler rather than a designer.

10   Q.   And he put together what?

11   A.   He put together nuclear weapons in such a way that they

12   would function on command order and would not go off before you

13   wanted them to.

14   Q.   And where did he do this?

15   A.   He did this at Sarov, in Russia, at the facility known as

16   Arzamas-16.

17   Q.   And based upon all your experience in nuclear

18   nonproliferation, was that something that was familiar to you?

19   A.   Yes.

20   Q.   Was it your understanding that he had been debriefed

21   extensively by the CIA?

22   A.   That was my understanding.

23   Q.   Now, in terms of moving forward in the operation, was that

24   important that he had been debriefed?

25   A.   Yes, because that helped us very substantially to assess

1   that he was going to be helpful to us, that he was not sent by

2   the Russians.

3   Q.   And the assessment by those who debriefed him, was that

4   important for you in evaluating whether to use him?

5   A.   Yes.

6   Q.   And as part of that assessment or part of the use of that

7   assessment, was that also in terms of his credibility?

8   A.   Yes.

9   Q.   How does his debriefings play into whether you could use

10  him and you could rely on him and trust him?

11  A.   The assessment of the experts who debriefed him was that

12  he had provided us true and incompatible information, something

13  that the Russians would never have let him release to us, and

14  this gave us confidence that we could trust him.

15  Q.   So as of 1996, you had a certain comfort level that he is

16  someone who could be trusted?

17  A.   Yes, based on the assessment of the experts and of Ms. D.

18  Q.   And what was your thinking at that time as to how you

19  could use Merlin operationally?

20  A.   This was a period of a great deal of concern about brain

21  drain; that is to say, the Soviet Union had collapsed its

22  nuclear weapons and other weapons of mass destruction, people

23  were not being paid in many cases, and the government of Iran,

24  for example, was advertising for talent in those key areas.  So

25  our conclusion was that Merlin might be very attractive to the

1    Iranians as a former Russian nuclear weapons engineer.  They

2    might be very interested in talking with him.

3    Q.   And when you say Iran was advertising, so that was

4    something that was publicly known?

5    A.   Yes.  They had Web sites looking for talent in areas of

6    WMD concern.

7    Q.   Do you know what I mean by the term "legend"?

8    A.   Yes.

9    Q.   What do you mean by the term "legend"?

10   A.   That is the story which has to be consistent from start to

11   finish that a human asset will tell to their targets to explain

12   who they are and what they are doing and what they are offering

13   and to make it credible that they have something that the

14   target country will be interested in.

15   Q.   And did Merlin fit easily into a legend?

16   A.   Yes.  That is, a former unemployed Russian nuclear

17   engineer working at a less remunerative and desirable job in

18   the U.S. as a refugee who had extensive knowledge that he was

19   willing to exchange for money.

20   Q.   So in other words, his actual training, experience, job at

21   the time was, in fact, his legend?

22   A.   Yes.

23   Q.   Was there a second human asset that was involved in what

24   we will call Classified Program No. 1?

25   A.   Yes, there was.

Robert S. - Direct                                                      352

1    Q.    And we call that person Human Asset No. 2.

2    A.    Okay.

3    Q.    Was he also Russian?

4    A.    Yes.

5    Q.    And just briefly, what was his background?

6    A.    He worked at another closed Soviet nuclear weapons

7    institute.  This is the one that designed and manufactured the

8    electronics packages that detonate nuclear weapons.

9    Q.    So he was a designer?

10   A.    Yes.

11   Q.    Is that an accurate assessment?

12   A.    Correct.

13   Q.    And within this Classified Program No. 1, what was his,

14   his role?

15   A.    Well, my technical colleagues thought that it would be a

16   very desirable product to offer to the Iranians the plans for

17   the nuclear weapons fire set, which Human Asset 2 knew about

18   and had designed them, and our thought was that Human Asset 1

19   would deliver them.  Probably that was the question of

20   personality.  He had a more aggressive personality and would

21   take more risks.  A doer rather than a designer.

22            MR. TRUMP:  Your Honor, at this point, we would get

23   into some of the cables.  It may be a convenient time to take

24   the break.

25            THE COURT:  This is about when I said I would break

Robert S. - Direct                                                        353

1    for the jury, so we'll have a -- since there are so many of

2    you, I'm going to give you 20 minutes for your mid-morning

3    break, and I'll have -- the witness needs to be back on the

4    stand at 11:30, all right?

5            We'll recess court at this time.

6            (Recess from 11:10 a.m., until 11:30 a.m.)

7                    (Defendant and Jury present.)

8            MR. TRUMP:  I apologize for not asking in advance of

9    the break, but could we distribute those notebooks to the

10   jurors, the ones sitting in the cart over there?

11           THE COURT:  All right.  Mr. Wood, if you would assist

12   in getting the notebooks to the jurors?

13           And again, ladies and gentlemen, remember our

14   procedure, that you are not to open the book until directed to

15   turn to a particular tab.

16           All right, Mr. S., you're still under affirmation

17   from your previous testimony.

18           THE WITNESS:  Yes.

19           THE COURT:  Go ahead.

20           MR. TRUMP:  Thank you, Judge.

21   Q.   Just so we have the terminology straight as we go through

22   some of these cables and have properly identified people, Human

23   Asset No. 1 is the person we're referring to as Merlin; is that

24   correct?

25   A.   Yes.

1   Q.   And Human Asset No. 2 was the second Russian who was

2   working with the lab, right?

3   A.   Yes.

4   Q.   Do you know someone by the name of Walt C.?

5   A.   I do.

6   Q.   And who is Walt C.?

7   A.   He was the program manager for the lab who evaluated the

8   design of the fire set plans and oversaw the effort to suborn

9   them so that they would look authentic but not, in fact,

10  operate.

11  Q.   And you had face-to-face contact with Walt C. from time to

12  time?

13  A.   Yes, regularly.

14  Q.   And then also in some of these documents, is there someone

15  by the name of William F.?

16  A.   Yes.

17  Q.   And was he part of the Counterproliferation Division?

18  A.   He was.  He was the Counterproliferation Division's

19  technical person who was responsible for the relationship with

20  Walt C. and his lab and responsible for making sure that the

21  product was technically sound.

22  Q.   And someone else identified in some of the cables is David

23  Shedd.

24  A.   Yes.

25  Q.   Who was David Shedd during this?

Robert S. - Direct                                                    355

1  A.   He was my direct supervisor.  At that point, he was chief

2  of operations in the Counterproliferation Division.

3           If I could explain, Mr. F. had the responsibility for

4  the technology; Mr. Shedd had the responsibility for the

5  approvals, legal and policy; and I had the responsibility for

6  the operation.

7  Q.   Now, prior to trial, have you reviewed a number of cables?

8  A.   Yes.

9           MR. TRUMP:  Unless there's any objection, I'll

10 identify the cables that we'll be looking at, and again, if

11 there's objection --

12          THE COURT:  All right, just read their numbers, and

13 we'll see if there's any objection to any of them.

14          MR. TRUMP:  What I'm going to be referring to are

15 cables 5 through 25, 27, 29 through 33, 35 through 38, and 44

16 through 47.

17          THE COURT:  Now, these are cable numbers, not

18 exhibit --

19          MR. TRUMP:  These are government exhibits.

20          THE COURT:  Government exhibits, all right.  Any

21 objection to any of those?

22          MR. POLLACK:  Your Honor, given the witness's tenure

23 with the program, it's my assumption that these are all cables

24 that he would have had access to at the time and have firsthand

25 knowledge of it.  If that's the record, I don't have any

 1   objection.

 2              MR. TRUMP:  I was going to establish that in a

 3   second.

 4              THE COURT:  All right, all right.  Then assuming that

 5   that's been established, we'll admit all of them.

 6   BY MR. TRUMP:

 7   Q.   All of the cables that, that you have looked at that have

 8   become government exhibits, were these cables that were part of

 9   Classified Program No. 1?

10   A.   Yes.

11   Q.   And as the senior operations/senior case officer with

12   respect to that program -- let me back up.

13              And they were all cables that were routed to and from

14   the Counterproliferation Division?

15   A.   Yes.

16   Q.   As such, you were either the author or the recipient in

17   some capacity of all of these cables; is that right?

18   A.   That is right.

19   Q.   And they were all stored and maintained as part of the

20   cabinet, the file for Classified Program No. 1?

21   A.   Yes, in an encrypted electronic file.

22   Q.   And you're familiar either again as, as the sender or

23   recipient with respect to all of these?

24   A.   Yes.

25              THE COURT:  They're all admitted.  So just for the

Robert S. - Direct                                                    357

1   record, 5 through 25, 27, 29 through -- and that means

2   including -- 33, 35 through and including 38, 44 through and

3   including 47, they're in.

4            (Government's Exhibit Nos. 5 through 25, 27, 29

5   through 33, 35 through 38, and 44 through 47 were received in

6   evidence.)

7            MR. TRUMP:   43 through -- excuse me, no, 44 through

8   47.

9   Q.   Would you please describe the general outline of

10  Classified Program No. 1 as it stood in January of 1997?

11  A.   We were just starting in January 1997 on all three tracks

12  that I laid out:   the operational, the technical, and the

13  approval.   We had identified a technology that we wanted to

14  use.   It still needed to be corrupted by the lab.   We had

15  identified a potential human asset who could help us with this

16  program, and we were aware of the steps that we would need to

17  take to get the legal and policy approval before we could

18  proceed to actually do it.

19           So January '97 was the beginning of the operation.

20  Q.   Do you have in front of you Government Exhibit 5?

21  A.   Yes.

22  Q.   And would you turn to that, please?

23           THE COURT:   All right, ladies and gentlemen, turn to

24  tab 5 now, please.

25  BY MR. TRUMP:

1    Q.    And as you stated, all of these cables would have been

2    marked in some fashion as a limited access program?

3    A.    Correct.

4    Q.    Those markings have been removed from, from these

5    documents, correct?

6    A.    Correct.

7    Q.    But anyone looking at them would realize immediately that

8    this is one such program?

9    A.    Yes.

10   Q.    And, and why is that?

11   A.    Because the activity and the technology and the people

12   that we were using were all sensitive, so we added additional

13   layers of protection to the normal cable traffic.

14   Q.    Would everyone within the Counterproliferation Division

15   have access to this program?

16   A.    No, just those who were read into it.

17   Q.    And just so we understand the significance of these

18   documents, what -- how would you describe a cable?  What is it

19   in terms of the recordkeeping of the CIA?

20   A.    It is the official record.  You can have conversations

21   over a classified telephone line, you can have conversations in

22   person, you can send informal notes, but only when that, the

23   result of those conversations is recorded in a cable does it

24   become the official record of the organization.

25   Q.    And for this program, if you wanted to task a field case

1   officer with something, would you do it in a cable?

2   A.   Yes.

3   Q.   And if a field officer wanted advice or to consult with

4   you regarding Classified Program No. 1, it would be done in a

5   cable?

6   A.   Right.  And this is not me sending a message to one field

7   officer, because even though at that point I was the equivalent

8   of a full colonel, as you can imagine, in CIA headquarters,

9   there are a lot of generals, so nobody can by himself establish

10  a policy, and that applies in the field as well.  It would be

11  reviewed by the supervisors both of me and of whoever in the

12  field was answering or writing their own cable.  It's part of

13  the checks and balances.

14  Q.   And each cable was dated; is that right?

15  A.   Yes.

16  Q.   And with the help of Mr. Francisco, just so we know where

17  to find this information on a cable, where is the date of the

18  cable on Exhibit 5?

19  A.   It's up at the very top, where it says "062025 January."

20  So that's the 6th of January, at 2025 Zulu, meaning five hours

21  later than 2025, so this was sent out probably early on the

22  morning of the 26th electronically.

23  Q.   And the cable has a To line?

24  A.   It does.

25  Q.   And this label was to Langley.  So that was to CPD --

Robert S. - Direct                                                         360

1   A.    From one of the field offices.

2   Q.    And it concerns Classified Program No. 1, correct?

3   A.    Yes.

4   Q.    And that information is in the cable?

5         If something has to be done, do you find it in the

6   action required portion of the cable?

7   A.    Yes.

8   Q.    And where is that reflected in terms of this?

9   A.    It's paragraph 1, "Action required:  Please process

10  app" -- approval -- "for Merlin based on the following

11  information.  Agreement and summary of 5 December 96 OPS

12  meeting with asset submitted in separate cables."

13  Q.    Now, there's some information -- let me back up.  Is there

14  a difference between the way that cables are composed and

15  released at headquarters versus the field?

16  A.    Essentially, no.

17  Q.    In terms of --

18  A.    There may be fewer people, fewer levels of oversight in

19  the field, perhaps just one or two people, whereas in

20  headquarters there might be five or six.  In headquarters, the

21  practice was if it was going to a particular area of the world,

22  the office there, then you would coordinate it with the senior

23  person in that area of responsibility and headquarters, but

24  basically, the process is similar in, in headquarters and the

25  field.

1  Q.    Now, you mentioned there's action required.  What is, what

2  is being asked for in this cable in paragraph 1?

3  A.    It is asking headquarters to make a formal approval of the

4  use of Merlin in Classified Program 1.

5  Q.    And did this cable get generated after you met with

6  Merlin?

7  A.    Yes.  And that's the reference to the 5 December '96 ops

8  meeting.

9  Q.    And is that reflected in paragraph 2?

10  A.    Yes.  Well, this is Ms. D. laying out the history of her

11  relationship with, with Merlin.

12  Q.    And it says in December 1996, the case officer.  That

13  would be Ms. D., correct?

14  A.    Ms. D.

15  Q.    And CPD officers, was that including you?

16  A.    Yes.

17  Q.    And then what is reflected in paragraph 3?

18  A.    This is a brief description of, of what we intended to ask

19  Merlin to do.

20  Q.    And in paragraph 4, what is paragraph 4 all about?

21  A.    This is Ms. D.'s assessment of Merlin's personality,

22  character, and suitability to perform these operational tasks

23  that we were going to ask him to do.

24  Q.    Did you concur in her assessment?

25  A.    Yes.

1  Q.   When you say personality necessary for these tasks as it

2  applies to Merlin, what was that?

3  A.   As I said in reference to the other asset, one was a

4  designer, and the other was a doer.  Merlin is the doer, who

5  had the chutzpah to actually approach the Iranians rather than

6  just thinking and designing in a safe environment in the United

7  States.  So that's a matter of personality.  He had the, the

8  character that would let him take some risks on our behalf.

9  Q.   Now, in the middle of that paragraph, she describes

10 "subject."  That would be Merlin, correct?

11 A.   Um-hum.

12 Q.   And she writes that he appears on the surface to be a

13 narrowly focused individual, with the stereotypical

14 engineering/technical mindset, but he is a person of more depth

15 and breadth than what appears.  He is a serious-minded person

16 who will take his job or in this case his operational duties

17 very seriously and will be conscientious in completing them.

18         Did you confer in her assessment as reflected in this

19 cable?

20 A.   Yes, explicitly.  She hit it right on the, on the head.

21 On the surface, partly it's a language problem.  He had only

22 been in the U.S. for a few years at that point, and his English

23 was still not very strong, but he comes across initially as

24 just an engineer, but once you get to know him, he's extremely

25 thoughtful.  There are many levels of depth in his thinking.

1   So she's very accurate in describing his personality.

2   Q.   And she also describes that he understands his

3   relationship with the CIA as a business relationship.

4   A.   Right.

5   Q.   Again, did you concur in that assessment?

6   A.   I did.  He expected for us to compensate him, and we

7   expected for him to perform as tasked, and I think with a few

8   hiccups along the way, I think both sides were satisfied with

9   the business relationship.

10  Q.   And in terms of your meeting with him and this

11  arrangement, was it also understood that you would protect his

12  identity?

13  A.   Yes.  We met him in places that were not associated with

14  either him or us.  We undertook explicitly with him that we

15  would protect the fact that he was assisting us in this rather

16  bold operation.  We undertook explicitly to protect his

17  identity and his cooperation with us.

18  Q.   She also writes that he can work with some ambiguity.  Why

19  is that important?

20  A.   Because this is not a linear business.  Stealing foreign

21  countries' or government or laboratories' or terrorist groups'

22  secrets doesn't go according to plan, and very often, you get a

23  curve ball thrown at you, and you have to be able to adapt, and

24  that's what Laurie was referring to in he's a person of greater

25  depth.

Robert S. - Direct                                                    364

1              He appeared to want everything strictly scripted, but

2      when it got off the script for one reason or another, he was

3      able to cope with it.

4      Q.    Now, at times during this operation, was he going to have

5      to live with the fact that he didn't know everything?

6      A.    Yes.

7      Q.    And were you concerned about that?

8      A.    No.  I mean, we told him explicitly from the outset that

9      we would only be sharing part of all of our plans and

10     intentions with him, and he was comfortable with that.  Partly

11     it was for his protection because he didn't need to know a lot

12     of things that might make him more vulnerable.

13     Q.    And finally, she advised in this cable that his wife is

14     aware of his relationship with the CIA.  Was that your

15     understanding as well?

16     A.    Yes.

17     Q.    Had you met her from time to time?

18     A.    Not at this point.  Eventually, I did.

19     Q.    But that he would not share details of the operation with

20     her.

21     A.    Right.

22     Q.    Was that --

23     A.    She was aware of a relationship, but he would not share

24     with her details of what exactly he was doing.  That was our

25     agreement.  And as far as I know, he kept that until we told

Robert S. - Direct                                                    365

1    him it was all right to share parts of it with her.

2    Q.    Now, you mentioned that from time to time, he would not be

3    given complete knowledge of the operation.

4    A.    Yes.

5    Q.    Why was that important to you and the CIA?

6    A.    There are various reasons.  The first and foremost is we

7    try to -- you can always -- you can never un-tell a person a

8    secret.  You can tell them later if it's necessary, but you

9    can't un-tell them, and we did not want to share with him our

10   complex technical plans n part because he was going in harm's

11   way.  He was going to be in the reach of the Iranian regime,

12   and frankly, the less he knew about the technical capabilities

13   of the United States National Laboratories, the better.

14        It would also make it much easier for him to do his

15   job if he didn't have to worry about not revealing any secrets

16   since he didn't know them.

17   Q.    Did you also have to consider the possibility that he

18   might be captured or taken by a foreign government?

19   A.    Yes.  Walking into a foreign country's embassy in whatever

20   country, that is their territory.  That is their sovereign

21   territory.  So there was the risk, minimal in most cases, but

22   there was the risk that they could have clapped handcuffs on

23   him and kept him and dragged him back to Iran, and he was aware

24   of that as a potential risk, and under those circumstances, the

25   less he knew about highly sensitive United States government

1  technical capabilities, the better.

2         He already knew about Russian-sensitive technical

3  capabilities.  We didn't want him to be in a position of having

4  to protect American ones as well.

5  Q.   Now, would you turn to Exhibit 6?  Is that another cable?

6  A.   Yes, it is.

7  Q.   And what is the date of that cable?

8  A.   The 28th of May, '97.

9  Q.   Now, what were -- what was going on with the operation

10 between January and May 1997?

11 A.   The technical work was proceeding under Mr. C.'s direction

12 at the laboratory, and Mr. W. was developing the personal and

13 professional relationship with Merlin better and beginning to

14 guide Merlin towards ways to contact the Iranians that would

15 appear natural.

16        We knew two or three people in the Iranian nuclear

17 weapons enterprise that we could have sent him to directly, but

18 then how would he explain that?  So instead, we needed him to

19 spend a couple of years obviously looking and foundering around

20 a bit so that when he did contact them, they would say, "Oh,

21 yeah, this guy's been trying to get in touch with us for two

22 years, and I guess he finally found us," rather than say, "Huh,

23 the CIA or Mossad must have sent him."

24 Q.   Before we talk about Mr. W, let's back up a second.  This

25 cable was generated from where?

1    A.    From our headquarters, from Langley.

2    Q.    And in addition to the information at the top of the page

3    where it says "To:  CIA Office 1" and "CIA Office 2," there is

4    information at the bottom at the end of the cable.  Would you

5    look at that?

6    A.    Yes.

7    Q.    And what information does that reflect in terms of you,

8    Mr. S.?

9    A.    Well, I have been meeting with Human Asset 2 and the --

10   Q.    Just the technical stuff at the bottom, at the end of the

11   cable.

12   A.    At the very end.

13   Q.    At the very end of the second page of the cable.  It says

14   "ORIG:  CP/" and then "Mr. S."

15   A.    Okay.  I drafted this cable, and then it was authorized by

16   another CIA officer.

17   Q.    What does "authorized" mean?

18   A.    The initial sanity check.  You write something.  You show

19   it to someone else familiar with the operation who does an

20   initial sanity check.

21   Q.    And what does "COORD" mean?

22   A.    Coordination.  That meant that it went to Mr. F., the

23   technical lead, and to, to other officers who had

24   responsibility for the area to which we were sending this

25   message.

1   Q.   And then what does "REL" mean?

2   A.   Released.

3   Q.   And again, that has your initial there?

4   A.   Yes.  I released it after it had been coordinated with

5   three other colleagues.

6   Q.   And what is the subject matter of this particular cable?

7   A.   An evaluation of Merlin and plans to introduce a new case

8   officer.

9   Q.   And was that the introduction of Mr. W.?

10  A.   It was.

11  Q.   That's Zach W.?

12  A.   Yes.

13  Q.   In other words, Ms. D., Laurie D., is on her way out?

14  A.   She's going to a new assignment.

15  Q.   And Zach W. is on his way in?

16  A.   Yes.

17  Q.   Paragraph 3 reflects what aspect of the, the operation?

18  A.   This is the progress on the technical side under the

19  direction of Mr. F. on the CIA side and Mr. C. on the

20  laboratory side.

21  Q.   And what does -- in this cable, you're writing it,

22  correct?

23  A.   Yes.

24  Q.   And "Per the lab experts," do you see that in paragraph 3?

25  The second sentence.

1    A.    Yes, okay.

2    Q.    Would you read that second sentence?

3    A.    "Per the lab experts, Human Asset 2 has provided excellent

4    assistance in their design of a copy of the Russian TBA-486

5    fire set" -- that's a typo on my part.  It's 480, not 486.

6    Q.    Okay.  And continue.

7    A.    ". . . allowing them to build a breadboard model which

8    C/O's saw tested successfully."

9          Continue?

10   Q.    Yes.

11   A.    "They are very pleased with his cooperation and believe

12   they will be able to conduct a highly credible, though fatally

13   flawed, knock-off of the TBA-486 design by early 1998, well

14   within our projected operational deadline.  Once this design

15   has been red-teamed by another (unwitting) group of lab experts

16   and they certify that it cannot work or be made to work, we

17   will provide it to M with a suitable explanation as feed

18   material for his contact with the Iranians, continuing to

19   stress that collection is our primary goal and steering him

20   away from any notion that the design is flawed."

21   Q.    Okay.  Just stop right there.  So this cable was going out

22   to --

23   A.    To the New York office.

24   Q.    To the New York office.

25   A.    And others.

1   Q.   And others.

2   A.   And its purpose is, quote, for the record, to give an

3   update as to where the operation stood as of the time of

4   its writing.

5   Q.   Why is it important that Mr. W., Zach W. knows where the

6   operation stands on the technical side?

7   A.   Because as soon as the change occurs, he will be

8   responsible for the handling of Merlin and for carrying forward

9   the operation from, from that perspective.

10  Q.   In this cable, you used the term "fire set"?

11  A.   Yes.

12  Q.   Have you also used the term "firing set"?

13  A.   Yes.

14  Q.   Is there any difference in your mind between the two

15  terms?

16  A.   No, there isn't.  And the Russians also call it both an

17  automatic block and a high-voltage block.  All of those terms

18  are essentially interchangeable.

19  Q.   The cable goes on to summarize the goals of the operation;

20  is that right?

21  A.   Yes.

22  Q.   And beginning at the top of the second page, would you

23  read what the goals of the operation are?

24  A.   "The goal is to plant this substantial piece of deception

25  information on the Iranian nuclear weapons program, sending

Robert S. - Direct                                                  371

1   them down blind alleys, wasting their time and money, and

2   discrediting Russian designs and equipment in their eyes.  The

3   terminology and list of parts are sufficiently specific that we

4   stand a good chance of learning whether the Iranians have in

5   fact adopted the design and are trying to make it work.  The

6   lab scientists" --

7   Q.    Just stop there.  Is that an accurate description of what

8   the goals are as of that date?

9   A.    Yes.

10  Q.    And again, you're informing Zach W. and the other people

11  involved of that fact?

12  A.    Right.  And also the official record.

13  Q.    And continuing?

14  A.    "The lab scientists expressed their confidence that with

15  Human Asset 2's cooperation, they can create a highly credible

16  Russian design which will never function.  Note that the whole

17  operational concept here is deception.  We will be offering a

18  set of plans rather than hardware, since it is not credible

19  that M and his shadow partner, Human Asset 2, would actually

20  have access to this highly controlled piece of a Russian

21  nuclear weapon."

22  Q.    Stop there.  So in other words, there's, there's no intent

23  to actually give them a piece of equipment, right?

24  A.    Oh, no.  It is plans which have been subverted by one of

25  the U.S. national nuclear laboratories so that they look good

Robert S. - Direct                                                     372

1   but will never work.

2   Q.   And without reading aloud, the balance of that paragraph,

3   paragraph 3, what is that all about?

4   A.   It explains why we are doing this and some of the

5   potential benefits that could come from it.

6   Q.   But it -- let me be more specific.  You discuss in the

7   balance of paragraph 3 a first generation weapon, even if it

8   were not intentionally flawed by the lab.  That, that language

9   in there, is that another fail-safe of what you're doing?

10  A.   Yes.  The design that we were going to give them, even

11  without its flaws, would have been essentially useless because

12  it was a circa 1980 design, and the Iranians were still back at

13  the 1950 level, and even if we hadn't subverted it, they would

14  have an extremely difficult time trying to make this work on a

15  first generation weapon.  So it's another level of fail-safe.

16  Q.   So another layer of assurance that we weren't giving away

17  nuclear secrets?

18  A.   Correct.

19  Q.   As a result of getting a cable like this, Mr. Zach W., the

20  case officer, would be apprised of the status of the operation,

21  the goals of the operation, what was done at the lab, how the

22  lab worked with the schematics, and all those details?  He gets

23  those in this cable?

24  A.   Yes.

25  Q.   Would you turn to Government Exhibit 7?  What is that?

Robert S. - Direct                                                    373

1    A.   This is a summary of the laboratory technical review,

2    which I attended on the 15th of January, 1998.

3    Q.   Let me back up a second.  It's another cable?

4    A.   Yes, it's another cable.

5    Q.   And again, for the record, what is the date of the cable?

6    A.   The 2nd of February, 1998.

7    Q.   Was it a cable that you prepared or at least were part of

8    the preparation of?

9    A.   Let me just check.  I think I prepared it, but it could be

10   Mr. F.

11        Yes, this was prepared by someone working closely

12   with me.

13   Q.   And you reviewed it prior to its release?

14   A.   Yes.

15   Q.   Is this one of these cables that is for the record,

16   providing information about the status of the program?

17   A.   Well, it serves a dual purpose.  It does establish for the

18   record what the status of the operation was as of that date,

19   but it also provides information to, to Zach W. at this point

20   as to where we're going and how he needs to prepare Merlin.

21   Q.   And in paragraph 2, that's the status of the, the

22   technical team at the lab?

23   A.   We met with them on January 15.  They had completed their

24   design of the Russian fire set, and they had inserted multiple

25   nested flaws of various types into the plans.

1    Q.   Now, in this paragraph 2, you correct the typo, and it's

2    TBA-480?

3    A.   TBA-480, yes.

4    Q.   But you also refer to it as a firing set rather than a

5    fire set; is that right?

6    A.   They're interchangeable terms.

7    Q.   And paragraph 3, what does that discuss?

8    A.   The plans to take what Human Asset 2 has designed and it

9    has been corrupted by the lab experts to include a very

10   substantial number of inherent technical flaws.  It will now be

11   given to another group of laboratory experts who do not know

12   where this came from and do not know that their colleagues have

13   corrupted it, and they will be asked to evaluate it and try to

14   make it work.

15   Q.   Now, at some point, you're going to need approvals to go

16   ahead with this, right?

17   A.   Yes.

18   Q.   And having this whole Red Team effort was important in

19   terms of getting those approvals?

20   A.   Yes.  It's one step in the technical approval process,

21   that we would be asked to demonstrate that, in fact, the plans

22   were highly credible but equally important that they could not

23   be made to function.

24   Q.   And paragraph 4 reflects what?

25   A.   That we had informed the lab leadership that we needed a

Robert S. - Direct                                            375

1    statement that the firing step plans are not and cannot be

2    enabling technology for the target, and this is crucial to our

3    obtaining the approval to proceed.

4    Q.   And the types of approval we're talking about are, are

5    within CPD, correct?

6    A.   Yes, as a start.

7    Q.   And then up to the most senior levels of the CIA, correct?

8    A.   Right, including on the legal side.  And --

9    Q.   The -- paragraph 5, what does that involve?

10   A.   That we as a fail-safe were going to show Human Asset 2,

11   the designer of this plans -- this set of plans, the corrupted

12   plans that the lab had worked over, and see if he spotted

13   anything.

14   Q.   And this was again another way of assuring you and senior

15   level officials that there would be no ability by Iran to make

16   use of this in developing a detonation device?

17   A.   Yes.  That's half of it, to make sure that it wouldn't

18   work, and the second half was to make sure that the flaws were

19   invisible, and we thought that by showing it to the designer,

20   that would be a very good fail-safe because he would know

21   better than anybody else.

22   Q.   And by the designer, this is Human Asset No. 2?

23   A.   Human Asset 2, yes.

24   Q.   Not Merlin?

25   A.   Right.

Robert S. - Direct                                                      376

1    Q.    As part of this operation, was -- did Human Asset 2 ever

2    meet Merlin or vice versa?

3    A.    No.

4    Q.    Why was that?

5    A.    To protect both of them.  Again, Merlin was going in

6    harm's way.  He had a legend of Human Asset 2, but he didn't

7    actually know him.  He could not describe him.  There was no

8    risk that he could be forced to betray him.

9    Q.    Now, would you turn to Government Exhibit 8?  Do you have

10   that in front of you?

11   A.    Yes.

12   Q.    Is that another cable?

13   A.    It is.

14   Q.    What is the date of that cable?

15   A.    15 April 1998.

16   Q.    So from February through April, February being the date of

17   the last cable, to April, just give us a run-down of what is

18   going on with Classified Program No. 1.

19   A.    We're proceeding on both the operational and technical

20   side.  At Mr. W.'s direction, Merlin is reaching out to

21   prospective Iranian targets on the Internet and by sending

22   old-fashioned snail mail letters, and the Red Team at the lab

23   has had its opportunity to review the plans, and we're going to

24   meet them and get their formal read-out.

25   Q.    Let's talk about the, the letter for a second.  This is a

Robert S. - Direct                                                         377

1    cable written by you, correct?

2    A.   Yes.

3    Q.   And it's directed to Mr. W.?

4    A.   Um-hum.

5            THE COURT:  You have to say yes or no.

6            THE WITNESS:  Yes.

7    BY MR. TRUMP:

8    Q.   Had you received a draft letter from Mr. W.?

9    A.   Have I --

10   Q.   Had you received --

11   A.   Yes.

12   Q.   -- a draft letter?

13           And what, what was Mr. W. asking for?

14   A.   He was asking for my input on the letter that had been

15   drafted by him and Merlin as one of the series of letters that

16   Merlin would be sending out to Iranian institutions and

17   individuals.

18   Q.   And in this cable, in paragraph 2, you say, "We suspect

19   there will be little response, since he looks like just one

20   more Russian engineer begging for a job, but we might get

21   lucky."  Is that right?

22   A.   Yes.  That was an honest assessment.

23   Q.   Were you expecting some sort of immediate response from

24   this effort by Merlin to reach out to the Iranian community?

25   A.   No.  We thought an immediate response would be suspicious

Robert S. - Direct                                                    378

1   if there were one.

2   Q.    Any -- was there any set timetable for getting a response?

3   A.    No.  These operations require patience.

4   Q.    And in some instances -- and were you willing to wait

5   months, if not years, for the operation to play out?

6   A.    Yes.

7   Q.    And I think you already mentioned the balance of that

8   paragraph 2 concerns the status of the effort by the lab?

9   A.    Yes.

10  Q.    And the certification required to get the approvals?

11  A.    To begin the approval process, we need their certification

12  on the soundness of the technology.

13              MR. TRUMP:  The Court's indulgence?

14              THE COURT:  Yes, sir.

15  BY MR. TRUMP:

16  Q.    When you were working with Mr. W. and Merlin on the reach,

17  the outreach to the Iranian community, was Merlin being

18  apprised of what was going on in the lab?

19  A.    Only in the most general sense.  We had not yet told him

20  what it was he would be offering.

21  Q.    And in that respect, did you ever tell him about the

22  process of developing these, these plans?

23  A.    No.

24  Q.    The actual process?

25  A.    No.  We never told him about the inherent flaws and the

1    whole process of building those in and checking that they were

2    effective but, but still invisible.  We never told him that.

3    Q.   Why not?

4    A.   We did not want him to know about the technical changes we

5    had made to the fire set plans.  As I explained before, it

6    would give him additional knowledge that he had to protect, and

7    it would probably make him more nervous in approaching the

8    Iranians if he knew that.

9    Q.   And turn to Government Exhibit 9.  Is that another cable?

10   A.   It is.

11   Q.   What is the date of that cable?

12   A.   15 May '98.

13   Q.   Where did this cable originate?

14   A.   Langley.

15   Q.   And were you the releasing officer on this cable?

16   A.   Let me look.

17          I was.

18   Q.   So this is going out from CPD to field officers?

19   A.   Yes.

20   Q.   And at the time, again, Zach W. is the case officer

21   working with, with Merlin?

22   A.   Yes.

23   Q.   What is discussed in the first part of this cable,

24   paragraph 2?

25   A.   The results of the red-teaming of the flawed plans.

Robert S. - Direct                                                    380

1   Q.   And just very briefly, what was the result of the Red

2   Team's --

3   A.   The Red Team thought they were genuine Russian plans.

4   They did not spot that they had been flawed.  They thought

5   there were some mistakes in them.  They were able to correct

6   some of those mistakes and get a laboratory breadboard version

7   of the plans to work.

8   Q.   And you are -- by drafting this cable and sending it out

9   to Mr. Zach W., you're informing him of where it stands with

10  respect to the lab?

11  A.   Right.  And also, again, entering this into the formal

12  record.

13  Q.   Paragraph 6, had Mr. W. reported to you about something

14  involving Merlin?

15  A.   Yes.  Merlin had gotten a response from an Iranian

16  institution or person that, as I describe here, a nibble.  They

17  show initial interest.

18  Q.   And would you turn to Exhibit 10?  Do you have that in

19  front of you?

20  A.   Yes.

21  Q.   What is the date of that cable?

22  A.   29 October 1998.

23  Q.   Again, where did, where did this cable originate?

24  A.   This is, this is from Langley to the New York office.

25  Q.   Okay.

1   A.   No, wait.  Sorry, this is from the New York office to

2   Langley.

3   Q.   And what is this cable informing Langley, Langley and CPD?

4   A.   That there had been a meeting between Mr. W. and Merlin,

5   that he was continuing his efforts to reach out to Iranians,

6   that plans had been made and accepted for a meeting in San

7   Francisco where we would be introducing the technology to

8   Merlin, and that Merlin had also been told that Mr. W. was

9   leaving and we would introduce a new case officer.

10  Q.   And who was that new case officer?

11  A.   Mr. Sterling.

12  Q.   And did you know Mr. Sterling at that time?

13  A.   Yes.

14  Q.   What was Mr. Sterling doing in October of 1998?

15  A.   He was preparing for his assignment in New York.

16  Q.   Was he assigned to the Counterproliferation Division?

17  A.   Yes.

18  Q.   And is that where you met him?

19  A.   Yes.

20  Q.   And do you see Mr. Sterling here in court today?

21  A.   Yes.

22          MR. POLLACK:  Your Honor, Mr. Sterling will remain

23  Mr. Sterling throughout the trial.

24          THE COURT:  I understand that, but it's important for

25  witnesses to make sure that -- it is important for the record

1    that a witness knows about whom he is speaking, so I'm going to

2    permit that.

3    BY MR. TRUMP:

4    Q.   Now, you mentioned that laying the groundwork for a change

5    from Mr. W. to Mr. Sterling.

6    A.   Yes.

7    Q.   Did you assist Mr. Sterling in getting up to speed on

8    Classified Program No. 1?

9    A.   Yes.

10   Q.   Prior to his assignment to this program, he was in the

11   Counterproliferation Division, correct?

12   A.   Yes.

13   Q.   Did he have access to the files, the documents, the cables

14   relating to Classified Program No. 1 before he was assigned to

15   it?

16   A.   Not until it was determined that he would be the new case

17   officer.

18   Q.   Once he was assigned as the new case officer, was he then

19   able to review the file?

20   A.   Yes.

21   Q.   And that would have included the prior cables that we've

22   already discussed here this morning?

23   A.   Yes.

24   Q.   What, what did you ask him to do with respect to

25   Classified Program 1 in preparation for his role as the case

Robert S. - Direct                                                    383

1  officer?

2  A.   To read the entire case file and to ask me any questions

3  that arose from that reading.

4  Q.   And as far as you know, is that what was done?

5  A.   Yes.

6  Q.   Did the two of you talk about it?

7  A.   Yes.

8  Q.   What was the, the purpose of having a meeting in San

9  Francisco?

10 A.   There were a number of issues here.  The first is this is

11 where we were going to introduce to Merlin what it was he would

12 be offering to the Iranians.  We hadn't told him anything about

13 what he would be offering.

14          San Francisco also contributed strongly to the

15 legend.  There were a large number of Russians in that area in

16 1998.  It would be natural for Merlin to be able to say that he

17 had met Human Asset 2 in San Francisco somewhere in the Russian

18 community there, and we wanted the opportunity for Merlin and

19 Mrs. Merlin to meet Mr. Sterling and get comfortable with

20 starting a new relationship with a new officer.

21 Q.   Now, you said that part of the purpose would be to explain

22 how Merlin would have met Human Asset No. 2, but he's not going

23 to actually meet him, correct?

24 A.   No, but we provided him a counterpart that would play that

25 role.

Robert S. - Direct                                                    384

1   Q.   Was -- were you the person who would -- who made the

2   decision to assign Mr. Sterling to this, this program?

3   A.   No.

4   Q.   Were you confident by the time of the meeting in San

5   Francisco that he was fully aware of the program and the status

6   of the program at that time?

7   A.   Yes.  He seemed quite engaged and interested in it.

8   Q.   Would this include the details about Merlin and his

9   background, things like that?

10  A.   Yes.  We discussed all of that, and anything that -- any

11  question that he had, I answered.

12  Q.   What about the technical side?  Did he familiarize himself

13  with that?

14  A.   Yes.  It's all in the traffic, and I explained it to him.

15  Q.   On balance, could you tell whether he had any greater

16  interest in the operational versus technical or --

17  A.   Well, like me, he's an operations officer, and I presume

18  he was more interested in the operational, but I can't

19  speculate.

20  Q.   Would you turn to Exhibit 11?  Do you have that in front

21  of you?

22  A.   Yes.

23  Q.   Is that another cable?

24  A.   It is.

25  Q.   And what is the date of that cable?

Robert S. - Direct                                                385

1   A.    5 November '98.

2   Q.    And who is getting that cable?

3   A.    The cable is going to Office 3, info Office 2.

4   Q.    And Office 2 is the New York office?

5   A.    Yes.

6   Q.    And that's where Zach W. is?

7   A.    Yes.

8   Q.    Where is Mr. Sterling in November of 1998?

9   A.    He's still at Langley.

10  Q.    And what is the purpose of sending out this cable?

11  A.    It announces that we will be traveling to San Francisco

12  for the purpose of that meeting.

13  Q.    And did you, in fact, travel to San Francisco on the dates

14  reflected in Government Exhibit 11?

15  A.    Yes.

16  Q.    Did you go over the plan for the meeting with the

17  defendant at CPD?

18  A.    Yes.

19  Q.    And, so he was aware of what was to take place in San

20  Francisco?

21  A.    Yes.

22  Q.    What was -- who from the CIA was, was going to be present

23  in San Francisco?

24  A.    Myself; Mr. Sterling; Mr. W.; and Mr. G., who is a case

25  officer with a unique background in that he's a native Russian

Robert S. - Direct                                                        386

1   speaker and an electrical engineer.

2   Q.   And was he known to Merlin as Len?

3   A.   Yes.  And he was the person in contact with Human Asset 2.

4   We had him play the role of Human Asset 2 for Merlin.

5           THE COURT:  So Merlin understood Len to be a fellow

6   former Russian scientist?  Is that --

7           THE WITNESS:  Yes.  He knew that Len was a CIA

8   colleague rather than the actual Human Asset 2.

9           THE COURT:  I'm sorry?

10          THE WITNESS:  He knew that Len was a CIA colleague

11  rather than the actual Human Asset 2.

12          THE COURT:  Oh, so -- oh, all right.

13          THE WITNESS:  We told him to think about Len when he

14  was describing Human Asset 2 to the Iranians.

15          THE COURT:  I see, all right.

16  BY MR. TRUMP:

17  Q.   In other words, if for some reason Merlin ever had to

18  explain Human Asset No. 2, he would, he would have a visual

19  image of someone and a background of someone to explain that

20  credibly?

21  A.   Yes.

22  Q.   And that was going to be Len?

23  A.   Yes.

24  Q.   But he knew that Len worked for the CIA?

25  A.   Right.

Robert S. - Direct                                               387

1   Q.   How long was -- how many days were spent in San Francisco?

2   A.   Three, I think.

3   Q.   And you traveled there.  Who else?

4   A.   Mr. Sterling, Mr. W., and Mr. G.

5   Q.   And what about Merlin?

6   A.   Oh, and Merlin and Mrs. Merlin separately from us.

7   Q.   They traveled separately from the CIA personnel, correct?

8   A.   Yes.

9   Q.   And again, why is that?

10  A.   Even within the United States, we wouldn't want them on

11  the same flight list.

12  Q.   Again, to protect their association with the CIA?

13  A.   Their cooperation with the CIA, yes.

14  Q.   And what was roughly the schedule for meeting in San

15  Francisco?

16  A.   Well, we had a social meeting first, a dinner, and then on

17  the following morning, the, the men, because Mrs. Merlin was

18  shopping at that point, the men got together to discuss the

19  legend and the technology.

20  Q.   So Mrs. Merlin was not part of any of the operational

21  meetings?

22  A.   No.

23  Q.   At these, at these meetings, was the defendant,

24  Mr. Sterling, introduced to Merlin for the first time?

25  A.   Yes.

Robert S. - Direct                                                    388

1   Q.   And what was explained to him in terms of this, this

2   change from Zach W. to Mr. Sterling, to Mr. Sterling?

3   A.   Well, Merlin already knew that Zach would be moving on, so

4   this was not a surprise to him, and he accepted it readily, the

5   change.  He was used to that by now.

6   Q.   And based on your observation, did the change go well?

7   A.   Yes.  I think there was good rapport.

8   Q.   Now, in terms of the operational meetings, what was it

9   that you explained to Merlin?

10  A.   That the disinformation that we would have him give to the

11  Iranians was a Russian fire set design.

12  Q.   And what did it consist of at -- what did you have in San

13  Francisco that you were going to show Merlin?

14  A.   We had schematics and a CAD/CAM, computer assisted drawing

15  of the fire set, and then a parts list and the schematic.

16  Q.   And did you give that to Merlin to review?

17  A.   Yes.

18  Q.   Who actually gave it to him?

19  A.   I don't recall exactly which one of us did, but it would

20  have been me or Mr. G.

21  Q.   And did he review it?

22  A.   Yes.

23  Q.   For how long?

24  A.   About two minutes.

25  Q.   And did he make any comments or observations about what

1   was given to him?

2   A.   He said, "This won't work."

3   Q.   And did he explain himself?

4   A.   I said, "Well, what do you mean, Merlin?"

5           He said, "Well, you've left out a couple of key

6   components.  They're in the parts list, but they aren't in the

7   schematic or the drawing, and the way this is presented, it

8   won't work."

9   Q.   Were you aware that there were, there were things missing

10  on the schematics?

11  A.   Yes.  It was our intention, of course, not to give them

12  the whole device.

13  Q.   And so was his response expected?

14  A.   Yes.  And it fits with his personality, the engineer who

15  has to have the last word and be smarter than everyone else, so

16  he was quite pleased with himself for having determined what,

17  in fact, we wanted him to determine, that the plans would not

18  work as presented.

19  Q.   Was there any further discussion of, of these, these

20  plans?

21  A.   Yes.  I told him that his concern -- he then said, "Okay.

22  If you're going to leave out these two key components from the

23  schematic and the drawing, why do you name them in the parts

24  list?  Maybe it would be better not to put them in the parts

25  list."

Robert S. - Direct                                              390

1          And I said, "Okay.  We will go back to the designer

2    and the laboratory that helped us make this design and ask them

3    if this is the right way they intend it to be presented."

4          And right in front of Merlin, I tasked Mr. G. first

5    to check with Human Asset 2 and then to follow up with the

6    laboratory.

7    Q.   The -- without identifying the missing items on the

8    schematics, were those important parts of the diagram, of the

9    schematics?

10   A.   Yes.  And they were major subcomponents which anyone would

11   know had to be in a fire set design but which the particular

12   designer did not know how to build because he had worked in a

13   different part of the institute.  So that was an additional

14   part of the veracity of this stuff, that he wouldn't have known

15   how to make those.

16   Q.   Now, at any point during -- let me back up a second.  Was

17   there more than one meeting over these schematics --

18   A.   Yes.  We talked about them for the next couple of days.

19   Q.   At any time during your discussions, did Merlin express a

20   concern that there were any sort of embedded flaws or secret

21   flaws in the design?

22   A.   No, no.  He came to accept what we explained to him, that

23   the purpose was to present incomplete plans and have him be

24   able to say to the Iranians, "Okay.  Here's 85 percent of what

25   you need, and it's accurate, but when you want the other 15

Robert S. - Direct                                              391

1    percent that you're going to need to make this work, that's

2    when I get paid."

3            And he had accepted that.  He did not at that point

4    or at any other point until I explained to him after the

5    publication of *State of War* spot or know about the laboratory

6    efforts to flaw the plans.

7    Q.   Now, at any time during these meetings, did the defendant,

8    Mr. Sterling, come to you with any concerns about Merlin's

9    reaction to the schematics?

10   A.   Yes, he did.

11   Q.   And what, what was that discussion all about?

12   A.   This is his first encounter with Merlin, and he was

13   clearly a little taken aback that Merlin had been, Merlin had

14   been a little dismissive and kind of a wiseguy about, well,

15   this won't work, and he said, "Is this going to be a problem?"

16           And I said, "Well, that's Merlin.  We will check with

17   Human Asset 2 and the lab to make sure that this is what they

18   intended, but if it is, we're going to stick with that, and

19   you're going to have to bring Merlin around to accepting it,

20   which I think he's already on the way because he now

21   understands the incompleteness is an advantage."

22   Q.   Was this conversation between the two of you?

23   A.   Yes.

24   Q.   Were Len or Mr. W. privy to that conversation?

25   A.   No.  They were in the far side of the room talking about

Robert S. - Direct                                                  392

1    something else, as I recall.

2    Q.   By the time you finished your meetings in San Francisco,

3    what was your assessment in terms of Merlin's comfort level

4    with the plan of this operation?

5    A.   He was going to need some additional encouragement, and

6    the first thing he would need was our response from Human Asset

7    2 and the lab saying that this was what our scientists

8    intended, but that basically he was going to do as we wanted

9    him to do.

10   Q.   So how was it left with Merlin at the conclusion of the

11   San Francisco meetings?

12   A.   That we were checking.  We thanked him for his very

13   perceptive ability to look at, you know, complex electronic

14   schematics and so on, and assess that they were incomplete.  We

15   thanked him for his pointing that out to us, and that we would

16   check with the people who had designed it to make sure that was

17   their intention, and we would advise him of the results.

18   Q.   And was it your intention to check?

19   A.   Yes, and we did check.

20   Q.   Now, during the San Francisco trip, did you spend any time

21   socializing with Merlin and Mrs. Merlin?

22   A.   Yes.  We had a couple of dinners, and then on the morning

23   after the formal meetings had concluded, Mr. Sterling and I

24   took them on a trip to Wine Country.

25   Q.   And where did you go?

Robert S. - Direct                                                        393

1    A.    We went to Healdsburg in Sonoma County.  I prefer Sonoma

2    wines to Napa wines.

3    Q.    And who accompanied you on that trip?

4    A.    It was a party of four:  myself, Mr. Sterling, and Mr. and

5    Mrs. Merlin.  I was the designated driver.

6    Q.    Where was Zach W.?

7    A.    He had gone back to New York.  He had other meetings that

8    he needed to attend to.

9    Q.    And Len didn't go along either?

10   A.    No.

11   Q.    Turn to Government Exhibit 13.  Well, first of all,

12   Government Exhibit 12, do you have that?

13   A.    Yes.

14   Q.    What's, what's the date of Government Exhibit 12?

15   A.    9 November '98.

16   Q.    Is this simply a cable confirming the travel arrangements

17   for the three people that --

18   A.    It's providing the identities of the people who will be

19   traveling from the agency.

20   Q.    And then Government Exhibit 13?

21   A.    Government Exhibit 13 is a write-up of the meeting in San

22   Francisco done by Mr. W. once he returned to New York.

23   Q.    And you were the recipient of this cable?

24   A.    Yes.

25   Q.    Now, as a matter of practice, if you participate in an

Robert S. - Direct                                                    394

1   event such as these meetings, somebody else wrote up a summary

2   and sent it to you by cable, if, if there was something

3   incorrect or misstated or left out that you thought was

4   important, what, what would you do?

5   A.   I would gently and politely correct my colleague,

6   particularly in something as significant as this meeting.

7   Q.   If the cable had already been released and sent to you,

8   how would that correction be made?

9   A.   I would send the message back and say:  I appreciate your

10  detailed write-up.  Wish to note for the record that in

11  addition, such-and-such happened, or my recollection is

12  somewhat different, to put an inflection on it.  I think we

13  need to note that this happened.

14  Q.   And you would do that by cable?

15  A.   Yes.

16  Q.   Now, what is the date of Government Exhibit 13?

17  A.   The 17th of November, 1998.

18  Q.   And that was a cable sent by Mr. W. to you at CPD and

19  others working on Classified Program No. 1?

20  A.   Yes.

21  Q.   And that would have included Mr. Sterling?

22  A.   Yes.

23  Q.   Paragraph 2, does that reflect the purpose of the meeting,

24  as you've already described?

25  A.   Yes.

1    Q.    To brief him on the fire set plans and to take the

2    opportunity to introduce Merlin to the defendant, Mr. Sterling?

3    A.    Yes.

4    Q.    Mr. W. characterized the meetings as, as having gone very

5    well.  Do you concur in that assessment?

6    A.    I do.

7    Q.    And then it says in paragraph 2, "M raised several

8    questions about the plans and the accompanying technical

9    specifications which Mr. G. will be following up on shortly.

10   All parties" -- and it goes on from there.

11          Is that what you're referring to when you testified

12   about his comments about the missing items on the schematics?

13   A.    Yes.

14   Q.    In paragraph 3, again, does that reflect a little bit more

15   detail about the concerns that Merlin raised with respect to

16   the schematics?

17   A.    Yes.

18   Q.    And it summarizes what you said about having Mr. G.

19   contact the other Russian to resolve those questions?

20   A.    Right.

21   Q.    Specifically, it says, "M raised several clarifying

22   questions, and Mr. G. scheduled a session with Human Asset No.

23   2 to obtain the answers."

24   A.    Right.

25   Q.    In paragraph 4, does Mr. W. summarize the, both the legend

1  for Merlin in terms of marketing the plans and the fact that

2  they were supposed to be incomplete?

3  A.   Yes.

4  Q.   And the fact that this incompleteness was part of the

5  operation so that they would come back to Merlin and pay him

6  for more information?

7  A.   The incompletion, in addition to serving the purpose that

8  you could never make a bomb work with these plans, was designed

9  to be Merlin's excuse why he would just give them to the

10  Iranians.  It was like the demonstration version of software,

11  not entirely enabled, and when you wanted all of the features

12  of the software, you had to buy the license, and we actually

13  used that, that language to explain it to Merlin, who was very

14  adept at software issues.

15  Q.   Now, paragraph 5, did Mr. G. follow up with Human Asset

16  No. 2 while you were in San Francisco?

17  A.   He did.

18  Q.   Is that follow-up then reflected in paragraph 5?

19  A.   Yes.

20  Q.   And what did Mr. G. report back to you and M,

21  Mr. Sterling, Zach W. as to what Human Asset No. 2 had said?

22  A.   Human Asset 2 agreed that leaving out those key parts was

23  part of the plan.  He did not know either about the

24  subversions, so obviously, we didn't go anywhere near that with

25  him.

1    Q.   And again, Mr. G. said that he would follow up with the

2    lab for a more, a more complete answer?

3    A.   Yes.

4    Q.   And that's reflected in Mr. W.'s write-up?

5    A.   Yes.

6    Q.   And finally, what does it say in paragraph 6 about --

7    A.   It says that on the 15th of November, Mr. W. returned to

8    New York as Sterling and I took the Merlins on a car trip into

9    Wine Country.

10   Q.   And does the cable reflect Sonoma County?

11   A.   It does not.

12   Q.   Did you create any other document or record or are you

13   aware of any other document or record that identifies Sonoma

14   County as the place you took Mr. and Mrs. Merlin and the

15   defendant, Mr. Sterling, during your trip to San Francisco?

16   A.   I did not create one, and I'm not aware of another one.

17   If I had been writing this trip summary cable, I probably would

18   have noted it, but Mr. W. wrote it, and he didn't know.  He

19   wasn't there.

20   Q.   He knew you were planning to go, but he didn't know where?

21   A.   Know where.  And that was a decision I made the morning of

22   the trip.

23   Q.   And would you turn to the next government exhibit, No. 14?

24   Is that another cable?

25   A.   Yes.

1   Q.   And what is the date of that cable?

2   A.   25 November '98.

3   Q.   And again, was this a cable sent out from CPD?

4   A.   Yes.

5   Q.   And did you actually draft this cable?

6   A.   Let me check.

7          Yes, I did.

8   Q.   And who was it being sent to?

9   A.   It was being sent to the New York office.

10  Q.   And Mr. W. is still in New York at this point?

11  A.   He is, and he's still responsible for Merlin.

12  Q.   Does this cable reflect the follow-up that you promised

13  Merlin?

14  A.   It does.

15  Q.   And in paragraph 2, Mr. C., is that Walt C.?

16  A.   It is.

17  Q.   Was he the person who provided the, the follow-up

18  information?

19  A.   Yes.

20  Q.   And that was then reported to you by, by Mr. G.?

21  A.   No.  Mr. G. had already contacted Mr. C., and Mr. C.

22  called "CP" on the secure phone to provide his feedback.

23  Q.   So you got it directly from Mr. C.?

24  A.   Directly from Mr. C.

25  Q.   And your job was then to communicate it to Zach W. so he

Robert S. - Direct                                                        399

1   could communicate it to, to Merlin?

2   A.   Correct.

3   Q.   And what was it that you learned from Mr. C. that you

4   wanted Mr. W. to tell Merlin?

5   A.   I will read it.  "As we had suspected, the inclusion of

6   certain assemblies on the parts list but not on the schematic

7   was indeed intentional, with the goal of suggesting that the

8   anonymous fire set designer knew that these two assemblies

9   (component 1 and component 2) were essential, but did not know

10  how to make or spec them in any detail.  In fact, these two

11  components were designed in different parts of Human Asset

12  2's institute, and he does not know how to make them, which is

13  fortunate since they are two of the hardest parts of a fire set

14  to design and build."

15  Q.   And so that information from the National Laboratories was

16  to satisfy Merlin's concerns as to the discrepancy between the

17  schematic, which had left out certain information, and the

18  parts list, which had included certain information?

19  A.   Yes.

20  Q.   Mr. Merlin had suggested perhaps there should be some

21  changes made between the schematics and the parts list; is that

22  fair?

23  A.   Yes.

24  Q.   What did the lab tell you about any suggested changes?

25  A.   ". . . per agreement between CP officers and Mr. C., we

Robert S. - Direct                                                400

1    will make no changes to the plans and lists unless a serious

2    discrepancy arises."

3    Q.   So Mr. W. had to go back to Merlin and explain why no

4    changes were made?

5    A.   Yes.  In fact, in this cable, I ask him to advise Merlin

6    of this and suggest that he acknowledge the omission to the

7    Iranians and say it is part of our story that we're only

8    offering them part of what they will need for free, with

9    follow-up details available later for the right price.

10   Q.   Mr. Sterling, the defendant, is at CPD at this time?

11   A.   Yes.

12   Q.   And he's read into the program?

13   A.   Yes.

14   Q.   So he was familiar or had access to this cable as well?

15   A.   In fact, he coordinated on it.

16   Q.   And how do you know that?

17   A.   Because his name is there on the bottom of the cable as

18   one of the coordinators.

19   Q.   And that's on the second page of the cable?

20   A.   Yes.

21   Q.   And again, when you coordinate the cables, is that before

22   it actually goes out?

23   A.   Yes.

24   Q.   And what is the responsibility of the coordinator?

25   A.   To make sure the cable is accurate.

Robert S. - Direct                                                      401

1   Q.   So by coordinating on that cable, Mr. Sterling was

2   representing that this cable was accurate before it went to

3   Mr. W.?

4   A.   Yes.

5   Q.   The coordinator on a cable, if there is something amiss,

6   there's something wrong or something missing that is important,

7   can the coordinator edit and change?

8   A.   Yes.  The coordinator in this case was also sitting a

9   dozen feet from me and could have raised an objection verbally,

10  but the coordinator can also edit the cable, and then it was my

11  job as the releaser to take into account whatever the

12  coordinator had said.

13  Q.   And as far as you know, Mr. Sterling did not raise any

14  concerns at this point with this cable or any other aspect of

15  the operation?

16  A.   No.

17  Q.   As far as you know, he was comfortable with the way it was

18  proceeding?

19  A.   Yes.

20  Q.   And you were comfortable that he was up to speed and knew

21  all the necessary details of the operation?

22  A.   Yes.  And I was pleased with the rapport he and Merlin had

23  established at the outset.

24  Q.   The next exhibit is Government Exhibit 15.  What is the

25  date of that cable?

Robert S. - Direct                                                      402

1    A.    11 December '98.

2    Q.    And that cable was sent to what office?

3    A.    It was sent to Langley.

4    Q.    From New York?

5    A.    Yes.

6    Q.    And what is the subject of this cable?

7    A.    The actual change of case officer meeting that occurred on

8    the 10th of December, that would have involved Mr. W. and

9    Mr. Sterling and Merlin.

10   Q.    And is part of the discussion of this cable the follow-up

11   that we just discussed in cable, Government Exhibit 14?

12   A.    Yes.  Mr. W. and Mr. Sterling described to Merlin the

13   results of our conversation with the laboratory.

14   Q.    Now, the first paragraph of the cable, paragraph 2, some

15   logistical issues were discussed in that, that paragraph?

16   A.    Yes.

17   Q.    Is that also to keep you informed of what is going on with

18   Merlin and New York?

19   A.    Yes.  It is part of the SOP to record the operational

20   details as well as the substantive.

21   Q.    Even some of the administrative and logistical issues?

22   A.    Yes.

23   Q.    And paragraph 3, is that the paragraph that discusses what

24   the defendant and Mr. W. told Merlin by way of follow-up to his

25   questions in San Francisco?

Robert S. - Direct                                                      403

1   A.   Yes, it is.

2   Q.   And what was it that he was told?

3   A.   He was told that it makes sense for the designer of the

4   fire set to know that certain parts, mainly nuclear components

5   1 and 2, are included within a fire set design, but that he

6   would not necessarily know how to configure such elements.  In

7   other words, the designer knows what they are and where they go

8   in the schematic, but he would not know how to design such

9   parts himself, therefore negating them from the parts list.

10          For the most part, Merlin accepted this explanation

11  and seemed comfortable with it.  Ever the engineer, Merlin then

12  suggested that if the discrepancy shall remain, then maybe it

13  would make better sense to have the schematic compiled noting

14  Russian parts and have the parts list provide only very brief,

15  uninformative descriptions, and so on.  Merlin is

16  second-guessing.

17  Q.   And this cable comes back to you --

18  A.   Yes.

19  Q.   -- so that you can address the concerns that Merlin

20  brought up at the meeting?

21  A.   They're not really concerns at this point.

22  Q.   Suggestions?

23  A.   They're suggestions.

24  Q.   Now --

25  A.   And these suggestions were potentially good ones that we

1   listened to.

2          MR. TRUMP:  The Court's indulgence?

3          THE COURT:  Yes, sir.

4   BY MR. TRUMP:

5   Q.   In looking at Exhibit 15, did, did Mr. W. get it in

6   reverse?  In other words --

7   A.   Yes, he did.

8   Q.   -- he was --

9   A.   About the --

10  Q.   Excuse me.  Just in Exhibit 14, what was he, what was he

11  told about the difference between the schematics and the parts

12  list?

13  A.   That the schematics would not be complete, whereas the

14  parts list would.  And Mr. W. appears to have got that reversed

15  here.

16  Q.   In the cable, he reversed the discussion of that?

17  A.   Well, he reversed where the missing pieces would show up

18  and where they wouldn't.

19  Q.   But based upon what Merlin had said in San Francisco, his

20  concern was something that was missing from the schematics but

21  included on the parts list?

22  A.   Yes.

23  Q.   And that's what was tasked to the lab?

24  A.   That's what was tasked to the lab, and that is what was

25  and remained in the plans.

Robert S. - Direct                                                    405

1   Q.   Discussion in paragraph 4 of this cable, is this getting

2   back to the operational use of Merlin --

3   A.   Yes.

4   Q.   -- rather than --

5   A.   His outreach to the Iranians.

6   Q.   And again, was that something that was communicated to you

7   as a routine part of keeping you informed of what Merlin's

8   doing and the results of his outreach?

9   A.   Yes.  And they were looking for my comments and

10  suggestions, just as I was looking for theirs.

11  Q.   In 5, is this another one of those sort of logistical

12  issues that had to be resolved?

13  A.   Right.  I mean, Merlin came from a culture where you fixed

14  things forever, rather than the American, it's broken, throw it

15  out and get a new one.  So he was struggling to get his

16  computer to work and spending inordinate amounts of time and

17  money with it in the repair shop instead of just buying a new

18  one, which we would have paid for.

19  Q.   And just to give the jury the perspective, we're talking

20  about computers in 1998, correct?

21  A.   '98 and '99, yes.

22  Q.   And that's a far cry from what you can do today?

23  A.   It's modems and a very much more basic Internet, yes.

24  Q.   Paragraph 7, what is being communicated to you there in

25  paragraph 7?

Robert S. - Direct                                                    406

1   A.   That the New York case officers feel that the operation is

2   proceeding nicely with Merlin, though Merlin's engineer-esque

3   perspective will likely continue throughout this project, feel

4   that Merlin is clearly showing signs of comfort and remains

5   eager to undertake this operation.

6   Q.   So according to the New York case officers, there's no

7   reluctance or concern or worry being expressed by Merlin as to

8   the design of the operation at this point?

9   A.   No.

10          MR. POLLACK:  Your Honor, I've allowed a lot of

11   leading to move it along, but I think we're doing too much on

12   direct.

13          THE COURT:  I'll sustain the objection.  That's

14   leading.

15          MR. TRUMP:  I was just trying to move it along,

16   Judge.

17          THE COURT:  I know.

18          MR. TRUMP:  I think everybody's getting hungry so --

19          THE COURT:  You've got five minutes.

20   BY MR. TRUMP:

21   Q.   What were the case officers expressing to you with respect

22   to Merlin's willingness to proceed in this operation?

23   A.   They were expressing Merlin's willingness to proceed and

24   demonstrating it by the fact that he's doing more outreach to

25   the Iranians.

Robert S. - Direct                                                    407

1   Q.   And if a case officer, either Zach W. or Mr. Sterling,

2   thought that there was any unwillingness or concern about

3   Merlin's continued support for the operation, would they be

4   obligated to, to inform you of that?

5   A.   Yes, they would.

6   Q.   Would that be an important detail that you as the senior

7   manager would have to take into account?

8   A.   Yes.  And if Merlin were unwilling, I would have to find

9   somebody else, because his willingness and cooperation and

10  spirit of adventure, if you will, were crucial to doing this.

11  If he were slacking in his, his willingness, then I would have

12  to rethink the whole thing.

13  Q.   Did you take up the issue of Russian parts versus other

14  parts?

15  A.   We had already discussed that with the lab, and they had

16  their reasons for doing it the way they did.  Fundamentally,

17  they wanted to put the parts in English and -- or at least to

18  stipulate English/American/Japanese parts because the Russian

19  parts no longer existed.  They were all part of a classified

20  nuclear weapons program from ten years earlier, and if you

21  wanted to build this, you couldn't call up Radio Shack and

22  order the parts from the Russian parts.  You could get most of

23  the small electronic pieces in the West, and the lab thought

24  that it would be better to keep them that way.

25  Q.   Now, as of -- the cable here, Exhibit 15, is as of

Robert S. - Direct                                                    408

1    December 11.  Had Mr. Sterling moved to New York yet?

2    A.   I'm not sure.  He was there for this meeting.  He might

3    still have been in, in, physically in the Washington area.

4              MR. TRUMP:  Your Honor, is that a convenient place to

5    take a break, or do you want to plow forward?

6              THE COURT:  All right, Mr. Trump's obviously very

7    hungry.

8                          (Laughter.)

9              THE COURT:  So we will have our lunch break now.

10   It's one hour, ladies and gentlemen.  I'll ask you to be back

11   here promptly at 2:00.

12             You're not required to stay in the building.  You can

13   go outside if you want to get lunch.  Just make sure you're

14   back here by two, all right?  Leave your notebooks on your

15   table.  I want to stay in session for a second.

16                          (Jury out.)

17             THE COURT:  And you may go back.  Thank you, sir.

18   And please be back here at 2:00.

19                          (Witness stood down.)

20             THE COURT:  All right, before I let you go for lunch,

21   I gave you at the break a note we got from Juror No. 41.  I'm

22   always pleased when I get that type of a note from a juror

23   because it shows how conscientious they are.

24             I don't see any problem with what has been written.

25   Does anybody have any issues with that situation?

1          MR. POLLACK:  Not on behalf of Mr. Sterling, Your

2    Honor.

3          MR. TRUMP:  No, Your Honor.

4          THE COURT:  All right, then the note is just going to

5    be made a part of the record at this point, and, Ms. Gunning, I

6    want to see you in chambers for a second, all right?

7          Other than that, you-all have a one-hour lunch break.

8          Yes, is there another issue?

9          MR. OLSHAN:  Your Honor, one other brief issue:

10   Before the -- or during the last break, one of the attorneys

11   from the CIA, who is sitting on this side of the courtroom,

12   mentioned to me that he noticed one of the jurors, I don't know

13   the name or the number, but I believe he's in seat 5 in the

14   first row, is on the board of the lawyer's son's soccer league,

15   and the lawyer has met him, he believes, one time, but did not

16   make eye contact, didn't communicate, just mentioned to me that

17   he knew this individual.

18         THE COURT:  Well, but that attorney was never

19   identified as a participant in the trial.  I doubt anybody even

20   knows, you know -- I don't see a concern about that.  Does

21   anybody?

22         MR. OLSHAN:  I just wanted to put it on the record.

23         THE COURT:  All right, that's fine.  That's fine.

24         MR. MAC MAHON:  Not from what we know, Your Honor.

25         THE COURT:  I'm sorry?

410

1          MR. MAC MAHON:  Not from what we know it doesn't

2    sound like a problem.

3          THE COURT:  No, it shouldn't be a problem, but again,

4    I appreciate you keeping us advised as to any issues of that

5    sort.

6          All right, we'll recess until 2:00.

7          MR. OLSHAN:  Thank you.

8          (Recess from 1:02 p.m., until 2:00 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    A F T E R N O O N   S E S S I O N

 2                             (Defendant and Jury present.)

 3             THE COURT:  All right, Mr. Trump?

 4             MR. TRUMP:  Thank you, Your Honor.

 5             THE COURT:  Before you get started, I would just like

 6    to thank Juror 41 for her note.  There's no problem, but we

 7    appreciate your bringing any issues to our attention.  Thank

 8    you very much.

 9         ROBERT S., GOVERNMENT'S WITNESS, PREVIOUSLY AFFIRMED

10                    DIRECT EXAMINATION (Cont'd.)

11    BY MR. TRUMP:

12    Q.   Mr. S., do you have the exhibits in front of you?

13    A.   I do.

14    Q.   Turn to Government Exhibit 16.  Do you have that in front

15    of you?

16    A.   Yes.

17    Q.   What is the date of that cable?

18    A.   18 December '98.

19    Q.   Who is that from?

20    A.   From Langley.

21    Q.   To where?

22    A.   To two CIA field offices, one of them being New York.

23    Q.   And was this a cable that you wrote?

24    A.   Yes.

25    Q.   And who coordinated on this cable?

Robert S. - Direct                                              412

1   A.    Mr. Sterling and it was released by, well, there's a

2   couple of other officers identified only by number here, I

3   don't recall who they were, but Mr. Sterling by name and

4   Mr. Shedd by name.

5   Q.    And again, Mr. Shedd was who?

6   A.    He was the chief of operations for Counterproliferation

7   Division and my boss.

8   Q.    The fact that Mr. Sterling coordinated on this cable, does

9   that indicate he was still at CPD, or could he have been in New

10  York by this point?

11  A.    It indicates he was still at Langley.

12  Q.    Now, the fact that he coordinated on the cable indicates

13  what?

14  A.    That he had read it and did not object to it.

15  Q.    What action is required with respect to this cable?

16  A.    Comments of these two CIA offices on the proposals laid

17  out below.

18  Q.    And the second paragraph sort of summarizes where you are

19  in the operation?

20  A.    Yes.

21  Q.    And the overall plan, the purpose, the lack, the

22  background of Merlin, that sort of thing?

23  A.    Yes.

24  Q.    And that goes into paragraph 3 as well?

25  A.    Yes.

Robert S. - Direct                                                413

1   Q.   At this point, an Iranian subject had been identified?

2   A.   Yes, someone who we thought would be good to approach.

3   Q.   And at the top of the second page, paragraph 4, this

4   person will be going to where?

5   A.   I didn't hear the last part.

6   Q.   Where would this person be approached?

7   A.   In Vienna.

8   Q.   Was this the first time in the cable traffic you're

9   talking about an approach in Vienna?

10  A.   Yes.

11  Q.   And what does the rest of that paragraph discuss?

12  A.   It discusses the efforts of Merlin to make contact with

13  the Iranians and our scenario of what might happen when he

14  approaches Iranian Subject 1.

15  Q.   And would -- you characterize this as a walk-in scenario.

16  What's that?

17  A.   He's not going to be introduced to the Iranian by anyone

18  else.  He's just going to bump into him and make his approach

19  that way.

20  Q.   Now, in this cable, I believe you discuss the example that

21  you had provided previously of software being a demonstration

22  version but accurate but not complete, correct?

23  A.   Yes.

24  Q.   And that's actually in this cable?

25  A.   It is.

Robert S. - Direct                                                    414

1    Q.   What do you say about your expectations in handing over

2    these documents on a walk-in scenario?

3    A.   That if the Iranians want the rest of the story, they can

4    contact Merlin via his post office box and then pay him

5    handsomely.  In fact, we will be satisfied if Iranian Subject 1

6    simply accepts the story and the plans and sends them back for

7    study, since this will be a successful plant of disinformation.

8    Q.   And a walk-in scenario in Vienna is preferable -- is a

9    much better situation than having Merlin travel to, to Iran,

10   for example?

11   A.   That was out of the question.

12   Q.   And why was that?

13   A.   It would most likely be a one-way trip.

14   Q.   In paragraph 5, what do you -- you indicate this is just a

15   preliminary thought?

16   A.   Yes.  I was soliciting their suggestions and their input

17   and any ideas they might have on how to make this work better.

18   Q.   Is this something you discussed with the defendant?

19   A.   Yes.

20   Q.   At this time, did you believe you had a, a good rapport

21   with the defendant?

22   A.   I believed I did.

23   Q.   And that he was handling his duties competently and

24   satisfactorily as far as you were concerned?

25   A.   That was my impression for the rest of the time that he

1    and I worked together, that he was doing a good job.

2    Q.    Did he confide with you with respect to other matters?

3    A.    He occasionally made comments about his frustration with

4    various other issues, yes.

5    Q.    But he never expressed any concerns about the operational

6    details, the plans, anything dealing with Classified Program

7    No. 1?

8    A.    His only expressions of concern were Merlin's occasional

9    difficult behavior.

10   Q.    And those difficulties generally surrounded around what?

11   A.    Around money, when Merlin thought he had been paid less

12   than he should be and so on and so on.   These came up

13   periodically.   Our recordkeeping was a lot better than

14   Merlin's.

15   Q.    And did you think the defendant did a credible job dealing

16   with Merlin on these issues?

17   A.    Yes, indeed.

18   Q.    If you thought otherwise, would you have taken steps to

19   remedy it?

20   A.    I would have -- given the significance of the operation, I

21   would have been pretty much forced to raise it with his

22   management after consulting mine, but there were no problems

23   with the defendant's performance.

24   Q.    And would you turn to Government Exhibit 17?   Is that

25   another cable?

Robert S. - Direct                                                   416

1    A.    Yes.

2    Q.    And what is the date of that cable?

3    A.    19 January '99.

4    Q.    And it's from where?

5    A.    It's from the New York office.

6    Q.    And it's to CPD?

7    A.    At Langley, yes.

8    Q.    And that would include you?

9    A.    Yes.

10   Q.    What does this cable report on?

11   A.    It reports Mr. Sterling's first solo meeting with Merlin

12   after the departure of Mr. W. and the advice that Mr. Sterling

13   was giving to him on how to be successful in his approach to

14   the Iranians.

15   Q.    And is that discussed in paragraph 3?

16   A.    Yes.

17   Q.    And in paragraph 4, what information does the defendant

18   provide to you in this cable?

19   A.    The exchange, brief exchange between Merlin and a

20   particular Iranian institution.

21   Q.    And he, and he copies that directly into the cable?

22   A.    Yes.

23   Q.    And is that a good practice so that you can get the

24   information accurately?

25   A.    Yes.  Not just so that I can get it accurately but so that

1    there's on the record what Merlin is saying to the Iranians and

2    what the Iranians are saying to Merlin.

3    Q.    And paragraph 5, is Merlin getting a little frustrated

4    with the pace of, of the operation?

5    A.    Yes.

6    Q.    And what does the defendant explain to him?

7    A.    He explains to him that the project is a rather

8    time-consuming effort and that results may not be quickly

9    forthcoming.

10   Q.    In other words, he should have some patience?

11   A.    What Merlin didn't know is that we were engaged in a

12   lengthy and detailed approval process, and that slowed down the

13   operational pace.  The technical work was essentially done, but

14   we still needed the formal certifications of its soundness, all

15   of which is involved in the approval process.

16   Q.    And the cable also reflects towards the end that, in

17   paragraph 8 that there's some rapport building going on between

18   the defendant and, and Merlin?

19   A.    Yes.

20   Q.    And that is something that you encouraged?

21   A.    Yes.

22   Q.    And paragraph 10, what does the defendant report to you

23   about his assessment of Merlin and the status of the, of the

24   program?

25   A.    He states that C/O, that Mr. Sterling is encouraged that

Robert S. - Direct                                            418

1  Merlin continues to show an eagerness and resourcefulness with

2  regard to the project.  Though he has been somewhat frustrated,

3  he is understanding of the fact that this is the nature of the

4  project.  C/O instructed Merlin to continue his effort via the

5  Internet and letters and scheduled the next meeting for the 2nd

6  of February.

7  Q.   No expression at all from Mr. Sterling, from the defendant

8  that he's having any difficulty getting Merlin to get himself

9  out there and do -- send e-mails, letters, things like that?

10 A.   No.

11 Q.   When Merlin shows up with documents, those are documents

12 from his computer or his --

13 A.   Right.  He shows up with drafts of letters and e-mails to

14 the Iranians, and then with letters and e-mails the Iranians

15 might have sent to him.

16 Q.   If those documents are to be maintained by case officer,

17 would they be maintained securely?

18 A.   Yes, in the, in the office.

19 Q.   Why is, why is it necessary to secure them within the

20 office?

21 A.   Well, to bring them into the office because they detail

22 connections between someone resident in the United States and

23 the Iranian authorities suggesting that the U.S. resident has

24 some valuable information he wants to share with the Iranians,

25 and that would be very alerting if it fell into the wrong

1    hands, so it needs to be secured.

2    Q.   So in, in your hands, that document establishes a

3    connection between Merlin and the CIA?

4    A.   Yes.

5    Q.   And between Merlin and the operation?

6    A.   Yes.

7    Q.   A compromise of that document, for example, to the, to the

8    Iranians would compromise Merlin?

9    A.   Well, if the Iranians learned that he was sharing his

10   e-mails with the CIA, that would be the end of the operation.

11   Q.   Would it also provide evidence of the methods of the

12   operation?

13   A.   Yes.

14   Q.   Go to Exhibit No. 18, please.  What's the date of this

15   cable?

16   A.   4th of February, 1999.

17   Q.   And is this a cable sent --

18   A.   From the New York office --

19   Q.   Who's it to?

20   A.   To Langley.

21   Q.   Who's it from?

22   A.   The New York office.

23   Q.   And that would be from Mr. Sterling?

24   A.   Yes.

25   Q.   And you received this cable at headquarters?

Robert S. - Direct                                                    420

1    A.    Yes.

2    Q.    And again, what's -- what information is the defendant

3    conveying to you in this cable?

4    A.    That Merlin had received positive responses from an

5    Iranian institution, and they asked for his resume and

6    additional information.  Merlin was excited about finally

7    receiving a response but noted some hesitancy in the direction

8    the project should now take.  C/O and Merlin then discussed the

9    type of response that should be sent to the Iranian

10   institution.

11   Q.    And this is exactly what the defendant should be doing

12   with Merlin at this time?

13   A.    Exactly what the defendant and Merlin should both be

14   doing.

15   Q.    And in this cable, are there actual verbatim copies of

16   those e-mails and correspondence?

17   A.    Yes.

18   Q.    Which you reviewed?

19   A.    Which --

20   Q.    Which you reviewed when you read this cable?

21   A.    Which I reviewed, yes.

22   Q.    Were you pleased with what was going on?

23   A.    Yes.  This was exactly what we wanted.  It's not pay dirt,

24   but it's the Iranians recognizing that Merlin has something to

25   offer, and he was successfully raising his profile as

1    Mr. Sterling and I had directed him.

2    Q.    And in paragraph 4, does the defendant report Merlin was

3    excited to receive the responses?

4    A.    Merlin was certainly excited to receive the above

5    responses.

6    Q.    In paragraph 5, did Merlin also raise some concerns to the

7    defendant?

8    A.    Yes, about his profile.

9    Q.    And in paragraph 6, what is reflected there?

10   A.    Mr. Sterling and Merlin discussed the best form of

11   response that should be sent.  They were planning the tactics

12   of the back-and-forth with the Iranians.

13   Q.    And what does Merlin say about the, the timing of such a

14   response?

15   A.    Would you tell me where that is in all of this?

16   Q.    Paragraph 6.

17   A.    Okay.

18   Q.    Just as far as what's reported to you.  The second

19   sentence.

20   A.    Yeah.  He's opined that it would be best to get a response

21   out as soon as possible considering the quick responses that

22   were sent to him.

23   Q.    And the defendant then in paragraph 7 asked for your

24   advice, right?

25   A.    Yes.  He's saying considering this is the second time he's

Robert S. - Direct                                                    422

1    had correspondence with a particular Iranian, we believe some

2    type of response should be sent as soon as possible.

3    Q.   So the defendant is agreeing with Merlin's assessment that

4    you should push this along?

5    A.   Yes.

6    Q.   And he's asking for your advice in that regard?

7    A.   Yes.

8    Q.   Turn to Exhibit 19.  Another cable?

9    A.   Yes.

10   Q.   And dated what?

11   A.   16 February '99.

12   Q.   And again, this is to Langley from New York?

13   A.   Yes.

14   Q.   And from the defendant to CPD, and you reviewed this,

15   correct?

16   A.   Yes.

17   Q.   Reflect results of a meeting on February 6?

18   A.   It does.

19   Q.   And what was discussed at that, that meeting?

20   A.   The letter that Merlin should send, they discussed a draft

21   of it.

22   Q.   And the draft is actually typed into the cable?

23   A.   It's in the cable, yes.

24   Q.   And in paragraph 4?

25   A.   Mr. Sterling notes that Merlin has obviously put some

Robert S. - Direct                                              423

1  thought into the formulation of this letter and then he's

2  suggesting ways to make it better.

3  Q.   What does Mr. Sterling, the defendant, suggest to make

4  this letter better?

5  A.   To make it, make it clear that he's not interested in a

6  job but, rather, a business opportunity.

7  Q.   And did you agree with that?

8  A.   Yes.  I thought that was a good suggestion by

9  Mr. Sterling.

10 Q.   Now, later in that same paragraph, the defendant indicates

11 that considering the necessary process for continuing with the

12 project, I feel the longer the Iranians can be strung along,

13 the better.  Is that referring to the --

14 A.   To the approval process.

15 Q.   -- the technical side to catch up?

16 A.   The approval process to catch up.

17 Q.   And you agree with that as well?

18 A.   Yes.

19 Q.   In paragraph 6, does the defendant ask for your advice in

20 this regard?

21 A.   Yes.  He's saying that prolonged inactivity on our part

22 will cause Merlin to have some second thoughts about our

23 preparedness for this project.  Merlin does appear to be

24 somewhat excited about the prospect that the project is coming

25 to fruition and it will only behoove the project to be able to

Robert S. - Direct                                                   424

1    build upon his enthusiasm.  Look forward to headquarters'

2    thoughts/comments.

3            So Mr. Sterling is prodding me.

4    Q.   And at least as far as you're being informed, Merlin is

5    pushing ahead, and the defendant wants to push ahead with --

6    A.   Yes, judiciously.  The defendant is trying to keep Merlin

7    at the right pace, not too fast and not too slow.

8    Q.   And the next exhibit, Exhibit 20?  Is that a cable?

9    A.   It is.

10   Q.   Dated?

11   A.   The 26th of February '99.

12   Q.   And who's it to?

13   A.   It is to Langley.

14   Q.   Again, from?

15   A.   From New York.

16   Q.   Are you aware of any other case officer in New York who

17   worked on this Classified Program No. 1?

18   A.   No.

19   Q.   What action is required in this -- by this cable?

20   A.   He's asking headquarters to review the letter and to reply

21   as soon as possible.  This is the draft letter for Merlin to

22   send to the Iranian who had contacted him.

23   Q.   And had the changes been made that were suggested by the

24   defendant?

25   A.   Yes.

Robert S. - Direct                                                    425

1    Q.    So that it reflects a business opportunity rather than a

2    job?

3    A.    Right.

4    Q.    What is reflected in paragraph 3?

5    A.    This is Merlin trying to figure out the best way to send

6    this while still protecting himself.

7    Q.    And in paragraph 5, is this the defendant's assessment of

8    where Merlin is with respect to Classified Program No. 1?

9    A.    Yes.  He's saying Merlin's concerns over the letter and

10   what should be included shows that he is indeed placing thought

11   into the project, even if he wants to be somewhat too

12   surreptitious.

13   Q.    And he goes on to say that it doesn't reflect an

14   unwillingness on the part of Merlin, but what?

15   A.    Merlin's overly cautious tendencies may reflect his belief

16   that the project is reaching a stage where he may actually have

17   to meet with the Iranians.  This is not to say that Merlin is

18   showing an unwillingness to continue the project.  He is just

19   letting his cautions be known.

20         Merlin continues to demonstrate his eagerness for the

21   project.  The diligent work on 24 February on the letter

22   clearly demonstrated that to C/O.

23   Q.    And he's asking you your input on sending out this letter?

24   A.    Yes.  And he's again prodding me.

25   Q.    Government Exhibit 21, is that another cable?

1    A.    Yes.

2    Q.    Dated March 1?

3    A.    March 1, '99.

4    Q.    And that is to Langley from New York?

5    A.    Yes.

6    Q.    What is discussed in this?

7    A.    Mr. Sterling is suggesting a salary increase for Merlin,

8    which Merlin had asked for.  It's also discussing Merlin's

9    ongoing efforts to reach out to the Iranians.

10   Q.    Is it the case officer's responsibility to handle these

11   type of discussions with the human asset?

12   A.    It is, and the case officer cannot himself or herself

13   unilaterally raise a salary, but it is their responsibility if

14   they believe it to advocate for such an increase.

15   Q.    And Mr. Sterling's recommendation is reflected in

16   paragraph 8?

17   A.    Yes.

18   Q.    And what is the defendant's assessment and response with

19   respect to Merlin's request?

20   A.    He says that the New York office, that is to say, not just

21   he but also his managers, recommends a raise of at least USD

22   250 a month for Merlin.  This will also make it easier to deal

23   with all of the minor administrative costs because you can just

24   give him a salary increase and tell him not to worry about

25   those, which is a good strategy.

1  Q.    So the case officers know how much the human assets are

2  making?

3  A.    Yes.

4  Q.    And just so everyone is clear, CIA Office No. 2 is New

5  York, right?

6  A.    Yes.

7  Q.    That's where the defendant is now on, on location, so to

8  speak?

9  A.    Yes.

10 Q.    The next exhibit is Exhibit 22.   What is the date of this

11 cable?

12 A.    22 March '99.

13 Q.    And who sent this cable?

14 A.    This came from CIA Office 2.

15 Q.    New York?

16 A.    New York.

17 Q.    And again, the defendant, correct?

18 A.    Yes.

19 Q.    Is this an informational cable?

20 A.    Yes.  It's a for your information only.

21 Q.    And what information is it providing you back at

22 headquarters?

23 A.    That another meeting was held between Mr. Sterling and

24 Merlin on the 16th of March, that Merlin asked whether it was

25 okay to send the edited letter.

Robert S. - Direct                                                      428

1   Q.   And in paragraph, in paragraph 4, again, the defendant

2   copies into the cable --

3   A.   A note that Merlin had received from the Iranians.

4   Q.   At the end of paragraph 4, what does the defendant

5   indicate he instructed Merlin to do?

6   A.   He instructed Merlin to bring copies of all correspondence

7   he sends and receives.

8   Q.   And again, is that what you would expect him to instruct

9   Merlin?

10  A.   Yes.  That was a good instruction.  I didn't have to tell

11  Mr. Sterling how to do his job.  He knew.

12  Q.   And at the end of the cable is a discussion of his salary

13  again?

14  A.   Yes.  He's informing him of a salary increase.

15  Q.   Which he recommended, correct?

16  A.   Which he recommended, and I raised him and got my bosses

17  to agree to a larger salary increase because we were getting

18  close to when we were going to launch Merlin at the Iranians,

19  and we wanted to keep him happy.

20  Q.   And again, once Merlin handed over documents to the

21  defendant, as he requests here, to the extent that they were

22  going to be retained by the CIA, they would have to be secured

23  properly?

24  A.   Yes.

25  Q.   The next exhibit is 23.  Is that another cable?

1    A.   Yes.

2    Q.   Is that by the defendant to --

3    A.   From New York to Langley.

4    Q.   Langley?

5    A.   And dated the 12th of April, '99.

6    Q.   Does this reflect another meeting that the defendant had

7    with Merlin?

8    A.   Yes, on the 6th of April.

9    Q.   And in paragraph 3, what is discussed there?

10   A.   That Merlin told Mr. Sterling that he had received another

11   indication of interest from the Iranians.

12   Q.   And again, in paragraph 4?

13   A.   It shows the response that he sent out, which he sent

14   before checking with Mr. Sterling, which to some extent we

15   frown on, but on the other hand, we like initiative, so he did

16   it.

17   Q.   Now, in the -- in paragraph 4, on the second page, is

18   Merlin at least according to the defendant's cable expressing

19   some concerns about the Iranians as the project seems to be

20   coming closer to fruition?

21   A.   Yes.  He is getting appropriately focused on the fact that

22   he's going to have to put himself into harm's way.

23   Q.   And in paragraph 6, does the defendant write what he told

24   Merlin?

25   A.   "C/O explained to Merlin that what will transpire is a

Robert S. - Direct                                                    430

1    business deal from which the Iranians should be more interested

2    in what Merlin has to offer as opposed to personal

3    credentials."

4             In other words, we will make them focus on the

5    information you're offering rather than on you.

6    Q.   And right above that, I skipped over it, but in paragraph

7    5, what is the defendant's assessment of the developments

8    expressed?

9    A.   That it's a positive development of events for the project

10   that the Iranians had responded.  He says that Merlin, in fact,

11   showed -- expressed extreme pleasure and excitement that the

12   Iranians are showing interest in the project as proceeding.

13   Q.   Is part of this cable devoted to some financial issues

14   with Merlin?

15   A.   Yes.

16   Q.   And again, this --

17   A.   This is unfortunately a fairly standard Merlin thing,

18   where he thinks he hasn't been paid as much as he has and so

19   on.  As I say, our record keeping was better than his.

20   Q.   Would you turn to the next exhibit, No. 24?

21            Another cable?

22   A.   Yes, from New York to Langley.

23   Q.   And what is the date of this?

24   A.   13 May '99.

25   Q.   By May of 1999, what's, what's the status of the project

Robert S. - Direct                                                    431

1    with respect to the technical --

2    A.    The technical work has been completed.  We're waiting for

3    a couple of specific statements from the lab management about

4    export control and enabling technology, which are part of the

5    approval process, but the technical work has been successfully

6    completed.

7    Q.    And until that's completed, even if Merlin gets a positive

8    response, he can't go forward?

9    A.    We have to stall.

10   Q.    What is -- was there another meeting in April that is

11   reflected in this cable?

12   A.    Yes, on the 5th of April.

13   Q.    And in paragraph 4, what does the defendant express -- or

14   what does he say he told Merlin?

15   A.    He took the opportunity to congratulate Merlin on his fine

16   work and noted that the pace of the project was going at a

17   comfortable level.  This was mainly in response to Merlin's

18   inquiry about what the next step will be should he receive a

19   response from the Iranians.  C/O explained that every aspect of

20   the project has been considered and that the necessary steps

21   will be taken as warranted.

22          He was in a difficult position because Merlin was

23   anxious to know what was happening and to move ahead, and

24   Mr. Sterling knew that we were still working on the approvals,

25   so he had to keep Merlin interested while at the same time

Robert S. - Direct                                                    432

1    slowing him down.

2    Q.    And in paragraph 5, the defendant is communicating back to

3    you what?

4    A.    He says that Merlin continues to show an eagerness towards

5    the project, and his interest is certainly piqued at what the

6    next steps will entail.  Then he asks me to come up and help

7    him in the process of keeping Merlin motivated but also paced.

8    Q.    And in paragraph 6, the money matters are discussed again,

9    correct?

10   A.    Right.

11   Q.    And again, it was a discrepancy between Merlin's

12   accounting and your accounting?

13   A.    Yes.

14   Q.    The CIA's accounting?

15   A.    Yes.

16   Q.    And that was resolved?

17   A.    It was.

18   Q.    Now, in that paragraph, does Merlin -- does the defendant

19   tell Merlin he has to sign his, his contract, his agreement

20   with the agency?

21   A.    Well, he says it will be ready for signing during the next

22   meeting, and Merlin requested that the language of the

23   agreement be changed to note that he does computer consulting

24   work for the USG.

25   Q.    And what does -- does Merlin express some concern that

1  that may become public or, or surface at some point?

2  A.   He does.  He says Merlin expressed concern about what

3  should happen if his agreement is ever discovered by someone

4  and what should happen, how he would be able to explain his

5  work for the USG.

6  Q.   And what was the defendant's response to Merlin, at least

7  according --

8  A.   C/O said that Merlin should not worry about his contract

9  ever surfacing outside of CIA.

10  Q.   And that's, in fact, what should happen, correct?

11  A.   That is what should happen.  That is our pledge to all

12  human assets, that we will protect their relationship with us

13  from any disclosure.

14  Q.   The next exhibit, 26 -- excuse me, 25?  What's the date of

15  this cable?

16  A.   The date is the 28th of May '99.

17  Q.   And was there another meeting?

18  A.   Yes.  On the 25th, I went to New York, as I did

19  periodically, and met with Merlin and Mr. Sterling.

20  Q.   And why, why did you go to New York?

21  A.   I did this periodically both to keep Merlin inspired and

22  in this case and in many cases, to tell him about the next

23  step, to introduce where we were going.

24  Q.   And in paragraph 2, what does the defendant -- did the

25  defendant write this cable?

1    A.    Yes.

2    Q.    And were you with him when you wrote it -- when he wrote

3    it?

4    A.    I don't know if I was with him, but, you know, certainly I

5    reviewed it and I received it.

6    Q.    And again, is Merlin eager to proceed?

7    A.    He is.

8    Q.    Paragraph 3, what does that paragraph express?

9    A.    It's Merlin saying he had no more response from the

10   Iranians and then my telling him the big news, that we would

11   want him to make his approach to them in Vienna.

12   Q.    And you're directing him to do what?

13   A.    To continue his Internet work and to look for any

14   information he could find on the open Internet about Iranian

15   Subject 1, whom we had determined would be the best person to

16   approach.  We wanted him to find it rather than our just

17   launching him.

18   Q.    At the end of that paragraph 3, the bottom of the page, is

19   Merlin now informed that he would be traveling to Vienna at

20   some point?

21   A.    Yes.

22   Q.    But by no means Iran?

23   A.    Exactly.

24   Q.    In your meeting with, with Merlin, did he express any

25   concerns at all with respect to proceeding with the project as

1  planned?

2  A.   No.

3  Q.   Had anything changed at this time with respect to the

4  overall design of the operation in terms of the schematics and

5  the plans and Merlin's approach?

6  A.   No.

7  Q.   It was still consistent with what was discussed way back

8  in San Francisco meetings?

9  A.   Yes.

10  Q.   And Merlin never expressed any concerns about that plan?

11  A.   He did not.

12  Q.   Next exhibit, 27?

13  A.   26 we're not talking about?

14  Q.   I did skip over -- 27 is the next cable.

15  A.   Yes.

16  Q.   I'm skipping over 26.  That's another exhibit.

17  A.   Okay.

18  Q.   Exhibit 27, is that a cable?

19  A.   Yes, it is.

20  Q.   What's the date of that cable?

21  A.   29 June '99.

22  Q.   Again, from New York to Langley?

23  A.   New York to Langley.

24  Q.   What does this cable discuss?

25  A.   It discusses the events in the meeting of 17 June between

Robert S. - Direct                                                    436

1    Mr. Sterling and Merlin.  They're discussing --

2    Q.   Are they at a point where they're trying to reach out to

3    the Iranian Subject No. 1?

4    A.   Yes, they are.

5    Q.   But Merlin was unable to find any information on that

6    subject?

7    A.   Right.

8    Q.   Paragraph 4 discusses the travel to Vienna; is that right?

9    A.   Yes.  And Merlin's rather exotic idea that he would make a

10   PowerPoint presentation of this fire set to the Iranians.

11   Q.   The defendant advised what with respect to that idea?

12   A.   That this would appear too slick and professional and that

13   Merlin should be thinking more furtively as someone who's

14   afraid to be offering it up and wants to offer it and wants to

15   get out of there, rather than a slick commercial professional,

16   who would have a PowerPoint presentation.

17   Q.   And you concurred in that advice, correct?

18   A.   Yes, particularly considering PowerPoint in 1999.

19   Q.   Do you have Exhibit 29 in front of you?

20           THE COURT:  You're skipping 28?

21           MR. TRUMP:  I believe 28 is a letter from the lab.

22           THE COURT:  Right.

23           THE WITNESS:  Yes, I have 29.

24   BY MR. TRUMP:

25   Q.   And that is another cable from New York to Langley?

1    A.    It is.

2    Q.    And what is -- does that discuss another meeting in June

3    of 1999?

4    A.    No.  It's, it's the assessment of Mr. Sterling of where

5    Merlin is, and it's asking for an extension of the agreement

6    and approval under which we worked with him.

7    Q.    I apologize, I was one cable behind you.

8               In paragraph 5, what is the defendant's

9    recommendation with respect to --

10   A.    That we continue to work with him.

11   Q.    And would you read what he says in paragraph 5 about

12   Merlin?

13   A.    "Merlin is an intelligent individual, knowledgeable in a

14   highly specialized area of expertise, and enthusiastic in his

15   support for and work with CIA.  Merlin is also motivated by the

16   financial remuneration he receives.  M is diligent in the work

17   he does on CIA's behalf and is continually thinking of other

18   methods that can be used for CIA's purposes.  M is responsive

19   to tasking and brings the key elements of his own experiences

20   and knowledge to his work for CIA."

21   Q.    And did you concur in that assessment?

22   A.    Yes.

23   Q.    In paragraph 6, what is the defendant telling you?

24   A.    It says that Merlin is sensitized to security issues and

25   always errs on the side of caution.  At times, Merlin will on

Robert S. - Direct                                                        438

1   his own initiative implement security measures consistent with

2   the overall objections of CIA.  Objectives, not objections.

3   Q.   Was that also your personal assessment of Merlin?

4   A.   Yes.  He was definitely on our side and was trying to make

5   this work.

6   Q.   Government Exhibit 30.  What's the date of that cable?

7   A.   5 November '99.

8   Q.   What, what has happened between July and November at this

9   point?

10  A.   We had received approval to proceed, and we were

11  sharpening our operational approach plans.

12  Q.   And does the cable reflect a brief meeting between Merlin

13  and Mr. Sterling?

14  A.   Yes, on the 4th of November.

15  Q.   And at that meeting, was there a discussion of a letter?

16  A.   Yes.

17  Q.   What is the -- had you discussed the use of a letter with,

18  with the defendant?

19  A.   Yes.

20  Q.   What was the point of using a letter?

21  A.   The letter would be Merlin's introduction to the Iranians.

22  Rather than having him sit there in the Iranian mission and

23  debate with them or try to get his words out, he would put

24  everything that we needed to say in with the documents so that

25  if need be, he could just leave it and it would be

Robert S. - Direct                                                    439

1    self-explanatory.

2    Q.   And this letter -- was Merlin asked to draft the letter?

3    A.   Yes.  We wanted it to be in his voice rather than in

4    Mr. Sterling's or mine.

5    Q.   And then after drafting it, what was he directed to do?

6    A.   He would bring his latest draft to the meeting, and

7    Mr. Sterling and I, if I were there, would review it.

8    Otherwise, Mr. Sterling would include it in a cable and send it

9    to me for review in Washington.

10   Q.   And then you would discuss it with, with the defendant?

11   A.   Yes.

12   Q.   And is this one version of the letter in this cable?

13   A.   It is one version.

14   Q.   Was this a relatively early version?

15   A.   I think there were four or five more before we were

16   completely satisfied with it.

17   Q.   Now, in this letter -- is this letter consistent with the

18   plan that you've already discussed and outlined for the jury?

19   A.   Yes.

20   Q.   And in this letter, oh, about two-thirds of the way down

21   in paragraph 5, "If your government will be interested to get

22   complete information or get answer on any technical questions,

23   let me know please."

24   A.   Yes.

25   Q.   The plans, the schematics, are going to be what?

1    A.    Incomplete.

2    Q.    And is this consistent then with the letter?

3    A.    Yes, it is.  It's a reference to the legend that we'd laid

4    out, that the plans are incomplete and if the Iranians want the

5    rest of them, they will have to pay.

6    Q.    Now, the pay part is not directly addressed in this

7    version letter, is it?

8    A.    Not in this one.

9    Q.    Did you and the defendant then discuss ways to improve

10   upon the letter?

11   A.    Yes.  And the defendant instructed Merlin to work on

12   different versions so that the most appropriate version can be

13   determined at the next meeting.

14   Q.    And moving on to that, let's look at Exhibit 31.  Is that

15   a cable dated November 24, 1999?

16   A.    Yes, it is.

17   Q.    And again, who's it to?

18   A.    It is to two CIA field offices.

19   Q.    And it's from?

20   A.    From Langley.

21   Q.    And who drafted this cable?

22   A.    I did, I think.  Let me check.

23         Yes.

24   Q.    And what does this cable discuss?

25   A.    It discussed that Merlin had received his travel documents

Robert S. - Direct                                                    441

1   that would enable him to go to Vienna, and more important, he'd

2   received a response showing interest from an Iranian who was in

3   our view a potential conduit into the nuclear weapons program.

4   Q.    Now, this was discussed with Merlin at a meeting?

5   A.    Yes.

6   Q.    Where?

7   A.    In New York.

8   Q.    And were you present?

9   A.    I was.

10  Q.    And was the defendant present?

11  A.    Yes.

12  Q.    In paragraph 4, is the, the legend and the story for the

13  Vienna trip discussed?

14  A.    Yes.

15  Q.    Is it planned that Mrs. Merlin would accompany him?

16  A.    Yes.  We thought that would make it much easier for him to

17  maintain a tourist legend, and she is a calming influence.

18  Q.    And in -- is there a further discussion in paragraph 4 as

19  to how this scenario would play out?

20  A.    Yes.

21  Q.    How you hoped it would play out?

22  A.    We're getting down to real specifics at this stage.

23  Q.    And paragraph 5?

24  A.    We're talking about the timing of when he will go and then

25  the discussion of whether we will send Merlin by himself or one

Robert S. - Direct                                                442

1   or both of us will go with him to provide him better guidance.

2   Q.   And was it decided that she should accompany him?

3   A.   Yes.   If I might comment, she is much more street smart.

4   Q.   Now, the, the two subjects that are discussed in this

5   e-mail, Iranian Subject 1 and the Iranian Institution 1 --

6   A.   Yes.

7   Q.   -- how was -- how were you hoping that this would play

8   out?

9   A.   We were hoping that the letter that Merlin wrote, which

10  would be addressed to the Iranian Subject 2, who had just

11  contacted him, and then handed to Iranian Subject 1 or his

12  staff, that it would explain who Merlin was and the efforts

13  he'd made to contact and show to Iranian Subject 1 in Vienna

14  that another Iranian who he certainly knew had expressed

15  interest in Merlin and his offer.

16          So it was a very good entrée to the Iranians.

17  Q.   And is this the first time you discussed the delivery at

18  the Iranian mission at the IAEA?

19  A.   Yes.

20  Q.   Why there?

21  A.   That was the most physical presence of the Iranians,

22  particularly Iranians associated with nuclear matters, anywhere

23  in the world.

24  Q.   And at this point, despite Merlin's attempt to contact

25  Iranian Subject 1, that had not happened yet?

Robert S. - Direct                                                        443

1    A.    Correct, but he had received contact from Iranian Subject

2    2, which was just as good.  So his two years of effort had paid

3    off.

4    Q.    Turn to Government Exhibit 33.  What's the date of this

5    cable?

6    A.    We're skipping 32?  It's a cable.

7    Q.    I apologize.  Thank you for keeping me on my toes.

8    A.    Well, I've got them all in front of me.

9    Q.    32, what's the date of this cable?

10   A.    The date is the 1st of December.

11   Q.    And it was to headquarters from New York?

12   A.    Yes.

13   Q.    And reflects another meeting on November 18, 1999?

14   A.    Oh, it's the same meeting, but this time, he's --

15   Mr. Sterling is including the text of the e-mail exchange with

16   the Iranian.

17   Q.    And that's in paragraph 4?

18   A.    Yes.

19   Q.    And what does Mr. Sterling represent in terms of this

20   e-mail exchange in paragraph --

21   A.    He says, ". . . this is a fortuitous turn of events for

22   the operation.  As a preliminary thought, the contact from

23   Iranian Subject 2 can be exploited to either provide another

24   person to present the material to, or somehow utilize this

25   contract to provide a more definite entree to Iranian Subject 1

Robert S. - Direct                                                    444

1    for Merlin."

2    Q.    Now, Exhibit 33.  What's the date of that cable?

3    A.    16 December '99.

4    Q.    And that's to headquarters from New York?

5    A.    To headquarters from New York.

6    Q.    What does this reflect?

7    A.    A meeting on the 14th of December between Mr. Sterling and

8    myself and Merlin in New York.

9    Q.    And what's the subject of that meeting?

10   A.    We are tightening down the specific plans of his approach

11   to the Iranians in Vienna, which would occur within a month or

12   two.

13   Q.    And did you discuss this, the letter of introduction

14   again?

15   A.    We did, and we discussed how Merlin would get it, get the

16   whole package to Vienna.

17   Q.    And do you recall whether you helped draft this cable or

18   not?

19   A.    Yes, I probably did.

20   Q.    What was -- how was, how was the letter described in

21   paragraph 3, the second sentence of paragraph 3?

22   A.    "It was discussed that the language should be specific

23   enough to absolutely catch Iranian Subject 1's and the

24   Iranians' attention, yet not too much so as to garner

25   suspicion."

1   Q.   And did you provide Merlin at that meeting with some

2   suggestions on how to do that?

3   A.   Yes, we did.

4   Q.   What else was he provided with at that meeting?

5   A.   Where are we?

6   Q.   In paragraph 3.

7   A.   Paragraph 3.  Oh, ". . . enough information so that any

8   concerns he will have about finding the building should be

9   alleviated."

10          Yes, we started to give him his specific directions

11   as to finding the Iranian mission to the IAEA.

12   Q.   And it says you gave him maps and directions.  Is the

13   location of that office a public fact?

14   A.   Yes, although it's hard to dig out, but it is public fact.

15   Q.   In paragraph 4, what, what is discussed there?

16   A.   How to get the documents to Vienna.  He didn't want his

17   wife to know exactly what he was doing.

18   Q.   And what were the different scenarios that you, the

19   defendant, and Merlin considered?

20   A.   Well, we could send Merlin with the documents himself,

21   with a suitable cover legend, or one or both of us could meet

22   him in Vienna and hand him the documents.

23   Q.   And at first, is that the preferred choice for Merlin,

24   that someone meet him there?

25   A.   That was our conclusion, and I was the one chosen because

Robert S. - Direct                                                    446

1   I had made many a trip to Vienna and knew it well.

2   Q.   And in paragraph 5, again, this is expression by -- or

3   this, this is an assessment by you and the defendant that --

4   A.   ". . . making good progress on the eventual launch in

5   mid-January.  Merlin is expressing his concerns, but as they

6   are more related to logistical realities, none are show-

7   shoppers.  Merlin continues to express his willingness to

8   undertake the operation."

9   Q.   And when you met with Merlin, any concern about the, the

10  schematics, the --

11  A.   No.

12  Q.   -- documents, anything dealing with the technical side of

13  the operation?

14  A.   No.

15  Q.   At this point, do you have all the technical approvals

16  necessary to move forward?

17  A.   We have the technical legal policy approvals.  We are good

18  to go.

19  Q.   Exhibit 35?

20         Before I discuss that, you've had now a couple of

21  face-to-face meetings with Merlin and the defendant in New

22  York, right, in December?

23  A.   Yes.

24  Q.   Did the defendant ever voice any concerns to you about

25  moving ahead with the operation?

1   A.   No.

2   Q.   Did he have plenty of opportunity to do so with you?

3   A.   Yes.  We had --

4   Q.   Did he ever express any concerns that Merlin had expressed

5   concerns to him?

6   A.   No.

7            THE COURT:  All right, you're on Exhibit 35,

8   Mr. Trump.

9            MR. TRUMP:  Yes.

10  Q.   Exhibit 35, is that another cable?

11  A.   It is.

12  Q.   What's the date of that cable?

13  A.   12 January 2000.

14  Q.   And that was from CIA Office No. 2 to Langley?

15  A.   Yes.

16  Q.   Was there another meeting in January between Merlin and

17  the defendant?

18  A.   Yes.

19  Q.   And what was the general discussion at that meeting?

20  A.   Well, the general discussion was the upcoming trip to

21  Vienna, and there's another version of the letter that they had

22  worked through.

23  Q.   And in paragraph 3, is there a discussion of how long he

24  will probably be in Vienna?

25  A.   Yes.  Mr. Sterling is outlining our plans for him to spend

Robert S. - Direct                                                      448

1   two-three days and then get out of town.

2   Q.   And what is Merlin told about the best way to deliver the

3   package?

4   A.   That we basically want him just to drop it off rather than

5   engaging in debate with anyone at the Iranian mission, say he

6   had a, he had a package for Iranian Subject 2, would they

7   please make sure he'd get it, and then leave.  Because the

8   letter was to be self-explanatory so Merlin didn't have to

9   answer a lot of questions.

10  Q.   And in paragraph 4, do you renew -- did the defendant and

11  Merlin discuss the concern about where he would take possession

12  of the package containing the schematics?

13  A.   Yes.

14  Q.   And what does Merlin say?

15  A.   He says the situation is changed and he can now take the

16  package.  He explained to his wife that he had to deliver some

17  materials while they were in Vienna and didn't tell her

18  anything else.  So he was now prepared to take the package

19  himself.

20  Q.   And is that something that you concurred with?

21  A.   Yes.  We preferred that because Merlin is not a trained

22  intelligence operative, and while Mr. Sterling and I are and we

23  could securely meet him, we would not be sure that he hadn't

24  attracted hostile attention and brought them to a meeting with

25  us, which would not be good at all.

1   Q.   Now, in paragraph 5, what is reflected there?

2   A.   Another draft of the letter to be included in the package

3   of disinformation materials.

4   Q.   Does this letter have some of the changes that you

5   discussed with the defendant?

6   A.   Yes.

7   Q.   Specifically, what is said now about the, the

8   incompleteness of the --

9   A.   He's saying, "If you try to create a similar device, you

10  will need to ask some practical questions.  No problem.  You

11  will get answers, but I expect to be paid for that."

12       So in his non-native English, he's laying out that

13  this is the demo version of the software, and when they want

14  the license, they have to pay.

15  Q.   Now, in paragraph 6, does the defendant relay to you his

16  suggestions on what could be done to improve this letter?

17  A.   Yes, he does, and this is an ongoing challenge because we

18  want it to be authentically Merlin speaking, but we also want

19  it to say what we want it to say.  So short of dictating it to

20  Merlin, we have to deal with his non-native English and try to

21  work it through.

22  Q.   And what does the defendant suggest as perhaps another

23  alternative?

24  A.   He suggests that a second letter could serve as an

25  introduction to Iranian Subject 1, so that the external package

Robert S. - Direct                                              450

1    would be addressed to Iranian Subject 1 and the internal

2    package would be addressed to Iranian Subject 2 and would

3    include the more detailed explanatory letter.

4            I thought it was a good idea.

5    Q.   The rest of the cable or a good bulk of the cable then is

6    discussing some financial matters again?

7    A.   Yes.  Merlin basically acting out, getting huffy and

8    walking out, as usual claiming that he hadn't been paid as much

9    as we said he had.

10   Q.   Was this something that came up almost every

11   January-February?

12   A.   Yes, sadly.

13   Q.   And again, it was his accounting versus agency accounting?

14   A.   Yes.

15   Q.   Would you go to Exhibit 36?

16           Do you have that in front of you?

17   A.   I do.

18   Q.   Is that a cable dated January 14?

19   A.   Yes.

20   Q.   Was this a cable to New York?

21   A.   To New York from Langley.

22   Q.   And did you draft this cable?

23   A.   I did.

24   Q.   So this went to the defendant in New York?

25   A.   Yes.

Robert S. - Direct                                              451

1    Q.   The first paragraph discusses the --

2    A.   I'm apologizing to Mr. Sterling for Merlin's bad behavior.

3    It wasn't my bad behavior, but I was still sorry that he caught

4    the brunt of it.  And this is all talking about stuff that was

5    beyond Mr. Sterling's control.

6    Q.   And paragraph 3 --

7    A.   Yep.

8    Q.   -- does that get back to the letter?

9    A.   Yes.

10   Q.   And you agreed with the defendant's comments about some of

11   the verbiage?

12   A.   Yes.

13   Q.   So do you make some suggestions?

14   A.   Yes.

15   Q.   And what were your suggestions, as reflected in --

16   A.   Again, ". . . acknowledge that what he is providing

17   initially is incomplete.  There should be a very clear message

18   that he expects to be paid for the rest of the details they

19   will need if they want to build the device."

20            In other words, to sharpen the message of this is

21   incomplete.  When you want the rest, pay me.

22   Q.   And further on the next page, you discuss some of the

23   other logistics in terms of the --

24   A.   Yes, how the -- there would be two letters, as

25   Mr. Sterling had suggested, and the package, the inner package

Robert S. - Direct                                                      452

1    would be addressed to the Iranian who had contacted him, and

2    the outer package would have the letter to the person, Iranian

3    Subject 1, who was in Vienna.

4    Q.   And what is discussed in paragraph 4?

5    A.   The trade-off between going and meeting Merlin and sending

6    him with the information by himself, the trade-off being that

7    if we were there, we could guide him much more specifically

8    into his target, but if we were there, he could also mistakenly

9    bring hostile attention to us and therefore expose himself.  So

10   it's a trade-off, and we went with sending him with it by

11   himself.

12   Q.   And Government 37?  What is that, another cable?

13   A.   Yes.

14   Q.   And what was the date of this cable?

15   A.   The 17th of February.

16   Q.   And what is discussed in this particular cable?

17   A.   A meeting that Mr. Sterling and I had with Merlin on the

18   evening of the 14th where despite my efforts to calm him down,

19   Merlin had marched out and then called me at my hotel the next

20   morning and apologized.  And I'm laying out the plans for how

21   we're going to get Merlin back in the box and how we're going

22   to assess whether he's ready to do this operation.

23   Q.   And the argument that you were having with Merlin was over

24   money again?

25   A.   Well, it wasn't an argument.  Merlin made his comments and

Robert S. - Direct                                                      453

1    walked out.

2    Q.   And what is, what is discussed then about the operational

3    details in place as of February 17?

4    A.   Well, our assessment first of all that he was just getting

5    cold feet before he actually had to go and walk into an Iranian

6    institution with stolen Russian nuclear weapons plans, and how

7    we were going to give him the few thousand dollars that he was

8    contending about just to placate him and keep him focused, and

9    that we would send him out there with the fire set plans if I

10   assessed at one more meeting that he was ready and he was going

11   to do as we asked.

12   Q.   And the plan is pretty much as you discussed a few minutes

13   ago, that he will have a letter?

14   A.   Yes.  He'll have a letter on his computer that he would

15   print out in Vienna, and then he would handwrite the letter No.

16   2 that goes on the outside.

17   Q.   And he was also supposed to send an e-mail prior to

18   leaving to --

19   A.   To Iranian Subject 2 saying, "Look, I'm going to be in

20   Vienna.  I will drop off this important package at your IAEA

21   mission."

22   Q.   Now, what was -- how was it left with Merlin on February

23   17?

24   A.   That we would have one more meeting and then I would

25   decide whether he was going to go and do this mission or not.

1    I didn't see him that next morning.  He called me, and then I

2    set up another meeting, and this is describing what happened

3    and what plans we had, and the thought occurred to me that

4    being a case officer is not all that different from being a

5    parent on some occasions.

6    Q.    So did you have a final meeting?

7    A.    Yes.

8    Q.    And will you go to Exhibit 38?

9    A.    Um-hum.

10   Q.    Is that a cable dated February 22?

11   A.    Yes, from New York to Langley.

12   Q.    And what does -- what's the discussion in this cable?

13   A.    This is I went into the New York office after the meeting

14   with Merlin and -- on the evening of the 21st, and he and I had

15   a serious discussion, and I concluded that he was ready to do

16   this, so I gave him the packet of misinformation and his travel

17   advance and paid him his salary for the last year, I believe.

18   Q.    Now, was the defendant with you when you went and gave

19   him --

20   A.    No.  We decided at that point that there was some friction

21   between the defendant and Merlin because the defendant had been

22   facing this, this immature behavior all along, so -- and I was

23   the senior officer, so we figured it would be better if I, if I

24   did this and made the call.

25   Q.    So you met him at a hotel?

1    A.    Yes.

2    Q.    And did you make an assessment as to whether he was ready?

3    A.    I did.

4    Q.    And what was that?

5    A.    That he was ready.  He had calmed down substantially.  I

6    could speculate that he had had a conversation with

7    Mrs. Merlin, who straightened him out, although I don't know

8    that, and he seemed focused and calm and able to do this.

9    Q.    And to resolve the financial issues that were raised,

10   what, what did you do?

11   A.    Told him I would meet him halfway on when and how he was

12   paid and, indeed, paid him the salary that he had not yet

13   received.

14   Q.    After you got the financial details out of the way, what,

15   what did you discuss with Merlin?

16   A.    Well, we went over how he's going to behave in Vienna,

17   staying out of trouble, meaning staying away from other

18   Russians, gave him a cover story, a legend for the plans that

19   he was carrying, that is to say, that the schematics were for a

20   data storage device, which nobody but an electrical engineer

21   would know better.

22   Q.    And the schematics were contained in what?

23   A.    The schematics and the CAD/CAM drawing and so on were in

24   an envelope.

25   Q.    Was it a sealed envelope?

1   A.    No, it was not.

2   Q.    Why wasn't it sealed?

3   A.    First, there was no reason to seal it.  We had already

4   shown it to Merlin many times; second, we wanted him to print

5   off the letter in Vienna and insert it in the envelope there;

6   and third, if he were challenged by some customs official

7   during his trip, he could just pull out the innocent envelope

8   of plans for a data storage device, and no one would further

9   trouble him.

10  Q.    And did you go over the plans for the drop-off again with

11  him?

12  A.    Yes, including finding the place.

13  Q.    And in paragraph 4, that's what is discussed, your final

14  instructions to him?

15  A.    Yes.

16  Q.    And in paragraph 5, what did you tell him to do once he

17  got to Vienna?

18  A.    Familiarize himself with the city and the area around the

19  mission.  I told him we would be keeping an eye on him, which

20  was true in a certain sense, but not as close as he thought we

21  might be watching him.  Again, it's the trade-off.  We could

22  have had people watching him, but then somebody might have seen

23  them, but we wanted to give him the idea both that we were

24  looking out for him, and we certainly alerted the U.S.

25  consulate and other overt authorities in Vienna that if

Robert S. - Direct                                                    457

1    somebody showed up, that they would protect them, and we wanted

2    to give him the idea that we were keeping an eye on him.

3    Q.   But there was no surveillance team or anything like

4    that --

5    A.   No.

6    Q.   -- that went with him?

7    A.   No.

8    Q.   And he was pleased that someone was going to keep an eye

9    on him?

10   A.   Yes.

11   Q.   Did he ask you for an emergency phone number?

12   A.   He did.

13   Q.   And what did you give him?

14   A.   Well, I had no other choice than to give him my cell phone

15   because we were sending him, a U.S. legal permanent resident,

16   into a friendly country, and he had zero capabilities as a

17   clandestine agent, as he was about to prove, so any of the

18   normal kind of thing that you would give to a trained and

19   skilled clandestine agent were out of the question.

20   Q.   So at the end of the meeting, did you give him the, the

21   schematics?

22   A.   Yes.

23   Q.   Do you set up a plan to meet with him when he got back?

24   A.   Yes.

25   Q.   Now, this cable was sent by you, and it was sent to the

1    New York office?

2    A.   No.  I wrote it from the New York office, I think, or

3    perhaps I -- yes, it's to Langley.  So I went into the New York

4    office and discussed it -- discussed what had happened with

5    Mr. Sterling, and then I sat down and drafted this cable.

6    Q.   So he was at the office when you wrote this cable?

7    A.   Yes.

8    Q.   And you discussed with him all the details that went into

9    the cable?

10   A.   Yes.

11   Q.   So he was fully aware of this final meeting with Merlin?

12   A.   Yes.

13   Q.   Did he express any concerns or reservations as to your

14   decision to, to send Merlin?

15   A.   No.

16   Q.   Did he support your decision?

17   A.   Seemed to.  Seemed pleased that we'd finally reached the

18   stage of going ahead.

19   Q.   I have to ask you to turn to the other exhibit binder.

20   A.   I only have one.

21          THE COURT:  Mr. Wood should have a second one there,

22   a second binder.

23          MR. TRUMP:  I seem to have misplaced my exhibit list,

24   Your Honor.

25   Q.   Would you look at Exhibit 39?

1   A.   That's in the other book.

2          THE COURT:  That's in the first book.  The first book

3   runs through 75.

4          MR. TRUMP:  He just doesn't have it yet, Your Honor.

5          THE WITNESS:  I think I have 39.

6   BY MR. TRUMP:

7   Q.   Do you have Exhibit 39 in front of you?

8   A.   I do.

9   Q.   What is that?

10  A.   It's a photograph of the exterior of the building in which

11  the Iranian mission to the IAEA is located in Vienna.

12  Q.   Have you been to that location?

13  A.   Well, I've certainly been outside it.

14  Q.   And does it accurately reflect the mission back in 2000?

15  A.   Yes, it does.

16  Q.   And Exhibit 40?

17         THE COURT:  Are you going to publish that to the

18  jury?

19         MR. TRUMP:  Not yet, Your Honor.

20         THE COURT:  All right.

21         All right, now, 39 you did not formally move in.  Are

22  you moving that in?

23         MR. TRUMP:  I will in a minute, Your Honor.

24         THE COURT:  All right.

25         MR. TRUMP:  I have a feeling there'll be an

1  objection.

2          THE COURT:  All right.

3          MR. TRUMP:  I'm just going to get through the four,

4  and then we can get --

5          THE COURT:  All right.

6  BY MR. TRUMP:

7  Q.   Exhibit 40?

8  A.   Yes.

9  Q.   What is that?

10  A.   That is a picture of the, the house number, 19

11  Heinestrasse, in front of the Iranian mission.

12  Q.   Is that the address you gave Merlin?

13  A.   Yes.

14  Q.   Have you been to this location?

15  A.   I've been outside it.  I wasn't going to go in.

16  Q.   And was this how this appeared in 2000?

17  A.   It was.  That's a very typical Vienna house number.

18  Q.   And 41?

19  A.   Yes.

20  Q.   Do you recognize that?

21  A.   Yes.  It's the list of doorbells and occupants of this

22  building.

23  Q.   And have you seen that?

24  A.   I have seen it.

25  Q.   And is this how it appeared in 2000?

Robert S. - Direct                                                      461

1    A.    It is.

2    Q.    And 42 is a close-up of the same?

3    A.    Yes.

4    Q.    And which, which label is associated with --

5    A.    The one in the lower left-hand corner, which says "1/1,"

6    meaning Apartment 1 on the first floor, "P.M. Iran," Permanent

7    Mission of Iran.

8    Q.    And 43?

9    A.    Yes.

10   Q.    What is that?

11   A.    That's the Hotel Intercontinental in Vienna.

12   Q.    Have you been there?

13   A.    Yes.  There I have gone inside.

14   Q.    And is that an accurate depiction of the Hotel

15   Intercontinental in 2000?

16   A.    Yes, it is.

17          MR. TRUMP:  We would move these into evidence, Your

18   Honor.

19          THE COURT:  Any objection?

20          MR. POLLACK:  Yes, Your Honor.  I'd like an

21   additional foundation laid in terms of when these photos were

22   taken and by whom.

23          THE COURT:  That's not relevant if the witness on the

24   stand was at the scene and says that the photograph is a true

25   and accurate representation of what he saw back in 1990.  You

Robert S. - Direct                                                    462

1    can cross him on it.

2              MR. POLLACK:  Okay.  I may have missed it, but I

3    don't believe he's testified when he saw these -- the things

4    depicted in this building -- in these photos.

5              THE COURT:  Were you in Vienna in 1990?

6              THE WITNESS:  I was there in 1999.

7              THE COURT:  I'm sorry, in 1999.  You were there when

8    Merlin went there?

9              THE WITNESS:  No.

10             THE COURT:  How close afterwards were you there?

11             THE WITNESS:  I was there beforehand several times to

12   gather the information I would need to prepare Merlin.

13             THE COURT:  So how far in advance of his being in

14   Vienna were you in Vienna?

15             THE WITNESS:  I don't recall the exact date, but it's

16   within two or three, four months.

17             THE COURT:  That's close enough.  I'm overruling the

18   objection.

19             MR. POLLACK:  Thank you, Your Honor.

20             THE COURT:  All right, Exhibits 39 through and

21   including 43 are into evidence.

22             (Government's Exhibit Nos. 39 through 43 were

23   received in evidence.)

24             THE COURT:  Do you want to publish those?

25             MR. TRUMP:  Yes.

Robert S. - Direct                                                      463

1           THE COURT:  All right.

2    BY MR. TRUMP:

3    Q.    And this is the what?

4    A.    This is the building in which the Iranian mission is

5    located.  I remember telling Merlin that it was the only one on

6    the street that the first floor was painted a pale green.

7    Q.    And the next one, 40?  You described this as what?

8    A.    That is the house number of the building, Heinestrasse 19,

9    19 Heinestrasse.

10   Q.    And the next exhibit, 41?

11   A.    That shows the doorbells to the various apartments within

12   this building, or offices.

13   Q.    And the next one?

14   A.    That shows the specific, if you look at the lower left

15   corner, "P.M. Iran," Permanent Mission of Iran.  That's the

16   doorbell to alert them that you want to come in.

17   Q.    Thank you.

18           What were the approximate dates of Merlin's travel to

19   Vienna?

20   A.    Late February-early March 2000.

21   Q.    And at some point, were you informed that he had returned?

22   A.    Yes.

23   Q.    While he was there, did you receive any communication from

24   him?

25   A.    Yes.  He called me on the emergency cell phone number.

Robert S. - Direct                                                        464

1   Q.   And what was that call all about?

2   A.   He couldn't find the building.

3   Q.   Which building?

4   A.   The building in which the Iranian Permanent Mission was

5   located.

6   Q.   The one that we just --

7   A.   The one we just looked at.

8   Q.   And what did you tell him?

9   A.   I told him to look one more time at the very specific

10  instructions and map guidance I had given him and that if he

11  did that and followed it to the letter, he would find it.

12  Q.   Is that the substance of the call?

13  A.   It was.  I tried to, you know, say, well, to make your

14  sales call, if you follow the instructions.  I didn't mention

15  the building or the Iranians or certainly not the materials

16  that we were delivering, but I told him basically to listen to

17  his instructions.

18  Q.   Did you receive word that he had returned?

19  A.   Yes, I did.

20  Q.   Who, who told you he had returned?

21  A.   Mr. Sterling.

22  Q.   What did you do in response?

23  A.   I went to New York to meet him, as we had planned on the

24  9th of March.

25  Q.   And according to Mr. Sterling, had he spoken with Merlin

1    upon his return?

2    A.   Yes, I believe so informally.

3    Q.   Would you look at Government Exhibit 44?

4              THE COURT:  Is there any objection to 44?

5              MR. POLLACK:  No objection to 44, Your Honor.

6              THE COURT:  All right, it's in.  And it's in the

7    jurors' book, correct?  44 is in the jurors' book?

8              MR. TRUMP:  Yes.

9              THE COURT:  Okay.

10             MR. TRUMP:  It's already -- it was in the group that

11   was moved in.

12             THE COURT:  All right, I'm sorry.

13   BY MR. TRUMP:

14   Q.   Another cable, Mr. S.?

15   A.   Yes.

16   Q.   What is the date of this cable?

17   A.   10th of March, 2000.

18   Q.   It's a cable from New York and directed to headquarters?

19   A.   Yes.

20   Q.   And it reflects your meeting with Merlin and the defendant

21   upon his return?

22   A.   Yes.

23   Q.   Would you describe just generally what, what happened at

24   that meeting?

25   A.   Merlin described what he had accomplished in Vienna, which

1    is to say after he had bumbled around and couldn't find it and

2    called me and I told him to remember what I told him, he did

3    find it.  He took pleasure -- I mentioned the engineer aspect.

4    He took pleasure in telling us that there were seven steps

5    inside the building instead of the four that we had told him

6    about, but he definitely had gotten to the right place.

7            He said that he tried several times, couldn't get in,

8    came back, and the postman had opened the door, so he used that

9    as his opportunity to go in and put the packet of information

10   and the two letters in the mailbox that was labeled for the

11   Iranian Permanent Mission right to the -- right beside the door

12   that said "Iranian Permanent Mission."

13   Q.   Now, did he describe in any detail how he delivered those,

14   that package?

15   A.   Yes, as I just described.

16   Q.   Was anyone there?

17   A.   Well, a mailman helped him get in, but there was no one --

18   no Iranian was there, which was fine.

19   Q.   And in paragraph 3 of this cable -- did you draft this

20   cable?

21   A.   I believe Mr. Sterling and I drafted it together.

22   Q.   And in paragraph 3, it reflects what you just said about

23   his phone call to you?

24   A.   Yes.

25   Q.   And the fact that he went inside the building?

1    A.    He did finally.

2    Q.    Does it mention the postman at all?

3    A.    No.

4    Q.    That's something he told you during the meeting?

5    A.    Yes, it is.

6    Q.    What's reflected in paragraph 4?  After going to the

7    mission, what does it say in paragraph 4?

8    A.    That he of his own volition took pictures inside the

9    building of the mailbox and so on, and he showed us those.

10   Q.    Prior to that sentence, does it reflect that he had been

11   to the office more than once?

12   A.    Yes.  He went several times, didn't have the stuff with

13   him, couldn't figure out how to get in.  This is once he

14   finally found it.

15   Q.    And so once he finally found it, he left the package, and

16   then he took some pictures?

17   A.    Yes.

18   Q.    Did he have the pictures with him at the meeting?

19   A.    He did.

20   Q.    As best you can recall, what was done with the pictures?

21   A.    I gave them -- I left them in the New York office, where

22   we were.

23   Q.    And in paragraph 5?

24   A.    It's an assessment that his stumbling around and being

25   very obviously not a trained intelligence agent probably added

Robert S. - Direct                                                      468

1   to his credibility.

2   Q.   And continuing that paragraph, what was your expectation

3   as to a response?

4   A.   We do not expect any quick answer from the Iranians, but

5   we alerted Merlin to begin checking his mailbox regularly

6   and -- that's his, you know, post office box -- and advise us

7   the first time of any sign that anyone was checking up on him.

8   Q.   About how long do you, do you recall this meeting taking

9   place?

10  A.   Hour, hour and a half, two hours.  We were all in quite a

11  good mood.

12  Q.   At that meeting, did, did Merlin express any

13  concerns/issues with the delivery of the package as it related

14  to the plans?

15  A.   No.  He was happy and relieved that his difficult task was

16  completed.

17  Q.   And did Mr. Sterling express any concerns about the

18  delivery of the plans?

19  A.   No.

20  Q.   Was he also pleased with the, the mission?

21  A.   Yes.

22  Q.   Do you have Exhibit 45 there with you?

23  A.   Yes.

24  Q.   Is that another cable?

25  A.   Yes.

1    Q.    Dated April 6 of 2000?

2    A.    From New York to Langley.

3    Q.    And this is reporting on a meeting between the defendant

4    and Merlin?

5    A.    And myself as well.

6    Q.    And what is the subject of the meeting?

7    A.    Just follow-up to see if he'd received any contact and to

8    give him some guidance as to what to do if he did, and giving

9    him the, the new agreement that he periodically had to sign

10   with us.

11   Q.    At that point, had he received any response from, from the

12   Iranians?

13   A.    No.  And I asked him if he'd be willing to continue his

14   relationship with us.  That's in paragraph 3.

15   Q.    And moving to Government Exhibit 46, is that another

16   cable?

17   A.    It is.

18   Q.    What is the date of that cable?

19   A.    5th of May, 2000.

20   Q.    And who was the author of that cable?

21   A.    I was.

22   Q.    And who was that directed to?

23   A.    It was directed to the New York office and other agency

24   offices overseas.

25   Q.    And the defendant was still at the New York office at this

1   point?

2   A.    Yes.  He was still a case officer.

3   Q.    And would you read what you say in paragraph 2?

4   A.    "Refs" -- ref messages -- "are excellent news.  It appears

5   that despite Merlin's bumbling, he managed to get the

6   Classified Project 1 deception materials into exactly the right

7   hands.  Better still, the targets took them seriously and

8   couriered them back to Iran rather than rejecting them at the

9   outset.  Since the goal of the operation ultimately is to waste

10  as much Iranian nuclear weapons expertise and money as

11  possible, we are off to a good start.  We must now await" --

12  and so on.

13  Q.    This is informing Mr. Sterling of information that you

14  had?

15  A.    Yes.

16  Q.    And in paragraph 3, what are you discussing in that

17  paragraph?

18  A.    The next meeting with Merlin.

19  Q.    And that will be in May?

20  A.    That will be in May.

21  Q.    Were you anticipating a change from Mr. Sterling as case

22  officer to a new case officer?

23  A.    Yes, we were, and we were also -- without telling Merlin

24  what we had learned, we were going to put him on notice to be

25  still more alert of his surroundings because we now had

1   intelligence that the Iranians had taken his package back with

2   them.

3   Q.   Moving to the next cable, Exhibit 47?  Is that a cable

4   dated May 25 of 2000?

5   A.   Yes, it is.

6   Q.   And is that from New York to headquarters, to Langley?

7   A.   Yes.

8   Q.   Does this cable concern the change from one case officer

9   to another?

10  A.   It does.

11  Q.   And that's from the defendant to a Mr. Y.?

12  A.   Yes.

13  Q.   In that cable, in paragraph 2, the second sentence, "Case

14  officers did not/not inform him that we had learned that the

15  Iranians took his packet of information seriously and arranged

16  to courier it back to Iran, but suggested instead that Merlin

17  be alert to any sign of monitoring or any efforts at contact by

18  the Iranians, since they would probably be checking him out

19  right now."

20        Was that a discussion that you had had with you and

21  the new case officer?

22  A.   And with Merlin.

23  Q.   What does it mean when it says, "Case officers did not/not

24  inform him"?

25  A.   We didn't tell him that we had learned that the Iranians

1    had taken the package back to Iran.  We did tell him that he

2    needed to be cautious and aware of his surroundings.

3    Q.    And that's reflected then in the balance of the cable?

4    A.    Yes.

5    Q.    And at this point, the defendant was no longer part of

6    Classified Program No. 1?

7    A.    That's correct.

8    Q.    And from that point on, he would not receive any

9    additional cable traffic or information about the operation?

10   A.    That's correct.

11             THE COURT:  Mr. Trump, how much longer is your direct

12   going to go?

13             MR. TRUMP:  Thirty to --

14             THE COURT:  All right, we might as well --

15             MR. TRUMP:  We have a few other topics to cover.

16             THE COURT:  All right.  Have you finished this

17   particular segment?

18             MR. TRUMP:  We can take a break now if you'd like.

19             THE COURT:  All right, I don't like jurors really to

20   sit more than about an hour and a half, hour and 40 minutes.

21   So why don't we take the afternoon break.  We'll reconvene at

22   4:00.

23             (Recess from 3:40 p.m., until 4:00 p.m.)

24                  (Defendant and Jury present.)

25             THE COURT:  All right, Mr. Trump?

Robert S. - Direct                                                      473

1    BY MR. TRUMP:

2    Q.   Mr. Sterling, at this point, the defendant is no longer

3    part of Classified Program No. 1, correct?

4    A.   That's correct, after the change.

5    Q.   And who is the case officer?

6    A.   Steve Y.

7    Q.   And is Merlin still an active human asset working with the

8    CIA?

9    A.   Yes.

10   Q.   To your knowledge, at least as far as what Merlin told you

11   or any of the case officers, was there any response by the

12   Iranians?

13   A.   No.

14   Q.   What were you planning to do as a result of that?

15   A.   We were planning after a certain, a decent interval to

16   send him back to them and say, "How about it?"

17   Q.   And was that in -- were you planning that in early 2003?

18   A.   Yes.  There was consideration of that at that time.

19   Q.   And do you have the exhibit book with Exhibit 103?

20   A.   103?

21            THE COURT:  Any objection to 103?  The jurors should

22   not look at that yet because we haven't admitted it.

23            MR. POLLACK:  No, Your Honor.

24            THE COURT:  No objection, 103 is in.

25            (Government's Exhibit No. 103 was received in

Robert S. - Direct                                                    474

1    evidence.)

2              THE COURT:  Now the jury may turn to it.

3    BY MR. TRUMP:

4    Q.   Is that another cable?

5    A.   Yes.

6    Q.   What's the date of that cable?

7    A.   11 March '03.

8    Q.   And who is the, the author of that cable?

9    A.   Let me see.

10             I am.

11   Q.   And where is that cable being sent?

12   A.   To New York.

13   Q.   And what does it concern?

14   A.   It concerns the possibility of an additional approach to

15   the Iranians in a different place.

16   Q.   And is that specifically what's discussed in paragraph 8?

17   A.   Yes.

18   Q.   And what happened with those plans?

19   A.   After the initial leak of the operation was made known to

20   us, we had to drop them.

21   Q.   And what you're referring to is the contact by James Risen

22   with the CIA in April of 2003?

23   A.   Yes.

24   Q.   You understood that there was no publication of any

25   article at that time?

Robert S. - Direct                                                475

1  A.    I understood that senior U.S. government officials were

2  able to head it off.

3  Q.    Why didn't you go ahead anyway if there had been no

4  publication?

5  A.    *The New York Times* and Mr. Risen are not in a SCIF.

6  That's the kind of safe area in which we work.  None of them

7  has taken a secrecy agreement and signed an oath to protect

8  secrets.  In fact, their business is to disseminate them.  So

9  we were afraid that once they learned of this, there was the

10 potential that it would leak to the Iranians.

11 Q.    So you decided not to pursue that approach?

12 A.    Yes.

13 Q.    And in your opinion, was there a potential loss of

14 intelligence as a result?

15 A.    Yes.  With something as complex as the, the modified plans

16 we had provided, a three-year, five-year period to assess them

17 and decide whether they wanted to get back to Merlin would not

18 be unreasonable.

19 Q.    Had you been involved in operations that took that long to

20 develop?

21 A.    Yes.  Longer.

22 Q.    Now, I'm going to ask you some specific questions which

23 because of the rules of the trial, I'd like you to answer just

24 yes or no.  You mentioned that you had left the agency briefly

25 and then came back as a contractor?

1    A.   Yes.

2    Q.   And between that time and 2003, was Merlin involved in

3    other similar operations?

4    A.   Yes.

5    Q.   By similar, was it involving Merlin as a human asset?

6    A.   Yes.

7    Q.   And by similar, was it an operation involving modified

8    plans to a nuclear weapons component?

9    A.   Yes.

10   Q.   And by similar, was it involving a, a foreign approach?

11   A.   Yes.

12   Q.   And by similar, was it targeting other countries that may

13   be -- at least the United States government believed may be

14   interested in developing nuclear weapons capability?

15   A.   Yes.

16   Q.   And all that was occurring between roughly 2001 and 2003?

17   A.   Yes.

18   Q.   Again, to the extent of the defendant's employment with

19   the CIA, he would not have been read into any of those programs

20   subsequent to any of those operations or cables or anything

21   like that subsequent to May of 2000?

22   A.   Yes.

23   Q.   I think I asked you this before:  When, when you met with

24   Merlin, you used his true first name?

25             THE COURT:  Yes, that has been asked and answered.

1    Let's start moving this along, Mr. Trump.

2    BY MR. TRUMP:

3    Q.   When you and the defendant met with Mr. Merlin, did the

4    defendant call Mr. Merlin by his true first name?

5    A.   Yes.

6    Q.   When the book was published -- when did you become aware

7    that the book had been published?

8    A.   Just as it was published.

9    Q.   In early 2006?

10   A.   Yes.

11   Q.   At that time, were you planning to use Merlin in an

12   operation completely unrelated to Classified Program 1?

13   A.   Yes.

14   Q.   And what happened with those plans as a result of the

15   publication of the book?

16   A.   We had to drop them.

17   Q.   And in your opinion, was that the potential loss of

18   valuable intelligence?

19   A.   Yes, it was.

20   Q.   As far as Classified Program No. 1 was concerned, did you

21   consider the publication of the book affecting that?

22   A.   Yes.  It shut it down completely and made all of our

23   efforts for nought.

24   Q.   So you never, never used the type of operation again?

25   A.   No.

Robert S. - Direct                                                    478

1    Q.   Were you ever able to use Merlin as a human asset again?

2    A.   After when?

3    Q.   After the publication of the book.

4    A.   No.

5    Q.   In your opinion, was that the potential loss of valuable

6    intelligence capability?

7    A.   He had unique characteristics which we could no longer use

8    on behalf of the United States.

9    Q.   Was that a yes answer?

10   A.   That's a yes answer.

11   Q.   And what were those unique characteristics?

12   A.   There's a very small group of Russian nuclear weapons

13   experts who are willing to help the United States whom we

14   trust.  So there's a very tiny population in the middle of that

15   Venn diagram, and he was there.

16   Q.   Did you continue to pay him for a brief period?

17   A.   The agency did, yes.

18   Q.   And at some point, that was ended as well, correct?

19   A.   Yes.

20   Q.   Do you know when that ended?

21   A.   I don't know exactly.

22   Q.   Now, based upon your experience both as a case officer,

23   supervisor, senior case officer as part of the

24   Counterproliferation Division, do you have an opinion as to the

25   potential damage caused by the publication of the book?

1   A.    I do have an opinion.

2   Q.    Was there potential damage, potential harm to the

3   intelligence methods employed in this operation?

4   A.    Yes.  There are a limited number of plays in one's

5   playbook, and this disclosed one particular play in very

6   considerable detail to everyone in the world because it was

7   published in a book, not just to foreign intelligence agencies

8   but to everyone who might care to read it or hear about it on

9   the Internet.

10  Q.    And what specific methods do you believe were compromised?

11  A.    The dangling of what appeared to be an accurate Russian

12  nuclear weapons plan that, in fact, had been compromised by our

13  National Labs, that showed a capability that we have that we

14  don't want everyone to know about, and it particularly

15  compromised that we had Russians who were formerly in the

16  Russian nuclear weapons program who were cooperating with the

17  CIA.

18  Q.    Why is -- let me back up.  Deception, dangle-types

19  operations are used by all sorts of intelligence services,

20  right?

21  A.    Right.

22  Q.    What made this one different in your opinion?

23  A.    The details that were, that were released.  It was

24  particularly sensitive involving nuclear weapons technology,

25  Russia, the United States, and Iran.  I have been an overt CIA

Robert S. - Direct                                                    480

1    employee since 1993, when another government agency

2    inadvertently declared me to the world, so it doesn't bother me

3    that people know that I'm associated with the CIA.  It very

4    much bothers me if they know exactly what I'm doing there, and

5    this is -- this kind of case reveals exactly what we're doing,

6    and that's why it's particularly damaging.

7    Q.    In your opinion, do foreign countries, foreign

8    intelligence services take steps to counter what they learn by

9    these types of disclosures?

10   A.    Yes.

11   Q.    And what type of countermeasures can be employed?

12   A.    Well, they would certainly be on the lookout for anything

13   at all involving a Russian or similar former nuclear person

14   presenting plans.  They would want to look very carefully at

15   anything that they gathered themselves, not necessarily by a

16   volunteer but by their own espionage efforts, that could have

17   been compromised by us, and it flags capabilities that our

18   government has to any and all opponents that we might have in

19   the world.

20   Q.    Was Iran, for example, put on notice of the CIA's effort

21   to infiltrate and gather intelligence with respect to its

22   nuclear weapons program?

23   A.    Yes, explicitly.

24   Q.    And what steps could a country like Iran take as a result?

25   A.    Well, certainly they stopped wasting any time on our fire

Robert S. - Direct                                                  481

1   set plans.  They probably took a very hard look at any other

2   information that they had gathered --

3           MR. POLLACK:  Your Honor, I'm going to object to

4   this.  I think we're now into the area of speculation.

5           THE COURT:  I think this is speculative.  I'm going

6   to sustain the objection.

7   BY MR. TRUMP:

8   Q.    In your opinion, could Iran take countermeasures?

9   A.    Iran could take countermeasures.

10  Q.    And could they be as simple as shoring up its own internal

11  security?

12  A.    Yes.

13  Q.    Is that potentially damaging to U.S. intelligence efforts?

14  A.    It is.

15  Q.    And why is that?

16  A.    The better Iranian security is, the more likely they are

17  to catch American spies or uncover our technical operations

18  like this.

19  Q.    Was Russia put on notice by the publication of the book?

20  A.    Yes, it was.

21  Q.    And were they put on notice that Merlin was cooperating

22  with the United States government?

23  A.    Yes.

24  Q.    What does that do with the value of any information

25  obtained by the United States from Merlin?

Robert S. - Direct                                                     482

1    A.    The Russian government would now know that anything that

2    Merlin knew had been compromised to us.

3    Q.    And why is that significant?

4    A.    Because they can then take countermeasures against his

5    body of knowledge and say, oh, he might have revealed

6    such-and-such, and so we need to make changes in our weapons.

7    Q.    In other words, we have an advantage if the Russians don't

8    know what Merlin told us.

9    A.    That's correct.

10   Q.    And we lost that advantage?

11   A.    We lost that advantage with the publication of the book.

12   Q.    In addition to intelligence methods, is there an effect on

13   intelligence sources as the result of the publication of this

14   book?

15   A.    Yes.  It has a chilling effect.

16   Q.    And what do you mean by that?

17   A.    We made promises to Merlin that we would protect the fact

18   of his cooperation with the CIA.  We were not able to do that.

19   That to any thinking person who is considering cooperating with

20   the CIA, that's an indication that we might not be able to

21   protect them, either.

22   Q.    And does that -- that promise extends not just to the

23   secrecy of the asset but the asset's relationship with the

24   agency?

25   A.    That's the most important thing to protect, that they are

Robert S. - Direct                                                      483

1    cooperating with us.

2    Q.    And so in your opinion, does this potentially -- is there

3    a potential damage in the loss of intelligence as a result?

4    A.    Yes, there is.

5    Q.    Now, you mentioned that you stopped using Merlin

6    operationally; is that right?

7    A.    Right.

8    Q.    In your opinion, was the information in the book specific

9    enough that Russia could identify him?

10   A.    Yes.

11   Q.    And does that in your opinion place him in potential

12   danger?

13   A.    Yes.  It makes it impossible for him or any of his family

14   members to travel to Russia to visit relatives or whatever.

15   Q.    And does it place him in potential danger with respect to

16   the Iranians?

17   A.    Yes, it does, because I'm sure they can figure out who he

18   is, too.

19   Q.    The publication of the book, what effect, if any, does

20   that have on relationship with foreign intelligence services

21   and foreign governments?

22   A.    It again demonstrates that the CIA may not be able to

23   protect secrets that they provide to us in exchange for secrets

24   that we provide to them with our allies.

25   Q.    And does the CIA work closely with foreign intelligence

 1  services?

 2  A.   With select ones, yes, it does.

 3  Q.   And in your opinion, would they have to think twice

 4  sometimes before working with the United States if they feel we

 5  cannot keep our secrets?

 6  A.   They would probably choose to limit the sensitivity of

 7  what they told us.  That's what I would do.

 8  Q.   In your opinion, does that represent a potential loss of,

 9  of intelligence?

10  A.   It does.

11  Q.   Now, do you have in front of you, I believe it's Exhibit

12  132?

13  A.   Yes.

14  Q.   And do you have the version that has paragraph numbers in

15  it?

16  A.   Yes.

17  Q.   And is this chapter 9 of *State of War* by James Risen?

18  A.   Yes.

19  Q.   Have you read it?

20  A.   Yes.

21  Q.   More than once?

22  A.   More than once.

23          THE COURT:  Is that exhibit in the jurors' notebook?

24          MR. TRUMP:  I don't believe so, Your Honor.

25          THE COURT:  All right.

Robert S. - Direct                                                    485

1              MR. TRUMP:  To the extent we can use the screen.

2              THE COURT:  All right.

3    BY MR. TRUMP:

4    Q.   I'm going to jump around a little bit with respect to the

5    paragraph numbers, so I'll give you a number, and if you could

6    refer to that?  Would you go to paragraph 83?  And that will be

7    on page?

8    A.   209.

9    Q.   209?

10             Paragraph 83, is that a summary of Operation Merlin?

11   A.   It's an incorrect and somewhat overstated summary, but

12   basically it summarizes the program.

13   Q.   For example, the, the part about Tehran getting a big

14   surprise when its scientists try to explode their new bomb, is

15   that --

16   A.   That's an exaggeration.  We did not think they would get

17   to the point -- we thought they would discover that they could

18   not make this fire set work long before they wasted it on some

19   very scarce highly enriched uranium or plutonium.

20   Q.   But the basic outline of Merlin is there in paragraph 83?

21   A.   Yes, it is.

22   Q.   I apologize for calling it Operation Merlin because that's

23   how it's referred to in the book.  This is Classified -- a

24   brief description of Classified --

25   A.   Classified Project 1, yes.

1    Q.   And, of course, the defendant was aware of the general

2    outline of Classified Program No. 1?

3    A.   Yes.

4    Q.   And paragraph 85, which is on page 210?  The first

5    sentence:  "The CIA had obtained genuine Russian nuclear

6    weapons blueprints from a Russian scientist and had forwarded

7    them to one of the national laboratories," is that generally a

8    description of what was provided by Human Asset No. 2?

9    A.   Yes.

10   Q.   And again, was that fact known to the defendant?

11   A.   Yes.

12   Q.   And paragraph 86, "Scientists at the national laboratory

13   were asked to implant flaws into the Russian blueprints.  The

14   flaws were supposed to be so clever and well hidden that no one

15   could detect their presence."  Is that an accurate statement?

16   A.   It is.

17   Q.   And again, was the defendant aware of that fact?

18   A.   Yes.

19   Q.   And paragraph 87, is that accurate?

20   A.   Yes, it is.

21   Q.   And again, the defendant was aware of that?

22   A.   Yes.

23   Q.   Paragraph 88, is that accurate?

24   A.   Yes.

25   Q.   And was the defendant aware of that?

Robert S. - Direct                                                487

1    A.    Yes.

2    Q.    Paragraph 79, the very first sentence of 79, is that a

3    fair statement in that first sentence?

4    A.    It is.

5    Q.    And again, something the defendant was aware of?

6    A.    Yes.

7    Q.    Paragraph 28 on page --

8              THE COURT:  198?

9              MR. TRUMP:  198.

10   Q.    It mentions there that in talking about the Russian,

11   "Before he defected, he had worked as an engineer at

12   Arzamas-16, the original center of the Soviet nuclear weapons

13   program and the Russian equivalent of Los Alamos" --

14             THE COURT:  Whoa, whoa.  Mr. Trump, it's late in the

15   day.  You've got to speak up if you're going to be reading it.

16             MR. TRUMP:  I'm sorry, Your Honor.

17   Q.    The sentence beginning, "Before he defected, he had worked

18   as an engineer at Arzamas-16," is part of that accurate?

19   A.    Part of it.

20   Q.    Which part?

21   A.    That he worked at Arzamas-16.

22   Q.    Was he a defector?

23   A.    No, he wasn't.

24   Q.    Paragraph 19, it's inaccurate to say he went through a CIA

25   defector program; is that correct?

Robert S. - Direct                                              488

1   A.    That is correct.

2   Q.    Is it accurate to say he endured long debriefings in which

3   CIA experts and scientists from the National Laboratories tried

4   to drain him of everything he knew about the status of Russia's

5   nuclear weapons program?

6   A.    That is correct.

7   Q.    And is that a fact known to the defendant?

8   A.    Yes.

9   Q.    Paragraph 24, do you have that in front of you, on page

10  197?

11  A.    I do.

12  Q.    "The Russian's assignment from the CIA was to pose as an

13  unemployed and greedy scientist who was willing to sell his

14  soul -- and the secrets of the atomic bomb -- to the highest

15  bidder.  By hook or by crook, the CIA told him, he was to get

16  the nuclear blueprints to the Iranians.  They would quickly

17  recognize their value and rush them back to their superiors in

18  Tehran."

19          Other than the fact that this was a fire set and not

20  an entire atomic bomb, is that a fairly accurate statement?

21  A.    It overstates the eagerness of all of us and, you know,

22  the highest bidder by hook or by crook.  I think we have

23  demonstrated that this was done very carefully, but it is an

24  accurate, if overheated, description of the operation.

25  Q.    And what Merlin's role in the operation was?

Robert S. - Direct                                                          489

1    A.    Yes.

2    Q.    And again, the defendant was aware of that fact?

3    A.    Yes.

4    Q.    Paragraph 25, does that paragraph describe in part the San

5    Francisco meeting?

6    A.    It does.

7    Q.    And does it mention the wine tasting trip to Sonoma

8    Country, although it's Sonoma County?

9    A.    It does.

10   Q.    And again, that's not something that's reflected in any

11   cables, is it?

12   A.    No.

13   Q.    It says, "In a luxurious San Francisco hotel room, a

14   senior CIA official involved in the operation walked the

15   Russian through the details of the plan."

16          Were you the senior CIA official who walked the

17   Russian through the details of the plan?

18   A.    I was.

19   Q.    Was it a luxurious hotel room?

20   A.    No, it was a very middle of the road.  We were trying to

21   keep a low profile, not show off.

22   Q.    It further states that he brought in experts from one of

23   the National Laboratories to go over the blueprints that he was

24   supposed to give the Iranians.

25          Was there an expert from the National Lab?

Robert S. - Direct                                                    490

1    A.   Not directly, but there was Mr. G., who was in touch with

2    the National Lab experts and was essentially their mouthpiece

3    to, to us.

4    Q.   And Mr. G. was known to Merlin as Len?

5    A.   Yes.

6    Q.   Paragraph -- and what's in the previous paragraph,

7    obviously, was known to the defendant, paragraph 25?

8    A.   Yes.

9    Q.   Paragraph 26 on page 198, it reads that the senior CIA

10   officer could see that the Russian was nervous.

11        Was Merlin nervous during the San Francisco meeting?

12   A.   No.

13   Q.   Did you try to downplay the significance of what they were

14   asking him to do?

15   A.   I tried to explain it in terms of intelligence collection

16   because I did not want to focus on the fact that the plans were

17   intentionally flawed.

18   Q.   So the part about the intelligence-gathering effort in

19   that paragraph is true?

20   A.   Yes.  And certainly there was never the suggestion that we

21   were going to give the Iranians a working nuclear device or the

22   plans thereof or do anything else illegal.

23   Q.   Did you ever say that it was all a game, nothing too

24   serious?

25   A.   No.

Robert S. - Direct                                                      491

1    Q.    As far as the intelligence-gathering effort of this

2    mission, was the defendant aware of that?

3    A.    Yes.

4    Q.    Paragraph 27 on the same page, "The Russian reluctantly

5    agreed, but he was still clearly suspicious of the CIA's

6    motives."

7          Did you see any reluctance in Merlin?

8    A.    No, nor suspicion.  He wanted to improve the product.  He

9    was not questioning our motives.

10   Q.    And was that something that we discussed ad nauseam

11   through the cables, his eagerness to fulfill his mission?

12   A.    Yes.

13   Q.    Paragraph 28, the first part of that paragraph, "He was

14   afraid because he fully understood the value of the information

15   he was supposed to pass to the Iranians," again, did you sense

16   any fear in Merlin at this point?

17   A.    No.  And only as he got closer to his actually taking the

18   risk did he start to show signs of trepidation, and he did

19   indeed understand the value of the information he was supposed

20   to pass, but he also knew that it was incomplete and wouldn't

21   work.

22   Q.    And were you, in fact, putting him in harm's way?

23   A.    Yes.

24   Q.    And did he understand that?

25   A.    He did.

Robert S. - Direct                                                  492

1   Q.    So it was reasonable for him to have some concern.

2   A.    That's correct.

3   Q.    Paragraph 52, we're still on the San Francisco trip.

4   A.    Yes.

5   Q.    Paragraph 52 states that he -- that would have been

6   Merlin -- could not stop thinking about his trip to San

7   Francisco, when he had studied the blueprints the CIA had given

8   him.  Within minutes of being handed the designs, he had

9   identified a flaw.  "This isn't right," he told the CIA

10  officers gathered around the hotel room.  "There is something

11  wrong."

12          He did express some questions about the plans; is

13  that right?

14  A.    My recollection of his exact words were, "This won't

15  work," and then he explained that we had put things in the, in

16  the CAD/CAM -- we put things on the parts list that we did not

17  put on the CAD/CAM or the schematic.

18  Q.    And it goes on to, "His comments prompted stony looks, but

19  no straight answer from the CIA men in the room.  No one in the

20  San Francisco meeting seemed surprised by the Russian's

21  assertion that the blueprints didn't look quite right, but no

22  one wanted to enlighten him further on the matter, either."

23          Is that accurate?

24  A.    No, it is not.

25  Q.    You testified before as to what happened at the meeting?

1    A.    That I immediately took his concern seriously and tasked

2    Len G. to look into them with first the Human Asset 2, the

3    designer, and then to initiate contact with Walt C. at the lab

4    to make sure that everything was as it was supposed to be, and

5    I did that in front of Merlin so he knew that we were taking

6    his comments seriously.

7    Q.    Now, do you see paragraphs 53 and 54 on page 203?

8    A.    Um-hum.

9    Q.    Now, Mr. Sterling, the defendant, was present during the

10   hotel room meeting?

11   A.    Yes.

12   Q.    Was he stunned by the Russian's statement?

13   A.    That's a value judgment.  I don't -- I can't say.

14   Q.    Did he appear to be stunned?

15   A.    No.

16   Q.    Did you have a private conversation with Mr. Sterling

17   during a break?

18   A.    Yes.

19   Q.    And did you describe accurately that conversation for the

20   jury previously?

21   A.    Yes, I did.

22   Q.    Is it accurately reflected here in the book?

23   A.    No.

24   Q.    Paragraph 55?  Now, as far as you know in terms of what

25   information the defendant provided you, he didn't have any such

1  fears?

2  A.   He did not have, and he never expressed them to me in the

3  almost year and, what, November, December, January, February,

4  March, year and five months between this meeting and the

5  delivery of the plans to the Iranians.

6  Q.   And based upon your reading of this chapter of the book,

7  according to the book, his fears were that we were handing over

8  nuclear technology to the Iranians, correct?

9  A.   That we were handing them plans that would enable them to

10  build a working weapon.

11  Q.   A pretty big fear?

12  A.   Pretty big fear.

13  Q.   But never articulated to you?

14  A.   Never.

15  Q.   Paragraph 48 on page 202:  "The Russian's cover story was

16  that he was the go-between for the other Russian scientist who

17  had brought the nuclear blueprints out of Arzamas."

18        Was that, in essence, part of the cover story?

19  A.   Yes.

20  Q.   And that was an accurate summary of that in the book?

21  A.   Yes.

22  Q.   And again, the defendant was aware of that?

23  A.   Yes.

24  Q.   And it goes on, "In truth, he had never met the other

25  defector, but that didn't matter."

Robert S. - Direct                                                    495

1                Was Human Asset No. 2 a defector?

2   A.   No, he wasn't.

3   Q.   But he was a Russian engineer?

4   A.   Yes.

5   Q.   And Merlin had not met him?

6   A.   No, he had not.

7   Q.   It goes on to say, "The story would help answer any

8   question the Iranians might have about how he came to acquire

9   the blueprints, which were not easy to access or remove from

10  Arzamas."

11               Was that part of the legend?

12  A.   Yes, it was.

13  Q.   And Mr. Sterling, the defendant, was aware of that?

14  A.   Yes.

15  Q.   Paragraph 49 on page -- excuse me, paragraph 49 on page

16  203:  "The Russian was also told not to try to hide the fact

17  that he now lived in the United States.  His story should be as

18  close to the truth as possible.  Just because he was living in

19  America didn't mean he was working for the CIA."

20               Is that a fairly accurate statement of Merlin's

21  instructions?

22  A.   It is quite accurate.

23  Q.   And again, the defendant was aware of that?

24  A.   Yes.

25  Q.   Paragraph 20, paragraph 20:  "One secret CIA report said

Robert S. - Direct                                                   496

1   that the Russian 'was a known handling problem due to his

2   demanding and overbearing nature.'  Yet the same report stated

3   that he was also a 'sensitive asset' who could be used in a

4   'high-priority covert-action operation.'"

5            Were you aware of any such report?

6   A.   No, I was not.

7   Q.   Do you know what a performance appraisal report is?

8   A.   Yes.

9   Q.   What is that?

10  A.   It is the way that we assess our subordinates and record

11  their successes and failures for the personnel record.

12  Q.   Even though you were the senior case officer on this

13  project working closely with the defendant, did you write his

14  performance appraisal?

15  A.   No.  He was in the New York office, and my

16  responsibilities were in Langley.  He did not work for me.

17  Q.   Had you ever seen any of his performance appraisals?

18  A.   No.

19  Q.   Are they initially marked Secret?

20  A.   Yes.

21  Q.   Paragraph 21:  ". . . the CIA had arranged for the Russian

22  to become an American citizen and had kept him on the payroll,

23  to the tune of $5,000 a month."

24            Had the CIA arranged for Merlin to become an American

25  citizen?

 1   A.    No.  He did it on his own.

 2   Q.    But he was, in fact, an American citizen eventually?

 3   A.    Eventually.

 4   Q.    A fact known to the defendant?

 5   A.    Yes.  He knew he was certainly in the process.  He was an

 6   LPR, who is in the pipeline for citizenship.

 7   Q.    And --

 8             THE COURT:  LPR is lawful permanent resident.

 9             THE WITNESS:  Yes, ma'am.

10   BY MR. TRUMP:

11   Q.    At the time that the defendant was the case officer, at

12   least initially at the time the defendant was the case officer

13   for Merlin, was his salary $5,000 a month?

14   A.    Yes, for part of that time.

15   Q.    And then as we discussed in some of the cables, he got a

16   raise?

17   A.    Yes.

18   Q.    So Mr. Sterling was aware of that fact?

19   A.    Yes.

20   Q.    Paragraph 22, "The CIA was placing him on the front lines

21   of a plan that seemed to be completely at odds with the

22   interests of the United States . . .."

23             The CIA was placing him on the front lines of a plan;

24   is that right?

25   A.    Yes.

Robert S. - Direct                                                        498

1   Q.   Was it completely at odds with the interests of the United

2   States?

3   A.   Nobody from me on up in the U.S. government thought so.

4   Q.   The balance of that paragraph says, ". . . it had taken a

5   lot of persuading by his CIA case officer to convince him to go

6   through with what appeared to be a rogue operation."

7           Who was the case officer between the San Francisco

8   meeting and the Vienna trip?

9   A.   Mr. Sterling.

10  Q.   Did you see any evidence that it took a lot of persuading

11  by his CIA case officer to convince him to go through what

12  appeared to be a rogue operation?

13  A.   I saw that it took a lot of case officer skill to guide

14  Merlin correctly, but other than a couple of outbursts, which

15  he quickly corrected himself, there was never any doubt that

16  Merlin was going to go through with it, nor was there any

17  suggestion of a rogue operation.  Indeed, the frustrations came

18  from the fact that we were being so meticulous in obtaining the

19  appropriate approvals before proceeding.

20  Q.   And paragraph 23 says, "The case officer worked hard to

21  convince him -- even though the officer had doubts about the

22  plan as well."

23          Did the defendant ever express any such doubts to

24  you?

25  A.   No.

Robert S. - Direct                                                    499

1          MR. POLLACK:  Your Honor, I'm going to object.

2    That's been asked and answered many times.

3          THE COURT:  Sustained.  That is becoming repetitive,

4    Mr. Trump.

5          MR. TRUMP:  Judge, we have to go through the book and

6    establish --

7          THE COURT:  You don't have to go through every word

8    of the book.  You've made the point.

9    BY MR. TRUMP:

10   Q.   Paragraph 35, without reading it, is that an accurate

11   statement?

12   A.   Yes, other than the description of both of these human

13   assets as defectors.

14   Q.   And paragraph 36?

15   A.   This is one of the few paragraphs in *State of War* that I

16   agree with.

17   Q.   And so that's a fairly accurate statement?

18   A.   It is.

19   Q.   And as to 35 and 36, that information was known to the

20   defendant?

21   A.   Yes.

22   Q.   Paragraph 37?  Without reading it, that was part of the

23   operation, to get Merlin to reach out to Iranians?

24   A.   It was.

25   Q.   And again, the defendant was aware of that?

1  A.   He was directing it.

2  Q.   And in paragraphs 38, 39, 40, all continuing that same

3  theme, the reach out by Merlin to the Iranians?

4  A.   Yes.

5  Q.   And that was something the defendant was aware of?

6  A.   Yes.

7  Q.   Paragraph 43, was there contact with an Iranian professor?

8  A.   Yes.

9  Q.   Was it from meeting him at a conference?

10 A.   No.

11 Q.   Was it through the e-mail traffic?

12 A.   Yes.

13 Q.   So other than that, it was a fact that he had made contact

14 with an Iranian professor?

15 A.   Yes.

16 Q.   And the defendant was aware of that?

17 A.   Yes.

18 Q.   Paragraph 44, again, other than suggesting that this was

19 an encounter at a conference, were there follow-up e-mails?

20 A.   Yes, there were.

21 Q.   And the defendant was aware of that?

22 A.   Yes.

23 Q.   And helped coach Merlin through those e-mails?

24 A.   Yes.

25 Q.   Paragraph 46, is that accurate?

1  A.    Not quite.

2  Q.    What is not accurate about that?

3  A.    That a high-ranking official would be traveling to Vienna

4  and visiting the Iranian mission.

5  Q.    What was true about the operation at that time?

6  A.    That an appropriate person for us to approach would be in

7  Vienna.

8  Q.    And that was Iranian Official No. 2 in the cables?

9  A.    Actually, it was Official No. 1.

10  Q.    Excuse me.

11  A.    It was Official 1 who would be in Vienna, would be the

12  best subject for us to approach.

13  Q.    And Iranian Official 2 was the person that Merlin had

14  exchanged e-mails with?

15  A.    Yes.

16  Q.    Now, 58, 59, 60, 61, 62, 63, what is that?

17  A.    This is a draft of the letter that Merlin was instructed

18  to print off and include with the package that went to the

19  Iranians.

20  Q.    And does this appear to be a nearly final draft?

21  A.    It does.

22  Q.    With very few minor changes to the ones -- the one that we

23  discussed in the, in the cable?

24  A.    Yes.

25  Q.    Between the one in the cable and this one, do you recall

1   what changes were made?

2   A.   I think we sharpened the reference to being paid.

3   Q.   Now --

4   A.   Yes, here it is:   ". . . I expect to be paid for that."

5   Q.   And where is that?

6   A.   That's in the next-to-the-last paragraph.

7   Q.   Paragraph --

8   A.   62.

9   Q.   62?

10          But this was -- in the book, this is characterized as

11  a letter that Merlin drafted hastily in Vienna.

12  A.   Right.

13  Q.   Is that a fair characterization of the book?

14  A.   That is how the book describes it.

15  Q.   But, in fact, this was something that you, the defendant,

16  and Merlin worked on prior to his departure?

17  A.   In many versions.

18  Q.   To the extent that Merlin gave the defendant a copy of

19  this letter, would it need to be secured in the same way that

20  we've discussed the other documents?

21  A.   Yes.

22  Q.   And again, why is that?

23  A.   Well, this lays out very clearly the principle of the

24  operation.   This is not something that you'd want to leave on

25  the streets in New York.

1   Q.   Does it also connect Merlin to his work at the CIA?

2   A.   It does.

3   Q.   So it would compromise both a source and a method?

4          MR. POLLACK:   Your Honor, again, we've covered this

5   ground already.

6          THE COURT:   I think we are getting highly repetitive,

7   Mr. Trump.  You need to start getting on new ground.

8          MR. TRUMP:   Your Honor, I'm just following up on a

9   lot of issues that have been raised by the defense in terms of

10  what information is at issue and what information is not, and

11  we're providing --

12         THE COURT:   You need to move this, you need to move

13  this along.  The book speaks for itself.  You've got the cables

14  already in evidence.  Let's get going here.

15         MR. TRUMP:   Your Honor, with all due respect --

16         THE COURT:   Mr. Trump, I've ruled.  I've ruled.

17  Let's go.

18  BY MR. TRUMP:

19  Q.   Now, paragraph 56 -- I only have a few more pages, Your

20  Honor -- was Merlin given an envelope with the blueprints

21  inside?

22  A.   Yes.

23  Q.   Was it a sealed envelope?

24  A.   No.

25  Q.   Was he told not to open the envelope under any

Robert S. - Direct                                                    504

1   circumstances?

2   A.   No.

3   Q.   The rest of the paragraph, is that -- those instructions,

4   "Keep it simple, and get out of Vienna safe and alive," is that

5   accurate?

6   A.   That's accurate.

7   Q.   Paragraph 47, page 202, "The CIA sent him to Vienna

8   without any backup," is that an accurate statement?

9   A.   It is.

10  Q.   Was the operation a what we're calling limited access

11  program?

12  A.   It was.

13  Q.   Was it a tightly held secret?

14  A.   Yes, it was.

15  Q.   And only a handful of CIA officers knew of the existence?

16          MR. POLLACK:  Your Honor, again, we've discussed this

17  already.

18          MR. TRUMP:  I don't believe we discussed it in the

19  context of the book, Your Honor.

20          THE COURT:  That's correct, and so I'm allowing a

21  little of this.  It's where the book is repetitive, all right,

22  that I'm going to cut Mr. Trump.  Go ahead.  Overruled.

23  BY MR. TRUMP:

24  Q.   And those facts were known to the defendant?

25  A.   Yes.

Robert S. - Direct                                                      505

1   Q.   But Merlin thought he did have some backup; is that right?

2   A.   He did, and in fact, we had provided him ways for him to

3   get out of trouble that would be available to anyone, a U.S.

4   legal permanent resident in Vienna.

5   Q.   The book has a fairly detailed description, paragraphs 7,

6   8, 9, 10, 11, 12, 13, and 14.  At any point in your debriefing

7   of Merlin following his trip, did he express any of the

8   fears/concerns that are expressed in those paragraphs, 7

9   through 13?

10  A.   Well, he certainly had trouble finding the place, but he

11  never expressed any concern about the probity and legality of

12  what we were asking him to do.

13  Q.   Paragraph 15, is that an accurate description of what he

14  was carrying around?

15  A.   Yes.  In overheated language, but accurate.

16  Q.   Again, the defendant was aware of that?

17  A.   Yes.

18  Q.   What's expressed in paragraph 16, is that -- just read it

19  to yourself.

20          Did you ever hear that from, from Merlin?

21  A.   No.

22  Q.   Did you ever hear that from the defendant?

23  A.   No.

24  Q.   Paragraphs 50 and 51, other than knowing that he needed

25  directions, were you aware of any of the information in these

1    two paragraphs?

2    A.    No.

3    Q.    To your knowledge, did Merlin provide you with any written

4    document detailing his adventure in Vienna?

5    A.    Not that I recollect.  I recollect an oral debriefing once

6    I met him.

7    Q.    And did you receive anything from the defendant in writing

8    as to any of these type of details?

9    A.    Not that I recollect.

10   Q.    And paragraph 57, a discussion of the purpose of the

11   letter in the book?

12   A.    Um-hum.

13   Q.    Was that ever discussed with Merlin?

14   A.    Was what discussed?

15   Q.    Did, did Merlin ever express any concerns, the ones that

16   are expressed in paragraph 57?

17   A.    No.

18   Q.    And again, this letter was something that was carefully

19   crafted prior to his --

20   A.    In which he was directed to provide rather than his doing

21   it on his own initiative to warn them.

22   Q.    Paragraph 67 -- sorry, 65, 66, and 67, the address is

23   correct in 67?

24   A.    It is.

25   Q.    Is that a fair description of the building?

Robert S. - Direct                                                    507

1   A.   Yes.

2   Q.   And the P.M. Iran that you described previously?

3   A.   Yes.

4   Q.   Paragraph 70, does that paragraph discuss his encounter

5   with the postman?

6   A.   Yes.

7   Q.   Is that something that was discussed with the defendant,

8   you, and Merlin?

9   A.   Right.  At the 9 March meeting in 2000, he told us about

10  the postman.

11  Q.   And is that in any cable traffic?

12  A.   It's not.

13  Q.   Paragraph 74, I believe you testified that you had

14  received some intelligence that the materials had been

15  couriered back to Iran?

16  A.   Yes.

17  Q.   Is what's represented in paragraph 74 accurate?

18  A.   No.

19  Q.   Paragraph 94, as of May of 2000, when Mr. Sterling, the

20  defendant, lost access to this program, was that a correct

21  statement?

22  A.   That he had not received any contact, yes, that's correct.

23  Q.   Subsequently, it was a known fact that the Iranians never

24  communicated with, with Merlin, correct?

25  A.   Until we dropped the operation in 2003, correct.

Robert S. - Direct                                                    508

1   Q.   And again, paragraph 76, it was a fact that there had been

2   other similar operations; is that right?

3   A.   Yes.

4           MR. TRUMP:  Your Honor, I'd like to show the

5   defendant two exhibits that I know the defense objects to.  We

6   don't have to show them to the jury, and we can discuss their

7   objections later.

8           THE COURT:  What are the numbers?  Are they not in

9   the notebooks?

10          MR. TRUMP:  No.

11          THE COURT:  I mean, my notebook.

12          MR. TRUMP:  I'll --

13          THE COURT:  What are the exhibit numbers?

14          MR. TRUMP:  These are going to be -- these are marked

15  132B and 132C, and I'll describe them through the witness, Your

16  Honor, because I know there will be objection we can discuss

17  later.

18          THE COURT:  Go ahead.

19  BY MR. TRUMP:

20  Q.   You're familiar with chapter 9 of *State of War*, correct?

21  A.   Yes.

22  Q.   Are there a lot of -- is there a lot of stuff in chapter 9

23  completely unrelated to Classified Program No. 1?

24  A.   Yes.

25  Q.   And in looking at 132B, is that the same as the previous

Robert S. - Direct                                                    509

1    exhibit, chapter 9, simply with all that stuff taken out?

2              THE COURT:  In other words, you've done an edited

3    version of the chapter 9?

4              MR. TRUMP:  Just taking out all the writing that is

5    unrelated to Classified Program No. 1 and Human Asset No. 1.

6              THE COURT:  All right.  Did this witness do that?

7              MR. TRUMP:  He's aware of what Classified Program

8    No. 1 is and Human Asset No. 1, and he just -- we just --

9              THE COURT:  My question was did this witness help you

10   in doing that --

11             MR. TRUMP:  Yes.

12             THE COURT:  -- or did you-all do that?

13             MR. TRUMP:  Yes.

14             THE COURT:  All right.

15             THE WITNESS:  That appears to be an accurate

16   description, that this is chapter 9 just referring to

17   Classified Program 1.

18   BY MR. TRUMP:

19   Q.   And Human Asset No. 1?

20   A.   And Human Asset 1.

21   Q.   And then the final one, 132C, when you read chapter 9 of

22   *State of War*, does it jump all over the place chronologically?

23   A.   Yes.

24   Q.   132C is 132B, just arranged as best you could

25   chronologically?

Robert S. - Direct                                                      510

1   A.   Yes.

2                MR. TRUMP:  And we can take that --

3                THE COURT:  We'll take it up later.

4                MR. TRUMP:  Take that argument up later.

5   Q.   And finally, Exhibit 148 in the book?

6                THE COURT:  Is there any objection to 148?

7                MR. POLLACK:  Yes, Your Honor.

8                THE COURT:  All right, we'll take that up later, too.

9   BY MR. TRUMP:

10  Q.   Other than -- do you have that in front of you?

11  A.   148, I do.

12  Q.   Other than the very last entry on 148, on page 10, on the

13  left-hand side of that chart are excerpts from cables that

14  we've gone through with you?

15  A.   Yes.

16  Q.   And on the right are corresponding passages from chapter

17  9; is that right?

18  A.   That's correct.

19               MR. TRUMP:  Subject to objection, we would move those

20  three additional exhibits into evidence.

21               THE COURT:  All right.  Well, we'll take that up

22  after the jury has left for the day.

23               MR. TRUMP:  The Court's indulgence?

24  Q.   Just one additional question:  You were describing Merlin

25  as a unique access -- asset, correct?

Robert S. - Cross                                                       511

1   A.   Correct.

2   Q.   The book discusses both Merlin and Human Asset No. 2.   Was

3   that even a more unique situation?

4   A.   Yes.

5   Q.   And is that compromised by the publication of *State of*

6   *War*?

7   A.   It is.

8             MR. TRUMP:   Nothing further, Your Honor.

9             THE COURT:   All right, cross-examination?

10            MR. POLLACK:   Thank you, Your Honor.

11                          CROSS-EXAMINATION

12  BY MR. POLLACK:

13  Q.   Good afternoon, Mr. S.  My name is Barry Pollack, and I'm

14  one of the attorneys representing Mr. Sterling.

15            Mr. S., it's fair to say that you were one of the

16  people who helped design what we're calling Classified Program

17  No. 1, correct?

18  A.   That is correct.

19  Q.   And you personally put a lot of time and effort into the

20  design and implementation of that program, correct?

21  A.   Correct.

22  Q.   And not only did you put a lot of time and effort into it;

23  other people at the CIA put a lot of time and effort into it,

24  correct?

25  A.   Correct.

1    Q.   And not just at the CIA.  People at National Laboratory

2    put a lot of time and effort into that program, right?

3    A.   Yes.

4    Q.   And you believed in that program, correct?

5    A.   We don't base it on belief.  We base it on experience and

6    on doing our work carefully.  I thought that the program was

7    well organized and well run.

8    Q.   You thought it was a fruitful, productive program for the

9    agency to be engaging in, correct?

10   A.   Yes.

11   Q.   And you certainly did not want the fact of that program

12   disclosed to the general public, correct?

13   A.   Certainly not.

14   Q.   And in 2003, April of 2003, you learned that Jim Risen, an

15   investigative reporter for *The New York Times*, said that he was

16   working on a story that he was intending to publish about

17   Classified Program No. 1, correct?

18   A.   I learned that, yes.

19   Q.   And you learned that what Mr. Risen claimed to know about

20   the program at that point was not in your mind accurate,

21   correct?

22   A.   I don't know exactly what Mr. Risen knew at that point or

23   claimed at that point.  I didn't really learn that until the

24   publication in 2006.

25   Q.   And in 2003, you didn't learn that he believed, that

Robert S. - Cross                                                513

1    Mr. Risen believed that Merlin had immediately spotted the

2    flaws in the, in the plans?

3    A.   I don't recall the details.  I simply recall that Risen

4    had approached the agency about publishing a story about that

5    operation and that senior officials of the government had

6    persuaded *The New York Times* not to do it.

7    Q.   Okay.  And you would not want a version of a story about

8    Classified Program No. 1 published that made it look like a

9    foolish and rogue operation, correct?

10   A.   I would not want any version of the classified operation

11   published.

12   Q.   I understand that.  And you certainly wouldn't want one

13   that made it look foolish and like a rogue operation, correct?

14   A.   Well, it was not any of those things, so that didn't

15   especially concern me.  It was the publication of the operation

16   that concerned me.

17   Q.   In the very beginning of 2006, Mr. Risen published his

18   book, correct?

19   A.   Correct.

20   Q.   And certainly at that point, you learned how he portrayed

21   the operation, correct?

22   A.   I did.

23   Q.   And you said in 2003, you thought that senior officials

24   had convinced him not to publish the story, correct?

25   A.   The story was not published.

Robert S. - Cross                                                    514

1    Q.   Right.

2    A.   It wasn't convincing him; it was convincing *The New York*

3    *Times* editors.

4    Q.   And ultimately, apparently he was not convinced, correct,

5    because he published it in 2006?

6    A.   Yes.

7    Q.   I'm sorry, I didn't mean to talk over you, Mr. S.

8              And from 2003, 2004, and 2005, if you knew that he

9    was still working on the story, you would want to dissuade him

10   from publishing it, correct?

11   A.   I had no contact with him.  That was not my mission.

12   Q.   Understood.  There were others at the CIA that were tasked

13   with that, being concerned about protecting programs from

14   publication by journalists like Mr. Risen?

15   A.   Yes.

16   Q.   And one way to convince an author not to do a story is to

17   try to convince him that he's got the story wrong, correct?

18   A.   I don't know.  It does not seem that the accuracy was

19   Mr. Risen's principal concern, but that's my assessment of the

20   chapter.

21             THE COURT:  When there's no question pending, one

22   ought not to volunteer an answer, all right?

23   BY MR. POLLACK:

24   Q.   In 2006, did you read the book?

25   A.   Yes.

1   Q.   Did you read the entire book or just chapter 9?

2   A.   Just chapter 9.

3   Q.   Were you curious as to what Mr. Risen said about who his

4   sources were for chapter 9?

5   A.   I didn't expect him to say anything about his sources.

6   Q.   Anything about his sources for the book at all?

7   A.   Correct.

8            MR. POLLACK:  I'd like to show Mr. S. what's been

9   marked as Defense Exhibit 1.

10           THE COURT:  Is there any objection?  Wait a minute,

11   is there any objection to that?  Before it goes on the screen,

12   before it goes on the screen.

13           Mr. Trump, any objection to Defense 1?

14           And do I have your book?  Do I have your exhibits?

15           MR. TRUMP:  Your Honor, we do object.

16           THE COURT:  All right.  Well, then I should have a

17   set of defense exhibits up here as well.

18           Are you -- do you have many others you're going to be

19   using in this examination, Mr. Pollack?

20           MR. POLLACK:  Potentially, Your Honor.  Let me hand

21   two others up.  I believe the other two the government does not

22   have objections to, and they will go in the binders that the

23   jury will receive.

24           THE COURT:  I don't know anything about that.  I just

25   know that the practice is each side has their exhibits bound

Robert S. - Cross                                                      516

1   and up here on the bench so when there's a reference to them,

2   we don't have to waste time going back and forth like this.  So

3   tomorrow make sure your exhibits are up here.

4            MR. POLLACK:  I will, Your Honor.  Thank you.

5            THE COURT:  All right.  As to No. 1, what's the

6   objection, Mr. Trump?

7            MR. TRUMP:  Your Honor, this is a note on sources at

8   the beginning of the book.  There's nothing that relates it

9   specifically to chapter 9.

10           THE COURT:  Well, more than that.

11           MR. TRUMP:  There's nothing that this witness can

12  comment on.

13           THE COURT:  That's the right objection.  This witness

14  didn't write the book, and if you're going to talk about the

15  book, you can move it into evidence, but it's not appropriate

16  to have this witness talking about how Mr. Risen wrote his

17  book.

18           MR. POLLACK:  Okay.

19           THE COURT:  What's in it is different.  Let's move

20  on.

21           MR. POLLACK:  I'm sorry, did the Court say I can move

22  the exhibit into evidence for completeness?  We've spent --

23           THE COURT:  The *State of War*, the book, is evidence,

24  not the whole book because that's irrelevant.  I think this

25  first note is part of this case.  I will admit this exhibit,

1   but it's not proper to ask this witness questions about it.

2              (Defendant's Exhibit No. 1 was received in evidence.)

3              MR. POLLACK:  May I -- if it's admitted, may I

4   publish it to the jury at this time even if I'm not going to --

5              THE COURT:  Quickly.  We're running late.

6              MR. POLLACK:  Thank you, Your Honor.

7              And it says, "Many people have criticized the use of

8   anonymous sources of late.  Yet all reporters know that the

9   very best stories -- the most important, the most sensitive --

10  rely on them.  This book would not be possible without the

11  cooperation of many current and former officials from the Bush

12  Administration, the Intelligence Community, and other parts of

13  government.  Many of them were willing to discuss sensitive

14  matters only on the condition of anonymity."

15  Q.   Now, in 2006, Mr. S., when this book was published, at

16  that point, it was certainly too late to talk Mr. Risen out of

17  doing the story, correct?

18  A.   It was not my job to do so, but yes, it was too late.  It

19  had been published.

20  Q.   And at that point -- at some point shortly after the book

21  was published, in March of '06, you were interviewed by the

22  FBI, correct?

23  A.   Correct.

24  Q.   And the FBI asked you questions about some of the things

25  that appeared in chapter 9, correct?

1    A.    Correct.

2    Q.    And you understood that they were trying to ascertain who

3    was the source or who were the sources for various things that

4    appeared in chapter 9, correct?

5    A.    I considered that to be the goal of their investigation.

6             MR. POLLACK:   Now, if you can -- if we can put up

7    page 209 of the book?  And if you could highlight, please, Mr.

8    Francisco, the last full paragraph, that begins with "Then

9    there was Merlin," and specifically the very first few lines

10   there, if you can blow that up?   Thank you.

11   Q.    It says, "On paper, Merlin was supposed to stunt the

12   development of Tehran's nuclear program by sending Iran's

13   weapons experts down the wrong technical path."

14             Do you see that, Mr. S.?

15   A.    I do.

16   Q.    And do you recall telling the FBI agents that "wrong

17   technical path" was -- to do this was, in fact, the purpose of

18   the program and "wrong technical path" was language that you

19   used all the time?

20   A.    Yes.

21   Q.    And, in fact, you told them that the cables would reflect

22   that, correct?

23   A.    Yes.

24   Q.    And if the cables reflected that language, then that

25   language could have been leaked to Mr. Risen by anybody who was

Robert S. - Cross                                                    519

1    a recipient of the cables, correct?

2              MR. TRUMP:  Objection.  Speculation.

3              THE COURT:  I'm going to allow it.  Overruled.

4              THE WITNESS:  If the cables could have been the

5    source of the leak, yes.

6    BY MR. POLLACK:

7    Q.   But conversely, if it was language that you used all the

8    time that wasn't in cables, that might cause the investigation

9    to focus on you, correct?

10   A.   Again, that's speculative, but I'll say yes.

11             MR. POLLACK:  Can we go ahead and pull up Exhibit 6?

12             THE COURT:  Government's 6?

13             MR. POLLACK:  Yes, Your Honor.

14             And if we can turn to the second page of Exhibit 6?

15   Q.   And, Mr. S., this is a cable that you authored, correct,

16   Government Exhibit 6?

17             Do you not have it?  Do you not have the exhibit?

18             MR. TRUMP:  In the exhibit book, No. 6.

19             THE WITNESS:  It was a slip of the tongue.

20             THE COURT:  Wait.  We need Exhibit 6.  Do you have

21   Exhibit 6 there?

22             MR. TRUMP:  I think we need a bench conference, Your

23   Honor.

24             THE COURT:  Oh, all right.  Mr. Trump, bench

25   conference, do we need the Mira?

Robert S. - Cross                                                    520

1              MS. GUNNING:  Yes.

2              MR. TRUMP:  Yes, I think so.

3              THE COURT:  Yes?  All right.

4              MR. TRUMP:  I have to ask the witness what his

5      concern is.

6              (Sealed Bench Conference B not transcribed in this

7      volume.)

8      BY MR. POLLACK:

9      Q.    Mr. S., do you have Government Exhibit 6?

10     A.    I do.

11     Q.    And if you could look at -- well, first of all, did you --

12     were you, in fact, the author of Government Exhibit 6?

13     A.    Yes.

14     Q.    And if you could look at the top of that second page?

15     A.    Yes.

16     Q.    It says, "The goal is to plant this substantial piece of

17     deception information on the Iranian nuclear weapons program,

18     sending them down blind alleys, wasting their time and money,

19     and discrediting Russian designs and equipment in their eyes."

20     Correct?

21     A.    Correct.

22     Q.    It does not use the phrase "wrong technical path"?

23     A.    This cable does not.

24     Q.    Let me have you look at Exhibit 16.  Are you the author of

25     Exhibit 16?

Robert S. - Cross                                                    521

1    A.    Yes.

2    Q.    And if you would look at paragraph 2, please?  You say,

3    "This operation is designed to introduced

4    flawed-but-authentic-looking plans for a nuclear weapons fire

5    set into the Iranian program, with the intention of encouraging

6    the Iranians to invest considerable time, money, and effort in

7    pursuing this technical dead end," right?

8    A.    Right.

9    Q.    It does not use the phrase "wrong technical path"?

10   A.    It's an equivalent phrase.

11   Q.    But a different one, correct?

12   A.    Yes.

13   Q.    A different phrase from the one that appears in the book

14   on page 209, correct?

15   A.    Yes.

16   Q.    Which is the phrase that you used all the time, correct?

17   A.    Including in discussions with Mr. Sterling.

18   Q.    And -- well, but you told the FBI that the cables

19   reflected that you use it all the time, right?

20   A.    Well, just as I use "fire set" or "firing set," then

21   "technical dead end," "blind alley," "wrong technical path" are

22   equivalent expressions.

23   Q.    Let's go to Government Exhibit 46, and, Mr. S., were you

24   the author of Government Exhibit 6?

25             MR. TRUMP:  46.

Robert S. - Cross                                                    522

1   BY MR. POLLACK:

2   Q.   I'm sorry, 46.  Thank you, Mr. Trump.

3   A.   Yes.

4   Q.   And in paragraph 2, you say, "Since the goal of the

5   operation ultimately is to waste as much Iranian nuclear

6   weapons expertise and money as possible, we are off to a good

7   start."

8        Nothing about the goal being to send them down "the

9   wrong technical path," correct?

10  A.   Correct.

11  Q.   Now, Classified Program No. 1 had been conceived by you

12  and others before Merlin was identified as the asset that would

13  play the role of the Russian scientist, correct?

14  A.   A few weeks before, yes.

15  Q.   And -- so then you were looking for somebody who could

16  play that role, correct?

17  A.   Correct.

18        MR. POLLACK:  And do you -- do you have loaded the

19  other two defense exhibits?

20        MR. FRANCISCO:  No.

21        MR. POLLACK:  You don't, okay.

22        Your Honor, I'd like to use one of the exhibits that

23  I just handed up, the Bates number is C02873, which is a cable.

24  I don't believe the government has any objection to it.  It

25  would be Defense Exhibit 2.

Robert S. - Cross                                                        523

1               MR. TRUMP:  No, Your Honor.

2               THE COURT:  All right, then it's in.  Defense 2 is

3       in.

4               (Defendant's Exhibit No. 2 was received in evidence.)

5               THE COURT:  Do you have a copy -- oh, it's going to

6       be on the screen.

7       BY MR. POLLACK:

8       Q.    And, Mr. S., are you the author of Defense Exhibit 2?

9       A.    Yes.

10      Q.    And is this a communication from you sort of asking if

11      people are aware of somebody that might be able to play the

12      role that, that you had in mind for this operation?

13      A.    Yes, that's what it is.

14      Q.    And to whom would this cable have gone out?

15      A.    To a CIA field office.

16      Q.    To one particular office?

17      A.    Yes.

18      Q.    And why was it sent to that particular office?  Did you

19      have reason to believe that they had somebody that would fit

20      the bill?

21      A.    This particular office is located in an area where there

22      is a lot of nuclear scientific activity, and as it suggests

23      here, "As discussed with COS," I had already had the

24      opportunity to raise the issue with one senior officer there.

25      Q.    Did -- you had testified in your direct testimony that

Robert S. - Cross                                                        524

1    Laurie D. had brought Mr. Merlin to your attention, correct?

2    A.    That's correct.

3    Q.    Was that a result of this cable, or was that

4    independently?

5    A.    That was independent.

6    Q.    At some point after this cable went out?

7    A.    Correct.  I did not just ask Laurie D.

8    Q.    You asked others as well?

9    A.    Here's an example.

10   Q.    But that's my question:  Is this just an example, or would

11   there be others in addition to the people who received this

12   cable and Laurie D.?

13   A.    I believe this is the only other person I asked.

14   Q.    Okay.  And you then met Mr. Merlin in late 1996; is that

15   correct?

16   A.    It is.

17   Q.    And that's fully two years before Mr. Sterling meets him,

18   correct?

19   A.    Correct.

20   Q.    And you assessed his suitability for the operation that

21   you had in mind, correct?

22   A.    Correct.

23   Q.    And you were in the process of coming up with a legend for

24   him, correct?

25   A.    Yes.

Robert S. - Cross                                                    525

1    Q.    A legend being a story, correct?

2    A.    Yes.

3    Q.    And that's sort of a term of art, right?

4    A.    It is.

5    Q.    And this is not the only operation in which you've

6    developed a legend, correct?

7    A.    Correct.

8    Q.    Either for yourself or for others?

9    A.    Correct.

10   Q.    And what a legend is is, essentially it's an elaborate

11   ruse, right?

12   A.    It contains some elements of truth and other elements that

13   have been twisted to suit our purposes.

14   Q.    And it is supposed to be difficult, if not impossible, for

15   the target of the operation to be able to separate which are

16   the elements of the truth and which are the fictional

17   components that have been designed by you to suit your

18   purposes, correct?

19   A.    We don't believe in impossible, but it's certainly

20   supposed to be difficult.

21   Q.    If we can go to page 199 of chapter 9?  And let's look at

22   the second full paragraph, the one that begins, "The end of the

23   Cold War."

24   A.    Um-hum.

25   Q.    And it says, "In the 1990s, in fact, the director of one

Robert S. - Cross                                                526

1    Russian nuclear institute killed himself, reportedly over the

2    government's failure to meet his payroll."  Correct?

3    A.    That's what it says.

4    Q.    And that was something that was of public knowledge prior

5    to the publication of *State of War*, correct?

6    A.    Yes.

7    Q.    And, in fact, that's something that at some point you

8    discussed with Merlin?

9    A.    Yes.

10   Q.    And that conversation may well have occurred before

11   Mr. Sterling was involved in Classified Program No. 1, correct?

12   A.    It might have.

13   Q.    In fact, you recall telling the FBI in 2006 that that

14   conversation may have occurred before -- the conversation

15   between you and Merlin about this Russian scientist killing

16   himself may have occurred before Mr. Sterling was even involved

17   in the program?

18   A.    That's correct.

19   Q.    And that is not reflected in any cable that you're aware

20   of, is it?

21   A.    No.  I believe this is something Merlin told me.

22   Q.    Now, after Laurie D., Zach W. became the case officer for

23   Merlin?

24   A.    Um-hum.

25   Q.    And you, you continued with the program throughout,

Robert S. - Cross                                                      527

1   correct?

2   A.    With the program?

3   Q.    Classified Program No. 1.

4   A.    Yes.

5   Q.    So you were there while Laurie D. was there; you were

6   there while Zach W. was there, correct?

7   A.    Yes.

8   Q.    Okay.  And that's all before Mr. Sterling becomes involved

9   in the program?

10  A.    Yes.

11  Q.    And go to page 200 of the book.  If we could go toward the

12  bottom, I guess it's the second-to-last full paragraph that

13  starts with "His CIA case officer"?

14        "His CIA case officer had coached the Russian as best

15  he could on how to make contact with the Iranians."  And then

16  after talking about you can't look them up in the Yellow Pages,

17  it goes on and says in the beginning of the next paragraph, "At

18  the case officer's urging, the Russian started sending messages

19  to Iranian scientists, scholars, and even Iranian diplomats

20  stationed at the IAEA in Vienna," correct?

21  A.    Yes.

22  Q.    Now, the -- it is your belief that the case officer

23  referenced there is Zach W., correct?

24  A.    No.

25  Q.    Okay.  Do you recall when you were interviewed in 2006 by

1   the FBI, telling the FBI that the case officer referred to on

2   page 200 is Zach W.?

3   A.    Well, looking at it more closely, any connection with the

4   IAEA in Vienna would have come under Mr. Sterling's watch

5   rather than Zach W.'s, but certainly Zach W. started this

6   process, and Mr. Sterling continued it, but now I look at it in

7   detail, I didn't have the book in front of me when I was being

8   interviewed by the FBI, but the reference to contact with the

9   IAEA did not occur when Laurie D. or Zach W. were the case

10  officer.

11  Q.    Okay.  So when you were speaking to the FBI, just to be

12  clear, you did tell the FBI that you believed it was Zach W.,

13  correct?

14  A.    That's correct.

15  Q.    But then now upon reflection, you believe it's some

16  amalgam, part of what is described here was done by Zach W.

17  whereas part of it was done by Mr. Sterling?

18  A.    That's my belief.

19  Q.    And if we can go to Exhibit 16 --

20          THE COURT:  Actually, Mr. Pollack, it is 5:30, and I

21  really try to keep the jury's schedule tight in appreciation

22  for you-all being here on time.  I'm not going to keep you here

23  after the time limit I set for today.  It's 5:30, so I'm

24  letting you go home for the evening.

25          Again, please remember my cautions about conducting

Robert S. - Cross                                                   529

1   no investigation, not looking at any media coverage, Internet,

2   any kind of coverage about this case.  Get a good night's

3   sleep, and we'll see you back here promptly tomorrow morning at

4   9:30.  We should have sunshine tomorrow and no weather issues,

5   so hopefully, it will be an easier trip in.  I want to stay in

6   session.

7              Sir, we'll need you back here 9:30 tomorrow morning,

8   all right?  And you sort of know the drill.

9              Ms. Gunning, perhaps you could help the witness out,

10  all right?

11             Thank you, sir.

12                        (Witness stood down.)

13             THE COURT:  We'll stay in session.

14             MR. POLLACK:  Thank you, Your Honor.

15             THE COURT:  Yes, do leave your notebooks here.

16                        (Jury out.)

17             THE COURT:  All right, we have those three government

18  exhibits for which the defense have objected.  My concern in

19  part on these three exhibits is that they do appear to be a way

20  of getting one particular witness's testimony sitting in the

21  jury deliberation room in a, in a somewhat artificial manner,

22  because basically what, what Mr. S. said was that he did this

23  parsing of the book and prepared these two exhibits, and to

24  some degree, that's like letting him just be in the jury room

25  testifying.

530

 1          Exhibit 148, I'm not even sure I know who made that.

 2   I'm not sure that came in.  That looks like a demonstrative

 3   that the government might use in making its closing argument.

 4   I'm not sure it's a proper exhibit.

 5          So what I'm going to do is I'm going to not rule on

 6   them tonight.  I'm going to keep an open mind about them.  I

 7   think they are problematic.  I'll certainly allow both sides to

 8   do a little bit of briefing on that.  I don't want to create an

 9   issue in this case that will come back to haunt, but that's my

10   preliminary view on those three exhibits.

11          MR. TRUMP:  I'd just point out, Your Honor, that

12   there's no editorializing.  There was nothing other than in one

13   exhibit taking out anything that didn't relate to Classified

14   Program No. 1, which is off limits under the Court's order in

15   terms of what's at issue in this case in terms of the

16   government has only charged and is only alleging that the

17   defendant was -- disclosed to Risen the information about

18   Classified Program No. 1 and Human Asset No. 1.

19          There is no allegation that he disclosed any of this

20   other information.

21          THE COURT:  Yeah, but you've moved the whole -- I

22   believe you've already -- haven't you moved that exhibit in?

23   Didn't you move chapter 9 in?

24          MR. POLLACK:  Yes.

25          MR. TRUMP:  Chapter 9 is what it is --

531

1           THE COURT:  It is what it is.

2           MR. TRUMP:  -- but the jury needs -- should have some

3  way of looking at chapter 9 and knowing what is at issue in

4  this case in terms of what information the government alleges

5  the defendant communicating as alleged in the indictment.

6           Now, chapter 9, it gives me a headache to read it,

7  Your Honor.  It goes all over the place.  There's interspersed

8  public record information.  Defense counsel just pointed out

9  something about a suicide that was public record.

10           I think that stripping out stuff that has nothing to

11  do with Classified Program No. 1 or Human Asset No. 1 allows

12  the jury to focus on exactly what it is that the government is

13  alleging was, was communicated.

14           Obviously, we could stand up during closing and say:

15  Well, focus on this paragraph, this paragraph, this paragraph,

16  but it's, I think -- the Court has the authority and the

17  responsibility to avoid confusing the jury, and exhibits that

18  would help the jury and avoid that confusion are certainly

19  admissible.

20           And there's nothing -- there's no testimony

21  associated with the exhibit.  It's simply those paragraphs in

22  the book that relate to Classified Program No. 1 and Human

23  Asset No. 1.  Haven't changed any of language at all.

24           THE COURT:  Well, it's not that unlike a summary

25  chart when there's a great deal of data.  I recognize that

532

1   these types of things can go into evidence.  This is a little

2   bit different.

3          Let me hear from you, Mr. Pollack.

4          MR. POLLACK:  I think it's quite different, Your

5   Honor.  A summary chart is when there's evidence that's so

6   voluminous that it doesn't make sense to admit all of it and it

7   makes sense for somebody to summarize it.

8          Here we've admitted chapter 9 already -- the

9   government admitted chapter 9 in its entirety.  The jury has

10  it.  This witness has spent several hours testifying about it

11  in detail.

12         For the sake of completeness, that is the exhibit,

13  and to rewrite the exhibit and come up with a version of

14  chapter 9 that never existed, that is, as the Court said, that

15  is at best a demonstrative exhibit.  It's not the kind of

16  exhibit that ought to be admitted into evidence and go to the

17  jury.

18         THE COURT:  All right.  Well, as I said, I'm going to

19  think about it.

20         Exhibit 148 is definitely in my view a demonstrative

21  type of exhibit, where you're comparing this with that.

22  There's no witness who has said that they, in fact, did this

23  analysis, and again, even if they did, I think that's closer to

24  again letting one particular witness's view of the evidence be

25  in the jury room testifying.

1          This jury is very attentive, and they're paying

2    attention, and I think this is probably not appropriate, but

3    I'm going to think about it.  We don't need an answer on it

4    now.

5          And what I do want to find out, Mr. Pollack, is just

6    a ballpark estimate as to how long you think you're going to

7    take in your cross-examination of this witness.

8          MR. POLLACK:  Your Honor, given, given the length of

9    the direct, I think I'll be an hour and a half to two hours.  I

10   will try to pare that down as I go through it this evening, but

11   that's what I think we're looking at.

12         THE COURT:  All right.  Now, is Secretary Rice going

13   to be called tomorrow, or is she not on your schedule?

14         MR. OLSHAN:  I think it is our plan to try to fit her

15   in tomorrow, yes, Your Honor.

16         THE COURT:  All right.  I do want you to give defense

17   counsel and the Court a list of the order of witnesses you

18   intend to call tomorrow, all right?  I think that's the only

19   other housekeeping matter we have to take care of.

20         Is there anything else?

21         MR. TRUMP:  I would ask the Court to reconsider with

22   respect to this Exhibit 1, "Note on Sources."  It's a page in

23   the beginning of the book.  It doesn't specify whether chapter

24   1, chapter 2, up to chapter 10.  Mr. Risen was up on the

25   witness stand.  If they wanted to link this to chapter 9, they

534

1    could have.

2            There is nothing that links this to chapter 9

3    specifically, and it's -- the suggestion is, oh, he said this

4    at the beginning of the book.  That must mean chapter 9 has

5    multiple sources.

6            This gets back a little bit to our discussion about

7    taking out of chapter 9 other stuff, because it's obvious that

8    there is a lot of other stuff in chapter 9.

9            THE COURT:  But you can make that argument to the

10   jury.  Look, I think it's -- defense is going to make an

11   argument that there may be multiple sources, but frankly, all

12   you have to prove is that Mr. Sterling was one of them.

13           MR. TRUMP:  We understand that.

14           THE COURT:  There could be ten sources for this book,

15   but if you convince this jury beyond a reasonable doubt that

16   one of those sources was Mr. Sterling, you've got your case,

17   and so I'm letting the defense put it in.  I think it's

18   consistent with what Risen said in his testimony, that he had

19   multiple sources.  As I recall, I think he has said that in his

20   testimony; I don't have the transcript in front of me; and this

21   simply confirms that.  And your, your team can eloquently argue

22   that point.

23           So I'm going to overrule that objection.  It is in.

24           All right, anything further?  If not, we'll see

25   you-all promptly at 9:30 tomorrow morning.

535

1          MR. POLLACK:  Thank you, Your Honor.

2     (Recess from 5:40 p.m., until 9:30 a.m., January 15, 2015.)

3

4              CERTIFICATE OF THE REPORTER

5      I certify that the foregoing is a correct transcript of

6 the record of proceedings in the above-entitled matter.

7

8

9                         _____
                                       /s/
10                             Anneliese J. Thomson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25