536

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .      Criminal No. 1:10cr485
                              .
     vs.                      .      Alexandria, Virginia
                              .      January 15, 2015
JEFFREY ALEXANDER STERLING,   .      9:30 a.m.
                              .
             Defendant.       .
                              .
. . . . . . . . . . .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>VOLUME III</u>

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:          JAMES L. TRUMP, AUSA
                             DENNIS M. FITZPATRICK, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314
                               and
                             ERIC G. OLSHAN, Deputy Chief
                             Public Integrity Section of the
                             Criminal Division
                             United States Department of
                             Justice
                             1400 New York Avenue, N.W.
                             Suite 12100
                             Washington, D.C. 20005


FOR THE DEFENDANT:           EDWARD B. MAC MAHON, JR., ESQ.
                             Law Office of Edward B.
                             MacMahon, Jr.
                             107 East Washington Street
                             P.O. Box 25
                             Middleburg, VA 20118

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 536 - 767)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1    APPEARANCES:   (Cont'd.)

2    FOR THE DEFENDANT:              BARRY J. POLLACK, ESQ.
                                    MIA P. HAESSLY, ESQ.
3                                   Miller & Chevalier Chartered
                                    655 - 15th Street, N.W.
4                                   Suite 900
                                    Washington, D.C. 20005-5701
5

6    CLASSIFIED INFORMATION         CHRISTINE E. GUNNING
     SECURITY OFFICERS:             MAURA PETERSON
7

8    ALSO PRESENT:                  GERARD FRANCISCO
                                    SA ASHLEY HUNT
9                                   JENNIFER MULLIN, ESQ.

10

     OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
11                                  U.S. District Court, Fifth Floor
                                    401 Courthouse Square
12                                  Alexandria, VA 22314
                                    (703)299-8595
13

14

15

16

17

18

19

20

21

22

23

24

25

538

I N D E X

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **WITNESSES ON BEHALF OF THE GOVERNMENT:** | | | | |
| Robert S. (Resumed) | | 543 | 616 | 627 |
| Stephen Y. | 627 | 640 | 646 | 647 |
| William Harlow | 650 | 675 | | |
| Condoleezza Rice, Ph.D. | 688 | 708 | | |
| Denis M. | 720 | 727 | 730 | |
| Thomas H. | 731 | 741 | | |
| Mark L. | 746 | 755 | 760 | 760 |

EXHIBITS

| | MARKED | RECEIVED |
|---|---|---|
| **GOVERNMENT'S:** | | |
| No. 59 | | 736 |
| 60 | | 750 |
| 75 | | 638 |
| 83 | | 734 |
| 105 | | 654 |
| 106 | | 656 |
| 107 | | 661 |
| 108 | | 663 |
| 111 | | 667 |
| 112 | | 667 |
| 113 | | 672 |
| 114 | | 671 |
| 115 | | 675 |
| 133 | | 724 |
| 135 | | 724 |
| 171 | | 766 |
| 172 | | 766 |

539

1                        EXHIBITS (Cont'd.)

2                                   MARKED        RECEIVED

3    DEFENDANT'S:

4    No. 3                                          592
         4                                          684
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

540

```
 1                    P R O C E E D I N G S

 2                    (Defendant and Jury present.)

 3          THE CLERK:  Criminal Case 10-485, United States of

 4   America v. Jeffrey Alexander Sterling.  Would counsel please

 5   note their appearances for the record.

 6          MR. TRUMP:  Jim Trump on behalf of the United States,

 7   Your Honor.

 8          MR. OLSHAN:  Eric Olshan on behalf of the United

 9   States.  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. FITZPATRICK:  Dennis Fitzpatrick on behalf of the

12   United States.

13          THE COURT:  Good morning.

14          MR. POLLACK:  Good morning, Your Honor.  Barry

15   Pollack on behalf of Mr. Sterling.

16          MR. MAC MAHON:  Good morning, Your Honor.  Edward

17   MacMahon on behalf of Mr. Sterling.

18          MS. HAESSLY:  Good morning, Your Honor.  Mia Haessly.

19          THE COURT:  Good morning.

20          And good morning, ladies and gentlemen.  Again, thank

21   you very much for being here on time.  You're a superb jury.

22   You may get the prize because we usually have at least one

23   juror who runs late, and you-all are being great.

24          I'm sorry it's a bit cold this morning.  Hopefully,

25   it will warm up a bit.  Do the best you can.  If you're really
```

1    uncomfortable and you want to bring coats in until it warms up

2    a bit, let me know, all right?

3            Are we ready to proceed?

4            MR. TRUMP:   There's one very brief matter we have to

5    take up at the bench, Your Honor.

6            THE COURT:   All right.   We want to keep these to a

7    minimum.   Regular machine?

8            MR. TRUMP:   Yes, Your Honor.

9            (Bench conference on the record.)

10           THE COURT:   Yes, Mr. Trump?

11           MR. TRUMP:   Last night, the witness was very upset

12   about the use of his name.

13           THE COURT:   I heard about that.

14           MR. TRUMP:   I conferred with Mr. MacMahon and asked

15   if the agency attorney would be able to speak with him about

16   the fact that you had stricken it from the record, and he was

17   still very upset later and spoke with the agency attorney and

18   the case agent, Ms. Hunt, who assured him that his name had

19   been stricken from the record.

20           They did not discuss his testimony at all and advised

21   him that no one from the prosecution would be able to speak

22   with him until the conclusion of the trial.

23           THE COURT:   Do you want me to bring him up here right

24   now and tell him it's stricken?

25           MR. TRUMP:   No, I don't believe that's necessary.

```
 1              THE COURT:  All right.  If it makes him feel any

 2   better, I didn't hear it, and I've got pretty good hearing.

 3              MR. TRUMP:  I think what's --

 4              THE COURT:  Ms. Gunning didn't hear it.  Only because

 5   Ms. Thomson has the earphones on did she pick it up.  None of

 6   you heard it.  So it was done in such passing at the end of the

 7   day, when folks are tired, and I'm told because of the screens,

 8   it's a little harder to hear back there.

 9              MR. TRUMP:  And he was told that because the agency

10   attorney was sitting back there as well.

11              THE COURT:  And also did not hear it.

12              MR. TRUMP:  And also did not hear it.

13              THE COURT:  Yeah.

14              MR. TRUMP:  So I think everything's fine.  I just

15   wanted to put it on the record that there was contact with the

16   witness by an agency counsel with the case agent, but nothing

17   concerning his testimony was discussed.

18              MR. POLLACK:  Your Honor, we have no objection to

19   that contact.

20              THE COURT:  All right.  You need to be very, very

21   careful.  The whole point for having these signs is as a

22   reminder, you know, that that's the person's name, all right?

23   Very good.

24              MR. TRUMP:  Thank you.

25              (End of bench conference.)
```

1          THE COURT:  Go ahead.

2          MR. POLLACK:  Thank you, Your Honor.

3   ROBERT S., GOVERNMENT'S WITNESS, PREVIOUSLY AFFIRMED, RESUMED

4               CROSS-EXAMINATION (Cont'd.)

5   BY MR. POLLACK:

6   Q.   Good morning, Mr. S.

7   A.   Good morning.

8   Q.   We spoke yesterday a little bit about your role in

9   assessing the suitability of Merlin to play the part in the

10  legend that you were creating for Classified Program No. 1,

11  right?

12  A.   Yes, we did.

13  Q.   And you said that based on your assessment, you found that

14  Merlin was suitable for that role.

15  A.   Yes.

16  Q.   In fact, you said that you assessed that he had chutzpah,

17  right?

18  A.   Yes.

19  Q.   Now, I don't believe that's a technical CIA term, but can

20  you tell me what you meant by that?

21  A.   He had the self-assurance that was necessary to perform

22  the mission that we'd set for him, that is to say, entering the

23  Iranian mission with allegedly Russian nuclear weapons plans.

24  Q.   And I think you said something to the effect of that you

25  judged that he was a person who would be willing to take risks

Robert S. - Cross                                                    544

1    on behalf of the CIA, correct?

2    A.   Yes.

3    Q.   And that's important for a human asset to be willing and

4    able to do, correct?

5    A.   Correct.

6    Q.   And to be willing and able to do it in a way that their

7    affiliation with the CIA is not known, correct?

8    A.   Yes.  We're looking for a balanced risk taker, not either

9    a reckless person or someone who will take no risk at all.

10   Q.   Right.  So somebody who can engage in conduct under legend

11   in a way that can't be traced back to the CIA?

12   A.   That's the hope.  It's not always the result.

13   Q.   Understood.  And we also talked a little bit about the

14   reference on page 200 of the book about a case officer coaching

15   Merlin as to the best way to make contact with the Iranians,

16   including sending messages to Iranian scientists and scholars.

17   Do you remember that?

18   A.   Yes.

19        MR. POLLACK:  And if I can have Mr. Francisco pull up

20   Exhibit 16, please?

21   Q.   And Exhibit 16 is a cable that was written on December 18,

22   1998, correct?

23   A.   Um-hum.

24        THE COURT:  I'm sorry --

25        THE WITNESS:  Yes, it is.

Robert S. - Cross                                                        545

1              MR. POLLACK:  Oh, I apologize, Mr. Olshan is pointing

2     out that I guess the jury does not have their notebooks that

3     contain the cables.  I don't know if Mr. Wood could pass those

4     back out to them.

5              THE COURT:  All right.  We have them up here?

6              MR. POLLACK:  Yes, they're up there, Your Honor.

7     Q.    Okay.  So, Mr. S., Exhibit 16 is a cable that was written

8     December 18, 1998, correct?

9     A.    Yes.

10    Q.    And the meeting in San Francisco that was the transition

11    from Case Officer Zach W. to Mr. Sterling had occurred in

12    November of '98, correct?

13    A.    Yes.

14    Q.    And this cable 16 is authored by you, correct?

15    A.    Correct.

16    Q.    And at the end of paragraph 3 -- if we can enlarge

17    that? -- it says, "M has raised his profile with Iranian

18    nuclear-related individuals and institutions by mail, Internet,

19    and conference attendance for the past year . . .."

20             And so the majority of that activity, if not all of

21    it, would have been when Zach W. was the case officer, correct?

22    A.    The activity as of this point, but it continued for

23    another year.

24    Q.    Correct.  My question is as of this point, Zach W. has

25    been doing that for a year, correct?

1  A.   Correct.

2  Q.   Now, in order to work on Classified Program No. 1,

3  Mr. Sterling physically relocated from the Washington, D.C.,

4  area to the New York office; is that correct?

5  A.   Correct.  That was not the only reason that he relocated,

6  but yes, he relocated.

7  Q.   Okay.  And in the New York office, there were a number of

8  managers above Mr. Sterling, correct?

9  A.   Correct.

10 Q.   There was a Mark L., correct?

11 A.   Yes.

12 Q.   A Thomas H.?

13 A.   Yes.

14 Q.   A Mary G.?

15 A.   Yes.

16 Q.   And a David C.?

17 A.   Yes.

18 Q.   And when Mr. Sterling would draft a cable, it would be

19 reviewed by at least some of those managers before it would be

20 sent on back to Langley, correct?

21 A.   Correct.

22 Q.   And at least Mr. L. and Mr. H. would have reviewed that

23 cable traffic, correct?

24 A.   I don't know if they reviewed every single cable, but

25 someone in that chain of command above Mr. Sterling would have

Robert S. - Cross                                                    547

1   reviewed each cable.

2   Q.   And that's before it was even sent on to Langley?

3   A.   Right.

4   Q.   And then when it was sent on, you would review the cables,

5   correct?

6   A.   I was probably the recipient intended by Mr. Sterling.  I

7   would be the first one to read it in most cases but not the

8   only one.

9   Q.   And in addition to being the recipient and reviewing

10  cables that came from New York pertaining to Classified Program

11  No. 1, you also would sometimes write cables to your superiors

12  about the program, correct?

13  A.   I wouldn't write cables to my superiors.  They were in the

14  same building, and the cable would go to another office, but I

15  would consult with my superiors, and they would review cables

16  that I wrote.

17  Q.   Okay.  Let me make sure I understand that because I think

18  you're telling us two different things.  First of all, for

19  people in the same office or same building, they would see the

20  cables, and you would also have oral conversations?

21  A.   Right.  They would see the cables in review before they

22  went out --

23  Q.   I see.

24  A.   -- but I would not write the cable to them.

25  Q.   I understand.  So the sequence would be, for example, if

Robert S. - Cross                                                    548

1    we're talking about a cable written by Mr. Sterling, first it

2    would get reviewed by New York management, right?

3    A.    Yes.

4    Q.    Then it would get reviewed by you?

5    A.    Yes.

6    Q.    Then it would get reviewed by others in your office or

7    your building, correct?

8    A.    Those who had access to this particular program, yes.

9    Q.    Right.  And then it would get sent out to other offices?

10   A.    No.  If Mr. Sterling from New York wrote the cable, then

11   it would not have to come to headquarters before, for example,

12   it went to another field office.

13   Q.    Okay.

14   A.    New York sent them independently to other field offices.

15   Q.    Okay.  So New York might send it to other field offices

16   before it even went through that review process -- that entire

17   review process we just discussed?

18   A.    Well, it would go out of New York after New York's

19   internal review process, but it didn't have to come to

20   headquarters for someone there to approve that cable going off

21   to another field office.

22   Q.    Okay.

23   A.    New York could do that on its own after its own review

24   process.

25   Q.    Okay.  So Mr. Sterling could write a cable, it would be

Robert S. - Cross                                                    549

1    reviewed by the New York office, it could then go to other

2    offices, and it could go to the D.C. area office, correct?

3    A.    Yes.

4    Q.    Your office?

5    A.    Yes.

6    Q.    And there you would review it, and others would review it,

7    correct?

8    A.    Correct.

9    Q.    And then might it get further disseminated from there?

10   A.    No.

11   Q.    Okay.  Would there be other cables about Classified

12   Program No. 1 that would be disseminated from there?

13   A.    I don't understand your question.

14   Q.    Sure.  Would there be cables that originated in Langley

15   about Classified Program No. 1 that were, that were then sent

16   out, or did all of the cables about Classified Program No. 1

17   originate in New York?

18   A.    No, we originated them ourselves, and they went to other

19   agency overseas offices.

20   Q.    Okay.  And cables that you originated also all went to

21   superiors of yours?

22   A.    Correct.

23   Q.    And, in fact, you had indicated that while you might have

24   been a colonel, there were an awful lot of generals, right?

25   A.    That's correct.

Robert S. - Cross                                                    550

1    Q.   And in 2003, after the CIA learned that Mr. Risen was

2    working on a story about Classified Program No. 1, you were

3    shown a list by the FBI of people that at that point the FBI

4    was aware of who were aware of the program, correct?

5    A.   Correct.

6    Q.   And that list had about 90 people on it, correct?

7    A.   Correct.

8    Q.   And you, you reviewed that list, and you said that that

9    list was likely incomplete, correct?

10   A.   Correct.

11   Q.   Meaning there were probably more people that had an

12   awareness of the program, correct?

13   A.   Correct.

14   Q.   You described yesterday that in the early stages of the

15   program, there were essentially separate and parallel tracks

16   that were taking place, correct?

17   A.   Throughout the program.

18   Q.   And so, for example, there was the operational phase

19   assessing Merlin, preparing Merlin, and then there was the

20   technical phase, the development of the plans, correct?

21   A.   Correct.

22   Q.   And in the planning stages of the operation, there were

23   some people within the CIA who were concerned that the

24   deployment of the technology in question might allow the

25   recipient nation to modify the technology and use it in some

Robert S. - Cross                                                    551

1    fashion, correct?

2    A.    That's correct.

3    Q.    Now, ultimately, they satisfied themselves that that was

4    only a very remote possibility, correct?

5    A.    Correct.

6    Q.    And the -- part of the technological development was to

7    have a, a team of scientists at a national lab who were not

8    involved in the creation of the plans to review the plans to

9    see if they would spot the flaws, correct?

10   A.    Correct.

11   Q.    And they worked on it for about five months?

12   A.    I don't know the exact time, but that sounds about right.

13   Q.    And they were able to detect about 25 percent of the

14   flaws?

15   A.    I have not heard that percentage before.

16   Q.    You were aware that they were able to detect some of the

17   flaws?

18   A.    Some of the flaws, yes.

19   Q.    And while they worked on it for five months, you expected

20   that the Iranians might spend three to five years examining

21   these plans, correct?

22   A.    Correct.

23   Q.    And the Iranians at that point had 1950s nuclear

24   technology?

25   A.    As far as we knew.

Robert S. - Cross                                                    552

1  Q.   And what you were planning to give them, these fire set

2  plans were essentially 1980s technology, correct?

3  A.   Correct.

4  Q.   Now, you didn't know whether the Iranians had access to

5  any Russian former nuclear scientists, correct?

6  A.   We assumed that they might.

7  Q.   But any one scientist wouldn't have a complete picture

8  even of a single component like a fire set, correct?

9  A.   Correct.

10  Q.   And so there would be holes in the Iranians' knowledge,

11  correct?

12  A.   Correct.

13  Q.   And presumably, the Iranians would be looking for

14  information that came from other sources that might fill in

15  some of those blanks for them?

16  A.   Yes.

17  Q.   During the time that Zach W. was the case officer for

18  Merlin, you met with Merlin about once a month?

19  A.   Probably less than that because we were still some

20  distance away from the operation, but I won't argue it.  If you

21  have cables that show that, then that's what happened.  I think

22  it was probably every other month, but it's 15 years ago, so

23  you may be right.

24  Q.   It is 15 years ago, but do you recall that you met with

25  Merlin about once a month to minimize the handling case

Robert S. - Cross                                                    553

1   officer's burden?

2   A.   Yes.

3   Q.   Now, in that meeting in San Francisco, when Merlin first

4   saw the plans, he said something to the effect of:  This won't

5   work.  It's a fake.  It will not work?

6   A.   He didn't say it's a fake.  He said it won't work.

7   Q.   He did not say it's a fake?

8   A.   Not to my recollection.

9   Q.   But it is 15 years ago.

10  A.   Yes.

11  Q.   And you testified yesterday that when -- whatever the

12  precise words were that Mr. Merlin used, when he made his

13  comments, Mr. Sterling seemed taken aback?

14  A.   I don't know whether you'd call it taken aback.  He

15  certainly wanted to know whether we were going to have a

16  problem.

17  Q.   Well --

18  A.   But I guess that was more about the Merlin reaction than

19  about the technology.

20  Q.   Okay.  My question is your observations of Mr. Sterling's

21  reaction when Merlin made the comments that he made about it

22  not working, okay?  And did you not testify yesterday that it

23  was your observation that Mr. Sterling seemed taken aback?

24  A.   I guess if that's what I said, that's what I said.  To be

25  honest, I was focusing more on Merlin than Mr. Sterling at that

1   time, but Mr. Sterling did approach me, as I have testified.

2   Q.   Okay.  And, in fact, he asked you if there was a problem,

3   correct?

4   A.   Yes.

5   Q.   And you told him that there wasn't, correct?

6   A.   I told him I didn't think so, and we would triple-check

7   with the designer and the laboratory.

8   Q.   Do you recall when interviewed by the FBI in 2006, saying

9   that Mr. Sterling asked, "Is this a problem?" and that you

10  replied that it was not?

11  A.   Yes.  And I elaborated.

12  Q.   When -- you testified yesterday that when you disagreed

13  with a subordinate, you would politely and correctly --

14  politely and tactfully correct them.

15  A.   If there were a significant issue, yes.

16  Q.   And were there ever occasions, Mr. S., where you were

17  maybe less than polite and tactful?

18  A.   Of course.  I'm human.

19  Q.   And on this particular occasion, would you characterize

20  your response to Mr. Sterling as essentially telling him to

21  shut up?

22  A.   Not at all.

23  Q.   Not at all?

24  A.   Not at all.  He was very much aware of the additional

25  steps we were going to take to address Merlin's questions.

Robert S. - Cross                                                      555

1   Q.   And, in fact, there was further consultation with the lab,

2   correct?

3   A.   Yes.

4   Q.   To see if what Merlin had spotted was precisely what they

5   intended, correct?

6   A.   Correct.

7   Q.   And you confirmed that it was, correct?

8   A.   The lab confirmed that it was.

9   Q.   That's what I mean.  You confirmed with the lab that it

10  was?

11  A.   Yes.

12  Q.   And if we could have Exhibit 14, paragraph 4, the

13  conclusion, the last sentence is, "We will make no changes to

14  the plans and lists unless a serious discrepancy arises."

15  Correct?

16  A.   Correct.

17  Q.   And so no changes were made, correct?

18  A.   No serious discrepancy arose, and no changes were made.

19  Q.   Following that meeting in San Francisco in November of

20  1998, for the next several months, say, through the spring of

21  1999, Mr. Sterling had a number of meetings with Merlin,

22  correct?

23  A.   Correct.

24  Q.   And those meetings are reflected in cable traffic,

25  correct?

1    A.    They are.

2    Q.    But as the operational details developed, you met with

3    Merlin to describe the details of the operation to him,

4    correct?

5    A.    When there was a major new development, I would go to New

6    York and meet with Merlin and Mr. Sterling to convey the new

7    information in person.

8    Q.    Let's go ahead and look at Government Exhibit 24.  This is

9    a cable dated May 13, 1999, correct?

10   A.    Correct.

11   Q.    And on the second page, paragraph 4, the partial paragraph

12   at the top of the page, it says, ". . . as the project

13   develops, M" -- which is Merlin, right?

14   A.    Um-hum.

15   Q.    ". . . should expect a visit from Mr. S." -- you, correct?

16   A.    Correct.

17   Q.    ". . . who will provide an update on the definite

18   direction of the project.  M understands that there are aspects

19   of the project that require certain approvals beyond the

20   purview of C/O."

21            And that's the case officer, correct?

22   A.    Correct.

23   Q.    And, in fact, you did meet with Merlin to describe the

24   details of the operation with him, correct?

25   A.    Yes, many times.

Robert S. - Cross                                                     557

1   Q.    Okay.  For example, Exhibit 25 -- do you want to pull that

2   up? -- this is a May 25 meeting that you attended with

3   Mr. Sterling and Merlin, correct?

4   A.    Right.

5   Q.    And in this meeting, in paragraph 3, you were the one who

6   explained to Merlin that the project had progressed such that

7   the next steps will entail Merlin making direct contact with an

8   Iranian official who would be interested in the Classified

9   Program No. 1 device, and you were the one who told him that he

10  would be directed to make contact with Iranian Subject No. 1,

11  correct?

12  A.    Yes.

13  Q.    And you are the one who told him that he would need to

14  travel to Vienna for this purpose?

15  A.    Yes.

16  Q.    And then -- I'm sorry, if we can just keep that up?

17          On the next page, paragraph 5, in this same meeting,

18  Merlin was given and signed an agreement that talked about what

19  his salary was going to be, correct?

20  A.    Correct.

21  Q.    And that was done in your presence?

22  A.    Yes.

23  Q.    And you had described yesterday that arrangement as being

24  a business arrangement, correct?

25  A.    Yes.

Robert S. - Cross                                                    558

1   Q.   The CIA made certain monetary promises to Merlin, correct?

2   A.   Not just monetary.  Also protecting his identity as

3   cooperating with us.

4   Q.   Yes.  And Merlin made promises to you, right?

5   A.   Yes.

6   Q.   And you believed that other than a few hiccups, I believe

7   you said, you thought that Merlin did his job well?

8   A.   Yes.

9   Q.   But you would agree and -- you would, you would agree that

10  Merlin was no one's idea of a clandestine operative, correct?

11  A.   Correct.

12  Q.   And, in fact, that's something that you noted in a cable,

13  correct?

14  A.   Yes.

15  Q.   And, in fact, you have described Merlin as having been a

16  difficult agent.

17  A.   That's correct.

18  Q.   If we can go ahead and pull up Exhibit 31, please?

19       And again, this is a cable that you drafted, Mr. S.?

20  A.   Yes.

21  Q.   And at the second page, when we look at paragraph 6 -- and

22  I should have noted this is November 24, 1999, right?

23  A.   Yes.

24  Q.   In paragraph 6, you say that he is also redrafting his

25  cover letter while retaining his wonderfully cracked English

Robert S. - Cross                                                    559

1   diction, correct?  And when you say "cover letter" there, I

2   want to make sure we know what you're talking about.  This was

3   a draft of the letter that was going to be put in the envelope

4   with the plans to go to the Iranian subject, correct?

5   A.    Yes.

6   Q.    The Iranians -- to be, hopefully to be delivered to the

7   Iranian subject back in Iran?

8   A.    To be delivered in Vienna and hopefully transited back to

9   Iran.

10  Q.    Right.  So that cover letter was intended for the person

11  back in Iran, if it ever made it that far?

12  A.    It was intended for any Iranian official who might read

13  this and care about the subject.

14  Q.    Okay.  But it was going to go with the package?

15  A.    Yes.

16  Q.    And your hope was that the package would get delivered to

17  Iran and read by somebody in Iran?

18  A.    Correct.

19  Q.    And I don't want to skip ahead too much, but just that so

20  we're all on the same page on the words that we're using,

21  ultimately, there was a decision made that there would also be

22  a, what I'll call a cover note, which was going to be a

23  handwritten note that would be on the outside of the package,

24  correct?

25  A.    Yes.  There were two different recipients.  One was the

1   person in Iran who whom Mr. -- not Mr. Sterling -- Merlin had

2   been in contact, and the other was an Iran official who we knew

3   to be in Vienna.

4   Q.   And so the cover note, if you will, the handwritten note,

5   that would be intended for the person in Vienna?

6   A.   Correct.

7   Q.   And the interior cover letter would be intended for

8   somebody in Iran?

9   A.   Correct, although we hoped that the person in Vienna, who

10  was also involved in nuclear things, would read it, too.

11  Q.   Okay.  But just so that we're all on the same page, you'll

12  understand if I'm talking about a cover note, I'm talking about

13  that handwritten note that was intended for the person in

14  Vienna, correct?

15  A.   If that's the language you're using, yes.

16  Q.   And if we're talking about a cover letter, we're talking

17  about the letter that was going to go inside the package,

18  correct?

19  A.   Okay.

20  Q.   Which was to be typed, correct?

21  A.   Yes.

22  Q.   Okay.  And so here in paragraph 6 -- this is before the

23  idea of the cover note even arises, right?

24  A.   Yes.

25  Q.   And so here we're clear that what we're talking about in

Robert S. - Cross                                                    561

1    paragraph 6 is the cover letter.

2    A.    Correct.

3    Q.    The interior letter.

4          And that was going to be typed?

5    A.    It was going to be printed off in a business center in a

6    hotel in Vienna.

7    Q.    But regardless of where it was going to be printed, it was

8    going to be a typed, computer-generated document, not a

9    handwritten note, correct?

10   A.    Correct.

11   Q.    Okay.  And when you say he is also redrafting his cover

12   letter, you wanted Merlin's input on the verbiage that was

13   going to be used in that cover letter because you wanted it to

14   be authentic.  You wanted it to be in his wonderfully cracked

15   English diction, correct?

16   A.    Correct.

17   Q.    And you understood that when he was drafting and

18   redrafting the drafts of this cover letter, that he was doing

19   it on a home computer, correct?

20   A.    Correct.

21   Q.    And he would bring in a printout of whatever the current

22   iteration was?

23   A.    Right.

24   Q.    And the CIA would review that draft, maybe have some

25   comments for him, and then he would go back to his home

Robert S. - Cross                                                    562

1    computer and create a new version, correct?

2    A.   Correct.

3    Q.   If we can look at Exhibit 32, this is a cable about a

4    November 18, 1999 meeting, correct?

5    A.   Correct.

6    Q.   And again, this is a meeting with Mr. Sterling and Merlin

7    and you, correct?

8    A.   Correct.

9    Q.   And during that meeting, you talked about some more

10   details about the forthcoming approach, correct?

11   A.   Yes.

12   Q.   Meaning the travel to Vienna, correct?

13   A.   Yes.

14   Q.   And in paragraph 3, you then provided Merlin with

15   additional information that should be included in the letter,

16   which will be included in the package being prepared for

17   Iranian Subject No. 1 in Vienna, correct?

18   A.   Yes.

19   Q.   Okay.  So you're giving Merlin some suggested changes to

20   the draft, again, the cover letter, correct?

21   A.   Yes.  We went through numerous drafts.

22   Q.   And he agreed to make those changes on his home computer,

23   correct?

24   A.   Yes.

25   Q.   And then in Exhibit 33, this is a December 16, 1999, cable

Robert S. - Cross                                                          563

1    about a December 14 meeting, right?

2    A.    Yes.

3    Q.    And again, this was a meeting with Merlin and Mr. Sterling

4    that you attended, correct?

5    A.    Correct.

6    Q.    And as it says at the beginning of paragraph 3, "Part of

7    the meeting was spent reviewing/revising the letter that is to

8    be included within the package of materials for passage,"

9    correct?

10   A.    Correct.

11   Q.    "M is to take revisions and formulate the letter in his

12   own particular prose for the sake of authenticity.  M was also

13   provided with maps and directions as to the location of the

14   Iranian mission as well as a general layout of the building,"

15   right?

16   A.    Yes.

17   Q.    So when you say you spent it reviewing and revising the

18   letter -- part of the meeting reviewing and revising the

19   letter, you're discussing with him revisions, right?

20   A.    Correct.

21   Q.    But he is going to actually go home and make those

22   revisions and do it in his own particular prose on his

23   computer, correct?

24   A.    Correct.

25   Q.    Now, let's go ahead to Exhibit 35.  Exhibit 35 is a cable

Robert S. - Cross                                              564

1    about a January 10, 2000, meeting, correct?

2    A.   Correct.

3    Q.   Now, this is a meeting just between Mr. Sterling and

4    Merlin.  You don't attend this meeting, correct?

5    A.   Correct.

6    Q.   And in this meeting, in paragraph No. 2, Merlin discusses

7    his dissatisfaction with the status of his salary

8    discrepancies, which culminated in him expressing an

9    unwillingness to continue with the project unless these issues

10   were resolved to his satisfaction, correct?

11   A.   Correct.

12   Q.   And so he's communicating that he's not going to do this

13   unless you resolve his salary dispute to his satisfaction,

14   correct?

15   A.   That's what he said.

16   Q.   And you had testified yesterday that it was not atypical

17   of Merlin, in fact, it was very common that Merlin would raise

18   disputes or what he believed to be discrepancies over the

19   amount of money that he was owed, correct?

20   A.   Yes, he did that repeatedly.

21   Q.   Now, on the second page of this cable, at paragraph 5,

22   Mr. Sterling sets out the present iteration of the draft cover

23   letter, correct?

24   A.   Correct.

25   Q.   And so he's quoting verbatim the latest version that

Robert S. - Cross                                                      565

1    Merlin has brought in on paper to, to show to Mr. Sterling,

2    correct?

3    A.    Right.

4    Q.    The computer version of this letter resides on Merlin's

5    home computer?

6    A.    Correct.

7    Q.    And in paragraph 6, Mr. Sterling says that it's his

8    suggestion this letter can be pared down a bit, correct?

9    A.    Correct.

10   Q.    And he then says that he defers to headquarters on the

11   final version of the letter, correct?

12   A.    Correct.

13   Q.    And that would be deferring to you, correct?

14   A.    Me and my superiors.

15   Q.    And then in paragraph 9 of the same exhibit, 35, Merlin

16   again reiterates that he's not going to proceed with the

17   project unless his salary demand is met, correct?

18   A.    Correct.

19   Q.    And specifically what he's asking for is $66,000 that he

20   believes is due to him, correct?

21   A.    Yes.  And our figure was 60.

22   Q.    Sixty would be $5,000 a month?

23   A.    Yes.

24   Q.    And that's what you recall even today in 2015, you recall

25   that that's what Merlin was receiving at that time, $5,000 a

Robert S. - Cross                                                    566

1    month?

2    A.   Well, he'd gotten a raise by this point, and I think we're

3    talking about the dispute was always how many months he was

4    being paid for.  He would always assert that we hadn't paid him

5    for a month, where our records showed that we had, and that's

6    where the difference comes out here, I think.

7    Q.   So you -- but you recall at some earlier time, he was

8    receiving $5,000 a month?

9    A.   Yes, he was.

10   Q.   Now, again -- well, let's go -- let's move on to Exhibit

11   36.  36 is a cable from you, correct?

12   A.   Yes.

13   Q.   Back to New York, correct?

14   A.   Correct.

15   Q.   This is basically a response, is it not, to the cable that

16   we just looked at?

17   A.   It is.

18   Q.   So Mr. Sterling reports on this meeting that he had with

19   Merlin, and you're now responding back to him?

20   A.   Correct.

21   Q.   And when you say in paragraph 2 "headquarters," is that

22   you, you and your superiors?

23   A.   Yes.

24   Q.   ". . . regrets that Sterling was a victim of the murdered

25   messenger syndrome after bringing (not very) bad news to

Robert S. - Cross                                                      567

1    Merlin."

2            And so what you're saying here is basically Merlin

3    was, was quite rude to Mr. Sterling?

4    A.    Yes.

5    Q.    And you felt it was a case of murdered messenger syndrome?

6    A.    Right.  He shot the messenger.

7    Q.    He shot the messenger.

8            So he was blaming Mr. Sterling for something that

9    wasn't Mr. Sterling's fault.

10   A.    Exactly.

11   Q.    In fact, later in that paragraph, it says, "Mr. S. will

12   also tell him" -- and that's a reference to Merlin, correct?

13   "Mr. S. will also tell [Merlin] to stop blaming Sterling for

14   things which occurred before his watch, and to avoid the

15   temptation to try to play one CIA officer against another,"

16   correct?

17           THE WITNESS:  (Nodding head.)

18           THE COURT:  I'm sorry, you have to say yes or no.

19   Nodding your head won't do it.

20           THE WITNESS:  Yes.  Sorry.

21           THE COURT:  That's all right.

22   BY MR. POLLACK:

23   Q.    Now, in fact, it had been your observation, had it not,

24   that Merlin didn't like Mr. Sterling?

25   A.    I'm not sure that's a fair assessment.  Merlin blamed

1    Sterling towards the end of this relationship for things that

2    weren't Sterling's fault.  By that point, I don't think

3    Mr. Sterling liked Merlin much, either.

4    Q.    Okay.  My question was whether Merlin disliked Sterling.

5    A.    He never said so to me.

6    Q.    Was it your belief that he disliked Sterling?

7    A.    No.

8    Q.    And you didn't believe that he disliked Sterling in part

9    because Sterling is black?

10   A.    I did not believe that.

11   Q.    Okay.

12   A.    I believe he was frustrated, and Sterling was the person

13   in front of him.

14   Q.    Do you recall being interviewed by the FBI on April 12,

15   2003?

16   A.    I was interviewed many times.  I don't know that specific

17   one.

18   Q.    Do you recall in an interview by the FBI telling the FBI

19   that the asset, as a reference to Merlin, the asset's dislike

20   for Sterling was at least in part due to the fact that Sterling

21   is black?

22   A.    If I said that at the time, then I did.

23   Q.    And I take it you wouldn't have said it if you didn't

24   believe it?

25   A.    At the time, I believed it, yes.

Robert S. - Cross                                                    569

1   Q.   And 2003 was a lot closer to the events of 1998 than 2015

2   is, correct?

3   A.   Correct.

4   Q.   And, in fact, you believed, did you not, that Merlin was,

5   in fact, racist to a certain degree?

6   A.   When he first arrived in the United States, he had very

7   typical Russian attitudes on racial matters.

8   Q.   In fact, in 1997, just a year before Mr. Sterling became

9   Merlin's case officer, Merlin was in the process of buying a

10  house, and he commented to you that he was concerned about

11  purchasing that house because he saw a black man in the

12  neighborhood.

13  A.   Yes, he did.

14  Q.   Your view was that Mr. Sterling had done fine work in

15  winning the trust of Merlin, correct?

16  A.   Yes.

17  Q.   And Merlin was somebody that you described as a somewhat

18  touchy asset, correct?

19  A.   Right.

20  Q.   Now, you testified yesterday, I believe, that you knew

21  Mr. Sterling even prior to the time that he became the case

22  officer for Merlin, correct?

23  A.   For a few months.

24  Q.   Okay.  And then you worked with him during the time that

25  he was the case officer for Merlin?

Robert S. - Cross                                                      570

1  A.   Correct.

2  Q.   You were aware, were you not, that Mr. Sterling had a

3  difficult upbringing in Missouri?

4  A.   He told me that.

5  Q.   And you were aware that he was the first in his family to

6  go to college?

7       MR. TRUMP:  I think we're getting far afield.  This

8  is all hearsay.  These are statements apparently made by

9  Mr. Sterling to the witness, and that's --

10      THE COURT:  They can't come in for the truth of their

11 contents, so what is the purpose of having those questions?

12 Mr. Pollack, what is the purpose?

13      MR. POLLACK:  I think that there have been various

14 characterizations of Mr. Sterling's conduct with respect to

15 this program and afterwards, and I think that --

16      THE COURT:  I don't think -- those questions don't

17 relate to that, so I'll sustain the government's objection.

18 Move on.

19 BY MR. POLLACK:

20 Q.   Mr. S., you knew that while Mr. Sterling was in New York

21 working on Classified Program No. 1, he was also pursuing a law

22 degree, correct?

23 A.   I knew that.

24 Q.   And studying for the bar exam, correct?

25 A.   Yes.

Robert S. - Cross                                                    571

1    Q.    And you knew that he passed the bar exam, became a

2    licensed lawyer?

3    A.    That's what he told me.

4              MR. TRUMP:  Again, objection.

5              THE COURT:  What's the relevance of that line,

6    Mr. Pollack?

7              MR. TRUMP:  And the basis of his knowledge again is

8    only hearsay.

9              THE COURT:  I'll sustain the objection.

10   BY MR. POLLACK:

11   Q.    You believed that Mr. Sterling believed that he had been

12   treated unfairly by the CIA?

13   A.    Mr. Sterling stated that he had been treated unfairly.

14   Q.    And --

15             THE COURT:  Wait, wait.  To make that -- in what

16   frame, if you can recall, did he make that statement to you or

17   those statements?

18             THE WITNESS:  During 1999.

19             THE COURT:  So while he was working on the project?

20             THE WITNESS:  Yes.

21             THE COURT:  And approximately how many times, if you

22   can recall, did he make such statements to you?

23             THE WITNESS:  A handful.

24             THE COURT:  Did you do anything in response to those

25   statements?

Robert S. - Cross                                                    572

1              THE WITNESS:  No.  I was not in his chain of command.

2     I expressed to him that I often felt frustrations with the

3     management, too, and that he needed to do his job well and not

4     worry about it.

5              THE COURT:  Thank you.  Go ahead.

6     BY MR. POLLACK:

7     Q.   And you felt that he did do his job well?

8     A.   He did.

9     Q.   But he also brought a discrimination claim against the

10    CIA, correct?

11    A.   I did not know that at the time.

12    Q.   Okay.  Mr. Trump asked you yesterday about a document

13    called a PAR?

14    A.   Yes.

15    Q.   And that stands for?

16    A.   Performance appraisal report.

17    Q.   And a PAR, or performance appraisal report, is a

18    performance evaluation of an employee, correct?

19    A.   Right.

20    Q.   And Mr. Trump asked you whether such documents, PARs, are

21    initially marked as Secret.  Do you recall that question?

22    A.   I do.

23    Q.   Are you aware, Mr. S., that when an employee is in a

24    discrimination suit against the agency, that an unclassified

25    version of the PAR is prepared and provided to the employee?

Robert S. - Cross                                                            573

1              MR. TRUMP:  Objection.  Well beyond the scope.

2              THE COURT:  It's way beyond the scope of the direct,

3   so I'm sustaining the objection.  There was nothing about this

4   at all raised in Mr. Trump's direct.

5              MR. POLLACK:  Well, Mr. Trump asked if PARs are

6   initially marked as Secret.  I'm exploring if he knows whether

7   there are later un-Secret versions of the PAR.

8              THE COURT:  Do you know one way or the other?

9              THE WITNESS:  I do not know.

10             THE COURT:  That's the answer.

11             MR. POLLACK:  Okay.  Thank you, Your Honor.

12             THE COURT:  And I do at this point want to alert the

13  jury to something that I omitted to tell you at the beginning,

14  and that is, the only evidence you have in the case are

15  stipulations, exhibits I've admitted, or the testimony of

16  witnesses.  What lawyers say to you is not evidence, so whether

17  it's in their opening statements, their closing arguments, or

18  in the form of a question, so if a lawyer makes a statement in

19  a question but the witness says, "I don't know," or "No,"

20  obviously, the lawyer's statement is not any evidence you

21  should consider.

22             Now, lawyers are allowed to do in cross-examination

23  what are called leading questions; that is, the lawyer almost

24  states a statement, makes a statement and then asks the

25  question, "Is that true or not?"  But if the witness says,

1    "It's not true," or "I don't know," you have to disregard that

2    question of the lawyer because it is not evidence.

3              All right, let's move on.

4              MR. POLLACK:  Thank you, Your Honor.

5    Q.   Let's look at Government Exhibit 36.  This is the document

6    we were looking at a moment ago, the one in which you said that

7    you regretted that Mr. Sterling was the victim of murdered

8    messenger syndrome or shoot the messenger.  If you'd go down to

9    paragraph 3 of that same cable from you, it says, "That

10   unpleasantness aside, his" -- meaning Merlin's -- "proposed

11   letter, now in its fifth iteration, shows real progress,"

12   correct?

13   A.   Correct.

14   Q.   And that's what you were discussing before, that there

15   were a number of different versions or iterations of this

16   letter, correct?

17   A.   Yes.

18   Q.   And the fifth iteration that you're referencing here that

19   you think is a great progress from the prior iterations is the

20   one that was set forth in the cable that you're responding to,

21   correct?

22   A.   Correct.

23   Q.   The one set forth in Exhibit 35, correct?

24   A.   Correct.

25   Q.   And then you make a suggestion as to even though you think

Robert S. - Cross                                                      575

1    it's made great progress, there's an additional suggestion that

2    you make, correct?

3    A.    There is.

4    Q.    You say that he -- meaning Merlin?

5    A.    Correct.

6    Q.    -- should say explicitly that he is offering the schematic

7    and associated parts list free, correct?

8    A.    Correct.

9    Q.    And so your anticipation in making that suggestion is that

10   it would be conveyed to Merlin, correct?

11   A.    Correct.

12   Q.    And then Merlin on his home computer would edit the fifth

13   iteration, correct?

14   A.    Correct.

15   Q.    The one, the one that appeared in Exhibit 35?

16   A.    Correct.

17   Q.    And add to it something that explicitly says that he's

18   offering the schematic and associated parts list for free,

19   correct?

20   A.    Correct.

21   Q.    And that would -- well, I'll stop there.  So -- let me

22   strike that.

23          So you would anticipate for Merlin to make that edit

24   on his home computer?

25   A.    Correct.

Robert S. - Cross                                                      576

1   Q.   Now, in all of this editing of the drafts back and forth,

2   it's fair to say that the editing of the drafts was done

3   mostly, not the physical editing but the ideas for the edits

4   mostly came from you, correct?

5   A.   No, it was a partnership.  Mr. Sterling had some excellent

6   ideas as well, as did Merlin.

7   Q.   Okay.  But as between you and Mr. Sterling, it was not a

8   50/50 partnership?

9   A.   I was the senior officer, but he had the hands-on

10  responsibility, so --

11  Q.   Is it fair to say --

12  A.   -- I don't know where you would parse out the percentage.

13  Q.   I'm sorry?

14  A.   I don't know where you would put the percentage.

15  Q.   You don't?

16  A.   He deferred to me on the overall program management

17  issues.

18  Q.   Okay.  Well, specifically with respect to revisions to the

19  cover letter, is it fair to say that you were the one doing

20  most of the thinking and that you would parse it 70 percent

21  you, 30 percent Sterling?

22  A.   I don't know that that's accurate.  I credit Mr. Sterling

23  with an awful lot of the thinking as well.

24  Q.   Do you recall being interviewed by the FBI on February 28,

25  2006?

Robert S. - Cross                                                     577

1    A.    I recall being interviewed.  The specific date, no.

2    Q.    Do you recall at any interview by the FBI the interviewing

3    agents asking whether it was you or Sterling that was

4    responsible for the editing of these drafts during the

5    preparation for the operation?  And you stated, "I was doing

6    most of the thinking.  I would give it 70 to 30 me to

7    Sterling."

8    A.    Okay.  I think I was being rather ungenerous there.

9    Q.    Today you'd like to give more of the credit to

10   Mr. Sterling?

11   A.    This was shortly after the publication of a book that

12   revealed the whole operation.  I was being ungenerous.

13   Q.    Let's go to Exhibit No. 37.  This is a cable on February

14   17, 2000, and this one's written by you, correct?

15   A.    Yes.

16   Q.    And this is describing a meeting that had taken place a

17   few days earlier, on February 14, correct?

18   A.    Correct.

19   Q.    And if we look at paragraph 2, this was again a meeting

20   with Merlin and Mr. Sterling that you attended, correct?

21   A.    Correct.

22   Q.    And you say that Merlin continued to object to minor

23   proposed changes in his agreement, and when you say

24   "agreement," the salary agreement, correct?

25   A.    Yes.

Robert S. - Cross                                                    578

1   Q.   And, in fact, Merlin walked out of the meeting, correct?

2   A.   Yes.

3   Q.   And the next day, he called you, not Mr. Sterling,

4   correct?

5   A.   Correct.

6   Q.   His storming out of the meeting over a minor dispute,

7   would that be another one of the hiccups in the relationship

8   with Merlin?

9   A.   Yes.

10  Q.   And when he called you the next day, that was to apologize

11  for his behavior the day before?

12  A.   Yes.

13  Q.   The behavior that occurred in front of Mr. Sterling?

14  A.   Yes.

15  Q.   But yet he called you to apologize, not Mr. Sterling,

16  correct?

17  A.   He did.

18  Q.   And let's go to Exhibit 37 -- no, I'm sorry -- yeah, 37.

19  I think it's the one we just had up.

20        Still in that second paragraph, this discusses that

21  he called you the next morning to say it was all a

22  misunderstanding, correct?

23  A.   Yes.

24  Q.   And you then set up a meeting with him for February 21,

25  correct?

Robert S. - Cross                                                        579

1   A.   Correct.

2   Q.   And that was going to be an opportunity for you to make a

3   final assessment as to whether Merlin really was in the right

4   frame of mind to go forward with the trip to Vienna, correct?

5   A.   Correct.

6   Q.   And you have -- well, in some -- in this time frame, this

7   meeting, the time leading up to that meeting on February 21,

8   it's fair to say that in your mind, Merlin to some degree or

9   another had developed cold feet?

10  A.   Yes.

11  Q.   And you had to convince him to move forward?

12  A.   I had to assess whether he had convinced himself or his

13  wife had convinced him to move forward.

14  Q.   You wouldn't characterize it as saying that you had to

15  convince him to move forward?

16  A.   No, I would not, because I was not going to try to twist

17  his arm to do this unless I sensed that he was completely

18  ready.

19  Q.   Do you recall -- and again, I appreciate you may not

20  recall specific dates, but you were interviewed by the FBI on

21  May 26, 2003 -- do you recall telling the FBI in an interview,

22  even if you can't pinpoint the date, that at some point prior

23  to the operation, you concluded that Merlin had developed "cold

24  feet" and you had to convince him to move forward?

25  A.   Over a series of meetings, yes.  Not at the last one.

Robert S. - Cross                                                    580

1   Q.   So over a series of meetings, you had to convince him to

2   move forward?

3   A.   Yes.

4   Q.   Let's look at 38, and this is that meeting that you had

5   set up with Merlin in your phone call with him, correct?

6   A.   Yes.

7   Q.   The meeting of February 21?

8   A.   Yes.

9   Q.   And this is a meeting that is attended just by you and

10  Merlin?

11  A.   Correct.

12  Q.   Mr. Sterling is not there?

13  A.   Correct.

14  Q.   And you wrote this cable?

15  A.   Correct.

16  Q.   And this is -- well, ultimately, you determined that in

17  your view, Merlin is ready to proceed, correct?

18  A.   He told me he was, and all of the signs were that that was

19  correct.

20  Q.   So you concluded that he was?

21  A.   Yes.

22  Q.   And so this ends up being the final meeting with him

23  between anybody at the CIA before he goes to Vienna, correct?

24  A.   Correct.

25  Q.   And it's just with you?

1    A.    Correct.

2    Q.    And in paragraph 2, it says you met with him and made

3    final preparations for his delivery of the CP 1.  The counter-

4    proliferation 1 is it?

5    A.    Classified program.

6    Q.    Classified Program 1, I'm sorry, Classified Program 1,

7    disinformation package to the Iranian mission in Vienna,

8    correct?

9    A.    Correct.

10   Q.    And in paragraph 3 -- I'm sorry, let's stay on paragraph

11   2.  In this meeting, you paid him the amount that he had said

12   that he wanted or he wasn't willing to proceed, correct?

13   A.    Correct.

14   Q.    And you're the one who paid him.  You're the only other

15   person at the meeting, right?

16   A.    Correct.

17   Q.    So when it says, "C/O paid him $66,000," the C/O that's

18   being referenced there is you, correct?

19   A.    Right.

20   Q.    And similarly, in paragraph 3, where it says, "Once the

21   financial part of the meeting was over, M and C/O went over his

22   travel plans, comportment in Vienna, and approach to the

23   Iranian mission in great detail" -- correct?

24   A.    Correct.

25   Q.    And you are the -- is "C/O" case officer?

Robert S. - Cross                                                    582

1    A.    Yes.

2    Q.    You are the case officer that went over his travel plans,

3    comportment in Vienna, and approach to the mission in great

4    detail, correct?

5    A.    Correct.

6    Q.    And you were very familiar with the City of Vienna?

7    A.    I was.

8    Q.    You had been there several times?

9    A.    Correct.

10   Q.    And specifically, you had been there several times for the

11   purpose of casing the city for purposes of this operation,

12   correct?

13   A.    Correct.

14   Q.    In other words, kind of doing a dress rehearsal of the

15   routes that, that Merlin might take, how to approach the

16   building, correct?

17   A.    I did not do that.

18   Q.    Okay.

19   A.    I approached the building myself and stayed a reasonable

20   distance and observed it --

21   Q.    Okay.

22   A.    -- so that I could provide to him explicit directions on

23   how to do it.

24          I did not do an elaborate route as to how he would

25   get there.

Robert S. - Cross                                                    583

1    Q.    You were familiar with the city generally?

2    A.    Correct.

3    Q.    But the purpose of -- was it a single trip or multiple

4    trips?

5    A.    Multiple trips.

6    Q.    The purpose of these multiple trips specifically was to

7    figure out the layout of the IAEA mission in Vienna, correct?

8    A.    Correct.

9    Q.    Now, as far as you know, Mr. Sterling has never been to

10   Vienna, correct?

11   A.    As far as I know.

12   Q.    And your briefing to Merlin was very detailed, correct?

13   A.    Correct.

14   Q.    Specifically, you briefed him on street names, correct?

15   A.    Yes.

16   Q.    Now, in this final meeting, in paragraph 4, we're still on

17   Exhibit 38, "Case officer again provided details of the

18   location and directions to the Iranian IAEA mission and went

19   over M's role in dropping off the packet," correct?

20   A.    Correct.

21   Q.    And again, C/O, case officer, that's you?

22   A.    That's me.

23   Q.    Okay.  And in paragraph 5, it discusses the fact that

24   Merlin asked for an emergency contact number that he could use

25   while he was in Vienna, correct?

Robert S. - Cross                                                                584

1   A.    Correct.

2   Q.    And you gave him your cell phone number, correct?

3   A.    Correct.

4   Q.    So it says, "C/O" -- case officer -- "provided his cell

5   phone number . . .."  That's you, correct?

6   A.    Correct.

7   Q.    But you gave him very explicit instructions to use that

8   only in the case of emergency, correct?

9   A.    A life-threatening emergency or he had been arrested or

10  something along those lines.

11  Q.    Okay.  And, in fact, you warned him very explicitly that

12  potential problems -- potentially serious problems could result

13  if he were to use it for anything other than that kind of an

14  emergency, correct?

15  A.    I did.

16  Q.    And it was your assessment that it was unlikely that he

17  would make use of this lifeline in anything short of a

18  life-threatening situation, correct?

19  A.    That was my assessment, which, of course, turned out to be

20  wrong.

21  Q.    And the plan was for Merlin to carry with him a sanitized

22  version of the cover letter, correct?

23  A.    Yes.

24  Q.    And that's reflected in paragraph 3, right?

25  A.    Right.

Robert S. - Cross                                                      585

1   Q.   Now, was there a plan in terms of how he was to do that,

2   whether he was to carry a piece of paper that had a sanitized

3   version of the letter with him or whether he was going to carry

4   a diskette that had it on there?

5   A.   It was the latter, a diskette.

6   Q.   Okay.  And when you say "sanitized," he was going to take

7   out some of the information that was in there that would reveal

8   what this was about in case somebody got ahold of that letter

9   before he was able to deliver it, correct?

10  A.   Yes.  And also specific references to the target country.

11  Q.   But the template for the letter he would have, and then he

12  could add back in the stuff that he had sanitized when he got

13  to Vienna, correct?

14  A.   Correct.

15  Q.   And so the expectation at least on your part would be that

16  the version of that cover letter that he would deliver in

17  Vienna would match the version that he has on his home

18  computer, correct?

19  A.   It would certainly be close.

20  Q.   And it was also the plan, was it not, that Merlin would

21  leave contact information so that the Iranians could get back

22  to him if they were interested?

23  A.   Correct.

24  Q.   And specifically, he was going to leave a post office box

25  in the United States, correct?

Robert S. - Cross                                                      586

1    A.    Correct.

2    Q.    In fact, an important part of his legend was that he lived

3    in the United States, correct?

4    A.    It would have been impossible to deny that.

5    Q.    And you -- not only could he not deny it, but

6    specifically, he was going to leave them a post office box in

7    the United States where they could reply to him?

8    A.    Correct.

9    Q.    And the way that you conclude this cable in paragraph 6,

10   you say everything is all ready to go.  The C/O, that's you,

11   case officer, was satisfied with Merlin's degree of preparation

12   and commitment, correct?

13   A.    Correct.

14   Q.    And you say, ". . . and now it is up to luck," correct?

15   A.    Yes.

16   Q.    And you scheduled with Merlin a meeting for March 9, which

17   would be after he returned from Vienna, for him to debrief you

18   as to what happened in Vienna, correct?

19   A.    Correct.

20   Q.    And you did, in fact, meet with Merlin on March 9 as

21   planned, correct?

22   A.    Along with Mr. Sterling, yes.

23   Q.    Right.  And let's look at Government's Exhibit 44.  This

24   is a cable that reflects the meeting between you, Mr. Sterling,

25   and Merlin after he returned from Vienna, correct?

1   A.    Correct.

2   Q.    And in paragraph 3, Merlin told you that he had difficulty

3   finding the Iranian mission despite the explicit directions

4   that he had received from you.

5   A.    Correct.

6   Q.    And, in fact, you already knew that, correct?

7   A.    Because he had called me.

8   Q.    While in Vienna, he called you on your cell phone,

9   correct?

10  A.    Correct.

11  Q.    Not because his life was being threatened or because he

12  was arrested, correct?

13  A.    Correct.

14  Q.    Because he was having trouble finding the building despite

15  the explicit directions you had given him, correct?

16  A.    Correct.

17  Q.    And he had been instructed not only he should only use the

18  cell phone number in an emergency; he had also been instructed

19  that if he did use the cell phone number, he should do it from

20  a pay phone, correct?

21  A.    Correct.

22  Q.    But, in fact, he used it in clearly a not life-threatening

23  situation.

24  A.    Yes.

25  Q.    And he made the phone call from the hotel that he was

1  staying at, correct?

2  A.    That's what he told us.

3  Q.    Now, let's go to page 205 of the book, so Exhibit 132, and

4  look at the second-to-last paragraph on that page.  It

5  says, "After his day of floundering around Vienna, the Russian

6  returned to his hotel near the city's large" -- is it

7  "Stadtpark"?  How do you pronounce it?

8  A.    "Stadtpark," yeah.  It means city park.

9  Q.    Okay.  And was that, in fact, was the hotel he stayed at

10  near that park?

11  A.    Yes.

12  Q.    And he did a computer search and found the right street

13  address for the mission, correct?

14  A.    That's what the book says.

15  Q.    Understood that's what the book says.  In fact, you had

16  already informed him of the right street address?

17  A.    Many times.

18  Q.    Right.  And he was supposed to use the hotel business

19  center, the hotel's computer to fill back in the portions of

20  his cover letter that he had sanitized, correct?

21  A.    He was.

22  Q.    You don't know one way or another whether he used that

23  hotel business center to get on the Internet to also look for

24  directions to the mission, do you?

25  A.    I don't know.

Robert S. - Cross                                              589

1    Q.    What you do know is that he was having trouble finding the

2    mission despite having explicit directions?

3    A.    So he told me.

4    Q.    And then in paragraph 4 of Exhibit 44, it says at the very

5    end of that page that finally, he left the package very clearly

6    addressed to Iranian Subject No. 1 in the locked mailbox right

7    outside the mission door, right?

8    A.    Correct.

9    Q.    And that's what he told you in that meeting?

10   A.    He did.

11   Q.    Now, it was your assessment that -- let's look at

12   paragraph 6 -- that Merlin demonstrated once again that he was

13   unable to follow even the simplest and most explicit direction,

14   correct?

15   A.    That was my assessment.

16   Q.    Did Merlin tell you that he did not leave a post office

17   box as contact information?

18   A.    No, he did not tell me that.

19   Q.    Did he tell you that the diskette that he took with him to

20   Vienna with the sanitized version of the letter, that he

21   destroyed that diskette in Vienna?

22   A.    I believe he did.

23   Q.    And you never saw a final version of the letter, correct?

24   A.    No, I didn't.

25   Q.    But that final version would continue to reside on

Robert S. - Cross                                                590

1   Merlin's home computer, correct?

2   A.   Yes.  Well, perhaps not.  I don't know.

3   Q.   Depending on what Merlin did with it, correct?

4   A.   Well, also depending on what changes he made in Vienna

5   with the sanitized version, but fundamentally, it would -- it

6   should reside on his home computer unless he removed it.  I

7   don't know.

8   Q.   Fair enough.  In other words, Merlin's the only person

9   other than possibly an Iranian who read it, Merlin's the only

10  person who knows for sure what was in that final version,

11  correct?

12  A.   Correct.

13  Q.   He did not bring a copy of the letter, the as-delivered

14  letter back with him?

15  A.   No, he didn't.

16  Q.   Now, he had not been instructed to take photographs of the

17  mission, correct?

18  A.   Correct.

19  Q.   In fact, he was instructed not to, wasn't he?

20  A.   Correct.

21  Q.   But he did.

22  A.   Yes, he did.

23  Q.   And he showed them to you in New York during this

24  debriefing session, correct?

25  A.   Correct.

Robert S. - Cross                                                591

1   Q.   And I think you testified on direct that the last you saw

2   of them, they were still in New York, right?

3   A.   That's my recollection.

4   Q.   Okay.  Do you know whether Merlin, in fact, took those

5   photos back with him and says that he destroyed them?

6   A.   I don't know.

7   Q.   Now, who wrote Government Exhibit 44, the one detailing

8   this debriefing meeting?

9   A.   It looks like it was a joint product between Mr. Sterling

10  and me.

11  Q.   When you say "joint product," would there have been a

12  primary drafter, somebody who drafted it first, and then --

13  A.   I probably was the primary drafter, although I suspect

14  Mr. Sterling was sitting at the next terminal.

15  Q.   And then -- Mr. Francisco, do you have Defendant's Exhibit

16  3 loaded?

17              MR. FRANCISCO:  I do.

18              MR. POLLACK:  Your Honor, I'd like to call up what

19  would be Defendant's Exhibit 3, which was handed up to the

20  Court yesterday.  It's the document that has C00115, and my

21  understanding is the government has no objection to its

22  admission.

23              THE COURT:  Is that correct?

24              MR. TRUMP:  Correct, Your Honor.

25              THE COURT:  All right, then it's in.

Robert S. - Cross                                                    592

1                (Defendant's Exhibit No. 3 was received in evidence.)

2                MR. POLLACK:  Now, Your Honor, these exhibits are not

3     in the cable book that the jury has.  I have copies --

4                THE COURT:  Let's just put it on the screen.

5                MR. POLLACK:  Okay.  That's fine, Your Honor.

6     Q.   Defense Exhibit 3 -- would it be easier for you, Mr. S.,

7     if you have a hard copy in front of you, or is the screen fine?

8     A.   I would prefer a hard copy.

9                MR. POLLACK:  Mr. Wood, do you mind?  Thank you.

10               THE WITNESS:  Thank you.

11    BY MR. POLLACK:

12    Q.   Defendant's Exhibit 3 is a cable that you authored on

13    March 13 of 2000, correct?

14    A.   Yes.

15    Q.   So this is four days after the debriefing?

16    A.   Yes.

17    Q.   And in paragraph 1, it has the address of the Iranian

18    mission in Vienna?

19    A.   I don't see the address.

20    Q.   At the end of paragraph 1.

21    A.   Oh, yes.  There it is.

22    Q.   And that address is?

23    A.   19 Heinestrasse.

24    Q.   So it's got the, not just the street name but the street

25    number?

Robert S. - Cross                                                        593

1  A.    Correct.

2  Q.    And that's in the cable that you wrote, correct?

3  A.    Correct.

4  Q.    Now, in the cable of the debriefing meeting that was

5  authored at least in part by Mr. Sterling, 44, the address of

6  the mission does not appear, correct?

7  A.    That had a different purpose.  This is a notification to

8  cooperating services, who had not previously been told that he

9  was directed to deliver it to that address.  That's why it's

10 included here.

11 Q.    Okay.  Understanding that the cables have a different

12 purpose, I am correct, am I not, that that address does not

13 appear in the cable that was coauthored by Mr. Sterling?

14 A.    Correct.

15 Q.    And in paragraph 2 of Defendant's Exhibit 3, which is a

16 cable authored by you -- correct?

17 A.    Correct.

18 Q.    You talk about the plans that were delivered, correct?

19 A.    Correct.

20 Q.    And you refer to them as the firing set plans, correct?

21 A.    Correct.

22 Q.    Now, you had testified earlier that there is no technical

23 difference between a "firing set" and "fire set."  They're two

24 ways to refer to the same thing, correct?

25 A.    That's my impression of it.  If you were to ask a

1  technical person, they might be more explicit, but my degree is

2  in history, not in physics or electronics.

3  Q.    I understand.  And I'm only asking you about your

4  understanding.  Your understanding is that those terms are

5  interchangeable?

6  A.    The terms are interchangeable, yes.

7  Q.    Okay.  But the term that you use here in a cable you

8  author is "firing set," correct?

9  A.    Yes.

10 Q.    Okay.  And Merlin on the other hand did not use either the

11 term "firing set" or "fire set," right?

12 A.    Correct.

13 Q.    Because the Russians refer to this same item as a

14 high-voltage block, correct?

15 A.    Or an automatics block.

16 Q.    Okay.  And again --

17 A.    High-voltage switch he sometimes called it.  So --

18 Q.    And again, to your understanding, those three terms are

19 all interchangeable, correct?

20 A.    Correct.

21 Q.    And they're also interchangeable with "firing set" and

22 "fire set."  All five of the terms essentially mean the same

23 thing, correct?

24 A.    Yes.

25 Q.    Okay.  But the term that Merlin used was "high-voltage

Robert S. - Cross                                                          595

1    block," correct?

2    A.   Not always.  Sometimes he called it the automatics block

3    or the high-voltage switch.

4    Q.   Okay.  So one of the terms that Merlin would use is

5    "high-voltage block"?

6    A.   Correct.

7    Q.   And would not use "firing set" or "fire set"?

8    A.   Well, I never saw anything that he wrote.  I think

9    occasionally in our discussions, I would call it a high-voltage

10   block, and he would call it a fire set, you know, in oral

11   discussions.

12           THE COURT:  We can take the picture off the screen.

13   BY MR. POLLACK:

14   Q.   Again, understanding you don't recall precise dates, you

15   were interviewed by the FBI on February 28 of 2006.  Do you

16   recall telling the FBI interviewing agents that the

17   term "high-voltage block" is a Russian term and the term used

18   by Merlin; "fire set" was not a term used by Merlin?

19   A.   Okay.  Not regularly.  Certainly not in anything he wrote.

20   In all of his drafts, he called it a high-voltage block or

21   something along those lines.  He didn't call it a fire set in

22   any of his draft messages, that's correct, but I cannot state

23   that he never said "fire set" to me or I didn't say

24   "high-voltage block" to him in an oral discussion.

25   Q.   Let's look at page 195 of chapter 9.  And if we can look

Robert S. - Cross                                                    596

1   at the last full paragraph that begins, "To be precise"?

2   A.   Um-hum.

3   Q.   "To be precise, he" -- meaning Merlin -- "was carrying the

4   technical designs for a TBA 480 high-voltage block, otherwise

5   known as a 'firing set' . . .."

6         So the term Mr. Risen uses, "high-voltage block," is

7   the precise term that you told the FBI was the term that was

8   used by Merlin, correct?

9   A.   That is the Russian name for the device.

10  Q.   And the term that Mr. Risen puts in quotation

11  marks, "firing set," is the term that you use in the cable

12  that's Defendant's Exhibit 3, correct?

13  A.   I along with many other English speakers.

14  Q.   During the time that Mr. Sterling was involved in

15  Classified Program No. 1, you would agree with me, would you

16  not, that the term that was typically used in all of the cable

17  traffic was "fire set," not "firing set"?

18  A.   I haven't reviewed every cable to see what one or the

19  other of us called it, but again, cables and draft letters to

20  Iranians are far more formal than oral discussion.

21  Q.   Now, in the far-more-formal-than-oral-discussions cables,

22  can you think of a single cable that was authored by

23  Mr. Sterling that used the term "firing set"?

24  A.   I have not conducted that review.  I presume you have.

25  Q.   And in -- you're not suggesting your cables were any more

Robert S. - Cross                                                  597

1   formal than Mr. Sterling's cables, are you?

2   A.   No.

3   Q.   And in your cables, we've seen you did use the

4   term "firing set," correct?

5   A.   Yes.

6   Q.   Okay.  If we can go to page 198 of the book, the first

7   partial paragraph?

8            This is talking about the meeting in the San

9   Francisco hotel room, correct?

10  A.   Correct.

11  Q.   And it says that a senior CIA official -- now, is it your

12  assumption that that is a reference to you?

13  A.   Yes.

14  Q.   Brought in experts from one of the National Laboratories

15  to go over the blueprints that he was supposed to give -- "he"

16  being Merlin -- was supposed to give to the Iranians.

17           Now, first of all, "blueprints" is not a term that

18  you used, correct?

19  A.   No.

20  Q.   Do you know if Merlin ever used the term "blueprints"?

21  A.   No, not to my recollection.  And, of course, it is not

22  correct, what is stated there.

23  Q.   In terms of the National Laboratory representative?

24  A.   Correct.  That is not correct.

25  Q.   Thank you.  I was just going to get to that.  In fact,

Robert S. - Cross                                                      598

1   there wasn't actually a person from the National Lab there,

2   correct?

3   A.    No, there was not.

4   Q.    There was a former Russian engineer, Mr. G., correct?

5   A.    Former Russian by which you mean current American?

6   Q.    Correct.

7   A.    Yes.

8   Q.    In fact, current CIA officer, right?

9   A.    Correct.

10  Q.    He wasn't with the National Labs; he was with the CIA?

11  A.    Correct.

12  Q.    But he had a background as a Russian engineer, correct?

13  A.    He did.

14  Q.    And this was -- Mr. G. was known to Merlin as Len,

15  correct?

16  A.    That's correct.

17  Q.    And Merlin had private conversations with this person,

18  with Len, at the San Francisco meeting, correct?

19  A.    Correct.

20  Q.    Now, Mr. Sterling knew that Mr. G. was not from the

21  National Lab; he was from the CIA, correct?

22  A.    He knew that, and Merlin knew that.

23  Q.    You believed that Merlin knew that?

24  A.    We told him.

25  Q.    Okay.  Did Merlin ever get confused about that point and

Robert S. - Cross                                                    599

1    indicate to you that he thought there was somebody there from

2    the National Labs?

3    A.    Not to me.

4    Q.    Okay.  We discussed a moment ago that you sensed that

5    before the trip, Merlin was getting cold feet?

6    A.    Yes.

7    Q.    And that you worked hard over a series of meetings to

8    assess that, and you told the FBI that you had to convince him

9    to move forward, correct?

10   A.    Yes, to stop his acting out.

11   Q.    And you're not aware -- well, you were the one who had to

12   convince him.  That's what you told the FBI?

13   A.    I think I played a major role in that, although

14   Mr. Sterling did as well.

15   Q.    And in that last meeting in the cable we saw that you were

16   referred to as C/O -- case officer, correct?

17   A.    Yes.

18   Q.    And page 197 of the book, in the paragraph in the middle

19   of the page that starts with "The case officer," that very

20   first sentence says, "The case officer worked hard to convince

21   him," and it says, "even though the officer had doubts about

22   the plan as well."

23         Now, you didn't have any doubts about the plan,

24   correct?

25   A.    No.  So this is not a reference to me.

1   Q.   Well, are you sure of that?

2   A.   I am.

3   Q.   How are you sure that when Mr. Risen talks about a case

4   officer that had to work hard to convince Merlin to go forward,

5   that it's not the person who's referred to in a cable in the

6   last meeting as case officer, when you yourself had to work

7   hard to convince him?

8   A.   Because if you read the rest of the paragraph, it's

9   clearly not a reference to me.

10  Q.   So in other words, if it is a reference to you, the latter

11  part of the paragraph is inaccurate, correct?

12  A.   Yes.

13  Q.   And you would agree with me that some of what is in

14  chapter 9 is accurate, correct?

15  A.   Some of it.

16  Q.   And some of what is in chapter 9 is not accurate,

17  correct?

18  A.   Correct.

19  Q.   Now, let's go to page 205 of chapter 9, the last

20  paragraph.  It says that by 8:00 a.m., he found 19

21  Heinestrasse.

22  A.   Spelled wrong, but it's the same place.

23  Q.   Yeah.  You're familiar enough with Austrian streets that

24  you know the proper spelling?

25  A.   Correct.

Robert S. - Cross                                                      601

1   Q.   Okay.  And then it says on the next page, 206, the last

2   full paragraph, at 1:30 p.m., he got a chance to look inside

3   the gate, correct?

4   A.   That's what it says.

5   Q.   Now, you don't recall Merlin in his debriefing ever

6   mentioning the precise times that he found the building or the

7   time that he got inside, correct?

8   A.   I do not recall that.

9   Q.   But Merlin would obviously know those times, correct?

10  A.   If he recalls them, yes.

11  Q.   Now, the debriefing meeting that occurred on March 9,

12  after Merlin got back from Vienna, was a meeting that both you

13  and Mr. Sterling attended, correct?

14  A.   Correct.

15  Q.   Now, I believe that you testified on direct that you

16  recall Mr. Sterling having met with Merlin alone in advance of

17  that meeting between the two of you, or did I miss something?

18  A.   Mr. Sterling told me that he had heard something from

19  Merlin and the news was good.  So I don't know whether he met

20  him or Merlin sent him an e-mail or -- I don't know what

21  happened, but I do recall that when I went into that meeting on

22  the 9th, I knew that things had gone well.

23  Q.   Any meeting with an asset is supposed to be documented?

24  A.   It is.

25  Q.   Documented in a cable?

Robert S. - Cross                                                    602

1   A.    Yes.

2   Q.    And your testimony is that you recall 15 years later that

3   there was a meeting between Mr. Sterling and Merlin that was

4   never documented?

5   A.    That's not what I said.  I said I recall that Mr. Sterling

6   had informed me that things had gone well.

7   Q.    Okay.  Was that the extent of the interaction?

8   A.    That's my recollection.

9   Q.    It was not a significant enough interaction that you told

10  Mr. Sterling that a cable needed to be done, correct?

11  A.    No, because I believe this was the day of or the day

12  before, and we were going to have a meeting which then

13  documented everything.

14  Q.    Now, one thing -- well, let's go back to -- let's go back

15  to page 198, the first partial paragraph, and it references the

16  wine-tasting trip that was done in conjunction with the

17  meetings in San Francisco?

18  A.    Yes.

19  Q.    And it says "Sonoma Country" rather than "Sonoma County,"

20  correct?

21  A.    It does.

22  Q.    Some kind of a conflation between Wine Country and Sonoma

23  County?

24  A.    Perhaps an editing problem with Mr. Risen's publisher.

25  I'm not sure.

Robert S. - Cross                                                        603

1    Q.    But in any event, the fact that you and Mr. Sterling and

2    the Merlins went to Wine Country in conjunction with San

3    Francisco's meetings is documented in a cable, correct?

4    A.    It is.

5    Q.    But what is not documented in a cable is specifically that

6    it was in Sonoma County, correct?

7    A.    That is correct.

8    Q.    And you are the one who selected Sonoma County, correct?

9    A.    Yes.

10   Q.    You know wines, Mr. S.?

11   A.    I do.

12   Q.    And you have a distinct preference for Sonoma County wines

13   over Napa County wines, correct?

14   A.    Basically, I prefer a pinot noir to cabernet.  I do prefer

15   Sonoma wine.

16   Q.    And this meeting took place in 1998, correct?

17   A.    Yes.

18   Q.    And 16-17 years later, you remember that it was Sonoma

19   that you went to?

20   A.    I remember specifically our having lunch in a restaurant

21   in Healdsburg Square, in the heart of Sonoma Wine Country

22   County -- Wine Country, whatever.

23   Q.    And even though that's not documented anywhere, you have

24   an independent recollection of that 16 years later because that

25   was of significance to you because you know wine, correct?

Robert S. - Cross                                                        604

1    A.    That's correct.

2    Q.    And it's a detail that whoever Mr. Risen spoke to

3    remembered that detail even though it's not documented?

4    A.    Correct.

5    Q.    Now, when you were interviewed by the FBI in 2006, you

6    were asked about a passage of the book that appears on page

7    206, so I'm going to call up the paragraph that begins, "At

8    1:30 p.m."  You were asked specifically about that paragraph,

9    and you recalled, did you not, that Merlin -- the paragraph

10   mentions that amongst other things, the mailbox was on the left

11   side of the door?

12   A.    Yes.

13   Q.    And you recalled in 2006 Merlin having mentioned that the

14   box was on the left side of the door, correct?

15   A.    That's my recollection.

16   Q.    That information is not in any cable, that it was the left

17   side of the door.

18   A.    Okay.

19   Q.    Well, let's look at Exhibit 44.  That's the debriefing

20   meeting.

21   A.    Um-hum.

22   Q.    In paragraph 4, it says that the locked mailbox was right

23   outside the mission door, correct?

24   A.    Yes.

25   Q.    It doesn't say it was to the left?

Robert S. - Cross                                                      605

1    A.    It does not.

2    Q.    And then let's look at Defense Exhibit 3, and paragraph 1.

3    Toward the end of the paragraph, it says that the locked

4    mailbox was immediately adjacent to the door, correct?

5    A.    Yes.

6    Q.    It doesn't say it was on the left side, correct?

7    A.    No.

8    Q.    But yet you recalled in 2006 that it was on the left side?

9    A.    I do, and that's partially based on the photograph that

10   Merlin took and showed us.

11   Q.    Okay.  So Merlin showed you a photograph in March of 2000,

12   correct?

13   A.    Correct.

14   Q.    And in 2006, you recalled from that photograph that the

15   mailbox was on the left side of the door?

16   A.    That was my recollection.  I'm a visual person.  I

17   remember things much better when I see a picture than just

18   reading it or hearing it.

19   Q.    Okay.  So presumably, that was a fact that you would have

20   recalled in 2003, 2004, and 2005, correct?

21   A.    I might have, yes.

22   Q.    Now, in -- if we can go back to that same paragraph on

23   page 206 of *State of War*, it says that Merlin covered the

24   package in an old newspaper.  Do you see that?

25   A.    Yes.

Robert S. - Cross                                                    606

1    Q.    And Merlin was not instructed to cover the package in an

2    old newspaper, was he?

3    A.    He was not.

4    Q.    He wasn't instructed to cover it in a newspaper at all,

5    correct?

6    A.    Correct.

7    Q.    And the fact that he covered it in a newspaper is not in

8    any cable, correct?

9    A.    Correct.

10   Q.    But in 2006, you told the FBI that you recalled Merlin

11   having, having mentioned the newspaper?

12   A.    Yes.  He said he put the package in, and he had a

13   newspaper that was already in it, and he stuck that in front of

14   it.  That's my recollection.

15   Q.    That's your recollection today?

16   A.    Today I'm recollecting what he told us in 2000.

17   Q.    Right.  And so you certainly would have recalled that in

18   2003 and 2004 and 2005, correct?

19   A.    Yes.

20   Q.    Even though it's not reflected in any cable?

21   A.    Correct.

22   Q.    And that fact that you recalled that's not in any cable is

23   in Mr. Risen's book?

24   A.    I don't follow you, sir.

25   Q.    The fact that Merlin covered the plans in a newspaper, a

1    fact that is not in any cable but a fact that you recall, ends

2    up in Mr. Risen's book, correct?

3    A.   That's correct.

4            THE COURT:  Since we're talking about that chapter,

5    did Merlin provide you-all with a letter as described in that

6    chapter?  It's quoted.

7            THE WITNESS:  Yes.  My recollection is that he did

8    not.

9            THE COURT:  All right.

10           THE WITNESS:  To me anyway.

11           THE COURT:  All right.

12   BY MR. POLLACK:

13   Q.   So you're not aware of any document that reflects this

14   information?

15   A.   No, I'm not.

16   Q.   But they are facts that you recall?

17   A.   I recall Merlin saying it orally, and I recall his showing

18   a picture which certainly showed the mailbox is to the left.  I

19   don't recall whether it showed the newspaper in front of the

20   package.

21   Q.   Now, chapter 9, on pages 193 and 194 -- 193 is the very

22   beginning of the chapter, correct?

23   A.   Yes.

24           MR. TRUMP:  Your Honor, this was discussed pretrial.

25           MR. POLLACK:  I'm certainly going to --

 1              THE COURT:  Let me hear the question first.  Let me

 2    hear the question first.

 3    BY MR. POLLACK:

 4    Q.   This material on pages 193 and 194 reflects an incident

 5    that Mr. Risen reports occurred in 2004, correct?

 6    A.   That's what it says.

 7              MR. TRUMP:  I'm objecting to the form of the

 8    question, Your Honor.

 9              THE COURT:  Well, I don't see -- I don't think that's

10    a problem.  I'll overrule that objection.  Go ahead, let me

11    hear the next question.

12    BY MR. POLLACK:

13    Q.   In 2004, Mr. Sterling was no longer employed by the CIA,

14    correct?

15    A.   That's my understanding.

16    Q.   And had not been for quite some time?

17    A.   That's my understanding.

18    Q.   You were still employed by the CIA in 2004?

19    A.   Correct.

20              THE COURT:  You can take it off the screen.

21    BY MR. POLLACK:

22    Q.   On page 2006 -- I'm sorry, 206, it -- Mr. Risen --

23              THE COURT:  What paragraph?

24              MR. POLLACK:  I'm sorry, Your Honor.  The paragraph

25    in the middle of the page that begins, "He came back that

1  afternoon."

2  Q.   Mr. Risen references the fact that Merlin observed an

3  Austrian postman, correct?

4  A.   Correct.

5  Q.   The fact that there was an Austrian postman is not

6  reflected in any cable, correct?

7  A.   Correct.

8  Q.   That's a fact that you recalled in 2006?

9  A.   Yes.   That's a fact that Merlin in his debriefing told us

10 about.

11 Q.   So that would be like the mailbox being to the left, the

12 plans being covered in newspaper, there being a postman there,

13 those are three facts that are not in any document that you

14 recall that Mr. Risen reports, correct?

15 A.   Correct.

16       MR. POLLACK:   Your Honor, can I have just a moment?

17       THE COURT:   Just a moment.

18 BY MR. POLLACK:

19 Q.   On page 207, if we can go to paragraph 74?   "Just days

20 after the Russian dropped off his package at the Iranian

21 mission, the NSA reported that an Iranian official in Vienna

22 abruptly changed his schedule and suddenly made airline

23 reservations and flew home to Iran."

24       I believe that you testified that to your knowledge,

25 that's not accurate, correct?

Robert S. - Cross                                                  610

1   A.    That's what I testified, and that is my knowledge.

2   Q.    All right.  And certainly you never told Mr. Sterling that

3   the NSA had reported that information, correct?

4   A.    It's not accurate.

5   Q.    All right.  So you certainly never told Mr. Sterling that,

6   correct?

7   A.    Correct.

8   Q.    Mr. Risen had to have gotten that from somewhere, right?

9   A.    Right.

10           MR. TRUMP:  Objection.

11           THE COURT:  Sustained.  That's purely speculative.

12  BY MR. POLLACK:

13  Q.    In April of 2003, you learned that Mr. Risen was working

14  on a story about Classified Program No. 1, correct?

15  A.    Correct.

16  Q.    And you -- I mean, did you learn about that from somebody

17  higher up at the CIA?

18  A.    I did.

19  Q.    And you knew that it was a topic of discussion amongst

20  some of your superiors at the CIA?

21  A.    Yes.

22  Q.    Amongst some of the generals, as you would put it?

23  A.    Yes.

24  Q.    And you certainly hoped that Mr. Risen would not publish

25  such a story, correct?

Robert S. - Cross                                                    611

1    A.    Yes.

2    Q.    And it's your understanding the generals at the CIA hoped

3    that he would not publish such a story, correct?

4    A.    That's my understanding.

5    Q.    In --

6          THE COURT:   Well, I think at this point, we've been

7    here for two hours.   I'm going to let the jury take their

8    morning break.   We'll recess until 10 of.

9          (Recess from 11:30 a.m., until 11:51 a.m.)

10                    (Defendant and Jury present.)

11          THE COURT:   All right, Mr. Pollack, I'm told you'll

12   wrap this up in about ten minutes, correct?

13          MR. POLLACK:   That's correct, Your Honor.

14          THE COURT:   All right.

15   BY MR. POLLACK:

16   Q.    Mr. S., you had testified on direct that you had learned

17   from intelligence sources that the plans had been taken from

18   Vienna back to Iran, correct?

19   A.    Correct.

20   Q.    You didn't have firsthand knowledge of that, correct?

21   A.    No.

22   Q.    And intelligence sources are not always correct; is that

23   fair?

24   A.    That is correct.

25   Q.    If I can have you turn to page 203 of the book, paragraph

Robert S. - Cross                                                        612

1    50?  There's a quote here that Mr. Risen attributes to the

2    Russian, and the quote is, "I spent a lot of time to ask people

3    as I could," and then he puts parenthetically "[language

4    problem] and they told me that no streets with this name are

5    around."

6              Is there any cable or, or other document that you're

7    aware of that reflects this language?

8    A.    No.

9    Q.    Do you know whether this is, in fact, something that

10   Merlin said?

11   A.    I do not know that.

12   Q.    Okay.  And you're not aware of any cable that would have

13   been available to Mr. Sterling that would have reflected that

14   quote?

15   A.    No.

16   Q.    Now, in April of 2003, when you learned that Mr. Risen was

17   working on a story about Classified Program No. 1, Mr. Sterling

18   was no longer employed by the agency, correct?

19   A.    That's my understanding.

20   Q.    And he had not been working on Classified Program No. 1

21   for about three years at that point?

22   A.    That is correct.

23   Q.    And had not had access to the cable traffic for three

24   years at that point?

25   A.    Correct.

Robert S. - Cross                                                   613

1    Q.   You continued to be read into Program No. 1, correct?

2    A.   Correct.

3    Q.   And you continued to have access to the cable traffic,

4    correct?

5    A.   Yes.

6    Q.   If we can pull up Exhibit 15?

7            This is a cable that reflects a meeting with Zach W.

8    and, and Mr. Sterling with Merlin, paragraph 2.

9    A.   Okay.

10   Q.   And shortly after you learned that Mr. Risen was working

11   on a story about Classified Program No. 1, you accessed this

12   document?

13   A.   Correct.

14   Q.   And there will be a stipulation entered about this later,

15   but I can represent to you that CIA records reflect that on

16   April 11, 2003, you accessed this document.

17   A.   Okay.

18   Q.   And will you look at Exhibit 35?  35 reflects a meeting --

19   again, if you can go to that paragraph No. 2? -- between

20   Mr. Sterling and Merlin?

21   A.   Yes.

22   Q.   And on May 8, 2003, you accessed this document, correct?

23   A.   I don't know that --

24   Q.   Okay.

25   A.   -- but I'm sure if the record shows that, that I did.

1   Q.    Fair enough.  Let's do it that way.  I'll represent to you

2   that CIA records reflect that.

3   A.    Okay.

4   Q.    And they also reflect that on that same day, May 8, 2003,

5   you also accessed Exhibit 38, and Exhibit 38 is the document

6   that reflects the meeting that you had alone with Merlin,

7   correct?

8   A.    Yes.

9   Q.    The reason that you were accessing these documents at this

10  time was so that you could provide information to your

11  superiors who were engaged in an effort to try to prevent or

12  dissuade Mr. Risen from publishing a story about Classified

13  Program No. 1, correct?

14  A.    I'm not sure of that.  I think it might also have been to

15  assist Agent Hunt in her inquiries, but I was directed by my

16  superiors to review the program.  Yes, I was.

17  Q.    And in 2006, in January of 2006, *State of War* was

18  published, correct?

19  A.    Yes.

20  Q.    And at that point, any effort by the CIA to dissuade

21  Mr. Risen from publishing about Classified Program No. 1 was

22  too late, correct?

23  A.    Yes.

24  Q.    And at that point, you knew that the FBI was again

25  investigating, correct?

Robert S. - Cross                                                    615

1    A.    Yes.

2    Q.    And that that investigation could focus on you?

3    A.    I was told that I was not a suspect, but, of course,

4    anything's possible.

5    Q.    And if we look at Exhibit 33, this is a meeting that you

6    attended -- this is a cable about a meeting that you attended

7    with Mr. Sterling, correct?

8    A.    Yes.

9    Q.    And Merlin?

10   A.    Yes.

11   Q.    And I'll represent to you that CIA records reflect that in

12   January and February of 2006, you accessed this cable six

13   times.  Even though you had access to Classified Program No. 1

14   throughout, the FBI told you that you were not at all a suspect

15   in their investigation?

16   A.    By 2006, they did.

17   Q.    At any point, at any point, did the FBI ever ask you for

18   your phone records?

19   A.    No.

20   Q.    Did they ever review your computer?

21   A.    I don't know that.

22   Q.    Your home computer?

23   A.    Not to my knowledge.

24          MR. POLLACK:  Thank you.  I don't have anything

25   further.

Robert S. - Redirect                                                    616

1              THE COURT:  All right, any redirect?

2              MR. TRUMP:  Thank you, Your Honor.

3                       REDIRECT EXAMINATION

4    BY MR. TRUMP:

5    Q.   I'll start at the end, Mr. S.  Did you provide any

6    information to James Risen?

7    A.   No.

8    Q.   Directly or indirectly?

9    A.   Directly or indirectly, I have never had any contact with

10   Mr. Risen.

11   Q.   Have you ever provided anyone who was not read in and

12   cleared for this program with information about Classified

13   Program 1 or Human Asset No. 1?

14   A.   No.

15   Q.   Now, you were asked some questions about Merlin's legend?

16   A.   Yes.

17   Q.   And that sometimes a legend has to be a mix of truth and

18   fiction?

19   A.   Yes.

20   Q.   But in Merlin's case, almost all of it was true, correct?

21   A.   Almost all of it, yes.  What was missing, of course, was

22   that he was doing it for the CIA.

23   Q.   Now, you were asked about some mention in Mr. Risen's book

24   about a suicide in Russia.  Do you recall that?

25   A.   I do.

1   Q.    That's public information, correct?

2   A.    It is.

3   Q.    Now, you were first interviewed by the FBI in 2003?

4   A.    Yes.

5   Q.    And at that time, you were also asked by your superiors to

6   do some research?

7   A.    Yes.

8   Q.    And so you looked at not just the cables that defense

9   counsel mentioned, but you looked at a lot of the stuff in the

10  files?

11  A.    All of the cables, yes.  As I did again in 2006.

12  Q.    And in 2006, you actually sat down with FBI agents at a

13  terminal and went through cable after cable after cable; is

14  that correct?

15  A.    With the specific approval of my superiors, yes.

16  Q.    And the agents at the time were also cleared for the

17  program, correct?

18  A.    Yes.

19  Q.    And you were interviewed in 2010?

20  A.    Yes.

21  Q.    And 2011?

22  A.    Yes.

23  Q.    And at all times, you were cooperative?

24  A.    Yes.

25  Q.    Honest?

1    A.    Yes.

2    Q.    Forthcoming?

3    A.    Yes.

4    Q.    You also provided them with access to Merlin, correct?

5    A.    Correct.

6    Q.    And you facilitated that access?

7    A.    Yes.

8    Q.    When you first discussed this program with, with the

9    defendant, Mr. Sterling, you gave him the hard file, correct?

10   A.    Yes, although that was less significant than that I

11   arranged for him to have access to the complete electronic

12   file.

13   Q.    So he had everything in Classified Program 1 when he was

14   read in and working with you at headquarters at CPD?

15           MR. POLLACK:  Your Honor, I realize it's redirect,

16   but it's still a leading question.

17           THE COURT:  Sustained.

18   BY MR. TRUMP:

19   Q.    What information did you provide to the defendant when he

20   was read into the program?

21   A.    Everything that I knew about the program.

22   Q.    At your offices in Langley, can you take documents without

23   being inspected or searched?

24   A.    I can.

25   Q.    It's an honor system, right?

Robert S. - Redirect                                                    619

1    A.   Well, there's periodic spot-checks.

2    Q.   But coming and going in the building, CIA employees are

3    not searched; is that right?

4    A.   Correct.

5    Q.   Same is true in New York, right?

6    A.   Yes.

7    Q.   You were asked some questions about access lists?

8    A.   Yes.

9    Q.   And at some point, did CPD provide the FBI with a list of

10   people who had, at one time or the other had been read into

11   Classified Program No. 1?

12   A.   Yes, I've seen a copy of that.

13   Q.   The number that counsel threw out, that was a number for

14   the entire --

15           THE COURT:  Wait, wait, wait.  That's going to be a

16   leading question; I can tell from the form.

17   BY MR. TRUMP:

18   Q.   Was the number that you provided for the entire time frame

19   of the program?

20   A.   Yes.

21   Q.   Did that number reflect the number of people who were

22   given access at a particular point in time?

23   A.   No.

24   Q.   So, for example, Zach W., he would be on such a list,

25   correct?

1    A.    He would.

2    Q.    After he was read out of the program, would he retain

3    access to the program?

4    A.    No.

5    Q.    Do you recall the questions about the percentage of flaws

6    that were discovered by the Red Team?

7    A.    I do.

8    Q.    Can you tell us whether spotting a flaw means being able

9    to fix a flaw?

10   A.    Not necessarily.

11   Q.    And even if -- based on your understanding of this Red

12   Team project, had they spotted all the flaws, does that mean it

13   would work?

14   A.    No, because the flaws were designed to nest, so that if

15   you fixed one, others would appear, and also, it was missing

16   two key components.

17   Q.    The discussion of the letters, the draft letters?

18   A.    Yes.

19   Q.    Did you work on those with the defendant?

20   A.    Yes.

21   Q.    Together?

22   A.    Yes.

23   Q.    Did you discuss language together?

24   A.    Yes.

25   Q.    Did you make some suggestions about language together to

1   Merlin?

2   A.   Yes.

3   Q.   In that regard, did you think the defendant was doing a

4   good job?

5   A.   I did.

6   Q.   The money issues with Merlin, did they come up every

7   January?

8   A.   Pretty much.

9   Q.   And in January, was his accounting different than your

10  accounting?

11  A.   Yes.

12  Q.   When it says you paid him $66,000, does that reflect you

13  paid him for the salary of $66,000 that he believed he was owed

14  for the whole year?

15          MR. POLLACK:   Objection.   Leading.

16          THE COURT:   Sustained.

17          MR. TRUMP:   I'm just trying to move things along,

18  Judge.

19          THE COURT:   Well, I'll move it on but just no

20  leading.

21  BY MR. TRUMP:

22  Q.   Would you explain what you meant when you said you paid

23  him $66,000?

24  A.   That was a year salary or 11 months probably.   The dispute

25  was over whether he had been paid for one month in the previous

Robert S. - Redirect                                          622

1    year or he had not, and as I say, his records were different

2    from ours.

3    Q.    So the actual cash that you paid him was the difference?

4    A.    No, I paid him the entire amount.

5    Q.    The entire amount for the year?

6    A.    Yes.

7    Q.    In Exhibit 36, did you note in that cable that Merlin was

8    actually right about some of his accounting?

9              MR. POLLACK:  Objection.

10             THE COURT:  That again is leading.  Sustained.

11   BY MR. TRUMP:

12   Q.    What is in the cable about the reference to Merlin and his

13   accounting?

14   A.    Could you point me to a --

15             THE COURT:  Well, I think the cable speaks for

16   itself.  Let's move this along, Mr. Trump.

17             THE WITNESS:  But --

18             THE COURT:  There's no question pending, sir.

19   BY MR. TRUMP:

20   Q.    Cable 36.

21   A.    Yes.

22   Q.    Was that a cable sent to New York by you?

23   A.    Yes.

24   Q.    To the defendant?

25   A.    He would certainly be the prime reader.

Robert S. - Redirect                                                  623

1   Q.   And did it provide him with directions to do something

2   with Merlin?

3              MR. POLLACK:  Objection.  It's leading.  It's also

4   not --

5              THE COURT:  Well, that's not sufficiently leading

6   that I'm going to -- let's move this along, but I want --

7   BY MR. TRUMP:

8   Q.   Was the purpose of the cable to provide the defendant with

9   some direction to take to Merlin?

10  A.   Yes.

11  Q.   The final meeting you had at the hotel --

12  A.   Yes.

13  Q.   -- was there any, was there any discussion of the

14  schematics?

15  A.   No, not that I recall.

16  Q.   Any discussion of any concern about the schematics?

17  A.   Definitely not.

18  Q.   At the final meeting, there was a discussion of maps and

19  streets and plans and things like that?

20  A.   Yes.

21  Q.   Had that been discussed at a prior meeting?

22  A.   Yes, it had.

23  Q.   Was the defendant present at that prior meeting?

24  A.   Yes.

25  Q.   Was it detailed?

1    A.    Yes.

2    Q.    Was there anything about your discussions with Merlin in

3    Exhibit 38 about the plan not something that was previously

4    discussed with the defendant?

5    A.    No.

6    Q.    Do you recall some questions about whether Merlin had made

7    any sort of racist comments?

8    A.    Yes, I recall questions.

9    Q.    When he made the comment that you referred to in your

10   direct, what did you say to him?

11   A.    When he asked about whether he should buy a house because

12   there was a black person in the neighborhood?

13   Q.    Correct.

14   A.    I said to him, "You are in America.  You are wanting to

15   become an American.  You've got to cut that out.  That black

16   person might well be wondering whether he should move into that

17   area because a newly arrived Russian immigrant is there.  His

18   people have been in the United States for 400 years.  Cut it

19   out.  Become an American."

20   Q.    And from what you observed, did his attitude, did his

21   attitude change over time?

22   A.    Yes, it did.

23   Q.    Now, I believe you actually were asked by the judge

24   certain questions about concerns that were expressed to you by

25   Mr. Sterling?

Robert S. - Redirect                                              625

1    A.    Yes.

2    Q.    Did he have a mentor at the CIA?

3    A.    He did.

4    Q.    Someone you knew?

5    A.    I didn't know him personally.  I certainly knew -- he was

6    a famous man.  I knew his position well.

7    Q.    He was one of those generals we talked about?

8    A.    Yes.

9    Q.    So you are aware that Mr. Sterling had someone to talk to

10   about these concerns?

11   A.    I was aware.

12   Q.    This collaborative process between, in terms of writing a

13   letter, did some of that occur at the New York office?

14   A.    Yes.

15   Q.    Side by side with the defendant?

16   A.    Yes.

17   Q.    Would you describe how you did that?

18   A.    Well, oftentimes, it occurred in the hotel meeting site

19   before we would meet with Merlin.  The defendant and I would

20   arrive early, and we'd discuss changes we'd want to make -- we

21   wanted to get Merlin to make, and we'd have half an hour to an

22   hour to plan for the session before he arrived.

23         And then most often, we would go over the meeting

24   that had occurred the next day back in the New York office.

25   This is standard procedure.

1   Q.   When you went back to the office, did you work together on

2   drafting the cable?

3   A.   Yes.

4   Q.   How did you do that?

5   A.   Well, one or the other of us would do a first draft and

6   immediately show it to the other and add or correct anything

7   that the other party thought needed to be changed.

8   Q.   Did you print it out and sit next to each other and go

9   over it?

10  A.   We'd usually look at it on the computer screen.

11  Q.   And you made edits?

12  A.   Real time.

13  Q.   In other words, whatever you knew, he knew?

14          MR. POLLACK:  Objection.

15          THE COURT:  Sustained.

16  BY MR. TRUMP:

17  Q.   You were asked questions about the door and left side,

18  right side, the building?

19  A.   Yes.

20  Q.   Would, would anyone going to Vienna be able to make those

21  observations?

22  A.   Yes.

23          MR. TRUMP:  The Court's indulgence?

24          THE COURT:  Yes, sir.

25          MR. TRUMP:  One moment, Your Honor.

1           That's all, Your Honor.

2           THE COURT:  All right, any recross?

3           MR. POLLACK:  Yes, Your Honor, very briefly.

4                          RECROSS EXAMINATION

5    BY MR. POLLACK:

6    Q.   Mr. S., would anybody going to Vienna be able to observe

7    that Merlin saw an Austrian postman while he was there?

8    A.   No.

9    Q.   Would they be able to observe that Merlin covered the

10   plans with an old newspaper?

11   A.   No.

12          MR. POLLACK:  That's all I have.  Thank you.

13          THE COURT:  All right.  Mr. S., thank you for your

14   testimony.  It's been a long haul, but you're finished now.

15   You may leave the building.

16          Thank you.

17                     (Witness excused.)

18          THE COURT:  Your next witness?

19          MR. FITZPATRICK:  Stephen Y., Your Honor.

20          THE COURT:  Stephen Y.

21      STEPHEN Y., GOVERNMENT'S WITNESS, AFFIRMED

22          MR. FITZPATRICK:  Thank you, Your Honor.

23                        DIRECT EXAMINATION

24   BY MR. FITZPATRICK:

25   Q.   Good afternoon, sir.

1   A.    Good afternoon.

2   Q.    Are you Stephen Y.?

3   A.    Yes, correct.  Steve Y.

4   Q.    Have you had a career with the CIA?

5   A.    Yes, I have.

6   Q.    And for how long is that career?

7   A.    For over 20 years.

8   Q.    And were you a case officer or an operations officer?

9   A.    Yes, I was.

10  Q.    Was there a point in time when you were assigned to the

11  New York office?

12  A.    Yes.

13  Q.    Were you assigned to the New York office on September 11

14  of 2001?

15  A.    Yes, I was.

16  Q.    For how long had you been in that office, roughly?

17  A.    Several years.

18  Q.    And was there a point in time during your stay in the New

19  York office where you were an acting supervisor?

20  A.    That's correct.

21  Q.    During your time in New York, did you meet a person by the

22  name of Jeffrey Sterling?

23  A.    Yes, I did.

24  Q.    Do you see Mr. Sterling in the courtroom today?

25  A.    Yes.  Mr. Sterling is seated at the table to my right.

Stephen Y. - Direct                                                      629

1          MR. FITZPATRICK:  May the record reflect, Your Honor?

2          THE COURT:  Yes.

3          MR. FITZPATRICK:  Thank you.

4    Q.    When -- do you approximately know when you met him?

5    A.    It would have been around 2000.

6    Q.    Did there come a point in time when you assumed

7    responsibilities for an individual by the name of Merlin, or

8    Human Asset No. 1?

9    A.    Yes, there was a time when I assumed responsibility.

10   Q.    And from whom did you assume that responsibility for the

11   handling case officer?

12   A.    From Mr. Sterling.

13   Q.    Describe how that changeover took place.

14   A.    Well, we would have a plan, a discussion first, and then

15   there would be a meeting in a secure location.

16   Q.    And do you recall having that meeting with Mr. Sterling

17   and others?

18   A.    Yes, that's correct.

19          MR. FITZPATRICK:  Your Honor, I'd like to show the

20   witness Government Exhibit No. 47, please.

21          THE COURT:  All right.

22          MR. FITZPATRICK:  It's been previously admitted.

23          THE COURT:  Yes.

24          MR. FITZPATRICK:  Mr. Francisco, if you could pull up

25   the first two paragraphs?

Stephen Y. - Direct                                                    630

1   Q.   Mr. Y., do you see that in front of you?

2   A.   Yes, I do.

3           THE COURT:  Well, just for the record, that's May 25,

4   2000?  Is that the date?

5           MR. FITZPATRICK:  That's correct.

6           THE COURT:  So the jury has a sense of the time.  All

7   right.

8           MR. FITZPATRICK:  Yes, Your Honor.

9   Q.   It's a cable dated May 25, 2000.  Have you previously seen

10  a version of this document?

11  A.   Yes.

12  Q.   And there's a reference there to a Mr. Y.?

13  A.   Yes.

14  Q.   Is that you?

15  A.   Yes.

16  Q.   And what does this document reflect?

17  A.   This is an account of a meeting, a changeover meeting.

18  Q.   And who else was in attendance?

19  A.   Mr. Sterling and myself.

20  Q.   And were there other people involved in the meeting as

21  well?

22  A.   (Nodding head.)

23  Q.   Who was -- for this operation, using just the first name

24  and the last initial, who was the, the operation manager, for

25  lack of a better --

1    A.    Bob S.

2    Q.    And what about the human asset?

3    A.    What was --

4    Q.    Was he in attendance as well?

5    A.    Yes, of course.  Yes, he was.

6    Q.    All right.  You can close the exhibit.  Thank you.

7              Now, prior to -- when you became involved in this

8    operation regarding Mr. Merlin, we'll call him, did you gain

9    access to the cable traffic for the operation?

10   A.    Yes.

11   Q.    Prior to taking on this assignment, were you allowed

12   access to this program?

13   A.    No, not prior to planning for the, the changeover meeting.

14   Q.    So when you became assigned to the program, in effect, you

15   educated yourself on the program?

16   A.    That's correct.

17   Q.    Did you also speak to Mr. Sterling?

18   A.    Yes.

19   Q.    And what was the purpose of speaking to Mr. Sterling?

20   A.    To sort of get a feel for the, for the asset, how he is,

21   what kind of a relationship there may be, and that would be, of

22   course, beneficial for me.  Also, what kind of contact plan had

23   been set up so if we needed to contact him, how I would be able

24   to do that.

25   Q.    And when you had this discussion with Mr. Sterling, what,

Stephen Y. - Direct                                              632

1    if any, operational concerns did he raise with you?

2    A.   He didn't raise any concerns with me.

3    Q.   Can you tell us, what is a soft file?

4    A.   A soft file is sort of a working file that we maintain.

5    It usually has the information that you need at your

6    fingertips, so things that you would like to keep and be able

7    to look at quickly.

8            So we keep, it's just a regular manila file, and

9    inside would be contact instructions, maybe telephone number or

10   contact plan in order to -- and plus some information about

11   when the next scheduled meeting might be, and it's kept in a,

12   just a soft manila file.

13   Q.   Is the, the maintenance of a soft file customary among

14   case officers?

15   A.   Yes, it is.

16   Q.   And are these personal files?

17   A.   No, they're official files.  They have to be maintained by

18   us, but they're official files; that's correct.

19   Q.   And how are they maintained?

20   A.   At the, at the conclusion of the day before you would

21   leave to go, to go home or to leave to go to an event or

22   whatever, these are stored in a secure, a secure vault, a

23   secure drawer, a safe drawer, and we would put it in there and

24   secure the, secure the safe.

25   Q.   And what is the purpose of maintaining the security of a

Stephen Y. - Direct                                                   633

1   soft file?

2   A.   Well, it's to protect the asset's identity and information

3   about him, also to protect the information that may have been

4   obtained from him, and also to protect, you know, a contact

5   plan information that you may need at a later date.

6   Q.   Would you maintain -- or would a case officer maintain if

7   necessary for that particular case officer cable traffic within

8   a soft file?

9   A.   Yes, there would be some select cables in there.  Cable

10  traffic would be maintained in there.

11  Q.   And who decides what information goes into an individual

12  case officer's soft file?

13  A.   The case officer himself.

14  Q.   Now, you said that you were in the New York office for at

15  least a couple of years.

16  A.   That's correct.

17  Q.   If a case officer desired to break protocol and take a

18  soft file away from the office, would that be possible?

19  A.   Yes.

20         MR. MAC MAHON:  Your Honor, I'm going to object to

21  the form of the question and the speculation as well.

22         THE COURT:  I think there's a better way of asking

23  that question.  I'm going to sustain the objection.

24         MR. FITZPATRICK:  Thank you, Your Honor.

25  Q.   What, if any, security measures are in place to measure a

Stephen Y. - Direct                                                    634

1    case officer's behavior with respect to soft files?

2    A.    There were none other than the fact of securing it in a

3    vault at the end of the evening.

4    Q.    You previously responded to one of my questions by saying

5    that Mr. Sterling had, didn't raise any operational concerns

6    with you about Mr. Merlin, or Human Asset No. 1.  Is that

7    right?

8    A.    That is correct.

9    Q.    And this was in May 25, 24-25, 2000, correct?

10   A.    That's correct.

11   Q.    When you educated yourself on this program, did you become

12   aware of a significant event that had happened several months

13   earlier?

14   A.    That is correct, yes.

15   Q.    And do you have a recollection, was this in short form the

16   Vienna operation?

17   A.    Yes.

18   Q.    Now, when that took place, did you have any access to this

19   program?

20   A.    When the Vienna operation actually occurred?

21   Q.    Yes.

22   A.    No, I did not.  Not until the time before the changeover

23   meeting.

24   Q.    In your discussions with Mr. Sterling, when you overlapped

25   with him in the New York office, did you have other discussions

Stephen Y. - Direct                                               635

1    with him about other matters?

2    A.   Yes, about some ideas, you know, ideas we might have for,

3    for new prospective activities or things that we wanted to try

4    to do.

5    Q.   How would you characterize Mr. Sterling's openness with

6    you?

7    A.   Not very open.  No, not very open.

8    Q.   Now, with respect to the maintenance of soft files, did

9    you receive any soft file from Mr. Sterling?

10   A.   No, I did not.

11   Q.   So when you became the primary handling officer, did you

12   create your own soft file?

13   A.   Yes.

14        THE COURT:  Did you ever ask Mr. Sterling, if you can

15   recall, for a soft file?

16        THE WITNESS:  No.  I never asked for it, no.

17        THE COURT:  Okay.

18   BY MR. FITZPATRICK:

19   Q.   And in addition, were there other files related to this

20   operation that you're aware of maintained within the New York

21   office back in --

22   A.   No.

23   Q.   -- prior to 2001?

24   A.   No.

25   Q.   Was it the practice in the New York office for case

Stephen Y. - Direct                                           636

1    officers, did you have the ability to print cables from your

2    duty station?

3    A.   Yes.

4    Q.   What -- describe for us, please, you said that you were

5    assigned to the New York office on September 11 of 2001.

6    A.   Yes.

7    Q.   What happened to your office on that day?

8    A.   It was destroyed, totally destroyed.

9    Q.   Did you make an effort or was there any effort to get your

10   files back from that office?

11   A.   Well, there was, there was an effort, but the building was

12   completely destroyed.

13   Q.   What, if anything, did you recover from your office?

14   A.   I didn't recover anything from the office.

15   Q.   To your knowledge, was anyone able to recover anything

16   from the office?

17   A.   Not to my knowledge.

18           MR. FITZPATRICK:  I want to show the witness -- this

19   has not been admitted yet -- I want to show the witness

20   Government Exhibit No. 75, please.

21           THE COURT:  Is there any objection to 75?

22           MR. MAC MAHON:  Objection to using this exhibit with

23   this witness, Your Honor.  We talked about this in a motion in

24   limine.  This is unfair the way this is coming in.

25           THE COURT:  Well, to be honest, I don't recall what

Stephen Y. - Direct                                                   637

1    the previous objection was.

2              MR. MAC MAHON:  Well, the witness has already

3    testified that the office was destroyed.  This would be

4    cumulative and unnecessary, Your Honor, in the way it's coming

5    in.

6              MR. FITZPATRICK:  I'm going into another line of

7    questioning.

8              THE COURT:  All right.  Well, let's pass on this now.

9    Do you have another line of questioning?

10             MR. FITZPATRICK:  Well, it was in relation to this.

11             THE COURT:  Related to this?  Well, let me hear what

12   your question is.

13   BY MR. FITZPATRICK:

14   Q.  All right.  With respect to the identity of the New York

15   office, what, if any, concerns do case officers have about

16   maintaining the secrecy of those offices?

17   A.  Well, it's for the protection of all the officers that

18   work there as well as the information that may be contained

19   there, which would be coming from some of our sources and

20   activities.

21             THE COURT:  In other words, you don't want your field

22   offices' locations being identified.

23             THE WITNESS:  That is correct.  Yes, yes, Your Honor.

24             THE COURT:  Ask the question directly.

25   BY MR. FITZPATRICK:

Stephen Y. - Direct                                                    638

1    Q.   Do you know, do you know James Risen?

2    A.   No, sir.

3    Q.   Have you ever spoken with him?

4    A.   No.

5         MR. FITZPATRICK:  Your Honor, I would move in

6    Government Exhibit 75.  It's self-authenticated.

7         THE COURT:  I'm going to permit it.  It's relevant to

8    the questioning.  It's in.

9         MR. FITZPATRICK:  Thank you.

10        (Government's Exhibit No. 75 was received in

11   evidence.)

12   BY MR. FITZPATRICK:

13   Q.   Going back to -- if we could just put up on the screen

14   Government Exhibit 75?

15        Now, Mr. Wood had shown you this just a couple of

16   moments ago.  You're familiar with this article?

17   A.   Yes.

18   Q.   And you've seen this article before?

19   A.   Yes.

20   Q.   Are you the source for Mr. Risen in this article?

21   A.   No.

22   Q.   All right, thank you.

23        THE COURT:  And I think that wasn't shown to the

24   jury, but we should get a date to make it relevant to the case,

25   the date of the article.

1              MR. FITZPATRICK:  Oh, yes, Your Honor.  It's

2    November 4, 2001.

3              THE COURT:  All right.

4              MR. FITZPATRICK:  Thank you.

5              If we could show the witness Government Exhibit 35,

6    please?  And, Mr. Francisco, if we could go to the second page,

7    please?

8    Q.   Mr. Y.?

9    A.   Yes.

10   Q.   On the second page of that cable, there is a text of a

11   letter, and it begins:  "To University."

12             Do you see that?

13   A.   Yes, I do.

14   Q.   And are you familiar with this?

15   A.   Yes, I've seen this letter before.

16   Q.   And was this one of the cables that you viewed back in

17   May 24, thereabout, when you became familiar with this case?

18   A.   Yes.

19   Q.   Have you disclosed the contents of this letter to anyone

20   outside of the CIA?

21   A.   No.

22   Q.   With respect to any hard copies of this letter, did you

23   maintain a hard copy of this letter?

24   A.   No.

25             MR. MAC MAHON:  Your Honor, objection to foundation.

Stephen Y. - Cross                                                      640

1   If he ever had a hard copy of the letter.

2           THE COURT:  All right, ask that question first.

3   BY MR. FITZPATRICK:

4   Q.   In what other forms, if any, did you have this letter?

5   A.   Only in the, in the traffic.  That was it.

6   Q.   Did you ever -- with respect to documents that were

7   maintained by you, did you receive anything from the human

8   asset?

9   A.   No.

10  Q.   If you had, what would have occurred to that document?

11          MR. MAC MAHON:  Your Honor, objection.  He said he

12  didn't receive one.

13          THE COURT:  I'm going to sustain the objection.

14          MR. FITZPATRICK:  All right.  One moment, Your Honor.

15          Nothing further, Your Honor.

16          THE COURT:  All right, Mr. MacMahon?

17          MR. MAC MAHON:  Thank you, Your Honor.

18                          CROSS-EXAMINATION

19  BY MR. MAC MAHON:

20  Q.   Mr. Y., good afternoon.

21  A.   Good afternoon.

22  Q.   If I say "why" and it's part of a question, I apologize if

23  it's your last name, it's our first Y.

24          Do I understand your testimony correctly that at the

25  New York office, that -- and this was a secure facility,

Stephen Y. - Cross                                                  641

1    correct?

2    A.    Yes.

3    Q.    Are you telling this jury that a CIA case officer could

4    come and go as they pleased with all the documents that they

5    wanted to?

6    A.    Yes.

7    Q.    There was no, no spot-checks, no nothing, huh?

8    A.    No spot-checks, no.

9    Q.    And you never saw Mr. Sterling leave the office with any

10   documents, did you?

11   A.    No, I've never seen that.  No.

12   Q.    No.  You never saw that, correct?

13         Do you know how many other articles there were

14   published in, after September 11 that disclosed that the CIA's

15   office in New York was destroyed other than the one that they

16   just showed the jury?

17   A.    No, I don't, I don't know how many were written.

18   Q.    You didn't look to see if there were other ones, correct?

19   A.    No, I did not.

20   Q.    And you have no idea who this source was for that story?

21   A.    No.

22   Q.    Now, when you -- you, you thought that Mr. Sterling was

23   very difficult to work with, correct?

24   A.    Yes.

25   Q.    All right.  And that's what you told the FBI in 2006, that

Stephen Y. - Cross                                                      642

1    he had a high opinion of himself?

2    A.    Yes.

3    Q.    And when you, when you took over for Mr. Sterling, I think

4    your testimony was that there was no soft file that existed,

5    correct?

6    A.    No, I said I never received one from Mr. Sterling.  No.

7    Q.    And you never asked him for one, either, did you?

8    A.    No.

9    Q.    In fact, you don't know whether he even kept one, do you?

10   A.    Well, to the best of my recollection, I don't recall

11   asking him for it, no.

12   Q.    Okay.  You don't recall ever seeing him -- how --

13   A.    Well, it would be standard practice to maintain one, so --

14   Q.    Right.  But you don't know what he did, do you?

15   A.    No, I don't.

16   Q.    And you don't know where he would have maintained any

17   documents in a soft file at all, correct?

18   A.    No.  I wouldn't be looking at his, you know, the things he

19   had in his file drawer.

20   Q.    How far was your office from his?

21   A.    Oh, 20 feet or so, 10 feet.  Between 10 or 20 feet to the

22   best of my recollection.

23            THE COURT:  I'm sorry, you said "file drawer."

24            THE WITNESS:  Right.

25            THE COURT:  Did each agent have his own drawer then?

1          THE WITNESS:  Yeah, that's exactly it.  Each one

2    would be assigned one drawer.

3          THE COURT:  And was there a lock or any kind of a --

4          THE WITNESS:  Oh, yeah.  It's a very heavily secured

5    safe.

6          THE COURT:  Well, that's the safe, but within the

7    safe, would each drawer have its own lock?

8          THE WITNESS:  No.

9          THE COURT:  So you could --

10         THE WITNESS:  One, one combination would open the

11   entire four-drawer safe, but there would be multiple safes.  So

12   that's the way it was done.  Each one would have about four

13   drawers, and then they would be lined up in a row, and each

14   officer would have his own, his own drawer to put his stuff in.

15         THE COURT:  But my question is if you had a drawer in

16   that safe --

17         THE WITNESS:  Yes, I did.

18         THE COURT:  -- then you could also look at the other

19   drawers within that safe.

20         THE WITNESS:  Yes, that's correct.

21         THE COURT:  All right.  Could you look at what was in

22   another safe?

23         THE WITNESS:  No, just the one that you had access

24   to.

25         THE COURT:  You only had access, all right.

Stephen Y. - Cross                                                          644

1          THE WITNESS:  That's correct.

2          THE COURT:  Go ahead.

3   BY MR. MAC MAHON:

4   Q.   So, Mr. Y., you have no personal knowledge at all that

5   Mr. Sterling kept a soft file dealing with Classified Program

6   No. 1, correct?

7   A.   No, I have, I have no knowledge.

8   Q.   And you have no knowledge that Mr. Sterling kept a soft

9   file with respect to any of his dealings with Mr. Merlin,

10  correct?

11  A.   No, I have no knowledge of that.

12  Q.   And you never -- when you took over for Mr. Sterling as

13  the case officer for Mr. Merlin, it's a fact that you never

14  asked Mr. Sterling for any documents you thought might be

15  missing from the file, correct?

16  A.   That's correct.

17  Q.   And you made an exhaustive review of the file when you

18  took over as a case officer, correct?

19  A.   Well, I have access to the information electronically as

20  well, so that would be the ones where I would have read the

21  past information.

22  Q.   But when you read through all that past information, your

23  testimony would be that at no time did you think by reading a

24  cable that there was something missing, correct?

25  A.   No, not by reading in an electronic cable.  How would I

1    know what's missing?

2    Q.   Nothing you read ever prompted you to call Mr. Sterling

3    and say, "Do you have something else?"  Right?

4    A.   No.

5    Q.   And you, you told the FBI that it was against CIA policy

6    to use e-mails in communicating with assets, correct?

7    A.   That's correct.

8    Q.   And you don't have any information that Mr. Sterling ever

9    did that, do you?

10   A.   No, I don't recall if he did.  To the best of my

11   recollection, I don't know.

12   Q.   Yeah.  And the same with respect to using recording

13   devices during debriefings.  That's completely against your

14   training, correct?

15   A.   Yes.

16   Q.   And you don't have any information that Mr. Sterling ever

17   did that, either, do you?

18   A.   No.  To the best of my recollection.

19   Q.   And you knew by the time that you met Mr. Sterling in New

20   York that he was in litigation with the CIA over a

21   discrimination case, correct?

22   A.   No, I did not.  I was not aware of that.

23   Q.   He never told you about that?

24   A.   No, he did not.

25   Q.   And by the time the story that the -- I'll strike that,

1     Your Honor.

2              Let me consult with Mr. Pollack for a second?

3              THE COURT:  Go ahead.

4              MR. MAC MAHON:  No further questions, Your Honor.

5              Thank you, sir.

6              THE COURT:  All right, redirect?

7                        REDIRECT EXAMINATION

8     BY MR. FITZPATRICK:

9     Q.   Was there a policy regarding removing soft files from the

10    office?

11    A.   Yes.

12    Q.   What was the policy?

13    A.   The policy is you could not take home any soft files or

14    information.  It was forbidden.

15    Q.   As a case officer, what is your secrecy agreement?

16    A.   It says that all the information that I acquire on

17    anything I can't discuss beyond working with my colleagues, my

18    coworkers.

19    Q.   What does the secrecy agreement say about the handling of

20    closely held or classified documents?

21    A.   That it must be secured and kept only in an official

22    installation.

23    Q.   And did that include the soft file?

24    A.   That's true, yes, sir.

25    Q.   Were all case officers trained in this regard?

Stephen Y. - Recross                                           647

1   A.   Oh, yes.

2          MR. FITZPATRICK:  I have nothing further.

3          THE COURT:  Any recross?

4          MR. MAC MAHON:  Just very briefly, Your Honor.

5                    RECROSS EXAMINATION

6   BY MR. MAC MAHON:

7   Q.   Again, this -- excuse me, I'll go to the podium.

8          You were asked questions about taking soft files out

9   of your office.  Do you remember that?  You have no evidence at

10  all that Jeffrey Sterling ever took a soft file out of his

11  office in New York or anywhere else; isn't that correct?

12  A.   To the best of my recollection.

13  Q.   Right.  And you don't even have evidence that he had a

14  soft file, right?

15  A.   No, sir.

16         MR. MAC MAHON:  That's all, Your Honor.  Thank you.

17         THE COURT:  All right, thank you, Mr. Y.  Your

18  testimony is finished.  You're excused.

19         THE WITNESS:  Okay.  Thank you

20                    (Witness excused.)

21         THE COURT:  I think rather than breaking into another

22  witness, it's easier to just move forward and have our lunch

23  break now, and then we'll start -- is the next witness

24  Denis M.?

25         MR. TRUMP:  Yes, Your Honor.

648

1          THE COURT:  How long do you anticipate that witness

2    to be?

3          MR. TRUMP:  This is a screen witness, whereas the

4    next two would not be, so if we want to do it now, we can.

5          THE COURT:  Well, I don't think he's up here.

6    There's no more witnesses here, right?  We didn't call for one.

7    I don't think there's one here.

8          THE COURT SECURITY OFFICER:  No.

9          THE COURT:  No.

10          MR. TRUMP:  So if you want to go to the unscreened

11    witnesses after lunch, we can put him in with the next three

12    remaining screened witnesses.

13          THE COURT:  All right, so we have two unscreened

14    witnesses.

15          MR. TRUMP:  Correct.

16          THE COURT:  We'll start those at quarter of two, just

17    a one-hour lunch break, just 15 minutes earlier.

18          All right, so we will need -- over the lunch break,

19    we need to push the screen back so that those two witnesses can

20    be seen publicly.  Who will those witnesses be so defense

21    counsel knows?

22          MR. TRUMP:  Mr. Harlow and Ms. Rice.

23          THE COURT:  All right, so everybody has those two on

24    board.  All right.

25          So, ladies and gentlemen, I'm giving you your lunch

649

1  break a little bit earlier today. It is one hour, so please be

2  back here promptly at quarter of two, and we'll see you-all

3  then. We'll recess court.

4           (Recess from 12:45 p.m., until 1:45 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  A F T E R N O O N   S E S S I O N

 2                          (Defendant and Jury present.)

 3              THE COURT:  Mr. Trump, call your next witness.

 4              MR. TRUMP:  Mr. Harlow.

 5              THE COURT:  Mr. Harlow.  He's outside, correct?

 6              MR. TRUMP:  Yes.

 7              THE COURT:  All right.  No, he's outside.

 8         WILLIAM HARLOW, GOVERNMENT'S WITNESS, AFFIRMED

 9              MR. TRUMP:  Mr. Wood, he'll need the binder with

10   exhibits in the hundred series.

11                          DIRECT EXAMINATION

12   BY MR. TRUMP:

13   Q.   Would you please state your name?

14   A.   William Harlow.

15   Q.   Would you spell your last name?

16   A.   H-a-r-l-o-w.

17   Q.   Were you formerly employed at the CIA?

18   A.   Yes, I was.

19   Q.   What was your title?

20   A.   I was the Director of Public Affairs.

21   Q.   And what, what was your term there?  What --

22   A.   I was there from 1997 until 2004.

23   Q.   Did you serve in the military?

24   A.   Yes, I did.

25   Q.   When did you begin your military service?

Harlow - Direct                                                   651

1   A.    I was commissioned in 1972 and served on active duty in

2   the Navy until I retired to take the job at the CIA in 1997.

3   Q.    Prior to working at the CIA, what position did you hold in

4   the military?

5   A.    I was a public affairs specialist for most of my time in

6   the Navy, so I served in jobs dealing with the news media,

7   public communication, information.  I had assignments overseas

8   in London and Japan, a lot of time in the Pentagon.  I served

9   four years while on active duty as the Assistant Press

10  Secretary for National Security Affairs at the White House.

11  That was 1988 to '92.

12  Q.    Have you held a Top Secret clearance?

13  A.    I'm sorry?

14  Q.    Have you held a Top Secret clearance?

15  A.    Yes, I have.

16  Q.    Since when?

17  A.    I believe I got my first Top Secret clearance in 1981.

18  Q.    And obviously, as a result of your -- as part of your

19  duties at the CIA, you had to be cleared?

20  A.    Absolutely, yes.

21  Q.    What, what does the Office of Public Affairs do?

22  A.    Well, among the things it does is deal with the news

23  media, respond to public inquiries from, from the media, try to

24  answer questions as we could from, from the media, and other

25  functions involving internal communication with agency

Harlow - Direct                                                    652

1  employees and other public communications, but the principal

2  part of my job was dealing with the news media.

3  Q.   And what was your position specifically, Director?  What

4  were your responsibilities?

5  A.   Well, my responsibility was to run the entire operation of

6  the, of the Press Office, or the Public Affairs Office, but

7  specifically with the news media, I would receive calls from

8  the media, respond to those calls.  They'd have questions.  I'd

9  try to answer if I could from my personal knowledge; if not,

10 research the question to try to find out what the answer was

11 and respond appropriately.

12 Q.   And were you authorized to speak to the media, obviously?

13 A.   Yeah.  I was the official spokesman for the agency.  I

14 was, was authorized and expected to be the person who would

15 respond to the, to the press on whatever matters they were,

16 they were concerned with.

17 Q.   And did you have what's called original classification

18 authority?

19 A.   I had that authority, yes.

20 Q.   Which means what in layman's terms?

21 A.   It means I could determine the information that I was

22 creating which I thought needed to be maintained at a certain

23 level of classification within the agency, or within

24 government.

25 Q.   In terms of executing your duties, however, did you always

Harlow - Direct                                                      653

1    seek authorization from those involved in whatever the activity

2    was for your discussions with the press?

3    A.    Well, there were many occasions where I had the

4    information already, I knew the information.  I had the

5    background that I could respond to the press.  On other

6    occasions, on very sensitive matters or things that I just

7    wasn't personally involved with or aware of, then I would seek

8    out other officials within the agency hierarchy to find out

9    what the facts were in order to be able to respond.

10   Q.    Do you know someone by the name of James Risen?

11   A.    Yes, I do.

12   Q.    And did you have dealings with him over time?

13   A.    Yes.  He was an intelligence correspondent who dealt with

14   the agency, first with the -- he worked for *The Los Angeles*

15   *Times* and then later became a correspondent for *The New York*

16   *Times* and was a regular caller to our office.

17   Q.    And what was the nature of your communication?  Was it

18   phone? direct? e-mail?

19   A.    Almost always telephonic.  Occasionally, we'd get e-mails

20   from him and other reporters, but generally, it was telephonic.

21   Q.    Let me direct your attention to April of 2003.  Do you

22   recall getting a telephone call from Mr. Risen?

23   A.    Yes, I do.

24   Q.    Do you recall exactly what date?

25   A.    I believe it was April 3.

1    Q.    Now, do you, do you and your staff keep a phone log?

2    A.    Yes, they do.

3    Q.    And how is that phone log kept?

4    A.    My administrative assistant would field incoming calls and

5    would write down the time of the call and the caller, and it

6    kept it in a running log.  They would also note the time that I

7    returned the call.  Sometimes I'd answer immediately, and that

8    time would be noted in the log.  Other times, I'd call back 15

9    minutes, an hour, two hours later.  They'd, they'd write down

10   the time of the return phone call.

11   Q.    Are these logs kept accurately?

12   A.    Yes.  To the best of my knowledge, they were.

13   Q.    And what purpose does it serve for you to have this log?

14   A.    Well, it, it ensured that I returned all of the phone

15   calls, which was a very important thing to do, to make sure

16   that I got that, and it would keep a record of who was calling

17   when so that if I needed to go back at a later date and find

18   out, you know, who I spoke to a week before, two weeks before,

19   whenever it was, I'd be able to determine what transpired.

20   Q.    Would you look at what's in the binder as Exhibit 105?

21              THE COURT:  Is there any exhibit -- any objection to

22   105?

23              MR. MAC MAHON:  No objection, Your Honor.

24              THE COURT:  All right, it's in evidence then.

25              (Government's Exhibit No. 105 was received in

1    evidence.)

2              MR. TRUMP:  Could we have that on the screen?

3              THE COURT:  You may.  It's in evidence.

4    BY MR. TRUMP:

5    Q.   All right.  And what is 105?

6    A.   This is the phone log from April 3 of 2003.

7    Q.   And your name is in the upper right-hand corner?

8    A.   That's correct.

9    Q.   And do you see an entry for 4:03?

10   A.   Yes.

11   Q.   And what does that entry indicate?

12   A.   It says, "Jim Risen, NYT."

13   Q.   And that's *New York Times*?

14   A.   Yes.

15   Q.   And the area that's blacked out, those were just the other

16   names of the people who called?

17   A.   Right.  The other, presumably the other reporters who

18   called during the course of that day.

19   Q.   When you receive a call from a reporter, do you take

20   notes?

21   A.   Yes, that was my practice.

22   Q.   And then if necessary, do you memorialize your notes in a

23   communication to other officials?

24   A.   Right.  I mean, very frequently it wasn't necessary, but

25   just you would never know, so I'd keep notes on a spiral steno

1    pad as I was talking to a reporter, and then if I needed to go

2    back and repeat anything to somebody either telephonically or

3    in an e-mail internally, I'd, I'd have the material available

4    to me to, to construct that, that communication.

5    Q.   And internally, do you call that a Lotus Note?

6    A.   That's correct.

7    Q.   And did you prepare a Lotus Note of your telephone

8    conversation with Mr. Harlow on April 3?

9              THE COURT:   Mr. Risen.

10   BY MR. TRUMP:

11   Q.   Excuse me, Mr. Risen on April 3?

12   A.   Yes, I did.

13   Q.   And you then communicated -- you communicate via Lotus

14   Note with those people who need to know what that conversation

15   was about?

16   A.   That's correct.

17   Q.   And would you look at Exhibit 106?

18             THE COURT:   Any objection to 106?

19             MR. MAC MAHON:   No objection, Your Honor.

20             THE COURT:   All right, it's in.

21             (Government's Exhibit No. 106 was received in

22   evidence.)

23   BY MR. TRUMP:

24   Q.   Was that the Lotus Note that you prepared of your

25   telephone conversation with Mr. Risen on April 3?

1    A.    Yes, it is.

2    Q.    And was that prepared from your notes?

3    A.    Yes.

4    Q.    Fairly contemporaneous with the conversation as your

5    duties would allow?

6    A.    Right.  It looks like the timing of this was 6:43 p.m., so

7    a couple hours later, I had time to, to create this note, but

8    it was based on my handwritten notes that were made

9    simultaneous to the incoming phone call.

10   Q.    And what, what did Mr. Risen call about?

11   A.    He called and told me that he was working on a story, and

12   he stressed that it wasn't a tomorrow story.  Usually if you

13   get a call late in the afternoon from a reporter, it may be

14   that they're on deadline.

15          He said it, you know, wasn't a tomorrow story but

16   implied that it was reasonably soon, and he said that he was

17   writing about a classified CIA program which he said involved

18   the Iranian nuclear program, weapons program, and he told me

19   that this program was, was known by a code name, he used the

20   word "Merlin," and he told me that there was a Russian

21   scientist who had defected to the U.S. who the CIA had arranged

22   to sell some nuclear weapons designs to the Iranians, and he

23   said that these designs had been modified by the National Labs,

24   which is a U.S. organization that is involved with nuclear

25   weapons design, production, and whatever, and they were

Harlow - Direct                                                        658

1   modified, he told me, so that they wouldn't work or there was

2   some problem with them, and he said that the Russian had given

3   the plans to, to the Iranians in Europe.

4   Q.   Let me, let me stop you there.  At this time, 2003, was

5   this subject matter something that you heard about a lot?

6   A.   This particular operation?

7   Q.   Let me -- I should rephrase it a better way.  Were most of

8   your calls about other subject matters?

9   A.   Yes.  This was a few weeks after the launch of the

10  invasion of Iraq.  This was 18 months or so into the post-9/11

11  period, so most of the activity I was getting was about

12  terrorism or about the Iraq war, although weapons proliferation

13  is always an important issue, but it wasn't one that I was

14  getting calls on on a daily basis, so this was a little bit out

15  of the blue to me.

16  Q.   And you mentioned that he had used a specific code word.

17  That code word specifically wasn't "Merlin."  It was a more

18  precise term?

19  A.   That's correct.

20  Q.   And you recognized it as a CIA type of code?

21  A.   It was a CIA type of code.  I didn't recognize it

22  specifically, but just the way it was formulated struck me as

23  the way we would encode things at the agency.

24  Q.   Was that also rare that you would receive that type of

25  information?

1  A.   Yes.  It's very rare that those code words leak or are

2  known to the public, and so if somebody purports to have one of

3  some operation which is current, not historical, that was quite

4  rare and alerting to me.

5  Q.   Okay.  Let's go on.  What did he say -- after he said the

6  Russian gave the Iranians the plans, did he tell you what the

7  plans involved?

8  A.    Yes.  He went on to explain, he said the plans involved

9  what he called a fire set, which he said controlled the

10 implosion of the nuclear weapons detonation, and, and he also

11 told me he wasn't sure whether this program was still going on

12 or not but that it, it had started in, in the year 2000 in the

13 previous administration.

14 Q.   Have you just summarized the substance of the factual

15 information provided by Mr. Risen?

16 A.    I'm sorry?

17 Q.   That summary were all the facts that Mr. Risen provided to

18 you?

19 A.    Yes, yes, right.

20 Q.   When you typed this note and you quoted the word "fire

21 set," was that a specific term that Mr. Risen had used?

22 A.    Yes.  It was a term specifically that he used; and I

23 wanted to put it in quotes to make clear that, that that was

24 the terminology he was using; it wasn't my own interpretation

25 of nuclear weapons design.

1   Q.   What did you tell Mr. Risen at this point?

2   A.   Well, I, I told him I would check to see if there was

3   anything I could tell him about, about his question, but I also

4   told him that, you know, that if there was such a program, I

5   didn't think a respectable newspaper should be writing about

6   it.  That is the kind of thing that was highly sensitive, and I

7   didn't think it was, would do any good for that kind of

8   information to be bandied about in the press.

9   Q.   How did you leave it with Mr. Risen?

10  A.   Only that I would look into it and, and get back to him.

11  Q.   Now, did you get a call from another intelligence public

12  affairs officer?

13  A.   Yes.  Later that afternoon, I did.

14  Q.   And what was that about?

15  A.   Another public affairs officer elsewhere in government

16  said he had gotten a similar call from Risen with the same kind

17  of questions.  He told me that Risen told him that he knew that

18  President Clinton --

19        MR. MAC MAHON:  Your Honor, this is hearsay on top of

20  hearsay.

21        THE COURT:  Well, it's not being offered for the

22  truth of its contents.  It's just being offered to explain what

23  that man had been told or heard.  I'm overruling the objection.

24  Go ahead.

25        THE WITNESS:  He told me that, that Risen had told

1   him that he heard that the program had been approved by

2   President Clinton, and he was trying to find out whether it had

3   been reapproved or continued to be approved under the current

4   administration, and he, too, had no immediate comment to Risen,

5   but he was just sharing with me a heads up that he had gotten a

6   similar call.

7   BY MR. TRUMP:

8   Q.   Did you get another call the following day?

9   A.   Yes, I did.

10  Q.   And that was April 4, 2003?

11  A.   Yes.

12          MR. TRUMP:  And if we could look at 107?

13          THE COURT:  Any objection to 107?

14          MR. MAC MAHON:  No, Your Honor.

15          THE COURT:  All right, it's in.

16          (Government's Exhibit No. 107 was received in

17  evidence.)

18  BY MR. TRUMP:

19  Q.   Is that your phone log for the following day?

20  A.   Yes, it is.

21  Q.   April 4?

22          And did you receive two telephone calls from

23  Mr. Risen?

24  A.   Yes.

25  Q.   Or -- on the first page of, excuse me, 107, there are two

1  calls listed?

2  A.   Yes.

3  Q.   And the second page, one?

4  A.   One more, right.

5  Q.   Sometimes calls are recorded that you don't return right

6  away?

7  A.   Yeah, sometimes.

8  Q.   But you had one conversation with Mr. Risen on April 4?

9  You only had one conversation on April 4?

10  A.   No, no, I don't think so.  I think the call at 10:43 looks

11  like I returned it at 11:00; the call at 4:33, I'm not sure

12  what that says; and then there was another call at 6:20.  It

13  doesn't have a call completed time.  That probably just meant

14  that my staff went home before I did, but I think the first

15  call, I may be wrong, but my vague recollection is the first

16  call was unrelated to his call the day before.

17          The second calls were -- I may be wrong on this, but

18  I think it was -- he may have been talking about multiple

19  things, and the later calls certainly were about this issue.

20  Q.   And again, did you prepare notes and then a Lotus Note of

21  the telephone conversations?

22  A.   Yes, I did.

23  Q.   And is that memorialized in Exhibit 108?

24  A.   Yes.

25          MR. MAC MAHON:  No objection, Your Honor.

Harlow - Direct                                                                    663

1              THE COURT:  All right, it's in.

2              (Government's Exhibit No. 108 was received in

3     evidence.)

4              THE WITNESS:  And I see from this I'm wrong because

5     the timing of this is, would have been after the first phone

6     call, so the others may have been follow-ups to it but --

7     BY MR. TRUMP:

8     Q.   The bottom of that exhibit is simply the e-mail chain from

9     the previous day?

10    A.   That's right.  The way it worked is you'd see the whole

11    chain.

12    Q.   Now, in this telephone call, did Mr. Risen provide any

13    more details of, of what he discussed the previous day?

14    A.   Yes.  Initially, he was asking did I have an answer for

15    him, and I told him I didn't yet but that I was working on it.

16    Do you want to go --

17    Q.   And what did you, what did you respond?

18    A.   I'm sorry?

19    Q.   What was your response?

20    A.   Well, I, I told him that, that, more about I was

21    questioning why he should want to write about a story like this

22    and told him that, you know, if the facts were correct as he

23    laid them out, which I wasn't confirming, that I told him I

24    thought such a story would jeopardize U.S. security and didn't

25    think it was in anyone's benefit to do so.

1          And he -- as I say in the note, he responded to me,

2    amazingly enough, that he hadn't really thought through the

3    security implications of the, of that particular article that

4    he was working on.

5    Q.   Let me, let me stop you there.  In terms of the factual

6    information or the information that Risen had for his story,

7    did you get anything more on April 4 that you didn't have on

8    April 3?

9    A.   I don't think so.  I think this is mostly him trying to

10   drag out of me:  Are you going to answer the question?  What's

11   the answer?

12   Q.   And how did you -- when you and Mr. Risen hung up, how was

13   it left with him?

14   A.   Well, just that I was going to continue to, to try to get

15   the answer.  He was telling me that he thought -- he would

16   think about how he might adjust the story so that it wouldn't

17   have an impact on national security.

18          And I'd also had a conversation with him as part of

19   this reminding him of an earlier incident where he had

20   objected, when senior officials at the White House had called

21   his publisher to try to prevent the publication of a very

22   sensitive bit of information, and he -- and his editor had

23   objected to that.  So I told him, you know, "We should work

24   together.  If you don't want that to happen, you should come

25   back to me and think this through," although I didn't think

1    that there was a way to dumb this story down to make it so that

2    it would be appropriate to put in the paper given the nature of

3    this particular, this particular story.

4    Q.   What did you do now?  Two phone calls, and what was your

5    responsibility at this point?

6    A.   When I would get calls like this and what I did in this

7    case would be to reach out to appropriate officials within the

8    agency and ask them:  What do you know about this?  Do you know

9    anything about this particular code word that he gave us --

10   gave me?  Is there such an operation?

11          And I'd try to gather information about it so that I

12   could advise senior leadership about if and how to respond.

13   Q.   Were you able to gather some information?

14   A.   I did.

15   Q.   Were you able to determine whether there was, in fact, a

16   program like this?

17   A.   Yes.  I learned that there was a program similar to what

18   he was describing and that it was highly sensitive and was not

19   the kind of information which we would ever have wanted to

20   reach the media.

21   Q.   In doing that research, did the name of the defendant,

22   Jeffrey Sterling, come up?

23   A.   Yes.  At one point, someone within that group, and I don't

24   know at this point who, mentioned to me this was the program

25   that Jeffrey Sterling had been working on or had been involved

Harlow - Direct                                                          666

1    in or something like that.

2    Q.   Did you know Jeffrey Sterling?

3    A.   I knew the name.  I never met Mr. Sterling, but I knew his

4    name.

5    Q.   And why was his name familiar to you?

6    A.   The previous year, I believe, he filed a lawsuit alleging

7    discrimination against the agency for his treatment while he

8    was a case officer.  That, that story got a lot of publicity,

9    was in the media quite a bit, and there was a, particularly a

10   story about him and his case written in *The New York Times*, I

11   believe, by Jim Risen.

12   Q.   After gathering the information, did you call Risen back,

13   or did he call you?

14   A.   We were still -- the way I left it with him is that he was

15   going to think about if there was a way to deal with the story,

16   and so as I recall, there was a period of time when he didn't

17   press the issue and I didn't have a good answer for him other

18   than don't do it.  So I think there was a gap in time before

19   there was another exchange on the specifics of this story.

20   Q.   And did that occur on April 25?

21   A.   Yes.

22   Q.   Of 2003?

23        And could we look at Government 111?

24   A.   Okay.

25   Q.   And again, was this the phone log of your calls?

1    A.    Yes.

2    Q.    And there were calls reflected from Mr. Risen?

3    A.    Yes.

4    Q.    And did you talk to him on April 25?

5    A.    Yes, I did.

6    Q.    Did you prepare notes and then subsequently a Lotus Note

7    of that conversation?

8    A.    Yes, I did.

9    Q.    And is that Exhibit 112?

10           THE COURT:  I assume there's no objection to 111 or

11   112?

12           MR. MAC MAHON:  No, Your Honor.

13           THE COURT:  All right.

14           (Government's Exhibit Nos. 111 and 112 were received

15   in evidence.)

16           THE WITNESS:  Yes, that's the note.

17   BY MR. TRUMP:

18   Q.    And about what time did you talk to Mr. Risen on April 25?

19   A.    It was about 3:30 in the afternoon.

20   Q.    And what did you discuss with him?

21   A.    He said he had been considering my previous communication

22   with him urging him to think about it, but he was still working

23   on the story, and then he started to read to me the lead of his

24   story.  So it was clear to me at this point that the story was,

25   was fairly well along, because usually by the time a reporter

1   has written out the lead and structure of their story, it's

2   getting closer to publication.

3            So he started reading to me the, what he planned to,

4   to write.

5   Q.   And it was the same story about the Iranian nuclear

6   weapons?

7   A.   Same story but, but it was more fully laid out, and he,

8   you know, told me how the story would probably appear in the

9   paper, you know, saying that the U.S. had an ongoing classified

10  program to derail the Iranian nuclear program and by selling

11  them intentionally flawed diagrams, and then he said something

12  about according to government documents and knowledgeable

13  people.

14  Q.   And what did that mean to you?

15  A.   You know, that triggered in my mind an alarm bell.  So I

16  stopped and asked him, you know, "Are you telling me that you

17  have documents about some of this stuff?"

18           And he said, "Yes."

19           Then he went on to further, you know, read from his

20  draft story, and he said the program was code name Merlin and

21  that it involved a Russian defector pretending to be a

22  scientist willing to sell the firing sets, and he said the deal

23  was eventually made and it was part of a larger program to

24  inject design flaws into the Iranian program.

25  Q.   Now, stopping you there, again, without revealing the true

1    code name, he had used the true code name for the -- he had

2    used a true cryptonym rather than --

3    A.   He used, he used a, more than "Merlin," which he said was

4    the description of the entire operation.  I believe I, you

5    know, by the time, I had learned that perhaps the code name

6    that he was using was referring to the individual as opposed to

7    the overall program, but he was still using very specific,

8    agency-like code words in his communication with me.

9    Q.   And in your Lotus Note, you used the term "firing set,"

10   i-n-g, rather than "fire sets."  Is this what Risen is telling

11   you, as best as you can recall?

12   A.   As best as I can recall, that's what he was saying, yes.

13   Q.   What did you ask him in response?

14   A.   Well, I, I asked him again whether he had considered the

15   wisdom of doing this story, and he told me he had, and he said

16   to me that he had talked to some people who believed that the

17   operation was not handled properly and that, that the Iranians

18   were already aware of the flaw.  Therefore, his revealing it

19   wouldn't be, wouldn't be a problem, and that the Iranians had

20   already been able to fix the flaws that were in the diagrams

21   that were sent to him.

22        And this was the first time that he ever mentioned to

23   me any notion that the program was not well run, successful,

24   appropriate, and that's the first time I had heard that

25   allegation either from him or anywhere else, so that was

1    concerning to me.

2    Q.    And what did you ask him to do?

3    A.    I asked him how widely this had been discussed at his

4    newspaper, because by this point, I was certain this was a

5    highly sensitive program, and I didn't want too many people

6    bandying about the story because the more people who know about

7    it in the newsroom, the greater the possibility that it might

8    leak.  Even if it didn't end up in *The New York Times*, it could

9    leak somewhere else.

10          So I asked him to control that, and I did tell him at

11   that point that I thought that there was enough concern about

12   this that very high officials in the U.S. government would want

13   to make strong representations to his leadership about the lack

14   of wisdom of running such an article, and so I urged him to not

15   go ahead until we had an opportunity to do that and to keep

16   tight the number of people who would see his draft or know

17   about this article that he was preparing.

18   Q.    Now, at the bottom of that note, it indicates you had to

19   move quickly?

20   A.    Yes.  Again, because he already had a draft of the

21   article, I thought this is something which could appear in the

22   paper in the next few days, so we didn't have a lot of time to

23   think about this.  If we wanted to prevent it from appearing in

24   a paper, we needed to act quickly to make a representation to

25   his leadership about not doing so.

1    Q.   So what did you do?

2    A.   Well, I sent this note to agency senior leadership.  They

3    agreed, and in conversations with the White House, there was a

4    decision that the National Security Advisor, Dr. Rice, would,

5    in fact, hold a meeting with *New York Times* officials to talk

6    about this, and then I was asked to craft some talking points

7    that she could have for her use or consideration in that

8    meeting to, to make the case to *The New York Times* that this

9    was not an article which ought to appear in their paper.

10   Q.   And did you, in fact, draft some talking points?

11   A.   Yes, I did.

12   Q.   Was that based upon the research that you had done over

13   the last two weeks or so?

14   A.   Yes.

15   Q.   And looking at Government 114 --

16            THE COURT:  114?  Any objection?

17            MR. MAC MAHON:  No objection, Your Honor.

18            THE COURT:  All right, it's in.

19            (Government's Exhibit No. 114 was received in

20   evidence.)

21   BY MR. TRUMP:

22   Q.   Are those the talking points you drafted?

23   A.   Yes, they are.

24   Q.   Now, when was the White House meeting?  Let me back up.

25   Did you prepare a memorandum memorializing the White House

1  meeting?

2  A.   Yes.  After the meeting took place, I prepared a --

3  because I was present at the meeting, I took notes and then

4  created a memo to circulate at the agency beyond this.

5  Q.   And did, did that memo reflect the date of the meeting?

6  A.   Yes.

7  Q.   And is that memo Exhibit 113, Exhibit 113?

8        THE COURT:  Any objection to 113?

9        MR. MAC MAHON:  No objection, Your Honor.

10        THE COURT:  All right, it's in.

11        (Government's Exhibit No. 113 was received in

12  evidence.)

13        THE WITNESS:  Yes.  That's, that's my note.

14  BY MR. TRUMP:

15  Q.   And when was the White House meeting?

16  A.   April 30.

17  Q.   And who was there on behalf of the CIA?

18  A.   The Director, George Tenet, was there; Steve Kappes, who

19  was the No. 2 in the clandestine service, the Deputy Director

20  of Operations; and myself.

21  Q.   And obviously, Dr. Rice was the chair of the meeting?

22  A.   Yes.

23  Q.   And who was there on behalf of The New York Times?

24  A.   Jill Abramson, who was then the Washington bureau chief,

25  and Jim Risen.

1    Q.   And there was also someone from NSC staff?

2    A.   Anna Perez, who is Dr. Rice's spokesperson, was also

3    present.

4    Q.   Did you give Dr. Rice the talking points, or had someone

5    given them to her?

6    A.   Someone had given them to her in advance, so she had them

7    before we arrived.

8    Q.   And tell us what happened at the meeting.

9    A.   It lasted about 15 minutes.  I noted that she followed the

10   talking points very closely, and when she got done, there was

11   some conversation.  Jill Abramson asked for more information

12   about one of the talking points, one of the assertions in the

13   talking points, which is that leak of this information could

14   result in people dying.

15         At that point, Director Tenet spoke up and said that,

16   reminding people that this was off the record because we didn't

17   want this to end up in their story if they ended up ignoring

18   us, but the Russian involved had used his true name when

19   dealing with the Iranians, and so if they learned that they had

20   been misled, they might go after him, and so that was a concern

21   particularly for, you know, for that one individual.

22   Q.   Did Mr. Risen ask any questions?

23   A.   Yes.  He, he asked about the question about we had

24   asserted -- or the notion of whether the Iranians were witting

25   of the program, whether they were aware this operation had been

1   conducted, and he said that he -- or he implied that he had

2   seen a letter to the Iranians from the Russian which had told

3   them that the program was flawed, and so he took from that that

4   it meant, you know, they already know, so, you know, our story

5   won't make it any worse for this guy.

6          And Director Tenet answered up and said no, the

7   purpose for the letter was for the individual to suggest to the

8   Iranians that they continue to need him, they needed his

9   services, so he wasn't telling them, "What I just gave you was

10  no good."  He was telling them, "You need me to continue to

11  help you on this program."

12  Q.   So what happened -- how did the meeting wrap up?

13  A.   Well, Jill Abramson, the Washington bureau's chief, said

14  that they had a fully realized draft, which to me meant the

15  story was done, it was ready to go, but they hadn't yet decided

16  to publish it, and they would go back and think about it and

17  would let us know.  And she said that the decision was above

18  her pay grade, that it would be made by her bosses in New York.

19         And there was a discussion about we were urging them

20  to keep the information very tightly held and don't have it

21  easily available on your computer systems, don't have it laying

22  around, don't have too many people editing it, because we

23  didn't want the information to leak.  Even if it didn't appear

24  in *The New York Times*, we didn't want it to appear anywhere

25  else.  We asked them to keep it closely held.

1   Q.   And how did it wrap up?

2   A.   Abramson said that she would let us know her decision --

3   or the paper's decision after she talked to her bosses in New

4   York, and that was the end of the meeting.

5   Q.   And did you later find out that *The New York Times* decided

6   not to post the story?

7   A.   Yes.  I believe it was a week, ten days later or so I got

8   a call from Anna Perez, the spokesperson for Dr. Rice, who said

9   that they had gotten a call from *The New York Times* saying not

10  to worry, we're not going with it, and that appeared to be the

11  end of the story.

12  Q.   And is that reflected in Government Exhibit 115?

13  A.   Yes.

14         MR. MAC MAHON:  No objection, Your Honor.

15         THE COURT:  All right, 115 is in evidence.

16         (Government's Exhibit No. 115 was received in

17  evidence.)

18         MR. TRUMP:  The Court's indulgence?

19         THE COURT:  Yes, sir.

20         MR. TRUMP:  That's all I have.

21         THE COURT:  All right.  Mr. MacMahon,

22  cross-examination?

23         MR. MAC MAHON:  Thank you, Your Honor.

24                         CROSS-EXAMINATION

25  BY MR. MAC MAHON:

1    Q.    Good afternoon, Mr. Harlow.  My name is Edward MacMahon.

2    I'm one of the attorneys representing Mr. Sterling.

3              Sir, you say, I think, on direct -- first of all,

4    these events took place how many years ago?

5    A.    Not quite 12 years ago.

6    Q.    All right.  And you've been reading off of the documents

7    in front of you as you testified today, haven't you?

8    A.    Yes.

9    Q.    Because you don't have really an independent recollection

10   of many of these events, do you?

11   A.    Well, this was a very memorable event, so of my time at

12   the agency, this was one of the more startling phone calls I

13   got, so I have a recollection of it.  I couldn't have given you

14   the date of the phone call or the exact order or the sequence

15   of events, but the events, you know, I remember that.

16   Q.    All right.  But you're reading off the paper in front of

17   you, aren't you?

18   A.    I was because it makes it easier and so I didn't get it

19   wrong, but I guarantee you I remember that phone call.

20   Q.    Okay.  And you said you told Mr. Risen that you didn't

21   think a respectable journalist would publish this story?

22   A.    Yes, sir.

23   Q.    That's not exactly what you told him, is it?  Didn't you

24   tell him Al Jazeera was the only outlet that would publish

25   that?

Harlow - Cross                                                          677

1    A.    If you'd like me to read all of these back to you, I'll

2    read the entire document, but yeah.

3    Q.    You did tell him that it would be Al Jazeera that would

4    publish this story?

5    A.    Yeah, I did because I thought that it might shock him into

6    thinking that a publication that maybe didn't have our best

7    interests, U.S. best interests, you know, we're talking weeks

8    after the invasion of Iraq, 18 months after 9/11, I wanted to

9    give him the impression that a reputable news organization

10   would not be putting this kind of information out, and so I

11   wanted to get his attention.

12           Whether I did or not, I don't know.

13   Q.    And Al Jazeera is what, an Arab-owned news network?

14           MR. TRUMP:  Objection, Your Honor.  This is going far

15   afield.

16           THE COURT:  It is.  However, it's mentioned in the

17   notes, and I'm going to allow just a bit of this.  I doubt

18   we're going very far.

19           MR. MAC MAHON:  I'm almost done, Your Honor, I

20   promise.

21           THE COURT:  Go ahead.  Overruled.

22   BY MR. MAC MAHON:

23   Q.    What is Al Jazeera, Mr. Harlow?

24   A.    It's an Arab-owned news network which at the time was not

25   particularly held in high regard.  It's gotten better over the

1    years from my observing from afar, but at the time, it wasn't

2    particularly held in high regard, and I was trying to get his

3    attention.

4    Q.   Did you get a reaction from Mr. Risen when you suggested

5    his journalism might appear on Al Jazeera?

6    A.   No.

7    Q.   Now, when you -- if you look at Exhibit 106, which I think

8    you told us was your notes of the first time that you talked to

9    Mr. Risen, correct?  About this subject.  I know that you

10   talked to him a lot.

11   A.   Right.  Yes.

12   Q.   Okay.  And in your notes -- if we could put that up,

13   Mr. Francisco? -- he told you that there were -- excuse me, he

14   was unaware, and this is in the middle, whether the program was

15   still in operation, correct?

16          THE COURT:  Third paragraph down.

17   BY MR. MAC MAHON:

18   Q.   Third paragraph down.  It starts with, "He went on to say

19   that the plans involved"?

20   A.   Yes, correct.

21   Q.   Right?  That's what you wrote down in your notes, that

22   Mr. Risen on April 3, 2003, was unsure that the program was in

23   operation but that it started in 2000.

24   A.   Right.

25   Q.   Now, that -- he obtained more information in the next

1  three weeks, didn't he?  He appeared to, didn't he?

2  A.    Yes.

3  Q.    Okay.  So if we'd look at Government Exhibit 112, and it's

4  the -- if Mr. Francisco could highlight the fifth line down?

5  It starts, "The United States," please.

6          Now, he says, "The United States has an ongoing

7  classified program"?

8          MR. TRUMP:  Objection.  That's not what it says, Your

9  Honor.

10 BY MR. MAC MAHON:

11 Q.    ". . . has had an ongoing classified program to derail the

12 Iranian nuclear weapons," correct?

13 A.    Right.

14 Q.    "Ongoing" is your word here, right?

15 A.    Right.

16 Q.    Is that what Mr. Risen told you, that he now knew the

17 program was ongoing?

18 A.    Assuming that he was telling me the truth in his first

19 call, that he didn't know whether it was ongoing, and he now is

20 saying it is ongoing, then I accept your point that he learned

21 something in that period.  Whether or not he did, I don't know.

22          Part of Risen's MO is that he would do all this

23 aw-shucks kind of stuff and would often not tell you much of

24 what he knew, and so whether he was, he was telling me

25 everything he knew, I'm certain he wasn't telling me everything

1    he knew on April 3, he was telling me more since he had drafted

2    his story on April 25.

3    Q.   Sir, you don't disagree that he told you something

4    different and knew that he -- on April 25 than he had told you

5    on April 3, correct?

6    A.   He definitely told me something different, yes.

7    Q.   Okay.  And in that same call, you said he had "according

8    to government documents and knowledgeable people," correct?

9    A.   Right.

10   Q.   He didn't attribute that to one person, did he?

11   A.   I wrote down what he told me.

12   Q.   Right.  Let's go to Exhibit 113 as well, if we could,

13   please.  And these are notes from the meeting at the White

14   House on April 30?

15   A.   Right.

16   Q.   And if we could focus in on the paragraph that starts with

17   "Risen said" -- "Risen asked," excuse me?  Mr. Risen said at

18   that meeting, and you were present, that he had seen a letter

19   to the Iranians from the Russian which told them that their

20   program was flawed.

21        That's what he said at the meeting, isn't it?

22   A.   It says he implied he had seen a letter to the Iranians.

23   Q.   Well, what did he exactly say, do you remember?

24   A.   I don't remember that.  You know, as he pointed out, it

25   was a dozen years ago.

1   Q.   Right.   This was your -- this is your best recollection of

2   what happened is that he implied that he had seen a letter to

3   the Iranians from the Russian telling them that their program

4   was flawed.   Right?

5   A.   Right.

6   Q.   Did you ever see that letter?

7   A.   No, sir.

8   Q.   Now, you were interviewed by the FBI several times about

9   this matter, correct?

10  A.   Yes, sir.

11  Q.   And did you tell the FBI that Mr. Risen has lots of

12  sources for the stories that he calls you with?

13  A.   Sure.   Most reporters, national news stories, they can

14  have lots of sources.

15  Q.   Right.   You told him that Mr. Risen had access to senior

16  CIA officials, correct?

17  A.   I think I told him former senior CIA officials.

18  Q.   Right.   He'd written a book recently with a former CIA

19  official named Milt Bearden, correct?

20  A.   Right.   Who had been retired for about ten years.

21  Q.   But that's something you told the FBI?

22  A.   I told them Milt Bearden, who had been retired for about

23  ten years, yes.

24  Q.   And you told -- you didn't -- Mr. Bearden wasn't the only

25  former CIA -- that was the only CIA official that you named

Harlow - Cross                                                        682

1   when you talked to the --

2   A.   Yeah.

3   Q.   Because you didn't know if there was anybody else,

4   correct?

5   A.   No.

6   Q.   All right.  And you also told the FBI in 2003 that you

7   didn't even know whether Mr. Risen had documents about the

8   program.

9   A.   I -- he said he did in response to me.  I don't know

10  whether he was telling me the truth again, but that's what he

11  told me.

12  Q.   Okay.  And you also told them that someone they should

13  talk to about something like this would be Bill Duhnke, a

14  person named Bill Duhnke, correct, up at the -- that worked at

15  the U.S. Senate?

16           MR. TRUMP:  Objection, Your Honor.  That gets into

17  another topic that we would need to discuss at the bench.

18           THE COURT:  Approach the bench.  Mira.

19           (Sealed Bench Conference C not transcribed in this

20            volume.)

21  BY MR. MAC MAHON:

22  Q.   Now, Mr. Harlow, in 2003, you told the FBI that you

23  thought that Mr. Risen might reach out to the Staff Director of

24  the Senate Select Intelligence Committee on Intelligence for

25  confirmation, that Mr. Risen would, correct?

1   A.   I'm sorry?

2   Q.   Do you remember telling the FBI that Mr. Risen didn't

3   indicate or tell you in any way where he'd gotten this story

4   from?

5   A.   That's correct; he didn't.

6   Q.   And you told him that he didn't tell you whether it was a

7   Hill staffer or not?

8   A.   He didn't tell me at all where he got it.

9   Q.   And you suggested to the -- you told the FBI that he might

10  have contact with someone affiliated with one of the

11  intelligence committees, and that's the permanent United States

12  Select Intelligence Committee on Intelligence, correct?

13  A.    My recollection is what the FBI asked me is who are the

14  kind of people that Risen might talk to on a story like this,

15  and I told them that he had regular contact with the

16  Congressional Oversight Committees, including the Senate

17  Intelligence Committee, and so the kind of places he might go

18  to ask about the story would be the Senate Oversight

19  committees.

20          That's my recollection of it.  You know, it's a dozen

21  years ago but --

22  Q.   And one of the names you gave them was Bill Duhnke, right?

23  A.    Right.

24  Q.   Now, do you -- you testified earlier that you were aware

25  from your duties in the Press Office, is it, that Mr. Sterling

1    had filed a discrimination case against the CIA?

2    A.    Yes.

3    Q.    Okay.  In fact, you had, you had written an e-mail in 2002

4    about Mr. Sterling's discrimination case.  Do you remember

5    that?

6    A.    No.

7    Q.    Do you remember an e-mail titled "Bill Harlow's Tirade"?

8    A.    No.

9    Q.    Do you know whether that e-mail has to do with

10   Mr. Sterling's discrimination case?

11   A.    I have no idea.

12            MR. MAC MAHON:  Your Honor, I have a document that's

13   marked as Defendant's Exhibit 4.  If I could hand it to the

14   witness?  I have copies for the Court.

15            MR. TRUMP:  I fail to see any relevance in this.  It

16   doesn't relate --

17            THE COURT:  Well, I don't have it, so let me take a

18   look at it.

19            I'm going to permit this.  Overruled.

20            MR. MAC MAHON:  Move Exhibit No. 4, Your Honor.

21            THE COURT:  All right, it's in.

22            (Defendant's Exhibit No. 4 was received in evidence.)

23   BY MR. MAC MAHON:

24   Q.    Are you done reading that, Mr. Harlow?

25   A.    Yes.

1    Q.   Does this e-mail -- if we can publish this for the jury,

2    please?  The subject line of this e-mail is "Bill Harlow's

3    Tirade"?

4    A.   Yes.

5    Q.   Does this refresh your recollection as to what the tirade

6    was about?

7    A.   Haven't a clue.

8    Q.   Does reading of the body of the e-mail suggest to you that

9    in any way this had to do with Mr. Sterling's pending case in

10   the Southern District of New York?

11   A.   It has something to do with it.  Exactly what it has to do

12   with it, I don't know.  I'm not even sure who it's from since

13   it's been blacked out, but --

14   Q.   But Mr. Sterling did have a case in the Southern District

15   of New York in 2002, correct?

16   A.   I believe that's where it was.  I know he had a case,

17   yeah.

18   Q.   All right.  And you knew that there were articles in the

19   paper and otherwise in that time frame?

20   A.   Yes.

21   Q.   And you were being asked to comment about his case,

22   weren't you?

23   A.   Sure.

24   Q.   And that resulted in your tirade, correct?

25   A.   I don't know if that's what resulted in it or not.  I'm

Harlow - Cross                                                      686

1    sure the "tirade" is a joke, but in any case, this is somebody

2    responding to it, saying while we can't talk about

3    Mr. Sterling's case, we can talk about our efforts to, to have

4    an effective hiring program, equal opportunity at the agency,

5    and somebody who wanted to talk about that, and we did to some

6    extent talk about that without talking about the specifics of

7    his case.

8           We were able to talk about how many people we had

9    hired in the last class of clandestine officers, 20-some

10   percent had been of minority.  So we were addressing the

11   overall charge that we were an organization which discriminated

12   against, without getting into specifics of his case because we

13   weren't allowed to due to privacy.

14   Q.   All right.  And lastly, Mr. Trump asked you about in April

15   of 2003, you were fielding a lot of calls, weren't you?

16   A.   Sure.

17   Q.   All right.  And you were fielding a lot of calls about

18   whether weapons of mass destruction had been found in Iraq,

19   correct?

20   A.   Sure.

21          MR. TRUMP:  Objection.

22          THE COURT:  Well, it's already been answered.  You

23   have to be faster on your feet, Mr. Trump.

24   BY MR. MAC MAHON:

25   Q.   That was a, that was a topic of great interest, correct?

1              MR. TRUMP:  Objection.

2              MR. MAC MAHON:  He opened the door.

3              THE COURT:  Well, he opened the door.  Your witness

4    did testify that he had a lot of activity.  We're not going to

5    go very far into that, but that's not inappropriate.

6    Overruled.

7    BY MR. MAC MAHON:

8    Q.   And that was the subject of most of your calls, was

9    whether the U.S. government was actually going to find weapons

10   of mass destruction in Iraq after you went to war, correct?

11   A.    No, I wouldn't say most of my calls.  Certainly not in

12   April, because the invasion had only happened a few weeks

13   before, and we were telling people, you know, that it was going

14   to take a lot longer than that, and it wasn't until months and

15   months later that we determined that we probably weren't going

16   to find weapons of mass destruction, so at this point, no.

17             We were getting questions at this point about how was

18   the war going?  Have you found Saddam yet?  And also, how is

19   the war against Al Qaeda going?  You know, have you found Bin

20   Laden yet?

21             So in April of 2003, that wasn't the principal

22   question.

23   Q.   But you were fielding calls at that time --

24   A.   Sure.

25   Q.   -- about whether the CIA --

Rice - Direct                                                           688

1   A.   We were getting some.  Some, yeah.

2           THE COURT:  That's been asked and answered.

3           MR. MAC MAHON:  Nothing further, Your Honor.

4           THE COURT:  All right, is there any redirect?

5           MR. TRUMP:  No, Your Honor.

6           THE COURT:  All right.  Mr. Harlow is not going to be

7   called as a witness again, correct?

8           MR. TRUMP:  Correct.

9           THE COURT:  Mr. Harlow, you're free to stay in court

10  and watch the proceedings if you want to, or you may leave.

11  Thank you for your testimony.

12          THE WITNESS:  Thank you very much.

13                      (Witness excused.)

14          THE COURT:  All right, call your next witness.

15          MR. OLSHAN:  Your Honor, the government calls

16  Condoleezza Rice.

17          THE COURT:  All right.  Mr. Wood, the next witness is

18  outside as well.

19     CONDOLEEZZA RICE, PH.D., GOVERNMENT'S WITNESS, AFFIRMED

20          MR. OLSHAN:  May I proceed?

21          THE COURT:  Yes, sir.

22                     DIRECT EXAMINATION

23  BY MR. OLSHAN:

24  Q.   Good afternoon, ma'am.

25  A.   Good afternoon.

1   Q.   If you could, please state and spell your name for the

2   record.

3   A.   My name is Condoleezza Rice, C-o-n-d-o-l-e-e-z-z-a, Rice,

4   R-i-c-e.

5   Q.   Secretary Rice, were you formerly the Secretary of State

6   for the United States?

7   A.   I was.

8   Q.   Can you tell the jury what years you were Secretary of

9   State?

10  A.   I was Secretary of State from January 2005 until 2009.

11  Q.   That's a cabinet-level position within the U.S.

12  government?

13  A.   It is.

14  Q.   Can you tell the jury a little bit about your educational

15  background?

16  A.   Yes.  I was a graduate -- I was an undergraduate student

17  at the University of Denver, where I studied first music and

18  then political science.  I received my B.A. in 1974 and then

19  did my master's degree at Notre Dame, finishing in 1975.  I

20  received my Ph.D. in International Studies from the University

21  of Denver in 1981 and then went to Stanford University.

22  Q.   And are you currently employed, Secretary Rice?

23  A.   I am.  I'm on the faculty of Stanford University in the

24  Graduate School of Business, and I'm a senior fellow at the

25  Hoover Institution on Public Policy.

Rice - Direct                                                        690

1   Q.   Do you teach courses?

2   A.   I do.  I teach undergraduate courses in American foreign

3   policy.  I teach courses for the business school in, concerning

4   political risk and also on global politics.

5   Q.   Other than your position as Secretary of State, have you

6   held other positions within the United States government?

7   A.   I have.  From 1989 until 1991, I was Special Assistant to

8   the President for National Security Affairs and Senior Director

9   for Soviet and East European Affairs in the administration of

10  President George H. W. Bush; and then from 2001, January of

11  2001 until my becoming Secretary of State in 2005, I was

12  Assistant to the President for National Security Affairs, more

13  commonly known as National Security Advisor.

14  Q.   Let's focus on that time, time frame.  In approximately

15  April of 2003, were you National Security Advisor?

16  A.   I was.

17  Q.   Can you briefly describe for the jury what the National

18  Security Advisor is and what she does?

19  A.   The National Security Advisor is the principal aide or

20  assistant to the President for National Security Affairs.  It's

21  the responsibility of the National Security Advisor to make

22  sure that the President is properly briefed on matters of

23  national security.

24        The National Security Advisor also coordinates the

25  government's policies through the National Security Council,

1    which consists of the Secretary of State, the Secretary of

2    Defense, and some other key national security officials; and

3    the National Security Advisor undertakes various tasks at the

4    direction of the President on behalf of American national

5    security policy.

6    Q.    Is it fair to say with that description that it's a fairly

7    high-ranking government position?

8    A.    Yes, I think that's fair.

9    Q.    As of April 2003, approximately how long had you been

10   National Security Advisor?

11   A.    I became National Security Advisor after the inauguration

12   of President George W. Bush.  The National Security Advisor

13   does not require confirmation, so upon his inauguration, I was

14   National Security Advisor.  That would have been in January of

15   2001, so roughly two years and a few months.

16   Q.    As the National Security Advisor, did you hold a security

17   clearance?

18   A.    I did hold several security clearances, yes.

19   Q.    And at other times prior to that, perhaps during the first

20   Bush administration, did you also hold security clearances?

21   A.    I had held security clearances a number of times during my

22   government service.

23   Q.    What about when you were later Secretary of State?

24   A.    As Secretary of State, I also held security clearances.

25   Q.    In connection with your government positions, did you

Rice - Direct                                                          692

1    receive training on how to properly handle classified

2    information?

3    A.    Yes.  We received training on how to properly handle

4    national security information to make certain that it would not

5    be disclosed, how to handle documents, how to secure documents,

6    and after that training, we were certified and, in fact,

7    certified by signature that we had been properly trained and

8    agreed to handle the materials properly.

9    Q.    You did this periodically through your career?

10   A.    Yes.

11   Q.    How important would you say the proper handling of

12   classified information was during your tenure?

13   A.    The proper handling of national security information is

14   extraordinarily important because it very often involves some

15   of the most sensitive programs that the United States is

16   carrying out to try to secure the country.  It can contain

17   intelligence information that is important to securing the

18   country.  So the handling of sensitive national security

19   information is extraordinarily important.

20   Q.    Do you recall attending a meeting on April 30, 2003, at

21   the White House with representatives from *The New York Times*?

22   A.    I do.

23   Q.    And that was in your office at the White House?

24   A.    The meeting was held in my office, yes.

25   Q.    Can you describe for the jury how that meeting came about?

Rice - Direct                                                      693

1   A.   Prior to that meeting, I received information from the

2   National Security Council press staff that *The New York Times*

3   had called to say that they were about to publish an article

4   related to a sensitive national security program.  I informed

5   the President that there was likely to be a *New York Times*

6   article about this program concerning the Iranian nuclear

7   program and efforts to disrupt it.

8          At that time, the President and I talked about and I

9   decided that I should ask *The New York Times* leadership to come

10  to the White House for a meeting to discuss why that story

11  should not be published.  In fact, Jill Abramson, the

12  Washington bureau chief of *The New York Times*, agreed to come.

13  I explained that I could not talk about this on an open line

14  and so it was very important that a meeting take place, and I

15  held that meeting in my office.

16  Q.   So let's back up a little bit.  First, you just mentioned

17  that you told Ms. Abramson that you couldn't talk about it on

18  an open line.  Can you tell the jury a little bit about why you

19  couldn't do that?

20  A.   Well, on an open line, one had to assume given that the

21  call would be between the White House and *The New York Times*

22  that those lines could have been monitored.  We have secure

23  lines but obviously would not have had a secure line to *The New*

24  *York Times*.  We would have had a secure line between the White

25  House and the Defense Department, for instance, but not with

1   *The New York Times.*

2            And on an open line, there was a chance of compromise

3   of the information, compromise to a foreign government, and so

4   I was concerned about talking, even talking about this program

5   in that way on an open line.

6   Q.   So you mentioned that your understanding as to the nature

7   of this proposed *New York Times* story was it had something to

8   do with disrupting the Iranian nuclear program; is that

9   correct?

10  A.   That's correct.

11  Q.   And do you remember any more general specifics about this

12  program as it was going to be reported in *The Times*?

13  A.   Yes.  It is my recollection that the thrust of the story

14  was that the effort to disrupt the Iranian nuclear program by

15  supplying to the Iranians flawed parts for their program had

16  been botched or had been mismanaged and that the program was

17  therefore not working.

18  Q.   At the time that you learned about this anticipated *New*

19  *York Times* story, were you familiar with a classified program

20  similar to the description of that article?

21  A.   I was familiar with the program that fit that description.

22  Q.   You'd been briefed on this program previously?

23  A.   I had been briefed on the program previously.

24  Q.   Secretary Rice, to your knowledge, did everyone -- you

25  mentioned the National Security Council.  To your knowledge,

Rice - Direct                                                          695

1    did everyone on the National Security Council know about this

2    specific classified program?

3    A.   No, quite to the --

4              MR. POLLACK:  I would object, Your Honor.  This may

5    be an issue that we need to take up at the bench, but I think

6    it is beyond the protective order's bounds.

7              MR. OLSHAN:  Your Honor, it's not.

8              THE COURT:  I think the government is very sensitive

9    to the protective order, and I doubt that they would go beyond

10   it so --

11             MR. OLSHAN:  I'll rephrase the question.

12             MR. POLLACK:  This is an area that if they go into

13   it, we can't be prevented from going into.

14             MR. OLSHAN:  I'll rephrase the question.

15             THE COURT:  Let me hear what the new question is.

16   BY MR. OLSHAN:

17   Q.   You testified, Secretary Rice, that you were familiar with

18   this program, correct?

19   A.   Yes.

20   Q.   How closely held would you describe this program?

21   A.   This program was very closely held.  It was one of the

22   most closely held programs during my tenure as National

23   Security Advisor.

24   Q.   When you learned that *The New York Times* was prepared to

25   write an article about this program, what was your initial

Rice - Direct                                                          696

1   reaction to that?

2   A.   Well, my initial reaction upon learning this was first of

3   all to be stunned because to my knowledge, very few people knew

4   about this program.  I knew that very, very few people knew

5   within the White House about the program, and so I was stunned

6   that *The Times* had the information.

7        Secondly, I was deeply concerned because this was not

8   just a sensitive program, but it was one of the only levers

9   that we believed we had, that the President had to try to

10  disrupt the Iranian nuclear program.

11  Q.   You said "one of the only levers."  Is that the same as

12  saying only a few options were in play as far as how to disrupt

13  a foreign nuclear program?

14  A.   The Iranian nuclear program was -- disruption of or even

15  preferably destruction of the Iranian nuclear program was one

16  of the highest priorities of the Bush administration.  It had

17  been a high priority before in the Clinton administration.  It

18  remains a high priority today for the Obama administration.

19       And so yes, it was an important option, an important

20  way that we might be able to disrupt the program, and that's

21  why I was concerned about its possible compromise.

22  Q.   You testified that you convened a meeting at the White

23  House, correct?

24  A.   Yes.

25  Q.   Do you recall who was in attendance at that meeting?

Rice - Direct                                                              697

1  A.   Well, I recall that Jill Abramson, the bureau chief,

2  Washington bureau chief with *The New York Times*, was there.

3  James Risen, the reporter who was going to write the story, was

4  there.  I remember also George Tenet, the Director of Central

5  Intelligence and the Director of the Central Intelligence

6  Agency.  The positions were combined at the time, and so George

7  held both the positions of Director of Central Intelligence and

8  the Director of the Central Intelligence Agency, the CIA.

9         And I can't remember specifically, but I believe that

10  there was also a member of my staff there from the Press

11  Office.

12  Q.   You mention that you were notified by an individual in the

13  Press Office; is that correct?

14  A.   That's correct.  In the NSC Press Office.

15  Q.   Did you share with that person from the Press Office any

16  of the details that you knew about this classified program?

17  A.   I did not share the details of this program.  I was in a

18  receiving mode to know what the press person had been told, but

19  because the press person would not have been briefed on the

20  program, would not have been, as we say, read into the program,

21  I did not discuss the details of the program with that person.

22  Q.   Was it important not to discuss the details with that

23  person?

24  A.   It was important not to discuss the details with anyone

25  who was not, not properly on a need-to-know basis for that

Rice - Direct                                                          698

1    program.

2    Q.   You testified that George Tenet was in attendance, and you

3    described his positions at the time.  Was he the

4    highest-ranking intelligence official in the United States

5    government at the time?

6    A.   At the time, the Director of Central Intelligence was the

7    highest-ranking intelligence official in the government.  There

8    have since been subsequent reforms that have created another

9    position, but at that time, the Director of Central

10   Intelligence, George Tenet, was the highest-ranking

11   intelligence official.

12   Q.   And the purpose of this meeting was to convince *The Times*

13   not to run the story?

14   A.   The purpose was to convince *The Times* not to run the

15   story.

16   Q.   Did you speak at the meeting?

17   A.   I did speak at the meeting.

18             MR. OLSHAN:  Your Honor, if we could bring up

19   Government's Exhibit 114, which is already in evidence?

20             THE COURT:  Yes.

21             If you'll look at the screen, that's probably the

22   easiest way of seeing it.

23             THE WITNESS:  Thank you.

24   BY MR. OLSHAN:

25   Q.   Secretary Rice, you've got two options there, one on the

Rice - Direct                                                          699

1   screen and a hard copy in front of you as well.

2   A.   Yes, thank you.

3   Q.   Do you recognize that document?

4   A.   I do recognize the document.

5   Q.   And what is that document?

6   A.   The document is a set of talking points that were provided

7   to me by the Central Intelligence Agency for use in the meeting

8   with *The New York Times*.

9   Q.   Was it common when you attended meetings as National

10  Security Advisor for someone to prepare talking points for you

11  to use?

12  A.   When I conducted or attended sensitive or important,

13  significant meetings, I was provided talking points so that I

14  would remember the key points that had to be, that had to be

15  made in said meeting.

16  Q.   How important were talking points such as these when you

17  were going to be dealing with not only a sensitive topic but a

18  classified topic?

19  A.   Well, in a case like this, I was concerned that I would

20  properly deliver to *The New York Times* a statement that, about

21  the importance of a program, about the sensitivity of the

22  program, about the dangers of its compromise; but I wanted to

23  do so in a way that would not further compromise the program by

24  inadvertently giving information that I didn't need to provide;

25  and so these points were to make certain that I stayed within

1   the boundaries of what the CIA thought was appropriate to, to

2   convey to *The New York Times*.

3            So the talking points were extremely important in

4   this case.

5   Q.   And would you have reviewed these prior to delivering

6   them?

7   A.   I would have reviewed them, I would have checked them for

8   whether they accorded with my own understanding of what the

9   program was and what had happened, and I would have reviewed

10  them several times.

11  Q.   In sensitive meetings where you're dealing with topics

12  such as a very significant classified program or story about

13  it, would you tend to hew closely to those talking points, or

14  would you sort of freelance a little?

15  A.   I would not freelance in a circumstance like this because

16  my concern was to in this meeting deliver only what I needed to

17  deliver to *The New York Times* to convince them not to publish

18  the story and to avoid straying into further information that

19  might have confirmed, directly confirmed the program, that

20  might give further information about the program, and so the

21  safety valve, if you will, was to adhere very closely to the

22  talking points.

23            I can't say that I delivered them word for word, but

24  I would have adhered to them very closely.

25  Q.   If we could highlight or if you could take a look at the

Rice - Direct                                                          701

1   second talking point, that starts with "We've never called"?

2   A.   Yes.

3   Q.   Can you read that, please?

4   A.   Yes.  "We've never called a meeting like this before in

5   this administration.  The fact that we have done so may tell

6   you how seriously we view this matter."

7   Q.   And do you recall as you sit here today conveying that

8   sentiment about never having convened a meeting like this at

9   the meeting?

10  A.   I did.

11  Q.   If you could take a look at the fourth, fifth, and sixth

12  bullet points?  It's the ones that start with "Jim" --

13  A.   Yes.

14  Q.   -- and go down to the bullet point that starts with "I say

15  incorrectly."

16  A.   Yes.

17  Q.   Do you see that?

18  A.   I do.

19  Q.   Do you remember making any comments at this meeting with

20  Mr. Risen and Ms. Abramson about whether the information they

21  had purportedly obtained was inappropriately provided to them?

22  A.   I told them that it had been inappropriately provided to

23  them and also that some of the information that they had

24  received was inaccurate.

25  Q.   And when you say "inappropriately," what do you mean by

Rice - Direct                                                               702

1   that?

2   A.   Inappropriately because intelligence programs are not to

3   be disclosed to those who are not authorized to know about

4   them, and *The New York Times* would not have been authorized to

5   know about them.

6   Q.   And again, can you recall word for word what you said?

7   A.   Some 12 years later, I can't recall word for word, but I

8   recognize these points, and I did say that they had been

9   inappropriately provided the information and that some of it

10  was inaccurate.

11  Q.   And to the extent the information as you understood it was

12  inaccurate, what were you thinking about?  What did you convey?

13  A.   I had been told that *The Times* was going to publish in the

14  story that the program had been botched, that it wasn't

15  working, and that the Iranians knew this, and it had been my

16  understanding, in fact, I had been told just the opposite, that

17  the program was indeed working, was underway and was working,

18  and I had no reason to believe that the Iranians knew anything

19  about it.

20  Q.   You testified that you, you had heard that the story was

21  that this program had been botched in some way; is that

22  correct?

23  A.   Yes.

24  Q.   Now, was the purpose of your convening this meeting out of

25  any sort of embarrassment that it would get out that there had

Rice - Direct                                                            703

1   been a botched operation?

2   A.   My concern in convening this meeting was that we had a

3   very sensitive, extremely important program for the security of

4   the country that was about to be compromised, and given that we

5   did not have very many options for disrupting and possibly

6   undermining the Iranian nuclear program, I was very concerned

7   that any compromise of this program was going to take a good

8   option out of the hands of the President.  That was my concern.

9   Q.   So was the disclosure of the existence of the program the

10  driving force behind convening the meeting?

11  A.   The driving force was the disclosure of a very sensitive

12  program which if disclosed and compromised, was going to at the

13  very least alert the Iranians that this, this program was

14  underway and the dangers associated with that, and that was my

15  concern was the disclosure and compromise of a highly sensitive

16  and closely held program.

17  Q.   Secretary Rice, you testified that this is the first time

18  in two-plus years that you had convened a meeting like this,

19  correct?

20  A.   Yes.

21  Q.   Did you, did you understand the significance of asking a

22  news-gathering organization not to print a story?

23  A.   I certainly understood the significance of the White House

24  asking *The New York Times* not to publish a story.  It's why I

25  talked first to the President about whether we should even do

1    so.

2              I understand and fully respect the role of the press.

3    I understand and fully respect the importance of a free press

4    to our democracy and our democratic values, but I needed in

5    this case to make certain that *The New York Times* understood

6    the import of what they were about to do, and so with the

7    President's consent, I went to them to ask that they not

8    publish the story.

9    Q.   If you could take a look at the last bullet point on the

10   first page of the bullet points, it starts, "Asking

11   journalists"?

12   A.   Yes.

13   Q.   Do you see the second -- excuse me, the third sentence

14   that begins, "I am going to"?

15   A.   Yes.

16   Q.   Can you read that?

17   A.   "I am going to ask in the strongest possible terms that

18   you not discuss this matter with colleagues and that you not

19   conduct further inquiries around town about it."

20   Q.   Why, if at all, was it important to convey to the

21   participants of this meeting not to go talking about this?

22   A.   Well, there were very few people who had been briefed on

23   the program, read into the program, but I knew that it was

24   often the practice of journalists that they would get a nugget

25   about a program and then they would make calls around town to

Rice - Direct                                                    705

1  different agencies to try to get confirmation, to get some

2  further information, and my concern was that in doing so, they

3  would actually spread the news about the program to people who

4  did not yet know.

5  Q.   Did you have any concern about further inquiries even

6  within the government ranks?

7  A.   Well, yes, within the government ranks especially, because

8  there were people who would likely be called by the press who

9  didn't know about the program, and to start asking questions

10  about it would further compromise the program itself.

11  Q.   Do you remember whether you expressed anything

12  specifically to the group about the gravity of this disclosure

13  and what it could mean for people's lives?

14  A.   I did say to *The New York Times*, to Ms. Abramson and to

15  Mr. Risen, that the disclosure of this program, the compromise

16  of this program would likely or could result in actual danger

17  to lives of people.  Obviously, it would endanger the program

18  itself and take away from us a tool for dealing with the

19  Iranian nuclear program.

20          I adhered closely to what was said in the talking

21  points because the problem is to say enough about what is being

22  proposed without confirming too many details of the program to

23  the press, and so the language that I used is actually, I

24  recognize this language that is in the talking points.

25  Q.   And specifically, which language are you referring to?

Rice - Direct                                                           706

1    A.    Let me see.

2    Q.    If I could direct your attention --

3    A.    Yes, it's --

4    Q.    Go ahead.

5    A.    I'm trying to.  "Preventing working nuclear weapons from

6    falling into the hands of rogue states is one of the most

7    important missions that this or any other administration can

8    have."

9    Q.    Thank you.

10          What was your understanding at the time of how close

11   *The Times* was to publishing this story?

12   A.    The NSC press spokesman, press people had told me that

13   they believed that the publication of the story was imminent,

14   probably within the next couple of days.

15   Q.    During the meeting, do you recall after you delivered the

16   talking points whether you answered any questions?

17   A.    I don't recall answering any questions, and it was my

18   practice in these circumstances to deliver the points, not to

19   get into a conversation so that I wouldn't inadvertently

20   disclose more information, and then to refer questions to the

21   agency, in this case to George Tenet.

22   Q.    Do you recall during the meeting whether you asked,

23   whether you asked *The New York Times*, either Ms. Abramson or

24   Mr. Risen, to do anything with any materials that they had?

25   A.    I, I do recall that I asked that if they had any

1    materials, that they would destroy them.  I remember saying

2    that I, I knew that they wouldn't give them back to us

3    because -- and I wouldn't ask that, but that if they had any

4    materials, to please destroy them.

5    Q.    Following the meeting, did you learn at some point that

6    *The New York Times* had decided not to run the story?

7    A.    I remember that the bureau chief, Ms. Abramson, told me

8    that she had to discuss this with her higher-ups, the editor,

9    Howell Raines, and she would get back to me.  I don't remember

10   precisely who she got back to, whether it was to me or to the

11   press shop.  I think it may have been to people in the press

12   area.  I don't remember having a further conversation with her

13   myself.

14   Q.    *The New York Times* did not run the story; is that right?

15   A.    That's correct.

16   Q.    And do you recall what your reaction was when you

17   ultimately did learn that the story wasn't running?

18   A.    I was relieved when I learned that the story was not

19   running and grateful to *The Times* for not doing so.

20   Q.    Other than sitting in that room with Mr. Risen, did you

21   ever have any other conversations with him about this

22   classified program?

23   A.    I had no conversations with Mr. Risen about this program.

24   Q.    And have you ever discussed this classified program with

25   anybody whom -- who was not authorized to know about it?

Rice - Cross                                                      708

1  A.   I did not at the time and I have not since discussed the

2  program with anyone who was not authorized to know about it.

3              MR. OLSHAN:  One moment, Your Honor?

4              THE COURT:  Yes, sir.

5              MR. OLSHAN:  That's all I have for now, Your Honor.

6              THE COURT:  All right.  Mr. Pollack?

7              MR. POLLACK:  Thank you, Your Honor.

8                        CROSS-EXAMINATION

9  BY MR. POLLACK:

10 Q.   Good afternoon, Dr. Rice.  My name is Barry Pollack, and

11 I'm one of the lawyers that represents Mr. Sterling.

12             Dr. Rice, you had indicated to Mr. Olshan that this

13 was the first meeting of this kind that you participated in as

14 the National Security Advisor, correct?

15 A.   That's correct.

16 Q.   But while this was the first such meeting, this was not

17 the only meeting that you participated in where there had been

18 a disclosure of such sensitive information, correct?

19 A.   That is correct.

20 Q.   And this also was not the first occasion on which you had

21 asked editors for *The New York Times* not to run a story,

22 correct?

23 A.   I don't recall having asked editors of *The New York Times*

24 prior to this not to run a story, but subsequent to this, I

25 did.

1    Q.   Okay.  If we could pull up Exhibit 108, which is already

2    in evidence?

3             Dr. Rice, this is a Lotus Note from Bill Harlow at

4    the CIA.  Do you know who Mr. Harlow is?

5    A.   I do.

6    Q.   He was the press person for the CIA?

7    A.   That's correct.

8    Q.   And this is Mr. Harlow indicating toward the middle of the

9    page, the paragraph that begins, "I reminded"?

10   A.   Yes.

11   Q.   This is less than 24 hours after Mr. Harlow received a

12   phone call from Mr. Risen about the story that Mr. Risen was

13   working on about Classified Program No. 1?

14            MR. OLSHAN:  Objection.  Can the defense lay a

15   foundation that this witness has any knowledge of that?

16            THE COURT:  All right.  Lay a foundation first,

17   Mr. Pollack.

18   BY MR. POLLACK:

19   Q.   Well, specifically, Dr. Rice, what I want to ask you about

20   is Mr. Harlow says that he reminded Mr. Risen of a recent

21   occasion on which they had Condi Rice call his publisher to

22   kill a story.

23   A.   I don't know to what Mr. Harlow is referring.

24   Q.   And you did learn -- you learned about Mr. Risen's story

25   from the press person at the National Security Council,

Rice - Cross                                                      710

1    correct?

2    A.    That's my recollection.

3    Q.    But you did become aware that a similar call had been made

4    by Mr. Risen to Mr. Harlow, the press person at the CIA?

5    A.    I was told by our press people that Bill Harlow said that

6    he had been called by Mr. Risen, yes.

7    Q.    Okay.  And you were aware that the CIA did not want this

8    story published, correct?

9    A.    That's correct.

10   Q.    And as you indicated in your talking points, Exhibit 114,

11   the -- in the middle of the page -- well, it's toward the

12   bottom of the screen now, preventing working nuclear weapons

13   from falling into the hands of rogue states is one of the most

14   important missions of your, the administration you worked for

15   certainly --

16   A.    Yes.

17   Q.    -- and any other administration, correct?

18   A.    That's correct.

19   Q.    And certainly counterproliferation was of great interest

20   at this particular time, correct?

21   A.    That's correct.

22   Q.    The United States had invaded Iraq the earlier month?

23            MR. OLSHAN:  Objection.

24            THE COURT:  Well, we've heard that before.  Let's

25   just move this along, Mr. Pollack.  Sustained.

Rice - Cross                                                           711

1   BY MR. POLLACK:

2   Q.   Well, specifically, it was of great interest --

3   counterproliferation was of great interest in the Intelligence

4   Community, correct?

5   A.   It was of great interest throughout the administration

6   and, of course, in the Intelligence Community.

7   Q.   And the Intelligence Community particularly at this point

8   in time did not want a story published about a

9   counterproliferation program that they were working against

10  Iran, correct?

11  A.   I cannot speak to the, what the Intelligence Community was

12  thinking.  I can only speak to what I was thinking about this

13  matter.

14  Q.   Okay.  But you were aware that the Intelligence Community

15  wanted you to meet with *The New York Times*, correct?

16  A.   I was aware that the Intelligence Community was concerned

17  about it and that they wanted the -- that no one wanted *The New*

18  *York Times* to publish this story, and it was actually with the

19  President that I talked about meeting with *The New York Times*.

20  Q.   Okay.  What I'm asking is about the CIA.  You weren't

21  meeting with *The New York Times* over the CIA's objection,

22  right?

23  A.   No, of course not.

24  Q.   Of course not.  The CIA very much wanted you to meet with

25  *The New York Times* because they believed that you might be

1    effective in convincing *The New York Times* not to publish the

2    story, correct?

3    A.    I wanted to meet with *The New York Times* because I

4    believed that I might be effective in convincing *The Times* not

5    to publish the story.

6    Q.    I understand that, but what I'm asking you is wasn't it

7    communicated to you that the CIA wanted the same thing?

8    A.    Of course.

9    Q.    It was -- you knew it was important to the CIA?

10   A.    It was important to the administration and to the CIA.

11   Q.    Yeah.  And, in fact, it was the CIA that drafted the

12   talking points that you used for that meeting, correct?

13   A.    That is correct.

14   Q.    The talking points that you adhered to very closely?

15   A.    That is correct.

16   Q.    And the meeting was attended by three officials from the

17   CIA?

18   A.    I remember George Tenet's attendance.  I don't remember

19   who else was there.

20   Q.    Do you remember the Assistant Deputy Director of

21   Operations was there?

22   A.    I don't remember.

23   Q.    Do you remember that Mr. Harlow was there?

24   A.    I don't remember.

25   Q.    And you were aware by the time of the meeting that

1    Mr. Risen had made an inquiry of the NSC press person, correct?

2    A.    Yes.

3    Q.    And an inquiry of the CIA press person?

4    A.    Yes.

5    Q.    Were you aware of others?

6    A.    I was not aware of others.

7    Q.    You don't know how many people Mr. Risen had spoken to at

8    that point?

9    A.    I do not.

10   Q.    And, Dr. Rice, from your experience at that point, you

11   knew that when the administration wanted to convince someone

12   not to publish a story, there were two tactics that they could

13   employ.  They could either indirectly confirm the story, or

14   they could say that the story was not entirely correct.

15             Would you agree with that?

16   A.    Well, there are several tactics that one can employ.  I

17   would imagine that those are among them.

18   Q.    Do you remember being interviewed by the FBI in April of

19   2006?

20   A.    Yes.

21   Q.    Do you remember telling the FBI that when scheduling a

22   meeting with a publication for the purpose of requesting it not

23   to publish a story, one of two tactics is usually taken:  The

24   administration either stated that the publication did not have

25   the story entirely correct, or the administration indirectly

Rice - Cross                                                              714

1    confirmed the story?

2    A.   Those are two of the tactics that you could use, yes.

3    Q.   And in this case, the administration chose to employ the

4    former tactic, correct?

5    A.   Would you repeat what the former tactic is?

6    Q.   Sure.  You told the FBI that the former tactic would be to

7    tell the publication that they did not have the story entirely

8    correct.

9    A.   That was a part of what I told *The New York Times*.

10   Q.   And that's what you told the FBI was the tactic that you

11   employed?

12   A.   I told *The New York Times* that part of the story, part of

13   what they had told -- had been told was not correct.

14   Q.   Because you believed that if you convinced *The New York*

15   *Times* that they did not have the story correct, that might

16   convince them not to publish it, correct?

17   A.   That was one part of what I told *The New York Times*.  The

18   other part was that it was a program of significance to

19   national security and that indeed, not only was part of it not

20   correct, but it was inappropriate that they had access to it at

21   all.  So I said both of those, not just one.

22   Q.   Hoping that both -- either or both would be effective?

23   A.   I certainly hoped, I certainly hoped they would not

24   publish.

25   Q.   But you understood that the danger of employing the tactic

Rice - Cross                                                              715

1    of trying to convince the publisher that the story is not

2    correct is that you might allow the reporter in doing so to

3    collect additional information about the story?

4    A.   My goal was to state for *The New York Times* that some of

5    what they had was not correct and that they had been

6    inappropriately provided this information, and then to do so

7    within points that did not provide further information to the

8    reporter.

9            It's also why I asked that they not continue to call

10   around to try to confirm the story.

11   Q.   Do you recall telling the FBI that the danger in answering

12   the questions of the reporter or in this case his superior is

13   that by doing so, the meeting becomes an interview during which

14   the reporter collects additional information for the story?

15   A.   That is why I adhered closely to talking points, not to

16   get into a conversation about the story, correct.

17   Q.   And in this particular meeting, it wasn't just the editor

18   of the publisher or the bureau chief of the publisher that was

19   there, but the reporter was there, correct?

20   A.   That's correct.

21   Q.   And in fact, *The Times* insisted on having Mr. Risen at

22   this meeting, correct?

23   A.   I believe that's right.

24   Q.   And in your experience, these meetings are often just with

25   the publisher, not with the reporter, correct?

Rice - Cross                                                    716

1   A.   Well, I can't speak in a general way about this.  These

2   meetings are set up with the appropriate people in the room,

3   and if *The New York Times* wanted to bring the reporter, that

4   was fine with me.

5   Q.   Do you remember telling the FBI that often such a meeting

6   would be held with the editor rather than the reporter and that

7   on occasions when a publication presses the government to meet

8   directly with the reporter, you believe it's because the

9   reporter wants to be present to develop additional information

10  for the story?

11  A.    I don't remember that specific statement, but clearly in

12  this case, *The New York Times* wanted to bring the reporter, and

13  I didn't object.

14  Q.   And as you indicated, it's -- because you don't want to

15  provide additional information, that's why you rarely -- well,

16  it's why you don't want to stray from the talking points,

17  correct?

18  A.    That's correct.

19  Q.   And at meetings like this, you personally rarely answer

20  questions, correct?

21  A.    In meetings of extraordinary sensitivity, particularly

22  ones that involve intelligence information, it was my practice

23  and habit not to stray from the talking points and to defer

24  questions really to the intelligence personnel.

25  Q.   And that's what you did here.  You decided it would be up

1   to the CIA to determine how much or how little to say, correct?

2   A.   That's correct.

3   Q.   And you referred to Director Tenet and the others from the

4   CIA to answer questions or to respond to comments from the

5   reporter, correct?

6   A.   I believe that that is the case.  I can't say that I

7   didn't answer any questions.  It's a very long time ago, but in

8   general, it was preferable to have the agency answer questions,

9   not me.

10  Q.   You do recall that Director Tenet answered at least one

11  question, a question that was posed by Mr. Risen where he said

12  that he had seen a letter and that suggested that the program

13  was flawed in some way, and Director Tenet told Mr. Risen that,

14  in fact, the letter was intended to suggest that the Iranians

15  needed the services that were being offered?

16  A.   I --

17        MR. OLSHAN:  Your Honor, I'm going to object.  If

18  Mr. Pollack is going to read from a document, he should show

19  the document to the witness.

20        THE COURT:  I think that's appropriate.  Do you have

21  a copy?  And I need to see one, too.  Is it a defense exhibit?

22        MR. POLLACK:  No.  Let's go to Government Exhibit

23  113, which is already in evidence.

24        THE COURT:  All right.  This is one of Mr. Harlow's

25  Lotus Notes.

Rice - Cross                                                    718

1           MR. POLLACK:  In fact, this is Mr. Harlow's notes of

2   the meeting in which Dr. Rice participated.

3   Q.   And if you can go to the fifth paragraph?

4   A.   Yes.

5   Q.   It says, "Risen asked about the issue of whether the

6   Iranians were witting of the program.  He implied that he had

7   seen a letter to the Iranians from the Russian which told them

8   that their program was flawed.  The DCI" -- now, DCI is the

9   Director of Central Intelligence?

10  A.   Yes.

11  Q.   That would be Mr. Tenet?

12  A.   That's correct.

13  Q.   ". . . DCI said that the individual was suggesting to the

14  Iranians that they needed his services, not telling them that

15  the designs they got from him were flawed."

16          Does that match your recollection of what happened?

17  A.   These are Mr. Harlow's notes apparently, and I don't

18  recall myself what Director Tenet said in response to the

19  question.

20  Q.   You don't recall whether in responding to the questions,

21  Director Tenet --

22          THE COURT:  She's answered the question.  She doesn't

23  recall.

24  BY MR. POLLACK:

25  Q.   Okay.  Do you recall whether Director Tenet gave any

1    additional information to Mr. Risen that he didn't have prior

2    to the meeting?

3    A.    I don't.

4    Q.    Now, this was the only meeting that you were involved in

5    with *The New York Times* on this issue, correct?

6    A.    I believe that's the case.

7    Q.    Okay.  You don't know what efforts the CIA made to

8    dissuade Mr. Risen from publishing this story?

9    A.    I do not.

10            MR. POLLACK:  I don't have anything further.  Thank

11   you, Dr. Rice.

12            THE WITNESS:  Thank you very much.

13            THE COURT:  Mr. Olshan, is there any redirect

14   examination for Secretary Rice?

15            MR. OLSHAN:  No redirect.

16            THE COURT:  All right.  Then thank you, ma'am, for

17   your testimony.  You're free to go.

18            THE WITNESS:  Thank you, Your Honor.

19                          (Witness excused.)

20            THE COURT:  All right, we're going to go back to

21   witnesses who need the screen, and we'll take a few extra

22   minutes to set the screen up, so let me give the jury a recess

23   until quarter of four to do that.

24            MR. TRUMP:  When was that?

25            THE COURT:  Until quarter of four.

1              MR. TRUMP:  Thank you.

2                   (Recess from 3:25 p.m., until 3:43 p.m.)

3                        (Defendant present, Jury out.)

4              THE COURT:  All right, there's an issue?

5              MR. MAC MAHON:  Yes, Your Honor.  We're going to have

6    to approach the bench.

7              THE COURT:  Approach the bench.

8              (Sealed Bench Conference D not transcribed in this

9    volume.)

10             THE COURT:  All right, let's bring the jury in.

11             Mr. MacMahon, I can't pay another attorney; you know

12   that.

13             MR. MAC MAHON:  He knows that.

14             THE COURT:  All right.

15                        (Jury present.)

16             THE COURT:  You-all seem to have adopted your own

17   chair.  Everybody keeps sitting in the same spot.  That's fine,

18   as long as you're comfortable.

19             DENIS M., GOVERNMENT'S WITNESS, AFFIRMED

20                      DIRECT EXAMINATION

21   BY MR. TRUMP:

22   Q.   Would you state your first name?

23   A.   Denis.

24   Q.   And your first initial of your last name?

25   A.   M.

1    Q.    Are you employed by the Central Intelligence Agency?

2    A.    Yes.

3    Q.    And at some point, were you assigned to the New York

4    office?

5    A.    Yes.

6    Q.    As a case officer?

7    A.    Yes.

8    Q.    And at some point in time, did you become the case officer

9    responsible for a human asset we are referring to as Merlin?

10   A.    Yes.

11   Q.    About what time was that?

12   A.    About 2005.

13           THE COURT:  Mr. M., can you speak up?

14           THE WITNESS:  Oh, I'm sorry.  Approximately 2005.

15   BY MR. TRUMP:

16   Q.    And at that time, was there a case officer from New York

17   who had -- who preceded you as a case officer for Merlin?

18   A.    Yes.

19   Q.    Was there a gap in case officers?

20   A.    Yes.

21   Q.    So when you met Merlin, who was it that introduced you?

22   A.    Bob S.

23   Q.    And who is Bob S. in relation to Merlin and the program

24   Merlin was working on?

25   A.    Bob S. was the headquarters officer responsible for the

Denis M. - Direct                                                722

1    operation.

2    Q.   And he was from the Counterproliferation Division?

3    A.   Yes.

4    Q.   From that point on, were you the, the last CIA case

5    officer to work with Merlin?

6    A.   Yes.

7    Q.   When you took over as case officer, did you discuss with

8    Merlin the things he had done with the agency?

9    A.   Not in much detail.

10   Q.   Were you able to obtain and read past cables with respect

11   to Merlin?

12   A.   Very few.

13   Q.   Why was that?

14   A.   We didn't have access to them at the time.

15   Q.   Was that a result of 9/11 and the destruction of the

16   office?

17   A.   Yes.  They were lost then.

18   Q.   So the only cables you were able to review were the

19   current ones?

20   A.   Yes.

21   Q.   If you had needed past cables, you'd have to make a

22   request of, of headquarters?

23   A.   Yes.

24   Q.   Did Merlin ever express to you any concerns about any of

25   his past work with the CIA?

1  A.   I don't recall specifically, but I think that he had

2  concerns about in general working with the agency if anything

3  was ever compromised.

4  Q.   He was concerned for his safety and his security?

5  A.   Yeah.  We talked about it several times, about any

6  operation that he was involved in, what his security would be

7  for that operation.

8  Q.   Now, at some point in time, were you working with Merlin

9  on the possibility of conducting an operation that was

10 completely unrelated to some of the other things he had done?

11 A.   Yes.

12 Q.   But that was just in the planning stages, is that right?

13 A.   Yes.

14 Q.   At some point, did you learn that a book had been

15 published?

16 A.   Yes.

17 Q.   Was that during your tenure as a case officer?

18 A.   Yes.

19 Q.   As a result of the publication -- was that book *State of*

20 *War*, by James Risen?

21 A.   Yes.

22 Q.   As a result of the publication of that book, did you scrap

23 your plans?

24 A.   Did I what?

25 Q.   Were the plans scrapped in terms of using Merlin

Denis M. - Direct                                                         724

1   operationally?

2   A.    Eventually, yes.

3   Q.    And at some point, did you have to meet with him and

4   discuss the fact that this book was published?

5   A.    Immediately because of fear for his security.

6   Q.    And that was reflected in a cable you drafted?

7   A.    I believe so, yes.

8   Q.    And was there then a second meeting with him?

9   A.    I don't have access to any of the cables, so I don't know

10  how many.  There were subsequent meetings, yes.

11              MR. TRUMP:  Is there any objection to those two

12  cables?

13              MR. MAC MAHON:  Well, just move them in.

14              THE COURT:  What are the cable numbers?

15              MR. TRUMP:  133 and 135, I believe.

16              THE COURT:  133 and 135?

17              MR. MAC MAHON:  No objection, Your Honor.

18              THE COURT:  All right, they're both in.

19              (Government's Exhibit Nos. 133 and 135 were received

20  in evidence.)

21              THE WITNESS:  Yes, I wrote those cables.

22  BY MR. TRUMP:

23  Q.    And 133 was a cable written on January 6 of 2006; is that

24  right?

25  A.    Yes.

Denis M. - Direct                                                      725

1    Q.   And that was the first meeting you had with Merlin and

2    Mrs. Merlin over the publication of the book?

3    A.   Yes.

4    Q.   And then the second cable was January 23, 2006; is that

5    right?

6    A.   Yes.

7    Q.   The first meeting, Bob S. accompanied you; is that right?

8    A.   Yes.

9    Q.   And then the second meeting was just you?

10   A.   Yes.

11   Q.   How much longer after that did you have contact with

12   Merlin?

13   A.   Several years.

14   Q.   About two years?

15   A.   I'd have to look at the cable traffic to be sure.  I think

16   so, yes.

17   Q.   And during that time, he was still paid a salary?

18   A.   Yes, yes.

19   Q.   Were you the case officer responsible for coordinating his

20   payments?

21   A.   To make sure he got paid, yes.

22   Q.   Did he occasionally have some questions/concerns about his

23   payments?

24   A.   It was only over the tax year in which he had to declare

25   payments.  So if he was paid in January for December salary, he

Denis M. - Direct                                                        726

1    wanted to know which year he had to declare the taxes for that

2    salary.

3    Q.    And that came up every January?

4    A.    Pretty much.

5    Q.    And at some point, those -- his salary and his operational

6    use for the agency was terminated?

7    A.    Yes.

8          MR. TRUMP:  The Court's indulgence?

9          THE COURT:  Yes, sir.

10   BY MR. TRUMP:

11   Q.    Now, the book was published and authored by James Risen.

12   Do you know James Risen?

13   A.    No.

14   Q.    Have you ever spoken to him?

15   A.    No.

16   Q.    Have you ever spoken to anyone from the media about Merlin

17   or Classified Program No. 1?

18   A.    I've never spoken to the media nor the Merlin operation.

19   Q.    Without describing what Merlin said after he read the

20   book, what was his, his reaction?

21         MR. MAC MAHON:  Your Honor, I'm going to object.

22   This was litigated before, and now they're going to hear Merlin

23   testify as to what happened.  You've already found they

24   couldn't put in an excited utterance.

25         THE COURT:  Not asking for statements.  This witness

Denis M. - Cross                                                727

1    can describe the physical reaction.  That's certainly an

2    observation he can make.

3           So did you notice anything about him physically when

4    you told him the news?

5    BY MR. TRUMP:

6    Q.   Without saying anything about what he said, just describe

7    what his reaction was.

8    A.   Yes.  He was very stressed, very nervous, very scared,

9    shocked, very unlike I'd ever seen him before.  He's generally

10   unanimated.

11          MR. TRUMP:  That's all I have, Your Honor.

12          THE COURT:  All right, cross-examination?

13                       CROSS-EXAMINATION

14   BY MR. MAC MAHON:

15   Q.   Mr. M., my name is Edward MacMahon.  I'm one of the

16   lawyers for Mr. Sterling.  Good afternoon.

17   A.   Good afternoon.

18   Q.   Just a few questions.  You don't know Mr. Sterling at all,

19   right?

20   A.   No.

21   Q.   Never had any interaction with him whatsoever?

22   A.   No.

23   Q.   Okay.  Now, you, you gave an interview to the FBI in 2006

24   in which you said in 2006 that there still wasn't a complete

25   file on Classified Program No. 1 at the New York office?  Am I

Denis M. - Cross                                                        728

1   right in reading it that way?

2   A.    Is Classified Program No. 1 the Merlin operation?

3   Q.    Yes.

4   A.    I'm sorry, I didn't --

5   Q.    I think I may have been confused, but you testified that

6   you didn't have a complete file in the New York office.

7   A.    That's correct.

8   Q.    Okay.  And when was that?

9   A.    From the day that I started the case.

10  Q.    Okay.  And that date was what?

11  A.    About 2005.

12  Q.    And so in 2005, the -- there was a complete file in

13  Langley, though, whatever that was, correct?

14  A.    I'm sure there was one in Langley, yeah.

15  Q.    Okay.  And did you, did you ever go and review the file in

16  Washington?

17  A.    No.

18  Q.    Did you ever see that there were -- I'm trying to

19  understand.  So if somebody between the September 11 attacks

20  and the day you saw the file wanted to see the complete file or

21  access the complete file, they had to be in headquarters,

22  correct?

23  A.    I assume so because I didn't have access to it.

24  Q.    Do you know whether that was the state of the file -- as

25  far as you know, that was the state of the file from September

1    11, '01, to when you saw it as well?

2    A.   As far as I know, there was no physical file.  There was

3    an electronic file somewhere at headquarters.

4    Q.   At headquarters.

5    A.   Yeah.

6    Q.   I'm probably asking you bad questions, but by -- there

7    wasn't a complete file in New York after the September 11

8    attack?

9    A.   No.

10   Q.   So somebody that wanted to get access to cables after 9/11

11   and other documents would have to be in headquarters here in

12   Washington, right?

13   A.   I don't know what the process would have been.  I didn't

14   have access to them.  That's all I know.

15   Q.   But you know they weren't in New York?

16   A.   They were not available to me.

17   Q.   And was there ever a year that, that you were in charge of

18   handling Merlin in which he made $60,000 a year?

19   A.   I don't recall specifically how much he made per year.

20   Q.   And Merlin never called you or Mrs. Merlin called you and

21   said that they were actually threatened at all, that anyone had

22   come to their house or called or e-mailed?  Nothing, right?

23   A.   That they called anybody.  I don't recall anything

24   specifically other than they were generally afraid for their

25   safety because they several times said that the Russians kill

Denis M. - Redirect                                                        730

1   people for much less and demonstrated publicly, and so my point

2   was to try to calm them down.

3   Q.   But that never happened to them, right?

4   A.   They're still alive as far as I know.  I don't --

5             MR. MAC MAHON:  That's all, Your Honor.  Thank you.

6             THE COURT:  Any redirect?

7                       REDIRECT EXAMINATION

8   BY MR. TRUMP:

9   Q.   You haven't had any contact with them since approximately

10  2008, correct?

11  A.   That's right.

12            THE COURT:  Any recross?

13            MR. MAC MAHON:  No, Your Honor.

14            THE COURT:  All right, thank you, sir, for your

15  testimony.

16            THE WITNESS:  Thank you.

17            THE COURT:  You're free to go.

18                      (Witness excused.)

19            THE COURT:  Call the next witness.

20            MR. FITZPATRICK:  Thomas H., Your Honor.

21            The Court's indulgence for one moment?

22            THE COURT:  Yes, sir.

23            All right, Mr. Fitzpatrick?  Everything okay?

24            MR. FITZPATRICK:  Yes, thank you, Your Honor.

25             THOMAS H., GOVERNMENT'S WITNESS, AFFIRMED

Thomas H. - Direct                                                     731

1                            DIRECT EXAMINATION

2   BY MR. FITZPATRICK:

3   Q.   Good afternoon, sir.  Are you Thomas H.?

4   A.   Yes, I am.

5   Q.   Sir, give us a brief description of your current

6   occupation, an overview.

7   A.   Currently?

8   Q.   Currently.

9   A.   Currently in Corporate America, in a managerial position.

10  Q.   Did you have a prior career?

11  A.   Yes, I did.

12  Q.   What is that prior career?

13  A.   I was an operations officer at the Central Intelligence

14  Agency.

15  Q.   When did you retire?

16  A.   At the end of 2010.

17  Q.   How long was your career?

18  A.   Just shy of 24 years.

19  Q.   I want to direct your attention to the New York office.

20  Were you ever assigned there?

21  A.   Yes, I was.

22  Q.   Were you assigned there in a supervisory capacity?

23  A.   Yes, I was.

24  Q.   When did you leave the New York office?

25  A.   July of 2000.

Thomas H. - Direct                                          732

1    Q.   And while you were assigned to the New York office and in

2    your supervisory capacity, do you see anyone in the courtroom

3    today that you recognize from that time?

4    A.   Yes, I do.

5    Q.   And who do you recognize?

6    A.   Mr. Sterling.

7    Q.   Would you please identify him?

8    A.   The gentleman right there (indicating).

9            THE COURT:   That's fine.

10           MR. FITZPATRICK:   Thank you, Your Honor.

11   Q.   With respect to your supervisory responsibilities on

12   Mr. Sterling, were you familiar with an individual where he

13   was the case officer that we're calling Merlin, or Human Asset

14   No. 1?

15   A.   Yes.

16   Q.   And why is it that you were familiar with that, that

17   program?

18   A.   I was Mr. Sterling's supervisor at the time that he was

19   involved with that case.

20   Q.   So was your involvement or knowledge of that program

21   limited to your administrative responsibilities over

22   Mr. Sterling?

23   A.   Yes.

24   Q.   With respect to the operational details of that program,

25   did you have any involvement in that?

Thomas H. - Direct                                                    733

1   A.    No.

2   Q.    And where was that program being run from or supervised

3   from?

4   A.    Out of our headquarters.

5   Q.    In your administrative or supervisory capacity over

6   Mr. Sterling, did you have access to the cables produced in, in

7   that program?

8   A.    Yes, I did.

9   Q.    And for what reason?

10  A.    To ensure that the right operational reporting,

11  administrative reporting, and intelligence reporting came out

12  of a meeting cycle.

13  Q.    When you left the New York office -- and tell us again

14  when you left.

15  A.    July of 2000.

16  Q.    Is that when your supervisory responsibilities -- on or

17  about that time, did your supervisory responsibilities for

18  Mr. Sterling end?

19  A.    Yes.

20  Q.    What happened to your ability to access the program that I

21  mentioned regarding Mr. Merlin, or Human Asset 1?

22  A.    After I left?

23  Q.    Yes.

24  A.    I don't have access to it anymore.

25  Q.    I want to show you -- it's Government Exhibit No. 83,

Thomas H. - Direct                                                      734

1   please, Mr. Wood.

2              THE COURT:  Is there any objection to 83?

3              MS. HAESSLY:  No objection, Your Honor.

4              THE COURT:  All right, it's in.

5              (Government's Exhibit No. 83 was received in

6   evidence.)

7              MR. FITZPATRICK:  We can publish it.

8   Q.   So the first page of this, Mr. H., it's an article dated

9   March 2, 2002, "Fired by CIA, He Says Agency Practiced Bias."

10  Have you seen this before?

11  A.   Yes.

12  Q.   And the name James Risen, are you familiar with that name?

13  A.   Yes.

14  Q.   Have you ever spoken with Mr. Risen?

15  A.   No.

16  Q.   Have you ever had any personal contact with Mr. Risen?

17  A.   No.

18  Q.   Have you ever provided any information at any time to

19  Mr. Risen?

20  A.   No.

21  Q.   I want to direct your attention to the second page of

22  Government Exhibit 83 and perhaps even direct your attention

23  further to the middle column.  Do you see where I'm talking

24  about?

25  A.   Yes, I do.

Thomas H. - Direct                                                    735

1   Q.   Do you recognize any language that's in the second column?

2   A.   Yes, I do.  The paragraph beginning with "Again, he was

3   assigned."

4   Q.   If you would, please, could you just read that entire

5   paragraph?

6   A.   "Again, he was assigned to try to recruit Iranians as

7   spies, and soon received a positive evaluation.  Mr. Sterling

8   'demonstrated good tradecraft in the handling of his assigned

9   cases,' according to an evaluation in September 1999 by a

10  supervisor and provided by Mr. Sterling."

11  Q.   And part of what you just read is quoted, and it says,

12  "demonstrated good tradecraft in the handling of his assigned

13  cases"; is that correct?

14  A.   Yes.

15  Q.   And how do you recognize that language?

16  A.   It appears it came out of the evaluation I wrote on

17  Mr. Sterling.

18  Q.   Do you recognize that as something you wrote?

19  A.   Yes, the part in quotes.

20  Q.   And you've never provided that to Mr. Risen; is that

21  correct?

22  A.   No.

23  Q.   I want to show you now, please, Government Exhibit No. 59.

24           THE COURT:  Any objection to 59?

25           MS. HAESSLY:  No objection, Your Honor.

Thomas H. - Direct                                                      736

1              THE COURT:  All right, it's in.

2              (Government's Exhibit No. 59 was received in

3    evidence.)

4    BY MR. FITZPATRICK:

5    Q.   I want to turn to the second page -- well, first of all,

6    what is a performance appraisal review?

7    A.   It's an annual report of an officer's accomplishments

8    during that period.

9    Q.   And who prepares -- and is the acronym "PAR"?

10   A.   PAR, yeah.

11   Q.   Who prepares PARs?

12   A.   The immediate supervisor.

13   Q.   And did you have responsibility for preparing PARs for

14   Mr. Sterling?

15   A.   Yes.

16   Q.   Turning to the second page, do you see a reference there

17   to a Mr. H.?

18   A.   Yes.

19   Q.   And who is Mr. H.?

20   A.   Me.

21   Q.   And do you recognize -- you've had a chance to review this

22   document prior to today?

23   A.   Yes.

24   Q.   And do you recognize -- what is this document?

25   A.   This is Mr. Sterling's PAR.

1   Q.    That you prepared?

2   A.    Yes.

3              THE COURT:  For what time period?

4              THE WITNESS:  10 January '99 to 31 July '99.

5              MR. FITZPATRICK:  If we could, Mr. Francisco, put

6   that on the screen, please?  It's Exhibit 59.  Just turn to the

7   second page, please.

8              THE COURT:  And, counsel, just so the jury is clear

9   about this, in this document, there are white spaces which

10  reflect deleted information, and there's also different type,

11  and where there's that smaller dark, black type, that was a

12  word substituted, correct, counsel, so we're clear about how

13  this exhibit was put together?

14             MR. FITZPATRICK:  Correct.

15             THE COURT:  And again, I warned you during voir dire

16  this was done for security reasons, so that's why this

17  document, it's a little hard to read, but that's why it looks

18  the way it does.

19             All right, are you ready to go?

20             MR. FITZPATRICK:  Just to be clear, Your Honor, this

21  document -- and I can get into this with the witness -- there

22  were two phases of redactions done to this document, one when

23  it was initially distributed and then one for the preparation

24  of this trial.  I'm only getting into the first phase of

25  redactions.

Thomas H. - Direct                                                738

1           THE COURT:  All right.

2    BY MR. FITZPATRICK:

3    Q.   So, Mr. H., directing your attention -- you can look at

4    the document.  At the bottom, there's a sentence that

5    begins, "Subject fully and completely met expectations."  Do

6    you recall writing that?

7    A.   Yes.

8    Q.   And then it continues, "Subject demonstrated good

9    tradecraft in the handling of his assigned cases."  Do you

10   recognize that?

11   A.   Yes, I do.

12   Q.   Did you write that?

13   A.   Yes, I did.

14   Q.   And is that the same language that appears in Mr. Risen's

15   article published March 2, 2002?

16   A.   Yes, it is.

17   Q.   Thank you.  You can close that.

18           Oh, one other question:  Are you familiar with when

19   individuals, case officers go into an Equal Employment

20   Opportunity process, or EEO process --

21   A.   Yes, I am.

22   Q.   -- what happens to their name?

23   A.   They're assigned another name for the course of the EEO

24   procedure.

25   Q.   By whom?

Thomas H. - Direct                                                    739

1   A.    An EEO officer at headquarters.

2   Q.    Okay.  So turning to the first page of that document, what

3   is the name reflected there?

4   A.    Samuel Crawford.

5   Q.    You don't -- do you know a Samuel Crawford?

6   A.    No, I don't.

7   Q.    But you're confident that this is an evaluation that you

8   prepared for Mr. Sterling?

9   A.    Yes, I am.

10  Q.    All right, thank you.

11          MR. POLLACK:  Your Honor, if I might?

12          THE COURT:  Well, wait, why are you objecting?  I

13  think your colleague is handling this witness.

14          MR. POLLACK:  She is.

15          THE COURT:  Well, then she's the only one who can --

16          MR. POLLACK:  I'm not objecting, Your Honor.  I was

17  just asking for a clarification on the document.

18          THE COURT:  One counsel per witness.

19          MR. POLLACK:  Thank you.  That's fine, Your Honor.

20  BY MR. FITZPATRICK:

21  Q.    During -- I'm just waiting to see if there's an objection

22  pending, Your Honor.

23          THE COURT:  59 is already in so --

24          (Discussion between Mr. Fitzpatrick and Ms. Haessly

25  off the record.)

Thomas H. - Direct                                                      740

1   BY MR. FITZPATRICK:

2   Q.   With respect to your supervisory responsibilities with

3   Mr. Sterling, did you ever have any conversations with

4   Mr. Sterling where he expressed dissatisfaction or perhaps

5   mishandling of an operation?

6   A.   No.

7   Q.   Had he expressed to you that a program was mishandled, is

8   that something you would have remembered?

9   A.   Yes.

10  Q.   And if that had been expressed to you, what would you have

11  been required to do?

12  A.   Notify my immediate supervisor as well as sending the

13  appropriate cable traffic to headquarters.

14  Q.   And did you ever have to do that in this case?

15  A.   No.

16          MR. FITZPATRICK:   The Court's indulgence for one

17  moment?

18          THE COURT:   Yes, sir.

19  BY MR. FITZPATRICK:

20  Q.   During your -- in your administrative responsibilities

21  over the Merlin file, did you ever remove any cables from the

22  cable traffic?

23  A.   No.

24  Q.   Or the electronic database?

25  A.   No.   The electronic database, no.

1    Q.    You never removed anything?

2    A.    No.

3    Q.    Final question:  Have you in the last several months

4    received an unexpected phone call?

5    A.    Yes.

6    Q.    And from whom did you receive that phone call?

7    A.    James Risen.

8    Q.    And where did the -- where did Mr. Risen call you?

9    A.    My cell phone.

10   Q.    Did you take the call?

11   A.    No.

12   Q.    And how do you know it's James Risen?

13   A.    On the voice mail, he said, "This is James Risen.  I'd

14   like to talk to you about CIA and Iran.  Please give me a call

15   back."

16   Q.    Did you return the call?

17   A.    No.

18   Q.    And again, have you ever had any contact with James Risen?

19   A.    No.

20              MR. FITZPATRICK:  Nothing further, Your Honor.

21              THE COURT:  All right, cross-examination?

22              MS. HAESSLY:  Thank you, Your Honor.

23                          CROSS-EXAMINATION

24   BY MS. HAESSLY:

25   Q.   Good afternoon, Mr. H.  My name is Mia Haessly, and I'm

Thomas H. - Cross                                                    742

1    one of the attorneys for Mr. Sterling.

2              You testified that you had administrative

3    responsibilities for Mr. Sterling while you were his

4    supervisor?

5    A.    In the Merlin case.

6    Q.    And as part of those administrative responsibilities, did

7    you review the cables that he authored?

8    A.    Yes.

9    Q.    Including cables about Classified Program No. 1?

10   A.    Yes.

11   Q.    So in your review then, you would have become familiar

12   with the details, with certain details about Classified Program

13   No. 1?

14   A.    Yes.

15   Q.    And once the cable was sent to headquarters or wherever it

16   was sent to, any number of people there would also become

17   familiar with details about Classified Program No. 1?

18   A.    Yes.

19   Q.    Mr. Fitzpatrick asked you about a performance evaluation.

20   I believe that was Exhibit 59?  Can we pull that up again?

21             Do you know if a declassified version of one of these

22   performance evaluations is made available to an employee during

23   a litigation?

24   A.    I wouldn't know.

25             THE COURT:  I'm sorry, what is your answer?

Thomas H. - Cross                                                    743

 1              THE WITNESS:  I wouldn't know.

 2              THE COURT:  You would not know, all right.

 3   BY MS. HAESSLY:

 4   Q.   And in this particular exhibit, if you look at the bottom,

 5   it appears that the word "Secret" has been whited out.

 6   A.   I'm sorry, can you repeat that?

 7   Q.   At the bottom of this exhibit, it appears that the

 8   word "Secret" has been -- has a slash through it at the bottom.

 9   A.   It appears partial.  I can't see a slash, but I see parts

10   of "Secret" in there.

11   Q.   Do you know whether this exhibit is a declassified version

12   of the PAR?

13   A.   I don't know.

14   Q.   Have you seen a declassified version of this?

15   A.   No.

16   Q.   Mr. H., while you were Mr. Sterling's supervisor, did you

17   ever see Mr. Sterling mishandle classified documents?

18   A.   No.

19   Q.   Did you ever see Mr. Sterling mishandle Human Asset No. 1,

20   who we refer to as Mr. Merlin?

21   A.   No.

22   Q.   In fact, you told the FBI during an interview that you

23   thought he handled him well; is that correct?

24   A.   In the PAR, they asked me the question, and I said he

25   handled his assigned cases well.

1  Q.   And do you recall being interviewed by the FBI?

2  A.   How long ago was that?

3  Q.   In 2003.

4  A.   Yeah.

5  Q.   And during that interview, you told the FBI that Sterling

6  did well handling the Merlin asset?

7  A.   Right.

8           MS. HAESSLY:  One moment, please.

9           Nothing further, thank you.

10          THE WITNESS:  Thank you.

11          THE COURT:  Any redirect?

12          MR. FITZPATRICK:  No, Your Honor.

13          THE COURT:  All right, sir, thank you for your

14  testimony.  You're free to go at this time.

15          THE WITNESS:  Thank you.

16                         (Witness excused.)

17          THE COURT:  Call the next witness.

18          MR. TRUMP:  There's one logistical issue with this

19  witness that we need to take up at the bench.

20          THE COURT:  All right.  Regular machine?

21          MR. TRUMP:  Yes, regular.

22          THE COURT:  All right.

23          (Bench conference on the record.)

24          THE COURT:  Yes.

25          MR. TRUMP:  The next witness is the witness who

1   prepared a PAR which we believe is quoted directly in the book,

2   but a portion of the quote refers to covert action operation.

3   I would like to simply read to the witness the part of the

4   quote that doesn't refer to anything that's off limits.

5          I don't want to show it on the screen, so that I

6   don't want to draw attention to those words that are quoted in

7   the book.  So in other words, I would just read to the witness,

8   "One secret CIA report said that the Russian was a known

9   handling problem due to his demanding and overbearing nature,"

10  and ask if that is the language in the PAR, and then say, "Yet

11  the same report stated he was also a sensitive asset," period.

12  Ask him if that's the language in the PAR, without reading the

13  next line, because I don't want to draw attention to that part.

14         THE COURT:  What's your view of that?  I mean, the

15  problem is you've put the exhibit into evidence.

16         MR. TRUMP:  I can't change what Mr. Risen wrote.

17         THE COURT:  I understand that, and I don't understand

18  how that reveals anything whatsoever since you've already

19  clearly established for this jury significant inaccuracies in

20  the chapter.  That could be just as inaccurate.

21         MR. TRUMP:  This is a quote from the PAR.  Mr. Risen

22  is quoting a CIA document, and he's putting it in quotes.

23         THE COURT:  Are you going to put that PAR in evidence

24  as well?

25         MR. TRUMP:  Yes, but that part -- those words are

1    redacted.  So I just want -- I don't want to draw attention to

2    those words.  I'm just going to confirm that the first part of

3    the quote comes from his PAR.

4              THE COURT:  All right, I'm going to permit that.  Of

5    course, the jury, you know, this jury is paying rapt attention.

6    If they put the two side by side, they'll see it themselves.

7              MR. TRUMP:  If they do that, they do that, but I

8    can't elicit that fact from those witnesses.

9              THE COURT:  All right.

10             MR. MAC MAHON:  That's fine.

11             MR. TRUMP:  So I'm not going to have it up on the

12   screen.

13             MR. MAC MAHON:  I'm not sure how I can object.

14             THE COURT:  You can't.

15             (End of bench conference.)

16          MARK L., GOVERNMENT'S WITNESS, AFFIRMED

17                         DIRECT EXAMINATION

18   BY MR. TRUMP:

19   Q.   Would you please state your first name?

20   A.   Mark.

21   Q.   And the first initial of your last name?

22   A.   L.

23   Q.   Had you previously worked for the Central Intelligence

24   Agency?

25   A.   Yes.

1  Q.   For how long?

2  A.   Twenty-one years.

3  Q.   And are you now retired from the official employment by

4  the CIA?

5  A.   Yes.

6  Q.   Do you still have a contractor relationship with the

7  agency?

8  A.   Yes.

9  Q.   Do you know the defendant, Mr. Sterling?

10  A.   Yes.

11  Q.   In what capacity?

12  A.   I worked with him in New York.

13  Q.   How long had you worked in New York?

14  A.   Three years.

15  Q.   From when to when?

16  A.   July 1999-June 2002.

17  Q.   And what was your position with respect to Mr. Sterling?

18  A.   I was his supervisor, branch chief.

19  Q.   And did you in turn report to someone else?

20  A.   Yes.

21  Q.   Was that Thomas H.?

22  A.   Yes.

23  Q.   And what were your duties as a branch supervisor with

24  respect to Mr. Sterling's job responsibilities?

25  A.   I set the expectations.  I provided oversight to his

1    activities.  I wrote his performance appraisal.

2    Q.   Were you generally familiar with his workload then?

3    A.   Yes.

4    Q.   And the operations that he was working on?

5    A.   Yes.

6    Q.   Are you familiar with a Counterproliferation Division

7    operation that we have called Classified Program No. 1

8    involving a human asset, a Russian known as Merlin?

9    A.   Yes.

10   Q.   Do you know generally what that operation was about?

11   A.   Yes.

12   Q.   And during your tenure, was Mr. Sterling a case officer

13   responsible for that?

14   A.   I'm sorry, could you repeat that?

15   Q.   Was Mr. Sterling the case officer responsible for that

16   operation?

17   A.   Yes.

18   Q.   Were there any other case officers in New York who worked

19   on it?

20   A.   Yes.

21   Q.   At the same time as Mr. Sterling?

22   A.   No.

23   Q.   What was your responsibility with respect to cables that

24   Mr. Sterling would have to draft as part of his role as a case

25   officer in this operation?

1   A.   I recall some occasions where I reviewed his write-up on

2   the case.

3   Q.   And that was a typical role of a supervisor, to review

4   cables?

5   A.   Yes.

6   Q.   So you were read into the program for that purpose?

7   A.   Yes.

8   Q.   And this was a, a limited access program requiring someone

9   to be read in before they had any access to documents or cables

10  of the program, correct?

11  A.   Yes.

12  Q.   At any time, do you recall removing language or cables

13  drafted by Mr. Sterling?

14  A.   No.

15  Q.   As a supervisor, you had to do his evaluation?

16  A.   Yes.

17  Q.   And did you prepare an evaluation for the period August 1,

18  '99, to July 31, 2000?

19  A.   Yes.

20  Q.   And that is typically called a performance appraisal

21  report, or PAR?

22  A.   That's correct.

23          MR. TRUMP:  Could we have Exhibit 60, please?

24          THE COURT:  Any objection to 60?

25          MR. MAC MAHON:  No objection, Your Honor.

1           THE COURT:  All right, it's in.

2           (Government's Exhibit No. 60 was received in

3    evidence.)

4    BY MR. TRUMP:

5    Q.   And prior to trial yesterday, you reviewed this exhibit;

6    is that right?

7    A.   Yes.

8    Q.   It doesn't have Mr. Sterling's name on it, does it?

9    A.   No.

10   Q.   But you've reviewed this, and you can testify that this

11   is, in fact, the evaluation you did for Mr. Sterling?

12   A.   Yes.

13   Q.   It has a fictitious name, Samuel Crawford?

14   A.   Yes.

15   Q.   At the bottom of page 2 and the top of page 3, do you see

16   that language:  "Subject fully met expectations"?

17   A.   Yes.

18   Q.   And did you write, "Subject securely and productively

19   handled a sensitive asset who was a known handling problem due

20   to his demanding and overbearing nature"?

21   A.   Yes.

22   Q.   And, "Subject persevered with this asset and applied his

23   tradecraft skills to work around these problems and guide the

24   asset through the successful first stage of a . . . classified

25   operation"?

1  A.   Yes.

2  Q.   What is your practice in preparing a PAR?  How do you

3  start the, the PAR process?

4  A.   Normally I would ask the employee to provide notes, what I

5  would call a brag sheet on their accomplishments, and then I

6  would prepare, draft the PAR from that and from my own

7  knowledge of the individual's cases.

8  Q.   And then from that, you drafted the actual document we see

9  here, without the redactions and the substitutions?

10  A.   Yes.

11  Q.   Then what would you do?

12  A.   Before it was transmitted to the headquarters, it would be

13  discussed with the employee.  There may also be a reviewing

14  process by one of my superiors.

15  Q.   So you sat down with Mr. Sterling and discussed this?

16  A.   I don't recall.

17  Q.   And was your practice also to provide them with copies?

18  A.   Yes.

19  Q.   As originally drafted, they're marked Secret and kept

20  classified?

21  A.   I'm sorry, say it again?

22  Q.   As originally drafted, they're marked Secret and

23  maintained as classified documents?

24  A.   Yes.

25            MR. TRUMP:  With the help of Mr. Wood?  Just show him

1    that.

2    Q.   What I've showed you is a copy of Government Exhibit 132,

3    and I'd just like to read a portion of it and ask you a

4    question.   The first sentence of paragraph 20, "One Secret CIA

5    report said that the Russian 'was a known handling problem due

6    to his demanding and overbearing nature.'"

7              That is the identical language from the PAR you

8    prepared, is it not?

9    A.   Yes.

10   Q.   And the book goes on to say, "Yet the same report stated

11   that he was also a 'sensitive asset' . . ..  Again, you used

12   that phrase, "sensitive asset," in your PAR, correct?

13   A.   Yes.

14   Q.   Now, were you in New York on 9/11, 2001?

15   A.   Yes.

16   Q.   Were you in the office that day?

17   A.   Yes.

18   Q.   Was the office completely destroyed?

19   A.   Yes, it was.

20   Q.   So all of your files were destroyed?

21   A.   Yes, they were.

22   Q.   Did you keep copies of these PARs after you prepared them?

23   A.   I'm not sure I understand.

24   Q.   Did you keep -- did you have any reason to keep copies of

25   the PAR that we just discussed in your office?

Mark L. - Direct                                                         753

1   A.   In the office, we would keep copies of PARs for all the

2   employees.

3   Q.   But those were destroyed in, in 9/11?

4   A.   To my knowledge, everything was destroyed.

5   Q.   Did you ever either orally or in writing give that

6   information to James Risen?

7   A.   No.

8   Q.   Have you ever spoken to James Risen?

9   A.   No.

10  Q.   Do you know James Risen?

11  A.   No.

12  Q.   With respect to Classified Program 1 and the cables that

13  you had reviewed with respect to that, did you ever provide any

14  information about that program to anyone outside the CIA?

15  A.   No.

16  Q.   Now, during your tenure as a CIA case officer, you had

17  been overseas for periods of time?

18  A.   Yes, 13 years.

19  Q.   And you also taught case officers; is that right?

20  A.   Yes.

21  Q.   You were a training officer for several years?

22  A.   I was an instructor for two years.

23  Q.   In the mid-1990s?

24  A.   Yes.

25  Q.   Is it part of the instruction of --

1   A.   Late 1990s.

2   Q.   Was it part of the instruction of case officers to train

3   them in the handling of classified materials?

4   A.   Yes.

5   Q.   Was it part of the instruction to train them in the

6   protection of human assets?

7   A.   Yes.

8   Q.   Was it also part of the instruction to train them to

9   understand why it was necessary to maintain the secrecy of

10  human assets and their relationship with the CIA?

11  A.   Yes.

12         MR. TRUMP:  The Court's indulgence?

13         THE COURT:  Yes, sir.

14  BY MR. TRUMP:

15  Q.   In the chain of command at, at New York, do those people

16  get these PARs?

17  A.   Those above me?

18  Q.   Those above you.

19  A.   Yes.

20  Q.   Are they sent out to any other -- let me back up.  Is

21  there any reason, for example, that the Counterproliferation

22  Division would need access to a PAR from someone in New York?

23         MR. MAC MAHON:  Your Honor, objection to foundation.

24  BY MR. TRUMP:

25  Q.   If you know.

Mark L. - Cross                                                    755

1           THE COURT:  If you know.

2           THE WITNESS:  I don't know.

3    BY MR. TRUMP:

4    Q.   But Thomas H. would have -- would review this, correct?

5    A.   Yes.

6    Q.   And then Charlie Seidel would review it?

7    A.   Yes.

8    Q.   And David Cohen would review it?

9    A.   Yes.

10          MR. TRUMP:  That's all I have.

11          THE COURT:  Mr. MacMahon?

12          MR. MAC MAHON:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14   BY MR. MAC MAHON:

15   Q.   Mr. L., my name is Edward MacMahon.  I'm one of the

16   lawyers for Mr. Sterling.  Good afternoon.

17   A.   Yes.

18   Q.   Did you work in the same office with Mr. Sterling?

19   A.   Same branch.

20   Q.   Were you physically in the same office with him at any

21   time in 1999 or 2000?

22   A.   On occasion.  I had my own office.

23   Q.   Was it, was it in the same building?

24   A.   Yes.

25   Q.   And in that time, you never saw him mishandle any

Mark L. - Cross                                                      756

1    classified information at all, did you?

2    A.    No.

3    Q.    You never saw him leaving with a backpack full of

4    documents or anything of the sort, right?

5    A.    No.

6    Q.    And were people in that office able just to come and go

7    with documents without being searched at all during 1999 and

8    2000?

9    A.    Yes.

10   Q.    There was no security at all in the office to stop anybody

11   from leaving with any documents at all; is that your testimony?

12   A.    You mean is there someone at the door checking our

13   packages?

14   Q.    Yeah.  Was there any security at all?

15   A.    Well, yes, there was security.

16   Q.    No spot checks on employees leaving with information or

17   coming and going or anything?

18   A.    I don't recall any spot checks of someone's baggage being

19   checked.

20   Q.    And nobody reported to you that Mr. Sterling had taken

21   documents or misplaced classified documents whatsoever, right?

22   A.    That's correct.

23   Q.    The document that Mr. Trump showed you, Exhibit No. 60 --

24   right?

25   A.    Yes.

1   Q.   Can you look at that again, please, Government Exhibit 60?

2   A.   Okay.

3   Q.   That's not a Secret report, is it?

4   A.   It was a Secret report when it was prepared in our office

5   and sent to our headquarters.

6   Q.   And you don't know whether the document was declassified

7   afterwards, correct?

8   A.   At our headquarters, you mean?

9   Q.   Ever, by anybody.  You don't know whether this document

10  was declassified after you prepared it, correct?

11  A.   Not to my knowledge.

12  Q.   In fact, the markings on the -- the Secret markings on the

13  bottom of this have been almost completely erased, haven't

14  they?  If you look at the bottom of all four pages.

15  A.   Well, the document's been heavily redacted.

16  Q.   Right.  And Mr. Trump's question to you was whether this

17  was originally marked, originally marked as Secret, correct?

18  A.   It was.

19  Q.   And you don't -- you can't tell us if in the litigation

20  process with Mr. Sterling, he received a declassified version

21  of this document, correct?

22  A.   I'm not sure what you're referring to, litigation process.

23  Q.   Are you familiar at all with the process with EEO claims

24  and what happens once they're initiated at the CIA?

25  A.   No.

1   Q.   So you wouldn't be a witness who could tell us if

2   Mr. Sterling did receive a declassified version of this?

3   A.   I could not tell you.

4   Q.   And this document actually does -- you know that there was

5   a discrimination case and EEO complaint filed by Mr. Sterling,

6   correct?

7   A.   Yes.

8   Q.   Okay.  And then on page 2 of this document, the second

9   page, it's just not marked, and that's the first full

10  paragraph -- if I may, Your Honor, can I show Mr. Francisco

11  which one to highlight?

12          THE COURT:  Go ahead.

13          MR. MAC MAHON:  Thank you, Your Honor.

14  Q.   Do you see the part that Mr. Francisco has highlighted

15  about him not fully meeting expectations and not having

16  sustained operations?  Do you read that?

17  A.   Yes.

18  Q.   Okay.  And do you know that these, that these complaints

19  were part of -- what's set forth here ended up being part of

20  Mr. Sterling's discrimination case against the CIA?

21  A.   No, I did not know that.

22  Q.   And that's the same article -- the same discrimination

23  case that's discussed in Government Exhibit 83, which you've

24  already seen, which is the article by Mr. Risen, correct?

25  A.   No, I don't know what you're referring to.

1    Q.    Okay.  Could we put up Exhibit 83 again, please?

2          Have you ever seen this document before?

3    A.    I don't recall seeing it before.

4    Q.    Okay.  And when was the first time you saw any copy of *The*

5    *New York Times* article about Mr. Sterling's discrimination

6    case?

7    A.    I don't recall.

8    Q.    Okay.  And who's the picture?  You identified Mr. Sterling

9    before, and the exhibit we have here is cut out, but can you

10   identify just partially who the person is?

11         If we go to the next page, I think it will be

12   clearer.

13         MR. TRUMP:  I think we can all agree that it's

14   Mr. Sterling.

15         THE COURT:  Yeah, that's not in dispute.

16   BY MR. MAC MAHON:

17   Q.    Mr. Sterling, correct?

18   A.    It appears to be.

19   Q.    And that was published in the newspaper in *The New York*

20   *Times*, correct?

21   A.    According to what's on the screen here, yes.

22         MR. MAC MAHON:  That's all I have, Your Honor.  Thank

23   you.

24         THE COURT:  Is there any redirect?

25         MR. TRUMP:  Just very briefly.

1                        REDIRECT EXAMINATION

2   BY MR. TRUMP:

3   Q.   There was security in the building, correct?

4   A.   Yes.

5   Q.   Only CIA employees with badges and access cards and things

6   like that could get in and out, correct?

7   A.   That's correct.

8   Q.   But if you had a briefcase or a satchel or even a folder,

9   whatever, that was not searched, correct?

10  A.   That's correct.

11  Q.   So if you or Mr. Sterling or anybody wanted to leave the

12  building with classified documents, you could?

13  A.   That's correct.

14  Q.   It was an honor system, right?

15  A.   Yes.

16            MR. TRUMP:  That's all I have, Your Honor.

17            THE COURT:  Any recross?

18                        RECROSS EXAMINATION

19  BY MR. MAC MAHON:

20  Q.   Is this even after the CIA was infiltrated by Aldrich

21  Ames?  Do you know when that happened?

22  A.   When it happened?  Yes.

23            MR. TRUMP:  I'm sorry, Your Honor, I was talking.  I

24  object to the question.

25            THE COURT:  You missed the Aldrich Ames question.  I

1   think that's far afield.

2             MR. MAC MAHON:  I'll withdraw the question, Your

3   Honor.

4   Q.   Let me ask you this:  The security was not CIA security in

5   the building, was it?

6   A.   Our office was CIA security.

7   Q.   But in the building itself, it was just regular commercial

8   security?

9   A.   When you came in off the street, there was a mezzanine

10  level with commercial security.

11            MR. MAC MAHON:  That's all I have, Your Honor.  Thank

12  you.

13            THE COURT:  All right, thank you, sir.  You're free

14  to go as a witness.  Thank you.

15                         (Witness excused.)

16            THE COURT:  And, ladies and gentlemen, your reward

17  for having been such an attentive and timely jury is I'm going

18  to actually let you get out even earlier tonight.  I've been

19  told by counsel we are actually ahead of schedule, which is

20  good.

21            I do want to start tomorrow morning at 10:00, not

22  9:30, and you really do need to get some coffee before you come

23  to court tomorrow morning because the first witness you're

24  going to hear from was done by deposition, and that means

25  you're going to be watching that testimony on the screen, and

1    so I want to make sure that you're able to stay nice and alert

2    and focused.

3         Please remember to follow my instructions about

4    avoiding any exposure to any media coverage of any kind about

5    this case.  Do not discuss what you've seen or heard in court

6    today.  I know Dr. Rice is somebody who you might want to talk

7    about.  You can't do it while this case is in progress, all

8    right?  Because I don't want you thinking about the case.  You

9    know, I warned you about that before.

10        So your best job to get ready for tomorrow is a good

11   night's sleep and then come in fresh and ready.  So 10:00

12   tomorrow morning, and I will have you out by five, no later

13   than five tomorrow.  Leave your stuff here.  You know the drill

14   at this point.  We'll see you tomorrow.

15        I'm going to stay in session for just a second with

16   counsel.

17                      (Jury out.)

18        THE COURT:  All right, now, what we're going to do

19   tomorrow morning is I have my regular docket at 9:00, so I have

20   two civil matters.  After that, we are going to reset the

21   courtroom.  The screen is going to shift to the other side, so

22   this is in part for our deputy.  The far, my far right is the

23   section of the courtroom that will not be available to people

24   who don't have clearances, so that the screen is not available.

25        I think we're going to have to turn down your,

1    defense counsel's machine and the witness box.  In other words,

2    we can't have any TV screens showing in a non-protected

3    context, all right?

4            My recollection is that the deposition is going to

5    run close to three hours.  Now, we can certainly cut -- we had

6    a 15- or 20-minute break.  We can cut that time, but it's going

7    to be a little bit dry at the end of it, especially because of

8    the accent.

9            I hope that the technology is in good shape.  I

10   assume the government has done a dry run of the tape to make

11   sure it's playing well.

12           MR. FRANCISCO:  Judge, we tested it during the break

13   earlier, and sound came out.

14           THE COURT:  All right, fine.

15           MR. FRANCISCO:  There's a portion at the beginning of

16   the video where the audio drops in and out for, like, the first

17   19 lines of the transcript, but after that, everything is fine.

18           THE COURT:  All right, that's fine.  And then my

19   understanding is what we agreed to was that there are

20   transcripts of the deposition, so the jurors are going to have

21   a physical transcript, correct?  Plus, they'll have the ability

22   to listen and watch the screen.  That's what we've told them to

23   do; is that right?

24           And everybody is comfortable with the transcript?

25   There are no issues with the transcript.  I think that is

1    correct as well.

2              MR. MAC MAHON:  Judge, so far as I understand, the

3    transcript's not going into evidence, though.  It's just going

4    to be an aid, correct?

5              THE COURT:  Correct.  This is like any other witness

6    who testifies.  We don't send witness testimony in to the jury.

7              MR. MAC MAHON:  I remember.  I just was --

8              THE COURT:  Yeah.  No, that's --

9              MR. MAC MAHON:  I'm sorry.  That's fine with the

10   defendant.

11             THE COURT:  All right.  So do we anticipate any other

12   issues?

13             And that will take care of tomorrow morning, and we

14   start at ten.  That will take us to the lunch break most

15   likely.  And then the government will have how many witnesses

16   approximately coming in tomorrow?

17             MR. OLSHAN:  Probably five to seven, Your Honor.

18             THE COURT:  All right.

19             MR. OLSHAN:  They're going to start going a little

20   bit quicker, so --

21             THE COURT:  Good.  And we don't need the screen --

22   will we need the screen any further for the government's case?

23             MR. OLSHAN:  I think that's it.

24             THE COURT:  All right.

25             MR. TRUMP:  The only possibility would be rebuttal.

1          THE COURT:  All right.  Does the defense think we may

2     need the screen for any of your witnesses?

3          MR. MAC MAHON:  Not that I can think of, Your Honor.

4          THE COURT:  All right.  I'll see whether we're going

5     to keep it up here or not.  I think out of an abundance of

6     caution, we'll keep it up here.

7          All right, is there anything else we need to address

8     before tomorrow?  No?

9          MR. MAC MAHON:  Not for the defense.

10         THE COURT:  All right.  Then, Mr. Trump?

11         MR. TRUMP:  Unless there's an objection, we would

12    move in the deposition as an official exhibit as part of the

13    trial record.

14         THE COURT:  It's part of the trial record, but it's

15    not going in as an exhibit to the jury.  It can't.

16         MR. TRUMP:  It has to be marked in some way, so we

17    were just going to mark it as an exhibit for purposes of

18    maintaining a number for the record.

19         THE COURT:  That's fine.  You check that out with

20    Ms. Guyton.  So just give it a number, but the point is that

21    document, that transcript will not be going to the jury.

22         MR. TRUMP:  No.  The actual tape would be the, the

23    disc or however it is -- it would be a disc, and that will be

24    marked as an exhibit.

25         MR. MAC MAHON:  If I understand, Your Honor, we

```
 1    haven't had a chance to argue this, I know that the disc itself
 2    needs to be marked as part of the record --
 3              THE COURT:  Correct.
 4              MR. MAC MAHON:  -- but it wouldn't be put in the cart
 5    that goes back into the jury room.
 6              THE COURT:  Correct.  It is not going to go to the
 7    jury --
 8              MR. TRUMP:  Correct.
 9              THE COURT:  -- for its consideration.
10              MR. TRUMP:  It just needs to be marked for purposes
11    of the record.
12              THE COURT:  And the transcript is going to also be
13    similarly marked.
14              MR. TRUMP:  Correct.
15              THE COURT:  So if the exhibit is 120, the transcript
16    is going to be 120A, so they're together.
17              MR. TRUMP:  It's actually 171 and 172.
18              THE COURT:  All right, 171 and 172.  172 is the
19    transcript; 171 is the disc; and that's for down the road if
20    there is an appeal, then the Court of Appeals has it.
21              (Government's Exhibit Nos. 171 and 172 were received
22    in evidence.)
23              Now, Ms. Thomson is not going to be taking anything
24    down while the deposition is being played.  I mean, she's going
25    to be here in court in case one of you says something, but, I
```

1    mean, that is the testimony.  It's my ruling on objections.

2    It's whatever you-all said during the deposition, all right?

3    So she's not going to do anything.

4           And as I said, if you want to have just one member of

5    each trial team here, and quite frankly, even if Mr. Sterling

6    wanted to sleep in in the morning, that's fine.  I mean, he was

7    present at the deposition.  You-all decide how you want to do

8    that, and I'll certainly explain to the jury why we're doing it

9    that way, because we were all together for that deposition.

10          All right, anything further before we recess?

11                       (No response.)

12          THE COURT:  No?  Then I'll see you-all back here at

13   10:00.  We start court at nine for the other cases.

14     (Recess from 4:48 p.m., until 10:00 a.m., January 16, 2015.)

15

16                  CERTIFICATE OF THE REPORTER

17     I certify that the foregoing is a correct transcript of

18   the record of proceedings in the above-entitled matter.

19

20

21                              _____
                                           /s/
                                     Anneliese J. Thomson
22

23

24

25