UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .        Criminal No. 1:10cr485
                              .
      vs.                     .        Alexandria, Virginia
                              .        January 16, 2015
JEFFREY ALEXANDER STERLING,   .        10:00 a.m.
                              .
              Defendant.      .
                              .
.  .  .  .  .  .  .  .  .  .  .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>VOLUME IV</u>

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:            JAMES L. TRUMP, AUSA
                               DENNIS M. FITZPATRICK, AUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314
                                 and
                               ERIC G. OLSHAN, Deputy Chief
                               Public Integrity Section of the
                               Criminal Division
                               United States Department of
                               Justice
                               1400 New York Avenue, N.W.
                               Suite 12100
                               Washington, D.C. 20005


FOR THE DEFENDANT:             EDWARD B. MAC MAHON, JR., ESQ.
                               Law Office of Edward B.
                               MacMahon, Jr.
                               107 East Washington Street
                               P.O. Box 25
                               Middleburg, VA 20118

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 768 - 881)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1   APPEARANCES:  (Cont'd.)

 2   FOR THE DEFENDANT:           BARRY J. POLLACK, ESQ.
                                  MIA P. HAESSLY, ESQ.
 3                                Miller & Chevalier Chartered
                                  655 - 15th Street, N.W.
 4                                Suite 900
                                  Washington, D.C. 20005-5701
 5

 6   CLASSIFIED INFORMATION       CHRISTINE E. GUNNING
     SECURITY OFFICERS:           MAURA PETERSON
 7

 8   ALSO PRESENT:                GERARD FRANCISCO
                                  SA ASHLEY HUNT
 9                                JENNIFER MULLIN, ESQ.

10

     OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
11                                U.S. District Court, Fifth Floor
                                  401 Courthouse Square
12                                Alexandria, VA 22314
                                  (703)299-8595
13

14

15

16

17

18

19

20

21

22

23

24

25
```

770

1                           I N D E X

2                    DIRECT   CROSS   REDIRECT   RECROSS

3   WITNESSES ON BEHALF OF
    THE GOVERNMENT:

4
    Merlin (by deposition)      774

5
    Charles Bratton Seidel      775     790      791

6
    David Cohen                 792     801

7
    Eileen Swicker              807     816      820       821

8
    Carrie Newton Lyons         823     828

9
    Scott A. Koch               832     842      848

10
    Charles Bruce Wells         849     863      872       878

11

12                          EXHIBITS

13                             MARKED          RECEIVED

14  GOVERNMENT'S:

15  No. 52                                       811
        78                                       835
16      81                                       835
        84                                       835
17      86                                       835

18      87                                       835
        89                                       849
19      90                                       849
        91                                       849
20      92                                       849

21      93                                       849
        99                                       835
22     127                                       835

23

    DEFENDANT'S:
24
    No. 5                                        867
25      6                                        867
        7                                        866

1              P R O C E E D I N G S

2                    (Defendant present, Jury out.)

3         THE COURT:  All right.

4         THE CLERK:  Criminal Case 10-485, United States of

5    America v. Jeffrey Alexander Sterling.  Would counsel please

6    note their appearances for the record.

7         MR. TRUMP:  Good morning, Your Honor.  Jim Trump on

8    behalf of the United States.

9         MR. FITZPATRICK:  Dennis Fitzpatrick on behalf of the

10   United States.

11        THE COURT:  Good morning.

12        MR. POLLACK:  Good morning, Your Honor.  Barry

13   Pollack on behalf of Mr. Sterling.

14        MR. MAC MAHON:  Edward MacMahon for Mr. Sterling,

15   Your Honor.

16        THE COURT:  All right, I want to get this started.  I

17   don't know what the taping problem is in terms of the screen,

18   but I'm going to leave it up to the marshals to make sure that

19   the appropriate people have access to the well and nobody else

20   can see in.

21        We need to get this jury.  They're all here again on

22   time.  I don't want them wasting their time.

23        THE COURT SECURITY OFFICER:  They are --

24        THE COURT:  Just wait one second.  What's the matter

25   you-all wanted to raise before we get started?

```
 1            MR. POLLACK:  Your Honor, it's not something we need
 2  to take up before the jury comes in, but it has to do with our
 3  getting notice of who the witnesses are that are going to be
 4  called.
 5            THE COURT:  Right.
 6            Come on in, folks.
 7                      (Jury present.)
 8            THE COURT:  I have told the government that I want
 9  the list of witnesses they expect to call and in the order they
10  expect to call them given to both the Court and defense counsel
11  at the beginning of each session.  This morning we know we have
12  one witness, so for the afternoon schedule, could we please
13  have that, Mr. Trump or Mr. Fitzpatrick, before the end of the
14  morning session?
15            Good morning, ladies and gentlemen.  Once again,
16  thank you for being here on time.  As I indicated to you
17  yesterday, what we're going to have this morning, you're going
18  to be doing a lot of television watching.  Hopefully, that
19  screen, the big one or the small ones for those of you in the
20  first row, will enable you to be able to look at the witness
21  carefully.
22            You also have, each of you have on your chair a
23  transcript.  That's a written transcript of what the witness
24  testified to.
25            Now, this witness is Mr. Merlin, whom you've heard a
```

1    great deal about, the human asset.  That's one of the reasons

2    again why the courtroom is set up this way, because his

3    picture, obviously, or his face can't be known to the general

4    public.

5              He speaks with a fairly thick Russian accent, and his

6    deposition was not taken here in Virginia, so it was, there's a

7    transmission issue, so sometimes it is difficult to hear what

8    he is saying, and so I urge you to just pay good attention.

9    That's why I said get a lot of coffee for this morning, all

10   right?

11             This deposition will take up probably the entire

12   lunch -- morning period.  I will give you a break around 11:30,

13   as we've been doing, and probably we'll break for lunch around

14   one because my estimation is this deposition runs close to

15   three hours.  I'm assuming when we took our breaks that we can

16   fast-forward, so it may be a little bit less than a total of

17   three hours, all right?

18             Unless there's anything further, we'll get started

19   with the deposition.  So you folks -- are we ready to go?  All

20   right --

21             MR. TRUMP:  Yes, Your Honor.

22             THE COURT:  You may open, you may open the

23   transcript, and let me know, I'll be watching you if there's

24   any issue.  If you're having trouble, raise your hands and

25   address it.

1            (Excerpt of Government's Exhibit No. 171, Deposition

2   of MERLIN, played.)

3            THE COURT:  It better be better than that or we're

4   not going to play it.

5            (Excerpt of Government's Exhibit No. 171, Direct

6   Examination of MERLIN, played.)

7            THE COURT:  All right, this is a logical time to stop

8   because we're going to go now to cross-examination, so why

9   don't we take our morning break.  I think today, folks, I'm

10  going to just give you 15 minutes and ask you to be back here

11  at 20 of, all right?  Fifteen-minute break.

12            (Recess from 11:23 a.m., until 11:43 a.m.)

13                           (Defendant and Jury present.)

14            THE COURT:  All right, we'll now go into the

15  Cross-Examination of the witness.

16            (Excerpt of Government's Exhibit No. 171,

17  cross-examination of MERLIN, played.)

18            THE COURT:  Well, why don't we stop now since we have

19  a short amount of redirect.  It is the lunch hour.  I do try to

20  keep us on schedule.  We'll take our one-hour lunch break or a

21  little bit less.  I'd like you back here at 2:00.  We'll finish

22  this up and then get right into some more live witnesses.

23            (Recess from 1:05 p.m., until 2:00 p.m.)

24

25

Seidel - Direct                                                    775

1                    A F T E R N O O N   S E S S I O N

2                       (Defendant and Jury present.)

3            THE COURT:  All right, we're finishing up, this is

4    now the redirect examination of the witness.

5            (Excerpt of Government's Exhibit No. 171, Redirect

6    Examination of MERLIN, played.)

7            THE COURT:  All right, ladies and gentlemen, you may

8    put those binders down now.  We've completed that witness's

9    testimony.  We'll take the visual off the screen, and now we

10   can open up the screen, and all the rest of the witnesses today

11   may testify in open court, correct?

12           MR. OLSHAN:  Correct.

13           THE COURT:  All right.  Mr. Fitzpatrick, if you don't

14   mind helping?

15           And there's enough room in the courtroom that anybody

16   whose vision is blocked can simply move over to the other side.

17           I will ask the jurors to be very careful moving in

18   and out until we get this screen completely down.

19           All right, Deputy, I'll ask you to assist us.  Who's

20   the witness who's next on board?  Is that Mr. Seidel?

21           MR. TRUMP:  Yes.

22           THE COURT:  All right.  Could you ask Mr. Seidel to

23   come in, please.

24      CHARLES BRATTON SEIDEL, GOVERNMENT'S WITNESS, AFFIRMED

25                         DIRECT EXAMINATION

1  BY MR. TRUMP:

2  Q.   Would you please state your name.

3  A.   Charles Bratton Seidel.

4  Q.   And would you spell your last name.

5  A.   Yes.  S -- as in Sam -- e-i-d -- as in delta -- e-l.

6  Q.   And your middle name for the court reporter?

7  A.   B -- as in bravo -- r-a-t-t-o-n.

8  Q.   Mr. Seidel, had you at one time worked with the CIA?

9  A.   Yes, I did.

10  Q.   And when did you begin your career with the CIA?

11  A.   February of 1980.

12  Q.   And when did you retire?

13  A.   June of 2006.

14  Q.   Was most of your career spent overseas?

15  A.   It was indeed.

16  Q.   When did you first go overseas?

17  A.   In the summer or fall of 1982.

18  Q.   Was that as an operations officer or case officer?

19  A.   It was.

20  Q.   And from that point until when did you work overseas?

21  A.   Until the summer or fall of 1998.

22  Q.   And while you were overseas, was that as a case officer

23  and then as a supervisor?

24  A.   That is correct, yes.

25  Q.   And in 1998, where did you go?

Seidel - Direct                                                      777

1   A.   New York station.  I was -- New York.

2   Q.   The New York office?

3   A.   That's correct.

4   Q.   And how long did you spend in New York?

5   A.   I was there approximately two years.

6   Q.   And after New York, did you go back overseas?

7   A.   I did, yes.

8   Q.   And finish your career overseas?

9   A.   Yes.  I actually, several months before I retired, in June

10  of 2006, I returned to the States for just a few months.

11  Q.   And again, that last stint overseas was primarily as a

12  supervisor?

13  A.   Yes.

14  Q.   Was all of your overseas -- or a substantial part of your

15  overseas career spent in North Africa and the Middle East?

16  A.   Yes, it was.

17  Q.   Do you know someone by the name of Jeffrey Sterling?

18  A.   I do.

19  Q.   Do you see him in court today?

20  A.   I do.

21          THE COURT:  Identity is established.

22  BY MR. TRUMP:

23  Q.   Would you just point him out?

24  A.   Yes (indicating).

25          MR. TRUMP:  May the record reflect that he's been

Seidel - Direct                                                      778

1    identified?

2            THE COURT:  Yes.  He's been established, Mr. Trump.

3    BY MR. TRUMP:

4    Q.   When did you meet Mr. Sterling?

5    A.   Well, it would have been in the -- I arrived in New York

6    at the New York office in 1998, and it was either at the end of

7    1998 or very early in 1999 when he was assigned there.

8    Q.   Were you responsible in part for his assignment to you?

9    A.   Yes, I was.

10   Q.   Would you please explain?

11   A.   Yeah.  It was during a visit to our headquarters in

12   Washington several months, I'm not sure precisely when.  I was

13   visiting our headquarters, and a senior manager in one of the

14   relevant geographic areas asked to see me, and he asked if I

15   would facilitate or support an assignment or identification of

16   a position in the office in New York for Mr. Sterling.

17   Q.   And that, in fact, happened?

18   A.   It did, yes.

19   Q.   When he came to New York, what was your responsibility

20   within the New York office?

21   A.   I was the second ranking officer in the facility.

22   Q.   So you were the, the deputy?

23   A.   I was the deputy, yes.

24   Q.   Who was the chief at the time?

25   A.   David Cohen.

1  Q.   And with respect to Mr. Sterling specifically, what was

2  your role?

3  A.   Well, I was -- as the No. 2 officer in the station, I was

4  responsible for overseeing really all aspects of the, of the

5  facility, and we had a layered management, so we were divided

6  into branches, so Mr. Sterling's initial supervisor, direct

7  supervisor would be a branch chief, and then above him was a

8  chief of operations, and then in the wiring diagram chain of

9  command, I was above the chief of operations and below

10 Mr. Cohen.

11 Q.   And during this period, one of his branch chiefs was

12 Thomas H.?

13 A.   That's correct, yes.

14 Q.   And then Mark L.?

15 A.   Yes.

16 Q.   And then his chief of operations became Tom H.?

17 A.   Yes.

18 Q.   And you were, as you said, the deputy, and Mr. Cohen was

19 the chief?

20 A.   Throughout Mr. Sterling's tenure in New York, I was the

21 deputy.

22 Q.   And specifically in terms of his caseload and duties, what

23 was your responsibility?

24 A.   Well, I came to New York having served six consecutive

25 assignments in the foreign field running and managing

Seidel - Direct                                                        780

1   operations, and I was selected by Mr. Cohen to take that job

2   because of the operational experience.  So there are a wide

3   range of activities run out of that office, but because of my

4   operational background, I had more of a, sort of a

5   responsibility and focus on operational, operational matters

6   undertaken by officers like Mr. Sterling, who were subordinate

7   to me.

8   Q.   So you were familiar with the operations with which he was

9   assigned?

10  A.   Yes, I was.

11  Q.   Are you familiar with the book *State of War* by James

12  Risen?

13  A.   Yes, I am.

14  Q.   Are you familiar with the operation that is described in

15  chapter 9, the operation run out of New York?

16  A.   Yes, I am.

17  Q.   And was Mr. Sterling assigned to that?

18  A.   Yes, he was.

19  Q.   As a supervisor, did you have to be read into whatever

20  program that operation was assigned to?

21  A.   Yes.

22  Q.   And by "read in," what do we mean?

23  A.   Well, there are different gradations of sensitivity of

24  operations, and the operation in question was one that was

25  particularly sensitive and compartmented and -- in terms of

1    limited access, so that anybody who had access to that

2    information had to be, quote, read into the sensitivity of it

3    and was, was, was instructed about the, the sensitivity.

4    Q.   And that gave you access to the cable traffic on that

5    operation?

6    A.   Yes, it did.

7    Q.   What was your responsibility with respect to cables?

8    A.   Well, it varied.  In some cases, although I don't recall

9    specific ones, I may have released cables, but initially, my

10   overall responsibility was to follow the course of the

11   operation.  In most cases, I would read copies of the messages

12   after they had been sent, but in general terms, it would be as

13   first line manager who would review and then release a cable,

14   but if there was something of particular importance or concern

15   perhaps, then he had the latitude, the authority to run it up

16   the chain to the chief of operations and in certain cases to me

17   as well.

18   Q.   So in other words, sometimes you saw a cable before it

19   went out, but you saw all of them after they went out?

20   A.   Yeah, unless I was away from the station for one reason or

21   another, but in general terms, yes.  My responsibility was to

22   remain conversant with all the traffic related to that

23   operation.

24   Q.   Did you have an informal role with respect to

25   Mr. Sterling?

Seidel - Direct                                                          782

1   A.    Well, yes.  I mean, I had supervisory responsibilities in

2   the sense that I was in the chain of command, but it was in my

3   interests for every officer assigned to that office to, to

4   ensure that they were doing well, on track, etc.  So yes, I met

5   him sort of formally and in counseling sessions, but informally

6   we occasionally chatted about his, his assignment and his

7   activities in, in the office.

8   Q.    Now, were you generally familiar with the general -- were

9   you generally familiar with how the operation was planned and

10  run?

11  A.    Yes.

12  Q.    At any time, did Mr. Sterling express any concerns to you

13  about the way the operation was planned or run?

14  A.    He did not.

15  Q.    Either formally or informally?

16  A.    He did not.

17  Q.    At the time Mr. Sterling was assigned to that operation,

18  were there any other case officers in New York assigned to it?

19  A.    Not to my recollection.

20  Q.    And we mentioned Thomas H. and Mark L.  Did they -- as

21  their supervisor, did they ever express any concerns to you

22  about the operation?

23  A.    I don't recall any concerns.  My recollection is that it

24  was not a high profile in the sense it was very sensitive, but

25  it was a very important operation, and it was going along

Seidel - Direct                                                      783

1  smoothly to all of my recollection throughout my tenure there

2  until the time I left.

3  Q.   Now, at the, at the New York office, in order to enter the

4  office, did you have to have proper identification and a badge

5  and those sorts of things?

6  A.   Yeah, there are various levels.  I don't recall the

7  precise details, but to get into our overall office space, yes.

8  There were various systems of security measures, so to speak.

9  Q.   And once in the case, did each case officer have secure

10  space to store --

11  A.   I don't remember the details, but in almost every case of

12  where I've been assigned, individual officers did have secure

13  location where they could store material related to their

14  operations.

15  Q.   And did one case officer have any access to another case

16  officer's storage?

17  A.   That would be unusual.

18  Q.   When leaving the office, were case officers inspected,

19  frisked?

20  A.   No.

21  Q.   Any procedures taken to make sure they weren't leaving

22  with classified material?

23  A.   No.

24  Q.   If someone left with classified material, would that be a

25  violation of the office procedure?

1  A.    Yeah.  I mean, it's very well known within the agency

2  procedures for handling classified information, and it would

3  be -- I mean, it's just not done.  I mean, one is not allowed

4  to take classified material unless there's a specified approved

5  reason outside of a controlled facility.

6  Q.    And if you did that, that would be a violation of your

7  security agreement?

8  A.    It would indeed, yes.

9  Q.    Rules and regulations of the CIA?

10  A.    Yes, it would.

11  Q.    And perhaps federal law?

12  A.    Yes.

13  Q.    If you accidentally took something home, was there a

14  procedure to handle that?

15  A.    Absolutely.  You'd immediately bring it back to the

16  facility, and you'd inform your supervisor, and you'd be issued

17  in almost every case, it would be reported back to our

18  headquarters and adjudicated, but in most cases, it would

19  result in what we refer to as a security violation.

20  Q.    Now, I'd like to ask you a few questions specifically

21  directed to your experience overseas.  When, when there's an

22  unauthorized disclosure of information about a program such as

23  that that was written up in, in Mr. Risen's book, again

24  focusing your overseas experience, what does that tell the

25  target company -- target country such as Iran?

Seidel - Direct                                                    785

1   A.   Well, theoretically --

2            MR. POLLACK:  Your Honor --

3            THE COURT:  Wait.

4            MR. POLLACK:  -- I'm going to object based on the

5   fact that we've already heard this testimony, heard it from

6   other witnesses, but I'm not sure the foundation has been laid

7   in terms of Mr. Seidel's expertise to respond to it.

8            THE COURT:  Well, I think given the number of years

9   he's worked overseas, I think he'd have a pretty good sense of

10  what the reaction on the ground might be, so I'm going to

11  overrule the objection.

12           MR. TRUMP:  And, Your Honor, we've tried to target

13  different areas where there was potential harm, and we're using

14  Mr. Seidel as a, put on our expert notice particularly with

15  respect to his overseas experience and his experience in the

16  Middle East.

17           THE COURT:  That's fine.  You may ask the question.

18  BY MR. TRUMP:

19  Q.   Again, what, what does a disclosure of this type tell the

20  target country, in this case Iran?

21  A.   Many things.  In almost every instance, a country that has

22  hostile relations with the U.S. understands on a theoretical

23  level that we are going after them, for lack of a better term,

24  in an intelligence perspective to find out what they're doing.

25           In the case of the Iranians, it wouldn't be a shock

Seidel - Direct                                                    786

1  that we were undertaking perhaps some operations to maybe

2  affect their capabilities, but if they were to learn something

3  specific, it's not just the reality that we are mounting an

4  operation, which would indeed provoke them to undertake a very

5  aggressive counterintelligence activity to learn the details,

6  but again, it's not just the operation itself; it's all the

7  details that go into an operation to make it successful,

8  because we undertake in the agency sort of countless steps to

9  mitigate risk, to avoid any kind of -- anything related to the

10 case that would reveal to the opposition that it is an

11 intelligence operation.  Each, each operation is distinct, and

12 in the operation that's in question here, there's so many

13 different aspects that went into it.

14       So the target country in this case would learn about

15 it, and their counterintelligence service -- and my whole

16 career was offensive operations against foreign government, so

17 I know firsthand what they do.  They will focus on it and they

18 will dissect it to the most minute degree, and they won't

19 assume that that's the only operation we're running.  They'll

20 look to see if there are other operations.  They'll consult

21 with friendly governments with whom they have intelligence

22 relations.  In the case of Iran, the first two that come to

23 mind are Syria and Russia.

24       And it's again not just the operation itself.  It's

25 people involved in the operation.

1  Q.   Now, does this have the potential to affect other

2  unrelated operations?

3  A.   Yes, it does.

4  Q.   And why is that?

5  A.   Well, in the case of if it's a third country, perhaps they

6  haven't been approached by the Iranians in this case, but if

7  they see a reputedly credible source that talks about a

8  specific CIA operation targeting a program, if they're running

9  a similar program, it's just natural that they would undertake

10  similar sort of a review, scrub, aggressive effort to determine

11  or to ensure that no similar operations are undertaken in their

12  similar programs.

13  Q.   I believe you mentioned in your experience, the United

14  States is trying to penetrate or obtain intelligence from, from

15  foreign countries.  What would their reaction be with respect

16  to their security measures by a disclosure such as this?

17  Potential.

18  A.   If I could just ask for a clarification?  Because in terms

19  of our intelligence collection, I could divide them into three

20  general categories.  One is those we undertake without any

21  cooperation with foreign governments, but in some cases, we, we

22  work with what we refer to as liaison partners.

23  Q.   Let me stop you there.  With respect to adversarial

24  situations, what would our -- what would our adversaries

25  potentially do as a result of this --

Seidel - Direct                                                        788

1    A.    They're going to undertake defensive measures to ensure

2    that anything -- they'll look at the, as I had said, every

3    aspect of this operation in terms of how it was mounted,

4    communications, people involved, modes of travel, etc.  They're

5    going to look for any, any similar patterns and, and basically

6    try to defend or prevent any similar offensive effort against

7    one of their -- any of their programs.

8    Q.    And now this same question with respect to friendly

9    services and governments:  How does it have the potential to

10   impact on, on our relationship with them?

11   A.    My background, as you had mentioned, is primarily in the

12   Middle East.  We have many cooperative relationships with Arab

13   intelligence services.  That cooperation is not popular among,

14   for lack of a better term, the Arab Street.  Leadership of

15   those countries make decisions about whether they're going to

16   cooperate with us to a large degree on our ability to convince

17   them that it's not going to become public.

18          So when they learn about such operations, they're

19   going to wonder can the CIA keep that a secret.

20          MR. TRUMP:  The Court's indulgence?

21          THE COURT:  Yes, sir.

22   BY MR. TRUMP:

23   Q.    I believe you mentioned this particular operation was, was

24   a, subject to very limited access and it was, was very

25   sensitive, and I asked you some questions about whether anyone

Seidel - Direct                                                      789

1  raised any concerns, including the defendant.  Had anyone

2  raised any concerns, including the defendant, what would your

3  responsibility be as deputy of the office?

4  A.    Twofold, twofold.  One would be to report it to make sure

5  that people back in the chain, back in Washington are aware of

6  it; and two, more importantly, ensure that any concerns were

7  addressed.  And it's hard to generalize, but to ensure that the

8  concerns don't reflect something in the operation that risks

9  the operation, the success of the operation and the security of

10 the operation.

11 Q.    And finally, Mr. Seidel, do you know James Risen?

12 A.    No.

13 Q.    Are you aware that he's a reporter?

14 A.    Yes.

15 Q.    Have you knowingly had any contact with him?

16 A.    No.  He has -- I have some former colleagues who have been

17 in touch with him, and I believe that following my retirement,

18 I mean, I know that they had mentioned at one time or another

19 that he might be interested in talking to me, not about this

20 topic, but I don't recall any -- I know I didn't have any

21 substantive conversation with him.  I don't believe we even

22 made superficial telephone contact or otherwise.

23 Q.    Have you divulged to anyone, media or otherwise, any

24 information about the operation we've been discussing to anyone

25 outside of the CIA?

1    A.    Absolutely not.

2    Q.    To anyone within your knowledge who did not have the

3    appropriate clearances?

4    A.    In no instance, no case, no time.

5              MR. TRUMP:  Thank you.

6              THE COURT:  All right, cross-examination?

7              MR. POLLACK:  Thank you, Your Honor.

8                         CROSS-EXAMINATION

9    BY MR. POLLACK:

10   Q.    Mr. Seidel, my name is Barry Pollack.  I'm one of the

11   lawyers representing Mr. Sterling.  How are you?

12   A.    Fine, thank you.

13   Q.    You mentioned a moment ago that some of your former

14   colleagues have mentioned to you that they've been in contact

15   with Mr. Risen.  When you say "former colleagues," does that

16   include people who worked at the CIA?

17   A.    Yes.

18   Q.    And, Mr. Seidel, during your time in New York where -- the

19   time that you overlapped with Mr. Sterling while he was working

20   on what we've been calling Classified Program No. 1, did -- you

21   did not hear any criticism of Mr. Sterling's handling of the

22   asset known as Merlin, correct?

23   A.    I don't recall any criticism of his handling of that

24   activity or the, the operation.

25              MR. POLLACK:  Thank you.  I don't have any other

Seidel - Redirect                                                        791

1    questions.

2              THE WITNESS:  Thank you.

3              THE COURT:  All right, any redirect?

4              MR. TRUMP:  Very briefly.

5              THE COURT:  It better be.  That was just one

6    question.

7              MR. TRUMP:  I understand.

8              THE COURT:  All right.

9                        REDIRECT EXAMINATION

10   BY MR. TRUMP:

11   Q.   A retired CIA officer like yourself is still bound by the

12   security agreements that you signed when you --

13   A.   Absolutely, yes.

14   Q.   So even former agency people cannot discuss these matters

15   subsequent to their employment?

16   A.   No, they cannot.

17             MR. TRUMP:  Thank you.

18             THE COURT:  All right, does anybody expect to call

19   Mr. Seidel again?

20             MR. POLLACK:  No, Your Honor.

21             THE COURT:  No?  Sir, you're excused as a witness.

22   You're free to leave.

23             THE WITNESS:  Thank you.

24                       (Witness excused.)

25             THE COURT:  All right, the next witness is Mr. Cohen,

Cohen - Direct                                                    792

1    I believe?

2              MR. OLSHAN:  Yes, Your Honor.

3              THE COURT:  All right.

4              MR. OLSHAN:  The government calls David Cohen.

5              DAVID COHEN, GOVERNMENT'S WITNESS, AFFIRMED

6              MR. OLSHAN:  May I proceed?

7              THE COURT:  Yes, sir.

8                            DIRECT EXAMINATION

9    BY MR. OLSHAN:

10   Q.   Good afternoon, sir.  If you could please state and spell

11   your name for the record?

12   A.   David Cohen.  It's D-a-v-i-d C-o-h-e-n.

13   Q.   Mr. Cohen, are you currently employed?

14   A.   Yes.

15   Q.   And in what field are you employed?

16   A.   I'm self-employed in the national security consulting

17   arena.

18   Q.   Is that in the private sector?

19   A.   Yes.

20   Q.   Prior to your current work in the private sector, did you

21   hold government jobs?

22   A.   Yes.

23   Q.   What was your most recent government position?

24   A.   I was the Deputy Commissioner for Intelligence for the New

25   York City Police Department.

Cohen - Direct                                                        793

1    Q.    How long did you hold that position?

2    A.    I held it from 4 January -- February 2002 until 1 January

3    2013.

4    Q.    Prior to that, did you have a career in the Central

5    Intelligence Agency?

6    A.    Yes.

7    Q.    And what years did you work for the CIA?

8    A.    From early 1966 until November 2000.

9    Q.    Approximately 34 years?

10   A.    34-35 years.

11   Q.    Can you briefly describe for the jury, Mr. Cohen, what

12   positions you held within the CIA during your tenure?

13   A.    I served initially as a, as an analyst, became an Office

14   Director in the analytical arm of the agency.  I served as a

15   Division Chief in the Directorate of Operations.  I served as

16   the Associate Deputy Director for Intelligence, the second most

17   senior job in the analytical arm of the agency.  I served as

18   the Deputy Director of Operations, the head of the clandestine

19   services, and I oversaw a field office.

20   Q.    Was that field office in New York?

21   A.    Yes.

22   Q.    Approximately when were you overseeing the field office in

23   New York?

24   A.    October 1997 through early November 2000.

25   Q.    Mr. Cohen, during the time that you worked for the CIA,

Cohen - Direct                                                    794

1  did you hold security clearances?

2  A.    Did I what?

3  Q.    Did you hold security clearances?

4  A.    Yes.

5  Q.    For the whole time you worked at the CIA?

6  A.    Yes.

7  Q.    Were you trained in the proper handling of classified

8  information in connection with that -- those jobs?

9  A.    Yes.

10 Q.    How would you describe the importance of handling

11 classified information?

12 A.    Extremely important.  People's lives depend on it.

13 Q.    You testified that you worked in the New York office from

14 1997 to 2000 approximately.  Is that correct?

15 A.    From October 1997 through early November 2000.

16 Q.    Excuse me, I apologize.

17        During that time, was -- did you work in a secure CIA

18 facility in New York?

19 A.    Yes.

20 Q.    Were there specific access controls to gain entry to that

21 CIA space?

22 A.    I believe there was a safe-like entrance.  You needed to

23 know the, the access code to it.

24 Q.    Inside the secure CIA space, did individual employees --

25 case officers, for example -- have personally assigned secure

Cohen - Direct                                                      795

1   safes?

2   A.   Each, each individual would have their own safe and safe

3   combination.

4   Q.   And did one case officer have access -- excuse me, would

5   one case officer have access to another case officer's safe?

6   A.   No.  And it would be a breach of security to leave it open

7   overnight.

8   Q.   If a case officer or any employee in that secure space

9   were to leave the space with classified documents or any kind

10  of document, would anyone have necessarily known that at the

11  time?

12          MR. MAC MAHON:  Your Honor, I object to this

13  speculation in the form of --

14          THE COURT:  Well, more than that, I think this is now

15  cumulative, so we don't need to hear it from two or three

16  different witnesses.

17          MR. OLSHAN:  Your Honor, this witness had not

18  testified about it, but I will move on if the Court would

19  prefer.

20          THE COURT:  Move on.

21  BY MR. OLSHAN:

22  Q.   Do you know an individual named Jeffrey Sterling,

23  Mr. Cohen?

24  A.   Yes.

25  Q.   Do you see him in the courtroom?

Cohen - Direct                                                          796

1    A.    Yes.

2              MR. OLSHAN:   Is that sufficient, Your Honor?

3              THE COURT:   Yes, that's sufficient in this case.

4    BY MR. OLSHAN:

5    Q.    How did you come to know Mr. Sterling, Mr. Cohen?

6    A.    Mr. Sterling was assigned to the New York office.

7    Q.    So was he a subordinate of yours?

8    A.    He was, he was a subordinate of mine, yes.

9    Q.    And you were the top-ranking CIA officer in that office;

10   is that correct?

11   A.    Yes.

12   Q.    Did he report directly to you, or did he report to others?

13   A.    He reported to others.

14   Q.    During the time that you overlapped with Mr. Sterling in

15   New York, did you interact with him at all?

16   A.    Yes.  I would see him in the, in the office, corridors.

17   We would pass.

18   Q.    Did you socialize with him?

19   A.    No.

20   Q.    How would you characterize your, your working relationship

21   to the extent that you saw Mr. Sterling?

22   A.    Rather good.

23   Q.    Mr. Cohen, are you aware of a specific classified program

24   involving an effort to undermine the nuclear weapons

25   capabilities of Iran?

1    A.    Yes, I am.

2    Q.    And was that program ongoing during the time that you were

3    in New York?

4    A.    Yes, it was.

5    Q.    And are you aware of whether Mr. Sterling was assigned in

6    some respect to work on that program?

7    A.    Yes, he was.

8    Q.    Can you describe for the jury what your day-to-day

9    involvement would have been in this particular program at the

10   time?

11   A.    My, my involvement in the program would have been

12   essentially twofold:  first, to understand the strategic

13   dimensions of it, what its broad objective was, and to

14   understand it first and foremost; and secondly, if there were

15   any problems that developed in the course of that office's

16   involvement or participation in the program, those problems

17   would have been brought to my attention for me to understand it

18   and see what next steps would be.

19   Q.    As the head of that particular office, would you have had

20   any day-to-day responsibilities for this particular program?

21   A.    No, not especially.  That would be the responsibility of

22   those that reported to me.

23   Q.    Can you recall whether this was the defendant's only

24   assignment or whether he had other assignments as well?

25   A.    He had multiple assignments.  That was certainly one.  He

1   had other responsibilities as well.

2   Q.    During your time in New York, how would you characterize

3   the significance of this particular classified program?

4   A.    The significance of this program?

5   Q.    Correct.

6   A.    I would consider it vitally important to the national

7   security of the country.

8   Q.    Relative to other programs that you were dealing with

9   during that time, how would you, how would you compare it?

10  A.    The single most important.

11  Q.    During your career with the CIA, did you become familiar

12  with the handling of human assets?

13  A.    Yes, I did.

14  Q.    And can you tell the jury in your view and in your

15  experience how closely held the true name of a human asset is?

16  A.    The, the holding -- the knowledge of the true name of a

17  human asset is the single most important piece of information

18  held by the Central Intelligence Agency because the

19  individual's life depended on it.

20  Q.    At some point, did the defendant leave the New York

21  office?

22  A.    Say that again?

23  Q.    At some point, did the defendant leave the New York

24  office?

25  A.    Yes.

Cohen - Direct                                                          799

1   Q.   And are you familiar with the circumstances under which he

2   left the office?

3   A.   Yes.

4   Q.   Did you have a role in his departure from the office?

5   A.   It was my decision that he leave the office.

6   Q.   And why was that?

7   A.   Because he was not performing consistent with the

8   expectations of a person with his background and grade.

9   Q.   Did you take any steps to assist the defendant in working

10  to achieve what he should be doing at the time?

11  A.   Yeah.  His performance was, was extremely subpar.  He had

12  been talked to about it and given guidance on what should be

13  done to sort of bring him up to the level of expectations for

14  an individual, a case officer with his, at again his grade

15  level.

16       At, at some point, when the situation got more

17  complicated, he was given an -- would have been given, I

18  believe he was, an advance work plan which maps out the steps

19  one would take to, to achieve the level that was expected.  In

20  Mr. Sterling's situation, you know, all of us worked very, very

21  hard to make sure that, you know, he had the maximum

22  opportunity to succeed.

23  Q.   Let me ask you, did you work with Mr. Sterling to -- so

24  that he would succeed?

25  A.   Well, I personally didn't, but I set the guidelines that

Cohen - Direct                                                      800

1   we wanted this gentleman to succeed in the New York area

2   because we had great expectations for him and thought it was an

3   arena where he should be able to do well.

4   Q.   Ultimately, did he meet those expectations?

5   A.   He did not meet those expectations with respect to the --

6   and they were quite minimal, I might add.

7   Q.   Mr. Cohen, do you know an individual named James Risen?

8   A.   I know the name.

9   Q.   And can you recall whether you've ever spoken to

10  Mr. Risen?

11  A.   I think in that period between 9/11, the attacks on the

12  World Trade Center, when I was still with -- in the private

13  sector with American International Group at that time, and

14  sometime between that and before February 2000, when I took my

15  responsibilities with the New York City Police Department,

16  Mr. Risen called me to talk -- to ask my, my views about some

17  of the very vague, because it was such a long time ago,

18  regarding the 9/11 events, but I chose not to talk to him.

19  Q.   Did you defer him to the CIA -- or refer him to the CIA?

20  A.   I would have said, "Go talk to someone else," and it might

21  have been CIA.  Anybody but me.

22  Q.   Have you ever spoken to Mr. Risen again that you can

23  recall?

24  A.   No.

25  Q.   And have you ever spoken to him about the specific

Cohen - Cross                                                          801

1   classified program that we've been discussing today?

2   A.   No.

3   Q.   Have you ever discussed this classified program with

4   anybody whom you believed was not authorized to know about it?

5   A.   No.

6            MR. OLSHAN:  One moment, Your Honor?

7            THE COURT:  Yes, sir.

8            MR. OLSHAN:  That's all I have, Your Honor.

9            THE COURT:  All right.  Mr. MacMahon?

10           MR. MAC MAHON:  Thank you, Your Honor.

11                         CROSS-EXAMINATION

12  BY MR. MAC MAHON:

13  Q.   Mr. Cohen, my name is Edward MacMahon.  I'm one of the

14  lawyers here for Mr. Sterling.  Good afternoon.

15           Was it your testimony that you were in the same

16  office as Mr. Sterling in New York?

17  A.   The same office suite.

18  Q.   The same office suite.  Well, how far away were you --

19  well, you had a suite.  You were -- did you have a bigger

20  office than Mr. Sterling?

21  A.   Yes.

22  Q.   Did you ever see Mr. Sterling's work space?

23  A.   It was virtually identical to everyone else's, I believe.

24  Q.   And how long -- were you able to walk by his work space

25  and see what he was doing?

1  A.   I don't ever recall peering in.

2  Q.   All right, let me ask the question a different way.   The

3  work space -- none of us have been to the office, CIA office in

4  New York, okay?  Did Mr. Sterling's work space have a door on

5  it?

6  A.   Yes.

7  Q.   And was it -- did you ever go by and see Mr. Sterling's

8  door closed?  Do you remember either way?

9  A.   I'm sure over time, I would have walked by, and sometimes

10 it would be open, and other times it would be closed.

11 Q.   And did every case officer have their own printer in their

12 office?

13 A.   I don't recall.

14 Q.   There wasn't a, a big printer somewhere that did print

15 jobs in the office?

16 A.   I don't recall.

17 Q.   Did the CIA when you were running that office have the

18 ability to track what case officers were printing off of their

19 computers?

20 A.   I don't recall.

21 Q.   Did they have any way to track what agents were doing on

22 the agency computers, meaning see who they were e-mailing, see

23 what Web sites they were looking at, anything like that?

24       MR. OLSHAN:  Your Honor, I'm going to object to

25 foundation.  Mr. Cohen hasn't established that he had any

Cohen - Cross                                                        803

1    position where he would have known about --

2               MR. MAC MAHON:  He says he ran the office, Your

3    Honor.

4               THE COURT:  Well, I'm the chief judge of this

5    building, and I couldn't tell you how the IT systems work.

6               MR. MAC MAHON:  Can I ask the question a different

7    way, Your Honor?

8               THE COURT:  Go ahead.

9    BY MR. MAC MAHON:

10   Q.   Were you, were you aware in 2000 in the New York office

11   whether the CIA was able to see what a, what a particular CIA

12   officer was doing on their computer?

13   A.   You know, CIA over the years has implemented a number of

14   what I would call counterintelligence techniques, but I

15   couldn't detail them.

16   Q.   Why were there counterintelligence techniques that the CIA

17   had to employ?

18              MR. OLSHAN:  Objection, Your Honor.

19              THE COURT:  Do we need to approach?

20              MR. MAC MAHON:  Excuse me?

21              MR. OLSHAN:  No, my objection is relevance.

22              THE COURT:  Mr. MacMahon?

23              MR. MAC MAHON:  Your Honor, I'm asking him

24   questions -- the evidence in the case will be that there was

25   no, the CIA can't track Mr. Sterling's computer use whatsoever

Cohen - Cross                                                        804

1   at this time, and I'm trying to see if that's correct, if he

2   has any personal knowledge of that.

3           THE COURT:  If this witness would know.  So the right

4   question, I think, is how familiar were you with the IT

5   systems?

6           THE WITNESS:  I can barely do an e-mail.

7           THE COURT:  That's the answer, all right.

8           MR. MAC MAHON:  Thank you.

9                       (Laughter.)

10          MR. MAC MAHON:  Thanks for saving me time.

11          THE COURT:  All right.  You're not the only one.

12          THE WITNESS:  Thank you.

13  BY MR. MAC MAHON:

14  Q.   Sir, did you, did you tell this jury that the operation

15  Merlin, as we call it here, was the most important operation

16  that the CIA had ongoing in 1999 and 2000?

17          THE COURT:  That's not what he said.

18          THE WITNESS:  I don't remember hearing that word,

19  "Merlin," until just now.

20  BY MR. MAC MAHON:

21  Q.   Well, the program that we're talking about today, and I

22  may have -- if I'm being corrected by the judge, I probably did

23  misunderstand your testimony.  What, what was your answer to

24  the question as to how important the operation that we're

25  talking about was?

1  A.    I think it was one of the most important operations CIA in

2  that era was running, and I say that on the basis of several

3  factors:  my, my senior positions held at the agency and my, my

4  position in that, in that field office and my 50-year

5  understanding of national security matters.

6  Q.    Right.  And that's the same time that you determined that

7  Mr. Sterling was a subpar employee, right?

8  A.    He certainly was on, on a lot of matters.

9  Q.    All right.  And that was your decision to put him on one

10  of the most important programs even though you, Mr. Cohen,

11  thought he was a subpar employee?

12  A.    I think he came to the, the office with that program

13  attached to him.  I didn't make that decision to the best of my

14  recollection.

15  Q.    But you made the assessment that he was a subpar employee,

16  correct?

17  A.    Absolutely.

18  Q.    All right.  And did you ask to have him taken off the

19  program?

20  A.    I didn't ask for that.  I asked that he be returned to

21  Washington, where they could assess the totality of his

22  responsibilities.

23  Q.    And no one had reported to you that Mr. Sterling had ever

24  taken any classified documents out of the building, right?

25  A.    You'd have to say that again.

1    Q.   Had anyone ever told you in 2000, when you were

2    Mr. Sterling's supervisor, that Mr. Sterling took classified

3    information out of the building?

4    A.   I don't know if anybody would have known it.

5    Q.   Sir, the question was nobody told you that, did they?

6    A.   Nobody told me, but it didn't -- doesn't mean it didn't

7    happen.

8    Q.   All right.  It was never brought to anybody's attention,

9    correct?

10   A.   No.

11   Q.   All right.  And you don't have any, any proof whatsoever

12   that Mr. Sterling violated any security protocol ever when he

13   worked for you at the CIA, correct?

14   A.   While he worked for me, I didn't have any firsthand

15   knowledge of that.

16          MR. MAC MAHON:  That's all I have, Your Honor.  Thank

17   you.

18          THE COURT:  All right, any redirect?

19          MR. OLSHAN:  No.

20          THE COURT:  All right, Mr. Cohen, thank you for your

21   testimony.  You're excused as a witness.

22                          (Witness excused.)

23          THE COURT:  Your next witness?

24          MR. FITZPATRICK:  Eileen Swicker, please.

25          THE COURT:  All right.

1          MR. FITZPATRICK:  Your Honor, can I speak to

2    Mr. Pollack and Mr. MacMahon?

3          THE COURT:  Yes, sir.

4          (Discussion among Mr. Fitzpatrick, Mr. MacMahon, and

5    Mr. Pollack off the record.)

6          MR. FITZPATRICK:  Thank you, Your Honor.

7       EILEEN SWICKER, GOVERNMENT'S WITNESS, AFFIRMED

8                    DIRECT EXAMINATION

9    BY MR. FITZPATRICK:

10   Q.   Good afternoon, ma'am.  If you could please state your

11   name and spell your name for the court reporter?

12   A.   Okay.  My name is Eileen Swicker, and it's spelled

13   S-w-i-c-k-e-r.

14   Q.   Ma'am, where is your current employment?

15   A.   I'm an attorney in Leesburg, Virginia.

16   Q.   And did you graduate from law school?

17   A.   I did in --

18   Q.   When was that?

19   A.   -- 2008.

20   Q.   Did you have a career prior to attending law school?

21   A.   I did.  I spent 32 years with CIA.

22   Q.   When did you retire?

23   A.   In 2005.

24   Q.   During your career, did you assume several overseas

25   positions?

Swicker - Direct                                                      808

1   A.   Yes, I did.

2   Q.   I want to direct your attention particularly -- did you

3   also serve domestically within the United States?

4   A.   Yes, I did.

5   Q.   I want to direct your attention to 1999.  Did you assume a

6   new job at that point?

7   A.   Yes, I did.  I became the chief of staff to the deputy

8   director of operations.

9   Q.   How did you get that job?

10  A.   I put in an application for it.

11  Q.   And for how long did you serve as the chief of staff to

12  the deputy director of operations?

13  A.   For about two years.

14  Q.   Can you explain for the jury what the Directorate of

15  Operations is?

16  A.   It's the section of CIA that's responsible for overseas

17  clandestine operations, espionage, and collecting intelligence.

18  Q.   And what were your responsibilities as the chief of staff?

19  A.   I was responsible for the nonoperational matters, policy,

20  budget, personnel matters, and I would be the representative

21  for the director on handling these issues.

22  Q.   During the course of your tenure as the chief of staff,

23  did you have an occasion to interact with Jeffrey Sterling?

24  A.   Yes, I did.

25  Q.   And do you see Mr. Sterling in the courtroom today?

1  A.  Yes, I do.

2         MR. FITZPATRICK:  Is that sufficient, Your Honor?

3         MR. MAC MAHON:  We'll stipulate the identification

4  going forward if it helps.

5         MR. FITZPATRICK:  I think it's important for the

6  record, Your Honor.

7         THE COURT:  I think just that simple question but it

8  will be assumed that there's no problem.  Just ask it so the

9  witness can say yes or no.

10         MR. FITZPATRICK:  Thank you, Your Honor.

11  Q.  Can you explain the circumstances of why you had

12  interactions with Jeffrey Sterling?

13  A.  I believe it was around the middle of 2000, he came to see

14  me as an introduction into the office of the DDO with some

15  issues that he was raising about how he was being treated in

16  his current job and a previous job and that he believed he was

17  being treated unfairly, and he wanted to raise these issues at

18  a sufficient level so that attention would be paid to them.

19  Q.  And at this point in time, you were at headquarters; is

20  that correct?

21  A.  That's right.

22  Q.  And where was Mr. Sterling stationed?

23  A.  He was in our office in New York.

24  Q.  Did he later come to headquarters?

25  A.  I believe he was directed to leave New York and come to

1    Washington and come to work in headquarters.

2    Q.   How many -- can you recall -- in that meeting that you

3    just described, was that face to face, in person?

4    A.   He came to my office.

5    Q.   How else would you communicate with Mr. Sterling?

6    A.   Several times he called and would give me an update on his

7    situation, ask questions, but I believe it was primarily by

8    telephone after that initial meeting.

9    Q.   And does a particular phone call stand out in your mind?

10   A.   After he came to me the first time, he called several

11   times concerning having his lawyers cleared and the speed with

12   which they are being cleared, and to give an update, he had

13   made, made a representation to the agency on what he thought

14   would be an equitable settlement, and he called to complain

15   that it had been rejected out of hand.

16   Q.   With the assistance of Mr. Wood, I'd like to show you

17   Government Exhibit No. 52, please.

18               THE COURT:  Is there going to be an objection to 52?

19               MR. MAC MAHON:  Excuse me, Your Honor.  I'm getting

20   the book.  The Court's indulgence?

21               THE COURT:  Yes, sir.

22               MR. FITZPATRICK:  Your Honor, while they're looking

23   for that, may I ask another question?

24               THE COURT:  Yes.

25   BY MR. FITZPATRICK:

1   Q.   You had made a reference that Mr. Sterling had called you

2   about having his lawyers cleared.  Describe what clearing a

3   lawyer means.

4   A.   Generally, if someone is looking to be represented by an

5   attorney for an agency matter, they have to be cleared to the

6   Secret level, which involves some sort of a background

7   investigation, and there is an established procedure, and it

8   usually takes about three weeks.  At least then it did.

9   Q.   Thank you.

10          Do you have Government Exhibit 52 in front of you?

11  A.   Yes.

12          MR. MAC MAHON:  There's no objection, Your Honor.

13          THE COURT:  All right, 52 is in.

14          MR. FITZPATRICK:  Thank you.

15          (Government's Exhibit No. 52 was received in

16  evidence.)

17  BY MR. FITZPATRICK:

18  Q.   Is this a Lotus Note?

19  A.   Yes, it is.

20  Q.   Would you tell us what a Lotus Note is?

21  A.   A Lotus Note is the technical name for the agency's

22  internal e-mail.

23  Q.   And did you prepare this particular note?

24  A.   Yes, I did.

25  Q.   And to whom did you send it?

Swicker - Direct                                                    812

1    A.    I sent it to the deputy director for operations and to

2    three or four other people who were involved in Mr. Sterling's

3    case.

4    Q.    And what does the Lotus Note reflect?

5    A.    It reflects a half-hour conversation that I had with him

6    the previous day by telephone.

7    Q.    And is that reflected in the first line of the Lotus Note?

8    A.    Yes.

9    Q.    And why did you take the step to memorialize this

10   particular conversation in a, in a Lotus Note?

11   A.    The issues that Mr. Sterling had raised were serious ones

12   of equitable treatment and harassment, and we were concerned

13   about it.  If this is accurate, it's got to be dealt with, and

14   therefore, I was going to make sure that any information that I

15   had, I made it a matter of record and conveyed it to everyone

16   else who was involved in the issue.

17   Q.    Now, within the Lotus Note, there is particular language

18   that is within quotation marks.  Why do you put things within

19   quotation marks?

20   A.    That would be if I was quoting him directly.

21   Q.    And you prepared this particular note within a day, 24 to

22   36 hours of the conversation; is that correct?

23   A.    Most likely I prepared it shortly after the conversation

24   and then just held it until the following morning to make sure

25   I reviewed and I had everything accurate.

1  Q.   Describe your, your note taking when you're having

2  conversations with case officers.

3  A.   I kept a series of steno notebooks.  I had been doing that

4  for years.  And I would take meticulous notes either when

5  sitting discussing an issue with someone or when talking to

6  them on the telephone.

7  Q.   And would you rely upon those notes when you prepared this

8  e-mail Lotus Note?

9  A.   Yes.

10 Q.   I want to direct your attention to the second paragraph.

11 If I could -- in particular, the last, the last sentence.  Can

12 you just read the last sentence aloud, please?

13 A.   "He was thinking about a community job; when I asked about

14 OGC, he cited his 'distaste' for the agency."

15 Q.   And "distaste" was a quote from him?

16 A.   Right.

17 Q.   Now, describe this conversation you're having.  When you

18 reference OGC, what is that?

19 A.   That's the Office of General Counsel, which is the section

20 of the agency where the attorneys are.

21 Q.   Why do you mention OGC, or Office of General Counsel, to

22 Mr. Sterling?

23 A.   Mr. Sterling had a law degree.

24 Q.   And what were you suggesting to him?

25 A.   He was not interested in going back to his parent

Swicker - Direct                                                      814

1   division, which is the Near East division, nor permanently

2   staying in the agency, but he needed to find a job within the

3   agency, and my suggestion was to match his skill with a section

4   of the agency that could possibly use it.

5   Q.    And what was his response to you when you suggested that?

6   A.    He didn't like the idea.

7   Q.    At the beginning of the next paragraph, you have in

8   quotes "what had been thrown at" him.

9         Can you explain how that statement was made to you?

10  A.    In the earlier part of the conversation, Mr. Sterling was

11  complaining that he had made an offer with what he believed to

12  be a reasonable settlement of his issues and a severance

13  package, and that this has just been disregarded completely.

14  He was, did not want to go to work in any division.  He was

15  being pushed to do that, and he considered all of these things

16  to be unfair.

17  Q.    If you could turn, please, to the next page of that note?

18  There's a reference at the very top of that page to headphones?

19  A.    Yeah.  When he first came to see me when he came down from

20  New York, he cited an incident that had happened that he was in

21  the habit of using, I think, probably a Walkman at that time

22  with headphones, and when he would work in his office, he'd

23  have the headphones on, and that someone had damaged them, and

24  that this was another indication of how he was being treated

25  unfairly, but in this phone conversation in August, he was

1   commenting that he had heard that people were trying to make it

2   out that he had damaged the headphones himself.

3   Q.   So this, this issue with the headphones, this was a

4   repeated theme?

5   A.   At least a couple of times, yeah.

6   Q.   Now, in, in this particular conversation that you had with

7   Mr. Sterling -- and I think you referenced that it was quite a

8   lengthy, 30-minute-long phone conversation; is that correct?

9   A.   That's correct.

10  Q.   Did he make any reference to a complaint about a

11  mishandled program?

12  A.   No.

13  Q.   Anything about a rogue operation?

14  A.   No.

15  Q.   In all of your communications or conversations with

16  Mr. Sterling, did those -- did that subject ever come up?

17  A.   No, it didn't.

18  Q.   Now, you said you were the chief of staff to the

19  directorate of operations?

20  A.   Correct.

21  Q.   Would your directorate have been the appropriate place to

22  lodge a complaint about a mishandled overseas operation?

23  A.   Definitely.

24          MR. FITZPATRICK:  Court's indulgence, Your Honor?

25          THE COURT:  Yes, sir.

1    BY MR. FITZPATRICK:

2    Q.   Just following up on that last question, had those issues

3    been raised about a mishandled program, would that have

4    registered a memory with you?

5            MR. MAC MAHON:  Your Honor, I object.

6            THE WITNESS:  Definitely.

7            MR. MAC MAHON:  The witness said it didn't happen.

8            THE COURT:  I think this witness can answer what

9    would -- what the normal course of action would be had it been

10   done, so I'm going to overrule the objection.

11           MR. FITZPATRICK:  Thank you, Your Honor.

12   Q.   Do you understand my question?

13   A.   Could you repeat it?

14   Q.   Sure.  Had an allegation of a mishandled or a rogue

15   operation been raised with you, would that have triggered a

16   memory with you?

17   A.   Yeah, because that would have been something equally

18   serious.

19           MR. FITZPATRICK:  Thank you.  Nothing further at this

20   time, Your Honor.

21           THE COURT:  All right.  Mr. MacMahon?

22           MR. MAC MAHON:  Very briefly, Your Honor.

23                           CROSS-EXAMINATION

24   BY MR. MAC MAHON:

25   Q.   Ma'am, my name is Edward MacMahon.  I'm one of the lawyers

1    here for Mr. Sterling.  Good afternoon.

2           Now, do you -- you wouldn't have had any need to know

3    anything about any classified program that Mr. Sterling had

4    worked on, right?

5    A.    It -- not necessarily.

6    Q.    Right.  And an officer trained not to disclose classified

7    items to people not entitled to know anything about it wouldn't

8    have told you anything about a classified program, correct?

9    A.    Well, if he were coming to raise an issue with the DDO and

10   he's talking to the DDO's chief of staff, I would expect he'd

11   raise all the issues that he would want to raise.

12   Q.    He would raise issues to you that you were cleared to hear

13   about, correct?

14   A.    As the -- I had the Top Secret/SCI clearance.

15   Q.    And you were -- were you read into the program that's at

16   issue in this case?

17   A.    I believe I was at least familiar with it.  We had

18   prepared documentation for the, the incoming administration.

19   Q.    But you -- Mr. Sterling in none of your meetings ever

20   mentioned anything to you that happened that had anything to do

21   with the facts or anything to do with this case, right?

22   A.    This case?

23   Q.    Do you even know what this case is about?

24   A.    Yes.

25   Q.    Okay.  Did he make any reference to you in any of your

1    meetings, phone calls, or otherwise about any facts about the

2    classified program at issue in this case?

3    A.    No.

4    Q.    Or about the agent -- the Human Asset No. 1 that we're

5    talking about in this case?  Mr. Sterling never said a word

6    about that to you, either, right?

7    A.    No.

8    Q.    The -- you also were asked questions by counsel about

9    Mr. Sterling wanting his lawyers cleared, right?

10   A.    Correct.

11   Q.    And that's because even a CIA agent is not allowed to tell

12   his lawyers anything about what they've been working on until

13   they've been cleared by the CIA, correct?

14   A.    He had one cleared lawyer.  He was waiting for a second

15   lawyer to be cleared, and from his conversation with me, he

16   expected one lawyer to handle his issues and another one to be

17   the one negotiating with the agency, and it was the negotiating

18   attorney who had not yet been cleared.

19   Q.    Right.  And those lawyers were never cleared into

20   Classified Program No. 1, were they?

21   A.    I don't know what they were cleared into.

22   Q.    That information never reached your way, did it?

23   A.    Of their clearances?

24   Q.    Yeah.

25   A.    No.

1    Q.   But Mr. Sterling was respecting as best you could tell the

2    requirement that his lawyers be cleared before he could proceed

3    with his EEO complaint, correct?

4    A.   And he had a cleared lawyer.

5    Q.   He was respecting that process, correct?

6    A.   At the point that he complained to me, he was waiting for

7    a second attorney to be cleared, but he had the EEO lawyer

8    cleared.

9    Q.   But he was waiting, waiting for the second lawyer to be

10   cleared, correct?

11   A.   He was the negotiating attorney.

12   Q.   Okay.  And that's what you would have expected a trained

13   officer to do would be to wait until his attorney was cleared,

14   correct?

15   A.   Yes.

16   Q.   And that's what he did, right?

17   A.   I don't know.

18   Q.   Well, you never heard any information that he didn't, did

19   you?

20              MR. FITZPATRICK:  Objection.  Asked and answered.

21              THE COURT:  I'm going to overrule the objection.  One

22   more time, Mr. MacMahon.

23   BY MR. MAC MAHON:

24   Q.   No information was ever transmitted to you that

25   Mr. Sterling told his lawyers anything they weren't cleared to

1    hear about his EEO case, right?

2    A.    I have no information about that.

3    Q.    And in, in Exhibit No. 52, which was shown to the jury

4    before -- if we could, Mr. Francisco, please?

5          At the bottom, do you see the reference there to

6    Mr. Sterling's response, given what was thrown at him?

7    Mr. Sterling did end up filing a discrimination case against

8    the agency, didn't he?

9    A.    Yes, he did.

10   Q.    And there wasn't anything disclosed in that discrimination

11   case that breached any of Mr. Sterling's classified protocols

12   at all, right, to your knowledge?

13   A.    I don't have any information about that.

14   Q.    Did anybody ever investigate Mr. Sterling's claim about

15   the Walkman?

16   A.    I don't know.

17          MR. MAC MAHON:  Nothing further, Your Honor.

18          THE COURT:  Any redirect?

19          MR. FITZPATRICK:  Thank you, Your Honor.

20                    REDIRECT EXAMINATION

21   BY MR. FITZPATRICK:

22   Q.    Did you have any direct responsibilities over any EEO

23   matters in your position?

24   A.    No, I didn't.

25   Q.    You were the chief of staff?

1    A.    Correct.  And there's an EEO staff.

2    Q.    I want to turn your attention back to the paragraph that

3    Mr. MacMahon referred to you, the last one.  In addition -- the

4    paragraph makes a reference to Representative Dixon.  What is

5    that referring to?

6    A.    Representative Dixon was a member of the House Select

7    Committee on Intelligence, which is one of the oversight

8    committees in Congress, and I don't recall how we had found out

9    about it, perhaps through Congressional Affairs, but

10   Mr. Sterling had made a call on Mr. Dixon to raise his

11   complaints.

12   Q.    What's referenced just preceding that parens reference to

13   Representative Dixon, something about inside and outside the

14   agency?

15   A.    Yeah, he told me that he intended to pursue his claim as

16   long and as loud as possible, and both inside and outside the

17   agency, just laying down what his intentions were.

18            MR. FITZPATRICK:  Thank you, ma'am.  I have no

19   further questions.

20            THE COURT:  Any recross?

21            MR. MAC MAHON:  Yes, just briefly, Your Honor.

22                        RECROSS EXAMINATION

23   BY MR. MAC MAHON:

24   Q.    Ma'am, someone called from the House to tell you that

25   Mr. Sterling had gone up there to complain?

Swicker - Recross                                                    822

1    A.    I don't remember how we found out.

2    Q.    And Mr. Sterling had every right in the world to go to the

3    House of Representatives and complain about what he perceived

4    as his treatment at the CIA, correct?

5    A.    I don't know.

6    Q.    How did the CIA find out about Mr. Sterling having a

7    meeting with a congressman?

8    A.    I don't know.

9    Q.    The reference to inside and outside the agency, as you

10   said, Mr. Sterling did make public complaints about his

11   discrimination, what he believed was discrimination at the CIA,

12   correct?

13   A.    I believe so.  That was his EEO case.

14   Q.    And he gave interviews and he went on television and he's

15   quoted in articles, correct?

16   A.    I don't know.

17          MR. MAC MAHON:  That's all, Your Honor.

18          THE COURT:  All right, is anybody going to call this

19   witness again?

20          MR. FITZPATRICK:  No, Your Honor.

21          THE COURT:  All right, ma'am, thank you for your

22   testimony.  You're excused.

23          THE WITNESS:  Thank you.

24                      (Witness excused.)

25          THE COURT:  Your next witness?

1           MR. FITZPATRICK:  Carrie Newton Lyons, please.

2           THE COURT:  All right.

3       CARRIE NEWTON LYONS, GOVERNMENT'S WITNESS, AFFIRMED

4                       DIRECT EXAMINATION

5           MR. FITZPATRICK:  Thank you, Your Honor.

6   Q.   Good afternoon, ma'am.

7   A.   Hi.

8   Q.   If you could please state your name and please spell your

9   name so the court reporter can take it down?

10  A.   Okay.  My name is Carrie Lyons.  Carrie is C-a-r-r-i-e.

11  Lyons is L-y-o-n-s.

12  Q.   Thank you.

13          If you -- Ms. Lyons, if you need a cup of water, if

14  you need to take a break, we're happy to indulge you, okay?

15  A.   Okay.  Thank you.

16  Q.   Do you -- what is your current job?

17  A.   I'm a supervisory attorney at Congressional Research

18  Service, which is part of the Library of Congress.

19  Q.   And, ma'am, do you have a law degree?

20  A.   Yes, I do.

21  Q.   And where did you obtain your law degree?

22  A.   I went to Harvard Law School.

23  Q.   And when did you graduate?

24  A.   I graduated in 2005.

25  Q.   Does that mean you started in 2002?

1   A.    Correct.

2   Q.    And did you have a career prior to going to law school?

3   A.    Yes, I did.

4   Q.    And where was your career?

5   A.    I worked at the Central Intelligence Agency.

6   Q.    And how long were you at the CIA?

7   A.    I was there for about nine years.

8   Q.    And I want to direct your attention -- were you a case

9   officer?

10  A.    Yes.  I was an operations officer, correct.

11  Q.    Operations officer.  Are those two terms used

12  interchangeably?

13  A.    Yes, they are.

14  Q.    I want to direct your attention to about September of

15  2000, that time period.  Without telling us exactly where, did

16  you go overseas?

17  A.    In September of 2000, yes, I was overseas.

18  Q.    And had you, had you become married at some point?

19  A.    Yes, I did.

20  Q.    And did you go over to join your husband?

21  A.    In September of 2000, yes.

22  Q.    And how long were you over there?

23  A.    Well, I was overseas -- I was over -- I went to a location

24  in September of 2000, but then around that time, I was recalled

25  from overseas and came stateside.

Lyons - Direct                                                              825

1    Q.    So you were only overseas for a short time, is that

2    correct, in that frame?

3    A.    Yeah.

4    Q.    And when you were recalled, where did you go?

5    A.    To CIA headquarters.

6    Q.    And do you recall for how long were you at CIA

7    headquarters?

8    A.    For about nine, between nine and ten months.

9    Q.    And while you were there, did you share an office location

10   or did you spend quite a bit of time with Jeffrey Sterling?

11   A.    For part of the time, I was located in an office with

12   Mr. Sterling, yes.

13   Q.    And do you know Mr. Sterling?  Do you see Mr. Sterling in

14   the courtroom today?

15   A.    Yes, I do (indicating).

16         MR. FITZPATRICK:   Thank you.

17         THE COURT:   Identity established.

18   BY MR. FITZPATRICK:

19   Q.    When -- did there come a point in time in 2001 when you

20   went back overseas?

21   A.    Yes, that's correct.

22   Q.    And as a frame of reference, September 11, 2001, when was

23   it in relationship to that event?

24   A.    I'm not sure I understand the question.

25   Q.    That day, September 11 --

1  A.    I was overseas?

2  Q.    I'm asking you.

3  A.    Yeah, I was overseas on September 11.

4  Q.    Do you know when you had gone back overseas?

5  A.    Probably about three months prior to that, approximately

6  three months prior to that.

7  Q.    And do you know what out-processing is from the CIA?

8  A.    Yes.  I did it.

9  Q.    Why don't you describe that for us.

10 A.    When I resigned from the organization, I had been

11 overseas.  I came back into the United States to do the

12 necessary paperwork to resign, do, you know, a retirement paper

13 and that kind of thing.

14 Q.    And did you have to finalize your out-processing or your

15 final resignation from the CIA back at headquarters?

16 A.    Yes, yes.  I had to return to CIA headquarters.

17 Q.    And would that have been in January of 2002?

18 A.    Yes.

19 Q.    During that time period, did you have some communications

20 with Mr. Sterling?

21 A.    Yes, I did.

22 Q.    And do you recall having a conversation with him about a

23 newspaper?

24 A.    Yes, I do.

25 Q.    And is there a particular reason why this conversation

Lyons - Direct                                                    827

1    sticks in your mind?

2    A.    Yes.  I was taken aback a bit by the conversation and was

3    a little bit surprised by what was said.

4    Q.    What did he state to you about a newspaper?

5    A.    Well, he said that he had confirmed the location of the

6    CIA office, the New York City CIA office that had been

7    destroyed in the September 11 event.

8    Q.    And did he mention a particular publication?

9    A.    I don't recall a particular publication.

10   Q.    Could you distinguish it, did he reference a newspaper or

11   a magazine?

12   A.    I recall a newspaper, but I don't recall the name of the

13   newspaper.

14   Q.    Do you recall the, the conversation, can you recall

15   Mr. Sterling's tone or his demeanor when he was stating this to

16   you?

17   A.    It seemed like he was showing off a little bit about it,

18   kind of boasting.

19   Q.    And you said earlier that you were, you were taken aback

20   by this statement.

21   A.    Correct.

22   Q.    Why were you taken aback?

23   A.    I wasn't sure if the information was classified or not.

24   Post-September 11, some information had seemed to be released

25   and some didn't, and I wasn't sure where that information fell.

1   Q.   Is this information that you would have revealed to a

2   newspaper?

3   A.   I don't think I would have revealed it, no.

4   Q.   Now, during this -- backing up, this time period that you

5   were in headquarters and you spent some time with Mr. Sterling,

6   you and, you and Mr. Sterling developed a friendship; is that

7   correct?

8   A.   Yes.

9   Q.   And do you like Mr. Sterling?

10  A.   I did at the time, yes.

11  Q.   How long has it been since you've had any contact with

12  him?

13  A.   Since that -- to the best of my recollection, since that

14  conversation that we were discussing earlier.

15          MR. FITZPATRICK:  The Court's indulgence for one

16  moment?

17          Your Honor, I have no further questions at this time.

18          THE COURT:  All right.  Mr. MacMahon?

19                       CROSS-EXAMINATION

20  BY MR. MAC MAHON:

21  Q.   Ms. Lyons, my name is Edward MacMahon.  I'm an attorney

22  here with Mr. Sterling.

23          You were overseas on September 11; is that what you

24  said?

25  A.   Yes.

Lyons - Cross                                                      829

1   Q.   Right.  And you, you filed a discrimination case against

2   the CIA as well, correct?

3   A.   Correct.

4            MR. FITZPATRICK:  Objection.  Relevance.

5            THE COURT:  I'm going to allow just a little bit.

6   We'll see, assuming this is not going to go too far.

7            MR. MAC MAHON:  I'm not going to linger on this

8   point, Your Honor.

9            THE COURT:  All right, go ahead.

10  BY MR. MAC MAHON:

11  Q.   You did, you filed a case as well, correct?

12  A.   Correct.

13  Q.   And that's how you came to meet Mr. Sterling in 2002 is

14  the next time you saw him would have been in what you called

15  the penalty box with Mr. Sterling, right?

16  A.   Well, we were -- I returned from an overseas location, and

17  we were seated together in a small office that he named the

18  penalty box.

19  Q.   Well, you referred to it as the penalty box as well?

20  A.   Yes.

21  Q.   You did.  And at that time, the two of you weren't

22  supposed to have communication with other CIA officers,

23  correct?

24  A.   No, I was not given those instructions.

25  Q.   You weren't given those instructions at all.

1              And, and exactly when was it that you came back to

2    the United States after the attacks of September 11?

3    A.   That would have been in that January 2002.

4    Q.   So four months after the attacks, correct?

5    A.   Yeah.

6    Q.   Okay.  And you told Mr. Fitzgerald that you didn't even

7    know if the information was classified, correct?

8    A.   What information?

9    Q.   That the CIA had had an office in New York that was

10   destroyed in the September 11 attacks?

11   A.   Correct.  I did not know at the time if it was classified

12   or not.

13   Q.   You don't know whether it is today, correct?

14   A.   That is correct.

15   Q.   And you don't know whether -- what reporter, if any,

16   Mr. Sterling even told that to, correct?

17   A.   I don't know which reporter; that's correct.

18   Q.   And you don't know whether that was actually even

19   published, correct?

20   A.   That is correct.

21   Q.   You don't know whether he was asked about something that

22   had already been published by some other author, correct?

23   A.   Correct.

24   Q.   In fact, you don't know anything about that?

25   A.   About?

Lyons - Cross                                                    831

1   Q.   About whether it was published, what newspaper, if any, it

2   was published in at all, correct?

3   A.   Correct.

4   Q.   Did you take any efforts to determine whether the

5   information was classified or not?

6   A.   No, I did not.

7           MR. FITZPATRICK:  Objection, Your Honor.  This is

8   repetitive.  He's asked the same question three times.

9           THE COURT:  A slightly different version.  I'll allow

10  it, but I'm sure we're almost done.

11  BY MR. MAC MAHON:

12  Q.   After you heard this from Mr. Sterling, as you say, did

13  you take any effort to find out whether the information was

14  classified?

15  A.   No.

16  Q.   Did you report it to any of your supervisors?

17  A.   No.

18  Q.   Do you remember telling the FBI that it might have been in

19  *The Wall Street Journal* or *The Post*?

20  A.   Yeah.

21          MR. MAC MAHON:  That's all, Your Honor.

22          THE COURT:  Any redirect?

23          MR. FITZPATRICK:  No, Your Honor.

24          THE COURT:  All right, thank you, ma'am, for your

25  testimony.  You're free to go.

1            THE WITNESS:  Thank you.

2                       (Witness excused.)

3            THE COURT:  Your next witness?

4            MR. FITZPATRICK:  Your Honor, Scott Koch.

5            THE COURT:  All right.

6            MR. FITZPATRICK:  Spelled K-o-c-h.

7            THE COURT:  We'll take the afternoon break after this

8    witness unless anybody needs a break before then.  And again,

9    folks, when you, when you go into the jury room, just be

10   careful not to trip on the screen.

11           SCOTT A. KOCH, GOVERNMENT'S WITNESS, AFFIRMED

12           MR. FITZPATRICK:  Thank you, Your Honor.

13                       DIRECT EXAMINATION

14   BY MR. FITZPATRICK:

15   Q.   Good afternoon, sir.  Please state your name and please

16   spell your full name for the court reporter.

17   A.   First name is Scott, middle initial A, Koch, spelled

18   K-o-c-h.

19   Q.   And, sir, where do you currently work?

20   A.   I work at the Central Intelligence Agency.

21   Q.   How long have you worked for the CIA?

22   A.   Twenty-four years.

23   Q.   What is your current position?

24   A.   I'm currently the chief of the Information Review and

25   Release Group.

Koch - Direct                                                              833

1   Q.   And how long have you been in that position?

2   A.   Eight years.

3   Q.   And describe, if you would, please, your educational

4   background.  Do you have a law degree?

5   A.   Yes, I do.

6   Q.   Please tell us about that.

7   A.   I have a law degree from the University of South Carolina.

8   Q.   And do you also have another advanced degree?

9   A.   Yes, I do.  I have a Ph.D. in Military History from Duke

10  University.

11  Q.   In your current position as the chief of the Information

12  Review and Release Group, can you describe what that group

13  does?

14  A.   Yes.  I'm responsible for all the information, review, and

15  release activities for the CIA, to include all the public

16  information disclosure programs, the Freedom of Information

17  Act, Privacy Act, Executive Order 13526, and publications

18  review.

19  Q.   So within -- let's just say that you have an umbrella of

20  oversight responsibilities; is that accurate?

21  A.   Yes.  There are five divisions in our group.

22  Q.   And is the Publications Review Board within that umbrella?

23  A.   Yes, it is.

24  Q.   Previously -- I want to direct your attention back to 1998

25  to 2002.  Earlier in your career, were you the chair of the

Koch - Direct                                                        834

1   Publications Review Board?

2   A.   Yes, I was, from 1998 to approximately September or August

3   2002.

4   Q.   Can you describe for Judge Brinkema and the jury what the

5   mission is of the Publications Review Board?

6   A.   The Publications Review Board is charged with balancing

7   the rights of authors, their First Amendment rights with the

8   agency's need to protect classified information.  When an

9   author submits a manuscript, our job was to go through and look

10   for classified information and ask the author to take that out.

11        We did not look for information that was embarrassing

12   or critical of the agency.  We could not take that out.  Our

13   only mission was to take things out for which we could

14   articulate damage to national security.

15   Q.   And within the mission, is there a balance that you're

16   trying to strike?

17   A.   Yes.  We, we strive to help the author reach a manuscript

18   that he or she can publish while protecting classified

19   information.  So it's a negotiation process.

20   Q.   And would you say that -- your job is not to be an

21   apologist for the CIA, correct?

22   A.   Oh, no, not at all.  We, we don't take out anything

23   critical or embarrassing.  We don't check facts.  We just only

24   look for classified information.

25   Q.   During your time as chair of the Publications Review Board

Koch - Direct                                                        835

1   between 1998 and 2002, and I'll specifically direct you to

2   2002, did you become familiar with a proposed publication by

3   Jeffrey Sterling?

4   A.   Yes.

5   Q.   And what -- do you recall the name of the publication that

6   had been submitted by Mr. Sterling?

7   A.   I recall it was a book proposal for something called *The*

8   *Shadow of Africa*, or *Out of Africa*, or something like that.

9            MR. FITZPATRICK:  Your Honor, at this time, I'm going

10  to move to admit Government Exhibits -- I think for the sake of

11  efficiency, we can do this all together.

12           THE COURT:  All right.

13           MR. FITZPATRICK:  Government Exhibits 78, 81, 84, 86,

14  and 87.  And then, Your Honor, I'll be admitting Government --

15           THE COURT:  Wait, wait, just one second.  86 and 87

16  were the last two.

17           MR. FITZPATRICK:  Yes, Your Honor.  And then also,

18  Government Exhibits 99 and 127 are public records.

19           THE COURT:  I assume there's no objection to 78?

20           MR. POLLACK:  There's no objection, Your Honor, to

21  any of the exhibits that was read.

22           THE COURT:  All right, they're all in.

23           (Government's Exhibit Nos. 78, 81, 84, 86, 87, 99,

24  and 127 were received in evidence.)

25           MR. FITZPATRICK:  Thank you, Your Honor.

1    Q.   So, Mr. Koch, if you could please turn to Government

2    Exhibit 78?  Do you have that document in front of you?

3    A.   Yes, I do.

4           MR. FITZPATRICK:  And if we could publish that,

5    Mr. Francisco?  We'll be publishing all of these.

6    Q.   Tell us what this document reflects.

7    A.   This is a cover letter that the Publications Review Board

8    received from Mr. Sterling, including his manuscript or a book

9    proposal for our review.

10   Q.   And that was on January 28 of 2002?

11   A.   That's correct.

12   Q.   If you could please turn to Government Exhibit No. 81?  Do

13   you see your name on this?

14   A.   Yes, I do.

15   Q.   And what is this document?

16   A.   This is a document to Mr. Sterling dated 7 February 2002

17   from me acknowledging receipt of his book proposal package

18   entitled *Spook*.  We usually -- we always send this out to

19   authors so we can acknowledge that we did receive their

20   manuscript.

21          The second paragraph is my text to him saying that

22   the reviews usually take 30 or fewer days but may take longer

23   depending on the complexity of the manuscript.  We tell this to

24   every author to make sure that they know what the deadline is.

25   Q.   And with respect to the last sentence in the middle

1   paragraph, you write to Mr. Sterling, ". . . you are not to

2   show it to editors, literary agents, publishers, reviewers or

3   anyone else"; is that correct?

4   A.    That's correct.

5   Q.    Why is that included?

6   A.    That's a standard practice to put authors on notice that

7   until the Publications Review Board gives them written approval

8   to proceed with their manuscript, they cannot divulge the

9   information in the manuscript they submitted to us.

10  Q.    Now, at this time, you were the chair of the PRB; is that

11  right?

12  A.    Yes.

13  Q.    And did you have an executive work with you?

14  A.    Yes, I did.

15  Q.    Who was that?

16  A.    That was Mr. Bruce Wells.  He was the executive secretary

17  of the Publications Review Board.

18  Q.    And describe the next steps in terms of the review process

19  for Mr. Sterling's book.  What would happen next?

20  A.    When we receive a manuscript from an author, our reviewers

21  take a look at it to determine which equities are involved, in

22  other words, which directorate of the agency might own that

23  information.  In other words, if it's about a covert action, it

24  might go to the Directorate of Operations.

25        Once our reviewers determine where those equities

Koch - Direct                                                           838

1   lie, we would send it to each Publications Review Board member,

2   who are at the time I was chairman, were senior intelligence

3   officers from each directorate.  There was one from each, and

4   they would review the manuscript for their directorate's

5   equities.

6   Q.   Why don't you describe, what are directorates?

7   A.   Directorates are the way the agency is organized.  There's

8   a directorate, right now there's a National Clandestine

9   Service, there's a Directorate of Intelligence, there's a

10  Directorate of Science and Technology, there's a director's

11  area, and there's a Directorate of Support.

12  Q.   So upon the initial review, the manuscript would be sent

13  to each directorate who potentially has an equity stake in the

14  information contained in the manuscript; is that correct?

15  A.   That's correct.

16  Q.   And you used the word "who owned the information."  Was

17  this -- is this information potentially government property?

18  A.   Yes.

19  Q.   If you could please turn to page 84?

20          THE COURT:  Exhibit 84.

21          MR. FITZPATRICK:  I'm sorry, Your Honor, Exhibit 84.

22  Q.   And just if you'd turn to the last page, page 4 of that

23  exhibit?  Do you see that?

24  A.   Yes, I do.

25  Q.   The -- describe for the jury what this letter is.

1    A.   This letter would be a response from the Publications

2    Review Board to Mr. Sterling about a completion of our review

3    of his manuscript that he submitted.  It looks like the review

4    applied only to the proposal and the sample chapter.

5              We're telling him in the first couple pages of the

6    letter what he must take out of his manuscript for it to meet

7    PRB approval.  You'll notice that it doesn't say specifically

8    what words to take out because those words or those clauses are

9    in themselves classified.  So we have to say on page 1, first

10   line, take out the first through fifth words.  That's why it's

11   written in an unclassified manner, so that we can send it back

12   to him.

13             We conclude the letter by saying that we are only

14   giving him approval for what he submitted so far, which is the

15   proposal and the sample chapter, and again, he is not -- that

16   is not approval for anything else that he might submit.  He

17   needs to submit whatever else he writes.

18   Q.   And just to go back to the first page, to further

19   describe -- for instance, in page 1, Proposal, line 11, you

20   state to Mr. Sterling, "Delete the first five words in the

21   line.  The agency has not acknowledged this information despite

22   press coverage."

23             You don't reference the particular information in the

24   proposal, do you?

25   A.   That's correct; we do not.

Koch - Direct                                                              840

1   Q.   And is that because a particular equity holder, a

2   particular directorate owns that information?

3   A.   Yes.  And that Publications Review Board representative

4   would have told us, "We need you to take out that information.

5   That is classified."

6   Q.   Thank you, sir.

7          If we could please turn to Exhibit 86, please?  Do

8   you have Government Exhibit 86 in front of you?

9   A.   Yes, I do.

10  Q.   And again, turning to the second page, do you recognize

11  your signature on that document?

12  A.   Yes, I do.

13  Q.   Can you please tell us what's reflected in Government

14  Exhibit 86?

15  A.   This is a letter dated 28 March 2002 from me to Mr. Mark

16  Zaid, who was Mr. Sterling's legal counsel.  Apparently, we had

17  talked by the telephone and had been unable to set up a date

18  for a meeting, so I memorialized what we wanted to do in this

19  letter.

20         Usually when authors have attorneys and they receive

21  our first manuscript, our decision and they don't like it, they

22  want to come in with a meeting for us so we can explain to them

23  why we took out what we took out and help them with suggestions

24  as to how they can possibly write around that to get a

25  publishable manuscript.

1           This is a standard practice that we would do with any

2    author if they have attorneys.  Any author doesn't even need an

3    attorney.  If they want a meeting with us, we would, we would

4    do that, and we've done it many times.

5    Q.   Based on your experience in this area, can you state how

6    common or uncommon it is for lawyers to get involved in the

7    process?

8    A.   Not every author has a lawyer, but it happens, I would say

9    when I was chairman of Publications Review Board, maybe 20

10   percent of the time.

11   Q.   Does -- with the introduction of lawyers, does it signify

12   anything to you in particular?

13   A.   No, no.  It's a negotiation process, and we work through

14   the lawyer instead of dealing directly with the, with the

15   author.

16   Q.   Now, I want to turn to Government Exhibit No. 87.  Do you

17   recognize that document?

18   A.   Yes, I do.

19   Q.   And what does this -- and your signature is on there?

20   A.   Yes, it is.

21   Q.   And what is reflected in this document?

22   A.   This is a letter that I sent to Mr. Zaid confirming a

23   meeting for Thursday, 18 April 2002, at 9:00, to discuss the

24   redactions to his client's chapter, and it also contains

25   information for how Mr. Zaid is to get access to the building.

1   Q.   Now, at a certain point in 2002, did you change positions

2   within the CIA?

3   A.   Yes, I did.  I became, I became the chief historian of the

4   agency.

5   Q.   And who took over your responsibilities as chair in an

6   acting capacity?

7   A.   Bruce Wells was the acting chairman of the Publications

8   Review Board.

9   Q.   And had Mr. Wells been actively working on and involved in

10  the Jeffrey Sterling manuscript up to this point?

11  A.   Yes, from the very beginning.

12  Q.   But after you left, did he assume the responsibilities for

13  managing it?

14  A.   Yes.

15          MR. FITZPATRICK:  The Court's indulgence for one

16  moment?

17          THE COURT:  Yes, sir.

18          MR. FITZPATRICK:  Your Honor, I have no further

19  questions at this time.

20          THE COURT:  All right.  Mr. Pollack?

21          MR. POLLACK:  Thank you, Your Honor.

22                       CROSS-EXAMINATION

23  BY MR. POLLACK:

24  Q.   Good afternoon, Mr. Koch.  That's how you pronounce your

25  last name?

Koch - Cross                                                        843

1   A.    That's correct.

2   Q.    My name is Barry Pollack.  I'm an attorney that represents

3   Mr. Sterling.

4         When Mr. Sterling first submitted his manuscript --

5   or, I'm sorry, let me strike that.

6         Let's go ahead and put up Exhibit 78, if we can.  And

7   if you could enlarge the text?

8         On January 28, 2002, he submits a book proposal and a

9   sample chapter; is that correct?

10  A.    Yes.

11  Q.    And at that time, were you aware that Mr. Sterling already

12  had pending against the CIA a lawsuit alleging that the CIA had

13  discriminated against him?

14  A.    No.

15  Q.    Did you come to learn that at some point?

16  A.    At some point, I was aware of it because I think it was in

17  the newspaper.

18  Q.    Did you become aware of it while you were still in charge

19  of the PRB process?

20  A.    I can't recall that.  I suspect probably.

21  Q.    Okay.  And the PRB process is a standard protocol that the

22  CIA has for people with the CIA who want to publish material

23  that might relate to their time at the CIA?

24  A.    Absolutely.

25  Q.    And it's perfectly appropriate and -- for someone who

Koch - Cross                                                        844

1    wants to write about their time with the CIA to go through that

2    process, correct?

3    A.    Yes.   They are required to go through that process.

4    Q.    They're required to, but there certainly have been

5    instances where people haven't, correct?

6    A.    That's correct.

7    Q.    Including recently the director of Central Intelligence

8    himself, the former director wrote a book and didn't go through

9    that process, correct?

10   A.    I was not chairman of PRB at that time.

11   Q.    Are you aware of it?

12   A.    I'm aware of what I read in the paper, not officially.

13   Q.    But Mr. Sterling went through this process, correct?

14   A.    He was going through the process when I was chairman of

15   PRB.

16   Q.    And he did so with a lawyer, and you said that that isn't

17   uncommon, correct?

18   A.    Correct.

19   Q.    And you don't -- do you know whether the lawyer that was

20   assisting him in the PRB process was also his lawyer for the

21   discrimination case?

22   A.    I don't know that.

23   Q.    And in his letter to you when he first makes his

24   submission, he indicates, does he not, that, as I understand

25   it, in accordance with the regulation, you are afforded 30 days

Koch - Cross                                                      845

1   for review, correct?

2   A.   That's correct.

3   Q.   Okay.  And then you respond to him in Exhibit 81, correct?

4   A.   That's correct.

5   Q.   And first of all, the title of his proposed book, you said

6   that you thought it was *Out of Africa* or *Shadow of Africa* or

7   something to that effect?

8   A.   Yes.

9   Q.   In fact, does this refresh your recollection that the book

10  was called *Spook*, or the book proposal?

11  A.   The proposal was called *Spook*, yes.

12  Q.   Okay.  "Spook" being another term for spy?

13  A.   As far as I know.

14  Q.   Okay.  And you explained to him that in response to his

15  letter saying that he believed that there was a requirement

16  that the review be completed within 30 days, that, in fact, it

17  is the norm that it's completed within 30 days or less,

18  correct?

19  A.   No, it's not the norm that they're completed in less.  We

20  have up to 30 days to do so, and in complex cases, it can take

21  longer.

22  Q.   Okay.  I understand that you put in the caveat that in

23  complex cases, it can take longer, but you do say that reviews

24  usually take 30 or fewer days, do you not?

25  A.   Yes.

1   Q.   And you said that the process that you go through is a

2   process of trying to, to balance competing interests, correct?

3   A.   First Amendment versus classified information.

4   Q.   And sometimes that's a tricky balance, correct?

5   A.   It can be.

6   Q.   In fact, there are often internal debates within the PRB

7   about whether particular words or particular phrases can be

8   used or not used, correct?

9   A.   That's correct, and that's why when I ran the board, the

10  PRB members were senior intelligence executives.

11  Q.   So what sounds like it might be a simple process is, in

12  fact, a fairly complicated process?

13  A.   It can be.

14  Q.   And in Exhibit 84, you're now getting back to Mr. Sterling

15  with respect to the proposal he submitted in January, correct?

16  A.   Yes.

17  Q.   And it's now March, correct?

18  A.   Yes.

19  Q.   So it took about a month and a half, as opposed to 30

20  days?

21  A.   Yes.

22  Q.   Okay.  And you get back to him with the changes that

23  you're requiring both for the proposal and for the sample

24  chapter, correct?

25  A.   Correct.

Koch - Cross                                                            847

1    Q.   And you tell him he doesn't need to resubmit the sample

2    chapter as long as he makes the changes that you're requesting,

3    correct?

4    A.   Yes.

5    Q.   And you tell him that most of the changes are, changes are

6    minor.  That's in the first paragraph.

7    A.   Yes.

8    Q.   Now, one of the -- one thing that was in his proposal or

9    in the sample chapter was that he had particular expertise and

10   was fluent in Farsi, correct?

11   A.   I don't know that.

12           MR. FITZPATRICK:  Objection, Your Honor.  We have a

13   protective order issue in place on this issue.

14           THE COURT:  All right, approach the bench.  Mira.

15           (Sealed Bench Conference E not transcribed in this

16   volume.)

17           THE COURT:  Ladies and gentlemen, I know how jurors

18   hate it when we have these long bench conferences, and since

19   we're close to the break time, let me give you your afternoon

20   break until 5 after four.  We'll come back in session at 4:00,

21   all right?  And we shouldn't hold you up for anything.

22           MR. POLLACK:  Thank you, Your Honor.

23           (Recess from 3:45 p.m., until 4:03 p.m.)

24                   (Defendant present, Jury out.)

25           THE COURT:  Actually, counsel, approach the bench.

Koch - Redirect                                                     848

1   This will have to be in front of the bench.

2              (Sealed Bench Conference F not transcribed in this

3   volume.)

4                        (Jury present.)

5              THE COURT:  All right, folks, you can have a seat.

6              We were in the cross-examination.  Mr. Pollack?

7              MR. POLLACK:  Your Honor, Mr. Koch, I don't have any

8   further questions for you.  Thank you.

9              THE COURT:  Was there any further redirect?

10             MR. FITZPATRICK:  Just very briefly, Your Honor.

11             THE COURT:  All right.

12                       REDIRECT EXAMINATION

13  BY MR. FITZPATRICK:

14  Q.   Turning back to Government Exhibit 84, if you could,

15  please?  Just for clarification, the title -- the book proposal

16  title was *Spook*, correct?

17  A.   That's correct.

18  Q.   And then throughout Government Exhibit 84, you're making

19  references to a chapter called "The Shadow of Africa"; is that

20  correct?

21  A.   That's correct.

22             MR. FITZPATRICK:  Nothing further, Your Honor.

23             THE COURT:  All right, any redirect -- recross?

24             MR. POLLACK:  No, Your Honor.

25             THE COURT:  No.  Mr. Koch, thank you for your

Wells - Direct                                                          849

1   testimony.  You're free to leave at this point.

2                       (Witness excused.)

3           THE COURT:  And I assume the next witness is

4   Mr. Wells?

5           MR. FITZPATRICK:  That's correct, Your Honor.

6           THE COURT:  All right, Mr. Wells.

7       CHARLES BRUCE WELLS, GOVERNMENT'S WITNESS, AFFIRMED

8           MR. FITZPATRICK:  Thank you, Your Honor.  And, Your

9   Honor, again, for the sake of efficiency, through this witness,

10  we'll be moving to admit Government Exhibits 89, 90, 91, 92,

11  93, and 116.

12          THE COURT:  Any objection?

13          MR. POLLACK:  No, Your Honor.  No objection to any of

14  those documents.

15          THE COURT:  All right, they're all in.

16          (Government's Exhibit Nos. 89 through 93 and 116 were

17  received in evidence.)

18          MR. FITZPATRICK:  Thank you.

19                      DIRECT EXAMINATION

20  BY MR. FITZPATRICK:

21  Q.   Good afternoon, sir.

22  A.   Good afternoon.

23  Q.   If you could, please, state your full name and please

24  spell your name for the court reporter.

25  A.   Charles Bruce Wells, W-e-l-l-s.

Wells - Direct                                                        850

1   Q.   And, sir, what is your current employment?

2   A.   I'm an independent contractor with the CIA.

3   Q.   And did you at some point retire officially from the CIA?

4   A.   Yes, I did.

5   Q.   When was that?

6   A.   Beginning of 2004-end of 2003.

7   Q.   And how long was your career with the CIA?

8   A.   Thirty-six years.  Came in in 1968.

9   Q.   Did there come a point in time when you worked within the

10  Publications Review Board?

11  A.   Yes.

12  Q.   When was that?

13  A.   1995 through 2003, when I retired.

14  Q.   Directing your attention to the early part of 2002, what

15  was your, your job at that point within the Publications Review

16  Board?

17  A.   I was the executive secretary.

18  Q.   And who did you report to directly?

19  A.   To Scott Koch, who was the chairman of the board.

20  Q.   Did there come a point in time when -- during that year

21  when Mr. Koch moved on to another position, and did you move

22  up?

23  A.   Yes.  I wasn't sure it was that year, but at one point, he

24  did.  It was perhaps 2002 maybe.  Yes.

25  Q.   And what title did you assume?

1  A.    I was acting chair of the Publications Review Board at

2  that time.

3  Q.    During that time period, did you become familiar with a

4  book proposal by Jeffrey Sterling?

5  A.    Yes.

6  Q.    And describe your responsibilities with respect to the

7  book review process on that book.

8  A.    As executive secretary, I basically handled the day-to-day

9  work of the book.  When a proposal came in, we did a cursory

10  review to find out who -- which members of the board should

11  review the book.  We made copies.  We got the copies of the

12  book to the -- or copies of the manuscript to those, to those

13  members.

14          Then we would, we would try to make sure that they

15  adhered to the deadlines, and then when the responses came in,

16  we would mark up, redact the manuscript and return it to the

17  authors.

18  Q.    Prior to -- well, I'll strike that.

19          When, when you assumed responsibility as the acting

20  chair of the Publications Review Board, did it become your

21  responsibility to communicate with the proposed author or his

22  attorneys on issues?

23  A.    Yes, that's correct.

24  Q.    And prior to that, that was Mr. Koch's responsibility?

25  A.    Yes, yes, although I composed the letters.  I mean, we did

1    sort of the mechanical end of it.

2    Q.   I understand.  I want to turn your attention to Government

3    Exhibit 89.  Mr. Wood's going to bring that to you.

4              We can publish that.  Thank you.

5              Do you have Government Exhibit 89 in front of you?

6    A.   Yes.

7    Q.   And do you recognize that document?

8    A.   Yes.

9    Q.   And just briefly describe to us what is, what is going on

10   in this document.

11   A.   This is the covering letter that, that accompanied the

12   manuscript.  We had done an earlier review of a book proposal

13   and one of the chapters, and he is now resubmitting the other

14   chapters that he wanted reviewed.

15   Q.   Had the -- the process with respect to Mr. Sterling's

16   book, had it been going on for a while at this point?

17   A.   Yes.  He had, he had done a sample chapter book proposal.

18   Q.   And was that -- having an author submit chapters sort of

19   piecemeal on a rolling basis, was that unusual?

20   A.   Yes, but not unprecedented.

21   Q.   Okay.  But you didn't have any objection to him doing it

22   on a rolling basis?

23   A.   No.

24   Q.   Okay.  If you could please turn to Government Exhibit 90,

25   please?  And why don't you turn to the last page, page 3 of

1    that document.

2              Do you recognize the signature on page 3?

3    A.    Yes.

4    Q.    And is that your signature?

5    A.    That is.

6    Q.    Could you please tell Judge Brinkema and the jury, what

7    are you communicating to Mr. Sterling by way of this letter?

8    A.    This -- these are the -- this is the covering letter again

9    that would -- that's describing the redactions that we are

10   asking for.  There would also have been the actual pages with

11   the material whited out, but this describes what we are asking

12   him to redact or take out of the book.

13   Q.    And just sticking with the first page of your letter, now,

14   you don't make specific reference to the problematic language

15   in the manuscript; is that correct?  You refer to the first

16   eight words in the line?

17   A.    Yes.

18   Q.    Is that the way it's done?

19   A.    That's correct.

20   Q.    Now, sticking with that, chapter 5, page 1, line 14, do

21   you see that?

22   A.    Yes.

23   Q.    You are -- you continue by saying, "You may wish to

24   substitute the phrase 'U.S. diplomat.'"

25   A.    Yes.

1  Q.   Is it part of your job -- is there a sort of a

2  problem-solving aspect to your job?

3  A.   Yes, there is.  We would often suggest alternative

4  language.  It was not a mandate, but it was, it was offered as

5  a suggestion.  If the author wanted to come up with something

6  else, he was perfectly willing to do so, and we would look at

7  that, but we would frequently put in words that were commonly

8  used in previous reviews.

9  Q.   And are you trying to facilitate the process to make the

10 author successful in his endeavor?

11 A.   Yes, we are.

12         MR. POLLACK:  Objection.  Leading.

13         THE COURT:  Sustained.

14 BY MR. FITZPATRICK:

15 Q.   These quotations, they continue on page 1; is that

16 correct?  For instance, chapter 6, page 3, line 7, you make

17 another suggestion?

18 A.   Yes.

19 Q.   And you undertake that process throughout the first two

20 pages of your letter; is that correct?

21 A.   Yes.

22 Q.   If you could please turn to page 91?

23         THE COURT:  Exhibit 91.

24         MR. FITZPATRICK:  Sorry, Your Honor.  Exhibit 91,

25 you're correct.  I apologize.

Wells - Direct                                                              855

1   Q.    Do you have Exhibit 91 in front of you?

2   A.    Yes.

3   Q.    What are you communicating in this letter?

4   A.    In this letter, in this letter, we are telling him that we

5   have finished.  We had made an effort to get him certain

6   numbers of chapters early because we were running a little bit

7   behind on the, on the total review, so I said we'll give you a

8   partial response and then we'll come back with the remaining

9   chapters that we hadn't had a chance to finish the review on.

10  Q.    And you -- do you recall -- the initial submission by

11  Mr. Sterling was a book proposal and an initial chapter 1; is

12  that correct?

13  A.    Yes.  Or I'm not sure it was chapter 1, but there was a

14  chapter.

15  Q.    A single chapter?

16  A.    A single chapter, correct.

17          THE COURT:  Mr. Wells, can you just move a little

18  closer to the microphone?

19          THE WITNESS:  Okay.

20          THE COURT:  Thank you.

21  BY MR. FITZPATRICK:

22  Q.    Now, I want you to turn to Government Exhibit 92, and

23  again, just can you identify your signature on page 5?

24  A.    Yes.

25  Q.    And what is this document?

1  A.    This is the, this is the redacted documents for the

2  remaining two chapters, and it looks like there's a small

3  addition from chapter 5.

4  Q.    And again, you're going through the same process of

5  receipt and respond with comments?

6  A.    Correct.

7  Q.    And this letter is dated January 3, 2003?

8  A.    Yes.

9  Q.    Why don't you turn to page -- excuse me, Exhibit 93.

10        Do you have Exhibit 93 in front of you?

11  A.    Yes.  Yes.

12  Q.    And is this a Lotus Note?

13  A.    Yes.

14  Q.    And did you prepare this?

15  A.    Yes.

16  Q.    And to whom are you sending this Lotus Note?  Without

17  identifying specific names, just to what positions?

18  A.    It would probably have been board members and perhaps some

19  other people that had interest in this review, such as our --

20  Q.    What are you -- and this note is dated January 7, 2003, at

21  about 3:21 p.m.; is that correct?

22  A.    Yes.

23  Q.    What are you attempting to communicate in this letter to

24  the other board members?

25  A.    I just wanted to let them know about a phone call I'd

1    received from Mr. Sterling and give them an idea of what he had

2    said during this conversation.

3    Q.    Had you returned a call that day --

4    A.    Yes.

5    Q.    -- from a message he had left?

6    A.    Yes.

7    Q.    So this note is made within several hours after your

8    conversation with Mr. Sterling?

9    A.    About three hours after, yes.

10   Q.    And I want to direct your attention to the first

11   paragraph.  There is phrases or information in the first

12   paragraph that is in quotation marks.  Why did you do that?

13   A.    To give a sense of an idea of some of the actual words

14   that he had used.

15   Q.    And you used that in other occasions in this Lotus Notes,

16   and when something is in quotations, those are direct quotes

17   from Mr. Sterling?

18   A.    To the best I can remember, yes.

19   Q.    With respect to the first paragraph, the

20   phrases "absolutely disgusted" and "absolutely reprehensible"

21   are in quotation marks?

22   A.    Yes.

23   Q.    Did Mr. Sterling say those things to you?

24   A.    Yes.

25   Q.    And what was that in response to, do you recall?

1   A.   That was in response to the redactions that he had

2   received.  I don't remember; it must have been the last two

3   chapters, that previous letter that we had just sent, the one

4   from --

5   Q.   And with respect to the second paragraph, there is the

6   word "inconsistencies" is in quotes.  What is that in reference

7   to?

8   A.   That would have been in reference to what he considered to

9   be inconsistencies in what the board had asked him to redact.

10  I can't remember if it was inconsistencies within the review or

11  inconsistency based on guidelines that he had received, but --

12  Q.   And then in the final paragraph of that note, there is a

13  sentence that begins, "He said that as a result."  Then it ends

14  in a quotation, "at us with everything at his disposal."  Do

15  you recall that?

16  A.   Yes.

17  Q.   And do you recall -- again, is that a direct quotation

18  from Mr. Sterling?

19  A.   Yes.

20  Q.   Do you recall the tone of voice or the demeanor that was

21  expressed over the phone?

22  A.   No.  He was, he was somewhat upset, but I don't recall any

23  very specifics at this time.

24  Q.   Do you have a memory, Mr. Wells, did this matter end up in

25  litigation?

Wells - Direct                                                        859

1   A.   Yes, it did.

2             MR. FITZPATRICK:  If I could just publish for the

3   jury Government Exhibit No. 99, please?

4             THE COURT:  99?

5             MR. FITZPATRICK:  Yes, please.

6             THE COURT:  All right.

7             MR. FITZPATRICK:  Thank you.

8   Q.   And, Mr. Wells, I want you to turn to Government Exhibit

9   116, please.  Could you please tell -- I want you to turn to

10  page 5.  Can you tell us who Paul-Noel Chretien is?

11  A.   Paul-Noel was the, was the chairman of the board at the

12  time.  He succeeded me.

13  Q.   So he took over for you?

14  A.   He took over for me.

15  Q.   And what's reflected here in Government Exhibit No. 116,

16  is this a letter that was another review with suggestions

17  delivered to Mr. Sterling?

18  A.   Yes.

19            MR. POLLACK:  I'm going to object to any further

20  questions based on lack of foundation.

21            MR. FITZPATRICK:  Well, I can ask --

22            THE COURT:  See if you can lay a foundation.

23  BY MR. FITZPATRICK:

24  Q.   In the first line there, it says, "In conjunction with the

25  preparation of a motion for summary judgment . . .."  Do you

Wells - Direct                                                            860

1    recall that?

2    A.    I'm sorry.

3    Q.    In the first line, there's a reference to a term "summary

4    judgment."  Did you file a document in -- were you asked to

5    prepare a declaration in conjunction with that?

6    A.    Yes.

7    Q.    And were you still working at this time in conjunction

8    with the Publication Review Board on this matter?

9    A.    I was, I was transitioning out.

10   Q.    Okay.

11   A.    But I was still there, yes.

12   Q.    You were still there?

13   A.    Yes.

14   Q.    And were you still working on the Jeffrey Sterling matter?

15   A.    Yes.

16          MR. FITZPATRICK:  Your Honor, I would move it in on

17   those grounds.  That's the proper foundation.

18          THE COURT:  Well, do you recall having seen this

19   letter or being involved at all in drafting it?

20          THE WITNESS:  No, I did not.

21          THE COURT:  Were you -- to your knowledge, were you

22   involved in any of the discussion of the issues in this letter?

23          THE WITNESS:  Yes.

24          THE COURT:  I think that's enough foundation.  I'm

25   going to permit it.

1              MR. FITZPATRICK:  Thank you, Your Honor.

2              MR. POLLACK:  Your Honor, just to be clear, I believe

3    we've already admitted the document.  I didn't have an

4    objection to the admission of the document.  The question is

5    the witness's competence to interpret the document.  He's not

6    the author of it.

7              THE COURT:  He may not be the author, but he's just

8    said that he was involved with some of this analysis that's

9    discussed here.  Is there a question you want to ask this

10   witness about the document?

11             MR. FITZPATRICK:  No, Your Honor.

12             THE COURT:  All right, let's move along then.

13             MR. FITZPATRICK:  Mr. Francisco, if you could please

14   put up Government Exhibit 99 once again?

15             THE COURT:  99?

16             MR. FITZPATRICK:  Yes, please.

17             THE COURT:  Okay.

18   BY MR. FITZPATRICK:

19   Q.   And, Mr. Wells, can you please turn to that as well?

20             THE COURT:  I'm not positive you moved that one in.

21   Any objection?  It's in?

22             MR. POLLACK:  I believe it is in, Your Honor.

23             THE COURT:  All right, that's fine.

24   BY MR. FITZPATRICK:

25   Q.   Mr. Wells, the date of this complaint, *Jeffrey Sterling v.*

Wells - Direct                                                      862

1   *Central Intelligence Agency*, this involves litigation

2   concerning the Publication Review Board and their review of his

3   manuscript; is that correct?

4   A.   Yes.

5   Q.   And this was filed on March 4 of 2003?

6   A.   Yes.

7   Q.   And in the document we just discussed, Government Exhibit

8   116, that was a document that was prepared after that civil

9   complaint was filed; is that correct?

10  A.   That's the deposition?

11  Q.   Government Exhibit 116, what's the date of that document?

12  A.   16, sorry.  25 August '03.

13  Q.   And that would be after the civil complaint?

14  A.   Yes.

15  Q.   Then I want you to turn to Government Exhibit 127, which

16  is already admitted.

17          I would just note, Your Honor, that this is a

18  stipulation of dismissal with prejudice filed July 30, 2004.

19          THE COURT:  I assume there's no objection to that.

20          MR. POLLACK:  No, Your Honor.

21          THE COURT:  All right, it's in.

22          MR. FITZPATRICK:  Mr. Wells, I have no further

23  questions for you.  Please answer Mr. Pollack's questions.

24          THE COURT:  All right.  Cross-examination?

25          MR. POLLACK:  The first time the government's ever

Wells - Cross                                                          863

1    told a witness to answer my questions.

2              THE COURT:  It may be the last, so be careful.

3                        CROSS-EXAMINATION

4    BY MR. POLLACK:

5    Q.   Mr. Wells, my name is Barry Pollack.  I'm one of the

6    attorneys that represents Jeffrey Sterling.

7              If we can go ahead and put up Government's Exhibit

8    89, please?

9              Now, you testified, Mr. Wells, that this is a

10   document where Mr. Sterling provides -- provided to the PRB, to

11   the Publications Review Board, additional chapters for his

12   book, correct, or proposed book?

13   A.   Yes.

14   Q.   He had previously submitted a book proposal and a sample

15   chapter, correct?

16   A.   Right.

17   Q.   And he was only required to submit chapters of the book to

18   the extent that they dealt with his career at the agency or

19   with classified information, correct?

20   A.   Or intelligence matters, yes.

21   Q.   Okay.  And in this document, he's telling you he's

22   submitting the remaining chapters of the book that fall in that

23   category, and so therefore, this is the bulk of what it is that

24   he's asking the PRB to review, correct?

25   A.   That's correct, yes.

1    Q.    And that submission is made on October 22, 2002, correct?

2    A.    I believe that is correct, yeah.  Correct.

3    Q.    Now, if we can go to Government's Exhibit 90, this was

4    your letter to him dated December 2, 2002, correct?

5    A.    Yes.

6    Q.    And that's more than 30 days from October 22, correct?

7    A.    Yes.

8    Q.    In fact, you say that, you say that you apologize that --

9    maybe you don't apologize.  You note that the response is

10   beyond the normal 30-day deadline, correct?

11   A.    That is correct.

12   Q.    And even at that, the response is not a complete response

13   because there's still material that you're continuing to

14   review, correct?

15   A.    That is correct.

16   Q.    Now, did you know at -- well, did you learn at some point

17   that Mr. Sterling had filed a lawsuit against the CIA claiming

18   that he had been discriminated against during his tenure at the

19   CIA?

20   A.    Yes, we were aware of that.

21   Q.    Were you aware of that from the beginning of this PRB

22   process?

23   A.    Very early on, if not at the beginning, yes.

24   Q.    And you don't know whether Mr. Sterling's complaint that

25   he was treated unfairly is correct or not correct?

1    A.   No, we did not.

2    Q.   But you were aware that he had made such a complaint?

3    A.   Yes, that is correct.

4          MR. POLLACK:  And I would like to hand to the witness

5    a document that I've marked as Defendant's Exhibit 7, Mr. Wood.

6    If you can help me out?

7          THE COURT:  Mr. Fitzpatrick, do you have a copy of

8    that?

9          MR. FITZPATRICK:  I don't.

10         THE COURT:  All right.

11         MR. POLLACK:  Oh, I'm sorry.

12         THE COURT:  7?

13         MR. POLLACK:  Yes, Your Honor.  This has been marked

14   as Defendant's Exhibit 7.

15         THE COURT:  Thank you.

16   BY MR. POLLACK:

17   Q.   And, Mr. Wells, can you just generally describe what this

18   document is?

19   A.   This would be, this would be another Lotus Note or e-mail

20   to several -- to members of the board.

21   Q.   And who authored it?

22   A.   I did.  And it went to --

23         MR. POLLACK:  Let me just stop you there.

24         I'd like to move to admit Defendant's 7.

25         THE COURT:  Any objection?

Wells - Cross                                                          866

1           MR. FITZPATRICK:  I have no objection.

2           THE COURT:  No?  All right, Defense 7 is in.

3           (Defendant's Exhibit No. 7 was received in evidence.)

4           MR. POLLACK:  And, Mr. Francisco, if you can put it

5    up on the screen?

6    Q.   Now, Mr. Wells, this is reflecting a -- memorializing a

7    phone call that you had made to Mr. Sterling?

8    A.   I'm not sure if it was one that I made or he made to me.

9    Let's see.

10   Q.   Well, the subject line says "Phone Call to Jeff Sterling"?

11   A.   Okay.  Then yes, it would be.  Okay.

12   Q.   Okay.  And this is dated December 12, 2002, correct?

13   A.   Yes.

14   Q.   So this is ten days after your letter to him where you

15   hadn't met the 30-day deadline and you were still reviewing

16   additional materials, correct?

17   A.   Yes.

18   Q.   And Mr. Sterling was advised, you say, ". . . I called

19   Mr. Sterling to advise him the review of his manuscript would

20   be delayed because the person reviewing was attending to a

21   family emergency.  As expected he was not happy, saw the move

22   as a delaying tactic by the Agency, and said he had no choice

23   but to get his attorney involved."  Correct?

24   A.   Yes.

25   Q.   And you put at the top of this message, "This message was

1    created in anticipation of litigation," correct?

2    A.    Yes.

3    Q.    And you did that because you believed that it was possible

4    that Mr. Sterling might file a lawsuit over the fact that the

5    PRB had not cleared his manuscript?

6    A.    Yeah.  Yes, sorry.

7    Q.    And if we can go to, I guess it's sort of the last full

8    paragraph, the way the conversation that you're reflecting here

9    concluded is he asked when the review would be done, and you

10   told him that the reviewer would be back next week, correct?

11   A.    That's correct.

12         MR. POLLACK:  And next I'd like to hand up to the

13   witness Defendant's Exhibit 5.

14         THE COURT:  Any objection to this document?

15         MR. POLLACK:  I'll go ahead and hand up 6 at the same

16   time just to save Mr. Wood a trip, but right now, we're only

17   going to be discussing Defendant's Exhibit 5.

18         Do you already have it, Mr. Wood?

19         THE COURT SECURITY OFFICER:  Yes.

20         MR. POLLACK:  Oh, so he's got it.  Okay.  Great.

21         THE COURT:  Mr. Fitzpatrick, is there any objection?

22         MR. FITZPATRICK:  No, Your Honor.

23         THE COURT:  All right, 5 and 6 are in then.

24         (Defendant's Exhibit Nos. 5 and 6 were received in

25   evidence.)

BY MR. POLLACK:

Q.   Okay.  So go ahead and put up 5.  And 5 is another Lotus
Note from you, correct?

A.   Yes.

Q.   Memorializing another phone conversation with
Mr. Sterling?

A.   Yes.

Q.   And the date of this one is the 19th?

A.   Yes.

Q.   Of December?

A.   Yes.

Q.   So in the previous one, you'd sort of concluded the
conversation by saying that you would -- that the reviewer
would be back next week, right, No. 7?

A.   No. 7?  If that's what it says, yes.

Q.   And here it is a week later, and you're having another
conversation with Mr. Sterling, correct?

A.   Correct.

Q.   And again, you're marking the memorandum as being prepared
in anticipation of litigation, correct?

A.   Correct.

Q.   And this one is your phone call to Mr. Sterling where
you're getting back to him with an update, correct?

A.   Yes.

Q.   And you tell him that the officer who needs to review the

1   remaining chapter has not returned to the building, correct?

2   A.   Yes.

3   Q.   But you assure him it will be a top priority when this

4   officer does return, correct?

5   A.   Yes.

6   Q.   And Mr. Sterling reminded you that the review has now

7   taken two months, correct?

8   A.   Yes.

9   Q.   And he, he wasn't happy about that; is that fair to say?

10  A.   That's fair to say.

11  Q.   Yeah.  And you were telling him at this point the review

12  was being delayed because the reviewer was out of the office,

13  and he asked why the review depended on a single individual,

14  correct?  This is in the second-to-last paragraph?

15  A.   Yes.

16  Q.   And you say, "I stammered around a bit that once questions

17  had been raised, additional review was required," correct?

18  A.   Yes.

19  Q.   And when you say you stammered around, that's because you

20  didn't have a very satisfactory answer to give Mr. Sterling,

21  correct?

22  A.   Probably correct, yes.

23  Q.   And now we'll go ahead and go to Exhibit 6.

24          THE COURT:  They would appear to be out of

25  chronology, right, in terms of time, or are they both the same

Wells - Cross                                                          870

1   time?

2          MR. POLLACK:  Oh, no, I understand, Your Honor.

3   Actually, I don't think we need to do 6.  I think 6 is actually

4   the same communication, and 5 -- 6 is the underlying

5   communication.

6   Q.   In 5, you then blind-copied the communication to Mr. Koch,

7   correct?

8   A.   That's correct.

9   Q.   But it's the same communication, okay.  So -- okay.

10         Now let's go to Government's Exhibit 91, if we can,

11  and Government's Exhibit 91 is a letter from you to

12  Mr. Sterling dated December 23, 2002, correct?

13  A.   Yes.

14  Q.   And you're telling him the PRB still has not finished its

15  review, correct?

16  A.   That is correct.

17  Q.   And then in 92, Government's Exhibit 92, this is

18  January 3, 2003, correct?

19  A.   Yes.

20  Q.   And you're now getting back to him with a number of,

21  several pages of redactions that you're requiring, correct?

22  A.   Yeah.  This would be -- this would have completed the

23  review.

24  Q.   This would have completed the review well past the 30-day

25  deadline, correct?

1  A.    Yes.

2  Q.    And there are about four pages' worth of redactions that

3  you're requiring, correct?

4  A.    I believe so, yeah.  Yes.

5  Q.    And then that -- and that communication was dated

6  January 3, right?

7  A.    Yes.

8  Q.    93, Government's Exhibit 93 is January 7, so it's four

9  days after you give him the belated response with four pages of

10  redactions, correct?

11  A.    Yes.

12  Q.    And Government 93 is again your memorialization of a

13  telephone conversation with Mr. Sterling, correct?

14  A.    That's correct.

15  Q.    And this is the one where toward the bottom of the, in

16  that last paragraph, that last big block paragraph, he tells

17  you after voicing his displeasure that he is going to be coming

18  "at us with everything at his disposal," correct?

19  A.    Yes.

20  Q.    And the very next line after that is telling you that

21  you're going to be hearing from his lawyer, right?

22  A.    That's right.

23  Q.    And within a couple of months, he's prepared and filed a

24  lawsuit against the CIA over this PRB review, correct?

25  A.    Yes.

Wells - Redirect                                                   872

1   Q.   Let me just go back for a second to Defense Exhibit 7.  At

2   the top of this exhibit, it says, "Three may keep a secret if

3   two of them are dead."  And that's a quotation from Benjamin

4   Franklin?

5   A.   Yes.

6   Q.   Was that a favorite quotation of yours?

7   A.   I had put it on sort of my standard banner line for most

8   of my e-mail correspondence.

9   Q.   Okay.  If three can keep a secret if two of them are dead,

10  what's the ability of over 90 people to keep a secret?

11              MR. FITZPATRICK:  Objection.  Argumentative.

12              THE COURT:  Overruled -- I'm sorry, sustained.  It's

13  late in the day.

14              MR. POLLACK:  I don't have any further questions.

15              THE COURT:  Anything further, Mr. Fitzpatrick?

16              MR. FITZPATRICK:  Thank you, Your Honor.

17                        REDIRECT EXAMINATION

18  BY MR. FITZPATRICK:

19  Q.   During this time, you were the executive of the

20  Publication Review Board, right?  Tell us again your true

21  title?

22  A.   Executive secretary up until, well, Scott was still here.

23  Then I became acting until the time I retired.

24  Q.   How large was your review staff at this time?

25  A.   With Scott, when we had a -- with me, the executive

1  secretary acting sort of was combined into one, but we usually

2  had a board chair, executive secretary, director of research,

3  two researchers, and an office administrator.

4  Q.   So the total --

5  A.   Six people.

6  Q.   I'm sorry?

7  A.   About six.

8  Q.   About six?

9  A.   Yeah.

10 Q.   And in addition to book proposal manuscripts, what other

11 documents were within your purview to review?

12 A.   Newspaper articles, op-eds, course syllibi occasionally,

13 research papers, almost anything that was, that was published

14 or about to go into the public domain written by former

15 employees.

16 Q.   Describe the pace of the work during this time period.

17      MR. POLLACK:  Your Honor, I'm going to object to

18 relevance and also not responsive to the cross.

19      THE COURT:  I think this is a little far afield.  I

20 mean, this case is not -- this is not the case that was filed

21 in the District of Columbia.  This is not a case about a delay

22 in allowing the book to be published.

23      MR. FITZPATRICK:  Well, Your Honor, Mr. Pollack went

24 into some great lengths as to the back-and-forth about the

25 nature of the delays.  I'm having the witness explain that.

Wells - Redirect                                                    874

1   Mr. Pollack didn't get in any of the reasons for the delay.

2              THE COURT:  The delays speak for themselves.  They

3   say they were still under review and that it was complex.  I

4   mean, he's got it right there in your papers.

5              Let's move on.

6              MR. FITZPATRICK:  I'll move on, Your Honor.

7   Q.   You testified earlier that the book was submitted to the

8   board, to your organization chapter by chapter in a piecemeal

9   fashion.  Is that correct?

10             THE COURT:  That's not quite correct.  Let's rephrase

11  the question.

12  BY MR. FITZPATRICK:

13  Q.   How was the manuscript presented to you for review?

14  A.   The initial submission was book proposal one chapter, then

15  the other chapters that dealt with intel issues were submitted.

16  The response was piecemeal.  We sent four or five chapters, and

17  then we did the final two chapters.

18  Q.   Do you receive manuscripts for review that are already

19  complete?

20  A.   Yes.

21  Q.   Can you describe for the judge or the jury, is it more

22  difficult or easier -- is there an objection?

23             THE COURT:  Well, I don't know.  Mr. Pollack is

24  halfway up.  The record will reflect that he's neither sitting

25  nor standing.

1                        (Laughter.)

2            MR. POLLACK:  I'm waiting for the rest of the

3    question.

4    BY MR. FITZPATRICK:

5    Q.   Can you characterize the difference between reviewing a

6    fully submitted manuscript with one that is submitted in

7    segments?

8            MR. POLLACK:  I object, Your Honor, based on

9    relevance.  Also, the testimony is that it had been fully

10   submitted for well past the 30-day deadline at this point.

11           THE COURT:  I'm going to allow this only because

12   we're going to finish this up quickly, but I think it is a fair

13   question as to whether a review of a book proposal is easier if

14   done all at one time or in segments.  So I'm overruling the

15   objection.

16   BY MR. FITZPATRICK:

17   Q.   Do you understand the question, Mr. Wells?

18   A.   Yes.

19   Q.   And what's the answer?

20   A.   A piecemeal review is far more difficult just

21   logistically.  Typically, a manuscript would be sent out to

22   various offices.  They would review it with their objections

23   that would have to come back, that would have to be

24   coordinated.  You would have to make sure that there were

25   consistencies issues in there.

1              So yes, it is -- the preferred, the preferred

2      submission was a full, a full manuscript.

3      Q.    And in your experience in handling Mr. Sterling's

4      submission and countless others, was Mr. Sterling treated any

5      differently than anybody else?

6      A.    Yes, slightly.

7      Q.    How so?

8      A.    Well, the fact, the fact that we even sent in -- that we

9      responded in segments was different, and this was --

10     Q.    Was that an accommodation that you were making?

11     A.    -- an accommodation that we were trying to make to him.

12             The idea of a book proposal and a sample chapter,

13     there were some objections raised that it was a piecemeal

14     review, but we countered pretty much with saying that this is a

15     common practice in publishing business to submit a chapter and

16     a book review, so we went ahead with that review just so he

17     could get it out and market the book.

18     Q.    And did the extent or the number of the edits that you had

19     to respond to Mr. Sterling with, did that contribute to the

20     delays?

21     A.    I don't think so.  I think the, the number of redactions

22     were, were in line with other books of this, of this type.  I

23     don't know what was causing the delays.  There were some people

24     that were, that were out that was mentioned, but it was -- but

25     a two-month review is not unprecedented for complicated books.

1   Q.   And with respect to Defendant's Exhibit No. 5 -- if we can

2   bring that up, please?

3           In the middle full paragraph, there's a sentence that

4   ends -- and this is a reflection of a conversation you had with

5   Mr. Sterling; is that correct?

6   A.   Correct.

7   Q.   There's a sentence that begins, "This had little impact on

8   him, and he commented that our next excuses would be the

9   holidays and then alien abduction."  Is that correct?

10  A.   Yes.

11  Q.   And that's what Mr. Sterling told you?

12  A.   I believe it was, yes.

13  Q.   And that alien abduction, that was sarcastic?

14  A.   Yes.

15  Q.   Did you ever engage with Mr. Sterling in a sarcastic

16  manner?

17  A.   I don't, I don't recall that we did.  I mean --

18  Q.   Did you view your performance as professional in this

19  regard?

20  A.   Yes.  And sarcasm on behalf of some of our authors is

21  again not unprecedented.

22  Q.   And the, the, the process of the Publication Review Board

23  and the authors who were submitting, it's, it's a collaborative

24  process, correct?

25  A.   Collaborative and, we hope, collegial, because, I mean,

1    they're former employees.  We think they're trying to do the

2    honorable thing, and we're trying to do the honorable thing

3    with helping them.

4    Q.   And it takes -- to collaborate takes two parties to agree,

5    correct?

6    A.   Yes.

7            MR. FITZPATRICK:  Thank you.  No further questions,

8    Your Honor.

9            THE COURT:  All right.  Mr. Pollack?

10           MR. POLLACK:  Very briefly, Your Honor.

11           If you can just go ahead and pull up Exhibit 89?

12                      RECROSS-EXAMINATION

13   BY MR. POLLACK:

14   Q.   Mr. Wells, on October 22, what Mr. Sterling submits is the

15   chapter of the book that he had previously submitted, correct?

16   He resubmits that?

17   A.   Yes, he does.

18   Q.   And then he also submits to you the entirety of the rest

19   of the book that needs review, correct?

20   A.   He -- yes, yes.

21   Q.   So on October 22, he is giving you all of the materials

22   that need to be reviewed, correct?

23   A.   Yes.

24   Q.   It's your response that's piecemeal because you get past

25   the 30-day deadline and so you're figuring it's better to give

Wells - Recross                                                              879

1   him a partial response than no response at all, correct?

2   A.   I wouldn't put it quite that way, but it was a piecemeal

3   one in an effort to, to help him out actually in some ways.

4   Q.   Right.  But it was the response that was piecemeal, not

5   the submission?

6   A.   Correct.

7            MR. POLLACK:  Thank you.

8            THE COURT:  All right, thank you, Mr. Wells.  You may

9   step down.

10                     (Witness excused.)

11           THE COURT:  Do we have enough time to do the last

12  witness?

13           MR. OLSHAN:  Your Honor, with 13 minutes before 5:00

14  on a Friday, I'd rather not risk it.

15           THE COURT:  All right, I'm sure the jury will not be

16  broken hearted.  Again, we're ahead of schedule, and I want to

17  again thank you-all for being here on time.  It saves, it saves

18  a lot of wear and tear on us.

19           Now, Monday is the Martin Luther King federal

20  holiday, so we're not in session.  So make sure you don't come

21  here.  Tuesday morning we will start again promptly at 9:30.

22           Please remember my cautions.  Over the weekend, if

23  you go to the movies, stay away from anything that's got the

24  CIA in it, just a few more days until this case is over.

25           I do want to mention one thing to you:  We've had

880

1    during the course of the trial an occasional time when there's

2    a joke or we laugh about something, and I want to make sure you

3    understand this is a very serious thing we're all involved with

4    today in this trial, but even in the most serious plays, those

5    of you who like the theater knows *Hamlet* is considered one of

6    the great tragedies in the English language, but in the midst

7    of this very dark tragedy, there is a comic routine, and it's

8    done to sort of break up the tension.  So please don't draw any

9    inference about this case or about how we approach this case

10   from the fact that occasionally there is a quip or somebody

11   laughs, all right?

12          But I want to thank you.  You've been a very

13   attentive jury.  We appreciate the time you're spending on this

14   case.  Please keep following my instructions, and we'll see you

15   Tuesday morning at 9:30, all right?

16          We're going to stay in session for a few minutes.

17                    (Jury out.)

18          THE COURT:  Ms. Gunning, I'm going to ask you to

19   assist us.  Anyone who does not have a clearance needs to leave

20   the courtroom at this time.  I have a classified matter I need

21   to take up.

22          (Sealed Conference G not transcribed in this volume.)

23    (Recess from 5:02 p.m., until 9:30 a.m., January 20, 2015.)

24

25

881

1                    CERTIFICATE OF THE REPORTER

2        I certify that the foregoing is a correct transcript of

3   the record of proceedings in the above-entitled matter.

4

5

6                                        /s/
                                   Anneliese J. Thomson
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25