UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .      Criminal No. 1:10cr485
                              .
      vs.                     .      Alexandria, Virginia
                              .      January 20, 2015
JEFFREY ALEXANDER STERLING,   .      9:30 a.m.
                              .
            Defendant.        .
                              .
.  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME V

APPEARANCES:

FOR THE GOVERNMENT:          JAMES L. TRUMP, AUSA
                             DENNIS M. FITZPATRICK, AUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314
                               and
                             ERIC G. OLSHAN, Deputy Chief
                             Public Integrity Section of the
                             Criminal Division
                             United States Department of
                             Justice
                             1400 New York Avenue, N.W.
                             Suite 12100
                             Washington, D.C. 20005


FOR THE DEFENDANT:           EDWARD B. MAC MAHON, JR., ESQ.
                             Law Office of Edward B.
                             MacMahon, Jr.
                             107 East Washington Street
                             P.O. Box 25
                             Middleburg, VA 20118


(Pages 882 - 1156)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1  APPEARANCES:  (Cont'd.)

2  FOR THE DEFENDANT:              BARRY J. POLLACK, ESQ.
                                   MIA P. HAESSLY, ESQ.
3                                  Miller & Chevalier Chartered
                                   655 - 15th Street, N.W.
4                                  Suite 900
                                   Washington, D.C. 20005-5701
5

6  CLASSIFIED INFORMATION          CHRISTINE E. GUNNING
   SECURITY OFFICERS:              MAURA PETERSON
7

8  ALSO PRESENT:                   GERARD FRANCISCO
                                   SA ASHLEY HUNT
9                                  JENNIFER MULLIN, ESQ.

10
   OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
11                                 U.S. District Court, Fifth Floor
                                   401 Courthouse Square
12                                 Alexandria, VA 22314
                                   (703)299-8595
13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WITNESSES ON BEHALF OF THE GOVERNMENT: | | | | |
| David Raymond Shedd | 887 | 904 | 915 | 917 |
| Michael Sheehy | 918 | 927 | | |
| Donald C. Stone | 928 | 956 | 996 | 998 |
| Vicki Jamieson Divoll | 999 | 1022 | 1053 | 1054 |
| Lorenzo Vernon Goco | 1056 | 1063 | | |
| Martha Lutz | 1070 | 1082 | 1086 | 1087 |
| Kim McManus | 1088 | 1094 | 1097 | |
| Reju Kurian | 1102 | 1126 | 1133 | 1135 |
| Julia Perriello | 1138 | 1141 | | |
| Gayle Scherlis | 1142 | | | |

EXHIBITS

|  | MARKED | RECEIVED |
|---|---|---|
| GOVERNMENT'S: | | |
| No. 1 | | 1145 |
| 2 | | 1145 |
| 3 | | 1145 |
| 4 | | 1145 |
| 34 | | 1092 |
| 53 | | 897 |
| 79 | | 1145 |
| 100 | | 935 |
| 101 | | 938 |
| 110 | | 1065 |
| 117 | | 1111 |
| 119 | | 1111 |

1          <u>EXHIBITS</u> (Cont'd.)

2                                    <u>MARKED</u>        <u>RECEIVED</u>

3     <u>GOVERNMENT'S:</u>

4     No. 120                                        1111
          121                                        1111
5         122                                        1111
          124                                        1111
6         126                                        1111

7         134                                         900
          142                                        1075
8         143                                        1075
          144                                        1075
9         145                                        1077

10        157                                        1106
          158                                        1106
11        159                                        1106
          160                                        1106

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2                   (Defendant and Jury present.)

3         THE CLERK:  Criminal Case 10-485, United States of

4   America v. Jeffrey Alexander Sterling.  Would counsel please

5   note their appearances for the record.

6         MR. TRUMP:  Good morning, Your Honor.  Jim Trump on

7   behalf of the United States.

8         MR. OLSHAN:  Eric Olshan on behalf of the United

9   States.  Good morning, Your Honor.

10        MR. FITZPATRICK:  Good morning, Your Honor.  Dennis

11  Fitzpatrick on behalf of the United States.

12        THE COURT:  Good morning.

13        MR. POLLACK:  Good morning, Your Honor.  Barry

14  Pollack on behalf of Mr. Sterling.

15        MR. MAC MAHON:  Good morning, Your Honor.  Edward

16  MacMahon for Mr. Sterling.

17        MS. HAESSLY:  Good morning.  Mia Haessly.

18        THE COURT:  Good morning.

19        And good morning, ladies and gentlemen.  I want to

20  thank you again for being here right on time.  Any problems

21  over the three-day weekend?  Didn't bump into anything about

22  the case?

23                   (Jurors shaking heads.)

24        THE COURT:  No?  Excellent.  Then we're ready to

25  proceed.  Call your next witness, please.

1              MR. TRUMP:  David Shedd.

2              THE COURT:  All right.

3              MR. TRUMP:  Your Honor, may I have a moment with

4    counsel while --

5              THE COURT:  Go ahead.

6        DAVID RAYMOND SHEDD, GOVERNMENT'S WITNESS, AFFIRMED

7                        DIRECT EXAMINATION

8    BY MR. TRUMP:

9    Q.    Would you please state your name.

10   A.    David Raymond Shedd.

11   Q.    Would you spell your last name, please.

12   A.    S-h-e-d-d.

13   Q.    What is your current position?

14   A.    I am the acting director of the Defense Intelligence

15   Agency.

16   Q.    How long have you been the acting director of DIA?

17   A.    Since August 7 of 2014.

18   Q.    What is DIA?

19   A.    I'm sorry?

20   Q.    What is DIA?

21   A.    DIA is a defense intelligence component in support of our

22   warfighters principally, and it is an agency that is

23   approximately 54 years old.

24   Q.    It's an intelligence agency?

25   A.    It is, embedded inside the Department of Defense.

1  Q.   And prior to being the acting director, what was your

2  position?

3  A.   Since September of 2010, I have been -- or had been the

4  deputy director of the Defense Intelligence Agency.

5  Q.   Before that, what did you do?

6  A.   For five years before that, I was -- I served in two

7  separate positions in the Office of the Director of National

8  Intelligence.  From May 2005, for approximately two years, I

9  was chief of staff to the Director of National Intelligence, a

10 position that was established after the 9/11 Commission created

11 and then under law the Intelligence Reform and Terrorism

12 Prevention Act established the Director of National

13 Intelligence.

14       My second job was as deputy director for Policy,

15 Plans, and Requirements for the entire Intelligence Community.

16 Q.   And during your time with the Office of the Director of

17 National Intelligence, did you maintain security clearances

18 with respect to all intelligence agencies and operations?

19 A.   I did.

20 Q.   Prior to your stint at ODNI, what did you do?

21 A.   From February, I believe, 20 of 2001 to May 2005, I served

22 on the National Security Council's Office for Intelligence

23 Programs and Intelligence Reform.

24 Q.   And what -- just briefly, what is the NSC, or the National

25 Security Council?

1    A.    The National Security Council was established under the

2    National Security Act of 1947 after World War II in order to

3    facilitate the decision making on behalf of the President and

4    his National Security Cabinet on all matters pertaining to

5    national security issues in our relations with countries abroad

6    and in setting those priorities that are set by the President

7    inside the executive branch.

8    Q.    It's a White House body?

9    A.    It is a White House body.

10   Q.    And who is in charge, so to speak, of the National

11   Security Council?

12   A.    Well, the President is the statutory one in charge of the

13   NSC, and he occasionally chairs the NSC meetings.  As a

14   practical matter, the National Security Advisor, one of whom

15   was my boss during that period of time that I served there,

16   Dr. Condoleezza Rice, really manages the National Security

17   staff, which I belong to.

18   Q.    Would you describe your role as an oversight role?

19   A.    Absolutely.

20   Q.    And would you please explain what, what function you

21   performed in terms of oversight?

22   A.    The White House and the President has a number of

23   sensitive programs that it oversees from a standpoint that

24   they, they are carried out in a manner that is consistent with

25   the policy objectives that have been established, consistent

1   with the reporting requirements to the U.S. Congress, both the

2   House of Representatives and the Senate, in terms of

3   intelligence oversight, and the conduct of those activities

4   consistent with law, policy, and the objectives then of the

5   policies that are set out by the President.

6   Q.   And again, that refers to all intelligence agencies,

7   correct?

8   A.   It does, to all 16 elements of the Intelligence Community,

9   now 17 with the Office of the Director of National

10  Intelligence.

11  Q.   Prior to your tenure on the NSC, what did you do?

12  A.   Prior to that, for approximately ten months, so I want to

13  say in March of -- or, yes, about March of 2000 until I went to

14  the NSC, I served on the Office of Congressional Affairs at

15  CIA, the Central Intelligence Agency.

16  Q.   And before that, were you also with the CIA?

17  A.   I was.  From August 1997 until I went to the Office of

18  Congressional Affairs, I served as the chief of operations for

19  the Counterproliferation Division in the Directorate of

20  Operations of the Central Intelligence Agency.

21  Q.   And just briefly, what was the mission of the

22  Counterproliferation Division at that time?

23  A.   It was critical for us based on the mandates of the

24  President and again the policy directives that we received to

25  collect intelligence on nations that would potentially present

1    threats to our national security in the areas of weapons of

2    mass destruction -- chemical, biological, radiological, and

3    nuclear weapons and their delivery systems -- that threaten the

4    United States, and then alongside of that, some related special

5    activities issues that may require the efforts to, to delay or

6    halt those activities.

7    Q.   And what were your duties and responsibilities as chief of

8    operations for the Counterproliferation Division?

9    A.   My duties consisted of applying the best possible review

10   and oversight in the conduct of actually doing the operations

11   aimed at the collection of sensitive intelligence as well as

12   the activities that touched upon the ability to forestall the

13   activities where, where possible.

14   Q.   During your --

15   A.   I'm sorry, to expand on that, by countries that wish to do

16   us harm.

17   Q.   And during your tenure as chief of operations for the

18   Counterproliferation Division, did you know someone by the name

19   of Robert S., or Bob S.?

20   A.   I did.

21   Q.   And were you in a, a supervisory position with respect to

22   Robert S.?

23   A.   I was.

24   Q.   And were you familiar with an operation that we have been

25   calling Classified Program No. 1?

1    A.    Was.

2    Q.    And what was Bob S. or Robert S.'s role in that operation?

3    A.    Mr. S. was the direct line supervisor/manager of that

4    program.

5    Q.    And very briefly, what was your understanding of that

6    operation during your tenure between 1997 and 2000?

7    A.    The objective of that operation was to provide a modified

8    fire set, which is best described as the inner workings to

9    cause the implosion of a nuclear weapons device, to, to Iran in

10   this particular case, that -- with alterations that would not

11   be detected.

12   Q.    Now, as the chief of operations, what was, what was your

13   day-to-day role with respect to Robert S. and, and the

14   operation?

15   A.    He worked for me.

16   Q.    Did he keep you informed about all aspects of the

17   operation?

18   A.    He did.

19   Q.    And how did he keep you informed?

20   A.    Most of the time, we would have conversations about them,

21   and he would provide updates.  I was in an operational division

22   that had many other types of operations going on, so I would

23   see him as often as necessary.

24          In other instances, I might see cable traffic

25   pertaining to the operational activity, cable traffic being our

1  form of correspondence at CIA by way of memorializing the

2  operational activities.

3  Q.    And from time to time, did you have to review and sign off

4  on cables drafted by Robert S. or others?

5  A.    I did.

6  Q.    Now, you mentioned Iran and flawed plans.  Was, was the

7  possibility of any technology transfer a significant concern to

8  you as the chief of operations?

9  A.    It was.

10  Q.    And how did you deal with that?

11  A.    We applied the most rigorous standards by relying on

12  specialists from a national laboratory to both not only create

13  and establish the flaws inside the fire set design but also to

14  red team it in a manner that would, through people with

15  expertise, that would then attempt to find the flaws inside the

16  fire set design.

17  Q.    Would you describe yourself as sort of the first line

18  supervisor who had to give approval to this operation?

19  A.    In the supervisory sense of the word, yes.

20  Q.    And were there then multiple layers of review above you?

21  A.    There were.

22  Q.    Was this a, a limited access program?

23  A.    It was.

24  Q.    Relative to other programs that you were overseeing at the

25  Counterproliferation Division, was this more or less closely

1   held?

2   A.   It was closely held relative to what other programs were

3   ongoing in counterproliferation.

4   Q.   Do you know the defendant, Jeffrey Sterling?

5   A.   I do.

6           MR. TRUMP:  May the record reflect he's identified

7   the defendant?

8           THE COURT:  It will.

9   BY MR. TRUMP:

10  Q.   Did you come in contact with him as the chief of

11  operations for the Counterproliferation Division?

12  A.   I did.

13  Q.   Was he working with Robert S.?

14  A.   He was.

15  Q.   And did you have meetings with Robert S. and the

16  defendant?

17  A.   I did.

18  Q.   And briefings on Classified Program No. 1?

19  A.   I did.

20  Q.   Did Mr. Sterling ever voice any concerns to you about the

21  operation?

22  A.   He did not.

23  Q.   As this operation moved through the approval process, how

24  did you address for your superiors the issue of the possible

25  technology transfer?

1    A.    Through multiple discussions and meetings, we sought to

2    seek the assurances through a red team, which consisted of

3    again individuals who were not part of the original team in

4    building the modifications into the fire set, and these were

5    specialists from a national lab who looked at, at the flawed

6    fire set in attempts to discover where those flaws were.  As a

7    nonspecialist myself, I had to rely then on individuals with,

8    with nuclear specialization.

9    Q.    And was this something that you briefed to those upper

10   management individuals who had to approve the program?

11   A.    I did.

12   Q.    When you left your position as chief of operations, you

13   moved on to the Congressional Affairs position?

14   A.    I did.

15   Q.    And was the -- and that was in March of, approximately

16   March of 2000?

17   A.    It was.

18   Q.    Was the Classified Program 1, that operation still ongoing

19   when you left?

20   A.    It was.

21   Q.    Now, in your position as the Congressional Affairs

22   liaison, what does that do?

23   A.    I was in the position of representing operational

24   activities to the U.S. Congress and our oversight committees,

25   the House Permanent Select Intelligence Committee on the House

1   side obviously and on the Senate Select Intelligence Committee,

2   SSCI, on the Senate side.

3           We have a long history at CIA in terms of oversight

4   and activities associated with that, and so this was a special

5   position intended to keep the Congress fully and currently

6   informed on intelligence activities as they unfolded or were

7   completed.

8   Q.   In your role, were you tasked to respond to questions

9   raised by either the House or Senate committees?

10  A.   I was.

11  Q.   And in that role, did you become aware of and familiar

12  with the defendant's EEO or employment-related complaints

13  against the agency?

14  A.   I did.

15  Q.   And, and how did you become familiar with that?

16  A.   I was asked by Mr. Mike Sheehy, who was on the committee,

17  and then joined by Wyndee Parker on the House Permanent Select

18  Intelligence Committee to come to a session with them to talk

19  about the career advancement of an officer inside the

20  Directorate of Operations or the Clandestine Service of the

21  CIA.

22          MR. TRUMP:  And if we could have the assistance of

23  Mr. Wood, Government 53?

24          THE COURT:  Is there any objection?

25          MR. MAC MAHON:  Just a second, Your Honor.  I'm

1    sorry.

2            No objection, Your Honor.

3            THE COURT:  All right, 53 is in.

4            (Government's Exhibit No. 53 was received in

5    evidence.)

6    BY MR. TRUMP:

7    Q.   Do you see what's been identified and received in evidence

8    as Government Exhibit 53?

9    A.   I do.

10   Q.   What is that document?

11   A.   That document memorializes a meeting then that I had on

12   the 8th of August of 2000 with HPSCI minority staff director

13   Mike Sheehy and HPSCI minority staff member Wyndee Parker.

14   Q.   And these were people that you were familiar with in your

15   position?

16   A.   Yes.

17   Q.   And what was the purpose of this memo?

18   A.   Again, the purpose was to put on record the conversation

19   that I had had with Mr. Sheehy and Ms. Parker concerning the

20   conversations that they had requested to have with me.

21   Q.   And to whom was this memo directed?

22   A.   To the Deputy Director of Operations, Jim Pavitt, and to

23   the Chief of Staff and now currently the Director of CIA, John

24   Brennan, when he was chief of staff to, to George Tenet.

25   Q.   So based on to whom it was sent, this, this was a serious

1   matter for the CIA?

2   A.    It was.

3   Q.    And what topics were discussed at that meeting?

4   A.    The essence of the topics were really focused on career

5   advancement within the Directorate of Operations for a case

6   officer, that is, a human intelligence collector, and what

7   might be the barriers to that advancement and how does the

8   process work by way of career opportunities, assignments, and

9   so forth.  It was purely the administrative side of the

10  management of a case officer's career.

11  Q.    And was it your understanding that the defendant had

12  already met with Mr. Sheehy and Ms. Parker prior to your

13  meeting with them?

14  A.    It was.

15  Q.    At your meeting with Mr. Sheehy and Ms. Parker, did either

16  of them raise any questions or issues with respect to any

17  specific operations or programs with which the defendant was

18  associated?

19  A.    No.

20  Q.    Any mention of Classified Program No. 1 at all?

21  A.    No.

22  Q.    And other than the redactions that were made for

23  classification purposes, was this a complete, thorough summary

24  of, of your meeting?

25  A.    To the best of my ability, yes.

1   Q.   Did you have any further involvement with respect to any

2   of the employment-related matters raised by, by the defendant?

3   A.   No.

4   Q.   Move forward to your position at the NSC.  In the spring

5   of 2003, were you aware of a meeting that Dr. Rice had with *The*

6   *New York Times*?

7   A.   I was.

8   Q.   Did you participate in that meeting?

9   A.   I did not.

10  Q.   Move on to your position with the Director of National

11  Intelligence and direct your attention specifically to January

12  of 2006.  What was your position at that time with the Office

13  of the Director of National Intelligence?

14  A.   I was chief of staff to Ambassador and Director of

15  National Intelligence John Negroponte.

16  Q.   And what were your day-to-day duties and responsibilities?

17  A.   Keep the trains running on time.

18  Q.   Were you familiar with a book called *State of War*?

19  A.   I was.

20  Q.   Specifically, chapter 9?

21  A.   Yes.

22  Q.   And did you review chapter 9 and prepare an assessment of

23  that chapter for your boss, the Director of National

24  Intelligence?

25  A.   I did.

1   Q.   And why did you do that?

2   A.   One of the principal responsibilities that the Director of

3   National Intelligence had in this newly created position in

4   2005 was to be principal intelligence advisor to the President.

5   In that role and function, it was a memo that I believed was

6   required in order for him to be familiar with what was believed

7   to be a significant leak of intelligence information in chapter

8   9 concerning national security affairs, and therefore, it was

9   to prepare him in the event of conversations at the White House

10  concerning that.

11  Q.   And did you prepare a memorandum to that effect?

12  A.   I did.

13  Q.   Would you look at Government 134?  It's in the second

14  book.

15         Do you have that in front of you?

16  A.   I do.

17  Q.   Is that the memorandum you prepared?

18  A.   It is.

19         THE COURT:  Is there any objection to that?

20         MR. MAC MAHON:  No objection, Your Honor.

21         THE COURT:  All right, it's in.

22         (Government's Exhibit No. 134 was received in

23  evidence.)

24  BY MR. TRUMP:

25  Q.   When you read chapter 9 of that book, there was an

1    operation described as Operation Merlin; is that right?

2    A.    That is correct.

3    Q.    Did you recognize it when you read about it?

4    A.    I did.

5    Q.    Is that the same operation we were referring to with

6    respect to Mr. Robert S. as Classified Program No. 1?

7    A.    Yes, certainly the individual associated with that

8    program.

9    Q.    In your memorandum, in paragraph 1, I'd like to focus on

10   the sentence, "Thus, the targets will know in detail that the

11   plans were a CIA operation designed to slow their nuclear

12   weapons progress."

13          Now, prior to that, you provided a brief summary of

14   the operation; is that right?

15   A.    Yes.

16   Q.    And why do you say, "Thus, the targets will know in detail

17   that the plans were a CIA operation designed to slow their

18   nuclear operations progress"?

19   A.    Because publicly, chapter 9 would confirm to the Iranians,

20   who were in receipt of the modified fire set, that the delivery

21   of that fire set was, in fact, a CIA operation back when it was

22   delivered in 2000.

23   Q.    And why is it necessary -- why was it necessary to point

24   that out with respect to your role with Ambassador Negroponte?

25   A.    It was important for Director Negroponte to understand

1   that there had been a breach of security that would affect --

2   or potentially affect certainly the ability of CIA to conduct

3   similar operations related to this, and now we had to accept on

4   safe assumption that the Iranians would know that, that we had

5   mounted an operation against them.

6   Q.    So in your opinion, it potentially compromised valuable

7   methodologies?

8   A.    Absolutely.

9   Q.    Now, in the last paragraph on the first page, you discuss

10  the disclosure to the Russians, and you state, "In addition to

11  disclosing important facts to Iran, the book will advise the

12  Russians not only that we have details of some of their most

13  sensitive nuclear weapons components, but that at least two

14  former Russian nuclear weapons experts are in the U.S. and are

15  cooperating with CIA."

16          Focusing first on the first part of that sentence,

17  why is that potentially damaging to the United States

18  intelligence interests, the disclosing of the details of some

19  of their most sensitive nuclear weapons components?

20  A.    Russia and formerly the Soviet Union before 1989, when the

21  Berlin Wall fell, has been an adversary of ours, and I believe

22  we can certainly say they're an adversary of us today.  We were

23  identifying intelligence about individuals who had either

24  defected or had been allowed to immigrate here and resettle in

25  the United States, and the knowledge that they had of Arzamas

1   16, which is where the nuclear weapons designs inside the

2   former Soviet Union/Russia today were actually designed, and so

3   what we were putting in evidence in chapter 9 is that we were

4   actually using for intelligence purposes these, these Russian

5   engineers in that regard.

6   Q.   And what is the potential harm to letting Russia know that

7   these individuals were working with the United States?

8   A.   I believe it is a safe assumption that our nuclear posture

9   inside the United States and security of the United States

10  relies heavily on understanding what our adversaries know or,

11  as importantly, do not know what we know about their programs,

12  and so by confirming this, aspects of the U.S. nuclear program,

13  in fact, could, I do not know for a fact, but could require

14  modification as a result.

15  Q.   Now, the second part of what you say in this paragraph,

16  "Moreover, there is enough detail about both former Russian

17  experts to allow Russian counterintelligence officials to

18  identify them," what does this say to other people that might

19  be approached by the CIA or other intelligence agency and asked

20  to cooperate with, with the government?

21  A.   My experience has been that with every public revelation,

22  we have found a reticence on the part of would-be cooperative

23  individuals to be more reluctant to cooperate in the area of

24  intelligence for fear that, of course, they will see either

25  their name or their activities or both in the public arena, and

1    in this case, that was no exception.

2    Q.   And finally, on the second page, you wrap up your

3    discussion of Classified Program No. 1 with the statement that

4    any beneficial effect of Classified Program No. 1 will likely

5    be negated by the book's publication, and without stating the

6    obvious, was that your assessment for your boss, the Director

7    of National Intelligence?

8    A.   It was.

9            MR. TRUMP:  One second.

10           The Court's indulgence?

11           THE COURT:  Yes, sir.

12           MR. TRUMP:  That's all I have, Your Honor.

13           THE COURT:  All right.  Cross-examination,

14   Mr. MacMahon?

15                      CROSS-EXAMINATION

16   BY MR. MAC MAHON:

17   Q.   Good morning, Mr. Shedd.

18   A.   Good morning.

19   Q.   I'm sorry, I hurt my back.  That wasn't a look for you; I

20   apologize.

21           I'm one of the -- my name is Edward MacMahon.  I'm

22   one of Mr. Sterling's lawyers.  How are you today?

23   A.   Doing well, thank you.

24   Q.   How many times did you meet with Mr. Trump to go over the

25   testimony that you gave today?

1    A.    I believe three times.

2    Q.    And, and your testimony was that Mr. Risen's story

3    confirms facts about Classified Program No. 1?  Is that what

4    you said?

5    A.    It is.

6    Q.    Isn't it your testimony that actually confirms what's in

7    Mr. Risen's book as being true?

8              MR. TRUMP:  Objection, Your Honor.

9              THE COURT:  Sustained.

10   BY MR. MAC MAHON:

11   Q.    You testified, I think you said that there were assets

12   that won't work with the CIA because of Mr. Risen's book.  Did

13   you say that?

14   A.    I believe what I said, to be more accurate, are reticent

15   to cooperate with CIA when there is public revelations.

16   Q.    Right.  And you, you can't tell us today of any single

17   asset or anyone who hasn't cooperated with the CIA because of

18   this book, correct?

19   A.    I cannot.

20   Q.    Right.  And most of those people cooperate with the CIA

21   because of money, right?

22   A.    No.

23   Q.    CIA pays a lot of money to sources, doesn't it?

24   A.    On occasion.

25   Q.    Excuse me?

1   A.   On occasion.

2   Q.   How many times were you interviewed by the FBI when you

3   were asked whether Mr., Mr. Sterling at the House of

4   Representatives made disclosures about Classified Program

5   No. 1?

6   A.   To the best of my recollection, two times.

7   Q.   Right.  And they kept asking you the same question:  Did

8   Sterling say anything at the House of Representatives about

9   Classified Program No. 1, correct?

10  A.   No.

11  Q.   That was the question the government kept asking you,

12  wasn't it?

13  A.   No.  The question was in my presence with Mr. Sheehy and

14  Ms. Wyndee Parker, whether the discussion was held about

15  classified programs.

16  Q.   Correct.

17  A.   And that's all I would be competent to answer.

18  Q.   Right.  And you told them no once, and they asked you

19  again, right?

20  A.   A second interview, yes.

21  Q.   The same question:  He must have done something wrong at

22  the interview at the House, right?

23       MR. TRUMP:  Objection, Your Honor.  He was not

24  present at the interview.

25       THE COURT:  Sustained.  Rephrase your question.

1  BY MR. MAC MAHON:

2  Q.   You -- it is perfectly legal for Mr. Sterling to go to the

3  House of Representatives and complain about what he considered

4  as discrimination at the House, correct?

5           MR. TRUMP:  Objection, Your Honor.  Mr. Shedd is not

6  an attorney.

7           THE COURT:  Well, Mr. Shedd, if you know.  And if you

8  don't know, don't guess.

9           THE WITNESS:  Could you repeat the question?

10 BY MR. MAC MAHON:

11 Q.   It was completely legal for Mr. Sterling to go to the

12 House of Representatives and complain about what he considered

13 was unfair treatment at the CIA, correct?

14 A.   I believe so from a legal standpoint.

15 Q.   And you, you were never told of any information that

16 Mr. Sterling disclosed to the House of Representatives that he

17 wasn't entitled to disclose, correct?

18 A.   That's correct.

19 Q.   You told the FBI that Mr. Risen is on your blacklist?  Is

20 that a term you used?

21 A.   I believe so.

22 Q.   And Mr. Risen is on a blacklist because he writes stories

23 that are critical of the CIA, correct?

24 A.   No.  He is on my blacklist because I had no interest in

25 speaking to him, and I had his efforts to contact me blocked.

1  Q.    Okay.  And when did that happen?

2  A.    During my period at the National Security Council.

3  Q.    And how many other journalists did you have blocked from

4  access to you when you worked with the NSC?

5         MR. TRUMP:  Objection, Your Honor.  Objection.  Not

6  relevant.

7         THE COURT:  I'm going to overrule that objection.

8  You can answer.  Go ahead.

9         THE WITNESS:  I do not recall, but the principle of

10  the matter was I was not interested in speaking to journalists

11  as an intelligence professional.

12  BY MR. MAC MAHON:

13  Q.    Right, but you listed Mr. Risen specifically as the

14  recipient of the blacklist for you, correct?

15  A.    I did.

16  Q.    Okay.  And you testified that the disclosures in the book

17  would tell Iran that we were trying to interfere with their

18  nuclear weapons program?  Is that a fair statement of what you

19  said?

20  A.    Disrupt would be the accurate word, yes.

21  Q.    And your testimony to the jury is that the Iranians don't

22  know that the United States government is trying to interfere

23  with their nuclear weapons program?

24  A.    Having it confirmed to them is very different than

25  suspecting that, in fact, we're doing it.

1    Q.    Do you believe the Iranians didn't know before 2006 that

2    the Americans were trying to interfere with their nuclear

3    weapons program?

4    A.    I do not believe before 2006 that they knew the modalities

5    in which we were trying to interfere or believed to interfere

6    with their nuclear program.  That would be a correct statement.

7    Q.    Were you ever given any details as to how the delivery of

8    the, I think your term, fire set plan was accomplished by

9    Merlin to the Iranians in Vienna?

10   A.    Yes.

11   Q.    You knew it was delivered wrapped in a newspaper?

12   A.    I don't recall how it was delivered.

13   Q.    Did you understand that it was actually delivered in

14   person to someone at the Iranian office?

15         MR. TRUMP:  Objection.  He just testified he does not

16   know how.

17         THE COURT:  Sustained.

18   BY MR. MAC MAHON:

19   Q.    So you don't know any details about how it occurred,

20   correct?

21   A.    That's a loaded word when you say "any details."

22   Q.    Do you know any details at all -- you said you were

23   briefed on this program in depth, correct?

24   A.    Correct.

25   Q.    Okay.  Do you remember any details at all about how it was

1   that Merlin delivered the plans for a nuclear weapon to the

2   Iranian office in Vienna?

3   A.   He had established contact through a letter, and he then

4   had a meeting at a certain location in Vienna.

5   Q.   A meeting with someone from Iran?

6   A.   From Iran, correct.

7   Q.   Now, Mr. Trump asked you if you did an evaluation of the

8   compromise caused by the publication of *State of War*.  Do you

9   remember that?

10  A.   In terms of chapter 9?  Is that what you're referring to?

11  Q.   Well, no, of the whole book, *State of War*.  That's what he

12  asked you, didn't he?

13  A.   I think the reference was to chapter 9.

14  Q.   Well, Mr. Tenet asked you to do an analysis of the whole

15  book, correct?

16          MR. TRUMP:  Objection, Your Honor.  Beyond the scope.

17          THE COURT:  And chapter 9 is the only -- chapter 9 is

18  the only issue in this case, so I'm going to -- you can confine

19  that question to chapter 9, please.

20          THE WITNESS:  Let the record show it wasn't

21  Mr. Tenet.

22  BY MR. MAC MAHON:

23  Q.   Who was it, sir?

24  A.   Ambassador Negroponte.

25  Q.   Okay.  I apologize.  But you did do an analysis of chapter

1   9, didn't you?

2   A.   I would not call it an analysis.

3   Q.   Well, what would you call it?

4   A.   I would call it a summary statement of what I believed to

5   be the compromises of chapter 9 in an approximately two-page

6   memo.

7   Q.   And you were also asked to do an analysis of who you

8   thought the likely sources were, weren't you?

9          MR. TRUMP:  Objection.  Beyond the scope.

10         MR. MAC MAHON:  It's the same analysis.

11         THE COURT:  I'm going to, I'm going to permit that.

12  Overruled.  So that is a question, sir.

13  BY MR. MAC MAHON:

14  Q.   Mr. Shedd --

15  A.   Repeat the question.

16  Q.   -- you were also asked, weren't you, to do an analysis of

17  who the likely source was for the disclosure of information in

18  *State of War*, chapter 9, correct?

19  A.   I was asked what potential individuals would have had

20  access to it; that's correct.

21  Q.   Right.  And your answer was --

22         THE COURT:  Well, be careful.  No improper revelation

23  of names.

24         MR. MAC MAHON:  I won't, Your Honor.

25         THE COURT:  All right, that's fine.

1  BY MR. MAC MAHON:

2  Q.   Your answer was that the likely source was agency --

3            MR. TRUMP:  Your Honor?

4            THE COURT:  Wait.

5            MR. TRUMP:  I'm going to object at this point.  He's

6  asking for an opinion of this person as to possible sources.

7            THE COURT:  The jury will be told that they can't

8  decide this case on conjecture but on the evidence, but I think

9  this evidence is sufficiently relevant to the defense.  I'm

10 overruling the objection.

11 BY MR. MAC MAHON:

12 Q.   Mr. Shedd, do you remember writing this report on

13 chapter -- one paragraph starts "Chapter 9, A Rogue Operation"?

14 No, it's not an exhibit, Mr. Shedd.  Do you remember writing

15 it?

16 A.   Could you give me a --

17            MR. TRUMP:  If there's a report that --

18            THE COURT:  Yes, I agree.  If you've got a document

19 authored by this witness, it's only fair to show it to him.

20            MR. MAC MAHON:  I will, Your Honor.

21            THE COURT:  All right.  What -- is there an exhibit

22 number?  Mr. MacMahon, is that --

23            MR. MAC MAHON:  It's not an exhibit, Your Honor.  I

24 can show it to him to refresh his recollection.

25            Can I show this to Mr. Wood, Your Honor -- give this

1   to Mr. Wood?

2              THE COURT:  Yes, go ahead.

3              Mr. Trump, do you have a copy of that someplace?

4              MR. TRUMP:  Someplace, Your Honor, but not --

5              THE COURT:  All right.

6   BY MR. MAC MAHON:

7   Q.   Just the page, just the page that was opened to,

8   Mr. Shedd.

9   A.   I need context.

10  Q.   And you can go back -- just look at the page that's opened

11  to you, where it says "Analysis of the Compromise."  Do you see

12  that?  Do you see "Rogue Operation"?

13  A.   I'm sorry, I see a blackened page with one sentence.

14             THE COURT:  All right, let's approach the bench.

15             (Bench conference on the record.)

16             THE COURT:  Mr. MacMahon, you've got to give him more

17  context than this.

18             MR. MAC MAHON:  It's all blacked out, Judge.  I'm

19  sorry, Your Honor.

20             THE COURT:  Well, where did it come from?

21             MR. MAC MAHON:  This came from discovery in this

22  case, and if you go back, he did an analysis of the entire

23  book, and it's --

24             THE COURT:  Is there a heading?  Is this a Lotus

25  note?  What is this?

1            MR. MAC MAHON:  I think you've got to go back a

2    couple more pages.  He's tasked to evaluate the whole book and

3    say who the likely sources are, and his answer is agency

4    officials for chapter 9, and that's the point.

5            THE COURT:  All right, but is this the start of it?

6            MR. MAC MAHON:  I think so.

7            THE COURT:  I'm looking at the Bates stamp numbers.

8    Even they are cut off.

9            Well, show him this first page.

10           MR. TRUMP:  I don't think this is Mr. Shedd, Your

11   Honor, but it may -- this, this part is, but not up here, I

12   believe.

13           THE COURT:  Do you have a better copy with the Bates

14   stamp number?

15           MR. MAC MAHON:  This is, this is as good as it gets

16   from what we have in the SCIF.

17           THE COURT:  Well, show this to him.

18           MR. MAC MAHON:  Can I just approach the witness just

19   briefly, Your Honor?

20           THE COURT:  Well, no, Mr. Wood can do that.

21           MR. MAC MAHON:  Okay.

22           THE COURT:  Give it to him like this, ask him if he

23   recognizes that, and see what happens from there.

24           MR. MAC MAHON:  Okay.  Thank you.

25           (End of bench conference.)

1    BY MR. MAC MAHON:

2    Q.   Mr. Shedd, directing your attention to the first page of

3    that document -- oh, I'm sorry.  Excuse me, Your Honor.

4         Mr. Shedd, directing your attention to the first page

5    of that document, do you see what, what we're looking at here?

6    What you're looking at, excuse me.

7    A.   There's a lot on the page.  What, what aspect of it?

8    Q.   Does that refresh your recollection that you wrote a

9    report in which you were asked to, to give information as to

10   who you believed the likely source was for the information in

11   chapter 9?

12   A.   That's correct.

13   Q.   Right.  And your answer when we looked at the next page

14   was that in your view, the likely source were agency officials,

15   correct?  That's the page with the red tab on it, Mr. Shedd.

16   A.   Correct.

17           THE COURT:  All right, you can return that.

18           Mr. Wood, if you would, return the document to

19   Mr. MacMahon.

20           MR. MAC MAHON:  I don't have any further questions,

21   Your Honor.  Thank you.

22           THE COURT:  All right.  Mr. Trump?

23                      REDIRECT EXAMINATION

24   BY MR. TRUMP:

25   Q.   By agency officials, do you mean anyone who was read into

1  this program and familiar with its details?

2  A.    I do.

3  Q.    That would include the defendant, Mr. Sterling, correct?

4           MR. MAC MAHON:   Your Honor, these are leading

5  questions.

6           THE COURT:   That is a leading question.  You can

7  rephrase it.

8  BY MR. TRUMP:

9  Q.    Would that include the defendant?

10  A.    Yes.

11  Q.    Now, you transitioned out of your position as the chief of

12  operations for the Counterproliferation Division in March of

13  2000, correct?

14  A.    Correct.

15  Q.    And at that time was when the Vienna operation was, was

16  underway?

17  A.    Correct.

18  Q.    Now, at the NSC, you were asked some questions about

19  Mr. Risen.  Have you ever spoken to Mr. Risen?

20  A.    No.

21  Q.    Either during your tenure at the CIA, NSC, Office of the

22  Director of National Intelligence, or the DIA, have you ever

23  had any contact with Mr. Risen?

24  A.    No.

25  Q.    Have you ever discussed with anyone classified information

 1  who was not cleared to receive that information?

 2  A.    I have not.

 3          MR. TRUMP:  That's all I have, Your Honor.

 4          THE COURT:  All right, any recross?

 5          MR. MAC MAHON:  Just briefly, Your Honor.

 6                      RECROSS-EXAMINATION

 7  BY MR. MAC MAHON:

 8  Q.    Mr. Shedd, the e-mail you looked at was dated January 3,

 9  2006, correct?

10  A.    Right.

11  Q.    And Mr. Sterling wasn't an agency official in 2006, was

12  he?

13  A.    To the best of my knowledge, he was not.

14  Q.    Right.  And your note doesn't say former agency employees

15  or case officers, correct?  It says agency officials, correct?

16  A.    Correct.

17          MR. MAC MAHON:  Thank you, Your Honor.

18          THE COURT:  All right, does anybody intend to call

19  Mr. Shedd again?  No?

20          MR. MAC MAHON:  Not from the defense, Your Honor.

21          THE COURT:  All right, sir.  Then thank you for your

22  testimony.  You're free to go at this time.

23                      (Witness excused.)

24          THE COURT:  All right, your next witness?

25          MR. OLSHAN:  Thank you, Your Honor.  The government

 1   calls Michael Sheehy.

 2          THE COURT:  All right, Mr. Sheehy.

 3          MICHAEL SHEEHY, GOVERNMENT'S WITNESS, AFFIRMED

 4                      DIRECT EXAMINATION

 5   BY MR. OLSHAN:

 6   Q.   Good morning, sir.

 7   A.   Good morning.

 8   Q.   If you could, please state and spell your name for the

 9   record.

10   A.   It's Michael William Sheehy, S-h-e-e-h-y.

11          THE COURT:  Mr. Sheehy, you need to move a little

12   closer to the microphone, please.  Thank you.

13   BY MR. OLSHAN:

14   Q.   Mr. Sheehy, are you currently employed?

15   A.   Yes.

16   Q.   How are you employed?

17   A.   I am employed by McBee Strategic Consulting.

18   Q.   So you're a consultant currently?

19   A.   I am.

20   Q.   Did you have a career prior to being a consultant?

21   A.   I did.

22   Q.   Was that in the United States House of Representatives?

23   A.   It was.

24   Q.   How long did you work for the House of Representatives?

25   A.   For 30 years.

1   Q.   What were the dates approximately of your tenure on the --

2   at the House?

3   A.   September of 1977 until March of 2009, one year out, '87,

4   to -- well, the year of 1988.  So 1977 until 1987, 1989 to

5   2009.

6   Q.   So in total --

7   A.   Thirty years.

8   Q.   Thirty years.

9           Sir, if you'd like some water, we can --

10  A.   That would be great, thank you.

11          MR. OLSHAN:   Thank you, Mr. Wood.

12  Q.   During your time at the House, Mr. Sheehy, did you work

13  for a particular committee?

14  A.   I did.

15  Q.   Did you work for one committee or multiple committees?

16  A.   I worked for one committee but not for 30 years.

17  Q.   What was the name of the committee that you worked for?

18  A.   I worked for the House Permanent Select Committee on

19  Intelligence.

20  Q.   And is that, is that known as HPSCI?

21  A.   Yes.

22  Q.   That's H-P-S-C-I?

23  A.   Correct.

24  Q.   How many of your 30 years did you work for HPSCI?

25  A.   From April 1 of 1990 until January 1 of 2003.

1    Q.    Approximately 13 years?

2    A.    Yes.

3    Q.    Can you tell the jury what the function of HPSCI is?

4    A.    The committee conducts oversight of the activities of

5    United States intelligence agencies and also authorizes or as

6    part of that oversight authorizes the annual budgets for those

7    agencies.

8    Q.    So is it fair to say that it performs -- HPSCI performs an

9    oversight function?

10   A.    That's correct.

11   Q.    Focused on the Intelligence Community?

12   A.    Correct.

13   Q.    Does that include the Central Intelligence Agency?

14   A.    It does.

15   Q.    Can you briefly describe the composition of HPSCI, both

16   the permanent or professional staff as well as the composition

17   of the members who sit on the committee?

18   A.    Well, the members rotate.  They are not permanently

19   assigned to the committee as members are to other congressional

20   committees, and so they are continually rotating on and off the

21   committee they serve.

22          When I was on HPSCI, the period of service was eight

23   years, maximum period of service.  The staff had no

24   restrictions on the amount of time they could spend in service

25   to the committee.  The committee was composed of a, what was

1    supposed to be a bipartisan or a nonpartisan staff.  In

2    reality, there were -- was a small set of staff personnel that

3    were designated to primarily assist the minority party members.

4    Q.   So if you can, just approximately during your 13 years on

5    HPSCI, what was the rough size of the staff?

6    A.   About 25.

7    Q.   And then the number of members of the House of

8    Representatives who would rotate onto the committee, what was

9    that size?

10   A.   Well, that number would change from Congress to Congress.

11   I can recall that at one point while I served on the committee,

12   the number was 13, but I'm sure there were different numbers as

13   the committee was composed in different Congresses.

14   Q.   During your tenure, was it always around that number, 13

15   or so?

16   A.   I don't recall it ever being less than 13.  I know that it

17   was more than 13, but I don't recall how much greater in size

18   it might have been.

19   Q.   Can you tell the jury a little bit about what your job was

20   or jobs were when you were a staffer on HPSCI?

21   A.   I started as the committee's chief counsel.  I was the

22   chief counsel from 1990 until 1993, January of '93.  January of

23   '93, I became the staff director and chief counsel.  This was

24   on the majority side.  I did that in '93 and '94.

25        In the election of '94, the control of the Congress

1   flipped from Democratic to Republican, so in '95, I became the

2   minority staff director and chief counsel, and I was in that

3   role until I left the committee in January of 2003.

4   Q.   In your role as staff director, was it part of your

5   function to meet with individuals who had concerns about the

6   proper functioning of the intelligence community?

7   A.   I did that from time to time, yes.

8   Q.   Let me direct your attention to the period 2000-2001.  Do

9   you recall attending a meeting at HPSCI with a man named

10  Jeffrey Sterling?

11  A.   I recall a meeting with Mr. Sterling, yes.

12  Q.   And can you identify him in court today?

13  A.   Seated at the defense table.

14          THE COURT:  All right, identity established.

15  BY MR. OLSHAN:

16  Q.   Now, Mr. Sheehy, do you remember exactly when the meeting

17  with Mr. Sterling occurred?

18  A.   No, I do not.

19  Q.   Is there any way you can place it in time within your own

20  memory?

21  A.   I know that it was before the September 11, 2001, attacks.

22  I don't know with any specificity how much before, but I know

23  it was before.

24  Q.   And why do you know it was before 9/11?

25  A.   The ranking member for whom I last worked on the

1    committee, Congresswoman Pelosi, wanted to visit the CIA

2    operation in New York City, which we did.

3    Q.   Let me stop you there.  Was there anything about anything

4    that Mr. Sterling said that you can recall that helps you place

5    it before 9/11?

6    A.   No.

7    Q.   But you have a recollection that you believe it was

8    sometime before 9-1-2001?

9    A.   Yes, I'm quite sure of that.

10   Q.   Mr. Sheehy, how did the meeting come to take place with

11   Mr. Sterling?

12   A.   I don't, I don't remember specifically whether

13   Mr. Sterling called the committee or whether he came to us from

14   another source or in another way, but I remember him in some

15   fashion making an appointment to come in and talk to us.

16   Q.   Did he meet with just you, or was anyone else present?

17   A.   I believe that there was one other person from the

18   minority side of the committee staff.

19   Q.   Who was that?

20   A.   I believe it was Wyndee Parker.

21   Q.   And is "Wyndee" spelled W-y-n-d-e-e?

22   A.   Yes.

23   Q.   Parker?

24   A.   Yes.

25   Q.   During the meeting with Mr. Sterling, what do you recall

1  the topic being?

2  A.   I recall that he was concerned about the treatment he had

3  received at his place of employment with the CIA.

4  Q.   And those sorts of concerns involving employment-related

5  matters in the intelligence community, was it appropriate to

6  bring those to HPSCI if someone wanted to?

7  A.   If someone felt that the agency had, was not paying enough

8  attention to their concerns, then on some occasions, they would

9  come to one or both of the congressional committees, yes.

10  Q.   So that would be appropriate?

11  A.   Yes.

12  Q.   Can you describe for the jury what you recall Mr. Sterling

13  saying during the meeting?

14  A.   I remember him having two primary concerns:  one, that he

15  did not feel he was being used by the agency in a manner

16  consistent with his background and abilities; and two, that he

17  felt he was the victim of harassment by his colleagues at his

18  place of employment, at his most recent place of employment

19  with the agency.

20  Q.   Other than the concerns that Mr. Sterling raised about his

21  underutilization by the CIA and the harassment that he believed

22  he was subject to at his last place of employment, did he

23  mention any other areas of concern?

24  A.   Not that I recall.

25  Q.   Can you recall whether he mentioned having any concerns

1    about any particular classified operations that he was involved

2    in while he was at the CIA?

3    A.   Not that I recall.

4    Q.   If an employee of the CIA has an operational concern, is

5    HPSCI an appropriate place for that person to go if they'd like

6    to raise those concerns?

7    A.   Well, again, if they feel that their concerns are not

8    being properly addressed within or by their employing agency,

9    then they have an ability to bring those concerns to the

10   congressional committees, yes.

11   Q.   And that's because the, because HPSCI performs an

12   oversight function; is that correct?

13   A.   That's correct.

14   Q.   And so it would be appropriate if somebody wanted to raise

15   operational concerns to bring them to HPSCI's attention?

16   A.   Yes.

17   Q.   Mr. Sheehy, are you familiar with a specific classified

18   operation that we've been referring to in this trial as

19   Classified Program No. 1?

20   A.   Yes.

21   Q.   Is that something you became familiar with during your

22   time on HPSCI?

23   A.   It is.

24   Q.   As an employee or a staffer on HPSCI, did you hold a

25   security clearance?

1   A.    I did.

2   Q.    And were you trained in the proper handling of classified

3   information?

4   A.    I was.

5   Q.    How important was that in your day-to-day job, or how

6   important was that to your job at HPSCI?

7   A.    That you treated classified information properly?

8   Q.    Yes.

9   A.    You didn't have a job unless you did that.

10  Q.    Do you remember specifically whether Mr. Sterling raised

11  any concerns about that classified program?

12  A.    I do not recall any such concerns being raised.

13  Q.    Would you remember if he had raised concerns about that

14  specific program?

15  A.    Well, the program was extremely sensitive, and for that

16  reason, I believe I would remember, but, of course, it's

17  possible that I would not.

18  Q.    Did you take Mr. Sterling's concerns seriously?

19  A.    We did.

20  Q.    And did you try to follow up on them?

21  A.    We did.

22  Q.    And did that involve meetings or communications with the

23  CIA about their employment practices?

24  A.    Well, it involved communications with the CIA about how

25  Mr. Sterling's concerns were being addressed.

1   Q.   And so you followed up?

2   A.   We did.

3   Q.   Can you recall whether you ever met Mr. Sterling again?

4   A.   I don't recall meeting Mr. Sterling again.  I may have

5   seen Mr. Sterling in the committee spaces again.  I don't

6   recall another meeting with him.

7   Q.   Have you ever disclosed any aspect of Classified Program

8   No. 1, as we're calling it, to anyone whom you believed did not

9   have the appropriate clearances?

10  A.   No, I have not.

11  Q.   Even as you sit here today, are you reluctant to discuss

12  it?

13  A.   I am.

14          MR. OLSHAN:  One moment, Your Honor?

15          THE COURT:  Yes, sir.

16          MR. OLSHAN:  That's all I have.

17          THE COURT:  All right.  Cross-examination?

18          MS. HAESSLY:  Thank you, Your Honor.

19                         CROSS-EXAMINATION

20  BY MS. HAESSLY:

21  Q.   Good morning, Mr. Sheehy.  My name is Mia Haessly, and I'm

22  one of the attorneys for Mr. Sterling.

23          You testified that it was appropriate for

24  Mr. Sterling to come to you with his concerns, correct?

25  A.   Correct.

1  Q.   And while he spoke to you then, did he discuss with you

2  anything that you were not authorized to hear?

3  A.   I don't recall that occurring, no.

4         MS. HAESSLY:  Okay.  One moment, Your Honor.

5         No further questions, thank you.

6         THE COURT:  Any redirect?

7         MR. OLSHAN:  No, Your Honor.

8         THE COURT:  All right, Mr. Sheehy, thank you for your

9  attendance, but you're free to go at this time.

10        THE WITNESS:  Thank you.

11        MR. OLSHAN:  Just to be clear, Your Honor, the

12 witness is released, correct?

13        THE COURT:  Yes, you are released.

14        THE WITNESS:  Thank you.

15                    (Witness excused.)

16        THE COURT:  Your next witness?

17        MR. OLSHAN:  Thank you, Your Honor.  The government

18 calls Donald Stone.

19        THE COURT:  All right.

20     DONALD C. STONE, GOVERNMENT'S WITNESS, AFFIRMED

21                    DIRECT EXAMINATION

22 BY MR. OLSHAN:

23 Q.   Good morning, sir.

24 A.   Good morning.

25 Q.   If you could, please state and spell your name for the

1   record.

2   A.    Donald C. Stone, S-t-o-n-e.

3   Q.    Mr. Stone, are you currently employed?

4   A.    Yes, I am.

5   Q.    And in what, what industry are you employed currently?

6   A.    I'm a consultant with Booz Allen & Hamilton.

7   Q.    You're a consultant?

8   A.    Yes.

9   Q.    And do you work for a specific client of Booz Allen

10  Hamilton?

11  A.    Yes, I do.  My client is the Central Intelligence Agency.

12  Q.    How long have you worked in that capacity?

13  A.    Approximately two-and-a-half years at the agency.

14  Q.    Just remember, Mr. Stone, to lean forward into that

15  microphone so the jury can hear you.

16  A.    It's not very stable.  Okay.

17  Q.    Thank you.

18        Mr. Stone, can you please describe your educational

19  background?

20  A.    I have a B.A. in Business Administration and an M.B.A. in

21  Finance from Loyola College in Baltimore.

22  Q.    You mentioned that you're currently a contractor to the

23  CIA.  Did you previously work at the CIA?

24  A.    Yes, I did, from 1984 to 1995.

25  Q.    So approximately 11 years?

1    A.    Yes.

2    Q.    During those 11 years from 1984 to 1995, what did you do

3    at the CIA?

4    A.    I was an auditor on the Inspector General's staff.

5    Q.    Break that down a little bit.  The Inspector General, is

6    that a component of the CIA?

7    A.    Yes.  That's kind of the internal watchdog over agency

8    activities.  It's made up of an audit staff, inspection staff,

9    and an investigation staff.  I was an auditor.

10   Q.    And so what, what is the purpose or function of the IG at

11   CIA?

12   A.    In a nutshell, the IG is in charge of finding fraud,

13   waste, and abuse, and ensuring that the agency's resources are

14   used in an effective and efficient manner.

15   Q.    As an auditor with the IG for those 11 years, did you --

16   how did you help determine whether there was fraud, waste, or

17   abuse at the CIA in that job?

18   A.    Well, when I started, it was mostly economy and efficiency

19   audits, so you were counting the cash, inventorying the

20   property, just generally making sure the resources were being

21   acquired and expensed and used in accordance with the rules and

22   regulations.  As the function evolved over time, there was a

23   shift to more economy efficiency audits, where we were actually

24   getting into the effectiveness and execution of the operational

25   activities of the agency.

1   Q.    So in other words, was it your job to make sure that the

2   CIA wasn't wasting its money?

3   A.    Yes.

4   Q.    You performed that role for approximately 11 years?

5   A.    Correct.

6   Q.    During that time, did you hold a security clearance?

7   A.    Yes, I did the entire time.

8   Q.    And as the need would arise with respect to specific

9   projects, would you be granted access to specific classified

10  programs?

11  A.    Yes.

12  Q.    Did you receive training on how to properly handle

13  classified information?

14  A.    Yes.  There was an annual requirement to go over the rules

15  and regulations for handling of classified information.

16  Q.    Once a project would end and you would finish your audit,

17  would you be read out of a specific program if you had been

18  read in?

19  A.    There were certain programs of that name where, in fact,

20  you would be read in to do the audit and then be read out when

21  the audit was completed.

22  Q.    Where did you go work in 1995?

23  A.    I went to the Senate Intelligence Committee on Capitol

24  Hill.

25  Q.    What's the formal name of that committee?  Is it the

1    Senate Select Committee on Intelligence?

2    A.    Sorry, yes, the Senate Select Committee on Intelligence,

3    SSCI.

4    Q.    And is that sometimes referred to as SSCI, S-S-C-I?

5    A.    Yes, it is.

6    Q.    When you went there in 1995, what was your role on the

7    Intelligence Committee?

8    A.    I was hired to be a member of the audit and evaluation

9    staff of the committee.

10   Q.    Were you hired to perform a similar function to what you

11   had done within the CIA?

12   A.    Yes.  It was a very similar function except it covered the

13   entire intelligence community rather than just the one agency.

14   Q.    Can you briefly describe for the jury what the Senate

15   Intelligence Committee's function is?

16   A.    The SSCI is the Senate's oversight mechanism for the

17   intelligence community, so they're in charge of overseeing all

18   of the activities of the various agencies:  CIA, NSA, NRO, DIA,

19   etc., etc.

20   Q.    Does it perform a similar function to the House

21   Intelligence Committee?

22   A.    Yes, very much so.

23   Q.    Other than at SSCI, did you ever work anywhere else on

24   Capitol Hill?

25   A.    Yes, I did.  I worked for two years on the House

1   Intelligence Committee, the House Permanent Select Committee on

2   Intelligence.

3   Q.   So you worked for SSCI and HPSCI?

4   A.   Yes.

5   Q.   Can you tell the jury the years that you worked for, for

6   both?

7   A.   So from 1995 until early 2005, I was on the Senate

8   Intelligence Committee.  For the rest of 2005 and all of 2006,

9   I was on the House Intelligence Committee, and from 2007

10  through 2010, I was back on the Senate Intelligence Committee.

11  Q.   And subsequent to 2010, you've been in the private sector?

12  A.   That is correct.

13  Q.   Focusing in on that first stint at SSCI, from 1995 to

14  2005, in addition to your audit function on the committee, did

15  you have any other function?

16  A.   Yes.  Pretty much from when I started, other duties as

17  assigned was to deal with whistleblowers or former disgruntled

18  employees or others who had made complaints about the

19  Intelligence Community to a member of the committee or a member

20  of Congress, and I would follow up on those as, as appropriate.

21  Q.   And was it part of SSCI's function to hear people who had

22  concerns about the intelligence community?

23  A.   Oh, most, most definitely.  We definitely had a role in

24  the whistleblower function.  The other complaints were more of

25  an ad hoc basis, but again, if it involved the intelligence

1   community in something we thought was a significant part or

2   worthy of further follow-up, we would follow up on it as part

3   of our oversight duties.

4   Q.   Do you know someone by the name of Jeffrey Sterling?

5   A.   I met with him once.

6   Q.   Do you see him in the courtroom today?

7   A.   I believe that to be the gentleman right there

8   (indicating).

9           THE COURT:  All right, the record reflects the

10  witness identified the defendant.

11  BY MR. OLSHAN:

12  Q.   You just testified that you met him once.  Was that in

13  approximately March of 2003?

14  A.   Yes, it was.

15  Q.   And at the time, what was your job at SSCI?

16  A.   I was at that point head of the audit and evaluation

17  staff.

18  Q.   Can you tell the jury how it is that you came to meet with

19  Mr. Sterling in March of 2003?

20  A.   The meeting was organized by the front office and another

21  member of the staff.  At some point, I was advised that I would

22  be taking part in the meeting.

23  Q.   What was your understanding of what the focus of the

24  meeting was going to be prior to going into the meeting?

25  A.   I was aware that there were personnel issues that we would

1    not be discussing and there was an operational issue that we

2    would be discussing.

3    Q.   Did Mr. Sterling appear by himself that day, or was he

4    accompanied by anyone?

5    A.   He was accompanied by his lawyer at the time, Mr. Zaid.

6    Q.   Mark Zaid?

7    A.   That is -- yeah.

8    Q.   Z-a-i-d, is that correct?

9    A.   Correct.

10   Q.   And were you -- did you meet with Mr. Sterling and

11   Mr. Zaid by yourself, or was someone else present from the SSCI

12   staff?

13   A.   Another staffer and I met with him in my office.

14   Q.   Who was that other staffer?

15   A.   Her name is Vicki Divoll.

16   Q.   With the assistance of Mr. Wood, if you could take a look

17   at Exhibit 100, Government Exhibit 100?

18            THE COURT:  Is there any objection to 100?

19            MR. POLLACK:  No, Your Honor.

20            THE COURT:  All right, it's in.

21            (Government's Exhibit No. 100 was received in

22   evidence.)

23            MR. OLSHAN:  May we publish that, Your Honor?

24            THE COURT:  Yes, it's in evidence.

25            MR. OLSHAN:  Thank you, Your Honor.

1    Q.   You've got two options, Mr. Stone.  There's the binder,

2    and there's also a picture of it on the screen here to your

3    left, whichever is easier for you.  What is that document?

4    A.   That looks like it's a visitors log from the Senate

5    Intelligence Committee.

6    Q.   And did -- in your experience at SSCI, did the committee

7    keep a log on people who came in?

8    A.   Yes, there was a daily log that was kept.

9    Q.   And does this appear to be a page from that log?

10   A.   Yes, it does.

11   Q.    If we could zoom in on the two entries that are not

12   redacted, do those appear to be the names J. Sterling and

13   M. Zaid?

14   A.   Definitely M. Zaid and that could certainly be a Sterling

15   above that.  They came in at the same time, so it looks like

16   they were together.

17   Q.   And if we could zoom back out, the date on the top of that

18   page is March 5, 2003?

19   A.   That is correct.

20   Q.   What was Ms. Divoll's role on the committee?

21   A.   She was one of the counsel on the committee, a lawyer.

22   Q.   Were you a lawyer?

23   A.   No, I was an auditor.

24   Q.   You testified your understanding going into the meeting

25   was that it was going to be about operational concerns; is that

1    correct?

2    A.    Yes.

3    Q.    Did you -- did Mr. Zaid participate in the sort of

4    substantive discussion with Mr. Sterling?

5    A.    No, he did not.  The committee has -- after you get past

6    the guard, the Capitol policeman, we have a reception area, and

7    then there's a door into the SCIF spaces, meaning it's free to

8    talk about classified information once you go beyond that door.

9    Mr. Zaid did not have the clearances required to discuss the

10   operational activities we were going to discuss with

11   Mr. Sterling, and so he remained in the reception area during

12   the time of our conversation.

13   Q.    So the people who attended the actual conversation were

14   you, Ms. Divoll, and Mr. Sterling?

15   A.    That is correct.

16   Q.    Why was the conversation limited to just operational

17   concerns and nothing about personnel issues?

18   A.    It was my understanding that his litigation against the

19   agency was ongoing.  As a general matter, the CIA -- I mean,

20   the committee did not get involved in ongoing cases, whether it

21   involved litigation or internal deliberations, until they were

22   done.

23   Q.    If you could take a look at Exhibit 101?

24            THE COURT:  Any objection?

25            MR. POLLACK:  No objection, Your Honor.

1           THE COURT:  All right, it's in.

2           (Government's Exhibit No. 101 was received in

3   evidence.)

4   BY MR. OLSHAN:

5   Q.   Mr. Stone, during the meeting with Mr. Sterling, did you

6   take notes?

7   A.   Yes, I did.

8   Q.   And as an auditor for a number of years leading up to that

9   point, how important was note taking to you?

10  A.   Oh, that was a significant part of my function.  We would

11  have interviews, numerous interviews on any kind of audit.  I

12  would take notes on those in person.  I would go back and from

13  my written notes create a document on the computer.

14  Q.   Did you take notes during your meeting with Mr. Sterling?

15  A.   Yes, I did.

16  Q.   This document that's at Exhibit 101, did you have a hand

17  in generating this, this memo?

18  A.   Yes, I did.  This is the summation of my notes from the

19  meeting.

20  Q.   Were you the primary author of this document?

21  A.   Yes, I was.

22  Q.   Did Ms. Divoll have a role in reviewing it before it was

23  finalized?

24  A.   I'm positive because I put her name up there that I

25  coordinated this memo after I generated it with her before I

1    finalized it.

2    Q.    And this memo was based off of the notes that you took?

3    A.    Yes, it was.

4           MR OLSHAN:  If you could zoom in, Mr. Francisco, on

5    the first two paragraphs?

6    Q.    Mr. Stone, does the first paragraph essentially summarize

7    the setup of the meeting?

8    A.    Yes, it is.

9    Q.    And it indicates that Mr. Zaid had contacted Ms. Divoll

10   and that precipitated the meeting; is that correct?

11   A.    That is correct.

12   Q.    The second paragraph makes reference to Mr. Sterling's

13   ongoing litigation; is that correct?

14   A.    Yes, it is.

15   Q.    And it makes note that Mr. Zaid was not permitted to take,

16   take part in the substantive conversation, correct?

17   A.    That is correct.

18   Q.    If you could, read the third paragraph, which carries over

19   to the next page.

20   A.    Okay.  "Mr. Sterling joined the CIA in 1993, and had at

21   least two overseas assignments.  In 1999, he was assigned to

22   CIA's New York office, where he was involved in a sensitive

23   operation.  The operation entailed a CIA asset providing Iran

24   with faulty plans for a Russian-based nuclear fire set.

25   Although the plans had been modified by the National

1   Laboratories, Mr. Sterling feared they were insufficiently

2   flawed to prevent a Russian scientist hired by the Iranians

3   from identifying and correcting the mistakes.  His concern was

4   based on the fact that the CIA asset recognized the plan's

5   flaws almost immediately after being shown them.  He would have

6   preferred to string the operation out by giving pieces of the

7   plan out over time.  In the end, the entire plan was turned

8   over to the Iranians without any means for further follow-up.

9   However, CIA supposedly deemed the operation a success.

10  Mr. Sterling fears the CIA gave the Iranians too much

11  information that they can either use themselves or sell to

12  someone else."

13  Q.   Does that portion that you just read match your memory as

14  to what Mr. Sterling said that day?

15  A.   Yes, it does.

16  Q.   So you recall that Mr. Sterling mentioned a Russian

17  nuclear fire set?

18  A.   Yes.

19  Q.   That had been modified by National Laboratories?

20  A.   Correct.

21  Q.   Did he mention the country Iran?

22  A.   Correct.

23  Q.   And he mentioned that the fire set plans had been

24  insufficiently -- or the flaws in them had been insufficient

25  to, to fool the Russian asset who first examined them -- or

1    when he first examined them?

2    A.    Yes.

3    Q.    Other than what's in this memo, do you recall whether

4    Mr. Sterling said anything about how these plans were actually

5    physically delivered to the Iranians?

6    A.    I do not recall specifics on how they were delivered.

7    Q.    Do you remember anything to do with a fence?

8    A.    I believe at some point, my description of the event

9    became they did the equivalent of throwing them over the fence.

10   Q.    You don't recall whether he actually said that?

11   A.    I do not recall if he said that.  It's not in my

12   memorandum, so it's not something I quoted.

13   Q.    Now, if we could go to the second page of the

14   memorandum -- actually, I apologize, Mr. Francisco, can you go

15   to the first page, at the top again?

16            The date on this memo is April 25, 2003?

17   A.    Correct.

18   Q.    And it reflects what happened at the March 5, 2003,

19   meeting?

20   A.    Yes.

21   Q.    And you maintained your notes during the interim?

22   A.    Yes, absolutely.

23   Q.    For when you finally prepared the, the memo, right?

24   A.    Correct.

25   Q.    Now, if we could go to that second page?

1              Did you ask Mr. Sterling why he was bringing this

2    information to the attention of the committee now?

3    A.   Yes, I did.

4    Q.   And why would -- why did you ask that question?

5    A.   It's a normal question to ask because there was a

6    significant amount of time between the actions he was

7    describing and the time he had brought them to our attention.

8    The normal course of action, we wanted to know what prompted

9    him to come to the committee, so it would also influence how we

10   would follow up.

11   Q.   And is that reflected in that first full paragraph on the

12   second page?

13   A.   Yes, it is.

14   Q.   And why did he say he was just bringing this to the

15   committee's attention now?

16   A.   He indicated that current events going on at the time had

17   prompted him to remember the issue or want to bring it to our

18   attention for further action.

19   Q.   Do you recall whether he was able to provide any

20   information as to why -- whether the CIA or the lab did not

21   take adequate precautions, whether they had taken inadequate

22   precautions?  Did he tell you anything that justified that?

23   A.   No.  I did ask whether or not he had a technical

24   background.  He did not.  He did not have any real specifics on

25   the level of detail in the plans or what had made them faulty

1    or not faulty enough.

2    Q.   Did you ask him whether he had raised his concerns with

3    the Inspector General?

4    A.   Yes, I did.  That was one of my normal questions, lines of

5    question.

6    Q.   Would it have been appropriate for him to raise

7    operational concerns with the Inspector General?

8    A.   Yes, it was.  The normal course of action for a

9    whistleblower case or any kind of case involving issues at the

10   agency would normal involve going to the Inspector General to

11   kind of vet the case, and then it would proceed to us if they

12   so desired.

13   Q.   And why did Mr. Sterling say he had not gone to the

14   Inspector General?

15   A.   He indicated that he had not had a pleasant -- hadn't had

16   a good time dealing with him as part of his personnel issues,

17   and he didn't want to bring this to their attention.

18   Q.   After the -- let me back up.

19        Going back to the first page of Exhibit 101, where it

20   references in that last paragraph, "The operation entailed a

21   CIA asset providing Iran with faulty plans for a Russian-based

22   nuclear fire set," and then it continues that the flaws were

23   insufficiently -- excuse me, he feared the flaws were

24   insufficiently -- excuse me, they were insufficiently flawed to

25   prevent a Russian scientist hired by the Iranians from

1   identifying and correcting the mistakes, do you recall whether

2   Mr. Sterling identified the asset who was going to deliver

3   these plans to the Iranians as Russian?

4   A.   He did not.

5   Q.   Do you recall whether Mr. Sterling mentioned anything to

6   do with the specific technical details of the fire set?

7   A.   No, he did not.

8   Q.   For example, the model number?

9   A.   No, he did not.

10  Q.   Is that the type of detail you would have written in your

11  notes?

12  A.   Yes.  As auditors, we're looking for who, what, when,

13  where, why, and how.  That would have definitely fallen within

14  that category.

15  Q.   What about details of a Russian asset's compensation?

16  A.   Again, as an auditor, that was a number.  That was

17  something I would have written down in my notes.

18  Q.   Would you have written it down if he had mentioned any

19  specific meetings, where specific meetings occurred with the

20  scientist who was to deliver the flaws?

21  A.   I would have been aware.  Yes, I would have.

22  Q.   And do you recall whether he mentioned anything to do with

23  a meeting in San Francisco?

24  A.   No, he did not.

25  Q.   Do you recall specifically the name of the country to

1    which the plans were going to be delivered?

2    A.    I stated in the memo it was Iran.

3    Q.    Not the ultimate recipient.  Where these plans were given?

4    A.    Oh, the location?  No, I do not recall him stating where

5    those were to be delivered.

6    Q.    Okay.  Would you have written that down?

7    A.    I believe so, yes.

8    Q.    Did anything occur on Mr. Sterling's way out of the

9    committee space?

10   A.    So after Vicki and I were done discussing the case in my

11   office, we walked him back out to the reception area, where we

12   were joined by Mr. Zaid, his attorney, obviously, exchanging

13   pleasantries.  I recall at some point them asking what we

14   planned to do with the information we had been provided.  We

15   were noncommittal on what we were going to do because

16   obviously, at that time, we had no idea what we would do to

17   pursue it, and then one of them, I don't recall exactly who,

18   made reference to, well, something has to be done soon or we're

19   going to do something else.

20   Q.    And do you know what they meant by that?

21   A.    I don't know exactly what they meant.  Normally that would

22   mean they were going to the press.

23        MR. POLLACK:  Your Honor, I'm going to move to strike

24   the last answer if he has no basis for it, it's not based on

25   any conversation he had with either Mr. Zaid or Mr. Sterling.

1          THE COURT:  What's your basis for that?

2          THE WITNESS:  I dealt with a number of, again,

3   complaints, whistleblower-type cases, and normally if they --

4   the committee is one of the last resorts, and if that wasn't

5   going to work, their only resort after that was to try to get

6   some publicity in the press.

7          THE COURT:  I'm going to allow it.  Overruled.

8   BY MR. OLSHAN:

9   Q.   Let me step back for one second, Mr. Stone.  Do you know

10  what a cryptonym is?

11  A.   Yes, I do.

12  Q.   Is that a fancy way of saying a code name?

13  A.   Yes, it is.

14  Q.   And during your time with the CIA, either as -- in your

15  audit capacity or when you were on the Hill, did you ever see

16  CIA cryptonyms?

17  A.   I would have definitely seen them regularly, on a regular

18  basis as an auditor within the CIA.  On the Hill, access to

19  cryptonyms was very rare.  Those were internal CIA names for

20  things that were not shared with us generally.

21  Q.   If Mr. Sterling had mentioned a specific cryptonym, would

22  you have made note of it?

23  A.   I believe I would, yes.

24  Q.   Can you recall whether he did that?

25  A.   I do not recall any mention of cryptonyms.

1    Q.   And do you recall whether he discussed anything to do with

2    asset's employment history prior to becoming a CIA asset?

3    A.   I do not recall that at all.

4    Q.   Did Mr. Sterling give you any documents during the

5    meeting?

6    A.   No, he did not.

7    Q.   You testified that this meeting took place in a secure

8    location within the committee space.  Is that correct?

9    A.   Correct.

10   Q.   Was it your understanding during the conversation with

11   Mr. Sterling that you were discussing classified information?

12   A.   Yes.

13   Q.   And did that influence the way that you dealt with this

14   topic after the meeting with Mr. Sterling as far as who you

15   would talk to about it?

16   A.   I handled it the way I would normally handle classified

17   information within the committee spaces.

18   Q.   And what was that?

19   A.   I mean, it was a SCIF'd area, which we -- it's an area

20   where you can discuss classified information, Sensitive

21   Compartmented Information Facility.  Still within that, just

22   because you know something doesn't mean you go around telling

23   everybody on the committee.  So I would have retained my notes

24   in a folder in my work area.  I'm sure I talked about the

25   meeting with the staff directors and then probably didn't

1  discuss it at all until I created this memo.

2  Q.   Mr. Sterling's complaints involved a nuclear, it was a

3  nuclear operation, correct?

4  A.   Correct.

5  Q.   Did you take that seriously?

6  A.   Oh, absolutely.

7  Q.   And so what did you do after you had the meeting with

8  Mr. Sterling where he expressed very serious concerns about

9  this operation?

10  A.   It's my recollection that I -- after the meeting, we

11  escorted them out.  At some point that day, next time I'd get a

12  chance with the staff director, I discussed the information

13  that was discussed with Mr. Sterling and then went on about my

14  regular duties.

15  Q.   So you raised this issue to people who might have more

16  knowledge about it or who could check into it?

17  A.   Correct.

18  Q.   And was one of those Lorenzo Goco?

19  A.   Yes, it was.

20  Q.   Can you tell the jury who Mr. Goco was?

21  A.   Mr. Goco was the staffer responsible for the oversight of

22  these types of programs.  It was a separate account because of

23  the sensitivity of the operations, and I knew that he would be

24  in a position as part of our normal oversight because we got

25  regular updates on the status of these operations, he would be

1    in a position to check the accuracy of the information provided

2    by Mr. Sterling.

3             MR. OLSHAN:  If we could go back to the memo on 101,

4    Mr. Francisco, the second page?  Zoom in on the third

5    paragraph.  Thank you.

6    Q.   Does this paragraph reflect the steps you took or asked

7    Mr. Goco to take in order to check into Mr. Sterling's

8    concerns?

9    A.   You're talking about the paragraph beginning with "The

10   operation described"?

11   Q.   Yes, sir.

12   A.   Yes, it is.

13   Q.   Did you ever hear back from Mr. Goco about whether he had

14   looked into Mr. Sterling's concerns?

15   A.   Yes, I did.

16   Q.   And what was your understanding of the take-away from his

17   efforts?

18   A.   My understanding was that he had asked the appropriate

19   officials at the agency about the information provided by

20   Mr. Sterling.  He had been assured that it had been executed in

21   the proper fashion, and I took from that that there was no need

22   for follow-up on my part.

23   Q.   The last paragraph of the memo that you and Ms. Divoll

24   drafted mentions in the first couple sentences further contact

25   for Mr. Sterling.  For example, it says, "Mr. Sterling has

1  e-mailed the committee highlighting press articles involving

2  Iran nuclear interests.  He has also left a phone message that

3  was not returned."

4          Can you recall any of those communications with

5  Mr. Sterling?

6  A.   I do not recall the communications to me from

7  Mr. Sterling.  I believe those to be entries coordinated with

8  Vicki.

9  Q.   But you have no recollection as to any further follow-up

10  directly with Mr. Sterling or his lawyer at the time?

11  A.   Not with Mr. Sterling.  There were subsequent e-mails from

12  Mr. Zaid involving other cases and other issues in the

13  community but --

14  Q.   But not related to --

15  A.   -- I do not recall them being related to this case, no.

16  Q.   Did you ever receive a call from a journalist named James

17  Risen?

18  A.   Yes, I did.

19  Q.   And was that in this time frame?

20  A.   Yes, it was.

21  Q.   And can you tell the jury about that contact from

22  Mr. Risen, what you remember?

23  A.   Okay.  As background, staffers were generally not allowed

24  to talk to the press.  On the committee, the staff director was

25  the only one allowed to talk to the press.  So I was at my

1    desk, and the phone rang, and the person introduced himself as

2    Mr. Risen.  With him being one of the well-known newspaper

3    authors involving the intelligence community, I immediately

4    advised him I was not allowed to talk to the press and ended

5    the conversation.

6    Q.    So do you remember, did he tell you why he was calling?

7    A.    I didn't give him the opportunity to tell me.

8    Q.    In the bottom of the memo that you drafted, second-to-last

9    sentence says, "The only other issue of note is that James

10   Risen of *The New York Times* attempted to contact Mr. Stone

11   directly several weeks ago."

12            Do you recall writing that?

13   A.    Yes, I do.

14   Q.    You inserted this language?

15   A.    Yes, I did.

16   Q.    The last sentence says, "He was not asked the topic of

17   inquiry and was told that any staff communication must come

18   from the staff directors."

19   A.    Correct.

20   Q.    Mr. Stone, can you recall why you put reference to

21   Mr. Risen's phone call to you in this memo about Mr. Sterling?

22   A.    I do not recall the exact details.  I assume it was

23   because I either, A, after the phone call went up to the staff

24   director to advise him I had been called by Mr. Risen, because

25   it was fairly rare for a reporter to get through to the

1    individual staffers.  We all had direct lines, but most people

2    only had the line for the committee.

3              So again, to make sure I didn't get in trouble for

4    talking to the press, I would have advised him.  Again, at some

5    point between when the meeting was held and the memo was

6    written, I'm sure I spoke to the staff director about this

7    case, and something was said that led me to believe there was

8    a -- Mr. Risen was somehow involved, and so that was why I

9    included that in this memo, to make it clear that I had been in

10   touch with him, but I had not spoken to him with any details.

11             THE COURT:  And, I'm sorry, I wasn't clear on your

12   answer.  Did this phone call occur, if you can recall, before

13   or after your meeting in the SCIF with Mr. Sterling?

14             THE WITNESS:  It would have been after the meeting.

15             THE COURT:  And how do you know that?

16             THE WITNESS:  Because if it had been before the

17   meeting, I would have noted that it was before the meeting.

18             THE COURT:  All right, thank you.

19   BY MR. OLSHAN:

20   Q.   So sometime between the meeting with Mr. Sterling on

21   March 5, 2003, and when this memo was finalized on April 25,

22   you received a call from Mr. Risen?

23   A.   Correct.

24   Q.   Did you ever have any subsequent contact with Mr. Risen?

25   A.   Not to my knowledge.

1    Q.   Have you ever discussed this specific classified program

2    with anyone whom you believed did not have the appropriate

3    clearances?

4    A.   No, I have not.

5    Q.   Mr. Stone, are you familiar with what's called a cable?

6    A.   Yes, I am.

7    Q.   And is that a document or documents that are generated in

8    the normal course of the CIA's business?

9    A.   Yes.  Generally, that's the formal documentation of the

10   activities of the agency.

11   Q.   And you've seen those over your many years either as a CIA

12   employee or now as a contractor?

13   A.   Yes, definitely in those cases.  Less so on the committee,

14   because generally the committee, like cryptonyms, was not

15   provided access to specific agency cables, but before and after

16   a direct employee as the CIA, yes, regular basis.

17   Q.   But not while you were on the Hill?

18   A.   No.  If it was exposed, it was always on a read-and-return

19   basis.  It wasn't something we retained.

20   Q.   So you didn't just keep a file of CIA cables in committee

21   space?

22   A.   No, absolutely not.

23           MR. OLSHAN:  May I have a moment, Your Honor?

24           THE COURT:  Yes, sir.

25           MR. OLSHAN:  That's all I have.

1    THE COURT:  All right.  Well, this is good timing.  I

2    think we'll take our mid-morning break.  I'll give the jury

3    until, we are normally doing 20 minutes in the morning, so 25

4    after, all right, folks?

5    I want to stay in session.  I have a couple of

6    housekeeping matters.

7    And you may step down, sir, and we'll see you back

8    here at 25 after.

9    THE WITNESS:  Thank you, ma'am.

10    THE COURT:  All right.

11    (Witness stood down.)

12    (Jury out.)

13    THE COURT:  I just want to take advantage of these

14    breaks to clear up various small housekeeping matters.  Last

15    week when we played the video deposition of Mr. Merlin, the

16    government indicated that they believed there were mistakes in

17    the transcript, and they asked the Court to correct them.

18    I said yes at the time because my hearing also here

19    in the court supported the government's view.  However, I went

20    over the audiotape much more carefully with my court reporter,

21    and, in fact, the transcript as originally done is correct.

22    Whether it was a misstatement by the witness or not, I don't

23    know, but we don't change transcripts.

24    And so for the record, page 83, line 10, will

25    continue to reflect that the witness said, "I did see him,"

1   not, "I didn't see him."  That's what I clearly heard along

2   with my court reporter.

3            And then on page 85, line 3, where the answer

4   was, "Again, all the commands were in sealed" blah, blah, blah,

5   the government wanted the word "plans."  I listened very

6   carefully; there's no question it was "commands."

7            So the transcript is remaining as it was originally

8   done.  I just wanted you to know that for the record.

9            All right, any other brief housekeeping matters

10  before we proceed for the break?

11                         (No response.)

12           THE COURT:  Now, I only got five witnesses listed

13  this morning.  I'm sure the government has more than that on

14  call for today at the rate we're going.  Is the government

15  going to rest today, or do you think it will be tomorrow

16  morning?

17           MR. OLSHAN:  It's hard to say, Your Honor.  It will

18  be close.  It could be at the very end of the day or sometime

19  early tomorrow morning.

20           THE COURT:  All right.  So defense is beginning to

21  line up any witnesses you-all might have, correct?

22           MR. MAC MAHON:  Yes, Your Honor.  We're doing the

23  best --

24           MR. POLLACK:  Yeah, this is the first that we've

25  heard that the government might rest today, so we'll scramble

1    and try to make sure we've got somebody first thing tomorrow

2    morning.

3              THE COURT:  All right.  And then tomorrow is

4    Wednesday.  Do you expect you will use all of tomorrow?

5              MR. POLLACK:  Probably not.  I don't think so, Your

6    Honor.

7              THE COURT:  All right, if there's any plan for a

8    rebuttal case, then the government needs to have any potential

9    rebuttal witnesses on call -- on deck for Wednesday.

10             All right, very good.  We'll recess court then.

11                  (Recess from 11:10 a.m., until 11:25 a.m.)

12                           (Defendant and Jury present.)

13             THE COURT:  All right, Mr. Pollack?

14             MR. POLLACK:  Thank you, Your Honor.

15                          CROSS-EXAMINATION

16   BY MR. POLLACK:

17   Q.   Good morning, Mr. Stone.  My name is Barry Pollack.  I'm

18   one of the lawyers for Mr. Sterling.

19   A.   Good morning.

20   Q.   Now, you met with Mr. Sterling on only one occasion that

21   you can recall.  That was on March 5, 2003, correct?

22   A.   Yes.

23   Q.   And at that time, you -- also present was another SSCI

24   staff member by the name of Vicki Divoll, correct?

25   A.   Yes.

1    Q.   And at that time, you had known Ms. Divoll for only about

2    a year; is that correct?

3    A.   I don't recall exactly how long.  From whenever she'd

4    joined the committee until then.

5    Q.   She's not somebody you socialized with, was not a personal

6    friend in any way?

7    A.   Not outside the committee, no.

8    Q.   And on the meeting on the 5th -- at the meeting on the

9    5th, you took some notes?

10   A.   Yes, I did.

11   Q.   And you tried to take careful and accurate notes?

12   A.   Yes.

13   Q.   But you weren't doing a transcript of that interview,

14   correct?

15   A.   No, there was no recorded transcript of the --

16   Q.   There was no court reporter, correct?

17   A.   Correct.

18   Q.   There was no audio recording, correct?

19   A.   Correct.

20   Q.   And you weren't getting down every word that was said,

21   correct?

22   A.   Correct.

23   Q.   Okay.  And what was the last time that you saw those notes

24   that you took?

25   A.   I do not recall.  I would have presumed they were either

1   destroyed sometime before I left the committee or when I left

2   the committee.

3   Q.   And when did you leave the committee?

4   A.   In, I believe, January of 2005.

5   Q.   So you haven't seen those notes since at least January of

6   2005, correct?

7   A.   I've not seen my handwritten notes.  I've seen copies of

8   the memorandum created from those notes.

9   Q.   I understand.  We'll talk about the memorandum in a

10  moment --

11  A.   Okay.

12  Q.   -- but right now, I'm just asking you about your

13  handwritten notes.

14          You haven't seen those since at least January of '05,

15  correct?

16  A.   Correct.

17  Q.   In fact, you may not have seen them since the time that

18  you prepared your memo from those notes, correct?

19  A.   I vaguely recall them being in a folder at some point and

20  that folder being destroyed after I'd written or created the

21  memo, but you're right, it's been a significant amount of time.

22  Q.   And when you created the memo, were you trying to capture

23  in that memo every single thing that was in your handwritten

24  notes?

25  A.   Generally, I was trying to capture the totality of all the

1    information captured in my notes, yes.

2    Q.   Okay.  And let's look at Government Exhibit 101, and

3    Mr. Olshan asked you about the first paragraph of this memo.

4    You said it's basically sort of setting the stage, if you will,

5    correct?

6    A.   Yes.

7    Q.   It's not relaying what actually happened at the meeting on

8    March 5?

9    A.   The first paragraph, no.

10   Q.   Okay.  And the second paragraph, this talks about what you

11   knew prior to the meeting, correct?

12   A.   Correct.

13   Q.   And whether or not Mr. Zaid, the attorney, was going to be

14   present for the meeting, correct?

15   A.   Correct.

16   Q.   But this paragraph also is not setting forth anything that

17   actually happened in your meeting with Mr. Sterling, correct?

18   A.   Correct.

19   Q.   Okay.  Now, the third paragraph, and it starts on that

20   page and continues on to the next page, and the fourth

21   paragraph do discuss what happened at your meeting with

22   Mr. Sterling, correct?

23   A.   Yes, they do.

24   Q.   And then if we go to the second page, the second-to-last

25   paragraph, the fifth paragraph starts with "The operation

1   described by Mr. Sterling," that talks -- that paragraph is

2   about what follow-up action you took after the meeting with

3   Mr. Sterling, correct?

4   A.    Correct.

5   Q.    And the sixth paragraph, the last paragraph is about

6   things that had happened since the meeting, correct?

7   A.    Correct.

8   Q.    So in this two-page memo, there are only two paragraphs

9   that actually discuss what happened in the meeting with

10  Mr. Sterling, correct?

11  A.    Yes.

12  Q.    And that was your effort to fully capture everything that

13  was in your notes?

14  A.    Correct.

15  Q.    And the memo was written a month and a half, seven weeks

16  after the meeting itself, correct?

17  A.    Correct.

18  Q.    Now, the meeting itself lasted between 45 minutes and an

19  hour, correct?

20  A.    To the best of my knowledge and belief, yes.  It would be

21  typical.

22  Q.    And it's fair to say that in two paragraphs, you weren't

23  able to capture everything that happened during your

24  45-minute-to-one-hour meeting, correct?

25  A.    No.  I would say those paragraphs reflect the level of

1    detail provided by Mr. Sterling during that meeting on the

2    operation he was describing.

3    Q.   Okay.  So you don't think there was any detail that was

4    provided in 45 minutes or 60 minutes that's not captured in

5    those two paragraphs?

6    A.   Well, that 60 minutes in my memory would capture the time

7    in the waiting area, the time at the beginning of the meeting,

8    the time in the waiting room after the meeting, the exchange of

9    pleasantries at the front door, again setting the scale in my

10   office, going over what we were going to cover, what we weren't

11   going to cover.  So I don't think there was a full 45 minutes

12   spent on the operation he was describing.

13   Q.   Do you remember being interviewed by the FBI in 2010?

14   A.   Can you remind me when that -- what location that was?

15   Was that in committee spaces?

16   Q.   It looks like that happened at the Senate Hart Office

17   Building.

18   A.   Yes, I do.

19   Q.   And do you remember telling the FBI agents that were

20   interviewing you that you recalled a discussion with

21   Mr. Sterling about the operation?

22   A.   Yes.

23   Q.   And do you recall telling them that you believed that the

24   meeting about the operation lasted 45 minutes to an hour?

25   A.   If that's in their notes, I will accept that.  I don't

1   recall the exact length of the meeting.

2   Q.   Now, by the way, the first time that the FBI interviewed

3   you was in November of 2005, correct?

4   A.   That sounds accurate, yes.

5   Q.   So that would be about two-and-a-half years after this

6   meeting with Mr. Sterling, correct?

7   A.   Correct.

8   Q.   Now, at the meeting itself, that March 5 meeting with

9   Mr. Sterling, Mr. Sterling spoke from memory, correct?

10  A.   He had no prepared information with him.

11  Q.   Exactly.  He didn't have any notes in front of him,

12  correct?

13  A.   I do not recall him having any notes in front of him, no.

14  Q.   He didn't have any documents?

15  A.   He definitely didn't leave any documents with the

16  committee.

17  Q.   But you don't recall him having any documents?

18  A.   I wouldn't know what he had on his person.  I do not

19  remember him bringing out documents during our discussion.

20  Q.   Okay.  So for the 45 minutes or an hour that you were

21  having a discussion with him, he did not have any documents out

22  in front of him?

23  A.   Again, I don't think we discussed this case for 45 minutes

24  to an hour.  I believe the exchange within the committee spaces

25  lasted from 45 minutes to an hour.

1   Q.   However long the discussion about the operation lasted,

2   you don't recall him having any documents in front of him that

3   he was referring to?

4   A.   I do not.

5   Q.   And let's go back to 101, your memo.  In the third

6   paragraph, it says that the operation entailed a CIA asset

7   providing Iran with faulty plans for a Russian-based nuclear

8   fire set.

9        Do you see that?

10  A.   Yes, I do.

11  Q.   And you would only have included the term "fire set" in

12  that memo if that's the term that Mr. Sterling had used,

13  correct?

14  A.   That is correct.

15  Q.   Now, following the meeting with Mr. Sterling, you had a

16  meeting with Bill Duhnke?

17  A.   Yes.

18  Q.   And Bill Duhnke was who?

19  A.   He was the staff director I referred to earlier.

20  Q.   So in your testimony with Mr. Olshan when you were

21  referring to someone who was a staff director, that was

22  Mr. Duhnke?

23  A.   Correct.

24  Q.   And then you also referenced a Mr. Goco?

25  A.   Yes.

1    Q.    And you met with him as well?

2    A.    Yes.

3    Q.    Was that one meeting, or were those two separate meetings?

4    A.    The meeting with Mr. Duhnke and Mr. Goco would have been

5    separate meetings.

6    Q.    And who was present for your meeting with Mr. Duhnke?

7    A.    I only recall Mr. Duhnke and myself.

8    Q.    Who was present for your meeting with Mr. Goco?

9    A.    Again, I would only recall myself and Mr. Goco.

10   Q.    And when you spoke to Mr. Goco, the program that

11   Mr. Sterling had discussed with you sounded familiar to

12   Mr. Goco, correct?

13   A.    Yes, as I recall.

14   Q.    And at this meeting just between you and Mr. Goco, it was

15   discussed that Mr. Goco would follow up with the CIA at his

16   next scheduled meeting with the CIA, correct?

17   A.    That is correct.

18   Q.    And you and Ms. Divoll did not have any additional

19   discussions about the meeting with Mr. Sterling, correct?

20   A.    Well, after I had created the memo, we certainly would

21   have discussed the content of the memorandum, so that I would

22   have included her name as both of us contributing to the memo.

23   I do not recall subsequent conversations after the creation of

24   the memo on this particular case.

25   Q.    What about between March 5 and the creation of the memo?

1    A.    Conversation with Ms. Divoll?

2    Q.    Yes.

3    A.    Coordination on this memo would have taken place between

4    the meeting and the creation of this memo.

5    Q.    Okay.  Maybe, let me try asking it a different way.  Other

6    than -- you drafted this memo?  You were the author?

7    A.    I was the primary author, yes.

8    Q.    But you showed it to Ms. Divoll, correct?

9    A.    Correct.

10   Q.    Other than that interaction, showing the memo to her and

11   getting any input she had, did you have any other conversations

12   with Ms. Divoll about your meeting with Mr. Sterling at any

13   time?

14   A.    I do not recall any such conversations.

15   Q.    Now, at the meeting on March 5, Mr. Sterling told you that

16   the program involved the use of two human assets, correct?

17   A.    I specifically recall the one asset, and then there was

18   the asset who found the plans to be faulty.  I don't recall if

19   that was one and the same or if it was two different assets.  I

20   can reread it.

21           MR. POLLACK:  I apologize, Your Honor, just a second

22   here.

23           THE COURT:  All right.

24   BY MR. POLLACK:

25   Q.    You said your first interview with the FBI was in 2005.

1   Does November 10, 2005, sound right?

2   A.    Yes, it does.

3   Q.    And in that interview with the FBI in 2005, you recalled

4   that Mr. Sterling mentioned two human assets involved in the

5   operation.  Do you recall telling the FBI that?

6   A.    I do not recall.  My most recent recollections are from

7   this memorandum which implies that the CIA asset was the one

8   who recognized the plans were faulty.  There may have been two.

9   I just don't recall whether there was one or two.

10  Q.    Do you recall Mr. Sterling told you that one asset, quote,

11  got cold feet with regard to passing the information on to the

12  intended target?

13  A.    Yes, I do.

14  Q.    And that there was a second asset who was the subject

15  matter expert?

16  A.    I don't know that I recall that.

17  Q.    But you do recall that one, one asset got cold feet at one

18  point?  Mr. Sterling told you that?

19  A.    Correct.

20  Q.    That's not reflected in your memo in Exhibit 101?

21  A.    I believe the memo states that the operation did not go as

22  planned.

23  Q.    Yeah.  Does it say anything about an asset getting cold

24  feet?

25  A.    It does not state it in here.

1  Q.   That would be a detail that you recall Mr. Sterling told

2  you in the meeting of March 5, 2003, that did not make it into

3  the memo that you prepared seven weeks later?

4  A.   What was the question again?

5  Q.   The fact that one of the human assets got cold feet at

6  some point was a detail that Mr. Sterling shared with you on

7  March 5, 2003, that did not make it into the memo that you

8  prepared about that meeting seven weeks later on April 25?

9  A.   Okay.  I agree with that, yes.  It would have been

10 captured in "The operation did not go as planned."

11      MR. POLLACK:  I'd like to have Mr. Wood, if I might,

12 Your Honor, hand up to Mr. Stone the 302 from his 2005

13 interview and direct his attention to the last paragraph on

14 page 3 to see if that refreshes his recollection about whether

15 Mr. Sterling told him that there were two human assets involved

16 in the program.

17      THE COURT:  All right.

18 BY MR. POLLACK:

19 Q.   And, Mr. Stone, I'm not asking you to read it out loud,

20 but go ahead and read it to yourself, and then I'll ask you a

21 question about it, okay?

22 A.   I'm sorry, which portion of this document?

23 Q.   The last portion on page 3.

24      Does that refresh your recollection that in 2005, you

25 told FBI agents that Sterling, Mr. Sterling mentioned two human

1   assets involved in the operation?

2   A.   Yes, it does.

3   Q.   And if we could --

4            MR. OLSHAN:  Your Honor, can we just get a

5   clarification as to whether the witness is saying yes, that's

6   what I told the FBI, versus yes, that's what Mr. Sterling --

7            THE COURT:  Sustained.  Do you recall now having read

8   that, having read your report of interview, do you recall now

9   whether or not Mr. Sterling did discuss two assets with you?

10           THE WITNESS:  I seem to recall that there was two

11  assets.  One was supposed to do the operation, and the other

12  asset was the one who found issue with the plans.

13           THE COURT:  All right, that's his answer.

14           MR. POLLACK:  Okay.

15  Q.   Now, if you go to your, your memo, Exhibit 101, in the

16  third paragraph, it says the operation entailed a CIA asset,

17  correct?

18  A.   Yes.  Yes, it does.

19  Q.   And a little later in that paragraph, it says, "His

20  concern was based on the fact that the CIA asset . . .,"

21  correct?

22  A.   That's what it reads.

23  Q.   Okay.  So the fact that Mr. Sterling had told you that

24  there were actually two human assets would be another detail

25  that he told you on March 5, 2003, that did not make it into

1    the memo that you drafted on April 25, 2003, correct?

2    A.   This document can certainly be read that there is one

3    asset.

4    Q.   Now, you told the FBI in 2003 that when the --

5    A.   I did not meet with the FBI in 2003.

6    Q.   I'm sorry.  Thank you, Mr. Stone; you're correct.

7            You told the FBI in 2005 that Mr. Sterling told you

8    in 2003 that when the second asset reviewed the plans, he

9    quickly recognized that the plans were faulty.  Do you recall

10   that?

11   A.   Yes, I do.

12   Q.   You also told the FBI in 2005 that you recall that

13   Mr. Sterling mentioned in the 2003 meeting with you and

14   Ms. Divoll that there was a message prepared by the asset that

15   was included in the package of plans for delivery to Iran.  Do

16   you recall telling the FBI that in 2005?

17   A.   I do not recall the full contents of that meeting.

18           MR. POLLACK:  I'm sorry, Mr. Wood, if you could go

19   ahead and pass the same document back up, the 2005 302?

20   Q.   And, Mr. Stone, I'm going to ask you to look at the first

21   partial paragraph on page 4 of that document.

22   A.   I've read it.

23   Q.   Does that refresh your recollection that in 2005, you told

24   the FBI that you vaguely recalled there may have been a message

25   prepared by the asset which was included in the package?

1   A.   Yes, it does.

2   Q.   And do you recall having -- do you recall having told the

3   FBI that in 2005, do you recall that you learned that

4   information from Mr. Sterling in the 2003 meeting?

5   A.   Say that again, please?

6   Q.   Sure.  In 2005, you told the FBI that you had a vague

7   recollection that there was a message prepared by the asset

8   that was included in the package.

9   A.   Correct.

10  Q.   My question is do you recall Mr. Sterling having told you

11  that in the 2003 meeting?

12  A.   Sitting here right now, I do not recall that.

13  Q.   All right.

14  A.   My memo was created as a summation to document the fact

15  the CIA had provided faulty plans.  It was not meant to capture

16  the entirety of every word spoken at the meeting.  When you're

17  questioned by the FBI, you have a tendency -- and you know

18  that's coming, you have a tendency to recollect the meeting in

19  greater detail.

20  Q.   Okay.  So the memo was not intended to capture every

21  detail?

22  A.   It was meant to capture the details of the conversation,

23  to document the need for further follow-up by the committee.

24  Q.   It was only intended to capture those details that might

25  require further follow-up?

1    A.    No, it was meant to capture the totality of the meeting.

2    Q.    But there were details about that meeting that you

3    recalled two-and-a-half years later when interviewed by the FBI

4    that were not captured in that memo, correct?

5          MR. OLSHAN:  Your Honor, I'm going to object.  Just

6    to clarify, the phrase that Mr. Pollack asked the witness about

7    is whether he said he vaguely recalled that there may have been

8    a message.  These are not concrete facts.

9          MR. POLLACK:  Your Honor --

10         THE COURT:  Well, you can do this on redirect.  You

11   can get into it with redirect, but I'm going to allow this, so

12   overruled at this point.  Go ahead.

13         MR. OLSHAN:   Thank you.

14   BY MR. POLLACK:

15   Q.    Mr. Stone, am I correct in understanding when you were

16   interviewed by the FBI in 2005, you did not have access to your

17   notes from the March 2003 meeting, correct?

18   A.    I would not have had access to my handwritten notes.

19   Q.    That's what I'm asking.

20   A.    I believe -- no, I did not have access to my handwritten

21   notes.

22   Q.    But you were doing the best --

23   A.    I do not believe.

24   Q.    Okay.  But you were doing the best that you could

25   two-and-a-half years later to recall everything that you could

1   have -- you could recall about the 2003 meeting with

2   Mr. Sterling, correct?

3   A.    That is correct.

4   Q.    And you were able to recall some things that you did not

5   capture in your April 25 memo, correct?

6   A.    Well, I didn't write this memo, so there clearly is

7   information in here that is not captured in my memorandum.

8   Q.    And you testified on your direct examination that you

9   recall Mr. Sterling saying something in the meeting that at

10  some point you later characterized as essentially the documents

11  were just thrown over the fence or something to that effect,

12  correct?

13  A.    Are you talking about my testimony earlier today?

14  Q.    Yes.

15  A.    Yes, I did.

16  Q.    And that phrase, "thrown over the fence," that was your

17  phrase, not Mr. Sterling's phrase, correct?

18  A.    I believe that to be correct, yes.

19  Q.    But what you were trying to characterize was the fact that

20  Mr. Sterling had told you that the plans were just left there,

21  not -- without any contact being made with anyone?

22  A.    Correct.

23  Q.    And the fact that the plans were just left there without

24  any contact being made with anyone, that detail is not

25  reflected in your April 25 memo, correct?

1  A.   To me, that's captured in "The operation did not go as

2  planned."

3  Q.   In the meeting in March of 2003, Mr. Sterling told you

4  that the human asset who said that the plans were faulty was a

5  Russian scientist.

6  A.   Actually, it says it would prevent a Russian scientist.

7  Q.   I understand what your memo says.  My question is in the

8  meeting, Mr. Sterling told you that the asset himself was a

9  Russian scientist?

10  A.   I don't know if that's the case or not.  I do not believe

11  that's the way it was stated.

12  Q.   I'm sorry?

13  A.   I do not believe that's the way it's stated.  I believe he

14  stated that if a Russian scientist were given these plans, they

15  would have been able to figure out they were flawed.

16  Q.   And that wasn't because a Russian scientist, in fact, was

17  given the plans and said that there was something wrong?

18  A.   I have no recollections of him stating they were given to

19  a Russian scientist.

20  Q.   Okay.  You don't recall one way or the other?

21  A.   I don't recall him saying they were given to a Russian

22  scientist.

23  Q.   Specifically, you don't recall him saying that the human

24  asset was a Russian scientist?

25  A.   I do not.

1  Q.    And Mr. Sterling told you that this operation, the

2  delivery of these plans, occurred in 2000, correct, calendar

3  year 2000?

4  A.    I believe I've written it as more than two years ago.  I

5  do not recall a specific date.

6  Q.    And I'm sorry, what are you referencing when you say "more

7  than two years ago"?

8  A.    The first full paragraph on the second page of my memo

9  states, "He was asked why he was bringing this information to

10 the committee over two years after the operation took place."

11 Q.    Okay.  Understanding what the memo says, my question is do

12 you recall that Mr. Sterling told you specifically that the

13 operation occurred in the year 2000?

14 A.    I do not.

15 Q.    Do you recall being interviewed by the FBI in 2010?  This

16 was the interview at the Hart Building.

17 A.    Okay.

18 Q.    Now, do you recall telling FBI agents in 2010 that Jeffrey

19 Sterling brought concerns to SSCI about a CIA operation

20 conducted in 2000?

21 A.    I do not recall my exact conversation with the FBI on that

22 date.

23 Q.    I'll go ahead and hand up the 302 of that interview and

24 ask you to look at the last paragraph on the first page.

25 A.    Which paragraph?  The first paragraph?

1    Q.    The last paragraph on the first page.

2    A.    I've read it.

3    Q.    Does that refresh your recollection that you told the FBI

4    that Mr. Sterling brought concerns to you about a CIA operation

5    conducted in 2000?

6    A.    I didn't write this memorandum.  I do not recall exactly

7    what I said.  I may have said something like two years before

8    or whatever.  I don't recall exact wording at that time.

9    Q.    So your answer is this does not refresh your recollection

10   one way or the other as to whether or not you specified that

11   the operation was in 2000?

12   A.    That is correct.

13   Q.    Let's go back to the memo.  In the third paragraph --

14   A.    What page?

15   Q.    The first page of the memo, the third paragraph.  This is

16   where you start discussing the meeting itself, correct?

17   A.    Um-hum.

18   Q.    You say that the operation involved providing faulty plans

19   to Iran, correct?

20   A.    Correct.

21   Q.    And that the plans were for a Russian-based nuclear fire

22   set, correct?

23   A.    Correct.

24   Q.    And you also say that the plans had been modified by the

25   National Laboratories, correct?

1    A.    Correct.

2    Q.    And that's something that you would have learned from

3    Mr. Sterling, correct?

4    A.    Yes.

5    Q.    And Mr. Sterling was concerned that the Iranians might be

6    able to identify and correct mistakes in the plans, correct?

7    A.    Yes.

8    Q.    And his concern was based on the fact that the CIA asset

9    recognized the plan's flaws almost immediately after being

10   shown them, correct?

11   A.    That is what he said.

12   Q.    Okay.  Well, actually, what you told the FBI he said is

13   that he recognized that the plans were faulty after looking at

14   them, correct?

15   A.    I'm not sure I see the distinction there.  Are you

16   referring to --

17   Q.    Yes.  Do you know -- do you recall telling the FBI that

18   the asset recognized the plans were faulty?  That was the word

19   you used with the FBI; do you recall that?

20   A.    That's the word that's on the piece of paper.  I did not

21   write that document, so I do not recall the exact words I used

22   with them, but "faulty" and "flawed" seem the same to me.

23   Q.    To you, they seem the same?

24   A.    Yes.

25   Q.    And if we continue on to the second page of your memo, in

1    that first partial paragraph, you say that Mr. Sterling told

2    you the entire plan was turned over to the Iranians without any

3    means for further follow-up, correct?

4    A.   Correct.

5    Q.   And does this get to the concept that you were discussing

6    earlier, that they were just simply left somewhere?

7    A.   Yes.

8    Q.   And yet nonetheless, according to Mr. Sterling, the CIA

9    deemed the operation a success, correct?

10   A.   That is what he said.

11   Q.   And it would have been Mr. Sterling's preference that

12   rather than give them the plans as, as the operation was

13   designed, that he would have thought it would have been better

14   to string the operation out by only giving smaller pieces of

15   the plan at any one time, correct?

16   A.   Correct.

17   Q.   Because that would allow for more follow-up with the

18   Iranians, correct?

19   A.   Presumably, yes.

20   Q.   And Mr. Sterling told you that he was concerned that the

21   CIA might have given the Iranians too much information,

22   correct?

23   A.   He would have given them information that they could have

24   been able to decipher themselves into more meaningful

25   information.

1   Q.    Well, go ahead and look at your memo.

2   A.    Okay.

3   Q.    He told you that he was concerned that the CIA gave the

4   Iranians too much information -- I'm sorry, it's the first

5   partial paragraph on the second page.

6   A.    That's the way it reads, yes.

7   Q.    And that the Iranians might be able to use that

8   information in some way, correct?  That was his concern as

9   expressed to you at the meeting?

10  A.    To build the device, yes.

11  Q.    Well, your memo doesn't say to build a device, does it?

12  A.    That sentence doesn't.

13  Q.    Okay.  What he expressed to you was the fear that if the

14  CIA gave the Iranians too much information, they might be able

15  to use that information in some way themselves or might be able

16  to sell that information in some way to someone else, correct?

17  A.    That's the way the sentences at the end of that paragraph

18  read.

19  Q.    Okay.  Is there a different sentence in here that talks

20  about his concern that the Iranians were going to build a

21  device from, from these plans?

22  A.    Well, the first part of the paragraph talks about a, to

23  use the exact words, "a nuclear fire set."  If there were plans

24  for a fire set, you would assume they'd be used to make a fire

25  set.

1    Q.   Your, your interpretation was that they might be able to

2    identify all of the flaws and actually build a fire set,

3    correct?

4    A.   Say that again?  My concern or --

5    Q.   Your interpretation of what Mr. Sterling was saying was

6    that the Iranians might be able to use -- might be able to find

7    all of the flaws and build a working fire set?  Is that what

8    you understood Mr. Sterling was telling you?

9    A.   Correct.  Yes, it is.

10   Q.   But, in fact, the specific fear that he identified was

11   that they might be able to use the information themselves or

12   sell it to someone, not that they would find all of the flaws

13   and construct a fire set, correct?

14   A.   I presume that complete accurate plans for a fire set

15   would be of value to the Iranians and any other foreign country

16   that didn't have one already.

17   Q.   You presume that?

18   A.   I guess what I'm saying is my recollection is the word

19   "information" in this sentence that you picked from the end of

20   the paragraph relates back to the fire set information in the

21   beginning part of the paragraph.

22   Q.   All right.  But there's a difference between a concern

23   that we might have given them too much information, that they

24   might be able to use it in some way, and a concern that they

25   could actually take those plans and build a working fire set

1   from them?  Those are two different concerns, correct?

2           MR. OLSHAN:  Objection.

3           THE COURT:  Sustained.

4   BY MR. POLLACK:

5   Q.   Mr. Sterling did not tell you that he thought this was a

6   rogue operation?

7   A.   No.  I did not get the impression the operation was

8   conducted outside of normal channels.

9   Q.   And Mr. Sterling told you, if we go on to the next

10  paragraph, you asked him why he was coming to the committee at

11  this point in time with his concerns, correct?

12  A.   Correct.

13  Q.   And he made a reference to current events, right?

14  A.   Correct.

15  Q.   And current events at this time, March 5, 2003, is the

16  United States was about to go to war with Iraq based at least

17  in part on the belief that Iraq had a program of weapons of

18  mass destruction, correct?

19          MR. OLSHAN:  Objection.  We're getting a little far

20  afield.  This is irrelevant, Your Honor.

21          THE COURT:  Well, I mean, it is referenced there.  If

22  you know.  Do you --

23          THE WITNESS:  I have no recollection of him giving a

24  specific reason beyond what is stated in this memorandum of why

25  he chose that time to come to the committee.

1          THE COURT:  All right.

2     BY MR. POLLACK:

3     Q.   Okay.  What, what did you understand current events -- a

4     reference to current events on March 5, 2003, to refer to?

5          THE COURT:  That's too vague.  I'm going to sustain

6     the objection.

7     BY MR. POLLACK:

8     Q.   He -- Mr. Sterling told you he had some concerns, but he

9     was not claiming that he had evidence that the CIA or the

10    National Laboratories did not take adequate precautions, right?

11    A.   I believe he stated he had concerns that they had not

12    taken adequate precautions.

13    Q.   Didn't he tell you that he could provide you no evidence

14    that they didn't take adequate precautions?

15    A.   I don't remember him saying he could provide no evidence

16    that they didn't take adequate precautions.  He claimed that

17    the --

18    Q.   Look at your first full paragraph on page 2.  "He could

19    provide no evidence that the CIA and the National Laboratories

20    did not take adequate precautions," correct?  He wasn't

21    claiming to have evidence that the CIA and the National Labs

22    did not take adequate precautions, was he?

23    A.   He claimed they didn't take adequate precautions.

24    Q.   He, he had concerns about that, but he wasn't claiming

25    that he had evidence.  It was something he wanted you to look

1    into, correct?

2    A.   He was claiming the plans were faulty, so I think the

3    evidence would be the plans.  Right, he did not provide the

4    plans in the meeting.

5    Q.   And he also readily conceded to you that he doesn't have a

6    technical background himself, correct?

7    A.   That is correct.

8    Q.   What he had was a concern based on the reaction of a human

9    asset, correct?

10   A.   Correct.

11   Q.   And you asked him if he had taken those concerns to the

12   Inspector General within the CIA, correct?

13   A.   Correct.

14   Q.   And he told you that he had not and he had not had a good

15   experience with the Inspector General related to his employment

16   discrimination claims, correct?

17   A.   That is true, yes.

18   Q.   And a CIA officer or a case officer or a former case

19   officer who has concerns about an operation may come to SSCI

20   with those concerns, correct?

21   A.   Generally, they were not supposed to come direct to the

22   committee.  It was supposed to be worked through the internal

23   channels first.

24   Q.   Okay.  But they -- such person is allowed to come to SSCI.

25   There was nothing improper about your having this meeting with

1    Mr. Sterling, was there?

2    A.   I don't recall the exact procedures in time at that place,

3    but there were procedures that should have been done before

4    they came to the committee.

5    Q.   Isn't part of the reason that there's a Senate Oversight

6    Committee so that if somebody doesn't feel that their issues

7    are going to be adequately addressed within the CIA, there's

8    another forum that they can go to?

9    A.   It is one of the forums they can go to after all the

10   correct procedures have been followed.  It should be noted that

11   the Inspector General works for both the committees and the

12   CIA.  He's statutorily appointed, so it's one of the main

13   oversight mechanisms we use since they are internal and have

14   direct access to all the direct cables, the cryptonyms, and

15   stuff we discussed earlier that we do not have.

16        So normally before we take action, we would want to

17   know the Inspector General had fully vetted the situation and

18   give us a sense that it was a credible complaint before we

19   would take it on.  Again, in this case, lawyers talk, and

20   whatever happened, we agreed to meet.

21   Q.   When you met with -- when you spoke to Ms. Divoll about

22   meeting with Mr. Sterling, did, did you tell her that while you

23   were agreeing to the meeting, it would be unlikely that SSCI

24   would take any action if this had not been something that had

25   been raised with the Inspector General?

1   A.    The decision to meet with Mr. Sterling was made before I

2   became involved in the situation.

3   Q.    So the answer is no?

4   A.    No.

5   Q.    Okay.  Did you have a discussion with Ms. Divoll after you

6   met with Mr. Sterling to tell her that you didn't think that

7   the committee was likely to take any action?

8   A.    We would have discussed the course of action with the

9   staff directors.  I was not the final arbiter on what we would

10  do or not do.

11  Q.    So the answer would be no.

12  A.    Correct.

13  Q.    And you first learned that there had been a leak of

14  information that Mr. Sterling had provided to you at that

15  March 5 meeting from Mr. Duhnke, correct?

16  A.    I believe so, yes.

17  Q.    The staff director?

18  A.    Correct.

19  Q.    And when --

20  A.    Well, I believe I would have learned from Mr. Duhnke there

21  were inquiries as to the information, the source of the

22  information or a leak.  I don't know the -- I don't recall the

23  exact conversation with Mr. Duhnke and what was --

24  Q.    Do you recall telling the FBI in 2005 that in response to

25  a question about how you became aware there was a possible

1  leak, you advised the FBI that Mr. Duhnke had called you in and

2  told you that the FBI was investigating?

3  A.   I do not recall.  Again, I did not create that memo.  I do

4  not recall the exact contents of that memo.

5  Q.   Okay.  You were there when you met with the FBI, correct?

6  A.   Yes.

7  Q.   Okay.  I'm asking you if you recall telling the FBI that

8  you learned about the possible leak of information because

9  Mr. Duhnke called you in and told you that the FBI was

10 investigating?

11 A.   I do not recall exactly what I told the FBI in 2005.

12 Q.   Do you recall, whether or not you recall exactly the

13 precise words, do you recall communicating to them that you

14 learned of an FBI leak investigation from Mr. Duhnke?

15 A.   What I will recall -- I do recall is it was through

16 Mr. Duhnke that I learned there was further information -- I'm

17 sorry, further interest in the information discussed with

18 Mr. Sterling.

19        THE COURT:  Well, did you understand at that time

20 that the concern was that there had been a leak or improper

21 disclosure of some of that information?

22        THE WITNESS:  That would have been -- I recall that

23 being the basis of the renewed interest, yes.

24        THE COURT:  All right.  So Duhnke did explain

25 something along those lines to you?

1            THE WITNESS:  But I don't know that he explained it

2    was leaked to the press or anybody in particular.

3            THE COURT:  But just that there had been an improper

4    disclosure?

5            THE WITNESS:  Yes.

6            THE COURT:  All right.

7    BY MR. POLLACK:

8    Q.   And that he told you that the FBI was investigating that

9    improper disclosure?

10   A.   He definitely told me somebody was looking into it.  I do

11   not recall if it was the CIA, the FBI, or -- there was just

12   clearly renewed interest, and thus, I created the memo.

13           MR. POLLACK:  Your Honor, I'm going to move to admit

14   into evidence Mr. Stone's -- I'm sorry -- yes, Mr. Stone's

15   statement to the FBI as reflected in the 302, and I will note

16   that the FBI gave him the opportunity to review that 302 and he

17   adopted the statement.

18           THE COURT:  No.  The Court does not accept 302s; you

19   know that.  That's not the --

20           MR. POLLACK:  Well, ordinarily, the FBI doesn't

21   give --

22           THE COURT:  I've ruled on it.

23   BY MR. POLLACK:

24   Q.   Did you tell the FBI when you were interviewed in 2005

25   that you prepared your April 25, 2003, memorandum, Exhibit 101,

1  after learning of the FBI's interest in the matter and made the

2  comment, "I'm no fool."

3  A.    I've read that, and I know I created the memo due to

4  somebody's interest.  I do not recall again exactly whose

5  interest in the information had been brought to the staff

6  director's attention, but that certainly prompted me to create

7  the memo, and I was smart enough to figure out if some other

8  executive agency was examining this information, it would be

9  important for me to document what I knew.

10 Q.    And you said you didn't know it involved a leak to the

11 media?

12 A.    Disclosure of classified information doesn't always mean a

13 leak to the media, so --

14 Q.    That's my question.  Is your testimony that you didn't

15 know that it involved a leak to the media?

16 A.    I do not recall exactly who was involved in the improper

17 disclosure of classified information.

18 Q.    You testified earlier this morning that sometime between

19 March 5, 2003, and April 25, 2003, you received on your direct

20 line a call from Jim Risen, a reporter with *The New York Times*,

21 correct?

22 A.    Correct.

23 Q.    And you after speaking to Mr. Duhnke and learning about

24 the leak thought it was important to put into your memo the

25 fact that Mr. Risen had called you but that you hadn't spoken

1  with him, correct?

2  A.    Correct.

3  Q.    And you did that even though you say you have no idea what

4  it was Mr. Risen was calling about, whether it had anything to

5  do with Classified Program No. 1 or not?

6  A.    Staff was not allowed to talk to the press in any shape or

7  fashion, whether it was classified or not classified.  The

8  activities, any activities of the committee we were not allowed

9  to talk to the press about.  The only person who was allowed to

10 talk to the press about a classified or unclassified issue

11 involving the committee was the staff director, and I wanted it

12 well documented that I had not done that.

13 Q.    And you wanted it documented in a memo you were writing

14 about Classified Program No. 1?

15 A.    Correct.

16 Q.    Mr. Risen had called your direct number, correct?

17 A.    I don't know who -- he could have called the receptionist,

18 and she could have put him through to my direct number.

19 Q.    Were you concerned that there might be a phone record that

20 reflected a call from Mr. Risen to your direct number?

21 A.    Not particularly.  I didn't really say anything to him.

22 Q.    And you wanted to make sure that you documented that fact?

23 A.    What fact?  That he had called -- that I had spoke with

24 him on the phone?

25 Q.    And in particular, you wanted to get in writing that you

1    hadn't spoken to him, right?

2    A.    Correct.

3    Q.    Even though you had no idea what he was calling you about?

4    A.    Speaking to the press without authorization is something

5    that can get you fired.  I wasn't looking to take that chance.

6    I would have -- I mean, any other time, any other day, if I'd

7    gotten a call from the press, I would have brought it to the

8    attention of the staff directors.

9    Q.    And that would be Mr. Duhnke, correct?

10   A.    Correct.

11   Q.    Mr. Duhnke, the person who was authorized to talk to the

12   press, correct?

13   A.    Correct.

14   Q.    Mr. Duhnke, the one who told you that there was a leak

15   investigation, correct?

16   A.    Same person, yes.

17   Q.    And you're aware, are you not, that Mr. Duhnke did not

18   cooperate with the FBI's investigation?

19            MR. OLSHAN:  Objection.

20            THE COURT:  Sustained.

21   BY MR. POLLACK:

22   Q.    It's fair to say that you're aware that Mr. Duhnke is not

23   a very big supporter of the CIA?

24            MR. OLSHAN:  Objection.

25            THE COURT:  I don't know what the relevance of that

1    question is.  I'll sustain the objection.

2            And remember, ladies and gentlemen, I've warned you

3    before that statements by the attorneys which would have seemed

4    to state a fact, if the witness doesn't say yes or no, or

5    obviously, if I sustain the objection, you erase that question

6    from your mind.  It's not evidence in the case.

7    BY MR. POLLACK:

8    Q.    In your meeting with Mr. Sterling, you don't recall him

9    using the code name affiliated with the operation or the asset

10   that he was speaking to you about, correct?

11   A.    I do not.

12   Q.    But it's your practice not to refer to something that

13   you're hearing about by its code name, correct?

14   A.    Depends on where I'm at, sir.  On the Hill, we generally

15   were not exposed to the cryptonym, so they wouldn't have been

16   used in our conversation.  In my current capacity, I use them

17   all the time.

18   Q.    Okay.  Well, I'm only talking to you, Mr. Stone, about

19   your time on the Hill.

20   A.    Okay.  In that case, the use of cryptonyms was extremely

21   rare.

22   Q.    And if Mr. Sterling had mentioned a code name to you in

23   the meeting with yourself and Ms. Divoll, in reporting it to

24   Mr. Goco, you would not have told him the code name, correct?

25   A.    I wasn't provided a code name, so I didn't provide

1   Mr. Goco a code name.

2   Q.   You now have a specific recollection you weren't provided

3   a code name?

4   A.   I've recalled all along I was not provided a code name.

5        Wait, are you using the word "code name" and saying

6   it as a cryptonym?

7        THE COURT:  That's what he means, yes.

8        THE WITNESS:  Okay.  Then I was not provided a

9   cryptonym, and therefore, I did not provide Mr. Goco a

10  cryptonym.

11  BY MR. POLLACK:

12  Q.   Well, whether or not it was a full cryptonym, do you

13  recall whether Mr. Sterling referred to this program by name,

14  like Merlin?

15  A.   I do not recall him providing a name of the program.

16  Q.   And in speaking to Mr. Goco, you would have mentioned the

17  target country of the operation rather than the code name of

18  the operation, correct?

19  A.   I would have made the referral to Iran, yes.

20  Q.   And your memo mentioned the target country but not the

21  code name, correct?

22  A.   That is correct.

23  Q.   Now, during your meeting on March 5 with Mr. Sterling and

24  Ms. Divoll, you sensed some frustration from Mr. Sterling,

25  correct?

1    A.    In regards to?

2    Q.    Anything.  In speaking to you, did he seem at times to be

3    somewhat frustrated?

4    A.    I would say during the meetings in my office with Vicki

5    Divoll present, I don't remember him being agitated,

6    frustrated, acting abnormally.  I'm not sure what you mean by

7    "frustrated."

8    Q.    He wasn't acting abnormally, correct?

9    A.    Correct.

10   Q.    He didn't seem overly agitated?

11   A.    No.

12   Q.    Remained calm throughout the meeting?

13   A.    Absolutely.

14   Q.    But while he remained calm, you did sense some

15   frustration?

16   A.    To what are you referring?

17   Q.    Well, let me ask you, do you remember in 2010 telling the

18   FBI that you sensed Sterling's frustration during the meeting,

19   although Sterling remained calm?

20   A.    There's multiple things going on.  I don't remember any

21   frustration during the meeting in my office discussing the

22   operation he was describing.  I think in the course of

23   discussions in the reception area, he was frustrated with his

24   case against the CIA and a bunch of other, you know, his basic

25   interaction with the CIA, but I do not recall him voicing, you

1    know, other than being unhappy with the operation, any other

2    frustrations or concerns or --

3    Q.    When you talk about the conversations in the hall --

4    A.    No, I said the reception area.

5    Q.    In the reception area.  Is that conversation before the

6    meeting or after the meeting?

7    A.    It could have been either one.

8    Q.    At some point, you recall him expressing some frustration

9    with the CIA in, in the reception area?

10   A.    Usually anybody who's come to the committee is frustrated

11   over their relationship with the Central Intelligence Agency.

12   That's why they're there.

13   Q.    Okay.

14   A.    So I don't -- if you're asking me to be, if I recall a

15   specific issue he was frustrated over, I do not.  In the course

16   of the conversation between him and his lawyer and us in the

17   reception area or whatever, clearly there was frustration with

18   his career at the CIA or his exchanges with the CIA on this and

19   his personnel other stuff.

20   Q.    And specifically frustration with his employment issue and

21   his employment discrimination lawsuit?

22   A.    Again, I don't recall the exact issue he was frustrated

23   over, but between the two of them, it would --

24   Q.    And as far as his comment or Mr. Zaid's comment, you don't

25   recall who made it, about hoping that something would happen

1    quickly, you don't recall whether that related to his

2    employment issues?

3    A.    I do not recall which one it applied to, no, either the

4    employment or the operation.  Such statements were so common

5    during these types of exchanges with people, complainants,

6    that, you know, they wanted, they wanted to move the ball:

7    What are you going to do?

8    Q.    Now, you understood when you met with Mr. Sterling on

9    March 5, 2003, that what Mr. Sterling was talking to you about

10   was a classified operation, correct?

11   A.    Correct.

12   Q.    And, in fact, that's why Mr. Zaid, the lawyer, had to sit

13   out in the reception area?  He couldn't even come in in the

14   meeting, correct?

15   A.    Correct.

16   Q.    And you understood that it was important not to disclose

17   information about that operation, correct?

18   A.    Correct.

19   Q.    And you understood that -- well, afterwards, you

20   understood -- at some point, you understood from Mr. Duhnke

21   that there was an investigation into --

22            MR. OLSHAN:  Objection, Your Honor.  We've been down

23   this road.

24            THE COURT:  Sustained.  It's been asked before.

25            MR. POLLACK:  I'm going to ask something different,

1  Your Honor.

2          THE COURT:  Well, then get right to it.

3          MR. POLLACK:  All right.

4  Q.   After you learned from Mr. Duhnke that there was an

5  investigation into a leak, you prepared this memo, right,

6  Exhibit 101?

7  A.   You used the word "leak."  I'm not sure exactly what he

8  said to me.  He said something to me that made it clear that I

9  should write the memo.

10 Q.   Well, but specifically, he made it clear that there was

11 some sort of an investigation going on, correct?

12 A.   It was clear to me there had been a disclosure of

13 classified information.

14 Q.   Okay.  And at that point, you would have understood very

15 clearly that if Mr. Sterling or his lawyer had been threatening

16 to go to the press not about his employment issues but about

17 Classified Program No. 1, that that would have been something

18 you would have wanted to document in your, your memo?

19 A.   Are you asking me if he said he was going to the press

20 or --

21 Q.   I'm saying that if he had or Mr. Zaid had, in fact, said

22 or even implied that they were going to go to the press about

23 Classified Program No. 1 at a time that you're writing a memo

24 because you're concerned about a leak about Classified Program

25 No. 1, that's a fact that you would have included in the memo

1   if that were a true fact?

2   A.   If it were a true fact, I believe that would be something

3   I would have included in the memo.

4   Q.   And the memo makes no reference to that comment at all,

5   correct?

6   A.   No, it does not.

7           MR. POLLACK:  I don't have anything further of

8   Mr. Stone.

9           THE COURT:  Redirect, Mr. Olshan?

10          MR. OLSHAN:  One moment, Your Honor.

11                      REDIRECT EXAMINATION

12  BY MR. OLSHAN:

13  Q.   Just a couple questions for you, Mr. Stone.

14          If we could bring up page 2, Exhibit 101?  That's the

15  memo that you drafted, Mr. Stone.  If you'd zoom in on the

16  second -- or the first full paragraph?

17          Mr. Pollack asked you some questions about

18  Mr. Sterling's technical background.  Do you remember that?

19  A.   Yes, I do.

20  Q.   Do you recall whether Mr. Sterling offered to you that he

21  didn't have a technical background or responded to a question

22  from you about that?

23  A.   I recall it was addressed in the conversation.  I do not

24  recall whether we asked or he offered that he did not have a

25  technical background.

1   Q.   Mr. Pollack asked you a number of questions about the

2   times you've been interviewed with -- by the FBI, right?

3   A.   Correct.

4   Q.   2005?  2010?

5   A.   I believe there's one other one after that.

6   Q.   The memos that Mr. Pollack showed you, did you write any

7   of those?

8           MR. POLLACK:  Objection.  Asked and answered.

9           THE COURT:  It's quite clear, 302s are written by FBI

10  agents.  They're not written by the person who is being

11  questioned.  Let's move this along.

12  BY MR. OLSHAN:

13  Q.   Mr. Stone, as you sit here today, in your view, what is

14  the best memorialization of what occurred in the meeting that

15  you and Ms. Divoll had with Mr. Sterling?

16  A.   That would be my memorandum.

17  Q.   And you made that in 2003?

18  A.   That is correct.

19  Q.   Other than that meeting with Mr. Sterling, are you aware

20  of anyone else ever raising any concerns to you at SSCI about

21  this specific program?

22  A.   Not to my knowledge.

23          MR. OLSHAN:  One moment, Your Honor?

24          THE COURT:  Yes, sir.

25          MR. OLSHAN:  That's all I have.

1          THE COURT:  All right, any recross?

2          MR. POLLACK:  Yes.

3                      RECROSS EXAMINATION

4  BY MR. POLLACK:

5  Q.   And the reason that that memo is the best memorialization

6  of what happened at the meeting is because you don't have your

7  handwritten notes, correct?

8  A.   Yes.

9          MR. POLLACK:  Thank you.

10         THE COURT:  All right, is anybody --

11         THE WITNESS:  It's also closest to the time of the

12 event.  Sorry, it's also closest to the time of the actual

13 meeting.

14 BY MR. POLLACK:

15 Q.   Your handwritten notes were closer to the time of the

16 event than your memo seven weeks later, correct?

17 A.   Correct, but those --

18 Q.   So the best memorialization of that meeting would be your

19 handwritten notes, correct?

20 A.   The handwritten notes wouldn't have been in full sentence,

21 so, I mean, you can argue that either -- I don't have an

22 opinion on that.

23         MR. POLLACK:  I don't have anything further.  Thank

24 you.

25         THE COURT:  Anybody going to call Mr. Stone again?

1          MR. OLSHAN:  No, Your Honor.

2          THE COURT:  No?  Then, sir, you're released as a

3   witness.  You can stay in court, or you may leave.  Thank you.

4          THE WITNESS:  Thank you, ma'am.

5                       (Witness excused.)

6          THE COURT:  Call your next witness.

7          MR. TRUMP:  Ms. Divoll.

8          THE COURT:  All right, Ms. Divoll.

9      VICKI JAMIESON DIVOLL, GOVERNMENT'S WITNESS, AFFIRMED

10                      DIRECT EXAMINATION

11  BY MR. TRUMP:

12  Q.    Good afternoon.  Would you please state your full name?

13  A.    Vicki Jamieson Divoll.

14  Q.    Would you spell your first name?

15  A.    V-i-c-k-i.

16  Q.    And would you spell your last name, please?

17  A.    D-i-v-o-l-l.

18  Q.    I'll ask you to speak loudly and clearly into the

19  microphone so everyone can hear you.

20  A.    Yes.

21  Q.    Are you currently employed?

22  A.    No.

23  Q.    What was your last employment?

24  A.    Most recently, I taught at the Naval Academy in Annapolis.

25  Q.    And what did you teach at the Naval Academy?

1    A.    I taught a course on U.S. government and the Constitution.

2    Q.    Are you an attorney?

3    A.    Yes.

4    Q.    Where did you go to law school?

5    A.    University of Virginia.

6    Q.    Did you practice law upon graduation?

7    A.    Yes.  I worked in a large Washington, D.C., law firm for

8    several years.

9    Q.    And was that in what type of law?

10   A.    I did a variety of things but primarily litigation.

11   Q.    And did you take a break from the practice of law for a

12   while?

13   A.    Yes.  After I had my second child, I had been working part

14   time at the law firm, and I took an extended leave of absence

15   which ended up being a total leave of absence for about ten

16   years and didn't, didn't work during that time and had a third

17   child during that period.

18   Q.    When did you return to full-time employment?

19   A.    I didn't return to full-time employment for quite a number

20   of years.  I returned to employment on a part-time basis, I

21   believe it was at the end of 2004.

22   Q.    So back up.

23   A.    No, I'm sorry, the end of -- it was the beginning of the

24   Clinton administration.  I'm sorry, I misspoke.  It would have

25   been the end of 1993 or beginning of '94.

1    Q.    And what did you do when you returned to employment?

2    A.    I had a position as a lawyer helping in the White House

3    Counsel's Office under President Clinton.

4    Q.    And how long did you work at the White House Counsel's

5    Office?

6    A.    I think it was a little under two years.

7    Q.    And after that, what did you do?

8    A.    I got a, a job as an attorney at the Central Intelligence

9    Agency.

10   Q.    And approximately when was that?

11   A.    That would have been the fall, I believe, November 1995.

12   Q.    Were you assigned to any particular division within the

13   CIA?

14   A.    Yes.  When I first came in, I was put in the litigation

15   division and worked there for about a year and a half, and then

16   I went to the counterterrorism center.

17   Q.    Did you have to have a Top Secret clearance to work as an

18   attorney for the CIA?

19   A.    Yes.

20   Q.    And did you maintain that clearance?

21   A.    Yes.

22   Q.    Were you trained in the proper handling of classified

23   information?

24   A.    Yes, I was.

25   Q.    How long were you at the CIA?

1    A.    I was there until January of 2000.

2    Q.    And what happened then?  Where did you go to work?

3    A.    I was hired to be the minority counsel on the Senate

4    Intelligence Committee.

5    Q.    And that's the Senate Select Committee on Intelligence?

6    A.    Yes.

7    Q.    Sometimes referred to as SSCI?

8    A.    Yes.

9    Q.    And just generally, what were your duties and

10   responsibilities at the committee when you were first hired?

11   A.    Well, the Democrats were in the minority in the Senate

12   then, and the, Senator Bryan of Nevada, the vice chairman,

13   hired me to be his lawyer on the minority side, so to help him

14   with legal issues.

15   Q.    And you were part of the staff of the committee?

16   A.    Yes.

17   Q.    Did you have to maintain a security clearance to, to work

18   on the committee?

19   A.    Yes.

20   Q.    And were you required to occasionally or -- were you

21   required to review classified information?

22   A.    Every day.

23   Q.    As a staff member, were you authorized to speak to the

24   press on your own?

25   A.    No.  There were occasions when -- later on where -- I

1  became general counsel later, and I guess you'll ask me about

2  that, but there were a few occasions where my boss asked me

3  specifically to speak to the press about a legislative matter

4  or a policy matter, but as a general rule, no.  Unless I was

5  asked to do so by my boss, no, I was not supposed to talk to

6  the press and didn't.

7  Q.   Let me direct your attention to late February-early March

8  of 2003.  What was your position with the committee in

9  approximately February-March of 2003?

10 A.   Well, I had been general counsel when the Democrats had

11 taken over.  I'd been moved from the minority lawyer job to the

12 majority lawyer job, but at the end, in the 2002 election, the

13 Democrats lost power, and my boss, Senator Graham at that time

14 from Florida, also retired from the Senate, so when the Senate

15 came back into session at the beginning of 2003, I was no

16 longer in a general counsel or minority counsel role, but I did

17 stay on the staff.

18 Q.   So you were a staff member for the committee?

19 A.   Yes.  Senator Rockefeller was going to bring on his own

20 lawyer to staff him, and I stayed on.  I still did some legal

21 matters for the committee as needed, but I was a general staff

22 member who also could do legal matters, work on legal matters.

23 Q.   At that time, did you know someone by the name of Mark

24 Zaid?

25 A.   I didn't know him, but I had heard the name many, many

1    times.

2    Q.   Did he contact you to arrange a meeting with a client of

3    his?

4    A.   Yes.

5    Q.   And did you arrange that meeting?

6    A.   I did.

7    Q.   To your, to your knowledge, what information did Mr. Zaid

8    provide to you for purposes of scheduling this meeting?

9    A.   I believe, I believe that he told me that he had a client

10   who had been an officer at the CIA who, my understanding was

11   that he was no longer there and that he wanted to come to the

12   committee to tell us about something that he thought we should

13   know.

14   Q.   And did you, did you schedule a meeting?

15   A.   Yes.

16   Q.   Sitting here today, do you recall the exact date of the

17   meeting?

18   A.   No.

19          MR. TRUMP:  If we could, Your Honor, pull up Exhibit

20   100?

21          THE COURT SECURITY OFFICER:  Did you say Exhibit

22   No. --

23          MR. TRUMP:  It's already in.  We'll just pull it up

24   on the screen.

25   Q.   If you could look at that screen?  Do you recognize that

1  document?

2  A.    In general.  I recognize the logbook, yes.

3  Q.    And that's a visitors log for March 5 of 2003?

4  A.    Yes, it is.

5  Q.    Does it also have, appear to have Mr. Zaid's name?

6  A.    I can't really read the --

7  Q.    If you could blow that up?

8  A.    Yes.  Yes, I see his name, M. Zaid.

9  Q.    And above that, a J. Sterling?

10  A.    Yes.  It's not very legible, but it looks like that, yes.

11  Q.    Does that refresh your recollection as to when the meeting

12  occurred?

13  A.    Yes.

14  Q.    Prior to the meeting, did you go to someone else on the

15  staff and ask that person to attend?

16  A.    Yes.  I, I don't exactly remember the sequence of events

17  there, but -- I don't recall if I asked the staff director how

18  we should proceed or whether I on my own decided that Don Stone

19  would be the proper person to conduct this meeting.

20  Q.    In the end, did Mr. Stone attend the meeting?

21  A.    Yes.

22  Q.    Was the meeting conducted in the secure space of the

23  committee?

24  A.    Yes.

25  Q.    Why was that necessary?

1   A.   Well, we -- well, all of our business is conducted in a

2   secure space.  All of our offices are in a secure space, but we

3   also anticipated that there might be classified matters that

4   Mr. Sterling wanted to discuss with us.

5   Q.   Was Mr. Zaid invited to participate in the meeting?

6   A.   No.

7   Q.   Do you see the person that we've been identifying as

8   Mr. Sterling here in court?

9   A.   Yes, I do.

10  Q.   Would you point him out, please?

11                          (Witness indicating.)

12        THE COURT:  The record will reflect the

13  identification.

14  BY MR. TRUMP:

15  Q.   Now, very generally speaking, what was, what was the

16  meeting about?

17  A.   Well, we already knew, either Mr. Zaid had told me or we

18  had somehow learned that Mr. Sterling was no longer with the

19  agency and was in a disputed situation with them about his

20  termination, and so we didn't want to talk about that, and we

21  had discussed in advance among ourselves that we didn't want to

22  get into that at all, and we told him that, but it turns out

23  that that was not what he wanted to talk about.  So we

24  proceeded to talk about the matter he came for.

25  Q.   And was a memo eventually prepared of that meeting?

1    A.    Yes.

2    Q.    And did you participate in the preparation of that memo?

3    A.    I did.

4    Q.    And would you describe your participation in the

5    preparation of that memo?

6    A.    Well, we agreed that Don would write -- we both took notes

7    during the meeting, and we agreed that Don would write the

8    first draft and I would review it and make changes or add

9    things as I deemed appropriate.

10   Q.    And if -- again, if we could, would you pull up Exhibit

11   101, Government 101?

12         Is that the memorandum that was prepared?

13   A.    Yes.

14   Q.    And have you gone over it prior to trial today?

15   A.    Yes.  You've shown it to me, and I've read it.

16   Q.    Is it an accurate summary of the meeting as best you can

17   recall?

18   A.    Well, I mean, so many years ago.  Yes, as far as I could

19   tell, it was accurate.  I don't -- there's nothing about it

20   that, that I would deem to be inaccurate.  So yes, I believe

21   it's an accurate description of the meeting.

22   Q.    The level of detail reflected in the memorandum, is that

23   fairly accurate with respect to the level of detail at the

24   meeting?

25   A.    Yes.  I mean, the way we, we handled the memo writing,

1  both of -- my habit is to take very detailed notes when I'm in

2  pretty much any meeting, but certainly a meeting like this, and

3  Don took notes as well, as I recall, and so we, you know, we

4  took this matter very seriously at the time, and we -- I

5  referred to my notes when I reviewed Don's draft to make sure

6  that he hadn't forgotten anything that I had made note of and

7  maybe he hadn't made note of or to see if there was anything

8  inaccurate.

9  Q.   And what was it that Mr. Sterling discussed with you at

10 your meeting?

11 A.   He talked to us about an operation that he had worked on

12 when he was at the agency, at CIA, and it involved the Iranian

13 nuclear program and efforts by the agency to thwart or slow

14 down or undermine the progress of their nuclear research, and

15 that the operation involved giving -- having plans developed,

16 nuclear plans, nuclear weaponry plans -- I'm not a scientist,

17 so I don't really know exactly how you would say that -- but

18 the plans would be developed by the United States government

19 and that they would be provided through one of the agency

20 sources to the Iranians in such a way that they would believe

21 that they were getting their hands on something valuable, but

22 instead, there was a flaw built into the plans that I

23 understood from Mr. Sterling the point of the operation was to

24 slow them down by heading them down the wrong path.

25 Q.   Now, that was the, the general outline of the operation,

1  correct?

2  A.    Yeah, as he described it to me.

3  Q.    What was Mr. Sterling's concern about the operation?

4  A.    He was concerned that the flaw in the plans was not very

5  well done and that the plans -- that the flaw would be easily

6  identified by Russian scientists who would be helping the

7  Iranians and that the operation would not be successful and, in

8  fact, could even be detrimental to our goals.

9  Q.    Now, let's look specifically at the third paragraph of

10  that exhibit.  Would you rather look at it on a piece of paper

11  or on the screen?

12  A.    The screen's good.

13  Q.    Okay.  Now, the memo reflects a CIA asset.  Do you recall

14  any additional information provided by Mr. Sterling with

15  respect to the asset?

16  A.    No.

17  Q.    There is terminology in that paragraph in the third

18  sentence, "The operation entailed a CIA asset providing Iran

19  with faulty plans for a Russian-based nuclear fire set."  Were

20  you familiar with that type of terminology when it was

21  mentioned by Mr. Sterling?

22  A.    The term "asset"?

23  Q.    No, the term "nuclear fire set."

24  A.    No.

25  Q.    That's the first time you'd ever heard it?

1    A.   Yes.  I'd never heard the term, and, in fact, I'm sure

2    that term came from Don's notes because I have no memory of

3    that term at all.

4    Q.   So sitting here today, you don't recall any additional

5    information about the phrase "nuclear fire set"?

6    A.   No.  All I recall is that there was a flaw in some aspect

7    of the plans.  That was all that I took away from the meeting.

8    Q.   The memo goes on to say at the bottom of the page that

9    he -- he's referring to Mr. Sterling, correct?

10   A.   Yes.

11   Q.   That he would have preferred to string the operation out

12   by giving pieces of the plan over time.  In the end, the entire

13   plan was turned over to the Iranians without any means for

14   further follow-up.

15        Do you recall any additional details provided by

16   Mr. Sterling as to what his specific concerns were about how

17   the operation was handled in this respect?

18   A.   I don't think so.  In fact, again, that's a little more

19   detailed than I personally recall.  The stringing out aspect of

20   it is not something I really remember.  I maybe knew it then,

21   but I don't remember it at all now, and I don't remember any

22   other details.  If I'd had them in my notes, I would have put

23   them in the memo.

24   Q.   And finally, in this paragraph, "Mr. Sterling fears the

25   CIA gave the Iranians too much information that they can either

1  use themselves or sell to someone else," again, did he provide

2  as best you can remember any additional details as how the

3  Iranians would make use of this information?

4  A.    No.  The impression I got from the way he described it was

5  that by seeing a flaw, that helps you understand better how to

6  do it correctly.  That's only how I understood it then and now.

7  Q.    From your days at the CIA, were you familiar with the

8  terminology "cryptonym"?

9  A.    Yes, cryptonym.

10 Q.    It's another way of saying codeword?

11 A.    Yes.

12 Q.    Did Mr. Sterling provide you with any cryptonyms or

13 codewords to describe this operation or the asset involved?

14 A.    No.  He didn't tell us anything about the asset in my

15 memory, and I'm sure if he had, it would be in the memo.

16 Q.    As best you can recall, did he tell you where these plans

17 were delivered to the Iranians?

18 A.    No.

19 Q.    Or when they were delivered?

20 A.    No.

21 Q.    Did he discuss with you any specific meetings that may

22 have occurred during the operation?

23 A.    No.

24 Q.    Did he give you any documents at the meeting?

25 A.    No.

1  Q.    You're familiar with CIA cables?

2  A.    Yes.

3  Q.    Did he show you or give you any CIA cables?

4  A.    No.  I would remember that because it wouldn't have been

5  appropriate for him to have them.

6  Q.    And while at the committee, working for the committee, was

7  it your practice to, to review CIA cables?

8  A.    Oh, yes.

9  Q.    Would you keep them or return them to the agency?

10 A.    In most cases, frankly, in most cases, if they were actual

11 cables as opposed to other kinds of documents, we would

12 actually review them out there.  Sometimes they ended up in our

13 files, but you can't take them out of the secure space.

14 Q.    When you say "out there," at the CIA?

15 A.    At the agency, yeah, Langley.

16 Q.    How did the meeting end?

17 A.    It was a very cordial meeting.  It wasn't a particularly

18 long meeting.  I think we shook hands and thanked him.  I mean,

19 I'm -- it's a long time ago, but that is the vague memory I

20 have of it, and that's normally how we would have.  I don't

21 remember there being anything alarming other than the story

22 itself about meeting with him, so I think we just said good-bye

23 and escorted him out.

24 Q.    When the meeting ended, did you have an understanding of

25 what Mr. Sterling expected you to do?

1   A.   Well, I think he expected us, I assumed then and he

2   probably said so, but that the reason he was here -- there

3   meeting with us was to, that he was frustrated that this CIA

4   operation was, was bad, and hoped that in our capacity as our

5   job is conducting oversight of the agency, that we would take

6   action out at CIA to do something about it.

7           And I think we probably said, you know, we'll decide

8   whether we're going to follow up or not.  I'm sure we left it

9   very vague with him because we wouldn't have made any promises

10  to him.

11  Q.   Now, the memorandum in the very last paragraph says that

12  since the meeting with Mr. Sterling and his attorney, there has

13  been minimal contact with staff.  Mr. Sterling has e-mailed the

14  committee highlighting press articles involving Iranian nuclear

15  interests.

16          Do you recall receiving any e-mails to that effect?

17  A.   No.  I don't recall -- I mean, my role in the meeting was,

18  was minimal, frankly.  Don Stone was the primary person who

19  needed to be at the meeting.

20          I was there because you would want at least two

21  people there, and also, I had been the person that Mark Zaid

22  had gotten in touch with, but my involvement in the matter

23  ended after the -- you know, shortly after the meeting, once

24  we'd talked to the staff director.  I had no further

25  involvement in the case at all.

1  Q.   So you referred to your discussion with the staff

2  director.  When did that occur?

3  A.   I think we went to the staff director right after

4  Mr. Sterling left.

5  Q.   And did you take this seriously?

6  A.   Yes.

7  Q.   And you understood it was a classified program?

8  A.   Yes.

9  Q.   And why did you take it to the staff director?

10  A.   Well, I mean, it was a highly sensitive program that if

11  Mr. Sterling was right about the problems with the program, was

12  something that we needed to move forward on in some way, shape,

13  or form, and the staff director would be the person to make

14  that decision.

15  Q.   And did he assign it to someone else on the committee

16  staff to follow up?

17  A.   Well, we had a very brief meeting, and he told us to do

18  the memo, that memo, and he brought Lorenzo Goco into the mix.

19  Q.   Once Mr. Goco was involved, did you step out of the

20  process?

21  A.   Yes, completely.

22  Q.   Other than the memo?

23  A.   Right, yeah.  I mean, it wasn't my job really to be part

24  of that.

25  Q.   Did you speak with anyone outside of the committee about

1  that meeting with Mr. Sterling?

2  A.   No.

3  Q.   Now, the memo refers to a telephone call by Mr. Risen to

4  Mr. Stone.  Do you see that?

5  A.   Yes.

6  Q.   Were you aware of that contact between Mr. Risen and

7  Mr. Stone?

8  A.   No.

9  Q.   Were you ever contacted by Mr. Risen about your meeting

10 with Mr. Sterling?

11 A.   No, not to my knowledge.

12 Q.   Were you ever contacted by Mr. Risen at all about

13 anything?

14 A.   No.

15 Q.   Do you know James Risen?

16 A.   No.

17 Q.   Have you ever spoken to him?

18 A.   Never.

19 Q.   Have you ever provided any information to Mr. Risen or

20 anyone working with Mr. Risen about any matters discussed in

21 the committee -- with the committee?

22 A.   No, never.

23 Q.   Did you ever discuss the meeting that you had with

24 Sterling with anybody from the press?

25 A.   No.  I didn't even discuss it with anyone else on the

1  committee who had clearances.  This was one of those topics

2  that was so sensitive that you didn't even want to talk to the

3  person in the next office about it.

4  Q.   Now, I'd like you to focus on early May of 2003.

5  A.   Yeah.

6  Q.   At that point, were you and members of the committee

7  working on an authorization bill?

8  A.   Yes.

9  Q.   And what, what's an authorization bill?

10 A.   Well, one of the primary jobs of the committee every year

11 is to authorize the entire budget of the intelligence

12 community, all the agencies.  The appropriators appropriate it,

13 but it has to go through our committee first for an

14 authorization bill that has to be passed by the House and the

15 Senate in addition to the appropriations bill.  So every year,

16 we worked on a bill that had budget items in it and also new

17 laws that would affect the community's actions.

18 Q.   And was it classified information?

19 A.   Was what classified information?

20 Q.   The authorization bill.

21 A.   Yes, a lot of it was.  The budget part was; the law parts

22 weren't.

23 Q.   Now, was there a closed session in earlier May 2003

24 regarding that bill?

25 A.   Yes.

1    Q.    And did you discuss that closed session with a colleague

2    on another Senate committee?

3    A.    Well, yes.  I mean, let me add that the closed session --

4    and this happens every year; it's just the way it's done -- the

5    budget -- it's really bifurcated, and the budget side of the

6    authorization bill, the actual numbers and why they want to do

7    certain numbers for different programs, is half of it, and

8    that's highly classified.

9            The other part of it is the proposed legislation for

10   that year, you know, whether we want to amend the National

11   Security Act or amend the Foreign Intelligence Surveillance Act

12   or other, add new laws into the picture, and so that part of

13   the hearing is really not classified, but because -- it's

14   involving public law, but it's held in the same hearing, so

15   it's in a closed hearing as well.

16   Q.    So this, this session in early May, was that both parts

17   that you just described?

18   A.    Yes, it was both parts.

19   Q.    The law part of the bill --

20   A.    Yes.

21   Q.    -- did you discuss with a colleague from another

22   committee?

23   A.    Well, yes.  I mean, there was a provision in the bill.

24   Now, remember, I wasn't a general counsel or minority counsel

25   anymore, so it was really -- I had a peripheral role for this

1    go-round of law making, but because there was no new lawyer for

2    the Democrats, they hadn't hired anyone yet, I was asked to

3    help out, and there was a provision in the proposed bill that

4    they were considering and voting on in that, in that hearing

5    that I was extremely concerned about, and so I took the

6    initiative, and it was initiative because it wasn't really

7    again my job anymore to do that.  I had been.

8            I took the initiative to go to the Democratic staff

9    director and say, "I'd like to pursue this, I'd like to do

10   talking points, I'd like to try to get this provision pulled

11   from the bill because it's a very bad provision," and I did

12   that.  I made talking points.  I met with staff members for all

13   the senators, including some Republicans actually, and worked

14   quite hard to -- for the end game of getting that pulled from

15   the bill.

16   Q.   And my question is did you also discuss that part of the

17   bill?

18   A.   Yes.  Leading up to the hearing, I had been --

19   Q.   One second.

20   A.   I'm sorry.

21   Q.   Did you discuss that with someone from another committee?

22   A.   I did.

23   Q.   And who was that?

24   A.   Her name is Julie Katzman.

25   Q.   And what committee?

1  A.    She was a lawyer, maybe the chief lawyer, I don't recall,

2  on the Judiciary Committee of the Senate.

3  Q.    Why had you been discussing it?

4  A.    Well, I had been discussing it with her leading up to the

5  hearing.  Her committee, Senator Leahy was the chairman, her

6  committee had co-jurisdiction over this particular issue.

7  There are many issues that aren't just intelligence, that

8  aren't just law enforcement; they overlap.  So their committee

9  had as much interest in this provision as we did, and she was

10 very interested in helping me and working with me to defeat it

11 in our committee.

12 Q.    And in that closed session, was that provision defeated?

13 A.    Yes.

14 Q.    Did you communicate that to Ms. Katzman?

15 A.    I did.

16 Q.    Shortly after that, did an article appear in *The New York*

17 *Times* about that closed session?

18 A.    Yes.  It may have been the next day.

19 Q.    And what happened as a result?

20 A.    I was fired.

21 Q.    By whom?

22 A.    Bill Duhnke, the staff director.

23 Q.    And was that because you discussed the closed session

24 outside of the committee?

25 A.    Well, I mean, he didn't really elaborate on why, but I

1   assumed that was why.  They were very upset about the, losing

2   the provision in the bill, and they were very upset about the

3   newspaper article because it embarrassed them, and they fired

4   me because of it.

5   Q.   Did you talk to anyone from the press about the closed

6   session?

7   A.   No.  And I had no idea that Julie Katzman was going to or

8   did until the article came out.  I was surprised.

9   Q.   And again, did you speak to anyone from *The New York*

10  *Times* -- Mr. Risen, anyone at all -- about the closed session

11  that we just discussed?

12  A.   Absolutely not.

13         MR. TRUMP:  The Court's indulgence?

14  Q.   If you know, was that article written by Mr. Lichtblau and

15  Mr. Risen?

16  A.   Yes.  I've seen it recently and am reminded that it was

17  written by them.

18  Q.   And the information that you communicated with

19  Ms. Katzman, was that classified or unclassified information?

20  A.   Oh, no, it was a legislative matter.  It was completely

21  unclassified.  It was a law that we were considering.

22  Q.   And the information that appears in the article was also

23  unclassified?

24  A.   Correct.

25         MR. TRUMP:  Nothing further, Your Honor.

1          THE COURT:  All right, perfect timing, Mr. Trump.

2    It's 12:00, lunchtime.

3          MR. TRUMP:  I try.

4          THE COURT:  So we will have the cross-examination of

5    this witness at two.

6          Ma'am, you're due back on the stand at 2:00.

7          THE WITNESS:  Thank you.

8          THE COURT:  All right, we'll recess court.

9           (Recess from 1:00 p.m., until 2:00 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     A F T E R N O O N   S E S S I O N

2                             (Defendant and Jury present.)

3              THE COURT:  Mr. Pollack?

4              MR. POLLACK:  Thank you, Your Honor.

5                         CROSS-EXAMINATION

6    BY MR. POLLACK:

7    Q.    Good afternoon, Ms. Divoll.  My name is Barry Pollack.

8    I'm one of the lawyers for Mr. Sterling.  How are you doing?

9    A.    Hello.

10   Q.    Ms. Divoll, you worked with the CIA from about 1995 to

11   2000, correct?

12   A.    Yes, correct.

13   Q.    And you then came to the Senate Select Committee on

14   Intelligence, correct?

15   A.    Yes.

16   Q.    Which we've been referring to as SSCI, correct?

17   A.    Okay.

18   Q.    And you had gotten a call from a lawyer, Mr. Zaid, asking

19   for you or other SSCI staff to meet with Mr. Sterling, correct?

20   A.    Yes.

21   Q.    And Mr. Stone was tasked with joining you for that

22   meeting?

23   A.    Yes.

24   Q.    And, in fact, Mr. Stone was kind of the primary person at

25   that meeting, right?

1    A.    Correct.

2    Q.    Because he dealt with whistleblower-type issues?

3    A.    Correct.

4    Q.    You were there solely because you were the one who had the

5    initial contact with Mr. Zaid, correct?

6    A.    Yes.  I think that is exactly why I was there.

7    Q.    And you took notes at that meeting, correct?

8    A.    I did.

9    Q.    And you typically try to take good notes when you're at a

10   meeting, right?

11   A.    Yes.

12   Q.    That's your practice?

13          And what was -- when is the last time that you've

14   seen the notes that you took of this March 5, 2003, meeting?

15   A.    Well, my practice, and I'm sure I did it in this case

16   because I did it routinely, was to rip my notes out of my legal

17   pad, staple them together, put a date at the top, and stick

18   them in a file, and the only reason I ever go back to that file

19   is if I need to for some reason.  In most cases, I don't go

20   back to it at all.

21          In this case, I'm sure I went back to it to look at

22   my notes when I was reviewing Don Stone's draft of the memo.

23   Q.    Now, the meeting with Mr. Sterling was on March 5,

24   correct?

25   A.    According to the records, yes.

1  Q.   And Mr. Stone's memo -- if we can go ahead and pull that

2  up?  That's Government Exhibit 101.

3  A.   Okay.  Yeah, I have it.

4  Q.   That's dated April 25, 2003, correct?

5  A.   Yes.

6  Q.   Some seven weeks later?

7  A.   Yes.

8  Q.   Do you recall when in the seven-week period from March 5

9  to April 25 you got a draft of Mr. Stone's memo and looked

10 again at your notes to review that?

11 A.   No, I have no idea.

12 Q.   Okay.  But whenever that was, it would have been some

13 point between those two dates, right?

14 A.   Correct.

15 Q.   And since that time, as far as you can recall, you haven't

16 seen your handwritten notes of the meeting since, correct?

17 A.   No.

18 Q.   And you mentioned in your testimony earlier the -- if we

19 go down, I guess, to the third paragraph of that document --

20 the term "fire set" is not a familiar term to you?

21 A.   No.

22 Q.   And, in fact, you think that probably came from

23 Mr. Stone's notes?

24 A.   I think it probably did, yes.

25 Q.   There may have been some details that you didn't capture

1   in your notes?

2   A.    Yes.  We probably each captured different things.

3   Q.    Okay.  And there were probably things that neither of you

4   captured, right?

5   A.    Perhaps.  I would find that unlikely, though.  It wasn't a

6   very long meeting, and we were paying close attention, and

7   there were two of us, so I would think most of what was said

8   was captured.

9   Q.    Most of it?

10  A.    Or all.

11  Q.    You weren't trying to take down verbatim notes, were you?

12  A.    No, but I'm a good note taker.

13  Q.    Okay.  But despite the fact you're a good note taker, you

14  don't think the words "fire set" were in your notes?

15  A.    I have no idea if those words were used or not.  I don't

16  recall the term.  When I read it in the memo during this

17  process, it wasn't a term that was familiar to me, but

18  obviously, it's in the memo, so --

19  Q.    Now, in the meeting itself -- you can go ahead and put

20  that down for the moment.

21          In the meeting itself on March 5, Mr. Sterling did

22  not have any documents with him, correct?

23  A.    No.

24  Q.    And you, you knew going into that meeting that he was in

25  an employment dispute with the CIA where he had advanced some

1    claims that he believed he'd been discriminated against,

2    correct?

3    A.    I was aware generally of that.

4    Q.    But at this meeting, the meeting that you had with him,

5    there was no discussion of his discrimination claims, correct?

6    A.    Correct.

7    Q.    He was talking to you about this classified operation,

8    correct?

9    A.    Correct.

10   Q.    And you were intrigued by what it is that he had to say,

11   correct?

12   A.    Yes.

13   Q.    He didn't come across as a nut or an oddball?

14   A.    He did not.

15   Q.    He didn't come across as somebody who had an axe to grind?

16   A.    I couldn't speak to that.

17   Q.    Well, do you recall being interviewed by the FBI in 2010?

18   A.    2010.  I've been interviewed several times by the FBI.

19   Q.    You don't recall a specific date.  Do you recall telling

20   the FBI in an interview that in your view, Mr. Sterling did not

21   come across as someone having an axe to grind?

22   A.    I don't recall saying that, but I may have.  I probably --

23   I do recall saying I didn't think he came across as a nut,

24   because sometimes whistleblowers are.

25   Q.    And at the conclusion of the portion of the meeting that

1  was just you, Mr. Stone, and Mr. Sterling, with Mr. Zaid out in

2  the reception area, at the conclusion of that, you said that

3  you would have been very vague about sort of what follow-up

4  there was going to be, correct?

5  A.   Yeah.  I mean, I have a, sort of a memory of that, but I'm

6  also -- that would have been our practice.  You wouldn't tell

7  someone coming in in that situation what your plans were, if

8  any, so I think it's likely we were very vague about that, just

9  took on board what he said and moved on.

10 Q.   If you'd go ahead and look at 101, on the second page, the

11 first full paragraph?

12 A.   Yes.

13 Q.   The last sentence of that paragraph says, "He was offered

14 no information on whether, or in what manner, the committee

15 would proceed . . .,"  correct?

16 A.   Yes.

17 Q.   But he seemed satisfied with the visit?

18 A.   I don't recall that, but I don't recall him being unhappy,

19 so that's maybe where that came from.

20 Q.   Okay.  When you saw this, if you thought that was

21 inaccurate, you would have corrected it, wouldn't you?

22 A.   Yes, absolutely.

23 Q.   Now, Mr. Sterling did not make any comments indicating any

24 intention on his part to take some kind of drastic action such

25 as going to the press?

1  A.   No.

2  Q.   You didn't get the sense that he was shopping this story

3  about Classified Program No. 1?

4  A.   I don't know.  I can't answer that.

5  Q.   Well, in your interview with the FBI, do you remember

6  telling them that you did not get the sense that Mr. Sterling

7  was shopping the story?

8  A.   I don't remember saying that to the FBI.

9  Q.   Now, after your meeting with, with Mr. Sterling, you and

10  Mr. Stone discussed the concerns that Mr. Sterling had raised

11  in the meeting with Bill Duhnke?

12  A.   Correct.

13  Q.   And Bill Duhnke was the staff director?

14  A.   Correct.

15  Q.   A Republican staff member?

16  A.   Yes.

17  Q.   And you're a Democrat, correct?

18  A.   Yes.

19  Q.   And at that meeting that you had with Mr. Duhnke, do you

20  recall that Mr. Goco was present?

21  A.   Well, you know, I know that Mr. Goco was brought into the

22  mix very quickly.  Whether he was in the room or we talked to

23  him right after, I actually remember standing in Mr. Goco's

24  doorway of his office briefly.  I don't remember -- it's, it's

25  logical that he would be, but I don't remember him being there.

1  Q.   Okay.  Do you remember Majority General Counsel Chris Ford

2  being there?

3  A.   I don't.

4  Q.   Staff Director Chris Mellon?

5  A.   I don't remember that.

6  Q.   Minority Deputy Staff Director Melvin Dubee?

7  A.   No.

8  Q.   Do you recall telling the FBI in 2004 that you believed

9  that those individuals may have been there?

10 A.   I may well have.  I just don't have the memory of it right

11 now.

12 Q.   Okay.  Whoever was present at that meeting, there were --

13 there was at least one person, maybe more, who seemed to have

14 already had some familiarity with the operation that

15 Mr. Sterling had talked to you and Mr. Stone about; is that

16 correct?

17 A.   It's possible, but I don't recall it.

18 Q.   Go ahead and look at 101, on page 2, the second full

19 paragraph, where it says, "The operation described by

20 Mr. Sterling seemed familiar to one that had been briefed in

21 the past."

22       Do you recall that?

23 A.   I see it in the memo, but I don't recall that.  I had not

24 been briefed on it in the past, so that wouldn't be something I

25 was familiar with.  It was completely new to me when

1   Mr. Sterling brought it up.

2   Q.   And I, I appreciate that.  What I'm asking is in your

3   follow-up discussion with Mr. Duhnke and others, did you learn

4   that while it was completely new to you, it wasn't necessarily

5   completely new to them?

6   A.   I have a general impression of that.  I don't have any

7   direct memory, though.  I mean, it's our job to be aware of,

8   you know, the operations of the agency, and so it wouldn't

9   surprise me that some people were familiar with it.  All I knew

10  was that I wasn't and that, again, I wasn't have a continuing

11  role, so I really, to be honest, wasn't paying all that much

12  attention.

13  Q.   Do you recall that Mr. Duhnke decided that what he wanted

14  done is he wanted the substance of Mr. Sterling's concerns

15  documented?

16  A.   I do recall that.

17  Q.   And then he wanted to, to shut it down and take no action?

18  A.   I'm sorry?  I don't understand the question.

19  Q.   He didn't want to take any further action other than to

20  have the substance of Mr. Sterling's concerns documented?

21  A.   I don't recall there being such a decision made.  This

22  was -- this meeting with Mr. Duhnke was immediately after the

23  meeting with Mr. Sterling, and I don't recall that a final

24  decision was made as to how to proceed at that meeting.

25          All I recall from that meeting is that we were told

1   to make a memo.

2   Q.   Was that the only meeting that you had with Mr. Duhnke?

3   A.   Yes, that's the only meeting I had on this topic.

4   Q.   Okay.  Do you remember Mr. Duhnke telling you that because

5   Mr. Sterling was in litigation against the CIA, all he wanted

6   to do was record the substance of Mr. Sterling's concerns and

7   take no action?

8   A.   I don't recall that.  That's -- I don't recall that.

9   Q.   Do you recall in 2004 telling the FBI that the decision

10  was to "record it, the substance of Sterling's concerns, and

11  shut it down.  We are not going to investigate it"?  And then

12  being asked about the basis for that decision, saying that

13  Mr. Duhnke did not think that they should get involved in the

14  matter due to the litigation issue?

15  A.   I don't -- sitting here today, I don't recall that, but I

16  don't recall that not happening, either, so --

17  Q.   Okay.  Now, in the meeting with Mr. Sterling, do you

18  recall Mr. Sterling discussing a Russian scientist?

19  A.   I remember mention of a Russian scientist, yes.

20  Q.   And that Russian scientist was an asset that was used in

21  the program?

22  A.   Well, I recall the use of the term "Russian scientist"

23  with respect to the fact that a Russian scientist would be able

24  to determine the flaw quickly.  I don't have a specific

25  recollection that the Russian scientist was also the asset

1  working with Mr. Sterling.  I just don't recall that one way or

2  the other.

3  Q.   And at some point after the meeting with Mr. Sterling, you

4  testified this morning that you were working on an intelligence

5  bill, correct, an authorization bill?

6  A.   I'm sorry, could you repeat that?

7  Q.   Sure.  At some point later in time, you were working on an

8  intelligence authorization bill?  Do you remember talking about

9  that this morning?

10 A.   Yes.

11 Q.   And that there was a provision that was in the proposed

12 bill that would have expanded the power of the CIA and the

13 Defense Department to issue national security letters?

14 A.   Correct.

15 Q.   And you were opposed to that provision?

16 A.   Not expanded.

17 Q.   Created.

18 A.   Created.

19 Q.   Fair enough.  Wanted to give them new power that they

20 didn't previously have?

21 A.   Yes.  It was a power that the Patriot Act had given to the

22 FBI.  It was controversial with respect to the FBI, and this

23 new provision would have given those same powers to the CIA and

24 the military.

25 Q.   And you, you worked for a Democrat, correct?

1  A.   Yes.

2  Q.   And you were opposed to that provision, giving that new

3  authority to the CIA?

4  A.   Yes.

5  Q.   And you, you were on the Select Committee on Intelligence,

6  but you were also working with members of the Judiciary

7  Committee with respect to that bill, correct?

8  A.   Here and there where our issues overlapped, yes.  Not on a

9  daily business.

10  Q.   And there was a staff member of the Judiciary Committee by

11  the name of Julie Katzman, correct?

12  A.   Yes.

13  Q.   And she worked for a Democratic senator, correct?

14  A.   Yes.

15  Q.   And she was also opposed to this same provision that you

16  were opposed to, correct?

17  A.   Yes.

18  Q.   And then at some point, you attended a closed door hearing

19  or session of SSCI, correct?

20  A.   Yes.  I mean, most of our hearings are closed door.

21  Q.   And -- but particularly, you attended one in which the

22  provision that we've just been talking about was discussed,

23  correct?

24  A.   Yes.

25  Q.   And at some point after that closed door session, you

1  reported what had happened in that closed door session to

2  Ms. Katzman, correct?

3  A.    Yes.  I think I went right over to her office after it.

4  Q.    Well, you remember that you were -- you didn't even wait

5  to go over to her office.  You were talking to her about it

6  over the telephone?

7  A.    Maybe.  I don't recall that.  I remember being in her

8  office.  I don't recall a phone conversation, but I don't not

9  recall it, either.

10  Q.    Do you recall a Republican staff member named Jackie

11  Russell who overheard the conversation you were having with

12  Ms. Katzman?

13  A.    Yes.  Yes, I do recall that, so there was a conversation.

14  I recall that now, yes.

15  Q.    Okay.  Do you recall that it was a phone conversation that

16  you were having?

17  A.    There was a phone conversation, yes.

18  Q.    And it's fair to say you were kind of gloating to

19  Ms. Katzman about what had happened in that closed door

20  session?

21  A.    Well, we were pretty happy with the outcome.  It's very

22  unusual when you're in the minority party in the Senate to have

23  any victories, and this was a pretty big victory.  To have the

24  chairman of the committee pull a provision is very unusual, so

25  I'm sure there was excitement in my voice, yes.

1  Q.   And the chairman of the committee was a Republican?

2  A.   Republican Senator Pat Roberts of Kansas.

3  Q.   And you thought that this was embarrassing to the

4  Republicans?

5  A.   I'm sure it was embarrassing to them, but you'll have to

6  ask them how embarrassed they were.

7  Q.   Okay.  Well, I'm asking you what you thought.

8  A.   I assume they were embarrassed.  I assume they were

9  certainly unhappy.

10  Q.   And do you recall telling the FBI in 2004 that you were

11  gloating to Ms. Katzman about what happened in that closed door

12  session?

13  A.   I recall -- I don't recall using that word, but yes, I

14  probably said something to that effect.

15  Q.   And the -- you knew at the time that Ms. Katzman was not a

16  member of the Senate Select Committee on Intelligence?

17  A.   Correct.

18  Q.   And you knew she wasn't a staff member of that committee?

19  A.   Correct.

20  Q.   And you knew that the rules of the Senate Select

21  Commission -- Committee on Intelligence did not allow for you

22  to share with somebody outside of the committee, even a staffer

23  from another committee, what had happened at a closed door

24  session?

25  A.   No, I did not know that at that time.  My belief at the

1   time and today as well was that the provision of the committee

2   rules about unclassified information, that they did not prevent

3   normal working relations between relevant -- our committee and

4   staffers from relevant committees.  We all did that on a

5   routine basis.  That was part of my job was to talk to her

6   about this kind of thing, and I had done so leading up to the

7   markup, to the vote, and I was just reporting the outcome to

8   her of the vote.

9           So no, I definitely did not believe at the time that

10  I was doing anything wrong.  I still don't.

11  Q.   Do you remember telling the FBI that you didn't fight your

12  firing because you knew you had broken SSCI rules?

13  A.   After I saw the article in the paper, which came as a

14  complete shock to me -- it never occurred to me that Julie or

15  anybody else would talk to the press about this.  It just

16  didn't occur to me because it wasn't -- our committee -- other

17  committees apparently talk to the press routinely, but our

18  committee for obvious reasons does not, and had she asked me or

19  had I had any inkling that she would have talked to the press

20  about what I told her, I would have told her, "Don't do that,"

21  because that was not the way our committee works.

22          I still believe that talking to her was appropriate,

23  but her telling the media was completely unexpected to me, and

24  I would have asked her in no uncertain terms not to do that had

25  I known she was going to do it.  She never asked me or told me

1    or warned me or anything.  I just saw it in the paper.

2    Q.   I understand your testimony that you didn't believe that

3    Ms. Katzman or anybody else was going to provide this

4    information to the press, but my question to you was didn't you

5    tell the FBI that you didn't fight your firing because you knew

6    that you had broken SSCI rules by talking to Ms. Katzman?

7    A.   Let me clarify.  That's not exactly accurate.  What's

8    accurate is after the article came out, I had sort of a Eureka

9    moment, and I went, "Oh, my God.  How did this get into the

10   press?"  And I realized that unfortunately, it may have come

11   indirectly from me, and I was panicked because then I

12   thought of -- only then did I think of the committee rule, and

13   I'm sure I pulled it out and looked at it and realized that

14   there were interpretations of that rule that could apply here,

15   not an interpretation -- I mean, believe me, Mr. Pollack, if it

16   hadn't been in the paper and they had known I talked to Julie

17   about this, nobody would have cared.  I wouldn't have been

18   fired for talking to Julie.

19            I was fired for talking to Julie and Julie telling

20   the paper.

21   Q.   That's your belief, that you wouldn't have been fired if

22   they had just found out you talked to Ms. Katzman?

23   A.   Yes, it's my firm belief.

24   Q.   But you told the FBI in 2003 and then you told them again

25   in 2008 that you did recognize -- you did at some point have

1  that Eureka moment.  You realized, in fact, that what you had

2  done violated committee rules, correct?

3  A.    An interpretation of the committee rules that Bill Duhnke

4  chose to apply to me in that circumstance.  I don't think that

5  rule had ever been used that way before to my knowledge or

6  since.  It was used -- I mean, this was a political firing,

7  Mr. Pollack, make no mistake.  I was fired because I beat them

8  and they didn't like it.

9          And they were embarrassed further not just by the

10  fact that I beat them -- and when I say me, this was me.  I did

11  this.  I worked really hard, and I knew they were very upset

12  that the chairman had to pull the provision.  That never

13  happens.

14          And I knew when I saw it in the paper that they were

15  going to really be upset, and so I was panicked, to be honest,

16  because I knew the hammer was going to come down on me, and I

17  realized that I'd given them the opening by not, as you say,

18  following the letter of the rule.

19          It was not an interpretation.  I mean, my job had

20  been to interpret those rules.  I knew what those rules said.

21  And as I was telling Julie, it never crossed my mind that there

22  was anything wrong in what I was doing even though I was an

23  expert in the rules.  So it came as a big surprise to me that

24  he chose an interpretation of that rule that he did, but it was

25  hard to argue with.  It was one interpretation of the rule.  It

1   definitely was.

2           And so there wasn't a chance to fight it anyway.  I

3   mean, they could fire me because they didn't like the color of

4   my dress that day.  There was no protection there.

5   Q.   It was a political firing?

6   A.   I believe so.

7   Q.   SSCI was a very partisan political place, correct?

8   A.   I believe so, yes.

9           MR. TRUMP:  Objection.  It's going far afield.

10          THE COURT:  Well, it was opened.  That's the last

11  question along that line.

12  BY MR. POLLACK:

13  Q.   After you spoke to Ms. Katzman, you say that you think it

14  was, in fact, maybe the very next day that the information that

15  you had given --

16  A.   Possibly.  A day or two, yeah.

17  Q.   -- outside of the committee ended up in *The New York*

18  *Times*, correct?

19  A.   Yes, but by the way, there was more information in -- a

20  lot more information in *The New York Times* article than I had

21  given Julie, so there may have been other sources that weren't

22  me.

23          MR. POLLACK:  Let me go ahead and mark as Defendant's

24  Exhibit 8 --

25          MR. TRUMP:  I don't think we need to go through this

1   article, Your Honor.  I think the witness has explained the

2   circumstances, and it's just another wild goose chase.

3           THE COURT:  Well, let me take a 30-second look at it.

4           Well, unless there's something more directly related

5   to this case, I think the government's objection is correct.

6   The witness has already testified to the article.  Now, what

7   else is relevant to this case, to our case?

8           MR. POLLACK:  Your Honor, what's relevant is the

9   author of the article, the citation to a congressional

10  Democratic aide that I want to ask --

11          THE COURT:  That's already in evidence through

12  testimony.  No, we don't need to introduce this.  I'll grant

13  the government's objection to 8.

14  BY MR. POLLACK:

15  Q.   Your -- Ms. Divoll, did the article cite an unnamed

16  congressional Democratic aide as the --

17          MR. TRUMP:  Objection, Your Honor.  Objection, Your

18  Honor.

19          THE COURT:  Yeah, I've ruled.  We've gone enough into

20  this.  Let's move on, please.  Sustained.

21  BY MR. POLLACK:

22  Q.   In 2008, the FBI asked you about this article, did they

23  not?

24  A.   I don't --

25          MR. TRUMP:  Objection again, Your Honor.  I think

1  we're done with this article.

2           THE COURT:  Is there something new you're trying to

3  bring out that's relevant to this case, not to that article?

4  The whole reason this line of questioning is relevant has

5  already been well established.  Is there anything else?

6           MR. POLLACK:  Yes, Your Honor, there is.

7           THE COURT:  Well, approach the bench.

8           (Bench conference on the record.)

9           THE COURT:  All right, where are you going with this?

10          MR. POLLACK:  Your Honor, I understand her testimony

11 that she is not the source, but I'm not stuck with that, and I

12 would like to explore it on cross-examination.  The article is

13 written, the coauthor, by Mr. --

14          THE COURT:  She has said --

15          MR. POLLACK:  Your Honor --

16          THE COURT:  She's the indirect source.  You're trying

17 to prove she was the direct source, that she spoke directly to

18 either Risen or this other person?

19          MR. POLLACK:  I'm trying to explore that with her,

20 yes, Your Honor.

21          MR. TRUMP:  Your Honor --

22          MR. POLLACK:  If I might explain?

23          THE COURT:  Go ahead.

24          MR. POLLACK:  The article was written both by

25 Mr. Risen and Mr. Lichtblau.  When she was interviewed by the

1   FBI, she tried to tell the FBI that Ms. Katzman was Risen's

2   source.

3           The FBI very astutely asked her, "How do you know

4   that the -- if you're saying you're not that Democrat aide, how

5   do you know that it was a Risen source and not a Lichtblau

6   source?"

7           And she said, "Well, I knew that Risen had written

8   the article.  I didn't know that Lichtblau had written the

9   article."

10          She had -- her prior boss, she will say, talked to

11  Risen and authorized her to talk to the press.  She has -- the

12  government has asked her very limited questions to try to

13  suggest that she has no relationship with Risen, but that's --

14          THE COURT:  Well, you can ask that question directly.

15  Ask her if she's ever, if she has ever communicated with Risen.

16          MR. POLLACK:  Your Honor, I don't want to inject the

17  $64,000 question that she's simply going to deny and already

18  has denied.  I want to build up to it by showing the stepping

19  stones in between.  She is in her position up until January of

20  this year, up until a couple months before this happened, she

21  was in a position where she worked with someone who had a

22  source relationship with Risen.  That person authorized her on

23  many occasions to talk to the press.

24          She, she has this information, it almost immediately

25  ends up in a Risen article, and she knows that even though she

1   claimed she's not the source, she knows that it's a Risen

2   source and not a Lichtblau source.

3           It seems to me the jury is entitled to hear all of

4   that in assessing her credibility.

5           MR. TRUMP:  Your Honor, this witness has no idea who

6   Risen's sources are for that article.  She can only speculate

7   because she told Ms. Katzman this information.  She has no

8   firsthand knowledge whether it was Ms. Katzman, other aides,

9   other staffers, no firsthand knowledge whatsoever as to who --

10  if counsel wants to ask, "Do you have any firsthand knowledge

11  as to who the sources are in this article?" fine, but she has

12  no firsthand knowledge of who those sources are.

13          THE COURT:  Well, I think you need to ask your

14  questions more directly.  This indirect method isn't very

15  successful.  If she's going to commit perjury on the stand,

16  that's a problem for her.  She's a lawyer.  She knows the

17  implications of that.  I would not expect a lawyer to lie.

18          And the thing is if you know her previous boss -- who

19  was her previous boss?

20          MR. POLLACK:  Mr. Cummings.

21          THE COURT:  Who?

22          MR. POLLACK:  Mr. Cummings.

23          THE COURT:  Cummings?

24          MR. POLLACK:  Yes.  Cumming, I'm sorry,

25  C-u-m-m-i-n-g.

1        THE COURT:  Cumming at times directed her to talk to

2   Risen?

3        MR. POLLACK:  No.  What she will say is that

4   Mr. Cumming --

5        THE COURT:  Her previous boss.

6        MR. POLLACK:  -- her previous boss, spoke with

7   Mr. Risen, that he was a Risen source, and that there were

8   times that Mr. Cumming asked her to speak to the press.

9        THE COURT:  I think those are fair questions.  Let's

10  hear what she has to say because any relationship that anybody

11  has in this case with Risen is fair game.  You've been asking

12  those questions, and it's fair for you to ask them, but ask

13  them directly, not this getting around it.  If it's that

14  direct, just go right for it, okay?

15        (End of bench conference.)

16  BY MR. POLLACK:

17  Q.   Ms. Divoll, prior to Mr. Duhnke being the staff director,

18  there was a staff director by the name of Al Cumming, correct?

19  A.   Yes.

20  Q.   And Al Cumming was a Democrat, correct?

21  A.   Yes.

22  Q.   And you worked for Mr. Cumming at that point, correct?

23  A.   I worked for the chairman, but Mr. Cumming was my

24  supervisor.

25  Q.   And you were aware, were you not, that Mr. Cumming in that

1   role as staff director would have occasion to talk to the

2   press, correct?

3   A.   Yes.

4   Q.   And specifically, you knew that he spoke to Mr. Jim Risen

5   on occasion, correct?

6   A.   I don't recall that.  He may have.  I don't know.

7   Q.   Do you recall telling the FBI in 2008 that Mr. Cumming

8   spoke to Mr. Risen?

9   A.   I don't recall that, but I may have said that.

10  Q.   And Mr. Cumming also would require you to speak to the

11  press on occasion, correct?

12  A.   I do occasionally, yes.

13  Q.   But after the change in party, it was Mr. Duhnke on that

14  committee whose job it was to talk to the press, correct?

15  A.   Well, I think the minority and the majority staff

16  directors may have had occasion to talk to the press, but other

17  staff members did not unless specifically asked to do so.

18  Q.   In your experience on SSCI, you would agree with me, would

19  you not, that it was not uncommon for a staff member to give a

20  reporter a story in return for getting another story of

21  interest to that staff member or the committee member for whom

22  the staff member worked?

23  A.   I have no idea what you just said.

24  Q.   Okay.  Let me try it again.  You worked, you worked for

25  SSCI, on the SSCI staff, correct?

1    A.    Yes.

2    Q.    In your experience on the SSCI staff, you would agree with

3    me that it was not uncommon for somebody on the SSCI staff to

4    give a reporter a story in return for getting another story of

5    interest?

6    A.    No, I have absolutely no knowledge of that practice.  I

7    knew that the staff directors talked to the press, but I have

8    no idea what they said to them or what kind of quid pro quos

9    they had, if any.  I had no knowledge of that whatsoever.

10   Q.    Do you remember telling the FBI in 2004 that the

11   information could have been provided quid pro quo?  You advised

12   that it was not unusual for a staffer to give a reporter one

13   story if they agreed to publish a second story in the interest

14   of the staffer, committee, or a member?

15   A.    I have -- that was 11 years ago.  I have, certainly have

16   no knowledge of saying that statement, and as I sit here today,

17   I don't -- I'm frankly surprised I ever would have said that,

18   and I'm wondering whether I did because that is not something I

19   was privy to.  It wasn't part of my job to know what they did

20   when they talked to the press.  I wasn't in the room.  I just

21   knew that they did talk to the press, but I don't know about

22   this quid pro quo thing.

23          THE COURT:  I'm sorry, wait a minute.  And you say

24   "they."  Who do you mean by "they"?

25          THE WITNESS:  The two staff directors, the minority

1   and the majority.

2          THE COURT:  So your testimony is that you know that

3   the staff directors would speak with the press?

4          THE WITNESS:  I do know that.

5          THE COURT:  Go ahead.

6   BY MR. POLLACK:

7   Q.   And did you tell the FBI that you would not be surprised

8   if Mr. Duhnke was responsible if it furthered Mr. Duhnke's

9   self-interest?

10         MR. TRUMP:  Objection.  That is not what is in the

11  report, Your Honor.

12         THE COURT:  Well, I don't have these 302s in front of

13  me.

14         MR. POLLACK:  I'll hand it up, Your Honor.  And, Your

15  Honor, referring to page 5 of the 302 --

16         THE COURT:  All right.

17         MR. POLLACK:  -- dated October 4, 2004, the first

18  paragraph on that page.

19         THE COURT:  Well, it does -- rephrase your question.

20  Let me hear it again.

21         MR. TRUMP:  Judge, I think my objection is that in

22  this line of -- in this part of the interview, they're asking

23  the witness to speculate about certain things.

24         THE COURT:  Well --

25         MR. TRUMP:  And this was one of the things she was

1  asked to speculate about.

2        THE COURT:  And on redirect, you can make that more

3  clear for the jury, but this does appear to be what's in the

4  report.

5        Mr. Wood, I'll let you return this to counsel.

6        Go ahead, Mr. Pollack, ask your question.

7        MR. POLLACK:  Thank you, Your Honor.

8  Q.   Do you recall telling the FBI that you would not be

9  surprised if Mr. Duhnke was responsible for providing a story

10 to the press even about classified information if it would

11 further Mr. Duhnke's self-interest to do so?

12 A.   I see this in the, in the 302.  I don't remember saying

13 that, but I assume I did say it and that it's recorded here

14 accurately.

15 Q.   And, in fact, you were yourself aware of other occasions

16 in which Mr. Duhnke had inappropriately provided information to

17 the press?

18 A.   Are you pointing to something in the 302?

19 Q.   I'm asking if you recall having said that to the FBI.

20 A.   Yes, but I -- no, I don't recall saying it.

21 Q.   Okay.

22 A.   I might have said it, but I don't recall it.

23 Q.   Okay.  In that case, let me just stop you there.  Go ahead

24 and look at that document at page 5, in the last full

25 paragraph.

1    A.    Last full paragraph, yes.

2    Q.    Okay.  Having had the opportunity to review that, do you

3    recall saying that you were aware of occasions --

4    A.    Yes, I was aware.

5    Q.    -- in which Mr. Duhnke had inappropriately provided

6    information?

7    A.    Yes, I recall that now.  Now, I didn't have direct

8    knowledge of that.  It was information I'd gleaned from working

9    on the committee, but it was a story that I had been told

10   thirdhand or fifth-hand; I don't know.

11   Q.    When you read the article in *The New York Times* about the

12   intelligence authorization bill, you were concerned that you

13   might be suspected of being a source, correct, for that

14   article?

15   A.    I was concerned, yes.

16   Q.    And --

17   A.    May I correct that?  I wasn't really concerned that I

18   would be thought of as a source but that maybe my talking to

19   Julie had, could have led to that story and that I would be at

20   fault for that.  That was what I was concerned about.  I don't

21   remember worrying that anyone would think I was a direct source

22   for that.

23   Q.    Do you recall telling the FBI that you were worried that

24   you'd be the prime suspect?

25   A.    I don't recall, but I could have said that, yes.  It's a

1    long time ago, sir.

2    Q.   And when you were interviewed by the FBI of the leak of

3    information that was provided to SSCI in that March 5, 2003,

4    meeting with Mr. Sterling --

5             MR. TRUMP:  Objection.

6    BY MR. POLLACK:

7    Q.   -- you were worried --

8             MR. TRUMP:  The information provided to SSCI was

9    never described as a leak.

10            MR. POLLACK:  No, no, that's not my question.

11            THE COURT:  Well, then rephrase the question.

12   BY MR. POLLACK:

13   Q.   Information that was leaked from that meeting, not that

14   that meeting was a leak.

15            MR. TRUMP:  Objection, Your Honor.

16            THE COURT:  Wait.

17            MR. TRUMP:  There's been no evidence or testimony

18   that any information from that meeting was leaked by any member

19   of SSCI.

20   BY MR. POLLACK:

21   Q.   Let me do it this way:  When the FBI interviewed you, were

22   you worried that the FBI might believe that you had leaked

23   information that you had learned from that meeting?

24   A.   Not for one second.

25   Q.   It didn't even cross your mind?

1  A.   Well, it certainly didn't cross my mind at first.  It just

2  didn't -- it may have entered my mind at some point, but I

3  certainly wasn't worried about it.

4  Q.   In the meeting with Mr. Sterling, do you recall that

5  Mr. Sterling told you and Mr. Stone that the operation that he

6  was discussing was carried out somewhere in Europe?

7  A.   I think I do remember that, yes.

8  Q.   He didn't specify that it was in Vienna, but he said it

9  took place someplace in Europe, correct?

10 A.   Again, it's a very long time ago, but that sounds familiar

11 to me.  I don't know actually upon reflection.

12          THE COURT:  There's no question pending.

13          THE WITNESS:  I'm sorry, Your Honor.

14          MR. POLLACK:  If I can have Mr. Francisco pull up

15 Government Exhibit 106, which is already in evidence?

16 Q.   The -- Mr. Sterling told you and Mr. Stone that the

17 operation involved a fire set, correct?

18 A.   Again, I don't remember the term "fire set."

19 Q.   But again, if you believed that information was incorrect,

20 you would have corrected it in the April 25 memo?

21 A.   Well, I mean, if that was something Don remembered.  I

22 mean, when Don wrote the original draft, my role would be to

23 add things that he might have forgotten or correct things that

24 I had remembered differently.  If he remembered additional

25 information than what I had in my notes, I would just leave it

1    and assume that was his information, but I don't remember the

2    term "fire set."

3    Q.    Okay.  But Mr. Stone did?

4    A.    You'll have to ask Mr. Stone.

5    Q.    Okay.  And -- but you do remember that the target of the

6    operation was Iran, correct?

7    A.    I'm sorry?

8    Q.    You do remember that Mr. Sterling told you that the target

9    of the operation was Iran?

10   A.    Yes.

11   Q.    And you do recall that Mr. Sterling told you that the

12   plans had been modified by the National Laboratories?

13   A.    I recall that he said the plans had been modified.  I

14   think perhaps Don Stone put the National Laboratories part in

15   the memo because I don't recall that specifically.

16   Q.    And you do recall -- did recall just a moment ago that he

17   said that the operation was carried out somewhere in Europe?

18   A.    I'd like to correct that answer because I don't think I do

19   recall that.  It's -- I don't have a specific memory of that,

20   no, sir.

21   Q.    Do you recall when you were interviewed by the FBI in 2010

22   telling the FBI that you thought Sterling indicated the

23   operation was carried out someplace in Europe?

24   A.    I don't recall that now, no.

25   Q.    I'm going to hand up the 302 dated October 12, 2010, and

1   I'll call your attention, Ms. Divoll, to page 3, the last

2   partial paragraph.

3   A.   Just on page 3?

4   Q.   Yes.

5   A.   Continued, should I read on to page 4?

6   Q.   No, I think if you read the last partial paragraph on page

7   3?

8   A.   Yes, I did read that.  Thank you.

9             MR. TRUMP:  Objection if she's asked to read it out

10  loud.  It either refreshes her recollection or it doesn't.

11            THE COURT:  Correct.  Does that refresh your memory?

12            THE WITNESS:  Yes.

13            THE COURT:  All right, then you can answer the

14  question -- ask a question then.

15  BY MR. POLLACK:

16  Q.   Having had the opportunity to review that, do you now

17  recall telling the FBI that you recall Mr. Sterling having said

18  that the operation took place someplace in Europe?

19  A.   I must have done because it's here in black and white.

20            MR. POLLACK:  I don't have any further questions.

21            THE COURT:  All right, any redirect?

22                         REDIRECT EXAMINATION

23  BY MR. TRUMP:

24  Q.   The few times you spoke to the press on behalf of the

25  staff director, you were authorized to do so, correct?

1    A.    Yes, specifically asked to do so.

2    Q.    Let's be clear, Ms. Divoll:  At any time during your

3    tenure at SSCI, did you ever provide Mr. Risen with any

4    information whatsoever about any matter?

5    A.    Never.  I've never had any contact with him about any

6    matter ever.

7    Q.    And that would include anyone working with Mr. Risen,

8    would it not?

9    A.    Correct.

10           MR. TRUMP:  Thank you.

11           THE COURT:  Any recross?

12                      RECROSS EXAMINATION

13   BY MR. POLLACK:

14   Q.    You never had any direct contact with Mr. Risen, correct?

15   A.    No.  Correct, I've never had any contact with Mr. Risen.

16   Q.    But when you've talked about committee business in

17   violation of committee rules, it's ended up in an article by

18   James Risen, correct?

19           MR. TRUMP:  Objection, Your Honor.  Again --

20           THE COURT:  Yeah.

21           MR. TRUMP:  -- she cannot testify as to where

22   Mr. Risen got that information.

23           She can only speculate.

24           THE COURT:  It's argumentative.  I'm going to sustain

25   the objection.

1    BY MR. POLLACK:

2    Q.   You understand that the reason for committee rules not to

3    talk about committee business is because if people do, it might

4    end up in *The New York Times*?

5           MR. TRUMP:  Objection, Your Honor.

6           THE COURT:  No, that one I'll overrule.

7           THE WITNESS:  Could you ask it again?

8    BY MR. POLLACK:

9    Q.   You understand that the reason that there are rules

10   against talking about committee business with people outside

11   the committee is that if people do that, committee business

12   might end up in *The New York Times*?

13   A.   Well, the committee business at stake here is in any other

14   committee and should have been in our committee public

15   business.  There was no reason for that hearing to be closed as

16   to the legislative matters because there was nothing classified

17   in those matters, and the American people have a right to know

18   what senators are saying and doing with regard to law-making.

19          So I think the rules were not set up for that at all.

20   That would be a way to hide behind a closed door that shouldn't

21   be closed.

22          MR. POLLACK:  I don't have any other questions.

23   Thank you.

24          THE COURT:  All right, does anybody anticipate

25   calling Ms. Divoll again?

1          MR. TRUMP:  No, Your Honor.

2          THE COURT:  How about the defense?  Mr. Pollack?

3          MR. POLLACK:  Oh, no, Your Honor.  Thank you.

4          THE COURT:  All right.  Then thank you, ma'am, for

5     your testimony.  You're excused as a witness.

6                         (Witness excused.)

7          THE COURT:  Your next witness?

8          MR. OLSHAN:  Your Honor, the government calls Lorenzo

9     Goco.

10         THE COURT:  All right.

11        LORENZO VERNON GOCO, GOVERNMENT'S WITNESS, AFFIRMED

12                      DIRECT EXAMINATION

13    BY MR. OLSHAN:

14    Q.   Good afternoon, sir.

15    A.   Good afternoon.

16    Q.   If you could please, state and spell your name for the

17    record.

18    A.   Lorenzo Vernon Goco.  Do you want me to spell the whole

19    thing?

20    Q.   How about just your last name?

21    A.   G-o-c-o.

22    Q.   Mr. Goco, are you currently employed?

23    A.   Yes, I am.

24    Q.   How are you employed?

25    A.   I'm employed by the Senate Select Committee on

1  Intelligence.

2  Q.   How long have you been an employee of the Senate Select

3  Committee on Intelligence?

4  A.   Nineteen years and six months.

5  Q.   So if I've got my math, you started in '96; is that

6  correct?

7  A.   1995.

8  Q.   During your 19-plus years working for the Senate

9  Intelligence Committee, can you tell the jury a little bit

10  about what you did -- or what you have done?

11  A.   I first came on the committee working for Senator Bob

12  Kerrey from Nebraska.  I was his special assistant.  For a

13  six-month period before he left the committee, I was the deputy

14  minority staff director, assisting him in his vice chairman

15  duties.  After that, I was a professional staff member for a

16  number of years.

17          In 2007, I became the budget director, and in 2009, I

18  became the deputy staff director.

19  Q.   So is it fair to say you've sort of moved up the ranks

20  over the years?

21  A.   Yes, it is.

22  Q.   At some point in connection with your work at the Senate

23  Intelligence Committee, did you have an oversight role related

24  to classified programs run by the CIA?

25  A.   Yes.  From the very beginning, I had -- we had -- I

1  participated in the oversight of the CIA.  In a particular

2  period from 1999 to 2006, I focused on certain CIA programs.

3  Q.   During that time or during your entire time working for

4  the Senate Intelligence Committee, did you hold a security

5  clearance?

6  A.   I did.

7  Q.   And were you trained on the proper handling of classified

8  information?

9  A.   Yes, I was.

10  Q.   Are you familiar with the concept of need to know?

11  A.   Yes.

12  Q.   And can you just briefly describe that for the jury?

13        MR. POLLACK:  We've been through this with a number

14  of witnesses.

15        THE COURT:  I don't think unless there's some nuance

16  from this witness, we don't need to hear that again.

17        MR. OLSHAN:  I'll move on.  I'm sure the witness

18  appreciates that.

19        THE COURT:  All right.

20  BY MR. OLSHAN:

21  Q.   Mr. Goco, let me direct your attention to March and April

22  2003.  Were you in that same role overseeing CIA programs at

23  that time?

24  A.   Yes, I was.

25  Q.   At some point during that period, do you recall having a

1  conversation with Vicki Divoll or Don Stone about a specific

2  program?

3  A.   Yes.  I don't recall exactly what day it was, but both

4  Vicki and Don came to my office and told me they had met with a

5  whistleblower.

6  Q.   And was that individual's name Jeffrey Sterling?

7  A.   I believe so, yes.

8  Q.   Have you ever met Jeffrey Sterling?

9  A.   No, I haven't.

10 Q.   What did Ms. Divoll and Mr. Stone tell you about their

11 meeting with Mr. Sterling?

12 A.   They said that Mr. Sterling was engaged in litigation with

13 the CIA and he came in to talk about a program that he was

14 helping to implement and that there was a problem with the

15 program.  Should I continue?

16 Q.   Sure.  What do you recall them saying about what

17 Mr. Sterling had told them?

18 A.   Their -- I was familiar with this program.  I had been

19 briefed on it before.  It was an attempt to pass some sabotaged

20 design plans to a foreign government.  Don and Vicki said that

21 Mr. Sterling had stated that the asset who was to pass these

22 designs to the Iranians had found a flaw, readily found a flaw,

23 and the flaws were supposed to be very subtle so that no one

24 could find them.

25 Q.   So was it your understanding that Mr. Sterling had

1    expressed to Ms. Divoll and Mr. Stone concerns about the

2    effectiveness of the specific program?

3    A.   Yes.  Based upon what they told Vicki and Don, he thought

4    that the program wouldn't work, the effort to pass these

5    sabotaged plans would be quickly uncovered, and the time and

6    effort and resources put into it would be wasted.

7    Q.   Beyond what you just described about Mr. Sterling's

8    concerns as relayed by Mr. Stone and Ms. Divoll, can you recall

9    any additional specifics that they provided about this

10   operation?

11   A.   The plans were for a nuclear fire set, which I believe

12   are -- it's a way to detonate conventional explosives to set

13   off a nuclear reaction to cause an explosion.

14   Q.   Let me ask, did they -- do you recall if they told you a

15   specific model number of the fire set involved in this program?

16   A.   No.

17   Q.   Did they provide any details from Mr. Sterling about

18   specific meetings or where meetings may have occurred in

19   connection with this program?

20   A.   No.

21   Q.   Did they provide any details to you about compensation

22   related to this specific asset?

23   A.   No.

24   Q.   Did Mr. Stone and Ms. Divoll use a specific cryptonym or

25   code name that may have been involved in the operation?

1    A.    No.

2    Q.    Is that something that you would remember?

3    A.    Yes, because we normally are not told that type of

4    information.

5    Q.    Do you recall whether they told you where these plans were

6    to be delivered?

7    A.    I knew the country they were going to be passed to, but I

8    don't know -- they didn't say where it was going to happen.

9    Q.    And the country it was going to be passed to was which

10   country?

11   A.    Iran.

12   Q.    Now, what was the reason that they came to talk to you

13   about this?

14   A.    It was part of my oversight responsibilities to oversee

15   this effort, and they wanted to know what I knew about this

16   program.  I had been briefed on it previously, and I let them

17   know that I was aware of the effort.

18   Q.    Okay.  Did you take these concerns conveyed to you by

19   Mr. Stone and Ms. Divoll seriously?

20   A.    Yes, I did.

21   Q.    Did you attempt to check into the validity of those

22   concerns?

23   A.    Yeah.  I mentioned to Vicki and to Don that I had a

24   briefing scheduled, I don't know if it was like the week or two

25   or maybe longer on this particular program, and that I would

1   bring up these issues at that briefing.

2   Q.   And at some point in the future, did you raise these

3   issues at a briefing on this program?

4   A.   At that briefing that I had scheduled previously, I

5   brought up the concerns that Vicki and Don had given to me, and

6   I asked the CIA officials about their efforts and about this

7   nuclear, nuclear fire set design and whether or not the flaws

8   that were in that design would be readily apparent to somebody

9   looking at it.

10  Q.   And what was the response, generally speaking?

11  A.   Generally speaking, there were -- they told me that there

12  were a number of flaws built into it.  They were designed to be

13  very subtle flaws that no one could see.  They had -- and after

14  they had been put together with the help of a laboratory, a

15  national laboratory, they had a Red Team, or an alternative

16  analysis team take a look at the fire set, and that -- and this

17  was a group of other nuclear scientists who had experience with

18  this type of design, and they could only find less than half of

19  the flaws, and it took them a number of -- it wasn't an easy

20  thing to do.

21  Q.   So ultimately after conferring with the relevant

22  stakeholders, did you reach a conclusion about the concerns

23  raised by Mr. Sterling?

24  A.   Yes.  I thought that -- I didn't give much credence to it.

25  Q.   Did you relay that back to Mr. Stone or Ms. Divoll?

1    A.   I did.

2    Q.   And by running down these concerns, is that something that

3    would fall within the normal scope of your duties?

4    A.   I wouldn't say it happens a lot, or it didn't happen a

5    lot, but yes, because I oversaw that type of program, that was

6    my responsibility.

7    Q.   Do you know a journalist named James Risen?

8    A.   I do not.

9    Q.   Have you ever spoken to James Risen?

10   A.   I have not.

11   Q.   Have you ever spoken to anybody who was not authorized to

12   know about classified -- this specific classified program --

13   strike that.

14            Have you ever spoken to anybody about this classified

15   program whom you believed was not authorized to know about it?

16   A.   No, I have not.

17            MR. OLSHAN:  May I have a moment, Your Honor?

18            THE COURT:  Yes, sir.

19            MR. OLSHAN:  That's all I have on direct, Your Honor.

20            THE COURT:  All right, cross?

21                         CROSS-EXAMINATION

22   BY MR. POLLACK:

23   Q.   Good afternoon, Mr. Goco.  My name is Barry Pollack.  I'm

24   one of the attorneys that represents Mr. Sterling.

25            When you had your meeting with Mr. Stone and

1   Ms. Divoll, you were aware or became aware that the employee

2   who had raised concerns about this program was somebody who had

3   been fired by the CIA?

4   A.   I don't recall them saying he'd been fired.  I think they

5   mentioned he was involved in administrative matters in

6   litigation with the CIA.

7   Q.   And as a result of understanding that he was in an

8   employment dispute with the CIA, you immediately had questions

9   about whether you should even raise the issue with the CIA at

10  all, correct?

11  A.   No.

12  Q.   Do you remember being interviewed by the FBI on July 26,

13  2010?

14  A.   I have been interviewed by the FBI a number of times.  I

15  don't recall exactly the date.

16  Q.   Okay.  And understanding you don't recall the date, in one

17  of the interviews with the FBI, do you recall telling the FBI

18  that when you heard a whistleblower had raised a concern

19  regarding the operation, it did not cause you concern?  When

20  you heard the employee had been fired, you immediately had

21  questions about whether you should pursue the issue with the

22  CIA?

23  A.   I don't recall us telling them that, no.

24  Q.   I'd like to go ahead and hand up to the witness a copy of

25  the 302 dated July 28, 2010, and ask, Mr. Goco, to direct your

1   attention to page 3, the second paragraph, and I'm not asking

2   you to read it out loud.  I just want you to review it for

3   yourself.

4          MR. OLSHAN:  Mr. Pollack has just read the language

5   to the witness and said, "Do you remember that?"

6          THE COURT:  I'll give him one chance to see if it's

7   refreshing.

8   BY MR. POLLACK:

9   Q.   Mr. Goco, the part I wanted you to review is page 3, this

10  second paragraph.

11  A.   Yes.

12  Q.   Do you recall telling the FBI that when you heard that the

13  employee had been fired, you immediately had questions about

14  whether you should pursue the issue with the CIA?

15  A.   I don't, I don't recall saying those words.  No, I don't.

16         MR. POLLACK:  Okay.  I'd like to go ahead and show

17  the witness Government Exhibit 110, which I do not believe is

18  yet in evidence but I'll go ahead and move its admission.

19         THE COURT:  All right, it's in.

20         (Government's Exhibit No. 110 was received in

21  evidence.)

22  BY MR. POLLACK:

23  Q.   And this is, Mr. Goco, an e-mail exchange, correct?  A

24  series of e-mails?

25  A.   Yes, it is.

1    Q.   And if we start at the bottom of the first page of 110,

2    there is an e-mail on April 24, and this is an e-mail to you

3    and others, and if you go to the next page, it's asking what

4    follow-up the committee has done with respect to the

5    whistleblower who had reported concerns about the CP.  And CP

6    stands for counterproliferation, correct?

7    A.   Yes, it does.

8    Q.   On 5 March.  And do you recall getting that e-mail?

9    A.   No, I do not recall getting this e-mail.

10   Q.   Okay.  And on the first page of the exhibit, in the middle

11   of the page is a response from you to that e-mail.  Do you see

12   that?

13   A.   Yes.

14   Q.   Okay.  And you say, "The only follow-up we had considered

15   was to ask a question regarding his complaint/assertion to the

16   Counterproliferation briefers at the next quarterly briefing.

17   I have not yet been briefed by that program, but will schedule

18   it after mark-up."

19        And is it correct that as of April 25, the follow-up

20   that you had considered was asking a question about it at your

21   next regularly scheduled briefing?

22   A.   Yes.

23   Q.   But that had not yet happened?

24   A.   Well, there's -- we have quarterly briefings on separate

25   programs, so it was regularly scheduled at that time.  So

1    there's no reason to schedule a, you know, special briefing on

2    the matter.

3    Q.   And you then go on to say, "Since his claims" -- and the

4    "his" here is the reference to Mr. Sterling, correct?

5    A.   Yes.

6    Q.   Since Mr. Sterling's claims involve extremely technical,

7    specialized nuclear designs, and the fire sets were altered by

8    our best nuclear scientists, I don't know of any way to

9    investigate further the validity of the complaint, correct?

10   A.   Yes.

11   Q.   So in other words, you didn't really have a way to

12   investigate it other than to ask the CIA themselves, correct?

13   A.   That would be the first step, and after that, I didn't

14   know where to go.

15   Q.   I'm sorry?

16   A.   After that, I wasn't aware of what the next step would be.

17   Q.   Okay.  Well, in fact, you were satisfied with the answer

18   that you got back from the CIA, so there was no next step,

19   right?

20   A.   Yes, there was no next step.

21   Q.   There was no, no follow-up, no further action?

22   A.   Yeah.  I tried to figure out what the next step would be.

23   Q.   Okay.  But my question is you posed the question at the

24   next quarterly briefing.  You got a response that satisfied

25   you, correct?

1    A.    I wouldn't say it fully satisfied me.  The problem was I

2    wouldn't know how else to investigate the claim.

3    Q.    Okay.  So as a result, as far as you're aware, SSCI took

4    no further action?

5    A.    As far as I'm aware, there was no action.

6                MR. POLLACK:  Okay.  That's all I have.  Thank you.

7                THE COURT:  Any redirect?

8                MR. OLSHAN:  No redirect.

9                THE COURT:  All right.  Thank you, Mr. Goco.  Your

10   testimony is complete, and you're excused as a witness.

11                        (Witness excused.)

12                MR. FITZPATRICK:  Martha Lutz, Your Honor.

13                THE COURT:  All right.

14                MR. FITZPATRICK:  Your Honor, while the witness is

15   coming in, this would be an appropriate time to enter one of

16   our stipulations.

17                THE COURT:  All right, that's fine.  Are you moving

18   it in as an exhibit?

19                MR. FITZPATRICK:  Yes, Your Honor.

20                THE COURT:  All right, what exhibit number?

21                MR. FITZPATRICK:  It's 169.

22                MR. OLSHAN:  Your Honor, may I speak with Ms. Gunning

23   for one minute?

24                THE COURT:  Yes, go ahead.

25                Just wait one minute, ma'am.

1          I don't want any speaking while we're giving the

2     witness the affirmation.

3          Are you ready to go?

4          MR. MAC MAHON:  I think we have a Mira moment, Your

5     Honor.  I'm sorry.

6          THE COURT:  All right.  Ma'am, just stay put for one

7     second.

8          Come on up.

9          (Sealed Bench Conference H not transcribed in this

10    volume.)

11         THE COURT:  Let's get the witness affirmed first.

12         MARTHA LUTZ, GOVERNMENT'S WITNESS, AFFIRMED

13         THE COURT:  We'll wait on distributing these exhibits

14    until you actually reference them, all right?

15         MR. FITZPATRICK:  Fine, Your Honor.

16         THE COURT:  All right.  And I'll have Ms. Gunning

17    assist in doing that.

18         MR. FITZPATRICK:  Your Honor, would you like me to

19    read the stipulation into the record?

20         THE COURT:  Yes.

21         MR. FITZPATRICK:  "Stipulation No. 9.  The United

22    States, through its attorneys, and the defendant, Jeffrey

23    Alexander Sterling, and the defendant's attorneys, hereby

24    stipulate and agree as follows:

25         "The documents contained in Government Exhibit 142,

1    Government Exhibit 143, Government Exhibit 144, and Government

2    Exhibit 145 were seized from Jeffrey Sterling's residence,

3    located at 1540 Rosedale Drive, O'Fallon, Missouri 63366, on

4    October 5, 2006."

5             That's the end of the stipulation, Your Honor.

6             THE COURT:  All right.

7                         DIRECT EXAMINATION

8    BY MR. FITZPATRICK:

9    Q.   Good afternoon, ma'am.

10   A.   Good afternoon.

11   Q.   If you could please, I'm going to ask you to keep your

12   voice up and speak into the microphone so we all can hear your

13   answers.  Please state your name.

14   A.   My name is Martha Lutz.

15   Q.   Why don't you spell your last name for the court reporter.

16   A.   L-u-t-z.

17   Q.   And, ma'am, where do you work?

18   A.   I work for the Central Intelligence Agency.

19   Q.   And how many years have you worked for the CIA?

20   A.   I've worked for the CIA since 1989.

21   Q.   What is your current position?

22   A.   My current position is chief of the litigation support

23   unit.

24   Q.   And how long have you been in that position?

25   A.   I've been in this position a little bit more than two

1   years.

2   Q.   What -- prior to that position, what job did you have?

3   A.   I was the information review officer for the director's

4   area of the CIA.

5   Q.   And for how many years did you have that position?

6   A.   I had that position for approximately 12 or 13 years.

7   Q.   And do you have original classification authority?

8   A.   I do.

9   Q.   How long have you had that authority?

10  A.   I've had that authority since I became the IRO for the

11  director's area in 1999.

12  Q.   Tell the ladies and gentlemen of the jury what is original

13  classification authority.

14  A.   Original classification authority is the ability that's

15  delegated from the President to the director of an agency and

16  from the director down to certain positions within the agency

17  to be able to classify information in the first instance that's

18  not been classified before in order to protect national

19  security information.

20  Q.   And is this authority, is this provided for by way of

21  executive order?

22  A.   Yes, it is.

23  Q.   And are executive orders your primary source for guidance

24  in this area?

25  A.   They are.  There also, of course, is, there are agency

1  regulations that also go along and follow the executive order.

2  Q.   And what is the current executive order that you're

3  operating under?

4  A.   We operate now under Executive Order 13526.

5  Q.   And was there a, was there an executive order that was

6  initiated in 1995, a predecessor executive order?

7  A.   There was.

8  Q.   And what was that?

9  A.   That was Executive Order 12958.

10  Q.   What are -- do the executive orders set out three

11  classification levels for classified materials?

12  A.   They do.

13  Q.   And what are those three levels?

14  A.   Those levels are Confidential, Secret, and Top Secret.

15  Q.   And starting with Top Secret, can you tell us what the

16  definition is for Top Secret information?

17  A.   Top Secret information is information that if it were to

18  be released without approval, official approval, would cause

19  exceptionally grave damage to the national security.

20  Q.   Moving down a step to Secret classification, what is the

21  definition of Secret?

22  A.   In the same scenario, Secret information would cause

23  serious damage to the national security.

24  Q.   And then stepping down one further level, what is

25  Confidential information?

1   A.    Confidential information would cause damage to the

2   national security.

3   Q.    And there's a -- what is -- are you familiar with a term

4   "SCI"?

5   A.    Yes, I am.

6   Q.    And what is SCI?

7   A.    That is Sensitive Compartmented Information.

8   Q.    Can you give us a definition of what Sensitive

9   Compartmented Information is?

10  A.    What it is, actually, within government, there are a

11  number of people who are cleared, let's say, to the Secret

12  level or even the Top Secret level.  There is information that

13  is more sensitive than that.  Simply being cleared to Top

14  Secret, for example, wouldn't be enough to protect this

15  information, and so compartments are created to provide limited

16  access to a limited number of people in order for them to be

17  able to do their job knowing what that information is about,

18  and other people are not able to know about it.

19  Q.    Have the, the definitions that you've set out for us for

20  Top Secret, Secret, and Confidential, have they remained the

21  same since 1995?

22  A.    Yes, they have.

23  Q.    Is it possible to classify tangible things such as

24  documents as well as intangible things such as information or

25  sources and methods?

1   A.   Yes, it is.

2        MR. FITZPATRICK:  Now, Your Honor, I would like to go

3   to Government Exhibits 142, 143, 144 under the Silent Witness

4   Rule.

5        THE COURT:  These documents, ladies and gentlemen,

6   are still classified documents.  They're for your eyes only at

7   this point plus the eyes of the people who are testifying and

8   the lawyers.

9        MR. FITZPATRICK:  Thank you.  May we hand them out,

10  Your Honor?

11       THE COURT:  Yes.

12       MR. FITZPATRICK:  And, Your Honor, the stipulation

13  didn't take care of this:  Your Honor, we are moving to admit

14  142, 143, and 144.

15       THE COURT:  And 145 as well or just -- are there

16  three or four exhibits in this packet that are going to the

17  jurors?

18       MR. FITZPATRICK:  Three.

19       THE COURT:  All right.  So 145 is not going in at

20  this time?

21       MR. FITZPATRICK:  Not yet, Your Honor.

22       THE COURT:  All right, that's fine.  142, 143, and

23  144 are in evidence.

24       MR. MAC MAHON:  Your Honor, subject to our prior

25  objections.  Thank you.

1        THE COURT:  All right.

2        (Government's Exhibit Nos. 142 through 144 were

3   received in evidence.)

4        THE COURT:  All right, are you ready to ask your

5   questions?

6        MR. FITZPATRICK:  Your Honor, I'm waiting for the

7   witness to get her copy.

8        THE COURT:  Okay.

9   BY MR. FITZPATRICK:

10  Q.   Ma'am, do you have Government Exhibits 142, 143, and 144

11  in front of you?

12  A.   I do.

13  Q.   If you could just briefly take a look at those?

14       Have you previously reviewed these documents prior to

15  today?

16  A.   I have done.  Yes, I have.

17  Q.   And do you recognize those documents?

18  A.   I do recognize these documents.

19  Q.   I'm going to ask you two questions:  First, when those

20  documents were originally classified, were they properly

21  classified at the Secret level?

22  A.   They were.

23  Q.   Standing today, are those documents today properly

24  classified at the Secret level?

25  A.   Yes, they are.

1          MR. FITZPATRICK:  Your Honor, I have no further

2    questions on these documents.

3    Q.   Ma'am, you can hand them back to Ms. Gunning.

4          Ma'am, next I want to turn your attention to

5    Government Exhibit No. 145.

6          THE COURT:  All right, ladies and gentlemen, I'm

7    going to ask you to just pack those all up and return those

8    exhibits at this point, all right?  Let's wait a minute while

9    we collect these exhibits.

10         Oh, is 145 still with the jury?

11         MR. FITZPATRICK:  No, Your Honor.

12         THE COURT:  All right.

13         The purpose for those -- the jury is looking quite

14   confused, and they need to understand a little context.  Would

15   you make a proffer as to -- well, let me just tell you you'll

16   get the context for why you were shown those exhibits a little

17   bit down the road, all right?  But the actual content of those

18   exhibits is really not anything you have to worry about, all

19   right?  At this point, they wanted you to see that there are

20   some exhibits in this case that are still classified as Secret.

21         All the documents you've seen up to this point have

22   been redacted or had corrections made to them such that you

23   could see them and that they could be shown publicly.

24         Right?

25         MR. FITZPATRICK:  Correct, Your Honor.

1          THE COURT:  All right.  These are the four for which

2   that has not happened.  All right.

3          MR. FITZPATRICK:  There were three documents.

4          THE COURT:  Three.  And now we're talking about the

5   fourth, all right.

6          MR. FITZPATRICK:  Your Honor, this document is not

7   under the Silent Witness Rule.

8          THE COURT:  Oh, all right.  So this one can be

9   discussed.

10         MR. FITZPATRICK:  Correct.

11         THE COURT:  All right.  But again, we have copies for

12  the jury, or is that going to go on the screen?

13         MR. FITZPATRICK:  It will go on the screen.

14         THE COURT:  That's fine, all right.

15         MR. FITZPATRICK:  Your Honor, at this time, I would

16  move to admit Government Exhibit 145.

17         THE COURT:  All right, the stipulation covers that,

18  so that's in as well.

19         (Government's Exhibit No. 145 was received in

20  evidence.)

21  BY MR. FITZPATRICK:

22  Q.   Ma'am, do you have Exhibit 145 in front of you?

23  A.   I do.

24  Q.   And are you familiar with the term "PAR"?

25  A.   Yes, I am.

1    Q.    What is a PAR?

2    A.    A PAR is a performance appraisal report.

3    Q.    And are case officer PARs classified?

4    A.    Yes, they are.

5    Q.    And why is that?

6    A.    They're classified because those reports will speak to the

7    operations that that, each case officer does, and those

8    operations will be classified operations and invariably will

9    rise to the Secret level, if not above.

10   Q.    Now -- thank you, ma'am.

11         Now, I want to ask you a question based on your

12   expertise as an original classification authority, and I'd ask

13   you to listen to this question carefully, please:  Can you

14   please state the classification level for an identified CIA

15   human asset engaging in and completing specific operational

16   activities for the CIA at an overseas location?

17         MR. MAC MAHON:  Your Honor, I'd object.  The witness

18   wasn't proffered for this testimony.  They've already heard the

19   evidence from the asset himself, and it's unduly prejudicial at

20   this time.

21         THE COURT:  Well, I thought this witness was going to

22   be in an expert capacity.  Is that --

23         MR. FITZPATRICK:  We've noticed her as an expert,

24   Your Honor, and I -- yes.

25         THE COURT:  Then I'm going to permit this line of

1   questioning.

2           MR. MAC MAHON:  This subject was not noticed in any

3   of the expert --

4           THE COURT:  Well, the --

5           MR. MAC MAHON:  -- documents that we received at all,

6   Your Honor.

7           THE COURT:  Were you not told that this witness would

8   opine about the classification level of evidence in the case?

9           MR. MAC MAHON:  We were told they would testify as to

10  these exhibits that we got here but not to start making, giving

11  opinions as to the classification level of certain functions

12  and other -- I don't think that that's even an issue in the

13  case, Your Honor.

14          MR. FITZPATRICK:  Your Honor --

15          MR. MAC MAHON:  Classification issues don't even

16  arise in this case.

17          MR. FITZPATRICK:  Your Honor, they've had this notice

18  for this witness, which -- and the notice is identical to the

19  prior witness, which was noticed a long time ago.  They've had

20  notice that this witness would testify to a full range of

21  classification issues.  This is one of them.

22          THE COURT:  All right, I'm going to overrule the

23  objection.  I think it was within the scope of the notice.  Go

24  ahead.

25          MR. FITZPATRICK:  Thank you, Your Honor.

1    Q.   Ma'am, would it help you to rephrase my question, or do

2    you still remember the question?

3    A.   If you could rephrase it, I'd appreciate it.  Thank you.

4    Q.   All right.  If you could please, state the classification

5    level for an identified CIA human asset engaging in and

6    completing specific operational activities on behalf of the CIA

7    at an overseas location.

8    A.   Information of that type would be classified at the Top

9    Secret/Sensitive Compartmented Information level.

10   Q.   And can you explain why?

11   A.   Yes, I can.  Because there we are talking about

12   identifying an asset for the CIA, somebody who worked for the

13   CIA, and that would be Top Secret information.  That would

14   cause exceptionally grave damage to the national security --

15          MR. MAC MAHON:  Your Honor, I'm going to object.  The

16   answer was as to why it's classified at a certain level.  Now

17   we're going to get a speech as to why.  That's not expert

18   testimony.

19          THE COURT:  I don't think it's a speech.  I think

20   it's an explanation, and you can certainly probe it on cross.

21   Overruled.

22   BY MR. FITZPATRICK:

23   Q.   You can continue your answer.

24   A.   I guess what I would like to say is this:  That when the

25   identity of an asset is given out, that's one of the most

1  serious things that can happen in the agency.  What happens

2  there first of all is that that asset is immediately put in

3  danger, perhaps his family also, others with whom he has

4  friendships might be at danger.

5           Additionally, other assets who work for the agency

6  might turn and look at a thing like that and say:  Is this the

7  best you can do to protect us?  If that's the case, then I'm

8  afraid I can't work for you anymore.

9           And finally, there are those who are thinking about

10 perhaps helping us and might see something like this.  It

11 creates a chilling effect for those people, too.

12          MR. FITZPATRICK:  Thank you, ma'am.

13          Your Honor, can I publish 145, please?

14          THE COURT:  Yes, go ahead.  It's in.

15 BY MR. FITZPATRICK:

16 Q.   Earlier, ma'am, you discussed PARs.  Can we go to the top,

17 please?

18          For the benefit of the jury, is this the document you

19 were referring to earlier regarding the PAR?  You have a screen

20 right there to your left.

21 A.   Oh, I'm sorry.

22          Yes.

23 Q.   And is this the, a 1993 PAR or evaluation for Jeffrey

24 Sterling?

25 A.   Yes, it is.

1        MR. FITZPATRICK:  All right, I have no further

2  questions, Your Honor.

3        THE COURT:  All right, cross-examination?

4        MR. MAC MAHON:  Yes.

5                    CROSS-EXAMINATION

6  BY MR. MAC MAHON:

7  Q.   Ma'am, how many documents are there at the CIA that are

8  classified as Secret, do you know?

9  A.   I don't know.

10 Q.   Millions?

11 A.   I bet there are hundreds of thousands, yes.  Millions

12 maybe.

13 Q.   Almost everything at the CIA is classified in one way or

14 another, correct?

15 A.   Most of the information but not all the information at

16 CIA, yes, is classified.

17 Q.   Almost everything, correct?

18 A.   Well, we have an open source center that does wonderful

19 work, and that information is not classified.  That comes from

20 open sources.  But yes, lots and lots of what we have is

21 classified.

22 Q.   And the road sign off G.W. Parkway used to say "FAA," too,

23 right?

24 A.   Yes, it did.

25 Q.   Was that classified, that sign?

1   A.   Not that I know of, sir.

2   Q.   The 142, 143, and 144, do you remember those documents?

3   A.   I do.

4   Q.   Okay.  What was the date on those documents, do you

5   remember?

6   A.   I don't think there was a date on those documents.

7   Q.   You didn't see the date February 1987 on those documents?

8   A.   I'm sorry, no, I didn't.

9   Q.   And the documents deal with using telephones when

10  someone's out of the office, correct?

11          MR. FITZPATRICK:  Objection, Your Honor.

12          THE COURT:  You can't go into the contents because

13  it's not relevant to this case.

14          MR. MAC MAHON:  Just one last question, Your Honor.

15  Q.   This is from 1987, correct?

16  A.   Okay.  Yes.

17  Q.   Okay.  Is this for using a rotary phone?

18          MR. FITZPATRICK:  Objection, Your Honor.

19          THE COURT:  Well, I think that's not giving up

20  anything.  We'll allow that.

21  BY MR. MAC MAHON:

22  Q.   Rotary phones in 1987, ma'am?

23  A.   Yes.

24  Q.   And Exhibit 145, was it your testimony based upon your

25  training and experience that this was a PAR for Mr. Sterling as

1  a case officer?

2  A.   Yes.

3  Q.   Okay.  And you know for a fact that -- if we could put

4  this back up on the screen, Your Honor, the first page of 145?

5          Mr. Sterling wasn't a case officer on 21 October

6  1993, was he?

7  A.   I'm sorry, I would have thought that he was a case officer

8  then or at least a trainee to be a case officer at that time.

9  Q.   He was a trainee to be a case officer then, right?

10 A.   Um-hum.

11 Q.   How did you learn that in preparing to testify?

12 A.   It's an interim assignment.  Somebody came in.  I have

13 some general knowledge of how case officers are trained and how

14 they work.

15 Q.   But this is not a PAR.  Your testimony now is this is not

16 a PAR that has anything to do with anything Mr. Sterling ever

17 did as a case officer for the CIA, correct?

18 A.   No, I wouldn't say that.  No.

19 Q.   As a trainee to be a case officer, is that correct?

20 A.   Absolutely, yes.  And doing the work of the Central

21 Intelligence Agency, yes.

22 Q.   And this doesn't have anything to do with Classified

23 Program No. 1, correct?

24          MR. FITZPATRICK:  Objection.  It's argumentative.

25 BY MR. MAC MAHON:

1  Q.   The information in Exhibit 145 --

2           THE COURT:  Wait.

3           MR. MAC MAHON:  I'm sorry, Your Honor.

4           THE COURT:  I'm going to allow it.  It's

5  cross-examination.

6  BY MR. MAC MAHON:

7  Q.   The information on any of the exhibits that counsel has

8  shown you, none of it has anything to do with Classified

9  Program No. 1, does it?

10          MR. FITZPATRICK:  It's beyond the scope, Your Honor.

11 Objection.  We never discussed --

12          MR. MAC MAHON:  He asked, he asked about the --

13          THE COURT:  We haven't discussed them.  The exhibits

14 are in evidence in a strange way.  I'll allow that last

15 question.

16 BY MR. MAC MAHON:

17 Q.   Ma'am, they don't have anything to do with Classified

18 Program No. 1, not a single exhibit you looked at today, right?

19 A.   No.

20          MR. MAC MAHON:  All right.

21          THE COURT:  Is there any redirect?

22          Wait one second.  Anything further, Mr. MacMahon?

23          MR. MAC MAHON:  Excuse me, can I consult with

24 Mr. Pollack, Your Honor?

25          THE COURT:  Go ahead.

1            MR. MAC MAHON:  I'm sorry.

2    Q.   Is there something specific in Exhibit 145 that reveals

3    something about Mr. Sterling's work at the CIA?

4    A.   I think it speaks to the type of operational traits that

5    we are looking for in our case officers, but specifics, no.

6            MR. MAC MAHON:  That's all.

7            THE WITNESS:  Not as I read it here.

8            MR. MAC MAHON:  That's all, Your Honor.  Thank you.

9            THE COURT:  All right.  Mr. Fitzpatrick?

10                        REDIRECT EXAMINATION

11   BY MR. FITZPATRICK:

12   Q.   Government Exhibits 142, 143, and 144, counsel asked you

13   about the date of those documents.

14   A.   Um-hum.

15   Q.   Those documents have -- a form of those documents are in

16   existence today, correct?

17   A.   Yes.

18   Q.   And --

19           MR. MAC MAHON:  There's no objection.  We're just

20   dealing with these very exhibits themselves, not what someone

21   might look like today, 25 years later.

22           THE COURT:  Well, I understand where I think the

23   government is going.  I'll overrule that objection.

24   BY MR. FITZPATRICK:

25   Q.   And did that knowledge form your opinion that these

1    documents would be properly classified at the Secret level

2    today?

3    A.    Absolutely.

4    Q.    Now, Government Exhibit No. 145, is that document

5    redacted?

6    A.    This is redacted, yes, which is why I said as I read it

7    here.

8    Q.    Have you had an opportunity to read the unredacted form of

9    that document?

10   A.    I have had that opportunity.

11   Q.    And having had the opportunity to read the unredacted form

12   of that document, is it still your opinion that that document

13   is classified at the Secret level?

14   A.    Yes, it is.

15            MR. FITZPATRICK:  I have no further questions, Your

16   Honor.

17            THE COURT:  Mr. MacMahon, any recross?

18            MR. MAC MAHON:  Yeah, just briefly, Your Honor.

19                     RECROSS EXAMINATION

20   BY MR. MAC MAHON:

21   Q.    And having read that document in its unredacted form, it

22   would still be your testimony that nothing in that document

23   discloses anything about what Mr. Sterling was doing for the

24   CIA, right?

25   A.    I'm sorry, no, in unredacted form, I think it would speak

1    to the types of things he was doing for the CIA.

2    Q.    But we're not allowed to talk about that, right?

3    A.    That's right.

4              MR. MAC MAHON:  Okay.  Thanks, Your Honor.

5              THE COURT:  All right.  Thank you, Ms. Lutz.  Your

6    testimony is finished.  You're excused as a witness.

7                         (Witness excused.)

8              THE COURT:  Call your next witness.

9              MR. FITZPATRICK:  Kim McManus, Your Honor.

10             THE COURT:  All right.  Do you expect this witness to

11   take very long?

12             MR. FITZPATRICK:  I don't.

13             THE COURT:  All right, we'll have our break after

14   this witness.

15             KIM MC MANUS, GOVERNMENT'S WITNESS, AFFIRMED

16                       DIRECT EXAMINATION

17   BY MR. FITZPATRICK:

18   Q.    Good afternoon, ma'am.  Please state your full name.

19   A.    Kim McManus.

20   Q.    And if you would, please, spell your last name for the

21   court reporter.

22   A.    M -- as in Mary -- c-M -- as in Mary --a-n -- as in

23   Nancy -- u-s -- as in Sam.

24   Q.    Who do you work for?

25   A.    I work for the Central Intelligence Agency, Office of

1  Inspector General, Investigations.

2  Q.   And how long have you been within the component the Office

3  of Inspector General within the CIA?

4  A.   Ten years.

5  Q.   And how long have you worked for the United States

6  government?

7  A.   Twenty-five years.

8  Q.   If you could, please, explain the role of the Inspector

9  General's Office.

10  A.   To conduct independent oversight of agency operations and

11  programs.

12  Q.   And what is your investigative role?

13  A.   I am in charge of the Headquarters Operations division,

14  and my division handled all incoming complaints into the Office

15  of Inspector General investigations.

16  Q.   Now, I want to direct your attention to the time period

17  1999 to 2002.  Are you familiar with the workings of the OIG,

18  the Office of Inspector General, during that time period?

19  A.   Yes.

20  Q.   And can you explain to the jury how is it that a CIA

21  employee could make a referral or a complaint to the Inspector

22  General's Office?

23  A.   There's several ways.  They can call us.  They can call us

24  over a secure line, over an open line.  They can submit a

25  complaint via our Web site.  They can submit a complaint via

1    the U.S. Mail.  They can walk into our office.

2    Q.   Various ways.

3    A.   Yes.

4    Q.   And how are the activities or the role of the Inspector

5    General, how is it publicized within the CIA community that you

6    exist and the role that you serve?

7    A.   We publicize that we exist.  We have a Web site that,

8    that's available to all agency employees.  We -- the IG attends

9    the new employee orientation, and that's agency-wide.  We

10   publicize via posters.  We have a hotline that's accessible via

11   the Web site posted throughout the facilities and by outreach,

12   where we communicate via attending different functions at the

13   agency.

14   Q.   Ma'am, do you regularly access Inspector General records

15   as part of your job?

16   A.   Yes.

17   Q.   And do you participate in creating records and maintaining

18   records within your recordkeeping system?

19   A.   Yes.

20   Q.   If you could, please, describe to us how are records

21   maintained within the Inspector General's Office?

22   A.   When we receive a complaint, we enter that complaint into

23   our system of records, our case management system, and that's a

24   stand-alone system, and we put the information, the facts of

25   the matter into that, into that case management system, where

1    it is maintained.

2           We also have a hard copy file that is the official

3    record, and that information is kept in our office, and we

4    follow the agency regulations on maintaining records.

5    Q.   Is your database connected to sort of the universal CIA

6    database?

7    A.   No, it's a stand-alone.

8    Q.   With respect to your process or procedures when CIA

9    employees leave, is there any purging of prior records in your

10   database upon an employee leaving the CIA?

11   A.   We do not purge when a person leaves the agency.  We

12   follow the agency's recordkeeping, which we're required to

13   maintain records for a certain number of years.  After a

14   certain amount of time for storage purposes, records will be

15   archived, but they still remain a part of the agency.  So if we

16   need to retrieve a record, we can do so.

17   Q.   Were you asked to perform a search of your records to

18   determine all the complaints filed by a person by the name of

19   Jeffrey Sterling?

20   A.   Yes.

21   Q.   And did you conduct that search?

22   A.   Yes.

23   Q.   And how many results did you get?

24   A.   One.

25           MR. FITZPATRICK:  Your Honor, I'd like to show the

1    witness Government Exhibit No. 34, and I'd move its admission

2    at this time.

3              MR. MAC MAHON:  No objection, Your Honor.

4              THE COURT:  All right, 34 is in.

5              (Government's Exhibit No. 34 was received in

6    evidence.)

7    BY MR. FITZPATRICK:

8    Q.    I'm going to show you what's up on the screen.  You also

9    have a hard copy in front of you.  Do you recognize Government

10   Exhibit 34?

11   A.    Yes.

12   Q.    And tell us what that document is.

13   A.    When we receive a complaint, this is the record that we --

14   we manually enter this into our case management system as a

15   record of the facts pertaining to an allegation or complaint

16   that comes in.

17   Q.    And when was this complaint received?

18   A.    November of 1999.

19   Q.    Would that be -- are you looking at the top left-hand

20   corner?  Oh, I'm sorry --

21   A.    Oh.

22   Q.    Top left-hand corner?

23   A.    Right.  December 20, 1999.

24   Q.    Okay.  And then how -- when was it closed out?

25   A.    December 22, 1999.

1  Q.   And was this the, a complaint reported to your office by

2  Jeffrey Sterling?

3  A.   Yes.

4  Q.   And how -- turning your attention to the paragraph that

5  begins "Allegation or issue," the first line there says "Duty

6  call received by STU-III on 19 December 1999."  Is that -- is a

7  duty call, is that one form in which individuals can make

8  complaints to the IG's Office?

9  A.   The complaint came in via the secure phone, which is the

10 STU-III.  The duty call is we have agents who on a particular

11 day are assigned the responsibility of handling a complaint

12 that comes in for that particular day, so that's what the duty

13 call is.  A person who was the duty officer on that particular

14 day took this complaint.

15 Q.   And does this complaint generally concern a personnel

16 matter raised by Mr. Sterling from the New York office?

17 A.   Yes.

18 Q.   Now, have you -- when you performed this search, you

19 testified this is the only document that you recovered from

20 your search?

21 A.   That was the complaint.

22 Q.   And so is it fair to say that there were no complaints

23 issued by Mr. Sterling to your office regarding any mishandled

24 programs?

25 A.   No, this is the only complaint.

1   Q.   Would the Inspector General's Office be an appropriate

2   place to report an allegation of an alleged mishandled program?

3   A.   Yes.

4           MR. FITZPATRICK:  The Court's indulgence for one

5   moment?

6           THE COURT:  Yes, sir.

7           MR. FITZPATRICK:  Your Honor, I have no further

8   questions for this witness.

9           THE COURT:  All right.  Mr. MacMahon?

10          MR. MAC MAHON:  Very briefly, Your Honor.  Thank you.

11                          CROSS-EXAMINATION

12  BY MR. MAC MAHON:

13  Q.   Ma'am, my name is Edward MacMahon.  I'm one of

14  Mr. Sterling's lawyers.

15          Is it your testimony that the search that you would

16  do -- or that you performed at the CIA database was exhaustive?

17  A.   Yes.

18  Q.   So it would have found anything that dealt with

19  Mr. Sterling complaining to the Inspector General's Office?

20  A.   It would show if he filed a complaint with our office, it

21  would show that in the system.

22  Q.   So the CIA has a lot of computers and a lot of backup, a

23  lot of backup files on computers?

24  A.   We do.

25  Q.   Now -- and all those files were searched to see if

1    Mr. Sterling had complained at all about any program, correct?

2    A.    Yes.

3    Q.    Now, it says here on the second page of Exhibit 34 that

4    Mr. Sterling -- in the third full paragraph that starts

5    with "Sterling says he intends"?

6    A.    Yes.

7    Q.    Okay.  This was an appropriate complaint for Mr. Sterling

8    to make without reference to that, correct?  If he was having

9    problems with his boss in New York, one place he could come was

10   to the Inspector General, right?

11   A.    Correct.

12   Q.    And that's what this is, right?

13   A.    Yes.

14   Q.    This is entirely appropriate, correct?

15   A.    Yes.

16   Q.    And what it says is that Sterling intends to seek outside

17   counsel to determine if he has any additional options, correct?

18   A.    Yes.

19   Q.    And that's something he's entitled to do, correct?

20   A.    Yes.

21   Q.    And it says after acknowledging his right to seek counsel,

22   he was cautioned that his position required he discuss

23   job-related information only with a cleared lawyer -- cleared

24   counsel.  Do you see that?

25   A.    Yes.

1   Q.   That's true?

2   A.   Yes.

3   Q.   And it says here that Mr. Sterling acknowledged that he

4   understood those requirements, correct?

5   A.   Yes.

6   Q.   Okay.  Do you know whether Mr. Sterling thereafter

7   obtained cleared counsel to file a lawsuit against the CIA?

8   A.   I do not know.

9   Q.   So you're not aware of any information, you didn't learn

10  anything that's in this case record that says Mr. Sterling ever

11  disclosed any job-related information to anyone that wasn't

12  cleared to know it, correct?

13  A.   No, I'm not aware of that.

14  Q.   That would be, that would be in a file if something like

15  that had happened?  You would have investigated that, correct?

16  A.   If it had come to our attention that he did not follow

17  procedure and someone found out about that and reported to us,

18  then yes, we would look into that.

19  Q.   Right.  And on December 22, 1999, at the bottom, he was

20  again reminded that he needs security-cleared counsel before

21  discussing job-related issues?

22  A.   Yes.

23  Q.   Do you see that?

24  A.   Yes.

25  Q.   And again, nothing ever came to your attention that

1   Mr. Sterling ever discussed his job-related issues with anyone

2   who wasn't entitled to hear that information, correct?

3   A.   Correct.

4           MR. MAC MAHON:  That's all.  Thank you, Your Honor.

5           THE COURT:  Any redirect?

6           MR. FITZPATRICK:  Very briefly, Your Honor.

7           THE COURT:  Yes, sir.

8                        REDIRECT EXAMINATION

9   BY MR. FITZPATRICK:

10  Q.   When you searched your database, in addition to using

11  Mr. Sterling's true name, did you also search under his

12  CIA-assigned aliases?

13  A.   Yes.

14  Q.   Any and all aliases?

15  A.   Yes.

16  Q.   And did you also get a negative result?

17  A.   Correct.

18          MR. FITZPATRICK:  Nothing further, Your Honor.

19          THE COURT:  Mr. MacMahon, anything further?

20          MR. MAC MAHON:  No, Your Honor.

21          THE COURT:  All right, thank you, Ms. McManus, for

22  your testimony.  You're excused as a witness.

23                        (Witness excused.)

24          THE COURT:  We'll take our afternoon break until 10

25  after four.  Thank you.

1     (Recess from 3:55 p.m., until 4:10 p.m.)

2                    (Defendant present, Jury out.)

3     THE COURT:  All right, what's the issue?  Because I

4  don't want to hold the jury up.

5     MR. OLSHAN:  Very briefly, Your Honor, there -- one

6  of the elements that the government must establish as to

7  Counts 1 and 20 is that members of the general public who are

8  not authorized to receive classified information, in fact, did

9  via publication of the book.  One of our exhibits is Barnes &

10 Noble's sales records showing that the book was shipped to

11 various Barnes & Noble retail stores throughout Eastern --

12 throughout Northern Virginia and that the book was sold.

13    We do have a witness who is a hairdresser who will

14 say, "I read the book.  I don't have a security clearance."

15 The reason we know who this person is is because Special Agent

16 Hunt in 2006, after the book was published, observed that the

17 hairdresser, her hairdresser had the book.

18    Fast-forward four years later, 2010, this case is

19 approaching indictment.  Special Agent Hunt for the first time

20 tells this hairdresser, her hairdresser, "I work for the FBI.

21 Do you recall reading this book?"  The woman confirmed that she

22 read the book.

23    The sole purpose of her testimony is:  I don't have a

24 clearance and I read the book.

25    THE COURT:  All right.

1    MR. OLSHAN:  We've asked the defense if they would

2    stipulate to that fact, which we think you can infer already

3    from the sale of the book throughout Northern Virginia.  The

4    defense has suggested they are not willing to stipulate to that

5    testimony.

6            THE COURT:  Look, if they're not going to, you need

7    to put the witness on.  There's no hairdresser privilege that

8    I'm aware of that's going to be a problem, right?

9            MR. OLSHAN:  Your Honor, if there were, this would be

10   the case where there would be.

11           THE COURT:  And you can't cross into anything about

12   the hairstyle or coloring or anything like that, all right?

13           Let's get the jury in.

14           MR. POLLACK:  So there is a privilege.

15           THE COURT:  You may invoke it, Special Agent Hunt.

16           MR. FITZPATRICK:  Just to be clear, Your Honor, it's

17   Ms. Hunt's hairdresser and not mine.

18           THE COURT:  I understand.

19                        (Jury present.)

20           THE COURT:  All right, Mr. Fitzpatrick, who is your

21   next witness?

22           MR. FITZPATRICK:  Thank you, Your Honor.  Mr. Reju

23   Kurian.

24           THE COURT:  All right, Mr. Kurian.

25           MR. FITZPATRICK:  Your Honor, I believe this is going

1    to be another appropriate time to do two stipulations.

2              THE COURT:  All right, go ahead.

3              REJU KURIAN, GOVERNMENT'S WITNESS, AFFIRMED

4              MR. FITZPATRICK:  Your Honor, before I begin with the

5    witness, should I read the stipulations?

6              THE COURT:  Yes, go ahead.

7              MR. FITZPATRICK:  Your Honor, this Stipulation No. 2,

8    at Government Exhibit 162.  For purposes of this witness, only

9    the top, the first two paragraphs are pertinent to this

10   witness.  I may as well just read the entire stipulation.

11             THE COURT:  Go ahead.

12             MR. FITZPATRICK:  "The United States, through its

13   attorneys, and the defendant, Jeffrey Alexander Sterling, and

14   the defendant's attorneys, hereby stipulate and agree that

15   business records reflect the following:  From 2003 through

16   2006, Jeffrey Sterling was the subscriber for the following MSN

17   e-mail addresses:  jeffreys@hotmail.com and second,

18   jsthe7th@hotmail.com.

19             "From 2003 through 2005, James Risen was a subscriber

20   for AOL e-mail address jrisen" -- that's r-i-s-e-n --

21   "@aol.com.  During this period, James Risen also used the work

22   e-mail address jrisen@newyorktimes.com.

23             "While living at 13455 Farmcrest Court, Herndon,

24   Virginia, Jeffrey Sterling was the subscriber for Verizon

25   telephone 703-793-9388.

1   "From 2003 through 2005, James Risen was the

2   subscriber for Verizon telephone 301-977-9159.

3   "From 2003 through 2005, James Risen was the

4   subscriber to cellular telephone No. 301-208-2580.

5   "From 2004 through 2005, James Risen was the

6   subscriber to cellular telephone No. 240-994-9524.

7   "From 2003 through 2005, the telephone number for the

8   Washington, D.C., office of *The New York Times* was

9   202-862-0300.

10  "From June 2004 through 2005, Jeffrey Sterling's

11  telephone number at his office in St. Louis, Missouri, was

12  314-923-4274, and his business cellular telephone number was

13  314-479-3563."

14  And then, Your Honor, continuing to Stipulation No.

15  4, at Government Exhibit 164, "The United States of America,

16  through its attorneys, and the defendant, Jeffrey Alexander

17  Sterling, and the defendant's attorneys, hereby stipulate and

18  agree as follows:

19  "On or about August 16, 2006, at the request of the

20  FBI, John and Lora Dawson voluntarily provided the following

21  personal computer to the FBI, which has been maintained since

22  that time pursuant to standard FBI evidence handling

23  procedures, including anytime during which it was submitted for

24  forensic analysis by FBI personnel:

25  "One Packard Bell L100 personal computer, bearing

1   serial No. P493907180, and containing Seagate Hard Drive

2   ST33210A, bearing serial No. 5AB11AEB."

3           THE COURT:  All right.

4                           DIRECT EXAMINATION

5   BY MR. FITZPATRICK:

6   Q.   Good afternoon, sir.

7   A.   Good afternoon.

8   Q.   I'm going to ask you to keep your voice up and speak into

9   the microphone so we can all hear your answers.

10  A.   Good afternoon.

11  Q.   Thank you.  Please state your name.

12  A.   My name is Reju Kurian, R-e-j-u, last name is Kurian,

13  K-u-r-i-a-n.

14  Q.   And, sir, how are you employed?

15  A.   I'm employed as an information technology specialist,

16  forensic examiner with the Federal Bureau of Investigation.

17  Q.   How long have you worked for the Federal Bureau of

18  Investigation?

19  A.   I was working for the bureau for more than 11 years.

20  Q.   And how long have you been in your current position as an

21  information technology specialist?

22  A.   I was an information technology specialist for more than

23  11 years.

24  Q.   Okay.  And do you -- give a brief description of your job

25  responsibilities as a forensic examiner of computers.

1  A.    As a computer forensic examiner, I participate in search

2  and seizures.  I will identify, preserve, and examine digital

3  media, and as for the examination, I will produce, examine, and

4  process for case agents and prosecutions for presented in the

5  court of law.

6  Q.    And, sir, during the course of your employment with the

7  FBI, do you routinely go through training procedures regarding

8  your profession?

9  A.    Yes.

10  Q.    And how often do you go through training procedures?

11  A.    At the beginning of the program, I underwent more than 450

12  hours of forensic training as part of the certification.

13  Q.    And are you certified as a forensic examiner?

14  A.    Yes.

15  Q.    And you're, you're originally from India; is that correct?

16  A.    Yes.

17  Q.    And did you attend university in India?

18  A.    Yes.

19  Q.    Do you have a degree?

20  A.    Yes.

21  Q.    What is your degree?

22  A.    I have a Bachelor's Degree in Electronics and

23  Communication Engineering in 1986.

24  Q.    Thank you.  When you came to the United States, did you

25  attend a graduate program?

1    A.    Yes.

2    Q.    And where is that?

3    A.    I took my Master's of Science in Computer Science from

4    Illinois Institute of Technology, Chicago.

5    Q.    And do you have a Master's of Science from there?

6    A.    Yes.

7    Q.    And in what program?

8    A.    It's computer science.

9    Q.    Have you also received training at Johns Hopkins

10   University?

11   A.    Yes.

12   Q.    And what -- do you have a certificate?

13   A.    Yes.

14   Q.    And what is that certificate from Johns Hopkins

15   University?

16   A.    It's an advanced certificate in computer science, which is

17   a post-master's certificate in computer science.

18         MR. FITZPATRICK:  Your Honor, I'm offering Mr. Kurian

19   as an expert in the forensic examination of computer hard

20   drives and related technology.

21         THE COURT:  Any objection?

22         MR. MAC MAHON:  No objection, Your Honor.

23         THE COURT:  All right, he's so certified.  And,

24   ladies and gentlemen, what that basically means is we usually

25   don't let people testify to their opinion.  However, if

1    somebody is deemed to be an expert based either upon

2    specialized training or experience and is deemed an expert,

3    then we allow that person to give his or her opinion, but you

4    as the jury are the fact-finders, and you are free to accept or

5    disregard any or all of any expert's opinion, particularly if

6    you feel it's not based on sufficient foundation or for other

7    reasonable reasons, and I'll give you more specific instruction

8    on that later.

9              All right, go ahead.

10             MR. FITZPATRICK:  Thank you.

11   Q.   Sir, do you recall -- I want to direct your attention back

12   to 2006, specifically September of 2006.  Do you recall being

13   asked to perform a forensic examination by Special Agent Hunt

14   and her colleague, Special Agent Gregory?

15   A.   Yes.

16   Q.   And when you took that assignment, did you receive a piece

17   of computer equipment?

18   A.   Yes.

19   Q.   And where did you get that equipment?

20   A.   After getting the service request for forensic examination

21   of the evidence item, I went to the Washington Field Office

22   evidence control room, and I checked out the evidence from

23   evidence control room.

24   Q.   And was it -- you checked out the evidence specific to the

25   case that Special Agent Hunt asked you to examine?

1    A.    Yes.

2    Q.    And did you take that back to your examination station?

3    A.    Yes.

4    Q.    And what is -- describe -- what's the first step in the

5    process when you are going to examine the hard drive of a

6    computer?

7    A.    First I will check out the evidence from the evidence

8    control room.  I will take that computer to my examination

9    machine.  I will physically examine the computer, and physical

10   examination means I will check out -- I will check whether the

11   barcode of the evidence item matches with the request, and I

12   matched that one and then started processing the evidence.

13   Q.    So you had the right computer?

14   A.    Yes.

15          MR. FITZPATRICK:  All right.  Your Honor, I'm going

16   to ask the witness questions about 157, 158, 159, and 160.  I'd

17   move them into admission at this time.

18          THE COURT:  Any objection?

19          MR. MAC MAHON:  Just a second, Your Honor.

20          THE COURT:  All right.

21          MR. MAC MAHON:  The Court's indulgence?

22          No objection, Your Honor.

23          THE COURT:  All right, all four are in evidence.

24          (Government's Exhibit Nos. 157 through 160 were

25   received in evidence.)

1   BY MR. FITZPATRICK:

2   Q.   Mr. Kurian, with the assistance of Mr. Wood, I want you to

3   show -- if you could please take a look at 157, please?  Do you

4   see 157 in front of you?

5   A.   157?  Yes.

6   Q.   What does that reflect in 157?  What is that?

7   A.   That's the hard drive inside the computer.

8   Q.   And when you received the computer from evidence control,

9   did you remove the hard drive?

10  A.   Yes.

11  Q.   And is this a photocopy of the hard drive?

12  A.   Yes.

13  Q.   And there are some notes to the left there.  What are

14  those notes?

15  A.   I noted down some of the connections on the left side.

16  That is a marking I noted down on this photostat copy.

17  Q.   And why do you do that?

18  A.   That is, that is a practice because when we start the

19  physical examination, I have a digital forensical sheet where I

20  will note down all the information from the computer, so I

21  noted down some of the information, which is on this photostat

22  copy, also.

23  Q.   Now, when you perform a forensic examination on a hard

24  drive, do you -- what's the next step that you take after your

25  initial evaluation?

1  A.   After initial evaluation, including a completion of the

2  digital forensical sheet, I will write-block the hard drive and

3  start imaging the hard drive to a forensically clean hard

4  drive.

5  Q.   And why do you, why do you make an image of the hard

6  drive?

7  A.   Because this is original evidence, so when as a CART

8  examiner, meaning computer analysis and response team member,

9  as per the standard of procedures, we will not start working on

10 the original evidence.  So I need to make a copy or clone of

11 the original hard drive before I start the examination.  That's

12 why I started with the image of the original hard drive.

13 Q.   And does 158 reflect your notation regarding the image of

14 the hard drive that you made?

15 A.   Yes.  158 reflects the photocopy of the hard drive

16 containing the image of the hard drive from the original

17 computer.

18 Q.   Are there security -- and when you make the image, you use

19 a clean hard drive disc; is that correct?

20 A.   Yes.

21 Q.   Are there security measures in place to make sure that you

22 have properly copied from the original hard drive to the image?

23 A.   Yes.  First, the destination hard drive is forensically

24 cleaned, and after that, once I complete the image, I will have

25 a digital fingerprint which matches with the original,

1   fingerprint of the original hard drive, which is what we call

2   is an MD5 hash.

3   Q.   And did you perform that security measure on the image of

4   the hard drive that you made in this case?

5   A.   Yes.

6   Q.   And what was your result?

7   A.   The result matches with the, with the MD5 of the original

8   hard drive.

9   Q.   So you were satisfied that you had a perfect match in the

10  image of the original hard drive?

11  A.   Yes.

12  Q.   Is there a tool that you use called FTK?

13  A.   Yes.

14  Q.   And what is that?

15  A.   FTK is the Forensic Toolkit developed by AccessData for,

16  for examination of the digital evidence.

17  Q.   Now, there came a point in time when Special Agent Hunt

18  and her colleague provided you with some keywords to search

19  for; is that correct?

20  A.   Yes.

21  Q.   Prior to doing that, did you, did you scan the image and

22  get an idea of the contents of that hard drive?

23  A.   The normal process is once I get the request to examine

24  the hard drive, I, as I said earlier, I use the write blocker,

25  and I use my forensic tool and produce the output for case

1  agent to review.  So before that, the case agent requested the

2  keyword search to be done, so I put the keyword searches in,

3  and the results were available for case agent to review.

4  Q.   All right.  And we'll go through those in just a second.

5  When you did the initial review of the image of the hard drive,

6  did you, did you make an impression on the size of the hard

7  drive?

8  A.   Yes.  It was a very small hard drive.

9  Q.   And can you tell us within the hard drive, what is

10 allocated space?

11 A.   Inside the computer hard drive, allocated space is the

12 space allocated to a file.

13 Q.   And is there a logical identification to allocated space?

14 Do you understand my question?

15 A.   Can you repeat that one, please?

16 Q.   Sure.  Within allocated space on a hard drive, is there a

17 logic to it, or are there identified files?

18 A.   Yes.

19 Q.   And what is within a hard drive, what is unallocated or

20 drive-free space?

21 A.   Unallocated or drive-free space is the space which is not

22 allocated to any file.

23 Q.   And when information is deleted from allocated space,

24 where does it go?

25 A.   Once a user deletes a hard drive, meaning -- deletes a

1  file in the hard drive, it goes to the unallocated space.

2  Q.   But regardless of whether it is allocated space or

3  unallocated space, all of that data remains on the hard drive;

4  is that correct?

5  A.   Yes, that's correct.

6  Q.   All right.  Now, I'm going to be showing you a series of

7  exhibits.

8       And, Your Honor, at this time, I'll be showing the

9  witness Exhibits 117, 119, 120, 121, 122, 123, 124, 126, and

10 146, and I would move them for admission at this time.

11      THE COURT:  Any objection?

12      MR. MAC MAHON:  No, Your Honor.

13      THE COURT:  All right.  So just to make sure, 117,

14 119, 120 through and including 123 -- I'm sorry, 124, 126, 146.

15      MR. FITZPATRICK:  Correct, Your Honor.

16      THE COURT:  All right, they're all in.

17      (Government's Exhibit Nos. 117, 119, 120 through 124,

18 126, and 146 were received in evidence.)

19 BY MR. FITZPATRICK:

20 Q.   Now, Mr. Kurian, after you did your initial examination,

21 did you consult with Special Agent Hunt, and did she provide

22 you with some keywords to search the hard drive with?

23 A.   Yes.

24 Q.   And did -- was one of the words "Merlin"?

25 A.   Yes.

1    Q.    I'd ask that you turn, please, to Government Exhibit 146.

2          Do you have 146 in front of you?

3    A.    Yes.  146, yes.

4    Q.    Now, do you see -- and you have a screen to your left

5    there.  You can look either at the exhibit or the screen.

6    There's a -- on the screen, there's a highlighted portion that

7    says "Q:\MERLIN," and then the string continues.  Do you see

8    that?

9    A.    Yes.

10   Q.    When you performed your keyword search "Merlin" on this

11   hard drive, did you get that result?

12   A.    Yes.

13   Q.    And where did you find that result?

14   A.    That result was found in drive-free space.

15   Q.    Did this file exist, or was it accessed by the hard drive?

16   A.    This is a drive-free space, which is an unallocated file.

17   Q.    And -- that's fine.  We'll move on.

18          If we can now turn to Exhibit 117, please?

19          Oh, before we turn to that, what does the

20   identification Q:\, what does that indicate to you?

21   A.    When I, when I look at this Q:\MERLIN, probably maybe a

22   logical drive in a partition.

23          MR. MAC MAHON:  Your Honor, I object.  "Probably

24   maybe" is not an accurate opinion.

25          THE COURT:  I agree with that.  Rephrase the question

1    and let's see about the answer.

2    BY MR. FITZPATRICK:

3    Q.   Can you -- do you have an opinion as to how that file was,

4    was formed?  In other words, does -- you used the phrase

5    "logical"; is that correct?

6    A.   Yes.

7    Q.   If you used the term "logical," does that mean it is

8    purposely created?

9    A.   Yes.

10   Q.   Okay.  By an individual, by a person?

11   A.   Yes.

12   Q.   When you did the search on this, was this string the only

13   thing that you located?

14   A.   For this particular keyword search, I located this

15   particular output.

16   Q.   Was there an actual document or file associated with this

17   string, or is it an indication that one may have existed?

18   A.   No, I did not see any document with the name Merlin.doc.

19   Q.   Do you have an opinion as to whether or not a document

20   could have existed with this logical file?

21        MR. MAC MAHON:  Your Honor, objection to form, and

22   it's beyond the scope.

23        THE COURT:  I think I'm going to sustain that

24   objection.

25        MR. FITZPATRICK:  All right.

1        THE COURT:  Yeah.

2        MR. FITZPATRICK:  Thank you, Your Honor.

3   Q.   Now, if we can move to 117?

4   A.   Yes.

5   Q.   Do you have 117 in front of you?

6   A.   Yes.

7   Q.   Now, the document that we looked at previously, 146, you

8   used a tool called dtSearch for that; is that correct?

9   A.   Yes.

10  Q.   After your initial request from Special Agent Hunt, did

11  you use another tool called EnCase?

12  A.   Yes.

13  Q.   And among those search terms that you were asked to use

14  with this tool called EnCase, was one of them "Risen"?

15  A.   Yes.

16  Q.   And when you used this tool and did a search for "Risen,"

17  is what's reflected in Exhibit 117 a result from that?

18  A.   Yes.

19  Q.   Now, up on the screen, I have the document, and the jury

20  can see it.  Does the, does the tool that you used to search

21  the hard drive, when it finds the search term, does it assign a

22  number to it?

23  A.   Yes.

24  Q.   And what does that -- and where is the number on

25  Government Exhibit 117?

1   A.    It's, it's -- the item was marked as item No. 93.

2   Q.    And does the contents here in Government Exhibit 117 or

3   your item No. 93, does this all come out of the same cluster?

4   A.    This, this information is coming from the unallocated

5   space, so it can be from the same cluster, or it can not be

6   from the same cluster.

7   Q.    Describe, what is a cluster within unallocated space?

8   A.    Basically, when you store data, the operating system gives

9   some clusters for the file to use, so that is a unit for

10  storage.

11          THE COURT:  A cluster is a unit of storage?  Is that

12  what you said?

13          THE WITNESS:  A cluster is a -- Your Honor, when,

14  when a file was allocated, suppose if the file needs three --

15  depending on the size of the file, the operating system

16  allocates some number of clusters.

17          THE COURT:  All right.

18  BY MR. FITZPATRICK:

19  Q.    When data moves from the allocated space on a computer to

20  the unallocated space, what happens when it reaches the

21  unallocated space to the data?

22  A.    Can you rephrase that question, please?

23  Q.    Sure.  Is there any logical reasoning to unallocated space

24  within a computer?

25  A.    When the user deletes a file which is in the active file,

1    it goes to the unallocated space.

2    Q.   And when it does that, does it do that randomly?

3    A.   Yes.

4    Q.   So looking at Government Exhibit 117, do you see the term

5    at the top highlighted in orange?

6    A.   Yes.

7    Q.   "Jrisen@aol.com"?

8    A.   Yes.

9    Q.   And then that is repeated again.  Do you see that?

10   A.   Yes.

11   Q.   And then there is a series of data as you sort of cascade

12   down, progress down the page.  Do you see that?

13   A.   Yes.

14   Q.   And then if you get to about three-quarters of the way

15   down the page, there is a date, a day, a month -- a day, week,

16   a month, a day, and a year.  Does that say "Tuesday, December

17   23, 2003"?

18   A.   Yes.

19   Q.   And shortly following that, is there another e-mail

20   address that says "jsthe7th@hotmail.com"?

21   A.   Yes.

22   Q.   Now, turning to the next page, as you progress down --

23   now, we're still in file unit 93, correct?

24   A.   Yes.

25   Q.   There's language that states, "can we get together in

1    early january?  jim."

2            Do you recognize that?

3    A.   Yes.

4    Q.   Given the proximity of that highlighted data that I just

5    read to you, do you have an opinion as to whether that was one

6    unified message?

7            MR. MAC MAHON:  Your Honor, I'm going to object to

8    foundation.

9            THE COURT:  Well, I think he put in enough

10   foundation, but the proper question is to a reasonable degree

11   of scientific certainty, so ask your question correctly.

12   BY MR. FITZPATRICK:

13   Q.   To a reasonable degree of forensic examination scientific

14   certainty, the highlighted data that I had in that, does that

15   go together in a, in a logical way?

16   A.   When a file is deleted, it goes to the unallocated space.

17   So this content is from the unallocated space.

18   Q.   And the proximity of that data that is highlighted, what

19   does that suggest to you?

20           MR. MAC MAHON:  Same objection, Your Honor.

21           THE COURT:  Well, all right, as I understand it, tell

22   me if I'm wrong, so when you delete a file, the information

23   that was in that file literally gets just spread throughout the

24   unallocated space that is available to absorb that information;

25   is that right?

1          THE WITNESS:  Yes.  Yes, that's correct.

2          THE COURT:  All right.  So the question is are you

3    able when you see this smattering of information in the

4    unallocated space, can you draw any conclusions about the

5    original message?

6          THE WITNESS:  It is randomly allocated in unallocated

7    space, so I cannot say the top section is part of the bottom

8    section.

9          THE COURT:  All right, that's the answer.

10   BY MR. FITZPATRICK:

11   Q.    So let's now move to Government Exhibit 121.

12         MR. MAC MAHON:  Your Honor, I'm sorry, we would move

13   to strike.  I thought there was going to be a foundation for

14   this exhibit coming in in the form that it is.  Now the witness

15   says he can't link the top to the bottom.

16         THE COURT:  Well, he may not be able to link it, but

17   it's still found within this hard drive, and that's

18   sufficiently relevant to this case.  So I'm overruling the

19   objection.

20         Go ahead, Mr. Fitzpatrick.

21   BY MR. FITZPATRICK:

22   Q.    Do you have 121 in front of you?

23   A.    Yes.

24   Q.    And was this document also identified by you in the

25   unallocated space?

1    A.    Yes, that's correct.

2    Q.    And was it in -- did the case program that you used create

3    the 103 file?

4    A.    Yes, 103 is the item number created by the tool.

5    Q.    And the highlighted data as we progress down the page was

6    all in proximity to each other when you found this data; is

7    that correct?

8    A.    Yes, that's correct.

9    Q.    It's highlighted "Saturday," and then there is another

10   e-mail address, "jsthe7th@hotmail.com"; is that correct?

11   A.    Yes.

12   Q.    And then continuing to the next page -- and this is still

13   within the file 103, correct?

14   A.    Yes.

15   Q.    There is a message, "I want to call today.  I'm trying to

16   write the story.  jim."

17            Is that correct?

18   A.    Yes.

19   Q.    Within the rest of the file, in the unallocated space,

20   there is interspersed random data; is that correct?

21   A.    Yes, that's correct.

22   Q.    And a lot of this random data is gibberish; is that

23   correct?

24   A.    Yes.

25   Q.    But the, the e-mail addresses and the, the statements on

1    the second page, that's logical, correct?

2              MR. MAC MAHON:  Your Honor, that's not part of expert

3    testimony.  He's just reading the exhibit now.

4              THE COURT:  Well, the real question is there's a lot

5    of leading going on to which you are not objecting.  So I'll

6    sustain the objection.

7              And, Mr. Fitzpatrick, you need to lead less.

8              MR. FITZPATRICK:  Thank you, Your Honor.

9    Q.   If we could turn to, please, Exhibit 122?

10   A.   Yes.

11   Q.   Do you have 122 in front of you?

12   A.   Yes.

13   Q.   Now, can you tell us what a swap file is?

14   A.   A swap file is a file which is given by the operating

15   system to expand the memory.

16   Q.   So do you have 122 in front of you?

17   A.   Yes.

18   Q.   And again, at the beginning, this is a result of a keyword

19   search that you performed on the image hard drive; is that

20   correct?

21   A.   Yes.

22   Q.   And this is in a unique file created by the program

23   No. 23; is that right?

24   A.   Yes.

25   Q.   Working down the page, is this the form of the data when

1   you recovered it from the hard drive?

2   A.   Yes.

3   Q.   And when you said that the swap file is -- you mentioned

4   memory; is that correct?

5   A.   Yes.

6   Q.   And explain how the swap file interacts with the

7   computer's memory.

8   A.   The computer will have some memory, but the operating

9   system may need to make a decision depending on the performance

10  of the computer, so it may allocate some area of the hard drive

11  as swap file so that some data in the memory can be stored

12  there.  So technically, it's an expansion of the memory.

13          THE COURT:  When you say expansion, does that mean

14  that the data that was in the unallocated space on the hard

15  drive is transferred to this swap memory?

16          THE WITNESS:  No.  Unallocated is already

17  unallocated.  This is the contents inside the RAM or the memory

18  which is going to the actual file, which is windows

19  386.swapfile, which is actually an allocated file.

20          THE COURT:  All right.

21  BY MR. FITZPATRICK:

22  Q.   But that data that we just saw, that existed on the hard

23  drive of the computer that you searched?

24  A.   Yes.

25  Q.   Now, going back to when you -- the initial search revealed

1  the Q:\MERLIN string; is that correct?

2  A.   Yes.

3  Q.   When you identified that, did you save that to a

4  particular disc?

5  A.   Yes.

6  Q.   All right, I want to show you Government Exhibit 159.

7           THE COURT:  Is there any objection to 159?

8           MR. MAC MAHON:  No, Your Honor.

9           THE COURT:  All right, it's in.

10  BY MR. FITZPATRICK:

11  Q.   What is this, 159, the disc there?

12  A.   Yeah, 159 is the disc I created containing the keyword

13  search results from the image of the hard drive.

14  Q.   Okay.  And then 160, does that also, does that disc also

15  contain the second keyword results that you obtained from

16  EnCase?

17  A.   Yes.

18           THE COURT:  Any objection to 160?

19           MR. MAC MAHON:  No, Your Honor.

20           THE COURT:  All right, it's in.

21           MR. FITZPATRICK:  The Court's indulgence for one

22  moment?

23           THE COURT:  Yes, sir.

24  BY MR. FITZPATRICK:

25  Q.   Mr. Kurian, we've discussed in the results that you

1  identified several e-mail strings; is that correct?

2  A.   Yes.

3  Q.   When e-mails are deleted from a, by way of using a

4  particular computer, do they randomly go to the unallocated

5  space?

6  A.   Yes.

7  Q.   So will e-mails go to any particular cluster, or will it

8  just be a random selection?

9       MR. MAC MAHON:  Your Honor, I think that's asked and

10  answered.

11       THE COURT:  No, I'll permit it.  Overruled.

12  BY MR. FITZPATRICK:

13  Q.   Do you understand my question?

14  A.   Yes.

15  Q.   All right, what's the answer?

16  A.   It can be random because once you delete a file, it goes

17  in unallocated space.  So the reference of the file has been

18  deleted, but the data is still in unallocated.  At that point,

19  in unallocated, there's a structure, but the link is gone, but

20  inside the unallocated, there's a structure.

21       So suppose if the person wanted to recover the data.

22  Only the link is needed to recover the data because the link is

23  still there.  But after some time, if the user uses more and

24  deletes more, it overwrites the unallocated.  So link is gone,

25  and then the contents are also overwritten, so there is no way

1    you can recover the data.

2           So just like what you said when you delete the

3    e-mail, initially the e-mail may be inside the unallocated, but

4    subsequently if the deletion happens, maybe it is a document

5    deleted, so at that point, it overwrites the unallocated which

6    contains the e-mail.

7    Q.   So if it's -- if there's an override, then that data is,

8    is effectively gone?

9    A.   Yes.

10   Q.   But the data contained here that you've identified still

11   remained?

12   A.   Yes, that's correct.

13          MR. MAC MAHON:  Objection.  Leading, Your Honor.

14          THE COURT:  That was leading, so I'll sustain the

15   objection.

16          MR. FITZPATRICK:  I'll move on, Your Honor.  Thank

17   you.

18   Q.   Government Exhibit -- turn back to 122, please.

19   A.   122.

20   Q.   When EnCase, the tool you used -- correct?

21   A.   Yes.

22   Q.   How does it assign the number when it identifies a search

23   term?

24   A.   This is the item number.

25   Q.   To what area of data?

1  A.    This is an item number.  When, when you look at the screen

2  of the tool, the item number is 23, but if you look into the

3  bottom, you can identify the cluster number or the offsets.  So

4  technically, if you look at this jrisen@aol.com, you can

5  identify the offset from the cluster.

6            MR. FITZPATRICK:  That's fine.

7            Your Honor, I have no further questions at this time.

8            THE COURT:  All right.  Mr. MacMahon?

9            MR. FITZPATRICK:  Your Honor, if you'd just indulge

10  me for one second?

11            THE COURT:  Go ahead.

12  BY MR. FITZPATRICK:

13  Q.    Just one follow-up question:  The data that you have

14  recovered that you've identified, do you recall that?

15  A.    Yes.

16  Q.    The fact that you were able to recover it, does that mean

17  it has not been overwritten?

18  A.    Yes.

19  Q.    Taking that a step further, does that mean that the

20  content of the e-mails that had been delivered also remain in

21  the unallocated space?

22            MR. MAC MAHON:  Your Honor, objection.  He's already

23  answered that question several times.

24            THE COURT:  Well, I think it's been a little

25  difficult to understand, so I'm going to overrule the

1    objection.

2    BY MR. FITZPATRICK:

3    Q.    Do you understand that question?

4    A.    Yes.

5    Q.    And what's the answer?

6    A.    Answer is yes, meaning what you are saying is once you

7    delete an e-mail, it's going to the unallocated space, right?

8    Q.    I'm asking you.

9    A.    Can you repeat that question, please, then?

10   Q.    Yes.  When you delete an e-mail, where does it go?

11   A.    It goes to unallocated space.

12   Q.    And the fact that you're able to identify the contents

13   within when you did your search indicates what to you?

14   A.    It's not overwritten.

15            MR. FITZPATRICK:  Okay.  Thank you.

16            THE COURT:  All right, Mr. MacMahon.

17            MR. MAC MAHON:  Thank you, Your Honor.  I apologize

18   for not sitting down.

19            THE COURT:  That's all right.  It probably felt

20   better for you to be standing up.

21            MR. MAC MAHON:  I'm trying, Your Honor.

22                         CROSS-EXAMINATION

23   BY MR. MAC MAHON:

24   Q.    Sir, you were given -- my name, I'm Edward MacMahon.  I'm

25   one of the lawyers for Mr. Sterling.  Good afternoon.

1           You were given a whole bunch of search terms to look

2    for, correct?

3    A.   Yes.

4    Q.   And you were asked to look for "*State of War*," and you

5    found nothing, right?

6    A.   What all keyword searches was done, the output was given

7    to the case agent, and I may have to look at the notes whether

8    I found any hit for that particular term or not.

9    Q.   You didn't do any report where you found something that

10   said that "*State of War*" was in the file, right?

11   A.   Okay.

12   Q.   And the same for "fire set," correct?

13   A.   I may need to check my notes.

14   Q.   "*New York Times*," "TBA-480," there's no report that says

15   you found any of those -- any responses to any of those words,

16   right?

17   A.   Yes.

18   Q.   And the -- if -- how old is the hard drive that you looked

19   at?

20   A.   Old.  Can you rephrase that question, please?

21   Q.   It's Exhibit 157.  Let's see if we can try that way.  If

22   Mr. Francisco would put up Exhibit 157?

23   A.   It's a very old hard drive.

24   Q.   It's a very old hard drive.

25   A.   Yes.

1    Q.   And when you did your analysis of the hard drive, did you

2    look to see who the users were that had made use of this hard

3    drive?

4             MR. FITZPATRICK:  Objection, Your Honor.  There's no

5    foundation for that.  It's beyond the scope.

6             THE COURT:  Well, it may be beyond the scope, but I'm

7    going to permit it because I think it certainly would be

8    relevant, so overruled.

9    BY MR. MAC MAHON:

10   Q.   Well, let me ask you this; I'll try it a different way:

11   How old is this hard drive?  Sometime from the --

12   A.   The size is very small, so it's very, very old hard drive.

13   That's all I can --

14   Q.   In early '90s?

15   A.   Can be.

16   Q.   Can be.  Is that your answer?

17   A.   It's an old hard drive.

18   Q.   And were you asked to look when you examined this hard

19   drive to see how many people had used this hard drive over

20   time?

21   A.   I didn't examine this hard drive.

22   Q.   Did you look to see if there was any log files that would

23   show when a certain e-mail or a document was deleted?

24   A.   No, I did not do a, examine that particular --

25   Q.   And you weren't asked to do an examination to see when and

1    if any of these files were even created, correct?

2    A.    Can you rephrase that question again?

3    Q.    You weren't asked to do an examination of the hard drive

4    to see if there -- if you could determine when any particular

5    file was created on the computer, correct?

6    A.    As a part of the examination process, I create a file

7    listing which records all the creation date of all the files.

8    Q.    Okay.  And how far back did those log files go?  Is that

9    "log file" a term that -- would that be the right term?

10            Let me try again.  Hopefully, we're not talking past

11   each other, but that computer would have log files on it which

12   shows when people are on it and not, correct?

13   A.    The hard drive contains an operating system.

14   Q.    Right.

15   A.    And the operating system keeps track of who uses the

16   computer.

17   Q.    Right.  And were you asked to examine that as part of your

18   examination in this case?

19   A.    I did a registry report as part of the examination.

20   Q.    And how far back -- when did the first person use the, use

21   the hard drive to your knowledge?

22   A.    I did not check on that particular question.

23   Q.    All right.  And you didn't check on when files were

24   created, when files were deleted at all, even though there are

25   log files that create that -- that maintain that information on

1  the computer, correct?

2  A.   As I said earlier, I created the file listing which

3  contains all the date modified, date created, and other

4  information which you are asking here.

5  Q.   Right.  But you didn't analyze that to determine who was

6  using the computer at any particular time, correct?

7  A.   Yes, that's correct.

8  Q.   And with respect to the, the Exhibit 146, which is Q/ -- I

9  don't have it in front of me.  I'm going to not say it right.

10              THE COURT:  Q:\.

11              MR. MAC MAHON:  Thank you, Your Honor.

12              THE COURT:  MERLIN.

13              MR. MAC MAHON:  MERLIN.

14              THE WITNESS:  Yes.

15  BY MR. MAC MAHON:

16  Q.   That's something you did find in your search, correct?

17  A.   Yes, that's correct.

18  Q.   But you can't tell this jury any information as to when

19  since this computer was first put into service in the '90s

20  until when you did the examination, when that event occurred at

21  all, correct?

22  A.   Which event are you talking about?

23  Q.   Whatever, whatever is on here.  Q:\MERLIN, you can't --

24  you weren't asked to find out when it was that that file was

25  created, correct?

1   A.    This was a keyword search hit.

2   Q.    All right, let me try again.  First of all, Q indicates

3   that a network drive is being used, correct?

4   A.    For a computer science person, if I look at it, Q:\

5   indicates possibly a logical drive.

6   Q.    Possibly a what?

7   A.    Logical drive.

8   Q.    And what is a logical drive?

9   A.    Okay.  In a computer, as a user, he can divide the hard

10  drive into different parts.  So suppose if I need to divide the

11  hard drive into different parts.  I can give a logical

12  partition, which is assigned maybe to Q number, and the rest of

13  the partition can be another number.

14  Q.    Right.

15  A.    So this is a logical partition I'm talking about.

16  Q.    And that would take somebody that was pretty good with a

17  computer to partition the hard drive and set up a file started,

18  called Q, correct?

19  A.    As a user, probably already the system comes with the

20  logical partitions.

21  Q.    Okay.  In any of the log files, you were never even asked

22  to look at any of the log files to see if anybody even created

23  a folder called Q:\MERLIN, were you?

24  A.    No.

25  Q.    And you can't tell this jury to any degree of certainty

1  whatsoever what that means, correct?

2  A.   This was a keyword search, and I got a hit in drive-free

3  space, which is Q:\MERLIN\MERLIN.DOC.

4  Q.   But as to who was sitting at the computer at any

5  particular time when this occurred, you can't tell this jury

6  anything about that, can you?

7  A.   This particular string was inside the computer when I

8  examined that computer.

9  Q.   All right.  But from that day going all the way back to

10  the day the computer was first put into service, you can't tell

11  the jury when it was that this was --

12            MR. FITZPATRICK:  Asked and answered.

13            MR. MAC MAHON:  He hasn't answered the question, Your

14  Honor.

15            THE COURT:  Well, that means he can't say.  He's

16  answered the question in that respect.

17  BY MR. MAC MAHON:

18  Q.   You can't say?  Is that your answer, sir?

19  A.    No, I examined this hard drive, and the hard drive

20  contains this Q:\MERLIN\MERLIN.DOC.

21            MR. MAC MAHON:  Let me try one more time, Your Honor.

22  I think I --

23            MR. FITZPATRICK:  Objection, Your Honor.  He's

24  answered the question.

25            THE COURT:  No, he hasn't answered it,

1   Mr. Fitzpatrick.

2   BY MR. MAC MAHON:

3   Q.   Didn't you testify before that a computer creates log

4   files as to when events take place that the user of the

5   computer is doing?

6   A.   It's in the registry file, yes.

7   Q.   And in the registry file, you weren't asked to and you

8   didn't find any file that said when this file was created,

9   correct?

10  A.   No.

11           MR. MAC MAHON:  That's all, Your Honor.  Thank you.

12           THE COURT:  All right, any redirect?

13           MR. FITZPATRICK:  Thank you, Your Honor.

14                         REDIRECT EXAMINATION

15  BY MR. FITZPATRICK:

16  Q.   When you performed your keyword searches, did you find any

17  files in the allocated space?

18  A.   Allocated space, yes.

19  Q.   You found files in the allocated space?

20  A.   Yes.

21  Q.   And the files that we've gone over -- the files that we've

22  discussed today were all deleted files, correct?

23  A.   Yes.

24  Q.   The -- Mr. MacMahon asked you about the log files.  Would

25  those have been -- when you performed your keyword search,

1  would those have been identified in the log-in?

2  A.   If there is this file in the log in the hard drive, it may

3  have got a positive hit on that particular portion of the hard

4  drive.

5  Q.   You don't -- your role in this process is to examine a

6  computer, correct?

7  A.   Yes.

8  Q.   And are you a special agent?

9  A.   No.

10 Q.   Do you get into the deep background of investigations?

11 A.   No.

12 Q.   And whose responsibility is that?  Is that Agent Hunt?

13 A.   Yes.

14 Q.   All right.  The swap file that we discussed earlier -- and

15 I believe that's Government Exhibit -- let's talk about that --

16 123.

17         MR. MAC MAHON:  Your Honor, I didn't ask the witness

18 anything about the swap file.

19         THE COURT:  You didn't, but this has been fairly

20 technical, and I'll give you some leeway on recross.

21         MR. MAC MAHON:  Thank you, Your Honor.

22         THE COURT:  I'll overrule the objection.

23 BY MR. FITZPATRICK:

24 Q.   This document, where was this document located?

25 A.   124?

1   Q.    123.  Was that in a swap file?

2   A.    Yes.

3   Q.    And where is the, where is the swap file located on a hard

4   drive?

5   A.    In the hard drive, the swap file was located by the name

6   win386.swp.

7   Q.    And with respect to the space within the hard drive, where

8   is the swap file located?

9   A.    It's an allocated file.

10  Q.    Earlier -- and is this the file that you found in

11  allocated space?

12  A.    Yes.

13  Q.    Does a -- describe what the function is of the swap file

14  within allocated space.

15  A.    As I mentioned earlier, the operating system decides

16  depending on the performance of the computer to copy some of

17  the data from the memory into the swap file.

18  Q.    Does -- if data ends up in a swap file, is that also used

19  for deleted information?

20  A.    It can contain the deleted information, also.

21          MR. FITZPATRICK:  Mr. Kurian, I have no further

22  questions for you.

23          MR. MAC MAHON:  Just briefly, Your Honor.

24          THE COURT:  Yes, sir.

25                       RECROSS EXAMINATION

1   BY MR. MAC MAHON:

2   Q.   Mr. Kurian, I understand that you're not a special agent

3   in the case, but you do take instructions as to what to do from

4   the FBI, don't you?

5   A.   I got the service request to perform a CART examination on

6   this evidence.

7   Q.   So when Special Agent Hunt asked you to look, she asked

8   you to look through the entire computer, correct?

9   A.   Yeah.  That is a request to look into the hard drive.

10  Q.   Not just the unallocated space or swap files.  You were

11  supposed to look at everything, correct?

12  A.   Yes, that's correct.

13  Q.   And in that search, you still didn't come up with a log

14  file that told you when any of these e-mails we looked at were

15  created, correct?

16  A.   Can you repeat, what is a log file you are, you are asking

17  for?

18  Q.   Did you look in the actual, in the hard drive of the

19  computer?

20        Let me ask you a different question.  Did you find

21  any log files -- were you instructed, excuse me, to find any

22  log files that showed when the Q drive was created?

23  A.   That was not in the request.

24  Q.   So to the -- standing here today, you can't tell this jury

25  when, if at all, that file was ever created, correct?

1    A.   The file you are talking about is Q.MERLIN?

2    Q.   Yes.

3    A.   That was a keyword search in a drive-free space.

4    Q.   I'm saying you can't tell the jury when that file was

5    opened, correct?  When it was created at all, correct?

6    A.   I cannot say that this is a keyword hit from a drive-free

7    space.

8              MR. MAC MAHON:  And if -- that's all I have, Your

9    Honor.  Thank you.

10             THE COURT:  All right.  Thank you, sir, for your

11   testimony.

12             THE WITNESS:  Thank you.

13             THE COURT:  You're excused.

14                    (Witness excused.)

15             THE COURT:  Call your next witness.

16             MR. OLSHAN:  Your Honor, the government calls Julia

17   Perriello.

18             THE COURT:  I'm sorry, who?

19             MR. OLSHAN:  Perriello, P-e-r-r-i-e-l-l-o.  That's

20   the witness we just discussed.

21             THE COURT:  All right.  Mr. Wood, she's not on our

22   list, but go ahead and get her.

23             MR. OLSHAN:  My apologies.

24        JULIA PERRIELLO, GOVERNMENT'S WITNESS, AFFIRMED

25             MR. OLSHAN:  May I proceed, Your Honor?

1          THE COURT:  Yes, sir.

2                        DIRECT EXAMINATION

3    BY MR. OLSHAN:

4    Q.    Good afternoon, ma'am.

5    A.    Hi.

6    Q.    If you could, please state and spell your name for the

7    record.

8    A.    It's Julia Perriello, J-u-l-i-a P-e-r-r-i-e-l-l-o.

9    Q.    Is it Perriello or "Perriello"?  How do you pronounce it?

10   A.    "Perriello."

11   Q.    "Perriello"?  Ms. Perriello, are you employed currently?

12   A.    Yes.

13   Q.    Can you tell the jury how you're employed?

14   A.    I'm a hairdresser.

15   Q.    How long have you been a hairdresser?

16   A.    Thirty-five years.

17   Q.    Ms. Perriello, are you familiar with the book *State of*

18   *War*, *The Secret History of the CIA in the Bush Administration*,

19   by James Risen?

20   A.    Yes, sir.

21   Q.    Have you read that book?

22   A.    Yes, sir.

23   Q.    And did you read every chapter of that book?

24   A.    Yes, sir.

25   Q.    Including a chapter that dealt with a specific operation

1   to undermine the Iranian nuclear program?

2   A.   Yes, sir.

3   Q.   Ms. Perriello, do you have a security clearance?

4   A.   No.

5   Q.   Do you live in the Eastern District of Virginia?

6   A.   Yes.

7   Q.   Where do you live?  What city?

8   A.   Alexandria.

9   Q.   And when you read this book, did you live in Alexandria at

10  the time?

11  A.   Yes.

12  Q.   To the best of your recollection, did you read the book

13  soon after it came -- after it was published?

14  A.   Yes.

15  Q.   That was approximately 2006?

16  A.   Yes.

17  Q.   Ms. Perriello, do you know Special Agent Ashley Hunt?

18  A.   Yes.

19  Q.   And how do you know Special Agent Ashley Hunt?

20  A.   I've cut her hair several times.

21  Q.   At some point, did Special Agent Hunt ask you whether you

22  had read this book?

23  A.   Yes.

24  Q.   Prior to talking to you about whether you had read the

25  book *State of War*, did you have any idea that Special Agent

1   Hunt was an FBI special agent?

2   A.   No.

3   Q.   Did you have any idea what she did for a living?

4   A.   No.

5          MR. OLSHAN:  One moment, Your Honor?

6          THE COURT:  How did you obtain the book; do you

7   remember?

8          THE WITNESS:  Either Borders or Barnes & Noble.

9          THE COURT:  So you bought the book?

10         THE WITNESS:  Yeah, I bought the book.

11         THE COURT:  And was that here in Virginia?

12         THE WITNESS:  Yes.

13         THE COURT:  In Alexandria? Fairfax?

14         THE WITNESS:  Possibly, or Bowie.

15         THE COURT:  Or?

16         THE WITNESS:  Bowie, Maryland.

17         THE COURT:  All right.

18         THE WITNESS:  My boyfriend lives in Clinton, and we

19  go up to Bowie sometimes.

20         THE COURT:  But you read it in Virginia?

21         THE WITNESS:  I think so, yeah.

22  BY MR. OLSHAN:

23  Q.   Did you have it in your place of business?

24  A.   Yes.

25  Q.   And where is that?

1    A.    The salon I work at?

2    Q.    Yes.

3    A.    It's in Alexandria.

4    Q.    Did anyone from the FBI tell you to read that book?

5    A.    No.

6              MR. OLSHAN:  That's all I have, Your Honor.

7              THE COURT:  All right, Mr. MacMahon?

8              MR. MAC MAHON:  Very briefly, Your Honor.

9                         CROSS-EXAMINATION

10   BY MR. MAC MAHON:

11   Q.    Good afternoon, ma'am.

12   A.    Hi.

13   Q.    I'm Edward MacMahon, one of Mr. Sterling's lawyers.

14             Is it your testimony you bought the book in Bowie,

15   Maryland?

16   A.    It was probably Virginia, but it might have been in Bowie.

17   Q.    So you don't really remember, do you?

18   A.    Not which bookstore I bought it at, no.

19   Q.    Not --

20   A.    There were several Borders and Barnes & Nobles.

21   Q.    But you don't remember whether you bought it here in

22   Virginia or whether you bought it in Maryland, correct?

23   A.    Correct.

24             MR. MAC MAHON:  That's all I have, Your Honor.  Thank

25   you.

1            THE COURT:  Any redirect?

2            MR. OLSHAN:  One moment, Your Honor.

3            That's all for Ms. Perriello.

4            THE COURT:  Ms. Perriello, thank you for your

5     testimony.  You're free to leave.

6            THE WITNESS:  Thank you.

7                              (Witness excused.)

8            THE COURT:  All right, your next witness?

9            MR. OLSHAN:  Your Honor, our next witness, just so

10    the Court's aware, will not finish in the next 15 minutes.

11           THE COURT:  All right, we can get him started.  We're

12    doing quite well.

13           MR. OLSHAN:  Okay.  The government's next witness is

14    Gayle Scherlis.

15           THE COURT:  All right.

16        GAYLE SCHERLIS, GOVERNMENT'S WITNESS, AFFIRMED

17                      DIRECT EXAMINATION

18    BY MR. OLSHAN:

19    Q.   Good afternoon, ma'am.

20    A.   Good afternoon.

21    Q.   If you could, please state and spell your name, and

22    remember to move close to that microphone.

23    A.   Gayle Scherlis, G-a-y-l-e, last name is S-c-h-e-r-l-i-s.

24    Q.   Ms. Scherlis, are you currently employed?

25    A.   Yes.

1   Q.   Can you tell the jury where you currently work?

2   A.   Trader Joe's.

3   Q.   Prior to your -- prior to working at Trader Joe's, did you

4   have a career at the CIA?

5   A.   Yes.

6   Q.   How long did you work at the CIA?

7   A.   Twenty-nine years.

8   Q.   Can you tell the jury a little bit about what you did

9   while you were at the CIA?

10  A.   Yes.  I was a security officer, and as a security officer,

11  we changed jobs every several years, so I had a variety of

12  assignments.  I was a background investigation adjudicator; I

13  did briefings, debriefings, and was assigned to several

14  components, and that entailed doing all the security-related

15  work for the component.

16  Q.   The entire time that you were at the CIA, were you in one

17  form or another a security officer?

18  A.   Yes.

19  Q.   You testified that you did briefings and debriefings.  Can

20  you outline for the jury what a briefing is?

21  A.   Yes.

22  Q.   What do you mean by that?

23  A.   Briefings can be many different things.  Briefings are

24  sometimes related to a component, a program that's going on.

25  So it would be briefing a person what the program was all

1    about.

2             Debriefings were either a person was no longer going

3    to be employed by the CIA or no longer having access to a

4    program.  So it was a twofold debriefing.

5    Q.   And what's the purpose of that briefing as far as their

6    access, for example, to a program?

7    A.   To remind the individual that they were still bound by the

8    secrecy agreement forever and couldn't divulge classified

9    information.

10            THE COURT:  That's for a debriefing, ma'am; is that

11   right?

12   BY MR. OLSHAN:

13   Q.   To the, to the Court's point, your answer just now was

14   with respect to reminding someone; is that correct?

15   A.   Yes.

16   Q.   And was that something that would occur in a debriefing or

17   a briefing or both?

18   A.   Both.

19   Q.   Is there a particular briefing that occurs on an employee

20   the very first day at the CIA?

21   A.   Yes.

22   Q.   And what's the nature of that briefing?

23   A.   It's a security briefing indoctrinating the individual

24   into security compartments and advising the individual of their

25   responsibilities as a CIA employee.

1   Q.   I'm going to show you five different exhibits during the

2   course of your testimony.  They are Exhibits 1 through 4 and

3   79, which are not in evidence yet, Your Honor.

4            THE COURT:  Any objection?  1 through 4 and 79.

5            MR. MAC MAHON:  The Court's indulgence, Your Honor?

6            No objection as to 1 through 4, Your Honor.

7            THE COURT:  All right, they're in.

8            (Government's Exhibit Nos. 1 through 4 were received

9   in evidence.)

10           MR. OLSHAN:  And for the witness's benefit, we will

11  be focusing on 1 through 4 to begin with.

12           MR. MAC MAHON:  And none to 79, Your Honor.

13           THE COURT:  All right.  All five are in, but probably

14  today only 1 through 4.

15           MR. MAC MAHON:  Thank you, Your Honor.

16           (Government's Exhibit No. 79 was received in

17  evidence.)

18  BY MR. OLSHAN:

19  Q.   Ms. Scherlis, you just testified that on an employee's

20  first day, they have their initial security briefing; is that

21  correct?

22  A.   Yes.

23  Q.   And do they sign what's called a secrecy agreement on that

24  day?

25  A.   Yes.

1   Q.   Does every CIA employee do that?

2   A.   Yes.

3   Q.   If we can publish Exhibit 1?

4          So you'll have it in the binder, Ms. Scherlis, but it

5   will also be on the screen to your left, whichever is easier

6   for you.

7   A.   Okay.

8          MR. OLSHAN:  And, Mr. Francisco, if we could just

9   start off by highlighting the first three paragraphs?

10  Q.   Ms. Scherlis, do you recognize that as a standard secrecy

11  agreement?

12  A.   Yes.

13  Q.   And just to be clear, this is a two-page document?

14  A.   Yes.

15  Q.   Whose name appears on the top of this document?

16  A.   Jeffrey Alexander Sterling.

17  Q.   Have you ever met Mr. Sterling?

18  A.   Yes.

19  Q.   Do you see him in the courtroom today?

20  A.   Yes.

21  Q.   And were you involved in the process of having

22  Mr. Sterling execute this first document?

23  A.   No.

24  Q.   And briefly, if you could flip to the second page, does it

25  appear to be executed?

1    A.    Yes.

2    Q.    And what's the date?

3    A.    14 May 1993.

4    Q.    If we could go back to the first page, please?

5          In the first paragraph, Ms. Scherlis, does it

6    indicate that this agreement is a prerequisite to being

7    employed by the CIA?

8    A.    Yes.

9    Q.    In order to have employment, you have to sign the secrecy

10   agreement?

11   A.    Yes.

12   Q.    And if you could read paragraph 2?

13   A.    "I understand that in the course of my employment or other

14   service with the Central Intelligence Agency, I may be given

15   access to information or material that is classified or is in

16   the process of a classification determination in accordance

17   with the standards set forth in Executive Order 12356 as

18   amended or superseded, or other applicable executive order,

19   that if disclosed in an unauthorized manner would jeopardize

20   intelligence activities of the United States government.  I

21   accept that by being granted access to such information or

22   material, I will be placed in a position of special confidence

23   and trust and become obligated to protect the information

24   and/or material from unauthorized disclosure."

25   Q.    Ms. Scherlis, Executive Order 12356 is referenced in that

1  paragraph.  Do you see that?

2  A.    Yes.

3  Q.    And does that executive order deal with classification, if

4  you're aware?

5  A.    Yes.

6  Q.    Take a look at paragraph 3.  What does the person signing

7  this agree with respect to disclosure of any of the information

8  that they obtain from the CIA?

9  A.    Agree to never disclose in any form or manner to any

10  person unauthorized.

11  Q.    And so are there appropriate mechanisms that somebody can

12  abide by in order to, if they would like to disclose classified

13  information?

14  A.    Yes.

15  Q.    Okay.  And, for example, if you could take a look at

16  paragraphs 4 through 6, there's reference in those paragraphs

17  to the Publications Review Board.  In your own words, can you

18  describe for the jury what do those paragraphs outline?

19          MR. MAC MAHON:  Your Honor, I don't mean any

20  disrespect.  We heard from the PRB on this.  This is somewhat

21  cumulative.

22          THE COURT:  Very, very briefly.  Again, the exhibit

23  is in evidence.  The jury will be able to read it for

24  themselves.

25          MR. OLSHAN:  I won't, I won't belabor the portion

1    regarding the PRB, just that it's in here.

2              THE COURT:  All right, that's fine.

3    BY MR. OLSHAN:

4    Q.   So if you could just very briefly for the jury's benefit

5    describe what this initial secrecy agreement says about the

6    publication process?

7    A.   An employee must get the approval of the PRB in writing

8    any book, any manuscript, any information.

9    Q.   If you could take a look at paragraph 7?  Does that

10   paragraph describe who possesses, who owns the property that is

11   the classified information somebody's going to obtain on their

12   job?

13   A.   Yes.

14   Q.   Can you read that paragraph?

15   A.   "I understand that all information or material that I may

16   acquire in the course of my employment or other service with

17   the Central Intelligence Agency that fits either of the

18   categories set forth in paragraph 3 of this agreement are and

19   will remain the property of the United States government unless

20   and until otherwise determined by an appropriate official or

21   final ruling of a court of law.  I agree to surrender anything

22   constituting, containing, or reflecting such information or

23   material upon demand by an appropriate official of the Central

24   Intelligence Agency, or upon the conclusion of my employment or

25   other service with the Central Intelligence Agency."

1  Q.   So what is somebody supposed to do if they leave the

2  agency, what are they supposed to do with the information that

3  they possess, any documents?

4  A.   Any documents must be returned in when they're departing

5  the agency.

6  Q.   Take a look at paragraph 9.  Does paragraph 9 set forth

7  some of those appropriate avenues for disclosure of information

8  related to the CIA?

9  A.   Yes, yes.

10 Q.   What does paragraph 9 say about where someone can go if

11 they have, if they have a concern, for example?

12 A.   It identifies the places that a person can go to report.

13 Q.   Which include?

14 A.   Sure.  Intelligence Oversight Board established by the

15 President or any successor body that the President may

16 establish or to the Select Committee on Intelligence of the

17 House of Representatives or the Senate or the --

18 Q.   Is there any reference to the Inspector General?

19 A.   Yes.  Agency's Inspector General or to the Director of

20 Central Intelligence.

21         MR. OLSHAN:  If we can flip to the second page of

22 Exhibit 1, please, Mr. Francisco?

23 Q.   If you could take a look at paragraph 10, Ms. Scherlis?

24 Focusing on the last sentence of that paragraph, does this

25 secrecy agreement put an individual on notice as to the

1  potential consequences of violating it?

2  A.    Yes.

3  Q.    What does it say?

4  A.    "Further, I understand that the disclosure of information

5  that I have agreed herein not to disclose can, in some

6  circumstances, constitute a criminal offense."

7  Q.    Moving down to paragraph 13, does 13 have any reference

8  to -- or what does 13 say regarding the, the duration of this

9  agreement?  How long does it last?

10 A.    During employment with the Central Intelligence Agency and

11 at all times thereafter.

12 Q.    So this secrecy agreement binds an employee during their

13 employment and after?

14 A.    Yes.

15 Q.    And if you could read what paragraph 18 says?

16 A.    "I make this agreement in good faith, and with no purpose

17 of evasion."

18          THE COURT:  All right, it's 5:30.  This might be a

19 logical point to stop at.  Ladies and gentlemen, again, I am

20 trying to keep you on a predictable schedule.

21          I had Ms. Guyton, my courtroom deputy, give you a

22 phone number.  They're talking possibly of weather issues

23 tomorrow morning, so what I will need is if any of you, if we

24 do have weather and there is any problem that any of you

25 foresee in getting here, you can call us to let us know using

1    that number.

2           If for any reason the federal government is opening

3    late, I would have this case start at 10:00 to give you a

4    little extra time to get in here.  If, however, that's going to

5    be a problem for you, call us as quickly as you can.  We'll see

6    if we can make arrangements to get you here, all right?  I'm

7    hoping we don't have an issue, but I just wanted to make that

8    plan.

9           Again, folks, please continue to follow my

10   instructions.  You've been a great jury.  I can tell you we've

11   been moving this case, and am I correct that it's likely the

12   government may rest tomorrow?

13          MR. OLSHAN:  Very likely.

14          THE COURT:  All right, which means the government's

15   evidence will be completed, we think, by close of business

16   tomorrow, which is Wednesday.

17          It is very possible you may get this case for

18   deliberation late Thursday or Friday.  I had warned you that

19   you might need all of the following week.  I mean, it will, I'm

20   sure, take several days to think about this case, but I just

21   don't want you to worry about February, all right?  We are

22   moving effectively.

23          I also don't yet know what time I'm going to ask you

24   to be here on Friday.  I have other cases I'm trying to see how

25   I work them in, but you should definitely plan to be here on

1    Friday.  I'm just not sure what time we'll start yet.

2              Thank you very much.  You're free to go for the

3    evening.  I want to stay in session.  There are some matters we

4    need to take up.

5                            (Jury out.)

6              THE COURT:  All right, I think there may have been a

7    CIPA issue which we maybe can do at the bench if it's not

8    complicated, all right?  You-all have a seat for a second.

9              I did want to start talking a little preliminarily

10   about jury instructions because I know juries hate a long

11   break, and I really don't think one is necessary here.  I'm

12   going to ask the government to resend me their instructions

13   with no headings and no citations, just clean, all right?

14             I, frankly, have gone over the government's

15   instructions pretty carefully over the weekend.  I did not see

16   an aiding and abetting instruction, although almost all of your

17   counts have a Section 2 added.  I might have missed it, but are

18   you jettisoning any aiding and abetting theory in this case?

19   It certainly makes it easier for the jury.

20             You don't have to answer tonight.  Think about it

21   overnight, but you should let me know first thing tomorrow

22   morning, all right?

23             MR. OLSHAN:  We will, Your Honor.

24             THE COURT:  The second thing is --

25             MR. MAC MAHON:  You have a witness in the box, ma'am.

1    THE COURT:  Oh, I'm sorry, ma'am.  You may leave for

2    tonight.

3    THE WITNESS:  Thank you.

4    THE COURT:  Please be back here at 9:30 tomorrow

5    morning.

6    THE WITNESS:  Thank you.

7    THE COURT:  Unless there's a weather issue.  Then it

8    will be 10:00.

9    (Witness stood down.)

10   THE COURT:  All right, in terms of the other issue,

11   the defense -- and I haven't gone through all of them, but

12   you're objecting to the government giving a summary of the

13   charge.  I'll give you two choices.  I don't normally send the

14   indictment in with the jury.  Either I'm sending the indictment

15   in or I'm giving the government's proposed instructions.

16   We've always given an overview for a jury in jury

17   instructions as to what the counts are.  I'm sure you don't

18   want the indictment going in.

19   Mr. MacMahon?

20   MR. MAC MAHON:  Can we talk about it tonight, Your

21   Honor?

22   THE COURT:  All right.  But, I mean, that was your --

23   you know, you had that objection to several of the, of the

24   instructions.

25   The venue instruction, I'm thinking of actually

1    combining the two, the one you-all just submitted plus the

2    defendant's.  So I'd like your feedback on proceeding that way

3    with the venue instruction.  Other than that, the government

4    has promised that you would get me a proposed verdict form as

5    soon as possible.

6           Now, again, things could change.  Not all counts may

7    necessarily go to the jury.  You know, we don't know whether

8    the defendant is going to testify or not testify, so obviously,

9    the instructions are in play until the end of the case, but I

10   want to have them as well prepared as possible.

11          So right now, most of the government's instructions,

12   there were a few words here and there that needed some

13   changing, look to me to be solid, and I didn't see, you know, I

14   didn't see any strong substantive objections from the defense.

15   So that's why I want a clean set from you-all that I can work

16   be off of because, you know, I have to give the jury copies of

17   the written instructions, all right?

18          The CIPA matter, should we take up now?  Can we do it

19   at the bench, or do I have to clear the courtroom?

20          MR. MAC MAHON:  Yes, Your Honor, if you want to.

21   It's very brief.

22          THE COURT:  All right, let's come up here then.

23          (Sealed Bench Conference I not transcribed in this

24   volume.)

25          THE COURT:  All right, we'll recess for the day.

1    (Recess from 5:58 p.m., until 9:30 a.m., January 21,

2    2015.)

3

4                    CERTIFICATE OF THE REPORTER

5        I certify that the foregoing is a correct transcript of

6    the record of proceedings in the above-entitled matter.

7

8

9                                    _____/s/_____

10                                   Anneliese J. Thomson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25