1157

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA     .      Criminal No. 1:10cr485
                             .
     vs.                   .      Alexandria, Virginia
                             .      January 21, 2015
JEFFREY ALEXANDER STERLING,    .      9:40 a.m.
                             .
              Defendant.     .
                             .
. . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>VOLUME VI</u>

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:            JAMES L. TRUMP, AUSA
                           DENNIS M. FITZPATRICK, AUSA
                           United States Attorney's Office
                           2100 Jamieson Avenue
                           Alexandria, VA 22314
                             and
                           ERIC G. OLSHAN, Deputy Chief
                           Public Integrity Section of the
                           Criminal Division
                           United States Department of
                           Justice
                           1400 New York Avenue, N.W.
                           Suite 12100
                           Washington, D.C. 20005

FOR THE DEFENDANT:             EDWARD B. MAC MAHON, JR., ESQ.
                           Law Office of Edward B.
                           MacMahon, Jr.
                           107 East Washington Street
                           P.O. Box 25
                           Middleburg, VA 20118

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 1157 - 1415)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1158

APPEARANCES:  (Cont'd.)

FOR THE DEFENDANT:                    BARRY J. POLLACK, ESQ.
                                      MIA P. HAESSLY, ESQ.
                                      Miller & Chevalier Chartered
                                      655 - 15th Street, N.W.
                                      Suite 900
                                      Washington, D.C. 20005-5701


CLASSIFIED INFORMATION                CHRISTINE E. GUNNING
SECURITY OFFICERS:                    MAURA PETERSON


8    ALSO PRESENT:                    GERARD FRANCISCO
                                      SA ASHLEY HUNT
9                                     JENNIFER MULLIN, ESQ.


10
     OFFICIAL COURT REPORTER:         ANNELIESE J. THOMSON, RDR, CRR
11                                    U.S. District Court, Fifth Floor
                                      401 Courthouse Square
12                                    Alexandria, VA 22314
                                      (703)299-8595
13

14

15

16

17

18

19

20

21

22

23

24

25

1159

1    <u>I  N  D  E  X</u>

2                          DIRECT   CROSS   REDIRECT   RECROSS

3    <u>WITNESSES ON BEHALF OF</u>
     <u>THE GOVERNMENT</u>:

4
     Gayle Scherlis            1166     1184     1186      1186

5
     SA Ashley K. Hunt         1188     1263     1290      1298

6
     Jill Eulitz              1304     1310

7
     <u>WITNESSES ON BEHALF OF</u>
8    <u>THE DEFENDANT</u>:

9    Howard M. Gilby          1314     1318

10

11                               EXHIBITS

12                                 <u>MARKED</u>          <u>RECEIVED</u>

13   <u>GOVERNMENT'S</u>:

14   Nos. 48 thru 51                              1227
          54 thru 58                              1228
15        61 thru 63                              1228
          65 thru 66                              1229
16        73 thru 74                              1228

17        77                                      1229
          94 thru 96                              1229
18        98                                      1226
          102                                     1196
19        118                                     1229

20        125                                     1219
          128                                     1247
21        129                                     1219
          130                                     1229
22        131                                     1250

23        132A                                    1410
          137                                     1190
24        139                                     1198
          140                                     1190
25        141                                     1193

1160

1        EXHIBITS (Cont'd.)

2                                    MARKED        RECEIVED

3    GOVERNMENT'S:

4    No. 161                                        1216
         163                                        1224
5        166                                        1411
         168                                        1255
6        175                                        1261

7        176                                        1303

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2                         (Defendant present, Jury out.)

3              THE CLERK:  Criminal Case 10-485, United States of

4    America v. Jeffrey Alexander Sterling.  Would counsel please

5    note their appearances for the record.

6              MR. TRUMP:  Good morning, Your Honor.  Jim Trump on

7    behalf of the United States.

8              MR. OLSHAN:  Eric Olshan on behalf of the United

9    States.

10             MR. FITZPATRICK:  Dennis Fitzpatrick on behalf of the

11   United States.

12             THE COURT:  Good morning.

13             MR. POLLACK:  Good morning, Your Honor.  Barry

14   Pollack on behalf of Mr. Sterling.

15             MR. MAC MAHON:  Edward MacMahon for Mr. Sterling,

16   Your Honor.

17             MS. HAESSLY:  And Mia Haessly for Mr. Sterling, Your

18   Honor.

19             THE COURT:  Good morning.

20             All right, there's an issue before we bring the jury

21   in?  What is it, please?

22             MR. MAC MAHON:  Very briefly, Your Honor.  Yesterday,

23   when the CART expert, whose name, I can't pronounce his last

24   name, testified, the government moved a series of exhibits in,

25   and, for example, if we can look at Exhibit 119, they put in

1   and they published to the jury the cluster, the gobbledygook I

2   think is what Mr. Fitzpatrick, how he described it, but on the

3   second page -- we went and looked at our exhibit book when we

4   got back.  On the second -- there's a second page behind it

5   where somebody just made a summary of what, I guess it's what

6   they think is in the exhibit.

7           THE COURT:  Hold on a second.

8           That's not proper.  No, that can't go in.

9           MR. MAC MAHON:  That goes, Your Honor, to 120 -- 119,

10  120, 121, 122, 123, 124, 126, and 146 is, is the same thing

11  though it's not as bad.  That's the Q:MERLIN\MERLIN.DOC, which

12  I'm not sure there was any foundation hardly for, but those are

13  exhibits that had a summary prepared that went behind them that

14  I didn't think was being moved into evidence, and I don't think

15  the evidence supported it either.

16          THE COURT:  I'm not allowing that.  That testimony

17  was so dense and difficult, and it's not fair to highlight it

18  that way for the jury so --

19          MR. FITZPATRICK:  Your Honor, I think we can explain

20  it if we're just allowed two minutes.  There's a division of

21  labor here, and we can explain just very briefly.

22          The witness testified that that was data that he

23  recovered from the hard drive with the exception of one file

24  that was in the swap drive from the unallocated space, and he

25  explained how that data got to the unallocated space and that

1   it goes in there into the unallocated space in a random

2   fashion.

3         He described that the program, the tool identified

4   the keywords under a unique file, for instance, 23.  There was

5   another one, 103.

6         He doesn't know the case.  He doesn't know the

7   meaning of the data within the file other than he was told to

8   search for a word:  "Risen."

9         The case agent -- and this is where there's the

10  division of labor -- the case agent then analyzes the search

11  results and goes through line by line and, with her

12  understanding of the case and what she's looking for,

13  identifies data that is connected, that is all relevant to one

14  another.

15        Agent Hunt then prepared the summary, which is what

16  Mr. MacMahon is referring to.  So it's the government's

17  intention to get the summaries in through Special Agent Hunt

18  when she testifies, and that will be Mr. Olshan's witness.

19        THE COURT:  I understand the issue.  Mr. MacMahon,

20  don't forget to raise it again.  Let the government finish that

21  evidence.  We'll address this issue.  It's on my radar.

22        MR. MAC MAHON:  Thank you.

23        THE COURT:  Just don't forget to remind me.

24        MR. MAC MAHON:  As long as it's not in now, I'm

25  happy.

1  THE COURT:  The summaries are not in now at this

2  point; that's right.

3  All right, can we bring the jury in now?  All right.

4  MR. OLSHAN:  Your Honor, may I confer with counsel

5  very briefly?

6  THE COURT:  Yes.

7  MR. POLLACK:  Your Honor, with respect to the issue

8  that was raised yesterday regarding Government Exhibit 60, it's

9  my understanding that the government has agreed to substitute a

10  version of Exhibit 60 that is identical to the unclassified

11  version that was part of -- as to the relevant language is

12  identical to the unclassified PAR that was part of the EEO

13  file.

14  THE COURT:  All right.  So the 60 that's going to go

15  to the jury will be the one that we had talked about at the

16  bench.

17  MR. OLSHAN:  May I, Your Honor?

18  THE COURT:  Yes.

19  MR. OLSHAN:  The term that we're --

20  THE COURT:  Correct.

21  MR. OLSHAN:  The phrase?  Yes, that will be -- the

22  relevant quoted language will be what's in the exhibit that

23  goes to the jury.  There was one other word that is a

24  substitution that's not at issue.  That will stay in its

25  substituted form, and that's not an issue for the defense.

1    THE COURT:  That's fine.  We just have to make

2  absolutely sure, I want you to hand-deliver that exhibit, the

3  corrected Exhibit 60 directly to Ms. Guyton.

4    MR. OLSHAN:  May I do it right now?

5    THE COURT:  Is it 100 percent ready now?  Show it to

6  the defense.  I want, I want both sides to have looked at this

7  so there's no question this is the exhibit that goes to the

8  jury.

9    Is it not ready yet?

10    MR. OLSHAN:  It's half-ready.

11    THE COURT:  Well, then let's not waste the jury's

12  time.  This is taking up unnecessary jury time.  Let's bring

13  the witness in; let's bring the jury in.  We'll take care of

14  this at a break.

15    MR. OLSHAN:  The upshot, Your Honor, is that we have

16  resolved it.

17    THE COURT:  Good.  We're ready.

18                    (Jury present.)

19    THE COURT:  Good morning, ladies and gentlemen.

20  Again, I know you were all here on time.  I had unfortunately

21  another matter unrelated to this case that I had to take up,

22  and that's why we're starting a little bit late.

23    But the weather was with us today, and again, did

24  anybody have any problems over the break?

25                    (Jurors shaking heads.)

1          THE COURT:  No?  Good.  Well, we're going to continue

2    now with the testimony of Ms. Scherlis.

3               GAYLE SCHERLIS, GOVERNMENT'S WITNESS,

4                  PREVIOUSLY AFFIRMED, RESUMED

5          THE COURT:  Ma'am, you're still under your

6    affirmation from yesterday, all right?

7          THE WITNESS:  Yes.

8          THE COURT:  All right, Mr. Olshan?

9               DIRECT EXAMINATION (Cont'd.)

10   BY MR. OLSHAN:

11   Q.   Good morning, ma'am.

12   A.   Good morning.

13   Q.   Ms. Scherlis, I think yesterday when we left off, we had

14   finished talking about the defendant's original secrecy

15   agreement.  Do you recall that?

16   A.   Yes.

17   Q.   That's the document that the defendant signed on his first

18   day of work with the CIA?

19   A.   Yes.

20          MR. OLSHAN:  If we could with the assistance of the

21   court security officer take a look at a couple additional

22   exhibits in the first binder, Exhibits 2, 3, and 4, which are

23   already in evidence?

24   Q.   Do you have 2 in front of you?

25   A.   Yes.

1              MR. OLSHAN:  If we could publish the first page of 2,

2    Mr. Francisco?

3    Q.   What does it say at the top of that document,

4    Ms. Scherlis?

5    A.   "Sensitive Compartmented Information Nondisclosure

6    Agreement."

7    Q.   Is this another type of agreement that CIA employees

8    sometimes have to sign?

9    A.   Yes.

10   Q.   And can you just generally describe for the jury what is

11   this document or this type of document?

12   A.   It's, it's a binding that the employee signs when they are

13   briefed into a program.  It could be any program, but it

14   reminds them of their responsibilities to protect classified

15   information.

16   Q.   So there are certain types of programs that require sort

17   of further briefing than the original secrecy agreement might

18   cover?

19   A.   Yes.

20   Q.   At the top, where it says "Sensitive Compartmented

21   Information," is that often referred to as SCI?

22   A.   Yes.

23   Q.   Typically, is that at the Top Secret level that someone

24   would deal with SCI information?

25   A.   Yes.

Scherlis - Direct                                                     1168

1    Q.   Do these types of agreements, these SCI nondisclosure

2    agreements, in any way supersede the original secrecy

3    agreement?

4    A.   No.

5    Q.   So the secrecy agreement is in place regardless of whether

6    anyone signs one of these?

7    A.   Yes.

8         MR. OLSHAN:   If we could highlight the first three

9    paragraphs of this document?

10   Q.   Ms. Scherlis, whose name is on this document?

11   A.   Jeffrey Alexander Sterling.

12   Q.   If you could read the first paragraph?

13   A.   "Intending to be legally bound, I hereby accept the

14   obligations contained in this agreement in consideration of my

15   being granted access to information or material protected

16   within special access programs, hereinafter referred to in this

17   agreement as Sensitive Compartmented Information, SCI.  I have

18   been advised that SCI involves or derives from intelligence

19   sources or methods and is classified or is in the process of a

20   classification determination under the standards of Executive

21   Order 12356 or other executive order or statute.  I understand

22   and accept that by being granted access to SCI, special

23   confidence and trust shall be placed in me by the United States

24   government."

25   Q.   So it's that same special confidence and trust that's in

Scherlis - Direct                                                    1169

1  the secrecy agreement?

2  A.   Yes.

3          MR. MAC MAHON:   Your Honor, I object.   The documents

4  speak for themselves.

5          MR. OLSHAN:   Your Honor, I'm not going to -- I'm not

6  going to have the witness read all of this.

7          THE COURT:   All right, then I'll overrule the

8  objection at this point.

9  BY MR. OLSHAN:

10  Q.   Ms. Scherlis, if you could take a look at paragraph No. 2,

11  does that make reference to whether the person signing it has

12  been apprised or made aware of the protections that are

13  required for SCI?

14  A.   Yes.

15  Q.   And if you could just read where, the last two sentences

16  that start with "I understand that I may be"?

17  A.   "I understand that I may be required to sign subsequent

18  agreements upon being granted access to different categories of

19  SCI.   I further understand that all my obligations under this

20  agreement continue to exist whether or not I am required to

21  sign such subsequent agreements."

22  Q.   So is it necessary that someone must sign one of these

23  agreements every time?

24  A.   No.

25  Q.   If you could read the first sentence of paragraph 3?

1   A.    "I have been advised that the unauthorized disclosure,

2   unauthorized retention, or negligent handling of SCI by me

3   could cause irreparable injury to the United States or be used

4   to advantage by a foreign nation."

5   Q.    Continue with the next sentence.

6   A.    "I hereby agree that I will never divulge anything marked

7   as SCI or that I know to be SCI to anyone who is not authorized

8   to receive it without prior written authorization from the

9   United States Government department or agency (hereinafter

10  Department or Agency) that last authorized my access to SCI."

11  Q.    If an individual who has SCI, is in possession of SCI

12  would like to disclose it, do they have to consult with the

13  agency pursuant to this agreement?

14  A.    Yes.

15  Q.    Do they have to seek approval?

16  A.    Yes.

17  Q.    And if you'd just read the last sentence of that

18  paragraph, paragraph 3?

19  A.    "I further understand that I am also obligated by law and

20  regulation not to disclose any classified information or

21  material in an unauthorized fashion."

22  Q.    In paragraph 6, are there any references to specific

23  criminal laws that could be violated by someone's violation of

24  this agreement?

25  A.    Yes.

Scherlis - Direct                                                      1171

1   Q.   Can you read the sentence that begins, "I have been

2   advised"?  It's in the middle of the paragraph.

3   A.   "I have been advised that any unauthorized disclosure of

4   SCI by me may constitute violations of United States criminal

5   laws, including the provisions of Sections 793, 794, 798, and

6   952, Title 18, United States Code, and Section 783(b), Title

7   50, United States Code.  Nothing in this agreement constitutes

8   a waiver by the United States of the right to prosecute me for

9   any statutory violation."

10  Q.   Take a look at paragraph 8 of this SCI nondisclosure

11  agreement.  What does this paragraph say about ownership of the

12  property that is the SCI?

13  A.   "Property of the United States government."

14  Q.   And does it mean -- does it continue to be the property of

15  the United States government?

16           MR. MAC MAHON:  Your Honor, objection to the form.

17           THE COURT:  Sustained.

18  BY MR. OLSHAN:

19  Q.   In the middle of paragraph 8, end of line 3, can you read

20  the sentence that begins "I agree that I shall"?

21  A.   "I agree that I shall return all materials that may have

22  come into my possession or for which I am responsible because

23  of such access, upon demand by an authorized representative of

24  the United States Government or upon the conclusion of my

25  employment or other relationship with the United States

1  Government entity providing me access to such materials.  If I

2  do not return such materials upon request, I understand this

3  may be a violation of Section 793, Title 18, United States

4  Code."

5  Q.    In paragraph 9, what does paragraph 9 indicate about how

6  long these obligations are in effect?

7  A.    During the time being granted SCI and all times after that

8  forever.

9  Q.    Can you read paragraph 11?

10  A.    "I have read this Agreement carefully, and my questions,

11  if any, have been answered to my satisfaction.  I acknowledge

12  that the briefing officer has made available Sections 793, 794,

13  798, and 952 of Title 18, United States Code, and Section

14  783(b) of Title 50, United States Code, and Executive Order

15  12356, as amended, so that I may read them at this time if I so

16  choose."

17  Q.    So is it standard practice in your experience to provide

18  at least the opportunity for someone signing one of these

19  agreements to review the relevant laws?

20  A.    Yes.

21  Q.    If we could flip to page 2 of this exhibit?  Does this

22  document appear to be signed and dated?

23  A.    Yes.

24  Q.    What's the date on this document?

25  A.    20 May 1993.

1    Q.    And what does it say in paragraph 15?

2    A.    "I make this Agreement without any mental reservation or

3    purpose of evasion."

4          MR. OLSHAN:  Mr. Francisco, if you could scroll down

5    and highlight or blow up that bold box portion?

6    Q.    Ms. Scherlis, in these SCI nondisclosure agreements, is it

7    standard to have one of these highlighted areas that

8    Mr. Francisco has blown up?  It's right next to you.

9    A.    Yes.

10   Q.    And can you describe to the jury what's the purpose of

11   this box?

12   A.    The compartments that are listed are the programs that the

13   person is being briefed into, and these are the typical ones

14   that an agency employee would be briefed into, and other

15   programs have other designations.

16   Q.    So these, for example, in this exhibit, the letters or

17   combination of letters that appear there are signifiers for

18   specific programs?

19   A.    Correct.

20   Q.    And does this document reflect whether Mr. Sterling was

21   briefed into those programs or debriefed on his way out of

22   them?

23   A.    He was briefed.

24   Q.    And is that reflected in the box that has "Brief" written?

25   A.    Yes.

1    Q.    Can you look at Exhibit 3?   What is Government Exhibit 3?

2    A.    Excuse me?

3    Q.    What is it?   What type of document is it?

4    A.    Same, a Sensitive Compartmented Information briefing form.

5    Q.    So this has the same content as 2?

6    A.    Yes.

7    Q.    And whose name is on this one?

8    A.    Jeffrey Sterling.

9    Q.    If we could publish the second page, what's the date on

10   that?

11   A.    4 January 1994.

12   Q.    Does this document reflect that Mr. Sterling was briefed

13   into and out of certain programs?

14   A.    Yes.

15   Q.    If you could take a look at Government Exhibit 4?

16          Let me back up for one second.   The last one, you

17   don't have to go back to it, reflected that Mr. Sterling had

18   signed in the debrief box.   Do you recall that?

19   A.    Yes.

20   Q.    What's the purpose of the debriefing for the benefit of

21   the jury?

22   A.    He was briefed out of the program, meaning reminded of the

23   secrecy agreement but no longer having access to the program.

24   Q.    Now, if you could go back to 4, is that another SCI

25   nondisclosure agreement?

1    A.    Yes.

2    Q.    With Mr. Sterling's name on it?

3    A.    Yes.

4    Q.    And is it signed on the second page?

5    A.    Yes.

6    Q.    Is there a date next to the first signature?

7    A.    No.

8    Q.    What about in the brief box?

9    A.    Yes.

10   Q.    What's that date?

11   A.    5/28/99.

12   Q.    And does it appear that this, the specific program

13   designators have been removed from this version?

14   A.    Yes.

15   Q.    Would somebody sign one of these without any tickets being

16   listed?

17   A.    Not normally.

18         THE COURT:  Well, do we know?  I mean, is this one

19   redacted, or is this just blank?

20         MR. OLSHAN:  It is.  It's redacted.

21         THE COURT:  It is redacted.  I think the jury needs

22   to know that.

23         MR. OLSHAN:  It was redacted.

24         THE COURT:  All right.  So the signifiers of the

25   program do not appear on this, but they did originally.

1           MR. OLSHAN:  Correct.

2           THE COURT:  All right.

3           MR. OLSHAN:  Thank you.

4   Q.   Now, Ms. Scherlis, you testified that you had met the

5   defendant; is that correct?

6   A.   Yes.

7   Q.   When did you meet him?  In what, what circumstances did

8   you meet him?

9   A.   I was debriefing him from his employment at Central

10  Intelligence Agency.

11  Q.   What does that mean?

12  A.   His employment was being terminated, so I was having him

13  sign the appropriate paperwork and reminding him of his

14  responsibilities and collecting whatever information he might

15  still have with him.

16  Q.   Is that standard?

17  A.   Yes.

18  Q.   So everybody who is departing from the agency goes through

19  a similar process?

20  A.   Yes.

21  Q.   And over your years working at the CIA, you've been

22  involved in these final out-briefings?

23  A.   Yes.

24  Q.   Many times?

25  A.   Yes.

Scherlis - Direct                                                    1177

1          MR. OLSHAN:  If we could flip to Exhibit 79, which I

2    believe is in the second binder, Mr. Wood?

3          THE COURT:  79 is in, is it not?

4          MR. OLSHAN:  It is in.

5          THE COURT:  Yeah.

6    BY MR. OLSHAN:

7    Q.   If you could just flip through that exhibit, it should be

8    three pages.  Do you see those, Ms. Scherlis?

9    A.   Yes.

10   Q.   Do you recognize those documents?

11   A.   Yes.

12   Q.   Let's focus on just the first two.  What are the first two

13   pages of this exhibit?

14   A.   Sensitive Compartmented Information Nondisclosure

15   Agreement, and then the second page lists the

16   Briefing/Debriefing Acknowledgment.

17   Q.   This is again the standard SCI nondisclosure agreement?

18   A.   Yes.

19   Q.   Did you present this to Mr. Sterling?

20   A.   Yes.

21   Q.   Other than just giving Mr. Sterling a document, do you --

22   did you talk to him at all?

23   A.   Yes.

24   Q.   What did you tell him?

25   A.   That in the termination of his employment, he was still

1   bound by the secrecy agreement, and from the third page, asked

2   him if he had any materials that he needed to return.

3   Q.   And so did you just give him sort of the standard

4   discussion that you give other people?

5   A.   Yes, yes.

6   Q.   So on the second page of this final nondisclosure

7   agreement, do you see the check marks by "Signature" and

8   "Date"?

9   A.   Yes.

10  Q.   Did you place those check marks there?

11  A.   Yes.

12  Q.   Why did you do that?

13  A.   So the, Mr. Sterling would know where to complete the

14  form.

15  Q.   Did he sign this form?

16  A.   No.

17  Q.   Why, why not?

18  A.   He refused to sign it.

19  Q.   Did you ask him why he was refusing to sign it?

20  A.   I don't believe so.

21  Q.   Did you sign this document?

22  A.   Yes.

23  Q.   That's your signature below where he should have signed?

24  A.   Yes.

25  Q.   And what's the date on it?

1   A.   31 January 2002.

2   Q.   If you could look at the debriefing box, do you see a

3   couple tickets listed there?

4   A.   Yes.

5           MR. OLSHAN:  And for the record, Your Honor, it

6   has -- this also has been redacted.

7           THE COURT:  All right.

8   BY MR. OLSHAN:

9   Q.   Again, did you place the check marks in that box?

10  A.   Yes.

11  Q.   And in the debrief box, is that where Mr. Sterling should

12  have signed?

13  A.   Yes.

14  Q.   What did you write there?

15  A.   "Admin debrief."

16  Q.   What does that mean?

17  A.   He was debriefed even though he did not sign the form.

18  Q.   At the bottom, is that your handwriting --

19  A.   Yes.

20  Q.   -- at the bottom of the document?

21           What did you write there?

22  A.   "Employee refused to sign."

23  Q.   If we could flip to the third page, do you see a form

24  that's called a Security Exit Form?

25  A.   Yes.

1    Q.    Is that also a standard form used during someone's final

2    exit from the CIA?

3    A.    Yes.

4    Q.    And what's the purpose of this form?

5    A.    Again, a reminder of the secrecy agreement and a means of

6    returning any information or materials that need to be

7    returned.

8    Q.    Focusing on the top part, the handwriting where it

9    says "Sterling J," and then an address in the top third of the

10   document, is that your handwriting?

11   A.    No.

12   Q.    Mr. Sterling filled that out?

13   A.    Yes.

14   Q.    Did he fill it out in your presence?

15   A.    Yes.

16   Q.    But he refused to sign this document?

17   A.    Yes.

18   Q.    Where it says "Please check accesses," on the left side

19   and "SCI" is checked, did you check that, or did Mr. Sterling

20   check that?

21   A.    Mr. Sterling.

22   Q.    And what about in the next box, where it says "Reason for

23   leaving"?  Do you see what's written there?

24   A.    "Involuntary separation."

25   Q.    With a makeshift box?

1   A.    Yes.

2   Q.    With a check in that?

3   A.    Yes.

4   Q.    Did you draw that?

5   A.    No.

6   Q.    Who did?

7   A.    Mr. Sterling.

8   Q.    Now, below that, there are a list of seven items.  Do you

9   see that?

10  A.    Yes.

11  Q.    Is that standard?

12  A.    Yes.

13  Q.    And can you read No. 1?

14  A.    "I understand that the Secrecy Agreement executed upon my

15  entrance-on-duty (EOD) requires the obligation to protect

16  classified information, sources, and methods against

17  unauthorized disclosure after my separation from Agency

18  employment."

19  Q.    No. 2, please?

20  A.    "I am advised that all information received and compiled

21  while employed with the Agency is official and is the property

22  of the U.S. Government forever and no employee or former

23  employee has any property right to such material."

24  Q.    No. 3, please?

25  A.    "I give my assurance that there is no classified material

Scherlis - Direct                                                    1182

1    in my possession, custody, or control at this time."

2    Q.    No. 4?

3    A.    "I am instructed that classified information pertaining to

4    intelligence operations, sources, and methods specific to the

5    Agency may not be divulged, without authorization of the

6    Director of Central Intelligence or designee, to any persons,

7    even though they possess a security clearance within their own

8    organization."

9    Q.    So even if somebody has a security clearance who works

10   elsewhere, you still can't disclose what you've learned with

11   the CIA?

12              MR. MAC MAHON:  Your Honor, objection to form.

13              THE COURT:  That is leading.  Sustained.

14   BY MR. OLSHAN:

15   Q.    What does this paragraph say about whether you can

16   disclose information you learn as a CIA employee to people with

17   clearances at other agencies?

18   A.    Cannot divulge classified information even if they have

19   clearances.

20   Q.    Did you go through these items with Mr. Sterling?

21   A.    Yes.

22   Q.    How important are these items?

23   A.    Very important.

24   Q.    Why?

25   A.    Because it binds him to this document.

1    Q.    And what about No. 7?

2    A.    "I am informed that should any question arise on security

3    matters, I may communicate with the Agency for assistance."

4    Q.    Did Mr. Sterling ever follow up with you, a security

5    officer, about any questions he had?

6    A.    No.

7    Q.    And at the bottom of this document, did you sign it?

8    A.    Yes.

9    Q.    As a witness?

10   A.    Yes.

11   Q.    And did you write -- at the bottom, the very bottom, is

12   that your handwriting again?

13   A.    Yes.

14   Q.    And again, what did you write?

15   A.    "Employee refused to sign."

16   Q.    Did you indicate to Mr. Sterling one way or the other

17   whether his refusal to sign changed his obligations?

18   A.    Yes.

19   Q.    What did you say?

20   A.    I told him he was still bound by the original secrecy

21   agreement.

22   Q.    In your experience conducting these debriefings for CIA

23   employees, how many other times did someone refuse to sign it?

24   A.    This is the only one that I can recall.

25              MR. OLSHAN:  One moment, Your Honor?

Scherlis - Cross                                                    1184

1            THE COURT:  Yes, sir.

2            MR. OLSHAN:  That's all I have.

3            THE COURT:  All right, Mr. MacMahon?

4            MR. MAC MAHON:  Thank you, Your Honor.

5                         CROSS-EXAMINATION

6    BY MR. MAC MAHON:

7    Q.   Ms. Scherlis, my name is Edward MacMahon.  I'm one of the

8    lawyers for Mr. Sterling.

9            These conversations took place 13 years ago?

10   A.   Yes.

11   Q.   Okay.  And how long did you work at the CIA?  I know you

12   told us yesterday, but I've forgotten.

13   A.   I retired in January 2009.

14   Q.   All right.  And how many years before that did you work at

15   the CIA?

16   A.   Twenty-nine years.

17   Q.   Did you take any notes of your conversation with

18   Mr. Sterling?

19   A.   No.

20   Q.   And how many times did you meet with Mr. Olshan to go over

21   your testimony that you've read today?

22   A.   Once.

23   Q.   Just once?

24   A.   Yes.

25   Q.   You testified earlier that there wasn't -- that

1  Mr. Sterling was bound by the original agreements that he

2  signed, correct?

3  A.   Yes.

4  Q.   So the, the signing of this form that's Exhibit 79 didn't

5  add or subtract anything from his obligations, did it?

6  A.   No.

7  Q.   And did you know that in January of 2002, that

8  Mr. Sterling was in litigation with the CIA?

9  A.   No.

10  Q.   When he checked "Involuntary Separation," had you ever

11  seen that written on a form before as you debriefed somebody?

12  A.   No.

13  Q.   Did you ask Mr. Sterling if he was in the middle of a

14  federal discrimination suit against the CIA at that time?

15  A.   No.

16  Q.   Did you ask him whether he'd had litigation with the

17  Publication Review Board at that time?

18  A.   No.

19  Q.   Had you ever debriefed somebody that was in litigation

20  with the CIA before?

21  A.   Not that I'm aware of.

22  Q.   And when you asked Mr. Sterling if he had any classified

23  information or otherwise, he told you that he didn't, correct?

24  A.   Yes.

25  Q.   And you don't have any, any information that that wasn't a

1    true statement when he told you that, right?

2    A.    True.

3    Q.    And you don't have any information that he ever divulged

4    any SCI or any other form of information to anyone, correct?

5    A.    Correct.

6              MR. MAC MAHON:  That's all, Your Honor.  Thank you.

7              THE COURT:  Any redirect?

8              MR. OLSHAN:  Very briefly, Your Honor.

9                        REDIRECT EXAMINATION

10   BY MR. OLSHAN:

11   Q.    Mr. MacMahon just asked you, Ms. Scherlis, whether

12   anything about having to sign this last document added or

13   subtracted from the overall secrecy agreement.  Do you remember

14   him asking you that?

15   A.    Yes.

16   Q.    Why is it important for somebody to acknowledge on their

17   last day that they understand their obligations?

18   A.    It's a reminder to them that they are bound by the secrecy

19   agreement.

20   Q.    And is that vital to the functioning of the CIA?

21   A.    Yes.

22             MR. OLSHAN:  No further questions.

23             THE COURT:  Any recross?

24             MR. MAC MAHON:  If I may, Your Honor?

25                        RECROSS EXAMINATION

1  BY MR. MAC MAHON:

2  Q.   Ma'am, you didn't have any question in your mind that

3  Mr. Sterling fully understood his obligations to the CIA in

4  late 2002, when you debriefed him, did you?

5          MR. OLSHAN:  That calls for speculation.  Objection.

6          MR. MAC MAHON:  He opened the door, Your Honor.

7          THE COURT:  I don't think the door was opened.  I'll

8  overrule -- I mean, I'll sustain the objection.

9  BY MR. MAC MAHON:

10 Q.   Did Mr. Sterling indicate to you at any time that he

11 didn't understand his obligations to the CIA?

12 A.   No.

13 Q.   And you gave him a full debrief, as you had for 20-some

14 years to people that were leaving, correct?

15 A.   Yes.

16         MR. MAC MAHON:  That's all, Your Honor.

17         THE COURT:  All right, thank you.

18         All right, thank you, ma'am, for your testimony.

19 You're excused as a witness.

20         THE WITNESS:  Thank you.

21                       (Witness excused.)

22         THE COURT:  Your next witness?

23         MR. OLSHAN:  The United States calls Special Agent

24 Ashley Hunt.

25         THE COURT:  All right.

1             SA ASHLEY K. HUNT, GOVERNMENT'S WITNESS, AFFIRMED

2                            DIRECT EXAMINATION

3    BY MR. OLSHAN:

4    Q.    Good morning.

5    A.    Good morning.

6    Q.    Would you please state and spell your name for the record?

7    A.    Ashley, middle initial K, Hunt, H-u-n-t.

8    Q.    How are you employed, ma'am?

9    A.    I'm employed by the Federal Bureau of Investigation.

10   Q.    And what's your job there?

11   A.    I'm a special agent.

12   Q.    When did you become a special agent with the FBI?

13   A.    In 2000.

14   Q.    So you've been a special agent for approximately how long?

15   A.    Almost 15 years.

16   Q.    Prior to becoming a special agent, did you have any other

17   jobs with the FBI?

18   A.    Yes, I did.  I was an analyst in a Russian

19   counterintelligence unit for three years before I became an

20   agent.

21   Q.    What's your educational background?

22   A.    I have a Bachelor's of Science Degree in Psychology from

23   the University of Alabama.

24   Q.    Other than your employment with the FBI, have you had any

25   other career?

1    A.    No.

2    Q.    Special Agent Hunt, are you the case agent assigned to the

3    investigation involving unauthorized disclosures related to

4    Classified Program No. 1 and Merlin?

5    A.    Yes.

6    Q.    And how long have you been assigned to that investigation?

7    A.    Almost 12 years.

8    Q.    Approximately when did you begin working on it?

9    A.    I opened the investigation on April 8, 2003.

10   Q.    Is this the only case that you've worked during those, the

11   last 12 years?

12   A.    No.

13   Q.    What kind of cases do you currently work on?

14   A.    For the past three years, I've been working on white

15   collar crime and public corruption matters.

16   Q.    And prior to that, what type of cases did you work?

17   A.    Espionage cases.

18   Q.    Special Agent Hunt, during the course of your

19   investigation, did you obtain a search warrant for the

20   defendant's e-mail accounts?

21   A.    Yes.

22   Q.    Let's talk through that process.  Who was the provider for

23   the defendant's e-mail accounts?

24   A.    MSN Hotmail.

25   Q.    And approximately when did you execute a search warrant?

1   A.    I believe the warrant was actually executed by my partner

2   in my absence in October of 2006.

3   Q.    Did you do anything to preserve the content of the

4   defendant's e-mail accounts prior to execution of the warrant?

5   A.    Yes.

6   Q.    Can you tell the jury what you did?

7   A.    Yes.  In April of 2006, I prepared what is called a

8   preservation letter, and I sent the preservation letter to MSN

9   Hotmail.

10  Q.    I'll stop you right there.  If we could with the

11  assistance of the court security officer take a look at the

12  second binder?  I'm going to ask Special Agent Hunt to look at

13  Exhibits 137 and 140.

14          THE COURT:  Any objection to those exhibits?

15          MR. MAC MAHON:  Not to 137 or 140, Your Honor.

16          THE COURT:  All right, they're both in.

17          (Government's Exhibit Nos. 137 and 140 were received

18  in evidence.)

19  BY MR. OLSHAN:

20  Q.    Do you see those documents, Special Agent Hunt?

21  A.    Yes.

22  Q.    Okay.  Let's look at 137 first.  In your own words, what

23  does that reflect?

24  A.    It is the response I received from MSN Hotmail to the

25  preservation letter I sent them.

1    Q.    Okay.  And this document is dated at the bottom May 12,

2    2006, correct?

3    A.    Yes.

4    Q.    When did you actually send the preservation letter?

5    A.    I sent it in April.

6    Q.    And the date in the middle of that page is 4/19/06.

7    A.    Correct.

8    Q.    Do you see that?

9          Is that around the time that you submitted the

10   preservation request?

11   A.    Yes.  I believe I submitted it a day or two before I

12   received this response.

13          THE COURT:  Go ahead.

14   BY MR. OLSHAN:

15   Q.    Special Agent Hunt, can you tell the jury what the purpose

16   of a preservation request is?

17   A.    Yes.  So when you send a preservation letter to a provider

18   of this kind, they take a snapshot of the entire contents of

19   the particular e-mail account that you've named in the

20   preservation letter.  You can also name more than one e-mail

21   account, but essentially, they preserve all the data in that

22   e-mail account on that day and on no other day moving forward.

23   Q.    So it's literally frozen in time in a sense?

24   A.    That's correct.

25   Q.    Did your preservation request to MSN Hotmail include

1   preservation of jeffreys@hotmail.com and jsthe7th@hotmail.com?

2   A.   Yes.

3   Q.   At some point, did you serve -- was another snapshot taken

4   by MSN?

5   A.   Yes.

6   Q.   Was that in July?

7   A.   Yes, July of 2006.

8   Q.   And what was the purpose of doing that?

9   A.   Well, my initial request was for MSN Hotmail to extend the

10  preservation of the April snapshot for an additional 90-day

11  period, so when you send a preservation letter and a snapshot

12  is taken, the provider agrees to freeze that data and keep it

13  for 90 days, so in July, I wanted them to keep the April data

14  for an additional 90-day period.

15          They misunderstood my request.  They took another

16  snapshot of the same e-mail account or accounts in July, and

17  then after I made a second request, they agreed to further

18  preserve the data that had been collected in April for an

19  additional 90-day period.

20  Q.   So in July of 2006, there were at that point two

21  snapshots?

22  A.   Correct.

23  Q.   And if you could look at Exhibit 140?  What does that

24  document reflect?

25  A.   It is a response I received from MSN Hotmail in July of

Hunt - Direct                                                    1193

1   2006.

2   Q.   Confirming the snapshot process you just discussed?

3   A.   Yes.

4   Q.   You testified at some point, you actually executed a

5   search warrant for these e-mail accounts; is that correct?

6   A.   I believe my partner did.

7   Q.   I'm sorry.

8   A.   Yes.

9   Q.   The FBI did.

10  A.   Yes, the FBI did.

11  Q.   If you could look at Exhibit 141, which is not in evidence

12  yet?

13          THE COURT:  Any objection to 141?

14          MR. MAC MAHON:  Well, Your Honor, you usually don't

15  put the affidavits and search warrants in evidence in the case.

16          MR. OLSHAN:  There's no affidavit, Your Honor.

17          MR. MAC MAHON:  There is a search warrant, Your

18  Honor.

19          THE COURT:  It's just the -- I just see the warrant

20  here.  My exhibit only has two pages.

21          MR. MAC MAHON:  No objection, Your Honor.

22          THE COURT:  All right.

23          MR. MAC MAHON:  I was flipping to the back.

24          THE COURT:  141 is in.

25          (Government's Exhibit No. 141 was received in

1    evidence.)

2    BY MR. OLSHAN:

3    Q.    Do you see that document?

4    A.    I do.

5    Q.    Is this the search warrant that the FBI executed for those

6    e-mail accounts?

7    A.    Yes.

8    Q.    After the search warrant was executed, did you receive the

9    proceeds of that search warrant?

10   A.    Yes.

11   Q.    Can you describe for the jury what you got?

12   A.    Yes.  MSN Hotmail sent a disc to the FBI in the mail, and

13   the disc had the data captured in April, the data captured in

14   July, and the data captured in October.  I'm not sure exactly

15   how this was done, but the disc and the data was given to a

16   filter agent who then printed all the data from the disc, and

17   the filter agent reviewed all of the data, removing any

18   communications he deemed to possibly be privileged.

19   Q.    So, for example, any communication that might reflect

20   conversation or communication between the defendant or anyone

21   else and a lawyer?

22   A.    Correct.

23   Q.    You were not involved in that process?

24   A.    That's correct.

25   Q.    What happened after that process ended?

1   A.   So after that process was complete, I was given a Bankers

2   Box or two full of the hard copy printouts from the e-mail

3   accounts divided into the April set, the July set, and the

4   October set.

5   Q.   And then did you review that material?

6   A.   Yes.

7   Q.   By hand?

8   A.   Yes.

9   Q.   If we could bring 141 back up just for the record?

10          The date of this search warrant at the bottom was

11  when?

12  A.   October 12, 2006.

13  Q.   Thank you.

14          If you could take a look at Exhibit 102, which should

15  be in the same binder but earlier?  If you could just focus on

16  the first six pages, do you recognize that?

17  A.   I do.

18  Q.   What is that?

19  A.   This is an e-mail dated March 10, 2003, and the e-mail is

20  from the account jeffreys@hotmail.com.

21  Q.   Before, before we get into that, where did you locate this

22  e-mail?

23  A.   This e-mail was located in the April set of data that was

24  received from MSN Hotmail.

25  Q.   And did you check whether this e-mail was maintained or

1  contained in the other batches from July or October?

2  A.   Yes.  I reviewed those batches of data, and this e-mail

3  did not appear in either one.

4           MR. OLSHAN:  Your Honor, we'd move in 102.

5           MR. MAC MAHON:  No objection, Your Honor.

6           THE COURT:  All right, it's in.

7           (Government's Exhibit No. 102 was received in

8  evidence.)

9           MR. OLSHAN:  If we could publish the first page,

10  Mr. Francisco, and zoom in on the portion where it starts

11  with "Date"?  And then you can just include the -- that's fine.

12  Q.   Is this the e-mail you're referring to?

13  A.   Yes.

14  Q.   What's the date?

15  A.   March 10, 2003.

16  Q.   And who's the sender?

17  A.   Jeffreys@hotmail.com.

18  Q.   And who's the recipients -- who are the recipients listed

19  in the "To" line?

20  A.   Jeffreys@hotmail.com and jrisen@nytimes.com.

21  Q.   Is there a subject below the "To" line?

22  A.   Yes.

23  Q.   Can you read the subject?

24  A.   It reads, "CNN.com - Report:  Iran has 'extremely

25  advanced' nuclear program - Mar. 10, 2003."

1   Q.   And then below that, is there text in the body of that

2   e-mail?

3   A.   Yes.

4   Q.   What does it say?

5   A.   It says, "I'm sure you've already seen this, but quite

6   interesting, don't you think?  All the more reason to

7   wonder . . . J."

8   Q.   And then is there a link attached to this e-mail?

9   A.   Yes.

10  Q.   Did you click on that link, or did you go to that link?

11  A.   Yes.

12  Q.   And if you could look at the last two pages of the

13  exhibit, is that the same story?

14  A.   Yes, it is.

15  Q.   Without reading it, what is the story about?

16  A.   The story is about the then current state of the Iranian

17  nuclear weapons program.

18  Q.   And it was -- this link was attached to an e-mail between

19  an e-mail account that the defendant used and an e-mail account

20  associated with Jim Risen?

21  A.   That's correct.

22  Q.   And again, what was the date?

23  A.   March 10, 2003.

24  Q.   In the course of your investigation, did you learn whether

25  Mr. Sterling went to the Senate at any point?

1    A.   Yes, I did.

2    Q.   What was the date on which Mr. Sterling went to the

3    Senate?

4    A.   March 5, 2003.

5    Q.   How many days later was this e-mail sent?

6    A.   Five.

7    Q.   You testified that this e-mail was not in the subsequent

8    snapshots from July and October, correct?

9    A.   That's correct.

10   Q.   Between April, that first snapshot, and the next July

11   snapshot, did you have any interaction with the defendant?

12   A.   Yes, I did.

13   Q.   Did you serve him a subpoena?

14   A.   Yes.

15   Q.   If you could take a look at Exhibit 139, which should be

16   in the same binder?

17          THE COURT:  Any objection?

18          MR. MAC MAHON:  No objection, Your Honor.

19          THE COURT:  All right, 139 is in.

20          (Government's Exhibit No. 139 was received in

21   evidence.)

22   BY MR. OLSHAN:

23   Q.   Is that two-page document the subpoena that, that you

24   served on Mr. Sterling?

25   A.   Yes, it is.

1   Q.   And where did that occur?

2   A.   That occurred in O'Fallon, Missouri.

3   Q.   That's where the defendant lived at the time?

4   A.   Yes.

5   Q.   Is that where he still resides to the best of your

6   knowledge?

7   A.   Yes.

8   Q.   And what's the date on this subpoena?

9   A.   The date on the subpoena is June 15, 2006.

10  Q.   Do you recall whether you actually served it on June 15?

11  A.   I served it on June 16.

12  Q.   If you could take a look at the second page?  Generally

13  speaking, what does this rider call for the production of?

14  A.   This subpoena was both for testimony and documents, and

15  the rider listed descriptions of categories of documents.

16  Q.   And would that rider have covered documents related to the

17  defendant's work?

18          MR. MAC MAHON:  Excuse me, Your Honor, the document

19  does speak for itself.

20          THE COURT:  I recognize that, but it's a complex

21  case.  I am letting documents be published.  So overruled.

22  BY MR. OLSHAN:

23  Q.   I'm not going to have you go through all of these.  Does

24  this cover documents related to the defendant's work?

25  A.   Yes.

1   Q.    Did the defendant work on Iranian matters?

2   A.    Yes.

3   Q.    Did he work on a specific program related to the Iranian

4   nuclear program?

5   A.    Yes.

6   Q.    That's what we've been referring to as Classified Program

7   No. 1?

8   A.    Yes.

9   Q.    You served this subpoena on the defendant, put him on

10  notice of your investigation on June 16, 2006?

11  A.    Yes, because in addition to the subpoena, we served him a

12  target letter at the same time.

13  Q.    And, Agent Hunt, this was between those two snapshots in

14  April and July; is that correct?

15  A.    Of 2006, yes.

16  Q.    Thank you, 2006.

17        Now, the e-mail that was found in the April one and

18  not in the subsequent July and August was from approximately

19  how long -- or how many months or years prior to when you

20  actually executed the search warrant?

21  A.    Three and a half.

22  Q.    So from October 2006 back to March of 2003?

23  A.    Yes.

24  Q.    When you were reviewing those three batches, did you

25  observe any -- how would you characterize the difference in

1   volume between batch 1 from April, batch 2 from July, and batch

2   3 from October?

3   A.   I don't recall there being a considerable difference.

4   Q.   Special Agent Hunt, were you involved in the analysis of a

5   computer obtained from John and Lora Dawson?

6   A.   Yes.

7   Q.   And when was that computer obtained from the Dawsons?

8   A.   In August of 2006.

9            MR. OLSHAN:  May I have a moment to confer with

10  counsel?

11           THE COURT:  Yes, sir.

12           MR. OLSHAN:  Your Honor, at this time, I'd like to

13  read one of the stipulations.

14           THE COURT:  Stipulation?

15           MR. OLSHAN:  Yes.

16           THE COURT:  Go ahead.

17           MR. OLSHAN:  It's not been marked yet.  I believe it

18  will be Government's Exhibit 174.

19           THE COURT:  All right.  Hold on one second, because

20  we have a 174 in the binder, but I don't think there's anything

21  behind it.  It's blank.

22           All right, so 174 is stipulation number what?

23           MR. OLSHAN:  I knew you would ask me that.  I think

24  this will be Stipulation No. 11.

25           THE COURT:  Okay.

1          MR. OLSHAN:  May I?

2          THE COURT:  Yes.

3          MR. OLSHAN:  "The United States of America, through

4   its attorney, and the defendant, Jeffrey Alexander Sterling,

5   and the defendant's attorneys, hereby stipulate and agree that

6   if called to testify, John and Lora Dawson would testify

7   consistent with the following:

8          "From approximately August 2003 to approximately July

9   2004, the defendant lived in the home of John and Lora Dawson

10  at 6817 Crest Avenue, University City, St. Louis, Missouri.  No

11  one other than John and Lora Dawson, their infant child, and

12  the defendant lived at that address during that time.  The

13  defendant did not own a cell phone or personal computer during

14  that time.

15         "John and Lora Dawson permitted the defendant to use

16  the telephone at their residence, which during that entire time

17  was assigned the number 314-862-8850.  The defendant used that

18  telephone to make and receive long distance telephone calls

19  while he lived with the Dawsons.

20         "From February 9, 2004, until June 11, 2004, 19

21  telephone calls were placed from 202-862-0300, the telephone

22  number for the Washington, D.C., office of *The New York Times*,

23  to 314-862-8850, the Dawsons' home telephone number, which is

24  reflected in Government Exhibit 98, page 3, call 8, through

25  page 8, call 25.

1           "During this time, neither of the Dawsons knew anyone

2    who lived or worked in Washington, D.C., and the Dawsons had no

3    reason to receive calls from anyone at the Washington, D.C.,

4    office or any other office of *The New York Times*.

5           "During the time the defendant resided with the

6    Dawsons, the Dawsons permitted the defendant to use a computer,

7    to wit:  a Packard Bell L100 bearing serial No. P493907180,

8    containing Seagate hard drive ST33210A, bearing serial number

9    5AB11AEB, located in their spare bedroom, to send and receive

10   e-mails, and the defendant did, in fact, use the Dawsons'

11   computer to do so.  During this time, no one other than the

12   Dawsons and the defendant had access to the computer.  At no

13   time did the Dawsons use the computer to send e-mails to or

14   receive e-mails from James Risen or anyone affiliated with *The*

15   *New York Times*."

16          Thank you.

17   Q.   Special Agent Hunt, were you involved in the analysis of

18   the computer that was just referenced in that stipulation?

19   A.   Yes, I was.

20   Q.   Can you describe for the jury what your involvement in

21   that analysis process was?

22   A.   Yes.  So my partner and I made a request of the computer

23   analysis personnel within our office, and that request was

24   assigned to Reju Kurian, who testified yesterday, and we

25   basically provided a list of keywords, and we asked him to

1    process the computer and search the entire computer for any

2    reference to any of the keywords on the list we provided to

3    him.

4    Q.   What happened after -- did Mr. Kurian execute the request

5    to do a keyword search?

6    A.   Yes.

7    Q.   And then what happened?

8    A.   Initially, he used a tool called Forensic Toolkit.   I

9    believe he also used a tool called dtSearch, and that resulted

10   in the location of the string that you saw in one of the

11   exhibits yesterday that said Q:\MERLIN\MERLIN.DOC.

12   Q.   If we could just briefly publish Government Exhibit 146,

13   which is that data?

14        The document at 146, this first page, that was a

15   result from that first part of Mr. Kurian's search?

16   A.   That's correct.   And I believe that this was actually

17   located on September 26, 2006.

18   Q.   That's when you identified it?

19   A.   I believe that's when Mr. Kurian completed his search and

20   located this data.

21   Q.   Now, to be clear, Special Agent Hunt, this says,

22   "Q:\MERLIN," etc.   Do you know whether there was any actual

23   document related to this string of data?

24   A.   No.

25   Q.   This was produced because it contained a particular

1   keyword?

2         MR. MAC MAHON:  Your Honor, objection to leading.

3   BY MR. OLSHAN:

4   Q.   Was there a --

5         THE COURT:  Sustained.

6   BY MR. OLSHAN:

7   Q.   Was there a particular keyword that resulted in this hit?

8   A.   Yes.  When the keyword "Merlin" was searched, it resulted

9   in the location of this data.

10  Q.   So if you could continue, after that search result, what

11  happened next?

12  A.   Mr. Kurian said that he was going to use a different tool

13  called EnCase to further analyze the data, and I believe he did

14  so on September 28, 2006, just two days after this.

15  Q.   You say EnCase.  Is that spelled E-n-C-a-s-e?

16  A.   Yes.

17  Q.   And did that -- did you give him search terms for that

18  analysis?

19  A.   Yes.  I believe he used the same list.

20  Q.   Did that search turn up any hits?

21  A.   Yes.

22  Q.   Did we talk about those yesterday?

23  A.   Yes.  It turned up the exhibits that were reviewed

24  yesterday as well as some others that were not reviewed.  They

25  were all responsive to the keyword "Risen."

1    Q.   So, for example, "Risen" is the same as "risen"?

2    A.   That's correct.

3    Q.   Were there hits that were not responsive to or not related

4    to your investigation?

5    A.   Yes.  The word "risen" appeared in other parts of the

6    computer, and so we as the case agents had to go through and

7    review all of the data responsive to the search.  We had to

8    eliminate what was not relevant, and we had to highlight for

9    Mr. Kurian the hits that were relevant to our investigation.

10   Q.   And did any of those hits come from unallocated space on

11   the computer?

12            MR. MAC MAHON:  Your Honor, I object.  We had an

13   expert testify to this yesterday.

14            THE COURT:  I think that's correct, so I'm going to

15   sustain that objection.

16            MR. OLSHAN:  Your Honor, I'm just laying a very

17   simple background foundation.  I'm not --

18            THE COURT:  Well, I think you should get to the

19   questions, and then if there's lack of foundation, you can go

20   back over it.

21            MR. OLSHAN:  Fair enough.

22   Q.   If you could take a look at Exhibit 117?  Does 117, the

23   first two pages, reflect the proceeds of the search, or part of

24   the proceeds of Mr. Kurian's search?

25   A.   Yes.

1  Q.   And what was the keyword that resulted in this hit?

2  A.   "Risen."

3  Q.   Is that reflected at the top?  If we could zoom in on the

4  top four lines?

5  A.   Yes.

6  Q.   What did you do when you got this hit with "Risen"

7  appearing?  How did you analyze this?

8  A.   Well, I believe with this and the other hits, we

9  bookmarked them or flagged them in some way for Mr. Kurian so

10  that he later could copy this data separately onto a separate

11  disc for us.

12  Q.   And did he do that?

13  A.   He did.

14  Q.   And then what did you do with the data when it was copied

15  to a disc?

16  A.   We reviewed it again, and we printed out what appears as

17  the exhibit.

18  Q.   And how did you go about reviewing this data?

19  A.   I read it line by line.

20  Q.   What were you looking for?

21  A.   Well, when I initially saw the appearance of an e-mail

22  address that appeared to be one for James Risen, because the

23  e-mail address is Jrisen@aol.com, I scrolled down further

24  looking for text that might be part of a message.

25  Q.   Did you find any?

1    A.    I did.

2    Q.    So if you could scroll to the bottom third of that page,

3    do you see a date?  Were you able to to extract a date?

4    A.    Yes.  "Tuesday, December 23, 2003."

5    Q.    And the time?

6    A.    "2:29 p.m."

7    Q.    Right below that, is there the word "To"?

8    A.    Yes.

9    Q.    And is there another e-mail address?

10   A.    Yes, jsthe7th@hotmail.com.

11   Q.    Reviewing this cluster data, did you find any content

12   that -- as you were analyzing?

13   A.    Yes.

14   Q.    Can you go to the next page?  Do you see any particular

15   content?

16   A.    I do.  I see text that says, "can we get together in early

17   january?  jim."

18   Q.    And Jrisen was the e-mail address on the first page,

19   correct?

20   A.    That's correct.

21   Q.    Do you know his first name?

22   A.    James, Jim.

23   Q.    And does he go by "Jim"?

24   A.    Yes.

25   Q.    What did you do after you were able to extract these

1    fragments of the message?

2    A.    I prepared a summary, a summary document that only

3    contained the "From," "To," the sent date, and what appeared to

4    be the text of the message.

5    Q.    Okay.  If we could go to Exhibit 119?  What is that?

6    A.    It appears to be another fragment.

7    Q.    And did you analyze this one?

8    A.    I did.

9    Q.    And what did you locate in this fragment?

10   A.    I see "From" and the e-mail address "Jrisen@aol.com."

11   Q.    And just to be clear, that starts on the second line?

12   A.    Yes, and it wraps around to the third.

13   Q.    Keep going.

14   A.    And then on the fourth line, I see a date, "Monday,

15   March 22, 2004."

16   Q.    On that line, do you see the word "Sent"?

17   A.    Yes.

18   Q.    And the date again?

19   A.    "Monday, March 22, 2004."

20   Q.    The time?

21   A.    On the following line, it says "12:52 p.m."

22   Q.    And then below that, do you see "To" for a recipient?

23   A.    Yes, "To jsthe7th@hotmail.com."

24   Q.    Were you able to locate any content related to this data?

25   A.    No.

Hunt - Direct                                                    1210

1   Q.   Go to 120.  Did you also examine this fragment?

2   A.   I did.

3   Q.   Again, do you see a "From"?

4   A.   I do.

5   Q.   Who is that from?

6   A.   "From Jrisen@aol.com."

7   Q.   Two lines later, "Sent"?

8   A.   "Sent Thursday, May 6, 2004, 12:34 a.m."

9   Q.   And "To"?

10  A.   "To jsthe7th@hotmail.com."

11  Q.   And if you could go ahead two pages in that exhibit, do

12  you see another fragment that's part of Exhibit 120?

13          Flip ahead two pages in the same exhibit.  Do you see

14  another fragment?

15  A.   I do.

16          THE COURT:  Wait, in Exhibit 120?

17          MR. OLSHAN:  Yes.  So this is page 3 of Exhibit 120.

18          THE COURT:  All right.

19  BY MR. OLSHAN:

20  Q.   Did you follow the same process, Agent Hunt?

21  A.   I did.

22  Q.   Just to step back, did you do this process for all of the

23  data that was produced to you by Mr. Kurian?

24  A.   I did it for the data that was responsive to the keyword

25  searches.

1    Q.   And what would -- how would you describe the volume of

2    information that you reviewed line by line?

3    A.   Well --

4    Q.   You don't need to be specific.

5    A.   Sure.

6    Q.   Just characterize it.

7    A.   Sure.  These, these extracts that appear as exhibits were

8    actually part of much larger files, and after these hits were

9    initially located, these responses to the keyword searches, I

10   actually scrolled through some of this unallocated cluster

11   data, and I scrolled for possibly up to a hundred pages in

12   connection with what was -- in connection with the part of the

13   computer where just one of these hits was located.

14          I wanted to see if I could find any other relevant

15   data, and I could not, and at a, at a certain point, searching

16   any further in this sort of nonsensical script seemed to be

17   counterproductive.

18   Q.   If you could locate that page, page 3 of Exhibit 120?

19   A.   Yes.

20   Q.   Did you employ that same process on this fragment?

21   A.   Yes.

22   Q.   And again, do you see on the first line "From"?

23   A.   Yes.

24   Q.   And what e-mail address follows that?

25   A.   "From Jrisen@aol.com."

1    Q.    And then two lines later, what else do you see?

2    A.    "Sent Friday, May 7, 2004, 3:47 p.m."

3    Q.    Two lines later, is there a recipient?

4    A.    Yes, "To jsthe7th@hotmail.com."

5    Q.    And again, were you able to locate when you continued to

6    review this any content that might be related to these -- to

7    this e-mail?

8    A.    No.

9    Q.    Keep going to Exhibit 121.  Did you examine this fragment?

10   A.    Yes.

11   Q.    Do you see a "From" at the top of that?

12   A.    I do.

13   Q.    Again, what's the e-mail address?

14   A.    "From Jrisen@aol.com."

15   Q.    Scrolling down, do you see a, a date?

16   A.    "Sent Saturday, May 8, 2004, 5:15 p.m."

17   Q.    If we could zoom to the bottom half of that page?

18          I'm sorry, that was what?  What was the date again?

19   A.    "Sent Saturday, May 8, 2004, 5:15 p.m."

20   Q.    And do you see a "To"?

21   A.    I do.

22   Q.    To whom was this addressed?

23   A.    "To jsthe7th@hotmail.com."

24   Q.    Were you able to locate any content for this?

25   A.    Yes.

1   Q.   On the second page of Exhibit 121?

2   A.   Yes.

3   Q.   What's written next to the word "SCRIPT," which is in

4   brackets about two-thirds of the way down?

5   A.   "I want to call today.  I'm trying to write the story.

6   jim."

7   Q.   If you could look at Exhibit 122?  Did you follow that

8   same process again for this fragment?

9   A.   Yes.

10  Q.   And does this reflect an e-mail from Mr. Risen?

11  A.   Yes.

12  Q.   Do you see "From"?

13  A.   "From Jrisen@aol.com."

14  Q.   What else do you see?

15  A.   "Sent Sunday, May 16, 2004, 8:52 p.m., To

16  jsthe7th@hotmail.com."

17  Q.   And about two-thirds of the way down the page, did you

18  locate any content?

19  A.   Yes.

20  Q.   Can you read that?

21  A.   Yes.  "I am sorry if I have failed you so far.  But I

22  really enjoy talking with you, and I would like to continue.

23  jim."

24  Q.   Take a look at Government Exhibit 123.  Did you follow the

25  same process for this fragment?

Hunt - Direct                                                                    1214

1    A.    I did.

2    Q.    What was the term you found at the top of this one?

3    A.    "From Jrisen@aol.com."

4    Q.    And were you able to locate when this was sent at the

5    bottom?

6    A.    Yes.

7    Q.    Do you see where it says "Sent"?

8    A.    I do.

9    Q.    Six lines up from the bottom?

10   A.    Yes.

11   Q.    What does it say after that?

12   A.    "Sent Monday, May 17, 2004, 1:11 p.m."

13   Q.    To?

14   A.    "To jsthe7th@hotmail.com."

15   Q.    Were you able to locate any content related to this

16   e-mail?

17   A.    I was not.

18   Q.    Let's go to 124.  Again, did you follow the same process

19   that you had used in reviewing the other data for this

20   fragment?

21   A.    Yes.

22   Q.    And was the hit again "Jrisen," or "Risen"?

23   A.    Yes.

24   Q.    And at the top, do you see a "From" line?

25   A.    Yes.  "From Jrisen@aol.com."

1  Q.   And then as you scroll down toward the middle of the page,

2  do you see a "Sent"?

3  A.   Yes.  "Sent Thursday, June 10, 2004, 4:12 p.m."

4  Q.   Is there a reference to the "To" line?

5  A.   Yes.  "To jsthe7th@hotmail.com."

6  Q.   Just to be clear, each of these that we've gone through

7  has "From," "Sent," and "To," correct?

8  A.   Correct.

9  Q.   And, I'm sorry, the "To" on this one was who -- was what?

10 What e-mail address was this to?  It's on the first page of

11 124.

12 A.   "To jsthe7th@hotmail.com."

13 Q.   And as you reviewed this cluster, were you able to locate

14 any content?

15 A.   Yes.

16 Q.   Appear on the next page of the exhibit, about a quarter of

17 the way down on the second page of that exhibit?

18 A.   Yes.

19 Q.   What was that content?

20 A.   "I can get it to you.  where can I send it?"

21 Q.   Now, if we could just go back to the first page, what was

22 the date on this fragment that you found?

23 A.   The date was June 10, 2004.

24 Q.   June 10, 2004.

25        Let's pause with the e-mails for a second.  In the

1    course of your investigation, did you obtain bank records or

2    credit card records for Mr. Risen?

3    A.    Yes.

4              MR. OLSHAN:  Your Honor, at this point, I'd like to

5    read a brief stip, stipulation.

6              THE COURT:  All right.  And the number?

7              MR. OLSHAN:  This is Stipulation No. 1, Government's

8    Exhibit 161, which should be in the Court's binder in an

9    unexecuted form.

10             THE COURT:  All right.  So 161 is going into

11   evidence, correct, counsel?

12             MR. OLSHAN:  Yes.

13             THE COURT:  Yes?  All right.

14             (Government's Exhibit No. 161 was received in

15   evidence.)

16             MR. OLSHAN:  May I read it, Your Honor?

17             THE COURT:  Yes.

18             MR. OLSHAN:  "Stipulation No. 1.  The United States

19   of America, through its attorneys, and the defendant, Jeffrey

20   Alexander Sterling, and the defendant's attorneys, hereby

21   stipulate and agree as follows:

22             "The following documents are records of regularly

23   conducted activity within the meaning of Rule 803 of the

24   Federal Rules of Evidence and admissible at trial without

25   further authentication or identification:"

1            And then it lists Government's Exhibits 125 and 129.

2            THE COURT:  All right.  So Exhibits 125 and 129 are

3   being moved in at this point.  Any objection?

4            MR. MAC MAHON:  No, Your Honor.

5            THE COURT:  All right, they're in.

6            (Government's Exhibit Nos. 125 and 129 were received

7   in evidence.)

8            MR. OLSHAN:  If we could publish 125?

9   Q.   Do you recognize that document, Special Agent Hunt?

10  A.   I do.

11  Q.   And what is that document?

12  A.   This is a Bank One statement for James Risen.

13  Q.   And does it list a series of charges on that Bank One

14  account?

15  A.   It does.

16  Q.   And have all but one been redacted?

17  A.   Yes.

18  Q.   What is the remaining charge?  If we could zoom in on

19  that?

20           THE COURT:  Now, let me just tell the jury because

21  we've had redactions in this case, this is not a national

22  security issue.  This is just a privacy issue, all right?  So I

23  want them to know the difference.

24           MR. OLSHAN:  That's exactly right.  Thank you, Your

25  Honor.

1  Q.    That one line item --

2  A.    Yes.

3  Q.    -- what does it say as the description of it?

4  A.    I believe the date of the charge is June 28.  However, the

5  information indicates that the charge is for a FedEx shipment

6  on June 11, 2004, in the amount of $40.49.

7  Q.    And just to be clear, the last exhibit I had shown you,

8  124, with that fragment, was dated June 10, one day before?

9  A.    That's correct.

10 Q.    And that's the fragment that had, "I can get it to you.

11 where can I send it?"

12 A.    That's correct.

13         MR. MAC MAHON:  Your Honor, excuse me, I think this

14 says June 28, not June 10.

15         MR. OLSHAN:  The agent read the whole --

16         THE COURT:  If you read the whole "FEDEX SHP

17 6/11/04," that's what she's talking about.

18         MR. MAC MAHON:  Okay.  Thank you, Your Honor.

19         THE COURT:  All right.

20 BY MR. OLSHAN:

21 Q.    Is that correct, Agent Hunt?

22 A.    That's correct.  It appears to be a charge on June 28 for

23 a shipment on June 11, 2004.

24 Q.    You're basing that on reviewing this record?

25 A.    Yes.

1          MR. OLSHAN:  We can take that down.  Thank you,

2    Mr. Francisco.

3    Q.   Go to 126.  Again, Special Agent Hunt, did you use the

4    same process in analyzing this fragment?

5    A.   I did.

6    Q.   And what do you see in this fragment?

7    A.   "From Jrisen@aol.com; Sent June 11, 2004, 11:59 a.m.; To

8    jsthe7th@hotmail.com."

9    Q.   And were you able to locate any content related to that

10   e-mail fragment?

11   A.   No.

12   Q.   If you could flip ahead two pages in the same exhibit, so

13   it's page 3 now, Exhibit 126?

14          Again, did you analyze that fragment?

15   A.   Yes.

16          MR. OLSHAN:  One moment, Your Honor?

17          THE COURT:  Yes, sir.

18   BY MR. OLSHAN:

19   Q.   Did you analyze this fragment?

20   A.   I did.

21   Q.   And what did you find in this fragment?

22   A.   "From Jrisen@aol.com; Sent June 11, 2004, 2:05 p.m.; To

23   jsthe7th@hotmail.com."

24   Q.   Again, were you able to locate any content related to that

25   e-mail fragment?

1    A.    No.

2    Q.    If you could skip ahead two more pages, same exhibit, so

3    it will be page 5 now of Exhibit 126?  There should be a

4    fragment with the number "158."  Do you see that?

5    A.    I do.

6    Q.    Did you use the same analysis?

7    A.    Yes.

8    Q.    If you could look at the bottom third or so of that

9    fragment, do you see -- what do you see there?  What did you,

10   what did you find?

11   A.    I see, "From Jrisen@aol.com; Sent Friday, June 11, 2004,

12   2:23 p.m.; To jsthe7th@hotmail.com."

13   Q.    Again, did you find any content for that e-mail fragment

14   on June 11?

15   A.    No.

16   Q.    Two more pages, same exhibit, 126.  Do you see a fragment

17   with "155" at the top?

18   A.    I do.

19   Q.    And again, if you could review the bottom third of that

20   fragment, do you see -- what do you see there when you analyzed

21   it?

22   A.    "From Jrisen@aol.com; Sent Friday, June 11, 2004, 3:36

23   p.m., To jsthe7th@hotmail.com."

24   Q.    Any content located for that fragment?

25   A.    No.

Hunt - Direct                                                          1221

1    Q.    Last one in this batch, two more pages forward, please, in

2    Exhibit 126, do you see a fragment with the number "154"?

3    A.    I do.

4    Q.    And did you analyze that the same way you'd analyzed all

5    the other ones we've talked about?

6    A.    Yes.

7    Q.    And what did you find in that fragment?

8    A.    "From Jrisen@aol.com; Sent Sunday, June 13, 2004, 12:33

9    p.m.; To jsthe7th@hotmail.com."

10   Q.    Any other -- any content found when you did that?

11   A.    No.

12          MR. OLSHAN:  Your Honor, I actually think I'm done

13   with that topic for now.  If this would be an appropriate time

14   to break?

15          THE COURT:  All right, it seems to be the magic hour,

16   11:05.  That's where we were yesterday, too.  I'll give the

17   jury 20 minutes, so we'll start back up again at 25 after.

18          And, Agent Hunt, you need to be back then.

19          (Recess from 11:05 a.m., until 11:28 a.m.)

20                      (Defendant and Jury present.)

21          THE COURT:  All right, Mr. Olshan?

22          MR. OLSHAN:  Thank you.

23   Q.    Special Agent Hunt, I believe when we left off, we talked

24   about e-mails that you were able to recover, correct?

25   A.    Yes.

1  Q.   During the course of your investigation, did you obtain

2  phone records for the defendant, Jeffrey Sterling?

3  A.   I did.

4  Q.   Did those include phone records from when he resided at

5  13455 Farm Crest Court, in Herndon, Virginia?

6  A.   Yes.

7  Q.   When did he live there?

8  A.   He lived there from sometime in the year 2000, when he

9  returned from New York, until August of 2003.

10  Q.   How do you know that he no longer resided there after

11  August of 2003?

12  A.   Because the Dawsons told the FBI that he came to live with

13  them --

14        MR. MAC MAHON:   Your Honor, I object.   That's hearsay

15  and beyond the scope of the stipulation.

16        THE COURT:   Sustained.

17        MR. OLSHAN:   Your Honor, that's fine.   The

18  stipulation makes it clear.   I'll move on.

19        THE COURT:   Sustained.

20  BY MR. OLSHAN:

21  Q.   After August of 2003, did the defendant live with the

22  Dawsons for a period of time?

23  A.   Yes.

24        THE COURT:   And that was in Missouri?

25        THE WITNESS:   Yes.

1  BY MR. OLSHAN:

2  Q.   That was approximately August 2003 to approximately July

3  2004?

4  A.   Yes.

5  Q.   After July 2004, when the defendant left the Dawsons' home

6  in Missouri, where did he go?

7  A.   He went to live with his then girlfriend/now wife in

8  O'Fallon, Missouri.

9  Q.   You testified that you obtained phone records for the

10  defendant?

11  A.   Yes.

12  Q.   Does that include phone records related to each of those

13  locations where he lived?

14  A.   Not exactly.

15  Q.   Explain.  What phone records did you get?

16  A.   I --

17  Q.   I'm sorry, I'll start over.  For what phone numbers -- did

18  you get phone records for his landline phone in Virginia?

19  A.   Yes.

20  Q.   Were you aware of whether he had a cell phone at the time?

21  A.   I did not know of any cell phone he used when he was in

22  Virginia.

23  Q.   And did you obtain phone records for his time in Missouri?

24  A.   Yes.

25  Q.   Did that include both home and business phone records?

Hunt - Direct                                                    1224

1    A.    Those records included records for the landline at the

2    Dawsons' residence, his work number at Blue Cross-Blue Shield,

3    and a cellular telephone number he used at that time.

4    Q.    In Missouri?

5    A.    In Missouri.

6              MR. OLSHAN:  Your Honor, at this time, I'd like to

7    read Stipulation No. 3, which is Exhibit 163.

8              THE COURT:  All right, 163 is in evidence.

9              (Government's Exhibit No. 163 was received in

10   evidence.)

11             MR. OLSHAN:  "The United States, through its

12   attorneys, and the defendant, Jeffrey Alexander Sterling, and

13   the defendant's attorneys, stipulate and agree that telephone

14   records reflect that the following 47 telephone calls occurred

15   between the listed phone numbers at the specified dates and

16   times and for the listed duration:"

17             Your Honor, I'm not going to read the list of 47

18   phone calls that are contained in the stipulation.

19             THE COURT:  But they're listed in Exhibit 163?

20             MR. OLSHAN:  They are.  And they're also referenced

21   in the next exhibit that I'm going to show the witness.

22             THE COURT:  All right.

23   BY MR. OLSHAN:

24   Q.    Special Agent Hunt, if you could take a look at Exhibit

25   98?

1            With the assistance of the court security officer?

2   Thank you, sir.

3            Agent Hunt, you testified that you obtained phone

4   records for the defendant, correct?

5   A.   Yes.

6   Q.   Did you also obtain subscriber information to -- for

7   Mr. Risen and phone numbers associated with him?

8   A.   Yes.

9   Q.   Government's Exhibit 98, did you have a hand in creating

10  that?

11  A.   I created it.

12  Q.   And generally, what is, what is this?

13  A.   This exhibit is a chart I created summarizing the

14  telephone calls between Jeffrey Sterling and James Risen, and

15  it also includes summary information related to the e-mails

16  that we discussed that are other exhibits.

17  Q.   Does it also make reference not just to the phone calls

18  but also who the relevant subscribers were?

19  A.   Yes.

20  Q.   And the phone records that you reviewed in creating this

21  document, were they voluminous?

22  A.   Yes.

23            MR. OLSHAN:  Your Honor, at this time, we would offer

24  Government's Exhibit 98.

25            MR. MAC MAHON:  Your Honor, we object.  This isn't a

1   summary under 1001.  We stipulated to the calls both as to the

2   Dawsons and to the place in Virginia, and then this just

3   intersperses, it's more argument than it is a summary.

4            THE COURT:  Well, it's not uncommon in a complex case

5   with voluminous records for either party to introduce charts or

6   summaries that help the jury work their way through the

7   evidence, but ultimately, the value of any chart or summary

8   must be evaluated in terms of the underlying data.  If the

9   chart or summary is not accurately reflecting the data, you

10  should disregard the chart.

11           No, I'm going to permit it in as a reasonable aid for

12  the jury.

13           MR. OLSHAN:  Thank you.

14           THE COURT:  So over the objection of defense, 98 is

15  in.

16           (Government's Exhibit No. 98 was received in

17  evidence.)

18           MR. OLSHAN:  If we could publish the first page of

19  Exhibit 98?

20  Q.   Special Agent Hunt, you testified that this summary chart

21  includes phone records, subscriber information, and e-mail

22  content, correct?

23  A.   Yes.

24  Q.   Is it arranged chronologically?

25  A.   Yes.

1    Q.    What is the first entry?

2    A.    The first entry indicates a telephone call from the number

3    affiliated with Jeffrey Sterling's residence to a number

4    affiliated with James Risen's residence on February 27, 2003,

5    at 8:03 p.m., with a duration of 50 seconds.

6    Q.    Was that the first telephone contact you were able to find

7    between numbers associated with Mr. Sterling and numbers

8    associated with Mr. Risen?

9    A.    Yes.

10            MR. OLSHAN:  Your Honor, we'd like to move in a

11   series of exhibits.  It's not by stipulation; there's just no

12   objection from defense.

13            THE COURT:  And what are they?

14            MR. OLSHAN:  At this time, I think we'd like to move

15   in -- or we would like to move in Government's Exhibits 48

16   through 51.

17            THE COURT:  All right, hold on a second so I can get

18   the book.

19            MR. OLSHAN:  Sure.

20            THE COURT:  Wait a minute.

21            And there's no objection to these?

22            MR. MAC MAHON:  No, Your Honor.

23            THE COURT:  All right, 48 through 51, they're in.  Go

24   ahead.

25            (Government's Exhibit Nos. 48 thru 51 were received

Hunt - Direct                                                    1228

1    in evidence.)

2            MR. OLSHAN:  54 through 58, I believe they're not in

3    yet.

4            THE COURT:  Any objection?

5            MR. MAC MAHON:  I'm looking through them, Your Honor.

6            THE COURT:  All right.

7            MR. MAC MAHON:  Court's indulgence?

8            No objection, Your Honor.

9            THE COURT:  All right, 54 through and including 58

10   are in.

11           (Government's Exhibit Nos. 54 thru 58 were received

12   in evidence.)

13           MR. OLSHAN:  61 through 63.

14           MR. MAC MAHON:  No objection, Your Honor.

15           THE COURT:  All right, they're in.

16           (Government's Exhibit Nos. 61 thru 63 were received

17   in evidence.)

18           MR. OLSHAN:  73 and 74.

19           MR. MAC MAHON:  No objection.

20           THE COURT:  All right, they're in.

21           (Government's Exhibit Nos. 73 and 74 were received in

22   evidence.)

23           MR. OLSHAN:  A couple more.

24           THE COURT:  Go ahead.

25           MR. OLSHAN:  65, 66.

1          MR. MAC MAHON:  No objection, Your Honor.

2          THE COURT:  All right, they're in.

3          (Government's Exhibit Nos. 65 and 66 were received in

4     evidence.)

5          MR. OLSHAN:  77.

6          MR. MAC MAHON:  Just a second, Your Honor.

7          THE COURT:  It's the other book.  That's a summons.

8          MR. MAC MAHON:  No objection to 77, Your Honor.

9          THE COURT:  All right.

10          (Government's Exhibit No. 77 was received in

11     evidence.)

12          MR. OLSHAN:  94 to 96.

13          THE COURT:  I'm sorry, 94 to 96?

14          MR. OLSHAN:  Yes.

15          MR. MAC MAHON:  No objection, Your Honor.

16          THE COURT:  All right, they're in.

17          (Government's Exhibit Nos. 94 thru 96 were received

18     in evidence.)

19          MR. OLSHAN:  And then the last two are 118 and 130.

20          MR. MAC MAHON:  No objection to either of those

21     either, Your Honor.

22          THE COURT:  All right, they're in.

23          (Government's Exhibit Nos. 118 and 130 were received

24     in evidence.)

25          MR. OLSHAN:  Thank you.

1   Q.   Special Agent Hunt, you testified that the first phone

2   call you found and that's reflected in Exhibit 98 was on

3   March -- excuse me, February 27, 2003.

4   A.   Yes.

5   Q.   In the course of your investigation, did you become

6   familiar with the defendant's litigation involving the CIA?

7   A.   I did.

8   Q.   And during the course of that litigation, were there a

9   series of settlement offers extended by either Mr. Sterling or

10  his lawyers?

11  A.   Yes.

12  Q.   If you can take a look at Exhibit 96, which should be in

13  the same binder?  Actually, I apologize, 95.

14          Does that document reflect a settlement offer from

15  lawyers representing Mr. Sterling?

16  A.   Yes.

17  Q.   And if we could zoom in on the bottom paragraph of that?

18  Actually, quickly, it says what date at the top?

19  A.   January 27, 2002.

20  Q.   Do you believe that's a typo, or is that correct as far as

21  the year?

22  A.   I believe the year is 2003, because on the second page,

23  there's a reference to 7 February 2003.

24  Q.   And is there a fax header at the top of this exhibit?

25  A.   Yes.  It says "January 27, '03."

1    Q.    Do you have any reason to believe this was not transmitted

2    on January 7, 2003?

3    A.    No.

4    Q.    And if we could zoom in on the second paragraph, does it

5    state -- does this letter state a settlement offer?

6    A.    It does.

7    Q.    Can you read that paragraph?

8    A.    The second paragraph?

9    Q.    Yes, please.

10   A.    "Mr. Sterling is willing to voluntarily dismiss his

11   lawsuit in exchange for payment of $200,000 plus attorneys'

12   fees and costs; a favorable employment recommendation and/or

13   statement, the language of which is to be negotiated in good

14   faith; and the government's consent to unseal Judge Schwartz's

15   decision (following its declassification, of course)."

16   Q.    That's fine.  This was January 27, 2003, correct?

17   A.    Correct.

18   Q.    If you could look at 96?  Does that appear to be another

19   letter from Mr. Sterling's lawyers?

20   A.    Yes, yes.

21   Q.    What's the date of that?

22   A.    12 February 2003.

23   Q.    And if you could read the first two paragraphs?

24         Actually, I apologize, could you just read the first

25   paragraph?

1    A.   "I write in reference to my client's settlement offer

2    conveyed to you by my letter dated 27 January 2003.  The

3    settlement offer expired Friday, 7 February 2003."

4    Q.   This letter is dated February 12, correct?

5    A.   Yes, 2003.

6    Q.   And approximately how many days from this letter about the

7    lapse of the settlement offer until that first phone call to

8    Mr. Sterling -- excuse me, between Mr. Sterling's phone and

9    Mr. Risen's phone?

10   A.   Roughly two weeks.

11   Q.   You testified that in, sometime in 2000 through August

12   2003, the defendant resided in Herndon.  Is that correct?

13   A.   Yes.

14   Q.   Do you know if he was employed during that time?

15   A.   Well, he was employed by the CIA until January 31, 2002.

16   Q.   Thank you.

17            After that, was he employed?

18   A.   He was not as far as I know.

19   Q.   If we could go to the first page of Exhibit 98, please?

20            Do you see the second entry?

21   A.   I do.

22   Q.   Is that the e-mail, does that reference the e-mail that

23   was obtained pursuant to the search warrant in October of 2006?

24   A.   Yes.  It's a reference to the March 10, 2003 e-mail.

25   Q.   If you could, the bottom of that first page, the second

1    call, what's the date?

2    A.   March 10, 2003.

3    Q.   This is a very short call?

4    A.   Yes, six seconds.

5    Q.   And who are the parties to that call?

6    A.   The call was made from the landline at Jeffrey Sterling's

7    residence to the landline at James Risen's residence.

8    Q.   If you could flip the page and look at calls or -- calls 3

9    through 7?  On the left column, does that designate call

10   numbers if there's a number listed there?

11   A.   That's correct.

12   Q.   So calls 3 through 7, what month did those take place?

13   A.   They took place in March of 2003.

14   Q.   And, for example, the third call, that's March 10, 2003?

15   A.   Yes.

16   Q.   How many days after the defendant's meeting with the

17   Senate was that call?

18   A.   Five.

19   Q.   I apologize if I already asked you this:  The remainder of

20   the calls on that page occurred when the defendant lived in

21   Virginia?

22   A.   Yes.

23   Q.   They're all from his landline or involve his landline?

24   A.   They're all from his landline in Herndon, Virginia.

25   Q.   And who's originating those calls?

1    A.    Jeffrey Sterling.

2    Q.    To James Risen's phone numbers?

3    A.    To James Risen's phone numbers.

4    Q.    If you could flip to page 3 of the chart?

5          Does the first line refer to the e-mail you were able

6    to extract from that data we discussed before?

7    A.    Yes.  The first line refers to the e-mail dated December

8    23, 2003, that said, "can we get together in early january?

9    jim."

10   Q.    Now, if you could, I'm going to take you through these a

11   little bit quicker, Special Agent Hunt.  Calls 8 through 21,

12   flip through and take a look at those.

13         Do those all involve the same originating phone

14   number?

15   A.    They do.

16   Q.    And what originating phone number is that?

17   A.    It is the telephone number for the office of *The New York*

18   *Times* in Washington, D.C.

19   Q.    And what's the terminating phone number?

20   A.    The terminating phone number, or the number where the call

21   was received, is the number for the residence of Lora and John

22   Dawson in St. Louis, Missouri.

23   Q.    And what's the span of dates for the ones that we focused

24   on, 8 through 21?

25   A.    February 9, 2004, to April 22, 2004.

1   Q.   So a series of calls over approximately two-and-a-half

2   months in 2004?

3   A.   Yes.

4   Q.   And again, are some of those short?

5   A.   Yes.

6   Q.   Let me direct your attention to page 5 of this exhibit.

7   Call 18, do you see that call?

8   A.   I do.

9   Q.   What's the duration of that call?

10  A.   24 minutes and 58 seconds.

11  Q.   And again, that's from *The New York Times* to the Dawsons'

12  residence?

13  A.   That's correct.

14  Q.   And if you flip the page to page 6, do you see call 21?

15  A.   I do.

16  Q.   The duration of that call?

17  A.   4 minutes and 42 seconds.

18  Q.   Following that, do you see a series of the e-mail

19  extracts?

20  A.   Yes.

21  Q.   Is it fair to say that during the course of this phone

22  communication, there's interspersed e-mail traffic based on

23  your analysis?

24  A.   Yes, that was my conclusion.

25  Q.   E-mail F on page 6?

1    A.   Yes.

2    Q.   From May 8, 2004, what does that one say?

3    A.   "I want to call today.  I'm trying to write the story

4    jim."  And it also included text that said, "I need your phone

5    number again."

6    Q.   If you could flip to the next page?  Do you see a series

7    of e-mails and phone calls in May of 2004?

8    A.   Yes.

9    Q.   Again, did that -- do they involve contact -- the phone

10   calls, do they involve contact between *The New York Times* and

11   the Dawsons' residence?

12   A.   Yes.

13   Q.   How long is call No. 23 and call No. 24?

14   A.   Call No. 23 on May 12, 2004, was 10 minutes and 9 seconds.

15   Q.   Call 24?

16   A.   Call 24, which occurred on May 25, 2004, was 7 minutes and

17   52 seconds.

18   Q.   And on May 16, about nine days before that

19   7-minute-52-second call, did you find an e-mail for that date?

20   A.   Yes.

21   Q.   What did it say?

22   A.   It said, "I am sorry if I have failed you so far.  But I

23   really enjoy talking with you, and I would like to continue.

24   jim."

25   Q.   If you could flip to the next page, page 8?  Does the

1   series of phone calls and e-mail contact continue?

2   A.   Yes.

3   Q.   And this is late May through mid-June 2004?

4   A.   Yes.

5   Q.   If you could flip to page 9?  At a certain point, did you

6   find phone traffic between phone numbers associated with

7   Mr. Risen and/or *The New York Times* and Mr. Sterling's work

8   numbers at Blue Cross in Missouri?

9   A.   Yes.

10  Q.   Is that reflected in calls 27, 28, and 29, on page 9?

11  A.   Yes.

12  Q.   Flipping to page 10, calls 30 and 31, did they also

13  involve contact with the defendant's work phone?

14  A.   Yes, from *The New York Times* and from James Risen's

15  residential number.

16  Q.   What's call 31?  What's the duration of that?

17  A.   The duration is 3 minutes and 2 seconds.  It's a call that

18  occurred on July 8, 2004.

19  Q.   And it was from Mr. Risen's personal residence?

20  A.   Correct.

21  Q.   What does call 32 reflect?

22  A.   Call 32 on November 6, 2004, reflects a one-minute

23  telephone call from a cellular telephone used by Jeffrey

24  Sterling to a residential number for James Risen.

25  Q.   Over the course of this period, there are multiple calls

1   between multiple phone numbers for both men?

2   A.   Correct.

3   Q.   If you could flip to page 11 and look at call 33, is that

4   from February 14, 2005?

5   A.   It is.

6   Q.   What's the duration of that call?

7   A.   35 minutes and 57 seconds.

8   Q.   And who are the parties to that?

9   A.   The call was made from the number for *The New York Times*'

10  office in Washington, D.C., to Jeffrey Sterling's number at

11  Blue Cross-Blue Shield in Missouri.

12  Q.   If you could flip from page 11 through to page 14?  Agent

13  Hunt, how long did the communication or the phone traffic last

14  according to this chart between phone numbers associated with

15  Mr. Sterling and phone numbers associated with Mr. Risen?

16  A.   The last relevant call I found was a call on November 20,

17  2005, from a cellular telephone number used by James Risen to a

18  cellular telephone number used by Jeffrey Sterling.

19  Q.   11/20/2005.  Are you aware when *State of War* was

20  published?

21  A.   Yes.

22  Q.   And when was it published?

23  A.   January of 2006.

24  Q.   The book started shipping in December of '05?

25  A.   I believe so.

1    Q.    What does that last entry in the chart reflect?

2    A.    The last entry provides a date range of November 21, 2005,

3    to May 8, 2007, and indicates that during phone records

4    collected for that time period, no calls were found between

5    James Risen and Jeffrey Sterling.

6    Q.    So from the period of about a month before the book came

7    out to sometime in mid-2007, no phone calls?

8            MR. MAC MAHON:  Your Honor, objection.  He asked what

9    the dates were.

10           MR. OLSHAN:  I'm clarifying this for the jury, Your

11   Honor.

12           THE COURT:  I'm, I'm going to permit that.

13   Overruled.

14   BY MR. OLSHAN:

15   Q.    So the question was from approximately one month before

16   *State of War* was published through the middle of 2007, how many

17   calls did you find between Mr. Sterling and Mr. Risen?

18   A.    None.

19   Q.    If you could go to the first binder and look at Exhibit

20   59, which is already in evidence?  Do you recognize this

21   document?

22   A.    I do.

23   Q.    Is this a performance assessment report, or PAR, for

24   Mr. Sterling?

25   A.    Yes.

1    Q.   And is this a version that was provided to Mr.,

2    Mr. Sterling in the course of his EEO litigation?

3    A.   Yes.

4    Q.   And this document was unclassified when provided to

5    Mr. Sterling?

6    A.   Yes.

7            MR. OLSHAN:  May I confer with counsel?

8            THE COURT:  Go ahead.

9    BY MR. OLSHAN:

10   Q.   Just to clarify, Agent Hunt, the version that appears as a

11   trial version, does this contain substitutions?

12   A.   Yes, it does.

13   Q.   Otherwise, is this document the same version that

14   Mr. Sterling received in unclassified form during the EEO

15   litigation?

16   A.   Yes.

17   Q.   I hate to do this to you.  If you could -- actually,

18   Mr. Francisco, if we could just pull up on the screen Exhibit

19   83, which is already in evidence?

20           Special Agent Hunt, do you recognize this newspaper

21   article?

22   A.   I do.

23   Q.   And does language from Exhibit 59 appear in Exhibit 83?

24   A.   Yes.

25           MR. OLSHAN:  May I have one moment, Your Honor?

1              THE COURT:  Yes, sir.

2    BY MR. OLSHAN:

3    Q.   And in Exhibit 83, was that language from Exhibit 59

4    quoted in the newspaper article?

5    A.   Yes.

6    Q.   Have you read chapter 9 of *State of War*?

7    A.   Yes.

8    Q.   If you could take a look at Exhibit 60?  Do you have 60 in

9    front of you?

10   A.   I do.

11   Q.   One thing to just clarify very quickly:  59 and 60, the

12   name that appears on the first page says "Samuel L. Crawford."

13   Is that correct?

14   A.   That's correct.

15   Q.   What's your understanding of who that person is?

16   A.   My understanding is that that was a pseudonym used for

17   Jeffrey Sterling.

18   Q.   For purposes of the EEO process?

19   A.   Yes.

20             THE COURT:  But not necessarily the name that he was

21   using at the CIA, is that right?

22             THE WITNESS:  That's my understanding.

23             THE COURT:  So this was a name that was substituted

24   the way we've substituted Merlin?

25             MR. OLSHAN:  No, this is specifically, if the witness

1   knows, was this name specifically substituted for purposes of

2   giving him a name in the EEO process?

3           THE WITNESS:  Yes.

4   BY MR. OLSHAN:

5   Q.   Not for trial purposes?

6   A.   That's correct.

7   Q.   So the version that Mr. Sterling received of these

8   exhibits said "Samuel L. Crawford"?

9   A.   Yes, it did.

10  Q.   You testified that you have read *State of War*?

11  A.   Yes.

12  Q.   Chapter 9?

13  A.   Yes.

14          THE COURT:  I'm sure she's read it several times, all

15  right?  Let's move this along.

16                          (Laughter.)

17          MR. OLSHAN:  I know that's the fact, Your Honor.

18  Q.   Is there language that appears in Exhibit 60 that is also

19  quoted in chapter 9?

20  A.   Yes.

21  Q.   Right.  And just, just to be clear, Exhibit 60 contains,

22  contains substitutions for trial purposes, correct?  Some

23  substitutions for trial purposes?

24  A.   That's correct.

25  Q.   But the original version of Exhibit 60 that was provided

1    to the defendant was unclassified?

2    A.    That's correct.

3    Q.    You've reviewed the performance assessment, the PAR that

4    appears at Exhibit 60, correct?

5    A.    Yes.

6    Q.    Have you reviewed the original version of that?

7    A.    Yes.

8    Q.    The original version that was provided to Mr. Sterling

9    during the course of his employment?

10   A.    Yes.

11   Q.    And the one that was provided to him in the course of the

12   EEO process?

13   A.    Yes.

14   Q.    Do any of those documents, either version, make any

15   reference to this specific classified program or to Merlin?

16   A.    Yes.

17   Q.    Is the language that appears in the original version

18   specifically connected to an asset or a program?

19            MR. MAC MAHON:  Your Honor, I object.  If they're not

20   going to put the document in evidence, there's no way to

21   cross-examine.

22            THE COURT:  I think this is too vague.  I'm going to

23   sustain the objection.

24            MR. OLSHAN:  That's fine.  I'll leave that.

25            Your Honor, at this time, I've got two more

1    stipulations.

2              THE COURT:  All right.

3              MR. OLSHAN:  This is Stipulation No. 7, and it's

4    Exhibit 167:  "The United States, through its attorneys, and

5    the defendant, Jeffrey Alexander Sterling, and the defendant's

6    attorneys, hereby stipulate and agree that the following

7    exhibits may be admitted at trial without further

8    authentication or identification:

9              "Exhibit 128, Exhibit 132, and Exhibit -- Defense

10   Exhibit 1."

11             Your Honor, for the record, both 132 and Defense

12   Exhibit 1 are already in.

13             THE COURT:  All right.

14             MR. OLSHAN:  "The parties further agree that a

15   representative from Simon & Schuster would testify as follows:

16             "The document contained in Government's Exhibit 128

17   was submitted to Simon & Schuster by James Risen in or about

18   September 2004.  *State of War:  The Secret History of the CIA*

19   *and the Bush Administration*, by James Risen, was published in

20   or about December 2005."

21             This is Stipulation No. 10.  It would be Government's

22   Exhibit 173:  "The United States, through its attorneys, and

23   the defendant, Jeffrey Alexander Sterling, and the defendant's

24   attorneys, hereby stipulate and agree that if called as a

25   witness at trial, James Risen would testify as follows:

1              "Mr. Risen is the author of the book *State of War*,

2     which was published by Simon & Schuster in 2006.  Mr. Risen had

3     unidentified or unnamed sources for the information contained

4     in chapter 9 of *State of War*.  Chapter 9 of *State of War*

5     accurately reflects information Mr. Risen obtained from a wide

6     range of sources, including information from unnamed sources,

7     information from public sources, and information from his own

8     research.

9              "If asked by either the United States or the defense,

10    Mr. Risen would refuse to identify who was or was not an

11    unnamed source for any information set forth in chapter 9 of

12    *State of War*.

13             "If asked by either the United States or the defense,

14    Mr. Risen would refuse to identify who was or was not an

15    unnamed source for any of his other writings, including

16    newspaper articles."

17             If we could publish Exhibit 129?

18    Q.   Special Agent Hunt, you testified that you reviewed

19    Mr. Risen's bank records; is that correct?

20    A.   Yes.

21    Q.   Did you locate any specific charges related to a trip to

22    Vienna?

23    A.   I did.

24    Q.   And does Exhibit 9 -- 129 also reflect, similar to 125, a

25    Bank One credit card statement?

1    A.    Yes.

2    Q.    And what are the charges that have not been redacted from

3    this document?

4    A.    There is a charge dated 11/17, November 17.  It's a charge

5    at the Inter-Continental Vienna.

6    Q.    And that's 11/17 of what year?  Up at the top, do you

7    see --

8    A.    2004.

9    Q.    And do you see another charge?

10   A.    Yes.  A second charge on November 21, 2004, also at

11   Inter-Continental Vienna.

12   Q.    And do you know where it was that Merlin stayed in Vienna

13   during the operation in February 2000?

14   A.    Yes.  He stayed at the Inter-Continental Vienna.

15   Q.    If you could take a look at Exhibit 128?

16          THE COURT:  Now, I will tell you that the Exhibit 129

17   in the Court's book did not have redactions on it to the same

18   extent of what was shown on the screen, so I want to make sure

19   that the physical exhibits that are going to go to the jury are

20   absolutely consistent with what they're being shown in court.

21          MR. OLSHAN:  They will be, Your Honor.  We may have

22   passed it up.  If we didn't, I apologize, but what the jury

23   will get and what's being shown are the versions that are --

24          THE COURT:  Agent Hunt, as you look through that

25   book, because that's the book that's going to go to the jury,

1    does 129 look exactly like the screen did?

2              THE WITNESS:  Yes.  It's redacted.

3              THE COURT:  Completely other than those two lines?

4              THE WITNESS:  Yes.

5              THE COURT:  All right, okay.

6              I'm sorry, now, 128?

7              MR. OLSHAN:  128.  Based on the stipulation, we'd

8    move -- we would move 128 in.

9              THE COURT:  I assume there's no objection?

10             MR. MAC MAHON:  No objection, Your Honor.

11             THE COURT:  All right, it's in.

12             (Government's Exhibit No. 128 was received in

13   evidence.)

14   BY MR. OLSHAN:

15   Q.   Special Agent Hunt, what is Exhibit 128?

16   A.   Exhibit 128 is a book proposal we received from Simon &

17   Schuster.

18   Q.   And if you flip through, is most of this document

19   redacted?

20   A.   Yes.

21   Q.   And, for example, on that first page, where it says, it

22   looks like a stamp, "Redacted"?

23   A.   Yes.

24   Q.   Wherever that appeared throughout the document, to your

25   knowledge, who applied those redactions?

1   A.   Simon & Schuster.

2   Q.   Is there a portion of this document related to or that

3   describes Classified Program No. 1 and Merlin?

4   A.   Yes, beginning on the fourth page.

5   Q.   If we could move to that, that page?  Can you read the

6   first sentence which runs onto the second page?

7   A.   "Under Merlin, True First Name, a Russian nuclear

8   scientist who had earlier defected to the United States, posed

9   as an unemployed and greedy scientist willing to sell nuclear

10  designs to the highest bidder."

11  Q.   If you could go back to that first page, the

12  words "Merlin" -- the word "Merlin" and the phrase "True First

13  Name," were those substitutions for use at trial?

14  A.   Yes.

15  Q.   Have you reviewed the original document that was produced

16  by Simon & Schuster?

17  A.   I have.

18  Q.   And what is the word that appears beneath, without saying

19  it, how would you describe the word that is beneath "True First

20  Name"?

21  A.   The word --

22  Q.   I'll ask a different way.

23  A.   The word in the original was the true first name of the

24  asset we're referring to as Merlin.

25  Q.   In the course of your investigation, you learned what the

1   true first name was?

2   A.   I did.

3   Q.   Can you continue reading on page 2, where it starts

4   with "Under CIA orders"?

5   A.   "Under CIA orders, True First Name approached Iranian

6   officials in Vienna and turned over the nuclear blueprints.

7   Within days, the National Security Agency, which secretly

8   eavesdrops on all international airline reservations systems,

9   watched as an Iranian official in Vienna abruptly left Austria

10  and returned home to Iran.  The CIA later learned from another

11  source that the blueprints were being kept in a highly secure

12  place in the Iranian facility where scientists are working on a

13  nuclear weapon.

14          "CIA officers involved in the operation have come to

15  the author to discuss the case because they now feel enormous

16  guilt for a program that they believe has aided Iran's nuclear

17  program.  This book will provide the full details of Merlin and

18  will explain how and why the CIA mounted such a dangerous

19  operation."

20  Q.   Other than those couple paragraphs, is there anything else

21  in this, this document that would -- is there anything else in

22  this document?

23  A.   No.  The remainder of the document was redacted by Simon &

24  Schuster.

25  Q.   And just for the record, based on the stipulation, this

1    was a document that was submitted to Simon & Schuster in

2    September 2004?

3    A.   That's my understanding.

4    Q.   During the course of your investigation, did you review

5    records from Barnes & Noble?

6    A.   Yes.

7            MR. OLSHAN:  One moment, Your Honor.

8            THE COURT:  Yes, sir.

9    BY MR. OLSHAN:

10   Q.   Can you take a look at Exhibit 131?

11           THE COURT:  Is there a question?

12   BY MR. OLSHAN:

13   Q.   Do you have that in front of you?

14   A.   Yes.

15   Q.   Do those appear to be Barnes & Noble records?

16   A.   Yes.

17           MR. OLSHAN:  We would offer those.

18           THE COURT:  Any objection?

19           MR. MAC MAHON:  No objection, Your Honor.

20           THE COURT:  All right, 131 is in.

21           (Government's Exhibit No. 131 was received in

22   evidence.)

23   BY MR. OLSHAN:

24   Q.   If we could zoom in on the first portion, down to where it

25   says "Total Sales, Maximum On Hand & On Order," Special Agent

1   Hunt, generally speaking, what do these records reflect?

2   A.   These records reflect the number of copies of the book

3   *State of War* that were located in various Barnes & Noble stores

4   in the Eastern District of Virginia.

5   Q.   So for example, the first set is for a location on Wilson

6   Boulevard in Arlington, correct?

7   A.   That's correct.

8   Q.   And then the next set is Clarendon Boulevard in Arlington?

9   A.   Correct.

10  Q.   And the third is Tysons Corner in McLean?

11  A.   Yes.

12          MR. OLSHAN:  If you could zoom in on the first batch?

13  Thank you.

14  Q.   Do you see in the column towards the right where it says

15  "Sales Units"?

16  A.   Yes.

17  Q.   Does that reflect books being sold?

18  A.   I believe so.

19  Q.   And in particular, this is for the Wilson Boulevard

20  location?

21  A.   Yes.

22  Q.   What does the column read for the week ending January 7,

23  '06, sales units?

24  A.   I'm sorry, which week?

25  Q.   The week ending January 7, '06.

1    A.    On hand units, 45.

2    Q.    What does it say for sales units?

3    A.    Five.

4    Q.    And if you can go down to the summary there, total sales,

5    maximum on hand and on order, what does it say for sales units?

6    A.    Nineteen.

7    Q.    And then going to the next store, Clarendon Boulevard,

8    during the relevant period of time, how many sales units were

9    there total for that store?

10   A.    Seventy.

11   Q.    The next one, Tysons Corner, on page 2, what's the total

12   for sales units?

13   A.    Seventy-two.

14   Q.    Fountain Drive, the next one?

15   A.    Ninety-two.

16   Q.    Does this Exhibit 131 contain similar data for other

17   locations in the Eastern District of Virginia?

18   A.    Yes.

19   Q.    Are you familiar with Government's Exhibits 142, 143, 144,

20   which were shown to the jury but not published?

21   A.    Yes.

22   Q.    And Exhibit 145 as well?  You can look at 145 in your

23   binder.

24   A.    Yes.

25   Q.    Were those documents obtained from a search of the

 1   defendant's home?

 2   A.   Yes, in October of 2006.

 3   Q.   And where was that home located?

 4   A.   O'Fallon, Missouri.

 5   Q.   By the time of that search in October of 2006, how much

 6   time had passed since the defendant had access to the CIA, or

 7   CIA facility?

 8   A.   More than four-and-a-half years.

 9   Q.   And between his last stint at the CIA and where these

10   documents were recovered when they were recovered, had he lived

11   in one place or multiple places?

12   A.   Multiple places.

13   Q.   These were found in his residence in O'Fallon?

14   A.   Yes.

15            MR. MAC MAHON:  Your Honor, that's asked and

16   answered.

17            MR. OLSHAN:  That's all I had on that topic, Your

18   Honor.

19            THE COURT:  All right, overruled.

20   BY MR. OLSHAN:

21   Q.   If you could look at Exhibit 73?

22            THE COURT:  That's in the first binder.

23            MR. OLSHAN:  In the first binder.

24            This is already in evidence, Your Honor.

25            THE COURT:  I'm sorry?

1           MR. OLSHAN:  It's already in evidence.

2           THE COURT:  All right.

3    BY MR. OLSHAN:

4    Q.   Do you have the document?

5    A.   I do.

6    Q.   And what is 73?

7           If you can publish that?  Thank you.

8    A.   It's entitled in the subject line:  "Second Appeal of the

9    Recommendation of the Personnel Evaluation Board/Employee

10   Review Panel."

11   Q.   And what is the purpose of this?

12   A.   The purpose of this document was to inform Jeffrey

13   Sterling of the fact that his appeal had been denied and that

14   his employment with the CIA was being terminated.

15   Q.   This is dated October 31, 2001?

16   A.   That's correct.

17   Q.   If you could take a look at Government Exhibit 75?  Do you

18   see the newspaper article in 75?

19   A.   Yes.

20   Q.   Does that newspaper -- is that written by Mr. Risen?

21   A.   Yes.

22   Q.   And does that newspaper article reference unnamed sources

23   for the fact that a CIA office was destroyed on 9/11?

24   A.   Yes.

25   Q.   How many days after Mr. Sterling was notified that he was

1   being terminated did this story run?

2   A.    Four.

3   Q.    And just to be clear, Agent Hunt, after the defendant

4   received that notification on October 31, 2001, did he continue

5   on a term basis with the CIA for a period of time?

6   A.    That's my understanding.

7   Q.    And that was through end of January 2002?

8   A.    Yes.

9            MR. OLSHAN:  May have a moment, Your Honor?

10           THE COURT:  Yes, sir.

11           MR. OLSHAN:  One more minute, Your Honor.  I

12   apologize.

13           One more stip, Your Honor?

14           THE COURT:  Yes, sir.

15           MR. OLSHAN:  This is Stipulation No. 8, Government

16   Exhibit 168.

17           THE COURT:  All right.  I assume it's in then.  It's

18   a stipulation.

19           (Government's Exhibit No. 168 was received in

20   evidence.)

21           MR. OLSHAN:  "The United States, through its

22   attorneys, and the defendant, Jeffrey Alexander Sterling, and

23   the defendant's attorneys, hereby stipulate and agree as

24   follows:

25               "The following documents are records of regularly

1   conducted activity within the meaning of Rule 803 of the

2   Federal Rules of Evidence and admissible at trial without

3   further authentication or identification:

4           "Exhibit 131.

5           "A representative from Barnes & Noble would testify

6   that on or about December 24, 2005, Barnes & Noble shipped

7   copies of *State of War:  The Secret History of the CIA and the*

8   *Bush Administration*, by James Risen, from New Jersey via

9   commercial carrier to the Eastern District of Virginia, where

10  they were made available for sale at Barnes & Noble retail

11  locations."

12  Q.   Special Agent Hunt, you might not have it up there, but

13  have you had a chance to review what's been marked as

14  Government's Exhibit 132B?

15  A.   Yes.

16  Q.   Do you have a copy with you?

17  A.   I do.

18          THE COURT:  Now, that's not up here, or if it is,

19  it's not in the book.

20          MR. OLSHAN:  May I pass it up, Your Honor?

21          THE COURT:  Go ahead.

22  BY MR. OLSHAN:

23  Q.   You're familiar with this exhibit?

24  A.   I am.

25  Q.   And what is 132B?

1  A.    132B is a photocopy of chapter 9 from *State of War*, but

2  anything in the chapter that's not related to Classified

3  Program 1 has been removed.

4  Q.    So, for example --

5           MR. MAC MAHON:  Your Honor, if I may, we object to

6  this exhibit coming in.

7           THE COURT:  And the basis for the objection?

8           MR. MAC MAHON:  It's not a summary.  It's not a

9  substitute.  It's nothing that's admissible.  It's just taking

10  the same chapter and deleting the information that the agent

11  has decided to do, but we heard testimony from Bob that he's

12  the one that did this in the first place, and it's misleading

13  to the jury.  They can get the whole chapter.  It's already in

14  evidence.

15           THE COURT:  I think the best evidence is the entire

16  chapter.  I mean, again, the jury instruction you even

17  submitted suggested that, you know, you were submitting the

18  entire chapter so the jury would have a complete picture.  So

19  I'm going to sustain that objection.

20           MR. OLSHAN:  Your Honor --

21           THE COURT:  You can argue how the jury should look at

22  the exhibit.  That's perfectly proper for both sides, but I'm

23  not going to have it go in like this.

24           MR. OLSHAN:  Your Honor, I wasn't even going to ask

25  to have it admitted.  I was going to ask to use it as a

Hunt - Direct                                                          1258

1    demonstrative with this witness.

2              THE COURT:  Just during her testimony?

3              MR. OLSHAN:  Correct.

4              THE COURT:  That's all right.  It's not going to go

5    back to the jury.  So 132B will not go into evidence.

6    BY MR. OLSHAN:

7    Q.   You've had a chance to review this?

8    A.   Yes.

9    Q.   And any paragraph that does not relate to Mr. -- to Merlin

10   or Classified Program No. 1 has been removed from this

11   demonstrative exhibit?

12   A.   That's correct.

13   Q.   And if you could just very briefly tell the jury which

14   paragraphs have been removed?

15   A.   Paragraphs 1 through 6, paragraph 29.

16   Q.   1 through 6, 29.

17   A.   Paragraph 29 -- paragraphs 29 through 34.

18   Q.   29 through 34.

19   A.   Most of paragraph 40, paragraph 73, paragraph 75,

20   paragraphs 77 and 78, paragraphs 80 through 82, paragraphs 89

21   through 91, and paragraphs 95 through 117.

22   Q.   Now, paragraphs 95 through 117, that's page 212 through

23   the end of the chapter?

24   A.   Yes.

25             MR. OLSHAN:  One moment, Your Honor.

1   Q.   Going back briefly to Exhibit 60, it's that performance

2   assessment, PAR --

3   A.   Yes.

4   Q.   -- that contains language that is quoted in the chapter?

5   A.   Yes.

6   Q.   The PAR itself, does it have the word "Merlin" anywhere in

7   it?

8   A.   No.

9   Q.   Does it identify the classified program that we've been

10  dealing with?

11          MR. MAC MAHON:  Your Honor, this is asked and

12  answered several times, going through the same documents.

13          MR. OLSHAN:  I just have two more questions.

14          THE COURT:  I'll allow two more questions but no

15  more.

16  BY MR. OLSHAN:

17  Q.   The question was does the PAR in any version make

18  reference to Classified Program 1 or Merlin?

19          MR. MAC MAHON:  The same objection.  In a version the

20  jury can't even see, Your Honor.

21          THE COURT:  Overruled.  Let's continue this.  Go

22  ahead.

23          THE WITNESS:  No.  There's no reference to Merlin or

24  Classified Program No. 1 in this PAR by name.  By name.

25  BY MR. OLSHAN:

Hunt - Direct                                                                1260

1  Q.   The only connection to this is in the book?

2  A.   That's correct.

3            MR. MAC MAHON:  Your Honor, objection.

4            THE COURT:  Wait, wait, wait, wait.  That was

5  leading.  Sustained.

6  BY MR. OLSHAN:

7  Q.   Does the book connect the language in the PAR to the

8  operation and Merlin?

9            MR. MAC MAHON:  Your Honor, that's asked and answered

10 now two or three times.

11           THE COURT:  I'm going to sustain the objection.

12           MR. OLSHAN:  One moment?

13           That's all I have.

14           THE COURT:  All right.  Cross-examination,

15 Mr. MacMahon?

16           MR. TRUMP:  Wait, sorry.

17           THE COURT:  Wait, was there anything else?

18           MR. OLSHAN:  I apologize, there is one other

19 stipulation.

20           MR. MAC MAHON:  May I remain standing, Your Honor?

21 I'm sorry.

22           THE COURT:  Yes, you may.

23           MR. MAC MAHON:  Thank you.

24 BY MR. OLSHAN:

25 Q.   Special Agent Hunt, during your review of the defendant's

Hunt - Direct                                                          1261

1   phone records, did you identify records of calls between

2   Mr. Sterling and other members of the media or news outlets?

3   A.   I did.

4   Q.   And in particular, was there a specific member of the

5   media, a person?

6   A.   Yes.

7   Q.   Who was that?

8   A.   Ronald Kessler.

9   Q.   And the -- and anything else?  Anyone else or any entity?

10  A.   The *LA Times*.

11       MR. OLSHAN:  Found it.  I believe this is Stipulation

12  No. 12, and it will be Government's Exhibit 174 -- 5, 175.

13       THE COURT:  All right, it's in.

14       (Government's Exhibit No. 175 was received in

15  evidence.)

16       MR. OLSHAN:  "The United States, through its

17  attorneys, and the defendant, Jeffrey Alexander Sterling, and

18  the defendant's attorneys, hereby stipulate and agree that

19  business records reflect the following:

20       "During 2003, Ronald Kessler of Potomac, Maryland,

21  was the subscriber for Telephone No. 301-279-5818.  During

22  2003, the telephone number for the Washington, D.C., office of

23  the *Los Angeles Times* was 202-293-4650.  The toll free number

24  for the office was 800-528-4637.

25       "The parties further stipulate and agree that

1   telephone records reflect that the following ten telephone

2   calls occurred between the listed phone numbers at the

3   specified dates and times and for the listed duration."

4           I want to read this, Your Honor.

5           THE COURT:  Go ahead.

6           MR. OLSHAN:  "Call 1, April 9, 2003, Wednesday; time,

7   2:21 p.m.; duration, 23 seconds; originating number,

8   703-793-9388; terminating number, 301-279-5818.

9           "Call 2, also April 9, 3 p.m., 36-second duration;

10  originating number, 703-793-9388; terminating number,

11  301-279-5818.

12          "Also April 9, 4:14 p.m., 13-second call; originating

13  number, 703-793-9388; terminating number 301-279-5818."

14          That's the first three calls, Your Honor.  Those

15  involve the number for Mr. Kessler.  The remaining seven calls

16  involve numbers for the *LA Times*.  I'll just go ahead and

17  proffer, the jury will have this document, the originating

18  number for the remaining calls and all of the calls is the

19  defendant's landline, 703-793-9388; and the terminating number

20  for calls 4 through 10 is either the, is either the 800 number

21  for the *LA Times* or their office in D.C.

22          Your Honor, I notice there's an issue with this

23  document.  I haven't had a chance to discuss it with counsel.

24          THE COURT:  All right.

25          MR. OLSHAN:  So we may need to resubmit a different

1   version of this.  I'll confer with counsel.

2           THE COURT:  All right.  Is there anything further for

3   Agent Hunt?

4           MR. OLSHAN:  No, Your Honor.

5           THE COURT:  All right.

6           MR. MAC MAHON:  Excuse me, Your Honor.

7           THE COURT:  That's all right.  So sort that issue out

8   over the lunch break, all right?

9           MR. OLSHAN:  Very well.

10                       CROSS-EXAMINATION

11  BY MR. MAC MAHON:

12  Q.   Special Agent Hunt, how are you?

13  A.   Good.  How are you?

14  Q.   Good afternoon.

15          The calls to Mr. Kessler that are set forth in the

16  stipulation, four calls:  23 seconds, 36 seconds, 13 seconds,

17  and 46 seconds, correct?

18  A.   I don't know.  I don't have it in front of me.

19  Q.   Did you ever ask Mr. Kessler if he ever spoke to

20  Mr. Sterling?

21  A.   I did not.

22  Q.   You didn't bother to ask him?

23  A.   No.

24  Q.   So you can't tell the jury because you never even asked

25  what it is that Mr. Sterling may have talked about with

1    Mr. Kessler, correct?

2    A.    I cannot.

3    Q.    Right.  And the same would be that whatever these other

4    calls are to the *LA Times*, you don't know who they were to,

5    what was discussed, or anything else, right?

6    A.    That's correct.

7    Q.    Right.  And you know that in this -- from the beginning of

8    his discrimination case, that Mr. Sterling was very interested

9    in his discrimination case, correct?

10   A.    Can you repeat the question?

11   Q.    Well, Mr. Sterling had a discrimination case against the

12   CIA, correct?

13   A.    Yes.

14   Q.    And that went on for a long time, didn't it?

15   A.    Yes.

16   Q.    Okay.  And you know that Mr. Sterling was interested

17   because he spoke to Mr. Risen in a public story about his

18   discrimination case, correct?

19   A.    I could speculate that that's the case.

20   Q.    He was interested in getting publicity about his

21   discrimination case, correct?

22   A.    I don't know.  You'd have to ask him.

23   Q.    Well, you never asked Mr. Risen, did you?

24   A.    No.

25   Q.    And when was Mr. Sterling's discrimination case finally

1   dismissed?

2   A.    I think it may have been -- well, I'm not sure.  I think

3   that the Supreme Court denied cert in early 2006.

4   Q.    2006.  It was ongoing all the way up through 2006,

5   correct?

6   A.    I think so.

7   Q.    Right.  And do you remember why the case was dismissed?

8            MR. OLSHAN:  Objection.  Irrelevant.

9            MR. MAC MAHON:  He brought up the issue of the case,

10  Your Honor.

11           THE COURT:  I'm going to overrule the objection.  You

12  brought the case up.

13           THE WITNESS:  I did not study that.

14  BY MR. MAC MAHON:

15  Q.    Did you read the Fourth Circuit opinion that said that --

16           MR. OLSHAN:  Objection, Your Honor.  The legal

17  reasoning for a court upholding a decision or rejecting a

18  decision is not relevant to this case.

19           MR. MAC MAHON:  Let me ask a question a different

20  way, Your Honor.

21           THE COURT:  Well, let me hear the question without --

22  now, if it's a leading question, you're going to be, you know,

23  making a statement, and I don't want the jury to hear an

24  improper statement.

25           MR. MAC MAHON:  I will do my best, Your Honor.

1   Q.   The CIA invoked the national security privilege --

2            MR. OLSHAN:  Objection, Your Honor.

3   BY MR. MAC MAHON:

4   Q.   -- to have Mr. --

5            THE COURT:  Wait, wait, wait, wait, wait, wait, wait,

6   wait, wait, wait.  Look, the jury has been told multiple times,

7   and this is a very attentive jury, that when lawyers make

8   statements, that's not any evidence, all right?  That's the

9   first thing.  Number two, it needs to be relevant to this case.

10           I don't think the details of the lawsuit or certainly

11  not the legal rulings in the lawsuit are appropriate or

12  relevant.  It's wasting the jury's time.  So I'm going to

13  sustain the objection, all right?

14           MR. MAC MAHON:  Your Honor, with respect --

15           THE COURT:  Wait.  It's relevant that the case was

16  going on for a period of time.  That's not inappropriate, but

17  to get into the details of why one court in a totally separate

18  case made certain types of rulings or what positions the

19  parties took is not relevant to this case.

20           MR. MAC MAHON:  Thank you, Your Honor.

21           THE COURT:  All right.

22  BY MR. MAC MAHON:

23  Q.   Agent Hunt, you, you were here in court when people

24  testified that PARs were all classified, correct?  Did you hear

25  that testimony?

1    A.    I did.

2    Q.    All right.  You heard multiple witnesses tell this jury

3    that PARs were classified documents, correct?

4    A.    Yes.

5    Q.    And the two exhibits, I think they're 59 and 60, were

6    completely declassified when they were given to Mr. Sterling,

7    correct?

8    A.    Yes.

9    Q.    There was no prohibition on him just giving those

10   documents to anybody if he felt it would help his

11   discrimination case, was there?

12   A.    I don't know.  I believe that the CIA gave him some sort

13   of instruction, and without it in front of me, I couldn't tell

14   you what it was.

15   Q.    But you don't disagree that they were completely

16   declassified and given to his uncleared lawyer, correct?

17   A.    I don't know if his lawyer had a clearance at the time or

18   not.

19   Q.    Well, they were given to his civil lawyer in New York,

20   weren't they?

21   A.    I'm not sure.

22   Q.    And they were filed correctly?  The two PARs were filed in

23   an unclassified version, correct?

24   A.    Without documentation in front of me, I can't really

25   answer these questions.

1  Q.   All right.  You, you testified that you made edits to

2  chapter 132 to show the jury the documents.

3            If we could put up 132, page 93, please?  The first

4  page, please, Mr. Francisco.

5            And the next page, please?

6            This is a, this is a page that you redacted from your

7  analysis of the case?

8  A.   I did not do the analysis, but yes, it is one of the, one

9  of the pages, paragraphs that have been redacted.

10 Q.   Right.  And this, and this -- if we could focus on, hook

11 in on -- excuse me, zoom in on paragraph 1, please.

12           This part of *State of War* deals with something that

13 happened in 2004, correct?

14 A.   That's what the book says.

15 Q.   And Mr. Sterling wasn't there at that time, was he?

16 A.   At the CIA?

17 Q.   No.

18 A.   No.

19 Q.   He wasn't, was he?

20           And if we could go to page 207, please?  And

21 paragraphs 73 and 74?

22 A.   Yes.

23 Q.   Did you redact those two paragraphs as well?

24           MR. OLSHAN:  Your Honor, if Mr. MacMahon is going to

25 have the witness go back and forth between the demonstrative

1    and what's in evidence, we'd ask to move the demonstrative in.

2              THE COURT:  No.

3              MR. MAC MAHON:  Your Honor, she's testified as to

4    what paragraphs she took out.

5              THE COURT:  No, we're not, we're not going to move

6    the demonstrative in.

7              THE WITNESS:  I did not make the redactions, but 73

8    has been redacted; 74 has not.

9    BY MR. MAC MAHON:

10   Q.   Okay.  And you know that the part in 73 is information

11   from sitting through this trial that was never given to

12   Mr. Sterling at all, correct?

13             MR. OLSHAN:  Objection, Your Honor.  I think we're

14   getting a little bit close here.

15             THE COURT:  I think, Mr. MacMahon, this is not

16   appropriate.  I mean, this whole issue about redacting or

17   editing the chapter, I think, is improper, and I don't think

18   the government should have gotten into it.  So you opened a can

19   of worms, so I'm going to close it and just tell the jury to

20   disregard this whole line of testimony.  It's not relevant to

21   the case.

22             The issue in this case is whether any of the

23   information that's been discussed, that is, concerning

24   Operation No. 1 or Merlin, is in the book, all right?

25             All right, go ahead.

1           MR. MAC MAHON:  I will, Your Honor, but -- I'll move

2    along.  The Court's ruled.

3    Q.   Let's look at Exhibit 139, if you would, please, which is

4    the subpoena to testify in front of a grand jury that you

5    served on Mr. Sterling?

6    A.   Yes.

7    Q.   All right.  And when Mr. Olshan was showing you a

8    document, he was also showing you an e-mail that Mr. Sterling

9    sent to Mr. Risen in 2003, correct?

10   A.   Yes, on March 10.

11   Q.   All right.  And it was a CNN article, correct?

12   A.   There was a link to a CNN article in the e-mail.

13   Q.   Right.  And that article wasn't classified, was it?

14   A.   No.

15   Q.   And that article didn't talk at all about anything that

16   Mr. Sterling ever did at the CIA, did it?

17   A.   No.

18   Q.   And who drafted the rider?  Let's look at page 2 of the

19   subpoena.  Did you draft this?

20   A.   No.

21   Q.   Now, you -- there's nothing in this rider that asks

22   Mr. Sterling to preserve any correspondence with James Risen,

23   is there?

24   A.   No.

25   Q.   Well, that was the focus of your investigation, wasn't it?

1    A.   The focus of the investigation was the unauthorized

2    disclosure of national defense information.

3    Q.   To Mr. Risen, correct?

4    A.   Yes.

5    Q.   In the attachment to the subpoena to Mr. Sterling, nobody

6    thought to put, "Preserve any communications you may have with

7    James Risen," correct?

8            MR. OLSHAN:  Objection.  The witness has already

9    testified she didn't draft the document.

10           THE COURT:  Well, she's been asked to testify about

11   it.  I mean, but frankly, the jury can read it as well.  It's

12   not there.  Let's move this along.

13   BY MR. MAC MAHON:

14   Q.   Did you -- when you executed this search warrant on

15   Mr. Sterling's house, you didn't find any classified documents

16   whatsoever dealing with Merlin at all, did you?

17   A.   No.

18   Q.   And you didn't find any documents dealing with Classified

19   Program No. 1 at all, correct?

20   A.   That's correct.

21   Q.   Did you, did you tell the grand jury -- or, excuse me, the

22   jury that there was a -- you found a FedEx receipt of

23   Mr. Risen's?  It's one of, one of his credit card records that

24   showed a FedEx receipt?

25   A.   A FedEx charge, yes.

Hunt - Cross                                                          1272

1    Q.   A FedEx charge.

2         You wouldn't want to mislead the jury as to what that

3    was, would you, ma'am?

4    A.   I wouldn't want to mislead them about anything.

5    Q.   Right.  And you, you had actually served subpoenas for the

6    FedEx records of Mr. Risen, hadn't you?

7    A.   Yes.

8    Q.   Right.  And you served -- and you received FedEx records

9    dealing with Mr. Risen and his wife, correct?

10   A.   I don't recall exactly what was in the records.  I would

11   have to review them.

12   Q.   You asked for FedEx records just for Mr. Risen, correct?

13   A.   I would have to look at the records.

14   Q.   Well, you did get FedEx receipts from Mr. -- showing

15   communication between Mr. Risen and his lawyers, right?

16            MR. OLSHAN:  Objection, Your Honor.

17            THE COURT:  What's the basis for the objection?

18            MR. OLSHAN:  It's not relevant.

19            MR. MAC MAHON:  Let me -- I'll ask it a different

20   way.

21            THE COURT:  All right.

22   BY MR. MAC MAHON:

23   Q.   You did a thorough request of FedEx for all FedEx receipts

24   you could find, whether they were Mr. Sterling, Mr. Risen, or

25   Mr. Risen's wife, right?

1    A.   I would have to look back at my original request to FedEx.

2             THE COURT:  You have it -- you've got papers in your

3    hand, Mr. MacMahon.

4    BY MR. MAC MAHON:

5    Q.   I don't want to put all these in evidence.  The point,

6    ma'am, you do not have the FedEx receipt or charge you showed

7    the jury on that credit card, you don't have any evidence that

8    that was a FedEx that was sent from Mr. Risen to Mr. Sterling,

9    do you?

10   A.   I do not.

11   Q.   And you don't even know if it has anything to do with this

12   case, do you?

13   A.   I do not.

14   Q.   And again, you got all Mr. Sterling's FedEx records,

15   right?

16            MR. OLSHAN:  Objection.  Asked, asked and answered.

17            THE COURT:  I think you've made your point.

18   BY MR. MAC MAHON:

19   A.   And you didn't find any communication --

20            THE COURT:  Mr. MacMahon, there was an objection.

21            MR. MAC MAHON:  I'm sorry, Your Honor.

22            THE COURT:  I'm sustaining the objection because

23   you've made your point on that.

24            MR. MAC MAHON:  Well, I just wanted to take it a

25   little further, Your Honor, with respect to what was received,

1    which is that you received all -- you didn't find any FedEx

2    transactions whatsoever between Mr. Sterling and Mr. Risen,

3    correct?

4             THE WITNESS:  I did not, but FedEx no longer had the

5    underlying records for the FedEx shipment that was made on

6    June 11, 2004.  They could not provide me with that data in

7    response to my request.

8    BY MR. MAC MAHON:

9    Q.   So you don't know what it was?

10   A.   I don't.

11   Q.   Did you receive any FedEx receipts back into 2004 from

12   FedEx?

13   A.   I would have to look back at the date of my request.

14   Q.   When did you request the records?

15   A.   Without the record in front of me, I cannot recall.  What

16   I do recall is that FedEx only maintained records for a certain

17   time period, and going back, they -- the records for the

18   shipment on June 11, 2004, did not fall within the time period

19   of what they had still maintained in their records at the point

20   of my request.

21   Q.   And the credit card records don't show who it was a FedEx

22   to or from, either, right?

23   A.   That's correct.

24   Q.   And you found no communication written of any form between

25   Mr. Sterling and Mr. Risen that relates to any classified

1    information at all, do you?

2    A.   The communications I did find, I'm not sure to what

3    they're referring.

4    Q.   But there's no classified information in any communication

5    that you found and pasted back together between Mr. Risen and

6    Mr. Sterling, correct?

7    A.   That's correct.

8    Q.   And Exhibit 124, which you, which you put up for the jury,

9    that's Mr. Risen offering to send something to Mr. Sterling,

10   correct?

11   A.   Yes.

12   Q.   And you don't know -- have any idea what that is, right?

13   A.   I don't.

14   Q.   You don't even know if he ever sent him anything, do you?

15   A.   I don't.

16   Q.   I mean, you don't know, you can't testify today that

17   Mr. Sterling ever gave any classified documents to Mr. Risen

18   whatsoever, correct?

19   A.   That's correct.

20   Q.   And you can't say where, if at all, Mr. Risen or

21   Mr. Sterling ever talked about classified matters, correct?

22   A.   I'm not certain.  I can only make deductions from phone

23   records.

24   Q.   The phone records don't tell you what people are talking

25   about, do they, ma'am?

1   A.    They don't.

2   Q.    And speaking of phone records, you never got Bob's phone

3   records at all, did you?

4   A.    I did not.

5   Q.    You originally said that you had, and then you looked back

6   and found that you didn't, right?

7   A.    I thought that I had.  I left for another assignment three

8   years ago, and I don't know where all the documents related to

9   this case are located in this office.

10  Q.    But, ma'am, you knew that Bob was somebody who's quoted in

11  Mr. Risen's article in one way or another, isn't he?

12  A.    I don't know that he's quoted.

13  Q.    Well, he's certainly attributed in the book, isn't he?

14  Information that's attributed to him is set forth in *State of*

15  *War*?

16  A.    One could say that he is described in the chapter.

17  Q.    And one way to tell the jury that Bob and Mr. Risen ever

18  talked would have been to get Bob's phone records, right?

19            MR. OLSHAN:  Objection, Your Honor.  This is

20  argument.

21            THE COURT:  No, I don't think so.  I'm going to

22  permit it.  Overruled.

23            THE WITNESS:  Yes.

24  BY MR. MAC MAHON:

25  Q.    And do you remember telling Merlin that if he could think

1  of anything to talk about about the Classified Program No. 1

2  and the leak, to go -- have him tell Bob?

3  A.   I do not recall that.

4  Q.   Did you ever, did you ever ask Bob for any of his e-mails?

5  A.   What e-mails?

6  Q.   Any e-mails.  Did you ask to look at any of his e-mail

7  accounts at all?

8  A.   No.

9  Q.   You never got any of Mr. Risen's e-mails, right?

10 A.   Only the ones that we have described as having been

11 recovered from the computer from the Dawsons.

12 Q.   No other e-mails at all, right?

13 A.   No.

14 Q.   And you never analyzed any of the hard drives of

15 Mr. Risen's, correct?

16 A.   I didn't have the permission to do that.

17 Q.   And you didn't analyze any of the hard drive or e-mails of

18 Ms. Divoll or anyone else at the Senate, right?

19 A.   I did not.

20 Q.   And Mr. Duhnke didn't ever talk to you, did he?

21 A.   Briefly.

22 Q.   He didn't talk to you in any detail about what happened

23 after Mr. Sterling was up at the Senate, correct?

24 A.   That's correct.

25 Q.   "He didn't cooperate" was your exact words, correct?

1    A.   I don't know if those were my exact words.

2    Q.   You don't have any information that shows if Mr. Sterling

3    or Mr. Risen ever met in person, correct?

4    A.   I have information suggesting they did, but I do not know

5    that they did.

6    Q.   Right.  And you don't know if they did, where they met at

7    all, correct?

8    A.   I do not.

9    Q.   And Mr. Risen lives in Maryland, right?

10   A.   Yes.

11   Q.   And his office is in D.C.?

12   A.   Yes.

13   Q.   You have no witness that says that Mr. Sterling ever left

14   the CIA with a soft file, correct?

15   A.   Correct.

16   Q.   There's no witness that says Mr. Sterling printed up

17   cables about Classified Program No. 1 and took them home,

18   correct?

19            MR. OLSHAN:  Objection, Your Honor.

20            MR. MAC MAHON:  She's the case agent, Your Honor.

21            THE COURT:  The, the scope of the investigation is

22   fair game.  I'm permitting it.  Overruled.

23            MR. OLSHAN:  Fair enough.

24            THE WITNESS:  Could you repeat the question?

25   BY MR. MAC MAHON:

1    Q.   You have no witness that saw Mr. Sterling leave the CIA

2    with any classified documents, correct?

3    A.   Correct.

4    Q.   You have no witness that said that Mr. Sterling ever

5    printed a classified document or took it home, correct?

6    A.   Correct.

7    Q.   And the, the letter that's in the book, you don't have a

8    copy even of that letter, do you?

9    A.   Not in, not in its exact form.

10   Q.   All right.  And you have no copy of that letter that was

11   in Mr. Sterling's possession at any time, do you?

12   A.   No.

13   Q.   You have no information as to why Merlin is accurately

14   quoted in the book, correct?

15   A.   I don't know that he's accurately quoted, but I do not

16   know the origin of the quotes.

17   Q.   Right.  And Merlin told you when you interviewed him that

18   he couldn't account for how he came to be quoted in the book,

19   correct?

20   A.   I believe that's correct.

21   Q.   You have no information how it is that the information

22   about Merlin using a newspaper appears in Mr. Sterling's -- in

23   Mr. Risen's book, correct?

24   A.   I do not.

25   Q.   Because it's not in any CIA report that, for example,

1  Mr. Sterling may have printed, correct?

2  A.    That's correct.

3  Q.    The same with the postman, correct?

4  A.    That's correct.

5  Q.    And the same with Sonoma, correct?

6  A.    That's correct.

7  Q.    And you heard Mr. Harlow testify that Mr. Risen had

8  additional information that he didn't have on his first call

9  when he called the CIA the second time, correct?

10          MR. OLSHAN:   Objection.   That wasn't the testimony,

11  Your Honor.

12          THE COURT:   Sustained.

13  BY MR. MAC MAHON:

14  Q.    Did you hear Mr. Harlow say that he had additional

15  information, that Mr. Risen indicated there was different

16  information on the second call than he had on the first call?

17          MR. OLSHAN:   Objection.

18          THE COURT:   Wait, wait, wait, wait.   I'm going to

19  sustain that objection again.

20          MR. OLSHAN:   That wasn't the testimony, Your Honor.

21          THE COURT:   I know.   Sustained.

22  BY MR. MAC MAHON:

23  Q.    Do you remember writing in 2003 that you thought it was a

24  SSCI staffer that was responsible for the leak?

25  A.    I probably did.

1   Q.   And you wrote and said that what you needed to figure out

2   who was responsible for the leak was a copy of the actual

3   letter provided by the Russian to the Iranian, correct?

4   A.   I don't know.  I would need my memory refreshed.

5   Q.   You never got a copy of that letter, right?

6   A.   No, not as it appears in the book.

7   Q.   Do you remember writing in January of 2006 that SSCI was

8   unified in its opposition at every level to your investigation?

9   A.   I'd have to have my memory refreshed.

10           THE COURT:  All right, do you have her report?

11           MR. MAC MAHON:  I do, Your Honor.

12           The Court's indulgence, Your Honor?

13           THE COURT:  Yes, sir.

14           MR. MAC MAHON:  It's not jumping right up, Your

15   Honor.

16           THE COURT:  Well, should we take the lunch break at

17   this point?

18           MR. MAC MAHON:  Yeah, that would help me find it,

19   Your Honor.

20           THE COURT:  All right, we'll go ahead and do that,

21   folks.  We'll reconvene at 5 of two.

22              (Recess from 12:53 p.m., until 1:55 p.m.)

23

24

25

1              A F T E R N O O N   S E S S I O N

2                          (Defendant and Jury present.)

3              THE COURT:  All right, Mr. MacMahon?

4              MR. MAC MAHON:  May it please the Court, Your Honor?

5              THE COURT:  Yes, sir.

6              MR. MAC MAHON:  Thank you.

7                          CROSS-EXAMINATION (Cont'd.)

8    BY MR. MAC MAHON:

9    Q.   Agent Hunt, when we broke, I was asking you about some

10   statements in a document, and now I've got a copy for you and

11   the Court, if the Court wants a copy as well.

12             THE COURT:  Yes, please.

13   BY MR. MAC MAHON:

14   Q.   Ma'am, I've handed you a document that's dated January 17,

15   2006.  It's results of investigation.  I won't say the top

16   word.  Have you seen that document before?

17   A.   Yes.

18   Q.   You wrote this, right?

19   A.   Yes.

20   Q.   And if you'd turn to page 8, the first full paragraph,

21   read that first full paragraph and see if that refreshes your

22   recollection as to whether you wrote that there was unified

23   opposition exhibited by SSCI at every level of your

24   investigation.

25   A.   Yes.

1    Q.    That is what you wrote, isn't it?

2    A.    Yes.

3    Q.    And do you also remember writing in 2006 that the FBI

4    director contacted the SSCI Chairman and Senator Pat Roberts,

5    right?

6    A.    Yes.

7    Q.    And that Senator Roberts told Director Mueller that he

8    wasn't going to cooperate with the FBI at all in this

9    investigation, correct?

10   A.    Yes.

11   Q.    And that never changed, did it?

12   A.    It did change.

13   Q.    You then got some cooperation from SSCI, correct?

14   A.    I did.

15   Q.    You never got an interview with Mr. Duhnke, right?

16   A.    I did not interview Mr. Duhnke.

17   Q.    And you never received any phone record that showed

18   Mr. Risen calling Mr. Stone, as he testified yesterday,

19   correct?

20   A.    I collected records from Mr. Stone.  I did not find a call

21   in any of those records.

22   Q.    So even though Mr. Stone admits talking to Mr. Risen, by

23   pulling out phone records, you were unable to prove that that

24   was true, correct?

25   A.    That's correct.

1   Q.   Do you remember doing a -- do you remember writing a, or

2   seeing a report dated September 6, 2007?

3   A.   I would have to see a copy of it.

4   Q.   About whether the information at the New York station --

5   excuse me, excuse me, the New York office in New York -- strike

6   that question.

7          Do you remember seeing a CIA document that indicates

8   that before the Risen story that you showed the jury as an

9   exhibit was published about the World Trade Center, that there

10  was a prior news story on *ABC News*?

11  A.   I would need to have my memory refreshed.

12          MR. MAC MAHON:  May I show this to the witness, Your

13  Honor?

14          THE COURT:  Yes.  And I'll return this to you because

15  this is not going into evidence.

16          MR. MAC MAHON:  No, Your Honor, it's not.

17          THE COURT:  All right.

18          MR. MAC MAHON:  And this is a document dated

19  September 6, 2007.

20          THE WITNESS:  What's the question?

21  BY MR. MAC MAHON:

22  Q.   Have you ever seen that document before?

23  A.   Yes.

24  Q.   And that document indicates that there was a story about

25  the fact that a CIA office in New York was destroyed on

1   September 11 was public before Mr. Risen's story that you

2   showed the jury, right?

3   A.   It says October 2001, yes.

4   Q.   And you don't have any phone records that show

5   Mr. Sterling talking to Mr. Risen in 2001, correct?

6   A.   Correct.

7   Q.   And you know that the -- from your investigation that the

8   CIA is unable to say in any way what Mr. Sterling ever did on

9   his computer when he worked at the CIA, correct?

10  A.   No, that's not my understanding.

11  Q.   Does the CIA have some information on, on cables that

12  Mr. Sterling accessed at any point in time?

13  A.   No, but they provided log-in and log-out information for

14  him.

15  Q.   And when was the last time that Mr. Sterling logged into

16  his computer at the CIA when he was cleared to know anything

17  about Classified Program No. 1?

18  A.   I'm not sure because I don't have the records in front of

19  me.

20  Q.   But they don't have any -- the CIA's computer systems

21  weren't such that they could tell you when it was that he

22  printed anything from that file, if he did so, right?

23  A.   That's correct.

24  Q.   Or if he e-mailed himself or -- with documents, correct?

25  They couldn't tell you that?

1   A.   I have no knowledge of those things.

2   Q.   And you don't have any e-mails, any copies of any e-mails

3   that Mr. Sterling sent to himself while he was at the CIA, if

4   it even happened, right?

5   A.   I don't fully understand your question.

6   Q.   In your investigation, you saw no e-mails at all from

7   Mr. Sterling's account at the CIA, right?

8   A.   I don't know.  I saw a lot of e-mails during the course of

9   the investigation.  I don't know if I saw any with his name on

10  them or not.

11  Q.   And you didn't see any e-mails in Mr. Sterling's account

12  that contained classified information regarding Merlin or

13  Classified Program No. 1, correct?

14  A.   You're talking about within CIA's systems?

15  Q.   Yes.

16  A.   I don't recall.

17  Q.   And you've already said you didn't find any on any of the

18  computers of his that you searched, either, correct?

19  A.   I didn't find what?

20  Q.   Any classified information on any computer of

21  Mr. Sterling's.

22  A.   That's correct.

23  Q.   Did you search Mr. Sterling's computer that was seized in

24  2006 for any log files?

25  A.   What I can tell you is that the computer was processed.

1    When we make a request, I don't know that we would have

2    specifically requested log files.  We would have requested for

3    them to look for evidence of certain things in the entirety of

4    the computer.

5    Q.   And that would have been a keyword search like the one

6    that the gentleman testified to yesterday?

7    A.   Yes.

8    Q.   And nothing came up, no positive hits on that at all,

9    correct?

10   A.   I believe we found one letter that you're aware of.

11   Q.   A draft letter.

12   A.   I don't know what it was.

13   Q.   Anything other than that, you didn't find anything,

14   correct?

15   A.   Correct.

16           MR. MAC MAHON:  Just a second, Your Honor.

17           THE COURT:  Okay.

18   BY MR. MAC MAHON:

19   Q.   Ma'am, did you subpoena Mr. Risen's Western Union

20   receipts?

21   A.   I believe I did.

22   Q.   Did you -- you were given back a receipt of a transfer of

23   money from Mr. Risen to his son by Western Union?

24           MR. OLSHAN:  Objection.  Why is that relevant, Your

25   Honor?

1            THE COURT:  Yeah.

2            MR. MAC MAHON:  Scope of the investigation, Your

3    Honor.

4            THE COURT:  I'm sorry?

5            MR. MAC MAHON:  The scope of the investigation.

6            MR. OLSHAN:  Every piece of paper that was obtained

7    is not necessarily -- is not relevant, Your Honor.

8            THE COURT:  No, I understand that.  I think it's for

9    a different purpose.  I'll overrule the objection.  I

10   understand, Mr. MacMahon.

11           THE WITNESS:  I don't recall what was in the Western

12   Union records I received.  I would need to review the records

13   to make any sort of definitive comment.

14   BY MR. MAC MAHON:

15   Q.   All right.  But you never found any -- though you were

16   looking, you never found any transfer, any evidence of any

17   transfer of money from Mr. Sterling to Mr. Risen or vice versa,

18   correct?

19   A.   I did not.

20   Q.   That's what you were looking for, wasn't it?

21   A.   I would have to go back and look at the records.  There

22   was something in some other record that suggested to me that

23   information regarding a Western Union transaction might be

24   related to my investigation, and so I then sought Western Union

25   records.

1   Q.   And found nothing relevant to your investigation, correct?

2   A.   That's correct.

3   Q.   And you -- how many times did you pull credit reports on

4   Mr. Risen?

5   A.   Without the records in front of me, I couldn't tell you.

6   Q.   What were Mr. Risen's credit reports going to tell you

7   about whether Mr. Sterling had disclosed classified information

8   to Mr. Risen?

9            MR. OLSHAN:   Objection, Your Honor.   How is this

10  relevant?

11           THE COURT:   The scope of the investigation is

12  relevant to this particular case.   Overruled.

13           THE WITNESS:   I obtained Mr. Risen's credit report or

14  reports in order to identify the credit cards he used because I

15  then obtained records for his credit cards.   The e-mails that

16  have already been discussed suggested that James Risen was

17  meeting with Jeffrey Sterling, and we also had a witness tell

18  us that they, in fact, did meet.

19           MR. MAC MAHON:   Your Honor, object to her repeating

20  these questions -- her testifying --

21           THE COURT:   And that would be hearsay, so I'm going

22  to go ahead and have that stricken.   Go ahead.

23           MR. OLSHAN:   Your Honor, respectfully, the witness

24  was answering the question.

25           THE COURT:   Well, I think it was more of a narrative.

1           But go ahead, Mr. MacMahon.

2    BY MR. MAC MAHON:

3    Q.   You testified already that you have no information on

4    whether Mr. Sterling and Mr. Risen ever, ever met in person,

5    correct?

6    A.   I have no definitive evidence but I --

7    Q.   You've got a strong suspicion, right, ma'am?

8    A.   I was told that they did.

9           THE COURT:  Well, you opened the door to that one.

10          MR. MAC MAHON:  That's fine.

11   Q.   And do you have any proof that they ever met together

12   other than some witness who said that to you?

13   A.   No.

14   Q.   You weren't able to verify that statement, correct?

15   A.   I was not.

16   Q.   And sitting here today, you can't tell this jury anything

17   about where or when Mr. Risen or Mr. Sterling met or what they

18   ever discussed, correct?

19   A.   Correct.

20          MR. MAC MAHON:  That's all I have, Your Honor.

21          THE COURT:  All right.  Redirect, Mr. Olshan?

22          MR. OLSHAN:  Yes, Your Honor.

23                      REDIRECT EXAMINATION

24   BY MR. OLSHAN:

25   Q.   Special Agent Hunt, Mr. MacMahon asked you some questions

1    about phone records.  Do you recall those?

2    A.    Yes.

3    Q.    Did you obtain phone records for Vicki Divoll?

4    A.    I did.

5    Q.    And did those reflect any communications between

6    Ms. Divoll and Mr. Risen?

7    A.    They did not.

8    Q.    And what about phone records for Merlin?  Did you obtain

9    any of those phone records?

10   A.    I did.

11   Q.    What did they reflect about communications with Mr. Risen?

12   A.    They reflected no contact between Merlin and James Risen.

13   Q.    Mr. MacMahon asked you about Mr. S. and his

14   characterization in the book.  Do you recall those questions?

15   A.    Yes.

16   Q.    And in the book, is he referred to as the senior case

17   officer or the senior CIA officer?

18   A.    Or perhaps official, something like that.

19   Q.    But he is referenced in the book?

20   A.    Yes.

21   Q.    Do any of Mr. S.'s -- does language from any of Mr. S.'s

22   PARs show up in chapter 9?

23   A.    No.

24   Q.    How many articles did James Risen write about Mr. S.,

25   newspaper articles?

1   A.    One.

2   Q.    What was that?  About Mr. S.

3   A.    I'm sorry, about --

4             MR. MAC MAHON:  They're confusing Mr. S.'s, Your

5   Honor.

6             THE WITNESS:  Yes.  I'm sorry.  No, I'm sorry.

7   BY MR. OLSHAN:

8   Q.    How many newspaper articles?

9   A.    Are we talking about Bob S.?

10  Q.    Yes.

11  A.    He wrote no articles about Bob S.

12  Q.    Thank you.

13        You testified that you had written that SSCI as an

14  organization was not cooperative at first.  Is that correct?

15  A.    That's correct.

16  Q.    Was Vicki Divoll cooperative during the course of your

17  investigation?

18  A.    Yes.

19  Q.    What about Don Stone?

20  A.    Yes.

21  Q.    Special Agent Hunt, when you investigate a case, do you

22  consider motive?

23  A.    I do.

24  Q.    How important is motive evidence in your investigation?

25            MR. MAC MAHON:  Your Honor, objection to testimony as

1  to her theory of motive.

2           MR. OLSHAN:  Your Honor, the defense put the

3  thoroughness of this investigation at issue.  The witness

4  should be able to describe why it is that she focused her

5  direction a particular way.

6           THE COURT:  I'll permit it.  I believe the door was

7  opened.  Overruled.

8  BY MR. OLSHAN:

9  Q.   My question, Special Agent Hunt, was how important is

10 motive evidence when you conduct a criminal investigation?

11 A.   It is very important.

12 Q.   Did you obtain evidence that you believed provided --

13 presented a motive for somebody to disclose information to

14 Mr. Risen during the course of this investigation?

15 A.   Yes.

16 Q.   And who did that evidence involve?

17 A.   Jeffrey Sterling.

18 Q.   Has Robert S. ever sued the CIA?

19 A.   No.

20 Q.   Merlin ever sued the CIA?

21 A.   No.

22 Q.   When you initiated the investigation, I believe you

23 testified it was in April of 2003?

24 A.   That's correct.

25 Q.   At the time when you initiated your investigation

1    concerning unauthorized disclosure of classified information to

2    James Risen, did you learn any information regarding Mark Zaid

3    and Mr. Krieger that, that directed your investigation?

4    A.   I did.

5            MR. MAC MAHON:  Your Honor, objection.  That door was

6    not opened as to Mr. Sterling's prior lawyers.

7            MR. OLSHAN:  Your Honor, this is about why --

8            THE COURT:  Again, the scope of the investigation,

9    what was done and not done, was clearly part of the cross.  I'm

10   going to allow it, excuse me, on redirect; and if there needs

11   to be recross on that, you'll be allowed to.  Go ahead.

12           MR. MAC MAHON:  Thank you, Your Honor.

13   BY MR. OLSHAN:

14   Q.   What did you learn at the outset of your investigation

15   about information from Mr. Krieger and Zaid that helped you

16   direct your investigation and focus it?

17   A.   When I opened my investigation on April 8, 2003, my

18   investigation was based on a report I received from the CIA

19   dated April 7, 2003.  In that report, the CIA provided

20   information about the fact --

21           MR. MAC MAHON:  Your Honor, that's hearsay.

22           THE COURT:  Wait.

23           MR. OLSHAN:  Your Honor, this is not for the truth.

24   It's why she took the actions.

25           THE COURT:  It explains why she is acting, takes the

1    investigative tacks that she does, so I'm going to overrule the

2    objection.  It's not hearsay.

3    BY MR. OLSHAN:

4    Q.    You may continue, Special Agent Hunt.

5    A.    The CIA advised that on February 24, 2003, it was

6    contacted by Mark Zaid and Roy Krieger.  They told the CIA on

7    February 24 that a client of theirs had contacted them on

8    February 21, 2003, and that that client, that unnamed client at

9    the time voiced his concerns about an operation that was

10   nuclear in nature, and he threatened to go to the media.

11   Q.    Did you later learn who that client was from Mr. Zaid and

12   Mr. Krieger in the course of your investigation?

13   A.    I did.

14   Q.    Did those facts help you focus the direction of your

15   investigation?

16   A.    They did.

17   Q.    And who did you learn was the client of Mr. Krieger and

18   Mr. Zaid?

19   A.    Jeffrey Sterling.

20   Q.    You testified that you have read the chapter a number of

21   times; is that correct?

22   A.    Yes.

23   Q.    Which person in your opinion, which person received the

24   most favorable treatment as written in chapter 9?

25            MR. MAC MAHON:  Your Honor, that's --

1          THE COURT:  All right, now I think that's going

2    beyond the scope of proper cross -- proper redirect.

3          MR. OLSHAN:  If it's relevant to the investigation,

4    Your Honor.

5          THE COURT:  Well, then ask the question in a

6    different way.

7    BY MR. OLSHAN:

8    Q.   Was the characterization of certain individuals in chapter

9    9 relevant to your investigation and how you conducted it after

10   the book was published in 2006?

11   A.   Yes, it was.

12   Q.   And which character in the book is referenced most

13   favorably?

14   A.   The case officer who was handling the Merlin asset.

15   Q.   And who was that in reality?

16   A.   Jeffrey Sterling.

17   Q.   Chapter 9 also references two specific events:  the trip

18   to Vienna and the San Francisco meeting.  Do you recall those?

19   A.   I do.

20   Q.   Relative to Mr. Sterling's time as the case officer, did

21   those events -- strike that.

22          Where do those events fall relative to Mr. Sterling's

23   time as the case officer for Merlin?

24   A.   The San Francisco meeting occurred at the beginning of

25   Jeffrey Sterling's time as the case officer for this asset and

1   operation, and the operation carried out in Vienna in

2   February-March of 2000 falls toward the end of his time as the

3   case officer.

4   Q.   The fact about the Sonoma trip, in the course of your

5   investigation, did you determine whether that was known to

6   Mr. Sterling?

7   A.   It was.

8   Q.   And the fact about the postman in Vienna, was that known

9   to Mr. Sterling?

10  A.   It was.

11  Q.   Did those facts and the additional details about the San

12  Francisco meeting and the Vienna trip influence the direction

13  of your investigation?

14  A.   Yes.

15           MR. OLSHAN:  May I have a moment, Your Honor?

16           THE COURT:  Yes, sir.

17  BY MR. OLSHAN:

18  Q.   You testified that you obtained phone records from

19  Mr. Stone; is that correct?

20  A.   Yes.

21  Q.   Were those phone records for his personal phone numbers or

22  his Senate phone numbers or both?

23  A.   I tried to obtain records for all of the numbers, both

24  his, his residence and his number at the Senate.  I'm not sure

25  that -- well, I collected some of those records in 2003 and

1    some of them later.

2    Q.   When you testified that SSCI was not cooperative as an

3    organization, did that include the lawyers for the Senate not

4    being cooperative?

5    A.   Yes.

6              MR. OLSHAN:  That's all.

7              THE COURT:  All right, recross?

8              MR. MAC MAHON:  Briefly, Your Honor.

9                      RECROSS EXAMINATION

10   BY MR. MAC MAHON:

11   Q.   Ma'am, whatever records you got from Mr. Stone, you were

12   never able to document the call that he said he got from

13   Mr. Risen right at the same time when the, after Mr. Sterling

14   had met there, correct?

15   A.   That's correct.

16   Q.   So you're not able to tell the jury how long that phone

17   call was?

18   A.   No.

19   Q.   You can't, you can't tell them what the originating number

20   was or the terminating number, correct?

21   A.   I have no records that reflect that call.

22   Q.   And that's a fact that you learned in early 2003 from

23   Mr. Stone, correct?

24   A.   No.

25   Q.   Well, how long did it take for Mr. Stone to tell you that

1   he'd spoken to James Risen?

2   A.   I did not see the memorandum that documented the call

3   until March of 2005.

4   Q.   And in March of 2005, you were still investigating this

5   case completely, right?

6   A.   Yes.

7   Q.   Okay.  And you had written about Mr. Sterling in 2003,

8   hadn't you, the same time you're telling in answer to

9   Mr. Olshan's questions that you were hearing some hearsay about

10  Mr. Sterling's lawyers?

11  A.   I'm sorry, what's the question?

12  Q.   You said you had heard some hearsay that Mr. Sterling's

13  lawyers were talking about him at the CIA, correct?

14  A.   What I said is that his attorneys went to the CIA on

15  February 24.  At that time, they did not name Jeffrey Sterling.

16  Q.   All right.  But on April 12 of 2003, you wrote a memo

17  about Mr. Sterling, and you said that it was unlikely that it

18  was Mr. Sterling who was the leak, correct?

19  A.   If I wrote that at that time, then that was based on the

20  information I had at that time.

21  Q.   Right.  You said that it's unlikely that someone who has

22  already attempted to settle an EEO lawsuit for a few hundred

23  thousand dollars would choose to attack and enrage the

24  organization from which he seeks but has not yet received a

25  settlement.

1       That's your writing, isn't it?

2   A.   I don't know.  You haven't shown me the document.

3   Q.   And you also in the same document dismiss your concerns

4   about Mr. Zaid and Krieger, correct?  You don't remember that?

5   A.   I don't know.  It was 12 years ago.

6   Q.   And in the last 12 years, you still haven't come up with

7   any proof that Mr. Sterling ever talked to Mr. Risen about

8   Classified Program No. 1 or Merlin, right?

9   A.   Correct.

10          MR. MAC MAHON:  That's all, Your Honor.  Thank you.

11          THE COURT:  All right, thank you, Agent.  You may

12  step down.

13                      (Witness excused.)

14          THE COURT:  Your next witness?

15          MR. FITZPATRICK:  Your Honor?

16          THE COURT:  Yes.

17          MR. FITZPATRICK:  The government's final witness at

18  lunch had to go and check out of her hotel room.  I don't

19  believe she has returned yet.  Perhaps we could take a short

20  break and take care of some housekeeping matters, and she'll be

21  back very, very shortly.

22          THE COURT:  All right.  Ladies and gentlemen, we --

23          MR. OLSHAN:  We could read some stipulations, Your

24  Honor.

25          THE COURT:  Why don't you read stipulations.  There

1   you go.

2        MR. OLSHAN:  I know everyone's dying to hear some

3   more.

4        THE COURT:  All right.  Did you work out any problems

5   you had with that other stipulation?

6        MR. OLSHAN:  We did.  We've got a corrected version,

7   and we will, we will enter that in.  I could read it if the

8   Court would like.  It was just that some of the phone numbers

9   were, were incorrect, and I noticed that as I was reading it.

10        THE COURT:  I don't think the jury needs to hear the

11   numbers, but I'll tell you what:  You've got the corrected

12   exhibit?  Give it right to Mr. Wood, and he'll pull the -- all

13   right, make sure that we have that.

14        MR. OLSHAN:  It is not marked with an exhibit number.

15        THE COURT:  Well, I thought it was replacing -- does

16   it not have an exhibit --

17        MR. OLSHAN:  It is.  It is, but I can put a new

18   exhibit number -- actually, I apologize, Your Honor, this was

19   not replacing anything.  This document had not been put in the

20   binders yet.

21        THE COURT:  What exhibit number do you want for that?

22        MR. OLSHAN:  This will be 175, Stip. 12, 175.

23   Stipulation No. 12 is Government's 175.

24        THE COURT:  All right, 175 is in evidence, and you

25   can hand it up now.

1    (Government's Exhibit No. 175 was received in

2  evidence.)

3    MR. OLSHAN:  This is Stipulation No. 6, which is

4  Government's Exhibit 166:  "The United States of America,

5  through its attorneys, and the defendant, Jeffrey Alexander

6  Sterling, and the defendant's attorneys, hereby stipulate and

7  agree as follows:

8    "At the request of the FBI, the National Laboratory

9  calculated that as of July 1998, the CIA had expended at least

10  $1.5 million on Classified Program No. 1."

11    THE COURT:  All right.

12    MR. OLSHAN:  Your Honor, there were two additional

13  stipulations that were attached to that particular order we've

14  discussed.  Those need to be marked as trial exhibits and read

15  in as well, and I can do that now.

16    THE COURT:  All right, any objection?

17    MR. MAC MAHON:  No, Your Honor.

18    THE COURT:  All right.

19    MR. OLSHAN:  We will do one, and the defense will do

20  the other, Your Honor.

21    THE COURT:  All right, that's fine.

22    MR. OLSHAN:  This will be Stipulation No. 13 and

23  Government's Exhibit 176.

24    THE COURT:  176?

25    MR. OLSHAN:  Yes.

1303

1       THE COURT:  All right.

2           (Government's Exhibit No. 176 was received in

3   evidence.)

4       MR. OLSHAN:  "The United States, through its

5   attorneys, and the defendant, Jeffrey Alexander Sterling, and

6   the defendant's attorneys, hereby stipulate and agree as

7   follows:

8           "From 1994 through 2009, the CIA paid Merlin and his

9   wife the following funds:  1994, $12,745.85; 1995, $112,000;

10  1996, $100,500; 1997, $88,750; 1998, $48,750; 1999, $71,000;

11  2000, $66,000; 2001, $60,000; 2002, $82,000; 2003, $78,000;

12  2004, $78,000; 2005, $60,000; 2006, $66,723.67; 2007, $72,000;

13  2008, $72,000; and 2009, $6,000."

14      I think that's it for now, Your Honor.  We'll have to

15  make a copy of this and get it into the binder.

16      THE COURT:  All right, that's fine.  Was there

17  another stipulation?

18      MR. FITZPATRICK:  No, Your Honor, but we have our

19  witness.

20      THE COURT:  The witness is here?  All right,

21  Mr. Wood, do you want to bring her in?

22      Is that Ms. Eulitz?

23      MR. FITZPATRICK:  Yes, Your Honor.

24      THE COURT:  All right.

25      MR. FITZPATRICK:  The government calls Jill Eulitz.

1            JILL EULITZ, GOVERNMENT'S WITNESS, AFFIRMED

2            MR. FITZPATRICK:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4    BY MR. FITZPATRICK:

5    Q.   Good afternoon, ma'am.

6    A.   Good afternoon.

7    Q.   I'm going to be asking you a series of questions.  If you

8    could, please, keep your voice up and speak into the

9    microphone.

10   A.   Sure.

11   Q.   If we could start, please, by please state your name.

12   A.   My name is Jill Eulitz.

13   Q.   Can you spell your last name so the court reporter can

14   take it down?

15   A.   Yes.  E-u-l-i-t-z.

16   Q.   And where do you currently work?

17   A.   I'm currently employed with Con Edison in New York as a

18   director of business ethics investigations.

19   Q.   And how long have you been in that position?

20   A.   It will be five years February 1.

21   Q.   What was your profession prior to joining Con Edison?

22   A.   I was a special agent with the FBI.

23   Q.   And how long were you with the FBI?

24   A.   I was initially employed in 1985.  I became an agent in

25   1986.  I worked mostly criminal matters from 1986 until 1994 in

Eulitz - Direct                                                    1305

1  Greensboro, North Carolina, and Chicago, Illinois, and then I

2  left the bureau for two years.  When I joined the bureau in

3  '96, I was assigned to the New York field office.  From 1996

4  until I retired in 2009, I worked Russian foreign

5  counterintelligence matters.

6  Q.   And directing your attention to your position that you

7  held right before your retirement, what was that?

8  A.   When I retired as a deputy assistant director over

9  counterintelligence administrative matters.

10 Q.   And describe for the, for the jury where you are in the

11 hierarchy of the FBI in that position.

12 A.   In that position at FBI headquarters, I reported to the

13 assistant director for all of counterintelligence operations,

14 and that assistant director reported to the director of the

15 FBI.

16 Q.   And so the primary focus of the last 13 years of your

17 career was Russian counterintelligence; is that correct?

18 A.   Yes.

19 Q.   And during the course of those 13 years, did you have an

20 occasion to gain a lot of information and intelligence about

21 the Russian Intelligence Services?

22 A.   Yes.  Specifically in New York, I was assigned to a squad

23 that that was our sole purpose was to counter the efforts of

24 the Russian Intelligence Service in the United States.  I

25 continued in that role for -- from 1996 until 1999, when I was

1   promoted to supervisor at FBI headquarters.  As a supervisor at

2   FBI headquarters, my role expanded to include the operations

3   across the United States, overseeing different programs

4   countering the Russian Intelligence Service.

5           I was promoted back to squad supervisor into New York

6   in 2002.  I was a squad supervisor overseeing our operational

7   activities targeting the Russians from 2002 until 2005, when I

8   was promoted to an assistant special agent in charge.

9           For a few months, I was the assistant special agent

10  in charge in the New York office, overseeing administrative

11  matters for the whole office.  Then they moved me back to the

12  counterintelligence program, where I oversaw our

13  counterintelligence programs, some of them for the rest of the

14  world for a few months, and then for the, about a year, Russian

15  intelligence matters.

16          Then I was promoted -- I don't know if I'm going too

17  fast but --

18  Q.   No, that's fine.

19  A.   In 2008, then I was promoted to a section chief, which is

20  a senior executive service in the FBI.  I was a section chief

21  over the Russian program, responsible for our operations across

22  the United States, and then I was promoted to the deputy

23  assistant director job in 2009.

24  Q.   When you were a field agent beginning in 1996 in the

25  Russian counterintelligence area, did you have an occasion to

1    participate in debriefings of Russian individuals for

2    intelligence-gathering purposes?

3    A.   Yes.   I wasn't the main person face to face, but we were

4    part of the debriefings with monitoring what was going on as

5    far as, as the Russians were being debriefed.

6    Q.   And then as you progressed into the supervisory ranks and

7    then to the deputy director position, did you oversee those

8    intelligence-gathering activities?

9    A.   Yes.

10   Q.   And did you have occasion to analyze the reports that were

11   produced from those intelligence-gathering activities?

12   A.   Yes.

13   Q.   During your professional career in this area, did your

14   work also include performing damage assessments of Russian

15   breaches of U.S. intelligence?

16   A.   Yes, absolutely.   Unfortunately.

17   Q.   I want to direct your attention to chapter 9 of a book

18   entitled *State of War*.   Have you read that?

19   A.   Yes, I have.

20   Q.   And have you read it recently?

21   A.   Yes.

22   Q.   And did the government, did we ask you to read that book?

23   A.   Yes, you did.

24   Q.   And was there -- after reading that book, was there

25   something that you paid particular attention to in that book?

1   A.   Yes.  Based upon my career and knowledge of the Russian

2   Intelligence Service, what was -- what brought my attention as

3   far as that chapter 9 is concerned is identifying the Russian

4   scientist as working for U.S. intelligence, being directed

5   operationally, targeting another country.

6   Q.   Based on your experience in this field, how would you

7   assess how the Russian government or the Russian Intelligence

8   Services would react to learning about the Russian scientist in

9   chapter 9?

10  A.   The Russian government in my experience would consider the

11  scientist a traitor.  They would do everything that they could

12  to do their own damage assessment to try and identify who this

13  person was, to try and identify what information he had, what

14  access to information he had.  They would consider all of that

15  information given to the U.S. intelligence.

16         They would try and restrict others from traveling and

17  from us having access to them.  They would --

18  Q.   When you say "others," who do you refer to?

19  A.   Other scientists, the Russian scientists perhaps assigned

20  even to that same facility.

21  Q.   So the Russians would inhibit their own scientists from

22  traveling outside of Russia?

23  A.   Yes.

24  Q.   What other methods would the Russian Intelligence Services

25  or the Russian government employ that would stifle U.S.

Eulitz - Direct                                                      1309

1   intelligence-gathering capabilities?

2   A.   What they might do is change the way that they conduct

3   their business, the way that they protect their information,

4   access that we would have or potential access to their

5   scientists in overseas locations.  They would also look to

6   retaliate against the United States for doing -- for recruiting

7   this person and using him in an operation, and they would

8   potentially look to find him since he would be considered a

9   traitor, bring him back to Russia, and prosecute him.

10  Q.   And do you have an opinion as to the potential harm faced

11  by the Russian scientist described in chapter 9, do you have an

12  opinion as to the harm faced by him today?

13  A.   Yes.  I would think based upon the past behavior of the

14  Russian Intelligence Service, that he would be in harm's way.

15  Q.   And can you explain why?

16  A.   Yes.  Because he is considered a traitor to them by

17  cooperating with U.S. intelligence, they would want to bring

18  him back home, prosecute him, imprison him.  Depending on what

19  other information they have, if they identify him, to

20  corroborate who he is, what he did, what he had knowledge of,

21  and he would definitely be in harm's way.

22  Q.   In terms of the Russian Intelligence Service's

23  perseverance or their ability to stay focused on particular

24  individuals, do you have an opinion with respect to that, that

25  perspective?

1  A.   Yes.  The Russian Intelligence Service is very patient,

2  much more so than the United States, our counterparts, us.

3  They're much more patient in that they will take their time,

4  they will be deliberate, and they will continue to pursue for

5  as many years as it takes.

6           MR. FITZPATRICK:  The Court's indulgence for one

7  moment?

8           Ms. Eulitz, I don't have any further questions for

9  you at this time.  Thank you.

10          THE COURT:  All right, who's cross-examining this

11 witness, if anyone?

12          MS. HAESSLY:  I am, Your Honor.

13          THE COURT:  All right.

14                      CROSS-EXAMINATION

15 BY MS. HAESSLY:

16 Q.   Good afternoon, Ms. Eulitz.

17 A.   Good afternoon.

18 Q.   My name is Mia Haessly.  I'm one of the attorneys for

19 Mr. Sterling.

20          The Russian scientist who is described in chapter 9,

21 are you aware that he has ever been identified because of this

22 book?

23 A.   No, I'm not.

24 Q.   And has he ever been prosecuted, imprisoned, taken back to

25 Russia?

1   A.    I don't know that.

2   Q.    Are you aware of any harm that's ever come to him as a

3   result of this book?

4   A.    I am not aware.

5   Q.    And I believe the Russian scientist was, actually worked

6   for the Soviet Union; is that correct?

7   A.    I'm sorry, could you repeat that?

8   Q.    The Russian scientist in the book was, he had worked for

9   the Soviet Union?

10  A.    I really don't know his past, just what was in chapter 9.

11  Q.    And when did the Soviet Union collapse?

12  A.    In '91.

13          MS. HAESSLY:  No further questions.

14          THE WITNESS:  Thank you.

15          THE COURT:  Any redirect?

16          MR. FITZPATRICK:  Nothing further, Your Honor.

17          THE COURT:  All right, thank you, Ms. Eulitz.  You're

18  finished as a witness, and you're excused.

19          THE WITNESS:  Thank you.

20                      (Witness excused.)

21          THE COURT:  All right, are there any other witnesses

22  the government plans to call right now?

23          MR. TRUMP:  Not in our case-in-chief, Your Honor.

24          THE COURT:  All right.

25          MR. TRUMP:  We have a right for rebuttal, and as is

1312

1   normal practice, we would like to check with the clerk and make

2   sure our exhibit list compares with yours.  To the extent that

3   we may have forgotten a stipulation or something, we would

4   certainly request leave to check first before we officially

5   rest.

6           THE COURT:  All right, that's fine.  Thank you.

7           All right, Mr. MacMahon?

8           MR. MAC MAHON:  Your Honor, we have a motion.

9           THE COURT:  Approach the bench.

10          (Bench conference on the record.)

11          THE COURT:  Lookit, I know you want to make a Rule 29

12  motion, all right?

13          MR. MAC MAHON:  We do, Your Honor.

14          THE COURT:  Have you got one witness?

15          MR. MAC MAHON:  Yes, Your Honor.

16          THE COURT:  All right.  That witness is an

17  out-of-town witness.  Let's put the witness on now.  You're

18  not -- you're reserving your right to make the Rule 29

19  argument, and we'll do that once the jury is done for the day,

20  all right?  So you have one witness.

21          How many rebuttal, if any, witnesses do you-all have?

22          MR. OLSHAN:  If the witness -- who is the witness?

23          MR. MAC MAHON:  Mr. Gilby.

24          THE COURT:  Gilby.

25          MR. OLSHAN:  We have no rebuttal witnesses in that

1313

1    case.

2          THE COURT:  All right, so let's do this:  Let's

3    finish the evidence.  I'm going to send the jury home.  We'll

4    hear your argument, and then depending on what happens as a

5    result of that, we'll do the jury charge, we're all set, all

6    right?

7          MR. MAC MAHON:  That's what we were going to suggest,

8    Your Honor, so that's fine with the defense.

9          THE COURT:  All right, that's fine.  All right?  All

10   right.

11         (End of bench conference.)

12         THE COURT:  All right, ladies and gentlemen, as I

13   indicated to you, we are definitely on schedule.  The

14   government has rested.  That means the government believes they

15   have presented all of the evidence that they need.

16         The defense is going to be calling some evidence --

17   putting on some evidence now, so we're going to start the

18   defendant's case, all right?

19         Who's calling this witness?

20         MR. POLLACK:  I am, Your Honor.

21         THE COURT:  All right, Mr. Pollack.  And that's -- go

22   ahead.

23         MR. POLLACK:  Mr. Sterling will call Mr. Gilby.

24         THE COURT:  Gilby.

25         MR. POLLACK:  Yes.

1           HOWARD M. GILBY, DEFENDANT'S WITNESS, AFFIRMED

2                        DIRECT EXAMINATION

3    BY MR. POLLACK:

4    Q.   Mr. Gilby, can you please state your full name and spell

5    your last name.

6    A.   Okay.  Howard M. Gilby, G-i-l-b-y.

7    Q.   And, Mr. Gilby, what, what city and state do you live in

8    presently?

9    A.   I live in St. Louis, Missouri.

10   Q.   And what do you currently do for a living?

11   A.   I'm retired, but I have a small construction company that

12   does renovation work.

13   Q.   And were you living in Missouri in 2003?

14   A.   Yes, I was.

15   Q.   And did you have a daughter by the name of Lora Dawson?

16   A.   Yes, that's right, my youngest daughter.

17   Q.   And was she also living in Missouri in 2003?

18   A.   Yes, she was.

19   Q.   And in 2003, did someone come to live in the Dawson -- in

20   your daughter's house?

21   A.   Yes.  Jeff Sterling came in, I think, in the, in the fall,

22   August-September, somewhere in there.

23   Q.   Jeffrey Sterling?

24   A.   Jeffrey, yeah.

25   Q.   Do you see Mr. Sterling in the courtroom today?

1    A.    I'm sorry, sir?

2    Q.    Do you see Mr. Sterling today?

3    A.    Yes.

4    Q.    Can you point him out?

5    A.    Right here (indicating).

6            THE COURT:  The witness identified Mr. Sterling.

7            MR. POLLACK:  Oh, Your Honor, I wanted to, I wanted

8    to say that for the record.  I never got to do that.

9    Q.    And what is it that -- why was it your understanding that

10   Mr. Sterling was staying in your daughter's house?

11   A.    It's my understanding that he --

12           MR. OLSHAN:  Objection, Your Honor.  This calls for

13   hearsay.

14           THE COURT:  Is this being offered to explain

15   something this man has done, or is this offered for the truth

16   of its contents?

17           MR. POLLACK:  It is not being offered, offered for

18   the truth, merely to explain Mr. Gilby's actions that are

19   relevant here.

20           THE COURT:  Then it's not hearsay, so I'll overrule

21   the objection.

22           THE WITNESS:  As I understand it, he had some

23   problems with his employment and at the time was unemployed and

24   asked to stay and was helping her with her granddaughter, who

25   was born in May then.

1    BY MR. POLLACK:

2    Q.   And did Mr. Sterling have a bedroom in the house that he

3    used?

4    A.   Yeah.  My daughter's home has a bedroom with a bath

5    attached in the lower level, in the basement, and the rest of

6    the basement is finished, has a laundry area and that sort of

7    thing.  So it's, it's a nice place to stay.

8    Q.   And who lived in the house at that time?

9    A.   Who was in the house at that time?

10   Q.   Yes.

11   A.   My daughter, her husband, and Bailey, her daughter.

12   Q.   And Mr. Sterling --

13   A.   And Mr. Sterling.

14   Q.   And Mr. Sterling was the daughter -- your granddaughter's

15   caregiver, correct?

16   A.   Yes, he was.

17   Q.   And did Mr. Sterling have a computer in the bedroom that

18   he used?

19   A.   Well, there was a computer station in that room, and there

20   was a computer there.  It's one I'd given her before.

21   Q.   The computer that was in the room Mr. Sterling was staying

22   in was a computer that you had given to your daughter?

23   A.   Yes, that's what I understand.  It's the one I had given

24   her, yeah.

25   Q.   But before you gave her that computer, did you wipe it

Gilby - Direct                                                        1317

1    clean of all the data that was on it?

2    A.   Well, I was trying to think back whether I had wiped

3    everything clean.  I, I had quite -- I had attempted to make

4    sure there was -- we had some financial data on there.  We had

5    some planning programs, and we had a program that drew floor

6    plans and that sort of thing.  I probably took, I probably took

7    them all off or tried to take them all off.  I'm not that

8    skilled with taking these things off the machines.

9    Q.   But you tried to delete that stuff?

10   A.   I tried to delete that stuff, yeah.  So I gave her a

11   machine that wasn't a bunch of junk on there that she couldn't

12   run or didn't need to run.

13   Q.   Now, when you had the computer, what use did you make of

14   the computer?

15   A.   Well, we kept our company books on there.  We had --

16   through Quicken -- I think Quicken was on there, one of the

17   standard software packages.  We had -- I think I had Chief

18   Architect, which is a drawing program that did floor plans, had

19   some Excel programs to keep track of things, and I had some,

20   pretty much what you, any business would have on these

21   machines.

22        I had -- there was a word processing program.  We

23   kept our letters and all that sort of stuff on there that we,

24   we used.  Now, we transferred those over to other -- you know,

25   transferred them over to another program -- another computer.

1   Q.   Now, in addition to the software packages that you were

2   using in your business, did you from time to time look at

3   various pieces of commercially available software to consider

4   whether or not they would be of value to you in your business?

5   A.   I tended to try to find better drawing programs, better

6   scheduling programs to use, and I would sometimes download

7   those or send for them or that sort of thing and evaluate them.

8   I didn't have much success in finding things I really thought

9   were good.

10  Q.   And specifically, do you recall looking at and considering

11  using a commercially available software program called Merlin?

12  A.   Yeah.  I, I can't remember why I downloaded that or got

13  that program.  It's a scheduling program, a Gantt, charged as

14  Gantt, charged in project management, that sort of thing.  I

15  did play with that for a while and wasn't -- I shouldn't say

16  wasn't that impressed with it, but I just -- I did remember the

17  name because it's a catchy name, and the -- I've forgotten the

18  names of some other programs I downloaded that weren't exciting

19  news, but that one I remember.

20            MR. POLLACK:  I don't have any other questions.

21  Thank you.

22            THE WITNESS:  Okay.

23            THE COURT:  Mr. Olshan?

24                       CROSS-EXAMINATION

25  BY MR. OLSHAN:

Gilby - Cross                                                         1319

1   Q.   Good afternoon, sir.  My name is Eric Olshan.  I'm one of

2   the attorneys for the government in this case.  I just have a

3   couple questions for you.

4   A.   Would you speak a little louder?  My hearing aids aren't

5   picking up very well.

6   Q.   Absolutely.  Is that better?

7   A.   That's better.

8   Q.   Mr. Gilby, you testified that this particular computer you

9   gave to your daughter was yours before you gave it to her; is

10  that right?

11  A.   As I recall, that is one I gave her.  We, we tend to turn

12  our machines over every two or three years, and I gave her, I

13  gave her -- I just gave her one last year.  I remember giving

14  her one at around that time.

15  Q.   When you gave her the computer -- when you had the

16  computer, did you use it to e-mail people?

17  A.   As a matter of fact, probably did.  It was, you know, we

18  just do the stuff that we all do, you know.

19  Q.   Do you know someone named James Risen, a *New York Times*

20  journalist?

21  A.   Only from what I've read in the last few weeks and --

22  Q.   When you had that computer, Mr. Gilby, did you send any

23  e-mails to James Risen?

24  A.   No, I didn't.  I didn't even know him then.

25  Q.   So you didn't send --

Gilby - Cross                                                        1320

1   A.    In fact, I've never known the man.  I just know from what

2   I've seen from the discussions about this, this trial here.

3   Q.    So you didn't send any e-mails to jrisen@aol.com; is that

4   correct?

5   A.    No.

6   Q.    Or jrisen@newyorktimes.com, correct?

7   A.    No.

8   Q.    And did you ever use an e-mail address that was

9   jeffreys@hotmail.com?  Is that an e-mail address you used?

10  A.    No.

11  Q.    What about jsthe7th.com?  Was that an e-mail you used?

12  A.    No.  I never e-mailed -- hotmailed at all.

13  Q.    So if there were e-mails on that computer between those

14  e-mail addresses, you wouldn't know anything about that; is

15  that correct?

16  A.    No, I would not.

17            MR. OLSHAN:  No further questions.

18            THE COURT:  Any redirect?

19            MR. POLLACK:  No, Your Honor.

20            THE COURT:  All right, thank you, Mr. Gilby, for your

21  testimony.  It was a long trip for about five minutes, but we

22  appreciate your being here.

23                      (Witness excused.)

24            THE COURT:  All right, counsel, you need to approach

25  the bench.

1          (Bench conference on the record.)

2          THE COURT:  Actually, I need Mr. Sterling next to

3   you.

4          Mr. Sterling?  Mr. Sterling, I want to make sure for

5   the record, I assume your attorneys have discussed with you

6   your right to testify if you want to during this trial.

7          THE DEFENDANT:  Yes, Your Honor, they have.

8          THE COURT:  All right.  And you've consulted with

9   them about your options?

10         THE DEFENDANT:  Yes, I have, Your Honor.

11         THE COURT:  All right.  And I assume you're electing

12  not to testify; is that correct?

13         THE DEFENDANT:  That is correct, Your Honor.

14         THE COURT:  All right.  In any way, do you feel

15  you've been forced or pressured into that position?

16         THE DEFENDANT:  No, I have not, Your Honor.

17         THE COURT:  And you're making it with the advice of

18  counsel?

19         THE DEFENDANT:  Absolutely.

20         THE COURT:  You are an attorney?

21         THE DEFENDANT:  Yes, I am.

22         THE COURT:  All right, I think that's a sufficient

23  finding for the record.  The defendant is voluntarily and

24  knowingly waiving his right to testify, all right?  I will,

25  obviously, give the jury instruction that he made that

1322

1   decision.

2           All right, I'm going to let the jury go home then.

3           MR. MAC MAHON:  If I may, one thing, Your Honor?

4           THE COURT:  Yeah.

5           MR. MAC MAHON:  We haven't looked back through all

6   the --

7           THE COURT:  On your exhibits?

8           MR. MAC MAHON:  We haven't looked at the documents to

9   see if --

10          THE COURT:  We'll take care of that.  Let's get the

11  jury home.

12          MR. MAC MAHON:  Yes, Your Honor.

13          THE COURT:  Now, I'm going to tell the jury I have a

14  plea at 9:00 unrelated to this case.  Because the jury's been

15  so good and we're way ahead of schedule, what I'm going to do

16  is have them come at ten tomorrow morning, and what we're going

17  to do tomorrow morning is the two closing arguments.  We'll

18  close the case before lunch.  We'll have a lunch break.  I'll

19  instruct them after lunch, and they'll have the case for

20  deliberation tomorrow afternoon, all right?

21          So what I want to do after we take a brief break now,

22  I'm going to send the jury home, tell them to come back at ten.

23  I'm going to take ten minutes to pull the jury instructions

24  together.  The first thing I'll do is hear your argument.

25          I assume you didn't prepare a brief or anything?

1    MR. MAC MAHON:  We have a brief, Your Honor, but

2  there's a little more than what's just in the brief.

3    THE COURT:  I'll give you a chance to argue the case,

4  argue the Rule 29 motions, and then depending upon what happens

5  as a result of that, we'll do a charging conference.  So when

6  you go home tonight, you'll know what the charge looks like.

7  It's my practice, at some point this evening, I'll send you the

8  charge, so you'll have it physically with you tomorrow morning.

9    If there are any last-minute issues about the charge,

10  you've got between 9:30 and ten tomorrow morning to bring them

11  to my attention so we don't waste the jury's time.  So you-all

12  need to be here.  If there's no issue, you don't have to be

13  here until ten.  If there is an issue, you need to let my

14  chambers know.  We're here by 7:30 in the morning.  You can

15  reach us and let us know, and then we'll hear you right after

16  the plea, okay?

17    MR. MAC MAHON:  Yes, Your Honor.

18    MR. POLLACK:  Thank you.

19    THE COURT:  We'll send the jury home.

20    (End of bench conference.)

21    THE COURT:  All right, ladies and gentlemen, we have

22  now concluded all the evidence in this case.  What I'm going to

23  do because it takes a fair amount of time to get the case set

24  up for the very last two stages, which are the closing

25  arguments and then making sure all the evidence is in order so

1   that when you get the case to deliberate, you have all the

2   correct evidence, and I need to make sure that all of the

3   instructions are typed and ready for you.  So I'm actually

4   letting you get home early tonight.  I'm sure none of you will

5   be too upset about that.

6          Tomorrow, just so you know what the schedule is for

7   tomorrow, I would like you here at 10:00, you'll have a little

8   bit later start time, and what we're going to do first thing

9   tomorrow morning is you're going to hear the closing arguments

10  of counsel.  I've given each side approximately one hour.  So

11  that's going to be the morning session.

12         Now, it's not my plan to give you a morning break

13  since you're starting a little bit late.  So the plan is we

14  will have closing arguments tomorrow morning.  Then you'll get

15  your lunch break.  When you come back from lunch, I will then

16  give you the instructions.  They take -- in this case, they're

17  going to take a bit of time, so I want you, you know, well fed,

18  relaxed, and fresh.

19         And that means you will get this case to begin your

20  deliberations sometime mid-afternoon tomorrow, which is

21  Thursday.  Because you have the case at that point, in terms of

22  your schedule on Friday, unless it's a problem for any of you,

23  and I don't think we have any weather to worry about the rest

24  of the week and we avoided any problems today, I would like you

25  to plan to be here at 9:30 Friday morning unless you want to

1    come earlier.  Once you start deliberating, you can set your

2    own schedule.  If you-all want to start at 9:00, that's also

3    fine, but you've been on a 9:30 schedule, and my experience is

4    most jurors sort of get into a pattern they kind of like.

5         But in any case, Friday morning, there's no reason

6    why you can't start as early as you want because I will be

7    doing other matters unrelated to this case in this courtroom,

8    but at any point, if you need to interact with the Court, we'll

9    stop what I'm doing here and bring you back in, all right?  So

10   that you can plan your schedule for the next two days

11   accordingly.

12        It's extremely important that you continue to follow

13   my instructions about not conducting any investigation.  Don't

14   be thinking about the case.  Don't call or e-mail each other

15   about it.  Don't in any respect start deliberating because you

16   have not heard the closing arguments or the Court's

17   instructions.  So just continue doing what you've been doing,

18   and we'll see you back here at 10:00 tomorrow morning, all

19   right?

20        I'm going to take a ten-minute break to let everybody

21   get things reset, and then we'll go and make sure that all the

22   exhibits are in.  We can take care of that once I come back on

23   the bench, all right?  Thank you, ladies and gentlemen.

24             (Recess from 2:55 p.m., until 3:13 p.m.)

25                  (Defendant present, Jury out.)

1    THE COURT:  All right, I think the first order of

2  business should be to make sure that the exhibits are in

3  evidence.  My practice normally is to have Ms. Guyton simply

4  slowly read the exhibits which our records show are in

5  evidence, all right?

6    Mr. Olshan?

7    MR. MAC MAHON:  Your Honor, may I stand?  I'm sorry.

8    THE COURT:  Whatever make you comfortable.

9    MR. MAC MAHON:  Thank you, Your Honor.

10    MR. OLSHAN:  Your Honor, one issue did come up during

11  our discussions before that I'd like to flag before we go

12  through all of them, if that's all right?

13    THE COURT:  All right.

14    MR. OLSHAN:  I had had discussions with counsel for

15  Mr. Sterling about not moving into evidence certain documents

16  concerning the defendant's EEO litigation, his civil

17  litigation, because there was a dispute -- the Court may or may

18  not recall this -- there was a dispute when Mr. Sterling filed

19  his lawsuit in SDNY as to whether the complaint contained

20  classified information, and there was a back-and-forth in

21  letters between counsel for Mr. Sterling at the time and the

22  CIA about whether there was classified information in that

23  complaint.

24    Counsel for the defense suggested because that was

25  resolved in a way where it's unclear whether there was, the

1327

1    defense doesn't like the inference that he may have done it.

2    We acceded to that.

3          The issue is we realized just now that one of those

4    documents that referenced the potential classified nature of

5    his civil complaint also at the bottom of it memorializes that

6    the CIA was rejecting his most recent settlement offer.  That

7    fact is something that, frankly, we would not have agreed not

8    to put in had we realized this at the time.

9          So we've asked the defense if they would be willing

10   merely to stipulate that the settlement offer that is extended

11   in an exhibit that is in evidence, which is 66, was rejected on

12   a particular date, which would take this whole classified issue

13   and any documents related to it off the table.  My

14   understanding from the defense is they are not prepared to

15   stipulate to that fact.

16         THE COURT:  Mr. MacMahon or Mr. Pollack?

17         MR. POLLACK:  I think it's my issue, Your Honor.

18         THE COURT:  What's the exhibit number?

19         MR. POLLACK:  There are a number of exhibits that the

20   government had asked if we would have objections to if the

21   government offered them, and we had indicated that we had.  The

22   government chose not to offer them.

23         Agent Hunt testified that on October 31 of 2001,

24   Mr. Sterling was fired from the agency, and that within a few

25   days, Mr. Risen wrote his article about the New York office

1   being destroyed in 9/11.  The government now wants -- is asking

2   us to enter a stipulation to a fact that it has not elicited

3   from any witness, that on October 30, the CIA rejected a

4   settlement offer in the civil litigation.

5          It's obvious to the jury that he was fired the next

6   day and that the litigation did not get resolved, that it

7   continued, and there's --

8          THE COURT:  Well, we already have that -- that

9   evidence is in this record.  It's been testified to.

10          MR. POLLACK:  I think there's been testimony about

11   the back-and-forth.  I think what the government's asking now

12   is for us to stipulate to a new fact about a particular offer

13   and the date that it was rejected, and I don't see why it adds

14   anything and why we ought to be stipulating to new facts at

15   this point.

16          MR. OLSHAN:  Your Honor, if I may?

17          THE COURT:  Yes.

18          MR. OLSHAN:  Agent Hunt testified that on that date,

19   October 31, as reflected in a different exhibit, the defendant

20   was terminated by the CIA.  That is different than the fact

21   that the CIA also rejected his settlement offer, which was one

22   of many.

23          There's not been any testimony about that; that's

24   correct.  The only reason the government agreed not to offer

25   that exhibit was because, frankly, we were understanding of the

1329

1    defense concern about this other issue that had to do with

2    whether there was classified information in the civil

3    complaint.  We certainly would not have agreed not to put in

4    that bare fact that, in fact, this one settlement offer was

5    rejected.

6         THE COURT:  But the reality of it is you haven't

7    tried to move it in, and the case is closed.  So I'm not going

8    to reopen it at this point because that opens other cans of

9    worms.  So the case is closed, so I'll -- okay.  I

10   misunderstood.  I thought there was already an exhibit that had

11   been entered that had to be changed somehow.

12        But that brings up a point.  As you know, you have

13   been, both sides have been required to post publicly the

14   exhibits that have been entered into evidence.  We have an

15   exception for I think it's three, maybe four exhibits that are

16   not available to the public.

17        Some of those exhibits that have been now posted

18   publicly were at one time classified.  They've been

19   declassified, and my understanding is that your technical

20   person has written through the classification like a line, and

21   then there's, what, a stamp "Declassified" that's on the

22   document.  That's how they've been going out.

23        MR. OLSHAN:  That's right.

24        THE COURT:  Now, the documents that are in the

25   witness book that would be going to the jury have not been

1   treated that way, correct?  In other words -- yeah, that --

2        MR. OLSHAN:  They certainly have not.  They don't

3   have stickers on the, on the evidence binders that say

4   "Declassified," no.

5        THE COURT:  Well, more than that, the individual

6   documents, to the extent we have a document in the book that

7   might still have "Secret" on it --

8        MR. OLSHAN:  I believe they may have been struck

9   through.  I may be wrong on that.

10        THE COURT:  Here's my point:  I'm not taking my time

11   to do this with you-all.  Ms. Gunning is here, and you are

12   here.  Whenever it is that we recess for the day, counsel for

13   both sides, it's your responsibility working with Ms. Guyton

14   and Ms. Gunning to make sure that the physical exhibits that

15   are going to go to the jury are in the proper format, all

16   right?  That's not an issue I want coming back.  Neither side

17   should want that coming back, all right?

18        So there will be three or four exhibits that will go

19   to the jury with the proper covers indicating that they are

20   still classified.

21        Now, one thing that's missing from the pack of jury

22   instructions that you-all gave me, it was, I think, possibly in

23   a voir dire question but we didn't have to ask it, was a

24   direction to the jury about how to handle these documents.  So

25   I'm going to take that early voir dire question that you had

1    and have to rearrange that into a question -- into an

2    instruction to the jury to tell them as to those three or four

3    exhibits, they have not been declassified, and therefore, once

4    this case is over, they can't be discussing them or reveal

5    their contents, all right?

6           And I assume the defense doesn't object to that.

7           MR. POLLACK:  Your Honor, I certainly don't have any

8    objection to that instruction.  I do have an objection to those

9    documents getting the red cover sheet with the word "Secret."

10   Similarly, how we did not do that with the exhibit books, if

11   they're going to be marked "Secret" and the jury is going to be

12   told they're secret and the jury is going to be told that they

13   need to return them, I think that is more than enough in making

14   those stand out for the jury as somehow being more important or

15   different than the other -- all the other documents in this

16   case, to then on top of that put the cover sheet, I think, is

17   just too much and more than is needed.

18          THE COURT:  My understanding is that's how they have

19   to be handled.  I will simply, though, I'll have to fashion an

20   instruction telling them they're not to draw any special

21   inference from the fact they have a cover on them.  That's just

22   to enable us to quickly retrieve them.  I'll make it a little

23   more benign than that.  And you'll have -- that's one of the

24   instructions look for tonight.  I don't have that one written

25   yet, all right?

1332

1   MR. POLLACK:  Thank you, Your Honor.

2   THE COURT:  All right.

3   MR. TRUMP:  Your Honor, perhaps it would expedite

4   things if we simply have an instruction that except for those

5   three exhibits, all of the other exhibits and documents have

6   been now unclassified as a result of their use in a public

7   trial, and that any markings or words, "Secret," whatever, that

8   were on the documents have no effect in terms of their present

9   classification.

10  THE COURT:  Well, even if that's the case, I think

11  that the record of this case needs to be consistent with what

12  may have been out publicly, and so --

13  MR. TRUMP:  No question, but we can do that when

14  we're done, but the way they saw the documents during the trial

15  and the way they were published is the way they're in the books

16  now.  They can be told that none of these documents remain

17  classified; therefore --

18  THE COURT:  Is the defense comfortable handling it

19  that way?

20  MR. MAC MAHON:  That's fine, Your Honor.

21  THE COURT:  Is it fine?  All right.  Why don't you

22  craft that for me, all right?

23  MR. TRUMP:  That's fine, Your Honor.

24  THE COURT:  All right.

25  MR. TRUMP:  I just don't want them to be surprised by

1333

1    seeing something --

2              THE COURT:  -- that's different from what they saw.

3              MR. TRUMP:  From what they saw up on the screen.

4              MR. MAC MAHON:  If I may, Your Honor?

5              THE COURT:  Yeah.

6              MR. MAC MAHON:  Other than as to the other

7    instruction you were talking about, about not drawing any

8    inference from the red paper or whatever else it is, so I think

9    we would need both.

10             THE COURT:  Right.  I'm still going to do mine, and

11   Mr. Trump is going to do his.

12             MR. MAC MAHON:  All right.

13             THE COURT:  All right?  And again, Mr. Trump, I need

14   that as soon as possible so that I can get it in the packet,

15   because, you know, they have to be ready to go tomorrow, all

16   right?  Okay.

17             All right, let me hear -- unless there's any other

18   housekeeping matters, I'm going to assume at this point all the

19   evidence is in that you expected to be in, all right?  So let's

20   just get the motions taken care of at this point.

21             MR. MAC MAHON:  Thank you, Your Honor.  Your Honor,

22   we do have a brief memo that was prepared and which I can hand

23   up to the Court.  I've already given a copy to the United

24   States.

25             THE COURT:  All right.

1      MR. MAC MAHON:  Pursuant to Rule 29, Mr. Sterling

2  moves for a judgment of acquittal on Counts 1 through 9, Your

3  Honor.  The first basis, which is not in the motion, we'll kind

4  of go backwards, the obstruction of justice count --

5      THE COURT:  That's Count 10.

6      MR. MAC MAHON:  That's Count 10, Your Honor.  1

7  through 9 on venue purposes, but obstruction of justice I

8  specifically want to address and note to the Court that an

9  obstruction count in this case is particularly poisonous for

10 Mr. Sterling because it's added to the case to make it look as

11 if there was some consciousness of guilt in that when he got a

12 subpoena, he went and did something he wasn't allowed to do.

13 So I think the Court needs to look at this very carefully.

14      The exhibit that we saw in evidence, which was the

15 actual subpoena, does not request that he preserve any records

16 of his contact with Mr. Risen whatsoever.  Agent Hunt even on

17 cross-examination admitted that the CNN article and the

18 communication with Mr. Risen had nothing to do with his work

19 whatsoever.

20      So there is no way that by deleting that e-mail, even

21 if that's what the jury thinks happened, that that could rise

22 to the level of obstruction of justice because what we have is

23 the document has got to be construed against the government,

24 the actual list of what's asked for, and if you go through the

25 list -- and I don't have the exhibit number before or after,

1   Your Honor, but there's -- I'm sure we can come up with the

2   exact exhibit number, but when you look at the list of what he

3   was told not to destroy, you'll see that.

4          And I would also add with respect to that, Your

5   Honor, that the preservation letter went out in April, not by

6   July, when this happened.  So there isn't even any evidence in

7   the record as to when this was deleted relevant to the actual

8   subpoena itself.  The subpoena is in June so --

9          THE COURT:  I think it's Exhibit 139.

10         MR. MAC MAHON:  Yes, Your Honor.  I -- we didn't have

11  this written up as -- so -- exactly, Your Honor.  They could

12  have been destroyed anytime after the peak in May -- the

13  service, but either way, it's not even requested.  So we can, I

14  mean, I think it's important, the government's got to put on

15  some evidence that would be, would let that charge go to the

16  jury.  It's not a -- there's no venue issue on the obstruction

17  because of the grand jury here in Virginia.

18         THE COURT:  Correct.

19         MR. MAC MAHON:  I understand that, but I don't think

20  that -- and again, I think it's highly unfair to put that issue

21  to the jury based upon a complete lack of evidence that's

22  before you.  There's no other evidence of obstruction by

23  Mr. Sterling whatsoever.  In fact, the 404(b) evidence that we

24  looked at are classified documents in his possession that he

25  didn't destroy, so when the search warrant is executed on his

1    house, those documents are still there, and so that's another

2    basis for that.

3            With -- and also with respect to Count 8, which is

4    mail fraud, Your Honor, this is not a mail fraud case.  I

5    really don't, I don't think that the government has made any --

6    put on any evidence that would support the elements of the

7    offense of a scheme or artifice to defraud anybody in a way

8    that use of the mails -- I don't think we heard evidence of any

9    mailing other than by Simon & Schuster whatsoever, that Simon &

10   Schuster may have shipped books down to Virginia.  That can't

11   really be Mr. Sterling's responsibility as a criminal basis.

12           The, the other evidence was this FedEx receipt that

13   Agent Hunt talked about, and she was very clear in her

14   testimony that there was no way to tell whether that had

15   anything to do whatsoever with this case at all.

16           So really, every element of 18 U.S.C. 1341 is

17   lacking, and that charge, I think, was just brought because of

18   the venue issues with respect to the other charges.

19           THE COURT:  All right, let me stop you there and have

20   the government respond to those first two arguments first.

21           Mr. Olshan?

22           MR. OLSHAN:  Your Honor, I'll go in the order that

23   Mr. MacMahon went in.

24           THE COURT:  Yeah.

25           MR. OLSHAN:  So as to the obstruction count, there is

1    no dispute that the grand jury -- on its face, that grand jury

2    subpoena was from the Eastern District of Virginia.  That makes

3    it clear there was a grand jury investigation here.

4            What's important about the service of that subpoena

5    is not so much what it calls for but that it puts the defendant

6    on notice that the FBI is investigating.  There was testimony

7    that the article that was deleted was from three-and-a-half

8    years before the snapshots were made.  The testimony was that

9    the defendant, while he was employed by the CIA, worked on

10   Iranian matters and nuclear matters.  That's been the subject

11   of this entire trial.

12           It's very clear, certainly viewing the evidence in

13   the light most favorable to the government at the Rule 29

14   stage, that by receiving a grand jury subpoena in the middle of

15   those two snapshots, the defendant was on notice that he was

16   being investigated or that there was a grand jury

17   investigation.

18           THE COURT:  All right, I think there's enough to let

19   this case go to the jury on this count.  The, the fact that the

20   document was in his e-mail in March and then disappears the

21   second time -- between the first and the second look-ats, and

22   the timing of all this, that the subpoena comes in the middle

23   of that, I think is enough circumstantial evidence to let the

24   case go to the jury.

25           And I do think that the document itself, the rider,

1    it says "any and all."  That's pretty expansive.  It certainly

2    doesn't have to specify with Mr. Risen.  "Any and all

3    documents" is a very broad request for documents, so I don't

4    think that the defendant's argument that the failure to specify

5    Risen's communications undercuts the strength of that argument.

6    So I'm going to deny the motion as to Count 10.

7              How about Count 8?

8              MR. OLSHAN:  Count 8 is the mail fraud count, Your

9    Honor.  I'll start with the actual mailing.  There was a

10   stipulation, I read it today, as to the shipment of the books

11   into the Eastern District of Virginia from New Jersey.

12             As the Court knows, the actual jurisdictional element

13   for purposes of mail fraud just needs to be reasonably

14   foreseeable to the person who executes the scheme to defraud.

15             THE COURT:  But how were they shipped?

16             MR. OLSHAN:  By a commercial carrier.

17             THE COURT:  How does that constitute mail fraud?

18             MR. OLSHAN:  It can be by a, by the U.S. Postal

19   Service or by a commercial carrier, and it's alleged that way,

20   Your Honor.

21             THE COURT:  As U.S. Mails or interstate carrier?

22             MR. OLSHAN:  Correct.

23             THE COURT:  Let me look.

24             MR. OLSHAN:  For -- I will go ahead and apologize for

25   not having a case at the ready, but for purposes of mail fraud,

1  I believe the law is fairly clear that it does not need to be

2  by the United States Postal Service.  It can be by --

3          THE COURT:  -- a private or commercial interstate

4  carrier.

5          That's how you've alleged it in the --

6          MR. OLSHAN:  Right, correct.  This is page 26 of the

7  indictment.

8          THE COURT:  Right.  And here you've got section 2.

9          MR. OLSHAN:  Yes.

10         THE COURT:  And I didn't get overnight an aiding and

11  abetting instruction.

12         MR. OLSHAN:  Correct.

13         THE COURT:  All right.

14         MR. OLSHAN:  I can address that.

15         THE COURT:  All right, you're reading the code book.

16         MR. OLSHAN:  Mr. Trump has handed me the code book,

17  and in the statutory text for 1341, it says, "or deposits or

18  causes to be deposited any matter or thing whatever to be sent

19  or delivered by any private or commercial interstate carrier,"

20  and so the stipulation was that they were, that they were

21  shipped by interstate, by commercial carrier from New Jersey to

22  the Eastern District of Virginia.

23         THE COURT:  All right.

24         MR. OLSHAN:  As to the scheme or artifice to defraud,

25  the evidence is that the defendant through the course of his

1    career executed multiple secrecy agreements and SCI

2    nondisclosure agreements where he was obliging himself not to

3    disclose, not to co-opt to the CIA's property, which is all of

4    the information he came into possession of during the course of

5    his employment.

6            By executing those agreements, he was defrauding the

7    CIA to the extent that he would later break them.  He was

8    saying, "I'm going to abide by these," and he didn't.  So he

9    was leading the CIA to believe, "I understand my oath," and so

10   the scheme is that by doing that, he was able to defraud the

11   agency out of the property, which is its --

12           THE COURT:  But he had to have an intent to defraud

13   at the time he entered those statements, those agreements.  I

14   think the mail fraud is a real stretch as a matter of law.  Do

15   you have any cases that have used that theory for this type of

16   a fact pattern?  I mean, because essentially, this is a case of

17   improper disclosure of classified information, misuse of

18   government property, you know, retaining government property,

19   but fraud is different.

20           Every time a person, you know, misuses their

21   employer's property doesn't mean there's a fraud that's been,

22   happened, and if the basic argument is that the fraud occurs

23   when he signs these agreements that he will not divulge the

24   government's secrets and then later on years down the road he

25   divulges the secrets, I don't know how that could support a

1341

1        scheme.

2               MR. OLSHAN:  Your Honor --

3               MR. TRUMP:  One moment, Your Honor?

4               MR. OLSHAN:  So, Your Honor, the reason why the

5        defendant was granted access to the information in the

6        documents both in this program and in all of his other

7        assignments during the entire tenure he was at the CIA was

8        because he had made that oath.

9               So from 1993 through when he was ultimately finally

10       finished at the CIA in January of 2002, the CIA was under the

11       impression that this man was obliging, was honoring his secrecy

12       agreement.  Prior to his departure from the CIA, this operation

13       took place, and in order for him to have the document that he's

14       alleged to have had, that occurred in 2000.  We have evidence

15       that he was in possession of other documents even after he left

16       the CIA.

17              The fact is that if the CIA had known that this man

18       was intent on not abiding by his secrecy agreements, he would

19       not have been allowed access to these programs during the time

20       from '93 to 2002.

21              THE COURT:  But the problem is there's no evidence in

22       this case that at the time he signed those initial

23       nondisclosure agreements, there was any intent or plan on his

24       part to violate those agreements.  Events occurred many years

25       after the fact, and then he had possibly a motive and possibly

1    did these other acts.

2            No, the mail fraud count I just don't think fits

3    these facts, and no one's given me a case or a pattern where

4    this type of theory has been used, and in my experience, I've

5    not seen a mail fraud count used under this type of a fact

6    pattern.  You've got enough counts going to this jury.  They've

7    been attentive, and your case is not going to get made or

8    broken on Count 8 so --

9            MR. OLSHAN:  Just for the record --

10           THE COURT:  Yeah.

11           MR. OLSHAN:  -- one last point, Your Honor:  An

12   individual can be convicted of mail or wire fraud when there

13   have been material omissions as well as affirmative

14   misrepresentations.

15           THE COURT:  That's correct.

16           MR. OLSHAN:  And so when somebody who is under an

17   ongoing obligation to bring to the attention of people with

18   whom he works that he has an intention to do something to

19   disclose something, that's a material omission, and so part of

20   the case in this, in this prosecution is that the defendant

21   disclosed the existence of that New York office.  That occurred

22   prior to his departure.

23           And so the government -- it's not just that he signed

24   certain agreements.

25           THE COURT:  But that's not what you've charged in

1   Count 8.

2            MR. OLSHAN:  One moment, Your Honor.

3            THE COURT:  You've only discussed Author A's book for

4   commercial retail.  The scheme is to knowingly cause to be

5   delivered by the U.S. Postal Service or any private or

6   commercial interstate carrier, blah, blah, blah, blah, blah.

7   You don't have it there.  It's not there, so I'm going to grant

8   the motion as to Count 8.

9            MR. MAC MAHON:  Thank you, Your Honor.

10           And, Judge, I would argue the sufficiency of the

11  evidence on the -- we'll just do all the 793 cases now, issues,

12  but specifically in the brief that I've sent to you, that we've

13  delivered to you is the issue of whether the government has

14  proven venue at all.  We've proposed an instruction to you --

15           THE COURT:  I don't think your instruction is right.

16           MR. MAC MAHON:  Excuse me?

17           THE COURT:  I don't think your instruction is right.

18  I gave you my venue instruction, which I think is a better

19  statement of the law.  If any act in furtherance of a crime

20  occurs in a district, then that district does have venue.

21           MR. MAC MAHON:  We were citing you, Your Honor, in

22  your opinion in this case in the grand jury subpoena against

23  Verizon.

24           THE COURT:  No, actually, this is coming from

25  O'Malley.  O'Malley --

1    MR. MAC MAHON:  The proposed instruction -- I'm

2  sorry, Your Honor.

3    THE COURT:  Go ahead.  I gave you a copy of what I

4  think is the proper proposed instruction, but the government is

5  correct.  I mean, all there needs to be is one act that

6  furthers the crime occurring in a district, so as you know, I

7  mean, there's a case where they used the Federal Reserve Bank

8  of Richmond, right?  One transaction occurred through that

9  bank.  That's enough to give venue in this district.

10    MR. MAC MAHON:  I understand, Your Honor.

11    THE COURT:  Now, whether there's -- whether the

12  evidence is here, I'll hear you argue that, all right?

13    MR. MAC MAHON:  Okay.  Just for the record, Your

14  Honor --

15    THE COURT:  All right.

16    MR. MAC MAHON:  -- the way we read your court order

17  in this case was that the government needed to have Mr. Risen

18  testify because they had to prove beyond a preponderance of the

19  evidence that Sterling was in the Eastern District when he

20  disclosed the national defense information to Mr. Risen.

21  That's where we, we got this instruction.

22    And I think that -- and this is a strange statute,

23  793, and one of the elements is plainly disclosure or receipt

24  of the information.  One of those two things obviously could

25  happen in the same place, but we think that if this is the

1   instruction you're going to give, we would object to that as

2   well because I think the jury needs to be instructed that they

3   have to find that the disclosure or the receipt of the evidence

4   took place in this district.

5           Otherwise, it could be that the harm -- you could

6   bring this case anywhere where the CIA could come forward and

7   say, well, the harm to the United States happened in all 50

8   states.

9           THE COURT:  No, not the harm.  An act.  There has to

10  be an act in furtherance of the crime to give you venue.

11          MR. MAC MAHON:  Well, I've made my -- I understand

12  your ruling, Your Honor.

13          THE COURT:  All right.  Let me hear from the

14  government, though, because there's no use in the Court giving

15  an incorrect statement of the law.  It comes back to haunt

16  after the fact.

17          MR. TRUMP:  One moment, Your Honor.

18          MR. OLSHAN:  Your Honor, having just gotten the

19  Court's instruction, we, we agree with that instruction, but

20  again, we'll take the Court up on the Court's offer that if

21  there's anything that we, that we in discussing this later

22  decide we need to flag for the Court, we will do that by first

23  thing tomorrow morning, but as we sit here, we think this is an

24  appropriate instruction.

25          THE COURT:  Well, I'm just now looking at the

1  defendant's brief.  They are citing some, some case law from

2  the Fourth Circuit.  Let's see, the *Bowens* case.  It says there

3  venue on a count is proper only in a district in which an

4  essential, an essential conduct element of the offense took

5  place.

6          I don't think that's the law any longer.  Now, again,

7  there may be some special venue statutes that I'm not aware of

8  for these particular offenses, but I do know in I think it was

9  a wire fraud case that I had, and I don't know if any of

10  you-all were the prosecutors on that one, but it was a case

11  where the only connection to the EDVA was the use of a server

12  in this district as part of the communications.  That's all.

13  And that was enough, as I recall, with the Fourth Circuit.

14          And I know there's -- it might have been in the

15  *Ebersole* case, where we had a fraud count, and I think the

16  venue for that was because one of the Federal Reserve -- the

17  Federal Reserve was used in Richmond, and it got it in the

18  Eastern District of Virginia.  I mean, there's Fourth Circuit

19  case law, I know, addressing venue with some very, one might

20  think, ephemeral connections to the district, but the

21  connection is that part of the instrumentality of committing

22  the crime involved activity in the district.  It might not have

23  been the -- it might not have been, you know, the key or most

24  dramatic events, but activity in the district did occur, and

25  that was enough for venue.

1     So I think that proposition is correct the way I've

2  written it in that instruction, but if you find case law to the

3  contrary, let me know, all right?

4     MR. OLSHAN:  Along those lines, Your Honor, we would

5  note, and I think this is relevant for some of the other issues

6  as well, that the statutory language for 793 contains the

7  word "causes," and so therefore, in order to meet the statutory

8  definition, it would, it would be sufficient that any causative

9  act occur in the relevant district.

10     THE COURT:  I'll let you two -- I'll let you research

11  that, but, I mean, right now, on that argument -- now, the

12  secondary question, though, is evidence, evidence of venue, all

13  right?

14     MR. MAC MAHON:  And if I may, Your Honor, I make this

15  just for the record, that same argument on the retention count,

16  that the essential element would be retention in this district.

17  With respect to the Court's ruling, I just want to put that on

18  the record.

19     With respect to evidence of venue, Your Honor --

20     THE COURT:  Argue the retention issue in terms of

21  venue.

22     MR. MAC MAHON:  There has to be some evidence that

23  Mr. Sterling retained some document that's been charged in this

24  case here in the Eastern District of Virginia.  Unlawful

25  retention, and frankly, I think for the conveyance charge, too,

1348

1      that he would have had to -- he could have conveyed it in some

2      other district, but there's no evidence of that, but for that

3      charge to lie here, there would have to have been some evidence

4      of possession of the property in the first place and/or

5      conveyance afterwards.

6            You know, in this case, Judge, there's no AOL

7      evidence as to the servers.  The government didn't put on

8      evidence that these e-mails from Mr. Risen back and forth went

9      through Virginia or anything.  There's no classified

10     information that's even referenced in any of those e-mails, so

11     they can't make the argument that the Court made here because

12     I'm sure it was put on through expert testimony.

13           But with respect to venue, for either one of those

14     two counts, whether it's a charge of retention or conveyance of

15     government property, I guess this goes together.  I mean,

16     Special Agent Hunt was very clear they don't have any evidence

17     of where these things happened.  It couldn't have been any more

18     clear.  They don't know where it happened.  They don't know

19     where he disclosed anything.  They don't know what he

20     disclosed.  They have no evidence that Mr. Sterling even had a

21     copy of the letter, Your Honor.

22           He's charged with the letter that's published in the

23     book *State of War*, and Agent Hunt admitted they have no

24     evidence of when he got it, where he kept it, or anything.

25           And when the jury hears that, and that's the state of

1   the government's case, to allow it to go forward even on the

2   elements of the retention of others is really a too far stretch

3   because they're being asked to guess, and there's a, there's a

4   line between an allowable inference and an actual speculation

5   or a suggestion that something may have occurred, especially in

6   a case as serious as this.

7           So both of those arguments in that regard, Your

8   Honor, I think, are made.

9           THE COURT:  All right, Mr. Olshan or Mr. Trump?

10          MR. TRUMP:  On the document issue, Your Honor, the

11  evidence in the case is that Robert S. and the defendant and

12  Merlin conferred on the creation of a letter.  They went back

13  and forth.  A copy of the letter is in one of the final cables

14  prior to the Vienna operation.

15          Robert S. in a cable communicated, suggested changes

16  to Mr. Sterling to confer with Merlin to make those changes.

17  Merlin testified that he made the final changes and he gave a

18  copy of the letter to the defendant about two weeks prior to

19  his departure to Vienna.  He puts a copy of the letter with the

20  final changes in the defendant's hands.

21          THE COURT:  In New York.

22          MR. TRUMP:  In New York.  New York was destroyed in

23  9/11.  To the extent that there is, there was any physical

24  paper copy of anything, it had to be removed from New York

25  prior to 9/11.

1       Where did the defendant go?  He moved to Virginia.

2  The only place he could have stored that document was at his

3  home in Virginia.  When you take all the inferences in the

4  light most favorable to the government, that's the only place.

5  He didn't have an office at the CIA anymore.  The only place he

6  could have kept that document was at his home.

7       The next place where he lived, in Missouri, is where

8  he kept whatever other documents he had from the CIA, he kept

9  them at his home.

10      So I think the logical inference that can be drawn

11  particularly with respect to a preponderance standard is that

12  that's where that letter resided before it was given to the

13  reporter, Mr. Risen.

14      THE COURT:  I think it's enough because the

15  preponderance standard is much less than the proof beyond a

16  reasonable doubt standard.  I'll deny the motion as to Counts 3

17  and 9.

18      And is it the same venue argument as to the remaining

19  counts?

20      MR. MAC MAHON:  Yes, Your Honor, just the added twist

21  that again -- Your Honor, by the way, nobody said that

22  Mr. Sterling even left New York with this letter, but with

23  respect to the disclosures, there isn't any evidence at all of

24  a disclosure.  They don't get to say, use their 404(b) for

25  that, but there's no evidence that Mr. Sterling ever met with

1    Mr. Risen, again, very clear testimony from Agent Hunt, that he

2    ever met with him at all in Virginia, that he disclosed

3    anything to him in Virginia.

4           And these brief phone calls where the agents say they

5    don't have any idea what was discussed on those phone calls,

6    there's three or four phone calls when he's in Virginia, but

7    the jury can only speculate on what happened on those phone

8    calls.  That can't possibly be enough for this to go forward,

9    and it also isn't even enough of a phone call to transfer any

10   information.  We know from looking at the book that there was a

11   lot more information.

12          You have about, I don't have the exhibit in front of

13   me, maybe it's two minutes, three minutes of phone calls in

14   Virginia from Mr. Sterling to Mr. Risen's house, and there's

15   no, no evidence whatsoever -- and also, because nobody ever,

16   the government never even asked Mr. Risen, there's no evidence

17   of what was ever talked about on there.

18          So they can't draw an inference from the fact that

19   there was a document in Maryland on this one, and they really

20   just don't have any evidence.  It's insufficient as a matter of

21   law even as to the, beyond the venue argument as to whether the

22   charge should go forward even in the light most favorable to

23   the government.

24          THE COURT:  Because the jury is allowed to make

25   conclusions based on circumstantial evidence and they are

1    allowed to make reasonable inferential calls and there's enough

2    smoke in this case that I think it can properly go to the jury,

3    so I'm going to deny the motion on the other counts, and we'll

4    see what the jury does with the case, all right?  All right, so

5    that's the case.

6           Now, let's go to the charge itself.  So I'm going to

7    take out, obviously, those instructions that relate to the mail

8    fraud.

9           And let's start with the government's proposed

10   verdict form.  Is there any objection to the verdict form?

11   Obviously, we'll amend it so that Count 8 comes out.

12   Anything -- I hope you-all looked at it carefully.

13           MR. MAC MAHON:  Your Honor --

14           THE COURT:  I'm going to -- I'm sorry, I'm going to

15   take off of the verdict form the listing of the counts under

16   criminal number.  We don't need that on the verdict form.

17           MR. TRUMP:  We will remove that from the verdict

18   form, Your Honor.

19           THE COURT:  All right.  And Count 8 needs to come

20   out.

21           Was there anything -- I think the rest of it is

22   clear.  Now, you know, the verdict form itself doesn't

23   differentiate the specifics of each count, but because the jury

24   instructions are going to go into the jury room and in the

25   explanation of the charges, because I double-checked this, the

1    government does have the date and the specifics as to each

2    count, so the jury, if they take those instructions with the

3    verdict form, should be able to sort out what we're talking

4    about, all right?

5              But, Mr. MacMahon, did you-all get a chance to really

6    look at this carefully?

7              MR. MAC MAHON:  Yes, Your Honor.  I don't think that

8    the list of the charges needs to go at the top.

9              THE COURT:  Right.  We're going to take that out.

10             MR. MAC MAHON:  This part's going to come out.  Then

11   we don't object to the verdict form, Your Honor.

12             THE COURT:  All right.

13             MR. TRUMP:  I just want to note that in reviewing the

14   instructions last night and taking out the headers and the

15   footnotes, we gave you a packet as they existed before, but I

16   also handed to your clerk a suggestion for the definition of

17   "NDI" in terms of the national defense information defined.

18             THE COURT:  Go ahead.  And?

19             MR. TRUMP:  And in the first paragraph, which reads,

20   "For Counts 1, 2, and 4 through 7, the term 'information

21   relating to the national defense,'" included the

22   phrase "including matters relating to the nation's intelligence

23   capabilities."  That's out of *Gorin*, *Boyce*, *Truong*, *Rosen*.

24             All of those cases discuss the fact that national

25   defense information is not limited to military matters, but I

1    think -- I don't want to misquote Judge Ellis, but I think his,

2    his quote from his written decision was that it includes all

3    matters relating to foreign policy and, and intelligence.

4            So I think just adding that phrase, "may reasonably

5    be connected with the national defense of the United States

6    against any of its enemies, including matters related to the

7    nation's intelligence capability," is consistent with the law.

8            THE COURT:  All right.  Does defense want to address

9    that, Mr. MacMahon?

10           MR. MAC MAHON:  Yes, Your Honor.  The form

11   instruction is sufficient.  A lot of these instructions are

12   leading, are kind of leading the jury to a certain position.

13   The term "national defense information" describes itself.  I

14   don't think it's necessary for you to add to the instruction

15   things that expert witnesses have said here or otherwise

16   because --

17           THE COURT:  Well, we're not.  It's what other

18   colleagues have said, and it's been not reversed by the Fourth

19   Circuit, but I think because the word "defense" is in that

20   heading, it could mislead the jury, and they do need to

21   understand that it doesn't just affect the military.  It also

22   does relates to intelligence sources.

23           So, I mean, you know, I don't think it's a

24   misstatement of the law, and I think it helps clarify things

25   for the jury.  If it's wrong on the law, you need to make sure

1    you've told me.

2              MR. MAC MAHON:  No, it's wrong on the law in the

3    sense that we're describing what the statute, what the statute

4    reads, and then we're adding words to it in the sense that

5    tailors itself to what the government thinks it's put on in its

6    case.  That's what I --

7              THE COURT:  All right.

8              MR. MAC MAHON:  It's not a misstatement of law.  I

9    just don't think that it's necessary, and it's unduly

10   prejudicial as it indicates.

11             THE COURT:  Mr. Trump?

12             MR. TRUMP:  I could just -- I have the quote from the

13   *Morison* case and the *Rosen* case, and Judge Ellis summarizes

14   *Morison* and *Truong* and says, "The phrase 'information related

15   to national defense' has consistently been construed broadly to

16   include information dealing with military matters and more

17   generally with matters relating to the United States foreign

18   policy and intelligence capabilities."

19             THE COURT:  Yeah, I'm going to let it -- I'm going to

20   keep that in.  That's not an improper statement of law.

21             All right, there was an objection to the government's

22   definition of "possession," and again, is "possession" a term

23   of art in these statutes any different from any other criminal

24   statute?

25             MR. MAC MAHON:  Can we go back, Your Honor?

1          THE COURT:  I'm sorry.

2          MR. MAC MAHON:  I'm sorry, but in the definition of

3  "national defense information," and I think you were looking at

4  the government's exhibit, the last sentence says, "Finally, a

5  person 'not entitled to receive' NDI can include the press or a

6  member of the press."  I haven't --

7          THE COURT:  I can leave that out.  That's not part of

8  the definition.

9          MR. MAC MAHON:  Okay.  Thank you, Your Honor.

10         THE COURT:  I mean, all right, we'll strike that from

11 it, okay?

12         All right, now, there was an objection by the defense

13 to the government's proposed possession instruction, and my

14 question is why are we not just using the standard instruction

15 for possession?

16         MR. MAC MAHON:  Your Honor, I'm sorry, what

17 instruction is that?

18         THE COURT:  The number?  You objected to it, so --

19         MR. MAC MAHON:  I know.  I can't tell.

20         MR. OLSHAN:  It's 8.  8, Your Honor.

21         THE COURT:  No. 8?  I took your numbers off.  My

22 problem is I pulled it out of my set because I didn't like it,

23 either.

24         MR. MAC MAHON:  Yes, Your Honor.  Our objection is

25 that the standard instruction would be fine.  This goes into

```
 1   too much theory of the government's case as to what constitutes

 2   possession.

 3           THE COURT:  Now, the only thing is that we're

 4   really -- at no point are we talking joint possession in this

 5   case.  We're talking actual or -- actually, we're just talking

 6   actual construction, aren't we?

 7           MR. MAC MAHON:  That's all I understand, Your Honor.

 8           THE COURT:  Who's addressing possession?  Mr. Olshan?

 9           MR. OLSHAN:  Your Honor, I think the definition of

10   "lawful possession" and "unauthorized possession" are important

11   to keep in here.  They are terms that appear in the statute as

12   to whether the defendant lawfully possessed information versus

13   unlawfully possessed a document or tangible item, so it is

14   necessary to instruct the jury as to the distinction between

15   "lawful possession" and "unauthorized possession," and in order

16   to discuss either of those, you have to get into who is

17   permitted to have possession of this type of information, and

18   that's individuals with a need to know.  That's what the 793

19   offenses get at.

20           MR. MAC MAHON:  Just briefly, the evidence in this

21   case, Your Honor, is that after maybe it's May 1 of 2000,

22   Mr. Sterling was not authorized to have any of this

23   information.  So the government has to prove that he actually

24   possessed this information at some point in time after he

25   was -- so to get into all these -- the actual facts of the case
```

1   are actual possession that had to have continued past the time

2   he was allowed to have it, there is no argument that he had a

3   need to know after that date.

4          THE COURT:  Well, actual possession basically is the

5   person who knowingly has direct physical control over a thing

6   at a given time.  That's actual possession.  So we -- that does

7   need to be in that definition.  That's the core of the

8   possession instruction.

9          MR. OLSHAN:  May I have a moment to confer with my

10  colleagues?

11         THE COURT:  Yeah.

12         MR. OLSHAN:  Your Honor, as we read it, lawful

13  possession does need to be changed.  Half of the counts that

14  are 793 counts deal with the defendant's unauthorized

15  disclosure of information.

16         Obviously, when you leave the employment of the CIA,

17  you cannot purge your brain of information that you know.  It's

18  retained there, and you are in lawful possession of it so long

19  as you don't disclose it in some unauthorized fashion.

20         So the definition as it currently reads does need to

21  be changed because "lawful possession" does not mean possession

22  of classified information by a person who holds an appropriate

23  security clearance and has a need to know.  That's not the case

24  when somebody leaves their employment with the CIA or anywhere

25  else.  They are still in lawful possession of it regardless of

1    whether they had the sufficient clearance.

2            So that the definition should be something more akin

3    to "lawful possession" means possession of classified

4    information that a person obtained while they held the

5    appropriate security clearance and had the need to know.

6            THE COURT:  We're going to get into a degree of

7    complexity here because we're talking both information in the

8    head and physical documents, two different types of

9    information.  So I want both sides to sit down and think about

10   this, but the possession instruction needs to be redrafted.

11   I'll take a crack at it as well, all right?  Okay.

12           MR. MAC MAHON:  Thank you, Your Honor.

13           MR. TRUMP:  I assume, Judge, there's no debate that

14   information can be possessed.

15           THE COURT:  Of course.

16           MR. TRUMP:  That's not the issue.

17           THE COURT:  No, that's not the issue.

18           MR. TRUMP:  That's been well settled in terms of the

19   case law for decades, that you can possess classified

20   information.  It doesn't have to be a tangible possession.

21           THE COURT:  Correct.

22           MR. MAC MAHON:  The difference here, Judge, is there

23   are charges dealing with tangible evidence.

24           THE COURT:  It's both.  It's both.

25           MR. MAC MAHON:  Yes.

1    THE COURT:  That's the problem.  There's a tangible

2  evidence charge, and then there's just information.

3    MR. OLSHAN:  Right.  So that's why the distinction

4  does make a difference, and just giving a possession charge

5  might not provide the jury with the appropriate instruction as

6  to the fact that there is a distinction between lawful

7  possession and unlawful possession.  Lawful possession deals

8  with information.  Unlawful possession deals with tangible

9  items such as a letter that the defendant retained when he

10  left.

11    THE COURT:  Well, again, we're here to try to help

12  the jury reach an appropriate decision in light of the correct

13  law and facts, and so it doesn't help if you give me a

14  muddled-up instruction.

15    MR. OLSHAN:  Well, we agree.

16    THE COURT:  So we need to get that one clarified.

17    While you're on your feet, Mr. Olshan, what about

18  this aiding and abetting issue?  Because again, you've got

19  Section 2, I think, in every one of these counts.

20    MR. OLSHAN:  Your Honor, we're not asking for a

21  specific aiding and abetting instruction.  The only utility to

22  Section 2 in this case would be 2(b), which is the causation

23  prong, when you willfully cause an innocent intermediary to

24  effectively complete the crime.  Because 793, as I mentioned

25  before, already has in its statutory language causes, there's

1   no need to provide a separate instruction on Section 2(b).

2            THE COURT:  All right, does the defense agree with

3   that?

4            MR. MAC MAHON:  Well, Your Honor, I don't know how

5   Mr. Risen has gone as far as he is now to he's completely

6   innocent of involvement in this.  The charge of mailing the

7   book, I mean, I know that's out of it now, but the receipt of

8   all this information, the jury will hear, was, was a crime in

9   and of itself if Mr. Sterling wasn't authorized to release it,

10  but if the government is totally giving up on that Mr. Sterling

11  aided and abetted any crime and then can't use the acts that

12  Mr. Risen undertook, that would be the -- it would be

13  abandoning Mr. Risen as a player in determining the guilt in

14  this or innocence on any one of these charges, because I don't

15  understand why it was in there in the first place if Mr. Risen

16  isn't considered to have been, the term was inextricably

17  involved in these crimes.

18           So I'm not sure I understand the answer.  Is the

19  government abandoning any possibility that Mr. Sterling

20  assisted Mr. Risen in committing a crime?

21           THE COURT:  That's not -- no one has argued the case

22  this way.  I mean, that wasn't in either side's opening

23  statement, that Risen himself committed any crime.

24           MR. MAC MAHON:  That would be -- but if he aided and

25  abetted, he'd have to aid and abet somebody who did commit a

1    crime.

2            THE COURT:  Correct.  Look, the government didn't

3    actually use the language "aid and abet."  I just noted,

4    however, you've cited to that section in all these counts in

5    the indictment, and I wanted to make sure, I mean, you have the

6    right as the agency bringing the case to dismiss or to reduce

7    the charges.  If you were telling me you're dismissing the "and

8    to" portion of the charges, that's fine.  It's dismissed, and

9    we don't need to get into aiding and abetting.

10           MR. MAC MAHON:  That's fine, Your Honor.

11           THE COURT:  All right?

12           MR. OLSHAN:  Your Honor, just to be clear --

13           THE COURT:  If the statute says "causes," if within

14   793 it says "and causes something to be the case," then you've

15   got it within the statutory language of the principal offense,

16   and you don't need a separate aiding and abetting instruction,

17   nor did you need to even cite to that section when you indicted

18   the case.

19           MR. OLSHAN:  That's correct.  As the Court is aware,

20   even if there were a true aiding and abetting theory in the

21   sense that Mr. Risen would have been participating in the

22   crime, you still don't even have to cite Section 2 for it to be

23   instructed.

24           Here any Section 2 theory was causation, which is

25   2(b), not 2(a).  So the Court is correct.  Nobody has argued

1363

1    that Mr. Risen was a participant in the crime; rather,

2    Mr. Sterling caused Mr. Risen to communicate this information,

3    and that is contained in Section 793, and the causation

4    instruction that we submitted accounts for that.

5             THE COURT:  And therefore, I don't need a 2(b)

6    instruction.

7             MR. OLSHAN:  That's exactly right, Your Honor.

8             THE COURT:  Excellent, all right.

9             MR. OLSHAN:  I think they're quite similar, but there

10   does not need to be a separate one.

11            THE COURT:  All right.  And I don't believe the

12   causation one was a problem for the defense, correct?

13            MR. MAC MAHON:  I did these objections a couple

14   nights ago, Your Honor; I'm sorry.

15            THE COURT:  That's all right.

16            MR. MAC MAHON:  I think we did object to the

17   instruction as it was written.  I don't have my objections

18   here.

19            THE COURT:  All right, you don't have a set?

20            MR. MAC MAHON:  Not of the objections.

21            THE COURT:  Well, all right, we'll print one out for

22   you so you've got it, but let me -- I want to go through your

23   objections now so that we don't have an issue down the road,

24   and I want to, I want to focus primarily on the specific

25   instructions.  This would be on page 3 of your objections.

1    I told you yesterday I was not going to grant your

2  request to not instruct on the nature of the charges, and you

3  raised that with, with all of them.  That's -- the standard

4  practice in this court is to give some kind of instruction as

5  to nature of the charges, and I told you the alternative to

6  that was sending in the indictment, which I know you don't want

7  the Court to do, correct?

8    MR. MAC MAHON:  That's correct.

9    THE COURT:  All right.  So we're going to go ahead,

10 and I think the government's brief summary of each count was

11 sufficient.  That's what they submitted, and I intend to go

12 with what they submitted.  So those objections are overruled.

13    Then you had an objection to 8.  I think we've just

14 addressed that one, but let me just make sure.  That's

15 possession.  So we're working on possession.  So that objection

16 is, it's fine.  We're going to work on that.

17    You objected to No. 9, which was the national defense

18 information.  We've been through that one as well.  I'm

19 striking the reference in the last sentence to the press, and

20 we are adding the intelligence information that was submitted.

21 So 9 has been taken care of.

22    With 10, reason to believe, your only objection to

23 that is you think it misstates the law and it's unduly

24 suggestive of guilt.  I think "reason to believe" is part of

25 the language in the, in the charging document.  That does have

1    to be explained to the jury.

2         So why is it a misstatement of the law?  What law do

3    you have that suggests that that's a misstatement?

4         MR. MAC MAHON:  Your Honor, I think the objection is

5    just to the last paragraph.  The reason to believe is a common

6    term that I've seen before, but the government does not have to

7    prove, that could be used both to, that kind of language, we've

8    got at lot of this in these instructions where they're telling

9    the jury what they don't have to find, which is what, what I've

10   objected to as we go along.

11        The jury should be instructed what they do have to

12   find and not led away in other directions.  It's obviously

13   adapted from the model jury instruction.  The model would be

14   fine.

15        THE COURT:  Let me take a look.  The problem is that

16   I pulled them out of order because I -- I don't know why the --

17   I mean, the explanation of disjunctive versus conjunctive, I

18   think, is proper, but there's no issue in this case about a

19   non-enemy country being involved.  I mean, the whole question

20   has been Iran and Russia, right?  And so I don't know why we

21   need that last sentence starting with "Further."

22        You have no objection to the first paragraph.

23        MR. MAC MAHON:  No, Your Honor.

24        THE COURT:  All right.

25        MR. MAC MAHON:  I think that's the form.  I think

1366

1    that's from the model.

2            THE COURT:  What's the defense response --

3    government's response to that?

4            MR. OLSHAN:  I'm sorry, Your Honor, the defense's

5    objection was just to the second sentence?

6            THE COURT:  It's -- well, they have a problem in

7    particular with, I think, the last sentence of the second

8    paragraph, "Further."

9            MR. MAC MAHON:  The last two sentences, Your Honor, I

10   think is what I said.

11           THE COURT:  The law two sentences.  The first two

12   sentences in the second paragraph are correct.  "The statute

13   reads in the alternative, so proof of either will suffice," and

14   then the first sentence, you know, explains what the two

15   alternatives are.

16           MR. OLSHAN:  Right.  That's fine, Your Honor.  The

17   statute does say "foreign nations," so it's enough to leave it

18   at that without breaking into --

19           THE COURT:  Fine.  So I'm getting rid of the -- that

20   instruction is going to go as is, with the last two sentences

21   starting with the word "Further" to the end is stricken.

22           All right, Mr. Pollack?

23           MR. POLLACK:  I'm in agreement with that.  I have a

24   slightly separate point to make.  If the jury is going to be

25   instructed they can find either or, then they should also be

1   instructed that they have to be unanimous on which one they

2   find.

3          MR. OLSHAN:  No.  Your Honor, many statutes are

4   charged in the disjunctive, and there's not a standard

5   instruction that they must agree as to the specific means

6   establishing -- excuse me, many -- yes, that's right.

7          THE COURT:  Well, we can make a special verdict form

8   and see what they find.  I mean, that's the other option on

9   that one, although I don't think -- unless you've got case law

10  that they have to be unanimous as to which one they find, I

11  think I'm going to leave it as is, because as a normal course

12  of business, you don't have to tell the jury.  You do for overt

13  acts in a conspiracy, they have to be unanimous on the, on

14  the -- or do they?  They don't have to be unanimous on the

15  overt act, do they, in a conspiracy charge?

16         MR. TRUMP:  They just have to have unanimously

17  decided there's at least one overt act.

18         THE COURT:  That an overt act, yeah.  That would be

19  consistent with finding either alternative.

20         MR. TRUMP:  There's no case law that suggests as to

21  this type of element, that a special verdict is necessary.

22         THE COURT:  Yeah.  No, we're going to leave it as is.

23  All right, okay.

24         Then the next objection was to 10, which I think is

25  willful, right?  I lost your numbers when I started redoing

1368

1    these, yeah.

2          MR. OLSHAN:  I think we may have just finished 10.

3    10 was reason to believe.

4          THE COURT:  Okay.

5          MR. POLLACK:  11 is willful.

6          THE COURT:  Okay.  And they've objected to 11 as

7    well.

8          MR. MAC MAHON:  "Willfully" is a term you use all the

9    time in instructing jurors, Your Honor.  This additional

10   language -- I'm sorry, Your Honor, can I sit down?

11         THE COURT:  Yes, whatever makes you comfortable.  I

12   can hear you.

13         MR. MAC MAHON:  I'm sorry.  But the in deciding

14   willfully, you may consider all the evidence introduced at

15   trial, including any evidence concerning the classification

16   status of information.

17         THE COURT:  Yeah, you're right; that shouldn't be in

18   there.  That's coming out, all right.

19         And again, 12 was the nature of offenses, so that's

20   not going in.  13, 14, 15, there was no objection.

21         16.  All right, now, we've already defined "national

22   defense information," so I don't think that's a problem, right?

23         MR. OLSHAN:  I'm sorry, which instruction, Your

24   Honor?

25         THE COURT:  Well, I think I have the right number.

1    Again, as I said, I got rid of these numbers.  Instruction

2    No. 16, what's your 16?

3           MR. POLLACK:  Willful retention, the definition of

4    "willful retention," Your Honor.

5           THE COURT:  The next one, all right.  Willful

6    retention, all right.  And what is the problem with that?

7           MR. POLLACK:  Okay.  The first sentence in this,

8    well, I guess it's the entirety of the second paragraph, it's

9    the same issue we just dealt with.  It's about classification.

10   There's already a separate instruction on classification.

11          THE COURT:  All right, so that whole paragraph should

12   come out.

13          MR. POLLACK:  Agreed, Your Honor.

14          THE COURT:  Second paragraph.

15          MR. POLLACK:  And then in the third paragraph, the --

16   nothing -- no objection to the first sentence, which is

17   repeating what's already been instructed, but I do object to

18   the last portion, the "Unlike."  Again, highlighting what the

19   government does not have to prove as opposed to simply

20   instructing what they do have to prove for this count, there's

21   no need to do a compare and contrast of the different counts.

22   The jury will have the instruction for each count.

23          So I, I would ask Your Honor to just strike

24   everything from "Unlike the intent element" forward.

25          THE COURT:  I think this is necessary to distinguish

1370

1    this count from the other ones because there are differences,

2    and without this, it doesn't distinguish it.

3           MR. POLLACK:  If the -- understanding the Court's

4    ruling in that regard, then I would suggest where you say,

5    "Unlike . . . for Counts 1, 2, and 4 through 7, the government

6    does not have to prove," I would insert "for purposes of Count

7    3, that the defendant," etc., so that it's clear that this

8    instruction only pertains to Count 3.

9           THE COURT:  All right, I assume the government

10   doesn't object to that?

11          MR. OLSHAN:  No, Your Honor.

12          THE COURT:  All right, that will be added to that

13   one.  All right.

14          All right, the ones about mail fraud come out.  So

15   we're moving on to the objection to property, instruction

16   No. 19?  I don't have my index here.  Hold on a second.

17          MR. POLLACK:  That still relates to the mail fraud,

18   Your Honor.

19          THE COURT:  That's right; that's out.  Then false

20   pretenses, that's out, too, right?

21          MR. POLLACK:  Correct.

22          THE COURT:  Okay.  And material is out.  "Willfully"

23   has been defined.  "Knowingly" has been defined.  Mailing is

24   out.

25          MR. POLLACK:  27, I think, Your Honor, is the next

1  one that we need to deal with.

2         THE COURT:  27?  What, the nature of the offense

3  charged?  No, I've already ruled that I'm going to allow that

4  unless you're maintaining the government's mischaracterized the

5  offense, and I don't think they have.

6         All right, thing of value was, I think, you're

7  objecting to thing of value, is that right, your objection on

8  31?

9         MR. POLLACK:  Yes, Your Honor.  It seems like this

10  instruction almost directs a verdict on this element when you

11  say, "Classified information is a thing of value to the United

12  States."

13         THE COURT:  I think that sentence should come out.  A

14  thing of value can be anything, including oral information or

15  intangible property, that has value.

16         MR. POLLACK:  Okay.  I understand.  Thank you, Your

17  Honor.

18         THE COURT:  All right?  Unless I hear a strong yelp

19  from the government, it's coming out.

20                    (No response.)

21         THE COURT:  All right.  All right, 33.

22         MR. OLSHAN:  Your Honor, 33 relates back to 25, which

23  was originally in the wire fraud set of charges.

24         THE COURT:  You mean mail fraud?

25         MR. OLSHAN:  Excuse me, mail fraud.

1372

| | |
|---|---|
| 1 | THE COURT:  All right, hold on. |
| 2 | MR. OLSHAN:  So our position would be that the full |
| 3 | knowingly instruction would need to be moved back to this |
| 4 | count. |
| 5 | THE COURT:  I'm just going to give the standard |
| 6 | instruction for knowingly, all right?  So that one shouldn't be |
| 7 | a problem. |
| 8 | Okay.  33, 34, 35. |
| 9 | Okay.  36, the essential elements of the offense for |
| 10 | obstruction of justice, the defense says that this is |
| 11 | incomplete. |
| 12 | MR. POLLACK:  Your Honor, before we get to that? |
| 13 | THE COURT:  Yeah. |
| 14 | MR. POLLACK:  34, I understand the Court's ruling |
| 15 | that it is going to give a nature of the offense instruction, |
| 16 | but in 34, the sentence in the middle that begins with, "The |
| 17 | defendant deleted this e-mail," I think should read, "The |
| 18 | defendant is alleged to have deleted this e-mail." |
| 19 | THE COURT:  Yes. |
| 20 | MR. OLSHAN:  Your Honor, it should also say "that had |
| 21 | a CNN article," not "*Newsweek*." |
| 22 | THE COURT:  I'm sorry, not *Newsweek*.  Yes, it should |
| 23 | be CNN.  And it attached as -- |
| 24 | MR. POLLACK:  Had a link to a CNN article. |
| 25 | THE COURT:  That linked to -- |

1373

1        MR. OLSHAN:  Thank you.

2        THE COURT:  -- a CNN article about the Iranian, okay.

3        All right, with those two corrections then, there is

4    no objection, correct, to the form of the instruction; is that

5    right?

6        MR. POLLACK:  Other than the objection we've already

7    made to giving a nature of the offense instruction.

8        THE COURT:  Correct.  Okay.  All right.  So that took

9    care of 34.  There was no objection to 35.

10        36, all right, you're objecting to the elements.  All

11    right, and what is the, what is the objection here?  It does

12    say "four essential elements," and you list three, so there's a

13    mistake in the instruction.

14        MR. MAC MAHON:  That was the basis for the objection,

15    Your Honor.

16        THE COURT:  So it should be three essential elements.

17        MR. MAC MAHON:  There's a form instruction that has

18    this charge, I know for sure.

19        THE COURT:  The government took this, did you not,

20    directly from a form instruction?

21        MR. MAC MAHON:  It doesn't appear to be, Your Honor.

22    It may have but --

23        MR. POLLACK:  The citation is to case law, not to any

24    form book.

25        THE COURT:  Well, I'll check the form book.  If it's,

1    if it's there, that's what I'm going to use.  All right, we'll

2    take a look at that one.

3         There was no objection to 37.  38 --

4         MR. POLLACK:  Actually, Your Honor, with respect to

5    37, again, the government gives no citation whatsoever for

6    where this is coming from.  I would have to assume there's a

7    form instruction for an official proceeding that would go along

8    with the form instruction for obstruction.  Boy, that's tough.

9         THE COURT:  Well, if not, I could almost take

10   judicial notice a grand jury investigation is an official

11   proceeding.  So do you want me to just take official notice and

12   tell the jury that?

13        MR. POLLACK:  No, Your Honor.  I don't think the

14   Court can direct a verdict of guilt on an element of the

15   offense.  I think there is a standard instruction, and that's

16   what ought to be given.

17        THE COURT:  Well, but even if there isn't a standard

18   instruction, I'm not uncomfortable telling the jury that a

19   grand jury proceeding would be an official proceeding.  I will

20   look to see if there is an instruction just to put your minds

21   at ease.

22        MR. POLLACK:  If the Court is inclined to do that,

23   then I will ask the Court to say that the jury may find that a

24   grand jury -- the Court cannot instruct the jury --

25        THE COURT:  I will look and see.  Some of these

1   instructions say, you know, official proceedings include such

2   matters as blah, blah, blah, blah, all right?  I'll take a look

3   at that one.

4           MR. POLLACK:  Thank you, Your Honor.

5           THE COURT:  All right.  And 38 you also objected to,

6   and again, you just want a form instruction.  Of course, you

7   didn't give me the form instruction, so these are not really

8   appropriate --

9           MR. POLLACK:  Well, this one, Your Honor, again,

10  there's a sentence at the end about what the government does

11  not have to prove that I don't believe is part of the form

12  instruction.  I haven't been able to look, but they cite a form

13  instruction, and they cite a number of cases, but again, the

14  first part of the instruction properly instructs the jury what

15  it does have to find.  The latter sentence says what they don't

16  have to find.

17          THE COURT:  Well, you know, some standard

18  instructions do have they don't have to prove certain things.

19  If you look at the conspiracy statute, there are a whole lot of

20  things that say the government doesn't have to prove that the

21  conspiracy was successful or that the defendant knew about it

22  at the beginning.  So it doesn't necessarily mean that this is

23  improper.

24          Mr. Olshan?

25          MR. OLSHAN:  That's exactly the point I was going to

1376

1  make, Your Honor.  Many form instructions say exactly that, and

2  that proposition is not controversial that the act of

3  obstruction is not needed to actually obstruct.

4          THE COURT:  I'm sure that's a correct statement of

5  the law.  I'll just look at the form book.  If it's slightly

6  worded differently, I'll change it.  Otherwise, it may go in

7  just the way it is, all right?

8          All right, you didn't like the causation instruction,

9  which is 39, and what specifically don't you like about the

10 causation instruction?  And this is your Section 2(b)

11 instruction.

12         MR. MAC MAHON:  Your Honor, again, I think there's a

13 form on causation here, and I just think when you get to the

14 end of this, again, more than half of the instruction is on

15 what they don't need to prove.

16         THE COURT:  All right, I will --

17         MR. MAC MAHON:  And that's a term that we use to

18 instruct juries all the time:  does not need to perform the

19 crime of unauthorized disclosure.

20         THE COURT:  All right, I'll look at it.

21         MR. MAC MAHON:  I mean, I don't know why you would

22 tell the jury that.  The whole government's case is that that's

23 what he did, that he was present, that he was aware.  I mean,

24 these are things that are reducing really the thought of what,

25 the willfulness also that needs to be proven.

1    THE COURT:  Well, this reads like a model

2  instruction.  Again, I didn't compare these to the form book,

3  but you've got here, ". . . a general suspicion that an

4  unlawful act may occur or that something criminal is happening

5  is not enough.  Mere knowledge that the unauthorized disclosure

6  of national defense information is being committed without more

7  is also not sufficient to establish causing an act to be done

8  through another."

9    So I think this reads pretty close to what that would

10  properly be.  I'll take another look at it.

11    MR. MAC MAHON:  And again, we would also ask that you

12  drop the Section 2.  Acts of another really aren't appropriate

13  in terms of what's being argued to the jury.

14    THE COURT:  Well, no, because they're saying that

15  within 793, there is cause to -- one causes it to happen.

16  Well, you cause something to happen usually because somebody

17  else or another actor has done it.  If you did it yourself, you

18  do it yourself.  If you cause it to happen, then there's

19  usually another player.

20    I'll take, I'll take a look at the instruction.

21    MR. MAC MAHON:  Just for the record, I think that

22  means if you go get somebody else, find somebody to hand the

23  information, you take it and get it out of the -- however it

24  would be done.  It doesn't -- it's not meant to be used in the

25  fashion here where we have a newspaper reporter or a book.

1378

1    It's having a coconspirator inside the circle is the way I read

2    the statute.

3          THE COURT:  Well, if Mr. Risen were not protected by

4    the newsman's privilege, I suspect he'd have been named as a

5    coconspirator.  I mean, he is the, he is the vehicle by which

6    the information went out to the general public.

7          MR. MAC MAHON:  And there is no privilege, Your

8    Honor.  That's been established.  I'd cite to this case as well

9    for that.

10         THE COURT:  Well, you're talking to the wrong

11   authority for that.  I'm on record for a different reason, all

12   right.  Anyway --

13         MR. OLSHAN:  Your Honor, just to be clear, the theory

14   is that Mr. Sterling caused Mr. Risen to communicate this

15   information to the world.  That's the causation, not somebody

16   caused a document to be taken out of --

17         THE COURT:  No, I understand that.  I understand

18   that's your theory of the case.  And as I said, I think, I

19   think that instruction is probably correct, but I will

20   double-check it.

21         All right, Instruction 40 was also objected to, and

22   that was the definition of "classified information."  What's

23   the objection?

24         MR. MAC MAHON:  Well, first of all, the jury has

25   heard about two days' worth of the definition of "classified

1    information," but there isn't an element in any, any of the

2    charges in this case at all dealing with classified

3    information.  We've asked for an instruction, lesser included,

4    Your Honor, but instructing the jury on classified information

5    would confuse them as they look to see what's national defense

6    information because, of course, one could be national defense

7    information, not be classified, and then be classified and not

8    be the adverse, and the opposite would be true either way.

9            So I think it bolsters the government's case to

10   highlight to the jury any more than they already have what is

11   or isn't classified.

12           THE COURT:  Well, I think where this ought to be used

13   is along with the elements for those offenses, not here at the

14   very end, and it seems to me that the jury should know that

15   classified information is not equivalent to national defense

16   information, although I'm not sure actually that's a correct

17   statement of the law, either.

18           MR. MAC MAHON:  I think it is, Your Honor.

19           MR. OLSHAN:  It's correct that just by virtue of

20   being classified, it does not necessarily satisfy the NDI

21   standard, but it's certainly something the jury can consider in

22   determining whether the NDI standard has been met.

23           THE COURT:  Well, the NDI standard is what degree of

24   harm, because even at the Confidential level, the definition

25   that's in the record in this case is that it could cause harm,

1    correct?

2              MR. OLSHAN:  Correct.

3              THE COURT:  All right.

4              MR. OLSHAN:  I believe that the language for the

5    definition of NDI is just injury to the United States.  I don't

6    think it uses the same phrases that appear in the definitions

7    of the classification levels.

8              THE COURT:  But is harm any different from injury?

9              MR. OLSHAN:  In my mind, no.

10             THE COURT:  In the law, is there a distinction

11   between harm and injury?

12             MR. MAC MAHON:  There is potential anyway, Your

13   Honor.

14             MR. TRUMP:  Your Honor?

15             THE COURT:  Yeah.

16             MR. TRUMP:  In the case law, it's primarily been

17   discussed in the context of closely held and --

18             THE COURT:  Well, closely held may be different than

19   classified.

20             MR. TRUMP:  No, what I mean, Judge, is courts have

21   said that juries can consider the fact that a document or

22   information is classified in deciding whether the government

23   has met its burden to show that it's NDI, and it's primarily to

24   the point of closely held that that is a factor the jury can

25   consider as to whether information has been closely held is the

1    fact that it has been classified, it was under strict controls,

2    etc., etc.  That's why we put on all the evidence as to the

3    level of classification, the compartmentalized nature of the

4    information.

5         But the jury can be -- can consider the fact that

6    it's classified in determining whether the government has met

7    its burden to prove that it's NDI.

8         THE COURT:  All right.  Well, there's a typo in here

9    anyway, but I think again, there's nothing inaccurate about how

10   this instruction is written.  It's not giving a false statement

11   of the law, and I don't think that it's misleading the jury, so

12   I'm going to overrule that objection.  You have "fat" rather

13   than "fact," so I need to change that.  Okay.

14        Now, Instruction 41, you've objected to the

15   instruction about the chapter 9.

16        MR. OLSHAN:  Your Honor, this has been an issue

17   throughout the trial.  We do believe an appropriate instruction

18   on this topic is necessary.

19        THE COURT:  Well, let me hear from you, Mr. MacMahon

20   or Mr. Pollack, on that one.

21        MR. MAC MAHON:  Your Honor, I think this instruction

22   is improper.  They've put this whole chapter in evidence and

23   suggested that Classified Program No. 1 and Human Asset No. 1

24   are the national defense information that we're dealing with,

25   but what they're not -- that has to be true, the jury has to

1    find that that's actually proved to be national defense

2    information.

3         You know, we've heard a lot of stuff from many

4    witnesses about how inaccurate the book is in and of itself,

5    but for them to tell the jury that Mr. Risen writes about other

6    purported intelligence -- they haven't heard anything about

7    those other operations other than the two that we were allowed

8    to talk about, which was the one from 2004 and that the NSA

9    part is wrong.  They heard -- they didn't hear about anything

10   else.

11        But for the government to come in and say that

12   nothing in this book is true, that -- the government hasn't

13   confirmed the existence of these operations nor the truth of

14   what Mr. Risen says about this other operation, nor are they

15   required to do so, that puts a patina again of national defense

16   over this case, where really the confirmation of this book came

17   from the trial as what has really happened, but the jury

18   shouldn't be told anything else about these other parts of it

19   because it's just going to make it --

20        THE COURT:  Well, what --

21        MR. MAC MAHON:  -- look like there's more.

22        THE COURT:  All right, what about -- the first

23   sentence you have no problem with, telling them they can read

24   the whole chapter if they want.

25        MR. MAC MAHON:  No.  In fact, I'd expect that's the

 1    first thing they're going to do.

 2              THE COURT:  All right.

 3              MR. MAC MAHON:  I don't think the rest of it's even

 4    necessary.  It's, again, unduly suggestive.  They can have

 5    their first -- I'm not sure why they need to be told they can

 6    read the book.  They can read any exhibit they want.

 7              THE COURT:  I think you're right.  I don't think

 8    there's any need for this instruction at all.  It's just going

 9    to the jury.  They've got the book.  They can do what they want

10    with it.

11              MR. TRUMP:  But --

12              THE COURT:  Wait.  That also means, though, that I

13    don't expect there to be argument about chapter 9 in that -- in

14    this respect.  In other words, if, if you start arguing

15    about -- especially I think this is more likely to come from

16    the defense than from the government:  If you start arguing

17    about other portions of chapter 9, then you open the door for

18    the Court instructing the jury as to how they have to approach

19    chapter 9.

20              MR. MAC MAHON:  Other than the two instances I just

21    discussed, Your Honor, which is the 2004, which we cleared with

22    you ahead of time, and then the NSA language on page 212, I

23    believe, those are -- they've asked witnesses about that as the

24    case has gone on.

25              THE COURT:  Mr. Trump?

1    MR. MAC MAHON:  Other than that, Mr. Pollack is doing

2  the closing, so I should defer to him on this, Your Honor.

3    THE COURT:  Mr. Trump?

4    MR. TRUMP:  Your Honor, it goes back to the way the

5  case has been charged.  The case has been charged with respect

6  to Classified Program No. 1 and Merlin, Human Asset No. 1.

7  That is the only burden the government has with respect to

8  chapter 9.

9    The jury's going to immediately see that there is

10  roughly 40-50 percent of that chapter that has nothing to do

11  with Classified Program 1 and Human Asset No. 1, and they're

12  going to be confused because there was no testimony about it,

13  there was no evidence about it.  Yet it's there, and they may

14  assume, incorrectly, that the way the case has been charged is

15  that everything in chapter 9 has come from this defendant to

16  Risen to the book, and that would be an incorrect assumption

17  for them to make.

18    They should be told that consistent with the first

19  sentence, "The government has alleged that chapter 9 contains

20  national defense information," that is a correct statement.

21  It's also correct that Mr. Risen writes about other matters --

22  I don't, I don't really care what phrase is used -- but writes

23  about other United States intelligence operations against Iran

24  in chapter 9.

25    That is a true statement, but those matters are not

1   at issue in this case, and the jury should be told as much,

2   because if they sit back there and read chapter 9, they're

3   going to wonder, What do we do with all this other stuff, and

4   why haven't we heard any evidence about it?

5          THE COURT:  All right.

6          MR. TRUMP:  If you -- if the Court wishes to stop at

7   the end of "you should not consider them in any way during your

8   deliberations," that's fine, but --

9          THE COURT:  I think maybe what we should say in the

10  second sentence is, "This case focuses solely on the -- this

11  case focuses solely on those parts of chapter 9 that deal with

12  Classified Program No. 1 and Human Asset No. 1."

13         MR. MAC MAHON:  But, Your Honor, if I may, we still

14  have these other two issues.

15         THE COURT:  But I said "focuses."  Now, if you raise

16  these other issues as two side issues, that's --

17         MR. MAC MAHON:  They go to source, Your Honor.

18         THE COURT:  I'm sorry?

19         MR. MAC MAHON:  I'll defer -- Mr. Pollack is doing

20  the closing so --

21         THE COURT:  The law is it doesn't make any difference

22  if Risen had ten sources.  If one of those sources was

23  Mr. Sterling and the information that he revealed was

24  classified, then he's guilty, all right?

25             So the fact that there are other sources of other

1   information in the book is really irrelevant.  That's a red

2   herring.  The question is are there other reasonable sources

3   for the information that's at issue in this case, and the fact

4   that there might have been a source about X project or Y

5   project is irrelevant to this case.

6           MR. POLLACK:  Your Honor, I think -- I don't think --

7           THE COURT:  Mr. Pollack, let me stop you for a

8   second --

9           MR. POLLACK:  Yes.

10          THE COURT:  -- because you've got clear evidence in

11  this case that Risen has said he had multiple sources.

12          You've got that in the preface, and you've had it in

13  other pieces of evidence here.

14          MR. POLLACK:  I understand, Your Honor.  I don't

15  think there, I don't think there really is as much of an issue

16  here as the Court may be concerned.  With respect to the NSA

17  information that's, that's -- that Risen writes about,

18  irrespective of whether or not it's accurate, that relates to

19  Classified Program No. 1, so that's not even an issue.

20          The only thing that doesn't relate to Classified

21  Program No. 1 that I plan to mention in argument is what has

22  already been said in the trial, which is that there is a

23  discussion of something that supposedly happened in 2004, and

24  to the extent that Mr. Risen had sources for that information,

25  certainly it wasn't Mr. Sterling, and the jury can infer from

1387

1    that that it is less likely therefore that Sterling was a

2    source for the Classified Program No. 1 information.   In other

3    words, if Risen had a source that could tell him about both, he

4    could have gotten it from, from that source, and therefore,

5    it's less likely that he got the Classified Program No. 1 stuff

6    from Sterling.

7         So I fully understand that the fact that there are

8    multiple sources is not in and of itself a defense, and the

9    fact that other people might have committed crimes is never a

10   defense, but it goes to whether, the likelihood that

11   Mr. Sterling committed the charged offense, the fact that Risen

12   has sources that are not Sterling.

13        But it's just with respect to those first two cases

14   that have already been discussed with a couple witnesses now,

15   and I wouldn't do it in an argument any differently or any more

16   expansively than what's already been done.

17        THE COURT:   All right, I'm not going to give an

18   instruction on the book.   That whole exhibit is in.   You can

19   argue it.   It's perfectly proper for both sides to argue, focus

20   the jury's attention on what they have to pay attention to and

21   shouldn't, but I'm not going to do this.   So that one's out.

22   Okay.   Instruction -- that was 41, I think, yeah.

23        42 is multiple sources.

24        MR. POLLACK:   And on this, Your Honor, this goes back

25   to the point that we were just discussing.   There is a standard

1388

1    instruction or at least a common instruction that is given that

2    evidence that somebody else might have committed a crime isn't

3    a defense and that you have to decide whether or not the

4    defendant committed the crime charged.

5            We have no objection to that kind of instruction

6    here, but this, this instruction as written, I think, is far

7    beyond what needs to be said on that topic and really is

8    suggestive that if you find that Mr. Sterling provided

9    anything, you have to find him guilty, and the jury does have

10   to find that there is national defense information, that they

11   can find beyond a reasonable doubt that that particular

12   national defense information came from Mr. Sterling, and I

13   think this instruction just goes too far in suggesting

14   otherwise.

15           So I would suggest replacing this with the

16   instruction -- an instruction that says that the fact that

17   other people might have provided him national defense

18   information is not relevant to your consideration.  That's not

19   a defense.  What you need to decide is did Mr. Sterling provide

20   him national defense information and has the government proven

21   that beyond a reasonable doubt or not.

22           THE COURT:  Well, what if we take this portion out?

23   This portion does seem to be a correct statement of the law

24   without any problems:  "For each of . . . Counts 1, 2, and 4

25   through 7, the government must prove beyond a reasonable doubt

1    each and every element of these offenses as I have explained

2    them to you.  The government, however, does not have to prove

3    that the defendant was the only person who communicated the

4    national defense information alleged in the indictment to James

5    Risen."

6              And then jump down to, "Your duty as jurors is

7    limited to determining whether the government has proved beyond

8    a reasonable doubt that the defendant committed the offenses

9    charged, irrespective of whether other persons may have

10   communicated the same or similar information to James Risen."

11             That's, I think, a fair statement of the law.

12             MR. OLSHAN:  That's fine for us, Your Honor.  My only

13   suggestion would be in that portion the Court read, that second

14   sentence that starts, "The government, however" --

15             THE COURT:  Yeah?

16             MR. OLSHAN:  --  it should probably end

17   with "indictment."

18             So it's "the only person who communicated the

19   national defense information alleged in the indictment," but

20   it's not just to James Risen in some of the counts.  Other

21   counts are to the public at large.

22             So rather than just focusing in on Risen, just leave

23   it as "the national defense information alleged in the

24   indictment," period.

25             THE COURT:  That's really getting subtle because, I

1  mean, every single disclosure was through the vehicle of

2  Risen's writing.

3           MR. OLSHAN:  That is correct, but the way the case is

4  charged, the communication that matters for Counts 1 and 2 and

5  6 and 7 is communication or attempted communication to the

6  public.  So we would ask that the instruction, just leave it

7  at, "The government, however, does not have to prove that the

8  defendant was the only person who communicated the national

9  defense information alleged in the indictment."

10          THE COURT:  All right.  All right, Mr. Pollack, with

11 those edits, are you comfortable then with the multiple

12 sources?

13          MR. POLLACK:  I think we're getting close, Your

14 Honor.  I would --

15          THE COURT:  So we're not going to use the first

16 paragraph at all, I don't think.  Let's see.

17          Yeah, because the first paragraph repeats what we've

18 already said in the description of the offenses.

19          MR. OLSHAN:  That's fine.

20          THE COURT:  All right, so that's coming out entirely,

21 and so we would start again, the first sentence and the second

22 sentence, with the words "to James Risen" omitted, right?  The

23 first two sentences of paragraph 2.

24          MR. POLLACK:  Stop there, Your Honor.  The only

25 change I would say there is to change the word "communicated"

1    to "disclosed."

2            MR. OLSHAN:  I believe the statute has both words.

3            THE COURT:  Does it use both?

4            MR. OLSHAN:  "Willfully communicates, delivers,

5    transmits, or causes to communicate, be communicated,

6    delivered, or transmitted."  So it's not disclosed; it's

7    communicated.

8            THE COURT:  I'm going to leave "communicated" then if

9    that's what the language is.

10           All right, so we'll leave that in.  We're going to

11   get rid of the example and then go to the last sentence:  Your

12   duty as jurors is to determine whether the government.

13           MR. POLLACK:  And that last sentence, Your Honor, I

14   would end with "the offenses charge."

15           THE COURT:  "Whether the government has proved beyond

16   a reasonable doubt that the defendant committed the offenses

17   charged."  No, that has to be there.  "Irrespective of whether

18   other persons may have communicated the same or similar

19   information."

20           MR. POLLACK:  Well, you've already said, you've

21   already said, Your Honor, the government does not have to prove

22   that the defendant was the only person who disclosed the

23   national defense information alleged in the indictment, so I

24   don't think you need to repeat that again in that latter

25   clause.

1    THE COURT:  Well, I think it, I think it clarifies

2    it, so I'm going to go ahead and do it that way, all right?

3    Okay.  So that takes care of multiple sources.  We're almost

4    done.

5    43, well, motive was a significant issue in this

6    case, and it's not an element, but I think it's been discussed

7    enough that unless it's a mis-definition of motive -- let me

8    take a look here.

9    I mean, there's been the, been the nuance here of

10   whistleblowing.  I mean, that's certainly also floated in the

11   case from the defense standpoint, and the government has

12   discussed motive extensively.  Unless this is -- and I don't

13   think this is an incorrect definition of "motive."  I don't see

14   what the objection is.

15   Mr. Pollack?

16   MR. POLLACK:  May I have a moment, Your Honor?

17   THE COURT:  Yes, sir.

18   MR. POLLACK:  Your Honor, in the second paragraph,

19   certainly if the Court's inclined to give the instruction, in

20   the last sentence, where it says "may aid you in determining

21   that defendant's intent," I would add "or lack of intent," and

22   the last paragraph, which, I guess, is all one sentence, I

23   would strike the first part and just say the latter part, which

24   is that the presence or absence of motive is a circumstance you

25   may consider as bearing on the intent or lack of intent of a

1393

1    defendant.

2         And it seems, I mean, it seems repetitive.  You could

3    probably just strike the last sentence of that second paragraph

4    in its entirety and just give that latter clause of the third

5    paragraph.

6         THE COURT:  All right, what's the government's view

7    of that?

8         MR. OLSHAN:  Your Honor, we believe that this is

9    appropriate as written.  Mr. Pollack's suggestion as for that

10   last sentence in paragraph 2, "The motive of a defendant is

11   irrelevant except insofar as motive may aid you in determining

12   that defendant's intent or lack of intent," suggests to the

13   jury that if you find he had some kind of good motive, then

14   that negates intent, but that's not what this instruction is.

15        MR. POLLACK:  I don't think it suggests that at all.

16   In fact, you're going to say explicitly to the contrary if you

17   give this instruction.  My, my point is the government can't

18   have it both ways.  If they want the jury to know that if they

19   buy the government's motive evidence, that they can consider

20   that in forming the view that the defendant did have the

21   intent, then equally if they don't buy the government's motive

22   evidence, they can consider that in finding that the government

23   hasn't proved intent.

24        THE COURT:  All right, I'm going to -- I know that

25   motive is a standard instruction.  I'm just going to look at

1   the books and see what they have, all right?  And I'm going to

2   use what they have in the book.

3          Okay.  Those were the specific instructions that you

4   had objections to.  As to 44, witness protective measures and

5   substitutions, redactions, you said they were already given,

6   they probably -- they do need to be given again, so let me tell

7   you, I have looked at those, and I'm going to give them --

8   again, I'm going to get you a set, you probably won't get them

9   for another hour or so, of the proposed charge, so you'll have

10  the whole thing, but just so you know, I am going to tell the

11  jury that the number of witnesses and the amount of evidence

12  submitted is not, you know, a deciding factor, so that's a

13  pretty standard instruction.

14         Here's what I wrote on witness protection measures.

15  "During this trial, you heard testimony from witnesses who are

16  currently employed by the CIA.  You also heard testimony from

17  former employees of the CIA, some of whom continue to work for

18  the CIA as contractors, and you have heard the testimony of

19  Human Asset No. 1 by video deposition and that of his wife.

20  These witnesses testified either by using only initials or

21  using a made-up name such as Merlin, and you were not told

22  their true names.  These witnesses also testified with a screen

23  preventing the general public from seeing them.

24         The disclosure of the witness's names and their

25  physical identity could potentially compromise either their

 1    continued work for the CIA or expose them to safety issues.

 2            As I explained to you, one of your roles as jurors

 3    will be to assess the credibility of each witness who has

 4    testified during the trial.  You should not make any judgments

 5    about the credibility of those witnesses simply because they do

 6    not -- you do not know their full names or because they

 7    testified with the screen.  Moreover, you should not consider

 8    the manner in which such witnesses testify as an expression of

 9    my opinion as to any of the facts of this case.  It is your job

10    and yours alone to decide the facts of this case."

11            So I think that takes care of the protective measures

12    issue, and I'm assuming there's no objection to that.

13                        (No response.)

14            THE COURT:  Okay.  No objection was heard.

15            I'm going to give the standard instruction on the

16    effect of the defendant's failure to testify, and I think that

17    heading is probably -- that's the standard heading, but I think

18    I just will say "not testifying" rather than "failure to

19    testify," unless you don't care.

20            MR. MAC MAHON:  What's that, Your Honor?  I'm sorry.

21            THE COURT:  Yeah, the heading for this instruction,

22    which is right out of the book, is "failure to testify," and I

23    think I'll just say "effect of the defendant not testifying" --

24            MR. MAC MAHON:  That's fine, thank you.

25            THE COURT:  -- is probably more benign.

1    Every time I do these instructions, I find something

2 else I don't like about them.  Okay.

3    There were two proposed defendant's jury

4 instructions, and I'm not sure what you mean, what you intended

5 by this, so what -- the first one is -- you don't have numbers

6 on them.  There were two instructions that you asked the Court

7 to give.

8    "Your verdict must be based on the facts as you find

9 them and on the law contained in all of these instructions."

10 I'm certainly giving that.

11    And then you have two questions -- or two statements.

12 What was the point of these instructions?

13    MR. MAC MAHON:  Your Honor, I'm not exactly sure what

14 you're looking at.

15    THE COURT:  All right.

16    MR. MAC MAHON:  We did propose an instruction on the

17 lesser-included offense, if that's what you're looking at.

18    THE COURT:  Well, where did -- how did you do that?

19 I don't remember ever seeing that.

20    MR. MAC MAHON:  They were filed by ECF a couple days

21 ago.

22    THE COURT:  Well, what I have is, "Whether an

23 employee of the United States, who by virtue of his employment

24 or position came to possess documents," I mean, blah, blah,

25 blah, this made no context.

1     MR. MAC MAHON:  We'll withdraw that, Your Honor,

2  because I don't even know what you're looking at.

3     THE COURT:  Here, I'll show it.

4     Show them this.

5     MR. MAC MAHON:  Yes, Your Honor.  These are the --

6  these were the jury instructions that were -- they weren't

7  submitted.

8     THE COURT:  They were not submitted?

9     MR. MAC MAHON:  They were submitted, Your Honor, but

10  not in the exact form that I understood, and what these were

11  were the potential jury instructions on a lesser-included

12  offense that we would ask the Court to consider.

13     THE COURT:  Oh, oh, oh.  All right, hand that back up

14  here.

15     All right, so this is the only proposed substantive

16  instruction then from the defense.  Well, you have No. 2.

17     MR. MAC MAHON:  Well, we have the instruction on

18  venue that the Court has already rejected.

19     THE COURT:  All right.  What is the government's view

20  about a lesser included?

21     MR. TRUMP:  I really am at a loss.

22     THE COURT:  Well, it's not a lesser included.  I

23  mean, a lesser included would be still another offense within

24  it.

25     MR. TRUMP:  A lesser-included offense has to marry up

1   in terms of the elements of the larger offense.  There's no

2   lesser included, as far as I know, to any of the offenses that

3   we have charged.

4            THE COURT:  No, this can't be a lesser-included

5   offense.  This is an acquittal.  This is saying if the

6   information is not national defense information, simply because

7   it's embarrassing to one or another public official, you have

8   to acquit.  I mean, you're taking this from --

9            MR. MAC MAHON:  That's a different instruction, Your

10  Honor; I'm sorry.  The other instruction we gave was the

11  statute that deals with possession or disclosure of classified

12  information.

13           THE COURT:  Well --

14           MR. MAC MAHON:  The jury could find that there was

15  classified information that was disclosed or possessed, and

16  that's a separate charge altogether.

17           THE COURT:  Well, I'm confused.  I thought we had --

18  I had my staff, I thought, download everything you submitted.

19  I must have missed one, so somebody needs to give me what

20  you've got.

21           Does the government have it?

22           MR. TRUMP:  I don't think we have it.

23           THE COURT:  I don't think we got a lesser included.

24  Are you sure you filed one?

25           MR. MAC MAHON:  I thought we had, Your Honor.

1    Mr. Holt was supposed to file it.  I'm not trying to throw him

2    under the bus.

3            THE COURT:  Oh, okay.

4            MR. MAC MAHON:  The lesser included would have been

5    the possession of classified information.  It doesn't marry up

6    except for the national defense charges.  The Court, I'm sure,

7    has had these cases here where just the simple possession of

8    the classified information.  The jury has heard a lot of

9    information about why things are classified and what

10   Mr. Sterling possessed, and we just think that that should be a

11   charge that they can consider if they decided to do so.

12           THE COURT:  But there's absolutely no dispute, I

13   mean, there's no evidence in this case to suggest that this is

14   not -- there really isn't -- any national defense information.

15   I mean, every witness who's testified for the government has

16   said that it is.

17           You haven't had any evidence, there's no evidence in

18   this case to my knowledge that undermines that part of this

19   case.

20           MR. MAC MAHON:  Well, the jury still doesn't have to

21   find it, Your Honor.

22           THE COURT:  No, the jury, the jury might not find it,

23   but you still don't give the jury an instruction when there's

24   no evidence.  There still has to be evidence to suggest the

25   basis for a lesser-included offense.

1400

1      Mr. Olshan?  You have to be at the lectern.

2   Mr. MacMahon gets a bye because of his back.

3      MR. OLSHAN:  Even if there were some evidence that it

4   was not NDI, legally, the instruction they want is a completely

5   separate offense.  I'm not aware of any case law that says it's

6   properly considered to somehow be a lesser-included offense.

7      So on both bases, we don't think any other

8   instruction would be appropriate.  There's no other offense.

9   The offenses that are charged are the 793 offenses, period.

10      THE COURT:  All right.  Well, obviously, if the

11   defense feels strongly about this and they have a basis for it,

12   that's something you need to submit to us this evening, not

13   tomorrow morning at 9:30, but get it to us tonight so we can

14   take a careful look at it and see if it should be there, but

15   I've not seen the proposed lesser-included instruction.

16      MR. TRUMP:  Judge, I've researched this in the

17   context of a completely different case, but it only pertains to

18   tangible information.  It would not pertain to intangible

19   classified information, I believe, so it can't be a

20   lesser-included offense with respect to the majority of the 793

21   counts.

22      THE COURT:  All right.  Well, I don't even have it in

23   front of me, and I don't know what the basis --

24      MR. TRUMP:  The statute relates to the removal of

25   classified material.

1401

```
 1              THE COURT:  And is that the misdemeanor?
 2              MR. MAC MAHON:  Yes, Your Honor.
 3              THE COURT:  Yeah.  That was used in the Drake case?
 4              MR. TRUMP:  I have no idea, Your Honor.
 5              THE COURT:  It might have been.  That case was
 6    resolved with a misdemeanor.
 7              MR. MAC MAHON:  It's 1924, Your Honor.
 8              THE COURT:  All right.  But does not appear to be in
 9    this case because that's -- this is different.
10              MR. TRUMP:  Much different.
11              THE COURT:  Yeah, yeah.  All right.
12              Well, anyway, at this point, I'm not giving it.  So
13    are there any other instructions that either side wants the
14    Court to be considering?
15              MR. POLLACK:  Do you have something?
16              MR. OLSHAN:  I do have something.
17              MR. POLLACK:  Go ahead.
18              MR. OLSHAN:  Your Honor, something that we hit on a
19    few minutes ago got me thinking about the sort of omnibus issue
20    for the instructions, which is that although the charges are
21    captioned in the indictment as unauthorized disclosure, the
22    actual charging language and statute is not disclosure; it's
23    communication; and so anywhere that the instructions reference
24    the means of dissemination, it should be the statutory
25    language, which is communication, not --
```

1     THE COURT:  I'm letting you make those changes.

2  That's -- I mean, I'm not going to go through -- you have them

3  on your computer as well, right?

4     MR. OLSHAN:  We do.  So, for example, just making

5  sure that the capsule summary for the charges tracks the

6  statutory language and not the captioned language.  We can do

7  that.

8     Related to that, Your Honor, if we could go back to

9  instruction 39, which is the causation instruction?

10     THE COURT:  Well, wait a minute.  I'm looking real

11  fast.  I think you are okay.  I'm looking at your Instruction

12  No. 2.  You've got it there, "caused national defense

13  information to be communicated, delivered, and transmitted."

14     MR. OLSHAN:  Correct.

15     THE COURT:  That's the correct language.

16     MR. OLSHAN:  We just want to make sure it's

17  consistent.

18     THE COURT:  Okay.  All right, go ahead.

19     MR. OLSHAN:  Instruction 39, which is the causation

20  instruction?

21     THE COURT:  Yeah.

22     MR. OLSHAN:  The way that it's written, it

23  says, "First, that another person committed the crime."

24     That's, that's not what it is.  That should be

25  changed.  It's "that another person performed the acts

1403

1   constituting the crime," because the next sentence or two

2   sentences later says that intermediary does not have the

3   necessary intent.

4          So you cannot say that somebody else committed the

5   crime unless they also had the intent, and so my recommendation

6   for this, and we can submit this to the Court overnight, is

7   that where it says "First," this should be, "First, that

8   another person performed the acts constituting the crime of the

9   unauthorized communication of national defense information."

10          And then below, where it says, "The government need

11   not prove," it should be, "The government need not prove that

12   the person who performed the acts constituting the crime of the

13   unauthorized communication of national defense information did

14   so with criminal intent.  That person may be an innocent

15   intermediary or pawn."

16          Similarly, the next sentence, "The defendant need not

17   perform the crime," well, obviously, the defendant has to

18   commit a crime in order to be convicted, and I would imagine

19   the defense doesn't like this language for that reason, and so

20   it can similarly be clarified to, "The defendant need not

21   perform the acts constituting -- the acts that constitute the

22   crime of the unauthorized disclosure of national defense

23   information."

24          THE COURT:  You're getting -- you need to -- we all

25   need to sit down and think about that one carefully.  I don't

1   want these instructions so complicated that this jury can't

2   figure out what they're doing, all right?  That's getting

3   really complicated, and there's got to be a simpler way of

4   doing that.  So rather than trying to do this ad-libbed, think

5   about it carefully.

6          And again, now what's going to -- you need to get

7   these distributed as quickly as possible so I can get a

8   reasonable response from the defense if they have an objection

9   to it.  And again, this has been a great jury.  I don't want to

10  hold them up, and so I -- and I, again, I have a hearing at

11  nine o'clock, so we have basically a half-an-hour window to get

12  any last-minute things ironed out tomorrow morning, all right?

13         MR. OLSHAN:  And just so the parties are clear, we

14  should get together on, I believe, the possession instruction;

15  is that correct?

16         THE COURT:  See if you can work out a joint

17  instruction that you're happy with for possession.  I'm going

18  to look at it as well, yeah.

19         MR. OLSHAN:  And we'll also submit something on

20  causation.

21         THE COURT:  On causation.

22         MR. OLSHAN:  And I believe the Court suggested the

23  Court would circulate another --

24         THE COURT:  I'm going to give you my proposed charge

25  before I go home tonight, so you'll, you know, look -- check in

1  your e-mail, all right?

2         MR. OLSHAN:  Thank you.

3         THE COURT:  We're going to e-mail it to you rather

4  than putting -- I'm not putting it on ECF because it's a work

5  in progress.  Therefore, make sure we have good e-mail, leave

6  them with my law clerk before you go, good e-mail addresses for

7  you, all right?

8         All right, is there anything else?

9                    (No response.)

10        THE COURT:  Now, the last thing is it's only five

11 o'clock.  You've got to make sure before you leave the

12 courtroom that you've worked with Ms. Guyton and Ms. Gunning on

13 making sure that the physical exhibits that are going to go to

14 the jury are the ones you thought you had entered -- in fact,

15 we should do that right now.  Just I'll have the list read to

16 you, but I want you physically to have looked at them so

17 there's no question about the integrity of what's going to go

18 to the jury, all right?

19        We're not giving them the transcript for Merlin; we

20 already agreed on that.  And the cable books, we may get a --

21 oh, juries always ask for an index.  I've had this happen

22 before, so that's another job the government's got if you don't

23 already have it is an index of the exhibits that have been

24 entered into evidence, and we need one for the defense as well.

25 No editorial comments.  Enough to explain what it is, and it

1  may be very similar to the exhibit list you filed already.

2  Just make sure you don't list anything there that was not

3  entered into evidence.

4         That in a case like this will be one of the first

5  questions the jury asks.  So both sides need to make sure

6  you've done that, okay, so we have that ready for them tomorrow

7  morning.

8         MR. MAC MAHON:  Your Honor, they may also ask for

9  multiple copies of the chapter as well.  I don't know how the

10  Court wants to deal with that.

11         THE COURT:  I have no problem -- all right, we'll

12  make sure that there are 12 --

13         MR. TRUMP:  We can have multiple copies.

14         With respect to that exhibit, 132 was the exhibit

15  without paragraph markings.

16         THE COURT:  I think we should put the paragraph

17  numbers in.

18         MR. TRUMP:  And 132A is the one with the numbers.

19         THE COURT:  All right.

20         MR. TRUMP:  If you want to have them both, they can

21  have both.  The numbers are very easy in terms of argument if

22  someone --

23         THE COURT:  I think it's easier for you-all if you're

24  going to argue the case to do it to numbers, all right?

25         MR. POLLACK:  As long as we're talking about the

1  chapter in its entirety, I have no problem with there being a

2  version of numbered paragraphs.

3        THE COURT:  All right.  And I'm almost positive I've

4  mentioned it to the jury that the numbers would be added.

5        MR. TRUMP:  It's 132A.

6        THE COURT:  Yeah.

7        MR. TRUMP:  It doesn't matter to me whether 132 and

8  132A go in, but 132A is the one with the paragraphs.

9        THE COURT:  Let's make the 12 copies -- your job is

10  to make 12 copies of 12A (sic) if we don't already have that.

11        Now, what about the cable books?

12        MR. TRUMP:  Well, they're all in the exhibit book.

13  All the cables are in the exhibit books.  They don't need their

14  cable books unless --

15        THE COURT:  I don't think we should.  I think the

16  practice has always been to have one set of exhibits, with the

17  exception being chapter 9 because that will take them, you

18  know, half an hour or so to read if they all want to sit down

19  and read it.  Okay?

20        All right, so unless there's anything else, I'm going

21  to have Ms. Guyton read --

22        MR. POLLACK:  Yes, Your Honor.  I think it's clear

23  for the record, but just out of an abundance of caution, I want

24  to make sure that it is:  With respect to our back-and-forth on

25  the charge, we're reserving our objections, and to the extent

1   that they lead to modifications, those are understanding the

2   Court's initial rulings --

3        THE COURT:  You've filed your objections.  We've

4   denied some of them and granted some of them, and that's the

5   law of the case, and you can certainly, you know, appeal any

6   objections.

7        MR. POLLACK:  I understand, Your Honor.  Thank you.

8        THE COURT:  All right.  So are you ready to

9   double-check your list?  All right, Ms. Guyton will now read it

10  to you.

11       I think the easiest way of doing this in looking at

12  Ms. Guyton's notes is to tell you what's not in evidence, all

13  right?  Because the vast majority of these exhibits went in.

14  So I'm going to have her just read the numbers of the

15  government's exhibits that did not go into evidence.  I think

16  that's much faster and easier to do it that way, okay?

17       THE CLERK:  Okay.

18       THE COURT:  Yeah, Mr. Olshan?

19       MR. OLSHAN:  One brief thing.  Your Honor, the issue

20  of the summary e-mails that were behind each of those exhibits?

21       THE COURT:  Ah.

22       MR. OLSHAN:  So I didn't reference those when we were

23  dealing with those exhibits with Agent Hunt, and so we're fine

24  just to pull those out.  Frankly, they're now redundant because

25  they are part of Exhibit 98, which is the fulsome summary that

1   she did of the calls and e-mails.  So we can pull those out

2   from the official exhibits that are going to go back.

3          THE COURT:  I think they're extremely helpful for the

4   jury, and I don't think they're unfair.  They're not

5   inaccurate.  I think we should leave them with them, all right?

6   Because the jury has to look at that summary chart and decide

7   whether it's accurate, and those are the supporting materials

8   for it.

9          MR. OLSHAN:  Certainly our position was they were

10  generated by Agent Hunt, and the parties can argue about the

11  sanctity of those summaries all we want, and so it's fine by,

12  it's fine by our standard -- or we're fine with leaving them

13  in.  We just wanted the Court to know we were still thinking

14  about it.

15         THE COURT:  All right.

16         MR. POLLACK:  Your Honor, I would just like to note

17  an objection to that.  The, the government agreed that they had

18  not moved them in through the computer expert.  They were not

19  in evidence, and then they did not attempt to move them in

20  through Agent Hunt.  They're not in evidence.

21         THE COURT:  All right, to avoid any problems since

22  you do have it in the other document, they're out, all right?

23  So you need to make sure, though, physically when you go

24  through these books to make sure that what's going to the jury

25  is correct, that you have those removed, all right?

 1            MR. OLSHAN:  Very well.

 2            THE COURT:  Because there's that one exhibit where I

 3  think there are three or four different strings discussed --

 4            MR. OLSHAN:  Correct.

 5            THE COURT:  -- and there are three or four separate

 6  summaries like that.

 7            MR. OLSHAN:  That's right.  There were four, four or

 8  so that had no content.

 9            THE COURT:  Yeah, right.  Okay.

10            All right, so here are the exhibits that were not

11  entered into evidence.

12            THE CLERK:  Government Exhibit Nos. 64, 67, 68, 69,

13  70, 71, 72, 76, 80, 82, 85, 88, 97, 104, 109.

14            132A, is that going to be admitted?

15            THE COURT:  132A is in.

16            (Government's Exhibit No. 132A was received in

17  evidence.)

18            THE CLERK:  132B was offered but not admitted.  136,

19  not admitted -- was not offered, I'm sorry; and 138 not

20  admitted.  147, 149, 150, 151 --

21            MR. TRUMP:  Wait up, please.

22            THE CLERK:  I'm sorry.

23            MR. TRUMP:  Can we go back to 147?

24            THE CLERK:  Okay.  147, 149, 150, 151, 152, 153, 154,

25  155, 156, 165, 166.

1        THE COURT:  And there were so few defense exhibits,

2   let's read the ones that are in evidence.

3        MR. OLSHAN:  166, I did move that one, Stipulation

4   No. 6, about the $1.5 million.

5        THE COURT:  That, that was your stipulation?

6        MR. OLSHAN:  It was.

7        THE COURT:  I think that's right.

8        MR. OLSHAN:  Stipulation No. 5, which is Exhibit 165,

9   we did not read in, but 166 we did.

10        THE COURT:  Hold on a second.

11        MR. MAC MAHON:  132C, was that on the list?  I'm

12   sorry.

13        THE COURT:  No, 132C is not in.

14        MR. MAC MAHON:  That's out.

15        THE COURT:  132C is not in.  166 then is in.

16        (Government's Exhibit No. 166 was received in

17   evidence.)

18        THE COURT:  All right, are you satisfied then?

19        MR. TRUMP:  We had 170, 171, and 172 -- 171 and -72

20   are in the record, but they don't go to the jury, correct?

21        THE COURT:  Are those --

22        MR. TRUMP:  Merlin.

23        THE COURT:  The video deposition is not going in as

24   an exhibit.

25        MR. TRUMP:  It's marked just for appellate purposes.

1412

1      THE COURT:  Correct.

2      MR. TRUMP:  And our list goes through 175, but there

3  is a 176, which is Stipulation No. --

4      THE CLERK:  13.

5      MR. TRUMP:  -- 13.

6      THE COURT:  Right, that's in.  All right?

7      All right, the government's satisfied?  And again,

8  the last job will be to check physically on the exhibits, all

9  right?

10     But we'll now read the defense exhibits that were

11 entered into evidence.

12     THE CLERK:  Defense Exhibit No. 1, No. 2, No. 3,

13 No. 4, 5, 6, and 7.  8 was not admitted.

14     THE COURT:  Is that consistent with your records?

15     MR. MAC MAHON:  Yes, Your Honor.

16     THE COURT:  Yes, all right.

17     Yes, Mr. Olshan?

18     MR. OLSHAN:  I seem to recall 5 and 6 were the same

19 document.  Did they both actually go in?  Not that it matters,

20 but just to make sure.

21     MR. POLLACK:  Well, there was an underlying e-mail

22 chain, and then there was a second document that showed that

23 that e-mail chain was forwarded to Mr. Koch.

24     THE COURT:  Right.

25     MR. POLLACK:  So they're not identical documents.

1413

1    MR. OLSHAN:  But they're both in?

2    THE COURT:  Yes.  All right?

3    All right, so unless there's anything else, so the

4  government is going to redo the verdict form, taking out Count

5  8, all right?  And I will just tell the jury, I have to tell

6  them something about Count 8 not being there on the verdict

7  form.  I'll just say Count 8 is being omitted or something like

8  that, all right?  Because otherwise, they're going to read the

9  verdict form, and they'll see the different count numbers, and

10  the jury is not stupid; they'll figure out something is

11  missing.

12    MR. FITZPATRICK:  Your Honor, I was going to letter

13  them.  A will be Count 1, B will be Count 2, is that what

14  you're talking about?

15    THE COURT:  Look, I mean, the jury instructions are

16  written by count number.

17    MR. FITZPATRICK:  Oh.

18    MR. OLSHAN:  The Court could renumber them.

19    THE COURT:  Oh, we're not going to renumber all the

20  counts.  I mean, the jury will know that you're talking

21  about -- they'll see instructions for Counts 1, 2, 3, 4, 5, 6,

22  7, 8 -- I'm sorry, 9, and 10, and we'll have a juror who will

23  say, "Where's Count 8?"

24    So I need to tell them that I've taken care of

25  Count 8 one way or the other, not to worry about it, all right?

1414

1   That doesn't tell them whether I've convicted or acquitted on

2   Count 8.  It's no longer for them to worry about.

3          There's so much information in this case, I don't

4   even think Mr. Trump mentioned mail fraud.  I may have said it

5   in the opening, but, I mean, this jury is not going to be

6   looking for a mail fraud claim in this case, so that's not

7   going to be a problem, all right?

8          But you're going to prepare the new verdict form.

9          MR. OLSHAN:  Yes.

10         THE COURT:  All right.  And you're going to give me

11  whatever additional instructions, and again, if there's

12  something else that comes to mind, yeah.

13         MR. TRUMP:  We will prepare an exhibit list

14  consistent with the omissions.

15         THE COURT:  Correct, a new index.

16         MR. TRUMP:  Correct.

17         THE COURT:  And defense is short, but yours as well,

18  okay?

19         All right, anything else?

20                      (No response.)

21         THE COURT:  No?  All right, then make sure you go

22  through these exhibits with Ms. Gunning and Ms. Guyton.

23    (Recess from 5:18 p.m., until 9:53 a.m., January 22, 2015.)

24

25

1415

1   CERTIFICATE OF THE REPORTER

2       I certify that the foregoing is a correct transcript of

3   the record of proceedings in the above-entitled matter.

4

5

6                                          /s/
                                   _____
7                                  Anneliese J. Thomson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25