UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA      .      Criminal No. 1:10cr485
                              .
     vs.                      .      Alexandria, Virginia
                              .      January 22, 2015
JEFFREY ALEXANDER STERLING,   .      9:53 a.m.
                              .
          Defendant.          .
                              .
.  .  .  .  .  .  .  .  .  .   .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME VII

APPEARANCES:

FOR THE GOVERNMENT:        JAMES L. TRUMP, AUSA
                           DENNIS M. FITZPATRICK, AUSA
                           United States Attorney's Office
                           2100 Jamieson Avenue
                           Alexandria, VA 22314
                             and
                           ERIC G. OLSHAN, Deputy Chief
                           Public Integrity Section of the
                           Criminal Division
                           United States Department of
                           Justice
                           1400 New York Avenue, N.W.
                           Suite 12100
                           Washington, D.C. 20005


FOR THE DEFENDANT:         EDWARD B. MAC MAHON, JR., ESQ.
                           Law Office of Edward B.
                           MacMahon, Jr.
                           107 East Washington Street
                           P.O. Box 25
                           Middleburg, VA 20118

(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 1416 - 1577)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1    APPEARANCES:  (Cont'd.)

2    FOR THE DEFENDANT:           BARRY J. POLLACK, ESQ.
                                  MIA P. HAESSLY, ESQ.
3                                 Miller & Chevalier Chartered
                                  655 - 15th Street, N.W.
4                                 Suite 900
                                  Washington, D.C. 20005-5701
5

6    CLASSIFIED INFORMATION       CHRISTINE E. GUNNING
     SECURITY OFFICERS:           MAURA PETERSON
7

8    ALSO PRESENT:                GERARD FRANCISCO
                                  SA ASHLEY HUNT
9                                 JENNIFER MULLIN, ESQ.

10
     OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
11                                U.S. District Court, Fifth Floor
                                  401 Courthouse Square
12                                Alexandria, VA 22314
                                  (703)299-8595
13

14

15

16

17

18

19

20

21

22

23

24

25

1418

<u>I</u> <u>N</u> <u>D</u> <u>E</u> <u>X</u>

Closing Argument by Mr. Olshan:                Page 1437

Closing Argument by Mr. Pollack:               Page 1467

Rebuttal Argument by Mr. Trump:                Page 1505

```
 1                      P R O C E E D I N G S

 2                      (Defendant present, Jury out.)

 3           THE CLERK:  Criminal Case 10-485, United States of

 4  America v. Jeffrey Alexander Sterling.  Would counsel please

 5  note their appearances for the record.

 6           MR. TRUMP:  Good morning, Your Honor.  Jim Trump on

 7  behalf of the United States.

 8           MR. OLSHAN:  Good morning, Your Honor.  Eric Olshan

 9  on behalf of the United States.

10           MR. FITZPATRICK:  Good morning, Your Honor.  Dennis

11  Fitzpatrick on behalf of the United States.

12           THE COURT:  Good morning.

13           MR. POLLACK:  Good morning, Your Honor.  Barry

14  Pollack on behalf of Mr. Sterling.

15           MR. MAC MAHON:  Edward MacMahon on behalf of

16  Mr. Sterling, Your Honor.

17           MS. HAESSLY:  Good morning.  Mia Haessly on behalf of

18  Mr. Sterling, Your Honor.

19           THE COURT:  Good morning.  All right, counsel, have a

20  seat.  We're going to hopefully do this very quickly.

21           The verdict form that was submitted by the

22  government, we've made -- the only change we've made to it is

23  we always want the foreperson's printed signature as well, so

24  that's been changed.  Otherwise, that's exactly as it was left

25  with us.  There's been no objection, so that's the one we're
```

1    going to send to the jury.

2            In terms of the final charge, just so you know, we

3    did make two small typographical corrections since last night.

4    The instruction for Count 10, where it gives the elements, we

5    struck out the word "four" to "three," because there are only

6    three elements; and in the witness protection instruction,

7    there was a typo.  I think "on" was "no."  Whatever it was, it

8    was a one-letter typo, but it makes no change.

9            I looked at the government's request to change the

10   possession instruction.  I'm not going to add the requested

11   changes.  I think that's arguing your case.

12           The job of the instructions is simply to give

13   definitions of law to the jury but not necessarily to explain

14   how those definitions apply to the case.  In my view, that

15   would overly help the jury making a decision one way or the

16   other.

17           So I'm not going to make the changes that the

18   government requested, and as far as I can tell, other than the

19   classification markings instruction we just got, there were no

20   other requests to change anything in the charge.  Is that

21   correct?

22           MR. FITZPATRICK:  That's right, Your Honor.

23           THE COURT:  All right, that's fine, Mr. Fitzpatrick.

24           Now, the defense filed a series of objections.  I

25   don't think those objections require any changes to the

1  instructions to the extent that both the instruction as to the

2  witnesses and the exhibits that have -- that we had to handle

3  specially clearly told the jury not to draw any inferences, and

4  therefore, the language is already there, and I don't think the

5  additional language is helpful, so I'm not going to add that.

6          In terms of the description of the counts, including

7  language about the Eastern District of Virginia, I told the

8  defense the choice you have is either a brief summary of what's

9  involved in those counts or the indictment goes to the jury,

10  and you-all are much happier with the indictment not going in.

11  Those counts do allege Eastern District of Virginia, and I

12  think it is therefore appropriate that that be in the overall

13  very brief summary of those counts, so I'm overruling that

14  objection.

15          And I didn't think there was any merit to any of the

16  others, but I'll hear any last-minute discussion of the

17  instructions.

18          The other thing I just want you to know so there's no

19  surprises, it's my standard practice when I give them the

20  direct and circumstantial evidence instruction to give them an

21  example, and it's usually it snowed in your front yard.  You

22  see a footprint.  You can draw an inference that there was

23  someone in your yard.  Most of you have heard me do that one

24  before.

25          And with possession, I am leaving constructive

1422

1    possession in here because you have Mr. -- the allegation that

2    Mr. Risen got the possession from the defendant.  I give the

3    jury, my standard example is actual possession, I've got

4    physical control of this pen.  Constructive possession,

5    Ms. Guyton works for me, and therefore, I can tell her what to

6    do with her laptop computer, and therefore, I am considered in

7    the eyes of the law to have constructive possession of that

8    computer.

9             I'm not going to do joint and single.  That we don't

10   need.

11            And those should be the only two slight ad libs.

12            All right, Mr. MacMahon?

13            MR. MAC MAHON:  Yes, Your Honor, good morning.  Just

14   briefly, with respect to the -- can I read from here, Your

15   Honor?

16            THE COURT:  Yeah.  I know you're uncomfortable, yeah.

17            MR. MAC MAHON:  Judge, with respect to the venue

18   instruction, I understand the Court's ruling, but I did want to

19   put in the record -- I assume our objections are going to be

20   put in the record.  Do you want us to file them ECF?

21            THE COURT:  You should do them ECF so they're

22   formally on the record, yes.

23            MR. MAC MAHON:  We will do that, Your Honor, and I'll

24   hand Mr. Trump a copy.  We have one for you, Your Honor, but --

25            THE COURT:  Oh, my law clerk can get it from you.

1423

1        Ms. Copsey?

2        MR. MAC MAHON:  Judge, I'm just handing you a page

3   from your opinion on the grand jury subpoena of Mr. Risen just

4   to put in the record here --

5        THE COURT:  All right.

6        MR. MAC MAHON:  -- as well.

7        What you wrote on page 24 of the opinion, which is

8   November 30, 2010, is -- and this, this is the substance of the

9   instruction that we asked for and it was refused -- is that

10  prosecutions involving disclosure of classified information,

11  venue is proper both where the information is sent and where it

12  is received.

13       And you talk about venue --

14       THE COURT:  But read the next sentence:  "Then you

15  may be in multiple districts as long as part of the criminal

16  act took place in that district," and I think that's not

17  inconsistent with my statement that as long as an act in

18  furtherance of the crime occurred in the district, there's

19  venue.  So I --

20       MR. MAC MAHON:  Well, I understand your ruling, Your

21  Honor, but I don't -- the defendant objects to the instruction.

22       THE COURT:  I understand.

23       MR. MAC MAHON:  It doesn't say the disclosure, that

24  venue is proper where it's sent or received.  I'm just making

25  the record, Your Honor.  Thank you.

1424

1          THE COURT:  That's fine, Mr. MacMahon.  Anything

2    else?

3          MR. TRUMP:  Yes.

4          THE COURT:  And, Mr. MacMahon, the other objections

5    you had as to a definition of "causation" and "classified

6    information," the Court not only gives the elements of the

7    offense to a jury in jury instructions, but it's also expected

8    to give legal definitions of key terms within the elements, and

9    "national defense information" is a key term that does have to

10   be explained, and some of the -- as does "willfully,"

11   "knowingly."

12         I mean, some of these are English language words, but

13   in any standard charge, you still give the jury some specific

14   help.  So to the extent that we've defined certain terms and

15   you've objected to that, I'm overruling that objection as well.

16         Now, Mr. Trump?

17         MR. TRUMP:  Yes, Your Honor.  On the possession

18   issue, and I don't believe there was any dispute from the

19   defense this morning, the definition, the fifth paragraph in

20   that instruction --

21         THE COURT:  All right, give me the number of the

22   instruction.

23         MR. TRUMP:  Possession defined.

24         THE COURT:  Yeah.  You've got page numbers.  Just I

25   can get it faster.  On the bottom of your -- go ahead.  While

1   you're talking, let me look for it.  Go ahead.

2          MR. TRUMP:  The way it reads is incorrect in terms of

3   Counts 1, 4, and 6.  It should be in the past tense.  In other

4   words, "In this case, lawful possession of classified

5   information means possession" --

6                          (Knocking on Jury Room door.)

7          THE COURT:  Wait, wait, wait, wait, wait.

8          MR. TRUMP:  Page 31, Your Honor.

9          THE COURT:  Thank you.  Go ahead.

10          MR. TRUMP:  "For Counts 1, 4, and 6, a person has

11  lawful possession of something if he is entitled to have it.

12  In this case, lawful possession of classified information means

13  possession of classified information by a person who held an

14  appropriate security clearance at the time the person acquired

15  the information."

16          THE COURT:  Does the defense have any objection to

17  that?

18          MR. MAC MAHON:  No, Your Honor, not to that part of

19  it.  I mean, I've looked at it this morning.  The part about

20  the memories and otherwise, I think, is argumentative, but, you

21  know, the issue in the case is there's no question Mr. Sterling

22  had a clearance when he obtained this information and that all

23  the events that took place thereafter, he didn't, he didn't

24  have a need to know, so I think that is a clarification that

25  would be good.

1        The rest of it, I don't think it's necessary.

2        THE COURT:  All right, so let me go over that again.

3   "Possession of classified information by a person who held an

4   appropriate security clearance" --

5        MR. TRUMP:  -- "at the time the person acquired the

6   classified information."

7        THE COURT:  Wait a minute.  Do we need "and had a

8   need to know"?

9        MR. TRUMP:  "And had a need to know."

10       THE COURT:  "At the time he acquired"?

11       MR. TRUMP:  "At the time the person acquired the

12  classified information."

13       THE COURT:  We will add that.

14       I did omit to tell the government, you-all, I am

15  striking the 404(b) instruction.  It's not -- the defense

16  doesn't want it; the government doesn't need it.  It's normally

17  done to protect the defendant, so I agree with you, I don't

18  think in this case it helps your case very much, all right?

19       MR. MAC MAHON:  The instruction, Your Honor.

20       THE COURT:  I'm getting rid of the instruction.

21  That's what you wanted, and I think that's correct.

22       MR. MAC MAHON:  Well, the way it was written, Your

23  Honor, suggested it was evidence of other crimes.

24       THE COURT:  Well, I tried to make it other acts.  But

25  you don't want a 404(b) instruction; is that correct?  If you

1427

1     look at the book, if you look at O'Malley, it has acts and it

2     has crimes.

3          MR. MAC MAHON:  Well, there's clearly going to be

4     argument about these letters and that they're not -- they

5     aren't part of the indictment, so I think the jury --

6          THE COURT:  It's not the letters.  It's the --

7          MR. MAC MAHON:  It's the phone number, whatever --

8          THE COURT:  It's the three documents that the

9     government maintained were still Secret when they were obtained

10    from your client's home, correct?

11         MR. MAC MAHON:  Yes.

12         THE COURT:  All right.  Do you want an instruction on

13    that or not?

14         MR. MAC MAHON:  Can I consult with Mr. Pollack, Your

15    Honor, briefly?

16         THE COURT:  All right.

17         MR. MAC MAHON:  Your Honor, the instruction goes to

18    other acts.  I think the jury is going to wonder, especially in

19    the manner in which they saw those, what those documents would

20    be.  The objection I filed last night was as to the -- there's

21    no, there's no 404(b) pattern type of evidence here that that

22    evidence would be, so it's hard to craft the instruction, I

23    understand.

24         THE COURT:  Well, all right.  That's why I omitted

25    the, the docket numbers.  I could do it now.  What I was going

1    to say and what it says now, "The government has introduced

2    evidence that defendant had classified documents," and I'm

3    going to do the exhibit numbers.  I think it's 141 through --

4              MR. MAC MAHON:  There's four of them.

5              THE COURT:  141, -42, -43.  It's just those three.

6              MR. MAC MAHON:  No, there were four, Your Honor.

7    There was also the, the report he had when he was a trainee.

8              MR. OLSHAN:  Your Honor, there was four exhibits,

9    only three of which were introduced by the silent witness rule.

10             THE COURT:  All right.  Is that 145 then?

11             MR. OLSHAN:  Correct.

12             THE COURT:  All right.  "In his custody when his

13   residence was searched."  And that's correct, and that evidence

14   did come in.

15             MR. MAC MAHON:  Yes.

16             THE COURT:  And I changed the instruction slightly.

17   "Evidence that an act was done by the defendant at some time is

18   not, of course, evidence or proof whatever that at another time

19   the defendant performed a similar act, including the offenses

20   charged in the indictment."

21             MR. MAC MAHON:  Yes.  We would request that

22   instruction.

23             THE COURT:  Well, that's what I gave you here.

24             MR. MAC MAHON:  Well, I thought there was more to it

25   that --

1   THE COURT:  Well, then it says, "Evidence of a

2   similar act may not be considered by the jury in determining

3   whether the defendant actually performed the physical acts."

4   MR. MAC MAHON:  Mr. Pollack is asking that it be

5   "another act," because there isn't a similarity here between

6   the acts and the way the evidence came in, but I think the jury

7   does need to be instructed that it's just an act and how it

8   could be considered, because it was proffered just as evidence

9   of venue, and they don't need to be told -- I'm sure they'll be

10  told that in the argument, but --

11  THE COURT:  All right, I believe I got the

12  word "other crimes" out, but I think I still left it in the

13  last paragraph, but, I mean, the way I modified the standard

14  404(b) instruction was to get out "evidence of other crimes"

15  and do it "evidence of other acts," all right?  And that's

16  relevant only to the issue of intent.

17  Yeah.

18  MR. OLSHAN:  Would the Court mind just reading the

19  portion of the instruction that the Court has as to what they

20  may consider it for?

21  THE COURT:  Look at 24.

22  MR. OLSHAN:  Page 24.

23  MR. MAC MAHON:  Page 24, Your Honor?

24  THE COURT:  Page 24 is where I've got it.

25  So the key -- I think the key paragraph, "If the jury

1430

1  should find a reasonable doubt from other evidence in the case

2  that the defendant did the act or acts alleged in the

3  particular count under consideration, the jury may then

4  consider evidence as to an alleged earlier act of a like nature

5  in determining the state of mind or intent with which the

6  defendant actually did the act or acts charged in the

7  particular count."

8           Now, that's verbatim from the standard jury

9  instruction.

10          MR. MAC MAHON:  I think that's a model instruction,

11  isn't it, Your Honor?

12          THE COURT:  It is a model instruction.  I took out

13  the word "crime," so it's been modified, frankly, in your favor

14  in that respect.  And then I have to take the word "crimes" out

15  of the last paragraph.

16          MR. MAC MAHON:  They've already been told he's not on

17  trial for any other crimes.

18          THE COURT:  Correct.  And I've got it in the previous

19  instruction, on 23.  So, I mean, it's been told twice.

20          MR. POLLACK:  I'm sorry, Your Honor, in the first

21  paragraph, you're going to say that at another time, the

22  defendant performed another act, or is it going to say a

23  similar act?

24          THE COURT:  It just says, "The government has

25  introduced evidence that defendant had classified documents,

1   Exhibits 141 through 145" -- right?  I'm going to add that.

2          MR. OLSHAN:  142 through 145.

3          THE COURT:  142 through 145.

4          MR. POLLACK:  Yes.

5          THE COURT:  ". . . in his custody when his residence

6   was searched.  Evidence that an act was done by the defendant

7   at some other time is not, of course, any evidence or proof

8   whatever that at another time, the defendant performed a

9   similar act, including the offenses charged in the indictment."

10          That's absolutely, I mean, that's absolutely -- other

11   than I took the word "crimes" out as to the 404(b) evidence,

12   all right?

13          MR. POLLACK:  Yeah.  And I understand, Your Honor.  I

14   just -- I would in that last line say "performed another act"

15   rather than "a similar act."

16          THE COURT:  I'm not going to do that.  I think I'm

17   sticking with the language.  I've changed enough of it.

18          MR. MAC MAHON:  Your Honor, can I talk to Mr. Trump

19   for one second about this instruction?

20          THE COURT:  Go ahead.

21          MR. MAC MAHON:  Your Honor, with respect to the

22   possession defined instruction?

23          THE COURT:  Yes.

24          MR. MAC MAHON:  In the government's revised draft on

25   the new paragraph 6?

1432

```
 1              THE COURT:  Go ahead.

 2              MR. MAC MAHON:  It says, "unauthorized possession of

 3    classified information means possession of classified

 4    information," and what was handed to me is a, is a statement,

 5    namely, a letter related to Classified Program No. --

 6              THE COURT:  I don't have that.  I did not agree to

 7    put that request in this instruction.

 8              MR. MAC MAHON:  Okay.  That's fine, Your Honor.

 9              THE COURT:  Okay?

10              MR. MAC MAHON:  I didn't know that that had been -- I

11    think it may help the jury.  So it can't be -- but that's fine;

12    I accept that.

13              THE COURT:  Do you want --

14              MR. MAC MAHON:  I mean, I would think that rather

15    than thinking that it was all the classified information that

16    may have been in his head or other things, that we're limited

17    to the letter about Classified Program No. 1, which is the

18    chart.

19              THE COURT:  If you -- if both sides want that, I'll

20    be glad to enter it.

21              MR. TRUMP:  For those counts, 2, 5, and 7, it's taken

22    directly from the indictment, namely, a letter related to

23    Classified Program No. 1.

24              MR. MAC MAHON:  And I think that would eliminate the

25    potential for confusion of the jury as they try to decide what
```

1    exact classified information.

2              THE COURT:  All right, tell me which line in that you

3    want it.  "In this case, unauthorized possession of classified

4    information means possession of classified information by a

5    person."

6              MR. MAC MAHON:  After "classified information" is

7    comma, "namely, a letter related to Classified Program No. 1."

8              THE COURT:  All right, I will add that.

9              MR. POLLACK:  Your Honor, Mr. Trump said that applies

10   to Counts 2, 5, and 7.  I think it also applies to Count 3.

11             THE COURT:  Well, we're not talking about Count 3

12   here.

13             MR. POLLACK:  I understand, but I think the same

14   should be on the Count 3 instruction.  The national defense

15   information we're talking about in Count 3 is the letter.

16             THE COURT:  All right, does the government agree with

17   that?  What we could do is on page 41, where we're giving the

18   elements of Count 3, and the first element, "that on or about

19   the date set forth in the indictment" -- I thought we had put

20   the date in there because I want to help the jury not have to

21   search for those things -- "the defendant had unauthorized

22   possession or control over a document relating to the national

23   defense, specifically, a letter."

24             MR. POLLACK:  Yeah, it looks like you already have

25   it, Your Honor, I'm sorry, on page 39.

1434

1    MR. MAC MAHON:  I'm sorry to be double-teaming you,

2  Your Honor.  We're all trying to get this done.  But on page

3  39, the nature of the offense on Count 3, says "namely, a

4  letter relating to Classified" --

5    THE COURT:  So it's there.  And the date --

6    MR. MAC MAHON:  It's there, but it's not described as

7  an element of the offense.

8    THE COURT:  Well, it's not really an element.  It's

9  not an element.  That's the, that's the item that fulfills that

10 element.

11   MR. MAC MAHON:  Thank you, Your Honor.

12   THE COURT:  So all right, it's there.

13   All right, is there anything else?  Because we want

14 to get the jury --

15   MR. TRUMP:  Yes, yes, Your Honor.  The modification

16 to your 404(b) evidence does not take into account the other

17 permissible uses of 404(b).  We did not offer it for proof of

18 intent.  We offered it for proof of opportunity, intent,

19 preparation, plan, and knowledge.  All of those should be in

20 the instruction.

21   THE COURT:  What book are you looking at?  Because

22 the one I took it --

23   MR. TRUMP:  I'm looking at the rule, Your Honor.

24   THE COURT:  I'm sorry?

25   MR. TRUMP:  I'm looking at the rule, Rule 404(b).  I

1435

1   mean, typically, 404(b) in many cases is offered for intent,

2   but that is not the purpose here.

3           THE COURT:  I'm using the standard jury instruction,

4   which is not a misstatement of the law.  And you can argue.

5   You can argue.  I've ruled on that.

6           All right, anything else, Mr. Trump?

7           MR. TRUMP:  No, Your Honor.

8           THE COURT:  No?  All right, are you all ready then

9   for the opening?  Now, how do you want to split up your time?

10  45-15?  50-10?

11          MR. OLSHAN:  Hopefully, closer to 50-10.

12          THE COURT:  50-10, all right.  Everybody is ready.

13  We're going to try to go without a break, so that again, the

14  plan is after they've gotten closing arguments, we're breaking

15  for lunch.  Then I'm going to instruct them, all right?

16          All right, let's bring the jury in.

17                      (Jury present.)

18          THE COURT:  Good morning, ladies and gentlemen.

19  Thank you.  Please have a seat.  And again, you've been on

20  time.  We had a few matters we had to take care of.

21          I do want to ask you, did any of you look at *The*

22  *Washington Post* this morning before coming to court?  No?

23  Either online or in the paper?

24                      (No response.)

25          THE COURT:  All right, because there was an article

1436

1    about the case.  Again, you must be very careful to avoid any

2    exposure to anything about this case and avoid any kind of

3    outside-of-the-courtroom contact.

4              We're going to now go into closing arguments.  As I

5    told you yesterday, we're going to hear first from the

6    government their closing argument, then the defense closing

7    argument, and because the burden of proof is on the government,

8    they'll get to do a brief rebuttal, and then you will have your

9    lunch break.

10             Obviously, that's going to be about two hours.  If

11   any of you do need a break, you know, I'll be looking at you.

12   Just make a signal and we'll have to take a break.

13             We'll have the regular one-hour lunch break, but it's

14   earlier today, and then after lunch, you'll get the

15   instructions from the Court, and then you'll have the case to

16   deliberate.

17             Who's going to open for the government?

18             MR. OLSHAN:  I am, Your Honor.

19             THE COURT:  All right, Mr. Olshan, it's lovely to see

20   the sunshine, but if it's too bright, if it's bothering you, we

21   can close the blinds.

22             MR. OLSHAN:  I think the sunshine is good, Your

23   Honor.

24             THE COURT:  All right, that's fine.

25

1437

CLOSING ARGUMENT

BY MR. OLSHAN:

1       One of the most important priorities of the United

2   States government is to do everything it possibly can to

3   prevent a foreign enemy from obtaining a nuclear weapon.

4   Keeping nuclear weapons out of the hands of countries like Iran

5   protects the United States, and it protects the American

6   public.  Make no mistake; we don't have that many options.  The

7   classified program at issue in this case was one of those

8   options.

9       When the CIA developed Classified Program No. 1, they

10   vetted it, they approved it, they put time and resources into

11   it so that this country had an option, an option to disrupt the

12   nuclear weapons capabilities of Iran.  It was one of the only

13   levers that we believed that we had to try to disrupt the

14   Iranian nuclear weapons program.

15       Those were the words of former National Security

16   Advisor and Secretary of State Condoleezza Rice.  She was one

17   of a parade of witnesses who came into this courtroom and sat

18   in that witness box and told you how important, how vitally

19   important this classified program was.  Not just that we would

20   develop a classified program that could help undermine the

21   Iranian nuclear program, but the fact that that program was a

22   secret.

23       Without question, the operation at the heart of this

1  case was one of the CIA's and the United States' most sensitive

2  and closely held programs.  Public disclosure of that program

3  and Merlin, the human asset at the heart of it, risked grave

4  harm not only to Mr. Merlin and his family but also to the

5  United States and its ability to keep programs like this one a

6  secret.

7          So why are we here talking about it in a courtroom?

8  Because of that man, the defendant, Jeffrey Sterling, someone

9  who violated the oath he swore on the first day he became an

10  employee of the CIA in 1993, an oath to safeguard the CIA's

11  secrets not just while he was employed at the CIA but forever.

12  That was his oath, and he broke it.

13          In 2002, on his last day as an employee at the CIA,

14  what did he do?  He refused to sign that last form saying he

15  understood his obligations and he would abide by them.  The

16  same promise that he made on his way into the agency, the

17  defendant refused to make on the way out.

18          You see, the defendant's career was in shambles by

19  that point, and he blamed the CIA.  He felt he'd been

20  mistreated by the agency, he was angry, and he was bitter, and

21  so he was done keeping the CIA's secrets.

22          Four years later, many of the secrets that had been

23  entrusted to the defendant during his time at the CIA came

24  spilling out of chapter 9 of James Risen's book, *State of War*.

25  Risen and Sterling had developed a relationship during

1439

1    Sterling's discrimination lawsuit, and Risen was a natural

2    conduit for Mr. Sterling's story, and so out came the details

3    of Sterling's work on a classified program and with a

4    classified human asset, that's Merlin, the defendant knew very

5    well.  That's why you're here, ladies and gentlemen.

6           Over the course of this trial, you've heard testimony

7    and seen documents that establish a simple truth:  Jeffrey

8    Sterling, a disgruntled former CIA employee with an axe to

9    grind, disclosed the CIA's secrets to Risen, a reporter he knew

10   well.

11          But let's step back.  This case comes down to three

12   basic questions:

13          1:  Who knew all of the information about Classified

14   Program No. 1 that shows up in chapter 9 of *State of War*?

15          Question 2:  Who had a motive to disclose that

16   information?

17          Question 3:  Who had a relationship with James Risen?

18          The evidence in this case has proven beyond a

19   reasonable doubt that the single answer to all three of those

20   questions is just one person:  the defendant, Jeffrey Sterling.

21   Not only did the defendant know all of the relevant facts about

22   Classified Program No. 1 that showed up in Risen's book; he was

23   an eyewitness to many of them.

24          More importantly, Mr. Sterling, unlike anyone else

25   who knew anything about this operation at any point, was the

1440

1    only person who had a reason to tell Mr. Risen what he knew

2    about it.  By the time Mr. Risen picked up the phone to call

3    Bill Harlow at the CIA in April of 2003 with Mr. Risen's story

4    about this botched Iranian nuclear operation, Mr. Sterling had

5    run out of options.  He'd lost his EEO complaint, and his civil

6    lawsuit was going nowhere.  The agency had rejected not one,

7    not two, but five settlement offers from Mr. Sterling and his

8    lawyers.

9            The defendant was unemployed, he was angry, and he

10   was bitter.  He wanted to lash out.  There's your motive.

11           And finally, he knew how to lash out.  He already had

12   a documented relationship with Risen.  Just five weeks after

13   Mr. Sterling refused to sign that final nondisclosure

14   agreement, Mr. Risen published a story about the defendant in

15   *The New York Times*.  So the next year, in 2003, Mr. Sterling

16   knew who would listen to him.  Three questions, one common

17   answer:  Jeffrey Sterling.

18           Let's take each question one at a time.  Question 1:

19   Who knew all the information in chapter 9?  When you go back to

20   the jury room, you're going to get a couple binders filled with

21   all of the exhibits in this case.  Before you take a look at

22   any of those nondisclosure agreements or any of the cables we

23   looked at for a number of days or any of those settlement

24   offers that were rejected by the CIA, pull out Exhibit 132.

25   That's chapter 9.

1441

1    As you go through chapter 9, remember one thing:  All

2    that matters for purposes of this case and your job as jurors

3    is information in that chapter about Classified Program No. 1

4    and Merlin.  Everything else in that chapter you can ignore.

5    Cross it out.  It's irrelevant.

6    The publication of that chapter exposed to the world,

7    friends and enemies alike, the details of Classified Program

8    No. 1, so let's start with it.  As you read it, you'll notice

9    that much of the chapter has nothing to do with Classified

10   Program No. 1 or Merlin.  All that's left when you take that

11   out is what matters.

12   Ladies and gentlemen, at its core, chapter 9 contains

13   accurate classified details about Classified Program No. 1 and

14   Merlin.  Let's start with what Risen gets right:  The core true

15   corroborated facts.  I'll highlight a few.

16   The book accurately describes that Classified Program

17   No. 1 was designed to stunt the development of Tehran's nuclear

18   program by sending Iran's nuclear experts down the wrong

19   technical path, wasting years trying to make a flawed nuclear

20   design work instead of focusing on their existing nuclear

21   program.  That's the basic overview of the program, and it's

22   true.

23   More specifically, the chapter details the nature of

24   the flawed plans, identifying the specific nuclear component as

25   a TBA 480 high-voltage block or firing set for a

1442

1    Russian-designed nuclear weapon.  That specific detail, that's

2    true.

3         The book also accurately sources the original Russian

4    intelligence to a Russian scientist who's working with the CIA.

5    You've seen him referred to in cables as Human Asset No. 2.

6    The book notes that the intelligence from Human Asset No. 2 was

7    sent to a National Laboratory and scrutinized by a team of

8    scientists.  All of that is true.  The same team was asked to

9    implant flaws deliberately into those Russian -- into that

10   Russian design, and those flaws were supposed to be so clever

11   and well hidden that no one would be able to detect their

12   presence.

13        Again, it's in the book, and it's true.  Walt C.

14   testified about exactly how the National Laboratory went about

15   taking that intelligence from Human Asset No. 2, creating that

16   working fire set, deconstructing it to add in those embedded

17   flaws, and testing it with a Red Team.  That's true.

18        Now, in addition to specific technical details of the

19   operation, chapter 9 also contains several facts about Merlin,

20   also known as Human Asset No. 1.  For example, the book

21   accurately reflects that Merlin was a Russian scientist who had

22   worked at Arzamas-16 in the former Soviet Union and who had

23   endured long debriefings in which CIA experts and scientists

24   from the National Laboratories tried to drain him of everything

25   he knew about the status of Russia's nuclear weapons program.

1443

1    Those details about Merlin are true.  And when he

2    testified, he told you that the description of him in the book

3    was enough for the Russians to figure out who he was and the

4    fact that he was working with the United States government.

5    As for Merlin's role in Classified Program No. 1, the

6    book once again gets many things right.  For example, as part

7    of the operation, Merlin's job was to pose as an unemployed and

8    greedy scientist who would serve as a go-between for the other

9    Russian scientist, the one with the greater technical know-how.

10    That's true.

11    In order to develop viable Iranian contacts, the CIA

12    instructed Merlin to send e-mails to Iranian scientists and

13    scholars and to attend scientific conferences.  That's true.

14    Those were his instructions.

15    Ultimately, Merlin communicated with an Iranian

16    professor, and later, when the CIA learned that another

17    Iranian, this one a top official, was headed to the

18    International Atomic Energy Association, or IAEA, in Vienna,

19    the decision was made to send Merlin over with the fire set

20    plans.  All true and all in the book.

21    So Merlin traveled at the CIA's direction to Vienna

22    in February of 2000 to make the delivery.  During his trip,

23    Merlin saw a postman while he was trying to figure out how to

24    deliver the plans.  Ultimately, he found the mission and

25    delivered them.

1444

1    Ladies and gentlemen, these facts are true, and

2    they're all in chapter 9.  There's also no dispute that all of

3    the facts that I've just recited to you were facts known to the

4    defendant, but that's not all.

5    The chapter also contains a number of additional

6    details that point to Mr. Sterling specifically as the source

7    for Risen.  First, as you read chapter 9, pay attention to who

8    gets the most favorable treatment of all the people who are

9    referenced in that chapter.  It's not Merlin.  No, Merlin's

10   portrayed as being a handling problem, a bumbler, somebody

11   who's out for money.

12   And it's not Robert S.  No, he was more concerned

13   about pushing ahead than listening to the concerns raised by

14   the case officer or Merlin as portrayed in the book.

15   And it's certainly not the CIA managers, who somehow

16   deem this mission a success despite those risks portrayed in

17   the book.

18   No, the only person who comes out smelling like roses

19   in Mr. Risen's telling is Mr. Sterling, the case officer.  Who

20   was the case officer during the operation?  Jeffrey Sterling.

21   The book even mentions the fact that the case officer took his

22   concerns to the Senate.  You know that's also true.  The way

23   Mr. Risen writes it, the defendant, the case officer, is the

24   hero of chapter 9.

25   You should also pay attention to the two most

1    detailed events related to Classified Program No. 1 that show

2    up in the book.  Both took place during the defendant's time as

3    Merlin's case officer:  the meeting in San Francisco and the

4    trip to Vienna.  Those events bookended the defendant's time as

5    Merlin's case officer:  trip to San Francisco, trip to Vienna.

6    No other case officer had greater knowledge of those events

7    than the defendant.

8         First the San Francisco meeting.  Chapter 9

9    accurately reflects that Merlin was first shown the fire set

10   design in a hotel room during the trip.  It also mentions that

11   the case officer, that's Sterling, and the senior CIA officer,

12   that's Robert S., had a private conversation after Merlin

13   raised initial concerns about the completeness of the plans.

14        That private meeting is reflected in no cable

15   traffic.  You have the cables.  You won't see any single

16   reference to that private conversation between Robert S. and

17   the defendant.

18        And what about the trip to Sonoma?  You remember

19   that.  That happened.  You heard it from Mr. S.  He told you

20   about the kinds of wines he liked.

21        The only people who went on the trip were Mr. and

22   Mrs. Merlin, the defendant, and Robert S.  Once again, no

23   mention of Sonoma in any cable traffic.

24        What about the other bookend to Sterling's time as

25   Merlin's handler, the Vienna trip?  Much of chapter 9 deals

1  with Merlin's attempt to deliver the flawed plans to the

2  Iranian mission, to the IAEA.  Once again, the book contains a

3  true detail that appears in no official CIA document and would

4  have been known only to Merlin and the people who debriefed him

5  when he got back, Sterling and Robert S.  That detail was the

6  postman Merlin saw when he was attempting to deliver the plans.

7         Next we have the letter.  In chapter 9, Risen

8  reproduces verbatim the letter Merlin purportedly gave to the

9  Iranians when he delivered the plans.  This is the letter that

10 laid out for the Iranians what Merlin was giving them and the

11 fact that Merlin expected to be paid if they wanted any more.

12        With one minor exception, the version of the letter

13 that appears in the book is an exact duplicate of the last

14 version of the letter to appear in any CIA cable.  You have a

15 draft letter.  It's embedded in the cable that's at Government

16 Exhibit 35.  That was a cable drafted by the defendant on

17 January 12, 2000.

18        Two days later, you have edits coming back from

19 headquarters from Robert S.  He recommends changing the letter

20 to reflect that it's clear to the Iranians that this initial

21 package is for free.  That's in Government's Exhibit 36.

22        What appears in the book is the draft letter from

23 Exhibit 35 with the changes made that show up in Exhibit 36.

24 The evidence at this trial established that the people who

25 worked most closely on back-and-forth edits to those letters

1     over a period of months were Mr. Sterling and Merlin.

2            And during, during Merlin's testimony, when

3     Mr. MacMahon asked him about the last version of the letter,

4     what did Merlin say?  He said a couple weeks before he left for

5     Vienna, he took the last version and he gave it to Jeff, the

6     defendant.

7            Finally, take a look at page 197 when you go back in

8     the jury room of chapter 9.  At the very top, in paragraph 20,

9     there is a reference to a secret CIA report that referred to

10    Merlin as a known handling problem due to his demanding and

11    overbearing nature, and according to the book, he was a

12    sensitive asset who had been used in a "high-priority

13    operation."

14           Again, that's true, but what's even more interesting

15    about this language is the source of it.  This language appears

16    verbatim in the defendant's performance assessment report, or

17    PAR, from 2000, the same exact language.

18           And you know the defendant was given a copy of his

19    PAR with that quoted language in the course of his EEO

20    litigation, but keep one other thing in mind:  Nothing in the

21    performance evaluation connects that quoted language to a

22    specific classified program or specific asset.  It's vague.

23           The only way James Risen knew to take that language

24    and connect it to this operation and this asset was if someone

25    told him that that language connected to the asset in the

1    program.

2           Bottom line, not only does chapter 9 contain a number

3    of core facts related to Classified Program No. 1 and Merlin;

4    all of them were known to the defendant.  That's question 1.

5           What about question 2?  Who had motive?  Who had any

6    motive to disclose any information about Merlin and Classified

7    Program No. 1?  This is an easy question, ladies and gentlemen.

8    The only person who had any reason to do this was the

9    defendant.  There is absolutely no, zero evidence that anyone

10   else had any motive to disclose these facts about this

11   operation and Merlin.  Just the defendant.

12          How do you know?  Look at the particular spin that

13   Mr. Risen puts on the operation in the book.  He took those

14   core true facts and he spun them in a particular way.  That's

15   the claim that this was somehow a botched operation that risked

16   handing over the keys to the nuclear kingdom to Iran.

17          Who had reason to spin a story in a way that made the

18   CIA look hapless and reckless?  It's not Mr. Merlin or Robert

19   S.  They both testified they thought the operation was

20   brilliant.  No.

21          Who had a reason not only to out the program but to

22   do it in a way that would inflict maximum damage to the CIA?

23   Jeffrey Sterling.  Jeffrey Sterling's spin is what appears in

24   the book.  It's the exact story he told Don Stone and Vicki

25   Divoll when he went to the Senate Intelligence Committee on

1449

1    March 5, 2003, less than a month after the CIA had rejected his

2    fifth settlement offer.

3           The only other time anyone expressed the concerns

4    that Risen parroted in his book was when Mr. Sterling went to

5    the Senate.  That meeting took place over three years, three

6    years since the trip to Vienna, when Merlin handed over the

7    plans.

8           Take a look at the cables.  At no point leading up to

9    the trip, over a year, from December of 1998 to when the trip

10   occurred in February of 2000, at no point during that time did

11   the defendant raise a single concern about this operation, not

12   a word to Robert S., not a word to his chain of command in New

13   York -- that's Mark L., Tom H., Charles Seidel, David Cohen --

14   not a word.

15          This is very serious stuff we're talking about,

16   ladies and gentlemen.  This is nuclear weapons technology.  If

17   the case officer who was assigned to oversee this operation had

18   concerns, why wouldn't he raise them before these plans made

19   their way overseas?  He'd be crazy not to.

20          The defendant didn't speak up because he didn't have

21   any concerns.  Not a word when he went to the CIA Inspector

22   General to complain about discrimination in December 1999.

23   That was before the operation occurred into 2000.

24          And when Sterling went to the House Intelligence

25   Committee, you'll remember that's HPSCI, in August of 2000,

1    again, not a single word about a botched operation.  Michael

2    Sheehy testified that a program -- that this program was

3    extremely sensitive.  He was reluctant to talk about it in

4    court this week, 15 years later.  Not a word to Mr. Sheehy.

5           No, Sterling didn't raise any concerns until March

6    2003, almost five years, five years since the first meeting in

7    San Francisco where Merlin was shown the plans.

8           What happened between August 2000, when he went to

9    the House, and March 2003, when the defendant went to the

10   Senate?  About three years of bitter litigation involving

11   Sterling and the CIA.

12          First there was the EEO process.  It took more than a

13   year.  Sterling lost.  Then the civil litigation, not one but

14   ultimately two lawsuits.  You have the exhibits.  The defendant

15   lost.  And all the while, the CIA rejected every one of the

16   defendant's settlement offers.  The CIA wasn't giving in.

17          During that time in August 2000, Sterling told Eileen

18   Swicker, she's the chief of staff to the Deputy Director of

19   Operations, that he would, quote, pursue his claims as long and

20   as loud as possible, inside and outside the agency.

21          Later in January 2003, when the defendant was

22   fighting with the Publications Review Board over the

23   publication of his memoir, he told Bruce Wells that he was,

24   quote, absolutely disgusted with the CIA and that the board's

25   conduct was, quote, absolutely reprehensible.  He told Wells

1451

1    he'd be coming at the CIA with, quote, everything at his

2    disposal.

3         Now, I want to talk to you very directly about the

4    defendant's claims against the CIA.  Discrimination is a

5    serious matter.  There is no place for it in the workplace,

6    whether it's government or private sector.  No one here is

7    going to say otherwise.

8         But regardless of the merits of Mr. Sterling's claims

9    against the CIA, one thing was abundantly clear:  Mr. Sterling

10   was very unhappy with the CIA.  Everyone agrees Mr. Sterling

11   was angry at the CIA.  That's what matters in this case.

12        That is what gave Mr. Sterling the motive to take the

13   secrets entrusted to him by the CIA, valuable secrets that the

14   CIA had spent years investing in, and put a spin on them, the

15   spin that he took to the Senate, the same one that showed up

16   later in chapter 9, where the defendant is the hero.

17        What about some of the other people we've heard about

18   in this trial?  What about their motives?  Let's start with

19   Robert S.  At least two things came across clearly in his

20   testimony:  One, this program was his baby, and he was very

21   proud of it; and two, he had absolutely no reason to talk to

22   Sterling -- excuse me, Risen.

23        This was a program that Mr. S. invested ten years of

24   his career developing.  What reason did he have to talk to

25   Risen, let alone to tell him that his brainchild was somehow

1    botched?  No reason.

2         And if Mr. S. had spoken to Mr. Risen, you'd expect

3    there would be some additional details in the book, things that

4    Mr. S. knew that the defendant didn't know.  But conveniently

5    in the book, the timeline lines up with the defendant's

6    involvement in the program.  Mr. S. was there from start to

7    finish, but the book only covered the defendant's time.

8         How about Ms. Divoll from the Senate?  She only knew

9    the barest sketch of the details contained in chapter 9.  She

10   told you that.  So did Don Stone.  There was a memo written at

11   the time in April of 2003.

12        Don Stone and Vicki Divoll didn't hear that this was

13   a TBA 480 fire set.  They didn't hear that there was a meeting

14   in San Francisco.  They didn't hear about the postman.  They

15   didn't hear that these plans were delivered to Vienna.  They

16   didn't hear about Merlin's compensation or whether he was a

17   handling problem.  None of their performance evaluations show

18   up in chapter 9.  They just didn't know.

19        And what motive did Ms. Divoll have to call Risen and

20   talk about this program?  None.

21        And finally, you've heard the defense actually

22   suggest, actually suggest that Merlin may have been a source

23   for Risen.  Ladies and gentlemen, when you come through those

24   doors and into this courtroom or that door into this courtroom,

25   you don't check your common sense when you enter.  There is no

1    reason in this world why Merlin would put his own life at risk,

2    the life of his wife and his family, by talking to Mr. Risen

3    about what he did while working for the CIA.  He didn't even

4    tell his wife what he was doing.  She told you that.

5            When the defense asked Mrs. Merlin when she was

6    testifying if they had actually been contacted by the KGB yet,

7    she said, "No, not yet."  These people live in abject fear,

8    day-to-day, that the people from their former country are going

9    to come get them.  What reason would Merlin have to talk to

10   James Risen?  None.

11           What makes most sense, the commonsense answer is that

12   the only person with motive was the defendant.  That's question

13   2.

14           Question 3, who had a relationship with James Risen?

15   Again, the evidence in this case has established that only one

16   person had a relationship to James Risen:  Jeffrey Sterling.

17   Go back to that first article after 9/11.  It's Government's

18   Exhibit 75.  On November 4, 2001, Mr. Risen wrote an article

19   citing unnamed sources for the fact that a CIA office had been

20   destroyed on 9/11.  That was five days after Jeffrey Sterling

21   lost his appeal and was terminated from the CIA, five days, and

22   then that story ran.  A couple of months later, the defendant

23   was gloating about it when he spoke to Carrie Newton Lyons

24   about how he had disclosed that fact to a newspaper.

25           And then there was this article, ladies and

1454

1    gentlemen.  This is Government's Exhibit 83.  It ran on

2    March 2, 2002, about a month after the defendant refused to

3    sign his final secrecy agreement.  The byline is James Risen.

4    The subject?  The only subject of this article is Jeffrey

5    Sterling.  That's his picture.  Jeffrey Sterling and his fight

6    against the CIA.  1,630 words, ladies and gentlemen, that James

7    Risen wrote about Jeffrey Sterling in *The New York Times*.

8            There is simply no better proof of an existing

9    relationship between Jeffrey Sterling and James Risen than that

10   article.  Not only does Risen quote extensively from Sterling;

11   he also quotes from another one of his PARs, the 1990 -- excuse

12   me, the 1999 PAR that Sterling got during the EEO process.

13   That's Exhibit 59.

14           Specifically, the article states that Sterling had

15   received a positive performance evaluation which stated that

16   he, quote, demonstrated good tradecraft in the handling of his

17   assigned cases.

18           So you've got the 1999 PAR quoted in this article and

19   the 2000 PAR quoted in chapter 9, both documents that Sterling

20   had, both quoted in Risen's work.

21           But that wasn't the end of the relationship, not by

22   any stretch.  Take a look at Government's Exhibit 98.  It's a

23   summary of calls and e-mails between the defendant and James

24   Risen.  Special Agent Hunt took you through it yesterday.

25           The first call, first documented call is on

1    February 27, 2003.  That was about two weeks after

2    Mr. Sterling's final settlement offer lapsed and about a week

3    before he showed up at the Senate.

4           Exhibit 98 shows a pattern of calls beginning in

5    February 2003 and ending in November 2005, about a month before

6    State of War was published.  February 2003 to November 2005.

7    During that time, Risen's contact with the defendant continued

8    even when the defendant moved.

9           In February and March of 2003, the calls were from

10   the defendant's home in Herndon, right here in the Eastern

11   District of Virginia.

12          The next year, after Mr. Sterling had moved in with

13   his friends, the Dawsons, in Missouri, the phone traffic

14   continued, and after he moved out of the Dawsons' house later

15   in 2004, Sterling continued to communicate by phone with Risen

16   from the defendant's work phones.

17          In total, 47 calls, some very short, some longer, but

18   47 times these individuals called each other.  These calls

19   began before Sterling went to the Senate.  They continued

20   through Mr. Risen's calls to Bill Harlow about his New York

21   Times article that he was planning to write.  They continued

22   through the time when the article was squashed and through

23   finally the lead-up to State of War's publication.

24          And then there were the e-mails.  First let's look at

25   the e-mail from March 10, 2003.  This was the e-mail that was

1    deleted from Mr. Sterling's e-mail account.  It was deleted

2    sometime three years later, around when he learned the FBI was

3    investigating.  It says:  "I'm sure you've already seen this,

4    but quite interesting, don't you think?  All the more reason to

5    wonder...J."

6            This is an e-mail from Mr. Sterling to James Risen.

7    And what's the link that's included in this e-mail?  It's an

8    article, a CNN article titled, "Report:  Iran Has 'Extremely

9    Advanced' Nuclear Program."

10           The defendant sent this e-mail just five days, five

11   days after he went to the Senate with his story, his story

12   about how the classified program may have actually aided the

13   Iranians.  And wouldn't you know, five days later, he's

14   e-mailing an article about Iran and its nuclear weapons program

15   to James Risen.

16           This isn't an e-mail about race discrimination or his

17   complaints against the CIA.  This is about Mr. Sterling and his

18   work and whether the Iranian nuclear program has been advanced.

19   It says, "All the more reason to wonder."

20           What does Mr. Sterling want Risen to wonder about

21   when he's sending him that?  It's that story that he told the

22   Senate, whether they had actually aided the Iranian nuclear

23   weapons program.

24           It fits, ladies and gentlemen.  It fits the

25   defendant's spin, the one he gave the Senate and the one he

1   gave Risen.

2          That wasn't it for e-mails, though.  There were the

3   deleted e-mails Special Agent Hunt was able to recover from the

4   Dawsons' computer.  Let's take a look at a few.

5          December 23, 2003, after the defendant had left

6   Virginia, Risen to Sterling:  "Can we get together in early

7   January?"

8          May 8, 2004, Risen to Sterling:  "I want to call

9   today.  I'm trying to write the story.  Jim."  And, "I need

10  your phone number again."

11         May 16, 2004, Risen to Sterling:  "I am sorry if I

12  have failed you so far.  But I really enjoy talking with you,

13  and I would like to continue.  Jim."

14         Finally, June 10, 2004:  "I can get it to you.  Where

15  can I send it?"

16         A few months after that last e-mail, Risen submitted

17  a book proposal to Simon & Schuster.  That's Government's

18  Exhibit 128.  That document contains Merlin's true first name,

19  not his code name.  His true first name.

20         Ladies and gentlemen, this evidence -- the 9/11

21  article, the *New York Times* profile of the defendant, and the

22  e-mail and phone traffic -- all make clear that not only did

23  the defendant and Risen have a relationship; they maintained

24  that relationship all the way through publication of *State of*

25  *War*.

1        After the book came out in January of 2006, how many

2   more calls did you see?  How many more calls was Special Agent

3   Hunt able to identify until sometime in the middle of 2007,

4   when the request had ended?

5        Zero calls.  No more calls between Mr. Sterling and

6   Risen after the book came out.

7        The job was done, ladies and gentlemen.  Mr. Risen

8   wrote the story; it got published.

9        Three questions; three common answers.  Who knew all

10  the true details in chapter 9?  The defendant.  Who had a

11  motive to disclose those facts and paint them in a false light?

12  The defendant.  And who had someone in the media who would

13  listen to him?  The defendant.

14       One other thing:  After lunch, the Court will

15  instruct you that the government only has to prove that the

16  defendant was a source for Risen; that's all.  So long as you

17  conclude that Sterling was a source, one source, it's

18  completely irrelevant whether he had any other -- whether

19  Mr. Risen had any other sources for the same or different

20  information related to this program or Merlin.  Keep that in

21  mind as you review the evidence.

22       There are nine charges in this case.  After the

23  lawyers finish up, as I mentioned, the judge will instruct you

24  on the law that you should apply to the facts.  Listen

25  carefully to those instructions.  I'm not going to repeat all

1    of them here, but let me break them down very briefly.

2            Six of the counts, Counts 1 and 2, 4 and 5 and 6 and

3    7, address the defendant's unauthorized disclosure or

4    communication of material related to Classified Program No. 1

5    and Human Asset No. 1, or Merlin.  Counts 1 and 2 charge the

6    defendant with causing, causing the unauthorized communication

7    of what's called national defense information to the general

8    public via publication of *State of War* in 2006.

9            Counts 4 and 5 charge the defendant with the

10   unauthorized communication of national defense information to

11   James Risen in 2003, and Counts 6 and 7 charge the defendant

12   with attempting to cause the unauthorized communication of

13   national defense information to the general public through that

14   *New York Times* article that Mr. Risen wanted to write and was

15   about to publish until the meeting with Condoleezza Rice.

16           These charges are grouped in pairs, one count

17   focusing on the disclosure of information and the other count

18   focusing on the disclosure of a tangible item, the letter to

19   the Iranians that Risen reproduced in chapter 9.

20           That's six of the charges.  So what do you need to

21   decide as to each?  First, did the defendant have possession of

22   the relevant information or letter relating to the national

23   defense?

24           Again, there is no dispute that all of the true

25   details about Classified Program No. 1 and Merlin that show up

1  in Risen's book were known to Mr. Sterling.  They are the same

2  details that Risen told Bill Harlow he was prepared to put in a

3  *New York Times* article in 2003.

4         You also know that Sterling had access to the letter

5  that shows up in chapter 9.  Merlin testified that he gave the

6  defendant a copy.  Risen told the CIA in 2003 he had seen a

7  letter.

8         I want you to remember a distinction between

9  information generally and the physical document, the letter.

10 The defendant is not charged with unlawfully possessing the

11 information that came into his head when he was an employee at

12 the CIA.  When you leave the job, you can't purge that from

13 your mind.  He can lawfully possess that information forever.

14 The problem is if you take that information and you disclose

15 it.

16         The same is not true for the document.  Once

17 Mr. Sterling no longer had a need to know about Classified

18 Program No. 1, his continued connection or retention of that

19 document was unlawful.  That possession was unlawful.  He was

20 not allowed to have it.  In fact, Gayle Scherlis told you that

21 when he was leaving the CIA, she instructed him that he was

22 obliged to return any classified information that he had, and

23 he did not.

24         Once you determine that the information or letter was

25 in the defendant's possession, you must also determine whether

1   the material related to the national defense.  The judge will

2   tell you that something relates to the national defense, it's a

3   term of art, if it is closely held by the government and could

4   be damaging to the United States or used for the benefit of an

5   enemy of the United States.

6           Once again, the evidence establishes that the

7   information and document in question without question relate to

8   the national defense.  You heard witness after witness describe

9   how closely held this program was.  Secretary Rice told you

10  this was one of the most closely held programs during her

11  entire tenure as National Security Advisor.  David Cohen, the

12  boss of the New York office, told you this was one of the most

13  closely held programs during his entire 35-year career with the

14  CIA.  David Shedd said the same thing.

15          Even the scientist, Walt C., who testified on one of

16  the first days of trial, he told that you in over 40 years of

17  experience between his work with the Air Force and his work at

18  the National Laboratory, this program was the most closely held

19  operation he'd every worked on.

20          You also heard multiple witnesses discuss just how

21  damaging that sort of disclosure could be.  Secretary Rice

22  commented on how few options the United States had to undermine

23  the Iranian nuclear program.  Robert S. and Charles Seidel

24  talked about how devastating it can be to the United States'

25  national security interests when a program like this is

1    exposed.  Not only does it tell our foreign adversaries that we

2    are targeting them; it tells them how we're doing it.

3         Disclosure of this sort of information has the

4    potential to do real damage to our relationships abroad.  If

5    this country cannot keep its secrets, why would any other

6    country share theirs with us?  And if we cannot protect our

7    human assets, why would anybody willingly become one?

8         Next, you must determine whether the defendant had a,

9    quote, reason to believe disclosure could cause potential harm

10   to the United States or aid a foreign nation.  This is easy,

11   ladies and gentlemen.  Mr. Sterling was a trained case officer.

12   He knew the implications of disclosing this information.

13        Finally, you have to determine that the defendant

14   willfully or with an unlawful purpose communicated the

15   information or caused another person to communicate it to

16   someone who did not have a right to receive it.  You've seen

17   the defendant's secrecy agreement.  He knew it was a crime to

18   disclose classified information to anyone without appropriate

19   clearances, anyone, let alone James Risen.

20        And how do you know he wanted to go one step further

21   and cause Mr. Risen to communicate these same facts to the

22   public at large?  Because that's what reporters do, ladies and

23   gentlemen.  You talk to a reporter because you want them to

24   tell your story.  You don't go talk to a reporter because

25   you're hoping that they'll keep all of your secrets.  There's

1   no other reason to talk to a reporter.

2           Sterling did for years -- 47 calls, multiple

3   e-mails -- because he knew Risen would be his mouthpiece and

4   broadcast his version of events to the world, and that's what

5   he did.  That's how you know he willfully caused Risen to

6   communicate those facts to the public.

7           Ladies and gentlemen, as to Counts 1 and 2, there's

8   no dispute that *State of War* was sold in the Eastern District

9   of Virginia, none.  Those facts were communicated to people

10  here in the Eastern District of Virginia, everyday folks,

11  enemies and friends alike, who had no right to access that

12  information.

13          There's also no dispute that the defendant was

14  unemployed and living in Herndon, in the Eastern District of

15  Virginia in earlier 2003, when Risen first picked up the phone

16  and called Bill Harlow to tell him the details of his story

17  about Classified Program No. 1 and Merlin.  There is no dispute

18  Sterling called Risen from his home in February 2003, and

19  there's no dispute that Sterling e-mailed Risen the CNN article

20  while Mr. Sterling was living in Herndon.

21          There's also no dispute that Mr. Sterling was in

22  possession of classified CIA documents when his house in

23  Missouri was searched in 2006.  Four-and-a-half years after he

24  had any access to CIA facilities, where did Mr. Sterling keep

25  CIA documents?  At his home.  He had moved two times, and yet

1464

1    there they were at his home.  This is a man who keeps CIA

2    documents at his home.

3           Again, when he left the CIA, he was living in

4    Herndon, right here in the Eastern District of Virginia, during

5    the same time Risen was preparing the *New York Times* story that

6    Condoleezza Rice ultimately convinced the paper not to run.

7    That's six of the counts.  That leaves three additional counts.

8           Count 3 is similar to the first six I told you about.

9    It has to deal with the defendant's unlawful retention of that

10   letter.  Again, Merlin told you he gave the defendant the

11   letter.  Where did the defendant keep CIA documents?  At his

12   home.  Where was the first place he moved when he left the CIA?

13   Right here, Herndon.

14          Count 9 charges the defendant with causing Risen to

15   convey the CIA's property to the general public.  What was the

16   property?  It was those secrets about Classified Program No. 1

17   and Merlin.

18          The judge is going to instruct you that property can

19   be something intangible, it can be secrets, and what's more

20   valuable to the CIA than its secrets?  The CIA put ten years

21   into this classified program.  Between case officers, people

22   like Robert S. in the Counterproliferation Division, and all

23   the people who worked on planning and implementing the program,

24   that's thousands and thousands of man-hours.

25          What about the lab?  The lab spent the better part of

1    two years and over a million-and-a-half dollars developing the

2    fire set plans.

3            In order to establish the defendant's guilt as to

4    Count 9 and whether he caused the conveyance of these -- this

5    property in the Eastern District of Virginia, you must

6    determine that the value of that information was $1,000; that's

7    all.  There's no doubt that it far exceeded that amount.

8            And finally, Count 1, obstruction of justice, this

9    count focuses on the deletion of the March 10, 2003 e-mail.

10   You heard about it already.  The defendant got a snapshot at

11   three different times.  They got the April 2006 snapshot,

12   before the defendant knew any idea that there was an FBI

13   investigation, that there was a grand jury investigation.

14   After he received that, there were two more snapshots in July

15   and October of 2006.

16           This e-mail, Government's Exhibit 102, appears in

17   just the first one.  So for some reason, it disappeared between

18   April and July of 2006, three-and-a-half, almost

19   three-and-a-half years after it was written.  Why would

20   somebody go back three-and-a-half years later and delete an

21   e-mail?

22           Agent Hunt told you the whole account wasn't wiped

23   out.  There wasn't appreciable differences between the volume

24   in batch 1 from April and the other two batches.  This was

25   targeted, ladies and gentlemen.

1      The defendant knew that the FBI was investigating,

2   that there was a grand jury investigation, and that his work

3   was at issue.  And what did he work on?  Iran and nuclear

4   weapons programs.

5          THE COURT:  Time's almost up.

6          MR. OLSHAN:   Thank you.

7      The CIA has a right to keep its secrets secret for

8   the safety and security of the American people.  The evidence

9   in this case has established that the defendant put his own

10  selfishness and his own vindictiveness ahead of the American

11  people.  He made a decision to break his oath, and he made it

12  knowing full well the ramifications that his actions could

13  have.

14         It could mean scuttling a viable classified program

15  that was employed not just once but multiple times, and it

16  could mean endangering the life of Merlin, a man who had come

17  to this country with his family as a refugee, seeking a better

18  life, a man who had agreed to help the CIA and to put his life

19  at risk for his new country.

20         The defendant risked all of it, and for what?

21  Because he hated the CIA and he wanted to settle the score.

22  Those aren't the actions of a patriot, ladies and gentlemen.

23  Those are the actions of a criminal.

24         We have brought you the evidence.  We have proven the

25  defendant was a source for Risen.  We have proven that he knew

1467

1   the classified information that wound up in chapter 9.  We have

2   proven that he had the motive to disclose those facts and the

3   letter so that they would get out to the public and harm the

4   CIA, and we have proven that he had a relationship with

5   Mr. Risen.  We ask that you hold him responsible for his

6   actions because he's guilty of each and every offense charged

7   in the indictment.

8            Jeffrey Sterling was the hero of Risen's story.

9   Don't let him be the hero of this one.  Thank you.

10            THE COURT:  All right, Mr. Pollack?

11            Why don't you wait one second, Mr. Pollack, while we

12   get people settled.

13            MR. POLLACK:  Your Honor?

14            THE COURT:  Yes, sir.

15                         CLOSING ARGUMENT

16                       BY MR. POLLACK:

17            Ladies and gentlemen, make no mistake, this is a very

18   important case to the government.  It has assigned a team, a

19   team of excellent lawyers.  One of those lawyers, Mr. Olshan,

20   just laid out a compelling argument setting forth the

21   government's theory of how Mr. Sterling could have been a

22   source of national defense information published by Mr. Risen.

23            The government has great lawyers.  It has a great

24   theory.  It just made a great argument.  What the government

25   lacks is evidence.  Yesterday, Agent Hunt candidly admitted

1    that to you.

2              Explaining how something could have happened is

3    simply not enough.  The government has to prove to you not

4    just, as Mr. Olshan said, that Mr. Risen was a source -- I'm

5    sorry, that Mr. Sterling was a source for Mr. Risen.  It has to

6    point to national defense information contained in chapter 9

7    and present evidence to prove to you beyond a reasonable doubt

8    that Mr. Sterling was the source for that information and that

9    Mr. Sterling committed part of that crime in the Eastern

10   District of Virginia.

11             The government cannot do that because there is no

12   such evidence.  The government's theory is not supported by

13   evidence.  It's not even the most likely theory of what

14   actually happened.

15             The evidence, ladies and gentlemen, has shown that

16   everything that Mr. Risen wrote could have and likely did come

17   from sources other than Mr. Sterling and, yes, from people who

18   had their own motive to talk to Mr. Risen.  Some of what

19   Mr. Risen wrote he got right.  Some of it he got wrong.

20             The government has spent a lot of time in this trial

21   putting in evidence about the things that Mr. Risen got wrong,

22   but whether Mr. Risen's rendition of Classified Program No. 1

23   is accurate or not is not an issue in this case.  Likewise, the

24   government has spent a lot of time putting on evidence about

25   how important Classified Program No. 1 was, how important to

1    the CIA; to the National Security Advisor, Dr. Rice; and even

2    to the President of the United States, George W. Bush.

3            Whether Classified Program No. 1 was a bad idea,

4    whether it was poorly executed, or whether it was the most

5    important intelligence operation this country has ever

6    undertaken is not an issue in this trial.  These things may be

7    important to the CIA, they may be important to Merlin, they may

8    be important to the government, but they should not be

9    important to you.

10           Through this trial, the government has allowed the

11   CIA to tell its side of the story of Classified Program No. 1,

12   and it is a story very different than the one told by

13   Mr. Risen.  Whether or not the CIA has been successful in this

14   trial in getting its reputation back is for others to judge.

15           If you're angry that Mr. Risen reported about a

16   highly classified program, if you're unhappy that his reporting

17   was not always accurate or even fair to the CIA, you cannot

18   take that out on Mr. Sterling.  Mr. Sterling did not provide

19   national defense information about Classified Program No. 1 to

20   Mr. Risen.

21           Where is the evidence that Jeffrey Sterling in 2000,

22   before he left, printed out cables, snuck them out of the CIA,

23   then proceeded to sit on them for three years, only to give

24   them to Jim Risen in 2003?  Where is the evidence that even if

25   he had done that, he would have remembered years later details

1  that aren't in any of those CIA documents, like the fact that

2  the mailbox in Vienna was on the left, the fact that Merlin

3  covered the plans with an old newspaper, details that Bob S.

4  and Merlin do remember?

5        Where is the evidence that Mr. Sterling would have

6  used language in describing the operation to Mr. Risen

7  like "high-voltage block" or "firing set" that Merlin and

8  Bob S. used, but there's no evidence that Mr. Sterling used

9  even when he was involved in the program three years earlier?

10        Mr. Sterling knew about Classified Program No. 1

11  since November of 1998.  He lost access to the documents

12  related to the program in May of 2000.  In August of 2001, he

13  filed a discrimination suit against the CIA.  He was told he

14  was being fired from the CIA in October of 2001.

15        Mr. Risen wrote about Mr. Sterling's discrimination

16  suit in *The New York Times* in March of 2002.  By March of 2003,

17  Mr. Sterling had known about Classified Program No. 1 for

18  years.  He had been upset about his treatment at the agency for

19  years.  He had been in litigation with the CIA for years.  He

20  had made settlement offers, he had had settlement offers

21  rejected for years.  And he had known Mr. Risen for at least a

22  year if you believe the government that he was the source for

23  confirmation of a publicly known fact that the CIA had an

24  office in New York at 9/11.  He had known Risen for longer than

25  that because that article was in November of 2001.

1    Yet all of this time, there is no evidence that

2    Mr. Risen knew anything about Classified Program No. 1.  In

3    March of 2003, Mr. Sterling legally talked to SSCI, the Senate

4    Select Committee on Intelligence, about Classified Program

5    No. 1.  Less than a month later, Mr. Risen calls the CIA,

6    Mr. Harlow, to tell him that Mr. Risen, that he knows about

7    Classified Program No. 1.

8    Why does Mr. Risen learn about Classified Program

9    No. 1 then?  Why?  Because the Hill had just learned about it

10   then.  SSCI had just learned about it then from Mr. Sterling.

11   And as often happens, people on the Hill talk, and when they

12   do, reporters like Mr. Risen listen, and then they go out and

13   investigate what they've learned, and that's why they win

14   Pulitzer Prizes.

15   Mr. Risen went to his sources to see what he could

16   learn after finding out from SSCI that a former CIA officer,

17   Jeffrey Sterling, had come in with complaints about a program,

18   and he started calling his CIA sources, and what happened?

19   They became very alarmed.

20   Now, Bob S., he told you that he was a colonel, but

21   he also told you that there were a lot of generals above him,

22   and when the generals learned that Jim Risen of *The New York*

23   *Times* had a story about a classified program and were afraid

24   that he was going to disclose it, they told Bob S. to brief

25   them on that program, and Bob S. told you, "I went back and I

1   accessed the cables in 2003 so I could brief the generals."

2            Now, the CIA and National Security Advisor

3   Condoleezza Rice both worked to kill the story.  Dr. Rice told

4   you the administration had two tactics when trying to kill a

5   story.  One is to confirm the story unofficially and ask the

6   reporter not to publish it.

7            The other, the one chosen here, was to try to

8   convince the author that he was jeopardizing national security

9   and that he had the story wrong.  The problem with this tactic

10  is that you have to give the reporter additional information to

11  try to convince them that he has the story wrong.

12           Now, Dr. Rice, she only participated in a single

13  meeting, and she told you she doesn't know what the generals at

14  the CIA did separately.  And what the evidence in this trial

15  shows is what they did is they fed Mr. Risen information and

16  documents about the program to try to convince him that the

17  story was wrong and that he would jeopardize national security

18  by publishing it, and in doing so, they gave him more detail

19  about the program than what Mr. Risen had learned from SSCI.

20           Did Bob S. have a motive to feed information to

21  Mr. Risen?  Absolutely he did.  His program, his baby is about

22  to be in *The New York Times*.  He has every incentive to feed

23  CIA cables to Risen and convince him this wasn't a screwed-up

24  program; this was an excellent program.

25           Merlin, does Merlin have a motive to assist in that

1    process?  Merlin thinks his life is going to be in danger if

2    this program is disclosed.  Does he have a motive to get

3    information, directly or indirectly, to get information to

4    Risen to get this story killed?  You bet he does.

5           But their strategy ultimately backfired.  As

6    Mr. Trump put it in the opening, they won the battle, but they

7    lost the war.  Mr. Risen not only ends up writing the story

8    later in a book, but he's now armed with a lot more detail,

9    detail that came from the CIA in its failed effort to kill the

10   story.

11          Worse yet for the CIA, the story is still written

12   from essentially the same perspective, in some ways an accurate

13   perspective, that Mr. Risen started with when he learned

14   secondhand about Mr. Sterling's meeting on the Hill, and the

15   story made the CIA look bad.

16          So let's start with Mr. Sterling's meeting on the

17   Hill.  Mr. Sterling had no documents with him.  That makes

18   sense.  He hadn't had access to documents in years.

19          He said that current events -- now, remember, this is

20   right before the United States is going to invade Iraq, based

21   in part on Iraq's supposed program of weapons of mass

22   destruction.  Mr. Sterling says in that environment of current

23   events, he decided he wanted to come in and talk to SSCI about

24   concerns he had about a weapons of mass destruction

25   counterproliferation program he had worked on.

1    Now, we know that Mr. Sterling did not have much of a

2  technical background, and he was taken aback in San Francisco

3  when he saw that Merlin's immediate reaction on seeing the

4  plans was to say that there was something wrong with them, and

5  we know he tried to raise that with Bob S.

6    Now, Bob S. might have thought he was being tactful,

7  but as Merlin put it, Bob S. told Jeffrey Sterling to shut up,

8  and the plans were not changed.  Sterling had raised his

9  concerns with his superior and was told to shut up.  He was

10 already having problems with the agency, and he believed he was

11 being held to an unfair standard.  Is it surprising that he

12 didn't feel comfortable raising the issue again?

13    He went to the Inspector General of the CIA with his

14 employment issues in December of 1999.  All he was told was

15 that he could appeal his complaints internally with the CIA.

16 The Inspector General closed its file on Jeffrey Sterling two

17 days after it opened it.  That's Government's Exhibit 34.  Is

18 it surprising that Jeffrey Sterling didn't take his concerns

19 about Classified Program No. 1 to the Inspector General?

20    Okay.  Why didn't he go to SSCI sooner?  You can take

21 him at his word, he was prompted by current events, or you can

22 believe that he had grown so disappointed with the agency by

23 this point that he was no longer to accept their assurance that

24 this was a good program and wanted somebody outside of the

25 agency to take a look at it.

1    Either way, Sterling legally told Ms. Divoll and

2  Mr. Stone about the program and about his concerns.  You heard

3  their testimony:  He was calm.  He was rational.  He did not

4  claim it was a rogue operation.  He did not claim that the CIA

5  had just handed blueprints for a working fire set to the

6  Iranians.  What he did was he told Mr. Stone and Ms. Divoll

7  that he had concerns about the program that had never been

8  addressed to his satisfaction.

9    Go ahead and put up Government Exhibit 101.

10    He told them that the human asset immediately saw

11  that there were problems about the plans.  He was concerned

12  that Iran might be able to figure out and correct some of the

13  problems with the plans and that if they did, they might learn

14  new information about a nuclear fire set that they didn't have

15  before.

16    Whether he is right or he is wrong, whether that

17  concern is justified or is not justified -- let me start with

18  that third paragraph -- is not the issue.  He expressed his

19  concern.

20    The second concern he expressed to SSCI was that he

21  did not think the CIA should have given the Iranians the fire

22  set plans all at once.  By just leaving the plans, there was no

23  way to assure that the Iranians would follow up.  They might

24  just take what we gave them, learn something from it, or sell

25  them.

1       And we know that, in fact, in the almost six years

2  from the time that the plans were left in Vienna to the

3  publication of *State of War*, the Iranians never did follow up

4  with Merlin.  But again, whether Sterling's concern was

5  justified or not is not the issue.  He was legally expressing

6  his concerns.

7       And he was not told how, if at all, SSCI was going to

8  follow up.  Yet he seemed satisfied with the visit.  That's

9  what Mr. Stone wrote in his memo.

10      Mr. Stone now says that he recalls in the reception

11 area after the meeting Mr. Sterling's lawyer making some

12 comment about wanting the CIA to act quickly, didn't know if

13 that related to the employment issues or related to Classified

14 Program No. 1.  No mention of the press, but Mr. Stone from his

15 experience with other people thought that that was a reference

16 to the press.

17      But Ms. Divoll said that that didn't happen at all.

18 Ms. Divoll said that there was no such threat, no suggestion

19 that any drastic action was going to be taken such as going to

20 the press.  And it's not reflected in Mr. Stone's memo.

21      And Ms. Divoll was there the entire time.  Remember,

22 Ms. Divoll said she ended up escorting Mr. Sterling out of the

23 offices.  If this happened, it would have to have happened in

24 Ms. Divoll's presence, and she says it didn't happen at all.

25      Special Agent Hunt told you that she had heard a

1    rumor that Sterling's lawyer had made such a threat.  Again,

2    not clear whether it related to going public with the

3    employment concerns, which he had every right to do, or if it

4    related to Classified Program No. 1.  So Special Agent Hunt

5    tried to chase that rumor down, and guess what?  She wasn't

6    able to corroborate it.

7           She wasn't able to corroborate it because there was

8    not a threat to go public with Classified Program No. 1.  What

9    Mr. Sterling did with Classified Program No. 1 was he legally

10   talked to SSCI about it.

11          Now, Mr. Stone says that at some point afterwards,

12   Mr. Risen called him, and claims that Mr. Stone did not speak

13   with Mr. Risen.  Agent Hunt's phone record search did not find

14   that call.

15          Now, that could mean that Mr. Stone is lying about

16   that call, but it could also mean that phone records -- a phone

17   record search would not show a call through the Senate

18   switchboard, and if that's true, that means that anyone at SSCI

19   could have had a phone conversation with Mr. Risen about

20   Mr. Sterling's meeting there.

21          Ms. Divoll said that while her old boss had a

22   relationship with Mr. Risen and asked Ms. Divoll to talk to the

23   press on occasion, she said that she never talked directly to

24   Risen, doesn't know him.  Now, you can believe that or not

25   believe it.  It doesn't matter whether Ms. Divoll directly

1  spoke to the press.

2         What we do know is that when Ms. Divoll shared closed

3  door SSCI business with someone outside the committee within a

4  week of when Mr. Stone's memo was written, what she disclosed

5  ended up in *The New York Times* the very next day in a story

6  written by Jim Risen.

7         Now, the Senate is a very -- the Senate Committee on

8  Intelligence, Ms. Divoll told you, is a very partisan place.

9  The Republicans had just taken over.  Democrats love stories

10  that embarrass Republicans.  Here was a former CIA officer

11  coming in with concerns about a counterproliferation weapons of

12  mass destruction operation right before the invasion of Iraq.

13  Was there someone on the Hill who wouldn't have minded getting

14  that story out to the press?

15         Mr. Goco told you that he didn't really have a way to

16  follow up after asking the CIA about the program at his next

17  scheduled meeting, so SSCI didn't do anything further in

18  response to Mr. Sterling's concerns.  Mr. Sterling would not

19  know that.  He was not told what action SSCI would take, but if

20  we look at the book, at page 211, at paragraph 92, it tells us

21  that SSCI took no action, something that Mr. Risen had to have

22  learned from SSCI.

23         What did Sterling tell Stone and Divoll?  Again, this

24  is Government Exhibit 101.  He told them that the program

25  involved getting faulty plans for a fire set to Iran.  He told

1  them that the National Labs had modified the plans.  Both Stone

2  and Divoll recall that Sterling mentioned a Russian scientist,

3  and Divoll recalls that the plans were passed to the Iranians

4  in Europe.

5       Call up 106, please.

6       Less than a month later, Jim Risen is calling

7  Mr. Harlow at the CIA.  What does he know about the program

8  when he calls Mr. Harlow?  He knows it involves faulty plans

9  for a fire set.  He knows that the plans were modified at the

10 National Labs.  He knows that the operation involved a Russian

11 scientist.

12      Did, did the memo get all the details right about the

13 Russian scientist?  No, but Mr. Sterling told the Hill about a

14 Russian scientist.  Mr. Risen knows it, and he knows that the

15 plans were given to Iran in Europe, exactly what Vicki Divoll

16 recalls from that meeting.  Not Vienna, in Europe.

17      And he knows that it happened in 2000, and he doesn't

18 know if the program is still in operation.  In other words, he

19 knows exactly what Jeffrey Sterling told Divoll and Stone.

20      Now, the government has pointed out that Risen also

21 knew that the code name was Merlin and neither Stone nor Divoll

22 remember that Sterling mentioned the code name Merlin.  He may

23 have and they didn't remember it when they wrote up their memo

24 seven weeks later, or Risen could have gotten that information

25 afterwards, when he followed up on the information that he

1    learned from SSCI.

2            In this first call with Mr. Harlow, Mr. Risen also

3    says that he knows that the program had been approved by

4    President Clinton and wants to know if Bush had reapproved it.

5    There is no evidence that Mr. Sterling told Divoll or Stone

6    anything about President Clinton approving the program, but

7    Stone and Divoll told you that others on SSCI already knew

8    about Classified Program No. 1 before Sterling came in.

9            If Risen followed up with people on the Hill, people

10   like Bill Duhnke, the Republican partisan, asking questions

11   about a supposedly flawed program, would that person tell Risen

12   that that was a program that was approved by a Democratic

13   president?

14           Now, as you know, when the book finally comes out,

15   it's not just the version that Mr. Sterling told SSCI.  It's

16   that version on steroids.  Now it's not just Mr. Sterling who

17   has concerns about the program; it's Merlin himself who has

18   concerns about the program.  He's wandering around Vienna,

19   concerned that he's about to give a nuclear, working nuclear

20   fire set to the Iranians in a rogue operation.

21           Now, how did that happen?  Sterling said that Merlin

22   immediately saw a problem with the plans, and he said that

23   Merlin later got cold feet.  Both are true, but Risen puts them

24   together to create an impression that is not accurate.  But

25   it's also not something that Mr. Sterling ever said.

1       Risen does not ultimately tell Mr. Sterling's story.

2   Mr. Risen tells Mr. Risen's story.  Now, whether Mr. Risen was

3   simply mistaken because he misunderstood some of the facts,

4   whether he was engaging in hyperbole to sell a book, or whether

5   he found others that gave him a different version than Jeffrey

6   Sterling told the Hill does not matter.  Chapter 9 is Risen's

7   story; it is not Sterling's story.

8       After the first call from Risen to Mr. Harlow, both

9   the CIA and the NSC, the National Security Council, are

10  alarmed.  We know that.  Bob S. starts accessing cables to

11  brief the generals at the CIA.  On April 3, that first phone

12  call, Risen was unsure whether the program was still in

13  operation.

14      Let's go to Exhibit 112, if we can.  It's now April

15  25.  It's three weeks later, and Mr. Risen calls the CIA again.

16  Has Mr. Risen been sitting on his hands for these three weeks,

17  or has he gone out and got additional information from what he

18  learned from the Hill?

19      Risen now knows that this is an ongoing program.

20  Indeed, the lead for his story, he tells Mr. Harlow, is that

21  the United States has had an ongoing program, something he

22  didn't know three weeks earlier, and more importantly,

23  something that Mr. Sterling, who hadn't been at the agency for

24  years, did not know and could not have told Mr. Risen.

25      Mr. Risen got that by talking to CIA sources after he

1482

1    talked to the Hill.  He now knows, he now knows that the

2    program involved nuclear firing sets, plural, and that it was

3    part of a larger program to inject flawed designs into Iran.

4           Now, when Sterling was on the Hill, he used the

5    term "fire set."  It's in Exhibit 101.  It's also the term

6    Risen used when he called Harlow initially.  It's in 106.

7           Now, in 112, Risen is using the term "firing set,"

8    the term that Bob S. used in cables.

9           And by April 25, Mr. Risen tells Harlow he has

10   documents, something he did not say on April 3.  Where did he

11   get those documents?  He got those documents from people that

12   knew that in 2003, this was an ongoing operation, wanted to

13   convince Risen of that, and wanted to kill the story.

14          Now, "fire set" and "firing set" may be the same

15   thing -- may mean the same thing.  Mr. Sterling says tomato;

16   Mr. S. says "tomato"; they mean the same thing; but Risen has

17   now switched from using the language that Sterling used when he

18   talked to the Hill to the words that Bob S. uses in cables.

19          Now, Risen only knows that they're running this

20   operation against Iran, and that's all he's asking about.

21   There'd be no reason for the CIA generals to tell him:  Oh, by

22   the way, we're also running it with these other countries.

23          They don't want to give him information that he

24   doesn't have and isn't going to write about.  What they want to

25   do is convince him that he's wrong about what he does want to

1483

1    write about, and so they want to give him more information

2    about the Iranian operation, the Vienna operation, to convince

3    him that he's got it wrong.

4            Now, where did the information that Risen got come

5    from?  Let's talk about Merlin.  Merlin is told by Bob S.

6    there's been a leak.  Merlin, according to Bob S., has chutzpa.

7    Merlin, according to Bob S., was chosen for this program

8    because Merlin is willing to take risks and do them in a way

9    that they won't be traced back to the CIA.

10           What does Merlin recall about the San Francisco

11   meeting?  In his testimony, he was asked, "Who attended the

12   meetings in San Francisco?"

13           And the judge is going to instruct you it is your

14   recollection of this testimony that controls, not mine, but let

15   me suggest to you that I believe that he testified that in San

16   Francisco, he met Jeff for the first time.  There was another

17   CIA person there, I believe Lenny Bob, if I remember correctly.

18   There was a representative from the National Laboratory.

19           Mr. Trump says, "There was?"

20           "Yes, from Los Alamos or Sandia."

21           Now, we know from everybody else's testimony that, in

22   fact, there was nobody from the National Laboratories at the

23   meetings in San Francisco.  Merlin is mistaken.  He's the only

24   one who believes that there was a representative of the

25   National Laboratories there.

1484

 1          What does the book say?  Page 98, paragraph 125:  "In

 2   a luxurious San Francisco hotel room, a senior CIA official --

 3   Bob -- involved in the operation, walked the Russian through

 4   the details of the plan.  He brought in experts from one of the

 5   National Laboratories to go over the blueprints that he was

 6   supposed to give to the Iranians."

 7          Also, the book uses the word "blueprints."  That's a

 8   word that does not appear in any cable.  I asked Bob S. about

 9   the term "blueprints," and Bob S. told me that would be an

10   inaccurate term.  But Merlin testified, not in response to any

11   question, in his own terminology:  "What was discussed at the

12   meetings in San Francisco?"

13          "The schematics and blueprints were introduced."

14          "This letter, what were you supposed to do with the

15   letter?"

16          "I was supposed to pass it to the Iranians with

17   documents, blueprints, and schematics."

18          The only person affiliated with Classified Program

19   No. 1 who uses the word "blueprints" is Merlin.  The

20   term "blueprints" appears in chapter 9 repeatedly.  By my

21   count, "blueprint" or "blueprints" appears in chapter 9 at

22   least 20 times.

23          The note.  The cables and the testimony make clear

24   that it was decided in advance that there will be a note to the

25   person in Vienna on the outside of the envelope, the inside of

1   which would contain the plans and a cover letter directed to

2   the person back in Iran, but Merlin, Merlin testified that on

3   the spot in Vienna, he had the idea to write a handwritten

4   cover note when he realized he was going to have to leave the

5   package at a mailbox rather than give it to somebody.

6           "I have the time to think, and I realize nobody's in

7   the office.  I, I thought it would be suspicious, somebody puts

8   this very expensive documents, these very important documents

9   without any explanation, and I decided to wrote very short this

10  sized note where I said I came many times to your office.  It

11  was closed.  Please take attention to this envelope.  This is

12  important and valuable information."

13          Merlin returns, and he's debriefed by Bob S. and

14  Mr. Sterling together.  The cable of that debriefing is Exhibit

15  44.  It does not mention a handwritten cover note by Merlin.

16  Review it carefully.  Only Merlin knows about this note.

17          What does the book say?  Page 204 in paragraph 57:

18  "In Vienna, the Russian went over his options one more time and

19  made a decision.  He unsealed the envelope with the nuclear

20  blueprints and included a personal letter of his own to the

21  Iranians."

22          Now, Risen gets a lot of things wrong here.  He

23  thinks that this personal note that he quotes at length is

24  actually the cover letter that was done in advance, the draft

25  of which appears in Exhibit 35.  He also thinks that the letter

1486

1    is warning the Iranians of flaws in the plans rather than

2    telling them that the plans are incomplete.

3            But what is important is not what Mr. Risen got

4    wrong; what is important is what Mr. Risen got right, that

5    Merlin wrote a personal note on the spot in Vienna that had not

6    been planned in advance.  Merlin knows this.  It is not

7    reflected in any cable, and it ends up in Mr. Risen's book.

8            The times that things happened, "Merlin, what time

9    did you get inside the office building?"

10           "The first time I came about 8 a.m. on a Friday.  The

11   office was closed.  I came back after lunch, like 1 or 2 p.m."

12           Look at Exhibit 44, the debriefing.  No time is

13   reflected.  Bob S. testified he didn't recall Merlin ever

14   telling him the times.

15           What does the book say?  Page 205, paragraph 67:  "By

16   8 a.m., he found 19 Heinestrasse."

17           Page 206, paragraph 71:  "At 1:30 p.m., I got the

18   chance to be inside of the gate."  That one is in quotes.

19           Merlin testified that the times were 8 a.m. and

20   between 1 and 2 p.m.  The book says 8 a.m. and 1:30 p.m. and

21   quotes Merlin.

22           Mr. Risen reports that this information came from a

23   document that Merlin later wrote.  That's at page 206,

24   paragraph 71.  But Merlin and Bob S. both testified that Merlin

25   did not write any report of his trip to Vienna.  The

1     information is not in any cable.

2             After the generals at the CIA learned that Risen had

3     the story and were asking for information about Classified

4     Program No. 1, did Bob have Merlin write him a report of the

5     trip that someone at the CIA leaked to Risen?  There's no

6     evidence that the time is written out anywhere.  Whether or not

7     they were, we know that Merlin knew them, and they end up in

8     the book.

9             We've talked about the terminology, the fact that

10    "high-voltage block" is the Russian term and that "firing set"

11    is Bob S.'s term, and that's what ends up in the book.

12            There's a quote from Merlin at page 203, paragraph

13    50, where he's asking for directions.  Now, Merlin says in his

14    testimony that he did, in fact, know enough German that he

15    could have asked for directions, but he claims that he wouldn't

16    have because it would look suspicious for a Russian scientist

17    to ask for directions to the address of the IAEA.

18            Now, it's not at all clear why that makes sense.

19    Remember, this is a building that has not just the IAEA Mission

20    in it; it also is an apartment building.  Why would it be

21    suspicious for somebody to ask for an address for an apartment

22    building?

23            But that doesn't matter because the book doesn't say

24    that he asked for the address.  It just says that he asked if

25    people knew where that street was.  There would be no reason

1488

1    for Merlin not to have asked where the street was.  There's no

2    place that it's in a cable, and it's in quotations attributed

3    to Merlin in the book.

4           Ladies and gentlemen, most importantly, the cover

5    letter.  The cover letter is at the heart of most of the

6    charges in this case.  That's the document that supposedly

7    Mr. Sterling leaked to Mr. Risen, gave to Mr. Risen, physically

8    gave the document itself.  There's no evidence, no evidence

9    that Mr. Sterling had that letter ever.

10          Now, in Merlin's testimony, he admitted the drafts of

11   the cover letter were typed on his home computer.  He would

12   talk to -- take a printout to Mr. Sterling, they would go over

13   it, they would talk about revisions, and then Merlin would take

14   the paper back to his house, make the revisions on his home

15   computer.

16          The cover letter is quoted at length at pages 204 and

17   205 of the book.  This is a real problem for Merlin if the only

18   version of that letter resides on his home computer.  As

19   Mr. Olshan says, so on cross-examination, he claims that he

20   gave a copy of the final version of the letter to Mr. Sterling

21   when he met him about two weeks before leaving for Vienna.

22          There's one problem with that testimony:  It's not

23   true.  I mean, go ahead and put up that timeline.

24          We know Exhibit 35 is a January 10, 2000, meeting

25   between Merlin and Mr. Sterling where they come up with the

1  fifth version of the cover letter, which Mr. Sterling then in a

2  cable sends on to headquarters.

3          On January 14, 2000, Exhibit 36, Bob S. writes the

4  cable directing that the words "for free" be added to the

5  letter.  Mr. Olshan talked about this.

6          On February 14, 2000, there's a meeting between

7  Merlin, Bob S., and Mr. Sterling.  This is the meeting that

8  Merlin storms out of.  Bob S. did not say that Mr. Sterling was

9  given a copy of the final letter at this meeting.  It's not

10 reflected in the cable, and you can be sure if Mr. Sterling was

11 given a copy of that letter, it would have to have been

12 reflected in that cable.

13         On February 21, 2000, there is a meeting, this is the

14 final meeting, it's Exhibit 38, between Bob S. and Merlin.

15 This meeting takes place without Mr. Sterling being there.

16         And then on March 3, Merlin delivers the cover letter

17 and the plans in Vienna, and that's in Defendant's Exhibit 3.

18         As Mr. Olshan noted, the version that's in the book

19 includes the "for free" language.  It is the final version of

20 the letter.  It is the version that resides on Merlin's

21 computer.

22         Merlin told you he did not bring back a version of

23 this letter from Vienna.  The only place it resides is on his

24 computer.  So Merlin says, "Well, I gave a copy to Jeff two

25 weeks before I left when I met with him."

1    He didn't meet with Jeff alone two weeks before he

2   left.  The last time that he met alone with Jeff before he left

3   is on January 10, two months earlier, and at that point,

4   the "for free" language didn't exist yet.  He couldn't have

5   given Mr. Sterling a copy of the final letter with the "for

6   free" language, the copy that appears in the book, he could not

7   have given that to Mr. Sterling two weeks before he left.  He

8   couldn't have given it to Mr. Sterling at any time because he'd

9   never met alone with Mr. Sterling when that language existed.

10    Merlin's mistaken belief that someone from the

11  National Labs was in San Francisco, that Merlin decided at the

12  last minute to include a personal cover note, the term

13  "blueprints," "high-voltage block," the times that Merlin got

14  into the building, the quote asking for directions, and most

15  importantly, the final version of that letter, all of those

16  things came from Merlin.  Merlin attempted to mislead you

17  otherwise.

18    Bob S.  Directly or indirectly, Bob S. was likely a

19  source for chapter 9.  In 2003, in 2004, in 2005, Mr. Sterling

20  no longer has access to cables.  Bob S. does.  Mr. Sterling

21  (sic) also still has access to Merlin.  Mr. Sterling does not.

22    Bob S. designed disinformation campaigns and created

23  legends for a living.  To quote none other than the Rolling

24  Stones, he was practiced in the art of deception, and he had

25  Merlin, who had chutzpah.  Whether he gets the information from

1491

1    Merlin and passes it on himself, whether he gets the

2    information from Merlin and passes it on through others,

3    whether Merlin passes it on, it has to be some combination of

4    people that still have access to the program.

5           What is in the book that sounds like it came from Bob

6    S.?  We've discussed the term "firing set."

7           The Wine Country.  Mr. Olshan tells you that's right,

8    Sonoma is not in any cable.  Now, it's true that Mr. Sterling

9    would have known that, but is that a fact that Mr. Sterling is

10   going to remember years later?

11          We know that Bob S. remembers it now, 16 years later,

12   because it's important to him because he cares about wine, and

13   to him, there's a big difference between Napa wine and Sonoma

14   wine, but there's no reason for this detail to be important to

15   anybody else, and this detail that is uniquely important to Bob

16   S. is in the book.

17          The book details the names of various streets in

18   Vienna, a city that Bob knew well even before he went there on

19   more than one occasion to case for this operation.  There's no

20   evidence that Mr. Sterling's ever been to Vienna.  Who would

21   remember the details about these street names years later, Bob

22   S. or Mr. Sterling?

23          More tellingly is Bob S. in his testimony recalled

24   that the mailbox in which Merlin left the package was to the

25   left of the door.  Look at Exhibit 44, the debriefing cable.

1    It's not in there.  Yet this detail appears in the book at page

2    206, paragraph 71.

3            Why would Jeffrey Sterling remember that detail years

4    later?  We know that Bob S. did either on his own or because he

5    had talked again to Merlin.

6            Even more telling, Bob S. in his testimony recalled

7    that Merlin saw an Austrian postman and that he covered the

8    package with a newspaper.  Neither of those details is in

9    Exhibit 44 or any other cable.  Even if Mr. Sterling had

10   somehow secreted cables with him and held them for three years,

11   he wouldn't know this unless he remembers it.  There's no

12   evidence he would remember those details, but Bob S. remembers

13   both, the postman and the newspaper.  Whether he remembers them

14   on his own or because he's talked to Merlin, both appear in the

15   book.

16           Why is it particularly telling that he recalls these

17   details?  Remember, Bob S. tried to explain away how Risen

18   could have known that the mailbox was on the left.  Maybe Risen

19   saw that when he traveled to Vienna.  But Bob S. couldn't

20   explain away how it is Risen could possibly have known that

21   Merlin saw an Austrian postman or that he left the plans under

22   a newspaper.  Only Merlin could know that, and it's not in any

23   cable.

24           The national defense information that appears in

25   chapter 9 that did not come from the Hill came from Merlin, Bob

1    S., or someone at the CIA.

2           What was Mr. Sterling's relationship with Mr. Risen?

3    Because Mr. Olshan is correct, they clearly did have a

4    relationship.  Was Mr. Sterling hiding that fact?  You saw

5    Exhibit 83.  He's got his picture in *The New York Times* in a

6    story by Jim Risen where he's quoted in his own name.  Of

7    course he has a relationship with Mr. Risen.

8           And absolutely, Mr. Risen is writing about his

9    employment discrimination suit, and Mr. Sterling is given

10   unclassified PARs as part of that suit.  You haven't heard it's

11   illegal in any way for him to give those unclassified PARs to

12   Mr. Risen, who's following his employment discrimination suit,

13   and yes, he wants attention to that suit both inside and

14   outside of the agency.  That's why he hired outside lawyers,

15   that's why he filed a lawsuit, and that's why he wants that

16   lawsuit publicly covered.

17          And yes, part of Exhibit 59 is quoted in Exhibit 3,

18   Risen's story, and yes, and part of 60 is quoted in chapter 9.

19   By 2006, when Mr. Risen publishes the book, how does he know

20   that the PAR he obtained back in 2002, the report on Sterling's

21   discrimination suit, is talking about Merlin?

22          He knows that Sterling speaks Farsi and is an Iranian

23   expert.  He reports that in Exhibit 83.  He knows that Sterling

24   worked in New York from January '99 until 2000.  He knows after

25   talking to the Hill in 2003 that Sterling came to talk about an

 1    asset that had been used in an operation in 2000 against Iran,

 2    and from talking to whoever his sources were at the CIA after

 3    he had talked to the Hill, he knew that Merlin was a known

 4    handling problem, demanding, overbearing in nature, walked out

 5    of meetings.  Mr. S. described him as a difficult asset.  The

 6    cables describe him as somebody unable to follow even the

 7    simplest and most explicit direction.

 8           How hard would it be for Mr. Risen to piece together

 9    that when he's got a PAR praising Sterling's handling of a

10    known -- of an asset who's difficult, demanding, overbearing,

11    and a known handling problem, how hard would it be for him to

12    figure out that that asset was Merlin?

13           In 2003 -- well, again, 2003, Mr. Sterling goes to

14    SSCI to talk about Classified Program No. 1.  Risen is

15    following the discrimination suit.  Risen learns from the Hill

16    that Sterling has been out talking about the classified

17    program.  Risen and Sterling have several conversations in this

18    period.

19           Is Risen trying to get information from Sterling

20    about Classified Program No. 1?  Almost certainly.  Does that

21    mean that Sterling gave him any?  No.

22           What do we know that he gave him?  Risen comes to him

23    and says, "Hey, heard you were up on the Hill talking about

24    this classified program."

25           Sterling sends him an e-mail with a publicly

1  available CNN article and says, "Yeah, makes you wonder."

2         That's what he passed on to Mr. Risen when he was

3  asked about Classified Program No. 1.  He talks to Mr. Risen

4  about his discrimination suit.

5         Mr. Risen is able to keep his discrimination claims

6  and his concerns about Classified Program No. 1 separate.  We

7  know this.  When he talks to HPSCI, he talks about the

8  employment discrimination claims.  He doesn't talk about

9  Classified Program No. 1.  When he talks to SSCI, he talks

10  about Classified Program No. 1.  He doesn't talk about his

11  employment claims.  And in March 2002, he talked to Risen about

12  his discrimination case and did not talk to him about

13  Classified Program No. 1.

14         Over the years, Sterling and Risen have spoken a

15  number of times, but there's no evidence, no evidence that they

16  speak about Classified Program No. 1 in a way that Mr. Sterling

17  is providing him national defense information.  Mr. Olshan says

18  that Sterling is the hero of chapter 9.  I don't know if that's

19  accurate or not.  We know that Sterling has a relationship with

20  Risen and we know that Risen seems to have some sympathy for

21  Sterling if you read that article, article 83.

22         But more importantly, how, how does the chapter

23  portray Merlin?  Mr. Olshan said as a bumbler.  That's funny,

24  the cables say he can't follow the simplest direction.  He

25  can't even find the mission after having been given explicit

 1    instructions.

 2            Mr. Olshan says that the chapter portrays Robert S.

 3    as pushing forward with the program -- Robert S. was pushing

 4    forward with the program -- and that Jeffrey Sterling is

 5    portrayed as a competent case officer.  Guess what?  He was.

 6    Read those PARs.  Every witness on the stand said that he did a

 7    good job.  Even, even Bob S. said he did a good job on this

 8    operation.  If you read the PARs, he got high marks for the

 9    operations.  He got high marks for his security measures.

10            Their criticism of him was that he didn't go -- not

11    how he handled the cases that he was given but that he didn't

12    do enough to go out and develop new cases.

13            Let's look at the timeline.  If we can go ahead and

14    put up that modified Exhibit 98?

15            This is the government exhibit, but I've added, I've

16    added some things that the government didn't put on the

17    timeline.  On March 3, the PRB suit that has been in the works

18    for a couple of months is filed by Mr. Sterling's lawyer

19    against the CIA.  March 6, there is an order that transfers his

20    employment discrimination suit from New York to Virginia.

21            Mr. Olshan said in this time frame in March,

22    Mr. Sterling is out of options.  He's not out of options.  His

23    case has just been transferred to Virginia, and it's going to

24    move forward.  That's Exhibit 94.

25            After the public PRB suit is filed and after the

1    public order transferring the case, he has a number of

2    conversations with Mr. Risen.  What were they likely talking

3    about?  The PRB suit and the discrimination suit.

4         Let's go to page 4.  On March 3, 2004, a year later,

5    the employment discrimination suit is dismissed by the Virginia

6    court.  And again, there are a series of conversations over the

7    next couple of months between Mr. Sterling and Mr. Risen, about

8    27 minutes' worth of conversations in March, about 43 minutes

9    of conversations by mid-May, in the two months since the

10   employment suit was dismissed.

11        And let's go to page 7.  What does Risen say?  "I am

12   sorry if I have failed you so far."

13        How has he failed him?  He hasn't written a single

14   article about the dismissal of the employment discrimination

15   suit.  He hasn't followed up on the employment discrimination

16   suit with any published article since 2002.  "But I really

17   enjoy talking to you, and I'd like to continue.  Jim."

18        Now, if we can go to page 10?

19        In July of 2004, according to the records pulled by

20   Agent Hunt, Mr. Risen goes to Vienna to research the book.  In

21   September of '04, he submits the book proposal.  These are

22   Exhibits 128 and 129.  In this period of time, when he's

23   clearly, when Risen's clearly working on the book, how many

24   conversations does he have with Jeffrey Sterling?  None.

25        And finally, the government points out that their

1498

1    relationship seemed to end at the end of 2005 and notes that

2    the book was published in January of 2006, and that's true, but

3    it's also true that in January 2006, Agent Hunt told you this,

4    the Supreme Court decided not to take the appeal from

5    Mr. Sterling's employment discrimination suit.  Their

6    relationship ends when the employment discrimination suit ends.

7         The government's suspicion of Jeffrey Sterling is not

8    evidence.  As we learned, Benjamin Franklin said that three can

9    keep a secret if two of them are dead.  In this case, at least

10   90 people had a secret.  Someone, several people didn't keep

11   it.  But the evidence of one who did, who time and time again

12   went through legal channels, was Jeffrey Sterling.

13        So what does the government rely on?  They rely on

14   1987 telephone rotary phone instructions and an interim

15   evaluation report from when he was a trainee in 1993 that they

16   find in his house.  Nothing to do with the charges in this

17   case, nothing to do with Classified Program No. 1, nothing to

18   do with any other classified operation.

19        He shouldn't have had those documents in his house,

20   but they're not evidence that he disclosed national defense

21   information about Classified Program No. 1 to Jim Risen.

22        The obstruction of justice charge.  From August 3 --

23   sorry, from August of 2003 to July of 2004, Mr. Sterling had

24   use of the computer in the Dawson home.  That's in stipulation

25   11.  On April 19, 2006, two years later, data is preserved at

1    hotmail, and this March e-mail to Mr. Risen with the CNN

2    article is still on there.  By July 14, it's no longer in the

3    hotmail account.

4            Mr. Risen is served with a grand jury subpoena on

5    June 16, 2006.  That's Exhibit 139.  Look at the attachment to

6    139.  139 tells Mr. Sterling that there's a grand jury

7    proceeding.  It also tells him what the grand jury wants him to

8    bring with him in the way of documents.  It wants him to bring

9    any classified documents he has.  It wants him to bring PARs

10   that he has.  Clearly, they're looking for those 1999 and 2000

11   PARs that have been quoted by Risen.  It says that it wants

12   information about his time at the agency.

13           There is not a single category in there of things

14   that they're interested in that has anything to do with his

15   communications with Risen about publicly available information.

16           The computer is turned over by Ms. Dawson to the FBI

17   in August of '06.  If that e-mail is not there, that would mean

18   Mr. Sterling deleted it, he would have had to have deleted it

19   by 2004, two years earlier, when he lost access to the

20   computer.

21           If it is still there, it means that he didn't delete

22   it; it's still there.  The government has not explained to you

23   how it is that Mr. Sterling had the ability to get into

24   hotmail's database and delete it from hotmail's records.

25           Also, we have no idea when it was that it got deleted

1    from hotmail or why.  Mr. Sterling's not put on notice to the

2    grand jury until June, and the data is preserved again in July.

3    That could have been deleted anytime between April and July,

4    before Mr. Sterling even knew about the subpoena, the subpoena

5    that tells him that they're not interested in this e-mail.

6           So you now have to believe that Mr. Sterling kept

7    the, the e-mail on his computer but then somehow got into

8    hotmail's records to delete them because he was put on notice

9    of the fact that the grand jury was not interested in this

10   document.  There is no obstruction of justice in this case.

11          Now, ladies and gentlemen, all of our lives would

12   have been a lot easier if Mr. Risen would have revealed who his

13   sources were and who they were not for his reporting on

14   Classified Program No. 1, but he didn't, and whether you think

15   that's a good thing or a bad thing is no more relevant than

16   whether you think Classified Program 1 was a good program or a

17   bad one or Mr. Risen's reporting good or bad.

18          The government says that chapter 9 is only about

19   Jeffrey Sterling's time with the program.  Well, they say that

20   only after telling you to ignore the entire rest of the

21   chapter.  The chapter starts on pages 193 and 194 with an event

22   that happened in 2004, after Mr. Sterling is gone.  It ends its

23   discussion about Classified Program No. 1 with information

24   about the NSA tracking the person from Vienna going back to

25   Tehran.  There's no evidence that anyone ever told Mr. Sterling

1    that.  There's no reason he would have told Mr. Risen that.

2         The government's suspicion that because the book

3    talks in detail about things that Mr. Sterling knew simply is

4    not enough.  The Hill knew what Mr. Sterling told them.

5    Mr. Risen had sources at the CIA.

6         They have a theory; I have a theory.  I think my

7    theory is the more likely theory, but frankly, that doesn't

8    matter.  We're not dealing in competing theories.  We're

9    dealing in evidence, and it is the government's burden to put

10   on evidence beyond a reasonable doubt that it was Mr. Sterling.

11        You heard from any number of CIA, former/current CIA

12   people in this case, and Mr. Sterling himself spent years of

13   his life with the CIA.  Why?  Because all of these people want

14   to defend our national defense.  Why?  Because they believe in

15   a system where you are not convicted of extraordinarily serious

16   crimes because the government believes that you committed them.

17        You took an oath to decide this case only on the

18   evidence presented to you, not on theories.  The evidence does

19   not prove beyond a reasonable doubt that Mr. Sterling committed

20   the offense charge -- the offenses charged.

21        Now, this is my last opportunity to speak to you.

22   The government gets to get up, they get to go last.  They get

23   the last word, and that's appropriate.  It is the government's

24   burden to prove the case, and the burden is a high one.

25   Indeed, in this case, it is an insurmountable one.

1502

1          The government has great lawyers.  One of them is

2   going to get up now, and they're going to think of an argument

3   that I have not thought of.  They're going to discuss a piece

4   of evidence that I didn't mention or I didn't discuss

5   thoroughly enough.  They're going to make a compelling

6   argument.

7          Yes, the government is allowed to use circumstantial

8   evidence, and there may be cases where guilt can be established

9   beyond a reasonable doubt based on circumstantial evidence, but

10  this is not one of those cases.  Be very careful.  It's

11  dangerous.

12          Can you put up Exhibit 146?

13          THE COURT:  You've got one more minute.

14          MR. POLLACK:  Thank you, Your Honor.

15          Can you blow it up?  Yeah, blow that up.

16          The government offered this to you as circumstantial

17  evidence that Mr. Sterling had a classified document on his

18  computer pertaining to Classified Program No. 1, circumstantial

19  evidence that he provided that information to Mr. Risen.

20          Ladies and gentlemen, it would have been a tragedy if

21  we had not found Mr. Gilby or if he had not remembered that he

22  had used a software called Merlin.  You would have convicted

23  Jeffrey Sterling of grave charges because Mr. Gilby researched

24  scheduling software for use in his business renovating homes.

25          When you get back to the jury room, before you begin

1   your deliberations in earnest, please think carefully about how

2   I would have responded to the government's final arguments had

3   I been given the chance.  Look at the evidence carefully, and

4   make my arguments for me.  You'll make them better than I can.

5   And Mr. Sterling deserves that.

6           Then and only then begin deliberating, and when you

7   are done, do the only thing that you can do on the evidence

8   that has been presented:  Find Mr. Sterling not guilty of each

9   and every count.

10          Thank you.

11          THE COURT:  All right, Mr. Trump, you have ten

12  minutes.

13          MR. TRUMP:  May we approach, Your Honor?

14          THE COURT:  Yes.

15          (Bench conference on the record.)

16          THE COURT:  Mr. Trump?  Yes.

17          MR. TRUMP:  I just want to make sure that I don't

18  step over the line should I make this argument, but counsel

19  suggested that there was some sort of conspiracy within the CIA

20  to kill this story, to feed documents to Jim Risen tasking

21  Bob S. to write a report after the fact to feed to Risen.

22          Obviously, Judge, if there had been any such

23  conspiracy, if anybody had actually done that, if there were

24  documents, we were legally obligated to produce that to the

25  defense.

1504

1     MR. POLLACK:  If you have them.

2     MR. TRUMP:  And we didn't, and the CIA was legally

3  obligated to provide them to us.  There is no such documents.

4  There is no such evidence.

5     THE COURT:  Well, you need to be careful from my past

6  experience in these cases.  You're not aware of any such

7  evidence.  You don't want to put yourself in the -- you can't

8  testify, if that's what your concern was about, about that.  I

9  think you don't want to make that argument.

10     MR. TRUMP:  Okay.  I just want to make sure I don't

11  go too far, Your Honor.

12     THE COURT:  I don't think you want to make that

13  argument.

14     MR. TRUMP:  Okay.

15     (End of bench conference.)

16     MR. TRUMP:  May I consult with cocounsel for one

17  minute?

18     THE COURT:  Yes.

19     It's always a bad sign when a lawyer pours a glass of

20  water.

21                         (Laughter.)

22     THE COURT:  We used to have a colleague here who

23  wouldn't let the lawyers have water.  It made the trials go

24  very quickly.

25                         (Laughter.)

1    THE COURT:  All right, Mr. Trump, are you ready?

2                    REBUTTAL ARGUMENT

3                    BY MR. TRUMP:

4    Good afternoon.

5    Sorry, Your Honor, something doesn't seem to be -- I

6    only have a few minutes, so I'll just address a few points.

7    Don't overlook the obvious.  Don't get lost in conjecture and

8    speculation and possibilities and probabilities.

9    Circumstantial evidence can be compelling.  It can be

10   powerful.  It can be sufficient to convict.  If you look

11   outside and you see that it's wet, you know it rained.  You

12   don't have to see the rain to know it's true.

13   Counsel just went through a scenario for which there

14   is absolutely no evidence whatsoever.  The idea that Jim Risen

15   had a source somewhere on Capitol Hill, that somehow someone

16   from SSCI talked to James Risen, there's no evidence that that

17   happened.  There's no evidence that then he called Bill Harlow

18   and there was some sort of conspiracy, some sort of group

19   effort by the CIA to feed him documents in an effort to kill

20   the story, that they enlisted Merlin, they enlisted Bob S.,

21   that they asked Bob S. to write after-the-fact reports which

22   they could then feed to Mr. Risen to support an effort to kill

23   the story.  There's absolutely no evidence whatsoever that that

24   ever happened.

25   The evidence is that Risen called Harlow, that there

1    was a meeting at the White House.  That was the interaction

2    between the CIA and James Risen in April about this story.

3          The idea that Risen was able to write this chapter of

4    this book based on other sources, on other information, without

5    the defendant, without the help of the defendant, the one who

6    had a motive, the one who said he was going to come after the

7    CIA, the one who had an ongoing --

8          MR. POLLACK:  Your Honor, I'm sorry, I have to

9    object.  That statement is not even coming in for the truth.

10   He can't argue it.

11         THE COURT:  The jury's recollection of the evidence

12   is what will govern them in their deliberations.  If counsel

13   have misstated the evidence, the jury will remember that.

14         Go ahead, Mr. Trump.

15         MR. TRUMP:  The one who had an ongoing relationship

16   with Risen since 2001, a relationship that abruptly ends with

17   the publication of the book in 2006, who was the case officer

18   assigned to this operation during the relevant time frame, who

19   was a participant and knowledgeable, who did have access while

20   he worked at the CIA to all of the cables that Bob had access

21   as well, as well as all the other case officers, who is the

22   only person who had knowledge of every fact known to Risen,

23   from the true name of the asset to his $5,000 salary, to the

24   technical and logistical aspects of the operation, who had

25   received a copy of the letter quoted in the book from Merlin a

1507

1    week or two prior to the Vienna trip.

2         Now, counsel can say that it didn't happen, but the

3    only evidence in the record is that Merlin said he gave a copy

4    of that letter to the defendant, who, like Risen, did not know

5    about the ongoing operations, and even though, yes, Mr. Risen

6    said that it was an ongoing program, but when he actually wrote

7    the book, he didn't.  He wrote it in the time frame of Jeffrey

8    Sterling.

9         The 2000 PAR, there is absolutely no way, and you

10   will have it in evidence, there is no way without the defendant

11   telling Risen that this PAR relates to Merlin and this

12   operation, that he would be able to figure that out on his own.

13   Look at it.

14        He's the only person who said, falsely, that the

15   operation may have given nuclear secrets to the Iranians.  And

16   why did he wait five years?  Because at this point in time, he

17   had lost all hope of a financial settlement with the agency.

18   It was done.

19        Now, yes, he had ongoing litigation with respect to

20   the PRB, but the prospect of getting money was done.  It was

21   over.

22        And as of March 10, 2003, he sent Risen an e-mail

23   about the CNN article, just five days after his trip to SSCI.

24   Now, you saw a comparison of the Harlow memo and the Stone

25   memo, and yes, there's similar information in there because the

1   information comes from the same source.  It comes from Jeffrey

2   Sterling to SSCI, it comes from Jeffrey Sterling to James

3   Risen, but Risen had more detailed information.  He had, he had

4   talked with the defendant.  By this time, he's getting more and

5   more information.  He's preparing to write the article.

6           And again, look at the phone calls.  Look at the

7   phone records.  There's a whole cluster of records indicating

8   continuing contact in March and April between the defendant and

9   James Risen.

10          The other suspects.  Merlin.  There is absolutely no

11  evidence whatsoever that Merlin had any sort of relationship

12  with James Risen, none.  No motive whatsoever.  None.  It

13  ruined his relationship with the CIA.  He lost his job

14  essentially.  There is absolutely no evidence in this record to

15  suggest that Merlin had any contact whatsoever with James

16  Risen, that he was tasked by the CIA with Bob to try to kill

17  the story.  Nothing.

18          Merlin never knew about the deeply embedded flaws.

19  They kept that from him.  He didn't know about the Red Team

20  efforts.  That was information that was never provided to him.

21  He doesn't know anything about the PAR.  He doesn't know

22  anything about the SSCI meeting.

23          The note?  There was a discussion of a handwritten

24  note.  In fact, it was something that was raised by the

25  defendant as an additional suggestion to the cover letter.  It

1   was raised, it was discussed in the cable that the defendant

2   had brought up having two notes, two documents, one a

3   typewritten letter addressed to the official that he had

4   engaged with in terms of the e-mails, and then a note on the

5   top -- on the outside of the package to the person in Vienna so

6   that they could get in touch.  It was something that was

7   actually suggested by the defendant.

8           The quotes, we don't know how it was that Risen

9   purportedly quotes a report of Merlin's trip to Vienna.  Bob S.

10  testified he had never seen such a report.  Merlin said he did

11  not prepare a written report.  When asked about the passage in

12  the book by the defense counsel, Merlin stated, "Well, maybe

13  the defendant secretly taped me; I don't know."

14          Plausible?  Perhaps.  More plausible than Bob S.

15  getting tasked to write an after-the-fact document by the CIA

16  in order to feed it to James Risen in order to kill the story.

17          Again, Bob S., as my cocounsel explained, this was

18  his baby.  He is not going to leak the information to James

19  Risen.  This is ten years of his life.

20          And again, there's absolutely no evidence that he had

21  any sort of relationship with James Risen.  He had no knowledge

22  of the defendant's PAR, no knowledge of the SSCI meeting.

23          How do the details get into the book about Vienna?

24  James Risen went to Vienna.  He walked those streets.  He

25  looked at those streetcars.  He went to that building.  He saw

1510

1    the same things that Merlin saw.  That's how it gets up -- ends

2    up in the book.

3         And what's interesting is that defense counsel pulls

4    information from interviews, from testimony, from facts in the

5    record.  You should believe Vicki Divoll when she says this.

6    You should believe Don Stone when he says this.  You should

7    believe Bob when he talks about fire set or firing set.  You

8    should believe Merlin when he says this because it fits into

9    his narrative.

10        But when they say they did not provide information to

11   James Risen, when they say they had no relationship with James

12   Risen, then don't believe them.

13        Phone calls and the e-mail.  Counsel came up with a

14   story to try to explain the series of phone calls and e-mails

15   from 2003 through 2005.  Look carefully at each of the clusters

16   of communications between the defendant and Risen.

17        There's a group of communications in March and April

18   of 2003.  What is happening at that point?  James Risen is

19   going to the CIA.  He says he has a story; it's nearly

20   complete; he's ready to publish.

21        There's a second cluster, primarily in

22   April-May-June, mostly June.  Right before what happens?  Risen

23   submits a book proposal to Simon & Schuster.

24        Look at the June 10, June 11, June 13 series of

25   events, the Federal Express, and then four calls at the end of,

1   end of June.  And then what happens?  Very little activity for

2   a long period.

3         Then another cluster of calls in August of 2005 and

4   then in November of 2005, and what is happening at that point?

5   Final touches to the book, which is then published and released

6   in 2006.

7         This case is not about politics.  It's not about

8   salvaging the reputation of the CIA.  What happened here was a

9   big deal.  Nuclear weapons, the capabilities of our

10  adversaries, that's a big deal.  The compromise of this

11  operation, this asset, ruining ten years of work under two

12  different administrations, wasting millions of dollars, giving

13  away our secrets, our strategic advantages, endangering the

14  lives of an asset, his family, that all is a big deal.

15        THE COURT:  One minute.

16        MR. TRUMP:  You were given a very rare, a very unique

17  glimpse into the lives of those who work for the CIA.  You

18  heard from case officers who toil for years in the shadows.

19  I'm sure they find their work rewarding, fascinating at times,

20  but it comes with a heavy, heavy price:  no public accolades,

21  no discussion with friends and family, sometimes not even with

22  their colleagues.  And they must forever, forever keep their

23  country's secrets.  That's their solemn promise.

24        But they serve, and we rest easier as a result.

25  Sometimes they stand in harm's way so that we don't have to.

1    They are true patriots.

2           On April 5, 1999, Merlin and the defendant met,

3    Exhibit 24.  At that meeting, Merlin asked the defendant what

4    would happen if his work for CIA would ever get exposed?  The

5    defendant assured him he should not worry, that will never

6    happen.

7           Jeffrey Sterling could not keep his promises.

8    Jeffrey Sterling betrayed his country.  He betrayed the CIA.

9    He betrayed his colleagues.  He betrayed Merlin.  Jeffrey

10   Sterling is not a patriot.  He is the defendant, and he is

11   guilty.

12          THE COURT:  All right, ladies and gentlemen, you've

13   now heard all of the closing arguments.  Again, the case is by

14   no means finished because you have not gotten the instructions

15   from the Court.  So I want you to now take your lunch break,

16   I'll ask you to be back here approximately 25 after, and then

17   you'll get the instructions.

18          Please do not begin any deliberations, and continue

19   to follow my cautions about not interacting with anything

20   outside of the courtroom that could possibly taint your thought

21   process, and we'll see everybody back here at 25 after.  Thank

22   you.

23          (Recess from 12:25 p.m., until 1:25 p.m.)

24

25

```
 1              A F T E R N O O N   S E S S I O N

 2                   (Defendant present, Jury out.)

 3          THE COURT:  All right, before we bring in the jury,

 4   again the ground rules are while the Court's instructing, no in

 5   and out of the courtroom, so I assume that's going to be taken

 6   care of.

 7          We gave you over the lunch break, there are four jury

 8   instructions that have been slightly changed, and there's a new

 9   one.  Let me take 11(a), the classification markings had been

10   submitted by the government, I think, earlier, but I needed

11   also -- and this comes from our court security people -- to

12   advise the jury as to how they must approach the three still

13   classified exhibits, so I want to know whether there's any

14   objection to the language.  It's 11(a).  It should be in the

15   small, independent package that each of you have, if there's

16   any objection to that additional language.

17          So what I've added there is, "Because Exhibits 142,

18   143, and 144 remain classified as Secret, you may not

19   communicate the contents of these exhibits to anyone after this

20   trial is concluded.  You should draw no inference as to the

21   guilt or innocence of the defendant from the fact that you

22   cannot communicate anything about these exhibits."

23          Is there any objection to that?

24          MR. MAC MAHON:  No objection from the defense, Your

25   Honor.
```

1514

1    THE COURT:  I assume --

2    MR. TRUMP:  That's fine.

3    THE COURT:  All right, good.  All right, so that's

4    11(a) if you want to put it in your packet.

5    Then if you look at, we've made the modifications we

6    talked about to Exhibit -- to instruction page 24.  We've added

7    the exhibit numbers 142 through 145.  That's the 404(b)

8    evidence exhibit -- I'm sorry, instruction, and we in the last

9    paragraph struck out "or crimes."  So "the defendant is not on

10   trial for any acts not alleged in the indictment," all right?

11   MR. MAC MAHON:  Thank you, Your Honor.

12   THE COURT:  No objection to that, correct?

13   Okay.  Possession, which is 31, we have changed the

14   tense to the past tense in the paragraph for Counts 1, 4, and

15   6, so it says, "by a person who held an appropriate security

16   clearance and had a need to know at the time the person

17   acquired the classified information," and then we've added the

18   "namely, a letter related to Classified Program No. 1" in the

19   next paragraph.

20   Any problem with that new instruction?

21   MR. MAC MAHON:  No, Your Honor.

22   THE COURT:  All right?  So make sure you replace that

23   in your packets.

24   And then the only change we made to 41, we had

25   intended to have the date so that the jury doesn't have to go

1    back and forth rummaging through the instructions, so we've

2    just added the dates that were alleged in that count.  All

3    right, any problem with that?  No?

4            MR. MAC MAHON:  Not from the defense, Your Honor.

5            THE COURT:  All right, then I believe we are about

6    ready to bring the jury in.  Are there any other last-minute

7    matters?  Were all the exhibits taken care of at the close of

8    business yesterday?  Was there any issue with any of the

9    physical exhibits?

10            MR. FITZPATRICK:  No, Your Honor.

11            THE COURT:  I'm sorry?

12            MR. FITZPATRICK:  No, Your Honor.

13            THE COURT:  No?  Mr. Olshan?

14            MR. OLSHAN:  As a housekeeping matter --

15            THE COURT:  Yes, sir.

16            MR. OLSHAN:  -- Exhibit 176 was a stipulation.

17            It's the last one we moved in.  The exhibit that goes

18    to the jury just needs to be executed by the parties.

19            THE COURT:  Let's do that right now.  So let me have

20    176 pulled out of the stack.  Do you have them?

21            MR. OLSHAN:  We don't have the official evidence

22    binder.

23            THE CLERK:  No, I have it.

24            MR. OLSHAN:  May I approach?

25            THE COURT:  Yes.  So you -- have you signed it?  Has

1516

```
 1    anybody signed it?

 2              MR. OLSHAN:  I don't believe so.

 3              THE COURT:  All right.  So just pull 176 out.

 4              Mr. MacMahon, while that's being done, was there some

 5    issue you had as well?

 6              MR. MAC MAHON:  No, Your Honor.

 7              THE COURT:  Okay.

 8              MR. MAC MAHON:  I'm just taking the chance to stand

 9    up.

10              THE COURT:  You can do that during, during the charge

11    if you want.

12              MR. MAC MAHON:  I'll be fine, Your Honor.  Thank you

13    very much.

14              THE COURT:  I mean, frankly, you don't even have to

15    be here for the charge.  You know what I'm going to say.

16              MR. MAC MAHON:  I know, but I wouldn't do that, Your

17    Honor.

18              THE COURT:  All right, that's fine.

19              MR. OLSHAN:  One moment, Your Honor?

20              THE COURT:  Yes, sir.

21              MR. OLSHAN:  We need to grab a copy of that one.

22    It's just a stipulation.  It shouldn't be an issue.  If it's

23    easier to --

24              THE COURT:  I'm sorry?  You need a copy?

25              MR. OLSHAN:  The formal exhibit binder does not have
```

1517

1   a version of it, have the exhibit.  If the defense has a copy,

2   we can just sign it.

3        MR. MAC MAHON:  We'll see if we have one.

4        THE COURT:  All right.  Did you-all do your indexes

5   of the exhibits?

6        MR. OLSHAN:  Yes.

7        THE COURT:  You're looking over your shoulder,

8   Mr. Olshan.  Is it in the courthouse -- courtroom?

9        MR. FRANCISCO:  Yes.

10       THE COURT:  We have it?

11       Did you show it to defense counsel?  Is there any

12   objection to the form of the index?  I usually have defense

13   counsel actually initial it just to make sure there's no

14   argument that there's something that was said in the index that

15   could be an issue.

16       All right, so 176 is fully endorsed now?  It's all

17   set.

18       MR. OLSHAN:  Thank you, Your Honor.

19       THE COURT:  All right.  And the -- again, the index,

20   no objections to the index?  Are you still looking at that,

21   Mr. Pollack?

22       MR. POLLACK:  Your Honor, if I can have just a

23   minute?

24       THE COURT:  All right.  And the defense list is so

25   short, I'm assuming there's no objection to -- we don't have a

1518

1   defense index.  Do you have one?

2             MS. HAESSLY:  Yes, we have one, Your Honor.

3             THE COURT:  All right.  Hold on.

4             Ms. Copsey, would you go get that?

5             All right, any objection, Mr. Trump?

6             MR. TRUMP:  No.

7             THE COURT:  All right, that's fine.  So the defense

8   list is in.

9             Well, I'll tell you what, I want to start charging

10  the jury.  Mr. Pollack, you can be looking at that at the same

11  time.  If there's an objection, we still haven't sent it in to

12  the jury, and we can correct that afterwards, all right?

13            MR. POLLACK:  Yes.  There are a couple of issues, but

14  we can take them up later.

15            THE COURT:  All right.  Mr. Wood, let's bring the

16  jury in.

17                      (Jury present.)

18            THE COURT:  Have a seat, ladies and gentlemen.  Thank

19  you.

20            All right, now that you have heard all of the

21  evidence to be received in this trial and each of the arguments

22  of counsel, it becomes my duty to give you the final

23  instructions of the Court as to the law that is applicable to

24  this case and which will guide you in your decisions.

25            All of the instructions of law given to you by the

1    Court -- those given to you at the beginning of the trial,

2    those given to you during the trial, and these final

3    instructions -- must guide and govern your deliberations.

4         It is your duty as jurors to follow the law as stated

5    in all of the instructions of the Court and to apply these

6    rules of law to the facts as you find them from the evidence

7    received during the trial.

8         Counsel have quite properly referred to some of the

9    applicable rules of law to you in their closing arguments.  If,

10   however, any difference appears to you between the law as

11   stated by counsel and that as stated by the Court in these

12   instructions, you are, of course, to be governed by the

13   instructions given to you by the Court.

14        You are not to single out any one instruction alone

15   as stating the law but must consider all of the instructions as

16   a whole in reaching your decisions.

17        Neither are you to be concerned with the wisdom of

18   any rule of law stated by the Court.  Regardless of any opinion

19   you may have as to what the law ought to be, it would be a

20   violation of your sworn duty to base any part of your verdict

21   upon any other view or opinion of the law than that given in

22   these instructions of the Court, just as it would be a

23   violation of your sworn duty as judges of the facts to base

24   your verdict upon anything but the evidence received in the

25   case.

1520

1        You were chosen as jurors for this trial in order to

2   evaluate all of the evidence received and to decide each of the

3   factual questions presented by the allegations brought by the

4   government in the indictment and the pleas of not guilty of the

5   defendant.

6        In deciding the issues presented to you for decision

7   in this trial, you must not be persuaded by bias, prejudice, or

8   sympathy for or against any of the parties to this case or by

9   any public opinion.

10        Justice through trial by jury depends upon the

11   willingness of each individual juror to seek the truth from the

12   same evidence presented to all of the jurors here in the

13   courtroom and to arrive at a verdict by applying the same rules

14   of law as are now being given to each of you in these

15   instructions.

16        During this trial, I permitted you to take notes.  As

17   I advised you at the beginning of the trial, many courts do not

18   permit note taking by jurors.  You are instructed that your

19   notes are only a tool to aid your own individual memory, and

20   you should not compare your notes with those of other jurors in

21   determining the content of any testimony or in evaluating the

22   importance of any evidence.

23        Moreover, you are 12 coequal judges of the facts.

24   The memory or opinions about the evidence of a juror who took

25   extensive notes is no more or less deserving of consideration

1   than the memory or opinions about the evidence held by a juror

2   who took few or no notes.  Your notes are not evidence and are

3   by no means a complete outline of the proceedings or even a

4   list of the highlights of the trial.  Above all, your memory

5   should be your greatest asset when it comes time to deliberate

6   and render a decision in this case.

7          Now, the evidence in this case consists of the sworn

8   testimony of the witnesses, regardless of who may have called

9   them, all exhibits received in evidence, regardless of who may

10  have produced them, and all stipulations of fact agreed to by

11  the parties.

12         Any proposed testimony or proposed exhibit to which

13  an objection was sustained by the Court and any testimony or

14  exhibit ordered stricken by the Court must be entirely

15  disregarded.  Anything you may have seen or heard outside the

16  courtroom is not proper evidence and must be entirely

17  disregarded.

18         Questions of the lawyers are not evidence.  Only a

19  witness's answer to a question is evidence.  Objections,

20  statements, and arguments of counsel are not evidence in the

21  case.

22         You are to base your verdict only on the evidence

23  received during the trial.  In your consideration of the

24  evidence received, however, you are not limited to the literal

25  statements of the witnesses or to the literal assertions in the

1    exhibits.  In other words, you are not limited solely to what

2    you see and hear as the witnesses testify or as the exhibits

3    are admitted.  Instead, you are permitted to draw from the

4    testimony and exhibits which you find reliable such reasonable

5    inferences as you find justified in the light of your

6    experience and common sense.  Inferences are simply conclusions

7    which can reasonably be drawn from the evidence received during

8    the trial.

9          There is nothing particularly different in the way

10   that a juror should consider the evidence in a trial from that

11   in which any reasonable and careful person would treat any very

12   important question that must be resolved by examining facts,

13   opinions, and evidence.  You are expected to use your good

14   sense in considering and evaluating the evidence in the case

15   for only those purposes for which it has been received and to

16   give such evidence a reasonable and fair construction in the

17   light of your common knowledge of the natural tendencies and

18   inclinations of human beings.

19         If any reference to a witness's testimony or the

20   exhibits either by the Court or by counsel does not coincide

21   with your own memory of the evidence, it is your memory of the

22   evidence which controls during your deliberations and not that

23   of the Court or of counsel.

24         It is the duty of the Court to admonish an attorney

25   who out of zeal for his or her cause does something which I

1    feel is not in keeping with the rules of evidence or procedure.

2    You are to draw absolutely no inference against the side to

3    whom an admonition of the Court may have been addressed during

4    the trial of this case.

5         And during the course of the trial, I occasionally

6    asked questions of a witness.  Do not assume that I hold any

7    opinion on the matters to which my questions may relate.  The

8    Court may ask a question simply to clarify a matter, not to

9    help one side of the case or hurt the other side.

10         It is the sworn duty of an attorney on each side of a

11   case to object when the other side offers testimony or exhibits

12   which that attorney believes is not entirely admissible -- or

13   properly admissible.  Only by raising an objection can a lawyer

14   request and obtain a ruling from the Court on the admissibility

15   of the evidence being offered by the other side.  You should

16   not be influenced against an attorney or the attorney's client

17   because the attorney has made objections.

18         Moreover, do not attempt to interpret my rulings on

19   objections as somehow indicating to you who I believe should

20   win or lose the case.

21         Now, I'm going to talk in these next set of

22   instructions a little bit about evidence.  There are two types

23   of evidence which are generally presented during a trial --

24   direct evidence and circumstantial evidence.  Direct evidence

25   is the testimony of a person who asserts or claims to have

1524

1    actual knowledge of a fact, such as an eyewitness.

2    Circumstantial evidence is proof of a chain of facts and

3    circumstances indicating the existence of a fact.

4          And I have a standard example I always give to juries

5    about circumstantial evidence.  You leave your home one morning

6    in, let's say it's February.  It's been cold out, but your

7    front yard is bare.  There's no snow on the ground.  And you

8    leave, let's say, at 9:00 in the morning, and you come home at

9    1:00 in the afternoon.

10         Now, in the meantime, it has snowed, and when you

11   come home at 1:00, there's a white blanket of snow in your

12   front yard, and you see a footprint in that snow.  You do not

13   see a person, but you see the facts -- you have the facts I've

14   just given you.

15         Now, you have direct evidence that it has snowed.

16   You know what time you left the house, you know what time

17   you've come back, you see the footprint, and you know from

18   ordinary human experience a human being normally is associated

19   with a footprint.

20         From those facts, you can draw the inference that

21   there was a person in your yard sometime between nine and one,

22   although you never saw the person.  That's an example of

23   circumstantial evidence.

24         Now, the law makes absolutely no distinction between

25   the weight or value to be given to either direct or

1  circumstantial evidence, nor is a greater degree of certainty

2  required of circumstantial evidence than of direct evidence.

3  In other words, you should weigh all the evidence in the case

4  in reaching your verdict.

5       During this trial, documents have been entered into

6  evidence that have had words and phrases and sometimes entire

7  paragraphs redacted or deleted.  In other instances, you have

8  seen that there have been words or phrases substituted for the

9  original words or phrases that may appear in a document.

10       I have decided to allow substitutions and redactions

11 in this fashion to protect national security interests.  Many

12 of the substitutions and redactions pertain to names and

13 specific locations, and those specific names themselves are

14 simply not relevant to the issues at hand.  Sometimes I have

15 permitted substitutions and redactions to protect sensitive and

16 highly classified matters, most of which have nothing to do

17 with this case.

18       I caution you that you should not consider the manner

19 in which substitutions and redactions have been used as an

20 expression of my opinion regarding the facts of this case.  It

21 is your job and your job alone to decide the facts of this

22 case.

23       A number of the exhibits received in evidence contain

24 their original classification markings, such as Secret.  Except

25 for Exhibits 142, 143, and 144, which I will address shortly,

1    all of these exhibits are now unclassified.  These unclassified

2    exhibits are public, are public record documents and do not

3    require any special handling procedures.

4            Because Exhibits 142, 143, and 144 remain classified

5    as Secret, and you're going to know that because they have a

6    red cover on them when you see them in the jury room, you may

7    not communicate the contents of these exhibits to anyone after

8    this trial is concluded.  You should drew no inference as to

9    the guilt or innocence of the defendant from the fact that you

10   cannot communicate anything about these exhibits.

11           Now, certain charts and summaries have been shown to

12   you in order to help explain the facts disclosed by the books,

13   records, and other documents which are in evidence in the case.

14   Such charts or summaries are not in and of themselves evidence

15   or proof of any facts.  If such charts or summaries do not

16   correctly reflect the facts or figures shown by the evidence in

17   the case, you should disregard them.

18           In other words, such charts and summaries are used

19   only as a matter of convenience.  So if, and to the extent that

20   you find they are not in truth summaries of facts or figures

21   shown by the evidence in the case, you are to disregard them

22   entirely.

23           The next group of instructions talk about witnesses

24   and how you go about approaching and evaluating witnesses, and

25   this next instruction also addresses evidence.

1        In evaluating the evidence, always consider the

2    quality of the evidence over the quantity.  You are not bound

3    to decide any issue of fact in accordance with the testimony of

4    any number of witnesses which does not produce in your minds

5    belief in the likelihood of truth, as against the testimony of

6    a lesser number of witnesses or other evidence which does

7    produce such belief in your minds.  In other words, the test is

8    not which side brings the greater number of witnesses or

9    presents the greater quantity of evidence but which witness and

10   which evidence appeals to your minds as being most accurate and

11   otherwise trustworthy.

12       The testimony of one witness or just a few witnesses

13   in whom you have complete confidence may outweigh the testimony

14   of several witnesses in whom you do not have such confidence.

15   Similarly, one or two exhibits which you find compelling may

16   outweigh numerous exhibits which you find less compelling.  So

17   it is the quality of the evidence, not the quantity of the

18   evidence, that you should be concerned with.

19       Now, you as jurors are the sole and exclusive judges

20   of the credibility of each of the witnesses called to testify.

21   Only you determine -- excuse me -- only you determine the

22   importance or the weight that their testimony deserves.  After

23   evaluating the credibility of a witness, you may decide to

24   believe all of that witness's testimony, only a portion of it,

25   or none of it at all.

1528

1    In evaluating a witness's credibility, you should

2    carefully consider all of the testimony given, the

3    circumstances under which each witness has testified, and every

4    matter in evidence which tends to show whether a witness in

5    your opinion is worthy of belief.  Consider each witness's

6    intelligence, motive to falsify, state of mind, and appearance

7    and manner while on the witness stand.  Consider the witness's

8    ability to observe the matters as to which he or she has

9    testified, and consider whether the witness impresses you as

10   having an accurate memory or recollection of these matters.

11   Consider also any relation a witness may bear to either side of

12   the case, the manner in which each witness might be affected by

13   your verdict, and the extent to which, if at all, each witness

14   is either supported or contradicted by other evidence in the

15   case.

16   Inconsistencies or discrepancies in the testimony of

17   a witness or between the testimony of different witnesses may

18   or may not cause you to disbelieve or discredit such testimony.

19   Two or more persons witnessing an incident may simply see or

20   hear it differently.  Innocent mistakes in remembering

21   something is not an uncommon human experience.  In evaluating

22   the effect of a discrepancy, however, always consider whether

23   it pertains to a matter of importance or to an insignificant

24   detail, and consider whether the discrepancy results from

25   innocent error or from intentional falsehood.

1    After making your own judgment concerning the

2    believability of a witness, you can then attach such importance

3    or weight to that testimony, if any, that you feel it deserves.

4    The rules of evidence ordinarily do not permit

5    witnesses to testify as to opinions or conclusions.  An

6    exception to this rule exists as to those whom we call expert

7    witnesses.  Witnesses who by education and experience have

8    become expert in some art, science, profession, or calling may

9    state their opinions as to relevant and material matters in

10   which they profess to be expert and may also state their

11   reasons for the opinions.

12   You should consider each expert opinion received in

13   evidence and give it such weight as you think it deserves.  If

14   you should decide that the opinion of an expert witness is not

15   based upon sufficient education and experience or if you should

16   conclude that the reason given in support of the opinion --

17   reasons given in support of the opinion are not sound, or if

18   you feel that it is outweighed by other evidence, you may

19   disregard the opinion entirely.

20   A witness may be discredited -- and the technical

21   term is "impeached" -- by contradictory evidence or by evidence

22   that at some other time, the witness has said or done something

23   or has failed to say or do something that is inconsistent with

24   the witness's present testimony.

25   If you believe any witness has been impeached and

1    thus discredited, it is your exclusive province to give the

2    testimony of that witness such credibility, if any, as you may

3    think it deserves.

4         If a witness is shown knowingly to have testified

5    falsely concerning any material matter, you have a right to

6    distrust such witness's testimony in other particulars, and you

7    may reject all the testimony of that witness or give it such

8    credibility as you may think it deserves.

9         An act or omission is knowingly done if voluntarily

10   and intentionally done and not done because of a mistake or

11   accident or other innocent reason.

12        Now, during the trial of this case, the testimony of

13   Mr. Merlin was presented to you by way of video deposition

14   which consisted of sworn recorded answers to questions asked of

15   the witness in advance of the trial by the attorneys for the

16   parties to the case.  The testimony of a witness who for some

17   reason cannot be present to testify from the witness stand may

18   be presented through a video recording played on a television

19   set.  Such testimony is entitled to the same consideration and

20   is to be judged as to credibility and weighed and otherwise

21   considered by the jury insofar as possible in the same way as

22   if the witness had been physically present in the courtroom and

23   had testified from the witness stand.

24        During this trial, you heard testimony from witnesses

25   who are currently employed by the Central Intelligence Agency.

1531

1    You also heard testimony from former employees of the Central

2    Intelligence Agency, some of whom continue to work for the

3    agency as contractors, and you heard the testimony of Human

4    Asset No. 1 by video deposition and that of his wife.  These

5    witnesses testified either by using only initials or using a

6    made-up name -- Merlin, that's a made-up name -- if you were

7    not told their true names.  These witnesses also testified with

8    a screen preventing the general public from seeing them.

9         The disclosure of the witnesses' names and their

10   physical identity could potentially compromise either their

11   continued work for the CIA or expose them to safety issues.

12        As I have explained to you, one of your roles as

13   jurors will be to assess the credibility of each witness who

14   has testified during this trial.  You should not make any

15   judgments about the credibility of those witnesses simply

16   because you do not know their full names or because they

17   testified with the screen.  Moreover, you should not consider

18   the manner in which such witnesses testified as an expression

19   of my opinion as to any of the facts of this case.  Again, it

20   is your job and your job alone to decide the facts of this

21   case.

22        The defendant in a criminal case has an absolute

23   right under our Constitution not to testify.  The fact that the

24   defendant, Jeffrey Alexander Sterling, did not testify must not

25   be discussed or considered by the jury in any way when

1    deliberating and in arriving at your verdict.  No inference of

2    any kind may be drawn from the fact that a defendant decided to

3    exercise his privilege under the Constitution and did not

4    testify.

5           As I stated earlier, the law never imposes upon a

6    defendant in a criminal case the burden or duty of calling any

7    witnesses or of producing any evidence.

8           Now, the next series of instructions are going to

9    talk about the indictment, which is the document used to bring

10   the charges, and then the specific charges involved in this

11   case, and we'll also be giving you some definitions of some of

12   the terms that are involved in those charges.

13          An indictment is a formal method used by the

14   government to accuse a person of a crime.  It is not evidence

15   of any kind against a person.  Mr. Sterling is presumed to be

16   innocent of the crimes charged.  Even though the indictment has

17   been returned against Mr. Sterling, he begins this trial with

18   absolutely no evidence against him.

19          Mr. Sterling has pleaded not guilty to all the

20   charges in this indictment and therefore denies that he is

21   guilty of the charges.

22          A separate crime is alleged against the defendant in

23   each count of the indictment.  Each alleged offense and any

24   evidence pertaining to it should be considered separately by

25   the jury.  The fact that you find the defendant guilty or not

1   guilty of one of the offenses charged should not control your

2   verdict as to any other offense charged against the defendant.

3         In other words, you must give separate and individual

4   consideration to each charge against the defendant.

5         The indictment charges that the alleged offenses were

6   committed between on or about certain dates.  Although it is

7   necessary for the government to prove beyond a reasonable doubt

8   that each offense was committed on a date reasonably near the

9   date or dates alleged in the specific count being considered,

10  it is not necessary for the government to prove that each

11  offense was committed precisely on the dates charged.

12        The defendant is not on trial for any act or any

13  conduct not specifically charged in the indictment.

14        Now, the government has introduced evidence that

15  defendant had classified documents, and these are Exhibits 142

16  through 145, in his custody when his residence was searched.

17  Evidence that an act was done by the defendant at some other

18  time is not, of course, any evidence or proof whatever that at

19  another time, the defendant performed a similar act, including

20  the offenses charged in this indictment.

21        Evidence of a similar act may not be considered by

22  the jury in determining whether the defendant actually

23  performed the physical acts charged in this indictment.  Nor

24  may such evidence be considered for any other purpose

25  whatsoever unless the jury first finds beyond a reasonable

1  doubt from other evidence in the case standing alone that the

2  defendant did the acts charged in the indictment.

3       If the jury should find beyond a reasonable doubt

4  from other evidence in the case that the defendant did the act

5  or acts alleged in the particular count under consideration,

6  the jury may then consider evidence as to an alleged earlier

7  act of a like nature in determining the state of mind or intent

8  with which the defendant actually did the act or acts charged

9  in that particular count.

10      As previously stated, the defendant is not on trial

11  for any acts not alleged in the indictment.  Nor may a

12  defendant be convicted of the crimes charged even if you were

13  to find that he committed other acts, even acts similar to the

14  one charged in this indictment.

15      Now, the defendant has been charged in the indictment

16  with knowingly and willfully communicating national defense

17  information to another not entitled to receive such information

18  while being in lawful possession of such information.  Count 1

19  charges specifically that the defendant caused national defense

20  information, namely, information about Classified Program No. 1

21  and Human Asset No. 1, to be communicated, delivered, and

22  transmitted to any person of the general public not entitled to

23  receive this information, including foreign adversaries,

24  through the publication, distribution, and delivery of *State of*

25  *War* into the Eastern District of Virginia in approximately late

1    December and early January of 2006.

2            It's further alleged in Count 1 that the defendant

3    did so while having reason to believe that this national

4    defense information could be used to the injury of the United

5    States or to the advantage of any foreign nation.

6            Count 4 charges that the defendant communicated,

7    delivered, and transmitted national defense information,

8    namely, information about Classified Program No. 1 and Human

9    Asset No. 1, directly and indirectly to James Risen, a person

10   of the general public not entitled to receive this information,

11   between February 12 and April 30 of 2003.  It's further alleged

12   that the defendant did so while having reason to believe that

13   this national defense information could be used to the injury

14   of the United States or to the advantage of any foreign nation.

15           Finally, Count 6 charges that the defendant attempted

16   to communicate, deliver, and transmit national defense

17   information, namely, information about Classified Program No. 1

18   and Human Asset No. 1, to any person of the general public not

19   entitled to receive this information, including foreign

20   adversaries, through the publication, distribution, and

21   delivery of a *New York Times* article in the Eastern District of

22   Virginia between February 27, 2003, and April 30, 2003.  And

23   it's further alleged that the defendant did so while having

24   reason to believe that this national defense information could

25   be used to the injury of the United States or to the advantage

1   of any foreign nation.

2          Now, the statute defining the offenses charged -- the

3   offense charged in Counts 1, 4, and 6 is Title 18 of the United

4   States Code, Section 793(d), and that code provides in part:

5          Whoever, lawfully having possession of, access to,

6   control over, or being entrusted with any document,

7   writing, . . ., or note relating to the national defense, or

8   information relating to the national defense which information

9   the possessor has reason to believe could be used to the injury

10  of the United States or to the advantage of any foreign nation,

11  willfully communicates, delivers, transmits, or causes to be

12  communicated, delivered, or transmitted . . . the same to any

13  person not entitled to receive it . . . shall be guilty of an

14  offense against the United States.

15         The defendant -- and I'm going to now talk about

16  Counts 2, 5, and 7.  The defendant has been charged in the

17  indictment with knowingly and willfully disclosing -- I'm

18  sorry, communicating national defense information to another

19  not entitled to receive said information while not being in

20  lawful possession of this information.

21         Count 2 charges that the defendant caused national

22  defense information, namely, a letter relating to Classified

23  Program No. 1, to be communicated, delivered, and transmitted

24  to any person of the general public not entitled to receive

25  this information, including foreign adversaries, through the

1    publication, distribution, and delivery of *State of War* into

2    the Eastern District of Virginia in approximately late December

3    and early January 2006.  The defendant did so while having

4    reason to believe that this national defense information -- I'm

5    sorry, it's alleged that the defendant did so while having

6    reason to believe that this national defense information could

7    be used to the injury of the United States or to the advantage

8    of any foreign nation.

9              Count 5 charges that the defendant communicated,

10   delivered, and transmitted national defense information,

11   namely, a letter relating to Classified Program No. 1, directly

12   and indirectly to James Risen, a person of the general public

13   not entitled to receive this information, between February 12,

14   2003, and April 30, 2003.  And it's further alleged that the

15   defendant did so while having reason to believe that this

16   national defense information could be used to the injury of the

17   United States or to the advantage of any foreign nation.

18             Finally, Count 7 charges that the defendant attempted

19   to communicate, deliver, and transmit national defense

20   information, namely, a letter about Classified Program No. 1,

21   to any person of the general public not entitled to receive

22   this information, including foreign adversaries, through the

23   publication, distribution, and delivery of a *New York Times*

24   article in the Eastern District of Virginia between February 27

25   and April 30 of 2003.  And it's further alleged that the

1    defendant did so while having reason to believe that this

2    national defense information could be used to the injury of the

3    United States or to the advantage of any foreign nation.

4         Now, Counts 2, 5, and 7 involve a different

5    subsection of Section 793 of Title 18 of the United States

6    Code, and (e) provides in relevant part that:  Whoever,

7    unlawfully having possession of, access to, control over, or

8    being entrusted with any document, writing, . . ., or note

9    relating to the national defense, or information relating to

10   the national defense which information the possessor has reason

11   to believe could be used to the injury of the United States or

12   to the advantage of any foreign nation, willfully communicates,

13   delivers, transmits, or causes to be communicated, delivered,

14   or transmitted . . . the same to any person not entitled to

15   receive it . . . shall be guilty of an offense against the

16   United States.

17        Now, every crime has what are called elements.  These

18   are actually the essential components of that crime, and in a

19   criminal case, in order for a person to be found guilty of a

20   particular crime, the government must produce enough evidence

21   to establish each and every element beyond a reasonable doubt.

22   So if you have a crime with four elements and you're satisfied

23   the government has proven three of those four elements beyond a

24   reasonable doubt but not the fourth element, the government has

25   not met its burden, and you would have to acquit the defendant

1   for that particular count.

2        So in order to meet its burden of proof on Counts 1,

3   2, and 4 through 7, that is, the counts I've just summarized

4   for you, the government must prove beyond a reasonable doubt

5   the following elements:

6        First, for Counts 1, 4, and 6, that the defendant

7   lawfully had possession of, access to, control over, or was

8   entrusted with intangible or oral information relating to the

9   national defense.

10       For Counts 2, 5, and 7, the first element is that the

11  defendant had unauthorized possession of, access to, control

12  over, or was entrusted with a document, writing, or note

13  relating to the national defense.

14       So the first element is different for Counts 1, 4,

15  and 6.  It's one first element.  There's a different first

16  element for Counts 2, 5, and 7.  But the second, third, and

17  fourth elements for these offenses are the same.

18       The second element -- this applies then to all of

19  those counts -- is that the defendant had reason to believe

20  that this national defense information could be used to the

21  injury of the United States or to the advantage of any foreign

22  nation.

23       The third element that's common to all of those

24  counts is that the defendant willfully communicated, delivered,

25  transmitted, or caused to be communicated, delivered, or

1    transmitted this national defense information.

2           And the fourth element common to all of those counts

3    is that the defendant did so to a person not entitled to

4    receive it.  A person is not entitled to receive classified

5    information if he did not hold a security clearance or if he

6    holds a security clearance but has no need to know the

7    information.

8           Now, the word "possess" means to own or to exert

9    control over something.  The word "possession" can take on

10   several different but related meanings.

11          The law recognizes two kinds of possession -- actual

12   possession and constructive possession.  A person who knowingly

13   has direct physical control over a thing at a given time is in

14   actual possession of it.  The example is I'm holding this blue

15   pen in my hand.  I have actual, physical possession of this

16   blue pen.

17          Now, a person who although not in actual possession,

18   knowingly has both the power and intention at a given time to

19   exercise dominion or control over a thing, either directly or

20   through another person or persons, is said to have constructive

21   possession of it.  My courtroom deputy, Ms. Guyton, sitting

22   right here, works for me.  She's got the computer.  If I direct

23   her to send an e-mail message to my secretary, I at that time

24   have constructive possession of that computer because I'm in

25   the position to control how it's being used.

1    Now, you may find that the element of possession as

2  that term is used in these instructions is present if you find

3  beyond a reasonable doubt that the defendant had actual or

4  constructive possession of the thing at issue.

5    For Counts 1, 4, and 6, I'm now going to define two

6  key terms:  "lawful possession" and "unlawful possession,"

7  because that's what differentiates that first element for these

8  counts.  So for Counts 1, 4, and 6, a person has lawful

9  possession of something if he is entitled to have it.  In this

10  case, lawful possession of classified information means

11  possession of classified information by a person who held an

12  appropriate security clearance and had a need to know at the

13  time the person acquired the classified information.

14    For Counts 2, 5, and 7, a person has unauthorized

15  possession of something if he is not entitled to have it.  In

16  this case, unauthorized possession of classified information,

17  namely, a letter related to Classified Program No. 1, means

18  possession of classified information by a person who does not

19  hold a security clearance or by a person who holds a security

20  clearance without the need to know, or by a person who holds a

21  security clearance, has a need to know, but removed the

22  classified information from the official premise without

23  authorization.

24    The term "need to know" means a determination made by

25  an authorized holder of classified information that a

1 prospective recipient requires access to specific classified

2 information in order to perform or assist in a lawful and

3 authorized government function.

4        For those first six counts, that is, for Counts 1, 2,

5 and 4 through 7, the term "information relating to the national

6 defense" broadly refers to all matters that directly or may

7 reasonably be connected with the national defense of the United

8 States against any of its enemies, including matters relating

9 to the nation's intelligence capabilities.

10        The term "national defense" is a generic concept of

11 broad connotation referring not only to military, naval, and

12 air establishments, but also to all related activities of

13 national defense preparedness.  National defense information

14 can be oral or intangible information.

15        To prove that documents, writings, or intangible

16 information relate to the national defense, there are two

17 things that the government must prove.  First, it must prove

18 that the disclosure of the material would be potentially

19 damaging to the United States or might be useful to an enemy of

20 the United States.  Second, it must prove that the material is

21 closely held by the United States government.

22        The disclosure of the information relating to the

23 national defense need not cause actual damage or harm to the

24 United States.  Instead, potential damage or harm to the United

25 States is sufficient to establish this prong of the essential

1   element.

2           In determining whether material is closely held, you

3   may consider whether it has been classified by appropriate

4   authorities and whether it remained classified on the date or

5   dates pertinent to the indictment.  Where the indictment has

6   been made public by the United -- I'm sorry, where the

7   information has been made public by the United States

8   government and is found in sources lawfully available to the

9   general public, it does not relate to the national defense.

10  Similarly, where the sources of information are lawfully

11  available to the public and the United States government has

12  made no effort to guard such information, the information

13  itself does not relate to the national defense.

14          In deciding this issue, you should examine the

15  information and also consider the testimony of witnesses who

16  testified as to the content and significance of the information

17  and who described the purpose and the use to which the

18  information contained therein could be put.

19          During the trial, you may have heard the attorneys

20  refer to certain evidence or materials as classified

21  information or that certain information was classified.

22  Classified information is information that has been determined

23  pursuant to a system established by the Executive Branch to

24  require protection against unauthorized disclosure.

25          As I have previously instructed you, when considering

1544

1    Counts 1, 2, and 4 through 7, you are to determine whether

2    certain information in this case was national defense

3    information.  That is not the same as classified information.

4    However, you may consider the fact that information was

5    classified in determining whether the information at issue was

6    national defense information.

7         For Counts 1, 2, and 4 through 7, the phrase "with

8    reason to believe that it could be used to the injury of the

9    United States or to the advantage of a foreign nation" means

10   that the defendant knew facts from which he concluded or

11   reasonably should have concluded that the documents, writings,

12   or intangible information relating to the national defense

13   could be used for the prohibited purposes.  In considering

14   whether or not the defendant acted with the intent or having

15   reason to believe that the material could be used to the injury

16   of the United States or to the advantage of a foreign country,

17   you may consider the nature of the documents or information

18   involved.

19        The government does not have to prove that the

20   documents or information could be used both to injure the

21   United States and to the advantage of a foreign country.  The

22   statute reads in the alternative, so proof of either will

23   suffice.

24        If a defendant willfully causes an act to be done by

25   another, the defendant is responsible for those acts as though

1    he personally committed them.  To establish that the defendant

2    caused an act to be done, the government must prove beyond a

3    reasonable doubt:

4              First, that another person performed the acts that

5    constituted the crime of unauthorized communication of national

6    defense information or committed an indispensable element of

7    that crime; and

8              Two, that the defendant willfully caused these acts

9    even though he did not personally commit these acts.

10             The government need not prove that the person who

11   performed the acts that constituted the crime of unauthorized

12   communication of national defense information did so with

13   criminal intent.  That person may be an innocent intermediary

14   or pawn.

15             The defendant need not perform acts that constitute

16   the crime of unauthorized communication of national defense

17   information, be present when it was performed, or be aware of

18   the details of its execution to be guilty of causing an act to

19   be done by another.  However, a general suspicion that a lawful

20   act may occur or that something criminal is happening is not

21   enough.  Mere knowledge that the unauthorized communication of

22   national defense information is being committed without more is

23   also not sufficient to establish causing an act to be done

24   through another.

25             As I have instructed you, an act is done willfully if

1   done voluntarily and intentionally with the intent that

2   something the law forbids be done, that is to say, with bad

3   purpose, either to disobey or disregard the law.

4           For Counts 1, 2, and 4 through 7, an act is done

5   willfully -- and I'm just going to repeat this because it comes

6   through all the instructions -- if it is done voluntarily and

7   intentionally and with the specific intent to do something the

8   law forbids, that is, with a purpose to disobey the law.

9           Now, for Counts 1, 2, and 4 through 7, the government

10  must prove beyond a reasonable doubt each and every element of

11  these offenses as I have explained them to you.  The

12  government, however, does not have to prove that the defendant

13  was the only person who communicated the national defense

14  information alleged in the indictment.  Your duty as jurors is

15  limited to determining whether the government has proved beyond

16  a reasonable doubt that the defendant committed the offenses

17  charged, irrespective of whether other persons may have

18  communicated the same or similar information.

19          Now, we're moving on to Count 3.  The defendant has

20  been charged in Count 3 of the indictment with knowingly and

21  willfully retaining national defense information while having

22  unauthorized possession of that information.

23          Count 3 charges specifically that the defendant

24  unlawfully retained a document relating to the national

25  defense, namely, a letter relating to Classified Program No. 1,

1547

1    at his residence beginning in or about January 31, 2002, and

2    continuing through approximately April 30 of 2003.

3          The statute, and this is another section of 793 -- of

4    Title 18, United States Code, 793(a) -- (e), 793(e), provides

5    that:  Whoever having unauthorized possession of . . . any

6    document . . . relating to the national defense . . . willfully

7    retains the same and fails to deliver it to the office or

8    employee of the United States entitled to receive it . . .

9    shall be guilty of an offense against the United States.

10         And for this offense, for Count 3, there are two

11    essential elements:

12         First, that beginning in or about January 31 of

13    2012 -- that's 2002; that's a typo -- and continuing thereafter

14    through on or about April 20 of 2003, the defendant had

15    unauthorized possession or control over a document relating to

16    the national defense of the United States; and

17         Two, that the defendant willfully retained the same

18    document and failed to deliver the document to an officer or an

19    employee of the United States who was entitled to receive it.

20         The first element the government must prove for this

21    defense is that the defendant had unauthorized possession of or

22    control over information that relates to the national defense.

23    The definitions I previously provided you with respect to

24    unauthorized possession and information relating to the

25    national defense apply equally to this count.

1    The second element the government must prove beyond a
reasonable doubt is that the defendant willfully retained the
document in question and failed to deliver it to an officer or
employee of the United States authorized to receive the
document.

As I've instructed you already, an act is done
willfully if it is done voluntarily and intentionally and with
the specific intent to do something the law forbids, that is,
with a bad purpose either to disobey or disregard the law.
Unlike the intent element for Counts 1, 2, and 4 through 7, for
Count 3, the government does not have to prove that the
defendant acted with the intent or reason to believe that his
retention of the document could be used to the injury of the
United States or to the advantage of any foreign nation.
Instead, the government only must prove that the defendant
acted willfully as defined above.

Now, Count 9 of the indictment charges that between
on or about December 24, 2005, and on or about January 5, 2006,
the defendant caused to be conveyed without authority property
of the United States, namely, classified information about
Classified Program No. 1, which had a value of more than
$1,000, and came into the defendant's possession by virtue of
his employment with the Central Intelligence Agency, to any
member of the general public not entitled to receive said
information, including foreign adversaries, through the

1    publication, distribution, and delivery of the *State of War* for

2    retail sale in the Eastern District of Virginia.

3              Title 18 of the United States Code, Section 641,

4    provides:  Whoever . . . without authority sells, conveys, or

5    disposes of any record, voucher, money, or thing of value of

6    the United States or of any department or agency thereof, or

7    any property made or being made under control for the United

8    States or any department or agency thereof . . . shall be

9    guilty of an offense against the United States.

10             And there are four essential elements for this

11   offense.  Again, the government must prove each and every one

12   of these beyond a reasonable doubt:

13             First, that the defendant conveyed a thing of value

14   of the United States;

15             Second, that the defendant did not have the legal

16   authority to do so;

17             Third, that the thing of value referred to in the

18   indictment was of a value greater than $1,000; and

19             Four, that the defendant acted knowingly.

20             The word "convey" means to transfer or deliver or

21   caused to be transferred or delivered to another.  The

22   term "without authority" means without actual permission from

23   someone who has the legal capacity to give permission.

24             The term "value" can mean face value, par value,

25   market value, or cost price, either wholesale or retail,

1550

1    whichever is greater.  A thing of value can be any thing,

2    including oral information or intangible property, that has

3    value.

4            An individual acts knowingly if he was conscious and

5    aware of his actions, realized what he was doing or what was

6    happening around him, and did not act because of ignorance,

7    mistake, or accident.  Thus, if the defendant acted in good

8    faith, he cannot be guilty of the crime.  The burden to prove

9    intent, as with all other elements of the crime, rests with the

10   government.

11           Intent or knowledge may not ordinarily be proven

12   directly because there's no way of directly scrutinizing the

13   workings of the human mind.  In determining what the defendant

14   knew or intended at a particular time, you may consider any

15   statements made or acts done or omitted by the defendant and

16   all other facts and circumstances received in evidence that may

17   aid in your determination of the defendant's knowledge or

18   intent.  You may infer, but you certainly are not required to

19   infer, that a person intends the natural and probable

20   consequences of acts knowingly done or knowingly omitted.  It

21   is entirely up to you, however, to decide what facts are proven

22   by the evidence received during this trial.

23           Intent and motive are different concepts and should

24   not be confused.  Motive is what prompts a person to act or

25   fail to act.  Intent refers only to the state of mind with

1551

1    which the act is done or omitted.

2         Good motive alone is never a defense where the act

3    done or omitted is a crime.  The motive of the defendant is

4    therefore immaterial except insofar as evidence of motive may

5    aid in the determination of state of mind or the intent of the

6    defendant.

7         This is now the last count that you have to consider:

8    Count 10 of the indictment charges that the defendant knowingly

9    and corruptly destroyed the March 10, 2003, e-mail from himself

10   to James Risen that had a link to a CNN article about the

11   Iranian nuclear weapons program.  The defendant is alleged to

12   have deleted this e-mail from his e-mail account with the

13   intent to impair the e-mail's integrity and availability for

14   use in an investigation before a federal grand jury empaneled

15   in the Eastern District of Virginia between approximately April

16   18, 2006, and July 28, 2006.

17        Title 10 involves a violation of section 1512(c) of

18   Title 18 of the United States Code, which provides in part:

19   Whoever corruptly alters, destroys, mutilates, or conceals a

20   record, document, or other object, or attempts to do so with

21   the intent to impair the object's integrity or availability for

22   use in an official proceeding; or otherwise obstructs,

23   influences, or impedes any official proceeding, or attempts to

24   do so, shall be guilty of an offense against the United States.

25        There are three essential elements, again, all of

1    which must be proven beyond a reasonable doubt in order for

2    there to be a conviction on Count 10.

3            First is that the defendant altered, destroyed,

4    mutilated, or concealed a record, document, or other object, or

5    attempted to do so, or otherwise obstructed, influenced, or

6    impeded an official proceeding;

7            Two, that the defendant did so with the intent to

8    impair the object's integrity or availability for use in an

9    official proceeding; and

10           Third, that the defendant did so corruptly.

11           The document destroyed need not, need not be material

12   to the official proceeding.

13           An "official proceeding" means any proceeding,

14   including an investigation before a federal grand jury.

15           To act "corruptly" as that word is used in these

16   instructions means to act voluntarily and deliberately and for

17   the purpose of improperly influencing, or improperly

18   obstructing, or improperly interfering with the administration

19   of justice.  The defendant's conduct must have the natural and

20   probable effect of interfering with the due administration of

21   justice.  The government, however, does not have to prove that

22   the act of obstruction in fact obstructed the official

23   proceeding or was successful.

24           In addition to the elements of the specific charges

25   which the government must prove beyond a reasonable doubt, as

1    to each charge, the government must also establish the venue of

2    that charge in the Eastern District of Virginia because a

3    defendant has a right to be tried in the district where the

4    offense was committed.

5            Although, although the government has the burden to

6    prove venue, it is not required to prove venue beyond a

7    reasonable doubt.  Rather, the government must establish venue

8    by a preponderance of the evidence, which is a lower standard

9    of proof and requires that it is more likely than not that at

10   least one act in furtherance of that offense occurred in the

11   Eastern District of Virginia.  The government must establish

12   venue as to each charged offense.

13           If the government fails to establish venue for a

14   particular charge, the jury must acquit the defendant of that

15   charge.

16           I instruct you that you must presume the defendant to

17   be innocent of the crimes charged.  Thus, the defendant,

18   although accused of crimes in the indictment, begins the trial

19   with a clean slate, that is, with no evidence against him.  The

20   indictment, as you already know, is not evidence of any kind.

21   The defendant is, of course, not on trial for any act or crime

22   not contained in the indictment.  The law permits nothing but

23   legal evidence presented before the jury in court to be

24   considered in support of any charge against the defendant, and

25   the presumption of innocence alone therefore is sufficient to

 1    acquit the defendant.

 2         The burden is always upon the prosecution to prove

 3    guilt beyond a reasonable doubt.  That burden never shifts to

 4    the defendant for the law never imposes upon a defendant in a

 5    criminal case the burden or duty of calling any witnesses or

 6    producing any evidence.  The defendant is not even obligated to

 7    produce any evidence by cross-examining the witnesses for the

 8    government.

 9         It is not required that the government prove guilt

10    beyond all possible doubt.  The test is one of reasonable

11    doubt.  And I can't give you a definition for that term.  Those

12    are not technical legal terms.  English language.

13         Unless the government proves beyond a reasonable

14    doubt that the defendant has committed each and every element

15    of the offenses charged in the indictment, you must find the

16    defendant not guilty of the offenses.  If the jury views the

17    evidence in the case as reasonably permitting either of two

18    conclusions, one of innocence and one of guilt, the jury must,

19    of course, adopt the conclusion of innocence.

20         Now, this is the last instruction, and I know you've

21    been with this for almost an hour.  Upon retiring to the jury

22    room to begin your deliberations, you will elect one of your

23    members to act as your foreperson.  The foreperson will preside

24    over your deliberations, will be your spokesperson here in

25    court, and will sign the verdict form on your behalf.

1    Your verdict must represent the collective judgment

2  of the jury.  In order to return a verdict, it is necessary

3  that each juror agree to it.  That is what unanimity means.  In

4  other words, your verdict must be unanimous.

5    It is your duty as jurors to consult with one another

6  and to deliberate with one another with a view towards reaching

7  an agreement if you can do so without violence to your

8  individual judgment.  Each of you must decide the case for

9  yourself, but do so only after an impartial consideration of

10 all the evidence in the case with all the other jurors.  In the

11 course of your deliberations, do not hesitate to reexamine your

12 own views and to change your opinion if convinced it is

13 erroneous.  Do not surrender your honest conviction, however,

14 solely because of the opinion of the other jurors or for the

15 mere purpose of returning a verdict.

16    Remember at all times you are not partisans.  You

17 don't represent the government; you don't represent the

18 defendant.  Instead, you are judges, specifically, judges of

19 the facts of this case.  And your sole interest is to seek the

20 truth from the evidence received during the trial.

21    Your verdict must be based solely upon the evidence

22 received in the case.  Nothing you have seen or read outside of

23 court may be considered.  Nothing that I have said or done

24 during the course of this trial is intended in any way to

25 somehow suggest to you what I think your verdict should be.

1    The punishment provided by law for the offenses

2  charged in the indictment is a matter exclusively within the

3  province of the Court and should never be considered by the

4  jury in any way in arriving at an impartial verdict as to the

5  offenses charged.

6    Nothing said in these instructions and nothing in the

7  verdict form prepared for your convenience is to suggest or

8  convey to you in any way or manner any intimation as to what

9  verdict I think you should return.  What the verdict shall be

10  is the exclusive duty and responsibility of the jury.  As I've

11  told you many times before, you are the sole judges of the

12  facts.

13    Now, a verdict form has been prepared for your

14  convenience, and you will notice that it skips from Count 7 to

15  Count 9.  There is no Count 8 at issue in this case, so don't

16  worry about the missed number.

17    You will take this verdict form to the jury room, and

18  when you have reached your unanimous agreement as to your

19  verdict, the foreperson will write your verdict, date and sign

20  the form, and return with your verdict to the courtroom.

21    Let me go over the verdict form with you right now.

22  So it begins with the caption of the case, United States of

23  America v. Jeffrey Alexander Sterling, and it has the case

24  number, and then we've listed each count.

25    Count 1 -- and you can go back to the jury

1    instructions and find exactly what that count is referring to.

2    And it just says:  "With respect to Count 1, unauthorized

3    disclosure of national defense information," and then it has

4    the code section, "we, the jury, unanimously find the

5    defendant, Jeffrey Alexander Sterling," and there are two

6    choices:  Guilty/Not Guilty.  "G" comes before "N," so the fact

7    that Guilty is listed first in no respect suggests that that

8    should be your answer, but we have to put the thing someplace,

9    and alphabetical seems as easy as any other way of doing it.

10          And then we go through each count that way, so then

11   there's a separate line for Count 2.  Each one of these counts

12   gets an individual evaluation and individual decision, and

13   again, any decision as to any count must be unanimous.

14          At the very end then, the foreperson will date the

15   verdict form with the date the decision, the final decision is

16   made.  We'll ask the foreperson to sign his or her name and

17   then please print it underneath since we often can't read your

18   signatures.

19          Now, you will take this verdict form into the jury

20   room.  You will also have all of the physical exhibits that

21   were entered into evidence, and I asked the attorneys to

22   provide you with an index of those, so you'll have the exhibit

23   number and a little title of what the exhibit is to help you

24   find them because you have a lot of evidence in this case.

25          I will also, I have to correct a few typos, but I

1558

1    will have for you a couple of copies of these written jury

2    instructions as well so you can refresh yourselves as to any

3    matter that we've talked about in these instructions.  You may

4    take your notebooks with you as well.

5            If it becomes necessary during your deliberations to

6    communicate with the Court, you may send a note signed and

7    dated by your foreperson or by any of the other members of the

8    jury, and you do that by knocking on the door and giving the

9    note folded over to Mr. Wood, my court security officer.  Of

10   course, he is forbidden to communicate in any way or manner

11   with any member of the jury on any subject touching the merits

12   of the case.

13           No member of the jury should ever attempt to

14   communicate with the Court by any means other than a signed

15   writing, and the Court will never communicate with any member

16   of the jury on any subject touching the merits of the case

17   other than via writing or orally here in court.

18           Also, please bear in mind that you are never to

19   reveal to any person, not even the Court, how the jury stands

20   numerically or otherwise on any issue until after you've

21   reached the unanimous verdict.

22           All right, counsel, approach the bench.

23           (Bench conference on the record.)

24           THE COURT:  All right, you may have noticed as I read

25   I'm going to switch the word "communicate" on two of those

1559

```
 1    instructions.  That's how I read them.  They're just typed
 2    wrong, okay, for those counts.  Because we were using the word
 3    "communicate" rather than "disclose."
 4              MR. OLSHAN:  That's fine.
 5              THE COURT:  Any objection from the government to the
 6    charge that's just been given to the jury?
 7              MR. OLSHAN:  No, Your Honor.
 8              MR. TRUMP:  No.
 9              THE COURT:  Are there any changes, corrections,
10    anything you want the Court to change?
11              MR. OLSHAN:  No.
12              THE COURT:  No?
13              How about the defense?  Other than the objections
14    you've already put on the record, are there any additional
15    objections to the charge other than what you've already
16    objected to?
17              MR. MAC MAHON:  No, Your Honor.
18              THE COURT:  Are there any additional things you want
19    me to tell the jury?
20              MR. MAC MAHON:  No, Your Honor.
21              THE COURT:  We're set to go then, right?
22              MR. MAC MAHON:  We have to get rid of two jurors.
23              THE COURT:  I know.  We have to do the alternates.
24    That's the next thing, okay.  The practice here is that
25    Ms. Guyton should have all 14 jurors' names in the box.  Are
```

1560

1    you ready to do it?

2              Is everyone watching?  All right.

3              No, you do it.

4              All right, who is that?  All right, the first one is

5    David Harrison, Juror No. 42, all right?  So he's the alternate

6    No. 1.  And the second one is Suzanne Yerks, Juror No. 101.

7    She's No. 2.  All right?

8              Why don't you go back, and I'll excuse them.

9              MR. MAC MAHON:  Thank you, Your Honor.

10              (End of bench conference.)

11              THE COURT:  Now, ladies and gentlemen, I know you've

12    been a very smart and attentive jury, and I bet at least one of

13    you has been wondering, There are 14 of us, but juries are only

14    made up of 12 people.  It turns out two of you have been

15    selected to be alternates, and, Mr. Harrison, you're alternate

16    No. 1; Ms. Yerks, you are alternate No. 2.

17              Where's Ms. Yerks?

18                        (Juror Yerks raised hand.)

19              THE COURT:  I want to first of all tell you folks we

20    really appreciate the time you've spent listening to this case.

21    Now, your job is not over yet.  You will not be able to

22    deliberate with the 12 people who remain in the jury.  We have

23    to have alternates because should any of you have had a family

24    emergency or, you know, get sick, the flu is around, and would

25    have been unable to come to the courthouse, we have to have 12

1    jurors in a criminal case.  We would have had enough extra

2    people here to make sure we could get this case finished, but

3    at this point, I can't have more than 12 people in the jury

4    room.

5           If, however, during the course of the deliberations a

6    juror should get ill or for some reason before the jury is

7    finished we lose somebody, then, Mr. Harrison, we would call

8    you to come back in.  And, Ms. Yerks, if we lost two jurors,

9    then we'd have to call you back in.

10          Therefore, it's extremely important, and I know this

11   is terribly unfair, but I have to keep you under the same

12   caution:  You must still continue to avoid any publicity about

13   this case.  It was discussed on the first page of *The*

14   *Washington Post* this morning, so stay away from the paper or at

15   least go to the sports section.  Do not discuss this case.

16          The 12 of you can't e-mail or send any notes or have

17   any communication with your two former colleagues.

18          If you will leave your phone numbers with Ms. Guyton,

19   we will call you so that you know either that we need you back

20   here or the case is over so that you can then read the paper,

21   and other than anything you might remember about those three

22   classified exhibits, there's nothing that prohibits you from

23   talking about this case, although again, you may want to

24   respect the thoughts of your fellow jurors and not.

25          But at this point, we're going to let Mr. Harrison

1    and Ms. Yerks go.  Leave your notebooks here.  We'll keep them

2    so that should you have to come back and deliberate -- and as I

3    said, do leave us a note with your phone number on it, okay?

4    And I think we can let you folks go right now, all right?

5    Thank you.  We'll stay in session for another minute.

6            You should check out with the Clerk's Office,

7    Ms. Yerks and Mr. Harrison.  Let them know that you are

8    alternates so that you're not going to be coming back unless we

9    have to call you back, and just leave your phone numbers,

10   unless we already have them.

11           Is there a problem?

12           (Discussion off the record between the Court and the

13   Court Security Officer.)

14           THE COURT:  All right.  Well, you're going to get a

15   break now anyway, so what we'll do is this:  We're going to

16   give you your afternoon break.  What I would like you to do,

17   once the two alternates have left, so you need to step outside

18   while this is being done, the 12 of you decide who wants to be

19   the foreperson, all right?  And then if the foreperson could

20   let me know in a written note how long a break you want to

21   take, all right?  During that time, Ms. Yerks can retrieve her

22   cell phone from the car of one of the rest of you, all right?

23           And then you might want to decide how long you want

24   to deliberate today.  There's -- once a jury starts

25   deliberating, the schedule can change dramatically.  If you

1    want to stay past 5:30, that's fine.  If you're going to stay

2    much later than that, I need to know so I can keep some heat on

3    in the room for you.  If you want to stop at 5:30, which has

4    been our normal time, that's also fine.

5          You should know also that if you have a question, I

6    can't answer your question without running it by the attorneys,

7    and so I require at least one lawyer per side to always stay in

8    my courtroom.  That does mean, however, that if you are going

9    to be on a break, I can let those lawyers leave the courtroom

10   for that time period.

11         So anytime you take a lunch break or a coffee break,

12   I want you to let me know, you know:  We're breaking at this

13   time for 15 minutes, and that way I'll let everybody go so that

14   we don't waste your time.  If you have a question and I have to

15   track lawyers down, you know, you might wait a half an hour for

16   an answer, and we don't want to do that, all right?

17         You also might want to think about what time you want

18   to start tomorrow morning.  As I told you, I have other matters

19   unrelated to this case in my courtroom.  You'll be my first

20   priority, but the point is you can start at 9:00, you can start

21   at 8:30, frankly, whenever you want to start, but you can't

22   start until you're all together.

23         Jury deliberation is a collaborative process, and it

24   means that each of you must be listening to the other

25   discussing the evidence, so if someone's in the restroom, you

1564

1 should stop deliberating. If someone's run downstairs to get a

2 coffee, you've got to stop deliberating because it's important

3 that you hear each other, all right?

4        All right, we're going to let the jury go now, and if

5 you'd let us know who's going to be the foreperson, how long a

6 break you want, that will be just fine.

7        We'll recess court.

8        (Recess from 2:46 p.m., until 4:22 p.m.)

9                (Defendant present, Jury out.)

10       THE COURT: Well, I told you-all this was a smart

11 jury. I just, I love the questions that we get. It shows that

12 they're reading and thinking.

13       All right, the answer for the first question is easy.

14 "The jury would like further clarification on 'venue' (page 56

15 of the jury instructions). More directly, Count 10, how is

16 venue determined?"

17       And there is a Fourth Circuit case that I think is

18 right on point. It's *Rodriguez-Moreno* and *Bowens v. United*

19 *States*, but they both seem to hold the proposition that venue

20 is proper in the district where the effects of the offense

21 would be felt, concluding that because the effects of the

22 materially false statements were felt by those conducting a

23 federal investigation in Maryland, venue was proper in that

24 district.

25       So the effect for Count 10 would be felt by the grand

1    jury in the Eastern District of Virginia, and that's why that's

2    a relatively easy answer.

3              MR. TRUMP:  Yes, it's --

4              THE COURT:  Because they're specifically concerned

5    about Count 10.

6              MR. TRUMP:  Yeah, it's in the statute, Judge.  A

7    prosecution under this section may be brought in the district

8    in which the official proceeding was intended to be affected.

9              THE COURT:  That's even easier.  Hold on a second.

10                        (Laughter.)

11             THE COURT:  Always start with the statute.  You're

12   correct, Mr. Trump.  All right, let me -- what's our code

13   section for that?

14             MR. TRUMP:  1512(g) -- excuse me, (h)(i).

15             THE COURT:  All right, 1512(g)?

16             MR. TRUMP:  (H).

17             THE COURT:  I'm sorry, (h).

18             MR. TRUMP:  1512(h)(i).  Excuse me, it's just -- I'm

19   misreading that.  It's 1512(i).

20             THE COURT:  Correct, you're right.  So a prosecution

21   under -- the prosecution under Count 10 may be brought in the

22   district in which the official proceeding was intended to be

23   affected, all right?  Or in the district.  So I'm going to read

24   it that way, all right?  That's from the statute.

25             And I think that's the only answer they are

1566

 1    requesting at this point.

 2              MR. MAC MAHON:  Well, Your Honor, if I may, I think

 3    that the question about clarification on venue, I know they're

 4    just asking about Count 10 here, and, and I think that the

 5    instruction that we proffered before about where the element of

 6    these other offenses where the information was disclosed or

 7    where somebody was when they heard it is the proper venue in

 8    the 793 counts, and I think that's what they're asking as well,

 9    and I think that's what they should be told.

10              THE COURT:  Well, I'm not going to go beyond the

11    specifics of the question, and because they did it

12    specifically, I'm going to address that.  If they have further

13    questions, they are not going to be shy about coming back, all

14    right?

15              MR. MAC MAHON:  Your Honor, your answer is just,

16    you're going to be very clear that it pertains only to Count

17    10?

18              THE COURT:  To Count 10, yes.  All right?

19              MR. MAC MAHON:  It doesn't affect venue for any other

20    count.

21              THE COURT:  Correct.  I will say, though, in doing a

22    quick check of my book on Fourth Circuit criminal law, the

23    concept on venue does seem to be very statute specific, so I

24    suggest since this issue may come up again, the government --

25    both sides may want to do some specific research on these -- on

1567

1    the other counts for venue issues.

2            Again, what I said years ago in the context of, you

3    know, deciding on the Risen issue is not necessarily a complete

4    or full instruction.  That was never the intention of the Court

5    back then.  You've been citing me to me.  I'm not reversing

6    myself; I just want to -- there must be other judges who have

7    also addressed the issue of venue for these statutes, maybe

8    not.

9            MR. MAC MAHON:  We'd like the cite Brinkema on venue,

10   Your Honor.

11           THE COURT:  Yeah, Brinkema on venue, right.

12           But anyway, let's get the jury in.  They want to go

13   home at 5:15 tonight.  I will bring them in here before I send

14   them home.

15           MR. OLSHAN:  Your Honor?

16           THE COURT:  Yeah.

17           MR. OLSHAN:  There was a second question that just

18   came out?

19           THE COURT:  Yeah.  They want to stick sticky notes on

20   the wall, all right?  We're telling them they can't do that.

21   They have to use the board.

22           We're giving you every note that we get, and I

23   don't -- if you didn't get those yet --

24           MR. OLSHAN:  I think it literally just came out as

25   the Court was coming out.

1568

1    THE COURT:  Yeah.  Do you like our snazzy new forms?

2    We're giving them some structure.  Okay.

3                    (Jury present.)

4    THE COURT:  Again, folks, you can really sit anywhere

5    in the box where you're comfortable.  That's all right.  You

6    like your seats.  Have a seat, please.

7         I was just telling the attorneys I knew you were a

8    sharp jury, and that was a very smart question you sent.  Let

9    me address the easier question.  You can have all the Post-it

10   notes you want, but you can't put masking tape on my walls,

11   okay?

12   A JUROR:  I thought you might say that.

13   THE COURT:  Okay.  You can put masking tape on the

14   tripod; you know, we've given you an easel; and the sticky

15   notes, the Post-it notes won't hurt the walls.  I don't care if

16   you want to put those on the walls, all right?  But, you know,

17   it's government property.  You don't want to be destroying it.

18   All right.

19        Now, in terms of the substantive question, you've

20   asked:  "The jury would like further clarification on 'venue.'

21   More directly, Count 10, how is venue determined?"

22        I understand that's your question.  And for Count 10,

23   which is again the obstruction charge, that's actually -- the

24   venue provision is actually in the statute, and I probably

25   should have given that to you.  So a prosecution under this

1569

1    section may be brought in the district in which the official

2    proceeding (whether or not pending or about to be instituted)

3    was intended to be affected or in the district in which the

4    conduct constituting the alleged offense occurred.

5              And what I'll do is I'm going to photocopy just that

6    section to give to the jury so they have it as an additional

7    instruction along with the other ones.

8              Any objection to doing that?

9              MR. MAC MAHON:  No objection.

10             MR. TRUMP:  (Shaking head.)

11             THE COURT:  All right.  So this additional

12   instruction, I'll put another -- I'll put it in the, give you a

13   page number so it's sort of logical, and it will say for Count

14   10, so you don't mix it up with anything else, but for Count

15   10, there's actually a statutory provision, all right?  And

16   I'll get that to you, all right?

17             The other thing is, folks, I know you want to leave

18   at 5:15 today, and that's fine, but our, our practice will be

19   before any session is ended for the day, I always want to bring

20   you back in just to make sure I remind you about, you know, how

21   you have to behave from here on out, all right?

22             So we'll recess court to await your decision.

23             (Recess from 4:30 p.m., until 5:18 p.m.)

24                           (Defendant and Jury present.)

25             THE COURT:  Ah, the jury has indicated they want to

1570

1    start at 8:30 tomorrow morning, bright and early, so I'll

2    require at least one attorney for each side to be in the

3    courtroom.  That's great, ladies and gentlemen.

4            Now, it's pretty cold in the courtroom right now.

5    Was the jury room comfortable when you were in there?

6                    (Jurors nodding heads.)

7            THE COURT:  All right.  Don't be -- you won't be shy,

8    I don't even have to say that, about sending us notes.  The

9    temperature is tough to keep under control, but we'll try to

10   make it as comfortable for you as possible.

11           All right, so I'm going to send you home for the

12   evening.  Please remember my cautions:  You must not try to

13   communicate with each other or your two former colleagues.

14   Don't discuss this case with anyone.  Again, some of your

15   family may know what case you're sitting on.  If they want to

16   talk to you about the article in *The Post* or anything else,

17   you've got to tell them, "Judge said absolutely no."  Do not do

18   it.

19           And don't take any of the evidence home with you.

20   You can't be studying it overnight.  If you're reading the

21   chapter, Exhibit 132, you need to read it here in the jury

22   room.

23           So just -- you've been a great jury.  Don't let

24   anything mess up our case at this point.  And we'll see you

25   back here at 8:30.  I'm not going to bring you back into court.

 1  You can just report to the jury room, and once all 12 of you

 2  are there, you can start deliberating.  Again, until you're all

 3  12 in the room, you can make pleasantries about the weather or

 4  the upcoming weekend, but do not discuss the case, all right?

 5  Thank you.  We'll let you-all go.

 6            I'll stay in session for a few minutes.

 7            MR. MAC MAHON:  Thank you, Your Honor.

 8                      (Jury out.)

 9            THE COURT:  Mr. MacMahon, you had an issue you wanted

10  to raise?

11            MR. MAC MAHON:  Yes, Your Honor.  You invited us to

12  go do some more research on the venue question.

13            THE COURT:  Yeah.

14            MR. MAC MAHON:  And --

15            THE COURT:  Have you shared your results with the

16  government, or are they hearing it for --

17            MR. MAC MAHON:  It's hot off the press, Your Honor.

18            THE COURT:  All right.

19            MR. MAC MAHON:  And I'm happy to share it with them

20  now as well, and I have a copy for you, but the *Truong*, I think

21  it's the *Truong* case --

22            THE COURT:  Oh, that's an old case out of the Vietnam

23  War, yep.

24            MR. MAC MAHON:  Well, this, this -- we have a copy

25  for the Court as well.

1572

1   THE COURT:  All right, if you'd give it to Mr. Wood?

2   Yeah.

3   They have an exhibit for me.

4   MR. MAC MAHON:  Judge, it's footnote 11.  The way

5   this printed out is not -- but this is *U.S. v. Truong*,

6   T-r-u-o-n-g.

7   THE COURT:  I know the case.  I was around in those

8   days, yeah.

9   MR. MAC MAHON:  I was just giving it for the court

10   reporter, Your Honor.  I was getting that look from the court

11   reporter.

12   THE COURT:  Oh, I'm sorry.  Go ahead.

13   MR. MAC MAHON:  And it's 629 F.2d 908.

14   But, Judge, in footnote 11 in the *Truong* case, there

15   was -- and this was a search for venue questions in espionage,

16   and this was a 793 conviction and a 794 case, but what the

17   Fourth Circuit did in affirming in that case was language in a

18   footnote which is found on page 18, footnote 11 -- and it came

19   out double-sided; I'm sorry, Your Honor -- but the defendant in

20   that case complained about venue in an espionage case, and

21   there's the language about how it's constitutional and why it's

22   important that venue be established since the defendant has the

23   right to be charged in the district where the crime occurred,

24   and it says in 11 that since Krall was the means by which the

25   documents were carried to the Vietnamese in Paris, the

1   proscribed act, the act of transmission took place in

2   Alexandria.

3           So in that case, albeit in a footnote, there is a

4   Fourth Circuit opinion that says the proscribed act under 793

5   is the act of transmission, which is what we've been arguing to

6   the Court.  It's not all the other peripheral instances that

7   happened or may have happened in this case or even in the

8   *Truong* case.

9           And the cite there is to *U.S. v. Walden*, which I

10  think you cited to us a couple days before, and the *Walden*

11  case, which we pulled up, also, deals with how it's -- it is

12  element specific, the acts of venue, because of the

13  constitutional right to be tried in the, in the district where

14  the crime is committed.  They cite --

15          THE COURT:  But, you know, the other issue -- and

16  again, I'm going to let the government research this overnight.

17  It's early enough in the jury's deliberations if we have to

18  refine the venue instruction, it's not going to be a problem,

19  but there's also a pretty well-established principle that

20  where, where a -- where the effects of a crime are felt can be

21  part of the continuity of venue.  I mean, again, the government

22  has alleged that these disclosures, among the places where

23  there was an unlawful disclosure are here in Virginia.

24          MR. MAC MAHON:  All right, Judge.  There's a couple

25  counts that deal with that but not every count, and really, I

```
 1    don't think that in -- if the government needs time to research

 2    it, it's fine, but what these, what these cases are saying is

 3    that it's the proscribed act in the case.  It's not an

 4    ephemeral concept that we decide where, where a crime -- in

 5    very few cases is there an issue of venue.  Normally in all of

 6    our plea agreements or cases we have, someone says, "I was in

 7    the Eastern District of Virginia."  It's never an issue in

 8    almost any case that we've ever had -- that I've ever had in

 9    front of you.  I've never had the issue come up.

10             THE COURT:  But I've had the issue come up.  I

11    mentioned a couple examples to you yesterday.

12             MR. MAC MAHON:  But I don't, I don't believe -- I

13    think when you read Walden and you read this Truong case, that

14    you have to find an act that was element specific.  It says in

15    this Truong footnote --

16             THE COURT:  Wait.  But why is not at least, for

17    example, causing the disclosure or causing the communication --

18    part of the problem is the communication occurs, part of the

19    communication is in the Eastern District of Virginia.  That is,

20    when the book enters Virginia, there has been --

21             MR. MAC MAHON:  And that's very few counts, Judge.

22             THE COURT:  I'm sorry?

23             MR. MAC MAHON:  Not every count deals with the

24    publication of the book in Virginia.

25             THE COURT:  No, I recognize that.
```

1    MR. MAC MAHON:  There's attempts.  There's conveyance

2  of property.  There's other counts that it's possible you

3  could -- I mean, we would again renew the Rule 29 on this

4  issue, and I don't expect the Court to grant it at this time,

5  but there isn't any evidence of transmission of this

6  information.  The four phone calls add up to about a minute,

7  and it has to be element-specific.

8    It can't just be the sale of the book.  If it's just

9  the sale of the book, then every count but that has to go out

10  because there isn't any evidence of venue, and that was the

11  instruction that we gave you before, which is they have -- the

12  government has to prove where the act of transmission or

13  receipt took place here in the Eastern District of Virginia,

14  and there's no evidence of that whatsoever.

15    THE COURT:  All right, what I'm going to do, I mean,

16  the jury has this case now.

17    Mr. Trump, are you ready to respond?

18    MR. TRUMP:  Your Honor, in the *Truong* case, it was a

19  conspiracy case, and Truong and Humphrey were coconspirators.

20    THE COURT:  I know.

21    MR. TRUMP:  They were arguing the case that they

22  should have been charged in D.C. because that's where the

23  conspiracy was located, but they were prosecuted in Virginia

24  because they transferred the documents to the unwitting person

25  who then flew to Paris from Virginia.

1       So it was a question of in that case, that the

2  defendant was claiming I should have been charged in D.C., and

3  the court said no, there was an act of transmission occurring

4  in Virginia.  You could have been charged in D.C., but you

5  weren't.  You were charged in Virginia.

6       So it's not, it's not a definitive statement that the

7  only place the case could have been charged was in Virginia.

8       THE COURT:  And the even more general proposition of

9  law was that there was an act in furtherance of the conspiracy

10  that occurred in the Eastern District of Virginia in that case.

11       MR. TRUMP:  Well, there was also conspiracy to

12  violate 793, but even in the 793 context, it wasn't a

13  definitive statement that the only place it could have been

14  charged was, was Eastern District of Virginia, but there's also

15  a fundamental point that the jury has been instructed and we

16  argued the case based upon the proffered instruction.

17       I think at this point, if it's error, it's error, and

18  we'll find out at some point if the defendant is convicted, but

19  if we are to revise the instruction now, we can't go back and

20  reargue the case.

21       THE COURT:  Well, I don't think it was that major an

22  argument in the case, but I'll let it be as it is.  As I said,

23  if we get questions, we'll have to address the specific

24  questions that come up from the jury, and at this point, as I

25  said, I'm not uncomfortable with the venue instruction, and

1    that's what it is.

2            So you've made the record, Mr. MacMahon, and I'm not

3    changing --

4            MR. MAC MAHON:  We'll do more research, Your Honor,

5    if you want us to.  We'll go back to the library.

6            THE COURT:  I never discourage counsel from reading

7    the law; that's wonderful; but in any case, I do think, though,

8    out of fairness to the government and to the Court, you need to

9    send it to us in writing so that we have a chance to look at it

10   and not just have to, you know, think about it from the bench,

11   okay?

12           MR. MAC MAHON:  We'll draft something.

13           THE COURT:  All right.  So tomorrow morning, 8:30.

14   We'll recess court until then.

15      (Recess from 5:28 p.m., until 8:30 a.m., January 23, 2015.)

16

17                  CERTIFICATE OF THE REPORTER

18      I certify that the foregoing is a correct transcript of

19   the record of proceedings in the above-entitled matter.

20

21

22   _____
                              /s/
23                       Anneliese J. Thomson

24

25